## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

URS CORPORATION,

                    Plaintiff,

      v.

THE LEBANESE COMPANY FOR THE
DEVELOPMENT AND RECONSTRUCTION
OF BEIRUT CENTRAL DISTRICT, S.A.L.,
a/k/a SOLIDERE,

                    Defendant.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff URS Corporation ("URS" or "Plaintiff"), for its complaint against defendant the Lebanese Company for the Development and Reconstruction of Beirut Central District S.A.L. a/k/a Solidere ("Solidere"), avers as follows:

### NATURE OF THE ACTION

1.      This is an action for declaratory judgment, injunctive and other relief pursuant to Title 28, United States Code Section 2201, for the purpose of determining a question of actual controversy between the parties.

2.      URS seeks a declaratory judgment that: (i) URS has no agreement to arbitrate with Solidere; (ii) URS is not bound to arbitrate with Solidere any of the claims described herein; and (iii) the International Chamber of Commerce ("ICC") has no jurisdiction over URS because URS never agreed to arbitrate claims before the ICC and therefore cannot issue an enforceable award against URS on the claims asserted by Solidere.  URS also seeks injunctive relief barring Solidere from pursuing any arbitration against it.

3.      Defendant Solidere improperly has filed a demand for arbitration (the "Arbitration Demand") with the ICC in Paris, France, asserting that URS is required to submit to arbitration of disputes before the ICC pursuant to an arbitration agreement in a land reclamation contract for

the remediation of a landfill in Beirut, Lebanon (the "Contract"). The Contract is between Radian International LLC ("Radian"), a Delaware limited liability company with offices in, among other places, San Francisco, California, and Beirut, Lebanon, as an engineering and environmental services contractor, and Solidere, as land owner. URS is neither a signatory nor a party to the Contract and URS did not assume the performance of the Contract. In fact, URS had no connection whatsoever with either of the parties to the Contract at the time the Contract was executed. (A copy of the Arbitration Demand is attached as Exhibit A. A copy of the Contract is attached as Exhibit B.)

4.      The ICC Court of International Arbitration ("ICC Court") is a private arbitral body, whose arbitration powers derive exclusively from the written consent of all parties involved. Although URS has informed the ICC Court that URS is not a party to the Contract or the arbitration agreement in the Contract, and therefore should not be included in the ICC arbitration between Radian and Solidere initiated by Solidere with the Arbitration Demand (the "ICC Arbitration"), the ICC Court, at Solidere's urging, has referred the threshold question of the arbitrability of Solidere's claims against URS to the three-member Arbitration Tribunal ("Tribunal") that the ICC Court is currently composing. The ICC did not make any determination on the merits of whether URS should be compelled to arbitrate before the ICC and URS objected to the jurisdiction of the ICC to do so.

5.      Radian and Solidere are the only signatories to the Contract and hence the only parties to the arbitration agreement in the Contract. In fact, Radian and Solidere already have arbitrated certain claims before the ICC relating to the Contract and have commenced additional arbitrations to address new, but substantially similar, claims between them relating to performance under the Contract. Solidere's claims in the new ICC Arbitration, as a matter of substance, seek to enforce terms of the prior arbitration award between Radian and Solidere against URS, which was not a party to that arbitration proceeding.

2

6.      At the time Radian and Solidere commenced negotiations to enter into the Contract, Radian was owned by two subsidiaries of The Dow Chemical Company and had no relation whatsoever to URS Corporation. In January 1999, when Radian and Solidere entered into the Contract, Radian was a subsidiary of Dames & Moore, and still had no relation to URS Corporation. The only connection between URS and Radian is that URS purchased Dames & Moore in June of 1999 – some six months after Radian entered the Contract with Solidere. Consequently, Radian became an indirect subsidiary of URS. Although Radian is an indirect subsidiary of URS, Radian is a separate and distinct legal entity that observes all the necessary formalities and operates as a separate company with its own offices and employees.

7.      Unhappy with the agreement that it negotiated with Radian, Solidere now apparently sees some strategic advantage in trying to drag URS into its arbitration proceedings with Radian. To accomplish its strategic ends, Solidere has concocted a series of arguments to justify forcing URS to arbitrate in France even though URS is not a party or a signatory to the Contract, has no relationship with Solidere, and engaged in no conduct under or relating to the Contract that would justify imposing on it any obligation to arbitrate.

8.      Solidere has never disputed that URS is not a party to the Contract. Instead, Solidere has asserted that URS should be treated as the alter ego of Radian and/or be deemed to have assumed the Contract, but the only "facts" that Solidere has articulated comprise nothing more than features present in any parent-subsidiary relationship, facts that fall far short of the heavy burden that must be met to disregard the corporate separateness of two legally distinct entities or support the required manifestation of intent for assumption purposes.

9.      Solidere's position is newly minted as it arbitrated against Radian some of the very claims it now seeks to enforce against URS in a prior arbitration and never once asserted in that arbitration that URS "implied[ly] consent[ed]" to assume obligations under the Contract or that it was the real party in interest or an "alter ego" of Radian. Rather, Solidere never took any action against URS under the Contract until it determined that there was a tactical advantage to

3

dragging in URS, as the perceived "deep-pocket" defendant.  Solidere's new-found position is not only belied by the Contract terms and the conduct of the parties under that Contract, but also by Solidere's own negotiating positions leading up to the execution of the Contract.  Prior to entering into the Contract with Radian, Solidere was well-aware that Radian was owned by two subsidiaries of The Dow Chemical Company and yet never sought or asked for any guarantee of Radian's performance from Dow.  Similarly, when Solidere executed the Contract in January of 1999 and Radian was then owned by Dames & Moore, Solidere never asked for or received any guarantee from Dames & Moore.  Instead, fully aware of the corporate relationship that Radian had with its corporate parents, Solidere sought only an $8.2 million performance guarantee bond from Radian (via letter of guarantee), which was given, and that Radian obtain insurance, which it did.  Even after URS purchased Dames & Moore, and Solidere was expressly informed of the change in ownership, Solidere never asked for any alteration in the terms of the Contract, nor sought any form of guarantee from URS to secure Radian's performance under the Contract.  Now, unhappy with the terms of the Contract it negotiated, Solidere is seeking to re-write the Contract terms to obtain rights that it could have sought, but did not seek and never received.

10.     URS has not consented either to the ICC Court's referral of the threshold question of arbitrability to the Tribunal or to any determination by the Tribunal on whether Solidere and URS must arbitrate the claims asserted by Solidere in the Arbitration Demand. On the contrary, URS vigorously objected to the ICC Court's and the Tribunal's consideration of whether they have jurisdiction over it.  URS has the absolute right to have any claim that it must arbitrate litigated and resolved in a United States court applying the laws of Delaware, where URS is incorporated.  Conversely, forcing URS to submit to an arbitrator the determination whether it must arbitrate claims involving the Contract with Solidere would cause irreparable and unjust injury to URS.

11.     Accordingly, this Court should declare that URS is not required to arbitrate the matters set forth in Solidere's Arbitration Demand, and enjoin Solidere from proceeding with the ICC Arbitration against URS.

## THE PARTIES AND THEIR CITIZENSHIP

12.     Plaintiff URS Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business in San Francisco, California. URS is an engineering design firm providing a comprehensive range of professional planning, design, systems engineering and technical assistance, program and construction management, and operations and maintenance services.

13.     Upon information and belief, Defendant Solidere is a joint stock company organized under the laws of the Republic of Lebanon, with offices at Building 149, Saad Zaghloul Street, P.O. Box 119493, Beirut 2012 7305, Lebanon.

14.     Solidere has conducted a significant amount of business in the United States, much of which is directly related to the transactions at issue in the ICC Arbitration that underlies the claims asserted herein. For example, in January of 1999, Solidere entered into the Contract with Radian, a U.S. company with its principal place of business in San Francisco, California. In connection with the execution of the Contract, Solidere explicitly acknowledged that half of the work under the Contract would be performed in the United States. The U.S. portion of the Contract, as defined in correspondence with Solidere, included services provided by Radian's U.S.-based personnel and/or expatriates and U.S.-based consultants and/or subcontractors, as well as all the equipment and spare parts shipped from the U.S.

15.     In connection with the work performed under the Contract, Solidere conducted a feasibility study through another U.S. company, Paul C. Rizzo Associates, Inc., to examine the technical and commercial feasibility of multi-use development on the Normandy Landfill reclaimed land. Solidere financed that feasibility study with a $448,320 grant from the U.S. Trade and Development Agency ("USTDA"), an independent U.S. federal agency that assists U.S. companies in capitalizing on overseas business opportunities and responding to foreign competition. The grant agreement between Solidere and USTDA was signed into effect by the U.S. Ambassador to Lebanon on March 7, 2003. USTDA's relationship with Solidere dates back

to 1998 when USTDA provided a training grant to Solidere in connection with its award of the Contract to Radian.

16.    Solidere financed the U.S. portion of the Contract with a $14.7 million long-term guarantee from the Export-Import Bank of the United States, an independent U.S. government agency that helps finance the export of U.S. goods and services to emerging markets throughout the world by providing loans, loan guarantees, and export credit insurance.

17.    In addition, Solidere negotiated for and received from Radian an $8.2 million performance guarantee bond (via letter of guarantee) that was supported by the California branch of Wells Fargo Bank.  Solidere drew down the entire balance of that performance guarantee bond during the performance of the Contract by Radian.

18.    In addition to its direct contacts with the United States relating to the Contract, Solidere also has more general contacts with the United States.  For instance, Solidere raises its capital by, *inter alia*, offering to investors its Global Depository Receipts ("GDRs").  The depository for Solidere's GDRs is listed as Bank of New York, New York, New York. Solidere's GDRs are traded over the counter in the United States.  Solidere has continuously and publicly emphasized its success with the United States investors and has engaged in marketing efforts that specifically target U.S. investors.  For example, in February 2006, Solidere conducted a secondary offering, which specifically targeted U.S. investors via an extensive management roadshow.

## JURISDICTION AND VENUE

19.    The Court has subject matter jurisdiction under Title 28, United States Code Section 1332(a)(2) because (a) the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and (b) the dispute is between URS, which is a citizen of Delaware, and Solidere, which is a citizen of a foreign state (the Republic of Lebanon).

20.    The Court also has original subject matter jurisdiction under Chapter 2 of the Federal Arbitration Act ("FAA"), Title 9, United States Code Section 201 et seq., which applies the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10,

1958 (the "New York Convention"), 21 U.S.T. 2517, 330 U.N.T.S. 3. See 9 U.S.C. § 201 ("[t]he

Convention . . . shall be enforced in United States courts in accordance with this chapter").

     21.    Section 203 of the FAA states in pertinent part:

> An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy.

9 U.S.C. § 203.

     22.    Pursuant to Section 202 of the FAA, the arbitration agreement contained in the

Contract "falls under the Convention":

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in [9 U.S.C. § 2], falls under the Convention. . . . For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

9 U.S.C. § 202.

     23.    The Contract, which contains the arbitration agreement at issue, falls within the

terms of Section 202 (and, therefore, "falls under the Convention" for purposes of Section 203)

because: (1) it is a written agreement between a citizen of the United States (Radian) and a

citizen of a foreign state (Solidere), namely the Republic of Lebanon, both of which are

signatories to the New York Convention; (2) the agreement calls for arbitration in the territory of

a signatory to the New York Convention (France); (3) it arises out of a legal relationship that is to

be "considered as commercial" and international in scope, as the Contract calls for performance

of land rehabilitation services in a foreign country; and (4) it is a "transaction, contract or

arrangement [as] described in [section 2 of the FAA]," in that, for purposes of section 2 of the

FAA, the arbitration agreement at issue constitutes a "written provision in any . . . contract

evidencing a transaction involving commerce to settle by arbitration a controversy thereafter".

     24.    Moreover, the arbitration agreement contained in the Contract falls under the

express terms of the New York Convention (as subject to the Declaration Upon Accession

thereto by the United States) in that: (1) it is an "agreement in writing" in which Radian and

Solidere "undertake to submit to arbitration all and any differences which have arisen or which

may arise between them in respect to a defined legal relationship," New York Convention, Art. II(1); and (2) it relates to a transaction that is "commercial in nature" (see Declaration of the United States Upon Accession to the Convention, reprinted at 9 U.S.C.A. § 1 n.43).

25.     Finally, the Court is vested with jurisdiction over this action pursuant to Title 28, United States Code Section 1330(a) (foreign state jurisdiction) and Title 28, United Stated Code Sections 1603-1611 (Foreign Sovereign Immunities Act) ("FSIA"). Solidere is a "foreign state" under 28 U.S.C. 1603(a) because it is an agency or instrumentality of a foreign state – namely, the Republic of Lebanon, as defined under 28 U.S.C. Section 1603(b). On its website, Solidere describes itself as "government-empowered" corporation. Solidere's own counsel in the ICC Arbitration describes its representation of Solidere as "representing an entity owned by the Government of Lebanon, in relation to disputes arising out of the remediation of a landfill site in Beirut for the purposes of a high quality real estate development." Lebanese media reports that Solidere gets certain privileges from the Lebanese government, such as that the government's official real estate registry "has an official relationship with Solidere as if it were a ministry and has even moved into the company's building, and registered properties in Solidere's name."

26.     In connection with the Normandy Landfill, Solidere was, and continues to be, acting on behalf of the Lebanese government for the treatment of waste and its backfilling onto the Normandy Landfill site. Solidere's mandate is based on a law passed in 1991 (the "1991 law"), which provided that a so-called "real estate company" would "on behalf of, and at the expense of the State, and by virtue of an agreement between the company and the CDR [Council for Development and Reconstruction] (. . .) finance and ensure the execution of the infrastructure works such as the water, electricity and sewage networks, roads, sidewalks, electricity poles, parking lots, telecommunications as well as all of the public equipment and facilities in this area." This plan was approved by the Lebanese government by decree No. 4830 of March 4, 1994 (as amended by decree No. 5609 of September 3, 1994).

27.     Solidere was incorporated as a Lebanese joint stock company in May 1994. As the 1991 law provided, Solidere and the CDR entered into an agreement concerning the

infrastructure works to be completed by Solidere in Beirut, including on the Normandy Landfill site. This agreement is dated September 20, 1994 (the "1994 Agreement"), approved by decree No. 5665, and provides details as to Solidere's mandate and means of compensation for completing certain public works. This agreement details the works to be undertaken on the Normandy Landfill and specifically describes the work that was later undertaken by Radian under the Contract: "(a) Create a backfilled platform in the seabed, empty of waste and then discharge the contents of the dump on this platform after treatment of the waste, removal of the gases included in it and burning it."

28.    The 1994 Agreement also details the scheme of Solidere's compensation for undertaking the needed public works in Beirut – the scheme devised by the Lebanese government, which had no funds to otherwise compensate Solidere.  According to this scheme, Solidere would receive prime real estate land resulting from the land reclamation at the Normandy Landfill site as compensation. Once completed, the public works at the Normandy Landfill will immediately revert back to the Lebanese State, except for the plots given to Solidere as payment in kind. As much as 65% of the total backfilled area on the Normandy site will eventually revert back to the State, while Solidere would retain ownership of 35% of the site. According to the 1994 Agreement, Solidere's public works at the site were thus to be funded by the Lebanese State through payment in kind of reclaimed land.

29.    Radian was hired to perform various clean up tasks at the Normandy Landfill. The Contract's specifications were based on a study and specifications prepared by the CDR; and, to some extent, Radian's work under the Contract proceeded under CDR's continued supervision, as Solidere apparently has been and now continues to provide the CDR with updates and reports in regard to progress of the work.  The CDR's approval was a condition precedent to the Contract's very execution: "The Contract shall be subject to the approval of the Council of Development and Reconstruction on the Tender Document." (Ex. B at Art. 8.) In addition, Clause 29.3 of the General Conditions of Contract ("GCC"), which are part of the Contract between Solidere and Radian, provides that Solidere "is entitled at any time to assign to any

third party including the CDR . . . the benefit of the guarantees granted to [Solidere] under the Contract." (Id.)

30.    Solidere itself maintains that the work under the Contract is of great economic interest to the Republic of Lebanon, as the space is essential for Beirut to regain its position "as the economic and cultural capital of the Middle East." (Ex. A at ¶ 12.)  Further, Solidere also contends that the work under the Contract is of great interest to the environment and public health of Lebanon because it involves treatment of waste, which polluted the water, air and soil in the area, increasing the risk of diseases. (See Ex. B, Technical Conditions, Art. 2 (specifying that treatment under the Contract is to achieve such land condition "that poses no risk to human health, public welfare, structures, services and the environment")) Thus, according to Solidere, Solidere's project is of great public interest to the Republic of Lebanon.

31.    Solidere is not immune to suit under FSIA because (1) it has waived its immunity pursuant to 28 U.S.C. Section 1605(a)(1) by agreeing to arbitration on the territory of a signatory to the New York Convention (France); (2) this action is based upon a commercial activity carried on in the United States by Solidere within the meaning of 28 U.S.C. Section 1605(a)(2), including without limitation Solidere's loan and/or loan guarantee obtained from the U.S. Export-Import Bank in connection with the project at issue; and (3) this action relates to enforcement of an agreement to arbitrate arising under the New York Convention and thus qualifies for the "arbitration exception" under 28 U.S.C. Section 1605(a)(6).

32.    Venue is proper under Title 28, United States Code Section 1391(d) because Solidere is an alien. Venue is also proper under Title 9, United States Code Section 204 because an action with respect to the controversy between the parties could have been brought in this District, save for the arbitration agreement at issue.

## THE BACKGROUND FACTS

33.    The Contract is dated January 25, 1999.  It is concerned with the land reclamation work to be performed at the site commonly known as the Normandy Landfill.  The Normandy Landfill is located along the northern coast of Beirut, Lebanon.  The area where the landfill is

located is part of what is known as the Beirut Central District and is located next to a main sea-front avenue, "Avenue de Français." Between about 1975 and 1994, the Normandy Landfill site was used for the disposal of inert construction and demolition waste, municipal waste and unexploded ordnance, as well as all the debris of war.

34.    The work that Radian was hired by Solidere to perform under the Contract was part of a public works project to rehabilitate (or reclaim) the Normandy Landfill site to make it suitable for a park area and for construction of high-end real estate projects. Radian was hired to perform "Phase 2" of the remediation work at the Normandy Landfill. Phase 1 had been completed by October 1997 and consisted of approximately 7 hectares closest to the city center. Phase 2 of the work was to include the remaining 22 hectares. Under the Contract, Radian's responsibility was to excavate a 48 acre section of the landfill (approximately 5 million cubic meters), sort the waste to remove unacceptable landfill materials for off-site disposal (such as metal and unexploded ordnance), treat the soil if necessary to reduce organic material to levels specified in the contract using a variety of technologies (low temperature thermal desorption, and composting), and backfill the material.

35.    Clause 44 of the Contract provides as follows:

Settlement of Disputes

> All disputes arising out of or in connection with the present Contract shall be finally settled under the Rules of the Conciliation and Arbitration of the International Chamber of Commerce in force as of January 1st 1998 by one or more arbitrators appointed in accordance with the said Rules. The language of the arbitration shall be [E]nglish. The place of arbitration shall be Paris.

36.    Clause 50 of the Contract provides as follows:

Governing Law

> The Contract shall be governed by and construed in all respects in accordance with the laws of the Republic of Lebanon.

37.    The only parties to the Contract are Solidere and Radian.

38.    At the time Radian entered into the Contract, it had no affiliation with URS. As Solidere concedes in its Arbitration Demand, it was only in June 1999, i.e., six months after the Contract was executed, that Radian's ultimate parent entity, Dames & Moore Group, was

acquired by URS, thus making Radian an indirect subsidiary of URS. As URS acquired the stock to the Dames & Moore Group, it was the Dames & Moore Group that became a URS subsidiary, while Radian remained a subsidiary of the Dames & Moore Group.

39.    At the time the Contract was executed, Solidere did not seek and did not get a corporate parent guarantee either from Radian's immediate corporate parent (a Dames & Moore entity called Radian Acquisition Corp.) or Radian's ultimate parent Dames & Moore Group.  On the contrary, the Contract specifically imposes liability for conduct of Radian's affiliates on Radian *alone*.  (See Ex. B, GCC 22.1.)  To protect against any possibility that Radian might not have sufficient resources to make good on any claim for a breach of the Contract, Solidere bargained for and received a performance bonding requirement (via letter of guarantee) under the Contract.  Solidere already has drawn down on that bond in connection with the disputes between the parties under the Contract. Solidere did not seek or obtain a corporate parent guarantee at the time of URS's acquisition of the Dames & Moore Group from any of URS's affiliates. As a further protection mechanism for Solidere under the Contract, Radian was required by the Contract to maintain insurance coverage, including professional and environmental insurance with a minimum limit of $20 million in respect of each claim with an aggregate limit of $50 million "protecting the Contractor and the Employer from errors and omissions of the Contractor from or in connection with the Completion of the Works hereunder and which shall be maintained for a period of twenty (20) years after the date of Completion of the Works." (Ex. B, GCC Ex. 7 at 1.5.)

40.    When Radian commenced its performance of work under the Contract, URS had no connection with Radian.  To date, there has been no change in the core personnel hired by Radian to perform the work at the Normandy Landfill since the inception of the project.  After URS acquired Radian, the work under the Contract continued to be performed by the same people hired by Radian before it had any connection to URS.  All the subcontractors involved at the site were hired by Radian, and none have any contractual relationship with URS. All the operations at the site are in Radian's name, including, *inter alia*, governmental registrations for

purposes of the project, bank accounts, tax returns, customs receipts and forms, social security receipts, employment declarations and certificates, work permits and visas, payroll, insurance, title to equipment, and vehicle registrations.

41.    In May 2003, Radian, pursuant to a memorandum of understanding negotiated and executed between Radian and Solidere, but not URS, commenced arbitration proceedings with the ICC (the "Prior Arbitration") concerning landfill gas observed at the site.  The memorandum of understanding made clear that the Prior Arbitration was initiated as much for Solidere's benefit as it was for Radian's.  Solidere's claims asserted in its current Arbitration Demand stem from the Prior Arbitration.

42.    Although by the time of the Prior Arbitration URS had been affiliated with Radian for almost four years, URS was not a party to the Prior Arbitration, and Solidere never asserted at any time in the Prior Arbitration, which is the basis of Solidere's current Arbitration Demand, that its claims could properly be asserted against URS. In the Prior Arbitration, Solidere chose to proceed *only against Radian*, and not against URS, even though Solidere sought its own, separate relief in the Prior Arbitration for the allegedly defective work performed under the Contract.

43.    Solidere obtained an arbitration award from the Prior Arbitration, which Solidere thereafter moved to have confirmed by a French court. Those confirmation proceedings were instituted by Solidere only against Radian, not URS.  At no time during the confirmation proceedings did Solidere ever indicate that it intended to, or believed that it could, enforce the arbitration award from the Prior Arbitration against URS.  Solidere has taken no steps to enforce the Prior Award against URS in the United States in a court of appropriate jurisdiction.

## THE ICC ARBITRATION

44.    On February 13, 2006, Solidere commenced the ICC Arbitration by filing the Arbitration Demand with the ICC Court against both URS and Radian, claiming that Radian had breached the Contract and that URS was directly responsible for Radian's breach because URS purportedly took over the Contract's performance and/or is Radian's alter ego.  Solidere only

13

filed the Arbitration Demand <u>after</u> Radian had initiated its own arbitration with the ICC on the same subject matter.

45.    In the Arbitration Demand, Solidere alleges that Radian's performance under the Contract was defective, and that Radian and URS failed to implement the award issued in the Prior Arbitration. The award issued in the Prior Arbitration expressly ordered Radian and only Radian to pay Solidere's costs and submit a plan to remedy the defects in Radian's work. In the Arbitration Demand, Solidere is trying to enforce against URS the award issued in the Prior Arbitration, even though URS was not a party to the Prior Arbitration.

46.    Solidere maintains that URS is responsible for Radian's allegedly defective work and for damages purportedly caused thereby, estimated by Solidere to amount to "several billion US dollars." (Ex. A at ¶ 260.) URS is informed and believes, and based thereon, alleges that Radian intends to answer the Arbitration Demand on or around June 30, 2006 and to deny Solidere's allegations for the reasons set forth in Radian's own arbitration demand (filed with the ICC before Solidere's Arbitration Demand), a copy of which is attached hereto as Exhibit C.

47.    In various submissions to the ICC Court, which were made without submitting to the ICC's jurisdiction, counsel for URS informed the ICC Court that URS was not a party to any arbitration agreement with Solidere, should not be included as a respondent in the ICC Arbitration, and that URS objected to any assertion of ICC jurisdiction over it.

48.    On June 2, 2006, the ICC Court, despite URS's objections, informed URS's counsel that the ICC Arbitration will proceed against both URS and Radian, in accordance with Article 6(2) of the ICC's Rules of Arbitration ("ICC Rules"), leaving it to the Tribunal to determine whether it has the power to arbitrate claims asserted by Solidere against URS, even though URS never consented to the Tribunal deciding the issue of arbitrability and never submitted to the ICC's jurisdiction.  In its order, the ICC did <u>not</u> make any determination on the merits of the issue of whether the ICC or the Tribunal have jurisdiction over URS nor whether it was appropriate to compel URS to arbitrate against Solidere despite the absence of any contractual agreement to arbitrate.

49.     URS intends to answer the Arbitration Demand on or about June 30, 2006, renew its objections to the Tribunal's jurisdiction over it, and deny Solidere's allegations that URS should bear any responsibility for the work performed by Radian under the Contract.

50.     At no time has URS consented to be bound by ICC Rules, to the ICC Court's referral of the threshold issue of arbitrability to the Tribunal, or to the Tribunal's determination of whether an arbitration agreement exists between URS and Solidere.

## CLAIM FOR RELIEF:

### Declaration that URS Is Not Required To Arbitrate and

### Injunctive Relief Barring Solidere from Pursuing Arbitration against URS

51.     URS repeats the allegations in paragraphs 1-50 of this Complaint.

52.     URS is entitled to a declaration that it is not bound to arbitrate with Solidere.

53.     URS will be irreparably harmed and prejudiced if Solidere is permitted to pursue the ICC Arbitration against it in the absence of any agreement by URS to arbitrate with Solidere. Because URS has no adequate remedy at law, it is entitled to injunctive relief barring Solidere from pursuing the ICC Arbitration against it.

**WHEREFORE** URS prays for judgment:

A.  Declaring that (i) URS has no agreement to arbitrate with Solidere; (ii) URS is not bound to arbitrate with Solidere; and (iii) the ICC has no jurisdiction over URS because URS never consented to arbitrate claims before the ICC and therefore cannot issue an enforceable award against URS on the claims asserted by Solidere;

B.  Granting preliminary and permanent injunctive relief barring Solidere from pursuing the ICC Arbitration against URS;

C.  Awarding URS its costs, disbursements, and attorneys' fees in this action; and

D.  Granting URS such other relief as is just and proper.

Dated: Wilmington, Delaware
June 30, 2006

Respectfully submitted,

Edward P. Welch (I.D. No. 671)
Edward B. Micheletti (I.D. No. 3794)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

Attorneys for Plaintiff URS Corporation

<u>Of Counsel</u>:

Jeffrey H. Dasteel
Jason D. Russell
Marina V. Bogorad
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
300 S. Grand Avenue, 34th Floor
Los Angeles, CA  90071
(213) 687-5000

EXHIBIT A

INTERNATIONAL CHAMBER OF COMMERCE

INTERNATIONAL COURT OF ARBITRATION



THE LEBANESE COMPANY FOR THE DEVELOPMENT AND
RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT, S.A.L.
("SOLIDERE")

Claimant

v.

URS CORPORATION

AND

RADIAN INTERNATIONAL LLC

Respondents

---

**REQUEST FOR ARBITRATION**

---

February 13, 2006

**White & Case LLP**
11, Boulevard de la Madeleine
75001 Paris, France
Tel: (33 1) 55 04 15 15
Fax: (33 1) 55 04 15 16

Counsel for the Claimant

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## TABLE OF CONTENTS

**Page**

I.    Introduction ....................................................................................................1

    A.    The Parties ..............................................................................................1

        1.    SOLIDERE ...................................................................................1

        2.    URS Corporation And Radian International LLC ...............................3

    B.    Preliminary Statement ..............................................................................3

        1.    The Construction Contract ...............................................................4

        2.    URS Takes Over Radian And The Responsibility To Perform The Contract ....4

        3.    The Contractor Fails To Perform Meaningful Treatment ...................4

        4.    The Contractor Causes A Landfill Gas Defect ..................................5

        5.    The Contractor's Strategy To Avoid Dealing With The Landfill Gas Defect ....5

        6.    The Contractor Denies There Is A Landfill Gas Defect ....................5

        7.    A Unanimous ICC Award Confirms There Is A Landfill Gas Defect ...............6

        8.    In Continuance Of Its Strategy, The Contractor Initiates Arbitration II ...........6

        9.    The Contractor Refuses Continuously To Comply With The Award ................7

        10.    The Contractor Unilaterally Stops All Further Work .........................8

        11.    The Contractor Initiates Arbitration III............................................8

        12.    SOLIDERE Terminates The Contract ..............................................8

        13.    URS And Radian Are Jointly And Severally Liable For The Cost Of Completing The Works ...................................................................9

        14.    URS And Radian Are Jointly And Severally Liable For The Damages Caused By The Staggering Delay To The Project .........................................9

        15.    The Contractor May Not Rely On Any Contractual Limitations Of Damages...9

II.    Factual Background.........................................................................................10

    A.    Presentation Of The Normandy Landfill ..................................................10

    B.    Overview Of The Contract .....................................................................11

        1.    The Contract Documents...............................................................11

        2.    The "Objective Of The Works" .....................................................12

        3.    The Time For Completion..............................................................12

        4.    Time Is Of The Essence ................................................................13

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

**TABLE OF CONTENTS**
(continued)

**Page**

5.  The Parameters Relating To The Remediation Of The Normandy Landfill, Or "FSQs" ................................................................................................... 14

6.  Treatment Provisions ............................................................................... 15

7.  Remediation Provisions For A "Failure Or Defect" ............................ 16

8.  Termination .............................................................................................. 16

9.  The Contract Price .................................................................................... 18

10. The Governing Law .................................................................................. 19

11. The Construction Manager ...................................................................... 19

C.  The Contractor Intentionally Failed To Perform And/Or Grossly Mis-Performed The Contract ................................................................................................................ 19

1.  The Contractor's Gross Mis-Performance Of The Contract Caused The Landfill Gas Defect ................................................................................ 20

   (a)  The Contractor Mixed Organic And Inert Materials, In Conscious Violation Of Its Contractual Obligations ............................... 20

   (b)  The Contractor Treated Far Less Than The Contractual Treatment Quantities .................................................................................... 21

   (c)  Discovery Of The Landfill Gas Defect .................................... 22

2.  Until The Award, The Contractor Persistently And Disingenuously Denied There Was A Defect ................................................................................ 24

   (a)  The Contractor's Initial Reaction: Dodging The Issue ........... 24

   (b)  The Contractor's First Major Shift Of Position: Denial By Arguing That The FSQs Were "Indoor Air Criteria" .............................. 25

      (i)   The New Position Was Immediately Rejected By The CM .......... 25

      (ii)  SOLIDERE Threatens To Withhold Payments, Without This Affecting The Contractor ...................................................... 26

      (iii) SOLIDERE Withholds Payments ............................................ 28

      (iv)  The Contractor Knew Its "Indoor Air Criteria" Interpretation Was Wrong ................................................................................ 29

      (v)   Continuing To Avoid Remediation: The Contractor's Ill-Named "Site Action Plan" ................................................................ 29

   (c)  The Memorandum Of Understanding And Arbitration I ......... 31

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## TABLE OF CONTENTS
(continued)

| | | | | Page |
|---|---|---|---|---|

(d)    The Contractor's Second Major Shift Of Position: Denial Through A New Disingenuous Interpretation Of The Contract...................................32

(e)    The Contractor's Failure To Respect The Time For Completion ...........33

(f)    The Contractor Initiates Arbitration II ....................................................33

(g)    Call Of The Contractor's Performance Letter Of Guarantee .................34

3.    A Unanimous ICC Award Confirms That The Contractor's Works Are Defective .................................................................................................35

4.    While Accepting To Comply With The Award (As Regards The Defect), The Contractor Refuses Continuously To Do So In Fact.........................................36

     (a)    The Non-Compliant September 29, 2004 Proposal..................................37

     (b)    The Non-Compliant August 2, 2005 Task Plan ......................................38

     (c)    The Non-Compliant August 29, 2005 Task Plan ....................................39

5.    The Contractor Stops All Further Work Under False Pretexts ........................39

6.    SOLIDERE's Final Attempt To Induce The Contractor To Comply With The Contract and The Award .................................................................................41

7.    As A Result Of The Contractor's Numerous Defaults, SOLIDERE Terminates The Contract...................................................................................................43

III.    URS Is A Proper Party To This Arbitration ........................................................46

     A.    Radian Appears To Exist Only On Paper ...........................................................46

         1.    In June 1999 URS Acquired Radian Which Is Now A Wholly-Owned Subsidiary Of URS........................................................................................47

         2.    Radian No Longer Has Its Own Office Space, Telephone Number Or Facsimile Number ........................................................................................48

             (a)    Address ...................................................................................................48

             (b)    Telephone And Facsimile Numbers ......................................................49

         3.    URS Receives And Pays Money For Radian...................................................50

         4.    Radian's Employees Are Transferred to URS ................................................50

         5.    URS No Longer Advertises Radian As A Separate Entity ..............................51

     B.    Following URS's Take-Over Of Radian, URS Performed The Contract...................52

         1.    URS's Written Statements Affirm Its Responsibility For The Project............52

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## TABLE OF CONTENTS
(continued)

|  |  |  | **Page** |
|---|---|---|---|
| (a) | | The Change From Radian Letterhead To URS/Radian Letterhead And Initial Representations Concerning URS's Role | 52 |
| (b) | | URS's Nomination Of A New "Corporate Manager For The Normandy Landfill Project" | 53 |
| 2. | URS Presents The Contract As A URS Undertaking | | 55 |
| | (a) | URS's Website | 55 |
| | (b) | URS's Address In Lebanon | 55 |
| 3. | URS Treated Radian's Obligations Under The Contract As Its Own | | 56 |
| | (a) | URS's Personnel Responsible For Performance Of The Contract | 56 |
| | | (i) Mr. Amine Bou Onk | 56 |
| | | (ii) Mr. Vladimir Khazak | 56 |
| | | (iii) Mr. Thomas Bishop | 57 |
| | | (iv) Mr. Bart Eklund | 58 |
| | | (v) Mr. Robert Legrand | 58 |
| | | (vi) Mr. James Pratt | 59 |
| | | (vii) The Contractor's Presentation Of Its "Field Project Execution Management Team" | 59 |
| | (b) | URS's Senior Management's Variation Of The Contract Terms | 60 |
| | (c) | URS's Reports And Investigations Demonstrate URS's Operational Responsibility For The Project | 60 |
| | | (i) Reports Prepared As Part Of The Works | 60 |
| | | (ii) Reports And Investigations Related To The Landfill Gas Defect | 61 |
| | | (iii) Site Safety | 65 |
| | (d) | Accounting Matters | 65 |
| 4. | URS's Control Over Arbitration I And The Events Leading Up To It Further Demonstrate That The Project Was Under URS's Control | | 66 |
| | (a) | URS's And Radian's Legal Counsel | 66 |
| | (b) | URS's Participation In Meetings with SOLIDERE Leading Up To Arbitration I | 68 |
| | (c) | URS's Management Of Arbitration I | 70 |

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## TABLE OF CONTENTS
(continued)

|  |  |  |  | **Page** |
|---|---|---|---|---|
|  | 5. | URS Purported To Implement The Award | | 71 |
|  |  | (a) | Correspondence Between The Contractor And SOLIDERE Following The Award | 71 |
|  |  | (b) | Mediation By Mr. William Hadaya Of URS | 72 |
| | C. | Conclusion | | 72 |
| IV. | | SOLIDERE's Claims Against The Contractor | | 74 |
| | A. | Overview Of Relevant Provisions Of The Contract And The Lebanese Code Of Obligations And Contracts | | 74 |
| | | 1. | The Contract | 74 |
| | | 2. | The Lebanese Code Of Obligations And Contracts | 75 |
| | | 3. | The Contractual Limitations On Damages Do Not Apply | 76 |
| | B. | SOLIDERE's Costs In Arbitration I | | 77 |
| | C. | URS And Radian Are Jointly And Severally Liable For All Costs And Expenses Incurred By SOLIDERE In Completing The Works | | 78 |
| | D. | URS And Radian Are Jointly And Severally Liable For All Damages Incurred By SOLIDERE As A Consequence Of The Huge Delays To The Project | | 79 |
| | | 1. | Lost Profits | 79 |
| | | 2. | Project Costs And Expenses | 79 |
| V. | | Miscellaneous Matters | | 81 |
| | A. | The Agreement To Arbitrate – Place And Language Of The Arbitration | | 81 |
| | B. | Appointment Of The Arbitral Tribunal | | 81 |
| | C. | Notifications And Communications | | 81 |
| VI. | | Request For Relief | | 83 |
| VII. | | Reservation Of Rights | | 85 |
| VIII. | | Submission Of This Request For Arbitration | | 86 |

LIST OF EXHIBITS

EXHIBITS (INCLUDED IN SEPARATE VOLUMES)

-oo0Ooo-

**REQUEST FOR ARBITRATION**

I.       **INTRODUCTION**

1.       Pursuant to Article 4 of the Rules of Arbitration of the International Court of Arbitration
         of the International Chamber of Commerce (the "**ICC Rules**"), The Lebanese Company
         For The Development And Reconstruction Of Beirut Central District, S.A.L., a Lebanese
         Company ("**SOLIDERE**", the "**Claimant**" or the "**Employer**"), hereby submits this
         Request for Arbitration (this "**Request**") against URS Corporation, a Delaware (U.S.A.)
         company ("**URS**"), and Radian International LLC a Delaware (U.S.A.) company
         ("**Radian**"), (jointly, "**URS/Radian**" or the "**Respondents**"), to the Secretariat of the
         International Court of Arbitration of the International Chamber of Commerce.  The
         defined term "**Contractor**", as used hereafter, refers to Radian and, following URS's
         take-over of Radian, to URS and Radian jointly.

         A.       **THE PARTIES**

                  1.       **SOLIDERE**

2.       Following the end of the Lebanese civil war, which lasted from 1975 to 1990,
         SOLIDERE was constituted as a joint stock company in Lebanon on May 5, 1994 based
         on Lebanese Law 117 of 1991,[1] with the task of rebuilding and developing the Beirut
         Central District ("**BCD**"),[2] which was one of the worst hit areas during the war.

3.       To promote reconstruction while palliating the Lebanese government's lack of funds, a
         law and decree were adopted in Lebanon in 1991-92 obliging all land owners within the
         perimeter of the BCD to contribute their land to a new, specially-created company,

---

[1]       *See* Law No. 91-117 of December 7, 1991, **Exh. C 15**.

[2]       The BCD is the area of the center of the city of Beirut shown on the drawing at **Exh. C 27**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

SOLIDERE, in exchange for shares in SOLIDERE.[3]  Such land owners represented approximately 60% of the original shareholders, the other 40% being financial investors.

4.     The business purposes of SOLIDERE were and are to acquire such real estate properties in the BCD and to finance and ensure the execution of all infrastructure works in the BCD on the basis of an agreement with the Lebanese Council of Development and Reconstruction ("**CDR**"), to prepare and reconstruct the BCD area, to reconstruct or restore the existing buildings therein, to erect buildings therein and sell, lease or exploit such buildings and lots and, of particular relevance to this case, to develop the landfill on the seaside, called the "**Normandy Landfill**", which is described further in Section II.A below.[4]

5.     The shares of SOLIDERE are listed on the Beirut and Kuwait Stock Exchanges, and its Global Depository Receipts (GDRs) are traded on the London Stock Exchange.  The address of SOLIDERE is:

> Building 149 Marfaa, Saad Zaghloul Street
> P.O. Box 119493
> Beirut
> Lebanon

6.     Further information about SOLIDERE can be obtained on its website: www.solidere.com.

---

[3]     *See* Law No. 91-117 of December 7, 1991, **Exh. C 15**.

[4]     *See* SOLIDERE's Articles of Incorporation at Article 3 (Object of the Company), **Exh. C 16**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

### 2.    URS Corporation And Radian International LLC

7.    URS is an engineering design firm and contractor involved in a range of professional planning, design, program and construction management, and operation and maintenance services, and its shares are listed on the New York Stock Exchange.[5]

8.    When the Contract (as defined below) was signed (1999), Radian provided environmental, engineering and technical services as well as contracting services.

9.    Radian is a wholly-owned subsidiary of URS Corporation.

10.    URS's and Radian's address is:

> 600 Montgomery Street
> San Francisco CA 94111
> United States of America

### B.    Preliminary Statement

11.    Following the 15-year Lebanese civil war (1975-1990), SOLIDERE was formed to serve as the corporate vehicle to help redevelop and restore the historic BCD, which had, as stated above, been heavily damaged during the war.

12.    In its quest to regain its position as the economic and cultural capital of the Middle East, Beirut also needed space for modern development. The CDR perceived an opportunity in this regard in the form of the Normandy Landfill. The strategic location of the Normandy Landfill (on the coast in front of the BCD) and its size (29 hectares) meant that, once remediated (*i.e.*, excavated and treated), it would become among the more valuable pieces of real estate in the Middle East. Its value, once remediated, has been preliminarily assessed as exceeding US$ 4 billion.

---

[5]    *See* http://phx.corporate-ir.net/phoenix.zhtml?c=89381&p=irol-irhome, accessed February 3, 2006, Exh. C 184.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

13.    In order to help provide SOLIDERE with the financial means to restore the BCD, and in order to make the Normandy Landfill available for modern development, the CDR gave the Normandy Landfill to SOLIDERE, along with the responsibility to remediate it to render it suitable for development as prime real estate.

### 1.    The Construction Contract

14.    By a construction contract dated January 25, 1999 (the "**Contract**") SOLIDERE entrusted the remediation of the Normandy Landfill to Radian, a company which, as mentioned above, was specialized in environmental and engineering services and contracting, for a contract price of US$ 53,075,000.  Pursuant to the Contract, Radian was required to excavate the entire Normandy Landfill, sort and treat the materials and backfill them after treatment.  (*See, infra*, Section II.B.)

### 2.    URS Takes Over Radian And The Responsibility To Perform The Contract

15.    Soon after signing the Contract, in June 1999, Radian was acquired by URS, another U.S. company engaged in environmental engineering and contracting.  Since that time, URS has operationally taken over Radian and taken responsibility for performing the Contract. Radian appears today to exist only on paper.  URS and Radian have effectively operated and continue to operate as a single entity.  (*See, infra*, Section III.)

### 3.    The Contractor Fails To Perform Meaningful Treatment

16.    Since the Contract was awarded in 1999, the remediation of the Normandy Landfill has not significantly advanced.  The Contractor has excavated a significant part of the landfill, processed the excavated materials and backfilled them, but without performing any meaningful treatment which would lead to remediation of the excavated material. The Contractor found a simple way to ensure the lump-sum Contract would be highly profitable: it avoided doing the treatment work.  (*See, infra*, Section II.C.1.)

17.    SOLIDERE's construction manager repeatedly drew the Contractor's attention to its failures to comply with the Contract, but to no avail.  (*See, infra*, Sections II.C.1-2.)

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

### 4.     The Contractor Causes A Landfill Gas Defect

18.    As a direct consequence of the Contractor's failure to treat the backfilled materials, these
contain excessive quantities of one specific contaminant: organic carbon.  Organic carbon
decomposes over time, producing dangerous "landfill gas" in the process, including
methane and carbon dioxide.   In March 2001, SOLIDERE's construction manager
noticed bubbles of gas breaking the surface of ponds over backfilled and allegedly
remediated materials.  Samples of that gas were collected and analyzed, and shown to be
landfill gas, with high concentrations of methane and carbon dioxide. *(See, infra*, Section
II.C.1(c).)

### 5.     The Contractor's Strategy To Avoid Dealing With The Landfill Gas Defect

19.    Since the discovery of this "landfill gas defect" in March 2001, the Contractor has
refused to recognize, much less remediate, its defective work.  Instead, the Contractor
implemented a sophisticated legal strategy to avoid having to fully perform its obligations
under the Contract.

### 6.     The Contractor Denies There Is A Landfill Gas Defect

20.    The Contractor's strategy initially took the form of evasion and denial.  *(See, infra*,
Section II.C.2(a).)

21.    In the face of insistence from SOLIDERE's construction manager for the Contractor to
take action to remedy the defect, the Contractor engaged a number of in-house and
external experts to develop novel theories of contract interpretation, to justify the
Contractor's inadequate performance. *(See, infra*, Section II.C.2(b).)

22.    By 2003, the Contractor had refused to recognize or address the landfill gas defect for
two years, advanced different interpretations of the Contract in an effort to avoid its
obligations and, clearly, would be unable to complete the Contract within the time for
completion provided for by the Contract (April 14, 2004).  As the Contractor refused to

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

remedy the defect, SOLIDERE began withholding contractual payments to the Contractor. This got the Contractor's attention.

### 7.    A Unanimous ICC Award Confirms There Is A Landfill Gas Defect

23.    Under the pressure of payment withholdings but still not accepting that there was a defect, the Contractor agreed with SOLIDERE (in a Memorandum of Understanding dated May 13, 2003) to submit the issue of whether there was a defect to ICC arbitration (the procedure for the settlement of disputes provided for in the Contract) on a "fast track basis". SOLIDERE agreed, in the meantime, to release all contractual payments withheld and resume contractual payments, reserving its right to resume withholdings at any time. **This gave rise to ICC Case No. 12727/EC ("Arbitration I"), which began in May 2003**, led to a 5-day hearing in Paris in December 2003 and, after the exchange of post-trial briefs, to closure of the case in February 2004. (*See, infra*, Sections II.C.2(c)-(d).)

24.    **In a unanimous award dated July 12, 2004 (the "Award"), the arbitral tribunal in Arbitration I (John Blackburn Q.C., Chairman, Vivian Ramsey Q.C. and John Uff Q.C.) held *that the presence of landfill gas constituted a defect in the Works, which the Contractor was bound to remedy*.  This vindicated the position which SOLIDERE had been maintaining consistently since March 2001 when the landfill gas issue arose.  The arbitral tribunal further declared that the Contractor should provide SOLIDERE with a plan showing how the Contractor proposed to remedy the defect.** (*See, infra*, Section II.C.3.)

### 8.    In Continuance Of Its Strategy, The Contractor Initiates Arbitration II

25.    In addition, in May 2004, before notification of the Award, and possibly anticipating that it would be unfavorable, the Contractor (through a newly appointed law firm, Skadden,

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

Arps, Meagher and Flom LLP, Los Angeles and London[6]) applied to add new claims, seek other relief and generally re-open Arbitration I. On June 21, 2004, the arbitral tribunal rejected the application as wholly inconsistent with the "fast track" nature of the first arbitration which, moreover (as mentioned above), had already been closed. (*See*, *infra*, Section II.C.2(f).)

26.   As the claims were denied admission into the existing arbitration, on the same day (June 21, 2004), the Contractor began a new ICC arbitration (ICC Case No. 13341/EC, "**Arbitration II**") in which it reasserted the same claims and requests for other relief – all of which are groundless, in SOLIDERE's submission – and, for reasons of claimed efficiency, requested that the same three arbitrators as in Arbitration I be appointed to act in the new case. (*See*, *infra*, Section II.C.2(f).)

27.   Following the Award dated July 12, 2004, the Contractor said it would amend its Request for Arbitration, among other things, to take account of the Award and stated that, in the meantime, SOLIDERE should not have to file an Answer under the ICC Rules. However, the Contractor has not amended its Request for Arbitration nor pursued Arbitration II, which remains in abeyance. (*See*, *infra*, Section II.C.2(f).)

### 9.    The Contractor Refuses Continuously To Comply With The Award

28.   Following the Award, the Contractor declared that it would comply with the Award, and SOLIDERE initially believed that the Contractor would promptly do so. In hindsight though, it appears that, after refusing to rectify the Works from 2001 to 2003, the Contractor had used Arbitration I (and planned to use Arbitration II) as another ploy to delay and, ultimately, avoid performance of the Contract. The spirit of denial and obfuscation which had governed the Contractor's performance of the Contract from the early days continued. Since issuance of the Award in 2004, the Contractor has refused,

---

[6]   The Contractor had been represented in Arbitration I by Mayer, Brown, Rowe & Maw LLP, London, and Herbert Smith, London. These law firms appear no longer to be representing the Contractor in relation to this dispute.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

despite SOLIDERE's demands, to submit a plan which complies with the Award. On the contrary, the several purported plans submitted by the Contractor and rejected by SOLIDERE have all been consistent with the Contractor's long-standing strategy: to avoid ever having to perform the Contract. (*See*, *infra*, Section II.C.4.)

### 10. The Contractor Unilaterally Stops All Further Work

29. In February 2005, following the assassination of former Prime Minister Rafik Hariri in Beirut, the Contractor stopped all further work at the project site (the "**Site**"). While a stoppage of work for three days was justified on that occasion (as days of national mourning), as the Contractor presumably no longer anticipated earning profit from the Contract, the Contractor used this event as a pretext to discontinue all further work at Site and has done no work there since. (*See*, *infra*, Section II.C.5.)

### 11. The Contractor Initiates Arbitration III

30. Instead of submitting a plan which complies with the Award, the Contractor has reverted to the stratagem that it had already deployed twice as a diversionary tactic – starting a new arbitration. By a Request for Arbitration dated January 20, 2006, the Contractor referred to arbitration, among other issues, that of the compliance of its various purported remediation plans with the Contract and the Award. The Contractor also seeks a declaration to the effect that it should be relieved of its main remediation obligations under the Contract. This new arbitration has been registered at the ICC under No. 14208/EC ("**Arbitration III**"). (*See*, *infra*, Section II.C.7.)

### 12. SOLIDERE Terminates The Contract

31. The Contractor's persistent refusal to comply with the Award, its total work stoppage, its other Events of Default and, finally, its decision to initiate Arbitration III, take the Contractor's disregard for the Contract to new heights. Consequently, by notice dated February 10, 2006, SOLIDERE terminated the Contract. (*See*, *infra*, Section II.C.7.)

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

### 13.    URS And Radian Are Jointly And Severally Liable For The Cost Of Completing The Works

32.    SOLIDERE must now complete the Works itself and/or by other contractors. SOLIDERE's incurrence of costs for such completion will be a direct consequence of the existence of a defect for which the Contractor is responsible, as finally determined by the Award, and the Contractor's continuing failure to implement the Award. Thus, URS and Radian are liable, jointly and severally, for this amount to the extent it exceeds the Contract price. (*See, infra*, Section IV.C.)

### 14.    URS And Radian Are Jointly And Severally Liable For The Damages Caused By The Staggering Delay To The Project

33.    Further, in all its dealings with SOLIDERE, the Contractor has shown total disregard for the fact that time is "of the essence" under the Contract, and that every day of delay is causing SOLIDERE to suffer enormous damages: SOLIDERE is foregoing and will continue to forego hundreds of millions of US dollars in profits that SOLIDERE would derive from real estate sales had the Normandy Landfill been timely remediated under the Contract. (*See, infra*, Section IV.D.)

### 15.    The Contractor May Not Rely On Any Contractual Limitations Of Damages

34.    The Contractor's conscious and/or grossly negligent failures to comply with its contractual obligations should deprive it of any right to rely on the limitations on damages set forth in the Contract. SOLIDERE respectfully submits that URS and Radian should be held jointly and severally liable for SOLIDERE's ever-increasing actual damages, and SOLIDERE should be awarded all of the relief requested, including interest, fees, and costs. (*See, infra*, Section IV.)

-oo0Ooo-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## II.    FACTUAL BACKGROUND

### A.    PRESENTATION OF THE NORMANDY LANDFILL

35.    The Normandy Landfill is located along the northern coast of Beirut and apparently takes its name from the proximity of the historic Normandy Hotel.[7] It has a surface area of approximately 29 hectares and literally forms the coastal front of the BCD. It was created as the result of the deposit into the sea of a variety of wastes (inert construction and demolition wastes, household waste, unexploded ordnance as well as spoil material arising from civil engineering and building projects) during the fifteen years of Lebanon's civil war.

36.    The Lebanese civil war ended in about 1990, and the dumping process stopped in 1994. By then, millions of cubic meters of waste had been deposited in the adjoining sea, half of which was below sea level, down to water depths of 20 meters. Above the water line, the fill reached heights of 28 meters in some locations. What had become known as the "Normandy Landfill" had effectively reclaimed more than 25 hectares of land from the sea.

37.    As stated above,[8] SOLIDERE was incorporated to develop the BCD, including the area of the Normandy Landfill. No real estate development on a landfill can be contemplated before the landfill is rehabilitated and remediated so that what is effectively a waste dump is converted into, and can be marketed as, real estate without risk to the health or comfort of its users or to the environment. In the case of the Normandy Landfill, the land is to be marketed as prime real estate capable of supporting "a prestige high density development". [9]

---

[7]    *See* the map of Lebanon, **Exh. C 13**, showing the northern coast of Beirut, and aerial pictures of the BCD, including the Normandy Landfill, **Exh. C 27**.

[8]    *See, supra,* Section I.A.1.

[9]    *See, infra,* Section II.B.2.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

38.     As a first measure, in 1993, SOLIDERE sought to prevent the landfill from being washed into the sea by creating a 50 meter-wide strip of inert fill around the waste which was then fixed by the erection of a temporary rock protection.

39.     Subsequently, from 1998 to 2000, a line of caissons[10] was erected in the sea around the landfill, which defines what will become the boundary of the land after it has been fully reclaimed. This line of caissons can be easily identified on the aerial pictures of the BCD[11] as the light-colored, arc-shaped linear structure forming the sea-side boundary of the BCD.

40.     SOLIDERE decided to reclaim the landfill for mixed (commercial and residential) development in two phases. Phase 1, representing some 7 hectares closest to the Beirut city centre, was executed between June 1996 and October 1997. Phase 2, comprising some 22 hectares (the "**Project**"), was awarded to the Contractor by the Contract and is the subject of the dispute in this arbitration. The Contract is briefly described in Subsection B below and an account of the Contractor's gross mis-performance of the Contract is provided in Subsection C below.

### B.     OVERVIEW OF THE CONTRACT

#### 1.     The Contract Documents

41.     As stated above, on January 25, 1999, SOLIDERE entered into the Contract with the Contractor for the Phase 2 works. The Contract comprises three documents, as follows:

        (i)     an Agreement between the parties dated January 25, 1999 (the "**Agreement**");

---

[10]   A caisson is defined in John S. Scott's Penguin Dictionary of Civil Engineering, 4th edition (1991) as:

"A *foundation* built partly or wholly above ground and sunk below ground, usually by digging out the soil inside it", **Exh. C 14**.

In the case of the Normandy Landfill, concrete caissons were sunk into the seabed, with their top breaking the surface of the sea, so as to create a robust wall of concrete. The sea located between the landfill and the line of caissons was subsequently backfilled with inert material in order to extend the area of the Normandy Landfill up to the line of caissons, and to stabilize the caisson wall.

[11]   Aerial pictures of the BCD, **Exh. C 27**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

(ii)    the General Conditions of Contract and all Exhibits thereto ("**GC**"); and

(iii)   the Technical Conditions of Contract ("**TC**").[12]

### 2.    The "Objective Of The Works"

42.    Pursuant to the Contract, the Contractor agreed to "design and construct a reclamation scheme to meet the objective of the Works", which was described as follows:[13]

> "The objective of the Works is to reclaim the land and environment known as Phase 2 of the former Normandy Landfill (*see* Drawing RJ01[14]) as marketable development land that poses no risk to human health, public welfare, structures, services and the environment.
>
> The reclaimed land will be marketed by the Employer for the construction of a prestige high density development (offices, hotels and condominiums), park land, and associated infrastructure works. Development will comprise high multi-storey buildings with up to 7 levels or more of underground structures".[15]

### 3.    The Time For Completion

43.    The "**Time for the Completion**" of the Contract was fifty-four months beginning from the issuance of a Notice to Proceed.[16]

44.    The Time for Completion was subsequently extended to 60 months, which expired on April 14, 2004.[17]

---

[12]    *See* the Contract, Agreement Art. 2, **Exh. C 19**. In addition, there are two Addenda to the Contract dated February 18, 1999 and August 18, 2000, respectively. References to clauses of the GC are given hereafter as, for example, "GC 1.1" in the case of Article 1.1 of the GC.

[13]    *See* the Contract, Agreement Art. 3.1, GC 1.1 (definitions of "Complete" and "Works") and TC, Section 2, **Exh. C 19**.

[14]    Drawing RJ01, **Exh. C 24**.

[15]    The Contract, TC Section 2, **Exh. C 19**.

[16]    The Contract, Agreement Art. 3.2, **Exh. C 19**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

### 4.   Time Is Of The Essence

45.   The Contractor agreed that:

> "Time is of the essence in the performance of the Works and the
> Contractor agrees: (i) to Commence the Works after receipt by it of the
> Notice to Proceed; and (ii) to Complete the entire Works within the Time
> for Completion and in compliance with the Programme, Milestones and
> Detailed Programme and consistent with all specific durations set forth
> therein and/or elsewhere in the Contract".[18]

46.   Because timing was so important, GC 21.10 provides that the Contractor:

> "[...] recognizes and acknowledges that any material failure of, or
> suspension of the Works, by the Contractor or any Subcontractor or
> Supplier, would cause the Employer immediate and irreparable harm
> unable to be compensated by money damages alone, and the Contractor
> hereby accepts and agrees that it shall not under any circumstances
> whatsoever cease, delay or suspend performance of its Works under this
> Contract, except as may be expressly provided for under these GC".[19]

47.   The Contractor further agreed in GC 22.2 that:

> "[...] the timely performance and Completion by the Contractor of the
> entire Permanent Works within the Time for Completion and in
> accordance with the Programme and any intermediate Milestones is of the
> essence and a material term of the Contract.  The Completion of the
> Works within the Time for Completion is essential and vital for the timely
> and successful development and promotion of land and projects
> surrounding or near the Site and for the commercial viability and financial
> success of such parts of the Development for the Employer".[20]

---

(...continued)

[17]   *See* the Contract, Addendum Agreement No.2 dated August 18, 2000, **Exh. C 19**.  The Notice to Proceed
was issued by letter dated March 22, 1999 from SOLIDERE to Radian, effective April 14, 1999,
**Exh. C 21**.

[18]   The Contract, Agreement Art. 5, **Exh. C 19**.

[19]   The Contract, GC 21.10, **Exh. C 19**.

[20]   The Contract, GC 22.2, **Exh. C 19**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

5.    **The Parameters Relating To The Remediation Of The Normandy Landfill, Or "FSQs"**

48.    The "**Scope of Works**" was provided for in TC Section 3.0.    In this Section, the Contractor undertakes, among other things, to perform the described reclamation works (subsection 1), to do so in accordance with the GC (subsection 2) and to achieve certain "End Product acceptability criteria" with respect to landfill gas emissions, among other things, and to deliver land "Fit for the Purpose" (subsection 6).

49.    The "End Product acceptability criteria", also referred to as "Final Site Quality" criteria, or "**FSQs**", are set forth in TC Table 3.1:

"**TABLE 3.1**
**CHEMICAL AND BIOLOGICAL FINAL SITE QUALITY**

| Parameter | Level in mg/kg (unless shown otherwise) |
|---|---|
| Organic Carbon C | <5% |
| x    x    x | |
| Flammable Gas | <1% v/v (g)[21] |
| Carbon Dioxide | <1.5% v/v (g)[22] |
| Oxygen | 18%-23% (g)[23] |
| Landfill Gas | No specific precautions will need to be provided for built development including landscape works in the reclaimed areas." |

50.    The importance of, and links between, these FSQs will be further explained if and when needed in these proceedings.    For the purpose of this Request, it should be noted that

---

[21]    "<1% v/v" means "less than one per cent volume by volume", and means that, for the parameter to be satisfied, a volume of gas sampled from the material should include less than one per cent of flammable gas.  The inclusion of "(g)" is a typographical mistake.

[22]    "<1,5% v/v" means "less than one point five per cent volume by volume", and means that, for the parameter to be satisfied, a volume of gas sampled from the material should contain less than one and a half per cent of carbon dioxide.  The inclusion of "(g)" is a typographical mistake.

[23]    "18%-23%" means "18 per cent to 23 per cent" and means that one volume of gas sampled from the material should include between 18 and 23 per cent of oxygen.  The inclusion of "(g)" is a typographical mistake.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

"Organic Carbon C" (the first item quoted in TC Table 3.1 above) emits gas as it decomposes, which gas is referred to, in the context of landfills, as "landfill gas". Landfill gas typically contains approximately 60% methane (this is the "flammable gas" FSQ, the second item quoted in TC Table 3.1 above) and 40% carbon dioxide (the third item quoted in TC Table 3.1 above).

51.    The Contractor also undertook that the Works would be "Fit for the Purpose", defined as follows:

> "'**Fit for the Purpose**' means the land cleaned from any contaminated products, environmentaly [*sic*] safe and which is available to be built on including landscape works, without the need for any environmental treatment or containment".[24]

52.    The FSQs and the "Fitness for the Purpose" obligation were the subject of the dispute in Arbitration I.

### 6.    Treatment Provisions

53.    The Contract is titled "Normandy Landfill _Treatment_ Contract" [emphasis added].    It provides in Agreement Article 4.1 that:

> "[…] The Contract Price is calculated on the assumption that the quantity of Material to be Treated is 1.2 million cubic meters, and the quantity of materials to be excavated is 5 million cubic meters".[25]

54.    The Contractor set forth in the Contract a "Method Statement" specifying the various treatment methods that would be used in performing the Works.[26]

---

[24]    The Contract, GC 1.1 (definition of "Fit for the Purpose"), **Exh. C 19.**

[25]    The Contract, Agreement Art. 4.1, **Exh. C 19.**

[26]    The Contract, Table 3.3, TC Section 3.0, **Exh. C 19.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

55.    The Method Statement also identifies activities that are <u>not</u> considered proper treatment, and therefore, will not be used on the Site.   TC Table 3.3 indicates that prior to backfilling materials:

> "4.0    <u>Radian would not mix any organic matter or heavy organics
> contaminated media for the purpose of dilution.</u>  Our experience in many
> nations (i.e., ithe [*sic*] United States mixing for the purpose of dilution is
> not acceptable and in some instances could be considered as an action in
> violation of environmental laws) has shown that mixing of waste for
> dilution may not constitute treatment and manot [*sic*] be desirable by
> financial lending institutions and real estate investors".[27] [Emphasis
> added]

### 7.    Remediation Provisions For A "Failure Or Defect"

56.    In the event that the Works do not comply with the Contract, the parties provided that the Contractor would have, *inter alia*, two complementary duties: (i) to unilaterally remedy the defect <u>and</u> (ii) to submit a plan to SOLIDERE detailing how this would be done. GC 23.10 states in relevant part:

> "If a failure or defect in or of the Permanent Works, Materials, Plants or
> workmanship in accordance with the Contract is discovered during the
> carrying out of the Works, upon such discovery the Contractor shall
> immediately state in writing to the Employer the action which the
> Contractor proposes to take at no cost to the Employer to remedy or repair
> such failure or defect, and establish that there is no similar failure or defect
> in Works already executed or Materials already supplied (whether or not
> incorporated in the Works) [...]"[28]

### 8.    Termination

57.    Pursuant to GC 35.2, the Employer, among other things, may exercise specified rights, including termination of the Contract, if certain defined events occur and are not remedied:

---

[27]    The Contract, Table 3.3, TC Section 3.0, **Exh. C 19**.

[28]    The Contract, GC 23.10, **Exh. C 19**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

"If: (i) the Contractor has abandoned the Contract; or (ii) the Contractor has failed to provide review and/or maintain at all times in full force and effect and in accordance with the Contract the Performance Letter of Guarantee, the insurance required by the Contract, or provide, revise or resubmit or update the Detailed Programme; or (iii) the Contractor has failed to commence the Works, or has suspended the progress of the Works after receiving the Notice to Proceed from the Employer; or (iv) the Contractor is not performing the Works in accordance with the Contract or is in breach of any representation or warranty or is in breach of any of its obligations, responsibilities or undertakings under the Contract; or (v) the Contractor does not maintain the progress of the Works in accordance with the Detailed Programme and/or any Milestone; each also constituting an "Event of Default", then the Contractor shall be in Default. _If the Contractor fails to remedy such Event of Default within ten (10) Days, after receipt of written notice of such an Event of Default from the Employer, or if the Contractor fails to provide written evidence and/or Detailed Programme(s) satisfactory to the Employer that such Event of Default shall be corrected forthwith, then the Employer may,_ in addition to any and all other rights available to it under the Contract and without the need for any legal proceedings or court decision, _withhold any amount otherwise due under the Contract and/or may issue a Notice of Termination terminating the Contractor's right to proceed with any portion or the whole of the Works, without thereby releasing the Contractor from any remaining obligation or liability under the Contract, or affecting the rights and powers conferred on the Employer by the Contract, and may itself complete the Works or may employ any other contractor to Complete the Works, or the Employer may terminate the Contract._ The Employer or such other contractor may use for such completion so much of the Plant, Temporary Works and Materials, which have been deemed to be reserved exclusively for the performance of the Works, under the provisions of the Contract, as it or they may think proper".[29][Emphasis added]

58.    In the event of termination by the Employer, GC 35.3 provides that:

"If the Employer terminates the Contract pursuant to GC 35.1 or GC 35.2, the Employer shall not be liable to pay to the Contractor any money on account of the Contract until the costs of execution, damages for delay in Completion, if any, and all other expenses incurred by the Employer or damages to which the Employer is entitled, whether by Contract or at law, have been ascertained. The Employer shall then be obligated to pay only

---

[29]    The Contract, GC 35.2, **Exh. C 19**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

such sum, as the Employer may certify would have been due the
Contractor upon completion by it after deducting the damages, costs and
other expenses incurred by the Employer resulting from the termination.
If such amount exceeds the sum which would have been payable to the
Contractor on due completion by it, then the Contractor shall, upon
demand, pay to the Employer the amount of such excess and it shall be
deemed a debt due by the Contractor to the Employer and shall be
recoverable accordingly.  In addition, upon any such termination, the
Contractor shall assign to the Employer such orders with Suppliers or
Subcontractors as the Employer may request".[30]

### 9.    The Contract Price

59.    SOLIDERE agreed to pay the Contractor a fixed lump sum of US$ 53,075,000 for the
Works on the assumption that the quantity of the material to be treated is 1.2 million
cubic meters and the quantity of material to be excavated is 5 million cubic meters.[31]

60.    Pursuant to Article 4.1 of the Agreement, the parties increased the Contract Price by
US$ 2,000,000 to enable the Contractor to purchase a Low Temperature Thermal
Desorption unit for treating materials at the Site.[32]  The parties further increased the
Contract Price by US$ 1,557,500 (Change Order No. 2), in order for the Contractor to
purchase plastics pelletizing equipment.[33]

61.    The Contract Price was thus increased to a total of **US$ 56,632,500**, an amount at which
it remained through the termination of the Contract.[34]

---

[30]    The Contract, GC 35.3, **Exh. C 19**.

[31]    The Contract, Agreement Art. 4.1, **Exh. C 19**, which provides that if the quantity of material to be treated
or excavated exceeded these amounts, respectively, the Contractor was entitled to additional compensation.
On the other hand, if the quantities were less than these amounts, there was no provision for the Contract
Price to be reduced.

[32]    *See* letter dated February 4, 2002 from the CM to Radian confirming the increase in Contract Price by
US$ 2,000,000, **Exh. C 59**.

[33]    *See* letter dated February 27, 2002 from Radian to SOLIDERE, enclosing Change Order No. 2, **Exh. C 60**.
Although the Contractor requested a "Change Order No. 1", the subject-matter of such request was covered
in Addendum Agreement No. 2 dated August 18, 2000 (**Exh. C 19**) and no Change Order No. 1 was ever
executed.

[34]    On such termination, *see*, *infra*, Section II.C.7.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

### 10.    The Governing Law

62.    The Contract further provides that:

> "The Contract shall be governed by and construed in all respects in
> accordance with the laws of the Republic of Lebanon".[35]

### 11.    The Construction Manager

63.    The Contract provides for the appointment of a "Construction Manager" who is
empowered to take all actions and give all instructions and "Approvals" (subject to
certain exceptions) in SOLIDERE's name and on its behalf under the Contract.[36] Among
other things, he is empowered "to manage, coordinate and monitor compliance" by the
Contractor with the Contract and to make recommendations to the Employer concerning
payments to be made to the Contractor.[37]

### C.    THE CONTRACTOR INTENTIONALLY FAILED TO PERFORM AND/OR GROSSLY MIS-PERFORMED THE CONTRACT

64.    Following the signature of the Contract in January 1999, on March 18, 1999, SOLIDERE
notified the Contractor that it had appointed W.A. Fairhurst International, a Scottish firm
of consulting engineers ("**WAFI**"), to act as the Construction Manager (the "**CM**") under
the Contract.[38]

65.    By letter dated March 22, 1999, the Employer issued the Notice to Proceed to the
Contractor, instructing the Contractor to commence work on April 14, 1999.[39]

---

[35]    The Contract, GC 50, **Exh. C 19.**

[36]    The Contract, GC 2.1, **Exh. C 19.**

[37]    The Contract, GC 1.1 (definition of the "Construction Manager"), **Exh. C 19.**

[38]    *See* external memorandum dated March 18, 1999 from Mr. Hervé Dupont of SOLIDERE to Mr. Stan
Porfido of Radian, **Exh. C 20.** WAFI remained the CM until the WAFI Beirut team changed its affiliation
to Hornagold & Hills International, an English firm of consulting engineers and management consultants.
Without any changes to the CM team, the CM thus became Hornagold & Hills International ("**H2I**"), as
notified to URS/Radian by SOLIDERE by letter dated December 20, 2005, **Exh. C 171.**

[39]    *See* letter dated March 22, 1999 from SOLIDERE to Radian, **Exh. C 21.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

1.   **The Contractor's Gross Mis-Performance Of The Contract Caused The Landfill Gas Defect**

(a)   **The Contractor Mixed Organic And Inert Materials, In Conscious Violation Of Its Contractual Obligations**

66.   As will be demonstrated in the course of these proceedings, the performance of the Contract by the Contractor was rife with bad practices and intentional or grossly negligent disregard of contractual obligations.   The most egregious among the Contractor's bad practices consisted in mixing materials contaminated by organic matter, with uncontaminated materials.

67.   Pursuant to the Contract, the Contractor gave SOLIDERE an unambiguous commitment that it "would not mix any organic matter or heavy organics contaminated media for the purpose of dilution", supported with statements that "mixing for the purpose of dilution is not acceptable" and "may not constitute treatment".[40]

68.   The contractual prohibition of mixing was implemented in the Contractor's Work Plan (submitted pursuant to the Contract after execution of the Contract).   Because the different materials at the Normandy Landfill had been laid in discernible layers, the Work Plan prescribed excavation methods designed to segregate these bands, *i.e.*, allow the Contractor to remove and treat contaminated materials without contaminating inert material through mixing.[41]

69.   The Contractor only segregated organic materials for roughly one month.[42]   Shortly thereafter, the Contractor adopted excavation methods (contrary to the contractual Method Statement and the Work Plan) in which it made vertical cuts down through the

---

[40]   *See* item 4 in the Method Statement, set forth in the Contract, TC Table 3.3, **Exh. C 19**, quoted *supra*, Section II.B.6.

[41]   Letter dated November 12, 1999 from Radian to the CM, enclosing "Work Plan: 3rd and Final Revision," dated November 9, 1999, *see* Section 2.2.1 items 1, 4, and 6, **Exh. C 25**.

[42]   *See* Witness Statement of Mr. David W. Horne in Arbitration I, dated October 15, 2003 ("**Horne I**"), p. 10, ¶ 36, **Exh. C 105**. Mr. Horne was the CM's Representative from April 14, 1999 until June 13, 2003.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

different layers of material.   This practice thoroughly mixed organic with inert materials.[43]

70.   In addition to the excavation method used by the Contractor, its processing methods compounded the mixing of the excavated materials.[44]

### (b)   The Contractor Treated Far Less Than The Contractual Treatment Quantities

71.   The Contract Price was calculated on the assumption that the Contractor would treat 1.2 million of the 5 million cubic meters of material to be excavated at the Normandy Landfill.[45]

72.   As a result of its material-mixing practices and other poor working practices to be explained in the course of these proceedings, a comparatively small amount of excavated material was deemed by the Contractor to require treatment: according to the CM, as of the end of September 2005, only "about 94,800m³ of material have been worked upon in a manner claimed by the Contractor to constitute treatment as defined in the Technical Conditions of Contract".  This contrasts with the 1.2 million cubic meters assumed by the Contract Price.[46]

73.   The Contractor's activities were thus predominantly processing and mixing, and not treatment.[47]  While this no doubt dramatically increased the short-term profitability of the

---

[43]   *See* Horne I, p. 10, ¶¶ 37-40, **Exh. C 105**; Reply Witness Statement of Mr. David W. Horne in Arbitration I, dated November 21, 2003 ("**Horne II**"), p. 12, ¶¶ 44, 46, **Exh. C 109**.

[44]   *See* Witness Statement of Dr. Anthony C. Ellis in Arbitration I, dated October 15, 2003 ("**Ellis I**"), p. 10, ¶¶ 33-34, p. 13, ¶ 46, **Exh. C 104**.  Dr. Ellis was an environmental chemist who worked as a consultant to the CM.

[45]   The Contract, Agreement Art. 4.1, **Exh. C 19**.

[46]   *See* "Construction Manager's Monthly Report – No. 78" for September 2005, dated October 14, 2005, Section 4.4.1 (appendices omitted), **Exh. C 160**.

[47]   *See* Horne II, p. 14, ¶¶ 48-49, **Exh. C 109**.  Mr. Horne also refers to the Witness Statement of Mr. James Pratt, the Contractor's Quality Control Manager, which describes the Contractor's work on the backfilled materials as excavating, feeding material through a "bar screen", placing materials in a sorting plant that separates materials, and sampling and testing fines used in the backfill, *see* **Exh. C 109** at pp. 13-14, ¶ 47.

(continued...)

-21-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

Project for the Contractor, such performance was contrary to the Contractor's obligations and was to have disastrous consequences for the Project.

*    *    *

74. As will be demonstrated in the course of these proceedings, such bad practices constitute serious breaches of the Contractor's essential contractual obligations and, as a matter of fact, caused the excessive concentrations of landfill gas which were held in the Award to constitute a defect in the Works.

### (c)    Discovery Of The Landfill Gas Defect

75. Early in 2001, the CM noticed gas bubbles rising from water overlying submerged backfilled materials. In a letter dated March 1, 2001, the CM notified the Contractor that the gas was flammable and requested that the Contractor investigate the problem.[48]

76. After observing work practices at the Site, the CM notified SOLIDERE by letter dated May 23, 2001 that the Contractor was mixing materials, contrary to the Method Statement set forth at TC Table 3.3.[49] In the letter, the CM hypothesized that such work practices might have contributed to the landfill gas emissions from the backfill.

77. In June of 2001, the CM notified the Contractor of its concerns and hypothesis.[50] However, the Contractor did not change its working practices.[51]

---
(...continued)

In Mr. Horne's view, all of these activities constitute processing and not treatment under the terms of the Contract. *See also,* Horne I, p. 12, ¶ 41, **Exh. C 105**, in which Mr. Horne describes how the "treatment" element of the Works has been conspicuously absent.

[48]    *See* letter dated March 1, 2001 from the CM to Radian, **Exh. C 37**.

[49]    *See* letter dated May 23, 2001 from the CM to SOLIDERE, at Section 2.2, **Exh. C 43**.

[50]    *See* Minutes on Progress Meeting No. 81 dated June 20, 2001, item 4.2.5.1 (c), **Exh. C 45**.

[51]    *See* internal memorandum dated August 23, 2001 from Mr. David Horne to Mr. Hisham Karameh (the Employer's Representative), at items 1-5, **Exh. C 51**. Dr. Ellis also reprised his concern over the Contractor's practice of mixing inert and organic materials in his report dated August 2001 entitled "Review of Composting and Sampling Activities at Normandy Reclamation Project", p. 3, **Exh. C 48**. *See also,* Section 6.15 of the CM's October 14, 2002 Report entitled "Formal Report Into Landfill Gas In &

(continued...)

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

78.    As Mr. Horne, the CM's Representative at the time, explained:

> "The main reason for the excessive levels of landfill gas, in my view, is that Radian avoided treating material as it undertook to do under the Contract.  Instead, and contrary to Radian's Work Plan, Radian has mixed layers of highly organic material in the landfill with inert material to achieve, by this process of dilution, a level of Total Organic Carbon ("TOC") in backfilled materials of less than 5 per cent as required by the FSQs.  However, as Radian has, in this way, neglected treating highly organic material, it has rendered itself unable to comply with the FSQs relevant to landfill gas, namely, those applicable to flammable gas, carbon dioxide and oxygen".[52] [Citations omitted]

79.    Since notifying the Contractor of the gas problem by letter dated March 1, 2001,[53] the CM has sent the Contractor numerous letters reminding it that the Site was not compliant with FSQs.[54]  The CM repeatedly asked the Contractor to comply with its obligations.[55] However, over the course of three years, from the discovery of the landfill gas problem in March 2001 until the Award in Arbitration I, the Contractor never acknowledged that the FSQs were not being met in the backfill and thereby delayed investigating and remediating the defect.

---

(...continued)

Emission From Backfilled Material" (appendices omitted), **Exh. C 79**, which noted that the Contractor was still mixing materials as of that date.

[52]    Horne I, p. 2, ¶ 4, **Exh. C 105**.

[53]    *See* letter dated March 1, 2001 from the CM to Radian, **Exh. C 37**.

[54]    The FSQs, also referred to in some documents as "Final Site Quality criteria" or "End Product acceptability criteria", were presented *supra*, Section II.B.5.

[55]    *See* letter dated April 24, 2001 from the CM to Radian (attachment omitted), **Exh. C 40**; letter dated May 28, 2001 from the CM to Radian at point (e), **Exh. C 44**; letter dated July 11, 2001 from the CM to Radian, **Exh. C 47**; and letter dated August 7, 2001 from the CM to Radian, **Exh. C 49**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## 2.    Until The Award, The Contractor Persistently And Disingenuously Denied There Was A Defect

### (a)    The Contractor's Initial Reaction: Dodging The Issue

80.    In a letter dated March 10, 2001, the Contractor responded to the CM's March 1, 2001[56] notice of the gas problem by describing investigations and observations at the Site without once addressing the CM's claim that the Site did not comply with FSQs.[57]

81.    By letter dated April 5, 2001 and enclosed memorandum of a URS engineer (Mr. Robert Legrand),[58] the Contractor acknowledged that gas was bubbling from backfilled areas and that samples showed it contained more than 70% methane (whereas, according to the FSQs, "flammable gas" had to be less than 1%[59]).  Mr. Legrand wrote that, given the material at the Site, he expected landfill gas (which he termed "biogas") production to be "of short duration" and the Contractor would take steps to monitor the Site over the next year using gas monitoring wells,[60] a gas monitoring device installed in the backfill ("*in situ*").  This reference to the gas monitoring wells implied an understanding that the FSQs were to be measured *in situ* within the "headspace" of the gas monitoring well.  Again, the Contractor did not specifically address or acknowledge that the Site was non-compliant with the FSQs in violation of the Contract.

82.    In subsequent correspondence between April and August 2001, a pattern emerged: the CM would ask the Contractor to comply with the FSQs and ensure that the Site would be "Fit for the Purpose"[61] upon Completion,[62] and in response, the Contractor would side-

---

[56]    Letter dated March 1, 2001 from the CM to Radian, **Exh. C 37**.

[57]    *See* letter dated March 10, 2001 from Radian to the CM, **Exh. C 38**.

[58]    *See* internal memorandum of Mr. Robert Legrand dated April 5, 2001, attached to letter from Radian to the CM dated April 5, 2001, p. 3, **Exh. C 39**.

[59]    The Contract, TC Table 3.1, **Exh. C 19**.

[60]    *See* memorandum of Mr. Robert Legrand dated April 5, 2001, attached to letter from Radian to the CM dated April 5, 2001, p. 4, **Exh. C 39**.

[61]    The Contract, TC Section 3.0, item 6, and GC 1.1 (definition of "Fit for the Purpose"), **Exh. C 19**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

step the issue, never acknowledge its contractual responsibilities, and merely submit data or updates based on ineffective investigations.[63] In this process the Contractor never stated or implied that the FSQs should be measured other than *in situ.*

83.　In August 2001, the CM's technical experts inspected the Site and confirmed that the production of landfill gas from backfilled materials was "a serious problem" and that there was no evidence that the gas emissions were declining.[64] In a letter dated October 3, 2001, the CM advised the Contractor that SOLIDERE was "fully aware of the situation and [was] very concerned by its potential ramifications".[65] In the same letter, the CM invoked GC 23.10[66] and emphasized that the Contractor should have submitted a plan of action to correct the defect at the Site "long ago". In the event that SOLIDERE did not receive such a plan, the CM informed the Contractor that the Employer would be obliged to apply "the relevant Clauses of the General Conditions of Contract in order to secure its interest".[67]

　　　　　　　**(b)**　　　　**The Contractor's First Major Shift Of Position:  Denial By Arguing That The FSQs Were "Indoor Air Criteria"**

　　　　　　　　　　(i)　　　The New Position Was Immediately Rejected By The CM

84.　The Contractor responded to the CM's letter dated October 3, 2001 by letter dated October 26, 2001.[68] It maintained that the contractual requirements were "unambiguous"

---

(...continued)

[62]　　*See* letter dated April 24, 2001 from the CM to Radian, **Exh. C 40**; letter dated May 28, 2001 from the CM to Radian, **Exh. C 44**; letter dated July 11, 2001 from the CM to Radian, **Exh. C 47**.

[63]　　*See* letter dated April 26, 2001 from Radian to the CM, **Exh. C 41**; letter dated May 15, 2001 from Radian to the CM, **Exh. C 42**; letter dated July 3, 2001 from Radian to the CM, **Exh. C 46**.

[64]　　Letter dated October 3, 2001 from the CM to Radian (*see* second paragraph), **Exh. C 55**.

[65]　　Letter dated October 3, 2001 from the CM to Radian (*see* second paragraph), **Exh. C 55**.

[66]　　*See* letter dated October 3, 2001 from the CM to Radian (*see* fourth paragraph), **Exh. C 55**. Under the Contract, **Exh. C 19**, GC. 23.10, providing that if there is a "failure or defect" in the Permanent Works, Materials or workmanship during the carrying out of the Works, then upon discovery the Contractor shall immediately state in writing the action which it proposes to take at no cost to SOLIDERE to remedy the same.

[67]　　Letter dated October 3, 2001 from the CM to Radian (*see* fifth paragraph), **Exh. C 55**.

[68]　　*See* letter dated October 26, 2001 from Radian to the CM, **Exh. C 56**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

and argued, <u>for the first time and contrary to the parties' prior understanding until that time</u>, that the FSQs for flammable gas, carbon dioxide, and oxygen were <u>indoor air quality criteria</u>, that is, were to be measured inside a hypothetical building on the reclaimed land and not *in situ*.[69]

85.     Having operated this major change of paradigm, the Contractor felt able to conclude that "[t]here is no evidence that these air quality standards will not be met".[70]

86.     The CM responded by letter dated November 20, 2001, agreeing with the Contractor that the contractual requirements were "unambiguous" and rejecting the Contractor's indoor air quality argument.[71]  The CM reminded the Contractor that the FSQs were not met in backfill and that it awaited a report and plan of action to remediate the defect in accordance with GC 23.10.

87.     The Contractor never responded to this letter.  Instead, it maintained its new position that the FSQs were indoor air quality criteria until it became clear that its own independent experts (who would later appear in Arbitration I) would not support its interpretation.[72]

(ii)     <u>SOLIDERE Threatens To Withhold Payments, Without This Affecting The Contractor</u>

88.     The Contractor failed to address the problem.  At Progress Meeting No. 111 held on March 20, 2002, the CM advised the Contractor to ensure that a remediation report was submitted before the end of March 2002. SOLIDERE informed the Contractor that it would otherwise be obliged to begin withholding payments to the Contractor.[73]

---

[69]     Letter dated October 26, 2001 from Radian to the CM at p. 2, **Exh. C 56**.

[70]     Letter dated October 26, 2001 from Radian to the CM at p. 4, **Exh. C 56**.

[71]     Letter dated November 20, 2001 from the CM to Radian (*see* subheading entitled "Page 2. penultimate paragraph"), **Exh. C 57**.

[72]     *See, infra*, Section II.C.2(b)(iv).

[73]     *See* Minutes of Progress Meeting No. 111 dated March 20, 2002, at 4.2.5.1 – 4.2.5.2, **Exh. C 61**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

89.  By letter dated April 5, 2002, the Contractor submitted to the CM a document entitled "Normandy Landfill, Beirut - Investigation of Gas Emissions – Report", "Prepared by: URS Corporation […]" and dated March 2002.[74]  While admitting that gas bubbles had been observed at a number of locations at the Normandy Landfill,[75] the Contractor insisted in this report that the landfill gas (which it continued to refer to as "biogas") was a "small amount"[76] and, based on the Contractor's interpretation of the FSQs as indoor air criteria,[77] that the "project is stable, safe, and meets the End Product criteria [FSQs]".[78]

90.  By letter dated April 25, 2002, the CM responded, noting that the Contractor still had not acknowledged there to be a defect, that the Contractor did not propose to do anything other than to monitor the situation (inappropriately, in the CM's view) and that the Contractor had produced no plan of action, as required, to deal with the defect.[79]  Accordingly, the CM maintained that the backfilled materials were defective, the Works incomplete, and the backfill not "Fit for the Purpose".

91.  Shortly thereafter, in the summer of 2002, which was about one year after the CM's first recommendation to do so, the Contractor installed gas collection cells (*i.e.*, an *in situ* means of measuring landfill gas).[80]  The Contractor then began to send to the CM data regarding gas emissions from these new monitoring cells.  This data continued to show

---

[74]  "Normandy Landfill, Beirut – Investigation of Gas Emissions – Report" dated March 2002 ("**March 2002 Report**"), enclosed in letter dated April 5, 2002 from Radian to the CM, **Exh. C 62.**

[75]  *See* "March 2002 Report", pp. 1, 8, 23-25 and 27, as well as photographs of the bubbling phenomena in Appendix D to this report, **Exh. C 62.**

[76]  *See* "March 2002 Report", pp. 27-28, **Exh. C 62.**

[77]  *See* "March 2002 Report", pp. 20-22, **Exh. C 62.**

[78]  "March 2002 Report", p. 28, **Exh. C 62.**

[79]  *See* letter dated April 25, 2002 from the CM to Radian, **Exh. C 65.**

[80]  By letter dated May 28, 2001, point (b)(i), **Exh. C 44**, the CM recommended that Radian use gas monitoring cells/boxes to more effectively measure gas emission.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

that the flammable gas and carbon dioxide in the materials backfilled by the Contractor exceeded the FSQs, and that the oxygen fell outside the FSQ range.[81]

92.  Despite the clear evidence from the gas collection cells, the Contractor refused to acknowledge the existence of a defect or submit a plan of action to remedy it. Therefore, by the CM's letter dated June 29, 2002, the CM informed the Contractor that the amounts claimed by the Contractor for "treatment" during the month of May 2002 (in the Contractor's Request for Payment No. 37) should be withheld as a "preliminary measure" to protect the Employer.[82] Such withholding had earlier been recommended by the CM.[83]

93.  While still insisting that it was in compliance with the Contract, by a letter dated July 9, 2002 the Contractor agreed to submit a "detailed report" and a "detailed plan of action" by the end of August 2002.[84]

### (iii)  SOLIDERE Withholds Payments

94.  By letters dated July 30, 2002 and August 28, 2002,[85] the CM informed the Contractor that the amounts claimed for "treatment" during the months of June and July 2002, respectively (in the Contractor Requests for Payment Nos. 38 and 39, respectively), would be withheld, as preliminary measures, pending receipt and approval of the Contractor's plan of action to remedy the defect and its demonstration that the defect was, in fact, being remedied.

95.  The Contractor responded by letter dated September 9, 2002, attaching an update of the URS March 2002 report discussed above. In this update, while admitting the existence of

---

[81]  *See* letter dated June 19, 2002 from the CM to Radian (attachment omitted), **Exh. C 68**; letter dated July 2, 2002 from the CM to Radian (attachment omitted), **Exh. C 71**; and letter dated July 18, 2002 from the CM to Radian (attachment omitted), **Exh. C 73**.

[82]  *See* letter dated June 29, 2002 from the CM to Radian, **Exh. C 70**.

[83]  *See* letter dated April 30, 2002 from the CM to Radian, **Exh. C 67**.

[84]  Letter dated July 9, 2002 from Radian to the CM, point 5, **Exh. C 72**.

[85]  *See* letter dated July 30, 2002 from CM to Radian, **Exh. C 74**; letter dated August 28, 2002 from CM to Radian, **Exh. C 76**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

"measurable and observable" gas emissions in the backfill,[86] the Contractor continued to deny that this constituted a defect, and continued to insist that "the FSQ gas-related standards cannot apply to soil gas" but apply instead to indoor air quality.[87]

(iv)    The Contractor Knew Its "Indoor Air Criteria" Interpretation Was Wrong

96.    In December 2002, the Contractor was warned by one of its independent expert consultants (who was later to appear as an expert witness for the Contractor in Arbitration I) that interpreting the FSQs as indoor air criteria presented a danger:

> "the concentration limits of 1% methane and 1.5% carbon dioxide are inappropriate for ordinary indoor environments such as office spaces or residences. These levels are too high to be considered safe upper bounds, except by applying large additional safety factors (*e.g.* one order of magnitude) [...] So again, this is not a safe upper bound for indoor spaces [...]"[88] [Emphasis added]

97.    Yet, the Contractor persisted in its position despite the warning.

(v)    Continuing To Avoid Remediation: The Contractor's Ill-Named "Site Action Plan"

98.    In January 2003, the Contractor and its technical experts met with SOLIDERE's representatives in London. At this meeting, the Contractor acknowledged that there was a landfill gas issue that needed to be addressed and stated that it would submit a plan of action by January 31, 2003.[89]

---

[86]    *See* "Normandy Landfill, Beirut – Biogas Status Report" dated September 2002, prepared by URS, enclosed in letter dated September 9, 2002 from Radian to the CM at p. 1, **Exh. C 77.**

[87]    Normandy Landfill, Beirut – Biogas Status Report" dated September 2002, prepared by URS, enclosed in letter dated September 9, 2002, p. 7, **Exh. C 77.**

[88]    Email dated December 23, 2002 from Professor William Nazaroff to Mr. Bart Eklund, **Exh. C 86.**

[89]    *See* "Construction Manager's Monthly Report – No. 46" dated February 12, 2003, Section 5.2 (attachments omitted), **Exh. C 88.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

99.    In February 2003, <u>nearly two years</u> after the Contractor was first notified of the gas problem, the Contractor submitted to SOLIDERE a document entitled "Site Action Plan".[90]

100.    However, it continued to maintain in this document that there was no defect in its work, and that the Site was "unconditionally safe".[91]  The "Plan" was premised, contrary to the prior warning of its own independent expert, on the interpretation of the FSQs as indoor air quality criteria[92] and, despite its title, did not, in fact, contain any plan of action to remedy the landfill gas contamination.

101.    Since gas emissions were continuing from all backfilled areas, the CM once again, by letter dated March 28, 2003, pursuant to GC 23.10, instructed the Contractor to submit, for approval, a plan of action to remedy the landfill gas emission defect.[93]

102.    But no further "plans" were forthcoming.  On April 16, 2003 SOLIDERE and the CM attended a meeting in London with the Contractor, represented by Mr. Thomas Bishop, Mr. Vladimir Khazak, Mr. John Rakow, and Mr. Amine Bou Onk.   Despite clear evidence that there was a landfill gas contamination, the Contractor continued to deny that there was a problem, maintaining that no remedial action was necessary, and insisting that it would perform the Contract on time.   The Contractor adhered to its position that the FSQs for flammable gas, carbon dioxide and oxygen were "indoor air criteria", notwithstanding the advice of one of its independent expert consultants referred to earlier.[94]

---

[90]    "Normandy Landfill Gas Issue Site Action Plan" ("**Site Action Plan**") dated February 2003, **Exh. C 89**.

[91]    "Site Action Plan", Section 6 at p. 15, **Exh. C 89**.

[92]    *See* "Site Action Plan", Section 4.1 at p. 9, **Exh. C 89**.

[93]    *See* letter dated March 28, 2003 from the CM to Radian, **Exh. C 90**.

[94]    *See, supra*, at II.C.2(b)(iv).

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

(c)    **The Memorandum Of Understanding And Arbitration I**

103.    In view of the parties' differences on the interpretation of the FSQs ("End-product acceptability criteria" to be measured *in situ* according to SOLIDERE; to be interpreted as "indoor air criteria" according to the Contractor), SOLIDERE and the Contractor agreed pursuant to a Memorandum of Understanding dated May 13, 2003 (the "**MOU**"), to submit their dispute to arbitration under GC 44.[95]

104.    The parties agreed that the terms of the MOU are to be kept confidential.

105.    Pursuant to the MOU, the Contractor filed a Request for Arbitration dated May 19, 2003 with the ICC,[96] seeking a declaration that there was no failure or defect in the Works.[97] This arbitration was registered at the ICC under number 12727/EC (previously defined as "Arbitration I").

106.    SOLIDERE, in contrast, sought declarations, among other things, that there was a failure or defect in the Works pursuant to GC 23.10 because the Works did not comply with the FSQs and were not "Fit for the Purpose" as required by the Contract (which required eliminating hazards from landfill gas).[98]

107.    The arbitral tribunal in Arbitration I was constituted as follows:

-    Mr. John Uff Q.C. (arbitrator nominated by the Contractor);

-    Mr. Vivian Ramsey Q.C. (arbitrator nominated by SOLIDERE); and

-    Mr. John Blackburn Q.C. (Chairman agreed upon by the parties).

---

[95]    The Contract, GC 44, **Exh. C 19**.

[96]    *See* Radian's Request for Arbitration dated May 19, 2003, **Exh. C 95**.

[97]    Terms of Reference in Arbitration I, dated September 20, 2003, ¶ 17 (a), **Exh. C 97**.

[98]    Terms of Reference in Arbitration I, dated September 20, 2003, ¶ 17 (c), **Exh. C 97**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

108.   Both Messrs. Ramsey and Uff are civil engineers as well as English barristers and Mr. Blackburn is an English barrister.  All three members of the arbitral tribunal in Arbitration I are specialists in construction contracts and construction law.

(d)    **The Contractor's Second Major Shift Of Position: Denial Through A New Disingenuous Interpretation Of The Contract**

109.   It was only following the filing of its expert reports in Arbitration I, on October 15, 2003, which were not supportive of its theory, that the Contractor abandoned its position that the FSQs were indoor air quality criteria.[99]  It was subsequently dismissed as "irrelevant" by Adrian Williamson Q.C., counsel for the Contractor in Arbitration I.[100]

110.   In place of its indoor air criteria interpretation, through its witness statements and expert reports in Arbitration I, the Contractor sought refuge in another theory to avoid its contractual obligations: that the FSQs were to be assessed exclusively by laboratory tests provided for in the Contract at TC Table 3.2, and in no circumstances through any *in situ* tests.[101]

111.   This new theory was heralded by the Contractor as "the central issue between the parties", although it had never been an issue in the preceding years.[102]

112.   The hearing in Arbitration I took place in Paris from December 15 through 19, 2003.  The Award was dated July 12, 2004 and is discussed below.[103]

---

[99]   *See* Expert Report of Professor William Nazaroff in Arbitration I, dated October 14, 2003 ("**Nazaroff I**"), p. 2, lines 40-1, **Exh. C 100**; Expert Report of Professor Willy Verstraete, also an expert for the Contractor in Arbitration I, dated October 14, 2003 ("**Verstraete I**") p. 10, ¶ 6.5, **Exh. C 101**. Until the filing of these expert reports, the Contractor maintained its theory that the FSQs were indoor air criteria, even including the FSQs as indoor standards in its February 2003 "Site Action Plan", Section 4 at p.9, **Exh. C 89**.

[100]  *See* Hearing Transcript in Arbitration I, dated December 15-19, 2003, Day 1, 16:21-22, Williamson opening (excerpt only), **Exh. C 114**.

[101]  Nazaroff I, p. 2, lines 24-25, **Exh. C 100**; Witness Statement of Mr. Amine Bou Onk in Arbitration I, dated October 14, 2003 ("**Bou Onk I**"), pp. 9-10, ¶ 27, **Exh. C 102**. Mr. Bou Onk was the Contractor's Representative.

[102]  *See* Hearing Transcript in Arbitration I, dated December 15-19, 2003, Day 1, 7:4-9, Williamson opening (excerpt only), **Exh. C 114**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

### (e)    The Contractor's Failure To Respect The Time For Completion

113.    In view of the delays and unremedied landfill gas defect plaguing the Project, it was not surprising that, when the Time for Completion expired on April 14, 2004[104] the Works were far from Completed.

114.    Accordingly, by letter dated April 15, 2004, the CM notified the Contractor of an Event of Default pursuant to GC 35.2,[105] for failure to Complete the Works within the Time for Completion ("Second Notice").[106]

### (f)    The Contractor Initiates Arbitration II

115.    In May 2004, before an award was issued in Arbitration I and possibly anticipating that it would be unfavorable, the Contractor applied to add new claims, seek other relief and generally re-open Arbitration I.    On June 21, 2004 the arbitral tribunal rejected the Contractor's application as wholly inconsistent with the "fast track" nature of the first arbitration.

116.    By a Request for Arbitration dated the same day, June 21, 2004, Radian initiated a new arbitration, Arbitration II (ICC Case No. 13341/EC), pursuant to which it sought various increases in the Contract Price and extensions of time.[107]

---

(...continued)

[103]    *See, infra*, Section II.C.3.

[104]    *See, supra*, Section II.B.3.

[105]    The Contract, GC 35.2, **Exh. C 19.**

[106]    *See* letter dated April 15, 2004 from the CM to Radian, **Exh. C 121.**  SOLIDERE had already notified the Contractor of an Event of Default pursuant to GC 35.2, by letter dated March 30, 2004 (the "**First Notice**"), arising out of the Contractor's failure to submit a contractually-compliant Detailed Programme. *See* letter dated March 30, 2004 from the CM to URS/Radian, **Exh. C 120.**

[107]    *See* letter dated June 21, 2004 from Skadden, Arps, Slate, Meagher & Flom LLP to the ICC Secretariat, enclosing a Request for Arbitration (enclosure omitted), **Exh. C 125.**  The Contractor subsequently filed an amended Request dated July 16, 2004. *See* letter dated July 16, 2004 from Skadden, Arps, Slate, Meagher & Flom LLP to ICC Secretariat, enclosing an amended Request for Arbitration (enclosure omitted), **Exh. C 130.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

117.  The Contractor suggested that "the most efficient way to determine the additional disputes between Radian and Solidere is for the three Tribunal members in ICC Case No. 12727/EC also to be appointed as the Tribunal in the present case."[108]  SOLIDERE agreed with this suggestion,[109] which led the Contractor to express the view that "it is the most sensible way to settle the remaining disputes between the parties".[110]  Accordingly the ICC confirmed the same arbitral tribunal as in Arbitration I.

118.  Following the issuance of the Award,[111] the Contractor announced its intention to file an amended Request for Arbitration in Arbitration II to take account, among other things, of the Award and said that, in the meantime, SOLIDERE should not have to file an Answer under the ICC Rules.[112]  However, the Contractor has not amended its Request for Arbitration in this case and Arbitration II remains in abeyance.

### (g)    Call Of The Contractor's Performance Letter Of Guarantee

119.  Pursuant to GC 32.1, the Contractor had provided SOLIDERE with a Performance Letter Of Guarantee (the "**Performance Guarantee**").[113]

120.  In light of the expiry of the Time for Completion and SOLIDERE's mounting damages, it became necessary for SOLIDERE to call the Performance Guarantee in order to afford

---

[108]  Letter dated June 21, 2004 from Skadden, Arps, Slate, Meagher & Flom LLP to ICC Secretariat, **Exh. C 125**.

[109]  *See* letter dated July 19, 2004 from White & Case LLP to the ICC Secretariat, **Exh. C 131**.

[110]  *See* letter dated July 22, 2004 from Skadden, Arps, Slate, Meagher & Flom LLP to the ICC Secretariat, **Exh. C 132**.

[111]  *See, infra,* Section II.C.3.

[112]  *See, e.g.,* letter dated July 22, 2004 from Skadden, Arps, Slate, Meagher & Flom LLP to White & Case LLP, **Exh. C 132**; letter dated September 30, 2004 from Skadden, Arps, Slate, Meagher & Flom LLP to the arbitral tribunal, **Exh. C 140**; letter dated October 18, 2004 from Skadden, Arps, Slate, Meagher & Flom LLP to the arbitral tribunal, **Exh. C 141**.

[113]  *See* letter dated June 8, 1999 from Banque Saradar S.A.L. to SOLIDERE, **Exh. C 23**.  The amount of the Performance Letter of Guarantee was initially US$ 7,961,250, but was subsequently increased to US$ 8,494,875 as a result of the increases in the Contract Price.  *See* letter dated August 6, 2002 from Banque Saradar S.A.L. to Citibank Beirut N.A., **Exh. C 75**, and letter dated November 15, 2002 from Banque Saradar S.A.L. to Citibank Beirut N.A., **Exh. C 81**.  On the increase to the Contract Price, *see, supra,* Section II.B.9).

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

itself some protection against its actual and certain future losses.  By letter dated June 23, 2004 to the bank that had issued the Performance Guarantee,[114] SOLIDERE demanded payment of the Performance Guarantee.  The proceeds were received by SOLIDERE on June 29, 2004.[115]  As required by GC 32.4, SOLIDERE followed its demand with a letter to the Contractor explaining the basis for its demand.[116]

### 3.    A Unanimous ICC Award Confirms That The Contractor's Works Are Defective

121.    Arbitration I concluded with a unanimous final award upholding SOLIDERE's position and ordering Radian to pay most of SOLIDERE's costs (previously defined as the "Award").  In Section 12.1 of the Award dated July 12, 2004, the arbitral tribunal declared that:

- "**There is a failure or defect in the Permanent Works** and/or materials and/or workmanship within the meaning of the Contract as regards landfill gas emissions;

- **The Permanent Works are not Fit for the Purpose,** as defined in the Contract, as regards such emissions;

- **Radian is liable to remedy the defects at no cost to SOLIDERE** and to provide SOLIDERE with a plan showing how Radian propose that the Works will be completed so as to comply with the Contract;

- **SOLIDERE is entitled to withhold payment of sums otherwise due to Radian;**

---

[114]    *See* letter dated June 23, 2004 from SOLIDERE to Banque Saradar S.A.L., **Exh. C 126.**

[115]    *See* letter dated July 1, 2004 from Banque Saradar S.A.L. to SOLIDERE, **Exh. C 127,** confirming that it made payment of the amount of the Performance Guarantee to SOLIDERE's account with Citibank Beirut N.A., on June 29, 2004.

[116]    *See* letter dated July 8, 2004 from SOLIDERE to URS/Radian, **Exh. C 128.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

- **The parameters set forth in TC Table 3.1 apply to backfilled material and are to be measured after backfilling *in situ*".**[117] [Emphasis added]

122.   The Award further ordered the Contractor to pay SOLIDERE's costs relating to the arbitration, in the amount of US$ 2,358,000.[118]

123.   The Award confirmed the position SOLIDERE had taken for the past three years, that the landfill gas issue constituted a "defect" within the meaning of GC 23.10 and that Works were not Fit for the Purpose as required by the Contract.  These failures constituted an Event of Default within the meaning of GC 35.2(iv). By letter dated July 23, 2004, SOLIDERE accordingly notified the Contractor of the existence of this further Event of Default ("**Third Notice**") and called upon the Contractor to remedy the same in compliance with the Contract and the Award and to pay SOLIDERE's costs of the arbitration as required by the Award.[119]

### 4.   <u>While Accepting To Comply With The Award (As Regards The Defect), The Contractor Refuses Continuously To Do So In Fact</u>

124.   In response to SOLIDERE's July 23, 2004 letter asking the Contractor to implement the Award, the Contractor acknowledged its responsibility to do so by letter dated July 30, 2004:

> "We are mindful of our obligation under the tribunal's Award to prepare and propose a plan to determine compliance with the parameters set forth in TC Table 3.1 and to remedy any defects in connection with gas emissions.  We are actively working to prepare such a plan and expect that we shall submit it to you by the end of August."[120]

---

[117]   Award, Section 12.1 at p. 99, **Exh. C 129**.

[118]   Award, Sections 11.5 at p. 95, 11.6 at p. 95, and 11.12 at pp. 97-98, **Exh. C 129**.

[119]   *See* letter dated July 23, 2004 from SOLIDERE to URS/Radian, **Exh. C 133**.

[120]   Letter dated July 30, 2004 from Radian to SOLIDERE, **Exh. C 134**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

### (a)    The Non-Compliant September 29, 2004 Proposal

125.    The Contractor did not submit its first "plan showing how Radian propose that the Works will be completed so as to comply with the Contract",[121] required by the Award, until September 29, 2004.[122]

126.    The proposal itself was non-compliant with the Award and the Contract, as notified to the Contractor by a letter dated October 27, 2004 from the CM.[123]  In that letter, the CM listed eleven areas of non-compliance, including:

(i)     the proposal did not state what "action [...] the Contractor proposes to take at no cost to the Employer to remedy [...] [the] defect" pursuant to the Contract and the Award;

(ii)    the proposal reduced the scope of remediation to the so-called "unsaturated zone" of the Site, although about 80% of the backfilled materials is located in the "saturated zone" and although the Contract requires remediation to the seabed (*see* TC Section 3.0, item 1); and

(iii)   the proposed Detailed Programme set a lengthy and indefinite Completion time, providing for activities with uncertain durations and a Completion Date of July 2008.[124]

---

[121]    Award, Section 12.1 at p. 99, **Exh. C 129.**

[122]    *See* letter dated September 29, 2004 from Radian to SOLIDERE attaching "Normandy Landfill, Beirut – Proposed Measurement and Treatment Approaches for Final Site Quality (FSQ) Criteria" and a purported Detailed Programme, **Exh. C 139.**

[123]    *See* letter dated October 27, 2004 from the CM to URS/Radian, **Exh. C 142.**

[124]    *See* letter dated October 27, 2004 from the CM to URS/Radian, **Exh. C 142.**  The remaining eight areas of non-compliance are that the proposal: set forth "measurement approaches" and treatment methods without providing the Employer a "plan showing how Radian propose that the Works will be completed so as to comply with the Contract" as required by the Award; failed to acknowledge the existence of a failure or defect in the Works; ignored the express finding of the Award regarding the appropriate methodology of testing  FSQ compliance; proposed deletion and/or alteration of the FSQs; qualified the timing and success of its proposal although the Contract and Award require unqualified remediation of the effect "at no cost to SOLIDERE"; reintroduced "measurement approaches" that it had advanced in the arbitration and that the

(continued...)

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

127.  In its response, by letter dated November 3, 2004, the Contractor alleged that the CM's rejection of its (non-compliant) proposal constituted a breach of the Contract, and engaged in a lengthy justification of its position.[125]  The CM refuted the Contractor's allegations by letter dated November 12, 2004.[126]

128.  Given the Contractor's unwillingness to provide a compliant plan, Dr. Nasser Chammaa, Chairman of SOLIDERE, and Mr. Thomas Bishop, URS Vice-President and Radian Senior Vice-President, agreed that the parties would meet in Beirut on December 16, 2004 to explore ways of moving forward.[127]  Mr. William Hadaya, a "Senior Vice President" and "Office Manager" with URS, attended and helped to organize this meeting.[128]  At the meeting, SOLIDERE agreed, as a gesture of good faith and although this should have been totally unnecessary, to make its independent experts (Dr. Geoffrey Card and Professor James White) available to the Contractor to assist it in devising a remediation plan that would comply with the Contract and with the Award.

### (b)    The Non-Compliant August 2, 2005 Task Plan

129.  On August 2, 2005, the Contractor provided SOLIDERE with a second proposal or plan in purported compliance with the Award and the Contract.[129]  The proposal or plan was presented as being the first of a series of deliverables (the Task Plan) that, all together, were supposed to assure SOLIDERE that the Contractor would meet the requirements of the Contract and the Award.

---

(...continued)

Award implicitly rejected; included a programme that contained illogically linked activities and that was not resource-loaded, and therefore, was not a Detailed Programme as required by GC 21.

[125]  *See* letter dated November 3, 2004 from Radian to the CM, **Exh. C 144**.

[126]  *See* letter dated November 12, 2004 from the CM to URS/Radian, **Exh. C 145**.

[127]  *See* letter dated December 8, 2004 from Radian to the CM confirming the date of the meeting, **Exh. C 148**.

[128]  *See* business card of Mr. William M. Hadaya, PE, **Exh. C 5** and letter dated August 23, 2005 from SOLIDERE to URS (*see* second paragraph), **Exh. C 157**.

[129]  *See* "Proposed Measurement and Treatment Approaches for Achievement of Final Site Quality Criteria: Deliverable 1 – Task Plan" dated August 2, 2005, enclosed in letter dated August 2, 2005 from Radian to SOLIDERE, **Exh. C 155**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

130.    The new plan, again, did not comply with the Contract or the Award, did not reflect the discussions between the parties' experts and gave rise to a number of issues which SOLIDERE set out in a letter dated August 18, 2005 to the Contractor.[130] Pursuant to the same letter, SOLIDERE rejected the purported task plan.

(c)    **The Non-Compliant August 29, 2005 Task Plan**

131.    By letter dated August 26, 2005, the Contractor formally submitted an amended task plan (dated August 29, 2005).[131]

132.    In a letter and detailed table of comments dated September 23, 2005, SOLIDERE rejected the new proposed plan as non-compliant with the Award and the Contract.[132] SOLIDERE was obliged to repeat many of its previous objections, including but not limited to the following:

(i)    the proposal was at best unclear as to the Contractor's commitment to achieve the FSQs;

(ii)    the Contractor refused to provide any time frame for achieving the FSQs;

(iii)    the proposal reduced or eliminated the Contractor's remediation obligations in relation to the so-called "saturated zone" of the Site, which comprises roughly 80% of the backfilled material.

5.    **The Contractor Stops All Further Work Under False Pretexts**

133.    By letter dated February 18, 2005, the Contractor notified SOLIDERE of an alleged event of *force majeure* due to security concerns attending the assassination in Beirut of

---

[130]    Letter dated August 18, 2005 from SOLIDERE to URS/Radian, **Exh. C 156.**

[131]    *See* "Proposed Measurement and Treatment Approaches for Achievement of Final Site Quality Criteria: Deliverable 1 – Task Plan dated August 29, 2005" (**"August 29, 2005 Task Plan"**) enclosed in letter dated August 26, 2005, **Exh. C 159.**

[132]    *See* letter dated September 23, 2005 from SOLIDERE to URS/Radian, **Exh. C 161.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

former Prime Minister Rafik Hariri, causing the Contractor to "ceas[e] operations at the project site".[133]

134. By letter dated March 18, 2005, the CM acknowledged that operations were justifiably stopped for the three days of national mourning ordered by the Government of Lebanon: February 15, 16, and 17, 2005.[134]  In that letter, the CM noted that the event of *force majeure* ended at midnight on February 17, 2005.  The CM instructed the Contractor to resume work immediately considering that, among other things, work had resumed at construction sites closer to the place of assassination than the Site.  The CM reiterated its instruction to the Contractor in subsequent correspondence.[135]

135. The Contractor refused to resume work, relying on the allegedly continuing event of *force majeure* in the form of security issues created by the assassination of the former Prime Minister.[136]

136. By letter dated August 24, 2005, SOLIDERE notified the Contractor of a further Event of Default pursuant to GC 35.2,[137] for stopping work beyond the three days of national mourning (the "**Fourth Notice**").[138]  However, the Contractor has never resumed work.

137. It is noteworthy that, on at least two occasions, the Contractor has itself acknowledged the spurious nature of its claim of continuing *force majeure*.  It recognized that some activities could begin <u>immediately</u> at the Site, contrary to its claim that it was unable to resume work:

---

[133]    *See* letter dated February 18, 2005 from Radian to SOLIDERE, **Exh. C 149.**

[134]    *See* letter dated March 18, 2005 from the CM to URS/Radian, **Exh. C 150.**

[135]    *See* letter dated April 13, 2005 from the CM to URS/Radian, **Exh. C 152**; letter dated June 22, 2005 from the CM to URS/Radian, **Exh. C 153.**

[136]    Letter dated March 24, 2005 from Radian to the CM, **Exh. C 151.**

[137]    The Contract, GC 35.2, **Exh. C 19.**

[138]    *See* letter dated August 24, 2005 from the CM to URS/Radian, **Exh. C 158.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

(i)    the Contractor listed remediation activities that could begin immediately in the Detailed Programme attached to its August 29, 2005 Task Plan;[139] and

(ii)    by letter dated December 7, 2005, the Contractor proposed to begin work immediately on the Site by commencing Site evaluation activities.[140]

### 6.    SOLIDERE's Final Attempt To Induce The Contractor To Comply With The Contract and The Award

138.    In a final attempt to determine whether there was any possibility that the Contractor would comply with the Contract and the Award, and without abandoning its other concerns, SOLIDERE asked the Contractor to clearly address:

(i)    the need for remediation Works to achieve the FSQs throughout the Site;

(ii)    specifically, the need to monitor compliance with the FSQs in the so-called "saturated zone" to ensure that the entire Site is FSQ compliant as required by the Contract; and

(iii)    the Contractor's failure to propose schedules with acceptable timelines and with a clear and proximate Completion date, in accordance with its agreement that time is of the essence.[141]

139.    The Contractor responded by letter dated December 7, 2005 but failed to provide SOLIDERE with any commitment responsive to these three concerns.[142] By a detailed letter dated January 12, 2006, SOLIDERE's Chairman, Dr. Chammaa, responded to the Contractor by expressing his great disappointment at the Contractor's general strategy of

---

[139]    In a letter dated September 28, 2005 from the CM to URS/Radian, **Exh. C 163**, the CM noted that, in the programme attached to its August 29, 2005 Task Plan, **Exh. C 159**, (a) excavation, hauling and other activities related to Sections 6, 7, and 8, were scheduled to start immediately, and (b) activities related to resorting and pelletizing of plastics were also scheduled to begin immediately.

[140]    *See* letter dated December 7, 2005 from Radian to SOLIDERE, **Exh. C 170.**

[141]    *See* letter dated November 25, 2005 from SOLIDERE to URS/Radian, **Exh. C 169.**

[142]    *See* letter dated December 7, 2005 from Radian to SOLIDERE, **Exh. C 170.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

evasion and obfuscation and refusal to comply with its obligations under the Contract and the Award.[143]

140.    In the face of the Contractor's systematic refusal to implement the Contract and the Award, by three letters dated January 12, 2006, SOLIDERE notified the Contractor of the following further Events of Default pursuant to GC 35.2:

(i)      failure to submit a "plan showing how [the Contractor] propose[s] that the Works will be completed so as to comply with the Contract" promptly following the issuance of the Award, which put the Contractor in breach of obligations under the Contract including, but not limited to, Article 28(6) of the ICC Rules (incorporated into the Contract by GC 44), GC 23.10, Agreement Article 5, GC 21.10, GC 22.2, and GC 5.1(iv) and (v) ("**Sixth Notice**");[144]

(ii)     the Contractor's failure to diligently pursue the performance of the Contract, which put it in breach of its obligations under the Contract, including but not limited to, Article 28(6) of the ICC Rules (incorporated into the Contract by GC 44), Agreement Article 5, GC 21.10, GC 22.2, and GC 5.1(iv) and (v) ("**Seventh Notice**");[145] and

(iii)    the Contractor's refusal to give SOLIDERE any commitment as to the timing of the Completion of the Works, which put it in breach of its obligations under the Contract, including but not limited to, Agreement Article 5, GC 21.10, GC 22.2, and GC 5.1(iv), (v), and (vi) ("**Eighth Notice**").[146]

---

[143]    *See* letter dated January 12, 2006 from SOLIDERE to URS/Radian, **Exh. C 173**.

[144]    *See* letter dated January 12, 2006 from SOLIDERE to URS/Radian, **Exh. C 174**. The fifth Notice of an Event of Default was sent to the Contractor pursuant to a letter dated November 15, 2005, as a consequence of the Contractor's failure to maintain insurance as required by the Contract, *see* letter dated November 15, 2005 from SOLIDERE to URS/Radian (the "**Fifth Notice**"), **Exh. C 168**.

[145]    *See* letter dated January 12, 2006 from SOLIDERE to URS/Radian, **Exh. C 175**.

[146]    *See* letter dated January 12, 2006 from SOLIDERE to URS/Radian, **Exh. C 176**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

###### 7.    As A Result Of The Contractor's Numerous Defaults, SOLIDERE Terminates The Contract

141.    In summary, SOLIDERE had on eight occasions notified the Contractor of the occurrence of Events of Default:

1.    the Contractor's failure to submit a revised Detailed Programme, notified to the Contractor by the CM's letter dated March 30, 2004 ("**First Notice**");[147]

2.    the Contractor's failure to Complete the Works within the Time for Completion, notified to the Contractor by the CM's letter dated April 15, 2004 ("**Second Notice**");[148]

3.    the existence of a defect, as held by the Award, notified to the Contractor by SOLIDERE's letter dated July 23, 2004 ("**Third Notice**");[149]

4.    the Contractor's unjustified decision to stop execution of the Works, notified to it by the CM's letter dated August 24, 2005 ("**Fourth Notice**");[150]

5.    the Contractor's failure to maintain the insurance required by the Contract, notified to the Contractor by SOLIDERE's letter dated November 15, 2005 ("**Fifth Notice**");[151]

6.    the Contractor's failure to submit "a plan showing how [the Contractor] propose[s] that the Works will be completed so as to comply with the Contract"

---

[147]    Letter dated March 30, 2004 from the CM to URS/Radian, **Exh. C 120**; *see, supra*, footnote 106.

[148]    Letter dated April 15, 2004 from the CM to Radian, **Exh. C 121**; *see, supra*, Section II.C.2(e).

[149]    Letter dated July 23, 2004 from SOLIDERE to URS/Radian, **Exh. C 133**; *see, supra*, Section II.C.3.

[150]    Letter dated August 24, 2005 from the CM to URS/Radian, **Exh. C 158**; *see, supra*, Section II.C.5.

[151]    Letter dated November 15, 2005 from SOLIDERE to URS/Radian, **Exh. C 168**; *see, supra*, footnote 144.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

promptly following the issuance of the Award, notified to the Contractor by SOLIDERE's letter dated January 12, 2006 ("**Sixth Notice**"); [152]

7.    the Contractor's failure to diligently pursue the performance of the Contract, notified to the Contractor by SOLIDERE's letter dated January 12, 2006 ("**Seventh Notice**");[153] and

8.    the Contractor's refusal to give SOLIDERE any commitment as to the timing of the Completion of the Works, notified to the Contractor by SOLIDERE's letter dated January 12, 2006 ("**Eighth Notice**").[154]

142.   By letter dated October 14, 2005, the Employer reiterated the first four Notices of Events of Default, as the Contractor had failed to cure any of these Events of Default.[155]

143.   The Contractor has not cured its failure to maintain insurance (Fifth Notice), as explained in the CM's letters dated January 9, 2006[156] and February 1, 2006.[157]

144.   The Contractor responded to the Sixth, Seventh and Eighth Notices of Events of Default (dated January 12, 2006) by a letter dated January 20, 2006, in which it did not propose to cure the defaults.[158]   Instead, it reiterated all of its previous arguments made in correspondence, and informed SOLIDERE that it had decided to refer to arbitration the parties' dispute as to the compliance with the Contract and the Award of the Contractor's purported remediation plan.[159]

---

[152]   Letter dated January 12, 2006 from SOLIDERE to URS/Radian, **Exh. C 174**; *see, supra*, Section II.C.6.

[153]   Letter dated January 12, 2006 from SOLIDERE to URS/Radian, **Exh. C 175**; *see, supra*, Section II.C.6.

[154]   Letter dated January 12, 2006 from SOLIDERE to URS/Radian, **Exh. C 176**; *see, supra*, Section II.C.6.

[155]   *See* letter dated October 14, 2005 from SOLIDERE to URS/Radian, **Exh. C 166**.

[156]   *See* letter dated January 9, 2006 from the CM to URS/Radian, **Exh. C 172**.

[157]   *See* letter dated February 1, 2006 from the CM to URS/Radian, **Exh. C 185**.

[158]   *See* letter dated January 20, 2006 from Radian to SOLIDERE, **Exh. C 178**.

[159]   *See* letter dated January 20, 2006 from Radian to SOLIDERE, **Exh. C 178**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

145.  By letter dated January 25, 2006[160] the ICC Secretariat acknowledged receipt of Radian's Request for Arbitration, dated January 20, 2006[161] and registered the reference under number No. 14208/EC (previously defined as "Arbitration III").

146.  In this new arbitration, Radian seeks, among other relief, a declaration that it is economically and contractually relieved from the "burdens of meeting the FSQs and implementing any remediation and site completion plan".[162]

147.  As indicated above, SOLIDERE could have terminated the Contract in 2004 following issuance of any of the first three notices of Events of Default.  However SOLIDERE, in good faith, examined each of the Contractor's plans in detail.  Only when it became absolutely clear to SOLIDERE that there was no hope that the Contractor would perform its obligations under the Contract and the Award, did SOLIDERE terminate the Contract, pursuant to GC 35.2,[163] by a letter dated February 10, 2006.[164]

-oo0oo-

---

[160]  *See* letter dated January 25, 2006 from ICC Secretariat (attachment omitted), **Exh. C 181**.
[161]  *See* Radian's Request for Arbitration dated January 20, 2006, **Exh. C 180**.
[162]  Radian's Request for Arbitration dated January 20, 2006, pp. 24-5, ¶ 10.1(d), **Exh. C 180**.
[163]  The Contract, GC 35.2, **Exh. C 19**.
[164]  *See* letter dated February 10, 2006 from SOLIDERE to URS/Radian, **Exh. C 186**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

### III.    URS IS A PROPER PARTY TO THIS ARBITRATION

148.    As stated above,[165] the Contract was signed by Radian on January 25, 1999.

149.    Shortly thereafter, in June 1999, Radian was acquired by URS.   Following this acquisition, URS took over all of Radian's operations and stripped it of any autonomous existence – Radian seems to exist on paper only.   In the context of the Project, URS effectively took over and directly performed the Contract.

150.    SOLIDERE will demonstrate in these proceedings that the facts presented in this Section (to be further developed in the course of this arbitration) will justify a declaration that URS is bound by the Contract, including its arbitration clause, pursuant to any one or more of the following non-exhaustive list of legal doctrines:

-       URS's implied consent to the Contract, including its arbitration clause, resulting from its taking over of the Contract;

-       estoppel;

-       implied assignment;

-       piercing the corporate veil between URS and Radian; and/or

-       alter ego / confusion.

### A.       RADIAN APPEARS TO EXIST ONLY ON PAPER

151.    Following URS's takeover of Radian, Radian no longer has an independent functional existence, having been completely subsumed into URS.   As is shown in detail below, Radian has gradually ceased all activities and has been operationally combined into URS.

---

[165]    *See, supra*, Section I.B.

-46-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

152. Radian's lack of independence can be seen by URS's complete ownership of Radian (Subsection 1), Radian's lack of independent office space, telephone or facsimile number (Subsection 2), URS's receipt and payment of money for Radian (Subsection 3), the URS employment of Radian employees (Subsection 4) and URS's advertising of Radian as being the same entity as URS (Subsection 5).

### 1. In June 1999 URS Acquired Radian Which Is Now A Wholly-Owned Subsidiary Of URS

153. On July 31, 1998, the "Dames & Moore Group", an engineering, consulting and construction management service provider,[166] "acquired all of the membership interests of Radian International LLC"[167] for US$ 117 million,[168] as a result of which Radian became a wholly-owned subsidiary of the "Dames & Moore Group".

154. In June 1999 – i.e., less than six months after SOLIDERE and Radian International LLC signed the Contract – the "Dames & Moore Group" was acquired by URS.[169] As a result of that acquisition, Radian became a wholly-owned subsidiary of URS.[170]

155. As is shown in detail below, Radian has gradually ceased all independent activities and has been operationally merged into URS.

---

[166]  See Form 10-K filed with the SEC for the fiscal year ended October 31, 2003 (excerpt only), at p. 11, **Exh. C 106.**

[167]  See Form 8-K filed by Dames & Moore with the SEC on July 31, 1998, at p. 2 (excerpt only), **Exh. C 18.** Radian was incorporated in Delaware in January 1996 as a joint venture between The Dow Chemical Company and the Hartford Steam Boiler Inspection and Insurance Company, see Form 10-Q filed by The Dow Chemical Company with the SEC on March 31, 1996, at p. 10 (excerpt only), **Exh. C 17.** Hartford ceased to be a shareholder of Radian in January 1998. See Form 10-K filed by The Dow Chemical Company with the SEC on December 31, 1999, at p. 48 (excerpt only), **Exh. C 26.**

[168]  See Form 8-K filed by Dames & Moore with the SEC on July 31, 1998, at p. 2 (excerpt only), **Exh. C 18.**

[169]  See Form 10-K filed by URS with the SEC for the fiscal year ended October 31, 2003 (excerpt only), **Exh. C 106.** The acquisition was for approximately US$ 300 million in cash in addition to the assumption of approximately US$ 300 million of debt, for a total price of US$ 600 million. See Form 8-K filed by Dames & Moore with the SEC on May 5, 1999, at p. 50 (excerpt only), **Exh. C 22.**

[170]  See Form 10-Q filed by URS with the SEC for the quarterly period ended July 31, 2004 (excerpt only) at p. 16, **Exh. C 135.** Radian is also listed as a domestic subsidiary in URS's Form 10-K filed with the SEC for the fiscal year ended October 31, 2003 (excerpt only), **Exh. C 106.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

### 2. Radian No Longer Has Its Own Office Space, Telephone Number Or Facsimile Number

156. Following its acquisition by URS, Radian's offices were progressively either shut down or transferred to URS, leaving Radian with no office space, address, telephone, or facsimile number of its own.

#### (a) Address

157. Radian has listed offices at the same address as URS, at 600 Montgomery Street in San Francisco, California.[171] This is Radian's last known address. In 2003, both Radian and URS listed the 25th floor as their business address.[172] However, by January 22, 2004, URS had changed its principal executive office to the 26th floor of the same address.[173]

158. Upon a visit to 600 Montgomery Street, San Francisco, California, one is advised by the building/security personnel that no company named "Radian International LLC" resides in the building but that URS does reside in the building.[174]

159. URS's and Radian's official addresses before moving to 600 Montgomery Street were also the same: the fifth floor of 100 California Street, Suite 500, San Francisco, California.[175]

---

[171]  *See* California Limited Liability Company Statement of Information filed by Radian with the California Secretary of State's office on December 22, 2003, **Exh. C 116.**

[172]  *See* Form 8-K filed by URS Corporation with the SEC on October 3, 2003 (excerpt only), **Exh. C 107.**

[173]  *See* Form 8-K filed by URS Corporation with the SEC on January 22, 2004 (excerpt only), **Exh. C 117.**

[174]  *See* Memorandum dated January 18, 2006, from John Kline (Legal Assistant, White & Case LLP), to Charles Nairac (White & Case LLP), **Exh. C 177.**

[175]  *See* Form 10-K filed by URS with the SEC for the fiscal year ended October 31, 2002 (excerpt only) (listing URS's address as "100 California Street, Suite 500, San Francisco, California 94111"), **Exh. C 80;** Power of Attorney dated December 2, 2003, granted by Radian to Mayer, Brown, Rowe & Maw LLP, Herbert Smith and Mr. Adrian Williamson Q.C. (giving Radian's address as "100 California Street, 5th Floor, San Francisco, California"), enclosed in letter dated December 8, 2003, **Exh. C 111.** URS apparently changed its address from this address to 600 Montgomery Street at some time between October 31, 2002 and October 31, 2003. In its Form 10-K filed with the SEC for the fiscal year ended October 31, 2003 (excerpt only), URS listed its address as 600 Montgomery Street, 26th Floor, San Francisco, CA 94111, **Exh. C 106.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

### (b)    Telephone And Facsimile Numbers

160.    By letter dated April 16, 2004, the Contractor formally notified SOLIDERE of the address to which correspondence should be sent pursuant to Article 7.1 of the Agreement. It also included a facsimile number: "Fax Number: +1 415 986 7379".[176]  According to an information service available on the Internet, this number is registered to URS, at 600 Montgomery Street.[177]    Thus, "Radian" uses URS's facsimile number.    "Radian" frequently sends its correspondence by facsimile to SOLIDERE from URS's offices, as evidenced in facsimile lines indicating that the facsimile was sent: "From: URS", "From – URS" or "From – URS Corporation".[178]

161.    As of today, there are only four telephone numbers and addresses listed for Radian nationwide on the U.S. yellow pages website.[179]  Of these:

(i)    two numbers lead to URS mailboxes;

(ii)    one number led to a generic answering machine; and

(iii)    one number led to various tones similar to those of a fax line.[180]

162.    Thus, nowhere in the United States does a Radian receptionist answer a telephone.  On the contrary, URS has appropriated Radian's previously attributed telephone numbers and addresses, when these have not been abandoned altogether.

---

[176]    Letter dated April 16, 2004 from Radian to SOLIDERE, **Exh. C 122.**

[177]    *See* http://find.intelius.com search dated January 20, 2006, **Exh. C 179.**

[178]    *See, e.g.,* undated letter transmitted on November 21, 2003 from Radian to SOLIDERE, **Exh. C 108;** letter dated September 16, 2004 from Radian to SOLIDERE, **Exh. C 138;** letter dated July 14, 2005 from Radian to SOLIDERE, **Exh. C 154;** letter dated September 28, 2005 from Radian to SOLIDERE, **Exh. C 162;** letter dated October 12, 2005 from Radian to SOLIDERE, **Exh. C 165;** letter dated November 7, 2005 from Radian to SOLIDERE, **Exh. C 167.**

[179]    *See* search dated January 26, 2006 for "Radian International LLC" on the US yellow pages website, **Exh. C 183.**

[180]    Memorandum dated January 26, 2006 from Jacqueline Silva Sánchez (Legal Assistant, White & Case LLP) to Charles Nairac (White & Case LLP), **Exh. C 182.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

### 3.    URS Receives And Pays Money For Radian

163.    URS informs Radian's debtors, to the extent that any still exist, that:

> "[its] agreement with the financial institution of Mellon Bank is to accept receipts addressed to Radian International LLC."[181]

All monies owed to Radian are thus payable to URS instead of Radian.

164.    As discussed below in the context of URS's involvement in the Project, following its acquisition of Radian, URS also appears to have been responsible for at least some of the payments and receipts in connection with the Project.[182]

### 4.    Radian's Employees Are Transferred to URS

165.    As discussed in detail below,[183] the employment of all the key Radian employees involved in the Project was transferred to URS, following its acquisition of Radian.

166.    According to the Form 10-Q filed with the SEC by URS on June 14, 2004, URS has acquired Radian's pension plans "cover[ing] a selected group of Radian employees [...]".[184]

167.    Construction industry publications recognize the transfer of Radian employees to URS. One such publication states:

> "The Salt Lake City office of San Francisco-based engineering and design firm URS has [sic] was founded in 1999 and includes employees from the

---

[181]    Undated certificate from Ms. Aletha M. Church, Cash Application Manager of URS Corporation, **Exh. C 9**.

[182]    See, *infra*, Section III.B.3(d).

[183]    See, *infra*, Section III.B.3(a).

[184]    See Form 10-Q filed by URS with the SEC for the quarterly period ended July 31, 2004 (excerpt only) at p. 19, **Exh. C 136**. *See also* Form 10-K filed by URS with the SEC for the fiscal year ended October 31, 2004, p. 85 (excerpt only), **Exh. C 143**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

former URS Greiner Woodward Clyde, Dames & Moore, Radian
International, BRW, and Rogers and Associates".[185]

### 5.    URS No Longer Advertises Radian As A Separate Entity

168.    URS no longer advertises Radian as a discrete entity but instead as "URS Radian", "URS
Radian International", or even "URS Group (formally Radian International, LLC)".[186]
Indeed, an article published online in the Austin Business Journal on May 1, 2000
revealed that "URS Radian" would eventually drop the name "Radian" altogether and be
known simply as "URS".[187]

169.    Radian no longer maintains a website on the Internet.  Much of the correspondence on
"URS Radian" letterhead showing Radian's postal address in Beirut also lists
"www.ursccorp.com" as the company's website.[188]

*        *        *

170.    Radian thus appears to exist only on paper which justifies, in this case, in conformity
with applicable legal doctrine, the treatment of URS as a proper party to the Contract,
including its arbitration clause.  This conclusion is only reinforced by URS's direct
involvement in the Project, as shown in the following Section.

---

[185]    "URS Salt Lake City Location offers multiple services; Environmental Projects Main Focus but Expansion
Planned", Intermountain Contractor, October 1, 2005, p. 37, **Exh. C 164**.

[186]    *See* examples of articles published on the Internet concerning projects undertaken by "URS Radian",
URS Group (formally Radian International, LLC (Austin))" or "URS Radian International", **Exhs. C 6, 10,
11, 52**. Note that these names do not refer to any existing companies.

[187]    "*Radian in final talks on lease*" – Article published online in the Austin Business Journal on May 1, 2000
(print edition published on April 28, 2000), **Exh. C 29**.

[188]    *See, e.g.*, letter dated May 2, 2003 from Radian to SOLIDERE (attachment omitted), **Exh. C 94**; letter
dated September 16, 2004 from Radian to SOLIDERE, **Exh. C 138**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

**B.    FOLLOWING URS'S TAKE-OVER OF RADIAN, URS PERFORMED THE CONTRACT**

171.    Following the acquisition of Radian by URS in June 1999, the Contract was operationally transferred to URS.  This transfer is demonstrated by written statements following URS's acquisition of Radian (Subsection 1), URS's presentation of the Project as a URS undertaking (Subsection 2), the reality of URS's performance of the Contract (Subsection 3), URS's control over Arbitration I (Subsection 4), and URS's involvement in the purported implementation of the Award (Subsection 5).

**1.    URS's Written Statements Affirm Its Responsibility For The Project**

**(a)    The Change From Radian Letterhead To URS/Radian Letterhead And Initial Representations Concerning URS's Role**

172.    Following URS's acquisition of Radian, beginning on July 31, 2000, all correspondence that the Contractor submitted in connection with its performance of the Contract was on the letterhead of "$URS_{Radian}$" and provided the address of "Radian International, P.O. Box 11-1261, Beirut, Lebanon".[189]

173.    By letter dated September 19, 2000, SOLIDERE referred Radian to the change in its letterhead and requested to be officially informed of (i) any changes in Radian's ownership, (ii) any changes in the structure of the group of companies to which Radian belonged, and (iii) URS's identity and its relationship with Radian.[190]

174.    It was not until January 17, 2001 that the Contractor responded, by forwarding to SOLIDERE a certificate by URS's corporate counsel, Mr. John W. Rakow III.[191]  This

---

[189]    Compare, *e.g.*, the letter dated July 25, 2000 from Radian to the CM (Radian letterhead), **Exh. C 31**, with, *e.g.*, the letter dated July 31, 2000 from Radian to the CM (URS letterhead), **Exh. C 32**.

[190]    *See* SOLIDERE internal email dated September 19, 2000 from Mr. Walid Honein to Mr. Hisham Karameh *et al.*, enclosed in letter from the CM to Radian of the same day, **Exh. C 34**.

[191]    *See* letter dated January 17, 2001 from Radian to the CM, enclosing a letter dated January 16 from URS, 2001, **Exh. C 36**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

certificate is on the letterhead of "URS" and includes as a footer the address of "URS Corporation, Legal Department" in San Francisco.

175.  In the certificate, URS affirmed that URS had acquired Radian in June 1999, along with the other companies of the Dames & Moore Group and that, although Radian remained a separate subsidiary of URS, "all correspondence is now on URS Corporation letterhead".[192]

176.  This certificate also contained the following statement:

> "You will see no change in the manner in which <u>we</u> serve you or in <u>our</u> commitment to provide you with quality services.  All prior commitments, including your contract, will continue to be honored".  [Emphasis added]

177.  By this certificate, URS made an unambiguous representation to SOLIDERE that it considered itself <u>directly committed</u> to honor the Contract.

### (b)    URS's Nomination Of A New "Corporate Manager For The Normandy Landfill Project"

178.  URS's total control over and responsibility for the Project was further exemplified by a letter dated January 2, 2002 from Mr. Alan Krusi, Executive Vice-President of URS, to Dr. Chammaa, Chairman of SOLIDERE.[193]  Pursuant to this letter, Mr. Krusi notified Dr. Chammaa that he was assigning a <u>URS</u> Senior Vice President, Mr. Vladimir Khazak, to be the "Corporate Manager for the Normandy Landfill project".

179.  The letter is on the letterhead of "URS Construction Services" and includes the address of "URS Corporation" in Los Angeles at the bottom of each page.

---

[192]  Despite this official change in letterhead, the Contractor continued to occasionally use "Radian International LLC" letterhead, *see, e.g.,* letter dated April 8, 2003 from "Radian International LLC" to SOLIDERE, **Exh. C 91**.  After the Award dated July 12, 2004, the Contractor un-officially (without notification) appears to have reverted to "Radian International LLC" letterhead, *see, e.g.,* letter dated July 30, 2004 from "Radian International LLC" to SOLIDERE, **Exh. C 134**.

[193]  *See* letter dated January 2, 2002 from URS to SOLIDERE, **Exh. C 58**.

-53-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

180.    The body of the letter reads in relevant part as follows:

> "I wish to inform you and your project team that Mr. JB Holeman has
> retired and I have assigned Mr. Vladimir Khazak, Senior Vice President,
> to the position of Corporate Manager for the Normandy Landfill project.
> Mr. Khazak is a Group Manager in our Construction Services Division
> [...]   He is based in our Seattle, Washington office at the following
> address:
>
> URS Corporation
>
> [...]
>
> Mr. Amine Bou Onk, the Contractor's Representative, <u>will report directly
> to Mr. Khazak</u> [...]"  [Emphasis added]

181.    Thus:

    (i)    URS itself nominated the "Corporate Manager for the Normandy Landfill project";

    (ii)    that position was assigned to Mr. Khazak, a URS Vice President resident in URS's Seattle offices, without any apparent position with Radian; and

    (iii)    the Contractor's Representative, Mr. Bou Onk, was from then on to report directly and, apparently, solely to a URS Vice President, who became his immediate supervisor.[194]

182.    As detailed below, these written affirmations were consistent with URS's role in the performance of the Contract.

---

[194]    *See also* Bou Onk I at p. 10, ¶ 29, **Exh. C 102.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## 2.    URS Presents The Contract As A URS Undertaking

### (a)    URS's Website

183.    As of June 14, 2004, on its website, URS presented the Contract as a URS undertaking without any mention of Radian:

> "With the objective of restoring the area for future use, URS is undertaking the $53 million project to excavate, sort, treat, recycle, and backfill the entire landfill — estimated to be 5 million cubic meters of wastes, including solid waste, debris and unexploded ordnance".[195] [Emphasis added]

(It is to be noted that this section has subsequently, during the dispute with SOLIDERE, been taken off of URS's website.)

### (b)    URS's Address In Lebanon

184.    As of November 24, 2004, on the "office locations" page of one of its websites,[196] URS provided that it had an office in Beirut, as follows:

> "Lebanon
> Beirut
> URS Corporation
> c/o Normandy Landfill Site
> Eastern Entrance
> Beirut Central District
> Beirut
> Tel 961.1.983575
> Fax 961.1.983575"

185.    In 2001, Mr. Robert Legrand, one of the Contractor's senior engineers involved in the overall design of the remediation project, attended a meeting with SOLIDERE personnel at, as he described it, the "URS Beirut office".[197]

---

[195]    http://www.urscorp.com/whoweare/whatwedo/airwater/portfolio.html, accessed on June 14, 2004, **Exh. C 124.**

[196]    http://www.urs.com.au/office3.asp, accessed on November 24, 2004, **Exh. C 147.** (This web page is no longer available.)

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

186.    URS thus considered the Normandy Landfill office to be its own office in Beirut. Significantly, no mention was made of Radian.

### 3.    URS Treated Radian's Obligations Under The Contract As Its Own

187.    The Contract was performed by URS, who took over the Radian personnel, signed an amendment to the Contract and was represented as having prepared the reports and investigations submitted by Radian as part of the Works.

### (a)    URS's Personnel Responsible For Performance Of The Contract

188.    All the key personnel responsible for the Project were URS employees.

### (i)    Mr. Amine Bou Onk

189.    Mr. Amine Bou Onk, the Contractor's Project Manager since the beginning of the Works (prior to the take over by URS), described his position as follows in his witness statement in Arbitration I:

> "I am a Divisional Vice President of URS International LLC. I am also the General Manager of Radian International's Lebanon branch and the Project Manager of the Normandy Landfill Project, which I have been since it began in 1999 [...]"[198] [Emphasis added]

### (ii)    Mr. Vladimir Khazak

190.    Mr. Vladimir Khazak was the "Corporate Manager for the Normandy Landfill Project", following his nomination by Mr. Alan Krusi, Executive Vice-President of URS.[199]

---

(...continued)

[197]    URS internal minutes of a meeting dated August 21, 2001, held at the "URS Beirut office" entitled "Technical Discussion about Composting with Tony Ellis and Stewart Walker", **Exh. C 50.** Note, further, that the representatives of the Contractor are described as belonging to "URS".

[198]    Bou Onk I at p. 1, ¶ 1, **Exh. C 102.** Note that in the list of subsidiaries that appears in the Form 10-K filed by URS Corporation with the SEC for the fiscal year ended October 31, 2003 (excerpt only), **Exh. C 106,** there are no subsidiaries listed under the name "URS International LLC".

[199]    *See* letter dated January 2, 2002 from URS to SOLIDERE, **Exh. C 58.**

-56-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

191.    Mr. Khazak, a Senior Vice President of URS, was a Group Manager in URS's Construction Services Division, based in Seattle, Washington.[200]    His business card presents him as "Senior Vice President, Regional Manager" with URS Construction Services.[201]

(iii)    Mr. Thomas Bishop

192.    On April 16, 2004 Radian gave notice to SOLIDERE pursuant to Article 7.1 of the Agreement that all formal notices should be sent to Radian at:

> "600 Montgomery Street
> 25th Floor
> San Francisco, CA 94111-2727
> United States of America
>
> Attention: Mr. Tom Bishop
> Fax Number: + 1 415 986 7379".[202] [Emphasis added]

193.    Mr. Bishop has served as URS's Vice President, Strategy, since July 2003 and as URS's Senior Vice President, Construction Services Division, since March 2002.[203]  Mr. Bishop also signs some of his correspondence on "Radian International, L.L.C." letterhead under the title "Senior Vice President",[204] but he does not appear to have a Radian email address and lists his email contact information as: tom_bishop@urscorp.com.[205]

---

[200]    Letter dated January 2, 2002 from URS to SOLIDERE, **Exh. C 58.**

[201]    Business card of Mr. Vladimir Khazak, **Exh. C 3.**

[202]    Letter dated April 16, 2004 from Radian to SOLIDERE, **Exh. C 122.** The 25th floor was at the time the exact mailing address of URS.    The facsimile number noted also belongs to URS.    *See* http://www.find.intelius.com, search dated January 20, 2006, **Exh. C 179.**

[203]    *See* "Prospectus Supplement (to Prospectus dated March 1, 2004)" at p. S-51 (excerpt only), **Exh. C 119.**

[204]    *See, e.g.,* letter dated April 8, 2003 from Radian to SOLIDERE, **Exh. C 91.**

[205]    Letter dated November 18, 2004 from Radian to SOLIDERE, **Exh. C 146.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

194.    Mr. Bishop's business card presents him as "Senior Vice President, Construction
Services" for URS Corporation, 600 Montgomery Street, 26th Floor, San Francisco.[206]

(iv)    Mr. Bart Eklund

195.    Like Mr. Bou Onk, Mr. Bart Eklund, who was responsible for measuring gas emissions at
the Normandy Landfill and providing specialist advice in that capacity, became a URS
employee following URS's acquisition of Radian.    In his witness statement in
Arbitration I, Mr. Eklund described his employment status as follows:

> "I was first involved in the Normandy project at the proposal stage in
> 1997-1998.  I contributed to Radian's proposal at that time, and I am
> identified in the Technical and Management Proposal as the person at
> Radian responsible for air monitoring".[207]

> "I am [at present] a Principal Scientist employed by the URS Corporation,
> a position I have held since 1999".[208]

(v)    Mr. Robert Legrand

196.    Like Mr. Bou Onk and Mr. Eklund, Mr. Robert Legrand, who was involved in the overall
design of the remediation concept for the Normandy Landfill, became a URS employee
following URS's acquisition of Radian.    In his witness statement in Arbitration I,
Mr. Legrand described his change in employment status as follows:

> "I am a Senior Engineer employed by the URS Corporation, based in
> Austin, Texas.  I joined Radian Corporation (as it used to be called) in
> 1991.  After a series of corporate changes, Radian became part of the URS
> Corporation in 1999.  My employment changed from Radian to URS
> [...]"[209] [Emphasis added]

---

[206]    Business card of Mr. Thomas W. Bishop, PE, **Exh. C 4.**

[207]    Witness Statement of Mr. Bart Eklund in Arbitration I, dated October 10, 2003 ("**Eklund I**") at p. 2, ¶ 9,
**Exh. C 99.**

[208]    Eklund I at p. 1, ¶ 1, **Exh. C 99.**

[209]    Witness Statement of Mr. Robert Legrand in Arbitration I, dated October 14, 2003 ("**Legrand I**"), at p. 1,
¶ 1, **Exh. C 103.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

197. URS's correspondence explicitly confirmed that Mr. Legrand was a URS employee,[210] and his business card presents him as a "Senior Engineer" with "URS Corporation".[211] Mr. Legrand's curriculum vitae, included in a report sent to SOLIDERE, states that he has been a "Senior Engineer", with "URS Corporation, Austin, Texas, 1991-Present".[212] His curriculum vitae includes a description of the Project, with no mention of Radian.

198. It was thus in his capacity as a URS employee that he undertook his duties in regard to the Project.

(vi)    Mr. James Pratt

199. In his curriculum vitae, Mr. James Pratt describes himself as the Quality Control Manager for the Normandy Landfill Project. He states his employer to be "URS Corporation".[213]

200. He describes himself elsewhere as a "URS QCM" (Quality Control Manager).[214]

(vii)    The Contractor's Presentation Of Its "Field Project Execution Management Team"

201. By letter dated January 30, 2004, Radian officially provided the CM with a list of members of its "Project Execution Management Team".[215] The first two positions in this team were occupied by Mr. Robert Legrand and Mr. Bart Eklund. As seen above, both

---

[210]    *See, e.g.,* letter dated December 12, 2002 from Radian to the CM, **Exh. C 85.**

[211]    Business card of Mr. Robert Legrand, PE, **Exh. C 2.**

[212]    *See* curriculum vitae of Mr. Robert Legrand, submitted as Annexure 1 to his Witness Statement dated October 14, 2003 in Arbitration I, **Exh. C 7.**

[213]    *See* curriculum vitae of Mr. James Pratt, submitted as Annexure 1 to his Witness Statement dated October 14, 2003 in Arbitration I, describing his position in URS Corporation as: "Quality Control Manager for reclamation of 6.5 million cubic yard uncontrolled municipal waste and construction debris dump (55 acres) on the coast of downtown Beirut, Lebanon", **Exh. C 8.**

[214]    *See* Appendix B to "Quality Assurance Audit Report NL0210" conducted on September 24-26, 2002 (excerpt only), enclosed in a letter dated December 4, 2002 from Radian to the CM, **Exh. C 84.** The document also shows that other members of the Quality Control team considered themselves as URS employees.

[215]    *See* letter dated January 30, 2004 from Radian to the CM, **Exh. C 118.**

-59-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

Mr. Legrand and Mr. Eklund were URS employees.  The Contractor's letter identifies other team members who have also been identified as URS employees.[216]

### (b)    URS's Senior Management's Variation Of The Contract Terms

202.    Contract Change Order No. 2, pursuant to which the parties amended the Contract to increase the Contract Price, was executed on behalf of Radian by Mr. Vladimir Khazak, the URS-appointed Corporate Manager for the Project and a URS Senior Vice President.[217]

### (c)    URS's Reports And Investigations Demonstrate URS's Operational Responsibility For The Project

#### (i)    Reports Prepared As Part Of The Works

203.    Following URS's takeover of Radian, reports that were required to be prepared and issued by the Contractor under the Contract were prepared and issued by URS.

204.    For example, the Contractor's "Quality Assurance Audit Report" dated September 24-26, 2002, underscored URS's involvement in the Project:[218]

(i)    the report contains a "URS Corporation" header on the title page;

---

[216]    The four other team members identified in the Contractor's cover letter were Messrs. Hugh Notz, Don Burrows, Gary Beswick and Alberto Cuenca.  **Mr. Hugh Notz:** *see, e.g.,* email dated June 30, 2000 from Mr. Notz to Mr. Bou Onk, in which Mr. Notz communicated from a URS email address, and enclosed facsimile from Mr. Notz to Mr. Bou Onk dated June 30, 2000, in which Mr. Notz used URS letterhead for his facsimile, **Exh. C 30.**  **Mr. Don Burrows:**  Mr. Burrows was listed as URS's Senior Scientist in attendance at a URS internal auditing meeting, *see* letter dated December 4, 2002 from Radian enclosing URS's Quality Assurance Audit Report NL0210 conducted on September 24-26, 2002, at Appendix B (excerpt only), **Exh. C 84.**  **Mr. Gary Beswick:** *see, infra,* Section III.B.3(c)(iii).  **Mr. Alberto Cuenca:** *see, e.g.,* letter dated April 9, 2002, **Exh. C 63,** which is carbon copied to "Alberto Cuenca, URS".

[217]    *See* letter dated February 27, 2002 from Radian to SOLIDERE, enclosing Contract Change Order No. 2 for the Normandy Landfill Treatment Contract – Phase 2, **Exh. C 60.**

[218]    *See* letter dated December 4, 2002 from Radian to the CM, enclosing "Quality Assurance Audit Report NL0210" conducted on September 24-26, 2002 (excerpt only), **Exh. C 84.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

    (ii)    the title page describes the Report as "Technical Systems Audit and Split-Sample Analysis Results for: <u>URS Project Laboratory</u>, Reclamation of the Former Normandy Landfill, Beirut, Lebanon" [emphasis added];

    (iii)    in the cover letter enclosing the report, Mr. Amine Bou Onk referred to the report as "prepared by <u>our</u> technical staff in Austin, Texas, [and] summarize[d] the findings of <u>our</u> annual internal audit" [emphasis added]; and

    (iv)    Appendix B of the Report lists Mr. James Pratt, URS Quality Control Manager and Mr. Houri Kalinian, URS Analyst, among other URS employees, on the Audit Conference Attendance List.

205.    Soon after, URS issued a report to SOLIDERE entitled "Quality Assurance Project Plan for Measuring Air Emissions from the LTTD Unit during Proof of Performance Testing, Addendum One, Normandy Landfill, Beirut, Lebanon", dated December 20, 2002.[219] This report stated that it was "PREPARED BY: URS Corporation [...]".  The report contains no mention of Radian.

(ii)    <u>Reports And Investigations Related To The Landfill Gas Defect</u>

206.    Following the discovery of the landfill gas defect in March 2001,[220] extensive discussions and exchanges took place internally as well as between the parties and their respective technical experts.  The memoranda and reports prepared by the Contractor were all prepared by URS, or refer inconsistently to URS <u>and</u> Radian.

207.    Documents disclosed in Arbitration I show that all technical discussions internal to the Contractor were handled by URS.  For example, two memoranda dated October 1, 2001

---

[219]    Letter dated December 26, 2002 from Radian to the CM, enclosing "Quality Assurance Project Plan for Measuring Air Emissions from the LTTD Unit During Proof of Performance Testing, Addendum One" dated December 20, 2002, Exh. C 87.

[220]    *See, supra,* Section II.C.1(c).

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

and October 2, 2001, respectively, were sent by "Bart Eklund (URS-Austin)" to "Robert LeGrand (URS-Austin)"[221] and were entitled "Typical Levels of Methane Emissions from Soils for Comparison with Data from the Normandy Site" and "Approaches to Measure or Estimate Subsurface Transport of Methane", respectively.    Another memorandum was prepared by Mr. Robert Legrand and addressed to Messrs. Amine Bou Onk, James Pratt, Bart Eklund, and Vladimir Khazak on November 20, 2002 on URS stationery.[222]

208.    A report entitled "Investigation of Gas Emissions", dated March 2002, was attached to a letter sent from the Contractor to the CM and dated April 5, 2002.[223]  The report, though stated in its cover letter to have been prepared by "Radian International's technical team",[224] was in fact "Prepared by: URS, URS Corporation [...]", as indicated on the cover of the report.[225]

209.    Other URS personnel also understood this report to be a URS undertaking.  For example, Mr. Robert Legrand, in his witness statement in Arbitration I, stated that, "[w]hile preparing for this report [the March 2002 report], URS's Beirut staff noted that sewage outfalls were operating in the area after the seawall was constructed [...]" [emphasis added].[226]  Mr. James Pratt also recognized this report as having been prepared by URS. As a witness in Arbitration I, he stated that he accepted that this report was "[p]repared by URS, but for all intents and purposes Radian".[227]

---

[221]    URS internal memorandum dated October 1, 2001 from Mr. Eklund to Mr. Legrand, **Exh. C 53**; URS internal memorandum dated October 2, 2001 from Mr. Eklund to Mr. Legrand, **Exh. C 54**.

[222]    *See* URS internal memorandum dated November 20, 2002 from Mr. Legrand to Messrs. Bou Onk, Pratt, Eklund, and Khazak, **Exh. C 82**.

[223]    *See* letter dated April 5, 2002 from Radian to the CM, enclosing "March 2002 Report", **Exh. C 62**.

[224]    *See* letter dated April 5, 2002 from Radian to the CM, enclosing "March 2002 Report", **Exh. C 62**.

[225]    "March 2002 Report", **Exh. C 62**.

[226]    Legrand I at p. 14, ¶ 48, **Exh. C 103**.

[227]    Hearing Transcript in Arbitration I, dated December 15-19, 2003, Day 2, 17:21-17:23, Pratt cross, **Exh. C 115**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

210.    In a memorandum dated June 20, 2002, Mr. Robert Legrand wrote that:

> "The URS investigation of the Normandy Gas emissions (URS 2002) showed that the low level of gas production projected during biodegradation was entirely acceptable from an environmental and safety perspective (i.e. Fit for the Purpose) [...] Projections [of future biodegradation] are based on: [...] (b) URS's site-specific microcosms studies; and (c) URS's site-specific field studies and measurements [...]"[228] [Emphasis added]

211.    A report entitled "Biogas Status Report", dated September 2002, was attached to a letter from Radian to the CM, dated September 9, 2002.[229] The report, though stated to have been prepared by "Radian International's technical team" in the letter, was more prominently stated to have been "Prepared by: URS Corporation, 9400 Amberglen Blvd., Austin, Texas 78729", as indicated on the cover of the report. The report states that "URS/Radian has been reclaiming the Phase II area of the Normandy Landfill in Beirut since 1999"[230] [emphasis added] and that "Senior URS Corporation risk assessment specialists indicate that there is no applicable US regulation governing soil gas composition, there are only regulations governing indoor and outdoor air".[231] [Emphasis added]

212.    A memorandum enclosed in a letter dated November 25, 2002 and sent to SOLIDERE by the Contractor stated that its aim was to "[d]emonstrate compliance of Radian International work products with the Contract requirements [...]". The memorandum

---

[228]    URS/Radian internal memorandum dated June 20, 2002 from Mr. Robert Legrand to Mr. Amine Bou Onk, **Exh. C 69.**

[229]    Letter dated September 9, 2002 from Radian to the CM, enclosing "Biogas Status Report" dated September 2002, **Exh. C 77.**

[230]    "Biogas Status Report" dated September 2002, at p.1, enclosed in letter dated September 9, 2002 from Radian to the CM, **Exh. C 77.**

[231]    "Biogas Status Report" dated September 2002, Section 3.2, p. 8, enclosed in letter dated September 9, 2002 from Radian to the CM, **Exh. C 77.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

was written by Mr. Legrand on URS letterhead and listed his affiliation as "URS Corporation".[232]

213.    Attached to the same letter is a "Powerpoint" presentation entitled "Normandy Landfill, Beirut, Gas Issue Update", which prominently features URS's logo[233] and refers to URS and Radian interchangeably:

"Radian complies with the FSQ"[234] [emphasis added]

and, later:

"URS complies with all the FSQ standards"[235] [emphasis added].

214.    A report entitled "Normandy Landfill Gas Issue, Site Action Plan", dated February 2003, was attached to a letter dated February 14, 2003 from Radian to the CM.[236] This report aimed to summarize the actions proposed to be undertaken by the Contractor to correct the defects in relation to the presence of landfill gas at the Site. The cover of the Site Action Plan states that it was "Prepared By: URS Corporation, 9400 Amberglen Blvd., Austin, Texas". The Plan also states that it was "submitted by Radian International, LLC (Radian) now operating under the name of its parent corporation, URS Corporation ('URS') [...]".[237]

---

[232]    Memorandum dated November 25, 2002 from Mr. Robert Legrand to Mr. Hisham Karameh at p. 1, section 2.3, enclosed in the letter dated November 25, 2002 from Radian to SOLIDERE, **Exh. C 83**. Mr. Legrand copied his memorandum to Mr. David Horne (the CM's Representative); Mr. Vladimir Khazak and Mr. Amine Bou Onk, both listed as URS representatives.

[233]    URS Powerpoint presentation entitled "Normandy Landfill, Beirut, Gas Issue Update," dated November 2002, enclosed in letter dated November 25, 2002 from Radian to SOLIDERE, **Exh. C 83**.

[234]    URS Powerpoint presentation entitled "Normandy Landfill, Beirut, Gas Issue Update," dated November 2002, at p. 46, enclosed in letter dated November 25, 2002 from Radian to SOLIDERE, **Exh. C 83**.

[235]    URS Powerpoint presentation entitled "Normandy Landfill, Beirut, Gas Issue Update," dated November 2002, at p. 51, enclosed in letter dated November 25, 2002 from Radian to SOLIDERE, **Exh. C 83**.

[236]    *See* letter dated February 14, 2003 from Radian to the CM, enclosing "Site Action Plan" dated February 2003, **Exh. C 89**.

[237]    Letter dated February 14, 2003 from Radian to the CM, enclosing "Site Action Plan" dated February 2003, p. 1 ("Preface"), **Exh. C 89**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

(iii)    Site Safety

215.    URS took responsibility for safety issues at the Site. For example, when a laborer was injured on Site, URS dispatched to the Site from the USA the health and safety director of its Construction Division, to conduct an investigation of the incident. A letter sent from Mr. Bou Onk, the Contractor's Project Manager, to Mr. Vladimir Khazak, URS's Corporate Manager for the Project, on September 25, 2002, advised that:

> "Mr. Gary Beswick, the health and safety director for URS's Construction Division will arrive onsite from the USA today and will conduct a detailed investigation of the incident. An incident report and proposed corrective and/or preventive actions will be generated based on Mr. Beswick's investigation".[238]

**(d)    Accounting Matters**

216.    The Export-Import Bank of the United States ("Eximbank") extended a loan facility to SOLIDERE, pursuant to which SOLIDERE was entitled to draw down the equivalent of the U.S. portion of the cost of goods and services purchased by SOLIDERE. Accordingly, SOLIDERE periodically requested Radian to provide it with an appropriate certificate in order to demonstrate the amount of the U.S. portion of its purchases. These certificates were issued from a URS office located in Maryland, USA, as shown by the letterhead address on the invoices, and sent to Radian in Beirut, stamped by "Radian International L.L.C., Beirut, Lebanon", and copied to "Alberto Cuenca, URS",[239] a member of the Contractor's "Purchasing and Project Controls" department.[240]

---

[238]    Letter dated September 25, 2002 from Radian to the CM, **Exh. C 78.**

[239]    *See, e.g.*, letter dated April 26, 2002 from Radian to the CM and enclosed Eximbank invoice No. 33, **Exh. C 66.**

[240]    *See* letter dated January 30, 2004 from Radian to the CM, **Exh. C 118**, listing "Alberto Cuenca, Purchasing and Project Controls", as part of the technical specialists from "our U.S. based offices".

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

217.   The address for URS's "Accounts Payable" division is identical to that of Radian. Bills for equipment used on the Site have been sent to "Radian International" as well to "URS", <u>both</u> at "Accounts Payable, PO Box 201088, Austin, TX 78720-1088, […]".[241]

218.   Some requests for payment for work on the Project were sent on "URS$_{Radian}$" letterhead that included two addresses: "Radian International L.L.C., P.O. Box 11-1261, Riad El Solh Beirut 1107 2080" and "URS Corporation, 200 Orchard Ridge Drive, Suite 101, Gaithersburg, Maryland 20878, […]".[242]

219.   The receipts and invoices for the Project insurance also appear to have been managed by a URS employee.[243]

### 4.   URS's Control Over Arbitration I And The Events Leading Up To It Further Demonstrate That The Project Was Under URS's Control

#### (a)   URS's And Radian's Legal Counsel

220.   In the parties' negotiations of the MOU,[244] the Contractor was mainly represented by Mr. John Rakow III.[245] Mr. Rakow has been identified as Radian's legal counsel.[246] Mr. Rakow has also identified himself as URS's Vice-President and Corporate Counsel.[247]

---

[241]   Compare the billing address in commercial invoice dated June 16, 2000 from Wildcat Manufacturing Inc. ("**Wildcat**", a manufacturer of equipment used on the Site), enclosed in letter dated September 8, 2000 from Radian to SOLIDERE, **Exh. C 33**, with the billing address in a commercial invoice from Wildcat dated October 24, 2000, enclosed in a letter dated December 4, 2000 from Radian to SOLIDERE, **Exh. C 35**. In an email dated June 30, 2000 from Mr. Hugh Notz (URS) to Mr. Amine Bou Onk, enclosing a facsimile dated June 30, 2000 from Wildcat to Mr. Notz and Mr. Bou Onk, **Exh. C 30**, Wildcat promised to refund payments for equipment to the same address: "[i]f Wildcat receives full payment for the total amount for [the] trommel […] the duplicated payment made <u>by URS (Radian International) P.O. Box 201088, Austin, Texas</u> will be refunded". [Emphasis added].

[242]   *See, e.g.*, letter dated April 15, 2002 to SOLIDERE, showing both URS Corporation and Radian as senders, **Exh. C 64**.

[243]   *See* letter dated April 20, 2000 from Radian to the CM, enclosing an email dated April 6, 2000 from Ms. Joan Maloney of Willis Corroon Corporation to Ms. Peggy Pendergast of URS, enclosing Radian's paid invoice for "Project specific policy for Lebanon Project only – Reclamation of the land within the Phase 2 area of the Normandy Landfill, Beirut, Lebanon", **Exh. C 28**.

[244]   *See, supra*, Section II.C.2(c).

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

221.    In his correspondence with SOLIDERE, Mr. Rakow, himself a lawyer, does not distinguish URS from Radian. He treats them as being one and the same legal entity. Thus, in his communications with SOLIDERE's General Counsel, Dr. Mahmassani, Mr. Rakow wrote on <u>URS letterhead</u> containing a footer with the address of "<u>URS Corporation, Legal Department</u>".[248]   Mr. Rakow signed the letter "Vice President, Corporate Counsel".

222.    During negotiations leading up to the MOU, Mr. Rakow, wrote that:

> "<u>URS is manifestly committed</u> to the early resolution of this matter before the ICC".[249] [Emphasis added]

223.    Mr. Rakow was listed as Claimant's Contact and counsel in Radian's Request for Arbitration in Arbitration I.

224.    In August 2003, Mr. Rakow described the MOU as a URS/Radian undertaking:

> "<u>URS Corporation/Radian International, LLC ('Radian')</u> and the Lebanese Company for the Development and Reconstruction of Beirut Central District S.A.L. ('SOLIDERE') <u>entered into a Memorandum of Understanding</u> (MOU) on May 12, 2003 [sic]".[250] [Emphasis added]

---

(...continued)

[245]    See, e.g., letter dated April 23, 2003 from URS to Dr. Ghaleb Mahmassani, SOLIDERE's General Counsel (attachment omitted), **Exh. C 92**; letter dated May 2, 2003 from Mr. John Rakow of URS (attachment omitted), **Exh. C 94**.

[246]    See letter dated April 8, 2003 from Radian to SOLIDERE, **Exh. C 91**.

[247]    See, e.g., letter dated January 17, 2001 from Radian to the CM and enclosed letter dated January 16, 2001 from URS, **Exh. C 36**; letter dated April 23, 2003 from URS to Dr. Ghaleb Mahmassani (attachment omitted), **Exh. C 92**.

[248]    See, e.g., letter dated April 23, 2003 from URS to Dr. Ghaleb Mahmassani (attachment omitted), **Exh. C 92**.

[249]    Letter dated April 28, 2003 from URS to Dr. Ghaleb Mahmassani, enclosed in facsimile dated April 28, 2003 from URS to SOLIDERE (attachment omitted), **Exh. C 93**.

[250]    Letter dated August 29, 2003 from Radian to SOLIDERE (attachments omitted), **Exh. C 96**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

225.    Thus, the in-house lawyer of URS and Radian could see no reason to distinguish between URS and Radian nor to treat them as separate legal entities having separate legal relationships with SOLIDERE.

**(b)    URS's Participation In Meetings with SOLIDERE Leading Up To Arbitration I**

226.    The parties' discussions as to the existence of a serious defect in the Works led to several meetings, prior to the start of Arbitration I, during which the Contractor was represented by URS's officers and employees.

227.    On November 7, 2002, a meeting with SOLIDERE was held in Washington D.C. The following people attended on the Contractor's behalf: [251]

(i)     Mr. Vladimir Khazak, a URS Vice-President;[252]

(ii)    Mr. Robert Legrand, a URS Senior Engineer;[253] and

(iii)   Mr. Amine Bou Onk, the Contractor's Representative, URS Divisional Vice-President and General Manager of Radian International's Lebanon branch.[254]

228.    In January 2003, another meeting was organized between URS and SOLIDERE, this time in London.    In correspondence between URS and the CM, the Contractor's Representative, Mr. Bou Onk, stated that the following people would attend the meeting on the Contractor's behalf:

"1.     Mr. Vladimir Khazak, <u>URS</u>
 2.     Mr. Robert Legrand, <u>URS</u>

---

[251]    Legrand I, at p. 17, ¶ 63, **Exh. C 103**.

[252]    *See, supra*, Section III.B.3(a)(ii).

[253]    *See, supra*, Section III.B.3(a)(v).

[254]    *See, supra*, Section III.B.3(a)(i).

-68-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

       3.     Mr. Bart Eklund, <u>URS</u>

       4.     Mr. Amine Bou Onk, <u>URS</u> [...]"[255] [Emphasis added]

229.    The Contractor and SOLIDERE met again on April 16, 2003 in London.  The following individuals attended this meeting on behalf of the Contractor:[256]

(i)     Mr. Vladimir Khazak (a URS Vice-President);[257]

(ii)    Mr. Thomas W. Bishop (a URS Vice-President and Radian Senior Vice-President);[258]

(iii)   Mr. John W. Rakow III (URS Vice-President and Corporate Counsel; Radian legal counsel);[259]

(iv)   Mr. Robert Legrand (a URS Senior Engineer);[260]

(v)    Mr. Bart Eklund (a URS Principal Engineer);[261]

(vi)   Mr. Amine Bou Onk (the Contractor's Representative, URS Divisional Vice-President and General Manager of Radian International's Lebanon branch).[262]

230.    Mr. Vladimir Khazak, who identified himself as "Senior-Vice President of URS Corporation/Radian International LLC", sent SOLIDERE a proposed outline of an agenda for an upcoming meeting pursuant to the MOU.  The meeting was to be held in

---

[255]   Letter dated December 12, 2002 from Radian to the CM, **Exh. C 85.**

[256]   *See* Bou Onk I, at p. 13, ¶ 36, **Exh. C 102.**

[257]   *See, supra*, Section III.B.3(a)(ii).

[258]   *See, supra*, Section III.B.3(a)(iii).

[259]   *See, supra*, Section III.B.4(a).

[260]   *See, supra*, Section III.B.3(a)(v).

[261]   *See, supra*, Section III.B.3(a)(iv).

[262]   *See, supra*, Section III.B.3(a)(i).

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

London on October 16-17, 2003 and the agenda contemplated introductory remarks from "URS/Radian – Tom Bishop".[263]

### (c)    URS's Management Of Arbitration I

231.    Although Arbitration I was nominally between SOLIDERE and Radian, URS in fact controlled Radian's participation in the arbitration.

232.    The Power of Attorney given to the law firm of Mayer, Brown, Rowe & Maw LLP, the law firm of Herbert Smith, and Mr. Adrian Williamson Q.C. to represent "Radian" in Arbitration I was signed by Mr. Joseph Masters,[264] who happened to be URS Vice President and General Counsel. Although Mr. Masters purportedly signed "on behalf of Radian", he is not asserted nor known to have ever had any position with Radian, and the power of attorney was sent from the "URS LAW DEPT" fax machine.[265] Asked to identify Mr. Masters and the capacity in which he signed the Power of Attorney, counsel for Radian in Arbitration I admitted that he was "General Counsel of the URS Group".[266]

233.    Similarly, the power of attorney issued purportedly on behalf of Radian authorizing the law firm of Skadden, Arps, Slate, Meagher & Flom LLP to represent Radian in connection with Arbitration II was signed by Mr. Thomas Bishop.[267] As discussed above, Mr. Bishop served as URS's Vice President, Strategy, since July 2003 and as

---

[263]    Letter dated September 30, 2003 from Radian to SOLIDERE, enclosing outline for agenda Normandy Landfill Phase II Reclamation: "Meeting pursuant to Memorandum of Understanding (MOU)", **Exh. C 98.**

[264]    Power of Attorney dated December 2, 2003 granted by Radian to Mayer, Brown, Rowe & Maw LLP, Herbert Smith and Mr. Adrian Williamson Q.C., **Exh. C 111.**

[265]    Power of Attorney dated December 2, 2003 granted by Radian to Mayer, Brown, Rowe & Maw LLP, Herbert Smith and Mr. Adrian Williamson Q.C., **Exh. C 111.**

[266]    *See* letter dated December 8, 2003 from White & Case LLP to Mayer, Brown, Rowe & Maw LLP, **Exh. C 112**; letter dated December 9, 2003 from Mayer, Brown, Rowe & Maw to White & Case LLP, **Exh. C 113.**

[267]    *See* Power of Attorney dated May 14, 2004 granted by Radian to Skadden, Arps, Slate, Meagher, & Flom LLP, enclosed in letter dated May 17, 2004, **Exh. C 123.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

URS's Senior Vice President, Construction Services Division, since March 2002, as well as being a "Radian Vice-President".[268]

234.  During the hearing in Arbitration I, that took place in Paris in December 2003, Mr. Masters was in attendance for part of the time. Mr. Masters was never described as having any position with Radian. His business card, provided to SOLIDERE representatives in the course of the hearing, shows him to be URS's "Vice President and General Counsel", with an office at 600 Montgomery Street, 25th Floor, San Francisco.[269]

### 5.    URS Purported To Implement The Award

#### (a)    Correspondence Between The Contractor And SOLIDERE Following The Award

235.  Following the notification of the Award to the parties on July 16, 2004, SOLIDERE and the Contractor exchanged extensive correspondence regarding the implementation of the Award.

236.  Much of this correspondence was signed by Mr. Thomas Bishop.[270] As noted above, Mr. Bishop served as URS's Vice President, Strategy, since July 2003 and as URS's Senior Vice President, Construction Services Division, since March 2002, and was also a Radian Senior Vice-President.[271]

---

[268]    *See, supra,* Section III.B.3(a)(iii).

[269]    *See* business card of Mr. Joseph Masters, **Exh. C 1**.

[270]    *See, e.g.,* letter dated September 16, 2004 from Radian to SOLIDERE, **Exh. C 138**; letter dated July 14, 2005 from Radian to SOLIDERE, **Exh. C 154**; letter dated August 26, 2005 from Radian to SOLIDERE, **Exh. C 159**; letter dated September 28, 2005 from Radian to SOLIDERE, **Exh. C 162**; letter dated October 12, 2005 from Radian to SOLIDERE, **Exh. C 165**; letter dated November 7, 2005 from Radian to SOLIDERE, **Exh. C 167**; letter dated December 7, 2005 from Radian to SOLIDERE, **Exh. C 170**.

[271]    *See, supra,* Section III.B.3(a)(iii).

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

237.   Significantly, all the correspondence indicating that it was faxed from the United States also shows that the letters were sent from a "URS Corporation" fax machine at (415) 986-7379,[272] which is a URS facsimile number.[273]

(b)    **Mediation By Mr. William Hadaya Of URS**

238.   URS's control during this period is further exemplified by the involvement of Mr. William Hadaya of URS, who had no position with Radian, in the implementation of the Award.   The Chairman of URS called upon Mr. Hadaya, a URS "Senior Vice President" and "Office Manager",[274] to contact SOLIDERE and "help resolve" the parties' dispute in relation to implementing the Award.[275]

239.   Mr. Hadaya helped organize the meeting which took place between representatives of the Contractor, including himself, and SOLIDERE in Beirut in December 2004.[276]

**C.    CONCLUSION**

240.   The above facts demonstrate that, following URS's acquisition of Radian in 1999, Radian ceased effectively to function as an entity separate from URS.   Specifically, URS took over all aspects of the Project, over which it exercised full control, and was the entity which assumed responsibility for performing the Contract.

241.   These facts, and others to be developed in the course of these proceedings, will demonstrate that it is appropriate, pursuant to any one or more of the legal doctrines

---

[272]   *See, e.g.*, fax line on letter dated September 16, 2004 from Radian to SOLIDERE, **Exh. C 138**; fax line on letter dated September 28, 2005 from Radian to SOLIDERE, **Exh. C 162**; fax line on letter dated October 12, 2005 from Radian to SOLIDERE, **Exh. C 165**; fax line on letter dated November 7, 2005 from Radian to SOLIDERE, **Exh. C 167**.

[273]   *See* http://find.intelius.com search dated January 20, 2006, **Exh. C 179**.

[274]   Business card of Mr. William M. Hadaya, PE, **Exh. C 5**.

[275]   Letter dated August 23, 2005 from SOLIDERE to URS, **Exh. C 157**.

[276]   Letter dated August 23, 2005 from SOLIDERE to URS, **Exh. C 157**; on this meeting *see, supra,* Section II.C.4(a).

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

indicated above,[277] to find URS bound by the Contract, including its arbitration clause, and that URS is therefore a proper party to these proceedings.

-oo0Ooo-

---

[277]     *See, supra,* ¶ 150.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

**IV.    SOLIDERE'S CLAIMS AGAINST THE CONTRACTOR**

242.    Pursuant to the Contract and the Lebanese Code of Obligations and Contracts, SOLIDERE has the right to recover full compensation for the damage suffered as a consequence of the Contractor's contractual breaches.  SOLIDERE's claims will far exceed the limitations on damages set forth in the Contract.  As a consequence of the Contractor's intentional breaches and gross mis-performance of the Contract, URS and Radian should not be allowed to rely on such limitations to shield it against SOLIDERE's claims (Section A).

243.    Pursuant to the Award, Radian was ordered to pay SOLIDERE US$ 2,358,000 in costs, but the Contractor has refused to pay this amount.  SOLIDERE seeks an order directing URS and Radian, jointly and severally, to pay such amount, plus interest, in these proceedings (Section B).

244.    The Award has established the existence of a defect.  As a direct consequence of the existence of such a defect, and of the Contractor's continuous failure to implement the Award, SOLIDERE has suffered or will suffer considerable damage including, without limitation:

-    the costs incurred by SOLIDERE in completing the Works (Section C); and

-    the losses caused by the staggering delays that are affecting the Project, including loss of profits (Section D).

**A.    OVERVIEW OF RELEVANT PROVISIONS OF THE CONTRACT AND THE LEBANESE CODE OF OBLIGATIONS AND CONTRACTS**

**1.    The Contract**

245.    GC 22.1 provides for a broad right to compensation for breach of contract:

"In connection with any breach of any representation or warranty and in connection with any failure, breach, error or omission to perform, or in the performance of, any obligation, responsibility, or undertaking of the Contractor [...] the Contractor shall be fully responsible and liable to the

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

Employer for, and shall indemnify the Employer against, the full extent of any and all liabilities, loss and/or damage suffered, and for all additional costs and/or expenses incurred by the Employer (including, without limitation, financing costs, interest, attorneys' fees and expenses) [...]"[278]

## 2.   The Lebanese Code Of Obligations And Contracts

246.   GC 22.1 is consistent with the provisions of the Lebanese Code of Obligations and Contracts (translation):

"Article 260 – Damages must correspond exactly to the loss incurred and the profits [the claimant] has been deprived of.

Article 261 – Indirect damages are taken into consideration as are direct damages, provided they can be linked with total certainty to the failure to perform the obligation.

Article 262 – In contractual matters, compensation only covers damages that were foreseeable at the time the contract was formed, so long as the debtor has not committed *dol*."[279]

247.   *Dol* can be roughly translated as "intentional default".  Under Lebanese law, as will be explained in the course of these proceedings, *faute lourde* (which can be roughly translated as "gross misconduct") is considered equivalent to *dol* for the purpose of Article 262 of the Lebanese Code of Obligations and Contracts.

248.   The Lebanese Code of Obligations and Contracts thus usefully clarifies that, under Lebanese law, the measure of damage includes compensation for:

- the damage incurred;

- the loss of profits;

- indirect damages;

---

[278]   The Contract, GC 22.1, **Exh. C 19**.  GC 22.1 goes on to provide for a limitation on such damages to US$ 20 million.  On the enforceability of this limitation, *see, infra*, Section IV.A.3.

[279]   The Lebanese *Code des Obligations et des Contrats*, 1983 ed., reprinted 1995 (French language version), Articles 260-262, with unofficial English translation, **Exh. C 12**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

- unforeseeable damages, if the defendant is guilty of *dol*.

### 3. The Contractual Limitations On Damages Do Not Apply

249. The Contract sets forth two limitations on damages:

- pursuant to GC 22.1, damages under the Contract are limited to US$ 20,000,000, "subject to the terms of [...] GC 22.4 [...]"; and

- pursuant to GC 22.4 and Agreement Article 6, specified liquidated damages are payable for the first one hundred days of delay.

250. Under Lebanese law, and as will be demonstrated in the course of these proceedings, a contractual limitation on damages is inapplicable in the presence of *dol* or *faute lourde*, which respectively require:

- a showing of a conscious failure to perform under the relevant contract (*dol*);

- a showing that the breaching party has significantly departed from the behavior expected of it under the contract, or that the breaching party was aware of the damageable consequences of its actions, or that the breaching party, by its failure to perform an essential obligation of the contract, has defeated the object of the parties in entering into the contract (*faute lourde*).

251. As discussed above:

- the Contractor has deliberately chosen to follow bad working practices, contrary to the unambiguous terms of the Contract;[280]

- the Contractor was, pursuant to the terms of the Contract and as an experienced remediation contractor, entirely aware of the importance of treating the excavated

---

[280]   *See, supra,* Sections II.C.1(a)-(b).

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

materials in order to remove the organic carbon, and yet chose to act otherwise, with the result of a defect in the Works;[281]

- even after an ICC arbitral tribunal found unanimously, by the Award, that the Works are defective, even though the Contractor has not challenged the validity of the Award, the Contractor has continuously refused to implement the Award and remedy the defect;[282] and

- the Contractor has repeatedly chosen to delay and, since February 2005, has completely stopped, performance of the Contract, without any justification.[283]

252. As will be demonstrated in these arbitral proceedings, these failures constitute *dol* and/or *faute lourde* on the part of the Contractor, and therefore URS and Radian may not rely on the limitation on damages set forth in GC 22.1, GC 22.4 and Agreement Article 6.

### B.    SOLIDERE'S COSTS IN ARBITRATION I

253. Pursuant to the Award, Radian was ordered to pay SOLIDERE's costs of the arbitration amounting to US$ 2,358,000, as follows:

(i)    **US$ 2,150,000** for SOLIDERE's legal costs;[284]

(ii)    100% of the fees and expenses of the arbitral tribunal and the ICC administrative expenses, SOLIDERE's share of which amounted to **US$ 170,000**;[285] and

(iii)    **US$ 38,000** in connection with SOLIDERE's answer to a post-hearing application made by Radian;[286]

---

[281]    *See, supra*, Section II.C.1(c).

[282]    *See, supra*, Section II.C.4.

[283]    *See, supra*, Section II.C.5.

[284]    Award, p. 95, ¶ 11.6, **Exh. C 129**.

[285]    Award, p. 95, ¶ 11.5, **Exh. C 129**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

254.    Despite repeated requests from SOLIDERE,[287] Radian has refused to pay such due amounts to SOLIDERE.  Radian has not, however (as already stated), questioned the validity of the Award, which is no longer subject to challenge in France where it was rendered.  On the contrary, it affirmed its commitment to implement the Award by letter dated July 30, 2004.[288]

255.    The Contractor has breached its contractual obligation to carry out the Award "without delay", set forth in Article 28.6 of the ICC Rules, which is incorporated into the Contract by GC 44.  Radian and URS should therefore be ordered to comply with the Award without prejudice to SOLIDERE's claim for damages by way of post-award interest.

### C.    URS AND RADIAN ARE JOINTLY AND SEVERALLY LIABLE FOR ALL COSTS AND EXPENSES INCURRED BY SOLIDERE IN COMPLETING THE WORKS

256.    As of the termination of the Contract by SOLIDERE on February 10, 2006, the landfill gas defect remained to be remedied and the Works were not completed.

257.    As a direct consequence of the Contractor's failure to perform the Contract and to implement the Award, SOLIDERE will need to arrange for the Works to be completed by one or several contractors in replacement of the Contractor, at a cost which, when added to the amounts already paid to the Contractor by SOLIDERE under the Contract, is likely to far exceed the original Contract Price under the Contract.  Under the Contract and Lebanese law, the Contractor is liable to compensate SOLIDERE for all costs and expenses incurred by SOLIDERE in excess of the Contract Price, in connection with such completion works.

258.    SOLIDERE's costs, expenses and damages incurred in the Completion of the Works cannot be definitely ascertained until such works have been completed.

---
(...continued)

[286]    Award, p. 97-98, ¶ 11.12, **Exh. C 129.**

[287]    *See, e.g.,* letter dated July 23, 2004 from SOLIDERE to URS/Radian, **Exh. C 133;** letter dated August 5, 2004 from SOLIDERE to URS/Radian, **Exh. C 137.**

[288]    *See* letter dated July 30, 2004 from Radian to SOLIDERE, **Exh. C 134;** *see, supra,* Section II.C.4.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

259. Accordingly, SOLIDERE submits that it would be appropriate for the Arbitral Tribunal (i) to order URS and Radian, jointly and severally, to pay SOLIDERE all costs and expenses incurred in excess of the Contract Price for purposes of completing the Works; and (ii) following issuance of an award on item (i), to retain jurisdiction, in order to address any and all further issues of quantum of damages that may arise in the parties' implementation of the Arbitral Tribunal's award on item (i) above until SOLIDERE has been made whole for its claim.

### D. URS AND RADIAN ARE JOINTLY AND SEVERALLY LIABLE FOR ALL DAMAGES INCURRED BY SOLIDERE AS A CONSEQUENCE OF THE HUGE DELAYS TO THE PROJECT

#### 1. Lost Profits

260. As a result of the huge delays caused to the Project by the Contractor, SOLIDERE has been unable to sell the land at the Normandy Site in accordance with its original program which anticipated Completion, as envisaged by the Contract, on April 14, 2004. The expected but missing cash flow resulting from such sales has been preliminarily assessed as amounting to several billion US dollars. SOLIDERE has accordingly been deprived of the benefit of that cash flow, such deprivation being represented by lost interest on such amount or financing costs that would otherwise not have been incurred. SOLIDERE is entitled to compensation for this loss, which will be quantified in the course of the arbitral proceedings.

#### 2. Project Costs And Expenses

261. Every day of delay is causing SOLIDERE to incur costs and expenses that it would not have incurred but for the delay to the Project.

262. These costs and expenses include, without limitation, the additional cost of the CM, the cost of SOLIDERE's employees assigned to the Project, the cost of running and maintaining office facilities at the Site, overhead costs, *etc.*

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

263.    The quantum of SOLIDERE's costs and expenses caused by the Contractor's delay will
be assessed in the course of the arbitral proceedings.

-oo0Ooo-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## V.    MISCELLANEOUS MATTERS

### A.    THE AGREEMENT TO ARBITRATE – PLACE AND LANGUAGE OF THE ARBITRATION

264.    The agreement to arbitrate is set forth in GC 44:

> "All disputes arising out of or in connection with the present Contract shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce in force as of January 1st 1998 by one or more arbitrators appointed in accordance with the said Rules".[289]

265.    As set forth in GC 44, the place of arbitration is Paris, France and the language of the arbitration is English.

### B.    APPOINTMENT OF THE ARBITRAL TRIBUNAL

266.    SOLIDERE submits that the size and complexity of this dispute is such as to warrant the appointment of an Arbitral Tribunal of three arbitrators.

267.    In accordance with Articles 4.3(e) and 8.4 of the ICC Rules of Arbitration, the Claimant nominates the following person to serve as an arbitrator in these proceedings:

> Eric A. Schwartz, Esq.
> Freshfields Bruckhaus Deringer
> 2/4, rue Paul Cézanne
> 75008 Paris
> France
> Tel: +33 1 44 56 44 62
> Fax: +33 1 44 56 27 30
> Fax: +33 1 44 56 27 31
> E-mail: eric.schwartz@freshfields.com

### C.    NOTIFICATIONS AND COMMUNICATIONS

268.    Any written notifications or communications to the Claimant in relation to this arbitration should be delivered to the Claimant at the following address:

---

[289]    The Contract, GC 44, **Exh. C 19**.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

White & Case LLP
11, Boulevard de la Madeleine
75001 Paris, France
Attention: Mr. Christopher R. Seppälä
Tel: (33-1) 55 04 15 15
Fax: (33-1) 55 04 15 16
E-mail: cseppala@whitecase.com

and with a copy to:

Dr. Ghaleb Mahmassani
Avocat – Law Consultant
Serhal Building
Cairo Street – Hamra
Beirut
Lebanon
Tel: + 961 1 349 777
Fax: + 961 1 348 712
E-mail: ghmahmasani@terra.net.lb

-oo00oo-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## VI.   REQUEST FOR RELIEF

269.    In consideration of all the above, the Claimant respectfully requests that the Arbitral Tribunal:

(i)    declare that URS is a proper party to Contract, including its arbitration clause, and should be held liable jointly and severally with Radian for the Contractor's obligations under the Contract;

(ii)    order URS and Radian, jointly and severally, to pay SOLIDERE all costs and expenses incurred in excess of the Contract Price for purposes of completing the Works;

(iii)    retain jurisdiction following issuance of an award on item (ii) above, in order to address any further issues of quantum of damages that may arise in the parties' implementation of the Arbitral Tribunal's award on item (ii) above;

(iv)    order URS and Radian, jointly and severally, to compensate SOLIDERE for all its damages arising out of the delays to the Project, in an amount to be quantified in the course of these proceedings;

(v)    order URS and Radian, jointly and severally, to pay SOLIDERE the award of costs made against Radian in Arbitration I, amounting to US$ 2,358,000;

(vi)    order URS and Radian, jointly and severally, to pay interest on all principal amounts they are ordered to pay pursuant to these proceedings, from the date of the event giving rise to the claim, or as specified otherwise in the Contract;

(vii)    order URS and Radian, jointly and severally, to pay all costs and expenses (including, but not limited to, costs payable to the ICC, legal fees and expenses and fees and expenses of experts, consultants and others) incurred by SOLIDERE in connection with the preparation for and conduct of this arbitration;

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

(viii)   order URS and Radian, jointly and severally, to pay post-award interest on all amounts they are ordered to pay pursuant to these proceedings, from the date of the award until receipt of payment of such amount by SOLIDERE; and

(ix)    grant SOLIDERE such other and further relief as the Arbitral Tribunal deems appropriate under the circumstances.

-oo0Ooo-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## VII.   <u>RESERVATION OF RIGHTS</u>

270.   The Claimant reserves the right generally to amend and/or supplement this Request, among other things, to request other relief, including damages, as SOLIDERE may consider necessary or appropriate to enforce and/or defend its rights.

-oo0Ooo-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## VIII.  SUBMISSION OF THIS REQUEST FOR ARBITRATION

271.  In accordance with Article 4.4 of the ICC Rules, the Claimants are submitting six copies of this Request for Arbitration, along with a check in the amount of US$ 2,500, as required by Appendix III, Article 1.1 of the ICC Rules.

Respectfully submitted on behalf of
SOLIDERE

White & Case LLP

# EXHIBIT B

# AGREEMENT

*Between*

The Lebanese Company for the Development and Reconstruction of
Beirut Central District, S.A.L.

*&*

Radian International  LLC

# TABLE OF CONTENTS

## TO

## AGREEMENT

| ARTICLE N° | | PAGE N° |
|---|---|---|
| 1. | Terms | 1 |
| 2. | Contract Documents | 1 |
| 3. | Undertakings of the Contractor | 1 |
| 4. | Undertakings of the Employer | 2 |
| 5. | Timely Completion | 2 |
| 6. | Application of GC 22 | 3 |
| 7. | Notice to Proceed | 3 |
| 8. | Notices | 3 |
| 9. | Counterparts | 4 |
| 10. | Entire Agreement - Modifications | 4 |
| 11. | Assignment by the Employer | 4 |

(i)

Normandy Landfill Treatment Contract – Version 22/01/99
Ref. Nlfc



# AGREEMENT

This Agreement ("Agreement") is effective as of the 25th day of January, 1999 between The Lebanese Company for the Development and Reconstruction of Beirut Central District, S.A.L. ("Employer"), a company organized and existing under the laws of the Republic of Lebanon, with its registered office at Building 149 Marfaa, Saad Zaghloul Street, off Foch Street, BP.119493 Beirut, BP.119493 Beirut, Republic of Lebanon, and Radian International LLC, a company organized and existing under the laws of the State of Delawers, USA, with its registered office at 15204 Omega Drive, Rockville, Maryland 20850 ("Contractor").

The Employer desires the Works to be performed by the Contractor, and the Contractor agrees to perform the Works, upon the terms and conditions hereinafter set forth, as follows:

## 1. Terms

In this Agreement words and expressions shall have the same meanings as are respectively assigned to them in the General Conditions of Contract.

## 2. Contract Documents

The following documents ("Contract Documents") comprise the Contract ("Contract"):

(1) The Agreement;
(2) The General Conditions of Contract and all Exhibits thereto (GC); and
(3) The Technical Conditions of Contract (TC).

## 3. Undertakings of the Contractor

3.1 The Contractor agrees to Complete and guarantee the Works with due care and diligence and in strict conformity in all respects with the Contract and to furnish all the Contractor's Staff, Materials, Plant, Temporary Works and all other services and items, required in and for such performance, as the same are specified in or are to be reasonably inferred from, the Contract, or, as are otherwise required to complete such performance.

3.2 In the Contract, the term "Time for Completion" means a period of Fifty Four (54) Months during which, unless extended in accordance with the Contract, the Contractor agrees to Complete the entire Permanent Works, which period shall begin with the issuance of the Notice to Proceed.
The Time for Completion shall be extended by one (1) month for each extra 100.000 cubic meters to be excavated over five million cubic meters.



Normandy Landfill Treatment Contract – Version 22-01-1999
Ref. NIR\doc



3. The Contractor agrees to observe, discharge and fulfill its obligations, responsibilities and undertakings under the Contract.

## 4. Undertakings of the Employer

4.1 In this Contract, the term "Contract Price" means the fixed lump sum of United States Dollars Fifty Three Million and Seventy Five Thousand (US$ 53.075.000) and which the Employer agrees to pay the Contractor for the Completion and guarantee of the Works, at the times and in the manner prescribed in the Contract. Save and except for changes in the Contract Price which become effective in accordance with the Contract, the Contract Price shall not be subject to change for any reason, including, without limitation, for any rise or fall in the cost of labor, Materials and Plant or for any variations in exchange rates.

The Contract Price is calculated on the assumption that the quantity of Material to be Treated is 1.2 million cubic meters, and the quantity of materials to be excavated is 5 million cubic meters.

If the quantities of Material to be Treated are found to be more than 1.2 million cubic meters, then the Contract Price will be increased by 2.25 US$ for every additional cubic meter of material to be treated treated up to a cap of 2.925.000 US$ of additional payment.

If the quantities of material to be excavated is found to exceed 5 million cubic meters, then the Contract Price will be increased by 6 US$ for every additional cubic meter of material to be excavated.

The Contract Price is also based on the fact that the Contractor will not be using low temperature thermal desorption technology in the treatment of waste material. If the Contractor determines that such technology proves to be necessary to achieve the end product criteria, it will advise the Employer of its necessity and the Contract Price will then be increased by an amount of US$ 2,000,000.

4.2 The Employer agrees to observe, discharge and fulfill all of its obligations, responsibilities and undertakings under the Contract.

## 5. Timely Completion

Time is of the essence in the performance of the Works and the Contractor agrees: (i) to Commence the Works after receipt by it of the Notice to Proceed; and (ii) to Complete the entire Works within the Time for Completion and in compliance with the Programme, Milestones and Detailed Programme and consistent with all specific durations set forth therein and/or elsewhere in the Contract.





Normandy landfill Treatment Contract – Version 22.03799
Ref. Mile



**Application of GC 22**

The provisions of GC 22.3 shall apply to the first Fifty (50) Days of any Contractor failure referred to in GC 22.3 and the percentage of the Contract Price referred to in GC 22.3. shall be 0,1 percent (0,1%), subject to a maximum of ten percent (10%) of the Contract Price when cumulated with the total percentage, if any, of the Contract Price applied under GC 22.4. The provisions of GC 22.4 shall apply to the first hundred (100) Days of any Contractor failure referred to in GC 22.4. and the percentage of the Contract Price referred to in GC 22.4. shall be 0,15 percent (0,15%), subject to a maximum of fifteen percent (15%) of the Contract Price when cumulated with the total percentage, if any, of the Contract Price applied under GC 22.3.

## 7 . Notices

7.1    All formal notices to be given by either party to the other under the terms of the Contract, shall be given in writing to the correct address of the other party set out below or to such other address as the party to be served shall have previously notified in writing. No daily log or any other report, document or discussion of any type, except those written communications required under GC 25.12, shall constitute notice of any claim of any type.

7.2    Any such notice given in the manner described shall be effective upon receipt.

7.3    The correct addresses of each of the parties for the purpose of giving notices pursuant hereto are as follows:

Employer:    The Lebanese Company for the Development and Reconstruction of
Beirut Central District, S.A.L.
Building 149 Marfaa , Saad Zaghloul Street,
off Foch Street, BP.119493 Beirut, BP 119493
Beirut - Republic of Lebanon

Attention: Mr. Hervé DUPONT

Contractor:  Radian International LLC
15204 Omega Drive
Rockville, Maryland 20850

Attention: Mr. Stanley PORFIDO

## 8.  Condition Precedent

The Contract shall be subject to the approval of the Council of Development and Reconstruction on the Tender Document.



Normandy Landfill Treatment Contract - Version 22.03.99
Ref. M/c





If no approval is granted by the Council of Development and Reconstruction within three (3) months as from the signature of the Contract, the Employer will not issue the Notice to Proceed and the Contract shall be deemed null and void without liability for either party.

In any such event and notwithstanding anything to the contrary which may be contained in the Contract, there shall be no sum due by either party to the other and each party hereby waives any claim of whatever nature against the other party as a result of any such event, including without limitation and in respect of the Contractor, any claim for any loss of profit, cost incurred and/or any work performed by the Contractor prior to the date of the Agreement.

## 9.  Counterparts

This Agreement and the other documents comprising the Contract, have been prepared in the English language and have been executed by the parties in one (1) counterparts, which shall be deemed an original and deposited at a notary public in Beirut, Lebanon.

## 10. Entire Agreement – Modifications

The Contract contains the entire and only Contract between the parties concerning the subject matter hereof and supercedes and cancels all prior agreements, discussions and communications between or among the parties to this Contract, whether oral or written, including, without limitation, any discussions and communications which have been reproduced or memorialized in any written form, tape recordings or any other manner, whether as a summary, in whole or in part, and all documents and discussions issued or held during the Invitation to Tender and pre-Contract signature and negotiation period. No modification, termination, notice of termination or discharge of the Contract or any of the provisions hereof, nor any representation, waiver, promise or condition relating to the Contract shall be binding unless made in writing and signed by a duly authorized officer the party to be charged.

## 11.  Assignment by the Employer

The Employer may, at its discretion and at any time after the release by the Employer of any and all outstanding Letters of Guarantee provided by the Contractor pursuant to the Contract, assign to any entity the whole or part of the Employer's right under the Contract and upon any such assignment and the notification thereof by the Employer to the Contractor, any such entity shall became entitled to directly enforce against the Contractor any of such rights.





Normandy Landfill Treatment Contract – Version 22.03.99
Ref. File



IN WITNESS WHEREOF the parties have caused the Agreement and the other documents comprising the Contract to be executed the day and year set forth below, which shall not affect the effective date of the Agreement set forth above.

The Lebanese Company for the Development and Reconstruction of Beirut Central District, S.A.L.

Signature: ...........

Name: .Nasser Chammaa

Title: Chairman

Date: 1/28/99

Radian International LLC

Signature: .....................

Name: Stanley Porfido

Title: Sr. Vice President, Radian Int'l

Date: 1/25/99



Normandy Landfill Treatment Contract - Version 22/01/99
Ref. Nlfc

## Addendum No 1

To the Contract signed on the 25 of January 1999 between the Lebanese Company for the Development and Reconstruction of Beirut Central District S.A.L (the "Employer") and Radian International LLC (the Contractor")

Whereas both parties have signed a Contract (the "Contract") for the treatment of the Normandy Landfill located in the Beirut Central District.

Whereas both parties have agreed to bring some modifications to the Maximum Cumulative Payment Amount mentioned in Attachment 3 to Exhibit 3 of the General Conditions.

Whereas both parties have also agreed to change the Intermediate Milestones mentioned in Exhibit 5 to the General Conditions and in table 5.1 of the Technical Conditions.

Therefore, it has been agreed between the Employer and the Contractor as follows:

1- To replace the table provided under Attachment 3 to Exhibit 3 of the General Conditions (Maximum Cumulative Payment Amount) by the table provided in Annex 1 to this Addendum.

2- a) Paragraphs 3 and 4 of Exhibit 5 to the General Conditions (Programme and Milestones) will be modified as follows:

Excavation and filing of section 1 must be completed within three hundred and sixty (360) days as from the issuance of the Notice to Proceed.

Excavation and filing of Section 2 must be completed within five hundred and fifty (550) days as from the issuance of the Notice to Proceed.

b) The date for completion mentioned in table 5.1 (Phasing Requirements) of the Technical Conditions will be modified as follows:

Section 1: All works within 360 days as from the issuance of the Notice to Proceed.

Section 2: All works within 550 days as from the issuance of the Notice to Proceed.

All other terms of the Contract are still applicable.

This Addendum forms part and shall be read in conjunction with the Contract.

The Lebanese Company for the Development and Reconstruction of Beirut Central District S.A.L

by :

Name : Nasser Chammaa

Title : Chairman G.M.

Date : Feb 18 1999

Radian International LLC

by :

Name : Stanley Porfido

Title : Sr. Vice President

Date : Feb 18, 1999

## ANNEX 1

| Maximum Cumulative Payments Amount (amounts invoiced) | |
|---|---|
| **1999** | |
| january | |
| february | $ 12,300,000 |
| march | $ 12,300,000 |
| april | $ 12,300,000 |
| may | $ 12,300,000 |
| june | $ 12,300,000 |
| july | $ 12,300,000 |
| august | $ 12,300,000 |
| september | $ 12,300,000 |
| october | $ 12,300,000 |
| november | $ 13,350,000 |
| december | $ 14,400,000 |
| **2000** | |
| january | $ 15,450,000 |
| february | $ 16,500,000 |
| march | $ 17,550,000 |
| april | $ 18,600,000 |
| may | $ 19,650,000 |
| june | $ 20,700,000 |
| july | $ 21,750,000 |
| august | $ 22,800,000 |
| september | $ 23,850,000 |
| october | $ 24,900,000 |
| november | $ 25,950,000 |
| december | $ 27,000,000 |
| **2001** *and after no limit* | |

Ad-radin/99



**SOLIDERE**

# Addendum Agreement N° 2
# to the Contract

*Between*

## The Lebanese Company for the Development and
## Reconstruction of Beirut Central District S.A.L.

*and*

## Radian International LLC

*for*

# Normandy Landfill Treatment Contract
# Phase II



The Lebanese Company for the Development and Reconstruction of Beirut Central District, s.a.l.
Capital 1,650,000,000 US$ Fully Paid. Commercial Register 67000 Beirut.
Building 149, Saad Zaghloul Street, off Foch Street, P.O. Box 119493 Beirut, Lebanon.
Tel. (01) 980650 - 981350, Fax (01) 980661 - 980662
e-mail: solidere@solidere.com.lb
http://www.solidere.com.lb

HUG 24 2000 09:38 FR URS    - BETHESDH    301 656 3658 TU 14155477954    P.03/05



To the Contract signed on the 25th of January 1999 between the Lebanese Company for the Development and Reconstruction of Beirut Central District S.A.L (the "Employer") and Radian International LLC (the "Contractor"), and Addendum N° 1 dated 18th February 1999.

**WHEREAS**, both parties have signed a Contract (the "Contract") for the treatment of the Normandy Landfill Phase 2 located in the Beirut Central District.

**WHEREAS**, the Contractor has submitted a Claim (N° 1) and Request for Change Order (N° 1) in relation to the DUOS Waste Processing Plant.

**WHEREAS**, The Contractor has requested a change in the Time for Completion for the Whole of the Works. In addition, the Contractor has proposed the re-phasing of the Works. The re-phasing consists of the completion of the Works, from the west to the east, in segments stretching across the entire site from north to south. The Contractor has also requested the deletion of the Intermediate Milestones mentioned in Exhibit 5 to the General Conditions of Contract and in table 5.1 of the Technical Conditions.

NOW, THEREFORE, the Employer and Contractor agree as follows:

1. Paragraphs 2, 3 and 4 of Exhibit 5 to the General Conditions (Programme and Milestones) are hereby modified as follows:

   "All works must be completed within sixty (60) calendar months from the date of the Notice to Proceed.

   Excavation and filling of Section 1: Intermediate Milestone deleted.

   Excavation and filling of Section 2: Intermediate Milestone deleted.

   Excavation of Sections 1, 3, 4 and that part of Section 2 west of the line (and its projection) between Sections 5 & 4 together with backfilling of Section 1 and the above-mentioned part of Section 2 must be completed within 1090 days as from the issuance of the Notice to Proceed. Completion of these works by the due date constitutes an Intermediate Milestone in accordance with the Contract."

2. The dates for completion mentioned in table 5.1 (Phasing Requirements) of the Technical Conditions are hereby modified as follows:

   | Section 1: | Milestone date deleted. |
   |---|---|
   | Section 2: | Milestone date deleted. |

2



Excavation of Sections 1, 3, 4 and that part of Section 2 west of the line (and its projection) between Sections 5 & 4 together with backfilling of Section 1 and the above-mentioned part of Section 2 must be completed within 1090 days as from the issuance of the Notice to Proceed.

Whole of the Works: All works within 60 calendar months from the Notice to Proceed.

3. No additional costs shall be paid by the Employer to the Contractor in respect of the extended completion dates. Therefore, the Contract Price shall remain unchanged in relation with items 1 and 2. The Contractor hereby waives all rights in respect of such extended completion dates.

4. In an addition to the Contract Price the Employer agrees to:

    i.    Reimburse the Contractor, no later than September 15th, 2000, for the direct cost, FOB the site, of the Wildcat Trommel Model 6-280 which was delivered to the project on July 26, 2000, and

    ii.    Reimburse the Contractor, within 60 days of delivery to site, for the direct cost, FOB the site, of a Wildcat Trommel Model 6-280. The Wildcat Trommel Model 6-280 shall be of the same specifications as the trommel delivered on July 26, 2000.

    iii.    Pay the Contractor the amount of $120,000 (One Hundred and Twenty Thousand U.S. Dollars) in full and final settlement of the Contractor's Claim N° 1.

    iv.    Pay the Contractor the additional amount of $240,000 (Two Hundred and Forty Thousand U.S. Dollars) in one lump sum payment.

5. The Contractor hereby:

    i.    Withdraws the Request for Change Order No. 1 submitted under cover of its letter ref. ABO/CM/096 dated 19th November 1999.

    ii.    Waives irrevocably and unconditionally its right to any past, present or future claims or Change Orders in respect of the design specifications for, the performance of, and any other matters whatsoever related directly or indirectly to the DUOS WPP.

    iii.    Waives all rights to make any claims or request any Change Order in respect of the delay in the issuance of the letter of credit by the Employer.

3

AUG 24 2000 09:39 FR URS    = BETHESDA    301 656 3650 TO 14155477954    P.05/05



All rights of the Contractor to claim any extension to the Time for Completion and/or any increase to the Contract Price, in respect of the above items (i)-(iii) inclusive, are hereby finally and irrevocably waived.

6. The Contractor shall submit a detailed loaded programme fully in accordance with G.C. Clause 21 for the proposed re-phasing of the Works no later than 30 days from signature of this addendum to Contract.

7. Payments in accordance with items 4 (iii) and 4 (iv) shall be made within 30 days following submittal of the requisite detailed programme as in item 6.

8. Liquidated damages in accordance with clauses 22.3 and 22.4 of the General Conditions and clause 6 of the Agreement shall be applicable in the event the Contractor fails to complete the Works, or any specified section thereof, in accordance with the revised dates for completion specified in items 1 and 2 hereof.

Items 1 & 2 of this Addendum supercede Clause 2 of Addendum Nº 1.

All other terms of the Contract (and Addendum Nº 1) shall remain applicable.

This Addendum forms part of and shall be read in conjunction with the Contract.

IN WITNESS WHEREOF the Employer and the Contractor have caused this Addendum Agreement to be duly executed the day, month and year set forth hereunder.

0 1 5 3 7

Employer:-                                             Contractor:-

The Lebanese Company for the Development      Radian International LLC
And Reconstruction of Beirut Central District

By:  _____                                By: _____

Name: MAHER Y. BEYDOUN                                 Name: B B HOSEIN
                                                             A H 187

Title: VICE - CHAIRMAN                                 Title: Sr Vice Presid

Date: 18.08.00    A H 187    63 0 0 0 0              Date: 000 999

4                          0 1 5 3 8

** TOTAL PAGE.05 **



# GENERAL CONDITIONS

## OF

## CONTRACT





Normandy Landfill Treatment Contract - Version 22.03799
Ref. N1/c



# TABLE OF CONTENTS
## TO
### GENERAL CONDITIONS
### OF
### CONTRACT

| GENERAL CONDITION N° | PAGE N° |
|---|---|
| 1. Certain Definitions and Interpretations | 1 |
| 2. Roles and Authority of other Parties ; Representatives ; Communications and Approvals | 4 |
| 3. Contract Documents | 5 |
| 4. Sufficiency of Contract Price | 6 |
| 5. Certain Representations and Warranties of the Contractor | 6 |
| 6. Assignment and Subcontracting by the Contractor | 7 |
| 7. Contractor Obligations as to Employer Supplied and Other Information and as to Site and Surrounding Conditions | 7 |
| 8. Risk, Responsibility and Liability for Physical, Surface or Sub-surface Conditions | 8 |
| 9. General Coordination and Cooperation Obligations of the Contractor | 9 |
| 10. Design and Method Statement Responsibilities of the Contractor | 9 |
| 11. Permits, Licenses, Notices and Fees; Taxes and Customs Duties, Etc. | 10 |
| 12. Interference with Traffic and Adjoining Properties | 11 |
| 13. Access and Transportation | 11 |
| 14. Contract Submittals | 12 |
| 15. Contractor's Supervision and Staff | 14 |
| 16. Contractor's Labor and Daily Log | 15 |
| 17. Site Health and Safety Precautions and Site Space Utilization | 15 |
| 18. Setting-Out of the Works | 16 |
| 19. Responsibility for the Works | 16 |
| 20. Contractor's Obligations to Keep Site Clean | 17 |
| 21. Contractor's Detailed Programme | 17 |
| 22. Contractor's Responsibility for Non-Performance, Etc. and Indemnity | 20 |
| 23. Treated Product / Workmanship / Plant / Materials /Equipment | 22 |
| 24. Periodic and Other Payments by the Employer to the Contractor | 25 |
| 25. Changes in the Works | 25 |
| 26. Completion | 28 |
| 27. Issuance of Certificate(s) of Partial Completion | 28 |
| 28. Issuance of the Certificate of Completion | 28 |
| 29. Contractor's Guarantee | 29 |
| 30. Contractor to Search for Defects | 30 |
| 31. Issuance of the Certificate of Expiration of the First Year of Period of Guarantee | 30 |
| 32. Performance Letter of Guarantee | 30 |
| 33. Suspension by Employer | 32 |

(i)

Normandy Landfill Treatment Contract – Version 22.03.99
Rev. Nife



Force Majeure ............................................................
Termination ................................................................ 32
Insurance .................................................................... 99
Working Time Regulation ............................................. 36
Fossils, Coins, Etc. ...................................................... 36
Photography and Filming ............................................. 37
Confidentiality of Documents and Information .............. 37
Ownership of Employer's Name, Signs, Etc. ............... 37
Ownership of Documents, Etc. .................................... 38
Site Security, Environmental Protection and Site Organization ............... 38
Settlement of Disputes ................................................ 38
Rights of Inspection – Books and Records ................... 39
Relationship Between the Parties ................................ 39
Failure to Enforce ....................................................... 39

48.    Language of Communications, Signage, Labels, Etc. ................. 39
49.    Invalid Provisions ....................................................... 39
50.    Governing Law ............................................................ 40
51.    Edmax ........................................................................ 40
           ........................................................................ 40

## EXHIBITS

1.    Contract Price Breakdown and Schedule of Value
2.    Schedule of Unit Rates and Schedule of Unit Prices.
3.    Terms and Conditions Governing Periodic and Other Payments by the Employer to the Contractor
4.    Form of Request for Change Order and Form of Change Order
5.    Programme and Milestones and Contractor Preliminary Detailed Method Statements
6.    Form of Performance Letter of Guarantee.
7.    Insurance Provisions

\* \* \* \* \* \*

(ii)





Normandy Landfill Treatment Contract – Version 22.03.99
Red line



## TABLE OF DEFINITIONS
## TO CONTRACT

| TERM | Defined at |
|------|------------|
| Agreement | GC 1.1 |
| Approved and Approval | GC 1.1 |
| BOD | GC 1.1 |
| CDR | GC 1.1 |
| Certificate of Completion | GC 1.1 |
| Certificate of Expiration of the First Year of Period of Guarantee | GC 31 |
| Certificate of Partial Completion | GC 1.1 |
| Change Order | GC 1.1 |
| Communication | GC 25.1 |
| Completion or Complete(d) | GC 1.1 |
| Construction Manager | GC 1.1 |
| Construction Materials | GC 1.1 |
| Construction Plant | GC 1.1 |
| Consultant Engineer | GC 1.1 |
| Contract and Contract Documents | Agreement, Article 2 |
| Contract Period | GC 1.1 |
| Contract Price | Agreement, Article 4.1 |
| Contract Submittals | GC 14.1 |
| Contractor | Agreement, Introduction |
| Contractor's Preliminary Detailed Method Statement | Agreement, Annex 2 |
| Contractor's Staff | GC 1.1 |
| Day | GC 1.1 |
| Defective | GC 29.1 |
| Detailed Programme Impact Study | GC 25.8 |
| Development | GC 1.1 |
| Drawings | GC 1.1 |
| Employer | Agreement, Introduction |
| End Product | GC 1.1 |
| Event of Default | GC 35.1 and GC 35.2 |
| Fit for the Purpose | GC 1.1 |
| Force Majeure | GC 34.1 |
| General Conditions of Contract ("GC") | GC 1.1 |
| Manager | GC 15.2 |
| Materials | GC 1.1 |
| Material to be Treated | GC 1.1 |
| Method Statement | GC 1.1 |
| Milestone(s) | GC 1.1 |
| Notice of Claim | GC 25.12 |
| Notice of Termination | GC 35.1 |
| Notice of Termination for Convenience | GC 35.4 |
| Notice to Proceed | GC 1.1 |



| | |
|---|---|
| Performance Letter of Guarantee | GC 32.1 |
| Permanent Works ......................................... | GC ... |
| Plant ........................................................... | GC 1.1 |
| Programme .................................................. | GC 1.1 |
| Public Authority ......................................... | GC 1.1 |
| Request for Change Order ("RFCO") ............... | GC 25.3 |
| Schedule of Values ...................................... | Exhibit 1, Agreement, |
| Site .............................................................. | GC 1.1 |
| Specifications .............................................. | GC 1.1 |
| Subcontractor .............................................. | GC 1.1 |
| Subcontractor's Staff ................................... | GC 1.1 |
| Superintendent ............................................ | GC 15.1 |
| Supplier ....................................................... | GC 1.1 |
| Technical Conditions of Contract ("TC") ......... | GC 1.1 |
| Technical Controller .................................... | GC 1.1 |
| Temporary Works ......................................... | GC 1.1 |
| Test(s) ......................................................... | GC 23.1 |
| Time for Completion .................................... | Agreement, Article 3.2 |
| Unit Price Schedule...................................... | Agreement, Annex 1 |
| Work Products ............................................. | GC 41.1 |
| Works .......................................................... | GC 1.1 |

* * * * * *

(iv)







# GENERAL CONDITIONS
## OF
## CONTRACT

### Certain Definitions and Interpretations

**1.1** In the Contract, the following words and expressions shall have the meanings hereby assigned to them, except where in the context another meaning is obviously required :

**"Agreement"** means the Agreement, made between the Employer and the Contractor.

**"Approved"** and **"Approval"** means approved in writing, including subsequent written confirmation of previous verbal approval.

**"BCD"** means the area whose geographical limits are defined by Decree No. 2236 dated 9 February, 1992 and includes the area of reclaimed land from the sea defined by Decree No. 4830 dated 4 March, 1994 and by Decree No. 5609 dated 3 September, 1994.

**"CDR"** means the Council for Development and Reconstruction, at Talet al-Serail, Beirut, the Republic of Lebanon.

**"Certificate of Completion"** means with respect to the Permanent Works, the certificate issued pursuant to the terms of GC 28, which will only be issued when the entire Permanent Works are Complete, and the issuance of such certificate shall constitute evidence of the Employer's acceptance or "reception" of the Permanent Works.

**"Certificate of Partial Completion"** means with respect to part of the Permanent Works, the certificate issued pursuant to the terms of GC 27, which may be issued at the sole discretion of the Employer, when the part of the Permanent Works to which such certificate relates, are Complete, and the issuance of such certificate shall constitute evidence of the Employer's acceptance or "reception" of such part of the Permanent Works.

**"Change Order"** means a written agreement between the Employer and the Contractor in the form set forth in Exhibit 4 or as otherwise prescribed by the Employer, executed by the parties, constituting a change to the Contract.

**"Completion'** or **"Complete(d)"** means the full execution and performance of the design, supply, execution, treatment and testing of the entire Works in strict conformity in all respects with the Contract, so that the Employer can occupy and/or utilize the entire Works for the beneficial use intended by the Employer.







"Construction Manager" ~~means the~~ entity notified or which will be notified to the Contractor by the Employer, appointed by the Employer ~~to act as Construction Manager~~ in connection with the Completion of the Works and whose principal duties will be to manage, coordinate and monitor compliance and the performances of all of the entities involved in the performance of the Works under their respective contracts with the Employer; to Approve the Detailed Programme of the Contractor to verify that the Contractor's Method Statement, specifications, standards and critirea relating to the works are in accordance with the requirement and standards and intent set forth in the TC; and to make recommendations to the Employer concerning payments to be made to the Contractor and eventual Change Orders under the Contract.

"Plant" means all equipment, appliances or things of whatsoever nature required in or about the execution of the Works, but does not include Materials.

"Contractor's Staff" means those directors, officers, employees, agents and servants employed by the Contractor from time to time in the performance of its duties and obligations in relation to the Works, including, without limitation, the Project Manager and Project Superintendents.

"Contract Submittal" means any submittal of any kind which the Contractor is required under the Contract to submit to the Employer's and/or Construction Manager's review and approval, including without limitation material samples, Drawings and Specifications catalog cuts, test results, schedules, Method Statements, Detailed Programme, Site-specific health and safety plan and the like as required under any of the Contract Document.

"Day" means calendar day.

"Development" means the complete development, reconstruction and restoration of BCD, including, without limitation, the execution of infrastructure and marine protection works; the development and rebuilding of the area comprised within BCD by the restoration of existing buildings and the construction of new ones; and the sale, leasing or rental of land or property within BCD.

"Drawings" means the drawings listed or set forth in the TC and any additions or modifications to, or clarifications of, such drawings made by the Employer and/or the Contractor and Approved by the Employer or on its behalf by the Construction Manager.

"End Product" means the result of the Works executed in accordance with the Contract and which must be delivered to the Employer and meet at least the minimum critirea and standards set forth, including but not limited to land Fit for the Purpose, but does not include any requirement for structural support of future buildings at the Site.

"Fit for the Purpose" means the land cleaned from any contaminated products, ~~environmentally safe and which~~ is available to be built on including landscape Works, without the need for any environmental treatment or containment.



2
Normandy landfill Treatment Contract - Version 22/03/99
Reg Hfc



"General Conditions" or "GC" means the general conditions of Contract and all Exhibits thereto, or any general condition of the Contract as the context may require.

"Method Statement" means Contractor's methods, techniques, Plant and Materials to be employed and used in the execution of the Works and shall extend to include the estimated volumes of materials to be treated by the various methods proposed by the Contractor.

"Materials" means the equipment, fixtures, goods, systems, materials and other things to form part of or to be incorporated into any part of the Permanent Works.

"Material to be Treated" means all material that will be processed according to items 1.1, 1.2, and 1.3 of the Method of Statement as indicated in the Technical Conditions.

"Milestone(s)" means any date(s) set forth in the Programme and/or the Detailed Programme, by which the Contractor is obligated to Complete such part of the Works to which such Milestone(s) relate(s).

"Notice to Proceed" means the notice to be issued by the Employer to the Contractor instructing the Contractor to commence performance of all, or, such part only, of the Works, as shall be specified in such notice.

"Permanent Works" means every work executed by the Contractor and has a permanent nature *and which include the End Product*.

"Plant" means all equipment, appliances or things of whatsoever nature required in or about the execution of the Works, but does not include Materials.

"Programme" means the programme establishing the major time constraints for the Completion of the Works by the Contractor, set forth in Exhibit 5 to the GC.

"Public Authority" means any governmental, regional, or city entity, agency or individual acting in an official capacity.

"Site" means the land in, on or through which the Works are to be executed the boundaries of which are indicated in the Drawings and any other lands and places provided in writing or Approved by the Employer to the Contractor for working space or any other purpose, or, as may be specifically designated in the Contract as forming part of the Site.

"Special Waste" means waste which is enclosed in drums barrels or similar packaging and which is not amenable to being treated by the methods identified by the Contractor to deal with the municipal and inert material on the Site.
Animal carcasses, sharps and plasma bags specifically shall not be classed as special waste.

"Specifications" means the technical criteria or standards and other descriptions and/or requirements set forth in the TC including, without limitation, Materials, equipment, systems, methods and all other information describing and/or required for the Completion and guarantee of the Works and forming part of the Contract and any modifications thereof.



3

Normandy Landfill Treatment Contract - Version 22.3.99
Reg. Life

in addition thereto as may from time to time be furnished by the Employer and/or the Contractor and Approved by the Employer, or, which may be agreed by the parties.

"Subcontractor" means any person, firm or legal entity (other than a Supplier or an individual who is a member of the Contractor's Staff or of any Supplier's staff), at any tier, retained or employed by the Contractor or any Subcontractor to perform any part of the Works.

"Subcontractor's Staff" means with respect to any Subcontractor, those directors, officers, employees, agents and servants employed by such Subcontractor from time to time in discharging its duties under its subcontract.

"Supplier" means any person, firm or legal entity which sells or otherwise provides Materials or Plant to the Contractor or any Subcontractor or otherwise undertakes to assist the Contractor or any Subcontractor in the performance of any part of the Works, but which, in each such case, does not perform other than incidental or immaterial services on the Site with respect thereto.

"Technical Conditions of Contract" or "TC" means the Technical Conditions of Contract comprised of the Drawings and the Specifications.

"Temporary Works" means all temporary works of every kind required in or about the performance of the Works.

"Works" means all the operations mentioned in the TC and not limited to excavation above and under sea level, sorting, crushing, treatment of all the waste, screening and back filling all of a permanent nature required in or for the Completion and guarantee of the Permanent Work sand End Product, so far as the necessity thereof is specified in or may reasonably be inferred from the Contract or is otherwise required for the Completion and guarantee of any part of the Permanent Works.

1.2　　Words importing the singular also include the plural and vice versa where the context requires.

1.3　　The headings in the GC or TC shall not be deemed to be part thereof or be taken into consideration in the interpretation or construction thereof or of the Contract.

2.　　**Roles and Authority of other Parties; Representatives; Communications and Approvals**

2.1　　The Construction Manager is empowered to take all actions and give all instructions and Approvals in the Employer's name and on its behalf under the Contract except where otherwise provided under the Contract and provided, however, that the Construction Manager shall not be empowered to change the Contract Price or the Time for Completion, which may be made only by way of a Change Order signed by a duly authorised officer of the Employer.





2.2    All communications of any kind, from or by the Contractor to the Employer (except for formal notices referred to in Article 7 of the Agreement) including those relating to or connected with the duties of the Construction Manager will be addressed or made to or through the Construction Manager only, which will be responsible for making or obtaining the necessary reply.

2.3    The Employer will appoint a representative ("Employer's Representative") who is empowered to act at all times for and on behalf of and to bind the Employer, in all matters relating to the Contract. Such appointment and any revocation thereof shall be notified in writing by the Employer to the Contractor.

2.4    The Construction Manager will appoint a representative ("Construction Manager's Representative") who is empowered to act at all times, for and on behalf of and to bind the Construction Manager, in all matters relating to the Contract. Such appointment and any revocation thereof shall be notified in writing by the Construction Manager to the Contractor, with a copy to the Employer.

2.5    The Construction Manager or the Construction Manager's Representative may appoint any number of persons to assist in the performance of its duties. Any such appointment, together with the duties and scope of authority of such persons and any revocation of any such appointment, shall be notified in writing by the Construction Manager to the Contractor, with a copy to the Employer.

2.6    The Contractor will appoint a representative ("Contractor's Representative") who is empowered to act at all times for and on behalf of and to bind the Contractor in all matters relating to the Contract. Such appointment and any revocation thereof shall be notified in writing by the Contractor to the Employer and to the Construction Manager.

2.7    No Approval or oral approval or commitment given by the Employer or on behalf of the Employer by the Construction Manager, shall (i) change, relieve, discharge or release the Contractor from any of its obligations, responsibilities and undertakings under the Contract, except if by way of a Change Order signed by a duly authorized officer of the Employer; or (ii) constitute a representation, warranty or agreement that the subject matter of any such Approval or oral approval or commitment (including, without limitation, the Detailed Programme, the Materials and Methods Statements), for which the Contractor alone shall at all times remain responsible, is feasible, appropriate or meets or complies with the purpose intended or other Requirements of the Contract.

3.    **Contract Documents**

3.1    The Contract Documents are complementary and are intended to be mutually self-explanatory, but in the event of a discrepancy between them and subject to GC 3.2, the following order of precedence shall be used : (i) the Agreement ; (ii) the GC ; (iii) the TC.

3.2    Any item of the Works mentioned in any component part of the TC shall be provided as if shown and mentioned in all component parts. Any discrepancy within the documents comprising the TC or between the Contract Documents shall be resolved in




5
Normandy Landfill Treatment Contract - Version 22.03.99
Ref. Nife



favor of providing the better quality or greater quantity or Works, with no increase to the Contract Price and/or any extension to the Time for Completion and/or any Milestone.

3.3    The Employer may at any time cause clarifications of any of the Contract Documents to be provided which shall become part of the Contract Documents.

## 4.    Sufficiency of Contract Price

4.1    The Contractor has satisfied itself as to the correctness and sufficiency of the Contract Price, which includes all payments to be made by the Employer to the Contractor of whatever nature, including, without limitation, for all of the Contractor's costs, overheads, profits, taxes, including, without limitation, withholding taxes (whether in the Republic of Lebanon or elsewhere) and social security, medical and retirement contributions, and which is complete compensation for, and in consideration of, all of the Contractor's obligations, responsibilities and undertakings under the Contract, including, without limitation, performance of the Works and Completion and guarantee of the Permanent Works.

4.2    Notwithstanding any Method Statement included in the Technical Conditions of the Contract, the Contractor will do all the necessary to achieve End Product, without being entitled to any increase in cost or extension of time, except as set forth herein.

## 5.    Certain Representations and Warranties of the Contractor

5.1 The Contractor hereby represents and warrants to the Employer (i) that it has carefully reviewed, read and understood all of the provisions of the Contract Documents and has executed the Contract fully intending to be bound thereby; (ii) that it is a highly competent professional and is well qualified and has adequate personnel and resources to perform the Works; (iii) that in its performance of the Works, it shall fully comply with all applicable national, regional and city laws, rules, codes and regulations, including those relating to environment, the employment of labor, safety standards, hygiene and taxation imposed by any competent Public Authority; (iv) that it is familiar with and shall perform the Works in accordance with the most recent and reliable professional and industry standards, skill and care and in the most expeditious and economical manner consistent with the best interests of the Employer; (v) that it shall perform the Works in accordance with the Preliminary Programme and Milestones, the Detailed Programme and the Time for Completion and shall at all times employ and supply in the performance of the Works sufficient Contractor's Staff, Materials and Plant to maintain such progress; and (vi) that the execution of the Works as required under the Contract, can be implemented, and shall comply with all of the Specifications, Requirement, criteria and standards set forth in the Contract, (vii) that the Works when completed shall be Fit for the Purpose intended, (viii) that all materials which could be found will be dealt with by the Contractor except unexploded ordinances, which shall be handled by the Employer upon request of the Contractor, and humain remains which shall be handled as directed by the Employer, that the treatment of each material will be appropriate, (ix) that all Materials (a) shall conform to and comply with the Contract Documents; (b) be free from all apparent and hidden defects; and (c) be Fit for the Purpose intended and in good condition.

5.2  The Contractor hereby represents and warrants that he shall execute the Method Statement as included in the Technical Conditions of the Contract. Any modification to the Method Statements in order to reach End Product must be previously approved by the Employer without entitling the Contractor to any additional cost or extension of Time for Completion.

5.3  The Contractor further represents and warrants to the Employer that it has not entered into any agreement or arrangement of whatsoever nature, nor shall enter into any such Agreement or arrangement with any person or entity whatsoever, for the payment of money or for the giving of any other type of favors or advantages related to the Contract or the performance of the Works and that it shall immediately inform the Employer if any approach or effect is made by any party to convince it to enter into any such agreement or arrangement.

6.    **Assignment and Subcontracting by the Contractor**

6.1    The Contractor shall not assign this Contract or any part thereof, without the prior Approval of the Employer.

6.2   The Contractor shall not Subcontract or otherwise delegate performance of any part of the Works nor enter into any agreement with any Supplier without the prior approval of the Employer which approval shall not be unreasonably withheld. As a condition precedent to granting any such approval, the Contractor shall ensure that the terms of all agreements entered into with any Subcontractor or Supplier shall include at a minimum all relevant obligations of the Contractor under this Contract and shall incorporate the terms of the Contract Documents by reference.

6.3 The Contractor shall inspect and coordinate the Works of all Subcontractors and Suppliers and ensure that the Works are performed in accordance with the terms of the Contract Documents and shall reject and correct, or cause to be corrected, those portions of the Works which do not conform to the requirements of the Contract Documents. The Contractor shall be fully responsible to the Employer for all Works performed by any Subcontractor or Supplier and for all acts, errors, omissions, of any Subcontractor or Supplier. The approval by the Employer of any Subcontractor or Supplier shall not in any manner be construed as creating any contractual relationship between such Subcontractor or Supplier and the Employer. The Contractor shall be solely responsible for paying all amounts due to all of its Subcontractors and Suppliers.

7.   **Contractor Obligations as to Employer Supplied and Other Information and as to Site and  Surrounding Conditions**

7.1    The Employer has made available to the Contractor all relevant information in the possession of the Employer relating to the Site, including, without limitation, information (i) relating to environmental natural conditions, topographical, geological, hydrological and sub-surface conditions; (ii) relating to access and traffic constraints to, from and around the Site, and (iii) relating to the works which are being or will be performed on, around or near the Site contemporaneously with the Contractor's performance of the



7

Works. The Contractor acknowledges that the Employer neither represents nor warrants the accuracy, completeness or relevance of any of the Site information made available by the Employer, and any lack thereof shall be the Contractor's sole risk. The Contractor shall conduct all additional investigations as may be necessary for the proper performance of the Works.

7.2     The Contractor represents and warrants to the Employer that prior to the signing of the Contract (i) that it has made itself aware of the very substantial difficulties associated with road transportation, traffic and road congestion and major infrastructure works being performed in the BCD; (ii) that it has made such independent examinations, inspections, investigations and tests relating to the Works and the Site, its surroundings and all information available in connection therewith (including information furnished under the Contract) as should have been made by a reasonable, prudent and experienced contractor in the completion of the type of works the subject of the Contract, assuming all of the obligations, responsibilities, undertakings and liabilities of the Contractor under the Contract;   and (iii) that, in general, it has obtained for itself and satisfied itself as to the correctness and sufficiency of all necessary information as to the needs, risks and contingencies associated with its Completion and guarantee of the Works for the Contract Price and within the Time for Completion.

7.3     The Contractor acknowledges (i) that it has been afforded every opportunity to inspect and examine the Site and its surroundings and information available in connection therewith; and (ii) that where the Contract Documents contain recommendations or suggestions as to certain design, methods or processes, the Contractor has assured itself of the accuracy, reliability and appropriateness in the circumstances thereof and has made whatever calculations, verifications, studies and determinations it may deem necessary in the circumstances.

7.4     Without prejudice to the Contractor's obligations under above and its design obligations under the Contract, the Contractor warrants it has carefully reviewed the TC and shall, promptly and directly advise the Employer of any errors in the TC of which it is or becomes aware.

8.     **Risk, Responsibility and Liability for Physical, Surface or Sub-surface Conditions**

The Contractor assumes complete and exclusive risk, responsibility and liability for any and all physical, surface or sub-surface conditions encountered at any time during Completion of the Works to the exclusion of Special Waste which shall be dealt with according to the scope of works. Except as set forth in GC 20, the discovery of any Special Waste or unexpected or unforeseen physical, surface or sub-surface conditions shall under no circumstances entitle the Contractor to an extension of the Period for Completion and/or to an increase in the Contract Price or operate to relieve the Contractor of any of its obligations, responsibilities and undertakings under the Contract.




8
Normandy Landfill Treatment Contract - Version 22.01.99
Ref. NJC

### General Coordination and Cooperation Obligations of the Contractor

Because the Development will be completed by numerous owners, contractors and suppliers, often working in parallel or following one another, and will be achieved in stages, it is of paramount importance that performance of the Works is fully coordinated with preceding, concurrent and succeeding work performed or to be performed by others, in an orderly manner and in full and complete cooperation. Accordingly, the Contractor shall, in accordance with the overall requirements of the Development as determined by the Employer, afford all reasonable opportunities to any other owners, contractors or third parties and their workers, for carrying out their work and shall coordinate and cooperate in all respects and detail during every phase of the Contractor's performance of the Works.

9.2    The Contractor shall, coordinate, cooperate and conform fully and effectively the performance of all of its Works, with such requirements and conditions as the Construction Manager notify or recommend from time to time, provided, however, that the Construction Manager shall in no instance be authorized to change the Contract, including, without limitation, any change which will or might effect either the Contract Price and/or the Time for Completion and/or any Milestone and, provided, further, that no such notification or recommendation shall operate to exclude or limit the Contractor's obligations and liabilities under the Contract. The Contractor shall immediately inform the Employer of any change to the Contract suggested by the Construction Manager. Failure by the Construction Manager, to test, examine or disapprove any Works, including, without limitation, Materials, shall not prejudice the power of the Employer thereafter to disapprove such Works and to order the pulling down, removal or breaking up and replacement thereof.

9.3    In the event of any disagreement by the Contractor as to the requirements, conditions, directives, suggestions and recommendations of the Construction Manager, the Contractor shall prepare, for the Employer's review and answer, a written report to the Employer setting forth in reasonable detail the nature of the disagreement and the basis of the Contractor's position. This report shall not constitute any notice under GC 25.

9.4    The Contractor's Coordination and cooperation obligations shall include, without limitation, participation in frequent (periodic and special) meetings, day to day contacts and exchange of information and preparation of standardized documents and formats, and the preparation of fully coordinated drawings of all areas where the Contractor's works and join and interface with the work of others.

### 10.    Design and Method Statement Responsibilities of the Contractor

10.1    The Contract Documents, including, without limitation, the TC, contain the critireas and standards for the End Product on the basis of which the Contractor is to Complete the Works. The Employer does not represent or warrant that such critireas and standards are sufficient for the purpose intended.

10.2    The Contractor represents and warrants to the Employer (i) that prior to the signing of the Contract it has read and understood the TC; (ii) that it has made such independent verifications and tests relating to the execution of the Works (including

9
Normandy Landfill Treatment Contract – Version 22.03.99
Ref. Nlife

those elements furnished under the Contract) as should have been made by a reasonable, prudent and experienced contractor assuming the complete and exclusive responsibility and liability for the execution of the Works; (iii) that the Method Statement as developed by the Contractor under the Contract will be feasible, will be able to be implemented and that the Permanent Works will be Fit for the Purpose intended; and (iv) that the Works can be executed and Completed as required under the Contract.

10.3    It shall be the Contractor's responsibility to prepare and to develop the Method Statement of the Works through its various phases as foreseen in the TC; to prepare thereafter the Contractor's shop drawings and any other drawings, submittals of the types, standards and brands of the Materials, Plant and workmanship to be used in the Completion of the Works or any part thereof; and to perform any further Method Statement needed as a result of any change to the Works or for any unforseen discovery. Such Method Statement shall be carried out, completed and submitted in accordance with the Contract Documents. In the course of preparing, developing and completing the Method of Statement of the Works, the Contractor shall be entitled to prepare and submit to the Employer's Approval any Method of Statement solution for the Works, provided that such (i) complies in any and all respects with any and all Requirements set forth in the Contract, including without limitation the End Product critirea and standards and the scope of works, and (ii) does not alter or change the quality of the Works.

10.4    The Contractor accepts complete and exclusive responsibility and liability for the Method of Statement of the Works, and for the conformity of the Works as designed and executed by it, with any and all Requirements of the Contract.

10.5    The Contractor accepts complete and exclusive responsibility and liability for the sufficiency, appropriateness and suitability of any and all Requirements of the Contract for the proper performance, Completion and guarantee of the Works in accordance with the Contract. Notwithstanding that the Contractor shall comply with the Requirements of the TC and other technical Requirements for the Works set forth in the Contract, such compliance shall not in itself relieve the Contractor from any of its responsibilities, representations and warranties under the Contract, and it shall be the Contractor's responsibility to comply with any such additional requirements as may prove to be necessary or required for the proper performance, Completion and guarantee of the Works in accordance with the Contract.

11.    <u>Permits, Licenses, Notices and Fees; Taxes and Custom, Duties, Etc.</u>

11.1    Except as otherwise provided herein, the Contractor shall obtain (and update as may be required, including, without limitation, as a result of any changes to the Works) all necessary permits and licenses, give or file all notices, and pay all fees as may be required by all applicable laws, rules, regulations, ordinances or by-laws of any local or other Public Authority for performance of the Works by the Contractor and shall, upon the Employer's request, furnish the Employer with copies of any such permits, licenses or notices.




10

Normandy Landfill Treatment Contract – Version 22.03.99
Ref. File



The Employer shall from time to time upon the specific request of the Contractor, provide to the Contractor such reasonable assistance as shall be necessary in order to permit the Contractor to perform the said obligations.

11.5    The Contractor shall be solely responsible and liable for the payment of all taxes, duties, unemployment, social security, retirement, medical contributions and the like, of whatsoever nature, imposed on the Contractor by any Public Authority, arising out of or in connection with the Contractor's receipt of the Contract Price, the Contract and/or the Completion and guarantee of the Works and/or the employment by the Contractor of the Contractor's Staff, its Subcontractors and Suppliers at any tier and their respective personnel, including, without limitation, for all business, company, sales and income taxes and for customs and stamp duties including stamps for the Contract which amounts to 0.3% of the Contract Price.

## 12.    Interference with Traffic and Adjoining Properties

The performance of the Works shall be carried on so as not to interfere unnecessarily or improperly with the convenience of the public, or the access to, use and occupation of public or private roads and footpaths to any properties, whether in the possession of the Employer or of any other party.

The Contractor is not allowed to occupy any part of the working area of the marine works contract except as defined in the TC.

If any works have to be carried out in the above area, such work cannot be done as long as the Marine works contract is not completly executed, and without the prior approval of the Employer,

## 13.    Access and Transportation

13.1   The Contractor shall, prior to mobilization for any on-Site activity, provide in writing to the Employer for Approval, the Contractor's space proposal for such things as offices, equipment, parking and maintenance, material storage, and the like. Upon receipt of the Contractor's proposal, the Employer shall confer with the Contractor and shall issue a written response to the Contractor indicating the space or spaces allocated. The Employer shall provide to the Contractor access to so much of the Site as may be required to enable the Contractor to commence the performance of the Works and, from time to time as the Works proceed, access to such further portions of the Site as may be required for the Contractor to proceed with the Works in accordance with the Contract. The Contractor shall not be entitled to exclusive access and/or use to any part of the Site.

13.2   The Contractor shall prevent any highways or bridges communicating with or on the routes to the Site from being damaged or injured by any traffic of the Contractor or any of its Subcontractors or Suppliers and, in particular, shall select routes, choose and use vehicles and restrict and distribute loads so that extraordinary traffic from and to the Site shall be limited as far as reasonably possible.




11
Normandy Landfill Treatment Contract – Version 22.01/99
Ref. Nife

13.3    Should it be necessary for the Contractor to move loads of Plant, Materials or machinery over a highway or bridge, where damage may occur unless special protection or strengthening is carried out, then the Contractor shall give prior notice to the proper Public Authority, with a copy to the Employer, and effect such measures as may be required by the applicable Public Authority, all at its own cost.

13.4    If during the performance of the Works or at any time thereafter the Contractor or Employer shall receive any claim arising out of the performance of the Works in respect of damage or injury to routes, buildings or bridges, the party receiving such claim shall immediately report the same to the other party and the Contractor shall assume all responsibility and liability therefor.

14.    **Contract Submittals**

14.1    Not later than fifteen (15) Days after the issuance of the Notice to Proceed, the Contractor shall commence and thereafter proceed with the preparation of the Contract Submittals required for the performance of the Works or by the Contract Documents, and shall thereafter submit all such Contract Submittals to the Employer for its review and Approval to proceed as indicated. The Contractor shall initial and place its company stamp on each Contract Submittal using a title block prescribed by the Employer. Each Contract Submittal shall be issued in a transmission form prescribed by the Employer and shall comprise of up to four (4) hard copies, two (2) reproduciles and one (1) digital copy as required from time to time by the Employer.

14.2    Contract Submittals furnished by the Contractor shall be prepared in English, except as otherwise Approved by the Employer, shall comply with International Standard Sizes (base A4: 210 x 297 mm) with drawings established to ISO standards. They shall meet the requirements of the Contract and adequately describe the work or subject to which they refer. The title block, numbering, referencing and presentation of all Contract Submittals shall be prescribed by the Employer.

14.3    No portion of the Works requiring a Contract Submittal shall be started until the Employer has returned to the Contractor the Contract Submittals pertaining thereto Approved to proceed as indicated. It shall be the responsibility of the Contractor to submit each Contract Submittal on a regular basis and in reasonably small quantities and on a schedule that allows not less than thirty (30) Days for review and return to the contractor. Any Contract Submittal submitted by the Contractor for the Employer's review and approval shall be deemed automatically approved if within thirty (30) days from the Employer's receipt of such Contract Submittal the Employer has failed to return to the Contractor such Contract Submittal in accordance with GC 14.5.
The Contractor shall give written notice to the Employer of any Contract Submittal which in the Contractor's opinion has been automatically Approved pursuant hereto, within three (3) working days thereof.

14.4    If any Contract Submittal of the Contractor shows a variation from the requirements of the Contract Documents (including, without limitation, any requirements specified on or in any Drawings or Specifications) or from any Drawings or Specifications





previously Approved for any reason, the Contractor shall specifically mention each such variation and the reason therefor in its transmittal.

14.5    The Employer or its designee shall return each Contract Submittal to the Contractor stamped with one of the following: (i) No exceptions taken; (ii) Make corrections noted - do not resubmit; (iii) Make corrections noted - resubmit; (iv) Rejected - revise and resubmit. Under condition (i) the Contractor shall proceed. Under condition (ii) the Contractor shall proceed by implementing the comments received on the Contract Submittal; the Contractor shall revise the Contract Submittal as required, taking into account the comments received but shall not resubmit the Contract Submittal for Approval. Under condition (iii) the Contractor shall proceed by implementing the comments received on the Contract Submittal ; however, the Contractor shall revise the Contract Submittal as required, taking into account the comments received and shall resubmit the Contract Submittal for Approval as promptly as possible. Under condition (iv) the Contractor shall prepare the Contract Submittal in full conformity with the Contract requirements for resubmittal as promptly as possible, and the entire process shall be repeated but without any right of Contractor to any modifications of, or adjustments or variations in, the Contract Price, the Time for Completion and/or any Milestone, or any other terms or conditions of the Contract. Any "rejected" Contract Submittal which is resubmitted shall be accompanied by a written notification of any changes in such Contract Submittal made by the Contractor after rejection.

14.6    Approval to proceed as indicated on any Contract Submittal or automatic Approval pursuant to GC 14.3 shall not be construed as authorizing additional work or any modifications of, or adjustments or variations in, the Contract Price and/or the Time for Completion and/or any Milestone, or any other terms or conditions of the Contract. Approval to proceed as indicated of any Contract Submittal or automatic Approval pursuant to GC 14.3 shall not relieve the Contractor from responsibility for errors or omissions which may exist thereon, for the proper execution of the Works, or for furnishing of materials or work required by the Contract and as indicated on such Contract Submittal. Notwithstanding any other provision in the Contract, and irrespective of any Approval to proceed as indicated, the Contractor shall not be entitled to any increase in the Contract Price and/or extension of the Time for Completion and/or any Milestone where and to the extent that there has been: (i) any error, divergence, omission or discrepancy in anything provided by the Contractor under this GC 14, or provided by any other person or entity, that should have been detected by the Contractor, or for which the Contractor has assumed responsibility under the terms of the Contract; or (ii) any failure by the Contractor to provide any Contract Submittal in accordance with the Contract; or (iii) any failure by the Contractor to fulfill its obligations and responsibilities set forth in these GC including, without limitation, GC 5 and GC 14.7.

14.7    The Contractor's Contract Submittals shall  (i) satisfy in all respects any relevant performance specification  or any requirement included or referred to in the Contract; and (ii) shall be properly coordinated and integrated with the various elements of the C.

14.8    In addition to the notice requirements of GC 25 , if at the time the Contractor submits any Contract Submittal, it is aware of any fact related to the submission which it believes should give rise to a change in the Contract Price and/or extension to the time for



13
Normandy Landfill Treatment Contract - Version 22.03/99
Ref. mfc



Completion and/or any Milestone the Contractor shall notify the Employer in writing and if such notice is not given at the time of such submission the Contractor shall be deemed to have irrevocably waived the right to assert any related claim.

14.9   If requested by the Employer, the Contractor shall submit at such times and in such further detail as the Employer may reasonably require, information pertaining to the Method Statement which the Contractor proposes to adopt or use, together with all justification, so as to demonstrate to the Employer that such methods are safe, sound and protect and ensure the quality of the End Product.

14.10  The Contractor should provide the Employer with a progress report of the Works executed on Site and accompanied with a full set of progress photography.

### 15.   Contractor's Supervision and Staff

15.1   The Contractor shall appoint a  Manager (the "Project Manager") as its senior representative to supervise performance of the Works whose appointment and removal shall be subject to the Employer's Approval. Unless otherwise agreed, the Project Manager shall work and devote all of his time exclusively to  the Contract on Site and shall be available to attend any and  all meetings held in connection with the Works. The Project Manager shall receive and  implement, on behalf of the Contractor, directives and instructions from the Employer and shall be empowered to  act at all times for and on behalf of and to bind the Contractor in all matters relating to the Contract to negotiate any matters of modification, claim or dispute arising under the Contract.

15.2   The  Contractor shall provide and employ only such staff (the "Contractor's Staff") as are competent, skilled and experienced to give proper supervision to the Works and as required for the  proper and timely execution of the Works. The Contractor shall not employ for the performance of the Works any person unfit for or unskilled in his or her assigned task.   It is expressly understood and agreed that the Contractor shall remove at the request of the  Employer and without any entitlement to any increase in the Contract Price and/or in the Time for Completion, any member of the Contractor's Staff assigned to the Contract who the Employer shall deem unfit to perform the task assigned to him or otherwise finds objectionable regardless  of any prior Approval of such person, and such person shall  not again be employed in connection with the Contract without the Approval of the Employer.

15.3   The  Contractor's Staff will be liable to comply  with all laws and regulations in force in  the Republic of Lebanon, including those related to personal income tax and the Contractor shall comply with all applicable laws and regulations imposed upon it by reason of its being an employer of such personnel.

### 16.   Contractor's Labor and Daily Log

16.1   The Contractor shall  provide all labor, local or otherwise, as may be necessary to meet its obligations under the Contract.  The Contractor shall also make its own arrangements for the transport, housing, feeding and payment of its labor.




14
Normandy Landfill Treatment Contract – Version 22.03.1999
Reg Office



16.2    The Contractor shall provide on or near the Site, adequate sanitary facilities, drinking and other water, changing rooms, showers and any other facilities required by applicable laws or regulations and/or necessary for the use of the Contractor's Staff. All such facilities shall, however, be subject to the Employer's Approval as to appearance and location.

16.3    The Contractor shall not permit any alcoholic beverages, drugs, arms, weapons or ammunition to be consumed on, or brought on to, the Site by the Contractor's Staff or its Subcontractors, Suppliers or their respective agents or employees. The Employer has the right to confiscate any such substances or items found on the Site and to ban from the Site any person found in possession thereof.

16.4    The Contractor shall at all times take all reasonable precautions to prevent any unlawful, riotous or disorderly conduct by or among the Contractor's Staff or employees of its Subcontractors or Suppliers and for the preservation of peace and protection of persons and property in the location of the Works.

16.5    The Contractor shall not, in any circumstances, hire away or induce from their current employment, employees of the Employer or of others working in connection with the Development, notwithstanding the fact that the current work of such employees is delayed or suspended.

16.6    The Contractor shall submit a weekly report in a form supplied by the Employer which shall contain the following information at a minimum: (i) climatic conditions; (ii) hours worked; (iii) copies of accident reports and declarations of damage or loss to property (to be submitted immediately); (iv) staff and labor attendance; (v) major Construction Plant mechanical downtime; (vi) summary of daily activity; (vii) list of visitors and meetings; and (viii) any other information requested by the Employer.

17.    <u>Site Health and Safety Precautions and Site Space Utilization</u>

17.1    Within fifteen (15) Days from the Notice to Proceed, the Contractor shall, at its sole cost and expense, submit four (4) copies to the Employer of a plan for health and safety prepared by the Contractor.

17.2    The Contractor shall in connection with the Works provide and maintain at its own cost any lights, watchmen, fencing and security when and where necessary or as required by any Public Authority, for the protection of the Works, or for the safety and convenience of the public or others. Any such things provided by the Contractor shall first be Approved as to the quantity, appearance, location and type by the Employer and shall conform to the Employer's plan, if any, for security and safety within BCD.





15
Normandy Landfill Treatment Contract – Version 22.03.99
Ref: NIfe





## Setting-Out of the Works

The Contractor shall be solely responsible for the accurate setting-out of the Works in relation to original survey points given by the Employer and for the correctness of the position, level, dimension and alignment of all parts of the Works and for the provision of all the necessary instruments, Materials, Plant and labor in connection therewith. The Contractor shall, prior to the initiation of any Works at the Site, verify the correctness, position, level, dimension and alignment, performed by others. The Contractor shall preserve and protect at its expense all Employer furnished original survey points or monuments, the location of which the Employer reserves the right to move, at its expense. The Contractor shall maintain and preserve all stakes, markers and such other survey points of the Contractor until authorized by the Employer to remove them. If such stakes, markers and survey points are destroyed prior to Employer authorized removal, they will be replaced by the Contractor at its expense.

19. **Responsibility for the Works**

19.1. Subject only to the terms of GC 34, the Contractor assumes all risk of loss and shall be responsible and have full liability for, any loss of or damage to the Works arising out of or caused by any occurrence during the period commencing on the date of issuance of the Notice to Proceed and ending, in connection with the relevant part of the Works at midnight on the date that a Certificate of Partial Completion is issued by the Employer pursuant to GC 27 in relation to such part of the Works and ending in connection with the entire or remaining Works, at midnight on the date that a Certificate of Completion of the entire Works is issued by the Employer pursuant to GC 28. The Contractor shall protect the Works which may in any way be affected by the carrying out of other Works during such period.

19.2 If all or any part of the Permanent Works are damaged or polluted and the Contractor is responsible and liable to the Employer for such loss, damage or pollution under the provisions of this GC, at the request of the Employer, the Contractor shall, without prejudice to any other loss or damage to which the Employer is entitled, at the Contractor's own cost, promptly and diligently treat such parts of the Permanent Works so that the Permanent Works are in conformity in every respect with the Contract. The Contractor shall not be entitled to any increase in the Contract Price and/or extension to the Time for Completion if it is so required to repair or to treat any such part of the Permanent Works.

19.3 If at any time any remedial or other work shall in the opinion of the Employer be urgently necessary for the safety of the Works and the Contractor is unable or unwilling at once to do such work or repair, the Employer may, immediately and without the notice required under GC 35, employ and pay other persons to carry out such work or repair As the Employer may consider necessary. All expenses properly incurred by the Employer shall be reimbursed by the Contractor, or may be deducted by the Employer from any monies due or which may become due to the Contractor. The Employer shall, as soon





16
Normandy Landfill Treatment Contract – Version 22/03/99
Ref. 34/c



after the occurrence of any such emergency as may be reasonably practicable, notify the Contractor thereof in writing.

20. **Contractor's Obligations to Keep Site Clean**

The Contractor shall maintain all mobilisation and treatment areas used and occupied by it in a neat and controlled environment condition at all times. The Contractor shall immediately notify the Employer of the discovery of any human remains or explosive materials (which explosive materials shall be the Employer's risk and liability) which, shall not entitle the Contractor to an increase in the Contract Price and/or to an extension of the Time for Completion unless a delay results from the Employer's failure to handle the explosive materials or to direct the Contractor how to handle the human remains, in which case the Contractor may be entitled to an extension of the Time for Completion, if the delay(s) exceed fifteen (15) days in the aggregate for all such discoveries during the Contract. The Employer shall, at its expense, deal with all explosive materials discovered by the Contractor. The Contractor shall keep the Site free from all unnecessary obstruction and shall store neatly or remove from the Site promptly all unnecessary Plant, Materials or Temporary Works. In addition, no later than upon Completion of the Permanent Works, or upon early termination of the Contract (for whatever reason), or abandonment of the Works, the Contractor shall clear away and remove from the Site and its surroundings all Plant, Materials, rubbish of every kind, and leave the whole of the Site and Works clean. Should the Contractor fail to comply with the obligations of this GC, the Employer may, upon giving twenty four (24) hours notice, undertake to accomplish such obligations at the Contractor's expense.

21. **Contractor's Detailed Programme**

21.1 The Contractor shall, within the time limits stated in GC 21.2, submit and resubmit to the Employer for and until its Approval a Detailed Programme as outlined in GC 21.2 which once Approved by the Employer shall become the Contractor's Detailed Programme (the "Detailed Programme"). Such Detailed Programme shall be developed from and shall be consistent with the Contractor's Method Statement and with the Programme and shall incorporate all Milestones. In addition, the Detailed Programme shall take into account all factors or risks affecting, or which may affect, the Contractor's performance of the Works, including, without limitation, sorting and treatment of all special waste if any as required by the Technical Conditions of Contract all weather conditions, laws and regulations pertaining to the maximum number of working hours and Days per week and statutory holidays (all of which are the sole risk of the Contractor and shall not entitle the Contractor under any circumstances to an increase in the Contract Price and/or extension of the Time for Completion and/or any Milestone unless constituting an event of Force Majeure). The Contractor shall supply the Employer with two (2) copies of the Detailed Programme once Approved by the Employer and with two (2) copies of all Approved revised versions. The copies provided shall be in the form of magnetic diskettes and hard copy (paper) transmittals.




17
Normandy Landfill Treatment Contract - Version 22.01/99
Rev. NB

21.2    The Contractor shall submit the Detailed Programme within nine (9) weeks from the Employer's issuance of the Notice to Proceed in three (3) copies (free standing software and/or user network sessions) and in Primavera (latest version) using IBM compatible hardware or Employer Approved compatible substitutes. The Detailed Programme shall employ the precedence network technique in bar line format supported by a CPM logic network and shall include the following at a minimum: activity description, manpower loading by trade, order of precedence in which it proposes to carry out the Works, activity interdependence and relationships, duration and critical path of all tasks to be undertaken in the performance of the Works, all free and total float time per activity and all planned shift work and overtime. The Detailed Programme shall show dates of and/or start and finish dates for all Temporary Works (including offices and storage facilities); all design, construction, mock-ups/prototypes/ testing and commissioning; finishing work; Public Authority approvals; and permits required for the performance of the Works. The time units for all Detailed Programme activities shall be in Days. In addition, further subdivision into particular zones and/or levels may be requested by the Employer. Any changes to Detailed Programme activity duration, sequence, logic and the like must be Approved by the Employer and the Detailed Programme shall be updated whenever performance of any items of Works on the critical path is five (5) Days or more late, to reflect the current status of and all changes to the Works and/or strategy. Implementation and/or Approval of a revised logic and/or duration time estimates for updated Detailed Programmes, whether furnished by the Contractor or the Employer, shall not constitute or entitle the Contractor to an extension of the Time for Completion and/or any Milestone(s) to an increase in the Contract Price which may only be extended or increased, as the case may be, by a Change Order. Any revisions to the logic and/or duration time estimates for updated Detailed Programmes are made for the purpose of maintaining the accuracy of the Detailed Programme representation of the Works to be accomplished and to present best time estimates for Works yet to be performed. When submitting its Detailed Programme, the Contractor shall state the number of working Days per week, together with the number of shifts per Day for each activity, it intends to work and which are reflected in its Detailed Programme. The Contractor will at its cost furnish the Employer, upon request, with three original software packages and manuals of the software utilized by the Contractor in preparing its Detailed Programme.

21.3    All float-time identified within the Detailed Programme belongs to the Contractor, provided however, that in connection with any change to the Works ordered by the Employer and/or any Event of Force Majeure, the Employer shall be entitled to direct the Contractor to use any such float-time available at the time of the related change or event, as the case may be, to compensate for the time impact of such change or event on the performance of the works, without any increase in the Contract Price and/or extension of the Time for Completion.

21.4    The Employer's Approval of the Detailed Programme or any revisions thereto shall not be interpreted as an agreement that the Works or any task or event can be completed within the time allotted or with the manpower indicated, nor alter or waive the Contractor's obligation fully to Complete the Works or any part thereof in accordance with the Programme, Milestones and within the Time for Completion.





21.5    The Contractor shall submit to the Employer for approval a Contract Submittal Schedule and a Procurement Scheduled: (i) an initial Contract Submittal Schedule shall be furnished by the Contractor within fifteen (15) days from the Employer's issuance of the Notice to Proceed and shall include a listing of all method statements, procedural document, drawings, specifications and the like required by the Contract; and (ii) a final Contract Submittal Schedule shall be furnished by the Contractor within forty five (45) days from the Employer's issuance of the Notice to Proceed and shall include dates and timings for all above items. All Contract Submittals lists and/or Detailed Programmes shall be reconciled with any information furnished by the Employer and any conditions, corrections, deletions and/or discrepancies shall be identified and presented to the Employer for review.

In the case of the Procurement Schedule, (i) an initial Procurement Schedule shall be furnished by the Contractor within fifteen (15) days from the Employer's issuance of the Notice to Proceed and shall include a listing, indicating critical or long lead items and country of origin, of all material, plant and equipment purchases (excluding office and workshop equipment, office and workshop consumables, personal protective equipment and fuel) which are to be used in the execution and the completion of the Works, and (ii) a final Procurement Schedule shall be furnished by the Contractor within fourty five (45) days from the Employer's issuance of the Notice to Proceed and shall include dates and timings for all above items. The Employer reserves the right to make adjustments to the delivery schedule based upon on Site delivery constraints and country of origin.

21.6    In addition, one (1) month before the commencement of the Works by the Contractor on the Site as per Detailed Programme the Contractor shall provide a detailed, short-term schedule loaded with Materials and Plants covering the next four (4) weeks of planned work. This schedule shall be updated every two (2) weeks depicting a six (6) week "rolling window" to include all activities four (4) weeks in the future of and two (2) weeks in the past of the updated report. The short-term schedule shall be consistent and in accordance with the timing and sequencing shown in the Detailed Programme, and shall be in sufficient detail to enable the Contractor to control and manage the Works.

21.7    The Contractor shall be required to attend regular (generally weekly) Site meetings up to Completion of the Permanent Works. The progress planned and achieved relative to the Contractor's detailed six-week rolling window schedule shall be reviewed and recorded at these meetings. The Contractor shall, provide each month a written report to the Employer with the Contractor's Request for Payment. The minimum level of information required on this progress report shall be: contractual date for Completion; percentage progress scheduled and percentage progress achieved relative to each activity contained on the Contractor's Detailed Programme; actual start and finish dates for all activities; average rate of production for each item of Plant and combined average rate of production; reasons for any delays or anticipated delays and explanations of actions being implemented; any shortage of manpower and action being implemented; any shortage of information from whatever source; and any difficulties or delays in off-Site fabrication or delivery of Materials or Plants stating action being implemented, Works in progress and planned for the next two (2) weeks. The monthly report shall contain a graphic comparison between the Contractor's Detailed Programme and the current progress/projections.



21.8    The Contractor shall, whenever required by the Employer, also provide in writing a general description of the arrangements and methods which the Contractor proposes to adopt for the performance of the Works or any part thereof.

21.9    If at any time it should appear to the Employer that the actual progress of the Works does not conform to the latest Approved Detailed Programme, the Contractor shall produce, at the request of the Employer, a revised programme showing modifications to the latest Approved Detailed Programme necessary to ensure timely Completion of the Works in compliance with the Programme and Milestones. The revised programme shall be supported by a narrative description of the recovery plan which shall include, but not necessarily be limited to, changes in staffing, Plant, usage, methods of operation, Materials, and any other relevant details. If for any reason, the rate of progress of the Works or any part thereof is at any time, in the opinion of the Employer, too slow to ensure timely completion in accordance with the Programme and/or any Milestone(s), the Employer shall, without prejudice to any other rights under the Contract, so notify the Contractor in writing and the Contractor shall thereupon take such steps as are necessary to accelerate progress so as to Complete the Works or any part thereof by the prescribed time. If, as a result of any such notice given by the Employer, the Contractor shall seek the Employer's permission to perform any Works on an overtime basis or on holidays or Saturdays, such permission shall not be unreasonably refused. The Contractor acknowledges and agrees that the Employer may require the Contractor to modify its Site organization to work two (2) or three (3) shifts per Day. Except when the Contractor's performance of the Works is delayed as a result of events for which the Contractor is entitled to an extension of the Time for Completion under the Contract and the Employer directs the Contractor in writing to accelerate performance of the Works, the Contractor alone shall bear all additional costs and expenses it may incur in the acceleration of its performance. In the event acceleration is ordered by the Employer and the Contractor's progress is not less than that called for in the Approved Detailed Programme or the Contractor is entitled to an extension of the Time for Completion, and provided the Contractor otherwise complies in all respects with GC 14 and GC 25 as they may be applicable, the Contractor shall be paid for such acceleration in accordance with GC 25.

21.10    The Contractor recognizes and acknowledges that any material failure of, or suspension of the Works, by the Contractor or any Subcontractor or Supplier, would cause the Employer immediate and irreparable harm unable to be compensated by money damages alone, and the Contractor hereby accepts and agrees that it shall not under any circumstances whatsoever cease, delay or suspend performance of its Works under the Contract, except as may be expressly provided for under these GC.

22.    Contractor's Responsibility for Non-Performance, Etc. and Indemnity

22.1    In connection with any breach of any representation or warranty and in connection with any failure, breach, error or omission to perform, or in the performance of, any obligation, responsibility, or undertaking of the Contractor in accordance with the terms and conditions of the Contract by the Contractor or its Subcontractors or Suppliers or of their respective affiliates, officers, directors or employees, and subject to the terms of GC



20
Normandy Landfill Treatment Contract - Version 22.03.99
Ref. Nfc



22.3  and 22.4, the Contractor shall be fully responsible and liable to the Employer for, and shall indemnify the Employer ~~against~~ the full extent of any and all liabilities, loss and/or damage suffered, and for all additional costs and/or expenses incurred by the Employer (including, without limitation, financing costs, interest, attorneys' fees and expenses), up to a maximum of Twenty Millions United States Dollars (20.000.000 USD).

22.2  As set forth in the Contract, the timely performance and Completion by the Contractor of the entire Permanent Works within the Time for Completion and in accordance with the Programme and any intermediate Milestones is of the essence and a material term of the Contract.  The Completion of the Works within the Time for Completion is essential and vital for the timely and successful development and promotion of land and projects surrounding or near the Site and for the commercial viability and financial success of such parts of the Development for the Employer.

22.3  In the event the Contractor fails to Complete part of the Works by any intermediate Milestone applicable to such part of the Works (as any such Milestone may be extended from time to time in accordance with the terms and conditions of the Contract) the Contractor shall, for the number of Days specified in the Agreement of any such Contractor failure, unless and until the Employer exercises its termination rights pursuant to the Contract, pay the Employer, as liquidated damages and not as a penalty, the percentage of the Contract Price specified in the Agreement, for each Day, or part thereof, of such Contractor failure.

22.4  In addition to the provisions of GC 22.3, in the event the Contractor fails to Complete the entire Permanent Works within the Time for Completion (as such Time for Completion may be extended from time to time in accordance with the terms and conditions of the Contract) the Contractor shall, for the number of Days specified in the Agreement of any such Contractor failure, unless and until the Employer exercises its termination rights pursuant to the Contract, pay the Employer, as liquidated damages and not as a penalty, the percentage of the Contract Price specified in the Agreement, for each Day, or part thereof, of such Contractor failure.

22.5  The amount which the Contractor may become obligated to pay the Employer pursuant to GC 22.3 and/or GC 22.4 shall not exceed a cumulative total of fifteen percent (15%) of the Contract Price. The Employer may deduct from amounts due and payable to the Contractor under the Contract any amount which the Contractor owes the Employer under GC 22.3 and/or GC 22.4, but without prejudice to the Employer's right to make any demand for payment of such amount against the performance Letter of Guarantee.

22.6  Nothing in this GC 22 shall affect the right of the Employer to exercise, in addition to the rights specified in this GC, any other rights or remedies to which the Employer may be entitled pursuant to the Contract and/or applicable law, and in particular, and without limitation, the Employer's termination rights.

22.7  The Contractor shall be solely liable and responsible for, and shall indemnify the Employer against, all consequences of any claim (including, without limitation, all costs, expenses and attorneys' fees) arising out of or in connection with the performance of the Works or with any failure, breach, error or omission to perform by the Contractor, its



21
Normandy Landfill Treatment Contract - Version 22/6/1999
Ref. flc



subcontractors and Suppliers brought against the Employer by any entity or person, for any losses, damages or injuries of whatsoever nature suffered by such claimant, or the person through whom such claimant is claiming for personal injury, death, property loss or other damage and whether arising out of a tort, breach of contract or otherwise.

22.8    The  provisions of this GC 22 shall remain valid and applicable notwithstanding the expiration or early termination of the Contract.

### 23    Treated product/ Workmanship/Plant/Materials/Equipment

23.1    All Materials  and workmanship shall comply with the requirement of, and shall be of the respective  quality and kinds described in, the Contract and shall be subjected from time to time to such inspection  and tests ("Test(s)") as specified in the Contract, which shall include, without limitation, all required Tests as directed by or through the Construction Manager. The Contractor shall provide such laboratory assistance, instruments, machines, labor and materials as are normally required for examining, measuring and testing any Works and the quality,  weight or quantity of any Materials used. The Employer reserves the right to reject non-conforming or defective Materials and work at no cost to the Employer.

23.2   The Contractor is required to implement a quality control system to be Approved by the Employer  for sufficient control and testing (including giving prior written notice of all Tests) of all aspects of workmanship  and Materials as specified in the Contract. At the start of each phase of work,  the Contractor must demonstrate that the Contractor's methods, techniques and standards of work  are in strict compliance with the Contract requirements. Within sixty (60) Days of the signature of the Contract, the Contractor shall furnish the Employer  with a plan related to quality control and quality assurance systems pertaining to the Works.

23.3    The Contractor shall cooperate fully  with the Employer which may perform any Tests  to verify compliance with any requirements of the Works. The Contractor shall allow free and. ready access to the Site and execute  any preparatory work as may be directed.  The Employer shall  have access to any laboratory or agency under control or agreement with the Contractor to provide testing services.  The  Employer shall be provided with an original of all Test results. Under no circumstances shall this GC or any field  activity of the Employer or its representatives relieve the Contractor from its obligation to provide,  at its own cost, complete testing and reporting as may be outlined elsewhere in the Contract Documents, even in the event of duplication of certain activities. Whether any Test  or inspection  is carried out or not by the Employer, the Contractor is not relieved from any  provision of the Contract. All deficiencies whether discovered by the  Contractor's or Employer's testing or inspection program  shall be  remedied immediately to conform  to the Contract  requirements by the Contractor at its expense. The cost  of any Test shall be borne by the Contractor if such Test is customarily required by any Public Authority, or is required by or reasonably inferred from the Contract.  If any Test is ordered by the Employer which is not so required or intended then the cost of such Test  shall  be borne by the Employer unless the Test shows the workmanship or Materials





not to be in accordance with the provisions of the Contract or instructions given by the Employer.

23.4 The Employer and any person authorized by it shall at all times have access to the Works and to all workshops and places where Works are being prepared or from where Materials, manufactured articles or machinery are being obtained for the Works and the Contractor shall afford every facility for and assistance in obtaining such access.

23.5 No part of the Works shall be moved from one stage or area of work to a another one or put out of view without notification by the Contractor to the Employer at least twenty-four (24) hours in advance. The Contractor shall afford full opportunity for the Employer, and the Construction Manager, to examine and measure any part of the Works which is about to be moved or put out of view. No examination nor the failure to examine the Works shall operate to exclude or limit the Contractor's obligations and liabilities under the Contract.

23.6 Title to all Materials shall vest in the Employer upon arrival at the Site, or upon payment therefor, which ever occurs the earlier, free of all liens, claims, security interests and any other encumbrances or other charges of whatever nature.

23.7 The Contractor shall assure that Materials delivered to the Site (or elsewhere if necessary) are, to the extent necessary, fully protected from damage or deterioration by any cause; are maintained by the Contractor in "as-new" condition; are clearly marked and identified as being the property of the Employer; and are boxed, crated, wrapped, capped, lubricated, weatherized and otherwise fully protected by the Contractor from moisture deterioration or damage.

23.8 The Contractor warrants that all samples, catalog cuts and/or first articles furnished under the Contract, shall be wholly representative of the Works to be supplied and installed under the Contract. The Employer's acknowledgement, review or inspection of or its failure to acknowledge, review or inspect such samples, catalog cuts and/or first articles shall not exclude or limit the Contractor's obligations and liabilities under the Contract.

23.9 The Contractor shall uncover any part or parts of the Works or make boreholes in or through the same as the Employer may from time to time direct, and shall repair, reinstate and make good such part or parts. If such part or parts are found to be performed in accordance with the Contract, and provided that such part or parts had been previously moved by the Contractor in compliance with GC 23.5 the expenses of uncovering, making openings in or through, repairing, reinstating and making good the same shall be borne by the Employer, but in any other case all costs shall be borne by the Contractor.

23.10 If a failure or defect in or of the Permanent Works, Materials, Plants or workmanship in accordance with the Contract is discovered during the carrying out of the Works, upon such discovery the Contractor shall immediately state in writing to the Employer the action which the Contractor proposes to take at no cost to the Employer to remedy or repair such failure or defect, and establish that there is no similar failure or



23

Normandy Landfill Treatment Contract – Version 22.03.99
Rev. Mtfc

defect in Works already executed or Materials already supplied (whether or not incorporated in the Works). If the Employer has not received such statement within three (3) working Day of such discovery; or is not satisfied with the action proposed by the Contractor; or because of considerations of safety or any legal obligations is unable to wait for such written proposals from the Contractor; then the Employer may issue instructions requiring the Contractor immediately to remedy or repair the failure or defect and to make good any consequence thereof, all at the Contractor's cost, and/or may issue instructions requiring the Contractor immediately to open up for inspection any Works covered up or to arrange for any Test of any Materials (whether or not already incorporated in the Works) to establish that there is no similar failure or defect therein. The Contractor shall forthwith comply with any instruction issued under this GC and shall not be entitled to claim any extension of the Time for Completion and/or any Milestone or any addition to the Contract Price by reason of any such instruction or its compliance therewith.

**23.11**  The Employer shall during the performance of the Works have power to order the immediate removal from the Site, within such time or times as may be specified in the order, of any Materials which are not in accordance with the Contract; the immediate substitution of proper and suitable Materials; and the removal and proper re-execution, notwithstanding any previous Test thereof or interim payment therefor, of any Works which for any reason are not in accordance with the Contract.

**23.12**  The Contractor shall ensure that all plant and equipment used at the Site is in good working order and properly maintained.  In particular, the Contractor shall ensure that fuel and oil spills and or leaks are controlled so as not to cause any contamination of treated or untreated areas of the Site, of the sea, or of adjacent areas. Fuel bunkering, fueling, repairs, maintenance and, in particular oil changes shall, unless otherwise agreed by the Employer in advance, only be carried out in areas where measures have been taken to prevent contamination i.e. in specific bunkering, fueling and maintenance areas. The Employer shall have the right to order the immediate removal from the Site of any plant or equipment, which in his sole opinion has, is, or may cause contamination of the Site, the sea or adjacent areas and the Contractor shall not be entitled to any claim for additional costs, time or disruption arising from such action by the Employer. All waste materials arising from the operation and maintenance of plant and equipment on the Site shall be disposed of by the Contractor in an environmentally sound manner.

**23.13**  In case of default on the part of the Contractor in carrying out timely and prompt any instruction or order of the Employer issued pursuant to GC 23.10, 23.11 or 23.12, the Employer shall upon giving twenty four (24) hours notice to the Contractor, be entitled, without prejudice to any other rights or remedies it may have in relation thereto and without having to issue any formal Notice of Default under GC 35.2, to employ and pay other persons to carry out the same, and all expenses arising therefrom or incidental thereto shall be paid by the Contractor, or may be deducted by the Employer from any monies due or which may become due to the Contractor.





24
Normandy Landfill Treatment Contract - Version 22.03.99
Rev. One

24.   **Periodic and Other Payments by the Employer to the Contractor**

The terms and conditions governing periodic and other payments by the Employer to the Contractor of the Contract Price are set forth in Exhibit 3.

25.   **Changes in the Works**

25.1   The Contractor shall comply with and adhere strictly to any instruction, order, directive or similar communication ("Communication") on any matter concerning the Works and/or the Contract received from the Employer, including, without limitation, those relating to the variation or modification of the quality, or quantity of the Works or the addition to, omission from, or substitution for, any part of the Works, or, any discrepancy in or between Specifications, Drawings or other Contract Documents.

25.2   Except as provided in this GC 25, no Communication so issued to the Contractor shall result in any increase in the Contract Price and/or extension to the Time for Completion and/or any Milestone.

25.3   If the Contractor receives a Communication, whether oral or in writing and from whichever person or entity, that the Contractor believes should result in an increase in the Contract Price and/or extension to the Time for Completion and/or any Milestone, the Contractor shall not proceed to carry out the same (unless the Employer, whether in the original Communication or subsequent thereto, specifically directs the Contractor in writing to proceed to carry out immediately the same in any event) but shall submit to the Employer and separately to the Construction Manager, not later than ten (10) Days after the Contractor's receipt of such communication, a Request for Change Order containing the Contractor's reasons and full substantiation supporting such request and setting forth precisely the increase in the Contract Price and/or extension to the Time for Completion and/or any Milestone to which the Contractor believes it is entitled. If the Contractor shall fail to submit to the Employer any such Request for Change Order within such ten (10) Day time limit, the Contractor shall not be entitled thereafter to claim that it is entitled to an increase in the Contract Price or extension to the Time for Completion and/or any Milestone as a result of such Communication, but the Contractor shall nevertheless promptly, diligently and faithfully complete performance of the work.

25.4   If, following receipt of any Request for Change Order, the Employer determines that a Change Order is appropriate under the circumstances and if the Employer and the Contractor are able to agree upon the increase to the Contract Price and/or the extension to the Time for Completion and/or any Milestone (if any), the Employer will issue an appropriate Change Order, and such Change Order shall be signed by the parties and shall constitute total compensation due to the Contractor for the part of the Works contained therein.

25.5   If, following receipt of any Request for Change Order, the Employer determines that a Change Order is not appropriate under the circumstances, or if the Employer and the Contractor are unable to agree upon the increase to the Contract Price and/or the extension to the Time for Completion and/or any Milestone (if any), then the provisions of GC 25.7 shall apply.



25

Normandy Landfill Treatment Contract – Version 22.01.99

Reg Nife



25.6  If any Communication shall set forth the increase or reduction in the Contract Price and/or extension or reduction to the Time for Completion and/or any Milestone proposed by the Employer, the Contractor shall be bound thereby and shall carry out immediately the same unless the Contractor shall give the Employer written notice of its objections thereto within ten (10) Days of the Contractor's receipt thereof, and in such event the Contractor shall not proceed to carry out immediately the same (unless the Employer, whether in the original Communication or subsequent thereto specifically directs the Contractor in writing to  proceed to carry out immediately the same in any event).  Such written notice from the Contractor shall contain the Contractor's reasons and full substantiation supporting such objections and shall set forth precisely  the increase or reduction in the Contract Price and/or extension or reduction to the Time for Completion and/or any Milestone (if any) to which the Contractor believes it is entitled.   If the Employer and  Contractor are unable to agree upon such increase, extension or reduction, then the provisions of GC 25.7 shall apply.

25.7   In the circumstances stated in GC 25.5 and/or GC 25.6, the Employer shall determine what it considers to be fair, just and equitable under the circumstances, and shall give the Contractor  written notice of its determination. Upon receipt of any such determination, the Contractor shall promptly, diligently and faithfully perform the work required by such Communication (if it has not already begun to do so), notwithstanding anything in the Employer's determination with which the Contractor does not agree. Subject to compliance with GC 25.12 by the Contractor, the parties agree and expressly empower any arbitral tribunal appointed pursuant to  and in accordance with GC 43 to resolve  all unresolved issues between the parties arising out of this GC, including, without limitation, the power to determine the  price  and/or time impacts of any changes to the Works.

25.8   In  connection with any Request for a Change Order requesting an extension of the Time for Completion and/or any Milestone,  the Contractor shall, no later than ten (10) Days  after the Employer's request therefor, submit a Detailed Programme impact study (a "Detailed Programme Impact Study") which shall  describe in detail the effects of the requested adjustments or variations on the Detailed Programme. The Detailed Programme Impact Study shall  include, without limitation, the Contractor's description and planned sequence  of performing the work called for in the Request for Change Order, any proposed shop drawings, coordination drawings or other drawings, a proposed Detailed Programme for the procurement and delivery of Construction Materials required, the proposed revisions to the Detailed Programme, including the activities affected and any other items that may effect the Time for Completion and/or any Milestone. The Detailed Programme Impact  Study shall be reviewed by the Employer and after the same has been Approved,  the Detailed Programme and Programme (including any relevant Milestone set forth thereon) and the Time for Completion  shall be modified to take into account the effect agreed by Change Order. In connection with any change in the Works and/or any event which under the Contract entitles  the Contractor to an extension of the Time for Completion and/or any  Milestone,  extensions of time shall be allowed only to the extent that any change in the  Works affects an activity or activities in the Detailed Programme which  are on the critical path(s) or which are caused to become on the critical path(s) as result of the change to the Works and then only to the extent that the change to the Works extends the Time of Completion of any Milestone



25.9  The Employer shall make payments to the Contractor based on the Change Order agreed upon pursuant to GC 25.4 or based on the Employer's determination made pursuant to GC 25.7. Such payments shall be made in accordance with GC 24.

25.10  To the extent that any Communication referred to in GC 25 adds to, deletes, or descopes from part of the Works which is covered by a unit price set forth in the Unit Price Schedule, adjustments in the Contract Price shall be determined by reference to such unit price. In the event the matter is not encompassed in the Unit Price Schedule, then the Contractor's calculation of the lump sum variation to the Contract Price shall be calculated by taking the costs reasonably and necessarily incurred or to be incurred by the Contractor in the efficient and expedient performance of the Works in question and adding a markup. The markup shall be based on the following: (i) for the Contractor, for Works performed by the Contractor's own forces, fifteen percent (15%) of the labor cost;  (ii) for the Contractor, for Works performed by the Contractor's Subcontractor, six percent (6%) of the Subcontractor's labor cost; (iii) for each Subcontractor or Sub-Subcontractor involved, for Works performed  by that Subcontractor's or Sub-Subcontractor's own forces, fifteen percent (15%) of their labor cost. All proposals for variation to the Contract Price shall be accompanied by a complete itemization of costs including labor, Materials, Plant and subcontracts.

25.11  In the event the Employer instructs the Contractor to perform any additional Works on a cost reimbursable basis, the Contractor shall furnish to the Employer such payrolls, receipts, invoices or other vouchers as may be necessary to prove the costs incurred for labor, Construction Materials and Construction Plant and, before ordering the same, shall submit to the Employer quotations for its Approval.  In respect of all Works executed on a cost reimbursable basis, the Contractor shall, during the continuance of such Works, deliver each day to the Employer an exact list in duplicate of the names, occupation, time and rate of pay of all workmen employed on such Works and a statement, also in duplicate, showing the description and quantity of all Construction Materials and Construction  Plant used thereon, and shall at all times ensure that all costs and expenses incurred are reasonable under the circumstances. One copy of each list and statement  shall, if correct, or when agreed, be signed by the Employer and returned to the Contractor.   At the end of each month the Contractor shall deliver to the Employer a priced statement of the labor, additional supplies, Construction Materials and Construction Plant used  on a cost-reimbursable basis.   The calculation of the variation to the Contract Price  shall be calculated by taking the Approved costs incurred by the Contractor for cost reimbursable  Works and by adding a markup (which shall be the same and limited to those set forth in GC 25.10).

25.12  The Contractor shall give written notice to  the Employer and separately to the Construction Manager within ten (10) Days after the occurrence  of any act, event or omission of whatsoever  nature which in the opinion of the Contractor should result in an increase  in the Contract Price and/or an extension of the Time for Completion and/or any Milestone, which  notice shall include, without limitation, the Contractor's explanation of the  claim, the date on which the alleged act, event or omission occurred or began and the amounts by  which the Contractor believes the Contract Price should be increased and the Time for Completion extended, or both.  The notice required under this GC 25.12 shall be entitled Notice of Claim and shall be required as stated in this GC 25.12 including, without limitation, in response to any Employer determination pursuant to  GC 25.7.

27
Normandy Landfill Treatment Contract – Version 22.03.99
Reg Rule

regardless of any prior Request for Change Order or written notice of objections under these GC. Failure to give such notice shall constitute a definitive and irrevocable waiver of, and release from, any and all claims arising from any such act, event or omission and the Contractor shall be stopped from raising any claims arising from any such act, event or omission thereafter. Any claim made in accordance with GC 25.12 shall, upon written request by the Employer to the Contractor, be fully documented and substantiated by the Contractor no later than three (3) months from the date the Contractor receives such request. The election of the Contractor not to substantiate any such claim, shall constitute a complete waiver and renunciation of such claim by the Contractor, who shall be stopped from raising such claim thereafter.

25.13  The Employer may at any time, at its sole option, serve written notice upon the Contractor that unless the Contractor shall commence proceedings described in GC 44 in connection with any disputed matter arising under the Contract within ninety (90) Days of receipt of any such notice, the Contractor shall be barred thereafter from seeking recourse and shall be deemed to have conclusively waived all rights with respect to any such matter.

## 26.  Completion

The Contractor shall Complete all of the Permanent Works within the Time for Completion. In addition and subject to the requirements set forth in GC 24 and Exhibit 3, and elsewhere in the Contract, as a condition precedent to the next payment upon Completion of the Permanent Works, the Contractor shall furnish to the Employer: one (1) complete set of diskettes in full compliance with the EDMAX System reflecting the final "as-built" status of the Permanent Works and when applicable, operation and maintenance manuals in accordance with the requirements of the Contract.

## 27.  Issuance of Certificate(s) of Partial Completion

27.1  Prior to the issuance of the Certificate of Completion, the Employer may, issue one or more Certificates of Partial Completion in respect of any part of the Permanent Works. Any such Certificate(s) of Partial Completion shall indicate the parts of the Permanent Works concerned and the condition thereof at the date of issuance thereof.

27.2  The issuance of any Certificate of Partial Completion shall not preclude the Employer from listing reserves in relation to the Permanent Works which have been the object of any such Certificate of Partial Completion, at the time of the issuance of the Certificate of Completion.

## 28.  Issuance of the Certificate of Completion

The Employer and the Contractor hereby confirm and agree that acceptance or "reception" of the entire Permanent Works by the Employer shall take place only upon the Completion of the entire Works and shall be evidenced by the issuance of the Certificate of Completion and that the Period of Guarantee set forth in GC 29 shall commence on the date of Completion as set forth in the Certificate of Completion or if any for the relevant part(s) of the works, in the Certificate(s) of Partial Completion. When in the

28
Normandy Landfill Treatment Contract - Version 22.03.99
Reg. Life

Contractor's opinion the entire Works have been Completed, the Contractor shall notify the Employer accordingly and the Contractor shall provide the Employer at the same time with a signed statement that the Permanent Works have been Completed in full compliance with the Contract Documents and that there are no apparent defects to the Permanent Works. Within eight (8) Days of such notification from the Contractor, the Employer shall issue a notice summoning the Contractor, and the Construction Manager, to a Site meeting for the purpose for inspecting the Permanent Works and determining whether they are Complete, which Site meeting shall be held no later than fifteen (15) Days following issuance of such Employer's notice. Upon certification by the Construction Manager, that the Permanent Works have been completed in accordance with any and all terms and conditions of the Contract and are Complete, which certification shall be issued without unnecessary delay four (4) copies of the Certificate of Completion in respect of the Permanent Works and after the same have been signed by the Employer and the Construction Manager, the Employer shall retain two copies thereof and forward one copy to the Contractor and one copy to the Construction Manager, The Employer shall be under no obligation to issue the Certificate of Completion if and as long as the Permanent Works are not free from any apparent defects, provided, however, that the Employer shall not unreasonably withhold the issuance of such Certificate. Any reserves relating to the Permanent Works listed on the Certificate of Completion shall be performed within the agreed time limits or, failing such agreement within the time limits which the Employer shall prescribe after due consideration to the nature of the remedying works. In the event the Contractor does not complete the reserves within the time limits so agreed or prescribed, as the case may be, the Employer may have such reserves completed by any third party and the Contractor shall be liable for all direct and indirect costs incurred in connection therewith.

## 29.    Contractor's Guarantee

29.1    The Contractor guarantees the *Permanent Works and End Product* to the Employer to the full extent of applicable law and as expressly set forth in the Contract, from the date of the Certificate of Completion up to the expiration of the Period of Guarantee, as provided below. For purposes of the Contract, any Materials or workmanship employed in the Completion or guarantee of the *End Product* and or of any Works performed in connection therewith, shall be considered "Defective" if they fail in any respect to meet any of the provisions of the Contract, including the guarantee of the Contractor pursuant to this GC.

29.2    The Period of Guarantee shall expire at midnight on the 20th anniversary of the date of the Certificate of Completion.

29.3    The Employer is entitled at any time to assign to any third party including the CDR and any future buyer or developer of the Site or portion thereof, the benefit of the guarantees granted to the Employer under the Contract.

29.4    In the event the Employer believes it has a claim under the above guarantee, it will contact and submit such claim to the Contractor who shall promptly determine whether to submit such claim to the Insurer. Such determination shall not relieve the Contractor of its

29
Normandy Landfill Treatment Contract - Version 22/01/99
Ref. Rilc



obligation toward the Employer under the Contractor's Guarantee, nor shall it preclude the Employer from enforcing any right under applicable law.

30.  **Contractor to Search for Defects**

If requested by the Employer in writing, the Contractor shall, during the Period of Guarantee, search for the cause of any defect, imperfection, or fault in any part of the Permanent Works, under the directives of the Employer.  If such defect, imperfection, or fault shall be one for which the Contractor is liable, the cost and expenses of searching shall be borne by the Contractor, and the Contractor in such case shall repair, rectify, and make good such defect, imperfection, or fault at its own cost and expense in accordance with the provisions of the Contract.

31.  **Issuance of the Certificate of Expiration of the First Year of Period of Guarantee**

31.1    At least thirty (30) Days in advance of the expiration of the first year of the Period of Guarantee, the Employer shall issue a notice summoning the Contractor to a Site meeting and the Contractor shall conduct such inspection and Tests with respect to the Works as may be prescribed by the Contract and/or requested by the Employer in order to determine that there are no Defective Works. If the Contractor has met its obligations with respect to the Works, the Employer shall without unnecessary delay issue four (4) copies of the "Certificate of Expiration of the First Year of the Period of Guarantee" and shall retain two copies thereof and forward one (1) copy to the Contractor and one to the Construction Manager. In the event that the Contractor has not complied with all its obligations, as aforesaid (including, without limitation, the performance of any Works in the Employer's reserves in the Certificate of Completion) or in the event that any Materials or workmanship are found to be Defective, then such Certificate shall be issued only when the Contractor has complied with all of its obligations. Monies retained by the Employer pursuant to GC 24 and Exhibit 3 and the Contractor's Performance Guarantee may be used to meet the Contractor's obligations arising during the first year of the Period of Guarantee.

31.2    Notwithstanding the issuance of the Certificate of Expiration of the First Year of the Period of Guarantee, the Contractor must continue to fulfill its guarantee obligation under the Contract. Each of the Contractor's responsibilities, liabilities, warranties, guarantees and confidentiality obligations which under this Contract are to survive the issuance of the Certificate of Expiration of the First Year of the Period of Guarantee or which are otherwise imposed by law, shall survive termination or the issuance of the Certificate of Expiration of the First Year of the Period of Guarantee.

32.  **Performance Letter of Guarantee**

32.1   Within thirty (30) Days as from the issuance of the Notice to Proceed, the Contractor shall deliver to the Employer a Performance Letter of Guarantee in the Form of Exhibit 6 (the "Performance Letter of Guarantee"), issued by a bank located in the

Republic of Lebanon approved by the Employer in an amount equal to fifteen percent (15%) of the Contract Price. The Employer shall not be liable to make any payment under the Contract until the Contractor has complied with this General Condition. At the Employer's sole discretion, the Contractor shall increase the Performance Letter of Guarantee to take into account any increase in the Contract Price resulting from any Employer Approved Change Orders so that at all times the Performance Guarantee is in an amount equal to fifteen percent (15%) of the Contract Price.

32.2    The Performance Letter of Guarantee shall remain valid and enforceable until the issuance and presentation to the issuing bank by the Contractor of the Certificate of Expiration of the First Year of the Period of Guarantee as defined and referred to in GC 31 signed by the Employer.   The Performance Letter of Guarantee shall remain in full force and effect notwithstanding any early termination pursuant to and in accordance with GC 35.

32.3    In its sole and absolute discretion, at any one or more times prior to the issuance of the Certificate of Expiration of the First Year of the Period of Guarantee, Employer may demand payment of all or any portion (as determined by the Employer) of the face amount of the Performance Letter of Guarantee by making written demand in accordance with the terms thereof.   The Employer may at its election (but shall not have any obligation to) send a copy of any such demand to the Contractor.  The issuer of the Performance Letter of Guarantee, in respect of which a demand for payment has been made in accordance with the terms thereof, is hereby authorized and directed by the Contractor faithfully to honor such demand notwithstanding any objection by the Contractor or any other person or entity whatsoever. The Contractor hereby covenants that neither the Contractor nor any affiliate thereof shall sue the Employer, the issuer of any such Performance Letter of Guarantee, or any other person, firm, or corporation to enjoin, restrain, prevent, delay or otherwise impede the issuer of the Performance Letter of Guarantee from timely honoring any demand for payment made thereunder.

32.4 The Employer agrees that within ten (10) Days after the receipt by it of all monies which are the subject of any demand under the Performance Letter of Guarantee it shall provide the Contractor by written notice in reasonable detail the basis for such demand. If the Contractor believes that there was or is no basis for such demand, the Contractor shall have the right to commence proceedings in accordance with GC 44, for purposes of seeking a decision by the Employer to return the monies so received.

32.5    Unless the arbitral Tribunal appointed shall determine that (i) at the time of the demand for payment of any monies under the Performance Letter of Guarantee an Event of Default then existed; or (ii) that such demand was reasonably necessary at such time in order to protect the Employer from any loss potentially arising out of the Contractor's performance (or lack thereof) under the Contract, the arbitral Tribunal shall order the Employer to return all or such lesser part of the monies received by the Employer pursuant to such demand as the arbitral Tribunal in its sole and absolute discretion shall determine, together with an amount equal to such losses, costs, and expenses, if any, reasonably and proximately caused by the Employer as a result of such demand.



31
Normandy Landfill Treatment Contract – Version 22.03.99
Ref. Nte





32.6    The Contractor agrees that the foregoing procedures before the arbitral Tribunal for seeking the return of ~~monies paid~~ to the Employer pursuant to a demand against the Performance Letter of Guarantee shall be its ~~sole and exclusive recourse against the~~ Employer or any of the Employer's directors, officers, employees, agents and servants for seeking the return of such monies or for asserting any other cause of action or claim against the Employer or any of the Employer's directors, officers, employees, agents and servants in respect of or arising out of any such demand.

32.7    The Contractor shall be responsible for the payment of all fees, expenses, and other costs incurred in connection with obtaining the Performance Letter of Guarantee and maintaining the Performance Letter of Guarantee until the expiration date.

### 33.    Suspension by Employer

33.1    The Contractor shall, on the written order of the Employer, suspend the performance of the Works or any part thereof for such time or times and in such manner as the Employer may instruct and, during any such suspension, shall properly protect and secure the Works, as is necessary to prevent any damage. Except for suspensions which are: (i) otherwise provided for in the Contract; and for which the Contract does not entitle the Contractor to an increase in the Contract Price or any extension to the Time for Completion; or (ii) necessary by reason of an Event of Default on the part of the Contractor; or (iii) necessary by reason of climatic conditions on the Site; or (iv) necessary for the safety of the Works or any part thereof, the additional costs and/or delays incurred by the Contractor in giving effect to the Employer's instructions under this GC shall subject to, and in accordance with, the provisions of GC 25, entitle the Contractor (a) to an extension of the Time for Completion and/or (b) to an extension of any affected Milestone and/or (c) to an increase in the Contract Price necessary to compensate the Contractor for any additional reasonable costs directly incurred by the Contractor as a result of and during any such suspensions exceeding a combined total of fifteen (15) Days, the first fifteen (15) Days of additional costs incurred by the Contractor remaining for the Contractor's account. The Contractor shall use its best efforts to avoid or mitigate any Contractor costs and delays caused by any Employer suspensions of the Works hereunder.

33.2    If the Contractor's performance of the Works or any part thereof, is suspended by the Employer pursuant to this GC and such suspension continues for a period of one hundred and eighty (180) Days or more, then the Contractor may, unless such suspension is necessary for the reasons set forth in GC 33.1 (i) to (iv), elect to treat any such suspension of the Works or part of the Works, as the case may be, as a termination by the Employer for convenience pursuant to GC 35.4.

### 34.    Force Majeure

34.1    The term "Force Majeure" means any event that is unforeseen, unpredictable and beyond the control of either party in the meaning understood in the Republic of Lebanon, and any event occurring during the period of the Contract shall be considered as an event of "Force Majeure" only if and to the extent that it meets the conditions for Force Majeure





32
Normandy Landfill Treatment Contract - Version 22.03.99
Reg. 3/fc

under the laws of the Republic of Lebanon and include also without limitation, riots, invasion, hostilities, civil war, ~~rebellion~~, revolution, insurrection, outbreak of war in the Republic of Lebanon, whether declared or not, ~~seismic shocks, ionizing radiations or~~ contamination by radioactivity from any nuclear fuel or from any nuclear waste, from the combustion of nuclear fuel, radioactive, toxic, explosive, or other hazardous properties, of any explosive nuclear assembly or nuclear component thereof, and extreme and exceptional weather circumstances. The Contractor is fully aware of the prevailing political and security situation in the whole of Lebanon and has entered into the Contract knowing the situation which shall not constitute grounds of Force Majeure. Labor difficulties, disputes or strikes of any scope involving the Contractor's Staff or any Subcontractor's or Supplier's employees shall not constitute an event of Force Majeure, unless in the case of the Contractor's Staff, such labor difficulties, disputes or strikes are part of an industry wide or national strike.

34.2    The non-performance or delay in performance by the Employer and/or the Contractor, or either of them, of any obligation under the Contract shall be excused if and to the extent that such non-performance or delay is caused by an event of Force Majeure. During the occurrence of a Force Majeure event the Contractor shall, unless and until the Contract is suspended or terminated under these provisions, continue to use its best endeavours to complete the Works in accordance with its obligations under the Contract. Upon the occurrence of any event of Force Majeure the party suffering therefrom shall immediately give the other party written notice thereof including a statement describing the event of Force Majeure and demonstrating its effect upon the performance of the Contract. At the request of either party, the Employer and the Contractor shall consult regarding action to be taken.

34.3    At any time during the occurrence of any event of Force Majeure, the Employer may by written notice to the Contractor terminate the Contract by reason of the Force Majeure, in which event the provisions of GC 35.6 shall apply. At any time after the expiration of a period of one hundred and eighty (180) Days following the occurrence of any event of Force Majeure causing non performance or delay by the Employer and/or the Contractor , the Contractor may by written notice to the Employer terminate the Contract by reason of Force Majeure, in which event the provision of GC 35.6 shall apply.

34.4    Within seven (7) Days after the termination of any Force Majeure event, the Contractor shall file a written notice with the Employer specifying what the Contractor believes is the impact thereof on the Detailed Programme and/or any Milestones and/or on the Contract Price. If justified, the Employer may grant the Contractor an extension to the Programme and/or any Milestone, subject to and in accordance with GC 25, as a result of any such Force Majeure.

35.    **Termination**

35.1    If the Contractor (i) assigns the Contract without the prior Approval of the Employer; (ii) is in breach of the terms and conditions of GC 5.2; (iii) goes into bankruptcy, liquidation or files a petition in bankruptcy or seeking reorganization or arrangement with creditors, or admits its insolvency or (iv) experiences changes in the

33
Normandy Landfill Treatment Contract - Version 22.03.99
Rep. Life

Contractor's commercial or financial situation which has a substantially adverse effect on the Contractor's performance of its duties or obligations under this Contract (an "Event of Default"), then the Contractor shall be in Default and, to the extent permitted by mandatory rules of bankruptcy law and without the need for any legal proceedings or court decision, the Employer may forthwith withhold any amount otherwise due under the Contract and/or may in addition to any and all other rights available to it under the Contract issue a notice ("Notice of Termination") terminating the Contractor's right to proceed with all or any portion of the Works and/or terminating the Contract.

35.2    If:   (i) the Contractor has abandoned the Contract; or (ii) the Contractor has failed to provide   review and/or maintain at all times in full force and effect and in accordance with the Contract the Performance Letter of Guarantee, the insurance required by the Contract, or provide, revise or resubmit or update the Detailed Programme; or (iii) the Contractor has failed to commence the Works, or has suspended the progress of the Works after  receiving the Notice to Proceed from the Employer; or (iv) the Contractor is not  performing the Works in accordance with  the Contract or is in breach of any representation or warranty or is in breach of any  of its obligations, responsibilities or undertakings under  the  Contract; or (v) the Contractor does not maintain the progress of the Works in accordance  with the Detailed Programme and/ or any Milestone; each also constituting an "Event of Default", then the Contractor shall be in Default.   If the Contractor fails to remedy such Event of Default within ten (10) Days, after receipt of written  notice of such an Event of Default from the Employer, or if the Contractor fails to provide  written  evidence and/or Detailed Programme(s) satisfactory to the Employer that such Event of Default shall be corrected forthwith, then the Employer may, in addition to any and all other rights available to  it under the Contract and without the need for any legal  proceedings  or court decision, withhold any amount otherwise due under the Contract and/or may issue  a Notice of Termination terminating the Contractor's right to proceed with any portion or the whole of the Works, without thereby releasing the Contractor from any  remaining obligation or liability under the Contract, or affecting the rights and powers conferred on the Employer by the Contract, and may itself complete the Works  or may employ any other contractor to Complete the Works, or the Employer may terminate  the Contract.   The Employer or such other contractor may use for such completion so much of the Plant, Temporary Works and Materials, which have been deemed  to be reserved exclusively for the performance of the Works, under the provisions of the Contract, as it or they may think proper.

35.3    If the Employer terminates the Contract pursuant to  GC 35.1 or GC 35.2, the Employer shall not be liable to pay to the Contractor any money on account of this Contract until the costs of execution, damages for delay in Completion, if any, and all other  expenses incurred by  the Employer or damages to which the Employer is entitled, whether  by Contract or at law, have been ascertained.   The Employer  shall  then be obligated to pay only such sum, as  the Employer may certify would have been due this Contractor upon completion  by it after deducting the damages, costs and other expenses incurred  by  the Employer resulting from the termination. If such amount exceeds the sum which would have been payable to the Contractor on due completion  by it, then the Contractor shall,  upon demand, pay to the  Employer the amount of such excess and it shall be deemed a debt  due by the Contractor to the Employer and shall be recoverable





34
Normandy Landfill Treatment Contract - Version 22.01799
Ref. Nife

accordingly.  In addition, upon any such termination the Contractor shall assign to the Employer such orders with ~~Suppliers or~~ Subcontractors as the Employer may request.

35.4    The Employer may at any time terminate the Contract for its convenience in whole or in part upon giving thirty (30) Days written notice thereof ("Notice of Termination for Convenience") to the Contractor which shall specify the extent to which performance of the Works under the Contract is terminated, and the date upon which such termination becomes effective. Upon receipt of notice of any such termination, the Contractor waives any claims for damages, including loss of anticipated profits, on account thereof, but as the sole right and remedy of the Contractor, the Employer shall pay the Contractor in accordance with GC 35.6, provided, however, that those provisions of the Contract which by their very nature survive final acceptance under the Contract shall remain in full force and effect.

35.5    Upon receipt of any Notice of Termination for Convenience, the Contractor shall, unless the notice specifies otherwise:  (i) immediately discontinue performance of the Works on the date and to the extent specified in the notice; (ii) enter into no further agreements with Subcontractors or Suppliers and purchase no additional Materials, other than as may be necessary or required for completion of such portion of the Works under the Contract that is not terminated; (iii) assist the Employer, as specifically requested in writing in the maintenance, protection and disposition of works acquired by the Employer under the Contract; (iv) complete performance of the part of the Works which has not been terminated; pursuant to the Notice of Termination for Convenience; (v) within seven (7) Days, submit to the Employer a certified list of any or all items terminated; and (vi) take all steps as are reasonably necessary to resolve or settle outstanding liabilities and claims arising out of orders with Suppliers and Subcontractors with the prior Approval of the Employer to the extent it may require, or, assign to the Employer as requested all of such orders with Suppliers and Subcontractors.

35.6    Subject to, and in accordance with, the provisions of GC 24 and GC 25, in the event of either Termination for Convenience or for Force Majeure, the Employer shall pay to the Contractor such amount calculated as follows: all amounts due to the Contractor for Works completed in accordance with the Contract prior to such notice and for Works thereafter completed as specified in such notice; reasonable costs incurred pursuant to GC 35.5 (iii) above; reasonable demobilization costs not to exceed the rates set out in the Unit Price Schedule if applicable; all amounts due by the Employer to the Contractor in respect of Requests for Change Orders or claims submitted pursuant to and in accordance with GC 25 outstanding as of the date of termination; less all unliquidated advances or other payments made to the Contractor applicable to the terminated portion of the Contract, but not covered by Works performed, and all claims which the Employer may have against the Contractor in connection with the Contract. In the case of any Termination for Convenience only, the Employer shall in addition pay the Contractor zero point three percent ( 0.3 %) of the value of the part of the Works which the Contractor is not anymore required to perform pursuant to the notice of Termination for Convenience. The Contractor accepts all of the amounts under the terms hereof in full and final settlement as a result of any such termination.





35
Normandy Landfill Treatment Contract – Version 22.03.99
Ref. Nafe

35.7    The Contractor agrees to use constantly its best efforts to avoid, minimize and mitigate against its losses, costs and expenses incurred as a result of termination of the whole or any part of the Contract pursuant to this GC 35.

35.8    If the Employer goes into bankruptcy, liquidation or files a petition in bankruptcy or seeking reorganization or arrangement with creditors, or admits its insolvency (an "Employer's Event or Default") then the Employer shall be in Default and, to the context permitted by mandatory rules of bankruptcy law and without the need for any legal proceedings or court decision, the Contractor may in addition to any and all other rights available to it under the Contract, issue a notice "Notice of Termination" terminating the Contract.

35.9    If the Employer is in breach of any of its obligations under the Contract, constituting an "Event of Employer's Default", then the Employer shall be in Default. If the Employer fails to remedy such Event of Employer's Default within ten (10) Days, or if the Employer fails to provide written evidence that such Event of Employer's Default shall be corrected forthwith, then the Contractor may, in addition to any and all rights available to it under the Contract and without the need of any legal proceedings or court decision, terminate the Contract.

35.10   If the Contractor terminates the Contract pursuant to GC 35.8 or GC 35.9, the Employer shall be fully responsible and liable to the Contractor, for the full extent of any and all liabilities, loss and/or damage, suffered by the Contractor as a result of any such termination and in connection with the Contract provided, however, that in the event of any such termination and/or in connection with any Event of Employer's Default and/or breach of Contract or otherwise and notwithstanding anything to the contrary in the Contract, the Employer shall not be liable to the Contractor for any consequential damages, including without limitation any loss of profits, suffered by the Contractor as a result thereof.

35.11   Termination by the Contractor pursuant to GC 35.8 or GC 35.9 will not affect obligations of the Contractor under the Contract which by their terms are intended to survive termination.

36.    **Insurance**

Set forth in Exhibit 7 are (i) details of the Employer supplied insurance; (ii) details of the insurance to be obtained by the Contractor; (iii) applicable subrogation and waiver provisions with which the Contractor shall comply.

37.    **Working Time Regulation**

The parties hereby mutually agree that in the case where the competent official authorities issue general regulations whereby firms are under all circumstances prohibited from working 24h / 24h without any possible derogation, the Contractor shall then be allowed to apply for an extension of Time for Completion to be mutually agreed on with the Employer, without any additional compensation to the Contractor.



36
Normandy Landfill Treatment Contract - Version 22/01/99
Ref. NITC



### Fossils, Coins, Etc.

All fossils, coins, articles of value or antiquity and structures and other remains of things of geological or archaeological interest discovered on the Site shall be the absolute property of the Employer. The Contractor shall take reasonable precautions to prevent its workers or any persons from removing or damaging any such article or thing and shall immediately upon discovery thereof and, before removal, notify the Employer of such discovery, which shall be the Employer's risk and liability and which, subject to compliance with GC 25, shall entitle the Contractor to extension of the Period for Completion. The Contractor shall carry out, at the Employer's expense, orders of the Employer as to the disposal or any such article or thing discovered.

39. **Photography and Filming**

From time to time at the request of the Employer, the Contractor shall take photographs of the Works, sufficient to show the progress made on the Works since the previous photographs, furnish to the Employer three prints and the negative of each such photograph or such other amount as the Employer may reasonably request, which shall be the property of the Employer.

40. **Confidentiality of Documents and Information**

40.1    The Contract and everything contained or incorporated therein or arising therefrom shall be treated as strictly confidential by the Contractor and its employees. Subject to certain disclosure rights set forth below, the Contract and everything contained therein or arising therefrom and any knowledge acquired by the Contractor through its engagement hereunder and the name of the Employer shall not be used, published or divulged by the Contractor in connection with any services rendered by the Contractor to any other person, firm or corporation, in any advertising or promotion regarding the Contractor or its services, or in any other manner or connection whatsoever without first having obtained the Approval of the Employer, which the Employer may withhold in its sole discretion.

40.2    The Contract and everything contained or incorporated therein or arising therefrom shall not be disclosed by the Contractor or its employees except: (i) exclusively to employees and agents of the Contractor to the extent such is required for proper performance by the Contractor of its obligations hereunder; or (ii) for the purposes of providing Materials and entering into agreements with Subcontractors and Suppliers; or (iii) to the extent required by law; or (iv) to any bank, insurance company or other institutional lender to the extent it is reasonably necessary to do so in connection with such bank, insurance company or other institutional lender providing loans or other financial accommodations to the Contractor.

40.3    The Contractor shall take all steps necessary to protect the confidentiality of the Contract and everything contained or incorporated therein or arising therefrom including, without limitation, verbal and written notification to its employees, Subcontractors and







Suppliers and any other person or entity to whom such information is disclosed in accordance herewith.

### 41    Ownership of Employer's Name, Signs, Etc.

The Contractor shall acquire no right whatsoever under this Contract, to the name of the Employer, including, without limitation, no rights to use same (i) in any of its advertising, publicity or promotion; (ii) to express or imply any endorsement by the Employer of its services; or (iii) in any other manner whatsoever (whether or not similar to the uses hereinabove specifically prohibited). Furthermore, the Contractor acknowledges and agrees that, except as may be required by law, the Employer shall have the sole and absolute discretion to forbid or permit any names or signs on, about or adjacent to the Works which indicate the Contractor's involvement with the Works. Any signs permitted in the Employer's sole and absolute discretion shall require the Employer's prior Approval of the size, form, content and location thereof.

### 42.    Ownership of Documents, Etc.

42.1    Title to all plans, Drawings, Specifications, ideas, concepts, models, samples, or other tangible work product produced by the Contractor or its Subcontractors or Suppliers pursuant hereto (hereinafter the "Work Products") shall be and remain the sole and exclusive property of the Employer for the purpose of the Works.. The Contractor hereby conveys to the Employer definitely and unconditionally any and all rights (if any) of the Contractor and/or any of its affiliated or related entities, employees, and/or agents in and to any one or more Work Products. It is further expressly agreed and accepted by the Contractor that each and every payment made to the Contractor shall constitute confirmation of such conveyance and transfer as aforesaid of any and all rights (if any) of the Contractor and/or any of its affiliated or related entities, employees, and/or agents in and to any one or more Work Products.

42.2    Notwithstanding the provisions of GC 42.1, the Contractor does not by this Contract convey to the Employer any proprietary industrial property, designs or technology developed by the Contractor prior to or outside of this Contract.

### 43.    Site Security, Environmental Protection and Site Organization

43.1    Exhibits to these General Conditions sets forth rules and regulations pertaining to Site Security, Environmental Protection and Site Rules, with which the Contractor shall comply.

43.2    The Contractor shall preserve and protect the environment at and surrounding the Site and in particular, the coast, sea-bed and the sea. The Contractor shall take all precautions to prevent any pollution of such areas or of the sea and shall be fully responsible and liable to the Employer and/or any applicable Public Authority for any failure to do so.





'38
Normandy Landfill Treatment Contract – Version 22.03.99
Rev. Nice



**Settlement of Disputes**

All disputes arising out of or in connection with the present Contract shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce in force as of January 1st 1998 by one or more arbitrators appointed in accordance with the said Rules.

The language of arbitration shall be english.

The place of arbitration shall be Paris.

## 45. Rights of Inspection – Books and Records

45.1    With respect to all Works and services to be performed by the Contractor under the Contract, including, without limitation, regarding costs and expenses incurred in connection with any such services which are reimbursable pursuant to the Contract, the Contractor shall maintain comprehensive books and records relating thereto. Such books and records will be retained by the Contractor for a period of at least ten (10) years from the date of the Certificate of Completion. The Employer, its agents or its representatives shall have the right to make copies and audit such records at all reasonable times upon prior notice to the Contractor.

45.2    Upon request, the Employer, its agents and representatives shall have reasonable access, during normal working hours, to the Contractor's place(s) of business and to the Contractor's files, personnel, records, materials and other data in any way relating to the Works.

## 46. Relationship between the Parties

Nothing contained herein shall be construed as establishing or creating between the parties a relationship of master and servant or principal and agent. The Contractor is and shall perform the Works as an independent contractor.

## 47. Failure to Enforce

Except as otherwise provided in the Contract, the failure of the Employer to enforce at any time or for any period of time the provisions hereof in accordance with their terms shall not be construed to be a waiver of such provisions or of the right of the Employer thereafter to enforce each and every such provision.

## 48. Language of Communications, Signage, Labels, etc.

All communications of whatsoever nature between the parties in connection with the Contract or the performance of the Works shall be given in the English language.





39

Normandy Landfill Treatment Contract – Version 22.03.99
Ref. Nife





**Invalid Provisions**

Should any provision of the Contract now or later judicially be construed to conflict with any applicable law or administrative regulation with the force of law, whether national or supra-national which has mandatory application to the Contract, or be determined to be invalid or unenforceable for any reason whatsoever, the said provision(s) shall be considered amended and/or replaced to the extent required to conform with such law or regulation, unless such would create an inequitable result, in which case, the provision shall be as not written and of no effect and all other provisions of the Contract shall remain in full force and effect and be unaffected thereby.

50.    **Governing Law**

The Contract shall be governed by and construed in all respects in accordance with the laws of the Republic of Lebanon .

51.    **EDMAX**

The Contractor shall adopt the codification Scheme prescribed by the Employer in connection with the communication of all documents of whatsoever nature relating to the Contract and shall at the request of the Engineer, communicate and exchange all such documents via the EDMAX System implemented by the Employer which shall communicate to the Contractor the EDMAX Welcome Package and the CAD software or other software requirements approved by the Employer for such purpose which the Contractor shall procure and utilise at its cost along with any updating to the EDMAX System.

* * * * * *

0 0 6 3 1





40
Normandy Landfill Treatment Contract – Version 22.03.99
Red Wife

# EXHIBIT 1

## TO GENERAL CONDITIONS OF CONTRACT

### CONTRACT PRICE BREAKDOWN

### AND

### SCHEDULE OF VALUE

41
Normandy Landfill Treatment Contract – Version 22.03.99
Ref: 6/Me

## Contract Price Breakdown and Schedule of Value

| SCHEDULE OF VALUES | | PRICE US$ |
|---|---|---|
| 1. | General Conditions | |
| 2. | Mobilization | 10,150,000 |
| 3. | Equipment | 2,360,000 |
| | Section 1 | 10,300,000 |
| | 4.1 Excavation / hauling | 980,000 |
| | 4.2 Sorting processing | 990,000 |
| | 4.3 Treatment | 180,000 |
| | 4.4 Hauling/backfilling | 630,000 |
| 5. | Section 2 | |
| | 5.1 Excavation/hauling | 2,850,000 |
| | 5.2 Sorting/processing | 2,400,000 |
| | 5.3 Treatment | 460,000 |
| | 5.4 Hauling/backfilling | 1,500,000 |
| 6. | Sections 3, 4, 5, 6, 7, 8 | |
| | 6.1 Excavation/hauling | 7,120,000 |
| | 6.2 Sorting/processing | 6,600,000 |
| | 6.3 Treatment | 1,250,000 |
| | 6.4 Hauling/backfilling | 4,780,000 |
| 7. | Demobilization | 425,000 |
| 8. | Site Monitoring | 100,000 |
| | Total | U.S$53,075 |





42
Normandy Landfill Treatment Contract – Version 22/03/99
Ref: Nife







### EXHIBIT 2

### *TO GENERAL CONDITIONS OF CONTRACT*



### SCHEDULE OF UNIT RATES

### AND SCHEDULE OF UNIT PRICES





43
Normandy Landfill Treatment Contract - Version 22/01/99
Ref:NNIc



## Schedule of Unit Rates and Schedule of Unit Prices

| SCHEDULE OF VALUES | | UNIT PRICES |
|---|---|---|
| 1. | General Conditions | month |
| 2. | Mobilization | lump sum |
| 3. | Equipment | month(a) |
| 4. | Section 1 | |
| | 4.1 Excavation / hauling | $m^{3(b)}$ |
| | 4.2 Sorting processing | $m^{3(c)}$ |
| | 4.3 Treatment | $m^{3(d)}$ |
| | 4.4 Hauling/backfilling | $m^{3(e)}$ |
| 5. | Section 2: | |
| | 5.1 Excavation/hauling | $m^{3(b)}$ |
| | 5.2 Sorting/processing | $m^{3(c)}$ |
| | 5.3 Treatment | $m^{3(d)}$ |
| | 5.4 Hauling/backfilling | $m^{3(e)}$ |
| 6. | Sections 3, 4, 5, 6, 7, 8 | |
| | 6.1 Excavation/hauling | $m^{3(b)}$ |
| | 6.2 Sorting/processing | $m^{3(c)}$ |
| | 6.3 Treatment | $m^{3(d)}$ |
| | 6.4 Hauling/backfilling | $m^{3(e)}$ |
| 7. | Demobilization | lump sum |
| 8. | Site Monitoring | year |

Additional unit rates:

$2.25/m^3$ for treatable material > 1.2 million $m^3$ (measured by in-situ calculation)
$6/m^3$ for excavation > 5 million $m^3$ (measured by survey)

Notes:

a) from first mobilization taken over 18 months at 0%, 0%, 10%, 10%, 5%, 5%, 5%, 5%, 5%, 5%, 5%, 5%, 10%, 10%, 5%, 5%, 5%, 5%,
b) measured by in-situ survey
c) measured by observation
d) measured by in-situ caculation
e) measured by in-situ survey

Payment for the US $2M Low Temperature Thermal Desorption equipment (L.T.T.D.), if required, will be paid at a rate of 25% upon issuance of the purchase order for the equipment, 25% upon approval of shop drawings, 25% upon purchase of associated materials and parts and 25% upon delivery of the equipment.







**EXHIBIT 3**

## *TO GENERAL CONDITIONS OF CONTRACT*

## TERMS AND CONDITIONS GOVERNING PERIODIC AND OTHER PAYMENTS BY THE EMPLOYER TO THE CONTRACTOR





45
Normandy Landfill Treatment Contract - Version 22.01/99
Rev N.fc



# TERMS AND CONDITIONS GOVERNING PERIODIC AND OTHER PAYMENTS BY THE EMPLOYER TO THE CONTRACTOR

1.      If not already agreed at the time of signature of the Contract , within ten (10) Days of the execution of the Contract, the Contractor shall submit for the Employer's Approval, and continue to revise and resubmit until such Approval is issued, a detailed "Schedule of Values" which shall break down the Contract Price by labor, material, craft, work category and location of the Permanent Works, The Contractor shall, if so instructed by the Employer, modify and submit to the Employer for Approval a Schedule of Values reflecting Approved Change Orders which affect the Contract Price. No payments shall be made to the Contractor until the Employer has issued its Approval to the detailed Schedule of Values.

2.      Within ten (10) Days following the end of each calendar month during the Contractor's performance of the Works, the Contractor shall prepare and submit to the Employer its monthly Request for Payment covering Permanent Works properly performed in the preceding month. Such requests shall be in the form set forth in Attachment 1 to this Exhibit or as otherwise Approved or prescribed by the Employer. Requests for Payment shall be based upon the percentage of the total Works properly performed in the preceding month and shall be stated in the nearest whole percentile in accordance with the Approved Schedule of Values. Additionally, the Contractor shall include payments requested for Works performed on a cost reimbursable basis pursuant to GC 25.11 in its request. The Employer may, at its sole discretion, require that the Contractor's periodic payment requests be broken down in greater detail or by labor, craft, work category or location. All periodic Approved payments shall be deemed provisional and subject to adjustment by the Employer at any time, to account for the total value of Works completed in accordance with the Approved Schedule of Values.

3.      Each Request for Payment shall be supported by sufficient data and documentation to enable the Employer to verify the accuracy thereof and shall constitute a representation and warranty by the Contractor that (i) except as listed in its Request for Payment, all amounts due to all Subcontractors and Suppliers have been paid and title to all Materials and Works covered by such application is vested in the Employer free and clear of all liens, claims, security interests and any other encumbrances or other charges of whatever nature; (ii) all statements and representations in such application for payment are true, accurate and complete in all material respects and do not omit to state any material fact required to be stated therein in order to make the statements and representations contained therein not misleading; and (iii) the Works which are the subject of such application for payment do not contain Defective Works or Construction Materials.

4. Notwithstanding the provisions of Section 2 and 3 above, the aggregate amount to be paid monthly by the Employer to the Contractor shall not exceed the amount set forth in Attachment 3 to this Exhibit - Maximum Cumulative Payment Amount (MCPA). In a case where the cumulative amount to be paid by the Employer to the Contractor according to the Requests for Payment will exceed the Maximum Cumulative Payment Amount corresponding to that monthly date, the amount exceeding such Maximum



46
Normandy Landfill Treatment Contract - Version 22.03/99
Rev: Nifc



Cumulative Payment Amount shall be released and paid to the Contractor the next month to the extend possible taking into account the Maximum Cumulative Payment Amount for the next month.

5.    The Employer's Approval  (or refusal to Approve, as the case may be) whether in whole or in part of any Request for Payment, shall be given not later than twenty-eight (28) Days following the Employer's receipt of any such Request for Payment. Upon the Employer's Approval of any amount set forth in Request for Payment, payment of the Approved  amount shall be made within thirty (30) Days from the Employer's Approval. No  Approval of a Request for Payment nor the making of payment shall release or diminish the Contractor's obligations and liabilities under the Contract.

6.    The Employer may deduct from each payment any sums that relate to items of Works for which  there remains a disagreement, any sums representing payments withheld or  determined by the Employer under the Contract, and retention, as specified below.

7.    The Employer may withhold from any payment otherwise due to the Contractor amounts sufficient  to protect itself from any loss arising out of any of the following:  (i) Defective Works which have not been satisfactorily remedied; (ii) the assertion of, or the occurrence of an event which  has given rise to the assertion of, any third party claims against  the Contractor or the Employer for which adequate insurance coverage does not exist;   (iii)  any application  for payment which  contains a mistatement or misrepresentation of a material fact or which omits to state a material fact required to be stated therein in order to make statements  and representations contained therein not misleading;  and (iv) an Event of Default of the Contractor under the Contract.

8.    In the event the Employer determines not to pay all or any portion of any Request for Payment, the Employer shall  give prompt written notice to the Contractor of such determination and the reasons therefor not later  than fifteen (15) Days following the Employer's receipt of any such Request for Payment. When the Contractor has corrected or remedied the  reasons given by the Employer for refusing to make such a payment, it shall  notify the Employer of that fact in writing and shall supply the Employer with such evidence  thereof as the Employer shall reasonably request.  If the Employer decides that such corrections or remedies are satisfactory,  payment of such amounts, which the Employer previously determined not to pay shall be made within thirty (30) Days.

9.    From each periodic Approved  payment the Employer shall retain a sum equal to ten percent (10%)  of the payment due subject to a maximum cumulated total retention of five percent (5%)  of the Contract Price.  Such retention shall be released to the Contractor  upon the issuance by the  Employer of the Certificate of Expiration of the First Year of the Period of Guarantee as defined and referred to in GC 31.

10.    Within forty five (45) Days after the issuance of the Certificate of Completion, the Contractor shall submit a full  and complete statement of account to date.  Thereafter, when  the  Contractor makes its request for its final progress payment, it shall provide to the Employer a full and complete  account of payments received and an unconditional release  of the Employer and its agents, representatives, officers, employees, successors





47
Normandy Blandfill Treatment Contract - Version 22.03.99
Ref. Nife

and assigns from any further claim of liability to the Contractor , its Subcontractors or Suppliers, arising out of the Contract and the Works, except for acts or events arising after the date of such release, including, without limitation, the enforcement and/or release of the Performance Letter of Guarantee and/or the retention under 8 above. The effectiveness of the release shall be conditional only upon the making of the final progress payment by the Employer.

11. As a further, material inducement to the Employer's final progress payment, the Contractor shall furnish with its final progress payment request, the Contractor's written statement that all bills or invoices for labor, supplies, equipment and Construction Materials furnished by the Contractor have been paid and that (except as listed in its request for final progress payment) there are no sums due and owing or claimed to be due and owing to Subcontractors and Suppliers, arising out of the Contract or the Works. Such statement shall contain a covenant from the Contractor that it has settled all claims and shall pay all sums due and owing to the Subcontractors and Suppliers forthwith upon receipt by it of the Employer's final progress payment. At the Employer's request, the Contractor shall furnish written statements from Subcontractors and Suppliers confirming the accuracy of the Contractor's written statement. Such statement shall also provide that, in consideration of the final progress payment, the Contractor agrees to defend, indemnify and hold harmless the Employer and its agents, representatives, officers, employees, successors and assigns from and against any claim, demand, suit or other liability to third parties, including the Contractor's Staff, Subcontractors and Suppliers, arising out of the Contract and the Works.

12. The making of the final progress payment by the Employer shall not be construed to waive or otherwise alter the Contractor's and the Employer's continuing obligations under the Contract including, but not limited to, the Contractor's guarantees, responsibilities, liabilities and confidentiality obligations as defined in these GC.

13. In the event the Employer fails to pay any amount of the Contract Price when due in accordance with the terms and conditions hereof, the Employer shall pay the Contractor interest compounded monthly for each day for which payment is overdue at the average US Dollars Libor rate quoted by the clearing banks in London, at 10:00 a.m. on the first business day following the date payment first became due which rate shall remain fixed until settlement has been made.

14. The Employer shall pay the Contractor an advance payment equal to ten percent (10%) of the Contract Price, which shall be paid within thirty (30) Days of the Employer's receipt of the Contractor's related Request for Payment and the receipt by the Employer of an Advance Payment Guarantee in the form set forth in Attachment 2 to this Exhibit.

15. The advance payment shall be repaid in twenty (20) equal installments and deducted from amounts of the Contract Price the Employer becomes due to pay the Contractor and to be applied to the first twenty (20) invoices submitted by the Contractor.





48
Normandy Landfill Treatment Contract – Version 22.03.99
Reg. No.



16.  The Employer may call the Advance Payment Guarantee, to recover any of the advance payment outstanding at such time, if the terms of 15 above cannot, for any reason, be complied with.

17.  Within fourty five (45) days as from the issuance of the Notice to Proceed the Employer shall open a letter of credit in the amount of twenty percent (20%) of the Contract Price (in a form mutually agreed by the parties) in favor of the Contractor, valid for an initial period of one year (1) and shall be replenished in the same amount for the second year.

The Contractor will draw on that letter of credit by the presentation to the confirming bank of the confirmed and approved payment duly signed by the Employer representative.

Payment  will be made by the Bank between the 25st and 30st days from the Employer's Approval

* * * * * *





49
Normandy Landfill Treatment Contract – Version 22/03/99
Ref: 96 LR

# ATTACHMENT 1

## TO

### EXHIBIT 3

## *OF THE GENERAL CONDITIONS OF CONTRACT*

## FORM OF REQUEST FOR PAYMENT

50
Normandy Landfill Treatment Contract – Version 22/03/99
Ref: Nllc



| | | US $ | % |
|---|---|---|---|
| CONTRACTOR | | | |
| PROJECT | REQUEST FOR PAYMENT No.: | | |
| CONTRACT No. | DATE: | | |
| WORKS | PERIOD COVERED | | |
| | FROM ———— TO ———— | | |

This Request for Payment corresponds to the attached Schedule of Values.

| CALCULATION OF PAYMENT | US $ | % |
|---|---|---|
| ORIGINAL CONTRACT VALUE | ———— | |
| CHANGE ORDERS APPROVED TO DATE | ———— | ———— % |
| CURRENT CONTRACT VALUE | ———— | 100% |
| VALUE OF WORKS COMPLETED TO DATE | ———— | ———— % |
| LESS PREVIOUS AMOUNTS PAID | ———— | ———— % |
| RETENTION WITHHELD | ———— | ———— % |
| THIS REQUEST FOR PAYMENT | ———— | ———— % |
| LESS RETENTION | ———— | ———— % |
| LESS REIMBURSEMENT OF ADVANCE PAYMENT | ———— | ———— % |
| ADJUSTED AMOUNT OF THIS PAYMENT | ———— | ———— % |
| TOTAL AMOUNT DUE THIS REQUEST FOR PAYMENT | ———— | ———— % |

The Contractor certifies that its Request for Payment constitutes a representation and warranty by the Contractor that (i) except as listed in this Request for Payment, all amounts due to all Subcontractors and Suppliers have been paid and title to all Construction Materials and Works covered by such application is vested in the Employer free and clear of all liens, claims, security interests and any other encumbrances or other charges of whatever nature; (ii) all statements and representations in such application for payment are true, accurate and complete in all material respects and do not omit to state any material fact required to be stated therein in order to make the statements and representations contained therein not misleading; (iii) to the Contractor's best knowledge none of the Works which is the subject of such application for payment contains Defective Works or Construction Materials.





51
Normandy Landfill Treatment Contract – Version 22.03/99
Ref. NIfc







## ATTACHMENT 2

### TO

### EXHIBIT 3



### *OF THE GENERAL CONDITIONS OF CONTRACT*

### FORM OF ADVANCE PAYMENT LETTER OF GUARANTEE

00677





52
Normandy Landfill Treatment Contract - Version 22.03.99
Reg. No



[On letterhead of issuing bank]

## ADVANCE PAYMENT LETTER OF GUARANTEE

To

The Lebanese Company For The Development And Reconstruction of Beirut Central District, S.A.L.

Building 149 Marfaa , Saad Zaghloul Street, off Foch Street, BP.119493  Beirut

Attention:  Mr. Abdul Hafiz Mansour

++++++++++++++, Lebanon.    Date: +++++++++++++++++++, 1999

REF:    OUR L/G No. +++++++++++++++++
        FOR an amount of ++++++++++++

We refer to the Contract (the "CONTRACT") dated the +++ day of +++++++++++++++ 1997 made between The Lebanese Company for the Development And Reconstruction of Beirut Central District, S.A.L. and +++++++++++++++++++++ (the "CONTRACTOR") having its main office at +++++++++++++++++++ regarding the performance of the Works (as defined in the CONTRACT) in connection with the development , reconstruction and restoration of Beirut Central District.

1.    We hereby unconditionally and irrevocably agree to pay you, on your first demand complying with the terms of paragraph 3 below, by wire transfer to an account in your name at such bank as you shall stipulate, such amount or amounts as you shall demand from time to time, up to a maximum amount of +++++++++++++++++ +++++++++++++++++++++ (++++++++++) (the "GUARANTEED AMOUNT").

2.    The GUARANTEED AMOUNT shall be automatically reduced by the amount appearing on any and all Payment Certificate(s) relating to the reimbursement by the Contractor of the Advance Payment made to it under the CONTRACT, signed by duly authorized representatives of the Employer (as defined in the CONTRACT), until reduction of the GUARANTEED AMOUNT to zero.

3.    Any demand for payment by you shall:
(i)    be by letter;
(ii)    refer to the number and date of this Letter of Guarantee;
(iii)    state the amount for which payment is demanded;

53
Normandy Landfill Treatment Contract - Version 22.01.99
Ref. Nlfe



state the name of the bank and account number to which payment is to be made; and

be signed by the General Manager and one (other) Member of the Board of Directors of your Company.

4.    This first demand Letter of Guarantee constitutes an unconditional and irrevocable direct obligation of this bank which is separate and independent of the CONTRACT, including the CONTRACTOR's obligations under the CONTRACT. Notwithstanding any alteration or change of the CONTRACT, or the early termination of the CONTRACT, or in the extent or nature of the Works (as defined in the CONTRACT) or of the conditions of performance under the CONTRACT, or of the financial condition or otherwise of the CONTRACTOR (including, without limitation, bankruptcy or liquidation), none of which shall constitute novation, and notwithstanding any contestation or objection or the commencement of any legal or other proceedings brought by any person or entity whatsoever (including the CONTRACTOR) to prevent, delay or in any way hamper or stop payment of any amount you may demand payment of from time to time in accordance with the terms hereof, and notwithstanding any other circumstance which might hinder prompt enforcement of this Letter of Guarantee, and without any need or requirement for you to have first demanded payment of the amount or amounts in question by the CONTRACTOR, we shall comply with our payment obligations hereunder, without any of the above events, circumstances or provisions justifying any delay in the performance of our obligations or constituting an exoneration, discharge or any release thereof.

5.    The GUARANTEED AMOUNT shall be reduced by the amount of any payment made by us hereunder. Any such payment shall be paid free and clear of, and without deduction for or on account of, any present or future taxes, levies, imposts, duties, charges, fees, commissions, deductions, or withholding of any nature whatsoever and by whomsoever imposed all of which shall be for the CONTRACTOR's account.

6.    This Letter of Guarantee shall remain valid and enforceable for an initial period of two (2) years from the date hereof and shall be automatically extended for periods of one (1) year until the GUARANTEED AMOUNT is reduced to zero in accordance with paragraph 2 above, or, until you release us from our obligations hereunder, whichever occurs the earlier.

7.    We will honor all demands for payment up to the GUARANTEED AMOUNT from the date hereof to the date this Letter of Guarantee expires according to its terms.

8.    This Letter of Guarantee shall be governed by, and construed in accordance with the laws of the Republic of Lebanon

BY: ++++++++++++++++++++++

TITLE: ++++++++++++++++++++++







54
Normandy Landfill Treatment Contract – Version 22/03/99
Ref. 99/...







# ATTACHMENT 3

## TO

## EXHIBIT 3

## OF THE GENERAL CONDITIONS OF CONTRACT

## MAXIMUM CUMULATIVE PAYMENT AMOUNT





55
Normandy Landfill Treatment Contract – Version 22/01/99
Ref:2/nfc



## Maximum Cumulative Payment

| Payment/Month | Amount US$ |
|---|---|
| **1999** | |
| February | 14,619,125 |
| March | 14,619,125 |
| April | 14,619,125 |
| May | 14,619,125 |
| June | 14,619,125 |
| July | 14,619,125 |
| August | 14,619,125 |
| September | 14,619,125 |
| October | 14,619,125 |
| November | 15,541,150 |
| December | 16,464,375 |
| **2000** | |
| January | 17,387,000 |
| February | 18,309,625 |
| March | 19,232,250 |
| April | 20,154,875 |
| May | 21,077,500 |
| June | 22,000,125 |
| July | 22,922,750 |
| August | 23,845,375 |
| September | 24,770,000 |
| October | 26,090,000 |
| November | 27,410,000 |
| December | 28,750,000 |
| **2001 and after no limit** | |





56
Normandy Landfill Treatment Contract – Version 22.03.99
Ref. Nfc

# EXHIBIT 4

## *TO GENERAL CONDITIONS OF CONTRACT*

## FORM OF REQUEST FOR

## CHANGE ORDER

## AND

## FORM OF CHANGE ORDER



# FORM OF REQUEST FOR CHANGE ORDER

Date: _____

No.: _____

A. (Describe Employer's instruction, order, direction or similar communication giving rise to RFGO).

B. (Quantify proposed adjustment - detail why a Change Order should be issued, and the proposed modification of, or adjustment to or variation in, the Contract Price or the Time for Completion. Attach substantiation upon which RFGO is based, in accordance with contract requirements).

For and on behalf of:

_____

By:

_____

Signature: _____

Title of Contractor's Representative:

_____

Receipt acknowledged (Employer/Construction Manager):

By: _____

Signature: _____

Title: _____

Date: _____

# CONTRACT CHANGE ORDER

Project:

Contract No:

Contractor:

Date:

The Employer hereby gives to the Contractor a Change Order for, and the Contractor agrees to provide and perform, the Construction Materials and Works described below:

### *(SEE ATTACHED "EXHIBIT A" FOR DESCRIPTION OF WORKS)*

|  | US DOLLARS |
|---|---|
| Original Contract Price: | $———— |
| Previous Change Order through No: _____ | ———— |
| Adjusted Contract Price through Change Order No: _____ | $———— |
| Amount of this Change Order No: _____ | $———— |
| Revised Contract Price to date: | $———— |

Change to Time for Completion granted by this Change Order:

Revised Completion Date:

The Contractor shall be solely responsible for paying amounts due to its Subcontractors and Suppliers for the performance of the Works which are the subject of this Change Order and agrees to indemnify the Owner in connection with any Subcontractor and/or Supplier claims arising therefrom.

The total amount of this Change Order includes all applicable taxes, guarantees, insurance, delivery, supervision, overhead, profit, labor, labor impact, construction materials, changes, delays, acceleration and inefficiency, or any claims therefor, and the Contractor hereby waives any and all claims for such items associated with or related to the Works covered by this Change Order.

This Change Order represents the entire and integrated agreement between the parties and supercedes all prior negotiations related to this change to the conditions of the Contract, including, without limitation, those concerning payment.

CONTRACTOR

The Lebanese Company for the Development and
Reconstruction of Beirut Central District, S.A.L.

Authorized Signature_____
Signature_____

Authorized

Name: _____
_____

Name:

Title: _____
_____

Title:

Date: _____
_____

Date:

**EXHIBIT 5**

## PROGRAMME AND MILESTONES

## Programme and Milestones

The following milestones constitute part of the programme. The dates or period presented hereforth constitute milestones as per the General Conditions of Contract.

All works must be completed in fifty four (54) months from date of Notice to Proceed.

Excavation and filing of Section 1 must be completed by December 31, 1999. This date constitutes an intermediate milestone.

Excavation and filing of Section 2 must be completed by June 30, 2000. This date constitutes an intermediate milestone.



## EXHIBIT 6

### *TO GENERAL CONDITIONS OF CONTRACT*

### FORM OF PERFORMANCE

### LETTER OF GUARANTEE

**[On letterhead of issuing bank]**

## PERFORMANCE LETTER OF GUARANTEE

To:        The Lebanese Company for the Development
           and Reconstruction of Beirut Central District, S.A.L.
           Building 149 Marfaa , Saad Zaghloul Street,
           off Foch Street, BP.119493 Beirut
           Attention: Mr. Abdul Hafiz Mansour.

‡‡‡‡‡‡‡‡‡‡‡‡‡, Lebanon.   Date: ‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡, 1999

REF:       OUR L/G Nº ‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡
           FOR an amount of ‡‡‡‡‡‡‡‡‡‡‡

We refer to the Contract (the "CONTRACT") dated the ‡‡‡ day of ‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡ 1998 made between The Lebanese Company for the Development and Reconstruction of Beirut Central District, S.A.L. and ‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡ (the "CONTRACTOR") having its main office at ‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡ regarding the performance of the Works (as defined in the CONTRACT) in connection with the development, reconstruction and restoration of Beirut Central District.

1.    We hereby unconditionally and irrevocably agree to pay you, on your first demand complying with the terms of paragraph 2 below, by wire transfer to an account in your name at such bank as you shall stipulate, such amount or amounts as you shall demand from time to time, up to a maximum amount of ‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡  ‡‡‡‡‡‡‡(‡‡‡‡‡‡‡‡) (the "GUARANTEED AMOUNT").

2.    Any demand for payment by you shall:
      (i)     be by letter;
      (ii)    refer to the number and date of this Letter of Guarantee;
      (iii)   state the amount for which payment is demanded;
      (iv)    state that in your binding opinion the Contractor is in breach of his obligations under the Contract.
      (v)     state the name of the bank and account number to which payment is to be made; and
      (vi)    be signed by the General Manager and one (other) Member of the Board of Directors of your Company.

3.    This first demand Letter of Guarantee constitutes an unconditional and irrevocable direct obligation of this bank which is separate and independent of the CONTRACT, including the CONTRACTOR'S obligations under the

CONTRACT. Notwithstanding any alteration or change of the CONTRACT, or the early termination of the CONTRACT, or in the extent or nature of the Works (as defined in the CONTRACT) or of the conditions of performance under the CONTRACT, or of the financial condition or otherwise of the CONTRACTOR (including, without limitation, bankruptcy or liquidation), none of which shall constitute novation, and notwithstanding any contestation or objection or the commencement of any legal or other proceedings brought by any person or entity whatsoever (including the CONTRACTOR) to prevent, delay or in any way hamper or stop payment of any amount you may demand payment of from time to time in accordance with the terms hereof, and notwithstanding any other circumstance which might hinder prompt enforcement of this Letter of Guarantee, and without any need or requirement for you to have first demanded payment of the amount or amounts in question by the CONTRACTOR, we shall comply with our payment obligations hereunder, without any of the above events, circumstances or provisions justifying any delay in the performance of our obligations or constituting an exoneration, discharge or any release thereof.

4. The GUARANTEED AMOUNT shall be reduced by the amount of any payment made by us hereunder. Any such payment shall be paid free and clear of, and without deduction for or on account of, any present or future taxes, levies, imposts, duties, charges, fees, commissions, deductions, or withholding of any nature whatsoever and by whomsoever imposed, all of which shall be for the CONTRACTOR'S account.

5. This letter of Guarantee shall remain valid and enforceable for an initial period of five (5) years from the date hereof and shall be automatically extended for periods of one (1) year until we receive from the CONTRACTOR the "Certificate of Expiration of the First Year of the Period of Guarantee" as defined and referred to in GC 31 of the CONTRACT, signed by authorized signatories of the Employer (as defined in the CONTRACT), or, until you release us from our obligations hereunder, whichever occurs the earlier.

6. We will honor all demands for payment up to the GUARANTEED AMOUNT from the date hereof to the date this Letter of Guarantee expires according to its terms.

7. This Letter of Guarantee shall be governed by, and construed in accordance with, the laws of the Republic of Lebanon.

BY: ++++++++++++++++++++++++

Name: ++++++++++++++++++++++++

Title: ++++++++++++++++++++++++



# EXHIBIT 7

## *TO GENERAL CONDITIONS OF CONTRACT*

### INSURANCE PROVISIONS



# INSURANCE PROVISIONS

1.    **Insurance to be Provided by the Contractor**

1.1    The Contractor shall, at its sole expense, maintain in effect at all times during the performance of the Works, insurance coverages with limits not less than those set forth below with Lebanese Insurers and under forms of policies satisfactory to the Employer.

1.2    Worker's Compensation and Employer's Liability Insurance covering the Contractor's employees in accordance with Lebanese Laws and Decrees for an amount of not less than US$250,000 each occurrence unlimited in the aggregate.

1.3    Vehicle Bodily Injury and Property Damage Liability Insurance covering all vehicles, trucks, trailers or self-propelled vehicles owned or hired by the Contractor with limits as follows:

Bodily Injury:    Unlimited
Property Damage:    U.S.$250,000 each occurrence unlimited in the aggregate.

1.4    Contractor's Plant and Equipment Insurance to cover all such items including temporary buildings and contents owned, hired, used or provided by the Contractor for a sum sufficient to provide for their replacement at the Site.

1.5    Contractor's Professional and Environmental Insurance (including contractual coverage) with minimum limit of U.S.$20.000.000 in respect of each and every claim (with an agregate limit of US$ 50.000.000) protecting the Contractor and the Employer from errors and omissions of the Contractor from or in connection with the Completion of the Works hereunder and which shall be maintained for a period of twenty (20) years after the date of Completion of the Works. Details of the insurance coverage are set out in Attachment 2 to this Exhibit

1.6    Special Provisions with Respect to Policies Placed by the Contractor

1.6.1    The Contractor shall be responsible to ensure that its Subcontractors of each tier carry insurance equal to that stipulated herein (except for 1.5 above), including naming of additional insureds and waiver of subrogation.

1.6.2.    All the deductibles applicable to the foregoing insurances shall be for the account of the Contractor.

1.6.3    All the above mentioned insurance policies covering Worker's compensation and Employer's Liability and the Contractor's owned or hired properties shall include an insurer's waiver of rights of subrogation in favour of the Employer, and the Construction Manager.



1.6.4   The policies of insurance which provide Contractor's Professional and Enviromental Insurance shall name the Employer, the Construction Manager, the Consultant Engineer and the Technical Controller as additional insureds and shall state that it is primary insurance as regards the additional insureds and contain a cross liability or severability of interest clause.

1.6.5.   None of the requirements contained herein as to types, limits and Employer's approval of insurance coverage to be maintained by the Contractor, is intended to or shall in any manner limit or qualify the liabilities and obligations assumed by the Contractor under the Contract.

1.6.6   The Employer reserves the right at any time to obtain on behalf of the Contractor any or all of the insurances set forth above and in such case the Contractor shall be required to refund to the Employer on a pro-rata basis those insurance costs comprised in the Contract Price, and to comply fully with all coverage application and audit procedures.

1.6.7   The Contractor shall deliver to the Employer not later than fifteen (15) Days after signature of the Contract, but in any event prior to commencing Works on the Site, Certificates of Insurance identified on their face as to project name as evidence that policies providing such coverage and limits of insurance are in full force and effect, which certificates shall provide that not less than thirty (30) Days advance notice shall be given in writing to the Employer prior to cancellation, termination or alteration of said policies of insurance.

1.6.8   The Employer has the right to review and examine the rates for insurance carried and maintained by the Contractor and to receive upon request copies of the Policy documents and premium receipts.

2.   **Insurance Provided by the Employer**

2.1   Without in any way limiting the Contractor's obligations under the Contract, the Employer shall take out, carry and maintain in force at the Employer's expense and in the names of the Employer, the Construction Manager, the Consultant Engineer, the Contractor and Subcontractors at the location of the Works the following insurance:

2.2   Contractors All Risk Insurance insuring the Works. The Employer may provide this coverage at its option when the scope and method of work is finalized.

2.3   Third Party Liability Insurance insuring the Contractor and its Subcontractors and suppliers for their on the site activity only in the course of their performance of the Works under the Contract in Lebanon with a combined single limit per occurrence of U.S.$5,000,000 subject to a per occurrence retained liability of U.S.$5,000 which shall be at the Contractor's expense. The Policy will exclude liability arising out of the ownership, operation or use of motor vehicles and watercraft and will be primary insurance for all insureds and will contain a cross liability or severability of interest



clause. The period of coverage will include the first 12 months of the Period of Guarantee.

2.4   Résumés of the foregoing insurance including applicable exclusions are contained in Attachment 1 to this Exhibit. While these résumés are considered to be accurate representations of the terms and conditions of the Employer provided Insurance, in the event that conflict manifests itself between the policies and the résumés, the policies shall at all times be regarded as paramount and controlling.

2.5   To the extent that the Employer sustains a loss which is not covered by the insurance coverages provided pursuant to this Exhibit or which for whatever reason is not paid for by the Insurer, the responsibility provisions of the Contractor under the Contract shall apply.

* * * * * *





**ATTACHMENT 1**

**TO**

**EXHIBIT 7**



# RESUME OF
## INSURANCE PROVIDED BY THE EMPLOYER

The Insurances to be provided by the Employer will generally be in accordance with the following resume which is provided as a guide and should not be considered as overriding any policy terms and conditions and exclusions. **These details are indicative only as the insurance coverage cannot be finalized until the method of work is known.**

### BCD PROJECT INSURANCE POLICY

#### Period of Insurance

From commencement of Works on Site until Completion of the Permanent Works followed by 12 months in respect of the Contractor's Guarantee obligations.

#### Insured Parties

The Employer :         The Lebanese Company for the Development and
                       Reconstruction of Beirut Central District, S.A.L.
The Contractor:        Any Contractor appointed by the Employer or
                       any Subcontractor of any tier or Suppliers for their on
                       the Site activities only.

#### The Insured's Retained Liability

The total amount which shall be deducted from each loss before the Insurers shall be liable to make any payment.

#### The Site

The actual place or places to which property and materials are to be delivered or where Works are to be done by the Contractor other than premises of manufacture together with so much of the area surrounding the said place or places as the Contractor shall actually use in connection with the Works.

#### Geographical Limits

Anywhere in Lebanon.

#### General Exceptions

War Risks and Radioactive contamination.



# Section 1 - Third Party Liability

## Indemnity Provided

Covers the Insured's legal liability to pay compensation and damages in respect of death of or injury to or disease contracted or illness sustained to any person or damage to property happening within the Geographical Limits arising out of or in the course of or in connection with the carrying out of the Works.

## Limit of Indemnity

U.S.$ 5,000,000 each occurrence or series of occurrences arising out of one original cause.

## Insured's Retained Liability

Each claim or series of claims arising out of one original cause

|              |                 |
|--------------|-----------------|
| Nil          | Bodily Injury   |
| U.S.$ 5,000  | Property Damage |

## Additional Coverages And Clauses

- Cross Liability clause
- Director's Indemnity
- Indemnity to members of Insured's first aid, fire and ambulance services in connection with the Works.

## Exceptions To Section 2

- Death of or bodily injury to or illness or disease contracted by any person arising out of and in the course of his employment by the Insured.
- Vehicle liability.
- Aircraft and Watercraft Liability.
- Penalties for delay.
- Deliberate act or omission by the Insured.
- Claims arising out of advice, design or specification given for a fee.
- Liability for costs of rectification of products supplied or contract Works executed by the insured caused by any defect therein or the unsuitability thereof for its intended purpose.
- Pollution or contamination unless caused by a sudden identifiable unintended and unexpected incident happening during the Period of Insurance.

## Claims Procedures /Third Party Liability

Claim handling and reporting procedures will be provided to Contractor. Failure to abide by these procedures may invalidate the insurance coverage.

\* \* \* \* \* \*



# ATTACHMENT 2

## TO

### EXHIBIT 7

## CONTRACTOR;S PROFESSIONAL AND ENVIRONMENTAL INSURANCE

The Insurance to be provided by the Contractor to cover its obligations under this Agreement will be in accordance with the insurance coverages and limits set out below with Lebanese Insurer's and under forms of policies satisfactory to the Employer.

### Normandy Landfill - Phase II Project Policy

### Period of Insurance

From commencement of the Works until the date of the Certificate of Completion followed by an Extended Reporting Period of 20 years.

### Insured Parties

Named Insured:        Radian International LLC as Contractor and/or any Sub-Contractor

Additional Insureds:  The Lebanese Company for the Development and Reconstruction of Beirut Central District S.A.L.

### Territory

Worldwide

### Insurance Coverages

- Professional Liability
- Contractor's Environmental Liability
- Completed Operations Liability

### Limits of Liability

U.S. $20,000,000     Each Claim
U.S. $50,000,000     Aggregate Total for all Claims

### Insured's Retained Liability

U.S. $1,000,000

### General Exclusions

- War Risks
- Nuclear Energy Liability
- Dishonest, Criminal, Willful or Deliberate Acts
- Fines, Penalties
- Workman's Compensation Related Claims

* * * * *





# TECHNICAL CONDITIONS OF CONTRACT

## NORMANDY LANDFILL PHASE 2

# *CONTENTS*

**1.0 INTRODUCTION**

**2.0 OBJECTIVE OF THE PHASE 2 RECLAMATION WORKS**

**3.0 SCOPE OF WORKS**

**4.0 METHOD OF DETERMINATION OF VOLUME OF MATERIAL TO BE TREATED**

    4.1 Definitions
    4.2 Determining In-Situ Bulk Density of Material to be Treated
    4.3 Calculation of In-Situ Volume of Material to be Treated

**5.0 CONSTRAINTS AND REQUIREMENTS**

    5.1 Perimeter Road (Common User Access Road)
    5.2 Marine Works
    5.3 General External Fill Area
    5.4 Availability Of Land Outside The Phase 2 Boundary
    5.5 Imported Fill
    5.6 Installations Existing On Site
      5.6.1 Crushing Plant Location
      5.6.2 Crushing Plant Use by the Contractor
      5.6.3 B.C.B Concrete Batching Plant
      5.6.4 Waste Processing Plant
    5.7 Services
    5.8 Site Access
    5.9 Other Contractors
    5.10 Health and Safety
    5.11 Phasing Requirements

**6.0 REQUIREMENTS FOR SITE OFFICES AND VEHICLES FOR THE EMPLOYER AND OTHERS**

    6.1 Office Requirements
    6.2 Office Materials
    6.3 Notice Boards
    6.4 Vehicles and Other Facilities and Services for the Employer
      6.4.1 Vehicles
      6.4.2 Communications
      6.4.3 Security Services for the Employer
      6.4.4 Fueling and Services of Vehicles

6.5  Program Requirements
6.6  Reversions
6.7  Temporary Sanitary Facilities
6.8  Attendance
6.9  Publicity and Signboards
6.10 Clearance of Site on Completion
6.11 Weather and Meteorological Recording
6.12 Survey Equipment and Staff
6.13 Printed Forms

7.0 INFORMATION MADE AVAILABLE TO THE CONTRACTOR

APPENDIX A RULES, PROCEDURES AND REGULATIONS FOR THE EXECUTION
         AND COMPLETION OF WORKS IN THE BCD

APPENDIX B REGULATIONS AND PLANNING OF BEIRUT CENTRAL DISTRICT AND
         SECTORS A, B, C AND D

DRAWING RJ01, SITE MAP

BCD MASTER PLAN

## 1.0    INTRODUCTION

This document contains the Technical Conditions of Contract for the Phase 2 Reclamation of the Former Normandy Landfill. It sets out the technical requirements with which the Contractor is to comply in the Completion of the Works

## 2.0    OBJECTIVE OF THE PHASE 2 RECLAMATION WORKS

The objective of the Works is to reclaim the land and environment known as Phase 2 of the former Normandy Landfill (see Drawing RJ01) as marketable development land that poses no risk to human health, public welfare, structures, services and the environment.

The reclaimed land will be marketed by the Employer for the construction of a prestige high density development (offices, hotels and condominiums), park land, and associated infrastructure works. Development will comprise high multi-storey buildings with up to 7 levels or more of underground structures.

The Contractor is required to design and construct a reclamation scheme to meet the objective of the Works in accordance with the Contract.

## 3.0    SCOPE OF WORKS

The Contractor undertakes to:

1) Reclaim the land within the Phase 2 area to a readily acceptable marketable standard for development as:

   - Prestige high density multi-storey buildings (offices, hotels and condominiums) with up to 7 levels or more of underground structures.
   - Infrastructure comprising car parks, roads, footways, services, sewers, street lighting etc.
   - Park land with high quality hard and soft landscaping including a raised amphitheater, foot-ways, car parking, trees, lighting, lakes, etc.

The extent of the Normandy Landfill Phase 2 site at sea level is shown on Drawing RJ01. Phase 2 extends beyond the boundary shown on Drawing RJ01 to seabed at a maximum slope of 1 vertical to 6 horizontal, except along the southern boundary of Phase2. The Contractor is required to remediate such land (including land below the sea) outside the boundary of Phase2 as shown on Drawing RJ01 as it considers necessary to meet the Employers Objective for the Phase 2 site and provide the necessary guarantee as per the General Conditions of Contract. Notwithstanding the aforementioned, the maximum excavation volume shall not exceed 5.0 million cubic meters.

2) Reclaim the land within the Phase 2 area in accordance with the General Conditions of Contract.

3) Provide a level graded development platform at a reduced level of 1.5 meters above mean sea level (assuming mean sea level to be zero datum).

4) Undertake the Works so that, as far as is reasonably practical, there shall be no increased risk to human health, public welfare, buildings, construction materials, services and the environment either on or off the site from the environmental hazards on the site as a result of the Works.

5) Protect the Phase 1 area and development as well as all completed sections including completed Marine Works areas, as necessary, from any environmental hazards present within Phase 2 Normandy Landfill, or resulting from the Works.

6) Achieve the End Product acceptability criteria [landfill gas emissions (carbon dioxide and methane)], leachate and water quality, chemical contaminant levels (metals etc.) and geotechnical criteria which have been determined by the Contractor, and deliver the completed Works as land Fit for the Purpose. These chemical and biological site quality criteria are set out in the following table (table 3.1):

| TABLE 3.1 |  |
|---|---|
| **CHEMICAL AND BIOLOGICAL FINAL SITE QUALITY** | |
| Parameter | Level in mg/kg (unless shown otherwise) |
| Organic Carbon C | <5% |
| Total Nitrogen N | <2% |
| C/N Ratio | 10/1 to 25/1 |
| pH | 5 to 11 |
| Nutrients (P) | <1.5% |
| Ammonia | - |
| Ammonia/Nitrate ratio | <1 |
| Arsenic | 42 |
| Cadmium | 6 |
| Chloride | 2000 |
| Chromium | 240 |
| Lead | 308 |
| Mercury | 5 |
| Selenium | 6 |
| Boron | 3 |
| Copper | 113 |
| Nickel | 123 |
| Zinc | 430 |
| Cyanides (Free) | 11 |
| Phenols | 5 |
| VOC | 7 |
| PCB | 1 |
| Sulphate | 2000 |
| Polyaromatic Hydrocarbons | 50 |
| Mineral Oils | 1000 |
| Salmonella | Zero in 25 gr |
| E Coli | <1000 MPN/gr |
| Flammable Gas | <1% v/v (g) |
| Carbon Dioxide | <1.5% v/v (g) |

| TABLE 3.1 (Cont.) | |
|---|---|
| **CHEMICAL AND BIOLOGICAL FINAL SITE QUALITY** | |
| Parameter | Level in mg/kg (unless shown otherwise) |
| Oxygen | 18% - 23% (g) |
| Landfill Gas | No specific precautions will need to be provided for built development including landscape works in the reclaimed area |

The maximum particle size of replacement fill shall be 300 mm. Treated back-filled materials for use in the Permanent Works are not to have a visual appearance indicative of waste (i.e. plastics, etc.).

The achievement of the End Product criteria will be demonstrated by the implementation of a sampling and testing program to be determined by the Contractor that shall not be less than the following program (Table 3.2):

| TABLE 3.2 | | |
|---|---|---|
| **SAMPLING AND TESTING PROGRAM** | | |
| Parameter | Pre-Treat | Post-Treat/Prior To Disposal |
| 1. Organic Carbon | 1/1000 m3 | 1/500 m3 |
| 2. Total Nitrogen | 1/1000 m3 | 1/500 m3 |
| 3. Nutrients (P) Chloride, Sulfate, and Cyanides | 1/2000 m3 | |
| 4. RCRA Metals | 1/2000 m3 | 1/1000 m3 |
| 5. Mineral Oils | 1/1000 m3 | 1/500 m3 |
| 6. CO2, o2 & Flammable Gas (Head Space) | 1/500 m3 | 1/500 m2 |
| 7. PCBs | 1/4000 m3 | 1/2000 m3 |
| 8. VOCx | 1/1000 m3 | 1/1000 m3 |
| 9. PAHs | 1/4000m3 | 1/2000 m3 |
| 10. Ecoli/Salmonella | 1/1 month 1/3 months | 1/1 months for initial six months, 1/3 months thereafter |
| 11. Auto-Heating For Compost Maturity | | 1/500 m3 |

7) Undertake the remediation works for all wastes (e.g. animal carcasses, tyres, contaminated materials, etc.) with no exclusions except for munitions and special waste which are defined below.

Special Waste for the purposes of this Contract shall mean waste which is enclosed in drums, barrels or similar packaging and which is not amenable to being treated by the methods identified by the Contractor to deal with the body of the municipal and inert material on the site.

It is the Contractor's responsibility to identify Special Waste and to inform the Employer of its existence, composition (sufficient only for classification as Special Waste under this Contract), and approximate quantity. The Contractor is responsible for removing the waste from the excavation and placing it in a safe and secure location on the Normandy Site for delivery to the Employer. *Although the treatment of Special Waste is not included in the scope of works, the Contractor will assist the Employer in finding solutions for the management and disposal of the waste and in obtaining financial support for these tasks from relevant U.S. Governmental Agencies*

Munitions will be dealt with by the Lebanese army and the Contractor is to liase with them and the Employer in this respect. The principal point of contact for the Contractor will be the Employer or its representative.

Animal carcasses, sharps (i.e. needles) and plasma bags specifically shall not be classed as Special Waste.

Human remains shall be handled in accordance with the General Conditions of Contract.

8) Obtain all necessary licenses, permits, approvals etc. and undertake all necessary work required to comply with the same.

9) Comply with the phasing requirements set out in section 4.11 of this document.

10) Take account of and abide by the constraints and requirements set out in section 5.0 of this document.

11) Provide a guarantee as set forth in the General Condition GC 29.

12) Assess the site conditions from the information provided and such additional site investigation as the Contractor may carry out and determine;

- Extent of waste (horizontally and vertically to sea bed)
- Characteristics of wastes
- Chemical properties of wastes (organics, metals, etc.)
- Landfill gas
- Leachate quality
- Quality of environmental receptors (groundwater, sea air, etc.)

1) Provide an assessment demonstrating that the remediation will meet the Employer's requirements during and upon completion of the Works with regard to:

- Human Health (site users, general public, construction and maintenance workers)
- Buildings, construction materials and services
- Ground and surface waters

---

- Environmental receptors

The assessment shall address hazards from:

- Landfill gas
- Leachates
- Contaminated soils and wastes (heavy metals, oils, etc.)
- Ground instability (settlement, bearing pressures, etc.)
- Combustion of wastes
- Munitions

14) Determine volumes and nature of materials requiring treatment above and below reduced level minus 1.5 meters (assuming mean sea level to be zero datum).

15) Design and provide all Permanent and Temporary Works, and reinstate the site at the conclusion of the Works.

16) Determine acceptability criteria for the environmental monitoring [landfill gas (carbon dioxide and methane), leachate, odor and dust] during the Works. Determine and provide environmental monitoring regime and pest control, where required, for the duration of the Works.

17) Determine, provide and implement, to the satisfaction of the Employer a Quality Assurance regime to demonstrate that materials are inert or have been treated to achieve the End Product acceptability criteria [landfill gas (carbon dioxide and methane), chemical (metals, etc.), leachates and geotechnical].

The Quality Assurance programme must extend to any and all material used as backfill to the site, whether the material arises from the Works, is imported by the Contractor or is provided by the Employer.

18) Determine, provide and implement to the satisfaction of the Employer, post works monitoring for a period of 4 years after the issue of the Certificate of Completion to demonstrate that remediation criteria for landfill gas (carbon dioxide and methane), leachate and water quality, chemical contaminant levels (metals, etc.) are being met.

19) Undertake surveys at the end of each month and at the conclusion of each operation / phase of the Works to determine quantities and types of materials excavated, stockpiled, treated, disposed of, backfilled, etc. and provide 3 hard copies and 2 electronic copies in SDF or CSV format to the Employer.

20) Provide offices and facilities, and associated upkeep and utilities usage throughout the Contract period for the Employer and his Construction Manager/Technical Controller team together with three vehicles including all operational maintenance and fuels. Outline requirements are given in section 6.0 of this document.

21) Attend progress and co-ordination meetings as and when required by the Employer and shall provide the Employer such information and details on the progress and programming of the Phase 2 Works as and when the Employer may reasonably require but in no case less than monthly progress report submitted in 5 copies.

22) At the conclusion of the Works, provide the Employer with 4 copies of an Operational and Maintenance Manual for the site which shall include as a minimum:

- Site investigation information
- Environmental assessment as relating to the completed Works and covering at a minimum the items presented in 13 above
- All "as built drawings"
- Final site survey
- Quality assurance test results and assessment
- Environmental monitoring test results and assessment
- Post Works monitoring test results and assessment
- Description of Works undertaken and phasing
- Details of any health and safety procedures required for residual gas, leachate, and chemical and ground conditions
- Details of any development design constraints
- Operations and Maintenance manuals for any permanent plant and equipment

23) Carry out the Works generally in accordance with the following Method Statement, providing from time to time in accordance with the Contract such further method statements as required. The Contractors' attention is specially drawn to the provisions of G.C. 4.2 and 5.2 in relation to the standing of this method statement.

| **TABLE 3.3** | | |
|---|---|---|
| **METHOD STATEMENT PROVIDED BY THE CONTRACTOR** | | |
| **Ref** | **Item Description** | **Details** |
| 1.0 | Treatment Methods for the Material to be Treated as per Contract Definition | |
| 1.1 | Treatment method 1 | Windrow Composting will be used to treat pockets of wet and biodegradable organic material and material with high fraction of soils that is highly contaminated with biodegradable contaminants. |
| 1.2 | Treatment method 2 | Low Temperature Thermal Desorption (if needed) will be used to treat material with high soil content that is contaminated with hydrocarbons, solvents, and other organic contaminants. |
| 1.3 | Treatment method 3 | Radian may use BAG Composting (i.e., Aerated Static Pile Composting) in conjunction with windrow composting. This technology is similar to aerated static pile composting; however, it utilizes a special plastic envelope around the material, which allows for better control of odours and a more balanced aeration system. The waste is loaded into the envelope by a special machine and air is supplied via perforated pipe to the waste using blowers. |
| 1.4 | Treatment method 4 | Land Farming and Aeration in thin lifts will be used to treat material that has been degraded but it continues to include minor levels of organic contents. It will also be used for soils with amount of contamination |
| 2.0 | Other Treatment Methods | |
| 2.1 | Treatment method | Radian will also supply an incinerator (5 to 10 ton per day capacity) that will be used for burning plastic, paper, medical waste, animal carcasses, and other combustible wastes that cannot be recycled. Ash from this process will be backfilled in the park area as inert material. |
| 2.2 | Method of dealing with carcasses | Incineration |
| 2.3 | Method of dealing with plastics | Plastics and other combustible wastes that cannot be recycled will be burned in the onsite mobile incinerator that would be supplied and operated by Radian. Plastics may also be baled and placed in the park area. |
| 2.4 | Method of dealing with tyres | Tires will be shredded and used as bulking agent in the composting process. The shredded tires will be used as a fuel source for the incinerator or will be buried in areas of the site where no future structures and/or infrastructures are planned (i.e., park). Other beneficial uses will be considered as appropriate.<br><br>Radian will use a mobile shredding/grinding unit to shred segregated tires and wood material. |

**TABLE 3.3 (Cont.)**
**METHOD STATEMENT PROVIDED BY THE CONTRACTOR**

| Ref | Item Description | Details |
|-----|------------------|---------|
| 2.5 | Method of dealing with timber and paper | Segregated timber will be shredded and used initially as bulking agent in the composting process. The final use for shredded wood will be as mulch in landscaped areas. Such mulch will be stockpiled in an area approved by the owner for future use following the completion of landscaping construction. <br><br> Paper will be incinerated or burned appropriately. |
| 2.6 | Treatment Method Miscellaneous Items | Approximately 25,000 cubic meters of the total excavated volume will include miscellaneous items (i.e. vehicles, metals, etc.) that may have to be taken to an off-site location for disposal at a recycling facility or at an in-country approved landfill. |
| 2.7 | Treatment of Inorganic Materials | No specific treatment is included for inorganic contaminants as there is no basis for this requirement. |
| 3.0 | Method of moisture conditioning for excavated material from below the sea | Radian will initially stockpile material excavated from below sea level to allow for gravity draining/dewatering. This will be followed by spreading and turning for drying prior to screening |
| 4.0 | Mixing ratio of treated material to inert prior to backfilling | Radian would not mix any organic matter or heavy organics contaminated media for the purpose of dilution. Our experience in many nations (i.e., the United States mixing for the purpose of dilution is not acceptable and in some instances could be considered as an action in violation of environmental laws) has shown that mixing of waste for dilution may not constitute treatment and manot be desirable by financial lending institutions and real estate investors. |
| 5.0 | Compaction for fill materials | In the areas of future roadways, we will emphasise the use of course material (crushed concrete and rock and stone) above sea level to provide a better base for the planned streets. Backfill in areas designated for roadways will be compacted using mechanical means from elevation plus 0.5 to plus 1.5 m. <br><br> No other compaction is planned at the site by Radian. |
| 6.0 | Use of General External Fill Area | Estimated volume required is 1.5 million cubic meters (Radian will provide adequate notice of variation of the required volume to the Employer). |

**Exclusions**

The following items are excluded from the Scope of Works:

1. Treatment of existing leachate at the site.

2. The use of special foam/chemicals for control of odors.

3. The use of covered areas to store dry material or to dry wet material.

4.   The use of structural covers over the area (s) of composting or any other treatment process.

5.   No specific treatment is included for inorganic contaminants as there is no basis for this requirement.

6.   The mixing of material for geotechnical purposes.

7.   Except as required by the Contractor's operations, the cost of re-setup/erection, and/or removal of the DUOS waste processing plant from the site.

8.   The excavation and backfilling of waste from under any structure (i.e., roadway, culvert, drainage system, etc.) in the Phase 1 area of the site.

9.   The relocation of the on-site crusher, the Employer's on-site offices (at southeast corner of site), or the BCB plant.

*If the Contractor decides to implement any of the above operations for the execution of the Works, then these operations will be included in the scope of works, without any increase in the Contract Price or in the Time for Completion.*

## 4.0 METHOD OF DETERMINATION OF VOLUME OF MATERIAL TO BE TREATED

### 4.1    Definitions

$Wi$ = wet weight of in situ test cell material
$Vi$ = wet volume of in situ test cell material
$Di$ = bulk density of in situ test cell material
$Mi$ = moisture content of in situ test cell material

$Wt$ = wet weight of material to be treated
$Mt$ = moisture content of material to be treated
$Vt$ = volume of material to be treated

$Wdryt$ = dry weight of material to be treated
$Wwt$ = weight of water in the material to be treated

### 4.2    Determining In-situ Bulk Density of Material to be Treated

**Test Cell**

*Frequency*

- A minimum of three test cells, up to a maximum of ten, as required by the Construction Manager will be excavated per section. If a reasonable convergence of in-situ densities ($Di$) between the cells is not found, additional cells will be excavated as required.

- The above procedure will be repeated every three months.

- Additional cells will be excavated as agreed jointly by the Construction Manager and the Contractor.

*Cell Excavation*

- The cell will be of a size to fill one dump truck, and trimmed or enlarged to facilitate accurate measurement.

*Cell Measurements*

- The in-situ volume ($Vi$) of the cell will be determined by survey.

- The weight of the cell ($Wi$) will be determined by weighing the dump truck on a calibrated truck scale prior to loading and subtracting the weight after loading.

- The moisture content ($Mi$) of the cell will be determined by taking the average of five samples (four side walls and bottom) from the excavation pit.

**Material to be Treated**

- All material to be treated will be weighed

- Material to be treated will be weighed (Wt) on calibrated truck scales, belts or other weighing devices.

- The moisture content (Mt) of the material to be treated will be measured by taking the average of at least five samples per day.

## 4.3 Calculation of In-Situ Volume of Material to be Treated

- The method of calculating moisture content will be weight of water divided by dry weight of solids:

$$\text{moisture content} = \text{weight of water/weight of dry solids}$$

- The in situ density $Di = Wi/Vi$
- $Wdryt = Wt-Wwt$

- The volume of material to be treated $Vt = (Wdryt + \{[Min(Mi,Mt)/Mt] * Wwt\}) /Di$

N.B    Min(Mi,Mt) means that the lesser of Mi and Mt is to be used

**Overall Method of Application**

- Di in the formula to determine Vt will be the average of an agreed suite of test cells
- Vt will be calculated on a daily basis using the current value of Di

## 5.0    CONSTRAINTS AND REQUIREMENTS

### 5.1 Perimeter Road (Common User Access Road)

A 20 meters wide perimeter road, Common User Access Road, is present along the seaward edge of the site and abutting the Marine Works working area to the west (Drawing RJ01) for the use of all contractors working on the Normandy site or needing to pass through it. This route or an equivalent route which is acceptable to the Employer must be available at all times. The route will be maintained by the Employer until such time that any part of the road being used by the Marine Works contractor is modified or diverted by the Contractor after which time the Contractor will be responsible for the maintenance of that portion of the Common User Access Road.

The perimeter road may be diverted by the Contractor subject to agreement by the Employer who will need to consider the effect on any contractor entitled to use the road. Any diversion must be constructed by the Contractor to a standard similar to that of the existing road and the diversion must be completed and available for use before the current road is diverted.

If the road is disturbed for any reason by the Contractor without the prior approval of the Employer, or is not adequately maintained, the Contractor shall immediately and at his own expense reinstate this road and will be liable for the cost of any related claims successfully pursued against the Employer by any contractor (entitled to use the road).

### 5.2 Marine Works

The Employer has entered into a contract for the construction of Marine Works at the Normandy Site. The contract has commenced and is scheduled for completion in July 2000.

The Contractor must phase his works so as to allow for change in the Marine Works Programme and to ensure that the Phase 2 works do not interfere in any way with the Marine Works or the operations of the Marine Works contractor.

In particular, the Contractor shall ensure that his excavations do not undermine the Marine Works structural support and that the Contractor's filling operations do not affect the Marine Works Contract operations.

### 5.3 General External Fill Area

The principal requirement for placing fill is within the boundary of the Phase 2 site as shown on drawing RJ01. Additional area is available in the general fill zone along the northern boundary of the landfill. There is no requirement under this Contract to fill in the General External Fill Area however it is available should the Contractor wish to make use of it. This additional area is subject to phasing restrictions which limit its availability and there are constraints on the method of filling in proximity to the caissons and supporting material.

The filling in the general fill zone can commence on June 1, 1999 starting across from Caisson number 13. The head of the filling (tipping) should be perpendicular to the Caisson line and at all time be behind a line of ten (10) caissons including stablizing backfill placed by the Marine Works contractor. Additionally, no filling above +1.0m mean sea level (MSL) is to take place before all caissons and support backfill are placed (provisionally scheduled for completion in January 2000). No filling is to take place within 10 meters of caisson back wall.

The Contractor shall agree and co-ordinate any use of the additional fill areas with the Employer. The placing of fill in the general fill area will be carried out by the Employer. The Contractor is required to deliver fill material to the fill area at the location or locations specified by the Employer from time to time.

Fill materials delivered to the General External Fill Area by the Contractor shall be subject to the same guarantees of quality and fitness for purpose as fill materials used in the Phase 2 area. If it is used by the Contractor, the General External fill Area shall be included in the Post Works Environmental Monitoring Scheme.

### 5.4 Availability of Land Outside the Phase 2 Boundary

The Employer at his sole discretion may from time to time make other areas of land available for use by the Contractor outside the Phase 2 boundary.

### 5.5 Imported Fill

In the event that the Contractor needs to import fill onto the site then he must make his own arrangements for its procurement, and obtain the Employers' agreement to material being imported and to the source, type, and quality of that material.

The Employer at his sole discretion may supply the Contractor with fill material at no cost. The type, quality and rate of supply however cannot be guaranteed and it will be the Contractors' responsibility to ensure that it is suitable for the purpose for which it is to be used. The Employer will use its best endeavors to provide material to meet the Contractors programme but will not accept any liability whatsoever for any failure to do so.

### 5.6 Installations Existing on Site

### 5.6.1   Crushing Plant Location

An operating crushing plant is situated within the Phase 2 site at the location shown on Drawing RJ01. This plant is owned by the Employer and is operated on his behalf under a separate contract. If the Contractor requires the crushing plant to be moved, then he shall notify the Employer at least six months before the Contractor needs to do reclamation work in that area.

Only one relocation of the crushing plant will be permitted and the new location must be approved by the Employer.

The crushing plant and associated working area comprise approximately 1.5 hectares and that area must be available for the crusher operations at all times. Additionally, approximately one (1) hectare within the site boundary and generally in proximity to the crushing plant must be available for the stockpiling of rubble and reinforced concrete that require processing through the plant.

### 5.6.2   Crushing Plant Use by the Contractor

The Contractor may deliver to the crusher stockpile hard material that arises from the Phase 2 excavation and that is greater than 300 mm in size.

Once placed in the crusher stockpile, the material will be processed by the Employer and used by him. Hard material delivered to the crusher stockpile shall comprise stone, brick, concrete, reinforced concrete, and like material and shall not contain timber, munitions, nor municipal, industrial, medical or special waste.

### 5.6.3    B.C.B. Concrete Batching Plant

The B.C.B. concrete Batching Plant is situated at the location shown on Drawing RJ01. The Contractor shall arrange his operations such that they do not interfere with the normal working of the B.C.B. Plant.

The B.C.B. Plant cannot be removed from the site until 30 September 2000 and only then after the Contractor notifies the Employer six months before the possession date required by the Contractor.

### 5.6.4    Waste Processing Plan

The Employer has entered into a contract with Duos Engineering B.V. of the NETHERLANDS for the design and construction of a Waste Processing Plant to be erected on the site at the location shown on Drawing RJ01.

The Contractor will be required to take over the operation of the Waste Processing Plant for use on the Phase 2 reclamation. "Take over the operation of the Plant" means all operation, staffing, management, running and maintenance. The contract between the Employer and Duos includes strategic and wear parts together with a spares procurement service. The spare parts scheduled in the contract between the Employer and Duos will be made available to the Contractor at no cost however any additional spare or wear parts will be at the Contractors' cost. The specifications of the waste processing plant and the list of the provided spare parts are included in Section 8.

The Contractor is required to provide the needed personnel and earth-moving equipment for the commissioning of the plant, and to excavate and deliver material to and from the plant as required for the commissioning. The training program provided by Duos Engineering B.V. (October, 1998) shall apply to Contractor's personnel.

The Contractor will be wholly responsible for moving the plant and all associated costs.

The Employer does not guarantee the actual through put rate of the plant.

The Contractor may amend or modify the plant at his own cost with the agreement of the Employer.

If any loss or damage occurs to the plant during the works from any cause whatsoever, the Contractor shall at his own expense, rectify such loss or damage to the satisfaction of the Employer.

The Waste Processing Plant shall remain the property of the Employer.

The Contractor shall hand-over the plant back to the Employer after the completion of the Works in good working condition except for reasonable normal wear and tear.

Should the Contractor decide to purchase equipment related to the pre-processing phase (i.e. for the handling/conditioning of excavated material prior to processing through the waste processing plant) or to upgrade the Waste Processing Plant with additional equipment or to contract the Waste Processing Plant supplier to further assist in the operation of the Waste

Processing Plant, the Contractor should inform the Employer immediately of its decision, associated cost, specifications of equipment and/or services and period of implementation.

The Employer thereafter, within a period of 15 days, may offer to the Contractor an option whereby the Employer may supply or arrange to be supplied such equipment and/or services, in which case and if agreed by the Contractor the Contract Price would be adjusted accordingly.

### 5.7 Services

The Employer will not provide services (water, power etc.) for the Contractor's works.

### 5.8 Site Access

The main site access location is shown on Drawing RJ01. This access will be used by other Contractors.

### 5.9 Other Contractors

Others who may have access to the site include, but are not limited to:

1) The Contractor for the removal of the inert stockpile, crusher operations and sorting works.
2) Traffic to the stores and office areas.
3) Contractors for the Marine Works and Infrastructure works using the perimeter road.
4) Emergency services.
5) The Lebanese army and security forces.
6) BCB vehicles.
7) External vehicles bringing import fill to the Normandy Site.
8) The Employer's employees and his visitors/guests.
9) The Construction Manager.

### 5.10 Health and Safety

The Contractor shall undertake the works under the BCD rules, procedures and regulations and shall abide and implement a Project Health and Safety programme that shall address but not limited to:

1) Handling contaminated wastes and any associated hazards.
2) Landfill gases.
3) Leachate.
4) Unexploded munitions.
5) Special wastes, animal carcasses, medical wastes.
6) Works over the sea.
7) Ground instability.
8) Combustion of wastes.
9) Earthworks and remediation operations, plant, equipment, etc.
10) Other Contractors operations.
11) Services.
12) Enforce a No Smoking policy on the Site.

13) Carry on all vehicle maintenance in controlled areas agreed to by the Employer.

<u>5.11 Phasing Requirements</u>

The Contractor shall phase his works to comply with the following phasing and completion requirements, (Table 5.1)

| TABLE 5.1 Phasing Requirements | | |
|---|---|---|
| Section* | Commencement | Completion |
| Section 1 | Excavation above level +1.5** may commence at any time.<br><br>Excavation below +1.5** must <u>not</u> commence Until after April 30,1999<br><br>Filling to any location must <u>not commence until after April 30, 1999</u> | All works by December 31,1999 |
| Section 2 | No restrictions | All works by June 30, 2000 |
| Whole of the works | Not applicable | All works within 4.5 years from the Notice to Proceed. |
| Notes:   * Section 1 and Section 2 are shown on Drawing RJ01<br>        ** Mean sea level is zero level | | |

and with any and all other restrictions in the Contract and attachments but not specifically mentioned in this section.

## 6.0    REQUIREMENTS FOR SITE OFFICES AND VEHICLES FOR THE EMPLOYER AND OTHERS

The Contractor shall at his own expense provide and properly maintain, for the duration of the Works, office facilities and vehicles for the use of the Employer, the Construction Manager, the Technical Controller and their respective staff.

The requirements of this section (Section 6.0) will be provided by the Contractor. The Employer on-site manager and the program manager will use their best endeavor to control cost.

The Contractor shall, until notified otherwise by the Employer upon the Completion of the Works, supply electricity, water, telephone and sanitary facilities for the offices referred to above. All shall operate 24 hours per day. The Contractor shall be fully responsible for the maintenance and operation, including cost, labour and materials of these utility systems, including a secondary backup electricity (generator) power supply for maintaining office power requirements. As well as, a central uninteruptable power supply for the networked P.C Computer/printers system.

The offices shall be sited at the location approved by the Employer. Prefabricated units, movable buildings or trailers will be accepted, subject to the approval of the Employer.

All facilities provided for the Employer, the Construction Manager, the Technical Controller and their respective staff shall remain available until the end of the first year of the Period of Guarantee or until such earlier time as the Employer may instruct.

The Works include the obligations of the Contractor for the:

- construction of the offices.
- provision and installation of furniture and equipment, which shall include at least the items listed hereafter.
- provision for supply of running water, electricity and telephone.
- maintenance of the offices, furniture and equipment, including daily cleaning and general attendance throughout the duration of the Works.

The Contractor shall provide and maintain the following services for the offices:

- heating and air-conditioning.
- electric lighting and power.
- telephone service.
- water supply.
- drainage system.
- fire fighting appliances.

## 6.1 Office Requirements

The Contractor shall provide prefabricated, portable or de-mountable offices for the sole use of the Employer, the Construction Manager, the Technical Controller and their respective staff. The offices shall at a minimum comprise of the specifications set forth below.

- The buildings shall be provided with adequate environmental control systems to permit a general temperature of 18°C with a tolerance of +/- 2°C to be maintained.

- Adequate ventilation shall be provided to all rooms with extractor fans in toilets, shower and kitchen area.

- All floor areas to be vinyl tiled except for wet areas, kitchen, toilets and shower areas are to be waterproofed and ceramic tiled as required.

- Unless stated otherwise walls and ceilings are to be finished white. Kitchen, toilet and shower areas are to be white ceramic tiled.

- All external doors are to be fitted with a suitable lock and duplicate keys provided as requested. Fire exit doors to be clearly marked and fitted with suitable panic bolt.

- Shall be provided such that the window area available is not less then 10% of the floor area. Opening windows for ventilation shall be provided at not less than 5% of the floor area. Also all windows to have flyscreens. Floor to ceiling height shall not be less than 2.4 meters.

- Windows shall be fitted externally with security grilles or opening shutters as appropriate and internally with venetian or other suitable sun blinds.

- Adequate lighting facilities such that a general level of 200 lux minimum and as appropriate to the use of room areas shall be provided.

- Adequate electrical power supply points shall be provided of sufficient number to suit the use of the room areas. The following minimum provision will be required:

| | |
|---|---|
| Photocopy / administration rooms | 6 outlets |
| Kitchens | 4 outlets |
| Toilets | 1 outlet |
| Showers | none |
| All other rooms | 4 outlets |

  Allow for 2 additional outlets to the above (if required).

  Service ducts are to be installed to all offices and working areas to allow the installation of a telephone system.

- The area for the site accommodation shall be cleared and prepared prior to the erection of the facilities.
- Suitable bitumen macadam or similar hardstandings, footways, car parking areas incorporating adequate drainage provision shall be provided adjacent to the office.

- All accommodation shall be cleaned daily and adequate attendance for maintenance and servicing of the accommodation shall be provided.

- Adequate numbers of fire extinguishers/smoke detectors and other appropriate fire fighting measures shall be made.

- Adequate external security/amenity lighting shall be provided in the areas around and adjacent to the accommodation and car parking areas.

Offices shall at a minimum include:

- One (1) conference room with a surface area of at least 25 square meters.
- Two (2) offices with a surface area of at least 20 square meters.
- Eight (8) offices with a surface area of at least 12 square meters each.
- One (1) kitchen and pantries.
- Sanitary facilities ( 3 toilets, 4 wash basins, 2 showers).
- Storeroom.
- Entrance area with space for desk, waiting and seating area.
- Parking & car shade cover for 12 cars.

Submit full details to the Employer for Approval before delivery to the Site and erection.

Offices Equipment, Furniture & Computer workstations

The offices shall at a minimum comprise of the items listed in this document and presented in Tables 1 through 11. Additionally, they shall include blinds, table-lamps, waste-paper baskets and all other miscellaneous items which can be reasonably expected. Upon Completion of the Work, processors and computers are to become the property of the Employer without any additional payments being due to the Contractor. The Contractor shall service and deliver them where directed.

**TABLE 6.1**

| _EXECUTIVE ASSISTANTS OFFICES_ | |
|---|---|
| _(requirements per office for 2 offices)_ | |
| **ITEM** | **AMOUNT** |
| **DESCRIPTION** | **REQUIRED** |
| 1. Shelving 4m long x 0.3m wide - fixed to walls as directed. | 4 |
| 2. Upholstered gas height adjustable typists chair - contoured with back rest. | 2 |
| 3. L-shaped typists desk 1600mm x 800mm and 1000mm x 600mm. | 1 |
| 4. Upholstered side chair. | 1 |
| 5. 4 drawer document filing cabinet with indexed pocket files. | 4 |
| 6. Free standing lockable storage cupboard 1800mm high x 1000mm wide x 450mm design. | 1 |
| 7. Wastepaper basket. | 2 |
| 8. 4 tier beanstalk filing tray. | 2 |
| 9. Engineering computer system as detailed below: | 1 |
|    _IBM Compatible Personal Computer System_ | |
|    Intel Pentium 2 233MHz with 265k cache | |
|    32Mbytes RAM | |
|    x 2 no. 4 Gig hard disc drive, IDE & Controller | |
|    1Mb SVGA PCI graphics card | |
|    3.5" floppy drive, 24 speed CD ROM drive | |
|    2 Serial ports, with 16550 UART | |
|    1 parallel port | |
|    Internal 28.8k Fax Modem & software | |
|    15" SVGA monitor | |
|    102 key Microsoft keyboard | |
|    Microsoft mouse | |
|    Desktop case & speakers | |
| 10. Iomega LS-120 SuperDisk Drive (ZIP DRIVE), External Parallel | 1 in total for both offices |
|    MS Dos 6.22 & Windows 97 Software | |
|    MS Office Professional Software | |
| 11. Hewlett Packard Deskjet Colour Printer 1100C | 1 |
| 12. Hewlett Packard Laser Printer - Laserjet 5P | 1 |
| 13. Plain paper photocopier | 1 |
|    Ricoh FT 4022 or equivalent. | |
| 14. Plain paper facsimile machine. Ricoh 2700L | 1 |
| 15. Heavy Duty (A4) Paper shredder & waste container | 1 |
| 16. Network System to suit Office P.C system | ITEM |
| 17. Hewlett Packard Scanjet 5100C | 1 in total for both offices |
| 18. Heavy duty paper punches | 1 |
| 19. A4/A5 Wire punch book binding System plus wire spines | 1 |

**TABLE 6.2**

| _MEETING ROOM_ | |
|---|---|
| **ITEM DESCRIPTION** | **AMOUNT REQUIRED** |
| 1. Conference table 4m x 1.4m | 1 |
| 2. Small table 2m x 1m | 1 |
| 3. Upholstered side chair | 16 |
| 4. Cork or fiber notice board - 10m² fixed to walls as directed | 2 |
| 5. Wall (drawing) Whiteboard with pen holder | 1 |
| 6. Wastepaper basket | 2 |
| 7. Coat hooks - fixed to walls as directed | 20 |

**TABLE 6.3**

| _SOLIDERE  &  CONSULTANT PROJECT MANAGERS_ (requirements per office for 2 offices) | |
|---|---|
| **ITEM DESCRIPTION** | **AMOUNT REQUIRED** |
| 1. Double Pedestal desk 1.8m x 0.8m with lockable drawers | 1 |
| 2. High back upholstered swivel desk armchair on castors | 1 |
| 3. Table 2m x 1m | 1 |
| 4. 4 drawer lockable filing cabinet with indexed pocket files | 2 |
| 5. Adjustable desk lamp | 1 |
| 6. Cork or fibre notice board, 5m² - fixed to walls as directed. Plus Drawing Whiteboard 5m² | 1 / 1 |
| 7. Upholstered side chair | 2 |
| 8. Book case | 1 |
| 9. Shelving 4m long x 0.3m wide - fixed to walls as direc | 1 |
| 10. Waste paper basket | 1 |
| 11. Free standing lockable storage cupboard 1800mm high x 1000mm wide | 1 |
| 12. 4 tier beanstalk filing tray | 1 |
| 13. Coat hook -fixed to walls as directed | 6 |
| 14. Couch seating for 4 persons and coffee table | 1 in total (for Solidere PM) |
| 15. Laptop computer system as detailed below; IBM Compatible laptop computer | |

```
Pe2. 233MHz CPU
64Mb RAM
1.4Gb hard disc
SVGA capability
3.5" internal floppy drive
CD (internal) x24 ROM
Serial port
PCMCIA Slot plus fax modem internal 28.8 kps card
TFT colour screen
Built-in mouse device
28.8 PCMCIA Fax Modem and Software
MS DOS 6.22 & Windows 97 Software
MS Office Professional Software
Microsoft Project Management Software
```

**TABLE 6.4**

| _SENIOR ENGINEERING STAFF - (requirements per office for 3 offices)_ | |
| --- | --- |
| **ITEM**<br>**DESCRIPTION** | **AMOUNT**<br>**REQUIRED** |
| 1. Double Pedestal desk 1.8m x 0.8m with lockable drawers | 1 |
| 2. High back upholstered swivel desk armchair on castors | 1 |
| 3. Table 2m x 1m | 1 |
| 4. 4 drawer lockable filing cabinet with indexed pocket files | 1 |
| 5. Adjustable desk lamp | 1 |
| 6. Cork or fibre notice board, 5m² - fixed to walls as directed. | |
| 7. Upholstered side chair | 4 |
| 8. Book case | 1 |
| 9. Shelving 4m long x 0.3m wide - fixed to walls as directed | 1 |
| 10. Waste paper basket | 1 |
| 11. 4 tier beanstalk filing tray | 1 |
| 12. Free standing lockable storage cupboard 1800mm high x 1000mm wide | 1 |
| 13. Coat hook - fixed to walls as directed | 5 |
| 14. IBM Compatible Personal Computer System | A total of 2 systems for the 3 offices |
|   Intel Pentium P2  233MHz CPU | |
|   64 Mbytes RAM | |
|   4 Gig Hard Disc Drive, IDE & Controller | |
|   1Mb SVGA PCI graphics card | |
|   ATIXPERT 98 3D Card | |
|   3.5" floppy drive, 24 speed CD ROM drive | |
|   2 Serial ports, with 16550 UART | |
|   1 parallel port | |
|   Internal 28.8k Fax Modem & software | |
|   15" SVGA monitor | |
|   102 key Mircosoft keyboard | |
|   Microsoft mouse | |

Techora

Desktop case & speakers
All Computers (incl laptops) Networked within office
MS Dos 6.22 or later & Windows 97 Software
MS Office Professional Software
Microsoft Project Management Software
AutoCad 14 Software
All Software to have Hardcopy Technical Manuals
15. Hewlett Packard Colour inkjet for *2 senior Staff members

*To be allocated
2

**TABLE 6.5**

| *ENGINEERS (requirements per office for 3 offices)* | |
|---|---|
| **ITEM DESCRIPTION** | **AMOUNT REQUIRED** |
| 1. Double pedestal desk 1.8m x 0.80m with lockable drawers | 2 |
| 2. Upholstered swivel desk armchair on castors | 2 |
| 3. Desk lamp | 2 |
| 4. Upholstered side chair | 2 |
| 5. Table 1.5m x 0.75m | 4 |
| 6. A0 size vertical plan storage cabinet | 2 |
| 7. 4 drawer filing cabinet with index pocket files | 1 |
| 8. Wastepaper basket | 3 |
| 9. Cork or fibre notice board - 4m², fixed to walls as directed PLUS Drawing Whiteboard - 4m2 fixed to wall | 2 / 1 |
| 10. Shelving 4m x 0.3m - fixed to walls as directed | |
| 11. Coat hooks - fixed to walls as directed | 1 |
| 12. 4 tier beanstalk filing tray | 6 |
| 13. A0 twin column height and angle adjustment drawing stand with A0 drawing board and parallel motion | 2 / 1 |
| 14. Free standing lockable storage cupboard 1800mm high x 1000mm wide | 1 |
| 15. Upholstered draughtsman's chair with gas height adjustment | 1 |
| 16. Anglepoise lamp for drawing board | 1 |
| 17. IBM Compatible Personal Computer System | A total of one system for the 3 offices |
|    Intel Pentium P2  233MHz CPU | |
|    64 Mbytes RAM | |
|    4 Gig Hard Disc Drive, IDE & Controller | |
|    1Mb SVGA PCI graphics card | |
|    ATIXPERT 98 3D Card | |
|    3.5" floppy drive, 24 speed CD Rom drive | |
|    2 Serial ports, with 16550 UART | |
|    1 parallel port | |
|    Internal 28.8k Fax Modem & software | |
|    15" SVGA monitor | |
|    102 key keyboard | |
|    Microsoft mouse | |
|    Desktop case & speakers | |
|    All Computers (incl laptops) Networked within office | |
|    MS Dos 6.22 or later & Windows 97 Software | |
|    MS Office Professional Software | |
|    AutoCad 14 Software | |
|    Microsoft Project Management Software | |
|    All Software to have Hardcopy Technical Manuals | |

**TABLE 6.6**

| <u>KITCHEN</u> | |
|---|---|
| <u>ITEM</u><br><u>DESCRIPTION</u> | <u>AMOUNT</u><br><u>REQUIRED</u> |
| 1. 10cu ft. refrigerator | 1 |
| 2. 1000 watt combination (grill, convection oven and microwave) oven - 0.9cu ft. internal capacity. | 1 |
| 3. 2 bowl stainless steel sink with draining boards, base unit and cold water supply. | 1 |
| 4. Electric instant hot water heater above sink | 1 |
| 5. Automated Arabic coffee maker | 1 |
| 6. Single burner gas ring with gas and kettle | 1 |
| 7. Filter coffee maker/coffee machine | 1 |
| 8. Set of coffee/tea cups and saucers (16 items per set) | 1 |
| 9. Milk jug and sugar set for item 9 | 1 |
| 10. Coffee/Tea spoons for item 9 | 1 |
| 11. Tray 0.75 x 0.6m approx. | 12 |
| 12. Crockery set<br>(Soup, meat, sweet and side plate). | 1<br>2 |
| 13. Non-stick saucepan set<br>(1 large, 1 medium, 1 small) | 1 |
| 14. Teapot (large) | 1 |
| 15. Teapot (small) | 1 |
| 16. Coffee mugs | 1 |
| 17. Condiment set | 20 |
| 18. 24 Piece stainless steel cutlery set | 1 |
| 19. 6 piece kitchen tool set and rack | 1 |
| 20. 6 piece kitchen knife set | 1 |
| 21. Chopping board | 1 |
| 22. Tin opener | 1 |
| 23. Glass tumblers | 1 |
| 24. Kitchen work top with storage cupboards below and wall cupboards over - 3 linear metres fixed as directed | 20<br>1 |
| 25. Extractor fan - fixed through external wall as directed | 1 |
| 26. First aid cabinet for 18 persons | 1 |
| 27. Kitchen bin with liners | 1 |
| 28. Fire blanket | 2 |
| 29. Tea towels | 1 |
| 30. Hand towels | 12 |
| 31. Chilled drinking water dispenser with supply of Mineral Water | 6 |
| 32. Tiled floor and walls | 1 |
| 33. Floor mop and mop bucket | ITEM |
| 34. Sweeping brush and dust pan set | 1 |
| 35. Disposable plastic cups | 2 |
| Supply of Tea, Coffee, Milk and Sugar (as required) | ITEM<br>ITEM |

**TABLE 6.7**

| *TOILETS ( requirements for 3 rooms)* | |
| --- | --- |
| **ITEM DESCRIPTION** | **AMOUNT REQUIRED** |
| 1. W C suit complete with water supply and waste | 1 |
| 2. Wash hand basin with cold and hot water supply and waste | 1 |
| 3. Wall mounted urinal with water supply and waste | 1 |
| 4. Mirror fixed above wash hand basin 500mmx300mm | 1 |
| 5. Paper towel dispenser with supply of towels | 1 |
| 6. Coat hooks - fixed as directed | 1 |
| 7. Hand towels | 6 |
| 8. Suitable partitions/doors with latches indicator bolts/locks etc. as necessary | 18 |
| 9 Walls and floor tiled | ITEM |
| 10. Extractor fan fixed through external wall as directed | ITEM |
| 11. Toilet brush and holder | 1 |
| 12. Toilet roll holder & toilet rolls (as required) | 1 |
| 13. Male/Female door signs | 1 |

**TABLE 6.8**

| *SHOWER ROOM (requirements for 2 rooms)* | |
| --- | --- |
| **ITEM DESCRIPTION** | **AMOUNT REQUIRED** |
| 1. Shower cubicle with hot water heater, cold water supply and waste | 1 |
| 2. Wash hand basin with cold and hot water supply and waste | 1 |
| 3. Mirror fixed above wash hand basin (500mmx300mm) | 1 |
| 4. Electric wall mounted hand/hair drier unit | 1 |
| 5. Coat hooks - fixed as directed | 1 |
| 6. Soap holder for shower | 6 no. |
| 7. Stackable plastic side chair | 1 |
| 8. Non-slip shower mat | 1 |
| 9. Bath towels (2 per Staff Member) | 20 |
| 10. Toilet brush and holder | 30 |
| 11. Toilet roll holder | 1 |
| 12. Suitable partitioning/doors with latches/indicator bolts/locks etc. as necessary | 1 |
| 13. Walls and floor fully tiled | 1 |
| 14. Automatic Washing Machine/Dryer (fitted) | 1 |

**TABLE 6.9**

| *RECEPTION AREA (requirements for 1 room)* | |
| --- | --- |
| **ITEM DESCRIPTION** | **AMOUNT REQUIRED** |
| 1. Reception Desk and Chair/stool | 1 |
| 2. Answering Machine | 1 |
| 3. Couch seating for 6 persons and coffee table | ITEM |
| 4. Telephone Exchange system | 1 |

**Miscellaneous Items for each Site office**

- Fire extinguisher/Smoke detector
- Window blinds
- Kettle (3 in total)

**Site Layout**

The Site offices shall be detached completely from the Contractor's own offices and shall be provided with an access road not less than 3.0 m wide and a parking area surfaced with a bitumen macadam - See Office requirements section.

### 6.2  Office Materials

The Contractor shall at his own expense provide the Employer, the Construction Manager and the Technical Controller throughout the duration of the Contract with all stationery and other materials and supplies as can reasonably be expected to be required for the running of the Site offices. An initial supply as listed below is to be provide by the Contractor.

### TABLE 6.10

| OFFICE MATERIALS - GENERAL | |
|---|---|
| **ITEM DESCRIPTION** | **AMOUNT REQUIRED** |
| 1. Fibre door mats (large) | 4 |
| 2. Paper punch 2 hole, A4 paper size | 14 |
| 3. Office stapler | 14 |
| 4. SLR  35mm camera with 35mm to 75mm zoom lens, data recording back, flash and carrying case | 1 |
| 5. 3.5" computer disk storage cabinet 20 disk capacity | |
| 6. HD 1.44 Hbyte 3.5" computer floppy disk | 14 |
| 7. Ball point pen | 280 |
| Fine and medium pont with red, black and blue inks | 20 off each |
| 8. A4 size ruled writing pads | |
| 9. Note books A6 size | 100 |
| 10. A4 photocopy/printer paper | 100 |
| 11. Post-it notes (100 sheets) - 76 x 127 and 38 x 51 mm sizes | 100 reams |
| 12. Staples to suit stapling machines (Item 3) | 50 pads of each |
| 13. Highlight marker pens (set of 8 colours) | 30 boxes |
| 14. Scotch draughting tape | 42 sets |
| 15. Scotch "magic" tape | 12 rolls |
| 16. Paper clips (box of 100) | 45 rolls |
| 17. Tippex correction fluid/pens | 30 No |
| 18. Lever arch files A4 size | 24 bottles/pens |
| 19. Envelopes - various sizes to suit A4 paper | 200 No |
| 20. Kodak 36 Slide Films | 100 of each |
| 21. Scale Rules | 100 Rolls |
| | 14 no |
| 22. Iomega Zip discs | |
| 23. Computer Anti-glare filter screens (for all PCs if needed) | 30 no. |
| | ITEM |

## TABLE 6.11

*SAFETY EQUIPMENT*

(Safety equipment requirements per person is listed below. The Contractor shall provide for 16 persons - Prior to purchase the contractor shall provide samples for review and approval by the Employer)

1. Steel soleplate/toe capped safety boots
2. Rubber Gum boots
3. High visibility vests - Canary Yellow with reflective strips
4. High visibility (detachably lined) water proof jackets with hoods - Colour as above etc
5. Hard Hats with ear protectors - Colour coded
6. Tinted safety glasses
7. Goggles
8. Dust Masks
9. Dust Masks carbon filter lined
10. High pitched whistles
11. Heavy duty rubber gloves
12. Workman's gloves

- Additionally the Contractor shall provide a minimum of 3 full sets of specialized safety equipment to inspect the works as required.

- The Contractor shall provide 2 full sets (for 16 persons) of First Aid Equipped Boxes. One of them is to be fixed within the Employers office and the other is to be mobile for site use.

### 6.3 Notice Boards

a   The Contractor shall provide and install two project sign boards, written as directed by the Employer. The dimension of the sign boards shall be 2.0 x 1.0 m minimum, and the specifications shall be as directed by the Employer. The text shall be written in three languages.

b) The sign boards are to be erected at the positions directed by the Employer. The sign boards shall be maintained in good order, for the duration of the Contract, by the Contractor, and at his expense.

c) Upon Completion of the Works, the project sign boards and supports shall be dismantled and removed from the Site.

### 6.4   Vehicles And Other Facilities And Services For The Employer

### 6.4.1 Vehicles

a) The Contractor shall provide three (3) brand new vehicles as specified herein for the exclusive use of the Employer and whomsoever it may designate from time to time for the duration of the Contract.

b) The vehicles provided shall conform to the following requirements:

- Four wheel drive, four door, air conditioned, with gasoline engine.

- The vehicle shall be of minimum 3 liter type engine, complete with spare tyre and tyre replacement equipment. Free running hubs with lock 4 wheel settings.

- Vehicle shall also be equipped with ventilated front disk brakes, and leading-trailing rear drum brakes. The rear differential lock, distributing torque equally to both rear wheels shall be controlled with a switch from the front cockpit.

- Windshield wipers shall be provided at front and rear windows. Provide two additional halogen beam lamps, front bumper mounted.

c) Prior to purchasing the vehicles the Contractor shall provide complete, detailed factory specifications for review by the Employer.

d) The Contractor shall be responsible for the required permits to use gasoline engine cars in Lebanon.

e) All costs for providing the vehicles, including purchase price, all duties and/or taxes, registration fee, vehicle preparation fees, handling and delivery are included in the Contract Price.

f) All operating and maintenance costs, service, fuel costs and insurance for the duration of the Contract are included in the Contract Price.

g) Each vehicle shall have a competent driver during normal working hours. The vehicles are to remain in the possession of the Employer and its staff for their use after normal working hours.

6.4.2    Communications

a) Radio

The Contractor shall obtain necessary permits for and shall provide, install, service, and maintain a radio communication service to be operated from the Site office of the Employer. This shall be such that will permit 24 hour communication between the Employers' Site office and the Employer's staff at all points of the Site (at least 7 communication units including spare batteries and multiple chargers should be provided). The Contractor shall pay all fees and licenses required.

b) Telephone

The Contractor shall arrange for and provide the installation of telephone line in each of the Site offices and shall arrange for and provide two (2) cellular phone lines and apparatuses. The Contractor shall make all necessary arrangements with the appropriate authorities for the provision, installation and maintenance of the telephones and shall pay all charges and fees in connection therewith and all local telephone calls made

The Contractor shall provide separate telephone connections for these offices, with extensions for each office. secretary and conference room and shall pay all charges except the cost of international calls.

### 6.4.3    Security Services for the Employer

The Contractor at its own cost shall provide adequate security at all times for the offices and vehicles furnished by it for the duration of the Contract.

### 6.4.4    Fueling and Servicing of Vehicles

a) The Contractor will provide full service, fuel and regulatory scheduled maintenance for the vehicles furnished by it.

b) The Contractor will also be responsible to service and repair, as necessary, the vehicles and to provide a temporary replacement for any vehicle while it is being serviced or under repair.

c) The vehicles shall be provided by the Contractor within thirty (30) Days of the date of Notice to Proceed.

### 6.5    Programme Requirements

a The Site office facilities shall be completed and made available within one hundred twenty (120) Days of the Notice to Proceed. Should the Contractor fail to make the facilities available within the one hundred twenty (120) Days stipulated, it shall at its own expense rent or otherwise provide equivalent temporary office facilities to the approval of the Employer.

b) The Contractor shall at its own expense rent or otherwise provide, to the approval of the Employer, equivalent temporary offices and accommodation, throughout the one hundred twenty (120) Day period stipulated above.

c) The Vehicles shall be made available within sixty (60) Days of the Notice to Proceed. Should the Contractor fail to make the vehicles available within the sixty (60) Days stipulated, it shall at its own expense rent or otherwise provide equivalent temporary transportation to the approval of the Employer.

### 6.6    Reversions

a Upon completion of the Contract, the Site offices ;accommodation, appurtenances, fixtures, fittings, furniture and all other items specified to be furnished by the Contractor shall become the property of the Employer without any additional payments being due to the Contractor.

b) Upon Completion of the Works, ownership of the vehicles shall revert to the Employer without any additional payments being due to the Contractor.

### 6.7    Temporary Sanitary Facilities

a For all temporary buildings on the Site, waste water shall be treated in order to avoid contamination of the surroundings.

b) The whole Site shall be kept clean and tidy. All refuse shall be deposited in an area specially

### 6.8   Attendance

The Contractor shall provide the attendance and personnel which may be required by the Employer in relation to preparation of the daily statements and works supervision, such as messengers, chain-men, watchmen, and the like, whether required permanently or on an occasional basis.

### 6.9   Publicity And Signboards

All publicity is prohibited on Site. This prohibition does not apply to signs showing the Contractor's name, the type of Works executed and the vbodies concerned. These notices shall be installed by the Contractor, after Approval of the wording, size and presentation by the Employer.

### 6.10   Clearance Of Site On Completion

After having cleared away and removed from the Site all Constructional Plant and Temporary Works, the Contractor shall restore the whole of the Site to a tidy condition. This restoration shall involve but is not limited to removing all protection of concrete foundation structures, metal parts, etc.

### 6.11   Weather And Meteorological Recording

a   The Contractor shall at his own expense furnish and maintain in good working order for the duration of the Contract, the following instruments and their necessary appurtenances to be used by the Employer in recording weather and meteorological data. The instruments shall be installed at the as directed by the Employer.

b)   The instruments required are:
* rain gauge;
* anemometer;
* recording barometer, with supply of charts;
* maximum-minimum thermometer.

c)   The instruments shall be supplied within 45 Days of Notice to Proceed.

### 6.12   Survey Equipment And Staff

a   The Contractor shall make available to the Employer surveying instruments, equipment, and workmen upon the Employer's request from time to time so as the Employer may undertake its own surveying duties.

b)   The workmen shall be selected for their capability to perform the required functions and knowledge of the English language and, so far as possible, the same men shall be provided throughout the Contract Period.

### 6.13   Printed Forms

The Contractor shall at his own expense provide the Employer with such printed forms as the Employer may require for the administration, supervision and control of the Works. The style, lay-out, quality and quantity of forms shall be as the Employer may determine.

## 7.0     INFORMATION MADE AVAILABLE TO THE CONTRACTOR

The following is a list of the available information provided to the Contractor by the Employer:

- Drawing # 002     BCD Master Plan
- Drawing # 003     Site Propagation Plan.
- Drawing # 004 A     Current Site Survey.
- Drawing # 004 B     Base Survey for Phase 1 Stockpiles.
- Drawing # 007     Bureau D'Etudes Topographiques 3 DWGS (1,2,3), Calculations and Bathymetric.
- Drawing # 008     Plan Layout of Marine Works.
- TURBA Additional Soil Investigation Report, September 1997.
- Chemical Analysis Results of Samples from TURBA.
- Approximate Particle Size Distributions Phase 1 and Phase 2 Waste.
- Phase 1 Chemical Analysis Results.
- FAIRHURST Report F/I/D/35416/03 April 1996 Amended October 1997 "Final Site Quality".
- Preliminary Programme for the Marine Works.
- Brief Description of the Marine Works and Effects on the Phase 2 Reclamation Works.
- Summary Detail of the Waste Processing Plant (WPP).
- WPP Design and Built Document, including DUOS Quotation dated October 6, 1997
- List of the WPP Spare Parts Provided by the Employer.
- Notice Provisions for the Crushing Plant.
- Notice Provisions for BCB Batching Plant.
- Telephone cables.
- Dames & Moore Environmental and Geotechnical Assessment Report February 1994.
- Waste Processing Plant Training Program, date 22 October 1998
- Waste Processing Plant Taking Over Program, date 25 November 1998

The attached Drawing RJ01 supersedes previous drawings.

**APPENDIX A (To Technical Conditions of Contract)**

**RULES, PROCEDURES AND REGULATIONS FOR THE EXECUTION AND COMPLETION OF WORKS IN THE BCD**

APPENDIX B (To Technical Conditions of Contract)

## REGULATIONS AND PLANNING OF BEIRUT CENTRAL DISTRICT AND SECTORS A, B, C AND D

# RULES, PROCEDURES AND REGULATIONS

## FOR

## THE EXECUTION AND  COMPLETION OF WORKS

## IN

## THE BEIRUT CENTRAL DISTRICT (BCD)

## RULES, PROCEDURES AND REGULATIONS
## FOR THE EXECUTION AND COMPLETION OF WORKS

### INTRODUCTION

These are the rules, procedures and regulations that are to be complied with by the Contractor, (and others), engaged upon the Works, they are set forth herein under four Sections.

|   |   | Page Nos. |
|---|---|---|
| A. | SITE RULES AND PROCEDURES | 2 - 28 |
| B. | REGULATIONS FOR THE HEALTH AND SAFETY OF PERSONNEL AND PROTECTION OF THE ENVIRONMENT | 29 - 44 |
| C. | REGULATIONS GOVERNING SUBSTANCES DANGEROUS OR HAZARDOUS TO HEALTH AND/OR THE ENVIRONMENT | 45-56 |
| D. | FINES FOR VIOLATION | 57-59 |

The Engineer reserves the right, (besides levying fines) to:

i.    halt or suspend the Works, or any part thereof, if any activity of a Contractor may lead to accident, illness, damage to persons, property or the environment, until such shortcoming is corrected;

ii.   require the dismissal, and removal from the Site of any member of the Contractors Staff who ignores or flouts any rules, procedures or regulations, including the responsible Manager or Representative.

The Contractor shall have no right to claim an extension of the Time for Completion and / or to any increase in the Contract Price resulting from any such failure by the Contractor, except only, if the Tribunal shall hold that the Engineer's actions were vexatious.

# CONSTRUCTION

## OF

# RULES, PROCEDURES AND REGULATIONS

## FOR

# THE EXECUTION AND COMPLETION OF WORKS

A.    SITE RULES AND PROCEDURES

## A.  SITE RULES AND PROCEDURES

### CONTENTS

|  |  | PAGE No. |
|---|---|---|
| 1. | INTRODUCTION | 5 |
| 2. | CONTRACTORS STAFF | 6 |
| 3. | HOURS OF WORK | 7 |
| 4. | FACILITIES TO BE PROVIDED BY THE CONTRACTOR | 8 |
| 5. | ADJACENT PROPERTIES | 12 |
| 6. | PROTECT EXISTING UTILITIES ETC. | 13 |
| 7. | SECURITY | 14 |
| 8. | CRANES AND HOISTS | 15 |
| 9. | TRAFFIC CONTROL | 16 |
| 10. | TRANSPORTING, HANDLING AND STORAGE OF MATERIALS | 18 |
| 11. | DELIVERY OF CONSTRUCTION MATERIALS, PLANT AND EQUIPMENT | 20 |
| 12. | RUBBISH REMOVAL AND DISPOSAL | 25 |
| 13. | PROGRESS REPORTS | 26 |
| 14. | SAFETY FENCE | 28 |

# A. SITE RULES AND PROCEDURES

## 1.    INTRODUCTION

1.1    The Site Rules and Procedures shall be complied with by all Contractors.    Minimum standards of compliance with these Sites Rules shall be ISO regulations, and where none exists it shall be an equivalent European standard.

1.2    It is the Contractor's obligation and responsibility to comply with all applicable laws, regulations and codes of whatsoever nature in the Completion and guarantee of the Works , including those relating to any of the subject matters of these Site Rules which are intended to supplement all existing applicable laws, regulations and codes and shall not relieve the Contractor from compliance therewith.

1.3.    The Contractor is responsible for all operations and logistic activities for his Works, coordinated, through the Employer, with all other Contractors operations in the Beirut Central District  to ensure the entire Works proceed smoothly and safely, with the minimum impact on surrounding areas.

1.4.    The Contractor shall take into account all adjacent concurrent and ensuing works being undertaken by others, allowing them reasonable access to their works.

1.5.    The Contractor shall nominate a Manager on Site as his Logistics Manager who will be responsible for coordinating all the Contractors activities and logistics operations, not only his own operations and those of his subcontractors and Suppliers, but through the Employer, with the operations of others engaged on the Works and / or within the Beirut Central District.

1.6    The Contractor shall study, and will be deemed to be aware of, the requirements detailed in the Tender/Contract Documents, especially those detailed in as being provided by the Employer, . The Contractor shall comply therewith and ensure that he provides all other facilities that are necessary and required for the proper  execution of the Works.

## 2. CONTRACTOR'S STAFF

2.1.   The Contractor shall make his own arrangements for the engagement of all Staff and Labor required for the due management and construction of the Works, whether they be citizens of Lebanon or expatriated foreign Nationals and is responsible for all costs of whatever type associated with their employment, including housing, feeding and transport.

In the engagement of Staff and Labor the Contractor shall:-

I)   obtain all necessary official documentation required including visas, residence permits or any other permissions and whilst the Employer will provide assistance in obtaining such visas, residence permits and the like, he will accept neither responsibility nor liability since the responsibility and liability for such affairs lies totally with the Contractor , who, in addition, is responsible for the payment of all costs, fees and charges involved therewith .

ii)   pay rates of wages and observe conditions of employment no less favorable than those established for the trade or industry in which the work is to be carried out. In the absence of any rates of wages or conditions so established then the Contractor shall pay rates of wages and provide conditions of employment not less favorable than the general level of wages and conditions observed by other Employers whose general circumstances in the trade or industry are similar to those in which the Contractor is engaged.

iii)   employ or cause to be employed only persons who are fit, qualified, and skilled in the work for which they are employed to perform. The Engineer may instruct the Contractor to remove from the site any person, who, in the opinion of the Employer, is not fit, qualified or skilled and the Contractor shall replace that person entirely at his own cost.

iv)   have due regard to all recognized festivals, days of rest and religious or other customs.

v)   comply at all times with the Laws and Regulations in force in Lebanon which cover the employment of Labor in Lebanon

vi)   require that its employees obey all precautionary warning signs, product or process labels, and posted instructions.

vii)   be responsible for the good conduct at all times of its employees and those of its Subcontractors and Suppliers, and take all precautions to prevent any unlawful, riotous or disorderly conduct by or amongst its employees and to preserve the peace and to protect persons and property in the neighborhood of the Works against such conduct

viii)   be responsible for keeping all its persons and workmen (including those employed by all Subcontractors and Suppliers) within the boundaries of the Site . Contractor's

staff or workmen straying into other work areas will be asked to return to their own area and may be instructed to leave BCD.

ix)  ensure that no firearms, weapons, controlled or illegal substances, or alcoholic beverages are brought by Contractor's employees, onto the Site or any accommodation provided to employees, and that no Contractors employees under the influence of alcohol or drugs are permitted on the Site.

x)  ensure that persons recruited by the Contractor for the purposes of this Contract shall, upon termination of their Contract of Employment, be returned to the place of their recruitment, whether that place of recruitment is within or beyond the borders of Lebanon and the Contractor is responsible for all costs incurred in connection therewith.

2.2  No prospective employee shall be disbarred from employment with the Contractor on the grounds of color, race or creed.

2.3  The Contractor shall not recruit nor attempt to recruit any staff or labor from amongst the staff or labor in the employ or engagement of the Employer or any other Contractor engaged upon works in the BCD.

2.4  The Contractor's staff shall not destroy, duplicate, or copy Employer's records, nor shall they remove any records from the Employer's property . Contractor's Staff shall not bring cameras onto the Site without the express permission of the Engineer.

2.5  The Contractor shall, in order to minimize the volume of traffic on roads within the Beirut Central District, at its own expense, transport his workforce to and from the site by a suitable mode of transport approved by the Engineer.

## 3.  HOURS OF WORK

3.1  Normal working hours for the Site shall be from 7-30 a.m. to 5-30p.m. Mondays to Saturdays inclusive.  No work is to be undertaken outside of these hours, on Sundays or during holidays without the Contractor requesting and the Engineer granting permission. In the event that the Contractor deems it necessary to work overtime then the Employer will be entitled to seek reimbursement of any supervision or attendance required.

3.2.  The Contractor shall ensure that any refueling of equipment which is running on a continuous basis, that is, through the night or at weekends is undertaken during working hours .If the fuel tanks are not capable of providing enough fuel from 17:29 to 07:29 hrs, then there should be a tank placed beside them with either a hand pump or a small electric pump so that refueling can be accomplished with minimum noise disruption.



## 4.     FACILITIES TO BE PROVIDED BY THE CONTRACTOR

4.1     There follows details of some of the facilities, and the minimum standards thereof, that the Contractor is required to provide (unless otherwise stated in the Tender/Contract Documents) .

4.2     Contractor's Staff Accommodation

4.2.1   The Contractor shall provide all appropriate accommodation for its staff. Temporary accommodation for staff to live or sleep in BCD will not be permitted . The Contractor is to make whatever arrangements he deems necessary for their accommodation outside the area. Should the Contractor elect to establish temporary accommodation outside the Beirut Central District it is to do so entirely at its own cost. The Contractor is to obtain whichever licenses and permissions as are required by the City Authorities or any other interested Authorities and pay all fees and charges demanded by them. The Contractor is to indemnify the Employer against any claims, charges or other demands which may be levied by any of the Authorities referred to above in respect of the temporary accommodation for any reason whatsoever.

4.2.2   Prior to the erection of any temporary accommodation the Contractor is to submit to the Engineer, for his Approval, details of its proposals and the Engineer reserves the right to modify those proposals if he deems it appropriate. Upon completion of the Contract the Contractor is to remove the temporary accommodation and leave the site in a clean and tidy condition to the satisfaction of the Engineer and the City Authorities.

4.3     Site Office Accommodation and Welfare Facilities

4.3.1   The supply and maintenance of all Site accommodation and welfare facilities shall be the responsibility of the Contractor. All temporary buildings shall be of the cabin type, and be designed and maintained to a high standard. No shanty type buildings will be permitted . The Contractor shall include a plan detailing the type of buildings and the proposed layout of the Contractor's and Subcontractor's office accommodation and welfare facilities with his Method Statement.

4.3.2   Office accommodation and welfare facilities shall include, but not be limited to the following :

(i)     Provision and operation of all Contractor's Staff office accommodation inclusive of furniture, equipment, telecommunications and building services, including heating and ventilation.

ii)     Provision and operation of all Subcontractor office accommodation and facilities inclusive of furniture, equipment, building services and telecommunications.

iii) Canteen/food and eating facilities suitable to handle staff and worker populations.

iv) Toilet and welfare facilities ( at compound and work site) suitable to handle staff and worker populations. As a minimum one toilet shall be provided for every 24 workers on Site.

v) Provisions of sewerage and waste water disposal facilities from all toilet, canteen, office and any other welfare accommodation provided. Where it is not possible to connect into the city sewerage network the Contractor shall provide sewage holding tanks and arrange for these tanks to be pumped out to road tankers at regular and frequent intervals . The Contractor is responsible for full compliance with current City Regulations.

### 4.4    Temporary Construction Offices inside Buildings under Construction or Restoration

It is the Contractor's responsibility to obtain permits and authorization from the Building Owners, City Authorities and/or any other regulatory authorities for the location of temporary offices and facilities inside a building during its construction and for payment of all related fees, charges and additional insurance premiums. The Contractor's attention is drawn to the minimum fire prevention requirements for temporary office units inside buildings. In addition the Contractor shall allow for any other requirements that the local Fire Authorities may stipulate are necessary prior to the issuing of permits/approvals for temporary office accommodation inside buildings under construction.

### 4.5    Temporary Utilities

The supply and maintenance of all temporary utilities and services required for the Works is the responsibility of the Contractor. The Contractor shall remove all temporary utilities and services on Completion of the Works or when so directed by the Engineer. Temporary utilities and services shall include but not be limited to the following:

i) Water

Temporary water supply to the Works and to temporary accommodation, canteens, toilets and welfare facilities and distribution system as required to Complete the Works including design, statutory approvals and consents, fees, utility charges, pumps, equipment, piping connections and the like.

It is the Contractor's responsibility to liaise directly with the Ministry of Hydraulic Resources to obtain their approval for connecting into the existing water distribution network and the new network to be installed. The Contractor shall be responsible for all costs for supply and installation of water meters and for their consumption of water. In the event that existing water supplies are not adequate for all construction requirements the Contractor shall make its own arrangements to supply and install water storage tanks and supply them by water bowser.

Containers for drinking water are to be supplied by the Contractor as required.

The Contractor shall not waste water and shall be responsible at its own expense for clean-up and shall rectify any damage resulting from flooding caused at its sole cost.

(ii)    Power

Temporary electric supply and distribution system to the Works, temporary accommodation, welfare facilities etc., including design, statutory approval, connections and consents, fees, equipment, utility charges, cabling and the like as required to Complete the Works, including the emergency generating power when required.

The Contractor shall liaise directly with the local Electricity Authority to check on power availability through the existing network. It is however unlikely that electricity supplies can be made available from the existing network and the Contractor will therefore have to provide its own generating equipment.

The Contractor must liaise directly with the local Electricity Authority to make arrangements for connecting into the new electricity network when it is available.

iii)    Lighting

Temporary lighting supply and distribution system as required to maintain a well lit Site during all hours of operation and to complete the Works. The minimum levels of safety lighting must be provided at all times.

iv)    Fire Protection

Temporary fire protection system to temporary accommodation and facilities and as required to protect the Works during completion including all design, statutory approvals and consents, fees, procurement and installation of equipment, piping fixtures and the like.

The Contractor shall liaise directly with the concerned Ministry to check the availability of fire water through the existing/ planned network. The Contractor shall provide and supply fire water holding tanks wherever the existing water supply network is inadequate to meet fire fighting requirements.

v)    Fire Detection

Temporary fire detection and alarm system to temporary accommodation and facilities as required to provide life safety warning during construction including all design, statutory approvals and consents, fees, procurement and installation of equipment conduits and fixtures and the like.

vi)    Sewerage and Drainage

Temporary sewerage and surface water drainage system to temporary accommodation, welfare facilities and the Works and connections as required to Complete the Works

including all design, statutory approvals and consents, fees, utility charges, pumps, equipment, piping, maintenance and the like .

The Contractor shall liaise directly with the relevant Authority to check the possibility of connecting into the existing sewage network. Where this is not possible, the Contractor shall supply and install its own sewage holding tanks into which toilets and waste water facilities shall be connected . Sewage holding tanks shall be regularly pumped out to road tanks for disposal of sewage in accordance with current City and National regulations.

It is the Contractor's responsibility to arrange temporary drainage requirements of its compound laydown area and work Site. Drainage shall, where possible, be connected into the existing drainage network. As soon as the new storm water collector mains are installed and operational the Contractor will be required to connect into the network.

vii)   Telephones

Temporary telecommunications distribution and connections to temporary accommodation and facilities as required to Complete the Works including all design, statutory approval and consents, utility charges, equipment, wiring , devices, maintenance and the like.

The Contractor shall liaise directly with PTT ( Post and Telecommunication Authority) regarding the availability and installation of telecommunications.

viii)  Radios

The Contractor shall provide and operate a site radio communication system for ease of communication between his staff , his workforce, Subcontractors and the Engineer's team. The Employer will operate a site radio system ( FT 11R/41R YAESU) and the Contractor's system shall be compatible therewith , and accessible thereto.

5. **ADJACENT PROPERTIES**

5.1 Adjacent Occupied Premises

The Works are to be carried out around occupied premises. The Contractor shall undertake its works with minimum inconvenience, nuisance and danger to the adjacent occupants. If the danger to occupied premises is such as to involve the safety of persons, the Contractor shall arrange with the owner/occupier (via the Employer) to evacuate temporarily and for periods not exceeding 18 hours such persons until the danger is eliminated. The expense of evacuation, temporary accommodation and re-occupation of the premises and all other expenses involved shall be borne by the Contractor.

5.2 Protection of Structural Fabric

5.2.1 The Contractor shall provide and maintain during the execution of the Works all shoring, strutting, needling and other supports as may be necessary to preserve stability of buildings, roads and structures whether existing or under construction, on BCD or adjoining property that may be endangered or affected by the Works.

5.2.2 The Contractor shall submit to the Engineer details of the methods proposed to be used for the support necessary to preserve stability of buildings or other structures, together with the relevant drawings, calculations, specifications and subsoil investigation, as necessary for Approval. Such details shall be endorsed by an independent geotechnical consultant approved by the Engineer.

5.2.3 The Contractor shall take all reasonable precautions to prevent damage to adjacent and / or adjoining property and, if any damage is caused as a result of the execution of the Works, make good to the satisfaction of the Engineer and owner and at the Contractor's expense.

5.2.4 The Contractor shall obtain permission of the adjacent and/or adjoining owners ( via the Employer ) if it is necessary to erect Temporary Works or otherwise use adjoining property, and pay all charges, etc., so incurred.

5.2.5 The Contractor shall advise owners or occupiers of adjoining property (via the Employer ) of the dates on which work which may affect them is to be executed.

5.3 Encroachment on Surrounding Land or Properties

5.3.1 The Contractor is to ensure that there is no encroachment on surrounding land or properties, whether the land or properties be private or public, and he is to strictly confine his activities to within the boundary of the Site.

5.3.2 Continuous unimpeded access is to be maintained along all public footpaths adjacent to the site at all times and the Contractor must under no circumstances whatsoever use public footpaths for the storage of materials, waste, debris nor any item connected with the site. Should it be necessary for the Contractor to impede



access in any way along any footpath then he is to so advise, liaise with, and obtain the approval of the Engineer and Public Authorities (via the Employer).

6.    **PROTECTION OF EXISTING UTILITIES ETC.**

6.1    The Contractor shall take into account that parts of the BCD area are inhabited and that the owners and residents are dependent on the existing utility networks however inadequate they may be. Other contractors working in the BCD area are also to be connected into existing networks and be dependent on their supply. Utilities include, but not be limited to, existing water lines, power lines, PTT lines, sewer lines, service connections, water and PTT boxes, light poles and masts, pylons, cableways, signals, and all utility appurtenances within the limits of the proposed construction. The existing and planned utilities have not been identified on the Drawings, but the locations are available to the Contractor through the relevant Authorities. It is the Contractor's duty to inspect the Site and to satisfy itself as to Employer furnished information and to protect and maintain all such existing and planned utilities, unless otherwise specified in the Tender/Contract Documents.

6.2    Prior to disruption or cutting any existing or planned network, the Contractor shall implement the following procedure:

   i)    Give all Service Authorities and/or private owners (via the Employer) sufficient advance notice of each event to enable all work required for maintaining utility supplies to occupied buildings to be carried out. The Contractor shall agree with each Authority on which work, if any, will be carried out by the Authority.

   ii)   Agree with the Service Authorities on their requirements for the procedures to be adopted by the Contractor for work adjacent to or involving such utility services.

   iii)  Submit drawings to the Engineer to reflect the actual locations and requirements for Approval.

   iv)   Excavate trial pits or take any other measures as may be necessary for identification and verification of such utilities.

   v)    Be responsible for safeguarding and protecting from damage all utilities and appurtenances encountered during the Works and be responsible for the costs of making good any damage thereto. If any damage is caused to existing services as a result of execution of the Works, the Contractor shall notify the Engineer and the Service Authority or private Owner and make immediate arrangements to repair the damage, at the Contractor's expense.

   vi)   Issue written notification to all users of the network who will be affected giving them minimum 7 days notice of the disruption and its anticipated duration.

vii)   Advise the Engineer in writing seven (7) days in advance of the intended disruption.

viii)   Where a disruption to a used utility network is likely to exceed six (6) hours, the Contractor shall arrange a diversion to ensure continuity of supply to all users or provide a temporary source of supply available to the utility users for the duration of the disruption.

6.3     The Contractor shall protect public and private roads, footpaths, all infrastructure utilities networks and the like from damage by Site traffic or other causes arising from the execution of the Works and shall repair at his own cost any damage to the satisfaction of the relevant public Authority or Owner. The Contractor shall protect and preserve, trees, hedges, shrubs, lawns etc. and shall replace to Approval, or treat as instructed, any plants or areas damaged or removed without Approval. The Contractor shall prevent damage to existing buildings, fences, gates, walls, roads, paved areas and other features on the Site or adjacent thereto which are to remain in position during the execution of the Works.

6.4     The Contractor shall identify/verify all obstacles within or surrounding the Site above or below ground, and shall record all such information on suitable Drawings which shall be submitted to the Engineer prior to commencement of the affected part of the Works. Existing obstacles shall include, but not be limited to existing buildings, walls, fences, gates, wells, septic tanks, manholes, pits, pipes, culverts, roadways, sidewalks, signs and rubbish dumps, whether or not referred to in the Tender/Contract Documents.

6.5     If the Contractor fails to repair the damages inflicted to the infrastructure works (sidewalkes, asphalt, curbstones, manholes, utilities...) to the Employer and Engineer satisfaction, the Employer will have the right to execute these repairs at the Contractor cost.

## 7.   SECURITY

7.1     An overall security control within BCD is in force. This will include security control at access points to fenced work areas.

7.2     The Contractor shall be responsible for the safe keeping of all its Construction Plant and Construction Material on Site and for protection of the Works.

7.3     The Contractor is to comply with the requests, requirements and procedures of the appropriate Government Agencies and Authorities responsible for security. The Contractor shall at all times comply and co-operate with the Employer in connection with security arrangements on Site.

7.4     Security Passes

7.4.1   All the Contractor's Staff and that of all Subcontractors and Suppliers working on the Site shall be required to carry a personal security pass. Passes will be issued by the Employer and charged to the Contractor at U.S.$3.00 per pass . This charge will apply to both temporary and permanent passes. U.S.$ 1.50 per pass will be refunded to the Contractor on return of passes when workers leave the Site. There will be no refund on temporary passes. It is the Contractor's responsibility to provide lists of names and identification together with two photographs to the Employer at least 48 hours in advance of the Staff workers being required on Site. A temporary pass, valid for 3 days will be the Contractor's responsibility to process documentation for a permanent pass during these 3 days.

7.4.2   No person should be permitted to enter the Site without a personal security pass. All safety helmets (hard hats), which are obligatory on Site, shall carry the Contractor's logo so as to clearly identify their employer.

7.4.3   The Employer reserves the right to inspect all Site security passes on demand and to order personnel (through the Engineer) off Site if they do not hold a valid pass.

## 8.    CRANES AND HOISTS

8.1   The Contractor is, prior to the erection of any tower crane, ( be it static or mobile) or hoist ( be it passenger or goods ) to submit to the Engineer for his Approval, a report providing the following information ( as appropriate) :

(a)    Manufacturer and Description of the crane/hoist

(b)    Drawing(s) showing the proposed location(s) in relation to the building and any temporary site installations, including ties, etc., together with all necessary engineering calculations.

(c)    The layout of any rails if the crane/hoist is to run on rails and the method of installation of the rails

(d)    The height of the crane / hoist.

(e)    The swing circle of the jib, together with the variable load rating/capacity.

(f)    Procedures for the erection and removal of cranes/ hoists, which should include the safety measures to be adopted by the erection/dismantling crew. N.B. similar procedures are required for any alteration work which may be necessary on the crane/hoist.

(g)    If more than one crane is to be erected on the Site the Contractor is to indicate on the layout plan the precautions to be taken in order to prevent clashes principally in the form of the varying heights of the cranes and the




direction of swing but also any other precautions the Contractor intends to implement .

8.2    The Engineer requires a minimum 48 hours notice prior to the Contractor bringing a mobile crane on Site and will require the Contractor to comply with any scheduling requirements.

8.3    Only under exceptional circumstances will the Engineer accept the erection of any crane the jib of which extends beyond the Site boundary . Under these circumstances the Contractor is to obtain the express permission of the Employer(through the Engineer) in writing, the application for the permission must explain the reason for the positioning of the crane and the safety precautions that will be taken at the times when the jib will project beyond the Site boundary. The Contractor will be responsible for paying all costs of air rights etc.

## 9.    TRAFFIC CONTROL

9.1    All traffic in the BCD is subject to the current Traffic Laws of Lebanon and any subsequent modifications to the Traffic Rules of the City of Beirut. Whilst the Employer will assist the City of Beirut in maintaining an uninterrupted flow of traffic throughout the area, the Employer will not accept any responsibility nor accept any claims for loss and expense in the event that any traffic related occurrence disrupts or delays the progress of the Works of the Contractor engaged on the Site.

9.2    The Employer has appointed an Officer specially to monitor and control the flow of traffic in the BCD area and the drivers of all Contractors' vehicles, whether they be working directly for the Contractor or for his subcontractors, Suppliers or any other body associated with the Contractor, are to comply with his instructions and directions at all times. In addition all Contractors are to observe and comply with all and any Police regulations governing the loading and unloading of, or waiting by, vehicles on public thoroughfares, the carriage and haulage of equipment and materials and the use of protective coverings and warning displays.

9.3    The Employer will establish a system of standard traffic signs throughout the BCD area and these are to be adhered to by the drivers of all vehicles. Signs as a general rule will indicate:

(a)    The speed limit, which is 30 kph unless indicated otherwise.

(b)    The location of Contractors' offices.

(c)    The location of the Sites and work areas.

(d)    Access Roads ; and

(e)    Any other information as required.

9.4    Control of traffic by the Traffic Authorities and /or the Employer is for the benefit of the contractors engaged in the BCD and it is essential that all contractors inform and keep informed, the drivers of all vehicles needing to enter the BCD area of the most up to date routings and regulations since these may be modified by the Traffic Authorities and/or the Employer to suit the circumstances prevailing at the time.

9.5    Infringement of the regulations or non-compliance with the traffic signs may lead the Traffic Authorities and/or the Employer to impose penalties on the Contractor, regardless of whether the driver of the vehicle is employed by the Contractor or not. Any driver persistently flouting the regulations may be banned from driving in the Beirut Central District.

9.6    The  Contractor is to ensure that access along all roads, both public roads and access roads, remains unimpeded at all times in order to permit access by vehicles of the Emergency Services.

9.7    In order to keep congestion to a minimum, plant, equipment and materials should not be delivered to the BCD during the times of peak traffic which are between 7.00 a.m. and  9.30 a.m. and between 1.00 p.m. and 3.00 p.m.

9.8.    The Contractor is to take whatever steps are necessary, including, if required, the installation of wheel-washers, to ensure that mud and debris is not carried from Site and deposited on roads outside  the Site boundaries.

9.9    All Construction traffic entering the BCD area is to follow clearly defined routes to any Truck Holding Area ( see later herein).

9.10    Parking is forbidden in the whole of the BCD  except in specially designated parking areas. Vehicles parked in areas other than the designated parking areas will be towed away and the driver charged a fee similar to that charged by the Beirut City Authorities for towing away vehicles parked illegally in the City. Passes for the parking areas are obtainable upon application to the Employer's Officer, who may refuse to issue passes at his discretion.
The Employer reserves the right to assign the management of the parking areas to a commercial operator who will charge a commercial rate. The cost of parking is to be borne by the Contractor.

9.11    No parking of any vehicle is allowed on any of the Site access roads. The Contractor will not be permitted to park vehicles in the Site work areas other than for off loading equipment and materials, upon completion of which  the vehicle must be removed from the Site.

9.12    Where it is necessary to close any road within BCD to permit the performance of the Works, the Contractor shall obtain (through the Engineer) the Employer's and

the concerned Authority's prior approval to closure. The Contractor shall detail reason for closure, duration of closure and propose diversions where necessary. The Contractor shall be responsible for all road closure and diversion signs and when necessary advising the public in advance of closure.

## 10. TRANSPORTING, HANDLING AND STORAGE OF MATERIALS

10.1   The Contractor shall transport, store and handle materials to, exclude, foreign material, and to prevent soiling and increase of moisture content.   To prevent damage to material, structure and finishes, the Contractor shall:

* Avoid excessive loading stresses in material and properly stack materials in regard to size, type, and length in piles, shelves, or bins.

* Deliver packaged products, and store until used, in original unopened wrapping or containers, with manufacturer's seals and labels intact.

* Not deliver plastic materials to Site in advance of installation time : avoid exposure of plastic materials to sunlight and complete the installation and concealment as rapidly as possible to each area of work.

* Label packaged products to describe contents, quantity and other information as specified and not remove labels.

* Store materials which will be damaged by weather in suitable dry accommodation and provide ventilation as required to maintain temperatures and humidity levels as recommended by the material manufacturer.

* Store highly combustible or volatile materials separately from other materials and under no circumstances within buildings and protect against open flame and other fire hazards and store as otherwise detailed later herein.

* Not store material and equipment detrimental to finished surfaces within areas of the building where finishing has commenced or has been completed

* Handle and store materials in accordance with manufacturer's and supplier's recommendations and remove and replace damaged materials.

* Store steel on racks or skids and cover to protect it from dirt, water and damage and maintain steel in its fabricated form.

* Store premixed cementitious materials, and cover adequately with waterproof coverings.

* Deliver and store masonry units at the site on pallets, adequately covered with waterproof coverings.

* Provide flat, solid support for sheet material during storage.

* Store and mix paints in a room assigned for this purpose which shall be kept under lock and key. Oily rags and any other combustible materials shall be removed every night, and handled as otherwise detailed later herein.

* Store and handle flammable liquids and other hazardous materials in approved safety containers and as otherwise detailed later herein.

* Store materials as to assure the preservation of their quality and suitability for the Works and so as to facilitate their prompt inspection.

* Provide proper personal protective equipment that may be necessary for a given product

* Ensure that only properly trained personnel handle hazardous materials, as further detailed later here.

10.2  Stored materials, approved before storage, may again be inspected prior to their use in the Works and damaged products and work will be rejected and removed from the premises immediately. The conditions of transportation, storage and handling shall also apply, as minimum requirements, for materials and equipment upon their incorporation in the Permanent Works.

10.3  If necessary, the Contractor shall schedule delivery of materials so that they may be installed directly in place and at all times minimize all impediments to traffic movement and the temporary closing of accesses and streets.

## 11.  DELIVERY OF CONSTRUCTION MATERIAL, PLANT AND EQUIPMENT

11.1    Generally this procedure is divided into four parts and covers:

11.2    Progressing deliveries through the Port.

11.3    Deliveries to the Beirut Central District.

11.4    Laydown areas.

11.5    Receipt and storage.

11.2    Progressing deliveries through the Port.

11.2.1    The Employer will maintain liaison with Beirut Port Authority and will, if requested by the Contractor, assist in the co-ordination and progressing of imported materials through the Port. Should the Contractor request the assistance of the Employer then the Contractor will be required to provide to the Employer (through the Engineer), at least three (3) months prior to any anticipated importation, a preliminary schedule of materials, plant and equipment to be imported into Lebanon , a monthly forecast of such imports in the following three (3) months, and weekly advice of such imports in the next week, as follows:

i)    The preliminary schedule shall show what construction material , plant and equipment are to be imported into Lebanon. The schedule should be formulated in a manner that shows in which month the construction plant, equipment and materials are programmed to arrive in Lebanon and:

   a)The Port of entry.

   b)The number and size of containers being delivered and which materials are packed into them.

   c)The number of crates or packages, their size and which materials are packed into them.

   d)The description and weight of bulk materials such as reinforcement and concrete drain pipes.

   e)The description of construction plant and equipment.

   f)Overland deliveries.

ii)    The monthly forecast shall show which goods will be imported into Lebanon during the three months following the report, each report is

to contain the latest information available and be submitted to the Employer on the last Friday of each month. The report is to provide the same information as that contained in the preliminary schedule.

iii)    The weekly report shall be submitted each Wednesday, give details of the arrivals which are due during the week          following the report and contain the following information:

a) The Port of entry.

b) The name of the vessel.

c) The estimated time of arrival of the vessel

d) The number and size of containers delivered and which materials are packed into them.

e) The number of crates and packages, their size and which materials are packed into them.

f) The description and weight of bulk materials such as reinforcement and drain pipes.

g) The description of construction plant and equipment.

h) Overland deliveries.

11.2.2    Whilst the Employer will liaise with the Port of Beirut Authority and provide the Contractor with whatever assistance he is able, in order to facilitate the progressing of materials through the port, it is to be clearly understood that the assistance provided in no way relieves the Contractor of the responsibility for arranging the delivery of materials, plant and equipment to Site as to Complete the Works in accordance with the Program. Further there will be no entitlement to any extension of the Time for Completion nor any increase in the Contract Price in the event of delays associated with the importation of plant, equipment or materials.

11.2.3    The Employer reserves the right to prepare an overall coordinated program covering the importation of materials for all contractors engaged on or all contracts in the BCD and the Contractor will be required to comply with this program.

11.2.4    Deliveries through other points of entry into Lebanon must follow the above procedures if the Contractor requires any assistance from the Employer.

11.3    Deliveries to Beirut Central District

11.3.1  In order to prevent traffic congestion in the area and on adjacent roads the Employer will strictly control all deliveries into BCD. All contractors are therefore required to provide to the Employer a monthly forecast of such deliveries in the following three (3) months, weekly forecast and daily advice of such deliveries:

   i)  The Monthly forecast shall be submitted by the last Friday of each month, with a three month forecast, based upon the latest information available, and showing the number of vehicles that will be making deliveries of both imports and local procurements to BCD . This forecast is to be prepared on a form approved and prescribed by the Employer.

   ii)  The Weekly forecast shall be submitted each Wednesday, giving details of the number of vehicles that will be making deliveries to the Site in the following week.

   iii)  The Daily Advice shall give details of all deliveries to the Site that the Contractor intends to make the following day. This advise to be prepared on a form approved or prescribed by the Employer, and is to include:

      a)The type of vehicle to be used e.g. articulated  lorry, tipper, pick-up, van.

      b)The name of the haulier.

      c)Material being delivered.

      d)Anticipated time of arrival to nearest hour.

N.B.  Any vehicle not included in the Materials Delivery Schedule may be diverted to, and held in, a holding area until a suitable time for delivery can be found.

   iv)The Contractor must give two (2) clear working days notice of the delivery of any abnormal loads or heavy plant or equipment and must consult with the Employer (through the Engineer) to verify that access routes are available and that there is no clash with the activities of other contractors engaged in the BCD.

11.3.2  Upon arrival, all vehicles will be directed to a vehicle holding area, located on the Western side of the BCD, at which time the Employer (through the Engineer) will inform the Contractor to whom the delivery is to be made. The vehicle will not be released unless and until the Contractor confirms that he can accept delivery immediately. Vehicles must not be left standing

outside of the Site after the Contractor has authorized its release from the holding area.

All deliveries are to be accompanied by a way-bill which is to include the following information:-

a) The Works name.

b) The Contractor's name.

c) The Supplier's name.

d) A description of the materials, plant or equipment being delivered.

e) The name and telephone number of the Contractor's Site representative.

Before leaving the holding area the Employer will endorse the way-bill to identify the entrance gate at which the delivery is to be made.

11.3.3   The Employer reserves the right to prepare an overall coordinated program covering deliveries to all developments in the BCD and the Contractor will be required to comply with this program as a part of the normal procedure for making deliveries to the area.

11.3.4   Whilst the Employer will take whatever steps are available to ensure the free flow of materials to the various development sites is to be clearly understood and accepted by the Contractor that there will be no entitlement to any extension of the Contract Period nor any increase in the Contract Price in the event of any delay caused by the volume of deliveries or any other problem whatsoever.

11.3.4   The Contractor is to ensure that all vehicles making deliveries must comply with all instructions and legislation of the Beirut City Authorities.

11.4    Laydown areas

11.4.1  If required by the Contractor, the Employer may allocate an area within the BCD where materials can be received and stored, however the Contractor is to lodge requests well in advance of the date for delivery since there can be no guarantee that an area will be available. If an area is available then the Contractor must accept the area in an "as found" condition and will be responsible for preparing and fencing the area for providing security and for paying the Employer's prevailing laydown area charges at the time of request.

11.4.2  The Contractor may be offered shared use of any such laydown area with other Contractors engaged in the BCD.

11.4.3  The Contractor is to maintain laydown areas neat, clean and tidy at all times.

11.5    Receipt and Storage

11.5.1  Deliveries are to be made during normal working hours unless by prior arrangement with the Employer. When deliveries need to be made outside of normal working hours the Contractor must ensure that adequate resources are arranged to enable the unloading and storage to be effected as quickly as possible.

11.5.2  The Contractor is to co-operate with the Employer and other contractors in the placement and storage of materials and constructional plant and equipment in order not to interfere with the progress of the works in BCD. Any materials or constructional plant or equipment which does interfere with the operations of others are to be re-located at no cost to the Employer. In the event of a dispute arising between contractors the decision of the Employer is final.

11.5.3  Procedures are to be put in place for the management of materials, constructional plant and equipment from the time of requisitioning until either their incorporation into the Works or their removal from Site. The Engineer has the right to inspect those procedures and subsequent records, on demand, if the need arises.

## 12. RUBBISH REMOVAL AND DISPOSAL

12.1　All demolition, and excavated materials, waste materials, rubbish, garbage and waste, whether hazardous or toxic or not, are to be properly disposed of at properly licensed, regulated tips with the capability of dealing with the material to be disposed of and as further detailed hereinafter. Tipping at tips which are not licensed and regulated will not be permitted in any way. The Contractor, if found to be involved in fly tipping, will be dealt with by the application of the laws of Lebanon.

12.2　All demolition and excavated material that passes through a 30cm diameter ring, and free from organic, plastic, rubber, ferrous and other like deleterious materials, shall be delivered to the Employer's designated land-fill site, in BCD, and tipped at such location therein as shall be directed by the Employer's Land-fill Area Manager.

12.3　All demolition concrete materials, including reinforced concrete, that does not pass through a 30cm ring and is no greater in size than 80 cm in any dimension, may be delivered to the Employer's designated concrete crushing plant, located within the BCD, as shall be directed by the Employer.

NB: Any and all such concrete of any dimension greater than 80 cm will not be accepted at the Employer's designated concrete crushing plant and shall be otherwise disposed of by the Contractor.

12.4　All dangerous / hazardous substances and wastes shall be disposed of in accordance with "The Regulations Governing Substances Dangerous or Hazardous to Health and / or the Environment", detailed elsewhere herein.

12.5　The various types of demolition and excavated materials, shall, if being delivered to the Employer's designated areas/ plants, be loaded and disposed of separately, as described above, and the lorry loads shall contain only one type of materials for disposal.

12.6　The Contractor shall comply with the following requirements for the collection, removal and disposal of other builders waste.

i)Provide rubbish containers and remove them promptly from Site as soon as they are full. Rubbish containers shall not be allowed to overflow.

ii)Provide hard standing and clear vehicle access for rubbish containers, including moves to suit the sequence of the Works.

iii)Maintain manifest records and reporting systems on all solid waste disposal

iv)Provide enclosed chute(s) of wood or metal whenever materials are dropped .

v)Enclose the area onto which the material is dropped to prevent spillage , dust, etc. Post signs warning of the hazard of falling materials . Do not remove waste material in the lower area until debris handling ceases above.

vi)Domestic and biodegradable waste from offices, canteens and welfare facilities shall be removed from the Site daily.

vii)Comply at all times with current statutory and municipal regulations and requirements for the disposal of rubbish and waste.

12.7   Waste Removal Contractors.

12.7.1 The Employer is aware that efficient waste disposal services may be difficult to obtain. It may be necessary to offer local waste disposal contractors business of sufficient volume and duration to encourage investment in new plant and equipment.

12.7.2 The Employer therefore reserves the right to appoint a " BCD Waste Contractor" for builders and domestic waste who would dispose of waste for all contractors engaged in the BCD.

12.7.3 The Employer appointed "BCD Waste Contractor's" services would be limited to provision, placement and collection of waste bins ( containers/ dumpsters) and the disposal of waste at a reasonable price.

12.7.4 The appointment and nomination of such a "BCD Waste Contractor" shall not entitle the Contractor to any increase in the Contract Price , unless the Contractor can show that such service is costing more than the Contractor is or would have been paying and provided that Contractor complies with the provisions of the Tender/Contract Documents.

## 13. PROGRESS REPORTS

13.1   The Contractor shall submit reports to, and in a form Approved and/or prescribed by the Employer, as follows:

(i)   Daily Report, to be submitted the following working day, showing:

a)Daily record of staff and workmen, engaged on the Works, by profession or Trade, for Contractor, sub-Contractor and Suppliers.

b)Daily record of all major items of plant or equipment deployed

c)Details of all major materials deliveries made.

(ii )  Weekly Report, to be submitted on the Monday (or first working day thereafter) following the week referred to , showing:

a) Details of all major materials call-offs made in the week.

b) List of all drawings and the like received and / or issued in the week, and their status.

c) Weekly record of progress made, by percentage, on each part or phase of the Works.

d) Comments on any major improvement, since last weekly report, on progress made or of failure to achieve planned progress.

e) Record of any events that may have impeded progress

f) Summary of any accidents occurring in the week.

g) The reference numbers only of all Instructions, Requests for and Variation Orders received and/ or issued in the week, Request of Information, and the like.

h) Reference to all short-term or detailed programs or method statements issued in the week.

i) Any other matter either referred to in the Contract Documents or reasonably requested by the Engineer.

(iii) Monthly Report , to be submitted no later than the last day of the month referred to, showing :

a) A Statement covering the situation of the Contractor's activities, achieved in the month and to date, and planned for the next month and to Completion of the Works.

b) A summary of the progress made to date (including marked up programs, schedules etc.)

c) A summary of the planned activities for the following month (including programs, schedules etc. )

d) Summaries of all the activities referred to in the relevant Weekly Reports.

e) Progress photographs, properly identified, showing the progress (or lack thereof) in the month.

f) Any other matter either referred to in the Contract Documents or reasonably requested by the Employer.

g) Any other matter which the Contractor especially wishes to highlight.

13.2  The submission of the above referenced Reports  and their receipt by the Engineer shall not be interpreted as the acceptance of the Employer and/or the Engineer of the validity and accuracy  of their contents, nor shall they relieve the Contractor of his obligations as expressly specified in the Contract Documents.

## 14. SAFETY FENCE

The Contractor shall provide and maintain a safety fence having the same design, height, signboard inserts and colors as illustrated in the sketch on the following page. The safety fence shall completely enclose the site to prevent unauthorized persons visiting the works site area. The fence shall incorporate an adequate number of lockable gates to the approval of the Engineer. In addition to the safety fence, protective fences and barriers shall be provided around excavation and other work areas, as required and/or specified in the contract documents.



## B.  REGULATIONS FOR THE HEALTH AND SAFETY OF PERSONNEL AND PROTECTION OF THE ENVIRONMENT

| CONTENTS | PAGE NO |
|---|---|
| 1. GENERAL STATEMENT | 30 |
| 2. SAFETY MANAGEMENT PROCEDURES | 31 |
| 3. ACCIDENT REPORTING | 32 |
| 4. CONTROL OF SUBSTANCES DANGEROUS OR HAZARDOUS TO HEALTH AND/OR THE ENVIRONMENT | 33 |
| 5. PERSONAL PROTECTIVE EQUIPMENT | 33 |
| 6. FIRST AID AND MEDICAL ATTENTION | 34 |
| 7. FIRE PROTECTION AND PREVENTION | 34 |
| 8. ELECTRICITY | 35 |
| 9. OXYGEN / ACETYLENE / FUEL GASES / CARTRIDGE TOOLS | 36 |
| 10. TEMPORARY WORKS | 36 |
| 11. USE OF LADDERS | 37 |
| 12. DEMOLITION | 37 |
| 13. USE OF EXPLOSIVES | 38 |
| 14. USE OF MOBILE/HEAVY PLANT AND EQUIPMENT | 39 |
| 15. CRANES | 40 |
| 16. TEMPORARY OR PERMANENT INSTALLATION OF EQUIPMENT. | 41 |
| 17. CONFINED SPACES | 41 |
| 18. EXCAVATION | 42 |
| 19. ELEVATED WORK | 42 |
| 20. ASBESTOS | 43 |
| 21. LASER SURVEY INSTRUMENTS | 43 |
| 22. LOCKING OUT, ISOLATING AND TAGGING OF EQUIPMENT | 43 |
| 23. NOISE CONTROL | 43 |
| 24. PREVENTION OF EROSION, SEDIMENT AND DUST | 44 |
| 25. PROTECTION OF PIPELINES ETC. FROM ENTRY OF SILT AND DEBRIS | 44 |
| 26. RODENT AND PEST CONTROL | 44 |
| 27. NO OPEN BURNING | 44 |

## B. REGULATIONS FOR THE HEALTH AND SAFETY OF PERSONNEL AND PROTECTION OF THE ENVIRONMENT

### 1. GENERAL STATEMENT

1.1 The prevention of injury and/or illness to personnel and protection of the environment, and compliance with applicable laws, are primary objectives of the Employer. Because of the importance the Employer places on meeting these objectives, selected requirements have been outlined in this document to guide contractors while working on BCD's premises . These Regulations cannot cover every eventuality. It is, therefore, expected that the Contractor will exercise good judgment in all such matters, even though not specifically mentioned herein. However, the requirements should be regarded by the Contractor as minimum standard and the Employer will not, in any way, be held liable for any action that might be attributed to following or not following these safety related standards.

It is the Contractor who is solely responsible for ensuring that adequate provisions are made for the health and safety of the Contractor's Staff and of the employees of Subcontractors, Suppliers, the Employer, the Engineer , Consultant Engineer/Architect, Technical Controller and concerned Authorities and that the Contractor fully complies with all applicable laws, regulations and codes of whatsoever nature in the Completion and guarantee of the Works.

1.2 The Contractor shall, throughout the execution and completion of the Works and the remedying of any defects therein:

i) have full regard for the safety of all persons entitled to be upon the Site and keep the Site (so far as the same is under its control) and the Works (so far as the same are not completed or occupied by the Employer) in an orderly state appropriate to the avoidance of danger to such persons.

ii) provide and maintain at its own cost all lights, guards, fencing, warning signs and watching for the protection of the Works or for the safety and convenience of the public or others;

iii) take all reasonable steps to protect the environment on and off the Site and to avoid damage or nuisance to persons or to property of the public or others, resulting from pollution, noise or other causes arising as a consequence of its methods of operation;

iv) bring to site, or allow to be brought to the Site only construction plant and equipment which is in sound condition and good working order and maintain that constructional plant and equipment in good working order whilst it is required on the Site. The Engineer shall have the right, and will exercise the right, to instruct the removal from Site of any plant or equipment, which in his opinion does not comply with appropriate standards.

v) know, understand, abide by, and impose on all employees, including those of Subcontractors and Suppliers, all the Laws of Lebanon and those of other

Public Authorities relating to Safety and governing the activities in which the Contractor is engaged. This information is to be prominently displayed for the benefit and information of all people entering the Site.

vi) that in the event of any outbreak of illness of an epidemic nature, comply with and carry out such regulations, orders and requirements as may be made by the Government, or the local medical or sanitary authorities, for the purpose of dealing with and overcoming same.

1.3    Prior to commencing work upon the Site the Contractor is to submit to the Engineer for Approval, copies of his own Site Safety Procedures embodying the provisions of these regulations and giving the name of the Contractor's full time representative who has overall responsibility for safety upon the Site. The person charged with this responsibility should not be employed in any role upon the Site which could lead to a clash of interests since safety must at all times take precedence over output. The Contractor is to ensure that upon approval by the Engineer the procedures are implemented and followed at all times. Any amendments required to the procedures by the Engineer are, similarly, to be incorporated, implemented and followed by the Contractor.

## 2.    SAFETY MANAGEMENT PROCEDURES

2.1    The Contractor shall appoint supervisors responsible for Health and Safety. Details of the supervisors, including a curriculum vitae, are to be submitted to the Engineer who may refuse the proposed candidate if, in his opinion, the proposed candidate appears unsuitable. When employed upon the Site the Safety Supervisors are to carry or wear some clearly visible means of identification. These supervisors shall be given sufficient time by the Contractor to carry out safety supervisory duties. As a guideline the Contract requirements are as follows:-

Workforce on Site 250 or more

full time safety supervisor

Workforce 100-250 on Site     50% of supervisor's time

Workforce on site below 100
As required for the Works but a minimum of 5 hours per week where more than 20 workers are employed on the site.

2.2    The Contractor must comply with the provisions of the Employer's Safety Management Procedures, which may be issued from time to time during the course of the Works.

2.3    The Contractor must provide safety refresher/ reinforcement training at regular intervals . The Contractor must provide safety induction training to its employees upon joining the Site .

2.4    The Contractor must provide safety instructions and receive feedback from its employees at Safety Meetings which must be conducted weekly.

2.5    The Employer may (through the Engineer) summon the Contractor's Health and Safety supervisor to BCD Health and Safety Meetings to ensure co-ordination of efforts by all persons on the BCD.

2.6    The Contractor must make regular safety inspections of the Site. This must involve every line manager from the Project Manager to Foreman taking a minimum of one hour every week to make such inspections of his/her areas of responsibility and correcting unsafe situations observed.

## 3.    ACCIDENT REPORTING

3.1    NB    Refer also to the contractual insurance obligations of the Employer and the Contractor in addition to the Claims Procedure , which shall take precedence as appropriate over the following:

The Contractor must report all accidents and dangerous occurrences to the Employer through the Engineer . Copies of accident reports, witness statements and other relevant items must be provided to the Employer through the Engineer. In the event of a serious accident or dangerous occurrence the Contractor is responsible for completing all statutory notifications and reports. Copies of all statutory reports shall be given to the Employer through the Engineer.

3.2    Reports of minor incidents are to be submitted to the  through the Engineer  by the close of work of the day following the day in which the incident occurred. More serious incidents, particularly those involving  death, serious personal injury, or serious damage to property are to be reported verbally to the Engineer and the Employer as soon as is practically possible, but in any case within two hours of the incident and followed up the same day by a comprehensive detailed report . The Contractor must acquaint himself with the relevant  Public Authorities and the notifications and reports they require and submit them with copies to the Employer through the Engineer.

4.  **CONTROL OF SUBSTANCES DANGEROUS OR HAZARDOUS TO HEALTH AND / OR THE ENVIRONMENT**

The Contractor shall comply with the Regulations in respect thereof detailed separately elsewhere herein

5.  **PERSONAL PROTECTIVE EQUIPMENT**

5.1 Personal protective equipment, including hard hats, safety glasses, respirators, gloves, safety shoes, and other such equipment, shall be provided as required by the Contractor to the Contractor's Staff and the Employer's , Engineer's, Consultant Engineer/Architect's and Technical Controller's staff. Non-metallic hard hats shall be worn at all times by all personnel at the Site. Safety glasses meeting international standards shall be made available for use and shall be worn in specified worksite areas. As a minimum, safety glasses shall be worn for the following types of work: hammering, chipping, welding, grinding, use of electrically powered or pneumatic equipment, insulation handling, spray painting , working with solvents, and other jobs where the potential of any eye injury exists. Face shields and /or monogoggles shall be required where possible exposure to hazardous chemicals, cryogenic fluids, acids, caustics, or dust exists and glasses may not provide adequate protection.

5.2 When handling acids, caustics, and chemicals with corrosive or toxic properties, suitable protection, such as acid suits or chemical resistive aprons and gloves, shall be worn to prevent accidental contact with the substance.

5.3 Personnel shall wear personal clothing and foot-wear that is safe and proper for the work and any job site exposure. As a minimum, full length trousers and T-shirts are required. The Contractor will be instructed to remove from site any worker, who in the opinion of the Engineer, is not wearing suitable clothing, and the worker will not be permitted to re-enter the site until he/she represents himself/ herself adequately attired.

5.4 The wearing of safety shoes with steel reinforced toes is recommended for all Contractor's Staff on Site . In all cases, the Contractor's Staff shall wear substantial work shoes that are commensurate with the hazards of the Works and the worksite area. The Contractor shall encourage employees to wear substantial work gloves whenever practical and safe to do so.

## 6. FIRST AID AND MEDICAL ATTENTION

6.1 The Contractor is required to have on Site a comprehensive First Aid Kit(s) at all times. First Aid Kits shall be conveniently located and clearly identifiable and the Contractor is required to have on Site one employee trained in First Aid for every 25 employees it has on Site.

6.2 The Contractor shall make advance arrangements, with a hospital of his choice, for all ambulance services , medical attention etc. , as may be required in the event of any accident to. the Contractor's Staff engaged on the Project and pay all deposits, fees and charges. The Contractor will be required to produce evidence of such arrangements, satisfactory to the Engineer, before commencing any work on the Site.

N.B. the Employer may, if so requested by the Contractor, make such arrangements on the Contractor's behalf, all costs arising being to the Contractor's account.

## 7. FIRE PROTECTION AND PREVENTION

7.1 The Contractor shall comply with fire protection instructions given by the Employer and/or the Authorities having jurisdiction in regards to fire protection regulations, but it shall be the Contractor's sole responsibility to provide adequate fire protection of all Temporary Works and Permanent Works. The Contractor shall prior to moving on to the Site ,  provide to the Employer and to the Local Authority a comprehensive fire prevention and evacuation plan. The Contractor shall co-operate with the Engineer in drawing up fire evacuation plans which will be updated from time to time as the Works progress.

7.2 No combustible site accommodation shall be allowed inside or within 10 meters of a building .Where units have to be used in these circumstances they must be constructed of non-combustible materials and have a half-hour fire rating inside to outside and outside to inside . Non-combustible furniture shall be used where practical.

7.3 All temporary accommodation and stores, inside or within 10 meters of a building, shall be provided with zoned smoke detectors and alarms . Elsewhere individual smoke detectors and external warning lights shall be installed.

7.4 Polyblock access systems must not be used. Correx and Mega film must only be used with a flame retarding additive (FRA). Expanded polystyrene with or without FRA, polythene, cardboard and hardboard shall not be used as protection materials. Plywood and chipboard may only be used as protection on floors. Vertical protection shall be non-combustible. Debris netting and weather protection sheeting shall be fire retardant. Portable tungsten-halogen lamps will not be permitted on site.

7.5 When using a cutting or welding torch or other equipment with open flame, the Contractor shall provide, at its own expense, a charged fire extinguisher close by at all times. All flammable material shall be cleared from area of hot works, or work location, prior to welding or oxy/gas burning operations. All hot works are to cease half an hour before the end of a work shift to allow for thorough checking for fires or smoldering

materials. Where appropriate areas of hot works are to be doused in water before the shift ends.

7.6 An adequate number of fire extinguishers, of the proper type for the material exposed, shall be placed in accessible, well-marked locations in the areas in which the works are being executed. Contractor's Staff shall be trained in their use. Extinguishers shall be checked monthly for usage and service condition.

7.7 Only approved containers shall be used for the storage and transport of flammable substances. Portable containers used for transporting or transferring gasoline or other flammable liquids shall be approved safety cans. Fuel burning engines shall be shut off while being refueled.

7.8 Adequate ventilation to prevent an accumulation of flammable vapors shall be provided where solvents or volatile cleaning agents are used. Flammable substances shall not be stored under overhead pipelines, cable tray, electrical wires, or stairways used for emergency egress. Oily waste, rags and other such combustible articles shall be stored in proper metal containers with self-closing lids.

## 8. ELECTRICITY

8.1 The Contractor's Staff must not work on or in proximity to energized circuits of any voltage unless adequate safety measures have been taken and the work operation has been reviewed and approved by the Engineer and a permit to work system established. Only authorized Contractor's Staff shall be allowed to work on or repair electrical equipment. All electrical installations must comply with current regulations dealing with on-site electrical installations.

8.2 Portable tools must be 110v unless otherwise agreed by the Engineer. When portable or semi-mobile equipment operates at voltages in excess of 110 v the supply must be protected by a Residual Current Device (RCD) regardless of any such device fitted to the equipment. The RCD must have a tripping characteristic of 30 milliamps at 30 milliseconds.

8.3 Lampholders on festoon lighting must be molded to flexible cable and be of the screw in type. Clip on guards shall be fitted to each lamp unit.

8.4 All tungsten-halogen lamps must be securely fixed at high level and must be fitted with a glass guard to the element.

8.5 All electrically powered equipment, including motors, transformers, generators, welders, and other machinery, shall be properly grounded, insulated ,and/or protected by a ground fault interruption device In addition, the skin of metal buildings and trailers with electric service shall be grounded. Metal steps, when used , shall be secured to the trailer.

8.6 Electrical equipment shall be periodically inspected and repaired as necessary

8.7 Any work on electrical equipment and systems shall be made safe through locking, tagging, and/or isolation of the equipment. Prior to the start of the work, the equipment or systems shall be tested to ensure that it has been properly de-energized and isolated.

8.8 Electrical repair work on energized systems shall be avoided whenever possible. Electrical troubleshooting shall be conducted only after getting Approval of the Engineer.

8.9. Unauthorized personnel shall not enter enclosures containing high voltage equipment such as switchgear, transformers, or substations.

## 9. OXYGEN/ACETYLENE/FUEL GASES/ CARTRIDGE TOOLS

9.1 Compressed oxygen shall be used in the place of compressed air.

9.2 Flash-back (Spark) arrestor must be fitted to gas equipment.

9.3 Liquid Petroleum Gas (LPG) cylinders must not be stored or left in areas below ground level overnight. Cylinders must be stored upright.

9.4 The quantity of Oxygen, Acetylene and Liquid Petroleum Gas Cylinders at the point of work shall be restricted to a maximum of one day's supply. Cylinders shall be kept in upright vertical rack containers or be safely secured to a vertical support.

9.5 Cartridge tools must be of the low velocity type. Operators must have received adequate training in the safe use and operation of the tool to be used.

## 10. TEMPORARY WORKS

10.1 Drawings and calculations must be submitted to the Engineer, prior to commencement on Site of the Works, for all Temporary Works, Excavations, Tower Crane and Hoist Installations, and all Scaffolds. Design shall conform to BS 5973 : 1993 and BS 5974:1990 and BS 5975 : 1982 or the equivalent international standards respectively Concrete support works design shall conform to BS 8110:1985 or the equivalent international standard. Scaffold loading shall conform to The Relevant British Standard or the equivalent international standard. Regularly used scaffold access will, however, be designed for an imposed load of 1.5 kn/m2.

10.2 The Engineer's acceptance of any Contractor's Temporary Works or Scaffold design does not imply Approval thereof, and shall in no way relieve the Contractor of his responsibilities in respect thereof.

10.3 The Contractor shall inspect and approve all Temporary Works, falsework and scaffolds after erection and before access or loading is allowed. Completed and approved Temporary Works falsework and scaffolds must be tagged with a staff-tag or similar safety system and the Safe Structure insert displayed. One tag shall be required per 32

$m^2$ face area, together with a central records system and weekly inspections made thereafter.

10.4 All mobile scaffold towers shall be erected in accordance with the manufacture's instructions and a copy of these shall be submitted to the Engineer prior to any use on Site. Additionally, all towers shall be erected complete with access ladder, safety rails and kick boards whatever the height.

10.5 The Contractor shall repair or replace, immediately, any scaffold including accessories, damaged or weakened from any cause.

10.6 The Contractor shall ensure that any slippery conditions on scaffolds are eliminated as soon as possible after they occur.

10.7 All Scaffolds used for storing materials, for brick or block laying, for access to formwork or for any other purpose, where materials may accidentally fall, are to be provided with wire mesh guards or guards of a substantial material, by the Contractor, in addition to the kick board.

## 11. USE OF LADDERS

11.1 Manufactured ladders shall meet the applicable safety codes for wood or metal ladders. Metal ladders are prohibited when the Site is in operational mode. In addition , metal ladders shall not be utilized unless they are clearly marked "Caution- Do Not Use Around Electrical Equipment".

11.2 Job made ladders will not be permitted.

11.3 Extension or straight ladders shall be equipped with non-skid safety feet and shall be no more than 12 m in height. Maximum height of a step ladder shall be 7 feet. Ladders shall not be used as platforms or scaffold planks.

11.4 Ladders rungs and steps shall be kept free of grease and oil.

11.5 Extension and straight ladders shall be tied off at the top and / or bottom when in use. Only one person shall be allowed on a ladder at a time.

11.6 Defective ladders shall be taken out of service and not used. Ladders shall not be painted and shall be inspected for defects prior to use.

## 12. DEMOLITION

12.1 All Demolition Works shall be undertaken in compliance with United States Code of Federal Regulations Part 1825.
Subpart T - Demolition and Subpart U - Blasting and Use of Explosives or the latest edition of BS 6187

## 13. USE OF EXPLOSIVES

13.1 The Contractor shall not use explosives without prior written permission from the Engineer and controlling Authorities.

13.2 The Contractor shall observe all regulations regarding proper purchasing, transportation, storage, handling and use of explosives, particularly the latest edition of BS 5607 : Safe use of Explosives in the Construction Industry

13.3 The Contractor shall ensure that explosives and detonators shall be stored in separate special buildings as approved by the concerned Authorities. These secured buildings should be located and clearly marked in English and Arabic as well as the language of the Contractor's Staff,
" DANGER - EXPLOSIVES"
as approved by the responsible Authorities.

13.4 The Contractor shall ensure that all possible precautions shall be taken against accidental fire or explosion, and to ensure that the explosives and detonators are kept in proper and safe condition.

13.5 The Contractor shall ensure that explosives and detonators shall always be transported in separate vehicles and kept apart until the last possible moment and that metallic tools shall not be used to open boxes of explosives.

13.6 Blasting Procedure: The Contractor shall:

(i) ensure that blasting shall only be carried out by experienced shot firers. Priming, charging, stemming and shot firing shall be carried out with greatest regard for safety and in strict accordance with the Rules and Regulations of the concerned Authorities. Adequate warning of blasting shall always be given and all persons cleared from the area, before blasting takes place.

ii) ensure that police, army and other Public Authorities shall be kept fully informed of the blasting program so that they may be present when blasting takes place if they so require.

iii) ensure that explosive charges are not excessive, charged boreholes are properly protected, and proper precautions are taken for the safety of persons and property.

iv) maintain an up-to-date inventory of all explosives and explosive devices and submit a weekly report to the Engineer, detailing the use of all explosives by date and location.

## 14    USE OF MOBILE/HEAVY PLANT AND EQUIPMENT

14.1    All plant and equipment must be inspected by the Contractor prior to delivery to Site and periodically thereafter to ensure that it is in safe working order, special attention being given to the inspection of cables, hoses, guards, booms, blocks, hooks, safety devices and the like. Defective equipment must be taken out of use immediately, and a warning notice attached to it, the equipment must under no circumstances be used again until the defect has been rectified.

14.2    The safe design capacity of any piece or equipment stipulated by the Manufacturer must never be exceeded, nor is any plant or equipment to be subjected to any modification that alters the Manufacturer's factor of safety or the safe working capacity of the plant or equipment. Any alarms or warning device fitted to plant or equipment by the Manufacturer are to be maintained in full working order, should any alarm or safety device cease to operate effectively and efficiently then the piece of plant or equipment to which the alarm is fitted is to be taken out of service at which time the plant or equipment will become subject to the conditions stipulated above.

14.3    A banksman / safety observer is to be assigned to direct plant or equipment where there is any possibility of personal injury or of damage to property or could hit overhead lines or structures as a result of the use of that plant or equipment. The banksman/ safety observer must also ensure no-one is allowed to pass beneath any load suspended from or being lifted or carried by plant or equipment.

14.4    At times when it is necessary for plant or equipment to exit from the Site and onto a public thorough fare, then a flag man, provided with red warning flags is to arrest the flow of traffic prior to the plant or equipment making any attempt to exit. Whilst plant is either traveling along, by or being transported along the public highways it is to be escorted by, an escort vehicle, traveling at the rear and carrying signs which warn other traffic of the hazard ahead. Regardless of these precautions the Contractor is to be aware that movement of plant or equipment along public highways falls totally within the jurisdiction of the Police Force of Lebanon and their requirements are to be adhered to at all times.

14.5    The Contractor is to ensure that only well trained, experienced operators are employed to operate plant and equipment. The Engineer will instruct the removal from site of any operator, who in his opinion, does not display the level of skill and competence which should be displayed by well trained, experienced operators. In addition the Contractor is to ensure that all operators are fully aware of the contents of their safety procedures and that those procedures are followed at all times.

14.6    Natural and synthetic fiber rope made of material such as manila, nylon, polyester or polypropylene shall not be used for slinging mobile equipment.

14.7    The Contractor is responsible for the safe operation of its lifting and handling equipment. The Contractor shall ensure that its installations and equipment respect safety recommendations and rules, particularly taking into account the Works and installations already in place or to be installed.

## 15. CRANES

The following apply particularly to use of cranes, both static and mobile, in addition to the rules for use of Mobile / Heavy Plant and Equipment.

15.1    Before any crane is brought into use on the Site the Contractor is to produce to the Engineer, for inspection, a copy of the current Test Certificate issued by a competent body Approved by the Engineer. The Contractor is to ensure that Test Certificates are maintained current whilst the crane is in operation since the Engineer will not allow the use of any crane not having a current Test Certificate.

15.2    Lifting tackle is to be of the highest quality and be covered by a current certificate verifying its suitability, it is to be inspected regularly in order to ensure that its quality does not deteriorate. Any tackle which does begin to show signs of deterioration or is not covered by a current certificate is to be removed from the Site. The Engineer will instruct the immediate removal from Site of any lifting tackle which, in his opinion, is not of the required strength or is not covered by a current test certificate.

15.3    Crane operators must be fully trained and experienced and hold a certificate issued by a competent body approved by the Engineer verifying that the operator has undertaken an approved course of training and has achieved the necessary level of competence required in order to safely operate the class of crane to which the operator is assigned. If no certified local training standard exists then the company supplying the crane will be required to verify the competence of the operator, in writing.

15.4    Banksman or other personnel charged with the control of cranes must hold a training certificate from a recognized training agency. If no such training agency exists then the contractor employing the banksman or other personnel will be required to verify their competence in writing.

15.5    Only certified slinger/banksman shall sling loads or guide crane/ load movement.

15.6    Operators, banksman and personnel charged with the control of cranes must not be required to work, nor permitted to work, more than 60 hours per week or 10 hours per day.

15.7    Safety harnesses must be worn and used at all times by personnel engaged on the erection/ alteration/ dismantling of tower cranes.

15.8    Neither cranes nor the loads that they are lifting can encroach within 4 meters of any live overhead power line, or critical structure.

### 16. TEMPORARY OR PERMANENT INSTALLATION

( Lifts / Escalators / Mechanical Service Aids )

16.1   During installation and testing the Contractor's engineer shall be in attendance.

16.2   All control mechanism panel and wiring diagrams must be printed in English and Arabic as well as the language of Contractor's Staff.

### 17. CONFINED SPACES

Confined spaces, including tanks, vessels, containers, pits, vaults, tunnels, shafts, trenches, ventilation, or other enclosures where known or potential hazards may exist , shall not be entered without first satisfying the Engineer that the Contractor has complied with the following:

i)   The area shall be completely isolated to prevent the entry or exit of hazardous substances, or materials which could cause an oxygen deficient atmosphere. All equipment that could become energized or mobilized shall be physically restrained and tagged. All lines going into the confined space shall be isolated and/or blanked.

ii)   Personnel, while working in a confined space where emergency escape or rescue could be difficult, shall wear a safety harness attached to a lifeline.

iii)   A qualified attendant(s) who is trained and knowledgeable in job-related emergency procedures shall be present at all times while persons are working within the confined space. The attendant shall be capable of effecting a rescue, have necessary rescue equipment immediately available, and be equipped with at least the same protective equipment as the person making entry.

iv)   All equipment to be used in a confined space shall be inspected to determine its acceptability for use. Where a hazard from electricity may exist, equipment utilized shall be of low voltage type.

v)   The atmosphere shall be tested to determine if it is safe. The permissible levels are: –
   - Oxygen  : 19.5 % lower – 22 % upper
   - Flammable Gas : not to exceed 10% of Lower Explosive Limit (LEL)
   - Toxic contaminants: not to exceed the Permissible Exposure Limit (PEL)
   Subsequent testing shall be done after each interruption and before re-entering the confined workspace as well as at regular intervals (not to exceed 4 hours). Continuous monitoring is preferable and may be necessary in certain situations.

vi)   Adequate ventilation shall be provided to prevent development of an oxygen excess (more than 22%) or deficiency (less than 19.5 %), or the accumulation of flammable or toxic contaminants in excess of the Permissible Levels.

### 18. EXCAVATION

The side of all excavations and trenches exceeding 1.3 m in depth which might expose personnel or facilities to danger resulting from shifting earth shall (as a minimum and where not otherwise specified in the Tender/Contract Documents) be protected by shoring or sloping to the appropriate angle of repose. All excavation, slope, shoring, and bracing shall be inspected daily and after each rain storm, before allowing personnel to enter the excavation. Excavations 1.3 m or more in depth and occupied by personnel shall be provided with ladders as a means for entrance and egress. Ladders shall extend not less than 1 m above the top of earth ramps. Adequate barrier protection for all excavations shall be provided by the Contractor. Barriers shall be readily visible by day or night.

## 19. ELEVATED WORK

19.1   The Contractor shall provide all employees, while working at an elevated position, with adequate protection from falls should a slip or other unexpected fall-producing situation occur. All elevated work platforms shall be inspected each day by the Contractor. Defects shall be corrected prior to use. The Contractor shall provide all employees, while working at an elevated position, with adequate protection.

19.2   Erection of Structures
Safety harnesses and lines shall be provided by the Contractor for use by the erection team who must wear and use them. Mobile elevating work platforms or the equivalent shall be used to erect structures where practicable and a suitable base is available. Operators shall be trained in the safe use of such platforms and hold a certificate of competence.

19.3   Work in or on Structures

a)In the absence of any erected scaffolding a properly constructed barrier and handrail are to be installed to protect workers whilst they are working at elevated levels . In the case of roofing being fixed to an erected structure then safety nets are to be fixed below the structure and as noted above harnesses must be worn.

b)Handrails are to be provided around edges of slabs, balconies, stairs and the like regardless of whether permanent scaffolding is erected or not.

19.4   Hoists
A copy or the current Test Certificate shall be submitted to the Engineer before any hoist ( personnel or material ) is brought into operation on the Site.    Where the range of travel is increased or reduced a copy of the revised Test Certificate shall be submitted. Each landing gate must be fitted with a mechanical or electrical interlock to prevent movement of the hoist when any such gate is in the open position. Safety harnesses must be worn and used by personnel erecting/ altering/ dismantling hoists.

19.5    **Suspended Cradles**
Suspended cradles must be installed/moved/dismantled by a specialist Sub-contractor. Suspended cradles must comply with local regulations. All powered suspended cradles must incorporate independent safety lines to overspeed braking devices and independent suspension lines for personal safety harness attachment.

## 20. ASBESTOS

No asbestos shall be permitted in any part of the Works .

## 21. LASER SURVEY INSTRUMENTS

Laser instruments of class 3B & 4 are prohibited from use on the Works. Where laser instruments of class 3A are used a competent person must have received safety training by the Contractor.

## 22. LOCKING-OUT, ISOLATING AND TAGGING OF EQUIPMENT

22.1    Equipment that could present a hazard to personnel if accidentally activated during the performance of installation, repair, alteration, cleaning, or inspection work shall be made inoperable and free of stored energy and/or material prior to the start of work. Such equipment includes circuit breakers, compressors, conveyors, elevators, machine tools, pipeline, pumps, valves, and similar equipment.

22.2    Where equipment is subject to unexpected external physical movement such as rotating, turning, dropping, falling, rolling, sliding etc. mechanical and / or structural constraints shall be applied to prevent such movement.

22.3    Equipment which has been locked-out, immobilised, or taken out of service for repair or because of a potentially hazardous condition shall be appropriately tagged indicating the reason it has been isolated and/ or taken out of service.

23.4    Where safety locks are used for locking out or isolating equipment, the lock shall be specially identified and easily recognized as a safety lock.

## 23 NOISE CONTROL

23.1    The Contractor shall, in all cases, adopt the best practicable means of minimising noise. For any particular job, the quietest available plant/ and or machinery shall be used. All equipment must be maintained in good mechanical order and fitted with the appropriate silencers, mufflers or acoustic covers where applicable . Stationary noise source must be sited as far away as possible from noise-sensitive development, and where necessary acoustic barriers must be used to shield them. Such barriers may be proprietary types, or may consist of site materials such as bricks or earth mounds.

23.2    The Contractor shall ensure that the Works are conducted in a manner so as to comply with all restrictions of the Authorities, as they relate to noise .

23.3    Compressors, percussion tools and vehicles are to have effective silencers of a type recommended by the manufacturers of the equipment. Pneumatic drills and other noisy appliances shall not be used during days of rest or after normal working hours without Approval of the Employer (through the Engineer).

23.4    Hearing protection is required in all posted high noise level areas. Hearing protection may also be required where excess noise exposure exists even on a temporary basis. This will include situations where equipment such as jackhammers, saws, drills, grinders, or heavy equipment is being utilized and the 90 decibel limit is exceeded.

23.5    Areas where noise levels exceed the 90 decibel standard, even on a temporary basis, shall be posted and personnel shall wear adequate hearing protection. This protection could include muffs, plugs, or a combination thereof. Employees required to wear such hearing protection shall be properly fitted and trained.

## 24. PREVENTION OF EROSION, SEDIMENT AND DUST

The Contractor shall take all necessary measures to ensure that all soil erosion, sediment, dust and windblown materials arising from the construction activities is kept to a minimum, including damping down dust with water on a regular basis during dry climatic condition.

## 25. PROTECTION OF PIPELINES ETC. FROM ENTRY OF SILT AND DEBRIS

All pipe and duct-work connection points in the area used by the Contractor, including grills of the stormwater drainage system, must be properly protected by the Contractor during construction so as to prevent entry into pipes and lines of silt and debris.

## 26. RODENT AND PEST CONTROL

In the event that rodents or other pests are encountered on the Site the Contractor is to take whatever steps are necessary to effect extermination of the rodents or pests to the Approval of the Engineer.

## 27. NO OPEN BURNING

There shall be no open burning whatsoever on the Site. This includes bonfires and cooking fires of every kind.

# CONSTRUCTION

## OF

## RULES, PROCEDURES AND  REGULATIONS

### FOR

### THE EXECUTION AND COMPLETION OF WORKS

C.    REGULATIONS  GOVERNING SUBSTANCES
DANGEROUS OR HAZARDOUS TO HEALTH
AND / OR THE ENVIRONMENT

## C.   REGULATIONS GOVERNING SUBSTANCES DANGEROUS OR HAZARDOUS TO HEALTH AND/OR THE ENVIRONMENT

**CONTENTS**                                                              **PAGE No.**

1. GENERAL STATEMENT                                                          47

2. DEFINITION OF DANGEROUS SUBSTANCES OR PREPARATIONS                        48

3. STORAGE OF DANGEROUS SUBSTANCES , PREPARATIONS
   OR WASTES                                                                  49

4. LABELLING OF DANGEROUS SUBSTANCES, PREPARATIONS
   OR WASTES                                                                  50

5. DOCUMENTATION FOR DANGEROUS SUBSTANCES
   OR PREPARATIONS                                                            51

6. USE OF DANGEROUS SUBSTANCES OR PREPARATIONS                               52

7. HANDLING OF HAZARDOUS WASTES                                              54

8. NOTICES, APPROVALS , ETC.                                                 56



## C. REGULATIONS GOVERNING SUBSTANCES DANGEROUS OR HAZARDOUS TO HEALTH AND/ OR THE ENVIRONMENT

### 1. GENERAL STATEMENT

1.1   The proper control of dangerous or hazardous substances is a crucial part of the Employer's primary objective of preventing injury or illness to personnel and protecting the environment. The Employer has outlined selected minimum requirements in this document with which the Contractor is to comply. In addition to these requirements, The Contractor is to comply, at all times, with the Laws of Lebanon covering use and handling of dangerous or hazardous substances. The Contractor is expected to exercise good judgment at all times. It is the Contractor who is solely responsible for ensuring proper control of dangerous or hazardous substances, preparations and their use, and for ensuring that his Staff, and the employees of his Sub-contractors and Suppliers, fully comply with these regulations and all applicable laws, regulations and codes of whatsoever nature in the Completion and Guarantee of the Works.

1.2   Any substance found on site which falls into the category of dangerous or hazardous or toxic substances must only be dealt with in accordance with either these regulations, internationally accepted guidelines or guidelines issued by the Manufacturer of the substance in question, if known, or both. In the event that any Contractor encounters a substance which has the possibility of being a dangerous, hazardous or toxic substance then the Contractor is to cease work in the area in which the substance has been encountered, securely cordon the area off, and inform the Engineer immediately, whereupon the Engineer will issue instructions as to the treatment and/ or disposal of the substance.

1.3   Should any dangerous, hazardous or toxic substance, whether it be gaseous, liquid , or solid, cause contamination to the atmosphere, any water course or to the ground then the Engineer must be informed immediately. Whether the escape is caused due to negligence of the Contractor or for any other reason the Contractor is to take whatever measures are immediately available to contain the extent of the contamination and ensure the well being of the people charged with effecting that containment and anyone who may be affected by the escape.

1.4 The Contractor is to inform the Engineer , in writing if at any time he considers it necessary to use any substance on the Site which could prove to be hazardous to health or the environment. The following information is to be provided:

   (a)        The name of the Manufacturer,

   (b)The name of the substance,

   (c)        The effects of inhalation or coming into contact with the substance,

   (d)Precautions to be taken including a description of any protective clothing or breathing equipment to be worn,

   (e)        Contingency plans in the event of mishap.

   Hazardous substances must under no circumstances be taken on the Site unless and until the Contractor has provided the above information, or any other information requested by the Engineer, and who has granted permission in writing.

2.  DEFINITION OF DANGEROUS SUBSTANCES OR PREPARATIONS
    ( All References are to French Laws Codes and Regulations)

   Substances and preparations are considered to be dangerous if so defined by the Code de la Santé Publique ( article 5152) and the decret du 29 December 1988  relatif à certaines substances et preparations dangereuses ( article 1 ), by the Loi  n 77-771 du 12 Juillet 1977 ( article 4), by the Code du Travail ( article 231-6), and by the texts written in application of these articles.

   Many of the dangerous substances or preparations are listed in the annexes to the arrete du 10 Octobre 1983 relatif à la liste et conditions d'etiquettage et d'emballage de substances dangereuses and the arrêté du 21 Fevrier 1990 definissant les criteres de classification and les conditions d'etiquettage et d'emballage de preparation dangereuses.

   The above definition includes ( but is not restricted to ) materials that are explosive, combustible, inflammable, toxic, harmful, corrosive or irritant, whether used as fuels, lubricants, hydraulic oils, solvents, paints, colorants, sealers, bitumens, glues, form release, concrete additives, detergents, cleaners, biocides or for any other use.

Wastes are considered hazardous if so defined by article 3 of the <u>decret n 77-974 du 19 Aout 1977 relatif aux informations a fournir au sujet du dechets generateurs de nuisances</u> and by annexe I to <u>the arrete du 4 Janvier 1985 relatif au controle des circuits d'elimination de dechets generateurs de nuisances</u> : This lists includes ( but not limited to): wastes containing heavy metals, cyanides, phenols and derivatives, fluorides, sulfides or aromatic or chlorinated solvents, toxic or explosive substances; paint waste, hydrocarbons and waste oil.

Spills of fuel or oil from refueling, lubrication or maintenance of vehicles, generators or compressors and sand, soil, containers or any material such as rags or brushes that is contaminated with any hazardous waste, shall be treated as hazardous waste.

## 3. STORAGE OF DANGEROUS SUBSTANCES, COMPOUND OR WASTES

### 3.1 Generally

Toxic or dangerous substances, compounds or wastes shall be stored on site in such a manner as to prevent contamination of the environment, soil, water and groundwater.

All hazardous waste is to be stored on Site at a "hazardous waste collection site" installed by the Contractor and identified as such by appropriate signs until shipment to an approved hazardous waste treatment or disposal facility.

Spill containment supplies of absorbent material such as sand, and equipment such as shovel, scoops or buckets and a safety kit ( eyewash, gloves, safety glasses, duck tape, plastic tarp) shall be available at the hazardous waste collection site.

### 3.2 Storage of Petroleum Products

Combustible petroleum products shall be stored on Site in accordance with the <u>arrete du 26 Fevrier 1974 fixant les regles technique applicable au stockage de produits petroliers dans les lieux nos vises par la legislation des installation classees.</u>

When the quantity stored is greater than 120 liters, the containers or tanks shall be placed in a leak-proof and non-combustible basin ( article 15 of the <u>arrete du 26 Fevrier 1974.</u>

The retention capacity of the basin must be at least equal to the greater of the two following values:

- 100 percent of the volume of the largest container
- 50 percent of the total volume of the containers in the basin.

### 3.3  Storage of Dangerous Substances, Preparation or Wastes

Any container, sack or envelope holding any dangerous substance or preparation shall conform to the requirements of the Code du Travail ( article 231-6) , the arrete du 10 Octobre 1983 relatif a la liste et conditions d'etiquettage et d'emballage de substances dangereuses ( article 4) and the arrete du 21 Fevrier 1990 definissant les criteres de classification and les conditions d'etiquettage et d'emballage de preparation dangereuses ( article 20)

The containers must be solid and leak-proof under all necessary handling. The material of which they are made must not be capable of being attacked by or of entering into dangerous chemical combinations with the contents. Any container equipped with a system of closure must be capable of being reclosed several times with no loss of contents.

Containers of toxic or dangerous products or wastes (including but not limited to drums, cans, sacks or envelopes) shall be stored on pallets at all times, with the pallets placed over a basin ( as descried above) backfilled with sand or absorbent material.

The pallets ( and basin) shall be roped off by hazard warning tape .

When not being filled, the containers of waste must be sealed in a leak-proof manner. The containers may not be overfilled. In drums this means at least 10 cm of space at the top. In other containers this means approximately 7/8 capacity.

Epoxy paint residue which hardens with time, may when hard be disposed of as ordinary non-hazardous waste.

## 4.  LABELLING OF DANGEROUS SUBSTANCES, PREPARATIONS, OR WASTES.

Any containers holding any dangerous substance or preparation ( with the exception of containers holding compressed gases under pressure) shall be labelled in conformity with the requirements of the Code du Travail (article 231-6), the arrete du 10 October 1983 relatif a la liste et conditions d'etiquettage et d'emballage de substances dangereuses (article 5-7) , and the arrete du 21 Fevrier 1990 definissant les criteres de classification and les conditions d'estiquettage et d'emballage de preparation dangereuse ( article 21-24)

The label or inscription must be legible horizontally when the container is in its normal position. The label must adhere by its whole surface to the container. The label must be written in English and Arabic languages, as well as all other languages of the Contractor's workforce.

The label or inscription must have the following minimum dimensions:

52 x 74 mm, if possible, for a volume of less than or equal to 3 litres,

74 x 105 mm for a volume of more than 3 litres and less than or equal to 50 litres

105x148 mm for a volume of more than 50 litres and less than or equal to 500 litres

148 x 210 mm for a volume of more than 500 litres

The label or inscription must indicate in highly visible and indelible characters:

a) The symbols and danger warnings attributed to the substance in annexe I of the arrete du 10 Octobre 1983 and illustrated in annexe II . Each symbol must be printed in black on an orange-yellow background and it must occupy at least one-tenth of the surface of the label.

b) The name or address of the manufacturer, distributor or importer

c) For a substance: the name of the substance under one of the forms appearing in the annexe I to the arrete du 10 Octobre 1983 . For a preparation : the designation or commercial name of the preparation, as well as the names of such substances present in the preparation as are required by the article 22 of the arrete du 21 Fevrier 1990

d) The risk codes and safety precautions attributed to the substance(s) in annexe I to the arrete du 10 Octobre 1983 and explained in annexes III and IV.

e) For waste containers only , the contents and the date that filling commenced

5. DOCUMENTATION FOR DANGEROUS SUBSTANCES OR REPARATIONS

5.1 Generally

All hazardous material shipments and deliveries shall be manifested in accordance with the French and European laws and regulations.

For any dangerous substance or preparation, the Contractor must obtain from the manufacturer the fiche de données de sécurité ( or FTS, fiche technique de securite) as required and defined by the article 231-46-1 of the Code du Travail , or its equivalent .
A copy of the fiche de données de sécurité must be kept on site, legible and accessible by all workers and inspectors. All workers must be informed of the existence and location of the fiche de données de sécurité.

6. USE OF DANGEROUS SUBSTANCES OR PREPARATIONS

### 6.1 Generally

Any works using dangerous substances or preparations shall be performed with all necessary measures and means in order to avoid any risk of exposure of personnel to such substances or preparation ( by inhalation, skin absorption, ingestion or eye contact), fire risks, or pollution of the environment ( air, water or soil).

Concentrations of dangerous substances in the atmosphere of the work place shall at no time exceed those prescribed in the Circulate du 19 Juillet 1982 relative aux valeurs admises pour les concentrations de certaines substances dangereuses dans l'atmosphere des lieux de travail.

### 6.2 Handling of Containers during Work

Containers of dangerous substances or preparations shall be handled in such a manner as to prevent any contamination of the environment.

Drums or cans of dangerous substances or preparations that are open and in use shall be set on pallets. The containers shall be sealed in a leak-proof manner when not in use.

Any drums with spigots that sit sideways on a stand shall be provided with a leak-proof retention basin, either around the entire stand or at a minimum under the spigot in such a manner as to collect any spills occurring during draw-off of product.

Empty drums of dangerous substances or preparations shall be promptly removed from the Site. Until removal, empty drums of dangerous substances or preparations shall be handled in the same manner as full drums or treated as hazardous waste.

### 6.3 Works of Surface Treatment (Painting and Blasting)

The requirements of this paragraph apply to all Works of surface cleaning: shot blasting, sandblasting, painting, spray-painting, flock spraying and the like activities.

### 6.3.1 Work Areas

Prior to execution of surface cleaning, blasting and/or painting activities, the Contractor shall undertake all necessary measures to prevent contamination of the environment, soil, water, etc. by materials such as (but not restricted to): detergents, cleaners, and thinners, paint residues, dust or overspray, blasting-sand and abrasives, or their residues or dust.

The work areas shall be kept dust and rainwater tight. For this purpose the Contractor shall erect temporary workshops and/or construct removable protection to create enclosed work areas.

Contaminating materials must be contained within and must not drift out of the work area. Surrounding areas, soil and water bodies must be protected against contamination by the placement of plastic tarpaulins or screens . When necessary to prevent contaminating materials from drifting out of the work area, the work area shall be kept under a slight negative pressure by means of air driven explosion proof ventilators with dust-catch filters. Air compressors shall be of the double-silenced type, fitted with water and oil traps.

### 6.3.2  Paint

All paints shall be stored and mixed in a room designated for the purpose which shall be kept under lock and key.

All paint left-overs, spent cloths and rags, cleaners, thinners, detergents, spent tools and brushes, are hazardous waste and shall not be buried or mixed with soil. They shall be  subject to every precaution to prevent spontaneous combustion, including being kept separate, collected daily, stored in closed separate labelled containers and transported to the hazardous waste collection area .

Working solvent and brush-cleaning containers may not be filled more than 2/3 full. Above this level they must be disposed of as hazardous waste.

Empty solvent drums may be dried completely and disposed of as normal construction waste. Empty dried drums shall be stored upside down or tightly reclosed to prevent the accumulation of rainwater. They should be labelled as being empty.

Paint buckets which have been completely emptied may be air dried for at least 24 hours, after which time they may be disposed as normal construction waste.

It is permitted to rinse solvent-based paint buckets until they are paint free. The rinse solvent is then to be disposed of as hazardous waste. The paint-free buckets can then be disposed of as normal construction waste.

### 6.3.3  Abrasives

Abrasives or sand for blasting shall not contain more than 5% silica or more than the French AFNOR norm in heavy metal residues or other contaminants.

Mixing of fresh abrasives or sand with spent abrasives or sand is not permitted.

Spent abrasives or sand is hazardous waste and shall not be buried or mixed with soil. It shall be collected daily, stored in closed labelled containers and transported to the hazardous waste collection area until removal from the Site by an Approved waste hauling subcontractor.

### 6.3.4  Lead or Mercury in paints

No lead-based paint pigments are permitted in either latex or solvent-based paints and coatings.

No latex paint with mercury-based preservatives will be permitted without special approval, including certified analyses of each purchased lot.

## 7.  HANDLING OF HAZARDOUS WASTES

### 7.1 The Contractors' Hazardous Waste Disposal Plan

The Contractor shall establish a plan for the disposal of hazardous wastes generated by its on-Site activity. This plan shall estimate the quantities and nature of hazardous wastes to be produced and the locations and structures to be provided for the on-Site storage. The name of the accredited transporters and off-Site treatment or disposal facilities shall be included in the plan, together with copies of accreditation documents. In the case where the Contractor lets any part of the Works to a Subcontractor, it shall give the Subcontractor a copy of these regulations. The Subcontractor must establish its own hazardous waste disposal plan at least two (2) weeks before beginning any activity on the Site.
All hazardous waste hauling subcontracts, including the routes to be taken by the hauling trucks, must be included in the plan.
All hazardous waste disposal facilities, (landfill, incineration, recycling ) are to be identified in the plan, as are the relevant details of the hazardous waste disposal subcontracts.

As part of the Contractor's hazardous materials program, the name of the person responsible for the management of the program shall be prominently displayed on the exterior of the building where the wastes are stored as well as the Contractor's general Site offices. A 24 hour telephone number for this individual shall also be prominently displayed.

### 7.2  Handling of Hazardous Wastes

### 7.2.1 Generally

Any hazardous waste produced on the site must be handled in accordance with the provisions of articles 2,9 and 11 of the Loi du 15 Juillet 1975 relative a l'elimination

des dechets et a la recuperation des materiaux . All hazardous wastes must be delivered to an installation of elimination accredited by the Government Authorities.

No hazardous waste shall contaminate the soil, the groundwater or surface water systems, the storm drains or the sanitary sewer system.

At no time and under no circumstance are empty containers, buckets or drums to be rinsed and disposed of in waterways, in storm sewers or sanitary sewers, or on the ground.

Liquid hazardous waste and cans containing hazardous liquid residue must not be put into open waste bins destined for non-hazardous waste only.

### 7.2.2 Handling of Waste Oil

All waste oils produced on the Site must be handled in accordance with the decret du 21 Novembre 1979 portant reglementation de la recuperation des huiles usagees.

The waste oil must be stored in such a manner as to avoid any admixture with water or any non-oily wastes. The Contractor must provide a leak-proof installation for the storage of the oils until their collection by an accredited waste oil collection company. The installation must be accessible to the collection vehicles.

The waste oil collection company must be accredited in accordance with the provisions of the arrete du 21 November 1979.

### 7.3 Disposal of Hazardous Wastes

All hazardous wastes must be delivered to an installation of elimination approved by the Employer and the Governmental Authorities through the Engineer . Whenever the Contractor delivers to a third party more than 100 kg of a hazardous waste appearing on the list in annex 1 to the arrêté du 4 Janvier 1985 it must fill out a manifest .

## 8. NOTICES, APPROVALS ETC.

The Contractor shall make an assessment of operations involving substances which are dangerous or may be hazardous to health and / or the environment, of their transportation, storage, use and eventual disposal. This assessment shall form part of the Contractor's Method Statement.

Upon appointment, the Contractor shall make a full re-assessment of all the operations which involve dangerous/ hazardous substances , and if this re-assessment involves any greater use of dangerous / hazardous substances, changes in methods, application, disposal etc., he shall submit a report to the Engineer seeking the Engineer's Approval to the revised proposals.

The assessment shall identify:

i)  the activities which may be dangerous/hazardous , and the measures to be taken to
    contain, reduce or eliminate such dangers.

ii) the types and approximate quantities of substances that are dangerous or may be
    hazardous and the means of use , protective containment measures to be adopted,
    and the means of disposal of waste.

iii) the waste haulage subcontractors, incineration / disposal plant(s), and traffic routes
    thereto .

The Contractor shall notify the Engineer at least ten (10) days before beginning any
activity involving the use of any dangerous substance or preparation , a copy of the
relevant "fiche de données de sécurité" must accompany any such notice.  The
Contractor shall notify the Engineer at least ten (10) days before beginning any shot
or sand blasting, of the source, approximate quantity , composition and quantity of
any abrasive sand or  the like material to be used and, before the completion of his
Works , of the actual quantity delivered, used, collected and removed from site.

The Contractor shall forward to the Employer through the Engineer copies of the
hazardous waste disposal manifests.

# CONSTRUCTION

## OF

## ARMY OFFICERS CLUB & HOTEL

# RULES, PROCEDURES AND REGULATIONS

## FOR

## THE EXECUTION AND COMPLETION OF WORKS

## D. FINES FOR VIOLATION

## D. FINES FOR VIOLATION

1. The Employer has prepared below a list of the most common violations of the Site rules, procedures and regulations implemented for the smooth and safe running of all activities on the Site and within B.C.D. The Contractor shall take responsibility for all personnel and activities associated with its Contract. The person or entity which breaks any Laws or Regulations of a Public Authority may be liable to penalties under the Laws of the Republic of Lebanon. The Employer may, at its absolute descretion, impose, by way of penalty, the amount of fine detailed against each item of violation listed below, which fine will be imposed on the responsible Contractor, not on his Staff, Subcontractor or Supplier who commits the violation. Such violations will be notified to the Contractor and any fines will be deducted from any amount of payment that otherwise may be due to the Contractor

| Violation | Fine in U.S.D per occurence |
|---|---|
| 1- Identification of contractor's personnel and vehicles | 25* |
| 2- Over speeding ( > 30 km/ hr. ) | 25* |
| 3- Overloading | 25* |
| 4- Loading without proper cover | 25* |
| 5- Parking in unauthorized areas | Warning* |
| 6- Blocking road access | Warning* |
| 7- Violation of traffic signs | 25* |
| 8- Dropping debris on streets | 100* |
| 9- Not fencing work areas (Demolition Contractors) | 500** |
| 10- Not fencing work areas (Construction Contractors) | 1000** |
| 11- Not posting required signs in work areas | 100** |
| 12- Not maintaining security at exit/entrance to work areas | 100* |
| 13- Not protecting street traffic/dust control | 25* |
| 14- Not providing flagman to direct traffic while heavy vehicles are moving | 100* |
| 15- Not wearing hard hats | 25* |

| | |
|---|---|
| 16- Not wearing dust masks | Warning* |
| 17- Not wearing gloves | Warning* |
| 18- Not providing first aid kits | 100* |
| 19- Not respecting safety rules | 100* |
| 20- Not respecting working hours & days | 100* |
| 21- Not controlling pollution (unauthorized use of drainage networks, garbage dumping, noise, asbestos use....) | 100* |
| 22- Trespassing SOLIDERE or other property without approval | 1000** |
| 23- Tampering with utilities (sewers, electricity, etc....) | 500** |
| 24- Not protecting adjacent buildings during excavation | 500** |
| 25- Dumping garbage/demolition materials outside property limits | 250* |
| 26- Mobilizing heavy equipment with tracks (chains) along public roads | 1000* |
| 27- Damages to any infrastructure utilities | 5000* |
| 28- Damages to side-walks tiles and/or curbstones | 2000* |
| 29- Damages to street lighting | 2000* |
| 30- Damages to any street furniture and fixtures and/or any landscape | 2000* |
| 31- Cracks and/or failure of street due to excavation | 5000* |

Notes:  (*) for each occurrence
         (**) weekly until violation is rectified

EXHIBIT C

INTERNATIONAL CHAMBER OF COMMERCE
INTERNATIONAL COURT OF ARBITRATION
ICC Case No. 14208/EC
BETWEEN:


### RADIAN INTERNATIONAL LLC

Claimant

and


### THE LEBANESE COMPANY FOR THE DEVELOPMENT AND RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT SAL ("SOLIDERE")

Respondent

---

### FIRST AMENDED REQUEST FOR ARBITRATION

---

# TABLE OF CONTENTS

**Page**

1.  INTRODUCTION ...................................................................................................... 1

2.  THE PARTIES ........................................................................................................... 2

    The Claimant ........................................................................................................... 2

    The Respondent ....................................................................................................... 3

3.  THE CONTRACT ..................................................................................................... 3

4.  THE AGREEMENT TO ARBITRATE ..................................................................... 4

5.  JURISDICTION OVER THE CURRENT DISPUTE ................................................ 5

6.  APPLICABLE RULES OF LAW AND THE PLACE AND LANGUAGE OF THE
    ARBITRATION ........................................................................................................ 5

7.  THE APPOINTMENT OF THE ARBITRAL TRIBUNAL ....................................... 5

8.  SUMMARY OF CLAIMANT'S CASE ..................................................................... 6

9.  RELEVANT FACTS ................................................................................................. 8

    Respondent's Public Purposes in Reclaiming the Normandy Landfill
    Site and the Contract Designed to Implement These Public Purposes ..................... 8

    The Claimant's Plans for Completion of the Project and the
    Respondent's Approval Thereof ............................................................................. 11

    Gas Emissions and the Ensuing Dispute Regarding FSQ Compliance
    Measurement ......................................................................................................... 12

    The First Arbitration Award and the Undecided Issues .......................................... 13

    The Claimant's Proposed Remediation Plan and Measurement Methods ............... 14

    Solidere's Rejection of the Original Proposal ........................................................ 16

    The Claimant's Alternative Proposals Based on the Respondent
    Experts' Recommendations .................................................................................... 18

    Solidere's Rejection of the August 2005 Plan and Notices of Default ................... 21

    The 12 January 2006 Default Notices .................................................................... 22

    The Cost and Delay to Remedy the Defect in the Works ....................................... 26

10. RELIEF SOUGHT ................................................................................................... 27

## 1. INTRODUCTION

1.1 This First Amended Request for Arbitration arises under a written agreement, effective as of 25 January 1999, by which the Respondent engaged the Claimant to carry out and complete certain works ("the Works") in that area of Beirut defined by Decree 2236 dated 19 February 1992, which includes the reclaimed land defined by Decree 4830 dated 4 March 1994 and Decree 5609 dated 3 September 1994, commonly known as the Normandy Landfill ("the Contract").

1.2 An earlier dispute arising out of the Contract was the subject of arbitration in ICC case number 12727/EC ("the First Arbitration"). The First Arbitration resulted in an award rendered on 12 July 2004 (the "Award"). Although some of the matters in this Request for Arbitration relate to the First Arbitration, the arbitration tribunal did not decide the issues presented here and did not reserve jurisdiction to do so.

1.3 A second arbitration was commenced on or about June 21, 2004 regarding issues unrelated to the First Arbitration or the issues raised in this Request for Arbitration (ICC case number 13341EC) (the "Suspended Arbitration"). In that regard, the First Arbitration Tribunal rejected the Claimant's application to add the claims in the Suspended Arbitration to the First Arbitration finding, in part, that "[t]he new claims are of a wholly different character to the issues in the present reference." (Procedural Order, dated 21 June 2004). Although three arbitrators were selected for that proceeding, the case was suspended and the file was not transmitted to the arbitral tribunal. In addition, the arbitrator appointed by the Respondent resigned and has not been replaced. Accordingly, an arbitral tribunal is not currently constituted in the Suspended Arbitration. Although the Claimant is not pursuing the claims in the Suspended Arbitration at this time, the Claimant reserves the right to reactivate the Suspended Arbitration should circumstances regarding the issues raised in the Suspended Arbitration warrant it.

1.4 This First Amended Request for Arbitration is submitted on behalf of the Claimant and concerns issues essentially unrelated to the Suspended

1

Arbitration. This First Amended Request for Arbitration relates to (1) contractual disputes arising out of the implementation of the First Arbitration Award, (2) contract interpretation issues not decided in the First Arbitration, and (3) contractual disputes arising out of Respondent's Notice of Termination issued on February 10, 2006, all of which require an analysis of fact and law independent of the disputes raised in the Suspended Arbitration and which were not decided in the First Arbitration. This First Amended Request for Arbitration amends the original Request for Arbitration in this matter to address the Notice of Termination issued by the Respondent on February 10, 2006 and the Claimant's additional claims arising out of that Notice, which are matters that arose after Claimant filed its original Request for Arbitration.

## 2.    THE PARTIES

**The Claimant**

2.1    The Claimant, Radian International LLC, is a limited liability company incorporated under and in accordance with the laws of the State of Delaware in the United States of America ("Radian" or "the Claimant"). The Claimant's business includes the provision of design, engineering, technical and environmental services and contracting.

2.2    The Claimant's address in Beirut, Lebanon is:

P.O. Box 11-1261
Riad El Solh Beirut 1107 2080
Commercial Register No.:74673. Beirut
Tel/Fax: 01 983 575
Beirut - Lebanon

2.3    The Claimant is represented in this arbitration by:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
USA
Telephone:    +1 (213) 687 5000
Fax:          +1 (213) 621 5206
Attention:    Jeffrey H. Dasteel
              Jason D. Russell
              Marina V. Bogorad

2

Skadden, Arps, Slate, Meagher & Flom (UK) LLP
40 Bank Street
Canary Wharf
London
E14 5DS
England
Telephone:     +44(0)20-7519-7000
Fax:           +44(0)20-7519-7070
Attention:     Karyl Nairn

**The Respondent**

2.4    Based on and in accordance with Lebanese Law 117 of 1991, the Respondent was constituted as a joint stock company with the object of redeveloping the Beirut Central District, following the damage to that area sustained during the Lebanese civil war, which lasted from 1975 to 1990.  The Respondent is commonly known as Solidere.

2.5    The Respondent's last known principal place of business and address is Building 150, Marfaa, Saad Zaghloul Street, off Foch Street, P.O. Box 119493, Beirut, Lebanon.

2.6    The Respondent is represented in this arbitration by:

Dr. Ghaleb Mahmassani
Serhal Building
Cairo Street -- Hamra
Beirut
Lebanon
Tel:     (961 1) 349 777 - 349 988
Fax:    (961 1) 348 712

White & Case LLP
11 Boulevard de la Madeline
75001 Paris
France
Telephone:     +33(1)55041515
Fax:           +33(1)55041516
Attention:     Christopher R. Seppälä

## 3.    THE CONTRACT

3.1    The original Contract between the parties is comprised of four documents:

3

(a)    an agreement effective as of 25 January 1999 between the Claimant and the Respondent, including an Addendum No. 1 dated 18 February 1999, and an Addendum No. 2 dated 18 August 2000 ("the Agreement");

(b)    the General Conditions of Contract and all exhibits thereto ("GCC");

(c)    the Technical Conditions of Contract ("TCC"); and

(d)    the Rules, Procedures and Regulations for the Execution and Completion of Works.

3.2    A copy of the original Contract was attached as Annex 1 to the original Request for Arbitration dated 20 January 2006. In addition to the original Contract, there were amendments and further agreements between the parties that concerned performance under the Contract.

3.3    The site of the Works is commonly known as the Normandy Landfill. Between about 1975 and 1994, the Normandy Landfill site was used for the disposal of inert construction and demolition waste, municipal waste and unexploded ordnance. The Works, forming the subject matter of the parties' Contract, were part of a public works project to rehabilitate (or reclaim) the Normandy Landfill site at the behest of Lebanon's Council for Development and Reconstruction.

## 4.    THE AGREEMENT TO ARBITRATE

4.1    Clause 44 of the GCC provides:

"Settlement of Disputes

All disputes arising out of or in connection with the present Contract shall be finally settled under the Rules of the Conciliation and Arbitration of the International Chamber of Commerce in force as of 1st January 1998 by one or more arbitrators appointed in accordance with the said Rules.

The language of the arbitration shall be [E]nglish.

4

The place of arbitration shall be Paris."

**5.    JURISDICTION OVER THE CURRENT DISPUTE**

5.1    This is a dispute arising out of and in connection with the Contract. Specifically, this dispute concerns whether the Claimant's plans to remediate defects in the Works under the Contract comply with the Contract and whether the Claimant's proposed method for measuring compliance with final site quality requirements complies with the Contract. The dispute also concerns whether the Claimant is entitled to any economic or other relief from the terms of the Contract related to remediation of the defects in the Works. Finally, the dispute concerns the Respondent's Notice of Termination to the Claimant, which arises predominantly out of the parties' inability to agree on the proper plan of gas remediation.

**6.    APPLICABLE RULES OF LAW AND THE PLACE AND LANGUAGE OF THE ARBITRATION**

6.1    Pursuant to Clause 50 of the GCC, the Contract between the parties shall be governed by and construed in accordance with the laws of the Republic of Lebanon.

6.2    In accordance with Clause 44 of the GCC:

(a)    the place of the arbitration shall be Paris, France, and

(b)    the language of the arbitration shall be English.

**7.    THE APPOINTMENT OF THE ARBITRAL TRIBUNAL**

7.1    The Claimant proposes that this dispute be decided by three arbitrators.

7.2    Pursuant to Articles 4(3)(e) and 8(4) of the ICC Rules, the Claimant nominates as its party appointed arbitrator for confirmation by the ICC Court the Honorable Charles B. Renfrew, Law Office of Charles B. Renfrew, 710 Sansome Street, San Francisco, California, USA. Telephone: 1-415-397-3933. Facsimile: 1-415-397-7188.

5

7.3    The Claimant confirms that the Honorable Charles B. Renfrew is of United States nationality and to the best of the Claimant's knowledge and belief he is independent of the parties to the arbitration.

## 8.    SUMMARY OF CLAIMANT'S CASE

8.1    On 12 July 2004, the arbitration tribunal in the First Arbitration (the "First Arbitration Tribunal") issued the Award.  The Claimant submits this Request for Arbitration to resolve certain disputes arising under the Contract as to matters not resolved in connection with the First Arbitration, including disputes that arose after the First Arbitration Tribunal issued the Award and ceased to have jurisdiction.

8.2    In the First Arbitration, the First Arbitration Tribunal determined there was a defect in the Works involving gas emissions and required the Claimant to remedy the defect. Specifically, the Award provided:

- "There is a failure or defect in the Permanent Works and/or materials and/or workmanship within the meaning of the Contract as regards landfill gas emissions;

- The Permanent Works are not Fit for the Purpose, as defined in the Contract, as regards such emissions;

- Radian is liable to remedy the defects at no cost to SOLIDERE and to provide SOLIDERE with a plan showing how Radian propose that the Works will be completed so as to comply with the Contract;

- SOLIDERE is entitled to withhold payment of sums otherwise due to Radian;

- The parameters set forth in TC Table 3.1 apply to backfilled material and are to be measured after backfilling *in situ*."

(Award at § 12.1.)

8.3    The First Arbitration Tribunal expressly declined to rule on the issue of how contractual compliance with respect to gas emissions should be measured. The First Arbitration Tribunal concluded that the parties had yet to agree on methods of measuring gas emission compliance with the contractual Final Site Quality ("FSQ") requirements (*see* Award §§ 9.65, 9.79).   The First

6

Arbitration Tribunal stated that the Contract "was far from comprehensive in terms of specifying how compliance [with the contractual FSQ requirements] was to be demonstrated" (*id.* at § 9.41), but explicitly declined to determine the appropriate method of measuring gas emission compliance with the contractual requirements for FSQs, leaving the issue open and subject to the parties' further agreement. (*See id.* § 9.79.)

8.4    Additionally, the First Arbitration Tribunal made no ruling as to what form of remediation plan would comply with the Contract (*see id.* § 10.3, last sentence), and the First Arbitration Tribunal did not reserve jurisdiction to make such a determination.

8.5    Pursuant to the First Arbitration Award, the Claimant, in conjunction with several leading experts in the field and under the guidance of the Respondent's own experts, developed a series of comprehensive plans and detailed programmes designed to remediate landfill gas emissions and to complete the Works. The Claimant contends that its plans are compliant with the Contract. The Respondent, however, rejected each of the proposed plans, claiming they were noncompliant with the Contract and/or the Award.

8.6    The most recent version of the plan to remedy the defect in the Works and complete the Works was submitted to the Respondent on or about August 29, 2005 (the "August 2005 Plan"). The August 2005 Plan was largely the result of agreements reached between the Claimant and the Respondent through their appointed experts. Notwithstanding the agreements reached between the parties experts, the Respondent rejected the August 2005 Plan. Subsequently, the Claimant agreed to make certain modifications to the Plan to resolve certain of the Respondent's objections. The Respondent rejected the August 2005 Plan, as modified, contending the Plan does not comply with the Contract and/or the Award.

8.7    With regard to implementation of any plan of remediation, the Claimant contends it is entitled to economic and contractual relief pursuant to: (1) commercial impossibility; and/or (2) the Respondent's duty to mitigate its

7

damages; and/or (3) the *théorie de Imprévision*; and/or (4) changed economic circumstances ("*bouleversement des conditions économiques du contrat*").

8.8    The Claimant also contends that the Respondent's termination of the Contract, predominantly arising out of the above-described disagreement as to the proper implementation of gas remediation under the Contract and/or the Award, is wrongful because (1) the asserted grounds for termination lack merit and therefore, cannot justify termination for cause under GCC 35.2; and (2) the Notice of Termination, which must be considered a termination for convenience, is deficient under GCC 35.4.

## 9.    RELEVANT FACTS

**Respondent's Public Purposes in Reclaiming the Normandy Landfill Site and the Contract Designed to Implement These Public Purposes**

9.1    The Normandy Landfill Project site is located along the northern coast of Beirut, Lebanon. The area where the landfill is located is part of what is known as the Beirut Central District ("BCD") and is located next to a main sea-front avenue, "Avenue de Français." Between about 1975 and 1994, the Normandy Landfill site was used for the disposal of inert construction and demolition waste, municipal waste and unexploded ordnance, as well as all the debris of war.

9.2    Lebanon's Council for Development and Reconstruction ("CDR"), a public entity, determined as part of a public works project to rehabilitate (or reclaim) the Normandy Landfill site to create an approximately 20 acre park area and approximately 22 acres of buildable land.

9.3    A law passed in 1991 (the "1991 Law") provided that a 'real estate company' would "on behalf of, and at the expense of the State, and by virtue of an agreement between the company and the CDR (. . .) finance and ensure the execution of the infrastructure works such as the water, electricity and sewage networks, roads, sidewalks, electricity poles, parking lots, telecommunications as well as all of the public equipment and facilities in this area." Decree no.

8

5665, quoting Law no. 117/91 dated 7 December 1991 (the "1991 Law") (translated from the Arabic).

9.4   The 1991 Law was necessary because in Lebanon, the State is normally required by law to provide for such infrastructure works. Development and reconstruction of the Beirut Central District (the "BCD"), which includes the Claimant's Works under the Contract, could not proceed without such infrastructure works.   The 1991 law and ensuing decrees thus gave the Respondent a mandate to proceed with such infrastructure work in the BCD on behalf of the State, including the Works under the Contract.   Because the Lebanese government had no funds to compensate the Respondent for undertaking the needed public works in the BCD, a scheme was devised whereby the Respondent would receive as compensation a portion of the prime real estate land resulting from the land reclamation at the Normandy Landfill site.

9.5   Respondent was incorporated as a Lebanese joint stock company in May 1994. As the 1991 Law provided, the Respondent and the CDR entered into an agreement concerning the infrastructure works to be completed by the Respondent in the BCD, including on the Normandy Landfill site.   This agreement was signed on September 9, 1994 (the "1994 Agreement") and provides details as to the Respondent's mandate and means of compensation for completing certain public works (*see* Decree No. 5665, dated 21 September 1994, ratifying and excerpting the 1994 Agreement).   The Respondent therefore acts for or on behalf of CDR in carrying out the public works associated with the Normandy Landfill.

9.6   On January 25, 1999, the Claimant entered into a contract with the Respondent to make the Normandy Landfill site in Beirut suitable for a park area and for construction of high-end real estate projects.   The Claimant was hired to perform "Phase 2" of the remediation work at the Site. Phase 1 was completed from June 1996 to October 1997 and consisted of approximately 7 hectares closest to the city center. Phase 2 of the work was to include the remaining 22 hectares.   Under the Contract, the Claimant's responsibility was to excavate a 48 acre section of the landfill (approximately 5 million cubic meters), sort the

9

waste to remove unacceptable landfill materials for off-site disposal (such as metal and unexploded ordnance), treat the soil to reduce organic material to levels specified in the contract using a variety of technologies (low temperature thermal desorption, and composting), and backfill the treated material. W.A. Fairhurst International ("WAFI") served as the Respondent's construction manager for Phase 1 and continued to serve in the same role for part of Phase 2. Subsequently, WAFI was replaced as Respondent's construction manager for Phase 2 by Hornagold & Hills International, which is Respondent's current construction manager.

9.7    The CDR's approval was a condition precedent to the execution of the Contract between the Claimant and the Respondent: "The Contract shall be subject to the approval of the Council of Development and Reconstruction on the Tender Document." (Contract at Art. 8.) In addition, Clause 29.3 of the GCC provides that the Respondent "is entitled at any time to assign to any third party including the CDR . . . the benefit of the guarantees granted to the [Respondent] under the Contract."

9.8    The object of the Contract is to complete public works normally provided by the State. The 1994 Agreement between the Respondent and the CDR details the works to be undertaken on the Normandy Landfill and specifically describes the Works that were later undertaken by the Claimant under the Contract: "(a) Create a backfilled platform in the seabed, empty of waste and then discharge the contents of the dump on this platform after treatment of the waste, removal of the gases included in it and burning it."

9.9    The Contract specifications are based on a study and specifications prepared by the CDR and, to some extent, under its continued supervision as the Claimant is informed and believes that the Respondent has been and now continues providing the CDR with updates and reports in regard to progress of the Works.

9.10    The Respondent's public works at the Site are funded by the State through payment in kind of reclaimed land. Once completed, the public works at the Site will immediately revert back to the State except for the plots given to the

Respondent as payment in kind. According to the Preamble to the 1994 Agreement, as much as 65% of the total backfilled area on the Normandy site will eventually revert back to the State, while the Respondent will retain ownership of 35% of the Site.

**The Claimant's Plans for Completion of the Project and the Respondent's Approval Thereof**

9.11    During 1997 and 1998 the Respondent conducted negotiations with Claimant, for Phase 2 of the remediation works at the Normandy Landfill. In late 1998 the Respondent reached agreement on commercial and technical terms with the Claimant, which resulted in the Contract's execution.

9.12    Under the Contract, the Respondent originally agreed to pay the Claimant a fixed lump sum of US $53,075,000 to complete the Works. By amendment, the price was subsequently increased to US $56,632,500, plus a settlement amount of US $1,014,614. The time to complete the work was originally 54 months from the Notice to Proceed issued on 14 April 1999, which was subsequently extended to 60 months from the Notice to Proceed, or 14 April 2004.[1]

9.13    The level of remediation to be achieved under the Contract was expressed in terms of Final Site Quality (FSQ) criteria. Specifically, the FSQ criteria for flammable gas, carbon dioxide and oxygen are stated as <1%, 1.5%, and 18%-23% respectively. (*See* TCC 3.0(6).) The Contract does not specify how these volumetric criteria are to be measured. There is a further requirement for landfill gas that "[n]o specific precautions" for such gas would be required for building on the finished site. (*Id.*)

9.14    Pursuant to Clause 14.3 of the GCC, "No portion of the Works requiring a Contract Submittal shall be started until the Employer has returned to the Contractor the Contract Submittals pertaining thereto Approved to proceed as

---

[1]    The Claimant has made claims for additional compensation and additional time to complete the Works due to circumstances beyond its control, which the Respondent rejected and are the subject of the Suspended Arbitration. Those claims are unrelated to the issues in this arbitration.

11

indicated." The Claimant, as required by the Contract (*see* Clause 1.1 of the GCC, defining "Contract Submittal"), produced drafts of its Work Plan, QA/QC Plan, Environmental Monitoring Regime and Master Health and Safety Plan.

9.15    Upon the Respondent's approval of the Claimant's plans for Phase 2 implementation and issuance of the Notice to Proceed on 14 April 1999, the Claimant commenced its work under the Contract. By February 2001, the Claimant had completed a part of the Works, including excavation above and below sea level, sorting, screening and treatment of waste and back-filling certain areas.

9.16    TCC Table 3.3 provides the agreed treatment methods for excavated material. As a part of completing the Works, the Claimant carried out tests on treated excavated material to assure that the material met contractual requirements for backfilled material. In that regard, the Contract required that "Treated back-filled materials for use in the Permanent Works are not to have a visual appearance indicative of waste (i.e., plastics, etc.)." TCC Table 3.2. Further, Claimant's tests established that the backfilled material met the maximum total organic carbon content of less than 5%, as well as other final site quality requirements for material to be backfilled. *See* TCC Table 3.1.

**Gas Emissions and the Ensuing Dispute Regarding FSQ Compliance Measurement**

9.17    Notwithstanding Claimant's adherence to the agreed treatment methods and backfilling criteria, by letter dated 1 March 2001, the Respondent notified the Claimant of gas bubbles emerging from water overlying submerged backfill material in completed areas of the site.

9.18    The Claimant maintained that the emissions at issue did not violate the FSQs because under Claimant's interpretation of the Contract the FSQs for flammable gas, carbon dioxide and oxygen referred to indoor air quality criteria, to be measured in a laboratory as a proxy for inside buildings to be constructed, and they were not meant to be evaluated *in situ*. The Respondent, on the other hand, maintained that the FSQs were to be measured *in situ* in the

back-filled materials. It was undisputed between the parties that based on the level of gas emissions observed on site, if the FSQs for methane and carbon dioxide were to be measured *in situ* as Respondent maintained, the Permanent Works would not meet the Contract standards for the Permanent Works for an undetermined time into the future.

9.19    In April 2003, the parties agreed to submit to arbitration the issue of whether the FSQs for methane, carbon dioxide and oxygen were to be measured in a laboratory as in-door air quality standards (as Claimant contended) or *in situ* (as Respondent contended). A determination of the laboratory versus *in situ* measurement issue was outcome determinative as to whether the Permanent Works comply with Contract. Thus, if Claimant's position was adopted by the First Arbitration Tribunal, then the Permanent Works would be found in compliance with the Contract. Conversely, if Respondent's *in situ* position was adopted, it would be undisputed that there was thereby a defect in the Permanent Works.

**The First Arbitration Award and the Undecided Issues**

9.20    On 19 May 2003, the parties went to arbitration over the issue of gas emissions and where measurements should be made to determine compliance with FSQs. In July 2004, the First Arbitration Tribunal issued its Award. Although it expressly "accept[ed] . . . that there was no agreement or provision as to the way in which FSQs would be tested *in-situ*" (Award at § 9.58), the First Arbitration Tribunal determined that compliance with gas FSQs must have been intended to be measured *in situ*. (*See id.* at § 12.) As a consequence, the First Arbitration Tribunal determined there was a defect in the Works involving gas emissions, that the Permanent Works were not Fit for the Purpose as defined in the Contract, and that the Claimant was liable to remedy the defect in the Works. (*Id.*)

9.21    The First Arbitration Tribunal expressly refused to rule on the method for measuring the FSQs. The First Arbitration Tribunal emphasized that the Contract "was far from comprehensive in terms of specifying how compliance [with the contractual FSQ requirements] was to be demonstrated" (Award at § 9.41) and expressly declined to determine the appropriate method of

13

measuring gas emission compliance with the contractual requirements. (*See id.* at § 9.79.) Nor did the First Arbitration Tribunal determine how the gas emissions defect was to be remedied or how long it must take to remedy the defect. (*See id.* § 10.3, last sentence.) Instead, the First Arbitration Tribunal ordered Claimant "to provide Solidere [Respondent] with a plan showing how Radian [Claimant] propose that the Works will be completed so as to comply with the Contract." (*See id.* § 12.1).

9.22    The First Arbitration Tribunal did not retain jurisdiction to determine whether any plan Claimant may propose complies with the Contract. Nor did the First Arbitration Tribunal retain jurisdiction to resolve the manner in which the FSQs were to be measured *in situ*.

### The Claimant's Proposed Remediation Plan and Measurement Methods

9.23    Although Claimant believed the First Arbitration Tribunal's Award made near term compliance with the FSQs commercially impossible and technically impracticable, Claimant determined to make every effort to follow the requirements of the Award. In that regard, Claimant hired independent outside experts to assist in the preparation of a plan to propose to Respondent for the remediation of the defect in the Works and completion of the Site. On 29 September 2004, the Claimant submitted to the Respondent a proposal in response to the Award in the First Arbitration, including a revised detailed programme (the "Original Proposal"). The Original Proposal, though commercially an extraordinary burden, was technically reasonable and feasible to achieve the FSQs in due course, and thus the Original Proposal was fully compliant with the Contract.

9.24    The Claimant's Original Proposal set forth five treatment approaches to existing stockpiles of materials waiting to be backfilled: (1) no amendments; (2) adding water; (3) adding water in addition to macronutrients such as nitrogen, phosphorus and potassium; (4) adding water, in addition to macronutrients and nitrate; and (5) adding a chemical oxidant, in addition to water and macronutrients. (*See* Original Proposal at 6.) Once the Claimant interpreted the results and spike tested the treated materials, the Claimant

14

proposed to apply the appropriate treatment method(s) to the stockpiles. (*See id.*)

9.25    The Original Proposal explained that once the stockpiles are treated and backfilled, the Claimant would assess the Site to determine the need and scope of further treatment efforts. As stated in the Original Proposal, while there had been numerous gas-phase measurements made at the Site, there was very little reliable data about soil gas concentrations in the unsaturated zone. (*See* Original Proposal at 9.) Consequently, the Claimant also proposed to perform a one-time survey using temporary ground probes. (*See id.*)

9.26    The Original Proposal specified that $CH_4$ and $CO_2$ levels in the unsaturated zone would be measured by using gas monitoring wells, with the wells being concentrated where the one-time soil gas ground probe survey revealed $CH_4$ concentrations exceeding the FSQ for $CH_4$. (*See* Original Proposal at 9.) Gas pressure was to be measured as part of this assessment to determine if the Site is "Fit for the Purpose." (*Id.* at 11.) Finally, gas generation rates in the saturated zone were to be measured to fine-tune treatment approaches. (*See id.* at 12.)

9.27    As the Claimant intended to assess the gas concentration and gas generation rates using standard measurement methods, the Original Proposal provided for application of both passive and active venting, as appropriate, to "enhance the movement of $CH_4$ and $CO_2$ out of the unsaturated zone and into the atmosphere, and to enhance the infiltration of air into the soil." (Original Proposal at 13.) Venting would also enhance the "biological oxidation of $CH_4$ in the unsaturated zone." (*Id.*)

9.28    For areas where passive venting is more appropriate, the Claimant proposed to implement a trench system as laid out in the sample diagram submitted with the Original Proposal. (*See* Figure 3 of the Original Proposal.) Vertical vent pipes were to be added to maximize the draft in the venting system, and could be combined with "passive wind turbines for additional ventilation." (*Id.* at 14). The venting trenches were to be connected to the rock bunds, which reached to the bottom of the excavation. This process was designed to allow

15

gases that were generated in "the unsaturated and, to some extent, the saturated soils near the rock bunds" to escape.  (*Id.*)

9.29    For areas where active venting was appropriate, the Claimant proposed to use "a network of buried perforated or slotted pipe manifolded to a blower." (Original Proposal at 14.)  The Claimant planned "to install the slotted or perforated pipe horizontally on a gravel bed at the bottom of a trench."  (*Id.* at 15.)

9.30    As the Original Proposal further specified, the Claimant intended to measure pressure "for input into the risk assessment process necessary to determine whether the site was fit for its intended purpose." (Original Proposal at 11-12.) Pressure measurements were to be made as part of the measurements at each soil-gas monitoring well.  (*See id.* at 11.)

9.31    The Original Proposal was thus designed to treat the gas defect in a way designed to achieve the Fit for the Purpose requirement and meet the FSQs. As the Original Proposal emphasized, the methods proposed by the Claimant to achieve those goals must necessarily vary in the various sections of the Site depending on the results of the Claimant's tests.  As noted in the Original Proposal, the treatment was to focus on the unsaturated zone of the Site because the saturated zone pores are by definition saturated with moisture so that residual volumes of gas are minimal and will rise to the unsaturated zone. This assumption was supported by the measurements made of saturated soils that display minimal elevated gas pressures, which would suggest that the presence of trapped gases was insignificant.

**Solidere's Rejection of the Original Proposal**

9.32    Pursuant to GCC 1.1, the Original Proposal constituted a "Contract Submittal" and thus fell within the requirements of GC Article 14 concerning the submission of Contract Submittals to the Respondent for approval.  In that regard, GCC 14.3 mandated that "[n]o portion of the Works requiring a Contract Submittal shall be started until the Employer [Respondent] has returned to the Contract the Contract Submittals pertaining thereto Approved

to proceed as indicated." Accordingly, on 29 September 2004, the Claimant submitted the Original Proposal to the Respondent for approval.

9.33    On 27 October 2004, the Respondent rejected the Original Proposal on the following grounds, which the Claimant believes were not well taken:

(a)    *The Claimant's Original Proposal allegedly arbitrarily reduced the scope of remedial works to the unsaturated zone of the site.* This assertion ignored the terms of the Original Proposal, which in fact addressed both the saturated and unsaturated zones (while focusing on the latter), and recognized basic biological realities concerning the saturated zone rendering passive or active venting ineffective and not feasible to enhance remediation of the saturated zone.

(b)    *The Claimant's Original Proposal allegedly disregarded the finding of the Award as to the appropriate methodology of testing compliance with the FSQ criteria.* While the Claimant did not deem itself required to adopt any particular measurement method because the First Arbitration Tribunal expressly refused to rule on the issue, the Claimant's Original Proposal nonetheless incorporated both the borehole and spike testing suggested by one of the Respondent's own experts in addition to other methodologies typical in the landfill gas industry.

(c)    *The Claimant's Proposal allegedly required deletion of the oxygen FSQ.* As the Claimant explained in its Original Proposal, literal attainment of oxygen FSQ *in situ* either is meaningless or is scientifically impossible because, as interpreted by Respondent, it would require atmospheric levels of oxygen throughout the depth of the Site, including in zones fully or partially saturated with water. Although the Claimant proposed to modify the oxygen FSQ, in the alternative, the Claimant proposed that if Respondent wished to retain the oxygen FSQ, measurement of compliance with the oxygen FSQ could be made *in situ* at or near the surface, where there could be some possible relevance to the purposes of the Contract.

17

(d)    *The Respondent objected that Claimant's Original Proposal provided for contingencies that could affect the timing and duration of the Original Proposal.*  To meet industry standards for landfill gas remediation plans, the Claimant's Original Proposal accounted for contingencies that might affect the timing of the Original Proposal's implementation and completion.    The Claimant's remediation performance could be affected by a number of factors beyond its control, such as extreme weather conditions and sewage spills in areas that are not undergoing remediation.  Moreover, under even the best conditions, there remained uncertainties as to the prospective effectiveness of proposed remediation methods and the length of time it would take to complete remediation.

9.34    When the Respondent rejected the Claimant's Original Proposal, it did not correct the proposal or otherwise instruct the Claimant on how to proceed with the remediation of the Site.  Nor did the Respondent approve the Claimant to proceed under any part of the rejected proposal.  Accordingly, pursuant to GCC 14.3, the Claimant was prohibited from proceeding to remediate the Works.

**The Claimant's Alternative Proposals Based on the Respondent Experts'**
**Recommendations**

9.35    Although the Claimant was confident that its Original Proposal was fully compliant with the Contract, in a good faith effort to reach agreement on remediation and completion of the Works, the Claimant undertook development of alternatives to the Original Proposal.  With the Respondent's express approval, the Claimant held a series of meetings and comprehensive discussions with the Respondent's technical experts over the course of several months, which resulted in three alternative remediation plans proposed by the Claimant on 5 March 2005.  The revised proposals included the "Revised Proposed Measurement and Treatment Approaches for Final Site Quality Criteria" (the "FSQ Proposal"), the "Expedited Proposal for Site Completion" (the "Expedited Proposal"), and the "Revised Proposed Measurement and Treatment Approaches for Expedited Achievement of Final Site Quality

18

Criteria" (the "Third Way Proposal") (collectively, the "Alternative Proposals").

9.36 The Alternative Proposals were designed to provide alternatives to balance both the Respondent's insistence on expedition of the remediation process and the technical requirements of the Contract as envisioned by the Respondent's own experts. In this connection, while the FSQ Proposal retained many of the same treatment features as the Original Proposal, the Expedited Proposal and the Third Way Proposal, which -- upon the suggestion and approval of the Respondent's experts -- were ultimately combined into one "Unified" Plan, set forth an alternative and feasible approach to expedite compliance with the contractual requirements. (*See* Claimant's proposal dated 21 May 2005.)

9.37 Following further correspondence and discussions between the parties' experts, additional versions of the Plan were prepared, culminating in the August 2005 Plan. The August 2005 Plan, which was devised and substantially agreed by the parties' experts, abandoned the stockpile treatment portions of the Original Plan and included a system of handover markers designed to demonstrate a trend to eventual compliance with the FSQs. The handover markers allowed the Respondent to accept portions of the Site as "Fit for the Purpose" under the Contract, *i.e.*, safe for construction without specific precautions. The August 2005 Plan is thus fully compliant with both the Contract and the First Arbitration Tribunal's Award, while also satisfying the Respondent's stated desire to make the Site marketable on an expedited basis.

9.38 Specifically, the August 2005 Plan followed a protocol that addressed the following key issues: excavation completion, backfilling of stockpile materials and active *in situ* treatment, as required; site monitoring and *in situ* treatment optimization; and FSQ compliance or mutually agreed acceptance on "Fit for the Purpose" criteria based on "Handover Markers." (*See* August 2005 Plan, at 1.) In particular:

(a) The August 2005 Plan established a system of (as termed by the Respondents' experts) "Handover Markers".. Under the August 2005

19

Plan, a "Handover Marker" was defined as "parameters derived from Site measurements and relating to the whole Site or well-defined parts of the Site, which identifies a set of conditions which would not unduly delay or prevent commercial development on a former landfill remediated in accordance with best-practice." (August 2005 Plan, at 1.) The agreed purpose of the Handover Markers was to adopt a measure by which the stability of the ground in terms of gas concentrations could be readily assured without the need for immediate attainment of the Contract's FSQs. Although the Contract's FSQs would still be eventually met, it was and is not feasible to pinpoint the exact point in time when that would happen. The Handover Marker system was thus designed to accommodate the Respondent's stated need for expedited remediation and its acceptance of the completed Site, while guaranteeing the Works' eventual compliance with the Contract's FSQs. (*See* August 2005 Plan, at 4.)

(b)     The August 2005 Plan contemplated that two markers would be designated, Marker A and Marker B. For portions of the Site where Marker A is not achieved, the August 2005 Plan called for certain remediation methods. When Marker A is achieved, measurements would be taken to determine convergence to Marker B. If needed, additional remediation methods would be applied. When Marker B is achieved, it will signal that no new remediation techniques are required, that the affected portion of the Site is trending towards FSQ compliance, and that no specific precautions are required to build on that portion of the Site. (*See* August 2005 Plan § 4.4.)

(c)     The backfilling, monitoring, and *in situ* treatment portions in the August 2005 Plan remained largely unchanged from the Original Proposal. Thus, shallow and deep boreholes would still be used to monitor gas levels, and the venting techniques would be utilized for *in situ* treatment. One amendment from the Original Proposal is an agreement to measure for elevated pressure in the saturated soils and to perform pilot testing of potential treatment measures, as required.

(d)     Under the August 2005 Plan, universal compliance with the gas-related FSQ values would not be taken as the sole condition defining Fit for the Purpose. (*Cf.* Award at § 9.76 (holding that "[c]ompliance with the FSQ is, in view of the Tribunal, a necessary but not sufficient requirement to comply with the obligation to deliver the Works as land Fit for the Purpose").) "The key element [would] be a [subjective] risk assessment based on a conceptual site model that [would] take into account all actual and perceived gas-hazard related issues which are not bound by the FSQ completion [approach] criteria." (August 2005 Plan, at 10.) The August 2005 Plan contemplated that the Claimant would submit all findings to the Respondent in a Site Completion Report. The Report would also include post-completion contingency measures in the event of area defects or impact on future use.

**Solidere's Rejection of the August 2005 Plan and Notices of Default**

9.39    Despite the fact that the August 2005 Plan embodied a technical consensus reached by the Claimant's and Respondent's experts after months of extensive discussions and revisions -- indeed, despite the fact that the August 2005 Plan is largely based on the specific language suggested by the Respondent's experts -- and, furthermore, despite the Respondent's own assurances that the August 2005 Plan was indeed largely satisfactory, the Respondent nonetheless rejected the August 2005 Plan and denied that its experts had agreed to key portions of the plan.

9.40    Notwithstanding Respondent's rejection of the August 2005 Plan, the Claimant continued to attempt to reach agreement with the Respondent on the form of the plan. In that regard, the Claimant agreed to make a series of modifications to the Plan and sought an in-person meeting of the parties' experts and principals to reach a final agreement on the plan. When the Respondent resisted a meeting to resolve the outstanding issues, the Claimant on 7 December 2005 offered to implement site characterization portions of the plan while the parties worked to resolve the remaining technical issues. On 12 January 2006, the Respondent refused this offer.

9.41    At no time has Respondent approved any part of the August 2005 Plan, as amended, for implementation, with or without corrections. Nor has the Respondent at any time instructed the Claimant on its own plan for remediation and completion of the Works. Accordingly, pursuant to the express terms of the Contract, the Claimant has been prohibited from implementing the August 2005 Plan, as amended, or any part of it.

**The 12 January 2006 Default Notices**

9.42    On 12 January 2006, the Respondent issued three Notices of Default (labeled the 6th, 7th and 8th Notices of Default) relating to implementation of the Award from the First Arbitration and the defect in the Works. The Notices of Default purportedly were based on the Claimant's (1) failure to submit "'a plan showing how [you] propose that the Works will be completed so as to comply with the Contract,'" (2) "fail[ure] to diligently pursue the performance of the Contract," including refusal to implement a site characterization program; and (3) refusing to commit "as to the timing of the Completion of the Works."

9.43    On 20 January 2006, the Claimant responded to the Respondent's Notices of Default.

(a)    6th Notice of Default: *failure to submit "a plan showing how [you] propose that the Works will be completed so as to comply with the Contract"*. The Claimant stated that the 6th Notice of Default is baseless because the Claimant submitted several good faith, reasonable proposals showing how contractual compliance is to be achieved. In particular, the Claimant submitted proposals on 29 September 2004, 5 March 2005, 21 May 2005, 15 July 2005, 2 August 2005, and 29 August 2005, as amended.

(b)    7th Notice of Default: *failure "to diligently pursue the performance of the Contract (including the failure to perform any remediation trials)."* The Claimant stated that this 7th Notice of Default is baseless for three independent reasons. First, as set forth above, by the express terms of the Contract, the Claimant is prohibited from implementing its plan

22

unless and until it is approved by the Respondent. The Respondent never approved for implementation any part of any submitted plan.

Second, although the Respondent claimed that the 7th Notice of Default was also based on the Claimant's purported "unjustified decision to stop execution of the Works," the decision to stop execution of the Works, as the Claimant had explained in earlier correspondence, was fully justified by the Contract's *force majeure* provisions following the assassination of former Prime Minister Hariri near the project site. The Claimant decision not to resume the Works, in turn, was caused in the first instance by a continuing *force majeure* and in any event by the inability to proceed with any meaningful portion of the Works in the absence of the Respondent's approval of a plan for the remediation and completion of the Works. In that regard, stockpiles of treated, excavated material clog the Site. Unless and until the Respondent approves a plan for backfilling the stockpiles or instructs the Claimant on disposition of the stockpiles, the Claimant is unable to perform any meaningful work on the Site.

Third, the Respondent's claim that Claimant's supposed lack of diligence is embodied in the Claimant's failure to conduct remediation trials is belied by the Respondent's refusal to approve Radian's express request to begin to implement the site characterization portions of the August 2005 Plan, as amended. In that regard, on 7 December 2005, the Claimant requested the Respondent's approval to implement site characterization procedures under sections 3.2, 4.2.2 and 4.2.3 of the August 2005 Plan, as amended. Notwithstanding the Respondent's stated desire for site characterization to begin, the Respondent rejected the Claimant's request for approval of those portions of the August 2005 Plan, as amended.

(c)   8th Notice of Default: *refusing to commit "as to the timing of the Completion of the Works."* The Claimant stated that this 8th Notice of Default is baseless. Both parties' experts concur that at this time that it cannot be known when precisely the site conditions will achieve the

23

FSQs. Because the August 2005 Plan, as amended, provides for different remediation options depending on site conditions, the effects of the proposed remediation techniques must be monitored and adjusted depending on the actual results. Within the constraints of inherent uncertainties associated with any reasonable remediation plan, the Claimant provided an estimated schedule with the August 2005 Plan, as amended. The estimated schedule provides as much detail as reasonably permitted by the uncertainties at the Site.

9.44    Over the course of 18 months since the Award was issued, the Claimant submitted a series of Detailed Programmes and plans to remedy the defect in the Works and complete the project in accordance with the Contract. At no time did the Respondent approve the Claimant to proceed under any of the submitted plan or provide instructions of its own. Instead, the Respondent rejected each and every plan asserting that Contract Submittals do not comply with the Contract and/or the Award. Accordingly, an impasse was reached in the dispute between the parties as to whether the August 2005 Plan, as amended, or any of the other submitted plans, complied with the Contract and, if not, what modification must have been made to the plans to comply with the Contract.

9.45    Without resolution of the dispute concerning measurement methods and plan contract compliance, the Claimant was unable to complete the Works. The Claimant, however, was committed, ready and willing to implement the resulting plan once the dispute over the contents of the August 2005 Plan, as amended, was resolved and complete the Works in compliance with the Contract.

**The 10 February 2006 Termination Notice**

9.46    On 10 February 2006, the Respondent purported to terminate the Contract for cause. The asserted grounds for termination included the 12 January 2006 Notices of Default, which, as shown above, lacked any merit, as well as the Respondent's earlier Notices of Default that were deficient as follows:

(a)    1st Notice of Default: *"failure to submit a revised Detailed Programme."* This purported event of default was long-cured by the Claimant's submission on April 8, 2004 and subsequent submissions as detailed above.    Further updates to the Programme have been forestalled by the Respondent's unreasonable refusals to approve the Claimant's remediation and site completion proposals.

(b)    2nd Notice of Default: *"failure to complete the Works within the Time for Completion."*    This purported event of default was cured as provided under the Contract by the submission of a plan for site completion.    In addition, the time to complete the Works has been extended for, among other reasons, the matters set forth in section 8.7 above.

(c)    3rd Notice of Default: *"failure to implement the Award."* This purported event of default is duplicative of the above-described 6th Notice of Default and is meritless for the same reasons.

(d)    4th Notice of Default: *"unjustified decision to unilaterally stop execution of the Works."* This purported event of default is subsumed by the above-described 7th Notice of Default and fails for the same reasons.

(e)    5th Notice of Default: *" failure to provide and/or maintain insurance required by the Contract."*    This purported event of default is unjustified because (1) there is no material failure to maintain insurance required by the Contract and (2) to the extent it is determined that there are any technical defects in insurance coverage, Claimant has taken all reasonable steps to cure such defects. In any event, any failure to maintain insurance is insufficient to support termination for cause under the Contract.

9.47    Because, as set forth above, all the notified events of default were groundless and/or had been or were in the process of being cured at the time of the Notice of Termination, Respondent's Notice of Termination fails the for-cause standard of GCC 35.2.

25

9.48    Because there are insufficient grounds to terminate the Contract for cause under GCC 35.2, the Respondent's Notice of Termination must be deemed a termination "for convenience" under GCC 35.4. As such, the Respondent's Notice of Termination is defective because, among other things:

(a)    the Respondent failed to provide the Claimant with the required thirty (30) days written notice in advance of termination pursuant to GCC 35.4;

(b)    the Respondent failed to provide the Claimant with the amounts due to the Claimant for Works completed prior to the Notice of Termination pursuant to GCC 35.6;

(c)    the Respondent failed to pay reasonable demobilization costs and the value of any on-site equipment retained by the Respondent pursuant to GCC 35.6;

(d)    the Respondent failed to pay the Claimant 0.3% of the value of the Works which the Claimant was no longer required to perform pursuant to the Notice of Termination.

9.49    The Respondent's wrongful termination of the Claimant is in breach of the Contract and, therefore, constitutes an "Event of Employer's Default" under GCC 35.9. As such, the Claimant is entitled to terminate the Contract pursuant to GCC 35.9 and recover from the Respondent "for the full extent of any and all liabilities, loss and/or damage [ ] suffered by the [Claimant]" as a result of the Respondent's Notice of Termination under GCC 39.10.

**The Cost and Delay to Remedy the Defect in the Works**

9.50    Until the appearance of landfill gas in the Permanent Works and the subsequent decision of the First Arbitration Tribunal requiring *in situ* measurement of the FSQs, the Claimant was, subject to the approval of certain

26

requests for extension of time related to other matters, on schedule to complete the Works in a timely fashion.[2]

9.51    The Claimant's liability to remedy the defect in the Works has dramatically increased the cost and time to complete the Works. The Claimant estimates that the August 2005 Plan, as amended, would cost at least an additional US $16.5 million to carry out. In addition, due to the delay in the completion of the Works, the Respondent has claimed entitlement to damages for delay, including the approximately US $8.5 million liquidated damages provided for in the Contract.

## 10.    RELIEF SOUGHT

10.1    As a result of the foregoing, the Claimant seeks a determination and declaration that:

(a)    The Claimant's August 2005 Plan, as amended, or the other submitted plans, complies with the Contract or, in the alternative, a determination and declaration as to what amendments are required to cause the plans to comply with the Contract;

(b)    The measurement methods including in the Claimant's August 2005 Plan, as amended, comply with the Contract or, in the alternative, a determination and declaration as to what measurement methods comply with the Contract;

(c)    The Respondent's 10 February 2006 Notice of Termination is without basis as a for-cause termination or, in the alternative, the Claimant's conduct with regard to the subject matters included in the underlying Notices of Default, including the initiation of this arbitration, cures such Notices of Default.

---

[2]    The Claimant had made requests for additional time associated with other events beyond its control, including severe weather and encountering large quantities of plastics unanticipated when the Contract was formed. As noted above, those claims were rejected by the Respondent and are the subject of the Suspended Arbitration.

(d)     The Respondent's Notice of Termination is a termination "for convenience" and is deficient under the terms of the Contract.

(e)     The Claimant is entitled to and shall be awarded all available relief for a termination for convenience under the Contract.

(f)     The Claimant is entitled to economic and contractual relief from the burdens of meeting the FSQs and implementing any remediation and site completion plan.   The Claimant is further entitled to be compensated for losses arising from the Respondent's wrongful termination of the Contract.

(g)     This arbitration tribunal retains jurisdiction to resolve any disputes arising out of any relief awarded in this matter.

10.2    The Claimant seeks a further declaration that it is entitled to:

(a)     costs of arbitrating the claims herein, including the costs of legal representation and assistance;

(b)     such other relief as the Tribunal sees fit.

Dated: 20 February 2006

Respectfully submitted

Signed: _____

Skadden, Arps, Slate, Meagher & Flom LLP

300 South Grand Avenue

Los Angeles, CA 90071-3144

per Jeffrey H. Dasteel, Jason D. Russell and Marina V. Bogorad


Skadden, Arps, Slate, Meagher & Flom (UK) LLP

40 Bank Street

Canary Wharf

London E14 5DS

per Karyl Nairn

INTERNATIONAL CHAMBER OF COMMERCE
INTERNATIONAL COURT OF ARBITRATION

IN THE MATTER OF AN ARBITRATION
BETWEEN:

RADIAN INTERNATIONAL LLC

Claimant

and

THE LEBANESE COMPANY FOR THE DEVELOPMENT AND
RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT SAL
("SOLIDERE")

Respondent

FIRST AMENDED REQUEST FOR
ARBITRATION

Skadden, Arps, Slate, Meagher
& Flom (UK) LLP
40 Bank Street
Canary Wharf
London
E14 5DS

Reference: 14208/EC

**INTERNATIONAL CHAMBER OF COMMERCE**
**INTERNATIONAL COURT OF ARBITRATION**
**ICC Case No.**
**BETWEEN:**

## RADIAN INTERNATIONAL LLC

**Claimant**

**and**

## THE LEBANESE COMPANY FOR THE DEVELOPMENT AND RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT SAL ("SOLIDERE")

**Respondent**

---

### REQUEST FOR ARBITRATION

---

# TABLE OF CONTENTS

PAGE

1.  INTRODUCTION ...................................................................................1

2.  THE PARTIES...................................................................................2

    The Claimant......................................................................................2

    The Respondent ................................................................................3

3.  THE CONTRACT .............................................................................3

4.  THE AGREEMENT TO ARBITRATE .............................................4

5.  JURISDICTION OVER THE CURRENT DISPUTE............................4

6.  APPLICABLE RULES OF LAW AND THE PLACE AND
    LANGUAGE OF THE ARBITRATION ................................................4

7.  THE APPOINTMENT OF THE ARBITRAL TRIBUNAL ....................5

8.  SUMMARY OF CLAIMANT'S CASE ..................................................5

9.  RELEVANT FACTS .........................................................................7

    Respondent's Public Purposes in Reclaiming the Normandy Landfill Site and
        the Contract Designed to Implement These Public Purposes ......................7

    The Claimant's Plans for Completion of the Project and the Respondent's
        Approval Thereof.....................................................................................10

    Gas Emissions and the Ensuing Dispute Regarding FSQ Compliance
        Measurement............................................................................................11

    The First Arbitration Award and the Undecided Issues...........................12

    The Claimant's Proposed Remediation Plan and Measurement Methods ............13

    Solidere's Rejection of the Original Proposal .......................................15

    The Claimant's Alternative Proposals Based on the Respondent Experts'
        Recommendations...................................................................................17

    Solidere's Rejection of the August 2005 Plan and Notices of Default .................20

    The 12 January 2006 Default Notices..................................................21

    The Cost and Delay to Remedy the Defect in the Works ......................24

10. RELIEF SOUGHT.............................................................................24

## 1.    INTRODUCTION

1.1    This Request for Arbitration arises under a written agreement, effective as of 25 January 1999, by which the Respondent engaged the Claimant to carry out and complete certain works ("the Works") in that area of Beirut defined by Decree 2236 dated 19 February 1992, which includes the reclaimed land defined by Decree 4830 dated 4 March 1994 and Decree 5609 dated 3 September 1994, commonly known as the Normandy Landfill ("the Contract").

1.2    An earlier dispute arising out of the Contract was the subject of arbitration in ICC case number 12727/EC ("the First Arbitration"). The First Arbitration resulted in an award rendered on 12 July 2004 (the "Award"). Although some of the matters in this Request for Arbitration relate to the First Arbitration, the arbitration tribunal did not decide the issues presented here and did not reserve jurisdiction to do so.

1.3    A second arbitration was commenced on or about June 21, 2004 regarding issues unrelated to the First Arbitration or the issues raised in this Request for Arbitration (ICC case number 13341EC) (the "Suspended Arbitration"). In that regard, the First Arbitration Tribunal rejected the Claimant's application to add the claims in the Suspended Arbitration to the First Arbitration finding, in part, that "The new claims are of a wholly different character to the issues in the present reference." (Procedural Order, dated 21 June 2004). Although three arbitrators were selected for that proceeding, the case was suspended and the file was not transmitted to the arbitral tribunal. In addition, the arbitrator appointed by the Respondent resigned and has not been replaced. Accordingly, an arbitral tribunal is not currently constituted in the Suspended Arbitration. Although the Claimant is not pursuing the claims in the Suspended Arbitration at this time, the Claimant reserves the right to reactivate the Suspended Arbitration should circumstances regarding the issues raised in the Suspended Arbitration warrant it.

1.4    This Request for Arbitration is submitted on behalf of the Claimant and concerns issues unrelated to the Suspended Arbitration. This Request for

Arbitration relates to (1) contractual disputes arising out of the implementation of the First Arbitration Award, and (2) contract interpretation issues not decided in the First Arbitration, both of which require an analysis of fact and law independent of the disputes raised in the Suspended Arbitration and which were not decided in the First Arbitration.

## 2.    THE PARTIES

**The Claimant**

2.1    The Claimant, Radian International LLC, is a limited liability company incorporated under and in accordance with the laws of the State of Delaware in the United States of America ("Radian" or "the Claimant"). The Claimant's business includes the provision of design, engineering, technical and environmental services and contracting.

2.2    The Claimant's address in Beirut, Lebanon is:

P.O. Box 11-1261
Riad El Solh Beirut 1107 2080
Commercial Register No.:74673. Beirut
Tel/Fax: 01 983 575
Beirut - Lebanon

2.3    The Claimant is represented in this arbitration by:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California  90071
USA
Telephone:    +1 (213) 687 5000
Fax:          +1 (213) 621 5206
Attention:    Jeffrey H. Dasteel
              Jason D. Russell
              Marina V. Bogorad

Skadden, Arps, Slate, Meagher & Flom (UK) LLP
40 Bank Street
Canary Wharf
London
E14 5DS
England
Telephone:    +44(0)20-7519-7000

2

Fax:        +44(0)20-7519-7070
Attention:  Karyl Nairn

**The Respondent**

2.4    Based on and in accordance with Lebanese Law 117 of 1991, the Respondent was constituted as a joint stock company with the object of redeveloping the Beirut Central District, following the damage to that area sustained during the Lebanese civil war, which lasted from 1975 to 1990. The Respondent is commonly known as Solidere.

2.5    The Respondent's last known principal place of business and address is Building 150, Marfaa, Saad Zaghloul Street, off Foch Street, P.O. Box 119493, Beirut, Lebanon.

3.     **THE CONTRACT**

3.1    The original Contract between the parties is comprised of four documents:

(a)    an agreement effective as of 25 January 1999 between the Claimant and the Respondent, including an Addendum No. 1 dated 18 February 1999, and an Addendum No. 2 dated 18 August 2000 ("the Agreement");

(b)    the General Conditions of Contract and all exhibits thereto ("GCC");

(c)    the Technical Conditions of Contract ("TCC"); and

(d)    the Rules, Procedures and Regulations for the Execution and Completion of Works.

3.2    A copy of the original Contract is attached as Annex 1 hereto. In addition to the original Contract, there were amendments and further agreements between the parties that concerned performance under the Contract.

3.3    The site of the Works is commonly known as the Normandy Landfill. Between about 1975 and 1994, the Normandy Landfill site was used for the disposal of inert construction and demolition waste, municipal waste and unexploded ordnance. The Works, forming the subject matter of the parties'

3

Contract, were part of a public works project to rehabilitate (or reclaim) the Normandy Landfill site at the behest of Lebanon's Council for Development and Reconstruction.

## 4.    THE AGREEMENT TO ARBITRATE

4.1    Clause 44 of the GCC provides:

"Settlement of Disputes

All disputes arising out of or in connection with the present Contract shall be finally settled under the Rules of the Conciliation and Arbitration of the International Chamber of Commerce in force as of 1st January 1998 by one or more arbitrators appointed in accordance with the said Rules.

The language of the arbitration shall be [E]nglish.

The place of arbitration shall be Paris."

## 5.    JURISDICTION OVER THE CURRENT DISPUTE

5.1    This is a dispute arising out of and in connection with the Contract. Specifically, this dispute concerns whether the Claimant's plans to remediate defects in the Works under the Contract comply with the Contract and whether the Claimant's proposed method for measuring compliance with final site quality requirements complies with the Contract. In addition, the dispute concerns whether the Claimant is entitled to any economic or other relief from the terms of the Contract related to remediation of the defects in the Works.

## 6.    APPLICABLE RULES OF LAW AND THE PLACE AND LANGUAGE OF THE ARBITRATION

6.1    Pursuant to Clause 50 of the GCC, the Contract between the parties shall be governed by and construed in accordance with the laws of the Republic of Lebanon.

6.2    In accordance with Clause 44 of the GCC:

(a)    the place of the arbitration shall be Paris, France, and

4

(b)    the language of the arbitration shall be English.

## 7.    THE APPOINTMENT OF THE ARBITRAL TRIBUNAL

7.1    The Claimant proposes that this dispute be decided by three arbitrators.

7.2    Pursuant to Articles 4(3)(e) and 8(4) of the ICC Rules, the Claimant nominates as its party appointed arbitrator for confirmation by the ICC Court the Honorable Charles B. Renfrew, Law Office of Charles B. Renfrew, 710 Sansome Street, San Francisco, California, USA.    Telephone: 1-415-397-3933. Facsimile: 1-415-397-7188.

7.3    The Claimant confirms that the Honorable Charles B. Renfrew is of United States nationality and to the best of the Claimant's knowledge and belief he is independent of the parties to the arbitration.

## 8.    SUMMARY OF CLAIMANT'S CASE

8.1    On 12 July 2004, the arbitration tribunal in the First Arbitration (the "First Arbitration Tribunal") issued the Award.  The Claimant submits this Request for Arbitration to resolve certain disputes arising under the Contract as to matters not resolved in connection with the First Arbitration, including disputes that arose after the First Arbitration Tribunal issued the Award and ceased to have jurisdiction.

8.2    In the First Arbitration, the First Arbitration Tribunal determined there was a defect in the Works involving gas emissions and required the Claimant to remedy the defect. Specifically, the Award provided:

- "There is a failure or defect in the Permanent Works and/or materials and/or workmanship within the meaning of the Contract as regards landfill gas emissions;

- The Permanent Works are not Fit for the Purpose, as defined in the Contract, as regards such emissions;

- Radian is liable to remedy the defects at no cost to SOLIDERE and to provide SOLIDERE with a plan showing how Radian propose that the Works will be completed so as to comply with the Contract;

5

- SOLIDERE is entitled to withhold payment of sums otherwise due to Radian;

- The parameters set forth in TC Table 3.1 apply to backfilled material and are to be measured after backfilling *in situ*."

(Award at § 12.1.)

8.3    The First Arbitration Tribunal expressly declined to rule on the issue of how contractual compliance with respect to gas emissions should be measured. The First Arbitration Tribunal concluded that the parties had yet to agree on methods of measuring gas emission compliance with the contractual Final Site Quality ("FSQ") requirements (*see* Award §§ 9.65, 9.79). The First Arbitration Tribunal stated that the Contract "was far from comprehensive in terms of specifying how compliance [with the contractual FSQ requirements] was to be demonstrated" (*id.* at § 9.41), but explicitly declined to determine the appropriate method of measuring gas emission compliance with the contractual requirements for FSQs, leaving the issue open and subject to the parties' further agreement. (*See id.* § 9.79.)

8.4    Additionally, the First Arbitration Tribunal made no ruling as to what form of remediation plan would comply with the Contract (*see id.* § 10.3, last sentence), and the First Arbitration Tribunal did not reserve jurisdiction to make such a determination.

8.5    Pursuant to the First Arbitration Award, the Claimant, in conjunction with several leading experts in the field and under the guidance of the Respondent's own experts, developed a series of comprehensive plans and detailed programmes designed to remediate landfill gas emissions and to complete the Works. The Claimant contends that its plans are compliant with the Contract. The Respondent, however, rejected each of the proposed plans, claiming they were noncompliant with the Contract and/or the Award.

8.6    The most recent version of the plan to remedy the defect in the Works and complete the Works was submitted to the Respondent on or about August 29, 2005 (the "August 2005 Plan"). The August 2005 Plan was largely the result of agreements reached between the Claimant and the Respondent through their appointed experts. Notwithstanding the agreements reached between the

6

parties experts, the Respondent rejected the August 2005 Plan. Subsequently, the Claimant agreed to make certain modifications to the Plan to resolve certain of the Respondent's objections. The Respondent rejected the August 2005 Plan, as modified, contending the Plan does not comply with the Contract and/or the Award.

8.7    With regard to implementation of any plan of remediation, the Claimant contends it is entitled to economic and contractual relief pursuant to: (1) commercial impossibility; and/or (2) the Respondent's duty to mitigate its damages; and/or (3) the *théorie de Imprévision*; and/or (4) changed economic circumstances ("*bouleversement des conditions économiques du contrat*").

## 9.    RELEVANT FACTS

### Respondent's Public Purposes in Reclaiming the Normandy Landfill Site and the Contract Designed to Implement These Public Purposes

9.1    The Normandy Landfill Project site is located along the northern coast of Beirut, Lebanon. The area where the landfill is located is part of what is known as the Beirut Central District ("BCD") and is located next to a main sea-front avenue, "Avenue de Français." Between about 1975 and 1994, the Normandy Landfill site was used for the disposal of inert construction and demolition waste, municipal waste and unexploded ordnance, as well as all the debris of war.

9.2    Lebanon's Council for Development and Reconstruction ("CDR"), a public entity, determined as part of a public works project to rehabilitate (or reclaim) the Normandy Landfill site to create an approximately 20 acre park area and approximately 22 acres of buildable land.

9.3    A law passed in 1991 (the "1991 Law") provided that a 'real estate company' would "on behalf of, and at the expense of the State, and by virtue of an agreement between the company and the CDR (. . .) finance and ensure the execution of the infrastructure works such as the water, electricity and sewage networks, roads, sidewalks, electricity poles, parking lots, telecommunications as well as all of the public equipment and facilities in this area." Decree no.

7

5665, quoting Law no. 117/91 dated 7 December 1991 (the "1991 Law") (translated from the Arabic).

9.4    The 1991 Law was necessary because in Lebanon, the State is normally required by law to provide for such infrastructure works. Development and reconstruction of the Beirut Central District (the "BCD"), which includes the Claimant's Works under the Contract, could not proceed without such infrastructure works.    The 1991 law and ensuing decrees thus gave the Respondent a mandate to proceed with such infrastructure work in the BCD on behalf of the State, including the Works under the Contract.    Because the Lebanese government had no funds to compensate the Respondent for undertaking the needed public works in the BCD, a scheme was devised whereby the Respondent would receive as compensation a portion of the prime real estate land resulting from the land reclamation at the Normandy Landfill site.

9.5    Respondent was incorporated as a Lebanese joint stock company in May 1994. As the 1991 Law provided, the Respondent and the CDR entered into an agreement concerning the infrastructure works to be completed by the Respondent in the BCD, including on the Normandy Landfill site.    This agreement was signed on September 9, 1994 (the "1994 Agreement") and provides details as to the Respondent's mandate and means of compensation for completing certain public works (*see* Decree No. 5665, dated 21 September 1994, ratifying and excerpting the 1994 Agreement). The Respondent therefore acts for or on behalf of CDR in carrying out the public works associated with the Normandy Landfill.

9.6    On January 25, 1999, the Claimant entered into a contract with the Respondent to make the Normandy Landfill site in Beirut suitable for a park area and for construction of high-end real estate projects. The Claimant was hired to perform "Phase 2" of the remediation work at the Site. Phase 1 was completed from June 1996 to October 1997 and consisted of approximately 7 hectares closest to the city center. Phase 2 of the work was to include the remaining 22 hectares. Under the Contract, the Claimant's responsibility was to excavate a 48 acre section of the landfill (approximately 5 million cubic meters), sort the

8

waste to remove unacceptable landfill materials for off-site disposal (such as metal and unexploded ordnance), treat the soil to reduce organic material to levels specified in the contract using a variety of technologies (low temperature thermal desorption, and composting), and backfill the treated material. W.A. Fairhurst International ("WAFI") served as the Respondent's construction manager for Phase 1 and continued to serve in the same role for part of Phase 2. Subsequently, WAFI was replaced as Respondent's construction manager for Phase 2 by Hornagold & Hills International, which is Respondent's current construction manager.

9.7    The CDR's approval was a condition precedent to the execution of the Contract between the Claimant and the Respondent: "The Contract shall be subject to the approval of the Council of Development and Reconstruction on the Tender Document." (Contract at Art. 8.) In addition, Clause 29.3 of the GCC provides that the Respondent "is entitled at any time to assign to any third party including the CDR . . . the benefit of the guarantees granted to the [Respondent] under the Contract."

9.8    The object of the Contract is to complete public works normally provided by the State. The 1994 Agreement between the Respondent and the CDR details the works to be undertaken on the Normandy Landfill and specifically describes the Works that were later undertaken by the Claimant under the Contract: "(a) Create a backfilled platform in the seabed, empty of waste and then discharge the contents of the dump on this platform after treatment of the waste, removal of the gases included in it and burning it."

9.9    The Contract specifications are based on a study and specifications prepared by the CDR and, to some extent, under its continued supervision as the Claimant is informed and believes that the Respondent has been and now continues providing the CDR with updates and reports in regard to progress of the Works.

9.10   The Respondent's public works at the Site are funded by the State through payment in kind of reclaimed land. Once completed, the public works at the Site will immediately revert back to the State except for the plots given to the

Respondent as payment in kind. According to the Preamble to the 1994 Agreement, as much as 65% of the total backfilled area on the Normandy site will eventually revert back to the State, while the Respondent will retain ownership of 35% of the Site.

**The Claimant's Plans for Completion of the Project and the Respondent's Approval Thereof**

9.11    During 1997 and 1998 the Respondent conducted negotiations with Claimant, for Phase 2 of the remediation works at the Normandy Landfill. In late 1998 the Respondent reached agreement on commercial and technical terms with the Claimant, which resulted in the Contract's execution.

9.12    Under the Contract, the Respondent originally agreed to pay the Claimant a fixed lump sum of US $53,075,000 to complete the Works. By amendment, the price was subsequently increased to US $56,632,500, plus a settlement amount of US $1,014,614. The time to complete the work was originally 54 months from the Notice to Proceed issued on 14 April 1999, which was subsequently extended to 60 months from the Notice to Proceed, or 14 April 2004.[1]

9.13    The level of remediation to be achieved under the Contract was expressed in terms of Final Site Quality (FSQ) criteria. Specifically, the FSQ criteria for flammable gas, carbon dioxide and oxygen are stated as <1%, 1.5%, and 18%-23% respectively. (*See* TCC 3.0(6).) The Contract does not specify how these volumetric criteria are to be measured. There is a further requirement for landfill gas that "[n]o specific precautions" for such gas would be required for building on the finished site. (*Id.*)

9.14    Pursuant to Clause 14.3 of the GCC, "No portion of the Works requiring a Contract Submittal shall be started until the Employer has returned to the Contractor the Contract Submittals pertaining thereto Approved to proceed as

---

[1]    The Claimant has made claims for additional compensation and additional time to complete the Works due to circumstances beyond its control, which the Respondent rejected and are the subject of the Suspended Arbitration. Those claims are unrelated to the issues in this arbitration.

indicated." The Claimant, as required by the Contract (*see* Clause 1.1 of the GCC, defining "Contract Submittal"), produced drafts of its Work Plan, QA/QC Plan, Environmental Monitoring Regime and Master Health and Safety Plan.

9.15    Upon the Respondent's approval of the Claimant's plans for Phase 2 implementation and issuance of the Notice to Proceed on 14 April 1999, the Claimant commenced its work under the Contract. By February 2001, the Claimant had completed a part of the Works, including excavation above and below sea level, sorting, screening and treatment of waste and back-filling certain areas.

9.16    TCC Table 3.3 provides the agreed treatment methods for excavated material. As a part of completing the Works, the Claimant carried out tests on treated excavated material to assure that the material met contractual requirements for backfilled material. In that regard, the Contract required that "Treated back-filled materials for use in the Permanent Works are not to have a visual appearance indicative of waste (i.e., plastics, etc.)." TCC Table 3.2. Further, Claimant's tests established that the backfilled material met the maximum total organic carbon content of less than 5%, as well as other final site quality requirements for material to be backfilled. *See* TCC Table 3.1.

**Gas Emissions and the Ensuing Dispute Regarding FSQ Compliance Measurement**

9.17    Notwithstanding Claimant's adherence to the agreed treatment methods and backfilling criteria, by letter dated 1 March 2001, the Respondent notified the Claimant of gas bubbles emerging from water overlying submerged backfill material in completed areas of the site.

9.18    The Claimant maintained that the emissions at issue did not violate the FSQs because under Claimant's interpretation of the Contract the FSQs for flammable gas, carbon dioxide and oxygen referred to indoor air quality criteria, to be measured in a laboratory a proxy for inside buildings to be constructed, and they were not meant to be evaluated *in situ*. The Respondent, on the other hand, maintained that the FSQs were to be measured *in situ* in the

11

back-filled materials. It was undisputed between the parties that based on the level of gas emissions observed on site, if the FSQs for methane and carbon dioxide were to be measured *in situ* as Respondent maintained, the Permanent Works would not meet the Contract standards for the Permanent Works for an undetermined time into the future.

9.19    In April 2003, the parties agreed to submit to arbitration the issue of whether the FSQs for methane, carbon dioxide and oxygen were to be measured in a laboratory as in-door air quality standards (as Claimant contended) or *in situ* (as Respondent contended). A determination of the laboratory versus *in situ* measurement issue was outcome determinative as to whether the Permanent Works comply with Contract. Thus, if Claimant's position was adopted by the First Arbitration Tribunal, then the Permanent Works would be found in compliance with the Contract. Conversely, if Respondent's *in situ* position was adopted, it would be undisputed that there was thereby a defect in the Permanent Works.

**The First Arbitration Award and the Undecided Issues**

9.20    On 19 May 2003, the parties went to arbitration over the issue of gas emissions and where measurements should be made to determine compliance with FSQs. In July 2004, the First Arbitration Tribunal issued its Award. Although it expressly "accept[ed] . . . that there was no agreement or provision as to the way in which FSQs would be tested *in-situ*" (Award at § 9.58), the First Arbitration Tribunal determined that compliance with gas FSQs must have been intended to be measured *in situ*. (*See id.* at § 12.) As a consequence, the First Arbitration Tribunal determined there was a defect in the Works involving gas emissions, that the Permanent Works were not Fit for the Purpose as defined in the Contract, and that the Claimant was liable to remedy the defect in the Works. (*Id.*)

9.21    The First Arbitration Tribunal expressly refused to rule on the method for measuring the FSQs. The First Arbitration Tribunal emphasized that the Contract "was far from comprehensive in terms of specifying how compliance [with the contractual FSQ requirements] was to be demonstrated" (Award at § 9.41) and expressly declined to determine the appropriate method of

12

measuring gas emission compliance with the contractual requirements. (*See id.* at § 9.79.) Nor did the First Arbitration Tribunal determine how the gas emissions defect was to be remedied or how long it must take to remedy the defect. (*See id.* § 10.3, last sentence.) Instead, the First Arbitration Tribunal ordered Claimant "to provide Solidere [Respondent] with a plan showing how Radian [Claimant] propose that the Works will be completed so as to comply with the Contract." (*See id.* § 12.1).

9.22   The First Arbitration Tribunal did not retain jurisdiction to determine whether any plan Claimant may propose complies with the Contract. Nor did the First Arbitration Tribunal retain jurisdiction to resolve the manner in which the FSQs were to be measured *in situ*.

### The Claimant's Proposed Remediation Plan and Measurement Methods

9.23   Although Claimant believed the First Arbitration Tribunal's Award made near term compliance with the FSQs commercially impossible and technically impracticable, Claimant determined to make every effort to follow the requirements of the Award. In that regard, Claimant hired independent outside experts to assist in the preparation of a plan to propose to Respondent for the remediation of the defect in the Works and completion of the Site. On 29 September 2004, the Claimant submitted to the Respondent a proposal in response to the Award in the First Arbitration, including a revised detailed programme (the "Original Proposal"). The Original Proposal, though commercially an extraordinary burden, was technically reasonable and feasible to achieve the FSQs in due course, and thus the Original Proposal was fully compliant with the Contract.

9.24   The Claimant's Original Proposal set forth five treatment approaches to existing stockpiles of materials waiting to be backfilled: (1) no amendments; (2) adding water; (3) adding water in addition to macronutrients such as nitrogen, phosphorus and potassium; (4) adding water, in addition to macronutrients and nitrate; and (5) adding a chemical oxidant, in addition to water and macronutrients. (*See* Original Proposal at 6.) Once the Claimant interpreted the results and spike tested the treated materials, the Claimant

13

proposed to apply the appropriate treatment method(s) to the stockpiles. (*See id.*)

9.25    The Original Proposal explained that once the stockpiles are treated and backfilled, the Claimant would assess the Site to determine the need and scope of further treatment efforts. As stated in the Original Proposal, while there had been numerous gas-phase measurements made at the Site, there was very little reliable data about soil gas concentrations in the unsaturated zone. (*See* Original Proposal at 9.) Consequently, the Claimant also proposed to perform a one-time survey using temporary ground probes. (*See id.*)

9.26    The Original Proposal specified that $CH_4$ and $CO_2$ levels in the unsaturated zone would be measured by using gas monitoring wells, with the wells being concentrated where the one-time soil gas ground probe survey revealed $CH_4$ concentrations exceeding the FSQ for $CH_4$. (*See* Original Proposal at 9.) Gas pressure was to be measured as part of this assessment to determine if the Site is "Fit for the Purpose." (*Id.* at 11.) Finally, gas generation rates in the saturated zone were to be measured to fine-tune treatment approaches. (*See id.* at 12.)

9.27    As the Claimant intended to assess the gas concentration and gas generation rates using standard measurement methods, the Original Proposal provided for application of both passive and active venting, as appropriate, to "enhance the movement of $CH_4$ and $CO_2$ out of the unsaturated zone and into the atmosphere, and to enhance the infiltration of air into the soil." (Original Proposal at 13.) Venting would also enhance the "biological oxidation of $CH_4$ in the unsaturated zone." (*Id.*)

9.28    For areas where passive venting is more appropriate, the Claimant proposed to implement a trench system as laid out in the sample diagram submitted with the Original Proposal. (*See* Figure 3 of the Original Proposal.) Vertical vent pipes were to be added to maximize the draft in the venting system, and could be combined with "passive wind turbines for additional ventilation." (*Id.* at 14) The venting trenches were to be connected to the rock bunds, which reached to the bottom of the excavation. This process was designed to allow

gases that were generated in "the unsaturated and, to some extent, the saturated soils near the rock bunds" to escape. (*Id.*)

9.29    For areas where active venting was appropriate, the Claimant proposed to use "a network of buried perforated or slotted pipe manifolded to a blower." (Original Proposal at 14.)  The Claimant planned "to install the slotted or perforated pipe horizontally on a gravel bed at the bottom of a trench." (*Id.* at 15.)

9.30    As the Original Proposal further specified, the Claimant intended to measure pressure "for input into the risk assessment process necessary to determine whether the site was fit for its intended purpose." (Original Proposal at 11-12.) Pressure measurements were to be made as part of the measurements at each soil-gas monitoring well. (*See id.* at 11.)

9.31    The Original Proposal was thus designed to treat the gas defect in a way designed to achieve the Fit for the Purpose requirement and meet the FSQs. As the Original Proposal emphasized, the methods proposed by the Claimant to achieve those goals must necessarily vary in the various sections of the Site depending on the results of the Claimant's tests.  As noted in the Original Proposal, the treatment was to focus on the unsaturated zone of the Site because the saturated zone pores are by definition saturated with moisture so that residual volumes of gas are minimal and will rise to the unsaturated zone. This assumption was supported by the measurements made of saturated soils that display minimal elevated gas pressures, which would suggest that the presence of trapped gases was insignificant.

### Solidere's Rejection of the Original Proposal

9.32    Pursuant to GCC 1.1, the Original Proposal constituted a "Contract Submittal" and thus fell within the requirements of GC Article 14 concerning the submission of Contract Submittals to the Respondent for approval.  In that regard, GCC 14.3 mandated that "[n]o portion of the Works requiring a Contract Submittal shall be started until the Employer [Respondent] has returned to the Contract the Contract Submittals pertaining thereto Approved

to proceed as indicated." Accordingly, on 29 September 2004, the Claimant submitted the Original Proposal to the Respondent for approval.

9.33   On 27 October 2004, the Respondent rejected the Original Proposal on the following grounds, which the Claimant believes were not well taken:

(a)   *The Claimant's Original Proposal allegedly arbitrarily reduced the scope of remedial works to the unsaturated zone of the site.* This assertion ignored the terms of the Original Proposal, which in fact addressed both the saturated and unsaturated zones (while focusing on the latter), and recognized basic biological realities concerning the saturated zone rendering passive or active venting ineffective and not feasible to enhance remediation of the saturated zone.

(b)   *The Claimant's Original Proposal allegedly disregarded the finding of the Award as to the appropriate methodology of testing compliance with the FSQ criteria.* While the Claimant did not deem itself required to adopt any particular measurement method because the First Arbitration Tribunal expressly refused to rule on the issue, the Claimant's Original Proposal nonetheless incorporated both the borehole and spike testing suggested by one of the Respondent's own experts in addition to other methodologies typical in the landfill gas industry.

(c)   *The Claimant's Proposal allegedly required deletion of the oxygen FSQ.* As the Claimant explained in its Original Proposal, literal attainment of oxygen FSQ *in situ* either is meaningless or is scientifically impossible because, as interpreted by Respondent, it would require atmospheric levels of oxygen throughout the depth of the Site, including in zones fully or partially saturated with water. Although the Claimant proposed to modify the oxygen FSQ, in the alternative, the Claimant proposed that if Respondent wished to retain the oxygen FSQ, measurement of compliance with the oxygen FSQ could be made *in situ* at or near the surface, where there could be some possible relevance to the purposes of the Contract.

16

(d)     *The Respondent objected that Claimant's Original Proposal provided for contingencies that could affect the timing and duration of the Original Proposal.*  To meet industry standards for landfill gas remediation plans, the Claimant's Original Proposal accounted for contingencies that might affect the timing of the Original Proposal's implementation and completion.  The Claimant's remediation performance could be affected by a number of factors beyond its control, such as extreme weather conditions and sewage spills in areas that are not undergoing remediation.  Moreover, under even the best conditions, there remained uncertainties as to the prospective effectiveness of proposed remediation methods and the length of time it would take to complete remediation.

9.34    When the Respondent rejected the Claimant's Original Proposal, it did not correct the proposal or otherwise instruct the Claimant on how to proceed with the remediation of the Site.  Nor did the Respondent approve the Claimant to proceed under any part of the rejected proposal.  Accordingly, pursuant to GCC 14.3, the Claimant was prohibited from proceeding to remediate the Works.

**The Claimant's Alternative Proposals Based on the Respondent Experts' Recommendations**

9.35    Although the Claimant was confident that its Original Proposal was fully compliant with the Contract, in a good faith effort to reach agreement on remediation and completion of the Works, the Claimant undertook development of alternatives to the Original Proposal.  With the Respondent's express approval, the Claimant held a series of meetings and comprehensive discussions with the Respondent's technical experts over the course of several months, which resulted in three alternative remediation plans proposed by the Claimant on 5 March 2005. The revised proposals included the "Revised Proposed Measurement and Treatment Approaches for Final Site Quality Criteria" (the "FSQ Proposal"), the "Expedited Proposal for Site Completion" (the "Expedited Proposal"), and the "Revised Proposed Measurement and Treatment Approaches for Expedited Achievement of Final Site Quality

17

Criteria" (the "Third Way Proposal") (collectively, the "Alternative Proposals").

9.36   The Alternative Proposals were designed to provide alternatives to balance both the Respondent's insistence on expedition of the remediation process and the technical requirements of the Contract as envisioned by the Respondent's own experts. In this connection, while the FSQ Proposal retained many of the same treatment features as the Original Proposal, the Expedited Proposal and the Third Way Proposal, which -- upon the suggestion and approval of the Respondent's experts -- were ultimately combined into one "Unified" Plan, set forth an alternative and feasible approach to expedite compliance with the contractual requirements. (*See* Claimant's proposal dated 21 May 2005.)

9.37   Following further correspondence and discussions between the parties' experts, additional versions of the Plan were prepared, culminating in the August 2005 Plan.   The August 2005 Plan, which was devised and substantially agreed by the parties' experts, abandoned the stockpile treatment portions of the Original Plan and included a system of handover markers designed to demonstrate a trend to eventual compliance with the FSQs. The handover markers allowed the Respondent to accept portions of the Site as "Fit for the Purpose" under the Contract, *i.e.*, safe for construction without specific precautions. The August 2005 Plan is thus fully compliant with both the Contract and the First Arbitration Tribunal's Award, while also satisfying the Respondent's stated desire to make the Site marketable on an expedited basis.

9.38   Specifically, the August 2005 Plan followed a protocol that addressed the following key issues:   excavation completion,   backfilling of stockpile materials and active *in situ* treatment, as required; site monitoring and *in situ* treatment optimization; and FSQ compliance or mutually agreed acceptance on "Fit for the Purpose" criteria based on "Handover Markers." (*See* August 2005 Plan, at 1.) In particular:

(a)   The August 2005 Plan established a system of (as termed by the Respondents' experts) "Handover Markers".   Under the August 2005

Plan, a "Handover Marker" was defined as "parameters derived from Site measurements and relating to the whole Site or well-defined parts of the Site, which identifies a set of conditions which would not unduly delay or prevent commercial development on a former landfill remediated in accordance with best-practice." (August 2005 Plan, at 1.) The agreed purpose of the Handover Markers was to adopt a measure by which the stability of the ground in terms of gas concentrations could be readily assured without the need for immediate attainment of the Contract's FSQs. Although the Contract's FSQs would still be eventually met, it was and is not feasible to pinpoint the exact point in time when that would happen. The Handover Marker system was thus designed to accommodate the Respondent's stated need for expedited remediation and its acceptance of the completed Site, while guaranteeing the Works' eventual compliance with the Contract's FSQs. (*See* August 2005 Plan, at 4.)

(b)     The August 2005 Plan contemplated that two markers would be designated, Marker A and Marker B. For portions of the Site where Marker A is not achieved, the August 2005 Plan called for certain remediation methods. When Marker A is achieved, measurements would be taken to determine convergence to Marker B. If needed, additional remediation methods would be applied. When Marker B is achieved, it will signal that no new remediation techniques are required, that the affected portion of the Site is trending towards FSQ compliance, and that no specific precautions are required to build on that portion of the Site. (*See* August 2005 Plan § 4.4.)

(c)     The backfilling, monitoring, and *in situ* treatment portions in the August 2005 Plan remained largely unchanged from the Original Proposal. Thus, shallow and deep boreholes would still be used to monitor gas levels, and the venting techniques would be utilized for *in situ* treatment. One amendment from the Original Proposal is an agreement to measure for elevated pressure in the saturated soils and to perform pilot testing of potential treatment measures, as required.

19

(d)    Under the August 2005 Plan, universal compliance with the gas-related FSQ values would not be taken as the sole condition defining Fit for the Purpose. (*Cf.* Award at § 9.76 (holding that "[c]ompliance with the FSQ is, in view of the Tribunal, a necessary but not sufficient requirement to comply with the obligation to deliver the Works as land Fit for the Purpose").) "The key element [would] be a [subjective] risk assessment based on a conceptual site model that [would] take into account all actual and perceived gas-hazard related issues which are not bound by the FSQ completion [approach] criteria." (August 2005 Plan, at 10.) The August 2005 Plan contemplated that the Claimant would submit all findings to the Respondent in a Site Completion Report. The Report would also include post-completion contingency measures in the event of area defects or impact on future use.

### Solidere's Rejection of the August 2005 Plan and Notices of Default

9.39    Despite the fact that the August 2005 Plan embodied a technical consensus reached by the Claimant's and Respondent's experts after months of extensive discussions and revisions -- indeed, despite the fact that the August 2005 Plan is largely based on the specific language suggested by the Respondent's experts -- and, furthermore, despite the Respondent's own assurances that the August 2005 Plan was indeed largely satisfactory, the Respondent nonetheless rejected the August 2005 Plan and denied that its experts had agreed to key portions of the plan.

9.40    Notwithstanding Respondent's rejection of the August 2005 Plan, the Claimant continued to attempt to reach agreement with the Respondent on the form of the plan. In that regard, the Claimant agreed to make a series of modifications to the Plan and sought an in-person meeting of the parties' experts and principals to reach a final agreement on the plan. When the Respondent resisted a meeting to resolve the outstanding issues, the Claimant on 7 December 2005 offered to implement site characterization portions of the plan while the parties worked to resolve the remaining technical issues. On 12 January 2006, the Respondent refused this offer.

9.41    At no time has Respondent approved any part of the August 2005 Plan, as amended, for implementation, with or without corrections. Nor has the Respondent at any time instructed the Claimant on its own plan for remediation and completion of the Works. Accordingly, pursuant to the express terms of the Contract, the Claimant has been prohibited from implementing the August 2005 Plan, as amended, or any part of it.

**The 12 January 2006 Default Notices**

9.42    On 12 January 2006, the Respondent issued three Notices of Default (labeled the 6th, 7th and 8th Notices of Default) relating to implementation of the Award from the First Arbitration and the defect in the Works. The Notices of Default purportedly were based on the Claimant's (1) failure to submit "'a plan showing how [you] propose that the Works will be completed so as to comply with the Contract'"; (2) "fail[ure] to diligently pursue the performance of the Contract," including refusal to implement a site characterization program; and (3) refusing to commit "as to the timing of the Completion of the Works."

9.43    On 20 January 2006, the Claimant responded to the Respondent's Notices of Default.

(a)    6th Notice of Default: *failure to submit "'a plan showing how [you] propose that the Works will be completed so as to comply with the Contract'".* The Claimant stated that the 6th Notice of Default is baseless because the Claimant submitted several good faith, reasonable proposals showing how contractual compliance is to be achieved. In particular, the Claimant submitted proposals on 29 September 2004, 5 March 2005, 21 May 2005, 15 July 2005, 2 August 2005, and 29 August 2005, as amended.

(b)    7th Notice of Default: *failure "to diligently pursue the performance of the Contract (including the failure to perform any remediation trials)."* The Claimant stated that this 7th Notice of Default is baseless for three independent reasons. First, as set forth above, by the express terms of the Contract, the Claimant is prohibited from implementing its plan

21

unless and until it is approved by the Respondent. The Respondent never approved for implementation any part of any submitted plan.

Second, although the Respondent claimed that the 7th Notice of Default was also based on the Claimant's purported "unjustified decision to stop execution of the Works," the decision to stop execution of the Works, as the Claimant had explained in earlier correspondence, was fully justified by the Contract's *force majeure* provisions following the assassination of former Prime Minister Hariri near the project site. The Claimant decision not to resume the Works, in turn, was caused in the first instance by a continuing *force majeure* and in any event by the inability to proceed with any meaningful portion of the Works in the absence of the Respondent's approval of a plan for the remediation and completion of the Works. In that regard, stockpiles of treated, excavated material clog the Site. Unless and until the Respondent approves a plan for backfilling the stockpiles or instructs the Claimant on disposition of the stockpiles, the Claimant is unable to perform any meaningful work on the Site.

Third, the Respondent's claim that Claimant's supposed lack of diligence is embodied in the Claimant's failure to conduct remediation trials is belied by the Respondent's refusal to approve Radian's express request to begin to implement the site characterization portions of the August 2005 Plan, as amended. In that regard, on 7 December 2005, the Claimant requested the Respondent's approval to implement site characterization procedures under sections 3.2, 4.2.2 and 4.2.3 of the August 2005 Plan, as amended. Notwithstanding the Respondent's stated desire for site characterization to begin, the Respondent rejected the Claimant's request for approval of those portions of the August 2005 Plan, as amended.

(c)    8th Notice of Default: *refusing to commit "as to the timing of the Completion of the Works."* The Claimant stated that this 8th Notice of Default is baseless. Both parties' experts concur that at this time that it cannot be known when precisely the site conditions will achieve the

FSQs. Because the August 2005 Plan, as amended, provides for different remediation options depending on site conditions, the effects of the proposed remediation techniques must be monitored and adjusted depending on the actual results. Within the constraints of inherent uncertainties associated with any reasonable remediation plan, the Claimant provided an estimated schedule with the August 2005 Plan, as amended. The estimated schedule provides as much detail as reasonably permitted by the uncertainties at the Site.

9.44    Over the course of 18 months since the Award was issued, the Claimant submitted a series of Detailed Programmes and plans to remedy the defect in the Works and complete the project in accordance with the Contract. At no time did the Respondent approve the Claimant to proceed under any of the submitted plan or provide instructions of its own. Instead, the Respondent rejected each and every plan asserting that Contract Submittals do not comply with the Contract and/or the Award. Accordingly, there now exists an impasse in the dispute between the parties as to whether the August 2005 Plan, as amended, or any of the other submitted plans, complies with the Contract and, if not, what modification must be made to the plants to comply with the Contract.

9.45    Unless the dispute concerning measurement methods and plan contract compliance is resolved, the Claimant will be unable to complete the Works. When this dispute over the contents of the August 2005 Plan, as amended, is resolved, the Claimant will implement the resulting plan and complete the Works in compliance with the Contract.

**The Cost and Delay to Remedy the Defect in the Works**

9.46    Until the appearance of landfill gas in the Permanent Works and the subsequent decision of the First Arbitration Tribunal requiring *in situ* measurement of the FSQs, the Claimant was, subject to the approval of certain requests for extension of time related to other matters, on schedule to complete the Works in a timely fashion.[2]

9.47    The Claimant's liability to remedy the defect in the Works has dramatically increased the cost and time to complete the Works. The Claimant estimates that the August 2005 Plan, as amended, will cost at least an additional US $16.5 million to carry out. In addition, due to the delay in the completion of the Works, the Respondent has claimed entitlement to damages for delay, including the approximately US $8.5 million liquidated damages provided for in the Contract.

## 10.    RELIEF SOUGHT

10.1    As a result of the foregoing, the Claimant seeks a determination and declaration that:

(a)    The Claimant's August 2005 Plan, as amended, or the other submitted plans, complies with the Contract or, in the alternative, a determination and declaration as to what amendments are required to cause the plans to comply with the Contract;

(b)    The measurement methods including in the Claimant's August 2005 Plan, as amended, comply with the Contract or, in the alternative, a determination and declaration as to what measurement methods comply with the Contract;

---

[2]    The Claimant had made requests for additional time associated with other events beyond its control, including severe weather and encountering large quantities of plastics unanticipated when the Contract was formed. As noted above, those claims were rejected by the Respondent and are the subject of the Suspended Arbitration.

(c)    The Respondent's 12 January 2006 Notices of Default are without basis or, in the alternative, the Claimant's conduct with regard to the subject matters included in the Notices of Default, including the initiation of this arbitration, cures such Notices of Default.

(d)    The Claimant is entitled to economic and contractual relief from the burdens of meeting the FSQs and implementing any remediation and site completion plan.

(e)    This arbitration tribunal retains jurisdiction to resolve any disputes arising out of any relief awarded in this matter.

10.2    The Claimant seeks a further declaration that it is entitled to

(a)    costs of arbitrating the claims herein, including the costs of legal representation and assistance;

(b)    such other relief as the Tribunal sees fit.

Dated: 20 January 2006

Respectfully submitted

Signed:   *M. Bogorad*

Skadden, Arps, Slate, Meagher & Flom LLP

300 South Grand Avenue

Los Angeles, CA 90071-3144

per Jeffrey H. Dasteel, Jason D. Russell and Marina V. Bogorad

Skadden, Arps, Slate, Meagher & Flom (UK) LLP

40 Bank Street

Canary Wharf

London E14 5DS

per Karyl Nairn

INTERNATIONAL CHAMBER OF COMMERCE
INTERNATIONAL COURT OF ARBITRATION

IN THE MATTER OF AN ARBITRATION
BETWEEN:

RADIAN INTERNATIONAL LLC

Claimant

and

THE LEBANESE COMPANY FOR THE DEVELOPMENT AND
RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT SAL
("SOLIDERE")

Respondent

REQUEST FOR ARBITRATION

Skadden, Arps, Slate, Meagher
& Flom (UK) LLP
40 Bank Street
Canary Wharf
London
E14 5DS

Reference:

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 0 6 - 4 1 5 _____

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ COPIES OF AO FORM 85.

_6-30-06_____

(Date forms issued)

_____
(Signature of Party or their Representative)

_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action

O( — 415

## CIVIL COVER SHEET

JS 44 (Rev. 11/04)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS

URS Corporation

**(b)** County of Residence of First Listed Plaintiff    New Castle
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Edward P. Welch, Edward B. Micheletti, Skadden Arps, State, Meagher & Flom LLP, One Rodney Square P.O. Box 636, Wilmington, Delaware 191899. Tel. 302-651-3001

### DEFENDANTS
The Lebanese Company for the Development and Reconstruction of Beirut Central District S.A.L. a/k/a Solidere
County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐X 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐X 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐X 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐X 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
  Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐X 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

### V. ORIGIN (Place an "X" in One Box Only)

☐X 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332(a)(2), 9 U.S.C. 201 et seq., 28 U.S.C. 1603 et seq.
Brief description of cause:
Injunctive and declaratory relief against arbitration by non-signatory

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐X No

### VIII. RELATED CASE(S) IF ANY
(See instructions)

JUDGE

DOCKET NUMBER

DATE  6/30/06

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE