IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------- x
URS CORPORATION                          )
                                         )
             Plaintiff,                  )
                                         )
      v.                                 )
                                         )  Civil Action No. 06-415-SLR
THE LEBANESE COMPANY FOR THE             )
DEVELOPMENT AND RECONSTRUCTION           )
OF BEIRUT CENTRAL DISTRICT, S.A.L.,      )
a/k/a SOLIDERE,                          )
                                         )
             Defendant.                  )
------------------------------------------------- x
```

## OPENING BRIEF IN SUPPORT OF DEFENDANT SOLIDERE'S MOTION TO DISMISS THE COMPLAINT

WHITE & CASE LLP

Paul B. Carberry (admitted *pro hac vice*)
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8507
pcarberry@whitecase.com

RICHARDS, LAYTON & FINGER, P.A.

Samuel A. Nolen (#971)
Matthew W. King (#4566)
One Rodney Square
Wilmington, DE 19899-0551
P.O. Box 551
302-651-7700
Nolen@rlf.com
King@rlf.com

*Attorneys for Defendant The Lebanese Company for the Development and Reconstruction of Beirut Central District, S.A.L. a/k/a SOLIDERE*

Dated: October 16, 2006

## Table of Contents

Page

TABLE OF AUTHORITIES ............................................................................................ i

Preliminary Statement.................................................................................................... 1

Statement of the Nature and Stage of the Proceedings ................................................. 2

Summary of Argument .................................................................................................. 3

Statement of Facts.......................................................................................................... 5

Argument ...................................................................................................................... 11

  I.  THIS COURT LACKS PERSONAL JURISDICTION OVER SOLIDERE ....................... 11

    A.  URS Has Failed To Meet Its Burden of Showing SOLIDERE Purposefully
      Availed Itself of the Laws and Protections of the United States..................................... 12

      1. Plaintiff Has Failed to Establish General Jurisdiction Over SOLIDERE ..................... 12

      2. Plaintiff Has Failed to Establish Specific Jurisdiction Over SOLIDERE ................... 18

    B.  The Assertion of Jurisdiction Here Would Not Be Fair and Reasonable ...................... 22

  II.  THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION BECAUSE
    DELAWARE IS NOT A CONVENIENT FORUM .......................................................... 24

    A.  The Pending ICC Arbitration Between URS and SOLIDERE is an
      Available, Adequate Alternative Forum ....................................................................... 25

    B.  URS's Strategic Choice of Delaware Federal Court Deserves No Deference
      .................................................................................................................................... 26

    C.  The Private Interest Factors Weigh Heavily in Favor of Dismissal ............................... 27

    D.  The Public Interest Factors Weigh Heavily in Favor of Dismissal ............................... 31

  III.  URS SHOULD BE EQUITABLY ESTOPPED FROM PROCEEDING
    WITH THIS ACTION.................................................................................................... 33

Conclusion .................................................................................................................... 37

# TABLE OF AUTHORITIES

## CASES

ADE Corp. v. KLA-Tencor Corp., 138 F. Supp. 2d 565 (D. Del. 2001)......................................28

Al Nawasi Trading Co. v. BP Amoco Corp., 191 F.R.D. 57 (S.D.N.Y. 2000) ..........................37

Asahi Metal Indus. Co. v. Super. Ct. of Cal. Solano County, 480 U.S. 102 (1987)............. 22, 23

Bechtel v. Robinson, 886 F.2d 644 (3d Cir. 1989) ...................................................................34

Bell Helicopter Textron, Inc. v. C&C Helicopter Sales, Inc., 295 F. Supp. 2d 400 (D. Del. 2000)...........................................................................................................................25

Bellante, Clauss, Miller & Partners v. Alireza, 634 F. Supp. 519 (M.D. Pa. 1985) .................20

Blue Ball Prop., Inc. v. McClain, 658 F. Supp. 1310 (D. Del. 1987) ........................................20

BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254 (3d Cir. 2000) ............... passim

Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985)................................................. 18, 19, 20

China Minmetals Imp. & Exp. Co. v. Chi Mei Corp., 334 F.3d 274 (3d Cir. 2003) ..................22

Chrysler Capital Corp. v. Woehling, 663 F. Supp. 478 (D. Del. 1987).....................................26

Contact Lumber Co. v. P.T. Moges Shipping Co. Ltd., 918 F.2d 1446 (9th Cir. 1990).] ..........31

DeJames v. Magnificence Carriers, Inc., 654 F.2d 280 (3d Cir. 1981) .....................................13

Dollar Sav. Bank v. First Sec. Bank of Utah, N.A., 746 F.2d 208 (3d Cir. 1984).....................11

Dynegy Midstream Servs., LP v. Trammochem, 451 F.3d 89 (2d Cir. 2006).............................14

E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187 (3d Cir. 2001)...........................................................................................28

Grand Entm't Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476 (3d Cir. 1993)..................19

Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947).................................................................. 24, 27

Hanson v. Denckla, 357 U.S. 235 (1958) ................................................................................12

Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408 (1984) ...............................13

ICT Pharm., Inc. v. Boehringer Ingelheim Pharm., Inc., 147 F. Supp. 2d 268 (D. Del. 2001) .......................................................................................................................23

IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254 (3d Cir. 1998) ................................................. 18

Int'l Shoe Co. v. Wash., 326 U.S. 310 (1945) ....................................................... 12, 13, 18, 22

Koster v. Am. Lumbermens Co. 330 U.S. 518 (1947) ....................................................... 25, 27

Lacey v. Cessna Aircraft Co., 862 F.2d 38 (3d Cir. 1988) ............................................... 25, 31

Lacey v. Cessna Aircraft Co., 932 F.2d 170 (3d Cir. 1991) ..........................................25-26, 27

Lesser & Kaplin, P.C. v. Am. Ins. Co., 723 F. Supp. 1099 (E.D. Pa. 1989) ........... 13, 16, 17, 18

Lony v. E.I. Dupont de Nemours & Co., 886 F.2d 628 (3d Cir. 1989) ...................................... 27

M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972) ....................................................... 21

Malloy v. Harnischfeger Corp., No. CIV. A. 92-2795, 1993 WL 57191 (E.D. Pa. Feb. 26,
    1993) ............................................................................................................................ 17

Machulsky v. Hall, 210 F. Supp. 2d 531 (D.N.J. 2002) .......................................................... 12

Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1 (1983) ............................ 21

Palmco Corp. v. JSC Techsnabexport, No. SA CV 06-214DOC, 2006 WL 2473316 (C.D.
    Cal. July 25, 2006) ........................................................................................................ 30

Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981)............................................................. 25, 31

Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas, 675 F.2d 587 (3d Cir.
    1982) ............................................................................................................................ 13

S. Megga Telecomms. Ltd. v. Lucent Techs., Inc., No. 96-357-SLR, 1997 WL 86413 (D.
    Del. Feb. 14, 1997)................................................................................................... passim

Saudi v. Acomarit Maritime Servs., S.A., 114 Fed. Appx. 449 (3d Cir. 2004).......................... 16

Simplicity, Inc. v. MTS Prods., Inc., No. 05-3008, 2006 WL 924993 (E.D. Pa. Apr. 6,
    2006) ............................................................................................................................ 16

Sunbelt Corp. v. Noble, Denton & Assocs., Inc., 5 F.3d 28 (3d Cir. 1993) ........................ 17, 19

Tech. Dev. Co., v. Onischenko, No. 05-4835, 2006 WL 869292 (3d. Cir. April 5, 2006).......... 24, 27

Telcordia Techs., Inc. v. Alcatel S.A., No. Civ.A. 04-874 GMS, 2005 WL 1268061 (D.
    Del. May 27, 2005) ............................................................................................ 12, 13, 14, 18

Telcordia Techs., Inc. v. Telkom SA Ltd., 485 F.3d 172 (3d Cir. 2006).................................... 36

Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773 (2d Cir. 1995)............................... 28

Toner v. Allstate Ins. Co., Civ. A. No. 92-624-SLR, 1994 WL 828294 (D. Del. Dec. 29, 1994) ................................................................................................................................ 34

USX Corp. v. Adriatic Ins. Co., 345 F.3d 190 (3d Cir. 2003) .................................................. 14

Van Cauwenberghe v. Baird, 486 U.S. 517 (1988) ........................................................... 27, 31

Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co., 75 F.3d 147 (3d Cir. 1995) ..................................................................................................................... 16, 18, 19

Waggoner v. Laster, 581 A.2d 1127 (Del. Supr. 1990) ........................................................... 34

Ware v. Ball Plastic Container Corp., 432 F. Supp. 2d 434 (D. Del. 2006) ............................. 13

Wilson v. Am. Ins. Co., 209 A.2d 902 (Del. 1965) ................................................................. 34

World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286 (1980) ............................ 12, 18, 21

## FEDERAL STATUTES

9 U.S.C. § 201 ........................................................................................................................ 14

9 U.S.C. § 202 ........................................................................................................................ 20

28 U.S.C. § 1603(b)(2) ........................................................................................................... 14

28 U.S.C. § 1603-11 ............................................................................................................... 14

Fed. R. Civ. P. 4(k)(2) ............................................................................................................ 14

Fed. R. Civ. P. 45(b)(2) .......................................................................................................... 28

## INTERNATIONAL AGREEMENTS

Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, art. V(1)(e), 21 U.S.T. 2517, 330 U.N.T.S. 38 .......................................... 20, 36

## STATE STATUTES

Del. Code. Ann. Tit. 10 § 3104(c) ........................................................................................... 15

## FOREIGN STATUTES

New  French Code of Civil Procedure,  Article 1466....................................................................21

## OTHER INTERNATIONAL AUTHORITY

Rules of Arbitration of the ICC Court ................................................................................ <u>passim</u>

## PUBLICATIONS

<u>Fouchard Gaillard Goldman on International Commercial Arbitration</u> (ed. Emmanuel
Gaillard & John Savage) (1999) ........................................................................................ 22

<u>International Chamber of Commerce Arbitration</u> (W. Laurence Craig, William W. Park
& Jan Paulsson) (3d ed. 2000) ...................................................................................... 9, 30

<u>International Commercial Arbitration</u> (Gary B. Born) (3d ed. 2000) ...................................... 28

ICC Publication 810 "International Court of Arbitration, Dispute Resolution
Services" (ICC) (2005) ........................................................................................................1

The New International Atlas 1-17, 1-192 (Jon M. Leverenz et al ed., Rand McNally &
Co., 25th ed. 1994) (1969) ................................................................................................ 29

Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3), Defendant,

The Lebanese Company for the Development and Reconstruction of Beirut Central District,

S.A.L., a/k/a SOLIDERE ("SOLIDERE"), respectfully submits[1] this opening brief and supporting

declarations[2] in support of its motion to dismiss the Complaint for Declaratory and Injunctive

Relief (the "Complaint") filed by Plaintiff, URS Corporation ("URS"), seeking to enjoin a

previously commenced international arbitration.

### Preliminary Statement

This action is an improper attempt at forum-shopping by Plaintiff, which seeks to

enjoin an international arbitration proceeding taking place abroad, under the auspices of the

International Court of Arbitration ("ICC Court") of the International Chamber of Commerce

("ICC"),[3] and to improperly extend the jurisdiction of this Court to a foreign corporation which

conducts no business or activity in the United States – let alone in this district. Plaintiff, having

requested a prima facie ruling on jurisdiction from the ICC Court and having lost that ruling, now

has decided to change tack and seek a ruling from this Court on whether URS is bound by an

arbitration agreement with SOLIDERE entered into by URS's wholly-owned subsidiary. URS

seeks such a ruling despite the fact that the rules governing the jurisdictional review that it

initiated (the ICC Rules of Arbitration (the "ICC Rules")) call for such a determination now to be

made by the arbitral tribunal in the previously commenced (and still pending) ICC proceeding.

---

[1] SOLIDERE appears in this action for the limited purpose of challenging the Court's jurisdiction and maintains that the sole, proper forum for the resolution of all disputes with URS is the ICC Arbitration and, consequently, reserves all of its rights in that regard.

[2] Submitted concurrently with this opening brief in support of the motion are the Declaration of Nasser Chammaa ("Chammaa Decl."), executed on October 16, 2006, and the Declaration of Paul B. Carberry ("Carberry Decl."), executed on October 16, 2006, and the exhibits thereto.

[3] The ICC is the world's leading organization in the field of international commercial dispute resolution. Established in 1923 as the arbitration body of the ICC, the ICC Court has, since its creation, administered over 13,000 international arbitration cases involving parties and arbitrators from some 180 countries and territories. See Carberry Decl. Ex. J (ICC Publication 810 entitled "International Court of Arbitration, Dispute Resolution Services" (2005), at 2).

Further, even if this Court could exercise jurisdiction over Defendant – which it cannot – and award the relief sought by Plaintiff, this district, indeed the United States, would still not be an appropriate forum in which to litigate this distinctly international dispute; especially in light of the currently pending arbitral proceeding abroad. In addition, the relief sought by Plaintiff would be premature since any claim that it faces irreparable harm absent the requested relief is purely speculative as Plaintiff will have ample opportunity to present its case on jurisdiction to the arbitral tribunal, which is in the course of being constituted and, in the event of an adverse award by such tribunal, to national courts in France and in any other jurisdiction, including in the United States, called upon to recognize and enforce such award.

Finally, Plaintiff should be equitably estopped from seeking declaratory and injunctive relief here because, having initiated the ICC process for determining the jurisdiction of the ICC arbitral tribunal in Paris, France, Plaintiff should now be held to that choice. Having failed to dissuade the ICC Court from concluding that it was prima facie satisfied that an arbitration agreement under the ICC Rules may exist (the jurisdictional ruling which Plaintiff had invited and by which it indicated it would abide), Plaintiff now asks this Court to ignore Plaintiff's conduct in the previously-filed (and still pending) arbitration proceeding and enjoin a party clearly outside its jurisdiction from proceeding with that arbitration. Essentially, having become disenchanted with its initial choice of forum in which to consider this issue, Plaintiff now seeks to "trump" the ICC Court's determination that a prima facie case of jurisdiction over Plaintiff may exist and obtain a "do over" on that issue before a U.S. federal court. For the reasons stated below, the Court should decline URS's invitation to subvert the rightful authority of an ICC arbitral tribunal to determine its own jurisdiction.

### Statement of the Nature and Stage of the Proceedings

On June 30, 2006, Plaintiff filed its Complaint for Declaratory and Injunctive Relief against Defendant seeking a declaratory judgment, injunctive and other relief pursuant to Title 28, United States Code Section 2201. D.I. 1. Subsequently, Plaintiff has made several

requests of the Clerk of the Court to serve a Summons and Complaint on Defendant, SOLIDERE, in Beirut, Lebanon, via registered mail. D.I. 4, 8, 15, 28. In response to Plaintiff's requests, the Clerk has made several attempts to serve the Summons and Complaint on Defendant, most recently on October 11, 2006. D.I. 6-7, 17-18, 21, 30-31. To date, those attempts have been unsuccessful[4]. D.I. 13, 24, 26. Defendant did receive informal notice of this action and a copy of the Complaint through its counsel sometime in early July 2006.

Soon after Defendant became aware of this action, its counsel initiated discussions with Plaintiff's counsel in a good faith attempt to negotiate a briefing schedule for Defendant's motion to dismiss the Complaint and Plaintiff's anticipated motion for a preliminary injunction. Both parties contemplated that the Court would consider the motion to dismiss in advance of the motion for preliminary injunction and jointly filed a proposed stipulation of extension of time to answer in order to complete their negotiations. D.I. 14. That stipulation was so ordered by the Court on September 6, 2006. Ultimately, the parties were unable to agree on a briefing schedule and Defendant filed a motion requesting a teleconference with the Court to discuss scheduling issues. D.I. 19. That motion has been fully briefed, (D.I. 22-23), and is currently sub judice.

Defendant SOLIDERE now files this Opening Brief in Support of its Motion to Dismiss the Complaint.

### Summary of Argument

1.    First, it is axiomatic that the power of this Court to issue injunctive relief extends only to those parties over which it can exercise personal jurisdiction. Here, the party against which injunctive relief is sought is clearly beyond the jurisdiction of the Court. SOLIDERE is a publicly-held, foreign corporation which exists solely for the purpose of acquiring, reconstructing or restoring and commercially developing certain real property located

---

[4] As of the time of this filing, it appears that a copy of the summons and complaint in this action may have been delivered via registered mail to SOLIDERE in Beirut, Lebanon on October 16, 2006. However, counsel has not yet had the opportunity to verify whether that is, indeed, the case.

in downtown Beirut, Lebanon, which was ravaged by civil war in that country from 1975 to 1990. It has no presence in the United States; it does not sell any products or provide any services here. The disparate, sporadic contacts, which Plaintiff has alleged, between SOLIDERE and entities located in the U.S. are demonstrably insufficient to establish jurisdiction over SOLIDERE. Moreover, it would be manifestly unfair and inconsistent with traditional notions of fair play and substantial justice to subject SOLIDERE to the injunctive power of this Court given the absence of any purposeful availment by SOLIDERE of the laws or protections of the United States, let alone of this jurisdiction. The failure of Plaintiff properly to serve Defendant with the Summons and Complaint in this action, (see supra), despite the pendency of this action for more than three and a half months, is further evidence of Defendant's absence from this forum.

2.      Second, even if SOLIDERE were subject to the Court's jurisdiction – which it is not – this is a distinctly foreign dispute which has no place in a U.S. federal court and for the convenience of the parties and in the interest of the Court should be resolved by an ICC arbitral tribunal located in Paris, France, as provided for by the relevant arbitration clause. This Court previously has recognized, in S. Megga Telecomms. Ltd. v. Lucent Techs., Inc., No. 96-357-SLR, 1997 WL 86413, at *3 (D. Del. Feb. 14, 1997), that an international arbitration can provide an adequate alternative remedy to a federal action and, here, both the public interest of the forum and the private interests and conduct of the parties counsel dismissal in favor of the pending ICC Arbitration under the doctrine of forum non conveniens.

3.      Third, Plaintiff should be equitably estopped from seeking declaratory and injunctive relief here because, in addition to such request being premature, Plaintiff chose to initiate the ICC process for determining the ICC's jurisdiction and should now be held to that choice. The ICC Court, after receiving extensive briefing on the issue from both parties and having determined that it was prima facie satisfied that an arbitration agreement under the ICC Rules may exist, has referred this issue to an ICC arbitral tribunal for determination, as provided for in the ICC Rules and consistent with the generally recognized principle that arbitrators are

empowered to determine the scope of their own jurisdiction (commonly referred to as the doctrine

of "competence-competence"). Given Plaintiff's invitation to the ICC Court to rule <u>prima facie</u>

on whether it may have jurisdiction and the fact that that jurisdictional review is still incomplete,

allowing Plaintiff to change tack now and abandon that proceeding – after receiving an initial

adverse ruling – in favor of this action would endorse forum-shopping. Having initiated and

actively engaged the ICC Court on this very issue, Plaintiff should arbitrate that issue through to a

conclusion before being allowed to seek relief from this Court.

     For these reasons, as set out further below, the Complaint should be dismissed.

**Statement of Facts**

<u>The Parties</u>

     SOLIDERE is a publicly-traded joint stock company organized under the laws of

Lebanon with its sole place of business in Beirut, Lebanon. SOLIDERE's sole business activities

are the acquisition of real estate properties in the Beirut Central District and the reconstruction or

restoration and commercial development of the area, including the remediation of the seaside area

called the Normandy Landfill. Chammaa Decl., ¶ 3. SOLIDERE was constituted on May 5,

1994 on the basis of Lebanese Law 117 of 1991. Chammaa Decl., ¶ 3. As a joint stock company

owned by private investors, SOLIDERE is empowered to act, and has acted, independently of the

control of the Lebanese government, which was a 0.05% shareholder of SOLIDERE as of

October 13, 2006.[5] Chammaa Decl., ¶ 5(b). SOLIDERE is not authorized to do business and

does not maintain an office in Delaware or elsewhere in the United States. SOLIDERE has not

transacted business or performed any work in Delaware; it has not contracted to supply goods or

services to Delaware residents; it has not caused any tortious injury (nor has it been alleged to

have caused such injury) in Delaware nor anywhere in the United States; nor has it solicited

---

[5] Since the shares of SOLIDERE are actively traded on the Beirut and Kuwait Stock Exchanges, the number of those shares held by the Lebanese government at any given time is subject to change, however, since its constitution, the Lebanese government has never been a majority shareholder in SOLIDERE. <u>See</u> Chammaa Decl., ¶ 5(b).

business, engaged in a persistent course of conduct, or derived any revenue from goods or services used in Delaware; SOLIDERE also has not contracted to insure or provide surety for any entity in Delaware. Chammaa Decl., ¶ 6.

URS is an engineering design firm organized under the laws of Delaware and having its principal place of business in San Francisco, California. Compl., ¶ 12. Radian International LLC ("Radian") is an indirect subsidiary of URS incorporated in Delaware. Compl., ¶ 6.

The Contract

By a contract, dated January 25, 1999, SOLIDERE entrusted the reclamation and remediation of part of the Normandy Landfill site in Beirut (the "Works") to Radian, an engineering and environmental services contractor. Compl., ¶¶ 3, 33-34. The parties entered into the contract detailing the Works (the "Contract") following negotiations between representatives of Radian and SOLIDERE, in Beirut, between February 1997 and December 1998. Chammaa Decl., ¶ 7(a), Ex. C. The Normandy Landfill had been created as a result of waste deposited into the sea off the coast of Beirut during Lebanon's civil war. Chammaa Decl., ¶ 3. Pursuant to the Contract, Radian was required to excavate part of the Normandy Landfill site, sort and treat the materials, and backfill them after treatment. Compl., ¶ 34. Under the terms of the Contract, the "objective of the Works" was principally to reclaim the land comprising part of the Normandy site "as marketable development land that poses no risk to human health, public welfare, structures, services and the environment." Chammaa Decl. Ex. C (Contract), ¶ Technical Conditions, Section 2. The Contract provides that all disputes arising therefrom are to be resolved pursuant to arbitration in Paris, France, under the Rules of Arbitration of the International Chamber of Commerce. Chammaa Decl., ¶ 7(b), Ex. C (Contract) ¶ General Conditions, Section 44.

URS's Acquisition of Radian

After the Contract was signed, URS acquired Radian in June 1999. Compl., ¶ 6. Following this acquisition, Radian was fully absorbed into its ultimate parent, URS, and gradually ceased independent operations, while continuing to exist on paper. As of today, Radian no longer has any independent office space or telephone numbers. URS accepts receivables due to Radian and URS has advertised Radian as being the same entity as URS. See Carberry Decl. Ex. A (SOLIDERE's Request for Arbitration (the "Request")), ¶¶ 163-164.

Performance of the Contract

Following URS's acquisition of Radian, URS took over performance of the Contract in Beirut. While most of the key personnel responsible for performance of the Contract did not change, these individuals openly stated that their employer was URS and no longer Radian. Reports prepared as part of the Works and sent to SOLIDERE in Beirut were prepared and issued by URS rather than Radian. See Carberry Decl. Ex. A (Request), ¶¶ 203-215.

Eventually, a dispute arose in relation to URS/Radian's failure to perform any meaningful treatment of the material excavated and backfilled from the Normandy Landfill site. Chammaa Decl., ¶ 7(d). As a direct result of this failure, dangerous "landfill gas," including high concentrations of methane and carbon dioxide, contaminated the Normandy Landfill. Id. That the presence of landfill gas constituted a defect in performance of the Contract was confirmed by a unanimous arbitral award, dated July 12, 2004, in an ICC arbitration between SOLIDERE and Radian.[6] See Compl., ¶ 43. Notwithstanding such award, URS/Radian have steadfastly refused to submit a proper plan or take other action to remedy such defect and they have, in fact, since

---

[6] Although this arbitration was nominally between SOLIDERE and Radian, URS in fact controlled Radian's participation in the arbitration. For example, the powers of attorney given to Radian's outside counsel were signed by individuals with no purported position within Radian or whose primary positions were as part of URS senior management. In events leading up to this arbitration, the individual identified as Radian's legal counsel, John Rakow III, did not distinguish between Radian and URS, stating, for example, that "URS is manifestly committed to the early resolution of this matter before the ICC." Carberry Decl. Ex. A (Request), ¶¶ 220-234.

February 2005, unjustifiably ceased all work on the Normandy Landfill.  Chammaa Decl., ¶ 7(f).

As a result, SOLIDERE terminated the Contract on February 10, 2006.  Id.

The Pending Arbitration

Faced with URS/Radian's steadfast refusal to remedy the defect in their work

under the Contract, on February 13, 2006, SOLIDERE commenced an ICC arbitration (the "ICC

Arbitration") by filing a Request for Arbitration with the ICC Court against URS and Radian in

accordance with the dispute resolution provisions of the Contract.[7]  Compl., ¶ 44.  The ICC Court

is not a "court" in the ordinary sense; it is an administrative body that ensures the application of

the ICC Rules.  Although its members do not decide themselves the disputes submitted to ICC

arbitration – this is the task of the arbitrators appointed under the ICC Rules – the ICC Court

oversees the ICC arbitration process.  One month after the Request was submitted, URS, via

letter-brief, dated March 13, 2006, stated to the ICC Court, with reference to Article 6(2) of the

ICC Rules (see supra pp. 2, 4):

> "We respectfully invite the ICC Court of Arbitration to consider
> . . . [w]hether it is appropriate for this arbitration to proceed
> against URS."

Carberry Decl. Ex. D (letter-brief dated March 13, 2006), at 1.  Under Article 6(2), where the

existence, validity, or scope of the arbitration clause is in issue, the ICC Court will decide

whether it is "prima facie satisfied" that an arbitration agreement may exist.  If the ICC Court is

prima facie satisfied that such an agreement may exist, the ICC Court will refer the case to the

arbitral tribunal which will decide whether there is in fact such an agreement.  Carberry Decl. Ex.

C (ICC Rules), at 12-13.

---

[7] This Request followed Radian's pre-emptive action in initiating an arbitration before the ICC by a
Request for Arbitration, dated January 20, 2006.  Compl., ¶ 44.  Radian engaged in this pre-emptive action
only after SOLIDERE had notified Radian of no less than eight separate Events of Default, as defined in
the Contract, between March 30, 2004 and January 12, 2006, and almost one year after Radian had
unjustifiably stopped all work under the Contract, on February 18, 2005.  Carberry Decl. Ex. A (Request),
¶¶ 133-147.

Over the course of the next several months, the parties filed numerous letter-briefs before the ICC Court,[8] both sides presenting their jurisdictional arguments.[9]  URS could have specified that its submissions to the ICC Court were "without prejudice" to its right to introduce its jurisdictional objections before another decision-making body, but it did not do so. It was only in its third letter-brief to the ICC Court, dated April 21, 2006, that URS first argued – erroneously, SOLIDERE submits – that American courts have exclusive jurisdiction to decide the issue of arbitral jurisdiction over URS.  Compl. ¶¶ 47-48.  Despite this contention, URS explicitly indicated a willingness and intent to abide by the ICC Court's resolution of this issue.  In its March 13, 2006 submission to the ICC Court, both URS and Radian requested an extension of time of thirty (30) days after the ICC Court's decision on URS's application under Article 6(2) to respond (should the application be denied) to the merits of SOLIDERE's Request ("by way of . . . answer by Radian and URS in the New Arbitration").  Carberry Decl. Ex. D (letter-brief dated March 13, 2006), at 12.  Obviously, URS would not have requested such an extension if it was not prepared to accept an adverse decision by the ICC Court on jurisdiction and thereafter to have that issue as well as the merits decided by an ICC arbitral tribunal.

On June 2, 2006, after receiving multiple briefs from both parties, the ICC Court decided, pursuant to Article 6(2), it was <u>prima facie</u> satisfied that an arbitration agreement may exist between URS and SOLIDERE with the consequence that, under the ICC Rules, a determina-

---

[8] In addition to its 12-page letter brief of March 13, 2006 (which also included numerous exhibits), URS submitted a six-page reply letter brief on March 30, 2006 and another six-page letter brief on April 21, 2006, in which it further argued its case.  Carberry Decl. Ex. D.

[9] As a respected commentary on ICC arbitration has stated:

> "Despite the fact that respondents get 'another bite at the apple' on the issue of jurisdiction before the arbitral tribunal, they generally present full argument before the [ICC] Court of Arbitration [under Article 6(2) of the ICC Rules] in the hope of terminating the proceedings at the earliest stage.  Accordingly, there is often elaborate correspondence between parties and the [ICC] Court."

Carberry Decl. Ex. G (excerpt from W. Laurence Craig, William W. Park & Jan Paulsson, <u>International Chamber of Commerce Arbitration</u> 159 (3d Ed. 2000)).  This aptly describes the conduct of URS before the ICC Court in this case.

tion on jurisdiction would be made by an ICC arbitral tribunal, subject to review by French and/or

other national courts. Within the 30-day extension of time which URS and Radian had requested

in their March 13, 2006 submission to the ICC Court (see supra), that is, on June 30, 2006, URS

and Radian made the following two submissions to the ICC Court:

> (1)    URS submitted to the ICC Court a 49-page brief entitled, "Respondent URS
> Corporation's Objections to Jurisdiction," and

> (2)    Radian submitted to the ICC Court a 37-page brief entitled, "Respondent Radian
> International LLC's Answer."

On that same day, URS filed its "Complaint for Declaratory and Injunctive Relief" with this

Court. In URS's "Objections to Jurisdiction," URS has requested the arbitral tribunal to grant it

the following relief:

> "9.    REQUEST FOR RELIEF
>
> 9.1    In consideration of the foregoing, URS
> respectfully requests that the [ICC] Tribunal:
>
> > (a)    declare that the [ICC] Tribunal lacks
> > jurisdiction over URS because it is not a
> > party to and bound by any arbitration
> > agreement with Solidere;
> >
> > (b)    deny Solidere all the relief against URS;
> >
> > (c)    order Solidere to pay all costs and
> > expenses[.]"

Carberry Decl. Ex. E (brief dated June 30, 2006), at 48. Consequently, by this brief, URS clearly

manifested its intention of pursuing relief before the arbitral tribunal in parallel with the action

before this Court.

In addition to briefing the issue of arbitrability before the ICC Court, the parties

have each nominated an arbitrator to the arbitral tribunal. URS and Radian, which are repre-

sented by the same counsel, have nominated the same arbitrator, former United States District

Judge Charles B. Renfrew. SOLIDERE has nominated Eric A. Schwartz, Esq., a member of the

California and Paris bars and a well-known international arbitration practitioner. Both nominees

have accepted their nominations and have been confirmed by the ICC Court. The parties'

respective counsel have jointly nominated Professor Bernard Hanotiau, a Belgian law professor

and legal practitioner, to serve as Chair of the arbitral tribunal. Carberry Decl. Ex. D (facsimile

dated February 22, 2006 from the ICC Court; facsimile dated July 18, 2006 from the ICC Court;

letter dated July 26, 2006 from White & Case LLP and Skadden, Arps, Slate, Meagher & Flom

LLP; letter dated July 26, 2006 from White & Case LLP; letter dated July 27, 2006 from

Skadden, Arps, Slate, Meagher & Flom LLP; letter dated October 9, 2006 from Skadden, Arps,

Slate, Meagher & Flom LLP; and letter dated October 10, 2006 from White & Case LLP).


### Argument

The Complaint, which seeks a declaratory judgment that URS has no agreement

to arbitrate with SOLIDERE and an injunction barring SOLIDERE from pursuing any arbitration

against URS (Compl. ¶ 2), should be dismissed because (i) this Court lacks personal jurisdiction

over SOLIDERE; (ii) this is not a convenient forum in which to litigate this action; and (iii)

URS's previous initiation and active pursuit of the ICC arbitral process should estop it from

pursuing this parallel, duplicative action.


### I.

### THIS COURT LACKS PERSONAL JURISDICTION OVER SOLIDERE

URS's request for declaratory and injunctive relief should be dismissed because

this Court lacks personal jurisdiction over SOLIDERE. It is beyond dispute that the authority of

a federal court to issue injunctive relief extends only to those subject to its jurisdiction. See

Dollar Sav. Bank v. First Sec. Bank of Utah, N.A., 746 F.2d 208, 215 (3d Cir. 1984) (vacating

district court injunction, finding that the district court should not have proceeded on merits and

issued an injunction because personal jurisdiction over the defendant was lacking). SOLIDERE

is a publicly-held foreign corporation which conducts its business and activities outside the

United States. Chammaa Decl., ¶¶ 3, 5. As such, it lacks the minimal contacts necessary to

ensure that subjecting SOLIDERE to the jurisdiction of this Court is consistent with due process

and traditional notions of fair play and substantial justice. See Telcordia Techs., Inc. v. Alcatel S.A., No. Civ.A. 04-874 GMS, 2005 WL 1268061, at *1 (D. Del. May 27, 2005) (citing Int'l Shoe Co. v. Wash., 326 U.S. 310, 316 (1945)).

### A. URS Has Failed To Meet Its Burden of Showing SOLIDERE Purposefully Availed Itself of the Laws and Protections of the United States

The Due Process clause forbids subjecting a foreign defendant to the jurisdiction of the federal judiciary unless the defendant's conduct is such that the defendant should reasonably anticipate being haled into court. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). Only where a party "purposefully avails itself of the privilege of conducting activities within the forum State," does it have clear notice that it is subject to suit there. Id. (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). The plaintiff bears the burden of establishing with reasonable particularity, and with actual proof, not mere allegations, sufficient contacts between the defendant and the forum state to support the exercise of personal jurisdiction over that defendant. Machulsky v. Hall, 210 F. Supp. 2d 531, 537 (D.N.J. 2002). In order to meet this burden, a plaintiff must establish either that (i) the defendant's contacts with the forum state are "continuous and systematic" such that jurisdiction over that defendant for all purposes satisfies the requirements of due process ("general jurisdiction"), or (ii) the cause of action at issue arose directly from the defendant's activities within the forum state ("specific jurisdiction"). See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 259 (3d Cir. 2000).

Here, URS has failed to allege facts sufficient to establish either general or specific jurisdiction over SOLIDERE.

### 1. Plaintiff Has Failed to Establish General Jurisdiction Over SOLIDERE

In this Circuit, a plaintiff must meet a "much higher threshold" than mere minimum contacts in order to show general jurisdiction. Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas, 675 F.2d 587, 589 (3d Cir. 1982) (citation omitted). A plaintiff seeking

to exert general jurisdiction must show that "the defendant has maintained continuous and substantial forum affiliations." Id. at 588 (internal quotation marks and citation omitted); see also Telcordia, 2005 WL 1268061 at *1 (finding contacts must be "continuous and systematic" to establish general jurisdiction) (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984)). Establishing general jurisdiction "entails a very high threshold of proof since . . . the facts required to assert this general jurisdiction must be extensive and persuasive." Lesser & Kaplin, P.C. v. Am. Ins. Co., 723 F. Supp. 1099, 1102 (E.D. Pa. 1989) (internal quotation marks and citations omitted); see also Ware v. Ball Plastic Container Corp., 432 F. Supp. 2d 434, 438 (D. Del. 2006) ("Plaintiff must establish, through extensive and persuasive facts, that defendant has maintained continuous and substantial affiliations with the forum state.") (internal quotations and citation omitted).  Solitary or discrete contacts with a forum will not suffice to establish general jurisdiction. See Int'l Shoe, 326 U.S. at 317 ("[T]he casual presence of the corporate agent or even his conduct of single or isolated items of activities in a state in the corporation's behalf are not enough to subject it to suit on causes of action unconnected with the activities there.").

In its Complaint, URS seeks to establish jurisdiction over SOLIDERE on the basis of seven discrete alleged contacts between SOLIDERE and the United States stretching over a period of eight years. See Compl. ¶¶ 14-18. None of these alleged contacts relates to the provision of goods or services in Delaware or to any tortious or other activity conducted in the state.[10] Six of the seven alleged contacts relate to contracts entered into by SOLIDERE where its

---

[10] From the complete lack of Delaware contacts alleged by Plaintiff, it is clear that URS intends to rely on SOLIDERE's contacts with the United States as a whole to establish personal jurisdiction. While a "nationwide contacts" test can be appropriate in certain circumstances for evaluating whether a foreign defendant is subject to the court's jurisdiction, here, it is clear that personal jurisdiction does not exist over SOLIDERE under any standard, including a nationwide standard.

Where federal question jurisdiction exists, courts will measure a foreign defendant's contacts with the United States as a whole (i.e. "nationwide contacts"), rather than with regards to a particular state, inquiring whether it would be fair and reasonable to subject a foreign national to suit in the United States. DeJames v. Magnificence Carriers, Inc., 654 F.2d 280, 292 (3d Cir. 1981). In the absence of a federal statute

contractual counterparty was based in the United States, although in no case in Delaware. The

seventh alleged contact relates to SOLIDERE's alleged offering of equity investments to U.S.

investors. None of the contracts with U.S. entities contemplates performance in the United

States, let alone Delaware. Further, the cited agreements with all but one U.S. entity were

negotiated wholly outside of the United States. See Chammaa Decl., ¶¶ 7(a), 8, 9, 10, 11.

      URS has not, indeed cannot, allege that SOLIDERE has conducted any activity

sufficient for the exercise of jurisdiction under the Delaware long-arm statute, i.e. URS has not

alleged that SOLIDERE:

---

authorizing nationwide service of process, however, the court must look to Federal Rule of Civil Procedure 4(k)(2) (i.e. the federal long-arm statute) as the basis for jurisdiction.

URS asserts federal question jurisdiction under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201 et. seq. (Compl. ¶¶ 20-24), which does not authorize nationwide service of process, Dynegy Midstream Servs., LP v. Trammochem, 451 F.3d 89 (2d Cir. 2006), and the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1603-11 (Compl. ¶¶ 25-31), which does.

However, URS has failed to establish that SOLIDERE is subject to the FSIA as "an organ of a foreign state or political subdivision thereof" (28 U.S.C. § 1603(b)(2)), because it has failed to allege that SOLIDERE meets the seven-part test, articulated by the Third Circuit in USX Corp. v. Adriatic Ins. Co., 345 F.3d 190, 208 (3d Cir. 2003). The USX test considers the following factors: (1) the circumstances surrounding the entity's creation; (2) the purpose of its activities; (3) the degree of supervision by the government; (4) the level of government financial support; (5) the entity's employment policies, particularly regarding whether the foreign state requires the hiring of public employees and pays their salaries; (6) the entity's obligations and privileges under the foreign state's laws; and (7) the ownership structure of the entity. Id. at 209.

URS cannot satisfy the USX test because SOLIDERE was created as a joint-stock real estate company and operates in the private sector as a company whose shares are listed on the Beirut and Kuwait Stock Exchanges. The Lebanese government owns less than one percent of the shares of SOLIDERE, and SOLIDERE's employees are all private sector, not government, employees. SOLIDERE is run by its board of directors with no day-to-day oversight from the government. SOLIDERE is under contract with the government to oversee the downtown Beirut restoration project, but does not possess any exclusive legal rights outside of that contractual arrangement. SOLIDERE is paid for its work, as any private sector company that contracts with the government. Chammaa Decl., ¶¶ 3, 4, 5. Thus, in order to employ the "nationwide contacts" test, URS must meet the requirements of Fed. R. Civ. Pro. 4(k)(2).

In order to establish the applicability of Rule 4(k)(2): (1) the plaintiff's claim must arise under federal law; (2) the defendant must lack sufficient contacts with any state to subject it to personal jurisdiction; and (3) the defendant must have sufficient contacts with the United States as a whole to satisfy due process. Telcordia, 2005 WL 1268061 at *4 (citation omitted). Thus, while the due process analysis under Rule 4(k)(2) is the same as under a federal statute authorizing nationwide service of process, i.e. the exercise of jurisdiction over the foreign defendant must comport with traditional notions of fair play and substantial justice, URS must also show that SOLIDERE is not amenable to the exercise of jurisdiction in any other state. While URS has, as yet, failed to make such a showing, for the purposes of this analysis, SOLIDERE will assume, without conceding, that a "nationwide contacts" test applies for the purpose of determining whether it is subject to the Court's jurisdiction. Even under this more expansive test, SOLIDERE lacks sufficient contacts with the United States as a whole to subject it to the jurisdiction of this Court consistent with the requirements of due process.

> (1) Transacts any business or performs any character of work or service in the State; (2) Contracts to supply services or things in this State; (3) Causes tortious injury in the State by an act or omission in this State; (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State; (5) Has an interest in, uses or possesses real property in the State; or (6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

See Del. Code. Ann. Tit. 10 § 3104(c).

The seven contacts alleged by URS are: (i) the Contract; (ii) a contract for a feasibility study to be conducted of the Works by Paul C. Rizzo Associates (the "Rizzo Contract"), a U.S. company, based in Pennsylvania; (iii) a grant from the U.S. Trade and Development Agency ("USTDA"), located in Arlington, Virginia, used by SOLIDERE to finance the Rizzo Contract; (iv) a training grant provided by USTDA to SOLIDERE in connection with the Contract (v) a loan guarantee from the Export-Import Bank of the United States ("Ex-Im Bank"), located in Washington D.C., to finance the work to be performed under the Contract; (vi) a US$ 8.2 million performance guarantee bond issued by a bank located in Lebanon, which Radian was required under the Contract to deliver to SOLIDERE, the counter-guarantee for which was allegedly issued in favor of the Lebanese bank by the California branch of the Wells Fargo Bank; and (vii) SOLIDERE's alleged offering of Global Depository Receipts ("GDRs") to United States investors.[11] Compl. ¶¶ 14-18. On their face, these allegations of solitary, discrete contacts, falling sporadically over a period of eight years (from 1998-2006), cannot constitute the "continuous and systematic" contacts required to establish general jurisdiction over a foreign defendant. See Saudi v. Acomarit Maritimes Servs., S.A., 114 Fed. Appx. 449, 452 (3d Cir.

---

[11] Contrary to Plaintiff's allegation, SOLIDERE did not offer its GDR's for sale to all U.S. investors. Rather, under applicable Securities and Exchange Commission regulations, the GDR's could be (and were) only offered to qualified institutional investors within the United States. These restrictions were explicitly included in the Offering Circular for the GDR's.

2004) (affirming district court's finding that general jurisdiction was lacking because the

defendant's contacts with the forum state "were sporadic at best, rather than continuous and

systematic."); Simplicity, Inc. v. MTS Prods., Inc., No. 05-3008, 2006 WL 924993, at *3-4 (E.D.

Pa. Apr. 6, 2006) (finding no general jurisdiction where, over a period of five years, only 5% of

the defendant's total sales took place in the forum and sales representatives lived in and visited

the forum, but were not exclusively dedicated thereto.)

 Moreover, contacts (i)-(vi)[12] – which allege contracts between SOLIDERE and

various U.S. entities – cannot, as a matter of law, support a finding of general jurisdiction over

SOLIDERE. As an initial matter, the mere act of contracting with a forum resident, in and of

itself, has been found insufficient to establish jurisdiction over a foreign defendant. See Lesser &

Kaplin, 723 F. Supp. at 1101 (finding that even if the dispute had arisen out of the contract

between the parties, the contract would not be a sufficient basis upon which to assert jurisdiction).

Further, the Third Circuit has recognized that "informational communications in furtherance of [a

contract between a resident and a nonresident] do not establish the purposeful activity necessary

for a valid assertion of personal jurisdiction over [the nonresident defendant]." Vetrotex

Certainteed Corp. v. Consol. Fiber Glass Prods. Co., 75 F.3d 147, 152 (3d Cir. 1995) (quoting

Sunbelt Corp. v. Noble, Denton & Assocs., Inc., 5 F.3d 28, 32 (3d Cir. 1993)).

 In addition, with regards to each of the contracts to which SOLIDERE was a

party, cited by URS, the fact that SOLIDERE's contractual partner was a U.S. entity (as opposed

to one of another nationality) was inconsequential to the establishment of the contractual

relationship between the parties. The contracts between SOLIDERE and all but one

---

[12] While contact (vi) – the counter-guarantee issued by Wells Fargo in relation to the performance
guarantee bond – is insufficient as a matter of law to establish jurisdiction over SOLIDERE for the same
reason that contacts (i)-(v) fail, that alleged contact is deficient for the additional reason that the Wells
Fargo guarantee was not in favor of SOLIDERE, but rather, was in favor of Banque Saradar s.a.l., the
Lebanese bank which issued the performance guarantee bond in favor of SOLIDERE. See Chammaa
Decl., ¶ 11. Thus, even as alleged, the Wells Fargo guarantee in no way indicates a contact between
SOLIDERE and a U.S. entity.

counterparty[13] were negotiated wholly outside the United States. Chammaa Decl., ¶¶ 7(a), 8, 9,

10, 11. Further, each contract contemplates that performance was to be rendered outside the

United States – e.g., the Contract called for remediation of a contaminated site in Beirut,

Lebanon, while the Rizzo Contract called for a feasibility study of the Works, also to be

conducted on-site in Beirut, Lebanon. Similarly, the USTDA grants, the Ex-Im Bank guarantee,

and the performance guarantee bond each relate to the finance or guarantee of activities taking

place in Beirut. See Chammaa Decl., at ¶¶ 8, 9, 10, 11. Similarly, the mere act of offering for

sale equity instruments as investments to a limited class of specified investors (qualified

institutional buyers) within the forum will not create jurisdiction over the offering entity in the

forum. See Lesser & Kaplin, 723 F. Supp. at 1102.

        The Lesser & Kaplin case is instructive. There, the court found that general

jurisdiction did not exist over a foreign defendant who may have (i) occasionally solicited bids

from contractors resident in the forum; (ii) entered into contracts with several such contractors;

(iii) sold bonds indirectly to forum residents; and (iv) advertised in publications of general

circulation which find their way into the forum. Id. Similar to the allegations here, the foreign

defendant in Lesser & Kaplin was alleged to have entered into contractual relationships with and

sold securities to forum residents, in addition to other activities, all of which the court found

insufficient for the exercise of general jurisdiction. Id. ("The negligible contacts cited by plaintiff

are simply insufficient to give this court jurisdiction over the [defendant]."). Plaintiff's

allegations of contact between SOLIDERE and the United States to support general jurisdiction

are far less pervasive than those allegations rejected as insufficient in Lesser & Kaplin and,

---

[13] Understandably, the two contracts between SOLIDERE and the USTDA were negotiated in the U.S.
Chammaa Decl., ¶ 9. These contacts alone – wholly unrelated to Plaintiff's claims – are insufficient to
create personal jurisdiction over SOLIDERE for any purpose. See Malloy v. Harnischfeger Corp., No.
CIV. A. 92-2795, 1993 WL 57191, at *5 (E.D. Pa. Feb. 26, 1993) (finding no specific or general
jurisdiction over Japanese corporation that had entered into several joint ventures with Pennsylvania
companies, where agreements were negotiated in Pennsylvania but none of the agreements involved
activity within Pennsylvania.).

therefore, the Court should find that Plaintiff has failed to establish general jurisdiction over SOLIDERE.

## 2.  **Plaintiff Has Failed to Establish Specific Jurisdiction Over SOLIDERE**

In the absence of continuous and systematic contacts with the forum, personal jurisdiction over a foreign defendant must be based on the concept of specific jurisdiction. See IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 260 (3d Cir. 1998). Specific jurisdiction exists where a plaintiff's claim arises out of the defendant's contacts with and activities within the forum. BP Chems., 229 F. 3d at 259. As with general jurisdiction, before specific jurisdiction will be found, a court must be satisfied of the existence of "minimum contacts" between the defendant and the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Telcordia, 2005 WL 1268061, at *1 (citing Int'l Shoe, 326 U.S. at 316). In addition, the plaintiff must show that the defendant "purposefully availed itself of the privilege of conducting activities within the forum state," id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (alterations omitted)), and that "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen, 444 U.S. at 297. In considering whether a plaintiff has met its burden to establish specific jurisdiction, only those contacts directly related to plaintiff's cause of action are to be considered. See Vetrotex, 75 F.3d at 152.

Here, URS seeks a declaratory judgment that it is not bound by the arbitration clause contained in the Contract. Compl. ¶ 2. The only alleged contact between SOLIDERE and the United States which specifically relates to URS's claim is the fact that URS and Radian – SOLIDERE's original contractual counterparty in the Contract – are Delaware corporations. Thus, that alleged contact is the sole basis upon which URS may attempt to establish specific

jurisdiction over SOLIDERE. As a matter of law, this allegation standing alone is insufficient to satisfy the minimum contacts test and the reasonable anticipation test.

It is black-letter law in this Circuit that the mere existence of a contract between a foreign defendant and a party within the forum state is an insufficient basis for the assertion of personal jurisdiction over the foreign defendant. BP Chems., 229 F.3d at 254; Vetrotex, 75 F.3d at 151 ("the [breached agreement], standing alone, is an insufficient ground upon which to exercise specific personal jurisdiction over [a foreign defendant]"); Grand Entm't Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 482 (3d Cir. 1993) ("[A] contract alone does not 'automatically establish sufficient minimum contacts in the other party's home forum.'") (quoting Burger King, 471 U.S. at 478)). Equally insufficient are "informational communications in furtherance of [such a] contract." Sunbelt Corp., 5 F.3d at 32.

In addition, in determining whether specific jurisdiction exists over a dispute arising from a contract, the relevant factors to be considered are "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." Burger King, 471 U.S. at 479. Each of these factors supports a finding that SOLIDERE's entry into the Contract is insufficient to establish personal jurisdiction over SOLIDERE.

First, all of the negotiations between Radian and SOLIDERE concerning the Contract were conducted in Beirut, Lebanon. Chammaa Decl., ¶ 7(a). These negotiations extended from about February 1997 (when Radian personnel made an initial site visit to Beirut) through December 1998 and included numerous trips by Radian personnel to Beirut.[14] Id.

---

[14] Although negotiation of the Contract occurred wholly outside the United States, the parties did sign the agreement at a ceremony in Washington, D.C. on January 25, 1999. However, the fact that the ministerial act of signing the Contract occurred in the United States is still not a sufficient basis upon which to confer personal jurisdiction over SOLIDERE. See Blue Ball Prop., Inc. v. McClain, 658 F. Supp. 1310, 1316 (D. Del. 1987) (finding personal jurisdiction over Maryland defendant lacking where contract was signed in Delaware). Execution of a contract within the forum is not sufficient to establish personal jurisdiction over a foreign defendant, consistent with due process. See id. at 1317. Moreover, the United States Supreme Court has held that the formation of a contract is merely an "intermediate step" in the conduct of a business

Second, the future consequences and terms of the agreement, i.e. the performance of the environmental remediation services, were contemplated, and actually conducted, entirely at the Normandy Landfill site in Beirut. Id. at ¶ 7(c).

In similar circumstances – where the negotiation of a contract between a foreign defendant and a domestic plaintiff as well as the performance of the contract all occur outside the United States – courts in this Circuit have held that specific jurisdiction is not established. See BP Chems., 229 F.3d at 261 (finding contractual contacts insufficient where contract was for purchase of equipment to be shipped to Taiwan and negotiations were through Taiwanese agents of U.S. vendors); Bellante, Clauss, Miller & Partners v. Alireza, 634 F. Supp. 519, 527 (M.D. Pa. 1985) (finding no personal jurisdiction where "no pre-contract negotiations took place in [the forum state of] Pennsylvania, the terms of the contracts did not provide for performance in Pennsylvania and the construction occurred in Saudi Arabia.").

Finally, the Contract provides that all disputes arising therefrom are to be resolved in Paris, France, pursuant to the ICC Rules. See Chammaa Decl., ¶ 7(b), Ex. C (Contract) ¶ General Conditions, Section 44. Under Article 2 of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"),[15] contracting states (which includes the United States) must "recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by

---

transaction and the place of execution is not a controlling factor as to the assertion of jurisdiction based on the contract. Burger King, 471 U.S. at 479 ("It is these factors – prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing – that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.").

[15] 21 U.S.T. 2517, 330 U.N.T.S. 38. The New York Convention would apply to any award rendered by an arbitral tribunal in this case pursuant to § 202 of the FAA, which states that the New York Convention applies to foreign arbitral awards, which include all those arising out of commercial relationships that are not entirely between U.S. citizens. See 9 U.S.C.A. § 202. The New York Convention applies to awards considered foreign in the place of enforcement. See New York Convention, Art. I(1).

arbitration."[16]  In addition, Article 2 of the FAA, stating that a written agreement to arbitrate

"shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity

for the revocation of any contract," is a "congressional declaration of a liberal federal policy

favoring arbitration agreements." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460

U.S. 1, 24 (1983). Thus, the existence in the relevant Contract of an arbitration clause providing

for arbitration in a foreign country, as here, demonstrates conclusively that such a party did not

expect to be subject to the jurisdiction of the U.S. courts in relation to disputes arising from that

contract, including disputes over whether the arbitral tribunal has jurisdiction since the ICC Rules

(Article 6), Carberry Decl. Ex. C (ICC Rules), at 12-13, and the law of France (Art. 1466 of the

French New Code of Civil Procedure, Carberry Decl. Ex. B) where the arbitration takes place,

expressly provide that an arbitral tribunal shall have the power to decide its own jurisdiction.

Furthermore, an arbitration clause is a specific form of forum selection clause,

which is itself well-recognized under U.S. law as a means of providing a degree of predictability

to the legal system, "allow[ing] potential defendants to structure their primary conduct with some

minimum assurance as to where that conduct will and will not render them liable to suit." World-

Wide Volkswagen, 444 U.S. at 297; see also M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 8-

9 (1972) (enforcing a contract clause providing for dispute resolution before the "London Court

of Justice," stating that "far too little weight and effect were given [by the lower court] to the

forum clause . . . [t]he expansion of American business and industry will hardly be encouraged if,

notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be

resolved under our laws and in our courts").

In light of both the strong federal policy in favor of arbitration and the United

States Supreme Court's strong support of the enforcement of forum selection clauses, especially

in international business agreements, SOLIDERE could hardly have anticipated being haled

---

[16] New York Convention, Art. II(1).

before this Court, where its Contract, negotiated at arms-length between sophisticated parties,

contained a clause providing for dispute resolution by ICC arbitration in Paris, France.[17] From its

election to have all disputes in relation to the Contract resolved in accordance with the ICC Rules

in Paris, it is clear that SOLIDERE intentionally avoided availing itself of the laws and protec-

tions of the United States in entering into the Contract.  Therefore, the Court should find that

Plaintiff has failed to establish specific jurisdiction arising out of the Contract.

### B. The Assertion of Jurisdiction Here Would Not Be Fair and Reasonable

Even where a foreign defendant has sufficient contacts with the forum to

conclude that it has purposefully availed itself of the laws and protections of that jurisdiction,

personal jurisdiction will still not lie where the exercise of jurisdiction would not be fair and

reasonable.  Asahi Metal Indus. Co. v. Super. Ct. of Cal. Solano County, 480 U.S. 102 (1987);

Int'l Shoe, 326 U.S. at 316 (holding a defendant must have "certain minimum contacts with [the

forum State] such that the maintenance of the suit does not offend traditional notions of fair play

and substantial justice.") (internal quotations and citations omitted).

The factors to be considered in determining whether the exercise of jurisdiction is

fair and reasonable include: (i) the burden placed on defendant; (ii) the interest of the forum State;

(iii) the plaintiff's interest in obtaining relief; (iv) the interstate judicial system's interest in

obtaining the most efficient resolution of controversies; and (v) the shared interest of the several

States in furthering fundamental social policies.  Asahi, 480 U.S. at 113.  Moreover, courts should

consider "[t]he unique burdens placed upon one who must defend oneself in a foreign legal

---

[17] Quite the contrary, parties entering into such contracts expect that all disputes, including those relating to jurisdiction, will be resolved by arbitration, in accordance with the internationally-recognized principle of competence-competence, which "gives arbitrators the power to decide their own jurisdiction." China Minmetals Imp. & Exp. Co. v. Chi Mei Corp., 334 F.3d 274, 287-288 (3d Cir. 2003) (noting further that "[c]ompetence-competence is applied in slightly different ways around the world" but that the "one element common to all nations is the conferral of the power to decide jurisdiction on the arbitrators themselves"); see also Carberry Decl. Ex. I (excerpt from Fouchard Gaillard Goldman on International Commercial Arbitration (ed. Emmanuel Gaillard & John Savage) 397 (1999)) (observing that the "competence-competence principle is now recognized by the main international conventions on arbitration, by most modern arbitration statutes, and by the majority of institutional arbitration rules").

system [and such burdens] should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." See ICT Pharm., Inc. v. Boehringer Ingelheim Pharm., Inc., 147 F. Supp. 2d 268, 273 (D. Del. 2001) (citing Asahi, 480 U.S. at 113-114). All of these factors weigh heavily against this Court's exercise of jurisdiction over SOLIDERE.

First, SOLIDERE will be heavily burdened by having to defend this action in the United States. Practically all of the principals and likely witnesses of SOLIDERE are citizens and residents of Lebanon. Chammaa Decl., ¶ 12. In recent years, Lebanese citizens have faced significant obstacles and burdens in traveling to the U.S. See infra Part II.C. In addition, a significant portion of the evidence needed to defend this action will be located in Lebanon or in other locations abroad. Chammaa Decl., ¶¶ 12, 14, 15. Further, SOLIDERE – a Lebanese company doing no business in the United States – fully anticipated that all claims arising out of the Contract would be resolved in an international arbitration in Paris, France; such an expectation should weigh heavily against a finding of personal jurisdiction.

Second, neither the State of Delaware nor the United States has any significant interest in the resolution of this international dispute. This controversy has no connection to the State of Delaware other than the fact that Delaware is the place of incorporation of URS and its wholly-owned subsidiary, Radian. Moreover, the strong federal policy of the United States supporting arbitration, and the Supreme Court's clear jurisprudence on enforcing arbitration agreements and other forum-selection agreements, counsel that the policy interests of the United States will be better served by allowing the contractually provided-for dispute resolution process to go forward, especially where that process is already underway in another forum.

Third, URS's interest in obtaining relief is already being served by the pending international arbitration. The ICC arbitral tribunal in Paris will afford URS an opportunity to re-litigate before the ICC arbitral tribunal the issue of its jurisdiction over URS and the tribunal's

award on jurisdiction will be subject to de novo review by the Paris Court of Appeal as well as by any U.S. or other national court called upon to recognize and enforce any eventual arbitral award.

   Fourth, the interstate system's interest in the efficient resolution of controversies and the shared interests of the several States is not directly implicated by this matter, but the interests of that system would be ill-served by this Court's intercession in an ongoing arbitral proceeding that has no bearing on any domestic interest.

   For these reasons, the Complaint must be dismissed because this Court lacks personal jurisdiction over SOLIDERE.

## II.

## THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION BECAUSE DELAWARE IS NOT A CONVENIENT FORUM

   The Court should decline to exercise jurisdiction under the doctrine of forum non conveniens because – even if the Court could exercise personal jurisdiction over SOLIDERE consistent with due process – this action does not belong in the United States, let alone in this district. Forum non conveniens dismissal is both warranted and justified where, as here, (i) there is an available adequate alternative forum; and (ii) a balancing of the private interests of the parties and the public interests of the fora strongly favors the alternative forum as the one which will best serve the interests of justice. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 506-509 (1947); Tech. Dev. Co. v. Onischenko, No. 05-4835, 2006 WL 869292, at *2 (3d Cir. April 5, 2006) (adding amount of deference to be accorded to the plaintiff's choice of forum as an additional criteria to be considered); S. Megga Telecomms., 1997 WL 86413, at *11 (noting that court in China or arbitration court in Sweden would provide adequate alternate forum); see also Bell Helicopter Textron, Inc. v. C&C Helicopter Sales, Inc., 295 F. Supp. 2d 400, 410-11 (D. Del. 2000). In deciding a motion to dismiss on forum non conveniens grounds, the "ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." Lacey v. Cessna Aircraft Co., 862 F.2d 38, 42 (3d Cir. 1988) ("Lacey I") (quoting Koster v. Am.

Lumbermens Co., 330 U.S. 518, 527 (1947)).  Here, it is clear that all four factors strongly favor

dismissal in that (1) arbitration under the ICC Rules in Paris constitutes an entirely adequate and

available alternative forum; (2) URS's choice of forum is entitled to little or no deference; (3) the

private interest factors strongly favor dismissal; and (4) the public interest factors also strongly

favor dismissal.

        The ICC Arbitration is an adequate alternative forum that is more than simply

available – an arbitration is currently pending there between these parties on the same issue

presented here.  URS's choice of Delaware as a forum is not deserving of deference because

Delaware has little, if any, connection to this dispute, which arises out of a contract with a

Lebanese company to perform environmental remediation services in Lebanon.  The private

interest factors point strongly towards the ICC Arbitration because most of the witnesses and

documents on the issues likely to be raised at trial are located abroad and are much more easily

accessible to the arbitral tribunal in Paris than they are to the Court in Delaware.  Finally, the

public interest factors also point strongly towards dismissal because the public policy of the

foreign jurisdiction greatly outweighs Delaware's minimal interest in this dispute.

### A.  The Pending ICC Arbitration Between URS and SOLIDERE is an Available, Adequate Alternative Forum

        "The requirement of an adequate alternative forum is generally satisfied when the

defendant is amenable to process in the other jurisdiction."  Lacey v. Cessna Aircraft Co., 932

F.2d 170, 180 (3d Cir. 1991) ("Lacey II") (internal quotes omitted) (citing Piper Aircraft Co. v.

Reyno, 454 U.S. 235, 254, n.22 (1981)).  In addition, the remedy provided by the alternative

forum must not be "clearly unsatisfactory," a requirement that is met when the subject matter of

the suit is cognizable in the alternative forum.  Id.  The fact that the proposed alternative forum is

an international arbitration does not disqualify it from being adequate.  See S. Megga

Telecomms., 1997 WL 86413, at *3 (dismissing counterclaims on forum non conveniens grounds

where adequate alternative forum was international arbitration to be conducted in Sweden and governed by Chinese law).

Here, the criteria for finding an adequate alternative forum are clearly met. Both SOLIDERE and URS are amenable to process in the ICC Arbitration – in fact, the parties have already participated in extensive briefing before the ICC Court on the very issue before this Court, have nominated their party-arbitrators and are participating in their agreed process for selecting a tribunal chairperson. Similarly, the remedy available to URS in the ICC Arbitration – a finding that it is not bound by the arbitration clause and a determination that SOLIDERE may not proceed against it – is the exact same remedy URS seeks from this Court. Therefore, there can be no dispute that the pending ICC Arbitration represents an available, adequate, alternative forum for this dispute.

### B.  URS's Strategic Choice of Delaware Federal Court Deserves No Deference

This case has no meaningful connection to this Court. With its principal place of business elsewhere, URS's strategic decision to file suit here is based, not on the status of Delaware as its "home forum," but solely on the state as its place of incorporation. Where, as here, a plaintiff's only meaningful connection to the state of filing is that it is the situs of incorporation, the locale is not considered to be the plaintiff's "home forum." Chrysler Capital Corp. v. Woehling, 663 F. Supp. 478, 482 (D. Del. 1987). As the Supreme Court recognized in Koster:

> [C]orporations often obtain their charters from states where they no more than maintain an agent to comply with local requirements, while every other activity is conducted far from the chartering state.  Place of corporate domicile in such circumstances might be entitled to little consideration under the doctrine of forum non conveniens, which resists formalization and looks to the realities that make for doing justice.

330 U.S. at 527-528. This is precisely the situation here.

In addition, this case is not one where URS filed suit in Delaware to maximize its chances of obtaining jurisdiction over SOLIDERE here. Cf. Onishenko, 2006 WL 869292, at *4 (vacating order of dismissal based on forum non conveniens where plaintiff had sued defendant in Delaware "largely because it was the only place [plaintiff] felt confident it could obtain jurisdiction."). To the contrary, URS must have known that its chances of obtaining jurisdiction in Delaware over SOLIDERE, a Lebanese company with no presence in Delaware or anywhere else in the United States, were minimal. See supra Part I.A.1.

### C. The Private Interest Factors Weigh Heavily in Favor of Dismissal

The private interest factors to be considered in evaluating a motion to dismiss on forum non conveniens grounds clearly weigh in favor of dismissal. These private interest factors include: (i) the relative ease of access to sources of proof; (ii) the availability of compulsory service of process to secure attendance of unwilling witnesses; (iii) the cost of obtaining attendance of willing witnesses; (iv) the possibility to view the premises at issue, if such viewing would be appropriate to the action; and (v) all the other practical problems that make the trial of a case easy, expeditious and inexpensive. Lacey II at 180 (citing Gulf Oil, 330 U.S. at 508). In examining these factors, a court should scrutinize the substance of the dispute to determine what evidence is crucial. Lony v. E.I. Dupont de Nemours & Co., 886 F.2d 628, 635 (3d Cir. 1989) (citing Van Cauwenberghe v. Baird, 486 U.S. 517 (1988)).

The substance of the dispute before this Court is whether URS is bound by an arbitration clause contained in the Contract entered into by its wholly-owned subsidiary, Radian, which, subsequent to that subsidiary's entry into the Contract, URS absorbed in all but name and assumed performance of the Contract. Thus, one important issue at trial will be the degree to which URS performed the Contract after it absorbed Radian.[18] Key evidence on this issue will

---

[18] Under most national laws, including U.S. law, a non-signatory's consent to an arbitration clause may be established through a variety of legal theories. See Carberry Decl. Ex. H (excerpt from Gary B. Born, International Commercial Arbitration 664-672 (2001)); see, e.g., Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995) (recognizing "five theories for binding nonsignatories to arbitration

include testimony from (i) SOLIDERE employees who managed the Contract and interacted with URS/Radian personnel; (ii) URS/Radian employees who performed work under the Contract; (iii) SOLIDERE's construction manager, who managed the Contract on behalf of SOLIDERE and had day-to-day interaction with URS/Radian personnel; and (iv) various subcontractors and suppliers who performed work on the Normandy Landfill and had day-to-day interaction with URS/Radian and SOLIDERE personnel. Clearly, the vast majority of these potential witnesses are foreign nationals who live and work outside the United States, mostly in Lebanon. See Chammaa Decl., ¶¶ 12-15.

Witnesses living in Lebanon or other locations abroad are not subject to compulsory process in Delaware and, thus, cannot be compelled to appear at any trial of this action. See Fed. R. Civ. P. 45(b)(2); see also ADE Corp. v. KLA-Tencor Corp., 138 F. Supp. 2d 565, 569 (D. Del. 2001) ("[Defendant] will not, however, be able to compel [employees residing in California] to appear and testify if the case is tried in Delaware, as they do not live or reside in the District, or within 100 miles of the court."). While ICC arbitrators, likewise, lack subpoena power to compel the attendance of unwilling witnesses at hearing, the greater flexibility of the ICC Rules permits arbitrators to change the location and organization of their proceedings to make witness attendance more likely.

Further, the cost and inconvenience of travel to the United States would pose a significant burden on witnesses willing to appear in Delaware. As an initial matter, the geographic distance between Beirut and Delaware is significant – roughly 5,722 miles. See The New International Atlas 1-17, 1-192 (Jon M. Leverenz et al ed., Rand McNally & Co., 25th ed. 1994)

---

agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel"); E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 195 (3d Cir. 2001) (citing Thomson-CSF and stating that "[e]ach of appellants' theories for binding [the non-signatory] to the arbitration clause . . . is a recognized principle of contract or agency law applicable in the arbitration context"). Following its acquisition of Radian in June 1999, URS absorbed Radian in all but name and took over performance of the Contract with SOLIDERE. Under these circumstances, URS may be bound by the arbitration clause in the Contract between Radian and SOLIDERE under several recognized theories, including (but not limited to) as the alter ego of Radian.

(1969) (providing latitude and longitude coordinates for Beirut and Wilmington, Delaware); Nat'l

Weather Serv. Nat'l Hurricane Ctr. Tropical Prediction Ctr., Latitude/Longitude Distance

Calculator, http://www.nhc.noaa.gov/gccalc.shtml (last visited Oct. 10, 2006) (calculator

providing distance between two points of latitude and longitude). Moreover, there are no direct

flights between Beirut and the United States. Thus, a potential witness would be required to fly

four hours from Beirut to Paris (or another location in Europe or the Middle East with direct air

service to the United States) and then on to Philadelphia before finally making their way to the

federal courthouse in Wilmington to appear at any trial in this action. In addition, due to

heightened security concerns and the potential for additional unrest in Lebanon, obtaining the

necessary visas for travel to the United States would be burdensome.[19] By contrast, none of these

costs and burdens need be imposed since the place of the ICC Arbitration is Paris, France, and,

under the ICC Rules, the place for conducting hearings or meetings is flexible. Thus, under

Article 14(2) of the ICC Rules, the arbitral tribunal may, after consultation with the parties,

conduct hearings or meetings at any location it considers appropriate. Carberry Decl. Ex. C (ICC

Rules), at 19. In addition, the ICC Rules governing the admissibility of evidence are more

---

[19] Lebanon is not among the twenty-seven countries that participate in the U.S. State Department's Visa Waiver Program, which enables nationals of certain countries to travel to the United States for tourism or business for stays of 90 days or less without obtaining a visa. See U.S. Dep't of State, Visa Waiver Program, http://www.travel.state.gov/visa/temp/without/without_1990.html#1 (last visited Oct. 10, 2006). Therefore, Lebanese citizens called as witnesses in a Delaware trial would need to obtain a nonimmigrant visa to travel to the United States. See U.S. Dep't of State, Temporary Visitors to the U.S., http://travel.state.gov/visa/temp/temp_1305.html (last visited Oct. 10, 2006). Laws passed since the events of September 11, 2001 have increased the processing time for visa applications. See U.S. Dep't of State, Destination USA, New Procedures, http://www.unitedstatesvisas.gov/visapolicy/procedures.html (last visited Oct. 10, 2006). Additional procedures and paperwork including (1) interviews, (2) fingerscans, (3) an evaluation of an applicant's security risk by consular officers, and (4) a supplemental application for all male nonimmigrant applicants between the ages of 16-45, are now necessary. Id. In addition, the U.S. Consulate in Beirut, which issues visas to Lebanese nationals, has been closed during past periods of unrest in Lebanon. See U.S. Dep't of State, Immigrant and Nonimmigrant Visa Processing for Lebanese Citizens, http://travel.state.gov/visa/laws/telegrams/telegrams_2998.html (last visited Oct. 10, 2006) (noting the closure of the U.S. Consulate in Beirut during the July-August 2006 armed conflict involving Israel); see also Press Release, U.S. Dep't of State, Immigrant Visa Services Commence at the U.S. Embassy, Awkar (Nov. 10, 2004) (available at http://www.usembassy.gov.lb/Pressreleases/2004/111004PR_IV_Commence.htm) (noting the interruption of immigrant visa services at the U.S. Consulate in Beirut for twenty years during Lebanon's civil war).

flexible than the Federal Rules of Civil Procedure and, thus, less stringent in requiring live witness testimony at trial.[20]

Likewise, it is reasonable to assume that most of the documents to be used at trial are housed in Lebanon requiring costly and time-consuming retrieval and production under the discovery regime imposed by the Federal Rules of Civil Procedure as compared to the more permissive and flexible procedures in ICC arbitral proceedings. See Carberry Decl. Ex. G (excerpt from W. Laurence Craig, William W. Park & Jan Paulsson, International Chamber of Commerce Arbitration 118 (3d Ed. 2000)).

Finally, the existence of a pending arbitration between these parties on the same issues strongly favors dismissal. Palmco Corp. v. JSC Techsnabexport, No. SA CV 06-214DOC, 2006 WL 2473316, at *5 (C.D. Cal. July 25, 2006) ("The fact that tilts the private interest factors sharply toward [defendant] is that the parties are already engaged in arbitration over the exact same issues in Sweden."). A Delaware trial would require both parties to litigate identical issues in two forums simultaneously, a result that is unnecessarily burdensome and inefficient (and could result in inconsistent determinations). As the district court in Palmco explained:

> Everything necessary to resolve this dispute must be presented in Sweden. A second lawsuit here, covering at least some of the same territory and requiring the parties to attend and produce evidence, even if not necessarily requiring direct witness testimony, is highly inefficient and duplicative of the ongoing arbitration. Even though only interim relief is sought here, the parties would need to invest resources in the development of the factual record while concurrently undergoing the same effort in Sweden, and both the arbitral tribunal and this Court would have to make factual and legal findings on matters governed by Swedish law. As the Ninth Circuit has noted, "There are significant advantages in having all the parties ··· assert their claims in one forum, not only to avoid inconsistent factual findings, but also to spare the litigants the additional costs of duplicate lawsuits." [Contact Lumber Co. v. P.T. Moges Shipping Co. Ltd., 918 F.2d 1446, 1449 (9th Cir. 1990).] Dismissal serves the

---

[20] Under Article 20.1 of the ICC Rules, the arbitral tribunal is to "establish the facts of the case by all appropriate means" (emphasis added). Under Article 20.6 of the ICC Rules, the arbitral tribunal "may decide the case solely on the documents submitted by the parties unless any of the parties requests a hearing." Carberry Decl. Ex. C (ICC Rules), at 22-23.

goals of economy and efficiency, and furthers the convenience of
both parties.

2006 WL 2473316, at *5. The same is true here.

### D. The Public Interest Factors Weigh Heavily in Favor of Dismissal

The public interest factors to be considered in evaluating a motion to dismissal

on forum non conveniens grounds clearly weigh in favor of dismissal. These public interest

factors include: (i) the administrative difficulties flowing from court congestion; (ii) the local

interest in having localized controversies decided at home; (iii) the interest in having the trial of a

diversity case in a forum that is at home with the law that must govern the action; (iv) the

avoidance of unnecessary problems in conflict of laws, or in application of foreign laws; and (v)

the unfairness of burdening citizens in an unrelated forum with jury duty. Lacey I, 862 F.2d at 48

(citing Piper, 454 U.S. at 241 n. 6). "In evaluating the public interest factors the district court

must 'consider the locus of the alleged culpable conduct, often a disputed issue, and the

connection of that conduct to plaintiff's chosen forum.'" Id. (quoting Van Cauwenberghe, 486

U.S. at 528).

There is no dispute that the locus of the culpable conduct here – URS's failure to

perform according to the Contract, following its absorption of Radian and subsequent assumption

of performance of the Contract – occurred in Beirut. In addition, the Contract was negotiated in

Lebanon, involves a construction project in Lebanon, is governed by Lebanese law and provides

for dispute resolution via international arbitration in Paris. By contrast, the sole interest of

Delaware in this dispute is that URS and Radian, its wholly-owned subsidiary, are incorporated

here. These circumstances weigh heavily against any deference to the minimal interest of this

forum in the parties' dispute.

This Court's dismissal, on forum non conveniens grounds, of counterclaims

asserted by a defendant in S. Megga Telecomms., 1997 WL 86413, at *3, is instructive. There,

this Court held that dismissal was appropriate since the counterclaims related to a joint venture

agreement that was governed by Chinese law and provided for dispute resolution by international

arbitration in Sweden which the Court found to be an adequate alternative forum. Id. at *2, 11.

Similar to the S. Megga Telecomms. case, here, the contract at issue is governed by Lebanese law

and calls for disputes to be resolved by ICC arbitration in France. Even more compelling here is

that the parties have already begun arbitration proceedings and filed written submissions with the

ICC Court on the issue of whether the arbitrators have jurisdiction to determine whether URS is

bound by the arbitration clause.

      The other public interest factors clearly weigh in favor of dismissal as well.

      First, the relative congestion of this Court's docket dwarfs that of an arbitral

tribunal constituted under the ICC Rules because such a tribunal will be specifically constituted to

hear this dispute alone and have no other mission.

      Second, as detailed above, Delaware has only the most attenuated connection to

this dispute which can hardly be categorized as "local." This jurisdiction has no significant

interest in seeing this dispute resolved here. By contrast, Lebanon has a significant interest in

seeing this dispute involving a Lebanese construction project resolved in the manner bargained-

for by a Lebanese company, i.e. by international arbitration in Paris, France applying Lebanese

law (which is similar to French law) as called for by the Contract.

      Third, it is likely that the members of the ICC arbitral tribunal will be

experienced in handling an international dispute like this regardless of the national law or laws

which may apply, be it Lebanese (as called for by the Contract), French (as the situs of the

arbitration) or American (as urged by URS). The arbitral tribunal hearing this dispute already is

comprised of a respected former U.S. federal judge and experienced international arbitrator,

Judge Charles B. Renfrew, chosen by URS as its party-arbitrator and a respected international

arbitration practitioner who is a member of the California and Paris bars, Eric A. Schwartz,

chosen by SOLIDERE. In addition, the parties have jointly nominated a highly experienced

international practitioner, Professor Bernard Hanotiau, a Belgian national, to act as Chair of the arbitral tribunal.

Fourth, were this case to proceed in Delaware, as described above, the Court would be faced with a complex choice of law analysis. Two of the possibly applicable sets of laws would require the application of foreign law. By contrast, an ICC arbitral tribunal will not necessarily be required to decide on an applicable substantive law, and, if a choice does prove to be necessary, it is likely that experienced international arbitrators would be well qualified to conduct any relevant conflicts analysis and to select and apply foreign law. The international nature of this dispute, including the potential need to apply foreign procedural and substantive laws, further counsels in favor of dismissal. See S. Megga Telecomms., 1997 WL 86413, at *11 (dismissing counterclaims under doctrine of forum non conveniens where counterclaims "would involve complex issues of Chinese procedural and substantive law.").

Finally, as detailed above, Delaware has only a minimal interest in the resolution of this non-local, international dispute. Given this fact, it certainly would be unfair to burden the citizens of Delaware with serving on a jury in a trial of this case.

For these reasons, the Court should decline to exercise jurisdiction over URS's claims and dismiss the Complaint pursuant to the doctrine of forum non conveniens.

### III.

### URS SHOULD BE EQUITABLY ESTOPPED FROM PROCEEDING WITH THIS ACTION

Assuming the Court finds that it has personal jurisdiction over SOLIDERE and that this is a convenient forum in which to litigate this dispute, the Court should still dismiss the Complaint on the equitable grounds that URS has already chosen to arbitrate before the ICC the issue of whether, prima facie, it may be bound to the arbitration clause in the Contract, thereby inducing SOLIDERE's reasonable reliance on that proceeding, and thus should not be permitted to stop that proceeding prior to its resolution.

The doctrine of equitable estoppel is well-recognized under Delaware law.

Bechtel v. Robinson, 886 F.2d 644, 650 (3d Cir. 1989). "Under Delaware law, '[equitable]

estoppel may arise when a party by his conduct intentionally or unintentionally leads another, in

reliance upon that conduct, to change position to his detriment.'" Id. (quoting Wilson v. Am. Ins.

Co., 209 A.2d 902, 903-04 (Del. 1965) (alteration in original)); Toner v. Allstate Ins. Co., Civ. A.

No. 92-624-SLR, 1994 WL 828294, at *3-4 (D. Del. Dec. 29, 1994). In addition to showing

reasonable reliance, the party seeking estoppel must show that it "lacked knowledge or the means

of obtaining knowledge of the truth of the facts in question." Waggoner v. Laster, 581 A.2d

1127, 1136 (Del. Supr. 1990) (citing Wilson). Here, the elements of equitable estoppel are

clearly present: (i) URS intentionally "invited" the ICC Court to initiate a jurisdictional review in

accordance with Article 6(2) of the ICC Rules and indicated that it would abide by the

determination reached in that proceeding, knowing that SOLIDERE, in reasonable reliance on

URS's conduct, would expend resources in participating in that proceeding, (ii) SOLIDERE did,

in fact, expend considerable resources in arbitrating the jurisdictional issue, prima facie, before

the ICC Court, (iii) SOLIDERE had no knowledge, and no means of obtaining knowledge, of

URS's true intent not to abide by the ICC Court's determination and, instead, to pursue this

interdictory action. Absent application of the doctrine of equitable estoppel, SOLIDERE faces

the wasteful expenditure of additional resources to re-litigate this issue, as well as potentially

inconsistent, binding determinations of this issue.

As noted supra, the ICC Arbitration was commenced on February 13, 2006.

Rather than immediately commencing an action in this or another U.S. federal court (or ignoring

the arbitration entirely), URS filed a 12-page letter-brief with the ICC Court, on March 13, 2006,

in which it explicitly "invite[d]" that court to consider whether, prima facie, an arbitration

agreement with URS under the ICC Rules might exist and "respectfully requested that under

Article 6(2) of the ICC Rules, the ICC Court should decide not to allow [SOLIDERE's]

arbitration proceedings against URS to go forward." Carberry Decl. Ex. D (letter-brief dated

March 13, 2006), at 1, 12. Further, URS asked the ICC Court for an extension of thirty (30) days in which to respond to the merits of SOLIDERE's Request for Arbitration <u>following any adverse (to URS) determination by the ICC Court on arbitrability</u>, thus implicitly acceding to the ICC Court's jurisdiction to determine this issue. URS then fully participated in all proceedings before the ICC Court, including filing two additional letter-briefs with that body on the very issue upon which it now seeks a declaratory judgment from this Court. Pursuant to Article 6(2) of the ICC Rules, the ICC Court considered the parties' arguments as to whether URS should be bound by the agreement to arbitrate in the Contract and found, on June 2, 2006, that a <u>prima facie</u> case for the exercise of jurisdiction over URS may exist and that, therefore, the case "shall proceed against both Respondents," <u>i.e.</u> URS and Radian. Carberry Decl. Ex. D (facsimile dated June 2, 2006), at 2. In accordance with Article 6(2) of the ICC Rules, the ICC Court referred determination of the issue of arbitrability to the arbitral tribunal. <u>Id.</u>

URS intentionally waited for the ICC Court's decision and only sought relief in this Court on June 30, 2006, twenty-eight days after the ICC's decision rejecting URS's arguments. On that same day, and simultaneous with its request for relief to this Court, URS filed a 49-page brief entitled "Respondent URS Corporation's Objections to Jurisdiction" in the ICC Arbitration in which URS "respectfully requests that the [ICC] Tribunal . . . declare that the [ICC] Tribunal lacks jurisdiction over URS[.]" URS is therefore requesting the same relief in the ICC Arbitration as it is requesting from this Court: a declaration that the ICC arbitral tribunal lacks jurisdiction over URS. Thus, this action, initiated by URS, is duplicative of the jurisdictional review—also initiated by URS—to be conducted by the ICC arbitral tribunal.

Consequently, URS should now be estopped from preventing the ICC arbitral tribunal from ruling on this jurisdictional issue. In addition, it is possible that the ICC arbitral tribunal will decide in URS's favor and hold that it is not bound by the arbitration agreement and,

thus, not a proper party to the ICC Arbitration. In that case, URS would suffer no harm[21] and there would be no question for this Court to decide. In addition, even if the ICC arbitral tribunal were to find that URS is bound by the agreement to arbitrate, it could still find that URS is not liable to SOLIDERE on the merits of SOLIDERE's claims. Again, in this instance, URS would suffer no injury and there would be no relief for this Court to grant.

Moreover, assuming that the arbitral tribunal finds against URS on the issue of arbitrability, URS would then be entitled to seek review of that arbitral award before the courts of France which, as the situs of the arbitration proceeding, have primary supervisory jurisdiction over the arbitration proceedings. The Paris Court of Appeal would examine the question of jurisdiction de novo. Were such court to set aside the award, a U.S. court would be entitled to refuse enforcement of the award in the United States, pursuant to Article V(1)(e) of the New York Convention.[22] See Telcordia Tech. Inc. v. Telkom SA Ltd., 485 F.3d 172, 175-176 (3d Cir. 2006) ("[t]he setting aside or annulment of the arbitral award by the South African Court [at the situs of arbitration] would be grounds for other courts to refuse recognition and enforcement of the arbitral award pursuant to Article V of the New York Convention"). Here again, URS would suffer no injury and could ask for no relief from this Court.

Finally, SOLIDERE has reasonably relied on URS's voluntary decision to "invite" the ICC Court to decide prima facie the issue of arbitrability and its express request that an

---

[21] URS's anticipated response that it will suffer harm by having to participate in the ICC Arbitration is a red herring. First, URS has already submitted itself to the jurisdiction of the ICC Court by participating in the briefing of this issue. Second, as noted above, any expense or inconvenience experienced by URS in presenting its case to the arbitral tribunal, while entirely the result of its own strategic conduct, will also be significantly less than the cost and burden it would face in proceeding to trial before this Court. Third, pursuant to Article 31 of the ICC Rules, the successful party can (and often does) recover the costs of the arbitration, including its attorneys' legal fees and expenses, from the unsuccessful party. Carberry Decl. Ex. C (ICC Rules), at 29-30.

[22] This Article states that "[r]ecognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that . . . (e) The award . . . has been set aside . . . by a competent authority of the country in which, or under the law of which, that award was made." Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, art. V(1)(e), 21 U.S.T. 2517, 330 U.N.T.S. 38.

ICC arbitral tribunal decide whether it has jurisdiction over URS, by actively arbitrating this issue before the ICC Court. Thus, URS should be estopped from abandoning the ICC process for determining this issue in favor of resort to this Court. URS was free to ignore, from the outset, the ICC Arbitration and/or immediately seek relief from this Court as soon as that proceeding was initiated in February 2006. Instead, it made the tactical decision to engage solely that body to determine the issue of arbitrability, to induce SOLIDERE's reasonable reliance on that decision and, only after it received an adverse prima facie ruling on jurisdiction from that body, following five months of proceedings before it (February to June 2006), did it revert to this Court. Having voluntarily chosen its forum—arbitration under the ICC Rules—URS should now be held to that choice. Allowing URS to undermine the ICC Arbitration by filing this interdictory action would subject SOLIDERE to harm as a result of its reasonable reliance on URS's actions by obliging it to litigate the same issue in separate proceedings simultaneously or re-litigate the same issue here as initially determined by the ICC Court and would endorse forum-shopping. The strong public policy against such tactics further supports dismissal of the Complaint. See Al Nawasi Trading Co. v. BP Amoco Corp., 191 F.R.D. 57, 59 (S.D.N.Y. 2000) (denying plaintiff's motion for expedited discovery in aid of a prospective motion for a preliminary injunction where plaintiffs had already begun proceeding in London Court of International Arbitration, invoking "the modern preference for international arbitration[.]"). For these equitable reasons, the Court should not permit URS to proceed with this action until the conclusion of the ICC Arbitration.

### Conclusion

For the foregoing reasons, Defendant SOLIDERE respectfully requests that the Court dismiss the Complaint, decline to exercise jurisdiction under the doctrine of forum non

conveniens, or stay any action in this case pending resolution of the ICC Arbitration and grant

such other relief as the Court may deem proper and just.

_____
Samuel A. Nolen (#971)
Matthew W. King (#4566)
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware  19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Nolen@rlf.com
King@rlf.com

OF COUNSEL:
Paul B. Carberry (admitted *pro hac vice*)
White & Case LLP
1155 Avenue of the Americas
New York, NY  10036
Telephone: (212) 819-8507
pcarberry@whitecase.com

*Attorneys for Defendant The Lebanese
Company for the Development and
Reconstruction of Beirut Central District,
S.A.L. a/k/a SOLIDERE*

Dated: October 16, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2006, I electronically filed the foregoing with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following and which has also been served as noted:

### BY HAND

Edward P. Welch
Edward B. Micheletti
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899

I hereby certify that on October 16, 2006, the foregoing document was sent to the following non-registered participants in the manner indicated:

### VIA FEDERAL EXPRESS

Jeffrey H. Dasteel
Jason D. Russell
Marina V. Bogorad
Skadden, Arps, Slate, Meagher & Flom LLP
300 S. Grand Avenue, 34th Floor
Los Angeles, CA 90071

Matthew W. King (#4566)
king@rlf.com

RLF1-3061959-1