IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------   x
                                                    )
                                                    )
URS CORPORATION                                     )
                                                    )   Civil Action No  06-415-SLR
               Plaintiff,                           )
                                                    )
                                                    )
       v.                                           )
                                                    )
THE LEBANESE COMPANY FOR THE                        )
DEVELOPMENT AND RECONSTRUCTION                      )
OF BEIRUT CENTRAL DISTRICT, S A L.,                 )
a k/a SOLIDERE,                                     )
                                                    )
               Defendant                            )
                                                    x
-------------------------------------------------
```

## DECLARATION OF NASSER CHAMMAA IN SUPPORT OF DEFENDANT SOLIDERE'S MOTION TO DISMISS THE COMPLAINT

NASSER CHAMMAA declares as follows

1.      I am the Chairman and General Manager of The Lebanese Company for the Development and Reconstruction of Beirut Central District, S A L., a/k/a SOLIDERE ("SOLIDERE")  I submit this declaration, pursuant to 28 U.S C. 1746, in support of Defendant SOLIDERE's Motion to Dismiss the Complaint  Unless otherwise noted, the information contained herein is based on my own personal knowledge

2.      After the Lebanese civil war, which lasted from 1975 to 1990, Lebanon began the process of rebuilding the Beirut Central District ("BCD"), which was heavily damaged during the war.  Initially, this process was undertaken by the State of Lebanon, through the Council of Development and Reconstruction ("CDR"), which is the authority in charge of overseeing major public works projects in Lebanon  However, this effort was marred mainly by inadequate resources and confusion over property rights  In response to this situation, Lebanese

Law No. 91-117 came into effect and authorized the CDR to accomplish the rebuilding by contracting with a private entity. Attached hereto as Exhibit A is a true and correct English-language copy of Lebanese Law No. 91-117.

3.    On May 5, 1994, SOLIDERE was constituted as a private-sector, joint stock company on the basis of Lebanese Law No. 91-117. Under Article 3 of SOLIDERE's Articles of Incorporation, SOLIDERE's sole business activities are the acquisition of real estate properties in the BCD and the re-construction or restoration and commercial development of the area, including the remediation of the seaside area called the Normandy Landfill. The Normandy Landfill was created as a result of waste deposited into the sea off the coast of Beirut during the civil war. Attached hereto as Exhibit B is a true and correct English-language copy of the Articles of Incorporation of SOLIDERE.

4.    As part of SOLIDERE's creation, Lebanese Law No. 91-117 compelled owners of real estate properties in the BCD as well as owners of all other rights pertaining thereto to contribute their rights to SOLIDERE in exchange for shares in the company. The CDR then entered into a contract with SOLIDERE, under which SOLIDERE became responsible for executing the infrastructure of the BCD and all the financing thereof. As compensation for its efforts, SOLIDERE received title and development rights to 291,800 sq. meters of land on the reclaimed land known as the Normandy Landfill. Because of its prime location adjacent to the Mediterranean Sea, the Normandy Landfill was considered to be the crown jewel of the BCD and stood to become, once remediated, one of the most prestigious pieces of real estate in the Middle East.

2

5.    SOLIDERE is owned by individuals, companies and others and is governed by the same Lebanese commercial law that applies to all commercial companies in Lebanon.

a.    Sixty percent (60%) of SOLIDERE's initial capital consisted of contributions in kind represented by the ownership of real estate properties and all other rights pertaining thereto, while forty percent (40%) represented cash contributions made by private investors from Lebanon and abroad.

b.    The State of Lebanon is one of many shareholders of SOLIDERE, whose total number exceeds 34,000 shareholders, and, as of October 13, 2006, owns 83,707 shares of the company, representing 0.05% of the SOLIDERE's total shares. The State of Lebanon has never owned a majority of SOLIDERE's total shares. Upon formation of SOLIDERE, the State of Lebanon owned 492,816 shares, representing 0.25% of SOLIDERE's total shares.

c.    Article 3, Section 5 of SOLIDERE's Articles of Incorporation explicitly grants SOLIDERE the power to "carry out all operations and works necessary for the accomplishment of the Company's object." SOLIDERE is managed by its board of directors, which is comprised entirely of private citizens with the exception of a single director who represents the State of Lebanon and the Municipality of Beirut as shareholders and who has the same powers as the other directors. The State of Lebanon has no role in supervising SOLIDERE's activities. SOLIDERE is subject to the same regulatory oversight as any publicly-owned company in Lebanon.

d.    Employees of SOLIDERE are employed solely by SOLIDERE and are not employed in any public or governmental capacity by the Lebanese government. Article

3

18 of SOLIDERE's Articles of Incorporation provides that at least two-thirds of its twelve-member board of directors must be Lebanese nationals. There are no other restrictions of any kind on who may be employed by SOLIDERE.

e.    Shares of SOLIDERE are registered on the Beirut Stock Exchange and the Kuwait Stock Exchange. Global Depositary Receipts ("GDRs") linked to SOLIDERE's shares are listed on the London Stock Exchange.

6.    SOLIDERE is not authorized to do business in Delaware or elsewhere in the United States. SOLIDERE does not maintain an office in Delaware or elsewhere in the United States and does not solicit or conduct business in Delaware or elsewhere in the United States. SOLIDERE has not contracted to supply goods or services to Delaware or derived any revenue from goods or services used in the state. SOLIDERE has not contracted to insure or provide surety for any entity in Delaware.

7.    On January 25, 1999, SOLIDERE and Radian International LLC ("Radian") executed a construction contract calling for the remediation of the Normandy Landfill in Beirut (the "Contract"). Attached hereto as Exhibit C is a true and correct copy of the Contract.

a.    The Contract was executed following negotiations held between representatives of Radian and SOLIDERE in Beirut from February 1997 through December 1998. Throughout the negotiations, Radian personnel made numerous trips to Beirut including an initial site visit in February 1997. These negotiations included informal email exchanges between Radian and SOLIDERE.

b.    Section 44 of the General Conditions of the Contract provides that all disputes arising out of or in connection with the Contract are to be resolved pursuant to

4

arbitration to be conducted in Paris, France under the Rules of Arbitration of the International
Chamber of Commerce ("ICC").

       c     Performance of the Contract was contemplated, and actually
conducted, entirely at the Normandy Landfill in Beirut, Lebanon.

       d     Following URS's acquisition of Radian in June 1999, several
disputes arose in relation to the failure of URS/Radian to perform any meaningful treatment of
the material excavated and backfilled from the Normandy Landfill site. As a direct result of this
failure, dangerous "landfill gas," including high concentrations of methane and carbon dioxide,
contaminated the Normandy Landfill.

       e     In December 2003, SOLIDERE participated in arbitration hearings
regarding the failure of URS/Radian to perform under the Contract. Although the arbitration had
been nominally initiated by Radian, URS was highly involved with and, upon information and
belief, in fact, controlled these proceedings. A unanimous ICC arbitral award dated July 12,
2004 confirmed that the treatment had not been performed in conformity with the Contract. This
award stated, inter alia, that there was a "failure or defect" in the works, which were not "Fit for
the Purpose, as defined in the Contract."

       f     Following the arbitral award, a plan was supposed to be submitted
explaining how this defect would be remedied. URS/Radian failed to submit a proper plan or
take other action to remedy the defect and have, since February 2005, unjustifiably ceased all
work on the Normandy Landfill. The defect in the work that was recognized by the arbitral
award continues to exist. These failures and others are reflected in the eight separate Events of
Default, as that term is defined in Article 35.2 of the General Conditions of the Contract, of

5

which SOLIDERE notified Radian or URS/Radian between March 30, 2004 and January 12, 2006. As a result of these failures, SOLIDERE terminated the Contract on February 10, 2006.

        8.    On September 9, 2003, SOLIDERE and Paul C. Rizzo Associates entered into a contract to study the feasibility of multi-use land development on the Normandy Landfill (the "Rizzo Contract"). The Rizzo Contract was negotiated outside of the United States and included informal email exchanges between SOLIDERE and Paul C. Rizzo Associates. Attached hereto as Exhibit D is a true and correct copy of the Rizzo Contract.

        9.    In 1998, SOLIDERE and the United States Trade and Development Agency ("USTDA") had entered into an agreement under which USTDA provided a training grant in connection with the Contract (the "1998 USTDA Grant"). In 2003, SOLIDERE and the USTDA entered into an agreement under which USTDA granted funding for the Rizzo Contract (the "2003 USTDA Grant"). Both the 1998 USTDA Grant and the 2003 USTDA Grant were negotiated in the United States.

        10.    On July 13, 2001, SOLIDERE, Citibank, N.A., Beirut Branch, Citibank International PLC, London, England, and the Export-Import Bank of the United States (the "Ex-Im Bank") entered into a $14.7 million Credit Agreement which provided funding for a portion of the Contract. The Credit Agreement included a partial guarantee by the Ex-Im Bank. The Credit Agreement was negotiated in Lebanon. Attached hereto as Exhibit E is a true and correct copy of the Credit Agreement.

        11.    On June 8, 1999, Banque Saradar, S.A.L., a Lebanese bank, provided a Performance Letter of Guarantee, which covered Radian's performance under the Contract, to SOLIDERE (the "Banque Saradar Guarantee"). This Performance Letter of Guarantee was required by Article 32 of the General Conditions of the Contract, which stated that the guarantee

6

would be issued by a Lebanese bank approved by SOLIDERE. The Banque Saradar Guarantee was negotiated in Lebanon. Attached hereto as Exhibit F is a true and correct copy of the Banque Saradar Guarantee. Upon information and belief Banque Saradar may have obtained a counter-guarantee from a bank based in the United States; however, SOLIDERE had no involvement whatsoever in the negotiation or obtainment of that counter-guarantee.

12.     Practically all SOLIDERE employees who managed the Contract and interacted with URS/Radian personnel are Lebanese citizens who live in Lebanon. Documents used by these employees in the course of their work under the Contract are stored in Lebanon.

13.     Upon information and belief, a number of URS/Radian employees who performed work in connection with the Contract are Lebanese citizens who live in Lebanon.

14.     As provided by the Contract, SOLIDERE appointed a construction manager to manage the Contract on behalf of SOLIDERE. Employees of SOLIDERE's construction manager who performed work in connection with the Contract and interacted on a day-to-day basis with URS/Radian employees are Lebanese or British citizens who live in Lebanon. Documents used by these employees in the course of their work under the Contract are stored in Lebanon.

15.     Upon information and belief, employees of several subcontractors and suppliers who performed work in connection with the Contract and interacted with URS/Radian employees are Lebanese citizens who live in Lebanon. Upon information and belief, documents used by these employees in the course of their work under the Contract are stored in Lebanon.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 16, 2006.

7

NASSER CHAMMAA

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2006, I electronically filed the foregoing with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following and which has also been served as noted:

### BY HAND

Edward P. Welch
Edward B. Micheletti
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899

I hereby certify that on October 16, 2006, the foregoing document was sent to the following non-registered participants in the manner indicated:

### VIA FEDERAL EXPRESS

Jeffrey H. Dasteel
Jason D. Russell
Marina V. Bogorad
Skadden, Arps, Slate, Meagher & Flom LLP
300 S. Grand Avenue, 34th Floor
Los Angeles, CA 90071

Matthew W. King (#4566)
king@rlf.com

# EXHIBIT A

# Law No. 91 - 117

Amendment of certain provisions of Law Decree No. 5 promulgated on 31st January 1977 (Formation of the Council of Development and Reconstruction) and its amendments.

The Chamber of Deputies has voted, and the President of the Republic hereby promulgates the following law:

## Single Article

The Project of Law in Decree No. 1273 aiming at the amendment of certain provisions of Law Decree No. 5 promulgated on 31st January 1977 (Formation of the Council of Development and Reconstruction) and its amendments, as modified by the joint Parliamentary Commissions, is hereby ratified.

The present law shall be published in the Official Gazette.

Beirut, 7 December 1991

Signed: Elias HRAWI
*Issued by the President of the Republic*
*President of the Council of Ministers*
Signed : Omar KARAMI

# Law

Amendment of certain provisions of Law Decree No. 5 promulgated on 31st December 1977 (Formation of the Council of Development and Reconstruction) and its amendments.

## Single article

The Project of Law set out in Decree No 1273 aiming at the amendment of certain provisions of Law Decree No. 5 promulgated on 31st January 1977 (Institution of the Council of Development and Reconstruction) and its amendments, as modified by the Joint Parliamentary Commissions, is hereby ratified.

The present law shall be published in the Official Gazette

# Law

Amendment of certain provisions of Law Decree No. 5 promulgated on 31st January 1977 (Formation of the Council of Development and Reconstruction) and its amendments.

## Article 1

The text of paragraph 6 of Article 5 of the Law Decree No. 5 promulgated on the 31st of January 1977, amended by Article 1 of Law-Decree No. 16 dated 23rd of March 1985, is hereby abrogated and replaced by the following text:

"6 - To carry out directly or through any public administration, public entity, municipality, Joint-stock or mixed company that shall be formed with the participation of the Council of Development and Reconstruction or any Real Estate Company formed in line with the provisions of Article 21 of the Law on Town Planning the execution of any project assigned to it by the Council of Ministers in any of the areas specified for in paragraph 4 of the present Article.

The Articles of Incorporation, of every Joint-Stock or Mixed Company that shall be formed with the participation of the Council of Development and Reconstruction or any Real Estate Company mentioned in the preceding paragraph, shall be subject to the approval of the Council of Ministers and to the provisions of the Code of Commerce

## Article 2

The following paragraph 9 is added to Article 5 of Law-Decree No. 5 promulgated on 31st of January 1977, amended by Article 1 of Law-Decree No. 16 dated 23rd of March 1985:

"9 - Whenever the Council of Development and Reconstruction carries out the execution of the provisions referred to in paragraph 6 of this article through a Real Estate Company, such Company shall be formed and its Articles of Incorporation shall be approved by Decree adopted by the Council of Ministers

The Articles of Incorporation shall state and define all matters related to the formation of the company, its object, the conduct of its activities, the various prerogatives of its organs and its liquidation. Such Articles of Incorporation should not violate the basic rules

provided for in the laws in force and especially the provisions of the Code of Commerce

The Articles of Incorporation of the company may include provisional stipulations allowing for the formation of the company and the conduct of its activities before final settlements of the disputes concerning the rights of the property owners and any other rights pertaining to such property that have formed the contributions in kind (in the capital of the company)

### Article 3

The following provisions shall apply to the Real Estate Company:

I - Object of the Company

The object of the company shall be the planning (Amenagement) and reconstruction of one or more of the areas damaged during the hostilities in Lebanon in accordance with a Master Plan and Guiding Layout duly approved and the carrying out of the works necessary for the achievement of this object. The company's object shall include, the development and reconstruction of the area in accordance with the approved Master Plan and Guiding Layout, the sale of the developed lots, the erection of buildings thereon and the sale or lease of such buildings.

Where the damaged area is adjacent to the sea, the government may enter into an agreement with the Real Estate Company to bank up part of the sea side in accordance with a duly approved Master Plan and Guiding Layout.

The reclaimed land resulting therefrom shall be developed and shared between the State and the company in accordance with an agreement to be drawn up by the Council of Development and Reconstruction and approved by Decree adopted by the Council of Ministers pursuant to a proposal presented by the Minister of Finance and the Minister of Public Works and Transport.

II - Head Office of the Company

The Head Office of the Company shall be in Beirut or in any other place in Lebanon determined by its Articles of Incorporation

III - Duration of the Company

The Duration of the Company shall be fixed in its Articles of Incorporation

IV - Capital of the Company

The capital of the Company shall consist of the contributions in

kind (real estate properties) which fall within the boundaries of the area designated for redevelopment and reconstruction and of the contributions in cash to be subscribed to by the persons designated in paragraph \ of this Article.

The capital of the Company may be determined in a foreign currency, whereby the contributions in cash should not be in excess of the contributions in kind. Allowance should be made for the broadest possible number of subscribers

The cash subscriptions should be completed within six months from the date the Higher Appraisal Committee issues its appraisal decisions mentioned in this article

The appraisal of the real estate properties and rights therein, which form part of the Real Fast Companies' capital, shall be appraised in accordance with the following procedure:

1 - The real estate properties falling within the boundaries of the area forming the company's domain shall be fixed by a decree adopted by the Council of Ministers pursuant to a proposal presented by the Minister of Finance and the Minister of Public Works and Transport such decree shall be published in the Official Gazette and three local newspapers

2 - One or more first instance appraisal committee/committees, shall be appointed by virtue of a decree adopted by the Council of Ministers pursuant to a proposal presented by the Minister of Finance and the Minister of Public Works and Transport.

Such committees shall be composed of a judge of the tenth grade, at least, who shall act as chairman and two engineers, an economic expert and a real estate expert as members; each of such engineers and experts should have at least fifteen years of experience

The task of this committee shall be to determine the overall value of the various rights pertaining to the property owners, lessees, or management rights holders and any other right owner in every real estate property in the concerned area

3 - Before starting to carry out their task, the committee/committees referred to in the preceding paragraph shall publish in the Official Gazette and three local newspapers, selected by the chairman of the committee, a notice indicating the cadastral number of all the real estate properties and inviting the property rights holders therein to submit their demands, pleas, written remarks and documents where needed, and to elect domicile in the county where the area is located, within a period of three months from the date of publication of this notice

The committee shall issue its decisions after inspecting all the real estate properties in the relevant area and reviewing the remarks presented by the property rights holders.

4 - All decisions taken by the above mentioned committees shall be referred, upon their issuance, to a higher appraisal committee/committees, which will be appointed by a decree adopted by the Council of Ministers pursuant to a proposal presented by the Minister of Justice and the Minister of Public Works and Transport.

Such committee/committees shall be composed of a judge of the fifth grade, at least, who shall act as the chairman, two engineers, an economic expert and a real estate expert as members; each of the engineers and experts should have at least twenty years of experience

This committee/committees shall be in charge of reconsidering the decisions referred to it and, for this purpose, should again invite the property rights holders to submit their demands, pleas and remarks regarding the decisions of the first instance committee/committees, and follow the same procedure as described in paragraph three above

There shall be appointed a substitute chairman and substitute members for each of the first instance and higher appraisal committee/committees; such substitutes shall replace the original chairman and members in case of absence or for any reason that might prevent them from serving on their respective committees

The necessary number of judicial clerks, shall be attached to each first or higher committee/committees by virtue of a decision of the Minister of Justice and pursuant to a proposal presented by the Director General of the Ministry of Justice

The meetings of the first instance and higher appraisal committee shall not be valid unless attended by all members of each committee.

The above-mentioned committees shall take their decisions by unanimous or majority vote and shall define, in details, the base of their appraisal.

The chairman of the higher and first instance committee shall, before starting the appraisal, lay down together and by a majority vote, the principles and base to be adopted in the appraisal and seek for this purpose the assistance of expert members of the different committees

The decisions of the higher appraisal committee shall be final and are subject to no further means of recourse by any ordinary or extraordinary legal procedures, including that of power abuse

5 - All real estate properties in all their forms and whoever their owners, as well as the business concerns, the rights of lease or management rights falling within the domain of the area concerned

shall be deemed to be contributions in kind. An entry of lien shall be recorded on their respective lands and commercial registers.

Where the subscription of the cash capital is not completed for the entire issued shares within a period of six months as from the date of the decisions of the above-mentioned committee/committees, the entry of lien recorded at the Land Registry or the Commercial Registry shall ipso facto be deleted and the contributions in cash shall be returned to their owners. The Real Estate Company shall, by power of law, be annulled and all the resulting decrees, decisions, provisions and measures, which were taken in association thereof shall be repealed.

Upon completion of the cash subscription in the capital of the company the ownership of the real estate properties and business concerns, and rights of lease shall devolve to the Real Estate Company by power of law.

The issuance of the decree authorizing the formation of the company shall lead without the need for any further procedure, to the transfer of public properties falling within the Company domain to the category of private properties of the State.

Any real estate property or business concerns in the area concerned, encumbered with rights of lien, mortgage, or seizure shall be discharged therefrom and such rights shall be ipso facto attached to the shares issued against the contributions in kind, to the owner of such real estate property or business concerns.

The contributions in kind to the capital of the Real Estate Company, shall be exempted from the verifications procedures provided for in the article 86 of the Code of Commerce.

6 - The appraisal files pertaining to the real estate properties listed on the schedule published with the decree authorizing the formation of the Real Estate Company shall be referred to committees formed in conformity with the provisions of the Law on Expropriation.

These committees shall be in charge of the distribution of the appraised value of each real estate property between the proprietors, lease holders and other rights holders in such real estate property; the aggregate of all the shares allocated to these persons shall not exceed in each real estate property the total amount for such property as estimated by the higher appraisal committee/committees mentioned above.

In case of delay in settling the distribution of the property values for whatever reason, the committee in charge of the matter shall, at the request of any interested party, appoint a representative for the shares in question.

Such representative will attend on their behalf all types of general meetings held by the Real Estate Company

The parties concerned shall be notified at the domicile elected by each of them in accordance with paragraph 2 above; in absence of such domicile they shall be notified at the office of the committee.

The decisions of these committees shall be subject to the procedures and terms provided for in the Law on Expropriation concerning the decisions of the expropriation committees

Whenever any interested party resorts to any of the means of recourse, the case of the distribution of the appraised value shall be reconsidered by the proper courts for all the right holders in the property concerned.

However under no circumstances should the total amount of shares pertaining to the right holders in any real estate property exceed the valuation of the higher appraisal committee of this real estate property

In case of dispute regarding the obligation, the right to decide on the dispute lies with the court having jurisdiction. For this purpose additional courts wholly devoted to such matters may be set up by decree adopted pursuant to a recommendation by the Minister of Justice to rule these disputes and work during and outside office hours against remuneration to be determined in the same decree

V - Priority

1 - Share holding in the Company

Priority to subscription in the cash component of the capital of the company shall be given to subscribers in the following order:

a - Owners of real estate properties and right holders therein

b - Lebanese nationals and purely Lebanese Companies in the sense of the Law on the Acquisition of Property by non-Lebanese nationals

c - The State and the Public Institutions and Municipalities concerned

d - Persons of Lebanese Origin, Official and Semi Official Arab Institutions and Nationals of Arab Countries.

2 - The shareholder in the Company

Pursuant to the provisions of Clause V of Article 3, and subject to the provisions of paragraph 2 of Clause IV of the present Article, in case of increase of the company's capital, the former shareholders shall

have a right of preference to subscribe in all the new shares in the proportion of the shares they are holding and should exercise this right within a period of one month from the date of offering the new shares for subscription.

Whenever it finds it necessary to bring in new shareholders, the extraordinary general meeting of the shareholders of the Real Estate Company, may decide that the right of subscription shall not be reserved to the former shareholders, or shall only be reserved to them partially

## VI - The Shares

1 - All the company's shares shall be and shall remain in registered form

The shares of the Real Estate Company shall become immediately negotiable in the Beirut Stock Exchange. The company may buy up to 10% of its shares notwithstanding the absence of reserve, provided that it shall resell these shares within a period not exceeding eighteen months from their date of purchase

2 - The holders of shares issued in representation of contributions in kind shall have a right of preference to use them for the settlement in full or in part, of the price of properties or part of properties or rights pertaining thereto that they might purchase in the area concerned

In this eventuality, the price of the share as well as the price of the real estate property will have to be set according to their respective prevailing market price at the time of the purchase

3 - The Articles of Incorporation of the Company should provide that the holders of shares representing contributions in kind shall have a number of seats on the Board of Directors in prorata to their contribution in the capital of the company.

## VII - Rights and Obligations of the Company

1 - The Real Estate Company shall be exempted from the provisions of Article 1 of the Law on the acquisitions by non-Lebanese of real estate property and from securing the governmental authorization provided that:

a - Two thirds at least of its Board members shall be Lebanese nationals.

b - Its Articles of Incorporation shall prohibit any shareholder from holding directly or indirectly more than 10% of the Company's capital

The spouses and minor descendants of the shareholders shall be considered as one person

Any contract or act contrary to the provisions of paragraphs (a) and (b) of this clause shall be null and void, and non existent even between the contracting parties, and the contravener shall be punishable by temporary hard labor and by a fine ranging between one fold and threefold of the right value.

These provisions shall apply to any legal act concluded through a fictitious person (prête nom) in an attempt to elude these provisions.

No amendment may be made to the Company's Articles of Incorporation which might violate the proportions set out in paragraph (a) and (b) of this clause.

2 - This Company shall be exempted from the Notary Public duties pertaining to the State, the registration duties at the Commercial Registry and the stamp duty on the capital. Its contributions in kind shall be exempted from all transfer duties from the original owners to the Company.

The Company shall be exempted from income tax for a period of ten years from the date of its formation; its shares and shareholders shall be exempted in this capacity from the tax provided for in chapter three of the Income Tax Law for this same period.

3 - The Company shall finance and ensure the execution of the construction of roads, squares and public gardens at the expense and for the account of the State by virtue of an agreement to be concluded between the Company and the Council of Development and Reconstruction in accordance with the laws and regulations in force and in compliance with the Master Plan and Detailed Guiding Layout prepared and duly approved for the area.

The areas developed in this manner shall become public domain and shall be the replacing counterpart of the original unbuilt public domain in the area concerned. Such original public domain will be automatically forfeited from the public domain.

The new areas shall not be less than that of the original ones, and shall not in any event be less than one fourth of the surface of the properties of the area concerned.

The Real Estate Company shall acquire without counter-part those parts of the unbuilt domain which do not fall within the new public domain, subject to the development provided for herein.

The built public properties, which according to the Plan and Layout of the concerned area is to be kept in the same location, shall remain the property of the public department concerned.

4 - By virtue of an agreement to be concluded between the Real Estate Company and the Council of Development and Reconstruction

and in conformity with the laws and regulations in force, the Company shall, for the account and at the expense of the State, finance and ensure the execution of the infrastructure works, such as the water system, electricity, sewage and drainage systems, roads, sidewalks, lightning poles, garages, telecommunications network and all other public facilities and installations in the area concerned

5 - By virtue of an agreement to be concluded between the Company and the Council of Development and Reconstruction and after approval of the Council of Ministers, the Company shall be reimbursed for all or part of the cost of works provided for in the two preceding clauses 3 and 4 of this Article, as well as for the infrastructure works of the lands reclaimed as a result of the banking up of the seaside in cash and/or by giving it a part of the said reclaimed lands and/or lands owned by the State in the area concerned and/or by giving it the right to exploit certain services resulting from the infrastructure in both areas and, in this latter case, such exploitation shall be made by virtue of laws to be promulgated in this respect

6 - The Company shall earmark a certain percentage of its available funds received from the cash subscriptions for restoring the buildings which are not intended to be demolished and for the construction of new buildings in the area concerned

7 - The Company shall appoint a principal auditor for a period of three years, and shall be exempted from appointing a complimentary auditor

VIII - The decree authorizing the establishment of the Real Estate Company shall be published in the Official Gazette and three local newspapers

The Company shall draw up within six months from the date of its incorporation a time schedule for the execution of the project and file such schedule with the government departments concerned.

IX - Upon dissolution of the Company for any reason whatsoever, the real estate rights cannot be divided and distributed in kind to non-Lebanese nationals except in accordance with the Law on the Acquisition of Real Estate Rights by non-Lebanese

## Article 4

Notwithstanding the legal provisions governing the contracts of lease, and with consideration to the private agreements concluded between the proprietors and the tenants before the enforcement of the present law, the contracts of lease concerning the buildings that were damaged during the hostilities that took place between 16 February

1975 and the effective date of the enforcement of this law shall remain in force with all their effects between the Lessors and the tenants in spite of the destruction defections or changes of the leased premises and the impossibility to use them in full or in part by the tenants

## Article 5

All legal provisions contrary to those of the present law or inconsistent with the context thereof shall be abrogated.

## Article 6

The present law shall be published in the Official Gazette

# EXHIBIT B



# Articles of Incorporation

The Lebanese Company for the
Development and Reconstruction of
Beirut City Center s.a.l





BOARD OF FOUNDERS
SOLIDERE

Board of Founders of the Lebanese Company for the Development and Reconstruction of Beirut Central District
"Banque de l'Industrie et du Travail" Building   Riyadh El Solh Street   PO Box 11 9493   Beirut   Lebanon

2nd Edition, September 1993

# Articles of Incorporation

The Lebanese Company for the
Development and Reconstruction of
Beirut Central District

Approved by Decree N° 2537 Dated July 22, 1992

## INDEX

CHAPTER ONE

**Formation, Name, Object, Duration and
Head Office of the Company**

| | | |
|---|---|---|
| Article 1 | Formation of the Company | 5 |
| Article 2 | Name of the Company | 5 |
| Article 3 | Object of the Company | 5 |
| Article 4 | Duration of the Company | 6 |
| Article 5 | Head Office of the Company | 6 |

CHAPTER TWO

**Capital of the Company and Amendments Thereto**

| | | |
|---|---|---|
| Article 6 | Capital of the Company | 7 |
| Article 7 | Cash Subscription in the Capital of the Company | 7 |
| Article 8 | Cash Contributions | 8 |

CHAPTER THREE

The Shares

| | | |
|---|---|---|
| Article 9 | Type of Shares | 9 |
| Article 10 | Transfer of Shares | 9 |
| Article 11 | Subscription Receipt | 9 |
| Article 12 | Provisional Certificates of Registered Shares | 10 |
| Article 13 | Indivisibility of the Share | 10 |
| Article 14 | Rights Pertaining to the Share | 10 |
| Article 15 | Liability of the Shareholder | 11 |
| Article 16 | Transfer of the Rights and Obligations of the Share | 11 |
| Article 17 | Maximum Authorized Shareholding | 11 |

CHAPTER FOUR

Management of the Company

| | | |
|---|---|---|
| Article 18 | The Board of Directors | 12 |
| Article 19 | Shares of Guarantee | 12 |
| Article 20 | Term of Office of the Directors | 13 |
| Article 21 | Meetings of the Board of Directors | 13 |
| Article 22 | Minutes of the Meetings | 13 |
| Article 23 | Remuneration of the Chairman and | |
| | Members of the Board of Directors | 14 |

| Article 24 | Powers of the Board of Directors | 14 |
| Article 25 | Duties of the Board of Directors | 14 |
| Article 26 | Responsibility of the Chairman and Members of the Board of Directors | 15 |
| Article 27 | Period of Office of the Chairman of the Board of Directors, of the Two Vice-Chairmen and the Secretary | 16 |
| Article 28 | Powers of the Chairman of the Board of Directors | 16 |
| Article 29 | Signature on Behalf of the Company | 17 |

## CHAPTER FIVE
### Auditors

| Article 30 | Appointment of Auditors | 18 |
| Article 31 | Powers and Duties of Auditors | 18 |

## CHAPTER SIX
### Shareholder General Meetings

| Article 32 | Types of General Meetings | 19 |
| Article 33 | Constitution of General Meetings | 19 |
| Article 34 | Notice of General Meetings | 19 |
| Article 35 | Shareholders' General Meetings | 20 |
| Article 36 | Minutes of Shareholders' General Meetings | 20 |
| Article 37 | Voting | 21 |
| Article 38 | Validity of the Resolutions of the General Meetings | 21 |

### Statutory Meeting

| Article 39 | Notice of Meeting | 21 |
| Article 40 | Quorum | 21 |
| Article 41 | Majority | 22 |
| Article 42 | Role of the Statutory Meeting | 22 |

### Ordinary General Meeting

| Article 43 | Meeting and Notice Thereof | 22 |
| Article 44 | Constitution of the Meeting | 22 |
| Article 45 | Conditions of Participation | 23 |
| Article 46 | Quorum | 23 |
| Article 47 | Majority | 23 |
| Article 48 | Powers of the Ordinary General Meeting | 23 |

### Extraordinary General Meeting

| Article 49 | Constitution of the Meeting | 24 |
| Article 50 | Powers of the Extraordinary General Meeting | 24 |
| Article 51 | Quorum | 24 |
| Article 52 | Majority | 24 |



## CHAPTER SEVEN
### Financial Year, Inventory, Accounts, Distribution of Profits

| Article 53 | Financial Year | 25 |
| Article 54 | Report of the Board of Directors | 25 |
| Article 55 | Auditors Report | 25 |
| Article 56 | Right of Access | 25 |
| Article 57 | Net Profit | 26 |
| Article 58 | Distribution of Profits | 26 |

## CHAPTER EIGHT
### General Provisions

| Article 59 | Right of the Company to Purchase Its Shares | 27 |
| Article 60 | Exclusions and Exemptions | 27 |
| Article 61 | Obligations of the Company | 27 |

## CHAPTER NINE
### Transitory Provisions

| Article 62 | Board of Founders | 29 |
| Article 63 | Recuperation of Certain Real Estate Properties | 29 |

## CHAPTER TEN
### Dissolution of the Company, Liquidation, Litigation

| Article 64 | Dissolution of the Company and Extension of Its Duration | 33 |
| Article 65 | Appointment of the Liquidators | 33 |
| Article 66 | Powers and Duties of the Liquidators | 33 |
| Article 67 | Duties of the Auditors During Liquidation | 34 |
| Article 68 | Distribution of Assets | 34 |
| Article 69 | Litigation | 34 |

## CHAPTER ELEVEN
### Provisions Concerning the Establishment of the Company

| Article 70 | The Founders | 36 |
| Article 71 | First Duties of the Founders | 36 |
| Article 72 | Studies and Execution | 36 |
| Article 73 | Final Incorporation of the Company | 37 |
| Article 74 | Establishment Expenses | 37 |

## CHAPTER ONE

# Formation, Name, Object, Duration and Head Office of the Company

### Article 1   Formation of the Company

By and between the owners of the real estate properties and the sections of the real estate properties whose numbers are specified in the schedules annexed to Decree No. 2236 dated 19th February 1992, and the owners of rights therein and such persons that may subscribe in cash to the capital, a real estate company is hereby incorporated in the form of a Lebanese joint-stock company governed by the provisions of paragraph 9 of Article 5 of Legislative Decree No. 5 promulgated on 31st January 1977 added by virtue of Law No. 117 dated 7th December 1991, the provisions of the present articles of incorporation and the non-contradicting provisions of the Lebanese Code of Commerce.

### Article 2   Name of the Company

The name of the Company shall be:

In English:

The Lebanese Company for the Development and Reconstruction of Beirut Central District, S.A.L.

In French:

Société Libanaise pour le Développement et la Reconstruction du Centre Ville de Beyrouth (SOLIDERE - CENTRE BEYROUTH)

### Article 3   Object of the Company

1 -   To acquire real estate properties and the sections of the real estate properties whose cadastral numbers are specified in the schedules annexed to Decree No. 2236 dated 19th February 1992 and all the rights recorded thereon or pertaining thereto

2 -   To finance and ensure the execution of the infrastructure works in the area where are located the real estate properties and the sections of the real estate properties referred to in paragraph 1 above for the account, and at the expense, of the State.

3 -   To prepare and reconstruct the area where the Company's real estate properties are located in accordance with the provisions of a plan and a guiding layout duly approved; restore the existing

buildings and sell them, and sell, as well, the replanned lands and the real estate properties; construct buildings thereon and sell, lease, exploit, manage and maintain them.

4 - To bank up part of the seaside in front of the Central District of Beirut at the locations which will be agreed upon with the Lebanese Government by virtue of an agreement to be drawn up by the Council of Development and Reconstruction and ratified by a decree adopted by the Council of Ministers pursuant to a proposal presented by the Minister of Finance and the Minister of Public Works and Transport in accordance with a plan and guiding layout duly approved; the said agreement shall indicate the preparation of the lands reclaimed by the banking up operation, the financing and execution of the infrastructure works pertaining to them, the acquisition by the Company of its share in these lands by virtue of the above mentioned agreement and their selling, as well as the construction of buildings thereon, the selling, leasing, exploiting managing or maintaining these buildings, and generally exercising all proprietorship rights thereon.

5 - To carry out all operations and works necessary for the accomplishment of the Company's object.

### Article 4    Duration of the Company

The Company's duration shall be twenty five years beginning from the date of its final incorporation.

### Article 5    Head Office of the Company

The Company's head office shall be in Beirut.

By virtue of a resolution of the Board of Directors, branches, agencies or offices may be established inside or outside Lebanon.

## CHAPTER TWO

# Capital of the Company and Amendments Thereto

### Article 6   Capital of the Company

The capital of the Company shall be fixed in U.S. dollars.

The capital shall consist of the contributions in kind represented by the ownership of the real estate properties, the sections of the real estate properties and all the rights pertaining thereto subject of Decree No. 2236 dated 19th February 1992 and of the cash subscriptions, the value of which shall be determined by the Council of Development and Reconstruction and subscribed to by the persons specified in paragraph 5 of Article 3 of Law No. 117 dated 7th December 1991, provided that the cash subscriptions shall not exceed in value the contributions in kind.

The value of the contributions in kind shall be determined in U.S. dollars by the High Committee of Appraisal provided for in paragraph 4 of Clause IV of Article 3 of Law No. 117 referred to above. These contributions shall be exempted from the formality of verification provided for in Article 86 of the Code of Commerce.

The value of the share shall be one hundred U.S. dollars.

### Article 7   Cash Subscription in the Capital of the Company

Once opened, subscription to the cash capital when called, shall be made available to the largest number of shareholders.

The call of subscriptions to the cash capital shall be announced in the official gazette and in at least three local newspapers

The right of the subscription in the cash capital shall be limited and priority shall be given, to the subscribers according to the following order:

1 -  The owners of the real estate properties and the sections of real estate properties provided to the Company as contribution in kind, as well as the owners of rights therein;

2 -  Lebanese nationals and purely Lebanese companies as specified by the Law on the Acquisition by Non-Lebanese Citizens of Real Estate Rights in Lebanon;

3 -  The State, public institutions and the Municipality of Beirut;

4 -  Persons of Lebanese origin, official and semi-official Arab institutions and nationals of Arab countries;

The value of the subscribed shares shall be fully paid upon subscription.

The amounts paid by the subscribers shall be deposited at the banks in a blocked account in the name of the Company (under formation). Such amounts shall represent the full value of the shares subscribed to.

The subscription in the cash capital shall be completed within a maximum period of six months from the date of the last decision of the high Appraisal Committee.

In the event that all shares are not subscribed to within the said period of six months, there shall be deleted, ipso facto, the entries of lien recorded at the Land Registry or the Commercial Registry on the folios of the real estate properties or in the files of the commercial firms concerned. The subscriptions will be returned to their owners, and the Company will be ipso facto annulled and all decrees, decisions, proceedings and measures which would have arisen therefrom shall be repealed

Upon completion of subscription to the Company's shares, the ownership of the real estate properties, the sections of real estate properties, the Business Concerns (Fonds de Commerce), the rights of lease and all other rights shall be ipso facto transferred to the Company, at the value determined for them by the High Appraisal Committee

The rights of mortgage, privilege and seizure on the property or Business Concerns (Fonds de Commerce) shall be deleted, and these rights shall be attached to the shares pertaining to the owner of the property or the business concerns. against the contributions of each of them in the same seniority assigned to them

## Article 8   Cash Contributions

Cash contributions shall at no time exceed the value of the contributions in kind.

## CHAPTER THREE

# The Shares

## Article 9   Type of Shares

All shares shall be and shall remain in registered form, and may not be transferred except to persons of the categories specified in Article 7 hereof.

The Company's shares shall be divided into two categories :

Class (A) representing contributions in kind, and Class (B) representing contributions in cash

## Article 10   Transfer of Shares

With the exception of the guarantee shares, all the Company's shares are assignable, including those shares that represent contributions in kind, and will be immediately admitted to the Beirut Stock Exchange for negotiation.

The assignment of shares shall be made by a deed signed by the buyer and the seller or their representatives, which deed shall be entered in a special register at the Company. The assigned registered shares will be canceled and the transferee will be given new shares in his name bearing the entries, if any, recorded on the original shares.

The Company does not recognize transfers that are not duly entered in its register.

## Article 11   Subscription Receipt

The shareholder shall receive upon his subscription, a receipt attesting and indicating the name of the subscriber, the number and class of the shares subscribed to and the price paid thereof.

The said receipt shall be replaced by a provisional certificate of registered shares. Until such replacement is made, the receipt shall be considered as a title that gives the holder the right to take part in the General Meetings.

The Company shall withhold the shares issued in representation of contributions in kind which have not been allocated between their owners by the competent committees or courts, provided that such shares shall be represented at all types of General Meetings by the persons appointed by the competent committees dealing with the subject of distribution pursuant to the request of any interested party.



## Article 12   Provisional Certificates of Registered Shares

The provisional certificates of registered shares shall be detached from registers having counter-foils, bearing serial numbers, the corporate seal, and the signature of the Chairman of the Board of Directors and a Director specially designated for this purpose. The certificate shall mention the name, address and nationality of the shareholder; the number of shares subscribed to and the par value of the shares. The counter-foil shall reflect the data shown on the certificate.

*The Company shall later replace the provisional certificates by* share certificates detached from a register having counter foils with serial numbers, each share certificate being stamped by the corporate seal and signed by the Chairman of the Board of Directors and a director especially designated for this purpose.

## Article 13   Indivisibility of the Share

The share is indivisible, and the Company shall recognize only one owner for a single share. Joint owners, usufructuaries or bare owners of a share shall be represented toward the company by one of them.

## Article 14   Rights Pertaining to the Share

The share grants its owner:

1 - The right to receive dividends in accordance with the resolutions of the General Meeting.

2 - The right to take part and deliberate in the General Meetings and vote with a number of votes equal to the number of shares held.

3 - The right to receive a part of the Company's assets, upon its liquidation, in proportion to the number of shares held by him, subject in all cases to the Law on the Acquisition by Non-Lebanese Citizens of Real Estate Rights in Lebanon.

4 - The right to benefit from all resolutions passed by the General Meeting granting the owner of the share or any class thereof any special advantage in conformity with the provisions hereof.

5 - The right to the owners of shares issued in representation of contributions in kind to use them by priority as partial or full settlement of the price of real estate properties or sections of real estate properties or other rights thereof purchased from the Company. Such settlement shall take place at the market value of the shares.

The shareholders, their heirs, representatives or creditors may not, for any reason whatsoever, apply for any attachment or the sealing of

the Company's funds, chattels and documents, and may, in no manner interfere in the management of its business or apply for the division of its assets or the compulsory sale thereof. They shall be bound, in the exercise of the rights pertaining to them to rely on the financial and the balance sheets prepared by the Company and the resolutions of the General Meetings.

## Article 15   Liability of the Shareholder

The liability of the shareholder for the Company's debts is limited to the shares owned by him. No General Meeting may increase such liability.

## Article 16   Transfer of the Rights and Obligations of the Share

The rights and obligations pertaining to the share shall remain attached to it irrespective to whom it is transferred. The acquisition of a share shall automatically imply acceptance of the Company's Articles of Incorporation and of the resolutions passed by the General Meetings.

## Articles 17   Maximum Authorized Shareholding

No shareholder, whether he be a natural person or body corporate, may directly or indirectly own more than 10% (ten percent) of the Company's capital.

The spouse and minor descendants of the shareholder are considered as one person.

Any contract or act, contrary to the provisions of the present article, shall be null, void and non-existing, even between the contracting parties. The contravener shall be subject to the provisions of Law No. 117/91.

Where the shareholding exceeds the proportion specified here above as result of succession or bequest, the excess must be divested within a *maximum period of three months* under pain of the application of the provisions set out in the preceding paragraph.

The present provisions shall also apply to any legal act concluded through a fictitious person in an attempt to elude these provisions.

No amendment may be made to the Company's Articles of Incorporation which is likely to cause any change in the maximum authorized shareholding herein above provided for. Any amendment if made, shall be considered null and void.

## CHAPTER FOUR

# Management of the Company

### Article 18    The Board of Directors

The Company shall be managed by a Board consisting of twelve members.

In their capacity as owners of the real estate properties integrated in the domain of the Company, the State and the Municipality of Beirut shall be represented on the Board of Directors by one member to be appointed by a decree issued on the proposal of the Minister of Finance and the Minister of Public Works and Transport.

In all events, at least two thirds of the members of the Board of Directors shall be of Lebanese nationality.

No amendment may be made to the Company's Articles of Incorporation which may result in changing the proportion of the Lebanese nationals in the Board of Directors. Any violation in this respect shall be subject to the provisions of Law No. 117/91.

Companies and bodies corporate who are shareholders in the Company are eligible as members of the Board of Directors and may be represented thereat by a person appointed for this purpose, who need not be a shareholder and can be substituted at any time.

The shareholders of contributions in kind shall at all times be represented in the Board of Directors in prorata to their shareholding in the Company's capital.

### Article 19    Shares of Guarantee

Every member of the Board of Directors must own, during all the term of his office as director, at least two hundred shares, with the exception of the representative of the State and the Municipality of Beirut.

The said shares shall be non-transferable and shall bear a stamp to this effect. They shall be kept at the Company as guarantee for the liability of the Directors in respect of their acts of management, and may not be released except after the expiry of the director's term of office and his granting the quittance by the Ordinary Annual General Meeting.

## Article 20   Term of Office of the Directors

The term of office of the Board of Directors shall be three years.

In this respect, a year is construed to consist of the period of time falling between two consecutive Ordinary Annual General Meetings.

Directors are re-eligible for more than one term.

## Article 21   Meetings of the Board of Directors

The Board of Directors shall be convened by its Chairman whenever there is a need for a meeting or where a meeting is requested by three Directors. The notice of the meeting shall be sent to the directors at their address and shall contain the agenda of the meeting.

The Board of Directors meets at the head office of the Company or at any other place to be determined in the notice within Lebanon, or abroad in case of need. The resolutions of the Board shall be valid only when two thirds of its members are present or represented at the meeting.

An absentee may be represented by one of his colleagues by virtue of a written proxy to be given for that specific meeting. No Director may represent more than one other Director.

Resolutions shall be adopted by the absolute majority of the votes of the members present or represented, and in case of tie, the Chairman shall have a casting vote.

## Article 22   Minutes of the Meetings

The deliberations and resolutions of the Board of Directors shall be recorded in minutes, entered in a special register and signed by all the members present. The said minutes shall have a probative force toward all parties.

The said minutes are the documents to be relied upon for proving the number of Directors present and represented who took part in the deliberations, the names of these Directors, the names of the Directors delegated on behalf of bodies corporate who are members of the Board of Directors and the names of absentees.

The said minutes shall comprise the names of the dissenting members and the grounds for their dissent where the resolution is adopted by majority vote.

The Chairman of the Board, or two Directors authorized by the Board, will certify extracts and copies of the minutes intended to be produced to the courts or any other authority in case of need.



*Article 23*  **Remuneration of the Chairman and Members of the Board of Directors**

The remuneration of the Chairman and Members of the Board of Directors shall be fixed in conformity with Article 145 of the Code of Commerce.

*Article 24*  **Powers of the Board of Directors**

The Board of Directors shall have the broadest powers for the implementation of the resolutions of the Shareholders' General Meeting and for carrying out all acts required for the proper conduct of the Company's business, except those acts which are expressly assigned to the General Meeting by virtue of the law or the present Articles of Incorporation.

The Board of Directors shall have, in particular, the following powers:

1 - To set the general policy for the conduct of the Company's business including the policy for the sale, construction, leasing and restoring of the Company's real estate properties;

2 - To set the general policy for the placement of excess liquidity;

3 - To conclude agreements with any private or government agency at the terms which the Board deems suitable;

4 - To establish or close down any branch, agency or office for the Company in Lebanon or abroad;

5 - To approve the personnel statutes;

6 - To effect security and real estate and commercial mortgage; cancel, transfer and release guarantees of any nature;

7 - To compromise, enter into settlements, drop lawsuits and rights thereto, and approve agreements of compromise.

8 - To carry out all the necessary formalities for subjecting the Company to the laws of the countries in which the Company operates;

The Board of Directors may delegate part of its powers to its Chairman or to the General Manager in conformity with the provisions of Article 157 of the Code of Commerce.

*Article 25*  **Duties of the Board of Directors**

The Board of Directors shall:

1 - Implement the resolutions of the General Meeting;

2 -  Elect from among its members a Chairman, two Vice-Chairmen and a Secretary;

3 -  Prepare at the end of every six months a statement of the assets and liabilities of the Company;

4 -  Take the measures for constituting the  statutory reserve by setting aside 10% of the net profits at the end of each year until such reserve becomes equal to one third of the capital. Where the said reserve falls short of this limit for any reason whatsoever, it shall be replenished in the same manner;

5 -  Allocate part of the Company's funds to assist in the solution of the problem of  persons displaced before 1st January 1991 in the area of the Central District after ascertaining their conditions, within the policy adopted by the Board of Directors;

6 -  Call the shareholders to General Meetings whenever the need arises;

7 -  Prepare at the end of each fiscal year the inventory, the balance sheet, the profit and loss account, and to draw up its annual general report on the Company's activities and projects, and to put them at the disposal of the Auditors, fifty days before the annual General Meeting in conformity with the provisions of Article 174 of the Code of Commerce; to prepare as well its special report and submit all the suggestions which it deems suitable, especially with regard to the distribution of dividends and interests;

8 -  Carry out the publication formalities in accordance with the laws and regulations in force.

## Article 26  Responsibility of the Chairman and Members of the Board of Directors

1 -  The Chairman and Members of the Board of Directors shall carry out all acts required for the proper conduct of the Company's business and affairs, which acts shall be binding for the Company.

2 -  The Chairman and Members of the Board of Directors are responsible even toward third parties for all acts of fraud, swindling and any violation of the law or the Company's Articles of Incorporation. They shall also be responsible toward the shareholders for acts of mismanagement. Every shareholder may, to the extent of his interest in the Company, proceed against the said Directors on behalf of the Company should the latter fail to do so. In this respect the provisions of Article 170 of the Code of Commerce shall  apply.



## Article 27   Term of Office of the Chairman of the Board of Directors, of the Two Vice-Chairmen and the Secretary

The term of office of the Chairman of the Board of Directors, of the two Vice-Chairmen and the Secretary shall not exceed their respective terms in the Board of Directors.

## Article 28   Powers of the Chairman of the Board of Directors

The Chairman of the Board of Directors, and in his absence, the senior Vice-Chairman shall preside the meetings of the Board.

The Chairman of the Board of Directors shall conduct the general activities of the Company in his capacity as General Manager.

The Chairman may propose to the Board to appoint one or more Assistant General Managers. However, the Assistant General Manager shall carry out his duties for the account of the Chairman and at the latter's personal responsibility.

The Chairman of the Board of Directors may appoint one or more advisory committees either from among the members of the Board of Directors or from outside the Board. The members of such committee(s) shall study the issues referred to them by the Chairman. However, the opinion of such committee(s) shall not be binding on the Chairman or on the Board.

Where the Chairman of the Board of Directors is temporarily hindered from carrying out his duties, he may appoint one of the Directors to perform all or part of such duties. Such appointment shall be in all cases for a limited period of time. Such Director shall refer to his capacity by mentioning next to his signature the expression "Managing Director".

Should the Chairman become indefinitely incapable in carrying his duties, the Board shall consider that he has resigned and elect a replacement.

The Chairman represents the Company before the courts and toward third parties; he shall implement the Board's resolutions and transact the day-to-day business of the Company in accordance with the by-laws and commercial practice, under the supervision and control of the Board of Directors. He shall have the following powers:

1 -   To receive the amounts due to the Company, collect its moneys in Lebanon and abroad and pay the amounts due by it; this shall be accomplished by the joint signatures of the Chairman with a member of the Board of Directors duly delegated by the Board for this purpose.

2 - To open and close accounts at banks; draw, endorse and receive payment of checks bearing the signature of the Chairman, with that of the member of the Board of Directors duly delegated for this purpose.

3 - To appoint and promote employees and workers, determine their duties, prerogatives and salaries, transfer them to other posts and dismiss them from service, within the frame of the employment policy set by the Board of Directors;

4 - File all court proceedings, and appoint to this effect solicitors and lawyers.

### Article 29  Signature on Behalf of the Company

The signature of the Chairman, the Assistant General Manager or the Delegated Member within the scope of their respective powers, shall be binding for the Company.

The Chairman or the Assistant General Manager may delegate the authority to sign on behalf of the Company to each of the Managers and authorize personnel to conduct the day-to-day business of the Company.



## CHAPTER FIVE

# Auditors

### Article 30  Appointment of Auditors

The Statutory Meeting and thereafter the Ordinary General Meetings shall appoint one or more auditors for a period of three years and shall fix their remuneration. The Company shall be exempted from the appointment of a complementary auditor.

### Article 31  Powers and Duties of the Auditors

The Auditors shall exercise constant control over the conduct of the Company's activities, and shall have access to all deeds, documents, vouchers and financial statements. The Directors shall provide them with all requested information.

The Auditors shall submit to the annual General Meeting a report on the situation of the Company, its balance sheet and accounts submitted by the Board of Directors and on recommendations concerning the distribution of dividends on pain of avoidance of the resolution of the General Meeting concerning the approval of accounts.

The Board shall present to the Auditors the inventory, the balance sheet and the profit and loss statement at least fifty days before the convening of the General Meeting. The Auditors shall call the General Meeting to convene each time the Board of Directors fails to do so in the instances provided for by law or by the present articles.

They may call the shareholders to a General Meeting whenever they deem it necessary, and they are bound to do so whenever requested by a group of shareholders representing one fifth of the capital, provided that the notice of the meeting shall contain the agenda of the proposed meeting.

The Auditors shall be jointly or severally responsible even toward third parties for any fault in audit.

## CHAPTER SIX

# General Meetings

### Article 32   Types of General Meetings

Shareholders' meetings are of three types:

1 - The Statutory Meeting which is the first meeting held by the shareholders following the subscription to the shares;

2 - Ordinary General Meetings which deal with the accounts submitted by the Board of Directors, the distribution of dividends proposed by the Board, to elect new Directors, to appoint the Auditors and deliberate on all matters of concern to the Company with the exception of amending the Company's Articles of Incorporation;

3 - The Extraordinary General Meeting which convenes to discuss the amendment of the Company's Articles of Incorporation.

### Article 33   Constitution of General Meetings

Every shareholder shall have the right to take part in the different types of General Meetings, and those shareholders who are unable to attend a General Meeting are entitled to be represented thereat provided their representatives are themselves shareholders except for legal representatives of incapacitated persons.

As to legal entities shareholder of the Company, they shall take part in the Meetings through their legal representatives or the persons duly appointed to this effect.

Every shareholder is entitled to take part in voting with a number of votes equal to the number of shares he holds or represents without limitation.

In the event of any delay in passing a decision on the subject of distribution of shares to their owners, for any reason whatsoever, the Distribution Committee in charge of the matter shall, pursuant to the request of any interested party, appoint a representative on behalf of the undistributed shares which represent the contributions in kind, in all types of General Meetings

### Article 34   Notice of General Meetings

Ordinary and Extraordinary General Meetings are convened by the Board of Directors, and the Statutory Meeting by the Founders.

The Auditors shall assume the duty of the Board of Directors in calling the shareholders to a General Meeting in the instances provided for in article 31 hereof.

The notice of the Meeting shall specify the date, place and agenda of the Meeting, and shall be published in two daily local newspapers at least twenty days before the date fixed for the Meeting.

When a group of shareholders representing one fifth of the capital request the convening of the shareholders to a General Meeting, the notice shall be made within twenty days from the date of the deposit of the requisition

## Article 35   Shareholders' General Meetings

General Meetings convene at the Company's head office, and are presided by the Chairman of the Board of Directors, and in his absence, under the chairmanship of the senior Vice-Chairman.

Every General Meeting shall have a Secretariat composed of a Chairman, a Secretary and two scrutineers.

The duties of scrutineers shall be assumed by two of the shareholders present who own personally or represent by proxy the largest number of shares; should they decline, the shareholders following them in such capacity shall be appointed, and so on until the appointment is accepted.

There shall be prepared at every General Meeting an attendance list showing the names of the shareholders present and represented, their address for service, the number of shares held by each one and the number of votes pertaining to these shares.

The meeting may not consider matters other than those listed on the agenda, except unforeseen ones which are submitted by the Chairman of the Board of Directors or his deputy.

## Article 36   Minutes of Shareholders' General Meetings

The Secretariat of the General Meeting shall cause minutes of all proceedings of meetings which shall include a summary of the deliberations and the full text of the resolutions adopted. These minutes shall be signed by the Chairman and the members of the Secretariat.

The Chairman or two members delegated by the Board of Directors shall certify the extract of minutes intended to be produced to the courts or to any other authority

No shareholder may vote in his personal name or by proxy when the resolution under discussion concerns a matter involving him personally or a dispute between him and the Company.

### Article 37  **Voting**

Voting shall be made by a show of hands unless the subject-matter of the vote has a personal character such as the removal of Directors or the implication of their responsibility, and one of the shareholders requests a secret poll.

### Article 38  Powers of the Resolutions of the General Meetings

Resolutions duly adopted by General Meetings shall be binding on all shareholders including absentees, dissentient or incapacitated, provided that any concerned party shall have the right to challenge such resolutions on the grounds of irregularity, fraud or excess of authority.

The deliberations of General Meetings, whether ordinary or extraordinary, shall not be valid unless the number of shares present or represented owned by Lebanese nationals, amounts to or exceeds 51% of the total number of shares present or represented at the meeting.

# Statutory Meeting

### Article 39  Notice of Meeting

The Council of Development and Reconstruction shall call the Statutory General Meeting after the completion of the subscription and of all the formalities required for the formation of the Company.

The notice of the meeting shall be published twice in the official gazette, in an economic newspaper, and a local daily newspaper with an interval of at least one week between these two publications. The notice shall contain the agenda of the meeting.

### Article 40  Quorum

The Statutory Meeting shall consist of all the shareholders of contributions in kind and in cash. The quorum required for the first meeting consists of the attendance of shareholders representing at least two thirds of the capital.

If this quorum is not present, a notice to a second meeting shall be made by publication, twice in the official gazette, in an economic newspaper and two daily local newspapers with an interval of at least one week between one publication and the other. There shall be stated in the notice the agenda of the previous meeting and the results of its proceedings.



The proceedings of this second meeting shall be valid if the shareholders present thereat represent at least half of the capital.

If this latter quorum is not present, notice according to the same procedure may be made for the convening of a third Meeting which will be valid by the attendance of shareholders representing at least one third of the Company's capital.

### Article 41   Majority

Resolutions shall be adopted by the majority vote of two thirds of the shareholders present or represented.

### Article 42   Role of the Statutory Meeting

1 - The Statutory Meeting shall ascertain the fulfillment of the conditions of formation and the veracity of the statement concerning the subscription, and shall carry out all other verifications in accordance with the provisions of the present Articles of Incorporation.

2 - It shall elect the members of the first Board of Directors, ascertain their acceptance of their duties, and fix the remuneration of the Chairman and members of the Board of Directors and the Auditors.

# Ordinary General Meeting

### Article 43   Meeting and Notice Thereof

The Ordinary General Meeting shall convene once a year in the course of the first six months upon notice from the Board of Directors.

It may also convene:

1 - When this is requested by a number of shareholders representing one fifth of the capital.

2 - When this is requested by the Auditors in the instances provided for by the law and the present Articles of Incorporation.

3 - In case of emergence of unusual or urgent events.

### Article 44   Constitution of the Meeting

The Ordinary General Meeting consists of all the shareholders including those who hold a single share.

## Article 45  Conditions of Participation

The Board of Directors shall give each shareholder an attendance card indicating the number of shares he holds in accordance with the Shareholders' Register of the Company.

## Article 46  Quorum

The quorum required for the Ordinary General Meeting consists of the attendance or representation of a number of shareholders representing at least half of the Company's capital.

If this quorum is not present at the first meeting, a notice for a second meeting will be made where the attendance of a number of shareholders representing at least one third of the Company's capital will constitute adequate quorum.

## Article 47  Majority

Resolutions shall be adopted by the absolute majority of votes of the shares present and represented.

## Article 48  Powers of the Ordinary General Meeting

The Ordinary General Meeting shall have the broadest powers:

1 - It shall consider the report of the Board of Directors and the report of the auditors on the Company's situation, accounts and balance sheet. It shall discuss and adjust the accounts submitted to it, and either approve or reject them, and unless it finds an objection to do so, it shall grant quitus to the Chairman and members of the Board of Directors.

2 - It shall fix the dividends to be distributed pursuant to the recommendation of the Board of Directors and after taking note of the Auditors' report.

3 - It shall elect the members of the Board of Directors, accept their resignation, appoint the Auditors and fix the remuneration of the members of the Board of Directors and the Auditors.

4 - It shall grant the authorization to the members of the Board of Directors in conformity with the provisions of Articles 158 and 159 of the Code of Commerce.

5 - It shall grant the Board of Directors the necessary special powers to carry out acts that lie beyond its power according to the provisions of the present Articles of Incorporation.

6 - It shall deal with all issues listed on the agenda, and generally



with all that pertains to the Company's interests with the exception of amendments to the Company's Articles of Incorporation.

# Extraordinary General Meeting

### Article 49   Constitution of the Meeting

The Extraordinary General Meeting consists of all the shareholders including those who hold a single share and is convened in the same manner adopted with respect to the Ordinary General Meeting.

### Article 50   Powers of the Extraordinary General Meeting

The Extraordinary General Meeting shall deal:

1 - With every draft amendment to the Company's Articles of Incorporation, provided that such amendment shall not entail change of the Company's nationality, or increase of the shareholders' liability, or any prejudice to third parties' interests or amendment of the proportion provided for in each of Articles 17 and 18 hereof.

2 - With the dissolution of the Company or the extension of its duration.

Any amendment to the present articles shall become effective after completion of the formalities provided for herein and in the Code of Commerce, and after its ratification by a decree to be passed by the Council of Ministers.

### Article 51   Quorum

With regard to the resolutions providing for the amendment of the object or form of the Company, the quorum required shall always represent at least three quarters of the Company's capital irrespective of the number of sessions required in this respect.

As regards all other resolutions, the required quorum and periods of notice shall be in conformity with those provided for in Article 203 of the Code of Commerce

### Article 52   Majority

Resolutions shall be adopted by a two thirds majority vote of the shares present and represented.

## CHAPTER SEVEN

# Financial Year, Inventory, Accounts and Distribution of Profits

### Article 53   Fiscal Year

The fiscal year shall begin on the first of January and end on the thirty first of December of each year. However, the first fiscal year shall begin on the date of incorporation of the Company and end on the thirty first of December of the same year.

### Article 54   Report of the Board of Directors

The Board of Directors shall prepare at the end of the first six months of every year a concise statement of the Company's assets and liabilities. It shall prepare at the end of the year the inventory, the balance sheet, the profit and loss account and the annual report and place all these documents at the disposal of the auditors, at least fifty days before the date of the Meeting.

In its annual report, the Board shall put forward the propositions it considers appropriate, especially with regard to the distribution of dividend and the formation of capital reserves.

### Article 55   Auditors Report

After review of the Company's records and accounts, the Auditors shall draw up their report in conformity with Article 31 hereof and submit it to the Company at least sixteen days before the date of the General Meeting.

### Article 56   Right of Access

Every shareholder may have access at the Company's head office to the inventory, the balance sheet, the profit and loss account, the list of shareholders, the report of the Board of Directors, the report of the Auditors, the consolidated profit and loss account and the consolidated balance sheet, if any, and the Auditors' report thereof, during the fifteen days that precede the General Meeting.

The shareholder may secure, at his own expense, copies of these documents with the exception of the inventory.

*Article 57*   **Net Profit**

The net profit shall consist of the Company's revenues after deduction of the Company's costs, general expenses, operating costs, taxes, duties, charges and costs of whatever kind or nature, and after deduction of the amounts allocated for depreciation, emergencies, unforeseen events, Social Security contributions and other special reserves.

*Article 58*   **Distribution of Profits**

Ten percent of the net annual profits shall be set aside to constitute the statutory reserve fund as indicated in Article 25 hereof.

The balance of the net profit shall be distributed equally among the shares.

However, the General Meeting may, upon recommendation of the Board of Directors, decide not to distribute all or part of the profit, or to carry forward all or part of it to the next fiscal year, or to allocate it for additional depreciation, or for constituting a special reserve fund.

The General Meeting may also decide to distribute the special reserve fund to all the shareholders, or make up the shortage in the dividends left from a previous year.

Dividends shall be paid on the dates and at the places fixed by the Board of Directors.

## CHAPTER EIGHT

# General Provisions

### Article 59   Right of the Company to Purchase Its Shares

The Company may purchase up to 10% of its shares not withstanding the absence of reserve, provided that it shall resell these shares within a period not exceeding eighteen months.

### Article 60   Exclusions and Exemptions

1 -  The Company shall be exempted from the provisions of Article 1 of the Law on the Acquisition by Non-Lebanese of Real Estate Rights in Lebanon and relieved from the authorization to acquire real estate property.

2 -  The Company shall be exempted from the duties of the Notary Public pertaining to the State, the duties of registration at the Commercial register and the stamp duty on the capital. Contributions in kind shall be exempted from all duties of transfer from their original owners to the Company.

3 -  The Company shall be exempted from income tax for a period of ten years from the date of its incorporation well as its shares and shareholders only in their capacity as shareholders in the Company from the tax provided for in Section Three of the Income Tax Law for the same period.

### Article 61   Obligations of the Company

1 -  The Company shall earmark a certain percentage of the funds received from cash subscriptions for restoring the buildings that are not intended for demolition and for constructing new buildings in the area.

2 -  The Company shall draw up, within six months from the date of its incorporation, a time schedule for the execution of the project specifying the amounts earmarked for restoration and reconstruction, and file such schedule with the government departments concerned.

3 -  The Company shall finance and ensure the execution of the construction of roads, squares and public gardens at the expense of and for the account of the State by virtue of an agreement to be concluded with the Council of Development and Reconstruction in accordance with the laws and regulations in force and in compliance

with the Master Plan and the detailed guiding layout prepared and duly approved for the area concerned. The areas developed in this manner shall become public domain and shall be the replacing counterpart of unbuilt public domain in the area concerned and which will be automatically excluded from the public domain.

The new areas shall not be less than the original ones, and they shall in no case be less than one fourth of the real estate properties falling within the boundaries of the Company's domain.

The Company shall acquire without counter-part those parts of the unbuilt public domain that do not fall within the new public domain which will be subject to development.

The built public domain which according to the Plan and the regulations is to be kept in the same location, shall remain the property of the Public Department concerned.

4 - The Council of Development and Reconstruction may, pursuant to a decision by the Council of Ministers, request the Company to finance the rehabilitation of the Government and Municipal buildings located in the area, or erect government buildings therein, and in case of approval by the Company, such projects shall be carried out in accordance with an agreement to be concluded between the Company and the Council of Development and Reconstruction in conformity with the laws and regulations in force.

5 - In accordance with an agreement concluded with the Council of Development and Reconstruction and in conformity with the laws and regulations in force, the Company may, for the account and at the expense of the State, finance and ensure the execution of the infrastructure works, such as the water system, the electricity, telecommunications network, sewage and drainage systems, roads, sidewalks, lighting poles, garages and all other public facilities and installations in the area falling within the boundaries of the Company's domain.

6 - By virtue of an agreement to be concluded between the Company and the Council of Development and Reconstruction and after approval of the Council of Ministers, the Company may be compensated for all or part of the works provided for in paragraphs 3, 4 and 5 above, as well as for the infrastructure of the lands reclaimed as a result of the banking up of the seaside in cash and/or a part of the said reclaimed lands and/or lands belonging to the State in the area concerned and/or the right to exploit certain services resulting from the infrastructure, and in this latter case such exploitation shall be made by virtue of laws to be promulgated in this respect.

## CHAPTER NINE

# Transitory Provisions

### Article 62   Board of Founders

After promulgation of the decree approving the present Articles of Incorporation, the Council of Development and Reconstruction shall form a Board of Founders consisting of itself and eleven members from among the proprietors and right holders in the area of the Central District and the prospective financiers.

The financiers shall be selected following an invitation in the newspapers, from among persons whose solvency is established by bank guarantees acceptable to the Council of Development and Reconstruction.

The council shall appoint an international auditing firm which shall join the said Board.

### Article 63   Recuperation of Certain Real Estate Properties

I.  During the period of three months following the issuance of the decision of the High Appraisal Committee and the approval of the plan and guiding layout of the area of the Central District, the Board of Founders shall determine the real estate properties which may be returned to their owners on the bases of the conditions set out hereinafter.

II.  The present provisions shall apply to the real estate properties which meet the following conditions:

1 -  The buildings erected thereon should still be standing and in condition that does not preclude the use for which they were intended, or that the building be under construction;

2 -  The real estate properties should not be covered by the reorganization according to the plan and guiding layout of the Central District.

III.  The Board of Founders shall publish a list of the abovementionned real estate properties in the official gazette and in two local newspapers, the period of time given to the owners for exercising their right to recuperate the properties concerned shall commence from the date of the last publication.

IV.  The right of recuperation shall be exercised according to the following terms and conditions:

1 - Priority for the exercise of the right of recuperation shall be given to the owners, in proportion of their original equity in the property and within a maximum period of three months from the date of publication made in conformity with the provisions of clause 3 above. In the event one or more of these owners fail to exercise such right, the said right shall revert to the other owner or owners, each in proportion of their equity in the property, provided that they shall have expressed their desire in the application for recuperation, where needed, to use whatever reverts to them out of the rights of the defaulting owner or owners. In this case, they may associate with them parties other than the previous owners.

2 - In order to exercise the right of recuperation of a specified real estate property, the recuperation should cover full ownership of the recuperated property, and the owners should submit a proof acceptable to the Board Founders of their capability to execute.

3 - The price of recuperation shall be determined at the value fixed for the whole property by the High Committee of Appraisal provided for in paragraph 4 of clause IV of Article 3 of Law N° 117/91 dated 7th December 1991 plus a percentage not exceeding 12% of the said amount to be determined by the Board of Founders and which shall be earmarked by the company for reconstructing the neighboring areas and participating in the solution of the problem of displaced persons living in the Central District before 1/1/1991, after ascertaining the authenticity of their conditions, within the framework of the policy adopted by the Company's Board of Directors.

4 - If the owner or owners recuperate their right of ownership of the property in conformity with the foregoing conditions, then each holder of a right of occupation, based on legal ground, shall be given the opportunity to recuperate this right in the leased premises, provided he expresses his desire to recuperate the said right, within two months from the date of publication in the official gazette and in two local newspapers of the list of real estate properties recuperated by their owners.

In this case, and provided he transfers to the owner the shares belonging to him at their nominal value, free from any right in favor of third parties for returning them to the Company, and his paying to the owner the part due to him from the percentage mentioned in paragraph 3 above in respect of these shares, the holder of such a right shall recuperate the leased premises at the same previous conditions and at the same rental amount with the increases provided for in the laws in force.

The holder of a right of occupation who exercises the right to return to the leased premises, shall participate in the cost of rehabilitation of the building in agreement with the owner.

V.  In the case the owners of a right to recuperate their property do not exercise their said right within the period of time provided for in paragraph 1 of clause 4 above, the right of recuperation of the property shall pass over to the other right holders in the property concerned at the same conditions set out here above, and for a period of three months following the expiry of the period of time provided for in the said paragraph.

VI.  In case no owners of property or holders of rights therein fail to exercise their right to recuperate the property within the period of time prescribed here above, any holder of right to occupy the property concerned on legal grounds may apply to the Company to return to his leased premises, provided he expresses his desire to do so within one month from the date of the Company's final incorporation. In the event of there being more than one holder of right of occupation of the same premises, the application must be submitted by all of them. In this case, the senior occupant will be given priority to the lease on the bases of the rental amount and conditions determined by the Board of Directors.

VII.  The price of recuperation by the owner of the property or the holder of right who recuperates it, shall be settled by offsetting the amount owed to him by the Company for his contribution in kind in the property and the amount owed by him to the Company in counter-part of the recuperation

The settlement shall be made by the transfer of the shares to the Company at their nominal value, free from any right in favor of third parties, upon issue of the decision regarding the property concerned by the Distribution Committees of the appraised value among the owners and lessees in accordance with the provisions of paragraph 6 of Clause IV of Article 3 of Law No. 117 dated 7/12/1991.

The balance of the price of the part of the category to which belongs the recuperator, whether owner of property or holder of right, shall be paid in shares at the nominal value, or in cash on the very said date.

As to the other amounts in cash (i.e. the price of share of the property pertaining to a category other than that of the recuperator and the percentage referred to in paragraph 3 above), the recuperator may pay them in installments and at market rate of interest against a mortgage on the property.

As to the amounts representing the price of the share pertaining to a category other than that of the recuperator, they may be settled in installments over a seven year period at market interest rates.

As to the amounts representing the percentage mentioned in paragraph 3 above, payment thereof shall be scheduled with their



interest over a period of seven years. However, if the annual installment with the interest exceeds 50% of the total income from the recuperated property, the recuperator may have the period of scheduling extended so the annual single installment with the interest shall not exceed 50% of the total income from the property, provided that the period of scheduling into installments shall under no condition exceed the original duration of the Company.

In both of the above cases, the Company shall not object to that procedure.

**VIII.** The owner or owners of property or of holders of rights who have exercised the right of recuperation, must rehabilitate the building or complete its construction within a period of two years, and start the work within six months from the date of final incorporation of the Company in conformity with the plan and guiding lay-out of the Central District under pain of cancellation of the right of recuperation, while reserving the right of the Company to claim damages.

**IX.** The Board of Directors of the Company may apply the provisions set out in the present Chapter to the real estate properties originally unbuilt, located within the boundaries of the area concerned, which remain fit for construction in accordance with the laws and regulations in force.

In this case, the Board will ascertain the capability of the former owners to proceed with the construction in the recuperated real estate properties and its completion within the period of time prescribed by the Company.

**X.** The Board of Directors of the Company shall refrain from registering the real estate properties subject to recuperation in the name of the Company at the Land Registry until the expiration of the periods of time allowed for the exercise of the right of recuperation.

**XI.** The owner who recuperates his ownership rights in accordance with the provisions of the present chapter, shall be considered to have remained owner without interruption, and the lien entered on the folio of the property at the Land Registry and at the Commercial Registry in accordance with the provisions of paragraph 5 of Clause IV of Article 3 of Law No. 117 dated 7/12/1991 shall be removed.

## CHAPTER TEN

# Dissolution of the Company, Liquidation and Litigation

### Article 64   Dissolution of the Company and Extension of Its Duration

The Company shall be dissolved at the end of its duration as fixed in the present Articles of Incorporation, or if the realization of the project for which it was formed proves to be impossible.

The Extraordinary General Meeting may decide at any time, pursuant to a request by the Board of Directors to dissolve the Company before term, as it may also decide to extend its duration beyond the time determined in the present Articles of Incorporation.

Such resolution shall only take effect after its approval by Decree adopted by the Council of Ministers.

### Article 65   Appointment of the Liquidators

Upon expiration of the Company's duration, the Ordinary General Meeting shall appoint one or more liquidators and fix their remuneration, and in the case of dissolution before term, the appointment of liquidators shall be made by the Extraordinary General Meeting.

Where it is impossible to reach a resolution for the appointment of liquidators through the General meeting, the issue will be referred to the court.

All the powers of the Board of Directors shall cease upon the appointment of liquidators. However, the General Meeting shall retain its powers during the liquidation and may, at any time, revoke or change the liquidators and extend or restrict their powers, except where the liquidators are appointed by the court in which case the powers shall be given to the said court.

### Article 66   Powers and Duties of the Liquidators

1 -  Upon taking charge of their duties, the liquidators shall receive the Company's accounts as from the date of the last balance sheet approved by the last General Meeting. They shall either approve these accounts or call the shareholders to a General Meeting to approve them

2 - The liquidators shall draw up with the Managers of the Company the inventory, collect the Company's moneys, pay its debts, dispose of its assets and, in general, carry out all the acts required for liquidation within the scope of their powers and in accordance with the terms set out in the resolution of their appointment.

3 - Where the period of liquidation exceeds one year, the liquidators shall draw up the annual balance sheet and publish it according to the normal procedure.

## Article 67   Duties of the Auditors During Liquidation

The Auditors shall continue to exercise their duties during the liquidation and monitor the Company's operations; they shall draw up a report on the accounts submitted by the liquidators.

The Ordinary General Meeting shall approve the said accounts and release the liquidators from liability; in case of disapproval, the matter will be brought before the court.

## Article 68   Distribution of Assets

Upon completion of the liquidation, and after settlement of all amounts due by the Company, there shall be returned the nominal value of the shares, and the surplus will be distributed to all the shareholders in accordance with the law.

However, real estate rights cannot be divided and distributed in kind to non-Lebanese shareholders except in accordance with the provisions of the Law on the Acquisition of Real Estate Rights by Non-Lebanese in Lebanon.

## Article 69   Litigation

The competent Court of Beirut shall be the court having jurisdiction to deal with every dispute between the Company, the shareholders and the members of the Board of Directors.

The actions of liability filed against the Company are of two kinds:

1 - An individual action which the party who have suffered damages may file against the Company, and which the shareholders may not stop by a resolution from the General Meeting releasing the Chairman and members of the Board of Directors from liability.

2 - Disputes that concern the general interest of the Company, which cannot be directed against the Board of Directors or one of its members except in the name and for the account of all the shareholders, and in accordance with the resolution of the General

Meeting. Every shareholder desiring to file an action of this kind shall notify its subject to the Chairman of the Board of Directors by registered letter to be sent at least one month before the convening of the General Meeting. The Chairman of the Board shall insert the proposition on the agenda of the said meeting.

Should the meeting decide to reject the proposition, this decision shall be final and conclusive for all shareholders and none of them may raise anew the dispute in question. Where the proposition is accepted, the General Meeting shall appoint one or more attorneys to handle the dispute. Under pain of annulment, all notifications regarding the said dispute shall be served on the attorneys concerned, and no notification may be served in any case on the shareholders personally. In case the Board of Directors does not insert the subject of the dispute on the agenda, or the Meeting cannot deal with it for absence of quorum, the shareholder may file the action after the lapse of six weeks on the dispatch of the registered letter unless the Board of Directors shall have proceeded to call the shareholders to a second General Meeting, in which case the shareholder shall wait for the resolution of this Meeting.

The shareholder can file no claim except within the limits of his shareholding in the Company. In case of occurrence of disputes, the litigant parties shall elect domicile for notification within the jurisdiction of the Court of the Company's head office where they will be notified all papers and summons. Their notification at such address shall be valid irrespective of their actual place of residence.

Where no address for notification is given, any judicial or non-judicial notification shall be valid if served at the registry of the court of the Company's head office.

The explicit or implicit election of domicile for notification as plaintiff or defendant shall automatically give jurisprudence to the courts of the head office of the Company.

## CHAPTER ELEVEN

# Provisions Concerning the Establishment of the Company

### Article 70   The Founders

The Board of Founders shall carry out the formation procedures and shall have the power to approve the disbursements required for these procedures as well as the costs of works which will be performed during the stage of establishment in preparation for their submission to the Statutory Meeting for approval.

The mission of this Board shall come to an end upon the convening of the Statutory Meeting and the election of the first Board of Directors.

### Article 71   First Duties of the Founders

The Council of Development and Reconstruction shall secure the registration of the present Articles of Incorporation by a notary public established within the district of the Company's head office, and publish in the official gazette and three local newspapers the decree containing authorization for the formation of this Company and approval of its Articles of Incorporation. There shall be applied in the formation process the rules and procedures provided for in the Code of Commerce.

### Article 72   Studies and Execution

The Council of Development and Reconstruction, pursuant to a request from the Council of Ministers, may start :

1 -  Preparing the technical studies required for the reconstruction of the Commercial Center.

2 -  Preparing the technical studies required for the following works, and starting to execute them if need be:

a)  Infrastructure works,

b)  Rehabilitation of the existing government or municipal buildings,

c)  Construction of new government buildings in the area of the commercial center.

## Article 73   Final Incorporation of the Company

The Statutory Meeting, after ascertaining the veracity of the subscription to the whole capital of the Company, and of depositing the entire value of the shares subscribed in cash at the banks in the form of an account opened in the name of the Company (under formation), and after electing the members of the Board of Directors, appointing the auditors and ascertaining their acceptance of their duties, shall declare the Company formed.

Thereafter, the Board of Directors shall carry out, within one month from the date of final registration of the Company, the publication formalities provided for by law, the formalities of filing with the Court Registry and the recording at the Commercial Register.

## Article 74   Establishment Expenses

The Board of Founders shall open an account at one or more banks in Lebanon for the financing of the necessary expenses during the formation stage, with the guarantee of the financiers in the Board of Founders, whether jointly or severally, who will bear the amount of these expenses, should the incorporation of the Company fail to be formed for any reason whatsoever.

The Company shall bear all the expenses required for its formation, including the administrative and judicial expenses and the costs of preliminary studies. These expenses will be amortized over five years.

The Company shall also pay the costs of the technical studies and the works carried out by the Council of Development and Reconstruction with the approval of the Board of Founders during the formation stage and these costs shall be entered in the books of the Company.

The present Articles of Incorporation
have been drawn up in Arabic,
and henceforth, the said Arabic text shall control and
prevail any translation thereof.

# EXHIBIT C

# PART 1

# AGREEMENT

*Between*

The Lebanese Company for the Development and Reconstruction of
Beirut Central District, S.A.L.

*&*

Radian International LLC

# TABLE OF CONTENTS

## TO

## AGREEMENT

| ARTICLE N° | | PAGE N° |
|---|---|---|
| 1. | Terms | 1 |
| 2. | Contract Documents | 1 |
| 3. | Undertakings of the Contractor | 1 |
| 4. | Undertakings of the Employer | 2 |
| 5. | Timely Completion | 2 |
| 6. | Application of GC 22 | 3 |
| 7. | Notice to Proceed | 3 |
| 8. | Notices | 3 |
| 9. | Counterparts | 4 |
| 10. | Entire Agreement – Modifications | 4 |
| 11. | Assignment by the Employer | 4 |

(i)

# AGREEMENT

This Agreement ("Agreement") is effective as of the 25th day of January, 1999 between The Lebanese Company for the Development and Reconstruction of Beirut Central District, S.A.L, ("Employer"), a company organized and existing under the laws of the Republic of Lebanon, with its registered office at Building 149 Marfaa, Saad Zaghloul Street, off Foch Street, BP.119493 Beirut, BP.119493, Beirut, Republic of Lebanon, and Radian International LLC, a company organized and existing under the laws of the State of Delaware, USA, with its registered office at 15204 Omega Drive, Rockville, Maryland 20850 ("Contractor").

The Employer desires the Works to be performed by the Contractor, and the Contractor agrees to perform the Works, upon the terms and conditions hereinafter set forth, as follows:

## 1. Terms

In this Agreement words and expressions shall have the same meanings as are respectively assigned to them in the General Conditions of Contract.

## 2. Contract Documents

The following documents ("Contract Documents") comprise the Contract ("Contract"):

(1) The Agreement,
(2) The General Conditions of Contract and all Exhibits thereto (GC); and
(3) The Technical Conditions of Contract (TC).

## 3. Undertakings of the Contractor

3.1 The Contractor agrees to Complete and guarantee the Works with due care and diligence and in strict conformity in all respects with the Contract and to furnish all the Contractor's Staff, Materials, Plant, Temporary Works and all other services and items, required in and for such performance, as the same are specified in or are to be reasonably inferred from, the Contract, or, as are otherwise required to complete such performance.

3.2 In the Contract, the term "Time for Completion" means a period of Fifty Four (54) Months during which, unless extended in accordance with the Contract, the Contractor agrees to Complete the entire Permanent Works, which period shall begin with the issuance of the Notice to Proceed.

The Time for Completion shall be extended by one (1) month for each extra 100,000 cubic meters to be excavated over five million cubic meters.

3.3 The Contractor agrees to observe, discharge and fulfill its obligations, responsibilities and undertakings under the Contract.

## 4. Undertakings of the Employer

4.1 In this Contract, the term "Contract Price" means the fixed lump sum of United States Dollars Fifty Three Million and Seventy Five Thousand (US$ 53,075,000 ) and which the Employer agrees to pay the Contractor for the Completion and guarantee of the Works, at the times and in the manner prescribed in the Contract. Save and except for changes in the Contract Price which become effective in accordance with the Contract, the Contract Price shall not be subject to change for any reason, including, without limitation, for any rise or fall in the cost of labor, Materials and Plant or for any variations in exchange rates.

The Contract Price is calculated on the assumption that the quantity of Material to be Treated is 1.2 million cubic meters, and the quantity of materials to be excavated is 5 million cubic meters.

If the quantities of Material to be Treated are found to be more than 1.2 million cubic meters, then the Contract Price will be increased by 2.25 US$ for every additional cubic meter of material to be treated treated up to a cap of 2,925,000 US$ of additional payment.

If the quantities of material to be excavated is found to exceed 5 million cubic meters, then the Contract Price will be increased by 6 US$ for every additional cubic meter of material to be excavated.

The Contract Price is also based on the fact that the Contractor will not be using low temperature thermal desorption technology in the treatment of waste material. If the Contractor determines that such technology proves to be necessary to achieve the end product criteria, it will advise the Employer of its necessity and the Contract Price will then be increased by an amount of US$ 2,000,000.

4.2 The Employer agrees to observe, discharge and fulfill all of its obligations, responsibilities and undertakings under the Contract.

## 5. Timely Completion

Time is of the essence in the performance of the Works and the Contractor agrees: (i) to Commence the Works after receipt by it of the Notice to Proceed; and (ii) to Complete the entire Works within the Time for Completion and in compliance with the Programme, Milestones and Detailed Programme and consistent with all specific durations set forth therein and/or elsewhere in the Contract.

## 6. Application of GC 22

The provisions of GC 22.3 shall apply to the first Fifty (50) Days of any Contractor failure referred to in GC 22.3 and the percentage of the Contract Price referred to in GC 22.3. shall be 0,1 percent (0,1%), subject to a maximum of ten percent (10%) of the Contract Price when cumulated with the total percentage, if any, of the Contract Price applied under GC 22.4. The provisions of GC 22.4 shall apply to the first hundred (100) Days of any Contractor failure referred to in GC 22.4 and the percentage of the Contract Price referred to in GC 22.4, shall be 0,15 percent (0,15%), subject to a maximum of fifteen percent (15%) of the Contract Price when cumulated with the total percentage, if any, of the Contract Price applied under GC 22.3.

## 7. Notices

7.1 All formal notices to be given by either party to the other under the terms of the Contract, shall be given in writing to the correct address of the other party set out below or to such other address as the party to be served shall have previously notified in writing. No daily log or any other report, document or discussion of any type, except those written communications required under GC 25.12, shall constitute notice of any claim of any type.

7.2 Any such notice given in the manner described shall be effective upon receipt.

7.3 The correct addresses of each of the parties for the purpose of giving notices pursuant hereto are as follows:

Employer:    The Lebanese Company for the Development and Reconstruction of
Beirut Central District, S.A.L.
Building 149 Marfaa , Saad Zaghloul Street,
off Foch Street, BP.119493 Beirut, BP 119493
Beirut - Republic of Lebanon

Attention: Mr. Hervé DUPONT

Contractor:  Radian International LLC
15204 Omega Drive
Rockville, Maryland 20850

Attention: Mr. Stanley PORFIDO

## 8. Condition Precedent

The Contract shall be subject to the approval of the Council of Development and Reconstruction on the Tender Document.

If no approval is granted by the Council of Development and Reconstruction within three (3) months as from the signature of the Contract, the Employer will not issue the Notice to Proceed and the Contract shall be deemed null and void without liability for either party.

In any such event and notwithstanding anything to the contrary which may be contained in the Contract, there shall be no sum due by either party to the other and each party hereby waives any claim of whatever nature against the other party as a result of any such event, including without limitation and in respect of the Contractor, any claim for any loss of profit, cost incurred and/or any work performed by the Contractor prior to the date of the Agreement.

## 9. Counterparts

This Agreement and the other documents comprising the Contract, have been prepared in the English language and have been executed by the parties in one (1) counterparts, which shall be deemed an original and deposited at a notary public in Beirut, Lebanon.

## 10. Entire Agreement - Modifications

The Contract contains the entire and only Contract between the parties concerning the subject matter hereof and supercedes and cancels all prior agreements, discussions and communications between or among the parties to this Contract, whether oral or written, including, without limitation, any discussions and communications which have been reproduced or memorialized in any written form, tape recordings or any other manner, whether as a summary, in whole or in part, and all documents and discussions issued or held during the Invitation to Tender and pre-Contract signature and negotiation period. No modification, termination, notice of termination or discharge of the Contract or any of the provisions hereof, nor any representation, waiver, promise or condition relating to the Contract shall be binding unless made in writing and signed by a duly authorized officer the party to be charged.

## 11. Assignment by the Employer

The Employer may, at its discretion and at any time after the release by the Employer of any and all outstanding Letters of Guarantee provided by the Contractor pursuant to the Contract, assign to any entity the whole or part of the Employer's right under the Contract and upon any such assignment and the notification thereof by the Employer to the Contractor, any such entity shall became entitled to directly enforce against the Contractor any of such rights.

IN WITNESS WHEREOF the parties have caused the Agreement and the other documents comprising the Contract to be executed the day and year set forth below, which shall not affect the effective date of the Agreement set forth above.

The Lebanese Company for the
Development and Reconstruction
of Beirut Central District, S.A.L.

Signature: _____

Name: Nasser Chammaa

Title: Chairman

Date: 1/28/99

Radian International LLC

Signature: _____

Name: Stanley Porfido

Title: Sr. Vice President, Redit.

Date: 1/25/99

# GENERAL CONDITIONS

# OF

# CONTRACT

# TABLE OF CONTENTS
## TO
## GENERAL CONDITIONS
## OF
## CONTRACT

**GENERAL CONDITION Nº**                                                    **PAGE Nº**

1.    Certain Definitions and Interpretations...................................... 1
2.    Roles and Authority of other Parties ; Representatives ;................ 4
      Communications and Approvals
3.    Contract Documents ............................................................ 5
4.    Sufficiency of Contract Price ............................................... 6
5.    Certain Representations and Warranties of the Contractor ............... 6
6.    Assignment and Subcontracting by the Contractor ...................... 7
7.    Contractor Obligations as to Employer Supplied and..................... 7
      Other Information and as to Site and Surrounding Conditions
8.    Risk, Responsibility and Liability for Physical, Surface or............. 8
      Sub-surface Conditions
9.    General Coordination and Cooperation Obligations of the Contractor....... 9
10.   Design and Method Statement Responsibilities of the Contractor ........ 9
11.   Permits, Licenses, Notices and Fees; Taxes and Customs Duties, Etc....... 10
12.   Interference with Traffic and Adjoining Properties .................... 11
13.   Access and Transportation ................................................ 11
14.   Contract Submittals ...................................................... 12
15.   Contractor's Supervision and Staff ...................................... 14
16.   Contractor's Labor and Daily Log ....................................... 15
17.   Site Health and Safety Precautions and Site Space Utilization ......... 15
18.   Setting-Out of the Works ................................................. 16
19.   Responsibility for the Works ............................................. 16
20.   Contractor's Obligations to Keep Site Clean ............................ 17
21.   Contractor's Detailed Programme ......................................... 17
22.   Contractor's Responsibility for Non-Performance, Etc. and Indemnity ...... 20
23.   Treated Product / Workmanship / Plant / Materials /Equipment .......... 22
24.   Periodic and Other Payments by the Employer to the Contractor .......... 25
25.   Changes in the Works ..................................................... 25
26.   Completion ............................................................... 28
27.   Issuance of Certificate(s) of Partial Completion ...................... 28
28.   Issuance of the Certificate of Completion .............................. 28
29.   Contractor's Guarantee ................................................... 29
30.   Contractor to Search for Defects ........................................ 30
31.   Issuance of the Certificate of Expiration of the First Year of ......... 30
      Period of Guarantee
32.   Performance Letter of Guarantee ......................................... 30
33.   Suspension by Employer ................................................... 32

| 34. | Force Majeure | 32 |
|---|---|---|
| 35. | Termination | 33 |
| 36. | Insurance | 35 |
| 37. | Working Time Regulation | 36 |
| 38. | Fossils, Coins, Etc. | 37 |
| 39. | Photography and Filming | 37 |
| 40. | Confidentiality of Documents and Information | 37 |
| 41. | Ownership of Employer's Name, Signs, Etc. | 38 |
| 42. | Ownership of Documents, Etc. | 38 |
| 43. | Site Security, Environmental Protection and Site Organization | 38 |
| 44. | Settlement of Disputes | 39 |
| 45. | Rights of Inspection - Books and Records | 39 |
| 46. | Relationship Between the Parties | 39 |
| 47. | Failure to Enforce | 39 |
| 48. | Language of Communications, Signage, Labels, Etc. | 39 |
| 49. | Invalid Provisions | 40 |
| 50. | Governing Law | 40 |
| 51. | Eidmax | 40 |

## EXHIBITS

1. Contract Price Breakdown and Schedule of Value
2. Schedule of Unit Rates and Schedule of Unit Prices.
3. Terms and Conditions Governing Periodic and Other Payments by the Employer to the Contractor
4. Form of Request for Change Order and Form of Change Order
5. Programme and Milestones and Contractor Preliminary Detailed Method Statements
6. Form of Performance Letter of Guarantee.
7. Insurance Provisions

\* \* \* \* \* \*

Normandy Landfill Treatment Contract - Version 22/01/99
Ref. Nife

# TABLE OF DEFINITIONS
## TO CONTRACT

| TERM | Defined at |
|------|------------|
| Agreement | GC 1.1 |
| Approved and Approval | GC 1.1 |
| BCD | GC 1.1 |
| CDR | GC 1.1 |
| Certificate of Completion | GC 1.1 |
| Certificate of Expiration of the First Year of Period of Guarantee | GC 31 |
| Certificate of Partial Completion | GC 1.1 |
| Change Order | GC 1.1 |
| Communication | GC 25.1 |
| Completion or Complete(d) | GC 1.1 |
| Construction Manager | GC 1.1 |
| Construction Materials | GC 1.1 |
| Construction Plant | GC 1.1 |
| Consultant Engineer | GC 1.1 |
| Contract and Contract Documents | Agreement, Article 2 |
| Contract Period | GC 1.1 |
| Contract Price | Agreement, Article 4.1 |
| Contract Submittals | GC 14.1 |
| Contractor | Agreement, Introduction |
| Contractor's Preliminary Detailed Method Statement | Agreement, Annex 2 |
| Contractor's Staff | GC 1.1 |
| Day | GC 1.1 |
| Defective | GC 29.1 |
| Detailed Programme Impact Study | GC 25.8 |
| Development | GC 1.1 |
| Drawings | GC 1.1 |
| Employer | Agreement, Introduction |
| End Product | GC 1.1 |
| Event of Default | GC 35.1 and GC 35.2 |
| Fit for the Purpose | GC 1.1 |
| Force Majeure | GC 34.1 |
| General Conditions of Contract ("GC") | GC 1.1 |
| Manager | GC 15.2 |
| Materials | GC 1.1 |
| Material to be Treated | GC 1.1 |
| Method Statement | GC 1.1 |
| Milestone(s) | GC 1.1 |
| Notice of Claim | GC 25.12 |
| Notice of Termination | GC 35.1 |
| Notice of Termination for Convenience | GC 35.4 |
| Notice to Proceed | GC 1.1 |

Performance Letter of Guarantee .................................................. GC 32.1

Permanent Works .................................................................... GC 1.1

Plant ................................................................................ GC 1.1

Programme ........................................................................... GC 1.1

Public Authority .................................................................... GC 1.1

Request for Change Order ("RFCO") ................................................. GC 25.3

Schedule of Values .................................................................. Exhibit I, Agreement

Site.................................................................................. GC 1.1

Specifications ...................................................................... GC 1.1

Subcontractor ....................................................................... GC 1.1

Subcontractor's Staff ............................................................... GC 1.1

Superintendent ...................................................................... GC 15.1

Supplier ............................................................................ GC 1.1

Technical Conditions of Contract ("TC") ............................................ GC 1.1

Technical Controller ................................................................ GC 1.1

Temporary Works...................................................................... GC 1.1

Test(s) ............................................................................. GC 23.1

Time for Completion ................................................................. Agreement, Article 3.2

Unit Price Schedule.................................................................. Agreement, Annex 1

Work Products ....................................................................... GC 41.1

Works................................................................................ GC 1.1

* * * * * *

(iv)

# GENERAL CONDITIONS
# OF
# CONTRACT

### 1.    Certain Definitions and Interpretations

1.1    In the Contract, the following words and expressions shall have the meanings hereby assigned to them, except where in the context another meaning is obviously required:

"Agreement" means the Agreement, made between the Employer and the Contractor.

"Approved" and "Approval" means approved in writing, including subsequent written confirmation of previous verbal approval.

"BCD" means the area whose geographical limits are defined by Decree No. 2236 dated 19 February, 1992 and includes the area of reclaimed land from the sea defined by Decree No. 4830 dated 4 March, 1994 and by Decree No. 5609 dated 3 September, 1994.

"CDR" means the Council for Development and Reconstruction, at Talet al-Serail, Beirut, the Republic of Lebanon.

"Certificate of Completion" means with respect to the Permanent Works, the certificate issued pursuant to the terms of GC 28, which will only be issued when the entire Permanent Works are Complete, and the issuance of such certificate shall constitute evidence of the Employer's acceptance or "reception" of the Permanent Works.

"Certificate of Partial Completion" means with respect to part of the Permanent Works, the certificate issued pursuant to the terms of GC 27, which may be issued at the sole discretion of the Employer, when the part of the Permanent Works to which such certificate relates, are Complete, and the issuance of such certificate shall constitute evidence of the Employer's acceptance or "reception" of such part of the Permanent Works.

"Change Order" means a written agreement between the Employer and the Contractor, in the form set forth in Exhibit 4 or as otherwise prescribed by the Employer, executed by the parties, constituting a change to the Contract.

"Completion' or "Complete(d)" means the full execution and performance of the design, supply, execution, treatment and testing of the entire Works in strict conformity in all respects with the Contract, so that the Employer can occupy and/or utilize the entire Works for the beneficial use intended by the Employer.

1

"Construction Manager" means the entity notified or which will be notified to the Contractor by the Employer, appointed by the Employer to act as Construction Manager in connection with the Completion of the Works and whose principal duties will be to manage, coordinate and monitor compliance and the performances of all of the entities involved in the performance of the Works under their respective contracts with the Employer; to Approve the Detailed Programme of the Contractor to verify that the Contractor's Method Statement, specifications, standards and critirea relating to the works are in accordance with the requirement and standards and intent set forth in the TC; and to make recommendations to the Employer concerning payments to be made to the Contractor and eventual Change Orders under the Contract.

"Plant" means all equipment, appliances or things of whatsoever nature required in or about the execution of the Works, but does not include Materials.

"Contractor's Staff" means those directors, officers, employees, agents and servants employed by the Contractor from time to time in the performance of its duties and obligations in relation to the Works, including, without limitation, the Project Manager and Project Superintendents.

"Contract Submittal" means any submittal of any kind which the Contractor is required under the Contract to submit to the Employer's and/or Construction Manager's review and approval, including without limitation material samples, Drawings and Specifications, catalog cuts, test results, schedules, Method Statements, Detailed Programme, Site-specific health and safety plan and the like as required under any of the Contract Document.

"Day" means calendar day.

"Development" means the complete development, reconstruction and restoration of BCD, including, without limitation, the execution of infrastructure and marine protection works; the development and rebuilding of the area comprised within BCD by the restoration of existing buildings and the construction of new ones; and the sale, leasing or rental of land or property within BCD.

"Drawings" means the drawings listed or set forth in the TC and any additions or modifications to, or clarifications of, such drawings made by the Employer and/or the Contractor and Approved by the Employer or on its behalf by the Construction Manager.

"End Product" means the result of the Works executed in accordance with the Contract and which must be delivered to the Employer and meet at least the minimum critirea and standards set forth, including but not limited to land *Fit* for the Purpose, but does not include any requirement for structural support of future buildings at the Site.

"Fit for the Purpose" means the land cleaned from any contaminated products, environmentaly safe and which is available to be built on including landscape works, without the need for any environmental treatment or containment.

"General Conditions" or "GC" means the general conditions of Contract and all Exhibits thereto, or any general condition of the Contract, as the context may require.

"Method Statement" means Contractor's methods, techniques, Plant and Materials to be employed and used in the execution of the Works and shall extend to include the estimated volumes of materials to be treated by the various methods proposed by the Contractor.

"Materials" means the equipment, fixtures, goods, systems, materials and other things to form part of or to be incorporated into any part of the Permanent Works.

"Material to be Treated" means all material that will be processed according to items 1.1, 1.2, and 1.3 of the Method of Statement as indicated in the Technical Conditions.

"Milestone(s)" means any date(s) set forth in the Programme and/or the Detailed Programme, by which the Contractor is obligated to Complete such part of the Works to which such Milestone(s) relate(s).

"Notice to Proceed" means the notice to be issued by the Employer to the Contractor instructing the Contractor to commence performance of all, or, such part only, of the Works, as shall be specified in such notice.

"Permanent Works" means every work executed by the Contractor and has a permanent nature and which include the End Product.

"Plant" means all equipment, appliances or things of whatsoever nature required in or about the execution of the Works, but does not include Materials.

"Programme" means the programme establishing the major time constraints for the Completion of the Works by the Contractor, set forth in Exhibit 5 to the GC.

"Public Authority" means any governmental, regional, or city entity, agency or individual acting in an official capacity.

"Site" means the land in, on or through which the Works are to be executed the boundaries of which are indicated in the Drawings and any other lands and places provided in writing or Approved by the Employer to the Contractor for working space or any other purpose, or, as may be specifically designated in the Contract as forming part of the Site.

"Special Waste" means waste which is enclosed in drums barrels or similar packaging and which is not amenable to being treated by the methods identified by the Contractor to deal with the municipal and inert material on the Site.
Animal carcasses, sharps and plasma bags specifically shall not be classed as special waste.

"Specifications" means the technical criteria or standards and other descriptions and/or requirements set forth in the TC including, without limitation, Materials, equipment, systems, methods and all other information describing and/or required for the Completion and guarantee of the Works and forming part of the Contract and any modification thereof

3

or addition thereto as may from time to time be furnished by the Employer and/or the Contractor and Approved by the Employer, or, which may be agreed by the parties.

"Subcontractor" means any person, firm or legal entity (other than a Supplier or an individual who is a member of the Contractor's Staff or of any Supplier's staff), at any tier, retained or employed by the Contractor or any Subcontractor to perform any part of the Works.

"Subcontractor's Staff" means with respect to any Subcontractor, those directors, officers, employees, agents and servants employed by such Subcontractor from time to time in discharging its duties under its subcontract.

"Supplier" means any person, firm or legal entity which sells or otherwise provides Materials or Plant to the Contractor or any Subcontractor or otherwise undertakes to assist the Contractor or any Subcontractor in the performance of any part of the Works, but which, in each such case, does not perform other than incidental or immaterial services on the Site with respect thereto.

"Technical Conditions of Contract" or "TC" means the Technical Conditions of Contract comprised of the Drawings and the Specifications.

"Temporary Works" means all temporary works of every kind required in or about the performance of the Works.

"Works" means all the operations mentioned in the TC and not limited to excavation above and under sea level, sorting, crushing, treatment of all the waste, screening and back filling all of a permanent nature required in or for the Completion and guarantee of the Permanent Work sand End Product, so far as the necessity thereof is specified in or may reasonably be inferred from the Contract or is otherwise required for the Completion and guarantee of any part of the Permanent Works.

1.2    Words importing the singular also include the plural and vice versa where the context requires.

1.3    The headings in the GC or TC shall not be deemed to be part thereof or be taken into consideration in the interpretation or construction thereof or of the Contract.

2.    <u>Roles and Authority of other Parties; Representatives; Communications and Approvals</u>

2.1    The Construction Manager is empowered to take all actions and give all instructions and Approvals in the Employer's name and on its behalf under the Contract except where otherwise provided under the Contract and provided, however, that the Construction Manager shall not be empowered to change the Contract Price or the Time for Completion, which may be made only by way of a Change Order signed by a duly authorized officer of the Employer.

2.2    All communications of any kind, from or by the Contractor to the Employer (except for formal notices referred to in Article 7 of the Agreement) including those relating to or connected with the duties of the Construction Manager will be addressed or made to or through the Construction Manager only, which will be responsible for making or obtaining the necessary reply.

2.3    The Employer will appoint a representative ("Employer's Representative") who is empowered to act at all times for and on behalf of and to bind the Employer, in all matters relating to the Contract. Such appointment and any revocation thereof shall be notified in writing by the Employer to the Contractor.

2.4    The Construction Manager will appoint a representative ("Construction Manager's Representative") who is empowered to act at all times, for and on behalf of and to bind the Construction Manager, in all matters relating to the Contract. Such appointment and any revocation thereof shall be notified in writing by the Construction Manager to the Contractor, with a copy to the Employer.

2.5    The Construction Manager or the Construction Manager's Representative may appoint any number of persons to assist in the performance of its duties. Any such appointment, together with the duties and scope of authority of such persons and any revocation of any such appointment, shall be notified in writing by the Construction Manager to the Contractor, with a copy to the Employer.

2.6    The Contractor will appoint a representative ("Contractor's Representative") who is empowered to act at all times for and on behalf of and to bind the Contractor in all matters relating to the Contract. Such appointment and any revocation thereof shall be notified in writing by the Contractor to the Employer and to the Construction Manager.

2.7    No Approval or oral approval or commitment given by the Employer or on behalf of the Employer by the Construction Manager, shall (i) change, relieve, discharge or release the Contractor from any of its obligations, responsibilities and undertakings under the Contract, except if by way of a Change Order signed by a duly authorized officer of the Employer; or (ii) constitute a representation, warranty or agreement that the subject matter of any such Approval or oral approval or commitment (including, without limitation, the Detailed Programme, the Materials and Methods Statements), for which the Contractor alone shall at all times remain responsible, is feasible, appropriate or meets or complies with the purpose intended or other Requirements of the Contract.

3.    Contract Documents

3.1    The Contract Documents are complementary and are intended to be mutually self-explanatory, but in the event of a discrepancy between them and subject to GC 3.2, the following order of precedence shall be used : (i) the Agreement ; (ii) the GC ; (iii) the TC.

3.2    Any item of the Works mentioned in any component part of the TC, shall be provided as if shown and mentioned in all component parts. Any discrepancy within the documents comprising the TC or between the Contract Documents shall be resolved in

favor of providing the better quality or greater quantity of Works, with no increase to the Contract Price and/or any extension to the Time for Completion and/or any Milestone.

3.3     The Employer may at any time cause clarifications of any of the Contract Documents to be provided which shall become part of the Contract Documents.

## 4.     Sufficiency of Contract Price

4.1     The Contractor has satisfied itself as to the correctness and sufficiency of the Contract Price, which includes all payments to be made by the Employer to the Contractor of whatever nature, including, without limitation, for all of the Contractor's costs, overheads, profits, taxes, including, without limitation, withholding taxes (whether in the Republic of Lebanon or elsewhere) and social security, medical and retirement contributions, and which is complete compensation for, and in consideration of, all of the Contractor's obligations, responsibilities and undertakings under the Contract, including, without limitation, performance of the Works and Completion and guarantee of the Permanent Works.

4.2     Notwithstanding any Method Statement included in the Technical Conditions of the Contract, the Contractor will do all the necessary to achieve End Product, without being entitled to any increase in cost or extension of time, except as set forth herein.

## 5.     Certain Representations and Warranties of the Contractor

5.1     The Contractor hereby represents and warrants to the Employer (i) that it has carefully reviewed, read and understood all of the provisions of the Contract Documents and has executed the Contract fully intending to be bound thereby; (ii) that it is a highly competent professional and is well qualified and has adequate personnel and resources, to perform the Works; (iii) that in its performance of the Works, it shall fully comply with all applicable national, regional and city laws, rules, codes and regulations, including those relating to environment, the employment of labor, safety standards, hygiene and taxation imposed by any competent Public Authority; (iv) that it is familiar with and shall perform the Works in accordance with the most recent and reliable professional and industry standards, skill and care and in the most expeditious and economical manner consistent with the best interests of the Employer; (v) that it shall perform the Works in accordance with the Preliminary Programme and Milestones, the Detailed Programme and the Time for Completion and shall at all times employ and supply in the performance of the Works sufficient Contractor's Staff, Materials and Plant to maintain such progress; and (vi) that the execution of the Works as required under the Contract, can be implemented, and shall comply with all of the Specifications, Requirement, criteria and standards set forth in the Contract, (vii) that the Works when completed shall be Fit for the Purpose intended, (viii) that all materials which could be found will be dealt with by the Contractor, except unexploded ordinances, which shall be handled by the Employer upon request of the Contractor; and humain remains which shall be handled as directed by the Employer, that the treatment of each material will be appropriate, (ix) that all Materials (a) shall conform to, and comply with, the Contract Documents; (b) be free from all apparent and hidden defects; and (c) be Fit for the Purpose intended and in good condition.

5.2 The Contractor hereby represents and warrants that he shall execute the Method Statement as included in the Technical Conditions of the Contract.

Any modification to the Method Statements in order to reach End Product must be previously approved by the Employer without entitling the Contractor to any additional cost or extension of Time for Completion.

5.3 The Contractor further represents and warrants to the Employer that it has not entered into any agreement or arrangement of whatsoever nature, nor shall enter into any such Agreement or arrangement with any person or entity whatsoever, for the payment of money or for the giving of any other type of favors or advantages related to the Contract or the performance of the Works and that it shall immediately inform the Employer if any approach or effect is made by any party to convince it to enter into any such agreement or arrangement.

## 6.    Assignment and Subcontracting by the Contractor

6.1    The Contractor shall not assign this Contract or any part thereof, without the prior Approval of the Employer.

6.2    The Contractor shall not Subcontract or otherwise delegate performance of any part of the Works nor enter into any agreement with any Supplier without the prior approval of the Employer which approval shall not be unreasonably withheld. As a condition precedent to granting any such approval, the Contractor shall ensure that the terms of all agreements entered into with any Subcontractor or Supplier shall include at a minimum all relevant obligations of the Contractor under this Contract and shall incorporate the terms of the Contract Documents by reference.

6.3 The Contractor shall inspect and coordinate the Works of all Subcontractors and Suppliers and ensure that the Works are performed in accordance with the terms of the Contract Documents and shall reject and correct, or cause to be corrected, those portions of the Works which do not conform to the requirements of the Contract Documents. The Contractor shall be fully responsible to the Employer for all Works performed by any Subcontractor or Supplier and for all acts, errors, omissions, of any Subcontractor or Supplier. The approval by the Employer of any Subcontractor or Supplier shall not in any manner be construed as creating any contractual relationship between such Subcontractor or Supplier and the Employer. The Contractor shall be solely responsible for paying all amounts due to all of its Subcontractors and Suppliers.

## 7.    Contractor Obligations as to Employer Supplied and Other Information and as to Site and Surrounding Conditions

7.1    The Employer has made available to the Contractor all relevant information in the possession of the Employer relating to the Site, including, without limitation, information (i) relating to environmental natural conditions, topographical, geological, hydrological and sub-surface conditions; (ii) relating to access and traffic constraints to, from and around the Site; and (iii) relating to the works which are being or will be performed on, around or near the Site contemporaneously with the Contractor's performance of the

7

Works. The Contractor acknowledges that the Employer neither represents nor warrants the accuracy, completeness or relevance of any of the Site information made available by the Employer, and any lack thereof shall be the Contractor's sole risk. The Contractor shall conduct all additional investigations as may be necessary for the proper performance of the Works.

7.2    The Contractor represents and warrants to the Employer that prior to the signing of the Contract (i) that it has made itself aware of the very substantial difficulties associated with road transportation, traffic and road congestion and major infrastructure works being performed in the BCD; (ii) that it has made such independent examinations, inspections, investigations and tests relating to the Works and the Site, its surroundings and all information available in connection therewith (including information furnished under the Contract) as should have been made by a reasonable, prudent and experienced contractor in the completion of the type of works the subject of the Contract, assuming all of the obligations, responsibilities, undertakings and liabilities of the Contractor under the Contract; and (iii) that, in general, it has obtained for itself and satisfied itself as to the correctness and sufficiency of all necessary information as to the needs, risks and contingencies associated with its Completion and guarantee of the Works for the Contract Price and within the Time for Completion.

7.3    The Contractor acknowledges (i) that it has been afforded every opportunity to inspect and examine the Site and its surroundings and information available in connection therewith; and (ii) that where the Contract Documents contain recommendations or suggestions as to certain design, methods or processes, the Contractor has assured itself of the accuracy, reliability and appropriateness in the circumstances thereof and has made whatever calculations, verifications, studies and determinations it may deem necessary in the circumstances.

7.4    Without prejudice to the Contractor's obligations under above and its design obligations under the Contract, the Contractor warrants it has carefully reviewed the TC, and shall, promptly and directly advise the Employer of any errors in the TC of which it is or becomes aware.

8.    Risk, Responsibility and Liability for Physical, Surface or Sub-surface Conditions

The Contractor assumes complete and exclusive risk, responsibility and liability for any and all physical, surface or sub-surface conditions encountered at any time during Completion of the Works to the exclusion of Special Waste which shall be dealt with according to the scope of works. Except as set forth in GC 20, the discovery of any Special Waste or unexpected or unforeseen physical, surface or sub-surface conditions shall under no circumstances entitle the Contractor to an extension of the Period for Completion and/or to an increase in the Contract Price or operate to relieve the Contractor of any of its obligations, responsibilities and undertakings under the Contract.



### 9.    General Coordination and Cooperation Obligations of the Contractor

9.1.    Because the Development will be completed by numerous owners, contractors and suppliers, often working in parallel or following one another, and will be achieved in stages, it is of paramount importance that performance of the Works is fully coordinated with preceding, concurrent and succeeding work performed or to be performed by others, in an orderly manner and in full and complete cooperation. Accordingly, the Contractor shall, in accordance with the overall requirements of the Development as determined by the Employer, afford all reasonable opportunities to any other owners, contractors or third parties and their workers, for carrying out their work and shall coordinate and cooperate in all respects and detail during every phase of the Contractor's performance of the Works.

9.2    The Contractor shall, coordinate, cooperate and conform fully and effectively the performance of all of its Works, with such requirements and conditions as the Construction Manager notify or recommend from time to time, provided, however, that the Construction Manager shall in no instance be authorized to change the Contract, including, without limitation, any change which will or might affect either the Contract Price and/or the Time for Completion and/or any Milestone and, provided, further, that no such notification or recommendation shall operate to exclude or limit the Contractor's obligations and liabilities under the Contract. The Contractor shall immediately inform the Employer of any change to the Contract suggested by the Construction Manager. Failure by the Construction Manager, to test, examine or disapprove any Works, including, without limitation, Materials, shall not prejudice the power of the Employer thereafter to disapprove such Works and to order the pulling down, removal or breaking up and replacement thereof.

9.3    In the event of any disagreement by the Contractor as to the requirements, conditions, directives, suggestions and recommendations of the Construction Manager, the Contractor shall prepare, for the Employer's review and answer, a written report to the Employer setting forth in reasonable detail the nature of the disagreement and the basis of the Contractor's position. This report shall not constitute any notice under GC 25.

9.4    The Contractor's Coordination and cooperation obligations shall include, without limitation, participation in frequent (periodic and special) meetings, day to day contacts and exchange of information and preparation of standardized documents and formats, and the preparation of fully coordinated drawings of all areas where the Contractor's works and join and interface with the work of others.

### 10.    Design and Method Statement Responsibilities of the Contractor

10.1    The Contract Documents, including, without limitation, the TC, contain the critirea and standards for the End Product on the basis of which the Contractor is to Complete the Works. The Employer does not represent or warrant that such critireas and standards are sufficient for the purpose intended.

10.2    The Contractor represents and warrants to the Employer (i) that prior to the signing of the Contract it has read and understood the TC; (ii) that it has made such independent verifications and tests relating to the execution of the Works (including



those elements furnished under the Contract) as should have been made by a reasonable, prudent and experienced contractor assuming the complete and exclusive responsibility and liability for the execution of the Works; (iii) that the Method Statement as developed by the Contractor under the Contract will be feasible, will be able to be implemented and that the Permanent Works will be Fit for the Purpose intended; and (iv) that the Works can be executed and Completed as required under the Contract.

10.3    It shall be the Contractor's responsibility to prepare and to develop the Method Statement of the Works through its various phases as foreseen in the TC; to prepare thereafter the Contractor's shop drawings and any other drawings, submittals of the types, standards and brands of the Materials, Plant and workmanship to be used in the Completion of the Works or any part thereof; and to perform any further Method Statement needed as a result of any change to the Works or for any unforseen discovery. Such Method Statement shall be carried out, completed and submitted in accordance with the Contract Documents. In the course of preparing, developing and completing the Method of Statement of the Works, the Contractor shall be entitled to prepare and submit to the Employer's Approval any Method of Statement solution for the Works, provided that such (i) complies in any and all respects with any and all Requirements set forth in the Contract, including without limitation the End Product critirea and standards and the scope of works, and (ii) does not alter or change the quality of the Works.

10.4    The Contractor accepts complete and exclusive responsibility and liability for the Method of Statement of the Works, and for the conformity of the Works as designed and executed by it, with any and all Requirements of the Contract.

10.5    The Contractor accepts complete and exclusive responsibility and liability for the sufficiency, appropriateness and suitability of any and all Requirements of the Contract for the proper performance, Completion and guarantee of the Works in accordance with the Contract. Notwithstanding that the Contractor shall comply with the Requirements of the TC and other technical Requirements for the Works set forth in the Contract, such compliance shall not in itself relieve the Contractor from any of its responsibilities, representations and warranties under the Contract, and it shall be the Contractor's responsibility to comply with any such additional requirements as may prove to be necessary or required for the proper performance, Completion and guarantee of the Works in accordance with the Contract.

11.    Permits, Licenses, Notices and Fees; Taxes and Custom, Duties, Etc.

11.1    Except as otherwise provided herein, the Contractor shall obtain (and update as may be required, including, without limitation, as a result of any changes to the Works) all necessary permits and licenses, give or file all notices, and pay all fees as may be required by all applicable laws, rules, regulations, ordinances or by-laws of any local or other Public Authority for performance of the Works by the Contractor and shall, upon the Employer's request, furnish the Employer with copies of any such permits, licenses or notices.

The Employer shall from time to time upon the specific request of the Contractor, provide to the Contractor such reasonable assistance as shall be necessary in order to permit the Contractor to perform the said obligations.

11.2    The Contractor shall be solely responsible and liable for the payment of all taxes, duties, unemployment, social security, retirement, medical contributions and the like, of whatsoever nature, imposed on the Contractor by any Public Authority, arising out of or in connection with the Contractor's receipt of the Contract Price, the Contract and/or the Completion and guarantee of the Works and/or the employment by the Contractor of the Contractor's Staff, its Subcontractors and Suppliers at any tier and their respective personnel, including, without limitation, for all business, company, sales and income taxes and for customs and stamp duties including stamps for the Contract which amounts to 0.3% of the Contract Price.

## 12.    Interference with Traffic and Adjoining Properties

The performance of the Works shall be carried on so as not to interfere unnecessarily or improperly with the convenience of the public, or the access to, use and occupation of public or private roads and footpaths to any properties, whether in the possession of the Employer or of any other party.

The Contractor is not allowed to occupy any part of the working area of the marine works contract except as defined in the TC.

If any works have to be carried out in the above area, such work cannot be done as long as the Marine works contract is not completly executed, and without the prior approval of the Employer.

## 13.    Access and Transportation

13.1    The Contractor shall, prior to mobilization for any on-Site activity, provide in writing to the Employer for Approval, the Contractor's space proposal for such things as offices, equipment, parking and maintenance, material storage, and the like. Upon receipt of the Contractor's proposal, the Employer shall confer with the Contractor and shall issue a written response to the Contractor indicating the space or spaces allocated. The Employer shall provide to the Contractor access to so much of the Site as may be required to enable the Contractor to commence the performance of the Works and, from time to time as the Works proceed, access to such further portions of the Site as may be required for the Contractor to proceed with the Works in accordance with the Contract. The Contractor shall not be entitled to exclusive access and/or use to any part of the Site.

13.2    The Contractor shall prevent any highways or bridges communicating with or on the routes to the Site from being damaged or injured by any traffic of the Contractor or any of its Subcontractors or Suppliers and, in particular, shall select routes, choose and use vehicles and restrict and distribute loads so that extraordinary traffic from and to the Site shall be limited as far as reasonably possible.

11

13.3    Should it be necessary for the Contractor to move loads of Plant, Materials or machinery over a highway or bridge, where damage may occur unless special protection or strengthening is carried out, then the Contractor shall give prior notice to the proper Public Authority, with a copy to the Employer, and effect such measures as may be required by the applicable Public Authority, all at its own cost.

13.4    If during the performance of the Works or at any time thereafter the Contractor or Employer shall receive any claim arising out of the performance of the Works in respect of damage or injury to routes, buildings or bridges, the party receiving such claim shall immediately report the same to the other party and the Contractor shall assume all responsibility and liability therefor.

## 14.    Contract Submittals

14.1    Not later than fifteen (15) Days after the issuance of the Notice to Proceed, the Contractor shall commence and thereafter proceed with the preparation of the Contract Submittals required for the performance of the Works or by the Contract Documents, and shall thereafter submit all such Contract Submittals to the Employer for its review and Approval to proceed as indicated. The Contractor shall initial and place its company stamp on each Contract Submittal using a title block prescribed by the Employer. Each Contract Submittal shall be issued in a transmission form prescribed by the Employer and shall comprise of up to four (4) hard copies, two (2) reproducibles and one (1) digital copy as required from time to time by the Employer.

14.2    Contract Submittals furnished by the Contractor shall be prepared in English, except as otherwise Approved by the Employer, shall comply with International Standard Sizes (base A4: 210 x 297 mm) with drawings established to ISO standards. They shall meet the requirements of the Contract and adequately describe the work or subject to which they refer. The title block, numbering, referencing and presentation of all Contract Submittals shall be prescribed by the Employer.

14.3    No portion of the Works requiring a Contract Submittal shall be started until the Employer has returned to the Contractor the Contract Submittals pertaining thereto Approved to proceed as indicated. It shall be the responsibility of the Contractor to submit each Contract Submittal on a regular basis and in reasonably small quantities and on a schedule that allows not less than thirty (30) Days for review and return to the contractor. Any Contract Submittal submitted by the Contractor for the Employer's review and approval shall be deemed automatically approved if within thirty (30) days from the Employer's receipt of such Contract Submittal the Employer has failed to return to the Contractor such Contract Submittal in accordance with GC 14.5.
The Contractor shall give written notice to the Employer of any Contract Submittal which in the Contractor's opinion has been automatically Approved pursuant hereto, within three (3) working days thereof.

14.4    If any Contract Submittal of the Contractor shows a variation from the requirements of the Contract Documents (including, without limitation, any requirements specified on or in any Drawings or Specifications) or from any Drawings or Specifications



previously Approved for any reason, the Contractor shall specifically mention each such variation and the reason therefor in its transmittal.

14.5   The Employer, or its designee, shall return each Contract Submittal to the Contractor stamped with one of the following: (i) No exceptions taken; (ii) Make corrections noted - do not resubmit; (iii) Make corrections noted – resubmit; (iv) Rejected - revise and resubmit. Under condition (i) the Contractor shall proceed. Under condition (ii) the Contractor shall proceed by implementing the comments received on the Contract Submittal; the Contractor shall revise the Contract Submittal as required, taking into account the comments received but shall not resubmit the Contract Submittal for Approval. Under condition (iii) the Contractor shall proceed by implementing the comments received on the Contract Submittal ; however, the Contractor shall revise the Contract Submittal as required, taking into account the comments received and shall resubmit the Contract Submittal for Approval as promptly as possible. Under condition (iv) the Contractor shall prepare the Contract Submittal in full conformity with the Contract requirements for resubmittal as promptly as possible, and the entire process shall be repeated but without any right of Contractor to any modifications of, or adjustments or variations in, the Contract Price, the Time for Completion and/or any Milestone, or any other terms or conditions of the Contract. Any "rejected" Contract Submittal which is resubmitted shall be accompanied by a written notification of any changes in such Contract Submittal made by the Contractor after rejection.

14.6   Approval to proceed as indicated on any Contract Submittal or automatic Approval pursuant to GC 14.3 shall not be construed as authorizing additional work or any modifications of, or adjustments or variations in, the Contract Price and/or the Time for Completion and/or any Milestone, or any other terms or conditions of the Contract. Approval to proceed as indicated of any Contract Submittal or automatic Approval pursuant to GC 14.3 shall not relieve the Contractor from responsibility for errors or omissions which may exist thereon, for the proper execution of the Works, or for furnishing of materials or work required by the Contract and as indicated on such Contract Submittal. Notwithstanding any other provision in the Contract, and irrespective of any Approval to proceed as indicated, the Contractor shall not be entitled to any increase in the Contract Price and/or extension of the Time for Completion and/or any Milestone where and to the extent that there has been: (i) any error, divergence, omission or discrepancy in anything provided by the Contractor under this GC 14, or provided by any other person or entity, that should have been detected by the Contractor, or for which the Contractor has assumed responsibility under the terms of the Contract; or (ii) any failure by the Contractor to provide any Contract Submittal in accordance with the Contract; or (iii) any failure by the Contractor to fulfill its obligations and responsibilities set forth in these GC including, without limitation, GC 5 and GC 14.7.

14.7   The Contractor's Contract Submittals shall (i) satisfy in all respects any relevant performance specification or any requirement included or referred to in the Contract; and (ii) shall be properly coordinated and integrated with the various elements of the TC.

14.8   In addition to the notice requirements of GC 25, if at the time the Contractor submits any Contract Submittal it is aware of any fact related to the submission which it believes should give rise to a change in the Contract Price and/or extension to the Time for

13

Completion and/or any Milestone, the Contractor shall notify the Employer in writing and if such notice is not given at the time of such submission the Contractor shall be deemed to have irrevocably waived the right to assert any related claim.

14.9    If requested by the Employer, the Contractor shall submit at such times and in such further detail as the Employer may reasonably require, information pertaining to the Method Statement which the Contractor proposes to adopt or use, together with all justification, so as to demonstrate to the Employer that such methods are safe, sound and protect and ensure the quality of the End Product.

14.10  The Contractor should provide the Employer with a progress report of the Works executed on Site and accompanied with a full set of progress photography.

## 15.    Contractor's Supervision and Staff

15.1    The Contractor shall appoint a Manager (the "Project Manager") as its senior representative to supervise performance of the Works whose appointment and removal shall be subject to the Employer's Approval. Unless otherwise agreed, the Project Manager shall work and devote all of his time exclusively to the Contract on Site and shall be available to attend any and all meetings held in connection with the Works. The Project Manager shall receive and implement, on behalf of the Contractor, directives and instructions from the Employer and shall be empowered to act at all times for and on behalf of and to bind the Contractor in all matters relating to the Contract to negotiate any matters of modification, claim or dispute arising under the Contract.

15.2    The Contractor shall provide and employ only such staff (the "Contractor's Staff") as are competent, skilled and experienced to give proper supervision to the Works and as required for the proper and timely execution of the Works. The Contractor shall not employ for the performance of the Works any person unfit for or unskilled in his or her assigned task. It is expressly understood and agreed that the Contractor shall remove, at the request of the Employer and without any entitlement to any increase in the Contract Price and/or in the Time for Completion, any member of the Contractor's Staff assigned to the Contract who the Employer shall deem unfit to perform the task assigned to him or otherwise finds objectionable regardless of any prior Approval of such person, and such person shall not again be employed in connection with the Contract without the Approval of the Employer.

15.3    The Contractor's Staff will be liable to comply with all laws and regulations in force in the Republic of Lebanon, including those related to personal income tax, and the Contractor shall comply with all applicable laws and regulations imposed upon it by reason of its being an employer of such personnel.

## 16.    Contractor's Labor and Daily Log

16.1    The Contractor shall provide all labor, local or otherwise, as may be necessary to meet its obligations under the Contract. The Contractor shall also make its own arrangements for the transport, housing, feeding and payment of its labor.

16.2    The Contractor shall provide on or near the Site, adequate sanitary facilities, drinking and other water, changing rooms, showers and any other facilities required by applicable laws or regulations and/or necessary for the use of the Contractor's Staff. All such facilities shall, however, be subject to the Employer's Approval as to appearance and location.

16.3    The Contractor shall not permit any alcoholic beverages, drugs, arms, weapons or ammunition to be consumed on, or brought on to, the Site by the Contractor's Staff or its Subcontractors, Suppliers or their respective agents or employees. The Employer has the right to confiscate any such substances or items found on the Site and to ban from the Site any person found in possession thereof.

16.4    The Contractor shall at all times take all reasonable precautions to prevent any unlawful, riotous or disorderly conduct by or among the Contractor's Staff or employees of its Subcontractors or Suppliers and for the preservation of peace and protection of persons and property in the location of the Works.

16.5    The Contractor shall not, in any circumstances, hire away or induce from their current employment, employees of the Employer or of others working in connection with the Development, notwithstanding the fact that the current work of such employees is delayed or suspended.

16.6    The Contractor shall submit a weekly report in a form supplied by the Employer which shall contain the following information at a minimum: (i) climatic conditions; (ii) hours worked; (iii) copies of accident reports and declarations of damage or loss to property (to be submitted immediately); (iv) staff and labor attendance; (v) major Construction Plant mechanical downtime; (vi) summary of daily activity; (vii) list of visitors and meetings; and (viii) any other information requested by the Employer.

## 17.    Site Health and Safety Precautions and Site Space Utilization

17.1    Within fifteen (15) Days from the Notice to Proceed, the Contractor shall, at its sole cost and expense, submit four (4) copies to the Employer of a plan for health and safety prepared by the Contractor.

17.2    The Contractor shall in connection with the Works provide and maintain at its own cost any lights, watchmen, fencing and security when and where necessary or as required by any Public Authority, for the protection of the Works, or for the safety and convenience of the public or others. Any such things provided by the Contractor shall first be Approved as to the quantity, appearance, location and type by the Employer and shall conform to the Employer's plan, if any, for security and safety within BCD.

15

## 18.    Setting-Out of the Works

The Contractor shall be solely responsible for the accurate setting-out of the Works in relation to original survey points given by the Employer and for the correctness of the position, level, dimension and alignment of all parts of the Works and for the provision of all the necessary instruments, Materials, Plant and labor in connection therewith. The Contractor shall, prior to the initiation of any Works at the Site, verify the correctness, position, level, dimension and alignment, performed by others. The Contractor shall preserve and protect at its expense all Employer furnished original survey points or monuments, the location of which the Employer reserves the right to move, at its expense. The Contractor shall maintain and preserve all stakes, markers and such other survey points of the Contractor until authorized by the Employer to remove them. If such stakes, markers and survey points are destroyed prior to Employer authorized removal, they will be replaced by the Contractor at its expense.

## 19.    Responsibility for the Works

19.1    Subject only to the terms of GC 34, the Contractor assumes all risk of loss and shall be responsible and have full liability for, any loss of or damage to the Works arising out of or caused by any occurrence during the period commencing on the date of issuance of the Notice to Proceed and ending, in connection with the relevant part of the Works at midnight on the date that a Certificate of Partial Completion is issued by the Employer pursuant to GC 27 in relation to such part of the Works and ending in connection with the entire or remaining Works, at midnight on the date that a Certificate of Completion of the entire Works is issued by the Employer pursuant to GC 28. The Contractor shall protect the Works which may in any way be affected by the carrying out of other Works during such period.

19.2    If all or any part of the Permanent Works are damaged or polluted and the Contractor is responsible and liable to the Employer for such loss, damage or pollution under the provisions of this GC, at the request of the Employer, the Contractor shall, without prejudice to any other loss or damage to which the Employer is entitled, at the Contractor's own cost, promptly and diligently treat such parts of the Permanent Works so that the Permanent Works are in conformity in every respect with the Contract. The Contractor shall not be entitled to any increase in the Contract Price and/or extension to the Time for Completion if it is so required to repair or to treat any such part of the Permanent Works.

19.3    If at any time any remedial or other work shall in the opinion of the Employer be urgently necessary for the safety of the Works and the Contractor is unable or unwilling at once to do such work or repair, the Employer may, immediately and without the notice required under GC 35, employ and pay other persons to carry out such work or repair as the Employer may consider necessary. All expenses properly incurred by the Employer shall be reimbursed by the Contractor, or may be deducted by the Employer from any monies due or which may become due to the Contractor. The Employer shall, as soon

after the occurrence of any such emergency as may be reasonably practicable, notify the Contractor thereof in writing.

### 20.    Contractor's Obligations to Keep Site Clean

The Contractor shall maintain all mobilisation and treatment areas used and occupied by it in a neat and controlled environment condition at all times. The Contractor shall immediately notify the Employer of the discovery of any human remains or explosive materials (which explosive materials shall be the Employer's risk and liability) which, shall not entitle the Contractor to an increase in the Contract Price and/or to an extension of the Time for Completion unless a delay results from the Employer's failure to handle the explosive materials or to direct the Contractor how to handle the human remains, in which case the Contractor may be entitled to an extension of the Time for Completion, if the delay(s) exceed fifteen (15) days in the aggregate for all such discoveries during the Contract. The Employer shall, at its expense, deal with all explosive materials discovered by the Contractor. The Contractor shall keep the Site free from all unnecessary obstruction and shall store neatly or remove from the Site promptly all unnecessary Plant, Materials or Temporary Works. In addition, no later than upon Completion of the Permanent Works, or upon early termination of the Contract (for whatever reason), or abandonment of the Works, the Contractor shall clear away and remove from the Site and its surroundings all Plant, Materials, rubbish of every kind, and leave the whole of the Site and Works clean. Should the Contractor fail to comply with the obligations of this GC, the Employer may, upon giving twenty four (24) hours notice, undertake to accomplish such obligations at the Contractor's expense.

### 21.    Contractor's Detailed Programme

21.1    The Contractor shall, within the time limits stated in GC 21.2, submit and resubmit to the Employer for and until its Approval a Detailed Programme as outlined in GC 21.2, which once Approved by the Employer shall become the Contractor's Detailed Programme (the "Detailed Programme"). Such Detailed Programme shall be developed from and shall be consistent with the Contractor's Method Statement and with the Programme and shall incorporate all Milestones. In addition, the Detailed Programme shall take into account all factors or risks affecting, or which may affect, the Contractor's performance of the Works, including, without limitation, sorting and treatment of all special waste if any as required by the Technical Conditions of Contract all weather conditions, laws and regulations pertaining to the maximum number of working hours and Days per week and statutory holidays (all of which are the sole risk of the Contractor and shall not entitle the Contractor under any circumstances to an increase in the Contract Price and/or extension of the Time for Completion and/or any Milestone, unless constituting an event of Force Majeure). The Contractor shall supply the Employer with two (2) copies of the Detailed Programme once Approved by the Employer and with two (2) copies of all Approved revised versions. The copies provided shall be in the form of magnetic diskettes and hard copy (paper) transmittals.

17

21.2    The Contractor shall submit the Detailed Programme within nine (9) weeks from the Employer's issuance of the Notice to Proceed in three (3) copies (free standing software and/or user network sessions) and in "Primavera" (latest version), using IBM compatible hardware or Employer Approved compatible substitutes. The Detailed Programme shall employ the precedence network technique in bar line format supported by a CPM logic network and shall include the following at a minimum: activity description, manpower loading by trade, order of precedence in which it proposes to carry out the Works, activity interdependence and relationships, duration and critical path of all tasks to be undertaken in the performance of the Works, all free and total float time per activity and all planned shift work and overtime. The Detailed Programme shall show dates of and/or start and finish dates for all Temporary Works (including offices and storage facilities); all design, construction, mock-ups/prototypes/ testing and commissioning; finishing work; Public Authority approvals; and permits required for the performance of the Works. The time units for all Detailed Programme activities shall be in Days. In addition, further subdivision into particular zones and/or levels may be requested by the Employer. Any changes to Detailed Programme activity duration, sequence, logic and the like must be Approved by the Employer and the Detailed Programme shall be updated whenever performance of any items of Works on the critical path is five (5) Days or more late, to reflect the current status of and all changes to the Works and/or strategy. Implementation and/or Approval of a revised logic and/or duration time estimates for updated Detailed Programmes, whether furnished by the Contractor or the Employer, shall not constitute or entitle the Contractor to an extension of the Time for Completion and/or any Milestone(s) to an increase in the Contract Price which may only be extended or increased, as the case may be, by a Change Order. Any revisions to the logic and/or duration time estimates for updated Detailed Programmes are made for the purpose of maintaining the accuracy of the Detailed Programme representation of the Works to be accomplished and to present best time estimates for Works yet to be performed. When submitting its Detailed Programme, the Contractor shall state the number of working Days per week, together with the number of shifts per Day for each activity, it intends to work and which are reflected in its Detailed Programme. The Contractor will at its cost furnish the Employer, upon request, with three original software packages and manuals of the software utilized by the Contractor in preparing its Detailed Programme.

21.3    All float-time identified within the Detailed Programme belongs to the Contractor, provided however, that in connection with any change to the Works ordered by the Employer and/or any Event of Force Majeure, the Employer shall be entitled to direct the Contractor to use any such float-time available at the time of the related change or event, as the case may be, to compensate for the time impact of such change or event on the performance of the works, without any increase in the Contract Price and/or extension of the Time for Completion.

21.4    The Employer's Approval of the Detailed Programme or any revisions thereto shall not be interpreted as an agreement that the Works or any task or event can be completed within the time allotted or with the manpower indicated, nor alter or waive the Contractor's obligation fully to Complete the Works or any part thereof in accordance with the Programme, Milestones and within the Time for Completion.

21.5    The Contractor shall submit to the Employer for approval a Contract Submittal Schedule and a Procurement Scheduled : (i) an initial Contract Submittal Schedule shall be furnished by the Contractor within fifteen (15) days from the Employer's issuance of the Notice to Proceed and shall include a listing of all method statements, procedural document, drawings, specifications and the like required by the Contract; and (ii) a final Contract Submittal Schedule shall be furnished by the Contractor within fourty five (45) days from the Employer's issuance of the Notice to Proceed and shall include dates and timings for all above items. All Contract Submittals lists and/or Detailed Programmes shall be reconciled with any information furnished by the Employer and any conditions, corrections, deletions and/or discrepancies shall be identified and presented to the Employer for review.

In the case of the Procurement Schedule, (i) an initial Procurement Schedule shall be furnished by the Contractor within fifteen (15) days from the Employer's issuance of the Notice to Proceed and shall include a listing, indicating critical or long lead items and country of origin, of all material, plant and equipment purchases (excluding office and workshop equipment, office and workshop consumables, personal protective equipment and fuel) which are to be used in the execution and the completion of the Works, and (ii) a final Procurement Schedule shall be furnished by the Contractor within fourty five (45) days from the Employer's issuance of the Notice to Proceed and shall include dates and timings for all above items. The Employer reserves the right to make adjustments to the delivery schedule based upon on Site delivery constraints and country of origin.

21.6    In addition, one (1) month before the commencement of the Works by the Contractor on the Site as per Detailed Programme the Contractor shall provide a detailed, shortterm schedule loaded with Materials and Plants covering the next four (4) weeks of planned work. This schedule shall be updated every two (2) weeks depicting a six (6) week "rolling window" to include all activities four (4) weeks in the future of and two (2) weeks in the past of the updated report. The short-term schedule shall be consistent and in accordance with the timing and sequencing shown in the Detailed Programme, and shall be in sufficient detail to enable the Contractor to control and manage the Works.

21.7    The Contractor shall be required to attend regular (generally weekly) Site meetings up to Completion of the Permanent Works. The progress planned and achieved relative to the Contractor's detailed six-week rolling window schedule shall be reviewed and recorded at these meetings. The Contractor shall, provide each month a written report to the Employer with the Contractor's Request for Payment. The minimum level of information required on this progress report shall be: contractual date for Completion; percentage progress scheduled and percentage progress achieved relative to each activity contained on the Contractor's Detailed Programme; actual start and finish dates for all activities; average rate of production for each item of Plant and combined average rate of production; reasons for any delays or anticipated delays and explanations of actions being implemented; any shortage of manpower and action being implemented; any shortage of information from whatever source; and any difficulties or delays in off-Site fabrication or delivery of Materials or Plants stating action being implemented, Works in progress and planned for the next two (2) weeks. The monthly report shall contain a graphic comparison between the Contractor's Detailed Programme and the current progress/projections.

19

21.8    The Contractor shall, whenever required by the Employer, also provide in writing a general description of the arrangements and methods which the Contractor proposes to adopt for the performance of the Works or any part thereof.

21.9    If at any time it should appear to the Employer that the actual progress of the Works does not conform to the latest Approved Detailed Programme, the Contractor shall produce, at the request of the Employer, a revised programme showing modifications to the latest Approved Detailed Programme necessary to ensure timely Completion of the Works in compliance with the Programme and Milestones. The revised programme shall be supported by a narrative description of the recovery plan which shall include, but not necessarily be limited to, changes in staffing, Plant, usage, methods of operation, Materials, and any other relevant details. If for any reason, the rate of progress of the Works or any part thereof is at any time, in the opinion of the Employer, too slow to ensure timely completion in accordance with the Programme and/or any Milestone(s), the Employer shall, without prejudice to any other rights under the Contract, so notify the Contractor in writing and the Contractor shall thereupon take such steps as are necessary to accelerate progress so as to Complete the Works or any part thereof by the prescribed time. If, as a result of any such notice given by the Employer, the Contractor shall seek the Employer's permission to perform any Works on an overtime basis or on holidays or Saturdays, such permission shall not be unreasonably refused. The Contractor acknowledges and agrees that the Employer may require the Contractor to modify its Site organization to work two (2) or three (3) shifts per Day. Except when the Contractor's performance of the Works is delayed as a result of events for which the Contractor is entitled to an extension of the Time for Completion under the Contract and the Employer directs the Contractor in writing to accelerate performance of the Works, the Contractor alone shall bear all additional costs and expenses it may incur in the acceleration of its performance. In the event acceleration is ordered by the Employer and the Contractor's progress is not less than that called for in the Approved Detailed Programme or the Contractor is entitled to an extension of the Time for Completion, and provided the Contractor otherwise complies in all respects with GC 14 and GC 25 as they may be applicable, the Contractor shall be paid for such acceleration in accordance with GC 25.

21.10    The Contractor recognizes and acknowledges that any material failure of, or suspension of the Works, by the Contractor or any Subcontractor or Supplier, would cause the Employer immediate and irreparable harm unable to be compensated by money damages alone, and the Contractor hereby accepts and agrees that it shall not under any circumstances whatsoever cease, delay or suspend performance of its Works under this Contract, except as may be expressly provided for under these GC.

22.    <u>Contractor's Responsibility for Non-Performance, Etc. and Indemnity</u>

22.1    In connection with any breach of any representation or warranty and in connection with any failure, breach, error or omission to perform, or in the performance of, any obligation, responsibility, or undertaking of the Contractor in accordance with the terms and conditions of the Contract by the Contractor or its Subcontractors or Suppliers or of their respective affiliates, officers, directors or employees, and subject to the terms of GC

22.3 and 22.4, the Contractor shall be fully responsible and liable to the Employer for, and shall indemnify the Employer against, the full extent of any and all liabilities, loss and/or damage suffered, and for all additional costs and/or expenses incurred by the Employer (including, without limitation, financing costs, interest, attorneys' fees and expenses), up to a maximum of Twenty Millions United States Dollars (20.000.000 USD).

22.2 As set forth in the Contract, the timely performance and Completion by the Contractor of the entire Permanent Works within the Time for Completion and in accordance with the Programme and any intermediate Milestones is of the essence and a material term of the Contract. The Completion of the Works within the Time for Completion is essential and vital for the timely and successful development and promotion of land and projects surrounding or near the Site and for the commercial viability and financial success of such parts of the Development for the Employer.

22.3 In the event the Contractor fails to Complete part of the Works by any intermediate Milestone applicable to such part of the Works (as any such Milestone may be extended from time to time in accordance with the terms and conditions of the Contract) the Contractor shall, for the number of Days specified in the Agreement of any such Contractor failure, unless and until the Employer exercises its termination rights pursuant to the Contract, pay the Employer, as liquidated damages and not as a penalty, the percentage of the Contract Price specified in the Agreement, for each Day, or part thereof, of such Contractor failure.

22.4 In addition to the provisions of GC 22.3, in the event the Contractor fails to Complete the entire Permanent Works within the Time for Completion (as such Time for Completion may be extended from time to time in accordance with the terms and conditions of the Contract) the Contractor shall, for the number of Days specified in the Agreement of any such Contractor failure, unless and until the Employer exercises its termination rights pursuant to the Contract, pay the Employer, as liquidated damages and not as a penalty, the percentage of the Contract Price specified in the Agreement, for each Day, or part thereof, of such Contractor failure.

22.5 The amount which the Contractor may become obligated to pay the Employer pursuant to GC 22.3 and/or GC 22.4 shall not exceed a cumulative total of fifteen percent (15%) of the Contract Price. The Employer may deduct from amounts due and payable to the Contractor under the Contract any amount which the Contractor owes the Employer under GC 22.3 and/or GC 22.4, but without prejudice to the Employer's right to make any demand for payment of such amount against the performance Letter of Guarantee.

22.6 Nothing in this GC 22 shall affect the right of the Employer to exercise, in addition to the rights specified in this GC, any other rights or remedies to which the Employer may be entitled pursuant to the Contract and/or applicable law, and in particular, and without limitation, the Employer's termination rights.

22.7 The Contractor shall be solely liable and responsible for, and shall indemnify the Employer against, all consequences of any claim (including, without limitation, all costs, expenses and attorneys' fees) arising out of or in connection with the performance of the Works or with any failure, breach, error or omission to perform by the Contractor, its

Subcontractors and Suppliers brought against the Employer by any entity or person, for any losses, damages or injuries of whatsoever nature suffered by such claimant, or the person through whom such claimant is claiming for personal injury, death, property loss or other damage and whether arising out of a tort, breach of contract or otherwise.

22.8    The provisions of this GC 22 shall remain valid and applicable notwithstanding the expiration or early termination of the Contract.

### 23.    Treated product/ Workmanship/Plant/Materials/Equipment

23.1    All Materials and workmanship shall comply with the requirement of, and shall be of the respective quality and kinds described in, the Contract and shall be subjected from time to time to such inspection and tests ("Test(s)") as specified in the Contract, which shall include, without limitation, all required Tests as directed by or through the Construction Manager. The Contractor shall provide such laboratory assistance, instruments, machines, labor and materials as are normally required for examining, measuring and testing any Works and the quality, weight or quantity of any Materials used. The Employer reserves the right to reject non-conforming or defective Materials and work at no cost to the Employer.

23.2    The Contractor is required to implement a quality control system to be Approved by the Employer for sufficient control and testing (including giving prior written notice of all Tests) of all aspects of workmanship and Materials as specified in the Contract. At the start of each phase of work, the Contractor must demonstrate that the Contractor's methods, techniques and standards of work are in strict compliance with the Contract requirements. Within sixty (60) Days of the signature of the Contract, the Contractor shall furnish the Employer with a plan related to quality control and quality assurance systems pertaining to the Works.

23.3    The Contractor shall cooperate fully with the Employer which may perform any Tests to verify compliance with any requirements of the Works. The Contractor shall allow free and ready access to the Site and execute any preparatory work as may be directed. The Employer shall have access to any laboratory or agency under control or agreement with the Contractor to provide testing services. The Employer shall be provided with an original of all Test results. Under no circumstances shall this GC or any field activity of the Employer or its representatives relieve the Contractor from its obligation to provide, at its own cost, complete testing and reporting as may be outlined elsewhere in the Contract Documents, even in the event of duplication of certain activities. Whether any Test or inspection is carried out or not by the Employer, the Contractor is not relieved from any provision of the Contract. All deficiencies whether discovered by the Contractor's or Employer's testing or inspection program shall be remedied immediately to conform to the Contract requirements by the Contractor at its expense. The cost of any Test shall be borne by the Contractor if such Test is customarily required by any Public Authority, or is required by or reasonably inferred from the Contract. If any Test is ordered by the Employer which is not so required or intended then the cost of such Test shall be borne by the Employer unless the Test shows the workmanship or Materials

not to be in accordance with the provisions of the Contract or instructions given by the Employer.

23.4    The Employer and any person authorized by it shall at all times have access to the Works and to all workshops and places where Works are being prepared or from where Materials, manufactured articles or machinery are being obtained for the Works and the Contractor shall afford every facility for and assistance in obtaining such access.

23.5    No part of the Works shall be moved from one stage or area of work to a another one or put out of view without notification by the Contractor to the Employer at least twenty-four (24) hours in advance. The Contractor shall afford full opportunity for the Employer, and the Construction Manager, to examine and measure any part of the Works which is about to be moved or put out of view. No examination nor the failure to examine the Works shall operate to exclude or limit the Contractor's obligations and liabilities under the Contract.

23.6    Title to all Materials shall vest in the Employer upon arrival at the Site, or upon payment therefor, which ever occurs the earlier, free of all liens, claims, security interests and any other encumbrances or other charges of whatever nature.

23.7    The Contractor shall assure that Materials delivered to the Site (or elsewhere if necessary) are, to the extent necessary, fully protected from damage or deterioration by any cause; are maintained by the Contractor in "as-new" condition; are clearly marked and identified as being the property of the Employer; and are boxed, crated, wrapped, capped, lubricated, weatherized and otherwise fully protected by the Contractor from moisture deterioration or damage.

23.8    The Contractor warrants that all samples, catalog cuts and/or first articles furnished under the Contract, shall be wholly representative of the Works to be supplied and installed under the Contract. The Employer's acknowledgement, review or inspection of or its failure to acknowledge, review or inspect such samples, catalog cuts and/or first articles shall not exclude or limit the Contractor's obligations and liabilities under the Contract.

23.9    The Contractor shall uncover any part or parts of the Works or make boreholes in or through the same as the Employer may from time to time direct, and shall repair, reinstate and make good such part or parts. If such part or parts are found to be performed in accordance with the Contract, and provided that such part or parts had been previously moved by the Contractor in compliance with GC 23.5 the expenses of uncovering, making openings in or through, repairing, reinstating and making good the same shall be borne by the Employer, but in any other case all costs shall be borne by the Contractor.

23.10 If a failure or defect in or of the Permanent Works, Materials, Plants or workmanship in accordance with the Contract is discovered during the carrying out of the Works, upon such discovery the Contractor shall immediately state in writing to the Employer the action which the Contractor proposes to take at no cost to the Employer to remedy or repair such failure or defect ; and establish that there is no similar failure or

23

defect in Works already executed or Materials already supplied (whether or not incorporated in the Works). If the Employer has not received such statement within three (3) working Day of such discovery; or is not satisfied with the action proposed by the Contractor; or because of considerations of safety or any legal obligations is unable to wait for such written proposals from the Contractor; then the Employer may issue instructions requiring the Contractor immediately to remedy or repair the failure or defect and to make good any consequence thereof, all at the Contractor's cost, and/or may issue instructions requiring the Contractor immediately to open up for inspection any Works covered up or to arrange for any Test of any Materials (whether or not already incorporated in the Works) to establish that there is no similar failure or defect therein. The Contractor shall forthwith comply with any instruction issued under this GC and shall not be entitled to claim any extension of the Time for Completion and/or any Milestone or any addition to the Contract Price by reason of any such instruction or its compliance therewith.

23.11  The Employer shall during the performance of the Works have power to order the immediate removal from the Site, within such time or times as may be specified in the order, of any Materials which are not in accordance with the Contract; the immediate substitution of proper and suitable Materials; and the removal and proper re-execution, notwithstanding any previous Test thereof or interim payment therefor, of any Works which for any reason are not in accordance with the Contract.

23.12  The Contractor shall ensure that all plant and equipment used at the Site is in good working order and properly maintained. In particular, the Contractor shall ensure that fuel and oil spills and or leaks are controlled so as not to cause any contamination of treated or untreated areas of the Site, of the sea, or of adjacent areas. Fuel bunkering, fueling, repairs, maintenance and, in particular oil changes shall, unless otherwise agreed by the Employer in advance, only be carried out in areas where measures have been taken to prevent contamination i.e. in specific bunkering, fueling and maintenance areas. The Employer shall have the right to order the immediate removal from the Site of any plant or equipment, which in his sole opinion has, is, or may cause contamination of the Site, the sea or adjacent areas and the Contractor shall not be entitled to any claim for additional costs, time or disruption arising from such action by the Employer. All waste materials arising from the operation and maintenance of plant and equipment on the Site shall be disposed of by the Contractor in an environmentally sound manner.

23.13  In case of default on the part of the Contractor in carrying out timely and promptly any instruction or order of the Employer issued pursuant to GC 23.10, 23.11 or 23.12, the Employer shall upon giving twenty four (24) hours notice to the Contractor, be entitled, without prejudice to any other rights or remedies it may have in relation thereto and without having to issue any formal Notice of Default under GC 35.2, to employ and pay other persons to carry out the same, and all expenses arising therefrom or incidental thereto shall be paid by the Contractor; or may be deducted by the Employer from any monies due or which may become due to the Contractor.

24. Periodic and Other Payments by the Employer to the Contractor

The terms and conditions governing periodic and other payments by the Employer to the Contractor of the Contract Price are set forth in Exhibit 3.

25. Changes in the Works

25.1 The Contractor shall comply with and adhere strictly to any instruction, order, directive or similar communication ("Communication") on any matter concerning the Works and/or the Contract received from the Employer, including, without limitation, those relating to the variation or modification of the quality, or quantity of the Works or the addition to, omission from, or substitution for, any part of the Works, or, any discrepancy in or between Specifications, Drawings or other Contract Documents.

25.2 Except as provided in this GC 25, no Communication so issued to the Contractor shall result in any increase in the Contract Price and/or extension to the Time for Completion and/or any Milestone.

25.3 If the Contractor receives a Communication, whether oral or in writing and from whichever person or entity, that the Contractor believes should result in an increase in the Contract Price and/or extension to the Time for Completion and/or any Milestone, the Contractor shall not proceed to carry out the same (unless the Employer, whether in the original Communication or subsequent thereto, specifically directs the Contractor in writing to proceed to carry out immediately the same in any event) but shall submit to the Employer and separately to the Construction Manager, not later than ten (10) Days after the Contractor's receipt of such communication, a Request for Change Order containing the Contractor's reasons and full substantiation supporting such request and setting forth precisely the increase in the Contract Price and/or extension to the Time for Completion and/or any Milestone to which the Contractor believes it is entitled. If the Contractor shall fail to submit to the Employer any such Request for Change Order within such ten (10) Day time limit, the Contractor shall not be entitled thereafter to claim that it is entitled to an increase in the Contract Price or extension to the Time for Completion and/or any Milestone as a result of such Communication, but the Contractor shall nevertheless promptly, diligently and faithfully complete performance of the work.

25.4 If, following receipt of any Request for Change Order, the Employer determines that a Change Order is appropriate under the circumstances and if the Employer and the Contractor are able to agree upon the increase to the Contract Price and/or the extension to the Time for Completion and/or any Milestone (if any), the Employer will issue an appropriate Change Order, and such Change Order shall be signed by the parties and shall constitute total compensation due to the Contractor for the part of the Works contained therein.

25.5 If, following receipt of any Request for Change Order, the Employer determines that a Change Order is not appropriate under the circumstances, or if the Employer and the Contractor are unable to agree upon the increase to the Contract Price and/or the extension to the Time for Completion and/or any Milestone (if any), then the provisions of GC 25.7 shall apply.

25.6    If any Communication shall set forth the increase or reduction in the Contract Price and/or extension or reduction to the Time for Completion and/or any Milestone proposed by the Employer, the Contractor shall be bound thereby and shall carry out immediately the same unless the Contractor shall give the Employer written notice of its objections thereto within ten (10) Days of the Contractor's receipt thereof, and in such event the Contractor shall not proceed to carry out immediately the same (unless the Employer, whether in the original Communication or subsequent thereto specifically directs the Contractor in writing to proceed to carry out immediately the same in any event). Such written notice from the Contractor shall contain the Contractor's reasons and full substantiation supporting such objections and shall set forth precisely the increase or reduction in the Contract Price and/or extension or reduction to the Time for Completion and/or any Milestone (if any) to which the Contractor believes it is entitled. If the Employer and Contractor are unable to agree upon such increase, extension or reduction, then the provisions of GC 25.7 shall apply.

25.7    In the circumstances stated in GC 25.5 and/or GC 25.6, the Employer shall determine what it considers to be fair, just and equitable under the circumstances, and shall give the Contractor written notice of its determination. Upon receipt of any such determination, the Contractor shall promptly, diligently and faithfully perform the work required by such Communication (if it has not already begun to do so), notwithstanding anything in the Employer's determination with which the Contractor does not agree. Subject to compliance with GC 25.12 by the Contractor, the parties agree and expressly empower any arbitral tribunal appointed pursuant to and in accordance with GC 43 to resolve all unresolved issues between the parties arising out of this GC, including, without limitation, the power to determine the price and/or time impacts of any changes to the Works.

25.8    In connection with any Request for a Change Order requesting an extension of the Time for Completion and/or any Milestone, the Contractor shall, no later than ten (10) Days after the Employer's request therefor, submit a Detailed Programme impact study (a "Detailed Programme Impact Study") which shall describe in detail the effects of the requested adjustments or variations on the Detailed Programme. The Detailed Programme Impact Study shall include, without limitation, the Contractor's description and planned sequence of performing the work called for in the Request for Change Order, any proposed shop drawings, coordination drawings or other drawings, a proposed Detailed Programme for the procurement and delivery of Construction Materials required, the proposed revisions to the Detailed Programme, including the activities affected, and any other items that may effect the Time for Completion and/or any Milestone. The Detailed Programme Impact Study shall be reviewed by the Employer and after the same has been Approved, the Detailed Programme and Programme (including any relevant Milestone set forth thereon) and the Time for Completion shall be modified to take into account the effect agreed by Change Order. In connection with any change in the Works and/or any event which under the Contract entitles the Contractor to an extension of the Time for Completion and/or any Milestone, extensions of time shall be allowed only to the extent that any change in the Works affects an activity or activities in the Detailed Programme which are on the critical path(s) or which are caused to become on the critical path(s) as a result of the change to the Works and then only to the extent that the change to the Works extends the Time of Completion or any Milestone.

25.9    The Employer shall make payments to the Contractor based on the Change Order agreed upon pursuant to GC 25.4 or based on the Employer's determination made pursuant to GC 25.7. Such payments shall be made in accordance with GC 24.

25.10    To the extent that any Communication referred to in GC 25 adds to, deletes, or descopes from part of the Works which is covered by a unit price set forth in the Unit Price Schedule, adjustments in the Contract Price shall be determined by reference to such unit price. In the event the matter is not encompassed in the Unit Price Schedule, then the Contractor's calculation of the lump sum variation to the Contract Price shall be calculated by taking the costs reasonably and necessarily incurred or to be incurred by the Contractor in the efficient and expedient performance of the Works in question and adding a markup. The markup shall be based on the following: (i) for the Contractor, for Works performed by the Contractor's own forces, fifteen percent (15%) of the labor cost; (ii) for the Contractor, for Works performed by the Contractor's Subcontractor, six percent (6%) of the Subcontractor's labor cost; (iii) for each Subcontractor or Sub-Subcontractor involved, for Works performed by that Subcontractor's or Sub-Subcontractor's own forces, fifteen percent (15%) of their labor cost. All proposals for variation to the Contract Price shall be accompanied by a complete itemization of costs including labor, Materials, Plant and subcontracts.

25.11    In the event the Employer instructs the Contractor to perform any additional Works on a cost reimbursable basis, the Contractor shall furnish to the Employer such payrolls, receipts, invoices or other vouchers as may be necessary to prove the costs incurred for labor, Construction Materials and Construction Plant and, before ordering the same, shall submit to the Employer quotations for its Approval. In respect of all Works executed on a cost reimbursable basis, the Contractor shall, during the continuance of such Works, deliver each day to the Employer an exact list in duplicate of the names, occupation, time and rate of pay of all workmen employed on such Works and a statement, also in duplicate, showing the description and quantity of all Construction Materials and Construction Plant used thereon, and shall at all times ensure that all costs and expenses incurred are reasonable under the circumstances. One copy of each list and statement shall, if correct, or when agreed, be signed by the Employer and returned to the Contractor. At the end of each month the Contractor shall deliver to the Employer a priced statement of the labor, additional supplies, Construction Materials and Construction Plant used on a cost-reimbursable basis. The calculation of the variation to the Contract Price shall be calculated by taking the Approved costs incurred by the Contractor for cost reimbursable Works and by adding a markup (which shall be the same and limited to those set forth in GC 25.10).

25.12    The Contractor shall give written notice to the Employer and separately to the Construction Manager within ten (10) Days after the occurrence of any act, event or omission of whatsoever nature which in the opinion of the Contractor should result in an increase in the Contract Price and/or an extension of the Time for Completion and/or any Milestone, which notice shall include, without limitation, the Contractor's explanation of the claim, the date on which the alleged act, event or omission occurred or began, and the amounts by which the Contractor believes the Contract Price should be increased and the Time for Completion extended, or both. The notice required under this GC 25.12 shall be entitled "Notice of Claim" and shall be required as stated in this GC 25.12 including, without limitation, in response to any Employer determination pursuant to GC 25.7.

27

regardless of any prior Request for Change Order or written notice of objections under these GC. Failure to give such notice shall constitute a definitive and irrevocable waiver of, and release from, any and all claims arising from any such act, event or omission and the Contractor shall be stopped from raising any claims arising from any such act, event or omission thereafter. Any claim made in accordance with GC 25.12 shall, upon written request by the Employer to the Contractor, be fully documented and substantiated by the Contractor no later than three (3) months from the date the Contractor receives such request. The election of the Contractor not to substantiate any such claim, shall constitute a complete waiver and renunciation of such claim by the Contractor, who shall be stopped from raising such claim thereafter.

25.13 The Employer may at any time, at its sole option, serve written notice upon the Contractor that unless the Contractor shall commence proceedings described in GC 44 in connection with any disputed matter arising under the Contract within ninety (90) Days of receipt of any such notice, the Contractor shall be barred thereafter from seeking recourse and shall be deemed to have conclusively waived all rights with respect to any such matter.

## 26.    Completion

The Contractor shall Complete all of the Permanent Works within the Time for Completion. In addition and subject to the requirements set forth in GC 24 and Exhibit 3, and elsewhere in the Contract, as a condition precedent to the next payment upon Completion of the Permanent Works, the Contractor shall furnish to the Employer: one (1) complete set of diskettes in full compliance with the HDMAX System reflecting the final "as-built" status of the Permanent Works and when applicable, operation and maintenance manuals in accordance with the requirements of the Contract.

## 27.    Issuance of Certificate(s) of Partial Completion

27.1    Prior to the issuance of the Certificate of Completion, the Employer may, issue one or more Certificates of Partial Completion in respect of any part of the Permanent Works. Any such Certificate(s) of Partial Completion shall indicate the parts of the Permanent Works concerned and the condition thereof at the date of issuance thereof.

27.2    The issuance of any Certificate of Partial Completion shall not preclude the Employer from listing reserves in relation to the Permanent Works which have been the object of any such Certificate of Partial Completion, at the time of the issuance of the Certificate of Completion.

## 28.    Issuance of the Certificate of Completion

The Employer and the Contractor hereby confirm and agree that acceptance or "reception" of the entire Permanent Works by the Employer shall take place only upon the Completion of the entire Works and shall be evidenced by the issuance of the Certificate of Completion and that the Period of Guarantee set forth in GC 29 shall commence on the date of Completion as set forth in the Certificate of Completion or if any and for the relevant part(s) of the works, in the Certificate(s) of Partial Completion. When in the

Contractor's opinion the entire Works have been Completed, the Contractor shall notify the Employer accordingly and the Contractor shall provide the Employer at the same time with a signed statement that the Permanent Works have been Completed in full compliance with the Contract Documents and that there are no apparent defects to the Permanent Works. Within eight (8) Days of such notification from the Contractor, the Employer shall issue a notice summoning the Contractor, and the Construction Manager, to a Site meeting for the purpose for inspecting the Permanent Works and determining whether they are Complete, which Site-meeting shall be held no later than fifteen (15) Days following issuance of such Employer's notice. Upon certification by the Construction Manager, that the Permanent Works have been completed in accordance with any and all terms and conditions of the Contract and are Complete, which certification shall be issued without unnecessary delay four (4) copies of the Certificate of Completion in respect of the Permanent Works and after the same have been signed by the Employer and the Construction Manager, the Employer shall retain two copies thereof and forward one copy to the Contractor and one copy to the Construction Manager, The Employer shall be under no obligation to issue the Certificate of Completion if and as long as the Permanent Works are not free from any apparent defects, provided, however, that the Employer shall not unreasonably withhold the issuance of such Certificate. Any reserves relating to the Permanent Works listed on the Certificate of Completion shall be performed within the agreed time limits or, failing such agreement within the time limits which the Employer shall prescribe after due consideration to the nature of the remedying works. In the event the Contractor does not complete the reserves within the time limits so agreed or prescribed, as the case may be, the Employer may have such reserves completed by any third party and the Contractor shall be liable for all direct and indirect costs incurred in connection therewith.

## 29.    Contractor's Guarantee

29.1    The Contractor guarantees the *Permanent Works and End Product* to the Employer to the full extent of applicable law and as expressly set forth in the Contract, from the date of the Certificate of Completion up to the expiration of the Period of Guarantee, as provided below. For purposes of the Contract, any Materials or workmanship employed in the Completion or guarantee of the *End Product* and or of any Works performed in connection therewith, shall be considered "Defective" if they fail in any respect to meet any of the provisions of the Contract, including the guarantee of the Contractor pursuant to this GC.

29.2    The Period of Guarantee shall expire at midnight on the 20th anniversary of the date of the Certificate of Completion.

29.3    The Employer is entitled at any time to assign to any third party including the CDR and any future buyer or developper of the Site or portion thereof, the benefit of the guarantees granted to the Employer under the Contract.

29.4    In the event the Employer believes it has a claim under the above guarantee, it will contact and submit such claim to the Contractor who shall promptly determine whether to submit such claim to the Insurer. Such determination shall not relieve the Contractor of its

obligation toward the Employer under the Contractor's guarantee, nor shall it preclude the Employer from enforcing any right under applicable law.

### 30.    Contractor to Search for Defects

If requested by the Employer in writing, the Contractor shall, during the Period of Guarantee, search for the cause of any defect, imperfection, or fault in any part of the Permanent Works, under the directives of the Employer. If such defect, imperfection, or fault shall be one for which the Contractor is liable, the cost and expenses of searching shall be borne by the Contractor, and the Contractor in such case shall repair, rectify, and make good such defect, imperfection, or fault at its own cost and expense in accordance with the provisions of the Contract.

### 31.    Issuance  of the Certificate of Expiration of the First Year of Period of Guarantee

31.1    At least thirty (30) Days in advance of the expiration of the first year of the Period of Guarantee, the Employer shall issue a notice summoning the Contractor to a Site meeting and the Contractor shall conduct such inspection and Tests with respect to the Works as may be prescribed by the Contract and/or requested by the Employer in order to determine that there are no Defective Works. If the Contractor has met its obligations with respect to the Works, the Employer shall without unnecessary delay issue four (4) copies of the "Certificate of Expiration of the First Year of the Period of Guarantee" and shall retain two copies thereof and forward one (1) copy to the Contractor and one to the Construction Manager. In the event that the Contractor has not complied with all its obligations, as aforesaid (including, without limitation, the performance of any Works in the Employer's reserves in the Certificate of Completion) or in the event that any Materials or workmanship are found to be Defective, then such Certificate shall be issued only when the Contractor has complied with all of its obligations. Monies retained by the Employer pursuant to GC 24 and Exhibit 3 and the Contractor's Performance Guarantee may be used to meet the Contractor's obligations arising during the first year of the Period of Guarantee.

31.2    Notwithstanding the issuance of the Certificate of Expiration of the First Year of the Period of Guarantee, the Contractor must continue to fulfill its guarantee obligation under the Contract. Each of the Contractor's responsibilities, liabilities, warranties, guarantees and confidentiality obligations which under this Contract are to survive the issuance of the Certificate of Expiration of the First Year of the Period of Guarantee or which are otherwise imposed by law, shall survive termination or the issuance of the Certificate of Expiration of the First Year of the Period of Guarantee.

### 32.    Performance Letter of Guarantee

32.1    Within thirty (30) Days as from the issuance of the Notice to Proceed, the Contractor shall deliver to the Employer a Performance Letter of Guarantee in the Form of Exhibit 6 (the "Performance Letter of Guarantee"), issued by a bank located in the

Republic of Lebanon approved by the Employer, in an amount equal to fifteen percent (15%) of the Contract Price. The Employer shall not be liable to make any payment under the Contract until the Contractor has complied with this General Condition. At the Employer's sole discretion, the Contractor shall increase the Performance Letter of Guarantee to take into account any increase in the Contract Price resulting from any Employer Approved Change Orders so that at all times the Performance Guarantee is in an amount equal to fifteen percent (15%) of the Contract Price.

32.2    The Performance Letter of Guarantee shall remain valid and enforceable until the issuance and presentation to the issuing bank by the Contractor of the Certificate of Expiration of the First Year of the Period of Guarantee as defined and referred to in GC 31, signed by the Employer. The Performance Letter of Guarantee shall remain in full force and effect notwithstanding any early termination pursuant to and in accordance with GC 35.

32.3    In its sole and absolute discretion, at any one or more times prior to the issuance of the Certificate of Expiration of the First Year of the Period of Guarantee, Employer may demand payment of all or any portion (as determined by the Employer) of the face amount of the Performance Letter of Guarantee by making written demand in accordance with the terms thereof. The Employer may at its election (but shall not have any obligation to) send a copy of any such demand to the Contractor. The issuer of the Performance Letter of Guarantee, in respect of which a demand for payment has been made in accordance with the terms thereof, is hereby authorized and directed by the Contractor faithfully to honor such demand notwithstanding any objection by the Contractor or any other person or entity whatsoever. The Contractor hereby covenants that neither the Contractor nor any affiliate thereof shall sue the Employer, the issuer of any such Performance Letter of Guarantee, or any other person, firm or corporation to enjoin, restrain, prevent, delay or otherwise impede the issuer of the Performance Letter of Guarantee from timely honoring any demand for payment made thereunder.

32.4    The Employer agrees that within ten (10) Days after the receipt by it of all monies which are the subject of any demand under the Performance Letter of Guarantee it shall provide the Contractor by written notice in reasonable detail the basis for such demand. If the Contractor believes that there was or is no basis for such demand, the Contractor shall have the right to commence proceedings in accordance with GC 44, for purposes of seeking a decision ordering the Employer to return the monies so received.

32.5    Unless the arbitral Tribunal appointed shall determine that (i) at the time of the demand for payment of any monies under the Performance Letter of Guarantee an Event of Default then existed; or (ii) that such demand was reasonably necessary at such time in order to protect the Employer from any loss potentially arising out of the Contractor's performance (or lack thereof) under the Contract, the arbitral Tribunal shall order the Employer to return all or such lesser part of the monies received by the Employer pursuant to such demand as the arbitral Tribunal in its sole and absolute discretion shall determine, together with an amount equal to such losses, costs, and expenses, if any, reasonably and proximately caused by the Employer as a result of such demand.

32.6    The Contractor agrees that the foregoing procedures before the arbitral Tribunal for seeking the return of monies paid to the Employer pursuant to a demand against the Performance Letter of Guarantee shall be its sole and exclusive recourse against the Employer or any of the Employer's directors, officers, employees, agents and servants for seeking the return of such monies or for asserting any other cause of action or claim against the Employer or any of the Employer's directors, officers, employees, agents and servants in respect of or arising out of any such demand.

32.7    The Contractor shall be responsible for the payment of all fees, expenses, and other costs incurred in connection with obtaining the Performance Letter of Guarantee and maintaining the Performance Letter of Guarantee until the expiration date.

## 33.    Suspension by Employer

33.1    The Contractor shall, on the written order of the Employer, suspend the performance of the Works or any part thereof for such time or times and in such manner as the Employer may instruct and, during any such suspension, shall properly protect and secure the Works, as is necessary to prevent any damage. Except for suspensions which are: (i) otherwise provided for in the Contract; and for which the Contract does not entitle the Contractor to an increase in the Contract Price and or any extension to the Time for Completion; or (ii) necessary by reason of an Event of Default on the part of the Contractor; or (iii) necessary by reason of climatic conditions on the Site; or (iv) necessary for the safety of the Works or any part thereof, the additional costs and/or delays incurred by the Contractor in giving effect to the Employer's instructions under this GC shall subject to, and in accordance with, the provisions of GC 25, entitle the Contractor (a) to an extension of the Time for Completion and/or (b) to an extension of any affected Milestone and/or (c) to an increase in the Contract Price necessary to compensate the Contractor for any additional reasonable costs directly incurred by the Contractor as a result of and during any such suspensions exceeding a combined total of fifteen (15) Days, the first fifteen (15) Days of additional costs incurred by the Contractor remaining for the Contractor's account. The Contractor shall use its best efforts to avoid or mitigate any Contractor costs and delays caused by any Employer suspensions of the Works hereunder.

33.2    If the Contractor's performance of the Works or any part thereof, is suspended by the Employer pursuant to this GC and such suspension continues for a period of one hundred and eighty (180) Days or more, then the Contractor may, unless such suspension is necessary for the reasons set forth in GC 33.1 (i) to (iv), elect to treat any such suspension of the Works or part of the Works, as the case may be, as a termination by the Employer for convenience pursuant to GC 35.4.

## 34.    Force Majeure

34.1    The term "Force Majeure" means any event that is unforseen, unpredictable and beyond the control of either party in the meaning understood in the Republic of Lebanon, and any event occurring during the period of the Contract shall be considered as an event of Force Majeure only if and to the extent that it meets the conditions for Force Majeure

under the laws of the Republic of Lebanon and include also without limitation, riots, invasion, hostilities, civil war, rebellion, revolution, insurrection, outbreak of war in the Republic of Lebanon, whether declared or not, seismic shocks, ionizing radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste, from the combustion of nuclear fuel, radioactive, toxic, explosive, or other hazardous properties, of any explosive nuclear assembly or nuclear component thereof, and extreme and exceptional weather circumstances. The Contractor is fully aware of the prevailing political and security situation in the whole of Lebanon and has entered into the Contract knowing the situation which shall not constitute grounds of Force Majeure. Labor difficulties, disputes or strikes of any scope involving the Contractor's Staff or any Subcontractor's or Supplier's employees shall not constitute an event of Force Majeure unless in the case of the Contractor's Staff, such labor difficulties, disputes or strikes are part of an industry wide or national strike.

34.2    The non-performance, or delay in performance by the Employer and/or the Contractor, or either of them, of any obligation under the Contract shall be excused if and to the extent that such non-performance or delay is caused by an event of Force Majeure. During the occurrence of a Force Majeure event the Contractor shall, unless and until the Contract is suspended or terminated under these provisions, continue to use its best endeavours to complete the Works in accordance with its obligations under the Contract. Upon the occurrence of any event of Force Majeure the party suffering therefrom shall immediately give the other party written notice thereof including a statement describing the event of Force Majeure and demonstrating its effect upon the performance of the Contract. At the request of either party, the Employer and the Contractor shall consult regarding action to be taken.

34.3    At any time during the occurrence of any event of Force Majeure, the Employer may by written notice to the Contractor terminate the Contract by reason of the Force Majeure, in which event the provisions of GC 35.6 shall apply. At any time after the expiration of a period of one hundred and eighty (180) Days following the occurrence of any event of Force Majeure causing non performance or delay by the Employer and/or the Contractor, the Contractor may by written notice to the Employer terminate the Contract by reason of Force Majeure, in which event the provision of GC 35.6 shall apply.

34.4    Within seven (7) Days after the termination of any Force Majeure event, the Contractor shall file a written notice with the Employer specifying what the Contractor believes is the impact thereof on the Detailed Programme and/or any Milestones and/or on the Contract Price. If justified, the Employer may grant the Contractor an extension to the Programme and/or any Milestone, subject to and in accordance with GC 25, as a result of any such Force Majeure.

## 35.    Termination

35.1    If the Contractor (i) assigns the Contract without the prior Approval of the Employer, (ii) is in breach of the terms and conditions of GC 5.2; (iii) goes into bankruptcy, liquidation or files a petition in bankruptcy or seeking reorganization or arrangement with creditors, or admits its insolvency or (iv) experiences about it.

Contractor's commercial or financial situation which has a substantially adverse effect on the Contractor's performance of its duties or obligations under this Contract (an "Event of Default"), then the Contractor shall be in Default and, to the extent permitted by mandatory rules of bankruptcy law and without the need for any legal proceedings or court decision, the Employer may forthwith withhold any amount otherwise due under the Contract and/or may in addition to any and all other rights available to it under the Contract issue a notice ("Notice of Termination") terminating the Contractor's right to proceed with all or any portion of the Works and/or terminating the Contract.

35.2    If    (i) the Contractor has abandoned the Contract; or (ii) the Contractor has failed to provide review and/or maintain at all times in full force and effect and in accordance with the Contract the Performance Letter of Guarantee, the insurance required by the Contract, or provide, revise or resubmit or update the Detailed Programme; or (iii) the Contractor has failed to commence the Works, or has suspended the progress of the Works after receiving the Notice to Proceed from the Employer; or (iv) the Contractor is not performing the Works in accordance with the Contract or is in breach of any representation or warranty or is in breach of any of its obligations, responsibilities or undertakings under the Contract; or (v) the Contractor does not maintain the progress of the Works in accordance with the Detailed Programme and/ or any Milestone; each also constituting an "Event of Default", then the Contractor shall be in Default. If the Contractor fails to remedy such Event of Default within ten (10) Days, after receipt of written notice of such an Event of Default from the Employer, or if the Contractor fails to provide written evidence and/or Detailed Programme(s) satisfactory to the Employer that such Event of Default shall be corrected forthwith, then the Employer may, in addition to any and all other rights available to it under the Contract and without the need for any legal proceedings or court decision, withhold any amount otherwise due under the Contract and/or may issue a Notice of Termination terminating the Contractor's right to proceed with any portion or the whole of the Works, without thereby releasing the Contractor from any remaining obligation or liability under the Contract, or affecting the rights and powers conferred on the Employer by the Contract, and may itself complete the Works or may employ any other contractor to Complete the Works, or the Employer may terminate the Contract. The Employer or such other contractor may use for such completion so much of the Plant, Temporary Works and Materials, which have been deemed to be reserved exclusively for the performance of the Works, under the provisions of the Contract, as it or they may think proper.

35.3    If the Employer terminates the Contract pursuant to GC 35.1 or GC 35.2, the Employer shall not be liable to pay to the Contractor any money on account of the Contract until the costs of execution, damages for delay in Completion, if any, and all other expenses incurred by the Employer or damages to which the Employer is entitled, whether by Contract or at law, have been ascertained. The Employer shall then be obligated to pay only such sum, as the Employer may certify would have been due the Contractor upon completion by it after deducting the damages, costs and other expenses incurred by the Employer resulting from the termination. If such amount exceeds the sum which would have been payable to the Contractor on due completion by it, then the Contractor shall, upon demand, pay to the Employer the amount of such excess and it shall be deemed a debt due by the Contractor to the Employer and shall be recoverable

accordingly. In addition, upon any such termination, the Contractor shall assign to the Employer such orders with Suppliers or Subcontractors as the Employer may request.

35.4    The Employer may at any time terminate the Contract for its convenience in whole or in part upon giving thirty (30) Days written notice thereof ("Notice of Termination for Convenience") to the Contractor which shall specify the extent to which performance of the Works under the Contract is terminated, and the date upon which such termination becomes effective. Upon receipt of notice of any such termination, the Contractor waives any claims for damages, including loss of anticipated profits, on account thereof, but as the sole right and remedy of the Contractor, the Employer shall pay the Contractor in accordance with GC 35.6, provided, however, that those provisions of the Contract which by their very nature survive final acceptance under the Contract shall remain in full force and effect.

35.5    Upon receipt of any Notice of Termination for Convenience, the Contractor shall, unless the notice specifies otherwise: (i) immediately discontinue performance of the Works on the date and to the extent specified in the notice; (ii) enter into no further agreements with Subcontractors or Suppliers and purchase no additional Materials, other than as may be necessary or required for completion of such portion of the Works under the Contract that is not terminated; (iii) assist the Employer, as specifically requested in writing in the maintenance, protection and disposition of works acquired by the Employer under the Contract; (iv) complete performance of the part of the Works which has not been terminated; pursuant to the Notice of Termination for Convenience; (v) within seven (7) Days, submit to the Employer a certified list of any or all items terminated; and (vi) take all steps as are reasonably necessary to resolve or settle outstanding liabilities and claims arising out of orders with Suppliers and Subcontractors with the prior Approval of the Employer to the extent it may require, or, assign to the Employer as requested all of such orders with Suppliers and Subcontractors.

35.6    Subject to, and in accordance with, the provisions of GC 24 and GC 25, in the event of either Termination for Convenience or for Force Majeure, the Employer shall pay to the Contractor such amount calculated as follows: all amounts due to the Contractor for Works completed in accordance with the Contract prior to such notice and for Works thereafter completed as specified in such notice; reasonable costs incurred pursuant to GC 35.5 (iii) above; reasonable demobilization costs not to exceed the rates set out in the Unit Price Schedule if applicable; all amounts due by the Employer to the Contractor in respect of Requests for Change Orders or claims submitted pursuant to and in accordance with GC 25 outstanding as of the date of termination; less all unliquidated advances or other payments made to the Contractor applicable to the terminated portion of the Contract, but not covered by Works performed, and all claims which the Employer may have against the Contractor in connection with the Contract. In the case of any Termination for Convenience only, the Employer shall in addition pay the Contractor zero point three percent ( 0.3 %) of the value of the part of the Works which the Contractor is not anymore required to perform pursuant to the notice of Termination for Convenience. The Contractor accepts all of the amounts under the terms hereof in full and final settlement as a result of any such termination.

35.7    The Contractor agrees to use constantly its best efforts to avoid, minimize and mitigate against its losses, costs and expenses incurred as a result of termination of the whole or any part of the Contract pursuant to this GC 35.

35.8    If the Employer goes into bankruptcy, liquidation or files a petition in bankruptcy or seeking reorganization or arrangement with creditors, or admits its insolvency (an "Employer's Event or Default") then the Employer shall be in Default and, to the context permitted by mandatory rules of bankruptcy law and without the need for any legal proceedings or court decision, the Contractor may in addition to any and all other rights available to it under the Contract, issue a notice "Notice of Termination" terminating the Contract.

35.9    If the Employer is in breach of any of its obligations under the Contract, constituting an "Event of Employer's Default", then the Employer shall be in Default. If the Employer fails to remedy such Event of Employer's Default within ten (10) Days, or if the Employer fails to provide written evidence that such Event of Employer's Default shall be corrected forthwith, then the Contractor may, in addition to any and all rights available to it under the Contract and without the need of any legal proceedings or court decision, terminate the Contract.

35.10   If the Contractor terminates the Contract pursuant to GC 35.8 or GC 35.9, the Employer shall be fully responsible and liable to the Contractor, for the full extent of any and all liabilities, loss and/or damage, suffered by the Contractor as a result of any such termination and in connection with the Contract provided, however, that in the event of any such termination and/or in connection with any Event of Employer's Default and/or breach of Contract or otherwise and notwithstanding anything to the contrary in the Contract, the Employer shall not be liable to the Contractor for any consequential damages, including without limitation any loss of profits, suffered by the Contractor as a result thereof.

35.11   Termination by the Contractor pursuant to GC 35.8 or GC 35.9 will not affect obligations of the Contractor under the Contract which by their terms are intended to survive termination.

## 36.   Insurance

Set forth in Exhibit 7 are (i) details of the Employer supplied insurance; (ii) details of the insurance to be obtained by the Contractor; (iii) applicable subrogation and waiver provisions with which the Contractor shall comply.

## 37.   Working Time Regulation

The parties hereby mutually agree that in the case where the competent official authorities issue general regulations whereby firms are under all circumstances prohibited from working 24h / 24h without any possible derogation, the Contractor shall then be allowed to apply for an extension of Time for Completion to be mutually agreed on with the Employer, without any additional compensation to the Contractor.

38. Fossils, Coins, Etc.

All fossils, coins, articles of value or antiquity and structures and other remains or things of geological or archaeological interest discovered on the Site shall be the absolute property of the Employer. The Contractor shall take reasonable precautions to prevent its workers or any other persons from removing or damaging any such article or thing and shall immediately upon discovery thereof and, before removal, notify the Employer of such discovery, which shall be the Employer's risk and liability and which, subject to compliance with GC 25, shall entitle the Contractor to extension of the Period for Completion. The Contractor shall carry out, at the Employer's expense, orders of the Employer as to the disposal or any such article or thing discovered.

39. Photography and Filming

From time to time at the request of the Employer, the Contractor shall take photographs of the Works, sufficient to show the progress made on the Works since the previous photographs, furnish to the Employer three prints and the negative of each such photograph or such other amount as the Employer may reasonably request, which shall be the property of the Employer.

40. Confidentiality of Documents and Information

40.1 The Contract and everything contained or incorporated therein or arising therefrom shall be treated as strictly confidential by the Contractor and its employees. Subject to certain disclosure rights set forth below, the Contract and everything contained therein or arising therefrom and any knowledge acquired by the Contractor through its engagement hereunder and the name of the Employer shall not be used, published or divulged by the Contractor in connection with any services rendered by the Contractor to any other person, firm or corporation, in any advertising or promotion regarding the Contractor or its services, or in any other manner or connection whatsoever without first having obtained the Approval of the Employer, which the Employer may withhold in its sole discretion.

40.2 The Contract and everything contained or incorporated therein or arising therefrom shall not be disclosed by the Contractor or its employees except: (i) exclusively to employees and agents of the Contractor to the extent such is required for proper performance by the Contractor of its obligations hereunder; or (ii) for the purposes of providing Materials and entering into agreements with Subcontractors and Suppliers; or (iii) to the extent required by law; or (iv) to any bank, insurance company or other institutional lender to the extent it is reasonably necessary to do so in connection with such bank, insurance company or other institutional lender providing loans or other financial accommodations to the Contractor.

40.3 The Contractor shall take all steps necessary to protect the confidentiality of the Contract and everything contained or incorporated therein or arising therefrom including, without limitation, verbal and written notification to its employees, Subcontractors and

Suppliers and any other person or entity to whom such information is disclosed in accordance herewith.

## 41. Ownership of Employer's Name, Signs, Etc.

The Contractor shall acquire no right whatsoever under this Contract, to the name of the Employer, including, without limitation, no rights to use same (i) in any of its advertising, publicity or promotion; (ii) to express or imply any endorsement by the Employer of its services; or (iii) in any other manner whatsoever (whether or not similar to the uses hereinabove specifically prohibited). Furthermore, the Contractor acknowledges and agrees that, except as may be required by law, the Employer shall have the sole and absolute discretion to forbid or permit any names or signs on, about or adjacent to the Works which indicate the Contractor's involvement with the Works. Any signs permitted in the Employer's sole and absolute discretion shall require the Employer's prior Approval of the size, form, content and location thereof.

## 42. Ownership of Documents, Etc.

42.1    Title to all plans, Drawings, Specifications, ideas, concepts, models, samples, or other tangible work product produced by the Contractor or its Subcontractors or Suppliers pursuant hereto (hereinafter the "Work Products") shall be and remain the sole and exclusive property of the Employer for the purpose of the Works. The Contractor hereby conveys to the Employer definitely and unconditionally any and all rights (if any) of the Contractor and/or any of its affiliated or related entities, employees, and/or agents in and to any one or more Work Products. It is further expressly agreed and accepted by the Contractor that each and every payment made to the Contractor shall constitute confirmation of such conveyance and transfer as aforesaid of any and all rights (if any) of the Contractor and/or any of its affiliated or related entities, employees, and/or agents in and to any one or more Work Products.

42.2    Notwithstanding the provisions of GC 42.1, the Contractor does not by this Contract convey to the Employer any proprietary industrial property, designs or technology developed by the Contractor prior to or outside of this Contract.

## 43. Site Security, Environmental Protection and Site Organization

43.1    Exhibits to these General Conditions sets forth rules and regulations pertaining to Site Security, Environmental Protection and Site Rules, with which the Contractor shall comply.

43.2    The Contractor shall preserve and protect the environment at and surrounding the Site and in particular, the coast, sea-bed and the sea. The Contractor shall take all precautions to prevent any pollution of such areas or of the sea and shall be fully responsible and liable to the Employer and/or any applicable Public Authority for any failure to do so.

## 44. Settlement of Disputes

All disputes arising out of or in connection with the present Contract shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce in force as of January 1st, 1998 by one or more arbitrators appointed in accordance with the said Rules.

The language of arbitration shall be english.

The place of arbitration shall be Paris.

## 45. Rights of Inspection - Books and Records

45.1 With respect to all Works and services to be performed by the Contractor under the Contract, including, without limitation, regarding costs and expenses incurred in connection with any such services which are reimbursable pursuant to the Contract, the Contractor shall maintain comprehensive books and records relating thereto. Such books and records will be retained by the Contractor for a period of at least ten (10) years from the date of the Certificate of Completion. The Employer, its agents or its representatives shall have the right to make copies and audit such records at all reasonable times upon prior notice to the Contractor.

45.2 Upon request, the Employer, its agents and representatives shall have reasonable access, during normal working hours, to the Contractor's place(s) of business and to the Contractor's files, personnel, records, materials and other data in any way relating to the Works.

## 46. Relationship between the Parties

Nothing contained herein shall be construed as establishing or creating between the parties a relationship of master and servant or principal and agent. The Contractor is and shall perform the Works as an independent contractor.

## 47. Failure to Enforce

Except as otherwise provided in the Contract, the failure of the Employer to enforce at any time or for any period of time the provisions hereof in accordance with their terms shall not be construed to be a waiver of such provisions or of the right of the Employer thereafter to enforce each and every such provision.

## 48. Language of Communications, Signage, Labels, etc.

All communications of whatsoever nature between the parties in connection with the Contract or the performance of the Works shall be given in the English language.

### 49.    Invalid Provisions

Should any provision of the Contract now or later judicially be construed to conflict with any applicable law or administrative regulation with the force of law, whether national or supra-national which has mandatory application to the Contract, or be determined to be invalid or unenforceable for any reason whatsoever, the said provision(s) shall be considered amended and/or replaced to the extent required to conform with such law or regulation, unless such would create an inequitable result, in which case, the provision shall be as not written and of no effect and all other provisions of the Contract shall remain in full force and effect and be unaffected thereby.

### 50.    Governing Law

The Contract shall be governed by and construed in all respects in accordance with the laws of the Republic of Lebanon.

### 51.    EDMAX

The Contractor shall adopt the codification Scheme prescribed by the Employer in connection with the communication of all documents of whatsoever nature relating to the Contract and shall at the request of the Engineer, communicate and exchange all such documents via the EDMAX System implemented by the Employer which shall communicate to the Contractor the EDMAX Welcome Package and the CAD software or other software requirements approved by the Employer for such purpose which the Contractor shall procure and utilise at its cost along with any updating to the EDMAX System.

\* \* \* \* \* \*

## EXHIBIT 1

### TO GENERAL CONDITIONS OF CONTRACT

### CONTRACT PRICE BREAKDOWN

### AND

### SCHEDULE OF VALUE

# Contract Price Breakdown and Schedule of Value

| | SCHEDULE OF VALUES | PRICE US$ |
|---|---|---|
| 1. | General Conditions | 10,150,000 |
| 2. | Mobilization | 2,360,000 |
| 3. | Equipment | 10,300,000 |
| 4. | Section 1 | |
| | 4.1 Excavation / hauling | 980,000 |
| | 4.2 Sorting processing | 990,000 |
| | 4.3 Treatment | 180,000 |
| | 4.4 Hauling/backfilling | 630,000 |
| 5. | Section 2 | |
| | 5.1 Excavation/hauling | 2,850,000 |
| | 5.2 Sorting/processing | 2,400,000 |
| | 5.3 Treatment | 460,000 |
| | 5.4 Hauling/backfilling | 1,500,000 |
| 6. | Sections 3, 4, 5, 6, 7, 8 | |
| | 6.1 Excavation/hauling | 7,120,000 |
| | 6.2 Sorting/processing | 6,600,000 |
| | 6.3 Treatment | 1,250,000 |
| | 6.4 Hauling/backfilling | 4,780,000 |
| 7. | Demobilization | 425,000 |
| 8. | Site Monitoring | 100,000 |
| | Total | U.S$53,075 |

# EXHIBIT 2

## *TO GENERAL CONDITIONS OF CONTRACT*

### SCHEDULE OF UNIT RATES

### AND SCHEDULE OF UNIT PRICES

## Schedule of Unit Rates and Schedule of Unit Prices

| | SCHEDULE OF VALUES | UNIT PRICES |
|---|---|---|
| 1. | General Conditions | month |
| 2. | Mobilization | lump sum |
| 3. | Equipment | month(a) |
| 4. | Section 1 | |
| | 4.1 Excavation / hauling | $m^{3(b)}$ |
| | 4.2 Sorting processing | $m^{3(c)}$ |
| | 4.3 Treatment | $m^{3(d)}$ |
| | 4.4 Hauling/backfilling | $m^{3(e)}$ |
| 5. | Section 2: | |
| | 5.1 Excavation/hauling | $m^{3(b)}$ |
| | 5.2 Sorting/processing | $m^{3(c)}$ |
| | 5.3 Treatment | $m^{3(d)}$ |
| | 5.4 Hauling/backfilling | $m^{3(e)}$ |
| 6. | Sections 3, 4, 5, 6, 7, 8 . | |
| | 6.1 Excavation/hauling | $m^{3(b)}$ |
| | 6.2 Sorting/processing | $m^{3(c)}$ |
| | 6.3 Treatment | $m^{3(d)}$ |
| | 6.4 Hauling/backfilling | $m^{3(e)}$ |
| 7. | Demobilization | lump sum |
| 8. | Site Monitoring | year |

Additional unit rates:

$2.25/m^3$ for treatable material > 1.2 million $m^3$ (measured by in-situ calculation)
$6/m^3$ for excavation > 5 million $m^3$ (measured by survey)

Notes:

a) from first mobilization taken over 18 months at 0%, 0%, 10%, 10%, 5%, 5%, 5%, 5%, 5%, 5%, 5%, 5%, 10%, 10%, 5%, 5%, 5%, 5%,
b) measured by in-situ survey
c) measured by observation
d) measured by in-situ caculation
e) measured by in-situ survey

Payment for the US $2M Low Temperature Thermal Desorption equipment (L.T.T.D.), if required, will be paid at a rate of 25% upon issuance of the purchase order for the equipment, 25% upon approval of shop drawings, 25% upon purchase of associated materials and parts and 25% upon delivery of the equipment.

EXHIBIT 3

## TO GENERAL CONDITIONS OF CONTRACT

## TERMS AND CONDITIONS GOVERNING PERIODIC AND OTHER PAYMENTS BY THE EMPLOYER TO THE CONTRACTOR

45

## TERMS AND CONDITIONS GOVERNING PERIODIC AND OTHER PAYMENTS BY THE EMPLOYER TO THE CONTRACTOR

1. If not already agreed at the time of signature of the Contract, within ten (10) Days of the execution of the Contract, the Contractor shall submit for the Employer's Approval, and continue to revise and resubmit until such Approval is issued, a detailed "Schedule of Values" which shall break down the Contract Price by labor, material, craft, work category and location of the Permanent Works. The Contractor shall, if so instructed by the Employer, modify and submit to the Employer for Approval a Schedule of Values reflecting Approved Change Orders which affect the Contract Price. No payments shall be made to the Contractor until the Employer has issued its Approval to the detailed Schedule of Values.

2. Within ten (10) Days following the end of each calendar month during the Contractor's performance of the Works, the Contractor shall prepare and submit to the Employer its monthly Request for Payment covering Permanent Works properly performed in the preceding month. Such requests shall be in the form set forth in Attachment 1 to this Exhibit or as otherwise Approved or prescribed by the Employer. Requests for Payment shall be based upon the percentage of the total Works properly performed in the preceding month and shall be stated in the nearest whole percentile in accordance with the Approved Schedule of Values. Additionally, the Contractor shall include payments requested for Works performed on a cost reimbursable basis pursuant to GC 25.11 in its request. The Employer may, at its sole discretion, require that the Contractor's periodic payment requests be broken down in greater detail or by labor, craft, work category or location. All periodic Approved payments shall be deemed provisional and subject to adjustment by the Employer at any time, to account for the total value of Works completed in accordance with the Approved Schedule of Values.

3. Each Request for Payment shall be supported by sufficient data and documentation to enable the Employer to verify the accuracy thereof and shall constitute a representation and warranty by the Contractor that (i) except as listed in its Request for Payment, all amounts due to all Subcontractors and Suppliers have been paid and title to all Materials and Works covered by such application is vested in the Employer free and clear of all liens, claims, security interests and any other encumbrances or other charges of whatever nature; (ii) all statements and representations in such application for payment are true, accurate and complete in all material respects and do not omit to state any material fact required to be stated therein in order to make the statements and representations contained therein not misleading; and (iii) the Works which are the subject of such application for payment do not contain Defective Works or Construction Materials.

4. Notwithstanding the provisions of Section 2 and 3 above, the aggregate amount to be paid monthly by the Employer to the Contractor shall not exceed the amount set forth in Attachment 3 to this Exhibit - Maximum Cumulative Payment Amount (MCPA). In a case where the cumulative amount to be paid by the Employer to the Contractor according to the Requests for Payment will exceed the Maximum Cumulative Payment Amount corresponding to that monthly date, the amount exceeding such Maximum

Cumulative Payment Amount shall be released and paid to the Contractor the next month to the extend possible taking into account the Maximum Cumulative Payment Amount for the next month.

5.    The Employer's Approval (or refusal to Approve, as the case may be) whether in whole or in part of any Request for Payment, shall be given not later than twenty-eight (28) Days following the Employer's receipt of any such Request for Payment. Upon the Employer's Approval of any amount set forth in Request for Payment, payment of the Approved amount shall be made within thirty (30) Days from the Employer's Approval. No Approval of a Request for Payment nor the making of payment shall release or diminish the Contractor's obligations and liabilities under the Contract.

6.    The Employer may deduct from each payment any sums that relate to items of Works for which there remains a disagreement, any sums representing payments withheld or determined by the Employer under the Contract, and retention, as specified below.

7.    The Employer may withhold from any payment otherwise due to the Contractor amounts sufficient to protect itself from any loss arising out of any of the following: (i) Defective Works which have not been satisfactorily remedied; (ii) the assertion of, or the occurrence of an event which has given rise to the assertion of, any third party claims against the Contractor or the Employer for which adequate insurance coverage does not exist; (iii) any application for payment which contains a misstatement or misrepresentation of a material fact or which omits to state a material fact required to be stated therein in order to make statements and representations contained therein not misleading; and (iv) an Event of Default of the Contractor under the Contract.

8.    In the event the Employer determines not to pay all or any portion of any Request for Payment, the Employer shall give prompt written notice to the Contractor of such determination and the reasons therefor not later than fifteen (15) Days following the Employer's receipt of any such Request for Payment. When the Contractor has corrected or remedied the reasons given by the Employer for refusing to make such a payment, it shall notify the Employer of that fact in writing and shall supply the Employer with such evidence thereof as the Employer shall reasonably request. If the Employer decides that such corrections or remedies are satisfactory, payment of such amounts which the Employer previously determined not to pay shall be made within thirty (30) Days.

9.    From each periodic Approved payment, the Employer shall retain a sum equal to ten percent (10%) of the payment due subject to a maximum cumulated total retention of five percent (5%) of the Contract Price. Such retention shall be released to the Contractor upon the issuance by the Employer of the Certificate of Expiration of the First Year of the Period of Guarantee as defined and referred to in GC 31.

10.    Within forty five (45) Days after the issuance of the Certificate of Completion, the Contractor shall submit a full and complete statement of account to date. Thereafter, when the Contractor makes its request for its final progress payment, it shall provide to the Employer a full and complete account of payments received and an unconditional release of the Employer and its agents, representatives, officers, employees, successors

and assigns from any further claim or liability to the Contractor , its Subcontractors or Suppliers, arising out of the Contract and the Works, except for acts or events arising after the date of such release, including, without limitation, the enforcement and/or release of the Performance Letter of Guarantee and/or the retention under 8 above. The effectiveness of the release shall be conditional only upon the making of the final progress payment by the Employer.

11. . As a further, material inducement to the Employer's final progress payment, the Contractor shall furnish with its final progress payment request, the Contractor's written statement that all bills or invoices for labor, supplies, equipment and Construction Materials furnished by the Contractor have been paid and that (except as listed in its request for final progress payment) there are no sums due and owing or claimed to be due and owing to Subcontractors and Suppliers, arising out of the Contract or the Works. Such statement shall contain a covenant from the Contractor that it has settled all claims and shall pay all sums due and owing to the Subcontractors and Suppliers forthwith upon receipt by it of the Employer's final progress payment. At the Employer's request, the Contractor shall furnish written statements from Subcontractors and Suppliers confirming the accuracy of the Contractor's written statement. Such statement shall also provide that, in consideration of the final progress payment, the Contractor agrees to defend, indemnify and hold harmless the Employer and its agents, representatives, officers, employees, successors and assigns from and against any claim, demand, suit or other liability to third parties, including the Contractor's Staff, Subcontractors and Suppliers, arising out of the Contract and the Works.

12. The making of the final progress payment by the Employer shall not be construed to waive or otherwise alter the Contractor's and the Employer's continuing obligations under the Contract including, but not limited to, the Contractor's guarantees, responsibilities, liabilities and confidentiality obligations as defined in these GC.

13. In the event the Employer fails to pay any amount of the Contract Price when due in accordance with the terms and conditions hereof, the Employer shall pay the Contractor interest compounded monthly for each day for which payment is overdue at the average US Dollars Libor rate quoted by the clearing banks in London, at 10:00 a.m. on the first business day following the date payment first became due which rate shall remain fixed until settlement has been made.

14. The Employer shall pay the Contractor an advance payment equal to ten percent (10%) of the Contract Price, which shall be paid within thirty (30) Days of the Employer's receipt of the Contractor's related Request for Payment and the receipt by the Employer of an Advance Payment Guarantee in the form set forth in Attachment 2 to this Exhibit.

15. The advance payment shall be repaid in twenty (20) equal installments and deducted from amounts of the Contract Price the Employer becomes due to pay the Contractor and to be applied to the first twenty (20) invoices submitted by the Contractor.

16.  The Employer may call the Advance Payment Guarantee, to recover any of the advance payment outstanding at such time, if the terms of 15 above cannot, for any reason, be complied with.

17.  Within fourty five (45) days as from the issuance of the Notice to Proceed the Employer shall open a letter of credit in the amount of twenty percent (20%) of the Contract Price (in a form mutually agreed by the parties) in favor of the Contractor, valid for an initial period of one year (1) and shall be replenished in the same amount for the second year.

The Contractor will draw on that letter of credit by the presentation to the confirming bank of the confirmed and approved payment duly signed by the Employer representative.

Payment will be made by the Bank between the 25st and 30st days from the Employer's Approval

\* \* \* \* \* \*

49

<u>**ATTACHMENT 1**</u>

<u>**TO**</u>

<u>**EXHIBIT 3**</u>

<u>*OF THE GENERAL CONDITIONS OF CONTRACT*</u>

<u>**FORM OF REQUEST FOR PAYMENT**</u>

W

| CONTRACTOR | REQUEST FOR PAYMENT No.: |
| PROJECT | DATE: |
| CONTRACT No. | PERIOD COVERED |
| WORKS | FROM —————    TO ————— |

This Request for Payment corresponds to the attached Schedule of Values.

| CALCULATION OF PAYMENT | US $ | % |
|---|---|---|
| ORIGINAL CONTRACT VALUE | | |
| CHANGE ORDERS APPROVED TO DATE | | % |
| CURRENT CONTRACT VALUE | | 100% |
| VALUE OF WORKS COMPLETED TO DATE | | % |
| LESS PREVIOUS AMOUNTS PAID | | % |
| RETENTION WITHHELD | | % |
| THIS REQUEST FOR PAYMENT | | % |
| LESS RETENTION | | % |
| LESS REIMBURSEMENT OF ADVANCE PAYMENT | | % |
| ADJUSTED AMOUNT OF THIS PAYMENT | | % |
| TOTAL AMOUNT DUE THIS REQUEST FOR PAYMENT | | % |

The Contractor certifies that its Request for Payment constitutes a representation and warranty by the Contractor that (i) except as listed in this Request for Payment, all amounts due to all Subcontractors and Suppliers have been paid and title to all Construction Materials and Works covered by such application is vested in the Employer free and clear of all liens, claims, security interests and any other encumbrances or other charges of whatever nature; (ii) all statements and representations in such application for payment are true, accurate and complete in all material respects and do not omit to state any material fact required to be stated therein in order to make the statements and representations contained therein not misleading; (iii) to the Contractor's best knowledge none of the Works which is the subject of such application for payment contains Defective Works or Construction Materials.

# EXHIBIT C

# PART 2

**ATTACHMENT 2**

**TO**

**EXHIBIT 3**

## OF THE GENERAL CONDITIONS OF CONTRACT

## FORM OF ADVANCE PAYMENT LETTER OF GUARANTEE

[On letterhead of issuing bank]

# ADVANCE PAYMENT LETTER OF GUARANTEE

To :

The Lebanese Company For The Development
And Reconstruction of Beirut Central District,
S.A.L.

Building 149 Marfaa, Saad Zaghloul Street, off
Foch Street, BP.119493 Beirut

Attention: Mr. Abdul Hafiz Mansour

‡‡‡‡‡‡‡‡‡‡‡‡‡, Lebanon. Date: ‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡, 1999

REF:        OUR L/G No. ‡‡‡‡‡‡‡‡‡‡‡‡‡‡
            FOR an amount of ‡‡‡‡‡‡‡‡‡‡

We refer to the Contract (the "CONTRACT") dated the ‡‡‡ day of
‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡ 1997 made between The Lebanese Company for the
Development And Reconstruction of Beirut Central District, S.A.L. and
‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡ (the "CONTRACTOR") having its main office at
‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡ regarding the performance of the Works (as
defined in the CONTRACT) in connection with the development, reconstruction
and restoration of Beirut Central District.

1.      We hereby unconditionally and irrevocably agree to pay you, on your first
demand complying with the terms of paragraph 3 below, by wire transfer to an
account in your name at such bank as you shall stipulate, such amount or amounts as
you shall demand from time to time, up to a maximum amount of
‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡ ‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡ (‡‡‡‡‡‡‡‡) (the
"GUARANTEED AMOUNT").

2.      The GUARANTEED AMOUNT shall be automatically reduced by the
amount appearing on any and all Payment Certificate(s) relating to the
reimbursement by the Contractor of the Advance Payment made to it under the
CONTRACT, signed by duly authorized representatives of the Employer (as defined
in the CONTRACT), until reduction of the GUARANTEED AMOUNT to zero.

3.      Any demand for payment by you shall:
(i)     be by letter;
(ii)    refer to the number and date of this Letter of Guarantee;
(iii)   state the amount for which payment is demanded;

53

(iv)    state the name of the bank and account number to which payment is to be made; and

(v)    be signed by the General Manager and one (other) Member of the Board of Directors of your Company.

4.    This first demand Letter of Guarantee constitutes an unconditional and irrevocable direct obligation of this bank which is separate and independent of the CONTRACT, including the CONTRACTOR's obligations under the CONTRACT. Notwithstanding any alteration or change of the CONTRACT, or the early termination of the CONTRACT, or in the extent or nature of the Works (as defined in the CONTRACT) or of the conditions of performance under the CONTRACT, or of the financial condition or otherwise of the CONTRACTOR (including, without limitation, bankruptcy or liquidation), none of which shall constitute novation, and notwithstanding any contestation or objection or the commencement of any legal or other proceedings brought by any person or entity whatsoever (including the CONTRACTOR) to prevent, delay or in any way hamper or stop payment of any amount you may demand payment of from time to time in accordance with the terms hereof, and notwithstanding any other circumstance which might hinder prompt enforcement of this Letter of Guarantee, and without any need or requirement for you to have first demanded payment of the amount or amounts in question by the CONTRACTOR, we shall comply with our payment obligations hereunder, without any of the above events, circumstances or provisions justifying any delay in the performance of our obligations or constituting an exoneration, discharge or any release thereof.

5.    The GUARANTEED AMOUNT shall be reduced by the amount of any payment made by us hereunder. Any such payment shall be paid free and clear of, and without deduction for or on account of, any present or future taxes, levies, imposts, duties, charges, fees, commissions, deductions, or withholding of any nature whatsoever and by whomsoever imposed all of which shall be for the CONTRACTOR's account.

6.    This Letter of Guarantee shall remain valid and enforceable for an initial period of two (2) years from the date hereof and shall be automatically extended for periods of one (1) year until the GUARANTEED AMOUNT is reduced to zero in accordance with paragraph 2 above, or, until you release us from our obligations hereunder, whichever occurs the earlier.

7.    We will honor all demands for payment up to the GUARANTEED AMOUNT from the date hereof to the date this Letter of Guarantee expires according to its terms.

8.    This Letter of Guarantee shall be governed by, and construed in accordance with the laws of the Republic of Lebanon.

BY: ++++++++++++++++++++++++

TITLE: ++++++++++++++++++++++++

ATTACHMENT 3

TO

EXHIBIT 3

OF THE GENERAL CONDITIONS OF CONTRACT

MAXIMUM CUMULATIVE PAYMENT AMOUNT

W

55

Addendum #1
18/02/99

| Maximum Cumulative Payment | |
|---|---|
| Payment/Month | Amount US$ |
| 1999 | |
| February | 14,619,125 |
| March | 14,619,125 |
| April | 14,619,125 |
| May | 14,619,125 |
| June | 14,619,125 |
| July | 14,619,125 |
| August | 14,619,125 |
| September | 14,619,125 |
| October | 14,619,125 |
| November | 15,541,150 |
| December | 16,464,375 |
| 2000 | |
| January | 17,387,000 |
| February | 18,309,625 |
| March | 19,232,250 |
| April | 20,154,875 |
| May | 21,077,500 |
| June | 22,000,125 |
| July | 22,922,750 |
| August | 23,845,375 |
| September | 24,770,000 |
| October | 26,090,000 |
| November | 27,410,000 |
| December | 28,750,000 |
| 2001 and after no limit | |

12,300,000
"
"
"
"
"
"
"
13,350,000
14,400,000

15,450,000
16,500,000
17,550,000
18,600,000
19,650,000
20,700,000
21,750,000
22,800,000
23,850,000
24,900,000
25,950,000
27,000,000

W

**EXHIBIT 4**

**TO GENERAL CONDITIONS OF CONTRACT**

**FORM OF REQUEST FOR**

**CHANGE ORDER**

**AND**

**FORM OF CHANGE ORDER**

# FORM OF REQUEST FOR CHANGE ORDER

Date: _____

No.: _____

A. (Describe Employer's instruction, order, direction or similar communication giving rise to RFGO).

B. (Quantify proposed adjustment. - detail why a Change Order should be issued, and the proposed modification of, or adjustment to or variation in, the Contract Price or the Time for Completion. Attach substantiation upon which RFGO is based, in accordance with contract requirements).

For and on behalf of: _____

By: _____

Signature: _____

Title of Contractor's Representative: _____

Receipt acknowledged (Employer/Construction Manager):

By: _____

Signature: _____

Title: _____

Date: _____

# CONTRACT CHANGE ORDER

Project:                                        Contract No:

Contractor:                                     Date:

The Employer hereby gives to the Contractor a Change Order for, and the Contractor agrees to provide and perform, the Construction Materials and Works described below:

### (SEE ATTACHED "EXHIBIT A" FOR DESCRIPTION OF WORKS)

|  | US DOLLARS |
|---|---|
| Original Contract Price: | $ |
| Previous Change Order through No: | |
| Adjusted Contract Price through Change Order No: | $ |
| Amount of this Change Order No: | $ |
| Revised Contract Price to date: | $ |

Change to Time for Completion granted by this Change Order:

Revised Completion Date:

The Contractor shall be solely responsible for paying amounts due to its Subcontractors and Suppliers for the performance of the Works which are the subject of this Change Order and agrees to indemnify the Owner in connection with any Subcontractor and/or Supplier claims arising therefrom.

The total amount of this Change Order includes all applicable taxes, guarantees, insurance, delivery, supervision, overhead, profit, labor, labor impact, construction materials, changes, delays, acceleration and inefficiency, or any claims therefor, and the Contractor hereby waives any and all claims for such items associated with or related to the Works covered by this Change Order.

This Change Order represents the entire and integrated agreement between the parties and supercedes all prior negotiations related to this change to the conditions of the Contract, including, without limitation, those concerning payment.

59

CONTRACTOR

The Lebanese Company for the Development and
Reconstruction of Beirut Central District,  S.A.L.

Authorized Signature_____
Signature_____

Authorized

Name: _____

Name: _____

Title: _____

Title: _____

Date: _____

Date: _____

**EXHIBIT 5**

## PROGRAMME AND MILESTONES

✻ Addendum no 1
18/2/99

## Programme and Milestones

The following milestones constitute part of the programme. The dates or period presented hereforth constitute milestones as per the General Conditions of Contract.

All works must be completed in fifty four (54) months from date of Notice to Proceed. = 14/10/2003

8/4/2000 = NTP + 360 D₂

Excavation and filing of Section 1 must be completed by ~~December 31, 1999~~. This date constitutes an intermediate milestone.

14/10/2000 = NTP + 550 Dys

Excavation and filing of Section 2 must be completed by ~~June 29, 2000~~. This date constitutes an intermediate milestone.

w

Λ

## EXHIBIT 6

## *TO GENERAL CONDITIONS OF CONTRACT*

## FORM OF PERFORMANCE

## LETTER OF GUARANTEE

[On letterhead of issuing bank]

## PERFORMANCE LETTER OF GUARANTEE

To:     The Lebanese Company for the Development
        and Reconstruction of Beirut Central District, S.A.L.
        Building 149 Marfaa , Saad Zaghloul Street,
        off Foch Street, BP.119493 Beirut
        Attention: Mr. Abdul Hafiz Mansour.

━━━━━━━━━━━━, Lebanon.   Date: ━━━━━━━━━━━━━━━━, 1999 ...

REF:    OUR L/G N° ━━━━━━━━━━━━━
        FOR an amount of ━━━━━━━━━━

We refer to the Contract (the "CONTRACT") dated the ━━━ day of ━━━━━━━━━━━━━━━ 1998 made between The Lebanese Company for the Development and Reconstruction of Beirut Central District, S.A.L. and ━━━━━━━━━━━━━━━━━━ (the "CONTRACTOR") having its main office at ━━━━━━━━━━━━━━━━━━━━━━━ regarding the performance of the Works (as defined in the CONTRACT) in connection with the development, reconstruction and restoration of Beirut Central District.

1.  We hereby unconditionally and irrevocably agree to pay you, on your first demand complying with the terms of paragraph 2 below, by wire transfer to an account in your name at such bank as you shall stipulate, such amount or amounts as you shall demand from time to time, up to a maximum amount of ━━━━━━━━━━━━━━━━ ━━━━━━(━━━━━━━━) (the "GUARANTEED AMOUNT").

2.  Any demand for payment by you shall:
    (i)    be by letter;
    (ii)   refer to the number and date of this Letter of Guarantee;
    (iii)  state the amount for which payment is demanded;
    (iv)   state that in your binding opinion the Contractor is in breach of his obligations under the Contract.
    (v)    state the name of the bank and account number to which payment is to be made; and
    (vi)   be signed by the General Manager and one (other) Member of the Board of Directors of your Company.

3.  This first demand Letter of Guarantee constitutes an unconditional and irrevocable direct obligation of this bank which is separate and independent of the CONTRACT, including the CONTRACTOR'S obligations under the

*W.*

*()*

64

CONTRACT. Notwithstanding any alteration or change of the CONTRACT, or the early termination of the CONTRACT, or in the extent or nature of the Works (as defined in the CONTRACT) or of the conditions of performance under the CONTRACT; or of the financial condition or otherwise of the CONTRACTOR (including, without limitation, bankruptcy or liquidation), none of which shall constitute novation, and notwithstanding any contestation or objection or the commencement of any legal or other proceedings brought by any person or entity whatsoever (including the CONTRACTOR) to prevent, delay or in any way hamper or stop payment of any amount you may demand payment of from time to time in accordance with the terms hereof, and notwithstanding any other circumstance which might hinder prompt enforcement of this Letter of Guarantee, and without any need or requirement for you to have first demanded payment of the amount or amounts in question by the CONTRACTOR, we shall comply with our payment obligations hereunder, without any of the above events, circumstances or provisions justifying any delay in the performance of our obligations or constituting an exoneration, discharge or any release thereof.

4.  The GUARANTEED AMOUNT shall be reduced by the amount of any payment made by us hereunder. Any such payment shall be paid free and clear of, and without deduction for or on account of, any present or future taxes, levies, imposts, duties, charges, fees, commissions, deductions, or withholding of any nature whatsoever and by whomsoever imposed, all of which shall be for the CONTRACTOR'S account.

5.  This letter of Guarantee shall remain valid and enforceable for an initial period of five (5) years from the date hereof and shall be automatically extended for periods of one (1) year until we receive from the CONTRACTOR the "Certificate of Expiration of the First Year of the Period of Guarantee" as defined and referred to in GC 31 of the CONTRACT, signed by authorized signatories of the Employer (as defined in the CONTRACT), or, until you release us from our obligations hereunder, whichever occurs the earlier.

6.  We will honor all demands for payment up to the GUARANTEED AMOUNT from the date hereof to the date this Letter of Guarantee expires according to its terms.

7.  This Letter of Guarantee shall be governed by, and construed in accordance with, the laws of the Republic of Lebanon.

BY: ++++++++++++++++++++++++++

Name: +++++++++++++++++++++++++

Title: ++++++++++++++++++++++++

## EXHIBIT 7

## TO GENERAL CONDITIONS OF CONTRACT

## INSURANCE PROVISIONS

# INSURANCE PROVISIONS

### 1.    Insurance to be Provided by the Contractor

1.1    The Contractor shall, at its sole expense, maintain in effect at all times during the performance of the Works, insurance coverages with limits not less than those set forth below with Lebanese Insurers and under forms of policies satisfactory to the Employer.

1.2    Worker's Compensation and Employer's Liability Insurance covering the Contractor's employees in accordance with Lebanese Laws and Decrees for an amount of not less than US$250,000 each occurrence unlimited in the aggregate.

1.3    Vehicle Bodily Injury and Property Damage Liability Insurance covering all vehicles, trucks, trailers or self-propelled vehicles owned or hired by the Contractor with limits as follows:

Bodily Injury:        Unlimited
Property Damage:    U.S.$250,000 each occurrence unlimited in the aggregate.

1.4    Contractor's Plant and Equipment Insurance to cover all such items including temporary buildings and contents owned, hired, used or provided by the Contractor for a sum sufficient to provide for their replacement at the Site.

1.5    Contractor's Professional and Environmental Insurance (including contractual coverage) with minimum limit of U.S.$20,000,000 in respect of each and every claim (with an agregate limit of US$ 50,000,000) protecting the Contractor and the Employer from errors and omissions of the Contractor from or in connection with the Completion of the Works hereunder and which shall be maintained for a period of twenty (20) years after the date of Completion of the Works. Details of the insurance coverage are set out in Attachment 2 to this Exhibit

### 1.6    Special Provisions with Respect to Policies Placed by the Contractor

1.6.1    The Contractor shall be responsible to ensure that its Subcontractors of each tier carry insurance equal to that stipulated herein (except for 1.5 above), including naming of additional insureds and waiver of subrogation.

1.6.2    All the deductibles applicable to the foregoing insurances shall be for the account of the Contractor.

1.6.3    All the above mentioned insurance policies covering Worker's compensation and Employer's Liability and the Contractor's owned or hired properties shall include an insurer's waiver of rights of subrogation in favour of the Employer, and the Construction Manager.

1.6.4   The policies of insurance which provide Contractor's Professional and Enviromental Insurance shall name the Employer, the Construction Manager, the Consultant, Engineer and the Technical Controller as additional insureds and shall state that it is primary insurance as regards the additional insureds and contain a cross liability or severability of interest clause.

1.6.5.   None of the requirements contained herein as to types, limits and Employer's approval of insurance coverage to be maintained by the Contractor, is intended to or shall in any manner limit or qualify the liabilities and obligations assumed by the Contractor under the Contract.

1.6.6   The Employer reserves the right, at any time to obtain on behalf of the Contractor any or all of the insurances set forth above and in such case the Contractor shall be required to refund to the Employer on a pro-rata basis those insurance costs comprised in the Contract Price, and to comply fully with all coverage application and audit procedures.

1.6.7   The Contractor shall deliver to the Employer not later than fifteen (15) Days after signature of the Contract, but in any event prior to commencing Works on the Site, Certificates of Insurance identified on their face as to project name as evidence that policies providing such coverage and limits of insurance are in full force and effect, which certificates shall provide that not less than thirty (30) Days advance notice shall be given in writing to the Employer prior to cancellation, termination or alteration of said policies of insurance.

1.6.8   The Employer has the right to review and examine the rates for insurance carried and maintained by the Contractor and to receive upon request copies of the Policy documents and premium receipts.

## 2.   Insurance Provided by the Employer

2.1   Without in any way limiting the Contractor's obligations under the Contract, the Employer shall take out, carry and maintain in force at the Employer's expense and in the names of the Employer, the Construction Manager, the Consultant Engineer, the Contractor and Subcontractors at the location of the Works the following insurance:

2.2   Contractors All Risk Insurance insuring the Works, The Employer may provide this coverage at its option when the scope and method of work is finalized.

2.3   Third Party Liability Insurance insuring the Contractor and its Subcontractors and suppliers for their on the site activity only in the course of their performance of the Works under the Contract in Lebanon with a combined single limit per occurrence of U.S.$5,000,000 subject to a per occurrence retained liability of U.S.$5,000 which shall be at the Contractor's expense. The Policy will exclude liability arising out of the ownership, operation or use of motor vehicles and watercraft and will be primary insurance for all insureds and will contain a cross liability or severability of interest

clause. The period of coverage will include the first 12 months of the Period of Guarantee.

2.4    Résumés of the foregoing insurance including applicable exclusions are contained in Attachment 1 to this Exhibit. While these résumés are considered to be accurate representations of the terms and conditions of the Employer provided Insurance, in the event that conflict manifests itself between the policies and the résumés, the policies shall at all times be regarded as paramount and controlling.

2.5    To the extent that the Employer sustains a loss which is not covered by the insurance coverages provided pursuant to this Exhibit or which for whatever reason is not paid for by the Insurer, the responsibility provisions of the Contractor under the Contract shall apply.

\* \* \* \* \* \*

**ATTACHMENT 1**

**TO**

**EXHIBIT 7**

# RESUME OF
## INSURANCE PROVIDED BY THE EMPLOYER

The Insurances to be provided by the Employer will generally be in accordance with the following resume which is provided as a guide and should not be considered as overriding any policy terms and conditions and exclusions. These details are indicative only as the insurance coverage cannot be finalized until the method of work is known.

## BCD PROJECT INSURANCE POLICY

### Period of Insurance

From commencement of Works on Site until Completion of the Permanent Works followed by 12 months in respect of the Contractor's Guarantee obligations.

### Insured Parties

The Employer :          The Lebanese Company for the Development and
                        Reconstruction of Beirut Central District, S.A.L.

The Contractor:         Any Contractor appointed by the Employer or
                        any Subcontractor of any tier or Suppliers for their on
                        the Site activities only.

### The Insured's Retained Liability

The total amount which shall be deducted from each loss before the Insurers shall be liable to make any payment.

### The Site

The actual place or places to which property and materials are to be delivered or where Works are to be done by the Contractor other than premises of manufacture together with so much of the area surrounding the said place or places as the Contractor shall actually use in connection with the Works.

### Geographical Limits

Anywhere in Lebanon.

### General Exceptions

War Risks and Radioactive contamination.



# Section 1 – Third Party Liability

### Indemnity Provided

Covers the Insured's legal liability to pay compensation and damages in respect of death of or injury to or disease contracted or illness sustained to any person or damage to property happening within the Geographical Limits arising out of or in the course of or in connection with the carrying out of the Works.

### Limit of Indemnity

U.S.$ 5,000,000 each occurrence or series of occurrences arising out of one original cause.

### Insured's Retained Liability

Each claim or series of claims arising out of one original cause

| | |
|---|---|
| Nil | Bodily Injury |
| U.S.$ 5,000 | Property Damage |

### Additional Coverages And Clauses

- Cross Liability clause
- Director's Indemnity
- Indemnity to members of Insured's first aid, fire and ambulance services in connection with the Works.

### Exceptions To Section 2

- Death of or bodily injury to or illness or disease contracted by any person arising out of and in the course of his employment by the Insured.
- Vehicle liability.
- Aircraft and Watercraft Liability.
- Penalties for delay.
- Deliberate act or omission by the Insured.
- Claims arising out of advice, design or specification given for a fee.
- Liability for costs of rectification of products supplied or contract Works executed by the insured caused by any defect therein or the unsuitability thereof for its intended purpose.
- Pollution or contamination unless caused by a sudden identifiable unintended and unexpected incident happening during the Period of Insurance.

### Claims Procedures /Third Party Liability

Claim handling and reporting procedures will be provided to Contractor. Failure to abide by these procedures may invalidate the insurance coverage.

* * * * * *



**ATTACHMENT 2**

**TO**

**EXHIBIT 7**

## CONTRACTOR:S PROFESSIONAL AND ENVIRONMENTAL INSURANCE

The Insurance to be provided by the Contractor to cover its obligations under this Agreement will be in accordance with the insurance coverages and limits set out below with Lebanese Insurer's and under forms of policies satisfactory to the Employer

### Normandy Landfill - Phase II Project Policy

### Period of Insurance

From commencement of the Works until the date of the Certificate of Completion followed by an Extended Reporting Period of 20 years.

### Insured Parties

Named Insured:        Radian International LLC as Contractor and/or any Sub-Contractor

Additional Insureds:   The Lebanese Company for the Development and Reconstruction of Beirut Central District S.A.L.

### Territory

Worldwide

### Insurance Coverages

- Professional Liability
- Contractor's Environmental Liability
- Completed Operations Liability

### Limits of Liability

U.S. $20,000,000    Each Claim
U.S. $50,000,000    Aggregate Total for all Claims

### Insured's Retained Liability

U.S. $1,000,000

### General Exclusions

- War Risks
- Nuclear Energy Liability
- Dishonest, Criminal, Willful or Deliberate Acts
- Fines, Penalties
- Workman's Compensation Related Claims

* * * * *

# TECHNICAL CONDITIONS OF CONTRACT

## NORMANDY LANDFILL PHASE 2

# *CONTENTS*

1.0 INTRODUCTION

2.0 OBJECTIVE OF THE PHASE 2 RECLAMATION WORKS

3.0 SCOPE OF WORKS

4.0 METHOD OF DETERMINATION OF VOLUME OF MATERIAL TO BE TREATED

   4.1  Definitions
   4.2  Determining In-Situ Bulk Density of Material to be Treated
   4.3  Calculation of In-Situ Volume of Material to be Treated

5.0 CONSTRAINTS AND REQUIREMENTS

   5.1  Perimeter Road (Common User Access Road)
   5.2  Marine Works
   5.3  General External Fill Area
   5.4  Availability Of Land Outside The Phase 2 Boundary
   5.5  Imported Fill
   5.6  Installations Existing On Site
      5.6.1  Crushing Plant Location
      5.6.2  Crushing Plant Use by the Contractor
      5.6.3  B.C.B Concrete Batching Plant
      5.6.4  Waste Processing Plant
   5.7  Services
   5.8  Site Access
   5.9  Other Contractors
   5.10 Health and Safety
   5.11 Phasing Requirements

6.0 REQUIREMENTS  FOR SITE OFFICES AND VEHICLES FOR THE EMPLOYER AND
    OTHERS
   6.1  Office Requirements
   6.2  Office Materials
   6.3  Notice Boards
   6.4  Vehicles and Other Facilities and Services for the Employer
      6.4.1  Vehicles
      6.4.2  Communications
      6.4.3  Security Services for the Employer
      6.4.4  Fueling and Services of Vehicles

6.5  Program Requirements
6.6  Reversions
6.7  Temporary Sanitary Facilities
6.8  Attendance
6.9  Publicity and Signboards
6.10 Clearance of Site on Completion
6.11 Weather and Meteorological Recording
6.12 Survey Equipment and Staff
6.13 Printed Forms

7.0 INFORMATION MADE AVAILABLE TO THE CONTRACTOR

APPENDIX A RULES, PROCEDURES AND REGULATIONS FOR THE EXECUTION
          AND COMPLETION OF WORKS IN THE BCD

APPENDIX B REGULATIONS AND PLANNING OF BEIRUT CENTRAL DISTRICT AND
          SECTORS A, B, C AND D

DRAWING RJ01. SITE MAP

BCD MASTER PLAN

## 1.0    INTRODUCTION

This document contains the Technical Conditions of Contract for the Phase 2 Reclamation of the Former Normandy Landfill. It sets out the technical requirements with which the Contractor is to comply in the Completion of the Works

## 2.0    OBJECTIVE OF THE PHASE 2 RECLAMATION WORKS

The objective of the Works is to reclaim the land and environment known as Phase 2 of the former Normandy Landfill (see Drawing RJ01) as marketable development land that poses no risk to human health, public welfare, structures, services and the environment.

The reclaimed land will be marketed by the Employer for the construction of a prestige high density development (offices, hotels and condominiums), park land, and associated infrastructure works. Development will comprise high multi-storey buildings with up to 7 levels or more of underground structures.

The Contractor is required to design and construct a reclamation scheme to meet the objective of the Works in accordance with the Contract.

## 3.0    SCOPE OF WORKS

The Contractor undertakes to:

1) Reclaim the land within the Phase 2 area to a readily acceptable marketable standard for development as:

- Prestige high density multi-storey buildings (offices, hotels and condominiums) with up to 7 levels or more of underground structures.
- Infrastructure comprising car parks, roads, footways, services, sewers, street lighting etc.
- Park land with high quality hard and soft landscaping including a raised amphitheater, foot-ways, car parking, trees, lighting, lakes, etc.

The extent of the Normandy Landfill Phase 2 site at sea level is shown on Drawing RJ01. Phase 2 extends beyond the boundary shown on Drawing RJ01 to seabed at a maximum slope of 1 vertical to 6 horizontal, except along the southern boundary of Phase2. The Contractor is required to remediate such land (including land below the sea) outside the boundary of Phase2 as shown on Drawing RJ01 as it considers necessary to meet the Employers Objective for the Phase 2 site and provide the necessary guarantee as per the General Conditions of Contract. Notwithstanding the aforementioned, the maximum excavation volume shall not exceed 5.0 million cubic meters.

2) Reclaim the land within the Phase 2 area in accordance with the General Conditions of Contract.

3) Provide a level graded development platform at a reduced level of 1.5 meters above mean sea level (assuming mean sea level to be zero datum).

4) Undertake the Works so that, as far as is reasonably practical, there shall be no increased risk to human health, public welfare, buildings, construction materials, services and the environment either on or off the site from the environmental hazards on the site as a result of the Works.

5) Protect the Phase 1 area and development as well as all completed sections including completed Marine Works areas, as necessary, from any environmental hazards present within Phase 2 Normandy Landfill, or resulting from the Works.

6) Achieve the End Product acceptability criteria [landfill gas emissions (carbon dioxide and methane)], leachate and water quality, chemical contaminant levels (metals etc.) and geotechnical criteria which have been determined by the Contractor, and deliver the completed Works as land Fit for the Purpose. These chemical and biological site quality criteria are set out in the following table (table 3.1):

| TABLE 3.1 | |
|---|---|
| **CHEMICAL AND BIOLOGICAL FINAL SITE QUALITY** | |
| Parameter | Level in mg/kg (unless shown otherwise) |
| Organic Carbon C | <5% |
| Total Nitrogen N | <2% |
| C/N Ratio | 10/1 to 25/1 |
| pH | 5 to 11 |
| Nutrients (P) | <1.5% |
| Ammonia | - |
| Ammonia/Nitrate ratio | <1 |
| Arsenic | 42 |
| Cadmium | 6 |
| Chloride | 2000 |
| Chromium | 240 |
| Lead | 308 |
| Mercury | 5 |
| Selenium | 6 |
| Boron | 3 |
| Copper | 113 |
| Nickel | 123 |
| Zinc | 430 |
| Cyanides (Free) | 11 |
| Phenols | 5 |
| VOC | 7 |
| PCB | 1 |
| Sulphate | 2000 |
| Polyaromatic Hydrocarbons | 50 |
| Mineral Oils | 1000 |
| Salmonella | Zero in 25 gr |
| E Coli | <1000 MPN/gr |
| Flammable Gas | <1% v/v (g) |
| Carbon Dioxide | <1.5% v/v (g) |

Techeon

6

| TABLE 3.1 (Cont.) CHEMICAL AND BIOLOGICAL FINAL SITE QUALITY ||
| Parameter | Level in mg/kg (unless shown otherwise) |
|---|---|
| Oxygen | 18% - 23% (g) |
| Landfill Gas | No specific precautions will need to be provided for built development including landscape works in the reclaimed area. |

The maximum particle size of replacement fill shall be 300 mm. Treated back-filled materials for use in the Permanent Works are not to have a visual appearance indicative of waste (i.e. plastics, etc.).

The achievement of the End Product criteria will be demonstrated by the implementation of a sampling and testing program to be determined by the Contractor that shall not be less than the following program (Table 3.2):

| TABLE 3.2 SAMPLING AND TESTING PROGRAM |||
|---|---|---|
| Parameter | Pre-Treat | Post-Treat/Prior To Disposal |
| 1. Organic Carbon | 1/1000 m3 | 1/500 m3 |
| 2. Total Nitrogen | 1/1000 m3 | 1/500 m3 |
| 3. Nutrients (P) Chloride, Sulfate, and Cyanides | 1/2000 m3 | |
| 4. RCRA Metals | 1/2000 m3 | 1/1000 m3 |
| 5. Mineral Oils | 1/1000 m3 | 1/500 m3 |
| 6. CO2, o2 & Flammable Gas (Head Space) | 1/500 m3 | 1/500 m2 |
| 7. PCBs | 1/4000 m3 | 1/2000 m3 |
| 8. VOCx | 1/1000 m3 | 1/1000 m3 |
| 9. PAHs | 1/4000m3 | 1/2000 m3 |
| 10. Ecoli/Salmonella | 1/1 month 1/3 months | 1/1 months for initial six months, 1/3 months thereafter |
| 11. Auto-Heating For Compost Maturity | | 1/500 m3 |

7) Undertake the remediation works for all wastes (e.g. animal carcasses, tyres, contaminated materials, etc.) with no exclusions except for munitions and special waste which are defined below.

Special Waste for the purposes of this Contract shall mean waste which is enclosed in drums, barrels or similar packaging and which is not amenable to being treated by the methods identified by the Contractor to deal with the body of the municipal and inert material on the site.

It is the Contractor's responsibility to identify Special Waste and to inform the Employer of its existence, composition (sufficient only for classification as Special Waste under this Contract), and approximate quantity. The Contractor is responsible for removing the waste from the excavation and placing it in a safe and secure location on the Normandy Site for delivery to the Employer. *Although the treatment of Special Waste is not included in the scope of works, the Contractor will assist the Employer in finding solutions for the management and disposal of the waste and in obtaining financial support for these tasks from relevant U.S. Governmental Agencies*

Munitions will be dealt with by the Lebanese army and the Contractor is to liase with them and the Employer in this respect. The principal point of contact for the Contractor will be the Employer or its representative.

Animal carcasses, sharps (i.e. needles) and plasma bags specifically shall not be classed as Special Waste.

Human remains shall be handled in accordance with the General Conditions of Contract.

8) Obtain all necessary licenses, permits, approvals etc, and undertake all necessary work required to comply with the same.

9) Comply with the phasing requirements set out in section 4.11 of this document.

10) Take account of and abide by the constraints and requirements set out in section 5.0 of this document.

11) Provide a guarantee as set forth in the General Condition GC 29.

12) Assess the site conditions from the information provided and such additional site investigation as the Contractor may carry out and determine:

- Extent of waste (horizontally and vertically to sea bed)
- Characteristics of wastes
- Chemical properties of wastes (organics, metals, etc.)
- Landfill gas
- Leachate quality
- Quality of environmental receptors (groundwater, sea air, etc.)

1 ) Provide an assessment demonstrating that the remediation will meet the Employer's requirements during and upon completion of the Works with regard to:

- Human Health (site users, general public, construction and maintenance workers)
- Buildings, construction materials and services
- Ground and surface waters

8

• Environmental receptors

"The assessment shall address hazards from:"

• Landfill gas
• Leachates
• Contaminated soils and wastes (heavy metals, oils, etc.)
• Ground instability (settlement, bearing pressures, etc.)
• Combustion of wastes
• Munitions

14) Determine volumes and nature of materials requiring treatment above and below reduced level minus 1.5 meters (assuming mean sea level to be zero datum).

15) Design and provide all Permanent and Temporary Works, and reinstate the site at the conclusion of the Works.

16) Determine acceptability criteria for the environmental monitoring [landfill gas (carbon dioxide and methane), leachate, odor and dust] during the Works. Determine and provide environmental monitoring regime and pest control, where required, for the duration of the Works.

17) Determine, provide and implement, to the satisfaction of the Employer a Quality Assurance regime to demonstrate that materials are inert or have been treated to achieve the End Product acceptability criteria [landfill gas (carbon dioxide and methane), chemical (metals, etc.), leachates and geotechnical].

The Quality Assurance programme must extend to any and all material used as backfill to the site, whether the material arises from the Works, is imported by the Contractor or is provided by the Employer.

18) Determine, provide and implement to the satisfaction of the Employer, post works monitoring for a period of 4 years after the issue of the Certificate of Completion to demonstrate that remediation criteria for landfill gas (carbon dioxide and methane), leachate and water quality, chemical contaminant levels (metals, etc.) are being met.

19) Undertake surveys at the end of each month and at the conclusion of each operation / phase of the Works to determine quantities and types of materials excavated, stockpiled, treated, disposed of, backfilled, etc. and provide 3 hard copies and 2 electronic copies in SDF or CSV format to the Employer.

20) Provide offices and facilities, and associated upkeep and utilities usage throughout the Contract period for the Employer and his Construction Manager/Technical Controller team together with three vehicles including all operational maintenance and fuels. Outline requirements are given in section 6.0 of this document.

21) Attend progress and co-ordination meetings as and when required by the Employer and shall provide the Employer such information and details on the progress and programming of the Phase 2 Works as and when the Employer may reasonably require but in no case less than monthly progress report submitted in 5 copies.

22) At the conclusion of the Works, provide the Employer with 4 copies of an Operational and Maintenance Manual for the site which shall include as a minimum:

- Site investigation information
- Environmental assessment as relating to the completed Works and covering at a minimum the items presented in 13 above
- All "as built drawings"
- Final site survey
- Quality assurance test results and assessment
- Environmental monitoring test results and assessment
- Post Works monitoring test results and assessment
- Description of Works undertaken and phasing
- Details of any health and safety procedures required for residual gas, leachate, and chemical and ground conditions
- Details of any development design constraints
- Operations and Maintenance manuals for any permanent plant and equipment

23) Carry out the Works generally in accordance with the following Method Statement, providing from time to time in accordance with the Contract such further method statements as required. The Contractors' attention is specially drawn to the provisions of G.C. 4.2 and 5.2 in relation to the standing of this method statement.

| TABLE 3.3 METHOD STATEMENT PROVIDED BY THE CONTRACTOR | | |
|---|---|---|
| Ref | Item Description | Details |
| 1.0 | Treatment Methods for the Material to be Treated as per Contract Definition | |
| 1.1 | Treatment method 1 | Windrow Composting will be used to treat pockets of wet and biodegradable organic material and material with high fraction of soils that is highly contaminated with biodegradable contaminants. |
| 1.2 | Treatment method 2 | Low Temperature Thermal Desorption (if needed) will be used to treat material with high soil content that is contaminated with hydrocarbons, solvents, and other organic contaminants. |
| 1.3 | Treatment method 3 | Radian may use BAG Composting (i.e., Aerated Static Pile Composting) in conjunction with windrow composting. This technology is similar to aerated static pile composting; however, it utilizes a special plastic envelope around the material, which allows for better control of odours and a more balanced aeration system. The waste is loaded into the envelope by a special machine and air is supplied via perforated pipe to the waste using blowers. |
| 1.4 | Treatment method 4 | Land Farming and Aeration in thin lifts will be used to treat material that has been degraded but it continues to include minor levels of organic contents. It will also be used for soils with amount of contamination |
| 2.0 | Other Treatment Methods | |
| 2.1 | Treatment method | Radian will also supply an incinerator (5 to 10 ton per day capacity) that will be used for burning plastic, paper, medical waste, animal carcasses, and other combustible wastes that cannot be recycled. Ash from this process will be backfilled in the park area as inert material. |
| 2.2 | Method of dealing with carcasses | Incineration |
| 2.3 | Method of dealing with plastics | Plastics and other combustible wastes that cannot be recycled will be burned in the onsite mobile incinerator that would be supplied and operated by Radian. Plastics may also be baled and placed in the park area. |
| 2.4 | Method of dealing with tyres | Tires will be shredded and used as bulking agent in the composting process. The shredded tires will be used as a fuel source for the incinerator or will be buried in areas of the site where no future structures and/or infrastructures are planned (i.e., park). Other beneficial uses will be considered as appropriate. Radian will use a mobile shredding/grinding unit to shred segregated tires and wood material. |

TABLE 3.3 (Cont.)
METHOD STATEMENT PROVIDED BY THE CONTRACTOR

| Ref | Item Description | Details |
|-----|------------------|---------|
| 2.5 | Method of dealing with timber and paper | Segregated timber will be shredded and used initially as bulking agent in the composting process. The final use for shredded wood will be as mulch in landscaped areas. Such mulch will be stockpiled in an area approved by the owner for future use following the completion of landscaping construction. |
| | | Paper will be incinerated or burned appropriately. |
| 2.6 | Treatment Method Miscellaneous Items | Approximately 25,000 cubic meters of the total excavated volume will include miscellaneous items (i.e. vehicles, metals, etc.) that may have to be taken to an off-site location for disposal at a recycling facility or at an in-country approved landfill. |
| 2.7 | Treatment of Inorganic Materials | No specific treatment is included for inorganic contaminants as there is no basis for this requirement. |
| 3.0 | Method of moisture conditioning for excavated material from below the sea | Radian will initially stockpile material excavated from below sea level to allow for gravity draining/dewatering. This will be followed by spreading and turning for drying prior to screening |
| 4.0 | Mixing ratio of treated material to inert prior to backfilling | Radian would not mix any organic matter or heavy organics contaminated media for the purpose of dilution. Our experience in many nations (i.e., ithe United States mixing for the purpose of dilution is not acceptable and in some instances could be considered as an action in violation of environmental laws) has shown that mixing of waste for dilution may not constitute treatment and manot be desirable by financial lending institutions and real estate investors. |
| 5.0 | Compaction for fill materials | In the areas of future roadways, we will emphasise the use of course material (crushed concrete and rock and stone) above sea level to provide a better base for the planned streets. Backfill in areas designated for roadways will be compacted using mechanical means from elevation plus 0.5 to plus 1.5 m. |
| | | No other compaction is planned at the site by Radian. |
| 6.0 | Use of General External Fill Area | Estimated volume required is 1.5 million cubic meters (Radian will provide adequate notice of variation of the required volume to the Employer). |

Exclusions

The following items are excluded from the Scope of Works:

1.  Treatment of existing leachate at the site.

2.  The use of special foam/chemicals for control of odors.

3.  The use of covered areas to store dry material or to dry wet material.

4.     The use of structural covers over the area (s) of composting or any other treatment process.

5.     No specific treatment is included for inorganic contaminants as there is no basis for this requirement.

6.     The mixing of material for geotechnical purposes.

7.     Except as required by the Contractor's operations, the cost of re-setup/erection, and/or removal of the DUOS waste processing plant from the site.

8.     The excavation and backfilling of waste from under any structure (i.e., roadway, culvert, drainage system, etc.) in the Phase 1 area of the site.

9.     The relocation of the on-site crusher, the Employer's on-site offices (at southeast corner of site), or the BCB plant.

*If the Contractor decides to implement any of the above operations for the execution of the Works, then these operations will be included in the scope of works, without any increase in the Contract Price or in the Time for Completion.*

## 4.0 METHOD OF DETERMINATION OF VOLUME OF MATERIAL TO BE TREATED

### 4.1   Definitions

$Wi$ = wet weight of in situ test cell material
$Vi$ = wet volume of in situ test cell material
$Di$ = bulk density of in situ test cell material
$Mi$ = moisture content of in situ test cell material

$Wt$ = wet weight of material to be treated
$Mt$ = moisture content of material to be treated
$Vt$ = volume of material to be treated

$Wdryt$ = dry weight of material to be treated
$Wwt$ = weight of water in the material to be treated

### 4.2   Determining In-situ Bulk Density of Material to be Treated

**Test Cell**

*Frequency*

- A minimum of three test cells, up to a maximum of ten, as required by the Construction Manager will be excavated per section. If a reasonable convergence of in-situ densities (Di) between the cells is not found, additional cells will be excavated as required.

- The above procedure will be repeated every three months.

- Additional cells will be excavated as agreed jointly by the Construction Manager and the Contractor.

*Cell Excavation*

- The cell will be of a size to fill one dump truck, and trimmed or enlarged to facilitate accurate measurement.

*Cell Measurements*

- The in-situ volume (Vi) of the cell will be determined by survey.

- The weight of the cell (Wi) will be determined by weighing the dump truck on a calibrated truck scale prior to loading and subtracting the weight after loading.

- The moisture content (Mi) of the cell will be determined by taking the average of five samples (four side walls and bottom) from the excavation pit.

**Material to be Treated**

- All material to be treated will be weighed

- Material to be treated will be weighed (Wt) on calibrated truck scales, belts or other weighing devices.

- The moisture content (Mt) of the material to be treated will be measured by taking the average of at least five samples per day.

## 4.3 Calculation of In-Situ Volume of Material to be Treated

- The method of calculating moisture content will be weight of water divided by dry weight of solids:

  moisture content = weight of water/weight of dry solids

- The in situ density $DI = Wi/Vi$
- $Wdryt = Wt-Wwt$

- The volume of material to be treated $Vt = (Wdryt + \{[Min(Mi,Mt)/Mt] * Wwt\}) /Di$

  N.B    Min(Mi,Mt) means that the lesser of Mi and Mt is to be used

## Overall Method of Application

- Di in the formula to determine Vt will be the average of an agreed suite of test cells
- Vt will be calculated on a daily basis using the current value of Di

## 5.0   CONSTRAINTS AND REQUIREMENTS

### 5.1 Perimeter Road (Common User Access Road)

A 20 meters wide perimeter road, Common User Access Road, is present along the seaward edge of the site and abutting the Marine Works working area to the west (Drawing RJ01) for the use of all contractors working on the Normandy site or needing to pass through it. This route or an equivalent route which is acceptable to the Employer must be available at all times. The route will be maintained by the Employer until such time that any part of the road being used by the Marine Works contractor is modified or diverted by the Contractor after which time the Contractor will be responsible for the maintenance of that portion of the Common User Access Road.

The perimeter road may be diverted by the Contractor subject to agreement by the Employer who will need to consider the effect on any contractor entitled to use the road. Any diversion must be constructed by the Contractor to a standard similar to that of the existing road and the diversion must be completed and available for use before the current road is diverted.

If the road is disturbed for any reason by the Contractor without the prior approval of the Employer, or is not adequately maintained, the Contractor shall immediately and at his own expense reinstate this road and will be liable for the cost of any related claims successfully pursued against the Employer by any contractor (entitled to use the road).

### 5.2 Marine Works

The Employer has entered into a contract for the construction of Marine Works at the Normandy Site. The contract has commenced and is scheduled for completion in July 2000.

The Contractor must phase his works so as to allow for change in the Marine Works Programme and to ensure that the Phase 2 works do not interfere in any way with the Marine Works or the operations of the Marine Works contractor.

In particular, the Contractor shall ensure that his excavations do not undermine the Marine Works structural support and that the Contractor's filling operations do not affect the Marine Works Contract operations.

### 5.3 General External Fill Area

The principal requirement for placing fill is within the boundary of the Phase 2 site as shown on drawing RJ01. Additional area is available in the general fill zone along the northern boundary of the landfill. There is no requirement under this Contract to fill in the General External Fill Area however it is available should the Contractor wish to make use of it. This additional area is subject to phasing restrictions which limit its availability and there are constraints on the method of filling in proximity to the caissons and supporting material.

The filling in the general fill zone can commence on June 1, 1999 starting across from Caisson number 13. The head of the filling (tipping) should be perpendicular to the Caisson line and at all time be behind a line of ten (10) caissons including stablizing backfill placed by the Marine Works contractor. Additionally, no filling above +1.0m mean sea level (MSL) is to take place before all caissons and support backfill are placed (provisionally scheduled for completion in January 2000). No filling is to take place within 10 meters of caisson back wall.

16

The Contractor shall agree and co-ordinate any use of the additional fill areas with the Employer. The placing of fill in the general fill area will be carried out by the Employer. The Contractor is required to deliver fill material to the fill area at the location or locations specified by the Employer from time to time.

Fill materials delivered to the General External Fill Area by the Contractor shall be subject to the same guarantees of quality and fitness for purpose as fill materials used in the Phase 2 area. If it is used by the Contractor, the General External fill Area shall be included in the Post Works Environmental Monitoring Scheme.

## 5.4 Availability of Land Outside the Phase 2 Boundary

The Employer at his sole discretion may from time to time make other areas of land available for use by the Contractor outside the Phase 2 boundary.

## 5.5 Imported Fill

In the event that the Contractor needs to import fill onto the site then he must make his own arrangements for its procurement, and obtain the Employers' agreement to material being imported and to the source, type, and quality of that material.

The Employer at his sole discretion may supply the Contractor with fill material at no cost. The type, quality and rate of supply however cannot be guaranteed and it will be the Contractors' responsibility to ensure that it is suitable for the purpose for which it is to be used. The Employer will use its best endeavors to provide material to meet the Contractors programme but will not accept any liability whatsoever for any failure to do so.

## 5.6 Installations Existing on Site

### 5.6.1 Crushing Plant Location

An operating crushing plant is situated within the Phase 2 site at the location shown on Drawing RJ01. This plant is owned by the Employer and is operated on his behalf under a separate contract. If the Contractor requires the crushing plant to be moved, then he shall notify the Employer at least six months before the Contractor needs to do reclamation work in that area.

Only one relocation of the crushing plant will be permitted and the new location must be approved by the Employer.

The crushing plant and associated working area comprise approximately 1.5 hectares and that area must be available for the crusher operations at all times. Additionally, approximately one (1) hectare within the site boundary and generally in proximity to the crushing plant must be available for the stockpiling of rubble and reinforced concrete that require processing through the plant.

### 5.6.2 Crushing Plant Use by the Contractor

The Contractor may deliver to the crusher stockpile hard material that arises from the Phase 2 excavation and that is greater than 300 mm in size.

Once placed in the crusher stockpile, the material will be processed by the Employer and used by him. Hard material delivered to the crusher stockpile shall comprise stone, brick, concrete, reinforced concrete, and like material and shall not contain timber, munitions, nor municipal, industrial, medical or special waste.

### 5.6.3    B.C.B. Concrete Batching Plant

The B.C.B. concrete Batching Plant is situated at the location shown on Drawing RI01. The Contractor shall arrange his operations such that they do not interfere with the normal working of the B.C.B. Plant.

The B.C.B. Plant cannot be removed from the site until 30 September 2000 and only then after the Contractor notifies the Employer six months before the possession date required by the Contractor.

### 5.6.4    Waste Processing Plan

The Employer has entered into a contract with Duos Engineering B.V. of the NETHERLANDS for the design and construction of a Waste Processing Plant to be erected on the site at the location shown on Drawing RJ01.

The Contractor will be required to take over the operation of the Waste Processing Plant for use on the Phase 2 reclamation.    "Take over the operation of the Plant" means all operation, staffing, management, running and maintenance. The contract between the Employer and Duos includes strategic and wear parts together with a spares procurement service. The spare parts scheduled in the contract between the Employer and Duos will be made available to the Contractor at no cost however any additional spare or wear parts will be at the Contractors' cost. The specifications of the waste processing plant and the list of the provided spare parts are included in Section 8.

The Contractor is required to provide the needed personnel and earth-moving equipment for the commissioning of the plant, and to excavate and deliver material to and from the plant as required for the commissioning. The training program provided by Duos Engineering B.V. (October, 1998) shall apply to Contractor's personnel.

The Contractor will be wholly responsible for moving the plant and all associated costs.

The Employer does not guarantee the actual through put rate of the plant.

The Contractor may amend or modify the plant at his own cost with the agreement of the Employer.

If any loss or damage occurs to the plant during the works from any cause whatsoever, the Contractor shall at his own expense, rectify such loss or damage to the satisfaction of the Employer.

The Waste Processing Plant shall remain the property of the Employer.

The Contractor shall hand-over the plant back to the Employer after the completion of the Works in good working condition except for reasonable normal wear and tear.

Should the Contractor decide to purchase equipment related to the pre-processing phase (i.e. for the handling/conditioning of excavated material prior to processing through the waste processing plant) or to upgrade the Waste Processing Plant with additional equipment or to contract the Waste Processing Plant supplier to further assist in the operation of the Waste

Processing Plant, the Contractor should inform the Employer immediately of its decision, associated cost, specifications of equipment and/or services and period of implementation.

The Employer thereafter, within a period of 15 days, may offer to the Contractor an option whereby the Employer may supply or arrange to be supplied such equipment and/or services, in which case and if agreed by the Contractor the Contract Price would be adjusted accordingly.

## 5.7 Services

The Employer will not provide services (water, power etc.) for the Contractor's works.

## 5.8 Site Access

The main site access location is shown on Drawing RJ01. This access will be used by other Contractors.

## 5.9 Other Contractors

Others who may have access to the site include, but are not limited to:

1) The Contractor for the removal of the inert stockpile, crusher operations and sorting works.
2) Traffic to the stores and office areas.
3) Contractors for the Marine Works and Infrastructure works using the perimeter road.
4) Emergency services.
5) The Lebanese army and security forces.
6) BCB vehicles.
7) External vehicles bringing import fill to the Normandy Site.
8) The Employer's employees and his visitors/guests.
9) The Construction Manager.

## 5.10 Health and Safety

The Contractor shall undertake the works under the BCD rules, procedures and regulations and shall abide and implement a Project Health and Safety programme that shall address but not limited to:

1) Handling contaminated wastes and any associated hazards.
2) Landfill gases.
3) Leachate.
4) Unexploded munitions.
5) Special wastes, animal carcasses, medical wastes.
6) Works over the sea.
7) Ground instability.
8) Combustion of wastes.
9) Earthworks and remediation operations, plant, equipment, etc.
10) Other Contractors operations.
11) Services.
12) Enforce a No Smoking policy on the Site.

*# Addenn-*
*18/02/99*

13) Carry on all vehicle maintenance in controlled areas agreed to by the Employer.

### 5.11 Phasing Requirements

The Contractor shall phase his works to comply with the following phasing and completion requirements, (Table 5.1)

**TABLE 5.1**
**Phasing Requirements**

| Section* | Commencement | Completion |
|----------|--------------|------------|
| Section 1 | Excavation above level +1.5** may commence at any time.<br><br>Excavation below +1.5** must not commence Until after April 30,1999<br><br>Filling to any location must not commence until after April 30,1999 | All works by ~~December 31,1999~~ *APrL 8, 2000* *(8/* |
| Section 2 | No restrictions | All works by ~~June 30, 2000~~ *October 19, 2000* *(19/10/.* |
| Whole of the works | Not applicable | All works within 4.5 years from the Notice to Proceed. |

Notes:  * Section 1 and Section 2 are shown on Drawing RJ01
       ** Mean sea level is zero level

and with any and all other restrictions in the Contract and attachments but not specifically mentioned in this section.

## 6.0 REQUIREMENTS FOR SITE OFFICES AND VEHICLES FOR THE EMPLOYER AND OTHERS

The Contractor shall at his own expense provide and properly maintain, for the duration of the Works, office facilities and vehicles for the use of the Employer, the Construction Manager, the Technical Controller and their respective staff.

The requirements of this section (Section 6.0) will be provided by the Contractor. The Employer on-site manager and the program manager will use their best endeavor to control cost.

The Contractor shall, until notified otherwise by the Employer upon the Completion of the Works, supply electricity, water, telephone and sanitary facilities for the offices referred to above. All shall operate 24 hours per day. The Contractor shall be fully responsible for the maintenance and operation, including cost, labour and materials of these utility systems, including a secondary backup electricity (generator) power supply for maintaining office power requirements. As well as, a central uninteruptable power supply for the networked P.C Computer/printers system.

The offices shall be sited at the location approved by the Employer. Prefabricated units, movable buildings or trailers will be accepted, subject to the approval of the Employer.

All facilities provided for the Employer, the Construction Manager, the Technical Controller and their respective staff shall remain available until the end of the first year of the Period of Guarantee or until such earlier time as the Employer may instruct.

The Works include the obligations of the Contractor for the:

- construction of the offices.
- provision and installation of furniture and equipment, which shall include at least the items listed hereafter.
- provision for supply of running water, electricity and telephone.
- maintenance of the offices, furniture and equipment, including daily cleaning and general attendance throughout the duration of the Works.

The Contractor shall provide and maintain the following services for the offices:

- heating and air-conditioning.
- electric lighting and power.
- telephone service.
- water supply.
- drainage system.
- fire fighting appliances.

## 6.1  Office Requirements

The Contractor shall provide prefabricated, portable or de-mountable offices for the sole use of the Employer, the Construction Manager, the Technical Controller and their respective staff. The offices shall at a minimum comprise of the specifications set forth below.

- The buildings shall be provided with adequate environmental control systems to permit a general temperature of 18°C with a tolerance of +/- 2° C to be maintained.

- Adequate ventilation shall be provided to all rooms with extractor fans in toilets, shower and kitchen area.

- All floor areas to be vinyl tiled except for wet areas, kitchen, toilets and shower areas are to waterproofed and ceramic tiled as required.

- Unless stated otherwise, walls and ceilings are to be finished white. Kitchen, toilet and shower areas are to be white ceramic tiled.

- All external doors are to be fitted with a suitable lock and duplicate keys provided as requested. Fire exit doors to be clearly marked and fitted with suitable panic bolt.

- Shall be provided such that the window area available is not less then 10% of the floor area. Opening windows for ventilation shall be provided at not less than 5% of the floor area. Also all windows to have flyscreens. Floor to ceiling height shall not be less than 2.4 meters.

- Windows shall be fitted externally with security grilles or opening shutters as appropriate and internally with venetian or other suitable sun blinds.

- Adequate lighting facilities such that a general level of 200 lux minimum and as appropriate to the use of room areas shall be provided.

- Adequate electrical power supply points shall be provided of sufficient number to suit the use of the room areas. The following minimum provision will be required:

| | |
|---|---|
| Photocopy / administration rooms | 6 outlets |
| Kitchens | 4 outlets |
| Toilets | 1 outlet |
| Showers | none |
| All other rooms | 4 outlets |

Allow for 2 additional outlets to the above (if required).

Service ducts are to be installed to all offices and working areas to allow the installation of a telephone system.

- The area for the site accommodation shall be cleared and prepared prior to the erection of the facilities.

- Suitable bitumen macadam or similar hardstandings, footways, car parking areas incorporating adequate drainage provision shall be provided adjacent to the office.

- All accommodation shall be cleaned daily and adequate attendance for maintenance and servicing of the accommodation shall be provided.

- Adequate numbers of fire extinguishers/smoke detectors and other appropriate fire fighting measures shall be made.

- Adequate external security/amenity lighting shall be provided in the areas around and adjacent to the accommodation and car parking areas.

Offices shall at a minimum include:

- One (1) conference room with a surface area of at least 25 square meters.
- Two (2) offices with a surface area of at least 20 square meters.
- Eight (8) offices with a surface area of at least 12 square meters each.
- One (1) kitchen and pantries.
- Sanitary facilities ( 3 toilets, 4 wash basins, 2 showers).
- Storeroom.
- Entrance area with space for desk, waiting and seating area.
- Parking & car shade cover for 12 cars.

Submit full details to the Employer for Approval before delivery to the Site and erection.

Offices Equipment, Furniture & Computer workstations

The offices shall at a minimum comprise of the items listed in this document and presented in Tables 1 through 11. Additionally, they shall include blinds,  table-lamps, waste-paper baskets and all other miscellaneous items which can be reasonably expected. Upon Completion of the Work, processors and computers are to become the property of the Employer without any additional payments being due to the Contractor. The Contractor shall service and deliver them where directed.

Techwon

23

TABLE 6.1

## EXECUTIVE ASSISTANTS OFFICES
### (requirements per office for 2 offices)

| ITEM DESCRIPTION | AMOUNT REQUIRED |
|---|---|
| 1. Shelving 4m long x 0.3m wide - fixed to walls as directed. | 4 |
| 2. Upholstered gas height adjustable typists chair - contoured with back rest. | 2 |
| 3. L-shaped typists desk 1600mm x 800mm and 1000mm x 600mm. | 1 |
| 4. Upholstered side chair. | 1 |
| 5. 4 drawer document filing cabinet with indexed pocket files. | 4 |
| 6. Free standing lockable storage cupboard 1800mm high x 1000mm wide x 450mm design. | 1 |
| 7. Wastepaper basket. | 2 |
| 8. 4 tier beanstalk filing tray. | 2 |
| 9. Engineering computer system as detailed below; | 1 |
|    IBM Compatible Personal Computer System | |
|    Intel Pentium 2 233MHz with 265k cache | |
|    32Mbytes RAM | |
|    x 2 no. 4 Gig hard disc drive, IDE & Controller | |
|    1Mb SVGA PCI graphics card | |
|    3.5" floppy drive, 24 speed CD ROM drive | |
|    2 Serial ports, with 16550 UART | |
|    1 parallel port | |
|    Internal 28.8k Fax Modem & software | |
|    15" SVGA monitor | |
|    102 Key Microsoft keyboard | |
|    Microsoft mouse | |
|    Desktop case & speakers | |
| 10. Iomega LS-120 SuperDisk Drive (ZIP DRIVE), External Parallel | 1 in total for both offices |
|    MS Dos 6.22 & Windows 97 Software ; | |
|    MS Office Professional Software | |
| 11. Hewlett Packard Deskjet Colour Printer 1100C | 1 |
| 12. Hewlett Packard Laser Printer - Laserjet 5P | 1 |
| 13. Plain paper photocopier | 1 |
|    Ricoh FT 4022 or equivalent. | |
| 14. Plain paper facsimile machine, Ricoh 2700L | 1 |
| 15. Heavy Duty (A4) Paper shredder & waste container | 1 |
| 16. Network System to suit Office P.C system | ITEM |
| 17. Hewlett Packard Scanjet 5100C | 1 in total for both offices |
| 18. Heavy duty paper punches | 1 |
| 19. A4/A5 Wire punch book binding System plus wire spines | 1 |

Techstar

24

## TABLE 6.2

**MEETING ROOM**

| ITEM DESCRIPTION | AMOUNT REQUIRED |
|---|---|
| 1. Conference table 4m x 1.4m | 2 |
| 2. Small table 2in x 1m | 1 |
| 3. Upholstered side chair | 16 |
| 4. Cork or fiber notice board ~ 10m² fixed to walls as directed | 2 |
| 5. Wall (drawing) Whiteboard with pen holder | 1 |
| 6. Wastepaper basket | 2 |
| 7. Coat hooks - fixed to walls as directed | 20 |

## TABLE 6.3

**SOLIDERE & CONSULTANT PROJECT MANAGERS** (requirements per office for 2 offices)

| ITEM DESCRIPTION | AMOUNT REQUIRED |
|---|---|
| 1. Double Pedestal desk 1.8m x 0.8m with lockable drawers | 1 |
| 2. High back upholstered swivel desk armchair on casters | 1 |
| 3. Table 2m x 1m | 1 |
| 4. 4 drawer lockable filing cabinet with indexed pocket files | 2 |
| 5. Adjustable desk lamp | 1 |
| 6. Cork or fibre notice board, 5m² - fixed to walls as directed. Plus Drawing Whiteboard 5m² | 1 1 |
| 7. Upholstered side chair | 2 |
| 8. Book case | 1 |
| 9. Shelving 4m long x 0.3m wide - fixed to walls as direc | 1 |
| 10. Waste paper basket | 1 |
| 11. Free standing lockable storage cupboard 1800mm high x 1000mm wide | 1 |
| 12. 4 tier hepnstalk filing tray | 1 |
| 13. Coat hook -fixed to walls as directed | 6 |
| 14. Couch seating for 4 persons and coffee table | 1 in total(for Solidere PM) |
| 15. Laptop computer system as detailed below: IBM Compatible laptop computer | |

```
Pe2.. 233MHz CPU
64Mb RAM
1.4Gb hard disc
SVGA capability
3.5" internal floppy drive
CD (internal) x24 ROM
Serial port
PCMCIA Slot plus fax modem internal 28.8 kps card
TFT colour screen
Built-in mouse device
28.8 PCMCIA Fax Modem and Software
MS DOS 6.22 & Windows 97 Software
MS Office Professional Software
Microsoft Project Management Software
```

## TABLE 6.4

| SENIOR ENGINEERING STAFF - (requirements per office for 3 offices) | |
|---|---|
| ITEM DESCRIPTION | AMOUNT REQUIRED |
| 1. Double Pedestal desk 1.8m x 0.8m with lockable drawers | 1 |
| 2. High back upholstered swivel desk armchair on castors | 1 |
| 3. Table 2m x 1m | 1 |
| 4. 4 drawer lockable filing cabinet with indexed pocket files | 1 |
| 5. Adjustable desk lamp | 1 |
| 6. Cork or fibre notice board, 3m² - fixed to walls as directed. | |
| 7. Upholstered side chair | 4 |
| 8. Book case | 1 |
| 9. Shelving 4m long x 0.3m wide - fixed to walls as directed | 1 |
| 10. Waste paper basket | 1 |
| 11. 4 tier beanstalk filing tray | 1 |
| 12. Free standing lockable storage cupboard 1800mm high x 1000mm wide | 1 |
| 13. Coat hook - fixed to walls as directed | 5 |
| 14. IBM Compatible Personal Computer System<br>Intel Pentium P2  233MHz CPU<br>64 Mbytes RAM<br>4 Gig Hard Disc Drive, IDE & Controller<br>1Mb SVGA PCI graphics card<br>ATIXPERT 98 3D Card<br>3.5" floppy drive, 24 speed CD ROM drive<br>2 Serial ports, with 16550 UART<br>1 parallel port<br>Internal 28.8k Fax Modem & software<br>15" SVGA monitor<br>102 key Microsoft keyboard<br>Microsoft mouse | A total of 2 systems for the 3 offices |

Desktop case & speakers
All Computers (incl laptops) Networked within office
MS Dos 6.22 or later & Windows 97 Software
MS Office Professional Software
Microsoft Project Management Software
AutoCad 14 Software
· All Software to have Hardcopy Technical Manuals
15. Hewlett Packard Colour inkjet for *2 senior Staff members

*To be allocated
2

TABLE 6.5

| ENGINEERS (requirements per office for 3 offices) | |
| --- | --- |
| **ITEM DESCRIPTION** | **AMOUNT REQUIRED** |
| 1. Double pedestal desk 1.8m x 0.80m with lockable drawers | 2 |
| 2. Upholstered swivel desk armchair on castors | 2 |
| 3. Desk lamp | 2 |
| 4. Upholstered side chair | 4 |
| 5. Table 1.5m x 0.75m | 2 |
| 6. AO size vertical plan storage cabinet | 1 |
| 7. 4 drawer filing cabinet with index pocket files | 3 |
| 8. Wastepaper basket | 2 |
| 9. Cork or fibre notice board – 4m², fixed to walls as directed PLUS Drawing Whiteboard - 4m² fixed to wall | 1 |
| 10. Shelving 4m x 0.3m - fixed to walls as directed | 1 |
| 11. Coat hooks - fixed to walls as directed | 6 |
| 12. 4 tier beanstalk filing tray | 2 |
| 13. AO twin column height and angle adjustment drawing stand with AO drawing board and parallel motion | 1 |
| 14. Free standing lockable storage cupboard 1800mm high x 1000mm wide | 1 |
| 15. Upholstered draughtsman's chair with gas height adjustment | 1 |
| 16. Anglepoise lamp for drawing board | 1 |
| 17. IBM Compatible Personal Computer System | A total of one system for the 3 offices |
|    Intel Pentium P2  233MHz CPU | |
|    64 Mbytes RAM | |
|    4 Gig Hard Disc Drive, IDE & Controller | |
|    1Mb SVGA PCI graphics card | |
|    ATIXPERT 98 3D Card | |
|    3.5" floppy drive, 24 speed CD Rom drive | |
|    2 Serial ports, with 16550 UART | |
|    1 parallel port | |
|    Internal 28.8k Fax Modem & software | |
|    15" SVGA monitor | |
|    102 key keyboard | |
|    Microsoft mouse | |
|    Desktop case & speakers | |
|    All Computers (incl laptops) Networked within office | |
|    MS Dos 6.22 or later & Windows 97 Software | |
|    MS Office Professional Software | |
|    AutoCad 14 Software | |
|    Microsoft Project Management Software | |
|    All Software to have Hardcopy Technical Manuals | |

## TABLE 6.6

**KITCHEN**

| ITEM<br>DESCRIPTION | AMOUNT<br>REQUIRED |
|---|---|
| 1. 10cu.ft. refrigerator | 1 |
| 2. 1000 watt combination (grill, convection oven and microwave) oven – 0.9cu.ft. internal capacity. | 1 |
| 3. 2 bowl stainless steel sink with draining boards, base unit and cold water supply | 1 |
| 4. Electric instant hot water heater above sink | 1 |
| 5. Automated Arabic coffee maker | 1 |
| 6. Single burner gas ring with gas and kettle | 1 |
| 7. Filter coffee maker/coffee machine | 1 |
| 8. Set of coffee/tea cups and saucers (16 items per set) | 1 |
| 9. Milk jug and sugar set for item 9 | 1 |
| 10. Coffee/Tea spoons for item 9 | 12 |
| 11. Tray 0.75 x 0.6m approx. | 1 |
| 12. Crockery set | 2 |
| (Soup, meat, sweet and side plate) | |
| 13. Non-stick saucepan set | 1 |
| (1 large, 1 medium, 1 small) | |
| 14. Teapot (large) | 1 |
| 15. Teapot (small) | 1 |
| 16. Coffee mugs | 20 |
| 17. Condiment set | 1 |
| 18. 24 Piece stainless steel cutlery set | 1 |
| 19. 6 piece kitchen tool set and rack | 1 |
| 20. 5 piece kitchen knife set | 1 |
| 21. Chopping board | 1 |
| 22. Tin opener | 1 |
| 23. Glass tumblers | 20 |
| 24. Kitchen work top with storage cupboards below and wall cupboards over – 3 linear metres fixed as directed | 1 |
| 25. Extractor fan - fixed through external wall as directed | 1 |
| 26. First aid cabinet for 18 persons | 1 |
| 27. Kitchen bin with liners | 2 |
| 28. Fire blanket | 1 |
| 29. Tea towels | 12 |
| 30. Hand towels | 6 |
| 31. Chilled drinking water dispenser with supply of Mineral Water | 1 |
| 32. Tiled floor and walls | ITEM |
| 33. Floor mop and mop bucket | 1 |
| 34. Sweeping brush and dust pan set | 2 |
| 35. Disposable plastic cups | ITEM |
| Supply of Tea, Coffee, Milk and Sugar (as required) | ITEM |

TABLE 6.7

TOILETS ( requirements for 3 rooms)

| ITEM DESCRIPTION | AMOUNT REQUIRED |
|---|---|
| 1. W C suit complete with water supply and waste | 1 |
| 2. Wash hand basin with cold and hot water supply and waste | 1 |
| 3. Wall mounted urinal with water supply and waste | 1 |
| 4. Mirror fixed above wash hand basin 500mmx300mm | 1 |
| 5. Paper towel dispenser with supply of towels | 1 |
| 6. Coat hooks - fixed as directed | 6 |
| 7. Hand towels | 18 |
| 8. Suitable partitions/doors with latches indicator bolts/locks etc. as necessary | ITEM |
| 9 Walls and floor tiled | ITEM |
| 10. Extractor fan fixed through external wall as directed | 1 |
| 11. Toilet brush and holder | 1 |
| 12. Toilet roll holder & toilet rolls (as required) | 1 |
| 13. Male/Female door signs | 1 |

TABLE 6.8

SHOWER ROOM (requirements for 2 rooms)

| ITEM DESCRIPTION | AMOUNT REQUIRED |
|---|---|
| 1. Shower cubicle with hot water heater, cold water supply and waste | 1 |
| 2. Wash hand basin with cold and hot water supply and waste | 1 |
| 3. Mirror fixed above wash hand basin {500mmx300mm} | 1 |
| 4. Electric wall mounted hand/hair drier unit | 1 |
| 5. Coat hooks - fixed as directed | 6 no. |
| 6. Soap holder for shower | 1 |
| 7. Stackable plastic side chair | 1 |
| 8. Non-slip shower mat | 2 |
| 9. Bath towels (2 per Staff Member) | 30 |
| 10. Toilet brush and holder | 1 |
| 11. Toilet roll holder | 1 |
| 12. Suitable partitioning/doors with latches/indicator bolts/locks etc. as necessary | 1 |
| 13. Walls and floor fully tiled | 1 |
| 14. Automatic Washing Machine/Dryer (fitted) | 1 |

TABLE 6.9

RECEPTION AREA  (requirements for 1 room)

| ITEM DESCRIPTION | AMOUNT REQUIRED |
|---|---|
| 1. Reception Desk and Chair/stool | 1 |
| 2. Answering Machine | 1 |
| 3. Couch seating for 6 persons and coffee table | ITEM |
| 4. Telephone Exchange system | 1 |

Miscellaneous Items for each Site office

- Fire extinguisher/Smoke detector
- Window blinds
- Kettle (3 in total)

Site Layout

The Site offices shall be detached completely from the Contractor's own offices and shall be provided with an access road not less than 3.0 m wide and a parking area surfaced with a bitumen macadam - See Office requirements section.

6.2  Office Materials

The Contractor shall at his own expense provide the Employer, the Construction Manager and the Technical Controller throughout the duration of the Contract with all stationery and other materials and supplies as can reasonably be expected to be required for the running of the Site offices. An initial supply as listed below is to be provide by the Contractor.

TABLE 6.10

| OFFICE MATERIALS - GENERAL | |
|---|---|
| ITEM DESCRIPTION | AMOUNT REQUIRED |
| 1. Fibre door mats (large) | 4 |
| 2. Paper punch 2 hole, A4 paper size | 14 |
| 3. Office stapler | 14 |
| 4. SLR 35mm camera with 35mm to 75mm zoom lens, data recording back, flash and carrying case | 1 |
| 5. 3.5" computer disk storage cabinet 20 disk capacity | 14 |
| 6. HD 1.44 Kbyte 3.5" computer floppy disk | 280 |
| 7. Ball point pen | 20 off each |
| Fine and medium point with red, black and blue inks | |
| 8. A4 size ruled writing pads | 100 |
| 9. Note books A6 size | 100 |
| 10. A4 photocopy/printer paper | 100 reams |
| 11. Post-it notes (100 sheets) - 76 x 127 and 38 x 51 mm sizes | 50 pads of each |
| 12. Staples to suit stapling machines (Item 3) | 30 boxes |
| 13. Highlight marker pens (set of 8 colours) | 42 sets |
| 14. Scotch draughting tape | 12 rolls |
| 15. Scotch "magic" tape | 45 rolls |
| 16. Paper clips (box of 100) | 30 No |
| 17. Tippex correction fluid/pens | 24 bottles/pens |
| 18. Lever arch files A4 size | 200 No |
| 19. Envelopes - various sizes to suit A4 paper | 100 of each |
| 20. Kodak 36 Slide Films | 100 Rolls |
| 21. Scale Rules | 14 no |
| 22. Iomega Zip discs | 30 no. |
| 23. Computer Anti-glare filter screens (for all PCs if needed) | ITEM |

**TABLE 6.11**

### SAFETY EQUIPMENT

(Safety equipment requirements per person is listed below, The Contractor shall provide for 16 persons - Prior to purchase the contractor shall provide samples for review and approval by the Employer)

1. Steel soleplate/toe capped safety boots
2. Rubber Gum boots
3. High visibility vests - Canary Yellow with reflective strips
4. High visibility (detachably lined) water proof jackets with hoods - Colour as above etc
5. Hard Hats with ear protectors - Colour coded
6. Tinted safety glasses
7. Goggles
8. Dust Masks
9. Dust Masks carbon filter lined
10. High pitched whistles
11. Heavy duty rubber gloves
12. Workman's gloves

• Additionally the Contractor shall provide a minimum of 3 full sets of specialized safety equipment to inspect the works as required.

• The Contractor shall provide 2 full sets (for 16 persons) of First Aid Equipped Boxes. One of them is to be fixed within the Employers office and the other is to be mobile for site use.

### 6.3 Notice Boards

a  The Contractor shall provide and install two project sign boards, written as directed by the Employer.    The dimension of the sign boards shall be 2.0 x 1.0 m minimum, and the specifications shall be as directed by the Employer. The text shall be written in three languages.

b) The sign boards are to be erected at the positions directed by the Employer. The sign boards shall be maintained in good order, for the duration of the Contract, by the Contractor, and at his expense.

c) Upon Completion of the Works, the project sign boards and supports shall be dismantled and removed from the Site.

### 6.4  Vehicles And Other Facilities And Services For The Employer

#### 6.4.1 Vehicles

a) The Contractor shall provide three (3) brand new vehicles as specified herein for the exclusive use of the Employer and whomsoever it may designate from time to time for the duration of the Contract.

b) The vehicles provided shall conform to the following requirements:

- Four wheel drive, four door, air conditioned, with gasoline engine.

- The vehicle shall be of minimum 3 liter type engine, complete with spare tyre and tyre replacement equipment. Free running hubs with lock 4 wheel settings.

- Vehicle shall also be equipped with ventilated front disk brakes, and leading-trailing rear drum brakes. The rear differential lock, distributing torque equally to both rear wheels shall be controlled with a switch from the front cockpit.

- Windshield wipers shall be provided at front and rear windows. Provide two additional halogen beam lamps, front bumper mounted.

c   Prior to purchasing the vehicles the Contractor shall provide complete, detailed factory specifications for review by the Employer.

d)  The Contractor shall be responsible for the required permits to use gasoline engine cars in Lebanon.

e)  All costs for providing the vehicles, including purchase price, all duties and/or taxes, registration fee, vehicle preparation fees, handling and delivery are included in the Contract Price.

f)  All operating and maintenance costs, service, fuel costs and insurance for the duration of the Contract are included in the Contract Price.

g)  Each vehicle shall have a competent driver during normal working hours. The vehicles are to remain in the possession of the Employer and its staff for their use after normal working hours.

### 6.4.2   Communications

a) Radio

The Contractor shall obtain necessary permits for and shall provide, install, service, and maintain a radio communication service to be operated from the Site office of the Employer. This shall be such that will permit 24 hour communication between the Employers Site office and the Employer's staff at all points of the Site (at least 7 communication units including spare batteries and multiple chargers should be provided). The Contractor shall pay all fees and licenses required.

b) Telephone

The Contractor shall arrange for and provide the installation of telephone line in each of the Site offices and shall arrange for and provide two (2) cellular phone lines and apparatuses. The Contractor shall make all necessary arrangements with the appropriate authorities for the provision, installation and maintenance of the telephones and shall pay all charges and fees in connection therewith and all local telephone calls made

The Contractor shall provide separate telephone connections for these offices, with extensions for each office, secretary and conference room and shall pay all charges except the cost of international calls.

### 6.4.3    Security Services for the Employer

The Contractor at its own cost shall provide adequate security at all times for the offices and vehicles furnished by it for the duration of the Contract.

### 6.4.4    Fueling and Servicing of Vehicles

a) The Contractor will provide full service, fuel and regulatory scheduled maintenance for the vehicles furnished by it.

b) The Contractor will also be responsible to service and repair, as necessary, the vehicles and to provide a temporary replacement for any vehicle while it is being serviced or under repair.

c) The vehicles shall be provided by the Contractor within thirty (30) Days of the date of Notice to Proceed.

### 6.5    Programme Requirements

a  The Site office facilities shall be completed and made available within one hundred twenty (120) Days of the Notice to Proceed. Should the Contractor fail to make the facilities available within the one hundred twenty (120) Days stipulated, it shall at its own expense rent or otherwise provide equivalent temporary office facilities to the approval of the Employer.

b) The Contractor shall at its own expense rent or otherwise provide, to the approval of the Employer, equivalent temporary offices and accommodation, throughout the one hundred twenty (120) Day period stipulated above.

c) The Vehicles shall be made available within sixty (60) Days of the Notice to Proceed. Should the Contractor fail to make the vehicles available within the sixty (60) Days stipulated, it shall at its own expense rent or otherwise provide equivalent temporary transportation to the approval of the Employer.

### 6.6    Reversions

a  Upon completion of the Contract, the Site offices, accommodation, appurtenances, fixtures, fittings, furniture and all other items specified to be furnished by the Contractor shall become the property of the Employer without any additional payments being due to the Contractor.

b) Upon Completion of the Works, ownership of the vehicles shall revert to the Employer without any additional payments being due to the Contractor.

### 6.7    Temporary Sanitary Facilities

a  For all temporary buildings on the Site, waste water shall be treated in order to avoid contamination of the surroundings.

b) The whole Site shall be kept clean and tidy. All refuse shall be deposited in an area specially

### 6.8  Attendance

The Contractor shall provide the attendance and personnel which may be required by the Employer in relation to preparation of the daily statements and works supervision, such as messengers, chain-men, watchmen, and the like, whether required permanently or on an occasional basis.

### 6.9  Publicity And Signboards

All publicity is prohibited on Site. This prohibition does not apply to signs showing the Contractor's name, the type of Works executed and the vbodies concerned. These notices shall be installed by the Contractor, after Approval of the wording, size and presentation by the Employer.

### 6.10  Clearance Of Site On Completion

After having cleared away and removed from the Site all Constructional Plant and Temporary Works, the Contractor shall restore the whole of the Site to a tidy condition. This restoration shall involve but is not limited to removing all protection of concrete foundation structures, metal parts, etc.

### 6.11  Weather And Meteorological Recording

a   The Contractor shall at his own expense furnish and maintain in good working order for the duration of the Contract, the following instruments and their necessary appurtenances to be used by the Employer in recording weather and meteorological data. The instruments shall be installed at the as directed by the Employer.

b)  The instruments required are:

- rain gauge;
- anemometer;
- recording barometer, with supply of charts;
- maximum-minimum thermometer.

c)  The instruments shall be supplied within 45 Days of Notice to Proceed.

### 6.12  Survey Equipment And Staff

a   The Contractor shall make available to the Employer surveying instruments, equipment, and workmen upon the Employer's request from time to time so as the Employer may undertake its own surveying duties.

b)  The workmen shall be selected for their capability to perform the required functions and knowledge of the English language and, so far as possible, the same men shall be provided throughout the Contract Period.

### 6.13  Printed Forms

The Contractor shall at his own expense provide the Employer with such printed forms as the Employer may require for the administration, supervision and control of the Works. The style, layout, quality and quantity of forms shall be as the Employer may determine.

## 7.0    INFORMATION MADE AVAILABLE TO THE CONTRACTOR

The following is a list of the available information provided to the Contractor by the Employer:

- Drawing # 002        BCD Master Plan.
- Drawing # 003        Site Propagation Plan.
- Drawing # 004'A      Current Site Survey.
- Drawing # 004 B      Base Survey for Phase I Stockpiles.
- Drawing # 007        Bureau D'Etudes Topographiques 3 DWGS (1,2,3), Calculations and Bathymetric.
- Drawing # 008        Plan Layout of Marine Works.
- TURBA Additional Soil Investigation Report, September 1997,
- Chemical Analysis Results of Samples from TURBA.
- Approximate Particle Size Distributions Phase I and Phase 2 Waste.
- Phase 1 Chemical Analysis Results.
- FAIRHURST Report F/I/D/35416/03 April 1996 Amended October 1997 "Final Site Quality".
- Preliminary Programme for the Marine Works.
- Brief Description of the Marine Works and Effects on the Phase 2 Reclamation Works.
- Summary Detail of the Waste Processing Plant (WPP).
- WPP Design and Built Document, including DUOS Quotation dated October 6, 1997 .
- List of the WPP Spare Parts Provided by the Employer.
- Notice Provisions for the Crushing Plant.
- Notice Provisions for BCB Batching Plant.
- Telephone cables.
- Dames & Moore Environmental and Geotechnical Assessment Report February 1994.
- Waste Processing Plant Training Program, date 22 October 1998
- Waste Processing Plant Taking Over Program, date 25 November 1998 .

The attached Drawing RJ01 supersedes previous drawings.

APPENDIX A (To Technical Conditions of Contract)

## RULES, PROCEDURES AND REGULATIONS FOR THE EXECUTION AND COMPLETION OF WORKS IN THE BCD

APPENDIX B (To Technical Conditions of Contract)

## REGULATIONS AND PLANNING OF BEIRUT CENTRAL DISTRICT AND SECTORS A, B, C AND D

## Addendum No 1

To the Contract signed on the 25 of January 1999 between the Lebanese Company for the Development and Reconstruction of Beirut Central District S.A.L (the "Employer") and Radian International LLC (the Contractor")

Whereas both parties have signed a Contract (the "Contract") for the treatment of the Normandy Landfill located in the Beirut Central District.

Whereas both parties have agreed to bring some modifications to the Maximum Cumulative Payment Amount mentioned in Attachment 3 to Exhibit 3 of the General Conditions.

Whereas both parties have also agreed to change the Intermediate Milestones mentioned in Exhibit 5 to the General Conditions and in table 5.1 of the Technical Conditions.

Therefore, it has been agreed between the Employer and the Contractor as follows:

1- To replace the table provided under Attachment 3 to Exhibit 3 of the General Conditions (Maximum Cumulative Payment Amount) by the table provided in Annex 1 to this Addendum.

2- a) Paragraphs 3 and 4 of Exhibit 5 to the General Conditions (Programme and Milestones) will be modified as follows:

Excavation and filing of section 1 must be completed within three hundred and sixty (360) days as from the issuance of the Notice to Proceed.

Excavation and filing of Section 2 must be completed within five hundred and fifty (550) days as from the issuance of the Notice to Proceed.

b) The date for completion mentioned in table 5.1 (Phasing Requirements) of the Technical Conditions will be modified as follows:

Section 1: All works within 360 days as from the issuance of the Notice to Proceed.

Section 2: All works within 550 days as from the issuance of the Notice to Proceed.

All other terms of the Contract are still applicable.

This Addendum forms part and shall be read in conjunction with the Contract.

The Lebanese Company for the Development and Reconstruction of Beirut Central District S.A.L

by :

Name: Nasser Chammaa

Title: Chairman - G.M,

Date: Feb 18 1999

Radian International LLC

by :

Name: Stanley Porhilo

Title: Srivice - President

Date: Feb 18, 1999

## ANNEX 1

| Maximum Cumulative Payments Amount (amounts invoiced) | |
|---|---|
| 1999 | |
| january | |
| february | $ 12,300,000 |
| march | $ 12,300,000 |
| april | $ 12,300,000 |
| may | $ 12,300,000 |
| june | $ 12,300,000 |
| july | $ 12,300,000 |
| august | $ 12,300,000 |
| september | $ 12,300,000 |
| october | $ 12,300,000 |
| november | $ 13,350,000 |
| december | $ 14,400,000 |
| 2000 | |
| january | $ 15,450,000 |
| february | $ 16,500,000 |
| march | $ 17,550,000 |
| april | $ 18,600,000 |
| may | $ 19,650,000 |
| june | $ 20,700,000 |
| july | $ 21,750,000 |
| august | $ 22,800,000 |
| september | $ 23,850,000 |
| october | $ 24,900,000 |
| november | $ 25,950,000 |
| december | $ 27,000,000 |
| 2001 and after no limit | |




**SOLIDERE**

# Addendum Agreement N° 2
## to the Contract

*Between*

### The Lebanese Company for the Development and Reconstruction of Beirut Central District S.A.L.

*and*

### Radian International LLC

*for*

## Normandy Landfill Treatment Contract
## Phase II



The Lebanese Company for the Development and Reconstruction of Beirut Central District, s.a.l.
Capital 1,650,000,000 US$ Fully Paid. Commercial Register 67000 Beirut.
Building 149, Saad Zaghloul Street, off Foch Street, P.O. Box 119493 Beirut, Lebanon.
Tel. (01) 980650 - 981550, Fax (01) 980661 - 980662
e-mail: solidere@solidere.com.lb



To the Contract signed on the 25th of January 1999 between the Lebanese Company for the Development and Reconstruction of Beirut Central District.S.A.L (the "Employer") and Radian International LLC (the "Contractor"), and Addendum N° 1 dated 18th February 1999.

WHEREAS, both parties have signed a Contract (the "Contract") for the treatment of the Normandy Landfill Phase 2 located in the Beirut Central District.

WHEREAS, the Contractor has submitted a Claim (N° 1) and Request for Change Order (N° 1) in relation to the DUOS Waste Processing Plant.

WHEREAS, The Contractor has requested a change in the Time for Completion for the Whole of the Works. In addition, the Contractor has proposed the re-phasing of the Works. The re-phasing consists of the completion of the Works, from the west to the east, in segments stretching across the entire site from north to south. The Contractor has also requested the deletion of the Intermediate Milestones mentioned in Exhibit 5 to the General Conditions of Contract and in table 5.1 of the Technical Conditions.

NOW, THEREFORE, the Employer and Contractor agree as follows:

1. Paragraphs 2, 3 and 4 of Exhibit 5 to the General Conditions (Programme and Milestones) are hereby modified as follows:

    "All works must be completed within sixty (60) calendar months from the date of the Notice to Proceed.

    Excavation and filling of Section 1: Intermediate Milestone deleted.

    Excavation and filling of Section 2: Intermediate Milestone deleted.

    Excavation of Sections 1, 3, 4 and that part of Section 2 west of the line (and its projection) between Sections 5 & 4 together with backfilling of Section 1 and the above-mentioned part of Section 2 must be completed within 1090 days as from the issuance of the Notice to Proceed, Completion of these works by the due date constitutes an Intermediate Milestone in accordance with the Contract."

2. The dates for completion mentioned in table 5.1 (Phasing Requirements) of the Technical Conditions are hereby modified as follows:

    Section 1:        Milestone date deleted.

    Section2:        Milestone date deleted.

2



Excavation of Sections 1, 3, 4 and that part of Section 2 west of the line (and its projection) between Sections 5 & 4 together with backfilling of Section 1 and the above-mentioned part of Section 2 must be completed within 1090 days as from the issuance of the Notice to Proceed.

Whole of the Works: All works within 60 calendar months from the Notice to Proceed.

3. No additional costs shall be paid by the Employer to the Contractor in respect of the extended completion dates. Therefore, the Contract Price shall remain unchanged in relation with items 1 and 2. The Contractor hereby waives all rights in respect of such extended completion dates.

4. In an addition to the Contract Price the Employer agrees to:

   i.   Reimburse the Contractor, no later than September 15th, 2000, for the direct cost, FOB the site, of the Wildcat Trommel Model 6-280 which was delivered to the project on July 26, 2000, and

   ii.  Reimburse the Contractor, within 60 days of delivery to site, for the direct cost, FOB the site, of a Wildcat Trommel Model 6-280. The Wildcat Trommel Model 6-280 shall be of the same specifications as the trommel delivered on July 26, 2000.

   iii. Pay the Contractor the amount of $120,000 (One Hundred and Twenty Thousand U.S. Dollars) in full and final settlement of the Contractor's Claim N° 1.

   iv.  Pay the Contractor the additional amount of $240,000 (Two Hundred and Forty Thousand U.S. Dollars) in one lump sum payment.

5. The Contractor hereby:

   i.   Withdraws the Request for Change Order No.1 submitted under cover of its letter ref. ABO/CM/096 dated 19th November 1999.

   ii.  Waives irrevocably and unconditionally its right to any past, present or future claims or Change Orders in respect of the design specifications for, the performance of, and any other matters whatsoever related directly or indirectly to the DUOS WPP.

   iii. Waives all rights to make any claims or request any Change Order in respect of the delay in the issuance of the letter of credit by the Employer.

3





All rights of the Contractor to claim any extension to the Time for Completion and/or any increase to the Contract Price, in respect of the above items (i)-(iii) inclusive, are hereby finally and irrevocably waived.

6. The Contractor shall submit a detailed loaded programme fully in accordance with G.C. Clause 21 for the proposed re-phasing of the Works no later than 30 days from signature of this addendum to Contract.

7. Payments in accordance with items 4 (iii) and 4 (iv) shall be made within 30 days following submittal of the requisite detailed programme as in item 6.

8. Liquidated damages in accordance with clauses 22.3 and 22.4 of the General Conditions and clause 6 of the Agreement shall be applicable in the event the Contractor fails to complete the Works, or any specified section thereof, in accordance with the revised dates for completion specified in items 1 and 2 hereof.

Items 1 & 2 of this Addendum supercede Clause 2 of Addendum N° 1.

All other terms of the Contract (and Addendum N° 1) shall remain applicable.

This Addendum forms part of and shall be read in conjunction with the Contract.

01537

IN WITNESS WHEREOF the Employer and the Contractor have caused this Addendum Agreement to be duly executed the day, month and year set forth hereunder.

Employer:-                                    Contractor:-

The Lebanese Company for the Development         Radian International LLC
And Reconstruction of Beirut Central District

By:                                           By:

Name: MAHER Y. BEYDOUN                        Name:

Title: VICE-CHAIRMAN                          Title:

                                              Date:

# EXHIBIT D

## PROFESSIONAL CONSULTANCY SERVICES AGREEMENT

### BETWEEN

## THE LEBANESE COMPANY FOR THE DEVELOPMENT AND RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT, S.A.L

### AND

## PAUL C. RIZZO ASSOCIATES INC.

## COMMERCIAL AND TECHNICAL FEASIBILITY OF MULTI-USE LAND DEVELOPMENT ON THE RECLAIMED LAND

# TABLE OF CONTENTS

**Article N°**                                                                    **Page N°**

1.  Engagement ...................................................................................... 1
2.  The Consultant's Obligations, Representations and Warranties,
    Responsibilities and Guarantee ...................................................... 1
3.  Obligations of the Employer ........................................................... 2
4.  Termination by the Employer ......................................................... 2
5.  Termination by the Consultant ....................................................... 3
6.  Force Majeure .................................................................................. 3
7.  Administration; Communications; Approvals ................................ 4
8.  Supply of Personnel ........................................................................ 4
9.  Confidentiality; Use of Employer's Name; Signs .......................... 5
10. Ownership of Documents; Intellectual Property ............................ 5
11. Notices ............................................................................................. 6
12. Applicable Law ............................................................................... 6
13. Resolution of Disputes .................................................................... 7
14. General Provisions .......................................................................... 7

## Exhibits to the Agreement

1.  Terms of Reference and Description of the Services.
2.  Schedule.
3.  Payment Provisions.
4.  Insurance.
5   Key Employees
6.  U.S. Trade and Development Agency Mandatory Clauses

(i)

## AMENDMENT NO. 1

### TO THE CONTRACT BETWEEN
THE LEBANESE COMPANY FOR THE DEVELOPMENT AND RECONSTRUCTION OF
BEIRUT CENTRAL DISTRICT, S.A.L.
AND
PAUL C. RIZZO ASSOCIATES

The Contract between the Lebanese Company for the Development and Reconstruction Beirut
Central District, S.A.L. ("The Client") and Paul C. Rizzo Associates ("the Consultant") dated
September 9, 2003 to provide consulting services and prepare a feasibility study on the proposed
Reclaimed Land Multi-Use Development Project in Lebanon is hereby amended as follows:

1. Article 4 entitled "TERMINATION BY THE EMPLOYER" is amended by adding as
   Article 4.4 the following wording:

   > If the employer terminates the agreement, it must provide written notice to
   > USTDA.

2. Article 5 entitled "TERMINATION BY THE CONSULTANT" is amended by adding as
   Article 5.1 the following wording:

   > If the consultant terminates the agreement, it must provide written notice to
   > USTDA.

3. Article 6 entitled "FORCE MAJEURE" is amended by adding as Article 6.5 the
   following wording:

   > The parties shall provide USTDA with any written notice that either party is
   > terminating the agreement because of Force Majeure.

4. Article 9 entitled "CONFIDENTIALITY: USE OF EMPLOYER'S NAME: SIGNS" is
   amended by adding as Article 9.3 the following wording:

   > The parties understand that the requirement to keep the agreement confidential
   > does not apply to USTDA.

5. Article 10 entitled "OWNERSHIP OF DOCUMENTS: INTELLECTUAL PROPERTY"
   is amended by adding as Article 10.5 the following wording:

   > Subject to Clause H of Annex II entitled "USTDA Mandatory Contract Clauses,"
   > USTDA has an unlimited right in the Public Version of the Final Report to use,
   > disclose, reproduce, prepare derivative works, distribute copies to the public,

perform publicly; in any manner and for any purpose and to have or permit others to do so.

In all other respects and to the extent not amended by this Amendment No. 1, the provisions of the Contract shall remain the same and govern.

The Client and the Consultant have caused this Amendment No. 1 to the Contract to be signed by their responsible and authorized representatives effective as of September 9, 2003.

For the Client:

Dated:_____

For the Consultant:

Dated:_____

## PROFESSIONAL SERVICES AGREEMENT

This Professional Services Agreement and all Exhibits hereto (the "Agreement") is effective as of the ____ day of _____, 2003 by and between The Lebanese Company for the Development and Reconstruction of Beirut Central District, S.A.L. (the "Employer"), organized and existing under the laws of the Republic of Lebanon, with its registered office at Building 149 Marfaa, Saad Zaghloul Street, off Foch Street, PO Box 119493 Beirut, Republic of Lebanon and Paul C. Rizzo Associates Inc. a company organized and existing under the laws of Unites States of America · with its registered office at 105 Mall Boulevard, Monroeville, PA 15146 USA (the "Consultant").

The Employer and the Consultant agree as follows :

### 1.    ENGAGEMENT

1.1    The Employer engages the Consultant to execute and complete the services ("Services") described in Exhibit 1 and which consist in preparing a technical feasibility study of land uses in the reclaimed land in the Beirut Central District, within the time limits set forth in the schedule ("Schedule") set forth in Exhibit 2 (which time limits the Consultant acknowledges are of the essence), and in accordance with the terms and conditions set forth in this Agreement and its exhibits.

### 2.    THE CONSULTANT'S OBLIGATIONS, REPRESENTATIONS AND WARRANTIES, RESPONSIBILITIES AND GUARANTEE

The Consultant (i) agrees to perform the Services in accordance with the terms and conditions of the Agreement and accepts the relationship of loyalty, trust and confidence established between the Employer and the Consultant by the Agreement and covenants with the Employer to act as a faithful adviser to the Employer and to furnish professional standards of skill, care, diligence and professional judgment in the performance of its obligations and responsibilities under the Agreement and to cooperate in furthering the best interests of the Employer; (ii) agrees to furnish efficient business administration and superintendance and to oversee the completion of the Services in the most sound way and in the most expeditious and economical manner consistent with the best interests of the Employer; (iii) agrees to provide to the Employer Services which are free from any errors, omissions or defects and which are fit for the purpose intended, if any; (iv) shall at all times act as an independent Consultant and not as the employee, servant or agent of the Employer; (v) agrees to comply with the requirements (if any and/or applicable) pertaining to insurance set forth in Exhibit 4; (vi) agrees to comply in all respects with the provisions of any applicable rule, regulation, technical norm, standard or law including, without limitation, those expressly referenced in the Agreement; (vii) represents and warrants to the Employer that (a) it is a skilled professional and is fully qualified and has a sufficient number of skilled personnel to perform the Services in full compliance with the terms and conditions of the Agreement; (b) it will inform the Employer in writing, if at any time, it does not have sufficient facts and information to carry out, within the specified time periods, the Services and all of its obligations under the Agreement; (viii) certifies that it has not entered into any agreement or arrangement of whatsoever nature, nor shall it enter into any such agreement or arrangement, with any employee or officer of the Employer or with any other person or entity whatsoever, for the payment of money or for the giving of any other type of favors or advantages, related to the Agreement or its performance of the Services; (ix) agrees that in connection with any error, omission, defect or failure of the Consultant in its performance of any obligation, in accordance with the terms and conditions of

the Agreement, and in connection with any breach of the Consultant in its performance of any obligation, term or condition of the Agreement, the Consultant shall be fully responsible and liable to the Employer for the full extent of any and all liabilities, loss, damage or additional costs and/or expenses incurred or suffered by the Employer as a result thereof; and (x) hereby guarantees the Services to the Employer to the full extent of applicable law and/or as expressly provided for in the Agreement.

## 3.    OBLIGATIONS OF THE EMPLOYER

3.1    The Employer agrees to furnish the Consultant with all necessary documents and information in a timely manner to enable the Consultant to comply with its obligations under the Agreement.

3 2    In consideration of the performance by the Consultant of the Services in accordance with the terms and conditions of the Agreement, the Employer agrees to approve the payment to be paid to the Consultant by the US trade and development Agency (USTDA) in accordance with the payment terms and conditions set forth in Exhibit 3.

## 4.    TERMINATION BY THE EMPLOYER

4.1.    In the event of any breach by, or failure of, the Consultant to comply with any of its obligations or responsibilities under the Agreement, the Employer may, without the need for legal proceedings or a court decision, terminate the Agreement in whole or in part and/or set-off any amounts otherwise due to the Consultant under the Agreement against any loss or damage the Employer may sustain as a result of such default, any other antecedent breach of the Consultant's obligations or responsibilities hereunder, and any such termination, if within fifteen (15) days after receipt of written notice from the Employer the Consultant fails to remedy such default. If the Consultant abandons the Services or becomes insolvent or makes an assignment for the benefit of its creditors, or files a petition for an arrangement, composition, or compromise with its creditors under any applicable law, or has a person or entity appointed to take charge of its assets or is in breach of the terms of Article 2 (x), then the Consultant shall be in default and the Employer may withhold any amounts otherwise due to the Consultant under the Agreement and/or without the need for legal proceedings or court decision, terminate the Agreement in whole or in part.

4.2    The Employer may, at its sole option, at any time and/or in case the USTDA grant agreement signed with the Employer is terminated, terminate the Agreement in whole or in part, by a written notice of termination specifying the extent to which performance of the Services under the Agreement is terminated, and the date upon which such termination is to become effective (which in no event shall be earlier than thirty (30) days from receipt of such notice). In the event of any such termination, the Consultant hereby waives any claims for damages, including loss of profits, but as the sole right and remedy of the Consultant, the Employer shall pay to the Consultant all amounts due and not previously paid to the Consultant for Services which have been satisfactorily performed in accordance with the Agreement prior to the effective date of termination together with any amounts, if any, to be reimbursed to the Consultant in accordance with Exhibit 3. The Consultant shall continue to receive payment in accordance with Exhibit 3 for the Services, if any, specified in the notice of termination as being required to be completed pursuant to the Agreement after the effective date of termination.

Commercial and Technical Feasibility of multi-use land development on the reclaimed land
Ref. Paul o-Rizzo_1

4.3    Upon any termination by the Employer, the Consultant shall deliver promptly to the Employer all documents and other information relating to the Services which have been provided to the Consultant under the Agreement.

## 5.    TERMINATION BY THE CONSULTANT

If the Employer becomes insolvent or is adjudicated as bankrupt, or has an involuntary petition in bankruptcy filed against it, or makes an assignment for the benefit of its creditors, or files a petition for an arrangement, composition, or compromise with its creditors under any applicable law, then the Employer shall be in default and the Consultant may without the need for legal proceedings or court decision, terminate the Agreement in whole or in part. Upon any termination as aforesaid, the Employer shall be liable to the Consultant for the full extent of any and all liabilities, loss and/or damage suffered by the Consultant, as a result thereof and the Consultant shall deliver promptly to the Employer all documents and other information relating to the Services which have been provided to the Consultant under the Agreement.

## 6.    FORCE MAJEURE

6.1    The term "Force Majeure" shall have the meaning understood under the Laws of the Republic of Lebanon, including, without limitation, riots, invasion, hostilities, civil war, rebellion, revolution, insurrection, outbreak of war in the Republic of Lebanon, whether declared or not, seismic shocks, ionizing radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel, radioactive, toxic, explosive, or other hazardous properties of any explosive nuclear assembly or nuclear component thereof and extreme and exceptional weather circumstances. The Consultant is fully aware of the prevailing security situation in the whole of the Republic of Lebanon and has entered into the Agreement knowing the situation which shall not constitute grounds of Force Majeure. Labor difficulties, disputes or strikes of any scope involving the Consultant's staff shall not constitute an event of Force Majeure, unless such labor difficulties, disputes or strikes are part of an industry wide or national strike.

6.2    The non-performance or delay in performance by the Employer and the Consultant, or either of them, of any obligation under the Agreement shall be excused if and to the extent that such non-performance, delay or responsibility is caused by an event of Force Majeure. During the occurrence of a Force Majeure event the Consultant shall, unless and until the Agreement is terminated under these provisions, continue to use its best endeavors to complete the Services outstanding at such time. Upon the occurrence of any event of Force Majeure, the party suffering therefrom shall immediately give the other party written notice thereof including a statement describing the event of Force Majeure and its effect upon the performance of the Agreement. At the request of either party, the Employer and the Consultant shall consult regarding the action to be taken.

6.3.    At any time after the expiration of one hundred and eighty (180) days following the occurrence of any event of Force Majeure causing non-performance by the Employer or the Consultant, each of the Employer or the Consultant may by written notice to the other party terminate the Agreement. Upon any such termination the Consultant shall comply with the provisions of Article 4.2 of the Agreement and be entitled to such sums as are set forth in Article 4.2. as if the Agreement had been terminated for the Employer's convenience, up to the effective date of termination

6.4    Within seven (7) days after the termination of any Force Majeure event and subject to the Agreement not having been terminated before, the Consultant shall file a written notice with the Employer specifying the actual duration of the non-performance or delay resulting from Force Majeure and the delay impact on the Schedule as well as on the amounts payable under the Agreement, which shall be the Employer's risk and liability for the period following its receipt of the Consultant's notice. The actual duration of the delay shall be evaluated and a fair, just and equitable adjustment to the Schedule will be mutually agreed.

## 7.    ADMINISTRATION; COMMUNICATIONS; APPROVALS

7.1    Each of the Employer and the Consultant shall designate its representative for the purpose of all communications hereunder and such appointed representatives shall be empowered to bind the designating party as to all matters concerning the Agreement.

7.2    No approval or oral approval or commitment given by the Employer shall (i) change, relieve, discharge or release the Consultant from any of its obligations or responsibilities under the Agreement unless by way of a Change Order signed by a duly authorized officer of the Employer; or (ii) constitute a representation or warranty that the subject matter of any such approval or commitment meets or complies with the requirements of the Agreement.

## 8.    SUPPLY OF PERSONNEL

The Employer has relied upon and signed the Agreement with the Consultant because of the involvement of certain individuals employed by the Consultant identified in Exhibit 5 (Key Employees) and the Consultant agrees that the persons listed in Exhibit 5 shall be assigned to perform the Services within their particular fields of expertise. The Consultant shall not remove any Key Employee from performance of any such Services without the prior written consent of the Employer and for so long as any Key Employee is in the employ of the Consultant or any affiliate, or unless otherwise mutually agreed to by the parties, the reassignment from performance of Services by the Consultant of any one or more Key Employee, prior to completion of the Services shall constitute a default within the terms of Article 4.1.

## 9.    CONFIDENTIALITY; USE OF EMPLOYER'S NAME; SIGNS

9.1    The Agreement and everything contained and incorporated therein or arising therefrom (including the Services) shall be treated as strictly confidential by the Consultant and its employees and subject to certain disclosure rights set forth below, shall not be used, published, or divulged by the Consultant in connection with any services rendered by the Consultant to any other person, firm or corporation, in any advertising or promotion regarding the Consultant or its services, or in any other manner or connection whatsoever without first having obtained the written permission of the Employer, which the Employer may withhold in its sole discretion. The Agreement shall not be disclosed either in whole or in part by the Consultant except exclusively to employees and agents of the Consultant; to the extent required for the proper performance by the Consultant of its obligations hereunder; or to the extent required by law. The Consultant shall take all steps necessary to protect the confidentiality of the Agreement and everything contained or incorporated therein or arising therefrom, including, without limitation, verbal and written notification to its employees and agents.

9.2    The Consultant shall acquire no right whatsoever under the Agreement, in whole or part, to the name of the Employer including, without limitation, no rights to use it (i) in any of the Consultant's advertising, publicity or promotion; (ii) to express or imply any endorsement by the Employer of the Consultant's services; or (iii) in any other manner whatsoever (whether or not similar to the uses herein above specifically prohibited).

## 10.    OWNERSHIP OF DOCUMENTS; INTELLECTUAL PROPERTY

10.1    The Consultant assigns to the Employer all rights of exploitation and use to the technical engineering and architectural creations (including, without limitation, all rights to the plans, sketches, specifications, ideas, concepts, models, or any other tangible work) produced by the Consultant in connection with the Agreement (collectively the "Work Products"). Consequently, this assignment will include the transfer by the Consultant to the Employer of (i) Ownership to all Work Products; (ii) Ownership to all technical creations, inventions, and documents showing or proving title to intellectual property, such as patents, use certificates or certificates of addition (which the Employer alone will be entitled to exploit) all relating to the Work Products; (iii) all rights of reproduction by all processes, whether known or unforeseeable, of the Work Products; (iv) all rights of representation or communication relating to the Work Products, on any visual, graphic and/or audiovisual media of any kind, such as in the press or in posters (in view of any promotion or advertising), or by televised broadcast, or in movie theaters, or in theaters, and in any public or private place, whether paying or non-paying; (v) all rights of adaptation, transformation, arrangement, modification, or destruction of the Work Products, or of one, several, or all of its elements, without this bringing about a modification of the provisions of this assignment, in particular, as to its term. This assignment of rights includes the right for the Employer not to commence, continue or complete, and the right to terminate, or destroy one, several, or all the elements of the Work Products. This assignment of rights is effective for the term of the rights of the Consultant to the Work Products, even in the event of expiration of the Agreement, for any reason whatsoever.

10.2    The Consultant guarantees to the Employer that it is the sole holder of the rights hereby assigned to the Employer, and further guarantees to the Employer the free exercise and undisturbed enjoyment of these rights. The Consultant guarantees that it has not granted any right whatsoever to the Work Products, to anyone whatsoever, and, in addition, the Consultant shall not exploit or have exploited, one, several, or all the elements of the Work Products directly or indirectly, by one or several third parties, with or without modification of any nature whatsoever.

10.3.    The Consultant may keep a copy of the Work Products, but may use it only with the Employer's prior written authorization. The Consultant will neither make nor permit any commercial use, for any reason whatsoever, of one, several, or all the elements of the Work Products, without having obtained the Employer's prior written approval.

10.4    Notwithstanding anything to the contrary, the Consultant does not by the Agreement convey to the Employer any proprietary industrial property, designs or technology developed by the Consultant prior to or outside of the Agreement.

## 11. NOTICES

11.1    All formal notices to be given to either party by the other under the terms of the Agreement must be served in writing. The correct addresses of each of the parties are as set out below or such other address as the party to be served shall have previously notified in writing :

| | |
|---|---|
| Employer : | The Lebanese Company for the Development and Reconstruction of Beirut Central District, S.A.L. Building 149 Marfaa, Saad Zaghloul Street, off Foch Street B.P. 119493 Beirut, Lebanon Attention : Mr. Hisham Karameh. |
| Consultant : | Paul C. Rizzo Associates Inc 105 Mall Boulevard Monroeville, PA USA 15148 |
| | Attention: Mr. Paul Rizzo |

11.2.    Any such written notice addressed in the manner described shall be deemed to have been received by the other party upon the date received by the other party as evidenced by the recipient's acknowledgement of receipt or on the date receipt is acknowledged in any other manner.

## 12. APPLICABLE LAW

This Agreement and all matters arising under or by virtue of it shall be interpreted, construed and governed by the laws of the Republic of Lebanon.

## 13. RESOLUTION OF DISPUTES

All disputes arising between the parties in connection with this Agreement, shall be finally settled under the Rules of Conciliation and Arbitration at the Beirut Chamber of Commerce and Industry by one (1) or more Arbitrator(s) appointed in accordance with the said Rules. The parties declare accepting the provisions of the said Rules and undertake to abide by them

## 14. GENERAL PROVISIONS

14.1    The Consultant shall adopt the Codification Scheme prescribed by the Employer in connection with the communication of all documents of whatsoever nature relating to the Services and/or the Agreement and shall, at the request of the Employer, communicate and exchange all such documents via the EDMAX system implemented by the Employer which shall communicate to the Consultant the EDMAX Welcome Package and the CAD software or other software requirements approved by the Employer for such purpose which the Consultant shall procure and utilize at its cost.

Commercial and Technical Feasibility of multi-use land development on the reclaimed land
Ref Paul-c-Rizzo_1

14.2    The Agreement or the benefit hereof (including the Consultant's right to receive payment hereunder) shall not be assigned, subcontracted or otherwise transferred in whole or in part by the Consultant without the Employer's prior written consent which it may withhold in its sole discretion.

14.3    The Agreement embodies the entire agreement between the parties as to the subject matter hereof and supersedes all previous negotiations and agreements between the parties as to the subject matter hereof. The Agreement shall remain in full force and effect until the Consultant has completed the Services or until the earlier expiration or termination of the Agreement, with the exception of those terms of the Agreement that are intended to and shall survive completion of the Services and the expiration or termination of the Agreement.

14.4    The invalidity, illegality or unenforceability of any of the provisions, terms or conditions of the Agreement shall not affect the validity, legality or enforceability of the remaining provisions, terms or conditions of the Agreement.

14.5    All communications of whatsoever nature between the parties in connection with the Agreement or the performance of the Services shall be given in the English language.

14.6    The Agreement has been executed in two (2) counterparts in English, each of which shall be deemed an original instrument as to each party which has signed it.

Commercial and Technical Feasibility of multi-use land development on the reclaimed land
Ref. Pool-o-Rizzo_1

IN WITNESS WHEREOF the parties have caused the Agreement to be duly executed the day, month and year set forth below which shall not effect the effective date of the Agreement set forth above.

The Lebanese Company for the Development and Reconstruction of Beirut Central District, S.A.L.

By : _____

Name : Mounir Duaidy

Title : General Manager

Date : September 2, 2003

Paul C. Rizzo Associates Inc.

By : _____

Name : Paul C. Rizzo .

Title : President

Date : Sep 1 9 2003

EXHIBIT 1

TO THE

AGREEMENT

TERMS OF REFERENCE

AND

DESCRIPTION OF THE SERVICES

## TERMS OF REFERENCE AND DESCRIPTION OF THE SERVICES

### Task 1 :    Technical Feasibility Study

The Contractor shall perform technical analyses and prepare a Technical Feasibility Report
(TFR) that shall address the following technical issues associated with construction on the 70
hectares of reclaimed land:

- A conceptual and use plans
- Interpretation of Hydraulic model test results associates with protection of the
  reclaimed land. As part of this element of the Study, the Employer will provide
  hydraulic models test results;
- Assessment of the environmental risks of constructing on the former landfill and clean
  fill area, propose mitigation measures;
- Assessment of the seismic risk in Beirut;
- Assessment of the behavior of high-rise buildings constructed on the reclaimed fill,
  including long term (life of structure) and during earthquakes;
- Assessment of the construction risks associates with the heterogeneous nature of the
  fill, particularly foundations for high rise buildings, underground parking facilities,
  high ground water levels, roadways and buried piping.
- Assessment of the behavior of underground parking facilities constructed within the
  reclaimed fill, including earthquake response;
- Assessment of the behavior of roadways and buried piping constructed on or within
  reclaimed land; and
- Establishment of methods of support for buried piping, cable, conduct, and fiber optic
  in reclaimed land.

### Task 2 :    Commercial Feasibility Study

The Contractor shall perform analysis and prepare a Commercial Feasibility Report (CFR) to
evaluate the added value and stability of the new development alternatives (associated with the
eastern 20 hectares of the reclaimed area) with the intent of encouraging U.S. investment.
Subsections of the CFR shall include commercial evaluations related to the development of the
eastern 20 hectares, and shall also include the following:

- Convention center potentially inclusive of a high-rise hotel;
- Commercial quayside development adjacent to the military port; and
- Seaside recreational development inclusive of a marina and publicly accessible green
  space.

**Task 3 :**     **Development Partnership Prospectus**

The Contractor shall prepare a Development Partnership Prospectus (Prospectus) to serve as a
guide for potential U.S. investors. The Prospectus shall include:

- Summary of the TFR;
- Summary of the CFR;
- Options for partnership with the Employer;
- Engineer's capital cost estimate (inclusive of calculations of U.S. exports) and
- Internal rate of return analysis on investment (or net present value) analysis.

**Task 4 :**     **Orientation Visit to the U.S. by the Employer's Officials**

The purpose of the Orientation Visits for four (4) of the Employer's officials to meet with U.S.
based organizations and companies that are active in the following areas:

- Environmental concerns in the context of Land-use planning;
- Structural and geotechnical engineering technology;
- Risk management;
- Project management;
- Sustainable development;
- Infrastructure management;
- Property operation, maintenance and management of complex real estate development;
- Operation and maintenance of large parking facilities.

**Task 5 :**     **Final Report**

The Consultant shall submit to the Employer and to the US Trade and Development Agency a
Final Report that encompasses Tasks 1-4. The Final Report shall be prepared in accordance to
Exhibit 7 to this Agreement, and shall identify US sources of supply.
In addition, the Final Report shall provide information on the companies that were visited as
part of Task 4 visit to the US (including full contact information and an evaluation of each
company's meetings with the Employer delegation.

\* \* \* \* \*

## EXHIBIT 2

## TO THE

## AGREEMENT

## THE SCHEDULE

Commercial and Technical Feasibility of multi-use land development on the reclaimed land
Ref Pauk-e-Ritze_1

# THE SCHEDULE

| Milestone | Month | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sept '03 | Oct '03 | Nov '03 | Dec '03 | Jan '04 | Feb '04 | Mar '04 | Apr '04 | May '04 |
| Project Start | * | | | | | | | | |
| Draft TFR | | | * | | | | | | |
| Final TFR | | | | | * | | | | |
| Draft CFR | | | | | | * | | | |
| Orientation Visit | | | | | | | | * | |
| Draft DPP | | | | | | | * | | |
| Final CFR | | | | | | | | * | |
| Final DPP | | | | | | | | | * |

Commercial and Technical Feasibility of multi-use land developments on the reclaimed land
Ref. Paul-c-Rizzo, J

EXHIBIT 3

TO

AGREEMENT

PAYMENT PROVISIONS

## PAYMENT PROVISIONS

### 1.    Services - Remuneration

In consideration of the full and proper execution and completion of the Services in accordance with this Agreement, the Employer shall arrange for the payment by the USTDA to the Consultant the fixed lump sum amount of FOUR HUNDRED FORTY EIGHT THOUSAND THREE HUNDRED AND TWENTY United States Dollars ($448,320) (the "Fee"). Except as otherwise specifically provided for herein, this amount shall cover the performance by the Consultant of, and shall represent the total compensation for, the Services to be performed by the Consultant pursuant to this Agreement in accordance with the Agreement and/or for which the Employer is liable to pay the Consultant pursuant to this Agreement Accordingly, the Fee is the fixed lump sum amount, and the only amount which the Employer agrees to pay and is bound to pay the Consultant for performance of the Services to be performed by the Consultant pursuant to this Agreement; and (ii) for which the Consultant agrees to perform the Services pursuant to this Agreement and which includes payment for all costs and expenses of whatsoever nature incurred or to be incurred by the Consultant in such performance, including, without limitation, salaries; pension contributions; contributions to retirement, medical and sickness schemes; incentive bonuses or the like; car or car allowances; travelling, accommodation and subsistence; holiday; termination and completion benefits; overtime; workmen's compensation; taxes of any kind; overheads; profit; financing costs; any other payments required to be made by any applicable law; rent; rates; taxes; insurance; equipment; consumables; telephone; fax and stationary of any head or regional office and entertainment expenses.

### 2.    Settlement of Accounts

2.1    The U.S Trade and Development Agency ("USTDA") has made a Grant of FOUR HUNDRED FORTY EIGHT THOUSAND THREE HUNDRED AND TWENTY United States Dollars (U.S:$ 448,320) available to the Employer for the execution of the Services ("Grant Funds") pursuant to the Grant Agreement between USTDA and the Employer, dated March 07, 2003 ("Grant Agreement"). In consideration for the Consultant's performance of the Services the Employer shall arrange for the Grant Funds to be disbursed by USTDA directly to the Consultant as follows:

2    U.S$ 89,660, a mobilization (advance) payment, upon signature of the Agreement and approval by USTDA.

3    U.S$ 67,240, upon completion of Draft Technical Feasibility Report and its approval by the Employer.

4    U.S$ 44,830, upon completion of Final Technical Feasibility Report and its approval by the Employer.

5   U.S$ 44,830, upon completion of Draft Commercial Feasibility Report and its approval by the Employer.

6   U.S$ 48,000, upon completion of Final Plans for the Orientation Visit and its approval by the Employer.

7   U.S$ 43,260, upon completion of Draft Development Partnership Prospectus and its approval by the Employer.

8   U.S$ 43,260, upon completion of Final Commercial Feasibility Report and its approval by the Employer.

9   U.S$ 67,240, upon receipt by USTDA of the Final Development Partnership Prospectus and Final Report in accordance with the specifications and quantities set forth in Exhibit 7.

2.2 In accordance with the payment schedule set forth in clause 2.1 above, the Consultant shall submit invoices, containing the certification set forth in Exhibit 7 to the Employer for approval. The Employer shall approve, in accordance with the disbursement procedures in Exhibit 7, or for disapprove, each invoice within 15 days of its receipt. If the Employer disapproves an invoice, the Employer shall so inform the Consultant in writing, setting out the reasons for disapproval in order to enable the Consultant to take appropriate corrective measures. After the Employer approves an invoice and the invoice is received by TDA, TDA shall make its respective disbursement of the Grant Funds directly to the Consultant in the United States.

\* \* \* \* \*

Commercial and Technical Feasibility of multi-use land development on the reclaimed land
Ref: Paul-c-Rizzo_1

# EXHIBIT 4

# INSURANCE

Commercial and Technical Feasibility of multi-use land development on the reclaimed land
Ref. Paul-o-Rizzo_1

## INSURANCE REQUIREMENTS.

### 1.   Insurance to be Provided by the Consultant

1.1   The Consultant shall, at its sole expense, maintain in effect at all times during the performance of the Services, insurance coverages with limits not less than those set forth below with Lebanese Insurers and under forms of policies satisfactory to the Employer.

1.2   Worker's Compensation and Employer's Liability Insurance covering the Consultant and the Consultant's employees in accordance with Lebanese Laws and Decrees, and extended to include an Employer's liability cover for an amount of not less than US $ 100,000 each occurrence unlimited in the aggregate. Such insurance shall include a waiver of the insurer's right of subrogation in favor of the Employer. Special worker's compensation insurance should not exceed $500.

1.3   Vehicle Bodily Injury and Property Damage Liability Insurance covering all vehicles, trucks, trailers, or self - propelled vehicles (while on public road) owned or hired by the Consultant with limits as follows:

> Bodily Injury       : Unlimited
> Property Damage   : US$ 250,000 each occurrence
>                             unlimited in the aggregate.

1.4.   Special Provisions with Respect to Policies Placed by the Consultant.

1.4.1   The Consultant shall be responsible to ensure that its SubConsultants of each tier carry insurance equal to that stipulated herein including naming of additional insureds and waiver of subrogation.

1.4.2   All the deductibles applicable to the foregoing insurances shall be for the account of the Consultant.

1.4.3   None of the requirements contained herein as to types, limits and the Employer's approval of insurance coverage to be maintained by the Consultant is intended to or shall in any manner limit or qualify the liabilities and obligations assumed by the Consultant under the Agreement.

1.4.4   The Consultant shall deliver to the Employer not later than (15) calendar days after award of the Agreement, but in any event prior to commencing the Services, Certificates of Insurance identified on their face as to project name as evidence that policies providing such coverage and limits of insurance are in full force and effect, which certificates shall provide that not less than thirty (30) Calendar days advance notice shall be given in writing to the Employer prior to cancellation, termination or alteration of said policies of insurance.

1.4.5   The Employer has the right to review and examine the rates for insurance carried and maintained by the Consultant and to receive upon request copies of the Policy documents and premium receipts.

- 1 -
Commercial and Technical Feasibility of multi-use land development on the reclaimed land
Ref. Paul-e-Rizzo_1

## 2.    Insurance Provided by the Employer

2.1    Without in any way limiting the Consultant's obligations under the Agreement, the Employer shall take out, carry and maintain in force at the Employer's expense and in the names of the Employer, the Consultant, the Consultant, the Contractor and Subcontractors at the location of the Project the following insurance:

2.2    Third Party Liability Insurance insuring the Consultant and its SubConsultants in the course of their performance of the Services at the Site with a combined single limit per occurrence and in the aggregate of US$ 5,000,000 subject to a per occurrence retained liability of US$ 2,500 which shall be at the Consultant's expense. The Policy will exclude liability arising out of the ownership, operation or use of motor vehicles and watercraft and will be primary insurance for all insureds and contain a cross liability or severability of interest clause.

2.3    Résumé of the foregoing insurance including applicable exclusions is contained in Attachment 1 to this Exhibit. While this résumé is considered to be accurate representation of the terms and conditions of the Employer provided Insurance, in the event that conflict manifests itself between the policy and the résumé, the policy shall "at all times be regarded as paramount and controlling.

2.4    The Employer is not maintaining any insurance on behalf of the Consultant covering against loss or damage to the Services or to any property of the Consultant.

2.5    To the extent that the Employer sustains a loss which is not covered by the insurance coverages provided pursuant to this Exhibit or which for whatever reason is not paid for by the Insurer, the responsibility provisions of the Consultant under the Agreement shall apply

* * * * *

Commercial and Technical Feasibility of multi-use land development on the reclaimed land
Ref. Paut-o-Kizmo_1

# ATTACHMENT 1

## TO

## EXHIBIT 4

Commercial and Technical Feasibility of multi-use land development on the reclaimed land
Ref Paul-e-Rizzo_1

## RESUME OF
## INSURANCE PROVIDED BY THE EMPLOYER

The Insurances to be provided by the Employer will generally be in accordance with the following resume which is provided as a guide and should not be considered as overriding any policy terms and conditions and exclusions. These details are indicative only as the insurance coverage cannot be finalized until the design details and method of construction are known.

### BCD PROJECT INSURANCE POLICY

### Period of Insurance

From commencement of the Services on Site until completion of the Services.

### Insured Parties

| The Employer : | The Lebanese Company for the Development and Reconstruction of Beirut Central District, S.A.L. |
| The Contractor: | Any Contractor appointed by the Employer or any Subcontractor of any tier. |
| The Consultant: | Any Consultant or Engineer appointed by the Employer for on-Site activities only. |

### The Insured's Retained Liability

The total amount which shall be deducted from each loss before the Insurers shall be liable to make any payment.

### The Site

The actual place or places to which property and materials are to be delivered or where Project are to be done by the Contractor other than premises of manufacture together with so much of the area surrounding the said place or places as the Contractor shall actually use in connection with the Project.

### Geographical Limits

Anywhere on the Site.

### General Exceptions

War Risks, sabotage, terrorism and Radioactive contamination.

Commercial and Technical Feasibility of multi-use land development on the reclaimed land
Ref Paul-o-Rizzo_1

# Third Party Liability

## Indemnity Provided

Covers the Insured's legal liability to pay compensation and damages in respect of death of or injury to, or disease contracted or illness sustained to any person or damage to property happening within the Geographical Limits arising out of or in the course of or in connection with the carrying out of the Services.

## Limit of Indemnity

US$ 5,000,000 each occurrence or series of occurrences arising out of one original cause.

## Insured's Retained Liability

Each claim or series of claims arising out of one original cause

| Nil | Bodily Injury |
| US$ 2,500 | Property Damage |

## Additional Coverages And Clauses

- Cross Liability clause
- Director's Indemnity
- Indemnity to members of Insured's first aid, fire and ambulance services in connection with the Services.

## Exceptions

- Death of or bodily injury to or illness or disease contracted by any person arising out of and in the course of his employment by the Insured.
- Vehicle liability.
- Aircraft and Watercraft Liability.
- Penalties for delay.
- Deliberate act or omission by the Insured.
- Claims arising out of advice design or specification given for a fee.
- Liability for costs of rectification of products supplied or contract Works executed by the insured caused by any defect therein or the unsuitability thereof for its intended purpose.
- Pollution or contamination unless caused by a sudden identifiable unintended and unexpected incident happening during the Period of Insurance.

## Claims Procedures

Claims handling and reporting procedures will be provided to the Construction Manager. Failure to abide by these procedures may invalidate the insurance coverage.

* * * * * *

Commercial and Technical Feasibility of multi-use land development on the reclaimed land
Ref. Paul-c-Rizzo_1

## EXHIBIT 5

## KEY EMPLOYEES



**PAUL C. RIZZO Ph.D., P.E.**
PRESIDENT

**SPECIALTIES**
Civil Engineering Structures
Dams
Hydroelectric Plants
Historic Structures
Nuclear Facilities
Geotechnical Engineering
Liquefaction Analyses
Structural Dynamics
Public Hearings
Expert Testimony
Seismic Engineering

Dr. Rizzo has extensive experience related to the geotechnical engineering aspects of transportation systems, nuclear power plants, thermal plants, hydro plants, and earth and rockfill dams. He has more than 30 years experience on a wide variety of dam Tunnel projects. Dr. Rizzo serves as Principal-In-Charge for the firm's entire dam Tunnel projects located in the U.S. and internationally. He has lectured on a variety of civil/geotechnical topics, and has served on consulting boards dealing with various issues in dams, seismic design, and geotechnical engineering. Dr. Rizzo has actively participated in industry and regulatory forums dealing with regulations, criteria, and professional practice in his areas of expertise. He is especially recognized for his contributions in earthquake engineering and foundation design of major structures. He has served as a consultant to the utility, steel, petroleum, and mining industries. The professional and academic experience of Dr. Rizzo is reflected in his more than 30 publications in his areas of expertise.

**EDUCATION**
Ph.D., Civil Engineering, Carnegie Mellon University
M.S., Civil Engineering, Carnegie Mellon University
B.S., Civil Engineering, Carnegie Mellon University

**REGISTRATIONS/CERTIFICATIONS**
Professional Engineer: Alabama, Alaska, California, Florida, Idaho, Indiana, Maryland, Michigan, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Puerto Rico, South Carolina, Texas, Tennessee, Utah, West Virginia, Wisconsin

**AFFILIATIONS**
Dr. Rizzo is a member of more than 15 technical societies

Commercial and Technical Feasibility of multi-use land development on the reclaimed land
Ref. Paul-c-Rizzo_1

## Specific Projects

**Saluda Dam - South Carolina Electric & Gas Co.:** Dr. Rizzo served as Principal-in Charge for the site investigation and remedial design of this "puddle" type hydraulic fill dam. His responsibilities included the static slope stability analysis, dynamic slope stability analysis, liquefaction and deformation analyses, definition of the seismic hazard and seismic design criteria, development of alternate remediation schemes, and negotiations with the FERC.

**Yough Hydro Plant - D/R Hydro:** The scope of work for the project involved the design, finance and construction management of the complete two-unit 12 MW Plant with vertical Francis units. Dr. Rizzo served as both Owner and Principal-in-Charge of this project. Work included major pump-over diversion, lining and grouting an 18-foot diameter rock tunnel, a penstock bifurcation, gate structure, river cofferdam, road construction and seven miles of transmission line. Project responsibilities included all project financial analysis, licensing with the Federal Energy Regulatory Commission, and permitting with all state agencies and the Corps of Engineers.

**Banco de Bilbao:** Dr. Rizzo served as Principal in Charge for the geotechnical investigation and design/analysis of the Banco de Bilbao Station, including the adjacent box sections in downtown Madrid, Spain for an extension of the Madrid Metro. The Station is directly beneath and embedded within the pile foundation for the high-rise bank structure. The "boxes" on either side of the station were open cut with decking to allow for street traffic while the station was excavated by soft ground tunneling techniques. The design and analysis were complicated by the building owner's requirements for unusually strict settlement, vibration and noise control during construction and operation of the metro system. Settlement observations were made "before" and "during" construction and vibration measurements were taken "before" and "after" throughout the structure at the track level, ground surface and in office space at various floors in the structure.

**Paris Metro - Grand Palais Segment:** Dr. Rizzo served as Principal in Charge of the investigation and analysis/design of a segment of the Paris Metro that runs adjacent to the Grande Palais, Petite Palais and Le Pont Alexandre III in downtown Paris, France. Settlement of historical structures, vibrations in the two art museums and the impact on the imposing Horsemen Sculptures at the ends of Le Pont Alexandre III were special design considerations. This segment was constructed with soft ground tunneling techniques with injection grouting being required adjacent the River Seine near Le Pont Alexandre III.

**Washington Metro - Washington DC:** While President of ECI-Soletanche, a specialty foundation construction firm specializing in grouting and slurry walls for tunnels and shafts, Dr. Rizzo was responsible for the firms several subcontracts for grouting and slurry walls for the Washington Metro in the 1970's and 80's. The firm had total responsibility for the design, implementation and monitoring of grouting operation for several shafts, station structures and underground segments, generally as a specialty subcontractor.

**Pittsburgh Light Rail Transit System:** Dr. Rizzo served as Principal in Charge for the geotechnical investigation, geotechnical analysis and design, and grouting supervision for the underground segments of the Pittsburgh Light Rail Transit in downtown Pittsburgh, Pennsylvania. The firm served as the geotechnical subcontractor to a joint venture sponsored by Parsons Brinkerhoff. Site conditions including excessive ground water, running sands, shallow foundations supporting structures immediately adjacent to the decked open cuts and archeological findings.

**Second Avenue Subway – New York:** Dr. Rizzo is currently serving as the Principal-In-Charge of the firm's work directed at Geotechnical Investigations, Tunnel Design, Cut & Cover Design, Ground Improvement, Dewatering, Temporary Support of Excavation Structures, and Underpinning. The project is estimated at $15 billion and will be completed in 2015.

Commercial and Technical Feasibility of multi-use land development on the reclaimed land
Ref. Paul-c-Rizzo_1

 **DEBORAH A. LANGE, PH.D., P.E., DEE**
ENVIRONMENTAL

Ms. Lange has 18 years of experience in civil and environmental engineering including extensive landfill permitting, design, and construction project coordination and regularly participates in environmental assessment and design projects. Her civil/environmental experience enables her to effectively interact with regulators, attorneys, and clients in the development of permitting and design strategies. Ms. Lange serves as the consultant in the Heinz Foundation Mission to the Czech Republic.

## EDUCATION

M.S., Civil Engineering, Carnegie Mellon University
Ph.D., Civil Engineering, Carnegie Mellon University

## REGISTRATIONS/CERTIFICATIONS

Professional Engineer: Pennsylvania, Ohio, Delaware
Diplomate of Environmental Engineering (Solid Waste Specialty), American Academy of Environmental Engineers

## AFFILIATIONS

American Society of Civil Engineers
American Academy of Environmental Engineers
PWIA
NSWMA
Institute of Professional Practice

## SPECIALTIES

Solid Waste Management
CQA
Permit Applications
Solid Waste Landfills
EIS
Environmental Audits

## PROFESSIONAL EXPERIENCE

Ms. Lange's experience in civil and environmental engineering includes environmental assessments for power generation plants, including the development of streamlined processes for cost-effective preparation of audits, assessments, and environmental management programs. This experience includes environmental audits of a thermal electric power plant and an integrated steel-making facility in Argentina to assess compliance, with current and potential regulations governing allowable concentrations to air, surface water, ground water and soil. Other progessional experience includes landfill permitting, design, and construction; defining and providing solutions for complex water and air pollution control issues for

Commercial and Technical Feasibility of multi-use land development on this reclaimed land
Ref. Prol-o-Rizzo_l

manufacturing facilities; and the identification of fugitive emissions from steel making operations.

Ms. Lange's experience in civil and environmental engineering is applied to the steel, power generation, and the waste disposal industries. She directs feasibility studies, environmental assessments, environmental systems designs and project implementation for air and water pollution control projects. Ms. Lange worked for the United States Steel in developing and implementing air pollution control systems at USX Plants.

Ms. Lange regularly participates in environmental assessment and design projects and is responsible for project development. Her civil/structural experience enables her to effectively interact with regulators, attorneys, and clients in the development of permitting and design strategies.

## SPECIFIC PROJECTS

INTEGRATED STEEL MAKING FACILITY, SAN NICOLAS, BUENOS AIRES, ARGENTINA - A CEROS PARANA S.A.: Ms. Lange was the lead engineer for an environmental audit of a 4.5 square mile integrated steel making facility operated by the government and acquired by a private consortium. A systematic inventory to provide an objective evaluation of the plant was performed. Cost of environmental compliance was critical to performance in a competitive market.

LUJAN DE CUYO AND CRUZ DE PIEDRO POWER PLANTS - CMS GENERATION CO.: Environmental audits of two power plants were performed in Mendoza, Argentina. The audits included soil/ground water/air sampling, conducting interviews, and assessing potential environmental problems. Also, included was a limited chemical characterization of the facilities. An Environmental Management Plan was prepared for use by plant personnel which described actions required to maintain plant compliance with applicable environmental regulations.

ENVIRONMENTAL AUDITS AT 23 FACILITIES - CMS GENERATION CO.: Audits were conducted at power generation, transmission, and maintenance facilities and included soil and ground water sampling, conducting interviews, and assessing potential environmental problems. This included a chemical characterization of the facilities.

CURSORY ENVIRONMENTAL ASSESSMENT - CMS GENERATION CO.: A cursory environmental assessment of Nihuiles and Diamante hydroelectric power plant systems was performed. The Diamante system consists of a series of three dams and reservoirs on the Diamante River with a total installed capacity of 388 Mw. The Nihuiles system includes three power plants on the Atuel River with a total installed capacity of 210 Mw. The oldest facilities of the system have been operated under government ownership for over 10 years.

ENVIRONMENTAL AUDIT - CENTRAL TERMICA SAN NICOLAS S.A. (CTSN S.A.): With the authorization of AES Americas, Paul C. Rizzo Associates was retained by CTSN S.A. to perform an environmental audit of a 650 MW thermal electric power plant. The plant had five units with the capability to burn a combination of coal, gas, and fuel oil. The purpose of the environmental audit was to: define the environmental

conditions of the plant at the time of takeover; assess compliance with respect to provincial, state, federal, and international standards; perform thermal dispersion modeling of the cooling water outfall; measure flue gas concentrations of $CO$, $SO_2$ and $NO_x$; and perform dispersion modeling of the stack emissions of $CO$, $SO_2$, $NO_x$, and particulate matter.

SOLID WASTE MANAGEMENT PLAN - SEDESOL: Ms. Lange was the Principal-in-Charge of this $1.5 million project funded by the World Bank. Initial efforts involved the diagnosis of the existing solid waste management facilities, needs, demographics and infrastructure for 50 cities in Mexico. Twenty-five cities were selected by SEDESOL for further study regarding improved solid waste collection, hauling, and disposal.   Construction, operation, maintenance, and administrative costs were estimated.  A prioritized plan was prepared to serve as the basis for financing the implementation of the program.

ENVIRONMENTAL MASTER PLAN - SVEDAB: Ms. Lange was a member of a three-company team who prepared an environmental remediation master plan to be used as the basis for conducting environmental investigations/remediations in Sweden. Ms. Lange acted as the lead engineer in the development of a master plan for the remediation of the Lernacken Area. Considerations in the development of the master plan included cost/benefit of the proposed remedy, scheduling with respect to bridge construction, impact of the remedial efforts on the neighbors to the site, and both short term and residual risk associated with the remedy. Remedial efforts were estimated to be over $40,000,000.

RECYCLING FACILITY - BROWNING-FERRIS INDUSTRIES, INC.: Paul C. Rizzo Associates provided engineering support to Browning-Ferris Industries in the conceptualization, design, and construction of a state-of-the-art materials recovery facility located in Pittsburgh. This facility was constructed to attain compliance with the recycling requirements imposed by the Pennsylvania Department of Environmental Resources.

CRAVEN COUNTY WOOD ENERGY PLANT - CMS GENERATION CO.: Paul C. Rizzo Associates performed a Phase I Environmental Site Assessment and performed an Environmental, Health and Safety Audit of the wood-burning power plant.

BASELINE ENVIRONMENTAL ASSESSMENT - STEEL PROCESSING FACILITY - VSZ-U.S. STEEL, S.R.O.: Paul C. Rizzo was retained by VSZ-U.S. Steel to evaluate existing sources and the extent of air, soil, and groundwater contamination as measured with respect to current and future environmental quality regulations. The goal was to delineate conditions at the tinning mill operation that pre-existed the joint venture where any current or future violations of environmental requirements are the responsibility of the previous owner.

## EXHIBIT 6

# US TRADE AND DEVELOPMENT AGENCY MANDATORY CLAUSES

## USTDA Mandatory Contract Clauses

### A. USTDA Mandatory Clauses Controlling

The parties to this contract acknowledge that this contract is funded in part by the U.S. Trade and Development Agency ("USTDA") under the Grant Agreement between the Government of the United States of America acting through USTDA and The Lebanese Company for the Development and Reconstruction of Beirut Central District, s.a.l. (SOLIDERE) ("Client"), dated MARCH 7, 2003 ("Grant Agreement"). The Client has selected Paul C. Rizzo Associates, Inc. ("Contractor") to perform the feasibility study ("Study") for the Reclaimed Land Multi-Use Development Project ("Project") in Lebanon ("Host Country"). Notwithstanding any other provisions of this contract, the following USTDA mandatory contract clauses shall govern. All subcontracts entered into by Contractor funded or partially funded with USTDA Grant funds shall include these USTDA mandatory contract clauses, except for clauses B(1), G, H, and I. In addition, in the event of any inconsistency between the Grant Agreement and any contract or subcontract thereunder, the Grant Agreement shall be controlling.

### B. USTDA as Financier

#### (1) USTDA Approval of Contract

All contracts funded under the Grant Agreement, and any amendments thereto, including assignments and changes in the Terms of Reference, must be approved by USTDA in writing in order to be effective with respect to the expenditure of USTDA Grant funds. USTDA will not authorize the disbursement of USTDA Grant funds until the contract has been formally approved by USTDA or until the contract conforms to modifications required by USTDA during the contract review process.

#### (2) USTDA Not a Party to the Contract

It is understood by the parties that USTDA has reserved certain rights such as, but not limited to, the right to approve the terms of this contract and amendments thereto, including assignments, the selection of all contractors, the Terms of Reference, the Final Report, and any and all documents related to any contract funded under the Grant Agreement. The parties hereto further understand and agree that USTDA, in reserving any or all of the foregoing approval rights, has acted solely as a financing entity to assure the proper use of United States Government funds, and that any decision by USTDA to exercise or refrain from exercising these approval rights shall be made as a financier in the course of financing the Study and shall not be construed as making USTDA a party to the contract. The parties hereto understand and agree that USTDA may, from time to time, exercise the foregoing approval rights, or discuss matters related to these rights and the Project with the parties to the contract or any subcontract, jointly or separately, without thereby incurring any responsibility or liability to such parties.

Commercial and Technical Feasibility of multi-use land development on the reclaimed land
Ref. Paul-c-Rizzo_1

Any approval or failure to approve by USTDA shall not bar the Client or USTDA from asserting any right they might have against the Contractor, or relieve the Contractor of any liability which the Contractor might otherwise have to the Client or USTDA.

## C. Nationality, Source and Origin

Except as USTDA may otherwise agree, the following provisions shall govern the delivery of goods and services funded by USTDA under the Grant Agreement: (a) for professional services, the Contractor must be either a U.S. firm or U.S. individual; (b) the Contractor may use U.S. subcontractors without limitation, but the use of subcontractors from Host Country may not exceed twenty percent (20%) of the USTDA Grant amount and may only be used for specific services from the Terms of Reference identified in the subcontract; (c) employees of U.S. Contractor or U.S. subcontractor firms responsible for professional services shall be U.S. citizens or non-U.S. citizens lawfully admitted for permanent residence in the U.S.; (d) goods purchased for performance of the Study and associated delivery services (e.g., international transportation and insurance) must have their nationality, source and origin in the United States; and (e) goods and services incidental to Study support (e.g., local lodging, food, and transportation) in Host Country are not subject to the above restrictions. USTDA will make available further details concerning these provisions upon request.

## D. Record keeping and Audit

The Contractor and subcontractors funded under the Grant Agreement shall maintain, in accordance with generally accepted accounting procedures, books, records, and other documents, sufficient to reflect properly all transactions under or in connection with the contract. These books, records, and other documents shall clearly identify and track the use and expenditure of USTDA funds, separately from other funding sources. Such books, records, and documents shall be maintained during the contract term and for a period of three (3) years after final disbursement by USTDA. The Contractor and subcontractors shall afford USTDA, or its authorized representatives, the opportunity at reasonable times for inspection and audit of such books, records, and other documentation.

E. U.S. Carriers

    (1)     Air

Transportation by air of persons or property funded under the Grant Agreement shall be on U.S. flag carriers in accordance with the Fly America Act, 49 U.S.C. 40118, to the extent service by such carriers is available, as provided under applicable U.S. Government regulations.

(2) Marine

Transportation by sea of property funded under the Grant Agreement shall be on U.S. carriers in accordance with U.S. cargo preference law.

F. Workman's Compensation Insurance

The Contractor shall provide adequate Workman's Compensation Insurance coverage for work performed under this Contract.

G. Disbursement Procedures

(1) USTDA Approval of Contract

Disbursement of Grant funds will be made only after USTDA approval of this contract. To make this review in a timely fashion, USTDA must receive from either the Client or the Contractor a photocopy of an English language version of a signed contract or a final negotiated draft version to the attention of the General Counsel's office at USTDA's address listed in Clause L below.

(2) Payment Schedule Requirements

A payment schedule for disbursement of Grant funds to the Contractor shall be included in this Contract. Such payment schedule must conform to the following USTDA requirements: (1) up to twenty percent (20%) of the total USTDA Grant amount may be used as an advance payment; (2) all other payments, with the exception of the final payment, shall be based upon contract performance milestones; and (3) the final payment may be no less than fifteen percent (15%) of the total USTDA Grant amount, payable upon receipt by USTDA of an approved Final Report in accordance with the specifications and quantities set forth in Clause H below. Invoicing procedures for all payments are described below.

(3) Contractor Invoice Requirements

USTDA will make all disbursements of USTDA Grant funds directly to the Contractor. The Contractor must provide USTDA with an ACH Vendor Enrollment Form (available from USTDA) with the first invoice. The Client shall request disbursement of funds by USTDA to the Contractor for performance of the contract by submitting the following to USTDA:

## (a) Contractor's Invoice

The Contractor's invoice shall include reference to an item listed in the Contract payment schedule, the requested payment amount, and an appropriate certification by the Contractor, as follows:

(i) For an advance payment (if any):

"As a condition for this advance payment, which is an advance against future Study costs, the Contractor certifies that it will perform all work in accordance with the terms of its Contract with the Client. To the extent that the Contractor does not comply with the terms and conditions of the Contract, including the USTDA mandatory provisions contained therein, it will, upon USTDA's request, make an appropriate refund to USTDA."

(ii) For contract performance milestone payments:

"The Contractor has performed the work described in this invoice in accordance with the terms of its contract with the Client and is entitled to payment thereunder. To the extent the Contractor has not complied with the terms and conditions of the Contract, including the USTDA mandatory provisions contained therein, it will, upon USTDA's request, make an appropriate refund to USTDA."

(iii) For final payment:

"The Contractor has performed the work described in this invoice in accordance with the terms of its contract with the Client and is entitled to payment thereunder. Specifically, the Contractor has submitted the Final Report to the Client, as required by the Contract, and received the Client's approval of the Final Report. To the extent the Contractor has not complied with the terms and conditions of the Contract, including the USTDA mandatory provisions contained therein, it will, upon USTDA's request, make an appropriate refund to USTDA."

## (b) Client's Approval of the Contractor's Invoice

(i) The invoice for an advance payment must be approved in writing by the Client.

(ii) For contract performance milestone payments, the following certification by the Client must be provided on the invoice or separately:

"The services for which disbursement is requested by the Contractor have been performed satisfactorily, in accordance with applicable Contract provisions and the terms and conditions of the USTDA Grant Agreement."

(iii)   For final payment, the following certification by the Client must be provided on the invoice or separately:

"The services for which disbursement is requested by the Contractor have been performed satisfactorily, in accordance with applicable Contract provisions and terms and conditions of the USTDA Grant Agreement. The Final Report submitted by the Contractor has been reviewed and approved by the Client. "

(c) USTDA Address for Disbursement Requests

Requests for disbursement shall be submitted by courier or mail to the attention of the Finance Department at USTDA's address listed in Clause L below.

(4) Termination

In the event that the Contract is terminated prior to completion, the Contractor will be eligible, subject to USTDA approval, for reasonable and documented costs which have been incurred in performing the Terms of Reference prior to termination, as well as reasonable wind down expenses. Reimbursement for such costs shall not exceed the total amount of undisbursed Grant funds. Likewise, in the event of such termination, USTDA is entitled to receive from the Contractor all USTDA Grant funds previously disbursed to the Contractor (including but not limited to advance payments) which exceed the reasonable and documented costs incurred in performing the Terms of Reference prior to termination.

H.  USTDA Final Report

(1) Definition

"Final Report" shall mean the Final Report described in the attached Annex I Terms of Reference or, if no such "Final Report" is described therein, "Final Report" shall mean a substantive and comprehensive report of work performed in accordance with the attached Annex I Terms of Reference, including any documents delivered to the Client.

(2) Final Report Submission Requirements

The Contractor shall provide the following to USTDA:

(a) One (1) complete version of the Final Report for USTDA's records. This version shall have been approved by the Client in writing and must be in the English language. It is the responsibility of the Contractor to ensure that confidential information, if any, contained in this version be clearly marked. USTDA will maintain the confidentiality of such information in accordance with applicable law and

(b) Three (3) copies of the Final Report suitable for public distribution ("Public Version"). The Public Version shall have been approved by the Client in writing and must be in the English language. As this version will be available for public distribution, it must not contain any confidential information. If the report in (a) above contains no confidential information, it may be used as the Public Version (provided USTDA receives a total of four (4) copies). In any event, the Public Version must be informative and contain sufficient Project detail to be useful to prospective equipment and service providers.

The Contractor shall also provide one (1) copy of the Public Version of the Final Report to the Foreign Commercial Service Officer or the Economic Section of the U.S. Embassy in Host Country for informational purposes.

(3) Final Report Presentation

All Final Reports submitted to USTDA must be paginated and include the following:

(a) The front cover of every Final Report shall contain the name of the Client, the name of the Contractor who prepared the report, a report title, USTDA's logo, USTDA's mailing and delivery addresses, and the following disclaimer:

"This report was funded by the U.S. Trade and Development Agency (USTDA), an export promotion agency of the U. S. Government. The opinions, findings, conclusions or recommendations expressed in this document are those of the author(s) and do not necessarily represent the official position or policies of USTDA."

(b) The inside front cover of every Final Report shall contain USTDA's logo, USTDA's mailing and delivery addresses, and USTDA's mission statement. Camera-ready copy of USTDA Final Report specifications will be available from USTDA upon request.

(c) The Contractor and any subcontractor that performs work pursuant to the Grant Agreement must be clearly identified in the Final Report. Business name, point of contact, address, telephone and fax numbers shall be included for Contractor and each subcontractor.

(d) The Final Report, while aiming at optimum specifications and characteristics for the Project, shall identify the availability of prospective U.S. sources of supply. Business name, point of contact, address, telephone, e-mail, and fax numbers shall be included for each source.

(e) The Final Report shall be accompanied by a letter or other notation by the Client which states that the Client approves the Final Report. A certification by the Client to this effect provided on or with the invoice for final payment will meet this requirement.

Activity No.: 2002-10057B
Reservation No.: 3157133
Grant No.: GH3157133

M. Definitions

All capitalized terms not otherwise defined herein shall have the meaning set forth in
the Grant Agreement.

# EXHIBIT E

# PART 1

*Selim Osman*

<u>EXECUTION VERSION</u>

### CREDIT AGREEMENT

dated as of July 13, 2001

among

**THE LEBANESE COMPANY FOR THE
DEVELOPMENT AND RECONSTRUCTION
OF BEIRUT CENTRAL DISTRICT s.a.l.,**
as Borrower;

**CITIBANK, N.A., Beirut Branch,**
as Lender,

**CITIBANK INTERNATIONAL PLC,**
as Agent

and

**EXPORT-IMPORT BANK OF THE UNITED STATES**

Ex-Im Bank Transaction No. APO73269XX-Lebanon

EX-IM STANDARD L/T FORM A-4 (4/01)





Ex-Im Bank Transaction No. APO73269XX-Lebanon

Term Sheet

| 1. | Lender:<br>Agent: | Citibank, N.A., Beirut Branch<br>Citibank International plc |
|---|---|---|

2.    Borrower:        The Lebanese Company for the Development and
                      Reconstruction of Beirut Central District s.a.l.

3.    Borrower's Country:    Lebanon
                                  ٫ؙ

4.    Financed Portion:      U.S$13,547,687.00

5.    Exposure Fee (U.S. $9.30 per U.S.$100.00 of Financed Portion): U.S.$1,251,565.00

        (x) financed          ( ) not financed
        (x) as disbursed      ( ) up front

6.    Credit Amount:         U.S.$14,709,252.00

7.    Guarantee Commitment Fee: One-eighth of one percent (0.1250%) per annum on the uncancelled and undisbursed amount of the Credit, accruing from May 8, 2001 to the Final Disbursement Date, and payable on each April 25 and October 25 of each year, beginning on October 25, 2001.

8.    Principal Repayment: Ten (10) semi-annual installments, due and payable on each April 25 and October 25 of each year, beginning on October 25, 2004, until the Credit is repaid in full.

9.    Required Operative Date:    September 13, 2001

10.    Except as otherwise provided in the Agreement, all notices shall be directed to the respective parties in accordance with the following:

To the Borrower

Address:    Building 149, Saad Zaghloul Street, Off Foch Street
            P.O.Box 11-9493
            Beirut, Lebanon

Attention:    Mounir Douaidy, Head of Finance
Fax:          961 1 981136
Telephone:    961 1 980650
E-mail: douaidym@solidere.com



TS-1

## To the Agent

| | |
|---|---|
| Address: | Citibank International plc, as Facility Agent |
| | Riverdale House |
| | 68 Molesworth Street 3rd floor |
| | London, England SE 13 7EU |
| Attention: | Loans Agency |
| Fax: | 44-20-7500-4482/84 |
| Telephone: | 44-20-7500-4194 |
| E-mail: | |

With copy to :

| | |
|---|---|
| Address: | Structured Trade Finance |
| | Citigroup Centre |
| | 33 Canada Square, 5th Floor |
| | London, England  E14 5LB |
| Attention: | Gillian Barnfather/Stuart James |
| Fax: | 44-20-7986-4481 |
| Telephone: | 44-20-7986-4823-4856 |
| E-Mail: | gillian.barnfather@citi.com |

## To the Lender

| | |
|---|---|
| Address: | Citibank, N.A. Beirut Branch |
| | Gefinor Center Block E |
| | Clemenceau Street |
| | Beirut, Lebanon |
| Attention: | Corporate and Banking Department |
| Fax: | 961-1-738-993 |
| Telephone: | 961-1-738-400 |

With copy to:

| | |
|---|---|
| Address: | Structured Trade Finance |
| | Citigroup Centre |
| | 33 Canada Square, 5th Floor |
| | London, England  E14 5LB |
| Attention: | Gillian Barnfather/Stuart James |
| Fax: | 44-20-7986-4481 |
| Telephone: | 44-20-7986-4823-4856 |
| E-Mail: | gillian.barnfather@citi.com |



TS-2

To Ex-Im Bank

| | |
|---|---|
| Address: | Export-Import Bank of the United States |
| | 811 Vermont Avenue, N.W. |
| | Washington, D.C. 20571 |
| Attention: | Unless otherwise specified herein, Vice President - Asset Management Division |
| Fax: | 1-202-565-3625 (Asset Management Division) |
| | 1-202-565-3380 (Bank-wide) |
| Telephone: | 1-202-565-3600 |
| Email: | amd.credit@exim.gov |

rita.murrell @ exim.gov

TABLE OF CONTENTS

SECTION 1. DEFINITIONS AND PRINCIPLES OF CONSTRUCTION ............................... 1
   1.01   Defined Terms ........................................................................................................... 1
   1.02   Principles of Construction ........................................................................................ 7

SECTION 2. THE CREDIT ....................................................................................................... 7
   2.01   Amount ...................................................................................................................... 7
   2.02   Availability ................................................................................................................ 7

SECTION 3. DISBURSEMENTS .............................................................................................. 8
   3.01   Disbursements .......................................................................................................... 8

SECTION 4. EX-IM BANK GUARANTEE REQUIREMENTS ................................................ 8
   4.01   Eligibility for Ex-Im Bank Guarantee ...................................................................... 8
   4.02   Coverage of the Ex-Im Bank Guarantee .................................................................. 8

SECTION 5. TERMS OF THE CREDIT .................................................................................. 9
   5.01   Principal Repayment ................................................................................................. 9
   5.02   Interest Payment ....................................................................................................... 9
   5.03   Alternative Interest Rate ......................................................................................... 10
   5.04   Prepayment ............................................................................................................. 11
   5.05   Recapture ................................................................................................................ 11
   5.06   Evidence of Debt .................................................................................................... 11

SECTION 6. CONDITIONS PRECEDENT ............................................................................ 12
   6.01   Conditions Precedent to First Utilization ............................................................... 12
   6.02   Conditions Precedent to Each Utilization ............................................................... 14

SECTION 7. FEES AND EXPENSES ..................................................................................... 15
   7.01   Fees ......................................................................................................................... 15
   7.02   Taxes ....................................................................................................................... 16
   7.03   Expenses ................................................................................................................. 16
   7.04   Additional or Increased Costs ................................................................................ 17

SECTION 8. PAYMENTS ....................................................................................................... 18
   8.01   Method of Payment ................................................................................................. 18
   8.02   Application of Payments ......................................................................................... 19

SECTION 9. REPRESENTATIONS, WARRANTIES, AND COVENANTS .......................... 19
   9.01   Representations and Warranties of the Borrower .................................................... 19
   9.02   Affirmative Covenants of the Borrower .................................................................. 22
   9.03   Negative Covenants of the Borrower ...................................................................... 25

SECTION 10. CANCELLATION, SUSPENSION, AND EVENTS OF DEFAULT ................ 27
   10.01   Cancellation by the Borrower ................................................................................ 27

10.02  Suspension and Cancellation by Ex-Im Bank ........................................................ 27
10.03  Events of Default and Remedies ......................................................................... 27

SECTION 11.  GOVERNING LAW AND JURISDICTION ............................................. 30
11.01  Governing Law ...................................................................................................... 30
11.02  Submission to Jurisdiction .................................................................................... 30
11.03  Service of Process. ............................................................................................... 30
11.04  Waiver of Immunity ............................................................................................... 31
11.05  Waiver of Security Requirements ......................................................................... 31
11.06  No Limitation ......................................................................................................... 31

SECTION 12.  THE AGENT ................................................................................................ 31
12.01  Appointment .......................................................................................................... 31
12.02  Powers .................................................................................................................. 32
12.03  General Immunity .................................................................................................. 32
12.04  No Responsibility for Loans, Recitals, etc ............................................................ 32
12.05  Action on Instructions of the Lender ..................................................................... 32
12.06  Employment of Agents and Counsel ..................................................................... 33
12.07  Reliance on Documents; Counsel ......................................................................... 33
12.08  Agent's Reimbursement and Indemnification ....................................................... 33
12.09  Rights as a Lender ................................................................................................ 33
12.10  Lender Credit Decision .......................................................................................... 33
12.11  Successor Agent ................................................................................................... 34
12.12  Agency Division .................................................................................................... 34

SECTION 13.  MISCELLANEOUS ..................................................................................... 34
13.01  Computations ........................................................................................................ 34
13.02  Notices .................................................................................................................. 34
13.03  Disposition of Indebtedness .................................................................................. 35
13.04  Benefit of Agreement ............................................................................................ 35
13.05  Termination of Ex-Im Bank Guarantee ................................................................. 35
13.06  Disclaimer ............................................................................................................. 35
13.07  No Waiver; Remedies Cumulative ......................................................................... 35
13.08  Indemnification ..................................................................................................... 36
13.09  Entire Agreement .................................................................................................. 36
13.10  Amendment or Waiver ........................................................................................... 36
13.11  Counterparts ......................................................................................................... 36
13.12  Judgment Currency ............................................................................................... 36
13.13  English Language .................................................................................................. 37
13.14  Severability ........................................................................................................... 37
13.15  Waiver of Jury Trial ............................................................................................... 37

ANNEXES

| Annex A-1 | - | Form of Floating Rate Note |
|-----------|---|----------------------------|
| Annex B | - | Utilization Procedures |
| Exhibit 1 | - | Exporter's Certificate |

| Exhibit 2 | - | Request for Reimbursement to Borrower's Account |
| Exhibit 2(a) | - | Itemized Statement of Payments |
| Exhibit 3 | - | [intentionally omitted] |
| Exhibit 4 | - | Certificate Authorizing Reimbursement |
| | | |
| Exhibit 5 | - | Request for Letter of Credit Approval |
| Exhibit 6 | - | Certificate Approving Letter of Credit |
| Exhibit 7 | - | Request for Ex-Im Bank Approval of Amendment to Letter of Credit |
| Exhibit 8 | - | Certificate Approving Amendment to Letter of Credit |
| Exhibit 9 | - | Request for Lender Approval of Amendment of Letter of Credit |
| Exhibit 10 | - | Notice of Letter of Credit Amendment |

| Annex C | - | Form of Opinion of Borrower's Counsel |
| Annex D | - | Form of Acquisition List |
| Annex E | - | Form of Standby L/C |
| Annex F | - | Disclosure of Legal Proceedings against Borrower |

TABLE OF CONTENTS

SECTION 1. DEFINITIONS AND PRINCIPLES OF CONSTRUCTION ...............................1
 1.01 Defined Terms.................................................................................................1
 1.02 Principles of Construction..............................................................................7

SECTION 2. THE CREDIT..................................................................................................8
 2.01 Amount..............................................................................................................8
 2.02 Availability.......................................................................................................8

SECTION 3. DISBURSEMENTS.........................................................................................8
 3.01 Disbursements..................................................................................................8

SECTION 4. EXIMBANK GUARANTEE REQUIREMENTS.............................................8
 3.01 Cash Payment..................................................................................................8
 3.06 Amount.............................................................................................................9

SECTION 5. TERMS OF THE CREDIT...............................................................................9
 5.01 Principal Repayment.......................................................................................9
 5.02 Interest Payment..............................................................................................9
 5.03 Alternative Interest Rate...............................................................................10
 5.04 Prepayment.....................................................................................................11
 5.05 Recapture........................................................................................................11
 5.06 Evidence of Debt...........................................................................................12

SECTION 6. CONDITIONS PRECEDENT.........................................................................13
 6.01 Conditions Precedent to First Utilization....................................................13
 6.02 Conditions Precedent to Each Utilization....................................................15

SECTION 7. FEES AND EXPENSES..................................................................................16
 7.01 Fees.................................................................................................................16
 7.02 Taxes...............................................................................................................16
 7.03 Expenses.........................................................................................................17
 7.04 Additional or Increased Costs.......................................................................18

SECTION 8. PAYMENTS....................................................................................................18
 8.01 Method of Payment........................................................................................18
 8.02 Application of Payments................................................................................19

SECTION 9. REPRESENTATIONS, WARRANTIES, AND COVENANTS.......................20
 9.01 Representations and Warranties of the Borrower.........................................20
 9.02 Affirmative Covenants of the Borrower.......................................................23
 9.03 Negative Covenants of the Borrower............................................................26

SECTION 10. CANCELLATION, SUSPENSION, AND EVENTS OF DEFAULT.............28
 10.01 Cancellation by the Borrower.......................................................................28
 10.02 Suspension and Cancellation by Eximbank..................................................28

i

10.03   Events of Default and Remedies................................................................28

SECTION 11.  GOVERNING LAW AND JURISDICTION...............................................31
    11.01   Governing Law........................................................................................31
    11.03   Service of Process ...............................................................................31
    11.04   Waiver of Immunity.............................................................................32
    11.05   Waiver of Security Requirements...........................................................32
    11.06   No Limitation.......................................................................................32

SECTION 12.  MISCELLANEOUS......................................................................36
    12.01   Computations .......................................................................................36
    12.02   Notices.................................................................................................36
    12.03   Disposition of Indebtedness ..................................................................36
    12.04   Benefit of Agreement.............................................................................37
    12.05   Termination of Eximbank Guarantee.......................................................37
    12.06   Disclaimer ...........................................................................................37
    12.07   No Waiver; Remedies Cumulative............................................................37
    12.08   Entire Agreement..................................................................................37
    12.09   Amendment or Waiver...........................................................................38
    12.10   Counterparts.........................................................................................38
    12.11   Judgment Currency................................................................................38
    12.12   English Language ..................................................................................38
    12.13   Severability...........................................................................................38
    12.14   Waiver of Jury Trial...............................................................................38

ANNEXES
Annex A-1    -       Form of Floating Rate Note
Annex B      -       Utilization Procedures
    Exhibit 1       -       Exporter's Certificate
    Exhibit 2       -       Request for Reimbursement to Borrower's Account
    Exhibit 2(a)    -       Itemized Statement of Payments
    Exhibit 3       -       [intentionally omitted]
    Exhibit 4       -       Certificate Authorizing Reimbursement

    Exhibit 5       -       Request for Letter of Credit Approval
    Exhibit 6       -       Certificate Approving Letter of Credit
    Exhibit 7       -       Request for Ex-Im Bank Approval of
                            Amendment to Letter of Credit
    Exhibit 8       -       Certificate Approving Amendment to Letter of Credit
    Exhibit 9       -       Request for Lender Approval of Amendment of Letter of Credit
    Exhibit 10      -       Notice of Letter of Credit Amendment

Annex C      -       Form of Opinion of Borrower's Counsel
Annex D      -       Form of Acquisition List
Annex E      -       Form of Standby L/C
Annex F      -       Disclosure of Legal Proceedings against Borrower



This Credit Agreement (the "Agreement"), dated July 13, 2001, is made by and among The Lebanese Company for the Development and Reconstruction of Beirut Central District s.a.l., a private sector corporation (the "Borrower"), Citibank, N.A., Beirut Branch (the "Lender"), Citibank International plc, a corporation organized under the laws of England as agent for the Lender and its successors and assigns (in such capacity, the "Agent") and the Export-Import Bank of the United States, an agency of the United States of America ("Ex-Im Bank"). Capitalized terms used herein shall be defined as provided in Section 1.

## BACKGROUND

WHEREAS:

(A)    by this Agreement, the Lender has established an export financing credit (the "Credit") in the amount of U.S.$14,709,252.00, pursuant to which the Lender shall extend financing to the Borrower: (i) for the purchase of Eligible Goods and Services, and (ii) for the payment of the related Exposure Fee;

(B)    the establishment of the Credit will facilitate exports from the United States to the Borrower's Country;

(C)    a condition to the Lender's extension of the Credit under this Agreement is the availability of the Ex-Im Bank Guarantee pursuant to the terms and conditions of the Master Guarantee Agreement (Long-Term Credits) No._____-L (Syndicated) dated as of _____. 2001 between the Agent and Ex-Im Bank (the "Master Guarantee Agreement"); and

(D)    the Credit may be utilized by the Borrower in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS AND PRINCIPLES OF CONSTRUCTION

1.01    Defined Terms. For the purposes of this Agreement, unless otherwise defined herein, the following terms shall have the meanings specified below.

"Acquisition List" shall mean a list of the goods and services approved for financing under the Credit in the form of Annex D submitted pursuant to Section 6.01(g), as may be amended or otherwise modified from time to time (with the prior written consent of Ex-Im Bank, with a copy of such consent sent to the Agent by the Borrower promptly upon the Borrower's receipt of such consent).

1

"Agent" shall have the meaning set forth in the preamble to the Agreement.

"Agreement" shall mean this Credit Agreement, including any Annex, Exhibit, Schedule, Term Sheet and other attachment thereto, in each case as amended or otherwise modified from time to time.

"Alternative Base Rate" shall mean a rate per annum equal to the greater of (A) the rate of interest publicly announced from time to time by the Citibank, N.A. in New York, New York, as its base rate and (B) a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Agent from three federal funds brokers or recognized standing selected by the Agent plus five-tenths of one percent (0.50%).

"Amended Exporter's Certificate" shall mean any Exporter's Certificate amending an Initial Exporter's Certificate (or any previously delivered Exporter's Certificate).

"Borrower" shall have the meaning set forth in the preamble to this Agreement.

"Borrower Documents" shall mean this Agreement, any Note, and all other documents and instruments to be executed and delivered by the Borrower under this Agreement.

"Borrower Financial Statements" shall mean the financial statements of the Borrower dated December 31, 2000, which the Borrower has furnished to the Agent, the Lender and Ex-Im Bank prior to the date of this Agreement.

"Borrower's Country" shall mean Lebanon.

"Business Day" shall mean any day on which dealings in U.S. Dollar deposits are carried on in the London interbank market and on which commercial banks in London, Beirut and New York City are open for domestic and foreign exchange business.

"Cash Payment" shall have the meaning set forth in Section 4.01(a).

"Credit" shall have the meaning set forth in Whereas clause (A) of the recitals to this Agreement.

"Debarment Regulations" shall mean (a) the Government-wide Debarment and Suspension (Nonprocurement) regulations (Common Rule), 53 Fed. Reg. 19204 (May 26, 1988); (b) Subpart 9.4 (Debarment, Suspension, and Ineligibility) of the Federal Acquisition Regulations, 48 C.F.R. 9.400 – 9.409; and (c) the revised Government-wide Debarment and Suspension (Nonprocurement) regulations (Common Rule), 60 Fed. Reg. 33037 (June 26, 1995).

2

"Disbursement" shall mean either a Reimbursement or an L/C Payment, together with any Exposure Fee payment made in connection therewith.

"Disbursement Date" shall mean, in relation to any Disbursement, the Business Day on which the Lender shall make such Disbursement.

"Disbursement Percentage" shall mean the Disbursement Percentage (if any) stated in Part A of the relevant Exporter's Certificate.

"Disposition of Indebtedness" shall have the meaning set forth in Section 13.03.

"Dollars," "U.S. Dollars," "U.S. $" or "$" shall mean the lawful currency of the United States of America.

"Eligible Goods and Services" shall mean Goods and Services.

"Event of Default" shall have the meaning set forth in Section 10.03(a).

"Ex-Im Bank" shall have the meaning set forth in the preamble to this Agreement.

"Ex-Im Bank Approval" shall mean an "Ex-Im Bank Approval" (as such term is defined in the Master Guarantee Agreement), identified by reference to the Transaction Number.

"Ex-Im Bank Guarantee" shall mean the guarantee provided by Ex-Im Bank under the Master Guarantee Agreement and the Ex-Im Bank Approval with respect to the Credit.

"Exporter" shall mean the Person, specified as such in an Ex-Im Bank Approval or otherwise approved by Ex-Im Bank.

"Exposure Fee" shall have the meaning set forth in Section 7.01(a)(ii).

"Facility Office" shall mean, in respect of the Agent or the Lender, the office identified below such party's signature on the execution pages of this Agreement, or such other office as it may from time to time notify the other parties hereto as its Facility Office.

"Final Disbursement Date" shall have the meaning set forth in Section 2.02.

"Financed Portion" shall mean the portion of the Net Contract Price of the Goods and Services that may be covered under the Guarantee in accordance with Section 4.02(a).

"Floating Rate Note" shall mean a Note in the form of Annex A-1.

"Foreign Content" shall mean, with respect to any Supply Contract, the amount representing the foreign content in such contract as specified in Part A of the relevant Exporter's

3

Certificate. Ex-Im Bank shall determine what does and does not constitute Foreign Content, and such determination, in the absence of manifest error, shall be conclusive and binding for all purposes.

"Goods" shall mean goods (i) purchased in the United States under a Supply Contract and exported from the United States to the Borrower's Country, and (ii) listed on the Acquisition List; *provided* that Ex-Im Bank shall determine what does and does not constitute Goods, and such determination, in the absence of manifest error, shall be conclusive and binding for all purposes.

"Governmental Authority" shall mean the government or any political subdivision of the government of the Borrower's Country, any agency, department or any other administrative authority or instrumentality thereof, including, without limitation, any local or other governmental agency or other authority within the Borrower's Country.

"Guarantee Certificate" shall mean, with respect to a Utilization, Ex-Im Bank's Certificate Authorizing Reimbursement in the form of Exhibit 3 to Annex B, Ex-Im Bank's Certificate Approving Letter of Credit in the form of Exhibit 6 to Annex B, Certificate Approving Amendment to Letter of Credit in the form of Exhibit 8 to Annex B, whichever is appropriate.

"Guarantee Commitment Fee" shall have the meaning set forth in Section 7.01(a)(i).

"Initial Exporter's Certificate" shall mean the initial Exporter's Certificate delivered to the Agent prior to the first Disbursement with respect to any Supply Contract.

"Interest Payment Date" shall mean April 25 and October 25 of each year, beginning on October 25, 2001.

"Interest Period" shall mean, with respect to any Disbursement, (a) the period commencing on the Disbursement Date and extending up to, but not including, the next Interest Payment Date; provided, however, that if the Disbursement Date is within sixty (60) days of such Interest Payment Date, the Interest Period shall end on the next succeeding Interest Payment Date; and (b) thereafter the period commencing on each Interest Payment Date and extending up to, but not including, the next Interest Payment Date.

"L/C Bank" shall have the meaning set forth in Part III of Annex B.

"L/C Payment" shall have the meaning set forth in Section 3.01.

"Lender" shall have the meaning set forth in the preamble to this Agreement.

"Letter of Credit" shall mean any irrevocable documentary sight letter of credit (in compliance with the requirements of the Uniform Customs and Practices for Documentary Credits (International Chamber of Commerce Publication 500), as the same may be amended from time to time, for which Ex-Im Bank has issued a Guarantee Certificate under this Agreement.

4



"LIBOR" shall mean, in relation to any Interest Period, the rate appearing on Page 3750 of the Telerate Service (or any successor or substitute page of such Service, or any successor to or substitute for such Service, providing rate quotations comparable to those currently provided on such page of such Service, as determined by the applicable Lender from time to time for purposes of providing quotations of interest rates applicable to U.S. Dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the first day of such Interest Period, as the rate of interest for Dollar deposits for a period most closely approximating such Interest Period (the "Telerate LIBOR"); *provided* that, in the event the Telerate LIBOR cannot be determined for any Interest Period, as set forth above, then "LIBOR" for such Interest Period shall mean the rate of interest per annum (rounded upward, if necessary, to the nearest 1/100 of 1%) quoted by the principal London office of the Citibank, N.A. at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period for the offering to leading banks in the London interbank market of U.S. Dollar deposits for a period and in an amount comparable to such Interest Period and the principal amount upon which interest is to be paid during such Interest Period (the "Citibank, N.A. LIBOR"). Promptly after determining the applicable interest rate for an Interest Period, the Facility Agent shall give notice by telex or telecopy to the Borrower and the Lender of such rate, which rate, absent manifest error, shall be final, conclusive and binding on the Borrower.

"Lien" shall mean any lien, lease, mortgage, pledge, hypothecation, preferential arrangement relating to payments, or other encumbrance or security interest.

"MARAD" shall have the meaning set forth in Section 4.01(b).

"Master Guarantee Agreement" shall have the meaning set forth in Whereas clause (C).

"Net Contract Price" shall mean, with respect to a Supply Contract, the U.S. Content plus the Foreign Content.

"Note" shall have mean (a) a promissory note issued pursuant to Section 5.06(a), or (b) any replacement promissory note issued pursuant to this Agreement.

"Other Governmental Authority" shall mean any government or any political subdivision of a government, any agency, department or any other administrative authority or instrumentality thereof, including, without limitation, any local or other governmental agency or other authority.

"Payment Default Date" shall have the meaning set forth in Section 5.02(b)(iii).

"Permitted Lien" shall have the meaning set forth in Section 9.03(a).

"Person" shall mean an individual, corporation, partnership, trust, unincorporated organization or any other enterprise, or a Governmental Authority or Other Governmental Authority.

5

"Pooling Country Freight Costs" shall mean the cost of ocean freight for shipment of Goods from the United States to the Borrower's Country on an ocean vessel registered in the Borrower's Country, *provided*, (a) such freight costs are included in the Net Contract Price; (b) the Borrower's Country is deemed "MARAD Pooling Country" by MARAD; (c) the applicable maritime agreement between the Borrower's Country and MARAD remains in full force and effect; and (d) the Borrower has obtained a waiver of shipment on vessels of U.S. registry from MARAD.

"Principals" shall have the meaning set forth in Section 9.01(a)(xiv).

"Progress Payments" shall mean payments to an Exporter prior to completion and delivery of a Good, as set forth in Section 6.01(h).

"Regulatory Change" shall have the meaning set forth in Section 7.04(c).

"Reimbursement" shall have the meaning set forth in Section 3.01.

"Repayment Date" shall mean April 25 and October 25 of each year, beginning on October 25, 2004.

"Services" shall mean services (i) performed by the Exporter under a Supply Contract, and (ii) listed in the Acquisition List; *provided* that Ex-Im Bank shall determine what does and does not constitute Services, and such determination, in the absence of manifest error, shall be conclusive and binding for all purposes.

"Special LIBOR" shall mean, with respect to any Interest Period, the rate of interest per annum specified as the Dollar LIBOR Interbank fixing rate in the Financial Times under the table entitled "Money Rates", in effect on the day two Business Days prior to the first day of the relevant Interest Period for a term similar to the term of such Interest Period. If no rate is specified for such day, the applicable rate shall be the rate specified for the immediately preceding day for which a rate is specified, and if more than one rate is specified, the applicable rate shall be the highest of all such rates. In the event the Financial Times either completely ceases publication or discontinues publication of the Dollar LIBOR Interbank fixing rate, then Ex-Im Bank shall determine Special LIBOR by reference to a financial publication with a similar international or U.S. circulation, which publication shall be selected by Ex-Im Bank in its sole discretion.

"Standby L/C" shall mean the standby letter of credit described in Section 6.01(m).

"Standby L/C Issuing Bank" shall mean Citibank, N.A. or an alternative banking institution acceptable to Ex-Im Bank.

"Supply Contract" shall mean the contract(s) (or, if no contract is executed, any other document(s) satisfactory to Ex-Im Bank) for the purchase of Eligible Goods and Services entered into between the Borrower and an Exporter; *provided*, in each case, that multiple contracts



among the same parties with respect to a Transaction will only be considered a single "Supply Contract" for all purposes under this Agreement.

"Taxes" shall mean any taxes, fees, levies, imposts, duties or charges of whatsoever nature (whether imposed by withholding or deduction or otherwise) imposed by any Governmental Authority (including, without limitation, any taxing authority), or by any other jurisdiction from which payments required hereunder or under the Note(s) are made, excluding in the case of the Lender and the Agent, taxes imposed on its overall net income by the jurisdiction under the laws of which such Lender or the Agent (as the case may be) is organized or any political subdivision thereof and, in the case of each Lender, taxes imposed on its overall net income by the jurisdiction of such Lender's lending office or any political subdivision thereof, and excluding delay penalties imposed as a result of the Lender's or the Agent's negligence.

"Transaction Documents" shall mean the Borrower Documents, the Ex-Im Bank Guarantee and the Ex-Im Bank Approval.

"Transaction Number" shall mean "Ex-Im Bank Transaction No. AP073269XX-Lebanon", as specified in the Ex-Im Bank Approval.

"U.S. or "United States" shall mean the United States of America.

"U.S. Content" shall mean, with respect to any Supply Contract, the amount representing the U.S. content in such contract as specified in Part A of the relevant Exporter's Certificate. Ex-Im Bank shall determine what does and does not constitute U.S. Content, and such determination, in the absence of manifest error, shall be conclusive and binding for all purposes.

"U.S. Content Percentage" shall mean, with respect to any Supply Contract, the percentage specified as such in Part A of the relevant Exporter's Certificate.

"U.S. Treasury Rate" shall have the meaning set forth in Section 5.02(b)(iii).

"Utilization" shall mean either: (i) the making of a Reimbursement in accordance with the Reimbursement Procedure set forth in Section II of Annex B; or (ii) the issuance of a Letter of Credit in accordance with the Letter of Credit Procedure set forth in Section III of Annex B.

1.02    Principles of Construction.

(a)    The meanings set forth for defined terms in Section 1.01 or elsewhere in this Agreement shall be equally applicable to both the singular and plural forms of the terms defined.

(b)    Unless otherwise specified, all references in this Agreement to Sections, Term Sheets, Annexes, Exhibits and Schedules are to Sections, Term Sheets, Annexes, Exhibits and Schedules in or to this Agreement.

(c)    The headings of the Sections in this Agreement are included for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

## SECTION 2. THE CREDIT

2.01    Amount. The Lender hereby establishes the Credit, upon the terms and conditions set forth in this Agreement, in favor of the Borrower in an amount of up to U.S.$14,709,252.00 to enable the Borrower to finance: (a) the Financed Portion of the costs incurred on or after June 2, 1998 by the Borrower for purchase of the Goods and/or Services; and (b) the Exposure Fee payable on the Financed Portion.

2.02    Availability. Subject to the terms and conditions provided herein, including, without limitation, the conditions set forth in Section 6, Disbursements under the Credit may be made up to and including the Final Disbursement Date. "Final Disbursement Date" shall mean either September 25, 2004 or, if earlier, the date on which the full remaining balance of the Credit is cancelled by either (i) the Borrower in accordance with Section 10.01, or (ii) Ex-Im Bank in accordance with Section 10.02.

## SECTION 3. DISBURSEMENTS

3.01    Disbursements. Upon satisfaction of the conditions set forth in Section 6, the Credit may be disbursed in the manner described in, and subject to the conditions of, Annex B. Disbursements may be made: (i) through drawings by a beneficiary under, and in accordance with the terms of, a Letter of Credit ("L/C Payments"); and/or (ii) by advances from the Agent, on behalf of the Lender to the Borrower reimbursing the Borrower for payments to an Exporter and/or Ex-Im Bank ("Reimbursements"); and/or (iii) if financed, by payments of the Exposure Fee to Ex-Im Bank.

## SECTION 4. EX-IM BANK GUARANTEE REQUIREMENTS

4.01    Eligibility for Ex-Im Bank Guarantee. To be eligible for financing under the Credit and the Ex-Im Bank Guarantee:

(a)    The Borrower shall have made or caused to be made a cash payment for the purchase of Goods and Services in an amount equal to not less than 15% of the Net Contract Price.

(b)    All Goods that are to be exported by ocean vessel must be transported from the United States in vessels of U.S. registry, as required by 46 U.S.C. §1241-1 (Public Resolution No. 17 of the 73rd Congress of the United States, as amended), except to the extent that a waiver of this requirement is obtained from the U.S. Maritime Administration ("MARAD"), as described in Annex B. If any Goods are shipped on vessels of non-U.S. registry without a MARAD waiver or contrary to the provisions of a MARAD waiver, such Goods will not be eligible under the Ex-Im Bank Guarantee

8

and thus will not be eligible for financing under the Credit. If Goods are shipped on ocean vessels or aircraft of U.S. registry, the cost of shipment may be included in the U.S. Content of the Supply Contract. Subject to the waiver requirements set forth Section 4.01(b), if such Goods are shipped on ocean vessels or aircraft of non-U.S. registry, the cost of shipment may constitute Foreign Content if such cost has been included in the Net Contract Price. Pooling Country Freight Costs shall be deemed U.S. Content.

(c)     The Borrower shall obtain or cause to be obtained insurance against marine and transit hazards on all shipments of Goods in an amount not less than the amount of the Disbursements that have been or are to be made with respect to those shipments. The Borrower shall give United States insurers a non-discriminatory opportunity to bid for such insurance business related to such Goods.

4.02    Coverage of the Ex-Im Bank Guarantee. Subject to the terms and conditions of this Agreement, the Master Guarantee Agreement and the relevant Ex-Im Bank Approval, the Ex-Im Bank Guarantee shall cover a Disbursement up to the following maximum amount:

> (a)     an amount equal to the lesser of (i) eighty-five percent (85%), (ii) the U.S. Content Percentage, and (iii) the Disbursement Percentage, if any; in each case, of the U.S. Dollar invoice value of the Goods and Services to be financed by such Disbursement; plus

> (b)     an amount equal to one-hundred percent (100%) of the Exposure Fee on the amounts disbursed pursuant to (a).

## SECTION 5. TERMS OF THE CREDIT

5.01    Principal Repayment. The Borrower shall repay to the Agent for the account of the Lender all amounts disbursed under the Credit in ten (10) approximately equal, successive semi-annual installments, with each such installment to be payable on a Repayment Date; *provided* that, on the last Repayment Date, the Borrower shall repay in full the principal amount of the Credit then outstanding.

5.02    Interest Payment.

(a)     To the Lender

> (i)     On each Interest Payment Date, the Borrower shall pay to the Agent for the account of the Lender interest on all amounts disbursed and outstanding from time to time under the Credit, calculated at an interest rate per annum equal to the sum of (x) 0.25% per annum, and (y) LIBOR for the applicable Interest Period(s).

9

(ii)    (x) If all or any part of principal, accrued interest, fees or other amounts owing to the Lender or the Agent under this Agreement or any Note is not paid in full when due, whether at stated maturity, by acceleration or otherwise, or (y) if any sum due and payable by the Borrower to the Lender or Agent under any judgment of any court or arbitral tribunal in connection herewith is not paid within five Business Days from the date of such judgment (clause (x) and clause (y) above are each individually hereinafter referred to as an "Unpaid Amount") the Borrower shall pay to the Agent for the account of the Lender on demand interest on the Unpaid Amount (to the extent permitted by applicable law) for the period from the date such amount was due until such amount shall have been paid in full at an interest rate per annum equal to 2% per annum above the interest rate then applicable under Section 5.02(a)(i).

(b)    To Ex-Im Bank

(i)    Notwithstanding Section 5.02(a)(i), if Ex-Im Bank shall have made a claim payment to the Agent for the account of the Lender with respect to any Floating Rate Note, then, beginning on the date of such claim payment, the definition of Special LIBOR shall apply to each such Floating Rate Note (in place of the definition of LIBOR contained in each such Floating Rate Note) for all purposes, including, without limitation, Section 5.02(b)(ii).

(ii)    Notwithstanding Section 5.02(a)(ii), if Ex-Im Bank shall have made a claim payment to the Agent for the account of the Lender with respect to any Note, then, beginning on the date of such claim payment, if any amount of principal of or accrued interest on any Note then owing to Ex-Im Bank is not paid in full when due, whether at stated maturity, by acceleration or otherwise, the Borrower shall pay to Ex-Im Bank on demand, interest on such unpaid amount (to the extent permitted by applicable law) for the period from the date such amount was due to Ex-Im Bank until such amount shall have been paid in full at an interest rate per annum equal to one percent (1%) per annum above the interest rate then applicable under Section 5.02(a)(i) (as modified, if required, by 5.02(b)(i)).

(iii)    Except as otherwise provided in 5.02(b)(ii) with respect to amounts of principal and accrued interest, if, at any time, any amount owing to Ex-Im Bank under this Agreement or any Note is not paid in full when due, the Borrower shall pay to Ex-Im Bank on demand, interest on such unpaid amount for the period from the date such amount was due ("Payment Default Date") until such amount shall have been paid in full at an interest rate per annum equal to one percent (1%) per annum above the U.S. Treasury Rate. The "U.S. Treasury Rate" shall mean the interest rate specified in the Federal Reserve Statistical Release H.15 (519) Selected Interest Rates for six-month (180 days) Treasury Bills under the category entitled "Treasury Bills, Auction Average (Investment)" (or, if not included under such category, the category entitled "Treasury Constant Maturities"), which is in effect on the Payment Default Date.

5.03    Alternative Interest Rate.

10

(a)    If the Lender shall have determined (which determination shall be conclusive and binding for all purposes, absent manifest error), prior to the commencement of any Interest Period that:

(i)    Dollar deposits of sufficient amount and maturity for funding a Disbursement are not available to the Lender in the Beirut interbank market in the ordinary course of business;

(ii)    by reason of circumstances affecting the relevant market, adequate and fair means do not exist for ascertaining the rate of interest to be applicable to a Disbursement; or

(iii)    the relevant rate of interest referred to in the definition of LIBOR which is to be used to determine the rate of interest for a Disbursement does not cover the funding cost to the Lender of making or maintaining the Disbursement, then the Lender, so long as such condition shall exist, shall give notice to the Borrower and the Agent of the rate of interest that the Lender determines is equal to the Alternative Base Rate Interest that shall accrue during each applicable Interest Period at the rate set forth in the notice.

(b)    If, in the Lender's reasonable judgment, it becomes unlawful at any time for the Lender to make or maintain Disbursements based upon LIBOR, the Lender, so long as such condition shall exist, shall give notice to the Borrower and the Agent of the rate of interest which the Lender determines is equal to 2% above the Alternative Base Rate (expressed as an annual rate), and interest shall accrue during each applicable Interest Period at the rate set forth in such notice.

5.04    Prepayment. The Borrower may from time to time prepay, without premium or penalty, on any Interest Payment Date all or part of the principal amount of the Credit, provided that: (i) any partial prepayment shall be in a minimum principal amount of U.S.$5,000,000; (ii) the Borrower shall have given the Agent and Ex-Im Bank at least thirty (30) days' prior written notice of the prepayment (which notice shall be irrevocable); and (iii) the Borrower shall have paid in full all amounts due under the Credit as of the date of such prepayment, including interest which has accrued to the date of prepayment on the amount prepaid. Prepayments shall be applied to the installments of principal of the Credit in the inverse order of their maturity, and, in cases where more than one Note is outstanding, pro rata to each Note.

5.05    Recapture. The Borrower shall pay to the Agent, on behalf of the Lender, upon the written request of the Lender, such amounts as shall be sufficient (in the reasonable judgment of the Lender) to compensate the Lender for any loss, expense, or liability (including, without limitation, any loss, expense or liability incurred by reason of the liquidation or redeployment of deposits from third parties or in connection with obtaining funds to make or maintain any Disbursement) which the Lender reasonably determines is attributable to:

(a)    any payment or prepayment of the Credit other than in accordance with Section 5.01 or 5.04 (including, without limitation, by reason of acceleration); or

11

(b)    any failure by the Borrower to borrow any advance that has been requested in a Request for Reimbursement (as provided in Annex B).

The Lender shall deliver to the Agent, and the Agent shall deliver to the Borrower a statement specifying the amount of any claim pursuant to this Section 5.05 and the method of calculation thereof.

## 5.06    Evidence of Debt.

(a)    The Borrower agrees that to evidence further its obligation to repay all amounts disbursed under the Credit, with interest accrued thereon, it shall, not later than the date of the first Utilization hereunder, issue and deliver to the Agent, for the account of the Lender, in accordance with the written instructions of the Agent, one or more promissory notes (each such promissory note, or any replacement promissory note issued pursuant to Section 5.06(b) or Section 5.06(c), a "Note"). Each Note shall be in the form of either Annex A-1, or as otherwise agreed upon by the parties hereto, and shall be valid and enforceable as to its principal amount at any time only to the extent of the aggregate amounts then disbursed and outstanding under the Credit, and, as to interest, only to the extent of the interest accrued thereon. Any notations by the Agent on any Note regarding payments made on account of the principal thereof, in absence of manifest error, shall be conclusive and binding. Upon the payment in full of any Note, the Agent, on behalf of the Lender, shall cancel and surrender such Note to the Borrower upon the Borrower's request.

(b)    If requested by the Agent, within ten (10) days after the Final Disbursement Date, the Borrower shall issue and deliver to the Agent, for the account of the Lender, a new Note(s) in exchange for the Note(s) previously issued and delivered in accordance with Section 6.01(j), whereupon the Agent shall cancel and surrender such previously issued Note(s) for cancellation to the Borrower.  The principal amount of such new Note(s) shall equal in the aggregate the principal amount of the Credit then disbursed and outstanding.

(c)    If requested by the Agent or Ex-Im Bank pursuant to Section 7.02(b)(ii), the Borrower shall issue and deliver to the Agent, for the account of the Lender, a new Note(s) in exchange for the Note(s) previously issued and delivered in accordance with this Agreement, whereupon the Agent shall cancel and surrender such previously issued Note(s) to the Borrower.

(d)    If any Note is mutilated, lost, stolen or destroyed, the Borrower shall issue and deliver a new Note to the Agent, for the account of the Lender, of the same date, maturity and denomination as the Note so mutilated, lost, stolen or destroyed; provided that, in the case of any mutilated Note, such mutilated Note shall be returned to the Borrower after examination by Ex-Im Bank, and, in the case of any lost, stolen or destroyed Note, the Borrower and Ex-Im Bank shall have first received evidence of such loss, theft or destruction as shall reasonably be considered satisfactory to each of them

12



(e)    All replacement Notes issued in connection with this Agreement shall be signed by an authorized representative of the Borrower, as named in the evidence of authority submitted pursuant to Section 6.01(c) or otherwise acceptable to Ex-Im Bank and the Agent.

## SECTION 6. CONDITIONS PRECEDENT

6.01    Conditions Precedent to First Utilization. The obligation of the Lender to permit the first Utilization of the Credit shall be subject to the delivery to the Agent and Ex-Im Bank of the documents indicated below (each in form and substance satisfactory to the Lender and Ex-Im Bank) and to the fulfillment (in a manner satisfactory to the Agent and Ex-Im Bank) of the conditions set forth below:

(a)    This Agreement. This Agreement fully executed by the parties hereto, which shall be in full force and effect (with, if applicable, evidence that this Agreement has been registered with the appropriate authorities in the Borrower's Country).

(b)    Existence. Evidence that the Borrower is duly organized and validly existing under the laws of the Borrower's Country, with full power, authority and legal right to own its property and carry on its business as now conducted, including, without limitation, a copy of any applicable enabling legislation.

(c)    Authority. Certified copies and certified English translation of (i) the board resolutions or other evidence of the authority of the Borrower to execute, deliver, perform, and observe the terms and conditions of this Agreement, any Note, and any other Borrower Documents; and (ii) the specimen signatures and incumbency for each Person who, on behalf of the Borrower, signed this Agreement, will sign the Note(s), and/or signed or will sign any other Borrower Documents, or will otherwise act as the Borrower's representative in the operation of the Credit.

(d)    Government Authorizations. Either (i) copies, certified as true copies by a duly authorized officer of the Borrower, of each consent, license, authorization or approval of, and exemption by, any Governmental Authority and any Other Governmental Authority, which are necessary or advisable: (x) for the execution, delivery, performance and observance by the Borrower of the Borrower Documents, including, without limitation, all approvals relating to the availability and transfer of Dollars required to make all payments due under this Agreement and the Note(s); (y) for the validity, binding effect and enforceability of the Borrower Documents; and (z) for the execution, delivery and performance of any Supply Contract, the importation of the Goods, performance of the Services, and use of the Eligible Goods and Services in the Borrower's Country, or (ii) a written statement from the Borrower confirming that no such consent, license, authorization, approval or exemption are necessary or advisable.

(e)    Legal Opinion(s). (i) Opinion of legal counsel in the Borrower's Country in substantially the form of Annex C, (ii) if requested by Ex-Im Bank or the Agent, an opinion from

13

independent legal counsel selected by Ex-Im Bank or the Agent as to such matters relating to this Agreement or the transaction contemplated hereby as specified by Ex-Im Bank or the Agent.

(f)     Appointment of Process Agent. Evidence that (i) the Borrower has irrevocably appointed as its agent for service of process the Person or Persons so specified in Section 11.03(a) and (ii) each such agent has accepted the appointment for a term extending at least one year beyond the scheduled final repayment date of the Credit and has agreed to forward forthwith to the Borrower all legal process addressed to the Borrower received by such agent.

(g)     Acquisition List. A list of the Eligible Goods and Services in the form set forth in Annex D.

(h)     Supply Contract(s). A copy of the Supply Contract(s). If any Supply Contract provides for payments to an Exporter prior to completion and delivery of any Eligible Goods and Services ("Progress Payments"), the schedule for such Progress Payments, in Ex-Im Bank's reasonable judgment, must be reasonable and consistent with industry and financial standards.

(i)     Master Guarantee Agreement. The fully executed Master Guarantee Agreement and a fully executed Ex-Im Bank Approval, each of which shall be in full force and effect.

(j)     Note(s). The Note(s) in the aggregate principal amount of the Credit shall have been fully executed by the Borrower, and delivered to the Agent, with a copy to Ex-Im Bank.

(k)     Stamp Duty. Evidence that necessary stamp duty has been paid on each Note.

(l)     Outside Counsel Fees. Evidence that the reasonable fees and out-of-pocket expenses due and payable to counsel to the Lender, the Agent and Ex-Im Bank have been fully paid.

(m)     Standby Letter of Credit. An irrevocable standby Letter of Credit, in substantially the form of Annex E and in form and substance satisfactory to Ex-Im Bank ("Standby L/C"), shall have been issued by the Standby L/C Issuing Bank for the account of the Borrower in favor of Ex-Im Bank.

(n)     No Event of Default. No Event of Default and no event, which but for the giving of notice or the lapse of time or both would constitute an Event of Default, exists at the time all the foregoing conditions have been satisfied or waived.

(o) Letter Agreement. A fully executed letter agreement, in form and substance satisfactory to the Agent, confirming certain obligations of the Borrower to the Lender and the Agent following their assignment of rights under this Agreement to Ex-Im Bank, which is in full force and effect.

(p) Officer's Certificate. A certificate, signed by an officer of the Borrower, stating that on and as of the date of the first Utilization (i) no Event of Default or event which but for the

14



giving of notice and or the lapse of time or both would constitute an Event of Default has occurred and is continuing and (ii) the representations and warranties contained in Section 9.01 are true and correct in all material respects.

(q) Recordation. As required by applicable law, all Borrower Documents have been registered, recorded, enrolled or otherwise filed with any court or other Governmental Authority, or notarized.

6.02   Conditions Precedent to Each Utilization. The obligation of the Lender to permit any Utilization, including the first Utilization, shall be subject to the delivery to the Agent and Ex-Im Bank of the documents indicated below (each in form and substance satisfactory to the Agent and Ex-Im Bank) and to the fulfillment, as of the date of such Utilization (in a manner satisfactory to the Agent and Ex-Im Bank) of the conditions set forth below:

(a)   This Agreement and the Master Guarantee Agreement.   This Agreement, the Master Guarantee Agreement and the Ex-Im Bank Approval each shall continue to be in full force and effect.

(b)   No Restrictions. No law, regulation, ruling or other action of any Governmental Authority or Other Governmental Authority shall be in effect or shall have occurred, the effect of which would be to prevent any party to this Agreement from fulfilling its obligations.

(c)   Utilization Documents.   The Agent and Ex-Im Bank shall have received the documents required under Annex B with respect to the requested Utilization.

(d)   Legal Opinion(s). If, since the date of the legal opinion furnished pursuant to Section 6.01(e), there has been a change in circumstances that could have a material adverse effect on the ability of the Borrower to perform its obligations hereunder or under any Note, then Ex-Im Bank or the Agent may request supplemental legal opinions with respect to the possible consequences of such changed circumstances. Such supplemental opinions shall be dated as of the date on which the Utilization was requested, be addressed and delivered to Ex-Im Bank and the Agent, and be in form and substance satisfactory to Ex-Im Bank and the Agent.

(e)   Exposure Fee; Other Fees and Expenses.   Ex-Im Bank shall have been paid the Exposure Fee or arrangements satisfactory to Ex-Im Bank for the payment thereof shall have been made. All other fees and expenses then due and payable under Section 7 shall have been paid.

(f)   Guarantee Certificate.   Ex-Im Bank shall have issued a Guarantee Certificate with respect to the requested Utilization.

(g)   Representation and Warranties.   As of each Utilization, the representations and warranties made by the Borrower in this Agreement and in the other Borrower Documents shall be true and accurate on and as of the date of such Utilization and after giving effect to the requested Utilization.

(h)     Other Documents. Such other documents, certificates, instruments or information relating to this Agreement or any Note or the transactions contemplated hereby as either the Agent, the Lender or Ex-Im Bank may have reasonably requested.

(i)     No Event of Default. No Event of Default and no event, which but for the giving of notice or the lapse of time or both would constitute an Event of Default, exists or will exist after giving effect to the requested Utilization.

## SECTION 7. FEES AND EXPENSES

7.01    Fees.

(a)     The Borrower shall pay or cause to be paid to Ex-Im Bank the following fees:

(i)     a guarantee commitment fee ("Guarantee Commitment Fee") of one-eighth of one percent (0.1250%) per annum on the uncancelled and undisbursed balance from time to time of the Credit, computed on the basis of the actual number of days elapsed (including the first day but excluding the last), using a 360-day year, accruing from May 8, 2001 to the Final Disbursement Date, and payable on April 25 and October 25 of each year, beginning on October 25, 2001; and

(ii)    no later than each Disbursement Date, an exposure fee (an "Exposure Fee") equal to 9.30% of the amount of the related Reimbursement or L/C Payment.

The parties hereto acknowledge and agree that the Guarantee Commitment Fee shall continue to accrue and become due and payable as described above during any period in which Utilizations are suspended as described in Section 10.02(a).

(b)     The Borrower shall pay or cause to be paid to the Agent all fees and expenses as set forth in the fee letter dated the date hereof between the Borrower and the Agent.

7.02    Taxes.

(a)     The Borrower agrees to pay all amounts owing by it under this Agreement or any Note free and clear of and without deduction or withholding for or on account of any Taxes.

(b)     The Borrower further agrees:

(i)     that, if the Borrower is prevented by operation of law from paying any such Taxes or any such Taxes are required to be deducted or withheld, then the interest, fees or expenses required to be paid under this Agreement or any Note shall, on an after-tax basis, be increased by the amount necessary to yield to the Agent, Lender or Ex-Im Bank, as the case may be, interest, fees or expenses in the amounts provided for in this Agreement or such Note after the provision for the payment of all such Taxes;

16

(ii)     that the Borrower shall, at the request of either the Agent or Ex-Im Bank, execute and deliver to the Agent or Ex-Im Bank, as the case may be, such further instruments as may be necessary or desirable to effect the payment of the increased amounts as provided for in subsection (i) above, including new Note(s) to be issued by the Borrower in exchange for any Note(s) previously issued;

(iii)    that the Borrower shall hold the Lender and Ex-Im Bank harmless from and against any liabilities with respect to any Taxes (whether or not properly or legally asserted), including (but not limited to) any Taxes resulting from any Exposure Fee refund; and

(iv)     that, at the request of either the Agent or Ex-Im Bank, the Borrower shall provide the Agent and Ex-Im Bank, within the later of thirty (30) days after such request or thirty (30) days after the actual payment of such Taxes, with the original or a certified copy of evidence of the payment of any Taxes by the Borrower or, if no Taxes have been paid, provide the Agent and Ex-Im Bank, at the request of either the Agent or Ex-Im Bank, with a certificate from the appropriate taxing authority or an opinion of counsel acceptable to the Agent and Ex-Im Bank stating that no Taxes are payable.

(c)     Notwithstanding anything to the contrary contained herein, the agreements in this Section 7.02 shall survive the termination of this Agreement and the payment of the Note(s) and all other amounts due hereunder.

7.03    Expenses.     The Borrower agrees, whether or not the transactions hereby contemplated shall be consummated, to pay or reimburse the Agent, the Lender and Ex-Im Bank, respectively, promptly upon demand for the payment of all reasonable and duly documented costs and expenses arising in connection with the preparation, printing, execution, delivery, registration, implementation, and modification of or waiver or consent under, the Borrower Documents and the Master Guarantee Agreement, including, without limitation, the reasonable and duly documented out-of-pocket expenses of the Agent, the Lender and Ex-Im Bank (incurred in respect of telecommunications, mail or courier service, travel and the like), the reasonable and duly documented fees and expenses of counsel for the Agent, the Lender and/or Ex-Im Bank, all Taxes (including, but not limited to, interest and penalties, if any, unless such interest and penalties are due to the gross negligence or willful misconduct of the Lender, Agent and/or Ex-Im Bank) which may be payable in respect of the Borrower Documents and the Master Guarantee Agreement, any expenses in connection with the preservation or enforcement of the security interest in the Collateral. The Borrower shall also pay all of the costs and expenses (including, but not limited to, the fees and expenses of counsel and all Taxes) incurred by or charged to the Agent, the Lender or Ex-Im Bank in connection with the amendment or enforcement of any of the Borrower Documents or the protection or preservation of any right or claim of the Agent, the Lender or Ex-Im Bank arising out of any of the Borrower Documents. All amounts payable by the Borrower pursuant to this Section 7.03 shall be paid by the Borrower in the currency in which the same has been incurred and is payable by the Agent, the Lender or Ex-Im Bank, as the case may be.

### 7.04   Additional or Increased Costs.

(a)     If, due to any Regulatory Change that:  (i) changes the basis of taxation of any amounts payable to the Lender (other than taxes imposed on the overall net income of the Lender or of the office out of which it is acting hereunder); (ii) imposes or modifies any reserve, special deposit, deposit insurance or assessment affecting the Lender; or (iii) imposes any other condition affecting this Agreement or any Note, there shall be any increase in the cost to the Lender of agreeing to make or making, funding or maintaining any Utilization, then the Borrower shall from time to time, upon demand by the Agent, on behalf of Lender, pay to the Agent for the account of the Lender additional amounts sufficient to compensate the Lender for such increased cost.

(b)     Without duplication of Section 7.04(a), if the Lender, in its reasonable judgment, determines at any time that any Regulatory Change will have the effect of increasing the amount of capital required or expected to be maintained by the Lender (which term, for purposes of this Section 7.04(b), shall include any corporation controlling the Lender) based on the existence of the Lender's obligations hereunder, then the Borrower shall pay to the Agent for the benefit of the Lender, upon demand by the Agent on behalf of the Lender, such additional amounts as shall be required to compensate the Lender for the increased cost to the Lender as a result thereof (which compensation shall include, without limitation, an amount equal to any reduction in return on assets or equity of the Lender to a level below that which it could have achieved but for such Regulatory Change, taking into account the Lender's policies as to capital adequacy).

(c)     "Regulatory Change" shall mean the introduction or change after the date of this Agreement of or in United States or foreign national, state, municipal laws or regulations or in the interpretation or administration thereof, or the adoption or making after such date of any directives or requests (whether or not having the force of law) by any United States or foreign national, state, or municipal court or monetary authority, or other Governmental Authority or Other Governmental Authority.

(d)     The Lender shall take such reasonable steps, as it shall determine in its sole discretion, to minimize amounts demanded under this Section 7.04. In the event that the Lender transfers the booking office of the Credit to minimize amounts demanded under this Section 7.04, the Borrower shall pay any costs and expenses incurred in such transfer on demand by the Agent on behalf of the Lender.

(e)     Each demand for payment by the Agent under this Section 7.04 shall be accompanied by a certificate showing in reasonable detail the basis for the calculation of the amounts demanded, which certificate, in the absence of manifest error, shall be conclusive and binding for all purposes.

## SECTION 8.  PAYMENTS

### 8.01   Method of Payment.



18

(a)     All payments to be made by the Borrower under this Agreement and any Note shall be made to the Agent for its account and the account of the Lender without set-off or counterclaim in Dollars in immediately available and freely transferable funds no later than 11:00 A.M. (New York City time) on the date on which due (as applicable):

> (i)      to the Agent, for its account and the account of the Lender, at Citibank, N.A., New York, New York, Account Name Citibank International plc, London, Account number 10963054, Reference Eximbank Transaction No. APO73269XX-Lebanon;

> (ii)     to the Lender, at Citibank, N.A., New York, New York, Account Number 36120012, Reference Eximbank Transaction No. APO73269XX-Lebanon; and

> (iii)    to Ex-Im Bank at the Federal Reserve Bank of New York for credit to Ex-Im Bank's account: U.S. Treasury Department 021030004 TREAS NYC/CTR/BNF=/AC-4984 OBI=Export-Import Bank Due _____ on EIB Guarantee No. AP073269XX-Lebanon for [Commitment Fee] [Exposure Fee] [other: specify] from the Lebanese Company for the Development and Reconstruction of the Beirut Central District.

(b)     Except as otherwise provided herein, whenever any payment would otherwise fall due on a day which is not a Business Day, the due date for payment shall be the immediately succeeding Business Day and interest and fees shall be computed in accordance with Section 13.01.

(c)     When any amounts hereunder are to be paid to the Agent for account of another Person (for purposes of this Section 8.01(c), Ex-Im Bank shall not for any purpose be included within the definition of "Person"), the Agent shall not be obligated to pay such amounts to that Person until the Agent has been able to establish to its satisfaction that it has actually received such amounts, and once the Agent is so satisfied, the Agent shall promptly forward such amounts to such Person, provided, however that if the Agent does pay such amount and it proves to be the case that the Agent had not actually received such amount, then the Person to whom such amounts were so made available shall on request refund the same to the Agent, together with an amount sufficient to indemnify the Agent against any cost or loss, the Agent may have suffered or incurred by reason of its having paid out such sum prior to its having received such sum, including interest thereon at the Alternative Base Rate.

8.02    Application of Payments. The Agent and Ex-Im Bank shall each apply payments received by it under this Agreement or any Note (whether at stated maturity, by reason of acceleration, prepayment or otherwise) in the following order of priority: (a) interest due pursuant to Section 5.02(a)(ii), but only to the extent such amounts are included in the "Guaranteed Amount" as such term is defined in the Master Guarantee Agreement; (b) Guarantee.

19

Commitment Fees, Exposure Fees and all other amounts due to Ex-Im Bank under this Agreement and not otherwise provided for under this Section 8.02; (c) interest due pursuant to Section 5.02(a)(i); (d) installments of principal due in inverse order of maturity; and (e) all other amounts due under this Agreement and not otherwise provided for in this Section 8.02. Payments with respect to the Note(s) shall be applied *pro rata* to each Note in accordance with the above priorities.

# SECTION 9.  REPRESENTATIONS, WARRANTIES, AND COVENANTS

9.01    Representations and Warranties of the Borrower.

(a)    The Borrower represents and warrants to the Agent, the Lender and Ex-Im Bank that:

(i)    Existence and Authority.   The Borrower is duly organized and validly existing under the laws of the Borrower's Country, with full power, authority, and legal right to own its property and carry on its business as now conducted, and has taken all actions necessary or advisable to authorize it to execute, deliver, perform, and observe the terms and conditions of the Borrower Documents

(ii)    Government Authorizations.    All consents, licenses, authorizations and approvals of, and exemptions by, any Governmental Authority and any Other Governmental Authority that are necessary or advisable (A) for the execution, delivery, performance and observance by the Borrower of the Borrower Documents, including, without limitation, approvals relating to the availability and transfer of Dollars required to make all payments due under this Agreement and any Note; (B) for the validity, binding effect and enforceability of the Borrower Documents; and (C) for the execution, delivery and performance of any Supply Contract, the importation of the Goods, performance of the Services, and use of the Eligible Goods and Services in the Borrower's Country; have been in each case been obtained and are in full force and effect.

(iii)    Recordation.   To ensure the legality, validity, enforceability, priority or admissibility in evidence in the Borrower's Country of any of the Borrower Documents, it is not necessary that any of the Borrower Documents be registered, recorded, enrolled or otherwise filed with any court or Other Governmental Authority; be notarized; or that any documentary or other similar tax, imposition, or charge of any kind be paid on or in respect of any of the Borrower Documents except stamp duty due on each original Agreement and each Note.

(iv)    Restrictions.   The execution, delivery and performance or observance by the Borrower of the terms of, and consummation by the Borrower of the transactions contemplated by, each of the Borrower Documents does not and will not conflict with or result in a breach or violation of the charter, by-laws, or similar documents of the Borrower; (B) any law of the Borrower's Country or any other ordinance, decree,

20

constitutional provision, regulation, or other requirement of any Governmental Authority (including, without limitation, any restriction on interest that may be paid by the Borrower); or (C) any order, writ, injunction, judgment or decree of any court or other tribunal. Further, the execution, delivery and performance, or observance by the Borrower of the terms of and consummation by the Borrower of the transactions contemplated by each of the Borrower Documents does not and will not conflict with or result in a breach of any agreement or instrument to which the Borrower is a party, or by which it or any of its revenues, properties or assets may be subject, or result in the creation or imposition of any Lien upon any of the revenues, properties or assets of the Borrower pursuant to any such agreement or instrument.

(v)    Binding Effect.    The Borrower has duly executed and delivered this Agreement and the other Borrower Documents on or before the date hereof, and the Borrower will also duly execute and deliver any Note and each of the other Borrower Documents that may hereafter be executed. Each of the Borrower Documents that has been executed and delivered constitutes, and each such Borrower Document that may hereafter be executed and delivered will constitute, a direct, general and unconditional obligation of the Borrower that is legal, valid, and binding upon the Borrower and enforceable against the Borrower in accordance with its respective terms, except as such enforceability may be limited by applicable insolvency, reorganization, liquidation, moratorium, readjustment of debt or other similar laws affecting the enforcement of creditors' rights generally, and by the application of general principles of equity, regardless of whether such enforceability is considered in a proceeding at law or in equity. The Borrower's payment obligations under this Agreement rank, and under any Note when issued will rank, in all respects, at least *pari passu* in priority of payment and in right of security with all other unsecured and unsubordinated debt of the Borrower.

(vi)    Choice of Law.    Under the conflict of laws principles in the Borrower's Country, the choice of law provisions of this Agreement and the Note(s) are valid, binding, and not subject to revocation by the Borrower, and in any proceedings brought in the Borrower's Country for enforcement of any of the Borrower Documents, the choice of the law of the State of New York as the governing law of such documents will be recognized and such law will be applied.

(vii)    Commercial Activity.    The Borrower Documents and the transactions contemplated thereby constitute commercial activities (rather than governmental or public activities) of the Borrower, and the Borrower is subject to private commercial law with respect thereto. Neither the Borrower nor any of its property, assets, or revenue enjoys, under the laws of the Borrower's Country, any right of immunity from suit, court jurisdiction, attachment prior to judgment, attachment in aid of execution, set-off, execution, or from any other legal process with respect to any of the obligations under this Agreement, any Note, or any of the other Borrower Documents. The waiver of immunity contained in Section 11.04 is valid and enforceable in the Borrower's Country, and would be effective to waive such immunity should the Borrower become entitled to immunity in the future.

21

(viii) Legal Proceedings. Except for legal proceedings disclosed in Annex F, no legal proceedings are pending or, to the best of the Borrower's knowledge, threatened before any court, Governmental Authority or any Other Governmental Authority that might: (A) materially and adversely affect the Borrower's financial condition, business or operations; (B) restrain or enjoin or have the effect of restraining or enjoining the performance or observance of the terms and conditions of any of the Borrower Documents; or (C) in any other manner question the validity, binding effect or enforceability of any of the Borrower Documents. The Borrower has made diligent inquiry and consultation with in-house and outside legal counsel regarding the legal proceedings described in Annex F. To the best of the Borrower's knowledge and belief, taking into consideration such inquiry and consultation, the resolution of the legal proceedings set forth in Annex F will not have a material adverse effect on the Borrower's legal existence or financial condition, or the Borrower's ability to comply fully with its obligations under the Agreement.

(ix)    Supply Contract(s). No applicable law of the Borrower's Country is or will be violated by any Supply Contract or the Borrower's performance of its obligations thereunder.

(x)    Use of Eligible Goods and Services. The Eligible Goods and Services will be used for lawful purposes.

(xi)    Borrower Financial Statements. The Borrower Financial Statements present fairly the financial condition of the Borrower at the date of such statements and the results of the operations of the Borrower for such fiscal year. The Borrower Financial Statements have been prepared in accordance with generally accepted accounting principles in the Borrower's Country consistently applied. Except as fully reflected in the Borrower Financial Statements, there are no liabilities or obligations with respect to the Borrower of any nature whatsoever (whether absolute, accrued, contingent, or otherwise, and whether or not due) for the period to which the Borrower Financial Statements relate that, either individually or in the aggregate, would be material to the Borrower. Since the date of the Borrower Financial Statements, there has been no material adverse change in the financial condition, business, prospects, or operations of the Borrower.

(xii)    No Taxes. Except for stamp duty on each original Agreement and any Note, there is no Tax imposed on or in connection with: (A) the execution, delivery or performance of any of the Borrower Documents; (B) the enforcement of any of the Borrower Documents; or (C) on any payment to be made to the Lender or Ex-Im Bank under any of the Borrower Documents.

(xiii)    No Delinquency on Amounts Due to the United States. To the best of the Borrower's knowledge and belief after due diligence, the Borrower is not delinquent on any amounts due and owing to any Other Governmental Authority of the United States as of the date of this Agreement.

.22

(xiv) Suspension and Debarment, etc. The Borrower and each of its Principals individually, has not within the past 3 years been a) debarred, suspended, declared ineligible from participating in, or voluntarily excluded from participation in, a Covered Transaction, b) formally proposed for debarment, with a final determination still pending, c) indicted, convicted or had a civil judgment rendered against it for any of the offenses listed in the Regulations, d) delinquent on any substantial debts owed to the U.S. Government or its agencies or instrumentalities as of the date hereof.   For the purposes hereof, "Principals", with respect to the Borrower shall mean any officer, director, owner, partner, key employee, or other Person with primary management or supervisory responsibilities with respect to the Borrower or any other Person (whether or not an employee) who has critical influence on or substantive control over the transaction covered by this Agreement. All other capitalized terms not defined herein shall have the meanings set forth in the Debarment Regulations.

(xv)No Event of Default. No Event of Default and no event, which but for the giving of notice of the lapse of time or both would constitute an Event of Default, has occurred and is continuing.

(b)     The representations and warranties of the Borrower set forth in Section 9.01(a) shall be deemed repeated as of the date of each Utilization, with the same force and effect as if made on such date.

9.02    Affirmative Covenants of the Borrower.  The Borrower covenants and agrees that until all amounts owing under this Agreement and the Note(s) have been paid in full, the Borrower will, unless the Agent, on behalf of the Lender and Ex-Im Bank shall have consented in writing:

(a)     Notice of Defaults. Promptly, but in no event later than ten (10) days after the occurrence of an Event of Default or of any event, which but for the giving of notice or the lapse of time or both would constitute an Event of Default, notify the Agent and Ex-Im Bank by telecopier or hand delivery of the particulars of such occurrence and the corrective action proposed to be taken by the Borrower with respect thereto.

(b)     Financial Reports.  Beginning with the fiscal year in which this Agreement is executed and continuing until all amounts owing under this Agreement and the Note(s) have been paid in full, the Borrower shall furnish to the Agent and Ex-Im Bank (attn: Asset Management Division):

(i)     As soon as available but, in any event, within 60 days (or 90 days in the case of the final accounting period) after the end of each semi-annual accounting period in each fiscal year, a copy of its complete unaudited financial statements as at the end of such semi-annual period, including its balance sheet, statement of

23

income, and statement of cash flow for that fiscal year, all of which shall be certified by a financial officer of the Borrower, subject to normal year-end audit adjustments;

(ii)     As soon as available but, in any event, within 180 days after the end of its fiscal year, a copy of its annual financial statements, or, if existing, its consolidated financial statements, including its balance sheet, statement of income, and statement of cash flow for that fiscal year, all of which shall have been audited by an independent accounting firm acceptable to Ex-Im Bank and shall include the auditor's opinion and any accompanying notes.

All financial reports to be submitted to the Agent or Ex-Im Bank shall be prepared in accordance with generally accepted accounting principles in the Borrower's Country consistently applied, shall be in the English language (or accompanied by an accurate English translation), and shall fairly present the financial condition of the Borrower and the results of its operations for the periods covered. The Borrower agrees to submit to the Agent and Ex-Im Bank such additional financial reports and other data and information regarding its financial condition, business, and operations as the Agent or Ex-Im Bank may reasonably request.

(c)     Inspections. Permit representatives of the Agent, the Lender and Ex-Im Bank to make reasonable inspections of the project using or incorporating the Eligible Goods and Services, and of the Borrower's books and records in connection with this Agreement and the transactions contemplated hereby (including, without limitation, records regarding the use of the Eligible Goods and Services), and cause the officers and employees of the Borrower to give full cooperation and assistance in connection therewith.

(d)     Notice of Disputes. Promptly give written notice to the Agent and Ex-Im Bank of any material dispute which may exist between the Borrower and (i) any Governmental Authority thereof, (ii) any Other Governmental Authority, or (iii) any international financial institutions.

(e)     Government Authorizations. Promptly obtain and maintain all consents, licenses, authorizations and approvals of, and exemptions by, any Governmental Authority and any Other Governmental Authority that are necessary or advisable: (i) for the execution, delivery, performance, and observance by the Borrower of the Borrower Documents, including, without limitation, all approvals relating to the availability and transfer of U.S. Dollars required to make all payments due under this Agreement and the Note(s); (ii) for the validity, binding effect and enforceability of the Borrower Documents; and (iii) for the execution, delivery and performance of any Supply Contract, the importation of the Goods, performance of the Services, and use of the Eligible Goods and Services in the Borrower's Country.

(f)     Pari Passu. Ensure that its payment obligations under this Agreement and any Note will at all times constitute the direct, general and unconditional obligations of the Borrower and rank in all respects at least *pari passu* in priority of payment and in right of security with all other unsecured debt of the Borrower.

24

(g)    Notice of Suspension or Debarment. Provide immediate written notice to Ex-Im Bank if at any time it learns that the certification set forth in Section 9.01(a)(xiv) was erroneous when made or has become erroneous by reason of changed circumstances.

(h)    Acquisition List. Obtain the prior written consent of the Agent and Ex-Im Bank to any material alteration of the Acquisition List.

(i)    Supply Contract(s). Obtain the prior written consent of Ex-Im Bank (a copy of such consent to be sent by the Borrower to the Lender) to any assignment of the Borrower's rights or obligations under any Supply Contract or to any material modification to or cancellation of any Supply Contract.

(j)    Progress and Environmental Monitoring Reports.

(A)    Progress Reports. Beginning with the calendar quarter in which this Agreement is executed and continuing until the reclamation of Phase 2 of the Normandy Landfill (the "Project") is completed or until all amounts owing under this Agreement and the Note(s) have been paid in full, whichever occurs first, the Borrower shall submit to Ex-Im Bank (attn: Engineering and Environment Division) within 30 calendar days following the end of each calendar quarter a progress report ("Progress Report") with respect to the construction and development of the Project. Each Progress Report must be certified as correct by the Borrower and the report and the certification must be in form and substance satisfactory to Ex-Im Bank. Each Progress Report shall include the following:

(1)    a narrative statement of (i) the work completed on the Project during the quarter, including an explanation as to any change in the plans and any unusual conditions or problems encountered, and (ii) a work schedule for the next succeeding quarter;

(2)    a list of the equipment delivered and a list of the equipment installed to date and during the applicable quarter;

(3)    pertinent photographs (titled and dated) of construction and equipping operations;

(4)    a project construction and completion schedule showing (i) originally planned and actual progress and percentage completion, (ii) the currently estimated date of operation of the Project, and (iii) an explanation of any revisions to the original Project construction and completion schedule;

(5)    a description of any hazardous or toxic materials, containers of unknown content, or unexploded munitions encountered on the site, the location and manner in which such materials have been contained and/or stored, and a description and status of the disposal plan for these items; and

25

(6)     the total estimated cost of the Project by major components (with Dollar cost, local cost and other currency cost shown separately), the total cost incurred to date and during the applicable quarter, and an explanation of the reasons for any decrease or increase in the actual or estimated costs required to complete the Project over those originally estimated or estimated in previous Progress Reports.

(B)     Environmental Monitoring Reports. Within sixty (60) days following the completion of the Project, and continuing annually thereafter until all amounts owing under this Agreement and the Note(s) have been paid in full or until the post-works environmental monitoring period is complete, which ever occurs first, the Borrower shall submit to Ex-Im Bank (attn: Engineering and Environment Division) reports in English of the status and findings of the post reclamation monitoring activities. These reports shall include (i) a description of monitoring activities performed during the relevant reporting period, and (ii) a statement concerning the findings of these activities, including any identified problems and anticipated responses, and shall be supplemented by such other related information as may be requested

(k)     Cash Balance. Maintain a minimum balance of cash and cash equivalents (as reported in the Borrower's quarterly financial statements) of US$30 million.

(l)     Other Acts. From time to time, do and perform any and all acts and execute any and all documents as may be necessary or as reasonably requested by the Agent or Ex-Im Bank in order to effect the purposes of this Agreement and to protect the interests of the Lender and Ex-Im Bank in the Note(s) and the interests of the Agent and the Lender in the Ex-Im Bank Guarantee.

9.03    Negative Covenants of the Borrower. The Borrower covenants and agrees that until all amounts owing under this Agreement and the Note(s) have been paid in full, it will not, without the prior written consent of the Agent, acting on behalf of the Lender and Ex-Im Bank:

(a)     Liens on Goods. Create, assume, permit, or suffer to exist any Liens on any of the Goods that the Borrower owns, if any, except the following (each, a "Permitted Lien"):

(i)     Liens for taxes, assessments, or governmental charges or levies if the same shall not at the same time be delinquent or thereafter can be paid without penalty, or are being contested in good faith and by appropriate proceedings;

(ii)    Liens imposed by law, such as carriers', warehousemen's, and mechanics' liens, and other similar liens arising in the ordinary course of business that secure payment of obligations not more than thirty (30) days past due or that are being contested in good faith by appropriate proceedings, and for which adequate reserves shall have been set aside on its books; and

26

(iii)     Liens granted to a bank in connection with the issuance of a Letter of Credit, which liens shall be released automatically when such bank is reimbursed for payments made under such Letter of Credit.

(b)     Sale. Lease or Transfer of Eligible Goods and Services. Sell, lease or otherwise transfer, or agree to sell, lease or otherwise transfer, any Eligible Goods and Services (or any component thereof) to any Person; provided that this shall not apply to any Goods not owned by the Borrower.

(c)     Use of the Eligible Goods and Services. Use or permit the use of the Eligible Goods and Services outside the Borrower's Country; provided that this shall not apply to any Goods not owned by the Borrower.

(d)     Change in Business. Make any substantial change in the scope or nature of its business or operations.

(e)     Merger. Consolidation, Dissolution, and Sale. Merge or consolidate with any other entity; dissolve or terminate its legal existence; sell, lease, transfer or otherwise dispose of any substantial part of its properties or any of its properties essential to the conduct of its business or operations, as now or hereafter conducted; or enter into any agreement to do any of the foregoing.

(f)     Suspension and Debarment; etc. Knowingly enter into any transactions in connection with the Eligible Goods and Services with any person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in procurement or non-procurement transactions with any United States federal government department or agency pursuant to any of the Debarment Regulations.

(g)     Dividends: Restricted Payments. (i) Declare or pay any dividends or (ii) authorize or make any other distribution, payment or delivery of assets or liabilities of the Borrower or its subsidiaries to its shareholder as such (each a "Restricted Payment"), or set aside any funds for any Restricted Payment, unless:

(x)     such Restricted Payment is permitted by the law of the Borrower's Country;

(y)     no Default or Event of Default is then in existence that has not been waived (or would be in existence after giving effect to such Restricted Payment); and

(z)     no Restricted Payment has yet been made in such calendar year.

(h)     Treasury Shares. Permit (i) the number of treasury shares of the Borrower to exceed 10,131,829 at any time, or (ii) the aggregate value of treasury shares (as defined in the Borrower's quarterly financial statements) to exceed US$76 million at any time.

27



## SECTION 10.  CANCELLATION, SUSPENSION, AND EVENTS OF DEFAULT

10.01  Cancellation by the Borrower.  The Borrower may cancel at any time all or any part of the undisbursed and uncancelled amount of the Credit for which Letters of Credit have not been issued, advised or confirmed, provided that thirty (30) days' prior written notice is given to the Agent and Ex-Im Bank.  In the event of a cancellation of all or part of the Credit by the Borrower, the Borrower, on or before the proposed date of cancellation, shall pay (a) to Ex-Im Bank all Guarantee Commitment Fees accrued and unpaid under Section 7.01(a) and all other amounts due and payable to Ex-Im Bank under this Agreement as of the proposed date of cancellation and (b) to the Agent, for the account of the Lender any commitment fees accrued and unpaid under Section 7.01(b) and all other amounts due and payable to the Lender under this Agreement as of the proposed date of cancellation.

10.02  Suspension and Cancellation by Ex-Im Bank.

(a)     If an Event of Default should occur and be continuing, Ex-Im Bank, by written notice to the Agent and the Borrower may: (i) suspend further Utilizations of the Credit until Ex-Im Bank is satisfied that the cause of such suspension has been removed; or (ii) cancel the unutilized and uncancelled amount of the Credit, provided, however, that Ex-Im Bank shall not suspend or cancel any portion of the Credit for which Letters of Credit have been issued, advised or confirmed.  In the event of a cancellation of all or part of the Credit by Ex-Im Bank, the Borrower shall pay (1) to Ex-Im Bank all Guarantee Commitment Fees accrued and unpaid under Section 7.01(a) and all other amounts due and payable to Ex-Im Bank under this Agreement as of the date of cancellation and (2) to the Agent, for its own account and for the account of the Lender any commitment fees accrued and unpaid under Section 7.01(b) and all other amounts due and payable to the Agent or the Lender under this Agreement as of the date of cancellation.

(b)     If all of the conditions precedent to the first Utilization, as described in Section 6, are not fulfilled to the satisfaction of Ex-Im Bank (in its sole discretion) on or prior to the "Required Operative Date" specified on the Term Sheet hereof, then, after taking into account the circumstances of such failure, Ex-Im Bank may, by written notice to the Agent and the Borrower, cancel the Credit.

10.03  Events of Default and Remedies.

(a)     Events of Default.     Each of the following events or conditions shall be an "Event of Default" under this Agreement:

(i)     any failure by the Borrower to pay when due any amount owing under this Agreement or any Note;

(ii)    any failure by the Borrower to comply with its obligations under Section 9.02(a);

28

(iii)    any representation or warranty made or deemed made by the Borrower in this Agreement or in connection herewith, or any statement made in any certificate or report or financial statement furnished by the Borrower to the Agent, the Lender or Ex-Im Bank, or any statement made in the legal opinions of the Borrower concerning facts relating to the Borrower, or the transactions contemplated hereby, has proven to have been false or misleading in any material respect when made;

(iv)    any failure by the Borrower to perform or comply with any of the covenants or provisions set forth in this Agreement (exclusive of any events specified as an Event of Default in any other subsection of this Section 10.03(a)), which failure, if capable of being cured, remains uncured for a period of thirty (30) days after written notice thereof has been given to the Borrower by the Agent, the Lender or Ex-Im Bank;

(v)    any failure by the Borrower to pay when due, including any period of grace provided to the Borrower with respect thereto, any amounts payable under any other agreement or instrument providing for the payment by the Borrower of borrowed money or for the deferred purchase price of property or services received, or any such amount has, prior to the stated maturity thereof, become due, or any event specified in any such agreement or instrument shall occur the effect of which event is to cause, or (with the giving of notice or lapse of time or both) to permit any Person to cause, such amounts to become due, or to be repaid in full, prior to their stated maturity;

(vi)    the Borrower shall (A) be unable to pay its debts as they fall due or shall admit in writing its inability to pay its debts as they fall due or shall become insolvent; or the Borrower shall apply for or consent to the appointment of any liquidator, receiver, trustee, or administrator for all or a substantial part of its business, properties, assets, or revenues; or a liquidator, receiver, trustee, or administrator shall be appointed for the Borrower and such appointment shall continue undismissed, undischarged, or unstayed for a period of thirty (30) days; or (B) the Borrower shall institute (by petition, application, answer, consent, or otherwise) any bankruptcy arrangement, readjustment of debt, dissolution, liquidation, or similar executory or judicial proceeding, or a bankruptcy, arrangement, readjustment of debt, dissolution, liquidation, or similar executory or judicial proceeding shall be instituted against the Borrower and shall remain undismissed, undischarged, or unstayed for a period of thirty (30) days; (C) take any action seeking to take advantage of any other law relating to bankruptcy, insolvency, liquidation, termination, dissolution, winding up, or composition or readjustment of debts; or (D) take any corporate or similar action for the purpose of effecting any of the foregoing;

(vii)    any involuntary Lien other than Permitted Liens shall have been created upon the property of the Borrower in an amount that, in the reasonable judgment of Ex-Im Bank, the requirement of the Borrower to pay such amount would affect materially and adversely the ability of the Borrower to pay its indebtedness under this Agreement or any Note, and such Lien has not been removed or discharged for a period of thirty (30) days from the date of its creation;

29

(viii)   any judgment against the Borrower shall have been entered on a claim not covered by insurance in an amount that, in the reasonable judgment of Ex-Im Bank, the requirement of the Borrower to pay such amount would affect materially and adversely the ability of the Borrower to pay its indebtedness under this Agreement or any Note, and such judgment has not been removed or discharged, or a stay of execution thereof shall not be obtained within 45 days from the date of entry thereof.;

(ix)   any Governmental Authority or Other Governmental Authority shall have condemned, seized, or expropriated all or substantially all of the property of the Borrower; or (B) taken any action, which in the reasonable judgment of Ex-Im Bank, would affect materially and adversely the ability of the Borrower to pay its indebtedness under this Agreement or any Note;

(x)   any authorization, approval, consent, license, exemption, filing, registration, notarization or other requirement of any governmental, judicial or public body or authority necessary to enable the Borrower to comply with its obligations hereunder or under any Note shall have been revoked, rescinded, suspended, held invalid or otherwise limited in effect in a manner that would affect materially and adversely the Borrower's ability to perform its obligations hereunder or under any Note; or any law, rule or regulation, decree or directive of any competent authority shall be enacted or issued that shall impair materially and adversely the ability or the right of the Borrower to perform such obligations; or it shall become unlawful for the Borrower to perform any such obligations;

(xi)   any Supply Contract, or the performance by any party thereto of such party's obligations under any Supply Contract, in the reasonable judgment of Ex-Im Bank, contravenes any applicable law;

(xii)   the Borrower repudiates this Agreement or does or causes to be done any act or thing evidencing an intention to repudiate this Agreement;

(xiii)   the Standby L/C shall terminate, expire or otherwise cease to be available for drawings, other than in accordance with its terms, or the Standby L/C Issuing Bank repudiates or fails to perform its obligations under the Standby L/C, or the Standby L/C Bank shall cease to be a creditworthy entity as determined in Ex-Im Bank's sole reasonable discretion;

(xiv)   any other event occurs or any other circumstance arises which, in the reasonable judgment of Ex-Im Bank, is likely materially and adversely to affect the ability of the Borrower to perform all or any of its obligations under this Agreement or any Note.

(b)   Remedies.   Upon the occurrence of any Event of Default, and at any time thereafter, if such event is continuing, Ex-Im Bank, by written notice to the Borrower and the Agent, may declare immediately due and payable (i) all or any portion of the principal amount of the Credit and any Note then outstanding, including accrued interest thereon to the date of

payment, and (ii) all other amounts owing under this Agreement. Except as expressly provided in Section 10.03(a), presentment, demand, protest and all other notices of any kind are hereby expressly waived. The aforementioned right to accelerate is in addition to and not a substitute for any other rights and remedies available to the Agent, the Lender and/or Ex-Im Bank under this Agreement and any Note and under applicable laws.

# SECTION 11. GOVERNING LAW AND JURISDICTION

11.01 Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, U.S.A.

11.02 Submission to Jurisdiction. The Borrower hereby irrevocably agrees that any legal suit, action or proceeding arising out of or relating to any of the Borrower Documents, or any of the transactions contemplated thereby, may be instituted by the other parties hereto or any party to any Borrower Document in the Courts of the State of New York or the Federal Courts sitting in the Borough of Manhattan, City of New York, State of New York. The Borrower, in respect of itself and its properties and revenues, hereby irrevocably waives, to the fullest extent permitted by law, any objection which the Borrower may have now or hereafter to the laying of the venue or any objection based on forum non conveniens, or based on the grounds of jurisdiction with respect to any such legal suit, action or proceeding and irrevocably submits generally and unconditionally to the jurisdiction of any such court in any such suit, action or proceeding. The Borrower agrees that a judgment in any such action or proceeding shall be conclusive and binding upon the Borrower and may be enforced in any other jurisdiction, including without limitation, the Borrower's Country, by suit upon such judgment, a certified copy of which shall be conclusive evidence of the judgment.

11.03 Service of Process.

(a) In the case of the Courts of the State of New York or of the Federal Courts sitting in the State of New York, the Borrower hereby designates, appoints and empowers CT Corporation as its authorized agent to accept, receive and acknowledge, for and on behalf of the Borrower, its properties and revenues, service of any and all process which may be served in any action, suit or proceeding of the nature referred to above in the State of New York, which appointment shall be irrevocable until the appointment and acceptance of a successor authorized agent pursuant to the provisions of Section 11.03(d).

(b) The Borrower further agrees that such service of process may be made personally or by mailing or delivering a copy of the summons and complaint or other legal process in any such legal suit, action or proceeding to the Borrower in care of its agent designated above at the aforesaid address, and each such agent is hereby authorized to accept, receive and acknowledge the same for and on behalf of the Borrower and to admit service with respect thereto. Service upon each such agent shall be deemed to be personal service on the Borrower and shall be legal and binding upon the Borrower for all purposes notwithstanding any failure to mail copies of such

31



legal process to the Borrower or any failure on the part of the Borrower to receive the same, and shall be deemed completed upon the delivery thereof to such agent whether or not such agent shall give notice thereof to the Borrower or upon the earliest other date permitted by applicable law (including, without limitation, the United States Foreign Sovereign Immunities Act of 1976, as amended).

(c)     To the extent permitted by applicable law, including, without limitation, treaties by which the United States and the Borrower's Country, as the case may be, are bound, the Borrower further irrevocably agrees to the service of process of any of the aforementioned courts in any suit, action or proceeding by the mailing of copies thereof by certified mail, postage prepaid, return receipt requested, to the Borrower at the address referenced in Section 13.02, such service to be effective upon the date indicated on the postal receipt returned from the Borrower.

(d)     The Borrower agrees that it will at all times continuously maintain an agent to receive service of process in the State of New York on behalf of itself and its properties and revenues, and, in the event that for any reason its agent designated above shall not serve as agent for the Borrower to receive service of process in the State of New York on its behalf, the Borrower shall promptly appoint a successor satisfactory to the Agent and Ex-Im Bank so to serve, advise the Agent and Ex-Im Bank thereof, and deliver to the Agent and Ex-Im Bank evidence in writing of the successor agent's acceptance of such appointment. The foregoing provisions constitute, among other things, a special arrangement for service between the parties to this Agreement for the purposes of 28 U.S.C. §1608.

11.04 <u>Waiver of Immunity</u>. The Borrower hereby irrevocably agrees that, to the extent that the Borrower or any of its assets has or may hereafter acquire any right of immunity, whether characterized as sovereign immunity or otherwise, from any legal proceedings, whether in the United States, the Borrower's Country or elsewhere, to enforce or collect upon the Credit or any Note or any other liability or obligation of the Borrower related to or arising from the transactions contemplated by any of the Borrower Documents, including, without limitation, immunity from service of process, immunity from jurisdiction or judgment of any court or tribunal, immunity from execution of a judgment, and immunity of any of its property from attachment prior to any entry of judgment, or from attachment in aid of execution upon a judgment, the Borrower hereby expressly and irrevocably waives any such immunity and agrees not to assert any such right or claim in any such proceeding, whether in the United States, the Borrower's Country or elsewhere.

11.05 <u>Waiver of Security Requirements</u>. To the extent the Borrower may, in any action or proceeding arising out of or relating to any of the Borrower Documents brought in the Borrower's Country or elsewhere, be entitled under applicable law to require or claim that the Agent, the Lender or Ex-Im Bank post security for costs or take similar action, the Borrower hereby irrevocably waives and agrees not to claim the benefit of such entitlement.

11.06 <u>No Limitation</u>. Nothing in this Section 11 shall affect the right of the Agent, the Lender or Ex-Im Bank to serve process in any other manner permitted by law or to commence

32



legal proceedings or otherwise proceed against the Borrower in the Borrower's Country or in any other jurisdiction.

## SECTION 12 THE AGENT

12.01 Appointment. Citibank International plc is hereby appointed Agent hereunder and under the Borrower Documents, and the Lender irrevocably authorizes the Agent to act as the agent of the Lender. The Agent agrees to act as such upon the express conditions contained in this Section 12. The Agent shall not have a fiduciary relationship in respect of the Lender by reason of this Agreement.

12.02 Powers. The Agent shall have and may exercise such powers under the Borrower Documents as are specifically delegated to the Agent by the terms of each thereof, together with such powers as are reasonably incidental thereto. The Agent shall have no implied duties to the Lender, or any obligation to the Lender to take any action thereunder except any action specifically provided by the Borrower Documents to be taken by the Agent.

12.03 General Immunity. Neither the Agent nor any of its directors, officers, agents or employees shall be liable to any of the Borrower or the Lender for any action taken or omitted to be taken by it or them hereunder or under any other Transaction Document or in connection herewith or therewith except for its or their own gross negligence or willful misconduct.

12.04 No Responsibility for Loans, Recitals, etc. Notwithstanding anything to the contrary expressed or implied herein, neither the Agent nor any of its directors, officers, agents or employees shall be responsible for or have any duty to ascertain, inquire into, or verify (i) any statement, warranty or representation made in connection with any Borrower Document or any borrowing hereunder; (ii) the performance or observance of any of the covenants or agreements of any obligor under any Transaction Document; (iii) the satisfaction of any condition specified in Section 6, except receipt of items required to be delivered to the Agent; or (iv) the validity, effectiveness, enforceability or genuineness of any Transaction Document or any other instrument or writing furnished in connection therewith. The Agent shall be entitled to assume that all such representations and warranties are true and that no Event of Default (or event which, with the giving of notice or passage of time or both, would constitute an Event of Default) has occurred unless it has, in its capacity as Agent, received notice from the Lender, Ex-Im Bank or the Borrower to this Agreement describing such Event of Default or such other event and stating that such notice is a "notice of default". Notwithstanding anything to the contrary expressed or implied herein, the Agent shall not: (x) be bound to account to the Lender for any sum or the profit element of any sum received by it for its own account; (y) be bound to disclose to any other Person any information relating to the Borrower or any of its agencies if such disclosure would or might in its opinion constitute a breach of any law or regulation or be otherwise actionable at the suit of any Person; or (z) be under any obligations other than those for which express provision is made in any Borrower Document.

12.05. Action on Instructions of the Lender. The Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder and under any other Transaction

33

Document in accordance with written instructions signed by the Lender and such instructions and any action taken or failure to act pursuant thereto shall be binding on the Lender. The Agent shall be fully justified in failing or refusing to take any action hereunder and under any other Transaction Document unless it shall first have received an indemnity and/or security to its satisfaction by the Lender against any and all liability (other than resulting from the Agent's gross negligence or willful misconduct), cost and expense that it may incur by reason of taking or continuing to take any such action. Notwithstanding anything to the contrary expressed or implied herein, the Agent shall (i) promptly inform the Lender of the contents of any notice or document received by it from the Borrower hereunder, and (ii) promptly notify the Lender of the occurrence of any Event of Default or any default by the Borrower in the due performance of or compliance with its obligations under this Agreement of which the Agent has notice from any other party hereto as provided in Section 12.04.

12.06 Employment of Agents and Counsel. The Agent may execute any of its duties as Agent hereunder and under any other Transaction Document by or through employees, agents, and attorneys-in-fact and shall not be answerable to the Lender, except as to money or securities received by it or its authorized agents, for the default or misconduct of any such agents or attorneys-in-fact selected by it with reasonable care. The Agent shall be entitled to advice of counsel concerning all matters pertaining to the agency hereby created and its duties hereunder and under any other Transaction Document.

12.07 Reliance on Documents; Counsel. The Agent shall be entitled to rely upon any Note, notice, consent, certificate, affidavit, letter, telegram, statement, paper or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, and, in respect to legal matters, upon the opinion of counsel selected by the Agent, which counsel may be employees of the Agent.

12.08 Agent's Reimbursement and Indemnification. The Lender agrees to reimburse and indemnify the Agent (i) for any amounts for which the Agent is entitled to reimbursement by the Borrower under the Borrower Documents to the extent not promptly reimbursed by the Borrower, (ii) for any other expenses incurred by the Agent on behalf of the Lender, in connection with the preparation, execution, delivery, administration and enforcement of the Transaction Documents to the extent not promptly reimbursed by the Borrower and (iii) for any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind and nature whatsoever which may be imposed on, incurred by or asserted against the Agent in any way relating to or arising out of the Transaction Documents or any other document delivered in connection therewith or the transactions contemplated thereby, or the enforcement of any of the terms thereof or of any such other documents, provided that the Lender shall not be liable for any of the foregoing to the extent they arise from the gross negligence or willful misconduct of the Agent.

12.09 Rights as a Lender. In the event that the Lender assigns its rights as a Lender under this Agreement to the Agent, then with respect to its Commitment, Loans made by it and the Note issued to it, the Agent shall have the same rights and powers hereunder and under any other Borrower Document as any Lender and may exercise the same as though it were not the

34

Agent, and the term "Lender" or "Lenders" shall, unless the context otherwise indicates, include the Agent in its individual capacity. The Agent may accept deposits from, lend money to, and generally engage in any kind of trust, debt, equity or other transaction, in addition to those contemplated by this Agreement or any other Borrower Document, with the Borrower or any of its subsidiaries in which the Borrower or such subsidiary is not restricted hereby from engaging with any other Person.

12.10 Lender Credit Decision. The Lender expressly acknowledges that neither the Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates has made any representations or warranties to it and that no act by the Agent hereinafter taken, including any review of the affairs of the Borrower, shall be deemed to constitute any representation or warranty by the Agent to the Lender. The Lender acknowledges that it has, independently and without reliance upon the Agent and based on the Borrower Financial Statements and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and the other Borrower Documents. The Lender also acknowledges that it will, independently and without reliance upon the Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Borrower Documents. Except for notices, reports and other documents expressly required to be furnished to the Lender by the Agent hereunder, the Agent shall not have any duty or responsibility to provide the Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of the Borrower which may come into the possession of the Agent or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates.

12.11 Successor Agent. The Agent may resign at any time by giving written notice thereof to the Lender and the Borrower, and the Agent may be removed at any time with or without cause by written notice received by the Agent from the Lender. Upon any such resignation or removal, the Lender shall have the right to appoint, on behalf of the Borrower and the Lender, a successor Agent. If no successor Agent shall have been so appointed by the Lender and shall have accepted such appointment within thirty days after the retiring Agent's giving notice of resignation, then the retiring Agent may appoint, on behalf of the Borrower and the Lender, a successor Agent. Such successor Agent shall be a commercial bank, organized under the laws of the United States of America or of any state thereof or the laws of the United Kingdom, having capital and retained earnings of at least $50,000,000. Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Borrower Documents. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 12 shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as the Agent hereunder and under the other Borrower Documents.

12.12 Agency Division. In acting as agent hereunder for the Lender, the Agent shall be regarded as acting through its agency division which shall be treated as a separate entity from any

35

other of its divisions or departments. Notwithstanding the foregoing, any information received by some other division or department of the Agent may be treated as confidential and shall not be regarded as having been given to the Agent's agency division.

## SECTION 13.  MISCELLANEOUS

13.01 Computations. Each determination of an interest rate or fee by the Agent or Ex-Im Bank pursuant to any provision of this Agreement or any Note, in the absence of manifest error, shall be conclusive and binding on the Borrower. All computations of interest and fees hereunder and under any Note shall be made on the basis of a year of 360 days and actual days elapsed. All such calculations shall include the first day and exclude the last day of the period of calculation.

13.02 Notices. Except as otherwise specified, all notices given hereunder shall be in writing in the English language, shall include the applicable Transaction Number and shall be given by mail, telecopier, telex or personal delivery and shall be deemed to be given for the purposes of this Agreement on the day that such notice is received by the intended recipient thereof, except for notices given by Ex-Im Bank pursuant to Section 10, which shall be deemed given on the earlier of: (a) the day on which such notice is received by the intended recipient; or (b) the day on which such notice is deposited in the mail or sent by telecopier, tested telex or personal delivery. Unless otherwise specified in a notice delivered in accordance with this Section 12.02, all notices shall be delivered to the parties hereto at their respective addresses indicated on the Term Sheet.

13.03 Disposition of Indebtedness. The Lender may, with the prior written consent of the Agent, sell, assign, transfer, pledge, negotiate, grant participations in or otherwise dispose of all or any part of its interest in all or any part of the Borrower's indebtedness under this Agreement and any Note to any party (collectively, a "Disposition of Indebtedness"), and any such party shall enjoy all the rights and privileges of the Lender under this Agreement and each Note that is the subject of such Disposition of Indebtedness; provided, however, that such Disposition of Indebtedness shall not, without the prior written consent of Ex-Im Bank, relieve the Lender of its duties under this Agreement or the Master Guarantee Agreement and any assignment by the Lender is subject to a US $3,000 transfer fee to be paid by the transferee to the Agent. The Borrower shall, at the request of the Agent acting on behalf of the Lender, execute and deliver to the Lender, or to any party that the Agent may designate, any such further instruments as may be necessary or desirable to give full force and effect to a Disposition of Indebtedness by the Agent. Notwithstanding anything to the contrary contained herein, the Borrower may not assign or otherwise transfer any of its debts or obligations under this Agreement or any Note without the prior written consent of Ex-Im Bank and the Agent. A disposition of indebtedness by the Lender shall not release the Agent from any of its obligations under this Agreement or the Master Guarantee Agreement.

36

13.04 Benefit of Agreement. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto.

13.05 Termination of Ex-Im Bank Guarantee. In the event the Ex-Im Bank Guarantee terminates in its entirety pursuant to terms and conditions of the Master Guarantee Agreement, as of the date of termination, the rights of Ex-Im Bank under Section 10 shall automatically be deemed to have been assigned to the Agent, for the benefit of the Lender.

13.06 Disclaimer. None of Ex-Im Bank, the Lender or the Agent shall be responsible in any way for the performance of any Supply Contract, and no claim against the Exporter or any other person with respect to the performance of any Supply Contract will affect the obligations of the Borrower under any of the Borrower Documents.

13.07 No Waiver; Remedies Cumulative. No failure or delay on the part of the Agent, Lender or Ex-Im Bank in exercising any right, power, or privilege under this Agreement or any Note, and no course of dealing between or among the Borrower, the Agent, Lender, and/or Ex-Im Bank shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder or under any Note preclude any other right, power or privilege hereunder or thereunder. The rights and remedies expressly provided herein are cumulative and not exclusive of any rights or remedies that the Agent, the Lender or Ex-Im Bank would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Agent, the Lender or Ex-Im Bank to any other or further action in any circumstances without notice or demand.

13.08 Indemnification. Without limiting any other rights that the Lender or the Agent may have hereunder or under applicable law, the Borrower agrees to indemnify the Lender , the Agent and Ex-Im Bank from and against any and all damages, losses, claims, liabilities and related costs and expenses, including reasonable attorneys' fees and disbursements (all the foregoing being collectively referred to as "Indemnified Amounts") awarded against or incurred by either of them arising out of or as a result of this Agreement, excluding, however, Indemnified Amounts to the extent resulting from either a dispute in which the Borrower is not a party or the gross negligence or willful misconduct on the part of the Lender or the Agent, as the case may be.

13.09 Entire Agreement. This Agreement contains the entire agreement among the parties hereto regarding the Credit except for (a) the agreements between Ex-Im Bank and the Agent in the Master Guarantee Agreement and Ex-Im Bank Approval and (b) any agreements between the Lender and/or the Agent and the Borrower regarding obligations of the Borrower not covered by the Ex-Im Bank Guarantee. As between the Lender and/or the Agent and Ex-Im Bank, in the event of any inconsistency between the terms of this Agreement and the terms of either the Master Guarantee Agreement or the Ex-Im Bank Approval, the terms of first, such Ex-Im Bank Approval, and second, such Master Guarantee Agreement, shall govern and shall supersede the terms hereof to the extent of such difference.

37

13.10 <u>Amendment or Waiver</u>. This Agreement may not be changed, discharged or terminated without the written consent of the parties hereto, and no provision hereof may be waived without the written consent of the party to be bound thereby. No amendment, modification, termination or waiver of any provision of Section 12 hereof or any other provision referring to the Agent shall be effective without the written concurrence of the Agent. The Agent may, but shall have no obligation to, with the written concurrence of the Lender, execute amendments, modifications, waivers or consents on behalf of the Lender. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which is was given. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

13.11 <u>Counterparts</u>. This Agreement may be signed in separate counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

13.12 <u>Judgment Currency</u>. All payments of principal, interest, fees or other amounts due hereunder and under any Note shall be made in U.S. Dollars, regardless of any law, rule, regulation or statute, whether now or hereafter in existence or in effect in any jurisdiction, which affects or purports to affect such obligations. The obligation of the Borrower in respect of any amount due under this Agreement or any Note, notwithstanding any payment in any other currency (whether pursuant to a judgment or otherwise), shall be discharged only to the extent of the amount in U.S. Dollars that the Person entitled to receive that payment may, in accordance with normal banking procedures, purchase with the sum paid in that other currency (after any premium and costs of exchange) on the Business Day immediately succeeding the day on which that Person receives that payment. If the amount in U.S. Dollars that may be so purchased for any reason falls short of the amount originally due, the Borrower shall pay such additional amounts, in U.S. Dollars, to compensate for the shortfall. Any obligation of the Borrower not discharged by that payment shall be continue to be due as a separate and independent obligation and shall accrue interest in accordance with Section 5.02 until discharged as provided herein.

13.13 <u>English Language</u>. All documents to be delivered by any party hereto pursuant to the terms hereof shall be in the English language or, if originally written in another language, shall be accompanied by an accurate English translation upon which the other parties hereto shall have the right to rely for all purposes under this Agreement and any Note.

13.14 <u>Severability</u>. To the extent permitted by applicable law, the illegality or unenforceability of any provision of this Agreement shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement.

13.15 <u>Waiver of Jury Trial</u>. FOR THE PURPOSES OF THIS AGREEMENT AND EACH OTHER BORROWER DOCUMENT, EACH OF THE BORROWER, THE AGENT, THE LENDER AND EX-IM BANK HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHTS EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT, ANY OTHER BORROWER DOCUMENT, OR

38

ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN), OR ACTIONS OR OMISSIONS OF ANY PARTY HERETO, OR ANY OTHER PERSON, RELATING TO THIS AGREEMENT OR ANY OTHER BORROWER DOCUMENT.

39



IN WITNESS WHEREOF, each of the parties hereto has caused this Credit Agreement to be duly executed and delivered as of the date first above written.

**THE LEBANESE COMPANY FOR DEVELOPMENT AND RECONSTRUCTION OF THE BEIRUT CENTRAL DISTRICT s.a.l,**
as Borrower

By: _____
(Signature)

Name: Nasser Chammah
(Print)

Title: Chairman - G.M.
(Print)


**CITIBANK, N.A., Beirut Branch,**
as Lender

By: _____
(Signature)

Name: Elia S. Samaha
(Print)

Title: Vice President - General Manager.
(Print)


**CITIBANK INTERNATIONAL PLC,**
as Agent

By: _____
(Signature)

Name: _____
(Print)

Title: _____
(Print)

40



IN WITNESS WHEREOF, each of the parties hereto has caused this Credit Agreement to be duly executed and delivered as of the date first above written.

THE LEBANESE COMPANY FOR DEVELOPMENT
AND RECONSTRUCTION
OF THE BEIRUT CENTRAL DISTRICT s.a.l,
as Borrower

By: _____
                (Signature)

Name: _____
                 (Print)

Title: _____
                 (Print)


CITIBANK, N.A., Beirut Branch,
as Lender

By: _____
                (Signature)

Name: _____
                 (Print)

Title: _____
                 (Print)


CITIBANK INTERNATIONAL PLC,
as Agent

By: _____GRBarfather_____
                (Signature)

Name: __GILLIAN  BARNFATHER__
                 (Print)

Title: ___VICE PRESIDENT___
                 (Print)

40

EXPORT-IMPORT BANK OF THE UNITED STATES

By: _____
            (Signature)

Name: _____ Elaine Stangland _____
            Deputy General Counsel

Title: _____ Secretary _____
            (Print)

Ex-Im Bank Transaction No. AP073269XX-Lebanon

41

# EXHIBIT E

# PART 2

FORM OF GLOBAL FLOATING RATE NOTE

### [BORROWER]

### PROMISSORY NOTE

U.S.$ .$14,709,252.00

_____, 20__

FOR VALUE RECEIVED, Lebanese Company for Development and Reconstruction of the Beirut Central District [address of the Borrower] (the "Maker"), by this promissory note (this "Note") hereby unconditionally promises to pay to the order of Citibank International plc, (the Agent") on behalf of Citibank, N.A., Beirut Branch (the "Lender") at _____[1] the principal sum of Fourteen Million Seven Hundred Nine Thousand Two Hundred Fifty-Two U.S. Dollars (U.S.$14,709,252.00) or such lesser amount as shall be advanced by the Agent on behalf of the Lender to the Maker in installments as hereinafter provided, and to pay interest on the principal balance hereof from time to time outstanding, as hereinafter provided, at the rate of one-quarter of one percent (0.25%) per annum above LIBOR. Beginning on the Ex-Im Bank Claim Payment Date (hereinafter defined), the definition of Special LIBOR shall apply for all purposes, including, without limitation, the fifth paragraph hereof, in place of the definition of LIBOR.[2] All capitalized terms not defined herein have the meanings assigned to them in the Agreement (hereinafter defined).

The principal hereof shall be paid in ten (10) approximately equal, successive semi-annual installments, the first of which shall be due and payable on October 25, 2004. The remaining installments shall be due and payable semi-annually thereafter on each April 25 and October 25 of each year (each, a "Payment Date"), provided that, on the last Payment Date, the Maker shall repay in full the principal amount hereof then outstanding.

Interest on this Note is payable on each Payment Date, beginning on October 25, 2001. Interest will be calculated on the basis of the actual number of days elapsed (including the first day, but excluding the last day) over a year of 360 days.

If any amount of the principal or accrued interest on this Note is not paid in full when due (whether at stated maturity, by acceleration, or otherwise), the Maker shall pay to the Agent on behalf of the Lender on demand interest on such unpaid amount (to the extent permitted by applicable law) for the period from the date such amount was due until such amount shall have been paid in full at an interest rate per annum equal to (x) _____ percent (_____%) per annum above the interest rate then applicable under first paragraph hereof until the end of the then current Interest Period, and (y) thereafter ___% per annum above the _____.

---

[1] Insert name and address (i.e., bank name, ABA#, Ref.) of a banking institution in United States that is authorized to accept deposits.

[2] For sub-LIBOR transactions, interest must be no less than Special LIBOR. See Section 2.04(b) of the MGA.

A1-1

Notwithstanding the fourth paragraph hereof, beginning on the date on which Ex-Im Bank shall have made a claim payment to the Agent under the Master Guarantee Agreement ("Ex-Im Bank Claim Payment Date"), in the event any amount of principal of or accrued interest on this Note owing to Ex-Im Bank is not paid in full when due (whether at stated maturity, by acceleration, or otherwise), the Maker shall pay to Ex-Im Bank on demand interest on such unpaid amount (to the extent permitted by applicable law) for the period from the date such amount was due until such amount shall have been paid in full, at an interest rate per annum equal to one percent (1%) per annum above the interest rate then applicable under the first paragraph hereof.

This is one of the Notes referenced in Section 5.06 of the Credit Agreement, dated as of July 11, 2001 (the "Credit Agreement") by and among the Maker, the Lender, the Agent, and the Export-Import Bank of the United States. This Note is entitled to the benefits of, and is governed in all respects by, the terms of the Credit Agreement, which Credit Agreement, among other things, contains provisions for the payment of principal and interest (including default interest) hereon without set-off, counterclaim, deduction, withholding on account of taxes levied or imposed under the laws of the government of [the Borrower's Country], restrictions and conditions of whatever nature, and for acceleration of the maturity hereof upon the happening of certain stated events. The principal amount hereof may be prepaid in accordance with terms of the Credit Agreement. All payments received hereunder shall be applied in accordance with the order of priority set forth in Section 8.02 of the Credit Agreement.

The Maker hereby waives demand, diligence, presentment, protest, and notice of every kind, and warrants to the holder that all actions and approvals required for the execution and delivery hereof as a legal, valid, and binding obligation of the undersigned, enforceable in accordance with the terms hereof, have been duly taken and obtained.

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, U.S.A.

> THE LEBANESE COMPANY FOR
> DEVELOPMENT AND RECONSTRUCTION
> OF THE BEIRUT CENTRAL DISTRICT
>
> By:_____
>              (Signature)[3]
>
> Name:
> Title:

Promissory Note No. _____

---

[3] Personal makers should sign in their personal capacities only. Corporate makers should sign only in their corporate capacities with proper reference to their corporate titles.

UTILIZATION PROCEDURES    A-4 (CA)
FOR LONG-TERM CREDITS GUARANTEED BY EX-IM BANK                Annex B

## I.    Introduction

In order to be guaranteed by Ex-Im Bank, funds must be disbursed under the Credit in accordance with the "Reimbursement Procedure" and/or the "L/C Procedure," both of which are described below. No other disbursement methods are permitted.

## II.    Reimbursement Procedure

The Borrower may from time to time request that Disbursements be made by the Agent, on behalf of the Lender, to the Borrower's account at a commercial bank in the United States (unless otherwise agreed by Ex-Im Bank) selected by the Borrower and acceptable to the Lender, the Agent and Ex-Im Bank to: (i) reimburse the Borrower for the Financed Portion of any payments made by the Borrower to an Exporter or Ancillary Services Provider; and (ii) charge the Borrower for the Exposure Fee due to Ex-Im Bank (if financed). Ex-Im Bank may reasonably limit the number of requests for Reimbursements submitted by the Borrower per month.

To obtain Disbursements under the Reimbursement Procedure:

A.    The Borrower shall deliver to the Agent copies of the following documents (collectively, the "Reimbursement Documents"), all of which must be satisfactory in form and substance to the Lender, the Agent and Ex-Im Bank. Upon receipt, the Agent will review the Reimbursement Documents for compliance and promptly submit them to Ex-Im Bank if deemed satisfactory to it:

1.    The original Request for Reimbursement to Borrower's Account, in the form of Exhibit 2, signed by the authorized representative(s) of the Borrower designated pursuant to Section 6.01(c) of the Agreement, and accompanied by an Itemized Statement of Payments in the form of Exhibit 2(a) for each Exporter or Ancillary Services.

2.    Copies of the invoice(s) for the Eligible Goods and Services to be financed under the requested Disbursement, bearing a U.S. street address (unless otherwise agreed by Ex-Im Bank), and bearing or accompanied by evidence that the Exporter(s) or Ancillary Services Provider(s) thereof, as the case may be (the "Payee") has been paid. Evidence of payment may be any of the following: (a) a "paid" stamp on the invoice signed by the Payee; (b) a copy of a commercial bank's "Advice of Payment" to the Payee; (c) a copy of both sides of a cancelled check made payable to the Payee; or (d) a letter from the Payee acknowledging payment.

B-1



3. An original completed Exporter's Certificate(s) in the form of Exhibit 1, signed by an authorized officer or employee of the Exporter or Ancillary Services Provider (with attachments, if required) <u>unless</u> an Exporter's Certificate has been previously provided by such Exporter (or Ancillary Services Provider) pursuant to a prior Utilization.

4. Copies of signed, clean, on-board ocean, airway, railway or other bills of lading evidencing shipment of the Goods from the United States to the Borrower's Country (or, in the case that the Borrower's Country is either Canada or Mexico, a destination in the United States which is a point of importation into Canada or Mexico, respectively). Ocean bills of lading must either show shipment on vessels of U.S. registry or be accompanied by an appropriate MARAD waiver (as described in Section IV below). Bills of lading are not required for Services, Progress Payments.

5. Such other documents, statements, certificates, information and evidence as Ex-Im Bank may from time to time reasonably request.

Ex-Im Bank may receive copies of the Reimbursement Documents, except for (i) the Request for Reimbursement to Borrower's Account, and (ii) if required to be submitted, the Exporter's Certificate, which shall be manually signed originals.

B. If a Letter of Credit naming the Exporter as the beneficiary has been previously opened in accordance with the L/C Procedure set forth in Part III below, the Agent will coordinate with Ex-Im Bank and the Borrower to determine the appropriate percentage that will apply to the requested Reimbursement, based on the Exporter's Certificate submitted under the L/C Procedure.

C. Upon approval of the Reimbursement Documents, Ex-Im Bank shall issue to the Agent a Certificate Authorizing Reimbursement, in the form of Exhibit 4.

D. Upon receipt of the Certificate Authorizing Reimbursement, the Agent will reimburse the Borrower for the Financed Portion of the Goods and Services as approved by Ex-Im Bank in the Certificate, and will simultaneously pay to Ex-Im Bank the Exposure Fee (if financed) that is due on such Reimbursement, in accordance with the terms of the Agreement. The sum of the amounts so reimbursed to the Borrower and so paid to Ex-Im Bank shall constitute a Disbursement under the Credit.

III.    L/C Procedure

B-2



The Borrower may request a commercial bank located in the United States that is acceptable to the Agent and Ex-Im Bank ("L/C Bank")[1] to issue, confirm or advise letters of credit ("Letters of Credit") in favor of an Exporter (or U.S.-based Ancillary Services Provider) as the beneficiary. Ex-Im Bank reserves the right to limit the number of Letters of Credit for which it will issue Certificates Approving Letter of Credit. Whenever possible, all Eligible Goods and Services to be purchased from one beneficiary should be covered under a single Letter of Credit.

To obtain Disbursements under the L/C Procedure:

A. The Borrower shall cause the L/C Bank to submit to Ex-Im Bank the following documents (collectively, the "L/C Documents"), all of which must be satisfactory in form and substance to the L/C Bank, the Agent and Ex-Im Bank:

  1. The original Request for Letter of Credit Approval, in the form of Exhibit 5, signed by the authorized representative(s) of the Borrower designated pursuant to Section 6.01(b) of the Agreement.

  2. Three (3) copies of the proposed letter of credit in favor of the beneficiary, complete in all respects, except for date and signature by the L/C Bank, and accompanied by a copy of the related pro forma invoice or Supply Contract. The Borrower's instructions to the L/C Bank with respect to the proposed letter of credit shall provide that the documents to be presented for drawings under such letter of credit meet the documentary requirements of this Agreement, including the submission of invoices (except that invoices need not be accompanied by evidence of payment), any Amended Exporter's Certificates, and bills of lading, in form and substance as specified in Section II above.

  3. An original completed Exporter's Certificate(s), signed by an authorized officer or employee of the Exporter (or Ancillary Services Provider), with attachments if required, unless an Exporter's Certificate has been previously provided by such Exporter (or Ancillary Services Provider) pursuant to a prior Utilization.

  4. Such other documents, statements, certificates, information and evidence as Ex-Im Bank may from time to time reasonably request.

B. Upon approval of the L/C Documents, Ex-Im Bank shall issue to the L/C Bank, with a copy to the Agent, a Certificate Approving Letter of Credit, in the form of Exhibit 6.

C. Upon receipt of the Certificate Approving Letter of Credit, the L/C Bank shall issue, advise or confirm the Letter of Credit.

---

[1] The Lender may also be the L/C Bank if the Lender is a commercial bank located in the U.S.

D.  If the Exposure Fee is included in the Letter of Credit, before any drawings are permitted under the Letter of Credit, the L/C Bank shall have received from the beneficiary of such Letter of Credit its irrevocable instructions, in form and substance satisfactory to the Agent, L/C Bank and Ex-Im Bank, to: (i) deduct from the first payment (if the Exposure Fee is to be paid "up front") or each payment (if the Exposure Fee is to be paid "as disbursed") under the Letter of Credit an amount equal to the Exposure Fee payable to Ex-Im Bank; and (ii) to pay such amount directly to Ex-Im Bank.

E.  The L/C Bank will pay the beneficiary under the Letter of Credit upon presentation of the documents required by the Letter of Credit ("Drawing Documents"), and will simultaneously pay to Ex-Im Bank the applicable Exposure Fee, if any.   A Disbursement shall be deemed to occur when the L/C Bank makes payment of a draft drawn under the Letter of Credit ("L/C Payment"). The sum of the amounts so paid to the beneficiary and to Ex-Im Bank under, and in accordance with the terms of, the Letter of Credit shall constitute the amount of the Disbursement.

F.  Within three (3) Business Days after the date of an L/C Payment, the Agent shall deliver, or cause the L/C Bank to deliver, to Ex-Im Bank copies of the Drawing Documents related to such L/C Payment (including a copy of the advice of payment to the beneficiary's account), except any Exporter's Certificate which shall be a manually signed original.

G.  Ex-Im Bank Approval of Letter of Credit Amendments.

1.  Any amendments to a Letter of Credit not listed in Part III.H below must be approved by Ex-Im Bank, the Agent and the L/C Bank. The Borrower's request for Ex-Im Bank's approval of such amendment shall be made in the form of Exhibit 7, completed and signed by the authorized representative(s) of the Borrower designated pursuant to Section 6.01(c) of the Agreement, accompanied by any relevant documents. If Ex-Im Bank approves the proposed amendment, it shall issue to the L/C Bank, with a copy to the Agent, a Certificate Approving Amendment of Letter of Credit in the form of Exhibit 8.

2.  No Letter of Credit shall be amended except in accordance with the procedures set out in Part III.G.I. or Part III.H.2.

H.  Lender Approval of Letter of Credit Amendments.

1.  After Ex-Im Bank has issued a Certificate Approving a Letter of Credit, so long as the procedures set out in Part III.H.2 below are followed, the Lender and the L/C Bank may approve any of the following amendments to Letters of Credit in accordance with the Uniform Customs and Practices for Documentary Credits (International Chamber of Commerce Publication 500),

B-4

as the same may be amended from time to time ("UCP") without Ex-Im Bank's prior approval:

a.  In order to allow sufficient time for the presentation of all documents and the making of all Letter of Credit disbursements, extend the expiry date to the earlier of: (i) a date certain; and (ii) the Final Disbursement Date deemed by Ex-Im Bank to be effective under the Credit;

b.  Extend the final shipment date to the earlier of: (i) a date certain; and (ii) the Letter of Credit's expiry date.

c.  Permit partial shipment(s);

d.  Permit transhipment(s) in accordance with the provisions of 46 U.S.C. §1241-1 (Public Resolution No. 17 of the 73rd Congress of the United States, as amended);

e.  Permit shipment(s) by any airline rather than ocean vessel, provided that air waybill(s) are required with respect to such shipment(s) instead of ocean bill(s) of lading;

f.  In accordance with the prior consent of each beneficiary, permit a reduction of the Letter of Credit's face amount;

g.  Permit "on-deck" shipment(s);

h.  Permit a change in the address of a beneficiary, provided that such address, when changed, is a street address located in the United States;

i.  Permit ocean shipment(s), provided that signed, clean, on-board ocean bill(s) of lading are required with respect to such shipment(s) and that such bill(s) of lading evidence shipment(s) on ocean vessel(s) of either (i) U.S. registry or (ii) non-U.S. registry pursuant to a MARAD waiver of the provisions of 46 U.S.C. §1241-1 (Public Resolution No. 17 of the 73rd Congress of the United States, as amended);

j.  Permit language or spelling changes that do not constitute or give rise to a material change in the terms and conditions of such Letter of Credit, in order to: (i) correct a typographical error; (ii) correct an omission; or, (iii) clarify otherwise ambiguous language;

k.  Permit changes made on account of requirements for certain consularized documents, except that such change(s) shall not result in

B-5

the modification or elimination of a commercial invoice as a necessary document for presentation;

l.   Permit acceptance of "stale" documents or documents which are presented or are to be presented later than 21 calendar days from the related shipment date, provided that such documents are dated no earlier than the date set forth in Section 2.01 of the Agreement;

m.   Permit the change of either: (i) the originating port or originating airport to a different U.S. port or U.S. airport; or, (ii) the port of destination or airport of destination to a different port located in the Borrower's Country or a different airport located in the Borrower's Country;

n.   Permit changes in the number of copies of documents to be presented by a beneficiary, except that such change may not result in the deletion or modification in the terms of a document required for presentation.

2.   Any request by the Borrower to the Lender for approval of an amendment of a Letter of Credit pursuant to Part III.H.1. shall be made in the form of Exhibit 9, completed and signed by an authorized representative of the Borrower designated pursuant to Section 6.01(c) of the Agreement, and accompanied by the relevant documents, including copies of the proposed Letter of Credit amendment prepared by the L/C Bank. If the Lender approves the proposed amendment, the Lender shall issue to Ex-Im Bank, no later than ten (10) Business Days after the issuance of the Letter of Credit amendment, a Notice of Letter of Credit Amendment, in the form of Exhibit 10, completed and signed on behalf of the Lender by a Person authorized under the Master Guarantee Agreement, and accompanied by any relevant documents.

3.   By written notice to the Lender and the Borrower, Ex-Im Bank may suspend or cancel the authority of the Lender to approve Letter of Credit amendments pursuant to the procedure set out in this Part III.H.

IV.   Ocean Transportation - MARAD Waivers

If any of the Goods are to be exported on ocean vessels that are not vessels of U.S. registry, the Borrower must obtain a waiver from the provisions of 46 U.S.C. §1241-1 (Public Resolution No. 17 of the 73rd Congress of the United States, as amended). An application for waiver must be submitted to the U.S. Maritime Administration ("MARAD") at the following address: Director, Office of Market Development, Room 7207, Maritime Administration, Department of Transportation, 400 7th Street, S.W., Washington, DC 20590 (with a copy to Ex-Im Bank). For further information about PR17 waivers, please contact MARAD or go to its website at http://www.marad.dot.gov. Each application for such waiver must be submitted to MARAD sufficiently in advance of the

intended shipping date in order to allow MARAD adequate opportunity to process the application. If any of the Goods are shipped on ocean vessels of non-U.S. registry without a MARAD waiver, or contrary to the provisions of a MARAD waiver, such Goods will not be eligible for financing under the Credit.



Exhibits to Annex B:

| | | |
|---|---|---|
| 1 | - | Exporter's Certificate |
| 2 | - | Request for Reimbursement to Borrower's Account |
| 2(a) | - | Itemized Statement of Payments |
| [3 | - | Intentionally omitted] |
| 4 | - | Certificate Authorizing Reimbursement |
| | | |
| 5 | - | Request for Letter of Credit Approval |
| 6 | - | Certificate Approving Letter of Credit |
| 7 | - | Request for Ex-Im Bank Approval of Amendment to Letter of Credit |
| 8 | - | Certificate Approving Amendment to Letter of Credit |
| 9 | - | Request for Lender Approval of Amendment of Letter of Credit |
| 10 | - | Notice of Letter of Credit Amendment |

+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

The following is included for informational purposes only, and is not part of the Agreement:

Because the Exporter(s) (and Ancillary Services Provider and Local Cost Provider, if any), and the L/C Bank are not parties to the Agreement, the Borrower and Agent will need to take the following steps to ensure that the Credit is disbursed in a timely fashion:

1.    The Borrower should advise the Exporter(s) (and any Ancillary Services Providers and Local Cost Providers, if any) of the provisions of this Agreement that will require its cooperation, including, without limitation, the requirement that the Initial Exporter's Certificate be completed and submitted prior to the first Utilization. The Borrower should also advise the Exporter(s) (and any Ancillary Services Provider(s)) of its obligation, as described in Section 7 of the Exporter's Certificate, to submit an Amended Exporter's Certificate if the information or certifications set forth in a previously submitted Certificate become untrue.

2.    If the Borrower would like to use the L/C Procedure, the Borrower must make appropriate arrangements with the L/C Bank regarding the issuance, confirmation or advice of the Letters of Credit and the payment of any fees that the L/C Bank may charge. The Agent and the L/C Bank must enter into a reimbursement agreement with respect to the L/C Payments, which reimbursement agreement, along with Ex-Im Bank's Certificate Approving Letter of Credit, will be conditions precedent to the issuance, confirmation or advice of a letter of credit by the L/C Bank.

3.    Examples    of    sample    L/C    proviso    wording    can    be    found    at www.exim.gov/creditad.html.
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

Annex B
Exhibit 1

## FORM OF EXPORTER'S CERTIFICATE

Name and U.S. Street Address of Exporter:

Date: _____

RE:    Ex-Im Bank Credit/Guarantee/Insurance Number: _____
       Purchaser: _____
       Supply Contract/Purchase Order No.(s) _____.

Check one:    ☐ Initial Exporter's Certificate
              ☐ Amended Exporter's Certificate. The following has changed: [specify]

We understand that the Export-Import Bank of the United States ("Ex-Im Bank") provides credit support to promote U.S. export sales, and that Ex-Im Bank will determine the scope of its support for our sale to the Purchaser based on the information provided below. To aid in this determination, we, the Exporter, hereby certify:

### PART A: CONTENT

1.  Content. This information is based on our best efforts to assess the value of the goods and services ("Goods and Services") to be provided under our supply contract or signed purchase order with the Purchaser (the "Supply Contract/Purchase Order(s)"). Content changes may need to be reported via an amended Exporter's Certificate (see Part C below). Check one:

    ☐ The Goods and Services contain only U.S. Content the U.S. Content Percentage is 100% (i.e., no Foreign Content, Local Costs, or Excluded Goods and Services (defined below)). Please do not complete the chart if this box is checked.

    ☐ The Goods and Services contain less than 100% U.S. Content. Please complete the chart if this box is checked.

|   |   | Definition | USD |
|---|---|---|---|
| A. | Supply Contract/ Purchase Order(s) | The aggregate price of all Goods and Services in the Supply Contract/ Purchase Order(s). | |
| B. | Excluded Goods and Services | The aggregate price of all Goods and Services that are not eligible for (or excluded from) Ex-Im Bank support (e.g., goods not shipped from the U.S.) | |
| C. | Contract Price | A minus B | |
| D. | Local Costs | The aggregate price of all Goods originated/manufactured in the Purchaser's country and all Services provided by residents of the Purchaser's country. | |
| E. | Net Contract Price | C minus D | |
| F. | Foreign Content | The aggregate cost to the Exporter of any Goods (or components | |

Version 2/01

| | | thereof) that were produced or manufactured outside the U.S., Services provided by third country-resident personnel, and foreign freight costs and foreign insurance included in the Net Contract Price for Goods exported from the U.S. (Such amount shall not include any Local Costs.) | |
|---|---|---|---|
| G. | U.S. Content | E minus F | |
| H. | U.S. Content Percentage | G divided by E, expressed as a percentage. | % |
| I. | Disbursement Percentage | initial Exporter's Certificate: input the lower of (i) 85% and (ii) the percentage in H. Amended Exporter's Certificate: input the percentage obtained from the Disbursement Percentage Calculator page (if any). | % |

## PART B: CERTIFICATIONS

We hereby certify, as to ourselves and the Ex-Im Bank-approved Goods and Services sourced from the U.S. and the Purchaser's country, as follows:

2.  15% Cash Payment. We (i) have received (or will receive) payment for at least 15% of the Net Contract Price, and/or (ii) have financed (or will finance) such amount at market rates. We have submitted (or will submit) evidence of payment of our invoices. (For 100% U.S. Goods and Services, "Net Contract Price" means the aggregate price of such Goods and Services.)

3.  Invoices and Shipment. We have provided (or will provide) copies of (i) invoices describing the Goods and Services and (ii) signed, clean, onboard bills of lading evidencing that the Goods included in the Net Contract Price have been shipped from the U.S. to the Purchaser's country. For Services, progress payments for Goods prior to shipment, and/or Local Costs, the value of the work performed at the time the invoices therefor are submitted for payment shall equal or exceed the amount so invoiced (or we have obtained Ex-Im Bank's prior consent to an alternative arrangement).

4.  Suspension and Debarment. We and each of our Principals individually, have not within the past 3 years been a) debarred, suspended, declared ineligible from participating in, or voluntarily excluded from participation in, a Covered Transaction, b) formally proposed for debarment, with a final determination still pending, c) indicted, convicted or had a civil judgment rendered against us for any of the offenses listed in the Regulations, d) delinquent on any substantial debts owed to the U.S. Government or its agencies or instrumentalities as of the date of execution of this certification; or we have received a written statement of exception from Ex-Im Bank attached to this certification, permitting participation in this Covered Transaction despite an inability to make certifications a) through d) in this paragraph.

We further certify that we have not and will not knowingly enter into any agreements in connection with the Goods and Services with any individual or entity that has been debarred, suspended, declared ineligible from participating in, or voluntarily excluded from participation in a Covered Transaction. All capitalized terms not defined herein shall have the meanings set forth in the Government-wide Non-procurement Suspension and Debarment Regulations - Common Rule (Regulations).

5.  Other Payments; Local Compliance. Without Ex-Im Bank's written consent, a copy of which is attached, we have not and will not agree to, offer to, cause to, or arrange for, directly or indirectly, any payment, discount, allowance, rebate, commission, fee or other payment in connection with the sales of the Goods and Services under (or obtaining) the Supply Contract/Purchase Order(s) or Ex-Im Bank Credit/Guarantee/Insurance, except for a) payment of manufacturing costs or for the purchase of the Goods, b) the regular remuneration of our regular full-time directors, officers and employees; c) regular commissions or fees, if any, to our regular sales agent, broker or representative and readily identifiable on our books and records as to amount, purpose and recipient; d) any discounts, allowances, or rebates to the Purchaser that are disclosed in our invoices; or e) any letter of credit or other fees paid to commercial banks or any payments made to Ex-Im Bank in connection with the Ex-Im Bank Credit/Guarantee/Insurance.

In addition, we have not, and will not, engage in any activity in connection with this transaction that is a violation of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. " 78dd-1, et seq. To the best of our knowledge, the Supply Contract/Purchase Order(s) and the performance by the parties of their respective obligations thereunder does not violate any applicable law.

B1-1



6.   Munitions List. Except as described on our attached statement, none of the Goods and Services are on the U.S. Munitions List (part 121 of Title 22 of the Code of Federal Regulations).

## PART C: CHANGES AND EX-IM BANK RELIANCE

7.   Changes to Certifications. With respect to Part A, we will promptly complete and submit an amended Exporter's Certificate if there has been a "material change" in the U.S. Content Percentage (together with a copy of the completed "Disbursement Percentage Calculator" found at www.exim.gov/disbursement-calculator) prior to any further presentation of invoices for payment. A "material change" in the U.S. Content Percentage occurs if (a) the U.S. Content Percentage has decreased by more than 5% (as compared to the U.S. Content Percentage reported in the initial Exporter's Certificate) and (b) aggregate foreign content is over 20% (i.e., the new U.S. Content Percentage is less than 80%).

With respect to Parts B or C, if any of the certifications made therein become untrue, we will promptly submit an amended Exporter's Certificate, noting the changes and with any required attachments, prior to any further presentation of invoices for payment.

8.   Ex-Im Bank Reliance. With knowledge that Ex-Im Bank will rely on the certifications and representations made in this Certificate, we agree we are liable for any damages suffered by Ex-Im Bank's reliance. We understand that these certifications are subject to the penalties for fraud provided in Article 18 U.S.C., Section 1001. We agree that presentation of invoices for payment under the Ex-Im Bank Credit/Guarantee/Insurance is a confirmation by us of the information and certifications made herein. By his signature, the person signing this Certificate on behalf of the Exporter represents that he is fully authorized to do so. We agree to provide additional information with respect to any of the matters covered in this Certificate upon Ex-Im Bank's reasonable written request.

[ EXPORTER]


By: _____
     (Authorized Officer or Employee)
Name:
Title:



REIMBURSEMENT PROCEDURE

Annex B
Exhibit 2

## REQUEST FOR REIMBURSEMENT TO BORROWER'S ACCOUNT

_____, 20__

[NAME OF AGENT]
[ADDRESS OF AGENT]

Export-Import Bank of the United States
811 Vermont Avenue, N.W.
Washington, DC 20571
Attention:  Credit Review and Operations Division

Subject:      Ex-Im Bank Transaction No. AP0____XX-[Country]
              [Borrower] ("Borrower")
              Request for Disbursement No. _____

Ladies and Gentlemen:

In accordance with the terms and conditions of the Credit Agreement ("Agreement"), dated as of _____, 20__, by and among the Borrower, [name of Lender] ("Lender"), [name of Agent] ("Agent"), and the Export-Import Bank of the United States ("Ex-Im Bank"), we hereby request the Agent, on behalf of the Lender, to make a Disbursement under the Credit thereby established in the amount set forth below, with the Reimbursement amount thereof being paid to the account of [identify the Borrower's account as it is carried on the books of the payee bank] [complete name and address of the payee bank] [.] [, and with the Exposure Fee amount thereof being paid to Ex-Im Bank.]

Reimbursement amount       U.S.$_____
[[Exposure Fee amount]      U.S.$_____
TOTAL Disbursement U.S.$_____]][1]

We attach our Itemized Statement of Payments dated _____, 20__.

We hereby certify with respect to the payments made by us for the Eligible Goods and Services specified in the attached Itemized Statement of Payments that:

---

[1] If this is the first Disbursement in a transaction with a financed "up front" Exposure Fee, the entire amount of the Exposure Fee set forth in Section 7.01(a)(ii) should be specified here.  In all other cases, the financed Exposure Fee applicable to the Financed Portion should be specified.

B1-3

1.    All such payments were made exclusively for the purchase in the United States of Goods and Services, and such Goods and Services will be used for lawful purposes in accordance with the terms of the Agreement.

2.    We have not previously requested Disbursements on account of these payments.

3.    Copies of invoices and bills of lading (accompanied by evidence that the [Exporter/Ancillary Services Provider] has been paid) and other documents required by Ex-Im Bank's "Utilization Procedures" (set forth in Annex B to the Agreement) relating to the Eligible Goods and Services specified in the attached Itemized Statement of Payments are submitted herewith.

4.    All of those Goods which have been or will be transported to [insert name of country] on ocean vessels have been or will be shipped on vessels of U.S. registry, except to the extent that a waiver of this requirement has been obtained from the U.S. Maritime Administration.

5.    The Eligible Goods and Services covered by the enclosed invoices consist of services performed for, or goods accepted by, the [Borrower][Purchaser][Authorized End-User].

We further certify that:

> (i)    we have paid the exact amounts set forth in the attached Itemized Statement of Payments for the Eligible Goods and Services specified therein;
>
> (ii)    we have not, and to the best of our knowledge and belief, the Exporter(s) (and Ancillary Services Provider(s), if any) have not, and will not, agree to, offer to, cause to, arrange for or receive, directly or indirectly, any payment, discount, allowance, rebate, commission, fee or other payment in connection with the Eligible Goods and Services or the Supply Contract(s) or the Ex-Im Bank Guarantee, except for a) the regular remuneration of regular full-time directors, officers and employees; b) regular commissions or fees, if any, to regular sales agent or representative and readily identifiable on the party's books and records as to amount, purpose and recipient; or c) any letter of credit or other fees paid to commercial banks or any payments made to Ex-Im Bank in connection with the Ex-Im Bank Guarantee;
>
> (iii)    as of the date of this request, no event has occurred and is continuing which constitutes, or but for the requirement of giving notice or lapse of time, or both, would constitute, an Event of Default under the provisions of the Agreement; and



(iv)     as of the date of this request, the representations and warranties made by us in the Agreement are true.

Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned thereto in the Agreement.

Very truly yours,

[BORROWER]

By: _____
                        (Signature)[2]

Name: _____
                        (Print)

Title: _____
                        (Print)

Enclosures
     Itemized Statement of Payments and supporting documents

---

[2] May only be signed by one (or more, if required) of the authorized representatives designated by the Borrower pursuant to Section 6.01(e) of the Agreement.

Annex B
Exhibit 2(a)

## REIMBURSEMENT PROCEDURE

### ITEMIZED STATEMENT OF PAYMENTS

_____, 20___

Ex-Im Bank Transaction No. _____
Attachment to Request for Reimbursement No. _____
[Export][Ancillary Services Provided]. _____
Supply Contract No(s): _____
Date of Exporter's Certificate: _____

| Invoice No. | Date of Payment | Amount of Payment[1] U.S.$ | Brief Description of Good/Service[2] | Bill of Lading Date/No. | Remarks |
|---|---|---|---|---|---|
| | | | | | |

TOTAL U.S.$ _____ TOTAL AMOUNT OF PAYMENTS

$ _____ REIMBURSEMENT AMOUNT[3] at ____ %[3]

[1] If the amount of payment is not for the total invoice value, explain in Remarks.

[2] Description must match that provided in the Acquisition List.

[3] Total U.S. Invoice Value multiplied by the lesser of: (i) 85%, (ii) the U.S. Content Percentage from the most recently delivered Exporter's Certificate and (iii) the Disbursement Percentage (if any) from such Exporter's Certificate.

B1(a)-1

REIMBURSEMENT PROCEDURE

## CERTIFICATE AUTHORIZING REIMBURSEMENT

_____, 20__

[Name of Agent]
[Address of Agent]

Subject:    Ex-Im Bank Transaction No. AP0____XX-[Country]
            [Borrower] ("Borrower")
            Certificate Authorizing Reimbursement No._____

Ladies and Gentlemen:

In accordance with the terms and conditions of the Credit Agreement ("Agreement"), dated as of _____, 20__, by and among the Borrower, [name of Lender] ("Lender"), [name of Agent] ("Agent"), and the Export-Import Bank of the United States ("Ex-Im Bank") and with the Borrower's Request for Reimbursement to Account of Borrower, we hereby authorize the Agent, on behalf of the Lender, to make a Disbursement under the Credit in the aggregate amount of U.S.$_____ on or before _____, 20__,[1] by paying (i) the applicable Exposure Fee in the amount of U.S.$_____ to Ex-Im Bank and (ii) the Reimbursement amount of U.S._____ to the Borrower at [identify the Borrower's account as it is carried on the books of the payee bank] at [complete name and address of the payee bank].

We hereby acknowledge that such Reimbursement and Exposure Fee payment, when so made, shall constitute a Disbursement under the Credit, and, together with the interest accrued thereon at the Guaranteed Interest Rate (as defined in the Master Guarantee Agreement No. _____-L (Syndicated) dated as of _____, 20__ between the Lender, Agent and Ex-Im Bank (the "Master Guarantee Agreement"))[2], are guaranteed by Ex-Im Bank as provided in the Master Guarantee Agreement.

The defined terms in this Certificate shall have the respective meanings specified in the Agreement.

EXPORT-IMPORT BANK OF THE

----

[1] Date should be 30 days after the date of this Certificate.

[2] If the Ex-Im Bank Guarantee for your transaction is documented under a stand-alone guarantee agreement instead of a Lender's Master Guarantee Agreement then replace this parenthetical with the following: "(as defined in the Guarantee Agreement dated as of _____, 20__ (the "Guarantee Agreement"), between the Lender and Ex-Im Bank)" and globally change all references to "Master Guarantee Agreement" in this document to refer instead to "Guarantee Agreement".

UNITED STATES

By: _____
(Signature)

Name _____
(Print)

Title _____
(Print)

B3-2

B3-3



L/C PROCEDURE

## REQUEST FOR LETTER OF CREDIT APPROVAL

_____, 20__

[Name of Agent]
[Address of Agent]

Export-Import Bank of the United States
811 Vermont Avenue, N.W.
Washington, DC 20571
Attention: Credit Review and Operations Division

Subject:    Ex-Im Bank Transaction No. AP0____XX-[Country]
            [Borrower] ("Borrower")
            Request for Letter of Credit Approval

Ladies and Gentlemen:

   In accordance with the terms and conditions of the Credit Agreement ("Agreement"), dated as of _____, 20__, by and among the Borrower, [name of Lender] ("Lender"), [name of Agent] ("Agent"), and the Export-Import Bank of the United States ("Ex-Im Bank"), we enclose for your approval three copies of a proposed Letter of Credit No. _____ ("Proposed L/C"), prepared by [name of L/C Bank].

   Identifying data with respect to the Proposed L/C are as follows:

   Beneficiary:

   Amount:       U.S.$

   Expiry Date:

   Description of Eligible Goods and Services being purchased:

   Reference Number(s) from Acquisition List:

   If the terms and conditions of this letter of credit meet with your approval, please issue your Certificate Approving Letter of Credit in the form of Exhibit 5 to the Agreement.

B4-1

## CERTIFICATE

We hereby certify that:

(i)     all the payments to be made under the Proposed L/C will be made exclusively for the purchase in the United States of Goods and/or Services, and such will be used for lawful purposes in accordance with the terms of the Agreement.

(ii)    we have not, and to the best of our knowledge and belief, the beneficiary of the Proposed L/C has not, and will not, agree to, offer to, cause to, arrange for or receive, directly or indirectly, any payment, discount, allowance, rebate, commission, fee or other payment in connection with the Eligible Goods and Services or the Supply Contract(s) or the Ex-Im Bank Guarantee, except for a) the regular remuneration of regular full-time directors, officers and employees; b) regular commissions or fees, if any, to regular sales agent or representative and readily identifiable on the party's books and records as to amount, purpose and recipient; or c) any letter of credit or other fees paid to commercial banks or any payments made to Ex-Im Bank in connection with the Ex-Im Bank Guarantee;

(iii)   as of the date of this request, no event has occurred and is continuing which constitutes, or but for the requirement of giving notice or lapse of time, or both, would constitute, an Event of Default under the provisions of the Agreement; and

(iv)    as of the date of this request, the representations and warranties made by us in the Agreement are true.

Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned thereto in the Agreement.

Very truly yours,

[BORROWER]

By: _____
                (Signature)[1]

Name: _____
                (Print)

Title: _____
                (Print)

---

[1] May only be signed by one (or more, if required) of the authorized representatives designated by the Borrower pursuant to Section 6.01(c) of the Agreement.

Enclosures
    3 copies of Proposed L/C
    1 copy of Exporter's pro forma invoice, Supply Contract, or other document covering
        purchase
    Exporter's Certificate (if required)



B4-3

Annex B
Exhibit 6

## CERTIFICATE APPROVING LETTER OF CREDIT

Date _____, 20___

[Name of Letter of Credit Bank]
[Address of Letter of Credit Bank]

Subject:    Ex-Im Bank Transaction No. AP0_____XX-[Country]
            [Borrower] ("Borrower")
            Certificate Approving Letter of Credit No. _____

Ladies and Gentlemen:

In accordance with the terms and conditions of the Credit Agreement ("Agreement"), dated as of _____, 20___, between the Borrower, [name of Lender] ("Lender"), [name of Agent] ("Agent"), and the Export-Import Bank of the United States ("Ex-Im Bank"), and with the Borrower's Request for Certificate Approving Letter of Credit, we hereby approve the [issuance, confirmation or advice] by the L/C Bank of Letter of Credit No. ___ ("Letter of Credit"), in the face amount of U.S.$_____ and guaranteed by Ex-Im Bank to the maximum amount of U.S. $_____.

We hereby acknowledge that payments made under the Letter of Credit in accordance with its terms [including any payments to Ex-Im Bank of the applicable Exposure Fee,] constitute Disbursements under the Credit, and, together with interest accrued thereon at the Guaranteed Interest Rate (as defined in the Master Guarantee Agreement No. _____-L (Syndicated) dated as of _____, 20___ between the Lender, Agent and Ex-Im Bank ("Master Guarantee Agreement")[1]), are guaranteed by Ex-Im Bank as provided in the Master Guarantee Agreement.

The defined terms used in this Certificate shall have the respective meanings specified in the Agreement.

---

[1] If the Ex-Im Bank Guarantee for your transaction is documented under a stand-alone guarantee agreement instead of a Lender's Master Guarantee Agreement then replace this parenthetical with the following: "(as defined in the Guarantee Agreement dated as of _____, ____ (the "Guarantee Agreement"), between the Lender and Ex-Im Bank)" and globally change all references to "Master Guarantee Agreement" in this document to refer instead to "Guarantee Agreement".

EXPORT-IMPORT BANK OF THE
UNITED STATES

By: _____
(Signature)

Name: _____
(Print)

Title: _____
(Title)



L/C PROCEDURE

Annex B
Exhibit 7

## REQUEST FOR EX-IM BANK APPROVAL OF
## AMENDMENT TO LETTER OF CREDIT

_____, 20___

[Name of Agent]
[Address of Agent]

Export-Import Bank of the United States
811 Vermont Avenue, N.W.
Washington, DC 20571
Attention: Credit Review and Operations Division

Subject:     Ex-Im Bank Transaction No. APO_____XX-[Country]
             [Borrower] ("Borrower")
             Request for Amendment to Letter of Credit No. _____

Ladies and Gentlemen:

In accordance with the terms and conditions of the Credit Agreement ("Agreement") dated as of _____, 20___, by and among the Borrower, [name of Lender] ("Lender"), [Name of Agent] ("Agent"), and the Export-Import Bank of the United States ("Ex-Im Bank"), we enclose for your approval three copies of a proposed amendment ("Amendment") to Letter of Credit No. _____ ("Letter of Credit"), prepared by [name of L/C Bank]. The Letter of Credit needs to be amended because [list reason(s)].[2]

If this Amendment meets with your approval, please issue your Certificate Approving Amendment to Letter of Credit with respect to the Letter of Credit, as amended ("Amended L/C").

### CERTIFICATE

We hereby certify that:

(i)     all the payments to be made under the Amended L/C will be made exclusively for the purchase of in the United States of Goods and/or Services, and such will be used for lawful purposes in accordance with the Agreement;

_____
[2] Describe the facts or circumstances that justify the amendment.

B4(a)-3 _



(ii)     we have not, and to the best of our knowledge and belief, the beneficiary of the Amended L/C has not, and will not, agree to, offer to, cause to, arrange for or receive, directly or indirectly, any payment, discount, allowance, rebate, commission, fee or other payment in connection with the Eligible Goods and Services or the Supply Contract(s) or the Ex-Im Bank Guarantee, except for a) the regular remuneration of regular full-time directors, officers and employees; b) regular commissions or fees, if any, to regular sales agent or representative and readily identifiable on the party's books and records as to amount, purpose and recipient; or c) any letter of credit or other fees paid to commercial banks or any payments made to Ex-Im Bank in connection with the Ex-Im Bank Guarantee;

(iii)    as of the date of this request, no event has occurred and is continuing which constitutes, or but for the requirement of giving notice or lapse of time, or both, would constitute, an Event of Default under the provisions of the Agreement; and

(iv)     as of the date of this request, the representations and warranties made by us in the Agreement are true.

Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned thereto in the Agreement.

Very truly yours,

[BORROWER]

By:  _____
                    (Signature)[3]

Name:  _____
                    (Print)

Title:  _____
                    (Print)

Enclosures

    3 copies of proposed Amendment to L/C
    1 copy of Exporter's amended pro forma invoice, Supply Contract, or other document
        covering purchase

---

[3] May only be signed by one (or more, if required) of the authorized representatives designated by the Borrower pursuant to Section 6.01(e) of the Agreement.

B4(a)-4

L/C PROCEDURE

## CERTIFICATE APPROVING AMENDED LETTER OF CREDIT

_____, 20__

[Name of Letter of Credit Bank]
[Address of Letter of Credit Bank]

Subject:    Ex-Im Bank Transaction No. AP0____XX-[Country]
            [Borrower] ("Borrower")
            Certificate Approving Amendment to Letter of Credit No. _____

Ladies and Gentlemen:

In accordance with the terms and conditions of the Credit Agreement ("Agreement"), dated as of _____, 20__, between the Borrower, [name of Lender] ("Lender"), [name of Agent] ("Agent"), and the Export-Import Bank of the United States ("Ex-Im Bank"), and with the Borrower's Request for Certificate Approving Amendment to Letter of Credit, we hereby approve the proposed amendment to Letter of Credit No. _____, ("Letter of Credit").

We hereby acknowledge that all payments made under the amended Letter of Credit in accordance with its terms [including any payments to Ex-Im Bank of the applicable Exposure Fee], constitute Disbursements under the Credit, and, together with accrued interest thereon at the Guaranteed Interest Rate (as defined in the Master Guarantee Agreement No. ___-L (Syndicated) dated as of _____, 20__ between the Lender, Agent and Ex-Im Bank ("Master Guarantee Agreement")[1]), are guaranteed by Ex-Im Bank as provided in the Master Guarantee Agreement.

The defined terms used in this Certificate shall have the respective meanings specified in the Agreement.

---

[1] If the Ex-Im Bank Guarantee for your transaction is documented under a stand-alone guarantee agreement instead of a Lender's Master Guarantee Agreement then replace this parenthetical with the following: "(as defined in the Guarantee Agreement dated as of _____, ____ (the "Guarantee Agreement"), between the Lender and Ex-Im Bank)" and globally change all references to "Master Guarantee Agreement" in this document to refer instead to "Guarantee Agreement".

B5(a)-I

EXPORT-IMPORT BANK OF THE
UNITED STATES

By: _____
(Signature)

Name: _____
(Name)

Title: _____
(Title)

L/C PROCEDURE

## REQUEST FOR LENDER APPROVAL OF
## AMENDMENT TO LETTER OF CREDIT

_____, 20__

[Name of Lender]
[Address of Lender]

Subject:    Ex-Im Bank Transaction No. AP0____XX-[Country]
                [Borrower] ("Borrower")
                Request for Amendment to Letter of Credit No. ____

Ladies and Gentlemen:

In accordance with the terms and conditions of the Credit Agreement ("Agreement") dated as of _____, 20__, by and among the Borrower, [Name of Lender] ("Lender"), [name of Agent] ("Agent") and Export-Import Bank of the United States ("Ex-Im Bank"), we enclose for approval by the Lender three copies of a proposed amendment ("Amendment") to Letter of Credit No. _____ ("Letter of Credit"), prepared by [name of L/C Bank].

The Amendment is requested in order to (place an "x" next to each applicable request):

/__/    Allow sufficient time for the presentation of all documents and the making of all Letter of Credit disbursements by extending the expiry date to the earlier of: (i) _____ or (ii) the Final Disbursement Date deemed by Ex-Im Bank to be effective under the Credit;

/__/    Extend the final shipment date to the earlier of: (i) _____ or (ii) the Letter of Credit's expiry date;

/__/    Permit partial shipment(s);

/__/    Permit transhipments in accordance with the provisions of 46 U.S.C. §1241-1 (Public Resolution No. 17 of the 73rd Congress of the United States, as amended);

/__/    Permit shipment(s) by any airline rather than ocean vessel; we acknowledge that air waybill(s) will be required with respect to such shipment(s) instead of ocean bill(s) of lading;

/__/    Permit a reduction of the Letter of Credit's face amount; we enclose each beneficiary's consent to this request;

/__/    Permit "on-deck" shipment(s);

*/ /*     Permit a change in the address of [NAME OF BENEFICIARY], a beneficiary, to the following street address located in the United States:

```
_____
_____
_____
_____.
```

*/ /*     Permit ocean shipment(s); we acknowledge that clean, signed, on-board ocean bill(s) of lading will be required with respect to such shipment(s), and that such bill(s) of lading will evidence shipment(s) on ocean vessel(s) of either (i) U.S. registry or (ii) non-U.S. registry pursuant to a MARAD waiver of the provisions of 46 U.S.C. §1241-1 (Public Resolution No. 17 of the 73rd Congress of the United States, as amended);

*/ /*     Permit the following language or spelling changes:

```
_____
_____
_____
```

We certify that the requested changes (x) will not constitute or give rise to a material change in the terms and conditions of the Letter of Credit, and (y) are requested in order to: (i) correct a typographical error; (ii) correct an omission; or, (iii) clarify otherwise ambiguous language;

*/ /*     Permit changes made on account of requirements for the following consularized document(s):

```
_____
_____
_____
```

We certify that the requested change(s) shall not result in the modification or elimination of a commercial invoice, which we recognize is a necessary document for presentation;

*/ /*     Permit acceptance of "stale" documents or documents that are presented or are to be presented later than 21 calendar days from the related shipment date, provided that such documents are dated no earlier than the date set forth in Section 2.01 of the Agreement;

*/ /*     Permit the change of either (i) the originating port or originating airport to a different U.S. port or U.S. airport; or (ii) the port of destination or airport of destination to a different port located in the Borrower's Country or a different airport located in the Borrower's Country;

/__/ Permit changes in the number of copies of documents to be presented by a beneficiary, except that such change not result in the deletion or modification in the terms of a document required for presentation.

The Letter of Credit needs to be amended because [list reason(s)].[1]

If this Amendment is acceptable to the Lender, please approve the amendment of the Letter of Credit in accordance with the terms of this request and the UCP ("Amended L/C").

## CERTIFICATE

We hereby certify that:

(i)     all the payments to be made under the Amended L/C will be made exclusively for the purchase in the United States of Goods and/or Services, and such will be used for lawful purposes in accordance with the Agreement;

(ii)    we have not, and to the best of our knowledge and belief, the beneficiary of the Amended L/C has not, and will not, agree to, offer to, cause to, arrange for or receive, directly or indirectly, any payment, discount, allowance, rebate, commission, fee or other payment in connection with the Eligible Goods and Services or the Supply Contract(s) or the Ex-Im Bank Guarantee, except for a) the regular remuneration of regular full-time directors, officers and employees; b) regular commissions or fees, if any, to regular sales agent or representative and readily identifiable on the party's books and records as to amount, purpose and recipient; or c) any letter of credit or other fees paid to commercial banks or any payments made to Ex-Im Bank in connection with the Ex-Im Bank Guarantee;

(iii)   as of the date of this request, no event has occurred and is continuing which constitutes, or but for the requirement of giving notice or lapse of time, or both, would constitute, an Event of Default under the provisions of the Agreement; and

(iv)    as of the date of this request, the representations and warranties made by us in the Agreement are true.

Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned thereto in the Agreement.

Very truly yours,

---

[1] Describe the facts or circumstances that justify the amendment.



B6-3

[BORROWER]

By: _____
(Signature)[2]

Name: _____
(Print)

Title: _____
(Print)

Enclosures

    3 copies of proposed Amendment to L/C prepared by L/C Bank

    1 copy of amended Supply Contract, purchase order or other document evidencing need for amendment

---

[2] May only be signed by one of the authorized representatives designated by the Borrower pursuant to Section 6.01(c) of the Agreement.

L/C PROCEDURE

## NOTICE OF LETTER OF CREDIT AMENDMENT

_____, 20__

Export-Import Bank of the United States
811 Vermont Avenue, N.W.
Washington, DC 20571
Attention: Credit Review and Operations Division

Subject:    Ex-Im Bank Transaction No. AP0____XX-[Country]
            [Borrower] ("Borrower")
            Certificate Approving Letter of Credit No. _____

Ladies and Gentlemen:

In accordance with the terms and conditions of the Credit Agreement ("Agreement"), dated as of _____, 20__, by and among the Borrower, [Name of Lender] ("Lender"), [name of Agent] ("Agent") and Export-Import Bank of the United States ("Ex-Im Bank"), we hereby notify you of an amendment to Letter of Credit No. _____ ("Letter of Credit") approved by ourselves and by [name of L/C Bank] in accordance with the terms of the Borrower's Request for Lender Approval of Amendment to Letter of Credit, dated as of _____, _____ ("Borrower's Request") and the UCP. Enclosed herewith are copies of the Borrower's Request and its accompanying documents, along with a copy of the amendment of the Letter of Credit, as approved ("Amended L/C").

The Amended L/C was approved in order to (place an "x" next to each applicable change):

/__/    Allow sufficient time for the presentation of all documents and the making of all Letter of Credit disbursements by extending the expiry date to the earlier of: (i) _____ or (ii) the Final Disbursement Date deemed by Ex-Im Bank to be effective under the Credit;

/__/    Extend the final shipment date to the earlier of: (i) _____ or (ii) the Letter of Credit's expiry date;

/__/    Permit partial shipment(s);

/__/    Permit transhipments in accordance with the provisions of 46 U.S.C. §1241-1 (Public Resolution No. 17 of the 73rd Congress of the United States, as amended);

/__/    Permit shipment(s) by any airline rather than ocean vessel; we acknowledge that air waybill(s) will be required with respect to such shipment(s) instead of ocean bill(s) of lading;

/ /    Permit a reduction of the Letter of Credit's face amount; we enclose each beneficiary's consent to this request;

/ /    Permit "on-deck" shipment(s);

/ /    Permit a change in the address of [NAME OF BENEFICIARY], a beneficiary, to the following street address located in the United States:

_____
_____
_____
_____;

/ /    Permit ocean shipment(s); we acknowledge that clean, signed, on-board ocean bill(s) of lading will be required with respect to such shipment(s), and that such bill(s) of lading will evidence shipment(s) on ocean vessel(s) of either (i) U.S. registry or (ii) non-U.S. registry pursuant to a MARAD waiver of the provisions of 46 U.S.C. §1241-1 (Public Resolution No. 17 of the 73rd Congress of the United States, as amended);

/ /    Permit the following language or spelling changes:

_____
_____
_____

We certify that the requested changes (x) will not constitute or give rise to a material change in the terms and conditions of the Letter of Credit, and (y) are requested in order to: (i) correct a typographical error; (ii) correct an omission; or, (iii) clarify otherwise ambiguous language;

/ /    Permit changes made on account of requirements for the following consularized document(s):

_____
_____
_____

We certify that the requested change(s) shall not result in the modification or elimination of a commercial invoice, which we recognize is a necessary document for presentation;

/ /    Permit acceptance of "stale" documents or documents that are presented or are to be presented later than 21 calendar days from the related shipment date, provided that such documents are dated no earlier than the date set forth in Section 2.01 of the Agreement;

B6(a)-2



☐    Permit the change of either (i) the originating port or originating airport to a different U.S. port or U.S. airport; or (ii) the port of destination or airport of destination to a different port located in the Borrower's Country or a different airport located in the Borrower's Country;

☐    Permit changes in the number of copies of documents to be presented by a beneficiary, except that such change not result in the deletion or modification in the terms of a document required for presentation.

The reason(s) for amending the Letter of Credit are set forth in the Borrower's Request.

## CERTIFICATE

We hereby certify that:

1.    The Borrower's Request complies in form and substance with Exhibit 6 to Annex B of the Agreement, and that the Borrower has made all certifications set forth therein; and

2.    Without independent inquiry and relying solely upon the evidence(s) of authority and specimen signature(s) provided by the Borrower and accepted by Ex-Im Bank in accordance with the terms and conditions of the Agreement or any amendment thereto, the signature(s) appearing on the Borrower's Request correspond to the evidence(s) of authority and specimen signature(s) in effect on the date of such Borrower's Request

Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned thereto in the Agreement.

Very truly yours,

[AGENT]

By:    _____
                    (Signature)[1]

Name:    _____
                    (Print)

Title:    _____
                    (Print)

---

[1] May only be signed by one of the authorized representatives designated by the Lender pursuant to the Master Guarantee Agreement.



B6(a)-3

Enclosures
    1 copy of the Borrower's Request and attachments thereto
    1 copy of the Amended L/C



We have been and are acting as counsel for the Lebanese Company for Development and Recontruction of the Beirut Central District (the "Borrower"). You have requested our opinion as to certain matters concerning the Credit Agreement (the "Agreement") dated as of July 11, 2001, among the Borrower, Citibank, N.A., Beirut Branch, as Lender, Citibank International plc, as Agent, and the Export-Import Bank of the United States. Terms not otherwise defined in this opinion shall have the meanings assigned to them in the Agreement.

In connection with this opinion, we have reviewed such matters of law, and have examined originals, or copies identified to our satisfaction, of such agreements, corporate records, public records, communications of public officials and other documents and instruments, as we have considered necessary or appropriate.

Based upon the foregoing we are of the opinion that:

(1) Existence. The Borrower is duly organized and validly existing under the laws of the Borrower's Country. The Borrower's existence is not limited by: (i) any applicable law; (ii) the terms of any charter, by-law, or other similar document of the Borrower; or (iii) any other agreement, instrument or document to which the Borrower is a party or by which it is bound.

(2) Authority. The Borrower has the full power, authority, and legal right to own and use its properties; to carry on its business as now conducted, and to execute, deliver, perform, and observe the terms and conditions of the Agreement and the other Borrower Documents. The Borrower has taken all actions necessary or advisable to authorize it to execute, deliver, perform, and observe the terms and conditions of the Agreement and the other Borrower Documents. All corporate and other actions have been taken that are necessary or advisable to (i) authorize the Borrower to execute, deliver, perform and observe the terms and conditions of the Agreement and the other Borrower Documents; and (ii) authorize the officer(s) of the Borrower who has (have) signed the Agreement and the other Borrower Documents on or before the date hereof to take such action.

(3) Government Authorizations. No consents, licenses, authorizations or approvals of, or exemptions by, any Governmental Authority in the Borrower's Country are necessary or advisable: (i) for the execution, delivery, performance and observance by the Borrower of the Borrower Documents; (ii) for the validity, binding effect and enforceability of the Borrower Documents; or (iii) for the execution, delivery and performance of the Supply Contract(s), the importation of Goods, the performance of Services, or use of the Eligible Goods and Services in the Borrower's Country.. No legal requirements of the Borrower's Country with respect to the availability and transfer of foreign exchange (including Dollars)are required to make all payments due under the Agreement and the Note(s) have been satisfied.

(4) Recordation. To ensure the legality, validity, enforceability, priority, or admissibility in evidence in the Borrower's Country of any of the Borrower Documents, it is not necessary that any of the Borrower Documents be registered, recorded, enrolled, or otherwise filed with any court or

Other Governmental Authority in the Borrower's Country, be notarized, or any documentary, stamp or other similar tax, imposition, or charge of any kind be paid on or in respect of any of the Borrower Documents, except as provided for in paragraph {12} herein below.

(5)     Restrictions.  The execution, delivery and performance, or observance by the Borrower of the terms of and consummation by the Borrower of the transactions contemplated by each of the Borrower Documents does not and will not conflict with or result in a breach or violation of: (i) the charter, by-laws, or similar documents of the Borrower; (ii) any law of the Borrower's Country or any other ordinance, decree, constitutional provision, regulation or other requirement of any Governmental Authority in the Borrower's Country (including, without limitation, any restriction on interest that may be paid by the Borrower); or (iii) any order, writ, injunction, judgment, or decree of any court or other tribunal.  To the best of our knowledge after due diligence and inquiry, the execution, delivery, and performance or observance by the Borrower of the terms of and consummation by the Borrower of the transactions contemplated by each of the Borrower Documents does not and will not conflict with, or result in a breach of or the creation of a Lien under, any currently existing agreement or instrument (x) providing for the payment by the Borrower of borrowed money (or for the deferred purchase price of property or services received), or (y) that is material to the existence, operation, assets or revenues of the Borrower.

(6)     Conflict of Laws and Enforceability.

(i)     Under the conflict of laws principles in the Borrower's Country, the choice of law provisions of the Agreement and the Note(s) are valid, binding, and not subject to revocation by the Borrower, and in any proceedings brought in the Borrower's Country for enforcement of any of the Borrower Documents, the choice of the law of the State of New York as the governing law of such documents should be recognized and such law should be applied.  We have no reason to believe that the choice of the law of the State of New York as the governing law of such documents would not be recognized and such law applied.

(ii)     The Agreement and the other Borrower Documents, which the Borrower has duly executed on or before the date hereof, have also been duly authorized and delivered by the Borrower.  Assuming that the Borrower Documents are legal, valid, binding, and enforceable under the law of the State of New York, each of the Agreement and the Note(s) constitutes an obligation of the Borrower that is legal, valid, and binding upon the Borrower, enforceable against the Borrower in accordance with its respective terms, except as such enforceability may be limited by applicable insolvency, reorganization, liquidation, moratorium, readjustment of debt or other similar laws affecting the enforcement of creditors' rights generally and by the application of general principles of equity, regardless of whether such enforceability is considered in a proceeding at law or in equity.

C-2



(iii)    Notwithstanding paragraph (i) above, if any of the Borrower Documents were, by their terms, governed by and construed in accordance with the law of the Borrower's Country, or if a court in the Borrower's Country were to apply the law of the Borrower's Country to any of the Borrower Documents, each of the the Agreement and the Note(s) would constitute an obligation of the Borrower that is legal, valid and binding upon the Borrower and enforceable against the Borrower in accordance with its respective terms, except as such enforceability may be limited by applicable insolvency, reorganization, liquidation, moratorium, readjustment of debt or other similar laws affecting the enforcement of creditors' rights generally and by the application of general principles of equity, regardless of whether such enforceability is considered in a proceeding at law or in equity.

(7)    Submission to Jurisdiction, etc.  The submission to jurisdiction, appointment for service of process, and waiver of security requirements by the Borrower set forth in Sections 11.02, 11.03, and 11.05 of the Agreement, respectively, are each effective and irrevocably binding on the Borrower. It is not necessary that the appointment for service of process described in said Section 11.03 be registered, recorded, or filed with any court or other authority in the Borrower's Country, be notarized, or any documentary, stamp or similar tax, imposition, or charge be paid on or in respect of such appointment.

(8)    Commercial Activity.  The Borrower Documents and the transactions contemplated thereby constitute commercial activities (rather than governmental or public activities) of the Borrower, and the Borrower is subject to private commercial law with respect thereto.  The Borrower has waived, pursuant to Section 11.04 of the Agreement, any right of immunity that it or any of its assets has or may hereafter acquire, whether characterized as sovereign immunity or otherwise, from any legal proceedings in the Borrower's Country to enforce or collect upon the Credit or the Note(s), or any other liability or obligation of the Borrower related to or arising from the transactions contemplated by any of the Borrower Documents. Such waiver is effective and irrevocably binding on the Borrower, and assuming no change in relevant Lebanese laws, would be effective to waive any immunity to which the Borrower may become entitled in the future.

(9)    Legal Form, Judgments, etc.  The Agreement, the Note(s) and each of the other Borrower Documents are in proper legal form for enforcement against the Borrower in the Borrower's Country in the most expeditious manner available under the law of the Borrower's Country. In the event any state or Federal court in the United States renders a final judgment against the Borrower under any of the Borrower Documents, the courts of the Borrower's Country would enforced the same without any further review on the merits, provided it complies with the provisions of articles 1010, 1014 and 1015 of the Lebanese Civil Code of Procedure, which read as follows:

### Article 1010:

Foreign judgements cannot be executed in Lebanon by way of enforcement on assets or by coercion on persons unless they obtain the exequatur according to the conditions set forth under this title.

Nevertheless, it is possible, before obtaining such exequatur, to use the foreign judgement as a proof or a document to proceed with preventive measures such as preventive real estate inscription and judicial custody and filing by the official receiver for the bankruptcy's debts or its intervention in legal suits against the bankrupt, and seizure and attachment and garnishment. And the request for the exequatur stands for the lawsuit for the confirmation of the attachment or the demand for the validation of the debt.

### Article 1014:

The exequatur is granted to a foreign judgement if the following conditions are all met:

a) it must have been rendered by judges competent according to the laws of the state where it was rendered provided that their competence is not determined with regard to the plaintiff's nationality only, and in case two foreign judgements from two different countries are rendered on the same subject and between the same parties, the exequatur is then granted to the judgement that is compatible with the rules of Lebanese Laws for international competence.

b) it must have obtained the res judicata in the state in the name of which it was rendered. Nevertheless, it is possible to grant an exequatur to de gratia judgements or temporary judgements enforceable in the relevant state.

c) the condemned party must have been notified the lawsuit that led to the judgement and its rights of defense must have been secured.

d) it must have been rendered in the name of a State, which laws authorize the enforcement of Lebanese judgements on its soil after checking them or granting them the exequatur.

e) it should not contain anything contrary to the public order.

### Article 1015:

Lebanese Court to which a request to obtain the exequatur has been submitted is not authorized to review the judgement on the merit upon the request of the defendant, except in one of the following situations.

a) if it is established that the judgement has been rendered based on documents that were considered or declared untrue after it has been rendered.

b) if after the judgement was rendered, decisive documents were discovered and which one of the parties had prevented their submittal.

c) if there were any contradictions in the pronouncement.

d) if it is established that the laws of the state in the name of which it was rendered authorize the review on the merits of Lebanese judgements before granting them the exequatur.

We have no reason to believe that he enforcement of a foreign judgment relating to any of the Borrower Documents would be contrary to the law or public policy of the Borrower's Country, any international treaties binding in the Borrower's Country, or generally accepted principles of international law.

(10)  Pari Passu. The payment obligations of the Borrower under the Agreement and the Note(s) will at all times constitute the direct, general, and unconditional obligations of the Borrower, and rank, in all respects, pari passu in priority of payment and in right of security with all other unsecured debt of the Borrower.

(11)  Legal Proceedings. No legal proceedings are pending or, to the best of the undersigned's knowledge, threatened before any court, any Governmental Agency, or any Other Governmental Agency that might (i) materially and adversely affect the Borrower's financial condition, business, or operations; (ii) restrain or enjoin or have the effect of restraining or enjoining the performance or observance of the terms and conditions of any of the Borrower Documents; or (iii) in any other manner question the validity, binding effect, or enforceability of any of the Borrower Documents.

12)  No Taxes. There is no Tax imposed on or in connection with: (i) the execution, delivery, or performance of any of the Borrower Documents; (ii) the enforcement of any of the Borrower Documents; or (iii) on any payment to be made to the Agent, Lender or Ex-Im Bank under any of the Borrower Documents, except for (x) stamp duties due on each Note, which stamp and seal will be affixed by the Lebanese Ministry of Finance showing the amount due and paid, and (y) for any judicial dues on judicial enforcement of the Borrower Documents.

(13)  Licensing & Qualification. Under the law of the Borrower's Country, none of the Agent, Lender or Ex-Im Bank will, by reason of their entering into the Borrower Documents, performing their obligations, and enforcing their rights thereunder: (i) be required to be qualified, licensed, or otherwise entitled to do business in the Borrower's Country, or be required to comply with any requirement as to foreign registration or qualification in the Borrower's Country; (ii) be subject to taxation in the Borrower's Country; or (iii) except for court filings as described above, be required to make any filing with any court or other Governmental Authority in the Borrower's Country prior to any enforcement of any of the Borrower Documents or performance of any of the transactions contemplated by the Borrower Documents.

*[(14)  Standby L/C. The Standby L/C is in full force and effect and enforceable against the Standby L/C Issuing Bank and constitutes the valid, binding, and enforceable obligations of the Standby L/C Issuing Bank. No registration of the Standby L/C is required by or advisable under Lebanese law.]  *only include if LC is issued by Citibank N.A. Beirut Branch



## Annex D EXPORT-IMPORT BANK OF THE UNITED STATES
### Long Term Credit / Guarantee – Acquisition List

Effective Date:

Exporter's Name:

U.S. Street Address:

Telephone Number:
Fax Number:

Authorized Party Providing Information:

Signature:

Supply Contract/Purchase Order Number:

RE:    Ex-Im Bank Credit/Guarantee Number:

Purchaser:                                                      Country:

Project Name/Identification:

To the best of our knowledge the following is true and accurate, representing the identifiable or most likely procurement (sources and description of goods and services) covered under the Credit / Guarantee.

SECTION A - U.S. Procured Goods And Services

| Reference Number | Description of goods a/o Services (including model, # of units if applicable) SIC or NAICS code | Manufacturer & address of manufacture, plus (if different) Exporter and address | USD U.S. Export Value of described Products a/o Services (U.S. Content Amount) | Est. Date of Shipping or service execution |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |



EXPORT-IMPORT BANK OF THE UNITED STATES

Long Term Credit/Guarantee – Acquisition List (continuation) page U.S. Procured Goods and Services) ___ of ___

RE: Project Name/Identification:

Effective Date:

SECTION A – U.S. Procured Goods and Services (continued)

| Reference Number | Description of goods to/o Services (including model, # of units if applicable) SIC or NAICS code | Manufacturer & address of manufacture, plus (if different) Exporter and address | USD U.S. Export Value of described Products to/o Services (U.S. Content Amount) | Est. Date of Shipping or service execution |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

D-3



Net Contract Price:
Estimated Foreign Content in
Net Contract Price:

D-4



**EXPORT-IMPORT BANK OF THE UNITED STATES**

Long Term Credit/Guarantee – Acquisition List (continuation page for U.S. Local Goods and Services) ___ of ___

Exporter's Name:

U.S. Street Address:

Telephone Number:
Fax Number:

RE: Project Name/Identification:

Effective Date:

**SECTION B – Local Goods and Services**

| Reference Number | Description of goods n/o Services (including model, # of units if applicable) SIC or NAICS code | Manufacturer & address of manufacturer, plant (if different) Exporter and address | USD U.S. Export Value of described Products n/o Services (U.S. Content Amount) | Est. Date of Shipping or service execution |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

D-5



| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Total Associated Local Costs:

Sections A and B have been reviewed and approved by the R&E Division:

Initials: _____

Date: _____

D-6

Annex E

D-7

ANNEX E

IRREVOCABLE STANDBY LETTER OF CREDIT

[CITIBANK, N.A., NEW YORK BRANCH]

U.S. $3,566,993                                                   _____, 2001

No. _____

To:        Export-Import Bank of the United States ("Ex-Im Bank")
           811 Vermont Avenue, N.W.
           Washington, DC 20571
           Attn: Clement Miller, Asset Management Division

Ladies and Gentlemen:

        At the request and for the account of The Lebanese Company for the Development and
Reconstruction of Beirut Central District s.a.l., a private sector corporation (the "Account Party"),
we hereby issue in your favor this irrevocable standby letter of credit No._____ (the
"Credit"), in the aggregate amount of Three Million Five Hundred Sixty-Six Thousand Nine Hundred
Ninety-Three Dollars (U.S.$3,566,993), effective immediately, and as reduced from time to time in
accordance with the table set forth below (the "Available Amount"), which is available upon our
receipt of your duly completed and signed sight draft or drafts drawn on Citibank N.A., New York,
accompanied by a letter, signed by an officer of the Export-Import Bank of the United States
(together, the "Payment Documents"), certifying that: "An event of default has occurred under
Section 10.03(a)(i) of the Credit Agreement dated as of _____, 2001, by and among
Citibank International plc, as Agent, Citibank N.A., Beirut Branch as Lender, the Account Party and
the Export-Import Bank of the United States (as amended from time to time, the "Credit
Agreement")."

        The aggregate Available Amount for all drafts shall be no more than U.S.$3,566,993 from the
date hereof until [December 25, 2006]. Thereafter, the Available Amount during any period shall be
equal to the amount set forth below next to such period:

D-8

| Period | Available Amount |
|---|---|
| [December 26, 2006 through June 25, 2007 | $3,535,736 |
| June 26, 2007 through December 25, 2007 | $3,473,222 |
| December 26, 2007 through June 25, 2008 | $3,410,708 |
| June 26, 2008 through December 25, 2008 | $3,348,193 |
| December 26, 2008 through June 25, 2009 | $3,285,679 |
| June 26, 2009 through December 25, 2009 | $3,223,165 |
| December 26, 2009 through June 25, 2010 | $3,160,651 |
| June 26, 2010 through December 25, 2010 | $3,098,136 |
| December 26, 2010 through June 25, 2011 | $3,035,622] |

Partial drawings are permitted under this standby letter of credit.

Upon the payment of such sight draft(s), the aggregate Available Amount shall be reduced by such payment amount for that Available Amount period and each successive amount period.

All drawings must be made by presentation of the original Payment Documents and the Payment Documents are to be the sole operative instruments of payment drawing. Payment Documents shall be presented to Citibank N.A.'s servicer, Citicorp North America, Inc., 3800 Citibank Center, Building F, 1st Floor, Tampa Florida 33610, (or such other place as we may from time to time specify).

If a drawing is made by a beneficiary hereunder at or prior to 2:00 p.m., New York, New York time, at the office of our servicer specified in the immediately preceding paragraph (or such other place as we may from time to time designate), on a Business Day, and provided that such drawing and the Payment Documents presented in connection therewith conform to the terms and conditions hereof, payment shall be made to you of the amount specified, in immediately available funds, not later than 11:00 a.m., New York, New York time on the next succeeding Business Day and, if a drawing is made by the beneficiary hereunder after 2:00 p.m., New York, New York time, on a Business Day, and provided that such drawing and the Payment Documents presented in connection therewith conform to the terms and conditions hereof, payment shall be made to the beneficiary of the amount specified, in immediately available funds, not later than 11:00 a.m., New York, New York time on the second succeeding Business Day. The term "Business Day" as used herein shall mean any day other than a Saturday, Sunday or other day on which banking institutions in New York, New York or Tampa, Florida are authorized or obligated by law or executive order to be closed.

This Credit sets forth in full our undertaking to you, and compliance with each and all of the terms hereof is required. This Credit shall not be modified, amended, amplified or limited by

D-9



reference to any document, instrument, or agreement referred to herein; and any such reference shall not be deemed to incorporate herein by reference any document, instrument or agreement.

We hereby undertake to honor the beneficiary's drawing(s), so drawn in accordance and in compliance with the terms and conditions of this Credit, upon presentation of such drawing(s) at the office of our servicer, Citicorp North America Inc., 3800 Citicorp Center, Building F, 1ˢᵗ floor, Tampa Florida 33610, specifying our standby letter of credit No. _____, on or prior to the expiration date of this Credit, [June 25, 2011].

Except as otherwise expressly stated herein, this standby letter of credit is issued subject to the International Standby Practices (ISP98), International Chamber of Commerce Publication 590, and as to matters not governed by the ISP'98, shall be governed by and construed in accordance with the laws of the State of New York and applicable U.S. federal law.

Very truly yours,

[CITIBANK, N.A., NEW YORK BRANCH]

By _____
          Authorized Signature

By _____
          Authorized Signature

D-10



## DISCLOSURE OF LEGAL PROCEEDING S AGAINST BORROWER

1. The Lebanese Company for the Development and Reconstruction of Beirut Central District s.a.l. ("SOLIDERE" or "the Company") is subject to or otherwise may be affected by various legal proceedings relating primarily to challenges to the formation of the Company and the compulsory contribution of property to the Company's capital by operation of law. Actions brought against it in the Civil Court relate to the Company's formation and the acquisition of its property, while actions brought against the Lebanese State and the CDR in the Administrative Court allege irregularity of the Decrees establishing the Company including Decrees 2236, 2237, and 2537. All such actions brought before the Administrative Court, have either been withdrawn by the Plaintiffs or dismissed, except two actions still pending regarding the amendments of articles 6, 9, 16 of the by-laws of the Company and regarding the regularity of the transfer of a plot of land to the Company.

2. In addition, threats of legal actions by various parties, including former Property Right Holders, are made from time to time against the Company, principally through the Lebanese media. The Company is not in a position to make a meaningful assessment of such threats inasmuch as they generally remain vague.

3. Legal proceedings have also been brought against the Company and/or its founders before Lebanese Civil Courts, all of which remain pending before the First Instance Court, as follows:

a) Seven suits were brought before the ordinary courts challenging the validity of the incorporation of the Company based partly on grounds already rejected by the Administrative Court and/or the validity of some of its Shareholders Assemblies. These suits remain pending before the First Instance Court.

b) Other suits concerning specific properties within the BCD were brought before the Ordinary Courts against the Company mainly to challenge appraisal decisions, to stop transfer of ownership of said properties to SOLIDERE or to force SOLIDERE to surrender ownership of said properties to their former owners, and based partly on grounds already rejected by the Administrative Court and partly on article 63 of the by-laws of the Company.

c) A suit concerning disputed amounts of around 5.4 billion Lebanese Pounds alleged to be due by the Company to the CDR.

d) A suit concerning the ownership of the equivalent of 27530 shares brought against

```
ERROR: ioerror
OFFENDING COMMAND: imagemask

STACK:

-dictionary-
-savelevel-
```

# EXHIBIT F

**Banque Saradar, sal.**

Telegraphic address MARSAR BEIRUT  P O BOX 11 1121 and 11 3312
Telex  41003 MARSAR LE  41404 MARSAR LE  Telefax 4-404490
Telephone 1-464492 : 4-416804  1-501900  3-488411 Beirut Lebanon

Beirut, 8th June 1999

THE LEBANSE COMPANY FOR THE DEVELOPMENT
AND RECONSTRUCTION OF BEIRUT CENTRAL
DISTRICT SAL - (SOLIDERE)
BEIRUT – LEBANON

Reference: Our L/G No 7052/355/2
           For USD. 7, 961,250 –

We refer to the Contract (the "Contract") dated the 25th day of January 1999 made
between The Lebanese Company for the Development and Reconstruction of Beirut
Central District S.A.L and Radian International LLC, (the "Contractor") having its main
office at 8501 N.Mopac blvd., Austin TX 78759, regarding the performance of the
works, Reclamation of the former Normandy Landfill – Phase 2 (as defined in the
Contract) in connection with the development, reconstruction and restoration of Beirut
Central District.

1    We hereby unconditionally and irrevocably agree to pay you, on your first
     demand complying with the terms of paragraph 2 below, by wire transfer to an
     account in your name at such bank as you shall stipulate, such amount or
     amounts as you shall demand from time to time, up to a maximum amount of
     USD.7,961,250. - (US.Dollars Seven Million Nine Hundred Sixty One Thousand
     Two Hundred Fifty United States Dollars) (the "Guaranteed amount").

2.   Any demand for payment by you shall :
     (I)    be by letter
     (II)   refer to the number and date of this Letter of Guarantee
     (III)  state the amount for which payment is demanded
     (IV)   state that in your binding opinion the Contractor is in breach of his
            obligations under the contract
     (V)    state the name of the bank and account number to which payment is to
            be made
     (VI)   be signed by the General Manager and one (other) member of the board
            of Directors of your Company.

3.   This first demand Letter  of Guarantee constitutes an unconditional and
     irrevocable  direct obligation of this bank, which is separate and independent of
     the Contract, including the Contractor's obligations under the Contract
     Notwithstanding any alteration or change of the Contract, or the early
     termination of the Contract, or in the extent or nature of the works (as defined
     in the contract) or of the conditions of performance under the Contract, or of
     the financial condition or otherwise of the Contractor (including, without
     limitation, bankruptcy or liquidation), none of which shall constitute novation,
     and notwithstanding any contestation or objection  or the commencement of
     any legal or other proceedings brought by any person or entity whatsoever.

**ique Saradar, sal.**

Telegraphic address MARSAR BEIRUT P O BOX 11 1121 and 11 2312
Telex 41803 MARSAR LE 11104 MARSAR LE Telefax 4-404490
Telephone 4-404483 1-21(5264 1-601060 3-668411 Beirut Lebanon

Our L/G No 7052/355/2  For USD.7, 961,250. -

(including the Contractor) to prevent, delay or in any way hamper or stop payment of any amount you may demand payment of from time to time in accordance with the terms hereof, and notwithstanding any other circumstance which might hinder prompt enforcement of this Letter of Guarantee, and without any need or requirement for you to have first demanded payment of the amount or amounts in question by the Contractor, we shall comply with our payment obligations hereunder, without any of the above events, circumstances or provisions justifying any delay in the performance of our obligations or constituting an exoneration, discharge or any release thereof.

4.  The Guaranteed amount shall be reduced by the amount of any payment made by us hereunder. Any such payment shall be paid free and clear of, and without deduction for or on account of, any present or future taxes, levies, imposts, duties, charges, fees, commissions, deductions, or withholding of any nature whatsoever and by whomsoever imposed, all of which shall be for the Contractor's account.

5.  This Letter of Guarantee shall remain valid and enforceable for an initial period of five (5) years from the date hereof and shall be automatically extended for periods of one (1) year until we receive from the Contractor the "Certificate of Expiration of the first year of the period of Guarantee" as defined and referred to in GC 31 of the Contract, signed by authorized signatories of the Employer (as defined in the Contract), or, until you release us from our obligations hereunder, whichever occurs the earlier.

6.  We will honor all demands for payment up to the guaranteed amount from the date hereof to the date this Letter of Guarantee expires according to its terms.

7.  This Letter of Guarantee shall be governed by, and construed in accordance with, the laws of the Republic of Lebanon.

BANQUE SARADAR SAL

René G. Nejmé                    Caroline Gh. Khoury

Banque Saranar

# Banque Saradar, sal.

Beirut, 6th August 2002
Ashrafieh

CITIBANK N.A.
BEIRUT BRANCH
GEFINOR, BLOCK E
CLEMENCEAU STREET
BEIRUT - LEBANON

O/ref.1/28

Attention: Mrs Hanadi Naccache

Dear sirs

    Subject:    Our Guarantee No 7052/355/2
                For USD.7,961 250 -
                Assigned by "The Lebanese Company for
                The Development & Reconstruction of
                Beirut Central District SAL (Solidere) "
                in your favor

Further to our letter dated 5th April 2000 (photocopy enclosed) and to our letter dated 3rd August 2002 whereby we advised you that the Guarantee amount was increased by USD.233.625 - and upon the request of The Lebanese Company for the Development and Reconstruction of Beirut Central District SAL ("Solidère") we hereby irrevocably and unreservedly undertake to pay any amount up to USD.8.194 875.- (USD 7.961 250.- -- USD 233.625 - ) claimed by Solidère or any other duly authorized person under the Letter of Guarantee No 7052/355/2 issued by our bank on 08.06.1999. and in accordance with its terms, exclusively to the following Account :

    Account No 0-100125-102
    Citibank N.A.
    Beirut Branch
    Gefinor Center Block E
    Clemenceau Street, Beirut
    Account

No instructions from any party to amend, or deviate from, any of the aforementioned terms shall be considered and/or implemented by us, except with the written approval of Citibank N.A. - Beirut Branch

PAGE 1/2

# Banque Saradar, sal. 

**PAGE 2/2**

The above undertaking shall be automatically extended with each extension of the aforementioned Letter of Guarantee.

Assuring you of our best cooperation, we remain,

BANQUE SARADAR SAL.

Rime G. Steiter

Yolla F. Riz

CITIBANK N.A

Mark

FROM : SARADAR                    FAX NO. :                    Aug. 14 2002 12:23PM  P1

**nque Saradar, sal.**

Beirut 5ᵗʰ April 2000
Ashrafieh

Fax n° 981 136

CITIBANK N.A.
BEIRUT BRANCH
GEFINOR , BLOCK E
CLEMENCEAU STREET
BEIRUT - LEBANON

Our ref 108

LETTER OF GUARANTEE No 7052/355/2 For USD. 7,961,250.-

Upon the request of The Lebanese Company for the Development and Reconstruction of
Beirut Central District SAL ("Solidère") we hereby irrevocably and unreservedly undertake to
pay any amount claimed by Solidère or any other duly authorized person under the Letter of
Guarantee No 7052/355/2 issued by our bank on 08.06.1999, and in accordance with its
terms, exclusively to the following Account :

Account No 0-100125-102
Citibank N.A.
Beirut Branch
Gefinor Center Block E
Clemenceau Street, Beirut
Account

No instructions from any party to amend, or deviate from, any of the aforementioned terms
shall be considered and/or implemented by us, except with the written approval of Citibank
N.A. - Beirut Branch.

The above undertaking shall be automatically extended with each extension of the
aforementioned Letter of Guarantee.

Assuring you of our best cooperation, we remain,

BANQUE SARADAR SAL.

MR/rk



**Banque Saradar, sal.**

Telegraphic address MARSAR BEIRUT P. O. Box 11-1121 and 11-3312
1107-2805  Beirut  Lebanon  Telex  41800/4  MARSAR  LE
Telefax 4-404490 Telephone 4-410046 4-416004 4-620173 5-938411

٢٢١

Beirut, 15ᵗʰ November 2002
Ashrafieh

CITIBANK N.A.
BEIRUT BRANCH
GEFINOR, BLOCK E
CLEMENCEAU STREET
BEIRUT - LEBANON

O/ref.1/28

Attention: Mrs Hanadi Naccache

| Post-it® Fax Note | 7871 | Date May 14 pages 2 | | |
|---|---|---|---|---|
| To Selim Osman | | From Walter Sioufi | | |
| Co./Dept Solidere | | Co Citibank | | |
| Phone # 980660 | | Phone # 738400 | | |
| Fax # 980663 | | Fax # 738406 | | |

Dear sirs,

    Subject:    Our Guarantee No 7052/355/2
        For USD.8,194,875.-
        Assigned by "The Lebanese Company for
        The Development & Reconstruction of
        Beirut Central District SAL (Solidere) "
        in your favor

Further to our letters dated 5ᵗʰ April 2000, and 6ᵗʰ August 2002 (photocopies enclosed) and to our letter dated 12ᵗʰ November 2002 whereby we advised you that the Guarantee amount was increased by USD.300,000,- and upon the request of The Lebanese Company for the Development and Reconstruction of Beirut Central District SAL ("Solidère"), we hereby irrevocably and unreservedly undertake to pay any amount up to USD.8,494,875.- (USD.8,194,875.- + USD.300,000.- ) claimed by Solidère or any other duly authorized person under the Letter of Guarantee No 7052/355/2 issued by our bank on 08.06.1999, and in accordance with its terms, exclusively to the following Account :

    Account No 0-100125-102
    Citibank N.A.
    Beirut Branch
    Gefinor Center Block E
    Clemenceau Street, Beirut
    Account

No instructions from any party to amend, or deviate from, any of the aforementioned terms shall be considered and/or implemented by us, except with the written approval of Citibank N.A. - Beirut Branch.

PAGE 1/2

4923 15:39  FROM:CITIBANK 009611738406                    TO:9980663          P:2

# Banque Saradar, sal.

Telegraphic address MARBAR BEIRUT P.O. BOX 11-1121 and 11-3312
1107-2803  Beirut  Lebanon  Telex  41903/4  MARBAR  LE
Telefax 4-494490 Telephone 4-410049 4-415804 4-320173 3-655411

## PAGE 2/2

The above undertaking shall be automatically extended with each extension of the aforementioned Letter of Guarantee.

Assuring you of our best cooperation, we remain,

BANQUE SARADAR SAL.

Rimé n. Elaital.          Yolla F. Rizh

Mr/rk