IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------- x
URS CORPORATION                                            )
                                                           )
                    Plaintiff,                             )        Civil Action No. 06-415-SLR
                                                           )
        v.                                                 )
                                                           )
THE LEBANESE COMPANY FOR THE                               )
DEVELOPMENT AND RECONSTRUCTION                             )
OF BEIRUT CENTRAL DISTRICT, S.A.L.,                        )
a/k/a SOLIDERE,                                            )
                                                           )
                    Defendant.                             )
----------------------------------------------------------- x

## DECLARATION OF PAUL B. CARBERRY IN SUPPORT OF DEFENDANT SOLIDERE'S MOTION TO DISMISS THE COMPLAINT

PAUL B. CARBERRY declares as follows:

  1. I am an attorney admitted to practice law before the courts of the State of New York and a member of the law firm of White & Case LLP ("White & Case"), counsel for Defendant, The Lebanese Company for the Development and Reconstruction of Beirut Central District, S.A.L., SA ("SOLIDERE"), in the above-referenced action. I have been admitted pro hac vice to appear before this Court. This declaration is based entirely upon my personal knowledge and information supplied to me by other attorneys at White & Case, and is submitted, pursuant to 28 U.S.C. 1746, in support of Defendant SOLIDERE's Motion to Dismiss the Complaint.

  2. Attached hereto as Exhibit A is a true and correct copy of SOLIDERE's Request for Arbitration, dated February 13, 2006, submitted to the International Court of

Arbitration of the International Chamber of Commerce (the "ICC Court") in Paris, France (without exhibits).

3.      Attached hereto as Exhibit B is a true and correct English translation of Article 1466 the New French Code of Civil Procedure, as it appears on an official French government website, http://www.legifrance.gouv.fr/html/codes_traduits/ncpcatext.htm#TITLE%20II%20ARBITRATI ON%20PROCEEDINGS.

4.      Attached hereto as Exhibit C is a true and correct copy of the Rules of Arbitration of the ICC Court.

5.      Attached hereto as Exhibit D are true and correct copies of correspondence among White & Case, counsel for SOLIDERE; Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden, Arps"), counsel for URS/Radian; and the ICC Court, specifically:

- a facsimile dated February 22, 2006 from the ICC Court to White & Case, Dr. Ghaleb Mahmassani (SOLIDERE), and Skadden, Arps;

- a letter-brief dated March 13, 2006 from Skadden, Arps to the Secretariat of the ICC Court;

- a letter-brief dated March 30, 2006 from Skadden, Arps to the Secretariat of the ICC Court;

- a letter-brief dated April 21, 2006 from Skadden, Arps to the Secretariat of the ICC Court;

- a facsimile dated June 2, 2006 from the Secretariat of the ICC Court to White & Case, Dr. Ghaleb Mahmassani (SOLIDERE), and Skadden, Arps;

- a facsimile dated July 18, 2006 from the ICC Court to White & Case, Dr. Ghaleb Mahmassani (SOLIDERE), and Skadden, Arps;

- a facsimile dated July 26, 2006 from White & Case and Skadden, Arps to the Secretariat of the ICC Court;

- a facsimile dated July 26, 2006 from White & Case to the Secretariat of the ICC Court;

- a letter dated July 27, 2006 from Skadden, Arps to the Secretariat of the ICC Court;

- a letter dated October 9, 2006 from Skadden, Arps to the ICC Court; and

- a letter dated October 10, 2006 from White & Case to the ICC Court.

6.    Attached hereto as Exhibit E is a true and correct copy of Respondent URS Corporation's Objections to Jurisdiction, dated June 30, 2006, submitted to the ICC Court.

7.    Attached hereto as Exhibit F are true and correct copies of the unreported cases cited in SOLIDERE's Opening Brief in Support of its Motion to Dismiss the Complaint. These cases are: (1) Technology Development Co., Ltd. v. Onischenko, No. 05-4835, 2006 WL 869292; (2) S. Megga Telecommunications Ltd. v. Lucent Technologies, Inc., No. 96-357-SLR, 1997 WL 86413; (3) Telcordia Tech., Inc. v. Alcatel S.A., No. Civ. A. 04-874, 2005 WL 1268061 (D. Del. May 27, 2005); (4) Simplicity, Inc. v. MTS Prods., Inc., No. 05-3008, 2006 WL 924993 (E.D. Pa. Apr. 6, 2006); and (5) Malloy v. Harnischfeger Corp., No. CIV. A. 92-2795, 1993 WL 57191 (E.D. Pa. Feb. 26, 1993).

8.    Attached hereto as Exhibit G is a true and correct copy of an excerpt of W. Laurence Craig, William W. Park & Jan Paulsson, International Chamber of Commerce Arbitration (3d ed. 2000).

9.      Attached hereto as Exhibit H is a true and correct copy of an excerpt of

Gary B. Born, International Commercial Arbitration (2001).

10.     Attached hereto as Exhibit I is a true and correct copy of an excerpt of

Fouchard Gaillard Goldman on International Commercial Arbitration (ed. Emmanuel Gaillard &

John Savage) (1999).

11.     Attached hereto as Exhibit J is a true and correct copy of an excerpt from

ICC Publication 810 entitled "International Court of Arbitration, Dispute Resolution Services"

(2005).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 16, 2006.

PAUL B. CARBERRY

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2006, I electronically filed the foregoing with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following and which has also been served as noted:

### BY HAND

Edward P. Welch
Edward B. Micheletti
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899

I hereby certify that on October 16, 2006, the foregoing document was sent to the following non-registered participants in the manner indicated:

### VIA FEDERAL EXPRESS

Jeffrey H. Dasteel
Jason D. Russell
Marina V. Bogorad
Skadden, Arps, Slate, Meagher & Flom LLP
300 S. Grand Avenue, 34th Floor
Los Angeles, CA 90071

Matthew W. King (#4566)
king@rlf.com

# EXHIBIT A

# PART 1

INTERNATIONAL CHAMBER OF COMMERCE

INTERNATIONAL COURT OF ARBITRATION

---

THE LEBANESE COMPANY FOR THE DEVELOPMENT AND
RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT, S.A.L.
("SOLIDERE")

Claimant

V.

URS CORPORATION

AND

RADIAN INTERNATIONAL LLC

Respondents

## REQUEST FOR ARBITRATION

February 13, 2006

**White & Case LLP**
11, Boulevard de la Madeleine
75001 Paris, France
Tel: (33 1) 55 04 15 15
Fax: (33 1) 55 04 15 16

Counsel for the Claimant

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## TABLE OF CONTENTS

Page

I.  Introduction ...........................................................................................................................1

A.  The Parties ...................................................................................................................1

    1.  SOLIDERE .........................................................................................................1

    2.  URS Corporation And Radian International LLC ..............................................3

B.  Preliminary Statement .................................................................................................3

    1.  The Construction Contract.................................................................................4

    2.  URS Takes Over Radian And The Responsibility To Perform The Contract ....4

    3.  The Contractor Fails To Perform Meaningful Treatment...................................4

    4.  The Contractor Causes A Landfill Gas Defect ..................................................5

    5.  The Contractor's Strategy To Avoid Dealing With The Landfill Gas Defect ....5

    6.  The Contractor Denies There Is A Landfill Gas Defect ....................................5

    7.  A Unanimous ICC Award Confirms There Is A Landfill Gas Defect................6

    8.  In Continuance Of Its Strategy, The Contractor Initiates Arbitration II ............6

    9.  The Contractor Refuses Continuously To Comply With The Award.................7

    10.  The Contractor Unilaterally Stops All Further Work .......................................8

    11.  The Contractor Initiates Arbitration III...........................................................8

    12.  SOLIDERE Terminates The Contract .............................................................8

    13.  URS And Radian Are Jointly And Severally Liable For The Cost Of
          Completing The Works.....................................................................................9

    14.  URS And Radian Are Jointly And Severally Liable For The Damages Caused
          By The Staggering Delay To The Project ........................................................9

    15.  The Contractor May Not Rely On Any Contractual Limitations Of Damages ..9

II.  Factual Background...............................................................................................................10

A.  Presentation Of The Normandy Landfill ...................................................................10

B.  Overview Of The Contract .........................................................................................11

    1.  The Contract Documents...................................................................................11

    2.  The "Objective Of The Works" ........................................................................12

    3.  The Time For Completion.................................................................................12

    4.  Time Is Of The Essence ....................................................................................13

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| 5. | The Parameters Relating To The Remediation Of The Normandy Landfill, Or "FSQs" | | 14 |
| 6. | Treatment Provisions | | 15 |
| 7. | Remediation Provisions For A "Failure Or Defect" | | 16 |
| 8. | Termination | | 16 |
| 9. | The Contract Price | | 18 |
| 10. | The Governing Law | | 19 |
| 11. | The Construction Manager | | 19 |

C. The Contractor Intentionally Failed To Perform And/Or Grossly Mis-Performed The Contract ...... 19

1. The Contractor's Gross Mis-Performance Of The Contract Caused The Landfill Gas Defect ...... 20

   (a) The Contractor Mixed Organic And Inert Materials, In Conscious Violation Of Its Contractual Obligations ...... 20

   (b) The Contractor Treated Far Less Than The Contractual Treatment Quantities ...... 21

   (c) Discovery Of The Landfill Gas Defect ...... 22

2. Until The Award, The Contractor Persistently And Disingenuously Denied There Was A Defect ...... 24

   (a) The Contractor's Initial Reaction: Dodging The Issue ...... 24

   (b) The Contractor's First Major Shift Of Position: Denial By Arguing That The FSQs Were "Indoor Air Criteria" ...... 25

      (i) The New Position Was Immediately Rejected By The CM ...... 25

      (ii) SOLIDERE Threatens To Withhold Payments, Without This Affecting The Contractor ...... 26

      (iii) SOLIDERE Withholds Payments ...... 28

      (iv) The Contractor Knew Its "Indoor Air Criteria" Interpretation Was Wrong ...... 29

      (v) Continuing To Avoid Remediation: The Contractor's Ill-Named "Site Action Plan" ...... 29

   (c) The Memorandum Of Understanding And Arbitration 1 ...... 31

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## TABLE OF CONTENTS
### (continued)

Page

|   |   | (d) | The Contractor's Second Major Shift Of Position; Denial Through A New Disingenuous Interpretation Of The Contract...............................32 |
|---|---|-----|---|
|   |   | (e) | The Contractor's Failure To Respect The Time For Completion ...........33 |
|   |   | (f) | The Contractor Initiates Arbitration II ....................................................33 |
|   |   | (g) | Call Of The Contractor's Performance Letter Of Guarantee ..................34 |
|   | 3. | A Unanimous ICC Award Confirms That The Contractor's Works Are Defective .................................................................................................35 | |
|   | 4. | While Accepting To Comply With The Award (As Regards The Defect), The Contractor Refuses Continuously To Do So In Fact...........................................36 | |
|   |   | (a) | The Non-Compliant September 29, 2004 Proposal................................37 |
|   |   | (b) | The Non-Compliant August 2, 2005 Task Plan .....................................38 |
|   |   | (c) | The Non-Compliant August 29, 2005 Task Plan ...................................39 |
|   | 5. | The Contractor Stops All Further Work Under False Pretexts .........................39 | |
|   | 6. | SOLIDERE's Final Attempt To Induce The Contractor To Comply With The Contract and The Award ...............................................................................41 | |
|   | 7. | As A Result Of The Contractor's Numerous Defaults, SOLIDERE Terminates The Contract...........................................................................................43 | |
| III. | | URS Is A Proper Party To This Arbitration.....................................................................46 | |
| | A. | Radian Appears To Exist Only On Paper.................................................................46 | |
| |   | 1. | In June 1999 URS Acquired Radian Which Is Now A Wholly-Owned Subsidiary Of URS...............................................................................47 |
| |   | 2. | Radian No Longer Has Its Own Office Space, Telephone Number Or Facsimile Number ................................................................................48 |
| |   |   | (a) | Address.....................................................................................48 |
| |   |   | (b) | Telephone And Facsimile Numbers ........................................49 |
| |   | 3. | URS Receives And Pays Money For Radian....................................................50 |
| |   | 4. | Radian's Employees Are Transferred to URS .................................................50 |
| |   | 5. | URS No Longer Advertises Radian As A Separate Entity ................................51 |
| | B. | Following URS's Take-Over Of Radian, URS Performed The Contract...................52 | |
| |   | 1. | URS's Written Statements Affirm Its Responsibility For The Project.............52 |

## TABLE OF CONTENTS
(continued)

Page

(a) The Change From Radian Letterhead To URS/Radian Letterhead And
Initial Representations Concerning URS's Role .......................................52

(b) URS's Nomination Of A New "Corporate Manager For The Normandy
Landfill Project" .......................................................................................53

2. URS Presents The Contract As A URS Undertaking ........................................55

(a) URS's Website ..........................................................................................55

(b) URS's Address In Lebanon .......................................................................55

3. URS Treated Radian's Obligations Under The Contract As Its Own..............56

(a) URS's Personnel Responsible For Performance Of The Contract...........56

    (i)    Mr. Amine Bou Onk ........................................................................56

    (ii)   Mr. Vladimir Khazak ......................................................................56

    (iii)  Mr. Thomas Bishop .........................................................................57

    (iv)   Mr. Bart Eklund ..............................................................................58

    (v)    Mr. Robert Legrand .........................................................................58

    (vi)   Mr. James Pratt ...............................................................................59

    (vii)  The Contractor's Presentation Of Its "Field Project Execution
           Management Team".........................................................................59

(b) URS's Senior Management's Variation Of The Contract Terms............60

(c) URS's Reports And Investigations Demonstrate URS's Operational
Responsibility For The Project..................................................................60

    (i)    Reports Prepared As Part Of The Works.........................................60

    (ii)   Reports And Investigations Related To The Landfill Gas Defect.61

    (iii)  Site Safety ......................................................................................65

(d) Accounting Matters ..................................................................................65

4. URS's Control Over Arbitration I And The Events Leading Up To It Further
Demonstrate That The Project Was Under URS's Control ...............................66

(a) URS's And Radian's Legal Counsel ........................................................66

(b) URS's Participation In Meetings with SOLIDERE Leading Up To
Arbitration I .............................................................................................68

(c) URS's Management Of Arbitration I ........................................................70

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## TABLE OF CONTENTS
(continued)

Page

5.  URS Purported To Implement The Award .............................................................71

    (a)  Correspondence Between The Contractor And SOLIDERE Following
         The Award .........................................................................................................71

    (b)  Mediation By Mr. William Hadaya Of URS .............................................72

C.  Conclusion .................................................................................................................72

IV. SOLIDERE's Claims Against The Contractor ...............................................................74

A.  Overview Of Relevant Provisions Of The Contract And The Lebanese Code Of
    Obligations And Contracts .......................................................................................74

    1.  The Contract .......................................................................................................74

    2.  The Lebanese Code Of Obligations And Contracts ......................................75

    3.  The Contractual Limitations On Damages Do Not Apply ...........................76

B.  SOLIDERE's Costs In Arbitration I ......................................................................77

C.  URS And Radian Are Jointly And Severally Liable For All Costs And Expenses
    Incurred By SOLIDERE In Completing The Works ..............................................78

D.  URS And Radian Are Jointly And Severally Liable For All Damages Incurred By
    SOLIDERE As A Consequence Of The Huge Delays To The Project ....................79

    1.  Lost Profits ........................................................................................................79

    2.  Project Costs And Expenses .............................................................................79

V.  Miscellaneous Matters .......................................................................................................81

A.  The Agreement To Arbitrate – Place And Language Of The Arbitration ...............81

B.  Appointment Of The Arbitral Tribunal .................................................................81

C.  Notifications And Communications ........................................................................81

VI. Request For Relief ..............................................................................................................83

VII. Reservation Of Rights ........................................................................................................85

VIII. Submission Of This Request For Arbitration .................................................................86

LIST OF EXHIBITS

EXHIBITS (INCLUDED IN SEPARATE VOLUMES)

-oo0Ooo-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## REQUEST FOR ARBITRATION

### I. INTRODUCTION

1.  Pursuant to Article 4 of the Rules of Arbitration of the International Court of Arbitration of the International Chamber of Commerce (the "**ICC Rules**"), The Lebanese Company For The Development And Reconstruction Of Beirut Central District, S.A.L., a Lebanese Company ("**SOLIDERE**", the "**Claimant**" or the "**Employer**"), hereby submits this Request for Arbitration (this "**Request**") against URS Corporation, a Delaware (U.S.A.) company ("**URS**"), and Radian International LLC a Delaware (U.S.A.) company ("**Radian**"), (jointly, "**URS/Radian**" or the "**Respondents**"), to the Secretariat of the International Court of Arbitration of the International Chamber of Commerce. The defined term "**Contractor**", as used hereafter, refers to Radian and, following URS's take-over of Radian, to URS and Radian jointly.

### A. THE PARTIES

#### 1. SOLIDERE

2.  Following the end of the Lebanese civil war, which lasted from 1975 to 1990, SOLIDERE was constituted as a joint stock company in Lebanon on May 5, 1994 based on Lebanese Law 117 of 1991,[1] with the task of rebuilding and developing the Beirut Central District ("**BCD**"),[2] which was one of the worst hit areas during the war.

3.  To promote reconstruction while palliating the Lebanese government's lack of funds, a law and decree were adopted in Lebanon in 1991-92 obliging all land owners within the perimeter of the BCD to contribute their land to a new, specially-created company,

---

[1]   *See* Law No. 91-117 of December 7, 1991, **Exh. C 15.**

[2]   The BCD is the area of the center of the city of Beirut shown on the drawing at **Exh. C 27.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

> SOLIDERE, in exchange for shares in SOLIDERE.[3] Such land owners represented
> approximately 60% of the original shareholders, the other 40% being financial investors.

4.    The business purposes of SOLIDERE were and are to acquire such real estate properties
      in the BCD and to finance and ensure the execution of all infrastructure works in the
      BCD on the basis of an agreement with the Lebanese Council of Development and
      Reconstruction ("CDR"), to prepare and reconstruct the BCD area, to reconstruct or
      restore the existing buildings therein, to erect buildings therein and sell, lease or exploit
      such buildings and lots and, of particular relevance to this case, to develop the landfill on
      the seaside, called the "Normandy Landfill", which is described further in Section II.A
      below.[4]

5.    The shares of SOLIDERE are listed on the Beirut and Kuwait Stock Exchanges, and its
      Global Depository Receipts (GDRs) are traded on the London Stock Exchange. The
      address of SOLIDERE is:

> Building 149 Marfaa, Saad Zaghloul Street
> P.O. Box 119493
> Beirut
> Lebanon

6.    Further information about SOLIDERE can be obtained on its website:
      www.solidere.com.

---

[3]    *See* Law No. 91-117 of December 7, 1991, Exh. C 15.

[4]    *See* SOLIDERE's Articles of Incorporation at Article 3 (Object of the Company), Exh. C 16.

-2-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

### 2.    URS Corporation And Radian International LLC

7.    URS is an engineering design firm and contractor involved in a range of professional planning, design, program and construction management, and operation and maintenance services, and its shares are listed on the New York Stock Exchange.[5]

8.    When the Contract (as defined below) was signed (1999), Radian provided environmental, engineering and technical services as well as contracting services.

9.    Radian is a wholly-owned subsidiary of URS Corporation.

10.    URS's and Radian's address is:

> 600 Montgomery Street
> San Francisco CA 94111
> United States of America

### B.    PRELIMINARY STATEMENT

11.    Following the 15-year Lebanese civil war (1975-1990), SOLIDERE was formed to serve as the corporate vehicle to help redevelop and restore the historic BCD, which had, as stated above, been heavily damaged during the war.

12.    In its quest to regain its position as the economic and cultural capital of the Middle East, Beirut also needed space for modern development. The CDR perceived an opportunity in this regard in the form of the Normandy Landfill. The strategic location of the Normandy Landfill (on the coast in front of the BCD) and its size (29 hectares) meant that, once remediated (i.e., excavated and treated), it would become among the more valuable pieces of real estate in the Middle East. Its value, once remediated, has been preliminarily assessed as exceeding US$ 4 billion.

---

5    *See* http://phx.corporate-ir.net/phoenix.zhtml?c=89381&p=irol-irhome, accessed February 3, 2006, Exh, C 184.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

13.    In order to help provide SOLIDERE with the financial means to restore the BCD, and in
       order to make the Normandy Landfill available for modern development, the CDR gave
       the Normandy Landfill to SOLIDERE, along with the responsibility to remediate it to
       render it suitable for development as prime real estate.

### 1.    The Construction Contract

14.    By a construction contract dated January 25, 1999 (the "Contract") SOLIDERE
       entrusted the remediation of the Normandy Landfill to Radian, a company which, as
       mentioned above, was specialized in environmental and engineering services and
       contracting, for a contract price of US$ 53,075,000.  Pursuant to the Contract, Radian
       was required to excavate the entire Normandy Landfill, sort and treat the materials and
       backfill them after treatment.  (*See, infra*, Section II.B.)

### 2.    URS Takes Over Radian And The Responsibility To Perform The Contract

15.    Soon after signing the Contract, in June 1999, Radian was acquired by URS, another U.S.
       company engaged in environmental engineering and contracting.  Since that time, URS
       has operationally taken over Radian and taken responsibility for performing the Contract.
       Radian appears today to exist only on paper.  URS and Radian have effectively operated
       and continue to operate as a single entity.  (*See, infra*, Section III.)

### 3.    The Contractor Fails To Perform Meaningful Treatment

16.    Since the Contract was awarded in 1999, the remediation of the Normandy Landfill has
       not significantly advanced.  The Contractor has excavated a significant part of the
       landfill, processed the excavated materials and backfilled them, but without performing
       any meaningful treatment which would lead to remediation of the excavated material.
       The Contractor found a simple way to ensure the lump-sum Contract would be highly
       profitable: it avoided doing the treatment work.  (*See, infra*, Section II.C.1.)

17.    SOLIDERE's construction manager repeatedly drew the Contractor's attention to its
       failures to comply with the Contract, but to no avail.  (*See, infra*, Sections II.C.1-2.)

-4-

#### 4.    The Contractor Causes A Landfill Gas Defect

18.    As a direct consequence of the Contractor's failure to treat the backfilled materials, these contain excessive quantities of one specific contaminant: organic carbon. Organic carbon decomposes over time, producing dangerous "landfill gas" in the process, including methane and carbon dioxide. In March 2001, SOLIDERE's construction manager noticed bubbles of gas breaking the surface of ponds over backfilled and allegedly remediated materials. Samples of that gas were collected and analyzed, and shown to be landfill gas, with high concentrations of methane and carbon dioxide. *(See,infra,* Section II.C.1(c).)

#### 5.    The Contractor's Strategy To Avoid Dealing With The Landfill Gas Defect

19.    Since the discovery of this "landfill gas defect" in March 2001. the Contractor has refused to recognize, much less remediate, its defective work. Instead, the Contractor implemented a sophisticated legal strategy to avoid having to fully perform its obligations under the Contract.

#### 6.    The Contractor Denies There Is A Landfill Gas Defect

20.    The Contractor's strategy initially took the form of evasion and denial. *(See, infra,* Section II.C.2(a).)

21.    In the face of insistence from SOLIDERE's construction manager for the Contractor to take action to remedy the defect, the Contractor engaged a number of in-house and external experts to develop novel theories of contract interpretation. to justify the Contractor's inadequate performance. *(See, infra,* Section II.C.2(b).)

22.    By 2003, the Contractor had refused to recognize or address the landfill gas defect for two years, advanced different interpretations of the Contract in an effort to avoid its obligations and, clearly, would be unable to complete the Contract within the time for completion provided for by the Contract (April 14, 2004). As the Contractor refused to

-5-

remedy the defect, SOLIDERE began withholding contractual payments to the Contractor. This got the Contractor's attention.

### 7. A Unanimous ICC Award Confirms There Is A Landfill Gas Defect

23. Under the pressure of payment withholdings but still not accepting that there was a defect, the Contractor agreed with SOLIDERE (in a Memorandum of Understanding dated May 13, 2003) to submit the issue of whether there was a defect to ICC arbitration (the procedure for the settlement of disputes provided for in the Contract) on a "fast track basis". SOLIDERE agreed, in the meantime, to release all contractual payments withheld and resume contractual payments, reserving its right to resume withholdings at any time. This gave rise to ICC Case No. 12727/EC ("Arbitration I"), which began in May 2003, led to a 5-day hearing in Paris in December 2003 and, after the exchange of post-trial briefs, to closure of the case in February 2004. (*See, infra*, Sections II.C.2(c)-(d).)

24. In a unanimous award dated July 12, 2004 (the "Award"), the arbitral tribunal in Arbitration I (John Blackburn Q.C., Chairman, Vivian Ramsey Q.C. and John Uff Q.C.) held that the presence of landfill gas constituted a defect in the Works, which the Contractor was bound to remedy. This vindicated the position which SOLIDERE had been maintaining consistently since March 2001 when the landfill gas issue arose. The arbitral tribunal further declared that the Contractor should provide SOLIDERE with a plan showing how the Contractor proposed to remedy the defect. (*See, infra*, Section II.C.3.)

### 8. In Continuance Of Its Strategy, The Contractor Initiates Arbitration II

25. In addition, in May 2004, before notification of the Award, and possibly anticipating that it would be unfavorable, the Contractor (through a newly appointed law firm, Skadden,

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

> Arps, Meagher and Flom LLP, Los Angeles and London[6]) applied to add new claims,
> seek other relief and generally re-open Arbitration I. On June 21, 2004, the arbitral
> tribunal rejected the application as wholly inconsistent with the "fast track" nature of the
> first arbitration which, moreover (as mentioned above), had already been closed. *(See,*
> *infra*, Section II.C.2(f).)

26. As the claims were denied admission into the existing arbitration, on the same day (June
21, 2004), the Contractor began a new ICC arbitration (ICC Case No. 13341/EC,
"**Arbitration II**") in which it reasserted the same claims and requests for other relief – all
of which are groundless, in SOLIDERE's submission – and, for reasons of claimed
efficiency, requested that the same three arbitrators as in Arbitration I be appointed to act
in the new case. *(See, infra*, Section II.C.2(f).)

27. Following the Award dated July 12, 2004, the Contractor said it would amend its Request
for Arbitration, among other things, to take account of the Award and stated that, in the
meantime, SOLIDERE should not have to file an Answer under the ICC Rules.
However, the Contractor has not amended its Request for Arbitration nor pursued
Arbitration II, which remains in abeyance. *(See, infra*, Section II.C.2(f).)

### 9.   The Contractor Refuses Continuously To Comply With The Award

28. Following the Award, the Contractor declared that it would comply with the Award, and
SOLIDERE initially believed that the Contractor would promptly do so. In hindsight
though, it appears that, after refusing to rectify the Works from 2001 to 2003, the
Contractor had used Arbitration I (and planned to use Arbitration II) as another ploy to
delay and, ultimately, avoid performance of the Contract. The spirit of denial and
obfuscation which had governed the Contractor's performance of the Contract from the
early days continued. Since issuance of the Award in 2004, the Contractor has refused,

---

[6]  The Contractor had been represented in Arbitration I by Mayer, Brown, Rowe & Maw LLP, London, and
Herbert Smith, London. These law firms appear no longer to be representing the Contractor in relation to
this dispute.

despite SOLIDERE's demands, to submit a plan which complies with the Award. On the
contrary, the several purported plans submitted by the Contractor and rejected by
SOLIDERE have all been consistent with the Contractor's long-standing strategy: to
avoid ever having to perform the Contract. (*See, infra,* Section II.C.4.)

### 10. The Contractor Unilaterally Stops All Further Work

29. In February 2005, following the assassination of former Prime Minister Rafik Hariri in
Beirut, the Contractor stopped all further work at the project site (the "Site"). While a
stoppage of work for three days was justified on that occasion (as days of national
mourning), as the Contractor presumably no longer anticipated earning profit from the
Contract, the Contractor used this event as a pretext to discontinue all further work at Site
and has done no work there since. (*See, infra,* Section II.C.5.)

### 11. The Contractor Initiates Arbitration III

30. Instead of submitting a plan which complies with the Award, the Contractor has reverted
to the stratagem that it had already deployed twice as a diversionary tactic – starting a
new arbitration. By a Request for Arbitration dated January 20, 2006, the Contractor
referred to arbitration, among other issues, that of the compliance of its various purported
remediation plans with the Contract and the Award. The Contractor also seeks a
declaration to the effect that it should be relieved of its main remediation obligations
under the Contract. This new arbitration has been registered at the ICC under
No. 14208/EC ("**Arbitration III**"). (*See, infra,* Section II.C.7.)

### 12. SOLIDERE Terminates The Contract

31. The Contractor's persistent refusal to comply with the Award, its total work stoppage, its
other Events of Default and, finally, its decision to initiate Arbitration III, take the
Contractor's disregard for the Contract to new heights. Consequently, by notice dated
February 10, 2006, SOLIDERE terminated the Contract. (*See, infra,* Section II.C.7.)

### 13.   URS And Radian Are Jointly And Severally Liable For The Cost Of Completing The Works

32.   SOLIDERE must now complete the Works itself and/or by other contractors. SOLIDERE's incurrence of costs for such completion will be a direct consequence of the existence of a defect for which the Contractor is responsible, as finally determined by the Award, and the Contractor's continuing failure to implement the Award. Thus, URS and Radian are liable, jointly and severally, for this amount to the extent it exceeds the Contract price. *(See, infra, Section IV.C.)*

### 14.   URS And Radian Are Jointly And Severally Liable For The Damages Caused By The Staggering Delay To The Project

33.   Further, in all its dealings with SOLIDERE, the Contractor has shown total disregard for the fact that time is "of the essence" under the Contract, and that every day of delay is causing SOLIDERE to suffer enormous damages: SOLIDERE is foregoing and will continue to forego hundreds of millions of US dollars in profits that SOLIDERE would derive from real estate sales had the Normandy Landfill been timely remediated under the Contract. *(See, infra, Section IV.D.)*

### 15.   The Contractor May Not Rely On Any Contractual Limitations Of Damages

34.   The Contractor's conscious and/or grossly negligent failures to comply with its contractual obligations should deprive it of any right to rely on the limitations on damages set forth in the Contract. SOLIDERE respectfully submits that URS and Radian should be held jointly and severally liable for SOLIDERE's ever-increasing actual damages, and SOLIDERE should be awarded all of the relief requested, including interest, fees, and costs. *(See, infra, Section IV.)*

-oo00oo-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## II.    FACTUAL BACKGROUND

### A.    PRESENTATION OF THE NORMANDY LANDFILL

35.    The Normandy Landfill is located along the northern coast of Beirut and apparently takes its name from the proximity of the historic Normandy Hotel.[7] It has a surface area of approximately 29 hectares and literally forms the coastal front of the BCD. It was created as the result of the deposit into the sea of a variety of wastes (inert construction and demolition wastes, household waste, unexploded ordnance as well as spoil material arising from civil engineering and building projects) during the fifteen years of Lebanon's civil war.

36.    The Lebanese civil war ended in about 1990, and the dumping process stopped in 1994. By then, millions of cubic meters of waste had been deposited in the adjoining sea, half of which was below sea level, down to water depths of 20 meters. Above the water line, the fill reached heights of 28 meters in some locations. What had become known as the "Normandy Landfill" had effectively reclaimed more than 25 hectares of land from the sea.

37.    As stated above,[8] SOLIDERE was incorporated to develop the BCD, including the area of the Normandy Landfill. No real estate development on a landfill can be contemplated before the landfill is rehabilitated and remediated so that what is effectively a waste dump is converted into, and can be marketed as, real estate without risk to the health or comfort of its users or to the environment. In the case of the Normandy Landfill, the land is to be marketed as prime real estate capable of supporting "a prestige high density development".[9]

---

[7]    *See* the map of Lebanon, Exh. C 13, showing the northern coast of Beirut, and aerial pictures of the BCD, including the Normandy Landfill, Exh. C 27.

[8]    *See, supra,* Section I.A.1.

[9]    *See,i nfra,* Section II.B.2.

-10-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

38.    As a first measure, in 1993, SOLIDERE sought to prevent the landfill from being washed into the sea by creating a 50 meter-wide strip of inert fill around the waste which was then fixed by the erection of a temporary rock protection.

39.    Subsequently, from 1998 to 2000, a line of caissons[10] was erected in the sea around the landfill, which defines what will become the boundary of the land after it has been fully reclaimed. This line of caissons can be easily identified on the aerial pictures of the BCD[11] as the light-colored, arc-shaped linear structure forming the sea-side boundary of the BCD.

40.    SOLIDERE decided to reclaim the landfill for mixed (commercial and residential) development in two phases. Phase 1, representing some 7 hectares closest to the Beirut city centre, was executed between June 1996 and October 1997. Phase 2, comprising some 22 hectares (the "Project"), was awarded to the Contractor by the Contract and is the subject of the dispute in this arbitration. The Contract is briefly described in Subsection B below and an account of the Contractor's gross mis-performance of the Contract is provided in Subsection C below.

### B.    OVERVIEW OF THE CONTRACT

#### 1.    The Contract Documents

41.    As stated above, on January 25, 1999, SOLIDERE entered into the Contract with the Contractor for the Phase 2 works. The Contract comprises three documents, as follows:

    (i)    an Agreement between the parties dated January 25, 1999 (the "Agreement");

---

[10]    A caisson is defined in John S. Scott's Penguin Dictionary of Civil Engineering, 4th edition (1991) as:

"A *foundation* built partly or wholly above ground and sunk below ground, usually by digging out the soil inside it", **Exh. C 14.**

In the case of the Normandy Landfill, concrete caissons were sunk into the seabed, with their top breaking the surface of the sea, so as to create a robust wall of concrete. The sea located between the landfill and the line of caissons was subsequently backfilled with inert material in order to extend the area of the Normandy Landfill up to the line of caissons, and to stabilize the caisson wall.

[11]    Aerial pictures of the BCD, **Exh. C 27.**

-11-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

    (ii)     the General Conditions of Contract and all Exhibits thereto ("GC"); and

    (iii)the    Technical Conditions of Contract ("TC").[12]

### 2.    The "Objective Of The Works"

42.    Pursuant to the Contract, the Contractor agreed to "design and construct a reclamation scheme to meet the objective of the Works", which was described as follows:[13]

> "The objective of the Works is to reclaim the land and environment known as Phase 2 of the former Normandy Landfill (*see* Drawing RJ01[14]) as marketable development land that poses no risk to human health, public welfare, structures, services and the environment.
>
> The reclaimed land will be marketed by the Employer for the construction of a prestige high density development (offices, hotels and condominiums), park land, and associated infrastructure works. Development will comprise high multi-storey buildings with up to 7 levels or more of underground structures".[15]

### 3.    The Time For Completion

43.    The "Time for the Completion" of the Contract was fifty-four months beginning from the issuance of a Notice to Proceed.[16]

44.    The Time for Completion was subsequently extended to 60 months, which expired on April 14, 2004.[17]

---

[12]    *See* the Contract, Agreement Art. 2, **Exh. C 19.** In addition, there are two Addenda to the Contract dated February 18, 1999 and August 18, 2000, respectively. References to clauses of the GC are given hereafter as, for example, "GC 1.1" in the case of Article 1.1 of the GC.

[13]    *See* the Contract, Agreement Art. 3.1, GC 1.1 (definitions of "Complete" and "Works") and TC, Section 2, **Exh. C 19.**

[14]    Drawing RJ01, **Exh. C 24.**

[15]    The Contract, TC Section 2, **Exh. C 19.**

[16]    The Contract, Agreement Art. 3.2, **Exh. C 19.**

-12-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

### 4.    Time Is Of The Essence

45.    The Contractor agreed that:

> "Time is of the essence in the performance of the Works and the
> Contractor agrees: (i) to Commence the Works after receipt by it of the
> Notice to Proceed; and (ii) to Complete the entire Works within the Time
> for Completion and in compliance with the Programme, Milestones and
> Detailed Programme and consistent with all specific durations set forth
> therein and/or elsewhere in the Contract".[18]

46.    Because timing was so important, GC 21.10 provides that the Contractor:

> "[...] recognizes and acknowledges that any material failure of, or
> suspension of the Works, by the Contractor or any Subcontractor or
> Supplier, would cause the Employer immediate and irreparable harm
> unable to be compensated by money damages alone, and the Contractor
> hereby accepts and agrees that it shall not under any circumstances
> whatsoever cease, delay or suspend performance of its Works under this
> Contract, except as may be expressly provided for under these GC".[19]

47.    The Contractor further agreed in GC 22.2 that:

> "[...] the timely performance and Completion by the Contractor of the
> entire Permanent Works within the Time for Completion and in
> accordance with the Programme and any intermediate Milestones is of the
> essence and a material term of the Contract. The Completion of the
> Works within the Time for Completion is essential and vital for the timely
> and successful development and promotion of land and projects
> surrounding or near the Site and for the commercial viability and financial
> success of such parts of the Development for the Employer".[20]

---

( . continued)

[17]    *See* the Contract, Addendum Agreement No.2 dated August 18, 2000, **Exh. C 19**. The Notice to Proceed
was issued by letter dated March 22, 1999 from SOLIDERE to Radian, effective April 14, 1999,
**Exh. C 21**.

[18]    The Contract, Agreement Art. 5, **Exh. C 19**.

[19]    The Contract, GC 21.10, **Exh. C 19**.

[20]    The Contract, GC 22.2, **Exh. C 19**.

-13-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## 5. The Parameters Relating To The Remediation Of The Normandy Landfill, Or "FSQs"

48.    The "**Scope of Works**" was provided for in TC Section 3.0. In this Section, the Contractor undertakes, among other things, to perform the described reclamation works (subsection 1), to do so in accordance with the GC (subsection 2) and to achieve certain "End Product acceptability criteria" with respect to landfill gas emissions, among other things, and to deliver land "Fit for the Purpose" (subsection 6).

49.    The "End Product acceptability criteria", also referred to as "Final Site Quality" criteria, or "**FSQs**", are set forth in TC Table 3.1:

## "TABLE 3.1
### CHEMICAL AND BIOLOGICAL FINAL SITE QUALITY

| Parameter | Level in mg/kg (unless shown otherwise) |
|---|---|
| Organic Carbon C | <5% |
| | X X X |
| Flammable Gas | <1% v/v $(g)^{21}$ |
| Carbon Dioxide | <1.5% v/v $(g)^{22}$ |
| Oxygen | 18%-23% $(g)^{23}$ |
| Landfill Gas | No specific precautions will need to be provided for built development including landscape works in the reclaimed areas." |

50.    The importance of, and links between, these FSQs will be further explained if and when needed in these proceedings. For the purpose of this Request, it should be noted that

---

[21]    "<1% v/v" means "less than one per cent volume by volume", and means that, for the parameter to be satisfied, a volume of gas sampled from the material should include less than one per cent of flammable gas. The inclusion of "(g)" is a typographical mistake.

[22]    "<1.5% v/v" means "less than one point five per cent volume by volume", and means that, for the parameter to be satisfied, a volume of gas sampled from the material should contain less than one and a half per cent of carbon dioxide. The inclusion of "(g)" is a typographical mistake.

[23]    "18%-23%" means "18 per cent to 23 per cent" and means that one volume of gas sampled from the material should include between 18 and 23 per cent of oxygen. The inclusion of "(g)" is a typographical mistake.

-14-

> "Organic Carbon C" (the first item quoted in TC Table 3.1 above) emits gas as it
> decomposes, which gas is referred to, in the context of landfills, as "landfill gas".
> Landfill gas typically contains approximately 60% methane (this is the "flammable gas"
> FSQ, the second item quoted in TC Table 3.1 above) and 40% carbon dioxide (the third
> item quoted in TC Table 3.1 above).

51.     The Contractor also undertook that the Works would be "Fit for the Purpose", defined as
        follows:

> "'**Fit for the Purpose**' means the land cleaned from any contaminated
> products, environmentaly [*sic*] safe and which is available to be built on
> including landscape works, without the need for any environmental
> treatment or containment".[24]

52.     The FSQs and the "Fitness for the Purpose" obligation were the subject of the dispute in
        Arbitration 1.

### 6.     Treatment Provisions

53.     The Contract is titled "Normandy Landfill Treatment Contract" [emphasis added]. It
        provides in Agreement Article 4.1 that:

> "[...] The Contract Price is calculated on the assumption that the quantity
> of Material to be Treated is 1.2 million cubic meters, and the quantity of
> materials to be excavated is 5 million cubic meters".[25]

54.     The Contractor set forth in the Contract a "Method Statement" specifying the various
        treatment methods that would be used in performing the Works.[26]

---

[24]     The Contract, GC 1.1 (definition of "Fit for the Purpose"), Exh. C 19.

[25]     The Contract, Agreement Art. 4.1, Exh. C 19.

[26]     The Contract, Table 3.3, TC Section 3.0, Exh. C 19.

-15-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

55.    The Method Statement also identifies activities that are not considered proper treatment, and therefore, will not be used on the Site.  TC Table 3.3 indicates that prior to backfilling materials:

> "4.0    Radian would not mix any organic matter or heavy organics contaminated media for the purpose of dilution.  Our experience in many nations (i.e., ithe [*sic*] United States mixing for the purpose of dilution is not acceptable and in some instances could be considered as an action in violation of environmental laws) has shown that mixing of waste for dilution may not constitute treatment and manot [*sic*] be desirable by financial lending institutions and real estate investors".[27]  [Emphasis added]

### 7.    Remediation Provisions For A "Failure Or Defect"

56.    In the event that the Works do not comply with the Contract, the parties provided that the Contractor would have, *inter alia*, two complementary duties: (i) to unilaterally remedy the defect and (ii) to submit a plan to SOLIDERE detailing how this would be done. GC 23.10 states in relevant part:

> "If a failure or defect in or of the Permanent Works, Materials, Plants or workmanship in accordance with the Contract is discovered during the carrying out of the Works, upon such discovery the Contractor shall immediately state in writing to the Employer the action which the Contractor proposes to take at no cost to the Employer to remedy or repair such failure or defect, and establish that there is no similar failure or defect in Works already executed or Materials already supplied (whether or not incorporated in the Works) [...]"[28]

### 8.    Termination

57.    Pursuant to GC 35.2, the Employer, among other things, may exercise specified rights, including termination of the Contract, if certain defined events occur and are not remedied:

---

27    The Contract, Table 3.3, TC Section 3.0, Exh. C 19.

28    The Contract, GC 23.10, Exh. C 19.

-16-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

> "If: (i) the Contractor has abandoned the Contract; or (ii) the Contractor
> has failed to provide review and/or maintain at all times in full force and
> effect and in accordance with the Contract the Performance Letter of
> Guarantee, the insurance required by the Contract, or provide, revise or
> resubmit or update the Detailed Programme; or (iii) the Contractor has
> failed to commence the Works, or has suspended the progress of the
> Works after receiving the Notice to Proceed from the Employer; or (iv) the
> Contractor is not performing the Works in accordance with the Contract or
> is in breach of any representation or warranty or is in breach of any of its
> obligations, responsibilities or undertakings under the Contract; or (v) the
> Contractor does not maintain the progress of the Works in accordance
> with the Detailed Programme and/or any Milestone; each also constituting
> an "Event of Default", then the Contractor shall be in Default. If the
> Contractor fails to remedy such Event of Default within ten (10) Days,
> after receipt of written notice of such an Event of Default from the
> Employer, or if the Contractor fails to provide written evidence and/or
> Detailed Programme(s) satisfactory to the Employer that such Event of
> Default shall be corrected forthwith, then the Employer may, in addition to
> any and all other rights available to it under the Contract and without the
> need for any legal proceedings or court decision, withhold any amount
> otherwise due under the Contract and/or may issue a Notice of
> Termination terminating the Contractor's right to proceed with any portion
> or the whole of the Works, without thereby releasing the Contractor from
> any remaining obligation or liability under the Contract, or affecting the
> rights and powers conferred on the Employer by the Contract, and may
> itself complete the Works or may employ any other contractor to
> Complete the Works, or the Employer may terminate the Contract. The
> Employer or such other contractor may use for such completion so much
> of the Plant, Temporary Works and Materials, which have been deemed to
> be reserved exclusively for the performance of the Works, under the
> provisions of the Contract, as it or they may think proper".[29][Emphasis
> added]

58.    In the event of termination by the Employer, GC 35.3 provides that:

> "If the Employer terminates the Contract pursuant to GC 35.1 or GC 35.2,
> the Employer shall not be liable to pay to the Contractor any money on
> account of the Contract until the costs of execution, damages for delay in
> Completion, if any, and all other expenses incurred by the Employer or
> damages to which the Employer is entitled, whether by Contract or at law,
> have been ascertained. The Employer shall then be obligated to pay only

---

[29]    The Contract, GC 35.2, Exh. C 19.

-17-

such sum, as the Employer may certify would have been due the
Contractor upon completion by it after deducting the damages, costs and
other expenses incurred by the Employer resulting from the termination.
If such amount exceeds the sum which would have been payable to the
Contractor on due completion by it, then the Contractor shall, upon
demand, pay to the Employer the amount of such excess and it shall be
deemed a debt due by the Contractor to the Employer and shall be
recoverable accordingly. In addition, upon any such termination, the
Contractor shall assign to the Employer such orders with Suppliers or
Subcontractors as the Employer may request".[30]

## 9. The Contract Price

59. SOLIDERE agreed to pay the Contractor a fixed lump sum of US$ 53,075,000 for the
Works on the assumption that the quantity of the material to be treated is 1.2 million
cubic meters and the quantity of material to be excavated is 5 million cubic meters.[31]

60. Pursuant to Article 4.1 of the Agreement, the parties increased the Contract Price by
US$ 2,000,000 to enable the Contractor to purchase a Low Temperature Thermal
Desorption unit for treating materials at the Site.[32] The parties further increased the
Contract Price by US$ 1,557,500 (Change Order No. 2), in order for the Contractor to
purchase plastics pelletizing equipment.[33]

61. The Contract Price was thus increased to a total of US$ 56,632,500, an amount at which
it remained through the termination of the Contract.[34]

---

[30] The Contract, GC 35.3, Exh. C 19.

[31] The Contract, Agreement Art. 4.1, Exh. C 19, which provides that if the quantity of material to be treated
or excavated exceeded these amounts, respectively, the Contractor was entitled to additional compensation.
On the other hand, if the quantities were less than these amounts, there was no provision for the Contract
Price to be reduced.

[32] See letter dated February 4, 2002 from the CM to Radian confirming the increase in Contract Price by
US$ 2,000,000, Exh. C 59.

[33] See letter dated February 27, 2002 from Radian to SOLIDERE, enclosing Change Order No. 2, Exh. C 60.
Although the Contractor requested a "Change Order No. 1", the subject-matter of such request was covered
in Addendum Agreement No. 2 dated August 18, 2000 (Exh. C 19) and no Change Order No. 1 was ever
executed.

[34] On such termination, see, infra, Section II.C.7.

-18-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

### 10.    The Governing Law

62.    The Contract further provides that:

> "The Contract shall be governed by and construed in all respects in
> accordance with the laws of the Republic of Lebanon",[35]

### 11.    The Construction Manager

63.    The Contract provides for the appointment of a "Construction Manager" who is
empowered to take all actions and give all instructions and "Approvals" (subject to
certain exceptions) in SOLIDERE's name and on its behalf under the Contract.[36] Among
other things, he is empowered "to manage, coordinate and monitor compliance" by the
Contractor with the Contract and to make recommendations to the Employer concerning
payments to be made to the Contractor.[37]

### C.    THE CONTRACTOR INTENTIONALLY FAILED TO PERFORM AND/OR GROSSLY MIS-PERFORMED THE CONTRACT

64.    Following the signature of the Contract in January 1999, on March 18, 1999, SOLIDERE
notified the Contractor that it had appointed W.A. Fairhurst International, a Scottish firm
of consulting engineers ("WAFI"), to act as the Construction Manager (the "CM") under
the Contract.[38]

65.    By letter dated March 22, 1999, the Employer issued the Notice to Proceed to the
Contractor, instructing the Contractor to commence work on April 14, 1999.[39]

---

[35]    The Contract, GC 50, Exh. C 19.

[36]    The Contract, GC 2.1, Exh. C 19.

[37]    The Contract, GC 1.1 (definition of the "Construction Manager"), Exh. C 19.

[38]    See external memorandum dated March 18, 1999 from Mr. Hervé Dupont of SOLIDERE to Mr. Stan
Porfido of Radian, Exh. C 20. WAFI remained the CM until the WAFI Beirut team changed its affiliation
to Hornagold & Hills International, an English firm of consulting engineers and management consultants.
Without any changes to the CM team, the CM thus became Hornagold & Hills International ("H2I"), as
notified to URS/Radian by SOLIDERE by letter dated December 20, 2005, Exh. C 171.

[39]    See letter dated March 22, 1999 from SOLIDERE to Radian, Exh. C 21.

### 1. The Contractor's Gross Mis-Performance Of The Contract Caused The Landfill Gas Defect

#### (a) The Contractor Mixed Organic And Inert Materials, In Conscious Violation Of Its Contractual Obligations

66.   As will be demonstrated in the course of these proceedings, the performance of the Contract by the Contractor was rife with bad practices and intentional or grossly negligent disregard of contractual obligations.   The most egregious among the Contractor's bad practices consisted in mixing materials contaminated by organic matter, with uncontaminated materials.

67.   Pursuant to the Contract, the Contractor gave SOLIDERE an unambiguous commitment that it "would not mix any organic matter or heavy organics contaminated media for the purpose of dilution", supported with statements that "mixing for the purpose of dilution is not acceptable" and "may not constitute treatment".[40]

68.   The contractual prohibition of mixing was implemented in the Contractor's Work Plan (submitted pursuant to the Contract after execution of the Contract).   Because the different materials at the Normandy Landfill had been laid in discernible layers, the Work Plan prescribed excavation methods designed to segregate these bands, *i.e.*, allow the Contractor to remove and treat contaminated materials without contaminating inert material through mixing.[41]

69.   The Contractor only segregated organic materials for roughly one month.[42]   Shortly thereafter, the Contractor adopted excavation methods (contrary to the contractual Method Statement and the Work Plan) in which it made vertical cuts down through the

---

[40]   *See* item 4 in the Method Statement, set forth in the Contract, TC Table 3.3, **Exh. C 19**, quoted *supra*, Section II.B.6.

[41]   Letter dated November 12, 1999 from Radian to the CM, enclosing "Work Plan: 3rd and Final Revision," dated November 9, 1999, *see* Section 2.2.1 items 1, 4, and 6, **Exh. C 25**.

[42]   *See* Witness Statement of Mr. David W. Horne in Arbitration I, dated October 15, 2003 ("**Horne I**"), p. 10, ¶ 36, **Exh. C 105**.  Mr. Horne was the CM's Representative from April 14, 1999 until June 13, 2003.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

different layers of material.    This practice thoroughly mixed organic with inert
materials.[43]

70.    In addition to the excavation method used by the Contractor, its processing methods
compounded the mixing of the excavated materials.[44]

### (b)    The Contractor Treated Far Less Than The Contractual
Treatment Quantities

71.    The Contract Price was calculated on the assumption that the Contractor would treat 1.2
million of the 5 million cubic meters of material to be excavated at the Normandy
Landfill.[45]

72.    As a result of its material-mixing practices and other poor working practices to be
explained in the course of these proceedings, a comparatively small amount of excavated
material was deemed by the Contractor to require treatment: according to the CM, as of
the end of September 2005, only "about 94,800m³ of material have been worked upon in
a manner claimed by the Contractor to constitute treatment as defined in the Technical
Conditions of Contract". This contrasts with the 1.2 million cubic meters assumed by the
Contract Price.[46]

73.    The Contractor's activities were thus predominantly processing and mixing, and not
treatment.[47] While this no doubt dramatically increased the short-term profitability of the

---

[43]    *See* Horne I, p. 10, ¶¶ 37-40, **Exh. C 105**; Reply Witness Statement of Mr. David W. Horne in Arbitration
1, dated November 21, 2003 ("**Horne II**"), p. 12, ¶¶ 44, 46, **Exh. C 109**.

[44]    *See* Witness Statement of Dr. Anthony C. Ellis in Arbitration I, dated October 15, 2003 ("Ellis I"), p. 10,
¶¶ 33-34, p. 13, ¶ 46, **Exh. C 104**. Dr. Ellis was an environmental chemist who worked as a consultant to
the CM.

[45]    The Contract, Agreement Art. 4.1, **Exh. C 19**.

[46]    *See* "Construction Manager's Monthly Report – No. 78" for September 2005, dated October 14, 2005,
Section 4.4.1 (appendices omitted), **Exh. C 160**.

[47]    *See* Horne II, p. 14, ¶¶ 48-49, **Exh. C 109**. Mr. Horne also refers to the Witness Statement of Mr. James
Pratt, the Contractor's Quality Control Manager, which describes the Contractor's work on the backfilled
materials as excavating, feeding material through a "bar screen", placing materials in a sorting plant that
separates materials, and sampling and testing fines used in the backfill, *see* **Exh. C 109** at pp. 13-14, ¶ 47.

(continued . )

-21-

Project for the Contractor, such performance was contrary to the Contractor's obligations and was to have disastrous consequences for the Project.

\* \* \*

74. As will be demonstrated in the course of these proceedings, such bad practices constitute serious breaches of the Contractor's essential contractual obligations and, as a matter of fact, caused the excessive concentrations of landfill gas which were held in the Award to constitute a defect in the Works.

### (c) Discovery Of The Landfill Gas Defect

75. Early in 2001, the CM noticed gas bubbles rising from water overlying submerged backfilled materials. In a letter dated March 1, 2001, the CM notified the Contractor that the gas was flammable and requested that the Contractor investigate the problem.[48]

76. After observing work practices at the Site, the CM notified SOLIDERE by letter dated May 23, 2001 that the Contractor was mixing materials, contrary to the Method Statement set forth at TC Table 3.3.[49] In the letter, the CM hypothesized that such work practices might have contributed to the landfill gas emissions from the backfill.

77. In June of 2001, the CM notified the Contractor of its concerns and hypothesis.[50] However, the Contractor did not change its working practices.[51]

---
( continued)

In Mr. Horne's view, all of these activities constitute processing and not treatment under the terms of the Contract. *See also*, Horne I, p. 12, ¶ 41, **Exh. C 105**, in which Mr. Horne describes how the "treatment" element of the Works has been conspicuously absent.

[48] *See* letter dated March 1, 2001 from the CM to Radian, **Exh. C 37**.

[49] *See* letter dated May 23, 2001 from the CM to SOLIDERE, at Section 2.2, **Exh. C 43**.

[50] *See* Minutes on Progress Meeting No. 81 dated June 20, 2001, item 4.2.5.1 (c), **Exh. C 45**.

[51] *See* internal memorandum dated August 23, 2001 from Mr. David Horne to Mr. Hisham Karameh (the Employer's Representative), at items 1-5, **Exh. C 51**. Dr. Ellis also reprised his concern over the Contractor's practice of mixing inert and organic materials in his report dated August 2001 entitled "Review of Composting and Sampling Activities at Normandy Reclamation Project", p. 3, **Exh. C 48**. *See also*, Section 6.15 of the CM's October 14, 2002 Report entitled "Formal Report Into Landfill Gas In &
(continued. .)

-22-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

78.    As Mr. Horne, the CM's Representative at the time, explained:

> "The main reason for the excessive levels of landfill gas, in my view, is
> that Radian avoided treating material as it undertook to do under the
> Contract. Instead, and contrary to Radian's Work Plan, Radian has mixed
> layers of highly organic material in the landfill with inert material to
> achieve, by this process of dilution, a level of Total Organic Carbon
> ("TOC") in backfilled materials of less than 5 per cent as required by the
> FSQs. However, as Radian has, in this way, neglected treating highly
> organic material, it has rendered itself unable to comply with the FSQs
> relevant to landfill gas, namely, those applicable to flammable gas, carbon
> dioxide and oxygen".[52] [Citations omitted]

79.    Since notifying the Contractor of the gas problem by letter dated March 1, 2001,[53] the
CM has sent the Contractor numerous letters reminding it that the Site was not compliant
with FSQs.[54]  The CM repeatedly asked the Contractor to comply with its obligations.[55]
However, over the course of three years, from the discovery of the landfill gas problem in
March 2001 until the Award in Arbitration I, the Contractor never acknowledged that the
FSQs were not being met in the backfill and thereby delayed investigating and
remediating the defect.

---

(...continued)

Emission From Backfilled Material" (appendices omitted), Exh. C 79, which noted that the Contractor was
still mixing materials as of that date.

[52]    Horne I, p. 2, ¶ 4, Exh. C 105.

[53]    See letter dated March 1, 2001 from the CM to Radian, Exh. C 37.

[54]    The FSQs, also referred to in some documents as "Final Site Quality criteria" or "End Product acceptability
criteria", were presented *supra*, Section II.B.5.

[55]    See letter dated April 24, 2001 from the CM to Radian (attachment omitted), Exh. C 40; letter dated May
28, 2001 from the CM to Radian at point (c), Exh. C 44; letter dated July 11, 2001 from the CM to Radian,
Exh. C 47; and letter dated August 7, 2001 from the CM to Radian, Exh. C 49.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## 2. Until The Award, The Contractor Persistently And Disingenuously Denied There Was A Defect

### (a) The Contractor's Initial Reaction: Dodging The Issue

80.  In a letter dated March 10, 2001, the Contractor responded to the CM's March 1, 2001[56] notice of the gas problem by describing investigations and observations at the Site without once addressing the CM's claim that the Site did not comply with FSQs.[57]

81.  By letter dated April 5, 2001 and enclosed memorandum of a URS engineer (Mr. Robert Legrand),[58] the Contractor acknowledged that gas was bubbling from backfilled areas and that samples showed it contained more than 70% methane (whereas, according to the FSQs, "flammable gas" had to be less than $1\%$[59]). Mr. Legrand wrote that, given the material at the Site, he expected landfill gas (which he termed "biogas") production to be "of short duration" and the Contractor would take steps to monitor the Site over the next year using gas monitoring wells,[60] a gas monitoring device installed in the backfill ("*in situ*"). This reference to the gas monitoring wells implied an understanding that the FSQs were to be measured *in situ* within the "headspace" of the gas monitoring well. Again, the Contractor did not specifically address or acknowledge that the Site was non-compliant with the FSQs in violation of the Contract.

82.  In subsequent correspondence between April and August 2001, a pattern emerged: the CM would ask the Contractor to comply with the FSQs and ensure that the Site would be "Fit for the Purpose"[61] upon Completion,[62] and in response, the Contractor would side-

---

[56]  Letter dated March 1, 2001 from the CM to Radian, Exh. C 37.

[57]  *See* letter dated March 10, 2001 from Radian to the CM, Exh. C 38.

[58]  *See* internal memorandum of Mr. Robert Legrand dated April 5, 2001, attached to letter from Radian to the CM dated April 5, 2001, p. 3, Exh. C 39.

[59]  The Contract, TC Table 3.1, Exh. C 19.

[60]  *See* memorandum of Mr. Robert Legrand dated April 5, 2001, attached to letter from Radian to the CM dated April 5, 2001, p. 4, Exh. C 39.

[61]  The Contract, TC Section 3.0, item 6, and GC 1.1 (definition of "Fit for the Purpose"), Exh. C 19.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

> step the issue, never acknowledge its contractual responsibilities, and merely submit data
> or updates based on ineffective investigations.[53] In this process the Contractor never
> stated or implied that the FSQs should be measured other than *in situ*.

83.    In August 2001, the CM's technical experts inspected the Site and confirmed that the
production of landfill gas from backfilled materials was "a serious problem" and that
there was no evidence that the gas emissions were declining.[54] In a letter dated October
3, 2001, the CM advised the Contractor that SOLIDERE was "fully aware of the situation
and [was] very concerned by its potential ramifications".[65] In the same letter, the CM
invoked GC 23.10[66] and emphasized that the Contractor should have submitted a plan of
action to correct the defect at the Site "long ago". In the event that SOLIDERE did not
receive such a plan, the CM informed the Contractor that the Employer would be obliged
to apply "the relevant Clauses of the General Conditions of Contract in order to secure its
interest".[67]

### (b)    The Contractor's First Major Shift Of Position: Denial By Arguing That The FSQs Were "Indoor Air Criteria"

#### (i)    The New Position Was Immediately Rejected By The CM

84.    The Contractor responded to the CM's letter dated October 3, 2001 by letter dated
October 26, 2001.[58] It maintained that the contractual requirements were "unambiguous"

(. continued)

[62]    *See* letter dated April 24, 2001 from the CM to Radian, Exh. C 40; letter dated May 28, 2001 from the CM to Radian, Exh. C 44; letter dated July 11, 2001 from the CM to Radian, Exh. C 47.

[63]    *See* letter dated April 26, 2001 from Radian to the CM, Exh. C 41; letter dated May 15, 2001 from Radian to the CM, Exh. C 42; letter dated July 3, 2001 from Radian to the CM, Exh. C 46.

[64]    Letter dated October 3, 2001 from the CM to Radian (*see* second paragraph), Exh. C 55.

[65]    Letter dated October 3, 2001 from the CM to Radian (*see* second paragraph), Exh. C 55.

[66]    *See* letter dated October 3, 2001 from the CM to Radian (*see* fourth paragraph), Exh. C 55. Under the Contract, Exh. C 19, GC. 23.10, providing that if there is a "failure or defect" in the Permanent Works, Materials or workmanship during the carrying out of the Works, then upon discovery the Contractor shall immediately state in writing the action which it proposes to take at no cost to SOLIDERE to remedy the same.

[67]    Letter dated October 3, 2001 from the CM to Radian (*see* fifth paragraph), Exh. C 55.

[68]    *See* letter dated October 26, 2001 from Radian to the CM, Exh. C 56.

-25-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

> and argued, for the first time and contrary to the parties' prior understanding until that
> time, that the FSQs for flammable gas, carbon dioxide, and oxygen were indoor air
> quality criteria, that is, were to be measured inside a hypothetical building on the
> reclaimed land and not *in situ*.[69]

85.    Having operated this major change of paradigm, the Contractor felt able to conclude that
       "[t]here is no evidence that these air quality standards will not be met".[70]

86.    The CM responded by letter dated November 20, 2001, agreeing with the Contractor that
       the contractual requirements were "unambiguous" and rejecting the Contractor's indoor
       air quality argument.[71] The CM reminded the Contractor that the FSQs were not met in
       backfill and that it awaited a report and plan of action to remediate the defect in
       accordance with GC 23.10.

87.    The Contractor never responded to this letter. Instead, it maintained its new position that
       the FSQs were indoor air quality criteria until it became clear that its own independent
       experts (who would later appear in Arbitration I) would not support its interpretation.[72]

> (ii)    SOLIDERE Threatens To Withhold Payments, Without
>          This Affecting The Contractor

88.    The Contractor failed to address the problem. At Progress Meeting No. 111 held on
       March 20, 2002, the CM advised the Contractor to ensure that a remediation report was
       submitted before the end of March 2002. SOLIDERE informed the Contractor that it
       would otherwise be obliged to begin withholding payments to the Contractor.[73]

---

[69]    Letter dated October 26, 2001 from Radian to the CM at p. 2, **Exh. C 56.**

[70]    Letter dated October 26, 2001 from Radian to the CM at p. 4, **Exh. C 56.**

[71]    Letter dated November 20, 2001 from the CM to Radian (*see* subheading entitled "Page 2, penultimate paragraph"), **Exh. C 57.**

[72]    *See, infra*, Section II.C.2(b)(iv).

[73]    *See* Minutes of Progress Meeting No. 111 dated March 20, 2002, at 4.2.5.1 – 4.2.5.2, **Exh. C 61.**

-26-

89.    By letter dated April 5, 2002, the Contractor submitted to the CM a document entitled
       "Normandy Landfill, Beirut - Investigation of Gas Emissions – Report", "Prepared by:
       URS Corporation [...]" and dated March 2002.[74] While admitting that gas bubbles had
       been observed at a number of locations at the Normandy Landfill,[75] the Contractor
       insisted in this report that the landfill gas (which it continued to refer to as "biogas") was
       a "small amount"[76] and, based on the Contractor's interpretation of the FSQs as indoor
       air criteria,[77] that the "project is stable, safe, and meets the End Product criteria
       [FSQs]".[78]

90.    By letter dated April 25, 2002, the CM responded, noting that the Contractor still had not
       acknowledged there to be a defect, that the Contractor did not propose to do anything
       other than to monitor the situation (inappropriately, in the CM's view) and that the
       Contractor had produced no plan of action, as required, to deal with the defect.[79]
       Accordingly, the CM maintained that the backfilled materials were defective, the Works
       incomplete, and the backfill not "Fit for the Purpose".

91.    Shortly thereafter, in the summer of 2002, which was about one year after the CM's first
       recommendation to do so, the Contractor installed gas collection cells (*i.e.*, an *in situ*
       means of measuring landfill gas).[80] The Contractor then began to send to the CM data
       regarding gas emissions from these new monitoring cells. This data continued to show

---

[74]   "Normandy Landfill, Beirut – Investigation of Gas Emissions – Report" dated March 2002 ("**March 2002
       Report**"), enclosed in letter dated April 5, 2002 from Radian to the CM, **Exh. C 62.**

[75]   *See* "March 2002 Report", pp. 1, 8, 23-25 and 27, as well as photographs of the bubbling phenomena in
       Appendix D to this report, **Exh. C 62.**

[76]   *See* "March 2002 Report", pp. 27-28, **Exh. C 62.**

[77]   *See* "March 2002 Report", pp. 20-22, **Exh. C 62.**

[78]   "March 2002 Report", p. 28, **Exh. C 62.**

[79]   *See* letter dated April 25, 2002 from the CM to Radian, **Exh. C 65.**

[80]   By letter dated May 28, 2001, point (b)(i), **Exh. C 44,** the CM recommended that Radian use gas
       monitoring cells/boxes to more effectively measure gas emission.

-27-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

> that the flammable gas and carbon dioxide in the materials backfilled by the Contractor
> exceeded the FSQs, and that the oxygen fell outside the FSQ range.[81]

92.    Despite the clear evidence from the gas collection cells, the Contractor refused to
       acknowledge the existence of a defect or submit a plan of action to remedy it. Therefore,
       by the CM's letter dated June 29, 2002, the CM informed the Contractor that the amounts
       claimed by the Contractor for "treatment" during the month of May 2002 (in the
       Contractor's Request for Payment No. 37) should be withheld as a "preliminary measure"
       to protect the Employer.[82]  Such withholding had earlier been recommended by the CM.[83]

93.    While still insisting that it was in compliance with the Contract, by a letter dated July 9,
       2002 the Contractor agreed to submit a "detailed report" and a "detailed plan of action"
       by the end of August 2002.[84]

### (ii)SOLIDERE Withholds Payments

94.    By letters dated July 30, 2002 and August 28, 2002,[85] the CM informed the Contractor
       that the amounts claimed for "treatment" during the months of June and July 2002,
       respectively (in the Contractor Requests for Payment Nos. 38 and 39, respectively),
       would be withheld, as preliminary measures, pending receipt and approval of the
       Contractor's plan of action to remedy the defect and its demonstration that the defect
       was, in fact, being remedied.

95.    The Contractor responded by letter dated September 9, 2002, attaching an update of the
       URS March 2002 report discussed above. In this update, while admitting the existence of

---

[81]    See letter dated June 19, 2002 from the CM to Radian (attachment omitted), Exh. C 68; letter dated July 2,
        2002 from the CM to Radian (attachment omitted), Exh. C 71; and letter dated July 18, 2002 from the CM
        to Radian (attachment omitted), Exh. C 73.

[82]    See letter dated June 29, 2002 from the CM to Radian, Exh. C 70.

[83]    See letter dated April 30, 2002 from the CM to Radian, Exh. C 67.

[84]    Letter dated July 9, 2002 from Radian to the CM, point 5, Exh. C 72.

[85]    See letter dated July 30, 2002 from CM to Radian, Exh. C 74; letter dated August 28, 2002 from the CM to
        Radian, Exh. C 76.

"measurable and observable" gas emissions in the backfill,[86] the Contractor continued to deny that this constituted a defect, and continued to insist that "the FSQ gas-related standards cannot apply to soil gas" but apply instead to indoor air quality.[87]

    (iv)    The Contractor Knew Its "Indoor Air Criteria" Interpretation Was Wrong

96.    In December 2002, the Contractor was warned by one of its independent expert consultants (who was later to appear as an expert witness for the Contractor in Arbitration I) that interpreting the FSQs as indoor air criteria presented a danger:

> "the concentration limits of 1% methane and 1.5% carbon dioxide are inappropriate for ordinary indoor environments such as office spaces or residences. These levels are too high to be considered safe upper bounds, except by applying large additional safety factors (*e.g.* one order of magnitude) [...] So again, this is not a safe upper bound for indoor spaces [...]"[88] [Emphasis added]

97.    Yet, the Contractor persisted in its position despite the warning.

    (v)    Continuing To Avoid Remediation: The Contractor's Ill-Named "Site Action Plan"

98.    In January 2003, the Contractor and its technical experts met with SOLIDERE's representatives in London. At this meeting, the Contractor acknowledged that there was a landfill gas issue that needed to be addressed and stated that it would submit a plan of action by January 31, 2003.[89]

---

[86]   *See* "Normandy Landfill, Beirut – Biogas Status Report" dated September 2002, prepared by URS, enclosed in letter dated September 9, 2002 from Radian to the CM at p. 1, **Exh. C 77.**

[87]   Normandy Landfill, Beirut – Biogas Status Report" dated September 2002, prepared by URS, enclosed in letter dated September 9, 2002, p. 7, **Exh. C 77.**

[88]   Email dated December 23, 2002 from Professor William Nazaroff to Mr. Bart Eklund, **Exh. C 86.**

[89]   *See* "Construction Manager's Monthly Report – No. 46" dated February 12, 2003, Section 5.2 (attachments omitted), **Exh. C 88.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

99.   In February 2003, nearly two years after the Contractor was first notified of the gas
      problem, the Contractor submitted to SOLIDERE a document entitled "Site Action
      Plan".[90]

100.  However, it continued to maintain in this document that there was no defect in its work,
      and that the Site was "unconditionally safe".[91] The "Plan" was premised, contrary to the
      prior warning of its own independent expert, on the interpretation of the FSQs as indoor
      air quality criteria[92] and, despite its title, did not, in fact, contain any plan of action to
      remedy the landfill gas contamination.

101.  Since gas emissions were continuing from all backfilled areas, the CM once again, by
      letter dated March 28, 2003, pursuant to GC 23.10, instructed the Contractor to submit,
      for approval, a plan of action to remedy the landfill gas emission defect.[93]

102.  But no further "plans" were forthcoming. On April 16, 2003 SOLIDERE and the CM
      attended a meeting in London with the Contractor, represented by Mr. Thomas Bishop,
      Mr. Vladimir Khazak, Mr. John Rakow, and Mr. Amine Bou Onk.  Despite clear
      evidence that there was a landfill gas contamination, the Contractor continued to deny
      that there was a problem, maintaining that no remedial action was necessary, and
      insisting that it would perform the Contract on time. The Contractor adhered to its
      position that the FSQs for flammable gas, carbon dioxide and oxygen were "indoor air
      criteria", notwithstanding the advice of one of its independent expert consultants referred
      to earlier.[94]

---

90    "Normandy Landfill Gas Issue Site Action Plan" ("Site Action Plan") dated February 2003, Exh. C 89.

91    "Site Action Plan", Section 6 at p. 15, Exh. C 89.

92    *See* "Site Action Plan", Section 4.1 at p. 9, Exh. C 89.

93    *See* letter dated March 28, 2003 from the CM to Radian, Exh. C 90.

94    *See, supra,* at II.C.2(b)(iv).

-30-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

### (c)   The Memorandum Of Understanding And Arbitration I

103.   In view of the parties' differences on the interpretation of the FSQs ("End-product acceptability criteria" to be measured *in situ* according to SOLIDERE; to be interpreted as "indoor air criteria" according to the Contractor), SOLIDERE and the Contractor agreed pursuant to a Memorandum of Understanding dated May 13, 2003 (the "**MOU**"), to submit their dispute to arbitration under GC 44.[95]

104.   The parties agreed that the terms of the MOU are to be kept confidential.

105.   Pursuant to the MOU, the Contractor filed a Request for Arbitration dated May 19, 2003 with the ICC,[96] seeking a declaration that there was no failure or defect in the Works.[97] This arbitration was registered at the ICC under number 12727/EC (previously defined as "Arbitration I").

106.   SOLIDERE, in contrast, sought declarations, among other things, that there was a failure or defect in the Works pursuant to GC 23.10 because the Works did not comply with the FSQs and were not "Fit for the Purpose" as required by the Contract (which required eliminating hazards from landfill gas).[98]

107.   The arbitral tribunal in Arbitration I was constituted as follows:

-   Mr. John Uff Q.C. (arbitrator nominated by the Contractor);

-   Mr. Vivian Ramsey Q.C. (arbitrator nominated by SOLIDERE); and

-   Mr. John Blackburn Q.C. (Chairman agreed upon by the parties).

---

[95]   The Contract, GC 44, Exh. C 19.

[96]   *See* Radian's Request for Arbitration dated May 19, 2003, Exh. C 95.

[97]   Terms of Reference in Arbitration I, dated September 20, 2003, ¶ 17 (a), Exh. C 97.

[98]   Terms of Reference in Arbitration I, dated September 20, 2003, ¶ 17 (c), Exh. C 97.

-31-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

108. Both Messrs. Ramsey and Uff are civil engineers as well as English barristers and Mr. Blackburn is an English barrister. All three members of the arbitral tribunal in Arbitration I are specialists in construction contracts and construction law.

### (d) The Contractor's Second Major Shift Of Position: Denial Through A New Disingenuous Interpretation Of The Contract

109. It was only following the filing of its expert reports in Arbitration I, on October 15, 2003, which were not supportive of its theory, that the Contractor abandoned its position that the FSQs were indoor air quality criteria.[99] It was subsequently dismissed as "irrelevant" by Adrian Williamson Q.C., counsel for the Contractor in Arbitration I.[100]

110. In place of its indoor air criteria interpretation, through its witness statements and expert reports in Arbitration I, the Contractor sought refuge in another theory to avoid its contractual obligations: that the FSQs were to be assessed exclusively by laboratory tests provided for in the Contract at TC Table 3.2, and in no circumstances through any *in situ* tests.[101]

111. This new theory was heralded by the Contractor as "the central issue between the parties", although it had never been an issue in the preceding years.[102]

112. The hearing in Arbitration I took place in Paris from December 15 through 19, 2003. The Award was dated July 12, 2004 and is discussed below.[103]

---

[99] See Expert Report of Professor William Nazaroff in Arbitration I, dated October 14, 2003 ("Nazaroff I"), p. 2, lines 40-1, Exh. C 100; Expert Report of Professor Willy Verstraete, also an expert for the Contractor in Arbitration I, dated October 14, 2003 ("Verstraete I") p. 10, ¶ 6.5, Exh. C 101. Until the filing of these expert reports, the Contractor maintained its theory that the FSQs were indoor air criteria, even including the FSQs as indoor standards in its February 2003 "Site Action Plan", Section 4 at p.9, Exh. C 89.

[100] See Hearing Transcript in Arbitration I, dated December 15-19, 2003, Day 1, 16:21-22, Williamson opening (excerpt only), Exh. C 114.

[101] Nazaroff I, p. 2, lines 24-25, Exh. C 100; Witness Statement of Mr. Amine Bou Onk in Arbitration I, dated October 14, 2003 ("Bou Onk I"), pp. 9-10, ¶ 27, Exh. C 102. Mr. Bou Onk was the Contractor's Representative.

[102] See Hearing Transcript in Arbitration I, dated December 15-19, 2003, Day 1, 7:4-9, Williamson opening (excerpt only), Exh. C 114.

-32-

### (e) The Contractor's Failure To Respect The Time For Completion

113. In view of the delays and unremedied landfill gas defect plaguing the Project, it was not surprising that, when the Time for Completion expired on April 14, 2004[104] the Works were far from Completed.

114. Accordingly, by letter dated April 15, 2004, the CM notified the Contractor of an Event of Default pursuant to GC 35.2,[105] for failure to Complete the Works within the Time for Completion ("**Second Notice**").[106]

### (f) The Contractor Initiates Arbitration II

115. In May 2004, before an award was issued in Arbitration I and possibly anticipating that it would be unfavorable, the Contractor applied to add new claims, seek other relief and generally re-open Arbitration I. On June 21, 2004 the arbitral tribunal rejected the Contractor's application as wholly inconsistent with the "fast track" nature of the first arbitration.

116. By a Request for Arbitration dated the same day, June 21, 2004, Radian initiated a new arbitration, Arbitration II (ICC Case No. 13341/EC), pursuant to which it sought various increases in the Contract Price and extensions of time.[107]

---

[continued]

[103] *See,i nfra*, Section II.C.3.

[104] *See, supra*, Section II.B.3.

[105] The Contract, GC 35.2, **Exh. C 19.**

[106] *See* letter dated April 15, 2004 from the CM to Radian, **Exh. C 121.** SOLIDERE had already notified the Contractor of an Event of Default pursuant to GC 35.2, by letter dated March 30, 2004 (the "**First Notice**"), arising out of the Contractor's failure to submit a contractually-compliant Detailed Programme. *See* letter dated March 30, 2004 from the CM to URS/Radian, **Exh. C 120.**

[107] *See* letter dated June 21, 2004 from Skadden, Arps, Slate, Meagher & Flom LLP to the ICC Secretariat, enclosing a Request for Arbitration (enclosure omitted), **Exh. C 125.** The Contractor subsequently filed an amended Request dated July 16, 2004. *See* letter dated July 16, 2004 from Skadden, Arps, Slate, Meagher & Flom LLP to ICC Secretariat, enclosing an amended Request for Arbitration (enclosure omitted), **Exh. C 130.**

-33-

SOLIDERE v URS *Corporation* and *Radian* International LLC
Request for Arbitration

117.    The Contractor suggested that "the most efficient way to determine the additional disputes between Radian and Solidere is for the three Tribunal members in ICC Case No. 12727/EC also to be appointed as the Tribunal in the present case."[108]  SOLIDERE agreed with this suggestion,[109] which led the Contractor to express the view that "it is the *most sensible way to settle the remaining disputes between the parties*".[110]  Accordingly the ICC confirmed the same arbitral tribunal as in Arbitration I.

118.    Following the issuance of the Award,[111] the Contractor announced its intention to file an amended Request for Arbitration in Arbitration II *to take account, among other things,* of the Award and said that, in the meantime, SOLIDERE should not have to file an Answer under the ICC Rules.[112]  However, the Contractor has not amended its Request for Arbitration in this case and Arbitration II remains in abeyance.

        **(g)     Call Of The Contractor's Performance Letter Of Guarantee**

119.    Pursuant to GC 32.1, the Contractor had provided SOLIDERE with a Performance Letter Of Guarantee (the "**Performance Guarantee**").[113]

120.    In light of the expiry of the *Time for Completion and SOLIDERE's mounting damages, it* became necessary for SOLIDERE to call the Performance Guarantee in order to afford

---

108    Letter dated June 21, 2004 from Skadden, Arps, Slate, Meagher & Flom LLP to ICC Secretariat, **Exh.** C 125.

109    *See* letter dated July 19, 2004 from White & Case LLP to the ICC Secretariat, Exh. C 131.

110    *See* letter dated July 22, 2004 from Skadden, Arps, Slate, Meagher & Flom LLP to the ICC Secretariat, **Exh.** C 132.

111    *See,i nfra*, Section II.C.3.

112    *See, e.g.*, letter dated July 22, 2004 from Skadden, Arps, Slate, Meagher & Flom LLP to White & Case LLP, **Exh.** C 132; letter dated September 30, 2004 from Skadden, Arps, Slate, Meagher & Flom LLP to the arbitral tribunal, **Exh.** C 140; letter dated October 18, 2004 from Skadden, Arps, Slate, Meagher & Flom LLP to the arbitral tribunal, **Exh.** C 141.

113    *See* letter dated June 8, 1999 from Banque Saradar S.A.L. to SOLIDERE, Exh. C 23.  The amount of the *Performance Letter of Guarantee was initially US$ 7,961,250, but was subsequently* increased to US$ 8,494,875 as a result of the increases in the Contract Price.  *See* letter dated August 6, 2002 from Banque Saradar S.A.L. to Citibank Beirut N.A., **Exh.** C 75, and letter dated November 15, 2002 from *Banque Saradar S.A.L. to Citibank Beirut N.A.*, Exh. C 81.  On the increase to the Contract Price, *see, supra*, Section II.B.9).

itself some protection against its actual and certain future losses. By letter dated June 23, 2004 to the bank that had issued the Performance Guarantee,[114] SOLIDERE demanded payment of the Performance Guarantee. The proceeds were received by SOLIDERE on June 29, 2004.[115] As required by GC 32.4, SOLIDERE followed its demand with a letter to the Contractor explaining the basis for its demand.[116]

### 3. A Unanimous ICC Award Confirms That The Contractor's Works Are Defective

121. Arbitration I concluded with a unanimous final award upholding SOLIDERE's position and ordering Radian to pay most of SOLIDERE's costs (previously defined as the "Award"). In Section 12.1 of the Award dated July 12, 2004, the arbitral tribunal declared that:

"• **There is a failure or defect in the Permanent Works and/or materials and/or workmanship within the meaning of the Contract as regards landfill gas emissions;**

• **The Permanent Works are not Fit for the Purpose, as defined in the Contract, as regards such emissions;**

• **Radian is liable to remedy the defects at no cost to SOLIDERE and to provide SOLIDERE with a plan showing how Radian propose that the Works will be completed so as to comply with the Contract;**

• **SOLIDERE is entitled to withhold payment of sums otherwise due to Radian;**

---

[114]   *See* letter dated June 23, 2004 from SOLIDERE to Banque Saradar S.A.L., **Exh. C 126.**

[115]   *See* letter dated July 1, 2004 from Banque Saradar S.A.L. to SOLIDERE, **Exh. C 127**, confirming that it made payment of the amount of the Performance Guarantee to SOLIDERE's account with Citibank Beirut N.A., on June 29, 2004.

[116]   *See* letter dated July 8, 2004 from SOLIDERE to URS/Radian, **Exh. C 128.**

- **The parameters set forth in TC Table 3.1 apply to backfilled material and are to be measured after backfilling *in situ*.**[117] [Emphasis added]

122. The Award further ordered the Contractor to pay SOLIDERE's costs relating to the arbitration, in the amount of US$ 2,358,000.[118]

123. The Award confirmed the position SOLIDERE had taken for the past three years, that the landfill gas issue constituted a "defect" within the meaning of GC 23.10 and that Works were not Fit for the Purpose as required by the Contract. These failures constituted an Event of Default within the meaning of GC 35.2(iv). By letter dated July 23, 2004, SOLIDERE accordingly notified the Contractor of the existence of this further Event of Default ("Third Notice") and called upon the Contractor to remedy the same in compliance with the Contract and the Award and to pay SOLIDERE's costs of the arbitration as required by the Award.[119]

### 4. While Accepting To Comply With The Award (As Regards The Defect), The Contractor Refuses Continuously To Do So In Fact

124. In response to SOLIDERE's July 23, 2004 letter asking the Contractor to implement the Award, the Contractor acknowledged its responsibility to do so by letter dated July 30, 2004:

> "We are mindful of our obligation under the tribunal's Award to prepare and propose a plan to determine compliance with the parameters set forth in TC Table 3.1 and to remedy any defects in connection with gas emissions. We are actively working to prepare such a plan and expect that we shall submit it to you by the end of August."[120]

---

[117]   Award, Section 12.1 at p. 99, Exh. C 129.

[118]   Award, Sections 11.5 at p. 95, 11.6 at p. 95, and 11.12 at pp. 97-98, Exh. C 129.

[119]   *See* letter dated July 23, 2004 from SOLIDERE to URS/Radian, Exh. C 133.

[120]   Letter dated July 30, 2004 from Radian to SOLIDERE, Exh. C 134.

-36-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

(a)   The Non-Compliant September 29, 2004 Proposal

125.   The Contractor did not submit its first "plan showing how Radian propose that the Works
will be completed so as to comply with the Contract",[121] required by the Award, until
September 29, 2004.[122]

126.   The proposal itself was non-compliant with the Award and the Contract, as notified to the
Contractor by a letter dated October 27, 2004 from the CM.[123]   In that letter, the CM
listed eleven areas of non-compliance, including:

   (i)   the proposal did not state what "action [...] the Contractor proposes to take at no
cost to the Employer to remedy [...] [the] defect" pursuant to the Contract and the
Award;

   (ii)   the proposal reduced the scope of remediation to the so-called "unsaturated zone"
of the Site, although about 80% of the backfilled materials is located in the
"saturated zone" and although the Contract requires remediation to the seabed
(see TC Section 3.0, item 1); and

   (iii)the   proposed Detailed Programme set a lengthy and indefinite Completion time,
providing for activities with uncertain durations and a Completion Date of July
2008.[124]

---

[121]   Award, Section 12.1 at p. 99, Exh. C 129.

[122]   See letter dated September 29, 2004 from Radian to SOLIDERE attaching "Normandy Landfill, Beirut –
Proposed Measurement and Treatment Approaches for Final Site Quality (FSQ) Criteria" and a purported
Detailed Programme, Exh. C 139.

[123]   See letter dated October 27, 2004 from the CM to URS/Radian, Exh. C 142.

[124]   See letter dated October 27, 2004 from the CM to URS/Radian, Exh. C 142.   The remaining eight areas of
non-compliance are that the proposal: set forth "measurement approaches" and treatment methods without
providing the Employer a "plan showing how Radian propose that the Works will be completed so as to
comply with the Contract" as required by the Award; failed to acknowledge the existence of a failure or
defect in the Works; ignored the express finding of the Award regarding the appropriate methodology of
testing FSQ compliance; proposed deletion and/or alteration of the FSQs; qualified the timing and success
of its proposal although the Contract and Award require unqualified remediation of the effect "at no cost to
SOLIDERE"; reintroduced "measurement approaches" that it had advanced in the arbitration and that the

(continued ...)

-37-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

127. In its response, by letter dated November 3, 2004, the Contractor alleged that the CM's rejection of its (non-compliant) proposal constituted a breach of the Contract, and engaged in a lengthy justification of its position.[125] The CM refuted the Contractor's allegations by letter dated November 12, 2004.[126]

128. Given the Contractor's unwillingness to provide a compliant plan, Dr. Nasser Chammaa, Chairman of SOLIDERE, and Mr. Thomas Bishop, URS Vice-President and Radian Senior Vice-President, agreed that the parties would meet in Beirut on December 16, 2004 to explore ways of moving forward.[127] Mr. William Hadaya, a "Senior Vice President" and "Office Manager" with URS, attended and helped to organize this meeting.[128] At the meeting, SOLIDERE agreed, as a gesture of good faith and although this should have been totally unnecessary, to make its independent experts (Dr. Geoffrey Card and Professor James White) available to the Contractor to assist it in devising a remediation plan that would comply with the Contract and with the Award.

       (b)    **The Non-Compliant August 2, 2005 Task Plan**

129. On August 2, 2005, the Contractor provided SOLIDERE with a second proposal or plan in purported compliance with the Award and the Contract.[129] The proposal or plan was presented as being the first of a series of deliverables (the Task Plan) that, all together, were supposed to assure SOLIDERE that the Contractor would meet the requirements of the Contract and the Award.

---
(…continued)

Award implicitly rejected; included a programme that contained illogically linked activities and that was not resource-loaded, and therefore, was not a Detailed Programme as required by GC 21.

[125]   *See* letter dated November 3, 2004 from Radian to the CM, **Exh. C 144.**

[126]   *See* letter dated November 12, 2004 from the CM to URS/Radian, **Exh. C 145.**

[127]   *See* letter dated December 8, 2004 from Radian to the CM confirming the date of the meeting, **Exh. C 148.**

[128]   *See* business card of Mr. William M. Hadaya, PE, **Exh. C 5** and letter dated August 23, 2005 from SOLIDERE to URS (*see* second paragraph), **Exh. C 157.**

[129]   *See* "Proposed Measurement and Treatment Approaches for Achievement of Final Site Quality Criteria: Deliverable 1 – Task Plan" dated August 2, 2005, enclosed in letter dated August 2, 2005 from Radian to SOLIDERE, **Exh. C 155.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

130. The new plan, again, did not comply with the Contract or the Award, did not reflect the discussions between the parties' experts and gave rise to a number of issues which SOLIDERE set out in a letter dated August 18, 2005 to the Contractor.[130] Pursuant to the same letter, SOLIDERE rejected the purported task plan.

### (c)    The Non-Compliant August 29, 2005 Task Plan

131. By letter dated August 26, 2005, the Contractor formally submitted an amended task plan (dated August 29, 2005).[131]

132. In a letter and detailed table of comments dated September 23, 2005, SOLIDERE rejected the new proposed plan as non-compliant with the Award and the Contract.[132] SOLIDERE was obliged to repeat many of its previous objections, including but not limited to the following:

    (i)     the proposal was at best unclear as to the Contractor's commitment to achieve the FSQs;

    (ii)    the Contractor refused to provide any time frame for achieving the FSQs;

    (iii)   the proposal reduced or eliminated the Contractor's remediation obligations in relation to the so-called "saturated zone" of the Site, which comprises roughly 80% of the backfilled material.

### 5.    The Contractor Stops All Further Work Under False Pretexts

133. By letter dated February 18, 2005, the Contractor notified SOLIDERE of an alleged event of *force majeure* due to security concerns attending the assassination in Beirut of

---

[130]   Letter dated August 18, 2005 from SOLIDERE to URS/Radian, Exh. C 156.

[131]   *See* "Proposed Measurement and Treatment Approaches for Achievement of Final Site Quality Criteria: Deliverable I – Task Plan dated August 29, 2005" ("August 29, 2005 Task Plan") enclosed in letter dated August 26, 2005, Exh. C 159.

[132]   *See* letter dated September 23, 2005 from SOLIDERE to URS/Radian, Exh. C 161.

-39-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

> former Prime Minister Rafik Hariri, causing the Contractor to "ceas[e] operations at the project site".[133]

134. By letter dated March 18, 2005, the CM acknowledged that operations were justifiably stopped for the three days of national mourning ordered by the Government of Lebanon: February 15, 16, and 17, 2005.[134] In that letter, the CM noted that the event of *force majeure* ended at midnight on February 17, 2005. The CM instructed the Contractor to resume work immediately considering that, among other things, work had resumed at construction sites closer to the place of assassination than the Site. The CM reiterated its instruction to the Contractor in subsequent correspondence.[135]

135. The Contractor refused to resume work, relying on the allegedly continuing event of *force majeure* in the form of security issues created by the assassination of the former Prime Minister.[136]

136. By letter dated August 24, 2005, SOLIDERE notified the Contractor of a further Event of Default pursuant to GC 35.2,[137] for stopping work beyond the three days of national mourning (the "**Fourth Notice**").[138] However, the Contractor has never resumed work.

137. It is noteworthy that, on at least two occasions, the Contractor has itself acknowledged the spurious nature of its claim of continuing *force majeure*. It recognized that some activities could begin immediately at the Site, contrary to its claim that it was unable to resume work:

---

[133] *See* letter dated February 18, 2005 from Radian to SOLIDERE, Exh. C 149.

[134] *See* letter dated March 18, 2005 from the CM to URS/Radian, Exh. C 150.

[135] *See* letter dated April 13, 2005 from the CM to URS/Radian, Exh. C 152; letter dated June 22, 2005 from the CM to URS/Radian, Exh. C 153.

[136] Letter dated March 24, 2005 from Radian to the CM, Exh. C 151.

[137] The Contract, GC 35.2, Exh. C 19.

[138] *See* letter dated August 24, 2005 from the CM to URS/Radian, Exh. C 158.

-40-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

(i)     the Contractor listed remediation activities that could begin immediately in the Detailed Programme attached to its August 29, 2005 Task Plan;[139] and

(ii)    by letter dated December 7, 2005, the Contractor proposed to begin work immediately on the Site by commencing Site evaluation activities.[140]

### 6.     SOLIDERE's Final Attempt To Induce The Contractor To Comply With The Contract and The Award

138.    In a final attempt to determine whether there was any possibility that the Contractor would comply with the Contract and the Award, and without abandoning its other concerns, SOLIDERE asked the Contractor to clearly address:

(i)     the need for remediation Works to achieve the FSQs throughout the Site;

(ii)    specifically, the need to monitor compliance with the FSQs in the so-called "saturated zone" to ensure that the entire Site is FSQ compliant as required by the Contract; and

(iii)   the Contractor's failure to propose schedules with acceptable timelines and with a clear and proximate Completion date, in accordance with its agreement that time is of the essence.[141]

139.    The Contractor responded by letter dated December 7, 2005 but failed to provide SOLIDERE with any commitment responsive to these three concerns.[142] By a detailed letter dated January 12, 2006, SOLIDERE's Chairman, Dr. Chammaa, responded to the Contractor by expressing his great disappointment at the Contractor's general strategy of

---

[139]   In a letter dated September 28, 2005 from the CM to URS/Radian, Exh. C 163, the CM noted that, in the programme attached to its August 29, 2005 Task Plan, Exh. C 159, (a) excavation, hauling and other activities related to Sections 6, 7, and 8, were scheduled to start immediately, and (b) activities related to resorting and pelletizing of plastics were also scheduled to begin immediately.

[140]   *See* letter dated December 7, 2005 from Radian to SOLIDERE, Exh. C 170.

[141]   *See* letter dated November 25, 2005 from SOLIDERE to URS/Radian, Exh. C 169.

[142]   *See* letter dated December 7, 2005 from Radian to SOLIDERE, Exh. C 170.

-41-

evasion and obfuscation and refusal to comply with its obligations under the Contract and the Award.[143]

140. In the face of the Contractor's systematic refusal to implement the Contract and the Award, by three letters dated January 12, 2006, SOLIDERE notified the Contractor of the following further Events of Default pursuant to GC 35.2:

(i) failure to submit a "plan showing how [the Contractor] propose[s] that the Works will be completed so as to comply with the Contract" promptly following the issuance of the Award, which put the Contractor in breach of obligations under the Contract including, but not limited to, Article 28(6) of the ICC Rules (incorporated into the Contract by GC 44), GC 23.10, Agreement Article 5, GC 21.10, GC 22.2, and GC 5.1(iv) and (v) ("Sixth Notice");[144]

(ii) the Contractor's failure to diligently pursue the performance of the Contract, which put it in breach of its obligations under the Contract, including but not limited to, Article 28(6) of the ICC Rules (incorporated into the Contract by GC 44), Agreement Article 5, GC 21.10, GC 22.2, and GC 5.1(iv) and (v) ("Seventh Notice");[145] and

(iii) the Contractor's refusal to give SOLIDERE any commitment as to the timing of the Completion of the Works, which put it in breach of its obligations under the Contract, including but not limited to, Agreement Article 5, GC 21.10, GC 22.2, and GC 5.1(iv), (v), and (vi) ("Eighth Notice").[146]

---

[143] *See* letter dated January 12, 2006 from SOLIDERE to URS/Radian, Exh. C 173.

[144] *See* letter dated January 12, 2006 from SOLIDERE to URS/Radian, Exh. C 174. The fifth Notice of an Event of Default was sent to the Contractor pursuant to a letter dated November 15, 2005, as a consequence of the Contractor's failure to maintain insurance as required by the Contract, *see* letter dated November 15, 2005 from SOLIDERE to URS/Radian (the "Fifth Notice"), Exh. C 168.

[145] *See* letter dated January 12, 2006 from SOLIDERE to URS/Radian, Exh. C 175.

[146] See letter dated January 12, 2006 from SOLIDERE to URS/Radian, Exh. C 176.

-42-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

### 7. As A Result Of The Contractor's Numerous Defaults, SOLIDERE Terminates The Contract

141. In summary, SOLIDERE had on eight occasions notified the Contractor of the occurrence of Events of Default:

   1. the Contractor's failure to submit a revised Detailed Programme, notified to the Contractor by the CM's letter dated March 30, 2004 ("**First Notice**");[147]

   2. the Contractor's failure to Complete the Works within the Time for Completion, notified to the Contractor by the CM's letter dated April 15, 2004 ("**Second Notice**");[148]

   3. the existence of a defect, as held by the Award, notified to the Contractor by SOLIDERE's letter dated July 23, 2004 ("**Third Notice**");[149]

   4. the Contractor's unjustified decision to stop execution of the Works, notified to it by the CM's letter dated August 24, 2005 ("**Fourth Notice**");[150]

   5. the Contractor's failure to maintain the insurance required by the Contract, notified to the Contractor by SOLIDERE's letter dated November 15, 2005 ("**Fifth Notice**");[151]

   6. the Contractor's failure to submit "a plan showing how [the Contractor] propose[s] that the Works will be completed so as to comply with the Contract"

---

[147] Letter dated March 30, 2004 from the CM to URS/Radian, **Exh. C 120**; *see,s upra*, footnote 106.

[148] Letter dated April 15, 2004 from the CM to Radian, **Exh. C 121**; *see, supra*, Section II.C.2(c).

[149] Letter dated July 23, 2004 from SOLIDERE to URS/Radian, **Exh. C 133**; *see, supra*, Section II.C.3.

[150] Letter dated August 24, 2005 from the CM to URS/Radian, **Exh. C 158**; *see, supra*, Section II.C.5.

[151] Letter dated November 15, 2005 from SOLIDERE to URS/Radian, **Exh. C 168**; *see, supra*, footnote 144.

-43-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

> promptly following the issuance of the Award, notified to the Contractor by
> SOLIDERE's letter dated January 12, 2006 ("**Sixth Notice**"); [152]

7.  the Contractor's failure to diligently pursue the performance of the Contract,
    notified to the Contractor by SOLIDERE's letter dated January 12, 2006
    ("**Seventh Notice**");[153] and

8.  the Contractor's refusal to give SOLIDERE any commitment as to the timing of
    the Completion of the Works, notified to the Contractor by SOLIDERE's letter
    dated January 12, 2006 ("**Eighth Notice**").[154]

142. By letter dated October 14, 2005, the Employer reiterated the first four Notices of Events
     of Default, as the Contractor had failed to cure any of these Events of Default.[155]

143. The Contractor has not cured its failure to maintain insurance (Fifth Notice), as explained
     in the CM's letters dated January 9, 2006[156] and February 1, 2006.[157]

144. The Contractor responded to the Sixth, Seventh and Eighth Notices of Events of Default
     (dated January 12, 2006) by a letter dated January 20, 2006, in which it did not propose to
     cure the defaults.[158]   Instead, it reiterated all of its previous arguments made in
     correspondence, and informed SOLIDERE that it had decided to refer to arbitration the
     parties' dispute as to the compliance with the Contract and the Award of the Contractor's
     purported remediation plan.[159]

---

[152]   Letter dated January 12, 2006 from SOLIDERE to URS/Radian, Exh. C 174; *see,s upra*, Section II.C.6.

[153]   Letter dated January 12, 2006 from SOLIDERE to URS/Radian, Exh. C 175; *see,s upra*, Section II.C.6.

[154]   Letter dated January 12, 2006 from SOLIDERE to URS/Radian, Exh. C 176; *see,s upra*, Section II.C.6.

[155]   *See* letter dated October 14, 2005 from SOLIDERE to URS/Radian, Exh. C 166.

[156]   *See* letter dated January 9, 2006 from the CM to URS/Radian, Exh. C 172.

[157]   *See* letter dated February 1, 2006 from the CM to URS/Radian, Exh. C 185.

[158]   *See* letter dated January 20, 2006 from Radian to SOLIDERE, Exh. C 178.

[159]   *See* letter dated January 20, 2006 from Radian to SOLIDERE, Exh. C 178.

-44-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

145.   By letter dated January 25, 2006[160] the ICC Secretariat acknowledged receipt of Radian's
       Request for Arbitration, dated January 20, 2006[161] and registered the reference under
       number No. 14208/EC (previously defined as "Arbitration III").

146.   In this new arbitration, Radian seeks, among other relief, a declaration that it is
       economically and contractually relieved from the "burdens of meeting the FSQs and
       implementing any remediation and site completion plan".[162]

147.   As indicated above, SOLIDERE could have terminated the Contract in 2004 following
       issuance of any of the first three notices of Events of Default. However SOLIDERE, in
       good faith, examined each of the Contractor's plans in detail. Only when it became
       absolutely clear to SOLIDERE that there was no hope that the Contractor would perform
       its obligations under the Contract and the Award, did SOLIDERE terminate the Contract,
       pursuant to GC 35.2,[163] by a letter dated February 10, 2006.[164]

-oo00oo-

---

[160]   *See* letter dated January 25, 2006 from ICC Secretariat (attachment omitted), **Exh. C 181**.

[161]   *See* Radian's Request for Arbitration dated January 20, 2006, **Exh. C 180**.

[162]   Radian's Request for Arbitration dated January 20, 2006, pp. 24-5, ¶ 10.1(d), **Exh. C 180**.

[163]   The Contract, GC 35.2, **Exh. C 19**.

[164]   See letter dated February 10, 2006 from SOLIDERE to URS/Radian, **Exh. C 186**.

# EXHIBIT A

## PART 2

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## III. URS IS A PROPER PARTY TO THIS ARBITRATION

148. As stated above,[165] the Contract was signed by Radian on January 25, 1999.

149. Shortly thereafter, in June 1999, Radian was acquired by URS. Following this acquisition, URS took over all of Radian's operations and stripped it of any autonomous existence – Radian seems to exist on paper only. In the context of the Project, URS effectively took over and directly performed the Contract.

150. SOLIDERE will demonstrate in these proceedings that the facts presented in this Section (to be further developed in the course of this arbitration) will justify a declaration that URS is bound by the Contract, including its arbitration clause, pursuant to any one or more of the following non-exhaustive list of legal doctrines:

- URS's implied consent to the Contract, including its arbitration clause, resulting from its taking over of the Contract;

- estoppel;

- implied assignment;

- piercing the corporate veil between URS and Radian; and/or

- alter ego / confusion.

### A. RADIAN APPEARS TO EXIST ONLY ON PAPER

151. Following URS's takeover of Radian, Radian no longer has an independent functional existence, having been completely subsumed into URS. As is shown in detail below, Radian has gradually ceased all activities and has been operationally combined into URS.

---

[165]   *See, supra,* Section I.B.

152.   Radian's lack of independence can be seen by URS's complete ownership of Radian
       (Subsection 1), Radian's lack of independent office space, telephone or facsimile number
       (Subsection 2), URS's receipt and payment of money for Radian (Subsection 3), the URS
       employment of Radian employees (Subsection 4) and URS's advertising of Radian as
       being the same entity as URS (Subsection 5).

### 1.    In June 1999 URS Acquired Radian Which Is Now A Wholly-Owned Subsidiary Of URS

153.   On July 31, 1998, the "Dames & Moore Group", an engineering, consulting and
       construction management service provider,[166] "acquired all of the membership interests
       of Radian International LLC"[167] for US$ 117 million,[168] as a result of which Radian
       became a wholly-owned subsidiary of the "Dames & Moore Group".

154.   In June 1999 – i.e., less than six months after SOLIDERE and Radian International LLC
       signed the Contract – the "Dames & Moore Group" was acquired by URS.[169] As a result
       of that acquisition, Radian became a wholly-owned subsidiary of URS.[170]

155.   As is shown in detail below, Radian has gradually ceased all independent activities and
       has been operationally merged into URS.

---

[166]   See Form 10-K filed with the SEC for the fiscal year ended October 31, 2003 (excerpt only), at p. 11,
        Exh. C 106.

[167]   See Form 8-K filed by Dames & Moore with the SEC on July 31, 1998, at p. 2 (excerpt only), Exh. C 18.
        Radian was incorporated in Delaware in January 1996 as a joint venture between The Dow Chemical
        Company and the Hartford Steam Boiler Inspection and Insurance Company, see Form 10-Q filed by The
        Dow Chemical Company with the SEC on March 31, 1996, at p. 10 (excerpt only), Exh. C 17. Hartford
        ceased to be a shareholder of Radian in January 1998. See Form 10-K filed by The Dow Chemical
        Company with the SEC on December 31, 1999, at p. 48 (excerpt only), Exh. C 26.

[168]   See Form 8-K filed by Dames & Moore with the SEC on July 31, 1998, at p. 2 (excerpt only), Exh. C 18.

[169]   See Form 10-K filed by URS with the SEC for the fiscal year ended October 31, 2003 (excerpt only),
        Exh. C 106. The acquisition was for approximately US$ 300 million in cash in addition to the assumption
        of approximately US$ 300 million of debt, for a total price of US$ 600 million. See Form 8-K filed by
        Dames & Moore with the SEC on May 5, 1999, at p. 50 (excerpt only), Exh. C 22.

[170]   See Form 10-Q filed by URS with the SEC for the quarterly period ended July 31, 2004 (excerpt only) at
        p. 16, Exh. C 135. Radian is also listed as a domestic subsidiary in URS's Form 10-K filed with the SEC
        for the fiscal year ended October 31, 2003 (excerpt only), Exh. C 106.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## 2.    Radian No Longer Has Its Own Office Space, Telephone Number Or Facsimile Number

156. Following its acquisition by URS, Radian's offices were progressively either shut down or transferred to URS, leaving Radian with no office space, address, telephone, or facsimile number of its own.

### (a)    Address

157. Radian has listed offices at the same address as URS, at 600 Montgomery Street in San Francisco, California.[171] This is Radian's last known address. In 2003, both Radian and URS listed the 25th floor as their business address.[172] However, by January 22, 2004, URS had changed its principal executive office to the 26th floor of the same address.[173]

158. Upon a visit to 600 Montgomery Street, San Francisco, California, one is advised by the building/security personnel that no company named "Radian International LLC" resides in the building but that URS does reside in the building.[174]

159. URS's and Radian's official addresses before moving to 600 Montgomery Street were also the same: the fifth floor of 100 California Street, Suite 500, San Francisco, California.[175]

---

[171]   See California Limited Liability Company Statement of Information filed by Radian with the California Secretary of State's office on December 22, 2003, Exh. C 116.

[172]   See Form 8-K filed by URS Corporation with the SEC on October 3, 2003 (excerpt only), Exh. C 107.

[173]   See Form 8-K filed by URS Corporation with the SEC on January 22, 2004 (excerpt only), Exh. C 117.

[174]   See Memorandum dated January 18, 2006, from John Kline (Legal Assistant, White & Case LLP), to Charles Nairac (White & Case LLP), Exh. C 177.

[175]   See Form 10-K filed by URS with the SEC for the fiscal year ended October 31, 2002 (excerpt only) (listing URS's address as "100 California Street, Suite 500, San Francisco, California 94111"), Exh. C 80; Power of Attorney dated December 2, 2003, granted by Radian to Mayer, Brown, Rowe & Maw LLP, Herbert Smith and Mr. Adrian Williamson Q.C. (giving Radian's address as "100 California Street, 5th Floor, San Francisco, California"), enclosed in letter dated December 8, 2003, Exh. C 111.   URS apparently changed its address from this address to 600 Montgomery Street at some time between October 31, 2002 and October 31, 2003.  In its Form 10-K filed with the SEC for the fiscal year ended October 31, 2003 (excerpt only), URS listed its address as 600 Montgomery Street, 26th Floor, San Francisco, CA 94111, Exh. C 106.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

#### (b)    Telephone And Facsimile Numbers

160.    By letter dated April 16, 2004, the Contractor formally notified SOLIDERE of the address to which correspondence should be sent pursuant to Article 7.1 of the Agreement. It also included a facsimile number: "Fax Number: +1 415 986 7379".[176] According to an information service available on the Internet, this number is registered to URS, at 600 Montgomery Street.[177]    Thus, "Radian" uses URS's facsimile number.    "Radian" frequently sends its correspondence by facsimile to SOLIDERE from URS's offices, as evidenced in facsimile lines indicating that the facsimile was sent: "From: URS", "From – URS" or "From – URS Corporation".[178]

161.    As of today, there are only four telephone numbers and addresses listed for Radian nationwide on the U.S. yellow pages website.[179]    Of these:

   (i)    two numbers lead to URS mailboxes;

   (ii)    one number led to a generic answering machine; and

   (iii)one    number led to various tones similar to those of a fax line.[180]

162.    Thus, nowhere in the United States does a Radian receptionist answer a telephone. On the contrary, URS has appropriated Radian's previously attributed telephone numbers and addresses, when these have not been abandoned altogether.

---

[176]    Letter dated April 16, 2004 from Radian to SOLIDERE, Exh. C 122.

[177]    See http://find.intelius.com search dated January 20, 2006, Exh. C 179.

[178]    See, e.g., undated letter transmitted on November 21, 2003 from Radian to SOLIDERE, Exh. C 108; letter dated September 16, 2004 from Radian to SOLIDERE, Exh. C 138; letter dated July 14, 2005 from Radian to SOLIDERE, Exh. C 154; letter dated September 28, 2005 from Radian to SOLIDERE, Exh. C 162; letter dated October 12, 2005 from Radian to SOLIDERE, Exh. C 165; letter dated November 7, 2005 from Radian to SOLIDERE, Exh. C 167.

[179]    See search dated January 26, 2006 for "Radian International LLC" on the US yellow pages website, Exh. C 183.

[180]    Memorandum dated January 26, 2006 from Jacqueline Silva Sánchez (Legal Assistant, White & Case LLP) to Charles Nairac (White & Case LLP), Exh. C 182.

-49-

### 3.    URS Receives And Pays Money For Radian

163.    URS informs Radian's debtors, to the extent that any still exist, that:

> "[its] agreement with the financial institution of Mellon Bank is to accept
> receipts addressed to Radian International LLC."[181]

All monies owed to Radian are thus payable to URS instead of Radian.

164.    As discussed below in the context of URS's involvement in the Project, following its
acquisition of Radian, URS also appears to have been responsible for at least some of the
payments and receipts in connection with the Project.[182]

### 4.    Radian's Employees Are Transferred to URS

165.    As discussed in detail below,[183] the employment of all the key Radian employees
involved in the Project was transferred to URS, following its acquisition of Radian.

166.    According to the Form 10-Q filed with the SEC by URS on June 14, 2004, URS has
acquired Radian's pension plans "cover[ing] a selected group of Radian employees
[…]".[184]

167.    Construction industry publications recognize the transfer of Radian employees to URS.
One such publication states:

> "The Salt Lake City office of San Francisco-based engineering and design
> firm URS has [sic] was founded in 1999 and includes employees from the

---

[181]    Undated certificate from Ms. Aletha M. Church, Cash Application Manager of URS Corporation, **Exh. C 9.**

[182]    See,i nfra, Section III.B.3(d).

[183]    See,i nfra, Section III.B.3(a).

[184]    See Form 10-Q filed by URS with the SEC for the quarterly period ended July 31, 2004 (excerpt only) at
p. 19, **Exh. C 136.** See also Form 10-K filed by URS with the SEC for the fiscal year ended October 31,
2004, p. 85 (excerpt only), **Exh. C 143.**

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

> former URS Greiner Woodward Clyde, Dames & Moore, Radian
> International, BRW, and Rogers and Associates".[185]

### 5.  URS No Longer Advertises Radian As A Separate Entity

168.  URS no longer advertises Radian as a discrete entity but instead as "URS Radian", "URS
Radian International", or even "URS Group (formally Radian International, LLC)".[186]
Indeed, an article published online in the Austin Business Journal on May 1, 2000
revealed that "URS Radian" would eventually drop the name "Radian" altogether and be
known simply as "URS".[187]

169.  Radian no longer maintains a website on the Internet.  Much of the correspondence on
"URS Radian" letterhead showing Radian's postal address in Beirut also lists
"www.ursccorp.com" as the company's website.[188]

*       *       *

170.  Radian thus appears to exist only on paper which justifies, in this case, in conformity
with applicable legal doctrine, the treatment of URS as a proper party to the Contract,
including its arbitration clause.  This conclusion is only reinforced by URS's direct
involvement in the Project, as shown in the following Section.

---

[185]   "URS Salt Lake City Location offers multiple services; Environmental Projects Main Focus but Expansion
Planned", Intermountain Contractor, October 1, 2005, p. 37, Exh. C 164.

[186]   See examples of articles published on the Internet concerning projects undertaken by "URS Radian",
URS Group (formally Radian International, LLC (Austin))" or "URS Radian International", Exhs. C 6, 10,
11, 52.  Note that these names do not refer to any existing companies.

[187]   "Radian in final talks on lease" – Article published online in the Austin Business Journal on May 1, 2000
(print edition published on April 28, 2000), Exh. C 29.

[188]   See, e.g., letter dated May 2, 2003 from Radian to SOLIDERE (attachment omitted), Exh. C 94; letter
dated September 16, 2004 from Radian to SOLIDERE, Exh. C 138.

-51-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## B.    FOLLOWING URS'S TAKE-OVER OF RADIAN, URS PERFORMED THE CONTRACT

171.    Following the acquisition of Radian by URS in June 1999, the Contract was operationally transferred to URS. This transfer is demonstrated by written statements following URS's acquisition of Radian (Subsection 1), URS's presentation of the Project as a URS undertaking (Subsection 2), the reality of URS's performance of the Contract (Subsection 3), URS's control over Arbitration I (Subsection 4), and URS's involvement in the purported implementation of the Award (Subsection 5).

### 1.    URS's Written Statements Affirm Its Responsibility For The Project

#### (a)    The Change From Radian Letterhead To URS/Radian Letterhead And Initial Representations Concerning URS's Role

172.    Following URS's acquisition of Radian, beginning on July 31, 2000, all correspondence that the Contractor submitted in connection with its performance of the Contract was on the letterhead of "URS$_{Radian}$" and provided the address of "Radian International, P.O. Box 11-1261, Beirut, Lebanon".[189]

173.    By letter dated September 19, 2000, SOLIDERE referred Radian to the change in its letterhead and requested to be officially informed of (i) any changes in Radian's ownership, (ii) any changes in the structure of the group of companies to which Radian belonged, and (iii) URS's identity and its relationship with Radian.[190]

174.    It was not until January 17, 2001 that the Contractor responded, by forwarding to SOLIDERE a certificate by URS's corporate counsel, Mr. John W. Rakow III.[191] This

---

[189]    Compare, e.g., the letter dated July 25, 2000 from Radian to the CM (Radian letterhead), Exh. C 31, with, e.g., the letter dated July 31, 2000 from Radian to the CM (URS letterhead), Exh. C 32.

[190]    See SOLIDERE internal email dated September 19, 2000 from Mr. Walid Honein to Mr. Hisham Karameh et al., enclosed in letter from the CM to Radian of the same day, Exh. C 34.

[191]    See letter dated January 17, 2001 from Radian to the CM, enclosing a letter dated January 16 from URS, 2001, Exh. C 36.

-52-

certificate is on the letterhead of "URS" and includes as a footer the address of "URS Corporation, Legal Department" in San Francisco.

175. In the certificate, URS affirmed that URS had acquired Radian in June 1999, along with the other companies of the Dames & Moore Group and that, although Radian remained a separate subsidiary of URS, "all correspondence is now on URS Corporation letterhead".[192]

176. This certificate also contained the following statement:

> "You will see no change in the manner in which we serve you or in our commitment to provide you with quality services. All prior commitments, including your contract, will continue to be honored". [Emphasis added]

177. By this certificate, URS made an unambiguous representation to SOLIDERE that it considered itself directly committed to honor the Contract.

### (b)   URS's Nomination Of A New "Corporate Manager For The Normandy Landfill Project"

178. URS's total control over and responsibility for the Project was further exemplified by a letter dated January 2, 2002 from Mr. Alan Krusi, Executive Vice-President of URS, to Dr. Chammaa, Chairman of SOLIDERE.[193] Pursuant to this letter, Mr. Krusi notified Dr. Chammaa that he was assigning a URS Senior Vice President, Mr. Vladimir Khazak, to be the "Corporate Manager for the Normandy Landfill project".

179. The letter is on the letterhead of "URS Construction Services" and includes the address of "URS Corporation" in Los Angeles at the bottom of each page.

---

[192]   Despite this official change in letterhead, the Contractor continued to occasionally use "Radian International LLC" letterhead, *see, e.g.*, letter dated April 8, 2003 from "Radian International LLC" to SOLIDERE, Exh. C 91. After the Award dated July 12, 2004, the Contractor un-officially (without notification) appears to have reverted to "Radian International LLC" letterhead, *see, e.g.*, letter dated July 30, 2004 from "Radian International LLC" to SOLIDERE, Exh. C 134.

[193]   *See* letter dated January 2, 2002 from URS to SOLIDERE, Exh. C 58.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

180.    The body of the letter reads in relevant part as follows:

> "I wish to inform you and your project team that Mr. JB Holeman has
> retired and I have assigned Mr. Vladimir Khazak, Senior Vice President,
> to the position of Corporate Manager for the Normandy Landfill project.
> Mr. Khazak is a Group Manager in our Construction Services Division
> [...] He is based in our Seattle, Washington office at the following
> address:
>
> URS Corporation
>
> [...]
>
> Mr. Amine Bou Onk, the Contractor's Representative, will report directly
> to Mr. Khazak [...]" [Emphasis added]

181.    Thus:

(i)     URS itself nominated the "Corporate Manager for the Normandy Landfill
        project";

(ii)    that position was assigned to Mr. Khazak, a URS Vice President resident in
        URS's Seattle offices, without any apparent position with Radian; and

(iii)   the Contractor's Representative, Mr. Bou Onk, was from then on to report directly
        and, apparently, solely to a URS Vice President, who became his immediate
        supervisor.[194]

182.    As detailed below, these written affirmations were consistent with URS's role in the
        performance of the Contract.

---

[194]    See also Bou Onk I at p. 10, ¶ 29, **Exh. C 102**.

-54-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## 2.    URS Presents The Contract As A URS Undertaking

### (a)    URS's Website

183.    As of June 14, 2004, on its website, URS presented the Contract as a URS undertaking
without any mention of Radian:

> "With the objective of restoring the area for future use, URS is
> undertaking the $53 million project to excavate, sort, treat, recycle, and
> backfill the entire landfill — estimated to be 5 million cubic meters of
> wastes, including solid waste, debris and unexploded ordnance".[195]
> [Emphasis added]

(It is to be noted that this section has subsequently, during the dispute with SOLIDERE,
been taken off of URS's website.)

### (b)    URS's Address In Lebanon

184.    As of November 24, 2004, on the "office locations" page of one of its websites,[196] URS
provided that it had an office in Beirut, as follows:

> "Lebanon
> Beirut
> URS Corporation
> c/o Normandy Landfill Site
> Eastern Entrance
> Beirut Central District
> Beirut
> Tel 961.1.983575
> Fax 961.1.983575"

185.    In 2001, Mr. Robert Legrand, one of the Contractor's senior engineers involved in the
overall design of the remediation project, attended a meeting with SOLIDERE personnel
at, as he described it, the "URS Beirut office".[197]

---

[195]   http://www.urscorp.com/whoweare/whatwedo/airwater/portfolio.html,   accessed   on   June   14,   2004,
Exh. C 124.

[196]   http://www.urs.com.au/office3.asp, accessed on November 24, 2004, Exh. C 147. (This web page is no
longer available.)

186. URS thus considered the Normandy Landfill office to be its own office in Beirut. Significantly, no mention was made of Radian.

### 3.    URS Treated Radian's Obligations Under The Contract As Its Own

187. The Contract was performed by URS, who took over the Radian personnel, signed an amendment to the Contract and was represented as having prepared the reports and investigations submitted by Radian as part of the Works.

#### (a)    URS's Personnel Responsible For Performance Of The Contract

188. All the key personnel responsible for the Project were URS employees.

##### (i)    Mr. Amine Bou Onk

189. Mr. Amine Bou Onk, the Contractor's Project Manager since the beginning of the Works (prior to the take over by URS), described his position as follows in his witness statement in Arbitration I:

> "I am a Divisional Vice President of URS International LLC. I am also the General Manager of Radian International's Lebanon branch and the Project Manager of the Normandy Landfill Project, which I have been since it began in 1999 [...]"[198] [Emphasis added]

##### (ii)    Mr. Vladimir Khazak

190. Mr. Vladimir Khazak was the "Corporate Manager for the Normandy Landfill Project", following his nomination by Mr. Alan Krusi, Executive Vice-President of URS.[199]

( continued)

[197] URS internal minutes of a meeting dated August 21, 2001, held at the "URS Beirut office" entitled "Technical Discussion about Composting with Tony Ellis and Stewart Walker", Exh. C 50. Note, further, that the representatives of the Contractor are described as belonging to "URS".

[198] Bou Onk I at p. 1, ¶ 1, Exh. C 102. Note that in the list of subsidiaries that appears in the Form 10-K filed by URS Corporation with the SEC for the fiscal year ended October 31, 2003 (excerpt only), Exh. C 106, there are no subsidiaries listed under the name "URS International LLC".

[199] See letter dated January 2, 2002 from URS to SOLIDERE, Exh. C 58.

-56-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

191. Mr. Khazak, a Senior Vice President of URS, was a Group Manager in URS's Construction Services Division, based in Seattle, Washington.[200] His business card presents him as "Senior Vice President, Regional Manager" with URS Construction Services.[201]

### (iii)   Mr. Thomas Bishop

192. On April 16, 2004 Radian gave notice to SOLIDERE pursuant to Article 7.1 of the Agreement that all formal notices should be sent to Radian at:

> "600 Montgomery Street
> 25th Floor
> San Francisco, CA 94111-2727
> United States of America
>
> Attention: Mr. Tom Bishop
> Fax Number: + 1 415 986 7379".[202] [Emphasis added]

193. Mr. Bishop has served as URS's Vice President, Strategy, since July 2003 and as URS's Senior Vice President, Construction Services Division, since March 2002.[203] Mr. Bishop also signs some of his correspondence on "Radian International, L.L.C." letterhead under the title "Senior Vice President",[204] but he does not appear to have a Radian email address and lists his email contact information as: tom_bishop@urscorp.com.[205]

---

[200]   Letter dated January 2, 2002 from URS to SOLIDERE, Exh. C 58.

[201]   Business card of Mr. Vladimir Khazak, Exh. C 3.

[202]   Letter dated April 16, 2004 from Radian to SOLIDERE, Exh. C 122. The 25th floor was at the time the exact mailing address of URS. The facsimile number noted also belongs to URS. See http://www.find.intelius.com, search dated January 20, 2006, Exh. C 179.

[203]   See "Prospectus Supplement (to Prospectus dated March 1, 2004)" at p. S-51 (excerpt only), Exh. C 119.

[204]   See, e.g., letter dated April 8, 2003 from Radian to SOLIDERE, Exh. C 91.

[205]   Letter dated November 18, 2004 from Radian to SOLIDERE, Exh. C 146.

-57-

194. Mr. Bishop's business card presents him as "Senior Vice President, Construction Services" for URS Corporation, 600 Montgomery Street, 26th Floor, San Francisco.[206]

### (iv) Mr. Bart Eklund

195. Like Mr. Bou Onk, Mr. Bart Eklund, who was responsible for measuring gas emissions at the Normandy Landfill and providing specialist advice in that capacity, became a URS employee following URS's acquisition of Radian. In his witness statement in Arbitration I, Mr. Eklund described his employment status as follows:

> "I was first involved in the Normandy project at the proposal stage in 1997-1998. I contributed to Radian's proposal at that time, and I am identified in the Technical and Management Proposal as the person at Radian responsible for air monitoring".[207]

> "I am [at present] a Principal Scientist employed by the URS Corporation, a position I have held since 1999".[208]

### (v) Mr. Robert Legrand

196. Like Mr. Bou Onk and Mr. Eklund, Mr. Robert Legrand, who was involved in the overall design of the remediation concept for the Normandy Landfill, became a URS employee following URS's acquisition of Radian. In his witness statement in Arbitration I, Mr. Legrand described his change in employment status as follows:

> "I am a Senior Engineer employed by the URS Corporation, based in Austin, Texas. I joined Radian Corporation (as it used to be called) in 1991. After a series of corporate changes, Radian became part of the URS Corporation in 1999. My employment changed from Radian to URS [...]"[209] [Emphasis added]

---

206 Business card of Mr. Thomas W. Bishop, PE, Exh. C 4.

207 Witness Statement of Mr. Bart Eklund in Arbitration I, dated October 10, 2003 ("Eklund I") at p. 2, ¶ 9, Exh. C 99.

208 Eklund I at p. 1, ¶ 1, Exh. C 99.

209 Witness Statement of Mr. Robert Legrand in Arbitration I, dated October 14, 2003 ("Legrand I"), at p. 1, ¶ 1, Exh. C 103.

197. URS's correspondence explicitly confirmed that Mr. Legrand was a URS employee,[210] and his business card presents him as a "Senior Engineer" with "URS Corporation".[211] Mr. Legrand's curriculum vitae, included in a report sent to SOLIDERE, states that he has been a "Senior Engineer", with "URS Corporation, Austin, Texas, 1991-Present".[212] His curriculum vitae includes a description of the Project, with no mention of Radian.

198. It was thus in his capacity as a URS employee that he undertook his duties in regard to the Project.

### (vi)  Mr. James Pratt

199. In his curriculum vitae, Mr. James Pratt describes himself as the Quality Control Manager for the Normandy Landfill Project. He states his employer to be "URS Corporation".[213]

200. He describes himself elsewhere as a "URS QCM" (Quality Control Manager).[214]

### (vii)  The Contractor's Presentation Of Its "Field Project Execution Management Team"

201. By letter dated January 30, 2004, Radian officially provided the CM with a list of members of its "Project Execution Management Team".[215] The first two positions in this team were occupied by Mr. Robert Legrand and Mr. Bart Eklund. As seen above, both

---

[210]  *See,e .g.,* letter dated December 12, 2002 from Radian to the CM, Exh. C 85.

[211]  Business card of Mr. Robert Legrand, PE, Exh. C 2.

[212]  *See* curriculum vitae of Mr. Robert Legrand, submitted as Annexure 1 to his Witness Statement dated October 14, 2003 in Arbitration 1, Exh. C 7.

[213]  *See* curriculum vitae of Mr. James Pratt, submitted as Annexure 1 to his Witness Statement dated October 14, 2003 in Arbitration I, describing his position in URS Corporation as: "Quality Control Manager for reclamation of 6.5 million cubic yard uncontrolled municipal waste and construction debris dump (55 acres) on the coast of downtown Beirut, Lebanon", Exh. C 8.

[214]  *See* Appendix B to "Quality Assurance Audit Report NL0210" conducted on September 24-26, 2002 (excerpt only), enclosed in a letter dated December 4, 2002 from Radian to the CM, Exh. C 84. The document also shows that other members of the Quality Control team considered themselves as URS employees.

[215]  *See* letter dated January 30, 2004 from Radian to the CM, Exh. C 118.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

> Mr. Legrand and Mr. Eklund were URS employees. The Contractor's letter identifies
> other team members who have also been identified as URS employees.[216]

### (b)    URS's Senior Management's Variation Of The Contract Terms

202.    Contract Change Order No. 2, pursuant to which the parties amended the Contract to
increase the Contract Price, was executed on behalf of Radian by Mr. Vladimir Khazak,
the URS-appointed Corporate Manager for the Project and a URS Senior Vice
President.[217]

### (c)    URS's Reports And Investigations Demonstrate URS's
Operational Responsibility For The Project

#### (i)    Reports Prepared As Part Of The Works

203.    Following URS's takeover of Radian, reports that were required to be prepared and
issued by the Contractor under the Contract were prepared and issued by URS.

204.    For example, the Contractor's "Quality Assurance Audit Report" dated September 24-26,
2002, underscored URS's involvement in the Project:[218]

(1)    the report contains a "URS Corporation" header on the title page;

---

[216]    The four other team members identified in the Contractor's cover letter were Messrs. Hugh Notz, Don
Burrows, Gary Beswick and Alberto Cuenca. Mr. Hugh Notz: *see, e.g.*, email dated June 30, 2000 from
Mr. Notz to Mr. Bou Onk, in which Mr. Notz communicated from a URS email address, and enclosed
facsimile from Mr. Notz to Mr. Bou Onk dated June 30, 2000, in which Mr. Notz used URS letterhead for
his facsimile, Exh. C 30. Mr. Don Burrows: Mr. Burrows was listed as URS's Senior Scientist in
attendance at a URS internal auditing meeting, *see* letter dated December 4, 2002 from Radian enclosing
URS's Quality Assurance Audit Report NL0210 conducted on September 24-26, 2002, at Appendix B
(excerpt only), Exh. C 84. Mr. Gary Beswick:*se e, infra*, Section III.B.3(c)(iii). Mr. Alberto Cuenca:*se e,
e.g.*, letter dated April 9, 2002, Exh. C 63, which is carbon copied to "Alberto Cuenca, URS".

[217]    *See* letter dated February 27, 2002 from Radian to SOLIDERE, enclosing Contract Change Order No. 2 for
the Normandy Landfill Treatment Contract – Phase 2, Exh. C 60.

[218]    *See* letter dated December 4, 2002 from Radian to the CM, enclosing "Quality Assurance Audit Report
NL0210" conducted on September 24-26, 2002 (excerpt only), Exh. C 84.

-60-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

- (ii) the title page describes the Report as "Technical Systems Audit and Split-Sample Analysis Results for: <u>URS Project Laboratory,</u> Reclamation of the Former Normandy Landfill, Beirut, Lebanon" [emphasis added];

- (iii) in the cover letter enclosing the report, Mr. Amine Bou Onk referred to the report as "prepared by <u>our</u> technical staff in Austin, Texas, [and] summarize[d] the findings of <u>our</u> annual internal audit" [emphasis added]; and

- (iv) Appendix B of the Report lists Mr. James Pratt, URS Quality Control Manager and Mr. Houri Kalinian, URS Analyst, among other URS employees, on the Audit Conference Attendance List.

205. Soon after, URS issued a report to SOLIDERE entitled "Quality Assurance Project Plan for Measuring Air Emissions from the LTTD Unit during Proof of Performance Testing, Addendum One, Normandy Landfill, Beirut, Lebanon", dated December 20, 2002.[219] This report stated that it was "PREPARED BY: URS Corporation [...]". The report contains no mention of Radian.

> (ii) Reports And Investigations Related To The Landfill Gas Defect

206. Following the discovery of the landfill gas defect in March 2001,[220] extensive discussions and exchanges took place internally as well as between the parties and their respective technical experts. The memoranda and reports prepared by the Contractor were all prepared by URS, or refer inconsistently to URS <u>and</u> Radian.

207. Documents disclosed in Arbitration 1 show that all technical discussions internal to the Contractor were handled by URS. For example, two memoranda dated October 1, 2001

---

[219] Letter dated December 26, 2002 from Radian to the CM, enclosing "Quality Assurance Project Plan for Measuring Air Emissions from the LTTD Unit During Proof of Performance Testing, Addendum One" dated December 20, 2002, Exh, C 87.

[220] See, supra, Section II.C.1(c).

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

> and October 2, 2001, respectively, were sent by "Bart Eklund (URS-Austin)" to "Robert
> LeGrand (URS-Austin)"[221] and were entitled "Typical Levels of Methane Emissions
> from Soils for Comparison with Data from the Normandy Site" and "Approaches to
> Measure or Estimate Subsurface Transport of Methane", respectively.     Another
> memorandum was prepared by Mr. Robert Legrand and addressed to Messrs. Amine Bou
> Onk, James Pratt, Bart Eklund, and Vladimir Khazak on November 20, 2002 on URS
> stationery.[222]

208.   A report entitled "Investigation of Gas Emissions", dated March 2002, was attached to a
       letter sent from the Contractor to the CM and dated April 5, 2002.[223]  The report, though
       stated in its cover letter to have been prepared by "Radian International's technical
       team",[224] was in fact "Prepared by: URS, URS Corporation [...]", as indicated on the
       cover of the report.[225]

209.   Other URS personnel also understood this report to be a URS undertaking.  For example,
       Mr. Robert Legrand, in his witness statement in Arbitration I, stated that, "[w]hile
       preparing for this report [the March 2002 report], URS's Beirut staff noted that sewage
       outfalls were operating in the area after the seawall was constructed [...]" [emphasis
       added].[226]  Mr. James Pratt also recognized this report as having been prepared by URS.
       As a witness in Arbitration I, he stated that he accepted that this report was "[p]repared
       by URS, but for all intents and purposes Radian".[227]

---

[221]   URS internal memorandum dated October 1, 2001 from Mr. Eklund to Mr. Legrand, Exh. C 53; URS
        internal memorandum dated October 2, 2001 from Mr. Eklund to Mr. Legrand, Exh. C 54.

[222]   See URS internal memorandum dated November 20, 2002 from Mr. Legrand to Messrs. Bou Onk, Pratt,
        Eklund, and Khazak, Exh. C 82.

[223]   See letter dated April 5, 2002 from Radian to the CM, enclosing "March 2002 Report", Exh. C 62.

[224]   See letter dated April 5, 2002 from Radian to the CM, enclosing "March 2002 Report", Exh. C 62.

[225]   "March 2002 Report", Exh. C 62.

[226]   Legrand I at p. 14, ¶ 48, Exh. C 103.

[227]   Hearing Transcript in Arbitration I, dated December 15-19, 2003, Day 2, 17:21-17:23, Pratt cross,
        Exh. C 115.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

210.   In a memorandum dated June 20, 2002, Mr. Robert Legrand wrote that:

> "The URS investigation of the Normandy Gas emissions (URS 2002)
> showed that the low level of gas production projected during
> biodegradation was entirely acceptable from an environmental and safety
> perspective (i.e. Fit for the Purpose) [...] Projections [of future
> biodegradation] are based on: [...] (b) URS's site-specific microcosms
> studies; and (c) URS's site-specific field studies and measurements
> [...]"[228] [Emphasis added]

211.   A report entitled "Biogas Status Report", dated September 2002, was attached to a letter
from Radian to the CM, dated September 9, 2002.[229] The report, though stated to have
been prepared by "Radian International's technical team" in the letter, was more
prominently stated to have been "Prepared by: URS Corporation, 9400 Amberglen Blvd.,
Austin, Texas 78729", as indicated on the cover of the report. The report states that
"URS/Radian has been reclaiming the Phase II area of the Normandy Landfill in Beirut
since 1999"[230] [emphasis added] and that "Senior URS Corporation risk assessment
specialists indicate that there is no applicable US regulation governing soil gas
composition, there are only regulations governing indoor and outdoor air".[231] [Emphasis
added]

212.   A memorandum enclosed in a letter dated November 25, 2002 and sent to SOLIDERE by
the Contractor stated that its aim was to "[d]emonstrate compliance of Radian
International work products with the Contract requirements [...]". The memorandum

---

[228]   URS/Radian internal memorandum dated June 20, 2002 from Mr. Robert Legrand to Mr. Amine Bou Onk,
Exh. C 69.

[229]   Letter dated September 9, 2002 from Radian to the CM, enclosing "Biogas Status Report" dated September
2002, Exh. C 77.

[230]   "Biogas Status Report" dated September 2002, at p.1, enclosed in letter dated September 9, 2002 from
Radian to the CM, Exh. C 77.

[231]   "Biogas Status Report" dated September 2002, Section 3.2, p. 8, enclosed in letter dated September 9, 2002
from Radian to the CM, Exh. C 77.

-63-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

> was written by Mr. Legrand on URS letterhead and listed his affiliation as "URS Corporation".[232]

213. Attached to the same letter is a "Powerpoint" presentation entitled "Normandy Landfill, Beirut, Gas Issue Update", which prominently features URS's logo[233] and refers to URS and Radian interchangeably:

> "Radian complies with the FSQ"[234] [emphasis added]

and, later:

> "URS complies with all the FSQ standards"[235] [emphasis added].

214. A report entitled "Normandy Landfill Gas Issue, Site Action Plan", dated February 2003, was attached to a letter dated February 14, 2003 from Radian to the CM.[236] This report aimed to summarize the actions proposed to be undertaken by the Contractor to correct the defects in relation to the presence of landfill gas at the Site. The cover of the Site Action Plan states that it was "Prepared By: URS Corporation, 9400 Amberglen Blvd., Austin, Texas". The Plan also states that it was "submitted by Radian International, LLC (Radian) now operating under the name of its parent corporation, URS Corporation ('URS') [...]".[237]

---

[232] Memorandum dated November 25, 2002 from Mr. Robert Legrand to Mr. Hisham Karamch at p. 1, section 2.3, enclosed in the letter dated November 25, 2002 from Radian to SOLIDERE, Exh. C 83. Mr. Legrand copied his memorandum to Mr. David Horne (the CM's Representative); Mr. Vladimir Khazak and Mr. Amine Bou Onk, both listed as URS representatives.

[233] URS Powerpoint presentation entitled "Normandy Landfill, Beirut, Gas Issue Update," dated November 2002, enclosed in letter dated November 25, 2002 from Radian to SOLIDERE, Exh. C 83.

[234] URS Powerpoint presentation entitled "Normandy Landfill, Beirut, Gas Issue Update," dated November 2002, at p. 46, enclosed in letter dated November 25, 2002 from Radian to SOLIDERE, Exh. C 83.

[235] URS Powerpoint presentation entitled "Normandy Landfill, Beirut, Gas Issue Update," dated November 2002, at p. 51, enclosed in letter dated November 25, 2002 from Radian to SOLIDERE, Exh. C 83.

[236] See letter dated February 14, 2003 from Radian to the CM, enclosing "Site Action Plan" dated February 2003, Exh. C 89.

[237] Letter dated February 14, 2003 from Radian to the CM, enclosing "Site Action Plan" dated February 2003, p. 1 ("Preface"), Exh. C 89.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

### (iii) Site Safety

215. URS took responsibility for safety issues at the Site. For example, when a laborer was injured on Site, URS dispatched to the Site from the USA the health and safety director of its Construction Division, to conduct an investigation of the incident. A letter sent from Mr. Bou Onk, the Contractor's Project Manager, to Mr. Vladimir Khazak, URS's Corporate Manager for the Project, on September 25, 2002, advised that:

> "Mr. Gary Beswick, the health and safety director for URS's Construction Division will arrive onsite from the USA today and will conduct a detailed investigation of the incident. An incident report and proposed corrective and/or preventive actions will be generated based on Mr. Beswick's investigation".[238]

### (d) Accounting Matters

216. The Export-Import Bank of the United States ("Eximbank") extended a loan facility to SOLIDERE, pursuant to which SOLIDERE was entitled to draw down the equivalent of the U.S. portion of the cost of goods and services purchased by SOLIDERE. Accordingly, SOLIDERE periodically requested Radian to provide it with an appropriate certificate in order to demonstrate the amount of the U.S. portion of its purchases. These certificates were issued from a URS office located in Maryland, USA, as shown by the letterhead address on the invoices, and sent to Radian in Beirut, stamped by "Radian International L.L.C., Beirut, Lebanon", and copied to "Alberto Cuenca, URS",[239] a member of the Contractor's "Purchasing and Project Controls" department.[240]

---

[238]   Letter dated September 25, 2002 from Radian to the CM, Exh. C 78.

[239]   *See, e.g.,* letter dated April 26, 2002 from Radian to the CM and enclosed Eximbank invoice No. 33, Exh. C 66.

[240]   *See* letter dated January 30, 2004 from Radian to the CM, Exh. C 118, listing "Alberto Cuenca, Purchasing and Project Controls", as part of the technical specialists from "our U.S. based offices".

217. The address for URS's "Accounts Payable" division is identical to that of Radian. Bills for equipment used on the Site have been sent to "Radian International" as well to "URS", both at "Accounts Payable, PO Box 201088, Austin, TX 78720-1088, [...]".[241]

218. Some requests for payment for work on the Project were sent on "URS$_{Radian}$" letterhead that included two addresses: "Radian International L.L.C., P.O. Box 11-1261, Riad El Solh Beirut 1107 2080" and "URS Corporation, 200 Orchard Ridge Drive, Suite 101, Gaithersburg, Maryland 20878, [...]".[242]

219. The receipts and invoices for the Project insurance also appear to have been managed by a URS employee.[243]

### 4. URS's Control Over Arbitration I And The Events Leading Up To It Further Demonstrate That The Project Was Under URS's Control

#### (a) URS's And Radian's Legal Counsel

220. In the parties' negotiations of the MOU,[244] the Contractor was mainly represented by Mr. John Rakow III.[245] Mr. Rakow has been identified as Radian's legal counsel.[246] Mr. Rakow has also identified himself as URS's Vice-President and Corporate Counsel.[247]

---

[241] Compare the billing address in commercial invoice dated June 16, 2000 from Wildcat Manufacturing Inc. ("Wildcat", a manufacturer of equipment used on the Site), enclosed in letter dated September 8, 2000 from Radian to SOLIDERE, Exh. C 33, with the billing address in a commercial invoice from Wildcat dated October 24, 2000, enclosed in a letter dated December 4, 2000 from Radian to SOLIDERE, Exh. C 35. In an email dated June 30, 2000 from Mr. Hugh Notz (URS) to Mr. Amine Bou Onk, enclosing a facsimile dated June 30, 2000 from Wildcat to Mr. Notz and Mr. Bou Onk, Exh. C 30, Wildcat promised to refund payments for equipment to the same address: "[i]f Wildcat receives full payment for the total amount for [the] trommel [...] the duplicated payment made by URS (Radian International) P.O. Box 201088, Austin, Texas will be refunded". [Emphasis added].

[242] See, e.g. letter dated April 15, 2002 to SOLIDERE, showing both URS Corporation and Radian as senders, Exh. C 64.

[243] See letter dated April 20, 2000 from Radian to the CM, enclosing an email dated April 6, 2000 from Ms. Joan Maloney of Willis Corroon Corporation to Ms. Peggy Pendergast of URS, enclosing Radian's paid invoice for "Project specific policy for Lebanon Project only – Reclamation of the land within the Phase 2 area of the Normandy Landfill, Beirut, Lebanon", Exh. C 28.

[244] See, supra, Section II.C.2(c).

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

221. In his correspondence with SOLIDERE, Mr. Rakow, himself a lawyer, does not distinguish URS from Radian. He treats them as being one and the same legal entity. Thus, in his communications with SOLIDERE's General Counsel, Dr. Mahmassani, Mr. Rakow wrote on URS letterhead containing a footer with the address of "URS Corporation, Legal Department".[248] Mr. Rakow signed the letter "Vice President, Corporate Counsel".

222. During negotiations leading up to the MOU, Mr. Rakow, wrote that:

> "URS is manifestly committed to the early resolution of this matter before the ICC".[249] [Emphasis added]

223. Mr. Rakow was listed as Claimant's Contact and counsel in Radian's Request for Arbitration in Arbitration I.

224. In August 2003, Mr. Rakow described the MOU as a URS/Radian undertaking:

> "URS Corporation/Radian International, LLC ('Radian') and the Lebanese Company for the Development and Reconstruction of Beirut Central District S.A.L. ('SOLIDERE') entered into a Memorandum of Understanding (MOU) on May 12, 2003 [*sic*]".[250] [Emphasis added]

---

(...continued)

245   *See, e.g.*, letter dated April 23, 2003 from URS to Dr. Ghaleb Mahmassani, SOLIDERE's General Counsel (attachment omitted), Exh. C 92; letter dated May 2, 2003 from Mr. John Rakow of URS (attachment omitted), Exh. C 94.

246   *See* letter dated April 8, 2003 from Radian to SOLIDERE, Exh. C 91.

247   *See, e.g.*, letter dated January 17, 2001 from Radian to the CM and enclosed letter dated January 16, 2001 from URS, Exh. C 36; letter dated April 23, 2003 from URS to Dr. Ghaleb Mahmassani (attachment omitted), Exh. C 92.

248   *See, e.g.*, letter dated April 23, 2003 from URS to Dr. Ghaleb Mahmassani (attachment omitted), Exh. C 92.

249   Letter dated April 28, 2003 from URS to Dr. Ghaleb Mahmassani, enclosed in facsimile dated April 28, 2003 from URS to SOLIDERE (attachment omitted), Exh. C 93.

250   Letter dated August 29, 2003 from Radian to SOLIDERE (attachments omitted), Exh. C 96.

225.    Thus, the in-house lawyer of URS and Radian could see no reason to distinguish between URS and Radian nor to treat them as separate legal entities having separate legal relationships with SOLIDERE.

       **(b)**    **URS's Participation In Meetings with SOLIDERE Leading Up To Arbitration I**

226.    The parties' discussions as to the existence of a serious defect in the Works led to several meetings, prior to the start of Arbitration I, during which the Contractor was represented by URS's officers and employees.

227.    On November 7, 2002, a meeting with SOLIDERE was held in Washington D.C. The following people attended on the Contractor's behalf:[251]

    (i)    Mr. Vladimir Khazak, a URS Vice-President;[252]

    (ii)    Mr. Robert Legrand, a URS Senior Engineer;[253] and

    (iii)    Mr. Amine Bou Onk, the Contractor's Representative, URS Divisional Vice-President and General Manager of Radian International's Lebanon branch.[254]

228.    In January 2003, another meeting was organized between URS and SOLIDERE, this time in London.    In correspondence between URS and the CM, the Contractor's Representative, Mr. Bou Onk, stated that the following people would attend the meeting on the Contractor's behalf:

    "1.    Mr. Vladimir Khazak, <u>URS</u>
    2.    Mr. Robert Legrand, <u>URS</u>

---

[251]    **Legrand I, at p. 17, ¶ 63, Exh. C 103.**

[252]    *See, supra,* Section III.B.3(a)(ii).

[253]    *See, supra,* Section III.B.3(a)(v).

[254]    *See, supra,* Section III.B.3(a)(i).

3.    Mr. Bart Eklund, <u>URS</u>
4.    Mr. Amine Bou Onk, <u>URS</u> [...]"[255] [Emphasis added]

229.   The Contractor and SOLIDERE met again on April 16, 2003 in London. The following
       individuals attended this meeting on behalf of the Contractor:[256]

       (i)     Mr. Vladimir Khazak (a URS Vice-President);[257]

       (ii)    Mr. Thomas W. Bishop (a URS Vice-President and Radian Senior Vice-
               President);[258]

       (iii)   Mr. John W. Rakow III (URS Vice-President and Corporate Counsel; Radian
               legal counsel);[259]

       (iv)    Mr. Robert Legrand (a URS Senior Engineer);[260]

       (v)     Mr. Bart Eklund (a URS Principal Engineer);[261]

       (vi)    Mr. Amine Bou Onk (the Contractor's Representative, URS Divisional Vice-
               President and General Manager of Radian International's Lebanon branch). [262]

230.   Mr. Vladimir Khazak, who identified himself as "Senior-Vice President of URS
       Corporation/Radian International LLC", sent SOLIDERE a proposed outline of an
       agenda for an upcoming meeting pursuant to the MOU. The meeting was to be held in

---

[255]   Letter dated December 12, 2002 from Radian to the CM, Exh. C 85.

[256]   See Bou Onk I, at p. 13, ¶ 36, Exh. C 102.

[257]   See, supra, Section III.B.3(a)(ii).

[258]   See, supra, Section III.B.3(a)(iii).

[259]   See, supra, Section III.B.4(a).

[260]   See, supra, Section III.B.3(a)(v).

[261]   See, supra, Section III.B.3(a)(iv).

[262]   See, supra, Section III.B.3(a)(i).

-69-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

> London on October 16-17, 2003 and the agenda contemplated introductory remarks from
> "URS/Radian – Tom Bishop". [263]

### (c)    URS's Management Of Arbitration I

231.    Although Arbitration I was nominally between SOLIDERE and Radian, URS in fact
controlled Radian's participation in the arbitration.

232.    The Power of Attorney given to the law firm of Mayer, Brown, Rowe & Maw LLP, the
law firm of Herbert Smith, and Mr. Adrian Williamson Q.C. to represent "Radian" in
Arbitration I was signed by Mr. Joseph Masters, [264] who happened to be URS Vice
President and General Counsel. Although Mr. Masters purportedly signed "on behalf of
Radian", he is not asserted nor known to have ever had any position with Radian, and the
power of attorney was sent from the "URS LAW DEPT" fax machine. [265]    Asked to
identify Mr. Masters and the capacity in which he signed the Power of Attorney, counsel
for Radian in Arbitration I admitted that he was "General Counsel of the URS Group". [266]

233.    Similarly, the power of attorney issued purportedly on behalf of Radian authorizing the
law firm of Skadden, Arps, Slate, Meagher & Flom LLP to represent Radian in
connection with Arbitration II was signed by Mr. Thomas Bishop. [267]    As discussed
above, Mr. Bishop served as URS's Vice President, Strategy, since July 2003 and as

---

[263]    Letter dated September 30, 2003 from Radian to SOLIDERE, enclosing outline for agenda Normandy
Landfill Phase II Reclamation: "Meeting pursuant to Memorandum of Understanding (MOU)", Exh. C 98.

[264]    Power of Attorney dated December 2, 2003 granted by Radian to Mayer, Brown, Rowe & Maw LLP,
Herbert Smith and Mr. Adrian Williamson Q.C., Exh. C 111.

[265]    Power of Attorney dated December 2, 2003 granted by Radian to Mayer, Brown, Rowe & Maw LLP,
Herbert Smith and Mr. Adrian Williamson Q.C., Exh. C 111.

[266]    *See* letter dated December 8, 2003 from White & Case LLP to Mayer, Brown, Rowe & Maw LLP,
Exh. C 112; letter dated December 9, 2003 from Mayer, Brown, Rowe & Maw to White & Case LLP,
Exh. C 113.

[267]    *See* Power of Attorney dated May 14, 2004 granted by Radian to Skadden, Arps, Slate, Meagher, & Flom
LLP, enclosed in letter dated May 17, 2004, Exh. C 123.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

> URS's Senior Vice President, Construction Services Division, since March 2002, as well
> as being a "Radian Vice-President".[268]

234.    During the hearing in Arbitration 1, that took place in Paris in December 2003,
        Mr. Masters was in attendance for part of the time. Mr. Masters was never described as
        having any position with Radian.   His business card, provided to SOLIDERE
        representatives in the course of the hearing, shows him to be URS's "Vice President and
        General Counsel", with an office at 600 Montgomery Street, 25th Floor, San
        Francisco.[269]

## 5.    URS Purported To Implement The Award

### (a)    Correspondence Between The Contractor And SOLIDERE Following The Award

235.    Following the notification of the Award to the parties on July 16, 2004, SOLIDERE and
        the Contractor exchanged extensive correspondence regarding the implementation of the
        Award.

236.    Much of this correspondence was signed by Mr. Thomas Bishop.[270]  As noted above,
        Mr. Bishop served as URS's Vice President, Strategy, since July 2003 and as URS's
        Senior Vice President, Construction Services Division, since March 2002, and was also a
        Radian Senior Vice-President.[271]

---

[268]    See, supra, Section III.B.3(a)(iii).

[269]    See business card of Mr. Joseph Masters, Exh. C 1.

[270]    See, e.g., letter dated September 16, 2004 from Radian to SOLIDERE, Exh. C 138; letter dated July 14,
         2005 from Radian to SOLIDERE, Exh. C 154; letter dated August 26, 2005 from Radian to SOLIDERE,
         Exh. C 159; letter dated September 28, 2005 from Radian to SOLIDERE, Exh. C 162; letter dated October
         12, 2005 from Radian to SOLIDERE, Exh. C 165; letter dated November 7, 2005 from Radian to
         SOLIDERE, Exh. C 167; letter dated December 7, 2005 from Radian to SOLIDERE, Exh. C 170.

[271]    See, supra, Section III.B.3(a)(iii).

-71-

237. Significantly, all the correspondence indicating that it was faxed from the United States also shows that the letters were sent from a "URS Corporation" fax machine at (415) 986-7379,[272] which is a URS facsimile number.[273]

### (b) Mediation By Mr. William Hadaya Of URS

238. URS's control during this period is further exemplified by the involvement of Mr. William Hadaya of URS, who had no position with Radian, in the implementation of the Award. The Chairman of URS called upon Mr. Hadaya, a URS "Senior Vice President" and "Office Manager",[274] to contact SOLIDERE and "help resolve" the parties' dispute in relation to implementing the Award.[275]

239. Mr. Hadaya helped organize the meeting which took place between representatives of the Contractor, including himself, and SOLIDERE in Beirut in December 2004.[276]

### C.  CONCLUSION

240. The above facts demonstrate that, following URS's acquisition of Radian in 1999, Radian ceased effectively to function as an entity separate from URS. Specifically, URS took over all aspects of the Project, over which it exercised full control, and was the entity which assumed responsibility for performing the Contract.

241. These facts, and others to be developed in the course of these proceedings, will demonstrate that it is appropriate, pursuant to any one or more of the legal doctrines

---

[272]   *See, e.g.*, fax line on letter dated September 16, 2004 from Radian to SOLIDERE, Exh. C 138; fax line on letter dated September 28, 2005 from Radian to SOLIDERE, Exh. C 162; fax line on letter dated October 12, 2005 from Radian to SOLIDERE, Exh. C 165; fax line on letter dated November 7, 2005 from Radian to SOLIDERE, Exh. C 167.

[273]   *See* http://find.intelius.com search dated January 20, 2006, Exh. C 179.

[274]   Business card of Mr. William M. Hadaya, PE, Exh. C 5.

[275]   Letter dated August 23, 2005 from SOLIDERE to URS, Exh. C 157.

[276]   Letter dated August 23, 2005 from SOLIDERE to URS, Exh. C 157; on this meeting *see, supra*, Section II.C.4(a).

indicated above,[277] to find URS bound by the Contract, including its arbitration clause, and that URS is therefore a proper party to these proceedings.

-oo0Ooo-

---

277    *See, supra,* ¶ 150.

## IV.   SOLIDERE'S CLAIMS AGAINST THE CONTRACTOR

242.   Pursuant to the Contract and the Lebanese Code of Obligations and Contracts, SOLIDERE has the right to recover full compensation for the damage suffered as a consequence of the Contractor's contractual breaches. SOLIDERE's claims will far exceed the limitations on damages set forth in the Contract. As a consequence of the Contractor's intentional breaches and gross mis-performance of the Contract, URS and Radian should not be allowed to rely on such limitations to shield it against SOLIDERE's claims (Section A).

243.   Pursuant to the Award, Radian was ordered to pay SOLIDERE US$ 2,358,000 in costs, but the Contractor has refused to pay this amount. SOLIDERE seeks an order directing URS and Radian, jointly and severally, to pay such amount, plus interest, in these proceedings (Section B).

244.   The Award has established the existence of a defect. As a direct consequence of the existence of such a defect, and of the Contractor's continuous failure to implement the Award, SOLIDERE has suffered or will suffer considerable damage including, without limitation:

-   the costs incurred by SOLIDERE in completing the Works (Section C); and

-   the losses caused by the staggering delays that are affecting the Project, including loss of profits (Section D).

### A.   OVERVIEW OF RELEVANT PROVISIONS OF THE CONTRACT AND THE LEBANESE CODE OF OBLIGATIONS AND CONTRACTS

#### 1.   The Contract

245.   GC 22.1 provides for a broad right to compensation for breach of contract:

> "In connection with any breach of any representation or warranty and in connection with any failure, breach, error or omission to perform, or in the performance of, any obligation, responsibility, or undertaking of the Contractor […] the Contractor shall be fully responsible and liable to the

-74-

> Employer for, and shall indemnify the Employer against, the full extent of
> any and all liabilities, loss and/or damage suffered, and for all additional
> costs and/or expenses incurred by the Employer (including, without
> limitation, financing costs, interest, attorneys' fees and expenses) [...]"[278]

## 2. The Lebanese Code Of Obligations And Contracts

246. GC 22.1 is consistent with the provisions of the Lebanese Code of Obligations and
Contracts (translation):

> "Article 260 – Damages must correspond exactly to the loss incurred and
> the profits [the claimant] has been deprived of.
>
> Article 261 – Indirect damages are taken into consideration as are direct
> damages, provided they can be linked with total certainty to the failure to
> perform the obligation.
>
> Article 262 – In contractual matters, compensation only covers damages
> that were foreseeable at the time the contract was formed, so long as the
> debtor has not committed *dol*."[279]

247. *Dol* can be roughly translated as "intentional default". Under Lebanese law, as will be
explained in the course of these proceedings, *faute lourde* (which can be roughly
translated as "gross misconduct") is considered equivalent to *dol* for the purpose of
Article 262 of the Lebanese Code of Obligations and Contracts.

248. The Lebanese Code of Obligations and Contracts thus usefully clarifies that, under
Lebanese law, the measure of damage includes compensation for:

- the damage incurred;

- the loss of profits;

- indirect damages;

---

[278] The Contract, GC 22.1, **Exh. C 19**. GC 22.1 goes on to provide for a limitation on such damages to
US$ 20 million. On the enforceability of this limitation, *see*, infra, Section IV.A.3.

[279] The Lebanese *Code des Obligations et des Contrats*, 1983 ed., reprinted 1995 (French language version),
Articles 260-262, with unofficial English translation, **Exh. C 12**.

- unforeseeable damages, if the defendant is guilty of *dol*.

### 3.    The Contractual Limitations On Damages Do Not Apply

249.  The Contract sets forth two limitations on damages:

- pursuant to GC 22.1, damages under the Contract are limited to US$ 20,000,000, "subject to the terms of [...] GC 22.4 [...]"; and

- pursuant to GC 22.4 and Agreement Article 6, specified liquidated damages are payable for the first one hundred days of delay.

250.  Under Lebanese law, and as will be demonstrated in the course of these proceedings, a contractual limitation on damages is inapplicable in the presence of *dol* or *faute lourde*, which respectively require:

- a showing of a conscious failure to perform under the relevant contract (*dol*);

- a showing that the breaching party has significantly departed from the behavior expected of it under the contract, or that the breaching party was aware of the damageable consequences of its actions, or that the breaching party, by its failure to perform an essential obligation of the contract, has defeated the object of the parties in entering into the contract (*faute lourde*).

251.  As discussed above:

- the Contractor has deliberately chosen to follow bad working practices, contrary to the unambiguous terms of the Contract;[280]

- the Contractor was, pursuant to the terms of the Contract and as an experienced remediation contractor, entirely aware of the importance of treating the excavated

---

[280]    *See, supra,* Sections II.C.1(a)-(b).

> materials in order to remove the organic carbon, and yet chose to act otherwise,
> with the result of a defect in the Works;[281]

- even after an ICC arbitral tribunal found unanimously, by the Award, that the *Works are defective, even though the Contractor has not challenged the validity* of the Award, the Contractor has continuously refused to implement the Award and remedy the defect;[282] and

- the Contractor has repeatedly chosen to delay and, since February 2005, has completely *stopped, performance of the Contract, without any justification.*[283]

252. As will be demonstrated in these arbitral proceedings, these failures constitute *dol* and/or *faute lourde* on the part of the Contractor, and therefore URS and Radian may not rely on the limitation on damages set forth in GC 22.1, GC 22.4 and Agreement Article 6.

### B.    SOLIDERE'S COSTS IN ARBITRATION I

253. Pursuant to the Award, Radian was ordered to pay SOLIDERE's costs of the arbitration amounting to US$ 2,358,000, as follows:

(i)    *US$ 2,150,000 for SOLIDERE's legal costs;*[284]

(ii)    100% of the fees and expenses of the arbitral tribunal and the ICC administrative expenses, SOLIDERE's share of which amounted to US$ 170,000;[285] and

(iii)US$ 38,    000 in connection with SOLIDERE's answer to a post-hearing application made by Radian;[286]

---

[281]    *See, supra,* Section II.C.1(c).

[282]    *See, supra,* Section II.C.4.

[283]    *See, supra, Section II.C.5.*

[284]    Award, p. 95, ¶ 11.6, Exh. C 129.

[285]    Award, p. 95, ¶ 11.5, Exh. C 129.

-77-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

254.  Despite repeated requests from SOLIDERE,[287] Radian has refused to pay such due amounts to SOLIDERE. Radian has not, however (as already stated), questioned the validity of the Award, which is no longer subject to challenge in France where it was rendered. On the contrary, it affirmed its commitment to implement the Award by letter dated July 30, 2004.[288]

255.  The Contractor has breached its contractual obligation to carry out the Award "without delay", set forth in Article 28.6 of the ICC Rules, which is incorporated into the Contract by GC 44. Radian and URS should therefore be ordered to comply with the Award without prejudice to SOLIDERE's claim for damages by way of post-award interest.

## C.    URS AND RADIAN ARE JOINTLY AND SEVERALLY LIABLE FOR ALL COSTS AND EXPENSES INCURRED BY SOLIDERE IN COMPLETING THE WORKS

256.  As of the termination of the Contract by SOLIDERE on February 10, 2006, the landfill gas defect remained to be remedied and the Works were not completed.

257.  As a direct consequence of the Contractor's failure to perform the Contract and to implement the Award, SOLIDERE will need to arrange for the Works to be completed by one or several contractors in replacement of the Contractor, at a cost which, when added to the amounts already paid to the Contractor by SOLIDERE under the Contract, is likely to far exceed the original Contract Price under the Contract. Under the Contract and Lebanese law, the Contractor is liable to compensate SOLIDERE for all costs and expenses incurred by SOLIDERE in excess of the Contract Price, in connection with such completion works.

258.  SOLIDERE's costs, expenses and damages incurred in the Completion of the Works cannot be definitely ascertained until such works have been completed.

[... continued]

286    Award, p. 97-98, ¶ 11.12, Exh. C 129.

287    *See, e.g.,* letter dated July 23, 2004 from SOLIDERE to URS/Radian, **Exh. C 133**; letter dated August 5, 2004 from SOLIDERE to URS/Radian, **Exh. C 137.**

288    *See* letter dated July 30, 2004 from Radian to SOLIDERE, Exh. C 134; *see,s upra,* Section II.C.4.

259. Accordingly, SOLIDERE submits that it would be appropriate for the Arbitral Tribunal (i) to order URS and Radian, jointly and severally, to pay SOLIDERE all costs and expenses incurred in excess of the Contract Price for purposes of completing the Works; and (ii) following issuance of an award on item (i), to retain jurisdiction, in order to address any and all further issues of quantum of damages that may arise in the parties' implementation of the Arbitral Tribunal's award on item (i) above until SOLIDERE has been made whole for its claim.

### D. URS AND RADIAN ARE JOINTLY AND SEVERALLY LIABLE FOR ALL DAMAGES INCURRED BY SOLIDERE AS A CONSEQUENCE OF THE HUGE DELAYS TO THE PROJECT

#### 1. Lost Profits

260. As a result of the huge delays caused to the Project by the Contractor, SOLIDERE has been unable to sell the land at the Normandy Site in accordance with its original program which anticipated Completion, as envisaged by the Contract, on April 14, 2004. The expected but missing cash flow resulting from such sales has been preliminarily assessed as amounting to several billion US dollars. SOLIDERE has accordingly been deprived of the benefit of that cash flow, such deprivation being represented by lost interest on such amount or financing costs that would otherwise not have been incurred. SOLIDERE is entitled to compensation for this loss, which will be quantified in the course of the arbitral proceedings.

#### 2. Project Costs And Expenses

261. Every day of delay is causing SOLIDERE to incur costs and expenses that it would not have incurred but for the delay to the Project.

262. These costs and expenses include, without limitation, the additional cost of the CM, the cost of SOLIDERE's employees assigned to the Project, the cost of running and maintaining office facilities at the Site, overhead costs, *etc.*

263.  The quantum of SOLIDERE's costs and expenses caused by the Contractor's delay will
      be assessed in the course of the arbitral proceedings.

-oo0oo-

## V.    MISCELLANEOUS MATTERS

### A.    THE AGREEMENT TO ARBITRATE – PLACE AND LANGUAGE OF THE ARBITRATION

264.    The agreement to arbitrate is set forth in GC 44:

> "All disputes arising out of or in connection with the present Contract
> shall be finally settled under the Rules of Conciliation and Arbitration of
> the International Chamber of Commerce in force as of January 1st 1998 by
> one or more arbitrators appointed in accordance with the said Rules".[289]

265.    As set forth in GC 44, the place of arbitration is Paris, France and the language of the arbitration is English.

### B.    APPOINTMENT OF THE ARBITRAL TRIBUNAL

266.    SOLIDERE submits that the size and complexity of this dispute is such as to warrant the appointment of an Arbitral Tribunal of three arbitrators.

267.    In accordance with Articles 4.3(c) and 8.4 of the ICC Rules of Arbitration, the Claimant nominates the following person to serve as an arbitrator in these proceedings:

> Eric A. Schwartz, Esq.
> Freshfields Bruckhaus Deringer
> 2/4, rue Paul Cézanne
> 75008 Paris
> France
> Tel: +33 1 44 56 44 62
> Fax: +33 1 44 56 27 30
> Fax: +33 1 44 56 27 31
> E-mail: eric.schwartz@freshfields.com

### C.    NOTIFICATIONS AND COMMUNICATIONS

268.    Any written notifications or communications to the Claimant in relation to this arbitration should be delivered to the Claimant at the following address:

---

[289]    The Contract, GC 44, Exh. C 19.

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

> White & Case LLP
> 11, Boulevard de la Madeleine
> 75001 Paris, France
> Attention: Mr. Christopher R. Seppälä
> Tel: (33-1) 55 04 15 15
> Fax: (33-1) 55 04 15 16
> E-mail: cseppala@whitecase.com

and with a copy to:

> Dr. Ghaleb Mahmassani
> Avocat – Law Consultant
> Serhal Building
> Cairo Street – Hamra
> Beirut
> Lebanon
> Tel: + 961 1 349 777
> Fax: + 961 1 348 712
> E-mail: ghmahmasani@terra.net.lb

-oo0oo-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

## VI.    REQUEST FOR RELIEF

269.  In consideration of all the above, the Claimant respectfully requests that the Arbitral
Tribunal:

   (i)      declare that URS is a proper party to Contract, including its arbitration clause, and
            should be held liable jointly and severally with Radian for the Contractor's
            obligations under the Contract;

   (ii)     order URS and Radian, jointly and severally, to pay SOLIDERE all costs and
            expenses incurred in excess of the Contract Price for purposes of completing the
            Works;

   (iii)retain    jurisdiction following issuance of an award on item (ii) above, in order to
            address any further issues of quantum of damages that may arise in the parties'
            implementation of the Arbitral Tribunal's award on item (ii) above;

   (iv)     order URS and Radian, jointly and severally, to compensate SOLIDERE for all its
            damages arising out of the delays to the Project, in an amount to be quantified in
            the course of these proceedings;

   (v)      order URS and Radian, jointly and severally, to pay SOLIDERE the award of
            costs made against Radian in Arbitration I, amounting to US$ 2,358,000;

   (vi)     order URS and Radian, jointly and severally, to pay interest on all principal
            amounts they are ordered to pay pursuant to these proceedings, from the date of
            the event giving rise to the claim, or as specified otherwise in the Contract;

   (vii)    order URS and Radian, jointly and severally, to pay all costs and expenses
            (including, but not limited to, costs payable to the ICC, legal fees and expenses
            and fees and expenses of experts, consultants and others) incurred by SOLIDERE
            in connection with the preparation for and conduct of this arbitration;

-83-

SOLIDERE v URS Corporation and Radian International LLC
Request for Arbitration

    (viii)   order URS and Radian, jointly and severally, to pay post-award interest on all amounts they are ordered to pay pursuant to these proceedings, from the date of the award until receipt of payment of such amount by SOLIDERE; and

    (ix)   grant SOLIDERE such other and further relief as the Arbitral Tribunal deems appropriate under the circumstances.

-oo0oo-

ERROR: ioerror
OFFENDING COMMAND: imagemask

STACK:

-dictionary-
-savelevel-

# EXHIBIT B



**.gouv.fr**

LE SERVICE PUBLIC DE L'ACCES AU DROIT

DEUTSCH  ENGLISH  ESPAÑOL

RECHERCHE SIMPLIFIEE    ACCES THEMATIQUE    RECHERCHE EXPERTE

Nouveau code de procédure civile



Retour

**Mise A jour LEGIFRANCE LE 15 sept 2003**
dernier texte modificateur signalé : Decret 2003-542 du 23/06/03 (JO 25/06/03)

## NEW CODE OF CIVIL PROCEDURE

BOOK I PROVISIONS COMMON TO ALL COURTS

TITLE I PRELIMINARY PROVISIONS

CHAPTER I GUIDING PRINCIPLES FOR TRIAL

SECTION I PROCEEDINGS

### Article 1

Only the parties may institute proceedings, save where the law shall provide otherwise. They shall have the right to terminate the same prior to them being disposed of by way of a judgment or by virtue of the law.

### Article 2

Parties shall conduct the proceedings under the duties incumbent upon them. They shall carry out the procedural steps in accordance with the manner and within the time-limit as applicable.

### Article 3

The judge shall supervise over the proper progress of the proceedings; he shall exercise such powers in view of imparting the time-limits and of giving such directions as necessary.

SECTION II THE SUBJECT MATTER OF A DISPUTE

### Article 4

The subject matter of a dispute shall be determined by the respective claims of the parties.
Such claims shall be set out in the originating application and in the defence. Notwithstanding the above, the subject matter of a dispute may be amended by incidental claims where they display a sufficient link so as to connect them with the original claim.

~~Arbitration proceedings shall terminate, save where there are specific agreement between the parties:~~

1° by the revocation, death or impediment of an arbitrator as well as his lost of the full exercise of his civil rights;

2° by the withdrawal or recusal of an arbitrator;

3° by the lapsing of the time-limit for arbitration.

*Article 1465*


*(Inserted by Decree No.81-500 of 12 May 1981, Official Journal of 14 May 1981, amendment JORF of 21 May 1981)*


Abatement of an arbitration proceedings shall be governed by the provisions of Articles 369 to 376.

*Article 1466*


*(Inserted by Decree No.81-500 of 12 May 1981, Official Journal of 14 May 1981, amendment JORF of 21 May 1981)*


Where, before an arbitrator, one of the parties has challenged as by way of principles, or with reference to its compass, the vires of the arbitrator, it shall belong to the latter to rule upon the validity and limits of his nomination.

*Article 1467*


*(Inserted by Decree No.81-500 of 12 May 1981, Official Journal of 14 May 1981, amendment JORF of 21 May 1981)*


Save where there is a contrary agreement to the same, an arbitrator shall entertain vires to determine the subsidiary interlocutory issues in relation to the verification of writing or of forgery in accordance with the provisions of Articles 287 to 294 and of Article 299.

Where there shall be a plea of forgery, Article 313 shall be applicable before the arbitrator. The time-limit for arbitration shall run from the day on which the subsidiary interlocutory issue has been determined.

*Article 1468*


*(Inserted by Decree No.81-500 of 12 May 1981, Official Journal of 14 May 1981, amendment JORF of 21 May 1981)*


The arbitrator shall fix the date on which the matter shall be deliberated.

After that date, no claim may be brought or new issue raised. No observation may be submitted nor any document be produced, save where it shall be at the request of the arbitrator.

# EXHIBIT C

# Rules of Arbitration

*in force as from 1 January 1998*

Cost scales effective as of 1 July 2003

**International Chamber of Commerce**
38 cours Albert 1er
75008 Paris - France
Telephone +33 1 49 53 28 28
Fax +33 1 49 53 29 33
Web site www.iccwbo.org

The ICC Rules of Arbitration and their Appendices have been translated into many different languages. However, the English and French versions are the only official texts.

© International Chamber of Commerce 1997, 2001

All rights reserved.

ICC No.: publication 808

Date of this online publication: October 2004

## FOREWORD

The closing decades of the twentieth century saw international commercial arbitration gain worldwide acceptance as the normal means of resolving international commercial disputes. National laws on arbitration have been modernized on all continents. International treaties on arbitration have been signed or adhered to with impressive success. Arbitration has become part of the curricula of large numbers of law schools. With the gradual removal of political and trade barriers and the rapid globalization of the world economy, new challenges have been created for arbitration institutions in response to the growing demand of parties for certainty and predictability, greater rapidity and flexibility as well as neutrality and efficacy in the resolution of international disputes.

Since the International Court of Arbitration was established in 1923, ICC arbitration has been constantly nourished by the experience gathered by the ICC International Court of Arbitration in the course of administering more than thirteen thousand international arbitration cases, now involving each year parties and arbitrators from over 100 countries and from a diversity of legal, economic, cultural and linguistic backgrounds.

The present ICC Rules of Arbitration came into effect on 1 January 1998. They are the result of an intensive, worldwide consultation process and constitute the first major revision of the Rules in more than 20 years. The changes made are designed to reduce delays and ambiguities and to fill certain gaps, taking into account the evolution of arbitration practice. The basic features of the ICC arbitration system have not been altered, however, notably its universality and flexibility, as well as the central role played by the ICC Court in the administration of arbitral cases.

Every ICC arbitration is conducted by an arbitral tribunal with responsibility for examining the merits of the case and rendering a final award. Each year, ICC arbitrations are held in numerous countries, in most major languages

3

and with arbitrators from all over the world. The work of those arbitral tribunals is monitored by the ICC Court, which meets weekly all year round. Composed of members from over 80 countries, the Court organizes and supervises arbitrations held under the ICC Rules of Arbitration. The Court must remain constantly alert to changes in the law and the practice of arbitration in all parts of the world and must adapt its working methods to the evolving needs of parties and arbitrators. For the day-to-day management of cases in many languages, the ICC Court is supported by a Secretariat based at the headquarters of the International Chamber of Commerce, in Paris.

Although the ICC Rules of Arbitration have been especially designed for arbitrations in an international context, they may also be used for non-international cases.

4

## STANDARD ICC ARBITRATION CLAUSE

The ICC recommends that all parties wishing to make reference to ICC arbitration in their contracts use the following standard clause.

Parties are reminded that it may be desirable for them to stipulate in the arbitration clause itself the law governing the contract, the number of arbitrators and the place and language of the arbitration. The parties' free choice of the law governing the contract and of the place and language of the arbitration is not limited by the ICC Rules of Arbitration.

Attention is called to the fact that the laws of certain countries require that parties to contracts expressly accept arbitration clauses, sometimes in a precise and particular manner.

The ICC Rules of Arbitration have been translated into several of the languages listed below. These translations are available on the web site of the ICC International Court of Arbitration:

**www.iccarbitration.org**

### English

'All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules."

5

## STANDARD CLAUSE FOR AN ICC
## PRE-ARBITRAL REFEREE PROCEDURE AND
## ICC ARBITRATION

The ICC Pre-Arbitral Referee Procedure provides for the appointment of a person empowered to make certain orders that might be necessary prior to a case being referred to arbitration or the courts. Use of this procedure presupposes a written agreement between the parties. Where parties wish to have recourse to both the ICC Pre-Arbitral Referee Procedure and ICC arbitration, specific reference should be made to both procedures. The following standard clause is recommended:

"Any party to this contract shall have the right to have recourse to and shall be bound by the Pre-Arbitral Referee Procedure of the International Chamber of Commerce in accordance with its Rules for a Pre-Arbitral Referee Procedure.

All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules of Arbitration."

For translations of this clause, please consult the web site of the ICC International Court of Arbitration:

**www.iccarbitration.org**

6

## RULES OF ARBITRATION OF THE
## INTERNATIONAL CHAMBER OF COMMERCE

### INTRODUCTORY PROVISIONS

### Article 1
### International Court of Arbitration

1

The International Court of Arbitration (the "Court") of the International Chamber of Commerce (the "ICC") is the arbitration body attached to the ICC. The statutes of the Court are set forth in Appendix I. Members of the Court are appointed by the World Council of the ICC. The function of the Court is to provide for the settlement by arbitration of business disputes of an international character in accordance with the Rules of Arbitration of the International Chamber of Commerce (the "Rules"). If so empowered by an arbitration agreement, the Court shall also provide for the settlement by arbitration in accordance with these Rules of business disputes not of an international character.

2

The Court does not itself settle disputes. It has the function of ensuring the application of these Rules. It draws up its own Internal Rules (Appendix II).

3

The Chairman of the Court or, in the Chairman's absence or otherwise at his request, one of its Vice-Chairmen shall have the power to take urgent decisions on behalf of the Court, provided that any such decision is reported to the Court at its next session.

4

As provided for in its Internal Rules, the Court may delegate to one or more committees composed of its members the power to take certain decisions, provided that any such decision is reported to the Court at its next session.

7

*ICC Rules of Arbitration*

### 5

The Secretariat of the Court (the "Secretariat") under the direction of its Secretary General (the "Secretary General") shall have its seat at the headquarters of the ICC.

## Article 2
## Definitions

In these Rules:

(i)  "Arbitral Tribunal" includes one or more arbitrators.

(ii) "Claimant" includes one or more claimants and "Respondent" includes one or more respondents.

(iii) "Award" includes, *inter alia*, an interim, partial or final Award.

## Article 3
## Written Notifications or Communications; Time Limits

### 1

All pleadings and other written communications submitted by any party, as well as all documents annexed thereto, shall be supplied in a number of copies sufficient to provide one copy for each party, plus one for each arbitrator, and one for the Secretariat. A copy of any communication from the Arbitral Tribunal to the parties shall be sent to the Secretariat.

### 2

All notifications or communications from the Secretariat and the Arbitral Tribunal shall be made to the last address of the party or its representative for whom the same are intended, as notified either by the party in question or by the other party. Such notification or communication may be made by delivery against receipt, registered post, courier, facsimile transmission, telex, telegram or any other means of telecommunication that provides a record of the sending thereof.

### 3

A notification or communication shall be deemed to have been made on the day it was received by the party itself

or by its representative, or would have been received if made in accordance with the preceding paragraph.

4

Periods of time specified in or fixed under the present Rules shall start to run on the day following the date a notification or communication is deemed to have been made in accordance with the preceding paragraph. When the day next following such date is an official holiday, or a non-business day in the country where the notification or communication is deemed to have been made, the period of time shall commence on the first following business day. Official holidays and non-business days are included in the calculation of the period of time. If the last day of the relevant period of time granted is an official holiday or a non-business day in the country where the notification or communication is deemed to have been made, the period of time shall expire at the end of the first following business day.

## COMMENCING THE ARBITRATION

### Article 4
### Request for Arbitration

1

A party wishing to have recourse to arbitration under these Rules shall submit its Request for Arbitration (the "Request") to the Secretariat, which shall notify the Claimant and Respondent of the receipt of the Request and the date of such receipt.

2

The date on which the Request is received by the Secretariat shall, for all purposes, be deemed to be the date of the commencement of the arbitral proceedings.

3

The Request shall, *inter alia*, contain the following information:

9

*ICC Rules of Arbitration*

a) the name in full, description and address of each of the parties;

b) a description of the nature and circumstances of the dispute giving rise to the claim(s);

c) a statement of the relief sought, including, to the extent possible, an indication of any amount(s) claimed;

d) the relevant agreements and, in particular, the arbitration agreement;

e) all relevant particulars concerning the number of arbitrators and their choice in accordance with the provisions of Articles 8, 9 and 10, and any nomination of an arbitrator required thereby; and

f) any comments as to the place of arbitration, the applicable rules of law and the language of the arbitration.

4

Together with the Request, the Claimant shall submit the number of copies thereof required by Article 3(1) and shall make the advance payment on administrative expenses required by Appendix III ("Arbitration Costs and Fees") in force on the date the Request is submitted. In the event that the Claimant fails to comply with either of these requirements, the Secretariat may fix a time limit within which the Claimant must comply, failing which the file shall be closed without prejudice to the right of the Claimant to submit the same claims at a later date in another Request.

5

The Secretariat shall send a copy of the Request and the documents annexed thereto to the Respondent for its Answer to the Request once the Secretariat has sufficient copies of the Request and the required advance payment.

6

When a party submits a Request in connection with a legal relationship in respect of which arbitration proceedings between the same parties are already pending under these Rules, the Court may, at the request

10

of a party, decide to include the claims contained in the Request in the pending proceedings provided that the Terms of Reference have not been signed or approved by the Court. Once the Terms of Reference have been signed or approved by the Court, claims may only be included in the pending proceedings subject to the provisions of Article 19.

## Article 5
## Answer to the Request; Counterclaims

1

Within 30 days from the receipt of the Request from the Secretariat, the Respondent shall file an Answer (the "Answer") which shall, *inter alia*, contain the following information:

a) its name in full, description and address;

b) its comments as to the nature and circumstances of the dispute giving rise to the claim(s);

c) its response to the relief sought;

d) any comments concerning the number of arbitrators and their choice in light of the Claimant's proposals and in accordance with the provisions of Articles 8, 9 and 10, and any nomination of an arbitrator required thereby; and

e) any comments as to the place of arbitration, the applicable rules of law and the language of the arbitration.

2

The Secretariat may grant the Respondent an extension of the time for filing the Answer, provided the application for such an extension contains the Respondent's comments concerning the number of arbitrators and their choice and, where required by Articles 8, 9 and 10, the nomination of an arbitrator. If the Respondent fails to do so, the Court shall proceed in accordance with these Rules.

3

The Answer shall be supplied to the Secretariat in the number of copies specified by Article 3(1).

*ICC Rules of Arbitration*

### 4

A copy of the Answer and the documents annexed thereto shall be communicated by the Secretariat to the Claimant.

### 5

Any counterclaim(s) made by the Respondent shall be filed with its Answer and shall provide:

a) a description of the nature and circumstances of the dispute giving rise to the counterclaim(s); and

b) a statement of the relief sought, including, to the extent possible, an indication of any amount(s) counterclaimed.

### 6

The Claimant shall file a reply to any counterclaim within 30 days from the date of receipt of the counterclaim(s) communicated by the Secretariat. The Secretariat may grant the Claimant an extension of time for filing the reply.

## Article 6
## Effect of the Arbitration Agreement

### 1

Where the parties have agreed to submit to arbitration under the Rules, they shall be deemed to have submitted *ipso facto* to the Rules in effect on the date of commencement of the arbitration proceedings, unless they have agreed to submit to the Rules in effect on the date of their arbitration agreement.

### 2

If the Respondent does not file an Answer, as provided by Article 5, or if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the Court may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist. In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral

*ICC Rules of Arbitration*

Tribunal itself. If the Court is not so satisfied, the parties shall be notified that the arbitration cannot proceed. In such a case, any party retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement.

### 3

If any of the parties refuses or fails to take part in the arbitration or any stage thereof, the arbitration shall proceed notwithstanding such refusal or failure.

### 4

Unless otherwise agreed, the Arbitral Tribunal shall not cease to have jurisdiction by reason of any claim that the contract is null and void or allegation that it is non-existent, provided that the Arbitral Tribunal upholds the validity of the arbitration agreement. The Arbitral Tribunal shall continue to have jurisdiction to determine the respective rights of the parties and to adjudicate their claims and pleas even though the contract itself may be non-existent or null and void.

## THE ARBITRAL TRIBUNAL

### Article 7
### General Provisions

### 1

Every arbitrator must be and remain independent of the parties involved in the arbitration.

### 2

Before appointment or confirmation, a prospective arbitrator shall sign a statement of independence and disclose in writing to the Secretariat any facts or circumstances which might be of such a nature as to call into question the arbitrator's independence in the eyes of the parties. The Secretariat shall provide such information to the parties in writing and fix a time limit for any comments from them.

*ICC Rules of Arbitration*

3

An arbitrator shall immediately disclose in writing to the Secretariat and to the parties any facts or circumstances of a similar nature which may arise during the arbitration.

4

The decisions of the Court as to the appointment, confirmation, challenge or replacement of an arbitrator shall be final and the reasons for such decisions shall not be communicated.

5

By accepting to serve, every arbitrator undertakes to carry out his responsibilities in accordance with these Rules.

6

Insofar as the parties have not provided otherwise, the Arbitral Tribunal shall be constituted in accordance with the provisions of Articles 8, 9 and 10.

## Article 8
## Number of Arbitrators

1

The disputes shall be decided by a sole arbitrator or by three arbitrators.

2

Where the parties have not agreed upon the number of arbitrators, the Court shall appoint a sole arbitrator, save where it appears to the Court that the dispute is such as to warrant the appointment of three arbitrators. In such case, the Claimant shall nominate an arbitrator within a period of 15 days from the receipt of the notification of the decision of the Court, and the Respondent shall nominate an arbitrator within a period of 15 days from the receipt of the notification of the nomination made by the Claimant.

3

Where the parties have agreed that the dispute shall be settled by a sole arbitrator, they may, by agreement,

14

*ICC Rules of Arbitration*

nominate the sole arbitrator for confirmation. If the parties fail to nominate a sole arbitrator within 30 days from the date when the Claimant's Request for Arbitration has been received by the other party, or within such additional time as may be allowed by the Secretariat, the sole arbitrator shall be appointed by the Court.

4

Where the dispute is to be referred to three arbitrators, each party shall nominate in the Request and the Answer, respectively, one arbitrator for confirmation. If a party fails to nominate an arbitrator, the appointment shall be made by the Court. The third arbitrator, who will act as chairman of the Arbitral Tribunal, shall be appointed by the Court, unless the parties have agreed upon another procedure for such appointment, in which case the nomination will be subject to confirmation pursuant to Article 9. Should such procedure not result in a nomination within the time limit fixed by the parties or the Court, the third arbitrator shall be appointed by the Court.

## Article 9
## Appointment and Confirmation of the Arbitrators

1

In confirming or appointing arbitrators, the Court shall consider the prospective arbitrator's nationality, residence and other relationships with the countries of which the parties or the other arbitrators are nationals and the prospective arbitrator's availability and ability to conduct the arbitration in accordance with these Rules. The same shall apply where the Secretary General confirms arbitrators pursuant to Article 9(2).

2

The Secretary General may confirm as co-arbitrators, sole arbitrators and chairmen of Arbitral Tribunals persons nominated by the parties or pursuant to their particular agreements, provided they have filed a statement of independence without qualification or a qualified statement of independence has not given rise to

15

objections. Such confirmation shall be reported to the Court at its next session. If the Secretary General considers that a co-arbitrator, sole arbitrator or chairman of an Arbitral Tribunal should not be confirmed, the matter shall be submitted to the Court.

### 3

Where the Court is to appoint a sole arbitrator or the chairman of an Arbitral Tribunal, it shall make the appointment upon a proposal of a National Committee of the ICC that it considers to be appropriate. If the Court does not accept the proposal made, or if the National Committee fails to make the proposal requested within the time limit fixed by the Court, the Court may repeat its request or may request a proposal from another National Committee that it considers to be appropriate.

### 4

Where the Court considers that the circumstances so demand, it may choose the sole arbitrator or the chairman of the Arbitral Tribunal from a country where there is no National Committee, provided that neither of the parties objects within the time limit fixed by the Court.

### 5

The sole arbitrator or the chairman of the Arbitral Tribunal shall be of a nationality other than those of the parties. However, in suitable circumstances and provided that neither of the parties objects within the time limit fixed by the Court, the sole arbitrator or the chairman of the Arbitral Tribunal may be chosen from a country of which any of the parties is a national.

### 6

Where the Court is to appoint an arbitrator on behalf of a party which has failed to nominate one, it shall make the appointment upon a proposal of the National Committee of the country of which that party is a national. If the Court does not accept the proposal made, or if the National Committee fails to make the proposal requested within the time limit fixed by the Court, or if the country of which the said party is a national has no National

*ICC Rules of Arbitration*

Committee, the Court shall be at liberty to choose any person whom it regards as suitable. The Secretariat shall inform the National Committee, if one exists, of the country of which such person is a national.

### Article 10
### Multiple Parties

1

Where there are multiple parties, whether as Claimant or as Respondent, and where the dispute is to be referred to three arbitrators, the multiple Claimants, jointly, and the multiple Respondents, jointly, shall nominate an arbitrator for confirmation pursuant to Article 9.

2

In the absence of such a joint nomination and where all parties are unable to agree to a method for the constitution of the Arbitral Tribunal, the Court may appoint each member of the Arbitral Tribunal and shall designate one of them to act as chairman. In such case, the Court shall be at liberty to choose any person it regards as suitable to act as arbitrator, applying Article 9 when it considers this appropriate.

### Article 11
### Challenge of Arbitrators

1

A challenge of an arbitrator, whether for an alleged lack of independence or otherwise, shall be made by the submission to the Secretariat of a written statement specifying the facts and circumstances on which the challenge is based.

2

For a challenge to be admissible, it must be sent by a party either within 30 days from receipt by that party of the notification of the appointment or confirmation of the arbitrator, or within 30 days from the date when the party making the challenge was informed of the facts and circumstances on which the challenge is based if such date is subsequent to the receipt of such notification.

3

The Court shall decide on the admissibility and, at the same time, if necessary, on the merits of a challenge after the Secretariat has afforded an opportunity for the arbitrator concerned, the other party or parties and any other members of the Arbitral Tribunal to comment in writing within a suitable period of time. Such comments shall be communicated to the parties and to the arbitrators.

## Article 12
## Replacement of Arbitrators

1

An arbitrator shall be replaced upon his death, upon the acceptance by the Court of the arbitrator's resignation, upon acceptance by the Court of a challenge, or upon the request of all the parties.

2

An arbitrator shall also be replaced on the Court's own initiative when it decides that he is prevented *de jure* or *de facto* from fulfilling his functions, or that he is not fulfilling his functions in accordance with the Rules or within the prescribed time limits.

3

When, on the basis of information that has come to its attention, the Court considers applying Article 12(2), it shall decide on the matter after the arbitrator concerned, the parties and any other members of the Arbitral Tribunal have had an opportunity to comment in writing within a suitable period of time. Such comments shall be communicated to the parties and to the arbitrators.

4

When an arbitrator is to be replaced, the Court has discretion to decide whether or not to follow the original nominating process. Once reconstituted, and after having invited the parties to comment, the Arbitral Tribunal shall determine if and to what extent prior proceedings shall be repeated before the reconstituted Arbitral Tribunal.

*ICC Rules of Arbitration*

5

Subsequent to the closing of the proceedings, instead of replacing an arbitrator who has died or been removed by the Court pursuant to Articles 12(1) and 12(2), the Court may decide, when it considers it appropriate, that the remaining arbitrators shall continue the arbitration. In making such determination, the Court shall take into account the views of the remaining arbitrators and of the parties and such other matters that it considers appropriate in the circumstances.

## THE ARBITRAL PROCEEDINGS

### Article 13
### Transmission of the File to the Arbitral Tribunal

The Secretariat shall transmit the file to the Arbitral Tribunal as soon as it has been constituted, provided the advance on costs requested by the Secretariat at this stage has been paid.

### Article 14
### Place of the Arbitration

1

The place of the arbitration shall be fixed by the Court unless agreed upon by the parties.

2

The Arbitral Tribunal may, after consultation with the parties, conduct hearings and meetings at any location it considers appropriate unless otherwise agreed by the parties.

3

The Arbitral Tribunal may deliberate at any location it considers appropriate.

19

*ICC Rules of Arbitration*

## Article 15
## Rules Governing the Proceedings

1

The proceedings before the Arbitral Tribunal shall be governed by these Rules and, where these Rules are silent, by any rules which the parties or, failing them, the Arbitral Tribunal may settle on, whether or not reference is thereby made to the rules of procedure of a national law to be applied to the arbitration.

2

In all cases, the Arbitral Tribunal shall act fairly and impartially and ensure that each party has a reasonable opportunity to present its case.

## Article 16
## Language of the Arbitration

In the absence of an agreement by the parties, the Arbitral Tribunal shall determine the language or languages of the arbitration, due regard being given to all relevant circumstances, including the language of the contract.

## Article 17
## Applicable Rules of Law

1

The parties shall be free to agree upon the rules of law to be applied by the Arbitral Tribunal to the merits of the dispute. In the absence of any such agreement, the Arbitral Tribunal shall apply the rules of law which it determines to be appropriate.

2

In all cases the Arbitral Tribunal shall take account of the provisions of the contract and the relevant trade usages.

3

The Arbitral Tribunal shall assume the powers of an *amiable compositeur* or decide *ex aequo et bono* only if the parties have agreed to give it such powers.

20

## Article 18
## Terms of Reference; Procedural Timetable

1

As soon as it has received the file from the Secretariat, the Arbitral Tribunal shall draw up, on the basis of documents or in the presence of the parties and in the light of their most recent submissions, a document defining its Terms of Reference. This document shall include the following particulars:

a) the full names and descriptions of the parties;

b) the addresses of the parties to which notifications and communications arising in the course of the arbitration may be made;

c) a summary of the parties' respective claims and of the relief sought by each party, with an indication to the extent possible of the amounts claimed or counterclaimed;

d) unless the Arbitral Tribunal considers it inappropriate, a list of issues to be determined;

e) the full names, descriptions and addresses of the arbitrators;

f) the place of the arbitration; and

g) particulars of the applicable procedural rules and, if such is the case, reference to the power conferred upon the Arbitral Tribunal to act as *amiable compositeur* or to decide ex *aequo et bono*.

2

The Terms of Reference shall be signed by the parties and the Arbitral Tribunal. Within two months of the date on which the file has been transmitted to it, the Arbitral Tribunal shall transmit to the Court the Terms of Reference signed by it and by the parties. The Court may extend this time limit pursuant to a reasoned request from the Arbitral Tribunal or on its own initiative if it decides it is necessary to do so.

3

If any of the parties refuses to take part in the drawing up of the Terms of Reference or to sign the same, they shall

be submitted to the Court for approval. When the Terms of Reference have been signed in accordance with Article 18(2) or approved by the Court, the arbitration shall proceed.

4

When drawing up the Terms of Reference, or as soon as possible thereafter, the Arbitral Tribunal, after having consulted the parties, shall establish in a separate document a provisional timetable that it intends to follow for the conduct of the arbitration and shall communicate it to the Court and the parties. Any subsequent modifications of the provisional timetable shall be communicated to the Court and the parties.

## Article 19
## New Claims

After the Terms of Reference have been signed or approved by the Court, no party shall make new claims or counterclaims which fall outside the limits of the Terms of Reference unless it has been authorized to do so by the Arbitral Tribunal, which shall consider the nature of such new claims or counterclaims, the stage of the arbitration and other relevant circumstances.

## Article 20
## Establishing the Facts of the Case

1

The Arbitral Tribunal shall proceed within as short a time as possible to establish the facts of the case by all appropriate means.

2

After studying the written submissions of the parties and all documents relied upon, the Arbitral Tribunal shall hear the parties together in person if any of them so requests or, failing such a request, it may of its own motion decide to hear them.

3

The Arbitral Tribunal may decide to hear witnesses, experts appointed by the parties or any other person, in

the presence of the parties, or in their absence provided they have been duly summoned.

### 4

The Arbitral Tribunal, after having consulted the parties, may appoint one or more experts, define their terms of reference and receive their reports. At the request of a party, the parties shall be given the opportunity to question at a hearing any such expert appointed by the Tribunal.

### 5

At any time during the proceedings, the Arbitral Tribunal may summon any party to provide additional evidence.

### 6

The Arbitral Tribunal may decide the case solely on the documents submitted by the parties unless any of the parties requests a hearing.

### 7

The Arbitral Tribunal may take measures for protecting trade secrets and confidential information.

## Article 21
## Hearings

### 1

When a hearing is to be held, the Arbitral Tribunal, giving reasonable notice, shall summon the parties to appear before it on the day and at the place fixed by it.

### 2

If any of the parties, although duly summoned, fails to appear without valid excuse, the Arbitral Tribunal shall have the power to proceed with the hearing.

### 3

The Arbitral Tribunal shall be in full charge of the hearings, at which all the parties shall be entitled to be present. Save with the approval of the Arbitral Tribunal and the parties, persons not involved in the proceedings shall not be admitted.

23

4

The parties may appear in person or through duly authorized representatives. In addition, they may be assisted by advisers.

## Article 22
## Closing of the Proceedings

1

When it is satisfied that the parties have had a reasonable opportunity to present their cases, the Arbitral Tribunal shall declare the proceedings closed. Thereafter, no further submission or argument may be made, or evidence produced, unless requested or authorized by the Arbitral Tribunal.

2

When the Arbitral Tribunal has declared the proceedings closed, it shall indicate to the Secretariat an approximate date by which the draft Award will be submitted to the Court for approval pursuant to Article 27. Any postponement of that date shall be communicated to the Secretariat by the Arbitral Tribunal.

## Article 23
## Conservatory and Interim Measures

1

Unless the parties have otherwise agreed, as soon as the file has been transmitted to it, the Arbitral Tribunal may, at the request of a party, order any interim or conservatory measure it deems appropriate. The Arbitral Tribunal may make the granting of any such measure subject to appropriate security being furnished by the requesting party. Any such measure shall take the form of an order, giving reasons, or of an Award, as the Arbitral Tribunal considers appropriate.

2

Before the file is transmitted to the Arbitral Tribunal, and in appropriate circumstances even thereafter, the parties may apply to any competent judicial authority for interim

*ICC Rules of Arbitration*

or conservatory measures. The application of a party to a judicial authority for such measures or for the implementation of any such measures ordered by an Arbitral Tribunal shall not be deemed to be an infringement or a waiver of the arbitration agreement and shall not affect the relevant powers reserved to the Arbitral Tribunal. Any such application and any measures taken by the judicial authority must be notified without delay to the Secretariat. The Secretariat shall inform the Arbitral Tribunal thereof.

## AWARDS

### Article 24
### Time Limit for the Award

1

The time limit within which the Arbitral Tribunal must render its final Award is six months. Such time limit shall start to run from the date of the last signature by the Arbitral Tribunal or by the parties of the Terms of Reference or, in the case of application of Article 18(3), the date of the notification to the Arbitral Tribunal by the Secretariat of the approval of the Terms of Reference by the Court.

2

The Court may extend this time limit pursuant to a reasoned request from the Arbitral Tribunal or on its own initiative if it decides it is necessary to do so.

### Article 25
### Making of the Award

1

When the Arbitral Tribunal is composed of more than one arbitrator, an Award is given by a majority decision. If there be no majority, the Award shall be made by the chairman of the Arbitral Tribunal alone.

25

*ICC Rules of Arbitration*

2

The Award shall state the reasons upon which it is based.

3

The Award shall be deemed to be made at the place of the arbitration and on the date stated therein.

## Article 26
## Award by Consent

If the parties reach a settlement after the file has been transmitted to the Arbitral Tribunal in accordance with Article 13, the settlement shall be recorded in the form of an Award made by consent of the parties if so requested by the parties and if the Arbitral Tribunal agrees to do so.

## Article 27
## Scrutiny of the Award by the Court

Before signing any Award, the Arbitral Tribunal shall submit it in draft form to the Court. The Court may lay down modifications as to the form of the Award and, without affecting the Arbitral Tribunal's liberty of decision, may also draw its attention to points of substance. No Award shall be rendered by the Arbitral Tribunal until it has been approved by the Court as to its form.

## Article 28
## Notification, Deposit and Enforceability of the Award

1

Once an Award has been made, the Secretariat shall notify to the parties the text signed by the Arbitral Tribunal, provided always that the costs of the arbitration have been fully paid to the ICC by the parties or by one of them.

2

Additional copies certified true by the Secretary General shall be made available on request and at any time to the parties, but to no one else.

26

*ICC Rules of Arbitration*

3

By virtue of the notification made in accordance with Paragraph 1 of this Article, the parties waive any other form of notification or deposit on the part of the Arbitral Tribunal.

4

An original of each Award made in accordance with the present Rules shall be deposited with the Secretariat.

5

The Arbitral Tribunal and the Secretariat shall assist the parties in complying with whatever further formalities may be necessary.

6

Every Award shall be binding on the parties. By submitting the dispute to arbitration under these Rules, the parties undertake to carry out any Award without delay and shall be deemed to have waived their right to any form of recourse insofar as such waiver can validly be made.

## Article 29
## Correction and Interpretation of the Award

1

On its own initiative, the Arbitral Tribunal may correct a clerical, computational or typographical error, or any errors of similar nature contained in an Award, provided such correction is submitted for approval to the Court within 30 days of the date of such Award.

2

Any application of a party for the correction of an error of the kind referred to in Article 29(1), or for the interpretation of an Award, must be made to the Secretariat within 30 days of the receipt of the Award by such party, in a number of copies as stated in Article 3(1). After transmittal of the application to the Arbitral Tribunal, the latter shall grant the other party a short time limit, normally not exceeding 30 days, from the receipt of the application by that party, to submit any comments

27

*ICC Rules of Arbitration*

thereon. If the Arbitral Tribunal decides to correct or interpret the Award, it shall submit its decision in draft form to the Court not later than 30 days following the expiration of the time limit for the receipt of any comments from the other party or within such other period as the Court may decide.

3

The decision to correct or to interpret the Award shall take the form of an addendum and shall constitute part of the Award. The provisions of Articles 25, 27 and 28 shall apply *mutatis mutandis*.

## COSTS

### Article 30
### Advance to Cover the Costs of the Arbitration

1

After receipt of the Request, the Secretary General may request the Claimant to pay a provisional advance in an amount intended to cover the costs of arbitration until the Terms of Reference have been drawn up.

2

As soon as practicable, the Court shall fix the advance on costs in an amount likely to cover the fees and expenses of the arbitrators and the ICC administrative costs for the claims and counterclaims which have been referred to it by the parties. This amount may be subject to readjustment at any time during the arbitration. Where, apart from the claims, counterclaims are submitted, the Court may fix separate advances on costs for the claims and the counterclaims.

3

The advance on costs fixed by the Court shall be payable in equal shares by the Claimant and the Respondent. Any provisional advance paid on the basis of Article 30(1) will

28

*ICC Rules of Arbitration*

be considered as a partial payment thereof. However, any party shall be free to pay the whole of the advance on costs in respect of the principal claim or the counterclaim should the other party fail to pay its share. When the Court has set separate advances on costs in accordance with Article 30(2), each of the parties shall pay the advance on costs corresponding to its claims.

4

When a request for an advance on costs has not been complied with, and after consultation with the Arbitral Tribunal, the Secretary General may direct the Arbitral Tribunal to suspend its work and set a time limit, which must be not less than 15 days, on the expiry of which the relevant claims, or counterclaims, shall be considered as withdrawn. Should the party in question wish to object to this measure, it must make a request within the aforementioned period for the matter to be decided by the Court. Such party shall not be prevented, on the ground of such withdrawal, from reintroducing the same claims or counterclaims at a later date in another proceeding.

5

If one of the parties claims a right to a set-off with regard to either claims or counterclaims, such set-off shall be taken into account in determining the advance to cover the costs of arbitration in the same way as a separate claim insofar as it may require the Arbitral Tribunal to consider additional matters.

## Article 31
## Decision as to the Costs of the Arbitration

1

The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scale in force at the time of the commencement of the arbitral proceedings, as well as the fees and expenses of any experts appointed by the Arbitral Tribunal and the reasonable legal and other costs incurred by the parties for the arbitration.

29

2

The Court may fix the fees of the arbitrators at a figure higher or lower than that which would result from the application of the relevant scale should this be deemed necessary due to the exceptional circumstances of the case. Decisions on costs other than those fixed by the Court may be taken by the Arbitral Tribunal at any time during the proceedings.

3

The final Award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.


## MISCELLANEOUS

### Article 32
### Modified Time Limits

1

The parties may agree to shorten the various time limits set out in these Rules. Any such agreement entered into subsequent to the constitution of an Arbitral Tribunal shall become effective only upon the approval of the Arbitral Tribunal.

2

The Court, on its own initiative, may extend any time limit which has been modified pursuant to Article 32(1) if it decides that it is necessary to do so in order that the Arbitral Tribunal or the Court may fulfil their responsibilities in accordance with these Rules.

### Article 33
### Waiver

A party which proceeds with the arbitration without raising its objection to a failure to comply with any provision of these Rules, or of any other rules applicable to the proceedings, any direction given by the Arbitral Tribunal,

*ICC Rules of Arbitration*

or any requirement under the arbitration agreement relating to the constitution of the Arbitral Tribunal, or to the conduct of the proceedings, shall be deemed to have waived its right to object.

## Article 34
## Exclusion of Liability

Neither the arbitrators, nor the Court and its members, nor the ICC and its employees, nor the ICC National Committees shall be liable to any person for any act or omission in connection with the arbitration.

## Article 35
## General Rule

In all matters not expressly provided for in these Rules, the Court and the Arbitral Tribunal shall act in the spirit of these Rules and shall make every effort to make sure that the Award is enforceable at law.

## APPENDIX I
## STATUTES OF THE INTERNATIONAL
## COURT OF ARBITRATION OF THE ICC

### Article 1
### Function

1

The function of the International Court of Arbitration of the International Chamber of Commerce (the "Court") is to ensure the application of the Rules of Arbitration of the International Chamber of Commerce, and it has all the necessary powers for that purpose.

2

As an autonomous body, it carries out these functions in complete independence from the ICC and its organs.

3

Its members are independent from the ICC National Committees.

### Article 2
### Composition of the Court

The Court shall consist of a Chairman, Vice-Chairmen, and members and alternate members (collectively designated as members). In its work it is assisted by its Secretariat (Secretariat of the Court).

### Article 3
### Appointment

1

The Chairman is elected by the ICC World Council upon the recommendation of the Executive Board of the ICC.

2

The ICC World Council appoints the Vice-Chairmen of the Court from among the members of the Court or otherwise.

32

*Appendix I to the ICC Rules of Arbitration*

3

Its members are appointed by the ICC World Council on the proposal of National Committees, one member for each Committee.

4

On the proposal of the Chairman of the Court, the World Council may appoint alternate members.

5

The term of office of all members is three years. If a member is no longer in a position to exercise his functions, his successor is appointed by the World Council for the remainder of the term.

## Article 4
### Plenary Session of the Court

The Plenary Sessions of the Court are presided over by the Chairman or, in his absence, by one of the Vice-Chairmen designated by him. The deliberations shall be valid when at least six members are present. Decisions are taken by a majority vote, the Chairman having a casting vote in the event of a tie.

## Article 5
### Committees

The Court may set up one or more Committees and establish the functions and organization of such Committees.

## Article 6
### Confidentiality

The work of the Court is of a confidential nature which must be respected by everyone who participates in that work in whatever capacity. The Court lays down the rules regarding the persons who can attend the meetings of the Court and its Committees and who are entitled to have access to the materials submitted to the Court and its Secretariat.

33

*Appendix I to the ICC Rules of Arbitration*

### Article 7
### Modification of the Rules of Arbitration

Any proposal of the Court for a modification of the Rules is laid before the Commission on Arbitration before submission to the Executive Board and the World Council of the ICC for approval.

34

## APPENDIX II
## INTERNAL RULES OF THE INTERNATIONAL
## COURT OF ARBITRATION OF THE ICC

### Article 1
### Confidential Character of the Work of the
### International Court of Arbitration

1

The sessions of the Court, whether plenary or those of a Committee of the Court, are open only to its members and to the Secretariat.

2

However, in exceptional circumstances, the Chairman of the Court may invite other persons to attend. Such persons must respect the confidential nature of the work of the Court.

3

The documents submitted to the Court, or drawn up by it in the course of its proceedings, are communicated only to the members of the Court and to the Secretariat and to persons authorized by the Chairman to attend Court sessions.

4

The Chairman or the Secretary General of the Court may authorize researchers undertaking work of a scientific nature on international trade law to acquaint themselves with Awards and other documents of general interest, with the exception of memoranda, notes, statements and documents remitted by the parties within the framework of arbitration proceedings.

5

Such authorization shall not be given unless the beneficiary has undertaken to respect the confidential character of the documents made available and to refrain from any publication in their respect without having previously submitted the text for approval to the Secretary General of the Court.

*Appendix II to the ICC Rules of Arbitration*

6

The Secretariat will in each case submitted to arbitration under the Rules retain in the archives of the Court all Awards, Terms of Reference and decisions of the Court, as well as copies of the pertinent correspondence of the Secretariat.

7

Any documents, communications or correspondence submitted by the parties or the arbitrators may be destroyed unless a party or an arbitrator requests in writing within a period fixed by the Secretariat the return of such documents. All related costs and expenses for the return of those documents shall be paid by such party or arbitrator.

## Article 2
## Participation of Members of the International Court of Arbitration in ICC Arbitration

1

The Chairman and the members of the Secretariat of the Court may not act as arbitrators or as counsel in cases submitted to ICC arbitration.

2

The Court shall not appoint Vice-Chairmen or members of the Court as arbitrators. They may, however, be proposed for such duties by one or more of the parties, or pursuant to any other procedure agreed upon by the parties, subject to confirmation.

3

When the Chairman, a Vice-Chairman or a member of the Court or of the Secretariat is involved in any capacity whatsoever in proceedings pending before the Court, such person must inform the Secretary General of the Court upon becoming aware of such involvement.

4

Such person must refrain from participating in the discussions or in the decisions of the Court concerning

the proceedings and must be absent from the courtroom whenever the matter is considered.

5

Such person will not receive any material documentation or information pertaining to such proceedings.

## Article 3
### Relations between the Members of the Court and the ICC National Committees

1

By virtue of their capacity, the members of the Court are independent of the ICC National Committees which proposed them for appointment by the ICC World Council.

2

Furthermore, they must regard as confidential, vis-à-vis the said National Committees, any information concerning individual cases with which they have become acquainted in their capacity as members of the Court, except when they have been requested by the Chairman of the Court or by its Secretary General to communicate specific information to their respective National Committees.

## Article 4
### Committee of the Court

1

In accordance with the provisions of Article 1(4) of the Rules and Article 5 of its Statutes (Appendix I), the Court hereby establishes a Committee of the Court.

2

The members of the Committee consist of a Chairman and at least two other members. The Chairman of the Court acts as the Chairman of the Committee. If absent, the Chairman may designate a Vice-Chairman of the Court or, in exceptional circumstances, another member of the Court as Chairman of the Committee.

*Appendix II to the ICC Rules of Arbitration*

3

The other two members of the Committee are appointed by the Court from among the Vice-Chairmen or the other members of the Court. At each Plenary Session the Court appoints the members who are to attend the meetings of the Committee to be held before the next Plenary Session.

4

The Committee meets when convened by its Chairman. Two members constitute a quorum.

5

(a)     The Court shall determine the decisions that may be taken by the Committee.

(b)     The decisions of the Committee are taken unanimously.

(c)     When the Committee cannot reach a decision or deems it preferable to abstain, it transfers the case to the next Plenary Session, making any suggestions it deems appropriate.

(d)     The Committee's decisions are brought to the notice of the Court at its next Plenary Session.

## Article 5
## Court Secretariat

1

In case of absence, the Secretary General may delegate to the General Counsel and Deputy Secretary General the authority to confirm arbitrators, to certify true copies of Awards and to request the payment of a provisional advance, respectively provided for in Articles 9(2), 28(2) and 30(1) of the Rules.

2

The Secretariat may, with the approval of the Court, issue notes and other documents for the information of the parties and the arbitrators, or as necessary for the proper conduct of the arbitral proceedings.

*Appendix II to the ICC Rules of Arbitration*

### Article 6
### Scrutiny of Arbitral Awards

When the Court scrutinizes draft Awards in accordance with Article 27 of the Rules, it considers, to the extent practicable, the requirements of mandatory law at the place of arbitration.

## APPENDIX III
## ARBITRATION COSTS AND FEES

### Article 1
### Advance on Costs

**1**

Each request to commence an arbitration pursuant to the Rules must be accompanied by an advance payment of US\$ 2,500 on the administrative expenses. Such payment is non-refundable, and shall be credited to the Claimant's portion of the advance on costs.

**2**

The provisional advance fixed by the Secretary General according to Article 30(1) of the Rules shall normally not exceed the amount obtained by adding together the administrative expenses, the minimum of the fees (as set out in the scale hereinafter) based upon the amount of the claim and the expected reimbursable expenses of the Arbitral Tribunal incurred with respect to the drafting of the Terms of Reference. If such amount is not quantified, the provisional advance shall be fixed at the discretion of the Secretary General. Payment by the Claimant shall be credited to its share of the advance on costs fixed by the Court.

**3**

In general, after the Terms of Reference have been signed or approved by the Court and the provisional timetable has been established, the Arbitral Tribunal shall, in accordance with Article 30(4) of the Rules, proceed only with respect to those claims or counterclaims in regard to which the whole of the advance on costs has been paid.

**4**

The advance on costs fixed by the Court according to Article 30(2) of the Rules comprises the fees of the arbitrator or arbitrators (hereinafter referred to as "arbitrator"), any arbitration-related expenses of the arbitrator and the administrative expenses.

4 0

*Appendix III to the ICC Rules of Arbitration*

5

Each party shall pay in cash its share of the total advance on costs. However, if its share exceeds an amount fixed from time to time by the Court, a party may post a bank guarantee for this additional amount.

6

A party that has already paid in full its share of the advance on costs fixed by the Court may, in accordance with Article 30(3) of the Rules, pay the unpaid portion of the advance owed by the defaulting party by posting a bank guarantee.

7

When the Court has fixed separate advances on costs pursuant to Article 30(2) of the Rules, the Secretariat shall invite each party to pay the amount of the advance corresponding to its respective claim(s).

8

When, as a result of the fixing of separate advances on costs, the separate advance fixed for the claim of either party exceeds one half of such global advance as was previously fixed (in respect of the same claims and counterclaims that are the subject of separate advances), a bank guarantee may be posted to cover any such excess amount. In the event that the amount of the separate advance is subsequently increased, at least one half of the increase shall be paid in cash.

9

The Secretariat shall establish the terms governing all bank guarantees which the parties may post pursuant to the above provisions.

10

As provided in Article 30(2) of the Rules, the advance on costs may be subject to readjustment at any time during the arbitration, in particular to take into account fluctuations in the amount in dispute, changes in the amount of the estimated expenses of the arbitrator, or the evolving difficulty or complexity of arbitration proceedings.

*Appendix III to the ICC Rules of Arbitration*

11

Before any expertise ordered by the Arbitral Tribunal can be commenced, the parties, or one of them, shall pay an advance on costs fixed by the Arbitral Tribunal sufficient to cover the expected fees and expenses of the expert as determined by the Arbitral Tribunal. The Arbitral Tribunal shall be responsible for ensuring the payment by the parties of such fees and expenses.

## Article 2
## Costs and Fees

1

Subject to Article 31(2) of the Rules, the Court shall fix the fees of the arbitrator in accordance with the scale hereinafter set out or, where the sum in dispute is not stated, at its discretion.

2

In setting the arbitrator's fees, the Court shall take into consideration the diligence of the arbitrator, the time spent, the rapidity of the proceedings, and the complexity of the dispute, so as to arrive at a figure within the limits specified or, in exceptional circumstances (Article 31(2) of the Rules), at a figure higher or lower than those limits.

3

When a case is submitted to more than one arbitrator, the Court, at its discretion, shall have the right to increase the total fees up to a maximum which shall normally not exceed three times the fees of one arbitrator.

4

The arbitrator's fees and expenses shall be fixed exclusively by the Court as required by the Rules. Separate fee arrangements between the parties and the arbitrator are contrary to the Rules.

5

The Court shall fix the administrative expenses of each arbitration in accordance with the scale hereinafter set out or, where the sum in dispute is not stated, at its

42

*Appendix III to the ICC Rules of Arbitration*

discretion. In exceptional circumstances, the Court may fix the administrative expenses at a lower or higher figure than that which would result from the application of such scale, provided that such expenses shall normally not exceed the maximum amount of the scale. Further, the Court may require the payment of administrative expenses in addition to those provided in the scale of administrative expenses as a condition to holding an arbitration in abeyance at the request of the parties or of one of them with the acquiescence of the other.

6

If an arbitration terminates before the rendering of a final Award, the Court shall fix the costs of the arbitration at its discretion, taking into account the stage attained by the arbitral proceedings and any other relevant circumstances.

7

In the case of an application under Article 29(2) of the Rules, the Court may fix an advance to cover additional fees and expenses of the Arbitral Tribunal and may make the transmission of such application to the Arbitral Tribunal subject to the prior cash payment in full to the ICC of such advance. The Court shall fix at its discretion any possible fees of the arbitrator when approving the decision of the Arbitral Tribunal.

8

When an arbitration is preceded by an attempt at amicable resolution pursuant to the ICC ADR Rules, one half of the administrative expenses paid for such ADR proceedings shall be credited to the administrative expenses of the arbitration.

9

Amounts paid to the arbitrator do not include any possible value added taxes (VAT) or other taxes or charges and imposts applicable to the arbitrator's fees. Parties have a duty to pay any such taxes or charges; however, the recovery of any such charges or taxes is a matter solely between the arbitrator and the parties.

43

*Appendix III to the ICC Rules of Arbitration*

### Article 3
### ICC as Appointing Authority

Any request received for an authority of the ICC to act as appointing authority will be treated in accordance with the Rules of ICC as Appointing Authority in UNCITRAL or Other *Ad Hoc* Arbitration Proceedings and shall be accompanied by a non-refundable sum of US$ 2,500. No request shall be processed unless accompanied by the said sum. For additional services, ICC may at its discretion fix administrative expenses, which shall be commensurate with the services provided and shall not exceed the maximum sum of US$ 10,000.

### Article 4
### Scales of Administrative Expenses and Arbitrator's Fees

1

The Scales of Administrative Expenses and Arbitrator's Fees set forth below shall be effective as of 1 July 2003 in respect of all arbitrations commenced on or after such date, irrespective of the version of the Rules applying to such arbitrations.

2

To calculate the administrative expenses and the arbitrator's fees, the amounts calculated for each successive slice of the sum in dispute must be added together, except that where the sum in dispute is over US$ 80 million, a flat amount of US$ 88,800 shall constitute the entirety of the administrative expenses.

*Appendix III to the ICC Rules of Arbitration*

### A. ADMINISTRATIVE EXPENSES

| Sum in dispute (in US Dollars) | | | Administrative expenses[*] |
|---|---|---|---|
| up to | 50 000 | | $ 2 500 |
| from | 50 001 | to | 100 000 | 3.50% |
| from | 100 001 | to | 500 000 | 1.70% |
| from | 500 001 | to | 1 000 000 | 1.15% |
| from | 1 000 001 | to | 2 000 000 | 0.70% |
| from | 2 000 001 | to | 5 000 000 | 0.30% |
| from | 5 000 001 | to | 10 000 000 | 0.20% |
| from | 10 000 001 | to | 50 000 000 | 0.07% |
| from | 50 000 001 | to | 80 000 000 | 0.06% |
| over | 80 000 000 | | $ 88 800 |

*(*) For illustrative purposes only, the table on the following page indicates the resulting administrative expenses in US$ when the proper calculations have been made.*

### B. ARBITRATOR'S FEES

| Sum in dispute (in US Dollars) | | | | Fees[**] | |
|---|---|---|---|---|---|
| | | | | minimum | maximum |
| up to | 50 000 | | | $ 2 500 | 17.00% |
| from | 50 001 | to | 100 000 | 2.00% | 11.00% |
| from | 100 001 | to | 500 000 | 1.00% | 5.50% |
| from | 500 001 | to | 1 000 000 | 0.75% | 3.50% |
| from | 1 000 001 | to | 2 000 000 | 0.50% | 2.75% |
| from | 2 000 001 | to | 5 000 000 | 0.25% | 1.12% |
| from | 5 000 001 | to | 10 000 000 | 0.10% | 0.616% |
| from | 10 000 001 | to | 50 000 000 | 0.05% | 0.193% |
| from | 50 000 001 | to | 80 000 000 | 0.03% | 0.136% |
| from | 80 000 001 | to | 100 000 000 | 0.02% | 0.112% |
| over | 100 000 000 | | | 0.01% | 0.056% |

*(**) For illustrative purposes only, the table on the following page indicates the resulting range of fees when the proper calculations have been made.*

*Appendix III to the ICC Rules of Arbitration*

| SUM IN DISPUTE (in US Dollars) | A. ADMINISTRATIVE EXPENSES(*) (in US Dollars) | B. ARBITRATOR'S FEES(**) (in US Dollars) | |
|---|---|---|---|
| | | Minimum | Maximum |
| up to 50 000 | 2 500 | 2 500 | 17.00% of amount in dispute |
| from 50 001 to 100 000 | 2 500 + 3.50% of amt. over 50 000 | 2 500 + 2.00% of amt. over 50 000 | 8 500 + 11.00% of amt. over 50 000 |
| from 100 001 to 500 000 | 4 250 + 1.70% of amt. over 100 000 | 3 500 + 1.00% of amt. over 100 000 | 14 000 + 5.50% of amt. over 100 000 |
| from 500 001 to 1 000 000 | 11 050 + 1.15% of amt. over 500 000 | 7 500 + 0.75% of amt. over 500 000 | 36 000 + 3.50% of amt. over 500 000 |
| from 1 000 001 to 2 000 000 | 16 800 + 0.70% of amt. over 1 000 000 | 11 250 + 0.50% of amt. over 1 000 000 | 53 500 + 2.75% of amt. over 1 000 000 |
| from 2 000 001 to 5 000 000 | 23 800 + 0.30% of amt. over 2 000 000 | 16 250 + 0.25% of amt. over 2 000 000 | 81 000 + 1.12% of amt. over 2 000 000 |
| from 5 000 001 to 10 000 000 | 32 800 + 0.20% of amt. over 5 000 000 | 23 750 + 0.10% of amt. over 5 000 000 | 114 650 + 0.616% of amt. over 5 000 000 |
| from 10 000 001 to 50 000 000 | 42 800 + 0.07% of amt. over 10 000 000 | 28 750 + 0.05% of amt. over 10 000 000 | 145 400 + 0.193% of amt. over 10 000 000 |
| from 50 000 001 to 80 000 000 | 70 800 + 0.06% of amt. over 50 000 000 | 48 750 + 0.03% of amt. over 50 000 000 | 222 600 + 0.135% of amt. over 50 000 000 |
| from 80 000 001 to 100 000 000 | 88 800 | 57 750 + 0.02% of amt. over 80 000 000 | 263 400 + 0.112% of amt. over 80 000 000 |
| over 100 000 000 | 88 800 | 63 750 + 0.01% of amt. over 100 000 000 | 285 600 + 0.056% of amt. over 100 000 000 |

(*)(**) See following page

46

# EXHIBIT D

# PART 1

1



**International Chamber of Commerce**
*The world business organization*

## International Court of Arbitration ● Cour Internationale d'arbitrage

# TRANSMISSION BY TELECOPIER
# TRANSMISSION PAR TELECOPIE

| | | | | |
|---|---|---|---|---|
| **TO/A** | : | Christopher R. Seppälä, Esq. | **Fax** : | 01 55 04 15 16 |
| | : | Dr. Ghaleb Mahmassani, Esq. | **Fax** : | 00 961 1 34 87 12 |
| **CC** | : | Mr. Eric A. Schwartz | **Fax** : | 01 44 56 27 30 |
| **FROM/DE** | : | Eliseo Castineira | **Fax** : | 00 33 1 49 53 57 75 |
| | | Lara Hammoud | **Phone** : | 00 33 1 49 53 28 84 |

SECRETARIAT OF THE ICC INTERNATIONAL COURT OF ARBITRATION
SECRETARIAT DE LA COUR INTERNATIONALE D'ARBITRAGE DE LA CCI

**DATE**    22 February 2006                    **REF.** :    14236/EC

**Nombre de pages (y compris celle-ci) :**    11 (Parties)
2 (Co-arbitrato )

*(If any pages are missing or illegible, please call the number indicated above).*
*(En cas de pages manquantes ou illisibles, veuillez appeler le numéro indiqué ci-dessus).*

*The information contained in this fax is confidential information only for the use of the individual or entity named above. If the reader of this message is not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination or copying of this communication is prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via the postal service. Thank you.*

*Les informations contenues dans cette télécopie sont confidentielles et sont destinées à l'usage exclusif du(des) destinataire(s). La personne qui reçoit cette télécopie et qui n'est pas le destinataire, l'un de ses employés, ou un mandataire habilité à remettre ce message au destinataire est avisé qu'il est interdit d'en divulguer ou d'en reproduire le contenu. Si vous avez reçu cette communication par erreur, nous vous saurions gré de nous le faire connaître par téléphone dans les meilleurs délais et de nous retourner celle-ci par voie postale. Merci.*

**ICC International Court of Arbitration ● Cour internationale d'arbitrage de la CCI**
38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28    Faxes +33 1 49 53 29 29 / +33 1 49 53 29 33
Website www.iccarbitration.org    E-mail arb@iccwbo.org



**International Chamber of Commerce**
*The world business organization*

## International Court of Arbitration • Cour internationale d'arbitrage

22 February 2006 – sht/lhd

14236/EC

THE LEBANESE COMPANY FOR THE DEVELOPMENT AND RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT, SAL ("SOLIDERE") (Lebanon) vs/ 1. URS CORPORATION (U.S.A.) 2. RADIAN INTERNATIONAL LLC (U.S.A.)

Counsel in charge of the file: Mr. Eliseo Castineira (dir. tel: 33 1 49 53 :?0 06 – dir. fax: 33 1 49 53 57 75)

Christopher R. Seppälä, Esq.
WHITE & CASE LLP
11, Boulevard de la Madeleine
75001 Paris
France

*Fax: 01 55 04 15 16*

Dr. Ghaleb Mahmassani
Massabki-Serhal Building
Cairo Street
Hamra
Beirut
Lebanon

*Fax: 00 961 1 34 87 12*

URS CORPORATION
600 Montgomery Street
San Francisco, CA 94111
U.S.A.

*DHL*

RADIAN INTERNATIONAL LLC
600 Montgomery Street
San Francisco, CA 94111
U.S.A.

*DHL*

Dear Sirs,

The Secretariat sends you a copy of the Declaration of Acceptance and Statement of Independence, and of the *curriculum vitae* of Mr. Eric A. Schwartz who has been nominated as co-arbitrator by Claimant.

Yours faithfully,

Eliseo Castineira
Counsel
Secretariat of the ICC International Court of Arbitration

Encl.:  - Declaration of Acceptance and Statement of Independence of Mr. Eric A. Schwartz
        - *Curriculum vitae* of Mr. Eric A. Schwartz

cc:    Mr. Eric A. Schwartz

ICC International Court of Arbitration • Cour internationale d'arbitrage de la CCI
38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Faxes +33 1 49 53 29 29 / +33 1 49 53 29 33
Website www.iccarbitration.org   E-mail arb@iccwbo.org

22/02 2006 11:25 FAX

**The world business organization**
International Court of Arbitration

Cour internationale d'arbitrage

CASE N°   14236/EC

# ARBITRATOR'S DECLARATION OF ACCEPTANCE
# AND STATEMENT OF INDEPENDENCE

(Please tick the relevant box or boxes)

I, the undersigned,

Name _____ SCHWARTZ _____   First Name _____ Eric _____

## ACCEPTANCE

☑  hereby declare that I accept to serve as arbitrator under the ICC Rules of Arbitration in the instant case. In so declaring, I confirm that I have familiarized myself with the requirements of the ICC Rules of Arbitration and am able and available to serve as an arbitrator in accordance with all of the requirements of those Rules and accept to be remunerated in accordance therewith.

## INDEPENDENCE

(If you accept to serve as arbitrator, please also check one of the two following boxes. The choice of which box to check will be determined after you have taken into account, inter alia, whether there exists any past or present relationship, direct or indirect, with any of the parties or their counsel, whether financial, professional or of another kind and whether the nature of any such relationship is such that disclosure is called for pursuant to the criteria set out below. (If in doubt should be resolved in favour of disclosure.)

☑  I am independent of each of the parties and intend to remain so; to the best of my knowledge, there are no facts or circumstances, past or present, that need be disclosed because they might be of such nature as to call into question my independence in the eyes of any of the parties.

**OR**

☐  I am independent of each of the parties and intend to remain so; however, in consideration of Article 7, paragraphs 2 & 3 of the ICC Rules of Arbitration, I wish to call your attention to the following facts or circumstances which I hereafter disclose because they might be of such a nature as to call into question my independence in the eyes of any of the parties. (Use separate sheet if necessary.)

## NON-ACCEPTANCE

☐  hereby declare that I decline to serve as arbitrator in the subject case. (If you wish to state the reasons for checking this box, please do so.)

Date: February 20, 2006

Signature: _____



**International Chamber of Commerce**
*The world business organisation*
**International Court of Arbitration**

Cour Internationale d'arbitrage

CASE N° 14236/BC

For the *confidential* use of the ICC International Court of Arbitration and communication to the parties. To be completed in English.

## CURRICULUM VITAE

NAME:   SCHWARTZ                                    FIRST NAME:   Eric

DATE OF BIRTH:   October 26, 1951                   NATIONALITY(IES):   French/American

PERSONAL ADDRESS:
                7, bis rue Lalo
                75116 Paris
                France

TELEPHONE:                        TELEFAX:

E-MAIL:

BUSINESS ADDRESS (including company or firm name where applicable):

Freshfields Bruckhaus Deringer
2 Rue Paul Cézanne
75008 Paris
France

TELEPHONE:   +33 1 44 56 44 62       TELEFAX:                       MOBILE:   +33 6 87 80 78 95
                                     +33 1 44 56 44 00/01/4.2

E-MAIL:                              WEBSITE:
     eric.schwartz@freshfields.com        www.freshfields.com

Please indicate which address you wish to be used for correspondence:

☐  PERSONAL                          ☑  BUSINESS

CASE N° - 14236/EC 　　　　　　　　　　　　　　　　Page 2

*For the confidential use of the ICC International Court of Arbitration and communication to the parties. To be completed in English.*

**ACADEMIC DEGREES / QUALIFICATIONS:**

Dartmouth College, B.A., 1973
Yale University, J.D., 1976

**CURRENT PROFESSIONAL ACTIVITIES) AND POSITION(S):**

Partner, Freshfields Bruckhaus Deringer

(See also the attached *curriculum vitae*)

**PROFESSIONAL EXPERIENCE:**

(See also the attached *curriculum vitae*)

**ADDITIONAL INFORMATION (Use separate sheet if necessary):**

(See also the attached *curriculum vitae*)

**LANGUAGES** *(mark, as appropriate, if you consider that you are able to conduct arbitration proceedings and to draft an award in the languages listed without the assistance of an interpreter or translator):*

☐ ARABIC 　　☑ ENGLISH 　　☑ FRENCH 　　☐ GERMAN
☐ ITALIAN 　　☐ RUSSIAN 　　☐ SPANISH 　　☐ OTHER _____

Please indicate other languages of which you have good knowledge:

Date: February 20, 2006 　　　　　Signature: _____

December 2005

# CURRICULUM VITAE

## Eric A Schwartz

### Personal

Date of birth:          26 October 1951

Citizenship:            American, French

Professional address:   2, Rue Paul Cézanne
                        75008 Paris, France

                        Tel:      (+33)(0)1 44 56 44 56
                        Dir:      (+33)(0)1 44 56 44 62
                        Fax:      (+33)(0)1 44 56 44 00/01/02
                        E-mail:   eric.schwartz@freshfields.com

Present Position:       Partner in the law firm, Freshfields Bruckhaus Deringer

### Education

Dartmouth College, B.A., 1973

Yale University, J.D., 1976

### Professional Experience

Partner, Freshfields Bruckhaus Deringer (since December 1, 1998)

Partner, Salans Hertzfeld & Heilbronn, a Paris-based international law firm. Head of the firm's International Arbitration Practice Group (November 1996 to November 1998).

Secretary General, ICC International Court of Arbitration (January 1992 to October 1996).

Associate (November 1978 to August 1983) and then Partner (September 1983 to January 1992), Law Offices of S.G. Archibald, Paris, with an international business practice relating particularly to international commercial arbitration and international transactions, with special emphasis on international construction and engineering contracts. Partner in charge of the firm's Brussels office specializing in European Community law from September 1983 until August 1986.

-2-

Associate (September 1976 until October 1978) with the firm of Wyman, Bautzer, Rothman and Kuchel in Los Angeles, practicing corporate and securities law.

Member:    Admitted to the Bars of Paris since 1992 (as an "avocat")
and the State of California since 1976
American Bar Association
American Society of International Law
International Bar Association
Inter-Pacific Bar Association
Union Internationale des Avocats

## Arbitration Experience

Mr. Schwartz regularly acts as a counsel and arbitrator in ICC and other international arbitration proceedings and is on the arbitration panels of numerous arbitral institutions. He has particular expertise in connection with disputes in the fields of civil engineering and construction and, more generally, in respect of complex international commercial transactions. From January 1, 1992 to October 31, 1996, Mr. Schwartz was the Secretary General of the ICC International Court of Arbitration, where, during his tenure, he oversaw the work of the ICC Court's Secretariat in respect of approximately 2,500 international arbitration and conciliation cases. He has lectured and written extensively on the subject of international arbitration.

## Arbitration Panels, Organizations and Journals

International Panel, American Arbitration Association

International Panel, CPR Institute for Dispute Resolution

Arbitration Panel, China International Economic and Trade Arbitration Commission

Arbitration Panel, Hong Kong International Arbitration Centre

Arbitration Panel, Japan Commercial Arbitration Association

Arbitration Panel, Korean Commercial Arbitration Board

Arbitration Panel, World Intellectual Property Organization.

Member, the Chartered Institute of Arbitrators

Member, London Court of International Arbitration

Member, Comité Français de l'Arbitrage

Member, ICC Commission on International Arbitration

Member, Swiss Arbitration Association

Member, The International Arbitration Club

- 3 -

Member, International Arbitration Commission, Union Internationale des Avocats

Alternate Member, International Chamber of Commerce International Court of Arbitration

Former Member, Working Party on the Revision of the ICC Arbitration Rules (1995-1997)

Former member of the ICC Working Group of the Subcommittee on FIDIC Civil Standard Conditions of the International Bar Association, Section on Business Law, Committee Law, Committee T-International Construction Contracts

Advisory Board, The Institute for Transnational Arbitration

Editorial Board, *The Arbitration and Dispute Resolution Law Journal*

Editorial Advisor, *Chinese Arbitration Association, Taipei Arbitration Journal*

News Editor, France, *The International Arbitration Law Review*

### Publications

Books:

*A Guide to the ICC Rules of Arbitration* (with Y. Derains) 2nd Edition (Kluwer 2005),

*The Freshfields Guide to Arbitration and ADR* (with J. Paulsson, N. Rawding, L. Reed) (Kluwer 1999),

*A Guide to the New ICC Rules of Arbitration* (with Y. Derains) (Kluwer 1998).

Articles:

"Do International Arbitrators Have a Duty to Obey the Orders of Courts at the Place of the Arbitration? Reflections on the Role of the *Lex Loci Arbitri* in the Light of a Recent ICC Award," in *Global Reflections on International Law, Commerce and Dispute Resolution, Liber Amicorum in Honour of Robert Briner* (ICC Publishing 2005).

"Finality at What Cost? The Decision of the *Ad Hoc Committee* in *Wena Hotels v. Egypt*," in *Annulment of ICSID Awards: The Foundation of a New Investment Protection Regime in Treaty Arbitration, IAI Series on International Commercial Arbitration No. 1* (Juris Publishing, Inc. 2004).

"Dispute Resolution for Government Contracts – Conciliation, Mediation, Arbitration and Litigation," publication forthcoming in the *CAA Arbitration Journal*.

"The Award," (with L. Reed and J. Sutcliffe), in *The Practitioner's Handbook on International Arbitration and Mediation* (ed. Rhoades *et al*) (Juris Publishing 2002).

"Choosing between Broad Clauses and Detailed Blueprints," in *Improving the Efficiency of Arbitration Agreements and Awards, 40 Years of Application of the New*

- 4 -

*York Convention*, International Council for Commercial Arbitration, Congress series no.9, Ed. Kluwer Law International 1999, pp.105-113.

"The Role of the Arbitral Institution in the New Millennium," in *The Journal of the Chartered Institute of Arbitrators*, Vol. 65, No. 4 (Nov 1959).

"The Effect of the Arbitration Agreement on the Enforcement of the Award: Issues for the Coming Decade," *The ICC International Court of Arbitration Bulletin, Arbitration in the Next Decade – Special Supplement 1999*, pp.105-112.

"Reconciling Speed with Justice in International Arbitration," in *Improving International Arbitration: The Need for Speed and Trust*, Liber Amicorum Michel Gaudet, ICC Publishing S.A. International Chamber of Commerce, Ed. Benjamin G. Davis, 1998, pp. 44-48.

"Court-Assisted Discovery in Aid of International Commercial Arbitrations: Two Recent U.S. Cases Regarding the Applicability of 13 U.S.C. § 1782" (with R. Johnson), *Journal of International Arbitration*, Vol. 15, No. 3 (September 1998).

"Emergency Measures by Institution-Appointed Arbitrators: the Position Under the ICC Rules of Arbitration," *Contemporary International Law Issues: New Forms, New Applications* (Asser Institute 1997), p. 212.

"French Supreme Court Renders Final Judgment in the *Hilmarton* Case," in International Arbitration Law Review, Vol. 1, No 1 (December 1997).

"The 1998 ICC Arbitration Rules," in *Arbitration and Dispute Resolution Law Journal* (1997).

Comments, "The New 1998 ICC Arbitration Rules," Special Supplement, *The Bulletin of the ICC International Court of Arbitration* (1997).

"Going Astray in Bordelais: A Comment on a Recent Decision of the Court of Appeal of Bordeaux," in *Arbitration and Dispute Resolution Law Journal* (1997).

"A Comment on Chromalloy: *Hilmarton à l'américaine*," in *Journal of International Arbitration*, Vol. 14, No. 2 (June 1997).

Book review, *Dealing in Virtue, ICSID Review – Foreign Investment Law Journal*, Vol. 12, No. 1 (Spring 1997).

"International Construction Arbitration," (with M. Hoellering), Cushman, Myers, Butler and Fisher (eds.), *Construction Dispute Resolution Formbook* (Wiley 1997).

"Arbitration Awards – Challenge and Enforcement," in *Globalization and Harmonization of the Basic Notions in International Arbitration* (IFCAI 1996).

"Planning Efficient Arbitration Proceedings: Practical Experiences and Solutions," in *ICCA Congress Series No. 7* (Kluwer 1996).

"The Rights and Duties of ICC Arbitrators," in *The Status of the Arbitrator* (ICC Publishing 1995).

-5-

"The Resolution of International Commercial Disputes under the Auspices of the ICC International Court of Arbitration," in *The Hastings International and Comparative Law Review*, Vol. 18, No. 4 (Summer 1995).

"The Reform of Commercial Arbitration Procedures: Perspectives from the ICC," in *The Reform of Commercial Arbitration Procedures* (Strategic Corporate Services Ltd. 1995).

"Resolution of International Construction Disputes,' in *International Business Lawyer*, Vol. 23, No. 4 (April 1995).

"The Domain of Arbitration and Issues of Arbitrability: The View from the ICC", ICSID *Review – Foreign Investment Law Journal*, Vol. 9, No. 1 (Spring 1994).

"International Conciliation and the ICC", in *The ICC International Court of Arbitration Bulletin*, Vol. 5, No. 2 (November 1994).

"ICC Arbitration and the Resolution of International Commercial Disputes," in ICC World Business and Trade Review (Sterling Publications 1994).

"The ICC Arbitration Rules and the UNCITRAL Model Law," in *Arbitration International*, Vol. 9, No. 3 (1993).

"Multi-Party Arbitration and the ICC: in the Wake of *Dutco*," in *Journal of International Arbitration*, Vol. 10, No. 3 (1993).

"Arbitration under the Rules of the International Chamber of Commerce," in *The Arbitration and Dispute Resolution Law Journal* (September).

"The Practices and Experiences of the ICC Court," in *Conservatory and Provisional Measures in International Arbitration* (ICC Publishing 1993).

"The Costs of ICC Arbitration," in *The ICC International Court of Arbitration Bulletin*, Vol. 4, No. 1 (May 1993).

"International Construction Arbitration under the Rules of the International Chamber of Commerce and UNCITRAL" (with S. Jarvin), in Cushman, Hedemann, Tucker (eds.), *Alternative Dispute Resolution in the Construction Industry* (Wiley 1990).

"Disputes Between Joint Venturers: A Case Study," in *The International Construction Law Review*, Vol. 3, Pt. 4 (July 1986).

Other:

Module on ICSID "Procedural Issues" for the *Course on Dispute Settlement in International Trade, Investment and Property* (with R. Mohtashami) (United Nations Conference on Trade and Development 2003)

## Languages

English (mother tongue)

French (fluent)

**2**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA 90071-3144

TEL: (213) 687-5000
FAX: (213) 687-5600
www.skadden.com

13 March 2006

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
NEWARK
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
—
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

**VIA FEDERAL EXPRESS AND EMAIL**

Eliseo Castineira
Secretariat
International Court of Arbitration
International Chamber of Commerce
38 cours Albert 1ᵉʳ
Paris 75008
FRANCE

        Re:    ICC Case No: 14208/EC
               Radian International LLC v. The Lebanese Company for the
               Development and Reconstruction of Beirut Central District; and
               ICC Case No: 14236/EC
               The Lebanese Company for the Development and Reconstruction of
               Beirut Central District v. Radian International LLC and URS
               Corporation

Dear Mr. Castineira:

        As in ICC Case No. 14208/EC, we represent Radian International LLC ("Radian") in
connection with ICC Case No. 14236/EC. We also represent Radian's indirect, third level
parent company URS Corporation ("URS") with respect to the attempt to involve URS in the
arbitration of the disputes between Radian and The Lebanese Company for the Development
and Reconstruction of Beirut Central District s.a.l. ("Solidere"). We write in reference to the
Request for Arbitration filed on 13 February 2006, ICC Case No. 14236/EC (referred to
alternatively as the "New Request," "Solidere's Request" and the "New Arbitration"), by
Solidere against Radian and URS. We respectfully invite the ICC Court of Arbitration to
consider the following preliminary matters:

        1.     Whether it is appropriate for this arbitration to proceed against URS, the
               indirect corporate parent of Radian, even though: (a) URS is not a signatory to
               any contract with Solidere; (b) URS has not had any involvement in carrying
               out the works under the contract between Solidere and Radian; and (c) the
               claims asserted in the New Arbitration are essentially efforts to enforce an
               arbitration award entered in a prior ICC proceeding between Solidere and

Radian in which URS was <u>not</u> a party and which was based on claims arising out of a contract to which URS was <u>not</u> a signatory.

2.  Whether the claims asserted against Radian in the New Arbitration should be deemed to be counterclaims under Article 5(5) of the ICC Rules to the arbitration proceedings instituted by Radian on 20 January 2006, as amended on 20 February 2006 ("Radian Arbitration," "Radian's Request" or "ICC Case No. 14208/EC"), in the light of the fact that the Radian Arbitration is between the same parties, involves the same transactions, disputes, and events, and was filed first.

### *Solidere Cannot Make A Prima Facie Case That URS Is A Signatory To or Bound By Any Arbitration Clause*

With respect to the first point above, there is no basis to permit the arbitration to proceed against URS, which is not a party to any contract with Solidere, had no corporate relationship with Radian at the time Solidere entered into its contract with Radian, and had no involvement in carrying out the works under the contract between Solidere and Radian. Consequently, for the reasons set out below, we invite the ICC Court, in applying Article 6(2) of the ICC Rules, to decline to allow the case to proceed against URS.

A review of the procedural history of the dispute between Solidere and Radian confirms there is no basis to drag URS into these arbitration proceedings. Solidere's claims in the New Request arise from the arbitration award rendered in the first arbitration between Solidere and Radian (a respondent here), which was initiated by agreement between Solidere and Radian almost three years ago (ICC Case No. 12727/EC (the "Prior Arbitration")).[1] URS was <u>not</u> a party to the Prior Arbitration, and Solidere never asserted at any time in the Prior Arbitration that its claims could properly be asserted against URS. As discussed below, there would have been no basis to name URS as a party because it was not a signatory to any agreement with Solidere, did not perform work on the site in dispute, and has not under operation of law assumed the obligations of Radian.

The findings made in the Prior Arbitration as to Radian's conduct (in which URS was <u>not</u> a party) are central to Solidere's allegations in the New Arbitration, and Solidere seeks remedies for Radian's purported failure to implement the award rendered in that proceeding in July 2004 (the "Award").[2] Now, having maintained its claims against <u>only</u> Radian for nearly three years, Solidere seeks retroactively to apply the Prior Arbitration and Award to URS – an entirely new party – for the acts Solidere previously attributed solely to Radian. The <u>only</u> connection URS has to any party here is that it is the indirect corporate parent of Radian, a fact that in no way justifies forcing it to participate in the New Arbitration. Given the lengthy history of litigation on the subject at hand, Solidere's eleventh hour procedural maneuvering is an abuse of the ICC arbitration process.

---

[1]  Solidere expressly concedes that the Prior Arbitration was initiated as much for its own benefit as it was for Radian's. It expressly refers to the 13 May 2003 Memorandum of Understanding between Solidere and Radian, wherein both parties expressly "agreed . . . to submit their dispute to arbitration . . ." (*see* New Request ¶¶ 103-106). Moreover, the Claimant expressly confirms that it sought its own, separate relief in the Prior Arbitration (*see id.* ¶ 106 ("SOLIDERE . . . sought declarations . . . that there was a failure or defect in the Works")) – but only against Radian.

[2]  (*See, e.g., id.* ¶¶ 28, 31, 124-132, 138-141, 144, 147, 243-244, 253-255.)

At no time throughout the lengthy history of the gas emissions dispute between Solidere and Radian did Solidere suggest that URS was responsible for or otherwise directly involved in the dispute. As Solidere freely admits in the New Request, it was well aware of URS's acquisition of Radian in June 1999, long before the disputes arose between Solidere and Radian.[3] When the time came to go into arbitration over the gas emissions issue – the subject of the Prior Arbitration – Solidere chose of its own volition to proceed only against Radian. Indeed, nowhere in the May 2003 agreement to arbitrate did Solidere insist that URS should be a party to the proceedings.[4] Neither did Solidere attempt to bring in URS when, after the Prior Arbitration concluded, Solidere moved a French court for confirmation of the Awards.[5] Now, almost seven years after URS's indirect acquisition of Radian, a year and a half after the Award issued, and a year after the confirmation proceedings, it is simply untenable for Solidere to commence a new proceeding against URS, based almost entirely on the Award in the Prior Arbitration between Solidere and Radian, and attempt to impose liability on someone else simply by virtue of its corporate status as a parent corporation of the respondent.[6]

### *Solidere's New Arbitration Should Be Deemed A Counterclaim To Radian's Previously Filed Arbitration Concerning The Same Disputes*

With respect to the second point above, to the extent the New Arbitration relates to Radian, we urge the ICC Court to find that Solidere's claims should be deemed counterclaims in Radian's Arbitration – the proceedings already commenced between Radian and Solidere at the time the New Request was filed and currently pending as ICC Case No. 14208/EC. As shown below, the claims asserted in the New Arbitration are really counterclaims in disguise to the claims asserted in Radian's Arbitration and, pursuant to Article 5(5) of the ICC Rules, must be asserted there. Article 5(5) requires the Respondent to include counterclaims in its Answer. As that Article makes plain, related claims –such as those asserted now by Solidere here – must be brought in the same proceedings (i.e., the Radian Arbitration) and must be raised immediately in the Answer or else be deemed waived. This requirement to assert all related claims in a single proceeding derives from the important policy consideration to avoid inconsistent rulings and the duplication of costs and efforts that would arise if competing arbitrations were permitted on related claims. The record here is clear. Radian asserted its claims against Solidere first. The claims in the New Arbitration asserted against Radian indisputably relate to the same subject matter and disputes as those asserted in the Radian Arbitration. Consequently, Solidere's claims in the New Arbitration should be included in the Radian Arbitration as counterclaims.

---

[3]   (See id. ¶¶ 154, 173-177 (citing, inter alia, 17 January 2001 letter confirming that Radian had been acquired by URS, but "continues to operate as a separate subsidiary under its own, current name"; further assuring Solidere that the services at issue would continue to be provided by Radian).)

[4]   (See id. ¶¶ 103-106.)

[5]   (See copies of Solidere's confirmation papers attached as Annex 1 hereto.)

[6]   Indeed, even after Solidere filed its claims against URS here, Solidere's course of conduct clearly establishes that even Solidere itself does not believe that URS has anything to do with the dispute at hand. In its latest filing in Beirut on 16 February 2006 in a related litigation, wherein the Claimant requested appointment of an expert to oversee the turnover of the onsite equipment following the Claimant's termination of the contract, nowhere did the Claimant even hint that the subject equipment belongs to URS, not Radian. (Translation of the Claimant' 16 February 2006 filing is attached as Annex 2 hereto.)

We set out below, a more detailed description of the various bases for our submissions in relation to both the exercise of the Court's ICC discretion under Article 6(2) and the exercise of the Court's powers under Article 5(5) of the Rules.

**I.    Solidere cannot maintain arbitration proceedings against URS for the claims in the New Arbitration because URS never entered into an arbitration agreement with Solidere and never assumed Radian's obligations to arbitrate with Solidere**

There are two major (although not exhaustive) reasons why the ICC Court should not allow the case against URS to proceed under Article 6(2) of the ICC Rules.    First, the Claimant cannot show a *prima facie* agreement by URS to arbitrate.  Lacking any agreement to submit to the authority of an arbitrator for claims asserted by Solidere, any ICC tribunal appointed in these proceedings will have no jurisdiction over URS.    Second, insofar as it relates to URS, the New Arbitration is an abuse of the ICC process.  The Claimant has decided at the last minute to add a parent company as a party to proceedings as a back-door means of trying to secure a better enforcement position in respect of an award already obtained against its indirect subsidiary in earlier proceedings and already enforced solely against that subsidiary.

This attempt to improve its enforcement position is especially egregious because Solidere had the opportunity and in fact did bargain for provisions in the contract related to enforcement.  In that regard, Solidere did not seek and did not get a corporate parent guarantee either from Radian's immediate corporate parent at the time the contract was executed (a Dames & Moore entity called Radian Acquisition Corp.) or Radian's ultimate parent Dames & Moore Group.  Nor did Solidere ask for or obtain a corporate parent guarantee at the time of URS's acquisition of the Dames & Moore Group from any URS affiliate.  Instead, Solidere bargained for and got a bonding requirement -- which it has drawn down in connection with the disputes between the parties.  Solidere should now be regarded as estopped from trying to improve on its bargained for position by asserting that the indirect parent company, URS, is a proper party to this dispute.

**A.    The Claimant cannot show a *prima facie* agreement to arbitrate, as required under Article 6(2) of the ICC Rules**

URS has never been a party to any arbitration or arbitration agreement with Solidere. Thus, as far as URS is concerned, this is a new arbitration, which is subject to the provisions of Article 6(2) of the ICC Rules.  Accordingly, the ICC Court "<u>may</u>" allow the arbitration to proceed <u>only</u> "if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist."  It must be apparent <u>from the face of the agreement</u> that there is a legitimate basis for allowing the arbitration to proceed.  For the following reasons, the ICC Court should refuse to allow the New Arbitration against URS to proceed.[7]

---

[7]    For an example of a case where the ICC Arbitral Tribunal refused what appears to have been a similar request, *see Partial Award in Case No. 4402 of 1983*, 9 Y.B. COM. ARB. 138 (1984).  In this case, applying, *inter alia*, the ICC Rules, the Tribunal refused to extend to the parent company the arbitration clause which had been signed on account of its subsidiary, specially set up to perform the disputed project. *Cf. Award in Case No. 4972 of 1989*, Collection of ICC Arbitral Awards 1986-1990 380 (Sigvard Jarvin, Yves Derains & Jean-Jacques Arnaldez eds., 1994) (applying French law).

1.   **URS never agreed to arbitrate before this Court, and neither Solidere nor Radian could have intended for URS to be a party to the underlying contract**

It is <u>undisputed</u> that there is no express arbitration agreement between Solidere and URS. Solidere itself concedes that URS is <u>not</u> a party to the construction contract dated 25 January 1999 (the "Contract"), which contains the relevant arbitration agreement, and also concedes that URS had no involvement whatsoever in the negotiation of the Contract. (*See* New Request at ¶¶ 14, 148.)   The only signatory to the Contract is Radian, which unsurprisingly is the only party against whom Solidere has ever asserted claims until now. Although Solidere fully participated in the Prior Arbitration – which, as shown above, was initiated by agreement between Solidere and Radian (*see id.* ¶¶ 103-106, citing the May 2003 Memorandum of Understanding) – and was represented there by the same experienced arbitration counsel representing Solidere in the purported New Arbitration, Solidere chose to litigate <u>only against Radian</u> as the counterparty to the arbitration agreement, effectively conceding that only Radian could be held responsible for the wrongs alleged therein.  When Solidere subsequently initiated its confirmation proceedings to enforce the Award rendered in the Prior Arbitration in France, it recognized that the Prior Arbitration could only be enforced <u>against Radian</u>.

Given the absence of any express agreement to arbitrate, Solidere relies on the so-called "group of companies" doctrine to justify dragging URS into arbitration proceedings. Solidere's reliance on this doctrine does not work because Solidere has failed to make out a *prima facie* case for applicability of the "group of companies" approach – or any other vicarious liability theory for that matter – to compel URS to arbitrate this case.  Companies under a corporate umbrella regularly cooperate with each other; however, it is well-settled that a legal subsidiary (like Radian) nonetheless remains a distinct entity from its parent (here, URS) and other companies in the group.  An arbitration agreement cannot be extended to apply to a member of a corporate group that did not sign the arbitration agreement unless the party seeking to compel arbitration proves that the intent of the contracting parties was to bind the "group of companies" to the arbitration provisions.  *See* Fouchard, Gaillard, Goldman, *International Commercial Arbitration* (eds. 1999), at paragraph 500 (the decisive test for extending an arbitration agreement under the "group of companies" theory is "not so much the existence of a group that results in the various companies of the group being bound by the agreement signed by only one of them, but rather the fact that such was the true intention of the parties") (emphasis added).

ICC Case No. 5721 (1990) is particularly illustrative here because it shows why Solidere's allegations of vicarious liability cannot withstand scrutiny and should be rejected. In that case, the Arbitral Tribunal held that the claimant (who alleged that the arbitration agreement extended to the person controlling the company who had signed the agreement) had not established that the claimant "intended to deal" with that person, or that such person "intended personally to be a party to the arbitration agreement."[8]  In this case, the fact that URS indisputably did not own or have any relationship whatsoever with Radian at the time the arbitration agreement was signed[9] forecloses any argument that Solidere could have

---

[8]   19 YEARBOOK OF INT'L COMM. ARB. 1024 (1994).

[9]   The Contract was signed on 25 January 1999 (New Request ¶ 41), and URS's acquisition of an indirect interest in Radian did not take place until June 1999 (*id.* ¶ 154).

intended to include URS within the scope of the Contract's arbitration agreement. The lack of such intent dooms Solidere's "group of companies" argument on its face.

### 2.  Solidere's apparent authority and/or alter ego allegations are baseless and afford no basis to compel URS to arbitrate claims against it

Solidere's other legal theories, upon which it alternatively relies in its attempt to get URS involved in the New Arbitration, can be rejected out of hand. Thus, for example, even if (which is not accepted) a group of companies doctrinal approach is warranted in the present case, the facts relied upon by Solidere do not make a *prima facie* case. In particular, Solidere's emphasis on URS purportedly "taking over" the position of Radian is insufficient to establish a *prima facie* case for jurisdiction over URS. In ICC Case No. 10818 (2001),[10] the claimant sought to arbitrate against a second respondent on the grounds that it allegedly had "taken over" the position of the first respondent in the agreement. Rejecting this theory, the Arbitral Tribunal noted that: "Either played a distinct role. The Agreement was negotiated, concluded, and, at first, solely performed by [the first respondent]. Only after the contractual relationship between [the first respondent] and [the Claimant] had gone on for several months [the second respondent] entered the stage and started to contribute to the performance of the Agreement."

Solidere's allegations, which URS disputes, are no different here, and the evidence cannot be credibly disputed that URS did not take over Radian's position. Indeed, URS had no involvement whatsoever in the performance of the works under the Contract.[11] Consequently, Solidere's theory of appearances fails. Furthermore, case-law and practice confirm that a claimant cannot validly commence arbitration against a respondent's parent company, even if such respondent were to dissolve after commencement of the arbitral proceedings.[12]

Solidere's alter ego theories are similarly untenable and do not provide a basis to force URS into the arbitration proceedings against its will. Recognizing the weakness of its position, Solidere attempts to paint a distorted and misleading picture in the New Request of the relationship between URS and Radian. Solidere's creative view of the facts fails to account for even basic matters, such as the fact that URS is not the direct corporate parent of Radian; rather, URS owns a separate legal entity that in turn owns Radian. Moreover, given the indirect relationship between URS and Radian, Solidere's rendition of URS's involvement in the affairs of Radian, particularly as they relate to Solidere, is inaccurate and unsupported by the facts. However, even if all Solidere's contentions were true (they are not), those facts still do not satisfy the very limited circumstances in which non-signatories have been joined to an ICC arbitral process against their will.

---

[10]  16 ICC Int'l Ct. of Arb. Bull. 98 (2005).

[11]  As previously noted, URS is not the direct parent of Radian. Rather, URS Corporation acquired Dames & Moore Group (itself a separately incorporated legal entity) in June of 1999. Dames & Moore Group in turn owed a number of subsidiary corporations, including Radian. Although there have been restructurings since that time, URS is still not the direct corporate parent of Radian and has no day-to-day involvement in the operations or management of its indirect subsidiary.

[12]  *Société des Grands Travaux de Marseille (SGTM) v. Bangladesh*, ATF 102Ia at 582 (6 May 1976).

The determination of whether URS and Radian are purportedly alter egos is a matter for determination under the laws of the United States, the place of incorporation of Radian, URS Resources (Radian's sole member), URS Holdings, Inc. (the owner of URS Resources), and URS. Solidere cannot establish, even on a prima facie level, any of the recognized grounds under US law for the application of the alter ego theory. Solidere has no basis to assert that Radian has "disappeared" or that URS assumed responsibility for the project. When the project began, URS had no connection with Radian. To date, there has been no change in the core personnel hired by Radian to perform the work at the Normandy Landfill since the inception of the project – the same people hired by Radian before it had any connection with URS to perform the work under the Contract continued to perform the work after Radian was acquired by URS. Indeed, the weekly reports prepared by Solidere's on-site agent describing on-site meetings at which Solidere and its agent were present clearly identify "Radian" -- and only Radian -- as the performing party every week from the start of the project through February 2005, the date of the last weekly meeting. (*See* copies of selected meeting minutes attached as Annex 3 hereto.) This demonstrates that the Contract's performance has been continuously implemented by Radian's personnel, and Solidere knew it. Moreover, all the subcontractors involved at the site were hired by Radian, and none have any contractual relationship with URS.

### B.    Solidere is precluded by its own conduct from arbitrating against URS

Even if the ICC Court were *prima facie* satisfied that there is a basis to permit a claim to proceed against URS under some theory of vicarious liability, the ICC should exercise its discretion under Article 6(2) nonetheless to decline to permit Solidere to proceed with its arbitration against URS. Given the course of conduct by Solidere over the nearly seven years of its dispute with URS, there is ample basis for the Court to consider that Solidere is estopped from trying to enforce the Award from the Prior Arbitration between Solidere and Radian against URS by arbitrating its claims based on the Prior Arbitration Award in the New Arbitration against URS.[13]

Solidere should be estopped from commencing any arbitration against URS under the Contract because it has acted inconsistently with an intent to proceed against URS and has forced Radian to proceed in years of arbitrations and negotiations, only to now have Solidere claim that it was actually not the real party in control. If Solidere believed that the "real" party to this dispute was URS, rather than Radian, then it should have asserted claims against URS in the Prior Arbitration in 2003. It did not do so, even though Solidere knew that Radian had been acquired by URS some four years prior to the initiation of the Prior Arbitration. (*See, e.g.*, New Request ¶¶ 154 (citing publicly available sources disclosing the acquisition), 172-177 (conceding that it requested and received confirmation of the acquisition by 17 January 2001).) Indeed, Solidere cites a series of documents, each confirming that by May 2003 – when Solidere entered into an agreement to commence the Prior Arbitration with Radian – not only did it know that Radian had been acquired by URS as an indirect subsidiary, but already possessed almost all the evidence it currently relies on for its contention that URS purportedly acted on Radian's behalf.

---

[13]    If this Court were to decline to proceed in this fashion, it would in no way prejudice Solidere's rights, whatever those might or might not be, because a discretionary refusal to proceed with the arbitration under Article 6(2) is made "without prejudice to the admissibility or merits of the plea" concerning the lack of an arbitration agreement. Indeed, under Article 6(2), Solidere retains any right which might otherwise exist "to ask any court having jurisdiction whether or not there is a binding arbitration agreement."

The correspondence between Solidere and Radian clearly demonstrates that Solidere knew full well what URS was, what its relationship was with Radian and how that relationship impacted Radian's performance of the Contract, if at all. Specifically, in September of 2000, Solidere wrote to Radian and stated:

> [W]e see that it is necessary for Solidere to be informed officially of the changes in the shareholding of Radian International and the changes in the structure of the group of companies which Radian International is part of and finally who is URS and its relation with Radian. In addition to this information, both Radian International and URS must send to Solidere a joint letter informing us of the modifications that have occurred and a guarantee that no impact will occur on the execution of the Contract signed with Radian International.

(*See* 19.9.2000 e-mail from Walid Honein to David Horne (New Request, Exh. C 34).)

The response by Radian to the inquiry not only answered Solidere's questions, but also assured Solidere that there would be no changes in Solidere's relationship with Radian:

> URS Corporation, a publicly traded design and engineering firm (NYSE: URS), incorporated in Delaware, acquired Dames & Moore Group and all of its subsidiaries (. . . Radian International and others) in June 1999. The various Dames & Moore Group companies continue to operate as separate subsidiaries under their existing names, although all correspondence in now on URS Corporation letterhead. Radian International, LLC has not changed its corporate name. It continues to operate as a separate subsidiary under its own, current name. You will see no change in the manner in which we serve you or in our commitment to provide you quality services. All prior commitments, including your contract, will continue to be honored.

(*See* 16.01.2001 letter from John W. Rakow III (New Request, Exh. C 36) (emphasis added).)

Thus, Solidere was told the exact nature of URS's corporate acquisition of the corporate parent of Radian and further assured that there would be no change in the manner in which Solidere's rights would be handled under the Contract by Radian, which "continues to operate as a separate subsidiary under its own, current name." Solidere appeared to accept the position described in this correspondence and continued to interact with Radian as before. Indeed, the weekly meetings on site, which were attended both by Solidere and its construction manager, continued to reflect that all work was performed by Radian. (*See* Annex 3.) Although Solidere now contends that URS was actually controlling Radian's activities in performing the Contract, the record proves that all parties believed otherwise then and now. Indeed, despite having all purportedly telling evidence Solidere now cites – and despite purportedly observing URS's control over the Prior Arbitration (*see* New Request ¶¶ 220-234) – Solidere made no attempt to raise any claims against URS in the Prior

8

Arbitration, thus waiving any right to do so now, in a new proceeding, which is in many respects an enforcement proceeding vis-à-vis the Award.[14]

Perhaps the most compelling basis for finding an estoppel here is Solidere's conduct in negotiating and signing the May 2003 Memorandum of Understanding (the "MOU"). Shortly before the Prior Arbitration was commenced, Solidere negotiated with Radian over the terms and content of those proceedings and expressly agreed to resolve all its claims arising out of the landfill gas issue in the Prior Arbitration. Telling of Solidere's view of the "real" party to the dispute, Solidere negotiated and signed a document in which URS was not a party. Indeed, Solidere never mentioned URS at any time, much less attempted to have URS become a signatory to the MOU. (See New Request ¶¶ 103-106.) If, as Solidere now conveniently asserts, Solidere actually believed that URS was the "real" party behind the scenes, it defies credulity that it would proceed to negotiate and sign a document agreeing to arbitrate without that party present. Indeed, Solidere recognized that URS was not a party to the Prior Arbitration when it enforced the Award only against Radian. Moreover, under Article 29 of the ICC Rules, if Solidere had a good faith basis to assert that URS somehow was a party to the Prior Arbitration and that the tribunal erroneously left URS's name off the Award, then Solidere had an obligation to seek to have URS named in the entry and enforcement of the Award. Solidere did not do so for the obvious reason that it knew that URS was not responsible in any way for the performance (or alleged failure to perform) under the Contract, and cannot use the New Arbitration as a back door way to enforce the Award against URS.

The principle according to which one party cannot contradict itself to the detriment of others is well-recognized in international law. In the seminal case of *Preah Vihear Temple* of 15 June 1962, the International Court of Justice held that "a State party to an international litigation is bound by its previous acts or attitude when they are in contradiction with its claims in the litigation." Vice-President Alfaro stated that "the legal effect of the principle is always the same," namely preclusion (*venire contra factum proprium non valet*). The Court

---

[14]   The Claimant's allegations in support of imposing liability on URS are almost entirely based on events preceding the Prior Arbitration, commenced on 19 May 2003 (or, at the very least, the July 2004 Award rendered in that proceeding) and were in fact then known to the Claimant and/or publicly available at the time. (*See, e.g.,* New Request ¶¶ 153-154 (describing the June 1999 acquisition of Radian by URS), 157 (alleging sharing of addresses in 2003), 159 (alleging sharing of addresses in 2002 and 2003), 160 (citing, *inter alia,* a letter of 21 November 2003, allegedly indicating sharing of telephone and facsimile numbers), 166 (alleging transfer of employees based on 14 June 2004 public filing), 168-169 (citing a 1 May 2000 article and a 2 May 2003 letter allegedly indicating that Radian was no longer advertised as a separate entity), 172-177 (citing documents dating back to 31 July 2000, indicating letterhead changes; also citing a 17 January 2001 communication in support of allegations of direct involvement by URS), 178-182 (citing a 2 January 2002 letter in support of allegations of URS's involvement in the project), 183 (citing website representations as to URS's purported involvement in the project as of 14 June 2004), 185 (citing evidence of URS's alleged involvement dating back to 2001), 189-202 (citing witness statements from the Prior Arbitration dated 14 October 2003 and 10 October 2003, a 1 March 2004 public filing and letters of 2 January 2002, 27 February 2002, 4 December 2002, 12 December 2002, 8 April 2003, 30 January 2004 and 16 April 2004 in support of allegations of involvement by URS's personnel), 204-205 (citing the 24-26 September 2002 and 20 December 2002 reports purportedly demonstrating involvement of URS), 207-214 (expressly relying on "[d]ocuments disclosed in [the Prior] Arbitration" to show purported involvement by URS in gas investigations; also citing various 2002-2003 reports and memoranda), 215 (citing a 25 September 2002 letter, purportedly showing that URS took responsibility for site safety), 216-219 (citing 20 April 2000, 8 September 2000, 4 December 2000, 15 April 2002, 26 April 2002, and 30 January 2004 letters, purportedly showing shared accounting), 220-234 (alleging appearance of URS's control over the Prior Arbitration).)

of Arbitration of the International Chamber of Commerce should give due consideration to the principle of consistency or estoppel. As Emmanuel Gaillard writes, it has become a "basic principle of the law of international commerce."[15]

If the ICC allows the New Arbitration to proceed despite Solidere's prior inconsistent conduct, it would be condoning a claimant's strategy to arbitrate initially against a signatory party and then to proceed (through the mechanism of a second proceedings) to enforce that award against another party that did not appear or defend in the prior proceedings. Under Article 28(6) of the ICC Rules, an award is binding only on the parties to the arbitration. URS was not a party to the proceedings in the Prior Arbitration, ICC Case No 12727/EC, and did not have an opportunity, as the parent company, to participate in that proceeding, either by contesting jurisdiction at the outset of the dispute, or by addressing arguments on the merits. The interests of a parent and subsidiary are not necessarily the same and plainly not the same here. Its commercial risk profile was and is very different. Undoubtedly, URS would have contested jurisdiction of the arbitrators. A party's inability to present its case is a basic ground for refusal of recognition and enforcement of an award under the New York Convention. The requirements of procedural fairness must be observed. The Award dated 12 July 2004 rendered in the Prior Arbitration accordingly cannot bind URS, which never had a chance to defend those arbitral proceedings.

Cutting through Solidere's machinations, Solidere is effectively seeking to undermine the ICC's arbitral process by filing a Request for Arbitration against a parent entity as a means to try to enforce an award obtained against the parent's subsidiary. Bringing URS into the latest proceedings instigated by the New Request is Solidere's attempt to impose on URS liability for the Award obtained against Radian, which decision URS had no opportunity to contest and which was rendered as a result of proceedings in which URS was not a party. The question of whether Solidere is entitled to rely on the group of companies doctrine or alter ego theory to enforce an award previously rendered against its subsidiary is a matter exclusively for an enforcing court to determine; it is not something with which a subsequent ICC tribunal can properly be convened to address. Solidere is bound by the way it chose to conduct its previous arbitration, in dealing only with Radian. To the extent it seeks to suggest now that URS and Radian are the same entity, it is too late to change its position.

## II. The ICC should deem Solidere's claims in the New Request to be counterclaims in the pending Radian Arbitration

Aside from its allegations attempting to tie URS to a contract it did not sign, execute or perform, the remainder of Solidere's Request concerns its claims against Radian. Those claims are in reality the mirror of issues already raised in Radian's Arbitration, ICC Case No. 14208/EC as they relate to the same parties, the same agreements, and the same transactions and occurrences. Under Article 5(5) of the ICC Rules, a respondent to an arbitration is required to assert any counterclaims it may have that relate to the events asserted in the arbitration. As Solidere's claims are against the same party (Radian), relate to the same agreement (the Contract), and relate to the same transactions and occurrences (namely, the

---

[15]  Translated from: "L'interdiction de se contredire au détriment d'autrui a récemment été consacrée par quelques sentences arbitrales comme un nouveau principe général du droit du commerce international." Emmanuel Gaillard, *L'Interdiction de se contredire au détriment d'autrui comme principe général du droit du commerce international (le principe de l'estoppel dans quelques sentences arbitrales récentes)*, REVUE DE L'ARBITRAGE 241 (1985). *See also id.* at 258.

events occurring at the Normandy Landfill), there is no credible dispute that Solidere's claims in the New Arbitration are nothing more than thinly disguised counterclaims, and Solidere should be required to litigate them in the Radian Arbitration or not at all.

Even if Solidere's claims in the New Arbitration were not disguised counterclaims (they are), these claims still should be joined in the Radian Arbitration under Article 4(6) of the ICC Rules, which states:

> When a party submits a Request in connection with a legal relationship in respect of which arbitration proceedings between the same parties are already pending under these Rules, the ICC Court may, at the request of a party, decide to include the claims contained in the Request in the pending proceedings provided that the Terms of Reference have not been signed or approved by the ICC Court. . . .

The claims against Radian in the New Request are undeniably in connection with a legal relationship, in respect of which arbitration proceedings between the same parties are already pending. Solidere's claims in its Request are grounded and necessarily turn on the same issues in Radian's Arbitration, save that Solidere also seeks (impermissibly) to adduce claims which are properly a matter for an enforcing court. The alleged inadequacies of Radian's performance asserted by Solidere arise from the parties' inability (after the Award was issued) to agree on the appropriate methods to remedy the landfill gas issue at the Normandy Landfill. The remediation dispute is the main subject of both Requests. If the Tribunal to be appointed in Radian's Arbitration were to find that Radian satisfied its remediation obligations, Solidere would have no substantive case in its New Arbitration.

Specifically, both Requests involve a Tribunal's consideration as to:

A.    The sufficiency of Radian's gas remediation efforts and whether they were fully adequate, including:

    1.    Compliance of Radian's 29 September 2004 remediation plan with the Contract and/or Award (*compare* Solidere's Request at ¶¶ 28, 125-28, *with* Radian's Request at ¶¶ 8.5, 9.23-9.34);

    2.    Compliance of Radian's 29 August 2005 remediation plan with the Contract and/or Award (*compare* Solidere's Request at ¶¶ 28, 131-32, *with* Radian's Request at ¶¶ 8.5-8.6, 9.35-9.41);

B.    The propriety of the February 2005 work stoppage under both the *force majeure* provision of the Contract and the ongoing gas remediation dispute (*compare* Solidere's Request at ¶¶ 29, 133-37, *with* Radian's Request at ¶ 9.43(c));

C.    The legitimacy of Solidere's Notices of Default under the Contract and in the light of the ongoing gas remediation dispute (*compare* Solidere's Request at ¶¶ 114, 123, 136, 140-44, *with* Radian's Request at ¶¶ 9.42-9.43 and Radian's Amended Request at ¶¶ 9.46);

D.    The propriety of Solidere's 10 February 2006 Notice of Termination under the Contract and in the light of the ongoing gas remediation dispute (*compare*

11

Solidere's Request at ¶¶ 31, 141-47, *with* Radian's Amended Request at ¶¶ 8.8, 9.46-9.49).

In substance, the <u>only</u> difference between the issues raised in the parties' respective arbitration requests is Solidere's improper attempt to impose liability for Radian's purported defects in performance upon its indirect corporate parent, URS (*see* Solidere's Request at ¶¶ 148-241) and Solidere's attempts to have judicial enforcement issues determined by an arbitration tribunal.   Solidere's claims against URS, however, are based on the same underlying conduct as its claims against Radian and thus cannot justify a separate proceeding initiated by Solidere.

The continuance of two sets of proceedings, seeking the same or similar relief in respect of the same or similar facts (even if the same tribunal is ultimately appointed in each case) also exposes the parties to a significant risk of increased costs.  Indeed, the precise purpose of Articles 4(6) and 5(5) is to avoid the prospect of two separate arbitrations, potentially with two different tribunals, proceeding between the same parties in connection with the same legal relationship and the same legal issues.

*              *              *

For the above reasons, we therefore respectfully request that under Article 6(2) of the ICC Rules, the ICC Court should decide not to allow the Claimant's arbitration proceedings against URS to go forward; and under Articles 4(6) and 5(5) of the ICC Rules, in relation to the remainder of the proceedings against Radian, the ICC Court should deem the claims against Radian in the New Request to be counterclaims in the pending proceedings in ICC Case No. 14208/EC.

Finally, Radian and URS request an extension of time of 30 days after the Court makes a final determination on this application to respond to Solidere's claims whether by way of reply by Radian in the Radian Arbitration or, should this application be rejected, answer by Radian and URS in the New Arbitration.  In addition, Radian and URS request the same extension of time to respond to all issues regarding selection of arbitrators.

Yours sincerely,

Skadden, Arps, Slate, Meagher & Flom LLP

cc:    Christopher R. Seppälä, White & Case LLP
       Dr. Ghaleb S. Mahmassani

12

1

Société Civile Professionnelle
**Danièle KARSENTI-PÉRÈS**
HUSSIER DE JUSTICE ASSOCIÉ
14, RUE NOTRE-DAME-DES-VICTOIRES
75002 PARIS

TÉLÉPHONE 01 42 60 03 66
TÉLÉCOPIE 01 42 61 41 79
CCP PARIS 2123-29 Y

karsenti.peres@huissierdeparis.com

Paris le 07 Janvier 2004

**SOCIETE RADIAN INTERNATIONAL**
**600 Montgomery Street**
**26th Floor**
**SAN FRANCISCO**
**CA 94111**
**ETATS-UNIS D'AMERIQUE**

C.O.


Aff : **THE LEBANESE COMPANY FOR THE DEVELOPMENT
AND RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT
C/ RADIAN INTERNATIONAL LLC**


Messieurs,


        Conformément à la loi, je vous adresse sous ce pli copie de
la **SIGNIFICATION DE SENTENCE ARBITRALE** que je vous fais
parvenir par la voie diplomatique.


        Veuillez agréer, Messieurs, mes sincères salutations.




                D. KARSENTI-PERES

C.O.

L'an deux mil cinq et le **Vingt Six** JANVIER

## SIGNIFICATION DE SENTENCE ARBITRALE
------------------------------------

Danièle KARSENTI-PERES, Huissier de Justice, Membre de la Société Civile Professionnelle Danièle KARSENTI-PERES, Huissier de Justice Associé près le Tribunal de Grande Instance de PARIS, demeurant en ladite ville (2ème) - 14 rue Notre Dame des Victoires, soussignée,

### A -
----



La société **RADIAN INTERNATIONAL LLC** dont le siège social est 600 Montgomery Street - 26th Floor - SAN FRANCISCO - CA 94111 - ETATS-UNIS D'AMERIQUE, prise en la personne de son représentant légal y domicilié, ET CE, conformément à la loi, par la voie diplomatique, au Parquet de Monsieur le Procureur de la République près le Tribunal de Grande Instance de PARIS, en ses bureaux sis au Palais de Justice de ladite ville - 4 Boulevard du Palais, où étant et parlant à l'un de Messieurs les Substituts présent qui a visé,

### A LA DEMANDE DE -
----------------

THE LEBANESE COMPANY FOR THE DEVELOPMENT AND RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT, S.A.L., société Libanaise dont le siège social est situé Building 149, Marfaa, Saad Zaghloul Street, Off Foch Street, BP 119493, BEIRUT - LEBANON, agissant par son représentant légal domicilié en cette qualité audit siège,

I

Elisant domicile au cabinet **WHITE & CASE LLP**, Avocats au Barreau de PARIS, 11 Boulevard de la Madeleine,

Je vous signifie et vous remets ci-joint :

1°) - copie d'une expédition d'une sentence arbitrale rendue le DOUZE JUILLET DEUX MIL QUATRE par la COUR INTERNATIONALE D'ARBITRAGE - CHAMBRE DE COMMERCE INTERNATIONALE, exéquaturée et revêtue de la formule exécutoire par ordonnance du Président du TRIBUNAL DE GRANDE INSTANCE DE PARIS en date du QUINZE SEPTEMBRE DEUX MIL QUATRE,

2°) - de sa traduction en Français par **M. BONNEFOUS**, Traducteur Interprète, Expert près la Cour d'Appel de PARIS.

**TRES IMPORTANT**
--------------

**Vous pouvez faire APPEL** de cette sentence arbitrale devant la Cour d'Appel de PARIS sise dite ville 4 Boulevard du Palais, dans le délai d'**UN MOIS** à compter de la date indiquée en tête du présent acte, augmenté du délai de distance prévu à l'article 643 du Code de Procédure Civile, lequel est ainsi conçu :

2

<u>Article 643</u> : « Lorsque la demande est portée devant une juridiction qui a son siège en France métropolitaine, les délais de comparution, d'opposition, d'appel et de pourvoi en cassation sont augmentés de :

1°) - UN MOIS pour les personnes qui demeurent dans un Département d'Outre-Mer ou dans un Territoire d'Outre-Mer,

2°) - <u>DEUX MOIS</u> pour celles qui demeurent à l'étranger ».

Si vous entendez exercer ce recours, vous devez charger un Avoué près cette Cour d'Appel d'accomplir les formalités nécessaires **avant l'expira-tion de ce DELAI QUI EST DE RIGUEUR.**



Vous pouvez consulter sur ce point un Avocat et lui demander de vous assister devant la Cour.

Vous rappelant enfin les dispositions des articles 1486 - 1487 du décret numéro 81.500 du 12 Mai 1981 ainsi conçus :

<u>ARTICLE 1486</u> :

«          L'appel et le recours en annulation sont portés devant la Cour d'Appel dans le ressort de laquelle la sentence arbitrale a été rendue.

3

Ces recours sont recevables dès le prononcé de la sentence ; ils cessent de l'être s'ils n'ont pas été exercés dans le mois de la signification de la sentence revêtue de l'exequatur.

Le délai pour exercer ces recours suspend l'exécution de la sentence arbitrale. Le recours exercé dans le délai est également suspensif ».

## ARTICLE 1487 :

« L'appel et le recours en annulation sont formés, instruits et jugés selon les règles relatives à la procédure en matière contentieuse devant la Cour d'Appel. La qualification donnée par les parties à la voie de recours au moment où la déclaration est faite peut être modifiée ou précisée jusqu'à ce que la Cour d'Appel soit saisie ».

Vous déclarant en outre que l'article 680 du Nouveau Code de Procédure Civile, modifié par l'article 29 du décret du 12 MAI 1981, indique :

« Que l'auteur d'un recours abusif ou dilatoire peut être condamné à une amende civile ou au paiement d'une indemnité à l'autre partie ».

4

Vous rappelant qu'une copie supplémen-
taire du présent acte vous est adressée par lettre
recommandée avec accusé de réception, conformément aux
dispositions de l'article 660 du Nouveau Code de
Procédure Civile.


SOUS TOUTES RESERVES
A CE QUE VOUS N'EN IGNORIEZ


Le présent acte a été notifié à la susnommée domicile et
parlant comme dessus, par clerc assermenté dont les
mentions seront visées par moi sur l'original, le tout
conformément à la loi.


COUT / CENT CINQUANTE EUROS


Employé pour la copie cent dix sept feuilles.



Maître Danièle KARSENTI

5

**TRIBUNAL
DE GRANDE
INSTANCE
DE PARIS**

■

**GREFFE CIVIL**

DÉPÔT N° 04/4264
DU
13 Septembre 2004

# EXPÉDITION EXÉCUTOIRE D'UNE
# SENTENCE ARBITRALE

## RENDUE DANS LE DIFFÉREND

## OPPOSANT

Société RADIAN INTERNATIONAL LLC (U.S.A.)

### A

THE LEBANESE COMPANY FOR THE DEVELOPMENT AND
RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT S.A.L.
(Lebanon)

M° Myrtille LAPUELLE
N° J. 002

# RÉPUBLIQUE FRANÇAISE

## AU NOM DU PEUPLE FRANÇAIS

Le Président du Tribunal de Grande Instance de Paris a, par son ordonnance du *15 Septembre 2004* rendu exécutoire le jugement arbitral dont la teneur suit :

## ACTE DE DÉPÔT

L' an ~~milneufcentquatre~~ *deux mil quatre* et le ~~treize septembre~~.

Au Greffe du Tribunal de Grande Instance de Paris et par devant nous Greffier soussigné

A comparu M. *Mystille LAPUELLE*.

Lequel a déposé entre nos mains, pour demeurer au rang des minutes du Greffe, conformément aux articles **1477** et **1500** du Nouveau Code de Procédure Civile l'original d'un jugement arbitral rendu par *John UFF, Vivian RAMSEY, John BLACKBURN*.

Ledit jugement statuant sur le différend opposant

*Ste RADIAN INTERNATIONAL LLC* à *(U.S.A.)* *Ste THE LEBANESE COMPANY FOR THE DEVELOPMENT AND RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT S.A.L. (Lebanon)*

Et a signé avec Nous, Greffier, après lecture.

signé *AUDAN* et *LAPUELLE*

[Translation]

## SAMI NAHAS LAW OFFICE

Clémenceau St., Bank of Beirut and Arab Countries Bldg., Hamra, Beirut
Tel.: (01) 364991 – (01) 364990 – Fax: (01) 369663
E-mail: nahaslawoff@inco.com.lb

Beirut, on February 16, 2006

ATTENTION: HONORABLE SUMMARY JUDGE IN BEIRUT
PETITION FOR APPOINTMENT OF AN EXPERT
SUBMITTED BY

The Petitioner: The Lebanese Company for the Development and Reconstruction of
Beirut Central District SAL (SOLIDERE)

Represented by Mr. Sami NAHAS, attorney-at-law
By virtue of a power of attorney, copy enclosed

1- On January 25, 1999, the Petitioner signed with Radian International Limited
(hereinafter the "Contractor") a Contract for Services whereby the latter would
carry out the rehabilitation works of the Normandy dumping ground located in
Beirut central district. According to article 44 of the said Contract, the settlement
of disputes arising therefrom shall be subject to the arbitration regulations
applicable by the International Chamber of Commerce.
- Enclosed a copy of the afore-mentioned Contract and its translation into Arabic
(**Exhibit 1**).

2- Many conflicts emerged between the Petitioner and the Contractor, which were
mainly due to the fact that the Contractor failed to complete the rehabilitation

1

works of the Normandy dumping ground as per the specifications expressly determined in the Contract, and failed to complete the works within the time limits specified in the Contract.

3- Following the various violations, by the Contractor, of the Contract provisions, and pursuant to article 35-2 thereof, the Petitioner served on the Contractor several warnings requesting the Contractor to remedy the defaults determined in each letter, within 10 days as of receipt thereof, subject to Contract termination at the own risk of the Contractor.

4- Notwithstanding the notification of the afore-mentioned letters, the Contractor did not take the needed action to remedy the defaults. Accordingly, the Petitioner had to terminate the Contract at the risk of the Contractor, and decided to pursue the works either by itself or through another contractor to be appointed by the Petitioner, at the expense of the Contractor.

- Enclosed a copy of the said letter terminating the Contract at the own risk of the Contractor (**Exhibit 2**).

5- The Petitioner, pursuant to the Contract provisions, filed an arbitration request with the International Chamber of Commerce in Paris. According to the arbitrations regulations applicable by the said Chamber, in particular article 23-2 thereof, both parties may have recourse to any judicial authority, whether before or after the file is referred to arbitration, in order to take interim and preventive measures. Such recourse shall not be deemed as a violation, an infringement or a waiver of the arbitration agreement, and shall not prejudice the jurisdiction of the arbitral tribunal nor affect the powers reserved for the same.

6- Whereas article 35-2 of the Contract provides that the Petitioner or any other contractor to be appointed by the Petitioner for the completion of the works, shall be entitled to use whatever equipment and tools it deems appropriate, of those

2

belonging to the Contractor on site and which may be solely used for work completion.

7- Whereas the Petitioner intends to start completing the works by itself, therefore it needs to use all of the equipment and tools belonging to the Contactor on site, and wishes to receive and use the same to pursue the rehabilitation works of the Normandy dumping ground.

8- To avoid any subsequent claims from the Contractor regarding the quality, quantity and condition of the equipment and tools the Petitioner shall receive and use for the rehabilitation works of the Normandy dumping ground.

For all the reasons above,

We hereby ask you to appoint an expert to perform the following duties:

1- Go on site where the equipment and tools belonging to the Contractor, Radian International Limited are located, and make a detailed and accurate inventory thereof.

2- Take pictures of any and all equipment and tools belonging to the Contractor on site.

3- Specify the following particulars:

      i. The name of the owner

      ii. In case of leased equipment, the name of the lessor.

      iii. An accurate and detailed description of the equipment and tools.

      iv. A description of the maintenance works on such equipment and tools, and a description of their condition.

      v. A description of the equipment and tools condition and whether they are operational or not.

4- A permit licensing the expert to interrogate whomever he deems appropriate, such as staff members of the Petitioner and/or the Contractor or others, have access to and procure copies of any and all documents he deems necessary to perform his mission.

3

Without prejudice

*Mr. Sami Nahas, attorney-at-law, p.p.*
*(Signed)*

*Document received on February 16, 2006*
*Registration no: 132/2006*
*Signed and sealed by the summary judge of Beirut*

*[Verbatim translation of the Arabic text attached hereto, delivered under no 160-06K, on February 27, 2006.]*

4

3



**FAIRHURST**
INTERNATIONAL

Consulting Engineers
Project & Construction Managers
Transportation & Environmental Consultants

W A Fairhurst International Partnership
Daouk Building, 10th Floor
Sidani Street, Ras Beirut
P. O. Box 11-4040
Beirut, Lebanon
Commercial Registration No: 69741
TEL : 01 742 765/6      FAX : 01 742 764

## Minutes of Meeting

**To**        :   Mr. Hisham Karameh                        Solidere

**From**      :   David W. Horne                            WA Fairhurst
                                                           International

**Date**      :   2204/99

**Subject**   :   **Initial Contract Site Meeting**

| Invited | Company /Division /Department | Present |
|---------|-------------------------------|---------|
| A. BouOnk | Radian International | X |
| H. Karameh | Solidere | X |
| D.W. Horne | W A Fairhurst International | X |

Meeting    Date:      21/04/99        Next Meeting   Date:      23/04/99

           Time:      09.00 hrs                      Time:      15.00 hrs
           Location:  Solidere                       Location:  Solidere
                      Normandy Site                             Normandy Site
                      Offices                                   Offices

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---------------|-----------|-------------|--------|--------|----------|-----------|------|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0001 | | MOM-0001 | MOM-0001 | 1/3 |

Union House, Wedbeck Street, London W1
Tel : 0171 935 1137  Fax : 0171 935 1957

**FAIRHURST**
**INTERNATIONAL**

| Item | Record | Action |
|---|---|---|
| 1. Finance | 1.1 ABO advised that the financing of the Contract was still not tied up. The EXIM bank loan was still not agreed, Citibank were discussing with Solidere. | ABO |
| | 1.2 ABO was due to meet with Munir Douaidi (Solidere Finance Division Manager) 21/04/99 to pursue the financial arrangements. | ABO/ MD |
| | 1.3 ABO agreed to advise HK/DWH on the situation after his meeting with MD. | |
| | 1.4 DWH expressed his concern that the Contract clock was running and that unless the financing was agreed, delays will ensue. | ABO |
| 2. Registration | ABO advised that Radian's registration in Lebanon was almost complete, and should be complete 24/04/99. | ABO |
| 3. Contractor's Staff | ABO advised he was returning to the USA at the end of this week (25/04/99). ABO would not be full-time resident in Lebanon until end of June 1999, but would be visiting regularly until then. | ABO |
| 4. Contract Submittals | 4.1 DWH asked for Radian's Outline programme, mobilisation intentions, and intentions on Contractual Obligations generally. | |
| | 4.2 ABO handed over a hard copy of Radian's draft programme entitled "Classic Schedule Layout" dated 19/04/99 (copy attached). | |
| | 4.3 DWH stated he would study the draft programme in the light of the Contract requirements, and comment accordingly. | DWH |
| | 4.4 ABO agreed to send a soft copy of the draft programme by e-mail to DWH during week commencing 26/04/99. | ABO |
| 5. Site Offices & Equipment | 5.1 ABO stated that an architect was to be appointed this week to produce layout plans for the site offices. | ABO |
| | 5.2 DWH tabled up-dated specifications of the computers WAFI would like to have provided, for the laptop and desktop models (copy attached). | |
| | In order to assist with overall project planning DWH/HK requested that the laptop be purchased as soon as possible by Radian. | |
| | 5.3 ABO stated that Radian would study these requests and advise. | ABO |
| | 5.4 ABO stated that until Radian secured finance (item 1) he could not purchase items. ABO stated that if WAFI were prepared to purchase the laptop, he would reimburse in due course. DWH would check if this was acceptable to WAFI, and advise. | DWH |

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0001 | | MOM-0001 | MOM-0001 | 2/3 |

**FAIRHURST**
**INTERNATIONAL**

| 6. DUOS WPP | 6.1 DWH handed a copy of the DUOS Taking Over Programme to ABO, and asked for confirmation that the programme would fit with Radian's overall programme. | |
| | 6.2 ABO advised that the Duos programme was acceptable, and would fit the Radian programme. | |
| 7. Method Statement | 7.1 DWH asked for Radian's up dated method statement to be submitted as soon as possible. | |
| | 7.2 ABO agreed to provide an outline of proposed operations, but stated that operations would generally be in accordance with the Radian Revised Technical and Management Proposal dated January 1998. | |
| | 7.3 DWH stated that he required benching plans to show the purposed outline method of work. ABO agreed to submit details. | ABO |
| | 7.4 ABO advised that Radian's terminology for Method Statement was Work Plan, and this was included on the draft programme (4.2). | |
| 8. Vehicles | 8.1 ABO advised he would provide a suitable rental vehicle for DWH until such time as Radian purchased the permanent vehicles. | ABO |
| 9. Incinerator | 9.1 ABO advised his intention to purchase a new incinerator to the latest European Standards, instead of the used incinerator originally proposed. | ABO |
| | 9.2 ABO stated this may delay the arrival of the incinerator on site by 1 month. | ABO |
| 10. A.O.B. | 10.1 Next Meeting- 23/04/99 at 15.00 hrs. at Solidere Normandy Site Offices. | |

Minutes Prepared by DWH.
Distribution    ABO   - Radian
              HK     - Solidere
              DWH - WAFI

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0001 | | MOM-0001 | MOM-0001 | 3/3 |



Consulting Engineers
Project & Construction Managers
Transportation & Environmental Consultants

W A Fairhurst International Partnership
Daouk Building, 10th Floor
Sidani Street, Ras Beirut
P. O. Box 11-4040
Beirut, Lebanon
Commercial Registration No: 69741
TEL : 01 742 765/6        FAX : 01 742 764
E-mail: wafi@wafi.com.lb

### Minutes of Meeting

| To | : | Mr. Hisham Karameh | Solidere |
| From | : | D.W. Horne | WA Fairhurst International |
| Date | : | 6th December 2000 | |
| Subject | : | **Progress Meeting No. 59** | |

| Invited | Company /Division /Department | Present |
|---------|-------------------------------|---------|
| A. BouOnk | Radian International | YES |
| H. Karameh | Solidere | YES |
| D.W. Horne | WA Fairhurst International | YES |

| Meeting | Date: | 6th December 2000 | Next Meeting | Date: | 13th December 2000 |
|---------|-------|-------------------|--------------|-------|--------------------|
| | Time: | 10.00 hrs. | | Time: | 10.00 hrs. |
| | Location: | Normandy Site Offices | | Location: | Normandy Site Offices |

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---------------|-----------|-------------|--------|--------|----------|-------------|------|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0131 | | MPM-0059 | MPM-0059 | 1/7 |

Head Office:
11 Woodside Terrace, Glasgow G3 7XQ, United Kingdom

FAIRHURST
INTERNATIONAL

1. Minutes of Previous Meeting

　1.1. Radian asked that the words "for approval" be deleted from item 3.1.1. This was agreed by all.

　1.2. The Minutes of Meeting N° 58 were otherwise accepted as a true record.

2. Health & Safety

　2.1. Health & Safety.

　　2.1.1. WAFI noted that some improvements had been made to the CUAR at trouble spots and asked Radian to maintain the CUAR in appropriate condition at all times, especially in view of the imminent wet weather.
**Radian**

　　2.1.2. WAFI noted that current excavations in the latest cut of working area were recreating the usual safety benches. WAFI asked Radian to ensure the stability of the highwalls and so ensure the safety of the workforce and operations below.
**Radian**

　　2.1.3. WAFI recorded that the dust plume ejected by the mobile vacuum trailer when in operation was unsatisfactory, and asked Radian to take appropriate steps to control the generation of dust so as to reduce the hazard to on site workers, and prevent dust leaving the site. Radian advised they were looking into dust control measures.
**Radian**

　　2.1.4. WAFI asked Radian to ensure that adequate portable ablutions facilities (with appropriate waste disposal) were available for the use of the work force.
**Radian**

3. Plant & Labour Resources on Site

　3.1. Radian International.

　　3.1.1. WAFI requested details of the pelletizing plant together with a schematic process/flow diagram. Radian agreed to provide this. WAFI thanked Radian for arranging a demonstration run for the benefit of WAFI visiting staff.
**Radian**

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0131 | | MPM-0059 | MPM-0059 | 2/7 |

FAIRHURST
INTERNATIONAL

3.1.2. Radian confirmed the 4th Trommel was delivered to site 29th November 2000.

3.1.3. Radian delivered the relevant shipping documents and invoices for the 4th trommel to Solidere 6th December 2000.

**Radian**

4. Progress

4.1. Progress to date.

4.1.1. According to the revised detailed programme (data date 31st August 2000) received 15th September 2000 after signature of Addendum N° 2, and the latest survey data, the scheduled and actual progress of excavation works up to the 5th November 2000 are as follows:

| Item | Quantity (m³) | Source | % |
|---|---|---|---|
| Total Expected > +1.5 | 1,870,747 | Prog. | 100.00 |
| Scheduled > +1.5 | 695,827 | Prog. | 37.20 |
| Actual > +1.5 | 660,573 | Survey | 35.31 |
| Difference | -35,254 | -- | -5.07 |
| Total Expected < +1.5 | 3,129,253 | Prog. | 100.00 |
| Scheduled < +1.5 | 350,140 | Prog. | 11.19 |
| Actual < +1.5 | 317,787 | Survey | 10.16 |
| Difference | - 32,353 | -- | -9.24 |
| Overall Expected Total | 5,000,000 | Prog. | 100.00 |
| Scheduled Total Excavated | 1,045,967 | Prog. | 20.92 |
| Actual Total Excavated | 978,360 | Survey | 19.57 |
| Difference | - 67,607 | -- | - 6.46 |

4.1.2. WAFI noted that this up date shows actual progress has fallen further behind schedule, and asked Radian what steps they intended to take to increase the rate of progress in order to recover lost production and ensure timely Completion of the Works.

**Radian**

4.1.3. Radian stated they would be working Sundays in an attempt to increase production when possible, and that they were confident the Contract Milestones would be met.

**Radian**

FAIRHURST
INTERNATIONAL

4.2. The Works on Site.

4.2.1.  WAFI again urged Radian to take wet weather precautions to facilitate:

    (i)     drying materials
    (ii)    keeping already dry material in a dry condition
    (iii)   general site drainage,
    (iv)   haul road drainage

**Radian**

Radian advised they would be using tarpaulins to keep stockpiles dry, and suitable gradients on storage areas to prevent ponding.

Radian also advised they would stockpile sub sea excavated material in the North West corner of Section 8 (opposite the DUOS WPP) during the winter months.

**Radian**

4.2.2.  Sea Bed Clearance, Verification and Backfilling.

4.2.2.1. Solidere again stated it was very important that Radian commence backfilling in Section 1 since space in the General External Fill Area was now very limited, and only the highest quality material could be accommodated in the General External Fill Area above +1.5m. Solidere noted that they have already accepted 1.0 Mm³ in the GEFA, and very little space remained.

**Radian**

4.2.2.2. Radian explained they intended to construct a rock-bund running South to North in Section 1 so as to confine the spread of fine backfill material and prevent overlap into uncleared areas. Radian advised the smaller (Lima) barge was presently completing the final part of Section 1 up to the "C" Line (Northern limit of Phase 1) following which sea bed verification and construction of the rock-bund would follow.

**Radian**

4.2.3.  Radian confirmed that they wished to bury shredded tyres and pelletized plastics in the park area, and agreed to write to WAFI with their proposals.

**Radian**

4.2.4.  DUOS WPP.

4.2.4.1. Radian asked when DUOS would replace the failed feeder controller. WAFI advised this had been written into the Addendum Agreement between Solidere and DUOS and it was therefore incumbent upon DUOS to replace the item forthwith.

**DUOS**

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0131 | | MPM-0059 | MPM-0059 | 4/7 |

FAIRHURST
INTERNATIONAL

4.2.4.2.WAFI asked if the hot air blower system installed by Radian was having a beneficial effect. Radian advised it would take time to assess the performance.

**Radian**

4.2.5.  Protection of the Environment.

4.2.5.1.WAFI stated that the combination of booms installed across the lagoon now appeared to be largely effective in preventing floating materials leaving the working area, but asked Radian to make adjustments whenever required so as to protect the environment. WAFI noted the recent removal of all booms to facilitate movement of marine equipment had resulted in debris escaping, and asked Radian to improve operations such that these failures do not recur.

**Radian**

4.2.6.  Final Site Quality.

4.2.6.1.Radian confirmed that efforts were continuing to modify the trommel feeding methods in order to secure an improvement in quality. Radian were currently trying to smooth the feed rate into trommels, which Radian believe will lead to improved quality.

**Radian**

4.2.6.2.Solidere asked if Radian intended to carry out plastic content tests on raw feed material and finished product as previously discussed. Figures to demonstrate the major reduction in plastic content would be most helpful. Radian confirmed they would do so, but reminded the meeting this was not a contractual obligation, and stated it would be some time before this was done.

**Radian**

4.2.6.3.Radian confirmed that the on-site laboratory was set up for E.Coli testing, and that independent checking by I.R.I. would still be used.

WAFI stated that their visiting analytical chemist had carried out an audit of the laboratory, and his report would be forwarded to Radian for action in due course.

**WAFI**

4.2.6.4.WAFI advised their visiting specialists had reviewed the incinerator operation results, and had observed some anomalies. WAFI had written separately to Radian on this issue. Radian stated they were working on the issues raised, and would rectify the problems.

**Radian**

FAIRHURST
INTERNATIONAL

4.2.7. Site Survey.

    4.2.7.1.WAFI asked Radian to include all backfill areas in the month end survey.

    4.2.7.2.WAFI asked that Radian work with the Employer's survey auditor to reconcile the discrepancy in calculated volumes.

**Radian/WAFI/Solidere**

    4.2.7.3.WAFI asked Radian to confirm that the rock bund constructed behind and parallel to the Caissons did not extend beyond 90m from the Caissons. Radian confirmed the bund did not extend beyond 90m from the Caissons.

## 5. Programme

5.1. Progress of the works is monitored according to the timescale of the programme submitted 15th September 2000.

## 6. Payments

6.1. WAFI stated they had reviewed Request for Payment N°18, and had determined to adjust and reduce the amount payable.

## 7. Changes in the Works

7.1. WAFI referred to Radian's letter ABO/Emp/0030 dated 19th October 2000 in respect of Claim N° 2, and confirmed Solidere had replied rejecting the claim.

**Solidere**

7.2. WAFI asked Radian what their intentions were with regard to Notice of Claim N°3 given WAFI's previous advice (letter Let-0320-PN-RAD dated 5th May 2000) of no grounds for a claim for extension of time or additional costs.

Radian stated details of Claim N° 3 will be submitted in due course

**Radian**

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0131 | | MPM-0059 | MPM-0059 | 6/7 |

**FAIRHURST**
INTERNATIONAL

8. <u>A.O.B.</u>

8.1. WAFI asked Radian to respond (to WAFI letter Let-0440-DWH-RAD dated 19th September 2000) regarding their change of letterhead to URS.

8.2. WAFI asked Radian for their intended working hours during the Christmas/Eid holiday period. Radian advised the site operations would be shut down 23rd December 2000 to 2nd Janaury 2001.

8.3. WAFI advised their Mr. D.W. Horne would be on leave 20th December 2000 to 3rd January 2001 inclusive. Mr. J.A. Wright will deputise during this period.

9. <u>Date of Next Meeting</u>

9.1. Wednesday 13th December 2000 at 10.00 hrs.

Prepared by:    DWH
Distribution:    Those present plus JAW / YM / JAS / PN / BK / IH / MS

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0131 | | MPM-0059 | MPM-0059 | 7/7 |



**FAIRHURST**
**INTERNATIONAL**

Consulting Engineers
Project & Construction Managers
Transportation & Environmental Consultants

W A Fairhurst International Partnership
Daouk Building, 10th Floor
Sidani Street, Ras Beirut
P. O. Box 11-4040
Beirut, Lebanon
Commercial Registration No: 69741
TEL : 01 742 765/6          FAX : 01 742 764
E-mail: wafi@wafi.com.lb

## Minutes of Meeting

| To | : | Mr. Hisham Karameh | Solidere |
| From | : | D.W. Horne | WA Fairhurst International |
| Date | : | 19th December 2000 | |
| Subject | : | **Progress Meeting No. 60** | |



| Invited | Company /Division /Department | Present |
| --- | --- | --- |
| A. BouOnk | Radian International | YES |
| H. Karameh | Solidere | YES |
| D.W. Horne | WA Fairhurst International | YES |

| Meeting | Date: | 19th December 2000 | Next Meeting | Date: | 10th January 2001 |
| | Time: | 10.00 hrs. | | Time: | 10.00 hrs. |
| | Location: | Normandy Site Offices | | Location: | Normandy Site Offices |

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0132 | | MPM-0060 | MPM-0060 | 1/6 |

Head Office:
11 Woodside Terrace, Glasgow G3 7XQ, United Kingdom
Tel.: 0141 332 8754  Fax: 0141 332 5083

FAIRHURST
INTERNATIONAL

1. Minutes of Previous Meeting

   1.1. The Minutes of Meeting N° 59 were accepted as a true record.

2. Health & Safety

   2.1. Health & Safety.

      2.1.1. WAFI asked Radian to maintain the CUAR in appropriate condition at all times, especially in view of the wet weather. WAFI noted the road was narrow in places.

      Radian advised the road would shortly be relocated.
      
      **Radian**

      2.1.2. WAFI noted that most recent excavations in the latest cut of the working area had proceeded without the usual safety benches. WAFI asked Radian to ensure the stability of the highwalls and so ensure the safety of the workforce and operations below.
      
      **Radian**

      2.1.3. WAFI asked Radian to check and ensure that vehicle lights and audible reversing devices were in good working condition.
      
      **Radian**

3. Plant & Labour Resources on Site

   3.1. Radian International.

      3.1.1. WAFI asked Radian to issue formal advice of the change in management on site following the departure of Phil Fachan, site manager.
      
      **Radian**

      3.1.2. WAFI requested details of the pelletizing plant together with a schematic process/flow diagram. Radian agreed to provide this.
      
      **Radian**

      3.1.3. WAFI asked Radian to clarify labour returns in the weekly reports, since it appeared the labour force had reduced from 280 to 130.
      
      **Radian**

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0132 | | MPM-0060 | MPM-0060 | 2/6 |

FAIRHURST
INTERNATIONAL

4. Progress

4.1. Progress to date.

4.1.1. According to the revised detailed programme (data date 31st August 2000) received 15th September 2000 after signature of Addendum N° 2, and the latest survey data, the scheduled and actual progress of excavation works up to the 5th December 2000 are as follows:

| Item | Quantity (m³) | Source | % |
|------|---------------|--------|---|
| Total Expected > +1.5 | 1,870,747 | Prog. | 100.00 |
| Scheduled > +1.5 | 737,510 | Prog. | 39.42 |
| Actual > +1.5 | 710,606 | Survey | 37.99 |
| Difference | -26,904 | -- | -3.65 |
| Total Expected < +1.5 | 3,129,253 | Prog. | 100.00 |
| Scheduled < +1.5 | 396,612 | Prog. | 12.67 |
| Actual < +1.5 | 353,807 | Survey | 11.31 |
| Difference | - 42,805 | -- | -10.79 |
| Overall Expected Total | 5,000,000 | Prog. | 100.00 |
| Scheduled Total Excavated | 1,134,122 | Prog. | 22.68 |
| Actual Total Excavated | 1,064,413 | Survey | 21.29 |
| Difference | - 69,709 | -- | - 6.15 |

4.1.2. WAFI noted that this up date shows actual progress to 5th December 2000 is now behind schedule by 3 weeks and asked Radian what steps they intended to take to increase the rate of progress in order to recover lost production and ensure timely Completion of the Works. WAFI noted that whilst the rate of excavation above +1.5m had increased, the rate below +1.5m had again decreased.

**Radian**

4.1.3. Radian stated they would either be bringing in additional equipment for the sub-sea works, specifically a 3rd long reach excavator, and a 3rd crane barge, or increasing the sub-sea working hours to 24 hours from the current 16hrs.

**Radian**

4.2. The Works on Site.

4.2.1. WAFI asked if Radian's wet weather precautions had assisted in:

(i)     drying materials
(ii)    keeping already dry material in a dry condition

**Radian**

Radian advised their use of tarpaulins to keep stockpiles dry, and suitable gradients on storage areas to prevent ponding had improved progress.

FAIRHURST
INTERNATIONAL

4.2.2.  Sea Bed Clearance, Verification and Backfilling.

4.2.2.1. WAFI asked when excavation of Section 1 would be completed, and when the next strip of sea bed would be ready for inspection and verification. Radian stated they would very soon ask WAFI to carry out a further verification.

**Radian**

4.2.2.2. Radian advised that once the next section of sea bed was clear, they intended to construct a submerged toe bund running south to north in Section 1, behind which fine materials would be backfilled. Radian advised the toe bund would be constructed from cap material from the North side of the CUAR in Sections 6 & 8 excavated by the American barge, and transported to location in split hopper barges.

**Radian**

4.2.3.  Radian again confirmed that they wished to bury shredded tyres and pelletized plastics in the park area, and agreed to write to WAFI with their proposals.

4.2.4.  Radain stated they wished to temporarily stockpile shredded tyres and plastic pellets on the backfilled area next to the caissons. Solidere agreed to look at the options with WAFI.

**WAFI/Solidere**

4.2.5.  DUOS WPP.

4.2.5.1. Radian asked when DUOS would replace the failed feeder controller. WAFI advised this had been written into the Addendum Agreement between Solidere and DUOS and it was therefore incumbent upon DUOS to replace the item forthwith.

**DUOS**

4.2.5.2. WAFI asked if the hot air blower system installed by Radian was having a beneficial effect. Radian advised it would take time to assess the performance.

**Radian**

4.2.6.  Protection of the Environment.

4.2.6.1. WAFI stated that the combination of booms installed across the lagoon now appeared to be largely effective in preventing floating materials leaving the working area, but asked Radian to make adjustments whenever required so as to protect the environment.

WAFI advised that the marine contractor's vessels were preaparing to leave the lagoon, and asked Radian to manage the issue of debris control in the lagoon.

**Radian**

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0132 | | MPM-0060 | MPM-0060 | 4/6 |

FAIRHURST
INTERNATIONAL

4.2.7.  Final Site Quality.

4.2.7.1. Solidere asked if Radian intended to carry out plastic content tests on raw feed material and finished product as previously discussed. Figures to demonstrate the major reduction in plastic content would be most helpful. Radian confirmed they would do so, but reminded the meeting this was not a contractual obligation, and stated it would be some time before this was done.

**Radian**

4.2.7.2. WAFI stated that their visiting analytical chemist had carried out an audit of the laboratory, and his report had been forwarded to Radian for action.

**Radian**

4.2.7.3. WAFI advised their visiting specialists had reviewed the incinerator operation results, and had observed some anomalies. WAFI had written separately to Radian on this issue. Radian stated they were working on the issues raised, and would rectify the problems.

**Radian**

4.2.8.  Site Survey.

4.2.8.1. WAFI asked Radian to include all backfill areas in the month end survey, and to estimate volumes of all materials in stockpiles

**Radian**

4.2.8.2. WAFI asked Radian to confirm that the rock bund constructed behind and parallel to the Caissons did not extend beyond 90m from the Caissons. Radian confirmed the bund did not extend beyond 90m from the Caissons, and would maintain a check to ensure it did not do so as construction progressed east.

**Radian**

## 5.  Programme

5.1. Progress of the works is monitored according to the timescale of the programme submitted 15th September 2000.

## 6.  Payments

6.1. WAFI stated they had received Request for Payment N°19, which was under review.

FAIRHURST
INTERNATIONAL

7. Changes in the Works

7.1. WAFI referred to Radian's letter ABO/Emp/0030 dated 19th October 2000 in respect of Claim N° 2, and confirmed Solidere had replied rejecting the claim.

**Solidere**

7.2. WAFI asked Radian what their intentions were with regard to Notice of Claim N°3 given WAFI's previous advice   (letter Let-0320-PN-RAD dated 5th May 2000) of no grounds for a claim for extension of time or additional costs.

Radian stated details of Claim N° 3 will be submitted in due course

**Radian**

8. A.O.B.

8.1. WAFI asked Radian to respond (to WAFI letter Let-0440-DWH-RAD dated 19th September 2000) regarding their change of letterhead to URS.

8.2. Radian now advised the site operations would be shut down 23rd December 2000 to 2nd Janaury 2001, but that earthmoving would take place Thursday, Friday and Saturday 28/29/30th December 2000.

8.3. WAFI asked who would control issues during the above period. Radian confirmed the site would be managed by Messrs. A. Bou Onk, H. Gabriel, J. Pratt and K. Klausmier.

**Radian**

9. Date of Next Meeting

9.1. Wednesday 10th January 2001 at 10.00 hrs.

Prepared by:   DWH
Distribution:   Those present plus JAW / YM / JAS / PN / BK / IH / MS

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0132 | | MPM-0060 | MPM-0060 | 6/6 |

# EXHIBIT D

# PART 2



**FAIRHURST**
INTERNATIONAL

Consulting Engineers
Project & Construction Managers
Transportation & Environmental Consultants

W A Fairhurst International Partnership
Daouk Building, 10th Floor
Sidani Street, Ras Beirut
P. O. Box 11-4040
Beirut, Lebanon
Commercial Registration No: 69741
TEL : 01 742 765/6          FAX : 01 742 764
E-mail: wafi@wafi.com.lb

## Minutes of Meeting

**To**        :  Mr. Hisham Karameh          Solidere

**From**     :  D.W. Horne                          WA Fairhurst International

**Date**     :  10th January 2001

**Subject**  :  **Progress Meeting No. 61**



| Invited | Company /Division /Department | Present |
|---------|-------------------------------|---------|
| A. BouOnk | Radian International | YES |
| H. Karameh | Solidere | YES |
| D.W. Horne | WA Fairhurst International | YES |

| Meeting | Date: | 10th January 2001 | Next Meeting | Date: | 17th January 2001 |
|---------|-------|-------------------|--------------|-------|-------------------|
| | Time: | 10.00 hrs. | | Time: | 10.00 hrs. |
| | Location: | Normandy Site Offices | | Location: | Normandy Site Offices |

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---------------|----------|-------------|--------|--------|----------|-------------|------|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0133 | | MPM-0061 | MPM-0061 | 1/6 |

**Head Office:**
11 Woodside Terrace, Glasgow G3 7XQ, United Kingdom
Tel - 0141 332 8754  Fax: 0141 332 5083

**FAIRHURST**
INTERNATIONAL

1. Minutes of Previous Meeting

    1.1. The Minutes of Meeting N° 60 were accepted as a true record.

2. Health & Safety

    2.1. Health & Safety.

        2.1.1. WAFI asked Radian to confirm who was now in charge of Health & Safety at site. Radian stated that Mohammed Charour was now the Site Health & Safety Officer. WAFI asked Radian to confirm this appointment in writing.

                                                               **Radian**

        2.1.2. Solidere stated that despite their introduction of two explosives experts to the site to handle UXO, it had become clear that members of Radian's workforce were handling explosives. Solidere suggested that this hazardous operation be left to their experts. Radian stated their workforce should not be handling UXO and would enforce this on site..

                                                                **Radian**

        2.1.3. WAFI referred to the sections of excavation where 10m highwalls had been cut vertically, with no safety benches. WAFI expressed their view that these sections are unsafe, and that there was a distinct possibility of collapse, especially given the very obvious sand and cohesionless material horizons and lenses in the highwalls. WAFI asked Radian to ensure safety below these highwalls and to remedy the hazards. Radian stated that these were short term features, and therefore did not represent major hazards. Nonetheless, Radian stated they would work to ensure highwalls were constructed with safety benches in the longer term.

                                                                **Radian**

        2.1.4. Radian advised they were constructing a further diversion of the CUAR to the east of the present location. WAFI asked Radian to ensure this new road was not within the potentially hazardous zone close to the vertical highwall sections referred to in 2.1.3 above.

                                                                 **Radian**

        2.1.5. WAFI noted that the very large stockpile of tyres adjacent to the incinerator was now severely restricting the operating space for personnel and equipment at the incinerator. WAFI advised the remaining space was too small and hazardous for the use of a forklift and personnel, and asked Radian to rectify the situation.

                                                                  **Radian**

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0133 | | MPM-0061 | MPM-0061 | 2/6 |

**FAIRHURST**
INTERNATIONAL

2.1.6. WAFI asked if the recent fire in the large plastics stockpile had been brought under control. Radian confirmed the fire had been capped with wet sub-sea excavated material, and appeared to have been extinguished. WAFI noted another location from which smoke was rising, and asked Radian to investigate and ensure fires are extinguished.

**Radian**

## 3. Plant & Labour Resources on Site

3.1. Radian International.

3.1.1. WAFI asked Radian to issue formal advice of the change in management on site following the departure of Phil Fachan, site manager. Solidere asked Radian to issue a revised site organogram.

**Radian**

3.1.2. WAFI advised the staff and labour force according the Weekly QC report had now dropped to 108 N°. Radian advised there must be some incomplete reporting, since the total of staff and labour should be in the order of 230. WAFI urged Radian to clarify this.

**Radian**

## 4. Progress

4.1. Progress will be updated following receipt of December 2000 month end survey data. Radian estimated excavation was 65,000m³ in December 2000.

4.2. Progress to date.

4.2.1. According to the revised detailed programme (data date 31st August 2000) received 15th September 2000 after signature of Addendum N° 2, and the latest available survey data, the scheduled and actual progress of excavation works up to the 5th December 2000 are as follows:

| Item | Quantity (m³) | Source | % |
|------|------|------|------|
| Total Expected > +1.5 | 1,870,747 | Prog. | 100.00 |
| Scheduled > +1.5 | 737,510 | Prog. | 39.42 |
| Actual > +1.5 | 710,606 | Survey | 37.99 |
| Difference | -26,904 | -- | -3.65 |
| Total Expected < +1.5 | 3,129,253 | Prog. | 100.00 |
| Scheduled < +1.5 | 396,612 | Prog. | 12.67 |
| Actual < +1.5 | 353,807 | Survey | 11.31 |
| Difference | - 42,805 | -- | -10.79 |
| Overall Expected Total | 5,000,000 | Prog. | 100.00 |
| Scheduled Total Excavated | 1,134,122 | Prog. | 22.68 |
| Actual Total Excavated | 1,064,413 | Survey | 21.29 |
| Difference | - 69,709 | -- | - 6.15 |



**FAIRHURST**
INTERNATIONAL

4.2.2.  WAFI noted that this up date shows actual progress to 5th December 2000 is now behind schedule by 3 weeks and asked Radian what steps they intended to take to increase the rate of progress in order to recover lost production and ensure timely Completion of the Works. WAFI noted that whilst the rate of excavation above +1.5m had increased, the rate below +1.5m had again decreased.

**Radian**

4.2.3.  Radian stated they would either be bringing in additional equipment for the sub-sea works, specifically a 3rd long reach excavator, and a 3rd crane barge, or increasing the sub-sea working hours to 24 hours from the current 16hrs.

**Radian**

4.3. The Works on Site.

4.3.1.  WAFI asked for some explanation of the present excavation sequence, which had departed from the planned north-south cuts. Radian stated this had been to create new working locations for the trommels, and that they would resume with north-south cuts in the near future.

**Radian**

4.3.2.  Sea Bed Clearance, Verification and Backfilling.

4.3.2.1.A further strip of sea bed had been inspected 20th December 2000. Radian delivered the appropriate letter and drawings to record the cleared sea bed 10th January 2001.

**Radian**

4.3.2.2.Radian advised that they would not be proceeding with a submerged bund at this stage, but would inform WAFI prior to start of construction. Radian stated they had commenced backfilling in section 1 over cleared sea bed, and were monitoring the backfill slopes to ensure there was no encroachement onto uncleared areas.

**Radian**

4.3.3.  Radian stated they wished to temporarily stockpile shredded tyres and plastic pellets on the backfill to the West of Section 1 prior to backfilling in the Park area. Solidere agreed this was acceptable.

**Radian**

4.3.4.  Radian again confirmed that they wished to bury shredded tyres and pelletized plastics in the park area, and agreed to write to WAFI with their proposals. WAFI stated that no backfilling should take place prior to receipt of Radian's proposals, and acceptance.

**Radian**

| Project Name: | Normandy Landfill Treatment Contract | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0133 | | | MPM-0061 | MPM-0061 | 4/6 |

FAIRHURST
INTERNATIONAL

4.3.5.  DUOS WPP.

4.3.5.1. DUOS had confirmed the replacement feeder controller was en-route to Beirut.

**DUOS**

4.3.5.2. Radian advised they were installing a new conveyor to by-pass the crusher. WAFI asked Radian to ensure metals were removed effectively, since the over band magnet would also be by-passed.

**Radian**

4.3.6.  Protection of the Environment.

4.3.6.1. WAFI stated that the combination of booms installed across the lagoon now appeared to be largely effective in preventing floating materials leaving the working area, but asked Radian to make adjustments whenever required so as to protect the environment. WAFI noted that semi-submerged debris was still leaving the site, and asked Radian to address this issue.

**Radian**

4.3.7.  Final Site Quality.

4.3.7.1. WAFI confirmed receipt of Radian's letter ABO/CM/266 dated 9th January 2001 regarding the incinerator operation, in response to anomalies recorded by WAFI's visiting staff in November 2000.

WAFI advised they would seek the further advice of their staff, but meanwhile asked Radian to ensure the incinerator was operated fully in accordance with the requisite standards, and with defensible data records to verify compliance.

**Radian**

4.3.7.2. WAFI tabled a copy of page 2 of Radian's Weekly QC report N° 0069 (week ending 31/12/00) which includes incorrect and inappropriate statements about the Construction Manager and material stockpiles respectively. WAFI offered Radian the opportunity to retract the reported statements. Radian accepted, and will issue a revised corrected page.

**Radian**

4.3.8.  Site Survey.

4.3.8.1. WAFI asked Radian to include all backfill areas in the month end survey, and to estimate volumes of all materials in stockpiles. Radian confirmed the latest survey would include all stockpiles.

**Radian**

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0133 | | MPM-0061 | MPM-0061 | 5/6 |



5. Programme

    5.1. Progress of the works is monitored according to the timescale of the programme submitted 15th September 2000.

6. Payments

    6.1. WAFI stated they had reviewed Request for Payment N°19, and had approved a reduced amount for payment.

7. Changes in the Works

    7.1. There are no outstanding issues.

8. A.O.B.

    8.1. WAFI asked Radian to respond (to WAFI letter Let-0440-DWH-RAD dated 19th September 2000) regarding their change of letterhead to URS.

9. Date of Next Meeting

    9.1. Wednesday 17th January 2001 at 10.00 hrs.

Prepared by:   DWH
Distribution:  Those present plus JAW / YM / JAS / PN / BK / IH / MS

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0133 | | MPM-0061 | MPM-0061 | 6/6 |



**FAIRHURST**
INTERNATIONAL

Consulting Engineers
Project & Construction Managers
Transportation & Environmental Consultants

W A Fairhurst International Partnership
Normandy Remediation Project Office
P.O.Box 11-4040
Beirut, Lebanon
TEL: +961 1 983 579/80
FAX: +961 1 982 579/80

## Minutes of Meeting

| | | |
|---|---|---|
| To | : | Mr. Hisham Karameh |
| From | : | Neville Judd |
| Date | : | 3rd February 2005 |
| Subject | : | Progress Meeting No. 219 |

Solidere

WA Fairhurst International

| Invited | Company /Division /Department | Present |
|---|---|---|
| A. BouOnk | Radian International | YES |
| H. Karameh | Solidere | YES |
| N. Judd | WA Fairhurst International | YES |
| N. Abdul Salam | WA Fairhurst International | YES |

Meeting   Date:      2nd February 2005      Next Meeting   Date:      16th February 2005
          Time:      10.00 hrs.                             Time:      10.00 hrs.
          Location:  Normandy Site                          Location:  Normandy Site
                     Offices                                           Offices

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0303 | | MPM-0219 | MPM-0219 | 1/6 |

197 Marfaa 3rd Floor, Saad Zaghloul Street, Beirut Central District, Lebanon
Commercial Registration No: 69741
Tel: +961 1 999009, Fax: +961 1 999010

**FAIRHURST**
INTERNATIONAL

1. Minutes of Previous Meeting

    1.1. The Minutes of Meeting N° 218 were accepted as a true record.

2. Health & Safety

    2.1. Radian confirmed receipt of WAFI's letter Let-1294-JAW-RAD 28th October 2004 with regard to the accident on site.

    Radian stated the police investigation is still ongoing and thus a response to this letter is not ready yet. Radian confirmed the police report and its translation to English will be sent to WAFI as soon as ready.

**Radian**

    2.2. Solidere asked if Radian have finished excavations of the stockpiled subsea material on Beach 2.

    Radian stated they completed the surface.

    WAFI stated they would like to know accurately the progress made on processing this stockpiled material.

    Radian stated they have an old survey showing the original area before stockpiling that could be compared to the current survey.

    WAFI asked Radian to send a copy of this old survey.

    Radian agreed to do so.

**Radian**

    2.3. Radian stated they may be forced to recommence stockpiling material on Beach 2 as they are short of space.

    Solidere asked what type of material are Radian planning to stockpile; i.e. sorted or excavated.

    Radian replied excavated material.

**Radian**

    WAFI asked Radian if they had recently stockpiled any significant amount of material at Beach 2. Radian said not much had been stockpiled recently.

3. Plant & Labour Resources on Site

    3.1. Radian confirmed that the Hydromar Lima barge and the SNE barge are parked and the American barge is being operated.

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0303 | | MPM-0219 | MPM-0219 | 2/6 |

**FAIRHURST**
**INTERNATIONAL**

## 4. Progress

### 4.1. Progress to date.

4.1.1.  The programme is the subject of ongoing correspondence.

4.1.2.  According to the revised detailed programme (data date 31st August 2000) received 15th September 2000 after signature of Addendum N° 2, all works should have been completed 14 April 2004.

### 4.2. Access to BIEL/CUAR.

4.2.1.  WAFI noted that the rock bund that will carry the diversion of the CUAR and the BIEL access road has been established at 20m width, and that the road is now asphalted.

Solidere stated they will arrange for some lights to be installed on the mural to be positioned between the asphalted road and the haul road.

WAFI asked if Solidere intend to install any kind of barriers at the South side of the road for safety reasons.

Solidere stated that they will install jersey barriers, and that they already installed several bumps to control car speed.

WAFI suggested the bumps be painted. Solidere agreed.

**Solidere**

Radian stated they need to excavate section 7B as soon as the road diversion is complete. Radian also stated that they intend if possible to complete the excavation in the extreme South East end of Section 7B using land based cranes or land based excavators. However if their subcontractor claims this method is unsafe they will continue the excavation works using the barges and hence will have to breach the road.

**Radian**

### 4.3. Dredger

4.3.1.  Radian stated the dredger is now operational.

### 4.4. LTTD Unit

4.4.1.  WAFI noted that people were seen working on the LTTD plant.

Radian stated the LTTD unit is being put back together.

**Radian**

### 4.5. Pelletiser

4.5.1.  Radian stated the operation of the pelletiser continues to be slow as the material is wet as a result of the latest rain fall.

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0303 | | MPM-0219 | MPM-0219 | 3/6 |

FAIRHURST
INTERNATIONAL

4.6. Stockpiles

   4.6.1. see item 2.2.

4.7. Incinerator.

   4.7.1. Radian stated the incinerator is not being operated until they resolve the issue with the Ministry of Environment. Radian's lawyer is currently dealing with this matter.

   4.7.2. Radian added they were asked to prepare an environmental assessment in accordance with a 2002 law about medical waste. It is to be determined if this law applies to this incinerator.

   4.7.3. Radian said they are supposed to meet with the Ministry of Environment representatives Friday 4th February 2005.

   4.7.4. Radian added they received a report issued by one of the inspectors stating that the Greenpeace complaint has no proper foundation. Radian stated they will submit this report to WAFI/SOL as soon as it is properly translated.

                                                                        **Radian**

4.8. Protection of the Environment.

   4.8.1  WAFI noted that QC report 0264 refers to the naphthalene that was found in area 7B and WAFI asked when Radian's Mr. James Pratt would return to site as he could indicate the resultant treated material stored next to the pelletiser.

   Radian stated JP is now present on site and has discussed the matter with BK.

   4.8.2  WAFI stated now that JP is back, he can review the metals issue with them.

   WAFI noted that the metals issue was not discussed with Dr. Card during his last visit.

                                                                        **Radian**

   4.8.3  WAFI noted that the drums of bituminous material found in Section 7B were still in the ground.

4.9. Tyre Shredder.

   4.9.1. WAFI noted the tyre shredder is operational intermittently.

4.10. Final Site Quality.

   4.10.1. A meeting was held in Beirut on 16th December 2004 in the presence of Radian's Messrs. Tom Bishop, William Hadaya, Berwick Manley and Mike Marley as per their letter ABO/CM/622.

   Berwick Manley and Mike Marley will meet with Geoff Card and Jim White Thursday/Friday 3rd/4th February 2005.

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0303 | | MPM-0219 | MPM-0219 | 4/6 |

**FAIRHURST**
INTERNATIONAL

Radian stated their experts (i.e. Messrs. Manley and Marley) will be present on site tomorrow Thursday 3rd February 2005.

WAFI stated that Dr. Card and Prof. White are already on site having arrived yesterday evening.

4.11. Seabed Inspections.

    4.11.1. Nothing discussed.

4.12. Radian stated they did not receive DAR's survey audits for the months of August, September, October and November, and December

WAFI stated DAR are making a review and it is hoped they will submit their findings in a couple of days.

Radian expressed their concern with regard to this issue. Radian explained that they pay their subcontractor based on the actual work completed. The subcontractor's reports show that they have exceeded 5 million $m^3$. Radian believe that they are close to this number but they need to know for a fact.

Radian stated that they also need to clarify this issue vis a vis the Contract. Radian asked what if they have to exceed 5 million $m^3$ to excavate the area inside the Phase 2 boundary.

WAFI stated that the Contract demands that the whole area inside the Phase 2 boundary be excavated. If this volume was to exceed 5 million $m^3$, Radian would be paid for the additional $m^3$. Solidere agreed with this statement.

Radian stated they need Solidere's approval to continue excavation if they exceed 5 million $m^3$.

## 5. Programme

    5.1 See 4.1.1 and 4.10.

## 6. Payments

    6.1 This issue is the subject of ongoing correspondence.

## 7. Changes in the Works

    7.1 Nothing discussed.

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0303 | | MPM-0219 | MPM-0219 | 5/6 |

**FAIRHURST**
**INTERNATIONAL**

## 8.  A.O.B.

8.1 WAFI stated their HP 4500 Laserjet cannot be used as one of its toners is empty. Radian stated they will send the toner immediately after the meeting, which they did.

8.2 Radian stated that they will continue their operations during St. Maroun's Day and Hijri New Year i.e. 9th and 10th February 2005.

8.3 After the meeting, WAFI asked Radian what is their current position with regard to the provision of professional indemnity insurance. Radian stated they will ask their insurance experts in the U.S. and reply in due course.

Radian

## 9.  Date of Next Meeting

9.1 The next progress meeting is scheduled Wednesday 16th February 2005 at 10.00 hrs.

Prepared by:  NAS

Distribution: Those present plus JAW / YM / JAS / BB / BK / IH / MS

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0303 | | MPM-0219 | MPM-0219 | 6/6 |

1

Société Civile Professionnelle
**Danièle KARSENTI-PÉRÈS**
HUSSIER DE JUSTICE ASSOCIE
14, RUE NOTRE-DAME-DES-VICTOIRES
75002 PARIS

TÉLÉPHONE 01 42 60 03 66
TÉLÉCOPIE 01 42 61 41 79
CCP PARIS 2123-29 Y

karsenti.peres@huissierdeparis.com

Paris le 08 Janvier 2004

SOCIETE RADIAN INTERNATIONAL
600 Montgomery Street
26th Floor
SAN FRANCISCO
CA 94111
ETATS-UNIS D'AMERIQUE

C.O.

Aff : **THE LEBANESE COMPANY FOR THE DEVELOPMENT
AND RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT**
C/ **RADIAN INTERNATIONAL LLC**

Messieurs,

Conformément à la loi, je vous adresse sous ce pli copie de la **SIGNIFICATION DE SENTENCE ARBITRALE** que je vous fais parvenir par la voie diplomatique.

Veuillez agréer, Messieurs, mes sincères salutations.

D. KARSENTI-PERES

C.O.

L'an deux mil cinq et le **VINGT SIX** JANVIER

## SIGNIFICATION DE SENTENCE ARBITRALE

Danièle KARSENTI-PERES, Huissier de Justice, Membre de la Société Civile Professionnelle Danièle KARSENTI-PERES, Huissier de Justice Associé près le Tribunal de Grande Instance de PARIS, demeurant en ladite ville (2ème) - 14 rue Notre Dame des Victoires, soussignée,

A -



La société **RADIAN INTERNATIONAL LLC** dont le siège social est 600 Montgomery Street - 26th Floor - SAN FRANCISCO - CA 94111 - ETATS-UNIS D'AMERIQUE, prise en la personne de son représentant légal y domicilié, ET CE, conformément à la loi, par la voie diplomatique, au Parquet de Monsieur le Procureur de la République près le Tribunal de Grande Instance de PARIS, en ses bureaux sis au Palais de Justice de ladite ville - 4 Boulevard du Palais, où étant et parlant à l'un de Messieurs les Substituts présent qui a visé,

A LA DEMANDE DE -

THE **LEBANESE COMPANY FOR THE DEVELOPMENT AND RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT, S.A.L.,** société Libanaise dont le siège social est situé Building 149, Marfaa, Saad Zaghloul Street, Off Foch Street, BP 119493, BEIRUT - LEBANON, agissant par son représentant légal domicilié en cette qualité audit siège,

|

Elisant domicile au cabinet **WHITE & CASE LLP**, Avocats au Barreau de PARIS, 11 Boulevard de la Madeleine,

Je vous signifie et vous remets ci-joint :

1°) - copie d'une expédition d'une sentence arbitrale rendue le DOUZE JUILLET DEUX MIL QUATRE par la COUR INTERNATIONALE D'ARBITRAGE - CHAMBRE DE COMMERCE INTERNATIONALE, exéquaturée et revêtue de la formule exécutoire par ordonnance du Président du TRIBUNAL DE GRANDE INSTANCE DE PARIS en date du QUINZE SEPTEMBRE DEUX MIL QUATRE,

2°) - de sa traduction en Français par M. **BONNEFOUS**, Traducteur Interprète, Expert près la Cour d'Appel de PARIS.

TRES IMPORTANT
------------------

Vous pouvez faire APPEL de cette sentence arbitrale devant la Cour d'Appel de PARIS sise dite ville 4 Boulevard du Palais, dans le délai d'UN MOIS à compter de la date indiquée en tête du présent acte, augmenté du délai de distance prévu à l'article 643 du Code de Procédure Civile, lequel est ainsi conçu :

2

Article 643 : « Lorsque la demande est portée devant une juridiction qui a son siège en France métropolitaine, les délais de comparution, d'opposition, d'appel et de pourvoi en cassation sont augmentés de :

1°) - UN MOIS pour les personnes qui demeurent dans un Département d'Outre-Mer ou dans un Territoire d'Outre-Mer,

2°) - DEUX MOIS pour celles qui demeurent à l'étranger ».

Si vous entendez exercer ce recours, vous devez charger un Avoué près cette Cour d'Appel d'accomplir les formalités nécessaires avant l'expiration de ce DELAI QUI EST DE RIGUEUR,



Vous pouvez consulter sur ce point un Avocat et lui demander de vous assister devant la Cour.

Vous rappelant enfin les dispositions des articles 1486 - 1487 du décret numéro 81.500 du 12 Mai 1981 ainsi conçus :

ARTICLE 1486 :

« L'appel et le recours en annulation sont portés devant la Cour d'Appel dans le ressort de laquelle la sentence arbitrale a été rendue.

3

Ces recours sont recevables dès le prononcé de la sentence ; ils cessent de l'être s'ils n'ont pas été exercés dans le mois de la signification de la sentence revêtue de l'exequatur.

Le délai pour exercer ces recours suspend l'exécution de la sentence arbitrale. Le recours exercé dans le délai est également suspensif ».

## ARTICLE 1487 :

« L'appel et le recours en annulation sont formés, instruits et jugés selon les règles relatives à la procédure en matière contentieuse devant la Cour d'Appel. La qualification donnée par les parties à la voie de recours au moment où la déclaration est faite peut être modifiée ou précisée jusqu'à ce que la Cour d'Appel soit saisie ».

Vous déclarant en outre que l'article 680 du Nouveau Code de Procédure Civile, modifié par l'article 29 du décret du 12 MAI 1981, indique :

« Que l'auteur d'un recours abusif ou dilatoire peut être condamné à une amende civile ou au paiement d'une indemnité à l'autre partie ».

4

Vous rappelant qu'une copie supplémentaire du présent acte vous est adressée par lettre recommandée avec accusé de réception, conformément aux dispositions de l'article 660 du Nouveau Code de Procédure Civile.

SOUS TOUTES RESERVES
A CE QUE VOUS N'EN IGNORIEZ

Le présent acte a été notifié à la susnommée domicile et parlant comme dessus, par clerc assermenté dont les mentions seront visées par moi sur l'original, le tout conformément à la loi.

COUT / CENT CINQUANTE EUROS

Employé pour la copie cent dix sept feuilles.

Maître Daniel KARSENTI

5

TRIBUNAL
DE GRANDE
INSTANCE
DE PARIS

**DÉPÔT N° 04/4264**
DU
~~13~~ Septembre 2004

GREFFE CIVIL

# EXPÉDITION EXÉCUTOIRE D'UNE
# SENTENCE ARBITRALE

## RENDUE DANS LE DIFFÉREND

## OPPOSANT

Société RADIAN INTERNATIONAL LLC (U.S.A.)

### A

THE LEBANESE COMPANY FOR THE DEVELOPMENT AND
RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT S.A.L.
(Lebanon)

Me Myrtille LAPUELLE
N° J. 002

# RÉPUBLIQUE FRANÇAISE

## AU NOM DU PEUPLE FRANÇAIS

Le Président du Tribunal de Grande Instance de Paris a, par son ordonnance du *15 Septembre 2004* rendu exécutoire le jugement arbitral dont la teneur suit :

## ACTE DE DÉPÔT

L' an ~~mil neuf cent quatre~~ *deux mil quatre* et le *treize septembre*.
Au Greffe du Tribunal de Grande Instance de Paris et par devant nous Greffier soussigné

À comparu M. *Myriam LAPUELLE*.

Lequel a déposé entre nos mains, pour demeurer au rang des minutes du Greffe, conformément aux articles 1477 et 1500 du Nouveau Code de Procédure Civile l'original d'un jugement arbitral rendu par *John UFF, Vivian RAMSEY, John BLACKBURN.*
Ledit jugement statuant sur le différend opposant

*Ste RADIAN INTERNATIONAL LLC à (U.S.A.)*   *Ste THE LEBANESE COMPANY FOR THE DEVELOPMENT AND RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT S.A.L. (Lebanon)*

Et a signé avec Nous, Greffier, après lecture.

signé *AUDAN* et *LAPUELLE*

[Translation]

## SAMI NAHAS LAW OFFICE

Clémenceau St., Bank of Beirut and Arab Countries Bldg., Hamra, Beirut
Tel.: (01) 364991 – (01) 364990 – Fax: (01) 369663
E-mail: nahaslawoff@inco.com.lb

Beirut, on February 16, 2006

## ATTENTION: HONORABLE SUMMARY JUDGE IN BEIRUT
### PETITION FOR APPOINTMENT OF AN EXPERT
### SUBMITTED BY

The Petitioner:The Lebanese Company for the Development and Reconstruction of
Beirut Central District SAL (SOLIDERE)

Represented by Mr. Sami NAHAS, attorney-at-law
By virtue of a power of attorney, copy enclosed

1- On January 25, 1999, the Petitioner signed with Radian International Limited
(hereinafter the "Contractor") a Contract for Services whereby the latter would
carry out the rehabilitation works of the Normandy dumping ground located in
Beirut central district. According to article 44 of the said Contract, the settlement
of disputes arising therefrom shall be subject to the arbitration regulations
applicable by the International Chamber of Commerce.

- Enclosed a copy of the afore-mentioned Contract and its translation into Arabic
(Exhibit 1).

2- Many conflicts emerged between the Petitioner and the Contractor, which were
mainly due to the fact that the Contractor failed to complete the rehabilitation

1

works of the Normandy dumping ground as per the specifications expressly determined in the Contract, and failed to complete the works within the time limits specified in the Contract.

3- Following the various violations, by the Contractor, of the Contract provisions, and pursuant to article 35-2 thereof, the Petitioner served on the Contractor several warnings requesting the Contractor to remedy the defaults determined in each letter, within 10 days as of receipt thereof, subject to Contract termination at the own risk of the Contractor.

4- Notwithstanding the notification of the afore-mentioned letters, the Contractor did not take the needed action to remedy the defaults. Accordingly, the Petitioner had to terminate the Contract at the risk of the Contractor, and decided to pursue the works either by itself or through another contractor to be appointed by the Petitioner, at the expense of the Contractor.

-   Enclosed a copy of the said letter terminating the Contract at the own risk of the Contractor (Exhibit 2).

5- The Petitioner, pursuant to the Contract provisions, filed an arbitration request with the International Chamber of Commerce in Paris. According to the arbitrations regulations applicable by the said Chamber, in particular article 23-2 thereof, both parties may have recourse to any judicial authority, whether before or after the file is referred to arbitration, in order to take interim and preventive measures. Such recourse shall not be deemed as a violation, an infringement or a waiver of the arbitration agreement, and shall not prejudice the jurisdiction of the arbitral tribunal nor affect the powers reserved for the same.

6- Whereas article 35-2 of the Contract provides that the Petitioner or any other contractor to be appointed by the Petitioner for the completion of the works, shall be entitled to use whatever equipment and tools it deems appropriate, of those

2

belonging to the Contractor on site and which may be solely used for work completion.

7- Whereas the Petitioner intends to start completing the works by itself, therefore it needs to use all of the equipment and tools belonging to the Contactor on site, and wishes to receive and use the same to pursue the rehabilitation works of the Normandy dumping ground.

8- To avoid any subsequent claims from the Contractor regarding the quality, quantity and condition of the equipment and tools the Petitioner shall receive and use for the rehabilitation works of the Normandy dumping ground.

For all the reasons above,

We hereby ask you to appoint an expert to perform the following duties:

1- Go on site where the equipment and tools belonging to the Contractor, Radian International Limited are located, and make a detailed and accurate inventory thereof.

2- Take pictures of any and all equipment and tools belonging to the Contractor on site.

3- Specify the following particulars:

    i. The name of the owner

    ii. In case of leased equipment, the name of the lessor.

    iii. An accurate and detailed description of the equipment and tools.

    iv. A description of the maintenance works on such equipment and tools, and a description of their condition.

    v. A description of the equipment and tools condition and whether they are operational or not.

4- A permit licensing the expert to interrogate whomever he deems appropriate, such as staff members of the Petitioner and/or the Contractor or others, have access to and procure copies of any and all documents he deems necessary to perform his mission.

3

Without prejudice

*Mr. Sami Nahas, attorney-at-law, p.p.*
*(Signed)*

*Document received on February 16, 2006*
*Registration no: 132/2006*
*Signed and sealed by the summary judge of Beirut*

*[Verbatim translation of the Arabic text attached hereto, delivered under no 160-06K, on February 27, 2006.]*

4

3



Consulting Engineers
Project & Construction Managers
Transportation & Environmental Consultants

W A Fairhurst International Partnership
Daouk Building, 10th Floor
Sidani Street, Ras Beirut
P.O. Box 11-4040
Beirut, Lebanon
Commercial Registration No: 69741
TEL : 01 742 785/6      FAX : 01 742 764

## Minutes of Meeting

| To | : Mr. Hisham Karameh | Solidere |
|---|---|---|
| From | : David W. Horne | WA Fairhurst International |

Date    :   2204/99

Subject  :   Initial Contract Site Meeting

| Invited | Company /Division /Department | Present |
|---|---|---|
| A. BouOrk | Radian International | X |
| H. Karameh | Solidere | X |
| D.W. Horne | WA Fairhurst International | X |

| Meeting | Date: | 21/04/99 | Next Meeting | Date: | 23/04/99 |
|---|---|---|---|---|---|
| | Time: | 09.00 hrs | | Time: | 15.00 hrs |
| | Location: | Solidere Normandy Site Offices | | Location: | Solidere Normandy Site Offices |

FAIRHURST
INTERNATIONAL

| Item | Record | Action |
|---|---|---|
| 1. Finance | 1.1 ABO advised that the financing of the Contract was still not tied up. The EXIM bank loan was still not agreed, Citibank were discussing with Solidere. | ABO |
| | 1.2 ABO was due to meet with Munir Douaidi (Solidere Finance Division Manager) 21/04/99 to pursue the financial arrangements. | ABO/ MD |
| | 1.3 ABO agreed to advise HK/DWH on the situation after his meeting with MD. | |
| | 1.4 DWH expressed his concern that the Contract clock was running and that unless the financing was agreed, delays will ensue. | ABO |
| 2. Registration | ABO advised that Radian's registration in Lebanon was almost complete, and should be complete 24/04/99. | ABO |
| 3. Contractor's Staff | ABO advised he was returning to the USA at the end of this week (25/04/99). ABO would not be full-time resident in Lebanon until end of June 1999, but would be visiting regularly until then. | ABO |
| 4. Contract Submittals | 4.1 DWH asked for Radian's Outline programme, mobilisation intentions, and intentions on Contractual Obligations generally. | |
| | 4.2 ABO handed over a hard copy of Radian's draft programme entitled "Classic Schedule Layout" dated 19/04/99 (copy attached). | |
| | 4.3 DWH stated he would study the draft programme in the light of the Contract requirements, and comment accordingly. | DWH |
| | 4.4 ABO agreed to send a soft copy of the draft programme by e-mail to DWH during week commencing 26/04/99. | ABO |
| 5. Site Offices & Equipment | 5.1 ABO stated that an architect was to be appointed this week to produce layout plans for the site offices. | ABO |
| | 5.2 DWH tabled up-dated specifications of the computers WAFI would like to have provided, for the laptop and desktop models (copy attached). | |
| | In order to assist with overall project planning DWH/HK requested that the laptop be purchased as soon as possible by Radian. | |
| | 5.3 ABO stated that Radian would study these requests and advise. | ABO |
| | 5.4 ABO stated that until Radian secured finance (item 1) he could not purchase items. ABO stated that if WAFI were prepared to purchase the laptop, he would reimburse in due course. DWH would check if this was acceptable to WAFI, and advise. | DWH |

**FAIRHURST INTERNATIONAL**

| 6. DUOS WPP | 6.1 DWH handed a copy of the DUOS Taking Over Programme to ABO, and asked for confirmation that the programme would fit with Radian's overall programme. | |
| | 6.2 ABO advised that the Duos programme was acceptable, and would fit the Radian programme. | |
| 7. Method Statement | 7.1 DWH asked for Radian's up dated method statement to be submitted as soon as possible. | |
| | 7.2 ABO agreed to provide an outline of proposed operations, but stated that operations would generally be in accordance with the Radian Revised Technical and Management Proposal dated January 1998. | |
| | 7.3 DWH stated that he required benching plans to show the purposed outline method of work. ABO agreed to submit details. | ABO |
| | 7.4 ABO advised that Radian's terminology for Method Statement was Work Plan, and this was included on the draft programme (4.2). | |
| 8. Vehicles | 8.1 ABO advised he would provide a suitable rental vehicle for DWH until such time as Radian purchased the permanent vehicles. | ABO |
| 9. Incinerator | 9.1 ABO advised his intention to purchase a new incinerator to the latest European Standards, instead of the used incinerator originally proposed. | ABO |
| | 9.2 ABO stated this may delay the arrival of the incinerator on site by 1 month. | ABO |
| 10. A.O.B. | 10.1 Next Meeting- 23/04/99 at 15.00 hrs. at Solidere Normandy Site Offices. | |

Minutes Prepared by DWH.
Distribution    ABO   - Radian
                HK    - Solidere
                DWH   - WAFI



**FAIRHURST**
**INTERNATIONAL**

Consulting Engineers
Project & Construction Managers
Transportation & Environmental Consultants

W A Fairhurst International Partnership
Daouk Building, 10th Floor
Sidani Street, Ras Beirut
P. O. Box 11-4040
Beirut, Lebanon
Commercial Registration No: 69741
TEL : 01 742 765/6          FAX : 01 742 764
E-mail: waf@waf.com.lb

## Minutes of Meeting

To        :   Mr. Hisham Karameh                    Solidere

From      :   D.W. Horne                            WA Fairhurst International

Date      :   6th December 2000

Subject   :   **Progress Meeting No. 59**

| Invited | Company /Division /Department | Present |
|---------|-------------------------------|---------|
| A. BouOnk | Radian International | YES |
| H. Karameh | Solidere | YES |
| D.W. Horne | WA Fairhurst International | YES |

Meeting   Date:      6th December 2000    Next Meeting   Date:      13th December 2000
          Time:      10.00 hrs.                               Time:      10.00 hrs.
          Location:  Normandy Site                            Location:  Normandy Site
                     Offices                                             Offices

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---------------|-----------|-------------|-------|--------|----------|------------|------|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0131 | | MPM-0059 | MPM-0059 | 1/7 |

Head Offices
11 Woodside Terrace, Glasgow G3 7XQ, United Kingdom



1. Minutes of Previous Meeting

   1.1. Radian asked that the words "for approval" be deleted from item 3.1.1. This was agreed by all.

   1.2. The Minutes of Meeting N° 58 were otherwise accepted as a true record.

2. Health & Safety

   2.1. Health & Safety.

      2.1.1. WAFI noted that some improvements had been made to the CUAR at trouble spots and asked Radian to maintain the CUAR in appropriate condition at all times, especially in view of the imminent wet weather.

                                                                         **Radian**

      2.1.2. WAFI noted that current excavations in the latest cut of working area were recreating the usual safety benches. WAFI asked Radian to ensure the stability of the highwalls and so ensure the safety of the workforce and operations below.

                                                                         **Radian**

      2.1.3. WAFI recorded that the dust plume ejected by the mobile vacuum trailer when in operation was unsatisfactory, and asked Radian to take appropriate steps to control the generation of dust so as to reduce the hazard to on site workers, and prevent dust leaving the site. Radian advised they were looking into dust control measures.

                                                                         **Radian**

      2.1.4. WAFI asked Radian to ensure that adequate portable ablutions facilities (with appropriate waste disposal) were available for the use of the work force.

                                                                         **Radian**

3. Plant & Labour Resources on Site

   3.1. Radian International.

      3.1.1. WAFI requested details of the pelletizing plant together with a schematic process/flow diagram. Radian agreed to provide this. WAFI thanked Radian for arranging a demonstration run for the benefit of WAFI visiting staff.

                                                                         **Radian**

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-905 | 10178 | MIN | 0131 | | MPM-0059 | MPM-0059 | 2/2 |

FAIRHURST
INTERNATIONAL

3.1.2. Radian confirmed the 4th Trommel was delivered to site 29th November 2000.

3.1.3. Radian delivered the relevant shipping documents and invoices for the 4th trommel to Solidere 6th December 2000.

**Radian**

## 4. Progress

### 4.1. Progress to date.

4.1.1. According to the revised detailed programme (data date 31st August 2000) received 15th September 2000 after signature of Addendum N° 2, and the latest survey data, the scheduled and actual progress of excavation works up to the 5th November 2000 are as follows:

| Item | Quantity (m³) | Source | % |
|---|---|---|---|
| Total Expected > +1.5 | 1,870,747 | Prog. | 100.00 |
| Scheduled > +1.5 | 695,827 | Prog. | 37.20 |
| Actual > +1.5 | 660,573 | Survey | 35.31 |
| Difference | -35,254 | -- | -5.07 |
| Total Expected < +1.5 | 3,129,253 | Prog. | 100.00 |
| Scheduled < +1.5 | 350,140 | Prog. | 11.19 |
| Actual < +1.5 | 317,787 | Survey | 10.16 |
| Difference | -32,353 | -- | -9.24 |
| Overall Expected Total | 5,000,000 | Prog. | 100.00 |
| Scheduled Total Excavated | 1,045,967 | Prog. | 20.92 |
| Actual Total Excavated | 978,360 | Survey | 19.57 |
| Difference | -67,607 | -- | -6.46 |

4.1.2. WAFI noted that this up date shows actual progress has fallen further behind schedule, and asked Radian what steps they intended to take to increase the rate of progress in order to recover lost production and ensure timely Completion of the Works.

**Radian**

4.1.3. Radian stated they would be working Sundays in an attempt to increase production when possible, and that they were confident the Contract Milestones would be met.

**Radian**

FAIRHURST
INTERNATIONAL

4.2. The Works on Site.

   4.2.1.  WAFI again urged Radian to take wet weather precautions to facilitate:

      (i)    drying materials
      (ii)   keeping already dry material in a dry condition
      (iii)  general site drainage,
      (iv)  haul road drainage

**Radian**

Radian advised they would be using tarpaulins to keep stockpiles dry, and suitable gradients on storage areas to prevent ponding.

Radian also advised they would stockpile sub sea excavated material in the North West corner of Section 8 (opposite the DUOS WPP) during the winter months.

**Radian**

   4.2.2.  Sea Bed Clearance, Verification and Backfilling.

      4.2.2.1. Solidere again stated it was very important that Radian commence backfilling in Section 1 since space in the General External Fill Area was now very limited, and only the highest quality material could be accommodated in the General External Fill Area above +1.5m. Solidere noted that they have already accepted 1.0 $Mm^3$ in the GEFA, and very little space remained.

**Radian**

      4.2.2.2. Radian explained they intended to construct a rock-bund running South to North in Section 1 so as to confine the spread of fine backfill material and prevent overlap into uncleared areas. Radian advised the smaller (Lima) barge was presently completing the final part of Section 1 up to the "C" Line (Northern limit of Phase 1) following which sea bed verification and construction of the rock-bund would follow.

**Radian**

   4.2.3.  Radian confirmed that they wished to bury shredded tyres and pelletized plastics in the park area, and agreed to write to WAFI with their proposals.

**Radian**

   4.2.4.  DUOS WPP.

      4.2.4.1. Radian asked when DUOS would replace the failed feeder controller. WAFI advised this had been written into the Addendum Agreement between Solidere and DUOS and it was therefore incumbent upon DUOS to replace the item forthwith.

**DUOS**

FAIRHURST
INTERNATIONAL

4.2.4.2.WAFI asked if the hot air blower system installed by Radian was having a beneficial effect. Radian advised it would take time to assess the performance.

Radian

4.2.5. Protection of the Environment.

4.2.5.1.WAFI stated that the combination of booms installed across the lagoon now appeared to be largely effective in preventing floating materials leaving the working area, but asked Radian to make adjustments whenever required so as to protect the environment. WAFI noted the recent removal of all booms to facilitate movement of marine equipment had resulted in debris escaping, and asked Radian to improve operations such that these failures do not recur.

Radian

4.2.6. Final Site Quality.

4.2.6.1.Radian confirmed that efforts were continuing to modify the trommel feeding methods in order to secure an improvement in quality. Radian were currently trying to smooth the feed rate into trommels, which Radian believe will lead to improved quality.

Radian

4.2.6.2.Solidere asked if Radian intended to carry out plastic content tests on raw feed material and finished product as previously discussed. Figures to demonstrate the major reduction in plastic content would be most helpful. Radian confirmed they would do so, but reminded the meeting this was not a contractual obligation, and stated it would be some time before this was done.

Radian

4.2.6.3.Radian confirmed that the on-site laboratory was set up for E.Coli testing, and that independent checking by I.R.I. would still be used.

WAFI stated that their visiting analytical chemist had carried out an audit of the laboratory, and his report would be forwarded to Radian for action in due course.

WAFI

4.2.6.4.WAFI advised their visiting specialists had reviewed the incinerator operation results, and had observed some anomalities. WAFI had written separately to Radian on this issue. Radian stated they were working on the issues raised, and would rectify the problems.

Radian

FAIRHURST
INTERNATIONAL

4.2.7. Site Survey.

    4.2.7.1.WAFI asked Radian to include all backfill areas in the month end survey.

    4.2.7.2.WAFI asked that Radian work with the Employer's survey auditor to reconcile the discrepancy in calculated volumes.

                                  **Radian/WAFI/Solidere**

    4.2.7.3.WAFI asked Radian to confirm that the rock bund constructed behind and parallel to the Caissons did not extend beyond 90m from the Caissons. Radian confirmed the bund did not extend beyond 90m from the Caissons.

## 5. Programme

5.1. Progress of the works is monitored according to the timescale of the programme submitted 15th September 2000.

## 6. Payments

6.1. WAFI stated they had reviewed Request for Payment N°18, and had determined to adjust and reduce the amount payable.

## 7. Changes in the Works

7.1. WAFI referred to Radian's letter ABO/Emp/0030 dated 19th October 2000 in respect of Claim N° 2, and confirmed Solidere had replied rejecting the claim.

                                          **Solidere**

7.2. WAFI asked Radian what their intentions were with regard to Notice of Claim N°3 given WAFI's previous advice   (letter Let-0320-PN-RAD dated 5th May 2000) of no grounds for a claim for extension of time or additional costs.

Radian stated details of Claim N° 3 will be submitted in due course

                                          **Radian**

**FAIRHURST**
INTERNATIONAL

**8. A.O.B.**

8.1. WAFI asked Radian to respond (to WAFI letter Let-0440-DWH-RAD dated 19th September 2000) regarding their change of letterhead to URS.

8.2. WAFI asked Radian for their intended working hours during the Christmas/Eid holiday period. Radian advised the site operations would be shut down 23rd December 2000 to 2nd Janaury 2001.

8.3. WAFI advised their Mr. D.W. Horne would be on leave 20th December 2000 to 3rd January 2001 inclusive. Mr. J.A. Wright will deputise during this period.

**9. Date of Next Meeting**

9.1. Wednesday 13th December 2000 at 10.00 hrs.

Prepared by:  DWH
Distribution:  Those present plus JAW / YM / JAS / PN / BK / IH / MS

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0131 | | MPM-0059 | MPM-0059 | 7/7 |



**FAIRHURST**
**INTERNATIONAL**

Consulting Engineers
Project & Construction Managers
Transportation & Environmental Consultants

W A Fairhurst International Partnership
Daouk Building, 10th Floor
Sidani Street, Ras Beirut
P. O. Box 11-4040
Beirut, Lebanon
Commercial Registration No: 69741
Tel : 01 742 7656        FAX : 01 742 714
E-mail: waf@waf.com.lb

## Minutes of Meeting

To        :   Mr. Hisham Karameh                    Solidere

From      :   D.W. Horne                            WA Fairhurst International

Date      :   19th December 2000

Subject   :   Progress Meeting No. 60

| Invited | Company /Division /Department | Present |
|---------|-------------------------------|---------|
| A. BouOnk | Radian International | YES |
| H. Karameh | Solidere | YES |
| D.W. Horne | WA Fairhurst International | YES |

Meeting   Date:      19th December 2000    Next Meeting  Date:      10th January 2001
          Time:      10.00 hrs.                          Time:  ·   10.00 hrs.
          Location:  Normandy Site                       Location:  Normandy Site
                     Offices                                        Offices

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---------------|-----------|------------|--------|--------|----------|------------|------|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-095 | 10170 | MIN | 0132 | | MPM-0060 | MPM-0060 | 1/6 |

Head Office:
11 Woodside Terrace, Glasgow G3 7XQ, United Kingdom
Tel: 0141 332 8754  Fax: 0141 372 5083

FAIRHURST
INTERNATIONAL

## 1. Minutes of Previous Meeting

1.1. The Minutes of Meeting N° 59 were accepted as a true record.

## 2. Health & Safety

2.1. Health & Safety.

2.1.1.  WAFI asked Radian to maintain the CUAR in appropriate condition at all times, especially in view of the wet weather. WAFI noted the road was narrow in places.

Radian advised the road would shortly be relocated.

**Radian**

2.1.2.  WAFI noted that most recent excavations in the latest cut of the working area had proceeded without the usual safety benches. WAFI asked Radian to ensure the stability of the highwalls and so ensure the safety of the workforce and operations below.

**Radian**

2.1.3.  WAFI asked Radian to check and ensure that vehicle lights and audible reversing devices were in good working condition.

**Radian**

## 3. Plant & Labour Resources on Site

3.1. Radian International.

3.1.1.  WAFI asked Radian to issue formal advice of the change in management on site following the departure of Phil Fachan, site manager.

**Radian**

3.1.2.  WAFI requested details of the pelletizing plant together with a schematic process/flow diagram. Radian agreed to provide this.

**Radian**

3.1.3.  WAFI asked Radian to clarify labour returns in the weekly reports, since it appeared the labour force had reduced from 280 to 130.

**Radian**

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1.1-0011-005 | f0170 | MIN | 0132 | | MPM-0060 | MPM-0060 | 2/6 |

FAIRHURST
INTERNATIONAL

## 4. Progress

### 4.1. Progress to date.

4.1.1. According to the revised detailed programme (data date 31st August 2000) received 15th September 2000 after signature of Addendum $N^\circ$ 2, and the latest survey data, the scheduled and actual progress of excavation works up to the 5th December 2000 are as follows:

| Item | Quantity (m²) | Source | % |
|------|---------------|--------|---|
| Total Expected > +1.5 | 1,870,747 | Prog. | 100.00 |
| Scheduled > +1.5 | 737,510 | Prog. | 39.42 |
| Actual > +1.5 | 710,606 | Survey | 37.99 |
| Difference | -26,904 | -- | -3.65 |
| Total Expected < +1.5 | 3,129,253 | Prog. | 100.00 |
| Scheduled < +1.5 | 396,612 | Prog. | 12.67 |
| Actual < +1.5 | 353,807 | Survey | 11.31 |
| Difference | - 42,805 | -- | -10.79 |
| Overall Expected Total | 5,000,000 | Prog. | 100.00 |
| Scheduled Total Excavated | 1,134,122 | Prog. | 22.68 |
| Actual Total Excavated | 1,064,413 | Survey | 21.29 |
| Difference | - 69,709 | -- | - 6.15 |

4.1.2. WAFI noted that this up date shows actual progress to 5th December 2000 is now behind schedule by 3 weeks and asked Radian what steps they intended to take to increase the rate of progress in order to recover lost production and ensure timely Completion of the Works. WAFI noted that whilst the rate of excavation above +1.5m had increased, the rate below +1.5m had again decreased.

**Radian**

4.1.3. Radian stated they would either be bringing in additional equipment for the sub-sea works, specifically a 3rd long reach excavator, and a 3rd crane barge, or increasing the sub-sea working hours to 24 hours from the current 16hrs.

**Radian**

### 4.2. The Works on Site.

4.2.1. WAFI asked if Radian's wet weather precautions had assisted in:

  (i)    drying materials
  (ii)   keeping already dry material in a dry condition

**Radian**

Radian advised their use of tarpaulins to keep stockpiles dry, and suitable gradients on storage areas to prevent ponding had improved progress.

FAIRHURST
INTERNATIONAL

4.2.2. Sea Bed Clearance, Verification and Backfilling.

4.2.2.1.WAFI asked when excavation of Section 1 would be completed, and when the next strip of sea bed would be ready for inspection and verification. Radian stated they would very soon ask WAFI to carry out a further verification.

Radian

4.2.2.2.Radian advised that once the next section of sea bed was clear, they intended to construct a submerged toe bund running south to north in Section 1, behind which fine materials would be backfilled. Radian advised the toe bund would be constructed from cap material from the North side of the CUAR in Sections 6 & 8 excavated by the American barge, and transported to location in split hopper barges.

Radian

4.2.3. Radian again confirmed that they wished to bury shredded tyres and pelletized plastics in the park area, and agreed to write to WAFI with their proposals.

4.2.4. Radain stated they wished to temporarily stockpile shredded tyres and plastic pellets on the backfilled area next to the caissons. Soñdere agreed to look at the options with WAFI.

WAFI/Solidere

4.2.5. DUOS WPP.

4.2.5.1.Radian asked when DUOS would replace the failed feeder controller. WAFI advised this had been written into the Addendum Agreement between Solidere and DUOS and it was therefore incumbent upon DUOS to replace the item forthwith.

DUOS

4.2.5.2.WAFI asked if the hot air blower system installed by Radian was having a beneficial effect. Radian advised it would take time to assess the performance.

Radian

4.2.6. Protection of the Environment.

4.2.6.1.WAFI stated that the combination of booms installed across the lagoon now appeared to be largely effective in preventing floating materials leaving the working area, but asked Radian to make adjustments whenever required so as to protect the environment.

WAFI advised that the marine contractor's vessels were preaparing to leave the lagoon, and asked Radian to manage the issue of debris control in the lagoon.

Radian

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | .10170 | MIN | 0132 | | MPM-0060 | MPM-0060 | 4/6 |

FAIRHURST
INTERNATIONAL

4.2.7. Final Site Quality.

4.2.7.1.Solidere asked if Radian intended to carry out plastic content tests on raw feed material and finished product as previously discussed. Figures to demonstrate the major reduction in plastic content would be most helpful. Radian confirmed they would do so, but reminded the meeting this was not a contractual obligation, and stated it would be some time before this was done.

**Radian**

4.2.7.2.WAFI stated that their visiting analytical chemist had carried out an audit of the laboratory, and his report had been forwarded to Radian for action.

**Radian**

4.2.7.3.WAFI advised their visiting specialists had reviewed the incinerator operation results, and had observed some anomalities. WAFI had written separately to Radian on this issue. Radian stated they were working on the issues raised, and would rectify the problems.

**Radian**

4.2.8. Site Survey.

4.2.8.1.WAFI asked Radian to include all backfill areas in the month end survey, and to estimate volumes of all materials in stockpiles

**Radian**

4.2.8.2.WAFI asked Radian to confirm that the rock bund constructed behind and parallel to the Caissons did not extend beyond 90m from the Caissons. Radian confirmed the bund did not extend beyond 90m from the Caissons, and would maintain a check to ensure it did not do so as construction progressed east.

**Radian**

## 5. Programme

5.1. Progress of the works is monitored according to the timescale of the programme submitted 15th September 2000.

## 6. Payments

6.1. WAFI stated they had received Request for Payment N°19, which was under review.

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0132 | | MPM-0060 | MPM-0060 | 5/6 |

FAIRHURST
INTERNATIONAL

### 7. Changes in the Works

7.1. WAFI referred to Radian's letter ABO/Emp/0030 dated 19th October 2000 in respect of Claim N° 2, and confirmed Solidere had replied rejecting the claim.

Solidere

7.2. WAFI asked Radian what their intentions were with regard to Notice of Claim N°3 given WAFI's previous advice  (letter Let-0320-PN-RAD dated 5th May 2000) of no grounds for a claim for extension of time or additional costs.

Radian stated details of Claim N° 3 will be submitted in due course

Radian

### 8. A.O.B.

8.1. WAFI asked Radian to respond (to WAFI letter Let-0440-DWH-RAD dated 19th September 2000) regarding their change of letterhead to URS.

8.2. Radian now advised the site operations would be shut down 23rd December 2000 to 2nd January 2001, but that earthmoving would take place Thursday, Friday and Saturday 28/29/30[th] December 2000.

8.3. WAFI asked who would control issues during the above period. Radian confirmed the site would be managed by Messrs. A. Bou Onk, H. Gabriel, J. Pratt and K. Klausmier.

Radian

### 9. Date of Next Meeting

9.1. Wednesday 10th January 2001 at 10.00 hrs.

Prepared by:  DWH

Distribution:  Those present plus JAW / YM / JAS / PN / BK / IH / MS



**FAIRHURST INTERNATIONAL**

Consulting Engineers
Project & Construction Managers
Transportation & Environmental Consultants

W A Fairhurst International Partnership
Daouk Building, 10th Floor
Sidani Street, Ras Beirut
P. O. Box 11-4040
Beirut, Lebanon
Commercial Registration No: 69741
TEL : 01 742 78576          FAX : 01 742 764
E-mail: walf@wafi.com.lb

## Minutes of Meeting

**To**      :  Mr. Hisham Karameh                    Solidere



**From**    :  D.W. Horne                             WA Fairhurst International

**Date**    :  10ᵗʰ January 2001

**Subject** :  Progress Meeting No. 61

| Invited | Company /Division /Department | Present |
|---------|-------------------------------|---------|
| A. BouOuk. | Radian International | YES |
| H. Karameh | Solidere | YES |
| D.W. Horne | WA Fairhurst International | YES |

Meeting   Date:      10ᵗʰ January 2001      Next Meeting   Date:      17ᵗʰ January 2001
          Time:      10.00 hrs.                            Time:      10.00 hrs.
          Location:  Normandy Site                         Location:  Normandy Site
                     Offices                                          Offices

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---------------|-----------|-------------|--------|--------|----------|------------|------|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuers ref. | Page |
| 3-1-0011-005 | 10170 | MIN | 0133 | | MFM-0061 | MFM-0061 | 1/6 |

Head Office:
11 Woodside Terrace, Glasgow G3 7XQ, United Kingdom
Tel : 0141 332 8754  Fax: 0141 332 5063

FAIRHURST
INTERNATIONAL

1. Minutes of Previous Meeting

1.1. The Minutes of Meeting N° 60 were accepted as a true record.

2. Health & Safety

2.1. Health & Safety.

2.1.1. WAFI asked Radian to confirm who was now in charge of Health & Safety at site. Radian stated that Mohammed Charour was now the Site Health & Safety Officer. WAFI asked Radian to confirm this appointment in writing.

**Radian**

2.1.2. Solidere stated that despite their introduction of two explosives experts to the site to handle UXO, it had become clear that members of Radian's workforce were handling explosives. Solidere suggested that this hazardous operation be left to their experts. Radian stated their workforce should not be handling UXO and would enforce this on site..

**Radian**

2.1.3. WAFI referred to the sections of excavation where 10m highwalls had been cut vertically, with no safety benches. WAFI expressed their view that these sections are unsafe, and that there was a distinct possibility of collapse, especially given the very obvious sand and cohesionless material horizons and lenses in the highwalls. WAFI asked Radian to ensure safety below these highwalls and to remedy the hazards. Radian stated that these were short term features, and therefore did not represent major hazards. Nonetheless, Radian stated they would work to ensure highwalls were constructed with safety benches in the longer term.

**Radian**

2.1.4. Radian advised they were constructing a further diversion of the CUAR to the east of the present location. WAFI asked Radian to ensure this new road was not within the potentially hazardous zone close to the vertical highwall sections referred to in 2.1.3 above.

**Radian**

2.1.5. WAFI noted that the very large stockpile of tyres adjacent to the incinerator was now severely restricting the operating space for personnel and equipment at the incinerator. WAFI advised the remaining space was too small and hazardous for the use of a forklift and personnel, and asked Radian to rectify the situation.

**Radian**

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID· | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0133 | | MPM-0061 | MPM-0061 | 2/6 |

2.1.6. WAFI asked if the recent fire in the large plastics stockpile had been brought under control. Radian confirmed the fire had been capped with wet sub-sea excavated material, and appeared to have been extinguished. WAFI noted another location from which smoke was rising, and asked Radian to investigate and ensure fires are extinguished.

**Radian**

## 3. Plant & Labour Resources on Site

### 3.1. Radian International.

3.1.1. WAFI asked Radian to issue formal advice of the change in management on site following the departure of Phil Pachan, site manager. Solidere asked Radian to issue a revised site organogram.

**Radian**

3.1.2. WAFI advised the staff and labour force according the Weekly QC report had now dropped to 108 N°. Radian advised there must be some incomplete reporting, since the total of staff and labour should be in the order of 230. WAFI urged Radian to clarify this.

**Radian**

## 4. Progress

4.1. Progress will be updated following receipt of December 2000 month end survey data. Radian estimated excavation was 65,000m³ in December 2000.

4.2. Progress to date.

4.2.1. According to the revised detailed programme (data date 31st August 2000) received 15th September 2000 after signature of Addendum N° 2, and the latest available survey data, the scheduled and actual progress of excavation works up to the 5th December 2000 are as follows:

| Item | Quantity (m³) | Source | % |
|---|---|---|---|
| Total Expected > +1.5 | 1,870,747 | Prog. | 100.00 |
| Scheduled > +1.5 | 737,510 | Prog. | 39.42 |
| Actual > +1.5 | 710,606 | Survey | 37.99 |
| Difference | -26,904 | -- | -3.65 |
| Total Expected < +1.5 | 3,129,253 | Prog. | 100.00 |
| Scheduled < +1.5 | 396,612 | Prog. | 12.67 |
| Actual < +1.5 | 353,807 | Survey | 11.31 |
| Difference | - 42,805 | -- | -10.79 |
| Overall Expected Total | 5,000,000 | Prog. | 100.00 |
| Scheduled Total Excavated | 1,134,122 | Prog. | 22.68 |
| Actual Total Excavated | 1,064,413 | Survey | 21.29 |
| Difference | - 69,709 | -- | - 6.15 |



4.2.2.  WAFI noted that this up date shows actual progress to 5th December 2000 is now behind schedule by 3 weeks and asked Radian what steps they intended to take to increase the rate of progress in order to recover lost production and ensure timely Completion of the Works. WAFI noted that whilst the rate of excavation above +1.5m had increased, the rate below +1.5m had again decreased.

                                                            Radian

4.2.3.  Radian stated they would either be bringing in additional equipment for the sub-sea works, specifically a 3rd long reach excavator, and a 3rd crane barge, or increasing the sub-sea working hours to 24 hours from the current 16hrs.

                                                            Radian

4.3. The Works on Site.

4.3.1.  WAFI asked for some explanation of the present excavation sequence, which had departed from the planned north-south cuts. Radian stated this had been to create new working locations for the trommels, and that they would resume with north-south cuts in the near future.

                                                            Radian

4.3.2.  Sea Bed Clearance, Verification and Backfilling.

    4.3.2.1.A further strip of sea bed had been inspected 20th December 2000. Radian delivered the appropriate letter and drawings to record the cleared sea bed 10th January 2001.

                                                            Radian

    4.3.2.2.Radian advised that they would not be proceeding with a submerged bund at this stage, but would inform WAFI prior to start of construction. Radian stated they had commenced backfilling in section 1 over cleared sea bed, and were monitoring the backfill slopes to ensure there was no encroachment onto uncleared areas.

                                                            Radian

4.3.3.  Radian stated they wished to temporarily stockpile shredded tyres and plastic pellets on the backfill to the West of Section 1 prior to backfilling in the Park area. Solidere agreed this was acceptable.

                                                            Radian

4.3.4.  Radian again confirmed that they wished to bury shredded tyres and pelletized plastics in the park area, and agreed to write to WAFI with their proposals. WAFI stated that no backfilling should take place prior to receipt of Radian's proposals, and acceptance.

                                                            Radian



### 4.3.5. DUOS WPP.

4.3.5.1.DUOS had confirmed the replacement feeder controller was en-route to Beirut.

DUOS

4.3.5.2.Radian advised they were installing a new conveyor to by-pass the crusher. WAFI asked Radian to ensure metals were removed effectively, since the over band magnet would also be by-passed.

Radian

### 4.3.6. Protection of the Environment.

4.3.6.1.WAFI stated that the combination of booms installed across the lagoon now appeared to be largely effective in preventing floating materials leaving the working area, but asked Radian to make adjustments whenever required so as to protect the environment. WAFI noted that semi-submerged debris was still leaving the site, and asked Radian to address this issue.

Radian

### 4.3.7. Final Site Quality.

4.3.7.1.WAFI confirmed receipt of Radian's letter ABQ/CM/266 dated 9th January 2001 regarding the incinerator operation, in response to anomalies recorded by WAFI's visiting staff in November 2000.

WAFI advised they would seek the further advice of their staff, but meanwhile asked Radian to ensure the incinerator was operated fully in accordance with the requisite standards, and with defensible data records to verify compliance.

Radian

4.3.7.2.WAFI tabled a copy of page 2 of Radian's Weekly QC report N° 0069 (week ending 31/12/00) which includes incorrect and inappropriate statements about the Construction Manager and material stockpiles respectively. WAFI offered Radian the opportunity to retract the reported statements. Radian accepted, and will issue a revised corrected page.

Radian

### 4.3.8. Site Survey.

4.3.8.1.WAFI asked Radian to include all backfill areas in the month end survey, and to estimate volumes of all materials in stockpiles. Radian confirmed the latest survey would include all stockpiles.

Radian

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 4-1-0915-995 | 10170 | MIN | 0133 | | MPM-0061 | MPM-0061 | 5/6 |

FAIRHURST
INTERNATIONAL

### 5. Programme

5.1. Progress of the works is monitored according to the timescale of the programme submitted 15th September 2000.

### 6. Payments

6.1. WAFI stated they had reviewed Request for Payment N°19, and had approved a reduced amount for payment.

### 7. Changes in the Works

7.1. There are no outstanding issues.

### 8. A.O.B.

8.1. WAFI asked Radian to respond (to WAFI letter Let-0440-DWH-RAD dated 19th September 2000) regarding their change of letterhead to URS.

### 9. Date of Next Meeting

9.1. Wednesday 17th January 2001 at 10.00 hrs.

Prepared by:  DWH
Distribution:  Those present plus JAW / YM / JAS / PN / BK / IH / MS

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0133 | | MPM-0061 | MPM-0061 | 6/6 |



# FAIRHURST
## INTERNATIONAL

Consulting Engineers
Project & Construction Managers
Transportation & Environmental Consultants

W A Fairhurst International Partnership
Normandy Remediation Project Office
PO Box 11-4040
Beirut, Lebanon
TEL: +961 1 983 579/80
FAX: +961 1 983 579/80

## Minutes of Meeting

To      :  Mr. Hisham Karameh          Solidere

From    :  Neville Judd                WA Fairhurst International

Date    :  3rd February 2005

Subject :  Progress Meeting No. 219

| Invited | Company /Division /Department | Present |
|---------|-------------------------------|---------|
| A. BouOnk | Radian International | YES |
| H. Karameh | Solidere | YES |
| N. Judd | WA Fairhurst International | YES |
| N. Abdul Salam | WA Fairhurst International | YES |

Meeting  Date:     2nd February 2005    Next Meeting  Date:     16th February 2005
         Time:     10.00 hrs.                         Time:     10.00 hrs.
         Location: Normandy Site                      Location: Normandy Site
                   Offices                                      Offices

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---------------|----------|----------|--------|--------|----------|------------|------|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0911-005 | 19170 | MIN | 0503 | | MPM-0219 | MPM-0219 | 1/6 |

157 Huntta 370 Floor, Saad Zaghoul Street, Bayrut Central District, Lebanon
Commercial Registration No: 69241
Tel: +961 1 999009, Fax: +961 1 999010

**FAIRHURST**
**INTERNATIONAL**

1. Minutes of Previous Meeting

   1.1. The Minutes of Meeting N° 218 were accepted as a true record.

2. Health & Safety

   2.1. Radian confirmed receipt of WAFI's letter Let-1294-JAW-RAD 28th October 2004 with regard to the accident on site.

   Radian stated the police investigation is still ongoing and thus a response to this letter is not ready yet. Radian confirmed the police report and its translation to English will be sent to WAFI as soon as ready.

                                                                   Radian

   2.2. Solidere asked if Radian have finished excavations of the stockpiled subsea material on Beach 2.

   Radian stated they completed the surface.

   WAFI stated they would like to know accurately the progress made on processing this stockpiled material.

   Radian stated they have an old survey showing the original area before stockpiling that could be compared to the current survey.

   WAFI asked Radian to send a copy of this old survey.

   Radian agreed to do so.

                                                                   Radian

   2.3. Radian stated they may be forced to recommence stockpiling material on Beach 2 as they are short of space.

   Solidere asked what type of material are Radian planning to stockpile; i.e. sorted or excavated.

   Radian replied excavated material.

                                                                   Radian

   WAFI asked Radian if they had recently stockpiled any significant amount of material at Beach 2. Radian said not much had been stockpiled recently.

3. Plant & Labour Resources on Site

   3.1. Radian confirmed that the Hydromar Lima barge and the SNE barge are parked and the American barge is being operated.

| Project Name | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Names | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 1017D | MIN | 0303 | | MFM-0219 | MFM-0219 | 2/6 |

FAIRHURST
INTERNATIONAL

### 4. Progress

4.1. Progress to date,

4.1.1. The programme is the subject of ongoing correspondence.

4.1.2. According to the revised detailed programme (data date 31ˢᵗ August 2000) received 15ᵗʰ September 2000 after signature of Addendum N° 2, all works should have been completed 14 April 2004.

4.2. Access to BIEL/CUAR.

4.2.1. WAFI noted that the rock bund that will carry the diversion of the CUAR and the BIEL access road has been established at 20m width, and that the road is now asphalted.

Solidere stated they will arrange for some lights to be installed on the mural to be positioned between the asphalted road and the haul road.

WAFI asked if Solidere intend to install any kind of barriers at the South side of the road for safety reasons.

Solidere stated that they will install jersey barriers, and that they already installed several bumps to control car speed.

WAFI suggested the bumps be painted. Solidere agreed.

Solidere

Radian stated they need to excavate section 7B as soon as the road diversion is complete. Radian also stated that they intend if possible to complete the excavation in the extreme South East end of Section 7B using land based cranes or land based excavators. However if their subcontractor claims this method is unsafe they will continue the excavation works using the barges and hence will have to breach the road.

Radian

4.3. Dredger

4.3.1. Radian stated the dredger is now operational.

4.4. LTTD Unit

4.4.1. WAFI noted that people were seen working on the LTTD plant.

Radian stated the LTTD unit is being put back together.

Radian

4.5. Pelletiser

4.5.1. Radian stated the operation of the pelletiser continues to be slow as the material is wet as a result of the latest rain fall.

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| J-1-0011-005 | 19170 | MIN | 0505 | | MPM-0219 | MPM-0219 | 3/6 |

FAIRHURST
INTERNATIONAL

4.6. Stockpiles

    4.6.1. see item 2.2.

4.7. Incinerator.

    4.7.1. Radian stated the incinerator is not being operated until they resolve the issue with the Ministry of Environment. Radian's lawyer is currently dealing with this matter.

    4.7.2. Radian added they were asked to prepare an environmental assessment in accordance with a 2002 law about medical waste. It is to be determined if this law applies to this incinerator.

    4.7.3. Radian said they are supposed to meet with the Ministry of Environment representatives Friday 4th February 2005.

    4.7.4. Radian added they received a report issued by one of the inspectors stating that the Greenpeace complaint has no proper foundation. Radian stated they will submit this report to WAFI/SOL as soon as it is properly translated.

                                                 **Radian**

4.8. Protection of the Environment.

    4.8.1 WAFI noted that QC report 0264 refers to the naphthalene that was found in area 7B and WAFI asked when Radian's Mr. James Pratt would return to site as he could indicate the resultant treated material stored next to the pelletiser.

    Radian stated JP is now present on site and has discussed the matter with BK.

    4.8.2 WAFI stated now that JP is back, he can review the metals issue with them.

    WAFI noted that the metals issue was not discussed with Dr. Card during his last visit.

                                                 **Radian**

    4.8.3 WAFI noted that the drums of bituminous material found in Section 7B were still in the ground.

4.9. Tyre Shredder.

    4.9.1. WAFI noted the tyre shredder is operational intermittently.

4.10. Final Site Quality.

    4.10.1. A meeting was held in Beirut on 16th December 2004 in the presence of Radian's Messrs. Tom Bishop, William Hadaya, Berwick Manley and Mike Marley as per their letter ABO/CM/622.

    Berwick Manley and Mike Marley will meet with Geoff Card and Jim White Thursday/Friday 3rd/4th February 2005.

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-505 | 10170 | MIN | 0305 | | MPM-0219 | MPM-0219 | 4/6 |

FAIRHURST
INTERNATIONAL

Radian stated their experts (i.e. Messrs. Manley and Marley) will be present on site tomorrow Thursday 3rd February 2005.

WAFI stated that Dr. Card and Prof. White are already on site having arrived yesterday evening.

4.11. Seabed Inspections.

    4.11.1. Nothing discussed.

4.12. Radian stated they did not receive DAR's survey audits for the months of August, September, October and November and December

WAFI stated DAR are making a review and it is hoped they will submit their findings in a couple of days.

Radian expressed their concern with regard to this issue. Radian explained that they pay their subcontractor based on the actual work completed. The subcontractor's reports show that they have exceeded 5 million $m^3$. Radian believe that they are close to this number but they need to know for a fact.

Radian stated that they also need to clarify this issue vis a vis the Contract. Radian asked what if they have to exceed 5 million $m^3$ to excavate the area inside the Phase 2 boundary.

WAFI stated that the Contract demands that the whole area inside the Phase 2 boundary be excavated. If this volume was to exceed 5 million $m^3$, Radian would be paid for the additional $m^3$. Solidere agreed with this statement.

Radian stated they need Solidere's approval to continue excavation if they exceed 5 million $m^3$.

## 5. Programme

    5.1 See 4.1.1 and 4.10.

## 6. Payments

    6.1 This issue is the subject of ongoing correspondence.

## 7. Changes in the Works

    7.1 Nothing discussed.

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10176 | MIN | 0303 | | MPM-0219 | MPM-0219 | 5/6 |

4.FEB.2005  15:45     RADIAN INTERNATIONAL +9611963575          NO.129   P.7



**8. A.O.B.**

8.1 WAFI stated their HP 4500 Laserjet cannot be used as one of its toners is empty. Radian stated they will send the toner immediately after the meeting, which they did.

8.2 Radian stated that they will continue their operations during St. Maroun's Day and Hijri New Year i.e. 9th and 10th February 2005.

8.3 After the meeting, WAFI asked Radian what is their current position with regard to the provision of professional indemnity insurance. Radian stated they will ask their insurance experts in the U.S. and reply in due course.

· **Radian**

**9. Date of Next Meeting**

9.1 The next progress meeting is scheduled Wednesday 16th February 2005 at 10.00 hrs.

Prepared by: NAS
Distribution: Those present plus JAW / YM / JAS / BB / BK / IR / MS

| Project Name: | Normandy Landfill Treatment Contract | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 10170 | MIN | 0905 | | MPM-0219 | MPM-0219 | 6/6 |

**3**

# EXHIBIT D

# PART 3

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

### 300 SOUTH GRAND AVENUE
### LOS ANGELES, CALIFORNIA 90071-3144

TEL (213) 687-5000
FAX (213) 687-5600
www.skadden com

30 March 2006

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
NEWARK
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D C
WILMINGTON
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

**VIA COURIER AND ELECTRONIC MAIL**

Eliseo Castineira
Sonia Doubin
Secretariat
International Court of Arbitration
International Chamber of Commerce
38 cours Albert 1$^{er}$
Paris 75008
FRANCE

> Re.  ICC Case No. 14208/EC
> Radian International LLC v. The Lebanese Company for the Development and Reconstruction of Beirut Central District; and
> ICC Case No: 14236/EC
> The Lebanese Company for the Development and Reconstruction of Beirut Central District v. Radian International LLC and URS Corporation

Dear Mr. Castineira and Ms. Doubin:

We are responding to[1] (i) Solidere's letter dated 21 March 2006 concerning the appointment of the Chairman and consolidation of the above-mentioned cases; (ii) the ICC Secretariat's letter dated 23 March 2006 directing Radian to submit its response concerning these issues by 30 March 2006; and (iii) Solidere's letter dated 24 March 2006 concerning jurisdiction over URS and extension of time for Radian and URS's answer in Solidere's Arbitration, as well as further addressing consolidation of the above-mentioned cases.

---

[1]  For the sake of clarity, we will hereinafter refer to the parties by their individual titles: Radian International LLC as "Radian"; URS Corporation as "URS", and the Lebanese Company for the Development and Reconstruction of Beirut Central District as "Solidere" Radian is the Claimant in ICC Case No 14208/EC ("Radian's Arbitration") and one of the Respondents in ICC Case No. 14236/EC ("Solidere's Arbitration") URS is the second Respondent in Solidere's Arbitration Solidere is the Claimant in Solidere's Arbitration and the Respondent in Radian's Arbitration

### 1. Constitution of the Arbitral Tribunal in Radian's Arbitration (ICC Case No: 14208/EC)

Radian agrees with Solidere's proposal that the parties, in consultation with their respective nominated co-arbitrators, should attempt to nominate jointly the Chairman of the Arbitral Tribunal for ICC Case No. 14208/EC within 30 days after the confirmation of the co-arbitrators.

### 2. Consolidation of Radian and Solidere's Arbitrations

We object to Solidere's proposal that consolidation of these cases should be without prejudice to Solidere's claims against URS in Solidere's Arbitration. Solidere expressly admits that the purpose behind initiating a new arbitration in addition to the already pending Radian Arbitration was Solidere's desire to bring URS (a third party) into the existing Radian/Solidere disputes. (See Solidere's March 24, 2006 letter, at 7, stating that Solidere initiated a separate proceeding because it could not join URS as a party to Radian's Arbitration.) As stated in our submission to the ICC dated 13 March 2006 (the "13 March Application"), Solidere should not be allowed to backdoor URS, a non-signatory to the underlying arbitration agreement and a non-party to the original arbitration between Radian and Solidere, into these proceedings by dressing up what are essentially counterclaims to Radian's claims in Radian's Arbitration into an entirely new case.

The ICC Court should reject Solidere's attempt to circumvent the ICC Court's firmly-established practice precluding Solidere as the Respondent from bringing into the arbitration a non-signatory to the underlying arbitration agreement by naming it in its counterclaims. *See, e.g.*, Whitesell and Silva Romero, *Multiparty and Multicontract Arbitration: Recent ICC Experience*, ICC ICArb Bull, Special Supplement ("Whitesell & Romero"), at p.7 (2003).

### 3. Constitution of the Arbitral Tribunal & Extension of Time to File an Answer in Solidere's Arbitration (ICC Case No. 14236/EC)

Although Solidere does not object to Radian and URS's request for an extension of time to file their answers until the issues raised by the 13 March Application are resolved, Solidere contends that selection of arbitrators in its Arbitration should be addressed before that. However, if Solidere's claims in ICC Case No. 14236/EC are treated as counterclaims in ICC Case No. 14208/EC (as they should be), the issue of selection of arbitrators for Solidere's Arbitration becomes moot, as selection of arbitrators for Radian's Arbitration is already well under way. Therefore, Radian and URS should not be required to address arbitral nominations for Solidere's Arbitration until the 13 March Application is resolved.

We note, however, that the ICC has requested our views on the number of arbitrators and manner of selection should the ICC deny that portion of the 13 March Application that seeks to have Solidere's claims in Case No. 14236/EC considered as counterclaims in Case No. 14208/EC. In that event, Radian and URS propose that there be three arbitrators (two party appointed arbitrators and a chair), that Radian (and URS if it has not been dismissed as a

2

party) identify their party appointed arbitrator in their Answer, and that the parties in consultation with their party appointed arbitrators have 30 days from confirmation of the party appointed arbitrators to reach agreement on the chair of the tribunal.

### 4.    Lack of Jurisdiction over URS in Solidere's Arbitration (ICC Case No. 14236/EC)

In its 13 March Application, URS demonstrated that Solidere should not be allowed to proceed against it in this arbitration because: (a) URS is not a signatory to any contract with Solidere; (b) URS has not undertaken to carry out the works under the contract between Solidere and Radian; and (c) the claims asserted in the Solidere's Arbitration are essentially efforts to enforce the arbitration award entered in a prior ICC proceeding between Radian and Solidere, ICC Case No. 12727/EC (the "Prior Arbitration") in which URS was not a party and which was based on claims arising out of a contract to which URS was not a signatory. Solidere's 24 March 2006 response fails to show otherwise.

Solidere does not and cannot dispute that URS was not a party to the Prior Arbitration. Nor does Solidere dispute the showing in the 13 March Application that before the Prior Arbitration began Solidere had in its hands the same "evidence" of URS's involvement in the project on which it now relies to make its claims against URS. Instead, Solidere merely claims that there was no reason to join URS and somehow it "would have defeated the agreed-upon 'fast track' nature of the proceedings, as well as any remaining spirit of cooperation" had Solidere named URS as a party to the Prior Arbitration.

Solidere cannot so easily avoid the consequences of its own conduct. As URS showed in its 13 March Application, the history of the underlying dispute goes back as early as 2003, when the parties agreed to arbitrate the landfill gas issue in the Prior Arbitration. Never in the three years that passed has Solidere claimed that URS was in any shape or form involved in the underlying dispute – nor in the agreement to arbitrate the landfill gas issue in the Prior Arbitration, nor in Solidere's self-described application to have the award rendered in the Prior Arbitration recognized by the French courts. That silence – in the face of what was (according to Solidere) mounting evidence of URS's involvement – cannot be explained away by the difference in relief sought or the "fast track" nature of the proceedings. (See Solidere's 24 March 2006 letter at 5 n.6 ) Declaratory or monetary, Solidere would not have wasted its time and money by seeking relief against an entity that it supposedly already suspected to be a sham, and no "fast track" intentions (see id.) could have justified its failure to preserve any legal rights against the party that it considered truly responsible. Realizing that it simply has no plausible response to the estoppel, Solidere resorts to contending that estoppel somehow is beyond the scope of the jurisdictional debate at hand, even though it was Solidere that expressly grounded its jurisdictional theory of extension of the underlying arbitration agreement to URS on "estoppel" (among others) (See Solidere's Request for Arbitration ¶

50 )[2] If the theory of estoppel can be used as a jurisdictional sword, it can be used as a jurisdictional shield as well.

Indeed, far from being a "common law doctrine", as Solidere asserts, the principle of estoppel has been recognized as a universal principle of international arbitration. As Emmanuel Gaillard writes, the principle of consistency or estoppel has become a "basic principle of the law of international commerce." (See 13 March Application at p. 10 & n.15.) Other arbitrators have confirmed this approach Philippe Pinsolle has recently echoed the view that estoppel constitutes a basic principle of the law of international commerce[3]. The principle of estoppel has also been applied specifically by French courts. In *A. Rahman Golshani c. Repub. Islamique d'Iran*, arrêt No. 1139, pourvoi No. S.01-15.912 (6 July 2005), the Cour de Cassation held, relying on the principle of estoppel, that a party could not maintain, in the context of enforcement of an arbitral award, a position contrary to that maintained throughout the arbitration

Solidere's belated attempt to bring URS into the existing Radian/Solidere arbitration dispute is the result of Solidere's recognition that as a matter of law it cannot enforce against URS an arbitration award made against Radian. Thus, if Solidere's arbitration is an attempt to enforce the Prior Arbitration award against Radian, Solidere implicitly recognizes that URS cannot be made a party and that, under the law, URS is a separate and distinct entity. Accordingly, Solidere has objected to classification of its Arbitration as essentially an enforcement proceeding vis-a-vis the award rendered in the Prior Arbitration -- in which URS was not a party and which was based on claims arising out of a contract to which URS was not a signatory. While Solidere underscores that the Prior Arbitration involved "the proper interpretation of specific provisions of the Contract relating to the level of remediation" (Solidere's 24 March 2004 letter at 6), it fails to acknowledge that its current claims are directly dependent on that interpretation in that they purport to fault Radian for failure to perform according to the award rendered in the Prior Arbitration. Indeed, central to the dispute between the parties is whether Solidere and Radian properly complied with the following provisions of the Prior Arbitration award:

> ♦ "Radian is liable to remedy the defects at no cost to SOLIDERE and to provide SOLIDERE with a plan showing how Radian propose that the Works will be completed so as to comply with the Contract;
>
> ♦ SOLIDERE is entitled to withhold payment of sums otherwise due to Radian;

---

[2]  In this regard, Solidere's doubts that "the common law doctrine of estoppel can have any application to this Paris-based arbitration" should be easily resolved by Solidere's reference to its own Request for Arbitration, which expressly relied on such a theory

[3]  See 'Les applications du principe de l'interdiction de se contredire au détriment d'autrui en droit du commerce international' (Philippe Pinsolle). L'interdiction de se contredire au détriment d'autrui, sous la direction de Martine Behar-Touchais, 2000. page 3S.

4

> • The parameters set forth in TC Table 3.1 apply to backfilled material and are to be measured after backfilling *in situ.*"[4]

Moreover, Solidere's Arbitration raises additional issues about how the following provisions of the Prior Arbitration award should be enforced against Radian:

> • "There is a failure or defect in the Permanent Works and/or materials and/or workmanship within the meaning of the Contract as regards landfill gas emissions;

> • The Permanent Works are not Fit for the Purpose, as defined in the Contract, as regards such emissions;"

> • "The Tribunal awards and declares that Radian should pay to SOLIDERE the sum of US$2,182,000 in respect of their costs of the Arbitration, including the additional costs awarded under para. 11.12 "

> • "The Tribunal awards and declares that Radian should bear the fees and expenses of the Tribunal and the ICC administrative expenses fixed by the ICC court at US$340,000 and should pay to SOLIDERE the sum of US$170,000 previously advanced by SOLIDERE."[5]

These aspects of the Prior Arbitration award are central to Solidere's claims, and Solidere's claims cannot survive without enforcement of the Prior Arbitration award.  Solidere's admitted failure to name URS as a party to the Prior Arbitration or to seek judicial enforcement or application of the award against URS on any available grounds precludes Solidere's 11th hour attempt to backdoor enforcement of the Prior Arbitration award against URS in the guise of a new arbitration.

Nor is Solidere helped by its contention that all it needs to do is set forth a "colorable" or "plausible'" argument "that an arbitration agreement may exist" (Solidere's 24 March 2006 letter, at 2.) Solidere fails its own test.  Solidere *does not dispute that* (i) URS was not a party to the Prior Arbitration and that the Prior Arbitration award cannot be enforced against URS and (ii) *no arbitration agreement exists* between URS and Solidere.  Nor is Solidere helped by its assertion that just because it has presented a laundry list of debatable legal theories, "[t]he very existence of such a debate" shows that jurisdiction "may" exist. (Solidere's 24 March 2004 letter, at 3.)  Solidere basically invents a maxim that, whenever jurisdiction is objected to, it "may" exist if there is a "debate" about it.  Were the Court to accept Solidere's position, it might as well delete Art. 6(2) from its Rules  (*See* Yves Derains & Eric A. Schwartz, *A Guide to the ICC Rules of Arbitration*, Second Edition (2005), p. 90 (cited by

---

* July 12, 2004 Award, issued in ICC Case No. 12727/EC, at p 99

[5] *Id*

Solidere in its 24 March letter) (noting that where the arbitration agreement does not show any legitimate basis to proceed against the party at issue, "the [ICC] Court may be required to make what is a difficult and delicate decision as to whether the arbitration ought to be allowed to proceed against such party"), Whitesell & Romero, at 9 (discussing the ICC Court's recent decisions sustaining threshold jurisdictional objections of non-signatories to the arbitration agreements at issue).)

In the end, Solidere ignores its own conduct in the Prior Arbitration and during the course of the project and, instead, faults URS for failing to prove a negative — i.e., that URS has failed to prove that it did not take over the Radian project and Radian's performance of the underlying contract (Solidere's 24 March 2006 letter, at 4). Relying on flimsy inferences from a purported Web site, company address, and letterhead as "overwhelming" evidence of URS's supposed takeover of the project, Solidere fails to explain what was in fact an express *disclaimer* of URS's responsibility for the project, as discussed in the 13 March Application (*See* 13 March Application at 8, citing 16.01.2001 letter from John W. Rakow III; *cf.* Solidere's Request for Arbitration at 52-53, relying on the Rakow letter and attaching it as "Exh. C 36".) Furthermore, Solidere ignores its own express ratifications of the weekly on-site project minutes that invariably listed Radian as the party controlling and performing work on the project and failed to make so much as a single mention of URS having any involvement in the project, as well as the undisputed fact that URS was not affiliated with or known to Radian at the time Solidere and Radian entered into their contract. Taken together, even setting aside Solidere's attempt to enforce the Prior Arbitration award against a non-party, Solidere has failed to make a *prima facie* case that the parties intended to make URS a party to any arbitration agreement.

For the above reasons, the Court should not allow Solidere's Arbitration to proceed against URS; additionally, it should order the claims set forth in the Solidere's Arbitration to be treated as counterclaims against Radian in Radian's Arbitration.

Yours sincerely,

M Bigend

Skadden, Arps, Slate, Meagher & Flom LLP

cc:   Christopher R. Seppälä, White & Case LLP
      Dr. Ghaleb S. Mahmassani

6

**4**

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA 90071-3144

TEL (213) 687-5000
FAX (213) 687-5600
www.skadden.com

21 April 2006

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
NEWARK
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON D.C.
WILMINGTON
—
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

### VIA FACSIMILE AND ELECTRONIC MAIL

Eliseo Casuneira
Sonia Doubin
Lara Hammoud
Secretariat
International Court of Arbitration
International Chamber of Commerce
38 cours Albert 1er
Paris 75008
FRANCE

Re:     ICC Case No: 14208/EC
        Radian International LLC v. The Lebanese Company for the
        Development and Reconstruction of Beirut Central District; and
        ICC Case No: 14236/EC
        The Lebanese Company for the Development and Reconstruction of
        Beirut Central District v. Radian International LLC and URS
        Corporation

Dear Mr. Castineira, Ms. Doubin and Ms. Hammoud,

    We are responding to Solidere's letter dated 13 April 2006.[1]

### I.      Consolidation of Radian and Solidere's Arbitrations

    As we showed both in our 13 March 2006 and 30 March 2006 submissions, Radian
and Solidere's Arbitrations are essentially one case, which was initiated *by Radian* on 20
January 2006 and Solidere's claims should be deemed counterclaims in Radian's arbitration,

---

[1]    All defined terms herein retain the same meaning as that assigned to them in the 30 March 2006 letter to the
ICC submitted by URS and Radian.

except for Solidere's new claims against URS, a party that Solidere concedes is not a signatory to any agreement with Solidere permitting the commencement of arbitration. Solidere does not dispute that the claims asserted against Radian in Solidere's Arbitration are *in substance* counterclaims to the claims asserted in Radian's Arbitration. While Solidere concedes that its claims against Radian are effectively counterclaims, which should have been asserted as such against Radian in Radian's first commenced proceeding, Solidere takes the position that it was "compelled, as a procedural matter, to bring a new arbitration against URS and Radian *instead of making counterclaims*" in Radian's Arbitration. (Solidere's 13 April 2006 letter, at 3 (emphasis added).) The reason for filing a separate, but wholly duplicative proceeding, of course, is that Solidere now wishes to enforce the first arbitration between Radian and Solidere against URS and to pursue new claims against URS, a non-signatory to the underlying arbitration agreement.

Given the undeniable fact that URS is *not* a signatory to *any* arbitration agreement, as well as the undeniable fact that Solidere's claims against URS are in reality nothing more than an attempt to enforce its prior arbitration award entered against Radian against URS as well, URS established that Solidere's commencement of a second proceeding was an attempt to circumvent the ICC's rules in an effort to re-write history and impose on URS obligations that had been awarded to Solidere by the ICC against URS's indirect subsidiary, Radian. In response to these facts, Solidere does not deny that it is effectively seeking to enforce its prior arbitration award against URS, even though URS was not a party to that arbitration. Instead, Solidere argues that the only procedural mechanism available to it to effectuate this improper course of conduct is by commencing a new arbitration. In doing so, Solidere simply glosses over that URS had *nothing* to do with any of the events at issue and that the only purported basis for dragging them into any proceeding is that URS purportedly was acting as an alter ego of Radian *well before the prior arbitration proceedings commenced*. Given that all the facts for asserting alter ego claims against URS were well-known to Solidere before the first arbitration between Radian and Solidere, there is no justification for Solidere to proceed as it has, namely arbitrate against Radian, obtain an award, and then commence a new proceeding seeking to enforce that award against *URS*, even though it was not a party to the first proceeding.[2]

Given that there is no serious dispute that the two new pending arbitrations are essentially *one case*, it is not Solidere's place to dictate which parties are to be involved because it was not Solidere that initiated the pending arbitration – it was Radian. The firmly established ICC practice that Solidere is thus circumventing via its second arbitration is Radian's right to identify the parties to its arbitration proceedings. (*See* Whitesell and Silva Romero, *Multiparty and Multicontract Arbitration: Recent ICC Experience*, ICC ICArb Bull, Special Supplement ("Whitesell & Romero"), at 10 (2003) (noting the ICC's "[t]raditional[] . . . idea that it is for the claimant side to identify the parties to arbitration proceedings").) As the Whitesell & Romero article explains, the traditional approach of the ICC Court is the

---

[2]    In reality, what has happened is that Solidere now wishes that it had negotiated for and obtained different rights than those it actually has. Specifically, what Solidere is trying to do through this arbitration is have the ICC give it what Solidere failed to get in negotiations with Radian, a corporate parent guarantee. Instead, Solidere bargained for and got a performance bond *from Radian*. If Solidere had wished for a corporate guarantee from Radian's parent, it should have sought one. Having failed to do so, Solidere should not be permitted to try and renegotiate its rights with the ICC's assistance to obtain what it never had

2

conservative approach that allocates the right to identify the participants to the party that initiated the proceedings. (See id. at 10.) Indeed, as Solidere acknowledges, the ICC Court chose to modify that approach only when a respondent asserts new claims against another signatory to the underlying arbitration agreement – a circumstance that cannot happen here because the only two signatories to the arbitration agreement are Radian and Solidere. (See Solidere's 13 April 2006 letter, at 3 n.3.) In all other cases (such as the case here), the ICC Court has chosen to retain its traditional approach disallowing respondent's joinders of new parties:

> It should be noted that the Court's position remains conservative when the new party that the respondent seeks to joint has not signed the arbitration agreement but, according to the respondent, has purportedly participated in the negotiation, execution, performance or termination of the contract containing that agreement. In such cases, the Court has decided not to join the new party to the arbitration.

(Whitesell & Romero, at 11.) While the Whitesell & Romero article notes that the traditional approach may force respondents to initiate new proceedings to assert claims against non-signatories to the underlying agreement, nowhere does it acknowledge that the Court would approve of such a procedural run around its rules. It should not. Because the cases, by Solidere's own admission, properly belong together, the ruse of a new proceeding – initiated with the sole purpose of joining in a non-signatory party that the Court usually refuses to join at the respondent's request – should be rejected.[3]

## II.    Lack of Jurisdiction over URS in Solidere's Arbitration (ICC Case No. 14236/EC)

In its 13 March 2006 and 30 March 2006 submission, URS demonstrated that Solidere should not be allowed to proceed against it in this arbitration because: (a) URS is not a signatory to any contract with Solidere; (b) URS has not undertaken to carry out the works under the contract between Solidere and Radian; and (c) the claims asserted in the Solidere's Arbitration are essentially efforts to enforce the arbitration award entered in a prior ICC proceeding between Radian and Solidere, ICC Case No. 12727/EC (the "Prior Arbitration") in which URS was not a party and which was based on claims arising out of a contract to which URS was not a signatory. In its 13 April 2006 submission, Solidere addresses three distinct points in relation to the jurisdictional dispute at issue, to which we respond below.

---

[3]    It is ironic that Solidere continues insisting that the cases cannot be consolidated under Article 4(6) of the Rules because "the two cases are not between the same parties" (Solidere's 13 April 2006 letter, at 2 n.2) – when it was Solidere that initiated the second case with the sole purpose of making the parties "different" by adding URS, a non-signatory to the underlying arbitration agreement. In any event, aside from Solidere's addition of URS (which should be dismissed from these proceedings for lack of jurisdiction), the Article 4(6) conditions for consolidation are fully satisfied here.

3

**Estoppel.** While Solidere's arbitration request sets forth its estoppel theory as supporting the *prima facie* determination of jurisdiction over URS,[4] Solidere now contends that URS's estoppel arguments precluding Solidere from seeking jurisdiction over URS should not be given any weight in that determination. Solidere offers no support for this double standard, in which Solidere can invoke the estoppel doctrine against URS, but cannot be made to answer to this doctrine when invoked by URS. Solidere's attempt to have it all ways at once is illogical, unprincipled and, particularly in this case, untenable. The only hint of argument that Solidere offers is to suggest that resolution of the estoppel arguments is not appropriate at this stage because the issues supposedly are "complex legal issues." Nothing could be further from the truth. URS's estoppel arguments are simple, straightforward and rely on facts that unfolded before this Court when Solidere was attempting to negotiate and structure the Prior Arbitration. Accordingly, the ICC Court may properly determine right now that Solidere's own conduct – which, for the most part, occurred before this Court in the context of the Prior Arbitration – should preclude Solidere from proceeding against URS, as outlined in the 13 March 2006 and 30 March 2006 submissions. Having expressly agreed in the Prior Arbitration to the identity of the parties – Radian and Solidere – at a time when it must have known all the facts it now relies on for its supposed prima facie case against URS, Solidere cannot now retroactively reverse course and enforce the Prior Arbitration against URS.

**Solidere's Arbitration as an Enforcement Action Vis-a-Vis the Prior Arbitration's Award** Once again, Solidere conveniently claims that only the theories propounded *in support* of finding jurisdiction over URS are entitled to make it into the *prima facie* analysis. However, the issue of whether Solidere has asserted a bona fide argument in support of its jurisdictional theory cannot be evaluated in a vacuum of Solidere's contentions alone – URS is entitled to show that the arguments are baseless. One of the reasons why Solidere's claims fail the *prima facie* test is because these claims are nothing more than an attempt to enforce the Prior Arbitration's award against URS, notwithstanding that URS was not a party to that proceeding. (*See, e.g.*, 30 March 2006 letter, at 4-5.) Certainly, such an attempt cannot be viewed as a "colorable," let alone "plausible" jurisdictional argument, thus failing Solidere's own test for the *prima facie* jurisdictional standard. (*See* Solidere's 24 March 2006 letter, at 2.)

Furthermore, Solidere's attempt to distinguish the Prior Arbitration on the basis that here Solidere has also asserted claims arising out of its termination of the underlying contract (*see* Solidere's 13 April 2006 letter, at 4) is unavailing because Solidere's termination of the contract was expressly grounded on Solidere's contention that Radian failed to fulfill its obligations under the Prior Arbitration's award. (*See* Solidere's 13 February 2006 Request for Arbitration ¶ 57 (reciting grounds for termination); *cf.* Radian's 20 January 2006 Request for Arbitration, as amended on 20 February 2006, at 9.43, 9.46 (explaining, *inter alia*, how the grounds for termination arose out of the Prior Arbitration).) Indeed, Solidere, in what cannot be characterized as anything other than an "enforcement" proceeding, unabashedly demands in its new arbitration that URS be required to pay the costs awarded in the Prior Arbitration against Radian. (*See* Solidere's Feb. 13, 2006 Request for Arbitration.)

---

[4]   Although Solidere now attempts to reserve its reliance on the estoppel theory for purposes of jurisdiction over URS until "a later, more appropriate time," its 13 February 2006 Request for Arbitration, which sets forth Solidere's alleged *prima facie* theory of jurisdiction, expressly relied on such a theory

4

**Lack of _prima facie_ evidence.** Solidere asserts that its jurisdictional evidence satisfies the _prima facie_ test and complains that URS has not seriously examined or rebutted it. At the same time, Solidere is still unable to point to anything more that an ordinary relationship between URS and its indirect subsidiary, Radian, in support of its purported _prima facie_ case. As the 13 March 2006 and 30 March 2006 submissions demonstrated, the _prima facie_ test cannot be satisfied by a mere corporate affiliation between the parties, and Solidere's evidence shows nothing more that these companies are related. Thus, it is unclear what exactly Solidere expects URS to rebut, as the corporate affiliation between these companies has never been disputed.[5] That said, URS already established, and Solidere never challenges, that the "evidence" cited by Solidere is simply insufficient, even if accepted, to permit Solidere to commence proceedings against URS, which admittedly never signed any arbitration agreements of any kind.

**A Determination of Arbitrability Must Be Made, If At All, By An American Court, Not This Court.** It is Solidere's contention that it may commence arbitration proceedings against URS, even though it is undisputed that URS never signed any arbitration agreement with Solidere. The basis for this aggressive, and untenable contention, is that URS supposedly is an alter ego of Radian and was effectively the contracting party. Solidere ignores that URS is an American company and that the decision whether an American company is the alter ego of another American company is one that is uniquely, and exclusively, reserved for resolution by an American court. _See Sarhank Group v. Oracle Corp_, 404 F.3d 657, 662 (2d Cir. 2005) ("It is American federal arbitration law that controls. An American nonsignatory cannot be bound to arbitrate in the absence of a full showing of facts supporting an articulable theory based on American contract law or American agency law."); _Abram Landau Real Estate v. Benova_, 123 F.3d 69, 72 (2d Cir. 1997) ("When parties disagree about whether they ever entered into an arbitration agreement, a court decides that issue, absent a clear and unmistakable delegation of that authority to the arbitrator.").

It is well-settled that a party cannot, as here, improvidently name a party as a respondent in an arbitration when it has not signed any arbitration agreement and then ask the arbitrator to resolve the issue. Permitting such a course of action, of course, would effectively take away a fundamental right of a party that has never signed an arbitration agreement – namely, the right to the protections of a court of law. Indeed, in a recent decision involving Solidere's counsel here, an American court held that the ICC lacked the power to adjudicate whether an American corporation that had not signed an arbitration

---

[5]  Solidere's contention that the jurisdictional issues should be decided by the arbitrators (rather than this Court) because they involve "_bona fide_ issues of facts" is meritless, not only because Solidere has failed to establish any genuinely _bona fide_ factual issues, but also because this Court's practice demonstrates that these issues have been consistently found to be within the Court's purview. (_See_ Whitesell & Romero at 8-9 (cataloguing recent ICC cases wherein the Court engaged into factual determinations concerning jurisdiction over non-signatories to arbitration agreements).) Indeed, even the authors of the treatise that Solidere cites in support of its proposition that the issue of jurisdiction should be left to the arbitrators (_see_ Solidere's 13 April letter, at 5, citing Craig, Park & Paulsson, _International Chamber of Commerce Arbitration_, 2000 ("ICC Arbitration 2000"), at 157) note that the "[ICC] Court . . . not infrequently determined that the arbitration may not proceed against some of the named parties, a practice necessitated by the tactics of some claimant parties who seek to join as defendants parties with such tenuous relationships to the arbitration agreement that it is impossible for the Court to be satisfied, even _prima facie_, that an arbitration agreement may exist concerning them." ICC Arbitration 2000, at 157.

agreement could be compelled to arbitrate given its "affiliation" with a related company that had signed an arbitration agreement. *See Masefield AG v. Colonial Oil Indus., Inc.*, No. 05 Civ. 2231 (PKL), 2005 WL 911770 (S.D.N.Y. Apr. 18, 2005). In that case, like here, the claimant asserted virtually identical arguments to those made by Solidere, including estoppel, affiliated companies, alter ego and agency. *Id.* Nevertheless, the American Court enjoined the claimant from proceeding before the ICC on the issue of arbitrability, holding that this issue was one for an American Court to resolve. *See also Masefield AG v. Colonial Oil Indus., Inc.*, No. 05 Civ. 2231 (PKL), 2005 WL 2105542 (S.D.N.Y. Sept. 1, 2005). In light of *Masefield, Sarhank* and similar authority, the determination of whether URS can be compelled to arbitrate in the absence of a signed arbitration agreement is not one that can be determined by the arbitration tribunal, but is one left exclusively to an American Court.

For the above reasons and the reasons stated in URS and Radian's 13 March 2006 and 30 March 2006 submissions, the Court should not allow Solidere's Arbitration to proceed against URS; additionally, it should order the claims set forth in the Solidere's Arbitration to be treated as counterclaims against Radian in Radian's Arbitration.

Yours sincerely,

Skadden, Arps, Slate, Meagher & Flom LLP

cc:    Christopher R. Seppala, White & Case LLP
       Dr. Ghaleb S. Mahmassani

6

5

5. JUN. 2006 10:40 FAX  33 WHITE & CASE LLP, PARIS ACCOUNT           N°0429   P. 2/3

Recu par Paris Fax System : 2006-06-02 - 19:05:37 - Page 1 sur 2



**International Chamber of Commerce**
*The world business organization*

## International Court of Arbitration ♦ Cour Internationale d'arbitrage

### TRANSMISSION BY TELECOPIER
### TRANSMISSION PAR TELECOPIE

TO/A        :   Christopher R. Seppälä, Esq.              Fax  :        01 55 04 15 16
            :   Dr. Ghaleb Mahmassani, Esq.              Fax  :        00 961 1 34 87 12
            :   Jeffrey H. Dasteel, Jason D. Russell     Fax  :        00 1 213 621 52 06
                & Marina V. Bogorad, Esqs.
            :   Karyl Naim, Esq.                         Fax  :        00 44 20 7519 7070

FROM/DE   :    Eliseo Castineira
               Lara Hammoud                              Fax  :        00 33 1 49 53 57 75
                                                         Phone :       00 33 1 49 53 28 84

SECRETARIAT OF THE ICC INTERNATIONAL COURT OF ARBITRATION
SECRETARIAT DE LA COUR INTERNATIONALE D'ARBITRAGE DE LA CCI

DATE      2 June 2006

                                                         REF.  :      14736/EC

Nombre de pages (y compris celle-ci) :    2

(If any pages are missing or illegible, please call the number indicated above).
(En cas de pages manquantes ou illisibles, veuillez appeler le numéro indiqué ci-dessus).

Ce message est confidentiel. Si vous avez reçu ce message par erreur, veuillez le détruire
et en informer l'expéditeur. Veuillez contacter le Secrétariat par téléphone au +33(0)1 49
53 28 78, fax au +33(0)1 49 53 29 33 et email gpk@iccwbo.org. Vous ne devez ni
conserver le message, ni en révéler le contenu.
This message is confidential. If you have received this message in error please delete it
and notify the sender immediately. Please contact the Secretariat by telephone at +33(0)1
49 53 28 78, fax at +33(0)1 49 53 29 33 and email at gpk@iccwbo.org. You should not
retain the message or disclose its contents to anyone.

ICC International Court of Arbitration · Cour internationale d'arbitrage de la CCI
38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28  Faxes +33 1 49 53 29 29 / +33 1 49 53 29 33
Website www.iccarbitration.org  E-mail arb@iccwbo.org



**ICC**

International Chamber of Commerce
*The world business organization*

**International Court of Arbitration • Cour internationale d'arbitrage**
2 June 2006 – shh/hd

14236/EC

THE LEBANESE COMPANY FOR THE DEVELOPMENT AND RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT, SAL ("SOLIDERE") (Lebanon) *vs/* 1. URS CORPORATION (U.S.A.) 2. RADIAN INTERNATIONAL LLC (U.S.A.)

Counsel in charge of the file: Mr. Eliseo Castineira (dir. tel: 33 1 49 53 29 86 – dir. fax: 33 1 49 53 57 75)

Christopher R. Seppälä
WHITE & CASE LLP
11, Boulevard de la Madeleine
75001 Paris
France

Dr. Ghaleb Mahmassani                                    *Fax: 01 35 04 15 16*
Massabki-Serhal Building
Cairo Street
Hamra
Beirut
Lebanon

Jeffrey Dasteel, Jason D. Russell & Marina V. Bogorad, Esqs.     *Fax: 00 961 1 34 87 12*
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
U.S.A.

Karyl Nairn, Esq.                                        *Fax: 00 1 213 621 52 06*
SKADDEN, ARPS, SLATE, MEAGHER & FLOM (UK) LLP
40 Bank Street
Canary Wharf
London E14 5DS
United Kingdom

Dear Madams, Dear Sirs,                                  *Fax: 00 44 20 7519 7070*

The Secretariat informs you that, at its session of today, the Court decided, in accordance with Article 6(2) of the Rules, that case 14236/EC shall proceed against both Respondents.

Pursuant to our faxes of 29 and 31 March 2006, Respondents' Answer and nomination of a co-arbitrator are expected within **30 days** as from receipt of this fax. We invite the parties to inform us of any agreement in this matter as to the procedure for the selection of the Chairman of the Arbitral Tribunal.

Yours faithfully,

Eliseo Castineira
Counsel
Secretariat of the ICC International Court of Arbitration

ICC International Court of Arbitration • Cour internationale d'arbitrage de la CCI
38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28  | Fax +33 1 49 53 29 29 / +33 1 49 53 29 33
Website www.iccarbitration.org    E-mail arb@iccwbo.org

**6**



**International Chamber of Commerce**
*The world business organization*

## International Court of Arbitration ● Cour internationale d'arbitrage

### TRANSMISSION BY TELECOPIER
### TRANSMISSION PAR TELECOPIE

| TO/A | : | Christopher R. Seppälä, Esq. | Fax | : | 01 55 04 15 16 |
| | : | Dr. Ghaleb Mahmassani, Esq. | Fax | : | 00 961 1 34 87 12 |
| | : | Jeffrey H. Dastzel, Jason D. Russell & Marina V. Bogorad, Esqs. | Fax | : | 00 1 213 621 52 06 |
| | : | Karyl Nairn & Noradele Ghubril, Esqs. | Fax | : | 00 44 20 7519 7070 |
| CC | : | The Honorable Charles B. Renfrew | Fax | : | 00 1 415 397 7188 |
| **FROM/DE** | : | Eliseo Castineira | Fax | : | 00 33 1 49 53 57 75 |
| | | Lara Hammoud | Phone | : | 00 33 1 49 53 28 84 |

SECRETARIAT OF THE ICC INTERNATIONAL COURT OF ARBITRATION
SECRETARIAT DE LA COUR INTERNATIONALE D'ARBITRAGE DE LA CCI

**DATE**   18 July 2006                      **REF, :**   14236/EC

**Nombre de pages (y compris celle-ci) :**   **13 (Parties)**
                                             **3 (Mr. Renfrew)**

*(If any pages are missing or illegible, please call the number indicated above).*
*(En cas de pages manquantes ou illisibles, veuillez appeler le numéro indiqué ci-dessus).*

---

*Ce message est confidentiel. Si vous avez reçu ce message par erreur, veuillez le détruire et en informer l'expéditeur. Veuillez contacter le Secrétariat par téléphone au +33(0)1 49 53 28 78, fax au +33(0)1 49 53 29 33 et email ept@iccwbo.org. Vous ne devez ni conserver le message, ni en révéler le contenu.*
*This message is confidential. If you have received this message in error please delete it and notify the sender immediately. Please contact the Secretariat by telephone at +33(0)1 49 53 28 78, fax at +33(0)1 49 53 29 33 and email at ept@iccwbo.org. You should not retain the message or disclose its contents to anyone.*

---

ICC International Court of Arbitration ● Cour internationale d'arbitrage de la CCI
38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Faxes +33 1 49 53 29 29 / +33 1 49 53 29 33
Website www.iccarbitration.org   E-mail arb@iccwbo.org

18/07 2006 11:37 FAX    Case 1:06-cv-00415-SLR    Document 35-8    Filed 10/16/2006    Page 20 of 45
@002/013
Recu par Paris Fax System : 2006-07-18 - 11:45:03 - Page 2 sur 13



**International Chamber of Commerce**
*The world business organization*

## International Court of Arbitration • Cour internationale d'arbitrage

18 July 2006 – kgn/lhd (by fax only)

**14236/EC**

THE LEBANESE COMPANY FOR THE DEVELOPMENT AND RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT, SAL (Lebanon) vs/ 1. URS CORPORATION (U.S.A.) 2. RADIAN INTERNATIONAL LLC (U.S.A.)

Counsel in charge of the file: Mr. Elliseo Cattineira (dir. tel: 33 1 49 53 29 06 - dir. fax: 33 1 49 53 57 75)

Christopher R. Seppälä
WHITE & CASE LLP
11, Boulevard de la Madeleine
75001 Paris
France

*Fax: 01 55 04 15 16*

Dr. Ghaleb Mahmassani
Massabki-Serhal Building
Cairo Street
Hamra
Beirut
Lebanon

*Fax: 00 961 1 34 87 12*

Jeffrey Dasteel, Jason D. Russell & Marina V. Bogorad, Esqs.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
U.S.A.

*Fax: 00 1 213 621 52 96*

Karyl Nairn, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM (UK) LLP
40 Bank Street
Canary Wharf
London E14 5DS
United Kingdom

*Fax: 00 44 20 7519 7070*

Dear Madams, Dear Sirs,

Enclosed please find a copy of the Declaration of Acceptance and Statement of Independence and *curriculum vitae* of The Honorable Charles B. Renfrew, who has been nominated as co-arbitrator by Respondents.

As the nominee has advised of facts or circumstances which might be of such a nature as to call into question his independence in the eyes of the parties, in conformity with Article 7(2) of the Rules, the Secretariat invites you to provide your comments, if any, by **25 July 2006**.

If a party does not provide comments within the time limit granted, it shall be considered that, as regards these facts or circumstances, said party does not object to the confirmation of The Honorable Charles B. Renfrew as an arbitrator in this procedure.

.../...

**ICC International Court of Arbitration** • Cour internationale d'arbitrage de la CCI
38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Faxes +33 1 49 53 29 29 / +33 1 49 53 29 33
Website www.iccarbitration.org    E-mail arb@iccwbo.org

Case 1:06-cv-00415-SLR    Document 35-8    Filed 10/16/2006    Page 21 of 45
18/07 2006 11:37 FAX                                                        ☒003/013
Recu par Paris Fax System : 2006-07-18 - 11:45:03 - Page 3 sur 13

14236/EC                                                                    page 2

---

After receipt of the parties' comments or upon the expiry of the time limit granted, the Court, or pursuant to Article 9(2) of the Rules, the Secretary General, will be invited to decide upon the confirmation of the nominee.

Yours faithfully,

Eliseo Castineira
Counsel
Secretariat of the ICC International Court of Arbitration

Encl.: - Declaration of Acceptance and Statement of Independence of The Honorable Charles B. Renfrew
        - *Curriculum vitae* of The Honorable Charles B. Renfrew

cc:     The Honorable Charles B. Renfrew

Case 1:06-cv-00415-SLR    Document 35-8    Filed 10/16/2006    Page 22 of 45
18/07 2006 11:38 FAX                                                    @004/013
01/12/00  11:30 FAX 010 001 1100                                       @002/013
Recu par PARIS Fax System : 2006-07-18 - 11:45:03 - Page 4 sur 13

04/07 2006 18:19 FAX                                                    @006/010



International Chamber of Commerce
*The world business organization*
ICC International Court of Arbitration        Cour Internationale d'arbitrage de la CCI

ARBITRATION CASE N° 14736/EC

## ARBITRATOR'S DECLARATION OF ACCEPTANCE
## AND STATEMENT OF INDEPENDENCE

*(Please mark the relevant box or boxes)*

I, the undersigned,

**Name** __m - RENFREW__        **First Name** __CHARLES B.__

## ACCEPTANCE

☑    hereby declares that I accept to serve as arbitrator under the ICC Rules of Arbitration in the instant case. In so declaring, I confirm that I have familiarized myself with the requirements of the ICC Rules of Arbitration and am able and available to serve as an arbitrator in accordance with all of the requirements of those Rules and accept to be remunerated in accordance therewith.

## INDEPENDENCE

*(If you accept to serve as arbitrator, please also check one of the two following boxes. The choice of which box to check will be determined after you have taken into account, inter alia, whether there exists any past or present relationship, direct or indirect, with any of the parties or their counsel, whether financial, professional or of another kind and whether the nature of any such relationship is such that disclosure is called for pursuant to the criteria set out below. Any doubt should be resolved in favor of disclosure.)*

☑    I am independent of each of the parties and intend to remain so; to the best of my knowledge, there are no facts or circumstances, past or present, that need be disclosed because they might be of such nature as to call into question my independence in the eyes of any of the parties.

OR

☐    I am independent of each of the parties and intend to remain so; however, in consideration of Article 7, paragraphs 2 & 3 of the ICC Rules of Arbitration*, I wish to call your attention to the following facts or circumstances which I hereafter disclose because they might be of such a nature as to call into question my independence in the eyes of any of the parties. (Use separate sheet if necessary.)

## NON-ACCEPTANCE

☐    hereby declare that I decline to serve as arbitrator in the subject case. (If you wish to state the reasons for checking this box, please do so.)

Date: __July 12, 2006__        Signature: *[signature]*

*"Article 7 (2): "Before appointment or confirmation, a prospective arbitrator shall sign a statement of independence and disclose in writing to the Secretariat any facts or circumstances which might be of such a nature as to call into question the arbitrator's independence in the eyes of the parties. The Secretariat shall provide such*

*information to the parties in writing and fix a time limit for any comments from them."*
*Article 7 (3): "An arbitrator shall immediately disclose in writing to the Secretariat and to the parties any facts or circumstances of a similar nature which may arise during the arbitration."*

07/05

16/07 2006 11:38 FAX                                                                    005/013
07/12/06   11:35 FAX 415 397 7188     Recu par ... Fax System : 2006-07-12 - 11:45:03 - Page 5 sur 13

04/07 2006 18:20 FAX                                                                    007/010



**International Chamber of Commerce**
*The world business organization*

ICC International Court of Arbitration          Cour internationale d'arbitrage de la CCI

CASE N° 14236/EC

*For the confidential use of the ICC International Court of Arbitration and communication to the parties. To be completed in English.*

## CURRICULUM VITAE

NAME:   Renfrew                                    FIRST NAME:   Charles B

DATE OF BIRTH:   10/31/1928                         NATIONALITY(IES):   U.S.A.

PERSONAL ADDRESS:   3575 Clay Street, San Francisco, CA   94118

TELEPHONE: 415-929-7463     TELEFAX:   415-929-1757

E-MAIL:   brenfrew@earthlink.net

BUSINESS ADDRESS (including company or firm name where applicable):
710 Sansome Street
San Francisco, CA   94111

TELEPHONE:   415-397-3933     TELEFAX:   415-397-7188     MOBILE;   415-425-7464

E-MAIL:   None          WEBSITE:   None

*Please indicate which address you wish to be used for correspondence:*

☐  PERSONAL                          ☒  BUSINESS

09/05

Case 1:06-cv-00415-SLR    Document 35-8    Filed 10/16/2006    Page 24 of 45
18/07 2006 11:39 FAX                                                    ☒008/013
07/12/06  11:38 FAX 415 397 7188 Reçu par Panafax System : 2006-07-18 - 14:45:03 - Page 6 sur 13

*For the confidential use of the ICC International Court of Arbitration and communication to the parties. To be completed in English.*

**ACADEMIC DEGREES / QUALIFICATIONS:**

| | | |
|---|---|---|
| Princeton University | A.B. | 1952 |
| University of Michigan Law School | J.D. | 1956 |

**CURRENT PROFESSIONAL ACTIVITY(IES) AND POSITION(S):**

SEE ATTACHED C.V.

**PROFESSIONAL EXPERIENCE:**

SEE ATTACHED C.V.

**ADDITIONAL INFORMATION** *(Use separate sheet if necessary):*

**LANGUAGES** *(Mark all languages, including your native language, in which you consider yourself able to conduct an arbitration and to draft an award without the assistance of an interpreter or translator)*

| | | | |
|---|---|---|---|
| ☐ ARABIC | ☒ ENGLISH | ☐ FRENCH | ☐ GERMAN |
| ☐ ITALIAN | ☐ RUSSIAN | ☐ SPANISH | ☐ OTHER _____ |

Please indicate other languages of which you have good knowledge:

Date: July 12, 2006                    Signature: _Chas B Rnf_

09/05

18/07 2008 11:39 FAX                                                                          007/013
07/12/06   11:38 FAX 415 397 7188   Recu par   PERKINS & YAN SYSTEM : 2006-07-19   14:45:03 - Page 7 sur 13

## DISCLOSURE

## THE LEBANESE COMPANY FOR THE DEVELOPMENT AND

## RECONSTRUCTION OF BEIRUT CENTRAL DISTRICT. SAL (Lebanon) vs. 1.

## URS CORPORATION (U.S.A.) 2. RADIAN INTERNATIONAL LLC (U.S.A)

While I know of no facts or circumstances which may call into question

my independence as an arbitrator, I do disclose that I have been involved in

several other arbitrations where I was either the sole arbitrator or a party-

appointed arbitrator, selected by Mr. Dasteel, Counsel for Claimant.  None of

the other arbitrations involved any of the parties to the instant arbitration.  I

am not familiar with, do not know and have not performed any legal service or

had any other professional or personal relationship with either of the parties.

Dated:  July 12, 2006.

_____
CHARLES B. RENFREW

358325.01

18/07 2006 11:38 FAX    Case 1:06-cv-00415-SLR    Document 35-8    Filed 10/16/2006    Page 26 of 45
                                                                                                    @008/013
· 07/12/06  11:38 FAX 415 397 718 Recu par [Federal Vax System] : 2006-07-18 - 11:45:03 - Page 8 sur 13

## ADDITION DISCLOSURE

Judge Renfrew was jointly appointed as sole arbitrator in a matter between ARCO Alaska, Inc., and BP Exploration (Alaska), Inc., in 1994.

Judge Renfrew was a party appointed arbitrator on behalf of Taco Bell and KFC in a matter between Taco Bell, KFC and Systemhouse in 1996.

Judge Renfrew was a party appointed arbitrator on behalf of ARCO China, Inc., KUFPEC (China) and China National Offshore Oil Corporation in a matter against Castle Peak Power Company Ltd., in 1998-99 for one matter and in 2002 for a follow on matter.

Judge Renfrew was a party appointed arbitrator on behalf of URS Corporation in a matter against EG&G Technical Services in 2004.

Case 1:06-cv-00415-SLR    Document 35-8    Filed 10/16/2006    Page 27 of 45
16/07 2006 11:40 FAX                                                          Ø008/013
07/12/06  11:39 FAX 415 397 7138 Recu par FERRRR FaxXAS yWeTn : 2006-07-18  11:45:03 - P Ø009 sur 13

**CHARLES B. RENFREW**
Law Offices of Charles B. Renfrew
710 Sansome Street
San Francisco, CA 94111-1704
Telephone (415) 397-3933
Facsimile (415) 397-7138

**Employment:**     Law Offices of Charles B. Renfrew

Partner in LeBoeuf, Lamb, Greene & MacRae, L.L.P., San Francisco, from
November 1, 1993 through December 31, 1997.

Standard Oil Company of California from January 1, 1983 as Vice-President,
Legal Affairs. Elected Director on March 1, 1984. Corporate name changed to
Chevron Corporation on July 1, 1984, retired from Chevron on October 31, 1993.

Pillsbury, Madison & Sutro, San Francisco, from March 1, 1981 to December 31,
1982.

Deputy Attorney General of the United States, Washington, D.C., February 28,
1980 to February 28, 1981.

United States District Judge for the Northern District of California, San
Francisco, February 1 1972 to February 27, 1980.

Pillsbury, Madison & Sutro, San Francisco, from July 1956 to January 1972.

Instructor (part-time) at Boalt Hall School of Law, University of California,
Berkeley, 1977, 1978-79, 1979-80.

**Professional:**     Member of Bar Association of San Francisco
Member of State Bar of California since 1956
Member of American Bar Association since 1965
Member of Committee on Corporate Law Departments, 1985-1991
Member of Resource Development Council 1983-1988
Vice-Chairman of Antitrust Section, 1982-83
Council Member of Antitrust Section, 1978-82
Member of American Law Institute, 1978-
Member of American College of Trial Lawyers, 1981
Regent of American College of Trial Lawyers, 1990
Treasurer, American College of Trial Lawyers, 1993
President, American College of Trial Lawyers, 1995-1996
Member of American Judicature Society, 1983
Fellow of American Bar Foundation, 1983
Vice Chairman, California Blue Ribbon Commission on Jury Reform, 1996
Member of Association of General Counsel, 1985
Research Fellow of the Southwestern Legal Foundation, 1983; Trustee, 1990
Member of Advisory Board of International and Comparative Law Center, 1983;
Chairman, 1990-1993

Case 1:06-cv-00415-SLR    Document 35-8    Filed 10/16/2006    Page 28 of 45
18/07 2006 11:40 FAX                                                    @010/013
07/12/06  11:40 FAX 415 397 7188 Reçu par PMSER & Van Nest 2006-07-18  11:45:03 - Page 10 sur 13

**Professional:**  Member of San Francisco Lawyers Committee for Urban Affairs (San Francisco Branch of the National Committee for Civil Rights under Law) 1983; Co-Chairman, 1971-72

Member, Extraordinary Challenge Committee under United States-Canada Free Trade, 1988

Member of National Judicial Panel of Center for Public Resources, 1981; Director 1988; Chairman, Executive Committee, 1989-1994; Chairman, Board of Directors, 1995

Head of United States Delegation to Sixth United Nations Congress on the Prevention of Crime and the Treatment of Offenders, held in Caracas, Venezuela, 1980

Member of Council on the Role of Courts, U.S. Department of Justice, 1978-83

Chairman of Special Committee to Study the Problems of Discovery, Federal Judicial Center, 1978-79

Member of Special Committee to Propose Standards for Admission to Practice in the Federal Courts, United States Judicial Conference, 1976-79

Recipient, American Jewish Committee Learned Hand Award, July 1996

Member, American Bar Association Standing Committee on the Federal Judiciary, 1997

**Publications:**  Negotiation and Judicial Scrutiny of Settlement In Civil and Criminal Antitrust Cases, 57 Chicago Bar Record 130-143 (Nov.-Dec. 1975) 70 F.R.D. 495-507

Sentence Review by the Trial Court: A Proposal to Amend Rule 35, 51 Indiana Law Journal 355-366 (Winter 1976)

The Paper Label Sentences: An Evaluation, 86 Yale Law Journal 589-618 (March 1977)

Fiduciary Responsibilities Under the Pension Reform Act, 32 The Business Lawyer 1829-1836 (July 1977)

Affirmative Action: A Plea for a Rectification Principle, 9 Southwestern University Law Review 597-611 (1977)

Discovery Sanctions: A Judicial Perspective, 67 California Law Review 264-283 (March 1979)

Query: Did the Devitt Committee Find Problems Worthy of Its Solutions? 64 Judicature 58-59, 100 (August 1980)

**Affiliations:**  Ninth Judicial Circuit Historical Society, Board of Directors, 1987

Claremont university, Board of Fellows, 1986

Historical Society of United States District Court for the Northern District of California, Board of Directors, 1986

London Court of International Arbitration, 1990; Member of the Court, 1993

Grace Cathedral, Board of Trustees, 1986-1989

National Judicial College, Board of Directors, 1985-1991

National Crime Prevention Council, Board of Directors, 1982-1990

**Affiliations:**

NAACP Legal Defense and Educational Fund, Inc., Board of Directors, 1982; Chairman of Committee of the Bar, 1983; Co-Chairman of Northern California Committee, 1982
San Francisco Museum of Modern Art, Board of Trustees, 1991-1996
Supreme Court Historical Society, 1989
Chairman Membership Committee, 1992-1994
National Lawyers Council of Democratic National Committee, 1986
Antitrust Lawyers Advisory Committee of The Business Roundtable, 1986
Youth Guidance Center Improvement Committee, 1986
Center for National Policy, Member of National Advisory Board, 1982
Council of Foreign Relations, Member 1982

**Selected Former Affiliations:**

UNC Resources, Board of Directors, 1984-1996
Coro Foundation, Board of Directors, 1982-1985
Stanford Law School Board of Visitors, 1983-1986
University of Michigan Law School, Committee of Visitors, 1977-1981
Princeton University, Alumni Trustee, 1976-1980
Episcopal Diocese of California, Chairman of Convention, 1977, 1978, 1979
Council for Civic Unity, Board of Directors 1968-1972, President, 1971-1972
Lawyers Committee for urban Affairs, Chairman, 1971-1972
World Affairs Council of Northern California, Board of Trustees, 1984-1987
American Petroleum Institute, Board of Directors, 1984-1986
New York Stock Exchange, Member of Legal Advisory Committee, 1984-1987
Town School for Boys, trustee, 1972-1980
President of Board of trustees, 1975-1980
University of Chicago Law School Visiting Committee, 1977-1979
J. Reuben Clark Law School, Brigham Young University, 1981-1984
San Francisco Symphony, Board of Governors, 1974-1991

**Personal:**

Born in Detroit, Michigan on October 31, 1928
Resides in San Francisco, California

Princeton University, 1948-1952, AB 1952
University of Michigan Law School, 1954-1956, JD 1956

U.S. Navy (enlisted A/S to ETM3c), 1946-1948
U.S. Army (First Lieutenant), 1952-1953

19/07 2006 11:41 FAX                                                     @012/013
Reçu par Panis E-& System - 2006-07-10 - 11:45:03 - Page 12 sur 13

# CHARLES B. RENFREW

710 SANSOME STREET
SAN FRANCISCO, CA 94111-1784
TELEPHONE (415) 397-3933
FACSIMILIE (415) 397-7188

---

ANNOUNCES THE FORMATION OF HIS OFFICES
SPECIALIZING IN

ALTERNATIVE DISPUTE RESOLUTION
AND INTERNAL CORPORATE INVESTIGATIONS

JANUARY 1, 1998

---

JUDGE RENFREW HAS SERVED AS A
UNITED STATES DISTRICT JUDGE,
THE DEPUTY ATTORNEY GENERAL
OF THE UNITED STATES, THE
TOP CORPORATE LEGAL OFFICER
OF CHEVRON CORPORATION, AND
AS A DIRECTOR AND TRUSTEE
OF NUMEROUS BOARDS.
R
JUDGE RENFREW
HAS LONG BEEN A LEADER IN THE
DISPUTE RESOLUTION MOVEMENT.
HE IS ON A NATIONAL PANEL OF DISTINGUISHED
NEUTRALS OF THE CPR INSTITUTE FOR
DISPUTE RESOLUTION AND SERVES AS CHAIRMAN
OF THE BOARD OF DIRECTORS.
R
HE IS A MEMBER OF
THE LONDON COURT OF
INTERNATIONAL ARBITRATION.
HE HAS SERVED AS A NEUTRAL IN
EVERY TYPE OF ADR PROCEEDINGS,
INCLUDING EARLY NEUTRAL EVALUATION,
CONCILIATION, MEDIATION, MINI-TRIAL
AND ARBITRATION, AND SERVED AS WELL
AS COURT APPOINTED SPECIAL MASTER
AND MEDIATOR FOR VARIOUS COURTS.

Judge Renfrew graduated Phi Beta Kappa from Princeton University in 1952 and
from the University of Michigan Law School in 1956, where he was a member of

18/07 2006 11:42 FAX

the Law review and Order of the Coif. He served in the United States Navy (1946-1948) and was a forward observer in Korea for the United States Army (1952-1953).

He joined Pillsbury, Madison & Sutro in 1956, becoming a partner in 1965. In February 1972, he was appointed United States District Judge for the Northern District of California, where he served until February 1980. In 1980-1981, Judge Renfrew was Deputy Attorney General of the United States in Washington, D.C. Thereafter, he joined Pillsbury, Madison & Sutro for two years. In 1983, he became Vice President of Chevron Corporation, responsible for its legal affairs, and in 1984, a Director. After retiring from Chevron, he was a partner at LeBoeuf, Lamb, Greene & MacRae from 1993-1997.

Among his many professional associations, Mr. Renfrew has served as President of the American College of Trial Lawyers, as well as a Fellow, Regent and Treasurer. He was Vice Chairman of the Antitrust Section of the American Bar Association, and is currently on its Standing Committee on Federal Judiciary. He served as a member of the American Law Institute, the American Judicature Society, the Association of General Counsel, the Legal Advisory Committee of the New York Stock Exchange, and as Fellow of the American Bar Foundation, as Chairman of the Advisory Board of International and Comparative Law Center of the Southwestern Legal Foundation, as Chairman of the General Committee on Law, American Petroleum Institute, and as Chairman of the Special Committee to Study the Problem of Discovery of the Federal Judicial Center. He taught trial advocacy and other courses at Boalt Hall School of Law, University of California at Berkeley, California.

Judge Renfrew has been active in a wide range of community organizations, including service on the boards of Princeton University, Claremont University Center, the San Francisco Symphony, the San Francisco Museum of Modern Art, the NAACP Legal Defense and Education Fund, the Lawyer Committee for Civil Rights and the Council for Civic Unity. He has also served as a board member on a number of for-profit corporations.

7

**Skadden, Arps, Slate,**
**Meagher & Flom LLP**
300 South Grand Avenue
Los Angeles, California 90071-3144
U.S.A.

**White & Case LLP**
11, Boulevard de la Madeleine
75001 Paris
France

July 26, 2006

## VIA FACSIMILE AND E-MAIL

Mr. Eliseo Castineira
Counsel
Ms. Lara Hammoud
Assistant Counsel
Secretariat of the International Court of Arbitration
International Chamber of Commerce
38, Cours Albert 1er
75008 Paris
France

Re: **ICC Case No. 14208/EC**
Radian International LLC v. The Lebanese Company For The Development And
Reconstruction Of Beirut Central District, S.A.L.
**ICC Case No. 14236/EC**
The Lebanese Company For The Development And Reconstruction Of Beirut Central
District, S.A.L. v. URS Corporation and Radian International LLC

Dear Mr. Castineira and Ms. Hammoud:

In your letter dated June 16, 2006 in ICC Case No. 14236/EC, you noted that the
parties have agreed to attempt to jointly nominate the Chairman in that case. The parties
have further agreed to attempt to jointly nominate the same Chairman in ICC Case
No. 14208/EC, and are discussing the idea of possibly requesting that these two cases be
consolidated.

In this connection, the parties in both ICC Cases hereby jointly request the ICC
International Court of Arbitration (the "**ICC Court**") to propose to the parties the names of
10 candidates for Chairman in these two cases, each of whom has the following
qualifications:

  (1)    has an excellent command of the English language, written and spoken;

  (2)    is a lawyer with considerable experience of international arbitration, acting as
         arbitrator;

PARIS 959630.CX1

(3)    has experience of civil law and, Radian International LLC and URS Corporation request, of common law as well; and

(4)    while substantial experience of international construction disputes is desirable, it is not essential.

The parties request that the 10 candidates, if possible, be drawn from no fewer than five nationalities.

When the ICC Court supplies the names of such 10 candidates, it would be helpful if it could also supply to the parties copies of their C.V.s.

Once the parties have received the ICC Court's proposals, the parties will discuss the same and endeavor to agree on one of these candidates, or any other candidate they may want to consider, to act as the Chairman in both the above ICC Cases.

It is understood that, when considering candidates for Chairman, each party shall be free to contact the arbitrator it has nominated to discuss the candidates and to ensure, in advance, that such arbitrator will have no objection to any candidate the parties might agree upon.

Please confirm that the ICC Court can provide this assistance to the parties. If so, the parties will look forward to receiving the ICC Court's proposals in due course.

We thank you for your attention.

Very truly yours,

*Christ R. Seppälä*

Jeffrey H. Dasteel
**Skadden, Arps, Slate,**
**Meagher & Flom LLP**

Christopher R. Seppälä
White & Case LLP

cc:    Dr. Ghaleb Mahmassani
General Counsel
SOLIDERE
Serhal Building
Cairo Street – Hamra
Beirut
Lebanon

(Via facsimile: + 961 1 348 712)

Keryl Nairn, Esq.                      (Via facsimile: +44 20 75 19 70 70)
Skadden, Arps, Slate, Meagher & Flom LLP
40 Bank Street
Canary Wharf
London E14 5DS
United Kingdom

8

# FACSIMILE

WHITE & CASE

White & Case LLP
Avocats au Barreau de Paris
Toque Générale : J 002
11, Boulevard de la Madeleine
75001 Paris

Tel  + 33 1 55 04 15 15
Fax  + 33 1 55 04 15 16
www.whitecase.com

Direct Dial : (33 1) 55 04 15 45    cseppala@whitecase.com

| | | |
|---|---|---|
| **Date:** | July 26, 2006 | **No. of Pages (including cover):**    4 |
| **To:** | Mr. Eliseo Castineira<br>Counsel<br>Ms. Lara Hammoud<br>Assistant Counsel<br>Secretariat of the ICC International<br>Court of Arbitration<br>Paris, France | **Fax Number:**    01 49 53 57 75<br>Contact Number.    01 49 53 29 06 |
| **cc:** | Skadden, Arps, Slate, Meagher & Flom LLP<br>Los Angeles, U.S.A.<br>Attn.: Jeffrey H. Dasteel, Jason D. Russell and Marina<br>V. Bogorad, Esqs. | (1 213) 621 52 06<br>(1 213) 687 50 00 |
| | Skadden, Arps, Slate, Meagher & Flom (UK) LLP<br>London, United Kingdom<br>Attn.: Karyl Naim, Esq. | (44 20) 75 19 70 70<br>(44 20) 7519 70 00 |
| | Dr. Ghaleb Mahmassani<br>General Counsel<br>SOLIDERE<br>Beirut, Lebanon | (961 1) 348 712<br>(961 1) 349 777 |
| **From:** | Christopher R. Seppälä | **Reference No.:**    23707 |
| **Re:** | **ICC Case No. 14208/EC**<br>Radian International LLC v. The Lebanese Company For The Development And<br>Reconstruction Of Beirut Central District, S.A.L.<br>**ICC Case No. 14236/EC**<br>The Lebanese Company For The Development And Reconstruction Of Beirut<br>Central District, S.A.L. ("SOLIDERE") v. URS Corporation and Radian<br>International LLC | |

**PLEASE NOTE:** The information contained in this facsimile message is privileged and confidential, and is intended only for the use of the individual named above and others who have been specifically authorized to receive it. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please contact sender or call + 33 1 55 04 15 15. Thank you.

ALMATY   ANKARA   BANGKOK   BEIJING   BERLIN   BRATISLAVA   BRUXELLES   BUDAPEST   DRESDE   DÜSSELDORF   FRANKFURT   HAMBOURG   HELSINKI
HO CHI MINH VILLE   HONG KONG   ISTANBUL   JOHANNESBURG   LONDRES   LOS ANGELES   MEXICO   MIAMI   MILAN   MOSCOU   MUMBAI   NEW YORK
PALO ALTO   PARIS   PRAGUE   RIAD   SAN FRANCISCO   SÃO PAULO   SHANGHAI   SINGAPOUR   STOCKHOLM   TOKYO   VARSOVIE   WASHINGTON, DC

Paris

WHITE & CASE

July 26, 2006

Dear Mr. Castineira and Ms. Hammoud:

As you know, the parties have agreed to attempt jointly to nominate the Chairman in the above two cases.

In this connection, I have agreed with Mr. Jeffrey Dasteel of Skadden, Arps, Slate, Meagher & Flom LLP, counsel for Radian International LLC and URS Corporation, on the terms of the enclosed letter to the ICC, dated today, which I have duly signed, requesting the ICC Court to propose the names of candidates for Chairman in the above two cases. Mr. Dasteel has authorized me to tell you that he agrees with the terms of the enclosed letter but you will, undoubtedly, want written confirmation from him to this effect, which I am confident he will provide.

Given the time it is likely to take the ICC Court to make such a proposal, I expect that you will need to extend the time allowed to the parties to make a joint nomination of a Chairman, which is currently due to expire on August 1, 2006 (*e.g.*, *see* our letter dated June 9, 2006 in ICC Case No. 14236/EC). I would suggest that the new time period (say, 30 days) run from the date of the ICC Court's proposal to the parties.

Please let me know if I may be of further assistance.

Very truly yours,

*Chris R. Seppälä*

Christopher R. Seppälä

**9**

Recu par Paris Fax System : 2006-07-27 - 20:15:14 - Page 2 sur 3

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA 90071-3144

TEL. (213) 687-5000
FAX: (213) 687-5600
www.skadden.com

July 27, 2006

DIRECT DIAL
213-687-5208
DIRECT FAX
213-621-5208
EMAIL ADDRESS
JDASTEEL@SKADDEN.COM

AFFILIATE OFFICES

BOSTON
CHICAGO
HOUSTON
NEWARK
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

### VIA FACSIMILE (+ 33 1 49 53 57 75)

Mr. Eliseo Castineira
Counsel
Ms. Lara Hammoud
Assistant Counsel
Secretariat of the International Court of Arbitration
International Chamber of Commerce
38, Cours Albert 1 er
75008 Paris

RE:   **ICC Case No. 14208/EC**
Radian International LLC v. The Lebanese Company for the Development
and Reconstruction of Beirut Central District, S.A.L.
**ICC Case No 14236/EC**
The Lebanese Company for the Development and Reconstruction of
Beirut Central District, S.A.L. v. URS Corporation and
Radian International LLC

Dear Mr. Castineira and Ms. Hammoud:

This is to confirm that our clients Radian International LLC and URS
Corporation concur with the letters sent to you by Claimant, dated July 26, 2006,
regarding the appointment of a chair in the above referenced cases, including the
request for extension of time for the parties to consult on the selection of the chair
following receipt of a list of proposed chairs from the ICC Court

I trust that this letter is sufficient authorization from us to enable you
to proceed accordingly.

Very truly yours,

Mr. Eliseo Castineira and Ms. Hammoud
July 27, 2006
Page 2

cc:   Christopher R. Seppälä                    (Via facsimile: + 33 1 55 04 15 16)
      White & Case
      Avocats au Barreau de Paris
      Toque Générale: J 002
      11, Boulevard de la Madeleine
      75001 Paris

      Karyl Nairn, Esq.                         (Via facsimile: + 44 20 75 19 7070)
      Skadden Arps Slate Meagher & Flom LLP
      40 Bank Street
      Canary Wharf
      London E14 5DS
      United Kingdom

      Dr. Ghaleb Mahmassani                     (Via facsimile: + 961 1 348 712)
      General Counsel
      SOLIDÈRE
      Serhal Building
      Cairo Street - Hamra
      Beirut
      Lebanon

~~Recu por Paris Fax System : 2006-10-09 - 20.44.53 - Page 1 sur 3~~

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3144

TELEPHONE NO.: (213) 687-5000
FACSIMILE NO.: (213) 687-5600

EMAIL: ljohnsto@skadden.com

## FACSIMILE TRANSMITTAL SHEET

FROM: Lisa G. Johnston                          DATE: October 9, 2006
DIRECT DIAL: 213-687-5135                        FLOOR/OFFICE NO: 3569
DIRECT FACSIMILE: 213-621-5135

THIS FACSIMILE IS INTENDED ONLY FOR USE OF THE ADDRESSEE(S) NAMED HEREIN AND MAY CONTAIN LEGALLY PRIVILEGED AND/OR CONFIDENTIAL INFORMATION. IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS FACSIMILE, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS FACSIMILE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL FACSIMILE TO US AT THE ADDRESS ABOVE VIA THE LOCAL POSTAL SERVICE. WE WILL REIMBURSE ANY COSTS YOU INCUR IN NOTIFYING US AND RETURNING THE FACSIMILE TO US.

IF THIS TRANSMISSION IS UNCLEAR OR INCOMPLETE, PLEASE CONTACT THE FACSIMILE DEPARTMENT AT (213) 687-5443
WHEN TRANSMITTING TO OUR MACHINES, PLEASE INCLUDE YOUR COVER SHEET AND NUMBER ALL PAGES CONSECUTIVELY.

TOTAL NUMBER OF PAGES INCLUDING COVER(S):    3

PLEASE DELIVER THE FOLLOWING PAGE(S) TO:

1. NAME: Eliseo Castrineira, Lara Hammoud          FIRM: ICC
   CITY: Paris, France                             TELEPHONE NO.: 011 33 1 49 53 29 06
   FACSIMILE NO.: 011 33 1 49 53 57 75 or
                  011 33 1 49 53 29 29/33

2. NAME: Christopher R. Seppala                     FIRM: White & Case
   CITY: Paris, France                             TELEPHONE NO: 011 33 1 55 04 15 15
   FACSIMILE NO: 011 33 1 55 04 15 16

3. NAME: Dr. Ghaleb S. Mahmassani                   FIRM:
   CITY: Beirut, Lebanon                           TELEPHONE NO: 011 961 1 349 777
   FACSIMILE NO: 011 961 1 348 712

4. NAME: Karyl Nairn                                FIRM: Skadden Arps Slate Meagher & Flom
   CITY: London, England                           TELEPHONE NO.: 011 44 20 7519 7000
   FACSIMILE NO.: 011 44 20 7519 7070

MESSAGE.
RE:
ICC Case No: 14208/EC
Radian International LLC v. The Lebanese Company for the Development and Reconstruction of Beirut Central District;

ICC Case No: 14236/EC
The Lebanese Company for the Development and Reconstruction of Beirut Central District v. Radian International LLC and URS Corporation

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3144

TEL: (213) 687-5000
FAX (213) 687-5600
www.skadden.com

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
NEWARK
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D C
WILMINGTON
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

DIRECT DIAL
215-687-5200
DIRECT FAX
215-621-5205
EMAIL ADDRESS
.OASTESS@SKADDEN.COM

October 9, 2006

### VIA FACSIMILE AND ELECTRONIC MAIL

Mr. Eliseo Castineira
Counsel
Ms. Lara Hammoud
Assistant Counsel
Secretariat of the International Court of Arbitration
International Chamber of Commerce
38, Cours Albert 1 er
75008 Paris

RE:  **ICC Case No. 14208/EC,** Radian International LLC v. The Lebanese
Company for the Development and Reconstruction of Beirut Central District,
S.A.L.;

**ICC Case No 14236/EC,** The Lebanese Company for the Development and
Reconstruction of beirut Central District, S.A.L. v, URS Corporation and
Radian International LLC

Dear Mr. Castineira and Ms. Hammoud:

We write on behalf of Radian International LLC and URS
Corporation and with the permission of counsel for The Lebanese Company for the
Development and Reconstruction of Beirut Central District. The parties thank the
ICC for its efforts in helping the parties to select a chair for the above referenced
matters. The parties have jointly agreed to nominate Mr. Bernard Hanotiau as the
chair for each of the above referenced matters.

The parties would very much appreciate it if the ICC would proceed
to contact Mr. Hanotiau to determine his willingness to serve.

Mr. Eliseo Castineira and Ms. Hammoud
October 9, 2006
Page 2

Finally, we note that to date the parties have not agreed to consolidate the above two referenced matters.

Very truly yours,

H. Dasteel

cc:     Christopher R. Seppälä           (Via facsimile: + 33 1 55 04 15 16)
        White & Case
        Avocats au Barreau de Paris
        Toque Générale: J 002
        11, Boulevard de la Madeleine
        75001 Paris

        Karyl Nairn, Esq.                (Via facsimile: + 44 20 75 19 7070)
        Skadden Arps Slate Meagher & Flom LLP
        40 Bank Street
        Canary Wharf
        London E14 5DS
        United Kingdom

        Dr. Ghaleb Mahmassani            (Via facsimile: + 961 1 348 712)
        General Counsel
        SOLIDERE
        Serhal Building
        Cairo Street - Hamra
        Beirut
        Lebanon

450305.04-Los Angeles Server 2A - MSW

WHITE & CASE

White & Case LLP
Avocats au Barreau de Paris
Toque Générale : J 002
11, Boulevard de la Madeleine
75001 Paris

Tel  + 33 1 55 04 15 15
Fax  + 33 1 55 04 15 16
www.whitecase.com

Direct Dial + (33 1) 55 04 15 45    eseppala@whitecase.com

October 10, 2006

## VIA FACSIMILE (+33 1 49 53 57 75) AND VIA E-MAIL

Mr. Eliseo Castineira
Counsel
Ms. Lara Hammoud
Assistant Counsel
Secretariat of the International Court of Arbitration
International Chamber of Commerce
38 Cours Albert 1er
75008 Paris

Re:  **ICC Case No. 14208/EC**
Radian International LLC v. The Lebanese Company For The Development
And Reconstruction Of Beirut Central District, S.A.L. ("SOLIDERE")

**ICC Case No. 14236/EC**
The Lebanese Company For The Development And Reconstruction Of Beirut
Central District, S.A.L. ("SOLIDERE") v. URS Corporation and Radian
International LLC

Dear Mr. Castineira and Ms. Hammoud:

With reference to the letter dated October 9, 2006 of Mr. Jeffrey Dasteel of Skadden,
Arps, Slate, Meagher & Flom LLP to you, and on behalf of SOLIDERE, I confirm our
agreement to the nomination of Mr. Bernard Hanotiau as the chair for each of the

ERROR: ioerror
OFFENDING COMMAND: image

STACK:

-dictionary~
-savelevel-

# EXHIBIT E

INTERNATIONAL CHAMBER OF COMMERCE
INTERNATIONAL COURT OF ARBITRATION
ICC Case No. 14236/EC

THE LEBANESE COMPANY FOR THE
DEVELOPMENT AND RECONSTRUCTION OF
BEIRUT CENTRAL DISTRICT SAL
("SOLIDERE")

Claimant

v.

URS CORPORATION

AND

RADIAN INTERNATIONAL LLC

Respondents

**RESPONDENT URS
CORPORATION'S OBJECTIONS
TO JURISDICTION**

June 30, 2006

**Skadden, Arps, Slate, Meagher & Flom LLP**
300 South Grand Ave, Suite 3400
Los Angeles, California 90071
United Sates

**Skadden, Arps, Slate, Meagher & Flom (UK) LLP**
40 Bank Street
Canary Wharf
London
E14 5DS

Counsel for the Respondent URS Corporation

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ......................................................................... iii

1.    INTRODUCTION ........................................................................... 1

2.    THE PARTIES ................................................................................ 5

The Claimant ....................................................................................... 5

The Respondents ................................................................................. 6

URS CORPORATION .......................................................................... 6

RADIAN INTERNATIONAL LLC ..................................................... 7

3.    THE CONTRACT .......................................................................... 8

4.    LACK OF AGREEMENT TO ARBITRATE ................................. 8

5.    THE APPOINTMENT OF THE ARBITRAL TRIBUNAL ........... 8

6.    LACK OF JURISDICTION OVER SOLIDERE'S CLAIMS
      AGAINST URS ............................................................................. 8

FACTUAL AND PROCEDURAL BACKGROUND ............................. 9

    (a)    Radian's Contract with Solidere ......................................... 9

    (b)    Radian's Independent Performance under the Contract ...... 13

    (c)    Prior ICC Arbitration between Radian and Solidere .......... 16

    (d)    Proceedings before the ICC Court in connection with the
           Request .......................................................................... 19

THE ARBITRABILITY OF SOLIDERE'S CLAIMS AGAINST URS MUST
BE DECIDED BY AN AMERICAN COURT UNDER AMERICAN LAW ............ 20

    (a)    Under American law, the arbitrability issue must be resolved by
           an American court, not this Tribunal ................................. 20

    (b)    Were this Tribunal to undertake the jurisdictional analysis and
           apply substantive American law, none of Solidere's
           jurisdictional theories asserted against URS would withstand
           scrutiny ........................................................................ 23

        1.    Veil-piercing/alter ego ............................................. 24

            (a)    The Standard For Veil-Piercing ..................... 24

|  | (b) | There Are No Facts To Justify Veil-Piercing............27 |

|  | (c) | The Materials Cited By Solidere Are False, Incomplete, or Irrelevant Under American Law..........28 |

|  | (d) | Solidere Does Not Allege, Nor Show, That URS Used Radian For No Purpose Other Than Fraud ..............................................................38 |

2. Estoppel.........................................................................39

3. Agency...........................................................................40

4. Incorporation by reference............................................41

5. Assumption of Contractual Obligation To Arbitrate............41

6. Third-Party Beneficiary..................................................42

EVEN IF THE TRIBUNAL WERE TO RULE ON ITS OWN
JURISDICTION AND APPLIED SOME FORM OF THE "GROUP OF
COMPANIES" PRINCIPLES, URS SHOULD NOT BE BOUND BY THE
ARBITRATION AGREEMENT SIGNED BY RADIAN...........................................43

REGARDLESS OF WHAT LAW SHOULD APPLY, SOLIDERE SHOULD
BE ESTOPPED FROM PROCEEDING AGAINST URS BASED ON
SOLIDERE'S CONDUCT IN THE PRIOR ARBITRATION..........................................45

7. REQUEST FOR RELIEF ........................................................................48

8. RESERVATION OF RIGHTS ....................................................................48

TABLE OF AUTHORITIES

**CASES**                                                                      **PAGES**

Action Manufacturing Co. v. Simon Wrecking Co.,
    375 F. Supp. 2d 411 (E.D. Pa. 2005).............................................29, 32

In re Acushnet River & New Bedford Harbor Proceedings Re Alleged PCB Pollution,
    675 F. Supp. 22 (D. Mass. 1987) ................................................28, 30

Akzona Inc. v. E.I. Du Pont De Nemours & Co.,
    607 F. Supp. 227 (D. Del. 1984)................................................33, 35

AT&T Technologies, Inc. v. Communications Workers of America,
    475 U.S. 643 (1986)................................................................21

Avery Dennison Corp. v. UCB SA,
    No. 95 C 6351, 1997 WL 441313 (N.D. Ill. July 30, 1997)..................35

Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. -
Pension Fund v. Centra,
    983 F.2d 495 (3rd Cir. 1992)....................................................45

China Minmetals Materials Import & Export Co. v. Chi Mei Corp.,
    334 F.3d 274 (3d Cir. 2003) .....................................................22

Corporate Safe Specialists, Inc. v. Tidel Technologies, Inc.
    No. 05 C 3421, 2005 WL 1705826 (N.D. Ill. July 15, 2005) ...............34

Creditors' Committee of Essex Builders, Inc. v. Farmers Bank,
    251 A.2d 546 (Del. 1969)........................................................41

Croyle v. Texas Eastern Corp.,
    464 F. Supp. 377 (W.D. Pa. 1979)..............................................29

CTS Corp. v. Dynamics Corp. of America,
    481 U.S. 69 (1987)................................................................23

Doe v. Unocal Corp.,
    248 F.3d 915 (9th Cir. 2001) ....................................................38

Edward D. Jones & Co. v. Sorrells,
    957 F.2d 509 (7th Cir. 1992) .....................................................5

E.I. DuPont De Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates,
S.A.S.,
    269 F.3d 187 (3d Cir. 2001) ............................................39, 40, 43

First Options of Chicago, Inc. v. Kaplan,
    514 U.S. 938 (1995)...........................................................21, 23

Fletcher v. Atex, Inc.,
  68 F.3d 1451 (2d Cir. 1995) ...............................................................30

Groca v. Alpha Therapeutic Corp.,
  19 F. Supp. 2d 862 (N.D. Ill. 1998)...............................................31, 32, 34

Harco National Insurance Co. v. Green Farms, Inc.,
  Civ. A. No. 1131, 1989 WL 110537 (Del. Ch. Sept. 19, 1989) ......................26, 27

Harper v. Delaware Valley Broadcasters, Inc.,
  743 F. Supp. 1076 (D. Del. 1990), aff'd, 932 F.2d 959 (3d Cir. 1991).....................26

Hoechst Celanese Corp. v. National Union Fire Insurance Co. of Pittsburgh, Pa.,
  No. Civ. A. 89-C-SE-35, 1995 WL 411795 (Del. Super. Ct. Mar. 31, 1995) ...31, 32

Household Int'l, Inc. v. Westchester Fire Ins. Co.,
  286 F. Supp. 2d 369 (D. Del. 2003)............................................................45

Howsam v. Dean Witter Reynolds, Inc.,
  537 U.S. 79 (2002).............................................................................21

InterGen N.V. v. Grina,
  344 F.3d 134 (1st Cir. 2003)...........................................................24, 43

Irwin & Leighton, Inc. v. W.M. Anderson Co.,
  532 A.2d 983 (Del. Ch. 1987) ................................................................27

Kaplan v. First Options of Chicago, Inc.,
  19 F.3d 1503 (3rd Cir. 1994), aff'd, 514 U.S. 938 (1995) ...........................25

LaSalle National Bank v. Vitro,
  85 F. Supp. 2d 857 (N.D. Ill. 2000)...........................................................33

Lubrizol Corp. v. Exxon Corp.,
  929 F.2d 960 (3rd Cir. 1991) ...............................................................48

Mars, Inc. v. Nippon Conlux Kabushiki-Kaisha,
  855 F. Supp. 673 (D. Del. 1994), aff'd, 58 F.3d 616 (Fed. Cir. 1995).....................45

Masefield AG v. Colonial Oil Industries, Inc.,
  No. 05 Civ. 2231 (PKL), 2005 WL 911770
  (S.D.N.Y. Apr. 18, 2005)...........................................................23, 25, 30, 40

Ministry of Defense v. Gould, Inc.,
  969 F.2d 764 (9th Cir. 1992) .................................................................35

Mobil Oil Corp. v. Linear Films, Inc.,
  718 F. Supp. 260 (D. Del. 1989)...............................................................24

Northeastern Power Co. v. Balcke-Durr, Inc.,
  49 F. Supp. 2d 783 (E.D. Pa. 1999)...........................................................29

iv

Pearson v. Component Technology Corp.,
   247 F.3d 471 (3d Cir. 2001) ........................................................................28, 30

In re Phillips Petroleum Securities Litigation,
   738 F. Supp. 825 (D. Del. 1990).................................................................24, 28

Realty Growth Investors v. Council of Unit Owners,
   453 A.2d 450 (Del. 1982) ....................................................................................41

Sarhank Group v. Oracle Corp.,
   404 F. 3d 657 (2nd Cir. 2005) ......................................................................22, 23

Savin Corp. v. Heritage Copy Products, Inc.,
   661 F. Supp. 463 (M.D. Pa. 1987)......................................................................29

Sears, Roebuck & Co. v. Sears plc,
   744 F. Supp. 1297 (D. Del. 1990).......................................................................26

Thomson-CSF, S.A. v. American Arbitration Ass'n,
   64 F.3d 773 (2d Cir. 1995) .............................................................24, 39, 40, 41

Trustees of Village of Arden v. Unity Construction Co.,
   No. C.A. 15025, 2000 WL 130627 (Del. Ch. Jan. 26, 2000) .............................25

United States v. Bestfoods,
   524 U.S. 51 (1998)................................................................................21, 34, 37, 38

United States v. Funds Held in the Name or for the Benefit of Wetterer,
   210 F. 3d 96 (2nd Cir. 2000) ..............................................................................24

Upjohn Co. v. Syntro Corp.,
   No. Civ. A. 89-107-JJF, 1990 WL 79232 (D. Del. Mar. 9, 1990) .............30, 32, 35

Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood,
   752 A.2d 1175 (Del. Ch. 1999) .................................................................2, 25, 38

## OTHER AUTHORITIES

28 Am. Jur. 2d Estoppel and Waiver § 28 (2000) ............................................................46

Emmanuel Gaillard, *L'Interdiction de se contredire au détriment d'autrui comme
principe général du droit du commerce international (le principe de l'estoppel dans
quelques sentences arbitrales récentes)*, REVUE DE L'ARBITRAGE 241 (1985). ........46

Fouchard, Gaillard, Goldman, International Commercial Arbitration (eds. 1999) .....44

## 1.    INTRODUCTION

1.1    Pursuant to Articles 5, 6(2) and 6(4) of the ICC Rules of Arbitration ("the ICC Rules"), URS Corporation ("URS") hereby responds to the Request for Arbitration (the "Request") of the Lebanese Company for the Development and Reconstruction of Beirut Central District S.A.L. ("Solidere") dated 13 February 2006 by objecting to jurisdiction of the ICC arbitral tribunal (the "Tribunal") over Solidere's claims against URS. Because URS is not a party to any agreement to arbitrate with Solidere, the Tribunal has no power to adjudicate any claims against URS asserted by Solidere.

1.2    Except as expressly admitted below, URS denies generally and specifically each and every allegation in the Request.

1.3    The Request arises under a written agreement, effective as of 25 January 1999, by which Solidere engaged Radian International LLC ("Radian") to carry out and complete certain works ("the Works") in that area of Beirut defined by Decree 2236 dated 19 February 1992, which includes the reclaimed land defined by Decree 4830 dated 4 March 1994 and Decree 5609 dated 3 September 1994, commonly known as the Normandy Landfill ("the Contract").

1.4    Radian and Solidere are the only signatories to the Contract and hence the only parties to the arbitration agreement in the Contract. (See Request, Ex. C 19.) Neither at the time Radian and Solidere commenced negotiations to enter into the Contract, nor at the time when the Contract was executed, did Radian have any relation to URS. The only connection between URS and Radian is that URS purchased Radian's ultimate corporate parent, Dames & Moore, in June of 1999 – some six months after Radian entered into the Contract with Solidere.    Consequently, Radian became an indirect subsidiary of URS. Although Radian is an indirect subsidiary of URS, Radian is a separate and distinct legal entity that observes all the necessary formalities, and carries out operations as a separate company with its own offices and employees.

1.5    Unhappy with the agreement that it negotiated with Radian, Solidere now apparently sees some strategic advantage in trying to drag URS into this

1

arbitration proceeding with Radian. To accomplish its strategic ends, Solidere has concocted a series of arguments to justify forcing URS to arbitrate here, even though URS is not a party or a signatory to the Contract, has no relationship with Solidere, and engaged in no conduct under or relating to the Contract that would justify imposing on it any obligation to arbitrate before this Tribunal. Quite tellingly, Solidere first raised its contention that URS was responsible under the Contract <u>nearly six and a half years after URS first acquired Radian's corporate parent</u>.

1.6     Solidere has never disputed that URS is not a party to the Contract. Solidere also has never seriously contended that URS itself performed the actual Works under the Contract. Instead, Solidere has seized on the fact that URS, as any owner of a subsidiary would, has taken steps to monitor the Works under the Contract and the previous arbitration proceedings between Solidere and Radian to argue that URS somehow "implied[ly] consent[ed]" to assume Radian's obligations under the Contract. Solidere also has asserted that URS should be treated as the alter ego of Radian, but the only "facts" that it has articulated comprise nothing more than features present in any ordinary parent-subsidiary relationship, facts that fall far short of the "exceptional circumstances" that must be established by clear and convincing evidence to disregard the corporate separateness of two legally distinct entities under American law. In particular, the applicable American law requires a showing of "[f]raud or something like it" to pierce the corporate veil. <u>Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood</u>, 752 A.2d 1175, 1183-84 (Del. Ch. 1999) (for a Delaware court to pierce the corporate veil, "effectively, the [dominated] corporation must be a sham and exist for no other purpose than as a vehicle for fraud"). Here, Solidere does not even <u>allege</u>, much less cite any evidence, that would meet this extraordinarily heavy burden. The reason, of course, is that there is no basis for such a claim.

1.7     Solidere's position is newly-minted. Solidere previously arbitrated against Radian the substance of some of the very claims it now seeks to arbitrate against URS in the ICC Case No. 12727/EC (the "Prior Arbitration") and never once asserted in the Prior Arbitration that URS "implied[ly]

2

consent[ed]" to assume obligations under the Contract or that it was the real party in interest or an "alter ego" of Radian.[1] Quite the contrary, Solidere negotiated a memorandum of understanding with Radian in May of 2003, which established the parties to the Prior Arbitration, the scope of claims, and other procedural items relating to the conduct of that proceeding. Although Solidere was aware of all facts that it offers now, Solidere did not assert that URS was a proper party to the Prior Arbitration, never objected when URS was not included, and made no effort whatsoever to include URS in the Prior Arbitration in any way.

1.8    Further, Solidere never took any actions against URS under the Contract until it determined that there was tactical advantage to dragging in URS, as the perceived "deep-pocket" respondent. Solidere's new-found position is not only belied by the Contract's terms and the conduct of the parties under that Contract, but also by Solidere's own negotiating positions leading up to the execution of the Contract.

1.9    Prior to entering into the Contract with Radian, Solidere was well-aware that Radian was owned by two subsidiaries of The Dow Chemical Company and yet never obtained any guarantee of Radian's performance from its affiliates or corporate parents. Similarly, when Solidere executed the Contract in January of 1999, and Radian was then owned by Dames & Moore, Solidere never asked for or received any guarantee from Dames & Moore. Instead, fully aware of the corporate relationship that Radian had with its corporate parents, Solidere sought an $8.2 million performance guarantee bond (via performance letter guarantee) from Radian, which was given, as well as certain insurance coverage, which was obtained.

---

[1]    Although Solidere raised certain issues in the Prior Arbitration, such as the gas emissions issue and the claims regarding excavation and treatment, the arbitrators did not rule on all the issues raised. For instance, the arbitrators did not rule on methods to measure for FSQs; and, the arbitrators did not rule on whether Radian properly excavated or treated the material at the site. The arbitrators provided a conclusion that whatever the cause, the end product did not meet the contract standards, was not fit for purpose, and the FSQs must be measured in situ to determine whether the end product meets the contract requirements.

3

1.10    Even after URS purchased Dames & Moore, and Solidere was expressly informed of the change in ownership, Solidere never asked for any alteration in the terms of the Contract, nor sought any form of guarantees from URS to secure Radian's performance under the Contract. Nor was such a request necessary or appropriate as Radian did not change in any way its performance under the Contract. Radian continued to use the same employees, at the same locations, and work with the same sub-contractors as before. Indeed, the letter sent by URS to Solidere expressly noted that each of the subsidiaries acquired by URS from the Dames & Moore Group would "continue to operate as separate subsidiaries under their existing names, although all correspondence is now on URS Corporation letterhead" and that "Radian International, LLC has not changed its corporate name. It continues to operate as a separate subsidiary under its own, current name." (See Request, Ex. C 36.) Moreover, URS expressly stated that there would be "no change" in Radian's performance under the Contract. (Id.)

1.11    Other than noting on its letterhead that Radian was now a URS subsidiary, there was no change at all as far as Solidere was concerned. Solidere alleges that URS purportedly acknowledged responsibility under the Contract and expressly assumed obligations under that agreement. (See Request ¶¶ 176-177.) However, the very document offered by Solidere (see id., Ex. C 36) belies this assertion and makes clear that URS at no time expressly stated that it was assuming any responsibility under the Contract, and instead stated that there would be "no change" in Solidere's relationship with Radian because Radian would "continue[] to operate as a separate subsidiary under its own, current name." (Id.)

1.12    Now, unhappy with the terms of the Contract it negotiated, Solidere is seeking to re-write the Contract terms to obtain rights that it could have sought, but did not seek and never received. URS has not consented either to the ICC Court's 2 June 2006 referral of the threshold question of arbitrability to this Tribunal or to any determination by this Tribunal on whether Solidere and URS must arbitrate the claims asserted by Solidere in the Request. On the contrary, URS vigorously objected to the ICC Court and this Tribunal's jurisdiction over it,

4

URS has the absolute right to have any claim that it must arbitrate be litigated and resolved in a United States court applying the laws of Delaware, where URS is incorporated.

1.13    Accordingly, URS has initiated a separate proceeding in the United States District Court for the District of Delaware, seeking to enjoin Solidere from proceeding with this arbitration and obtain a judgment declaring that URS is not bound by the arbitration agreement contained in the Contract between Solidere and Radian. (See URS Ex. 1 (URS Corporation's Complaint for Declaratory and Injunctive Relief, filed on June 30, 2006).)[2]  Furthermore, unless Solidere agrees to stay these proceedings pending a determination by the United States District Court for the District of Delaware, URS intends to seek a preliminary injunction against Solidere's proceeding with its claims against URS before this Tribunal.

1.14    Consequently, this Tribunal should refuse to exercise jurisdiction over Solidere's claims against URS and defer to the American courts.

## 2.    THE PARTIES

### The Claimant

2.1    Based on and in accordance with Lebanese Law 117 of 1991, the Claimant was constituted as a joint stock company with the object of redeveloping the Beirut Central District, following the damage to that area sustained during the Lebanese civil war, which lasted from 1975 to 1990.    The Claimant is commonly known as Solidere.

2.2    The Claimant's last known principal place of business and address is Building 150, Marfaa, Saad Zaghloul Street, off Foch Street, P.O. Box 119493, Beirut, Lebanon.

---

[2]    URS does not waive its right of recourse to an American court by objecting to the Tribunal's jurisdiction here. See Edward D. Jones & Co. v. Sorrells, 957 F.2d 509, 514 n.7 (7th Cir. 1992) ("A party's efforts to alert an arbitration panel to its lack of jurisdiction over some of the claims before it is not a waiver of that party's substantive right to have a federal court determine the scope of the arbitrator's jurisdiction.").

2.3    The Claimant is represented in this arbitration by:

> Dr. Ghaleb Mahmassani
> Serhal Building
> Cairo Street – Hamra
> Beirut
> Lebanon
> Tel:    (961 1) 349 777 - 349 988
> Fax:    (961 1) 348 712

> White & Case LLP
> 11 Boulevard de la Madeline
> 75001 Paris
> France
> Telephone:    +33(1)55041515
> Fax:          +33(1)55041516
> Attention:    Christopher R. Seppälä

**The Respondents**

**URS CORPORATION**

2.4    Respondent URS Corporation, without waiving its above-stated objections to jurisdiction of this Tribunal, states that it is a corporation organized under and in accordance with the laws of the State of Delaware in the United States of America.  URS is an engineering design firm providing a comprehensive range of professional planning, design, systems engineering and technical assistance, program and construction management, and operations and maintenance services.

2.5    URS's address is:

> 600 Montgomery Street, 26th Floor
> San Francisco, California 94111-2728, USA

2.6    URS is represented by:

> Skadden, Arps, Slate, Meagher & Flom LLP
> 300 South Grand Avenue, Suite 3400
> Los Angeles, California  90071
> USA
> Telephone:    +1 (213) 687 5000
> Fax:          +1 (213) 621 5206
> Attention:    Jeffrey H. Dasteel

6

Jason D. Russell
Marina V. Bogorad

Skadden, Arps, Slate, Meagher & Flom (UK) LLP
40 Bank Street
Canary Wharf
London
E14 5DS
England
Telephone:    +44(0)20-7519-7000
Fax:          +44(0)20-7519-7070
Attention:    Karyl Nairn
              Noradele Ghubril

## RADIAN INTERNATIONAL LLC

2.7   Respondent Radian International LLC is a limited liability company organized under and in accordance with the laws of the State of Delaware in the United States of America.   Radian's business includes the provision of design, engineering, technical and environmental services and contracting.

2.8   At the time of the events addressed in this arbitration, Radian's address in Beirut, Lebanon, was:

P.O. Box 11-1267
Riad El Solh Beirut 1107 2080
Commercial Register No.:74673. Beirut
Tel/Fax: 01 983 575
Beirut - Lebanon

2.9   Radian is represented in this arbitration by:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
USA
Telephone:    +1 (213) 687 5000
Fax:          +1 (213) 621 5206
Attention:    Jeffrey H. Dasteel
              Jason D. Russell
              Marina V. Bogorad

Skadden, Arps, Slate, Meagher & Flom (UK) LLP
40 Bank Street
Canary Wharf
London
E14 5DS
England

| Telephone: | +44(0)20-7519-7000 |
| Fax: | +44(0)20-7519-7070 |
| Attention: | Karyl Nairn |
| | Noradele Ghubril |

## 3. THE CONTRACT

3.1 The Contract at issue is between Solidere and Radian only. URS is not a signatory to the Contract and has never agreed expressly or impliedly to be bound by its terms. (A copy of the Contract is attached to the Request as Ex. C 19.)

## 4. LACK OF AGREEMENT TO ARBITRATE

4.1 Although the Contract provides for arbitration under the ICC Rules, URS is not a signatory to the Contract and, as more fully detailed below, has never consented, adopted or in any other way manifested its assent to and, therefore, is not bound by the arbitration provision contained in the Contract.

4.2 Accordingly, only Solidere and Radian are proper parties to this arbitration.

## 5. THE APPOINTMENT OF THE ARBITRAL TRIBUNAL

5.1 Without waiving its jurisdictional objections, URS concurs with the arbitral nomination by Radian as stated in Radian's separately filed Answer.

## 6. LACK OF JURISDICTION OVER SOLIDERE'S CLAIMS AGAINST URS

6.1 Without waiving its jurisdictional objections, URS hereby incorporates the factual allegations and substantive claims stated in Radian's separately filed Answer to the extent they are relevant to the jurisdictional dispute at hand, as well as the additional facts and arguments set forth below.

8

## 7.    FACTUAL AND PROCEDURAL BACKGROUND

### (a)    Radian's Contract with Solidere

7.1    On January 25, 1999, Radian, which at the time was an indirect subsidiary of Dames & Moore Group, entered into a contract with Solidere, a Lebanese company with close ties to the Government of Lebanon. (See Request, Ex. C 19.) The Contract called for Radian to perform land reclamation work at the site commonly known as the Normandy Landfill. The work, which Radian was hired by Solidere to perform under the Contract, was part of a public works project to rehabilitate (or reclaim) the Normandy Landfill site to make it suitable for a park area and for construction of high-end real estate projects.

7.2    In relevant parts, the Contract called for settlement of all disputes arising under the Contract to be submitted to the ICC arbitration in Paris, France. (See Request, Ex. C 19 at General Conditions of Contract ("GCC") 44.) The Contract also specified that it was governed by the laws of the Republic of Lebanon. (See id. at GCC 50.) The only parties to the Contract were Solidere and Radian.

7.3    At the time Radian entered into negotiations with Solidere over the Contract's terms, Radian was owned by two subsidiaries of The Dow Chemical Company. Solidere was well aware of this fact, as Radian emphasized its corporate structure in its proposal to Solidere in connection with the project and even used it as a marketing tool to attract Solidere: "Because we are a highly integrated set of companies, our no-barriers approach ensures that the required resources will be available to meet your needs. . . . [I]n addition to the Radian International staff, we have contractual access to the extensive technological expertise of The Dow Chemical Company. Because we are highly integrated, our no-barriers approach ensures that the required resources are available." (URS Ex. 2 at 573, 577.)

7.4    It was, therefore, the fundamental understanding of the deal between Solidere and Radian in connection with the Works that Radian would utilize all the resources available to it, including those of its parent entity. It was thus only to be expected that Radian's performance under the Contract continued in line

9

with that understanding. · Yet, despite that fundamental understanding, Solidere never obtained any guarantee of Radian's performance under the Contract from any of Radian's affiliates. Nor did Solidere demand or assert that any of Radian's affiliates were also parties to or responsible under the Contract.

7.5    Before the Contract's execution, Radian became an indirect subsidiary of Dames & Moore Group. Although Solidere knew of this change in corporate ownership, at the time of the Contract's execution, Solidere did not seek and, therefore, the Contract does not provide for a corporate parent guarantee either from Radian's immediate corporate parent (a Dames & Moore entity) or Radian's ultimate parent Dames & Moore Group. Instead, Solidere bargained for and received from Radian a performance bonding requirement under the Contract, which Solidere has already collected upon in connection with the dispute at hand. (See Request, Ex. C 19 at GCC 32.1; see also id. at ¶¶ 119 (confirming existence of performance guarantee bond), 120 (confirming that Solidere drew down on Radian's performance bond under the Contract in June 2004).) In addition, Solidere negotiated for, and obtained, a contractual right that Radian seek and obtain insurance for its work on the Project, which it did. (See Request, Ex. C 19, GCC Ex. 7 at 1.5.)

7.6    Although Solidere makes much of the fact that Radian began to denote on its letterhead that it was a URS subsidiary after that acquisition occurred, Radian's identification of itself as a subsidiary of other corporations occurred long before URS acquired Radian. Thus, for example, Radian highlighted its ownership by Dow to Solidere when Radian was bidding to obtain the Contract. Later, when Radian was acquired by Dames & Moore, it often used letterhead that read, "Radian International a Dames & Moore Group Company." (See, e.g., Request, Ex. C 25.) Nevertheless, at no time when Radian was using this letterhead did Solidere indicate that it believed that Dames & Moore had become a contracting party or was somehow obligated under the Contract.

7.7    Solidere's contention that URS (or any other predecessor corporate parent of Radian) somehow became directly obligated on the Contract also is belied by

10

the Contract's express terms, which <u>disclaims any liability on behalf of any of Radian's affiliates</u>, as it imposes liability for conduct undertaken by Radian's affiliates <u>on Radian alone</u>. (See id., Ex. C 19 at GCC 22.1 ("In connection with any breach of any representation or warranty and in connection with any failure, breach, error or omission to perform, or in the performance of, any obligation, responsibility, or undertaking of [Radian] in accordance with the terms and conditions of the Contract by [Radian] or its Subcontractors or Suppliers <u>or of their respective affiliates</u>, officers, director or employees, . . . [Radian] shall be fully responsible and liable to [Solidere] for, and shall indemnify [Solidere] against, the full extent of any and all liabilities, loss and/or damage suffered. . . .") (emphasis added). Had Solidere wished to obtain the right to proceed against Radian's corporate affiliates, it would not have contractually given those rights away under the express terms of the Contract and would instead have negotiated some form of parental guarantee, which did not occur.[3]

7.8    As Solidere concedes in its Request, it was only in June 1999 — i.e., six months after the Contract was executed -- that Radian's ultimate parent, Dames & Moore Group, was acquired by URS. (See Request at ¶ 154.) Notably, even at the time of the June 1999 acquisition, Solidere again failed to seek or obtain a corporate parent guarantee from any of Radian's affiliates for the work undertaken by Radian under the Contract.

7.9    There can be no doubt that Solidere was well-aware of the change in corporate ownership, as well as the <u>absence</u> of any change in Radian's relationship with

---

3    Although Solidere contends that it believed it was dealing with URS, the documents submitted by Solidere in support of its Request belie that assertion. For instance, after URS acquired Radian, in August of 2000, Solidere entered a second addendum to the Contract, which was signed by <u>Radian</u> and which made clear that <u>only</u> Radian was a party to the Contract. (Request, Ex. C 19.) Similarly, Solidere signed an MOU in 2003, where it again acknowledged that the <u>only</u> party with whom it was dealing was Radian. (See URS Ex. 18.) Moreover, the formal minutes for the weekly project meetings among Solidere, Solidere's Construction Manager, and Radian for every week of the project from 1999 through February 2005 reflect that Radian was both the contracting party and responsible to carry out the Works. No claim is made anywhere in these minutes — prepared by Solidere's construction manager and approved by Solidere — that URS somehow was responsible for or had taken over the project. (See URS Exs. 21 to 239.)

Solidere. In September of 2000, more than a year after URS first acquired Radian, David Horne of W.A. Fairhurst International Partnership ("WAFI"), Solidere's construction manager, wrote to Radian's Project Manager for the Normandy Landfill and asked that Radian provide detail on URS's acquisition of Radian. (See Request, Ex. C 34.) On January 17, 2001, Mr. Amine Bou Onk wrote to Mr. Horne and enclosed a letter from URS's corporate counsel that responded to Mr. Horne's inquiry. (See id., Ex. C 36.) Mr. Bou Onk's letter was written on letter-head that identified his employer as "Radian International." In the letter from URS's corporate counsel, John W. Rakow III, URS stated that it had acquired the Dames & Moore Group and all of its subsidiaries, including Radian International LLC. The letter confirmed that each of the subsidiaries would "continue to operate as separate subsidiaries under their existing names, although all correspondence is now on URS Corporation letterhead." The letter also confirmed that "Radian International, LLC has not changed its corporate name. It continues to operate as a separate subsidiary under its own, current name." (Id. (emphasis added).) Finally, the letter confirmed that Radian's performance under the Contract would not be impacted and that there would be "no change" in Radian's dealings with Solidere. (See id.)

7.10    Radian commenced the Works under the Contract on 14 April 1999 upon Solidere's issuance of the Notice to Proceed. By February 2001, Radian had completed a portion of its total obligations under the Contract, such as certain excavation above and below sea level, sorting, screening and treatment of waste and back-filling certain areas. In March 2001, Solidere notified Radian that, notwithstanding Radian's adherence to the agreed treatment methods and backfilling criteria, there were gas bubbles emerging from water overlying submerged backfill material in completed areas of the site. Solidere ultimately terminated the Contract in early 2006, after the parties went through years of protracted attempts to settle on appropriate treatment for the landfill gas issue, including the Prior Arbitration between Radian and Solidere, described in greater detail below.

**(b)    Radian's Independent Performance under the Contract**

7.11    It is undisputed that when Radian commenced its performance of work under the Contract, URS had no connection with Radian. (See Request at ¶ 154.) Since the June 1999 acquisition, URS and Radian maintained nothing more than a normal parent-subsidiary relationship, with all the attendant corporate formalities. At all the relevant times, Radian was adequately capitalized for purposes of its performance under the Contract. (See URS Ex. 3 (certificate from the Ministry of Economy of Lebanon acknowledging the value of Radian's capital), URS Ex. 4 (Radian's Declaration of Information for Establishment of a Branch in Lebanon, specifying its capital structure); see also Request, Ex. C 17 (Dow Chemical Company 1996 Form 10-Q (stating that "Radian International LLC is expected to have annual revenues of nearly $400 million")); URS Ex. 16 (Aug. 4, 1998 article from New York Times, reporting that when Dames & Moore acquired Radian International, Radian was "generat[ing] annual revenues of about $300 million from the engineering and construction services it sells to large companies and government agencies"); URS Ex. 240 (Dames & Moore Group 1998 Form 8-K/A (estimating Radian's total assets at the time of the June 1999 acquisition at over $78,000,000)).)[4]

7.12    URS did not participate in the daily management, operations or business affairs of Radian, nor was Radian required to seek authorization from URS for ordinary business decisions or marketing activities. URS and Radian kept separate accounting, bookkeeping, and payroll systems, and did not engage in collective marketing. URS did not control the selection and assignment of Radian's executive personnel. Nor did Radian act as an agent for URS in conducting business transactions. At all times relevant to the events herein, URS did not participate in, control or direct transactions effectuated by Radian.

---

[4]    In addition, URS has consistently and carefully maintained the corporate separateness from its subsidiary, Radian. This separateness is noted in, among other places, URS's annual filings with the SEC, in which Radian is discussed as a separate legal entity from URS. (See URS Exs. 241 (URS 2004 10-K), 242 (URS 2005 10-K), 243 (URS Q1 2006 10-Q).)

7.13    Far from acting as a single entity, Radian meticulously took steps to insure that it was clear who was acting under the Contract. For instance, it was Radian that in 1999 registered in Lebanon for purposes of performing work under the Contract – a fact that never changed despite changes in ownership of Radian. The application materials for registration in Lebanon are in Radian's name alone. (See URS Exs. 5-6.) These materials specify that Radian appointed its own branch manager, hired its own local counsel and auditor for branch accounts. (See URS Ex. 5.) They further specify that Radian's shareholders' equity as of 16 February 1999 was at $116,925,033 – i.e., that it was fully capitalized to perform the work under the Contract. (See URS Ex. 4.) Finally, the license and registrations issued by the State of Lebanon allowing Radian to work as a foreign company in Lebanon were also in Radian's name alone. (See URS Exs. 3, 7-9, 244-45.)

7.14    To date, there has been no change in the core personnel hired by Radian to perform the work at the Normandy Landfill since the inception of the project. After URS's acquisition of Radian, the work under the Contract has been performed by the same people hired by Radian before it had any connection to URS. All of the Radian employees working at the Normandy Landfill were paid directly by Radian. All the subcontractors involved at the site were hired and paid by Radian, and none have any contractual relationship with URS. (See URS Ex. 10 (Radian's subcontract with Societe Monawad-Edde S.A.R.L.), URS Ex. 11 (Radian's subcontract with Bureau Sfeir); see also URS Ex. 12 (evidence of payments by Radian to Societe Monawad-Edde S.A.R.L. from July 1999 through October 2004, drawn upon Radian's bank account).)[5]

---

[5]    After the acquisition, there were some employees who had affiliations with URS that also worked on the Normandy Landfill Project. However, in each such instance, either the employee was employed by both Radian and URS (and worked on the Project in their Radian capacity) or was an employee who worked for URS or one its subsidiaries and was seconded to the Project to perform limited work for Radian and whose time was charged to Radian's account. A perfect example of this is found in Thomas Bishop, who held the title of Senior Vice President with URS, as well as the title of Senior Vice President of Radian International, LLC. Mr. Bishop was the senior executive working on the Project. Whenever performing work on the Project, Mr. Bishop did so in his capacity as a Radian officer, as all of his correspondence makes clear because it is all on Radian International, LLC letterhead.

14

7.15    All the operations at the site are in Radian's name, including, inter alia, bank accounts, social security certificates, work permits, insurance, title to equipment, vehicle registrations and permits, phone services and multiple other vendor services. (See URS Ex. 13 (Radian's Lebanese bank account statements from 1999 to 2003, reflecting, inter alia, payments from Solidere itself); URS Ex. 14 (evidence of workers' compensation, plant and machinery, and vehicle insurance maintained in Radian's name); URS Ex. 246 (social security certificates); URS Ex. 247 (work permits for American expatriates); URS Ex. 248 (commercial vehicle registrations and permits); URS Ex. 249 (phone and other vendor invoices and/or vendor payments); see also URS Ex. 15 (report of court-appointed expert issued in a separate proceeding initiated by Solidere in Lebanon; confirming Radian's title of equipment and vehicles).) Indeed, Solidere itself directed all its payments under the Contract to the bank account held exclusively in Radian's name. (See URS Ex. 13.)

7.16    Furthermore, for every week of the Project from 1999 through February 2005, Radian, Solidere and Solidere's construction manager (WAFI) held weekly progress meetings concerning the progress of work under the Contract, and URS has never attended and/or participated in these meetings. (See URS Exs. 21 to 239.) As the meetings' minutes demonstrate, it was Radian, not URS, that undertook all the actual tasks in connection with performance of the Works under the Contract. (See id.) No claim is made anywhere in these minutes – prepared by Solidere's construction manager and approved by Solidere – that URS somehow was responsible for or had taken over the Project.

7.17    Indeed, after Solidere terminated its Contract with Radian and initiated this proceeding, Solidere's course of conduct establishes that even Solidere does not believe that URS has anything to do with the dispute at hand. In a related litigation in Beirut, initiated by Solidere to request appointment of an expert to oversee the turnover of the onsite equipment, nowhere did Solidere even hint that the subject equipment belongs to URS, not Radian. (See URS Ex. 17.) The ensuing report issued by the court-appointed expert, which summarized

15

the inventory subject to the turnover under the Contract, never even mentions URS as having any connection to the proceedings at hand. (See URS Ex. 15.)

    (c)    **Prior ICC Arbitration between Radian and Solidere**

7.18    In May 2003, Radian, pursuant to a memorandum of understanding negotiated between Radian and Solidere ("MOU"), commenced the Prior Arbitration with the ICC concerning landfill gas observed at the site. (See URS Ex. 18.) The MOU makes clear that the Prior Arbitration was initiated as much for Solidere's benefit as it was for Radian's. Indeed, Solidere expressly refers to the MOU between Solidere and Radian in the Request, confirming that in it both parties expressly "agreed . . . to submit their dispute to arbitration . . . ." (Request ¶¶ 103-106.) During the negotiation of the MOU, Solidere never indicated that it believed that URS was a proper party to the Prior Arbitration, nor made any effort to include URS as a party to the MOU. Solidere's negotiation of the MOU to name only Solidere and Radian as parties to the gas emissions dispute is fundamentally inconsistent with Solidere's current claims and its after-the-fact attempt to apply the July 2004 award issued in the Prior Arbitration (the "Award") retroactively to URS.

7.19    Solidere's claims asserted in the Request here stem from the Prior Arbitration because they are directly dependent on the interpretation of the Award in that they purport to fault Radian (and, therefore, URS) for failure to perform according to the Award. Indeed, central to the dispute between the parties here is whether Solidere and Radian properly complied with the following provisions of the Award:

    •    "Radian is liable to remedy the defects at no cost to SOLIDERE and to provide SOLIDERE with a plan showing how Radian propose that the Works will be completed so as to comply with the Contract;

    •    SOLIDERE is entitled to withhold payment of sums otherwise due to Radian;

    •    The parameters set forth in TC Table 3.1 apply to backfilled material and are to be measured after backfilling *in situ.*"

12 July 2004 Award, issued in ICC Case No. 12727/EC, at 99.

16

7.20    Moreover, the Request here raises additional issues about how the following provisions of the Award should be enforced against Radian:

   •    "There is a failure or defect in the Permanent Works and/or materials and/or workmanship within the meaning of the Contract as regards landfill gas emissions;

   •    The Permanent Works are not Fit for the Purpose, as defined in the Contract, as regards such emissions;"

   •    "The Tribunal awards and declares that Radian should pay to SOLIDERE the sum of US$2,188,000 in respect of their costs of the Arbitration, including the additional costs awarded under para, 11.12,"

   •    "The Tribunal awards and declares that Radian should bear the fees and expenses of the Tribunal and the ICC administrative expenses fixed by the ICC court at US$340,000 and should pay to SOLIDERE the sum of US$170,000 previously advanced by SOLIDERE,"

12 July 2004 Award, issued in ICC Case No. 12727/EC, at 99.

7.21    The above-cited aspects of the Award rendered in the Prior Arbitration are central to Solidere's claims here, and Solidere's claims cannot survive without enforcement of the Award. However, as the MOU demonstrates, Solidere negotiated only with Radian over the terms and content of the Prior Arbitration and expressly agreed to resolve all its claims arising out of the landfill gas issue in the Prior Arbitration. Telling of Solidere's view of the "real" party to the dispute, Solidere negotiated and signed a document in which URS was not a party. (See URS Ex. 18.) Indeed, Solidere never mentioned URS at any time, much less attempted to have URS become a signatory to the MOU. (See Request ¶¶ 103-106.) Moreover, Solidere expressly confirms that it sought its own, separate relief in the Prior Arbitration (see id. ¶ 106 ("SOLIDERE . . . sought declarations . . . that there was a failure or defect in the Works")) – but only against Radian. In fact, Solidere insisted that counsel for each party in the Prior Arbitration specifically identify what parties they represent via specific power of attorney, and Radian's counsel filed just such a statement, showing that it represented only Radian and no other. (See URS Ex. 20.)

7.22    Thus, although by the time of the Prior Arbitration URS had been affiliated with Radian for almost four years, Solidere did not consider that its claims in

17

the Prior Arbitration – which for the most part, concern the same underlying disputes at issue in the current Request – could be properly stated against URS. In the Prior Arbitration, Solidere chose to proceed only against Radian, and not against URS, even though Solidere sought its own, separate relief in the Prior Arbitration for the allegedly defective work performed under the Contract. It did not do so, even though Solidere clearly knew that Radian had been acquired by URS some four years prior to the initiation of the Prior Arbitration. (See, e.g., Request ¶ 154 (citing publicly available sources disclosing the acquisition), ¶¶ 172-177 (conceding that it requested and received confirmation of the acquisition by January 17, 2001).)

7.23    Indeed, in the Request, Solidere cites a series of documents, each confirming that by May 2003 – when Solidere entered into the MOU to commence the Prior Arbitration with Radian – not only did it know that Radian had been acquired by URS as an indirect subsidiary, but already possessed almost all the evidence it currently relies on for its contention that URS purportedly acted on Radian's behalf. As the Request demonstrates, Solidere's allegations in support of imposing liability on URS are almost entirely based on events preceding the Prior Arbitration, commenced on 19 May 2003 (or, at the very least, the 12 July 2004 Award rendered in that proceeding) and were in fact then known to Solidere and/or publicly available at the time. (See, e.g., Request ¶¶ 153-154 (describing the June 1999 acquisition of Radian by URS), ¶ 157 (alleging sharing of addresses in 2003), ¶ 159 (alleging sharing of addresses in 2002 and 2003), ¶ 160 (citing, inter alia, a letter of November 21, 2003, allegedly indicating sharing of telephone and facsimile numbers), ¶ 166 (alleging transfer of employees based on June 14, 2004 public filing), ¶¶ 168-169 (citing a May 1, 2000 article and a May 2, 2003 letter allegedly indicating that Radian was no longer advertised as a separate entity), ¶¶ 172-177 (citing documents dating back to July 31, 2000, indicating letterhead changes; also citing a January 17, 2001 communication in support of allegations of direct involvement by URS), ¶¶ 178-182 (citing a January 2, 2002 letter in support of allegations of URS's involvement in the project), ¶ 183 (citing website representations as to URS's purported involvement in the project as of June 14, 2004), ¶ 185 (citing evidence of URS's alleged involvement dating back to

18

2001), ¶¶ 189-202 (citing witness statements from the Prior Arbitration dated October 14, 2003 and October 10, 2003, a March 1, 2004 public filing and letters of January 2, 2002, February 27, 2002, December 4, 2002, December 12, 2002, April 8, 2003, January 30, 2004 and April 16, 2004 in support of allegations of involvement by URS's personnel), ¶¶ 204-205 (citing the September 24-26, 2002 and December 20, 2002 reports purportedly demonstrating involvement of URS), ¶¶ 207-214 (expressly relying on "[d]ocuments disclosed in [the Prior] Arbitration" to show purported involvement by URS in gas investigations; also citing various 2002-2003 reports and memoranda), ¶ 215 (citing a September 25, 2002 letter, purportedly showing that URS took responsibility for site safety), ¶¶ 216-219 (citing April 20, 2000, September 8, 2000, December 4, 2000, April 15, 2002, April 26, 2002, and January 30, 2004 letters, purportedly showing shared accounting), ¶¶ 220-234 (alleging appearance of URS's control over the Prior Arbitration).}

7.24    Moreover, once Solidere obtained the Award in the Prior Arbitration, it thereafter moved to confirm it in France. (See URS Ex. 19.) Again, those confirmation proceedings were instituted by Solidere only against Radian, not URS.

### (d)    Proceedings before the ICC Court in connection with the Request

7.25    On 13 February 2006, Solidere commenced this arbitration by filing the Request with the ICC Court, claiming that Radian had breached the Contract and that URS was directly responsible for Radian's breach because URS purportedly took over the Contract's performance and/or is Radian's alter ego. (Request ¶¶ 150, 171.) The Request was filed after Radian initiated its own arbitration with the ICC on the same subject matter under ICC Case No. 14208/EC.

7.26    Without submitting to the ICC Court's jurisdiction, URS informed the Court that it was not a party to any arbitration agreement with Solidere, should not be included as a respondent in this arbitration, and that URS objected to any assertion of ICC jurisdiction over it on these grounds. On 2 June 2006, the Court, despite URS's objections, informed URS's counsel that this arbitration

will proceed against both URS and Radian, in accordance with Article 6(2) of the ICC Rules, leaving it to this Tribunal to rule on its own jurisdiction to arbitrate claims asserted by Solidere against URS, even though URS never consented to this Tribunal's deciding the issue of arbitrability and never submitted to the ICC's jurisdiction.

7.27    At no time has URS consented to be bound by ICC Rules, to the Court's referral of the threshold issue of arbitrability to this Tribunal, or to this Tribunal's determination of whether an arbitration agreement exists between URS and Solidere.

## 8.     THE ARBITRABILITY OF SOLIDERE'S CLAIMS AGAINST URS MUST BE DECIDED BY AN AMERICAN COURT UNDER AMERICAN LAW

### (a)    Under American law, the arbitrability issue must be resolved by an American court, not this Tribunal

8.1    The public policies of the United States mandate that the issue of whether an American company is bound by its affiliate's agreement to arbitrate overseas must be decided under American law. As the United States Court of Appeals for the Second Circuit recently declared:

> It is American federal arbitration law that controls. An American nonsignatory cannot be bound to arbitrate in the absence of a full showing of facts supporting an articulable theory based on American contract law or American agency law, . . . To hold otherwise would defeat the ordinary and customary expectations of experienced business persons. The principal reason corporations form wholly owned foreign subsidiaries is to insulate themselves from liability for the torts and contracts of the subsidiary and from the jurisdiction of foreign courts. The practice of dealing through a subsidiary is entirely appropriate and essential to our nation's conduct of foreign trade.

Sarhank Group v. Oracle Corp., 404 F. 3d 657, 662 (2nd Cir. 2005) (emphasis added).[6]    The principle of corporate separateness has been singled out by the highest court of the United States as a bedrock principle of the American

---

[6]    For the Tribunal's reference, all the cited American legal authorities are gathered in the Appendix of U.S. Authorities, filed herewith.

economic system that is central to the functioning of the American economy:
"It is a general principle of corporate law deeply 'ingrained in our economic
and legal systems' that a parent corporation (so-called because of control
through ownership of another corporation's stock) is not liable for the acts of
its subsidiaries." United States v. Bestfoods, 524 U.S. 51, 61 (1998).[7]

8.2    Under American law, it is for the courts, not the arbitrators, to decide whether
a dispute is arbitrable. This is a rule consistently upheld by the nation's
highest court: "[u]nless the parties clearly and unmistakably provide
otherwise, the question of whether the parties agreed to arbitrate is to be
decided by the court, not the arbitrator." AT&T Tech., Inc. v. Comme'ns
Workers of America, 475 U.S. 643, 649, 651 (1986) ("The willingness of
parties to enter into agreements that provide for arbitration of specified
disputes 'would be drastically reduced ... [if an] arbitrator had the power to
determine his own jurisdiction.'"); accord Howsam v. Dean Witter Reynolds,
Inc., 537 U.S. 79, 83-84 (2002) ("[A] gateway dispute about whether the
parties are bound by a given arbitration clause raises a 'question of
arbitrability' for a court to decide."); First Options of Chicago, Inc. v. Kaplan,
514 U.S. 938, 943 (1995) ("If ... the parties did not agree to submit the
arbitrability question itself to arbitration, then the court should decide that
question just as it would decide any other question that the parties did not
submit to arbitration, namely, independently.").

8.3    Indeed, this bedrock principle has been followed even where American courts
recognized that the particular arbitral rules and the host nation's legal
principles allow the arbitrators to decide their own jurisdiction over the
dispute. Thus, the United States Court of Appeals for the Third Circuit, which
is the appellate court with jurisdiction over the court where URS filed its
action for declaratory and injunctive relief, acknowledged that "international

---

[7]    While URS acknowledges that under Art. 17.1 of the ICC Rules, this Tribunal has
discretion in choosing the appropriate rules concerning the effect and scope of its
jurisdiction pursuant to the arbitration agreement, URS nevertheless respectfully
urges this Tribunal to defer to American jurisprudence on this issue, given the strong
precedent cited herewith and the esteemed importance of public policies involved,
and the fact that URS did not sign or agree to any arbitration provision.

21

arbitration rules tend to favor the rule of competence-competence (sometimes known as kompetenz-kompetenz) – the principle that gives arbitrators the power to decide their own jurisdiction" and specifically cited the ICC Rules as an example. China Minmetals Materials Import & Export Co., Ltd. v. Chi Mei Corp., 334 F.3d 274, 287 & n.14 (3d Cir. 2003) (citing ICC Rules, Art. 6(2)). Nonetheless, the Third Circuit found that the American rule mandating referral of the arbitrability issue to the courts must be applied to determine whether the arbitration agreement could be extended to bind a non-signatory. This is because even if the arbitration agreement incorporated the rules of arbitration allowing arbitrators to rule on the issue of their own jurisdiction, "incorporation of this rule into the contract is relevant only if the parties actually agreed to its incorporation. After all, a contract cannot give an arbitral body any power, much less the power to determine its own jurisdiction, if the parties never entered into it." Id. at 288.

8.4    There is no evidence – and, surely, none of the "clear and unmistakable" kind required by the United States Supreme Court – that URS and Solidere agreed to anything, let alone to submit any disputes to arbitration. Because URS is not a signatory to the Contract, American law mandates that the issue of whether it should nevertheless be bound by the arbitration agreement contained in the Contract is for an American court to resolve, not this Tribunal. See, e.g., Masefield AG v. Colonial Oil Indus., Inc., No. 05 Civ. 2231 (PKL), 2005 WL 911770, at *2 (S.D.N.Y. Apr. 18. 2005) (where plaintiffs did not sign the arbitration agreement, there is no "clear and unmistakable evidence that plaintiffs agreed with defendant on any issue, much less the issue of arbitration"); accord Sarhank, 404 F.3d at 661-62 ("An agreement between [two other parties] which does not mention [the non-signatory] does not evidence a 'clear and unmistakable' intent by [the non-signatory] to arbitrate or to permit the arbitrator to decide the issue of arbitrability.") (citation omitted).

8.5    In accordance with the above-cited authorities, URS has tendered the issue of arbitrability of Solidere's claims against URS to the United States District Court for the District of Delaware by filing a complaint against Solidere

22

seeking declaratory and injunctive relief. (See URS Ex. 1.) In the event Solidere does not agree to stay this proceeding pending a jurisdiction determination by the United States District Court for the District of Delaware, that court will be asked to consider a request by URS to preliminarily enjoin Solidere from proceeding with its claims against URS before this Tribunal. Accordingly, this Tribunal, out of respect for the fundamental public policy of the United States and the deep-rooted rule concerning the judiciary's prerogative over the issue of arbitrability, should defer to the Delaware court and refuse to exercise jurisdiction over Solidere's claims against URS. Deferral is particularly appropriate here insofar as Solidere has known of URS's ownership of Radian for nearly seven years – and almost four years from when it commenced the Prior Arbitration with Radian, but failed to raise any claims against URS until now.

**(b)    Were this Tribunal to undertake the jurisdictional analysis and apply substantive American law, none of Solidere's jurisdictional theories asserted against URS would withstand scrutiny**

3.6    Even if this Tribunal were to decide to explore the merits of Solidere's jurisdictional theories, it still should refuse to exercise jurisdiction over Solidere's claims against URS because each of Solidere's theories fails as a matter of law. The U.S. courts recognize only six possible legal grounds upon which a non-signatory to an arbitration agreement could be compelled to arbitrate – namely, veil-piercing/alter ego;[8] estoppel; agency; incorporation by reference; assumption of contractual obligations; and third party beneficiary.[9]

---

[8]    American courts recognize that the "so-called 'alter ego' theory is often used interchangeably with such expressions as 'disregarding the corporate entity' and 'piercing the corporate veil.'" See Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 266 (D. Del. 1989).

[9]    Although arbitrability is a question of U.S. federal arbitration law, see Sarhank, 404 F. 3d at 662, the underlying issue of whether a party is bound by the arbitration agreement in the first place, such as in cases of non-signatories, involves application of ordinary state law principles governing contract formation. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). Here, because URS is a Delaware corporation, Delaware law determines whether, as Solidere maintains, its corporate veil should be pierced, so that Radian's agreement to arbitrate would bind URS. It is a fundamental principle of American corporate law that the law of the jurisdiction of incorporation governs a corporation's internal affairs. See CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 90 (1987) ("This beneficial free market system depends at its core upon the fact that a corporation - except in the rarest situations – is organized

23

See Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F. 3d 773 (2d Cir. 1995); see also InterGen N.V. v. Grina, 344 F. 3d 134, 146 (1st Cir. 2003) (discussing third-party beneficiary status when one party was trying to compel a non-signatory to the relevant contract to arbitrate).

8.7    Of the six theories recognized by American courts as valid for purposes of binding a non-signatory to arbitration, Solidere asserted only veil-piercing/alter ego and estoppel theories. (See Request ¶ 150.) However, out of an abundance of caution URS will show below that none of the six theories apply here. In addition to two theories recognized by American courts, Solidere also asserts that URS should be bound by Radian's arbitration agreement via "implied consent to the Contract," "implied assignment," and "confusion." (Id.) These are not among the cognizable theories under American law for purposes of forcing a non-signatory to arbitrate and thus have no application here for that reason. See Sarbank, 404 F. 3d at 662 (specifying that the issue of arbitrability for purposes of binding a parent to its subsidiary's arbitration agreement is governed by American federal arbitration law). Each of these theories is discussed below and shown to be without merit on the facts applicable here.

    1.    **Veil-piercing/alter ego**

        (a)    **The Standard For Veil-Piercing**

8.8    Solidere cannot establish that URS is the alter ego of Radian under Delaware law, which governs here. This is because in Delaware, whose law governs the analysis, "[d]isregard of the corporate entity is appropriate *only in exceptional circumstances*." Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 268, 270 (D. Del. 1989) (emphasis added); see also In re Phillips Petroleum Sec.

---

under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of its incorporation."); United States v. Funds Held in the Name or for the Benefit of Wetterer, 210 F. 3d 96, 106 (2nd Cir. 2000) (holding that the court below erred in failing to apply company's domestic law for purposes of piercing its corporate veil; "[q]uestions relating to the internal affairs of corporations-for profit or not-for-profit-are generally decided in accordance with the law of the place of incorporation, and we see no reason to deviate from that principle here") (citations omitted). Given that URS never signed a contract, equity dictates that if it is to be forced to arbitrate, that determination must be made under American laws.

Litig., 738 F. Supp. 825, 838 (D. Del. 1990) (the "courts of Delaware do not easily pierce the corporate veil," and that the "separate corporate existence will not be set aside merely on a showing of common management or whole ownership.").

8.9    Indeed, the burden of evidentiary showing on the alter ego is extremely high because Delaware courts require "[f]raud or something like it" to pierce the corporate veil. Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P., v. Wood, 752 A.2d 1175, 1183-84 (Del. Ch. 1999) (for a Delaware court to pierce the corporate veil, "effectively, the [dominated] corporation must be a sham and exist for no other purpose than as a vehicle for fraud"); see generally Kaplan v. First Options of Chicago, Inc., 19 F. 3d 1503, 1521 (3d Cir. 1994), affd, 514 U.S. 938 (1995) ("Not every disregard of corporate formalities or failure to maintain corporate records justifies piercing the corporate veil. That remedy is available only if it is also shown that a corporation's affairs and personnel were manipulated to such an extent that it became nothing more than a sham used to disguise the alter ego's use of its assets for his own benefit in fraud of its creditors."). Furthermore, it is a matter beyond any possible dispute that Radian was not the alter ego of URS at the time it entered into the Contract with Soldiere, given that URS acquired Radian six months later and thus URS could not have misused Radian's corporate form for purposes of the key provision at issue, i.e., the arbitration provision.

8.10   The fraud element must be shown by "clear and convincing evidence." Id. at 1522. This evidence must show that the corporation's owners abused the legal separation of a corporation from its owners and used the corporation for illegitimate purposes; "[o]f course, common management of two entities does not, by itself, justify piercing the corporate veil." Trustees of Village of Arden v. Unity Const. Co., No. C.A. 15025, 2000 WL 130627 (Del. Ch. Jan. 26, 2000).

8.11   In the specific context present here, U.S. courts uniformly acknowledge that forcing a non-signatory to arbitrate on a veil-piercing theory is exceedingly difficult. See, e.g., Masefield AG, 2005 WL 911770, at *6 (enjoining ICC arbitration against affiliates of Swiss entity that had signed arbitration

25

agreement; non-signatory affiliates' avowed membership of the same "'group' of companies" was immaterial); accord Kaplan, 19 F. 3d at 1520-23 (affirming district court's refusal to extend arbitration agreement to bind a non-signatory to the agreement on the alter ego grounds because plaintiff failed to establish that the signatory at issue was "'an artifice and a sham to execute illegitimate purposes and [an] abuse of the corporate fiction and immunity that it carries'").

8.12    Factors that the U.S. courts may consider include whether the corporation was adequately capitalized for the undertaking at issue at the time it undertook the obligation; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder. See, e.g., Harper v. Delaware Valley Broadcasters, Inc., 743 F. Supp. 1076, 1085 (D. Del. 1990), aff'd, 932 F.2d 959 (3d Cir. 1991) (also noting that "no single factor could justify a decision to disregard the corporate entity, but that some combination of them was required, and that an overall element of injustice or unfairness must always be present, as well" ); see also Sears, Roebuck & Co. v. Sears plc, 744 F. Supp. 1297, 1305 (D. Del. 1990) ("Any breach of contract and any tort . . . is, in some sense, an injustice . . . . The underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element [of the alter ego analysis] meaningless, and would sanction bootstrapping.").

8.13    In Delaware, courts are reluctant to pierce the veil even when several of the above-cited factors are present. For example, in Harco National Insurance Co. v. Green Farms, Inc., Civ. A. No. 1131, 1989 WL 110537, at *6 (Del. Ch. Sept. 19, 1989) plaintiffs cited (1) a failure to follow corporate formalities, in particular, the failure to maintain adequate corporate records, (2) commingling of assets between shareholders and the corporation, and (3) undercapitalization. Even though the defendants in that case conceded that the corporate records were not properly maintained and that there was likely a commingling of assets, and the court even went as far as noting that "[s]uch

26

glaring oversights seemingly present a good case for piercing the corporate veil," the court still refused to pierce the veil at that time. Id. (finding evidence insufficient to pierce corporate veil; noting, inter alia, that it was "unclear whether there was an actual commingling of assets" and whether transfers of assets to dominant shareholders "were done to defraud creditors or were done merely to siphon off corporate assets, rather than to repay outstanding loans").

### (b)    There Are No Facts To Justify Veil-Piercing

8.14    Here, an evaluation of the foregoing factors confirms that URS and Radian are distinct legal entities that have operated independently. As described above, Radian and URS observed separate legal formalities at all the relevant times, and URS has consistently treated and identified Radian as a legally distinct corporate entity. (See supra ¶¶ 7.11-7.17.) This has been found to be one of the most important factors in analyzing the alter ego issue under Delaware law. See Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A. 2d 983, 989 (Del. Ch. 1987). Further, at all the relevant times, Radian was adequately capitalized for purposes of its performance under the Contract. (See URS Exs. 3 and 4.) URS did not participate in the daily management, operations or business affairs of Radian, nor was Radian required to seek authorization from URS for ordinary business decisions or marketing activities. URS and Radian kept separate accounting, bookkeeping, and payroll systems, and did not engage in collective marketing. URS did not control the selection and assignment of Radian's executive personnel. Nor did Radian act as an agent for URS in conducting business transactions. At all times relevant to the events herein, URS did not participate in, control, or direct transactions effectuated by Radian.

8.15    Furthermore, as described above, Radian's performance under the Contract was an independent undertaking. (See supra ¶¶ 7.11-7.17 (citing evidence establishing Radian's independent operations in Lebanon).)    Radian is registered in Lebanon in its own name and pays its employees in Lebanon in its own name; there are bank accounts, branch tax returns, customs receipts, forms and social security receipts attesting to its independence. (See id.)

27

There are also numerous documents establishing that Radian, and not URS, owns the equipment used on the project and holds insurance for the project in its own name. (See id.)

### (c) The Materials Cited By Solidere Are False, Incomplete, or Irrelevant Under American Law

8.16 In its demand, Solidere asserts that there are five categories of facts that supposedly evidence that Radian lacks "independence" from URS. (Request ¶ 152.) As shown below, these categories are comprised of allegations that simply are not true, are presented in an incomplete and misleading manner, and/or are irrelevant as a matter of law under American jurisprudence.

8.17 The first category of information alleged by Solidere is that Radian is a wholly-owned subsidiary of URS. (See Request ¶¶ 153-155.) Under American law, the mere fact that a subsidiary is wholly-owned by a parent corporation is insufficient as a matter of law to justify treating the two companies as alter egos. See, e.g., In re Phillips Petroleum Sec. Litig., 738 F. Supp. at 838 (the "separate corporate existence will not be set aside merely on a showing of common management or whole ownership").

8.18 Without any supporting evidence or detail, Solidere also alleges that "Radian has gradually ceased all independent activities and has been operationally merged into URS." (Request ¶ 155 (emphasis omitted).) This allegation is not true in that Radian continues to exist as a separate entity and continues to perform under a number of contracts, including the Contract at issue here. It is true that, for convenience and financial reasons, Radian has enjoyed the benefits of being owned by companies owned by URS, including utilization of consolidated financial reporting, shared office and logistical support, and the like. However, use of shared services is insufficient as a matter of law to pierce the corporate veil. See, e.g., Pearson v. Component Tech. Corp., 247 F.3d 471, 485 (3d Cir. 2001) ("courts have refused to pierce the veil even when subsidiary corporations use the trade name of the parent, accept administrative support from the parent, and have a significant economic relationship with the parent"); In re Acushnet River & New Bedford Harbor Proceedings Re Alleged PCB Pollution, 675 F. Supp. 22, 34 (D. Mass. 1987)

(declining to pierce veil under federal common law despite the centralized cash management system employed by the parent, loan guarantees provided by the parent, parent loaned money to the subsidiary, parent required subsidiary to seek approval for large expenditures, subsidiary submitted financial reports to parent, subsidiary's logo was changed to include parent's initials, subsidiary and parent used the same law firm in much litigation, and parent acquired an umbrella insurance policy which listed all its subsidiaries as insureds).

8.19 The second category of information that Solidere alleges shows a lack of independence is that Radian purportedly does not have its own office space, telephone numbers, fax lines or websites. (See Request ¶¶ 156-162.) Solidere's allegations are simply incorrect, as Radian has numerous offices and, at various times during its dispute with Solidere, has had offices in dozens of states in America. Moreover, Solidere ignores that Radian at all times relevant to this dispute had an office in Lebanon – an office that existed precisely to support its performance under the Contract.[10]

8.20 Regardless, even if Solidere's allegations were true – and they are not – American law treats as irrelevant the fact that a subsidiary shares office space with its corporate parent. See, e.g., Savin Corp. v. Heritage Copy Prods., Inc., 661 F. Supp. 463, 471 (M.D. Pa. 1987), citing Croyle v. Tex. E. Corp., 464 F. Supp. 377, 379 (W.D. Pa. 1979); accord Ne. Power Co. v. Balcke-Durr, Inc., 49 F. Supp. 2d 783 (E.D. Pa. 1999) (rejecting jurisdictional alter ego allegations against German parent, even though parent and subsidiary shared office space, telephone and facsimile lines, and officers, and subsidiary's employees corresponded with utility on parent's letterhead); Action Mfg. Co.,

---

[10] Solidere argues that URS considered Radian's office in Beirut to be its own. (See Request ¶ 185.) Yet, the address Solidere sets forth as the purported address for URS in Beirut (see id. ¶ 184) does not match Radian's Beirut address, as set forth on Radian's Lebanese letterhead. Furthermore, Solidere purports to cite "URS internal minutes" as allegedly supporting the proposition that there was a meeting held at the "URS Beirut office" in August 2001 (see Request at p. 56 n.197, citing Ex. C 50), but the purported "internal" meeting minutes do not show how and where Solidere obtained access to such "internal" memoranda and, furthermore, whether it is indeed URS's "internal" memoranda, as the letterhead is smudged, and no other indication of authenticity is present.

Inc. v. Simon Wrecking Co., 375 F. Supp. 2d 411, 418, 425 (E.D. Pa. 2005) (noting that the parent and subsidiary "share the same Florida office space, mailing address, and phone number and the same website," but rejecting alter ego allegations).

8.21    The third category of information identified by Solidere as supposedly showing a lack of independence is that URS purportedly receives and pays money for Radian. (See Request ¶¶ 163-164.) Solidere offers no evidence of this purported fact. But even if it had, the fact that a parent corporation can receive monies from its subsidiary's business or that the parent loans money to its subsidiary is insufficient to establish an alter ego relationship. See Pearson, 247 F.3d at 486-88; Fletcher v. Atex, Inc., 68 F.3d 1451, 1459-60 (2d Cir. 1995) (rejecting allegations of alter ego relationship between subsidiary and parent, despite subsidiary's use of a cash management system, holding that "Atex's participation in Kodak's cash management system is consistent with sound business practice and does not show undue domination or control") (applying Delaware law); In re Acushnet River, 675 F. Supp. at 34 (declining to pierce veil under federal common law despite the centralized cash management system employed by the parent, loan guarantees provided by the parent, parent loaned money to the subsidiary, parent required subsidiary to seek approval for large expenditures, subsidiary submitted financial reports to parent); Upjohn Co. v. Syntro Corp., No. CIV. A. 89-107-JJF, 1990 WL 79232, at *5 (D. Del. Mar. 9, 1990) (rejecting alter ego claims based on, among other things, subsidiary's use of consolidated financials); Masefield, 2005 WL 911770, at *4.[11]

---

[11]    In Masefield, the court rejected an argument that a non-signatory affiliate's receipt of all inquiries and payments on behalf of the signatory affiliate under the Contract and the self-described "group of companies" structure formed by the non-signatory with the signatory affiliate, taken together with evidence showing that the two companies were separate and independent, could show that the non-signatory exercised dominance over the signatory affiliate for the purpose of harming defendant or that there was a "virtual abandonment of separateness" between the affiliates at issue. See Masefield, 2005 WL 911770, at **5-6. (Compare Request ¶¶ 163-164, 216-219 (alleging, inter alia, that URS received payments under the Contract on behalf of Radian).)

8.22  The fourth category of information identified by Solidere as supposedly showing a lack of independence is that Radian's employees are supposedly transferred to URS. (See Request ¶¶ 165-167.) Again, Solidere offers no evidence of this whatsoever, pointing only to the fact that URS has acquired Radian's pension plans for "a selected group of Radian employees" and to a hearsay statement in a trade journal, which indicates that URS has among its employees individuals who previously were employed by Radian, with no mention of any wholesale transfer from Radian to URS. In fact, all of the employees working on the Project are either Radian employees, and have been the entire time, or are both URS and Radian employees, and are treated as Radian employees when working on the Project – as reflected by the fact that Radian pays the employees when in Lebanon and that its employees continue to use Radian letterhead when communicating with, among others, Solidere.

8.23  The final category of information identified by Solidere as supposedly showing a lack of independence is that URS no longer advertises Radian as a separate entity. (See Request ¶¶ 168-170.) Again, Solidere offers no specific evidence to substantiate such allegations but it would be irrelevant under American law even if it had. The alleged fact that URS supposedly advertises Radian as part of URS, if it were true, would be irrelevant as a matter of law. See, e.g., Pearson, 247 F.3d at 486-87 (observing that "courts have refused to pierce the veil even when subsidiary corporations use the trade name of the parent . . ."); Hoechst Celanese Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa., No. CIV. A. 89-C-SE-35, 1995 WL 411795, at *2 (Del. Super. Ct. Mar. 31, 1995), (refusing to acknowledge use of joint letterhead as evidence of alter ego relationship, as it merely demonstrates affiliation between the companies); Gruca v. Alpha Therapeutic Corp., 19 F. Supp. 2d 862, 867-68 (N.D. Ill. 1998) (marketing references to "our" projects and "our operations," which included subsidiary's projects, do not establish alter ego liability).

8.24  Solidere also suggests that there are five categories of facts showing that URS supposedly directly involved itself in the performance of the Contract. As with the prior five categories, Solidere offers either no evidence, an

31

incomplete and misleading rendition of facts, or facts that are totally irrelevant under American law.

8.25    In the first category, Solidere trumpets that Radian supposedly began using URS's letterhead in "all correspondence" after July 31, 2000. (Request ¶ 172.) Solidere is simply wrong in its allegation; Radian and its employees have consistently and repeatedly used letterhead that does not contain any reference to URS. (See, e.g., Request, Exs. C 91, C 108, C 134, C 138, C 139, C 143, C 146, C 148, C 149, C 151.) Regardless, the fact that Radian may have, at times, in its correspondence referenced its affiliation with URS or predecessor corporate parents, while still noting the name of the subsidiary (and contracting party) is insufficient as a matter of law to treat the two separate companies as one and the same. See, e.g., Hoechst, 1995 WL 411795, at *2 (use of joint letterhead did not suffice to establish an alter ego relationship, as it merely demonstrates affiliation between the companies); Pearson, 247 F.3d at 486-87 (observing that "courts have refused to pierce the veil even when subsidiary corporations use the trade name of the parent . . ."); Action Mfg. Co., 375 F. Supp. 2d at 418, 425.[12]

8.26    Second, Solidere alleges that URS purportedly held itself out as the Contracting party on the Project. (See Request ¶¶ 183-219.) The items cited by Solidere, however, are nothing more than marketing materials reflecting performance on the Project by a URS subsidiary and do not state that URS has assumed the Contract or any obligations thereunder. In its communications with Solidere, as well as in communications with subcontractors and the U.S. government, the description of involvement in the Project has always been clearly attributed to Radian, not URS. Regardless, allegations that one company held itself out as involved in its affiliate's activities are irrelevant under American law. See, e.g., Gruca, 19 F. Supp. 2d at 867-68 (marketing references to "our" projects and "our operations," which included subsidiary's projects, do not establish alter ego liability); Upjohn Co. v. Syntro Corp., 1990

---

[12]    Solidere also alleges that URS purportedly directly committed itself to the Contract and to Solidere. (See Request ¶¶ 173-177.) As shown above, this allegation is totally without basis as the document referred to by Solidere actually refutes any notion that URS bound itself to the Contract. (Supra at ¶ 7.9.)

32

WL 79232, at *5 (D. Del. Mar. 9, 1990) (ruling that plaintiff "establishes merely a normal, legitimate parent-subsidiary relationship and has not demonstrated that [parent] exercises such complete domination and control over [subsidiary] that would warrant disregard of the separate corporate entities" despite allegations that parent corporation referred to subsidiary's product as its own in various public filings); Akzona Inc. v. E.I. Du Pont De Nemours & Co., 607 F. Supp. 227, 237-38 (D. Del. 1984) (same); LaSalle Nat'l Bank v. Vitro, 85 F. Supp. 2d 857, 865 (N.D. Ill. 2000) (alter ego/veil piercing analysis cannot be based on how the company presents itself, but must be grounded on how the company actually operates).[13]

8.27    Third, Solidere asserts that "the Contract was performed by URS" and purports to support this by alleging that various Radian employees also held titles with URS. (Request ¶¶ 187-202.) Even a cursory review of the materials offered by Solidere establishes that in each instance, the identified employee either held titles with both URS and Radian (see, e.g., Thomas Bishop (Request ¶ 193)) or clearly were acting as agents for Radian (see, e.g., Request ¶ 202 (alleging that Mr. Khazak signed orders for Radian) and Ex. C 98 (identifying Mr. Khazak as a Senior Vice President for Radian International LLC).) In fact, Radian consistently used the same employees at the site, each of whom were paid by Radian.

8.28    The employees identified by Solidere, by its own admission, corresponded as representatives of Radian (see, e.g., Mr. Amine Bou Onk (acting as "the General Manager of Radian International's Lebanon Branch") (Request ¶ 189), Mr. Bishop (acting as "Senior Vice President" of Radian International, LLC (id. ¶ 193), Mr. Cuenca (identified as acting as Radian's agent for Purchasing and Controls (id. ¶ 216 & Ex. C 118).) Moreover, to the extent that URS lent

---

[13]    It is worth noting that WAFI, who was tasked with supervising Radian's work, surely was not confused as to who it was dealing with as its correspondence (see, e.g., Request Exs. C 47, C 57, C 65, C 67, C 68, C 70, C 73, C 74, C 76, C 90, C 120, C 121), minutes (see id. Ex. C 45 (minutes reflecting Radian's participation and no mention of URS), C 61 (same)), and reports (see id. Ex. C 79 (identifying Radian International as the contracting party), C 88 (same)) all are addressed to Radian, until long after the conclusion of the Prior Arbitration and issuance of the Award in that proceeding.

certain employees to the Project on a consulting or limited basis, such a fact still would not suffice to establish alter ego liability. Gruca, 19 F. Supp. 2d at 869 (finding no alter ego relationship based on joint performance of scientific investigation).[14]

8.29    Under American law, the fact that an individual is a director, officer or employee of both a corporation and its subsidiary does not establish that the two entities are alter egos of one another. See United States v. Bestfoods, 524 U.S. 51, 69 (1998) ("[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts. [ ] This recognition that the corporate personalities remain distinct has its corollary in the 'well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do "change hats" to represent the two corporations separately, despite their common ownership.'").

8.30    Moreover, to the extent that a representative of both Radian and Solidere made a careless error in how they addressed or titled certain documents, or referenced projects of the subsidiary as part of URS, that in no way establishes that a parent and a subsidiary are in fact alter egos of one another. A recent decision in an American federal court is instructive of the lack of probative value created by an employee's careless reference to one entity versus another. In Corporate Safe Specialists, Inc. v. Tidel Technologies, Inc., a federal court was faced with arguments that a parent corporation had referred interchangeably to its subsidiary in various documents and public filings.

---

[14]    Solidere also points to a number of instances where URS is referenced in a document involving the Project. In most instances, the reference to URS is simply one found on the letterhead, with no indication of actual involvement by URS. (See, e.g., Request Ex. C 66 (on Radian International LLC letterhead), C 78 (same), C 118.) In other instances, Radian drew upon its corporate relationship with URS to borrow scientific expertise in a limited fashion. In those few limited instances, Radian was careful to transmit the information on Radian letterhead. (See, e.g., Request, Ex. C 84.) The fact that Radian borrowed or collaborated with URS on certain narrow technical issues does not suffice to establish alter ego liability. See, e.g., Gruca, 19 F. Supp. 2d at 867-68 (marketing references to "our" projects and "our operations," which included subsidiary's projects and fact of joint scientific research, do not establish alter ego liability).

34

Nevertheless, the trial court found such errors to have no probative value and to not establish that the parent and subsidiary were properly treated as alter egos:

> CSS' more compelling argument concerns those statements in which Tidel Technologies does not identify Tidel Engineering as its subsidiary and instead identifies itself as the manufacturer, seller and distributor of the products manufactured by Tidel Engineering. Some of these statements appear in Tidel Technologies' filings, including Leonard Carr's affidavit. These were no more than an attorney's mistake, writing "Tidel Technology" where he should have written "Tidel Engineering." However, the statements in the 10-K Form, discussed above, do reveal a carelessness in not specifying that it is Tidel Technologies' subsidiary that controls the manufacture, sale and distribution of its cash security systems. Similarly in [Avery Dennison Corp. v. UCB SA, 1997 WL 441313 at *2 (N.D. Ill. July 30, 1997)], the plaintiff produced evidence of an advertisement and employee correspondence that conflated the defendant parent company and its subsidiary. Nonetheless, in both Avery and in the instant case, these inexact statements are insufficient evidence to establish that the parent company acted as the alter ego of its subsidiary.

No. 05 C 3421, 2005 WL 1705826, at *5 (N.D. Ill. July 15, 2005) (applying federal common law). See also Ministry of Defense v. Gould, Inc., 969 F.2d 764, 769-70 (9th Cir. 1992) (rejecting alter ego allegations, despite the following evidence: two documents incorrectly referred to subsidiary as division of corporation, modification to one contract of subsidiary was signed by official of parent corporation, application for export license for subsidiary was completed by parent corporation, and corporation and subsidiary were represented by same attorneys) (applying federal common law in a case arising under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards); Upjohn Co., 1990 WL 79232, at *5 (rejecting alter ego allegations despite reference by parent to subsidiary's products as its own); Akzona, 607 F. Supp. at 237-38 (rejecting alter ego claims where parent referred to subsidiary as a "division," referred to subsidiary's projects as its own in public filings, and where parent directly supervised subsidiary's activities).

35

8.31  Here, URS and Radian were very precise in public filings with the United States Securities and Exchange Commission. (See, e.g., Request, Exs. C 17, C 18, C 22, C 26, C 80, C 106, and C 135 (describing Radian's relationship to URS and discussing the Prior Arbitration between Solidere and Radian); see also URS's annual filings with the SEC, in which Radian is discussed as a separate legal entity from URS. (See URS Exs. 241 (URS 2004 10-K), 242 (URS 2005 10-K), 243 (URS Q1 2006 10-Q).)

8.32  The fact that a few scientists and other consultants, who lacked the required understanding of and were not involved in the business or legal operations of Radian or URS, are alleged by Solidere to have inadvertently conflated the two entities proves only that the two entities were affiliated and shared resources, not that corporate formalities were ignored.

8.33  Fourth, Solidere alleges that URS purportedly was involved in the Prior Arbitration and the events leading up to it. (See Request ¶¶ 220-234.) However, Solidere's "evidence" of this fact is that an attorney who was identified as representing Radian International LLC (see Request, Ex. C 91), negotiated the MOU with Solidere and expressly made clear that the only parties to the Prior Arbitration would be Solidere and Radian.[15] (See Request ¶¶ 220-225.) Solidere also points out that individuals holding titles with both URS and Radian (but purporting to act and communicating solely on behalf of Radian) attended various meetings with Solidere. (See Request ¶¶ 226-230.) But again, Solidere admits that these very individuals held titles with both companies. (See, e.g., Mr. Khazak (identified as a Senior Vice President of

---

[15]  Solidere alleges that Radian's legal counsel made no effort to distinguish between Radian and URS (see Request ¶ 221, citing Ex. C 92), but the very document Solidere cites states "I very much enjoyed the opportunity to meet with you last week in connection with the discussions between Solidere and Radian International concerning the Normandy Landfill Project . . ." (Request, Ex. C 92 (emphasis added); see also id. Ex. C 94 (letter from Mr. Rakow to Solidere discussing "Radian's wish (concerning the arbitration)").) Of course, the best evidence refuting Solidere's allegations are the terms of the MOU itself, which clearly limited the arbitration proceedings to Solidere and Radian. (See URS Ex. 18.) To the extent that Mr. Rakow may have inadvertently referenced URS in one of his letters (see Request, Ex. C 93), it was clearly an inadvertent error as all of his subsequent correspondence, as well as the MOU, attest. As such, any error is irrelevant to the alter ego analysis. See Corporate Safe Specialists, Inc., 2005 WL 1705826, at *5.

36

Radian International LLC in Request, Exs. C 91 and C 98, among others), Mr. Bishop (a Senior Vice President with Radian) (Request ¶ 229(ii)), Mr. Rakow ("Radian legal counsel") (id. ¶ 229(iii) & Ex. C 91); Mr. Bou Onk (identified as "General Manager of Radian International's Lebanon branch") (Request ¶ 229(vi) and every letter written by Mr. Bou Onk).) Finally, Solidere alleges that the appointment of Radian's counsel in the Prior Arbitration was signed by the "General Counsel of the URS Group," but fails to mention that Radian International LLC is a member of that group and it was in that capacity that the appointment was signed. (See Request, Ex. C 113.)

8.34    Although Solidere alleges that "[a]lthough Arbitration I was nominally between SOLIDERE and Radian, URS in fact controlled Radian's arbitration in the arbitration," it has no evidence to substantiate that sweeping assertion. The two things that Solidere points to both undermine its assertion. First, Solidere notes that the Power of Attorney in the Prior Arbitration was signed by Joseph Masters "on behalf of Radian International LLC." (Request, Ex. C 111.) Although Mr. Masters is also the General Counsel of the URS Group, that fact is irrelevant. As discussed above, a subsidiary can share resources, including legal departments, without becoming an alter ego of its parent. (See supra ¶ 8.18.)

8.35    Moreover, a parent is permitted to supervise and monitor its subsidiary and appropriate monitoring would include: "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures[.]" Best Foods, 524 U.S. at 72. Thus, even ignoring that the two companies properly shared legal counsel, it certainly would be appropriate for URS to have directly supervised its subsidiary's choice of counsel and any expenditure of monies in furtherance of such a decision. See id. Second, Solidere also points to the Power of Attorney appointing Skadden, Arps, which was signed by Thomas Bishop, who was and is a Senior Vice President of Radian International LLC, and who signed that document in his capacity as an officer of Radian.[16]

_____

[16]    Solidere also falsely contends that URS purportedly implemented the Award in the Prior Arbitration (see Request ¶¶ 235-237), but all of the documents cited in support

37

8.36   Regardless, even if one credited Solidere's allegations, which are simply
       incorrect or misleading because they are incomplete, those allegations still
       would be irrelevant under American law. As the United States Supreme Court
       has made plain, it is perfectly appropriate for a parent corporation to monitor
       the activities of its subsidiary so long as that involvement is "consistent with
       the parent's investor status." Bestfoods, 524 U.S. at 72. Accord Doe v.
       Unocal Corp., 248 F.3d 915, 926 (9th Cir. 2001). Here, URS plainly had and
       continues to have a right to monitor the proceedings between Solidere and
       Radian because they directly impact the value of URS's investment (i.e., the
       money it invested to purchase Radian's corporate parent). In monitoring the
       Prior Arbitration, as even Solidere is forced to admit, URS was careful to
       insure that it did not become a party, and all documentation in the prior
       proceedings made plain that Radian, not URS, was the arbitrating (and
       contracting) party against Solidere.

8.37   In sum, none of the "facts" alleged by Solidere show anything more than a
       routine relationship between a parent and its corporate subsidiary and these
       "facts" fall far short of the "exceptional circumstances" that must be shown by
       "clear and convincing evidence" to justify disregarding the separate corporate
       identities of Radian and URS.

                    (d)    **Solidere Does Not Allege, Nor Show, That URS
                           Used Radian To Commit A Fraud**

8.38   As noted above, a prerequisite to a finding of alter ego liability under
       American law is that the parent corporation engaged in "[f]raud or something
       like it." Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P., 752 A.

---

of these allegations are on Radian's letterhead and do not purport to be on URS's
behalf. (See Request ¶ 236 and n. 270 (citing Exs. C 138 (letter from Thomas Bishop
on Radian International LLC letterhead as Senior Vice President of that entity, no
mention of URS), C 154 (same), C 159 (same), C 162 (same), C 165 (same), C 167
(same), C 170 (same).) Moreover, Solidere's own chairman expressly acknowledged
that the Chairman of URS had asked one of its employees if it could 'try to help
resolve the dispute which Solidere had with URS's subsidiary Radian International,
LLC ('Radian'), in relation to an international arbitration award SOLIDERE had
obtained against Radian." (Request, Ex. C 157 (23 August 2005 letter from
Chairman of Solidere) (emphasis added).) Thus, even Solidere's most senior official
explicitly acknowledged that URS had no involvement in any of the proceedings, but
at most was trying to mediate a dispute between its subsidiary and a third-party.

38

2d at 1183-84. Thus, for a Delaware court to pierce the corporate veil, "effectively, the [dominated] corporation must be a sham and exist for no other purpose than as a vehicle for fraud." Id. Despite this threshold requirement, and despite spending eighty-six pages making all manner of allegations, Solidere did not make any allegations to show that Radian existed "for no other purpose than as a vehicle for fraud." One can fairly surmise, given that Solidere has had seven years to develop the argument, that if a basis existed to make such an allegation, then Solidere would have done so. That it could not make such allegations proves beyond dispute that there is no basis to allege, much less to litigate, alter ego issues in this proceeding.

### 2.    Estoppel

8.39    There are two U.S. theories of equitable estoppel in the context of compelling non-signatories to arbitration agreements to submit to arbitration; neither applies here to help Solidere. "First, courts have held non-signatories to an arbitration clause when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement." E.I. DuPont De Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 199 (3d Cir. 2001) (citing Thomson-CSF, 64 F. 3d at 778). The U.S. courts expressly cautioned that, under the first estoppel theory, "we must be careful about disregarding the corporate form and treating a non-signatory like a signatory." DuPont, 269 F. 3d at 201. To this end, another U.S. court in Thomson-CSF found that the non-signatory's acquisition of a party to a contract conferred upon the non-signatory only an indirect benefit insufficient to invoke equitable estoppel; there was no direct benefit derived by the non-signatory from the contract itself. See 64 F.3d at 779. Similarly, URS has derived no direct benefit from the Contract. Like the non-signatory in Thomson-CSF, the only benefit to URS was its purchase of Radian's corporate parent, an "indirect benefit insufficient to invoke equitable estoppel." Moreover, Solidere does not allege, and no basis exists to allege, that URS in fact exploited the Contract.

8.40    "Second, courts have bound a signatory to arbitrate with a nonsignatory 'at the nonsignatory's insistence because of "the close relationship between the

entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations.'"" DuPont, 269 F. 3d at 199 (citations omitted, internal quotation marks omitted). This theory of estoppel, however, is inapplicable where the nonsignatory seeks to avoid arbitration, rather than compel it. Id. at 202. Here, because URS seeks to avoid arbitration, this second theory of estoppel does not apply on its face.

### 3. Agency

8.41 Under U.S. law, "[t]raditional principles of agency law may bind a nonsignatory to an arbitration agreement." Thomson-CSF, 64 F. 3d at 777. "To bind a principal by its agent's acts, the plaintiff must demonstrate that the agent was acting on behalf of the principal and that the cause of action arises out of that relationship." E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S., 269 F. 3d 196, 198 (3d Cir. 2001). A parent-subsidiary relationship, such as the indirect affiliation at issue here, is insufficient to create an agency relationship: "[o]ne corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company." Id. (applying Delaware law); see also Masefield, 2005 WL 911770, at *8 (refusing to extend arbitration agreement to non-signatory affiliate based on agency principles, even though the non-signatory was listed in the contract as the designated recipient for all operational enquiries, received all payments under the contract on behalf of its signatory affiliate, and provided some operational support to the signatory affiliate).

8.42 In Thomson-CSF, the court held that a parent company "could not possibly be bound under an agency theory" where the agreement at issue was formed between a subsidiary and the defendant well before the parent purchased the subsidiary. 64 F. 3d at 776-77. The same is true here; URS cannot be bound to the Contract under an agency theory because URS did not acquire Radian until six months after the Contract was signed. (See Request at ¶ 154.) Plainly, Radian could not have been acting on behalf of URS during the

40

negotiation and signing of the Contract because there was no relationship between the two whatsoever. Therefore, any effort by Solidere to argue an agency theory would fail as a matter of law.

### 4.    Incorporation by reference

8.43    Under both federal and Delaware law, "[a] nonsignatory may compel arbitration against a party to an arbitration agreement when that party has entered into a separate contractual relationship with the nonsignatory which incorporates the existing arbitration clause." Thomson-CSF, 64 F.3d at 777; accord Realty Growth Investors v. Council of Unit Owners, 453 A.2d 450, 454 (Del. 1982) ("A contract can be created by reference to the terms of another instrument if a reading of all documents together gives evidence of the parties' intention and the other terms are clearly identified.") (emphasis added). URS has no contractual relationship with Solidere, much less one that incorporates the existing arbitration clause between Radian and Solidere.    Thus, incorporation by reference is a non-starter for Solidere, which is presumably why Solidere did not assert this ground in its Request.

### 5.    Assumption of Contractual Obligation To Arbitrate

8.44    In the absence of a signature, a party may be bound by an arbitration clause if its subsequent conduct "manifest[s] a clear intention" to assume the obligation to arbitrate. Thomson-CSF, 64 F.3d at 777; cf. Creditors' Committee of Essex Builders, Inc. v. Farmers Bank, 251 A. 2d 546, 548-49 (Del. 1969) ("A contract will be implied in fact only when the Court may fairly infer such an intent from the evidence; it represents the presumed intention of the parties as indicated by their conduct.").

8.45    URS has never manifested an intent to be bound by the arbitration agreement (or the Contract in general, for that matter).    To the contrary, URS has consistently maintained its position that it is not bound to any arbitration agreement with Solidere.    Although Solidere appears to argue that URS's involvement in the project (in the form of lending certain employees to Radian and for monitoring Radian's involvement in the Prior Arbitration) somehow manifested its assumption of the Contract's obligations, Solidere could not

41

have relied on any such purported manifestation, as Solidere knew in advance that Radian committed to the Project all the resources available to it, including the resources of its affiliates.

8.46    Indeed, as shown above, in Radian's initial proposal to Solidere, Radian used this position as a marketing tool to attract Solidere in the first place: "Because we are a highly integrated set of companies, our no-barriers approach ensures that the required resources will be available to meet your needs. . . . [I]n addition to the Radian International staff, we have contractual access to the extensive technological expertise of [Radian's parent entity at the time]. Because we are highly integrated, our no-barriers approach ensures that the required resources are available." (URS Ex. 2.) Moreover, Solidere was expressly aware that the Prior Arbitration involved only two parties – itself and Radian (See URS Ex. 20.) Finally, as shown above, Solidere was expressly informed of URS's acquisition of Radian and told that Radian would continue to operate as a legally distinct entity and that there would be "no change" in Solidere's dealings with Radian. Accordingly, any argument that Solidere could have relied on the purported assumption based on URS's extending its resources to assist Radian on the Project or monitoring proceedings in the Prior Arbitration is simply untenable.

8.47    In any event, the Contract expressly precludes Solidere from relying on the claimed assumption of contract. This is because the Contract provides that Radian "shall not assign this Contract or any part thereof, without the prior Approval of [Solidere]." (Request, Ex. C 19 at GCC 6.1.) Under the Contract, "'[a]pproval' means approved in writing, including subsequent written confirmation of previous verbal approval." (Id. at GCC 1.1.) As Solidere has not provided any such approval, it could not rely on the purported assumption of the Contract by URS.

### 6.    Third-Party Beneficiary

8.48    Solidere cannot successfully force URS into arbitration because URS is not a third-party beneficiary. Under Delaware law, to qualify as a third-party beneficiary of a contract, the parties must have intended to benefit the third

42

party at issue <u>at the time when they entered into the contract</u>. See <u>DuPont</u>, 269
F. 3d at 198 (also noting that "incidental" benefit would not qualify to create a
"third-party" beneficiary). Here, because URS was not even in the picture
when the Contract was signed, there can be no plausible argument that the
parties could have intended to benefit it. <u>See id.</u> at 200 n.7 ("Under the third
party beneficiary theory, a court must look to the intentions of the parties at
the time the contract was executed."). Therefore, there is no evidence that
Radian or Solidere intended to benefit URS or give URS the right to sue under
the Contract, which is presumably the reason why Solidere did not rely on this
theory in its Request.

8.49    In any event, the third-party beneficiary theory cannot be grounded solely on
the parent-subsidiary relationship. <u>See InterGen</u>, 344 F. 3d at 147 (stating that
"an intimate corporate relationship, without more, is not tantamount to an
assignment of specific rights. There is an important distinction between a
nonsignatory who may benefit from a signatory's exercise of its contractual
rights (because of, say, an equity stake) and a third-party beneficiary.") (citing
<u>DuPont</u>, 269 F.3d at 196-97). Thus, the fact that URS is the ultimate parent of
Radian and arguably benefits from this relationship does not make URS a
third-party beneficiary of the Contract.

8.50    As there is no other colorable basis for forcing URS into arbitration with
Solidere under American law, this Tribunal should refuse to exercise
jurisdiction over Solidere's claims against URS.

**EVEN IF THE TRIBUNAL WERE TO RULE ON ITS OWN JURISDICTION
AND APPLIED SOME FORM OF THE "GROUP OF COMPANIES"
PRINCIPLES, URS SHOULD NOT BE BOUND BY THE ARBITRATION
AGREEMENT SIGNED BY RADIAN**

8.51    Even if the Tribunal were to adjudge the jurisdictional issue outside of the
U.S. jurisprudence, the result is the same. Although Solidere attempts to paint
a picture of a "group of companies" at work on the Project at issue, that
approach does not apply here. Companies under a corporate umbrella
regularly cooperate with each other – indeed, here it was expressly proposed
to Solidere from the start that, given the magnitude of the Project, Radian
would utilize all the resources available to it, including those of its affiliated

companies, to complete the Works under the Contract. (See URS Ex 2.)

8.52    However, it is well-settled that a legal subsidiary (like Radian) nonetheless remains a distinct entity from its parent (here, a URS subsidiary) and other companies in the group. An arbitration agreement cannot be extended to apply to a member of a corporate group that did not sign the arbitration agreement unless the party seeking to compel arbitration proves that the intent of the contracting parties was to bind the "group of companies" to the arbitration provisions.    See Fouchard, Gaillard, Goldman, International Commercial Arbitration (eds. 1999), at paragraph 500 (the decisive test for extending an arbitration agreement under the "group of companies" theory is "not so much the existence of a group that results in the various companies of the group being bound by the agreement signed by only one of them, but rather the fact that such was the true intention of the parties") (emphasis added).

8.53    Unsurprisingly, when other Arbitral Tribunals apply the doctrine, the intent of the parties is their main guidepost, be it where the non-signatory appeared to "the pivot of the contractual relations in a particular matter," as in ICC Case No. 5721 (1990), or where the non-signatory company was involved in the negotiations of the agreement in question to such an extent that it could be assumed that it has tacitly consented to be bound by the arbitration clause, as in ICC Case No. 8385 (1995). These facts are simply not present here, as URS was not even affiliated with Radian when the Contract was negotiated and never exercised anything but usual parental control over Radian's affairs after the acquisition.

8.54    ICC Case No. 5721 (1990) is particularly illustrative here because it shows why Solidere's "group of companies" allegations cannot withstand scrutiny and should be rejected. In that case, the Arbitral Tribunal held that the claimant (who alleged that the arbitration agreement extended to the person controlling the company who had signed the agreement) had not established that the claimant "intended to deal" with that person, or that such person "intended personally to be a party to the arbitration agreement." 19 YEARBOOK OF INT'L COMM. ARB. 1024 (1994). Cf. ICC Case No. 7626

44

(1995) (refusing to lift the corporate veil of non-signatory for purposes of extending arbitration agreement because there was insufficient evidence that respondents' corporate structure was utilized to evade mandatory legal provisions or the enforcement of existing third party rights).

8.55    In this case, the fact that URS indisputably did not own or have any relationship whatsoever with Radian at the time the arbitration agreement was signed (see Request at ¶ 154) forecloses any argument that Solidere could have intended to include URS within the scope of the Contract's arbitration agreement. The lack of such intent dooms Solidere's "group of companies" argument, if any, on its face.

## SOLIDERE SHOULD BE ESTOPPED FROM PROCEEDING AGAINST URS UNDER RES JUDICATA AND EQUITABLE PRINCIPLES BASED ON SOLIDERE'S CONDUCT IN THE PRIOR ARBITRATION

8.56    For all the reasons described above, URS cannot be dragged into this suit for Radian's liabilities and actions, because Radian is indisputably a separate corporate entity, not a mere shell controlled by URS. But assuming for argument's sake that Solidere could prove otherwise – and it assuredly cannot – then Soldiere would be precluded from seeking redress against URS for enforcement of the Prior Arbitration because "res judicata may be invoked against a plaintiff who has previously asserted essentially the same claim against different defendants where there is a close or significant relationship between successive defendants." Lubrizol Corp. v. Exxon Corp., 929 F.2d 960, 966 (3rd Cir. 1991) (finding claim against wholly owned subsidiary barred because plaintiff had previously litigated claims in prior suit against parent) (collecting cases). Accord Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. - Pension Fund v. Centra, 983 F.2d 495, 504 (3rd Cir. 1992) (acquiring parent company was in privity with subsidiary party to prior suit for preclusion purposes); Mars, Inc. v. Nippon Conlux Kabushiki-Kaisha, 855 F. Supp. 673, 677 (D. Del. 1994), aff'd, 58 F.3d 616 (Fed. Cir. 1995) (rejecting claims against parent already litigated against subsidiary arising from same transaction); see also Household Int'l, Inc. v. Westchester Fire Ins. Co., 286 F. Supp. 2d 369, 374 (D. Del. 2003) (privity

45

demonstrated for res judicata purposes "if the subsidiary represented the parent's interests and the parent directed the litigation.").

8.57    Here, while URS vigorously denies all of Solidere's allegations, if Solidere could prove them (and it cannot) then the current dispute arises out of the underlying dispute at issue in the Prior Arbitration and URS (at least according to Solidere) purportedly controlled Radian's defense of the Prior Arbitration. Thus, if this court concludes, which it should not, that URS controlled and dominated Radian, then Solidere is barred from asserting additional claims arising from the same dispute against URS because Solidere could have – but did not – assert such claims against URS in the Prior Arbitration.

8.58    In the alternative, Solidere should be precluded from proceeding against URS as a matter of equitable considerations because its conduct in the Prior Arbitration is inconsistent with its current resolve to litigate against URS. See, e.g., 28 Am. Jur. 2d Estoppel and Waiver § 28 at 453 (2000) ("estoppel is a judicial remedy by which a party may be precluded by his own act or omission from asserting a right to which it otherwise would have been entitled"). This concept also finds support in the international jurisprudence. Indeed, the principle according to which one party cannot contradict itself to the detriment of others is well-recognized in international law. In the seminal case of Preah Vihear Temple of 15 June 1962, the International Court of Justice held that "a State party to an international litigation is bound by its previous acts or attitude when they are in contradiction with its claims in the litigation." Vice-President Alfaro stated that "the legal effect of the principle is always the same," namely preclusion (*venire contra factum proprium non valet*). This Tribunal should thus give due consideration to the principle of consistency or estoppel. As Emmanuel Gaillard writes, it has become a "basic principle of the law of international commerce."[17]

---

[17]    Translated from: "L'interdiction de se contredire au détriment d'autrui a récemment été consacrée par quelques sentences arbitrales comme un nouveau principe général du droit du commerce international." Emmanuel Gaillard, *L'Interdiction de se contredire au détriment d'autrui comme principe général du droit du commerce international (le principe de l'estoppel dans quelques sentences arbitrales récentes)*, REVUE DE L'ARBITRAGE 241 (1985). *See also id.* at 258.

8.59    Here, Solidere should be precluded from dragging URS into the arbitration over Solidere's dispute with Radian because Solidere could have raised its claims against URS in the Prior Arbitration. As outlined above, the Prior Arbitration involved the same subject matter (Radian's alleged default under the Contract based on its failure to remediate landfill gas formed at the site); however, Solidere litigated only against Radian, even though Solidere had already possessed all its current evidence purportedly establishing that URS and Radian should be treated as one and the same. (See supra ¶¶ 7.18-7.24.) Indeed, when it later moved to confirm the Award obtained in the Prior Arbitration, Solidere continued to proceed only against Radian. (See URS Ex. 19.) It is thus clear that Solidere's conduct in the Prior Arbitration demonstrates that Solidere does not consider URS to be a proper party to the dispute at hand.

8.60    Although the Prior Arbitration was initiated by Radian, that is immaterial because the Prior Arbitration was commenced as much for Solidere's benefit as it was for Radian's, pursuant to the May 2003 memorandum of understanding between them. (See URS Ex. 18.) As the memorandum demonstrates, Solidere negotiated with Radian over the terms and content of the Prior Arbitration and expressly agreed to resolve all its claims arising out of the landfill gas issue in the Prior Arbitration – in a document to which URS was not a party. Indeed, Solidere never mentioned URS at any time, much less attempted to have URS become a signatory to the memorandum. (See Request ¶¶ 103-106.) Moreover, Solidere expressly confirms that it sought its own, separate relief in the Prior Arbitration (see id. ¶ 106 ("SOLIDERE . . . sought declarations . . . that there was a failure or defect in the Works")) – but only against Radian.

8.61    Essentially, Solidere's current ICC arbitration is an attempt to enforce against URS the Award obtained in the Prior Arbitration – which decision URS had no opportunity to contest and which was rendered as a result of proceedings in which URS was not a party. Consequently, Solidere should not be allowed now to proceed against URS on essentially the same facts as those at issue in the Prior Arbitration. Because URS did not have an opportunity, as the parent

47

company, to participate in the Prior Arbitration, either by contesting jurisdiction at the outset of the dispute, or by addressing arguments on the merits, Solidere should not be allowed to pursue a strategy of arbitrating initially against a signatory party and then proceeding (through the mechanism of a second proceeding) to enforce the award obtained in the first proceeding against another party that did not appear or defend in the prior proceedings. It cannot be seriously disputed that the interests of a parent and subsidiary are not necessarily the same and plainly not the same here, as URS's commercial risk profile was and is very different from that of Radian. Therefore, Solidere should be precluded from proceeding against URS in this arbitration by Solidere's failure to raise claims against URS in the Prior Arbitration.

## 9.    REQUEST FOR RELIEF

9.1    In consideration of the foregoing, URS respectfully requests that the Tribunal:

   (a)    declare that the Tribunal lacks jurisdiction over URS because it is not a party to and not bound by any arbitration agreement with Solidere;

   (b)    deny Solidere all the relief against URS;

   (c)    order Solidere to pay all costs and expenses (including, but not limited to, costs payable to the ICC, legal fees and expenses and fees and expenses of experts, consultants and others) incurred by URS in connection with preparation for and conduct of this arbitration.

## 10.    RESERVATION OF RIGHTS

10.1    URS respectfully reserves the right to amend/or supplement these Objections to Jurisdiction, as URS may consider necessary or appropriate.

Dated: 30 June 2006

Respectfully submitted

Signed:
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071-3144
per Jeffrey H. Dasteel, Jason D. Russell and Marina V. Bogorad

Skadden, Arps, Slate, Meagher & Flom (UK) LLP
40 Bank Street

48

Canary Wharf
London E14 5DS
per Karyl Nairn and Noradelle Ghubril

INTERNATIONAL CHAMBER OF COMMERCE
INTERNATIONAL COURT OF ARBITRATION

IN THE MATTER OF AN ARBITRATION
BETWEEN:

THE LEBANESE COMPANY FOR THE
DEVELOPMENT AND RECONSTRUCTION OF
BEIRUT CENTRAL DISTRICT SAL
("SOLIDERE")

Claimant

v.

URS CORPORATION

AND

RADIAN INTERNATIONAL LLC

Respondents

---

**RESPONDENT URS
CORPORATION'S OBJECTIONS TO
JURISDICTION**

---

Skadden, Arps, Slate, Meagher
& Flom (UK) LLP
40 Bank Street
Canary Wharf
London
E14 5DS

Reference: 14236/EC

# EXHIBIT F

Westlaw.

Slip Copy
Slip Copy, 2006 WL 869292 (3rd Cir.(N.J.))
(Cite as: 2006 WL 869292 (3rd Cir.(N.J.)))

Page 1

### Briefs and Other Related Documents

Only the Westlaw citation is currently available.

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
THE TECHNOLOGY DEVELOPMENT
COMPANY, LTD., Appellant
v.
Michael ONISCHENKO.
No. 05-4835.

Argued March 6, 2006.
Decided April 5, 2006.

**Background:** Plaintiff, which was company that developed new technologies in the pharmaceutical industry and which had its principal place of business in Moscow, Russia, brought breach of contract suit against defendant, who was plaintiff's former attorney and who had allegedly taken plaintiff's books and money from Moscow office. Defendant moved to dismiss on forum non conveniens grounds. The United States District Court for the District of New Jersey, Mary Little Cooper, J., granted defendant's motion to dismiss, and plaintiff appealed.

**Holdings:** The Court of Appeals, Roth, J., held that:

(1) court's conclusory statement that "well established" case law demonstrated adequacy of Russian courts for commercial and tort law cases was not enough to demonstrate that court had properly analyzed whether Russia was an adequate alternative forum;

(2) federal district court may dismiss case on ground of forum non conveniens when an alternative forum has jurisdiction to hear case, and when trial in chosen forum would establish oppressiveness and vexation

to defendant out of all proportion to plaintiff's convenience;

(3) court abused its discretion by failing to set forth how much deference it owed foreign plaintiff's choice of forum; and

(4) when analyzing whether to dismiss case based on forum non conveniens, dismissal is not appropriate merely because the public and private factors do not favor retaining jurisdiction.

Vacated and remanded.

[1] Federal Courts ⬅45

170Bk45 Most Cited Cases
Federal district court's conclusory statement that "well established" case law demonstrated adequacy of Russian courts for commercial and tort law cases was not enough to demonstrate that court had properly analyzed whether Russia was an adequate alternative forum to trying case in federal district court in New Jersey, as part of test to determine if case should be dismissed based on forum non conveniens, where plaintiff, which was corporation with its principal place of business in Russia, had protested adequacy of Russian court as alternative forum both before the district court and on appeal, and defendant, which was attorney who was resident of New Jersey, had offered minimal evidence in support of adequacy of the Russian forum.

[2] Federal Courts ⬅45

170Bk45 Most Cited Cases
Federal district court may dismiss case on ground of forum non conveniens when an alternative forum has jurisdiction to hear case, and when trial in chosen forum would establish oppressiveness and vexation to defendant out of all proportion to plaintiff's convenience.

[3] Federal Courts ⬅45

170Bk45 Most Cited Cases
When analyzing whether to dismiss case based on forum non conveniens, dismissal is not appropriate merely because the public and private factors do not favor retaining jurisdiction; court needs to determine whether litigation in chosen forum is vexatious or oppressive to defendant out of all proportion to plaintiff's convenience.

[4] Federal Courts ⬅45
170Bk45 Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 869292 (3rd Cir.(N.J.))
(Cite as: 2006 WL 869292 (3rd Cir.(N.J.)))

Page 2

When analyzing whether to dismiss case based on forum non conveniens, dismissal is not appropriate merely because the public and private factors do not favor retaining jurisdiction; court needs to determine whether litigation in chosen forum is vexatious or oppressive to defendant out of all proportion to plaintiff's convenience.

On Appeal from the United States District Court for the District of New Jersey. District Court No. 05-cv-04282. District Judge: Hon. Mary Little Cooper.

James B. Manning, (Argued), LeBoeuf, Lamb, Greene & MacRae, New York, NY, for Appellant.

Frederick L. Whitmer, (Argued), Akiva M. Cohen, Brown, Raysman, Millstein, Felder & Steiner LLP, New York, NY, for Appellee.

Before ROTH and GREENBERG, Circuit Judges and BUCKWALTER, [FN*] District Judge.

### OPINION

ROTH, Circuit Judge:

I. Background and Procedural History

*1 [1] This is an appeal from a District Court order dismissing The Technology Development Company's (TTDC) Complaint on the ground of *forum non conveniens*. Because we believe the District Court's analysis failed to address adequately all of the necessary factors of the *forum non conveniens* test, we will vacate the order of dismissal and remand for reconsideration based on the existing record.

TTDC is a Bermuda corporation that, for much of the time relevant to this appeal, maintained its principal place of business in Moscow, Russia. Its exact business purpose is unclear; it appears that TTDC was interested in developing new technologies in the pharmaceutical industry. From 1999 until 2005, Michael Onischenko, a member of the New York bar, represented TTDC and its owner and president, Thomas De Shazo. The District Court found, and the parties appear to agree, that Onischenko is a resident of New Jersey. De Shazo is a United States citizen with a residence in Idaho.

In 2002, TTDC began work to develop and commercialize a product for oral delivery of insulin and gene cell therapies. As part of its effort to develop the technology, TTDC employed Dr. Vladimir Sabetsky. The employment agreement provided that TTDC would set up a holding company

in which Dr. Sabetsky would be a 25% owner and to which he would assign all patents. The agreement further provided that TTDC would contribute the money necessary for Dr. Sabetsky to develop his idea.

In the spring of 2005, TTDC decided to leave Russia for the United States because it believed it could strike a deal with a U.S. pharmaceutical company on the basis of Dr. Sabetsky's work. De Shazo came to the United States before Onischenko and left Onischenko in charge of TTDC's Moscow operations. TTDC claims that around the time it decided to move into the U.S. market, Onischenko began to demand an equity position in the holding company that would own the technologies. De Shazo was not interested and asked for Onischenko's resignation. Onischenko complied.

The separation was not amicable. TTDC claims that when Onischenko demanded his equity position in the holding company, he threatened to derail the project unless TTDC agreed. After TTDC declined Onischenko's "offer," Onischenko purportedly began to make good on his threat by, among other things, trying to cut off TTDC's ability to obtain patents. Further, TTDC claims that Onischenko stole TTDC's original books and $240,000 in operating funds from the Moscow office. TTDC also avers that Onischenko turned Dr. Sabetsky and TTDC consultants Geosta Bergvall and Dr. Stefan Arver against it. Finally, TTDC claims that Onischenko has interfered or is interfering with its negotiations with New Jersey drug companies.

On September 1, 2005, TTDC filed a Complaint and request for a preliminary injunction against Onischenko in federal court in the District of New Jersey. The Complaint alleged breach of contract, breach of fiduciary duty, tortious interference with contract and prospective economic advantage, and wrongful conversion. Onischenko moved to dismiss on *forum non conveniens* grounds. On September 30, 2005, the District Court heard oral argument on the motion and issued an oral decision granting it. TTDC filed a timely notice of appeal.

II. Jurisdiction and Standard of Review

*2 The District Court exercised diversity jurisdiction under 28 U.S.C. § 1332. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

We review a decision to dismiss on *forum non conveniens* grounds for abuse of discretion. *Lony v.*

Slip Copy
Slip Copy, 2006 WL 869292 (3rd Cir.(N.J.))
(Cite as: 2006 WL 869292 (3rd Cir.(N.J.)))

*E.I. Du Pont de Nemours & Co.,* 886 F.2d 628, 631-32 (3d Cir.1989) (*Lony I* ). "[W]here the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). Despite this standard, "dismissal for forum non conveniens is the exception rather than the rule." *Lacey v. Cessna Aircraft Co.,* 862 F.2d 38, 46 (3d Cir.1988) (*Lacey I* ) (quoting *In re Air Crash Disaster Near New Orleans, Louisiana on July 9, 1982,* 821 F.2d 1147, 1164 n. 26 (5th Cir.1987)). A district court abuses its discretion "when it fails to consider adequately and to determine the amount of deference due the foreign plaintiff's choice of forum or when it clearly errs in weighing the factors to be considered." *Lony I,* 886 F.2d at 632 (citations omitted). Finally, the defendant bears the burden of persuasion as to the elements of the *forum non conveniens* analysis. *Lony I,* 886 F.2d at 632 (citing *Lacey I,* 862 F.2d at 43).

### III. Analysis

[2] In *Lacey I,* we set forth the general standard for dismissal in *forum non conveniens* cases: "A district court may ... dismiss a case 'when an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would 'establish ... oppressiveness and vexation to a defendant ... out of all proportion to the plaintiff's convenience....' ' " 862 F.2d at 43 (quoting *Piper Aircraft,* 454 U.S. at 241 (quoting *Koster v. Am. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947))). In ruling on a motion to dismiss based on *forum non conveniens,* a district court must address four issues: (1) the availability of an alternative forum; (2) the amount of deference to be accorded to the plaintiff's choice of forum; (3) the private interest factors; and (4) the public interest factors, *Lony I,* 886 F.2d at 633. In addition to considering these four factors, *Piper Aircraft* "requires that the district court consider the availability of an adequate alternative forum and the amount of deference to be accorded the plaintiff's choice of forum before it weighs the private and public interest factors...." *Lacey I,* 862 F.2d at 45.

### A. The Availability of an Alternative Forum

The Supreme Court has noted that this requirement is usually satisfied where the defendant is " 'amenable to process' in the other jurisdiction." *Piper Aircraft,* 454 U.S. at 254 n. 22 (citing *Gulf Oil Corp. v.*

*Gilbert,* 330 U.S. 501, 506-07, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)). Where, however, the alternative jurisdiction cannot provide a satisfactory remedy, dismissal on *forum non conveniens* grounds is improper. *Id.* at 254.

*3 Inadequacy of the alternative forum is rarely a barrier to *forum non conveniens* dismissal. *Id.* at 254 n. 22. Nonetheless, we believe the District Court should have done more than simply conclude that Russia provides an adequate forum without any discussion whatsoever of the remedies available in Russia or any citation to cases supporting the view that the Russian courts are adequate to handle disputes of this nature. *Lacey I,* 862 F.2d at 44 (reversing *forum non conveniens* dismissal where the district court did not adequately address, *inter alia,* the adequacy of British Columbia as an alternative forum); *Lony I,* 886 F.2d at 633 (expressing skepticism about a district court's decision to look to the plaintiff to show the inadequacy of the alternative forum but declining to find reversible error where the defendant put forward "some evidence" on adequacy and plaintiff did not specifically challenge the adequacy finding on appeal).

The District Court did no more than make a conclusory statement that "well established" case law demonstrated the adequacy of the Russian courts for commercial and tort law cases. [FN1] It may well be that a proper analysis will reveal that Russia is an adequate alternative forum, but where a plaintiff protests the alternative jurisdiction's adequacy both before the District Court and on appeal, the attack is not patently specious, and the defendant offers minimal evidence in support of adequacy, dismissal without a reasonably detailed discussion is an abuse of discretion.

### B. Amount of Deference Due Plaintiff's Choice of Forum

[3] Ordinarily, a court is required to give a plaintiff's choice of forum significant deference. *Piper Aircraft,* 454 U.S. at 255. Where, however, the plaintiff is foreign, the amount of deference is potentially less because a court cannot assume that the forum was chosen based on convenience factors. *Id.* at 255-56. We have stressed that *Piper Aircraft* is " 'not an invitation to accord a foreign plaintiff's selection of an American forum *no* deference since dismissal for forum non conveniens is the exception rather than the rule.' " *Lacey I,* 862 F.2d at 45-46 (quoting *In re Air Crash,* 821 F.2d at 1164 n. 26) (emphasis in *Lacey I* ). Accordingly, "[w]here a foreign plaintiff has made

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 869292 (3rd Cir.(N.J.))
(Cite as: 2006 WL 869292 (3rd Cir.(N.J.)))

Page 4

a strong showing of convenience, ... the district court must indicate how far that showing goes toward putting the foreign plaintiff on the same footing as a domestic plaintiff." _Lony I_, 886 F.2d at 634; _Iragorri v. United Techs. Corp._, 274 F.3d 65, 71-72 (2d Cir.2001) (noting that the more it appears that a foreign plaintiff's choice of forum was dictated by reasons the law deems legitimate, the more deference it should receive); _Norex Petroleum Ltd. v. Access Indus, Inc._, 416 F.3d 146, 154 (2d Cir.2005) (same).

We believe the District Court committed an abuse of discretion by failing to set forth how much deference it owed TTDC's choice of forum. After stating that it was required to determine how much deference to give TTDC's choice of forum in its opening recitation of the _forum non conveniens_ standard, the only portion of its oral decision arguably addressing the issue was its language, a number of transcript pages later, that "[t]he plaintiff has no contact with New Jersey. The plaintiff is a Bermuda limited liability company with its principal place of business in Moscow and the location of residence of its principal, Mr. De Shazo, most recently Idaho." Given that these statements were made in the section of the decision in which the District Court was discussing the private and public interest factors, it is not clear whether the District Court was even thinking about deference issues at all.

*4 Onischenko asks this Court to conclude that those two sentences indicate that the District Court decided not to afford TTDC any more deference than a typical foreign plaintiff is afforded under _Piper Aircraft_. Onischenko attempts to draw support for this argument from _Lacey v. Cessna Aircraft Co._, 932 F.2d 170, 179 (3d Cir.1991) (_Lacey II_ ), in which we noted that a district court does not have to "mark on a continuum" the exact amount of deference it is affording a foreign plaintiff's forum selection. _Lacey II_ upheld a _forum non conveniens_ dismissal where the district court addressed the issue of deference, noted that it was impossible to quantify, and further provided that it was requiring that the defendants establish a strong preponderance in favor of dismissal. _Id._ On the basis of the district court's treatment, we were able to say that the district court demonstrated that it accorded the plaintiff's forum selection "not insignificant weight...." _Id._

Onischenko also directs our attention to the portion of _Lacey II_ in which we discussed a district court's statement that "[b]ecause plaintiff is a foreign national with no connection to the forum, his choice is not entitled to the same degree of deference

accorded a resident or citizen who chooses his home forum." _Id._ at n. 6 (alteration in _Lacey II_ ). He asserts that our endorsement of this language stands for the proposition that a district court's statement that a foreign plaintiff has no connection to the forum is equivalent to a statement that the plaintiff has not made the required showing of convenience to overcome the negative presumption that attaches to a foreign plaintiff's forum choice.

Contrary to Onischenko's claims, _Lacey II_ does not support the District Court's approach in this case. Initially, the District Court in _Lacey II_ went much further in addressing the deference issue than does the District Court here. Indeed, it takes a generous reading of the decision here even to conclude that the deference issue was addressed at all. Moreover, _Lacey II_ states that a foreign plaintiff with no connection to the chosen forum is entitled to less deference than a domestic plaintiff who chooses his home forum. 932 F.2d at 170 n. 6. However, simply because a foreign plaintiff without a connection to the forum is not entitled to the same deference as a domestic plaintiff who chooses his home jurisdiction, it does not follow automatically that such a plaintiff receives only the lowest level of deference. The best reading of _Lony I_ and _Lacey II_ is that where, as here, there is some evidence of convenience (even if it is not in the form of the foreign plaintiff's direct contacts to the forum), the proper approach is to "decide just how much less deference is due this plaintiff's choice of forum ..." than a domestic plaintiff's choice of forum. 886 F.2d at 634; _Norex Petroleum_, 416 F.3d at 155-56 (vacating a dismissal based on _forum non conveniens_ where the district court failed to determine how much deference it was according a foreign plaintiff's forum choice despite the plaintiff's demonstration of convenience-based decision making).

*5 In this case, TTDC sued Onischenko in Onischenko's home jurisdiction largely because it was the only place TTDC felt confident it could obtain jurisdiction. Moreover, with TTDC moving its business operations from Russia to the United States, New Jersey appears to be more convenient for TTDC and its United States resident principal. _See Wiwa v. Royal Dutch Petroleum Co._, 226 F.3d 88, 103 (2d Cir.2000) (holding that a district court erred in failing to take plaintiff's status as a United States citizen into account because "[t]he benefit for a U.S. resident plaintiff of suing in a U.S. forum is not limited to suits in the very district where the plaintiff resides....").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 869292 (3rd Cir.(N.J.))
(Cite as: 2006 WL 869292 (3rd Cir.(N.J.)))

Page 5

Our view of the importance of the deference determination is underscored by the unusual scenario presented in this case. Most *forum non conveniens* cases involve a defendant, sued far from home, arguing against being forced to litigate in a remote forum. *Lony v. E.I. Du Pont de Nemours & Co.*, 935 F.2d 604, 608 (3d Cir.1991) (*Lony II* ). Here, by contrast, Onischenko was sued in his own forum and is arguing that it would be more convenient for him to defend himself thousands of miles away. In *Lony I*, we implied that a foreign plaintiff's decision to sue a defendant in the defendant's home forum was itself a factor suggesting that the foreign plaintiff's decision was based on convenience rather than some ulterior motive. 886 F.2d at 634; *Norex Petroleum*, 416 F.3d at 155-56. Even granting that much of the conduct involved in this litigation occurred while the parties were in Russia, the fact that TTDC chose to sue Onischenko in the only place it thought it could obtain jurisdiction is evidence that its choice of forum was based on convenience factors. This, plus that the fact that TTDC was wrapping up its Russian business and beginning the transition to the United States, shows that the District Court's treatment of this issue was too superficial. Therefore, dismissing without a more detailed inquiry into the proper level of deference to be accorded to TTDC's forum selection constituted an abuse of discretion.

### C. Private and Public Interest Factors

[4] We are concerned that the District Court may not have applied the proper standard to weighing the private and public interest factors. As stated above, Onischenko bears the burden of establishing that litigation in New Jersey would be oppressive and vexatious to him. *Piper Aircraft*, 454 U.S. at 241. In *Lony I*, we took exception to a district court's suggestion that dismissal was appropriate where the balance of private factors was at equipoise or tipped toward dismissal. 886 F.2d at 635. Here, it is unclear whether the District Court concluded that litigation in New Jersey was vexatious and oppressive to Onischenko out of all proportion to TTDC's convenience, or whether, all things being equal, Russia was a better forum. The former is a basis for dismissal; the latter is not. The District Court concluded its private interest analysis by stating that "I think I have given a sufficient recitation to show that there are no private factors and certainly no interest of this forum factors that favor retaining jurisdiction in this forum." The problem is that dismissal is not appropriate just because the private and public factors do not favor *retaining* jurisdiction. *See Lony I*, 886 F.2d at 635.

*6 On remand, we hope the District Court should carefully consider and address the private and public interest factors. We make no forecast whether or not a proper analysis will lead to the conclusion that the private and public interest factors weigh strongly against litigation in New Jersey.

### IV. Conclusion

The District Court abused its discretion by failing to address properly the Supreme Court's and this Court's *forum non conveniens* jurisprudence. In view of TTDC's opposition to the alternate forum, the District Court did not sufficiently discuss or determine its adequacy. Nor did the District Court address the issue of the proper level of deference to be afforded TTDC's forum selection. We are also concerned that the District Court may not have applied the proper standard in weighing the private and public interest factors. Therefore, we will vacate the order of dismissal and remand this case for reconsideration based on the record as it currently stands.

> FN* The Honorable Ronald L. Buckwalter, Senior United States District Court Judge for the Eastern District of Pennsylvania, sitting by designation.

> FN1. Before the District Court, Onischenko relied on *Miller v. Boston Scientific Corp.*, 380 F.Supp.2d 443, 449-450 (D.N.J.2005), in support of his contention that TTDC was required to dispute the adequacy of the Russian courts and, having failed to do so, TTDC cannot now seek to establish reversible error. Assuming that *Miller* states the proper standard (and we take no position on that issue), Onischenko's argument is still troublesome because TTDC did challenge Onischenko's failure to "establish that Russian courts have jurisdiction ..., will provide satisfactory remedies, or that they even recognize TTDC's claims...." We leave to the District Court in the first instance the task of resolving whether, in light of TTDC's challenge to the adequacy of the Russian court system, Onischenko had to do more than merely state that he was amenable to suit in Russia and cite a single case to the effect that Russian courts are not corrupt.

Slip Copy, 2006 WL 869292 (3rd Cir.(N.J.))

**Briefs and Other Related Documents (Back to top)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 869292 (3rd Cir.(N.J.))
(Cite as: 2006 WL 869292 (3rd Cir.(N.J.)))

• 05-4835 (Docket) (Oct. 31, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 86413 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 1

**C**

Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
S. MEGGA TELECOMMUNICATIONS LIMITED,
a Hong Kong corporation, and S. Meggatel Sdn.
Bhd., a Malaysian corporation, Plaintiffs,
v.
LUCENT TECHNOLOGIES, INC., a Delaware
corporation Defendant.
No. 96-357-SLR.

Feb. 14, 1997.

Arthur G. Connolly, of Connolly, Bove, Lodge &
Hutz, Wilmington, Delaware. Byron L. Gregory,
Esquire, Jillisa Brittan, Charles P. Beveridge, of
McDermott, Will & Emery, Chicago, IL, of counsel,
for plaintiffs.

Jesse A. Finkelstein, John T. Dorsey, of Richards,
Layton & Finger, Wilmington, Delaware. Francis P.
Barron, Philippe Z. Selendy, and David M. Hornik,
of Cravath, Swaine & Moore, New York City, of
counsel, for defendant.

MEMORANDUM OPINION
ROBINSON, District Judge.

I. INTRODUCTION

*1 On July 1, 1996 plaintiffs S. Megga
Telecommunications Limited ("S.Megga") and S.
Meggatel SDN. BHD. ("S. Meggatel") (collectively
referred to as "plaintiffs") filed this action against
defendant Lucent Technologies, Inc. ("Lucent")
seeking to recover damages as a result of Lucent's
alleged breaches of contracts, tortious conduct, and
antitrust violations. (D.I. 1) On August 20, 1996,
Lucent filed a motion to dismiss counts I through VII
of plaintiffs' complaint. (D.I. 8) On January 2, 1997,
Lucent filed an answer to count VIII, counterclaims,
and a motion for a temporary restraining order. (D.I.
16, 20) Plaintiffs responded by filing an answer and
motion to dismiss Lucent's counterclaims. (D.I. 22,
23) On January 6, 1997, the court heard oral
argument on Lucent's motion for a temporary
restraining order. (D.I. 21) All of the motions have
been fully briefed. (D.I. 9, 11, 17, 24, 25, 31, 32, 33,
35, 36)

This case is presently before the court on Lucent's

motion to dismiss counts I through VII of plaintiffs'
complaint, its motion for a temporary restraining
order, and plaintiffs' motion to dismiss Lucent's
counterclaims. (D.I. 8, 16, 23) For the reasons that
follow, the court shall deny Lucent's motion to
dismiss as to counts I through V and grant its motion
as to counts VI and VII. The court shall also grant
plaintiffs' motion to dismiss Lucent's counterclaims
and deny Lucent's motion for a temporary restraining
order.

II. BACKGROUND

S. Megga is a Hong Kong corporation with its
principal place of business in Hong Kong and with
manufacturing facilities in the People's Republic of
China ("China"). (D.I. 1 at 3) Plaintiff S. Meggatel is
a Malaysian corporation with its principal place of
business in Klang, Malaysia.[FN1] (D.I. 1 at 3)

> FN1. S. Meggatel is an affiliate of S.
> Megga. S. Megga is a wholly-owned
> subsidiary of S. Megga International
> Holdings, Ltd., a corporation organized
> under the laws of the British Virgin Islands.
> (D.I. 1 at 3) S. Megga International
> Holdings, Ltd. also owns seventy percent of
> S. Meggatel. (D.I. 1 at 4)

Defendant Lucent is a Delaware corporation that does
business throughout the United States. (D.I. 20 at 1)
Lucent is composed of "certain former AT&T
Corporation ("AT&T") businesses and operations
relating to the design, development, manufacturing
and marketing of telecommunications equipment and
related software." (D.I 20 at 1)

Since 1983, S. Megga has manufactured consumer
products for Lucent. (D.I. 1 at 4) In 1986, S. Megga
began manufacturing cordless telephones for Lucent.
(D.I. 1 at 5) In 1992, S. Meggatel also began
manufacturing cordless telephones for Lucent. (D.I. 1
at 5-6) Plaintiffs assert that, in early 1991, Lucent
induced S. Meggatel to build a new facility
"dedicated exclusively to the manufacturing of
cordless telephones for Lucent." (D.I. 1 at 5) Lucent
is alleged to have represented to plaintiffs that it
would purchase a minimum of 400,000 telephones
annually from S. Meggatel for the "long term" and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 86413 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 2

continue to purchase telephones from S. Megga unless restrictions by China were imposed. (D.I. 11 at 1-2) Plaintiffs also allege that, in 1995, Lucent induced S. Megga to build a new manufacturing facility in China in order to meet Lucent's demands. (D.I. 11 at 1-2) From 1983 to 1995, Lucent allegedly instructed plaintiffs not to manufacture telephones for Lucent's competitors or it would terminate its business relationship with them. (D.I. 1 at 7) Lucent also allegedly directed plaintiffs to defer their profits on sales to Lucent from 1994 to 1995. (D.I. 1 at 8)

*2 In return for all these concessions, plaintiffs allege that Lucent promised S. Megga and S. Meggatel a business relationship with Lucent for the "long term." (D.I. 11 at 3) In December 1995, however, Lucent terminated its relationship without notice. (D.I. 1 at 8) As a result, plaintiffs have set forth claims for breach of contract (count I), breach of implied covenant of good faith and fair dealing (count II), promissory estoppel (count III), fraudulent misrepresentation (count IV), negligent misrepresentation (count V), attempted monopolization (count VI), and breach of fiduciary duty (count VII).

In its motion to dismiss counts I through VII of the complaint, Lucent argues that its contractual relationship with plaintiffs is governed by General Purchase Agreements ("GPAs") that S. Megga entered into in 1986 and S. Meggatel entered into in 1992.[FN2] (D.I. 1 at 4, 6) According to Lucent, both GPAs (1) "constitute the entire agreement between the parties with respect to purchases of cordless telephones;" (2) "disclaim any minimum purchase obligation;" and (3) "state that Lucent can cease making purchase orders at any time." (D.I. 9 at 2) In opposing Lucent's motion, plaintiffs argue that their complaint concerns conduct and agreements with Lucent that are outside the scope of both GPAs.

> FN2. The contract between S. Meggatel and Lucent was amended in March of 1993 to include cordless telephones. Although the agreement between Lucent and S. Meggatel that was attached to plaintiffs' complaint is not specifically identified as a "General Purchase Agreement," both parties appear to refer to it as such. (D.I. 9 at 2; D.I. 11 at 2)

Lucent's motion for a temporary restraining order and its counterclaims relate to cordless telephones that S. Megga made for a joint venture corporation. In 1994, AT&T (now Lucent), S. Megga, and the Central

Technology Center,[FN3] a Chinese government corporation, entered into a contract ("Joint Venture Agreement") to create the joint venture corporation AT&T-CTB ("Joint Venture"). (D.I. 25, Ex. 1 at 4) The Joint Venture Agreement is governed by the laws of China and provides that disputes arising in connection with it shall be submitted to the court of arbitration in Stockholm, Sweden. (D.I. 25, Ex. 1 at 22)

> FN3. The Central Technology Center is a wholly-owned subsidiary of the China National Posts and Telecommunications Industry Corporation, an agency of the Chinese government. (D.I. 17 at 4)

After the Joint Venture Agreement was executed, Lucent authorized S. Megga to manufacture cordless telephones for AT&T-CTB. (D.I. 17 at 5) With these instructions, S. Megga manufactured approximately 60,000 to 70,000 cordless telephones for AT&T-CTB. (D.I. 21 at 1) According to S. Megga, these telephones were intended to be sold by the Joint Venture only in China. (D.I. 24 at 1) In December 1995, Lucent allegedly advised S. Megga that it was withdrawing from the Joint Venture.[FN4] (D.I.25 at 2 and Ex. 2, ¶ 6)

> FN4. At oral argument, counsel for Lucent denied that Lucent had withdrawn from the Joint Venture. (D.I. 21 at 13) Lucent, however, admits that it advised S. Megga in December 1995 that it was considering selling its interest in AT&T-CTB. (D.I. 20 at 5)
> Plaintiffs claim that because Lucent wanted to withdraw from the Joint Venture it entered into a settlement agreement with S. Megga in January 1996 ("January 1996 Agreement"). The January 1996 Agreement involved "an adjustment of costs ... under which Lucent agreed ... that it owed and would pay S. Megga U.S. $3 million as part of the reconciliation of costs related to the Joint Venture and S. Megga would, as it did, take over Lucent's position in the Joint Venture at no additional costs to S. Megga." (D.I. 1 at 21) Plaintiffs' count VIII alleges that Lucent breached the January 1996 Agreement. Lucent does not seek to dismiss this claim.

The telephones that S. Megga manufactured

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 86413 (D.Del.)
(Cite as: Not Reported in F.Supp.)

consisted of three different models: model numbers 5548, 5545, and 4615. (D.I. 25 at 1) According to S. Megga, Models 5548 and 5545 accounted for all but 1,000 of the 60,000 to 70,000 units S. Megga manufactured. (D.I. 25 at 1) Model 4615 accounted for the remaining 1,000 units. (D.I. 25 at 1) S. Megga claims that models "5548 and 5545 were designed entirely by S. Megga" and only S. Megga's tooling and electronics were used. (D.I. 25 at 1) The 5548 and 5545 models carry the AT&T logo and were packaged in boxes with the AT&T logo. The 1000 units of model 4615 were made using AT&T's tooling. (D.I. 25 at 2) The 4615 model does not carry the AT&T logo and was made using only S. Megga's electronics. (D.I. 25 at 2)

*3 Lucent argues that S. Megga has breached its GPA by selling these cordless telephones in China without Lucent's authorization. S. Megga's GPA contains provisions relating to the use of Lucent's tooling equipment,[FN5] information,[FN6] identification,[FN7] and insignia.[FN8] The GPA also contains a clause which provides that S. Megga may not knowingly "transmit directly or indirectly ... [a]ny immediate product ... produced directly by the use of technical information ... or [a]ny commodity produced by such immediate product ... to ... [the] People's Republic of China ..." without the prior written consent of the United States Department of Commerce. (D.I. 1, Ex. A at 19)

FN5. The "Title to Special Tooling" clause, in subparagraph (7), provides, in part, that "[i]f [S. Megga] defaults ... or if [AT&T] is not obligated to purchase products ... [AT&T] may withdraw all or any part of the TOOLING and TOOLING drawings." (D.I. 1, Ex. A) The GPA defines "special tooling" as "including, but not limited to molds, dies, punches, printed circuit masters, integrated circuit masks, and the like, including the media in which embodied, and services required to produce the same." (D.I. 1, Ex. A)

FN6. The "Use and Information" clause provides that any information furnished or acquired by S. Megga from Lucent shall remain Lucent's property and must be returned at Lucent's request. The term "information" is defined as "[a]ny specifications, drawings, sketches, models, samples, tools, computer or other apparatus programs, technical or business information

or data, written, oral or otherwise, owned or controlled by [ [ Lucent] ...." (D.I. 1, Ex. A; D.I. 17 at 10 n. 5)

FN7. The identification clause provides in part that "[S. Megga] shall make no use of any identification of ... [AT&T] ... in its advertising and promotional efforts in reference to activities undertaken by [S. Megga] under this Agreement." The GPA defines "identification" as "any trade names, trademark, service mark, [or] insignia...." The clause also provides that "[S. Megga] agrees to remove any such identification prior to any sale, use or disposition of material ... not purchased by Company...." (D.I. 1, Ex. A; D.I. 20 at 9, ¶ 38)

FN8. The insignia clause in the GPA provides in part that "[cordless phones] rejected or not purchased by Company which utilized such INSIGNIA shall have all such Insignia removed prior to any sale, use or disposition thereof." (D.I. 1, Ex. A; D.I. 20 at 10, ¶ 39) The GPA defines "insignia" as "certain Company trademarks, trade names, insignia, symbols, decorative designs, packaging designs or evidences of Company's inspection." (D.I. 1, Ex. A)

S. Megga claims that all of the units were made before December 1995. (D.I. 25 at 1) S. Megga also claims that Lucent approved these telephones for sale in China. (D.I. 25 at 1) At oral argument, counsel for Lucent disputed S. Megga's claim that the 4615 models were made before December 1995. Counsel for Lucent suggested that a manufacturing date of June 1996 was stamped on the bottom of the 4615 telephones.[FN9] (D.I. 21 at 14)

FN9. At oral argument, the court noted that the numbers "96" and "6" appeared to be stamped or embossed on the bottom of a sample model 4615 telephone.

In December 1995, S. Megga still possessed 16,000 telephone units from those it had manufactured for the Joint Venture. S. Megga claims that the Joint Venture could not pay for these units because of Lucent's withdrawal. (D.I. 25 at 2 and Ex. 1, ¶ 8) S. Megga then attempted to secure payment for these telephones from Lucent but was unsuccessful. Consequently, in August 1996, S. Megga began selling the cordless telephones to third parties in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 86413 (D.Del.)
(Cite as: Not Reported in F.Supp.)

China to mitigate its losses. (D.I. 25 at 2) Between August and December 1996, S. Megga sold 12,000 units. Presently, S. Megga claims it has approximately 4,000 telephone units in its possession. (D.I. 25 at 3)

Lucent disputes these facts. In its counterclaim, Lucent alleges that, at or around July 1996, S. Megga began to manufacture, distribute, and sell cordless telephones in China made with Lucent's equipment, technology, and intellectual property. (D.I. 17 at 5-6) Lucent's affiant, Patrick Leung, the General Manger of the Joint Venture, asserts that he believes the number of telephones sold by S. Megga is increasing. (D.I. 19, ¶ 13) Leung states that he has "seen no evidence to suggest that S. Megga is reducing its distribution and sale of Lucent/AT&T cordless telephones." (D.I. 19, ¶ 13) Leung also states that "the volume of sales by [the Joint Venture] ... of Lucent/AT&T cordless telephones in China [] has declined by 90% from July to December. (D.I. 19, ¶ 14) Lucent also complains that S. Megga has not returned Lucent's capital tooling equipment and technical information as requested by Lucent.[FN10] (D.I. 17, Ex 1; D.I. 21 at 9)

> FN10. At oral argument, counsel for S. Megga and S. Meggatel asserted that Lucent's tooling equipment has been or will be returned. (D.I. 21 at 43) Counsel for S. Megga and S. Meggatel stated that S. Megga and S. Meggatel are not using such equipment and have no interest in it. (D.I. 21 at 43)

Based on these allegations, Lucent filed its counterclaims and this motion for a temporary restraining order. Lucent's counterclaims fall into two basic categories: breach of contract claims and intellectual property claims. Count I of Lucent's counterclaims alleges that S. Megga breached its GPA by selling cordless phones in China that are marked with the AT&T logo or made with Lucent's tooling. Counts II through IV of Lucent's counterclaims allege that, by selling these phones in China, S. Megga has violated the trademark, unfair competition, and business secret laws of China.

### III. DISCUSSION

*4 The parties' motions will be addressed *seriatim*.

### A. Lucent's Motion to Dismiss

Lucent has moved to dismiss counts I through VII of plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6). Counts I through V and VII of plaintiffs' complaint are based on state contract and tort law. Count VI is based on federal antitrust law. Although the parties use different rationales, they do not dispute that New Jersey law governs both the interpretation of the GPAs and plaintiffs' state law claims. (D.I. 9 at 6 n.3; D.I. 11 at 4 n.1) The court finds that New Jersey law applies to plaintiffs' state law claims and to all claims arising out of the GPAs. New Jersey law applies to plaintiffs' state law claims because it is the state with the most significant relationship to these claims. See *IBM v. Comdisco, Inc.*, C.A. No. 91 C-07-199, 1991 WL 269965, at *5-7 (Del. Super. Ct., Dec. 4, 1991). The court also finds that New Jersey law applies to the GPAs because there is a material connection that links the chosen jurisdiction to the transaction.[FN11] *Annan v. Wilmington Trust Co.*, 559 A.2d 1289, 1293 (Del. 1989).

> FN11. The GPAs contain choice of law provisions that state "[t]he construction, interpretation and performance of this Agreement and all transactions under it shall be governed by the laws of the State of New Jersey...." (D.I. 1, Ex. A; D.I. 9, Ex. 1) Since Lucent is headquartered in New Jersey, there is a material connection between the chosen jurisdiction and the transaction. *Suburban Trust & Sav. Bank v. Univ. of Del.*, 910 F. Supp. 1009, 1013 (D. Del. 1995).

#### 1. Rule 12(b)(6) Standard for Dismissal

In ruling on a motion to dismiss, the court will consider primarily the allegations contained in the complaint. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The court, however, may also consider matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint. *Id.* The court must accept all factual allegations in the complaint as true. *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam). The court is also bound to give the plaintiffs the benefit of every reasonable inference to be drawn from the complaint. *Retail Clerks Int'l Ass'n v. Schermerhorn*, 373 U.S. 746 (1963). Additionally, the court must resolve any ambiguities concerning the sufficiency of the claims

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 86413 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 5

in favor of the plaintiffs. *Hughes v. Rowe,* 449 U.S. 5, 10 (1980) *(per curiam).* The "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

### 2. Plaintiffs' Contract Claims

In their complaint, plaintiffs set forth claims for breach of contract (count I), breach of implied covenant of good faith and fair dealing (count II), and promissory estoppel (count III).[FN12] Lucent's argument that these claims should be dismissed is essentially based upon the assertion that both GPAs are the "master agreements" governing its relationship with the plaintiffs.

> **FN12.** Plaintiffs rely upon essentially the same allegations for each of these claims. The conduct plaintiffs base their claims on is Lucent's (1) failure to maintain its volume of purchases with S. Megga once the Malaysian facility was built; (2) failure to purchase annually at least 400,000 units from S. Meggatel for the period necessary to recoup its investment or for the long term; (3) failure to allow plaintiffs to recover profits on sales to Lucent during 1994 to 1995; and (4) failure to allow plaintiffs to continue to sell cordless telephones to Lucent at the price at which plaintiffs could recover their profits. Plaintiffs allege that Lucent promised them this "long-term" business relationship if they would defer profits for two years and build or expand their manufacturing facilities. Plaintiffs also allege that Lucent made these promises even though it had decided to terminate its business relationship with them.

According to Lucent, both GPAs' merger clauses clearly establish that they are the "master agreements" governing Lucent's purchasing relationship with plaintiffs.[FN13] Based on this assertion, Lucent argues that plaintiffs cannot rely on any allegations of prior or contemporaneous oral agreements to alter the terms of both GPAs because the merger clauses and the parole evidence rule bar such allegations. (D.I. 9 at 8) Lucent argues that these claims fail because, under the terms of both GPAs, Lucent had the right to terminate its relationship with plaintiffs for any reason and was not obligated to purchase a minimum number of telephone units.[FN14]

> **FN13.** The S. Megga GPA contains an "Entire Agreement" clause which provides: This Agreement shall incorporate the typed or written provisions on Company's [Lucent's] orders issued pursuant to this Agreement, and this Agreement as supplemented by such provisions shall constitute the entire agreement between the parties with respect to the subject matter of this Agreement and shall not be modified or rescinded, except by a writing signed by Supplier [S. Megga] and Company …. Estimates furnished by Company shall not constitute commitments. The provisions of this Agreement supersede all prior oral and written quotations, communications, agreements and understandings of the parties with respect to the subject matter of this Agreement.
> (D.I. 1, Ex. A) S. Meggatel's GPA contains a substantially similar clause. (D.I. 9, Ex. 1)

> **FN14.** S. Megga's GPA contains a "Non-Exclusive Marketing Rights" clause that provides, in part:
> Supplier [S. Megga] agrees that the purchases by Company [Lucent] under this Agreement shall not restrict the right of the Company to cease purchasing or require Company to continue any level of such purchases.
> (D.I. 1, Ex. A). S. Meggatel's GPA contains a substantially similar clause. (D.I. 1, Ex. B) S. Megga's GPA also contains a "Termination of Purchase Order" clause that provides in part:
> Company [Lucent] may at any time terminate any or all purchase orders placed by it hereunder. Unless otherwise specified herein, Company's liability to Supplier [S. Megga] with respect to such terminated purchase order or orders shall be limited to (1) Supplier's purchase price of all components [], plus (2) actual costs incurred by Supplier in procuring and manufacturing MATERIAL [], less (2) any salvage value thereof.
> (D.I. 1, Ex. A) S. Meggatel's GPA has the exact same clause. (D.I. 1, Ex. B)

**\*5** Plaintiffs argue that their breach of contract claim involves "other agreements" that were "separate and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 86413 (D.Del.)
(Cite as: Not Reported in F.Supp.)

independent of the GPAs." In other words, plaintiffs argue that the GPAs do not represent the entire relationship between them and Lucent. For this reason, plaintiffs assert that the court cannot dismiss their claims without first considering evidence relating to these "other agreements."

The court agrees with plaintiffs. The interpretation of an agreement involves determining the intention of the parties as revealed by the language used by them. *Atlantic Northern Airlines v. Schwimmer*, 96 A.2d 652, 656 (N.J. 1953). Under New Jersey law, the intention of the parties is determined by the "the situation of the parties, the attendant circumstances, and the objects they were... striving to attain ...." *Id.* Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. *Id.*

Lucent argues that *Schwimmer* is inapplicable to the case at bar because that case involved the construction of a contract that did not contain an integration clause.[FN14] (D.I. 14 at 6 n.9) The court recognizes that some courts, in applying New Jersey law, have given conclusive effect to integration clauses in determining whether the parties intended to make a contract integrated. *See Zone Co. v. Service Transp. Co., Inc.*, 57 A.2d 562, 564-565 (N.J. 1948); *see also Dow Chemical Co. v. Schaefer Salt & Chemical Co.*, 1992 WL 672289 at \*9 (D.N.J. July 21, 1992) (citing *United States v. Clementon Sewerage Authority*, 365 F.2d 609, 614 n.1 (3d Cir. 1966)). The court, however, finds *Schwimmer* to be the authoritative statement in New Jersey on the manner of proving integration. *United States v. Clementon Sewerage Authority*, 365 F.2d 609, 613 (3d Cir. 1966) (stating that *Schwimmer* is the authority in New Jersey on integration); *Doyle v. Northrop Corp.*, 455 F. Supp. 1318, 1333 (D.N.J. 1978). The court notes, as the Third Circuit noted in *Clementon Sewerage*, that two older New Jersey Supreme Court cases apparently determine integration by reference only to the written agreement. 365 F.2d at 614 n.1 (citing *Brautigam v. Dean & Co.*, 89 A. 760 (N.J. 1914) and *Zone Co.*, 57 A.2d 562, 564-565 (N.J. 1948)). Both these cases, however, do not specifically address the manner in which courts are to determine whether a contract is integrated.[FN16]

FN15. Lucent notes correctly that, in *Schwimmer*, the court allowed the introduction of parole evidence "only for the purpose of interpreting the writing-- not for

the purpose of modifying or enlarging or curtailing its terms." 96 A.2d at 656. Lucent, however, is incorrect in characterizing plaintiffs' claims as "seek[ing] to modify, enlarge or curtail the terms of the GPAs." (D.I. 14 at 6-7 n.9) Plaintiffs' argument that the terms of the GPAs do not apply to its other agreements involves interpreting what the parties intended the terms of the GPAs to mean.

FN16. In *Brautigam*, the New Jersey Supreme Court considered a contract without an integration clause. The *Brautigam* court simply held that the contract was incomplete upon examining its terms. 89 A. at 763. The court recognizes that in *Zone Co.* the New Jersey Supreme Court held that the contract was integrated because "there is a clear implication of fact from the writing itself." 57 A.2d at 564. However, the New Jersey Supreme Court in *Zone Co.* also specifically declined to pursue the question of whether extrinsic evidence is admissible in determining whether a contract was integrated. 57 A.2d at 564.

In *Schwimmer*, the New Jersey Supreme Court held that the intent of the parties is not to be determined solely by reference to the four corners of the written agreement "even when the contract on its face is free from ambiguity." 96 A.2d at 656. The *Schwimmer* court stated:

Whether a particular subject of negotiation is embodied by the writing depends wholly upon the intent of the parties; but the intent must be judged by an external standard. The writing is not 'wholly and intrinsically self-determinative of the parties' intent to make it the sole memorial' of the subject of negotiation; this intent 'must be sought ... in the conduct and language of the parties and the surrounding circumstances. The document alone will not suffice. What it was intended to cover cannot be known till we know what there was to cover. The question being whether certain subjects of negotiation were intended to be covered, we must compare the writing and the negotiations before we can determine whether they were in fact covered.'

\*6 *Id.* at 657. (quoting Wigmore on Evidence (3rd ed.), sections 2413, 2430, 2431). Given this directive, although a contract with a "merger clause is strong evidence that the parties" intended the writing to be the complete and exclusive agreement between them, it is not dispositive. *L.S. Heath & Son, Inc. v. AT&T*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 86413 (D.Del.)
(Cite as: Not Reported in F.Supp.)

*Information Systems, Inc.*, 9 F.3d 561, 569 (7th Cir. 1993) (applying New Jersey law).

The parole evidence rule does not apply in determining the "subject matter" of the GPAs or whether they were intended to be the "master agreements." *Schwimmer*, 96 A.2d at 656. As the *Schwimmer* court stated, "[t]he parole evidence rule is a rule of substantive law not related to interpretation or the admission of evidence for the purpose of interpretation." *Id.* "The terms of any contract must be given a meaning by interpretation before it can be determined whether an attempt is being made to 'vary or contradict them.'" *Id.* (quoting Corbin on Contracts, section 579); *see also Garden State Plaza Corp. v. S.S. Kresge Co.*, 189 A.2d 448, 496 (App. Div., 1963) (stating that "the parole evidence rule does not even come into play until it is first determined what the true agreement of the parties is--I.e., what they meant by what they wrote down").

In accordance with these settled principles of contract construction, the court must consider extrinsic evidence in order to determine the scope and meaning of the GPAs as a matter of law. *See L.S. Heath & Son, Inc.* 9 F.3d at 569. Likewise, the court must consider extrinsic evidence in interpreting plaintiffs' alleged "other agreements."[FN17]

> FN17. In the alternative, Lucent argues that the statute of frauds renders any oral contract regarding the purchase of telephones unenforceable. (D.I. 9 at 8) Plaintiffs cite *California Natural, Inc. v. Nestle Holdings, Inc.*, for the proposition that they can avoid the application of the statute of frauds through the doctrine of promissory estoppel, 631 F. Supp. 465, 472 (D.N.J. 1986) (applying New Jersey law). In response, Lucent argues that, as a matter of law, plaintiffs cannot show reasonable reliance on the alleged agreements because the GPAs contain explicit terms to the contrary. However, without first considering extrinsic evidence relating to the GPAs and other agreements, the court cannot determine, as a matter of law, that plaintiffs' reliance was unreasonable. *Id.* at 473 (stating that "[u]ntil all factual issues are resolved ... the court cannot rule as a matter of law that [plaintiffs'] reliance was unreasonable").

Plaintiffs allege that their contract claims involve agreements relating to new or expanded facilities and deferred profits that are beyond the subject matter of the GPAs. Plaintiffs specifically allege that Lucent promised them a long-term business relationship if they deferred profits and invested in new or expanded facilities. Plaintiffs allege that Lucent terminated its relationship without allowing them to recoup these profits and investments.[FN18] Plaintiffs also allege that they reasonably relied upon these promises and suffered substantial and definite detriment.[FN19] Consequently, the court finds plaintiffs' allegations as to counts I through III are sufficient to withstand Lucent's motion to dismiss.

> FN18. Under New Jersey law, a breach of an implied covenant of good faith and fair dealing may be established if a defendant encourages a plaintiff to make substantial investments while actively concealing its decision to terminate a contract. *Bak-A-Lum Corp. v. Alcoa Building Prod.*, 351 A.2d 349 (N.J. 1976); *see also Sons of Thunder, Inc. v. Borden, Inc.*, 666 A.2d 549, 563 (App. Div. 1995) (distinguishing *Bak-A-Lum Corp.*, on the grounds that the defendant did not actively conceal its decision to terminate the contract). In the present case, plaintiffs allege that Lucent concealed its decision to terminate its relationship, while it encouraged plaintiffs to invest in new or expanded facilities. (D.I. 11 at 20)

> FN19. Under New Jersey law, in order to state a claim for promissory estoppel a plaintiff must allege the following: (1) a clear and definite promise was made by the promisor; (2) the promise was made with the expectation that the promise would rely on it; (3) the promisee must in fact reasonably rely on the promise; and (4) the promisee suffered detriment on a definite and substantial nature in reliance on the promise. *R. J. Longo Constr. Co. v. Transit Am.*, 921 F. Supp. 1295, 1305 (D.N.J. 1996). The court finds that plaintiffs have alleged these required elements.

3. Fraudulent and Negligent Misrepresentation

Counts IV and V allege fraudulent and negligent misrepresentation respectively. (D.I. 1 at 14-17) Both claims are based on the allegations that Lucent decided to terminate its business dealings with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 86413 (D.Del.)
(Cite as: Not Reported in F.Supp.)

plaintiffs at the same time that it (1) represented to plaintiffs that the level of business in 1996 would at least be equal to 1995 levels; (2) encouraged plaintiffs to expand their facilities at a substantial cost to plaintiffs; and (3) held firm to a requirement that plaintiffs not deal with Lucent's competitors. (D.I. 1 at 14-15)

Under New Jersey law, the elements for a claim of fraudulent misrepresentation are: (1) a material misrepresentation of presently existing or past fact; (2) knowledge of falsity by the person making the misrepresentation; (3) intent that the misrepresentation be relied upon; (4) actual and reasonable reliance on the misrepresentation; and (5) detriment to plaintiff. *Jewish Ctr. of Sussex County v. Whale*, 432 A.2d 521, 524 (1981). The elements of negligent misrepresentation are (1) a material misrepresentation of a presently existing or past fact; (2) negligently made; and (3) justifiably relied upon. *H. Rosenblum, Inc. v. Adler*, 461 A.2d 138 (1983).

*7 Lucent admits that plaintiffs' first allegation-- that business in 1996 would be at least be equal to 1995 levels— constitutes an alleged "misrepresentation." (D.I. 9 at 14 at 25 n.34) Lucent argues, however, that plaintiffs could not have reasonably relied upon alleged estimates of 1996 purchase orders because the GPAs explicitly provide that forecasts of future purchase order are not commitments to purchase.[FN20] As discussed above, the court cannot determine whether plaintiffs' reliance on the allegations was reasonable until it considers extrinsic evidence relating to the formation of the GPAs and plaintiffs' alleged other agreements. *See California Natural, Inc. v. Nestle Holding, Inc.*, 631 F. Supp. 465, 473 (D.N.J. 1986).

> FN20. The "Entire Agreement Clause" in the GPAs provides Estimates or forecasts furnished by Company [Lucent] shall not constitute commitments.
> (D.I. 1, Ex. A; D.I. 9, Ex. 1)

Lucent also argues that count IV fails to meet the requirements of Federal Rule of Civil Procedure 9(b) because plaintiffs do not allege the identity of the individual agents of Lucent who made the alleged misrepresentations. Rule 9(b) provides, in relevant part, that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The Third Circuit has held that "focusing exclusively on [Rule 9(b)'s] 'particularity' language is too narrow an

approach and fails to take into account the general simplicity and flexibility contemplated by the rules." *Christidis v. First Pa. Mortgage Trust*, 717 F.2d 96, 100 (3d Cir. 1983).

Lucent cites *Saporito v. Combustion Eng'g, Inc.* for the proposition that plaintiffs are required by Rule 9(b) to plead the author and recipient of the alleged misrepresentations. 843 F.2d 666, 675 (3d Cir. 1988), *vacated on other grounds*, 489 U.S. 1049 (1989). In *Saporito*, however, the Third Circuit did not explicitly hold that a plaintiff must identify the author and recipient of the misrepresentations in order to satisfy the "particularity" requirement of Rule 9(b). Instead, the Third Circuit held that the pleadings simply did not provide a sufficient level of notice of the precise misconduct charged. *Id.* at 675. In *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, the Third Circuit stated that "Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." 742 F.2d 786, 791 (3d Cir. 1984). In accordance with these objectives and mindful of the ruling in *Christidis*, the Third Circuit held that allegations of date, place, or time are not required and "[p]laintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.*

Plaintiffs allege that while Lucent knew it was going to terminate its relationship with plaintiffs, it represented to them that plaintiffs' business for 1996 would at least be equal to 1995 levels. (D.I. 1 at 14) Plaintiffs allege that Lucent made this misrepresentation "less than three months before terminating its relationship" with them. (D.I. 1 at 14) Plaintiffs also allege that Lucent failed to disclose its plan to terminate its relationship with plaintiffs, despite its knowledge that plaintiffs built and expanded their facilities based upon Lucent's promise for a long-term business relationship. (D.I. 1 at 15) In addition to these allegations, a letter signed by one of Lucent's agents, detailing some of the alleged misrepresentations, is attached to the complaint. (D.I. 1, Ex. C) The court finds these allegations to be sufficiently particular under the requirement of Rule 9(b). Consequently, the court shall deny Lucent's motion as to counts IV and V.

### 4. Attempted Monopolization

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 86413 (D.Del.)
(Cite as: Not Reported in F.Supp.)

*8 In count VI, plaintiffs allege that Lucent violated Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, when it terminated its business relationship with them. Plaintiffs claim that Lucent controls a substantial percentage of the market for cordless telephones because it terminated its relationship with plaintiffs while encouraging them to invest in new facilities. (D.I. 1 at 18) According to plaintiffs, Lucent has exercised its market power to control the supply and price of cordless telephones, eliminate competition, and exclude others from participating or entering the relevant market. (D.I. 1 at 18)

Lucent argues that plaintiffs have failed to state an antitrust claim because, *inter alia*, they fail to allege a basis for subject matter jurisdiction. [FN21] Lucent asserts that the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a ("FTAIA"), applies to plaintiffs' claim because it involves trade or commerce with foreign nations. The FTAIA provides, in part, that sections 1 through 7 of the Sherman Act

> FN21. Lucent also argues that plaintiffs' antitrust claim should be dismissed because they fail to allege (1) that Lucent had a dangerous probability of success in attempting to monopolize the relevant market and (2) fail to allege an antitrust injury. The court declines to address these issues since it finds that plaintiffs have failed to establish jurisdiction.

shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless--
(1) such conduct has a direct, substantial, and reasonably foreseeable effect--
(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; ....

15 U.S.C. § 6a (emphasis added). Lucent contends that plaintiffs' complaint fails to plead facts from which the court can conclude that Lucent's conduct had a direct, substantial, and reasonably foreseeable effect in the United States.

According to plaintiffs, the direct, substantial and reasonably foreseeable standard of the FTAIA does not apply to conduct that affects import trade or

import commerce. (D.I. 11 at 31) Plaintiffs argue that the court need only determine whether the challenged conduct has, or is intended to have, any anticompetitive effect upon United States commerce. (D.I. 11 at 31) Plaintiffs argue that the challenged conduct in this case satisfies either standard. Plaintiffs claim that Lucent's conduct "preclud[ed] them from selling their goods in the United States and negatively affect[ed] consumers in the United States by forcing higher prices and reduced output." (D.I. 11 at 33) Plaintiffs also argue that Lucent engaged in anticompetitive activities by preventing them from dealing with Lucent's competitors and making profits. (D.I. 11 at 33-34)

The court finds plaintiffs' arguments meritless. The complaint contains no factual allegations that plaintiffs themselves imported or planned to import any product into the United States. The complaint also does not contain any allegations relating to how plaintiffs were prevented from importing products into the United States. The complaint clearly establishes that plaintiffs are foreign corporations that only manufactured products for Lucent. (D.I. 1 at 4-6) Since the parties' relationship involved trade and commerce with foreign nations, the court finds that the FTAIA applies. [FN22] *The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494, 500 (M.D.N.C. 1987) (applying section 6a to antitrust plaintiffs, "other than [] domestic importers"); *Coors Brewing Co. v. Miller Brewing Co.*, 889 F. Supp. 1394, 1398 (D. Colo. 1995) (stating that the FTAIA applies to antitrust plaintiffs "with the exception of claims brought by domestic importers"); *Caribbean Broadcast System Ltd. v. Cable and Wireless PLC*, C.A. No. 93-2050, 1995 WL 76164, at *2 (D.D.C. Dec. 21, 1995) (noting that the FTAIA "makes clear that the concern of the antitrust laws is protection of American consumers and American exporters, not foreign consumers or producers"); *United Phosphorus LTD v. Angus Chemical Co.*, C.A. No. 94-C-2078, 1994 WL 577246 (N.D. Ill. Oct. 18, 1994).

> FN22. The court declines to follow the ruling in *Eskofot A/S v. E.I. Du Pont de Nemours & Co.*, cited by plaintiffs, 872 F. Supp. 81 (S.D.N.Y. 1995). The majority of cases, cited above, establish that the "import trade or import commerce" exception in the FTAIA applies only to domestic importers. Furthermore, plaintiffs' case is factually different from *Eskofot A/S*. In *Eskofot A/S*, the plaintiff alleged that both it and the

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 86413 (D.Del.)
(Cite as: Not Reported in F.Supp.)

defendant planned to market and sell their products in the United States. *Id.* at 35. In the present case, the complaint contains no allegations that plaintiffs imported or planned to import any products into the United States themselves.

\*9 The FTAIA requires an "actual injury to plaintiff within the United States." *The 'In' Porters, Inc.* 663 F. Supp. at 500 (holding that a "foreign company can not demonstrate the domestic injury requirement by 'piggybacking' onto the injury of a United States exporter"); *Optimum, S.A. v. Legent Corp.*, 926 F. Supp. 530, 532-533 (W.D. Pa 1996). Plaintiffs' alleged injuries—lost sales to Lucent—are not injuries within the United States. Consequently, the court finds that plaintiffs fail to establish subject matter jurisdiction under the FTAIA and shall grant Lucent's motion as to count VI.

### 5. Breach of Fiduciary Duty

Count VII of the complaint alleges that Lucent breached its fiduciary duty to plaintiffs when it terminated their business relationship. (D.I. 1 at 19) Lucent argues that the parties in this case are "corporations dealing at arm's length" and therefore no fiduciary duty could exist between them.

The court agrees. There are no allegations in the complaint that could support a finding that Lucent owed a fiduciary duty to plaintiffs. In count VII, plaintiffs simply allege that they had a "special and unique relationship" with Lucent because of Lucent's involvement in establishing manufacturing facilities in Malaysia and China. (D.I. 1 at 19) In their brief, plaintiffs also argue that they had a special and unique relationship with Lucent because they were involved in the Joint Venture. (D.I. 11 at 40) Plaintiffs cite New Jersey law for the proposition that joint venturers owe each other a fiduciary duty. [FN23] The allegations in count VII, however, do not incorporate any allegations relating to the Joint Venture. (D.I. 1 at 19-20) Furthermore, the record clearly establishes that the Joint Venture Agreement is governed by Chinese law and plaintiffs do not cite any Chinese authority. (D.I. 25, Ex. 1 at 22) Consequently, the court finds as a matter of law that Lucent did not owe a fiduciary duty to plaintiffs. The court shall grant Lucent's motion as to count VII of the complaint.

FN23. The case plaintiffs cite is *LoBosco v.*

*Kure Eng'g Ltd.* 891 F. Supp. 1020 (D.N.J. 1995).

### B. Plaintiffs' Motion to Dismiss

On January 2, 1997, Lucent filed counterclaims against plaintiff S. Megga for selling telephones in China. (D.I. 20) Plaintiffs moved to dismiss Lucent's counterclaims. (D.I. 23) Plaintiffs argue that Lucent's counterclaims are permissive counterclaims and should be dismissed based on the doctrine of *forum non conveniens.*

#### 1. Compulsory vs. Permissive Counterclaims

In order for a federal court to entertain a counterclaim, the counterclaim must be either a compulsory counterclaim and so fall within the court's ancillary jurisdiction, or a permissive counterclaim with an independent basis of jurisdiction. *Akzona Inc. v. E.I. du Pont de Nemours & Co.*, 662 F. Supp. 603, 618 n.29 (D. Del. 1987). Rule 13(a) of the Federal Rules of Civil Procedure provides that a counterclaim is compulsory "if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." Permissive counterclaims are claims "not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed.R.Civ.P. 13(b).

\*10 As this court has noted before, "the United States Court of Appeals for the Third Circuit has embraced a fairly liberal interpretation of the 'transaction or occurrence' standard, establishing as 'the operative question in determining if a claim is a compulsory counterclaim ... whether [the counterclaim] bears a logical relationship to an opposing party's claim." *Standard Chlorine of Del., Inc. v. Sinibaldi*, C.A. No. 91-188-SLR, 1995 WL 562285 at \*3 (D. Del. Aug. 24, 1995) (citing *Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059 (3d Cir. 1978)).

In determining whether a 'logical relationship' exists between an opposing party's claim and a counterclaim, the court will analyze several factors: (1) Are the issues in fact and law raised by the claim and counterclaim largely the same?; (2) Would res judicata bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?; and (3) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaims?

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 86413 (D.Del.)
(Cite as: Not Reported in F.Supp.)

*Sinibaldi*, 1995 WL 562285 at *3. In its counterclaims, Lucent alleges that S. Megga breached and continues to breach its GPA, and has violated and continues to violate the trademark, unfair competition, and business secret laws of China by selling cordless telephones in China. (D.I. 20 at 15, 17-21) The factual issues raised by these counterclaims concern cordless telephones that were intended for sale to the Joint Venture. (D.I. 17 at 5; D.I. 24 at 4) Lucent also suggests that S. Megga may be making more cordless telephones with Lucent's technology and insignia for sale in China. (D.I. 19) Plaintiffs' complaint concerns Lucent's role in the building and expansion of plaintiffs' manufacturing facilities. The factual issues raised by plaintiffs' complaint concern the contractual relationship between the plaintiffs and Lucent.

Although both Lucent's and plaintiffs' claims involve the interpretation of S. Megga's GPA, there is no significant overlap of factual issues between Lucent's and plaintiffs' claims. The factual issues involved in Lucent's counterclaims concern telephones that S. Megga made for the Joint Venture. These telephones are not at issue in plaintiffs' complaint. The legal issues involved in Lucent's counterclaims are also different from any of plaintiffs' claims. [FN24] Given that there is no significant overlap of facts or law between Lucent's and the plaintiffs' claims, the court finds no "logical relationship" between Lucent's and plaintiffs' claims. *See Sinibaldi*, 1995 WL 562285 at *3 (D. Del 1995); *see also Alesayi Beverage Corp. v. Canada Dry Corp.*, 797 F. Supp. 320, 321 (S.D.N.Y. 1992). Consequently, the court finds that Lucent's counterclaims are permissive counterclaims. *See Brady v. Schwartz Motor Co., Inc.*, 723 F. Supp. 1045 (D. Del. 1989) (finding no logical relationship between a federal claim and a state law claim involving the same loan transaction); *see also Alesayi Beverage Corp.*, 797 F. Supp. at 322 (dismissing intellectual property counterclaims while maintaining jurisdiction over similar contract counterclaim).

FN24. Lucent's intellectual property counterclaims are based on Chinese law, whereas the GPAs and plaintiffs' claims are governed by New Jersey law. Furthermore, although Lucent's counterclaims are based on the GPAs, the telephones in dispute were intended for sale to the Joint Venture, which is governed by Chinese law.

*11 In anticipation that this court may determine that some or all of its counterclaims are permissive,

Lucent argues that this court has jurisdiction over its counterclaims based on diversity jurisdiction. (D.I. 21 at 24) In response, plaintiffs argue that Lucent's counterclaims should be dismissed on *forum non conveniens* grounds.

## 2. *Forum Non Conveniens*

The court has the discretion to grant or deny a motion to dismiss a claim under the doctrine of *forum non conveniens*. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981); *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 178 (3d Cir. 1991). Under this doctrine, the party seeking dismissal of a claim has the initial burden of establishing that an adequate alternative forum exists. *Id.* at 180. Once the moving party has established that an alternative forum exists, "it must then show that the private and public interest factors weigh heavily in favor of dismissal." *Id.*

Plaintiffs assert that an alternative forum exists in either the courts of China or the arbitration court of the International Chamber of Commerce in Sweden. (D.I. 24 at 8-9) Generally, an adequate alternative forum exists if the nonmoving party is amenable to process in the other jurisdiction. *Id.* Lucent does not argue that it is not amenable to process in either China or Sweden. Instead, Lucent argues that its claims are simply more conveniently adjudicated here since the plaintiffs have brought their claims in this court. (D.I. 21 at 24-25) Consequently, the court finds that an alternative forum exists for Lucent's intellectual property claims in either the courts of China or the arbitration court in Sweden.

Once an adequate alternative forum is established, the court must balance several private and public interest factors to determine whether dismissal is proper. *Id.*

The private interest factors include
relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; ... and all other practical problems that make a trial of a case easy, expeditious and inexpensive.

[] The public interest factors include:
... the 'local interest in having localized controversies decided at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 86413 (D.Del.)
(Cite as: Not Reported in F.Supp.)

unnecessary problems in conflict of laws, or in application of foreign laws....

*Id.* at 180 (*quoting Piper, 454 U.S. at 241*).

In reviewing the record, the court finds that, on balance, the private and public interest factors weigh in favor of dismissal. Lucent's claims involve telephones that were made by S. Megga for the Joint Venture, not for Lucent. The Joint Venture has not been joined as a party in this case and is governed by Chinese law. Furthermore, Lucent's intellectual property claims would involve complex issues of Chinese procedural and substantive law. With respect to these private interest factors, the court finds that Lucent's claims would unnecessarily burden the trial of plaintiffs' claims. *See Mars Inc. v. Kabushiki-Kaisha Nippon Conlux, 24 F.3d 1368, 1376 (Fed. Cir. 1994)* (stating that trial court made findings sufficient to support dismissal of Japanese patent infringement claim on *forum non conveniens* grounds). With respect to the public interest factors, the court finds, as the *Mars* court recognized, that "general concerns respecting international comity counsel against exercising jurisdiction over matters involving" Chinese intellectual property law. *Id.* Consequently, the court shall grant plaintiffs' motion to dismiss counts I through IV of Lucent's counterclaims on *forum non conveniens* grounds.

### C. Lucent's Motion for a Temporary Restraining Order

*12 Based on the allegations set forth in its counterclaims, Lucent moved for a temporary restraining order. (D.I. 16) Since the court shall dismiss Lucent's counterclaims, its motion for a temporary restraining order is denied as moot.

### IV. CONCLUSION

For the reasons stated above, the court shall deny Lucent's motion to dismiss as to counts I through V and grant its motion to dismiss as to counts VI and VII. The court shall grant plaintiffs' motion to dismiss Lucent's counterclaims. The court shall also deny Lucent's motion for a temporary restraining order as moot.

An order consistent with this memorandum opinion shall issue.

D.Del.,1997.

S. Megga Telecommunications Ltd. v. Lucent Technologies, Inc.
Not Reported in F.Supp., 1997 WL 86413 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1263061 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
TELCORDIA TECHNOLOGIES, INC., Plaintiff,
v.
ALCATEL S.A. and Alcatel USA, Inc., Defendants.
No. Civ.A. 04-874 GMS.

May 27, 2005.

Steven J. Balick, John G. Day, Ashby & Geddes,
Wilmington, DE, for Plaintiff.
Josy W. Ingersoll, Young, Conaway, Stargatt &
Taylor, Kevin M. Baird, Connolly Bove Lodge &
Hutz, Wilmington, DE, for Defendants.

*MEMORANDUM*

SLEET, J.

**I. INTRODUCTION**

*1 On July 16, 2004, the plaintiff, Telcordia
Technologies, Inc. ("Telcordia"), filed this patent
infringement action against Alcatel S.A. ("Alcatel
S.A.") and Alcatel USA, Inc. ("Alcatel USA").
Presently before the court is Alcatel S.A.'s motion to
dismiss for lack of personal jurisdiction. For the
following reasons, the court will grant the motion.

**II. BACKGROUND**

Alcatel S.A. is a French corporation with its principal
place of business in Paris, France. Alcatel S.A. is the
parent company of Alcatel USA, a Delaware
corporation with its principal place of business in
Plano, Texas. (D.I. 18 Ex. 2 ¶ ¶ 2-3.) It is a holding
company that does not manufacture, sell, advertise,
offer to sell, trade or import any goods or services in
the United States or anywhere in the world. (Id. ¶ ¶
3-5.) It does not maintain any offices or other
facilities in Delaware, or the United States. (Id. ¶ 7.)
It neither owns nor leases any real property in
Delaware or the United States, but it does own
United States patents. (Id. ¶ 8.) Alcatel S.A. does not
maintain any bank accounts in Delaware and has
never contracted to supply services or things in
Delaware or the United States. (Id. ¶ ¶ 9-10.)

Telcordia, a Delaware Corporation with its principal
place of business in Piscataway, New Jersey, is the
assignee and owner of the patent-in-suit, U.S. Patent
No. 4,893,306 (the " '306 patent").[FN1] The '306 patent
relates to a method and apparatus for multiplexing
circuit and packet traffic. The patent discloses a data
transmission technique, or Dynamic Time Division
Multiplexing ("DTDM"), that is compatible with the
digital circuit transmission format, as well as the
packet transmission format, thereby providing "a
flexible migration strategy between present circuit
networks and future broadband packet networks."
(U.S. Patent No. 4,893,306 Abstract.) The complaint
alleges that Alcatel S.A. and Alcatel USA have
infringed, induced infringement of, and/or
contributorily infringed one or more claims of the
'306 patent by making, using, offering for sale,
selling and/or importing into the United States
communication network products embodying the
patented invention. (D.I. 1 ¶ ¶ 13-14.)

> FN1. The '306 patent was issued on January
> 9, 1990 and assigned to Bell
> Communications Research, Inc.
> ("Bellcore"), which became Telcordia in
> 1999.

**III. STANDARD OF REVIEW**

Alcatel S.A. moves to dismiss the complaint for lack
of personal jurisdiction over the defendant. "Rule
12(b)(2) of the Federal Rules of Civil Procedure
requires a court to dismiss a case when the court
lacks personal jurisdiction over the defendant[ ]." *E.I.
DuPont de Nemours & Co. v. Rhodia Fiber & Resin
Intermediates,* 197 F.R.D. 112, 119 (D.Del.2000). In
determining whether personal jurisdiction exists,
courts engage in a two step analysis. First, the court
must decide whether jurisdiction is authorized by the
long-arm statute of the state in which the court sits.
*Transportes Aeros de Angola v. Ronair, Inc.,* 544
F.Supp. 864-65 (D.Del.1982). If jurisdiction is proper
per the long-arm statute, the court must then
determine whether exercising jurisdiction comports
with the requirements of the Due Process Clause of
the Fourteenth Amendment. *Id.* (noting, however,
"intent of the legislature to exercise jurisdiction over
non-residents whenever feasible"); *Compaq
Computer Corp. v. Packard Bell Elec., Inc., 948
F.Supp. 338, 342 (D.Del.1996)* (citation omitted). To

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

satisfy the second prong of this analysis, the court must find the existence of "minimum contacts" between the defendant and the forum state, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation omitted). Specifically, Telcordia must show that Alcatel S.A. "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)); *see also Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 108-09, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Unless the contacts are continuous and systematic, they must be related to the present cause of action. *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414-15, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

\*2 In determining the jurisdictional question, the court must accept as true the allegations in the complaint. *Altech Indus., Inc. v. Al Tech Specialty Steel Corp.*, 542 F.Supp. 53, 55 (D.Del.1982). However, Telcordia, the plaintiff, bears the burden of alleging facts sufficient to make a *prima facie* showing of personal jurisdiction over Alcatel S.A. *ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.*, 147 F.Supp.2d 268, 270-71 (D.Del.2001). To meet this burden, Telcordia must adduce facts which " 'establish with reasonable particularity' " that jurisdiction over Alcatel S.A. exists. *Id.* (quoting *Joint Stock Soc'y v. Heublein, Inc.*, 936 F.Supp. 177, 193 (D.Del.1996)).

## IV. DISCUSSION

### A. Delaware's Long-Arm Statute

The first step in the court's analysis is to determine whether any of the provisions of Delaware's long-arm statute, Del.Code Ann. tit. 10 § 3104, warrant the exercise of jurisdiction over Alcatel S.A. Alcatel S.A. contends that the court has no basis to assert jurisdiction, while Telcordia maintains that the conduct of Alcatel S.A. satisfies the requirements of subsections (c)(1) and (c)(3) of the long-arm statute.

Under subsection (c)(1), the court may exercise jurisdiction over a nonresident or agent of a nonresident who "transacts any business or performs any character of work or service in the State." Del.Code Ann. tit. 10 § 3104(c)(1). Subsection (c)(3) gives the court the authority to exercise jurisdiction over a nonresident or agent of a nonresident who "causes tortious injury in the State by an act or omission in this State." Del.Code Ann. tit. 10 § 3104(c)(3). Delaware courts construe the long-arm statute broadly to confer jurisdiction to the maximum extent possible so as to "provide residents a means of redress against those not subject to personal service within the state." *Boone v. Oy Partek Ab*, 724 A.2d 1150, 1156-57 (Del.Super.1997). The Delaware Supreme Court has interpreted subsections (c)(1) and (c)(3) as specific jurisdiction provisions that require a "nexus" between the plaintiff's cause of action and the conduct of the defendant that is used as a basis for jurisdiction. *See LaNuova D & B, S.p.A. v. Bowe Co.*, 513 A.2d 764, 768 (Del.1986). In order to meet the requirements of subsections (c)(1) and (c)(3), Alcatel S.A.'s actions must be directed at residents of Delaware and the protection of Delaware laws. *Thorn EMI N. Am. Inc. v. Micron Tech., Inc.*, 821 F.Supp. 272, 274 (D.Del.1993).

Telcordia asserts that the court should exercise jurisdiction under § 3104(c)(1) and/or (c)(3) because Alcatel S.A.'s contacts with Delaware are attributable to its subsidiary, Alcatel USA, under the principles of agency. [FN2] The principles of agency allow a court to establish jurisdiction over the parent based upon its jurisdiction over a subsidiary. Under the agency theory, "the court may attribute the actions of a subsidiary company to its parent where the subsidiary acts on the parent's behalf or at the parent's direction." *C.R. Bard Inc. v. Guidant Corp.*, 997 F.Supp. 556, 559 (D.Del.1998) (citing *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 266 (D.Del.1989). Thus, the agency theory "examines the degree of control which the parent exercises over the subsidiary." *Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F.Supp. 1458, 1463 (D.Del.1991). The factors relevant to the court's examination include: (1) "the extent of overlap of officers and directors"; (2) "methods of financing"; (3) "the division of responsibility for day-to-day management"; and (4) "the process by which each corporation obtains its business. No one factor is either necessary or determinative; rather it is the specific combination of elements which is significant." *Id.* If the court determines that an agency relationship exists, it may attribute certain actions of the subsidiary, Alcatel USA, to the parent corporation, Alcatel S.A., in assessing whether Telcordia has satisfied the requirements of the long-arm statute. *See id.* However, the mere existence of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

an agency relationship is not sufficient to confer jurisdiction. The court must still apply the Delaware long-arm statute. *See id.* at 1455 ("[A] finding of agency does not render the long-arm statute inapplicable, but simply implicates its 'or through an agent' provision.")

> FN2. Delaware law provides two theories that allow a court to exercise jurisdiction over a parent corporation based on its jurisdiction over a subsidiary: the alter ego theory and the agency theory. *Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F.Supp. 1458, 1463 (D.Del.1991). Under the alter ego theory, the party showing jurisdiction must show fraud or inequity in the use of the corporate form for a court to "pierce the corporate veil," or attribute the actions of a subsidiary to the parent corporation. *Id.; see Mobile Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260, 266 (D.Del.1989). Telcordia has neither asserted the existence of any fraud in the corporate structure of Alcatel S.A. and Alcatel USA nor introduced evidence that would support a finding of fraud. Accordingly, the court will not address this jurisdictional theory.

\*3 Telcordia contends that Alcatel S.A. should be subject to jurisdiction under the agency theory because "Alcatel S.A. and Alcatel USA are closely knit together, effectively operating as one." (D.I. 20, at 10.) Telcordia alleges the following to support its contention of an agency theory of jurisdiction: (1) Alcatel S.A. makes it abundantly clear that the United States market is very important to it and raises funds in the United States; (2) it owns patents, i.e. property, in the United States; (3) it fails to distinguish among its multinational subsidiaries-that is, it consolidates descriptions of its activities with those of its subsidiaries; (4) it chose to incorporate Alcatel USA in Delaware; (5) its Senior Vice President, Mike Quigley ("Quigley") is the CEO of Alcatel USA; and (6) its website solicits requests for information concerning its products, including allegedly infringing products from Delaware residents. (*Id.* at 3-5, 10.) Telcordia further contends that, "at the very least," Alcatel USA has offered to sell in Delaware products accused of infringing the '306 patent and, therefore, transacts business in the state. In addition, because Alcatel USA committed these acts as Alcatel S.A.'s agent, they are attributable to Alcatel S.A. (D.I. 20, at 10.)

Before the court can determine whether it should attribute Alcatel USA's alleged acts in Delaware to Alcatel S.A., it must determine whether an agency relationship exists between the two corporations. As previously stated, in order to make this determination, the court must consider the extent of overlap of officers and directors between Alcatel USA and Alcatel S.A., the methods of financing with respect to the two corporations, the division of responsibility for day-to-day management between the two, and the process by which each corporation obtains its business. After having considered these factors, the court concludes that Telcordia has not carried its burden. As to the first factor, Telcordia points to one overlap in officers between the two corporations: Quigley is Senior Executive Vice President of Alcatel S.A. and CEO of Alcatel USA. According to Alcatel S.A., there is a second overlap between the two corporations: its President and COO, Philippe Germond, is a member of the Board of Directors of Alcatel USA. (D.I. 23, at 3; D.I. 22 ¶ 6.) This minor overlap, however, is not dispositive, as "it is entirely appropriate for directors of a parent corporation to serve as directors of a subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *United States v. Bestfoods,* 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (citations omitted) (noting that it is "well established principle ... that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership"). As such, this factor does not weigh in favor of a finding of agency.

\*4 Likewise, the remaining factors do not weigh in favor of applying the agency theory in the present case. First, Alcatel S.A. is merely a holding company that does not manufacture, sell, or advertise in the United States, or anywhere in the world. (D.I. 18 ¶ ¶ 3-5.) Thus, this is not a case in which Alcatel S.A. manufactures a product and uses an independent distributor to sell its product. *Cf. C.R. Bard,* 997 F.Supp. at 561. In addition, Alcatel USA maintains its own executive team, which is responsible for the day-to-day management of Alcatel USA, and no employee of Alcatel S.A. is a member of the executive team of Alcatel USA. (D.I. 22 ¶ 5.) It also maintains its own financial statements, separate from those kept by Alcatel S.A. (D.I. 22 ¶ 10.) Alcatel USA files a consolidated United States federal income tax return that is separate from tax returns filed by Alcatel S.A. (*Id.* ¶ 12.) Alcatel USA finances its day-to-day activities through funds generated from its business activities, including the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

manufacture, marketing and distribution of the accused infringing products. (*See id.* ¶ 13.) Accordingly, the court finds that while there is a minor overlap of officers and directors between the parent and subsidiary, Telcordia has not produced sufficient evidence for the court to conclude that the specific combination of agency factors militates in favor of a finding that Alcatel USA was acting as Alcatel S.A.'s agent. Thus, sections (c)(1) and (c)(3) do not warrant the exercise of jurisdiction over Alcatel S.A.[FN3]

> FN3. The court need not address whether jurisdiction in Delaware comports with the requirements of the Due Process Clause because it has no statutory authority under the Delaware long-arm statute to exercise jurisdiction over Alcatel S.A.

**B. Federal Rule of Civil Procedure 4(k)(2)**

Telcordia next asserts that, even if the Delaware long-arm statute does not apply in the present case, the court should not grant Alcatel S.A.'s motion to dismiss because it has the authority to exercise personal jurisdiction over Alcatel S.A. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure. Rule 4(k)(2) provides:
If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Fed. R. Civ. P. 4(k)(2). In order to establish jurisdiction pursuant to Rule 4(k)(2), (1) Telcordia's claim must arise under federal law; (2) Alcatel S.A. must lack sufficient contacts with any state to subject it to personal jurisdiction; and (3) Alcatel S.A. must have sufficient contacts with the United States as a whole to satisfy due process. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 258-59 (3d Cir.2000). Telcordia contends that all three requirements of Rule 4(k)(2) are satisfied. The court disagrees.

First, the parties do not dispute, nor could they, that Telcordia's claims arise under federal law. The complaint alleges that Alcatel S.A. has infringed, induced infringement of, and/or contributorily infringed the '306 patent. Patents and the protection of patent rights are the subject of Title 35 of the

United States Code. 35 U.S.C. § 271 specifically provides the elements of patent infringement. Additionally, 28 U.S.C. § 1338 gives district courts original jurisdiction over patent actions. A patent infringement action, therefore, is one that arises under federal law. Telcordia has thus satisfied the first requirement of Rule 4(k)(2).

\*5 Having found that the first requirement of Rule 4(k)(2) is satisfied, the court next must determine whether Alcatel S.A. is not subject to jurisdiction in any state. *See United States v. Offshore Marine Ltd.*, 179 F.R.D. 156, 160 (D.Vi.1998); *Revak v. Locutum A.B.*, No. Civ. A. 03-4822, 2005 WL 1017771, at \*2 (E.D.Pa. Apr.28, 2005). As a preliminary matter, the court must determine whether Telcordia or Alcatel S.A. bears the burden of proving that Alcatel S.A. is not subject to the jurisdiction of any state. In *Offshore Marine Ltd.*, the United States District Court for the District of the Virgin Islands noted that "[t]he question [of] which party bears the burden of proving ... that the defendant is not subject to jurisdiction in any state appears to be an issue of first impression in this Court and in this Circuit, probably because it is generally the plaintiff's duty to allege and prove personal jurisdiction." *Offshore Marine Ltd.*, 179 F.R.D. at 160. Indeed, it appears that the Third Circuit has not yet addressed whether the plaintiff or defendant bears the burden of proving that the defendant is beyond the jurisdictional reach of any state court of general jurisdiction, or what is known as the negation requirement. *See Base Metal Trading Ltd. v. OJSC "Novokuzetsky Aluminum Factory"*, 47 Fed. Appx. 73, 75 (3d Cir.2002) (unpublished) (determining that negation issues need not be reached because the Due Process requirement of Rule 4(k)(2) was not satisfied).[FN4] Various district courts of the Third Circuit, however, have addressed the negation requirement and concluded that the plaintiff bears the burden of demonstrating that the defendant is not subject to jurisdiction in any state. *See Offshore Marine Ltd.*, 179 F.R.D. at 160 ("Accordingly to survive a motion to dismiss for want of personal jurisdiction, the plaintiff bears the burden to prove that [the defendant] is not otherwise subject to service of process in any state."); *see also Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 293 F.Supp.2d 423, 430 (D.Del.2003), *vacated on other grounds by* 395 F.3d 1315 (Fed.Cir.2005) (issue abandoned on appeal) ("Plaintiffs must also demonstrate that defendant is 'not subject to the jurisdiction of *any* state' under Rule 4(k)(2). Therefore, Rule 4(k)(2) 'provides 'a narrow exception which may subject an alien defendant to a federal court's jurisdiction.' ") The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

court agrees with the Third Circuit district courts that have addressed the negation requirement and concludes that Telcordia bears the burden of demonstrating that Alcatel S.A. is not subject to jurisdiction in any state.

> FN4. Likewise, it appears that the Federal Circuit has not had occasion to address the negation issue.

Here, Telcordia addresses the negation requirement only by asserting that, based on the information provided by Alcatel S.A. in its opening brief and the publicly available information regarding Alcatel S.A., an analysis of whether any other state has personal jurisdiction over Alcatel S.A. would not be "significantly different" from the analysis regarding Alcatel S.A.'s personal jurisdiction under the Delaware long-arm statute. (D.I. 20, at 13.) According to Telcordia, if the court cannot exercise jurisdiction over Alcatel S.A. pursuant to the Delaware long-arm statute then Rule 4(k)(2) applies. (*Id.*) The court is not persuaded by this argument, however, and concludes that Telcordia's conclusory statement does not support a finding that Alcatel S.A. lacks sufficient contacts with any state to subject it to personal jurisdiction. Thus, Telcordia has not satisfied the second requirement of Rule 4(k)(2).

\*6 Even assuming Telcordia was able to show that Alcatel S.A. was not subject to jurisdiction in any other state, it cannot satisfy the third requirement of Rule 4(k)(2) because the record evidence demonstrates that Alcatel S.A. lacks sufficient contacts with the United States as a whole to satisfy due process. The Due Process Clause requires that, in order to subject a defendant who is "not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party "ha[s] certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of justice and fair play.' " *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citations omitted). In order for the court to find that Alcatel S.A. has "minimum contacts" with the United States, Telcordia must demonstrate either specific or general personal jurisdiction. *Helicopteros Nacionales de Columbia v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The court can assert specific jurisdiction over a nonresident defendant that has "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or related to' those activities."

*Burger King,* 471 U.S. at 472 (citations omitted). The court can assert general jurisdiction over a defendant when its contacts with the forum, regardless of their relation to the litigation, are "continuous and systematic." *Helicopteros Nacionales,* 466 U.S. at 416. The court will address the reasons it cannot exercise specific or general jurisdiction over Alcatel S.A. in turn.

When determining whether a defendant's contacts give rise to specific jurisdiction, "[i]t is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum ... thus invoking the benefits and protections of its laws." *BP Chems.,* 229 F.3d at 259 (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 475, 100 S.Ct. 559, 62 L.Ed.2d 490). In other words, the defendant's contact must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 580, 62 L.Ed.2d 490 (1980). Thus, a court usually must determine the character of the defendant's activity in the forum, and whether the plaintiff's claim arises out of or has a substantial connection with that activity. *See Burger King,* 471 U.S. at 475-76. In the present case, however, the court need not make this determination because Telcordia bases its argument on the specific jurisdiction subsections of the Delaware long-arm statute which, as discussed in Section IV.A., *supra,* do not warrant the exercise of jurisdiction over Alcatel S.A. because Alcatel USA is not its United States agent.

The court also concludes that Alcatel S.A.'s contacts with the United States that are unrelated to the present litigation are not "continuous and systematic" so as to give rise to general jurisdiction. Telcordia contends that general jurisdiction exists because there is "ample evidence of Alcatel S.A.'s contacts with the United States." (D.I. 20, at 12.) According to Telcordia, this evidence includes the following: (1) Alcatel S.A. is listed on the New York Stock Exchange; (2) Alcatel S.A. owns property in the United States, specifically hundreds of patents; (3) Alcatel S.A.'s website fails to distinguish among its multinational subsidiaries and uses its name in the name of its subsidiaries; (4) Alcatel S.A.'s website describes its worldwide activities, including its activities in the United States, but never discloses that its United States activities are performed by one of its subsidiaries; and (5) Alcatel S.A. incorporated its subsidiary, Alcatel USA in Delaware. The court does

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

not find the evidence sufficient to support Telcordia's assertion.

*7 First, as previously discussed, Alcatel S.A. is a French holding company that does not make, sell, export or import any products into the United States. Alcatel S.A. does not maintain any offices in the United States, or lease or own any real property in the United States. It does not maintain any bank accounts in Delaware and has never contracted to supply services or things in Delaware or the United States. Alcatel S.A.'s employees also all reside outside of the United States.

Moreover, while Alcatel S.A. is listed on the New York Stock Exchange as an American Depository Receipt ("ADR"), this factor alone does not justify the exercise of jurisdiction. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289, 330 (S.D.N.Y.2003); *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir.2001) ("[T]he Court is not persuaded that Congress intended for the courts to assert jurisdiction under Rule 4(k)(2) whenever a corporation lists its stock on a United States exchange."). Likewise, "[o]wnership of a United States patent, without more, cannot support the assertion of personal jurisdiction over a foreign patentee in any state besides the District of Columbia." *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, No. C-95-3577 DLJ, 1996 WL 467293, at *6 n. 5 (N.D.Cal. July 24, 1996) (citing 35 U.S.C. § 293). Furthermore, incorporating a subsidiary in the United States does not give rise to jurisdiction unless the litigation is related to the act of incorporation and, here, it is not related. *See Applied Biosystems, 772 F.Supp. at 1468*. Additionally, "the mere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world. Rather, there must be evidence that the defendant 'purposefully availed' itself of conduct activity in the forum, knowingly interacting with residents of the forum state via its web site." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 454 (3d Cir.2003). Here, Telcordia has not adduced evidence to support a finding that Alcatel S.A.'s web site was intended to reach customers in Delaware, or any other state in the United States.[FN5]

FN5. Telcordia asserts that there can be "no question that Alcatel S.A.'s website solicits requests for information concerning its products (including allegedly infringing products) from Delaware residents, pointing to a "website page concerning the possible purchase of Alcatel products" with Delaware chosen as the potential buyer's state. (D.I. 20, at 5; Ex. 11.) Telcordia misses the point, however, as the record does not support any documented sales to persons in Delaware (or any other state in the United States). Nor does it support any interaction between Alcatel S.A. and Delaware residents, as the web site page, in Telcordia's own words, demonstrates only the *possible* purchase of Alcatel products.

The court also disagrees with Telcordia's assertion that Alcatel's website "never discloses that its U.S. activities are performed by some entity (or entities) other than Alcatel S.A." (D.I. 20, at 4.) First, when one enters the Alcatel website and clicks on "United States" as its country/region the web address changes from "www.alcatel.com" to "www.usa.alcatel.com." Further, when one clicks on the "About Alcatel" dropdown menu and selects "Alcatel in the U.S.A.," he or she is provided with information regarding Alcatel USA, including its business locations. Moreover, the web page states "[i]t is the policy of *Alcatel USA* to satisfy the expectation of our customers." www.usa.alcatel .com/company/ausa_info.jhtml (last visited May 23, 2005) (emphasis added). Thus, the Alcatel web site does distinguish Alcatel S.A. from Alcatel USA. This fact does not support the exercise of jurisdiction over Alcatel S.A. Accordingly, Alcatel S.A.'s alleged contacts with the United States do not provide a basis for the court to conclude that it has a "continuous and systematic" presence in the United States.

*8 Nor does the combination of Alcatel S.A.'s alleged contacts with the United States provide the court with a sufficient basis to conclude that the requirements for general jurisdiction are met. *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.*, 229 F.3d 254 (3d Cir.2000) is instructive on this point. In *BP Chemicals*, the Third Circuit found that a foreign defendant did not have sufficient contacts with the United States as a whole to justify the exercise of Rule 4(k)(2) jurisdiction, even though the defendant exported its products to the United States, held a small ownership interest in a Delaware corporation, and entered into contracts requiring its personnel to travel to the United States for training. *Id. at 263*. The Court of Appeals also found that the cumulative effect of the defendant's contacts did not meet the requirements for general jurisdiction. In the present case, Alcatel S.A.'s alleged contacts fall short of those alleged by the plaintiff in *BP Chemicals*. As such, the court finds that there is no basis for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

exercising Rule 4(k)(2) jurisdiction over Alcatel S.A.

### C. Jurisdictional Discovery

Lastly, Telcordia asserts that if the court does not conclude that Alcatel S.A. "is subject to personal jurisdiction under the *Delaware long-arm statute*," it should permit limited jurisdictional discovery rather than granting Alcatel S.A.'s motion to dismiss. (D.I. 20, at 11) (emphasis added). Telcordia asserts that its claims against Alcatel S.A. are not clearly frivolous, and that discovery is necessary due to the "limited publicly available information" that it has gathered without discovery. (D.I. 20, at 11.) Telcordia further asserts that the case will not be delayed as a result of any discovery on the personal jurisdiction issue.

Conversely, Alcatel S.A. contends that Telcordia's claims against it are clearly frivolous, because Telcordia has not carried its burden of making "a *prima facie* showing that Alcatel S.A. is subject to personal jurisdiction in Delaware." (D.I. 23, at 17.) In addition, Alcatel S.A. contends that it "strains belief that Plaintiff (1) did not know which entities in the Alcatel Family to sue, and (2) that Alcatel S.A. was not one of them." (*Id.* at 17 .) According to Alcatel S.A., Telcordia has had prior business interactions with Alcatel entities regarding the patent-in-suit, as well as other communications technology. (*Id.* at 2.) Alcatel S.A. further contends that Telcordia is "arguably the most knowledgeable company in the telecommunications field with respect to what products are sold by the various players in the market." (*Id.* at 1.) Thus, it "is hard to believe that it [Telcordia] does not know exactly who the relevant players in the market are." (*Id.*) Lastly, Alcatel S.A. contends that Telcordia is engaging in a fishing expedition, noting that the United States Supreme Court has held that courts should "exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position." (*Id* at 18-19 (citing *Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern Dist. Iowa,* 482 U.S. 522, 546, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987)). The court is persuaded by Alcatel S.A.'s argument.

*9 "Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction, courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.' " *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 456 (3d Cir.2003) (internal citations omitted). Thus, resolution of Telcordia's request "begins with the presumption in favor of allowing discovery to establish personal jurisdiction." *Hansen v. Neumueller GmbH,* 163 F.R.D. 471, 474 (D.Del. Oct.5, 1995). However, "[t]he court must be satisfied that there is some indication that this particular defendant is amenable to suit in this forum." *Id.* at 475. For example, "a plaintiff may not rely on the bare allegations in his complaint to warrant further discovery." *Id.* at 476. Likewise, "a mere unsupported allegation that [a] defendant 'transacts business' in an area is 'clearly frivolous." ' *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 107 F.3d 1026, 1042 (3d Cir.1997); *see B.L. Poe v. Babcock Int'l,* 662 F.Supp. 4, 7 (M.D.Pa. Mar.14, 1985) ("Since plaintiff has met defendants' affidavit evidence with mere speculation, plaintiff's request for an opportunity to conduct discovery on the matter must be denied. It would be inappropriate for this court to allow plaintiff to conduct a fishing expedition in order to construct a basis for jurisdiction."). Rather, "there must be *some* competent evidence to demonstrate that personal jurisdiction over [a] defendant might exist before allowing discovery to proceed." *Hansen,* 163 F.R.D. at 475. Furthermore, "[w]hen the lack of personal jurisdiction is clear, ... further discovery serves no purpose and should be denied." *Hockerson-Halberstadt, Inc. v. Propet USA, Inc.,* 62 Fed. Appx. 322, 338 (Fed.Cir.2003) (unpublished).

Here, as previously discussed in Section IV.A., *supra,* the record evidence regarding Telcordia's agency theory of specific jurisdiction is insufficient to support the conclusion that Alcatel USA was acting as Alcatel S.A.'s agent. In addition, Telcordia did not assert that the court could exercise personal jurisdiction over Alcatel S.A. based on the general jurisdiction subsection of the Delaware long-arm statute. For these reasons, the court believes it is clear that it may not exercise personal jurisdiction over Alcatel S.A. pursuant to the Delaware long-arm statute. Thus, further discovery would not be worthwhile. In other words, granting Telcordia's request for jurisdictional discovery would amount to allowing it to conduct a fishing expedition in order to form a basis for jurisdiction. The court, therefore, will deny Telcordia's request for jurisdictional discovery.

### ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 8

1. Alcatel S.A.'s Motion to Dismiss for Lack of
Personal Jurisdiction (D.I.17) is GRANTED.
2. Telcordia's request for jurisdictional discovery is
DENIED.


D.Del.,2005.
Telcordia Technologies, Inc. v. Alcatel S.A.
Not Reported in F.Supp.2d, 2005 WL 1268061
(D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1182445 (Trial Motion, Memorandum
and Affidavit) Plaintiff Telcordia Technologies, Inc.'s
Objections to Defendant Alcatel USA, Inc.'s Second
Notice of 30(b)(6) Deposition (Mar. 30, 2006)
Original Image of this Document (PDF)
• 2006 WL 1182446 (Trial Motion, Memorandum
and Affidavit) Plaintiff Telcordia Technologies, Inc.'s
Objections to Defendant Alcatel USA, Inc.'s Third
Notice of 30(b)(6) Deposition (Mar. 30, 2006)
Original Image of this Document (PDF)
• 2006 WL 1182444 (Trial Pleading) Telcordia's
Answering Claim Construction Brief Addressing
Telcordia's '633 Patent and Alcatel's '052 Patent
(Mar. 24, 2006) Original Image of this Document
(PDF)
• 2006 WL 1204461 (Trial Pleading) Alcatel's
Answering Claim Construction Brief for U.S. Patent
No. 6,247,052 (Mar. 24, 2006) Original Image of this
Document (PDF)
• 2006 WL 1182443 (Trial Motion, Memorandum
and Affidavit) Plaintiff Telcordia Technologies, Inc.'s
Objections to Defendant Alcatel USA, Inc.'s First
Notice of 30(b)(6) Deposition (Mar. 10, 2006)
Original Image of this Document (PDF)
• 2006 WL 1182441 (Trial Pleading) Alcatel's
Opening Claim Construction Brief for U.S. Patent
Nos. 6,247,052 and Re. 36,633 (Mar. 3, 2006)
Original Image of this Document (PDF)
• 2006 WL 1182442 (Trial Pleading) Telcordia's
Opening Claim Construction Brief (Mar. 3, 2006)
Original Image of this Document (PDF)
• 2005 WL 3666806 (Trial Motion, Memorandum
and Affidavit) Telcordia's Reply Brief in Support of
its Motion to Dismiss Or, in the Alternative, to Sever
and Stay Alcatel Usa, Inc.'s Patent Infringement
Counterclaim (Nov. 1, 2005) Original Image of this
Document (PDF)
• 2005 WL 2867944 (Trial Pleading) Telcordia's
Reply to Alcatel USA, Inc.'s Amended
Counterclaims and Demand for Jury Trial (Sep. 29,
2005) Original Image of this Document (PDF)
• 2005 WL 2867947 (Trial Motion, Memorandum

and Affidavit) Telcordia's Motion to Dismiss, or in
the Alternative, to Sever and Stay Alcatel USA, Inc.'s
Patent Infringement Counterclaim (Sep. 29, 2005)
Original Image of this Document (PDF)
• 2005 WL 2385505 (Trial Pleading) Alcatel Usa's
Answer and Counterclaims to Plaintiff's First
Amended Complaint and Demand for Jury Trial
(Aug. 10, 2005) Original Image of this Document
(PDF)
• 1:04cv00874 (Docket) (Jul. 16, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2006 WL 924993 (E.D.Pa.)
(Cite as: Slip Copy)

tradenames. Among the products MTS manufactures
and sells are an infant's crib sold as the Aspen Crib
and children's travel swings.

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
SIMPLICITY INC.
v.
MTS PRODUCTS, INC.
Civil Action No. 05-3008.

April 6, 2006.

Joseph E. Wolfson, Stevens & Lee, King of Prussia,
PA, for Simplicity Inc.
A. Christopher Young, Matthew R. Williams, Pepper
Hamilton, LLP, Philadelphia, PA, Cameron A.
Hopkins, Los Angeles, CA, for MTS Products, Inc.

### MEMORANDUM AND ORDER

JUAN R. SÁNCHEZ, J.

*1 MTS Products, Inc. asks this Court to dismiss a
seven-count complaint, which alleges it breached a
contract and express and implied warranties by
supplying Plaintiff Simplicity, Inc. with defective
merchandise. MTS contends it has no minimum
contacts with Pennsylvania to subject it to personal
jurisdiction in this forum. I agree and will grant the
motion in part. In lieu of dismissal, the interest of
justice permits a transfer to a district court where the
case could have been brought.

### FACTS[FN1]

> FN1. The facts reflect the allegations in the
> Complaint, which this Court must accept as
> true in deciding a motion to dismiss for lack
> of personal jurisdiction. Dayhoff Inc. v. H.J.
> Heinz Co., 86 F.3d 1287, 1302 (3d
> Cir.1996).

Simplicity, a Pennsylvania corporation with its
principal place of business in Reading, Pennsylvania,
is a wholesaler and distributor of children's furniture.
Simplicity markets its products both in its own
registered tradename and under tradenames utilized
under various licensing agreements. MTS is a
California corporation in the business of
manufacturing and selling children's furniture, which
its customers re-brand for sale under various

In 2004 and 2005, Simplicity contracted to buy
MTS's infant's cribs and travel swings. The terms of
the sales agreement permitted Simplicity to reject
shipment of the furniture if testing revealed the
products exceeded a 2% defective tolerance limit or
otherwise failed to comply with applicable federal,
state and local requirements. Simplicity subsequently
notified MTS it rejected the furniture because the
products did not meet the 2% defective tolerance
limit. Simplicity alleges MTS has refused to refund,
or otherwise provide credit, for the defective
products.

### DISCUSSION

A federal court sitting in diversity must apply the law
of the forum state to determine whether it has
personal jurisdiction over a non-resident defendant.
Fed.R.Civ.P. 4(e). Pennsylvania's long arm statute
authorizes Pennsylvania courts to exercise personal
jurisdiction over non-residents to the "fullest extent
allowed under the Constitution of the United States
and may be based on the most minimum contact with
this Commonwealth allowed under the Constitution
of the United States." 42 Pa.C.S. § 5322(b). The
statute thus "is coextensive with the due process
clause of the United States Constitution," Time Share
Vacation Club v. Atlantic Resorts Ltd., 735 F.2d 61,
63 (3d Cir.1984), and permits personal jurisdiction so
long as the nonresident defendant has "certain
minimum contacts with [the forum] such that the
maintenance of the suit does not offend 'traditional
notions of fair play and substantial justice,' "
International Shoe Co. v. Washington, 326 U.S. 310,
316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457,
463 (1940)).

Once a defendant has raised a jurisdictional defense
under Federal Rule of Civil Procedure 12(b)(2), the
burden shifts to the plaintiff, here Simplicity, to
establish the district court has personal jurisdiction
over the non-resident defendant. Provident Nat'l
Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434,
437 (3d Cir.1987). To establish these jurisdictional
facts, Simplicity must rely on sworn affidavits,
depositions or other competent evidence; depending

Slip Copy                                                                                          Page 2
Slip Copy, 2006 WL 924993 (E.D.Pa.)
(Cite as: Slip Copy)

on bare allegations in the complaint is insufficient. *Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1302 (3d Cir.1996); Time Share Vacation Club, 735 F.2d at 66 n. 9.* "All inferences must be drawn in favor of the non-moving party, all doubts must be resolved against the moving party, and all allegations of the non-moving party that conflict with those of the movant must be taken as true." *McKinney v. West End Voluntary Ambulance Ass'n, 821 F.Supp. 1013, 1017 (E.D.Pa.1992)* (citations omitted).

*2 This Court may assert either general or specific jurisdiction over a non-resident defendant. General jurisdiction exists when the non-resident party has continuous and systematic contacts with the forum state. *Provident, 819 F.2d at 437.* Where no such contacts exist, the court may assert specific jurisdiction provided the cause of action arose from or is related to the defendant's forum-related activities. *Id.* Simplicity contends MTS is amenable to suit in this jurisdiction because it "maintains systematic and continuous contacts with Pennsylvania." (Pl.'s Memo. Opp'n Mot. Dismiss 10.) Simplicity does not assert specific jurisdiction, and there is no evidence to suggest the claim arose out of MTS's activities within Pennsylvania. Therefore, I only consider whether I can exercise general jurisdiction over MTS.

"To obtain general jurisdiction over a corporation in Pennsylvania, the corporation must either: (1) be incorporated in Pennsylvania or licensed as a foreign corporation in the Commonwealth, (2) consent to jurisdiction, or (3) carry on a 'continuous and systematic part of its general business' within the Commonwealth." *Endless Pools, Inc. v. Wave Tec Pools, Inc., 362 F.Supp.2d 578, 581 (E.D.Pa.2005)* (citing 42 Pa.C.S. § 5301(a)(2)). The only basis for this Court to exercise jurisdiction is if MTS maintains "continuous and systematic" contacts here because MTS is neither incorporated nor licensed in Pennsylvania and has not consented to jurisdiction.[FN2]

> FN2. "[I]f the court determines that there are sufficient minimum contacts with the forum state, the court may then determine 'whether the assertion of personal jurisdiction accords with the notions of fair play and substantial justice.' " *Lehigh Coal & Navigation Co. v. Geko-Mayo, GmbH, 56 F.Supp.2d 559, 570 (E.D.Pa.1999).* I need not address this issue because I find MTS does not have sufficient contacts with this forum.

As an initial matter, the parties disagree as to the relevant time period for which this Court should determine whether MTS had sufficient contacts with Pennsylvania. Simplicity focuses on MTS's contacts with Pennsylvania between 2000 and 2005, whereas MTS limited its personal jurisdiction analysis to the years 2004 and 2005-the same period during which MTS and Simplicity conducted business. Although sufficient contacts must exist at the time the action arose, a district court need not limit its jurisdiction analysis only to those contacts coterminous with activities giving rise to a lawsuit. *Modern Mailers, Inc. v. Johnson & Quin, Inc., 844 F.Supp. 1048, 1052 (E.D.Pa.1994).* In *Modern Mailers,* the plaintiff sought a declaratory judgment it did not infringe defendant's patent between December, 1992 and the summer of 1993. Although the accusations occurred over a few months, the district court found three years a reasonable time frame in which to assess jurisdiction over the defendant. The court rejected the defendant's position the relevant time period was only the time in which the activities giving rise to the action occurred because such limited time frame "would often make it impossible for a court to determine whether sufficient contacts exist." *Id.* Instead, a "court must examine the contacts over a reasonable period of time to determine whether general jurisdiction existed when the action arose." *Id.* at 1052.

While MTS concurs a reasonable time period should apply, it reads *Modern Mailers* as inapposite to the current action because "none of the concerns raised by the court in *Modern Mailers* apply here." (Def.'s Letter Br. 2.) Specifically, Simplicity's claims involve a long-term commercial relationship, not a patent infringement case as in *Modern Mailers,* and the alleged activities in *Modern Mailers* occurred over a shorter period of time relative to the two-year business relationship between Simplicity and MTS. I find this reading of *Modern Mailers* erroneous. The court viewed neither the nature of the case relevant to its determination of the pertinent time period nor the length of time associated with the accusations giving rise to the claim. What the court found essential to determining "whether a defendant conducted a *continuous and systematic* part of its business in the forum state" was an examination of "the defendant's activities within the state over a period of time." *Id.* (emphasis added).

*3 The Second Circuit in *Metropolitan Life Insurance Company v. Robertson-Ceco Corporation, 84 F.3d 560, 569 (2d Cir.1996),* consistently found

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 924993 (E.D.Pa.)
(Cite as: Slip Copy)

Page 3

the "continuous and systematic" requirement for general jurisdiction justifies evaluating the defendant's contact with the forum state over time. The court went a step further, though, and reviewed general jurisdiction cases to determine the appropriate time frame. Although few cases discuss explicitly what constitutes a relevant time period, the Second Circuit's review of general jurisdiction cases revealed "contacts are commonly assessed over a period of years prior to the plaintiff's filing of the complaint." *Id.* The court crafted some general guidance for district courts, which I find persuasive:
The minimum contacts inquiry is fact-intensive, and the appropriate period for evaluating a defendant's contacts will vary in individual cases. In general jurisdiction cases, district courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances-up to and including the date the suit was filed-to assess whether they satisfy the "continuous and systematic" standard. The determination of what period is reasonable in the context of each case should be left to the court's discretion.

*Id.* at 569-70.

I find a five-year time frame for determining whether I have general jurisdiction over MTS is reasonable. Limiting the analysis to calendar years 2004 and 2005 simply would represent the time period related to the activities giving rise to the claim, which can neither bind this Court nor provide sufficient time to assess MTS's contacts. Accordingly, I will consider MTS's contacts with Pennsylvania from January 1, 2000 to June 23, 2005 to determine whether they constitute a continuous and systematic course of conduct in the Commonwealth.

Continuous and systematic contacts exist when the non-resident defendant's forum activities are "extensive and persuasive," *Fields v. Ramada Inn, Inc.,* 816 F.Supp. 103 3, 103 6 (E.D.Pa.1993), and "a continuous and central part of defendant's business," *Endless Pools,* 362 F.Supp.2d at 581. Such contact would permit the defendant to " 'purposefully avail[ ] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws,' " *Bucks County Playhouse v. Bradshaw,* 577 F.Supp. 1203, 1207 (E.D.Pa.1983) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)). It is undisputed MTS lacks a general business presence in this forum. MTS is not registered to conduct business in Pennsylvania, has maintained no offices or facilities here, and has designated no agent for service of process in

Pennsylvania. It neither owns nor leases property, and does not have a telephone or post office box in the Commonwealth. MTS has never paid taxes or filed any tax returns in this forum and has no assets or bank accounts. Simplicity, nevertheless, argues MTS's contacts are sufficient to assert general jurisdiction based on "MTS's product sales, product distribution, and other business activities in and directed to Pennsylvania." (Pl .'s Memo. Opp'n Mot. Dismiss 1.) This Court has stated general jurisdiction is usually found "where a non-resident defendant makes a substantial number of direct sales in the forum, solicits business regularly and advertises in a way specifically targeted at the forum market." *Modern Mailers,* 844 F.Supp. at 1054. Applying this general rule to the present case reveals MTS's Pennsylvania contacts were not continuous and systematic.

*4 Simplicity contends MTS directly ships a substantial amount of products directly into Pennsylvania equal to approximately 5% of MTS's total sales from 2000 to 2005. (Pl.'s Memo. Opp'n Mot. Dismiss 6.) Sales invoicing and quantity reports produced by MTS support this proposition. (Pl.'s Memo. Opp'n Mot. Dismiss Ex. K). The reports represent all MTS products sold or shipped to Pennsylvania customers, but overstate MTS's contacts with the forum in the general jurisdiction context because the reports include sales to Simplicity and some large retailers for whom MTS did not directly ship the purchased products into this forum. Specifically, I cannot consider sales to Simplicity because the transactions between MTS and Simplicity occurred exclusively in California. (Def .'s Reply Memo. 3.) The subject goods were manufactured in China and shipped to California where they were delivered to Simplicity's agent. (Def.'s Reply Memo. 3.) Simplicity does not dispute these facts.

The 5% figure further inflates MTS's contacts with Pennsylvania by including sales to non-Pennsylvania customers who later shipped goods into the Commonwealth. Specifically, the majority of MTS's sales are with large retail stores, such as Wal-Mart, Target and Kmart. MTS solicits sales from these retailers at their offices in Arkansas, Minnesota and Michigan, respectively, and sends invoices to offices located in those states. (Def.'s Reply Memo. Ex. 1, Vargas-Lee Aff. ¶ 6.) The retailers determine where the purchased MTS products will be distributed. (Def.'s Reply Memo. Ex. 1, Vargas-Lee Aff. ¶ 7.) For instance, for Wal-Mart and Target, MTS shipped the products to the retailers' distribution center

Slip Copy
Slip Copy, 2006 WL 924993 (E.D.Pa.)
(Cite as: Slip Copy)

Page 4

located in California, but created bills of lading which allowed the retailers to re-ship the purchased products to various distribution centers in the United States, including those in Pennsylvania. [FN2] (Pl.'s Memo. Opp'n Mot. Dismiss Ex. A., Michelle Vargas-Lee Dep. 26-27, 47-48, 52, Nov. 10, 2005; Def.'s Reply Memo. Ex. I, Vargas-Lee Aff. ¶ 6.) I cannot consider any sales transactions with Wal-Mart, Target and Kmart when determining whether this Court has general jurisdiction over MTS because sales to these retailers did not occur in Pennsylvania, and MTS did not directly ship goods sold to these retailers into Pennsylvania. [FN4]

> FN3. Some confusion arises regarding the shipping arrangements for MTS products sold to Kmart. During her deposition, Michelle Vargas, the Accounting Manager for MTS, explained MTS shipped goods sold to Kmart directly to Pennsylvania. (Pl.'s Memo. Opp'n Mot. Dismiss Ex. A., Vargas-Lee Dep. 52-55.) She explained, however, she was not certain as to this fact and had to verify this information with MTS representatives. (Pl.'s Memo. Opp'n Mot. Dismiss Ex. A., Vargas-Lee Dep. 53.) In a later affidavit, she avers MTS has no direct dealings with a Kmart store, distribution center or employee in Pennsylvania. (Def.'s Reply Memo. Ex. I, Vargas-Lee Aff. ¶ 7.) While this may represent a possible conflict, it also could reflect a correction to her prior statement. The invoices and shipping documents produced as to Kmart sales are virtually identical to those related to Target and Wal-Mart, suggesting MTS did not deviate from its billing and shipping procedures used with its large retail customers. (Pl.'s Memo. Opp'n Mot. Dismiss Ex. F, G, H; Def.'s Reply Memo. Ex. 4.) Even if this Court were to consider sales to Kmart, Simplicity's 5% figure remains flawed-MTS's sales to other retailers, including its largest customer Wal-Mart (Pl.'s Memo. Opp'n Mot. Dismiss Ex. A., Vargas-Lee Dep. 29), do not qualify as contacts with Pennsylvania.

> FN4. Evidence a non-resident defendant benefitted from placing its goods, albeit indirectly, into a forum may be sufficient to establish a stream of commerce theory of personal jurisdiction. See generally Pennzoil Prods. Co. v. Colelli & Assocs., Inc., 149

F.3d 197 (3d Cir.1998) (reviewing stream of commerce theory as defined in Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102 (1987) and applying the three articulated tests). The stream of commerce theory, however, is "relevant only to the exercise of specific jurisdiction; it provides no basis for exercising general jurisdiction over a nonresident defendant." Simeone v. Bombardier-Rotax GMBH, 360 F.Supp.2d 665, 673 (E.D .Pa.2005) (quotation omitted).

The only sales or shipments into this forum which this Court shall consider are MTS sales to "Mom and Pop" stores. [FN5] In 2004 and 2005, [FN6] MTS completed approximately thirty-four sales and issued thirteen credits to eleven independently-owned retailers located in Pennsylvania, most of whom engaged in multiple transactions. [FN7] (Pl.'s Memo. Opp'n Mot. Dismiss Ex. I, M.) MTS concedes the Court can consider its sales to these "Mom and Pop" stores, which amounted to less than 1.5% of MTS business in the last two calendar years (1.3% in 2004 based on $449,328 in total sales and .0002% in 2004 based on $10,735 in total sales). (Def.'s Reply Memo. 2, 3; Def.'s Reply Memo. Ex. I, Vargas-Lee Aff. ¶ 11.) MTS further transacted with fourteen retailers located outside Pennsylvania between 2004 and 2005 and directly shipped the purchased products to approximately thirty-one Pennsylvania customers. [FN8] (Pl.'s Memo. Opp'n Mot. Dismiss Ex. J.) Consequently, MTS sales and shipments into this forum represents less than 5% of its total sales over the relevant time period. Such a figure falls substantially below the "continuous and systematic" contacts required by the in personam jurisdiction standard. In fact, courts have found similarly small percentages of sales into this forum insubstantial for general jurisdiction purposes. See, e.g., Modern Mailer, 844 F.Supp. at 1054 (defendant's sales of less than .5% to Pennsylvania deemed not substantial); Romann v. Geissenberger Manuf. Corp., 865 F.Supp. 255, 261 (E.D.Pa.1994) (same as to 2-4% of sales); Allied Leather Corp. v. Altama Delta Corp., 785 F.Supp. 494, 499-500 (M.D.Pa.1992) (same as to 1% of sales); Derman v. Wilair Servs., Inc., 590 A.2d 317, 324 (Pa.Super.Ct.), appeal denied 600 A.2d 537 (Pa.1991) (same as to 1.5% of sales).

> FN5. "Mom and Pop" stores are independently-owned retailers who do less than $5,000 a year in annual sales with MTS. (Pl.'s Memo. Opp'n Mot. Dismiss Ex. A., Vargas-Lee Dep. 66.)

Slip Copy
Slip Copy, 2006 WL 924993 (E.D.Pa.)
(Cite as: Slip Copy)

Page 5

FN6. Other than the sales invoicing and quantity reports, which I find incorporates sales and shipments unrelated to MTS's contacts with Pennsylvania, the parties rely on documentary evidence related only to calendar years 2004 and 2005.

FN7. Three records were excluded: (1) a sales order transacted in September 2005, (2) a credit memo related to a Simplicity transaction, and (3) a credit memo noting only a Pennsylvania store had bad debt.

FN8. The record also includes documents evidencing MTS issued credit to or arranged to replace warrantied products for twenty-eight Pennsylvania customers. (Pl.'s Memo. Opp'n Mot. Dismiss Ex. J.) Most of these documents, however, do not specify when or if products were eventually shipped to the Pennsylvania customer. Additionally, some credit memos reflect items returned by the consumer to MTS, with no reference to subsequent activity by MTS.

*5 This Court is mindful, however, that "[i]t is the overall nature of the activity, rather than its quantitative character, that determines whether a Court may have general personal jurisdiction." *Romans,* 865 F.Supp. at 261. For instance, in *Provident,* the Third Circuit extended jurisdiction over a California bank which only had .066% of its depositors in Pennsylvania, received .071 % of its deposits from Pennsylvanians, and extended .083% of its outstanding loans to Pennsylvania residents. Though the defendant's number of Pennsylvania transactions were insufficient for the exercise of general jurisdiction, the Third Circuit focused on the defendant's maintenance and daily use of a continuous "controlled disbursement" account with a Pennsylvania bank. Unlike *Provident,* there is no evidence MTS engaged in daily contact with Pennsylvania. At best the records related to the "Mom and Pop" sales evidence less than one hundred sales and/or shipments into this forum, with four months of no activity.[FN9]

FN9. Sales to Kmart would not significantly alter this figure. Simplicity erroneously estimates the shipments at approximately seventy. My review of the documents uncovered only forty-five shipments after excluding multiple copies of the same bills of lading and accounting for multiple bills of lading covered by a single shipment. Additionally, I did not consider four shipments because the bills of lading, unlike the rest, lacked notations they actually were shipped to Pennsylvania (e.g., signature and date by carrier and/or shipper, trailer or seal numbers).

Simplicity argues this Court should exercise jurisdiction over MTS because the shipment of goods into a forum, in and of itself, meets the minimum contacts requirement. Simplicity relies on *White-Evans Manufacturers, Inc. v. Elevator Sales and Service,* 543 F.Supp. 398 (E.D.Pa.1982), in which the court extended jurisdiction over a New York business that shipped its goods into Pennsylvania after receiving orders at its New York office.[FN10] I find this case inapposite for two reasons. First, *White-Evans* provides limited guidance to this Court because, unlike MTS, the defendant conceded and did not dispute allegations its contacts with the forum were systematic, substantial and continuous, and it was these admissions which formed the basis of the court's conclusions. 543 F.Supp. at 400-01. Second, in the absence of these limiting facts, *White-Evans* does not support Simplicity's contention. In deciding to extend jurisdiction over the non-resident defendant, the court stated shipping goods into Pennsylvania reflects "a systematic method of conducting business, in that it follows a system or orderly procedure in distributing goods." *Id.* at 401. That may be true, but shipping alone should not automatically relegate a defendant's contacts to the personal jurisdiction threshold without considering whether the shipments were extensive and pervasive enough to meet the continuous and systematic requirement. In fact, the *White-Evans* court focused not only on the systematic nature of shipping, but further found the defendant "engages in 'continuous' and 'substantial' dealings with a Pennsylvania corporation." *Id.* If shipping itself were sufficient for a finding of personal jurisdiction, the court need not have relied on the defendant's continuous and substantial admissions.

FN10. Simplicity also relies on *AMP Inc. v. Methode Electronics, Inc.,* 823 F.Supp. 259 (E.D.Pa.1993), in which the court granted jurisdiction over a defendant who cultivated ties with the forum over a period of years by selling goods to a number of Pennsylvania customers through "house accounts." When Pennsylvania customers requested products

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 6

directly, the defendant referred them to an agent or distributor to complete the sale and ship the purchased products. The court found these contacts were substantial and made on a regular basis despite the defendant's sales to Pennsylvania customers accounting for a small percentage of its business. I find the *AMP* decision does not support Simplicity's shipping argument because the opinion focuses less on the shipment of goods and more on the defendant's established contacts with the forum through its distribution network. Additionally, the *AMP* decision is factually distinct from the present case. There is no evidence MTS established a special relationship with Pennsylvania customers, such as direct referrals to agents or distributor, or created a different method of billing or payment peculiar to customers in Pennsylvania, such as with house accounts.

Not only do I find MTS engaged in an insubstantial amount of direct sales and shipments to the Commonwealth (and the nature of this activity does little to undermine this conclusion), but I also find limited evidence of regular business solicitation by MTS in this forum. MTS admits it historically cultivated its relationships with "Mom and Pop" retailers at an annual trade show MTS attends in Dallas, Texas and through commissioned agents. (Pl.'s Memo. Opp'n Mot. Dismiss Ex. A., Vargas-Lee Dep. 66-67; Def.'s Reply Memo. Ex. 1, Vargas-Lee Aff. ¶ ¶ 4, 8.) The trade show provides no support for general jurisdiction in Pennsylvania because the event occurred outside the forum and there is no evidence MTS attended the event solely to develop Pennsylvania business.

*6 Nor does MTS's use of commissioned agents to solicit business support a finding of general jurisdiction. Simplicity focuses on three former MTS sales representatives-Dean Schearer, Spain Sales & Marketing (Spain) and Kenneth Sears.[FN1] None of MTS's commissioned agents were assigned exclusively to Pennsylvania. (Def.'s Reply Memo. Ex. 1, Vargas-Lee Aff. ¶ 4.) Spain and Sears covered portions of Pennsylvania, but both also served as a MTS representative to five or six other states. (Pl.'s Memo. Opp'n Mot. Dismiss Ex. B.) Schearer's sales area included specific customers such as Target, which is located in Minnesota, and covered eleven states other than Pennsylvania. (Pl.'s Memo. Opp'n Mot. Dismiss Ex. B.) Although all three representatives had Pennsylvania addresses (Pl.'s

Memo. Opp'n Mot. Dismiss Ex. B), there is no evidence MTS required their presence here. The sales representatives residences in this forum are not relevant to the jurisdiction analysis because a unilateral decision to live in the forum "does not constitute purposeful contacts by the foreign defendant, and cannot serve as a basis for the exercise of personal jurisdiction...." *Romann,* 865 F.Supp. at 261-62.

> FN1. It is unclear from the record whether Schearer, Spain and Sears were employees of MTS or independent contractors. There was no written contract between MTS and these three representatives, only an understanding each would receive a commission for each sale. (Def.'s Reply Memo. Ex. 1, Vargas-Lee Aff. ¶ 4.) They were not obligated to sell or market MTS products exclusively and actually sold and marketed products for MTS's competitors. (Def.'s Reply Memo. Ex. 1, Vargas-Lee Aff. ¶ 4.) Nor is there any evidence MTS instructed or otherwise controlled the manner in which the representative solicited sales. The employee-independent contractor distinction is an important one because several circuit courts refuse to attribute the activities of independent contractors in a forum state to a foreign defendant in the absence of an agency relationship. *See Guinness Imp. Co. v. Mark VII Distribs., Inc.,* 153 F.3d 607,614-15 (8th Cir.1998); *Kuenzle v. HTM Sport-Und Freizeitgerate AG,* 102 F.3d 453, 458-59 (10th Cir.1996); *R.L. Lipton Distrib. Co. v. Dribeck Imps., Inc.,* 811 F.2d 967, 969 (6th Cir.1987). Pennsylvania courts also have expressed reluctance at imputing the acts of independent contractors to a corporation for personal jurisdiction purposes. *See Meench v. Raymond Corp.,* 283 F.Supp. 68, 71 (E.D.Pa.1968); *Cecere v. Ohringer Home Furniture Co.,* 220 A.2d 350, 354 (Pa.Super.Ct.1966). I need not address this issue because viewing the facts most favorably towards the plaintiff, thereby assuming the sales representatives are agents for MTS, the evidence does not support a finding of regular business solicitation.

Simplicity avers minimum contacts are met because Spain and Sears received thousands of dollars in sales commission, thereby establishing they solicited and

Slip Copy
Slip Copy, 2006 WL 924993 (E.D.Pa.)
(Cite as: Slip Copy)

Page 7

generated substantial business in Pennsylvania on MTS's behalf. I disagree for two reasons. First, like the 5% sales figure, Simplicity reaches a flawed conclusion by relying on MTS's commission reports. The reports itemize sales commissions for Spain and Sears but do not indicate in which state the sales were made. (Pl.'s Memo. Opp'n Mot. Dismiss Ex. C.) Simplicity has provided no means by which this Court can distinguish which sales by Spain and Sears were directed to Pennsylvania. Second, Spain and Sears likely contributed to an insignificant amount of Pennsylvania sales because commissioned agents typically focused on sales with "Mom and Pop" retailers (Def.'s Reply Memo. Ex. 1, Vargas-Lee Aff. ¶ 8), which I previously deemed not substantial. Additionally, less than twenty credit memos identify Spain or Sears as sales representatives related to specific transactions. (Pl.'s Memo. Opp'n Mot. Dismiss Ex. 1, J.)

The final factor *Modern Mailer* identifies as relevant to a general jurisdiction analysis is whether the non-resident defendant advertises in a way specifically targeted at the forum market. MTS does not advertise in any newspapers, magazines or other publications sold or distributed in Pennsylvania. Instead, MTS markets its products in a catalog and via the Internet, neither of which creates the constitutionally required minimum contacts for personal jurisdiction purposes. MTS distributes its catalog only at the annual trade show in Texas. (Pl.'s Memo. Opp'n Mot. Dismiss Ex. A., Vargas-Lee Dep. 82; Def.'s Reply Memo. 2, 3; Def.'s Reply Memo. Ex. 1, Vargas-Lee Aff. ¶ 11.) There is no evidence MTS mailed the catalog to Pennsylvania customers or designed the catalog to target Pennsylvania customers.

*7 Likewise, MTS's Internet site, located at http://www.jason.com, advertises MTS's products but can offer no support for this Court's exercise of jurisdiction over MTS. The mere existence of a website is insufficient to establish personal jurisdiction anywhere the site is viewed. *Blackburn v. Walker Oriental Rug Galleries*, 999 F.Supp. 636, 639 (E.D.Pa.1998) ("Creating a Web Site may be felt nation or even world wide, but without more, it is not an act purposefully directed toward the forum."). This district has adopted a "sliding scale" approach for establishing jurisdiction based largely on the degree and type of interactivity on the website and the nature and quality of activity the entity conducts over the Internet. *Zippo Mfg. Co. v. Zippo DOT Com*, 952 F.Supp. 1119, 1124 (E.D.Pa.1997). At one end of the sliding scale are commercially interactive websites that permit defendants to conduct business

over the Internet. *Id.* The other end comprises passive websites that merely post information. *Id.* "The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." *Id.* MTS's website falls short of a commercially interactive site for which personal jurisdiction is proper because it does not allow customers to purchase products online-it merely provides the names and website links to retailers, etailers and specialty stores which sell its products. The website primarily is passive as it overviews MTS's products, provides contact and company information, details warranty and safety information, and addresses frequently asked questions. The only arguably interactive feature of the website is a contact for MTS's customer service, accounting and sales departments through an email link. Email links alone, though, do not rise to the level of interactivity required to justify general jurisdiction. *Blackburn*, 999 F.Supp. at 639. Even if this feature renders the website sufficiently interactive so as to fall in the middle of the sliding scale spectrum, it would remain an inappropriate basis upon which to exercise general jurisdiction because the Internet site does not specifically target customers in Pennsylvania. See *Molnlycke Health Care AB v. Dumex Med. Surgical Prods. Ltd.*, 64 F.Supp.2d 448, 452 (E.D.Pa.1999) (refusing to exercise general jurisdiction because "[p]laintiff has made no showing that defendant's websites targeted Pennsylvania").

Simplicity also relies on three other business activities by MTS in this forum: (1) MTS's presence as a defendant in a pending state court lawsuit, (2) MTS's filing "Stuffed Toy Registration Certificates" with the Pennsylvania Department of Labor and Industry from 2001 to 2004, and (3) MTS's payment of expenses associated with a trip by MTS's president to Pennsylvania in 2004. I find all these activities represent random and fortuitous contacts which do little to alleviate the barrier against haling MTS into court in this forum. First, MTS is a party to a pending state court lawsuit in which it did not contest jurisdiction. (Pl.'s Memo. Opp'n Mot. Dismiss Ex. N, O.) It does not follow, though, that this Court can exercise personal jurisdiction over MTS in this action simply because it did not contest jurisdiction in a prior lawsuit involving unrelated claims. See *Bowers v. NETI Techs., Inc.*, 690 F.Supp. 349, 356 (E.D.Pa.1988) (rejecting defendants' presence as parties in prior lawsuit sufficient to exercise personal

jurisdiction). Nor does MTS's compliance with the Stuffed Toy Act, 35 Pa.C.S. § 5201 *et seq.*, and registration with the Department of Labor and Industry establish the substantial and continuous contacts necessary for this Court to exercise jurisdiction over MTS. The Stuffed Toy Act requires manufacturers, distributors and sellers of stuffed toys to certify the toys "sold, distributed or given away" in Pennsylvania are free from dangerous and harmful substances. 35 Pa.C.S. § 5206. Registration does not equate to registering to do business in Pennsylvania, and Simplicity has cited no case law interpreting compliance with the Stuffed Toy Act as conferring jurisdiction. Finally, MTS's president had his expenses paid for a single trip to Philadelphia, Pennsylvania in 2004. (Pl.'s Memo. Opp'n Mot. Dismiss Ex. A., Vargas-Lee Dep. 43-45.) "Regular business trips or personal visits to the forum by an entity's employees or agents" may be sufficient for the exercise specific jurisdiction, *In re Auto. Refinishing Paint Antitrust Litig.,* 229 F.R.D. 482, 492 (E.D.Pa.2005), but Simplicity has not asserted a specific jurisdiction argument and a lone business trip is inadequate to meet the more strenuous "continuous and systematic" burden general jurisdiction requires.

*8 Based on all the evidence presented regarding MTS's contacts with this forum, I find MTS did not carry on a "continuous and systematic part of its general business" within Pennsylvania. Therefore, the defendant may not be subject to the general jurisdiction of this Court. Plaintiff asks the Court to transfer rather than dismiss the case should it conclude it lacks personal jurisdiction over MTS.[FN12] A district court finding jurisdiction is lacking "shall, if it is in the interest of justice, transfer [the action] to any other such court in which the action ... could have been brought at the time it was filed." 28 U.S.C. § 1631. Both parties agree this action could have been brought in the Central District of California. (Pl.'s Letter Br. 7; Def.'s Letter Br. 4.) The Central District can exert personal jurisdiction and venue over MTS because MTS resides there. Venue also is proper because all of the alleged conduct giving rise to this suit was undertaken by MTS and Simplicity's agent in California. As to the interest of justice, dismissal undermines "principles of sound judicial administration" and would be "time-consuming and justice defeating." *Lawman Armor Corp. v. Simon,* 319 F.Supp.2d 499, 507 (E.D.Pa.2004) (finding interest of justice permitted transfer) (citations and quotation omitted). Therefore, I will transfer this case in the interest of justice to the Central District of California.

FN12. This Court's Order of January 30, 2006 directed the parties to state their position on transfer in lieu of dismissal in case personal jurisdiction did not exist. The plaintiff supported transfer, whereas the defendant believed a transfer was not warranted relying on an unpublished, nonprecedential opinion.

An appropriate Order follows.

### ORDER

AND NOW this 6th day of April, 2006, Defendant's Motion to Dismiss (Document 11) is GRANTED IN PART and DENIED IN PART. This Court finds it lacks personal jurisdiction over the defendant, but denies defendant's request for dismissal. This case is hereby transferred in the interests of justice to the United States District Court for the Central District of California.

E.D.Pa.,2006.
Simplicity, Inc. v. MTS Products, Inc.
Slip Copy, 2006 WL 924993 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 1796734 (Trial Pleading) Complaint (Jun. 23, 2005) Original Image of this Document (PDF)
• 2:05cv03008 (Docket) (Jun. 23, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 57191 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 1

**c**
Briefs and Other Related Documents
Malloy v. Harnischfeger Corp.E.D.Pa.,1993.Only the
Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Patrick MALLOY and Kelly Malloy, Plaintiffs,
v.
HARNISCHFEGER CORP., Kobe Steel, Ltd.,
Century II, Inc., American Equipment & Fabricating
Corp., H & M Vibratory Co., C.C. & F.F. Keesler,
Inc., and Gannett Fleming Water Resources
Engineering, Inc., Defendants.
**No. CIV. A. 92-2795.**

Feb. 26, 1993.

OPINION

GAWTHROP

*1 This diversity action, *Erie*-bound to the law of
Pennsylvania, arises out of an accident which
occurred at the Philadelphia Naval Shipyard.
Plaintiff Patrick Malloy was working at the shipyard
when a portion of a crane separated and fell on him,
causing him serious injuries. Plaintiffs allege that
defendant Kobe Steel, Ltd. ("Kobe"), a Japanese
company, partially designed (along with defendant
Harnischfeger Corp.) and completely assembled and
manufactured the crane. Kobe moves for summary
judgment on the ground that the court lacks *in
personam* jurisdiction over it. Upon the following
reasoning, I shall grant Kobe's motion.

Federal Rule of Civil Procedure 4(e) authorizes a
federal court to assert personal jurisdiction over
nonresident defendants to the extent permissible
under the law of the state in which the district court
sits. *Mellon Bank (East) PSFS, N.A. v. Farino*, 960
F.2d 1217, 1221 (3d Cir.1992).

Although the court must view the case in the light
most favorable to the plaintiffs, the burden of proof is
on the plaintiff to demonstrate that the court has
jurisdiction over the defendant. *Mesalic v. Fiberfloat
Corp.*, 897 F.2d 696, 697 (3d Cir.1990). Plaintiffs
assert that the court has both specific jurisdiction and
general jurisdiction over Kobe. However, I find that
this court has neither personal nor general jurisdiction
over Kobe.

*Specific Jurisdiction*

A court has specific jurisdiction when the plaintiff's
alleged cause of action arises out of the defendant's
activities in the forum state. Under Pennsylvania's
long-arm statute, 42 Pa.C.S.§ 5322(b), Pennsylvania
courts may exercise personal jurisdiction over
nonresident defendants to the fullest extent permitted
by the United States Constitution. Thus, this court
may exercise jurisdiction over Kobe as long as the
exercise of jurisdiction does not violate due process.
*Mellon Bank*, 960 F.2d at 1221.

In *International Shoe Co. v. Washington*, 326 U.S.
310, 316 (1945), the Supreme Court held that the Due
Process Clause requires that, in order for a court to
have jurisdiction over a defendant, the defendant
must have had sufficient contacts with the state in
which the court sits, such that "the maintenance of
the suit does not offend 'traditional notions of fair
play and substantial justice.'" The Court has also
held that the defendant must have availed itself of the
benefit and protection of the laws of the forum state
by purposely conducting activities in that state, such
that the defendant should have "reasonably
anticipate[d] being haled into court there." *World-
Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286,
297 (1980).

Here, plaintiffs allege "a distribution scheme in
which Harnischfeger and Kobe jointly design the
Model CN 128 crane for distribution in the United
States. After the design process is completed, Kobe
then manufactures and assembles these cranes in
Japan. These cranes are then shipped by Kobe to
Harnischfeger in Panama City, Florida, for
distribution to markets throughout the United States."
Plaintiffs' Memorandum of Law in Opposition to
Kobe's Motion for Summary Judgment, at 11.
Essentially, plaintiffs argue that the court should
assert jurisdiction under the so-called "stream of
commerce" theory, since "Kobe Steel uses
Harnischfeger and its distributors to deal in the
international market for cranes. In addition, Kobe is
well aware of the fact that these cranes were being
sold for use in the United States, including
Pennsylvania." *Id.* at 11-12.

*2 In *World-Wide Volkswagen*, the Supreme Court
held, by a six-to-three margin, that "the mere
likelihood that a product will find its way into the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 57191 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

forum State" is not sufficient to establish the minimum contacts required for a court in that forum to assert jurisdiction. *World-Wide Volkswagen,* 444 U.S. at 297.

However, the court also held that a state could assert "personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id.* at 298. The Court drew a distinction between "an isolated occurrence" and "efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its products in other States," holding that in the latter case it is reasonable to subject the manufacturer or distributor to suit in the forum state if its merchandise has been the source of injury there. *Id.* at 297.

The Supreme Court revisited the "stream of commerce" theory in *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102 (1987). Kobe asserts that the Supreme Court rejected the "stream of commerce" theory in *Asahi.* Indeed, Justice O'Connor relied on *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985), for the proposition that, in order for a court to assert jurisdiction, the defendant must have purposefully directed his actions toward the forum state. *Asahi,* 480 U.S. at 112 (plurality opinion). Justice O'Connor continued: "The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Id.* However, in this portion of her opinion, Justice O'Connor was joined by only three other justices. Justice Brennan, also joined by three other justices, wrote that "our holding in *World-Wide Volkswagen* preserved the stream-of-commerce theory." *Asahi,* 480 U.S. at 120 (Brennan, J., concurring in part and concurring in the judgment). Justice Stevens, joined by two other justices, saw "no reason in this case for the Court to articulate 'purposeful direction' or any other test as the nexus between an act of a defendant and the forum State that is necessary to establish minimum contacts." *Asahi,* 480 U.S. at 122 (Stevens, J., concurring in part and concurring in the judgment).

Given the absence of a majority opinion in *Asahi,* I cannot agree with Kobe's assertion that the Supreme Court has completely rejected the "stream of commerce" theory of jurisdiction. To my knowledge, neither the Pennsylvania Supreme Court nor the Third Circuit has considered the "stream of commerce" theory since *Asahi.*

The leading pre-*Asahi* Third Circuit case is *Max Daetwiler Corp. v. R. Meyer,* 762 F.2d 290 (3d Cir.1985). There, the plaintiff argued that two American entities, Henry P. Korn of New York and Uddeholm Corp. of Delaware and Ohio, acted as middlemen or distributors for defendant, a German manufacturer, by shipping defendant's products all over the United States, including Pennsylvania. In the words of the court, "The presence of Meyer's blades in the United States is neither fortuitous nor the result of a single transaction. Rather, Meyer, by means of Korn and possibly Uddeholm, has attempted to serve indirectly the domestic market for his product." *Max Daetwiler,* 762 F.2d at 295. Uddeholm sold Meyer's products to at least three customers in Pennsylvania, but the court had "difficulty in finding that Uddeholm's sporadic transactions in Pennsylvania suffice to allow Meyer to anticipate being sued in Pennsylvania." *Id.* at 299. The court continued:

*3 Meyer's contacts with Pennsylvania are insufficient to enable us to conclude that Meyer either attempted to obtain any benefit from the state or could reasonably expect to be haled into court there. To hold that Uddeholm's intermittent sales of Meyer blades evidences continuous distributive activity, capable and certain of repetition, is to allow the mere possibility of future contact to support jurisdiction. We do not believe such hypothetical contacts can ground jurisdiction.

*Id.* at 300.

Courts in this district have continued to view *Max Daetwiler* as binding precedent even since the *Asahi* decision. *See, e.g., Narco Avionics, Inc. v. Sportsman's Market, Inc.,* 792 F.Supp. 398 (E.D.Pa.1992) (dismissing Japanese manufacturer and distributor of transceivers which sold products to American company for distribution in United States); *Kennedy v. Steeltastic West, Inc.,* Civ. A. No. 90-5017, 1991 WL 208780 (E.D.Pa.1991) (dismissing Arkansas corporation which manufactured tools in Illinois and sold them for distribution throughout United States); *Nguyen v. Rapid Granulator, Inc.,* Civ. A. No. 89-8307, 1991 WL 85352 (E.D.Pa.1991) (dismissing Swedish manufacturer which sold machines to American company for distribution in United States).

Pennsylvania's state courts have treated the "stream of commerce" theory similarly. In *Graham v. Machinery Distribution, Inc.,* 410 Pa.Super. 267, 599 A.2d 984 (1991), Nippon, a Japanese corporation, manufactured forklifts and sold them to Mitsubishi,

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 57191 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

another Japanese corporation, which shipped the forklifts to Machinery Distribution, a Texas corporation, for distribution throughout the United States, including Pennsylvania. The Pennsylvania Superior Court relied on *World Wide Volkswagen* and *Asahi* in holding that Pennsylvania courts did not have personal jurisdiction over Nippon. In the words of the court:

there is no evidence that Nippon designed its forklift in anticipation of sales in Pennsylvania ..., advertised its product in Pennsylvania, established channels for providing regular advice to customers in Pennsylvania or marketed the product through a Pennsylvania distributor who was acting as an agent for Nippon. The evidence does not show that Nippon has any agents or employees in Pennsylvania or that it solicits business in Pennsylvania. Under these circumstances, the courts of this Commonwealth cannot exercise in personam jurisdiction over Nippon merely because it was foreseeable that its forklift might find its way into Pennsylvania.

*Graham,* 599 A.2d at 988.

In light of the holding in *Graham* and the continuing validity of *Max Daetwiler,* I am constrained to find that this court does not have specific jurisdiction over Kobe. Plaintiffs have simply not satisfied their burden of proving that Kobe has purposefully availed itself of the privilege of doing business in Pennsylvania. Plaintiffs allege that Kobe owns 3.2% of Harnischfeger's stock. However, plaintiffs do not allege, nor does this court find, that Kobe controlled Harnischfeger's marketing or distribution schemes. While Kobe could surely have foreseen the likelihood that its cranes could find their way into a large industrial state like Pennsylvania, such an awareness is not sufficient to establish jurisdiction. *See, World Wide Volkswagen,* 444 U.S. at 297. Rather, under *Max Daetwiler* and *Graham,* Kobe must have purposefully directed cranes toward Pennsylvania. Merely building the cranes and selling them to Harnischfeger, even with knowledge that the cranes would be resold elsewhere in the United States, does not give Kobe sufficient contact with Pennsylvania to bring it within the jurisdiction of a Pennsylvania court. Nor does this court have jurisdiction over Kobe by virtue of Harnischfeger's identification of Kobe as the manufacturer of the CN 128 crane in its advertisements or instruction manuals.

*4 There have been a few cases in this jurisdiction in which foreign corporations were held to be within the jurisdiction of the court under the "stream of commerce" theory. However, those cases involved defendants which had substantially more contact with Pennsylvania than Kobe has had in this case. As the Third Circuit observed, in those cases "the manufacturers involved had made deliberate decisions to market their products in the forum state." *Max Daetwiler,* 762 F.2d at 299.

For example, in *Hewitt v. Eichelman's Subaru, Inc.,* 341 Pa. Super 589, 492 A.2d 23 (1985), the Pennsylvania Superior Court held that a Pennsylvania court had jurisdiction over Fuji, the Japanese manufacturer of Suburu automobiles. Fuji shipped cars to dealers throughout the United States, including Pennsylvania, through its sole distributor, a New Jersey corporation licensed to do business in Pennsylvania, 49% of whose stock was owned by Fuji. Over a six-year span, almost 50,000 Suburus were sold by 53 Suburu dealers in Pennsylvania. On these facts, the court held that Fuji had "availed itself of the privilege of conducting activity in Pennsylvania," relying on the United States Supreme Court's distinction in *World Wide Volkswagen* between "a dealer or regional distributor seeking to serve a limited market and a manufacturer or national distributor seeking to serve a larger market." *Hewitt,* 492 A.2d at 26. Obviously, the sales of 50,000 Suburus in Pennsylvania gave Fuji substantially more contact with Pennsylvania than Kobe has had in this case, in which plaintiffs have, thus far, alleged the sale of only two Model CN 128 cranes in Pennsylvania.

The only case plaintiffs have cited which truly supports their position is *Felty v. Conaway Processing Equip. Co.,* 738 F.Supp. 917 (E.D.Pa.1990). There, Linco Holland, a Dutch corporation, manufactured poultry processing machines and sold them to Lindholst, a Dutch distributer found by the court to be the manufacturer's agent, which then sold them to an American company, Conaway Equipment, for distribution in the United States. Judge Van Antwerpen distinguished the case from *Asahi* and did not cite *Max Daetwiler,* finding that the court had personal jurisdiction over Linco Holland. The record showed that Linco Holland maintained a list showing the locations in the United States where its machines had been installed, that it often dealt directly with Conaway, and that on at least one occasion, a Linco Holland representative met directly with a Pennsylvania customer. Ultimately, the court held that "[t]hrough Lindholst, its sole international marketing agent, Linco Holland purposefully directed its machines toward the United States, one of which,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 57191 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 4

Pennsylvania, plays a significant role in the poultry processing industry." *Felty,* 738 F.Supp. at 920.

I agree with plaintiffs that *Felty* is factually similar to the case at bar. However, *Max Daetwiler, Graham, Narco Avionics, Nguyen,* and *Kennedy* are equally, if not more, similar, *Felty* is somewhat distinguishable from the case at bar in that the manufacturer there maintained lists of the locations of its machines and occasionally dealt directly with customers in Pennsylvania, neither of which Kobe did in this case. Further, to the extent that *Felty* is similar to the case at bar, it appears to be contrary to the substantial weight of authority in this district and circuit, and therefore I shall not follow it.

**\*5** Kobe has no place of business or employees in Pennsylvania, nor does it sell or advertise its cranes here. Plaintiffs do not allege, nor could they, that Kobe designed the Model CN 128 crane specifically for sales in Pennsylvania, or that Kobe has engaged in a marketing campaign specifically directed at Pennsylvania. There is no evidence that Kobe keeps records of cranes sold in Pennsylvania, nor that it offers to repair or service the cranes which find their way here. In sum, there is no evidence that Kobe has anything at all to do with the cranes once it delivers them to Harnischfeger in Florida. Thus, there is no basis for this court to exercise specific personal jurisdiction over Kobe.

*General Jurisdiction*

Although a plaintiff's claim may not arise out of a defendant's contacts with the forum state, the court may still have general jurisdiction over the defendant. However, the standard for establishing general jurisdiction is much stricter than the "minimum contacts" standard applicable to specific jurisdiction. Under 42 Pa.C.S.§ 5301(a)(2)(iii), Pennsylvania courts are enabled to exercise general jurisdiction over a corporation when the corporation is engaged in "[t]he carrying on of a continuous and systematic part of its general business within this Commonwealth."

Plaintiffs argue that the court should exercise general jurisdiction over Kobe based on the allegations outlined previously in this Memorandum, and on the following additional alleged contacts of Kobe with Pennsylvania: (1) entry into a joint venture with, and an agreement to supply manufacturing technology to, Halstead Industries, a Pennsylvania-based company, to operate a plant located in North Carolina, (2) entry

into two joint ventures with USX, a Pennsylvania-based company, to operate plants located in Ohio, and (3) entry into two joint ventures with ALCOA, a Pennsylvania-based company, to operate plants located in Japan.

Kobe argues that not all of the above joint ventures are its own, but are instead ventures of some of its subsidiaries. But I need not look into the corporate structures of Kobe and its subsidiaries, since I find that these alleged contacts, even if accepted as true, would not justify this court's exercise of general jurisdiction over Kobe. Simply stated, Kobe has not carried on a **continuous** and **systematic** part of its general business in Pennsylvania. Kobe representatives may well have spent time in Pittsburgh and Zelienople negotiating **contracts** with Pennsylvania corporations, but none of those **negotiations** resulted in Pennsylvania-based ventures. Kobe's involvement in joint ventures with three Pennsylvania corporations does not make it subject to the general jurisdiction of the Pennsylvania courts, especially since none of the joint ventures involves activity within Pennsylvania. *See, e.g., Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408 (1984); *Allegheny Ludlum Steel v. Pacific Gas & Elec. Co.,* 607 F.Supp. 35, 38 (W.D. Pa.1984), *Strick Corp. v. A.J.F. Warehouse Distrib.,* 532 F.Supp. 951, 956 (E.D.Pa.1982).

*Conclusion*

**\*6** Since I find that this court lacks both specific and general personal jurisdiction over Kobe, I shall grant Kobe's motion for summary judgment. However, Kobe's dismissal from this case shall be without prejudice. If plaintiffs discover substantial new evidence which they, in good faith, believe would convince this court that it should exercise jurisdiction over Kobe, they may move the court to rejoin Kobe as a defendant. However, plaintiffs should bear in mind that they continue to bear the burden of showing that Kobe is subject to the court's jurisdiction, and that any further action of the court will be consistent with this Opinion and the cases cited herein.

An Order follows.

ORDER

AND NOW, this day of February, 1993, upon consideration of defendant Kobe Steel, Ltd.'s Motion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 57191 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

for Summary Judgment, plaintiffs' response thereto,
and defendant Kobe Steel, Ltd.'s reply, the motion is
GRANTED.   This case is DISMISSED WITHOUT
PREJUDICE as to defendant Kobe Steel, Ltd. only.

E.D.Pa.,1993.
Malloy v. Harnischfeger Corp.
Not Reported in F.Supp., 1993 WL 57191 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:92cv02795 (Docket) (May. 14, 1992)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

# INTERNATIONAL CHAMBER of COMMERCE ARBITRATION

### Third Edition

W. Laurence Craig
William W. Park
Jan Paulsson

OCEANA PUBLICATIONS, INC. / DOBBS FERRY, NY



International Chamber of Commerce
*The world business organization*

Information contained in this work has been obtained by Oceana Publications from sources believed to be reliable. However, neither the Publisher nor its authors guarantee the accuracy or completeness of any information published herein, and neither Oceana nor its authors shall be responsible for any errors, omissions or damages arising from the use of this information. This work is published with the understanding that Oceana and its authors are supplying information, but are not attempting to render legal or other professional services. If such services are required, the assistance of an appropriate professional should be sought.

Library of Congress Cataloging-in-Publication Data

Craig, W. Laurence (William Laurence)
    International Chamber of Commerce arbitration / by
W. Laurence Craig, William W. Park, Jan Paulsson. — 3rd ed.
        p. cm.
    Includes bibliographical references and index.
    ISBN 0-379-21392-3 (alk. paper)
    1. Arbitration and award, International.  2. International
Chamber of Commerce. Court of Arbitration. I. Park, William W.
II. Paulsson, Jan. III. Title.
K2400.C725 1998
341.5'22—dc21                                    97-47674
                                                 CIP

Third Edition
ICC Publication No. 594; ISBN 92-842-1251-0

© Copyright 2000 Oceana Publications, Inc.; ICC Publishing, SA; W. Laurence Craig; William W. Park; Jan Paulsson

All rights reserved. No part of this publication may be reproduced or transmitted in any way or by any means, electronic or mechanical, including photocopy, recording, xerography, or any information storage and retrieval system, without permission in writing from the publisher.

Manufactured in the United States of America on acid-free paper.

m sources
the accu-
or its au-
se of this
s authors
ional ser-
should be

## ABOUT THE AUTHORS:

### W. Laurence Craig

Member of the Bars of New York and the District of Columbia
Avocat, Paris
A.B., Williams College; J.D., Harvard University
Doctor of Law of the University of Paris
Partner, Coudert Frères, Paris

### William W. Park

Professor of Law, Boston University
Member of the Bars of Massachusetts and the District of Columbia
B.A., Yale University; J.D., Columbia University; M.A., Cambridge University
Counsel, Ropes & Gray, Boston

### Jan Paulsson

Member of the Bars of Connecticut and the District of Columbia
Avocat, Paris
A.B., Harvard University; J.D., Yale University
Diplôme d'études supérieures spécialisées, University of Paris
Partner, Freshfields, Paris

The authors express their thanks to Katherine Miller, legal intern, Coudert Frères,
for her assistance with the text.

ıg;

ted in any
g, xerogra-
riting from

In contracts of a relatively simple nature the parties may in accordance with Article 20(6) stipulate that the arbitral tribunal should (or may) decide on the basis of documents alone. Otherwise, Article 20(6) gives any party the right to insist on a hearing.

## 8.09   Use of discovery

The opportunities for discovery are far less in ICC arbitration than, for example, in the U.S. federal courts. To many continental practitioners, this fact is a reason to favor ICC arbitration, because they view U.S. discovery practices as overblown, time consuming, and too often abusive.

There may nevertheless be circumstances in which it is appropriate to make a contractual stipulation to the effect that either party shall at the request of the other make available documents or witnesses relevant to the major aspects of the contractual relationship issues. Faced with such contractual language, refusal to comply would not only be defiance of the arbitrator's general authority, but breach of a specific contractual undertaking. Such provisions are particularly self-explanatory in joint venture agreements under which one partner is the operator, and the other is a relatively passive investor who wishes to ensure transparency with respect to financial, technical, and operational matters. Contracts involving intellectual property may also call for explicit provisions to avoid controversy with respect to confidential data.

The International Bar Association's Supplementary Rules Governing the Presentation and Reception of Evidence in International Commercial Arbitration (usually referred to as the IBA Rules of Evidence) represent a compromise between common law and civil law approaches. Intended to supplement the general rules of arbitration chosen by the parties (such as the ICC Rules), they were first promulgated in 1983.[25] A revision is imminent. Well-informed drafters may consider reference to them in arbitration clauses, with the aim of achieving a higher degree of predictability.

## 8.10   Apportionment of costs

Article 31 of the Rules gives the arbitrator the power not only to allocate the burden of costs of arbitration and arbitrators' fees between the parties, but also to award an amount on account of fees for the prevailing parties' counsel as well as other reasonable outlays. This is common practice in certain countries, unlike the United States where each party is generally required to bear its own attorney's fees.

In the event the parties want either to exclude this possibility or to make it mandatory, they may stipulate to that effect.

---

25   Reprinted *in* X YEARBOOK 145 (1985).

---

In addition
costs, for e:
of arbitratic
will be mad
tral cost an

This kind o

## 8.11   Ent

It has long
clauses wit

and judg
tered in

The reason
to enforce ;
requires si
arises whe·
bitral awa1
related to ·
try-of-judg
this is for 1

First, recer
enforceabl·
stipulation
at the requ
objection ·
try-of-judg
pute, the ;
and bindir
ment on tl
Clause (*se*
cle 28 of tl

Second, th
ble in the ·
include th·

---

26   This lar
27   *See, e.g*
28   Audi N:
     *in* II YE
     the arbi
     *in Nati*

## 11.02   Procedure for raising jurisdictional issues before the Court of Arbitration

Even if there is an evident jurisdictional difficulty, the Request is invariably sent to the respondent to elicit a response. After all, that response may turn out to constitute an unqualified acceptance of ICC arbitration. Even when there is no ICC arbitration agreement at all, a response on the merits which does not contest arbitral jurisdiction is deemed a sufficient indication of acceptance of arbitral jurisdiction to permit the arbitration to proceed, without prejudice to the respondent's right to raise the jurisdictional issue with the arbitral tribunal. But if the respondent contests jurisdiction, or simply remains silent during the 30 day period defined in Article 5(1) of the Rules, the Court will be required to make its *prima facie* determination.

The procedure has been succinctly summarized by the Chairman of the Court of Arbitration:[9]

> If the Respondent contests the existence, validity or scope of the arbitration agreement or if the Respondent does not file an answer, the matter will, after payment by the Claimant of the provisional advance, be submitted to the Court. In clear cases of absence of an arbitration agreement under the Rules, the Court will decide that the arbitration cannot proceed. If the Court is *prima facie* satisfied that an arbitration agreement under the Rules may exist, it will refer the matter to the Arbitral Tribunal, which will then take a decision on its own jurisdiction.

The Court seeks to cut down groundless claims of arbitral jurisdiction intended to pressure an opponent by setting into motion the machinery for appointing an arbitral tribunal. Where there is no agreement to arbitrate, or where the parties have failed to stipulate ICC arbitration, or where there is a pathological arbitration clause, the Court must decline jurisdiction (*see* Chapter 9, *supra*). In determining whether an agreement for ICC arbitration may exist, the Court will limit itself to a review of the contractual documents or the written argument submitted by counsel. No opportunity whatsoever for oral argument is accorded by the Court, whose nature is purely administrative. No lawyer or party has ever appeared to plead a single issue before the ICC Court of Arbitration.

In light of the fact that jurisdictional issues are fully considered by the arbitral tribunal itself, this restriction on presenting arguments to the Court is fully justified. Article 6(2) of the Rules clearly provides that when the Court has determined that the arbitration will proceed ". . . any decision as

---

unfair competition were not subject to arbitration) on the grounds that they went to the "effectiveness" of the arbitration agreement. The author cites, however, no precedents of refusal to allow an arbitration to proceed on this basis.

9   R. Briner, *The Implementation of the 1998 ICC Rules of Arbitration*, 8 ICC BULL. 7 (December 1997).

to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself."

Despite the fact that respondents get "another bite at the apple" on the issue of jurisdiction before the arbitral tribunal, they generally present full arguments before the Court of Arbitration in the hope of terminating the proceedings at the earliest stage. Accordingly, there is often elaborate correspondence between parties and the Court. The most frequent arguments raised to show absence of arbitral jurisdiction are: (i) that the arbitration clause is pathological, typically in the sense of inadequately referring to ICC arbitration; (ii) that there is no arbitration clause or agreement at all; (iii) that respondent neither signed nor acquiesced in the arbitration agreement; (iv) that a party was not bound by an agreement to arbitrate made by an alleged but disavowed representative or agent, or by an affiliated company; and (v) that a party which guaranteed the performance of a contract was not bound by an arbitration clause in the contract whose performance was guaranteed.

The Court's practice in the past was to send even weakly arguable cases of jurisdiction to an arbitral tribunal for determination of the issue. Nevertheless it would on occasion refuse to constitute a tribunal when it was convinced that there was no *prima facie* arbitration agreement.[10] The 1998 revision of the Rules makes it even less likely than in the past that the Court will refuse to order the arbitration to proceed where jurisdiction is doubtful. The replacement of the necessity of finding a *"prima facie* agreement" by the need to be *prima facie* satisfied that an "agreement under the Rules may exist" lowers the bar.[11] Nevertheless, the Court will continue to play an impor-

---

10   In the *Cekobanka* case, the Court declined in 1985 to form an arbitral tribunal where the claimant party alleged that an arbitration agreement had been formed by exchange of telexes. Respondent denied this contention since *inter alia* the offer had been withdrawn prior to acceptance. The Court's determination is reported in subsequent judicial proceedings, *Tribunal de grande instance*, Paris, 8 October 1986, Cekobanka v. ICC, 1987 REV. ARB. 367. In the *R.E.D.E.C.* case in 1987, the Court ordered arbitration to proceed against R.E.D.E.C., the guarantor of a construction contract containing an ICC arbitration clause but, after initially deciding otherwise, refused to order arbitration to proceed against Gaeth Pharaon, the controlling owner and alleged alter ego of R.E.D.E.C. The Court's decision is reported in judicial proceedings, *Tribunal de grande instance*, Paris, 13 July 1988, R.E.D.E.C. et Pharaon v. Uzinexport Import et Chambre de Commerce Internationale, 1989 REV. ARB. 97. *See also*, A. Dimolitsa, *Issues Concerning the Existence, Validity and Effectiveness of the Arbitration Agreement*, 7 ICC BULL. 14 (December 1996), I. Hautot, *Les pouvoirs de la Cour d'arbitrage de la C.C.I. de décider ou non d'organiser l'arbitrage*, 1990 SWISS BULL. 12.

11   The other textual change in Article 6(2), that the Court should not allow an arbitration to proceed if not satisfied that "an arbitration *under the Rules* may exist" (emphasis added) was not intended to make any substantive change from the requirement in the prior Rules that the arbitration should not proceed if the Court found that there was a *prima facie* agreement but "it does not specify the International Chamber of Commerce" (Article 7, 1975 Rules, Article 12, 1980 Internal Rules). In 1998, the first year of application of the new Rules, the Court was required to make an Article 6(2) ruling in 78 cases and found that the *prima facie* test had been satisfied in 76 of the 78 cases. *See* Fabien Gélinas, *The Application of the ICC Rules by the Court: 1998 Overview*, 10 ICC BULL. 11 (Spring 1999).

tant preliminary role not only where it refuses to permit an arbitration to proceed but also where, in appropriate cases, it limits the scope of arbitration by refusing to join non-signatory parties (such as parent companies, guarantors, or states) as additional respondents in otherwise valid arbitrations. *See* section 11.05, *infra.*

When the Court of Arbitration has determined whether or not it is *prima facie* satisfied that an arbitration agreement may exist, the Secretariat notifies the parties and, if appropriate, the arbitral tribunal. No reasons are given for the decision, which is considered administrative in character. The circumstances in which decisions have been taken not to permit an arbitration to proceed are not made public and have only come to light in the very rare case of challenge before national courts.[12]

The power of the Court to act as gate keeper in determining whether ICC arbitrations will proceed has broadly been confirmed by national courts wherever such decisions of the Court have been called into question.[13]

In *Cekobanka v. ICC*[14] the Court of Arbitration determined that the documents exchanged between the parties did not contain an arbitration clause binding the parties to ICC arbitration; accordingly, there was no *prima facie* agreement to arbitrate. The disappointed claimant brought suit before the *Tribunal de grande instance* of Paris seeking to compel the ICC to constitute an arbitral tribunal to hear the affair. The court found that there was no proof that the Court of Arbitration had failed to respect its Rules and that the Court had not committed any wrong in refusing to organize the arbitration solicited by the claimant. Because of the administrative nature of the Court of Arbitration's mission, and the nature of the suit seeking to hold the ICC liable, the French court did not itself consider whether arbitral jurisdiction existed, but only whether the Court of Arbitration had fulfilled its role under the Rules.[15]

---

12   For informed commentary concerning non-public cases of Court refusal to permit arbitrations to proceed, *see* A. Dimolitsa (a member of the Court), *Issues Concerning the Existence, Validity and Effectiveness of the Arbitration Agreement,* 7 ICC BULL. 14 (December 1996); DERAINS & SCHWARTZ, 87-99.

13   For an example of a United States Court's willingness to confirm the ICC Court's role of forwarding cases to arbitral tribunals for determination of jurisdictional issues see Apollo v. Berg, 886 F.2d. 469 (lst Cir. 1989) (discussed *infra* at Section 28.02) where a U.S. Court of Appeals relied on the ICC Rules in holding that the validity of an ICC Arbitration Clause was for the ICC and the arbitrators to determine.

14   *Tribunal de grande instance,* Paris, 8 October 1986, 1987 REV. ARB. 367; P. Fouchard, *Les institutions permanentes d'arbitrages devant le juge étatique,* 1987 REV. ARB. 225, 233.

15   If, following a *prima facie* denial of arbitral jurisdiction by the Court of Arbitration, a suit were brought before a national court on the merits of the dispute between the contracting parties, the court would ordinarily be required to determine, as a preliminary matter, whether there was, in fact, a binding arbitration agreement (despite the ICC Court's *prima facie* negative finding) and the national court's determination of the issue would be binding. *See* 1987 JDI 1039, 1044 (note Y.D.).

In *R.E.D.E.C.*,[16] the French courts faced challenges to both the Court's decision to allow an arbitration to proceed against a non-signatory corporate guarantor of the payment obligations of the respondent signatory to the arbitration agreement, and its decision not to forward to arbitration claims against the owner of the guarantor, a physical person and its alleged *alter ego*. The Paris *Tribunal de grande instance* did not examine the merits of the challenge and found that these decisions were taken in accordance with the Court's proper exercise of its functions in accordance with the ICC Rules.

These typical judgments confirm that a decision by the Court of Arbitration finding *prima facie* arbitral jurisdiction over a dispute and referring the matter to an arbitral tribunal for a determination of all issues (including jurisdiction) retains its administrative character and is not subject to judicial review.[17] Only an award by the arbitrator (whether interim or final) constitutes the exercise of decision-making powers which, depending upon the law at the place of arbitration or execution, may be subject to judicial review.

## 11.03    Arbitrators' authority to determine their jurisdiction[18]

There are two reasons why an arbitration may proceed despite a challenge by one party to arbitral jurisdiction: first, the Rules enshrine the principle that arbitrators have jurisdiction to determine their own jurisdiction (Article 6(2)),[19] and second, the arbitration clause is severable from the main contract at issue (Article 6(4)) (*see* Section 5.04, *supra*). Even in the face of an ar-

---

16   *Tribunal de grande instance*, Paris, 13 July 1988, 1989 REV. ARB. 97, *see* note 10, *supra*.

17   *See Cour d'appel*, Paris, 11 July 1980, Japan Time v. Kienzle France and the International Chamber of Commerce (unpublished), where the Court of Appeal confirmed the dismissal of a law suit brought against the ICC, contesting its finding of *prima facie* jurisdiction. The court found that the only relief for a party contesting arbitral jurisdiction was recourse against the award, and that allowing a suit against the ICC, based on the Court of Arbitration's finding of *prima facie* jurisdiction, would create unauthorized and disguised judicial review. The court's judgment should be compared with its second decision on the same day in Japan Time v. Kienzle France, which reviewed the award in question, considered the jurisdictional defense (based on the allegation that the ICC should not have accepted jurisdiction since the arbitration was not international, as both parties were French) and dismissed the recourse as not founded. To the same effect is *Tribunal de grande instance* of Paris, 25 June 1980, Organisation de l'Energie Atomique de l'Iran (O.E.A.I.) v. Eurodif S.A., SOFIDIF, *et al.* (unpublished), where respondents contested the Court's decision to send claims involving multiple parties under different contracts to be resolved by a single ICC arbitral tribunal. The court found that the issue as to which parties were bound by diverse arbitration clauses was to be determined by the arbitrators, subject only to the possibility of *ex post facto* control by the court in review or execution proceedings involving an award.

18   *See generally*, Section 28.07, "Courts and Arbitral Jurisdiction."

19   Once the Court has made a positive *prima facie* finding, that article provides that ". . . any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself."

# EXHIBIT H

SECOND EDITION

# INTERNATIONAL COMMERCIAL ARBITRATION

## Commentary and Materials

### Gary B. Born

 Transnational Publishers

 Kluwer Law International

to minimize that disruption, but it appears to me both real and significant. Plaintiffs' discovery demands in aid of its alter ego theory are far-reaching, in respect of both document production and answers to interrogatories. The taking of depositions of TEA and defendants' officers and employees cannot be far behind. I say this not in criticism of the litigation tactics of plaintiffs' counsel here, but in recognition that such litigation would in all likelihood disrupt and delay the rather stringent procedural deadlines imposed by Mr. Gardam, the Singapore arbitrator. In addition, the Singapore court is currently considering whether plaintiffs are required to submit their claims as part of the arbitration under the main contract, or are entitled to a separate arbitration against TEA. This Court's order, adding three additional corporate parties to the Singapore proceedings, would constitute an intrusive action against which comity counsels.

Quite apart from these considerations, resolution of the issues in the Singapore arbitration may well limit or narrow the issues here. That is a sufficient basis for this Court to exercise its inherent power "to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel and for litigants." There is ample authority in this circuit for staying suits here on alleged guarantees given by corporate parents pending arbitration abroad between plaintiff and subsidiary. *Nederlandse Erts-Tanker-Smaatschappij, NV v. Isbrandtsen Company,* 339 F.2d 440 (2d Cir. 1964), and subsequent orders reported at 362 F.2d 205 (2d Cir. 1966) and 387 F.2d 954 (2d Cir. 1968).

The concerns this Court addressed in *Hidrocarburos, supra,* are alleviated by the present defendants' willingness, expressed through counsel, to waive any "due process" arguments arising out of their desired non-participation in the Singapore arbitration. I will exact that undertaking as a condition for a stay of these proceedings. Meaning no disrespect to counsel, the undertaking must take the form of corporate resolutions in proper form, given by each of the three corporate defendants. Those resolutions must set forth the defendants' agreements that if plaintiffs prevail on the merits of the petition at bar, defendants will regard themselves as bound by any award rendered in the Singapore arbitration against TEA, as to merits and quantum, precisely as if defendants had participated in that arbitration as parties from its inception. . . .

In addition, this court directs in an exercise of its equitable powers that the defendants take no steps which would hamper the progress of the Singapore arbitration, or serve to impede its completion within a reasonable time. In making that direction, I do not mean to preclude such litigation steps as TEA may be advised by their Singapore counsel to pursue. My focus will be upon possible bad-faith obstructionism generated by the corporate parents. . . . On these terms and conditions and in the exercise of my discretion, I grant a stay of proceedings under the petition and complaint, including discovery.

## Notes on Parties to International Arbitration Agreement

1. *Allocation of competence to determine the parties to an arbitration agreement.* As with other disputes over the enforceability and interpretation of arbitration agreements, determining the identities of the

...ies to an international arbitration agreement gives rise to debates concerning the allocation of competence between national courts and arbitrators. *See supra* pp.74-95. Consider how the materials excerpted ...re dealt with this issue.

(a) *Arbitral awards considering arbitrators' competence to determine parties to the arbitration agreement.* The arbitral tribunal in *Dow Chemical* readily concluded that it had the authority to decide whether ...parties' arbitration agreement was binding on particular parties. Other international arbitral tribunals ...a agreed. *See Award in ICC Case No. 4402 of March 17, 1983,* in S. Jarvin & Y. Derains, *Collection of ICC ...ral Awards 1974-85* 153 (1990).

What was the rationale for the tribunal's conclusion in *Dow Chemical* that it possessed competence ...determine the parties to the relevant arbitration agreement? What role did the ICC Rules (and particu-...Article 8 of the 1975 Rules) play in the tribunal's conclusion? How (if at all) do disputes regarding the ...ity of the parties to an arbitration agreement differ from other disputes over the enforceability and in-...retation of arbitration agreements?

(b) *Arbitrators' competence to determine parties to an arbitration agreement under national arbitration ...tutes.* As discussed above, most national arbitration statutes address the allocation of competence be-...een national courts and arbitrators to decide disputes over the enforceability and interpretation of arbi-...ation agreements. *See supra* pp. 88-93. Consider Articles 7, 8 and 16 of the UNCITRAL Model Law, ...Articles 178 and 186 of the Swiss Law on Private International Law, and Articles 1458 and 1466 of the French Civil Code, excerpted above at *supra* pp. 76-78. How does each provision deal with the allocation of competence to determine the parties to an arbitration agreement?

(c) *National court decisions holding that arbitrators can determine parties to arbitration agreement.* In *Builders Federal,* the court upheld an arbitral tribunal's authority to decide what parties are bound by an arbitration agreement. Consider the court's explanation of this conclusion. Does the court discuss how the parties' arbitration agreement (or any relevant institutional rules) submitted disputes over the parties to the arbitration agreement to arbitration? Is *Builders Federal* consistent with *First Options? See supra* pp. 74-95.

(d) *National court decisions holding that arbitrators cannot determine parties to arbitration agreement.* In apparent contrast to *Builders Federal, Oriental Commercial* and other courts have held that an "arbitration proceeding [is] not the proper forum for deciding whether an arbitrator may afford relief against a non-signatory who is not covered by an arbitration agreement." *Fiat SpA v. Ministry of Finance and Planning,* 1989 U.S. Dist. Lexis 11995 (S.D.N.Y. 1989); *Orion Shipping & Trading Co. v. Eastern States Petroleum Corp.,* 312 F.2d 299, 301 (2d Cir. 1983).

(e) *Allocation of competence to determine parties to arbitration agreement under* First Options. Review the U.S. Supreme Court's analysis in *First Options,* excerpted at *supra* pp. 81-84. The Court held that "arbitrability questions" could be arbitrable, provided that the parties have agreed to do so; additionally, the Court also held that an agreement to arbitrate arbitrability issues must be established by "clear and unmistakable" evidence. *See supra* pp. 89-93. These requirements were formulated by the *First Options* Court in the context of a dispute over the identity of parties to an arbitration agreement.

When will there be "clear and unmistakable" evidence of an agreement to arbitrate disputes over the identity of parties to the arbitration agreement? Suppose that a company denies that it is a party to an arbitration clause (or that it is bound by any institutional arbitration rules incorporated by the clause). What might constitute "clear and unmistakable" evidence that the company had agreed to arbitrate arbitrability issues? Wouldn't such evidence necessarily require showing (in court) that the company was a party to the arbitration agreement itself? *See supra* pp. 89-93.

2. *Competence of U.S. courts to determine the parties to an arbitration agreement.*

(a) *Determining parties to arbitration agreement in §4 action.* Lower U.S. courts have generally held that disputes over the proper parties to an arbitration agreement can be resolved in an action to compel arbitration under §4. These courts have reasoned that a party's denial that it is bound by an arbitration agreement puts into question "the making of the arbitration agreement" for §4 purposes. *See McAllister Bros., Inc. v. A & S Transp. Co.,* 621 F.2d 519, 522 (2d Cir. 1980); *N & D Fashions, Inc. v. DHJ Industries, Inc.,* 548 F.2d 722, 729 (8th Cir. 1977); *Interocean Shipping Co. v. National Shipping and Trading Corp.,* 462 F.2d 673, 677 (2d Cir. 1972) ("Whether a person is a party to [an] arbitration agreement . . . is included within the statutory issue of 'the making of the arbitration agreement,'"); *Fisser v. International Bank,* 282 F.2d 231 (2d Cir. 1960); *In re Hidrocarburos y Derivados, C.A.,* 453 F.Supp. 160 (S.D.N.Y. 1978) ("The question is one for the Court to determine, not the arbitrators.").

Is this necessarily the correct result? Applying *First Options,* when might there be "clear and unmistakable" evidence that the question of the identity of the parties to an arbitration agreement had been submitted to arbitration? Consider the possibility of conduct during an arbitration. *See supra* pp. 89-93. Recall that *First Options* itself involved a dispute over the parties to an arbitration agreement.

(b) *Section 4 trials concerning alter ego or agency status.* A dispute over the identity of the parties to an arbitration agreement often raises issues of fact. Some lower courts have required discovery and a hearing on such factual issues. *Interbras Cayman Co. v. Orient Victory Shipping, etc.,* 663 F.2d 4 (2d Cir. 1981); *Oriental Commercial and Shipping Co. v. Rosseel, NV,* 609 F.Supp. 75, 79 (S.D.N.Y. 1985). *See also supra* pp. 357-58.

3. *Judicial abstention from compelling non-signatories to arbitrate.* The *Builders Federal* court declined to consider whether to compel the various Turner entities, which had not executed the arbitration agreement, to participate in the Singapore arbitration. In doing so, the court cited considerations of comity and deference to the Singapore arbitral proceedings. Was this a sensible decision? Is this the same conclusion as a decision that the parties had agreed to arbitrate arbitrability issues?

For another lower court decision declining to compel arbitration by non-signatories, *see Cochin Refineries Ltd v. Triton Shipping Inc.,* No. 74 Civ. 216 (S.D.N.Y. March 19, 1974).

Does §4 of the FAA permit the abstention practised in *Builders Federal?* Other U.S. lower courts have concluded that it does not, and have compelled the joinder of non-signatories. *See O & Y Landmark Associates of Virginia v. Nordheimer,* 725 F.Supp. 578 (D.D.C. 1989). Consider the discussion about the propriety of abstention under §4 in other contexts. *See supra* pp. 400-407.

4. *Conditions on abstention from compelling non-signatories to arbitrate.* Note that in *Builders Federal* the court only agreed to abstain from deciding the proper parties to the arbitration after extracting commitments from the non-signatories to be bound by the arbitral award. Is this appropriate? Is it less of an interference in the Singapore arbitration than compelling the non-signatories to arbitrate? Why would the Turner companies have agreed to such an arrangement? Consider the issue of discovery in the Singapore arbitration.

5. *Procedural postures of disputes considering whether non-signatories are bound by an arbitration agreement.* As the materials excerpted above illustrate, disputes over the identities of the parties to an arbitration agreement can arise in various procedural settings. First, as in *Dow Chemical,* non-signatories may act in the capacity of claimants, seeking to invoke the benefits of an arbitration agreement. Second, as in the underlying *Builders Federal* and *Oriental Commercial* disputes, non-signatories to an agreement may be named as respondents. Third, as discussed below, a respondent may assert counterclaims against non-signatories who have not been named as claimants in the initial request or notice of arbitration.

(a) *Arbitral awards considering whether non- signatories may act as claimants.* Like *Dow Chemical,* several arbitral awards have permitted non-signatories to an arbitration agreement to act as claimants. *See MAP Tankers, Inc. v. Mobil Tankers, Ltd,* VII Y.B. Comm. Arb. 151 (1982) (Society of Maritime Arbitrators); *Award in ICC Case No. 2375 of 1975,* 1976 Journal du droit international 974 (arbitration clause held to bind both non-signatory claimant and respondent); *Award in ICC Case No. 1434,* 1976 Journal du droit international 978 (same).

(b) *Arbitral awards considering whether non-signatories may be named as respondents.* Other cases have involved claims being asserted in arbitration against respondents who did not execute the arbitration agreement. Several arbitral tribunals have permitted such claims. *See MAP Tankers Inc. v. Mobil Tankers Ltd,* VII Y.B. Comm. Arb. 151 (1982); *Interim Award of 5 March 1984 in ICC Case No. 3879,* XI Y.B. Comm. Arb. 127 (1986).

Other tribunals have refused to conclude that, based upon particular facts, that non-signatories could be named as respondents. *See Award in ICC Case No. 4402 of March 17, 1983,* in S. Jarvin & Y. Derains, *Collection of ICC Arbitral Awards 1974-1985* 153-57 (1990).

Are cases where claimants assert that they are bound by an arbitration clause different in principle from cases where claimants assert that respondents are bound by an arbitration agreement? *See* Sandrock, *Arbitration Agreements and Groups of Companies,* 27 Int'l Law. 941 (1993). Is it not the fact that, in both cases, a party will be required to arbitrate against an entity with which it asserts it has no arbitration agreement? What effect should a party's "waiver" of its separate corporate status have?

(c) *Arbitral awards considering whether to permit non-signatories to be named as counterclaim-respondents.* There are few reported arbitral awards considering whether a non-signatory to an arbitration agreement may be named as a counterclaim-respondent. As discussed below, *infra* pp. 676-77, the ICC's practice is to deny respondents the right to name additional parties as either claimants, respondents, or counter-

## The Parties to the Arbitration Agreement    667

claim-respondents. In contrast, under LCIA Rules, additional parties can be joined without the claimant's consent. *See infra* p. 677.

6. *Determining parties to arbitration agreement in action to enforce arbitral award.* Suppose that an arbitral award is made against one party, and then is sought to be enforced against another entity. May a party seek to enforce an award made against one entity against another entity?

Some national courts have answered in the negative. *See Orion Shipping & Trading Co. v. Eastern States Petroleum Corp.*, 312 F.2d 299 (2d Cir. 1963).

A few courts have suggested, however, that where factual issues are simple, an award made against one party can be enforced against another entity. *See Productos Mercantiles E Industriales SA v. Faberge USA, Inc.*, No. 92 Civ. 7916 (S.D.N.Y. Sept. 14, 1993) (*Orion* not applicable, and alter ego liability can be considered in §9 action to confirm, where "factual determination at issue is not complex"); *International Ass'n of Machinists, Inc. v. Numberale Stamp and Tool Co.*, 1987 U.S. Dist. Lexis 12736, at *4 (S.D.N.Y. October 28, 1987); *In re Arbitration Between Bowen and 39 Broadway Assoc.*, 1992 WL 73480, at *6 (S.D.N.Y. April 2, 1992); *Orlogin, Inc. v. U.S. Watch Co.*, 1990 U.S. Dist. Lexis 7794, at *17 (S.D.N.Y. June 25, 1990).

Some courts have also suggested that an arbitral award can be enforced, after it has been confirmed against one party, against another party. *See Orion Shipping & Trading Co. v. Eastern States Petroleum Corp.*, 312 F.2d 299 (2d Cir. 1963); *Carte Blanche (Singapore) Pte., Ltd v. Diners Club Int'l Inc.*, 2 F.3d 24 (2d Cir. 1993); *Cecil's, Inc. v. Morris Mechanical Enterprise, Inc.*, 735 F.2d 437 (11th Cir. 1984) (award enforced against non-signatory subcontractor); *Gilberg Switzer Assoc. v. National Housing Partnership, Ltd*, 641 F.Supp. 150 (D. Conn. 1986) (award enforced against general partner and third-party defendant).

In most cases, however, courts will regard a party's failure to join a non-party to an arbitration as a waiver of any right to enforce the award against the non-party. *Brownko Int'l, Inc. v. Ogden Steel Co.*, 585 F.Supp. 1432 (S.D.N.Y. 1983) (where party to arbitration tried to join third-party, but abandoned effort, it cannot later attempt to enforce award against that third-party). *Compare Productos Mercantiles E Industriales SA v. Faberge USA, Inc.*, No. 92 Civ. 7916 (S.D.N.Y. Sept. 14, 1993) (holding that award may be enforced against non-signatory of arbitration agreement on alter ego theory).

7. *Choice of law issues in determining parties to an arbitration agreement.* What law governs the question whether a non-signatory is bound by an arbitration agreement? As *Dow Chemical* illustrates, choice of law issues frequently arise in disputes over the identities of the parties to international arbitration agreements.

(a) *Effect of separability doctrine on choice of law analysis.* As discussed above, the separability doctrine permits the application of one law to the parties' underlying contract and another law to the arbitration clause contained in that contract. *See supra* pp. 72, 107-08. *Dow Chemical* illustrates this point well. What law applied to the underlying contract in *Dow Chemical*? To the arbitration clause?

Recall the discussion above regarding the laws which are ordinarily applicable to the arbitration agreement (assuming no express choice of this law by the parties): (i) the law applicable to the parties' underlying contract; or (ii) the law of the arbitral situs. *See supra* pp. 110-16. Consider again the arguments in favor of each. Is there any reason to prefer one or the other alternative more strongly in the context of determining the law governing the identity of the parties to an arbitration agreement?

(b) *Relevance of legal theory invoked against non-signatory to choice of law analysis.* Note that different legal theories can be invoked to subject non-signatories to an arbitration agreement. Consider how choice of law analysis may be affected by the substantive legal theory that is asserted against a non-signatory. For example, would the same law necessarily govern (i) alter ego; (ii) assumption; (iii) agency; or (iv) guarantee claims?

Suppose that A and B enter into an arbitration agreement that is expressly governed by the laws of State X. Does the law of State X necessarily govern the question whether C is an alter ego of B or whether C guaranteed B's obligations under the arbitration agreement?

8. *Choice of law issues under the FAA in determining parties to an arbitration agreement.* As in other contexts, choice of law issues in U.S. courts give rise to special difficulties in determining the parties to an international arbitration agreement.

(a) *Federal common law.* In actions under the FAA, U.S. courts have generally applied federal common law to the question whether a non-signatory is bound by an arbitration agreement. *See McPheeters v. McGinn, Smith & Co.*, 953 F.2d 771 (2d Cir. 1992); *Valero Refining, Inc. v. M/T Lauberhorn*, 813 F.2d 60, 64 (5th Cir. 1987); *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980); *Fisser v. International Bank*, 282 F.2d 231, 233 (2d Cir. 1960); *Creative Securities Corp. v. Bear Stearns & Co.*, 671 F.Supp.

961, 965 (S.D.N.Y. 1987), *aff'd,* 847 F.2d 834 (2d Cir. 1988); *Dougherty v. Mieczkowski,* 661 F.Supp. 267, 275 (D. Del. 1987); *Oriental Commercial and Shipping Co. v. Rosseel, NV,* 609 F.Supp. 75 (S.D.N.Y. 1985); *First Citizens Municipal Corp. v. Pershing Division etc.,* 546 F.Supp. 884, 887 (N.D. Ga. 1982); *In re Hidrocarburos y Derivados CA,* 453 F.Supp. 160, 167-68 (S.D.N.Y. 1977).

As discussed above, lower U.S. courts have generally held that federal common law governs issues relating to the formation of international arbitration agreements subject to the New York Convention. *See supra* pp. 114-16, 353-55. The same analysis and conclusion would appear fairly clearly to apply to determining the parties to an international arbitration agreement (thus confirming the weight of U.S. lower court authority).

(b) *State law.* As described above, the U.S. Supreme Court has held that generally-applicable state law governs the formation and validity of domestic arbitration agreements. *See supra* pp. 350-53. Similarly, some lower U.S. courts have applied state law, albeit without analysis, to determine whether an entity is bound by a domestic arbitration agreement it has not signed. *The American Ins. Co. v. Cazort,* 871 S.W.2d 575 (Ark. 1994) (applying state law contract principles to determine whether non-signatory is bound by arbitration clause); *Tyco Laboratories, Inc. v. DASI Industries, Inc.,* 1993 U.S. Dist. Lexis 12654 (N.D. Ill. 1993); *Wren Distributors, Inc. v. Phone-Mate, Inc.,* 600 F.Supp. 1576, 1580 (E.D.N.Y. 1985). *See also Carte Blanche (Singapore) Pte. Ltd v. Diners Club Int'l, Inc.,* 2 F.3d 24 (2d Cir. 1993) (applying New York law to enforce judgment entered on award against subsidiary and/or parent).

(c) *Foreign law.* Also as described above, some lower U.S. courts have applied foreign law to determine the formation and validity of international arbitration agreements. *See supra* pp. 115-16. The same theory should apply to the question whether a non-signatory is bound by the arbitration agreement.

(d) *International principles.* Also as discussed above, some lower U.S. courts and other authorities have concluded that "internationally neutral" principles govern the formation and validity of international arbitration agreements under the New York Convention. *See supra* pp. 114-15. Again, this theory would presumably extend to determining the parties to an arbitration agreement. What sources would contribute to the development of these principles of international law? How would lawyers (and arbitrators) ascertain these principles? How would legislators change them?

(e) *Lex mercatoria.* The *Dow Chemical* case relied on an international *lex mercatoria* to derive the "group of companies" theory. For a discussion of the *lex mercatoria* doctrine, *see supra* pp. 556-57. Other awards have followed *Dow Chemical. See Award in ICC Case No. 5721 of 1990,* 1990 Journal du droit international 1019. Is there any difference between the principles of *lex mercatoria* referred to in *Dow Chemical* and the "international neutral" principles relied upon by some lower U.S. courts?

9. *The "group of companies" theory.* The *Dow Chemical* award is widely cited in international arbitration circles as establishing the "group of companies" theory. That theory holds that companies which form part of an integrated economic "group" may, in some circumstances, be bound by one another's arbitration agreements. A more recent ICC arbitral award summarizes the "group of companies" theory as follows:

> When concluding, performing, nonperforming and renegotiating their contractual relations with [defendants], the three claimant companies appear, pursuant to the common intention of all parties engaged in the procedure, to have been real parties to all the contracts. In its formulation and in its spirit, this analysis is based on a remarkable and approved tendency of arbitral rulings favoring acknowledgement, under those circumstances, of the unity of the group. . . . The security of international commercial relations requires that account should be taken of its economic reality and that all the companies of the group should be held liable one for all and all for one for the debts of which they either directly or indirectly have profited at this occasion.

*Award in ICC Case No. 5103,* 1988 Journal du droit international 1206 (quoted and translated in Sandrock, *Arbitration Agreements and Groups of Companies,* 27 Int'l Law. 941, 944 (1993)).

What law provides the basis for the "group of companies" doctrine, as formulated in *Dow Chemical?* Is it national law or international law? If it is the latter, what are the sources of this law and who makes it?

Compare the "group of companies" doctrine to the alter ego theory, as articulated in U.S. decisions under the FAA such as *Oriental Commercial.* Which rule is more expansive (i.e., which rule more likely will subject new signatories to an arbitration agreement)? What precisely was the basis of the tribunal's award in *Dow Chemical?* What if Isover Saint Gobain had not asserted in French courts that all the Dow companies were liable under the underlying agreements?

10. *Alter ego as a basis for subjecting a non-signatory to an arbitration agreement.* As Oriental Commercial suggests, a number of authorities have concluded that a party that has not executed or otherwise directly assented to a contract containing an arbitration provision may nonetheless be bound by the provision, albeit only in exceedingly rare cases, if that party is an "alter ego" of an entity that did execute the agreement. Definitions of "alter ego" vary widely, but generally require compelling evidence that one entity entirely dominated the day-to-day actions of another and that it exercised this power to work fraud or gross injustice upon a third party.

(a) *Lower U.S. court decisions applying alter ego theory under the FAA.* A number of lower U.S. court decisions have considered whether alter ego analysis provides a basis for subjecting a non-signatory to an arbitration agreement. *See McAllister Bros., Inc. v. A & S Transp. Co.,* 621 F.2d 519 (2d Cir. 1980); *Interocean Shipping Co. v. National Shipping & Trading Co.,* 523 F.2d 527, 539 (2d Cir. 1975), *cert. denied,* 423 U.S. 1054 (1976); *Fisser v. International Bank,* 282 F.2d 231 (2d Cir. 1960); *Oriental Commercial and Shipping Co. v. Rosseel NV,* 609 F.Supp. 75 (S.D.N.Y. 1985); *Wren Distributors, Inc. v. Phone-Mate, Inc.,* 600 F.Supp. 1576, 1579 (E.D.N.Y. 1985); *Coastal States Trading, Inc. v. Zenith Nav. SA,* 446 F.Supp. 330 (S.D.N.Y. 1977).

(b) *Federal common law standards for establishing alter ego status under the FAA.* Lower U.S. courts have articulated various federal common law standards for determining alter ego status. According to the Second Circuit:

> Ordinary contract principles determine who is bound. In an appropriate situation, the corporate veil may be pierced and a party may be held bound to arbitrate as the signatory's alter ego.

*Interocean Shipping Co. v. National Shipping and Trading Corp.,* 523 F.2d 527, 539 (2d Cir. 1975) (citing *Fisser v. International Bank,* 282 F.2d 231, 233-34 (2d Cir. 1960)).

(c) *Presumption of separate corporate identity under the FAA.* The standard for establishing alter ego status under the FAA is, as in other contexts, extremely difficult to satisfy. The starting point is a strong presumption that a parent corporation and its affiliates are legally separate and distinct entities. *Gorill v. Ice-landair/Flugleidir,* 761 F.2d 847, 853 (2d Cir. 1985); *American Renaissance Lines, Inc. v. Saxis SS Co.,* 502 F.2d 674, 677 (2d Cir. 1974) ("absent findings of fraud or bad faith, a corporation . . . is entitled to a presumption of separateness from a sister corporation . . . even if both are owned and controlled by the same individuals").

(d) *Overcoming presumption of separate corporate identity under the FAA.* Most U.S. courts have held that overcoming the presumption of separateness requires showing: (i) the complete domination and control of the affiliate, including disregard of corporate formalities, such that it has no separate identity or existence, and (ii) fraudulent misuse of that control to the injury of adverse parties. *See Interocean Shipping Co. v. National Shipping & Trading Corp.* 523 F.2d 527, 539 (2d Cir. 1975), *cert. denied,* 423 U.S. 1054 (1976); *American Renaissance Lines, Inc. v. Saxis SS Co.,* 502 F.2d 674, 677 (2d Cir. 1974); *Fisser v. International Bank,* 282 F.2d 231, 238 (2d Cir. 1960); *In re Hidrocarburos y Derivados, CA,* 453 F.Supp. 160 (S.D.N.Y. 1977); *Coastal States Trading, Inc. v. Zenith SA,* 446 F.Supp. 330, 336-37 (S.D.N.Y. 1977) (finding no alter ego status). *See generally* P. Blumberg, *The Law of Corporate Groups* (1983). *Compare Carte Blanche (Singapore) Pte. Ltd v. Diners Club Int'l, Inc.,* 2 F.3d 24 (2d Cir. 1993).

(e) *Factors relevant to alter ego status under the FAA.* Lower U.S. courts have identified a variety of factors that are relevant to alter ego status. For typical lists, *see Carte Blanche (Singapore) Pte Ltd v. Diners Club Int'l, Inc.,* 2 F.3d 24 (2d Cir. 1993) (absence of corporate formalities; inadequate capitalization; financial dealings between parent and subsidiary; overlap in ownership, officers, directors, and personnel; common office space, address, and phone numbers; business discretion of allegedly dominated company; whether companies deal with each other at arms' length; whether companies are separate profit centers; parent's payment or guarantee of subsidiary's debts; subsidiary's use of parent's property); *Andrew Martin Marine Corp. v. Stork-Werkspoor Diesel BV,* 480 F.Supp. 1270 (E.D. La. 1979) (common ownership, common directors or officers, financing, capitalization, payment of expenses, use of property, sources of business, observance of legal formalities, integration of operations, control).

Typically, alter ego status can only be established with respect to an entity or person which owns shares in a company or holds a corporate position. Nonetheless, in unusual cases, other sorts of control relationships have been regarded as sufficient to establish alter ego status. *Freeman v. Complex Computing Co.,* F.3d 1044 (2d Cir. 1997) (holding that an "equitable owner" of a corporation may be held its alter ego, even where he is not a shareholder, officer, director or employee).

(f) *Requirement of fraud or its equivalent.* Even if alter ego status exists, most U.S. courts held that there must be a showing of fraud or its equivalent in order to bind a non-signatory to an arbitration agreement. *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997) (quoting *Morris v. New York State Department of Taxation & Fin.*, 603 N.Y.S.2d 807, 811 (Ct. App. 1993) ("While complete domination of the corporation is the key to piercing the corporate veil, . . . such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required.")); *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527, 539 (2d Cir. 1975), *cert. denied*, 423 U.S. 1054 (1976) (even if company has "no mind of its own," showing of fraud or something akin to fraud is needed); *Wren Distributors, Inc. v. Phone-Mate, Inc.*, 600 F.Supp. 1576 (E.D.N.Y. 1985).

11. *Agency relationship as a basis for subjecting a non-signatory to an arbitration agreement.* A number of authorities have also held that, in appropriate cases, an entity may be bound as principal by an arbitration agreement which it has not signed, but which was executed on its behalf by an agent. Alternatively, an agent may be permitted to invoke an arbitration clause in an agreement it executed on behalf of a principal.

(a) *Principal bound by arbitration clause in contract executed by agent.* Numerous authorities hold that a principal may be bound by an arbitration clause contained in a contract executed on its behalf by an agent. *E.g., In the Matter of the Arbitration Between Herlofson Mgt A/S and Ministry of Supply, Kingdom of Jordan*, 765 F.Supp. 78 (S.D.N.Y. 1991) (party need not sign arbitration agreement; agent may do so on its behalf).

(b) *Agent's right to invoke arbitration clause in principal's contract.* Some authorities have held that an agent may invoke an arbitration agreement contained in a contract which it executes on behalf of a principal. *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1282 (6th Cir. 1990) (applying "the well-settled principle affording agents the benefits of arbitration agreements made by their principal").

(c) *Standards for establishing agency relationships under the FAA.* In resolving disputes under the FAA over principal-agent relations, lower U.S. courts have generally applied federal common law agency principles, derived from the *Restatement (Second) of Agency. Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527, 537 (2d Cir. 1975); *In re Hidrocarburos y Derivados, CA*, 453 F.Supp. 160 (S.D.N.Y. 1977). *But see Wren Distributors, Inc. v. Phone Mate, Inc.*, 600 F.Supp. 1576, 1580-81 (E.D.N.Y. 1985) ("state contract law principles"); *Farkar Co. v. R.A. Hanson DISC, Ltd*, 441 F.Supp. 841, 845 (S.D.N.Y. 1977), *modified*, 583 F.2d 68 (2d Cir. 1978), *modified on other grounds*, 604 F.2d 1 (2d Cir. 1979).

12. *Incorporation and transfer of arbitration obligations.* Arbitration obligations in one contract may be incorporated into a related contract, including a contract involving different parties, or transferred.

(a) *Incorporation of arbitration agreement.* An arbitration clause in one agreement can be incorporated (by express reference or otherwise) into another agreement. This can occur, for example, when a charter party containing an arbitration clause is incorporated into a bill of lading. *Son Shipping Co. v. De Fosse & Tanghe, et al.*, 199 F.2d 687 (2d Cir. 1952); *Banque de Paris et des Pays-Bas v. Amoco Oil Co.*, 573 F.Supp. 1464 (S.D.N.Y. 1983); *Bunge Corp. v. M/T Stolt Hippo*, 1980 A.M.C. 2611 (S.D.N.Y. 1979); *Coastal States Trading, Inc. v. Zenith Nav. SA*, 446 F.Supp. 330 (S.D.N.Y. 1977); *G.B. Michael v. SS Thanasis*, 311 F.Supp. 170 (N.D. Calif. 1970). *See also supra* pp. 189-90.

(b) *Guarantors of arbitration agreement.* The guarantor of a contract may be deemed to have assumed obligations to arbitrate in the underlying contract which it has guaranteed. *See Compania Espanola de Petroleos, SA v. Nereus Shipping, SA*, 527 F.2d 966 (2d Cir. 1975); *Son Shipping Co. v. De Fosse & Tanghe*, 199 F.2d 687, 688 (2d Cir. 1952); *Development Bank of the Philippines v. Chemtex Fibers Inc.*, 617 F.Supp. 55 (S.D.N.Y. 1985) (guarantor of loan agreement, that signed loan agreement, bound by arbitration clause in agreement); *In re Hidrocarburos y Derivados, CA*, 453 F.Supp. 160 (S.D.N.Y. 1977); *Griffin v. Semperit of America, Inc.*, 414 F.Supp. 1384 (S.D.N.Y. 1976); *Wells Fargo Bank v. London SS Owners' Mutual Ins.*, 408 F.Supp. 626 (S.D.N.Y. 1976); *Vespe Contracting Co. v. Anvan Corp.*, 399 F.Supp. 516, 521 (E.D. Pa. 1975); *Midland Tar Distilleries, Inc. v. M/T Lotus*, 362 F.Supp. 1311 (S.D.N.Y. 1973); *Lowry & Co. v. SS Le Moyne D'Iberville*, 253 F.Supp. 396, 398 (S.D.N.Y. 1966).

A number of U.S. courts have rejected guarantee theories on particular facts as grounds for binding non-signatories to an arbitration clause. *Grundstad v. Ritt*, 166 F.3d 867 (7th Cir. 1997) (guarantor of agreement not bound by arbitration clause contained in agreement); *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527 (2d Cir. 1975), *cert. denied*, 423 U.S. 1054 (1976) (guarantor of charter party not bound by arbitration clause in charter party agreement); *Taiwan Navigation Co. v. Seven Seas Merchants Corp.*, 172 F.Supp. 721 (S.D.N.Y. 1959).

(c) *Assignment of arbitration agreement.* It is frequently argued that the assignee of a contract is bound by an arbitration clause contained in the assigned agreement. *Banque de Paris et des Pays-Bas v. Amoco Oil Co.,* 573 F.Supp. 1464 (S.D.N.Y. 1983); *Instituto Cubano v. The MV Driller,* 148 F.Supp. 739 (S.D.N.Y. 1957); *Application of Reconstruction Finance Corp.,* 106 F.Supp. 358 (S.D.N.Y. 1952). Compare *Lachmar v. Trunk-line LNG Co.,* 753 F.2d 8 (2d Cir. 1988) (assignee not bound by arbitration clause because assignment agreement absolved it); *United States v. Panhandle Eastern Corp.,* 672 F.Supp. 149 (D. Del. 1987) (same).

(d) *Assumption of arbitration agreement.* A non-signatory party may be bound by an arbitration clause if it has assumed that provision by conduct or otherwise. *Thomson-CSF, SA v. American Arbitration Association,* 64 F.3d 773 (2d Cir. 1995) ("party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate"); *Gvozdenovic v. United Air Lines, Inc.,* 933 F.2d 1100, 1105 (2d Cir.), *cert. denied,* 502 U.S. 910 (1991); *Matter of Arbitration between Keystone Shipping Co. and Texport Oil Co.,* 782 F.Supp. 28 (S.D.N.Y. 1992).

(e) *Estoppel.* A number of courts have recognized estoppel as a basis for permitting a non-signatory to invoke an arbitration agreement: where a party claims rights as a party under a contract, which contains an arbitration clause, it may be estopped from denying that it is a party to the arbitration provision. *Thomson-CSF, SA v. American Arbitration Association,* 64 F.3d 773 (2d Cir. 1995) (courts are "willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed"); *Sink Soft Drinks, Inc. v. Sink Trowers, Inc.,* 10 F.3d 753 (11th Cir. 1993), *cert. denied,*–U.S.–(1994) (party that asserts claim under contract is equitably estopped from denying it is party to arbitration clause in contract); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, SA,* 863 F.2d 315 (4th Cir. 1988); *McBio Planning & Dev. Co. v. Triangle Elec. Constr. Co.,* 741 F.2d 342 (7th Cir. 1984); *The Am. Ins. Co. v. Cazort,* 871 S.W.2d 575 (Ark. 1994); *Hughes Masonry Co. v. Greater Clarke County School Bldg Corp.,* 659 F.2d 836 (7th Cir. 1981); *Messing v. Rosenkrantz,* 872 F.Supp. 539 (N.D. Ill. 1995) (party that claimed non-signatory was bound by contract could not object to non-signatory invoking contract's arbitration clause); *A.L. Williams & Assoc. v. Mc-Mahon,* 697 F.Supp. 488 (N.D. Ga. 1988); *Tapper Realty Co. v. Mosaic Tile Co.,* 259 F.Supp. 688, 692 (S.D.N.Y. 1966) ("In short, [plaintiff] cannot have it both ways. It cannot rely on the contract when it works to its advantage and ignore it when it works to its disadvantage.").

Estoppel has not been applied, however, to bind a non-signatory to an arbitration agreement to which it objects. *Thomson-CSF, SA v. American Arbitration Association,* 64 F.3d 773 (2d Cir. 1995).

(f) *Employment relations.* A few U.S. courts have held that corporate employees, sued for actions taken in the course of their employment, (may invoke and be bound by) arbitration clauses contained in their employer's contracts with the adverse third party. *Nesslage v. York Securities, Inc.,* 823 F.2d 231, 233 (8th Cir. 1987) (employees of company that entered into arbitration agreement are third party beneficiaries of agreement); *Letizia v. Prudential-Bache Sec., Inc.,* 802 F.2d 1185, 1187-89 (9th Cir. 1986); *Mosca v. Doctors Assoc., Inc.,* 852 F.Supp. 152 (E.D.N.Y. 1993) ("Courts have consistently held that the acts of employees of party to an arbitration agreement are arbitrable . . ."); *Ripmaster v. Toyoda Gosei, Co.,* 824 F.Supp. 116 (E.D. Mich. 1993) (employee held bound by arbitration agreement entered into by his corporate employer); *Scher v. Bear Stearns & Co.,* 723 F.Supp. 211, 216-17 (S.D.N.Y. 1989); *Dale v. Prudential-Bache Sec., Inc.,* 719 F.Supp. 1164, 1169 (E.D.N.Y. 1989).

(g) *Third party beneficiaries.* In many legal systems, non-parties to a contract may, in certain circumstances, invoke the benefits of that contract as third party beneficiaries. In such circumstances, the third party may either be able to invoke or be bound by an arbitration clause contained in the contract. *Tractor-Trailer Supply Co. v. NCR Corp.,* 873 S.W.2d 627 (Mo. Ct. App. 1994) (third party beneficiary that invokes contract is bound by arbitration clause contained therein); *Thomson-CSF, SA v. American Arbitration Association,* 64 F.3d 773 (2d Cir. 1995) (if party "directly benefitted" from underlying contract, "it would be estopped from avoiding arbitration" pursuant to arbitration clause in contract); *Bevere v. Oppenheimer & Co.,* 862 F.Supp. 1243 (D.N.J. 1994) (party asserting claims under agreement is bound by arbitration clause contained in agreement); *Ziegler v. Whale Securities Co.,* 786 F.Supp. 739 (N.D. Ind. 1992); *Lester v. Basner,* 676 F.Supp. 481, 483 (S.D.N.Y. 1987); *Cauble v. Mabon Nugent & Co.,* 594 F.Supp. 985 (S.D.N.Y. 1984); *Jeans v. Arrow Ins. Co.,* 494 P.2d 1334 (Ariz. Ct. App. 1972).

(h) *Miscellaneous.* Some authorities have extended arbitration agreement to non-signatories in a variety of ill-defined, potentially expansive circumstances. *Isidor Paiewonsky Assoc., Inc. v. Sharp Properties, Inc.,* 990 F.2d 145, 155 (3d Cir. 1993) (non-party bound by arbitral award because it had "related and con-

gruent interests" with the parties); *Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d 923, 938-39 (9th Cir. 1985) (party who has not executed arbitration agreement may nevertheless be bound by it when its claims arise from contract containing agreement).

    13. *Possible applicability of presumption of arbitrability to determining whether non-signatory is bound by arbitration clause.* As discussed in detail above, U.S. courts uniformly apply a strong presumption in favor of arbitrability in interpreting the scope of an arbitration agreement, and some courts have applied a similar presumption in determining the existence of an arbitration agreement, *see supra* pp. 182-84, 317-18. A few lower courts have also applied a presumption of arbitrability to the question whether a particular party is bound by an arbitration agreement. *See Banque de Paris et des Pas-y-Bas v. Amoco Oil Co.*, 573 F.Supp. 1464, 1472 (S.D.N.Y. 1983).

# B. Consolidation, Joinder, and Intervention in International Arbitration

When three or more entities are party to an arbitration agreement, the arbitral tribunal or appointing authority can be faced with difficult procedural issues concerning the structure of a particular arbitration proceeding under that agreement. Most important are questions as to the identities and alignments of parties to the arbitral proceedings. This section examines these issues. The section first considers the extent to which a claimant's request or notice for arbitration defines the proper parties to the arbitration. Thereafter, it considers when a respondent may join additional parties, when such parties may intervene in an arbitration, and when two or more different arbitrations may be consolidated into a single proceeding. We consider the treatment of consolidation, joinder, and intervention by both arbitral tribunals and national courts.

## 1. Introduction

    In national courts, a variety of mechanisms exist for consolidating different claims between different parties to a dispute into a single judicial proceeding,[6] or permitting intervention or joinder of additional parties in an ongoing proceeding.[7] For example, if A, B, and C enter into related contracts (A with B and B with C), separate actions between A versus B and B versus C can often be consolidated into a single action; alternatively, C can either intervene or be joined in an existing action between A and B.

    Rules regarding consolidation, joinder, and intervention in national court proceedings are intended to permit proceedings to occur more efficiently and to avoid the possibility of inconsistent results. These considerations are, of course, equally applicable to international arbitration. In general, however, consolidation and joinder in international arbitration is far less common and much more difficult than in national court litigation.

# EXHIBIT I

# Fouchard, Gaillard, Goldman

# On

# International
# Commercial Arbitration

*Edited by*
Emmanuel Gaillard
and
John Savage



KLUWER LAW
INTERNATIONAL
THE HAGUE / BOSTON / LONDON

**TAE**

Library of Congress Cataloging-in-Publication Data

Table o
Forewo
Introdu

ISBN 90-411-1025-9

Published by Kluwer Law International,
P.O. Box 85889, 2508 CN The Hague, The Netherlands.

Sold and distributed in North, Central and South America
by Kluwer Law International,
675 Massachusetts Avenue, Cambridge, MA 02139, U.S.A.

In all other countries, sold and distributed
by Kluwer Law International, Distribution Centre,
P.O. Box 322, 3300 AH Dordrecht, The Netherlands.

Printed on acid-free paper

Section
§1. –

All Rights Reserved
© 1999 Kluwer Law International
Kluwer Law International incorporates the publishing programmes of
Graham & Trotman Ltd, Kluwer Law and Taxation Publishers,
and Martinus Nijhoff Publishers.

No part of the material protected by this copyright notice may be reproduced or
utilized in any form or by any means, electronic or mechanical,
including photocopying, recording or by any information storage and
retrieval system, without written permission from the copyright owner.

Printed in the Netherlands.

§2. –

Section
§1. –

never been accepted, neither before,[76] nor after the December 22, 1997 reform.[77] It therefore seems preferable to avoid the confusing German expression "*Kompetenz-Kompetenz*," in favor of "competence-competence," which is more in keeping with the origin of a principle which had been applied by the French courts as early as 1949.[78]

It should also be observed that Swiss authors, always sensitive to the finer distinctions of comparative law, were quick to point out that the expression "*Kompetenz-Kompetenz*" was inappropriate because of its traditional German meaning.[79]

**652.** — Having considered the terminology, we shall now examine how the principle of competence-competence was established (1°), its basis (2°) and its exact meaning (3°).

## 1° Recognition of the Principle

**653.** — The competence-competence principle is now recognized by the main international conventions on arbitration, by most modern arbitration statutes, and by the majority of institutional arbitration rules.

**654.** — As the 1958 New York Convention only deals with the conditions for recognition and enforcement of awards, it does not cover the competence-competence principle. By contrast, the 1961 European Convention provides very clearly, in Article V, paragraph 3 that:

> [s]ubject to any subsequent judicial control provided for under the *lex fori*, the arbitrator whose jurisdiction is called in question shall be entitled to proceed with the arbitration, to rule on his own jurisdiction and to decide upon the existence or the validity of the arbitration agreement or of the contract of which the agreement forms part.

The Washington Convention establishing ICSID contains a similar rule in its Article 41.

---

[76] *See* PETER SCHLOSSER, DAS RECHT DER INTERNATIONALEN PRIVATEN SCHIEDSGERICHTSBARKEIT 418, n. 546 (2d ed. 1989).

[77] See Article 1032(1) and (2) of the ZPO which, since January 1, 1998, allows parties to apply to the courts for a determination whether the arbitration is admissible "[p]rior to the constitution of the arbitral tribunal" without preventing the arbitral procedure from going forward. On the situation in comparative law, see *infra* para. 675 and Schlosser, *supra* note 73.

[78] *See infra* note 83.

[79] *See, e.g.*, PIERRE JOLIDON, COMMENTAIRE DU CONCORDAT SUISSE SUR L'ARBITRAGE 185 (1984), and the references cited therein. Swiss authors thus generally avoid using the expression "Kompetenz- Kompetenz;" *see, e.g.*, PIERRE LALIVE, JEAN-FRANÇOIS POUDRET, CLAUDE REYMOND, LE DROIT DE L'ARBITRAGE INTERNE ET INTERNATIONAL EN SUISSE 380 *et seq.* (1989); Robert Briner, *Switzerland* (at 26), *in* ICCA INTERNATIONAL HANDBOOK ON COMMERCIAL ARBITRATION (1998). *But see* Swiss Fed. Trib., Apr. 19, 1994, Les Emirats Arabes Unis v. Westland Helicopters Ltd., 1994 BULL. ASA 404, 412; 1995 BULL. ASA 186, and P. Schweizer's note; 1995 REV. SUISSE DR. INT. ET DR. EUR. 564, and P. Schweizer's note; ANDREAS BUCHER, PIERRE-YVES TSCHANZ, INTERNATIONAL ARBITRATION IN SWITZERLAND ¶¶ 139 *et seq.* (1988).

Case 1:06-cv-00415-SLR    Document 35-13    Filed 10/16/2006    Page 5 of 6

**655.** — Major international arbitration statutes also recognize the principle. The UNCITRAL Model Law provides in Article 16, paragraph 3 that "[t]he arbitral tribunal may rule on [a plea that the arbitral tribunal does not have jurisdiction] either as a preliminary question or in an award on the merits," and that, in the event of an action to set aside a partial award concerning jurisdiction, "the arbitral tribunal may continue the arbitral proceedings and make an award."[80] Most recent laws on arbitration contain similar provisions.[81]

In French domestic arbitration law, the principle is set forth at Article 1466 of the New Code of Civil Procedure. This provides that "[i]f, before the arbitrator, one of the parties challenges the principle or scope of the arbitrator's jurisdiction, the arbitrator shall rule on the validity or scope of his or her jurisdiction."[82] Where an international arbitration is subject to French law, the same rule applies by virtue of Article 1495 of the same Code. However, the rule in fact is of general application in French international arbitration law, as a result of case law predating the 1981 Decree.[83] Recent decisions have confirmed the principle, giving it a very broad scope.[84]

---

[80] For an example of the application of this provision, see Ontario Court of Justice, Mar. 1, 1991, Rio Algom Ltd. v. Sammi Steel Co. Ltd., XVIII Y.B. COM. ARB. 166 (1993).

[81] Art. 186 of the 1987 Swiss Private International Law Statute and Art. 8, para. 1, of the Swiss *Concordat*; Art. 1697(1) of the Belgian Judicial Code (Law of July 4, 1972); Art. 1052(1) of the Netherlands Code of Civil Procedure (Law of Dec. 1, 1986); Art. 23(3) of the Spanish Law 36/1988 of December 5, 1988 on Arbitration; Art. 21(1) of the Portuguese Law No. 31/86 of Aug. 29, 1986 on Voluntary Arbitration; Art. 61 of the Tunisian Arbitration Code promulgated by Law No. 93-42 of April 26, 1993; Art. 458 bis 7 of the Algerian Code of Civil Procedure (Legislative Decree No. 93-09 of April 25, 1993); Sec. 30 of the 1996 English Arbitration Act; Art. 1040 of the German ZPO (Law of Dec. 22, 1997).

[82] This provision, enacted by the Decree of May 14, 1980, brought to an end the controversial case law concerning French domestic arbitration whereby "any dispute regarding the validity of the arbitration clause . . . must be heard exclusively by the courts" (Cass. com., Oct. 6, 1953, Courtieu v. Blanchard, JCP, Ed. G., Pt. II, No. 8293 (1954); Dalloz, Jur. 25 (1954), and the commentary by MOTULSKY, *supra* note 63 ("*Menace sur l'arbitrage: la prétendue incompétence des arbitres en cas de contestation de l'existence ou de la validité d'une clause compromissoire,*" at 189 *et seq.*)).

[83] Cass. com., Feb. 22, 1949, Caulliez-Tibergien v. Caulliez-Hannart, JCP, Ed. G., Pt. II, No. 4899 (1949), and observations by H. Motulsky. *See also* MOTULSKY, *supra* note 63, at 222 *et seq.*; Trib. civ. Seine, Oct. 17, 1956, Kohorn v. Dimitrov, JCP, Ed. G., Pt. II, No. 9647 (1956), and observations by H. Motulsky; CA Colmar, Nov. 29, 1968, Impex v. P.A.Z., JCP, Ed. G., Pt. II, No. 16,246 (1970), and observations by P. Level and B. Oppetit; 1968 REV. ARB. 149: "The principle is that the judge hearing a dispute has jurisdiction to determine his own jurisdiction. This necessarily implies that when that judge is an arbitrator, whose powers derive from the agreement of the parties, he has jurisdiction to examine the existence and validity of such agreement." On the subsequent developments in the case, see *supra* para. 560.

[84] *See* TGI Paris, réf., Apr. 10, 1990, European Country Hotels Ltd. v. Consorts Legrand, 1994 REV. ARB. 545, 1st decision, and observations by P. Fouchard; CA Paris, Mar. 29, 1991, Ganz v. Société Nationale des Chemins de Fer Tunisiens (SNCFT), 1991 REV. ARB. 478, and L. Idot's note; CA Paris, May 19, 1993, Labinal v. Mors, 1993 REV. ARB. 645, and C. Jarrosson's note; 120 J.D.I. 957 (1993), and L. Idot's note; 1993 RTD COM. 494, and observations by E. Loquin; for an English translation, see 8 INT'L ARB. REP. 7 (July 1993); TGI Paris, réf., Jan. 10, 1996, *National Iranian Oil Co.*, *supra* note 46.

**656.** — The fact that the main institutional arbitration rules also include the principle of competence-competence[85] is a further example of its widespread recognition. Of course, from a strictly technical viewpoint, the recognition of the principle by the arbitral institutions is not sufficient to ensure its effectiveness. Institutional arbitration rules, which derive their authority from the parties' agreement, cannot grant the arbitrators more rights than the applicable legal systems allow them to exercise. In other words, unlike national laws, arbitration rules are contractual in nature and therefore cannot resolve the apparent contradiction which allows arbitrators to determine whether or not they have jurisdiction.[86] The same is true of arbitral awards applying the competence-competence principle.[87]

## 2° Basis of the Principle

**657.** — We have already seen that because case law develops by building on well-established rules in order to create new ones, the competence-competence principle has often been presented as the corollary of the principle of the autonomy of the arbitration agreement from the main contract.[88] As we noted, these two rules in fact overlap only slightly and should be carefully distinguished.[89]

**658.** — More fundamentally, although the arbitrators' jurisdiction to rule on their own jurisdiction is indeed one of the effects of the arbitration agreement (or even of a *prima facie* arbitration agreement, since the question would not arise in the absence of a *prima facie* arbitration agreement), the basis of that power is neither the arbitration agreement itself, nor the principle of *pacta sunt servanda* under which the arbitration agreement is binding.[90]

The competence-competence principle enables the arbitral tribunal to continue with the proceedings even where the existence or validity of the arbitration agreement has been challenged by one of the parties for reasons directly affecting the arbitration agreement, and not simply on the basis of allegations that the main contract is void or otherwise ineffective. The principle that the arbitration agreement is autonomous of the main contract is sufficient to resist a claim that the arbitration agreement is void because the contract containing it is invalid, but it does not enable the arbitrators to proceed with the arbitration where the

---

[85] *See, e.g.,* Art. 21(1) of the UNCITRAL Arbitration Rules; Art. 6(2) of the ICC Arbitration Rules (Art. 8(3) of the previous Rules); DERAINS AND SCHWARTZ, *supra* note 18, at 99 *et seq.*; Art. 23.1 of the 1998 LCIA Arbitration Rules; Art. 15(1) of the 1997 AAA International Arbitration Rules.

[86] See, on the other hand, for national laws, *infra* para. 658.

[87] *See, e.g.,* ICC Awards No. 1526 (1968), Belgian parties v. African state, 101 J.D.I. 915 (1974), and observations by Y. Derains; No. 2476 (1976), Swiss company v. Italian company, 104 J.D.I. 936 (1977), and observations by Y. Derains; No. 2558 (1976), Y v. French company, 104 J.D.I. 951 (1977), and observations by Y. Derains; No. 3987 (1983), Austrian company v. Greek company, 111 J.D.I. 943 (1984), and observations by Y. Derains; No. 6437 (1990), ICC BULLETIN, Vol. 8, No. 1, at 63 (1997). *See also* Yves Derains, *Les tendances de la jurisprudence arbitrale internationale*, 121 J.D.I. 829, 838 (1994).

[88] *See, e.g.,* CA Colmar, Nov. 29, 1968, *Impex*, *supra* note 83.

[89] *See supra* para. 416.

[90] *See supra* para. 627.

# EXHIBIT J



*Resolving business disputes worldwide*

2 | ICC International Court of Arbitration

## Introduction

The International Chamber of Commerce has long been the world's leading organization in the field of international commercial dispute resolution.

Established in 1923 as the arbitration body of ICC, the International Court of Arbitration has pioneered international commercial arbitration as it is known today. The Court took the lead in securing the worldwide acceptance of arbitration as the most effective way of resolving international commercial disputes. Since its creation, the Court has administered over 14,000 international arbitration cases involving parties and arbitrators from some 180 countries and territories.

*The ICC Court has administered over 14,000 international arbitration cases involving some 180 countries and territories.*

The dispute resolution mechanisms developed by ICC have been conceived specifically for business disputes in an international context. These disputes pose unique difficulties and challenges. Usually, the parties will be of different nationalities, with different linguistic, legal and cultural backgrounds. They may also have very different expectations about how a dispute can be resolved reasonably and fairly. Distrust may be relatively strong, accompanied by uncertainty or a lack of information about the course to follow. These difficulties may be compounded by distance and the disadvantages one party may face in submitting to a procedure on the other's home ground.

For all these reasons, national courts in the country of one of the parties may not appear suitable to the other parties. ICC has always led the way in providing international business with alternatives to court litigation.

Even in a domestic context, parties increasingly prefer alternatives to the courts that are less costly and time-consuming. ICC arbitration offers both these advantages, as well as confidentiality and freedom for the parties to choose the arbitrators, the place of arbitration, the applicable rules of law, and even the language of the proceedings.

This brochure is designed to improve understanding of the widely acclaimed services that the ICC International Court of Arbitration affords international business for the resolution of commercial disputes anywhere in the world.

Case 1:06-cv-00415-SLR    Document 35-14    Filed 10/16/2006    Page 4 of 5

Information on ICC arbitration and
other ICC dispute resolution
services may be obtained at the
following address:

The Secretariat
**ICC International
Court of Arbitration**
38 cours Albert 1er
75008 Paris – France
Tel: +33 1 49 53 29 05
Fax: +33 1 49 53 29 33
E-mail. arb@iccwbo.org
Web site: www.iccarbitration.org

Copyright © 1998, 2002
International Chamber of Commerce
All rights reserved

First edition July 1998
This second edition
first published by the
ICC International Court of Arbitration
December 2002, revised June 2003,
March 2004, February 2005, May 2005
ICC Publication 810
ISBN 92-842-1304-5
Designed by Rebus, Paris
Printed in France in June 2005 by
Editions Sétéca
100 rue Edouard Vaillant
92300 Levallois Perret
Dépôt légal: Juin 2005



International Chamber of Commerce