## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| URS CORPORATION,<br><br>                Plaintiff,<br><br>       v.<br><br>THE LEBANESE COMPANY FOR THE<br>DEVELOPMENT AND RECONSTRUCTION OF<br>BEIRUT CENTRAL DISTRICT SAL, a/k/a<br>SOLIDERE,<br><br>                Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. 06-415 (SLR)

## OPENING BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
## FOR A PRELIMINARY INJUNCTION ENJOINING ARBITRATION

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Edward P. Welch (I.D. No. 0671)
Edward B. Micheletti (I.D. No. 3794)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

Attorneys for Plaintiff URS Corporation

Of Counsel:

Jeffrey H. Dasteel
Jason D. Russell
Marina V. Bogorad
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
300 S. Grand Avenue
34th Floor
Los Angeles, CA 90071
(213) 687-5000

DATED: October 23, 2006

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -iii-

NATURE AND STAGE OF PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.      PRELIMINARY INJUNCTION STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II.     URS IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS . . . . . . . . . 16

A.      URS Is Not a Party to Any Arbitration Agreement and Thus
        Plainly Cannot Be Brought into Arbitration Before the ICC . . . . . . . . . . . . . . . . 17

B.      Arbitrability Is a Question for the Courts, Not an Arbitrator . . . . . . . . . . . . . . . . 19

C.      Solidere's Alter Ego And Vicarious Liability Theories Are Baseless
        and Provide No Basis to Force URS to Arbitrate Under the Contract . . . . . . . . . . 21

        1.      Veil-Piercing/Alter Ego . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

                (a)     Delaware courts do not pierce the corporate veil absent
                        "exceptional circumstances," which are not present here . . 22

                (b)     Solidere cannot establish that URS is Radian's "alter
                        ego" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

                        (i)     URS Cannot Be Radian's Alter Ego On The
                                Contract Because They Had No Relation To
                                One Another When The Contract Was Signed . . . . 25

                        (ii)    URS And Radian Are And Have Been Legally
                                Distinct Entities That Observe All Formalities . . . 27

                        (iii)   The "Facts" Alleged By Solidere Are Both
                                Factually Incorrect And Legally Irrelevant . . . . . . . 28

                (c)     Solidere does not allege, and cannot prove, that Radian
                        was a sham existing solely as a vehicle for fraud . . . . . . . . 32

        2.      Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        3.      Assumption of Contractual Obligations . . . . . . . . . . . . . . . . . . . . . . . 33

III.    URS WILL SUFFER IRREPARABLE HARM *PER SE* . . . . . . . . . . . . . . . . . . . 35

IV.    SOLIDERE WILL SUFFER NO INJURY IF AN INJUNCTION ISSUES  . . . . . . . 36

V.    PUBLIC POLICY FACTORS STRONGLY FAVOR AN INJUNCTION . . . . . . . . 37

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**TABLE OF AUTHORITIES**

CASES                                                                    PAGE(S)

ACE & Co., Inc. v. Balfour Beatty PLC,
    148 F. Supp. 2d 418 (D. Del. 2001) ...................................................................... 23

Action Manufacturing Co., Inc. v. Simon Wrecking Co.,
    375 F. Supp. 2d 411 (E.D. Pa. 2005) .............................................................. 29, 30

In re Acushnet River & New Bedford Harbor Proceedings Re Alleged PCB Pollution,
    675 F. Supp. 22 (D. Mass. 1987) ........................................................................... 29

Akzona Inc. v. E.I. Du Pont De Nemours & Co.,
    607 F. Supp. 227 (D. Del. 1984) ..................................................................... 30, 31

American Life Ins. Co. v. Parra,
    25 F. Supp. 2d 467 (D. Del. 1998) ............................................................... passim

AT&T Technologies, Inc. v. Communications Workers of America.,
    475 U.S. 643 (1986) ................................................................................... 2, 17, 19

Bel-Ray Co. v. Chemrite (Pty) Ltd.,
    181 F.3d 435 (3d Cir. 1999) .................................................................... 17, 21, 22

Bouriez v. Carnegie Mellon University,
    359 F.3d 292 (3d Cir. 2004) ............................................................................ 2, 17

Chase Manhattan Bank v. Iridium Africa Corp.,
    239 F. Supp. 2d 402 (D. Del. 2002) ...................................................................... 34

Chicago School Reform Board of Trustees v. Diversified Pharmaceutical Services, Inc.,
    40 F. Supp. 2d 987 (N.D. Ill.,1999) ...................................................................... 35

China Minmetals Materials Import & Export Co. v. Chi Mei Corp.,
    334 F.3d 274 (3d Cir. 2003) .................................................................................. 20

Comer v. Micor, Inc.,
    436 F.3d 1098 (9th Cir. 2006) .............................................................................. 19

Corporate Safe Specialists, Inc. v. Tidel Technologies, Inc.,
    No. 05 C 3421, 2005 WL 1705826 (N.D. Ill. July 15, 2005) ............................... 31

iii

Craig v. Lake Asbestos of Quebec, Ltd.,
    843 F.2d 145 (3d Cir. 1988) ................................................................. 26

Creditors' Committee of Essex Builders, Inc. v. Farmers Bank,
    251 A.2d 546 (Del. 1969) ...................................................................... 33

Croyle v. Texas Eastern Corp.,
    464 F. Supp. 377 (W.D. Pa. 1979) ......................................................... 29

CTF Hotel Holdings, Inc. v. Marriott International, Inc.,
    No. CIV.A.02-271-SLR, 2002 WL 1268049 (D. Del. May 22, 2002),
    aff'd in relevant part, 381 F.3d 131 (3d Cir. 2004) .................................. 2, 17, 22

CTS Corp. v. Dynamics Corp. of America,
    481 U.S. 69 (1987) ............................................................................... 22

Doe v. Unocal Corp.,
    248 F.3d 915 (9th Cir. 2001) ................................................................ 31

E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates,
S.A.S.,
    269 F.3d 187 (3d Cir. 2001) .............................................. 17, 21, 22, 32, 33

Everitt v. Dover Downs Entertainment, Inc.,
    No. CIV. A. 98-6116, 1999 WL 374163 (E.D. Pa. June 9, 1999) ................ 29

First Options of Chicago, Inc. v. Kaplan,
    514 U.S. 938 (1995) ........................................................... 2, 19, 20, 22, 38

Fisser v. International Bank,
    282 F.2d 231 (2d Cir.1960) ................................................................. 26

Fleetwood Enterprises, Inc. v. Gaskamp,
    280 F.3d 1069 (5th Cir. 2002) ............................................................. 20

Fletcher v. Atex, Inc.,
    68 F.3d 1451 (2d Cir. 1995) ................................................................ 29

Fluorine On Call, Ltd. v. Fluorogas Ltd.,
    380 F.3d 849 (5th Cir. 2004) ............................................................... 26

General Electric Co. v. Deutz AG,
        270 F.3d 144 (3d Cir. 2001) .......................................................... 19, 21

Graham v. Smith,
        292 F. Supp. 2d 153 (D. Me. 2003) ...................................................... 35

Grasty v. Michail,
        No. Civ. A. 02C-05-89 CLS, 2004 WL 396388 (Del. Super. Feb. 24, 2004) ...... 31

Greene v. New Dana Perfumes Corp.,
        287 B.R. 328 (D. Del. 2002) ................................................................ 26

Gruca v. Alpha Therapeutic Corp.,
        19 F. Supp. 2d 862 (N.D. Ill. 1998) ................................................. 30, 31

Harco National Insurance Co. v. Green Farms, Inc.,
        No. Civ. A. 1131, 1989 WL 110537 (Del. Ch. Sept. 19, 1989) .......................... 24

Harper v. Delaware Valley Broadcasters, Inc.,
        743 F. Supp. 1076 (D. Del. 1990), aff'd, 932 F. 2d 959 (3d Cir. 1991)  ............. 24

Hoechst Celanese Corp. v. National Union Fire Insurance Co. of Pittsburgh,
Pennsylvania,
        No. CIV. A. 89-C-SE-35, 1995 WL 411795 (Del. Super. Ct. Mar. 31, 1995)  .... 30

Howsam v. Dean Witter Reynolds, Inc.,
        537 U.S. 79 (2002) ...................................................................... 5, 19

InterGen N.V. v. Grina,
        344 F.3d 134 (1st Cir. 2003) ............................................................. 22

Invitrogen Corp. v. Employers Insurance Co. of Wausau,
        No. 06-232-PHX-MHM, 2006 WL 381666 (D. Ariz. Feb. 16, 2006) ................. 35

Irwin & Leighton, Inc. v. W.M. Anderson Co.,
        532 A.2d 983 (Del. Ch. 1987) ............................................................. 27

Kaplan v. First Options of Chicago, Inc.,
        19 F.3d 1503 (3d Cir. 1994) ................................................. 17, 19, 23, 24

Laborers' International Union of North America v. Foster Wheeler Corp.,
        868 F.2d 573 (3d Cir. 1989) ...................................................... 3, 19, 20

LaSalle National Bank v. Perelman,
    82 F. Supp. 2d 279 (D. Del. 2000) ........................................................ 22

LaSalle National Bank v. Vitro,
    85 F. Supp. 2d 857 (N.D. Ill. 2000) ..................................................... 30

Lester Building Associates, Inc. v. Davidson,
    514 A. 2d 1100 (Del. Ch. 1986) .......................................................... 17

Little Switzerland, Inc. v. Destination Retail Holdings Corp.,
    No. CIV. A. 98-315-SLR, 1999 WL 223496 (D. Del. Mar. 31, 1999) ................ 24

Litton Financial Printing Division v. N.L.R.B.,
    501 U.S. 190 (1991) ......................................................................... 19

Maryland Casualty Co. v. Realty Advisory Board on Labor Relations,
    107 F.3d 979 (2d Cir. 1997) ......................................................... 35, 36

Masefield AG v. Colonial Oil Industries, Inc.,
    No. 05 Civ 2231 (PKL), 2005 WL 911770
    (S.D.N.Y. Apr. 18, 2005) .............................................................. passim

McLaughlin Gormley King Co. v. Terminix International Co.,
    105 F.3d 1192 (8th Cir. 1997) ..................................................... 35, 36

Medtronic, Inc. v. ETEX Corp.,
    No. Civ. 04-1355 ADM/AJB), 2004 WL 768945 (D. Minn. Apr. 12, 2004) ...... 35

Ministry of Defense of the Islamic Republic of Iran v. Gould, Inc.,
    969 F.2d 764 (9th Cir. 1992) ............................................................. 31

Mobil Oil Corp. v. Linear Films, Inc.,
    718 F. Supp. 260 (D. Del. 1989) ....................................... 23, 25, 31, 32

Morgan v. Powe Timber Co.,
    367 F. Supp. 2d 1032 (S.D. Miss. 2005) ............................................. 26

Northeastern Power Co. v. Balcke-Durr, Inc.,
    49 F. Supp. 2d 783 (E.D. Pa. 1999) .................................................... 29

Olde Discount Corp. v. Tupman,
    805 F. Supp. 1130 (D. Del. 1992), aff'd, 1 F.3d 202 (3d Cir. 1993) ............. 16, 37

Opticians Association of America v. Independent Opticians of America,
    920 F.2d 187 (3d Cir. 1990) .......................................................................... 16, 36

Outokumpu Engineering Enterprises, Inc. v. Kvaerner EnviroPower, Inc.,
    685 A.2d 724 (Del. Super. 1996) .......................................................................... 24

PaineWebber Inc. v. Hartmann,
    921 F.2d 507 (3d Cir. 1990), overruled on other grounds by
    Howsam v. Dean Witter Reynolds, 537 U.S. 79 (2002) .......... 5, 18, 20, 35, 36, 38

PaineWebber Inc. v. Hofmann,
    984 F.2d 1372 (3d Cir. 1993) ............................................................................... 20

Pearson v. Component Technology Corp.,
    247 F.3d 471 (3d Cir. 2001) ........................................................................... 29, 30

In re Phillips Petroleum Securities Litigation,
    738 F. Supp. 825 (D. Del. 1990) .................................................................... 23, 29

Raytheon Engineers & Constructors, Inc. v. SMS Schloemann-
Sieman Akiengesellschaft,
    No. 99 C 7771, 2000 WL 420866 (N.D. Ill. Mar. 16, 2000) ................... 21, 35, 38

Reuters Ltd. v. United Press International, Inc.,
    903 F.2d 904 (2d Cir. 1990) ................................................................................. 35

Salisbury v. Credit Service,
    199 A. 674 (Del. Super. 1937) .............................................................................. 17

Sandvik AB v. Advent International Corp.,
    Nos. CIV.A.99-486-RRM (SLR), CIV.A.02-143-SLR,
    2002 WL 1268052 (D. Del. May 22, 2002) ........................................................ 19

Sarhank Group v. Oracle Corp.,
    404 F.3d 657 (2d Cir. 2005) ...................................................... 3, 19, 20, 21, 22, 38

Savin Corp. v. Heritage Copy Products, Inc.,
    661 F. Supp. 463 (M.D. Pa. 1987) ....................................................................... 29

Sears, Roebuck & Co. v. Sears plc,
    744 F. Supp. 1297 (D. Del. 1990) ........................................................................ 24

Tellium, Inc. v. Corning Inc.,
    No. 03 Civ. 8487(NRB), 2004 WL 307238 (S.D.N.Y. Feb. 13, 2004) ... 25, 26, 36

Tellium, Inc. v. Corning Inc.,
    No. 03 Civ. 8487(NRB), 2004 WL 1403297 (S.D.N.Y. June 22, 2004) ............ 35

Thomson-CSF, S.A. v. American Arbitration Association,
    64 F.3d 773 (2d Cir. 1995) ..................................................................... 22, 32, 33

Trustees of Village of Arden v. Unity Construction Co.,
    No. C.A. 15025, 2000 WL 130627 (Del. Ch. Jan. 26, 2000) ............................ 23

United States v. Bestfoods,
    524 U.S. 51 (1998) ............................................................................................. 31

United States for Use & Benefit of Capital Electric Construction
Co. v. Pool & Canfield, Inc.,
    778 F. Supp. 1088 (W.D. Mo. 1991) ................................................................. 35

United Steelworkers of America v. American Manufacturing Co.,
    363 U.S. 564 (1960) ........................................................................................... 17

United Steelworkers of America v. Enterprise Wheel & Car Corp.,
    363 U.S. 593 (1960) ........................................................................................... 17

United Steelworkers of America v. Warrior & Gulf Navigation Co.,
    363 U.S. 574 (1960) ........................................................................................... 17

United Steelworkers of America, AFL-CIO CLC v. Lukens Steel Co.
Division of Lukens Inc.,
    969 F.2d 1468 (3d Cir. 1992) ............................................................................ 20

Upjohn Co. v. Syntro Corp.,
    No. CIV. A. 89-107-JJF, 1990 WL 79232 (D. Del. Mar. 9, 1990) .......... 29, 20, 31

VantagePoint Venture Partners 1996 v. Examen, Inc.,
    871 A.2d 1108 (Del. 2005) ................................................................................ 22

Virginia Carolina Tools, Inc. v. International Tool Supply, Inc.,
    984 F.2d 113 (4th Cir. 1993) ............................................................................. 20

<u>Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood,</u>
752 A.2d 1175 (Del. Ch. 1999) ...................................................................... 23, 32

<u>Wausau Business Insurance Co. v. Turner Const. Co.,</u>
141 F. Supp. 2d 412 (S.D.N.Y. 2001) ................................................................ 28

<u>Ziegler v. Delaware County Daily Times,</u>
128 F. Supp. 2d 790 (E.D. Pa.2001) ................................................................. 26

## **STATUTES**

9 U.S.C. § 4 ......................................................................................................... 19

10 <u>Del. C.</u> § 5703(b) (1999) ................................................................................... 20

## NATURE AND STAGE OF PROCEEDING

On June 30, 2006, Plaintiff URS Corporation ("URS") filed its Complaint ("Compl.";
D.I. 1) seeking injunctive and declaratory relief due to the attempt by Defendant the Lebanese
Company for the Development and Reconstruction of Beirut Central District S.A.L., a/k/a
Solidere ("Defendant" or "Solidere") to force URS into arbitration before the International
Chamber of Commerce ("ICC"). Before filing this motion, URS asked Solidere to agree to stay
the ICC proceedings pending a decision in this Action. Solidere declined that request on August
2, 2006. Solidere then asked, as an accommodation to its counsel, that URS grant an extension
of time to respond to the Complaint. URS agreed to extend Solidere's deadline until the parties
could reach an agreement on scheduling, but in no event any later than September 8, 2006. A
stipulation to that effect was filed with the Court (D.I. 14). The parties then attempted to
negotiate a schedule that was mutually convenient for the parties and economical for the Court.
Unfortunately, the parties failed to reach agreement, and Solidere filed a motion seeking a
telephonic scheduling conference (D.I. 19). URS responded by proposing a schedule of its own
(D.I. 22). Before the Court could rule, Solidere filed its motion to dismiss (D.I. 32).

URS respectfully submits this opening brief in support of its Motion for Preliminary
Injunction for an order preliminarily enjoining Defendant from proceeding with arbitration
against URS before the ICC in Paris, France (the "ICC Arbitration") because URS never agreed
– in writing or otherwise – to arbitrate with Solidere. Because the arbitral panel appointed by
the ICC was fully constituted only last week, and no arbitration hearings have been scheduled,
URS does not require *highly* expedited proceedings. Instead, URS is prepared to proceed under
a reasonable schedule, agreeable to the parties and the Court, that would permit a timely
resolution of this matter by early next year.

## SUMMARY OF ARGUMENT

URS seeks an order preliminarily enjoining Solidere from pursuing arbitration
proceedings brought by Solidere against URS in Paris, France before the ICC because:

1.    URS is not party to any arbitration agreement with Solidere and has not "clearly
and unmistakably" agreed to arbitration of any claims (see Section II.A, infra);

2.    Where a party has not signed an arbitration agreement, whether that party can be forced to arbitrate presents a question for a court, not an arbitrator, which must be determined under state law contract and agency principles (see Section II.B, infra);

3.    No basis exists to enforce the arbitration agreement at issue against URS under contract, agency or other vicarious liability principles (see Section II.C, infra);

4.    URS will be irreparably harmed in the absence of such an injunction; indeed, irreparable harm is presumed per se in situations such as this (see Section III, infra);

5.    Solidere will suffer no harm if an injunction is issued (see Section IV, infra);

6.    All other factors favor preliminary relief (see Section V, infra).

## PRELIMINARY STATEMENT

It is axiomatic that a party cannot be compelled to arbitrate unless it has agreed to arbitrate. CTF Hotel Holdings, Inc. v. Marriott Intern., Inc., No. Civ.A.02-271-SLR, 2002 WL 1268049, at *2 (D. Del. May 22, 2002) (Robinson, J.) (citing, inter alia, AT&T Technologies, Inc. v. Communications Workers of Am., 475 U.S. 643, 648 (1986)), aff'd in relevant part, 381 F.3d 131 (3d Cir. 2004); Bouriez v. Carnegie Mellon Univ., 359 F.3d 292, 294 (3d Cir. 2004) ("[T]his Court has held that it is inappropriate to force a party to arbitrate their disputes unless that party agreed to such arbitration."); American Life Ins. Co. v. Parra, 25 F. Supp. 2d 467, 474 (D. Del. 1998).  It is equally axiomatic that "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."  AT&T Technologies, Inc., 475 U.S. at 649, 651 (emphasis added); First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995) (same).

It is also settled that a Delaware corporation is entitled to have a U.S. Court, applying Delaware law, determine whether that corporation can be required to arbitrate and defend claims brought against its subsidiary on a theory of piercing the corporate veil or similar vicarious liability theories.  As the Second Circuit unequivocally declared in a similar case:

> An American nonsignatory cannot be bound to arbitrate in the absence of a full showing of facts supporting an articulable theory based on American contract law or American agency law. . . . To hold otherwise would defeat the ordinary and customary expectations of experienced business persons.  The principal reason corporations form wholly owned foreign subsidiaries is to insulate themselves from liability for the torts and contracts of the subsidiary and from

2

the jurisdiction of foreign courts. <u>The practice of dealing through a subsidiary is entirely appropriate and essential to our nation's conduct of foreign trade.</u>

<u>Sarhank Group v. Oracle Corp.</u>, 404 F.3d 657, 662 (2d Cir. 2005) (emphasis added) (in action to enforce a foreign arbitration award under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), district court erred by refusing to consider whether the award was valid against non-signatory to arbitration agreement). Courts in the Third Circuit have followed <u>Sarhank</u>'s reasoning. <u>See, e.g., Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.</u>, 868 F.2d 573, 576 (3d Cir. 1989) ("it is the role of the district court, not the arbitrator, to pierce the corporate veil and require a parent corporation to participate in arbitration of a contract to which a subsidiary is formally a party").

Heedless of these settled principles, on February 13, 2006, Solidere commenced arbitration proceedings in Paris, France against URS and its indirect corporate subsidiary, Radian International LLC ("Radian"), claiming that URS is vicariously responsible for Radian's alleged breach of a contract for land reclamation works in Beirut, Lebanon (the "Contract"). (<u>See</u> Solidere's February 13, 2006 Request for Arbitration ("Arbitration Demand"), Compl., Ex. A.) The arbitration proceedings are based on a contract between Radian and Solidere, dated January 25, 1999, which contains an agreement to submit disputes to the ICC. (Compl., Ex. B (General Conditions of Contract ("GCC")) § 44.) In addition, the arbitration proceedings will be based on the law of the Republic of Lebanon. (<u>Id.</u> § 50.)

URS is not and has never been a party to the Contract and has never entered into any agreement with Solidere that would require URS to arbitrate any claim. In fact, URS had no affiliation with Radian when Radian signed the Contract with Solidere and disclaimed any responsibility for such contracts shortly after it acquired Radian's corporate parent. Solidere admits that URS is <u>not</u> a signatory to the arbitration agreement at issue, but claims that URS should be dragged into the arbitration proceedings in France because URS owns a company that, in turn, owns Radian. Solidere has manufactured a host of misleading, inconsequential or simply false "facts" demonstrating nothing more than an ordinary relationship between a parent and its subsidiary and dressed them up in a string of legal theories designed to bind URS to the arbitration agreement. None of Solidere's theories, as shown below, is tenable under American

3

law and none provide any basis to compel URS to arbitrate claims asserted against its subsidiary for a contract entered into by its subsidiary but not URS.

URS tried to avoid commencing litigation by asking the ICC to defer to the jurisdiction of American courts on the issue of arbitrability. Unfortunately, the ICC left that determination to the arbitration panel that will preside over the arbitration between Solidere and Radian (the "Tribunal"). That panel was fully constituted only last week, has not heard or even received any evidence, and has not scheduled a date for a hearing on the jurisdictional issue. URS has objected to allowing the Tribunal to decide whether it may exercise jurisdiction over URS. As a last ditch effort to avoid having to file this motion, URS asked Solidere to agree voluntarily to defer resolution of the issue of arbitrability to an American court. Solidere refused that request. Thus, URS had no choice but to seek injunctive relief from this Court to enjoin Solidere from proceeding before the ICC against URS while this Court determines whether URS should be bound by the arbitration agreement between Solidere and Radian.

URS's request for a preliminary injunction presents a straightforward case. It is undisputed that URS did not agree to arbitrate with Defendant. (See Section II.A.) Absent "clear and unmistakable" evidence of an agreement by a party to arbitrate – here, there is no evidence – the issue of arbitrability must be decided by a Court. (See Section II.B.) A party seeking to force someone to arbitrate when that person has not signed an arbitration agreement must show under one of a few narrow exceptions that there is a basis to impose the obligation to arbitrate on the non-signatory. None of those exceptions applies here. (See Section II.C.) Irreparable harm is presumed per se where, as here, a party is being asked to arbitrate in the absence of any agreement to arbitrate. (See Section III.) Solidere will suffer no prejudice from a preliminary injunction because (i) the arbitration proceedings have not even begun, (ii) no hearings have been scheduled, and (iii) Solidere will be required to arbitrate against the proper party (i.e., Radian). (See Section IV.) Finally, compelling public policies favor a preliminary injunction here. (See Section V.)

As the Third Circuit has explained, "[i]f a court determines that a valid arbitration agreement does not exist or that the matter at issue clearly falls outside of the substantive scope

of the agreement, <u>it is obliged to enjoin arbitration</u>." <u>PaineWebber Inc. v. Hartmann</u>, 921 F.2d 507, 511 (3d Cir. 1990) (emphasis added), <u>overruled on other grounds by</u> <u>Howsam v. Dean Witter Reynolds</u>, 537 U.S. 79, 85 (2002). For these reasons, URS respectfully requests the Court to enjoin Solidere from proceeding with its arbitration before the ICC.

**STATEMENT OF FACTS**

**Radian's Contract with Solidere**

On January 25, 1999, Radian, which was then an indirect subsidiary of Dames & Moore Group and had no affiliation with URS, entered into a contract with Solidere. (<u>See</u> Contract, Compl. Ex. B.) The <u>only</u> parties to the Contract were Solidere and Radian. (<u>Id.</u> at 1 ("AGREEMENT Between The Lebanese Company for the Development and Reconstruction of Beirut Central District, S.A.L. and Radian International LLC").) The Contract required Radian to perform land reclamation work at a site known as the Normandy Landfill. (<u>Id.</u>) The Normandy Landfill is located along the northern coast of Beirut, Lebanon. (Compl., Ex. A ¶ 35.) The landfill area is part of what is known as the Beirut Central District ("BCD") and is located next to a main sea-front avenue, "Avenue de Français." Between 1975 and 1994, the Normandy Landfill site was used for the disposal of inert construction and demolition waste, municipal waste and unexploded ordnance, as well as all the debris of war. (<u>Id.</u>)

Radian's task under the Contract was part of a public works project to rehabilitate (or reclaim) the Normandy Landfill site to make it suitable for a park area and for construction of high-end real estate projects. (Compl., Ex. B (Technical Conditions of Contract ("TCC")) § 2.0.) Radian was hired to perform "Phase 2" of the remediation work at the Normandy Landfill. Phase 1 had been completed by October 1997 and consisted of approximately 7 hectares closest to the city center. (Compl., Ex. A ¶ 40.) Phase 2 of the work was to include the remaining 22 hectares. (<u>Id.</u>) Under the Contract, Radian's responsibility was to excavate a 48 acre section of the landfill (approximately 5 million cubic meters), sort the waste to remove unacceptable landfill materials for off-site disposal (such as metal and unexploded ordnance), treat the soil, as necessary, to reduce organic material to levels specified in the contract using a variety of technologies (e.g., low temperature thermal desorption, and composting), and backfill the treated material. (Compl., Ex. B (TCC) § 3.0.)

5

The Contract required all disputes arising under the Contract between Radian and Solidere to be submitted to the ICC in Paris, France. (See Compl., Ex. B (GCC) § 44.) The Contract also specified that it was governed by the laws of the Republic of Lebanon. (Id. ¶ 50.)

**Radian's Corporate Ownership, And Lack Of Guarantees From Its Corporate Parents**

Radian was formed on January 19, 1996 as a Delaware limited liability company. (See Affidavit of David Balfour ("Balfour Aff.") ¶ 6.) When Radian first began negotiating with Solidere for the Contract to perform the work at the Normandy Landfill, Radian was owned by The Dow Chemical Company. (See Declaration of Jason D. Russell ("Russell Decl."), Ex. 1 (Dow 12/31/99 10-K) at 48.) Of course, Solidere knew this because Radian emphasized its corporate structure in its proposal to Solidere in connection with the project. (Russell Decl. Ex. 7 at 574, 577.) Radian was clear with Solidere that Radian would utilize the resources and expertise from, among others, its parent entity. Radian, however, never promised, agreed, or represented that its parent or affiliate entities would be parties to the Contract. Moreover, Solidere never sought or obtained any guarantee of Radian's performance under the Contract from any of Radian's affiliates. Nor did Solidere demand or assert that any of Radian's affiliates were also parties to or responsible under the Contract.

On July 31, 1998, before the Contract's execution, Dow sold Radian to Dames & Moore Group. (Russell Decl., Ex. 1 at 48.) As of the time of the acquisition, Radian had annual revenues of approximately $300 million (id., Ex. 2 (Dames & Moore Group 7/31/98 8-K)), which was consistent with Radian's revenues in prior years (id., Ex. 3 (Dow 3/31/96 10-Q) at 10), and estimated its total assets at over $78 million (id., Ex. 4 (Dames & Moore Group 10/9/98 8-K/A, Ex. 99.4 at 6)).

As with its ownership by Dow Chemical Company, Radian emphasized its relationship with its corporate parent and many of the submissions to Solidere noted the relationship. (See, e.g., Russell Decl., Ex. 7.) Although Solidere knew of Radian's corporate ownership at the time of the Contract's execution, Solidere did not seek and, therefore, the Contract does not provide for a corporate parent guarantee either from Radian's immediate corporate parent (Radian Acquisition Corp.) or Radian's ultimate parent (Dames & Moore Group). (See Affidavit of

6

Amine Bou Onk ("Bou Onk Aff.") ¶ 2.)  Instead, Solidere bargained for and received from Radian a performance bonding requirement under the Contract[1] (see Compl., Ex. B (GCC) § 32.1 (requiring a Performance Letter of Guarantee equal to 15% of the Contract Price or $8.2 million); Compl., Ex. A (Arbitration Demand) ¶ 119 (confirming that Radian "provided Solidere with a Performance Letter of Guarantee"). Solidere also negotiated for, and obtained, a contractual right that Radian seek and obtain insurance for its work on the Project, which it did. (See Compl., Ex. B (GCC Ex. 7 at 1.5).)[2]

In June of 1999, six months after Solidere contracted with Radian, URS acquired Dames & Moore Group and all of its subsidiaries, including Radian Acquisition Corporation, which was the sole member of Radian. (See Affidavit of Kristin L. Jones ("Jones Aff.") ¶ 3; Russell Decl. Ex. 5 (URS 10/31/03 10-K) at 10; id., Ex. 6 (URS 6/23/99 8-K, Ex. 99.2).)  As a result, URS became an indirect corporate parent of Radian. (See Jones Aff. ¶ 3.)  Solidere knew of the change in corporate ownership, as well as the absence of any change in Radian's relationship with Solidere.  In September of 2000, more than a year after URS first acquired Radian, David Horne of W.A. Fairhurst International Partnership ("WAFI"), Solidere's construction manager, wrote to Radian's Project Manager for the Normandy Landfill and asked that Radian provide detail on URS's acquisition of Radian. (Bou Onk Aff. ¶ 4; Russell Decl. Ex. 9.)  On January 17, 2001, Mr. Amine Bou Onk wrote to Mr. Horne and enclosed a letter from URS's corporate counsel that responded to Mr. Horne's inquiry. (Id., Ex. 10.)  Mr. Bou Onk's letter was written

---

[1]    Solidere has already (improperly) drawn down all of the $8.2 million on the Performance Letter of Guarantee for alleged breaches by Radian. (Compl., Ex. A (Arbitration Demand) ¶ 120 (admission by Solidere that it drew down on Performance Letter of Guarantee in June 2004).)

[2]    Solidere's failure to bargain for any corporate parent guarantee, coupled with the disclaimer of any liability on behalf of Radian's affiliates under the Contract (Compl., Ex. B at GCC § 22.1), is all the more telling given that Solidere knew all along that Radian operated as an affiliate of other companies. Although Solidere makes much of the fact that Radian began to denote on its letterhead that it was a URS subsidiary after that acquisition occurred, Radian's identification of itself as a subsidiary of other corporations occurred long before URS acquired Radian. Thus, for example, Radian highlighted its ownership by Dow to Solidere when Radian was bidding to obtain the Contract. (See supra at 6.) Later, when Radian was acquired by Dames & Moore, it often used letterhead that read, "Radian International, a Dames & Moore Group Company." (See, e.g., Russell Decl., Ex. 8.) Nevertheless, at no time when Radian was using this letterhead did Solidere indicate that it believed that Dames & Moore had thereby become a contracting party or was somehow obligated under the Contract.

7

on letterhead that identified his employer as "Radian International." In the letter from URS's corporate counsel, URS stated that it had acquired the Dames & Moore Group and all of its subsidiaries, including Radian International LLC and <u>confirmed that each of the subsidiaries would "continue to operate as separate subsidiaries under their existing names, although all correspondence is now on URS Corporation letterhead."</u> The letter also confirmed that "Radian International, LLC has not changed its corporate name. It continues to operate as a separate subsidiary under its own, current name." (<u>Id.</u> (emphasis added).) Finally, the letter confirmed that Radian's performance under the Contract would not be impacted and that there would be "no change" in Radian's dealings with Solidere. (<u>Id.</u>; <u>see also</u> Bishop Aff. ¶ 7.)

Solidere's lack of intent to seek any contractual guarantees of Radian's performance from any of its corporate affiliates is further illustrated by the Contract's <u>express disclaimer</u> of such a guarantee. Indeed, the Contract's express terms <u>disclaim any liability on behalf of any of Radian's affiliates</u>, as it imposes liability for conduct undertaken by Radian's affiliates <u>on Radian alone</u>. (<u>See</u> Compl., Ex. B (GCC) § 22.1.) Had Solidere wished to obtain the right to proceed against Radian's corporate affiliates, it would not have contractually given those rights away under the express terms of the Contract and instead would have negotiated some form of parental guarantee, which did not occur.[3]

### Radian's Independent Performance under the Contract

It is <u>undisputed</u> that when Radian commenced its performance of work under the Contract, URS had no connection with Radian. (<u>See</u> Affidavit of Thomas W. Bishop. ("Bishop Aff.") ¶ 6; <u>cf.</u> Compl., Ex. A (Arbitration Demand) ¶ 154.) Radian commenced its work under the Contract on April 14, 1999, upon Solidere's issuance of the Notice to Proceed. By February

---

[3]     Although Solidere contends it believed it was dealing with URS, the documents submitted by Solidere in support of its Arbitration Demand belie that assertion. For instance, <u>after</u> URS acquired Radian, in August of 2000, Solidere entered a second addendum to the Contract, which was signed by Radian and which made clear that <u>only</u> Radian was a party to the Contract. (<u>See</u> Compl., Ex. B.) Solidere also signed a Memorandum of Understanding in 2003, which again acknowledged that the <u>only</u> party with whom it was dealing was Radian. (<u>See</u> Russell Decl., Ex. 11.) The formal minutes for the weekly project meetings among Solidere, Solidere's construction manager, and Radian for every week of the project from 1999 through February 2005 reflect that Radian was both the contracting party and responsible to carry out the work. No claim is made anywhere in these minutes – prepared by Solidere's construction manager and approved by Solidere – that URS somehow was responsible for or had taken over the project. (<u>Id.</u>, Ex. 32.)

2001, Radian had completed a portion of its total obligations under the Contract, such as certain excavation above and below sea level, sorting, screening and treatment of waste and back-filling certain areas. In March 2001, Solidere notified Radian that, notwithstanding Radian's adherence to the agreed treatment methods and backfilling criteria, there were gas bubbles emerging from water overlying submerged backfill material in completed areas of the site. Solidere ultimately terminated the Contract in early 2006, after the parties went through years of protracted attempts to settle on appropriate treatment for the landfill gas issue, including the 2003 arbitration proceedings between Radian and Solidere, described in greater detail below.[4]

Since the June 1999 acquisition and over the course of Radian's performance under the Contract, URS and Radian maintained nothing more than a normal parent-subsidiary relationship, with all the attendant corporate formalities. (See Jones Aff. ¶¶ 5-6.) At the relevant times, Radian was adequately capitalized for purposes of its performance under the Contract. (See Russell Decl. Ex. 12 (certificate from the Ministry of Economy of Lebanon acknowledging the value of Radian's capital); id., Ex. 13 (Radian's Declaration of Information for Establishment of a Branch in Lebanon, specifying its capital structure); see also id., Exs. 2-4 (SEC filings demonstrating that before Radian entered into the Contract, it had annual revenues of approximately $300 million, which was consistent with Radian's revenues in prior years, and estimated its total assets at over $78 million).[5]

At all relevant times, URS did not participate in the daily management, operations or business affairs of Radian, nor was Radian required to seek authorization from URS for ordinary business decisions or marketing activities. (See Bishop Aff. ¶ 8.) Radian adhered to all the necessary separate corporate formalities under its own Limited Liability Company Agreement, dated January 19, 1996, which has been amended twice, in 2002 and 2004, after URS's acquisition of Radian. (See Balfour Aff. ¶¶ 5-8.) The amendments were made by formal vote

---

[4]     The history of unsuccessful negotiations over the gas remediation issues between Radian and Solidere, as well as unreasonable demands by Solidere pertaining to that dispute, are set out in Radian's Jan. 20, 2006 Request for Arbitration, as amended on February 20, 2006 (Compl., Ex. C).

[5]     URS also consistently and carefully maintained corporate separateness from its subsidiary, Radian. This separateness is noted in, among other places, URS's annual filings with the SEC, in which Radian is discussed as a separate legal entity from URS. (See Russell Decl., Exs. 14-16.)

9

via written consent of Radian's members. (See id. ¶ 6.) Radian maintains its registered office in Delaware and has maintained agents for service of process in various states before and after URS's acquisition of Radian. (See id. ¶ 5.) Radian also maintained independent operations outside of Delaware; for example, in June 2000 – i.e., more than a year after URS's acquisition – it renewed its office space lease in Austin, Texas, in its own name. (Russell Decl., Ex. 30.)

Although URS and Radian maintain a consolidated cash management system for convenience and for purposes of consolidated financial reporting, the accounting for Radian's projects is clearly segregated. (See Affidavit of Alberto Cuenca ("Cuenca Aff.") ¶ 2.) All funds that are expended or received on behalf of Radian are specifically earmarked. (See id. ¶ 3.) For example, whenever money is paid out on behalf of Radian, URS creates an accounts-payable entry in its books to reflect payment by Radian. (See id.) Conversely, whenever funds are received, URS creates an accounts-receivable entry in its books to reflect revenue for Radian. (See id.) Similarly, the payroll expended in connection with Radian's projects, such as the Normandy Landfill project at issue in this case, is separately charged to those projects under the employment agreements of the relevant employees. (See id. ¶ 4.) Thus, Radian's funds are maintained separately from URS's funds and are readily identifiable at any given time.

Further, URS did not control the selection and assignment of Radian's executive personnel working on the Normandy Landfill Project. (See Bishop Aff. ¶ 8.) Nor did Radian act as an agent for URS in conducting business transactions related to the Contract with Solidere. (See id.) Far from acting as a single entity, Radian meticulously took steps to insure that it was clear who was acting under the Contract. For instance, it was Radian that in 1999 registered in Lebanon for purposes of performing work under the Contract – a fact that never changed despite changes in ownership of Radian. The application materials for registration in Lebanon are in Radian's name alone. (See Russell Decl., Exs. 17-18.) These materials specify that Radian appointed its own branch manager, hired its own local counsel and auditor for branch accounts. (See id., Ex. 17.) They further specify that Radian's shareholders' equity as of February 26, 1999 was at $116,925,033 – i.e., that it was fully capitalized to perform the work under the Contract. (See id., Ex. 13.) Finally, the license and registrations issued by the State of Lebanon

10

allowing Radian to work as a foreign company in Lebanon were also in Radian's name alone. (See id., Exs. 12, 19-21; see also Bou Onk Aff., Ex. B.)

To date, there has been no change in the core personnel hired by Radian to perform the work at the Normandy Landfill since the inception of the project. After URS's acquisition of Radian, the work under the Contract has been performed by the same people hired by Radian before it had any connection to URS. (Cf. Bou Onk Aff. ¶¶ 4-8 (no significant changes in the daily performance of work under the Contract after the acquisition of Radian's parent by URS).) All of the Radian employees working at the Normandy Landfill were paid directly by Radian. (See id. ¶ 15.) All the subcontractors involved at the site were hired and paid by Radian, and none have any contractual relationship with URS. (See Russell Decl., Ex. 22 (Radian's subcontract with Societe Mouawad-Edde S.A.R.L.), Ex. 23 (Radian's subcontract with Bureau Sfeir); Bou Onk Aff., Ex. E (payments by Radian to Societe Mouawad-Edde S.A.R.L. from July 1999 through October 2004, drawn upon Radian's bank account).)

After the acquisition, there were some employees who had affiliations with URS who also worked on the Normandy Landfill Project. In each such instance, either the employee was employed by both Radian and URS (and worked on the Project in his or her Radian capacity) or was an employee who worked for URS or one its subsidiaries and was seconded to the Project to perform limited work for Radian and whose time was charged to Radian's account. For example, Thomas Bishop held the title of Senior Vice President with URS, as well as the title of Senior Vice President of Radian International, LLC. (See Bishop Aff. ¶ 1.) Mr. Bishop was the senior executive working on the Project. Whenever performing work on the Project, Mr. Bishop did so in his capacity as a Radian officer, as all of his correspondence makes clear because it is all on Radian International, LLC letterhead. (See id. ¶¶ 9-11.) Mr. Bishop's time spent on the Normandy Landfill Project was specifically segregated at the project level, and he understood that all the work he performed on the project was in his capacity as Radian's executive. (See id. ¶¶ 9-10; see also Cuenca Aff. ¶ 3 (work performed on Radian's projects billed as Radian's work); Bou Onk Aff. ¶¶ 5-6 (general manager on the Project made clear that he performed his duties on the Project on Radian's behalf).)

11

All the operations at the site are in Radian's name, including, bank accounts, social security certificates, work permits, insurance, title to equipment, vehicle registrations and permits, phone services and multiple other vendor services. (See Bou Onk Aff. ¶¶ 10-14, 15-19, Ex. D (Radian's Lebanese bank account statements from 1999 to 2003, reflecting payments from Solidere); Exs. G-I (workers' compensation, plant and machinery, and vehicle insurance maintained in Radian's name); Ex. C (social security certificates); Ex. F (work permits for American expatriates); Ex. I (commercial vehicle registrations and permits); Ex. J (phone and other vendor invoices and/or vendor payments); Russell Decl., Ex. 24 (report of court-appointed expert in a separate proceeding initiated by Solidere in Lebanon; confirming Radian's title of equipment and vehicles).) Solidere itself directed all its payments under the Contract to a bank account held exclusively in Radian's name. (See Bou Onk Aff. ¶ 11 & Ex. D.)

For every week of the Project from 1999 through February 2005, Radian, Solidere and Solidere's construction manager (WAFI) held weekly progress meetings concerning the progress of work under the Contract, and URS has never attended and/or participated in these meetings. (Russell Decl., Ex. 32 (meetings' minutes).) As the meetings' minutes demonstrate, it was Radian, not URS, that undertook all the actual tasks in connection with performance of the Works under the Contract. (See id.) No claim is made anywhere in these minutes – prepared by Solidere's construction manager and approved by Solidere – that URS somehow was responsible for or had taken over the Project. After Solidere terminated its Contract with Radian and initiated its arbitration proceedings with the ICC against URS, Solidere's course of conduct establishes that even it does not believe that URS has anything to do with the dispute at hand. In a related litigation in Beirut, initiated by Solidere to request appointment of an expert to oversee the turnover of the onsite equipment, nowhere did Solidere even hint that the subject equipment belongs to URS, not Radian. (See Russell Decl., Ex. 25.) The ensuing report issued by the court-appointed expert, which summarized the inventory subject to the turnover under the Contract, never even mentions URS as having any connection to the proceedings at hand. (See id., Ex. 24.)

**Radian's Prior ICC Arbitration With Solidere**

In May 2003, Radian, pursuant to a memorandum of understanding between Radian and Solidere ("MOU"), commenced the Prior Arbitration with the ICC concerning landfill gas observed at the site. (See Russell Decl., Ex. 11.) The MOU shows that the Prior Arbitration was initiated as much for Solidere's benefit as for Radian's. Solidere refers to the MOU between Solidere and Radian in its Arbitration Demand, confirming that both parties expressly "agreed . . . to submit their dispute to arbitration." (Compl., Ex. A ¶¶ 103-106.) While negotiating the MOU, Solidere never indicated that URS was a proper party to the Prior Arbitration, nor made any effort to add URS as a party to the MOU. Solidere's negotiation of the MOU to name only Solidere and Radian as parties to the gas emissions dispute is inconsistent with Solidere's current claims in the ICC Arbitration and its after-the-fact attempt to apply the July 2004 award issued in the Prior Arbitration (the "Award") retroactively to URS.

Solidere's claims in its current Arbitration Demand stem from the Prior Arbitration and are grounded on the alleged inadequacies of Radian's performance under the Contract. These purported inadequacies arise from the parties' inability to agree on the appropriate methods to remedy the landfill gas issue at the Normandy Landfill after Solidere obtained an award in Prior Arbitration determining that the gas emissions constitute a defect in Radian's work. Solidere's Arbitration Demand is thus nothing short of an attempt to enforce the Prior Arbitration's award against URS, which was expressly not a party to the Prior Arbitration. Indeed, central to the dispute between the parties here is whether Solidere and Radian properly complied with the following provisions of the Award:

- Radian is liable to remedy the defects at no cost to SOLIDERE and to provide SOLIDERE with a plan showing how Radian proposes that the Works will be completed so as to comply with the Contract;

- SOLIDERE is entitled to withhold payment of sums otherwise due to Radian;

- The parameters set forth in TC Table 3.1 apply to backfilled material and are to be measured after backfilling *in situ*.

12 July 2004 Award, issued in the Prior Arbitration (Russell Decl., Ex. 26) at 99.

Solidere's Arbitration Demand in the current ICC Arbitration also raises additional issues about how the following provisions of the Award should be enforced against Radian:

- There is a failure or defect in the Permanent Works and/or materials and/or workmanship within the meaning of the Contract as regards landfill gas emissions;

- The Permanent Works are not Fit for the Purpose, as defined in the Contract, as regards such emissions;

- The Tribunal awards and declares that <u>Radian</u> should pay to SOLIDERE the sum of US$2,188,000 in respect of their costs of the Arbitration, including the additional costs awarded under para. 11.12.

- The Tribunal awards and declares that <u>Radian</u> should bear the fees and expenses of the Tribunal and the ICC administrative expenses fixed by the ICC court at US$340,000 and should pay to SOLIDERE the sum of US$170,000 previously advanced by SOLIDERE.

<u>Id.</u> (emphasis added).

The foregoing aspects of the Award in the Prior Arbitration are central to Solidere's claims in its current Arbitration Demand, and Solidere's new arbitration claims cannot survive without enforcement of the Award. However, as the MOU proves, Solidere negotiated <u>only with Radian</u> over the terms and content of the Prior Arbitration and agreed to resolve all its claims arising out of the landfill gas issue in the Prior Arbitration. Telling of Solidere's view of the "real" party, Solidere negotiated and signed a document in which URS was <u>not</u> a party (<u>see</u> Russell Decl., Ex. 11) and never mentioned URS at any time, much less tried to make URS a signatory to the MOU. (<u>See</u> Compl., Ex. A ¶¶ 103-106.) Moreover, Solidere confirms that it sought its own, separate relief in the Prior Arbitration (<u>see id.</u> ¶ 106) – <u>but only against Radian</u>. In fact, Solidere insisted that counsel for each party in the Prior Arbitration identify what parties they represent via specific power of attorney, and Radian's counsel filed such a statement, showing that it represented <u>only Radian and no other</u>. (<u>See</u> Russell Decl., Ex. 27.)

Although by the time of the Prior Arbitration URS had been affiliated with Radian for <u>almost four years</u>, Solidere did not consider that its claims in the Prior Arbitration – which largely concern the same disputes at issue in the current Arbitration Demand – could be properly stated against URS. In the Prior Arbitration, Solidere chose to proceed <u>only against Radian</u>, and not against URS, even though Solidere sought its own, separate relief in the Prior Arbitration for the allegedly defective work performed under the Contract. Solidere made no attempt to proceed against URS, even though Solidere clearly knew that Radian had been acquired by URS <u>some four years prior</u> to the initiation of the Prior Arbitration. (<u>See, e.g.</u>, Compl., Ex. A ¶ 154

14

(citing publicly available sources disclosing the acquisition), ¶¶ 172-177 (conceding that it requested and received confirmation of the acquisition by Jan. 17, 2001).)

Indeed, in the Arbitration Demand, Solidere cites a series of documents, each confirming that by May 2003 – when Solidere entered into the MOU to commence the Prior Arbitration with Radian – not only did Solidere know that Radian had been acquired by URS as an indirect subsidiary, but already possessed almost all the evidence it currently relies on for its contention that URS purportedly acted on Radian's behalf. As Solidere's current Arbitration Demand demonstrates, Solidere's allegations in support of imposing liability on URS are almost entirely based on events preceding the Prior Arbitration, commenced on 19 May 2003 (or, at the very least, the 12 July 2004 Award rendered in that proceeding) and were in fact then known to Solidere and/or publicly available at the time.[6] Once Solidere obtained the Award in the Prior Arbitration, it moved to confirm it in France. (See Russell Decl., Ex. 28.) Those confirmation proceedings were instituted by Solidere only against Radian, not URS.

**Solidere's current ICC Arbitration against Radian and URS**

On February 13, 2006, Solidere commenced the ICC Arbitration by filing the Arbitration Demand with the ICC Court, claiming that Radian had breached the Contract and that URS was directly responsible for Radian's breach because URS purportedly took over the Contract's

---

[6]    (See, e.g., Compl., Ex. A ¶¶ 153-154 (describing URS's Jun. 1999 acquisition of Radian), ¶ 157 (alleging sharing of addresses in 2003), ¶ 159 (alleging sharing of addresses in 2002 and 2003), ¶ 160 (citing, inter alia, November 21, 2003 letter, allegedly indicating sharing of telephone and facsimile numbers), ¶ 166 (alleging transfer of employees based on Jan. 14, 2004 public filing), ¶¶ 168-169 (citing a May 1, 2000 article and a May 2, 2003 letter allegedly indicating that Radian no longer advertised as a separate entity), ¶¶ 172-177 (citing documents dating back to Jul. 31, 2000, indicating letterhead changes; also citing a Jan. 17, 2001 communication in support of allegations of URS's direct involvement), ¶¶ 178-182 (citing a Jan. 2, 2002 letter in support of allegations of URS's involvement), ¶ 183 (citing website representations as to URS's purported involvement in project as of June 14, 2004), ¶ 185 (allegations of URS's alleged involvement dating back to 2001), ¶¶ 189-202 (witness statements from the Prior Arbitration dated Oct. 14, 2003 and Oct. 10, 2003, a Mar. 1, 2004 public filing and letters of Jan. 2, 2002, Feb. 27, 2002, Dec. 4, 2002, Dec. 12, 2002, Apr. 8, 2003, Jan. 30, 2004 and Apr. 16, 2004 in support of allegations of involvement by URS's personnel), ¶¶ 204-205 (citing the Sept. 24-26, 2002 and Dec. 20, 2002 reports purportedly demonstrating involvement of URS), ¶¶ 207-214 (relying on "[d]ocuments disclosed in [the Prior] Arbitration" to show URS's purported involvement in gas investigations; also citing various 2002-2003 memoranda), ¶ 215 (citing Sept. 25, 2002 letter, purportedly showing URS took responsibility for site safety), ¶¶ 216-219 (citing Apr. 20, 2000, Sept. 8, 2000, Dec. 4, 2000, Apr. 15, 2002, Apr. 26, 2002, and Jan. 30, 2004 letters, purportedly showing shared accounting), ¶¶ 220-234 (URS's purported control over Prior Arbitration).)

performance and/or is Radian's alter ego. (See Compl., Ex. A ¶¶ 150, 171.) Solidere filed the Arbitration Demand after Radian initiated its own arbitration. (See Compl., Ex. C.) Without submitting to the ICC's jurisdiction, URS informed the ICC Court that it was not a party to any arbitration agreement with Solidere, should not be included as a respondent in the ICC Arbitration, and that URS objected to any assertion of ICC jurisdiction over it on these grounds. (See Russell Decl., Ex. 29.) On June 2, 2006, the ICC Court, despite URS's objections, informed URS's counsel that the ICC Arbitration will proceed against both URS and Radian, in accordance with Article 6(2) of the ICC's Rules of Arbitration ("ICC Rules") (id., Ex. 31), leaving it to the arbitration tribunal to determine whether it had power to arbitrate claims asserted by Solidere against URS, even though URS never consented to the Tribunal deciding the issue of arbitrability and never submitted to the ICC's jurisdiction.

## ARGUMENT

### I.    PRELIMINARY INJUNCTION STANDARD

URS seeks a preliminary injunction barring Solidere from continuing to prosecute its arbitration against URS before the ICC. When deciding a motion for a preliminary inunction, the court must evaluate the following four factors:  (1) the likelihood that the plaintiff will prevail on the merits at the final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. Olde Discount Corp. v. Tupman, 805 F. Supp. 1130, 1136 (D. Del. 1992) (Robinson, J.), citing Opticians Ass'n of Am. v. Independent Opticians of Am., 920 F.2d 187, 191-92 (3d Cir. 1990) (reversing denial of preliminary injunction); Am. Life, 25 F. Supp. 2d at 473.

### II.    URS IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

URS seeks a declaration that it is not bound by the arbitration provision in the Contract and need not arbitrate any disputes with Solidere. (Compl. ¶¶ 2, 51-53.) To prevail, URS must show that (i) it has not agreed to arbitrate with Solidere, (ii) the question of arbitrability is one for this Court rather than the ICC arbitral panel, and (iii) there is no basis for URS to be bound by the terms of the arbitration provision between Solidere and one of URS's indirectly-owned subsidiaries. As shown below, URS is likely to prevail on the merits.

16

**A.    URS Is Not a Party to Any Arbitration Agreement and Thus
Plainly Cannot Be Brought into Arbitration Before the ICC**

Forty-six years ago, the Supreme Court handed down a trilogy of cases that establish the principles for resolving whether a party may be compelled to arbitrate. See United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960); United Steelworkers of Am. v. Am. Mfg. Co., 363 U.S. 564 (1960); United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593 (1960). As the Supreme Court explained, "[t]he first principle gleaned from the Trilogy is that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" AT&T Techs., 475 U.S. at 648-49. "[T]his axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration. Id. Following this guidance, courts in the Third Circuit hold that a party cannot be forced to arbitrate unless it agreed to do so.  CTF Hotel Holdings, 2002 WL 1268049, at *2 ("As is universally recognized, 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute for which he has not agreed to submit'"); Bouriez v. Carnegie Mellon, 359 F.3d 292, 294 (3d Cir. 2004) ("it is inappropriate to force a party to arbitrate their disputes unless the party agreed to such arbitration.").[7]

The Contract containing the arbitration agreement is between Radian and Solidere. (See Compl., Ex. B; Compl., Ex. A (Arbitration Demand) ¶¶ 14, 148-150.)  URS is not and cannot be a signatory to the Contract, as URS had no relation to Radian at the time the Contract was executed. (Supra at 6-8.) Solidere cannot show any consent or agreement by URS to arbitrate any dispute before the ICC.[8]  To the contrary, URS at all times expressly disclaimed any responsibility under the Contract. Absent proof of an agreement to arbitrate, which does not

---

[7]    Accord E.I. Dupont De Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S., 269 F.3d 187, 194 (3d Cir. 2001); Bel-Ray Co. v. Chemrite (Pty) Ltd., 181 F.3d 435, 444 (3d Cir. 1999); Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1509 (3d Cir. 1994); Am. Life, 25 F. Supp. 2d at 474; Lester Bldg. Assocs., Inc. v. Davidson, 514 A.2d 1100, 1103-04 (Del. Ch. 1986) ("Absent agreement, a party may not be forced to arbitrate.").

[8]    Under Delaware law, formation of a contract requires an offer by one person and an acceptance of that offer by the person to whom it was made. See, e.g., Salisbury v. Credit Service, 199 A. 674, 681 (Del. Super. 1937). The Contract evidences neither as between Solidere and URS.

exist, URS cannot be forced into arbitration unless Solidere can establish that URS should be held legally responsible for the contract signed by Radian, a legally distinct entity, which was not even related to URS at the time it executed the contract. Thus, Solidere should be enjoined from proceeding with the ICC Arbitration against URS. See PaineWebber, 921 F.2d at 515; Am. Life, 25 F. Supp. 2d at 480.

As URS has not agreed to arbitrate, Solidere argues that URS is bound by the arbitration clause in the Contract between Solidere and Radian, its indirect subsidiary. (Compl., Ex. A ¶¶ 148-241.) As a matter of law, any attempt to impose an arbitration clause on URS fails because URS is not a party to the Contract, which governs Radian, a completely separate and individual entity. (Supra at 6-12.) Masefield AG v. Colonial Oil Indus., Inc., No. OS Civ. 2231 (PKL), 2005 WL 911770, at *6 (S.D.N.Y. Apr. 18, 2005), reached this conclusion on very similar facts.

In Masefield, plaintiffs' indirect subsidiary entered into a contract with defendant providing for arbitration with the ICC. Pursuant to the contract, defendant initiated arbitration with the ICC and named plaintiffs as parties to the arbitration in addition to plaintiffs' indirect subsidiaries. Plaintiffs objected to the ICC Court's jurisdiction; however, the ICC Court, just like in this case, determined that the issue of arbitrability should be resolved by the arbitral tribunal. See 2005 WL 911770, at *1. Plaintiffs then filed an action seeking to enjoin defendant from pursuing arbitration against them before the ICC. Id. Plaintiffs also requested judgment declaring that they have no agreement to arbitrate with defendant and are not bound to arbitrate with defendant. Id. The Masefield court granted preliminary injunctive relief, finding that the issue of arbitrability required judicial determination and holding that defendant presented no basis to bind the non-signatories to the arbitration agreement. Id. at *7. Masefield applies with full force here. See also Am. Life, 25 F. Supp. 2d at 479-80 (granting preliminary injunction against arbitration proceedings in the absence of evidence showing agreement to arbitrate). As Radian and URS are separate and distinct entities, and URS is a non-signatory to the Contract, Solidere's attempt to force URS to arbitrate must be enjoined.

18

**B.**    **Arbitrability Is a Question for the Courts, Not an Arbitrator**

The United States Supreme Court is clear that "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." AT&T Techs., 475 U.S. at 649, 651 ("The willingness of parties to enter into [arbitration] agreements ... would be 'drastically reduced' ... [if an] arbitrator had the 'power to determine his own jurisdiction.'"); see also First Options, 514 U.S. at 943 ("If ... the parties did not agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration."); Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83-84 (2002) ("a gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide"); Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 208 (1991) ("Whether or not a [party] ... is bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the court, and a party cannot be forced to 'arbitrate the arbitrability question.'"); Sandvik AB v. Advent Int'l Corp., Nos. Civ.A.99-486-RRM(SLR), Civ.A.02-143-SLR, 2002 WL 1268052, at *1 (D. Del. May 22, 2002) (Robinson, J.) ("a court must decide whether an agreement to arbitrate exists before it may order arbitration"); 9 U.S.C. § 4.[9]

Where, as here, a plaintiff is not a signatory to the arbitration agreement, only a court has power to compel plaintiff to arbitrate because the "clear and unmistakable" evidence to arbitrate arbitrability is lacking as a matter of law.[10] Masefield, 2005 WL 911770, at *2 (if plaintiffs did

---

[9]    This is true even if the arbitration panel has already made a determination as to jurisdiction and even if it ruled adversely to the non-signatory based on a finding of an alter ego status. Kaplan, 19 F.3d at 1520 ("neither this Court nor the district court is bound by the arbitrators' determination that [plaintiff] was the alter ego of [a signatory to arbitration agreement]. He is entitled to an independent judicial determination of that issue.") (citing Laborers' Int'l, 868 F.2d at 575-77); Sarhank, 404 F.3d at 662 ("district court was not, as a matter of law, bound by the arbitrators' determination of arbitrability on the part of [parent nonsignatory]"); Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 152-53 (3d 2001).

[10]    In such circumstances, the presumption under federal arbitration law favoring arbitration is inapplicable. Gen. Elec., 270 F.3d at 154 (where arbitrability is unclear, "law reverses the ordinary presumption of arbitrability. This approach reflects a reluctance to 'force unwilling parties to arbitrate a matter they reasonably would have thought a judge ... would decide'"). Accord Comer v. Micor, Inc., 436 F.3d 1098, 1104 n.11 (9th Cir. 2006) ("question here is not whether a particular

19

not sign arbitration agreement, there is no "clear and unmistakable evidence that plaintiffs agreed with defendant on any issue, much less the issue of arbitration"); First Options, 514 U.S. at 944; Am. Life, 25 F. Supp. 2d at 473-74 (parties did not agree to submit disputes for arbitration as plaintiff contested existence of agreement to arbitrate) (citing, inter alia, PaineWebber Inc. v. Hofmann, 984 F.2d 1372, 1376-77 (3d Cir. 1993), and United Steelworkers of Am. v. Lukens Steel Co., 969 F.2d 1468, 1473-74 (3d Cir. 1992)); Sarhank, 404 F.3d at 661-62 ("An agreement between [two other parties] which does not mention [the non-signatory] does not evidence a 'clear and unmistakable' intent by [the non-signatory] to arbitrate or to permit the arbitrator to decide the issue of arbitrability."); Laborers' Int'l, 868 F.2d at 576 ("[t]he requirement for a judicial determination of the obligation to arbitrate may not be circumvented ... by relying on the parent-subsidiary relationship" between the parties).

Absent proof of an arbitration agreement, URS is entitled to an injunction against arbitration because,"[i]f a court determines that a valid arbitration agreement does not exist or that the matter at issue clearly falls outside the substantive scope of the agreement, it is obliged to enjoin arbitration." PaineWebber, 921 F.2d at 511 (emphasis added).[11] This is especially true when the issue turns on an arbitrator's jurisdictional ruling in an international context. China Minmetals Materials Imp. & Export Co. v. Chi Mei Corp., 334 F.3d 274, 289 (3d Cir. 2003). As the China Minmetals court reasoned, "international law overwhelmingly favors some form of judicial review of an arbitral tribunal's decision that it has jurisdiction over a dispute." Id. This is because "a contract cannot give an arbitral body any power, much less the power to determine its own jurisdiction, if the parties never entered into it." Id. at 288.

---

issue is arbitrable, but whether a particular party is bound by the arbitration agreement. Under these circumstances, the liberal federal policy regarding the scope of arbitrable issues is inapposite."); Fleetwood Enters., Inc. v. Gaskamp, 280 F.3d 1069, 1073 (5th Cir. 2002) ("federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties; instead 'o]rdinary contract principles determine who is bound'"); Virginia Carolina Tools, Inc. v. Int'l Tool Supply, Inc., 984 F.2d 113, 117 (4th Cir. 1993) ("the presumption with respect to [arbitrability] runs the other way:  that except as clearly and unmistakably indicated in their contract, the parties did not intend to commit the very issue of the scope of arbitrability itself to arbitration."). This is because "arbitration is a matter of agreement; parties are bound to arbitrate only what they have agreed to arbitrate." Am. Life, 25 F. Supp. 2d at 474.

[11]      Delaware law also confers power to stay arbitration. 10 Del. C. § 5703(b) (1999).

Consistent with this logic, courts in this District and elsewhere have granted injunctive relief against foreign arbitration proceedings based on the lack of any agreement to arbitrate between the parties. See Masefield, 2005 WL 911770, at **6-8 (enjoining defendant from proceeding with ICC arbitration against plaintiffs – after the ICC Court decided in favor of arbitrability and referred the case to the arbitration tribunal – because plaintiffs, even though affiliated with one of the signatories to the arbitration agreement, never agreed to arbitrate with the defendant); accord Am. Life, 25 F. Supp. 2d at 479-80 (granting preliminary injunctive relief precluding foreign defendants from proceeding with international arbitration because of lack of agreement to arbitrate); Raytheon Eng'rs & Constructors, Inc. v. SMS Schloemann-Sieman Akiengesellschaft, No. 99 C 7771, 2000 WL 420866, at *3 (N.D. Ill. Mar. 16, 2000) (granting preliminary injunction against a foreign defendant, precluding the latter from proceeding with the ICC arbitration and ordering the defendant to withdraw its ICC arbitration request; "forcing a party to arbitrate a dispute that it has not agreed to arbitrate is irreparable harm"). This Court should do the same here and enjoin Solidere.

### C.    Solidere's Alter Ego And Vicarious Liability Theories Are Baseless and Provide No Basis to Force URS to Arbitrate Under the Contract

As URS never signed an arbitration agreement with Solidere, it cannot be compelled to arbitrate unless Solidere can establish an exception to the general rule that a non-signatory cannot be compelled to arbitrate. There are only a few narrow circumstances where a non-signatory can be bound to an arbitration agreement. None of those exceptions applies here.

The Third Circuit framed the issue presented here as follows, "[w]hen asked to enforce an arbitration agreement against a nonsignatory, we ask whether he or she is bound by that agreement under traditional principles of contract and agency law." Bel-Ray, 181 F.3d at 444; accord DuPont, 269 F.3d at 201-02 ("The distinction between signatories and non-signatories is important to ensure that short of piercing the corporate veil, a court does not ignore the corporate form of a non-signatory based solely on the interrelatedness of the claims alleged.").[12]

---

[12]    Although arbitrability is a question of federal arbitration law, Sarhank, 404 F.3d at 662, Gen. Elec., 270 F.3d at 154, whether a non-signatory party is bound by the arbitration agreement at all involves application of ordinary state law principles governing contract formation, even in the

21

To date, courts have found that the theories based on contract and agency law include only: veil-piercing/alter ego; estoppel; agency; incorporation by reference; and assumption. CTF Hotel Holdings, 2002 WL 1268049, at *2 n.1 (observing that "the court understands that an arbitration agreement may be enforced against a non-signatory under 'traditional principles of contract and agency law,' e.g., third party beneficiary, agency/principal, and equitable estoppel" and finding that "[n]one of these principles have been shown to be applicable to the facts of record") (citing DuPont); Bel-Ray, 181 F.3d at 446; Thomson-CSF, S.A. v. Am. Arb. Ass'n, 64 F.3d 773 (2d Cir. 1995)) Some courts discuss an intended third-party beneficiary theory. See DuPont, 269 F.3d at 196; InterGen N.V. v. Grina, 344 F.3d 134, 146 (1st Cir. 2003).

Of the six theories recognized by American courts as valid for purposes of binding a non-signatory to arbitration, Solidere has asserted only veil-piercing/alter ego, estoppel and assumption (or "implied assignment") theories. (See Compl., Ex. A (Arbitration Demand) ¶ 150.)[13] Each of these theories is discussed below and shown to be without merit.

### 1.    Veil-Piercing/Alter Ego.

#### (a)    Delaware courts do not pierce the corporate veil absent "exceptional circumstances," which are not present here

Solidere will not be able to establish that URS is the alter ego of Radian. As a decision of this District noted, "'[p]ersuading a Delaware court to disregard the corporate entity is a difficult task.'" LaSalle Nat'l Bank v. Perelman, 82 F. Supp. 2d 279, 295 (D. Del. 2000).

---

context of international arbitrations. Id., citing First Options, 514 U.S. at 944. As URS is a Delaware corporation, Delaware law determines whether its corporate veil may be pierced. It is axiomatic that the law of the jurisdiction of incorporation governs a corporation's internal affairs. CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 90 (1987) ("This beneficial free market system depends at its core upon the fact that a corporation - except in the rarest situations – *is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of its incorporation*.") (emphasis added); VantagePoint Venture Partners 1996 v. Examen, Inc., 871 A.2d 1108, 1112 (Del. 2005) ("internal affairs doctrine is a long-standing choice of law principle which recognizes that only one state should have the authority to regulate a corporation's internal affairs - the state of incorporation").

[13]    In addition to three theories recognized by American courts, Solidere also asserts that URS should be bound by Radian's arbitration agreement via "implied consent to the Contract" and "confusion"). (See Compl., Ex. A (Arbitration Demand) ¶ 150.) These are not cognizable theories under American law to force a non-signatory to arbitrate and thus have no application here for that reason. See Sarhank, 404 F.3d at 662 (specifying that the issue of arbitrability for purposes of binding a parent to its subsidiary's arbitration agreement is governed by American federal arbitration law).

Indeed, in Delaware, "[d]isregard of the corporate entity is appropriate only in <u>exceptional</u> <u>circumstances</u>." <u>Mobil Oil Corp. v. Linear Films, Inc.</u>, 718 F. Supp. 260, 268, 270 (D. Del. 1989) (emphasis added). <u>See also</u> <u>In re Phillips Petroleum Sec. Litig.</u>, 738 F. Supp. 825, 838 (D. Del. 1990) (the "courts of Delaware do not easily pierce the corporate veil," and that the "separate corporate existence will not be set aside merely on a showing of common management or whole ownership.").[14]

This is because Delaware courts require "[f]raud or something like it" to pierce the corporate veil. <u>Mobil Oil</u>, 718 F. Supp. at 268; <u>see also</u> <u>Wallace ex rel. Cencom Cable Income</u> <u>Partners II, Inc., L.P. v. Wood</u>, 752 A.2d 1175, 1183-84 (Del. Ch. 1999) (for a Delaware court to pierce the corporate veil, "[e]ffectively, the [dominated] corporation must be a sham and exist for no other purpose than as a vehicle for fraud"); <u>accord</u> <u>ACE & Co., Inc. v. Balfour Beatty</u> <u>PLC</u>, 148 F. Supp. 2d 418, 425 (D. Del. 2001) (Robinson, J.) ("In Delaware, to reach a parent corporation under the alter ego theory, the party asserting jurisdiction must establish some fraud, injustice, or inequity in the use of the corporate form."); <u>see generally</u> <u>Kaplan</u>, 19 F.3d at 1521 ("Not every disregard of corporate formalities or failure to maintain corporate records justifies piercing the corporate veil. That remedy is available <u>only if</u> it is also shown that a corporation's affairs and personnel were manipulated to such an extent that it became <u>nothing more than a</u> <u>sham</u> used to disguise the alter ego's use of its assets for his own benefit <u>in fraud of its</u> <u>creditors</u>.") (emphasis added). The fraud element must be shown by "clear and convincing evidence." <u>Id.</u> at 1522. This evidence must show that the corporation's owners abused the legal separation of a corporation from its owners and used the corporation for illegitimate purposes; "common management of two entities does not, by itself, justify piercing the corporate veil." <u>Trustees of Village of Arden v. Unity Constr. Co.</u>, No. C.A. 15025, 2000 WL 130627, at *3 (Del. Ch. Jan. 26, 2000).

---

[14]    As courts in this District recognize, the "so-called 'alter ego' theory is often used interchangeably with such expressions as 'disregarding the corporate entity' and 'piercing the corporate veil.'" <u>Mobil Oil</u>, 718 F. Supp. at 266 (citations omitted). URS treats these terms as interchangeable throughout this memorandum of law.

Courts uniformly acknowledge that forcing a nonsignatory to arbitrate on a veil-piercing theory is exceedingly difficult. See, e.g., Masefield AG, 2005 WL 911770, at *6 (enjoining ICC arbitration against affiliates of Swiss entity that had signed arbitration agreement; non-signatory affiliates' avowed membership of the same "'group' of companies" was immaterial); Kaplan, 19 F.3d at 1520-23 (affirming court's refusal to extend arbitration agreement to bind a non-signatory to the agreement on the alter ego grounds because plaintiff failed to establish that the signatory at issue was "'an artifice and a sham to execute illegitimate purposes and [an] abuse of the corporate fiction and immunity that it carries'").

Factors considered include whether the corporation was adequately capitalized for the undertaking; whether the corporation was solvent at the time; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder. See, e.g., Harper v. Delaware Valley Broadcasters, Inc., 743 F. Supp. 1076, 1085 (D. Del. 1990); Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc., 685 A.2d 724, 729 (Del. Super. Ct. 1996) ("the 'injustice' must be more than the breach of contract alleged in the complaint"); Little Switzerland, Inc. v. Destination Retail Holdings Corp., No. CIV. A. 98-315-SLR, 1999 WL 223496, at *10 (D. Del. Mar. 31, 1999) (Robinson, J.) (rejecting alter ego allegations because "plaintiff has not sufficiently 'show[n] fraud, injustice or inequity in the use of the corporate form' 'distinct from the tort alleged in the complaint'"), citing Sears, Roebuck & Co. v. Sears plc, 744 F. Supp. 1297, 1304-05 (D. Del. 1990) ("Any breach of contract and any tort ... is, in some sense, an injustice .... The underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping.").[15]

---

[15]    In Delaware, courts are reluctant to pierce the veil even when several of the above-cited factors are present. For example, in Harco National Insurance Company v. Green Farms, Inc., plaintiffs cited (1) a failure to follow corporate formalities, in particular, the failure to maintain adequate corporate records, (2) commingling of assets between shareholders and the corporation, and (3) undercapitalization. See Civ. A. No. 1131, 1989 WL 110537, at *6 (Del. Ch. Sept. 19, 1989). Even though the defendants in that case conceded that the corporate records were not

24

**(b)** **Solidere cannot establish that URS is Radian's "alter ego"**

**(i)** **URS Cannot Be Radian's Alter Ego On The Contract Because They Had No Relation To One Another When The Contract Was Signed**

As a threshold matter, Solidere cannot, as a matter of law, establish that URS was the alter ego of Radian under the Contract because the two entities <u>had no relationship with one another when the Contract was entered into</u>. (<u>See</u> Bishop Aff. ¶ 6; <u>cf.</u> Compl., Ex. A ¶ 154.) Since the theory of alter ego liability is that one company is being held liable for the acts of the other because the dominant corporation manipulated the subservient corporation and abused the corporate form to the detriment of the party claiming alter ego liability, it necessarily flows that there be some showing that the dominant corporation actually misused the corporate form in a way that caused harm to the injured party. <u>See, e.g.,</u> <u>Mobil Oil</u>, 718 F. Supp. at 269 ("law requires that fraud or injustice be found in the defendant's use of the corporate form" and noting that "the injured party must show some connection between its injury and the parent's improper manner of doing business – without that connection, even where the parent exercises dominion and control over the subsidiary, corporate separateness will be recognized"). Solidere admits that it seeks to bind URS to the arbitration provision in the Contract by showing that URS is Radian's alter ego. It therefore must show that URS abused the corporate form of Radian in a way that defrauded or caused injury to Solidere in terms of its rights to arbitration. URS had no relationship to Radian when Solidere negotiated the Contract. It follows that URS could not have abused the corporate form of Radian to Solidere's detriment.

<u>Tellium, Inc. v. Corning Incorporated</u>, No. 03 Civ. 8487 (NRB), 2004 WL 307238 (S.D.N.Y. Feb. 13, 2004), is instructive. In <u>Tellium</u>, a corporate parent that had acquired another company brought an action for declaratory and injunctive relief barring the defendant from attempting to force the parent to arbitrate disputes with defendant on contracts entered into by

---

properly maintained and that there was likely a commingling of assets, and the court even went as far as noting that "[s]uch glaring oversights seemingly present a good case for piercing the corporate veil," the court still refused to pierce the veil at that time. <u>Id.</u> (finding evidence insufficient to pierce corporate veil; noting, <u>inter alia</u>, that it was "unclear whether there was an actual commingling of assets" and whether transfers of assets to dominant shareholders "were done to defraud creditors or were done merely to siphon off corporate assets, rather than to repay outstanding loans").

25

the company acquired by the parent. The defendant argued in response that the parent was the alter ego of its subsidiary for purposes of enforcing the arbitration agreement. The district court rejected the argument because the parent had no relationship with the subsidiary when the agreement containing the arbitration agreement was executed:

> At the time of the transaction, there was absolutely no corporate relationship between the parties. Rather, Astarte and Tellium were functioning as two distinct corporations contemplating entering a business deal with each other. Such a relationship simply does not allow for the inference that Astarte was acting as Tellium's alter ego.

2004 WL 307238, at *7.

The Tellium court's conclusion flowed from the fact that the assessment of whether a parent is the alter ego of its subsidiary is measured as of the time of the disputed transaction, here the execution of the Contract containing the arbitration provision. At that time, there was absolutely no corporate relationship between Radian and URS. Thus, Solidere's alter ego theory must fail. See, e.g., Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145, 150 (3d Cir. 1988) ("The control which a parent must exercise over a subsidiary so as to warrant piercing the veil between them is more than 'mere majority or complete stock control;' instead it is 'complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own.'"); Fisser v. Int'l Bank, 282 F.2d 231, 238 (2d Cir. 1960) (same); accord Greene v. New Dana Perfumes Corp., 287 B.R. 328, 342-43 (D. Del. 2002) (rejecting alter ego claim where subsidiary had separate corporate existence at time in question); see also Fluorine On Call, Ltd. v. Fluorogas Ltd., 380 F.3d 849, 861-62 (5th Cir. 2004) (alter ego theory "presume[s] that the corporations are unified at the time of the wrongful act. It is illogical, for example, to hold a parent liable for controlling another corporation's debts when it had no control at the time the debts were incurred"); Morgan v. Powe Timber Co., 367 F. Supp. 2d 1032, 1035 (S.D. Miss. 2005) ("applicable law is clear that a parent corporation 'is not responsible for the pre-acquisition liabilities of its wholly-owned subsidiary'"); Ziegler v. Delaware County Daily Times, 128 F. Supp. 2d 790, 797 n.21 (E.D. Pa. 2001) (observing that evidence as to contacts and interrelations bearing on the corporate relationship between the

26

parent and subsidiary at a point in time after the events giving rise to the litigation was immaterial since the relevant question was the nature of the relationship of the companies at the time of the challenged activity).

(ii)    **URS And Radian Are And Have Been Legally Distinct Entities That Observe All Formalities**

Evaluating the foregoing factors confirms that URS and Radian are distinct legal entities that have operated independently and at arms-length.  Radian and URS observed separate legal formalities at all the relevant times.  (See supra at 9-10, citing Jones Aff. ¶¶ 5-6, Balfour Aff. ¶¶ 5-8.)  As former Chancellor Allen observed, this is a vital factor:

> Observation of appropriate formalities by those controlling a corporation is typically regarded as an important consideration because it demonstrates that those in control of a corporation treated the corporation as a distinct entity and had a reasonable expectation that the conventional attributes of corporateness, including limited liability, would be accorded to it.

Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 989 (Del. Ch. 1987).  At all relevant times, Radian was adequately capitalized for purposes of its performance under the Contract.  (See supra at 9-10.)  URS did not participate in the daily management, operations or business affairs of Radian, nor was Radian required to seek authorization from URS for ordinary business decisions or marketing activities.  (See supra at 9-10, citing Bishop Aff. ¶ 8.)  URS and Radian kept separate accounting, bookkeeping, and payroll systems, and did not engage in collective marketing.  (See supra at 10-11, citing Cuenca Aff. ¶¶ 2-5.)  URS did not control the selection and assignment of Radian's executive personnel.  (See supra at 10, citing Bishop Aff. ¶ 8.)  Nor did Radian act as an agent for URS in business transactions.  (Id.)

Furthermore, as described above, Radian's performance under the Contract was, for the large part, an independent undertaking.  (See supra at 10-12 (citing evidence establishing Radian's independent operations in Lebanon).)  Radian is registered in Lebanon in its own name; there are bank accounts, branch tax returns, customs receipts, social security certificates, work permits, phone services and multiple other vendor services billed directly to Radian, and vehicle registrations and permits attesting to its independence.  (See supra at 10-12.)  There are also numerous documents establishing that Radian, and not URS, owns the equipment used on the project and holds insurance for the project in its own name.  (See supra at 12.)  As the

27

evidence shows, all of the Radian employees working at the Normandy Landfill were paid directly by Radian, and all the subcontractors involved at the site were hired and paid by Radian, and none have any contractual relationship with URS. (See supra at 11.) Furthermore, the executives working on the Project understood that they were performing all their duties in Radian's name alone. (See supra at 11.) Finally, as the minutes for the Project's weekly progress meetings held by Solidere's construction manager clearly demonstrate, it was Radian, not URS, that undertook all the actual tasks in connection with performance of the Works under the Contract. (See supra at 12.)

Here, Solidere cannot prove that URS is the alter ego of Radian because URS and Radian operate as separate and distinct entities. (See supra at 6-12, citing, inter alia, Jones Aff. ¶¶ 5-6 and Balfour Aff. ¶¶ 5-8 (attesting to facts showing that URS and Radian are separate and independent companies, observing all the necessary formalities).) The sort of allegations by Solidere against URS in the Arbitration Demand for alter ego purposes was found insufficient in Masefield to extend the arbitration agreement to the non-signatory affiliate.[16] Thus, the Masefield court was unpersuaded that the non-signatory affiliate's receipt of all inquiries on behalf of the signatory affiliate under the Contract and the self-described "group of companies" structure formed by the non-signatory with the signatory affiliate, taken together with unchallenged declarations on behalf of the companies attesting that they were indeed separate and independent, could show that the non-signatory exercised dominance over the signatory affiliate for the purpose of harming defendant or that there was a "'virtual abandonment of separateness'" between the affiliates at issue. See 2005 WL 911770, at **5-6.

### (iii)   The "Facts" Alleged By Solidere Are Both Factually Incorrect And Legally Irrelevant

Solidere asserts that Radian lacks "independence" from URS through inaccurate allegations, presented in an incomplete and misleading manner, and/or are irrelevant as a matter of law. First, Solidere charges that Radian is a wholly-owned subsidiary of URS (Compl., Ex. A

---

[16]    Although the Masefield court applied New York law, Delaware law on the issue is not materially different. See Wausau Bus. Ins. Co. v. Turner Constr. Co., 141 F. Supp. 2d 412, 417 (S.D.N.Y. 2001) ("the standards for piercing the corporate veil are substantially similar under Delaware and New York law").

(Arbitration Demand) ¶¶ 153-155), but the mere fact that a subsidiary is wholly-owned by a parent corporation is insufficient as a matter of law to justify treating the two companies as alter egos.[17] Solidere also alleges, wrongly, that Radian "has been operationally merged into URS" (id. ¶ 155), though the use of shared services is also insufficient as a matter of law to pierce the corporate veil.[18] Second, Solidere alleges that Radian does not have its own office space (id. ¶¶ 156-162), yet even if Solidere's allegations were true, the fact that a subsidiary shares office space with its corporate parent is irrelevant as a matter of law.[19] Third, Solidere's claim that URS purportedly receives and pays money for Radian is unavailing (id. ¶¶ 163-164), as the fact that a parent corporation receives monies from its subsidiary's business or that the parent loans money to its subsidiary is insufficient to establish an alter ego relationship.[20] Fourth, Solidere

---

[17]    See, e.g., In re Phillips Petroleum Sec. Litig., 738 F. Supp. at 838  (the "separate corporate existence will not be set aside merely on a showing of common management or whole ownership").

[18]    See, e.g., Pearson v. Component Tech. Corp., 247 F.3d 471, 485 (3d Cir. 2001) ("courts have refused to pierce the veil even when subsidiary corporations use the trade name of the parent, accept administrative support from the parent, and have a significant economic relationship with the parent"); In re Acushnet River & New Bedford Harbor Proceedings, 675 F. Supp. 22, 34 (D. Mass. 1987) (declining to pierce veil despite myriad shared services between parent and subsidiary).

[19]    See, e.g., Savin Corp. v. Heritage Copy Prods., Inc., 661 F. Supp. 463, 471 (M.D. Pa. 1987), citing Croyle v. Texas E. Corp., 464 F. Supp. 377, 379 (W.D. Pa. 1979); accord Ne. Power Co. v. Balcke-Durr, Inc., 49 F. Supp. 2d 783, 788 (E.D. Pa. 1999) (rejecting alter ego allegations against German parent, even though parent and subsidiary shared office space, telephone and facsimile lines, and officers, and subsidiary's employees corresponded with utility on parent's letterhead); Action Mfg. Co., Inc. v. Simon Wrecking Co., 375 F. Supp. 2d 411, 418, 425 (E.D. Pa. 2005) (noting that parent and subsidiary "share the same Florida office space, mailing address, and phone number and the same website," but rejecting alter ego allegations); cf. Everitt v. Dover Downs Entm't, Inc., No. CIV. A. 98-6116, 1999 WL 374163, at *4 n.1 (E.D. Pa. June 9, 1999) ("Pennsylvania and Delaware apply similar standards to decide when to pierce the corporate veil").

[20]    See Pearson, 247 F.3d at 486-88; Fletcher v. Atex, Inc., 68 F.3d 1451, 1459-60 (2d Cir. 1995) (rejecting allegations of alter ego relationship between subsidiary and parent, despite subsidiary's use of a cash management system, holding that "'Atex's participation in Kodak's cash management system is consistent with sound business practice and does not show undue domination or control'") (applying Delaware law); In re Acushnet River, 675 F. Supp. at 34 (declining to pierce veil under federal common law despite the centralized cash management system employed by the parent, loan guarantees provided by the parent, parent loaned money to the subsidiary, parent required subsidiary to seek approval for large expenditures, subsidiary submitted financial reports to parent); Upjohn Co. v. Syntro Corp., No. CIV. A. 89-107-JJF, 1990 WL 79232, at *5 (D. Del. Mar. 9, 1990) (rejecting alter ego claims based on, among other things, subsidiary's use of consolidated financials); Masefield, 2005 WL 911770, at **4-6 (rejecting argument that a non-signatory affiliate's receipt of all inquiries and payments on behalf of the signatory affiliate under the Contract and the self-described "group of companies" structure formed by the non-signatory with the signatory affiliate, taken together with evidence showing that the two

29

alleges that Radian's employees are supposedly transferred to URS (id. ¶¶ 165-167), but all of the employees working on the Project are either Radian employees, or are both URS and Radian employees, and are treated as Radian employees when working on the Project. (See supra at 11.) Finally, Solidere's claim that URS advertises Radian as part of URS is irrelevant.[21]  (Compl., Ex. A ¶¶ 168-170.)

Solidere also incorrectly suggests that URS directly involved itself in the performance of the Contract, and that this is evidence of alter-ego status. First, Solidere asserts that Radian used URS's letterhead; however, references in Radian correspondence to its affiliation with URS are insufficient as a matter of law to treat the two separate companies as one and the same.[22] Second, Solidere alleges that URS held itself out as the Contracting party on the Project (id. ¶¶ 183-219); yet allegations that one company held itself out as involved in its affiliate's activities are irrelevant as a matter of law.[23] Third, Solidere asserts that "[t]he Contract was performed by URS," alleging that various Radian employees also held titles with URS (id. ¶¶ 187-202); however, allegations that URS lent certain employees to the Project on a consulting or limited

---

companies were separate and independent, could show that the non-signatory exercised dominance over the signatory affiliate for the purpose of harming defendant or that there was a "virtual abandonment of separateness" between the affiliates at issue) (Compare Compl., Ex. A ¶¶ 163-164, 216-219 (alleging that URS received payments under the Contract on behalf of Radian).)

[21]    See, e.g., Pearson, 247 F.3d at 485-86 ("courts have refused to pierce the veil even when subsidiary corporations use the trade name of the parent . . ."); Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., Civ. A. No. 89-C-SE-35, 1995 WL 411795, at **1-2 (Del. Super. Ct. Mar. 31, 1995) (refusing to acknowledge use of joint letterhead as sufficient evidence of corporate control or corporate closeness, even under the "less burdensome test" than alter ego, as it merely demonstrates affiliation between the companies); Gruca v. Alpha Therapeutic Corp., 19 F. Supp. 2d 862, 867-68 (N.D. Ill. 1998) (marketing references to "our" projects and "our operations," which included subsidiary's projects, do not establish alter ego liability).

[22]    See, e.g., Hoechst, 1995 WL 411795, at *2 (use of joint letterhead did not suffice to establish corporate control, as it merely demonstrates affiliation between the companies); Pearson, 247 F.3d at 485-86 (observing that "courts have refused to pierce the veil even when subsidiary corporations use the trade name of the parent . . ."); Action Mfg. Co., 375 F. Supp. at 418, 425.

[23]    See, e.g., Gruca, 19 F. Supp. 2d at 867-68; Upjohn, 1990 WL 79232, at *5 (plaintiff "establishes merely a normal, legitimate parent-subsidiary relationship and has not demonstrated that [parent] exercises such complete domination and control over [subsidiary] that would warrant disregard of the separate corporate entities" despite allegations that parent corporation referred to subsidiary's product as its own in various public filings); Akzona Inc. v. E.I. Du Pont De Nemours & Co., 607 F. Supp. 227, 237-38 (D. Del. 1984) (same); LaSalle Nat'l Bank v. Vitro, 85 F. Supp. 2d 857, 865 (N.D. Ill. 2000) (alter ego/veil piercing analysis cannot be based on how the company presents itself, but must be grounded on how the company actually operates).

basis,[24] or that an individual is a director, officer or employee of both a corporation and its

subsidiary, [25] or that a representative of both companies carelessly interchanged the two in

certain documents,[26] does not establish that the two entities are alter egos of one another. Fourth,

Solidere alleges that URS purportedly was involved in the Prior Arbitration, based solely on the

fact that employees holding titles in both companies negotiated the agreement, and that they

shared in-house legal representation. As discussed above, however, a subsidiary can share

resources, including legal departments, without becoming an alter ego of its parent (supra at 29

n.18).[27] Thus, URS plainly had and continues to have a right to monitor the proceedings between

Solidere and Radian because they directly impact the value of URS's investment (i.e., the money

---

[24]     Gruca, 19 F. Supp. 2d at 869 (no alter ego based on joint performance of investigation).

[25]     See United States v. Bestfoods, 524 U.S. 51, 69 (1998) ("'[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts.' [ ] This recognition that the corporate personalities remain distinct has its corollary in the 'well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do "change hats" to represent the two corporations separately, despite their common ownership.'").

[26]     See Corporate Safe Specialists, Inc. v. Tidel Techs., Inc., No. 05 C 3421, 2005 WL 1705826, at *5 (N.D. Ill. July 15, 2005) (no probative value in "inexact statements" by parent corporation in reference to subsidiary in various documents and filings); Ministry of Defense of Islamic Republic of Iran v. Gould, Inc., 969 F.2d 764, 769-70 (9th Cir. 1992) (rejecting alter ego allegations, despite the following evidence: two documents incorrectly referred to subsidiary as division of corporation, modification to one contract of subsidiary was signed by official of parent corporation, application for export license for subsidiary was completed by parent corporation, and corporation and subsidiary were represented by same attorneys); Upjohn Co., 1990 WL 79232, at *5 (rejecting alter ego allegations despite reference by parent to subsidiary's products as its own); Akzona, 607 F. Supp. at 237-38 (rejecting alter ego claims where parent referred to subsidiary as a "division," referred to subsidiary's projects as its own in public filings, and where parent directly supervised subsidiary's activities).

[27]     A parent is permitted to supervise and monitor its subsidiary and appropriate monitoring would include: "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures[.]" BestFoods, 524 U.S. at 72 (parent corporation can monitor the activities of its subsidiary so long as that involvement is "consistent with the parent's investor status."). Accord Doe v. Unocal Corp., 248 F.3d 915, 926 (9th Cir. 2001); Mobil Oil, 718 F. Supp. at 266-67 (holding that the facts were "insufficient for the alter ego theory to operate to pierce the corporate veil" where the parent corporation guaranteed certain debts of its subsidiary, used its own bank account to pay for some of its subsidiary's debts, shared common officers and directors, and "approved the hiring and salaries of officers of the [subsidiary], as well as other major expenditures and policies involving the subsidiary."); Grasty v. Michail, No. Civ. A. 02C-05-89 CLS, 2004 WL 396388, at *2 (Del. Super. Ct. Feb. 24, 2004) (commenting that the "court is reluctant to take the extreme measure of 'piercing the corporate veil'" where the parent corporation controlled the budgeting and funding of its subsidiary).

it invested to purchase Radian's corporate parent). In sum, Solidere cannot show anything more than a routine relationship between a parent and its corporate subsidiary.

(c)    <strong>Solidere does not allege, and cannot prove, that Radian was a sham existing solely as a vehicle for fraud</strong>

As noted above, a prerequisite to a finding of alter ego liability under American law is that the parent corporation engaged in "[f]raud or something like it." <u>Mobil Oil</u>, 718 F. Supp. at 268.  Under Delaware law, to pierce the corporate veil, "[e]ffectively, the [dominated] corporation must be a sham and exist for no other purpose than as a vehicle for fraud." <u>Wallace</u>, 752 A.2d at 1183-84; <u>Mobil Oil</u>, 718 F. Supp. at 269 ("The law requires that fraud or injustice be found in the defendant's use of the corporate form" and noting with approval that "the injured party must show some connection between its injury and the parent's improper manner of doing business – without that connection, even where the parent exercises dominion and control over the subsidiary, corporate separateness will be recognized").

Despite this threshold requirement, and despite spending eighty-six pages making all manner of allegations in its Arbitration Demand, Solidere did not make <u>any</u> allegations to show that Radian existed "for no other purpose than as a vehicle for fraud."  One can assume, given that Solidere has had seven years to develop the argument, that if a basis existed to make such an allegation, then Solidere would have done so.  That it could not make such allegations proves that there is no basis to allege, much less to litigate, alter ego issues in this proceeding.  Because there is no hint of any fraud or injustice in URS's relationship with Radian and its dealings with Solidere, URS cannot be forced into arbitration based on an alter ego theory.

2.    <u>Estoppel</u>

There are two theories of equitable estoppel in the context of compelling non-signatories to arbitration agreements to submit to arbitration; neither applies here to help Solidere.  "First, courts have held non-signatories to an arbitration clause when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement." <u>DuPont</u>, 269 F.3d at 199 (citing <u>Thomson-CSF</u>, 64 F.3d at 778).  The Third Circuit expressly cautioned that, under the first estoppel theory, "we must be careful about disregarding the corporate form and treating a non-signatory like a signatory." <u>DuPont</u>, 269 F.3d at 201.  To

32

this end, the Second Circuit in <u>Thomson-CSF</u> found that the non-signatory's acquisition of a party to a contract conferred upon the non-signatory only an <u>indirect</u> benefit that was insufficient to invoke equitable estoppel; there was no <u>direct</u> benefit derived by the non-signatory from the contract itself. <u>See</u> 64 F.3d at 779. URS also derived no direct benefit from the Contract. Like the non-signatory in <u>Thomson-CSF</u>, the only benefit to URS was its purchase of Radian, an "indirect benefit insufficient to invoke equitable estoppel." <u>DuPont</u>, 269 F.3d at 200, citing <u>Thomson-CSF</u>, 64 F.3d at 779. <u>See also</u> <u>Masefield</u>, 2005 WL 911770, at *4 (rejecting attempt to extend arbitration agreement to non-signatory based on estoppel, despite the signatory affiliate's compensation under the contract flowing directly to the non-signatory; finding that payments to the non-signatory were in satisfaction of unrelated debts, and "[t]hough [the non-signatory] may be taking advantage of [the signatory affiliate]'s agreement with defendant to secure repayment of [the signatory affiliate]'s prior obligations, any benefit derived from it is indirect").

"Second, courts have bound a signatory to arbitrate with a nonsignatory at the nonsignatory's insistence because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations." <u>DuPont</u>, 269 F.3d at 199-200 (citations omitted, internal quotation marks omitted). This theory of estoppel, however, is inapplicable where the nonsignatory seeks to avoid arbitration, rather than compel it. <u>Id.</u> at 202; <u>see also</u> <u>Masefield</u>, 2005 WL 911770, at *3 n.3. Here, because URS seeks to avoid arbitration, this second theory of estoppel does not apply as a matter of law.

### 3.    <u>Assumption of Contractual Obligations</u>

Absent a signature on a contract containing an arbitration provision, a party may be bound by an arbitration clause if its subsequent conduct "manifest[s] an intention" to assume the obligation to arbitrate. <u>Thomson-CSF</u>, 64 F.3d at 777; <u>accord</u> <u>Creditors' Comm. of Essex Builders, Inc. v. Farmers Bank</u>, 251 A.2d 546, 548-49 (Del. 1969) ("A contract will be implied in fact only when the Court may fairly infer such an intent from the evidence; it represents the

presumed intention of the parties as indicated by their conduct."); <u>Chase Manhattan Bank v.</u> <u>Iridium Africa Corp.</u>, 239 F. Supp. 2d 402, 408, 411 (D. Del. 2002) (to imply assent to contract from conduct, "the parties' mutual assent to the contract terms must be objectively manifest or shown. Mutual assent is neither a subjective nor personal understanding").

URS has never manifested an intent to be bound by the arbitration agreement (or the Contract in general, for that matter). To the contrary, URS has consistently maintained its position that it is <u>not</u> bound to any arbitration agreement with Solidere. Although Solidere appears to argue that URS's involvement in the project (by loaning certain employees to Radian for a fee and for monitoring Radian's involvement in the Prior Arbitration) somehow manifested its assumption of the Contract's obligations, Solidere could not have relied on any such purported manifestation, as Solidere was expressly told when URS acquired Dames & Moore that Radian's relationship with Solidere and performance under their Contract <u>would not change</u> and Radian would continue to operate as an independent entity separate from URS. (<u>Supra</u> at 7-8.) Solidere was aware that the Prior Arbitration involved only two parties – itself and Radian. (<u>See</u> Russell Decl., Ex. 27.) Thus, any argument that Solidere could have relied on the purported assumption based on URS's extending its resources to assist Radian on the project or monitoring proceedings in the Prior Arbitration is plainly unreasonable. In any event, the Contract expressly precludes Solidere from relying on the claimed assumption of contract. This is because the Contract provides that Radian "shall not assign this Contract or any part thereof, without the prior Approval of [Solidere]." (Compl., Ex. B (GCC) ¶ 6.1.) Under the Contract, "'[a]pproval' means approved in writing, including subsequent written confirmation of previous verbal approval." (<u>Id.</u> ¶ 1.1.) As Solidere has not provided any such approval, it could not rely on the purported assumption of the Contract by URS.

*    *    *

As there is no basis for forcing URS into arbitration with Solidere, URS is likely to succeed on the merits of its claim for a declaration that it need not arbitrate with Solidere.

34

### III.    URS WILL SUFFER IRREPARABLE HARM *PER SE*

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." Masefield, 2005 WL 911770, at *6 (finding irreparable harm based on defendant's proceeding with arbitration against plaintiffs, where plaintiff never agreed to arbitrate with defendant), citing Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990). Analysis of this factor is simple in this case because "[t]he Third Circuit recognizes a party is irreparably harmed as a matter of law if forced to arbitrate a matter that it has not agreed to arbitrate." Am. Life, 25 F. Supp. 2d at 479 (emphasis added). As the Third Circuit explained in affirming a preliminary injunction like the one sought here that enjoined an arbitration against a party that never signed an arbitration agreement:

> [W]e think it obvious that the harm to a party would be *per se* irreparable if a court were to abdicate its responsibility to determine the scope of an arbitrator's jurisdiction and, instead, were to compel the party, who has not agreed to do so, to submit to an arbitrator's own determination of his authority.

See PaineWebber, 921 F.2d at 515.[28]

Because of the Supreme Court's consistent teaching that a party contesting arbitrability is entitled to first submit the issue for judicial determination, harm to the moving party is

---

[28]    The Third Circuit's conclusion is endorsed by an avalanche of decisions in other courts. See, e.g., Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations, 107 F.3d 979, 985 (2d Cir. 1997); Masefield, 2005 WL 911770, at *6; Tellium, Inc. v. Corning Inc., No. 03 Civ. 8487(NRB), 2004 WL 1403297, at *4 (S.D.N.Y. June 22, 2004) ("[c]ompelling arbitration of a matter not properly subject to arbitration constitutes 'per se irreparable harm'"); see also McLaughlin Gormley King Co. v. Terminix Int'l Co. L.P., 105 F.3d 1192, 1194 (8th Cir. 1997) ("If a court has concluded that a dispute is non-arbitrable, prior cases uniformly hold that the party urging arbitration may be enjoined from pursuing what would now be a futile arbitration, even if the threatened irreparable injury to the other party is only the cost of defending the arbitration and having the court set aside any unfavorable award."); Invitrogen Corp. v. Employers Ins. Co. of Wausau, No. 06-232-PHX-MHM, 2006 WL 381666, at *1 (D. Ariz. Feb. 16, 2006) (granting preliminary injunction to enjoin arbitration after presuming irreparable injury); Medtronic, Inc. v. ETEX Corp., No. Civ 04-1355 ADM/AJB, 2004 WL 768945, at *2 (D. Minn. Apr. 12, 2004) (noting and following "the proposition, expressed in multiple decisions, that the injury to a party who is forced to submit to arbitration when it did not agree to do so constitutes per se irreparable harm"); Graham v. Smith, 292 F. Supp. 2d 153, 159 (D. Me. 2003); Raytheon Engineers, 2000 WL 420866, at *3 ("forcing a party to arbitrate a dispute that it has not agreed to arbitrate is irreparable harm"); Chicago Sch. Reform Bd. of Tr. v. Diversified Phar. Serv., Inc., 40 F. Supp. 2d 987, 996 (N.D. Ill.,1999) ("The court therefore finds that sending this case to arbitration would cause the Board irreparable harm."); United States for Use & Benefit of Capital Elec. Constr. Co., Inc. v. Pool and Canfield, Inc., 778 F. Supp. 1088, 1092 (W.D. Mo. 1991) ("It would be irrational to hold that there is no irreparable harm in forcing a party to be subjected to the cost and hardship of a meaningless proceeding simply because it could be later reviewed by a proper forum.").

considered *per se* irreparable if the arbitration proceeds before the issue is resolved. <u>See</u> <u>PaineWebber</u>, 921 F.2d at 514-15; <u>accord</u> <u>McLaughlin Gormley King Co. v. Terminix Int'l Co.</u> <u>L.P.</u>, 105 F.3d 1192, 1194 (8th Cir. 1997) (recognizing that the incident expense of participating in a potentially futile exercise of arbitral jurisdiction is irreparable injury); <u>Maryland Cas.</u>, 107 F.3d at 985 ("[T]he time and resources [plaintiff] would expend in arbitration is not compensable by any monetary award of attorneys' fees or damages pursuant to the provisions of the [arbitration] Agreement or the Arbitration Act."). Unless Solidere is enjoined from improperly attempting to force URS into arbitration, URS will be irreparably damaged. Solidere's actions threaten to harm URS by subjecting URS to the burden, expense and inconvenience of a meritless attempt to include it in arbitration.

URS has no adequate remedy at law. Relief is sought by way of preliminary injunction because the ICC already has determined to allow the issue of arbitrability to proceed to be resolved by the three-person arbitration panel. (<u>See</u> Russell Decl., Ex. 31.) There is no extreme urgency, however, because the arbitration panel was constituted only last week, and there are not even any hearings scheduled. At present URS does not believe that a hearing on arbitrability even will be set this calendar year. However, absent a preliminary injunction barring Solidere from proceeding with its arbitration proceedings against URS, there is a risk that Solidere's claims against URS in the ICC Arbitration will progress to a stage where URS's rights potentially might be compromised.

## IV.    <u>SOLIDERE WILL SUFFER NO INJURY IF AN INJUNCTION ISSUES</u>

One of the factors considered in the Third Circuit in deciding whether to issue a preliminary injunction is whether the defendant will suffer irreparable injury if an injunction issues. <u>See</u> <u>Opticians Ass'n</u>, 920 F.2d at 191-92; <u>Am. Life</u>, 25 F. Supp. 2d at 479. Here, Solidere will suffer no injury whatsoever if an injunction issues.

<u>First</u>, as Solidere only seeks money damages in its Arbitration Demand (<u>see</u> Compl., Ex. A (Arbitration Demand) ¶ 269 (prayer for damages, attorneys' fees and costs)), it will suffer no harm from a temporary injunction. <u>See, e.g.</u>, <u>Tellium</u>, 2004 WL 307238, at *8 ("The granting

of a preliminary injunction would thus harm no interest of [defendant], who seeks money damages only.").

Second, Solidere is not without a remedy as it may continue to arbitrate its claim against Radian. See Masefield, 2005 WL 911770, at *7 (finding "the balance of hardships tips decidedly in plaintiffs' favor here, as defendant should not be permitted to compel two non-signatories to arbitrate under the Contract without a clear basis in the law. Meanwhile, defendant is not left without a remedy as it may continue to pursue its claim in arbitration against [plaintiffs' affiliate]."); Am. Life, 25 F. Supp. 2d at 479 (finding no harm to enjoined defendant where that party could continue to arbitrate claims properly before arbitrator and only was enjoined from arbitrating claims that had not been submitted to arbitration).

Third, because the arbitration panel was fully constituted only last week, has not scheduled any hearings, and does not even expect to hold the first organizational meeting until December, the issuance of an injunction will have no impact on Solidere even if the injunction were wrongly issued. Indeed, given that it is unlikely that there will even be a preliminary hearing before the ICC arbitration panel on arbitrability until next year it is entirely likely that this case could be concluded before a hearing even occurred on a normal schedule.

Fourth, because Solidere has no contractual right to arbitrate with URS, but instead seeks to invoke vicarious liability theories, Solidere has no contractual or other reasonable right or expectation that it may arbitrate against URS. To the contrary, as established above, Solidere plainly either knew or should have known that any effort to force URS to arbitrate should have been litigated in an American court, not before a French arbitrator.

## V.    PUBLIC POLICY FACTORS STRONGLY FAVOR AN INJUNCTION

The final factor considered by courts in considering whether to issue a preliminary injunction is the public interest. See, e.g., Olde Discount, 805 F. Supp. at 1136; Am. Life Ins., 25 F. Supp. 2d at 473. This factor strongly favors URS's position and the issuance of a preliminary injunction. As shown above, there are a number of public policy considerations that are fostered by the issuance of an injunction here. The American Life court addressed this very issue and held that:

37

The Third Circuit recognizes "[i]f a court determines that a valid arbitration agreement does not exist or that the matter at issue clearly falls outside of the substantive scope of the agreement, it is obliged to enjoin arbitration." PaineWebber, 921 F.2d at 511. Allowing arbitrators to decide whether the parties agreed to submit a dispute to arbitration absent express agreement by the parties to this effect goes against "the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration. . . ." First Options of Chicago, Inc., 514 U.S. at 945, 115 S. Ct. 1920. Accordingly, the court finds it is in the public interest to issue a preliminary injunction preventing the defendants from arbitrating disputes arising under the General Release Agreement.

25 F. Supp. 2d at 479. See also Raytheon, 2000 WL 420866, at *3 ("public interest is not served by needlessly barring access to the courts"); Sarhank, 404 F. 3d at 662 (denying an American corporation a hearing under American law before binding a non-signatory to an arbitration agreement "would defeat the ordinary and customary expectations of experienced business persons"; recognizing American doctrine of corporate separateness; concluding that "[t]he practice of dealing through a subsidiary is entirely appropriate and essential to our nation's conduct of foreign trade").

## CONCLUSION

For the foregoing reasons, this Court should grant a preliminary injunction, enjoining Solidere from forcing URS into arbitration proceedings before the ICC.

Respectfully submitted,

/s/ Edward B. Micheletti
Edward P. Welch (I.D. No. 0671)
Edward B. Micheletti (I.D. No. 3794)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

Of Counsel:

Attorneys for Plaintiff URS Corporation

Jeffrey H. Dasteel
Jason D. Russell
Marina V. Bogorad
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
300 S. Grand Avenue, 34th Floor
Los Angeles, CA 90071
Tel: (213) 687-5000
Fax: (213) 678-5600

DATED: October 23, 2006

## **CERTIFICATE OF SERVICE**

I, Edward B. Micheletti, hereby certify that on October 23, 2006, the Motion for a

Preliminary Injunction Enjoining Arbitration, Statement Pursuant to Local Rule 7.1.1, proposed

Order for Preliminary Injunction, Opening Brief in Support thereof, and the Affidavit of David

Balfour, Affidavit of Thomas W. Bishop, Affidavit of Amine Bou Onk, Affidavit of Alberto

Cuenca and Affidavit of Kristin L. Jones were served electronically on the following counsel of

record:

VIA CM/ECF

Samuel A. Nolen, Esquire
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

/s/ Edward B. Micheletti
Edward B. Micheletti (I.D. No. 3794)
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

474145-Wilmington Server 1A - MSW