# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| URS CORPORATION, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 06-415 (SLR) |
| | ) |
| v. | ) |
| | ) **REDACTED VERSION** |
| THE LEBANESE COMPANY FOR THE | ) **FILED MARCH 2, 2007** |
| DEVELOPMENT AND | ) |
| RECONSTRUCTION OF BEIRUT | ) |
| CENTRAL DISTRICT SAL, a/k/a | ) |
| SOLIDERE, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

## PLAINTIFF URS CORPORATION'S OPPOSITION TO DEFENDANT SOLIDERE'S MOTION TO DISMISS THE COMPLAINT

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Edward P. Welch (#0671)
Paul J. Lockwood (#3369)
Edward B. Micheletti (#3794)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
(302) 651-3000

Attorneys for Plaintiff URS Corporation

Of Counsel:

Jeffrey H. Dasteel
Jason D. Russell
Stacy Horth-Neubert
Marina V. Bogorad
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
300 S. Grand Avenue
34th Floor
Los Angeles, CA  90071
(213) 687-5000

DATED: February 23, 2007

## REDACTED VERSION FILED MARCH 2, 2007

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

NATURE AND STAGE OF PROCEEDING

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.    SOLIDERE HAS SUFFICIENT CONTACTS WITH THE UNITED
      STATES FOR THE COURT TO EXERCISE PERSONAL
      JURISDICTION OVER  IT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.    Solidere's Contacts with the United States in Connection with
            the Underlying Dispute are Sufficient to Confer Specific
            Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      B.    Solidere's Contacts with the U.S. Confer General
            Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      C.    Exercise of Personal Jurisdiction Over Solidere Comports
            Comports With the Principles of Fair Play and Substantial
            Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

II.   THIS COURT HAS JURISDICTION OVER SOLIDERE
      UNDER THE FSIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      A.    Jurisdiction Exists Because Solidere Is an Organ of the
            State of Lebanon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

            1.    Solidere's Creation and Purpose . . . . . . . . . . . . . . . . . . 24

                  (a)    Lebanon's Supervision of Solidere . . . . . . . . . . . 24

                  (b)    Lebanon's Financial Support of Solidere . . . . . . 25

i

              (c)     Solidere's Privileges Under Lebanon's Laws . . . 25

              (d)     The Ownership Structure Of Solidere  . . . . . . . . 26

       2.     Solidere is Subject to Suit As It Falls Under Several
            FSIA Exceptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

              (a)     Solidere Waived FSIA Immunity By Agreeing
                     To Arbitrate in France . . . . . . . . . . . . . . . . . . . . 26

              (b)     Solidere's Commercial Activities Abrogate
                     Its Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

              (c)     Solidere's Agreement to Arbitrate the Contract
                     Deprives It Of Immunity From Jurisdiction
                     Under FSIA  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    B.     This Court Has Personal Jurisdiction Over Solidere
          Under the FSIA  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

III.   SOLIDERE FAILED TO CARRY ITS HEAVY FORUM NON
      CONVENIENS BURDEN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    A.     The ICC Cannot Be A Forum, Let Alone An Adequate
          Forum, for This Dispute  . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    B.     URS's Decision to Sue in Its State of Incorporation is
          Due Substantial Deference . . . . . . . . . . . . . . . . . . . . . . . . 31

    C.     The Private Interest Factors Strongly Favor Retaining
          Jurisdiction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    D.     The Private Interest Factors Weigh Heavily Against
          Dismissal Here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

IV.   SOLIDERE'S EQUITABLE ESTOPPEL ARGUMENT
      IS BASELESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S):**

<u>Adams v. Unione Mediterranea Di Sicurta,</u>
        364 F.3d 646 (5th Cir. 2004)  ................................................................  18

<u>ADE Corp. v. KLA-Tencor Corp.,</u>
        138 F. Supp. 2d 565 (D. Del. 2001)  ......................................................  33

<u>Alco Standard Corp. v. Benalal,</u>
        345 F. Supp. 14 (E.D. Pa. 1972)  ............................................................  14

<u>American Life Insurance Co. v. Parra,</u>
        25 F. Supp. 2d 467 (D. Del. 1998)  ..................................................  31, 39

<u>American Bio Medica Corp. v. Peninsula Drug Analysis Co.,</u>
        No. Civ. A. 99-218-SLR, 1999 WL 615175 (D. Del. Aug. 3, 1999)  ...............  19, 20

<u>American Cyanamid Co. v. Picaso-Anstalt,</u>
        741 F. Supp. 1150 (D.N.J. 1990)  .....................................................  31, 35

<u>Amirhour v. Marriott International Inc.,</u>
        No. C 06-01676, 2006 WL 3499241 (N.D. Cal. Dec. 4, 2006)  ...........................  31

<u>Amtrol, Inc. v. Vent-Rite Valve Corp.,</u>
        646 F. Supp. 1168 (D. Mass. 1986)  .......................................................  21

<u>Apollo Technologies Corp. v. Centrosphere Industrial Corp.,</u>
        805 F. Supp. 1157 (D.N.J. 1992)  ..........................................................  14

<u>In re Assicurazioni Generali S.p.A. Holocaust Insurance Litigation,</u>
        228 F. Supp. 2d 348 (S.D.N.Y. 2002)  ...............................................  34, 36

<u>In re AstroPower Liquidating Trust,</u>
        335 B.R. 309 (Bankr. D. Del. 2005)  ......................................................  19

<u>AT&T Technologies, Inc. v. Communications Workers of America,</u>
        475 U.S. 643 (1986)  ....................................................................  22, 30

<u>In re Automotive Refinishing Paint Antitrust Litigation,</u>
        358 F.3d 288 (3d Cir. 2004)  ...............................................................  13

BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,
    229 F.3d 254 (3d Cir. 2000) ................................................................. 13, 16

Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,
    192 B.R. 73 (S.D.N.Y. 1996) ................................................................. 17

Bechtel v. Robinson,
    886 F.2d 644 (3d Cir. 1989) ................................................................. 38

Bellante, Clauss, Miller & Partners v. Alireza,
    634 F. Supp. 519 (M.D. Pa. 1985) ........................................................ 16

Bering Diagnostics GmbH v. Biosite Diagnostics, Inc.,
    No. Civ. A. 97-501 MMS, 1998 WL 24354 (D. Del. Jan. 6, 1998) ............... 32, 36

Bhatnagar v. Surrendra Overseas Ltd.,
    52 F.3d 1220 (3d Cir. 1995) ................................................................. 30

Blue Ball Properties, Inc. v. McClain,
    658 F. Supp. 1310 (D. Del. 1987) .......................................................... 13, 14

Brautigam v. Priest,
    No. 99-365-SLR, 2000 WL 291534 (D. Del. Mar. 2, 2000) ......................... 12, 13

Brinn v. McCracken Financial Services, Inc.,
    No. Civ. A. 95-542-SLR, 1996 WL 79377 (D. Del. Feb. 20, 1996) ................. 13

Brown ex rel. FoxMeyer Drug Co. v. C.D. Smith Drug Co.,
    No. CIV. A. 98-494-SLR, 1999 WL 709992 (D. Del. Aug. 18, 1999) .............. 21

Burger King Corp. v. Rudzewicz,
    471 U.S. 462 (1985) ........................................................................... 13, 15

Cal Caulfield & Co. v. Colonial Nursing Homes, Inc.,
    642 F. Supp. 777 (D. Kan. 1986) .......................................................... 14

Campuzano v. Islamic Republic of Iran,
    281 F. Supp. 2d 258 (D. D.C. 2003) ...................................................... 29

Carteret Savings Bank, F.A. v. Shushan,
    954 F.2d 141 (3d Cir. 1992) ................................................................. 16

China Minmetals Materials Imprt & Export Co. v. Chi Mei Corp.,
    334 F.3d 274 (3d Cir. 2003) ................................................................. 19, 30, 38

Chisholm & Co. v. Bank of Jamaica,
     643 F. Supp. 1393 (S.D. Fla. 1986) ........................................................ 15

Chrysler Capital Corp v. Woehling,
     663 F. Supp. 478 (D. Del 1987) ............................................................ 32

Cole v. Tobacco Institute,
     47 F. Supp. 2d 812 (E.D. Tex. 1999) ................................................... 20

Comer v. Micor, Inc.,
     436 F.3d 1098 (9th Cir. 2006) .............................................................. 22

Commodity Futures Trading Commission v. Worldwide Commodity Corp.,
     366 F. Supp.2d 276 (E.D. Pa. 2005) .................................................... 18

In re Corel Corp. Inc. Sec. Litig.,
     147 F. Supp. 2d 363 (E.D. Pa. 2001) ................................................... 36

Creighton Ltd. v. Government of the State of Qatar,
     181 F.3d 118 (D.C. Cir. 1999) .............................................................. 27

Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,
     821 F. Supp. 962 (D. Del. 1993) ................................................... 32, 33

Cruz v. United States,
     387 F. Supp. 2d 1057 (N.D. Cal. 2005) ............................................... 29

D'Angelo v. Petroleos Mexicanos,
     398 F. Supp. 72 (D. Del. 1975) ............................................................ 31

DTC Health, Inc. v. Global Healing Center, Inc.,
     No. Civ. A. H-06-01364, 2006 WL 2022893 (S.D. Tex. July 17, 2006) ............... 39

Dardana Ltd. v. Yugauskneftegaz,
     317 F.3d 202 (2d Cir. 2003) ................................................................. 20

Deptula v. Derr Flooring Co.,
     No. Civ. A. 90-3857, 1990 WL 96635 (E.D. Pa. July 6, 1990) ............... 1

Derensis v. Coopers & Lybrand Chartered Accountants,
     930 F. Supp. 1003 (D.N.J. 1996) ......................................................... 13

In re EAL (Delaware) Corp.,
     No. 93-578-SLR, 1994 WL 828320 (D. Del. Aug. 3, 1994) .................. 29

E.I. duPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates, S.A.S.,
    197 F.R.D. 112 (D. Del. 2000), aff'd in part, 269 F. 3d 187 (3d Cir. 2001) ... 34, 35, 37

EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.,
    322 F.3d 635, (9th Cir. 2003) ........................................................ 24, 26

Edward D. Jones & Co. v. Sorrells,
    957 F.2d 509 (7th Cir. 1992) ............................................................ 39

Federal Insurance Co. v. Richard I. Rubin & Co.,
    12 F.3d 1270 (3d Cir. 1993) ............................................................ 27

Filler v. Hanvit Bank,
    378 F.3d 213 (2d Cir. 2004) ............................................................ 24

First Options of Chicago, Inc. v. Kaplan,
    514 U.S. 938 (1995) ................................................................ 30, 38

Fiscus v. Combus Finance AG,
    No. Civ. A. 03-1328, 2006 WL 1722607 (D.N.J. Jun. 20, 2006) .............. 22, 30, 31

Fleetwood Enterprises, Inc. v. Gaskamp,
    280 F.3d 1069 (5th Cir. 2002) ......................................................... 22

Foster Wheeler Energy Corp. v. Metallgesellschaft AG,
    No. Civ. A. 91-214-SLR, 1993 WL 669447 (D. Del. Jan. 4, 1993) ......... 12, 13, 20

Gates v. Victor Fine Foods,
    54 F.3d 1457 (9th Cir. 1995) ........................................................... 24

General Electric Co. v. Deutz AG,
    270 F.3d 144 (3d Cir. 2001) ............................................................ 22

Graduate Management Admission Council v. Raju,
    241 F. Supp. 2d 589 (E.D. Va. 2003) .................................................. 19

Grand Entertainment Group, Ltd. v. Star Media Sales, Inc.,
    988 F.2d 476 (3d Cir. 1993) ............................................... 13, 14, 16, 21

Green v. William Mason & Co.,
    996 F. Supp. 394 (D.N.J. 1998) ........................................................ 23

Gulf Oil Corp. v. Gilbert,
    330 U.S. 501 (1947) ...................................................................... 29

vii

Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,
    784 F.2d 1392 (9th Cir. 1986) ................................................................... 19

Matter of Harvard Industries, Inc.,
    173 B.R. 82 (Bankr. D. Del. 1994) ......................................................... 23

Heft v. AAI Corp.,
    355 F. Supp. 2d 757 (M.D. Pa. 2005) ....................................................... 1

Helicopteros Nacionales de Colombia S.A. v. Hall,
    466 U.S. 408 (1984) .................................................................................. 20

Hester International Corp. v. Federal Republic of Nigeria,
    681 F. Supp. 371 (N.D. Miss. 1988), aff'd, 879 F. 2d 170 (5th Cir. 1989) ............ 15

Howsam v. Dean Witter Reynolds, Inc.,
    537 U.S. 79 (2002) ................................................................................... 30

Ipitrade International, S.A. v. Federal Republic of Nigeria,
    465 F. Supp. 824 (D. D.C. 1978) ............................................................ 27

Joint Stock Society Trade House of Descendants of Peter Smirnoff, Official Purveyor to the Imperial Court v. Heublein, Inc.,
    936 F. Supp. 177 (D. Del. 1996) ............................................................ 36

Kaplan v. First Options of Chicago, Inc.,
    19 F.3d 1503 (3d Cir. 1994), aff'd, 514 U.S. 938 (1995) ....................... 23

Koster v. (American) Lumbermens Mutual Casualty Co.,
    330 U.S. 518 (1947) ................................................................................. 32

Laborers' International Union of North America v. Foster Wheeler Corp.,
    868 F.2d 573 (3d Cir. 1989) ............................................................... 2, 30

Lacey v. Cessna Aircraft Co., ("Lacey I"),
    862 F.2d 38 (3d Cir. 1988) .............................................................. 29, 31

Lacey v. Cessna Aircraft Co., ("Lacey II")
    932 F.2d 170 (3d Cir. 1991) ............................................................ 29, 33

Lesser & Kaplin, P.C. v. American Insurance Co.,
    723 F. Supp. 1099 (E.D. Pa. 1989) ........................................................ 20

Lexington Insurance Co. v. Forrest,
    263 F. Supp. 2d 986 (E.D. Pa. 2003) ..................................................... 15

Litton Financial Printing Division v. N.L.R.B.,
    501 U.S. 190 (1991) ................................................... 30

Lony v. E.I. Du Pont de Nemours & Co.,
    886 F.2d 628 (3d Cir. 1989) ....................................... 29, 33, 37

Lony v. E.I. DuPont de Nemours & Co.,
    935 F.2d 604 (3d Cir. 1991) ....................................... 32, 33, 36

Magla Products, L.L.C. v. Chambers,
    No. Civ. A. 06-0115 PGS, 2006 WL 2846274 (D.N.J. Sept. 29, 2006) ................ 29

Malaysia International Shipping Corp. v. Sinochem International Co.,
    436 F.3d 349 (3d Cir. 2006), cert. granted, 127 S. Ct. 36 (2006) ......................... 35

Malloy v. Harnischfeger Corp.,
    No. CIV. A. 92-2795, 1993 WL 57191 (E.D. Pa. Feb. 26, 1993) .......................... 20

Marine Midland Bank, N.A. v. Goyak,
    585 F. Supp. 1358 (S.D.N.Y. 1984) ......................................... 15

Max Daetwyler Corp. v. R. Meyer,
    762 F.2d 290 (3d Cir. 1985) ............................................... 13

McCurdy v. America Board of Plastic Surgery,
    157 F.3d 191 (3rd Cir. 1998) ................................................ 1

Mellon Bank (East) PSFS, National Association v. Farino,
    960 F.2d 1217 (3d Cir.1992) ....................................... 14, 15, 21

Miller Yacht Sales, Inc. v. Smith,
    384 F.3d 93 (3d Cir. 2004) ............................................... 13

Mobil Tankers Co., S. A. v. Mene Grande Oil Co.,
    363 F.2d 611 (3d Cir. 1966) ............................................... 31

Estate of Monroe v. Bottle Rock Power Corp.,
    No. Civ. A. 03-2682, 2005 WL 119883 (E.D. La. Jan. 19, 2005) ......................... 15

Nagrampa v. MailCoups, Inc.,
    469 F.3d 1257 (9th Cir. 2006) ............................................. 39

New Generation Foods, Inc. v. Spicer's International Common Trust,
    669 F. Supp. 599 (S.D.N.Y. 1987) ......................................... 14

Newport Components, Inc. v. NEC Home Electronics (U.S.A.), Inc.,
 671 F. Supp. 1525 (C.D. Cal. 1987) ........................................................ 17

Nocando Mem Holdings, Ltd. v. Credit Comm5ercial De France, S.A.,
 No. Civ. A. SA-01-1194-XR, 2004 WL 2603739 (W.D. Tex. Oct. 6, 2004) ........ 19

North Penn Gas Co. v. Corning Natural Gas Corp.,
 897 F.2d 687 (3d Cir.1990) ...................................................................... 13

Omni Capital Int'l. v. Rudolf Wolff & Co., Ltd.,
 484 U.S. 97 (1987) ................................................................................. 18

Padcom, Inc. v. NetMotion Wireless, Inc.,
 No. Civ. A. SA-01-1194-XR, 2004 WL 1192641 (D. Del. May 24, 2004) 20, 21, 23

PaineWebber Inc. v. Chase Manhattan Private Bank,
 260 F.3d 453 (5th Cir. 2001) .................................................................. 39

Palmco Corp. v. JSC Techsnabexport,
 No. SA CV 06-214 DOC MLGX, 2006 WL 2473316 (C.D. Cal. July 25, 2006) . 35

Pan Ocean Trade & Invest Co. v. Super Time International Corp.,
 No. CIV.A. 94-5539, 1995 WL 31613 (E.D. Pa. Jan. 26, 1995) ................... 14, 16

Pinker v. Roche Holdings Ltd.,
 292 F.3d 361 (3d Cir. 2002) .................................................................. 17, 18

Piper Aircraft Co. v. Reyno,
 454 U.S. 235 (1981) ............................................................................. 29

Price v. Socialist People's Libyan Arab Jamahiriya,
 294 F.3d 82 (D.C. Cir. 2002), aff'd in part, 389 F. 3d 192 (D.C. Cir. 2004) ........ 29

R. Maganlal & Co. v. M.G. Chemical Co.,
 942 F.2d 164 (2nd Cir. 1991) ................................................................. 37

Raytheon Engineers & Constructors, Inc. v. SMS Schloemann-Siemang Akiengesellschaft,
 No. 99 C 7771, 2000 WL 420866 (N.D. Ill. Mar. 16, 2000) ................... 22

Reavis v. Gulf Oil Corp.,
 85 F.R.D. 666 (D. Del.1980) ................................................................. 37

Reed v. Staker,
 C.A. No. 92-0419, 1992 WL 68272 (E.D. Pa. Mar. 23, 1992) .................. 20

x

Republic of Argentina v. Weltover, Inc.,
    504 U.S. 607 (1992) ................................................................ 18, 24, 28

Revak v. Locatum A.B.,
    Nos. Civ. A. 03-4822, 04-4253, 2005 WL 1017771 (E.D. Pa. Apr. 28, 2005) ..... 19

Rotondo Weirich Enterprise, Inc. v. Global Employment Solutions, Inc.,
    No. 99-CV-3661, 1999 WL 1077078 (E.D. Pa. Nov. 29, 1999) ......................... 16

Rux v. Republic of Sudan,
    No. Civ. A. 2:04CV428, 2005 WL 2086202 (E.D. Va. Aug. 25, 2005) ............... 29

Sandvik AB v. Advent International Corp.,
    83 F. Supp. 2d 442 (D. Del. 1999), aff'd, 220 F. 3d 1999 ..................................... 35

S. Megga Telecommunications Ltd. v. Lucent Technologies, Inc.,
    No. 96-357-SLR, 1997 WL 86413 (D. Del. Feb. 14, 1997) ................................. 37

Sarhank Group v. Oracle Corp.,
    404 F.3d 657 ( 2d Cir. 2005) ......................................................................... 3, 22

The Saudades,
    67 F. Supp. 820 (E.D. Pa. 1946) ..................................................................... 2, 31

Saudi v. Acomarit Maritimes Services, S.A.,
    114 Fed. Appx 449 (3d Cir. 2004) ........................................................................ 20

Saudi Basic Industries Corp. v. Exxonmobil Corp.,
    194 F. Supp. 2d 378 (D.N.J. 2002) ................................................................. 26, 28

Schnader, Harrison, Segal & Lewis, LLP v. Basic Capital Funds, Inc.,
    No. CIV. A. 99-4655, 2000 WL 1367601 (E.D. Pa. Sept. 21, 2000) .................... 15

S.E.C. v. Carrillo,
    115 F.3d 1540 (11th Cir. 1997) .................................................................... 18, 20

Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft
v. Navimpex Centrala Navala,
    989 F.2d 572 (2d Cir. 1993) ................................................................................ 27

Shadowbox Pictures, LLC v. Global Enterprises, Inc.,
    No. Civ. A. 05-2284, 2006 WL 120030 (E.D. Pa. Jan. 11, 2006) ......................... 16

Shamrock Holdings of California, Inc. v. Arenson,
    421 F. Supp. 2d 800 (D. Del. 2006) ..................................................................... 12

xi

Simplicity, Inc. v. MTS Products, Inc.,
    No. CIV.A. 05-3008, 2006 WL 924993 (E.D. Pa. Apr. 6, 2006) .......................... 20

Sinclair v. Attorney General,
    198 Fed. Appx 218 (3d Cir. 2006) ........................................................................... 21

SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.,
    382 F.3d 1097 (11th Cir. 2004) ............................................................................... 31

Stein v. Stein,
    No. 04-1311-JTM, 2005 WL 1242401 (D. Kan. May 25, 2005) ........................... 15

Sunbelt Corp. v. Noble, Denton & Associates, Inc.,
    5 F.3d 28 (3d Cir. 1993) .......................................................................................... 16

Sunds Defibrator, Inc. v. Durametal Corp.,
    No. Civ. A. 96-483 96-483 MMS, 1997 WL 74660 (D. Del. Jan. 31, 1997) ........ 32

Supra  Medical Corp. v. McGonigle,
    955 F. Supp. 374 (E.D. Pa. 1997) ........................................................................... 25

TMR Energy Ltd. v. State Property Fund of Ukraine,
    411 F.3d 296 (D.C. Cir. 2005) ................................................................................ 29

Telcordia Technologies Inc. v. Telkom SA Ltd,
    458 F.3d 172 (3d Cir. 2006) ............................................................... 14, 16, 20, 22

Telcordia Technologies, Inc. v. Alcatel S.A.,
    No. CIV.A. 04-874 GMS, 2005 WL 1268061 (D. Del. May 27, 2005) ............... 20

Telespectrum Worldwide, Inc. v. MBNA Canada Bank,
    No. Civ. A. 98-6292, 1999 WL 239112 (E.D. Pa. Apr. 16, 1999) ....................... 16

Texas Trading & Mill. Corp. v. Federal Republic of Nigeria,
    647 F.2d 300 (2d Cir. 1981) .............................................................................. 16, 28

Theo. H. Davies & Co. v. Republic of Marshall Islands,
    174 F.3d 969 (9th Cir. 1998) ............................................................................ 21, 27

Toner v. Allstate Insurance Co.,
    Civ. A. No. 92-624-SLR, 1994 WL 828294 (D. Del. Dec. 29, 1994) .................. 38

Tonoga Ltd. v. Ministry of Public Works & Housing,
    135 F. Supp. 2d 350 (N.D.N.Y. 2001) ................................................................... 28

Toys "R" Us, Inc. v. Step Two, S.A.,
     318 F.3d 446 (3d Cir. 2003) ................................................................. 1

Tse v. Ventana Medical Systems, Inc.,
     Civ. A. No. 97-37-SLR, 1997 WL 811566 (D. Del. Nov. 25, 1997) .................... 33

Turn of the Century Solution, L.P. v. International Rectifier Corp.,
     No. Civ. 05-816-SLR, 2006 WL 1653143 (D. Del. June 15, 2006) ............... 35, 37

U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,
     241 F.3d 135 (2d Cir. 2001) ................................................................. 28

U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping  Co.,
     16 F. Supp. 2d 326 (S.D.N.Y. 1998), aff'd, 241 F. 3d 135 (2d. Cir. 2001) .......... 14

USX Corp. v. Adriatic Insurance Co.,
     345 F.3d 190 (3d Cir. 2003) ................................................................. 24

United States v. Bestfoods,
     524 U.S. 51 (1998) ........................................................................... 22

United States v. Swiss American Bank,
     191 F.3d 30 (1st Cir. 1999) ................................................................. 19

U.S. ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.,
     976 F. Supp. 207 (S.D.N.Y. 1997) ......................................................... 14

Verlinden B.V. v. Central Bank of Nigeria,
     461 U.S. 480 (1983) ......................................................................... 29

Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co.,
     75 F.3d 147 (3d Cir. 1996) ................................................................. 13

Virginia Carolina Tools, Inc. v. International Tool Supply, Inc.,
     984 F.2d 113 (4th Cir. 1993) ............................................................... 22

Waimberg v. Medical Transport of America, Inc.,
     52 F. Supp. 2d 511 (E.D. Pa. 1999) ....................................................... 15

Walker v. West Michigan National Bank & Trust,
     324 F. Supp. 2d 529 (D. Del. 2004) ....................................................... 13

Waymouth v. Department of Natural Resources & Environmental Control,
     Nos. C.A. 6128, 1980, 1985 WL 22038 (Del. Ch. Sept. 16, 1985) ...................... 19

Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.,
  157 F.R.D. 215 (D. Del. 1993) ............................................................ 36

**STATUTES**                       **PAGE(S):**

H.R. Rep. No. 1487, 94th Cong., 2d Sess. at 18 (1976), reprinted in 1976 U.S.C.C.A.N.
6604, 6617 ............................................................................................. 26

H.R. Rep. No. 94-1487 (1976), reprinted in 1994 U.S.C.C.A.N. 6604, 6615-16 ............. 27

17 C.F.R. § 230 .............................................................................................. 18

28 U.S.C. §§ 1330(a) & 1604 ............................................................................ 24

28 U.S.C. § 1330(b) ........................................................................................ 29

28 U.S.C. §§ 1602, et seq ................................................................................. 2

28 U.S.C. § 1603(b) ..................................................................................... 2, 24

28 U.S.C. §1603(d) ..................................................................................... 27, 28

28 U.S.C. § 1604 ............................................................................................ 24

28 U.S.C. § 1605(a) ..................................................................................... 27, 28

28 U.S.C. § 1608 ............................................................................................ 28

Fed. R. Civ. Proc. 12(g) ................................................................................... 1

Fed. R. Civ. Proc. 12(h)(1) ............................................................................... 1

**OTHER AUTHORITIES**                **PAGE(S):**

Buhler & Webster, Handbook of ICC Arbitration, Sweet & Maxwell 2005 ..................... 39

Craig, et al., International Chamber of Commerce Arbitration (Oceana 2000), .............. 39

Derains & Schwartz, A Guide to the ICC Rules of Arbitration (Kluwer Law 2005), ....... 39

William W. Park, "Text and Context in International Dispute Resolution,"
  15 B.U. Int'l L.J. 191, 202 (1997) ......................................................... 30

## NATURE AND STAGE OF PROCEEDING

On June 30, 2006, URS filed this Action to enjoin Solidere from forcing URS to arbitrate before a panel of the International Chamber of Commerce in Paris, France (the "ICC Arbitration"). On October 16, 2006, Solidere moved to dismiss the Complaint. (D.I. 32.) On October 23, 2006, URS filed its Motion for a Preliminary Injunction. (D.I. 36.) The parties completed discovery on the motions on February 15, 2007. The parties also agreed that no substantive hearings could take place in the ICC Arbitration until April 15, 2007, so that the Court has sufficient time to consider the motions at hand. (D.I. 36.) The ICC has set a hearing on jurisdiction over URS for December 5, 2007.

## SUMMARY OF ARGUMENT

Solidere asserts three bases to dismiss URS's claims: (1) alleged lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2); (2) alleged improper venue under Fed. R. Civ. P. 12(b)(3), styled as a *forum non conveniens* argument; and (3) equitable estoppel.[1] Each argument is without merit.

1.    **This Court has specific personal jurisdiction over Solidere**. Solidere's contacts with the U.S.[2] as alleged in URS's Complaint (*see* Compl. ¶¶ 14-18) and substantiated through discovery are plainly sufficient to exercise jurisdiction over Solidere. Solidere bases its right to force URS to arbitrate on a contract that Solidere executed in the U.S. into with URS's U.S. subsidiary, after negotiations occurring in part in the U.S. Discovery revealed extensive contacts, showing Solidere:

- contracted that half of the work under the contract was to be performed out of the U.S. with U.S. workers and U.S. machinery, and certified the U.S. content;
- financed the Contract by targeting U.S. investors and receiving U.S. government aid;
- received a training grant from the U.S. government relating to the project;
- received another U.S. government grant to perform a feasibility study for the Project;
- applied for and received a $14.7 dollar guarantee from the American Import/Export Bank to ensure performance of the U.S. component of the Project;
- opened a bank account in New York to receive funds from the U.S. government for the Project;
- consented to jurisdiction in New York in connection with the opening of its U.S. bank account that received the funds from the American Import/Export Bank;
- appointed an agent for service of process in the United States for any disputes concerning the financing of the project.[3]

---

[1]    Solidere spends a page implying an infirmity in the service of process because URS made additional service attempts after Solidere was served on July 11, 2006. (D.I. 12.) Solidere ignores that those attempts proceeded under 28 U.S.C. § 1608, which governs service for suits brought under the Foreign Sovereign Immunities Act ("FSIA"), an alternative subject matter jurisdiction ground alleged in the Complaint. (D.I. 9 at ¶ 1.) Although URS met FSIA's service requirement (Deptula v. Derr Flooring Co., No. Civ. A. 90-3857, 1990 WL 96635, at *3 (E.D. Pa. July 6, 1990)), any challenges to the sufficiency of process under Fed. R. Civ. P. 12(b)(4) or 12(b)(5) has been waived as Solidere failed to assert them. See Fed. R. Civ. P. 12(g) & 12(h)(1); McCurdy v. Am. Bd. of Plastic Surgery, 157 F.3d 191, 193-95 (3d Cir. 1998).

[2]    The relevant forum for Solidere's contacts is the U.S. as a whole. Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 455 n.7 (3d Cir. 2003); Heft v. AAI Corp., 355 F. Supp. 2d 757, 768 (M.D. Pa. 2005).

[3]    Solidere argues that its contacts are "solitary discrete contacts, falling sporadically over a period of eight years (from 1998-2006)." (Def. Br. at 15.) Not so. As shown in Exhibits 134-37 of the Russell Decl. Solidere's contacts comprise literally hundreds of documented contacts touching 20 states and a score of American entities.

These contacts are directly related to the Contract on which Solidere initiated the ICC Arbitration against URS and plainly support specific personal jurisdiction over Solidere. (Infra § I.A.)

2.    **This Court has general personal jurisdiction over Solidere**. Solidere has sufficient systematic and continuous contacts with the U.S. to exercise general jurisdiction over it independent of the claims here. From its inception, Solidere sought and received substantial investment support from U.S. institutional investors. Solidere admits that it "targeted" investors in the U.S. and retained an American bank as its transfer agent. In a secondary offering, Solidere conducted an extensive management roadshow in the U.S. to ensure that U.S. investors continued investing in it. Solidere also targeted the U.S. to fill job positions at Solidere by using a job bank maintained by its founder's U.S.-based foundation. Solidere also contracted with U.S. companies in 14 states to work in Beirut. In addition to its myriad visits to the U.S., Solidere continuously utilized the U.S. mail, phone and facsimile lines, personal visits, as well as provisions of U.S. investment laws. (Infra § I.B.)

3.    **This Court has jurisdiction under FSIA.** Jurisdiction exists over Solidere under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, et seq. (Compl. ¶¶ 25-31). Solidere is an organ of the Republic of Lebanon under 28 U.S.C. § 1603(b) as it: (1) was created by the Lebanese government to redevelop post-war Beirut (a uniquely governmental function), (2) has governmental powers (eminent domain), (3) enjoys governmental benefits (immunity from taxes), (4) resides in a government building, (5) has its decisions made by a quasi-governmental board, (6) commands ministries, (7) (reportedly) has unlimited police powers in asserting its rights, (8) is partially-owned by the government, and (9) receives redeveloped public land for its services. Although a state organ, Solidere does not enjoy sovereign immunity because: (1) it agreed to arbitrate on the territory of a New York Convention signatory (France), (2) of its commercial activities in the United States, and (3) it consented to and participated in arbitration with Radian. Once the Court finds FSIA jurisdiction over Solidere, the Court also can exercise personal jurisdiction. (Infra § II.)

4.    **Solidere's *forum non conveniens* argument is trumped by URS's right to have an American court determine whether URS can be compelled to arbitrate on a contract it never signed.** Solidere argues that the ICC Arbitration in France is the proper forum to resolve the question of arbitrability but ignores two things. First, "an American court may not refuse to try a case brought by an American citizen, unless it feels that injustice would be done by allowing him to proceed in his own court." The Saudades, 67 F. Supp. 820, 821 (E.D. Pa. 1946). Here, there can be no injustice, as a matter of law, because "it is the role of the district court, not the arbitrator, to pierce the corporate veil and require a parent corporation to participate in arbitration of a contract to which a subsidiary is formally a party." Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp., 868 F.2d 573, 576 (3d Cir. 1989). This determination must be made under American law because "[a]n American

nonsignatory cannot be bound to arbitrate in the absence of a full showing of facts supporting an articulable theory based on American contract law or American agency law." Sarhank Group v. Oracle Corp., 404 F.3d 657, 662 (2d Cir. 2005). URS, a Delaware corporation, never contractually agreed to arbitrate and so arbitrability must be resolved by an American court under American law.

5.   Second, Solidere made no showing that France is a more convenient forum than here. The issue here is whether URS can be held liable for the contract of its U.S. subsidiary, which will involve analysis of corporate records and witnesses of two U.S. companies. There is no nexus between France and any party and no document or witness can be found there. Arbitrability will involve questions of American law, including application of alter ego principles under Delaware law that this Court is well-suited to apply and that French arbitrators have no experience or interest in applying. Moreover, applying the traditional public and private factors for *forum non conveniens*, Solidere has not come close to meeting its heavy burden. (See infra § III.)

6.   **URS cannot be estopped from litigating in this Court merely because it objected to the jurisdiction of the arbitral tribunal.** Solidere's contention that URS is estopped from litigating here because it objected in France to the ICC's jurisdiction is frivolous. Not surprisingly, Solidere's argument has been soundly rejected. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 946 (1995) ("merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue"). Solidere submitted the issue of jurisdiction to the ICC. Solidere that initiated the ICC Arbitration and tendered the jurisdictional issues to that body. Solidere cannot claim detrimental change in position by having to respond to URS's objections to Solidere's own jurisdictional claims, especially where URS's objection, as here, was that an American court, not the arbitral tribunal, must determine whether URS was subject to arbitral jurisdiction. (See infra § IV.)

## STATEMENT OF FACTS

**Radian's Contract with Solidere and the $220,000 USTDA Grant.**  In 1997, Solidere solicited Radian to submit a proposal "for the reclamation of the former Normandy Landfill in Beirut, Lebanon." (Exs. 9, 10; Ex. 1 at 79:7-81:2.)[4] Solidere engaged in extensive negotiations with Radian, which were largely directed to the U.S. (Ex. 1 at 99:14-100:2, 13-16 (describing calls to the U.S. re: negotiations of contract.) While its negotiations with Radian were ongoing, in 1998, Solidere directed correspondence and other communications to the U.S. when it applied for and received a $220,000 training grant from the United States Trade and Development Agency ("USTDA"), a U.S. federal agency that assists U.S. companies in capitalizing on overseas business opportunities. (See Exs. 25, 26.) The grant, which was negotiated in the U.S. (Chammaa Decl. ¶ 9), was given specifically "to support Radian International's bid for an engineering services and equipment supply contract for the Normandy Landfill Reclamation project in Beirut" and conditioned upon Solidere's award of the

---

[4]    All "Ex. __" references are to the Declaration of Jason D. Russell unless specifically noted.

contract to Radian. (Exs. 27, 28.) "USTDA threw in some more grant money to Solidere ..., about $220,000, 'as a condition that they select the American company [for the Normandy Landfill project].'" (Ex. 29.) The grant limited Solidere's ability to hire local subcontractors to no more than 20%, directed Solidere to give priority to U.S. suppliers of technology and equipment, as well as contractually obligated Solidere to obtain U.S. goods via U.S. aircraft/marine carriers. (Ex. 26 at 4-5, 7, Annex II at 2, 4.) Because of the U.S. government's support, Solidere chose Radian over four other bidders that also offered significant support from their respective governments. (Exs. 37-42; Ex. 1 at 88:25-89:16; 94:3-12 (Ex-Im Bank financial package was a factor in hiring Radian).)

Hailed as "the most significant involvement of a U.S. company in the reconstruction of Lebanon to date" (Ex. 4), on January 25, 1999, Solidere entered into a contract (the "Contract") with Radian to perform land reclamation work at the Normandy Landfill (the "Project"), part of the Beirut Central District ("BCD"). (Compl. Ex. A ¶¶ 14, 154.) The Contract was signed at the Department of Commerce in Washington, D.C. on January 25, 1999 in a ceremony attended by Chairman Chammaa. (Def. Br. at 19 n.14; Ex. 1 at 101:2-103:2; Exs. 3, 4.) By design, over half the Project was to be performed out of the U.S. utilizing U.S. resources. Indeed, Radian announced that "the contract will generate an estimated $30 million in U.S. exports with out-sourcing from companies in Florida, Iowa, Kansas, Illinois, Missouri, New Jersey, Maryland, Pennsylvania, South Dakota, Texas, and Wisconsin. The project will involve American equipment, spare parts, professional expertise, construction, waste treatment, and laboratory testing." (Ex. 4.) Solidere continuously acknowledged the "U.S. component" constituted about 50% of the Project, which included services of Radian's U.S. personnel and U.S. subcontractors, as well as equipment and parts shipped from the U.S. (Ex. 30.)

The only parties to the Contract were Solidere and Radian. (Compl. Ex. B at 1.) The Contract was governed by Lebanese law and set an arbitration panel appointed by the ICC in Paris, France as the forum for disputes between the parties. (Id. (GCC) §§ 44, 50.) When Radian signed the Contract, it was a subsidiary of Dames & Moore, with no affiliation to URS. (Compl. ¶ 38; id. Ex. A ¶ 154.) Although "people in Solidere knew that Dames & Moore group had become an owner of Radian prior to the signing of the contract," Solidere made no attempt to bind Dames & Moore to the Contract and sought a guarantee only from Radian. (Ex. 1 at 115:23-116:7 and 108:22-110:17; see also Ex. 5.) Solidere officials admit that they had no knowledge of any URS "involvement" with Radian at the time of the Contract signing. (Ex. 1 at 117:8-19.) It was not until June of 1999, more than six months after Solidere contracted with Radian, that URS acquired Dames & Moore Group and became an indirect corporate parent of Radian. (Id.; cf. Compl., Ex. A ¶ 154; Jones Decl. ¶¶ 3-4.) When URS acquired Radian, Solidere again took no steps to secure a corporate guarantee from URS for Radian's

conduct or to bind URS to the Contract. (Ex. 1 at 123:4-10, 125:11-126:9.)[5]

Radian began work under the Contract on April 14, 1999. After years of work on the Project, in March 2001, a dispute arose due to gas bubbles emerging from water overlying submerged backfill material in completed areas of the site. After years of effort trying to resolve that dispute, Solidere terminated the Contract in 2006. (Compl., Ex. C, ¶¶ 9.1-9.49.)

**The Ex/Im Bank Loan.** Solidere financed the U.S. services/equipment utilized for the Contract with U.S. government funds, taking out a $14.7 million long-term guarantee from the Export-Import Bank of the United States, an independent U.S. government agency located in Washington, D.C. that helps finance the export of U.S. goods and services to emerging markets throughout the world by providing loans, loan guarantees, and export credit insurance. (Exs. 45 ("Ex-Im Bank has been approached by Solidere to help it finance U.S. equipment and technology for the Normandy Landfill Project"), 46, 47; see also Compl. Ex. A ¶ 216, Exs. 48 at 26, 49; 49 at 48; 50 at 52; see generally Chammaa Decl. Ex. E; Ex. 51.) In connection with the Ex/Im Bank financing, Solidere sent many communications to the U.S. for purposes of negotiations of the deal and subsequent facilitation of disbursements (see, e.g., Exs. 52-57; see also Ex. 63), as well as subsequent payments on the Ex/Im loan guarantee. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

The Ex/Im Bank agreement's purpose was to facilitate exports from the United States to Solidere's home country. (Chammaa Decl. Ex. E at p. 1.) The press release issued for the transaction emphasized how much U.S. resources were utilized by Solidere on the Normandy Landfill project:

> The Export-Import Bank of the United States (Ex-Im Bank) is providing a $14.7 million long-term guarantee to support the $15.8 million export by Radian International LLC, Houston, TX and numerous other U.S. suppliers of excavation equipment and waste treatment and technology services to Lebanon. More than a third of the U.S. exports are from small businesses. The Lebanese Company for the Development and Reconstruction of Beirut Central District, known by its French acronym "SOLIDERE," will use the equipment and services to reclaim Phase 2 of the environmentally problematic Normandy Landfill adjacent to the Mediterrranean Sea in Beirut's Central District.
>
>            *   *   *
>
> SOLIDERE is the primary source of repayment on the transaction. Citibank, N.A., Manama, Bahrain, is the guaranteed lender.
>
>            *   *   *
>
> U.S. suppliers on the export sale include: Tarmac Industries Inc., Blue Springs, MO; Wildcat Manufacturing Co., Inc., Freeman, SD; Advanced Combustion Systems Inc., Bellingham, WA; Ati Global Inc., Delhi IA; Enviroquip Systems Inc., Myerstown, PA; S S I Shredding Systems Inc., Wilsonville, OR; O I Corporation, College Station, TX; Analytical Instrument Co. Inc., Golden, CO; Advanced Environmental Systems,

---

[5]    Since June 1999, URS and Radian have maintained a normal parent-subsidiary relationship adhering to all corporate formalities. (Compl. ¶ 6.) Radian maintained its own office and bank account in Beirut, appointed its own branch manager, hired its own local counsel and auditor for branch accounts, obtained all the necessary licenses and registrations in its name, maintained a separate payroll system and paid its own employees, hired its own subcontractors, and performed the work through the same personnel that started on the project before URS's acquisition of Radian. (Id. ¶ 40.)

Elkton, MD; Buck Scientific Inc., Norwalk, CT; Vallen Safety Supply Co., Irving, TX; Reed Machinery, Inc., Hingham, MA; and C K S Regal Plastics, Dallas, TX.

(Ex. 59 (emphasis added).)

Under the Ex/Im Bank agreement, the majority of personnel and services for the Project must come from the U.S. Id. Only U.S. goods and services were eligible for consideration, and Ex/Im Bank required Solidere to certify the U.S. origin of the goods and services utilized for Solidere to draw down on the loan. (Chammaa Decl. Ex. E at 3, 4, 6.) The Ex-Im Bank required that: all goods transported by sea to be moved via U.S. vessels, payments to the bank be directed to its account in New York, and the letters of credit under the contract be drawn via U.S. branches of Citibank. (Id. § 4.01(b); § 8.01(a)(iii); Annex B, Annex B, Ex. 1; Annex E.) ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████

The parties regularly created spreadsheets entitled "Normandy Landfill Treatment Contract: Ex-Im Bank Portion of U.S. Content of Interim Payments" detailing the U.S. resources Solidere expended on the Normandy Landfill site.[6] Those spreadsheets demonstrate that every aspect of the project had a U.S. component, including excavation, sorting/processing, treatment and backfilling. (Ex. 30.) ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████

Under its agreement with Ex/Im Bank, Solidere agreed to be bound by New York law, consented to jurisdiction of New York federal courts, and appointed CT Corp. in New York to serve as its service of process agent for nine years; Solidere also directed payment and correspondence to CT Corporation for its services in New York. (Chammaa Decl. Ex. E at ¶¶ 11.01-11.03; see also Exs.67, 68, 84.) Importantly, Solidere's consent to jurisdiction under the Ex/Im Bank Credit Agreement was expressly given in connection with "any legal suit, action or proceeding arising out of or relating to any of the Borrower Documents," one of which is the Contract with Radian at issue here. (Chammaa Decl. Ex. E ¶¶ 1.01,11.02.) ██████████████████████████ ████████████████████████████████████████

--------

[6] See, e.g., Exs. 30 (collecting parties' correspondence ████████████████████ ████), 61, 62 (████████████████████████████████████). Cf. Compl. Ex. A ¶ 216. All U.S.-exported equipment is now owed by Solidere, as contemplated by the Contract. (Compl. Ex. B at GCC § 23.6.)

███████████████ Solidere opened a New York Citibank account to receive funds drawn down from the Ex-Im Bank and to pledge funds for the required standby letter of credit. (See Exs. 70-73, 133 (collecting correspondence).) Pursuant to the Citibank account agreement, Solidere again submitted to the jurisdiction of New York courts, agreed to be bound by New York law, and appointed CT Corporation as its process agent. (Ex. 70 at SOLDEL 20469.) ████████████████

████████████████████████████████████████████████████

**The Wells Fargo Performance Bond.** ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ Solidere drew down the entire balance of that performance guarantee bond during Radian's performance of the Contract. (Ex. 76.) Solidere was on notice that the funds backing the bond were held in America and that if it drew down, that those funds would come from the U.S. (Compare Ex. 76 with Ex. 75.)

**Solidere Seeks And Obtains U.S. Training From U.S. Companies Under A USTDA Grant**

To better implement the Normandy Landfill reclamation, Solidere selected Carnegie Mellon University ("CMU") of Pittsburgh, Pennsylvania to provide the training funded by the $220,000 USTDA Grant. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████ Solidere sent correspondence to the U.S. in connection with the project and participated in developing the training agenda (see, e.g., Exs. 32-34; Ex. 34A, 85); furthermore, Solidere approved and sent invoices to the USTDA for payment for Carnegie's work. (Exs. 35,36.)

Solidere representatives also made at least three visits to the U.S. as part of "The Normandy Landfill Reclamation Training Project" funded by the USDTA grant and arranged by CMU to meet with and receive information for more than 130 U.S. vendors "for goods and services related to the needs of the Solidere Development Project." (Ex. 43 at 4 and App. A-C, E.) Karameh, Solidere's manager of the Normandy Landfill project, first visited the U.S. between January 22-26, 2001, attending presentations by and making presentations to more than ten U.S.-based firms and organizations in Pittsburgh and Washington D.C., including such sources for funding and partnership as the USTDA, the Overseas Private Investment Corporation and the U.S. Agency for International Development. (Exs. 43 at App. A, 45A at Resp. No. 11; Ex. 2 at 23:5-24.) From September 5-10, 2001, Karameh and three other Solidere representatives met with U.S. engineering, construction, planning/development and architecture firms in New York, Baltimore and Washington, D.C. (Exs. 43 at App. B, 45A at Resp. No. 11; Ex. 2 at 36:20-37:4.) The events of September 11, 2001 postponed

visits to four Washington D.C. area organizations, again including the USTDA, but the Solidere and CMU representatives contacted those organizations by phone before returning to Lebanon.  (Id.)

From October 28 to November 7, 2002, CMU organized meetings in Pittsburgh, New York, and Washington, DC for Solidere representatives, including Karameh, to get U.S. contractors involved in the Normandy Landfill.  (Ex. 43 at App. C.) ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████    Finally, CMU established a website for Solidere to access with a list of U.S. contacts of interest to the Project, such as engineers, architects, developers.  (Ex. 43 at 4.)

**Solidere's visits and correspondence in connection with the Contract.**  Not only was there virtually constant communications with and payment to various U.S. institutions related to the USTDA and Ex-Im Bank transactions, but there was a stream of correspondence and visits to the U.S. facilitating performance of the Contract, such as Dr. Nasser Chamma's attending the contract signing ceremony at the Department of Commerce in Washington, D.C. on January 25, 1999, and a meeting attended by Solidere representative Hisham Karameh on November 7, 2002 in Washington, D.C. to discuss Radian's progress.  (Exs. 3, 77; Ex. 1 at 101:2-103:2, 127:21-128:3.)  There also was regular correspondence directed to the U.S. by Solidere and its agent, Fairhurst.  (See Ex. 80 (collecting correspondence directed by Solidere to the United States in connection with the Contract); ████

█████████████████████

█████████████  cf. Ex. 79 at 2 (insurance application to Steadfast Insurance of Dover, Delaware, listing Solidere as additional insured).)

**Paul C. Rizzo Assocs. Feasibility Study and the Second USTDA Grant.**  In 2003, Solidere contracted with Paul C. Rizzo Associates of Monroeville, Pennsylvania, to conduct a comprehensive feasibility study to examine the technical and commercial feasibility of multi-use development on the Normandy Landfill reclaimed land.  (Chammaa Decl. Ex. D.)  Solidere contracted for Rizzo to prepare a Prospectus for Solidere to serve as a guide to potential U.S. investors and to arrange orientation visits to the U.S. for Solidere's representatives to meet with U.S.-based organizations and companies. (Id. at Ex. 1.) ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████████

[REDACTED] The grant agreement was negotiated in the U.S. (Chammaa Decl. ¶ 9) and signed by the U.S. Ambassador to Lebanon and Solidere's Chairman Chammaa on March 7, 2003. (Ex. 83 at 9.) Selection of a U.S. contractor for the feasibility study performed on the Normandy Landfill was one of the conditions of the USTDA grant; moreover, Solidere's ability to hire local subcontractors was limited to no more than 20%, and it was contractually obligated to obtain goods and associated delivery services only from the United States. (Chammaa Decl. Ex. D at Ex. 6, Clause C.) Solidere directed correspondence and other communications to both the USTDA in Virginia (Ex. 85 (collecting correspondence)), and Rizzo in Pennsylvania (Ex. 86 (same)). [REDACTED]

**Solidere's Other U.S. Contacts.** Solidere sought out and established relationships with at least <u>seven</u> other American companies in connection with the BCD rebuilding project, traveling to the U.S. and directing correspondence, communications, and payments to the U.S. on those projects. (<u>See, e.g.</u>, Ex. 1 at 229:20-23, 230:5-6, 10-15 (solicitation of U.S. companies by Solidiere); 220:24-221:7; 227:9-11 (travel to U.S. for negotiation and performance of these contracts).) [REDACTED]



### Solidere's U.S. Contact Prior To Retention Of Radian On The Project

The U.S. connection for the Project existed long before Solidere formally constituted. In 1993, Dames & Moore, which later became Radian's parent entity, an engineering company headquartered in Los Angeles, was appointed to perform an investigation of environmental and geotechnical aspects of the Normandy Landfill site. (Exs. 10 at ¶ 3.3, 11 at 1.)

From its inception and all the times thereafter, Solidere has continuously sought support from investors located in the United States to support its operations, which include the Normandy Landfill project. (Ex. 1 at 17:11-18:8, 19:2-25; Ex. 2 at 75:12-76:19; Ex. 132.) As early as 1995, Solidere's Chairman Chammaa traveled to the U.S. with the specific purpose of drumming up the U.S. investors' interest:

> [W]e are here to tell American companies that there is a place for them if they are interested. I believe it's an attractive program for the American investor. We are not asking for loans or grants, but rather, for them to take this opportunity to do business.

(Ex. 13;

)

Solidere's Global Depository Receipts ("GDRs") are trading on the U.S. Over The Counter ("OTC") Exchange under ticker symbols "SLDZF" and "SLDBY." (Ex. 14.) The trading is performed through Solidere's U.S. depository, Bank of New York in New York, which serves as Solidere's U.S. transfer agent. (Ex. 1 at 58:7-17; Ex. 15.) In this arrangement, Solidere representatives initiated and received various communications by facsimile, mail, and telephone with the Bank of New York. (Ex. 1 at 59:7-9, 59:13-60:2; Ex. 2 at 88:18-89:18; Ex. 16 (collecting correspondence reflecting Solidere's dealings with the Bank of New York).)

Solidere lists numerous U.S. institutional investors both in its Top 10 Institutional Holders of Solidere's A stock, as well as the Top 10 Institutional Holders for its GDRs, including such companies as Oppenheimer Fund and Fidelity Emerging Markets Fund. (Ex. 17; see also Ex. 1 at

55:18-56:4.)  But Solidere's GDRs did not end up in the United States by chance – on the contrary, Solidere representatives have made numerous visits to the United States with "roadshows" targeting U.S. investment. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ Solidere representatives met with nearly 30 U.S. institutional investors in New York, Boston, Milwaukee, San Antonio, and San Diego. (Exs.21-23.) ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ For Solidere's 2006 $380 million secondary offering "investors in the U.S. were targeted" through an "extensive management roadshow" to ensure Soldiere's offering's success in America.  (Ex. 24; Ex. 1 at 55:4-8.)

**Prior ICC Arbitration between Radian and Solidere.** As set forth in in URS's Motion for a Preliminary Injunction, Solidere's purported claims against URS stem from a prior arbitration and Solidere's contract dispute with Radian. In 2003, Radian, pursuant to a memorandum of understanding between Radian and Solidere ("MOU"), commenced arbitration proceedings with the ICC ("the Prior Arbitration") concerning landfill gas observed at the site.  While negotiating the MOU and throughout the Prior Arbitration, Solidere never asserted that URS was a proper party, nor made any effort to add URS.  (Ex. 1 at 132:7-11, 12-14, 17-22; 139:14-140:2; Ex. 104.)  Nor did it attempt to make URS a party to the enforcement proceedings before a French court to enforce the award in the Prior Arbitration.  (Compl. ¶¶ 9, 41-43.) During the Prior Arbitration, URS had been affiliated with Radian for <u>almost four years</u>, yet Solidere chose to proceed <u>only against Radian</u>.

**Solidere's ICC Arbitration against Radian and URS.** On February 13, 2006, Solidere commenced the ICC Arbitration, claiming that Radian had breached the Contract and that URS purportedly assumed the Contract's performance or is Radian's alter ego. (Compl., Ex. A ¶¶ 150, 171.) Solidere devoted half of its Arbitration Demand and its evidence to arguing that the ICC has jurisdiction over URS. (Id. ¶¶ 148-241.) On March 13, 2006, URS submitted its objections to the ICC's jurisdiction under Article 6(2) of the Rules of Arbitration by the ICC (the "ICC Rules"), arguing that arbitrability "is a matter for determination under the laws of the United States." (Ex. 122 at 7.)

Solidere responded to URS's objections on March 24, 2006. (Ex. 123.) The parties exchanged 3 letters each over six weeks. On June 2, 2006, the ICC made its administrative determination to defer arbitrability to the arbitrators, requiring URS to respond to Solidere's Arbitration Demand. (Ex. 126.) On June 30, 2006, URS filed expanded Objections to Jurisdiction, advising the ICC that it has filed this action, and explaining why the determination of arbitral jurisdiction belongs to this Court. (Ex. 127 at ¶¶ 1.13, 1.14, 8.1-8.50.) On the same day, Solidere's ICC Arbitration counsel received copies of the Complaint in this action. (Ex. 128.) The ICC Tribunal was constituted on October 18, 2006. The Tribunal held a preliminary hearing in Paris, France on December 18, 2006. At that hearing, the Tribunal set URS's jurisdictional objections for hearing on December 2007. (Ex. 129.)

## ARGUMENT

I.      **SOLIDERE HAS SUFFICIENT CONTACTS WITH THE UNITED STATES FOR THE COURT TO EXERCISE PERSONAL JURISDICTION OVER IT**

Once a jurisdictional challenge is raised, URS's burden is met by "coming forward with sufficient facts to establish that jurisdiction is proper." Brautigam v. Priest, No. 99-365-SLR, 2000 WL 291534, at *2 (D. Del. Mar. 2, 2000) (Robinson, J.). Where jurisdictional discovery has been taken, "'[t]he Court need not be blind to discovered materials and should look beyond the facade of the pleadings.'" Foster Wheeler Energy Corp. v. Metallgesellschaft AG, No. Civ. A. 91-214-SLR, 1993 WL 669447, at *1 (D. Del. Jan. 4, 1993) (Robinson, J.). However, where no evidentiary hearing has been held, a court "reviewing a motion to dismiss pursuant to Rule 12(b)(2) ... must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor." Shamrock Holdings of Cal., Inc. v. Arenson, 421 F. Supp. 2d 800, 803 (D. Del. 2006) (Robinson, J.). Accord Brautigam, 2000 WL 291534, at *2. "A complaint should be dismissed [for lack of jurisdiction] only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Shamrock, 421 F. Supp. 2d at 803.

Where, as here, jurisdiction is based on a federal long-arm statute, such as Fed. R. Civ. P. 4(k)(2), "the court has personal jurisdiction over the defendants so long as they have minimum contacts with the United States." Brautigam, 2000 WL 291534, at *2; accord In re Auto. Refinishing

Paint Antitrust Litig., 358 F.3d 288, 298 (3d Cir. 2004) ("when personal jurisdiction over a foreign corporation is based in essence on the federal long-arm statute, due process analysis involves contacts with the United States as a whole"). Minimum contacts exist where "the defendant is (i) doing business in the United States, (ii) doing an act in the United States, or (iii) causing an effect in the United States by an act done elsewhere." Derensis v. Coopers & Lybrand Chartered Accountants, 930 F. Supp. 1003, 1014 (D.N.J. 1996). "Due Process concerns under the Fifth Amendment are satisfied if a federal statute provides for nationwide service of process in a federal question case." Brautigam, 2000 WL 291534, at *2, citing Max Daetwyler Corp. v. R. Meyer, 762 F.2d 290, 295 (3d Cir. 1985).

**A.      Solidere's Contacts with the United States in Connection with the Underlying Dispute are Sufficient to Confer Specific Jurisdiction**

"Specific jurisdiction arises where the facts giving rise to the cause of action occur within the forum." Walker v. W. Mich. Nat'l Bank & Trust, 324 F. Supp. 2d 529, 533 (D. Del. 2004) (Robinson, J.). See also Padcom, Inc. v. NetMotion Wireless, Inc., No. Civ. A. 03-983-SLR, 2004 WL 1192641, at *2 (D. Del. May 24, 2004) (Robinson, J.). "To establish specific jurisdiction a plaintiff must show that the defendant has minimum contacts with the [forum] 'such that [the defendant] should reasonably anticipate being haled into court there.'" Foster Wheeler, 1993 WL 669447, at *2, citing N. Penn Gas Co. v. Corning Nat. Gas Corp., 897 F.2d 687, 690 (3d. Cir.1990) See also Grand Ent. Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 482 (3d Cir. 1993) ("defendant must engage in some affirmative act 'by which the defendant purposefully avails itself of the privilege of conducting activities within the forum ..., thus invoking the benefits and protections of its laws'"). "Where the contacts evaluated are those that give rise to the litigation, even one contact with the forum may be enough to justify jurisdiction." Grand, 988 F.2d at 483. Accord Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 n.18 (1985); Brinn v. McCracken Fin. Servs., Inc., 1996 WL 79377, at *2 (D. Del. Feb. 20, 1996) (Robinson, J.); Blue Ball Props., Inc. v. McClain, 658 F. Supp. 1310, 1316 (D. Del. 1987).

Solidere's suggestion that there is a strict causation relationship requirement between plaintiff's claim and defendant's jurisdictional contacts for specific personal jurisdiction has been soundly rejected by the Third Circuit.[7] See Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 99-100 (3d Cir. 2004). In Miller, the Third Circuit rejected "the more demanding" causative approach to the "arise out of or relate to" requirement for specific personal jurisdiction in favor of "a 'realistic approach' to

---

[7]      Solidere cites Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co., 75 F.3d 147, 152 (3d Cir. 1996), in support of its "direct[]" or "specific[]" relatedness theory. (Def. Br. at 18.) Yet, Vetrotex never enunciated such a theory. Moreover, Miller Yacht expressly limited Vetrotex, holding that it should not be read as establishing a causative approach to the "arise out of or relate to" requirement. 384 F.3d at 99 ("we analyze the totality of the circumstances surrounding a contract to determine whether the exercise of jurisdiction over the defendant is proper. We do not consider this totality of the circumstances test to be the equivalent of a requirement that the defendants' contacts with the forum be the proximate cause of the plaintiff's claims."). BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 259 (3d Cir. 2000) (Def. Br. at 12) is irrelevant as it merely restates the Burger King "'arise out of or related to'" test for specific jurisdiction contacts.

analyzing a defendant's contacts with a forum." Id. Applying this "realistic approach," the contacts alleged by URS for personal jurisdiction over Solidere are closely related to URS's claims here as URS claims that Solidere instituted wrongful arbitration proceedings based on Solidere's theory that URS assumed Radian's Contract and performed it in Radian's place. (Compl. Ex. A ¶¶ 150-241.)

Contacts relating to the negotiation and formation of a contract are routinely considered proper contacts on which to assert jurisdiction. See, e.g., U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., 16 F. Supp. 2d 326, 336 (S.D.N.Y. 1998) (in action to determine validity of arbitration agreement, measuring jurisdiction by contacts that went into formation and performance of the contract at issue), aff'd in relevant part, 241 F.3d 135 (2d Cir. 2001) (upholding specific personal jurisdiction based on defendant's "'purpose[ful] avail[ment]' of the United States forum by negotiating and forming a contract with an American corporation"); Mellon Bank, 960 F.2d at 1223 ("requisite [jurisdictional] contacts ... may be supplied by the terms of the agreement, the place and character of prior negotiations, contemplated future consequences, or the course of dealings between the parties"); Pan Ocean Trade & Invest Co. v. Super Time Int'l Corp., No. CIV.A. 94-5539, 1995 WL 31613, at *1 (E.D. Pa. Jan. 26, 1995) (although the "minimal threshold" of contacts required for specific jurisdiction "cannot be established solely on the basis of a contract with an in-[forum] plaintiff, but not much more is required") (emphasis added), citing, Grand, 988 F.2d at 482.[8]

Viewing Solidere's contacts relating to the Contract, which give rise to the arbitrability question presented in this Action, there is little question that Solidere has sufficient contacts to exercise specific personal jurisdiction. As discussed above, Solidere purposefully availed itself of the U.S. forum with respect to the Contract in dozens of ways on hundreds of occasions, when it:

- affirmatively solicited an American company (Radian) to bid on the Project;

---

[8]    Blue Ball, 658 F. Supp. at 1316-17 (Def. Br. at 19 n.14) does not compel a different conclusion. Blue Ball considered the contract's execution in the forum to favor finding jurisdiction but found it insufficient – based on a "very fact specific"determination – because the contract was entirely negotiated and called for performance in a different forum. Compare Telcordia Tech Inc. v. Telkom SA Ltd, 458 F.3d 172, 178 (3d Cir. 2006) ("fact that the contract called for the establishment of an office in South Africa is not determinative" for purposes of jurisdictional analysis). Here, the evidence shows that a large part of negotiations occurred via Solidere's direction of communications to the U.S. and Solidere agreed that half of the Contract's performance would be rendered out of the U.S. Apollo Techs. Corp. v. Centrosphere Indus. Corp., 805 F. Supp. 1157, 1184-85 (D.N.J. 1992) (limited presence in the forum, negotiation and execution of contracts in forum, together with correspondence, "speak in favor of personal jurisdiction"); New Generation Foods, Inc. v. Spicer's Int'l Common Trust, 669 F. Supp. 599, 601 (S.D.N.Y. 1987) (exercising jurisdiction where non-resident defendants visited forum for one day and negotiated and executed contract from which claims arose); Cal Caulfield & Co. v. Colonial Nursing Homes, Inc., 642 F. Supp. 777, 780 (D. Kan. 1986) (same); U.S. ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd., 976 F. Supp. 207, 210-11 (S.D.N.Y. 1997) (jurisdiction based on defendant's extensive contacts with the U.S., including entering into contracts with U.S. parties, communicating by mail and telephone with U.S. parties, and sending them invoices); Alco Standard Corp. v. Benalal, 345 F. Supp. 14, 15 (E.D. Pa. 1972) (sufficient contacts with U.S. where defendant negotiated and signed contract in U.S.).

- sent dozens of communications into the U.S. while it negotiated the Contract;[9]

- ████████████████████████████████████████████

- selected a U.S. University to train Solidere personnel in the U.S. concerning the Project;

- applied for and received a $14.7 million long-term guarantee from the Export-Import Bank of the United States that required Solidere to certify that over half of the Contract was performed using U.S. personnel and equipment;[10]

- opened a bank account in New York to receive funds from the Ex/Im Bank loan, in which Solidere consented to New York jurisdiction and appointed an agent for service of process for disputes concerning the disbursement of funds backed by the Ex/Im Bank;

- agreed as a condition of the Ex/Im Bank loan to utilize an extensive network of American suppliers and contractors – a total of thirteen U.S. companies spanning eleven different states to satisfy the Ex/IM Bank "U.S. content" requirement;

- executed the Contract in Washington, D.C. at the U.S. Department of Commerce;

- sent literally hundreds of communications to the U.S. during the performance of the Contract, as well as sent its employees to the U.S. to discuss progress on the Contract;

- applied for and received a second USTDA grant to finance a feasibility study commissioned with yet another American company;

- negotiated for and drew down upon a performance guarantee bond backed by an

---

[9]      See Fiscus v. Combus Fin. AG, No. Civ. A. 03-1328, 2006 WL 1722607, at *5 (D.N.J. Jun. 20, 2006) (jurisdiction proper based upon, inter alia, numerous faxes and e-mails directed to the forum for negotiation and performance of contract); Lexington Ins. Co. v. Forrest, 263 F. Supp. 2d 986, 993-94 (E.D. Pa. 2003) (same); Schnader, Harrison, Segal & Lewis, LLP v. Basic Capital Funds, Inc., No. CIV. A. 99-4655, 2000 WL 1367601, at **2-3 (E.D. Pa. Sept. 21, 2000) (same); Waimberg v. Med. Transp. of Am., Inc., 52 F. Supp. 2d 511, 515-17 (E.D. Pa. 1999) (same, even though contract at issue was to be performed out of the forum).

[10]      Reaching out to the U.S. to obtain financing has been held to satisfy the "minimum contacts" requirement of specific personal jurisdiction. See, e.g., Chisholm & Co. v. Bank of Jamaica, 643 F. Supp. 1393, 1402 (S.D. Fla. 1996) (jurisdiction proper where defendants participated in the Ex/Im Bank program and obtained line of credits from U.S. banks); Mellon Bank, 960 F.2d at 1223 (upholding jurisdiction where nonresident defendants negotiated and executed guarantee and surety agreements by approaching forum resident bank and later corresponding with the bank in the forum); Hester Int'l Corp. v. Fed. Republic of Nig., 879 F.2d 170 (5th Cir. 1989) (Nigerian corporation subject to jurisdiction because of "contacts invok[ing] American law governing banking and insurance industries and the United States mails" including "forward[ing] funds for the purchase of equipment in the United States through a letter of credit advised by an American bank"); Stein v. Stein, No. 04-1311-JTM, 2005 WL 1242401, at *4 (D. Kan. May 25, 2005) (finding loan arrangement for $1.4 million from forum resident bank to be the "most significant act upon which the court rests specific jurisdiction"; combining loan arrangement with "telephone calls, e-mails and other electronic transmissions as well as solicitation of potential business" to find jurisdiction); Estate of Monroe v. Bottle Rock Power Corp., No. Civ. A. 03-2682, 2005 WL 119883, at *7 (E.D. La. Jan. 19, 2005) (jurisdiction appropriate where defendant's contacts with forum referred to promissory note evidencing loan); Marine Midland Bank, N.A. v. Goyak, 585 F. Supp. 1358, 1359 (S.D.N.Y. 1984) (where loan was negotiated and consummated in forum, defendant received proceeds of loan in forum, defendant's endorsement was integral to loan, payment on guarantee was made in forum, and defendant agreed that obligation would be governed by the law of the forum, court had jurisdiction over defendant).

American bank;[11]

Solidere argues there can be no jurisdiction because it never came to the U.S. to negotiate the Contract, but only traveled here to facilitate the closing of the deal and facilitated negotiations of the Contract and Radian's contractual performance over the course of seven years without ever setting foot in the U.S., limiting itself to continuous phone, mail and fax communications, embodied in countless letters and facsimiles.  (Supra at 3-12.)[12] However, what Solidere concedes occurred is sufficient for specific jurisdiction. Telcordia Tech Inc., 458 F.3d at 177 (reversing dismissal for lack of jurisdiction; "physical presence in the forum is no longer determinative in light of modern commercial business arrangements; rather, mail and wire communications can constitute purposeful contacts when sent into the forum"); Grand Ent., 988 F.2d at 482-83 ("contract negotiations with forum residents can empower a court to exercise personal jurisdiction over persons outside the forum"; upholding jurisdiction based on defendant's "deliberate[] and personal[] direct[ion] [of] significant activities toward the [forum]" where defendant "directed at least twelve communications to the forum [and] ... engaged in negotiations for an agreement that would have created rights and obligations among citizens of the forum and contemplated significant ties with the forum"); Carteret Sav. Bank, F.A. v. Shushan,  954 F.2d 141, 147-48 (3d Cir. 1992) (calls and correspondence sent into forum, coupled with a meeting in the forum to facilitate closing of loan, provided sufficient contacts).[13]

Contrary to Solidere's insinuations (Def. Br. at 19 & n.14), a significant portion of the

---

[11]    Cf. Tex. Trading & Mill. Corp. v. Fed. Republic of Nig., 647 F.2d 300, 314-15 (2d Cir. 1981) (U.S. activities performed on behalf of alien defendant in connection with contractual letters of credit directly chargeable to defendant and significant for purposes of personal jurisdiction).

[12]    The volume and substance of Solidere's contacts distinguish them from the mere "informational communications in furtherance of ...[a] contract" that Solidere points to in Sunbelt Corp. v. Noble, Denton & Assocs., Inc., 5 F.3d 28, 32 (3d Cir. 1993). (See Def. Br. at 19.) Cf. Rotondo Weirich Enter., Inc. v. Global Employment Solutions, Inc., 1999 WL 1077078, at *4 (E.D. Pa. Nov. 29, 1999) (jurisdiction proper where "frequency and content of the mail and telephone communications between the parties indicate a substantive relationship as opposed to merely ministerial or informational communications in furtherance of the contract"). All the communications here were designed to facilitate performance under the Contract. See Telespectrum Worldwide, Inc. v. MBNA Canada Bank, No. Civ. A 98-6292, 1999 WL 239112, at **4, 6 (E.D. Pa. Apr. 16, 1999) (communications "related to the on-going implementation and performance of the services that defendant requested and plaintiff agreed to undertake" sufficient for jurisdiction; distinguishing "informational communications" where defendant's communication involved "'overall issues' such as [Plaintiff]'s performance" and "'the actual service that we [defendant] were being provided'"; holding that "[t]hese continuous contacts between plaintiff and defendant were not merely 'ministerial' exchanges, but instead were indicative of a more substantive relationship"); Pan Ocean, 1995 WL 31613, at *2 (distinguishing Sunbelt because the communications at issue "were not incidental to the contract but were for the express purpose of making and performing a contract"); Shadowbox Pictures, LLC v. Global Enters., Inc., No. Civ. A. 05-2284, 2006 WL 120030, at *5 (E.D. Pa. Jan. 11, 2006) (same).

[13]    Unlike here, Solidere's cases involve little or no contact with the forum. In BP Chems., the dispute was between two foreign companies on contracts that were negotiated and performed entirely outside the U.S. and where there was no injury in the U.S. 229 F.3d at 262. Similarly, in Bellante, Clauss, Miller & Partners v. Alireza, 634 F. Supp. 519, 525-26 (M.D. Pa. 1985), the court emphasized the lack of any evidence that defendant knew that the contract would be performed in the forum; moreover, there was but a "single telex" evidencing defendant's communications directed to the forum.

Contract's negotiations occurred via Solidere's direction of correspondence to the U.S. (supra at 3-12). When the time came to finance the project, it was a U.S. governmental agency, the Ex/Im Bank in Washington, D.C., that Solidere contacted to secure a $14.7 million long-term guarantee, which was expressly conditioned on Solidere's utilization of American resources to complete the Project. (Supra at 5-7.)  And again, both in connection with negotiations of the Ex/Im Bank transaction and the arrangements with Citibank, Solidere directed numerous communications to the U.S. to facilitate the deal, as well as payment on the loan guarantee and for services of its service of process agent. (Supra at 5-10.)  Cf. Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 192 B.R. 73, 80 (S.D.N.Y. 1996) ( proceeds of receivables, which passed through defendant's New York clearing account, and communications connected with the claims made supported minimum contacts with U.S.).

Solidere also obtained private U.S. investment support for its operations. ██████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ As investment funds sought by Solidere in the U.S. were applied toward financing of the Project, there is a direct relationship between the funds obtained by Solidere through its marketing of GDRs in the U.S. and the underlying dispute.  Acting through its U.S. agent, the Bank of New York, Solidere admits that it targeted investors in the U.S. to raise capital. (Def. Br. at 15 n.11.) Starting with its first issue of GDRs in 1996, its marketing efforts in 1997, and its secondary offering in 2006, Solidere has continuously emphasized its success with U.S. investors. (Supra at 10-11.)  Indeed, Solidere's Chairman went to the U.S. in 1995 with a specific purpose of drumming up U.S. investors' interest in Solidere. (Id.)  Moreover, the extensive U.S. management roadshows conducted on Solidere's behalf and with participation of Solidere's representatives in 1996, 1998, and in connection with its secondary offering in 2006 (id.) not only established Solidere's purposeful reaching out to the U.S., but show how vital U.S. investors' participation is for Solidere's financial well-being.

The U.S. securities market and attendant regulations allowed Solidere to reap substantial benefits from the U.S. – which is in itself a substantial jurisdictional factor in measuring Solidere's contacts with the U.S.  See Pinker v. Roche Holdings Ltd., 292 F.3d 361, 371 (3d Cir. 2002) ("In our view, by sponsoring an ADR ["American Depository Receipts," security interests similar to Solidere's GDRs] facility, [defendant] 'purposefully avail[ed] itself of the privilege of conducting activities' in the American securities market, and thereby established the requisite minimum contacts with the United States.");[14] Commodity Futures Trading Comm'n v. Worldwide Commodity Corp., 366 F.

---

[14]    Accord Newport Components, Inc. v. NEC Home Elecs. (U.S.A.), Inc., 671 F. Supp. 1525, 1539-40 (C.D. Cal. 1987) (by issuance of its ADRs on American market, defendant "has availed itself of the privileges and protections of the United States and its government.  These benefits have been ongoing [for more than twenty years], and constitute one form of 'systematic and continuous' contact with the United States as a whole. Given the obvious benefits the use of ADRs provide to [defendant], and in light of the fact that these securities are actively traded in the United States, and regulated by federal law, the Court believes it is proper to consider the

Supp. 2d 276, 281 (E.D. Pa. 2005); <u>Republic of Arg. v. Weltover, Inc.</u>, 504 U.S. 607, 619-20 (1992) ("[b]y issuing negotiable debt instruments denominated in United States dollars and payable in New York and by appointing a financial agent in that city," a foreign government had requisite contacts). The Third Circuit's reasoning in <u>Pinker</u> is squarely on point here:

> By sponsoring an ADR, ... [defendant] took affirmative steps purposefully directed at the American investing public. The aim of sponsoring an ADR, after all, is to allow American investors to trade equities of a foreign corporation domestically. [Defendant], therefore, clearly took 'action' – sponsoring an ADR in a deliberate attempt to solicit American capital – 'purposefully directed toward the [United States].' [Defendant]'s sponsorship amounted to an active marketing of its equity interests to American investors. ... The mere fact that its ADRs were not listed on an American stock exchange does not demonstrate that [defendant] did not seek to avail itself of the American securities market, for even though [defendant's] ADRs were not traded on an exchange.

292 F.3d at 371-72. Here, Solidere reached out to the U.S. market over twelve years ago to seek financial support for its operations, including work on the Project) from U.S. investors and continues relying on this support to this day. Furthermore, Solidere directed solicitation materials into the U.S. to target specific "qualified" institutions, which shows that Solidere contemplated a continuing relationship with U.S. investors. <u>S.E.C. v. Carrillo</u>, 115 F.3d at, 1546 (defendant's direction of solicitation materials to U.S. investors, including existing investors, satisfied the purposeful availment requirement of personal jurisdiction). Having availed itself of the benefits and regulations of the U.S. securities market, Solidere created a significant relationship with the U.S.

All of these transactions – which were designed to ensure the initiation and subsequent progress of work under the Contract, the same on contract on which Solidere relies to commence arbitration against URS – comprise Solidere's one indivisible approach to getting the project done by utilizing and seeking out as many U.S. resources as possible. Solidere's conduct is the very definition of the purposeful availment of U.S. benefits required by jurisdictional jurisprudence.[15] <u>Cf.</u> <u>Am. Bio</u>

---

trading of these securities for purposes of establishing personal jurisdiction."). While Solidere's GDRs may have been privately placed (<u>cf.</u> Def. Br. at 15 n.11), their distribution still proceeded under applicable U.S. securities laws and regulations. For example, the exception for registration and reporting requirements for such privately placed securities is provided by SEC Rule 144(a), 17 C.F.R. § 230. <u>Accord</u> Ex. 2 at 73:21-74:3. Solidere's GDRs are actively traded on American market as "over the counter" securities. (<u>Supra</u> at 10-11.) Regardless, Solidere's GDRs are regulated by federal security laws, and this further binds Solidere to the United States. <u>Cf.</u> <u>Pinker</u>, 292 F.3d at 373 n.5 ("without this regulatory protection [attendant to private security issuances], [defendant] and other foreign corporations might have a more difficult time obtaining American capital through ADR facilities").

[15]    Buried in a footnote, Solidere asserts that URS purportedly failed to satisfy the negation requirement under Fed. R. Civ. P. 4(k)(2) to qualify for application of the nationwide contacts standard. (Def. Br. at 14 n. 10.) Rule 4(k)(2) was intended to fill a gap in the law where a foreign defendant has contacts with the U.S. sufficient to justify the application of U.S. law and to satisfy federal standards of forum selection, but has insufficient contact with any single state to support jurisdiction under state long-arm legislation or meet the requirements of the Fourteenth Amendment limitation on state court territorial jurisdiction. <u>Omni Capital Int'l. v. Rudolf Wolff & Co.</u>, Ltd., 484 U.S. 97, 111 (1987). While 4(k)(2) has been read by some courts to require a certification by a plaintiff that a defendant lacks contacts sufficient to obtain jurisdiction in any one state, that so-called "negation" requirement has been acknowledged to be satisfied where, as here, the defendant denies that any state could assert jurisdiction over it. <u>See, e.g.</u>, <u>Adams v. Unione Mediterranea Di Sicurta</u>, 364 F.3d 646, 651 (5th

Medica Corp. v. Peninsula Drug Analysis Co., No. Civ. A. 99-218-SLR, 1999 WL 615175, at *3 (D. Del. Aug. 3, 1999) (Robinson, J.) ("The distinction between isolated business activities and those giving rise to personal jurisdiction has been explained on the basis of whether the conduct is 'part of a general business plan ... to solicit business in Delaware and deliver products to customers in Delaware.'"); id. at *4 n.5; cf. Haisten v. Grass Valley Med. Reimbursement Fund, Ltd., 784 F.2d 1392, 1398 (9th Cir. 1986) ("We look toward the economic reality of the [defendant]'s activities and conclude that the [defendant] 'purposefully directed' its commercial efforts toward [the forum's] residents. The substance, not form, of the defendant's activities are dispositive.") (emphasis added).[16]

## B.    Solidere's Contacts with the U.S. Confer General Jurisdiction

"[G]eneral jurisdiction does not require that a defendant's connections be related to the particular claims, but that defendant has continuous or systematic contacts with the forum." See

---

Cir. 2004) ("a piecemeal analysis of the existence *vel non* of jurisdiction in all fifty states is not necessary. Rather, so long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction.") (emphasis added); Revak v. Locatum A.B., Nos. Civ. A. 03-4822, 04-4253, 2005 WL 1017771, at *2 n.9 (E.D. Pa. Apr. 28, 2005) (negation element satisfied where "Defendant d[id] not challenge Plaintiffs' ability to show that [Defendant] [was] beyond the jurisdictional reach of any state court of general jurisdiction"). Here, Solidere states that "it is clear that personal jurisdiction does not exist over Solidere under any standard, including a nationwide standard." (Def. Br. at 14 n. 10 (emphasis added.) As Solidere denies that it is subject to jurisdiction in any state, URS respectfully submits that the negation standard has been met.

Assuming *arguendo* that Solidere's denial were insufficient, URS represents that discovery revealed that Solidere had no contact with 30 states (Russell Decl. Exs. 134-37), had minimal contacts with 6 states, and had contacts in 14 states as described above that URS believes would not, taken separately, rise to the level of constitutional sufficiency for any of the states involved to exercise general jurisdiction. Cf. U.S. v. Swiss Am. Bank, Ltd., 191 F.3d 30, 40-41 (1st Cir. 1999) (adopting burden-shifting approach for negation under Rule 4(k)(2) to avoid "requir[ing] a plaintiff to prove a negative fifty times over - an epistemological quandary which is compounded by the fact that the defendant typically controls much of the information needed to determine the existence and/or magnitude of its contacts with any given jurisdiction"; holding that, where plaintiff satisfied all other requirements, negation requirement is satisfied by plaintiff's certification that "based on the information that is readily available to the plaintiff and his counsel, the defendant is not subject to suit in the courts of general jurisdiction of any state"). URS reserves its rights to present an alternative argument if the Court decides to rely on the diversity basis for subject matter jurisdiction (28 U.S.C. § 1332(a)(2)) (Compl. ¶ 19) and look to Rule 4(k)(1) for personal jurisdiction. E.g., Graduate Mgmt. Admission Council v. Raju, 241 F. Supp. 2d 589, 600 (E.D. Va. 2003) ("personal jurisdiction claims may be properly analyzed in the alternative under 4(k)(1)(A) and 4(k)(2)"); Nocando Mem Holdings, Ltd. v. Credit Comm. De France, S.A., 2004 WL 2603739, at *38 (W.D. Tex. Oct. 6, 2004) (upholding "Plaintiffs' position that they may invoke Rule 4(k)(2), despite their alternative assertion that Defendants are amenable to jurisdiction in New York.").

[16]     Solidere's argument that this Court lacks jurisdiction because the Contract between Radian and Solidere contains a forum-selection clause (Def. Br. at 20-22) confuses venue with personal jurisdiction. In re AstroPower Liquidating Trust, 335 B.R. 309, 320 (Bankr. D. Del. 2005) ("[defendant] does not explain why a forum selection clause, without more, would *negate* personal jurisdiction where the defendant's actions are otherwise sufficient to establish minimum contacts with the forum. Indeed, it appears from the cases that such a 'defensive' use of a forum selection clause is a challenge to venue, not in *personam* jurisdiction."). Here, of course, there is a more fundamental issue – URS never signed the Contract and is not bound by the forum-selection clause. Waymouth v. Dep't of Natural Res. & Envtl. Control, Nos. C.A. 6128, 1980, 1985 WL 22038, at *4 (Del. Ch. Sept. 16, 1985) (expectations are not enforceable unless they were shared in a "meeting of the minds"). Solidere offered no support for its theory in its authority. China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp., 334 F.3d 274 (3d Cir. 2003) (Def. Br. at 22 n.17), undermines its position because that court upheld the nonsignatory's right to challenge arbitrability in court when faced with a similar provision to the one cited by Solidere here. Id. at 289.

Padcom, 2004 WL 1192641, at *2, citing American Bio, 1999 WL 615175; Foster Wheeler, 1993 WL 669447, at *2 ("'General jurisdiction is implicated where the claim arises from the defendant's non-forum related activities.'"), citing Reed v. Staker, C.A. No. 92-0419, 1992 WL 68272, at *2 (E.D. Pa. Mar. 23, 1992). Taken together with Solidere's contacts outlined above in support of specific jurisdiction, which spanned seven years of continuous ties with the U.S., Solidere's other activities in the U.S. provide sufficient basis for this Court to exercise general jurisdiction over Solidere.

Solidere's most significant activity in the U.S. unrelated to the Contract is its targeting of U.S. investors for distribution of Solidere's GDRs,[17] which financed Solidere's operations beyond those relating to the Project. (Supra (citing Pinker, Carrillo and Newport).)[18] Solidere also continuously reached out to the Hariri Foundation in Maryland to obtain resumes from potential candidates to fill vacancies at Solidere. (Supra at 10.) Helicopteros Nacionales de Colombia S.A. v. Hall, 466 U.S. 408, 411 (1984) (recruitment of employees from the forum was a factor in analyzing general jurisdiction). Finally, over the course of Solidere's operations, it has reached out to and hired at least seven other U.S.-based contractors to perform various reconstruction projects in Beirut, ███████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████.

Solidere's continuous utilization of American know-how for purposes of its operations, together with all the attendant communications and payment directed by Solidere to the U.S. in

---

[17]     Solidere's targeting of specific investors in the U.S. distinguishes this case from Lesser & Kaplin, P.C. v. Am. Ins. Co., 723 F. Supp. 1099, 1102 (E.D. Pa. 1989) (Def. Br. at 17-18), which noted that defendant's sale of securities to the forum residents was "indirect[]" and accomplished through "publications of general circulation which find their way into [the forum]." Solidere's other authority is similarly distinguishable. Saudi v. Acomarit Maritimes Servs., S.A., 114 Fed. Appx. 449, 453 (3d Cir. 2004) (non-precedential opinion, observing that the only contacts with forum amounted to one of defendant's employees living there and sending occasional communications to and from home; as for contacts with the U.S., neither the injury nor any of defendant's business activities occurred within the forum); Simplicity, Inc. v. MTS Prods., Inc., No. CIV.A. 05-3008, 2006 WL 924993, at *6 (E.D. Pa. Apr. 6, 2006) (observing that few of defendant's contacts were specifically targeted to reach the forum); Malloy v. Harnischfeger Corp., No. CIV. A. 92-2795, 1993 WL 57191, at *5 (E.D. Pa. Feb. 26, 1993) (emphasizing none of the contracts at issue involved performance within the forum).

[18]     While Pinker, Carillo and Newport analyzed the contacts with U.S. securities market for specific jurisdiction purposes, the language used by these courts made clear that such contacts are jurisdictionally significant even outside of that context. See, e.g., Cole v. Tobacco Inst., 47 F. Supp. 2d 812, 817 (E.D. Tex. 1999) (grounding finding of general jurisdiction on defendant's control of its ADR program in the United States, coupled with defendant's activities directed to attracting U.S. investors). While Telcordia Techs., Inc. v. Alcatel S.A., No. CIV.A. 04-874 GMS, 2005 WL 1268061, at *7 (D. Del. May 27, 2005), rejected jurisdiction based on the defendant's trading of its ADRs, where this was the only fact supporting jurisdiction. Here, however, Solidere's specific targeting of investors for its GDR distribution must be viewed in the context of Solidere's other numerous contacts with the forum. Telcordia Techs., 458 F.3d at 179 (defendant's contacts satisfied constitutional analysis based on "totality of the circumstances"); Dardana Ltd. v. Yuganskneftegaz, 317 F.3d 202, 208 (2d Cir. 2003) (reversing dismissal for lack of jurisdiction for failure to consider defendant's contacts on the nationwide basis, which included its trading of ADRs in the U.S.).

connection with its contracts with U.S. service providers, supports exercise of personal jurisdiction over it. See, e.g., Theo. H. Davies & Co., v. Republic of Marshall Is., 174 F.3d 969, 974-75 (9th Cir. 1998) (finding that jurisdiction was proper over defendant that "bought both goods and services from providers doing business or located in the United States[,]" solicited bids in Hawaii, negotiated the contract at issue in litigation in Guam, and sent representatives to attend contract meetings in Hawaii); Amtrol, Inc. v. Vent-Rite Valve Corp., 646 F. Supp. 1168, 1172-73 (D. Mass. 1986) (exercising jurisdiction over Dutch company proper based on three business relationships with U.S. companies).

## C.    Exercise of Personal Jurisdiction Over Solidere Comports With the Principles of Fair Play and Substantial Justice

Where, as here, the plaintiff has made out a *prima facie* case in favor of personal jurisdiction, the burden is on the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Mellon Bank, 960 F.2d at 1226. See also Grand Entm't, 988 F.2d at 483 (burden on defendant is "heavy"). This inquiry is guided by Due Process considerations "to ensure that the lawsuit does not offend 'traditional notions of fair play and substantial justice.'" Padcom, 2004 WL 1192641, at *6. The analysis focuses on "1) whether the defendant reasonably could have anticipated being haled into the forum ...; 2) the burden imposed on the defendant by litigating in that forum; and 3) plaintiff's interest in the forum." Id.[19]

Solidere failed to carry its burden and did not present a compelling case that exercising jurisdiction would be constitutionally unreasonable. First, Solidere complains that it would be burdened by litigation here because key witnesses and a significant portion of the evidence supposedly are in Lebanon. (Def. Br. at 23.) But this Action has little to do with Lebanon because the issue here is the corporate separateness and independence of two American companies, URS and its subsidiary, Radian. Indeed, Solidere's entire theory as to why URS should be subjected to arbitration under the Contract is that URS acted as Radian's alter ego. (Compl., Ex. A, at ¶¶ 148-241.) Thus, most of the evidence and witnesses are in the U.S., where Radian and URS reside.[20]

Solidere next asserts that it expected all the claims arising out of the Contract to be resolved in France and claims that such an expectation "should weigh heavily" against jurisdiction here. (Def. Br. at 23.) Solidere's expectations arising out of the Contract, however, have nothing to do with URS,

---

[19]    This Court has held that this analysis is inapplicable to cases like this one that proceed under the Fifth Amendment. Brown ex rel. FoxMeyer Drug Co. v. C.D. Smith Drug Co., No. CIV. A. 98-494-SLR, 1999 WL 709992, at **3, 5 (D. Del. Aug. 18, 1999) (Robinson, J.). The Third Circuit, however, "ha[s] not yet decided whether such an inquiry is required by Fifth Amendment due process." Sinclair v. Atty. Gen., 198 Fed. Appx. 218, 223 (3d Cir. Aug. 14, 2006). Thus, out of an abundance of caution, URS will show that if the Court applied the fair play and substantial justice analysis here, it would find the exercise of jurisdiction constitutionally proper.

[20]    Solidere's allusions to witnesses and evidence in Lebanon should be disregarded because Solidere failed to provide the Court with a description of the facts and circumstances that the witnesses at issue will testify to or why the information Solidere seeks to elicit cannot be obtained from other sources. Fiscus, 2006 WL 1722607, at *9 (defendant's failure to address these issues warranted a finding that he "has not met his burden of demonstrating a compelling case that this Court's personal jurisdiction would be unreasonable").

which did not sign the Contract. Indeed, accepting this argument would be tantamount to resolving jurisdiction by reaching the ultimate merits of the Action, which seeks this Court's determination that URS is not bound by the Contract. Cf. Fiscus, 2006 WL 1722607, at *9 ("If a defendant's subjective expectation about exposure to the forum's jurisdiction were to receive substantial weight in this [jurisdictional] calculus, no defendant would admit to the possibility of such jurisdiction regardless of the circumstances."). Solidere's arguments based on the federal policy favoring arbitration and enforcing forum-selection clauses (Def. Br. at 23) are irrelevant for the same reason.[21]

Solidere argues that the U.S. has no significant interest in this dispute. (Id.) The opposite is true. Solidere seeks to force a parent into a foreign arbitration proceeding by disregarding the distinction between a parent (URS) and its subsidiary (Radian). "The practice of dealing through a subsidiary is ... essential to our nation's conduct of foreign trade." Sarhank Group v. Oracle Corp., 404 F.3d 657, 662 (2d. Cir. 2005) (emphasis added). Indeed, "[i]t is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation ... is not liable for the acts of its subsidiaries." United States v. Bestfoods, 524 U.S. 51, 61 (1998). Thus, this dispute involves essential American policies. Sarhank, 404 F.3d at 662 (reversing decision confirming a foreign arbitral award against a non-signatory parent for failing to make an independent determination on arbitrability; "[a]n American nonsignatory [parent entity] cannot be bound to arbitrate in the absence of a full showing of facts supporting an articulable theory based on American contract law or American agency law").[22] This Action also concerns a dispute between a Delaware company and a quasi-governmental Lebanese entity and directly implicates the interests of URS's chosen forum. Telcordia Techs., 458 F.3d at 179 (in New York Convention action, exercise of personal jurisdiction over a South African defendant was fair and reasonable because "the arbitration at issue was between a New Jersey corporation and the former [South African] government-owned state telecommunications monopoly illustrates New Jersey's interest in adjudicating this dispute").

---

[21]    See supra n. _ (discussing Solidere's forum selection clause arguments); see also Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 154 (3d. Cir. 2001) (in non-signatory cases, "law reverses the ordinary presumption of arbitrability. . . This approach reflects a reluctance to 'force unwilling parties to arbitrate a matter they reasonably would have thought a judge ... would decide'"); Comer v. Micor, Inc., 436 F.3d 1098, 1104 n.11 (9th Cir. 2006) ("question here is not whether a particular issue is arbitrable, but whether a particular party is bound by the arbitration agreement. Under these circumstances, the liberal federal policy regarding the scope of arbitrable issues is inapposite."); Fleetwood Enters., Inc. v. Gaskamp, 280 F.3d 1069, 1073 (5th Cir. 2002) (same); Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc., 984 F.2d 113, 117 (4th Cir. 1993) (same).

[22]    Solidere asserts that the exercise of jurisdiction over it is unreasonable because URS is already obtaining relief in the ICC Arbitration. URS has the absolute right to have the issue of arbitrability decided by a court, not the ICC. AT&T Techs., Inc. v. Commc'n Workers of Am., 475 U.S. 643, 649, 651 (1986). Moreover, contrary to Solidere's argument (Def. Br. at 23-24), the eventual availability of judicial review after the arbitral tribunal renders its decision is not an adequate remedy for URS. See Raytheon Eng'rs & Constructors, Inc. v. SMS Schloemann-Siemang Akiengesellschaft, No. 99 C 7771, 2000 WL 420866, at *3 (N.D. Ill. Mar. 16, 2000) ("If the dispute is arbitrated, [the non-signatory party] would lose unlimited judicial review of its claim (versus the narrow review a court may give an arbitrator's award).").

Where, as here, the defendant has purposefully and continuously sought business ties with the forum, obtained countless resources and know-how from the forum, and directed numerous substantive communications to the forum to achieve those very goals, the burden of litigating in the forum in question cannot reach constitutional magnitude as a matter of law. Matter of Harvard Indus., Inc., is instructive. In Harvard, the court considered the difficulties of litigating in the U.S., but concluded that "[w]hile the corporate defendants may be burdened by having to litigate in the United States, nothing in the record indicates this burden is so substantial as to achieve constitutional magnitude ... For example, there are no facts to show that the defendants lack the resources to fairly litigate this case in a forum in the United States." 173 B.R. 82, 90 (Bankr. D. Del. 1994).

Like in Harvard, Solidere, a nearly $2 billion dollar company with no outstanding debt, plainly has resources to litigate this case in the U.S. Solidere's many visits to the U.S. and business relationships with various U.S. entities since its creation highlight the ease of Solidere's access to the forum. Moreover, like in Harvard, the U.S. has a significant interest in enforcing its "bedrock" principles, and the key records and witnesses on the central issue are located here, in the United States. See also Padcom, 2004 WL 1192641, at *6 (exercise of jurisdiction comported with fair play and substantial justice principles; "[b]y targeting businesses in the [forum], [defendant] knew that its conduct and connections with [the forum] were such that they reasonably should have anticipated being brought to this forum"); Green v. William Mason & Co., 996 F. Supp. 394, 396-97 (D.N.J. 1998) ("Geography is not the touchstone of fairness.... Not constrained by the artificial demarcations of state lines, Fifth Amendment due process seeks merely to ensure that the maintenance of an action in a particular forum will not offend 'traditional notions of fair play and substantial justice.'").

Finally, there are pragmatic factors that favor the Court's exercise of personal jurisdiction over Solidere. For instance, because URS's assets are in the U.S., Solidere will eventually submit to jurisdiction of the U.S. courts to enforce any judgment Solidere obtains against URS. In addition, exercising jurisdiction now preserves resources because upon enforcement of an arbitral away, any court presented with a foreign arbitration judgment involving findings on the issue of corporate separateness between URS and Radian would have to explore the same issues anew even if Solidere is allowed to proceed with the ICC Arbitration. See, e.g., Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1520 (3d Cir. 1994) ("neither this Court nor the district court is bound by the arbitrators' determination that [plaintiff] was the alter ego of [a signatory to arbitration agreement]. He is entitled to an independent judicial determination of that issue."), aff'd, 514 U.S. 938 (1995).

## II.    THIS COURT HAS JURISDICTION OVER SOLIDERE UNDER THE FSIA

### A.    Jurisdiction Exists Because Solidere Is an Organ of the State of Lebanon

Under the FSIA, this Court has jurisdiction over Solidere, as an "organ of a foreign state," if

a statutorily defined exceptions applies. 28 U.S.C. §§ 1330(a), 1603(b)(2) & 1604; Weltover, 504 U.S. at 610-11. While the FSIA does not define "organ," the Third Circuit looks to the following factors to assess FSIA organ status: (1) the circumstances surrounding the entity's creation; (2) the purpose of its activities; (3) the degree of supervision by the government; (4) the level of government financial support; (5) the entity's employment policies, particularly regarding whether the foreign state requires the hiring of public employees and pays their salaries; (6) the entity's obligations and privileges under the foreign state's laws; and (7) the ownership structure of the entity. See USX Corp. v. Adriatic Ins. Co., 345 F.3d 190, 209 (3d Cir. 2003). An examination of these factors confirm that Solidere is indeed an organ of the Lebanese State under the FSIA. See Gates v. Victor Fine Foods, 54 F.3d 1457, 1460-61 (9th Cir. 1995) (applying USX factors; finding organ status).

**Solidere's Creation and Purpose.** The Lebanese government created Solidere to rebuild Beirut following the Lebanese civil war and authorized it to perform infrastructure works "for the account and at the expense of the State, by virtue of an agreement to be concluded between the real estate company and the Council [Lebanon's Council for Development and Reconstruction ("CDR").]" (Exs. 105-107; Chammaa Decl. Ex. A; Ex. 2 at 40:4-7; Ex. 1 at 232:8-234:10.) Solidere's creation required the passage of a law in 1991 (the "1991 Law") because the State is legally required to provide infrastructure works. (Chammaa Decl. ¶¶ 2-4.) According to Solidere, its purpose is essential for the public good of Lebanon. (Compl., Ex. A at ¶ 12; Ex. 108 at SOLDEL20892.) See Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir. 2004) (entity is an organ of foreign state where formed by statute and performs traditional government functions).

**Lebanon's Supervision of Solidere.** The Lebanese government regulates investment in Solidere, dictates its capital structure, and mandates that 2/3 of its Board members must be Lebanese nationals. (Chammaa Decl., Ex. A at Art. 3.) Solidere's Articles of Incorporation had to be formed in consultation with the CDR (a Lebanese government agency (Ex. 107; see also Ex. 1 at 120:2-4, 244:7-8, 246:7-10, 249:11-12)) and approved by the Lebanese Council of Ministers (another government body endowed with executive and legislative powers under the Constitution (Ex. 109 at Art. 17 & 18; Chammaa Decl., Ex. A at Art. 1 & 2.) CDR approval was a condition precedent to executing the Contract, and it must be performed according to CDR's plans. (Compl. Ex. B at Art. 8 & GCC § 29.3.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Almost every aspect of Solidere's operations requires governmental approval. (Id.) Indeed, one director on Solidere's board actually *represents* Lebanon and the Municipality of Beirut. (Def. Br. at 14, n.10; Chammaa Decl. ¶ 5(c) & Ex. B at Art. 18.) EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd., 322 F.3d 635, 640 (9th Cir. 2003) (although "the [state] is not directly involved in the day-to-day activities of

[the entity that] does not mean that it is not exercising control over the entity").

**Lebanon's Financial Support of Solidere.** Solidere receives significant financial support from the government. ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ This arrangement gives Solidere title to "one of the most prestigious pieces of real estate in the Middle East." (Chammaa Decl. ¶ 4.) This plan was based on an agreement "drawn up by [CDR] and approved by the Council of Ministers pursuant to a proposal presented by the Minister of Finance and the Minister of Public Works and Transport." (Chammaa Decl., Ex. A at Art. 3; see also Ex. 1 at 246:15-18.) Lebanon exempts Solidere from tax liability (Ex. 110 at SOLDEL 24710), allows it to utilize U.S. dollars in its financials, and offers an array of other financial perquisites to Solidere that are not enjoyed by any private company. (Ex. 108 at SOLDEL 20888; ██████████████████████

████████████████████████████████████). Lebanon also gives priority in the cash component of Solidere's capital to "the State and the Public Institutions and Municipalities concerned." (Chammaa Decl., Ex. A at Art. 3.) The Lebanese government's "strong interest to see Solidere succeed" has led to "a number of tight covenants ensur[ing] the financial health of the company over several years" and its rise to become the largest company in Lebanon with a net worth of $1.7 billion in real estate and cash subscriptions, $180 million in revenues, and a net income of $54 million. (Exs. 43 at 1-2; 108 at SOLDEL20888, 20892; 110 at SOLDEL24710.)

**Solidere's Privileges Under Lebanon's Laws.** Solidere enjoys many exclusive privileges and exemptions. For instance, the 1991 law grants Solidere exclusive eminent domain rights to perform its infrastructure work. (Ex. 2 at 184:2-16.) Solidere is exempt from Lebanese registration and taxes and reports its financial statements in dollars, not Lebanese pounds like most other Lebanese companies. According to Lebanese media reports, not only does Solidere enjoy exclusive privileges from the Lebanese government, such that the government's official real estate registry "has an official relationship with Solidere as if it were a ministry and has even moved into the company's building, and registered properties in Solidere's name" (Ex.118), but also has the police force at its disposal to enforce its eminent domain privileges. Indeed, Solidere was named in 200 lawsuits by former property holders attacking "the legality, existence and formation of the company," which were dismissed as having "no legal foundation since the company was formed via a special law." (Ex. 108 at SOLDEL20890.) Where an "entity holds exclusive rights to some right," Supra Medi. Corp. v. McGonigle, 955 F. Supp. 374, 379 (E.D. Pa. 1997), and other similar entities are barred from performing the same activities, the entity enjoying the exclusive rights is an organ of the State. EIE

Guam, 322 F.3d at 640.[23]

**The Ownership Structure Of Solidere.** Solidere argues that it is a private company and that the state of Lebanon owns less than one percent of its shares. (Def. Br. at 14.) "[I]t is possible that a foreign state might not own any portion of any entity that nevertheless is its organ as section 1603(b)(2) does not require a foreign state to have any ownership interest in an entity for it to be its organ." USX, 345 F.3d at 209. Here, a number of Lebanese government entities own Solidere's stock, including the state Treasury, Ministry of Finance, Ministry of Youth, Ministry of Education, and Ministry of Communication, and the Municipality of Beirut. (Ex. 45A at Resp. No. 18.) These entities are heavily involved in providing Soldiere with authority and funds to implement the BCD improvement project. (Exs. 113-114.) Indeed, Solidere presents itself publicly as a "government-empowered" corporation. (Exs. 115, 116 at Ch.6 "Expropriation and Compensation"; Compl. ¶ 25.) And until URS filed this Action, Solidere's counsel described Solidere as "an entity owned by the Government of Lebanon." (Ex. 117.)

## 2.    Solidere is Subject to Suit As It Falls Under Several FSIA Exceptions

Although Solidere is an organ of Lebanon, and by extension a "foreign state" for purposes of the FSIA, it is subject to suit under the FSIA because: (1) it has waived its immunity by agreeing to arbitration on the territory of a signatory to the New York Convention (France); and (2) this action is based upon a commercial activity undertaken in the United States by Solidere; and/or (3) this action relates to enforcement of an agreement to arbitrate arising under the New York Convention.

### (a)    Solidere Waived Immunity By Agreeing to Arbitrate in France

Under the FSIA, "[a] foreign state shall not be immune from the jurisdiction of courts in the United States ... in any case ... in which the foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1).[24] Implied waiver exists "when the foreign state has agreed to arbitration in another country" or "when a foreign state has agreed that the law of a particular country shall govern a contract." Saudi Basic Indus. Corp. v. Exxonmobil Corp., 194 F. Supp. 2d 378, 402 (D.N.J. 2002). Solidere waived its immunity under the FSIA because it agreed to arbitrate in another signatory to the New York Convention (France) pursuant to the Contract, has actually

---

[23]    Exs. 119 ("Solidere was granted an unconstitutional and unconscionable concession ... The rights of the original owners and tenants were confiscated with meager compensation in the form of Solidere's own shares that can never be sold. A large police force was placed at the disposal of Solidere's management to evict owners and residents by force"); 120 (accounts of property owners thrown out of their homes by police at Solidere's command); 121. ██████████████████████████████████████████████████

[24]    The legislative history of Section 1605 acknowledged that courts have found waivers in cases where "a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract." H.R. Rep. No. 1487, 94th Cong., 2d Sess. at 18 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6617.

participated in the ICC Arbitration in France, and the current litigation arises from that arbitration.[25]

**(b)    Solidere's Commercial Activities Abrogate Its Immunity**

The FSIA also provides for waiver of sovereign immunity for commercial activity where: "the action is based upon [1] a commercial activity carried on in the United States by the foreign state; or upon [2] an act performed in the United States in connection with a commercial activity of the foreign State elsewhere; or upon [3] an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). "[C]ommercial activity" is defined as "a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. §1603(d). In ascertaining if a foreign state is engaging in "commercial" activities, "the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" Weltover, 504 U.S. at 614. The Third Circuit has a two-part test to determine whether a foreign state's commercial activities are sufficient to deprive it of immunity under FSIA's commercial activity exception: (1) "whether there is a sufficient jurisdictional nexus between the commercial activity and the United States;" and (2) "whether there exists a substantive nexus between the commercial activity and the subject matter of the claim." Fed. Ins. Co. v. Richard I. Rubin & Co., 12 F.3d 1270, 1286 (3d Cir. 1993).

Solidere plainly has engaged in numerous activities in the U.S. that constitute "commercial activity." As discussed above, Solidere contracted with over a dozen U.S. contractors, obtained USTDA grants, financed the "U.S. component" of the Contract with a guarantee from the Export-Import Bank,[26] and offered its GDRs on the U.S. OTC Exchange through its U.S. depositor, Bank of New York, which also serves as its U.S. transfer agent. (Supra at 10-11.) Thus, there is more than sufficient jurisdictional connection or nexus between Solidere's commercial activities and the U.S. See Theo. H. Davies, 174 F.3d at 973-74 (defendant's commercial transaction with plaintiff, even though a single transaction consisting of meeting with plaintiff in Guam and Hawaii and entering into

---

[25]    Though the Third Circuit has not yet considered the waiver exception to FSIA immunity, courts in other jurisdictions have examined this issue and found implicit waiver of the immunity. Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala is instructive. There, the Romanian "foreign state" defendant was found to have waived any sovereign immunity defense after entering into agreeing arbitrate any disputes before the ICC in France, and it actually participated in such an arbitration. 989 F.2d 572, 578-79 (2d Cir. 1993). As Romania was a signatory of the New York Convention, the court held that "by the very provisions of the Convention, the signatory State must have contemplated enforcement actions in other signatory States." Id. at 578. Accord Creighton Ltd. v. Gov't of the State of Qatar, 181 F.3d 118, 123 (D.C. Cir. 1999); Ipitrade Int'l, S.A. v. Fed. Republic of Nig., 465 F. Supp. 824, 826 (D. D.C. 1978) (holding that Nigeria, a signatory to the New York Convention, implicitly waived sovereign immunity under the FSIA due to its agreement to adjudicate all disputes arising under contract in accordance with Swiss law and rules of the ICC).

[26]    A substantial contact with the U.S. includes "indebtedness incurred by a foreign state which negotiates or executes a loan agreement in the United States, or which receives financing from a private or public lending institution located in the United States - for example, loans, guarantees or insurance provided by the Export-Import Bank of the United States." H.R. Rep. No. 94-1487 at 17 (emphasis added).

a contract with plaintiff, constituted a commercial activity within the meaning of 28 U.S.C. § 1603(d)).

These commercial activities also have a substantive connection to the subject matter of the claims because Solidere's wrongful joinder of URS in the ICC Arbitration is based upon Solidere's assertion that it was URS, not Radian, that performed the Contract via, inter alia, URS's control over Radian's operations exercised from the United States. (Compl. Ex. A ¶¶ 148-241.) Further, Solidere's breach of contract claim in the ICC Arbitration is necessarily "based upon" events in the U.S., as it includes its entering into the Contract in the U.S., and thus all the attendant U.S. connections.[27] Saudi Basic, 194 F. Supp. 2d at 404 ("a claim is 'based upon' events in the United States if those events establish a legal element of the claim."); Tonoga Ltd. v. Ministry of Public Works & Housing, 135 F. Supp. 2d 350, 356-57 (N.D.N.Y. 2001) (substantial contact with the U.S. for purposes of the commercial exception activity existed where significant portion of material produced by supplier for the underlying contract occurred in U.S. and parties expected contract to be fulfilled in part in U.S.).

### (c)   Solidere's Agreement to Arbitrate the Contract Deprives It of Immunity From Jurisdiction Under FSIA

Another exception that deprives Solidere of immunity as a "foreign state" under FSIA is the arbitration exception, which provides that a foreign state shall not be immune in any case:

> to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if ... (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards.

28 U.S.C. § 1605(a) (6). The Second Circuit recently upheld jurisdiction under this exception in a case involving a disputed contract with an arbitration provision between an American corporation and a Chinese state-owned corporation, which qualified as a "foreign state" under the FSIA. U.S. Titan, Inc., 241 F.3d at 143. The court ultimately held that it had jurisdiction over the Chinese state-owned corporation because the valid contract between the parties contained an arbitration clause, and both the United States and China were signatories to the New York Convention. See id. at 150-51. Here, the Contract, which Solidere alleges to be binding upon URS, indisputably contains an arbitration clause, and Lebanon and the United States are both signatories to the New York Convention.

---

[27]    Moreover, Solidere's activities outside of the United States that have a "direct effect" in the United States also satisfy the second part of the Third Circuit test. "[T]he relevant inquiry under the direct effect clause when plaintiff is a corporation is whether the corporation has suffered a 'direct' financial loss." Saudi Basic, 194 F. Supp. 2d at 406 (citing Tex. Trading & Milling Corp., 647 F.2d at 312). Also, the "direct effect" on URS need not be substantial or foreseeable so long as it follows as an immediate consequence of Solidere's activities. See Weltover, 504 U.S. at 618. Thus, examples such as Solidere's termination of the Contract that caused substantial financial losses to URS's subsidiary or unjustifiably initiating arbitration against URS, causing URS to expend resources and suffer financial losses, both suffice for the "direct effect" requirement of FSIA's commercial activity exception. See Saudi Basic, 194 F. Supp. 2d at 406-07.

**B.    This Court Has Personal Jurisdiction Over Solidere Under the FSIA**

As this Court has subject matter jurisdiction and URS complied with the FSIA's service requirement (supra at n.1), this Court also has personal jurisdiction over Solidere.  Under the FSIA, "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts" have subject matter jurisdiction and where service has been made under FSIA's service requirement.  28 U.S.C. § 1330(b) (emphasis added); Verlinden B.V. v. Central Bank of Nig., 461 U.S. 480, 485 n.5 (1983); see also Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 271-72 (D.D.C. 2003).  On its face, section 1330(b) confers this Court with personal jurisdiction over Solidere because (1) subject matter jurisdiction is proper over Solidere, as an organ of the Republic of Lebanon, under three different exceptions to jurisdictional immunity under FSIA (supra at 26-27), and (2) Solidere was properly served pursuant to 28 U.S.C. § 1608 (supra at 1 n.1).[28]

**III.    SOLIDERE FAILS TO CARRY ITS HEAVY _FORUM NON CONVENIENS_ BURDEN**

The doctrine of forum non conveniens gives a court the discretion to decline jurisdiction in exceptional circumstances.  See Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 504 (1947); Lacey v. Cessna Aircraft Co., 862 F.2d 38, 46 (3d Cir.1988) (Lacey I).  To show such exceptional circumstances, the moving party must show that an alternative forum exists and that the plaintiff's chosen forum is oppressive and vexatious to the defendant out of all proportion to the plaintiff's convenience.  Piper Aircraft Co. v. Reyno, 454 U.S. 235, 257 (1981); Lacy I, 862 F.2d at 43.  In ruling on a motion to dismiss based on _forum non conveniens_, a court must address four issues:  (1) the availability of an alternative forum;  (2) the amount of deference to be accorded to the plaintiff's choice of forum;  (3) the private interest factors;  and (4) the public interest factors.  Lony v. E.I. Du Pont de Nemours & Co., 886 F.2d 628, 633 (3d Cir.1989) (Lony I).  A court must consider the availability of an adequate alternative forum and the amount of deference to be accorded the plaintiff's choice of forum before it weighs the private and public interest factors.  Lacey I, 862 F.2d at 45.  "[T]he defendant bears the burden of persuasion as to all elements."  Lacey v. Cessna Aircraft Co., 932 F.2d 170, 180 (3d Cir. 1991) ("Lacey II"); Magla Prods., L.L.C. v. Chambers, No. Civ. A. 06-0115 PGS, 2006 WL 2846274, *5 (D.N.J. Sept. 29, 2006) ("The defendant bears the burden of proving that these factors weigh heavily in favor of dismissal....This is a heavy burden for the defendant to overcome[.]").

---

[28]    While this Court has previously held that foreign states are entitled to the same protections as "persons" under the Due Process Clause when sued in U.S. courts, In re EAL Corp., No. 93-578-SLR, 1994 WL 828320, at **13-14 (D. Del. Aug. 3, 1994), federal circuits since that decision have shifted away from requiring due process analysis for foreign states. In fact, in the years since In re EAL, courts from the D.C., Second, Fourth, Ninth and Tenth Circuits have all held that foreign states and their instrumentalities are not entitled to due process protection. See TMR Energy Ltd. v. State Prop. Fund of Ukraine, 411 F.3d 296, 301 (D.C. Cir. 2005); Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 96 (D.C. Cir. 2002) aff'd in part, 389 F.3d 192 (D.C. Cir. 2004) ("foreign states are not 'persons' protected by the Fifth Amendment"); Rux v. Republic of Sudan, No. Civ. A. 2:04CV428, 2005 WL 2086202, at **17-18 (E.D. Va. Aug. 25, 2005) (same); Cruz v. United States, 387 F. Supp. 2d 1057, 1067-68 (N.D. Cal. 2005). As such, URS respectfully requests that this Court follow this trend and hold that Solidere is indeed subject to personal jurisdiction in this forum under the FSIA.

29

A.    <u>The ICC Cannot Be A Forum, Let Alone An Adequate Forum, for This Dispute</u>

Under the "adequate alternative forum" prong, <u>where the remedy offered by the other forum is clearly unsatisfactory</u>, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied." <u>Bhatnagar v. Surrendra Overseas Ltd.</u>, 52 F.3d 1220, 1227 (3d Cir. 1995). Solidere insists that "this action does not belong in the United States, let alone in this district" and that the pending ICC Arbitration is "an available, adequate, alternative forum for this dispute." (Def. Br. at 24, 26.) Solidere ignores that under American law a court, not an arbitrator, decides whether a parent company is obliged to participate in arbitration when it never agreed to do so, based on a contract signed by an indirect corporate subsidiary. As addressed at length in URS's Preliminary Injunction motion, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." <u>AT&T Techs, Inc.</u>, 475 U.S. at 649, 651.[29] Solidere does not – because it cannot – offer any law countering this authority. Because the ICC arbitral tribunal simply cannot, as a matter of law, make the determination asked of this Court, it cannot be a forum *at all*, much less an adequate one.

Solidere's suggestion that the ICC Arbitration offers the same rights and remedies as to URS available here (Def. Br. at 26, 36) is preposterous. To begin, Solidere fails to offer any evidence in support of this assertion and thus fails to carry its burden as a matter of fact. <u>See</u> <u>Fiscus</u>, 2006 WL 1722607, at *13 (defendant failed its burden on the "adequate alternative forum" prong as he provided no proof showing that the proposed alternative forum recognized the claims brought by plaintiff). This argument also fails on its merits because under French law, unlike American law:

> [W]hen a dispute has been referred to an arbitral tribunal, <u>French courts must decline to hear the case until after an award has been rendered. Deference to an ongoing arbitration is required even if an independent judicial examination would reveal that the arbitrators lacked power to hear the case.</u>

William W. Park, "Text and Context in International Dispute Resolution," 15 B.U. Int'l L.J. 191, 202 (1997) (emphasis added); <u>China Minmetals</u>, 334 F.3d at 288 (in France, "[a] court only can decide arbitrability before an arbitral panel has been constituted if the alleged arbitration agreement is clearly void; otherwise, courts must decline to hear the case until after an arbitral award is rendered").

Thus, Solidere's purportedly "adequate alternative" would force URS to assume the costs and

---

[29]    <u>See also</u> Opening Brief in Support of URS's Motion for a Preliminary Injunction Enjoining Arbitration ("P.I. Br.") at 19-20 (citing, <u>inter alia</u>, <u>First Options</u>, 514 U.S. at 943 ("If ... the parties did *not* agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration."); <u>Howsam v. Dean Witter Reynolds, Inc.</u>, 537 U.S. 79, 83-84 (2002) (same); <u>Litton Fin. Printing Div. v. N.L.R.B.</u>, 501 U.S. 190, 208 (1991) ("Whether or not a [party] ... is bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the court, and a party cannot be forced to 'arbitrate the arbitrability question.'"), and <u>Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.</u>, 868 F.2d 573, 576 (3d Cir. 1989) ("it is the role of the district court, not the arbitrator, to pierce the corporate veil and require a parent corporation to participate in arbitration of a contract to which a subsidiary is formally a party...The requirement for a judicial determination of the obligation to arbitrate may not be circumvented ... by relying on the parent-subsidiary relationship" between the parties).)

delay of participating in an entire arbitration in a foreign forum thousands of miles away <u>before</u> the determination could be made that URS was obligated to be there, yet Solidere fails to explain how this result is anything but "clearly unsatisfactory." Here, "[t]he Third Circuit recognizes a party is irreparably harmed <u>as a matter of law</u> if forced to arbitrate a matter that it has not agreed to arbitrate." <u>Am. Life Ins. Co. v. Parra</u>, 25 F. Supp. 2d 467, 479 (D. Del. 1998) When all is said and done, Solidere's proposal would "simply transfer the inconvenience of litigating this matter in a foreign jurisdiction from [the defendant] to [the plaintiff]" – which, as a matter of law, is insufficient to establish that an adequate alternative forum exists. <u>Fiscus</u>, 2006 WL 1722607, at *12.

**B.    <u>URS's Decision to Sue in Its State of Incorporation is Due Substantial Deference</u>**

As Solidere's authority concedes, "the plaintiff's choice of forum <u>should rarely be disturbed</u>, unless the balance of factors is strongly in favor of the defendant." <u>Lacey I</u>, 862 F.2d at 43 (emphasis added). Thus, dismissal for *forum non conveniens* is proper only "when trial in the chosen forum would 'establish ... oppressiveness and vexation to a defendant ... out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems.'" <u>Lacey I</u>, 862 F.2d at 42.    URS's forum choice is due even greater deference because the alternative forum suggested by Solidere is not in the U.S. :

> [A]n American court <u>may not refuse</u> to try a case brought by an American citizen, unless it feels that injustice would be done by allowing him to proceed in his own court. The result of such a rule is that the discretion of the court, so far as it has any existence, is <u>limited</u>, and that mere inconvenience to the respondent, or to both parties, will not be considered a ground for exercising it to refuse jurisdiction.

<u>The Saudades</u>,  67 F. Supp. 820, 821 (F.D. Pa. 1946).  Courts in this District also note that "courts of the United States are reluctant to apply the doctrine of *forum non conveniens* when it would force an American citizen to seek redress in a foreign court." <u>D'Angelo v. Petroleos Mexicanos</u>, 398 F. Supp. 72, 85 (D. Del. 1975). <u>American Cyanamid Co. v. Picaso-Anstalt</u>, 741 F. Supp. 1150, 1155 (D.N.J. 1990) ("it has long been the law [in the Third Circuit] that particular deference is given to an American citizen's right to litigate in a federal forum"); <u>Mobil Tankers Co., S. A. v. Mene Grande Oil Co.</u>, 363 F.2d 611, 614 (3d Cir. 1966) (a U.S. plaintiff "may have no absolute right to have his case tried in a federal court but his election of such a forum should not be disregarded in the absence of persuasive evidence that the retention of jurisdiction will result in manifest injustice to the respondent. This is so even though the more convenient forum may be the foreign one.").[30]

Solidere makes much of URS's "strategic decision" to file suit in Delaware based "solely on

---

[30]    Accord <u>SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.</u>, 382 F.3d 1097, 1101 (11th Cir. 2004) ("district courts [should] require positive evidence of <u>unusually extreme circumstances</u>, and should be <u>thoroughly convinced that material injustice is manifest</u> before exercising any such discretion . . . to deny a United States citizen access to the courts of this country") (emphasis added); <u>Amirhour v. Marriott Int'l. Inc.</u>, No. C 06-01676, 2006 WL 3499241, at *5 (N.D. Cal. Dec. 4, 2006) (recognizing the "<u>almost impossible</u> burden in order to deny a citizen access to the courts of this country") (emphasis added).

the state as its place of incorporation." (Def. Br. at 26.) Relying on 20 year old authority, Solidere asserts that URS's decision to file here "deserves no deference" because it is not URS's "home turf," as URS's principal place of business is in California. (Def. Br. at 6, 26 (citing Chrysler Capital Corp. v. Woehling, 663 F. Supp. 478, 482 (D. Del. 1987).) However, almost ten years ago, this District rejected the argument "that a statutory place of incorporation is entitled to less weight than if the physical presence of the company was in the selected jurisdiction" because the home turf rule only applies where, unlike here, "the forum closest to a plaintiff's principal place of business is selected in order that personal service over the defendant can be obtained." Bering Diagnostics GmbH v. Biosite Diagnostics, Inc., No. Civ. A. 97-501 MMS, 1998 WL 24354, *3 (D. Del. Jan. 6, 1998). See also Sunds Defibrator, Inc. v. Durametal Corp., No. Civ. A. 96-483 MMS, 1997 WL 74660, at *2 n. 2 (D. Del Jan. 31, 1997). This District has repeatedly held that the fact that a company is incorporated in Delaware, even if its principal place of business is elsewhere, "should not be disregarded lightly" because "[b]y incorporating in Delaware, it can be assumed that [URS] desired the benefits it believed Delaware provides to chartered corporations." Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 821 F. Supp. 962, 965 (D. Del. 1993). See also Bering Diagnostics, 1998 WL 24354, at *4 ("[i]t is legitimate and rational ... for a plaintiff to choose to litigate in a forum in which it is incorporated"); Am. Cyanamid, 741 F. Supp. at 1154 (substantial deference given citizen's choice of its forum state "ensures that the Court will not improperly abdicate its duty to properly resolve cases in a manner and in a place consistent with the legitimate expectations of its own citizens.").[31]

### C.  The Private Interest Factors Strongly Favor Retaining Jurisdiction

Solidere also cannot show that the balance of private and public interest factors favors transfer. This Circuit defines the "relevant private interest factors" to include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; ... and all other practical problems that make trial of a case easy, expeditious and inexpensive." Lony v. E.I. DuPont de Nemours & Co., 935 F.2d 604, 609 (3d Cir. 1991) ("Lony II") "If, when added together, the relevant private and public interest factors are in equipoise, or even if they lean only slightly toward dismissal, the motion to dismiss must be

---

[31]    In relying on a sixty-year old case, Koster v. (Am.) Lumbermens Mut. Cas. Co., 330 U.S. 518 (1947) (Def. Br. at 26), to support its "home forum" argument, Solidere omits that Koster was brought by a New York plaintiff against an Illinois corporation, where all the transactions occurred in Illinois, and Illinois law applied (id. at 531). Here, Delaware law applies as a matter of law and the key issue is application of Delaware alter ego law. Even more significantly, Koster was a derivative suit, and the Supreme Court emphasized that where "there are hundreds of potential plaintiffs, all ...of whom could with equal show of right go into their many home courts, the claim of any one plaintiff that a forum is appropriate merely because it is his home forum is considerably weakened." Id. at 524 (emphasis added). The Koster court concluded that dismissal is appropriate only when "plaintiff's response not only disclose[d] so little countervailing benefit to himself in the choice of forum as it d[id] here, but indicate[d] such disadvantage as to support the inference that the forum he [had] chose[n] would not ordinarily be thought a suitable one to decide the controversy." Id. at 531-32. This forum is undoubtedly more than suitable given its role as URS's place of incorporation, the necessity of applying U.S. corporate law, this Court's familiarity with corporate identity issues, and relatively easy access for witnesses from both sides,.

denied." Lacey II, 932 F.2d at 180; accord Lony I, 886 F.2d at 635.

"To examine 'the relative ease of access to sources of proof,' and the availability of witnesses, the district court must scrutinize the substance of the dispute between the parties to evaluate what proof is required, and determine whether the pieces of evidence cited by the parties are critical, or even relevant, to the plaintiff's cause of action and to any potential defenses to the action." Lony I, 886 F.2d at 635. Soldiere persists that the private interest factors favor dismissal because it will need documents and testimony from Solidere, URS and Radian, including depositions of employees of the three entities, to demonstrate that URS is bound to the arbitration clause in the Contract because it "absorbed [Radian] in all but name and assumed performance of the Contract." (Def. Br. at 27; id. at 28-30.) Solidere "assume[s]," without support, "that most of the documents to be used at trial are housed in Lebanon requiring costly and time-consuming retrieval and production[.]" (Id. at 30.) Without naming the individuals whose testimony is allegedly necessary to its cause, Soldiere vaguely asserts that the "vast majority" of its potential witnesses are "foreign nationals who live and work outside the United States, mostly in Lebanon" and are therefore "not subject to compulsory process in Delaware." (Def. Br. at 28 (citing needed testimony from "(i) Solidere employees who managed the Contract.; (ii) URS/Radian employees who performed work under the Contract; (iii) Solidere's construction manager; and (iv) various subcontractors and suppliers who performed work on the Normandy Landfill.").)  Soldiere's assertions are misguided for several reasons.

First, as discussed above, the key issue in this case requires analysis of URS's and Radian's documents and witnesses, not those of Solidere, and all such witnesses and documents are here.

Second, Solidere admits that the ICC arbitral tribunal "lack[s] subpoena power to compel the attendance of unwilling witnesses." (Id. at 28.)  It is well-settled that where neither potential forum has compulsory power of attendance, "there is no significant advantage to a [foreign] forum over an American one[.]" Lony II, 935 F.2d at 610; see also E.I. duPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates, S.A.S., 197 F.R.D. 112, 125 (D. Del. 2000) aff'd in part, 269 F. 3d 187 (3d Cir. 2001) (private factors weighed against dismissal because of, inter alia, the court's ability "to compel third party witnesses to testify to the same extent that any other forum's court could").

Third, the law in this District is clear that the availability of compulsory process is only raised where the defendant has "represented to the Court that [a third party] would be unwilling to testify at trial voluntarily." Critikon, Inc., 821 F.Supp. at 967.  Indeed, Solidere's reliance here on ADE Corp. v. KLA-Tencor Corp., 138 F. Supp. 2d 565 (D. Del. 2001), is puzzling, as that court:

> question[ed] whether it is correct that we should discount a witness's willingness to voluntarily appear and testify at trial in Delaware. Previous decisions in this court have suggested that the better approach is to recognize that witnesses have and will appear here without having to be subpoenaed. [Citations.] Rather than starting with a presumption that witnesses may not appear and concluding the case should be

transferred based on that assumption, it may make more sense to look at the facts and circumstances of each witness to see whether a subpoena is necessary.

Id. at 570-71 (citing, inter alia, Tse v. Ventana Med. Sys., Inc., Civ. A. No. 97-37-SLR, 1997 WL 811566, at *7 (D. Del. Nov. 25, 1997) (Robinson, J.)) (emphasis added); see also In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig., 228 F. Supp. 2d 348, 362 (S.D.N.Y. 2002) (rejecting identical compulsory process argument where "defendants have not even established that those witnesses [living abroad] will be unwilling to travel voluntarily to this district"). Solidere does not even suggest that any of its potential witnesses would be unwilling to appear before this Court; indeed, Solidere's evidence demonstrates only that "upon information and belief," the employees and subcontractors in question are either "Lebanese or British citizens who live in Lebanon." (Chaamaa Decl. ¶¶ 14-15; id. ¶¶ 12-13.) Third, where, as here, the potential witness is a current or former employee of the defendant, "the Court must assume that he would be willing to testify absent a subpoena." Critikon, Inc., 821 F. Supp. at 967. Given that the majority of the potential witnesses Soldiere names are either Solidere employees or subcontractors of Solidere, and because Solidere does *not* suggest that any of its potential witnesses will not travel to this Court (Def. Br. at 28), Solidere has failed to show that a lack of compulsory process weighs against this Court's retaining jurisdiction here.[32]

Fourth, even if documents crucial to Solidiere's cause were located in Lebanon, and that has not been shown, Soldiere fails to explain how retrieval and production of said documents is any less "costly and time-consuming" to produce for a proceeding in Paris than the one before this Court. (Def. Br. at 30.) Similarly, Solidere's assertion that the "cost and inconvenience of travel to the United States poses a significant burden on witnesses willing to appear in Delaware[,]" citing the distance and lack of direct flights between Beirut and the U.S. (Def. Br. at 28), ignores the obvious – that the suggested alternative French forum similarly imposes the hassles of thousands of miles of international travel.[33] E.I. duPont de Nemours & Co., 197 F.R.D. 112, is directly on point. In duPont,

---

[32]    Indeed, Solidere could hardly argue its witnesses would be unwilling to come, given that both Chairman Chammaa and General Manager and Chief Financial Officer Douaidy of Solidere were available for depositions in New York in January. ████████████████████████████████████████████████████████████

[33]    For example, while Soldiere accurately states that "the geographic distance between Beirut and Delaware is significant" (Def. Br. at 28), it neglects to mention that nearly two thousand miles separate Beirut and Paris. (See Ex. 78 (Beirut and Paris are 1987.9 miles apart).) Solidere also argues that the "heightened security concerns and the potential for additional unrest in Lebanon" will make it difficult for Lebanese witnesses to get visas to enter the United States. (Def. Br. at 29.) But Solidere neglects to mention that the same "heightened security concerns" also await a Lebanese citizen trying to attend the ICC Arbitration in France. According to the French Ministry for Foreign Affairs, to enter France on a business trip of less than three months, a Lebanese resident or passport holder is required to submit not only a visa application but, inter alia, a "valid travel document," evidence of a round-trip ticket to and from France, "[d]ocumentary evidence of socio-professional situation"; "[l]etters of invitation from the firms visited, or notifications to visit them"; and "[d]ocumentary evidence of financial resources, or certificate of assumption of responsibility for payment by the organization issuing the invitation." The application may need to be in person. (See Ex. 131.) (An American passport holder arriving for the same purpose does not require a visa at all. Id.) Thus, unfortunately for Solidere's Lebanese witnesses, travel to either forum will necessitate bureaucratic and diplomatic wrangling and lengthy international flights, but

34

Defendants, French corporations, sought dismissal on *forum non conveniens* grounds of a Delaware corporation's suit arising from oral contracts related to a joint venture in China in favor of an ongoing arbitration in Singapore between the defendants and plaintiff's subsidiary, arguing that Singapore was more convenient to witnesses living in China and that the defendants had "consented to suit" in Singapore. Id. at 125.[34] The court held that defendants failed to show dismissal was required because, inter alia, regardless of their country of residence, "most witnesses will have to travel to Singapore to testify" and, because the parties' documentary evidence was housed in France, Delaware, and China, "the parties will have to ship some portion of the documents no matter where the litigation takes place." Id. (emphasis added).[35] See also Sandvik AB v. Advent Int'l Corp., 83 F. Supp. 2d 442, 450 (D. Del. 1999) aff'd, 220 F. 3d 99 (3d. Cir. 2000) (defendant's "burden to bring key witnesses from Germany" did not make litigation in Delaware oppressive and vexatious where plaintiff was Delaware corporation based in Boston because "key witnesses and documents are in the United States"); Am. Cyanamid, 741 F. Supp. at 1156 (no dismissal where the convenience of the parties is roughly balanced as "both [U.S. and foreign] forums contain ... obviously pertinent documents").

Fifth, and finally, the death knell for Soldiere's arguments sounds repeatedly in decisions from this Court and other courts in this District discussing the realities of discovery and trial practice, rendering Soldiere's arguments here wholly moot. As this Court has repeatedly noted, "[f]rom a practical standpoint, much of the testimony presented at trial these days is presented via recorded depositions, as opposed to witnesses traveling and appearing live. There certainly is no obstacle to [defendant's] embracing this routine trial practice." Turn of the Century Solution, L.P. v. Int'l

---

other a few hours less time in the air, the difference in burden is minimal. And the emphasis this Court should place on that burden is also minimal, because, as the Third Circuit has recognized, defendants are often subjected to sacrifices in time, effort and expense simply by being named in a lawsuit. See Malaysia Int'l Shipping Corp. v. Sinochem Int'l Co., 436 F.3d 349, 365 (3d Cir. 2006) cert. granted, 127 S. Ct. 36 (2006) (emphasizing the burden on defendant's resources "overdramatizes the [*forum non conveniens*] doctrine, as most litigation involves unwanted effort and expense for the defendant").

[34]    The court observed that the duPont action should proceed "[d]espite the potential for some factual overlay between this case and the arbitration" pending in Singapore. 197 F.R.D. at 128. This holding undermines Solidere's reliance on Palmco Corp. v. JSC Techsnabexport, No. S.A. CV 06-214 DOC MLGX, 2006 WL 2473316 (C.D. Cal. July 25, 2006), a factually disparate case holding that the "pending arbitration between these parties on the same issues strongly favors dismissal." (Def. Br. at 30.) Unlike here, the Palmco plaintiff did not dispute validity of the arbitration clause (2006 WL 2473316, at *3); moreover, the underlying dispute in Palmco had progressed substantially beyond the preliminary jurisdictional issues – indeed, the court noted that "[m]ultiple arbitration panels have already been convened to consider the parties' claims and counterclaims", and that these Swedish arbitration panels were better suited to resolve "the parties' differing interpretations of Swedish law[.]" Palmco, 2006 WL 2473316, at *5. See also Am. Cyanamid, 741 F. Supp. at 1155 (rejecting argument that plaintiff's "choice of forum should not be accorded the substantial deference which would otherwise be due, in that they filed the present action after litigation was already pending against them in France ... [as defendants] have cited no authority for this proposition and, indeed, the case law appears to admit to no such exception").

[35]    The duPont defendants alternatively sought to compel plaintiff's participation in the Singapore arbitration because its subsidiary was a signatory to the arbitration agreement under third-party beneficiary, agency and estoppel theories, but the court refused to compel the plaintiff, a non-signatory to the arbitration agreement, to arbitrate. Id. at 127-28.

Rectifier Corp., No. Civ. 05-816-SLR, 2006 WL 1653143, *3 (D. Del. June 15, 2006) (Robinson, J.);
see also Wesley-Jessen Corp. v. Pilkington Visioncare, Inc., 157 F.R.D. 215, 218 (D. Del. 1993)
(noting that "parties now routinely offer testimony at trial by videotape"). For this reason, Solidere's
argument that the ICC arbitral tribunal is preferable because it is "less stringent in requiring live
witness testimony at trial" than this forum falls flat. (Def. Br. at 29-30.)[36]

###### D.     The Public Interest Factors Weigh Heavily Against Dismissal Here

Nor can Soldiere demonstrate that the public factors outweigh URS's choice of forum. The
Third Circuit recognizes "the public interest factors to be considered in the *forum non conveniens*
balancing as including: the administrative difficulties flowing from court congestion; the "local
interest in having localized controversies decided at home"; the interest in having the trial of a
diversity case in a forum that is at home with the law that must govern the action; the avoidance of
unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of
burdening citizens in an unrelated forum with jury duty." Lony II, 935 F.2d at 612. This Court "must
also 'consider the locus of the alleged culpable conduct, often a disputed issue, and the connection of
that conduct to plaintiff's chosen forum.'" Id. (citing Lacey I, 862 F.2d at 48).

Soldiere points to court congestion and disposition time, arguing that the "relative congestion
of this Court's docket dwarfs that of an arbitral tribunal ... because such a tribunal will be specifically
constituted to hear this dispute alone and have no other mission." (Def. Br. at 32.) However, the ICC
jurisdictional hearing will not take place until December 2007 (Ex. 129) – well after this Court will
have ruled on URS's preliminary injunction motion. Moreover, this District is a less-congested forum
where resolution is prompt. Joint Stock Soc. Trade House of Descendants of Peter Smirnoff, Official
Purveyor to the Imperial Court v. Heublein, Inc., 936 F. Supp. 177, 190 (D. Del. 1996) ("[m]any
plaintiffs are drawn to the District of Delaware because of its lighter docket and faster case disposition
time"); Bering Diagnostics, 1998 WL 24354, at *7 (describing District's "light docket").

Soldiere trumpets Lebanon's connection to the underlying contract dispute, noting that "the
Contract was negotiated in Lebanon . . . [and] is governed by Lebanese law" and that events arising
to the contract dispute "occurred in Beirut." (Def. Br. at 31.) But try as it might, Solidere is hard-
pressed to demonstrate that the French forum, which obviously has no connection whatsoever to the
parties here, is somehow more connected to the dispute than this Court, merely asserting that
"Lebanon has a significant interest in seeing this dispute ... resolved in a manner bargained-for by a

---

[36]     Courts in this Circuit also repeatedly note that modern technology has virtually eliminated the burden
of document production here. See, e.g., Wesley-Jessen Corp., 157 F.R.D. at 218 ("lawyers in this case know that
within a matter of minutes they can prepare a paper in California, serve it on counsel in New York, file it with
the Clerk in Delaware, and deliver it to the Court for a telephone conference call linking lawyers in three or four
different cities"); In re Corel Corp. Inc. Sec. Litig., 147 F. Supp. 2d 363, 366(E.D. Pa. 2001) ("[I]n the context
of a document-intensive litigation ... [w]hile the initial repository of most relevant documents may be in [a foreign
forum], this fact is of lesser significance in the modern electronic age. Documents can easily be photocopied or
otherwise transferred to this jurisdiction"); Assicurazioni Generali, 228 F. Supp.2d at 359-60 (same).

Lebanese company, i.e. by international arbitration in Paris."[37]  (Id. at 32.)  Again, Solidere ignores

the well-settled law of this Circuit – that, as this Court has recognized, Delaware "has an interest in

litigation regarding companies incorporated within its jurisdiction." Turn of the Century Solution,

2006 WL 1653143, at *3.  Moreover, Solidere's argument has already been rejected in the factually

similar duPont case, where defendants argued that the public interest factors dictated that the Chinese

joint ventures sued had an interest in adjudicating their dispute in China.  The duPont court noted that

where, as here, the plaintiff was a Delaware corporation, "Delaware has an interest in providing a

forum for its citizens to settle contract . . . disputes." duPont, 197 F.R.D. at 125.  The court further

noted that, the interests of the Chinese joint venture aside, the arbitration was to take place in

Singapore, and therefore "there is no guaranty that China will have any part in the adjudication of this

dispute"; thus, the public interest factors dictated the court retain jurisdiction.  Id.  See also Lony I,

886 F. 2d at 632; supra at 22 (discussing U.S. interests in litigating this dispute).[38]

Soldiere also asserts that "the potential need to apply foreign procedural and substantive laws

[] further counsels in favor of dismissal" as the "ICC arbitral tribunal will be experienced in handling

an international dispute like this regardless of the national law or laws which may apply" and that

"experienced international arbitrators would be well qualified to conduct any relevant conflicts

analysis and to select and apply foreign law[,]" implying that this Court cannot accomplish "a complex

choice of law analysis." (Def. Br. at 32, 33).  Courts routinely reject such arguments as "fail[ing] to

justify the relegation of an American plaintiff to a foreign forum."  Reavis v. Gulf Oil Corp., 85

F.R.D. 666, 672 (D. Del.1980).  Indeed, this District has held that foreign law "poses no difficulties":

> Federal courts are often called upon to apply law foreign to the forum and with which
> they are unfamiliar. Aside from the difference in language, the task of interpreting the
> law of a foreign nation poses no difficulties not presented by the frequent necessity
> to interpret the laws of other states. There is no more reason, in general, to abstain
> from the former responsibility than from the latter.

Id. (emphasis added); R. Maganlal & Co. v. M.G. Chem. Co., 942 F.2d 164, 169 (2d Cir. 1991).

Regardless, Soldiere did not show that whether URS is obligated to arbitrate on its subsidiary's

contract, a question of U.S. law for U.S. courts, involves a complex analysis, much less foreign laws.

---

[37]    Solidere asserts that French procedural law governs the dispute because the Contract's arbitration clause specifies the situs of arbitration as Paris, France. (Def. Br. at 32.)  This argument ignores that URS never signed the Contract and never agreed to it arbitration clause, let alone its designation of the arbitration situs.

[38]    Soldiere's reliance on S. Megga Telecommunications Ltd. v. Lucent Technologies, Inc., No. 96-357-SLR, 1997 WL 86413 (D. Del. Feb. 14, 1997) (Robinson, J.), is unavailing. There, the plaintiffs were seeking to dismiss unrelated counterclaims, where there was "no significant overlap of facts or law" to plaintiffs' claims, as the counterclaims were governed by Chinese law involving a Chinese joint venture not even joined as a party to the original dispute.  Id. at **10-11.  Resolving these unrelated issues, as this Court found, "would unnecessarily burden the trial of plaintiffs' claims." Id. at *11.  It does not hold that this Court should disregard the deference due a citizen plaintiff's choice of forum in favor of an arbitration in a foreign venue unconnected to the dispute, especially where the issues to be resolved must be decided by a U.S. court under U.S. law.

**IV.    SOLIDERE'S EQUITABLE ESTOPPEL ARGUMENT IS BASELESS**

As a last gasp, Solidere asserts that URS should be estopped from proceeding here because URS objected in the ICC Court to the assertion of jurisdiction and allegedly submitted it for decision on the merits. In effect, Solidere argues that URS waived access to this Court by objecting to jurisdiction of the ICC. Cf. China Minmetals, 334 F.3d at 290 n.15 (noting, in response to defendant's argument that plaintiff waived its right to claim lack of arbitration agreement by raising objections to arbitral jurisdiction and thereby participating in the arbitration proceeding, that the court will not go into "the sometimes elusive distinction between the application of principles of waiver and estoppel").

Solidere's argument can be rejected out of hand, as the Third Circuit has held that raising objections to arbitral jurisdiction – and even receiving an adverse jurisdictional ruling – in no way waives the right to seek relief in court on the same issue. Id. at 291-92 (upholding plaintiff's right to resort to judicial remedies against arbitral jurisdiction, where plaintiff "participated ... in the arbitration primarily to argue the ... jurisdiction issue and consistently objected to [arbitral] jurisdiction throughout the proceedings"); accord First Options, 514 U.S. at 946 ("merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue ... insofar as the Kaplans were forcefully objecting to the arbitrators deciding their dispute with First Options").

Solidere complains that URS "invited" the ICC to rule on its objections, and Solidere "relied" on this invitation by expending resources to litigate the issue. (Def. Br. at 34.) Nonsense. Solidere, not URS, tendered the jurisdictional issue to the ICC by its Request for Arbitration, wherein Solidere alleged numerous theories as to why the ICC should exercise jurisdiction over URS. (Compl. Ex. A ¶¶ 148-241.) As Solidere tendered the issue in the first place, it certainly did not rely on URS's jurisdictional objections, as its expenditure of resources was caused by its own decision to place jurisdiction over URS at issue. Solidere thus cannot establish any detrimental change of position – an element of estoppel required by its own cases (see Def. Br. at 34 citing Bechtel v. Robinson, 886 F.2d 644, 650 (3d Cir. 1989)) – as its position did not change at all: it intended to litigate ICC jurisdiction over URS even before URS interposed its jurisdictional objections and it ended up doing just that.[39]

Moreover, as Solidere's own cases show, its reliance on the alleged fact that URS submitted the jurisdictional question to the ICC Court on the merits and intended to abide by the ICC Court's decision must have been reasonable. (See Def. Br. at 34, citing Toner v. Allstate Ins. Co., Civ. A. No. 92-624-SLR, 1994 WL 828294, at *4 (D. Del. Dec. 29, 1994) (Robinson, J.) (rejecting plaintiff's estoppel arguments because plaintiff failed to show that his reliance was reasonable).) The reasonableness of that reliance, however, is highly suspect here because (i) URS stated that it intended

---

[39]    While ignoring the self-imposed nature of its own alleged harm, Solidere attempts to minimize the harm of URS arising from forced participation in the ICC Arbitration. Solidere's arguments notwithstanding (see Def. Br. at 36 n.21), it is well established that URS will suffer irreparable harm as a matter of law if forced to participate in the arbitration proceeding that it never agreed to. (See P.I. Br. at 35-36 (collecting authorities).)

to litigate the issue in the United States (supra) and (ii) the ICC Court plays a purely administrative function and cannot decide any questions presented to it on the merits. See, e.g., Bühler & Webster, Handbook of ICC Arbitration, Sweet & Maxwell 2005, at ¶ 6-70 ("The decision of the ICC Court [regarding jurisdiction] is administrative"); Def. Br. at 8 (same).

It is well-settled that "instead of, or in conjunction with, a jurisdictional plea raised with the [ICC] Court under Article 6(2) [of the ICC Rules], a party might seek a court order enjoining the parties from proceeding with the arbitration or otherwise declaring that there is no valid arbitration agreement between the parties." Derains & Schwartz, A Guide to the ICC Rules of Arbitration (Kluwer Law 2005), at 81 (emphasis added). It is also common to exchange correspondence with citations to authorities as part of the jurisdictional objections under ICC Article 6(2):

> Despite the fact that respondents get "another bite at the apple" on the issue of jurisdiction before the arbitral tribunal, they generally present full arguments before the [ICC] Court of Arbitration in the hope of terminating the proceedings at the earliest stage. Accordingly, there is often elaborate correspondence between the parties and the [ICC] Court. ... The [ICC] Court's practice in the past was to send even weakly arguable cases of jurisdiction to an arbitral tribunal for determination.

Craig, et. al., Int'l Chamber of Commerce Arbitration (Oceana 2000), at 159 (emphasis added). Given the predictability of this process, Solidere's expectation that URS would submit to the ICC's jurisdiction because it submitted jurisdictional objections to the ICC Court is patently unreasonable.[40]

Jurisdictional objections like URS's before the ICC preserve access to judicial relief – even if an objecting party obtains an adverse jurisdictional ruling in arbitration. See, e.g., Am. Life Ins., 25 F. Supp. 2d at 477 (enjoining arbitration, holding relief proper even though plaintiff briefed the issue and got unfavorable ruling on the merits from the panel); Edward D. Jones & Co. v. Sorrells, 957 F.2d 509, 514 n.7 (7th Cir. 1992) ("A party's efforts to alert an arbitration panel to its lack of jurisdiction over some of the claims before it is not a waiver of that party's substantive right to have a federal court determine the scope of the arbitrator's jurisdiction."); DTC Health, Inc. v. Global Healing Ctr., Inc., No. Civ. A. H-06-01364, 2006 WL 2022893, at *3 (S.D. Tex. July 17, 2006) ("Nor can [Plaintiff] be said to have waived its right to independent court review, as [Plaintiff] vehemently objected to arbitral jurisdiction throughout its submissions to the arbitrator."); Nagrampa v. MailCoups, Inc., 469 F.3d 1257, 1277-78 (9th Cir. 2006) (same); PaineWebber Inc. v. Chase Manhattan Private Bank, 260 F.3d 453, 461 (5th Cir. 2001) ("we cannot fathom how a motion *premised* on a jurisdictional objection could simultaneously operate as a *waiver* of that very objection").

---

[40] Solidere's suggestion that URS should have ignored the pre-screening function of the ICC Court under Article 6(2) of the ICC Rules and resorted to judicial relief from the very start is baseless. URS was entitled to utilize a simple administrative step of the ICC that could have avoided this litigation. Once the administrative remedies were exhausted, URS filed this action less than a month after the ICC Court's June 2, 2006 decision.

## CONCLUSION

For all of the foregoing reasons, Defendant's motion should be denied in its entirety.

Dated: February 23, 2007                          Respectfully submitted,


                                                  _____/s/ Paul J. Lockwood_____
                                                  Edward P. Welch (#0671)
Of Counsel:                                       Paul J. Lockwood (#3369)
                                                  Edward B. Micheletti (#3794)
Jeffrey H. Dasteel                                SKADDEN, ARPS, SLATE,
Jason D. Russell                                    MEAGHER & FLOM LLP
Stacy Horth-Neubert                               One Rodney Square
Marina V. Bogorad                                 P.O. Box 636
SKADDEN, ARPS, SLATE,                             Wilmington, Delaware 19899
  MEAGHER & FLOM LLP                              (302) 651-3000
300 S. Grand Avenue, 34th Floor
Los Angeles, CA  90071                            Attorneys for Plaintiff URS Corporation
Tel:  (213) 687-5000
Fax:  (213) 678-5600