IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| --------------------------------x | | |
| URS CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-415-SLR |
| | ) | |
| THE LEBANESE COMPANY FOR THE | ) | |
| DEVELOPMENT AND RECONSTRUCTION OF | ) | **REDACTED** |
| BEIRUT CENTRAL DISTRICT, S.A.L., a/k/a | ) | **PUBLIC VERSION** |
| SOLIDERE, | ) | |
| | ) | |
| Defendant. | ) | |
| --------------------------------x | | |

**DEFENDANT SOLIDERE'S ANSWERING BRIEF IN OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION**

Samuel A. Nolen (#971)
Anne Shea Gaza (#4093)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
Wilmington, DE 19899-0551
P.O. Box 551
(302) 651-7700
Nolen@rlf.com
Gaza@rlf.com

OF COUNSEL:
Paul B. Carberry
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8507
pcarberry@whitecase.com

*Attorneys for Defendant The Lebanese
Company for the Development and
Reconstruction of Beirut Central District,
S.A.L. a/k/a SOLIDERE*

Dated: February 23, 2007

RLF1-3119423-1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

Preliminary Statement ............................................................................................................ 1

Statement of Nature and Stage of Proceedings ..................................................................... 2

Summary of Argument ........................................................................................................... 3

Statement of Facts .................................................................................................................. 4

Argument ................................................................................................................................ 6

I.      URS'S MOTION FOR AN ANTI-SUIT INJUNCTION AGAINST AN ICC
        ARBITRATION TAKING PLACE ABROAD SHOULD BE DENIED BECAUSE
        URS HAS FAILED TO ESTABLISH THAT SOLIDERE IS SUBJECT TO PERSONAL
        JURISDICTION IN THIS DISTRICT OR IN THE UNITED STATES ............................ 8

II.     URS'S MOTION FOR AN ANTI-SUIT INJUNCTION AGAINST AN ICC
        ARBITRATION TAKING PLACE ABROAD SHOULD  BE DENIED BECAUSE
        THE ICC ARBITRATION THREATENS NEITHER THIS COURT'S JURISDICTION
        NOR AN  IMPORTANT PUBLIC POLICY OF THE UNITED STATES ...................... 10

        A.      The Pending Arbitration Poses No Threat To The Jurisdiction Of This Court ............... 10

        B.      The Pending Arbitration Poses No Threat To An Important U.S. Public Policy ............ 13

III.    URS'S MOTION FOR AN ANTI-SUIT INJUNCTION AGAINST AN ICC
        ARBITRATION TAKING PLACE ABROAD SHOULD BE DENIED BECAUSE,
        EVEN APPLYING THE TRADITIONAL PRELIMINARY INJUNCTION STANDARD,
        URS HAS FAILED TO SHOW IT IS ENTITLED TO INJUNCTIVE RELIEF ............... 15

        A.      URS Cannot Show a Substantial Likelihood of Success on the Merits ...................... 15

                1.      URS's Invitation To The ICC Court To Conduct A Jurisdictional
                        Review Under Article 6(2) Of The ICC Rules Constitutes "Clear And
                        Unmistakable Evidence" Of Its Agreement To Submit The Issue Of
                        Arbitrability To The Tribunal ...................................................................... 16

                2.      Under Any Of The Possibly Applicable Legal Regimes Under Which
                        The Court Could Consider The Issue , URS Has Assumed The Obligation
                        To Arbitrate ................................................................................................. 19

                        a.      Applying Lebanese Or French Law, URS Will Be Bound By
                                The Arbitration Clause ................................................................... 21

                        b.      Applying Federal, Delaware, Or California Law, URS Will Be
                                Bound By the Arbitration Clause ................................................... 23

3.  The Evidence Clearly Establishes That URS Is Not Substantially Likely To Succeed On The Issue Of Whether To Pierce Radian's Corporate Veil And Bind URS To The Arbitration Clause ................................................................................25

   a.  Radian Has And Had No Independent Existence................................25

   b.  Piercing The Corporate Veil Is Necessary To Prevent Injustice By URS .....................................................................................31

B.  URS Cannot Show That It Will Suffer Irreparable Harm Absent The Relief Sought.......33

C.  SOLIDERE Will Suffer Irreparable Harm If Denied Its Bargained-For Forum of Dispute Resolution ...................................................................................................35

D.  The Public Interest Weighs Against The Issuance Of The Requested Injunction...........37

Conclusion...................................................................................................................39

## TABLE OF AUTHORITIES

### CASES

Adams v. Freedom Forge Corp.,
    204 F.3d 475 (3d Cir. 2000)................................................................37

Affymetrix, Inc. v. Synteni, Inc.,
    28 F. Supp. 2d 192 (D. Del. 1998) ...................................................36

Atlantic Richfield Co. v. Blosenski,
    847 F. Supp. 1261 (E.D. Pa. 1994)...................................................34

Automotriz Del Golfo de California S.A. v. Erwin G. Resnick,
    47 Cal. 2d 792 (Cal. 1957) ...........................................................25, 31

Bearry v. Beech Aircraft Corp.,
    818 F.2d 370 (5th Cir. 1987)..............................................................9

Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk,
    585 F.2d 39 (3d Cir. 1978) ................................................................24

Bergquist Co. v. Sunroc Corp.,
    777 F. Supp. 1236 (E.D. Pa. 1991)..............................................18, 37

Bradley v. Pittsburgh Board of Educ.,
    910 F.2d 1172 (3d Cir. 1990).............................................................15

Braman v. Mary Hitchcock Mem. Hosp.,
    631 F.2d 6 (2d Cir. 1980) ...................................................................9

Campbell v. City of New Kensington,
    C.A. No. 05-0467, 2006 WL 3308362 (W.D. Pa. Oct. 16, 2006) ...............15

Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc.,
    412 F.2d 577 (1st Cir. 1969) ...............................................................6

Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.,
    2 F.3d 24 (2d Cir. 1993) ...................................................................32

China Minmetals Importation & Exp. Co. v. Chi Mei Corp.,
    334 F.3d 274 (3d Cir. 2003)........................................................11, 12

China Trade & Dev. Corp. v. M.V. Chong Yong,
    837 F.2d 33 (2d Cir. 1987) ...............................................................11

City of Meridian v. Algernon Blair, Inc.,
    721 F.2d 525 (5th Cir. 1983)..............................................................33

Compagnie des Bauxites de Guinea v. Ins. Co. of N. America,
    651 F.2d 877 (3d Cir. 1981).................................................6, 7, 10, 11

Curiale v. Tiber Holding Corp.,
    No. Civ. 95-5284, 1997 WL 597944 (E.D. Pa. Sept. 18 1997) ................................... 20, 23

DER Travel Servs., Inc. v. Dream Tours & Adventures, Inc.,
    No. 99 Civ. 2231 (HPB), 2005 WL 2848939 (S.D.N.Y. Oct. 28, 2005) .......................... 32

Diebold Inc. v. Positran Mfg., Inc., No. C.A. 02-374, No. C.A. 02-374 (GMS), 2002 WL
    31234450 (D. Del. Oct. 4, 2002) ................................................................................... 26

Dollar Sav. Bank v. First Sec. Bank of Utah, N.A.,
    746 F.2d 208 (3d Cir. 1984) ........................................................................................... 8

Donovan v. City of Dallas,
    377 U.S. 408 (1964) ....................................................................................................... 7

ECRI v. McGraw-Hill, Inc.,
    809 F.2d 223 (3d Cir. 1987) .......................................................................................... 35

F.A. Davis Co. v. Wolters Kluwer Health, Inc.,
    413 F. Supp. 2d 507 (E.D. Pa. 2005) ............................................................................. 35

Frydman v. Cosmair, Inc.,
    94 Civ. 3772 (LAP), 1995 WL 404841 (S.D.N.Y. July 6, 1995) .................................... 20

Galgay v. Gangeloff,
    677 F. Supp. 295 (M.D. Penn.  1987) ........................................................................... 24

Gates Learjet Corp. v. Jensen,
    743 F.2d 1325 (9th Cir. 1984) ........................................................................................ 9

Gen. Elec. Co. v. Deutz AG,
    129 F. Supp. 2d 776 (W.D. Pa. 2000), aff'd in part, rev'd in part,
    270 F.3d 144 (3d Cir. 2001) ....................................................................................... 3, 7

Gen. Elec. Co. v. Deutz AG,
    270 F.3d 144 (3d Cir. 2001) .................................................................................... passim

Graphic Commc'ns Union, Chicago Paper Handlers' & Electrotypers'
    Local No. 2 v. Chicago Tribune Co., 779 F.2d 13 (7th Cir. 1985) ................................ 33

Harper v. Delaware Valley Broadcasters, Inc.,
    743 F. Supp. 1076 (D. Del. 1990) .............................................................................. 25, 31

Helicopteros Nacionales de Colombia, S.A. v. Hall,
    466 U.S. 408 (1984) ....................................................................................................... 9

Highlands Ins. Group v. Perini/Nugent Joint Venture,
    No. 98-CV-1725, 1998 WL 377953 (D.N.J. June 29, 1998) .......................................... 37

iv

In re Pregrine,
    C.A. No. 04-1325 (SLR), 2005 WL 2401955 (D. Del. Sept. 29, 2005)......................6, 10, 11

Int'l Shoe Co., v. Washington,
    326 U.S. 310 (1945)................................................................................8

JSC Foreign Econ. Associate Technostroyexport v. Int'l Dev. and Trade Services, Inc.,
    386 F. Supp. 2d 461 (S.D.N.Y. 2005)....................................................32

John Hancock Mutual Life Ins. Co. v. Olick,
    151 F.3d 132 (3d Cir. 1998).....................................................................24

Kaplan v. First Options of Chicago, Inc.,
    19 F.3d 1503 (3d Cir. 1994), aff'd, 514 U.S. 938 (1995)........................passim

Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,
    335 F.3d 357 (5th Cir. 2003)......................................................................18

Laker Airways Ltd. v. Sabena, Belgian World Airlines,
    731 F.2d 909 (D.C. Cir. 1984)...........................................................7, 10, 11

Lesser & Kaplin P.C. v. America Ins. Co.,
    723 F. Supp. 1099 (E.D. Pa. 1989)...........................................................9

M/S Bremen v. Zapata Off-Shore Co.,
    407 U.S. 1 (1972)......................................................................................37

Mabon, Nugent & Co. v. Texas America Energy Corp.,
    16 Del. J. Corp. 829, 1990 WL 44267 (Del. Ch. 1990)..............................31

Machulsky v. Hall,
    210 F. Supp. 2d 531 (D.N.J. 2002)..............................................................8

Madison Square Garden Corp. v. Braddock,
    90 F.2d 924 (3d Cir. 1937).........................................................................16

Malaysia Int'l Shipping Co. v. Sinochem International Co. Ltd.,
    436 F.3d 349 (3d Cir. 2006).......................................................................6

Masefield AG v. Colonial Oil Indus.,
    No. 05 Civ. 2231 (PKL), 2005 WL 911770 (April 18, 2005 S.D.N.Y.)..............19

Mazurek v. Armstrong,
    520 U.S. 968 (1997)..............................................................................15, 16

Meadows Indemnity Co. Ltd. v. Baccala & Shoop Ins. Serv., Inc.,
    760 F. Supp. 1036 (E.D.N.Y. 1991)............................................................20

Metro. Life Ins. Co. v. Robertson-Ceco Corp.,
    84 F.3d 560 (2d Cir. 1996).........................................................................9

Mobil Oil Corp. v. Linear Films, Inc.,
   718 F. Supp. 260 (3d Cir. 1989)......................................................................25

Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,
   290 F.3d 578 (3d Cir. 2002)...........................................................................35

Olde Discount Corp. v. Tupman,
   805 F. Supp. 1130 (D. Del. 1992)..................................................4, 15, 36, 37

Oncology Therapeutics Network Connection v. Virginia Hematology Oncology PLLC,
   C.A. No. 05-3033 (WDB), 2006 WL 334532 (N.D. Cal. Feb. 10, 2006).........23

Pearson v. Component Tech. Corp.,
   247 F.3d 471 (3d Cir. 2001)...........................................................................25

Peinado v. City Finance Co.,
   C.A. No. A093923, 2001 WL 1380441 (Cal. App. Nov. 6, 2001)....................24

Prima Paint Corp. v. Flood & Conklin Mfg. Co.,
   388 U.S. 395 (1967)........................................................................................20

Pritchard v. Dent Wizard Int'l Corp.,
   275 F. Supp. 2d 903 (S.D. Ohio 2003)...........................................................37

Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren,
   361 F.3d 11 (1st Cir. 2004).............................................................................11

Rep. of Nicaragua v. Standard Fruit Co.,
   937 F.2d 469 (9th Cir. 1991)..........................................................................24

Rhône Méditerranée Compagnia Francese di Assicurazioni e Riassicurazioni v. Lauro,
   712 F.2d 50 (3d Cir. 1983).............................................................................20

Ruhrgas AG v. Marathon Oil Co.,
   526 U.S. 574 (1999).................................................................................3, 6, 9

Sarhank Group v. Oracle Corp.,
   404 F.3d 657 (2d Cir. 2005)......................................................................14, 19

Scherk v. Alberto-Culver,
   417 U.S. 506 (1974)........................................................................................19

Steel Co. v. Citizens for a Better Env't,
   523 U.S. 83 (1998)........................................................................................3, 6

Stonington Partners, Inc. v. Lernout & Hauspie Speech Products N.V.,
   310 F.3d 118 (3d Cir. 2002)....................................................................passim

Tai Ping Ins. Co., Ltd. v. M/V Warschau,
   731 F.2d 1141 (5th Cir. 1984).........................................................................11

<u>Telecordia Techs., Inc. v. Alcatel S.A., No. Civ. A. 04-874 GMS,</u>
C.A. No. 04-874 (GMS), 2005 WL 1268061 (D. Del. May 27, 2005) ...........................................8

<u>Tellium, Inc. v. Corning, Inc.,</u>
No. 03 Civ. 8487, 2004 WL 307238 (S.D.N.Y. Feb. 13, 2004).........................................33

<u>The Shaw Group, Inc. v. Triplefine Int'l Corp.,</u>
322 F.3d 115 (2d Cir. 2003) ...........................................................21

<u>Trustees of the Nat'l Elevator Ind. Pension, Health Benefit and Educ. Funds v. Lutyk,</u>
332 F.3d 188 (3d Cir. 2003)............................................................24, 31, 32

<u>U.S. v. Golden Acres, Inc.,</u>
702 F. Supp. 1097 (D. Del. 1998) ........................................................32

<u>U.S. v. Pisani,</u>
646 F.2d 83 (3d Cir. 1981)............................................................26, 31

<u>U.S. v. Davis,</u>
767 F.2d 1025 (2d Cir. 1985)...........................................................11

<u>Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.,</u>
75 F.3d 147 (3d Cir. 1995).............................................................9

<u>Wilson v. Belin,</u>
20 F.3d 644 (5th Cir. 1994)...........................................................9

<u>World-Wide Volkswagen Corp. v. Woodson,</u>
444 U.S. 286 (1980) .................................................................8

<u>Younis Brother & Co., Inc. v. Cigna Worldwide Ins. Co.,</u>
167 F. Supp. 2d 743 (E.D. Pa. 2001)......................................................10

<u>Zubik v. Zubik,</u>
384 F.2d 267 (3d Cir. 1967)............................................................25

## FEDERAL STATUTES

9 U.S.C. § 10 .............................................................................16

Fed. R. Civ. P. 45(b)(2) ....................................................................36

## FOREIGN CASES

<u>Orri v. Société des Lubrifiants Elf Acquitaine,</u>
Cour d'Appel [CA] [regional court of appeal] Paris, 1e ch., January 11, 1990,
Rev. Arb. 1992, 95 .................................................................21

Soc. V 2000, Soc. Project XJ 220 LTD v. Renault Jean Francois,
    Cour d'Appel [CA] [regional court of appeal] Paris, December 7, 1994,
    RTD com. 1995, 401 ..................................................................................................21

Société Isover-Saint-Gobain v. Sociétés Dow Chemical France et autres,
    Cour d'Appel [CA] [regional court of appeal] Paris, 1e ch., October 21, 1983,
    Rev. Arb. 1984, 98 ...................................................................................................21

Société Kis France et autres v. Société Générale et autres,
    Cour d'Appel [CA] [regional court of appeal] Paris, 1e ch., October 31, 1989,
    Rev. Arb. 1992, 90 .............................................................................................21, 23

Société Korsnas Marma  v. Société Durand-Auzias,
    Cour d'Appel [CA] [regional court of appeal] Paris, 1e ch., November 30, 1988,
    Rev. Arb. 1989, 691 ......................................................................................21, 22, 23

Société Sponsor A.B. v. Lestrade,
    Cour d'Appel [CA] [regional court of appeal] Pau, November 26, 1986,
    Rev. Arb. 1988, 153 ......................................................................................21, 22, 23

## FOREIGN STATUTES

French New Code of Civil Procedure, Article 1458 ...................................................................23

## INTERNATIONAL AGREEMENTS

United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
    Article II, June 10, 1958 ...........................................................................................19

## PUBLICATIONS

Gary Born, International Commercial Arbitration Commentary and Materials (2d ed. 2001) ...........35, 16

Abdul Hamid El-Ahdab, Arbitration with the Arab Countries (1998)...........................................21

W. Laurence Craig, William W. Park & Jan Paulsson, International Chamber of Commerce
    Arbitration (3d ed. 2000)..........................................................................................37

Bernard Hanotiau, Non-Signatories in International Arbitration: Lessons from Thirty Years of
    Case Law, paper given at ICC Congress, Montreal (June 2006)..........................................14

Julian D M Lew QC, Control of Jurisdiction by Injunctions Issued by National Courts,
    Conference Paper – ICCA 2006.............................................................................. .......18

Looking for Law in All the Wrong Places: The Second Circuit's Decision in Sarhank Group v.
    Oracle Corp., Garfinkel, Barry H. & Herlihy, David, Mealey's Int'l Arb. Report, Vol. 20,
    #6 (June 2005) ........................................................................................................14

Fady Nammour, <u>Droit et pratique de l'arbitrage interne et international</u> (2005) ..........................21, 22, 23

Restatement (Second) of Conflict of Laws § 1.........................................................................................19

Restatement (Second) of Conflicts of Law § 188 (1971)............................................................................20

### Preliminary Statement

This action was commenced by URS Corporation ("URS") for the sole purpose of improperly extending the jurisdictional reach of this Court to a foreign corporation with neither business nor assets located in the United States, an entity which conducts no commerce here and has had minimal, sporadic contact with entities located here extending over the past decade. Subjecting that foreign party, The Lebanese Company for the Development and Reconstruction of Beirut Central District, s.a.l., a/k/a SOLIDERE, ("SOLIDERE"), to litigation in this forum is inconsistent with traditional notions of fair play and substantial justice, the due process guaranteed by the Constitution and all applicable Supreme Court precedent concerning the exercise of personal jurisdiction by U.S. federal courts.[1]

The instant motion (the "Motion," cited as "Mot.") is doubly offensive to the above principles since, not only does it seek improperly to extend the authority of this Court to a party beyond its proper jurisdictional limit, it also asks this Court to interfere with and supplant the jurisdiction of a properly constituted international arbitral tribunal sitting abroad, under the primary supervisory jurisdiction of the courts of a foreign sovereign, to decide an issue squarely within that tribunal's authority.

URS seeks to employ this action and the instant motion to avoid the consequences of having absorbed the operations and independent corporate existence of SOLIDERE's contractual counterparty, URS's wholly-owned subsidiary Radian International LLC ("Radian"), and of having invited the Court of the International Chamber of Commerce (the "ICC Court") to conduct a jurisdictional review of whether URS can be bound, as a result of its conduct during the performance and breach of the Contract[2] between SOLIDERE and Radian, by an arbitration clause contained in that contract.

---

[1] SOLIDERE appears in this action for the limited purpose of challenging this Court's jurisdiction and maintains that the sole, proper forum for the resolution of all disputes with URS is the arbitration between the parties currently pending in Paris, France and being conducted under the rules of the International Chamber of Commerce ("ICC") (the "ICC Arbitration").

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Opening Brief in Support of Defendant SOLIDERE's Motion to Dismiss the Complaint ("Motion to Dismiss," cited as "Mot. Dismiss").

RLF1-3119423-1

SOLIDERE maintains that, due to this Court's lack of personal jurisdiction over it, URS's invitation to the ICC Court – and, by extension, the arbitral tribunal – to consider whether it is a proper party to the ICC Arbitration, and URS's conduct in taking over performance of the Contract from Radian, the sole, proper forum in which to decide the issues raised by the Motion is the ICC Arbitration. For these reasons, and for the reasons stated in SOLIDERE's Motion to Dismiss, the Motion should be denied and this action dismissed with prejudice. See Mot. to Dismiss at 11-21, 33-37.

## Statement of Nature and Stage of Proceedings

Plaintiff filed its Complaint for Declaratory and Injunctive Relief (D.I. 1) in this action against Defendant on June 30, 2006 seeking a declaration that it has no agreement to arbitrate with SOLIDERE, is not bound to arbitrate any disputed claims with SOLIDERE and that the ICC has no jurisdiction over it. Defendant filed its Motion to Dismiss the Complaint, (D.I. 32), and supporting documents, on October 16, 2006 requesting the Court dismiss the Complaint with prejudice on the grounds that SOLIDERE has no presence and conducts no business in the United States and, thus, is not subject to personal jurisdiction here, that Delaware federal court is not a convenient forum for the resolution of this distinctly international dispute, and that Plaintiff should be equitably estopped from proceeding with this action because it made a tactical decision to initiate a jurisdictional review by the ICC Court – and, thereafter, by the arbitral tribunal – and should be bound by the resolution of that issue reached in that proceeding. Plaintiff filed its Motion for a Preliminary Injunction Enjoining Arbitration, (D.I. 36), and supporting documents, on October 23, 2006 seeking preliminary injunctive relief in the form of an anti-suit injunction against SOLIDERE preventing it from proceeding with the ICC Arbitration as against URS.

Once their respective motions had been filed, the parties negotiated an abbreviated period of discovery limited to the issues raised by the motions as well as a briefing schedule which called for the simultaneous filing and service of their respective answering briefs. The parties' agreement on the discovery period and briefing schedule was embodied in a stipulation, filed on October 26, 2006, (D.I. 47) (the "Scheduling Stipulation"). The parties subsequently agreed to certain modifications of the discovery period and briefing schedule which were embodied in a stipulation filed on January 5, 2007 (D.I. 65).

Pursuant to the Scheduling Stipulation, as subsequently modified, the parties have exchanged discovery requests, including requests for the production of documents, interrogatories and notices of deposition. The parties have also engaged in discovery practice, including the production of documents and taking of deposition testimony, on the issues raised by their respective motions and SOLIDERE hereby respectfully submits this answering brief in opposition to the Motion for Preliminary Injunction.

## Summary of Argument

1.      It is beyond question that the authority of a U.S. federal court to issue injunctive relief extends only so far as the limits of its jurisdiction. Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584 (1999). This requirement is firmly set in our jurisprudence and may not be avoided or circumscribed. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). SOLIDERE is a foreign corporation with no business or activities in the United States. Further, SOLIDERE has conducted its affairs so as to avoid any purposeful availment of the laws and protections of the United States or other activities from which it might reasonably anticipate being haled into court here. As such, SOLIDERE is beyond the jurisdictional grasp of this Court and, thus, cannot be the object of any injunction issued by this Court. Since the instant motion seeks an anti-suit injunction directed at the activities of SOLIDERE – a party over whom this Court cannot exercise personal jurisdiction – it must be denied.

2.      The Third Circuit has adopted the "restrictive" approach to determining whether to issue an anti-suit injunction directed at a legal proceeding pending abroad. Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods. N.V., 310 F.3d 118, 126 (3d Cir. 2002). This approach reflects a "serious concern for comity," Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 161 (3d Cir. 2001), and applies equally to proceedings pending before arbitral tribunals with their seat abroad as well as to those pending before foreign courts. See Gen. Elec. Co. v. Deutz AG, 129 F. Supp. 2d 776, 785-86 (W.D. Pa. 2000), aff'd in part, rev'd in part, 270 F.3d 144 (3d Cir. 2001). Since the instant motion seeks to enjoin the previously-commenced ICC Arbitration, which threatens neither this Court's jurisdiction nor an important public policy of the United States, and consistent with the "care and great restraint" to be exercised by courts in this circuit considering the issuance of such relief, it must be denied.

3.       Although the proper analytical framework for determining whether to issue an anti-suit injunction against an international arbitration proceeding pending abroad is the "restrictive" approach announced by the Third Circuit, in <u>Stonington</u>, 310 F.3d at 126, even under a traditional preliminary injunction analysis, <u>see</u> <u>Olde Discount Corp. v. Tupman</u>, 805 F. Supp. 1130, 1136 (D. Del. 1992), the instant motion must be denied since URS cannot show a substantial likelihood of success on the merits or that it will suffer irreparable harm absent the relief sought.  In addition, SOLIDERE will suffer irreparable harm should it be enjoined from proceeding with the ICC Arbitration and, the public interest weighs against the issuance of an anti-suit injunction here.

<u>Statement of Facts</u>

A comprehensive recitation of the facts relevant to the underlying dispute between the parties is contained in SOLIDERE's Motion to Dismiss, the relevant portions of which are expressly incorporated herein by reference, and, in the interests of efficiency, will not be repeated here.  However, additional facts relevant to URS's motion to enjoin an international arbitration pending abroad have surfaced as a result of the limited discovery conducted in this action.  These facts concern: (i) the complete dominance exerted by URS over the business of its wholly-owned subsidiary, Radian, following URS's acquisition of the Dames & Moore Group of companies in June 1999 ("Dames & Moore"); (ii) URS's abuse of the corporate form of Radian by URS resulting in inequity and injustice as concerns contractual counterparties and claimants of Radian (like SOLIDERE); (iii) the direct involvement in and performance by URS of the Contract signed between SOLIDERE and Radian; and, as a result of the foregoing, (iv) URS's assumption of the obligation to arbitrate the underlying dispute with SOLIDERE in accordance with the terms of the Contract.

Some examples of the evidence establishing these newly-discovered facts are described below:

•

# REDACTED

<u>See</u>, <u>e.g.</u>,  URS00106414-18[3]

---

[3] Documents produced by URS and SOLIDERE during discovery, non-public documents, deposition transcripts, and foreign materials and decisions cited herein are attached as exhibits to the Declaration of

URS00106423-26          **REDACTED**

• 

URS00105117-18          **REDACTED**          See

• URS instituted a "Corporate Identity Program" which presented the organization as a single company to "clients, competitors, potential employees, the media and the investment community[.]" See URS00097579-583(4/3/00 email entitled "Corporate Identity Program Update").

• 

**REDACTED**

147:10.                                 See Bishop Dep. Tr. 146:23-

• 

**REDACTED**          See URS00255861-64

URS00057037-41

• 

Tr. 26:3-7.          **REDACTED**          See Cuenca Dep.

• 

**REDACTED**          See URS00274717-19

76                                 URS00256275-

    In addition to providing extensive documentation of the above facts, see Section III.A.3.a., infra, submitted herewith is the Expert Report of Gene L. Deetz ("Deetz Report") which examines the parent/subsidiary relationship between URS and Radian and whether, and to what extent, the documents and testimony produced in this action are consistent with URS's assertion that Radian is now, and was throughout the performance of the Contract, an independently-managed, autonomous, viably operating economic entity  As the Deetz Report and the factual evidence clearly indicate, following its acquisition of Radian, URS stripped Radian of its independent corporate existence, subsumed its operations —

---

Paul B. Carberry in Support of Defendant SOLIDERE's Answering Brief in Opposition to Motion for Preliminary Injunction.

RLF1-3119423-1

including its performance of the Normandy Landfill Project under the Contract with SOLIDERE — and turned any semblance of separate, autonomous functioning by Radian into a mere fiction.

## Argument

A party seeking an anti-suit injunction against a foreign court proceeding or international arbitration must first demonstrate that the court has jurisdiction over the parties and the subject matter of the claims. See Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584 (1999) ("Personal jurisdiction, [ ], is an essential element of the jurisdiction of a district . . . court, without which the court is powerless to proceed to an adjudication.") (internal quotation marks and citation omitted); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established . . . is inflexible and without exception.") (internal quotation marks and brackets omitted); Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001) ("personal jurisdiction is essential to the validity of [an] injunction . . . ."); Malaysia Int'l Shipping Co. v. Sinochem Int'l Co. Ltd., 436 F.3d 349, 358 (3d Cir. 2006) (" [A]n actual determination must be made whether subject matter jurisdiction [and personal jurisdiction] exist[] before a court may turn to the merits of a case.").

Beyond the question of jurisdiction, a party seeking an anti-suit injunction in this circuit against a legal proceeding taking place abroad also bears a further heavy burden. Compagnie des Bauxites de Guinea v. Ins. Co of N. Am., 651 F.2d 877, 887 (3d Cir. 1981) (reversing grant of international anti-suit injunction despite duplication of issues between the foreign and domestic proceedings and delay in filing foreign action); see also Deutz, 270 F.3d at 161 ("Our jurisprudence thus reflects a serious concern for comity. This Court may properly be aligned with those that have adopted a strict approach when injunctive relief against foreign judicial proceedings is sought."); Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods. N.V., 310 F.3d 118, 126 (3d Cir. 2002). The Third Circuit has repeatedly held that, "restraining a party from pursuing an action in a court of foreign jurisdiction involves delicate questions of comity and therefore 'requires that such action be taken only with care and great restraint.'" Compagnie, 651 F.2d at 887 n.10 (quoting Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc., 412 F.2d 577, 578 (1st Cir. 1969)); see also In re Peregrine Sys., Inc., No. 02-12740 (JFK), 02-12741(JKF), Civ.

RLF1-3119423-1

04-1325-SLR, 2005 WL 2401955, at *4 (D. Del. Sept 29, 2005) ("for a [district] court to enjoin a foreign proceeding, the foreign proceeding must implicate important public policies or threaten United States jurisdiction in that it attempts to carve out exclusive jurisdiction over concurrent actions . . . . The issue at bar has everything to do with jurisdiction, with comity, and with restraint.") (internal quotation marks, alterations, and citation omitted). In fact, the Court of Appeals has explicitly adopted a "restrictive" approach to analyzing whether to issue an anti-suit injunction in an international context. Stonington, 310 F.3d at 126 ("Based on a 'serious concern for comity,' we have adopted a restrictive approach to granting anti-suit injunctions in the international arena." (citing Deutz, 270 F.3d at 161)). Under the Third Circuit's restrictive approach, an international anti-suit injunction will issue only "on the rare occasions when needed 'to protect jurisdiction or an important public policy.'" Id. at 127 (quoting Deutz, 270 F.3d at 161; citing Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 927 (D.C. Cir. 1984)).

This restrictive approach is consistent with the "general principle established 'early in our history,' [ ] that one court will not interfere with or try to restrain proceedings in another in an ordinary action in personam." Compagnie, 651 F.2d at 887 (quoting Donovan v. City of Dallas, 377 U.S. 408, 412 (1964)). This circuit's restrictive standard applies equally to proceedings pending before arbitral tribunals with their seat abroad as well as to those pending before foreign courts. See Deutz, 129 F. Supp. 2d at 785-86 (applying "restrictive approach" to issuance of anti-suit injunction aimed at international arbitration), aff'd in part, rev'd in part, 270 F.3d 144, 161 (3d Cir. 2001) (applying "restrictive approach" to reverse district court's issuance of anti-suit injunction against international arbitration).

Here, URS has failed to satisfy any of the above criteria[4] necessary to the extraordinary relief of an anti-suit injunction against an ICC arbitration taking place abroad.

_____

[4] The Motion mistakenly discusses only the four traditional factors to be considered in determining whether to issue a standard preliminary injunction. Mot. at 16. However, since Plaintiff seeks to enjoin SOLIDERE from proceeding against it in a previously-commenced international arbitration taking place abroad, see Mot. at 15-16, the proper analysis is that governing the issuance of an anti-suit injunction against a legal action pending abroad with the additional need for recognition of the interests of comity and deference to foreign proceedings. See also Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 161 (3d Cir.

7

I.    URS'S MOTION FOR AN ANTI-SUIT INJUNCTION AGAINST
      AN ICC ARBITRATION TAKING PLACE ABROAD SHOULD
      BE DENIED BECAUSE URS HAS FAILED TO ESTABLISH
      THAT SOLIDERE IS SUBJECT TO PERSONAL JURISDICTION
      IN THIS DISTRICT OR IN THE UNITED STATES

It is black-letter law that a court may only enjoin the activities of parties properly before it and

subject to the exercise of personal jurisdiction. See Dollar Sav. Bank v. First Sec. Bank of Utah, N.A.,

746 F.2d 208, 215 (3d Cir. 1984). URS, as the party asserting the existence of personal jurisdiction over

SOLIDERE, has the burden of establishing — through actual proof, not mere allegations — sufficient

contacts between SOLIDERE and the United States such that SOLIDERE should reasonably have

anticipated being haled into court here. See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286,

297 (1980); Machulsky v. Hall, 210 F. Supp. 2d 531, 537 (D. N.J. 2002). Any exercise of jurisdiction

over a foreign defendant – regardless of that defendant's conduct – must comport with traditional notions

of fair play and substantial justice consistent with the due process guarantees of the Constitution. See

Telecordia Techs., Inc. v. Alcatel S.A., C.A. No. 04-874 GMS, 2005 WL 1268061, at *1 (D. Del. May

27, 2005) (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

As stated in SOLIDERE's Motion to Dismiss, the relevant portions of which are expressly

incorporated herein by reference, URS cannot carry its burden of proving that this Court can exercise

personal jurisdiction over SOLIDERE consistent with due process because: (i) SOLIDERE is a publicly-

held, foreign corporation which is licensed to operate and only operates outside of the United States; (ii)

SOLIDERE has no presence and conducts no business in the United States, let alone in this district; (iii)

SOLIDERE neither sells nor provides goods or services in the United States, let alone in this district; (iv)

the disparate and sporadic contacts between SOLIDERE and the United States alleged by Plaintiff are

insufficient to establish jurisdiction over SOLIDERE; and (v) it would be manifestly unfair, unreasonable

_____

2001). The fact that URS seeks to prevent SOLIDERE from proceeding only against one of the parties to
the ICC Arbitration – namely URS – and not all parties to that proceeding, does not alter the nature of the
relief sought or the proper analytical framework to be applied. See Stonington, 310 F.3d at 125-26
(analyzing motion for injunctive relief under restrictive standard used for anti-suit injunctions where
movant sought to prevent presentation of certain claims, but not others, in foreign proceeding by non-
movant)

and inconsistent with traditional notions of fair play and substantial justice to subject SOLIDERE to the jurisdiction of this Court, given the absence of any purposeful availment by SOLIDERE of the laws and protections of the United States, let alone this district. See Mot. Dismiss at 11-22.

The handful of sporadic interactions between SOLIDERE personnel and various U.S. entities, wholly unconnected to the claims at issue in this action are insufficient to confer jurisdiction over SOLIDERE. Certain of those contacts – some of which date back to the mid 1990's – fall outside the relevant time period for determining jurisdiction over a foreign litigant. See Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 569 (2d Cir. 1996) (collecting cases declining to consider contacts falling outside "a reasonable period of years" prior to institution of the action); see also Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 409-11 (1984) (examining contacts over a seven-year period); Wilson v. Belin, 20 F.3d 644, 650-51 (5th Cir. 1994) (five-year period); Bearry v. Beech Aircraft Corp., 818 F.2d 370, 372-76 (5th Cir. 1987) (five-year period); Gates Learjet Corp. v. Jensen, 743 F.2d 1325, 1329-31 (9th Cir. 1984) (three-year period); Braman v. Mary Hitchcock Mem. Hosp., 631 F.2d 6, 9 (2d Cir. 1980) (five-year period). In addition, many of the activities cited by URS – e.g. entering into contracts with U.S. entities, offering securities for sale to a limited set of institutional United States investors, conducting informational communications with U.S. entities – have specifically been found insufficient, as a matter of law, to confer jurisdiction over a foreign party. See Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co., 75 F.3d 147, 152 (3d Cir. 1995) (finding informational communications insufficient); Lesser & Kaplin P.C. v. Am. Ins. Co., 723 F. Supp. 1099, 1101-02 (E.D. Pa. 1989) (finding mere contracting with and offering securities to forum residents insufficient).

Given that this Court cannot issue injunctive relief against SOLIDERE absent a finding that it has personal jurisdiction over SOLIDERE, see Ruhrgas, 526 U.S. at 584, the Court must consider and rule on SOLIDERE's Motion to Dismiss prior to considering the instant Motion. Since SOLIDERE has never purposefully availed itself of the laws and protections of the United States or of this district and its contacts with the United States, let alone this district, are insufficient to trigger a reasonable anticipation

9

of being haled into court here, personal jurisdiction over SOLIDERE is lacking and URS's motion for an anti-suit injunction against an arbitration taking place abroad should be denied.

II.   **URS'S MOTION FOR AN ANTI-SUIT INJUNCTION AGAINST AN ICC ARBITRATION TAKING PLACE ABROAD SHOULD BE DENIED BECAUSE THE ICC ARBITRATION THREATENS NEITHER THIS COURT'S JURISDICTION NOR AN IMPORTANT PUBLIC POLICY OF THE UNITED STATES**

The Third Circuit recognizes, rightly, that injunctions restraining foreign proceedings – which involve "delicate questions of comity" – should be issued only "with care and great restraint." Compagnie, 651 F.2d at 887 n.10. Such extraordinary injunctions represent "narrow exceptions" to the general rule mandating deference to and respect for the comity interests of foreign tribunals. Stonington, 310 F.3d at 128. Such injunctions should be issued "only on the rare occasions when needed to protect jurisdiction or an important public policy." Id. at 127 (internal quotations omitted) (emphasis added). The ICC Arbitration imperils neither this Court's jurisdiction nor an important public policy of the United States.

A.    The Pending Arbitration Poses No Threat To The Jurisdiction Of This Court

In order for a foreign proceeding to threaten the jurisdiction of a U.S. court, it must be "interdictory" in that it must threaten "to carve out exclusive jurisdiction over concurrent actions." Laker Airways, 731 F.2d at 930; In re Peregrine Sys., Inc., 2005 WL 2401955, at *4 (foreign proceeding must "threaten United States jurisdiction in that it attempt[s] to carve out exclusive jurisdiction over concurrent actions.") (internal quotation marks and citation omitted). That is, the foreign proceeding must present a danger of supplanting or impeding the U.S. court from proceeding with its adjudication of the domestic action. Stonington, 310 F.3d at 127. The high level of direct interference necessary is well illustrated by the cases where relief has been granted. In Younis Brother & Co., Inc. v. Cigna Worldwide Ins. Co., 167 F. Supp. 2d 743, 747 (E.D. Pa. 2001), the court granted an injunction against a suit in a Liberian court which sought to re-litigate an action already determined by the U.S court, finding "[t]he Liberian courts' refusal to recognize the legitimacy of this Court's final judgment [ ] implicitly threatens this Court's jurisdiction." Similarly, in Laker Airways, the defendants had obtained an injunction from a foreign court

prohibiting plaintiff in the U.S. action from prosecuting that action. See Laker Airways, 731 F.2d at 930. Likewise, in Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren, 361 F.3d 11 (1st Cir. 2004), the defendant in the United States sought and obtained a foreign court injunction against the plaintiff in the U.S. action forbidding that party from proceeding with discovery in the U.S. action. See Quaak, 361 F.3d at 20. Finally, in United States v. Davis, 767 F.2d 1025 (2d Cir. 1985), the court of appeals affirmed an anti-suit injunction preventing a U.S. criminal defendant (the officer of a U.S. corporation) from taking action in the Cayman Islands to prevent production of records by a Canadian bank that were necessary for the U.S. prosecution. Each of these cases, unlike this one, involved a direct attempt to interfere with and prevent proceedings from going forward in the United States or the nullification of a U.S. court's order. Mere identity of issues involved in the two proceedings or duplication of efforts between the tribunals are not sufficient absent a direct impediment to the U.S. action. See Compagnie, 651 F.2d at 887 (holding duplication of issues and delay in filing do "not justify the breach of comity among the courts of separate sovereignties"); In re Peregrine Sys., 2005 WL 2401955, at *4 (same). As the Second Circuit found in China Trade & Dev. Corp. v. M.V. Chong Yong, 837 F.2d 33 (2d Cir. 1987), where it reversed a decision ordering an anti-suit injunction against a parallel Korean action: "While the Korean court may determine the same liability issue as before the southern district, the Korean court has not attempted to enjoin the proceedings in New York. Neither the Korean court nor [the parties thereto] has sought to prevent the southern district from exercising its jurisdiction over this case." Id. at 37.[5]

The facts here are not even remotely sufficient to warrant an anti-suit injunction. The ICC Arbitration does not threaten to block or supplant the prosecution of this action, since an adjudication of URS's obligation to arbitrate by the arbitral tribunal will have no effect on this Court's jurisdiction nor hinder Plaintiff from pursuing this declaratory judgment action. Moreover, neither the ICC arbitral

---

[5] Moreover, under the Third Circuit's standard for issuing anti-suit injunctions, it is irrelevant that two jurisdictions may examine the same issue. See Stonington, 310 F.3d at 127. "Duplication of effort does not constitute" the sort of "exceptional circumstances" that justify action of a federal court to impede valid arbitration proceedings. See Tai Ping Ins. Co., Ltd. v. M/V Warschau, 731 F.2d 1141, 1146 (5th Cir. 1984). Thus, the arbitral tribunal's finding on whether URS is a proper party to the arbitration need not concern the Court.

tribunal nor SOLIDERE has attempted to enjoin the proceedings before this Court or otherwise interfere with this Court's ability to adjudicate this matter.

Further, in the event that SOLIDERE obtains a favorable arbitral award which it seeks to enforce in the United States, URS will be entitled to dispute the arbitrators' decision as to their jurisdiction and to seek a U.S. court's determination of whether it can be bound to the arbitration clause in the Contract. This is because, absent clear and unmistakable evidence[6] of an intent to arbitrate arbitrability, during a proceeding to enforce an arbitral award against a non-signatory, United States courts review de novo the decision of an arbitral tribunal to bind the non-signatory to applicable arbitration clause. See Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1520 (3d Cir. 1994), aff'd, 514 U.S. 938 (1995); China Minmetals Imp. & Exp. Co. v. Chi Mei Corp., 334 F.3d 274, 286-89 (3d Cir. 2003).

URS misstates the holding of First Options to assert that only a U.S. court may determine whether a non-signatory is obligated to arbitrate an issue. Mot. at 2, 19-20. The First Options case does not support that conclusion. Rather than establishing a chronological (or other) priority as between courts and arbitrators, the First Options Court considered the standard of review to be employed by courts when they considered the issue of whether a non-signatory is bound by an arbitration clause. First Options, 514 U.S. at 941 ("We granted certiorari to consider two questions regarding the standards that the Court of Appeals used to review the determination that the Kaplans' dispute with First Options was arbitrable.") (emphasis added). In fact, in First Options the Court expressly declined to establish an absolute rule of priority, as between courts and arbitrators, to determine the question of whether a non-signatory is obligated to arbitrate. Id. at 947. In response to First Options' argument "that permitting parties to argue arbitrability to an arbitrator without being bound by the result would cause delay and waste in the resolution of disputes," id. at 946, the Court stated that "factual circumstances vary too greatly to permit a confident

---

[6] While it is SOLIDERE's contention that "clear and unmistakable" evidence of URS's intent to arbitrate the issue of arbitrability does, in fact, exist, see infra Section III.A.1, it is still the case that, in any enforcement proceeding in the United States, URS will be entitled to a de novo determination by a U.S. court as to whether such evidence exists and, if it does not, a de novo review of whether URS may be bound to the arbitration clause. See First Options, 514 U.S. at 947.

conclusion about whether allowing the arbitrator to make an initial (but independently reviewable) arbitrability determination would, in general, slow down the dispute resolution process." Id. at 947. It is, thus, clear that First Options contemplated instances where it might be more efficient for the arbitrators to make such an initial determination. Further, First Options concerned a domestic arbitration involving two U.S. parties and, thus, is silent as to the role to be played by foreign courts with primary supervisory jurisdiction over an ICC arbitration pending abroad. There is certainly no support in First Options for the argument – which URS seems to put forth – that U.S. courts 'trump' the jurisdiction of such foreign courts over arbitral proceedings conducted within the territory of their jurisdiction on the sole basis of the national origin of one party to those proceedings.

The First Options case further underscores the conclusion that the ICC Arbitration does not imperil this Court's jurisdiction, but rather, has the potential to relieve this Court of the need to consider the fact-intensive issues at stake. That is, if the arbitral tribunal goes forward to consider whether URS is bound by the arbitration clause and determines that, in fact, it is not, then this Court need never consider that question. Similarly, if the arbitral tribunal were to determine that URS was obligated to arbitrate but find in URS's favor on the merits of the underlying dispute, likewise, this Court need not become involved in this matter. Even in the circumstance where the arbitral tribunal finds URS to be a proper party to the arbitration and subsequently finds for SOLIDERE on the merits, URS would still have recourse, in any enforcement proceeding in the United States, to a U.S court for a de novo determination of whether the arbitral tribunal correctly decided the issue of arbitrability as to URS – provided there was not clear and unmistakable evidence that URS agreed to arbitrate arbitrability. See First Options, 514 at 944. Thus, the ICC Arbitration does not threaten this Court's jurisdiction or URS's purported right to seek a U.S. court's determination of arbitrability so as to justify the issuance of an anti-suit injunction. See Gen. Elec. Co. v. Deutz, 270 F.3d at 157.

## B.    The Pending Arbitration Poses No Threat To An Important U.S. Public Policy

URS has failed to identify any important public policy of the United States that is threatened by the ICC Arbitration. To the contrary, the most relevant public policy at issue here is the Third Circuit's

13

strong policy of restraint in enjoining foreign proceedings. Stonington, 310 F.3d at 129 ("[O]ur case law unequivocally directs courts to exercise restraint in enjoining foreign proceedings . . . .").

URS's assertions to the contrary notwithstanding, see Mot. at 37-38, there is no public policy of the United States that mandates that an American court has chronological priority over a properly-constituted international arbitral tribunal in deciding whether a non-signatory can be bound by an arbitration clause. See First Options, 514 U.S. at 944-45 (declining to establish an absolute rule of priority in favor of U.S. courts to decide questions of arbitrability with regard to non-signatories). First Options simply does not support URS on this point, but stands instead for the proposition that U.S. courts should review a decision of an arbitral tribunal holding a non-signatory bound by an arbitration clause.[7] Nothing in First Options, however, requires that a U.S. court enjoin an international arbitration taking place abroad so as to wrest the issue of arbitrability away from the arbitrators.

The Sarhank case, principally relied on by URS, supports this view. "Under American law, whether a party has consented to arbitrate is an issue to be decided by the Court in which enforcement of an award is sought," Sarhank Group v. Oracle Corp., 404 F.3d 657, 661 (2d Cir. 2005) (emphasis added). While the Second Circuit in Sarhank found, on the particular facts of that case, no evidence of intent on the part of the non-signatory to be bound by the arbitration clause, it did not assert any ex ante right to decide that issue in priority to an arbitral tribunal.[8]

---

[7]   Where it is clear that the parties have agreed to submit the arbitrability issue to the arbitrators, courts should "defer to [the] arbitrator's arbitrability decision." Id. at 943.

[8]   We note that, the Sarhank decision has been widely criticized for misapplying Article V(2) to the issue of whether Oracle was bound to the arbitration clause contained in the contract between Sarhank and Systems. See Barry H. Garfinkle & David Herlihy, Looking for Law in All the Wrong Places: The Second Circuit's Decision in Sarhank Group v. Oracle Corp., Mealey's Int'l Arb. Report, Vol. 20, #6 (June 2005) ("The appellate court's opinion in [Sarhank] mistakenly interprets Article V(2)(a) of the Convention as an open door to second-guess arbitrators' decisions on the scope of their own jurisdiction. It also threatens to create a new frontier for disgruntled parties eager to resist enforcement of foreign arbitral awards in the United States."); Bernard Hanotiau, Non-Signatories in International Arbitration: Lessons from Thirty Years of Case Law, Paper given at ICC Congress, Montreal (June 2006) ("Unfortunately, the [Sarhank] decision is wrong, being based on a totally erroneous interpretation . . . of the term 'arbitrability' referred to in Article V(2) of the New York Convention . . . . In other words, enforcement may not be refused under Article V(2)(a) [ ] on the basis of the fact that one of the parties over which the arbitral tribunal accepted jurisdiction, did not sign the relevant arbitration agreement. This

14

      *         *         *

Due to the policy within the Third Circuit of strong reluctance to interfere with or impede foreign proceedings, and the fact that the ICC Arbitration threatens neither this Court's jurisdiction nor an important public policy of the United States, URS's motion to enjoin an international arbitration pending abroad should be denied.

**III.   URS'S MOTION FOR AN ANTI-SUIT INJUNCTION AGAINST AN ICC ARBITRATION TAKING PLACE ABROAD SHOULD BE DENIED BECAUSE, EVEN APPLYING THE TRADITIONAL PRELIMINARY INJUNCTION STANDARD, URS HAS FAILED TO SHOW IT IS ENTITLED TO INJUNCTIVE RELIEF**

The proper analytical framework to apply to the instant motion is the restrictive standard adopted by the Third Circuit for determining whether to grant an anti-suit injunction. See Argument I. However, even applying the less stringent, traditional test for the grant of a preliminary injunction, the Motion must be denied because: (i) URS cannot show a substantial likelihood of success on the merits; (ii) URS cannot show it will suffer irreparable harm absent injunctive relief; (iii) SOLIDERE will suffer irreparable harm should the requested injunction issue; and (iv) the public interest weighs against the issuance of the injunction. See Olde Disc. Corp. v. Tupman, 805 F. Supp. 1130, 1136 (D. Del. 1992).

**A.   URS Cannot Show a Substantial Likelihood of Success on the Merits**

"An essential element of the preliminary injunction test in the Third Circuit is likelihood of success on the merits." See Bradley v. Pittsburgh Bd. of Educ., 910 F.2d 1172, 1175 (3d Cir. 1990). It is not enough that the moving party show a _possibility_ of success on the merits. The movant must establish by a clear showing that its success is _substantially_ likely to succeed  See Campbell v. City of New Kensington, C.A. No. 05-0467, 2006 WL 3308362, at *1 (W.D. Pa. Oct. 16, 2006) ("'It 'frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, _by a clear showing_, carries the burden of persuasion.'" (citing Mazurek v. Armstrong, 520 U.S. 968, 972, (1997))) (emphasis in original); see also Madison Square Garden Corp. v.

---

is however what the United States Courts [sic] of Appeals unfortunately did in the Sarhank Group decision.").

Braddock, 90 F.2d 924, 927 (3d Cir. 1937) ("[U]pon an application for a preliminary injunction to doubt is to deny.").

The dispute here, on which URS must carry the burden of establishing a substantial likelihood of success, is whether this Court will declare that URS is not bound by the arbitration clause contained in the Contract signed between its wholly-owned subsidiary, Radian, and SOLIDERE, due solely to the fact that URS did not itself sign the Contract. URS cannot carry its burden, because: (i) there is clear and unmistakable evidence that URS agreed to submit the question of arbitrability to the arbitrators, requiring this Court to defer to the decision of the ICC Arbitration arbitral tribunal,[9] and (ii) even if this Court had jurisdiction to consider the issue of arbitrability de novo, under any of the possibly applicable legal regimes under which this Court could consider the issue (i.e. French and/or Lebanese law – as SOLIDERE asserts should apply here – or, U.S. federal, Delaware or California law), URS has assumed the obligation to arbitrate the dispute with SOLIDERE.

1.    URS's Invitation To The ICC Court To Conduct A Jurisdictional Review Under Article 6(2) Of The ICC Rules Constitutes "Clear And Unmistakable Evidence" Of Its Agreement To Submit The Issue Of Arbitrability To The Tribunal

A court reviewing the arbitrability decision of an arbitral tribunal applies a de novo standard of review unless there is clear and unmistakable evidence that the parties agreed to arbitrate that issue. First Options, 514 U.S. at 943. Here, it is clear and unmistakable that the parties did intend for the arbitrators to decide arbitrability and therefore "the court should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances." Id. (citing 9 U.S.C. § 10 (stating narrow grounds for putting aside arbitration award are that it was procured by corruption, fraud, or undue means, or that the arbitrator exceeded his powers)).

URS plainly acknowledged its intent to submit the arbitrability issue to arbitration when it "invited" the ICC Court to initiate a jurisdictional review pursuant to Article 6(2) of the ICC Rules of Arbitration (the "ICC Rules"). After hearing argument from all of the parties to the ICC Arbitration,

---

[9]  Since all of URS's arguments not to be bound to the arbitration clause are based on U.S. law and the arbitral tribunal is not likely to apply U.S. law to the question of arbitrability, it is not likely URS will prevail on this issue before the arbitral tribunal.

RLF1-3119423-1

including URS, the ICC Court found that a prima facie case for the exercise of jurisdiction over URS may exist. See Declaration of Paul B. Carberry in Support of Defendant SOLIDERE's Motion to Dismiss the Complaint ("Carberry Decl. Mot. Dismiss") (D.I. 34), Ex. D (facsimile dated June 2, 2006). In accordance with Article 6(2) of the ICC Rules, the ICC Court referred determination of the issue of arbitrability to the arbitral tribunal. Id.

There can be no more "clear and unmistakable" evidence of a party's intent to arbitrate an issue than that party's explicit invitation to a governing arbitral body – like the ICC Court – to decide whether submission of the issue of the arbitrators' jurisdiction to the arbitrators themselves, is appropriate. Further, URS clearly stated its intent to abide by the decision of the ICC Court and the arbitral tribunal concerning arbitrability when it sought a thirty-day extension of time to file an answer to SOLIDERE's Request for Arbitration following an adverse (to URS) decision of the arbitral tribunal that it was a proper party to the arbitration. See Carberry Decl. Mot. Dismiss, Ex. D (letter dated March 13, 2006), at 13. It was not until its third submission to the ICC Court on the question of arbitrability – months after the arbitration had begun – that URS argued for the first time that only a U.S. court could determine whether it had agreed to arbitrate the issue. See Carberry Decl. Mot. Dismiss, Ex. D (letter dated April 21, 2006), at 5.

URS's submission of the issue of arbitrability to the ICC Court distinguishes this case from First Options. In First Options, the defendant, First Options, argued that the Kaplans had agreed to submit the question of arbitrability to the arbitrators by "filing with the arbitrators a written memorandum objecting to the arbitrators' jurisdiction." First Options, 514 U.S. at 946. The Court rejected that argument, finding that the Kaplan's "forceful[ ] objecti[ons]" did not indicate an agreement to be bound and noted that the Kaplans had a reason to be before the arbitrators since the company in which they were principals was undoubtedly a proper party to the arbitration. Id. ("This conclusion draws added support from [ ] an obvious explanation for the Kaplans' presence before the arbitrators (i.e. that MKI, Mr. Kaplan's wholly owned firm was arbitrating workout agreement matters) . . . ."). Here, there is no "obvious explanation" as to why URS would invite the ICC Court to make a determination on the question of arbitrability, other

17

than the conclusion that URS intended to arbitrate that issue. If, as URS asserts, its wholly-owned subsidiary, Radian, truly is a separate, independent corporate entity, then URS should have – at the very least – taken the position from the outset that the ICC Arbitral Tribunal did not have the power to decide on its own jurisdiction and that the question of arbitrability was one exclusively for the U.S. courts. It could have immediately sought injunctive relief and a declaration of its rights before a U.S. court. URS, however, chose not to do so. Instead, it initiated the ICC Court's Article 6(2) procedure and "invit[ed]" the ICC Court (and, by extension, the arbitral tribunal) to determine whether it was a proper party to the arbitration. Only after receiving an unfavorable prima facie ruling in the Article 6(2) procedure which URS had initiated, did URS come to this Court seeking an anti-suit injunction against the ICC Arbitration. Compare Bergquist Co. v. Sunroc Corp., 777 F. Supp. 1236, 1251 (E.D. Pa. 1991) ("at some point it would [be] unfair to [the adverse party] to allow [the party contesting jurisdiction] to continue in the arbitration process, await an unfavorable decision, and then challenge the arbitration"). URS's intentional, knowing election to commit the question of arbitrability to the ICC's procedures has consequences, one of which is that URS may not now claim that it did not agree to arbitrate this issue in the first instance.[10]

---

[10] The instant Motion, while seeking to avoid the outcome of the process that URS itself set in motion when it invited the Article 6(2) procedure, also seeks to evade the jurisdiction of the French courts, which, as the courts of the situs of the arbitration, should have primary supervisory jurisdiction over the arbitration proceedings. See Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 335 F.3d 357, 372 (5th Cir. 2003) (stating that there was "strong evidence" "favoring Switzerland [as the situs of arbitration] as the paramount country of primary jurisdiction under the [New York] Convention"). In so doing, the Motion also violates customary international arbitration law, which "does not allow national courts outside the country of the seat of arbitration to intervene in the arbitration process by granting anti-arbitration injunctions." Julian D. M. Lew QC, Control of Jurisdiction by Injunctions Issued by National Courts, Conference Paper – ICCA 2006, at 47. This customary law was implicitly recognized by the Third Circuit in Deutz when it cited with approval Justice Thomas of the English High Court, who stated: "He [the district judge] will no doubt take into account . . . that he, as a judge of the United States Court, is being asked to exercise extraordinary extraterritorial jurisdiction over an arbitral tribunal sitting in London within the jurisdiction of this Court." 270 F.3d at 161-62. Such "extraordinary extraterritorial jurisdiction" can no more be justified here than in Deutz, where the Third Circuit overturned the District Court's grant of an anti-suit injunction on comity grounds. Id., at 162.

2.   Under Any Of The Possibly Applicable Legal Regimes Under Which The Court
Could Consider The Issue , URS Has Assumed The Obligation To Arbitrate

In considering whether URS should be bound by the arbitration clause in the Contract, this Court must determine the proper law under which to analyze URS's obligation to arbitrate.[11] See Restatement (Second) of Conflict of Laws § 1 ("Events and transactions occur, and issues arise, that may have a significant relationship to more than one state, making necessary a special body of rules and methods for their ordering and resolution"). In considering this question, U.S. courts have applied the law of a state selected by the parties. See Masefield AG v. Colonial Oil Indus., No. 05 Civ. 2231 (PKL), 2005 WL 911770, at *2 (April 18, 2005 S.D.N.Y.) (applying New York law subject to a forum selection clause in the parties' contract);[12] cf. Sarhank, 404 F.2d at 661 (applying U.S. law under Article V(2) of the New York Convention despite governing law clause in underlying contract calling for application of Egyptian law).[13] In First Options, the Court looked to the law of the state which governed the underlying contract (Illinois) and where the Kaplans lodged their objections to jurisdiction (Pennsylvania). First Options, 514 at 944 (examining Illinois law as "law of the [s]tate whose law governs the workout agreement" and Pennsylvania law as "law of the [s]tate where the Kaplans objected to arbitrability").

Consistent with the internationalist stance of the New York Convention, where a transaction has foreign elements, foreign laws (and not merely U.S. federal and/or state law) may be considered by a U.S. court in determining whether a non-signatory is bound by an arbitration clause. See United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Article II, June 10, 1958; Scherk v. Alberto-Culver, 417 U.S. 506, 520 n.15 (1974) (one of the purposes of the New York

---

[11] Obviously, the arbitral tribunal in the ICC Arbitration is not bound to pursue the same approach to choice of law as this Court and, in fact, may not ultimately apply any conflicts of law approach.

[12] Plaintiff's reliance on Masefield for the proposition that arbitrability is to be decided under U.S. law, Mot. at 19-21, is misplaced. In Masefield, the contract at issue called for the situs of the arbitration to be "the City of New York," 2005 WL 911770, at *1, and mandated the application of New York law, id. at *2, thus the application of U.S. law – specifically, New York law – to the question of arbitrability was clearly appropriate. Here, the situs of the arbitration is Paris, France, and the Contract is to be governed by Lebanese law. Thus, under the reasoning of Masefield, either French or Lebanese law should apply.

[13] As shown, supra Section II.B, the Sarhank decision has been criticized for its misapplication of Article V(2) of the New York Convention and is inapposite to the facts here.

Convention is "to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries"); Rhône Méditerranée Compagnia Francese di Assicurazioni e Riassicurazioni v. Lauro, 712 F.2d 50, 54 (3d Cir. 1983) ("signatory nations [of the New York Convention] have effectively declared a joint policy that presumes the enforceability of agreements to arbitrate[; n]either the parochial interests of the forum, nor those of states having more significant relationships with the dispute, should be permitted to supersede that presumption"). Indeed, determinations "under Article II(1) must be made on an international scale, with reference to the laws of the countries party to the Convention."[14] Meadows Indemnity Co. Ltd. v. Baccala & Shoop Ins. Servs., Inc., 760 F. Supp. 1036, 1041 (E.D.N.Y. 1991); see also Frydman v. Cosmair, Inc., 1995 WL 404841, at *4 (S.D.N.Y. 1995) ("[w]here . . . there is a dispute as to whether the parties agreed to arbitrate, the court must look to the state law which governed the contract formation . . . [s]ince the contract in dispute here was formed in France between French citizens, French law applies in the determination of whether it constitutes an agreement to arbitrate").

In keeping with these international standards and in the absence of a particular law chosen to govern the arbitration clause at issue here, French law (as the law of the situs of arbitration)[15] or Lebanese law (as the law of the place of negotiation and performance of the contract)[16] should govern this Court's determination of whether a non-signatory is bound by the arbitration clause. See Restatement (Second) of Conflicts of Law § 188 (1971) ("If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied . . . ."); see also The Shaw Group, Inc.

---

[14]  According to Article II(1),"[e]ach Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration."

[15]  The arbitration agreement is recognized to be separable from the main contract and, thus, may be governed by a separate law from the law governing the main contract, Lebanese law.  See Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 411 (1967).

[16]  See Curiale v. Tiber Holding Corp., C.A. No. 95-5284, 1997 WL 597944, at *11 (E.D. Pa. Sept. 18, 1997) ("the transactions by which defendant allegedly disregarded [the company whose veil was to be pierced]'s corporate form took place in New York, and New York law should therefore apply to the veil-piercing issues").

v. Triplefine Int'l Corp., 322 F.3d 115, 122, 125 (2d Cir. 2003) (discussing the ICC's Article 6(2) test in a contract calling for ICC arbitration and concluding that "the district court should have deferred to the arbitrator on the parties' dispute about the arbitrability of that claim").

           a.     Applying Lebanese Or French Law, URS Will Be Bound By The Arbitration Clause

Under French law, URS may, without question, be bound by the arbitration clause in the Contract between Radian and SOLIDERE. Similarly, URS would also likely be bound under Lebanese law, since it closely tracks French law on this issue.[17] Under both national laws, a non-signatory to a contract, particularly if it was signed by a related company, may be bound by the contract's arbitration clause where the non-signatory is found to have tacitly agreed to the clause.[18] The non-signatory may

---

[17] Lebanese law does not substantially differ from French law on the question of whether a non-signatory may be bound to an arbitration clause. See Abdul Hamid El-Ahdab, Arbitration with the Arab Countries 320-321 (1998) (noting that the origins of Lebanese arbitration law "did not stray far from french [sic] law" and that, "[a]s a general rule, [the Lebanese arbitration system] still remains much inspired by french [sic] legal thinking").

[18] See Société Isover-Saint-Gobain v. Sociétés Dow Chemical France et autres, Cour d'Appel [CA] [regional court of appeal] Paris, 1e ch., October 21, 1983, Rev. Arb. 1984, 98, 100 (stating that, "through a sovereign interpretation of the above agreements and the documents exchanged during the negotiations and their termination, the arbitrators have decided, following pertinent reasoning free from contradictions, that, in accordance with the common will of all the interested companies, Dow Chemical France and Dow Chemical Company were parties to these agreements notwithstanding the fact that they had not physically signed them, and the arbitration clause was thus applicable to them . . . ."); Société Sponsor A.B. v. Lestrade, Cour d'Appel [CA] [regional court of appeal] Pau, November 26, 1986, Rev. Arb. 1988, 153, 156 (noting that "[i]t is accepted in law 'that an arbitration clause expressly accepted by some companies within a group binds the other companies that, by the role they played in the conclusion, the performance or the termination of the agreements containing said clauses, appear, according to the common will of all the parties to the proceedings, to have been the real parties in interest to these contracts or to have been primarily concerned by them and by the disputes that may arise from them'" and that, "[i]ndeed, a group of companies has, despite the distinct legal personality belonging to each of the companies, a single economic existence, of which tribunals must take account, this existence being recognized by the customs of international commerce"); Société Korsnas Marma v. Société Durand-Auzias, Cour d'Appel [CA] [regional court of appeal] Paris, 1e ch., November 30, 1988, Rev. Arb. 1989, 691, 694 (maintaining that "an arbitration clause contained in an international contract has its own validity and effectiveness, which require that the clause be extended to parties directly involved in the performance of the contract and the disputes that arise out of it, once it has been established that their situation and their activities create the presumption that they were aware of the existence and scope of the arbitration clause, although they did not sign the contract containing it . . . ."); Société Kis France et autres v. Société Générale et autres, Cour d'Appel [CA] [regional court of appeal] Paris, 1e ch., October 31, 1989, Rev. Arb. 1992, 90, 93 (noting, in refusing to annul an arbitral award, that the arbitrators had "examined the agreement between the parties and held that the parties' mutual obligations were inexorably linked and that the two parent

demonstrate its tacit acceptance of the arbitration clause through its conduct during the negotiation, performance, or breach of the contract. See, e.g., Société Korsnas Marma, Rev. Arb. 1989, at 694; Fady Nammour, Droit et pratique de l'arbitrage interne et international 628 (2005). In their analysis, French and Lebanese courts consider which entity has actually performed the contract at issue. See Société Sponsor A.B., Rev. Arb. 1988, at 156 ("It also appears that, where Sponsor AB played an important role in the conclusion of the purchase undertaking, it played an equally important role in its non-performance. Therefore, the third party in question is a third party only in appearance and in fact appears to be the soul, inspiration and, in a word, the brains of the contracting party."); Nammour at 627-28; see also infra Section III.A.3.a.

---

companies played a dominant role vis-à-vis their subsidiaries, which were bound to abide by the parents' commercial and financial decisions"); Orri v. Société des Lubrifiants Elf Acquitaine, Cour d'Appel [CA] [regional court of appeal] Paris, 1e ch., January 11, 1990, Rev. Arb. 1992, 95, 97-98 (finding that, "according to the customs of international commerce, an arbitration clause contained in an international contract has its own validity and effectiveness, which require that the clause be extended to parties directly involved in the performance of the contract and the disputes that arise out of it, once it has been established that their contractual situation, their activities and the customary commercial relationship existing between the parties create the presumption that they accepted the arbitration clause, of whose existence and scope they were aware, although they did not sign the contract containing it . . . ." and that "[t]his agreement also results from the concept of a group of companies, since it appears that [the defendant] has always had business relations with [the person presiding over] the group of companies ... composed of companies each having a formal legal existence and formal independence, while linked in an economic unit subject to a single authority, exerted by [the president] himself. . . ."); Soc. V 2000, Soc. Project XJ 220 LTD v. Renault Jean Francois, Cour d'Appel [CA] [regional court of appeal] Paris, December 7, 1994, RTD com. 1995, 401, 405-06 ("in international arbitration law, an arbitration clause binds parties that are directly involved in the performance of the contract, provided that their situations and activities create the presumption that they were aware of the existence and scope of this clause, so that the arbitrator can consider all the economic and legal aspects of the dispute"); see also Fady Nammour, Droit et pratique de l'arbitrage interne et international 627-629 (2005) (citing to several French cases in discussion of Lebanese law and affirming that, under Lebanese international arbitration law, "[a]ccording to the usages of international commerce, an arbitration clause contained in an international contract has its own validity and effectiveness, which require that the clause be extended to parties directly involved in the performance of the contract and the disputes that arise out of it, once it has been established that their contractual situation, their activities and the on-going commercial relationships between the parties create the presumption that they accepted the arbitration clause and were aware of its existence and its scope, although they did not sign the contract containing it – to which factor one may attach the final factor that the third party was perfectly aware of the conditions governing the commercial relationship, including the arbitration clause, habitual in the practices of international commerce" and that, "[i]n the absence of a clause, case law attempts to extend the legal effect of the arbitration clause relying essentially on "the common intention of the parties") (citations omitted).

22

Another basis used by French courts to find a non-signatory bound by an arbitration clause is the lack of autonomy of the signatory party. French courts consider that a non-signatory is appropriately bound by an arbitration clause where there is no "economic autonomy" between the signatory and non-signatory. See Société Sponsor A.B., Rev. Arb. 1988, at 156-157. In the present case, as will be discussed below, there is no such economic autonomy between URS and Radian. To the contrary, Radian has had no independent capacity for financial or economic decision-making since it was taken over by URS.

Where, as here, a parent company dominates its subsidiary and has taken over performance of a particular contract to which the subsidiary was a party, it is highly likely the non-signatory parent will, under both French and Lebanese law, be found to have demonstrated the acceptance of the arbitration clause necessary for that clause to be extended to it. See Société Korsnas Marma, Rev. Arb. 1989, at 693; Société Kis France et autres, Rev. Arb. 1992, at 93; Nammour at 627-28.[19]

        b.    Applying Federal, Delaware, Or California Law, URS Will Be Bound By the Arbitration Clause

Although the Court should, in recognition of the international nature of this dispute and in accordance with the standards of international jurisprudence (and U.S. conflicts of laws principles) apply either Lebanese or French law to the issue of arbitrability, even under U.S. law,[20] URS will be bound by the arbitration clause in the Contract between Radian and SOLIDERE under a veil-piercing analysis.

---

[19] It is also important to note that, under French law, a French court would not examine whether URS is properly held to the arbitration clause until after the arbitral tribunal there has rendered an arbitral award. See French New Code of Civil Procedure, Article 1458, available at http://www.legifrance.gouv.fr/html/codes_traduits/ncpcatext.htm#TITLE%20II%20ARBITRATION%20PROCEEDINGS.

[20] URS's assertion that the question of whether it may be bound to the arbitration clause in the Contract must be determined under the law of Delaware pursuant to the "internal affairs doctrine," Mot. at 21, n.12, is incorrect. The "internal affairs doctrine" – that the law of the state of incorporation governs questions of veil-piercing – applies only to purely internal disputes, and not to disputes involving the rights of parties external to the corporation. See Curiale, 1997 WL 597944, at *11 ("'[a]s a general matter, the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation . . . . Different conflicts principles, however, apply where the rights of third parties external to the corporation are at issue.") (internal quotation marks and citation omitted). Quite the contrary, "[t]he conflict of laws principles that apply when the rights of third parties that are external to the corporation

Under U.S. law, whether federal or state, piercing the corporate veil is a tool of equity that courts may use to remedy any fundamental unfairness or injustice that results from upholding the corporate form. See Trs. of the Nat'l Elevator Ind. Pension, Health Benefit and Educ. Funds v. Lutyk, 332 F.3d 188, 192-94 (3d Cir. 2003).[21] The application of federal law to the veil-piercing analysis would consistent with the objectives of the FAA. See Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk, 585 F.2d 39, 32 (3d Cir,. 1978) ("the question of whether, in contracts involving commerce, there is an agreement to arbitrate an issue or dispute upon which suit has been brought is governed by federal law"); John Hancock Mut. Life Ins. Co. v. Olick, 151 F.3d 132, 136 (3d Cir. 1998) (the FAA "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate"). Under the Third Circuit standard, veil-piercing is appropriate where two corporations "acted interchangeably and in disregard of their corporate separateness." Galgay v. Gangloff, 677 F. Supp. 295, 300 (M.D. Penn. 1987). This standard must and does take into account that "[f]ederal policy strongly favors enforcement of arbitration agreements." Olick, 151 F.3d at 137; see also Rep. of Nicaragua v. Standard Fruit Co., 937 F.2d 469, 478 (9th Cir. 1991) (overturning district court's grant of summary judgment that arbitration clause was not binding on a non-signatory subsidiary where lower court had "disregarded the emphatic federal policy in favor of arbitral resolution [which] applies with special force in the field of international commerce") (internal quotations omitted).

Alternatively, under California law (as the law of the principal place of business of the corporation whose veil is to be pierced) or Delaware law (as the law of the state of incorporation) piercing

---

are at issue call for a weighing of contract and governmental interests." Curiale, 1997 WL 597944, at *12; see also Oncology Therapeutics Network Connection v. Virginia Hematology Oncology PLLC, C.A. No. 05-3033, 2006 WL 334532, at *17 (N.D. Cal. Feb. 10, 2006) (stating, in refusing to apply internal affairs doctrine, that "it is not clear to us that an 'alter ego' claim such as that asserted by plaintiff [that non-signatory was personally liable for debts arising from contract] involves 'internal' affairs of the corporation, as opposed to affairs 'external' to the corporation").

[21]  The veils of Limited Liability Companies are pierced using the same standards as those used for corporations. See Peinado v. City Fin. Co., C.A. No. A093923, 2001 WL 1380441, at *2 (Cal. App. Nov. 6, 2001) (upholding the decision of an administrative law judge, which had stated that "the protective veil of an LLC may be pierced when in the particular case presented and for the purposes of such case justice and equity can best be accomplished . . . ." (internal quotations omitted).

24

Radian's corporate veil would also be appropriate. In order to pierce the veil of a subsidiary to bind the parent to an arbitration clause, under both California and Delaware law, (1) the parent and the subsidiary must have "operated as a single economic entity" and have "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist" and (2) the parent must have used its domination of the subsidiary in furtherance of an injustice or inequity. See Harper v. Delaware Valley Broadcasters, Inc., 743 F. Supp. 1076, 1085 (D. Del. 1990); Automotriz Del Golfo de California S.A. v. Erwin G. Resnick, 47 Cal.2d 792, 796 (Cal. 1957).

Under any one of these standards, veil-piercing is appropriate in this case. See Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 268 (3d Cir. 1989) (the court is "convinced that regardless of which law is applied to the alter ego question – whether federal, Delaware or Oklahoma common law – the outcome is the same"). Where, as here, a corporate parent that completely dominates its subsidiary uses that domination to avoid its responsibilities under a contract signed by the subsidiary, the parent is bound by the arbitration clause contained in that contract.

      3.      The Evidence Clearly Establishes That URS Is Not Substantially Likely To Succeed On The Issue Of Whether To Pierce Radian's Corporate Veil And Bind URS To The Arbitration Clause

Piercing the corporate veil is appropriate where "the parent so dominated the subsidiary that it had no separate existence." Pearson v. Component Tech. Corp., 247 F.3d 471, 484 (3d Cir. 2001); Automotriz del Golfo de California, 47 Cal.2d at 796. Courts in the Third Circuit have held that it is appropriate to pierce the corporate veil where necessary to "prevent fraud, illegality, or injustice...." Zubik v. Zubik, 384 F.2d 267, 272 (3d Cir. 1967). Here, the documents produced by URS and the testimony of URS witnesses clearly establish that Radian has and had, during performance of the Contract, no independent existence and that piercing its corporate veil to bind URS to the arbitration clause is necessary to prevent injustice.

      a.      Radian Has And Had No Independent Existence

Where it can be shown that "the two corporations actually functioned as a single entity and should be treated as such," the corporate veil should be pierced. Pearson, 247 F.3d at 485. In the Third

Circuit, the following factors are considered in this inquiry: (1) undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) the insolvency of the debtor corporation at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a façade for the operations of the dominant stockholder or stockholders. U.S. v. Pisani, 646 F.2d 83, 88 (3d Cir. 1981). These factors are neither conjunctive nor exclusive. Diebold Inc. v. Positran Mfg., Inc., No. C.A. 02-374, 2002 WL 31234450, at *2 (D. Del. Oct. 4, 2002).

Using the above list of factors as a guide, the documents and testimony produced in this action clearly establish that, over time, Radian became no more than a shell entity and that Radian and URS functioned as a single economic and operational unit, justifying the piercing of Radian's corporate veil so as to hold URS bound by the arbitration clause.

(i)    Undercapitalization

• **REDACTED**

See Bishop Depo. Tr. 147:4-10

• See Bishop Depo. Tr. 209:4-213:13

**REDACTED**

Depo. Tr. 213:9-13    : see also Bishop

• See Bishop Depo. Tr. 209:15-18    **REDACTED**

• URS00274593-604    **REDACTED**    See

• **REDACTED**

(Jones

26

Aff. ¶ 6),           **REDACTED**           See Jones Depo. Tr. 70:17-73:3

(ii)    Failure to observe corporate formalities

- 

                                    See URS00105117-18

**REDACTED**

- See also URS00240712-34    **REDACTED**

- 

            **REDACTED**        URS00097579-83
    107:4                        , see also Bou Onk Dep. Tr. 102:2-
                                    URS00200308-
    09 (1/17/01 cover letter and attached letter from John Rakow, URS's corporate counsel,
    explaining the new URS letterhead).

- See also URS00097579-83 (Draft URS advertisement stating, "BRW, Dames & Moore,
    . . . Radian International . . . We are now URS" and listing URS's Beirut address as
    "Radian International, P.O. Box 11-1261, Beirut, Lebanon, Tel:01.983.575.").

- 
            **REDACTED**                See Bishop Dep. Tr.
    133:9-136:15.

- Radian does not have its own in-house legal department, rather it relies on URS in-house
    legal personnel.    **REDACTED**    ; see also SOLDEL00537-43

                            ; see also URS00236245-47 (10/04/04 E-mail from
    Alberto Cuenca, Regional Controller of URS, stating, "URS continues working on [the
    Project], the URS Corporate Legal Dept. is now managing this job because URS keeps
    filing Legal Claims in order to document our case.").

- Radian sought to utilize insurance coverage obtained by URS in satisfaction of its
    obligation to maintain adequate insurance under the Contract. See URS00001910-13
    (10/14/04 letter regarding insurance under the Contract, stating, "URS Corporation has an
    existing insurance policy written on an annual basis by an AIG affiliate or subsidiary . . .
    [if] we are unable to extend or reinstate [Radian's policy], we are seeking other project-
    specific insurance to cover any gap [in the URS policy]. We will provide you with
    evidence of URS's insurance coverage upon request.").

REDACTED    See Bishop Dep. Tr. 95:22-96:4

See Bishop Dep. Tr. 214:2-16

REDACTED

Balfour Dep. Tr. 121:7-17                                    See

See URS00255861-64    REDACTED

See URS00079321-78    REDACTED

(iii)    Nonpayment of dividends

REDACTED

See Cuenca Dep. Tr. 127:14-20

(iv)    The insolvency of the debtor corporation

REDACTED    See, e.g., Bou Onk Dep. Tr.
79:13-20

Cuenca Depo. Tr. 108:7-16

URS00055925-26                                See, e.g.,
URS00054767-68    REDACTED
URS00055510-11
URS00045766-67
URS00055456
see also Cuenca Dep.

Tr. 125:12-19

28

**REDACTED**

(v)    Siphoning of the corporation's funds by the dominant stockholder

- 

**REDACTED**                    See Cuenca Dep. Tr.

107:15-18.

- 

See URS00106394-404    **REDACTED**

URS00106386-87

URS00106414-18

URS00106423-26

(vi)    Absence of corporate records

- 

**REDACTED**

See Balfour Dep. Tr. 132:23-133:6, 133:17-22, 134:7-11, 134:21-135:1); see also Bishop Dep. Tr. 136:10-15
Balfour Dep. Tr. 92:23-93:1

- 

See Bishop Dep. Tr.

138:4-14    **REDACTED**

(vii)    The fact that the corporation is merely a façade for the operations of the dominant stockholder or stockholder

- 

**REDACTED**    See URS00274717-19

- Radian assigned certain of its lease agreements to URS.  See e.g., URS00164237-67

**REDACTED**

URS00234248-54 (12/25/2002

29

Second Amendment of an office lease between Greit – AmberOaks, LP, and URS Corporation of Nevada as successor in interest to Radian).

- See URS00238401-05

**REDACTED**

76

see also URS00256275-

- See Cuenca Depo. Tr. 26:3-7

**REDACTED**

- **REDACTED**

Tr. 83:16-84:11                    See Balfour Depo.
see also Bishop Depo. Tr. 127:3-8

- **REDACTED**

See URS00057037-41

- See URS00001932-42 (6/26/02 Monthly

**REDACTED**

- URS employees commonly referred to themselves and other personnel working on the Project as URS staff. See URS00108744-47 (12/12/05 email giving an update on URS personnel in Lebanon, stating, "All URS staff and their families have been accounted for and are safe [after bombing in Beirut].").

- **REDACTED**    See Bou Onk Depo. Tr. 62:13-63:21

- Numerous reports and other documents concerning the Normandy Landfill Project indicate that they were prepared by URS personnel. See e.g. URS00025440-87



30

**REDACTED**    URS00150406-20

URS00079203-62                                  URS00164354-87
(6/2/03 Final Site Quality ("FSQ") Criteria Proposal); URS00181132-77

As the above evidence, and analysis contained in the Deetz Report, clearly shows, Radian, as a division of URS and, thus, no longer the separate company with which SOLIDERE contracted for the remediation of the Normandy Site, is clearly the alter ego of URS.

    b.  Piercing The Corporate Veil Is Necessary To Prevent Injustice By URS

At times, the factors that show domination will suffice to demonstrate the "fundamental unfairness" necessary to justify piercing the corporate veil. See Lutvk, 332 F.3d at 193. Similarly, California law requires, in addition to unity of interest and ownership, "an inequitable result" in the absence of veil-piercing. Automotriz del Golfo de California, 47 Cal. 2d at 796. Delaware courts also "may regard a corporate parent as the sole party in interest where equitable considerations require it," Mabon, Nugent & Co. v. Texas Am. Energy Corp., 16 Del. J. Corp. 829, 838, 1990 WL 44267, at *5 (Del. Ch. Apr. 12, 1990) -- which is the case where an "overall element of injustice or unfairness . . . [is] present." Harper, 743 F. Supp. at 1085.

No one factor establishes the necessary injustice; rather, courts inquire generally whether the corporation at issue is "little more than a legal fiction." Lutvk, 332 F.3d at 194 (internal quotations omitted); see also Pisani, 646 F.2d at 88 (for veil-piercing to be appropriate, the situation must present an element of injustice or fundamental unfairness . . . a number of [] factors can be sufficient to show such unfairness") (internal quotations omitted).    **REDACTED**

    See URS00106394-404; URS00106386-87; URS00106414-18; URS00106423-

26.    **REDACTED**

    See Cuenca Dep. Tr. 26:37; see also URS00105117-18. URS ensured, through the use of what were by then its own personnel and assets, that "Radian" was able to continue functioning in Lebanon -- but only where doing so was convenient for URS. Essentially, URS deliberately deprived

SOLIDERE of the viable, autonomous contracting party with which it contracted in 1999 for the remediation of the Normandy site.

This Court has also held, specifically, that fundamental unfairness and injustice have occurred where a dominant party has siphoned off assets, causing the dominated company to be insolvent. See United States v. Golden Acres, Inc., 702 F. Supp. 1097, 1104 (D. Del. 1998). It would be just as inequitable to allow URS to deliberately drain Radian of its assets (and thereby deprive SOLIDERE of a viable, autonomous contracting partner), perform the contract itself, and then rely on the formally separate corporate identities of the two companies when it comes time to answer for defects in the performance of the contract. See DER Travel Servs., Inc. v. Dream Tours & Adventures, Inc., No. 99-CIV-2231, 2005 WL 2848939, at *9 (S.D.N.Y. Oct. 28, 2005) (a "plan" or "decision" by the controlling parent for the controlled subsidiary to breach its contract satisfies the requirement of injustice to pierce the corporate veil); JSC Foreign Econ. Assoc. Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 386 F. Supp. 2d 461, 476 (S.D.N.Y. 2005) (situation in which funds had been diverted from a dominated company before a claim was made but when there was notice of the claim suffices to render veil-piercing appropriate).

While courts often frame this issue as whether the corporation was "established" for an improper purpose, Lutyk, 332 F.3d at 197, there is no material difference between a corporation that was created for an improper purpose and one that was once a legitimate company but has since been turned into a shell, causing injustice. In such a situation, it would be absurd to expect SOLIDERE to have been aware of Radian's lack of independent existence, when that situation occurred only after it had entered into the Contract. See Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc., 2 F.3d 24, 28 (2d Cir. 1993) (stating, where the subsidiary signed a contract in August 1980 and was acquired in June 1981, that "the question . . . is whether [the subsidiary] . . . act[ed] as a separate corporation] in 1984 when the franchise agreement was breached, or whether, on the other hand, its actions were then dominated and controlled by its parent").

*            *            *

32

For these reasons, URS cannot carry its heavy burden of establishing a likelihood of success on the merits of whether this Court will determine that, as a non-signatory of the Contract signed between its wholly-owned subsidiary, Radian, and SOLIDERE, URS can be bound by the arbitration clause contained in that contract, since the evidence clearly shows that Radian's corporate separateness has become a simple fiction and "[t]o find otherwise would exalt form over reality." Atlantic Richfield Co. v. Blosenski, 847 F. Supp. 1261, 1281 (E.D. Pa. 1994).

**B.**      **URS Cannot Show That It Will Suffer Irreparable Harm Absent The Relief Sought**

In an arbitration context, courts have found harm per se irreparable only when matters not properly subject to arbitration are required to be arbitrated. See Tellium, Inc. v. Corning, Inc., No. 03 Civ. 8487, 2004 WL 307238, at *3 (S.D.N.Y. Feb. 13, 2004) ("Compelling arbitration of a matter not properly subject to arbitration constitutes per se irreparable harm.") (quotations omitted). Such are not the facts in the instant dispute. Here, as Radian's alter ego, URS is duly bound by the Contract, including its arbitration clause, and will not suffer irreparable harm if compelled to arbitrate before the arbitral tribunal.

Here, moreover, URS voluntarily chose to invite the jurisdictional review of the ICC Court under Article 6(2). Rather than immediately contesting the right of the ICC Court to conduct such a review – and of any ICC arbitral tribunal to determine its own jurisdiction – and commencing an action in U.S. federal court, URS made the tactical decision to initiate the Article 6(2) procedure. Carberry Decl. Ex. D at 1, 12 (letter-brief dated March 13, 2006). Therefore, any inconvenience and expense that URS may incur in presenting its case to the arbitral tribunal are the direct result of its own tactical choice to seek relief under the ICC Rules and plainly do not constitute irreparable harm. See Graphic Comme'ns Union, Chicago Paper Handlers' & Electrotypers' Local No. 2 v. Chicago Tribune Co., 779 F.2d 13, 14 (7th Cir. 1985) ("[T]he cost of the arbitration, whether it is an opportunity cost of time or an out-of-pocket expense for lawyers or witness fees or whatever, or both types of costs, does not show irreparable harm."); City of Meridian v. Algernon Blair, Inc., 721 F.2d 525, 529 (5th Cir. 1983) ("Although [the plaintiff] may have to suffer the expense of inappropriate arbitration, such expenditures do not constitute irreparable harm.

RLF1-3119423-1

An injury is irreparable only if it cannot be undone through monetary remedies.") (citations and quotations omitted).

In addition, appearing as a named party in the arbitration will not impose any additional burden upon URS. Since the commencement of the ICC Arbitration, URS and Radian have been jointly represented in that proceeding by the same outside counsel, Skadden, Arps, Slate, Meagher & Flom LLP. See Carberry Decl. Ex. D at 1 (letter-brief dated March 13, 2006) ("As in ICC Case No. 14208/EC, we represent Radian . . . in connection with ICC Case No. 14236/EC. We also represent Radian's . . . parent company URS Corporation . . . ."); see also Carberry Decl. Ex. D (letter-brief dated March 30, 2006; letter-brief dated April 21, 2006). URS's outside counsel is wholly familiar with the factual and legal issues related to the instant dispute and arbitrating on behalf of URS will not exact additional resources or time since, the same law firm will be acting in that capacity on Radian's behalf as well. Presumably, Radian and URS will both rely on the same documents and testimony as well in presenting their arguments to the arbitral tribunal.

Moreover, Radian no longer has an in-house legal department and the legal support it requires is provided by URS's in-house legal staff. See Balfour Dep. Tr. at 62:23-65:23 (Joe Moore and Kristin Jones, both employees of URS, provide legal support to Radian); 142:14-23 ("[W]hen Radian needs [legal representation] they get that from either URS corporate services or through external legal support."); see also Bishop Dep. Tr. Ex. 9 (May 12, 2003 letter from John Rakow, URS Vice President Corporate Counsel, regarding Memorandum of Understanding between Radian and SOLIDERE). As a result, URS's in-house legal staff is already involved in the ICC Arbitration. Indeed, through selection of outside legal counsel and attendance in arbitration proceedings, URS controlled Radian's participation in the first two ICC arbitrations concerning disputes over the Normandy Landfill Project ("Arbitration I" and "Arbitration II"). See Carberry Decl. Ex. A at 70-71 (SOLIDERE's Request for Arbitration, dated February 13, 2006) (Joseph Masters, URS Vice President and General Counsel, attended hearings and signed the power of attorney authorizing the law firm of Mayer, Brown, Rowe & Maw LLP, Herbert Smith, English solicitors, and Mr. Adrian Williamson Q.C., an English barrister, to represent Radian in

Arbitration I, and Thomas Bishop, URS Senior Vice President and Radian Vice President, signed the power of attorney authorizing the law firm of Skadden, Arps, Slate, Meagher & Flom LLP to represent Radian in Arbitration II). Since URS's in-house legal department already actively participates in the pending ICC Arbitration on behalf of Radian, nothing will fundamentally change for URS if it is compelled to arbitrate as a named party. Therefore, it is clear that URS cannot show that it will be irreparably harmed if compelled to proceed with the ICC Arbitration.

### C.    SOLIDERE Will Suffer Irreparable Harm If Denied Its Bargained-For Forum of Dispute Resolution

In deciding whether to issue injunctive relief, courts will balance the harms to the moving party if the preliminary relief is denied and to the nonmoving party if the injunction is granted. See F.A. Davis Co. v. Wolters Kluwer Health, Inc., 413 F. Supp. 2d 507, 510 (E.D. Pa. 2005) (citing ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987)). The court "must be convinced that [one of the] factors favor[ing] granting of preliminary relief . . . [is] the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued." Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 290 F.3d 578, 586 (3d Cir. 2002). Here, contrary to URS's allegations, SOLIDERE will suffer substantial injury if the Court grants URS's motion for an injunction enjoining ICC Arbitration.

Compelling SOLIDERE to litigate its claims against URS and Radian in U.S. federal court will deprive SOLIDERE of a significant share of its bargain under the Contract — a neutral forum for the resolution of disputes and international enforceability of any damages award. "[I]nternational arbitration is designed and accepted [] to assure parties from different jurisdictions that their disputes will be resolved neutrally . . . [T]he parties usually seek an independent decision-maker, detached from the courts, government institutions, and cultural biases of either party [and] ordinarily contemplate the arbitrator's application of internationally-neutral procedural rules, rather than a particular national legal regime . . . . Moreover, international arbitration awards are often more readily enforceable in jurisdictions other than their place of origin than national court judgments." Gary Born, Int'l Commercial Arbitration

Commentary and Materials 2-3 (2d ed. 2001); cf. Deutz, 270 F.3d at 153-54 ("[The defendant] points to landmark Supreme Court decisions in support of its position that federal policy favors arbitration for the resolution of international commercial disputes . . . [and] we agree that providing for dispute resolution in a neutral forum by an acknowledged competent agency is highly desirable . . . .").

SOLIDERE will also sustain significant damage if denied an opportunity to have its claim decided in the forum of its choice – an arbitration tribunal constituted under the ICC Rules. See Olde Disc. Corp., 805 F. Supp. at 1141 ("[L]oss of . . . right to arbitrate . . . constitutes irreparable harm clearly distinguishable from purely economic losses."). A Lebanese company with no significant ties to the United States, SOLIDERE agreed and expected to resolve any conflicts that may arise under the Contract by arbitration under the ICC Rules in Paris, France, applying Lebanese substantive law. See Chammaa Decl., ¶ 7(a), Ex. C (Contract), General Conditions at ¶¶ 44, 50.

In addition, forcing SOLIDERE to litigate in a U.S. federal court would be impractical and unduly burdensome. First, the international nature of this dispute and the potential need to apply French or Lebanese procedural and substantive law, will likely complicate and protract the proceedings in this Court. By contrast, the members of the ICC Arbitration tribunal are experienced international arbitrators, well qualified to select and apply foreign law.[22] Second, most key witnesses are based in Lebanon. Assuming arguendo that they would be willing to appear in Delaware,[23] the cost and inconvenience of their travel would be prohibitively high. Third, most documents and materials relevant for this trial are also in Lebanon. Costly and time-consuming retrieval and production would be necessary under the

---

[22]  The parties have already selected their arbitral panel. A respected former U.S. federal judge and experienced international arbitrator, Judge Charles B. Renfrew, was chosen by URS as its party-arbitrator and a respected international arbitration practitioner who is a member of the California and Paris bars, Eric A. Schwartz, was chosen by SOLIDERE. The parties have jointly nominated Professor Bernard Hanotiau, a Belgian national, who is a member of the Brussels and Paris bars, and a highly experienced international arbitrator, to act as Chair of the arbitral tribunal.

[23]  Witnesses living in Lebanon or elsewhere abroad are cannot be compelled to appear in this Court. See Fed. R. Civ. P. 45(b)(2); see also Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp. 2d 192, 204 (D. Del. 1998) ("As [out-of state residents, the] witnesses are outside the Court's subpoena power."). Although ICC arbitrators also lack subpoena power, Article 14(2) of the ICC Rules permits arbitrators to conduct hearings at any suitable location and, thus, can make it easier to hear witnesses, regardless of where they may reside.

36

Federal Rules of Civil Procedure as compared to the more flexible procedures in ICC arbitral proceedings. See Carberry Decl. Ex. G (excerpt from W. Laurence Craig, William W. Park & Jan Paulsson, International Chamber of Commerce Arbitration 118 (3d ed. 2000)). Finally, as SOLIDERE clearly did not anticipate being haled before this Court, it would be inequitable to compel it to litigate here.

**D.    The Public Interest Weighs Against The Issuance Of The Requested Injunction**

The final factor which courts consider when deciding whether to issue a preliminary injunction is the public interest. See Olde Disc. Corp., 805 F. Supp. at 1136; Adams v. Freedom Forge Corp., 204 F.3d 475, 484 (3d Cir. 2000) ("If relevant, the court should also examine . . . whether the injunction serves the public interest."). In the instant dispute, the public interest weighs decisively against granting an anti-suit injunction.

Courts recognize a clear public policy in favor of enforcement of private agreements between parties. See Highlands Ins. Group v. Perini/Nugent Joint Venture, No. 98-CV-1725, 1998 WL 377953, at *9 (D.N.J. June 29, 1998); Pritchard v. Dent Wizard Int'l Corp., 275 F. Supp. 2d 903, 920 (S.D. Ohio 2003) ("The public has an interest in the enforceability of contracts."). Here, SOLIDERE bargained for and agreed to arbitrate any disputes arising out of the Contract in arbitration under ICC Rules in Paris. URS acted, held itself out and performed as a party under the Contract. Having received the benefits of the Contract, URS is now bound by the Contract and arbitration provision therein.

Further, URS voluntarily appeared and fully participated in the ICC Arbitration. See Carberry Decl. Ex. D. It was not until after the ICC Court rejected its arguments that URS sought relief in this Court. Having unsuccessfully petitioned in the ICC Arbitration, URS should not be permitted a second bite at the apple and allowed to litigate the same issues in this forum. See Bergquist v. Sunroc Corp., 777 F. Supp. 1236, 1251 (E.D. Pa. 1991). A decision granting URS's injunction is not in the public interest and would have a direct, adverse and chilling effect on the expansion of American foreign commerce and trade. See M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 9 (1972) ("The expansion of American

37

business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts.").

Finally, neither the State of Delaware nor the United States has any significant interest in seeing the instant dispute resolved here. The only connection to this forum is that Delaware is the place of incorporation of URS and Radian. By contrast, Lebanon has a significant interest in seeing a dispute concerning a Lebanese remediation project of vital importance to the people of that country resolved in the manner bargained-for by a Lebanese company, i.e. by international arbitration in Paris, applying Lebanese substantive law. The public interest of Lebanon plainly outweighs Delaware's minimal interest in this litigation.

*   *   *

Thus, even under the more permissive, traditional standard for issuing injunctive relief, the Motion should be denied.

**Conclusion**

For the foregoing reasons, Defendant SOLIDERE respectfully requests that the Court

deny the Motion and grant such other relief as the Court may deem proper and just.

Samuel A. Nolen (#971)
Anne Shea Gaza (#4093)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
Wilmington, DE 19899-0551
P.O. Box 551
(302) 651-7700
Nolen@rlf.com
Gaza@rlf.com

OF COUNSEL:
Paul B. Carberry
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8507
pcarberry@whitecase.com

*Attorneys for Defendant The Lebanese
Company for the Development and
Reconstruction of Beirut Central District,
S.A.L. a/k/a SOLIDERE*

Dated: February 23, 2007

RLF1-3119423-1

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2007, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Edward P. Welch, Esquire
Edward B. Micheletti, Esquire
Skadden, Arps, Slate, Meagher
 & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899

I hereby certify that on February 23, 2007, I caused to be sent by electronic mail and Federal Express the foregoing document to the following non-registered participants:

Jeffrey H. Dasteel, Esquire
Jason D. Russell, Esquire
Marina V. Bogorad, Esquire
Skadden, Arps, Slate, Meagher
 & Flom LLP
300 S. Grand Avenue, 34th Floor
Los Angeles, CA 90071
jdasteel@skadden.com

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

RLF1-3089050-1

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2007, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Edward P. Welch, Esquire
> Edward B. Micheletti, Esquire
> Skadden, Arps, Slate, Meagher
> & Flom LLP
> One Rodney Square
> P.O. Box 636
> Wilmington, DE 19899

I hereby certify that on March 2, 2007, I caused to be sent by electronic mail the foregoing document to the following non-registered participants:

> Jeffrey H. Dasteel, Esquire
> Jason D. Russell, Esquire
> Marina V. Bogorad, Esquire
> Skadden, Arps, Slate, Meagher
> & Flom LLP
> 300 S. Grand Avenue, 34th Floor
> Los Angeles, CA 90071
> jdasteel@skadden.com

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700