IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------- x
URS CORPORATION                                 )
                                                )
                         Plaintiff,             )        Civil Action No. 06-415-SLR
                                                )
         v.                                     )
                                                )        REDACTED
THE LEBANESE COMPANY FOR THE                    )        PUBLIC VERSION
DEVELOPMENT AND RECONSTRUCTION                  )
OF BEIRUT CENTRAL DISTRICT, S.A.L.,             )        VOLUME I
a/k/a SOLIDERE,                                 )
                                                )
                         Defendant.             )
----------------------------------------------- x
```

## DECLARATION OF PAUL B. CARBERRY IN SUPPORT OF DEFENDANT SOLIDERE'S ANSWERING BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

PAUL B. CARBERRY declares as follows:

1.      I am an attorney admitted to practice law before the courts of the

State of New York and a member of the law firm of White & Case LLP ("White &

Case"), counsel for Defendant, The Lebanese Company for the Development and

Reconstruction of Beirut Central District, s.a.l., ("SOLIDERE"), in the above-referenced

action. I have been admitted pro hac vice to appear before this Court. This declaration is

based entirely upon my personal knowledge and information supplied to me by other

attorneys at White & Case, and is submitted, in support of Defendant SOLIDERE's

Answering Brief in Opposition to Motion for Preliminary Injunction.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the transcript of Nasser Chammaa's deposition conducted on January 23, 2007.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the transcript of Alberto Cuenca's deposition conducted on January 26, 2007.

4.      Attached hereto as Exhibit 3 is a true and correct copy of the transcript of Kristin L. Jones's deposition conducted on January 30, 2007.

5.      Attached hereto as Exhibit 4 is a true and correct copy of the transcript of Thomas Bishop's deposition conducted on January 31, 2007.

6.      Attached hereto as Exhibit 5 is a true and correct copy of the transcript of William D. Balfour's deposition conducted on February 1, 2007.

7.      Attached hereto as Exhibit 6 is a true and correct copy of the transcript of Amine Bou Onk's deposition conducted on February 2, 2007.

8.      Attached hereto as Exhibit 7 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00106414-18 (Sept. 30, 2002 Corporate Resolution).

9.      Attached hereto as Exhibit 8 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00106423-26 (April 13, 2004 Corporate Resolution).

10.     Attached hereto as Exhibit 9 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00105117-18 (Aug. 9, 2000 Letter from URS to the Texas Board of Professional Engineers).

11.    Attached hereto as Exhibit 10 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00097579-83 (April 3, 2000 Email entitled "Corporate Identity Program Update").

12.    Attached hereto as Exhibit 11 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00255861-64 (July 23, 2001 Facsimile attaching a copy of a Short Term Foreign Assignment Agreement).

13.    Attached hereto as Exhibit 12 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00057037- 41 (April 15, 2005 Email regarding creation of shell entity in Lebanon).

14.    Attached hereto as Exhibit 13 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00274717- 19 (Nov. 20, 2000 Email regarding novation of Radian contracts).

15.    Attached hereto as Exhibit 14 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00256275-76 (July 3, 2000 Amendment to Radian's 401(k) Thrift Plan).

16.    Attached hereto as Exhibit 15 is a true and correct copy of Julian D M Lew QC, Control of Jurisdiction by Injunctions Issued by National Courts, Conference Paper – ICCA 2006.

17.    Attached hereto as Exhibit 16 is a true and correct copy of  Abdul Hamid El-Ahdab, Arbitration with the Arab Countries 320-321 (1998).

18.    Attached hereto as Exhibit 17 are true and correct copies and translations of French cases and statutes: Société Isover-Saint-Gobain v. Sociétés Dow Chemical France et autres, Cour d'Appel [CA] [regional court of appeal] Paris, 1e ch.,

October 21, 1983, Rev. Arb. 1984, 98, 100; Société Sponsor A.B. v. Lestrade, Cour

d'Appel [CA] [regional court of appeal] Pau, November 26, 1986, Rev. Arb. 1988, 153,

156; Société Korsnas Marma v. Société Durand-Auzias, Cour d'Appel [CA] [regional

court of appeal] Paris, 1e ch., November 30, 1988, Rev. Arb. 1989, 691, 694; Société Kis

France et autres v. Société Générale et autres, Cour d'Appel [CA] [regional court of

appeal] Paris, 1e ch., October 31, 1989, Rev. Arb. 1992, 90, 93; Orri v. Société des

Lubrifiants Elf Acquitaine, Cour d'Appel [CA] [regional court of appeal] Paris, 1e ch.,

January 11, 1990, Rev. Arb. 1992, 95, 97-98; Soc. V 2000, Soc. Project XJ 220 LTD v.

Renault Jean François, Cour d'Appel [CA] [regional court of appeal] Paris, December 7,

1994, RTD com. 1995, 401, 405-06; and French New Code of Civil Procedure, Article

1458.

       19.    Attached hereto as Exhibit 18 is a true and correct copy and

translation of Fady Nammour, Droit et pratique de l'arbitrage interne et international 627-

629 (2005).

       20.    Attached hereto as Exhibit 19 is a true and correct copy of a

document produced by URS in this litigation bates-stamped URS00274593-604 (Jan. 3,

2005 Letter from Gardere, Wynne, Sewell LLP to Ambrust & Brown, LLP).

       21.    Attached hereto as Exhibit 20 is a true and correct copy of a

document produced by URS in this litigation bates-stamped URS00164282-311 (URS

Corp. Balance Sheet, dated as of December 26, 2006).

       22.    Attached hereto as Exhibit 21 is a true and correct copy of a

document produced by URS in this litigation bates-stamped URS00240712-34 (Jan. 5,

2000 Memorandum regarding URS contracts).

23.     Attached hereto as Exhibit 22 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00153076 (Jan. 17, 2001 Letter from John Rakow III).

24.     Attached hereto as Exhibit 23 are true and correct copies of documents produced by URS in this litigation bates-stamped URS00055925-26, URS00045767-68, URS00055510-11, URS00045766-67, and URS00055456-57 (Emails requesting funds for Radian).

25.     Attached hereto as Exhibit 24 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00200308-09 (Jan. 16, 2001 Letter attaching a letter from John Rakow III).

26.     Attached hereto as Exhibit 25 is a true and correct copy of a document produced by SOLIDERE in this litigation bates-stamped SOLDEL00537-43 (May 12, 2003 Facsimile from John Rakow III).

27.     Attached hereto as Exhibit 26 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00236245-47 (Dec. 2, 2004 E-mail from Alberto Cuenca).

28.     Attached hereto as Exhibit 27 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00001910-13 (Oct. 14, 2002 Letter regarding Contract insurance).

29.     Attached hereto as Exhibit 28 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00079321-578 (Undated agenda and supporting documents for a September 10, 2002 meeting).

30.    Attached hereto as Exhibit 29 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00106394-404 (Sept. 10, 2002 Corporate Resolution).

31.    Attached hereto as Exhibit 30 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00106386-87 (Sept. 30, 2002 URS Holdings Inc. Corporate Resolution).

32.    Attached hereto as Exhibit 31 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00164237-67 (July 15, 2004 Fourth Amendment to Lease Agreement).

33.    Attached hereto as Exhibit 32 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00234248-54 (Second Amendment of Office Lease).

34.    Attached hereto as Exhibit 33 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00238401-05 (April 6, 2000 URS Memorandum regarding 401(k) Retirement Plan).

35.    Attached hereto as Exhibit 34 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00001932-42 (June 26, 2002 Monthly Report on the Normandy Landfill Project).

36.    Attached hereto as Exhibit 35 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00108744-47 (Dec. 12, 2005 Email).

37.     Attached hereto as Exhibit 36 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00025440-87 (Jan. 14, 2003 Letter).

38.     Attached hereto as Exhibit 37 is a true and correct copy of B. Hanotiau, Non-Signatories in International Arbitration: Lessons from Thirty Years of Case Law, paper given at ICC Congress, Montreal (June 2006).

39.     Attached hereto as Exhibit 38 is a true and correct copy of the expert report of Gene L. Deetz, CPA.

40.     Attached hereto as Exhibit 39 is a true and correct copy of G. Born, International Commercial Arbitration Commentary and Materials 203 (2d ed. 2001).

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 23, 2007.

PAUL B. CARBERRY

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 2, 2007, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Edward P. Welch, Esquire
> Edward B. Micheletti, Esquire
> Skadden, Arps, Slate, Meagher
> & Flom LLP
> One Rodney Square
> P.O. Box 636
> Wilmington, DE 19899

I hereby certify that on March 2, 2007, I caused to be sent by electronic mail the foregoing document to the following non-registered participants:

> Jeffrey H. Dasteel, Esquire
> Jason D. Russell, Esquire
> Marina V. Bogorad, Esquire
> Skadden, Arps, Slate, Meagher
> & Flom LLP
> 300 S. Grand Avenue, 34th Floor
> Los Angeles, CA 90071
> jdasteel@skadden.com

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

RLF1-3089050-1

# EXHIBIT 1



This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 2


RECYCLED

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 3



This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 4



This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 5



This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 6


RECYCLED

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 7


RECYCLED

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 8



This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 9



This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 10





BRW
Dames & Moore
Greiner
O'Brien Kreitzberg
Radian International    *No Bold*
Thorburn Colquhoun
Walk Haydel
Woodward Clyde





We are now





*y's*
We are the industries finest planners, engineers, architects, environmental scientists, and program and construction managers joined in one full-service organization under on name.  We are URS.

**URS Corporation**
100 California Street, Suite 500
San Francisco, CA 94111-4529
Tel:  415.774.2700
Fax: 415.398.1905

**In Beirut:**
Radian International
P. O. Box 11-1261
Beirut, Lebanon
Tel: 01.983.575

URS00097579



*Sue*
*Jackie Graham (?)*
*(2 11) - 330 - 1975*

**BRW**
**Dames & Moore**
**Greiner**
**O'Brien Kreitzberg**
**Radian** → *Not Bold on Radian*
**Thorburn Colquhoun**
**Walk Haydel**
**Woodward Clyde**



We are now

# URS

We are the industry's finest planners, engineers,
architects, environmental scientists, and program
and construction managers joined in one full-service
organization under one name. We are URS.



URS Corporation
100 California Street, Suite 500
San Francisco, CA 94111-4529
Tel: 415.774.2700
Fax: 415.398.1905
www.urscorp.com

URS Corporation (NYSE:URS) is an Equal Opportunity and Affirmative
Action Employer. Minorities and women are encouraged to apply.

**Introduction**

**Logo Presentation**

**Logo Guidelines**

**Stationery**

**Business Cards**

**Client Announcement**

**Advertising**

**Web Site**

**Files to Download**

*Logo Guidelines PDF v3*

*URS Logo Files*

*Firm Name Files*

*Stationery Templates*

URS00097581



BRW
Dames & Moore
Greiner
O'Brien Kreitzberg
Radian
Thorburn Colquhoun
Walk Haydel
Woodward Clyde



We are now

# URS

We are the industry's finest planners, engineers, architects, environmental scientists, and program and construction managers joined in one full-service organization under one name. We are URS.



URS Corporation
100 California Street, Suite 500
San Francisco, CA 94111-4529
Tel: 415.774.2700
Fax: 415.398.1905
www.urscorp.com

URS Corporation (NYSE:URS) is an Equal Opportunity and Affirmative Action Employer. Minorities and women are encouraged to apply.

Sue Kilgannon

04/03/2000 06:23 PM

To: All Notes Users
cc:
Subject: Corporate Identity Program Update

Over the past several months, we have been developing a comprehensive corporate identity program that presents the combined Company as a full-service organization under the URS name. The ongoing program is designed to share our name change plans internally and provide employees with the tools required for doing business as URS, including new letterhead and business cards. Externally, we will communicate our new corporate identity to clients, competitors, potential employees, the media and the investment community.

In February, all employees received an animated presentation introducing the new URS logo. At that time, various electronic versions of the logo with guidelines for its use were posted in the Corporate Communications Database on Lotus Notes and on the *URS Connection* employee Web site. The phased production of new URS stationery and business cards featuring the new logo has begun and will be completed by November.

To introduce the new logo and branding to our clients and associates, name-change announcement cards were shipped to all offices in late March. These cards describe our expanded capabilities and our plans to operate under the URS name. Beginning this month, we will implement another important phase of our new identity program: an international advertising campaign and publicity program.

An advertisement that presents URS as "one full-service organization under one name" will appear in a variety of industry publications, beginning with the April issue of *American City and County,* and the April 10 issue of *ENR,* which features the magazine's annual ranking of the top 500 design firms. Employees can preview the ad in the Corporate Communications Database on Lotus Notes under "New Identity Ad Campaign" or on the employee Web site under "What's New." Additional advertisements, including customized versions of the ad, will follow in a variety of trade publications that focus on specific markets.

As part of our publicity program, Martin Koffel has been invited by the New York Stock Exchange to ring the closing bell on April 6 at 4:00 PM EDT. (This event is often replayed on TV financial-news channels.) In conjunction with these activities, and to reinforce our single identity, full-page ads will be placed in *The Wall Street Journal* the week of April 10, and the *Financial Times,* based in the U.K., later this week.

We realize you may have additional questions regarding our corporate identity program. On Monday, April 10, we will add a "New Identity" section to the *URS Connection* and the Corporate Communications Database in Lotus Notes to help answer them. In this new section, you will find detailed information regarding our plans, implementation schedules for many of our name-change initiatives and samples of some of the new materials we are producing, including stationery, business cards, advertising and the client announcement card.

As a reminder, you can access the *URS Connection* employee Web site at www.ursconnection.com (user name: URS; password: URSCONNECTION, both are uppercase.)

# EXHIBIT 11

RECYCLED

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 12

RECYCLED

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 13

RECYCLED

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 14

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 15

REDACTED

Conference Paper– ICCA 2006

# CONTROL OF JURISDICTION BY INJUNCTIONS ISSUED BY NATIONAL COURTS[1]

### Dr Julian D M Lew QC[2]

## 1. Introduction

1. In recent years, there has been an increasing discussion and concern about national courts issuing orders preventing a party from initiating, continuing, participating, or even co-operating with arbitration proceedings. Several cases have been reported where such injunctions were issued. In most of these cases the court issuing the "anti-suit" or more particularly "anti-arbitration" injunction, has been a court of the place of residence of the party requesting the injunction (often a State or a State-entity)[3]. Indeed, it is often the respondent in the arbitration, "who runs to its own courts to get the kind of 'assistance' which it could not hope to get from a neutral court or tribunal"[4]. Furthermore, the court issuing the injunction is either a court of the seat of arbitration or a court of the place of eventual enforcement of the award[5].

1.

---

[1] Report presented at ICCA Montreal 2006 – International Arbitration 2006: Back to Basics?, 1 June 2006.
[2] Arbitrator & Barrister, 20 Essex Street, Visiting Professor and Head of School of International Arbitration, Centre for Commercial Law Studies (CCLS), Queen Mary, University of London.
[3] Sigvard JARVIN, Comment on ICC No. 4862, Partial Award, 1986, in Collection of ICC Awards 1986-1990, Sigvard Jarvin, Yves Derains, Jean-Jacques Arnaldez (eds.), Deventer 1994, p. 517. For examples, see *Himpurna California Energy v Republic of Indonesia*; *Salini Construttori S.p.a. v Ethiopia*; *HUBCO v WAPDA* (for a discussion of these cases, see below, paras. 88ff). This observation is corroborated by informal information given to me by the General Counsel of the ICC, according to which the criterion that is the most frequently used to determine the national court having jurisdiction to grant the anti-arbitration injunction is the nationality of the respondent in the arbitral proceedings. Indeed, during the past ten years, approximately 31 cases involving anti-suit injunctions were brought to the attention of the ICC Court Secretariat. In 25 of these cases, the jurisdiction of the national court was based on the nationality of the respondent in the arbitration.
[4] Jan PAULSSON, Interference by National Courts, in The Leading Arbitrators' Guide to International Arbitration, Lawrence W Newan, Richard D Hill (eds.) New York 2004, p. 123.
[5] Alan REDFERN and Martin HUNTER, Law and Practice of International Commercial Arbitration, 4th edition, London 2004, p. 409, para. 7-33.

Conference Paper– ICCA 2006

2.      The extent of the problem of national courts' wrongful interference with the arbitration process in this way is unclear. Informal estimations given to me by some of the leading arbitration institutions suggest that cases of anti-arbitration injunctions remain relatively rare. Since 1996, the ICC Court Secretariat has been informed of 31 cases where requests for anti-arbitration injunctions were filed[6]. It is interesting to note that 10 of these cases were filed in 2005 alone. Fortunately, the occurrence of anti-arbitration injunctions is still far less frequent in international arbitrations administered by other institutions. In the case of the LCIA I understand that during the past ten years, there have only been seven cases affected by an anti-arbitration injunction, three of which arose during the past five years. The ICDR does not presently record the occurrence of anti-arbitration injunctions in ICDR arbitrations. The Stockholm Chamber of Commerce has reported only one case involving an anti-arbitration injunction in the past five years, and in this case the request for injunction was withdrawn before the court took any decision. Finally, the Hong Kong International Arbitration Centre, WIPO, the Singapore International Arbitration Centre[7], the Swiss Chamber of Commerce, the Austrian Federal Economic Chamber, as well as the Czech Arbitration Court, all have had no arbitrations affected by anti-arbitration injunctions[8].

3.      These figures are very small. However, anti-arbitration injunctions cause serious concerns for all those involved in the arbitration[9]. As pertinently described by Jan Paulsson

1.      _____

[6] It must be assumed that certain cases involving anti-arbitration injunctions were not brought to the attention of the ICC Court Secretariat. In 27 out of the 31 reported cases, the request for the anti-arbitration injunction was filed by the respondent to the arbitral proceedings.

[7] For a case involving anti-arbitration injunctions in Singapore see *Mitsui Engineering and Shipbuilding Co Ltd v Easton Graham Rush and Another* [2004] 2 SLR 14; [2004] SGHC 26. In this case, the High Court of Singapore refused to grant an anti-arbitration injunction in order to stay an arbitration governed by the Singapore International Arbitration Act which has incorporated the UNCITRAL Model Law.

[8] It is important to note that this information was provided unofficially and are not definitive statements of these institutions. The information is however illustrative of the rare nature of this problem.

[9] Julian D M LEW, Anti-suit Injunctions Issued by National Courts – To Prevent Arbitration Proceedings, in Anti-suit Injunctions in International Arbitration, IAI Series on International Arbitration No. 2, Emmanuel Gaillard (ed.), Bern 2005, p. 25.

Conference Paper– ICCA 2006

"[t]he subversion of an arbitration agreement is a grave matter. Instead of a neutral forum, the victim suddenly finds itself confronted by a jurisdiction which will judge its conduct according to a very different yardstick. Without even mentioning the unmentionable (corruption and xenophobia), everything is suddenly stacked in favour of the other side: language, procedure, practical convenience, ability to use one's own lawyers, cultural affinities with the decision-maker…and the list goes on"[10].

4.    This is exactly what the selection of arbitration aimed to avoid.

5.    The effect of an anti-arbitration injunction is to destabilize the parties' dispute resolution environment. In many cases, anti-arbitration injunctions are sought to protect a weak party and perhaps as a tactical play to indicate the power available to the party seeking the injunction. The effect of the injunction is to undermine the efficacy and integrity of international arbitration. Hence, Judge Stephen Schwebel described anti-arbitration injunctions as "one of the gravest problems of contemporary international commercial arbitration"[11]. In the absence of exceptional reasons, perhaps anti-arbitration injunctions should not exist at all.

6.    Anti-arbitration injunctions are sought when the existence or validity of an arbitration agreement is called into question[12]. It is generally accepted that the court of the seat of the arbitration has supervisory jurisdiction. Namely, this court may refuse to stay an arbitration or set aside an award on jurisdiction if they consider that the arbitral tribunal does not have jurisdiction, *e.g.*, there is no valid arbitration agreement. However, in accordance with the principle of competence-competence, national courts should normally allow the arbitral tribunal to consider the issue of its jurisdiction and the validity of the arbitration agreement in the first instance.

1.    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[10] J PAULSSON, *op. cit.* fn 4, p. 124.
[11] Stephen M SCHWEBEL, Anti-Suit Injunctions in International Arbitration – An Overview, in Anti-suit Injunctions in International Arbitration, *op. cit.* fn 9, p. 5.
[12] S JARVIN, *loc. cit.* fn 3.

3

Conference Paper– ICCA 2006

7.      There may be situations in which the court of the seat of the arbitration considers it appropriate to intervene in the arbitration process in order to stop or at least stay the arbitration until it has decided the issue of arbitral jurisdiction itself. The obligation to stay court proceedings in favour of arbitration under Article II of the New York Convention is subject to the arbitration agreement not being "null and void, inoperative or incapable of being performed". In this case, "[w]hen the intervening court is one at the seat of arbitration, it may be pointless, imprudent, or indeed unlawful for the arbitrators to proceed"[13].

8.      The question of greater interest is whether national courts not situated in the country of the seat of the arbitration – and therefore not enjoying any supervisory jurisdiction - may also stop arbitration proceedings by granting anti-arbitration injunctions. Can these courts determine the issue of arbitral jurisdiction and impose that decision on an arbitral tribunal sitting in another country before it has had an opportunity to rule on the issue? Why would a national court wish to take such action? What is the national court's interest to do so? What is the source of the national court's jurisdiction over foreign arbitration proceedings, *i.e.*, what is the legal basis for granting anti-arbitration injunctions? Most interesting, in many respects, is what actions should arbitrators take in the event of an anti-arbitration injunction? Should an arbitrator's personal interest under the law override his duty to the parties under the law and rules governing the arbitration?

9.      These are some of the questions that the present report will seek to analyse. The primary focus will be on anti-arbitration injunctions issued by national courts not in the country of the seat of arbitration seeking to restrain the implementation, continuation or conclusion of arbitration proceedings. The aim is to decide whether, and if so when, the granting of these anti-arbitration injunctions may be compatible with the system of international arbitration. Before answering these questions, the notion of "anti-arbitration injunction" must be clarified.

1.      ————————————

[13] J PAULSSON, *op. cit.* fn 4, p. 114.

4

Conference Paper– ICCA 2006

## 2.    What is an anti-arbitration injunction and what is it meant to do?

10.    An anti-suit injunction is a court order preventing a party from initiating or continuing with alternative proceedings abroad[14]. It is "a device, originally found in common law countries, whereby a court orders a party to refrain from bringing a claim before the courts of another State or before an arbitral tribunal or, if the party has already brought such a claim, orders that party to withdraw from, or to suspend, the proceedings"[15]. Anti-suit injunctions have been designed to prevent vexatious or oppressive litigation abroad[16]. The aim of the injunction is to protect the jurisdiction of one court in respect of the same parties and the cause of action from interference by the exercise of a jurisdiction of another court abroad[17].

11.    In the context of international arbitration, anti-suit injunctions can be requested to protect or to prevent the jurisdiction of an arbitral tribunal[18]. In the first case, the injunction is granted by a national court in order to stay court proceedings brought in violation of an arbitration agreement. The aim of this first type of injunction would be to enforce an arbitration agreement between the parties. This is in accordance with the requirements of Article II of the New York Convention and is found in many national laws. It also is clearly set out in Article 8 (1) of the UNCITRAL Model Law. This type of injunction is in support of the arbitration process.

12.    In the second case, the injunction seeks to prevent arbitration proceedings in order to protect the jurisdiction of a State court over a given case. As this second type of injunction is specifically directed against the arbitration, it is more appropriately called an "anti-arbitration injunction".

1.    _____

[14] J D M LEW, *loc. cit.* fn 9.
[15] Emmanuel GAILLARD, Introduction to "Anti-suit Injunctions in International Arbitration", *op. cit.* fn 9, p. 1.
[16] S M SCHWEBEL, *op. cit.* fn 11, p. 8.
[17] S M SCHWEBEL, *loc. cit.* fn 16.
[18] J D M LEW, *op. cit.* fn 9, p. 26.

Conference Paper– ICCA 2006

13.    Like anti-suit injunctions, anti-arbitration injunctions are made *in personam*. They may be directed against one or both parties to the arbitration, against the arbitral tribunal or a particular arbitrator, or against the arbitral institution itself[19].

14.    Anti-arbitration injunctions may have two purposes. Firstly, they may be granted in order to restrain the implementation, continuation or conclusion of arbitration proceedings. Secondly, they may seek to prevent actions for the enforcement of arbitral awards[20]. Since the present report deals with the control of arbitration proceedings by injunctions issued by national courts, the primary focus will be on the first type of anti-arbitration injunctions.

### 3.    Anti-arbitration injunctions in theory

15.    May a national court situated in a country other than the seat of the arbitration grant an anti-arbitration injunction in order to stop an arbitration abroad? In other words, may it decide the issue of arbitral jurisdiction and impose that decision on the arbitrators before they have had an opportunity to rule on the issue themselves?

16.    At first sight, anti-arbitration injunctions do not raise the same criticism levelled at traditional anti-suit injunctions because they do not directly interfere with the jurisdiction of a sovereign State[21]. However, the legality of anti-arbitration injunctions remains in question as they appear to be incompatible with international arbitration law[22].

1.    ─────────────────

[19] J D M LEW, *op. cit.* fn 9, p. 33.
[20] See, *e.g.*, *Oil & National Gas Commission Ltd v Western Company of North America*, (1987) All India Rep SC 674; *KBC v Pertamina* (Indonesian courts grant injunction in order to prevent KBC from starting enforcement proceedings before US courts under penalty of US$ 500'000 per day fine for any breach). On this case, see Emmanuel GAILLARD, KBC v Pertamina: Landmark Decision on Anti-Suit Injunctions, New York Law Journal, 2 October 2003..
[21] J D M LEW, *loc. cit.* fn 18; see also Sandrine CLAVEL, Anti-Suit Injunctions et arbitrage, Revue de l'arbitrage, No. 4 (2001), p. 701.
[22] S M SCHWEBEL, *op. cit.* fn 11, pp. 5f and pp. 9ff ; J D M LEW, *loc. cit.* fn 18; S CLAVEL, *loc. cit.* fn 21; Emmanual GAILLARD, Il est interdit d'interdire: réflexions sur l'utilisation des anti-suit injunctions dans l'arbitrage commercial international, Revue de l'arbitrage, No. 1 (2004), p. 47.

Conference Paper– ICCA 2006

17.    Anti-arbitration injunctions most often arise when the existence or validity of an arbitration agreement is called into question – though this may be just the pretext to stop or destabilize the arbitration. In theory at least, it may be entirely justified for a party contesting the existence of a valid arbitration agreement to commence court actions before the court it considers to have jurisdiction, rather than to initiate arbitration proceedings and to wait for the arbitral tribunal to render an award which would then be challenged on grounds of lack of jurisdiction. The question which arises is whether it also would be justified for a party having signed an arbitration agreement to commence a court action in order to prevent arbitration proceedings from being initiated, continued or concluded. Essentially, in each instance the question is whether an anti-arbitration injunction can be justified by the facts of the particular case or whether it is being used by a party and its lawyer as a device to undermine, destabilise, delay or avoid an arbitration[23].

18.    There are two fundamental practical considerations as to how anti-arbitration injunctions are used in practice and whether there are circumstances in which anti-arbitration injunctions can be justified. First, what in theory are the powers of national courts to grant anti-arbitration injunctions? Second, what are the various ways in which national courts can support – instead of hinder - foreign arbitration proceedings?

## 3.1.  Anti-arbitration injunctions in domestic law

19.    Anti-suit injunctions originated in common law jurisdictions. However, in international arbitration, anti-suit injunctions have also been granted by courts in certain civil law countries. This paper reviews the circumstances in which courts from common law and civil law countries have exercised the power to grant anti-arbitration injunctions. The primary focus is on the legal systems in England, United States, Switzerland, France, Sweden and the UNCITRAL Model Law.

1.    ———————————

[23] J D M LEW, *op. cit.* fn 9, p. 27.

Conference Paper– ICCA 2006

20.    The principles used in considering the granting of anti-arbitration injunctions are similar to those used in anti-suit injunctions. Analogy with anti-suit injunctions can therefore be made in the absence of clear anti-arbitration jurisprudence.

### 3.1.1.    England

21.    Courts in England have a general power to grant injunctions. However, the basis for the granting of anti-arbitration injunctions in particular is not entirely clear.

22.    Under the Arbitration Act 1996, a party who has taken no part in the arbitral proceedings, including participating in the constitution of the arbitral tribunal, can nevertheless apply to the courts for a declaration that the tribunal lacked jurisdiction. This request can be coupled with an injunction restraining the continuation of the arbitral proceedings[24]. The possibility to apply for such an injunction is only available to a person who has not participated in the arbitration[25].

23.    However, in *Welex AG v Rosa Maritime Ltd* (*"The Epsilon Rosa"*)[26], the Court of Appeal held that, in accordance with section 37 (1) of the Supreme Court Act 1981 for England and Wales, the High Court has a general power to grant permanent anti-suit injunctions "[...] in all cases in which it appears to the court to be just and convenient to do so". This case concerned an appeal against the High Court's decision to grant an anti-suit injunction restraining Welex from proceeding with court proceedings in Poland brought in violation of an arbitration agreement. The Court of Appeal ruled that even if the Arbitration Act 1996 did not give an express power to the High Court to grant the injunction, such power could be derived from its general power under section 37 (1).

1.    ————————————

[24] Section 72 (1) Arbitration Act 1996.
[25] MUSTILL & BOYD, Commercial Arbitration, 2nd edition, 2001 Companion, London 2001, p. 362. See also Andrew TWEEDDALE/ Keren TWEEDDALE, Arbitration of Commercial Disputes, Oxford 2005, para. 24.65, p. 704.
[26] [2003] EWCA Civ 938, [2003] 2 Lloyd's Report 509.

Conference Paper– ICCA 2006

24.    Even if the English courts' general power to grant injunctive relief includes anti-arbitration injunctions, they exercise this power only rarely. Indeed, the English courts take a very strict position regarding injunctions seeking to restrain arbitration proceedings. Only in exceptional circumstances and specifically only where it is clear that the arbitration proceedings have been wrongly brought will an anti-arbitration injunction be granted[27].

25.    This position is illustrated by the case of *Compagnie Nouvelle France Navigation S.A. v Compagnie Navale Afrique du Nord* (the *"Oranie"* and the *"Tunisie"*)[28]. In this case, the Court of Appeal held that although, as a matter of principle, courts have the power to stay arbitration proceedings when the validity of the arbitration agreement is in question, this power should be exercised very carefully. Indeed, anti-arbitration injunctions should not be granted simply because the balance of convenience favours the injunction. According to Sellers LJ, the guiding principles for granting anti-arbitration injunctions are (1) that the stay must not cause injustice to the claimant in the arbitration, and (2) that the applicant for a stay must satisfy the court that the continuation of the arbitration would be oppressive or vexatious on him or an abuse of process of the court. In this case, the Court of Appeal decided that the conditions were not met and denied the granting of the anti-arbitration injunction[29].

26.    This approach was confirmed recently in *Weissfisch v Julius, Weissfisch & Davis*[30]. In this case, an action was brought before the English High Court seeking (1)

1.    ───────────────

[27] David St. John SUTTON/ Judith GILL, Russel on Arbitration, 32nd ed., London 2003, p. 309, para. 7-031; Julian D M LEW/ Loukas A MISTELIS/ Stefan M KRÖLL, Comparative International Commercial Arbitration, The Hague, London, New York , 2003, p. 363, para. 15-25. See also the case of the *"Ithaka"* [1939] 3 All. E. R. 630, in which Mackinnon LJ held that a party could not be granted an anti-arbitration injunction because parties must be bound by their agreement to arbitrate.
[28] [1966] 1 Lloyd's Law Reports 477.
[29] See also *Industry Chimiche Italia Centrale v Alexander G. Tsavliris and Sons Maritime Co.* (*The Choco Star*) [1987] 1 Lloyd's Report 508, CA. In this case, the Court of Appeal decided not to grant an anti-arbitration injunction, even if the validity of the arbitration agreement was in question and even if the issues raised in the arbitration were less extensive than those raised in the court proceedings.
[30] [2006] EWCA Civ 218 (available under www.bailii.org/ew/cases/EWCA/Civ/2006/218.html). On this case, see H R DUNDAS, An Extraordinary Arbitration: Weissfisch v Julius & Ors [2006] EWCA Civ 218, in Transnational Dispute Resolution, Vol. 3, Issue 2 (2006).

Conference Paper– ICCA 2006

a declaration that the arbitration agreement providing for Swiss law and a Swiss arbitral seat was void and (2) an injunction restraining the sole arbitrator under the agreement from acting as arbitrator. The only real connection with England was the fact that the arbitrator was an English lawyer within the jurisdiction of the court.

27.     The Court of Appeal rejected the request on essentially the same grounds as the High Court. These grounds were: (1) the arbitration agreement states expressly that disputes should be resolved by the sole arbitrator, with his seat in Switzerland and governed by Swiss law; (2) consequently, any issues as to the validity of the arbitration agreement must be resolved in Switzerland according to Swiss law; (3) this conclusion accords with the principles of international arbitration law set out in the New York Convention and recognized in the English Arbitration Act 1996; (4) an English court which restrains an arbitrator under an arbitration agreement with a seat in a foreign jurisdiction to which the parties unquestionably agreed would violate these principles; (5) exceptional circumstances may, nonetheless, justify the English court in taking such an action; (6) in the present case, no special circumstances were shown to exist.

28.     The Court of Appeal did not specify the nature of these "exceptional circumstances" susceptible of justifying the granting of an anti-arbitration injunction, but referred this matter back to the High Court.

### 3.1.2.    United States

29.     It is well established that in the United States courts have a general power to grant anti-suit injunctions[31]. Before a court may grant an anti-suit injunction, three threshold requirements must be met: (1) the court issuing the injunction must have jurisdiction; (2) the parties to both proceedings must be the same; and (3) the decision in the action before the court issuing the injunction must dispose of the foreign court

1.     ————————————————

[31] *Kaepa, Inc. v Achilles Corp.*, 76 F.3d 624, 626 (5th Cir. 1996).

Conference Paper– ICCA 2006

proceedings. Once these requirements have been met, the standard applied for issuing an anti-suit injunction varies depending on the court before which the injunction is sought[32]: There appear to be different approaches of the US Courts of Appeal.

30.    The Courts of Appeal for the Second, Third, Sixth and District of Columbia Circuits apply a restrictive standard based on comity[33]. Accordingly, one court must not interfere with the jurisdiction of another court, even if the foreign court proceedings are oppressive or vexatious. In case of parallel proceedings, both proceedings may proceed until one court renders a final judgment which can be pled as a *res judicata* before the other court. Anti-suit injunctions should be granted rarely and only to protect the jurisdiction or a public policy of the US forum.

31.    The Courts of Appeal for the Fifth, Seventh, and Ninth Circuits follow a liberal standard when considering the granting of anti-suit injunctions[34]. According to these courts, anti-suit injunctions may be granted if the foreign court proceedings "would frustrate a policy of the forum issuing the injunction, would be vexatious or oppressive, would threaten the issuing court's jurisdiction, and when adjudicating in separate actions would result in delay, inconvenience, expense, inconsistency or race to judgement"[35]. Under this liberal standard, less importance is placed on comity. The most important criteria is whether the foreign proceedings are vexatious or oppressive. In this regard, the mere inconvenience of duplicative proceedings, namely the additional costs and delays involved, may suffice for granting the anti-suit injunction[36].

1.    _____

[32] On anti-suit injunctions in the United States, see generally John FELLAS, Anti-Suit Injunctions – Litigating Across Borders, Transnational Dispute Management, Vol. 3. Issue 1 (2006).
[33] See, e.g., *Laker Airways Ltd v Sabena, Belgian World Airlines*, 731 F.2d 909 (D.C. Cir. 1984); *Gau Shan Co v Bankers Trust Co*, 956 F.2d 1349 (6th Cir. 1992); *China Trade*, 837 F.2d 34; *Compagnie Des Bauxites de Guinea v Ins Co of N America*, 651 F.2d 877 (3rd Cir. 1981), cert. denied, 457 U.S. 1105 (1982); *Younis Bros & Co v Cigna Worldwide Ins Co*, 167 F. Supp. 2d 743 (E.D. Pa. 2001); *Kirby v Norfolk S Ry Co*, 71 F. Supp. 2d 1363, 1367 (N.D. Ga. 1999).
[34] See, e.g. *Kaepa*, 76 F.3d 626-627 ; *Allendale Mut Ins Co v Bull Data Sys, Inc*, 10 F.3d 425 (7th Cir. 1993); *Seattle Totems Hockey Club, Inc v Nat'l Hockey League*, 652 F.2d 852 (9th Cir. 1981), cert. denied, 457 U.S. 1105 (1982).
[35] J FELLAS, op. cit. fn 32, p. 2.
[36] Marco STACHER, You Don't Want to Go There – Antisuit Injunctions in International Commercial Arbitration, ASA Bulletin, Vol. 23, No. 4 (2005), p. 643.

Conference Paper– ICCA 2006

32.     The approach recently of the Court of Appeal for the First Circuit is somewhere in between the restrictive and the liberal standards[37]. Comity is an important criteria to be considered before granting an anti-suit injunction. However, an anti-suit injunction can be justified not only in the two situations contemplated by the courts following the restrictive approach, but also in other situations. The test is whether the anti-suit injunction can be justified in light of "the totality of the circumstances". According to the court

> "these include (but are by no means limited to) such things as: the nature of the two actions (i.e., whether they are merely parallel or whether the foreign action is more properly classified as interdictory); the posture of the proceedings in the two countries; the conduct of the parties (including their good faith or lack thereof); the importance of the policies at stake in the litigation; and, finally, the extent to which the foreign action has the potential to undermine the forum court's ability to reach a just and speedy result"[38].

33.     US courts are reluctant to grant anti-arbitration injunctions. One of the few cases where a US court has granted an anti-arbitration injunction in order to stop an arbitration abroad was *General Electric Company v Deutz AG*[39]. This case concerned a contract providing for ICC arbitration in London concluded between General Electric and a third company. Deutz subsequently joined in this agreement. A dispute arose and General Electric commenced court proceedings before a US court against Deutz alleging breach of contract. Deutz responded by requesting an order to compel General Electric to arbitration in conformity with the arbitration agreement. Deutz's request was denied on the ground that there was no arbitration agreement between Deutz and General Electric. Deutz nonetheless initiated an ICC arbitration. In response, General Electric requested an anti-arbitration injunction enjoining Deutz from proceeding with the ICC arbitration in London.

1.     ————————————

[37] *Quaak v Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11 (1st Cir. Mar. 8 2004). For an analysis of this case, see J FELLAS, *op. cit.* fn 32, pp. 15ff.
[38] 361 F.3d 19.
[39] Published in Mealey's International Arbitration Report, Vol. 15, No. 10 (2000), pp. C-1ff.

Conference Paper– ICCA 2006

34.     The Court granted the anti-arbitration injunction based on its general power to grant injunctive relief. It held that the principle of comity required it to distinguish between domestic and international arbitrations. It could not apply the rule, applicable in domestic arbitration, according to which a district court is obliged to enjoin arbitration if it concludes that the parties have not agreed to arbitrate. Rather, in order to respect the international nature of the arbitration, the court decided to follow the restrictive standard applicable in case of an anti-suit injunction against foreign court proceedings. It held that both situations for the granting of an anti-arbitration injunction under the restrictive standard existed. Firstly, the ICC arbitration commenced by Deutz threatened the jurisdiction of the US forum. Secondly, Deutz, by commencing arbitration proceedings, was evading strong US public policies. The court held that the preservation of the sanctity of the earlier judgment which denied the existence of an arbitration agreement between Deutz and General Electric was an important public policy of the United States.

35.     From the above it follows that US courts have the power to grant anti-arbitration injunctions on the same legal basis and under the same conditions as those applicable to anti-suit injunctions directed against foreign court proceedings.

### 3.1.3.   Switzerland

36.     There are no provisions in Swiss law providing Swiss courts with a legal basis for the granting of anti-arbitration injunctions[40].

37.     Further, the granting of anti-arbitration injunctions by the Swiss courts seems to be incompatible with the Swiss legal system. Indeed, in the very recent decision in *Air (PTY) Ltd v International Air Transport Association (IATA) and C SA in*

I.     ————————————

[40] Jan-Michael AHRENS, Enforcing Arbitral Jurisdiction in Switzerland, Arbitration Seminar, London 2-3 June 2005, para. 5.

13

Conference Paper– ICCA 2006

*liquidation*[41], the Court of First Instance of the Canton of Geneva ruled that anti-suit injunctions, including anti-arbitration injunctions, are contrary to the Swiss legal system[42].

38.    This is true for various reasons. Firstly, as will be shown in more detail below[43], anti-arbitration injunctions violate the New York Convention to which Switzerland is a Contracting State. Secondly, even in cases where the New York Convention does not apply, the granting of anti-arbitration injunctions seems to be contrary to Swiss law. Indeed, in its decision cited above, the Geneva Court ruled that anti-arbitration injunctions contradict the principle of competence-competence, which is a well established principle in Swiss law. According to the court

> "[a]s a matter of Swiss law there is no such thing as a 'judicial tutelage' of the courts over arbitrators; quite to the contrary, Swiss law fully implements the principle of 'Kompetenz-Kompetenz' both in its positive effect [...] and its negative effect [...]. The jurisdiction of a court to determine whether an arbitration agreement is valid – *which cannot in any event lead to an anti-suit injunction* – exists only when the arbitration agreement is relied upon as a defence before the court [...]". (Emphasis added)[44]

39.    This conclusion is consistent with the decision of the Swiss Federal Tribunal in *Fomento de Construcciones y Contratas S.A. v Colon Container Terminal S.A.*[45]. There the Federal Tribunal held that in cases of parallel proceedings, Swiss courts must apply the principles of *lis pendens* and *res judicata* in order to avoid contradictory judgments in Switzerland. These principles do not empower Swiss courts to prevent foreign courts from continuing with parallel proceedings and from rendering judgments. In accordance with these principles, contradictory judgments

1.    ⎯⎯⎯⎯⎯⎯⎯⎯⎯

[41] Case no. C/1043/2005-15SP, Republic and Canton of Geneva Judiciary, Court of First Instance, 2 May 2005 (an English translation of the decision is published in ASA Bulletin, Vol. 23, No. 4 (2005), pp. 739ff).
[42] See ASA Bulletin, Vol. 23, No. 4 (2005), pp. 739ff at p. 747.
[43] See *infra*, paras. 137ff.
[44] *Air (PTY) Ltd v International Air Transport Association (IATA) and C SA in liquidation*, decision cited under fn 41, p. 747.
[45] DFT 127 III 279; on this argument see M STACHER, *op. cit.* fn 36, pp. 650f.

14

Conference Paper– ICCA 2006

are avoided, not by preventing the rendering of foreign judgments, but by refusing to recognize or enforce such judgments[46].

### 3.1.4. France

40.    It appears to be generally possible for French courts to order a party not to continue proceedings brought before a foreign court[47]. However, concerning anti-arbitration injunctions in particular, the arguments against such injunctions in Swiss law seem to apply with even more force in French law. Indeed, the French New Code of Civil Procedure expressly mandates the negative effect of the competence-competence principle, and the French courts are very strict in its application[48].

41.    Article 1458 of the NCCP, which applies to both domestic and international arbitrations, provides that

> "(1) [i]f a dispute pending before an arbitral tribunal on the basis of an arbitration agreement is brought before a State court, it shall declare itself incompetent.
> (2) If the dispute is not yet before an arbitral tribunal, the State court shall also declare itself incompetent, unless the arbitration agreement is manifestly null and void.
> (3) In neither case may the State court declare itself incompetent at its own motion".

1. ───────────────────

[46] See Article 27 (2)(c) Swiss Private International Law Statute.
[47] See, e.g., *Banque Worms v Epoux Brachot et autres*, Cour de Cassation (1er Ch. Civile), 19 November 2002, 2003.797, commented by G Kairallah; JCP, 2002 II 10201; Gazette du Palais, 25-26 June 2003, 29, commented by M-L Niboyet.
[48] On the negative effect of the competence-competence principle in French law, see generally Philippe FOUCHARD/ Emmanuel GAILLARD/ Berthold GOLDMAN, International Commercial Arbitration, Emmanuel Gaillard and John Savage (eds.), The Hague, Boston, London 1999, p. 407, paras. 661ff; see also, *Société American Bureau of Shipping (ABS) v Copropriété maritime Jules Vernes et autres* (Cour de Cassation (1re Ch. Civile), 26 June 2001, Revue de l'arbitrage, No. 3 (2001), pp. 529ff) where the Cour de Cassation ruled: "Seule la nullité manifeste de la convention d'arbitrage est de nature à faire obstacle à l'application du principe selon lequel il appartient à l'arbitre de statuer sur sa propre compétence, principe qui consacre la priorité de la compétence arbitrale pour statuer sur l'existence, la validité et l'étendue de la convention d'arbitrage".

15

Conference Paper– ICCA 2006

42.     The effect of Article 1458 NCCP is to ensure that the arbitral tribunal is the first
to decide the issue of its jurisdiction "prior to any court or other judicial authority"[49].
The role of the courts is limited to the review of the arbitrator's award on jurisdiction
at the annulment or enforcement stage.

43.     It is interesting to note that at the time of the French international arbitration law
reform in 1981, the adoption of the negative effect of the competence-competence
principle was justified by two policy considerations. Firstly, the objective was to
avoid delaying tactics by the parties. Secondly, the reform intended that all questions
about the existence and validity of the arbitration agreement should be considered by
the court of appeal of the place of arbitration. It was intended that no other court, in
France or abroad, should have the power to rule on the existence or validity of the
arbitration agreement at least before the arbitral tribunal has reached its own
decision[50].

44.     Accordingly it would seem that French courts cannot grant anti-arbitration
injunctions as they are contrary to French international arbitration law.

### 3.1.5.   Sweden

45.     Swedish law does not recognise the negative effect of the competence-
competence principle. Article 2 (1) of the Swedish Arbitration Act 1999 provides

> "[t]he arbitrators may rule on their own jurisdiction to decide the
> dispute. *The aforesaid shall not prevent a court from determining
> such a question at the request of a party.* The arbitrators may
> continue the arbitral proceedings pending the determination by the
> court". (Emphasis added)

1.     _____

[49] P FOUCHARD/ E GAILLARD/ B GOLDMAN, *op. cit.* fn 48, p. 401, para. 660.
[50] On the policy considerations, see P FOUCHARD/ E GAILLARD/ B GOLDMAN, *op. cit.* fn 48, pp.
410ff, paras. 677ff.

16

Conference Paper– ICCA 2006

46.     Hence, under Swedish law arbitral tribunals do not enjoy a priority over State courts in determining the issue of their jurisdiction. A party may request a court to render a declaratory judgment on the jurisdiction of the arbitral tribunal before the arbitrators have rendered an award on the issue.

47.     This rule must be read in relation with Article 2 (2) which provides that the decision of an arbitral tribunal that it has jurisdiction is not binding. The arbitrators' acceptance of their jurisdiction is not expressed in the form of an award, but in the form of a decision, which is not final and binding either on the parties or on the arbitrators[51]. This would appear to mean that the arbitrators are free to reverse or amend their decision on jurisdiction at a later stage in the proceedings. It also means that a party dissatisfied with the arbitrators' decision can institute a court action during the continuation of the arbitration proceedings[52].

48.     The fact that Swedish law rejects the negative effect of the competence-competence doctrine suggests that Swedish courts may grant anti-arbitration injunctions or, at least, that the issuance of such injunctions is not contrary to the Swedish legal system. On the other hand, none of the rules contained in the Swedish Arbitration Act provide Swedish courts with a legal basis for the granting of anti-arbitration injunctions. By contrast, Article 2 (1) expressly empowers the arbitral tribunal to continue the arbitral proceedings pending the determination by the court of the arbitral jurisdiction. It would appear to be for the arbitrators – not to the courts – to decide whether to stay the arbitral proceedings awaiting the decision of the court or not. Hence the Swedish courts should not exercise the power to prevent the continuation of arbitration proceedings by issuing anti-arbitration injunctions.

49.     This conclusion is in line with the philosophy underlying the Swedish Arbitration Act, which "is, and has always been, that of freedom of contract, trust in

1. _____

[51] See section 27 Arbitration Act 1999 on the distinction between decision and award.
[52] Kaj HOBÉR, Arbitration Reform in Sweden, Arbitration International, Vol.17, No. 4 (2001), p. 358; Ulf FRANKE, Sweden, International Handbook on Commercial Arbitration – Supplement 32, Jan Paulsson (ed.), The Hague, London, New York 2000, p. 15.

17

Conference Paper– ICCA 2006

the arbitrators and recognition of the advantages of a single, privately administered dispute settlement mechanism"[53]. It also reflects the general practice of Swedish courts not to interfere in the arbitration process[54].

### 3.1.6.    UNCITRAL Model Law

50.    The UNCITRAL Model Law does not specifically deal with either anti-suit or anti-arbitration injunctions. However, both the purport of Article 5 of the Model Law and the intention of the Model Law itself suggest the preclusion of anti-arbitration injunctions[55]. Article 5 states:

> "In matters governed by this Law, no court shall intervene except where so provided in this Law".

51.    What matters are governed by the Model Law for the purposes of Article 5 may depend on the law of the particular country which has adopted the Model Law. It has been suggested that these matters shall include all matters concerning "the assistance to the arbitral process" and the "control of the legality of the arbitral process"[56].

52.    Anti-arbitration injunctions clearly seek to control the legality of the arbitral process. This is true no matter whether the injunction is directed against the arbitrators or against the parties[57]. Even if the injunction is directed against the

1.    ⸻⸻⸻⸻⸻⸻

[53] K HOBÉR, op. cit. fn 52, p. 351.

[54] Ibid.

[55] On the impact of Article 5 Model Law on anti-suit injunctions, see generally Frédéric BACHAND, The UNCITRAL Model Law's Take on Anti-Suit Injunctions, in Anti-suit Injunctions in International Arbitration, op. cit. fn 9, pp. 87ff.

[56] F BACHAND, op. cit. fn 55, p. 100. See also Aron BROCHES, Commentary on the UNCITRAL Model Law, International Handbook on Commercial Arbitration – Supplement 11, Jan Paulsson (ed.), The Hague, London, New York 1990, ad Article 5, para. 13.

[57] See however the decision of the Québec Court of Appeal in Lac d'amiante du Canada Ltée v Lac d'amiante du Québec Ltée, REJB 1999-15419, [1999] Q.J. (Quicklaw) No. 5438 (Qué. C.A.). In this case, an anti-arbitration injunction was rendered prohibiting one of the parties from pursuing an ICC arbitration in New York. The arbitrators admitted their jurisdiction over the claim. The anti-arbitration injunction was nevertheless upheld by the Court of Appeal of Québec on the grounds that the injunction did not interfere with the arbitration proceedings, but was destined to stop an arbitration abusively brought by one of the parties and incompatible with an action already pending before a Québec Court.

Conference Paper– ICCA 2006

parties, it still directly interferes in the arbitral process[58]. In both cases it seeks to control the jurisdiction of the arbitral tribunal and thus the legality of the arbitration process. Hence, anti-arbitration injunctions must be considered matters governed by the Model Law for the purposes of Article 5. Accordingly, national courts situated in a Model Law country may not rely on their domestic rules in order to grant anti-arbitration injunctions in those countries where there are separate arbitration regimes for domestic and international arbitration.

53.    It is also worth noting that, according to Article 1 (2) Model Law, Article 5 only applies if the injunction is granted by a court situated in the country of the seat of the arbitration. Therefore, it does not apply in the situation contemplated by the present report, where a national court grants an anti-arbitration injunction in order to prevent an arbitration abroad. Hence, the Model Law does not prohibit national courts from enjoining arbitration proceedings abroad.

54.    However, there is a strong argument that an anti-arbitration injunction seeking to restrain an arbitration abroad is contrary to the system which the Model Law establishes of judicial control of the legality of the arbitration process only after an award has been rendered. This assertion is corroborated by the *travaux préparatoires*. There it was decided to limit possibilities for court interventions during the course of the arbitration in order to discourage delaying tactics. In its report on the work of its eighteenth session, UNCITRAL noted that "resort to intervention by a court during the arbitral proceedings was often used only as a delaying tactic and was more often a source of abuse of the arbitral proceedings than it was a protection against abuse"[59].

55.    This supports the view that an anti-arbitration injunction, even if directed against an arbitration abroad, contradicts the non-interventionist system of the Model Law as it seeks to control the legality of the arbitration process before an award has

1.    _____

[58] *Channel Tunnel Group Ltd. V Balfour Beatty Construction Ltd.* [1993] A.C. 334, 364-365.
[59] XVI  UNCITRAL  Y.B.  3,  11,  para.  63  (1985)  (available  online  under www.uncitral.org/pdf/english/yearbooks/yb-1985-e/vol16-p3-46-e.pdf).

Conference Paper– ICCA 2006

been rendered. Further, the Model Law reserves the right to control the arbitration process to the courts of the seat of the arbitration. No national court situated outside the country of the seat of the arbitration should therefore seek to interfere or control the arbitration.

### 3.1.7.    Other legal systems

56.      Anti-arbitration injunctions may be granted under several other legal systems, mostly common law systems. This is the case, for example, in Australia, New Zealand, Malaysia, Nigeria, Israel, Indonesia and Pakistan.

57.      In Australia, which has adopted the Model Law without any amendments, courts have granted anti-arbitration injunctions based on their general power to grant injunctive relief when this is considered appropriate[60]. Under Australian Law, in accordance with Article 16 of the Model Law, an arbitral tribunal may rule on the issue of its own jurisdiction. However, the tribunal's decision is not considered to be binding and does not prevent a party from applying to the courts for an injunction restraining the arbitration[61].

58.      The Arbitration Act of New Zealand of 1996 is also based on the Model Law. It would seem that under this Act anti-arbitration injunctions may be granted in international arbitration, but only under very limited circumstances, namely if the parties agree to the application of the optional rules contained in the second schedule of the Act. These optional rules do not provide expressly for anti-arbitration injunctions. However, section 4 of the optional rules appears to allow the High Court to rule on the arbitral tribunal's jurisdiction prior to the arbitral tribunal[62]. According to this provision, with the consent of the arbitral tribunal or the parties, the High

1.    ――――――――――――――――――――

[60] See, *e.g.*, *Allstate Life Ins Co v Australia and New Zealand Banking Group*, Federal Court of Australia, 19 January 1996, unreported.
[61] Michael C PRYLES, Australia, International Handbook on Commercial Arbitration – Supplement 40, Jan Paulsson (ed.), The Hague, London, New York 2004, p. 22.
[62] Tómas KENNEDY-GRANT, New Zealand, International Handbook on Commercial Arbitration -- Supplement 25, Jan Paulsson (ed.), The Hague, London, New York 1998, p. 23.

Conference Paper– ICCA 2006

Court has the jurisdiction to determine "any question of law arising in the course of the arbitration".

59.    Under the Nigerian Arbitration and Conciliation Decree 1988, anti-arbitration injunctions seem to be available. The Decree implements the Model Law and does not contain any provision expressly providing the Nigerian courts with the power to grant anti-arbitration injunctions. However, according to one author

> "[a]lthough it is provided in Sect. 12 (1) of the Decree that an arbitral tribunal is competent to decide on a plea regarding its jurisdiction and in Sect. 12 (4) that the ruling of the arbitral tribunal on any plea concerning its jurisdiction 'shall be final and binding', it is still possible for either party to take an action to the court. [...] Furthermore, it is possible for either party to bring an action in court to stop arbitral proceedings until the court rules on the issue brought before it"[63].

60.    The Malaysian Arbitration Act 1980 expressly allows the High Court to grant an anti-arbitration injunction if it considers that the arbitrators are not impartial or if the dispute involves a question of fraud[64]. In these situations, the High Court may either revoke the authority of the arbitrators or grant an injunction restraining the parties or the arbitral tribunal from proceeding with the arbitration.

61.    An express authorisation for the granting of anti-arbitration injunctions is also contained in the Arbitration Act of Israel of 1968. According to Article 18 of the Act

> "[t]he filing of an application with the court in connection with an arbitration, whether by a party or by the arbitrator, shall not stay the arbitration proceedings *unless the court or the arbitrator so directs*". (Emphasis added)

1.    ————————————————

[63] Tinuade OYEKUNDE, The Federal Republic of Nigeria, International Handbook of Commercial Arbitration – Supplement 26, Jan Paulsson (ed.), The Hague, London, New York 1998, p. 15.
[64] See Articles 3 and Article 25 Malaysian Arbitration Act 1980.

Conference Paper– ICCA 2006

62.    The power of the Israeli courts to grant anti-arbitration injunctions can be explained by the fact that under Israeli law, the arbitral tribunal does not have the power to rule on its own jurisdiction, unless the parties specifically authorise it to do so. If the tribunal starts to rule on its jurisdiction in the absence of such an authorisation, the parties may apply to the courts for an injunction against the arbitral tribunal[65]. However, such an injunction will only be granted if the court is convinced that the arbitration agreement is null and void[66].

63.    It would seem that for the same reason, namely the arbitral tribunal's lack of power to rule on its own jurisdiction, courts in Indonesia have the power to grant anti-arbitration injunctions. It is for the Indonesian courts, not the arbitrators, to rule on the existence or validity of an arbitration agreement[67].

64.    Finally, Pakistani courts can also grant anti-arbitration injunctions. Under the Arbitration Act of Pakistan of 1940, a court can revoke the authority of the arbitral tribunal[68] and can order that a given arbitration agreement shall cease to have any effect[69]. Like in Israel and Indonesia, the arbitral tribunal does not have the power to rule on its own jurisdiction[70]. Furthermore, according to the Arbitration Act 1940, the existence of an arbitration agreement does not oust the jurisdiction of the national courts and, therefore, a party to an arbitration agreement may nevertheless commence court proceedings. When court proceedings upon the whole of the subject matter of the arbitration have been commenced between all the parties to the arbitration and a notice thereof has been given to the arbitrators, the arbitration will be considered invalid unless a stay of court proceedings is granted[71].

1.    _____

[65] Smadar OTTOLENGHI, Israel, International Handbook on Commercial Arbitration – Supplement 2, Jan Paulsson (ed.), The Hague, London, New York 1984, p. 16.
[66] *Mashiach v Ravia*, L.A. 130/71, 25 (2) P.D. 572. On anti-arbitration injunctions in Israel, see Smadar OTTOLENGHI, The Law of Arbitration in Israel, The Hague, London, Boston 2001, pp. 295 and 297.
[67] See generally Sudargo GAUTAMA, Indonesia, International Handbook on Commercial Arbitration Supplement 26, Jan Paulsson (ed.), The Hague, London, New York 1998, p. 19.
[68] Article 5 Arbitration Act 1940.
[69] See, *e.g.*, Article 12 Arbitration Act 1940.
[70] Section 31 Arbitration Act 1940.
[71] Section 35 Arbitration Act 1940. On arbitration in Pakistan, see generally Mahomed J JAFFER, National Report – Pakistan, Yearbook Commercial Arbitration, P Sanders (ed.), Vol. V (1980), pp. 119f.

Conference Paper– ICCA 2006

### 3.1.8. Conclusion

65.    In common law jurisdictions the power of national courts to grant anti-arbitration injunctions is well established. The arbitration laws of several common law countries provide a clear legal basis for the granting of such injunctions by national courts. The specific conditions for the granting of anti-arbitration injunctions vary from one jurisdiction to the other. Under both English and US law, it would seem that a court may only grant an anti-arbitration injunction to protect its jurisdiction against a foreign arbitration proceeding which it considers to be wrongly brought.

66.    In civil law countries, anti-arbitration injunctions are generally not available. Swiss, French and Swedish law do not provide a legal basis for the granting of anti-arbitration injunctions. It would seem that anti-arbitration injunctions are in fact contrary to these legal systems.

67.    Finally, although Article 5 UNCITRAL Model Law only expressly prohibits national courts situated in the country of the seat of the arbitration from granting anti-arbitration injunctions, the effect is much more extensive. The aim and purpose of the Model Law effectively precludes anti-arbitration injunctions generally, reflecting accepted international arbitration law and practice.

## 3.2.  Support by national courts of arbitration proceedings

68.    Instead of granting injunctions to prevent or interfere with foreign arbitration proceedings, national courts may also support arbitrations abroad. Foreign arbitrations may be supported in several ways, aimed specifically to enforce or to support an arbitration agreement.

23

Conference Paper– ICCA 2006

### 3.2.1.    Enforcement of arbitration agreements

69.      National courts may enforce an arbitration agreement by issuing an anti-suit
injunction destined to stay concurrent court proceedings brought in violation of the
arbitration agreement. In practice, anti-suit injunctions supporting arbitration
proceedings are more frequent than anti-arbitration injunctions[72]. However, anti-suit
injunctions are not the only measure permitting the enforcement of arbitration
agreements. In the United States, for example, courts may grant orders compelling the
performance of arbitration agreements and ordering parties to submit to arbitration.

*Anti-suit injunctions in support of arbitration proceedings*

70.      The majority of English cases involving anti-suit injunctions in international
arbitration concern injunctions ordering the stay of foreign court proceedings brought
in violation of an arbitration agreement providing for arbitration in England[73]. The
position taken by the English courts in this matter is well illustrated in the case of
*Aggeliki Charis Compania Maritima v Pagnan* (*The Angelic Grace*). There, the Court
of Appeal had to consider whether to grant a permanent injunction preventing a party
to an arbitration in England from proceeding with a claim before the courts in Italy.
The charter agreement clearly provided for arbitration in London. The charterer,
Pagnan, argued that the particular claim before the court in Venice did not fall within
the scope of the arbitration agreement. Furthermore, the High Court should not have
granted an injunction that effectively pre-empted the decision of the Italian court on
its own jurisdiction. The Court of Appeal held that

> "where an injunction is sought to restrain a party from proceeding in
> a foreign Court in breach of an arbitration agreement governed by
> English law, the English Courts feel no diffidence in granting the

1.      ────────────

[72] J D M LEW/ L A MISTELIS/ S M KRÖLL, *op. cit.* fn 27, p. 364, para. 15-28.
[73] Such an anti-suit injunction was granted in the very recent case of *Hewlett-Packard International Bank
PLC v Egypt Cyber Centre, National Telecommunication Company, Commercial International Investment
Co SAE and Egyptian Networks Company SAE*. In this case, the English High Court granted an anti-suit
injunction against Respondents restraining them to pursue court actions in Egypt brought to prevent LCIA
arbitration proceedings in London.

Conference Paper– ICCA 2006

injunction, provided that it is sought promptly and before the foreign proceedings are too far advanced. [...] The justification for the grant of the injunctions in either case is without it the plaintiff will be deprived of its contractual rights in a situation in which damages are manifestly an inadequate remedy. The jurisdiction is, of course, discretionary and is not exercised as a matter of course [...][74]".

71.    In *The Angelic Grace*, the Court of Appeal made it clear that in cases concerning the enforcement of arbitration agreements, anti-suit injunctions may be granted more freely than in other cases involving injunctions in relation with foreign proceedings. According to Millet LJ

"the time has come to lay aside the ritual incantation that this is a jurisdiction which should only be exercised sparingly and with great caution. [...] I cannot accept the proposition that any Court would be offended by the grant of an injunction to restrain a party from invoking a jurisdiction which he had promised not to invoke and which it was its own duty to decline"[75].

72.    Although in subsequent case law the approach of the English courts has sometimes been more cautious[76], the liberal approach set out in *The Angelic Grace* has continuously been confirmed[77].

73.    The position of US courts regarding anti-suit injunctions enforcing arbitration agreements is set out in *BHP Petroleum (Americas) Inc et al v Walter F Baer Reinhold*. In this case, BHP Petroleum requested the US District Court of the

1.    ─────────────

[74] [1995] 1 Lloyd's Law Reports 87, 96.
[75] [1995] 1 Lloyd's Law Reports 87, 96.
[76] See, e.g., *Welex AG v Rosa Maritime Ltd (The Epsilon Rosa)* [2003] 2 Lloyd's Report 509, [2003] All E. R. (D) 71 (July). In this case, the Court of Appeal held that "there is considerable debate as to whether the English courts should grant anti-suit injunctions where the Lugano or New York Conventions apply. Although the injunction acts in personam and is not directed at the foreign court this is not how it is always perceived". See also *Tonicstar Ltd v American Home Assurance Co* ([2004] All E.R. (D) 400 (May 2004)), where the High Court ruled that "the remedy of an anti-suit injunction is discretionary and the Court must look at all the circumstances of the case and only make an order if the interests of justice so require".
[77] See, e.g., *West Tankers Inv v Ras Riunione Adriatica di Sicurta "The Front Comor"* [2005] EWHC 454 (Comm), [2005] 2 Lloyd's Rep. 257; *Through Transport Mutual Insurance Association (Eurasia) Ltd v New India Assurance Co Ltd*, [2004] EWCA Civ 1598, [2005] 1 Lloyd's Rep. 67. This liberal approach has also been followed in a recent case involving not an arbitration agreement but an exclusive jurisdiction agreement: *OT Africa Line Ltd v Magic Sportswear Corporation and others* ([2005] EWCA Civ 710; [2005] 2 Lloyd's Rep 170; [2006] 1 All ER (Comm) 32).

Conference Paper– ICCA 2006

Southern District of Texas to compel Baer to arbitration in Texas and to enjoin him from continuing with court proceedings in Ecuador. The court decided

> "that an injunction barring a foreign action was proper if the simultaneous prosecution of an action would result in 'inequitable hardship' and 'tend to frustrate and delay the speedy and efficient determination of the cause'. [...] The focus of the inquiry is whether there exists a need to prevent vexatious or oppressive litigation. In light of the strong federal policy favouring arbitration, the court finds that plaintiffs would be irreparably harmed if Baer were permitted to continue litigation in Ecuador while the same claims were being arbitrated. Therefore, the court grants plaintiffs' application for injunction"[78].

74.    The position of the US courts is stricter than the position of the English courts. An important criteria for the granting of the injunction is "irreparable harm"[79]. This requirement was defined recently by the US District Court for the Southern District of New York in *ITABO v CDEEE*. In this case, ITABO, a private company incorporated in the Dominican Republic, requested the court to compel CDEEE, a company owned by the Dominican Republic, to ICC arbitration in New York in conformity with the arbitration agreement contained in ITABO's bylaws. It also requested an anti-suit injunction to enjoin CDEEE from continuing with litigation in the Dominican courts. The court denied both requests. Concerning the anti-suit injunction, the court held that ITABO had not met the heavy burden of establishing irreparable harm. It defined this notion in the following terms:

> "[i]njunctive relief 'is an extraordinary and drastic remedy which should not be routinely granted'. Where necessary to prevent irreparable harm, 'a federal court may enjoin a party before it from pursuing litigation in a foreign forum'. Irreparable harm is injury that 'is likely and imminent, not remote or speculative, and [...] is

1.    _____

[78] No H-97-879, XXIII YBCA 945 (1985), 12 (5) Mealey's International Arbitration Law Report I-1 (1997), (USDC, Southern District of Texas, Houston Division, 28 April 1997). See also *Wal-Mart Stores, Inc v PT Multipolar Corp et al*, XXV YBCA 1085 (2000) 1086 (9th Cir 1999).
[79] *Paramedics Electromedicina Comercial Ltda v GE Medical Systems Information Technologies Inc*, 2003 U.S. Dist. Lexis 26928, 4 June 2003. In this case the U.S. District Court of the Southern District of New York confirmed that "[i]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction".

not capable of being fully remedied by money damages'. The movant is required to establish not a mere possibility of irreparable harm, but that it is 'likely to suffer irreparable harm if equitable relief is denied'"[80].

75.     In addition to irreparable harm, when deciding whether to grant an anti-suit injunction a court must also consider the stage of the foreign proceedings, as well as the expectation of the parties to litigate in that particular court[81].

*Court orders compelling the performance of arbitration agreements*

76.     In the United States, an arbitration agreement can be enforced by a court order forcing a reluctant party to go to arbitration. Indeed, sections 4, 206 and 303 of the Federal Arbitration Act (FAA) authorise US courts to compel a party to arbitrate, and a party that does not follow the court's order will be in contempt of court[82].

77.     Section 4 FAA "empowers a court to grant what amounts to an injunction requiring a party to arbitrate pursuant to its arbitration agreement"[83]. According to this provision

> "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such an arbitration proceed in the manner provided for in such agreement. [...]".

78.     Section 206 FAA implements Article II of the New York Convention. Under this provision, a US court may compel a party to go to arbitration if (1) it has personal

1.     ───────────────────────────

[80] *Empresa Generadora de Electricidad ITABO SA ("ITABO") v Corporacion Dominicana de Empresas Electricas Estatales ("CDEEE")* 2005 U.S. Dist. Lexis 14712, 18 July 2005.
[81] J D M LEW/ L A MISTELIS/ S M KRÖLL, *op. cit.* fn 27, p. 366, para. 15-32.
[82] On court orders compelling the performance of arbitration agreement in U.S. law, see generally Gary B BORN, International Commercial Arbitration, 2nd ed., The Hague 2001, pp. 381ff.
[83] G B BORN, *op. cit.* fn 82, p. 386.

Conference Paper– ICCA 2006

jurisdiction over the party; (2) it has subject matter jurisdiction; and (3) the venue in the compelling court is proper under the FAA or otherwise. This compelling power applies even if the agreed-upon seat of the arbitration is outside the United States. By contrast, section 206 FAA does not apply if the parties have not agreed upon an arbitral seat or if this seat is situated in a State that is not a signatory to the New York Convention[84].

79.    In *Paramedics Electromedicina Comercial Ltda v GE Medical Systems Information Technologies Inc*[85], the District Court for the Southern District of New York granted a motion to compel the performance of an arbitration agreement on the basis of section 4 FAA. In this case, a Brazilian company (Paramedics) and a US company (GE Medical Systems) concluded two agreements, both containing an arbitration clause providing for arbitration under the rules of the Inter-American Commercial Arbitration Commission in Miami. When a dispute arose, Paramedics brought suit before a Brazilian court notwithstanding the arbitration agreement. GE Medical Systems initiated arbitration proceedings. When Paramedics requested an anti-arbitration injunction from a New York court, GE Medical Systems moved the action to the United States District Court for the Southern District of New York requesting an order compelling arbitration and an anti-suit injunction enjoining Paramedics from continuing with the Brazilian court proceedings. The court rejected Paramedics' request for an anti-arbitration injunction against GE Medical Systems. At the same time, it granted both the motion to compel Paramedics to arbitration and the anti-suit injunction enjoining Paramedics from continuing with the Brazilian action. The court held that where it is established that an arbitration agreement exists and that one of the parties to this agreement is not in compliance with it, an order compelling arbitration without further proceedings may be issued.

1.    ———————————————

[84] Similarly, section 303 FAA permits US courts to enforce arbitration agreements subject to the Inter-American Convention. Since, to date, there are only few cases applying section 303 FAA, cases applying section 206 FAA may have an influence on the interpretation of section 303 FAA
[85] Decision cited under fn 79.

Conference Paper– ICCA 2006

### 3.3. Support of arbitration agreement

80.    Instead of actively enforcing an arbitration agreement, most national courts take a passive role, giving effect to the arbitration agreement only indirectly. For instance, a court may simply stay an action brought before it in breach of an arbitration agreement instead of forcing a party either to go to arbitration or to stop a concurrent court proceeding. The court will not force the parties to arbitration. It is up to the claimant to initiate an arbitration.

81.    The stay of court actions brought in breach of an arbitration agreement is an indirect but efficient means of ensuring the respect of an arbitration agreement. It forces the claimant to go to arbitration, because the latter will have no other forum in which to bring his claim[86].

82.    A stay of court action is provided for in section 9 of the English Arbitration Act 1996. According to the first paragraph of this provision

> "[a] party to an arbitration agreement against whom legal proceedings are brought [...] in respect of a matter which under the agreement is to be referred to arbitration may [...] apply to the court in which the proceedings have been brought to stay the proceedings so far as they concern that matter".

83.    Section 9 further provides in its fourth paragraph that "the court shall grant a stay unless satisfied that the arbitration agreement is null and void, inoperative, or incapable of being performed"[87]. The obligation to stay proceedings under section 9 applies even if the arbitral seat "is outside England, Wales or Northern Ireland or no

1.    —————————

[86] Jean-François POUDRET/ Sébastien BESSON, Droit comparé de l'arbitrage international, Bruxelles, Paris, Zurich, Basel, Geneva 2002, p. 449, para. 497.
[87] See also Article 8 (1) UNCITRAL Model Law: "A court before which an action is brought in a matter which is subject of an arbitration shall, if a party so requests no later than when submitting his first statement on the substance of the dispute, refer the parties to arbitration unless it finds that the agreement is null and void, inoperative or incapable of being performed". Unlike Article 8 Model Law, section 9 Arbitration Act 1996 does not instruct the court to "refer the parties to arbitration".

Conference Paper– ICCA 2006

seat has been designated or determined"[88]. However, there is no power under the English Arbitration Act 1996 for the courts to order a party to participate in an arbitration.

84.    A prominent example for a case where a court action was stayed in support of an arbitration agreement is the *Channel Tunnel* case. Eurotunnel (the owners of the tunnel) and Trans-Manche Link (a consortium of English and French companies) had concluded a contract for the construction of a tunnel under the English Channel between England and France. The contract provided for a "two stage" dispute resolution mechanism. First, any dispute between Eurotunnel and Trans-Manche Link should be brought before a Panel of Experts. Then, if either party disagreed with the Panel's decision, the dispute could be referred to ICC arbitration with its seat in Brussels. A dispute arose as to the amounts payable in respect of the works on the tunnel's cooling system. Trans-Manche Link threatened to suspend their work alleging a breach of contract by Eurotunnel. Eurotunnel brought an action in the English courts requesting an interim injunction to restrain Trans-Manche Link from suspending their works. Trans-Manche Link argued that the English courts did not have the power to order such an injunction. In addition, Trans-Manche Link requested a stay of the action brought by Eurotunnel in favor of the arbitration on the basis of the then governing Arbitration Act 1975. The case went to the House of Lords which decided to stay the proceedings in favor of arbitration. This decision was not based on section 1 Arbitration Act 1975[89], but rather on the court's inherent jurisdiction to stay proceedings brought before it in breach of an arbitration agreement.

1.    ───────────────

[88] Section 2 (2)(a) Arbitration Act 1996.
[89] The House of Lords held that a "two stage" dispute resolution provision was not an "arbitration agreement" for the purposes of section 1 Arbitration Act 1975. Therefore, it held that section 1 Arbitration Act 1975 could not apply in the present case. This problem does not arise anymore under section 9 Arbitration Act 1996. Indeed, according to paragraph 2 of this section "[a]n application may be made notwithstanding that the matter is to be referred to arbitration only after the exhaustion of other dispute resolution procedures".

Conference Paper– ICCA 2006

## 4.    Anti-arbitration injunctions in practice

85.    I turn now to analyse how the power to grant anti-arbitration injunctions is used, or more properly abused, in practice. Indeed, in order to be able to determine whether the granting of anti-arbitration injunctions can ever be justified, it is important to consider not only how anti-arbitration injunctions are supposed to be used in theory, but also how they can be used in practice.

86.    As discussed above, anti-arbitration injunctions are intended to protect the national court's jurisdiction against foreign arbitration proceedings which have been wrongly brought. Are anti-arbitration injunctions used in this manner in practice or are they tools used by parties and their lawyers to undermine, destabilise, delay or avoid an arbitration?

87.    On reviewing past cases, it is clear that anti-arbitration injunctions are used primarily as a tactical tool to stop or delay the arbitration process.

### 4.1.    Himpurna California Energy v Republic of Indonesia

88.    The *Himpurna California Energy v Republic of Indonesia* case is a spectacular example of an anti-arbitration injunction granted in order to stop an arbitral tribunal from rendering an award against a party to the arbitration[90].

89.    This case arose from various contracts relating to the exploitation of geothermal reserves, by which Bermudan corporations owned by US investors agreed to build and operate an electrical generation plant in Indonesia. The contracts provided for *ad*

1.    —————————

[90] On this case see, *e.g.*, Peter CORNELL/ Arweb HANDLEY, Himpurna and Hub : International Arbitration in Developing Countries, Mealey's International Arbitration Report, Vol. 15, No. 9 (2000), pp. 39ff; Jacques WERNER, When Arbitration Becomes War – Some Reflections on the Frailty of the Arbitral Process in Cases Involving Authoritarian States, Journal of International Arbitration, Vol. 17, No. 4 (2000), pp. 97ff; H. Priyatna ABDURRASYID, They Said I Was Going To Be Kidnapped, Mealey's International Arbitration Report, Vol. 18, No. 6 (2003), pp. 29ff.

*hoc* arbitration with seat in Jakarta under the UNCITRAL Rules. Two different arbitration proceedings were subsequently initiated against the Republic of Indonesia.

90.    After the first arbitral tribunal rendered an award against PLN, an Indonesian State owned electricity corporation, an Indonesian court granted an injunction ordering the suspension of the enforcement of the first award. The court also granted an anti-arbitration injunction against Himpurna in order to prevent the second arbitration from taking place. A penalty of US$1 million per day was imposed on any party who violated this injunction.

91.    Despite this injunction, the arbitral tribunal continued the arbitration proceedings. The proceedings were held in The Hague, but the seat of the arbitration remained in Jakarta. After an attempt to obtain an anti-arbitration injunction in the Netherlands failed, the Indonesian arbitrator was prevented from participating in the hearings in The Hague and was forced to return to Indonesia. The truncated tribunal continued the proceedings and rendered an award against the Republic of Indonesia.

92.    The arbitral tribunal based its decision to continue with the arbitration proceedings on several grounds. Applying international law[91], the tribunal held that the Indonesian State has violated international public policy by first signing an arbitration agreement and then seeking to rely on the incompatibility of its obligation to arbitrate with its internal system, *i.e.* an anti-arbitration injunction issued by its courts. The tribunal stated in emphatic terms:

> "The present Arbitral Tribunal considers that it is a denial of justice for the courts of a State to prevent a foreign party from pursuing its remedies before a forum to the authority of which the State consented, and on the availability of which the foreigner relied in making investments explicitly envisaged by that state"[92].

1.    ——————————————

[91] The arbitral tribunal held that international law was applicable because of the existence of an international arbitration agreement and the involvement of a State party.
[92] *Himpurna California Energy Ltd v Republic of Indonesia*, Interim Award, 26 September 1999, YBCA, A.J. van den Berg (ed.), Vol. XXV (2000), pp. 11 – 432, para. 184.

Conference Paper– ICCA 2006

93.     Further, the tribunal justified its decision to continue with the arbitration on the grounds that the tribunal's authority comes from the parties' agreement to arbitrate. Its authority does not emanate from the legal order of the seat of the arbitration but rather from an international order[93].

## 4.2.   Salini Construttori S.p.a. v Ethiopia

94.     The *Salini Construttori S.p.a.  v Ethiopia* case is another example where the courts of the State party to the arbitration granted an injunction in order to stop arbitration proceedings which were taking an unfavorable turn for the State party[94].

95.     The dispute arose out of a FIDIC contract, supplemented by special conditions specifically negotiated by the parties. One of the general conditions contained an ICC arbitration clause providing for arbitration in Addis Ababa, and one of the special conditions contained an arbitration clause also providing for arbitration in Addis Ababa, but pursuant to the Ethiopian Civil Code. When the dispute arose, Salini initiated ICC arbitrations. Ethiopia objected to the jurisdiction of the arbitral tribunal.

96.     After the tribunal had accepted its jurisdiction, it was decided that for reasons of practical convenience a hearing on the merits should be held in Paris, but that the arbitral seat should remain in Addis Ababa. Ethiopia requested the ICC Court to have all arbitrators removed from the tribunal. It alleged that the fact that the arbitrators had decided to hold a hearing in Paris and not in Addis Ababa clearly showed that they were biased. After the ICC Court rejected this request, Ethiopia brought an identical request before the Ethiopian courts. Pending the decision on the issue, the

1.     ———————————

[93] *Himpurna California Energy Ltd v Republic of Indonesia*, decision cited under fn 92, paras. 175ff.
[94] Decision published in ASA Bulletin, Vol. 21, No. 1 (2003), pp. 82ff. On this case see, *e.g.*, Antonio CRIVELLARO, Note - Award of 7 December 2001 in Case No. 10623, ASA Bulletin, Vol. 21, No. 1 (2003), pp. 60-81; Matthias SCHERER, Note - Award of 7 December 2001 in Case No. 10623, ASA Bulletin, Vol. 21, No. 1 (2003), pp. 112-119; Frédéric BACHAND, Must An ICC Tribunal Comply With An Anti-Suit Injunction Issued By The Courts Of The Seat Of Arbitration ?, Mealey's International Arbitration Report, Vol. 20. No. 3 (2005), pp. 47-52.

Conference Paper– ICCA 2006

Ethiopian courts granted two anti-arbitration injunctions, one directed against the arbitral tribunal and one against the claimant.

97.    The ICC tribunal ruled that the injunctions had no bearing on the arbitral proceeding. It based its decision on three guiding principles of international arbitration, namely "the primary duty of the arbitral tribunal is owed to the parties", "the arbitral tribunal's duty to make every effort to render an enforceable award", and "a State or State entity cannot resort to the State's courts to frustrate an arbitration agreement"[95].

98.    On the first principle, the tribunal held that

> "the primary source of the Tribunal's powers is the parties' agreement to arbitrate. An important consequence of this is the Tribunal has a duty vis à vis the parties to ensure that their arbitration agreement is not frustrated"[96].

99.    In other words, since the primary duty of an international arbitral tribunal is owed to the parties, it is not bound by a court order which is inconsistent with the parties' agreement[97]. If the tribunal finds that the parties had agreed to resolve their disputes by arbitration, it must continue the arbitration in accordance with that agreement and make an award[98]. The fact that one party has changed its mind, for whatever reason, should not be allowed to derail the original agreement of the parties. Furthermore, the respect for party autonomy requires the tribunal to continue with the proceedings without any interruption because "[t]o wait for the decisions of the courts [...] would, in any event, be inconsistent with the Arbitral Tribunal's duty to render an award in due time"[99].

1.    ———————————

[95] See paras. 125ff, 140ff and 156ff of the decision cited under fn 94.
[96] *Salini Construttori S.p.a. v Ethiopia*, ICC No. 10623, Award, 7 December 2001, in ASA Bulletin, Vol. 21, No. 1 (2003), para. 128.
[97] F BACHAND, Must An ICC Tribunal Comply With An Anti-Suit Injunction Issued By The Courts Of The Seat Of Arbitration ?, *op. cit.* fn 94, p. 48.
[98] F BACHAND, Must An ICC Tribunal Comply With An Anti-Suit Injunction Issued By The Courts Of The Seat Of Arbitration, *op. cit.* fn 94, p. 49.
[99] *Salini Construttori S.p.a. v Ethiopia*, cited under fn 96, para. 139.

Conference Paper– ICCA 2006

100.    Concerning the second principle, the tribunal considered that its duty to render an enforceable award[100] did not oblige it to follow a court order contrary to the parties' arbitration agreement. Quite the contrary, it held that

> "the tribunal must follow its own judgment, even if that requires non-compliance with a court order. To conclude otherwise would entail a denial of justice and fairness to the parties and conflict with the legitimate expectations they created by entering into an arbitration agreement"[101].

101.    The tribunal added that

> "[a]n arbitral tribunal should not go so far as to frustrate the arbitration agreement itself in the interests of ensuring enforceability. Such an outcome would be, to say the least, a paradox"[102].

102.    Concerning the last principle, i.e. a State or State entity cannot resort to the State's courts to frustrate an arbitration agreement, it suffices to refer to the last paragraph of the tribunal's thorough analysis of the principle in which the tribunal sharply criticized Ethiopia's conduct of requesting anti-arbitration injunctions. The tribunal said that

> "[f]or the avoidance of doubt, we do not mean to suggest that any application by a state party to its own courts, in their capacity as the courts of the seat in arbitral proceedings, would be objectionable. [...] The problem arises in this particular case from the fact that a state entity is resorting to the state's own courts in an illegitimate effort to renege upon the arbitration agreement. It is unacceptable for a state party to invoke its own law in an effort to avoid the effect of an arbitration agreement that it has freely entered into. For similar

1.    ——————————

[100] This principle is codified in Article 35 of the ICC Rules which states that "[i]n all matters not expressly provided for in these Rules, the Court and the Arbitral Tribunal shall act in the spirit of these Rules and make every effort to make sure that the Award is enforceable at law".
[101] *Salini Construttori S.p.a. v Ethiopia*, cited under fn 96, paras. 142-143.
[102] *Salini Construttori S.p.a. v Ethiopia*, cited under fn 96, para. 144.

Conference Paper– ICCA 2006

> reasons, it is unacceptable for a state party to resort to its own courts for the same purpose".

### 4.3. The Hub Power Company Ltd (HUBCO) v Water and Power Development Authority of Pakistan (WAPDA)

103.    *HUBCO v WAPDA* is yet another example where a State party to an arbitration agreement successfully applied to the courts of its country for an order preventing an arbitration from proceeding[103].

104.    A tariff dispute arose out of a Power Purchase Agreement (PPA) concluded between HUBCO, a company incorporated in Pakistan, and WAPDA, a Pakistani State owned company. Under the PPA, HUBCO was to develop an electricity-generating plant in Pakistan and to sell the output to WAPDA. The Government of Pakistan guaranteed WAPDA's obligations under the PPA and the World Bank provided further guarantees. Three amendments were subsequently made to the PPA providing for an increase in the amount payable by WAPDA to HUBCO, and for a transformation of the PPA from a Build-Operate-Transfer deal into a Build-Operate-Own deal.

105.    When the dispute arose, HUBCO initiated an ICC arbitration in London in accordance with the arbitration agreement contained in the PPA. The method of calculating the price of electricity was the key issue to be determined by the arbitrators. Soon after, WAPDA wrote to HUBCO stating that it considered the three amendments to be illegal, fraudulent, collusive, without consideration, *mala fide* and designed to cause wrongful loss to WAPDA and the Government of Pakistan with

1.    ───────────

[103] Supreme Court of Pakistan, 20 June 2000, Arbitration International, Vol. 16, No. 4 (2000), pp. 439ff; Meaey's International Arbitration Report, Vol. 15, No. 7 (2000), pp. A.1ff (2000). On this case see, *e.g.,* Louise BARRINGTON, Hubco v WAPDA: Pakistan Top Court Rejects International Arbitration, 11 American Review of International Arbitration, Vol. 11 (2000), pp. 385ff; Nudrat B MAJEED, Commentary on the Hubco Judgment, Arbitration International, Vol. 16 No. 4 (2000), pp. 431 – 438; Neil KAPLAN, Arbitration in Asia – Developments and Crises – Part 2, Journal of International Arbitration, Vol. 19, No. 3 (2002), pp. 245-260.

Conference Paper– ICCA 2006

consequential wrongful gain to HUBCO. WAPDA also threatened to bring a lawsuit against HUBCO before the courts of Pakistan.

106.    In response to this letter, HUBCO filed suit in the High Court of Sindh at Karachi seeking an injunction restraining WAPDA from seeking resolution of the dispute through any other means except through ICC arbitration. The injunction was granted. WAPDA then filed suit before the Lahore court asking for a permanent injunction restraining HUBCO from pursuing the arbitration. The Lahore court granted an interim injunction. A large number of further proceedings and appeals on the injunction followed. At one point, HUBCO agreed not to continue the arbitration proceedings, but then filed a second request for arbitration with the ICC.

107.    The Supreme Court of Pakistan heard two appeals filed by HUBCO and WAPDA respectively. The HUBCO appeal concerned the injunctions preventing the first ICC arbitration, and the WAPDA appeal asked that HUBCO be restrained from invoking the arbitration clause in the PPA.

108.    The Supreme Court held that the only question to be decided was whether the dispute was arbitrable. In a majority decision it ruled that the matters raised were not arbitrable as they involved matters of criminality. Thus, it decided that the injunctions must be continued and that HUBCO must bring its claim before the courts of Pakistan[104].

109.    The Supreme Court decision, interestingly, never questioned the validity of the PPA, and thus the existence of a valid arbitration agreement. Little understanding of the fundamental principles of international arbitration, *i.e.* separability and competence-competence, was shown and no relevant international arbitration case

1.    ———————————————

[104] By contrast, Jehangiri J, in his dissenting opinion, concluded that the ICC arbitration clearly should have been allowed to proceed.

37

Conference Paper-- ICCA 2006

law was reviewed. It is generally considered that this was a political decision and a most unfortunate example of the courts being a pawn of the Government[105].

110.     In July of 2000, HUBCO filed a petition requesting the Supreme Court to revisit the case and to reverse its decision. However, before the Supreme Court rendered a decision on the issue, HUBCO and WAPDA announced that they had agreed to settle their dispute, thus rendering moot the question of review.

## 4.4.   Société Générale de Surveillance SA v Pakistan

111.     In *Société Générale de Surveillance SA (SGS) v Pakistan*, the Pakistani Supreme Court issued an anti-arbitration injunction against SGS restraining it from "taking any step, action or measure to pursue or participate or to continue to pursue or participate" in an ICSID arbitration[106].

112.     The dispute between SGS and Pakistan arose out of a contract concluded in 1994 for the assessment of all custom duties payable on goods imported into Pakistan. The contract contained an arbitration clause providing for arbitration in Islamabad under the Pakistani Arbitration Act of 1940. In 1996, Pakistan terminated the contract and SGS accepted the termination reserving its legal rights. SGS then initiated court proceedings in Switzerland alleging wrongful termination of the contract. Further, it claimed that it could not rely on the arbitration clause in the contract because no fair trial could be expected in Pakistan. The Swiss courts denied SGS's request.

1.     ─────────────────────

[105] See N KAPLAN, *op. cit.* fn 103, p. 252, where he said: "The majority decision was six pages long, with no citation of authority. The claimants had put in a 100-page written submission with copious citation of local and English authority, which was not referred to once by the majority. The minority decision was forty-four pages long and cited a considerable amount of authority. An interesting feature of the hearing before the Supreme Court was that not only did uniformed generals attend every day, but they were so fascinated by the legal argument, that they could not restrain themselves from making their own submissions in the middle of the claimant's submissions. The state-owned electricity company was the second largest employer in Pakistan after the army and the generals told the court how important the case was and that an ICC award would inevitably be adverse to the electricity authority and that the award would, therefore, be adverse to Pakistan's national interests".
[106] *Société Générale de Surveillance SA (SGS) v Federation of Pakistan*, Supreme Court of Pakistan (Appellate Jurisdition), 3 July 2002, Civil Appeal Nos. 459 & 460 of 2002, para. 84 (decision published in Yearbook of Commercial Arbitration, A J van den Berg (ed.), Vol. XXVIII (2003), pp. 1312-1341).

Conference Paper– ICCA 2006

113.    In 2000, Pakistan brought an action before the Pakistani courts seeking an order to enforce the arbitration agreement contained in the contract. In 2001, SGS initiated an ICSID arbitration on the basis of the Pakistan-Switzerland BIT.

114.    On 3 July 2002, the Supreme Court of Pakistan decided that SGS was not allowed to proceed with the ICSID arbitration, primarily on the ground that neither the ICSID Convention nor the Pakistan-Switzerland BIT had been implemented into Pakistani law. Therefore, the BIT and the ICSID Convention could not be enforced as law and could not defeat the arbitration clause contained in the contract. The Supreme Court granted Pakistan's request to proceed with the arbitration under the Arbitration Act 1940 pursuant to the contract.

115.    The ICSID tribunal decided to proceed with the arbitration notwithstanding the injunction, but one of the arbitrators, being a Pakistani national, resigned. The tribunal held that it was not bound by the Pakistani Supreme Court's decision and that, in accordance with Article 41 (1) of the ICSID Convention, it had the power to rule on its own jurisdiction. Further, the tribunal held that

> "the right to seek access to international adjudication must be respected and cannot be constrained by an order of a national court. Nor can a State plead its internal law in defence of an act that is inconsistent with its international obligations"[107]

## 4.5. Companhia Paranaense de Energia (COPEL) v UEG Arancaria Ltd.

116.    *COPEL v UEGA* is one of the few examples where an anti-arbitration injunction was granted by a court in a civil law country, namely Brazil[108]. The dispute arose out

1.    ———————————————

[107] *Société Générale de Surveillance SA (SGS) v Pakistan*, ICSID Case No. ARB/01/13, Procedural Order No. 2, in Anti-Suit Injunctions in International Arbitration, *op. cit.* fn 9, p. 220 (also published in 18 ICSID Revue – Foreign Investment Law Journal, pp. 293ff (2003)).
[108] The information on the *COPEL v UEGA* case was provided by Mr Mauricio Gomm Ferreira dos Santos who reported on this case in a paper prepared for the 4th Annual ICDR/AAA Meeting in Miami, 26-28 March 2006.

39

Conference Paper– ICCA 2006

of a contract relating to the investment for the construction and operation of a power plant in Brazil. The contract provided for ICC arbitration in Paris.

117.    UEGA, a private company, commenced ICC arbitration proceedings in Paris. COPEL, a Brazilian State owned company, sought an injunction before the Brazilian courts to stop UEGA from pursuing the arbitration and a declaration that the arbitration agreement was null and void. COPEL claimed that the dispute was not arbitrable, firstly, because, COPEL was a State controlled company and, secondly, because the dispute involved matters of public interest. The court granted the anti-arbitration injunction against UEGA and imposed a daily penalty of approximately US$ 400'000 in case of violation of the injunction.

118.    A number of appeals on the injunction followed. UEGA was allowed to continue with the arbitration. The Court of Appeal of the State of Parana held that a Brazilian State controlled entity could agree to arbitration, and that to prevent UEGA from proceeding with the arbitration would violate its right to access to justice, because arbitration was the method of dispute resolution agreed upon by the parties. A second challenge was brought by COPEL before the Special Chamber of the Parana State Superior Court. This court also denied COPEL's request. However, it should be noted that the request was denied on procedural grounds only and, therefore, cannot be interpreted as a general rejection of anti-arbitration injunctions.[109]

### 4.6.  Lac d'Amiante du Canada Ltée et 2858-0702 Québec Inc v Lac d'Amiante du Québec Ltée

119.    The *Lac d'Amiante* case is another example for an anti-arbitration injunction issued by a court in a civil law jurisdiction[110].

1.    ————————————

[109]    AS at this date, the final decision on the appeal filed by UEGA has not been rendered.
[110]   On this case, see generally note by Stewart R SHACKLETON, in International Arbitration Law Review, Vol. 3, Issue 1 (2000), pp. N-6ff.

Conference Paper– ICCA 2006

120.     This case concerned two Canadian companies, Lac d'Amiante du Québec (LAQ) and Lac d'Amiante du Canada (LAC), who were involved in a joint venture for the exploitation of asbestos sites in Québec. Several court actions and arbitration proceedings were brought in order to resolve disputes arising from this joint venture. In 1992, LAQ commenced court actions in Montréal against LAC. In 1996, LAC commenced an ICC arbitration in New York against LAQ. A few weeks later, LAQ filed a second action against LAC, again before the courts of Montréal.

121.     In 1997, LAQ informed the arbitral tribunal in the ICC arbitration that it intended to file a counterclaim in the New York arbitration relating to the same disputes that were already pending before the courts in Montréal. LAQ then filed a motion to stay the Montréal court actions commenced by itself against LAC pending the arbitral tribunal's decision on the counterclaim.

122.     LAQ's motion to stay the court actions was denied. LAQ nevertheless maintained the counterclaim in the ICC arbitration. LAC contested the arbitral tribunal's jurisdiction over the counterclaim. When the arbitral tribunal decided that it had jurisdiction over the counterclaim, LAC sought an anti-arbitration injunction from the courts in Montréal to prevent LAQ from maintaining its counterclaim in the ICC arbitration.

123.     The Québec Superior Court granted the anti-arbitration injunction against LAQ on several grounds. It considered that LAQ had waived its right to arbitrate by commencing court actions and that the counterclaim was, in fact, not covered by the arbitration agreement.

124.     The anti-arbitration injunction was upheld by the Québec Court of Appeal, primarily on the grounds that the injunction would stop an arbitration which had been abusively brought by LAQ and which was incompatible with the actions already pending before the courts in Montréal. According to the court, the aim of the

41

Conference Paper– ICCA 2006

injunction was not to control the arbitration process, but rather to stop the abusive behavior of LAQ[111].

### 4.7.  ICC No. 5294, 22 February 1988, Final Award

125.    In ICC case 5294, a contract was concluded between a Danish company and an Egyptian employer for the construction of a cattle abattoir in Egypt. The contract provided for ICC arbitration in Zurich. The Danish company subsequently subcontracted some works to an Egyptian company. When a dispute arose between the Danish company and the Egyptian company, the Danish company initiated an ICC arbitration in Zurich. A sole arbitrator was appointed by the ICC.

126.    The Egyptian party objected to the jurisdiction of the arbitrator. It informed the arbitrator that a court action had been introduced in Egypt requesting a declaration that the arbitration clause was invalid and a suspension of the arbitration proceedings pending the outcome of the Egyptian court proceedings. A couple of months later, the Egyptian party informed the arbitrator that an anti-arbitration injunction had been granted by the Egyptian court.

127.    The sole arbitrator decided to ignore the anti-arbitration injunction and accepted its jurisdiction. He held:

> "No order of any Egyptian Court was actually ever notified or submitted to the arbitrator either directly or by either of the parties. This is, however, immaterial. [...] [C]ourt proceedings in Egypt did not and do not have any direct influence on the present arbitration proceedings, since Egyptian Courts would not have jurisdiction of either these proceedings or the arbitrator. They certainly do not have any influence on the arbitrator's jurisdiction in the present case".

1.    _____

[111] In the words of the Québec Court of Appeal : "Le recours en injonction des intimées constitue une procédure destinée à arrêter des initiatives procédurales, abusives et incompatibles avec les demandes déjà présentées à Montréal pour les objets et les causes semblables. La demande de LAC vise le comportement même de la partie, non le contrôle de la décision des arbitres" (decision available online under www.mcgill.ca/files/arbitration/LacdAmiante.pdf ).

Conference Paper– ICCA 2006

### 4.8. Conclusion

128.    As the review of these cases shows, lawyers have discovered anti-arbitration injunctions as a tactical device. Originally intended to render the administration of justice more efficient, anti-arbitration injunctions are used – or abused – in practice as a tactical tool to stop or delay arbitrations. Unfortunately, these examples are not isolated cases[112] and one can presume that the tactical use of anti-arbitration injunctions will increase in the future.

### 5.    Are anti-arbitration injunctions ever justified?

129.    I now revert to the question initially raised, *i.e.* are anti-arbitration injunctions ever justified? Even if a domestic law gives its courts the power to grant anti-arbitration injunctions, is the exercise of this power appropriate?

130.    Typically, a party may attempt to justify the use of an anti-arbitration injunction on the basis that it would be highly unreasonable, inefficient, and very costly to proceed with the arbitration only to have the award set aside at the end of a lengthy arbitral process and to then bring the claim anew before the competent national court. Rather, time and money will be saved by bringing this issue directly before the national court in the first instance.

131.    Logically this argument is attractive. However, it ignores the nature and accepted practice of international arbitration and the accepted international law rules applicable to international arbitration. Anti-arbitration injunctions can rarely be justified; they are contrary to fundamental principles of international arbitration law, including the doctrines of competence-competence, separability, and party autonomy.

1.    ───────────────────

[112] See also, Bangladesh High Court, Dhaka, Decision of 5 April 2000 regarding ICC No. 7934/CK, Manjurul Basit, J, extracts in ASA Bulletin, No. 4 (2000), pp. 821-829; *Hitachi Ltd v Rupali Polyester*, Supreme Court of Pakistan, 10 June 1998, XXV YBCA (2000), pp. 443ff; *Paramedics Electromedicina Comercial Ltda v GE Medical Systems Information Technologies Inc*, decision cited under fn 79; ICC No. 4862, Partial Award, 1986, in Collection of ICC Awards 1986-1990, Sigvard Jarvin, Yves Derains, Jean-Jacques Arnaldez (eds.), Deventer 1994, pp. 508ff, commentary by Sigvard Jarvin.

Conference Paper– ICCA 2006

They also ignore the principle according to which judicial control of the legality of the arbitral process should only occur after an award has been rendered, either by a court of the arbitral seat or a court of the place of enforcement.

132.    According to the principle of competence-competence, "[a]n international arbitral tribunal is the judge of its own competence"[113]. In other words, the tribunal is empowered to decide on its own jurisdiction prior to a national court. Therefore, anti-arbitration injunctions intended to prevent the arbitral tribunal from exercising this power violate the competence-competence principle[114]. In the words of the late Professor Fouchard,

> "[t]he issuance of an anti-suit injunction based on a given court's understanding of the validity and scope of an arbitration agreement clearly negates the principle of competence-competence. For that reason alone, it should be avoided"[115].

133.    The principle of separability recognises that the arbitration clause remains effective notwithstanding the fact that there is a challenge to the existence or validity of the main agreement[116]. The arbitration agreement is autonomous from the main agreement in which it is contained. The granting of an anti-arbitration injunction may violate the principle of separability, because not infrequently, such injunctions are granted in response to a claim of the invalidity of the main contract[117].

134.    The anti-arbitration injunction being at variance with the principle of party autonomy was the driver of decision of the ICC tribunal in the *Salini* case. It refused to consider itself bound by an anti-arbitration injunction contrary the parties'

1.    ————————————

[113] S M SCHWEBEL, *op. cit.* fn 11, p. 15.
[114] S M SCHWEBEL, *loc. cit.* fn 113. See also the *Salini* award (cited under fn 96, para. 152), where the ICC tribunal held that "[i]t would be a clear breach of the fundamental principle of competence-competence if an international arbitral tribunal were obliged to stay its proceedings in deference to a court proceeding which had specifically been instituted to determine the question of the tribunal's jurisdiction".
[115] Philippe FOUCHARD, Anti-Suit Injunctions in International Arbitration – What Remedies?, in Anti-suit Injunctions in International Arbitration, *op. cit.* fn 9, p. 155.
[116] J D M LEW, *op. cit.* fn 9, p. 38.
[117] S M SCHWEBEL, *op. cit.* fn 11, p. 14.

44

Conference Paper – ICCA 2006

agreement. As seen above, following the principle of party autonomy, the tribunal decided that since the parties' wish was to resolve their disputes by arbitration, it had no choice but to ignore the anti-arbitration injunction and to continue the arbitration in accordance with the parties' agreement[118].

135.    Finally, anti-arbitration injunctions also violate the general principle according to which the legality of the arbitral process may only be controlled after an award was made, either by the court of the seat of the arbitration or by the court of the place of enforcement. Again, this was stated very clearly by the *Salini* tribunal holding that

> "[t]he appropriate occasion for the courts of State X to consider the issue of jurisdiction is in the context of an action to set aside the Tribunal's award, after the Tribunal has determined its own jurisdiction. The courts cannot, in the meantime, pre-empt the Tribunal's decision on its own jurisdiction"[119].

136.    These four principles are well established in international arbitration law. They may have their origins in one system or another, but they are fundamental to the mechanism and smooth working of international arbitration. Through wide acceptance, these principles are part of customary international law as it applies to international arbitration. These are today codified in the New York Convention, as well as in the UNCITRAL Model Law. They also exist in most modern arbitration legislation.

137.    In the New York Convention, the relevant provisions are Articles II, III, and V. According to Article II NYC

> "(1) Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration".

1.    _____

[118] See *supra*, pp. 33f.
[119] *Salini Construttori S.p.a. v Ethiopia*, Award cited under fn 96, para. 153.

45

Conference Paper– ICCA 2006

> "(3) *The court of a Contracting State,* when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, *shall, at the request of one of the parties, refer the parties to arbitration,* unless it finds that the said agreement is null and void, inoperative or incapable of being performed". (Emphasis added)

138.    Accordingly, under Article II NYC, there is an obligation under public international law on all States that are party to that Convention to stay court proceedings in favour of arbitration. This provision suggests that if there is a valid arbitration clause, the courts should not be issuing injunctions to stop an arbitration[120]. Indeed, when a national court issues an anti-arbitration injunction, it blocks the arbitration process agreed upon by the parties instead of referring the parties to arbitration as required by Article II NYC[121]. As has been pointed out by Judge Stephen Schwebel, it also

> "fails anticipatorily to 'recognize arbitral awards as binding and enforce them,' (Art. III) and it pre-emptively refuses recognition and enforcement on grounds that do not, or may not, fall within the bounds of Article V of the New York Convention"[122].

139.    The same arguments can be made for the incompatibility of anti-arbitration injunctions with the principles contained in Articles 8[123] and 16[124] of the UNCITRAL Model Law, *i.e.,* competence-competence, separability and party autonomy. Article 34 of the Model Law contains the principle that the judicial control of the legality of

1.    _____

[120] J D M LEW, *op. cit.* fn 9, p. 31.

[121] S M SCHWEBEL, *op. cit.* fn 11, p. 10

[122] S M SCHWEBEL, *loc. cit.* fn 121

[123] Article 8 Model Law: "(1) A court before which an action is brought in a matter which is the subject of an arbitration agreement shall, if a party so requests not later than when submitting his first statement on the substance of the dispute, refer the parties to arbitration unless it finds that the agreement is null and void, inoperative or incapable of being performed. (2) Where an action referred to in paragraph (1) of this article has been brought, arbitral proceedings may nevertheless be commenced or continued, and an award may be made, while the issue is pending before the court".

[124] Article 16 (1) Model Law: "The arbitral tribunal may rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement. For that purpose, an arbitration clause which forms part of a contract shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitral tribunal that the contract is null and void shall not entail ipso jure the invalidity of the arbitration clause".

46

Conference Paper– ICCA 2006

the arbitral process may occur only after an award was made by an application for setting aside the award before the courts of the seat of the arbitration.

140.     To date, the New York Convention has been ratified by 137 countries. By contrast, the UNCITRAL Model Law has been adopted by 49 countries. The principles reflected in the Model Law are generally accepted, even by countries that have not adopted it. Therefore, it can be said that the principles codified both in the New York Convention and in the Model Law constitute the law of international arbitration. Due to their wide recognition, they are part of customary international law and *lex mercatoria* as it applies to international arbitration.

141.     It follows that national courts which grant anti-arbitration injunctions violate conventional and customary international law, international public policy and international arbitration law[125]. International arbitration law and practice does not allow national courts outside the country of the seat of the arbitration to intervene in the arbitration process by granting anti-arbitration injunctions. An anti-arbitration injunction which aims to stop or interfere with an arbitration taking place in another jurisdiction cannot be justified.

## 6.     The Injuncted Arbitrator or Tribunal

142.     Finally, what should an arbitrator do when faced with an injunction from a court other than at the seat of arbitration, ordering that he personally and/or a tribunal in which he is a member, should stay its proceedings or otherwise not continue with the arbitration?  Should the arbitrator consider his duty to the parties and the arbitration agreement to override his own personal freedom and situation, especially as in some cases the penalty for breaching a court order may be fines or even imprisonment for contempt of court?

1.     ────────────────────

[125] S M SCHWEBEL, *op. cit.* fn 11, p. 5.

Conference Paper– ICCA 2006

143.    One possibility may be to simply ignore any injunction directed against the arbitration on the grounds that the court issuing the injunction does not have jurisdiction over the arbitration (only the court of the seat of arbitration does) and that such order violates the law and practice of international arbitration. This would be a bold action and may place the arbitrator or tribunal in a difficult predicament if any arbitrator visited the jurisdiction in question.  However, the arbitrators must take a pragmatic and legal position if they are to comply with their duty to the parties under the applicable arbitration rules and law.

144.    It is suggested the approach for arbitrators in the face of an anti-arbitration injunction will depend on the circumstances and vary from case to case. In each case, the arbitral tribunal and the individual arbitrators should examine carefully the various effects the injunction may have on the tribunal or one of its members, or on the parties. The arbitral tribunal's primary duty is owed to the parties. If it finds that the parties have agreed to resolve their dispute by arbitration, it must respect this agreement and make an award. Often the injunction will be against one of the parties, or at least a party and the arbitrators.  The reaction of the parties to the anti-arbitration injunction may well take the decision making responsibility away from the arbitrators, e.g. where the party subject to the anti-arbitration injunction considers it must respect and comply with it.

145.    The arbitral tribunal also should consider that an award rendered notwithstanding an injunction might not be enforceable in the country where the injunction was issued.  A tribunal has a duty to make every effort to render an enforceable award. Hence, if it decides to ignore the injunction, it must be sure that this will not endanger the enforceability of the award. On the other hand, if the problem is merely an enforceability issue, i.e. under the New York Convention, the tribunal may feel constrained to make an award and then allow the successful party to seek to enforce the award where it can, regardless of its effect in the country where the injunction seeking to stay or stop the arbitration was made.

Conference Paper– ICCA 2006

### 7.    Conclusion

146.    It is now widely recognised, both in national laws, international arbitration practice and international law, that the validity of an arbitration agreement should be decided in the first place by the arbitral tribunal properly appointed. It is also widely accepted that no national court outside the country of the seat of the arbitration should determine the validity of the arbitration agreement prior to the decision of the arbitral tribunal.

147.    Anti-arbitration injunctions rendered in order to prevent a foreign arbitral tribunal from determining its jurisdiction violate this international arbitration law and the accepted and expected practice of international arbitration. Therefore, even if some domestic laws empower their courts to grant anti-arbitration injunctions against arbitral tribunals abroad, this power should not be exercised.

148.    According to the late Professor Fouchard, "[i]n an ideal world, state courts should refrain from issuing anti-suit injunctions in the context of international arbitration"[126]. Professor Fouchard probably was correct in assuming that only "in an ideal world" will national courts refrain from issuing anti-arbitration injunctions. Given the possibility of using anti-arbitration injunctions as a tactical device and some national courts' tendency to protect their own interests at all costs, regrettably some national courts may continue to grant anti-arbitration injunctions in order to stop foreign arbitrations. However the courts are out of line with the law, practice and expectations in international arbitration.

1.    ————————————

[126] P FOUCHARD, *op. cit.* fn 115, p. 154.

# EXHIBIT 16


RECYCLED

# Arbitration
# with the Arab Countries
# 2nd Edition

NOTICE:
THIS MATERIAL MAY BE
PROTECTED BY COPYRIGHT
LAW (TITLE 17, U.S. CODE)

*by*

## Abdul Hamid El-Ahdab, Lawyer, LL D

*Chairman of the Arab Association for International Arbitration*
*Secretary General, Council for European Arab Arbitration*



Kluwer Law International

The Hague — London — Boston

A C.I.P. Catalogue record for this book is available from the Library of Congress.

ISBN 90-411-1097-6

Published by Kluwer Law International,
P.O. Box 85889, 2508 CN The Hague, The Netherlands

Sold and distributed in North, Central and South America
by Kluwer Law International,
675 Massachusetts Avenue, Cambridge, MA 02139, USA

In all other countries, sold and distributed
by Kluwer Law International, Distribution Centre
P.O. Box 322, 3300 AH Dordrecht, The Netherlands

Kluwer Law International incorporates the publishing programmes of
Graham & Trotman Ltd, Kluwer Law and Taxation Publishers,
and Martinus Nijhoff Publishers.

*Printed on acid-free paper*

All Rights Reserved

© 1999 Kluwer Law International

No part of the material protected by this copyright notice may be reproduced or utilized in
any form or by any means, electronic or mechanical, including photocopying, recording, or
by any information storage and retrieval system, without written permission from the
copyright owner.

Printed and bound in Great Britain by Antony Rowe Limited

TABLE OF CONTENTS

III.   The principle of a fair hearing ................................................ 304
IV.   Absence of one of the parties ................................................ 304
V.    Investigations, evidence and minutes ...................................... 304
VI.   Procedural incidents .......................................................... 305
      A.   Suspension of the proceedings ....................................... 305
      B.   Interruption of the proceedings ........ .............................. 305
VII.  Intervention by the courts .................................................. 306
VIII. Time-limits .................................................................... 306
IX.   Termination of the arbitration .............................................. 306

SECTION V — THE AWARD ............................................................ 307

I.    Applicable law ................................................................ 307
II.   The rule of majority .......................................................... 308
III.  Obligatory contents .......................................................... 308
IV.   Res judicata .................................................................. 308
V.    Registration of the arbitral award .......................................... 308
VI.   Correction of errors contained in the award .............................. 309

SECTION VI — ENFORCEMENT OF ARBITRAL AWARDS ............................ 311

I.    Enforcement of Kuwaiti awards .............................................. 311
II.   Enforcement of foreign arbitral awards .................................... 311

SECTION VII — MEANS OF RECOURSE .............................................. 313

I.    Rehearing .................................................................... 313
II.   Appeal ........................................................................ 313
III.  Setting aside .................................................................. 313
      A.   Who may request setting aside ? ..................................... 314
      B.   The competent court ................................................. 314
      C.   The time-limits ....................................................... 314
      D.   Reasons for setting aside ............................................ 315
      E.   The effect of a request for setting aside on enforcement of the award ........ 315
      F.   The effects of setting aside ......................................... 316

PART EIGHT — ARBITRATION IN LEBANON ........................................ 317

SECTION I — GENERAL OUTLINE .................................................... 319

I.    The courts .................................................................... 319
II.   The laws ...................................................................... 319
III.  The new arbitration act of 1983 ............................................ 320
      A.   The main characteristics of the Lebanese arbitration system ......... 320
      B.   International arbitration in the 1983 Lebanese Arbitration Act ......... 322

SECTION II — THE AGREEMENT TO ARBITRATE .................................... 325

I.    In national arbitration ........................................................ 325
      A.   Arbitration clauses and arbitration agreements ...................... 325
      B.   Arbitrability ............................................................ 327

xviii

ARBITRATION WITH THE ARAB COUNTRIES

important of which were the Civil Code,[1] the Code of Civil Procedure, the Commercial Code and the Penal Code.

The Lebanese Civil Code is considered to be one of the most modern of today's codes. It was inspired in principle by the then existing French statute law but it also contains certain recent French case law concepts, as well as those based on new theories then prevailing in France, Switzerland, Germany and other countries. Certain professors of Moslem Fiqh[2] have held that this legislative reform was not fundamentally different from the principles of Moslem Law.

However, Lebanese law is distinguished from the laws in other Arab countries by the fact that it does not mention that the Shari'a is the source of law. Also, its Constitution does not contain any provision concerning the religion of the Head of State, but the constitutional customs (which have the same force as the Constitution) require that the presidency of the Republic be held by a Maronite.

## III. THE NEW ARBITRATION ACT OF 1983

Before the 1983 Arbitration Act was issued, arbitration in Lebanon was defined by the Code of Civil Procedure. This had been drafted by Professor BARRAUT of the Lyon's Law Faculty. This draft was later modified by the Legislative Commission before being issued in 1933 and coming into force in 1934.

The 1983 Arbitration Act was also inserted into this code. It is a chapter apart. The old Lebanese Code was not as hostile to arbitration as the french Code of Civil Procedure, conceived after the 1789 Revolution, which was a reaction against the facilities granted to arbitration by the Revolution. The old Code even took into account later amendments introduced by French law, notably concerning arbitration clauses, and it especially took account of the evolving case law. Lebanese law thus found a compromise between the french texts which limited the scope of arbitration and the Courts which, in matters of international commerce, extended it as far as possible. Finally, it again followed French statute, where two acts relating to national and international arbitration were issued in 1980 and 1981.[3]

The Lebanese Act adopted most of the french provisions on international arbitration but only few provisions relating to national arbitration. It was slightly modified after it came into force.[4]

Lebanese law thus did not stray far from french law. However, it stands out from many other arab arbitration laws, as it makes a clear and precise separation between national and international arbitration in the very text of the law, without leaving this to the courts.

### A.  The main characteristics of the Lebanese arbitration system

1)  The lebanese arbitration system was one of the first Arab systems to adopt compulsory arbitration in addition to optional arbitration. As a first step, this

---

1.  The Code of Obligations and Contracts.
2.  Dr. sobhi Mahmassani: La théorie générale des obligations et des contrats dans la Chari'a Islamique (two volumes), Beirut 1948.
3.  The Lebanese Act was issued by decree-law no 90/83 which indicates that it would be implemented as of 01.01.1985.
4.  By decree-law no 20 dated 23 March 1985.

, the Commercial

odern of today's
e law but it also
e based on new
ountries. Certain
ot fundamentally

rab countries by
of law. Also, its
of the Head of
he Constitution)

was admittedly limited to labour conflicts but was later widened by the Code of Currency and Credits[1] to banking, despite its wish not to change its non-planned economical system. However, compulsory arbitration remains quite far from the meaning, concept and philosophy of optional arbitration.

2) The Lebanese arbitration system was inspired by french law: heavily in international arbitration, but much less so in national arbitration. As a general rule, it still remains much inspired by french legal thinking. The lebanese courts followed the steps of the french courts to admit arbitration in international commercial disputes where one of the parties is the State or a public administration. Moreover, a provision of the 1983 arbitration act provides this even more explicitly: 'The State, as well as juristic persons of public law, may resort to international arbitration.'[2]

3) Contrary to french law, lebanese law never held that arbitration clauses were void. On the other hand, it did not disseize the courts directly: arbitration clauses were reduced to the promise to enter into an arbitration agreement. Thus, if one of the parties refused to sign such an agreement after having been summoned to do so, the other party was entitled to summon it before the court, for damages. In such a case, the judge granted the defendant a time-period to sign the arbitration agreement. If this was not done, the court granted all the claimant's claims on the substance of the dispute.[3] At the same time, the 'arbitration clause'[4] authorized a party unduly summoned to appear before the court, to raise a plea of lack of jurisdiction. The new Code of Civil Procedure now recognizes the validity of arbitration clauses which do disseize the courts, unless they are obviously void.[5]

was defined by
ARRAUT of the
ive Commission

a chapter apart.
ch Code of Civil
ction against the
even took into
rning arbitration
ebanese law thus
pe of arbitration
nded it as far as
ating to national

tional arbitration
ly modified after

4) The new lebanese arbitration system explicitly recognizes institutional arbitration.[6] It also clearly distinguishes between national and international arbitration. National arbitration is covered in 47 articles (59 in french law). It was the first to do so, and later followed by tunisian, algerian and egyptian law. This is different from many laws throughout the world (notably in the Arab world) where this distinction is only made tacitly, mostly leaving it to the courts, who also often distinguish between institutional arbitration and ad hoc arbitration. Lebanese law did not leave this to the courts and defined international arbitration as that which involves international commercial interest.[7]

ds out from many
between national
this to the courts.

5) There is a fundamental difference between french law and lebanese law as to arbitral matters. Thus, french law does not authorize national arbitration in civil matters but lebanese law does.

ystems to adopt
a first step, this

hari'a Islamique (two

be implemented as of

1. Issued by law no. 1/9/1953.
2. Article 509, para. 2 of the Code of Civil Procedure.
3. Article 876 of the old Code of Civil Procedure.
4. This is what an agreement to arbitrate (whether an arbitration clause or an arbitration agreement) was called by the old Lebanese law (articles 823 and 824 of the old Code of Civil Procedure).
5. Articles 762 and 765 of the Code of Civil Procedure.
6. Articles 772 and 810 of the Code of Civil Procedure. The latter notably provides that 'the arbitrator's may be appointed . . . in the agreement to arbitrate, directly or by reference to a set of arbitration rules'.
7. Article 809 of the Code of Civil Procedure.

321

# EXHIBIT 17



### Paris Court of Appeal (1st Chambre suppl.)
### October 21, 1983

### Isover-Saint-Gobain v. Dow Chemical France *et al.*

By two contracts dated, for the first, October 1, 1965 and, for the second, July 9, 21, and 31, 1968, Dow Chemical International S.A. -- the successor to which is Dow Chemical A.G. – and Dow Chemical Europe granted to Compagnie de Saint-Gobain, Boussois-Isolation and Francisol – the successor to which is Isover-Saint-Gobain – the distribution in France of various products intended for thermal insulation.

Each of these contracts contained an arbitration clause, which, in the contract of 1968, was worded in the following manner:

"Any disputes arising from the present contract shall be resolved in Paris, under French law, according to the Rules of Conciliation and Arbitration of the International Chamber of Commerce, by one or more arbitrators appointed in accordance with these Rules."

As difficulties arose concerning the performance of these agreements, Dow Chemical France, Dow Chemical Company, Dow Chemical A.G. and Dow Chemical Europe filed an action with the Court of Arbitration of the ICC on April 21, 1981.

By an award termed "interim arbitral award" rendered in Paris on September 23, 1982, the arbitrators, Pierre Sanders, Berthold Goldman and Michel Vasseur, declared that it was within their jurisdiction to rule on the requests of the four claimant companies and rejected, in this instance, the plea of inadmissibility lodged by the defendant company against the requests of Dow Chemical A.G. and Dow Chemical Europe.

Isover-Saint-Gobain filed an appeal to annul this award, as provided by Article 1504 of the New Code of Civil Procedure.

In its pleadings, to which express reference is made for the complete statement of the facts of the case and the arguments and claims of the defendant in the present appeal, the claimant holds that the Tribunal ruled without an arbitration agreement and without complying with the terms of reference, invoking the first and third cases set out in Article 1502, to which Article 1504 of the New Code of Civil Procedure refers.

The defendant companies, to whose pleadings reference is also made for the statement of their claims and arguments, seek rejection of the appeal to annul.

The Court,

*Concerning the argument drawn from Article 150-3 of the New Code of Civil Procedure.*

Isover-Saint-Gobain, which points out that Dow Chemical France and Dow Chemical Company were not signatories to the above cited contracts of 1965 and 1968, essentially charges the arbitrators with having failed to comply with the terms of reference by ruling on their jurisdiction with regard to these companies without referring to French law as designated by the parties to the arbitration clause reproduced above.

Yet, in compliance with the Rules of Conciliation and Arbitration of the ICC, the terms of reference signed on December 23, 1981 by the arbitrators and the parties to the arbitration noted in particular:

"... the points of contention to be resolved by the Tribunal are the following:

1)    does the Arbitral Tribunal have jurisdiction to render an arbitral award between Dow Chemical France and Dow Chemical Company, on the one hand, and Isover-Saint-Gobain, on the other hand?

2)    What is the law governing the merits of the case?"

It is at least implicit in this undertaking that the question concerning the law governing the merits is separate from the question concerning the rules for determining jurisdiction; in this instance the arbitrators, who will have to rule specifically on this point, were not expressly instructed to apply French law even on the merits of the dispute.

The Arbitral Tribunal, without ignoring the responsibilities entrusted to it, could thus rule on its jurisdiction without relying on French law.

This argument is thus without grounds.

*Concerning the argument drawn from Article 1502-1 of the New Code of Civil Procedure.*

The claimant reproaches the Arbitral Tribunal for finding jurisdiction to rule on the claims of Dow Chemical France and Dow Chemical Company in the absence of an agreement designating the Court of Arbitration of the ICC to resolve disputes arising between these two companies and Isover-SaintGobain.

However, by the the arbitration clause noted above, the parties to the distribution agreements of 1965 and 1968 accepted to be subject to the provisions of the Rules of Conciliation and Arbitration of the ICC.

It emerges from the combination of Articles 8, 11 and 13 *in fine* of these Rules that, in order to rule on his or her jurisdiction, the arbitrator must, in particular, consider the wishes expressed on this point by the parties and common business practice.

The arbitrators correctly observed in this case that the applicable law for determining the scope and the effect of an arbitration clause establishing an international arbitration is not necessarily the same as the applicable law governing the merits of the dispute.

Through a sovereign interpretation of the above agreements and the documents exchanged during the negotiations and their termination, the arbitrators have decided, following pertinent reasoning free from contradictions, that, in accordance with the common will of all the interested companies, Dow Chemical France and Dow Chemical were parties to these agreements notwithstanding the fact that they had not physically signed them, and the arbitration clause was thus applicable to them.

The arbitrators made a secondary reference to the concept of "group of companies," the existence of which in international trade practice is not seriously contested by the claimant.

The arbitrators thus justified their jurisdiction, and the argument that they ruled without an arbitration agreement is thus, like the previous claim, lacking in grounds.

**On these grounds,**

The court dismisses Isover-Saint-Gobain's appeal to annul the award rendered on September 23, 1982 by the arbitrators, Pieter Sanders, Berthold Goldman and Michel Vasseur ;

The court orders claimant to pay the costs of this appeal.

**Mr. Mailhé, President; Mr. Boulley-Duparc, Prosecuter; J.-F. Rambaud, E. Lauvaux and D. Diedler, attorneys.**

## COUR D'APPEL DE PARIS (1re Chambre suppl.)

*21 octobre 1983*

Société Isover-Saint-Gobain c/ Sociétés Dow Chemical France et autres

**Arbitrage international.** — Droit applicable. — Clause compromissoire dési-gnant la loi française. — Arbitres tenus de se référer à la loi française pour apprécier leur compétence (non).

**Arbitre.** — « Compétence-compétence ». — Arbitrage international. — Droit applicable. — Règlement d'arbitrage de la C.C.I.

**Clause compromissoire.** — Effets. — Clause non signée par toutes les sociétés membres d'un groupe. — Circonstance indifférente. — Interprétation de leur volonté.

**Société.** — Groupe de sociétés. — Application d'une clause compromissoire aux diverses sociétés du groupe. — Conditions. — Usage du commerce international.

*Même si la clause compromissoire désignait la loi française, il résulte au moins implicitement de la mission confiée aux arbitres par un acte de mis-sion postérieur que la question de la loi applicable au fond a été distinguée de celle concernant les règles de détermination de la compétence, et qu'il n'a pas été donné mission aux arbitres — qui auront précédemment à se pro-noncer sur ce point — de faire application de la loi française même sur le fond du litige. Le Tribunal arbitral a donc pu, sans méconnaître la mission qui lui avait été confiée, juger de sa compétence sans se référer au droit français, et le moyen d'annulation de la sentence tiré de l'article 1502-3° du nouveau Code de procédure civile est sans fondement.*

*Il résulte de la combinaison des articles 8, 11 et 13 in fine du Règlement d'arbitrage de la C.C.I. que, pour statuer sur sa compétence, l'arbitre doit notamment tenir compte de la volonté des parties et des usages du commerce. Observant avec raison que la loi applicable pour la détermination de la portée et des effets de la clause compromissoire instituant un arbitrage inter-national ne se confondait pas nécessairement avec le droit applicable au fond du litige et, par une interprétation souveraine des conventions et docu-ments échangés, jugeant, au terme d'une motivation pertinente et exempte de contradiction, que deux sociétés, suivant la volonté commune de toutes les sociétés intéressées, avaient été parties à ces conventions, bien que ne les ayant pas matériellement signées, et que la clause compromis-soire leur était dès lors applicable, les arbitres, qui ont aussi fait accessoire-*

*(1984)*

*ment appel à la notion de groupe de sociétés dont l'existence à titre d'usage du commerce international n'est pas sérieusement contestée par la demande-resse en annulation, ont ainsi justifié leur compétence, et le moyen, tiré de l'article 1502-1er du même Code, selon lequel ils auraient statué sans conven-tion d'arbitrage, est dénué de fondement.*

Par deux contrats en date d'une part, du 1er octobre 1965 et, d'autre part, des 9, 21 et 31 juillet 1968, la société Dow Chemical International S.A. — aux droits de laquelle se trouve la société Dow Chemical A.G. — et la société Dow Chemical Europe ont confié aux sociétés Compagnie de Saint-Gobain, Boussois Isolation et Francisol — aux droits desquelles est la société Isover-Saint-Gobain — la distribution, en France de divers produits destinés à l'isolation thermique.

Chacun de ces contrats contenait une clause compromissoire qui, dans celui de 1968, était libellée de la manière suivante :

« Tous différends découlant du présent contrat seront tranchés à Paris,
« selon la loi française, suivant le Règlement de conciliation et d'arbitrage
« de la Chambre de commerce internationale, par un ou plusieurs arbitres
« nommés conformément à ce Règlement ».

Des difficultés étant survenues au sujet de l'exécution de ces conventions, les sociétés Dow Chemical France, Dow Chemical Company, Dow Che-mical A.G. et Dow Chemical Europe ont, par requête du 21 avril 1981, saisi la Cour d'arbitrage de la C.C.I.

Par une sentence dite « sentence arbitrale intérimaire », rendue à Paris le 23 septembre 1982, les arbitres Pierre Sanders, Berthold Goldman et Michel Vasseur se sont déclarés compétents pour statuer sur les demandes des quatre sociétés demanderesses et ont rejeté, en l'état, l'exception d'irre-cevabilité opposée par la société défenderesse aux demandes des sociétés Dow Chemical A.G. et Dow Chemical Europe.

La société Isover-Saint-Gobain a formé contre cette décision le recours en annulation prévu par l'article 1504 du N.C.P.C.

Dans ses conclusions, auxquelles il est expressément référé pour l'exposé complet des faits de la cause et des moyens et prétentions de la demande-resse au principal recours, celle-ci soutient, en invoquant les premier et troi-sième moyens prévus à l'article 1502 auquel renvoie l'article 1504 du N.C.P.C., que le Tribunal arbitral aurait statué sans convention d'arbitrage et sans se conformer à sa mission.

Les sociétés défenderesses, aux conclusions desquelles il est également référé pour l'exposé de leurs moyens et prétentions, sollicitent le rejet du recours en annulation.

La Cour,

*Sur le moyen tiré de l'article 1502-1° du N.C.P.C.*

Considérant que la société Isover-Saint-Gobain, qui fait valoir que les sociétés Dow Chemical France et Dow Chemical Company n'étaient pas

*(1984)*

signataires des contrats survisés de 1965 et 1968, reproche essentiellement aux arbitres d'avoir failli à leur mission en statuant sur leur compétence à l'égard de ces sociétés sans avoir recours à la loi française désignée par les parties dans la clause compromissoire ci-dessus reproduite;

Mais considérant que l'acte de mission signé le 23 décembre 1981 par les arbitres et les parties à l'arbitrage, conformément au Règlement de conciliation et d'arbitrage de la C.C.I., énonçait notamment:

«... les points litigieux à résoudre par le Tribunal arbitral sont les suivants:

1) le Tribunal arbitral est-il compétent pour rendre une sentence arbitrale entre Dow Chemical France et Dow Chemical Company, d'une part et Isover-Saint-Gobain, d'autre part?

2) Quelle est la loi applicable au fond du litige?

Qu'il résulte au moins implicitement de cette mission que la question de la loi applicable au fond a été distinguée de celle concernant les règles de détermination de la compétence; qu'au demeurant, il n'a pas été expressément donné mission aux arbitres — qui auront précisément à se prononcer sur ce point — de faire application de la loi française même sur le fond du litige;

Que le Tribunal arbitral a donc pu, sans méconnaître la mission qui lui avait été conférée, juger de sa compétence sans se référer au droit français;

Que ce moyen n'est dès lors sans fondement;

*Sur le moyen tiré de l'article 1502-1° du N.C.P.C.*

Considérant que la demanderesse fait grief au Tribunal arbitral de s'être déclaré compétent pour statuer sur les prétentions des sociétés Dow Chemical France et Dow Chemical Company en l'absence de convention désignant la Cour d'arbitrage de la C.C.I. pour résoudre les litiges pouvant opposer ces deux sociétés à Isover-Saint-Gobain;

Mais considérant que, par l'effet de la clause compromissoire ci-dessus rappelée, les parties aux contrats de distribution de 1965 et 1968 se sont soumises aux dispositions du Règlement de conciliation et d'arbitrage de la C.C.I.;

Considérant qu'il résulte de la combinaison des articles 8, 11 et 13 in fine de ce Règlement que, pour statuer sur sa compétence, l'arbitre doit notamment tenir compte de la volonté exprimée sur ce point par les parties et des usages du commerce.

Considérant qu'avec raison, les arbitres ont observé in la cause que la loi applicable pour la détermination de la portée et des effets de la clause compromissoire instituant un arbitrage international ne se confondait pas nécessairement avec le droit applicable au fond du litige;

Considérant que par une interprétation souveraine des conventions susvisées et des documents échangés lors de leur négociation et de leur résiliation, les arbitres ont jugé, au terme d'une motivation pertinente et exempte de contradiction, que, suivant la volonté commune de toutes les sociétés intéressées, les sociétés Dow Chemical France et Dow Chemical Company avaient été parties à ces conventions bien que ne les ayant pas matériellement signées, et que la clause compromissoire leur était dès lors applicable;

(1984)

Qu'ils ont aussi fait accessoirement appel à la notion de «groupe de sociétés» dont l'existence à titre d'usage du commerce international n'est pas sérieusement contestée par la demanderesse;

Qu'ils ont ainsi justifié leur compétence, et que le moyen selon lequel ils auraient statué sans convention d'arbitrage, est donc, comme le précédent, dépourvu de fondement;

Par ces motifs,

Déboute la société Isover-Saint-Gobain de son recours en annulation contre la sentence rendue le 23 septembre 1982 par les arbitres Pieter Sanders, Berthold Goldman et Michel Vasseur;

La condamne aux dépens de cette voie de recours.

MM. Mailhé, prés., Bouilloy-Duparc, av. gén., J.-F. Rambaud, E. Laureaux et D. Diedler, av.

—————

*NOTE.* – Une clause compromissoire souscrite par deux sociétés filiales d'un groupe international de sociétés engage-t-elle également la société-mère et une autre filiale intéressée du groupe?

C'est à cette importante question, tant sur le plan théorique que pratique que vient de répondre de façon affirmative l'arrêt rendu par la Cour d'appel de Paris le 23 octobre 1983. Cette décision se situe donc au carrefour du droit de l'arbitrage et du droit des groupes de sociétés et permet de faire le point sur la réception du deuxième par le premier.

Deux contrats de distribution en France de produits destinés à l'isolation thermique de toitures terrasses avaient été conclus en 1965 et 1968 entre trois sociétés françaises aux droits desquelles se trouve aujourd'hui la société Isover-Saint-Gobain et deux filiales de la société américaine The Dow Chemical Company.

Plus précisément, le contrat de 1965 avait été conclu avec la société Dow Chemical International S.A. (Venézuela) aux droits de laquelle se trouve Dow Chemical A.G. (Zurich) elle-même filiale de Dow Chemical Company (U.S.A.).

Quant au contrat de 1968, il était intervenu entre les trois mêmes sociétés françaises et la société Dow Chemical Europe (Zurich), filiale de Dow Chemical A.G. (Zurich) et donc sous-filiale de Dow Chemical Company (U.S.A.).

Les deux contrats contenaient l'un et l'autre une clause compromissoire qui, dans celui de 1968, énonçait: «tous différends découlant du présent contrat seront tranchés à Paris, selon la loi fran-

(1984)

çaise, suivant le Règlement de conciliation et d'arbitrage de la Chambre de commerce internationale, par un ou plusieurs arbitres nommés conformément à ce Règlement. »

Formellement, les contrats de 1965 et 1968 avaient donc été signés, du côté français par trois sociétés aux droits desquelles se trouve désormais Isover-Saint-Gobain et du côté du groupe américain, par deux filiale et sous-filiale, les sociétés Dow Chemical A.G. (venant aux droits de Dow Chemical International) et Dow Chemical Europe.

Mais il se trouve que, sans être signataire des contrats précités, la société Dow Chemical France, filiale française du groupe Dow, avait pris une part prépondérante dans la négociation, l'exécution et la résiliation des contrats. Quant à la société-mère, elle était titulaire des marques des produits distribués et exerçait un entier contrôle sur ses filiales et sous-filiales.

C'est dans ces conditions et ce contexte que, des incidents étant intervenus lors de l'utilisation des produits distribués en France, la société-mère The Dow Chemical Company et ses trois filiales et sous-filiale, Dow Chemical France, Dow Chemical A.G. et Dow Chemical Europe ont, par requête du 21 avril 1981, saisi la Cour d'arbitrage de la Chambre de commerce internationale. Par sentence dite « sentence arbitrale intérimaire », rendue à Paris le 23 septembre 1982 (pour le texte de la sentence, voir infra, Rev. arb., 1984, p. 137), les arbitres se sont déclarés compétents pour statuer sur les demandes du groupe Dow, par application des dispositions du Règlement de conciliation et d'arbitrage de la C.C.I., lesquelles renvoyaient notamment à la volonté exprimée par les parties et aux usages du commerce.

De plus, ils ont rejeté une exception d'irrecevabilité opposée par Isover-Saint-Gobain aux demandes des sociétés Dow Chemical A.G. et Dow Chemical Europe, dont il n'est pas nécessaire de parler davantage, car, fondée sur le défaut d'intérêt à agir, elle alléguait une absence de préjudice, grief qui ne pouvait être examiné qu'avec le fond du droit, ce qui est hors de notre présent propos.

La société Isover-Saint-Gobain a formé contre la sentence arbitrale un recours en annulation en vertu de l'article 1504 du nouveau Code de procédure civile, lequel énonce que « la sentence arbitrale rendue en France en matière d'arbitrage international peut faire l'objet d'un recours en annulation dans les cas prévus à l'article 1502. »

Plus précisément, la société française demanderesse fondait son recours sur les premier et troisième cas prévus à l'article 1502 N.C.P.C. : le Tribunal arbitral aurait statué sans convention d'arbitrage et sans se conformer à sa mission.

Le recours en annulation est rejeté par la Cour d'appel dans l'arrêt présentement commenté. Il est donc décidé que la clause compromissoire litigieuse engage les sociétés Dow Chemical France et Dow Chemical Company alors même que celles-ci ne l'ont pas formellement signée ; il y a bien convention d'arbitrage, laquelle justifie alors la compétence du Tribunal arbitral.

La solution apportée à cette question principale dépendait toutefois d'une question préalable, celle du droit applicable pour apprécier la compétence des arbitres. Sans doute est-ce la raison pour laquelle la Cour d'appel a inversé l'ordre dans lequel il est répondu aux moyens avancés. La clause compromissoire, en effet, se référait à la fois à la loi française et au Règlement de conciliation et d'arbitrage de la C.C.I. Or, seul ce dernier a été appliqué par les arbitres pour apprécier leur compétence. Ce faisant, n'ont-ils pas méconnu la mission qui leur avait été conférée ?

. Il convient donc, dans un premier temps de rechercher le droit applicable à la détermination de la compétence des arbitres (I) avant d'examiner dans un deuxième temps comment il a été effectivement appliqué (II).

I

A. — La question préalable à résoudre était de savoir selon quel droit décider si les sociétés Dow Chemical France et Dow Chemical Company devaient être considérées comme parties à la clause compromissoire, bien que ne l'ayant pas matériellement signée.

Si l'on s'en tient aux solutions généralement admises en droit international privé français, la détermination des parties et des tiers au contrat est en principe une question qui relève de la loi applicable au fond du contrat, donc de la loi d'autonomie (H. Batiffol et P. Lagarde, Droit international privé, 7e éd., Tome II, n° 603) laquelle doit d'ailleurs également recevoir application pour l'interprétation de celui-ci. Ne fallait-il donc pas décider en conséquence que la portée et les effets de la clause compromissoire devaient être appréciés selon la loi de fond applicable aux contrats dans lesquels elle était insérée ?

On conçoit, dans ces conditions, que la société Isover-Saint-Gobain ait eu intérêt à voir déclarer l'applicabilité de la loi française pour l'appréciation de la compétence des arbitres, car le droit français, on le sait, est réservé et réticent pour reconnaître la notion de groupe de sociétés en tant que telle, et s'en tient par conséquent au principe de la pluralité des personnes morales intéressées, lequel

ne peut céder que devant des circonstances bien précises qui ne se présentaient pas en l'espèce. L'application de la loi française conduisait donc, du moins à première vue, à considérer que les sociétés Dow Chemical France et Dow Chemical Company n'étaient pas engagées par la clause compromissoire, dont il fallait alors faire prévaloir une interprétation stricte et formaliste, laquelle conduisait à l'incompétence des arbitres au regard des deux sociétés intéressées.

Mais la Cour d'appel, emboîtant le pas aux arbitres, n'a pas statué en ce sens. Elle a, en effet, et avec raison, décidé que le Tribunal arbitral avait pu, «sans méconnaître la mission qui lui avait été conférée, juger de sa compétence sans se référer à la loi française.»

Pour parvenir à ce résultat, la Cour se livre à une interprétation de l'acte de mission signé par les arbitres. Car si la clause compromissoire précitée se référait conjointement à la loi française et au Règlement de conciliation et d'arbitrage de la Chambre de commerce internationale, sans d'ailleurs préciser les domaines d'application respectifs de l'une et de l'autre, en revanche, l'acte de mission signé le 23 décembre 1981 par les arbitres et les parties à l'arbitrage, énonçait notamment : ... «les points, litigieux, à résoudre par le Tribunal arbitral sont les suivants ...1) le Tribunal arbitral est-il compétent pour rendre une sentence arbitrale entre Dow Chemical France et Dow Chemical Company d'une part, et Isover-Saint-Gobain d'autre part 7 3) quelle est la loi applicable au fond du litige 7 »

La clause compromissoire était donc rédigée de façon très générale et se bornait à se référer à la loi française, laquelle était compétente pour faire l'objet d'un recours en annulation dans les cas prévus à l'article 1502.»

En revanche, l'acte de mission était plus précis, et sa rédaction permettait de penser que la loi française n'avait sans doute pas un domaine d'application aussi étendu. Il était en effet distingué, «au moins implicitement», dit la Cour, entre l'appréciation de la compétence du tribunal (point 1) et la détermination de la loi applicable au fond du litige (point 3).

Ne devait-on pas alors penser que la loi française dont il est question dans la clause compromissoire ne concernait que le fond du litige ? C'est en ce sens que semble s'être prononcée la sentence arbitrale du 23 septembre 1982 (point 19, laissant en conséquence le Règlement de conciliation et d'arbitrage de la C.C.I. régler les autres questions, et spécialement celle de la compétence des arbitres.

Mais la Cour d'appel est encore plus prudente ; elle remarque qu'«il n'a pas été expressément donné mission aux arbitres – qui auront précisément à se prononcer sur ce point – de faire application de la loi française, même sur le fond du litige». Et en effet, tion de la loi française, même sur le fond du litige, dans les divers points, de l'acte de mission des arbitres, de déterminer la loi applicable au fond du litige.

Mais alors, s'il en est véritablement ainsi, on peut raisonnablement avoir des doutes sur les chances d'application effective de la loi française : il est possible qu'elle ne soit pas appliquée au fond ; il est certain qu'elle ne le sera pas pour apprécier la compétence des arbitres. N'est-ce pas aller bien loin et laisser à la loi française une simple compétence virtuelle ?

B. – En tirant les conséquences de la dissociation opérée par l'acte de mission entre la compétence des arbitres et le droit applicable au fond, la Cour de Paris applique substantiellement une règle bien assise en jurisprudence depuis le célèbre arrêt Gosset du 7 mai 1963 (Rev. crit. dr. int. pr., 1963.615, note Motulsky, J.C.P., 1963.II.13405, note Goldman, Clunet, 1964.82, note Bredin, D., 1963.545, note Robert), celle de l'autonomie de la clause compromissoire. On sait que les réformateurs du droit de l'arbitrage, saisis de scrupules constitutionnels, n'ont pu codifier certaines règles issues de la jurisprudence antérieure parmi lesquelles précisément, la règle de l'autonomie de la clause compromissoire. Mais le rapport au Premier Ministre, constituant l'exposé des motifs du décret du 12 mai 1981, s'y réfère expressément (voir sur ce point, les observations de Ph. Fouchard, Rev. arb., 1981, pp. 460-461) si bien que la solution est celle de la continuité. La Cour fait ici une application très classique de la règle d'autonomie, avec cette précision que n'était pas en cause, en l'espèce, la validité de la clause compromissoire mais l'appréciation de sa portée et de ses effets, lesquels, en raison même de la règle d'autonomie, peuvent être déterminés selon une loi différente de celle qui régit le fond du contrat.

Formellement toutefois, il faut observer que ce n'est pas la jurisprudence française sur l'autonomie de la clause compromissoire qui reçoit application, puisque la loi française vient d'être écartée par la Cour d'appel, mais les dispositions du Règlement de la C.C.I. qui énonce des règles équivalentes sur ce point (art. 8.4 du Règlement).

Pour déterminer le droit applicable à la compétence des arbitres, l'arrêt d'appel procède curieusement en deux temps : négativement tout d'abord dans sa réponse au moyen tiré de l'article 1502.3 ; positivement ensuite, dans sa réponse au moyen tiré de l'article 1502-1.

Si, en effet, la Cour approuve les arbitres d'avoir apprécié leur compétence «sans se référer au droit français», elle ne précise pas davantage quel était le droit applicable à cette opération. La formule est négative et prudente. Sans doute les juges se sont-ils bornés à répondre sobrement à la question posée: les arbitres ont-ils statué sans se conformer à la mission qui leur aurait été conférée de statuer en application de la loi française?

Si l'arrêt s'arrêtait là, il faudrait assurément regretter un tel laconisme. Il faut attendre la réponse donnée au moyen tiré de l'article 1502-1° pour voir la Cour préciser de quel droit il s'agit. La sentence arbitrale querellée, déterminant les sources du droit dont il devait être fait application, n'avait pas manqué, en éliminant la loi française, de se situer d'emblée sur le terrain du Règlement de conciliation et d'arbitrage de la C.C.I. Certes, le Règlement, incorporé par les parties à leurs stipulations contractuelles, n'est pas à proprement parler un élément constitutif de la *lex mercatoria*. Il ne reçoit application que parce que les parties en ont décidé ainsi. Il ne constitue donc qu'un simple prolongement de leur volonté. Il n'en ouvre pas moins largement la porte sur le droit extradictique, et plus précisément sur les usages du commerce international, favorables à la reconnaissance de la notion de groupe de sociétés.

## II

Pour décider que les sociétés Dow Chemical France et Dow Chemical Company avaient été parties aux conventions de 1965 et 1968 sans toutefois les avoir matériellement signées, et que la clause compromissoire leur était dès lors applicable, les arbitres puis la Cour d'appel ont eu égard à l'analyse de «la volonté commune de toutes les sociétés intéressées» (A) et «à la notion de «groupe de société» dont l'existence, à titre d'usage du commerce international» n'était pas sérieusement contestée par la société Isover-Saint-Gobain (B).

A. — C'est la volonté commune de toutes les sociétés intéressées qui fonde en premier lieu la décision de considérer les sociétés Dow Chemical France et Dow Chemical Company comme engagées par la clause compromissoire bien que ne l'ayant pas matériellement signée.

Les deux sociétés sont placées sur un même plan par la Cour d'appel qui se retranche derrière l'interprétation souveraine par les arbitres des conventions susvisées ainsi que les documents échangés lors de leur négociation et de leur résiliation. On remarquera que le recours en annulation ne donne à la Cour d'appel que

les pouvoirs de juge de cassation dans l'appréciation de la légalité, toute révision au fond étant exclue. (Sur ce point, Voir Fouchard, «L'arbitrage international en France après le décret du 12 mai 1981», *Clunet*, 1982, n° 81, p. 414). Mais en l'espèce, on peut se demander si la référence à l'appréciation souveraine était bien justifiée, car le litige ne portait pas sur le bien-juge au fond par la sentence mais sur l'existence même de la convention d'arbitrage, ce qui est tout à fait différent.

Il convient en tout cas d'observer que la sentence arbitrale avait surtout insisté sur le rôle essentiel et déterminant joué par la société Dow Chemical France dans la négociation, l'exécution et la résiliation des conventions litigieuses. En l'état de ces constatations, on pouvait considérer sans grande hésitation que Dow Chemical France devait être traitée comme partie aux contrats litigieux, et par conséquent aux clauses compromissoires qu'ils contenaient.

En ce qui concerne la société Dow Chemical Company, la sentence observait plus brièvement que la société-mère était propriétaire des marques sous lesquelles les produits étaient diffusés et qu'elle exerçait un contrôle absolu sur toutes ses filiales. Si la première considération, relative à la propriété des marques, se rapporte bien aux contrats litigieux et permet de conclure à une participation effective, quoique passive, à la réalisation d'une même opération, en revanche la seconde, relative au contrôle exercé, est plus générale. Elle vise à montrer qu'en tant que société-mère contrôlant étroitement ses filiales et sous-filiales, la société Dow Chemical Company était engagée par la clause compromissoire litigieuse, ce qui jette un doute certain sur sa volonté effective d'accepter, dans cette opération précise, la clause compromissoire.

Mais la Cour d'appel n'a pas dissocié le sort de Dow Chemical France et Dow Chemical Company, plaçant filiale et société-mère sur un même plan, et supposant ainsi que l'une et l'autre avaient un rôle identique dans l'opération de distribution litigieuse. Elles sont traitées de la même façon sans d'ailleurs que leurs rapports de dépendance et de subordination apparaissent clairement à ce stade de la motivation de l'arrêt. Ce qui importe est la volonté d'une société de participer à l'opération de distribution de produits isolants. C'est parce que cette commune volonté est établie aux yeux de la Cour que la clause compromissoire leur est déclarée applicable.

En fin de compte, une telle décision ne remet pas en cause le principe de l'interprétation stricte des clauses compromissoires, énoncé par le Tribunal arbitral institué sous les auspices de la

C.C.I. (sentence rendue dans l'affaire n° 2138 jugée en 1974, Clunet, 1975.934, obs. Derains, spéc. p. 937). Il s'agissait également dans cette affaire d'une clause compromissoire, signée par l'une des sociétés d'un groupe. Les arbitres avaient refusé d'en étendre l'effet à une autre société de ce groupe qui n'avait été ni «signataire ni partie» au contrat litigieux. Mais ils avaient surtout observé que si la société en question avait mené la négociation de l'affaire et si «l'exclusion sur les termes essentiels... il n'est nullement établi que la société-mère... elle aurait accepté la clause compromissoire.» Il existait donc, dans cette affaire, un doute sur la volonté effective de la société en question, et c'est parce que cette volonté était équivoque, discutable, que la clause compromissoire n'a pas été étendue.

Rien de tel dans l'affaire Dow Chemical, où il ne semble pas, au vue des circonstances et des documents échangés, que la volonté de la société-mère et de sa filiale ait pu prêter à discussion.

Avant le décret du 12 mai 1981, il n'était d'ailleurs pas contesté en doctrine que l'acceptation d'une clause compromissoire puisse être simplement tacite à partir du moment où elle était certaine. (P. Level, J. Cl. Dr. Internat., fasc. 585, n° 81 ; Ph. Fouchard, L'arbitrage commercial international, n° 136, p. 79). Toutefois, les nouveaux textes du droit de l'arbitrage introduisent un élément d'incertitude. L'article 1443 du nouveau Code relatif à l'arbitrage interne, énonce en effet que « la clause compromissoire doit à peine de nullité être stipulée par écrit.» Une telle exigence ne doit-elle pas être transposée en droit international? La question n'a pas encore été tranchée, et les auteurs s'interrogent. (Voir notamment les obs. Sanders et Goldman à la Rev. arb., 1981, p. 490 et 498 ; et J. Robert, L'arbitrage, Droit interne - Droit international privé, Dalloz, 5e édition, 1983, n° 269, p. 235).

Le moyen n'a pas été soulevé dans la présente espèce. Il convient d'ailleurs de remarquer que la clause compromissoire avait bien un caractère écrit mais qu'elle n'était pas matériellement signée par toutes les parties intéressées. L'absence de signature n'a pas été relevée par l'arrêt d'appel qui semble donc, au moins implicitement, ne pas exiger un écrit signé.

Le point capital, il convient de le répéter, est qu'une société ne puisse pas se trouver engagée par une clause compromissoire sans l'avoir véritablement voulu, ce qui compromettrait grandement les chances d'exécution spontanée de la sentence. Mais à partir du moment où cette volonté est indiscutable, il convient de lui attribuer la portée juridique qu'elle mérite et que ses partenaires atten-

La jurisprudence arbitrale confirme d'ailleurs ce point de vue. C'est ainsi que deux sentences rendues par des tribunaux arbitraux institués par la C.C.I., l'une rendue dans l'affaire n° 2375 en 1975, l'autre dans l'affaire n° 1434 en 1975 (Clunet, 1976, p. 973 et 978 avec les observations Y. Derains) ont jugé opposable aux sociétés du groupe une clause compromissoire souscrite par l'une d'elles seulement, parce qu'en l'espèce, «la volonté réelle des parties, interprétée de bonne foi», et «l'esprit de coopération» imposaient une telle solution.

Le méconnaître serait certainement contraire au principe de bonne foi qui doit dominer les relations contractuelles. Ce serait aussi malmener, sans autre raison que celle d'un formalisme étroit, l'apparence ainsi créée selon laquelle les sociétés contractantes formaient une entité, une unité économique, un groupe de sociétés.

C'est précisément le deuxième volet de la motivation des juges d'appel.

B. – Ceux-ci, à l'instar des arbitres, se réfèrent à la «notion de groupe de sociétés, dont l'existence, à titre d'usage du commerce international n'est pas sérieusement contesté par la demanderesse».

A vrai dire, on peut se demander comment un concept, celui de groupe de sociétés, peut constituer un usage, c'est-à-dire une norme. Mais ce n'est vraisemblablement là qu'une maladresse de rédaction : sans doute faut-il lire qu'il s'agit d'une « notion dont l'existence est reconnue par les usages du commerce international», ce qui n'est d'ailleurs pas tout à fait la même chose, car cette dernière formulation suggère qu'il existerait, en formation, un droit applicable aux groupes de sociétés au titre de la lex mercatoria. Mais la sentence rendue dans l'affaire Dow n'apporte-t-elle pas, à l'élaboration de ce droit, sa part contributive ?

C'est aussi un élément de réponse à la question de l'institution de la lex mercatoria dans les ordres juridiques nationaux. Les contrats internationaux et les sentences arbitrales appartiennent, en le sait, comme des voies d'accès privilégiées d'un ordre à l'autre (B. Goldman, La lex mercatoria dans les contrats et l'arbitrage international, Réalités et perspectives », Clunet, 1979, p. 475 et s., et spéc. pp. 479-485). Or, l'intégration est ici réalisée de la façon la moins discutable (P. Lagarde, «Approche critique de la lex mercatoria», Etudes Goldman, 1982, p. 125 et spéc. pp. 144-146), puisqu'elle trouve une assise dans une manifestation de volonté des partenaires intéressés, lesquels ont expressément fait référence dans la clause compromissoire à un document précis, le Règlement de conciliation et d'arbitrage de la Chambre de commerce interna-

tionale, qui se trouve ainsi incorporé à leurs stipulations contractuelles. Elle ne doit pas moins être soulignée dans la mesure où elle repose sur l'hypothèse d'une coexistence d'ordres juridiques plus complémentaires que rivaux et constitue ainsi une ouverture sur le pluralisme juridique dont on sait qu'il constitue la toile de fond des discussions doctrinales actuelles concernant la *lex mercatoria*.

La sentence avait, dans sa dernière partie, mis l'accent sur la notion de groupe de sociétés. La référence est reprise par la Cour d'appel qui rejoint ainsi un courant doctrinal favorable à la reconnaissance d'une telle notion (voir X. Giocanti, compte rendu du colloque d'arbitres tenu à Paris le 5 octobre 1982, et organisé par l'Institut du droit et des pratiques des affaires internationales, *Rev. arb.*, 1982, p. 495 et s. et les références).

Pour faire prévaloir l'unité économique du groupe sur la pluralité juridique de ses membres, les arguments ne manquent certes pas. On peut songer, tout d'abord, à faire intervenir le principe de bonne foi qui interdirait à une ou plusieurs sociétés, de se réfugier derrière le voile de la personnalité morale pour refuser d'assumer les conséquences juridiques d'un comportement actif et personnel lors de la négociation ou de l'exécution des contrats. Il est également possible de s'attacher à l'apparence créée par les diverses sociétés du groupe qui ont concouru à la conclusion ou l'exécution des contrats litigieux d'une façon indivisible et indifférenciée ou, plus techniquement, à la notion de mandat apparent, les filiales signataires apparaissant comme des mandataires apparents de la société-mère et des filiales intéressées. Ou encore, si l'on se place, cette fois, du côté des sociétés françaises, la notion de croyance légitime peut assurément être invoquée (sur la notion : J.-L. Sournioux, « La croyance légitime », J.C.P., 1982.I.3058).

Toutefois, l'utilisation en la matière de la notion de groupe de sociétés semble de nature à susciter de très sérieuses réserves.

Il apparaît tout d'abord qu'en l'espèce, cette notion intervient à posteriori, comme pour conforter les conclusions de l'analyse de la volonté des sociétés intéressées. Dès lors, on peut se demander s'il était bien utile d'y avoir recours (voir, dans les circonstances voisines, les observations Oppetit et Sayag, « Méthodologie d'un droit des groupes de sociétés », *Rev. Soc.*, 1973, p. 577 s. et spéc. n° 4, p. 579). En effet, ce n'est pas parce que les quatre sociétés concernés appartenaient au même groupe que la clause compromissoire se déclare engager la société-mère et sa filiale française, mais parce qu'en fait, d'une part, Dow Chemical France avait pris une part prépondérante à la négociation, l'exécution et la résiliation du contrat, et que d'autre part, Dow Chemical Company, proprié-

taire des marques avait laissé le contrat se conclure et s'exécuter. C'est cette considération de fait qui est déterminante et qui permet de conclure à l'existence d'une volonté commune et effective des intéressés. La seule appartenance des sociétés à un même groupe, et donc le contrôle exercé par la société-mère sur ses filiales, est, en lui-même insuffisant.

D'une façon plus générale, les dangers de la notion de groupe de sociétés doivent être soulignés. Elle conduirait en effet, si elle était prise en considération à titre principal, à attirer toutes les sociétés d'un groupe à une instance arbitrale dès lors que l'une d'elles aurait signé une clause, compromissoire, ce qui serait manifestement excessif et conduirait, selon certains (Giocanti, *op. cit.*, p. 497), des entreprises pourtant favorables à l'arbitrage à s'en détourner en raison des risques d'extension encourus.

De plus, ne faudrait-il pas, si la solution devait être retenue, décider, par une sorte d'effet d'entraînement, que la société-mère est également tenue par les autres documents contractuels signés par sa filiale, telle par exemple une lettre d'intention.

De proche en proche, on finit ainsi par gommer purement et simplement la pluralité des personnalités morales en présence. Ne faudrait-il pas alors admettre que la société-mère est également tenue, dans l'hypothèse, voisine quoique différente, où le groupe serait constitué ultérieurement, c'est-à-dire au cas où la prise de contrôle interviendrait après la signature de la clause compromissoire ?

Cette situation est très différente de celle de l'absorption d'une société par une autre. Une sentence arbitrale C.C.I. a en effet décidé, en cas d'absorption de société en cours de procédure arbitrale, que la société absorbante avait qualité pour agir aux lieux et place de la société absorbée qui avait introduit la demande (sentence n° 3281, *Clunet*, 1982.990, obs. Derains). Si la sentence se fondait principalement sur la teneur du procès-verbal de l'assemblée générale des actionnaires de la société absorbante approuvant le projet de fusion, il convient d'ajouter qu'en droit français, l'effet principal de la fusion absorption est la transmission à titre universel du patrimoine de la société absorbée à la société absorbante, laquelle reprend en conséquence tant activement que passivement les obligations de la société absorbée (Y. Guyon, *Droit des affaires*, Economica, 1980, n° 635). La société absorbante doit donc être considérée comme tenue par une clause compromissoire signée par la société absorbée.

Dans l'affaire Dow, la sentence arbitrale rendue le 23 septembre 1982 est allée beaucoup moins loin en adoptant une position nuancée.

## 112
### JURISPRUDENCE FRANÇAISE

Certes, elle observe que Dow Chemical Company (U.S.A.) « possède et exerce le contrôle absolu de ses filiales qui ont, soit signé les contrats en cause, soit comme Dow France, effectivement et personnellement participé à leur conclusion, leur exécution et leur résiliation ». Aussi en déduit-elle que dans un tel groupe, caractérisé à la fois par une pluralité de personnalités juridiques et une unité économique, « la clause compromissoire, expressément acceptée par certaines des sociétés du groupe doit lier les autres sociétés qui, par le rôle qu'elles ont joué dans la conclusion, l'exécution et la résiliation des contrats contenant lesdites clauses, apparaissent, selon la commune volonté des parties à la procédure, comme ayant été de véritables parties à ces contrats ou comme étant concernées, au premier chef, par ceux-ci et par les litiges qui en peuvent découler. »

Ainsi se trouvent combinés l'appartenance des sociétés non signataires à un même groupe, le rôle joué par celles-ci dans la conclusion, l'exécution et la résiliation des contrats ainsi que leur commune volonté.

C'est dans ces conditions, et dans ces conditions seulement, que la notion de groupe de sociétés peut être opérationnelle. Considérée isolément, et d'une façon toute théorique, elle n'apporte rien, sinon le risque d'une désaffection pour l'arbitrage international. Combinée avec le critère de la participation effective à une même opération, elle permet de faire céder avec raison le principe de l'effet relatif des conventions.

Or, c'est bien sous ce jour que la sentence arbitrale doit être envisagée. La sentence arbitrale expose, en effet, que les partenaires à la négociation des contrats litigieux n'attachaient pas d'importance au choix de la société de groupe Dow qui signerait les contrats. C'est en réalité l'ensemble des sociétés concernées du groupe qui entendaient contracter, et c'est avec cet ensemble que voulaient contracter les sociétés françaises. Le groupe Dow apparaissait bien alors dans toute son unité économique sans que la moindre importance soit attachée à la pluralité des personnes morales en cause.

Dans ces conditions, les contractants français pouvaient légitimement croire que les contrats formellement conclus avec les filiales suisses engageaient en réalité toutes les sociétés du groupe concernées par la distribution en France de produits isolants sans se livrer à des vérifications complémentaires.

En définitive, même si l'élément déterminant reste bien la considération de la volonté effective des sociétés, l'intervention de la notion de groupe de sociétés présente l'avantage de faciliter l'établissement de la preuve qu'en réalité, il y avait bien volonté com-

(1984)

## 113
### JURISPRUDENCE FRANÇAISE

mune. Car par hypothèse, celle-ci n'a pas été expressément matérialisée par la signature d'un contrat, et dans ces conditions, un doute subsiste nécessairement. La prise en considération de la notion de groupe de sociétés permet alors de réduire l'incertitude en introduisant une sorte de présomption simple, non pas de participation à l'opération litigieuse, comme on l'a soutenu (en ce sens Y. Derains, obs., Clunet, 1975,984), ce qui serait excessif et dangereux pour les raisons sus indiquées, mais de relations réciproques actives à l'intérieur du groupe considéré. On peut aussi y voir un simple commencement de preuve de la volonté de la société non signataire de la clause compromissoire, commencement qui doit être complété, comme l'a très clairement énoncé la sentence arbitrale dans la présente affaire, par la preuve du rôle effectif et personnel joué dans la négociation, l'exécution et la résiliation du contrat litigieux.

On peut regretter que la Cour d'appel n'ait pas saisi l'occasion qui lui était donnée d'apporter de telles précisions en combinant le critère de l'appartenance à un groupe de sociétés avec celui de la participation effective à une même opération.

Toutefois, s'il en était bien ainsi, l'ordre du raisonnement suivi tant par les arbitres que par les juges d'appel devrait être inversé. Il faut d'abord constater l'appartenance de la société non signataire au groupe, laquelle permet de présumer des relations réciproques internes à celui-ci, puis ensuite vérifier la volonté commune, personnelle et effective des sociétés concernées bien que non signataires.

C'est sans doute par prudence que les arbitres, en l'espèce n'ont pas inversé l'ordre des questions. Dans l'éventualité d'un recours en annulation, la sentence était en effet plus solide sur le terrain de l'analyse de la volonté des sociétés concernées que sur celui des groupes de sociétés. Aussi les développements concernant cette notion prennent-ils l'apparence discrète d'un « obiter dictum », dont la Cour d'appel n'a d'ailleurs pas manqué de relever le caractère accessoire.

*

*

Ainsi, on le voit, la notion de groupe de sociétés n'apporte pas de solution miracle relativement à la question discutée. Elle permet seulement d'orienter et de faciliter les investigations de l'arbitre et du juge, lesquelles, en fin de compte, sont moins déterminées par des considérations d'ordre général, de nature juridique, économique ou financière, relatives aux rapports de domination de la

(1984)

114

société-mère et de ses filiales, que par l'examen concret des circonstances de fait tenant au comportement personnel et effectif des sociétés intéressées. Compte tenu de l'imprécision et de la pluralité des critères avancés en doctrine pour caractériser la notion de groupes de sociétés (voir notamment *L'entreprise multinationale face au droit*, sous la direction de B. Goldman et Ph. Francescakis, LITEC, 1977), un tel pragmatisme est en fin de compte fort rassurant.

André Chapelle

## COUR D'APPEL DE PARIS (7e Chambre, sect. B)

*13 mai 1983*

## TRIBUNAL DE COMMERCE DE PARIS (1re Chambre)

*16 janvier 1984*

Sociétés Géopipe, Transéthylène, SOTEM et autres
c/ Sociétés Omnium Technique des Transports par pipe-lines (OTP),
Entrepose, et autres

**Clause compromissoire.** — Effets. — Pluralité de défendeurs. — Article 42 N.C.P.C. — Inapplicabilité en présence d'une clause dérogeant à la compétence des tribunaux étatiques. — Indivisibilité du litige. — Circonstance indifférente. — Interprétation stricte.

*Si l'article 42 du nouveau Code de procédure civile permet d'attraire tous les co-défendeurs devant la juridiction du lieu où demeure l'un d'eux, cette disposition, qui ne déroge qu'aux règles de la compétence territoriale, n'est applicable qu'à la condition que le tribunal choisi ait la compétence d'attribution à l'égard de tous ; que tel n'est pas le cas lorsque par une clause du contrat les lient, certaines des parties ont entendu soustraire leurs contestations aux tribunaux étatiques pour les soumettre à l'arbitrage (1re décision).*

### PREMIÈRE DÉCISION

Statuant sur plusieurs demandes :
— des sociétés Transéthylène, Rhône-Poulenc Industries, Assurances Générales de France,
— de la société Géopipe,
— de la Compagnie Française de Raffinage, de la société Elf-France, de la société Française des Pétroles BP, contre la société de Terrassement et de Mécanique (SOTEM), Mariani ès-qualité de syndic du règlement judiciaire de cette société, la société Entrepose, l'Omnium Technique des Transports par pipe-lines (OTP), la société Pipe-Lines Services (PLS), tendant à

(1984)

I swear that I am a fluent speaker of the French language and that the above translation of the decision of the Paris Court of Appeal, dated October 21, 1983, is true and correct in every respect, to the best of my knowledge.

Signed on the 22nd of February 2007.

Elizabeth Lefebvre-Gross, Esq.

Member of the New York bar

White & Case LLP

1155 Avenue of the Americas

New York, New York 10036

212-819-8200

Pau Court of Appeal

November 26, 1986

Sponsor A.B. v. Lestrade

FACTS

At the end of 1980, the Swedish group Sponsor, led by Sponsor A.B. of Stockholm, undertook talks in order to acquire control of Stéréoscopes Lestrade & Cie and Sodilest, each with its head office in Vic-en-Bigorre and belonging to the Lestrade group.

On December 31, 1980, the President-Director General of Habbia S.A., another member of the Sponsor group, invited the representatives of the Lestrade group to come to Paris to negotiate the sale of the two companies cited above with the President of Sponsor A.B. Jean Berglund (Sweden).

During these negotiations, a protocol was prepared that provided in particular for the creation of Sponsor S.A. in order to purchase the totality of the shares of Stéréoscopes Lestrade & Cie and Sodilest.

On 26 March 1981, Sponsor S.A. had a request submitted to the Treasury Department to authorize an investment project consisting of the purchase "by the intermediary of a French subsidiary, Sponsor S.A." of 80% of the shares of Stéréoscopes Lestrade & Cie and Sodilest. The request specified that the investment "would be carried out by a new subsidiary to be created" with the name "Sponsor S.A.;" it was added that "Sponsor S.A. shall consequently be a holding company whose first investment will consist of taking control of the Lestrade group."

On 24 June 1981, the Treasury Department authorized the investment requested by Sponsor A.B., reminding it that this involved the following operations:

"1.    The underwriting by the Swedish company Sponsor A.B. and by two persons of the group who reside in Sweden of the quasi-totality of the initial share capital, set at 5 million francs, of a company, to be created, known as Sponsor S.A., whose head office shall be located in Paris and which shall have the principal purpose of taking the shares to be discussed below in the companies of the Lestrade group;

2.    The purchase by Sponsor S.A.:

a)    of 2,400 shares with a face value of 1,000 francs each of Stéréoscopes Lestrade & Cie, whose share capital amounts to 3 million francs and whose head office is located in Vic-en-Bigorre;

b)    of 320 shares with a face value of 1,000 francs each of the company Sodilest, whose share capital amounts to 400,000 francs and whose head office is located at Vic-en-Bigorre."

On September 14, 1981, in performance of the agreement concluded with Sponsor A.B. in January 1981 and in execution of the operation which was approved by the Treasury

Department in June 1981, the Lestrade group transferred 80% of the shares of Stéréoscopes Lestrade & Cie and Sodilest to Sponsor S.A.

On the same day, as agreed between the Sponsor group and the Lestrade group, Sponsor S.A. signed an irrevocable purchase undertaking from the Lestrade group for 600 shares of Stéréoscopes Lestrade & Cie and 80 shares of Sodilest, for a total price of 1,800,000 francs. It was provided that the Lestrade group could exercise this option between October 1 and October 31, 1985.

By letter dated October 2, 1985, confirmed by bailiff's writ dated October 25, 1985, the Lestrade group exercised the option granted to it by the purchase undertaking. But Sponsor S.A., despite a final notice dated November 16, 1985, remained impassive.

Now, the purchase undertaking contained the following arbitration clause:

"Any challenge concerning the interpretation or the performance of the present agreement shall be settled by arbitration under the following conditions:

In the absence of an agreement between the parties within a period of 10 days concerning the appointment of a sole arbitrator, the more diligent party shall notify the other party, by registered letter with proof of delivery, of the name of the first arbitrator.

The first party shall, at the same time, remind the adverse party of the subject of the dispute, shall list the issues to be resolved by the arbitral tribunal and shall invite the adverse party to inform it within two weeks of the name of the second arbitrator, with any possible observations.

If the second party fails to notify the first party of the name of a second arbitrator within the above mentioned period of two weeks, the first party may, upon simple request, have the second arbitrator appointed by the President of the Commercial Court of Tarbes."

The arbitral tribunal is thus completed with an arbitrator chosen by the first two arbitrators within ten days from the nomination of the second arbitrator or, in the absence of an agreement between them, by the President of the Commercial Court of Tarbes, upon the request of the more diligent party.

By registered letter with proof of delivery dated November 28, 1985 and by telex dated December 2, 1985, the Lestrade Group proposed that Sponsor S.A. and Sponsor A.B. submit the dispute to arbitration by a sole arbitrator appointed by the Arbitration Committee of Toulouse.

Sponsor S.A. France provided no response within the 10-day period provided by the agreement, while, by telex dated December 3, 1985, Sponsor A.B. responded that Sponsor S.A. was the sole representative of the Lestrade group.

The Lestrade group, in accordance with the arbitration clause, then appointed its arbitrator and invited the Sponsor group to appoint a second arbitrator within a period of 15 days. Sponsor S.A. France did not respond to this request. Sponsor A.B. (Sweden) made it known, by letter dated January 9, 1986, that it did not consider itself concerned by the proceedings.

Under these conditions, the Lestrade group summoned Sponsor S.A. and Sponsor A.B. before the President of the Commercial Court of Tarbes to have a second arbitrator appointed in

order to complete the arbitral tribunal, as provided by the arbitration clause contained in the purchase undertaking.

By a summary ruling dated April 28, 1986, the President of the Commercial Court of Tarbes, "in consideration of the reliable arguments affirmed by the Lestrade group, supported by the documents in the proceeding, declared that Sponsor A.B. should remain a party to the arbitration proceedings and be referred to the arbitral tribunal."

He appointed a second arbitrator in the person of Professor Percerou, who, with Professor Goldman, who had already been appointed by the partners in Lestrade, would then constitute the arbitral tribunal under the arbitration clause.

*The parties' claims*

The appeal lodged by Sponsor A.B. does not relate to the appointment of arbitrators, but to the part of the ruling that decided to maintain (*sic*) Sponsor A.B. in the arbitration proceeding and to refer it, with the claimants, to the arbitral tribunal although it was not a party to the contract.

The appellant emphasizes, as is recognized by the partners in Lestrade, that the contract was concluded between them and Sponsor SA, a French company with its registered office at 72, Quai des Carrières, 94100 Charenton; that Sponsor AB is a third party with respect to this contract, which it considered to be *res inter alios acta*; and that proceedings are even more stringent in the sense that they derogate from ordinary jurisdiction [*droit commun*] and that one cannot decide to admit a third party, without infringing upon the merits.

Appellant thus requests the Court:

> "to decide that Sponsor AB is not a proper party to the arbitration commenced by the partners in Lestrade";

> "dismiss the request of the partners in Lestrade aimed at drawing Sponsor AB into the arbitral proceedings";

> "require the partners in Lestrade to pay an indemnity of FF 10,000 on the basis of Art. 700 of the New Code of Civil Procedure";

> "require them to pay costs."

The partners in Lestrade in turn request that all grounds claimed in the appeal of Sponsor AB (Sweden) be rejected and that the decision rendered in the first instance be affirmed be affirmed. They also claim payment of FF 5,000 on the basis of Art. 700 of the New Code of Civil Procedure.

Legally the possibility to invoke the arbitration clause against Sponsor SA cannot be contested since it signed the purchase undertaking. A decision regarding the possibility of invoking this clause against Sponsor AB depends on an analysis of the relations of the parties and, especially, on the question whether, taking into account the existence of the Sponsor group and the conditions under which the heads of this group and those of the Lestrade group conducted the negotiations and subsequently concluded the purchase undertaking, Sponsor SA signed the purchase undertaking in its own name or as a mere instrument created by Sponsor AB in order to proceed with the acquisition of two companies of the Lestrade group.

3

It appears from the facts, not contested by the appellant, that Sponsor SA was created by Sponsor AB only for the purpose of acquiring the companies of the Lestrade group. It also appears that, where Sponsor AB played an important role in the conclusion of the purchase undertaking, it played an equally important role in its non-performance. Therefore, the third party in question is a third party only in appearance and in fact appears to be the soul, inspiration and, in a word, the brains of the contracting party.

It is accepted in law that "an arbitration clause expressly accepted by some companies within a group binds the other companies which, by the role they played in the conclusion, the performance or the termination of the agreements containing said clauses appear, according to the common will of all the parties to the proceedings, to have been the real parties to these contracts or to have been primarily concerned by them and by the disputes that may arise from them."

Indeed, a group of companies has, despite the distinct legal personality belonging to each of the companies, a single economic existence, of which tribunals must take account, this existence being recognized by the usages of international trade.

Consequently, it was legally correct for the judge of the first instance to have kept Sponsor AB as a party to the proceedings since it is a party involved in the dispute – without deciding the question of the arbitral tribunal's jurisdiction, since only that tribunal has to decide whether the parent company is bound by the contract signed by Sponsor SA.

Therefore, the judgment is affirmed, and the partners in Lestrade are awarded the sum of FF 2,500 on the basis of Art. 700 of the New Code of Civil Procedure.

**On these Grounds,**

The Court,

Ruling publicly, after hearing both parties, in a civil matter without option to appeal,

Confirms the judgment under appeal in all its provisions.

In addition,

The Court orders Sponsor A.B. to pay to the Lestrade partners the amount of 2,500 francs on the grounds of Article 700 of the New Code of Civil Procedure.

The Court orders Sponsor A.B. to pay all costs of the appeal.

Mr. Hebert, President; Mr. Biecher and Mr. Pellefiques, judges; Mr. Millet and Mr. Ameilhaud, attorneys.

## COUR D'APPEL DE PAU

26 novembre 1986

Société Sponsor A.B. c/ Lestrade

CLAUSE COMPROMISSOIRE. — EFFET. — GROUPE DE SOCIÉTÉS. — Société liée BIEN QUE NON SIGNATAIRE. — MOTIFS. — RÔLE DANS LA CONCLUSION OU L'EXÉCUTION DU CONTRAT. — INTERPRÉTATION DE LA VOLONTÉ DES PARTIES.

SOCIÉTÉ. — GROUPE DE SOCIÉTÉS. — APPLICATION D'UNE CLAUSE COMPROMISSOIRE À UNE AUTRE SOCIÉTÉ DU GROUPE. — CONDITIONS. — RÔLE DE CETTE SOCIÉTÉ. — INTERPRÉTATION DE LA VOLONTÉ DES PARTIES. — USAGES DU COMMERCE INTERNATIONAL.

USAGES. — USAGES DU COMMERCE INTERNATIONAL. — GROUPE DE SOCIÉTÉS. — RÉALITÉ ÉCONOMIQUE UNIQUE. — PERSONNALITÉ JURIDIQUE DISTINCTE. — EFFET. — CLAUSE COMPROMISSOIRE. — EFFET OBLIGATOIRE À L'ÉGARD D'UNE SOCIÉTÉ NON SIGNATAIRE.

*Il est admis en droit que la clause compromissoire, expressément acceptée par certaines des sociétés du groupe, doit lier les autres sociétés qui, par le rôle qu'elles ont joué dans la conclusion, l'exécution ou la résiliation des contrats contenant lesdites clauses, apparaissent selon la commune volonté de toutes les parties à la procédure, comme ayant été de véritables parties à ces contrats, ou comme étant concernées au premier chef par eux et par des litiges qui en peuvent découler.*

*En effet, un groupe de sociétés possède, en dépit de la personnalité juridique distincte appartenant à chacune de celles-ci, une réalité économique unique, dont les tribunaux doivent tenir compte, son existence étant reconnue par les usages du commerce international.*

### EXPOSÉ DES FAITS

Fin 1980, le groupe suédois Sponsor, animé par la société Sponsor A.B. de Stockholm, a engagé des pourparlers dans le but d'acquérir le contrôle des sociétés « Stéréoscopes Lestrade & C⁰ » et « Sodilest », chacune d'elles ayant son siège à Vic-en-Bigorre, et faisant partie du groupe Lestrade.

Le 31 décembre 1980, le Président-directeur général de la société Habbia S.A., autre membre du groupe Sponsor, a invité les représentants du groupe Lestrade à se rendre à Paris pour négocier la vente des deux sociétés précitées avec le Président du Sponsor A.B., Jean Berglund (Suède).

Lors de ces négociations, un protocole a été établi où l'on prévoyait notamment la création d'une société Sponsor S.A., dans le but de procéder à l'acquisition de la totalité d'actions de « Stéréoscopes Lestrade & C⁰ » et « Sodilest ».

(1988)

---

JURISPRUDENCE FRANÇAISE

Après avoir réglé les sommes ainsi mises à sa charge, l'une des parties introduisit contre les arbitres une action en contestation d'honoraires. La Cour d'appel saisie de ce litige, différent du premier, puisqu'il n'opposait plus la S.A.R.L. Bureau Qualitas à la société C.I.S.I. mais, dans le cadre du contrat d'arbitrage, la S.A.R.L. Bureau Qualitas aux arbitres, déclara pourtant que la fixation des honoraires ayant fait partie intégrante du dispositif de la sentence ne pouvait en conséquence être attaquée que par la voie de l'appel contre la sentence ; or, pour la Cour d'appel dont l'arrêt est ici cassé, la Cour d'appel saisie du litige au fond avait confirmé la sentence dans sa totalité — y compris le passage relatif à la fixation du montant des honoraires —, la rendant définitive.

6. Visant l'article 1351 C. civ., le texte général relatif à l'autorité de la chose jugée et non l'article 1476 N.C.P.C., texte spécial à l'autorité de la chose jugée de la sentence (il est vrai qu'ici la sentence avait été confirmée par un *arrêt*, décision judiciaire qui rendrait le visa de l'article 1476 peu opportun), la Cour de cassation casse l'arrêt de la Cour de Paris en ces termes : « En se déterminant ainsi, alors que les arbitres, défendeurs à l'instance en contestation d'honoraires, n'avaient pas été parties à la procédure d'appel suivie sur la sentence arbitrale, la Cour d'appel a violé le texte susvisé ».

Implicitement donc, la Cour de cassation désavoue tout effet juridique à la pratique qui consiste pour les arbitres à fixer le montant de leurs honoraires dans la sentence qu'ils rendent. Les motifs de la Cour étant très brefs, son raisonnement peut être décomposé de la façon suivante : la Cour de cassation a concentré sa motivation sur le caractère *relatif* de l'autorité de la chose jugée : les arbitres n'étaient pas — et pour cause — parties à la sentence arbitrale qu'ils ont rendue et à l'arrêt rendu sur appel de cette sentence. La Cour n'indique pas, mais cela va de soi, que les arbitres n'étaient pas parties à cette procédure parce qu'ils ne pouvaient l'être en raison de leur qualité de juges. Elle n'éprouve pas le besoin de dire autrement que la Cour d'appel a confondu l'instance qui opposait les sociétés Bureau Qualitas et C.I.S.I. et l'instance qui opposait la société Bureau Qualitas aux arbitres. On ne reprochera pas à la Cour suprême la brièveté de sa motivation sauf la cassation était évidente.

Charles JARROSSON.

(1988)

Le 26 mars 1981, Sponsor S.A., faisait présenter à la Direction du Trésor une demande d'autorisation d'un projet d'investissement consistant dans l'acquisition « par l'intermédiaire d'une filiale française Stéréoscopes Lestrade & Cⁱᵉ » et « Soditest », de 80 % des actions des sociétés « Stéréoscopes Lestrade & Cⁱᵉ » et « Soditest ». La demande précisait que l'investissement « sera réalisé par une société filiale nouvelle à créer » sous la dénomination « Sponsor S.A. ». « Il y était ajouté : « Sponsor S.A., sera en conséquence une société holding dont le premier investissement consistera en la prise de contrôle du groupe Lestrade. »

'Le 24 juin 1981, La Direction du Trésor autorisait l'investissement demandé par Sponsor A.B., en rappelant qu'il impliquait les opérations suivantes :

« 1 — Souscription par la société suédoise Sponsor A.B. et par deux personnes physiques de son groupe résidant en Suède, de la quasi-totalité du capital social, fixé à 5 millions de francs, d'une société anonyme à constituer, dénommée Sponsor S.A., dont le siège serait situé à Paris et qui aurait pour objet principal de prendre les participations dont il sera question ci-dessous dans les sociétés du groupe Lestrade ;

« 2 — Achat par la société Sponsor S.A. :

« a) de 2 400 actions d'une valeur normale de 1 000 F chacune de la société Stéréoscopes Lestrade & Cⁱᵉ, dont le capital s'élève à 3 millions de francs, dont le siège social est situé à Vic-en-Bigorre ;

« b) de 320 actions d'une valeur nominale de 1 000 F chacune de la société Soditest, dont le capital s'élève à 400 000 F et dont le siège est situé à Vic-en-Bigorre... »

Le 14 septembre 1981, en exécution de l'accord passé avec Sponsor A.B. en janvier 1981, et en réalisation de l'opération qui avait reçu l'autorisation de la Direction du Trésor en juin 1981, le groupe Lestrade cédait à Sponsor S.A. 80 % des actions des sociétés Stéréoscopes Lestrade & Cⁱᵉ et Soditest.

Le même jour, comme convenu, entre le groupe Sponsor et le groupe Lestrade, la société Sponsor S.A. signa une promesse irrévocable d'achat au groupe Lestrade de 500 actions, soit la totalité des actions représentant l'apport de 80 actions de la société Soditest, ceci pour un prix global de 600 000 F. Il était prévu que le groupe Lestrade pourrait lever l'option entre le 1ᵉʳ octobre et 31 octobre 1985.

Par lettre du 2 octobre 1985, confirmée par exploit d'huissier du 25 octobre 1985, le groupe Lestrade leva l'option qui lui était ouverte par la promesse d'achat. Mais la société Sponsor S.A., en dépit de cette dernière mise en demeure du 16 novembre 1985, resta taisante.

Or, la promesse d'achat contenait la clause d'arbitrage suivante :

« Toute contestation relative à l'interprétation ou à l'exécution de la présente convention sera réglée par voie d'arbitrage dans les conditions suivantes :

« A défaut d'accord intervenant entre les parties dans un délai de 10 jours sur la désignation d'un arbitre unique, la partie la plus diligente notifie à l'autre partie, par lettre recommandée avec accusé de réception, le nom d'un premier arbitre.

« La première partie rappelle, en même temps, à la partie adverse l'objet

(1988)

du litige, énonce les questions à résoudre par le tribunal arbitral, et invite la partie adverse à lui faire connaître dans un délai de quinzaine le nom du second arbitre, avec toutes observations éventuelles.

« Faute par la seconde partie de notifier à la première partie le nom d'un second arbitre dans le susdit délai de quinzaine, la première partie peut, sur simple requête, faire désigner le second arbitre par Monsieur le Président du Tribunal de commerce de Tarbes. »

Le tribunal arbitral est alors complété par un arbitre choisi par les deux premiers arbitres dans les dix jours de la nomination du second arbitre soit, à défaut d'accord entre ces derniers, par le Président du Tribunal de commerce de Tarbes, sur requête de la partie la plus diligente.

Par lettre recommandée avec avis de réception du 28 novembre 1985, et télex du 2 décembre 1985, le Groupe Lestrade a proposé aux sociétés Sponsor S.A. et Sponsor A.B. de soumettre le différend à l'arbitrage d'un arbitre unique désigné par le Comité d'arbitrage de Toulouse.

Sponsor S.A., France n'a formulé aucune réponse dans le délai de 10 jours prévu au contrat, alors que, par télex du 3 décembre 1985, Sponsor A.B. répondait que Sponsor S.A. était le seul interlocuteur du groupe Lestrade.

Le groupe Lestrade, conformément à la clause d'arbitrage, désigna alors son arbitre et invita le groupe Sponsor à désigner un deuxième arbitre dans un délai de 15 jours. La Société Sponsor S.A. France ne répondit pas à cette invitation, Sponsor A.B. (Suède) fit savoir, par lettre du 9 janvier 1986, qu'elle ne s'estimait pas intéressée par la procédure.

Dans ces conditions, le groupe Lestrade a assigné Sponsor S.A. et Sponsor A.B. devant le Président du Tribunal de commerce de Tarbes, pour voir nommer un deuxième arbitre pour compléter le tribunal arbitral, comme prévu par la clause compromissoire contenue dans la promesse d'achat.

Par ordonnance de référé du 28 avril 1986, le Président du Tribunal de commerce de Tarbes, « en considération des positions sérieuses affirmées par le groupe Lestrade, fondées sur les documents et sur la procédure, a déclaré qu'il convenait de maintenir Sponsor A.B., dans la procédure d'arbitrage et de la renvoyer devant le tribunal arbitral ».

Il a désigné un second arbitre en la personne du Professeur Percerou, lequel avec le Professeur Goldman, déjà désigné par les conseils Lestrade, aura à constituer le tribunal arbitral sur la clause compromissoire.

Les prétentions des parties :

L'appel formulé par la société Sponsor A.B. ne porte pas sur la désignation des arbitres, mais sur la partie de l'ordonnance qui décide de maintenir (sic) dans la procédure d'arbitrage la société Sponsor A.B. et de la renvoyer avec les demandeurs devant le tribunal arbitral alors qu'elle n'est pas partie à la convention.

L'appelante souligne, ainsi que le reconnaissent les conseils Lestrade, que les actes sont passés entre eux et la société Sponsor S.A., société de droit français ayant son siège : 72, quai des Carrières à (94100) Charenton ; qu'en l'espèce, la société Sponsor A.B. est un tiers au regard de cette convention qui, pour elle, est « res inter alios acta » ; que la procédure de l'arbitrage est

(1988)

## 156

d'autant plus stricte qu'elle est dérogatoire au droit commun et que l'on ne saurait, sans empiéter sur le fond, décider d'y attraire un tiers.

Elle demande dès lors à la Cour de :

— dire et juger que l'arbitrage mis en œuvre par les consorts Lestrade n'est pas opposable à la société Sponsor A.B. ;

— débouter les consorts Lestrade de leur demande tendant à voir introduire Sponsor A.B. dans la procédure d'arbitrage ;

— condamner les consorts Lestrade au paiement d'une indemnité de 10/000 F sur le fondement de l'article 700 du nouveau Code de procédure civile ;

— les condamner aux dépens.

Les consorts Lestrade sollicitent au contraire le débouté de la société Sponsor A.B. (Suède) de tous ses moyens d'appel, et de confirmer la décision entreprise. Ils réclament 5 000 F sur le fondement de l'article 700 du nouveau Code de procédure civile.

LA COUR,

En droit, l'opposabilité de la clause compromissoire à Sponsor S.A. est incontestable, puisqu'elle a manifestement signé la promesse d'achat. Toute décision quant à l'opposabilité de cette clause à Sponsor A.B. dépend d'une analyse des relations des parties, et notamment de la question de savoir, compte tenu de l'existence du groupe Sponsor et des conditions dans lesquelles ont été menés les pourparlers entre les dirigeants de ce groupe et ceux du groupe Lestrade, puis conclu la promesse d'achat, Sponsor S.A. a signé la promesse d'achat en son nom propre ou en tant que simple instrument créé par Sponsor A.B. pour procéder à l'acquisition de deux sociétés du groupe Lestrade.

Or, il apparaît par l'exposé des faits, non contestés par l'appelante, que la société Sponsor S.A. n'a été créée par la société Sponsor A.B. que pour acquérir les sociétés du groupe Lestrade. Il apparaît également qu'elle a joué un rôle important dans la conclusion de la promesse d'achat, car elle n'est pas moindre en ce qui concerne sa non-exécution. Dès lors, la tierce partie s'il apparaît être l'âme, l'impératrice et pour tout dire, la tête pensante de la partie contractante.

Il est admis en droit « que la clause compromissoire expressément acceptée par certaines des sociétés du groupe doit lier les autres sociétés qui par le rôle qu'elles ont joué dans la conclusion, l'exécution ou la résiliation des contrats contenant lesdites clauses, apparaissent selon la commune volonté des toutes les parties à la procédure comme ayant été de véritables parties à ces contrats, ou comme étant concernées, au premier chef, par ceux-ci et par des litiges qui en ont pu en découler ».

En effet, un groupe de sociétés possède, en dépit de la personnalité juridique distincte appartenant à chacune de celles-ci, une réalité économique unique, dont les tribunaux doivent tenir compte, son existence étant reconnue par les usages du commerce international.

Dès lors, c'est à bon droit, et sans trancher le fond, qui est de la compétence du tribunal arbitral, seuls les juges arbitraux étant appelés à dire

(1988)

## 157

si la société mère doit être tenue par le contrat souscrit par la société Sponsor S.A., que le premier juge a maintenu la société Sponsor A.B. (Suède) en l'instance, en tant que partie concernée par le litige.

Le jugement mérite dès lors confirmation et il sera alloué aux consorts Lestrade la somme de 2 500 F sur le fondement de l'article 700 du nouveau Code de procédure civile.

PAR CES MOTIFS,

LA COUR,

Statuant publiquement, contradictoirement, en matière civile et en dernier ressort,

Confirme en toutes ses dispositions le jugement dont appel.

Y ajoutant,

Condamne la société Sponsor A.B. à verser aux consorts Lestrade la somme de 2 500 F sur le fondement de l'article 700 du nouveau Code de procédure civile.

La condamne aux dépens d'appel.

M. HÉBERT, prés. ; MM. BRENNER et PELLERROUX, cons. ; MM. MILLER et AMBLLHAUD, av.

NOTE. — Créée régulièrement en France par le groupe suédois Sponsor A.B. pour prendre le contrôle du groupe français Lestrade, la société Sponsor S.A. France, filiale holding de Sponsor A.B. Suède, avait acquis, le 14 septembre 1981, 80 % des actions des sociétés Stéréoscopes Lestrade et Cie et Sodilest, appartenant au groupe Lestrade.

Le même jour, comme convenu entre les deux groupes, la société Sponsor S.A. signait une promesse irrévocable d'achat du solde du capital de Stéréoscopes Lestrade et Cie et Sodilest, dont l'option pouvait être levée dans le courant du mois d'octobre 1985.

Le groupe Lestrade levait l'option dans le délai convenu mais la société Sponsor S.A. France restait taisante. La promesse d'achat contenant une clause compromissoire, le groupe Lestrade proposait à Sponsor S.A. France (filiale) et à Sponsor A.B. Suède (société-mère non signataire de la clause) de soumettre le différend à l'arbitrage.

La constitution du tribunal arbitral se heurtant au silence de Sponsor S.A., au désintérêt de Sponsor A.B., laquelle faisait connaître qu'elle ne s'estimait pas concernée par la procédure, le groupe Lestrade saisissait le Tribunal de commerce de Tarbes en vue de la nomination d'un deuxième arbitre pour compléter le tribunal arbitral, en application des dispositions de la clause compromissoire contenue dans la promesse d'achat.

(1988)

158    JURISPRUDENCE FRANÇAISE

Le 28 avril 1986, le Président du Tribunal de commerce de Tarbes rendait une ordonnance de référé déclarant qu'il convenait de « maintenir » Sponsor A.B. dans la procédure d'arbitrage et de la renvoyer devant le tribunal arbitral qu'il complétait en nommant un deuxième arbitre.

La société Sponsor A.B. Suède, prétendant être un tiers au regard de la convention passée entre le groupe Lestrade et Sponsor S.A. France, interjetait appel de l'ordonnance la « maintenant » dans la procédure d'arbitrage. Le 26 novembre 1986, la Cour d'appel de Pau confirmait le jugement du Tribunal de commerce.

On peut, en premier lieu, s'étonner que la Cour ait cru devoir dire qu'elles sociétés étaient liées par la clause compromissoire. En vertu du principe d'autonomie de la clause compromissoire, il appartient en effet à l'arbitre de statuer sur la validité et les limites de son investiture lorsque le principe ou l'étendue de son pouvoir juridictionnel est contesté par une des parties (art. 1466 N.C.P.C.). Tel était le cas en l'espèce puisque la société Sponsor A.B. Suède, société-mère, prétendait être un tiers par rapport à la convention litigieuse. Il semble qu'en conséquence le tribunal et la Cour auraient dû se limiter à la désignation du deuxième arbitre et laisser le tribunal arbitral, une fois constitué, statuer sur la portée de la clause compromissoire, la validité de celle-ci n'était pas, par ailleurs, discutée. La compétence de l'arbitre n'est vérifiée par le juge étatique qu'à l'occasion d'un recours contre la sentence ou d'une instance en exequatur.

La décision doit cependant être signalée dans la mesure où elle se fait l'écho d'une jurisprudence arbitrale remarquable. Elle reprend en effet textuellement l'un des motifs de la sentence rendue à Paris le 23 septembre 1982 dans l'affaire Dow Chemical Company (Rev. arb., 1984.115 et Paris, 21 octobre 1983, Rev. arb., 1984.98 et nos observations) et apporte ainsi sa contribution au débat concernant l'opposabilité d'une clause compromissoire, signée par une société d'un groupe, à une autre société de ce groupe, en l'espèce, la société-mère (voir sur ce dernier point : Y. Derains, arbitration et groupes de sociétés, Comité Français de D.I.P. Communication du 24 avril 1985. Travaux du Comité, années 1984-1985. Ed. du C.N.R.S., 1987 ; chronique des sentences arbitrales C.C.I. par Y. Derains et S. Jarvin, Clunet, 1986, sentence n° 4504, p. 118 et les réf.).

Sans doute, en l'absence d'une règle matérielle précise énoncée par la Cour de cassation, il apparaît maladroit de présenter comme « admis en droit », c'est-à-dire comme une certitude en droit positif, ce qui, pour l'instant, n'est encore qu'une orientation de la jurisprudence arbitrale, quand bien même sa réception par les tribunaux étatiques serait à encourager. La solution est en effet reconnue en droit interne et discutée en droit international. L'arrêt doit cepen-

JURISPRUDENCE FRANÇAISE    159

dant être signalé, précisément en raison de l'autorité qu'il attache à la motivation développée dans l'affaire Dow Chemical et qu'il reprend à son compte, non sans avoir pris la précaution, comme dans un ultime sursaut de prudence, d'utiliser les guillemets.

La Cour de Pau s'est donc fondée à la fois sur la recherche de la commune volonté des parties et sur les usages du commerce international.

I. — Les juges se sont tout d'abord attachés à analyser les relations des parties et en particulier à rechercher les conditions dans lesquelles les dirigeants des deux groupes Lestrade et Sponsor avaient mené les pourparlers puis conclu la promesse d'achat litigieuse. La question était en effet de savoir quel rôle avait joué Sponsor S.A., société de droit français ayant son siège social à Charenton : avait-elle signé en son nom propre et pour son propre compte ou pour celui de Sponsor A.B., société-mère dont elle n'aurait été que le « simple instrument » ?

L'analyse des éléments de fait du dossier permettait à la Cour de conclure que la société Sponsor A.B. n'était qu'un « tiers en apparence » et constituait en réalité l'âme, l'inspiratrice et pour tout dire la tête pensante » de Sponsor S.A.

Il est vrai que l'hésitation n'était guère permise, puisque Sponsor S.A. France avait été créée dans l'unique dessein d'acquérir deux sociétés du groupe Lestrade. Sans doute avait-elle une existence juridique autonome. Mais de création récente et orientée dès l'origine vers une prise de contrôle du groupe Lestrade, il ne pouvait être contesté qu'elle s'inscrivait dans une stratégie économique dont elle constituait un élément. La décision de rachat de deux sociétés du groupe Lestrade avait d'ailleurs été antérieurement prise à sa création.

Cela explique amplement le rôle joué par Sponsor A.B., société-mère, dans la conclusion de la promesse d'achat et sa non-exécution. On pouvait observer que la promesse se situait dans le prolongement des pourparlers engagés dès 1980 par le groupe Sponsor pour prendre le contrôle du groupe Lestrade. Les représentants du groupe Lestrade n'avaient-ils pas été amenés à négocier la vente des deux sociétés avec le Président du groupe Sponsor, la société Habbia S.A., laquelle s'était, semble-t-il, désintéressée de la suite des opérations ? C'est dire qu'entre la société-mère et ses filiales, il n'y avait pas d'incertitude pour situer le centre de décision effectif, au-delà de la matérialité des signatures et par voie de conséquence, la commune volonté des parties.

II. — Cette analyse de fait des relations des parties se trouve consolidée par une référence aux usages du commerce international, lesquels reconnaissent la notion de groupe de sociétés.

Certains ont attribué une valeur résiduelle à cet appel aux usages (Fadlallah, *op. cit.*, p. 110 s., *contra* : Goldman, *ibid.*, discussion p. 125). Il semble qu'au contraire, la recherche de la commune volonté des parties n'a de sens que parce qu'elle s'inscrit dans le contexte d'un groupe de sociétés, lequel ne peut être envisagé que si les usages du commerce international le permettent. La référence aux usages et aux groupes de sociétés qu'ils reconnaissent est donc, en bonne logique, préalable à la recherche de la commune volonté des sociétés concernées, à travers leur comportement effectif.

En l'espèce, les usages du commerce international sont appliqués directement par la Cour sans que celle-ci ait pu être appelée d'en justifier l'application immédiate. Il est toutefois possible de se demander si l'on n'assiste pas ici à l'émergence, en jurisprudence étatique, d'une nouvelle règle matérielle, propre à l'arbitrage international, laquelle permettrait de ne pas s'arrêter à la pluralité juridique du groupe de sociétés mais de prendre en considération la réalité économique unique de celui-ci. Encore faut-il savoir quand.

Il ne semble pas opportun de distinguer, en vertu d'une morale internationale qui serait d'ailleurs à préciser, selon la position procédurale de la société non signataire. Il n'existe pas en effet de raison majeure pour écarter *a priori* que la solution doit être différente selon que la société du groupe non signataire d'une clause est invoquée contre une société non signataire, ou à son profit. Dans le même ordre d'idée, on voit mal comment on pourrait distinguer selon que la société non signataire a la position de filiale ou de société-mère.

C'est au cas par cas qu'il convient de procéder et cette démarche est assurée à la jurisprudence arbitrale et à la jurisprudence étatique. Cela n'est toutefois pas incompatible avec une certaine prévisibilité des solutions.

En l'espèce, la Cour utilise le critère tiré de la sentence *Dow Chemical*, lequel présente deux dimensions : l'une objective, l'autre subjective. Objectivement, la recherche le rôle joué par Sponsor S.A., dans la conclusion de la promesse d'achat et dans sa non exécution. Subjectivement, elle détermine la commune volonté des parties qui s'exprime par les éléments objectifs ci-dessus réputés. Elle arrive ainsi à conclure que c'est à bon droit que le premier juge « a maintenu la société Sponsor A.B. Suède en l'instance en tant que partie concernée par le litige ».

Une distinction semble ainsi être opérée entre les parties à la procédure et les parties au contrat, une partie à la procédure pouvant ne pas être une partie *stricto sensu* au contrat mais « concernée au premier chef par celui-ci et par les litiges qui peuvent en découler ».

Il convient enfin d'observer que, recherchant si Sponsor S.A. avait signé la promesse d'achat « en son nom propre ou en tant que

(1988)

simple instrument de Sponsor A.B., la Cour semble avoir été conduite à rechercher les éléments d'une représentation de la seconde par la première, en plus de sa qualité de partie qui n'était pas discutée.

L'argument de la représentation, parfois invoqué (sentence C.C.I. 1434, *Clunet*, 1976, p. 978) pour étendre à une société-mère l'effet d'une clause compromissoire signée par sa filiale, doit toutefois être manié avec précaution en raison de sa réversibilité. Il n'est pas exclu en effet que lorsqu'elle intervient dans la négociation, l'exécution d'un contrat, la société-mère puisse être considérée par l'arbitre ou le juge comme agissant au nom et pour le compte de sa filiale et qu'en conséquence, elle soit écartée de la procédure arbitrale en application du droit commun de la représentation (en ce sens, la sentence C.C.I. n° 4504, *Clunet*, 1986.1118 s. et sp. p. 1121-1124. Dans cette espèce, la société-mère était intervenue dans la négociation et l'exécution du contrat, mais au nom et pour le compte de sa filiale, qui était seule et directement intéressée. Il a, en conséquence, été décidé que la société-mère ne pouvait être considérée comme une partie).

Tout est donc, une fois de plus, question d'espèce. Il convient toutefois de remarquer qu'une telle recherche n'est rendue possible que par la prise en considération de la notion de groupe de sociétés. Au-delà des vices de compétence qui justifient la prise que par la considération de la notion de groupe de sociétés. Au-delà des vices de compétence qui affectent la décision, l'intérêt de l'arrêt commenté — qui fait actuellement l'objet d'un pourvoi — est de le rappeler opportunément, indépendamment des vices de compétence qui affectent la décision.

André CHAPELLE.

(1988)

I swear that I am a fluent speaker of the French language and that the above translation of the decision of the Pau Court of Appeal, dated November 26, 1986, is true and correct in every respect, to the best of my knowledge.

Signed on the 22nd of February 2007.

Elizabeth Lefebvre-Gross, Esq.

Member of the New York bar

White & Case LLP

1155 Avenue of the Americas

New York, New York 10036

212-819-8200

# PARIS COURT OF APPEAL (1st Ch. urg.)

## November 30, 1988

### Korsnas Marma v. Durand-Auzias

The Court,

By an agreement dated March 3, 1951, the Swedish company Marma-Langrors granted to another Swedish company, Barkman -- of which it was a subsidiary -- the exclusive right to represent its products.

A contract dated September 6, 1960 documented the transfer by Barkman of its participation in Marma Langrors to Korsnas, which then became Korsnas Marma, while confirming the representation of its entire production of wood and cellulose by Barkman, with the specification that sales in France would be transferred to the French subsidiary of Barkman, Durand-Auzias, organized under French law and with its head office in Paris.

Under the terms of an agreement dated March 12 and 15, 1984, Korsna Barkman decided to terminate the agreements of 1951 and 1960, making it clear, however, that this would not infringe the business relationship existing between Korsnas Marma and Durand-Auzias.

By letter dated November 27, 1985, Korsnas Marma informed Durand-Auzias that it was terminating all relations as a result of changes that had taken place in the management of the French company.

Durand-Auzias then brought suit against Korsnas Marma in the Paris Commercial Court to obtain compensation for this termination, which it termed abusive, and the Court, ruling in its judgment of April 27, 1988, declared that it had jurisdiction to rule on the case and rejected Korsnas Marma's argument that the Court lacked jurisdiction because the arbitration clauses included in the 1951 and 1960 agreements cited above designated the Swedish arbitration body.

In thus ruling, the Tribunal considered that the arbitration clause was not enforceable against the French company Durand-Auzias, a distinct and autonomous legal entity, for the essential reasons that:

- the agreements of 1951 and 1960 were expressly terminated in 1984, and from that moment the arbitration clauses were no longer applicable;

- the relationship that later subsisted between Durand-Auzias and Korsnas Marma, independent of Barkman, was recognized as an unwritten mandate of shared interests, and it was not proven that Durand-Auzias was aware of and had accepted the agreements concluded between Korsnas Marma and Barkman;

- Barkman could not bind Durand-Auzias, since the Chairman of this company possessed a significant minority holding, with 30% of the shares;

- Article 1119 of the French Civil Code was applicable, as Barkman alone made the commitment and could only stipulate on its own behalf;

- the termination had been notified by court bailiff on behalf of Korsnas Marma, not to Barkman in Sweden, but to Durand-Auzias in Paris;

- finally, the arbitration clause was not enforceable against Durand-Auzias, which was entitled to rely on the provisions of Article 46 of the New Code of Civil Procedure, which grants jurisdiction to the Paris courts as the place of execution of the contract.

Korsnas Marma appealed this judgment, requesting the Court to hold that the arbitration clause was enforceable against Durand-Auzias and to declare that the Paris Commercial Court did not have jurisdiction, as opposed to the arbitrators of the Swedish arbitration body designated by the arbitration clause.

Secondarily, the Court was requested – as it was stated that Swedish law was applicable to the merits – to declare that the Paris Commercial Court did not have territorial jurisdiction, as Durand-Auzias had waived the privileges of jurisdiction of Article 14 of the Civil Code in favor of the Swedish arbitration body or, alternatively, the Swedish court in the place of the defendant's head office.

Durand-Auzias argued for the judgment to be confirmed and for the Court to find that the Paris Commercial Court had jurisdiction and that French law was applicable because:

- the arbitration clause could not be enforced against Durand-Auzias, which had neither signed it nor tacitly accepted it, since such clauses are strictly interpreted and, in the present instance, on the contrary, the parties had intended to exclude Durand-Auzias, as was demonstrated by the fact that Korsnas Marma had used French procedures to inform Durand-Auzias in Paris of the termination and not Barkman in Sweden;

-- finally, the Paris Commercial Court had jurisdiction on the grounds of Article 14 of the Civil Code, which Durand-Auzias had not waived, neither on account of the existence of an arbitration clause nor on account of the applicability of Swedish law to the contract – which was formally contested, since the elements of localization of the contract implied its connection to French law, notwithstanding an erroneous translation of the contract provided by the adverse party.

Thus,

The arbitration clause invoked by Korsnas Marma is contained in the two agreements of March 31, 1951 and September 6, 1960, by which Korsnas Marma granted Barkman the exclusive representation of its products, this representation being granted, as concerns France, to Durand-Auzias, referred to in the second agreement as the "Paris office" of Barkman.

The agreement of March 12 and 15, 1984, by which the parties agreed to terminate their agreement expressly excluded from this termination the "business relationships" between Korsnas Marma and Durand-Auzias.

It emerges from these successive agreements that:

- Durand-Auzias had the role of ensuring the representation in France of Marma products as the "Paris office" of Barkman – *i.e.*, of acting on behalf of Barkman, without economic autonomy.

2

- the preservation, in 1984, of the "business relationship" of Marma with this French office of Barkman shows that earlier agreements concluded between Marma and Barkman to represent Marma products, in particular in France, were maintained with regard to Durand-Auzias.

An arbitration clause contained in an international contract has its own validity and effectiveness, which require that the clause be extended to parties directly involved in the performance of the contract and the disputes that arise out of it, once it has been established that their situation and their activities create the presumption that they were aware of the existence and scope of the arbitration clause, although they did not sign the contract containing it.

Such is the case in the present instance concerning the French company Durand-Auzias, because:

- on the one hand, this company holds its right to represent Marma products based on the agreements concluded between its parent company, Barkman, and Korsnas Marma, and it could only exercise and continue its activity on the basis of these agreements;

- on the other hand, its role as subsidiary of Barkman and its position as the "Paris office" of this company lead to the assumption that, in acting on behalf of Barkman, it was aware of the arbitration clause as it was aware of the other clauses of the contract that it was charged with executing in France.

Under these conditions, Korsnas Marma justly invokes the arbitration clause contained in the agreements of March 31, 1951 and September 6, 1960 against Durand-Auzias which is considered, as a result, to have waived the privilege of jurisdiction of Article 14 of the French Civil Code.

Finally, the question of the law applicable to the merits is separate from that of the international jurisdiction of the French court in which suit was brought, which is the sole subject of the present appeal.

On these grounds,

The Court admits the appeal of Korsnas Marma.

The Court invalidates the judgment.

The Court holds that the Paris Commercial Court does not have jurisdiction.

The Court refers the parties to plead before the arbitration body designated in the arbitration clause in this matter.

The Court hold that there are no grounds in this matter to apply Article 700 of the New Code of Civil Procedure.

The Court orders Durand-Auzias to pay the costs of the present appeal.

Mr. Ancel, President; Mr. Gautiet and Mr. Hannoun, judges; Mr. Bernard-Catat, prosecutor; Mr. Jalenques and Mr. Lassus, attorneys.

3

**COUR D'APPEL DE PARIS (1re Ch. urg.)**

*30 novembre 1988*

**Société Korsnas Marma c/ société Durand-Auzias**

---

**COUR D'APPEL DE PARIS (1re Ch. suppl.)**

*14 février 1989*

**Société Ofer Brothers c/ The Tokyo Marine
and Fire Insurance Co ltd et autres**

---

CLAUSE COMPROMISSOIRE. — EFFET. — PARTIES. — 1°). GROUPE DE SOCIÉTÉS.
— SOCIÉTÉ MANDANTE SIGNATAIRE. — SOCIÉTÉ FILIALE MANDATAIRE ET
NON SIGNATAIRE, MAIS AYANT PARTICIPÉ À L'EXÉCUTION DE LA CONVENTION
CONTENANT LA CLAUSE. — SOCIÉTÉ FILIALE AGISSANT POUR LE COMPTE DE
LA SOCIÉTÉ MÈRE SIGNATAIRE. — PRÉSOMPTION DE CONNAISSANCE DE LA
CLAUSE. — 2°). TRANSPORT MARITIME. — FRÉTEUR NON SIGNATAIRE DE LA
CHARTE-PARTIE CONTENANT LA CLAUSE COMPROMISSOIRE. — CONDITIONS
POUR ÊTRE LIÉ PAR LA CLAUSE. — PARTIE DIRECTEMENT IMPLIQUÉE DANS
L'EXÉCUTION DU CONTRAT. — PRÉSOMPTION DE CONNAISSANCE DE LA
CLAUSE.

ARBITRAGE INTERNATIONAL. — CLAUSE COMPROMISSOIRE. — EFFICACITÉ PRO-
PRE. — APPLICATION À UNE PARTIE NON SIGNATAIRE, MAIS DIRECTEMENT
IMPLIQUÉE DANS L'EXÉCUTION DU CONTRAT. — PRÉSOMPTION DE CONNAIS-
SANCE DE LA CLAUSE.

SOCIÉTÉ. — GROUPE DE SOCIÉTÉS. — APPLICATION D'UNE CLAUSE COMPROMIS-
SOIRE À UNE SOCIÉTÉ FILIALE DU GROUPE, NON SIGNATAIRE. — CONDI-
TIONS. — PARTICIPATION À L'EXÉCUTION DE LA CONVENTION CONTENANT
LA CLAUSE. — AGISSEMENT EN TANT QUE REPRÉSENTANTE DE LA SOCIÉTÉ
SIGNATAIRE. — PRÉSOMPTION DE CONNAISSANCE DE LA CLAUSE.

*La clause compromissoire insérée dans un contrat international a une validité
et une efficacité propres qui commandent d'en étendre l'application aux parties
directement impliquées dans l'exécution du contrat et dans les litiges qui
peuvent en résulter, dès lors qu'il est établi que leur situation et leurs activités
font présumer qu'elles ont eu connaissance de l'existence et de la portée de la
clause d'arbitrage, bien qu'elles n'aient pas été signataires du contrat la
stipulant (1re et 2e espèces).*

(1989)

692                          JURISPRUDENCE FRANÇAISE

PREMIER ARRÊT (Paris, 1re Ch. urg., 30 novembre 1988)

LA COUR,

Par convention du 3 mars 1951, la société suédoise Marma-Langrors a
donné à une autre société suédoise, la société Barkman — dont elle était la
filiale — la représentation exclusive de ses produits ;

Un contrat du 6 septembre 1960 a pris acte de la cession par la société
Barkman à une société Korsnas — devenue ensuite Korsnas Marma — de sa
participation dans la société Marma Langrors, en confirmant la représentation
de toute sa production de bois et cellulose par la société Barkman, étant
précisé que les ventes en France seraient transférées à la filiale française de
la société Barkman, la société de droit français Durand-Auzias, ayant son
siège à Paris ;

Aux termes d'un accord des 12 et 15 mars 1984, les sociétés Korsnas
Marma et Barkman ont décidé de mettre fin aux conventions de 1951 et
1960, étant toutefois précisé qu'il n'était pas porté atteinte aux relations
d'affaires existant entre Korsnas Marma et Durand-Auzias ;

Par lettre du 27 novembre 1985, la société Korsnas Marma a notifié à la
société Durand-Auzias la cessation de toute relation à la suite de change-
ments intervenus dans la direction de la société française ;

La société Durand-Auzias a alors fait assigner la société Korsnas Marma
devant le Tribunal de commerce de Paris pour obtenir l'indemnisation de
cette rupture, qualifiée d'abusive, et le Tribunal, statuant par jugement du
27 avril 1988, s'est déclaré compétent pour connaître de cette demande, en
rejetant l'exception d'incompétence invoquée par la société Korsnas Marma
au profit de la juridiction arbitrale suédoise désignée dans les clauses compro-
missoires stipulées dans les conventions précitées de 1951 et de 1960 ;

Pour se déterminer ainsi, le Tribunal a considéré que la clause d'arbitrage
n'était pas opposable à la société française Durand-Auzias, entité juridique
distincte et autonome, aux motifs essentiels :

— que les conventions de 1951 et 1960 avaient été expressément résiliées
en 1984, et que dès lors les clauses d'arbitrage n'étaient plus applicables ;

— que les relations ayant ensuite subsisté entre Durand-Auzias et Korsnas
Marma, indépendamment de Barkman, s'analysaient en un mandat d'intérêt
commun sans écrit, et qu'il n'était pas prouvé que Durand-Auzias ait connu
et accepté les conventions passées entre Korsnas Marma et Barkman ;

— que Barkman ne pouvait s'engager pour le compte de Durand-Auzias
alors que le Président de cette dernière société disposait, avec 30 % des
actions, d'une minorité significative ;

— qu'était applicable l'article 1119 du Code civil français, la société Bark-
man s'étant engagée seule et n'ayant pu stipuler que pour elle-même ;

— que la rupture avait été signifiée par huissier de justice par Korsnas
Marma, non à Barkman en Suède, mais à Durand-Auzias à Paris ;

— qu'enfin, la clause d'arbitrage ne pouvant être retenue à l'encontre de
Durand-Auzias, cette société était fondée à se prévaloir des dispositions de

(1989)

l'article 46 du nouveau Code de procédure civile donnant compétence à la juridiction parisienne du lieu d'exécution du contrat ;

La société Korsnas Marma a formé contredit à ce jugement, pour demander à la Cour de dire la clause compromissoire opposable à la société Durand-Auzias et déclarer le Tribunal de commerce de Paris incompétent au profit des arbitres du tribunal arbitral suédois désigné dans la clause d'arbitrage ;

Subsidiairement, il est demandé à la Cour — étant constaté que la loi suédoise est applicable au fond — de déclarer le Tribunal de commerce de Paris incompétent territorialement, Durand-Auzias ayant renoncé au privilège de juridiction de l'article 14 du Code civil, au profit du tribunal arbitral suédois, ou, à titre subsidiaire, de la juridiction suédoise du lieu du siège social du défendeur ;

La société Durand-Auzias a conclu à la confirmation du jugement, la Cour devant déclarer compétent le Tribunal de commerce de Paris et applicable la loi française aux motifs :

— que la clause compromissoire ne peut être opposée à la société Durand-Auzias, qui ne l'a pas signée, ni accepté tacitement, alors que de telles clauses sont d'interprétation stricte et qu'en l'espèce, au contraire, les parties avaient entendu en exclure la société Durand-Auzias, ainsi qu'en témoigne le fait que la société Korsnas Marma a employé les formes françaises pour signifier la rupture à Durand-Auzias à Paris, et non à Barkman en Suède ;

— qu'enfin le Tribunal de commerce de Paris est compétent en vertu de l'article 14 du Code civil, auquel Durand-Auzias n'a pas renoncé, ni du fait de l'existence d'une clause d'arbitrage, ni du fait de l'applicabilité au contrat de la loi suédoise, formellement contestée, dès lors que les éléments de localisation du contrat impliquaient son rattachement à la loi française, sans avoir égard à une traduction erronée du contrat donnée par la partie adverse ;

SUR CE :

Considérant que la clause d'arbitrage invoquée par la société Korsnas Marma est contenue dans les deux contrats des 31 mars 1951 et 6 septembre 1960 par lesquels la société Korsnas Marma a confié à la société Barkman la représentation exclusive de ses produits, cette représentation étant confiée, en ce qui concernait la France, à la société Durand-Auzias, qualifiée dans la seconde convention de « bureaux parisiens » de la société Barkman ;

Considérant que l'accord des 12 et 15 mars 1984 par lequel les parties sont convenues de mettre un terme à leur convention a expressément exclu de cette résiliation les « relations d'affaires » entre les sociétés Korsnas Marma et Durand-Auzias ;

Considérant qu'il résulte de ces conventions successives :

— que la société Durand-Auzias avait qualité pour assurer la représentation en France des produits Marma, en tant que « bureau parisien » de la société Barkman, c'est-à-dire agissant pour le compte de Barkman, sans autonomie économique ;

— que le maintien, en 1984, des « relations d'affaires » de Marma avec cette « agence française de la société Barkman signifie qu'à l'égard de la société Durand-Auzias étaient maintenues les conventions autrefois stipulées

(1989)

694
JURISPRUDENCE FRANÇAISE

entre Marma et Barkman pour la représentation des produits Marma, en France notamment ;

Considérant que la clause compromissoire insérée dans un contrat international a une validité et une efficacité propres qui commandent d'en étendre l'application aux parties directement impliquées dans l'exécution du contrat et dans les litiges qui peuvent en résulter, dès lors qu'il est établi que leur situation et leurs activités font présumer qu'elles ont eu connaissance de l'existence et de la portée de la clause d'arbitrage, bien qu'elles n'aient pas été signataires du contrat la stipulant ;

Considérant qu'il en est ainsi en l'espèce de la société française Durand-Auzias car :

— d'une part, cette société tient son droit de représentation des produits Marma des conventions conclues entre sa société mère Barkman et la société Korsnas Marma, et elle n'a pu exercer et poursuivre son activité qu'en exécution de ces conventions ;

— d'autre part, sa qualité de filiale de la société Barkman et sa situation de « bureau parisien » de cette société font présumer qu'agissant pour le compte de la société Barkman, elle avait connaissance de la clause compromissoire comme des autres conditions du contrat dont elle assurait l'exécution en France ;

Considérant que dans ces conditions, c'est à bon droit que la société Korsnas Marma invoque la clause d'arbitrage contenue dans les conventions des 31 mars 1951 et 6 septembre 1960 à l'égard de la société Durand-Auzias qui est réputée, de ce fait, avoir renoncé au privilège de juridiction de l'article 14 du Code civil français ;

Considérant, enfin, que la question de la loi applicable au fond est distincte de celle de la compétence internationale de la juridiction française saisie, seul objet du présent contredit ;

PAR CES MOTIFS,

Reçoit la société Korsnas Marma en son contredit ;

Infirme le jugement ;

Dit que le Tribunal de commerce de Paris n'est pas compétent ;

Renvoie les parties à se pourvoir devant la juridiction arbitrale désignée dans la clause compromissoire applicable en la cause ;

Dit n'y avoir lieu, en la cause, à application de l'article 700 du nouveau Code de procédure civile ;

Condamne la société Durand-Auzias aux dépens du présent contredit ;

M. ANCEL, prés. ; Mmes GAUTIER et HANNOUN, cons. ; BERNARD-CATAT, av. gén. ; Mes JALENQUES et LASSUS, av.

(1989)

694                                    JURISPRUDENCE FRANÇAISE

entre Marma et Barkman pour la représentation des produits Marma, en
France notamment :

Considérant que la clause compromissoire insérée dans un contrat interna-
tional a une validité et une efficacité propres qui commandent d'en étendre
l'application aux parties directement impliquées dans l'exécution du contrat et
dans les litiges qui peuvent en résulter, dès lors qu'il est établi que leur
situation et leurs activités font présumer qu'elles ont eu connaissance de
l'existence et de la portée de la clause d'arbitrage, bien qu'elles n'aient pas
été signataires du contrat la stipulant ;

Considérant qu'il en est ainsi en l'espèce de la société française Durand-
Auzias car :

— d'une part, cette société tient son droit de représentation des produits
Marma des conventions conclues entre sa société mère Barkman et la société
Korsnas Marma, et elle n'a pu exercer et poursuivre son activité qu'en
exécution de ces conventions ;

— d'autre part, sa qualité de filiale de la société Barkman et sa situation
de « bureau parisien » de cette société font présumer qu'agissant pour le
compte de la société Barkman, elle avait connaissance de la clause compro-
missoire comme des autres conditions du contrat dont elle assurait l'exécution
en France ;

Considérant que dans ces conditions, c'est à bon droit que la société
Korsnas Marma invoque la clause d'arbitrage contenue dans les conventions
des 31 mars 1951 et 6 septembre 1960 à l'égard de la société Durand-Auzias
qui est réputée, de ce fait, avoir renoncé au privilège de juridiction de
l'article 14 du Code civil français ;

Considérant, enfin, que la question de la loi applicable au fond est
distincte de celle de la compétence internationale de la juridiction française
saisie, seul objet du présent contredit ;

PAR CES MOTIFS,

Reçoit la société Korsnas Marma en son contredit ;

Infirme le jugement ;

Dit que le Tribunal de commerce de Paris n'est pas compétent ;

Renvoie les parties à se pourvoir devant la juridiction arbitrale désignée
dans la clause compromissoire applicable en la cause ;

Dit n'y avoir lieu, en la cause, à application de l'article 700 du nouveau
Code de procédure civile ;

Condamne la société Durand-Auzias aux dépens du présent contredit ;

M. ANCEL, prés. ; M<sup>me</sup> GAUTRET et HANNOUN, cons. ; BERNARD-CATAT,
av. gén. ; M<sup>es</sup> JALENOUES et LASSUS, av.

I swear that I am a fluent speaker of the French language and that the above translation of the decision of the Paris Court of Appeal, dated November 30, 1988, is true and correct in every respect, to the best of my knowledge.


Signed on the 22nd of February 2007.



Elizabeth Lefebvre-Gross, Esq.

Member of the New York bar


White & Case LLP

1155 Avenue of the Americas

New York, New York 10036

212-819-8200

Paris Court of Appeal (1st Ch. Supp.)

October 31, 1989

Kis France *et al.* v. Société Générale *et al.*

Kis France, a manufacturer of a new apparatus for rapid developing and printing of photographs (a mini-laboratory) put in place with Société Générale a system allowing this apparatus to be marketed in various countries, including the United States, through leasing and through the intermediary of their respective local subsidiaries.

For this, various agreements were concluded:

-- an agreement dated May 6, 1983 (referred to as the "framework"), concluded between Kis France and Société Générale, which declared that they were acting both in their name and on behalf of their subsidiaries, which agreement defined the financing terms for leasing the equipment put at the disposal of the users locally;

-- agreements referred to as "local," concluded between the local subsidiaries of Société Générale and Kis France for application in the specific context of the framework agreement of May 6, 1983, and, more specifically, for the United States, an agreement dated July 18, 1983 between Sogelease Corporation, the leasing subsidiary of Société Générale, and Kis California – which became Kis Corporation – the subsidiary of Kis; this contract was followed on July 1, 1985 by two other contractual documents – first, an amendment to the contract of May 6, 1983 signed by Société Générale, acting on its own behalf and on behalf of its subsidiary, and by Kis France, acting similarly, and, second, a contract concluded between Société Générale, acting similarly, and Kis Photo Industrie, acting on its own behalf and on behalf of its subsidiary Kis US (referred to as the Grenoble agreements).

Following difficulties resulting from increasing unpaid leasing fees beginning in 1985, Société Générale – after various court proceedings – terminated the agreements and then filed a claim with the Court of Arbitration of the International Chamber of Commerce (ICC), referring to the arbitration clause designating this organization in the framework agreement of May 6, 1983, which clause was referred to by a stipulation to the same effect inserted in the agreements of July 18, 1983 and July 1, 1985.

Thus, Société Générale and its two subsidiaries (Sogelease Pacifique and Sogelease Corporation) requested the tribunal to order Kis France and Kis Photo Industrie, jointly, to pay Société Générale the sums that Kis Corporation owed to Sogelease Corporation under the aforementioned agreements.

As Kis France and Kis Photo Industrie challenged the admissibility of Société Générale's request, contesting Société Générale's authority to demand the settlement of debts contracted by its [*sic*] subsidiary in the United States with the subsidiary of Société Générale, the arbitral tribunal, composed of three arbitrators, rendered a partial award on January 27, 1989 in which the arbitrators:

-- held that the requests of Société Générale and its subsidiaries were admissible against Kis France and Kis Photo Industrie;

-- held that Kis France and Kis Photo Industrie were jointly liable to the claimant companies for the sums for which such companies might be recognized as being owed;

-- held that a separate ruling would be made upon ordering an investigation in order to determine the accounts between the parties.

In thus ruling, the arbitral tribunal essentially retained from the analysis of the agreements that there exist two groups of companies and that the completion of a single economic operation within a contractual whole closely links the subsidiaries of the two contractual parties.

*

*  *

Kis France and Kis Photo Industrie filed an action to annul this judgment based on the provisions of Article 1502, paragraphs 1, 3 and 4, contending that the arbitral tribunal:

-- misapprehended the subject matter of the dispute and decided in the absence of an arbitration agreement;

-- breached the terms of reference in ruling out the application of French law on the merits;

-- misjudged its obligation to respond to the arguments made and to state the reasons upon which the award is based;

Consequently, the Court was requested to annul the award and to order Société Générale and its subsidiaries to pay Kis France and Kis Photo Industrie "an amount equal to the sums paid by them to the ICC and the appointed expert," in addition to 100,000 Francs on the basis of Article 700 of the New Code of Civil Procedure.

Société Générale and its subsidiaries filed an action requesting that the Court:

-- determine that Kis France and Kis Photo Industrie did not challenge, before the arbitrators, their jurisdiction concerning the subject of the dispute and even formally acknowledged this jurisdiction, such that the first argument is inadmissible and in any case without grounds;

-- state that the arbitrators observed the terms of reference in referring to the concept of a group of companies, which is not criticized by French law and which is recognized in international business practice, which practice is referred to by Article 1496 of the New Code of Civil Procedure and Article 13-15 of the Rules of the Court of Arbitration of the ICC;

-- state that the arbitrators responded to the argument of inadmissibility that was raised by Kis France and Kis Photo Industrie and that they thus justified their decision;

-- consequently, to reject the appeal and to order Kis France and Kis Photo Industrie to pay them 100,000 Francs under Article 700 of the New Code of Civil Procedure.

The Court,

First Grounds of Appeal (Art. 1502(1))

Claimants contend that the arbitrators misapprehended the subject matter of the dispute and decided in the absence of an arbitration agreement, thereby exceeding the limits of the jurisdictional powers granted to them by the agreement of the parties, by deciding the dispute between Société Générale, on the one hand, and KIS France and KIS Photo Industrie, on the other. According to the claimants, this dispute concerned the execution of local agreements to which Société Générale was not a party, and the arbitration clauses in the basic agreement and the local agreements allowed Société Générale to act in such cases only on behalf of its local subsidiaries. Claimants also contend that the arbitrators failed to decide the dispute which they were competent to hear, relative to the "comfort" clause of the contract dated May 6, 1983.

During the arbitral proceedings, KIS France and KIS Photo did not contest the arbitrators' jurisdiction. They contested the admissibility of the claim filed by Société Générale in its own name against KIS France and KIS Photo Industrie, contending that Société Générale could not claim the amounts allegedly owed to the foreign subsidiary by the subsidiaries of KIS France.

KIS France and KIS Photo Industrie allege that the arbitrators exceeded their powers under the arbitration clause contained in the basic agreement of May 6, 1983 and in the local agreement. Art. VIII of the basic agreement grants the arbitrators power to decide "any dispute concerning the interpretation and performance of this agreement which may arise between the parties" (i.e., Société Générale and KIS France). The local agreement, concluded by the respective subsidiaries of Société Générale and KIS France, refers to this arbitration clause. We infer from this reference that the arbitrators may decide the disputes concerning the performance of both the basic and the local agreement, but only upon request of the two parent companies. The position of the subsidiaries in this sense is totally subordinate.

In granting the claim filed by Société Générale and its subsidiaries against KIS France and KIS Photo Industrie, the arbitrators examined the agreements between the parties and held that the parties' mutual obligations were inexorably linked and that the two parent companies played a dominant role vis-à-vis their subsidiaries, which were bound to abide by the parents' commercial and financial decisions. KIS France agreed in the basic agreement (Art. VII) that it would take all necessary measures to ensure that its foreign subsidiaries fulfill their obligations with respect to the local leasing subsidiaries of the Société Générale group under the present agreement and the local agreements to follow. In the contract of July 1, 1985 it was stipulated that "the KIS group" would take all necessary measures to ensure that KIS Photo Industrie and KIS US fulfill their obligations to the banks under the present agreement.

The arbitrators inferred from the contractual relationships between the two groups of companies that there was a common intention of the parties to consider KIS France and KIS Photo Industrie directly liable for any amounts owed by them or their subsidiary KIS Corporation. Hence, the arbitrators deemed that the claim filed by Société Générale and its subsidiaries was admissible.

Consequently, the arbitrators decided the dispute between the parties concerning the scope of KIS France's obligations and correctly applied the arbitration clauses giving them the meaning them the parties intended to give them – considering that the dispute concerned the performance of both the basic and the local agreement.

3

The arbitrators, therefore, respected the arbitration clause defining their jurisdictional powers, and this grounds of appeal is rejected as without merit.

II. Second Grounds of Appeal (Art. 1502(3))

KIS France and KIS Photo Industrie contend that the arbitrators breached the terms of reference, which prescribed the application of French law to the dispute, by referring to the usages of international commerce in order to sustain the notion of a group of companies, on which they based their holding that KIS France and KIS Photo Industrie were liable vis-à-vis Société Générale for KIS Corporation's debts to Sogelease Corporation.

The agreement of the parties provides for the application of French law by the arbitrators. Since this is an international arbitration, Art. 1496 of the New Code of Civil Procedure requires that, even if the parties, as in the present case, have determined the applicable law, the arbitrators must take into account the usages of commerce. This norm is repeated in the ICC Rules, which apply to the present arbitration. Hence, by referring to international trade usages in order to apply the notion of a group of companies to the case at issue, the arbitrators did not violate the terms of reference.

Furthermore, the notion of group of companies, i.e., formally independent companies linked as one economic unit subject to a single authority, is recognized under French domestic law (see especially Law no. 82,915 of October 28, 1982 – Art. L. 439(1) et seq. of the Labor Code). Law no. 82,915 provides for an administrative body (called the group committee) to be established in such groups of companies, i.e., a dominant parent company and its subsidiaries belonging to the same economic unit.

Hence, the contention that the arbitrators breached their obligation to decide according to French law is unfounded. The arbitrators did not rely only on the notion of a group of companies in order to recognize the obligation of KIS France and KIS Photo Industrie with respect to Société Générale. The arbitrators' main consideration was that the parties intended by their agreements to carry out a single economic operation by establishing a contractual whole, in which the subsidiaries would be very dependent on the parent companies, which retained the decision-making power. Hence, this contention must be rejected.

III    Third Grounds of Appeal (Art. 1502(3) and (4))

Lastly, it is alleged that the arbitrators neglected their obligation to deal with the objections raised and to give reasons for their award. The arbitrators allegedly refused to examine the arbitration clauses and the guaranty clauses contained in the agreements of May 6, 1983 and July 1, 1985.

However, as we stated with respect to the first ground for appeal, the arbitrators held the claim admissible, decided the dispute on the scope of the obligations of KIS France and KIS Photo Industrie and held that, under French law, this being a commercial dispute, KIS France and KIS Photo Industrie were jointly and severally liable. They did so on the basis of the assessment that they allegedly failed to make. The award's holdings are consistent with the reasons given. Hence, this objection must be rejected.

**On these Grounds:**

The court rejects the appeal to for annulment.

4

The court states that there are no grounds to apply Article 700 of the New Code of Civil Procedure.

Mr. J.P. Ancel, president; Mr. S. Gautier, Mr. M.P. Brissier, judges, Ms. Bernard-Catat, substitute, Mr. J.F. Prat, Mr. B. Morreau, attorneys

JURISPRUDENCE FRANÇAISE

## COUR D'APPEL DE PARIS (1re Ch. suppl.)

### 31 octobre 1989

**Société Kis France et autres c/ Société Générale et autres**

ARBITRAGE INTERNATIONAL. — Groupe de sociétés. — Groupe de contrats. — DOMAINE DE LA CLAUSE COMPROMISSOIRE. — APPLICATION AUX SOCIÉTÉS DU GROUPE. — APPLICATION DU DROIT FRANÇAIS. — RÉFÉRENCE AUX USAGES.

CLAUSE COMPROMISSOIRE. — Groupe de contrats. — Groupe de sociétés. — INTERPRÉTATION DE LA CLAUSE. — IMBRICATION DES OBLIGATIONS DES PARTIES. — EXTENSION DES FILIALES PAR LES SOCIÉTÉS-MÈRES. — APPLICATION DE LA CLAUSE À L'EXÉCUTION DU CONTRAT-CADRE ET DES CONVENTIONS D'APPLICATION.

SOCIÉTÉS. — Groupe de sociétés. — ARBITRAGE INTERNATIONAL. — DROIT FRANÇAIS APPLICABLE. — RÉFÉRENCE À LA NOTION DE GROUPE DE SOCIÉTÉS PAR LES ARBITRES. — LIEN AVEC LES USAGES DU COMMERCE INTERNATIONAL. — RESPECT DE LEUR MISSION PAR LES ARBITRES.

USAGES. — USAGES DU COMMERCE INTERNATIONAL. — RÉFÉRENCE À LA NOTION DE GROUPE DE SOCIÉTÉS. — DROIT FRANÇAIS APPLICABLE. — RESPECT DE LEUR MISSION PAR LES ARBITRES.

*Ont à juste titre retenu leur compétence, les arbitres qui, interprétant les rapports contractuels créés entre deux groupes de sociétés, ont considéré que le litige à eux soumis était relatif à l'exécution tant du contrat-cadre que de la convention locale.*

*En se référant aux usages du commerce international pour faire application au litige de la notion de groupe de sociétés, les arbitres qui devaient statuer en droit français et, aux termes de l'art. 1496 NCPC, tenir compte des usages du commerce, ont respecté les termes de leur mission.*

La société Kis France, constructeur d'un matériel nouveau pour le développement et le tirage rapides des photographies (mini-laboratoire) a mis en place avec la Société Générale un système permettant la commercialisation et le matériel dans divers pays — dont les États-Unis — sous la forme du leasing et par l'intermédiaire de leurs filiales respectives.

Pour cela, diverses conventions sont intervenues :

— une convention du 6 mai 1983 (dite « cadre »), conclue entre la société Kis France et la Société Générale, déclarant agir tant en leur nom que pour le compte de leurs filiales, définissant les modalités du financement sous forme de leasing du matériel mis localement à la disposition des utilisateurs ;

— des conventions dites « locales », conclues entre les filiales locales de la Société Générale et de Kis France, pour l'application dans le contexte particulier de leurs États-Unis, une convention du 18 juillet 1983, conclue entre Sogelease Corporation, filiale de leasing de la Société Générale, et Kis California, devenue Kis Corporation, filiale de Kis, contrat suivi le 1er juillet 1983 de la convention cadre, d'une part un avenant au contrat du 6 mai 1983 signé par la Société Générale agissant pour son compte et pour sa

filiale et par Kis France agissant de même, et d'autre part un contrat passé entre la Société Générale agissant de la même façon d'une part et pour sa filiale Kis US (accords dits de Grenoble).

À la suite de difficultés nées de l'accroissement des loyers imposés à partir de 1985, la Société Générale a saisi la Chambre arbitrale de la Chambre de commerce internationale (CCI), en se référant à la clause compromissoire désignant cet organisme dans la convention-cadre du 6 mai 1983 — clause à laquelle faisait référence une stipulation dans le même sens insérée dans les conventions des 18 juillet 1983 et 1er juillet 1985 :

C'est ainsi que la Société Générale et deux de ses filiales (Sogelease Pacifique et Sogelease Corporation) ont demandé au tribunal de condamner solidairement la société Kis France et la société Kis Photo Industrie à payer à la Société Générale les sommes dont la société Kis Corporation serait débitrice à l'égard de Sogelease Corporation en vertu des conventions précitées ;

Les sociétés Kis France et Kis Photo Industrie ayant contesté la recevabilité de la demande de la Société Générale, celle-ci a, sur les usages du commerce international réclamer le règlement des dettes contractées par sa filiale aux États-Unis auprès de la filiale de la Société Générale, le tribunal arbitral, composé de trois arbitres, a rendu le 27 janvier 1989 une sentence partielle aux termes de laquelle les arbitres ont :

— dit la Société Générale et ses filiales recevables en leur demande à l'encontre de la société Kis France et de la société Kis Photo Industrie ;

— dit que la société Kis France et la société Kis Photo Industrie solidairement condamnées à l'égard des sociétés demanderesses des sommes dont celles-ci pourraient être reconnues créancières ;

— dit qu'une mesure d'information ferait l'objet d'une décision distincte, afin d'établir le compte entre les parties ;

Pour se déterminer ainsi, le tribunal arbitral a, pour l'essentiel, retenu de l'analyse des conventions l'existence de deux groupes de sociétés et la réalisation d'une opération économique unique dans un ensemble contractuel associant étroitement les filiales des deux contractants.

\*\*\*

La société Kis France et la société Kis Photo Industrie ont formé contre cette sentence un recours en annulation, fondé sur les dispositions de l'article 1502, 1°, 3° et 4°, en soutenant que le tribunal arbitral a :

— dit que l'objet du litige et statué sans convention d'arbitrage ;

— méconnu l'objet du litige et statué sans convention d'arbitrage ;

— méconnu sa mission en écartant l'application du droit français au fond ;

— méconnu son obligation de répondre aux moyens produits et de motiver sa sentence ;

Il est en conséquence demandé à la Cour d'annuler la sentence et de condamner la Société Générale et ses filiales à payer aux sociétés Kis France et Kis Photo Industrie « un montant équivalent aux sommes versées par elles à la CCI et à l'expert désigné », outre 100 000 F sur le fondement de l'article 700 du nouveau Code de procédure civile.

92     JURISPRUDENCE FRANÇAISE

La Société Générale et ses filiales ont conclu pour demander à la Cour :

— de constater que les sociétés Kis France et Kis Photo Industrie ont reconnu, devant les arbitres, leur compétence relativement à l'objet du litige, de sorte que le premier moyen proposé est irrecevable, et en tout cas mal fondé ;

— de dire que les arbitres ont respecté leur mission en se référant à la notion de groupe de sociétés, notion reconnue par le droit français et par les usages du commerce international tels qu'ils résultent notamment de la jurisprudence de la Cour internationale de la CCI ;

— de rejeter en conséquence le recours, et de condamner les sociétés Kis France et Kis Photo Industrie à leur verser 100 000 F au titre de l'article 700 du nouveau Code de procédure civile.

La Cour,

— 1er moyen (article 1502-3°)

Il est fait grief aux arbitres d'avoir méconnu l'objet du litige et statué sans convention d'arbitrage en outrepassant les limites du pouvoir juridictionnel qu'ils tenaient de la convention des parties, en ce que le tribunal a fait droit aux demandes formulées par la Société Générale contre Kis France et Kis Photo Industrie pour l'exécution des conventions locales dont elle n'était pas signataire, alors que les clauses compromissoires du contrat-cadre et des conventions locales ne lui permettaient d'agir en pareil cas qu'en représentation des filiales locales.

Il est également reproché aux arbitres d'avoir omis de statuer sur le litige qu'il avait compétence pour trancher, relatif à la clause « e » de conflit du contrat du 6 mai 1983.

Considérant que devant les arbitres Kis France et Kis Photo Industrie ont contesté, non leur compétence, mais la recevabilité de la demande de la Société Générale, en tant que présentée en son propre nom et qu'elle est dirigée contre Kis France et Kis Photo Industrie, en lui contestant la qualité et le droit de réclamer le paiement des sommes qui seraient dues à sa filiale étrangère par les filiales de Kis France ;

Considérant que pour soutenir que les arbitres auraient méconnu les limites de leur pouvoir juridictionnel, Kis France et Kis Photo Industrie se fondent sur les clauses compromissoires stipulées dans le contrat-cadre du 6 mai 1983 et dans la convention locale ;

Considérant que le contrat-cadre stipule (article VIII) une clause compromissoire donnant lieu à l'arbitrage et attribuant le pouvoir de trancher « tout différend relatif à l'interprétation ou à l'exécution de la présente convention qui pourrait s'élever entre les parties » (soit entre la Société Générale et Kis France) ;

(1992)

---

JURISPRUDENCE FRANÇAISE     93

clause d'arbitrage, dont le rapprochement avec les stipulations du contrat-cadre fait apparaître le pouvoir conféré aux arbitres de trancher les litiges nés de l'exécution, tant de la convention-cadre que de la convention locale, mais la seule initiative des deux sociétés-mères, les filiales demeurant dans une situation de complète subordination à cet égard ;

Considérant que pour accueillir la demande de la Société Générale et de ses filiales contre Kis France et Kis Photo Industrie, le tribunal arbitral a procédé à l'interprétation des conventions, et retenu l'étroite imbrication des obligations réciproques découlant de ces conventions, ainsi que la situation des sociétés-mères à l'égard de leurs filiales soumises à leur décision commerciales et financières — Kis France s'étant engagée dans le contrat-cadre (article VII) à « prendre toutes dispositions utiles pour que ses filiales à l'étranger respectent les engagements vis-à-vis des filiales de leasing locales du groupe Société Générale et à ce qu'elles remplissent leurs obligations » tandis que réciproquement les sociétés de leasing, filiales du groupe Société Générale, s'engageaient vis-à-vis des filiales des conventions locales qui en découlent... » ; cependant que dans le contrat du 1er juillet 1985 il était stipulé que « le groupe Kis » prendrait toutes dispositions utiles pour que Kis Photo Industrie et les filiales du groupe Kis US respectent les engagements vis-à-vis des banques tels qu'ils résultent de la présente convention ;

Considérant que les arbitres ont ainsi respecté les clauses compromissoires définissant leurs pouvoirs juridictionnels, sans encourir les griefs du moyen, qui doit dès lors être rejeté ;

— 2e moyen (article 1502-3°)

Kis France et Kis Photo Industrie reprochent aux arbitres d'avoir méconnu leur mission préservant l'application du droit français en litige, en se référant aux usages du commerce international pour retenir la notion de groupe de sociétés et en fondant sur l'obligation de Kis France et Kis Photo Industrie envers la Société Générale et sur les dettes contractées par Kis Corporation envers Sogelease Corporation ;

Considérant que la convention des parties prescrit aux arbitres de faire application du droit français ;

Considérant que s'agissant d'un arbitrage international, l'arbitre doit, aux termes de l'article 1496 du nouveau Code de procédure civile — dont la disposition est reprise par le règlement de la CCI, applicable au présent arbitrage — tenir compte des usages du commerce dans tous les cas, c'est-à-dire y compris lorsque, comme en l'espèce, les parties ont déterminé les règles de droit applicables ;

Considérant que des lors en ce se référant aux usages du commerce international pour faire application en la cause de la notion de groupe de sociétés, les arbitres n'ont pas méconnu les termes de leur mission ;

(1992)

Considérant, en outre, que la notion de groupe de sociétés — traduisant l'existence d'un ensemble de sociétés ayant une indépendance formelle tout en étant liées dans une unité économique soumise à un pouvoir unique — est consacrée en droit interne français, spécialement par la loi n° 82.915 du 28 octobre 1982 (articles L. 439-1 et suivants du Code du Travail) qui prescrit la constitution, dans de tels groupes de sociétés composés d'une société dite dominante et de ses filiales appartenant à un même ensemble économique — d'un organe administratif dénommé comité de groupe ;

Considérant que dès lors le grief fait aux arbitres d'avoir méconnu leur obligation de statuer conformément au droit français n'est pas fondé ;

Que le moyen n'est donc pas fondé ;

— 2e moyen (article 1502-3° et 4°)

Il est enfin reproché aux arbitres d'avoir méconnu leur obligation de répondre aux moyens proposés et de motiver leur sentence, en refusant de procéder à l'interprétation des clauses compromissoires et des clauses de garantie contenues dans les contrats des 6 mai 1983 et 1er juillet 1985 ;

Considérant cependant, qu'ainsi qu'il a été dit à propos du 1er moyen, c'est en procédant à l'interprétation qu'il lui est reproché de ne pas avoir faite que le tribunal arbitral aurait excédé les pouvoirs et la mission qui lui opposant les parties quant à la portée des engagements mis à la charge de Kis France et de Kis Photo Industrie, pour décider, conformément à la loi française que, s'agissant d'un litige de nature commerciale, une condamnation solidaire devait être prononcée ;

Et considérant que la sentence énonce des motifs qui ont un lien logique avec les dispositions prises de sorte que les critiques du moyen doivent être rejetées ;

PAR CES MOTIFS :

Rejette le recours en annulation ;

Dit qu'il n'y aura lieu, en la cause, à application de l'article 700 du nouveau Code de procédure civile ;

M. J.P. ANCEL, prés. ; Mmes S. GAUTIER, M.P. BRISSIER, cons. ; Mme BERNARD-CAYAT, subst. ; Mmes J.F. PRAT, B. MOREAU, av.

NOTE. — Cf. sur cette décision, les notes de MM. Daniel Cohen (supra p. 74) et Laurent Aynès (supra p. 70).

## COUR D'APPEL DE PARIS (1re Ch. suppl.)

11 janvier 1990

Ont cédé société des Lubrifiants Elf Aquitaine

ARBITRAGE INTERNATIONAL. — GROUPE DE SOCIÉTÉS. — CLAUSE COMPROMISSOIRE. — ENSEMBLE CONTRACTUEL. — INTERPRÉTATION DE LA CLAUSE. — FRAUDE. — EFFET. — CARACTÈRE OBLIGATOIRE DE LA CLAUSE À L'ÉGARD D'UNE PARTIE NON SIGNATAIRE.

CLAUSE COMPROMISSOIRE. — GROUPE DE SOCIÉTÉS. — PERSONNE PHYSIQUE DIRIGEANT LE GROUPE. — EFFET DE LA CLAUSE À SON ÉGARD. — ENSEMBLE CONTRACTUEL.

SOCIÉTÉ. — GROUPE DE SOCIÉTÉS. — UNITÉ ÉCONOMIQUE. — POUVOIR UNIQUE. — CLAUSE COMPROMISSOIRE. — INTERPRÉTATION DE PERSONNE. FRAUDE. — EFFET. — EFFICACITÉ DE LA CLAUSE.

USAGE. — USAGE DU COMMERCE INTERNATIONAL. — GROUPE DE SOCIÉTÉS. — RELATIONS D'AFFAIRES. — CLAUSE COMPROMISSOIRE. — EFFET. — ENGAGEMENT DE LA PARTIE NON SIGNATAIRE DIRECTEMENT IMPLIQUÉE DANS LA CONVENTION.

Selon les usages du commerce international, la clause compromissoire insérée dans un contrat international a une validité et une efficacité propres qui commandent d'en étendre l'application aux parties directement impliquées dans l'exécution du contrat et dans les litiges qui peuvent en résulter, dès lors qu'il est établi que leur situation contractuelle, leurs activités et les relations commerciales habituelles existant entre les parties font présumer qu'elles ont accepté la clause d'arbitrage dont elles connaissaient l'existence et la portée, bien qu'elles n'aient pas été signataires du contrat qui la stipulait.

Si c'est au moyen d'un subterfuge qu'un consortium s'est effacé pour laisser place à ce consortium, cette manœuvre est constitutive d'une fraude manifeste destinée à occulter le véritable contractant ; aucun effet de droit ne doit donc être reconnu d'un tel procédé et les arbitres ont justement estimé que la convention contenant la clause compromissoire engageait le véritable contractant.

Cet engagement trouve également sa source dans la notion de groupe de sociétés dès lors qu'il apparaît que la défenderesse a toujours été en relation d'affaires avec une personne prêtant un groupe de sociétés formant un ensemble ayant une existence juridique et une indépendance soumise à un pouvoir unique.

A la suite d'un litige survenu dans des relations commerciales de la société française Elf-Lub avec diverses sociétés dirigées par M. Mohamed Abdul Rahman Orri, de nationalité saoudienne, groupe de sociétés désignées communément sous le sigle « SEL » (Saudi Europe Lines), à propos de factures impayées relatives à la livraison des navires et des marchandises s'est tenue, le 2 novembre 1983 dans les bureaux de M. Orri, une réunion s'est tenue en cette ville le groupe Orri et les représentants du groupe Orri et les représentants d'Elf-Lub, après que cette dernière société eut fait procéder à la saisie à Rotterdam de l'un des navires du groupe pour obtenir une garantie de paiement de sa créance.

I swear that I am a fluent speaker of the French language and that the above translation of the decision of the Paris Court of Appeal, dated October 31, 1989, is true and correct in every respect, to the best of my knowledge.

Signed on the 22nd of February 2007.

_____

Elizabeth Lefebvre-Gross, Esq.

Member of the New York bar

White & Case LLP

1155 Avenue of the Americas

New York, New York 10036

212-819-8200

**Paris Court of Appeal (1st Ch. suppl.)**

**January 11, 1990**

**Orri v. Lubrifiants Elf Acquitaine**

Following a dispute that arose in the commercial relations of the French company Elf-Lub with various companies managed by Mr. Mohamed Abdul Rahman Orri, a Saudi national — which group of companies is designated jointly under the acronym SEL (Saudi Europe Lines) — concerning unpaid invoices for lubricants delivered to vessels belonging to shipping companies of the group which were managed at Pirée, a meeting was held in that city on November 2, 1983 in the offices of Mr. Orri between the representatives of the Orri group and the representatives of Elf-Lub. This meeting followed the seizure in Rotterdam of one of the ships of the group to obtain guarantee of payment for the debt.

A written agreement was then drafted, which fixed the amount of the debt (383,743 US dollars) and a payment schedule, in exchange for release of the ship.

This agreement was prepared on the letterhead of Saudi Europe Line S.A., a company managed by Mr. Orri, and signed for this company by Mr. Archaniotakis and by Mr. Orri himself.

The same day a contract was signed for the supply of lubricants to Saudi Europe Lines, which agreement contained an arbitration clause referring to the rules of the International Chamber of Commerce of Paris (ICC).

This contract was signed for Elf by Mr. Graille, who was at the time head of the Marine Lubricants Department of the French company, and for the other party ("the buyer") by Mr. Archaniotakis, whose name appears in the header of the agreement as the representative of Saudi Europe Lines, in the place of Mr. Orri, whose name was crossed out.

As the commitments made in the agreement of November 2, 1983 were not observed and numerous invoices issued since that date remained unpaid, Elf-Lub instituted an arbitration proceeding in accordance with Clause 10 of the supply contract of November 2, 1983, cited above, with the ICC in Paris, in which Mr. Orri and the companies Saudi Europe Line S.A. and Saudi Europe Lines were named as respondents.

Under the terms of an award rendered on August 24, 1988, the Arbitral Tribunal, composed of a panel of three arbitrators:

-- recognized the validity of the arbitration clause after reviewing the applicable law and held that it was enforceable against Mr. Orri personally;

-- affirmed its jurisdiction to rule on the claims made by Elf-Lub both against Mr. Orri, who was considered personally involved, and against Saudi Europe Line S.A.;

-- declared that the procedure was without cause as brought against Saudi Europe Lines, which was the "commercial name of defendant Orri and which does not constitute an entity distinct from him;"

-- ordered Mr. Orri to pay Elf-Lub the amount of 395,682 US dollars and the amount of 38,000 US dollars, as well as interest on the two amounts;

-- dismissed the action against Saudi Europe Line S.A. and ruled on the costs of arbitration.

Mr. Orri lodged an appeal to annul this award, which was rendered in France in the framework of international arbitration, in support of which appeal he invoked a single argument drawn from the fact that he was not party to the contract of November 2, 1982, which contained the arbitration clause, and that Mr. Archaniotakis, the sole signatory of the contract, did not have the power to represent him, and thus that the arbitrators ruled without an arbitration agreement.

Elf-Lub, which pointed out that its contractual partner had always been the Orri group – *i.e.*, Mr. Orri himself – under the cover of various companies controlled by him, with a complete confusion of assets, argued against the appeal, under Article 700 of the New Code of Civil Procedure, and for ordering Mr. Orri to pay damages and interest for abuse of process.

\*

\* \*

The Court,

According to the customs of international commerce, an arbitration clause contained in an international contract has its own validity and effectiveness, which require that the clause be extended to parties directly involved in the performance of the contract and the disputes that may arise out of it, once it has been established that their contractual situation, their activities and the customary commercial relationship existing between the parties create the presumption that they accepted the arbitration clause, of whose existence and scope they were aware although they did not sign the contract containing it.

In the present instance, two contractual documents were prepared the same day, November 2, 1983, during a meeting of the representatives of Elf with the representatives of the Orri group – including Mr. Orri himself – in the office of Mr. Orri in Pirée, which documents were created with the joint intention of the parties to settle the dispute having arisen between them regarding the payment delays and to establish conditions in which their commercial relationship could continue.

The first document, entitled report on the meeting of November 2, 1983, relates the negotiations conducted by the representatives of Elf with Mr. Orri, described as "Chairman" of the Orri group, and contains the express obligation of Saudi Europe Line to observe regular times for payment (Article 3).

This document was signed by Mr. Orri personally.

The second agreement signed the same day was a supply contract concluded between Elf and Saudi Europe Lines, as "buyer," which was declared in the contract to be represented by Mr. Archaniotakis, who affixed his signature in this role.

The arbitrators justly deemed that the arbitration clause inserted in this contract was known to Mr. Orri and accepted by him.

In effect, on the one hand, the agreement of November 2, 1983, signed personally by Mr. Orri, contained an implicit reference to the supply contract – in that it stipulated the commitment of Saudi Europe Line to ensure that the payments were timely in the future, a reference to continuation of the commercial relationship that the supply contract of the same date would ensure – in such a way that the two agreements constituted a indivisible contractual whole, in which Mr. Orri was personally committed under the name of "Saudi Europe Line" or "Saudi Europe Lines," as would be demonstrated.

On the other hand, Elf established by the production of a large number of invoices (several dozen, concerning various ships) that it had always dealt with Mr. Orri under the name "Saudi Europe Lines" (SEL) without any other explanation, addressing its invoices to the offices of Mr. Orri in Pirée.

Yet, it emerges from a statement produced in the procedure, from a Saudi attorney, Mr. Hassan Mahassini, and from the "certificate of registration of a sole-practitioner business" prepared by the Ministry of Trade of Saudi Arabia, that Mr. Orri is registered in Jeddah (Saudi Arabia) as a business under the business name "Saudi Europe Lines" to operate the business of a shipping company, with personal responsibility for all debts and obligations of the business.

This personal situation of Mr. Orri was confirmed by Mr. Orri himself during a suit against him before the High Court of London, on which occasion he declared in an affidavit dated November 26, 1980 (page 6) that he was the sole owner of and person liable for the enterprise designated "Saudi Europe Lines" and registered in Jeddah, with a "simple business purpose for (his) personal use."

It is thus established that the term "Saudi Europe Lines" (or "Saudi Europe Line") designates in reality Mr. Orri himself, so that, in this context, the contract of November 2, 1983, using this term, listed Saudi Europe Lines, which has been shown to be merged with the person of Mr. Orri, as the partner of Elf.

Therefore, it was only by subterfuge that Elf's actual contractual partner was withdrawn in order to substitute an associate, Mr. Archaniotakis, who has not even been shown to have the authority to bind Saudi Europe Lines.

This maneuver constitutes manifest fraud, intended to mask the true contractual partner, who is Mr. Orri personally.

Such dealings can thus have no legal effect, and the arbitrators consequently correctly considered that the agreement of November 2, 1983 contained an arbitration clause that binds Mr. Orri.

Finally, this agreement also results from the concept of a group of companies, since it appears that Elf has always had business relations with Mr. Orri as president (chairman) of a group of companies – each of which was responsible for managing one ship – composed of companies each having a formal legal existence and formal independence, while linked in an economic unit subject to a single authority, exerted by Mr. Orri himself.

The arbitration clause contained in the contract of November 2, 1983 was thus binding on Mr. Orri as the party directly involved in the agreement in his role as director of the Orri group, in the framework of regular business relations with Elf, which leads to the

3

presumption that he was completely aware of the conditions governing their commercial relationship, including the standard arbitration clause used in international commerce.

It follows that the arbitrators correctly enforced the arbitration clause against Mr. Orri, which granted them jurisdiction, and that their ruling is not subject to annulment.

The abusive or dilatory character of the appeal has not be established, and the claim brought in this regard by Elf must consequently be dismissed.

On these grounds:

The Court rejects the appeal for annulment.

The Court states that there are no grounds for damages.

The Court orders Mr. Orri to pay Elf-Lub compensation of 10,000 francs on the grounds of Article 700 of the New Code of Civil Procedure.

Mr. J.P. Ancel. president; Mr. S. Gautier, Mr. M. P. Brussier, judges; Mr. M. Bernard-Catat, substitute; Mr. de Richemont, Mr. Delamare, attorneys

Considérant, en outre, que la notion de groupe de sociétés — traduisant l'existence d'un ensemble de sociétés ayant une indépendance formelle tout en étant liées dans une unité économique soumise à un pouvoir unique — est consacrée en droit interne français spécialement par la loi n° 82.915 du 28 octobre 1982 (articles L. 439-1 et suivants du Code du Travail) qui prescrit la constitution, dans de tels groupes de sociétés — composés d'une société dite dominante et de ses filiales appartenant à un même ensemble économique — d'un organe administratif dénommé comité de groupe ;

Considérant que dès lors le grief fait aux arbitres d'avoir méconnu leur obligation de statuer conformément au droit français n'est pas fondé ;

Et considérant que pour admettre l'obligation des sociétés Kis France et Kis Photo Industrie envers la Société Générale, le tribunal arbitral ne s'est pas seulement fondé sur cette notion, mais a surtout retenu de l'analyse des éléments soumis à l'examen des parties de réaliser une opération économique unique en édifiant un ensemble contractuel dans lequel les filiales demeuraient dans un état d'étroite dépendance à l'égard des sociétés-mères, qui conservaient le pouvoir de décision ;

Que le moyen n'est donc pas fondé ;

— *3° moyen (article 1502-3° et 4°)*

Il est enfin reproché aux arbitres d'avoir méconnu leur obligation de répondre aux moyens proposés et de motiver leur sentence, en refusant de procéder à l'interprétation des clauses compromissoires et des clauses de garantie contenues dans les contrats des 6 mai 1983 et 1er juillet 1985 ;

Considérant cependant qu'ainsi qu'il a été dit à propos du 1er moyen, c'est en procédant à l'interprétation qu'il a estimé nécessaire des parties qu'il ne peut pas être fait grief au tribunal arbitral d'avoir déclaré la demande recevable en tranchant le différend opposant les parties quant à la portée des engagements mis à la charge de Kis France et de Kis Photo Industrie, pour décider, conformément à la loi française que, s'agissant d'un litige de nature commerciale, une condamnation solidaire devait être prononcée ;

Et considérant que la sentence énonce des motifs qui ont un lien logique avec les dispositions prises de sorte que les critiques du moyen doivent être rejetées ;

PAR CES MOTIFS :

Rejette le recours en annulation ;

Dit qu'il n'y aura lieu, en la cause, à application de l'article 700 du nouveau Code de procédure civile ;

M. J.P. ANCEL, prés. ; Mmes S. GAUTIER, M.P. BRUSSIER, cons. ; Mme BERNARD-CATOIX, subst. ; Me J.F. PRAT, B. MOREAU, av.

NOTE. — Cf. sur cette décision, les notes de MM. Daniel Cohen (supra p. 74) et Laurent Aynès (supra p. 70).

---

## COUR D'APPEL DE PARIS (1re Ch. suppl.)
### 11 janvier 1990

**Orri c/ sociétés des Lubrifiants Elf Aquitaine**

ARBITRAGE INTERNATIONAL. — GROUPE DE SOCIÉTÉS. — CLAUSE COMPROMISSOIRE. — ENSEMBLE CONTRACTUEL. — INTERPOSITION DE PERSONNE. — FRAUDE. — EFFET. — CARACTÈRE OBLIGATOIRE DE LA CLAUSE À L'ÉGARD D'UNE PARTIE NON SIGNATAIRE.

CLAUSE COMPROMISSOIRE. — GROUPE DE SOCIÉTÉS. — PERSONNE PHYSIQUE DIRIGEANT LE GROUPE. — EFFET DE LA CLAUSE À SON ÉGARD. — ENSEMBLE CONTRACTUEL.

SOCIÉTÉ. — GROUPE DE SOCIÉTÉS. — UNITÉ ÉCONOMIQUE. — POUVOIR UNIQUE. — CLAUSE COMPROMISSOIRE. — INTERPOSITION DE PERSONNE. — FRAUDE. — EFFET. — EFFICACITÉ DE LA CLAUSE.

USAGE. — USAGE DU COMMERCE INTERNATIONAL. — CLAUSE COMPROMISSOIRE. — EFFET. — ENGAGEMENT DE LA PARTIE NON SIGNATAIRE DIRECTEMENT IMPLIQUÉE DANS LA CONVENTION.

*Selon les usages du commerce international, la clause compromissoire insérée dans un contrat international a une validité et une efficacité propres qui commandent d'en étendre l'application aux parties directement impliquées dans l'exécution du contrat et les litiges qui peuvent en résulter, dès lors qu'il est établi que leur situation commerciale, leurs activités et les relations commerciales habituelles existant entre les parties font présumer qu'elles ont accepté la clause d'arbitrage dont elles connaissaient l'existence et la portée, bien qu'elles n'aient pas été signataires du contrat qui la stipule.*

*Si c'est au moyen d'un subterfuge qu'un contractant s'est effacé pour laisser place à un cosignataire, cette manœuvre est constitutive d'une fraude manifeste destinée à occulter le véritable contractant ; aucun effet de droit ne doit donc être reconnu à un tel procédé et les arbitres ont justement estimé que la convention contenant la clause compromissoire engageait le véritable contractant.*

*Cet engagement trouve également sa source dans la notion de groupe de sociétés dès lors qu'il apparaît que le défendeur a toujours été en relation d'affaires avec la personne présidant un groupe de sociétés formant un ensemble ayant une existence juridique et une indépendance formelles, tout en étant liées dans une unité économique soumise à un pouvoir unique.*

A la suite d'un litige survenu dans des relations commerciales de la société française Elf-Lub avec diverses sociétés dirigées par M. Mohamed Abdul Rahman Orri, de nationalité saoudienne — groupe de sociétés désignées communément sous le sigle « SEL » (Saudi Europ Lines), à propos de factures impayées de lubrifiants livrés aux navires des sociétés de navigation du groupe, géré depuis le Pirée, une réunion s'est tenue en cette ville le 2 novembre 1983 dans les bureaux de M. Orri, entre les représentants du groupe Orri et les représentants d'Elf-Lub, après que cette dernière société eut fait procéder à la saisie à Rotterdam de l'un des navires du groupe pour obtenir une garantie de paiement de sa créance.

## 96

Un accord écrit a alors été rédigé, constatant le montant de la dette (383.743 dollars américains) et l'échelonnement des paiements moyennant la levée de la saisie du navire.

Cet accord a été établi à l'en-tête de la société « Saudi Europe Line S.A. », société dirigée par M. Orri, et signé, pour cette société, par M. Archaniokais et par M. Orri lui-même.

Le même jour a été signé un contrat pour la fourniture de lubrifiants à « Saudi Europe Lines », convention ouvrant une clause compromissoire se référant au règlement de la Chambre de commerce internationale de Paris (CCI).

Ce contrat a été signé, pour Elf, par M. Graille, alors chef du département Lubrifiants de la Matrie de la société française, et, pour l'autre partie (« the buyer » : l'acheteur), M. Archaniokais, dont le nom figure dans l'en-tête de la convention en qualité de représentation de « Saudi Europe Lines » à la place de M. Orri, qui a été rayé.

Les engagements pris dans l'accord du 2 novembre 1983 n'ayant pas été tenus et de nombreuses factures émises depuis cette date étant demandées impayées, Elf-Lub a engagé une procédure d'arbitrage conformément à la clause 10 du contrat de fourniture du 2 novembre 1983 précité, devant la CCI à Paris qui ont été appelés comme défendeurs M. Orri et les sociétés Saudi Europe Line S.A. et Saudi Europe Lines.

Aux termes d'une sentence prononcée le 24 août 1988, le Tribunal arbitral, composé d'un collège de trois arbitres, a :

— reconnu la validité de la clause compromissoire après avoir examiné la loi qui lui était applicable, et jugé qu'elle était opposable à M. Orri personnellement ;

— retenu sa compétence pour statuer sur les demandes dirigées par Elf-Lub tant contre M. Orri, considéré comme engagé personnellement que contre la société Saudi Europe Line S.A. ;

— déclaré sans objet la procédure en tant que dirigée contre Saudi Europe Lines, « raison de commerce du défendeur Orri ne constituant pas une entité distincte de celui-ci » ;

— condamné M. Orri à payer à la société Elf-Lub la somme de 395.682 dollars américains, et celle de 38.000 dollars américains, outre les intérêts de ces deux sommes ;

— mis hors de cause Saudi Europe Line S.A. et statué sur les frais de l'arbitrage ;

M. Orri a formé contre cette sentence, rendue en France en matière d'arbitrage international, un recours en annulation, au soutien duquel il invoque un moyen unique, tiré du fait qu'il n'a pas été partie au contrat du 2 novembre 1982 signé à l'en-tête duquel il a figuré, que M. Archaniokais, seul signataire de ce contrat n'avait aucun pouvoir pour le représenter, de sorte que les arbitres auraient statué à son égard sans convention d'arbitrage.

La société Elf-Lub, faisant valoir qu'elle a toujours eu pour cocontractant le groupe Orri, c'est-à-dire M. Orri lui-même, sous couvert de diverses sociétés contrôlées par lui, avec une totale confusion des patrimoines, a conclu au rejet du recours, avec application à son profit de l'article 700 du

## 97

nouveau Code de procédure civile, et condamnation de M. Orri à des dommages-intérêts pour procédure abusive.

⁂

LA COUR,

Considérant que selon les usages du commerce international la clause compromissoire insérée dans un contrat international a une validité et une efficacité propres qui commandent d'en étendre l'application aux parties directement impliquées dans l'exécution du contrat et les litiges qui peuvent en résulter, dès lors qu'il est établi que leur situation contractuelle, leurs activités et les relations commerciales habituelles existant entre les parties font présumer qu'elles ont accepté la clause d'arbitrage, dont elles connaissaient l'existence et la portée, bien qu'elles n'aient pas été signataires du contrat qui la stipulait ;

Considérant qu'en l'espèce ont été établis le même jour 2 novembre 1983, lors d'une réunion des représentants de la société Elf avec les représentants du groupe Orri — dont M. Orri lui-même — dans les bureaux de M. Orri au Pirée, deux documents contractuels destinés, dans la commune intention des parties, à régler le contentieux né entre elles des retards de paiement et à établir les conditions dans lesquelles leurs relations commerciales pourraient se poursuivre ;

Considérant que le premier document, intitulé compte rendu de la réunion du 2 novembre 1983, relate les négociations conduites par les représentants de la société Elf avec M. Orri, qualifié de « Chairman juridique du groupe Orri », contient l'engagement exprès de « Saudi Europe Line » de respecter les échéances régulières de paiement (article 3) ;

Considérant que ce document a été signé par M. Orri personnellement ;

Considérant que la seconde convention signée le même jour est un contrat d'approvisionnement, conclu entre la société Elf et, en qualité d'« acheteur », Saudi Europe Lines », déclaré dans le contrat comme étant représenté par M. Archaniokais qui a apposé sa signature en cette qualité ;

Considérant que les arbitres ont à bon droit estimé que la clause compromissoire insérée dans ce contrat avait été connue de M. Orri et acceptée par lui ;

Considérant, en effet, que, d'une part, l'accord du 2 novembre 1983, signé personnellement par M. Orri, contenait une référence implicite à « Saudi Europe Line » de veiller à la régularité des paiements à l'avenir, référence aux relations commerciales dont le contrat d'approvisionnement du même jour devait assurer la poursuite, de sorte que les deux conventions constituaient un ensemble contractuel indivisible, dans lequel M. Orri s'est personnellement engagé sous la dénomination « Saudi Europe Line » ou « Saudi Europe Lines », ainsi qu'il va être démontré ;

Considérant que, d'autre part, la société Elf établit que la production d'un grand nombre de factures (plusieurs dizaines), concernant des navires différents) qu'elle a toujours traité avec M. Orri sous la dénomination « Saudi Europe Lines » (SEL) sans autre précision, en adressant ses factures aux bureaux de M. Orri au Pirée ;

Or considérant qu'il ressort d'un affidavit versé aux débats, émanant d'un avocat saoudien, Me Hassan Mahasni, établi par le ministère du commerce d'Arabie Saoudite, que M. Orri est immatriculé à Djeddah (Arabie Saoudite) en qualité de commerçant sous la raison sociale « Saudi Europe Lines » pour exercer l'activité de compagnie de navigation, avec engagement personnel pour toutes les dettes et obligations de l'établissement ;

Considérant que cette situation personnelle de M. Orri a été confirmée par l'intéressé lui-même, dans le cadre d'une procédure publique contre lui à la Haute Cour de Londres, à l'occasion de laquelle il a déclaré dans un affidavit du 26 novembre 1980 (page 6) qu'il était le seul propriétaire et responsable de l'établissement désigné sous les termes : « Saudi Europe Lines » immatriculé à Djeddah, « simple raison sociale à (son) usage personnel » ;

Considérant qu'ainsi il est établi que l'appellation « Saudi Europe Lines » (que « Saudi Europe Line ») désigne en réalité M. Orri lui-même, de sorte que, dans ce contexte, le contrat du 2 novembre 1983, reprenant cette appellation, a fait figurer comme partenaire de la société Elf la société « Saudi Europe Lines », dont il est démontré qu'elle se confondait avec la personne de M. Orri ;

Considérant dès lors ce n'est que par un subterfuge que le véritable contractant d'Elf s'est effacé pour laisser place à une compagnie, M. Archana-lakis, dont il n'est pas même établi qu'il ait eu qualité pour engager « Saudi Europe Lines » ;

Considérant que cette manœuvre est constitutive d'une fraude manifeste, destinée à occulter le véritable contractant qui est M. Orri personnellement ;

Considérant qu'aucun effet de droit ne doit donc être reconnu à un tel procédé et que les arbitres ont, en conséquence, justement estimé que la convention du 2 novembre 1983, contenant la clause compromissoire, engageait M. Orri ;

Considérant, enfin, que cet engagement trouve également sa source en l'espèce dans la notion de groupe de sociétés, dès lors qu'il apparaît que la société Elf a toujours été en relations d'affaires avec M. Orri en qualité de président (chairman) d'un groupe de sociétés, — chacune d'elles étant chargée de la gestion d'un navire — formant un ensemble de sociétés ayant une existence juridique et une indépendance formelles, tout en étant liées dans une seule entité économique soumise à un pouvoir unique, exercée par M. Orri lui-même ;

D'où il suit que les arbitres ont justement opposé à M. Orri la clause compromissoire qui les saisissait, et que leur sentence échappe aux griefs du recours ;

Considérant que le caractère abusif ou dilatoire du recours n'est pas établi et que la demande formée de ce chef par la société Elf doit en conséquence être écartée ;

PAR CES MOTIFS :

Rejette le recours en annulation ;

Dit qu'il y avoir lieu à dommages-intérêts ;

Condamne M. Orri à payer à la société Elf-Lub une indemnité de 10 000 F sur le fondement de l'article 700 du nouveau Code de procédure civile ;

(Me J.-P. ANCEL, prés. ; Mme S. GAUTHIER, M. P. BRISSIER, cons. ; Mme M. BERNARD-CAYAT, subst. gén. ; Mes de RICHEMONT, DELAMARE, av.)

NOTE. — Signe des temps ? L'arbitrage, principalement en matière internationale, devient-il... l'objet de rapports conflits et paraît de plus en plus s'éloigner de l'idéal de pacification des rapports commerciaux. Indépendamment de toute discussion sur le fond, les incidents de procédure et les contestations sur la compétence des arbitres ne cessent de se multiplier. Et si la question peut parfois se poser de manière légitime, il arrive à d'autres occasions que le débat ne devrait pas avoir lieu tant il semble réglé d'avance en raison de la mauvaise foi d'une partie qui cherche par tous les artifices, en s'abritant au besoin derrière des paravents, à renier ses engagements. L'espèce ci-dessus rapportée est à cet égard très significative.

De faits complexes, il faut retenir que la société Elf Marine aux droits de laquelle se trouve aujourd'hui la société des lubrifiants Elf-Aquitaine (Elf-Lub) fournissait du carburant maritime à de nombreux navires à travers le monde, correspondant à autant de sociétés distinctes, « gérés » par diverses sociétés et propriété d'une seule personne, M. Orri, hommes d'affaires saoudien. Les livraisons étaient facturées à Saudi Europe Lines et réglées pendant un temps par M. Orri sur différentes sociétés du groupe, une véritable techni-que, qu'il dirige. Assez rapidement, diverses factures demeurent impayées et Elf-Lub saisit l'un des navires qu'elle ravitaille afin d'obtenir paiement de sa créance.

Afin de régler le différend, obtenir paiement de l'arriéré et fixer les règles applicables à la poursuite de leurs relations, les intéressés se réunissent en Grèce dans les bureaux de M. Orri. Deux accords sont, alors, conclus, le premier (que l'on dénommera ci-après « procès-verbal » pour reprendre les termes de la sentence) porte sur l'établissement du règlement de l'arriéré et l'engagement de l'acheteur de faire le maximum pour payer à temps dans le futur les factures. Il est établi sur papier à en-tête de Saudi Europe Line S.A. et signé personnellement par M. Orri. Le second accord (que l'on dénommera ci-après « contrat litigieux ») passé immédiatement après porte conclusion d'un contrat de fourniture de lubrifiants entre Elf-Lub et l'« acheteur », avec ou annexe la liste des navires à ravitailler. Il comprend une clause compromissoire se référant au règlement d'arbitrage de la CCI et est signé pour l'« acheteur », en présence de

M. Orri, par M. Archaniotakis (signataire également du premier document) dont le nom remplace celui raturé de M. Orri.

Par la suite, les dates d'échéances fixées pour le paiement de l'arriéré ne sont pas respectées, et les nouvelles factures établies demeurent impayées. Dans l'impossibilité de recouvrer sa créance, la société Elf-Lub demande et obtient à titre provisoire une inscription hypothécaire sur les immeubles de M. Orri en Grèce, puis assigne en arbitrage tout à la fois M. Orri, Saudi Europe Line S.A. et Saudi Europe Lines. Le tribunal arbitral s'estime compétent à l'égard de M. Orri et de la société Saudi Europe Line S.A. et écarte de la procédure l'entreprise Saudi Europe Lines, simple dénomination commerciale sous laquelle M. Orri exerce personnellement le commerce. Sur le fond, il condamne M. Orri seul. L'intéressé exerce alors contre cette sentence internationale rendue en France un recours en annulation fondé sur l'article 1502-3° NCPC : l'accord n'a pas été valablement représenté à l'accord comprenant la clause compromissoire de sorte que le tribunal arbitral aurait statué à son égard sans convention d'arbitrage. Par un arrêt de sa première chambre, la Cour d'appel de Paris rejette le recours.

L'ensemble constitué par la sentence et l'arrêt (sur la sentence, v. les obs. de Y. Derains, JDI, 1990,1029 ; sur l'arrêt, la note de B. Audit, JDI, 1991,141) intéresse principalement la question des effets d'une clause d'arbitrage à l'égard d'une personne morale formellement ne l'a pas signée. Une précision de terminologie : bien que les deux décisions, arbitrale et judiciaire, parlent toutes deux d'« opposabilité » de la clause compromissoire, il s'agit bien en réalité de son effet obligatoire. La sentence (reproduite infra, p. 125) et l'arrêt arrivent à un résultat identique, mais par des approches différentes qu'il convient d'examiner.

## I. - LA SENTENCE

Avant de trancher le fond de l'affaire (C), qui présentait certains points non dénués d'intérêt, le tribunal arbitral avait à se prononcer sur sa compétence (B). Cette démarche effectivement suivie paraît de prime abord parfaitement logique. La sentence cependant paraît planer quelques doutes sur la méthode utilisée lorsqu'elle qu'avant d'examiner si la clause arbitrale est « opposable » à M. Orri, il y a lieu de déterminer avec qui la société Elf-Lub a contracté (A).

A) Le tribunal arbitral s'attache à montrer que la société Elf-Lub a traité avec M. Orri personnellement. La société Saudi Europe Line S.A. ne peut soutenir qu'elle est seule engagée depuis la conclusion du contrat litigieux. Le contrat est effectivement passé sur un papier à son en-tête, mais cela ne suffit pas : la société Elf-Lub n'a sans doute pas porté grande attention à la dénomination utilisée, très

proche de celle (Saudi Europe Lines) qu'elle rencontre à l'ordinaire et n'a pas cherché à l'époque à identifier avec précision son interlocuteur, habituée qu'elle était à traiter avec l'ensemble des sociétés du groupe Orri. Saudi Europe Line S.A. a toujours établi les factures au nom de Saudi Europe Lines et non à celui de Saudi Europe Line S.A. ; les demandes de règlement des factures non payées ont été envoyées à M. Orri personnellement en qualité de « chairman » qui n'a jamais émis la moindre réserve à ce sujet. Le tribunal arbitral indique en outre qu'il n'y a pas lieu de dissocier les relations commerciales antérieures et postérieures au contrat litigieux. ... tout ». La société Elf-Lub a entendu, avant comme après, contracter avec l'ensemble des navires du « Groupe Orri », dénomination qui figure sur plusieurs papiers de l'acheteur, groupe dont l'existence est avérée, testée par les défendeurs. « Aux yeux des tiers » notent les arbitres, l'ensemble des sociétés contrôlées de manière exclusive par M. Orri forme incontestablement un groupe de sociétés ; l'existence de celui-ci a été reconnue par diverses décisions judiciaires tant grecques qu'étrangères, et l'intéressé (M. Orri) est d'autant plus mal venu à le contester qu'il a lui-même « créé et entretenu l'apparence d'un tel groupe en utilisant des noms de navires et des raisons sociales proches les uns des autres au point de provoquer parfois même la confusion (a plus complète... ainsi qu'en mêlant comme à plaisir la gestion et les comptes de ces diverses sociétés ».

Le tribunal arbitral conclut fort logiquement que la société Elf-Lub a contracté avec M. Orri et Saudi Europe Lines, avant comme après le contrat litigieux. Par ailleurs, Saudi Europe Lines n'est pas une distance de M. Orri : elle n'est en réalité que le nom commercial, figurant sur le registre du commerce de Jeddah (Arabie saoudite) sous lequel M. Orri exerce personnellement le commerce, ainsi qu'il l'a lui-même reconnu devant une juridiction étrangère lors d'un contentieux différent, et que l'indiquent plusieurs affidavits d'avocats, M. Orri est donc le seul engagé envers la société Elf-Lub.

La discussion est bien menée, l'argumentation serrée et la conclusion à laquelle arrive le tribunal arbitral imparable, mais la cuirasse a un défaut. N'est-il pas en effet quelque vice à rechercher d'abord le véritable contractant du vendeur pour se demander ensuite s'il est lié par la clause compromissoire ? Cette recherche risque en effet de préjuger de la suite. L'intéressé, M. Orri, soutient qu'il n'est pas lié par la clause compromissoire et qu'il n'est pas partie au contrat la contenant. Dire qu'il est en réalité partie, et même le seul contractant ne conduit-il pas de facto à le lier à la clause d'arbitrage ? De deux choses l'une en effet : ou bien il n'est pas partie juridiquement au contrat comprenant la clause, et celle-ci ne peut avoir d'effet à son égard ; ou bien, il l'est et on voit mal comment il pourrait ne pas être lié par la clause... La démarche suivie par les arbitres peut donc étonner.

B) La question de la détermination de la compétence arbitrale concernait principalement M. Orri, seul des défendeurs à invoquer

l'absence de clause d'arbitrage à son égard. Pour trancher cette question, le tribunal arbitral indique que les parties s'étant entendues pour reconnaître que le contrat était régi par le droit grec, il est lié par ce choix, mais qu'il doit en revanche déterminer le droit applicable à la clause arbitrale, les parties ayant spécialement réservé cette question dans l'acte de mission. C'est à l'examen d'un panorama de solutions théoriquement envisageables que se livre le tribunal arbitral.

Contrairement à plusieurs sentences (v. par ex. sentences CCI n° 4131/1982 (Dow Chemical) Rev. arb., 1984.137 ; JDI, 1983.899, obs. Y. Derains, et rejet du recours en annulation par Paris, 1re Ch. supp., 21 octobre 1983, Rev. arb., 1984.98, note A. Chapelle) ; n° 4504/1985 et 1986, JDI, 1986.1118), il ne se contente pas tout d'abord d'invoquer le principe d'autonomie de la convention d'arbitrage par rapport au contrat pour en déduire que la clause serait valable indépendamment de toute loi étatique : « la convention d'arbitrage, pour être efficace, doit tirer sa force de son rattachement à un ordre juridique ». L'application directe de la Convention de New York, et de la règle posée à son article II relatif à la forme de la clause compromissoire, n'est pas non plus retenue par celle-ci s'adresse aux États contractants et non pas directement à l'arbitre international qui, statuant au nom de l'un de ces États, « doit rechercher librement quelle est selon la volonté expresse ou présumée des parties, la règle la plus appropriée au litige ».

Cette recherche conduit le tribunal arbitral à envisager plusieurs rattachements. Le droit grec pouvait être retenu à un double titre, celui de loi du lieu de conclusion du contrat et de loi applicable au fond, mais n'est pas finalement retenu. Prenant appui sur la clause compromissoire renvoyant à un arbitrage selon les règles de la CCI à Paris, le tribunal arbitral estime que le droit français a en revanche un triple titre à s'appliquer : en tant que loi du lieu de l'arbitrage, parce que la convention d'arbitrage a pour effet de priver la demanderesse du for de l'article 14 C. civ, et enfin à titre supplétif par renvoi de l'article 1495 NCPC.

S'agissant de l'application du droit français à titre supplétif en vertu du renvoi de l'article 1495 NCPC, les arbitres n'indiquent en rien comment ce texte trouve à s'appliquer si ce n'est parce que les rattachements « ne conduisent à aucun résultat certain ». Cette circonstance ne peut suffire à l'évidence pour l'application des dispositions de ce texte (pour une étude d'ensemble, v. notre article, « La soumission de l'arbitrage international à la loi française (Commentaire de l'article 1495 NCPC) », Rev. arb., 1991.155). Le tribunal arbitral semble même se contredire quelque peu compte tenu de sa position exprimée auparavant selon laquelle il ne peut se contenter de constater qu'il s'agit d'un arbitrage international se déroulant à Paris et soumis aux dispositions des articles 1492 et s., ces articles ne déterminant pas la loi applicable à la validité de la convention d'arbitrage.

(1992)

L'invocation de l'article 14 C. civ. étonne également. Le tribunal arbitral indique que la clause compromissoire privant la demanderesse du for de son domicile en France dont elle bénéficiait sans cela en vertu de l'article 14 C. civ., « il paraît dès lors logique que seule une clause d'arbitrage valable selon le droit français » puisse la priver du droit de s'adresser aux tribunaux français. Singulière et dangereuse affirmation ! Une partie française pourrait conclure des clauses compromissoires que si elles étaient valables selon le droit français ? Faudrait-il considérer que la renonciation à un privilège de juridiction laisse place au privilège d'application de sa loi nationale ? Il y a de quoi être surpris. Le recours à l'arbitrage doit priver la partie française d'invoquer les dispositions de l'article 14 C. civ. que la convention d'arbitrage soit ou non valable au regard du droit français et celui-ci n'a pas vocation à s'appliquer du seul fait que la partie demanderesse est française.

En réalité, le droit français paraît avoir été retenu par les arbitres comme loi applicable à la convention d'arbitrage au seul titre de loi du lieu de l'arbitrage (cf. Y. Derains, obs. préc., JDI, 1991, spéc. p. 1038 qui ne souffle mot des deux autres titres d'application du droit français). Cette solution, consacrée dans ses résolutions par l'Institut de droit international (Ann. Inst. dr. int., 1957, II, p. 479 et s. et 1959, II, p. 372 et s.) est souvent retenue par les arbitres internationaux (v. par ex. sentences CCI n° 4392/1983, JDI, 1983.907, obs. Y. Derains ; n° 4472/1984, JDI, 1984.464, obs. S. Jarvin).

Après cette recherche de la loi applicable à la convention d'arbitrage, le tribunal arbitral conclut que la question de savoir si M. Orri est lié par la clause compromissoire sera examinée au regard du droit français, et dans le cas d'une réponse positive, de surcroît au regard du droit grec, comme loi du fond. On pourrait alors penser qu'en définitive la recherche de la loi applicable était inutile, il n'en est rien puisque cette démarche de l'extrême prudence des arbitres. Si c'est la loi française qui est applicable, il n'est pas en effet nécessaire de contrôler les résultats de son application au regard de la loi grecque ; une réponse identique des deux droits permet cependant d'asseoir encore mieux la solution, et de montrer que le choix d'une autre loi applicable que celle retenue aurait conduit à un résultat identique. Cela est d'ailleurs d'autant plus important que la loi française n'a été en réalité choisie qu'au seul titre de loi du lieu de l'arbitrage, et qui ne correspond pas à une solution unanimement admise dans l'arbitrage international.

Au regard de la loi française, le tribunal arbitral ne rencontre guère de difficultés pour prouver que la clause compromissoire engage M. Orri. Figurant par écrit, elle est régulière en la forme et le défaut de signature de l'intéressé n'est pas gênant. Le droit français n'exige pas en effet que la convention d'arbitrage soit signée, et M. Archaniotakis « bénéficiait à tout le moins de pouvoirs

(1992)

JURISPRUDENCE FRANÇAISE 105

Line S.A., n'est pas en revanche partie au contrat, et ne peut en principe être engagée. La question ne présente du reste pas d'intérêt puisque le tribunal arbitral montre qu'à une dette de M. Orri et les payées sont prescrites : la prénotation hypothécaire qui a interrompu la prescription n'a été prise sur les immeubles de M. Orri, et à la différence notamment du droit français (art. 2249 C. civ.), le Code civil grec indique que les actes interruptifs de prescription concernant l'un des codébiteurs n'opèrent ni en faveur ni au préjudice des autres, à moins que le contraire ne résulte du rapport de droit, ce qui n'était pas le cas en l'espèce. A supposer que la société Saudi Europe Line S.A. ait été codébitrice de M. Orri, elle pouvait donc invoquer à juste titre la prescription. On mesure alors toute l'importance de la reconnaissance de l'effet obligatoire de la convention d'arbitrage à l'égard de M. Orri.

Sur la somme qui lui est due, la société Elf-Lub réclame le paiement d'intérêts moratoires au taux de 25 %, cela en application d'un texte grec permettant au créancier d'une somme d'argent de réclamer des intérêts moratoires sans faire la preuve d'un préjudice et de la réglementation grecque fixant le maximum de ce taux à hauteur de 25 % par an. La sentence est à cet égard intéressante. Le tribunal arbitral indique que ce taux, extraordinairement élevé, dicté notamment par l'évolution de taux, et de l'inflation dans ce pays, ne peut se rapporter qu'à une dette en monnaie locale (drachmes) et non en devises (dollars), comme c'est le cas en l'espèce, ainsi que l'indique d'ailleurs un arrêt d'une juridiction grecque. Il déclare ensuite que si « le principe d'un intérêt moratoire est certes justifié selon les usages du commerce international, encore convient-il, en revanche de le fixer au taux usuel pour la monnaie considérée », et estime justifié de retenir pour la période considérée (1984 à 1988) un taux de 9,5 %.

La sentence est conforme à l'opinion qui prévaut en doctrine et dans la pratique arbitrale internationale selon laquelle l'arbitre dispose, en l'absence de taux contractuellement déterminé d'une grande liberté dans la fixation du taux des intérêts moratoires (v. par ex. sentence ad hoc, Lausanne/Libye, Rev. arb., 1980.132, spéc. p. 187 ; sentences CIRDI Agip/Gouvernement du Congo : Agip, 30 novembre 1979, Rev. crit. DIP, 1982.92, spéc. p. 104 ; Benvenuti, 8 août 1980, Yearbook Commercial Arbitration, 1983.144, spéc. p. 151). Et si de nombreuses sentences déterminent ce taux à partir du droit applicable au contrat (v. par ex. sentences CCI n° 5277/ 1984, Recueil des sentences arbitrales de la CCI : 1974-1985 (partie anglaise) ; n° 5277/1987, Yearbook Commercial Arbitration, 1988, 80) — ce qui aurait conduit ici au droit grec — d'autres s'en tiennent au taux d'intérêt légal du pays du créancier (v. par ex. sentence CCI n° 2375/1975, JDI, 1976.973, obs. Y. Derains) — taux français en l'espèce. L'arbitre n'est cependant pas tenu de se référer au taux légal d'un système juridique national (Sentence CCI n° 6219/

(1992)

---

104 JURISPRUDENCE FRANÇAISE

apparents » pour signer la clause compromissoire au nom de M. Orri. Il avait participé à toutes les négociations, signé le procès-verbal, et comportait comme le mandataire autorisé de Saudi Europe Lines. Bien plus, M. Orri avait parfaite connaissance de la clause arbitrale qui figurait dans le projet qui lui avait été soumis au préalable et à même invité M. Archaniotakis à le signer en sa présence. Il avait de plus ratifié l'accord par la poursuite des relations d'affaires avec Elf-Lub sur la base du contrat litigieux.

Le tribunal arbitral conduit que M. Orri est lié par la clause d'arbitrage contenue dans le contrat litigieux « signé en son nom, sur ses instructions et en sa présence par M. Archaniotakis, qui n'était intervenir ». Et à supposer que M. Orri et n'avait aucun titre à kis, M. Orri ait voulu se soustraire à l'intervention de M. Archaniotakis, il aurait considérer qu'un tel procédé cauduleux et même dolosif ne mérite pas d'être protégé par la loi ».

C'est donc une motivation s'appuyant à la fois sur les pouvoirs apparents du signataire — dont on rappellera qu'ils suffisent à une personne qui peut disposer — pour engager valablement une société (Paris, 4 janvier 1980, Rev. arb., 1981.160, note P. Level) — la parfaite connaissance de la clause, la ratification de celui-ci dans l'exécution du contrat, et son éventuelle mauvaise foi — alors que de très nombreuses sentences internationales s'attachent à rappeler l'importance de la bonne foi dans les relations commerciales internationales — qui permet de retenir en l'espèce l'effet obligatoire de la clause d'arbitrage à l'égard d'une personne qui ne l'a pas signée.

Au regard du droit grec, pourtant plus formaliste que le droit français, le tribunal arbitral aboutit à un résultat équivalent. Le vice de forme tiré du défaut de signature de l'intéressé (M. Orri) est couvert par sa mauvaise foi à l'invoquer, sa médiatisation (M. Orri) contrat qu'il n'a jamais dénoncé et dont au contraire il a tiré profit ainsi que par sa parfaite connaissance de la clause d'arbitrage.

Au regard du droit français comme du droit grec, le tribunal arbitral peut donc retenir sa compétence à l'égard de M. Orri, écarter la procédure Saudi Europe Lines, qui n'est pas une entité distincte de M. Orri et qui sert uniquement de non commercial à celui-ci, et se reconnaître compétent à l'égard de la société Saudi Europe Line S.A. qui a participé à l'arbitrage sans réserves et conclu au fond sans soulever l'incompétence des arbitres.

C) Le tribunal arbitral applique conformément à la volonté des parties le droit grec pour le règlement du fond du litige. Le montant de la créance d'Elf-Lub n'est pas contesté, et il est dû par M. Orri personnellement, qui a traité sous la « raison de commerce individuelle », Saudi Europe Lines. L'autre défenderesse, Saudi Europe

(1992)

1990, *IDI*, 1990,1047, obs. Y. Derains), et le taux retenu doit « *être raisonnable, et fixé en tenant compte de toutes circonstances pertinentes, et notamment... des taux en vigueur sur le marché de la monnaie considérée et du taux d'inflation de cette monnaie... »* (même sentence, qui invoque de nombreuses sentences en ce sens). La sentence présente fait une exacte application de ces principes d'orientation: le taux retenu correspond de manière générale tant à un taux moyen pour une créance exprimée en dollars qu'au taux légal français de l'époque, taux du pays de Elf-Lub.

Enfin, on remarquera que la présente sentence pose l'exigence d'un préjudice effectif, distinct de celui couvert par les intérêts moratoires, pour l'attribution au créancier de *dommages et intérêts compensatoires*. A ce titre, les arbitres estiment par exemple que ne constitue pas un tel préjudice le surcroît de prestations imposé aux services de Elf-Lub par cette affaire : le temps consacré par le demanderesse elle-même au recouvrement de ses factures litigieuses *« entre normalement dans ses frais généraux »*. On peut rapprocher cette position du principe posé par de très nombreuses sentences de l'obligation faite au créancier de minimiser ses pertes (v. par ex. sentence 5721/1990, *IDI*, 1990,1019, obs. Y. Derains) dont on a pu écrire qu'il constitue l'un des principes les mieux établis des usages du commerce international et de la *lex mercatoria* (Y. Derains, obs. in *IDI*, 1988, p. 1216).

## II. — L'ARRÊT

La Cour d'appel de Paris rejette le recours en annulation contre la sentence intenté par M. Orri pour qui les arbitres auraient statué sans convention d'arbitrage à son égard. Pour ce faire, la Cour utilise un considérant qui pour être habituel n'en est pas moins critiquable (A), précisément en fonction des données de la cause qui permettaient d'asseoir plus nettement la décision que les multiples arguments invoqués par la Cour à l'appui de ce considérant (B).

A) L'arrêt s'ouvre sur le considérant d'après lequel *« selon les usages du commerce international la clause compromissoire insérée dans un contrat international prend une validité et une efficacité propre qui commandent d'en étendre l'application aux parties directement impliquées dans l'exécution du contrat et les litiges qui peuvent en résulter, dès lors qu'il est établi que leur situation contractuelle, leurs activités et les relations commerciales habituelles existant entre les parties font présumer qu'elles ont accepté la clause d'arbitrage, dont elles connaissaient l'existence et la portée, bien qu'elles n'aient pas été signataires du contrat qui la stipulait ».*

La méthode utilisée ne peut échapper. Alors que les arbitres s'étaient attachés à déterminer la loi applicable à la convention

d'arbitrage, la Cour préfère détacher la solution de tout droit étatique que se référant aux usages du commerce international. L'arrêt prend donc le contrepied total des arbitres pour qui la convention d'arbitrage pour être efficace doit tirer sa force de son rattachement à un ordre juridique, et se situe dans la mouvance des décisions considérant que la convention d'arbitrage est valable indépendamment de toute loi étatique (v. par ex. Paris, 13 décembre 1975, *Menicacci, Rev. crit. DIP*, 1976,507, note B. Oppetit ; Paris, 1977,147, note Ph. Fouchard ; *IDI*, 1977,106, note E. Loquin ; Toulouse, 26 octobre 1982, *IDI*, 1984.603, note H. Synvet ; Paris, 9 novembre 1984, *IDI*, 1986.1039, note E. Loquin).

Le considérant avancé en l'espèce l'a été à de nombreuses reprises auparavant par la Cour d'appel de Paris dans les espèces les plus diverses ayant en commun de lier par la convention d'arbitrage une personne qui n'en était pas signataire. C'est ainsi qu'il a successivement été invoqué, à quelques variantes près, pour le transfert de la convention d'arbitrage (comme accessoire d'une créance transmise (20 avril 1988, *Rev. arb.*, 1988.570), l'effet obligatoire en matière maritime de la clause compromissoire contenue dans une charte-partie à l'égard du fréteur non signataire (14 février 1989, *Rev. arb.*, 1989.691 (2e esp.), note P.-Y. Tschanz), l'effet obligatoire de la clause d'arbitrage conclue par le gouvernement désigné dans le même public étranger à l'égard d'un transporteur désigné dans le contrat contenant la clause et chargé de l'exécution (28 novembre 1989, *Rev. arb.*, 1990.675 (1er esp.) note P. Mayer), ou encore l'extension des effets de la convention d'arbitrage à une société appartenant au même groupe que la société qui l'avait conclue (30 novembre 1989, *Rev. arb.*, 1989.691 (1er esp.) note P.-Y. Tschanz).

Si dans ses applications pratiques, il n'a pas donné lieu à des résultats choquants, le considérant qui fonde ces multiples décisions, en en particulier l'arrêt rapporté, a été critiqué fortement par M. Mayer qui en a montré d'un point de vue théorique à la fois le caractère artificiel, en ce qu'il ne peut logique au regard de la théorie générale des obligations et d'un autre point de vue pratique le danger par le risque de confusion qu'il peut faire naître. Ce sont ses applications dans les situations très différentes (Cité sous Paris, 1er Ch., supra, 28 novembre 1988 et 8 mars 1990, *Rev. arb.*, 1990.675, spéc. p. 688 et s.).

B) À l'appui de son considérant la Cour d'appel de Paris invoque plusieurs arguments pour rejeter le recours en annulation.

Elle indique en premier lieu que les deux conventions litigieuses (le procès verbal et le contrat litigieux) constituent un *« ensemble contractuel indivisible »*. On pourrait alors être tenté d'appliquer à l'accord qui ne la contient pas la clause compromissoire inscrite dans l'autre convention, ainsi qu'on témoigne l'arrêt de l'*epraix* de la Chambre commerciale de la Cour de cassation (5 mars 1991 (rapporté *supra*, p. 66 avec la note de L. Aynès). Dans cet arrêt cependant, il

s'agit du champ d'application de la convention d'arbitrage quant à son objet, et de son éventuelle extension à un autre contrat mais il s'agit non seulement de préciser le champ d'application de la clause d'arbitrage quant à son objet (contienne dans le contrat litigieux, peut-elle s'appliquer au procès-verbal ?) mais aussi quant aux personnes qu'elle oblige (une personne non signataire de la clause d'arbitrage peut-elle néanmoins y être tenue ?). L'indication d'un *ensemble contractuel indivisible*, si elle est précieuse, ne suffit donc pas.

C'est donc fort logiquement que la Cour continue son raisonnement en montrant l'engagement de M. Orri pour toutes les relations avec la société Elf-Lub : s'il n'a matériellement signé que les procès verbal, il est juridiquement partie au contrat litigieux. La Cour reprend ici les conclusions de la sentence montrant que Saudi Europe Lines désigne en réalité M. Orri lui-même.

La Cour ne s'en tient cependant pas à ses seules appréciations et indique que « les tiers (...) ce n'est que par un *subterfuge* » que le véritable contractant d'Elf-Lub s'est « *effacé pour laisser la place à un comparse*, M. Archanulakis, et que « *cette manœuvre est constitutive d'une fraude manifeste, destinée à occulter le véritable contractant* qui est M. Orri personnellement ». Sur ce point, les arbitres se situaient largement en retrait : s'ils s'étaient laissés à dire, lors du défaut d'engagement de M. Orri « serait particulièrement choquant qu'ils avaient en définitive conclu de manière générale, en indiquant que M. Archanotakis avait signé au nom de M. Orri, en sa présence et sur ses instructions, réservant simplement l'*éventualité* d'une manœuvre de ce dernier qui aurait alors été considéré comme un « *procédé astucieux et même déloyal* ».

La prudence des arbitres contraste ici singulièrement avec l'autorité des juges étatiques, et rien n'obligeait la Cour d'appel à franchir le pas et à déclarer qu'il y avait ici « *fraude manifeste* ». A. A la lumière des circonstances de l'affaire, la fraude paraissait cependant patente, et on ne pourrait reprocher aux juges étatiques d'avoir été choqués, par le comportement de l'intéressé. Mais ce qui reste regrettable, c'est qu'ayant retenu la fraude manifeste, la Cour n'en ait pas tiré des conclusions plus fermes. C'est bien la fraude — la fraude qui corrompt tout — qui aurait pu permettre d'asseoir la solution de manière plus ferme que ne l'aurait du considérant critiqué. L'interposition de personne à fin d'échapper à ses engagements, ou de rester illégalement dans l'ombre, est bien un procédé frauduleux. Le mécanisme est connu en matière de sociétés au travers notamment pour quer les sociétés fictives (v. par ex. Cass. civ. 3e, 22 juin 1976, D., 1977.619 note P. Diener) ou pour annuler des cessions de droits sociaux visant à contourner une clause d'agrément licite (Grenoble,

30 juin 1988, *JCP*, 1989 II 21238, note B. Oppetit et rejet du pourvoi par Cass. com. 27 juin 1989, *D.*, 1990.314 note J. Bonnard).

Dès lors, c'était bien l'interposition de personne qui était au centre de cette affaire et la notion de groupe de sociétés auquel fait appel l'arrêt pour indiquer que l'engagement de M. Orri trouve encore son fondement dans cette notion est surabondant (en ce sens également, B. Audit, note préc.). La référence ainsi opérée est une personne physique dangereuse dans la mesure où elle entendrait appliquer à des personnes morales. Les arbitres avaient en la sagesse d'écarter l'argumentation des parties, tant ils demandaient-se que défenderesses par ailleurs - ce qui montre sans doute à quel point le maintien de l'argument était délicat - invoquant des décisions rendues sur l'arbitrage et les groupes de sociétés. Il n'est d'ailleurs pas sûr que les critères aujourd'hui dégagés par la jurisprudence française et certaines tendances internationales, et tirés de la volonté des sociétés concernées et de l'existence d'un groupe de sociétés, pour retenir l'extension des effets de la convention d'arbitrage conclue par une société à une autre société du groupe, soient satisfaisants. Il semble préférable en effet de s'appuyer sur des critères plus juridiques, et moins arbitraires, d'immixtion, caractérisée dans le fonctionnement d'une société, de confusion de patrimoines ou de fraude (pour une étude d'ensemble, v. notre thèse, *Arbitrage et société*, Thèse Paris II, 1991, n° 534 à 566).

La référence finale de l'arrêt au caractère usuel de la clause d'arbitrage dans la pratique du commerce international n'offre aucun intérêt dans une affaire où les circonstances étaient telles qu'on aurait pu espérer une forte motivation, plus serrée que celle utilisée, pour condamner haut et fort des pratiques répréhensibles. De ce point de vue, l'arrêt de la Cour d'appel de Paris laisse un arrière-goût d'insatisfaction.

Daniel COHEN

Docteur en Droit
Attaché d'enseignement et de recherche
à l'Université Panthéon-Assas (Paris II)

I swear that I am a fluent speaker of the French language and that the above translation of the decision of the Paris Court of Appeal, dated January 11, 1990, is true and correct in every respect, to the best of my knowledge.


Signed on the 22nd of February 2007.



_____

Elizabeth Lefebvre-Gross, Esq.

Member of the New York bar


White & Case LLP

1155 Avenue of the Americas

New York, New York 10036

212-819-8200

**Paris Court of Appeal (1stCh.D), December 7, 1994**

Parties :
Claimant : V 2000
Defendant : Project XJ 220 ITD et al

The Court rules on the grounds of appeal asserted by Jaguar France SA and by the company Project J 220 LTD to the judgment rendered on April 26, 1994 by the Court of First Instance of Paris, which:
- stated that the back of the *Application form* document, written in a foreign language, almost illegible, not signed or initialed by Philippe Renault, cannot bind him,
- stated that the French translation of the *application form*, which was initialed by Philippe Renault, binds him,
- stated that Philippe Renault was informed of the clause in Article 14 indicating that any disputes arising would be resolved by international arbitration,
- stated that the sale of the Jaguar XJ 220 vehicle does not involve international trade interests,
- stated that the arbitration clause in Article 14 of the agreement signed by the parties is null and void,
- stated that the Court of First Instance of Paris has jurisdiction to rule on the dispute between the parties.
-

During 1989, the English company Project XJ 220 (Project) planned to build and market in a limited series – and provided at least 220 acquisition offers were received – a new model of the Jaguar type XJ 220 car.

For France, and even though it was not in charge of the distribution of this vehicle, the Jaguar network served as a relay in the operation, under the legal conditions which are being considered.

In January 1990, Mr. Philippe Renault signed an acquisition offer or "*Application Form*" written in English with Project, as well as the French translation, made at the initiative of Jaguar France, of the general sales conditions applicable to the contract and appearing on the back of the *application form*, thus undertaking to buy an XJ 220 vehicle for the price of 290,000 pounds sterling II.T on January 1, 1990 – with indexation of this price to the evolution of the British Price Index – which was to be paid in three installments:
- one down-payment when accepting the offer,
- one second payment within 30 days from the notice by Project that the car would be available within nine months,
- the balance on delivery.

He accompanied his signature by a reservation check of 50,000 pounds sterling, which subsequently he replaced, at the request of Jaguar France, which had itself advanced the funds to Project by a check for 478,250 francs, corresponding to the equivalent in French francs of the amount of 50,000 pounds sterling written to the order of Jaguar France.

On March 15, 1990, he was notified that his offer had been accepted and then that the vehicle would be delivered to him within 9 months. The second payment was requested from him in November 1992. Mr. Philippe Renault, who did not want to keep his order, refused to pay and brought suit against Project and Jaguar France before the Court of First Instance of Paris to render the contract null and void and obtain a refund of the amounts paid.

Project and Jaguar France opposed the jurisdiction of this Court, citing the arbitration clause appearing in Article 14 of the contract, which granted jurisdiction in the event of dispute to an arbitrator designated by the President of the London Law Society.

The first judges rejected this defense, considering that the clause was null by application of Articles 2061 of the Civil Code and 631 of the Commercial Code.

To support their respective arguments, Project and Jaguar France, the successor to which is today Company V 2000, indicate that the disputed contract was signed directly between Mr. Philippe Renault and Project and not with Jaguar France whose role, according to them, was exclusively administrative and commercial.

They sustain that the sales agreement, which involved cross-border transfers of goods and funds, with Mr. Philippe Renault – to whom they would deny the status of regular consumer, given the speculative character and the amount of the acquisition he was making – involves, even though it is unique and even though the first down-payment was paid in French francs to Jaguar France, international trade interests.

They conclude that, even though it is found in a contract of a mixed nature, and even though the contract was executed with a consumer, the arbitration clause – the application of which V 2000 deems that it also has grounds to claim, even though it is not a party to the contract, since it is directly involved in its performance – which was accepted by Mr. Philippe Renault and which is not abusive or fraudulent under international public policy, is valid. They request a ruling that the Court of First Instance of Paris does not have jurisdiction to hear the case and that the case and the parties should be heard by the British arbitrator appointed by the President of the London Law Society.

Project requests, in addition, 4,000 francs under Article 700 of the New Code of Civil Procedure. Philippe Renault, for his part, contests that he has ever contracted with Project; he claims that his only contact was always Jaguar France, with which he closed the sale and which actually implicitly recognized this, in his opinion, by claiming the benefit of the arbitration clause.

He adds that this clause, which he did not accept, cannot be enforced against him and sustains that, in any event, it is null on the one hand because of the insufficient description of the terms of arbitration, and on the other hand, based on Articles 2061 of the Civil Code and 631 of the Commercial Code, since he is not a merchant. Thus, the contract is civil concerning him, and Article 1492 of the New Code of Civil Procedure, which validates these clauses in contracts of a mixed nature, is inapplicable in this case, due to the absence of involvement of international trade interests; and, finally, the clause is abusive because it was included fraudulently in a contract whose international character is a façade for the exclusive purpose of escaping the consumer protection regulations, while the dispute is actually inarbitrable under French law and under international public law.

He considers that, consequently, the Court of First Instance of Paris has jurisdiction to hear the case under Article 42 of the New Code of Civil Procedure.

The Public Prosecutor argues that the grounds of appeal should be rejected, since the contract in question is of a mixed nature and does not involve international trade interests.

*-On the grounds of appeal of Project XJ 220 LTD:*

Under Article 1458 of the New Code of Civil Procedure, applicable both to domestic arbitration and to international arbitration:
"where a dispute, referred to an arbitral tribunal pursuant to an arbitration agreement, is brought before a state court, the latter must decline jurisdiction;
Where the case has not yet been brought before an arbitral tribunal, the court must also decline jurisdiction save where the arbitration agreement is manifestly null."

Mr. Philippe Renault argues precisely that the arbitration clause appearing in Article 14 of the "application form" signed by him in January 1990 is null:
-because this is a domestic arbitration and he is not a merchant,
-because he did not accept it,
-because of insufficient description of the terms of arbitration,
-because the dispute is inarbitrable under domestic French law and under international public law, since it involves public policy regulations for the protection of the consumer.

The lower court judge considered that this could not be an international arbitration since the "purchase from a foreign company through a French company, which is the exclusive importer of this foreign brand, of a good produced abroad but in limited series, certainly expensive but picked out by an individual who does not intend to resell it after transforming it, or not, but rather intends it to be for his personal use, does not constitute an economic activity in the international sense.

The outcome of the case in fact depends on the domestic or international character of the disputed arbitration.

The internal or international character of the arbitration is determined exclusively from the nature of the economic operation concerned, involving international trade interests, regardless of the place of arbitration, of the law governing the merits of the case or the nationality of the contracting parties.

In the case at hand, it was indeed for the profit of the English company Project that Philippe Renault signed an acquisition offer in January 1990; the company accepted the offer, and it was also this company that built in the United Kingdom a vehicle that was to be later imported to France. In fact it was with that company that Mr. Philippe Renault directly corresponded afterwards.

Finally, it was that company that received or should have received in the end the payment of the sales price, whether it was paid directly by the client (2nd and 3rd payments) or advanced for commercial reasons by Jaguar France on behalf of the client (1st down-payment).

It can therefore be sustained that, regardless of the legal role played by Jaguar France in the execution of the operation, the contract signed, which was for a cross-border transfer of goods and funds, involved international trade interests pursuant to Article 1492 of the New Code of Civil Procedure.

In the international order, the arbitration clause is permitted as such, by virtue of the general principle of autonomy of the arbitration clause, which is a *règle matérielle*, assuring that it is effective, regardless of the

law governing the contract in which it is contained or of the parties to this contract, with only the condition of international public policy.

Such being the case, the mixed character of the contract signed in which the clause is contained does not render it manifestly null.

In addition, in international matters, the arbitrators alone determine their jurisdiction and the validity of their nomination and extent of their mission.

In particular, they have jurisdiction to determine their own jurisdiction as to the arbitrability of the dispute under international public policy. This jurisdiction is not excluded by the mere fact that an imperative regulation is applicable to the disputed legal relationship, and thus they have the power to apply the principles and rules related to such public policy and, subject to the oversight of the judge on appeal, penalize the violation of such principles and rules, as would result from a behavior contrary to the good faith that must prevail in relations between partners in international trade.

It follows that neither the possible applicability to the dispute of the consumer protection regulations, nor the accusation of fraud made by Mr. Philippe Renault against his co-contracting party or parties are of a nature, by themselves, to exclude the jurisdiction of the arbitrators.

Finally, it is true that Mr. Philippe Renault initialed the French translation of Project's general sales conditions, appearing on the back of the *application form* and especially page 4, on which the disputed arbitration clause clearly and legibly appears; consequently he cannot seriously claim that he was completely unaware of it, and it will be up to the arbitrators alone to decide whether these initials on a document which is not the agreement itself constitute or do not constitute the necessary consent for their appointment.

Furthermore, Article 1443 of the New Code of Civil Procedure, which considers that an arbitration clause that does not include terms for the designation of the arbitrators is null, does not apply to international arbitration.

Under these circumstances, the various grounds presented by Mr. Philippe Renault to avoid the application of the arbitration clause in his relationship with Project XJ 220 LTD are rejected.

Since said clause is not manifestly null, it must on the contrary be applied.

- *On the grounds of appeal raised by Jaguar France, which became V 2000*:
Jaguar France, the successor to which is V 2000, which Mr. Philippe Renault claims is his co-contracting party, is directly interested in the dispute; although it did not sign it, Jaguar France was aware of the disputed agreement, which it took the initiative of having translated, and, in particular, of the existence of the arbitration clause, the benefit of which it claims.

Yet, in international arbitration law, an arbitration clause binds parties that are directly involved in the performance of the contract, provided that their situations and activities create the presumption that they were aware of the existence and scope of this clause, so that the arbitrator can consider all the economic and legal aspects of the dispute.

By application of this rule, the grounds of appeal raised by Jaguar France are accepted.

Equity does not require giving Project XJ 220 LTD the benefit of the provisions of Article 700 of the New Code of Civil Procedure.

On these grounds:

the Court accepts the grounds of appeal asserted by Jaguar France, the successor to which is V 2000, and Project XJ 220 LTD to the judgment rendered on April 26, 1994 by the Court of First Instance of Paris; this Court does not have jurisdiction to hear the dispute between Philippe Renault, on the one hand, and V 2000 and Project XJ 220 LTD, on the other, and instructs the parties to go to a different forum; there is no need to grant Project XJ 220 LTD the benefits of the provisions of Article 700 of the New Code of Civil Procedure.

Ms. COLLOMP, President; Ms. CAHEN-FOUQUE, Mr. LINDEN, judges; Mr. GUIRIMAND, prosecutor; Messrs. SANTANA, MOISSINAC, attorneys.

Source: Revue de l'arbitrage, 1996 - No. 2, pp. 245 - 249

## Cour d'appel de Paris (1reCh. D), 7 décembre 1994

**Parties:**

| | |
|---|---|
| Claimant | Société V 2000 |
| Defendant | société Project XJ 220 ITD et autre |

Subject matters:
- ARBITRAGE INTERNATIONAL [international arbitration]
- CLAUSE COMPROMISSOIRE [arbitration agreement; arbitral clause]
- ACTE MIXTE
- VALIDITÉ
- ART. 2061 C. CIV.
- APPLICATION (NON)
- APPLICABILITÉ AU LITIGE DES RÈGLES DU DROIT DE LA CONSOMMATION
- CAUSE D'EXCLUSION DE LA COMPÉTENCE ARBITRALE (NON)
- CLAUSE COMPROMISSOIRE [Arbitration clause] [arbitration agreement; arbitral clause]
- 1°) ACTE MIXTE
- ARBITRAGE INTERNATIONAL [international arbitration]
- VALIDITÉ
- ART. 2061 C. CIV.
- APPLICATION (NON)
- APPLICABILITÉ AU LITIGE DES RÈGLES DU DROIT DE LA CONSOMMATION
- CAUSE D'EXCLUSION DE LA COMPÉTENCE ARBITRALE (NON)
- 2°) ARBITRAGE INTERNATIONAL
- EFFET
- EXTENSION AUX PARTIES DIRECTEMENT IMPLIQUÉES DANS L'EXÉCUTION DU CONTRAT



*Le caractère interne ou international de l'arbitrage se déduit exclusivement de la nature de l'opération économique concernée mettant en cause des intérêts du commerce international, indépendamment du lieu de l'arbitrage, de la loi applicable au fond ou de la nationalité des contractants.*
*Dans l'ordre international, la clause compromissoire est licite en tant que telle, en vertu du principe général d'autonomie de la convention d'arbitrage, règle matérielle qui lui assure une efficacité propre indépendamment de la loi applicable au contrat dans lequel elle est stipulée ou du contrat sous la seule réserve de l'ordre public international; dès lors, le caractère mixte du contrat souscrit où elle figure n'est pas de nature à la rendre manifestement nulle; par ailleurs, en matière internationale, il appartient aux seuls arbitres de statuer sur leur compétence, sur la validité et sur l'étendue de leur investiture; ils ont notamment compétence pour apprécier leur propre compétence quant à l'arbitrabilité du litige au regard de l'ordre public international, étant observé que celle-ci n'est pas exclue du seul fait qu'une réglementation impérative est applicable au rapport de droit litigieux, et qu'ils disposent aussi du pouvoir d'appliquer les principes et règles relevant de l'ordre public et de sanctionner sous le contrôle du juge de l'annulation leur méconnaissance telle celle qui résulterait d'un comportement contraire à la bonne foi qui doit présider aux relations entre partenaires du commerce international; il suit de là que l'éventuelle applicabilité au litige de la réglementation protectrice du consommateur n'est pas de nature, en elle-même, à exclure la compétence arbitrale.*
*L'article 1443 NCPC qui édicte la nullité d'une clause compromissoire qui ne prévoirait pas les modalités de désignation des arbitres est sans application à l'arbitrage international.*
*Dans le droit de l'arbitrage international, les effets de la clause compromissoire s'étendent aux parties directement impliquées dans l'exécution du contrat dès lorsque leur situation et leurs activités font présumer qu'elles avaient connaissance de l'existence et de la portée de cette clause afin que l'arbitre puisse être saisi de tous les aspects économiques et juridiques du litige.*

La Cour statue sur les contredits formés par la SA Jaguar France et par la société Project J 220 LTD au jugement rendu le 26 avril 1994 par le Tribunal de grande instance de Paris qui a:
- dit que le verso du document *Application form*, rédigé dans une langue étrangère quasi illisible, non signé, ni paraphé par Philippe Renault ne lui est pas opposable,
- dit que la traduction française de l' *application form* qui a été paraphée par Philippe Renault a valeur contractuelle,
- dit que Philippe Renault a eu la clause de l'article 14 prévoyant le recours à un arbitrage international en cas de différend, portée à sa connaissance,
- dit que la vente du véhicule Jaguar XJ 220 ne met pas en jeu les intérêts du commerce international,
- dit nulle la clause compromissoire de l'article 14 de la convention signée par les parties,
- dit que le Tribunal de grande instance de Paris est compétent pour statuer sur le litige qui oppose les parties.
Dans le courant de l'année 1989, la société de droit anglais Project XJ 220 (Project) a fait le projet de construire et de commercialiser, en série limitée et à la condition qu'elle reçoive au moins 220 offres d'achats, un nouveau modèle de voiture Jaguar XJ 220.
Pour ce qui concerne la France, et bien qu'il n'ait pas été chargé de la distribution de ce véhicule, le réseau Jaguar a servi, dans des conditions juridiques qui sont discutées, de relais à l'opération.
En janvier 1990, Monsieur Philippe Renault a signé une offre d'achat ou «Application Form» rédigée en anglais au profit de la Société Project ainsi que la traduction française, réalisée à l'initiative de la Société Jaguar France des conditions générales de vente applicables au contrat et figurant au verso de l' *application form*, s'engageant ainsi à acquérir un

véhicule de type XJ 220 au prix de 290 000 livres sterling H.T. au 1er janvier 1990 avec indexation de ce prix sur l'évolution de l'indice des prix britannique lequel devait être payé en trois fois:
- 1 acompte à l'acceptation de l'offre,
- 1 deuxième versement dans les 30 jours de la notification par la Société Project que la voiture serait disponible sous 9 mois,
- le solde à la livraison.
Il a accompagné sa signature d'un chèque de réservation de 50 000 livres sterling qu'il a remplacé ultérieurement à la demande de la Société Jaguar France qui avait elle-même avancé les fonds à la Société Project par un chèque de 478 250 francs correspondant à la contre valeur en francs français de la somme de 50 000 livres sterling établi à l'ordre de Jaguar France.
Le 15 mars 1990, il a été avisé que son offre avait été acceptée et par la suite que le véhicule lui serait livré sous 9 mois; le deuxième acompte lui a été réclamé en novembre 1992; Monsieur Philippe Renault qui n'entendait plus donner suite à sa commande a refusé de payer et a attrait les Sociétés Project et Jaguar France devant le Tribunal de grande instance de Paris pour faire prononcer la nullité du contrat et obtenir la restitution des sommes versées.
Les Sociétés Project et Jaguar France ont décliné la compétence de cette juridiction en se prévalant de la clause compromissoire figurant à l'article 14 du contrat et attribuant compétence en cas de litige à un arbitre désigné par le Président de la Law Society de Londres.
Les premiers juges ont rejeté cette exception en considérant que la clause était nulle par application des articles 2061 du Code civil et 631 du Code de commerce.
A l'appui de leurs contredits respectifs, les Sociétés Project et Jaguar France aux droits de laquelle se trouve aujourd'hui la Société V 2000 exposent que le contrat litigieux a été souscrit directement entre Monsieur Philippe Renault et la Société Project et non pas avec la Société Jaguar France dont selon elles, le rôle a été exclusivement administratif et commercial.
Elles soutiennent que la vente conclue avec Monsieur Philippe Renault auquel elles dénient la qualité de consommateur ordinaire compte tenu du caractère spéculatif et du montant de l'acquisition qu'il effectuait, qui réalise un transfert de biens et de fonds à travers les frontières met en cause, même si elle est unique et même si le premier acompte a pu être payé en francs français à la Société Jaguar France, les intérêts du commerce international.
Elles en déduisent que bien qu'insérée dans un contrat mixte et celui-ci fût-il conclu avec un consommateur, la clause compromissoire dont la Société V 2000 s'estime fondée à revendiquer aussi l'application même si elle n'est pas partie au contrat dès lors qu'elle est directement intéressée à l'exécution de celui-ci, qui a été acceptée par Monsieur Philippe Renault et qui est exclusive de tout caractère abusif ou frauduleux au regard de l'ordre public international est valable.
Elles demandent de dire que le Tribunal de grande instance de Paris est incompétent pour connaître du litige et de renvoyer la cause et les parties devant l'arbitre britannique nommé par le Président de la Law Society de Londres.
La Société Project sollicite en outre 4 000 francs sur le fondement de l'article 700 du nouveau Code de procédure civile.
Philippe Renault conteste quant à lui avoir jamais contracté avec la Société Project; il fait valoir que son interlocuteur unique a toujours été la Société Jaguar France avec laquelle il a conclu la vente ainsi d'ailleurs qu'elle le reconnaîtrait implicitement selon lui en se prévalant de la clause compromissoire.
Il ajoute que cette clause qu'il n'a pas acceptée lui est inopposable et soutient qu'en tout état de cause, elle est nulle d'une part du fait de l'insuffisante désignation des modalités d'arbitrage, d'autre part sur le fondement des articles 2061 du Code civil et 631 du Code de commerce, lui-même n'étant pas commerçant, le contrat étant civil à son égard et l'article 1492 du nouveau Code de procédure civile qui valide les clauses dans les contrats mixtes étant inapplicable en l'espèce en l'absence de mise en cause des intérêts du commerce international, enfin en raison de son caractère abusif pour avoir été insérée frauduleusement dans un contrat dont le caractère international n'est qu'apparent et dans le but exclusif d'échapper à la réglementation protectrice du consommateur alors que le litige est en réalité inarbitrable au regard du droit français et du droit public international.
Il estime que le Tribunal de grande instance de Paris est en conséquence compétent, par application de l'article 42 du nouveau Code de procédure civile pour connaître du litige.
Le Ministère Public conclut au rejet du contredit, le contrat en cause étant un acte mixte ne mettant pas en jeu les intérêts du commerce international.
- Sur le contredit formé par la société Project XJ 220 LTD:
Considérant qu'aux termes de l'article 1458 du nouveau Code de procédure civile, applicable tant aux arbitrages internes qu'aux arbitrages internationaux:
«lorsqu'un litige dont un tribunal arbitral est saisi en vertu d'une convention d'arbitrage est porté devant une juridiction de l'Etat, celle-ci doit se déclarer incompétente;
Si le tribunal arbitral n'est pas encore saisi, la juridiction doit également se déclarer incompétente à moins que la convention d'arbitrage ne soit manifestement nulle;
Considérant que Monsieur Philippe Renault soutient précisément que la clause compromissoire figurant à l'article 14 de d'application form qu'il a signée en janvier 1990 est nulle:
- parce qu'il s'agit d'un arbitrage interne et qu'il n'est pas commerçant,
- parce qu'il ne l'a pas acceptée,
- en raison de l'insuffisante désignation des modalités d'arbitrage,
- parce que le litige est inarbitrable au regard du droit interne français et du droit public international dès lors qu'il met en cause la réglementation d'ordre public protectrice du consommateur;
Que le premier juge a pour sa part considéré qu'il ne pouvait s'agir d'un arbitrage international alors que l'achat auprès d'une société étrangère par l'intermédiaire d'une société française importateur exclusif de cette marque étrangère, d'un bien produit à l'étranger mais en série limitée, certes coûteux mais isolé par un particulier qui n'entend pas le revendre après l'avoir transformé ou non mais le destine à son usage personnel ne constitue pas une activité économique au sens international;
Considérant que la solution du litige dépend en effet du caractère interne ou international de l'arbitrage litigieux;
Considérant que le caractère interne ou international de l'arbitrage se déduit exclusivement de la nature de l'opération économique concernée mettant en cause des intérêts du commerce international, indépendamment du lieu de l'arbitrage, de la loi applicable au fond ou de la nationalité des contractants;

Considérant qu'en l'espèce, c'est bien au profit de la société de doit anglais Project que Philippe Renault a signé une offre d'achat en janvier 1990; que cette offre a été acceptée par celle-ci; que c'est encore cette société qui construisait au Royaume-Uni un véhicule qui devait ensuite être importé en France; que c'est d'ailleurs avec elle que Monsieur Philippe Renault a directement correspondu par la suite;

Qu'enfin, c'est toujours elle qui a perçu ou devait percevoir en définitive le règlement du prix qu'il soit payé directement par le client (2eet 3eacomptes) ou avancé pour des raisons commerciales par la Société Jaguar France pour le compte de ce dernier (1eracompte);

Considérant qu'il peut donc être soutenu qu'indépendamment du rôle juridique joué par la Société Jaguar France dans la réalisation de l'opération, le contrat souscrit, qui réalisait un transfert de biens et de fonds à travers les frontières a mis en cause les intérêts du commerce international au sens de l'article 1492 du nouveau Code de procédure civile;

Or considérant que dans l'ordre international, la clause compromissoire est licite en tant que telle, en vertu du principal général d'autonomie de la convention d'arbitrage, règle matérielle qui lui assure une efficacité propre indépendamment de la loi applicable au contrat dans lequel elle est stipulée ou des parties à ce contrat sous la seule réserve de l'ordre public international;

Considérant dès lors que le caractère mixte du contrat souscrit où elle figure n'est pas de nature à la rendre manifestement nulle;

Considérant par ailleurs qu'en matière internationale, il appartient aux seuls arbitres de statuer sur leur compétence, sur la validité et sur l'étendue de leur investiture;

Qu'ils ont notamment compétence pour apprécier leur propre compétence quant à l'arbitrabilité du litige au regard de l'ordre public international, étant observé que celle-ci n'est pas exclue du seul fait qu'une réglementation impérative est applicable au rapport de droit litigieux, et qu'ils disposent aussi du pouvoir d'appliquer les principes et règles relevant de cet ordre public et de sanctionner sous le contrôle du juge de l'annulation leur méconnaissance telle celle qui résulterait d'un comportement contraire à la bonne foi qui doit présider aux relations entre partenaires du commerce international;

Considérant qu'il suit de là que ni l'éventuelle applicabilité au litige de la réglementation protectrice du consommateur, ni l'imputation de fraude avancée par Monsieur Philippe Renault à l'encontre de son ou de ses co-contractants ne sont de nature en elle-même à exclure la compétence arbitrale;

Considérant enfin qu'il est constant que Monsieur Philippe Renault a paraphé la traduction française des conditions générales de vente de la Société Project figurant au verso de l' *application form* et notamment la page 4 où se trouve reproduite clairement et lisiblement la clause compromissoire litigieuse; qu'il ne peut donc prétendre sérieusement l'avoir complètement ignorée et qu'il appartiendra aux seuls arbitres de rechercher si ce paraphe d'un document qui n'est pas la convention elle-même constitue ou non le consentement nécessaire à leur investiture;

Considérant encore que l'article 1443 du nouveau Code de procédure civile qui édicte la nullité d'une clause compromissoire qui ne prévoirait pas les modalités de désignation des arbitres est sans application à l'arbitrage international;

Considérant qu'ainsi les différents moyens développés par Monsieur Philippe Renault pour faire échec à l'application de la clause compromissoire dans ses rapports avec la Société Project XJ 220 LTD sont inopérants;

Que ladite clause n'étant pas manifestement nulle, elle doit au contraire recevoir application;

- Sur le contredit formé par la société Jaguar France devenue V 2000:

Considérant que la Société Jaguar France aux droits de laquelle se trouve la Société V 2000, dont Monsieur Philippe Renault prétend qu'elle est sa co-contractante, est directement intéressée par le litige; que bien qu'elle n'en soit pas signataire, elle a eu connaissance de la convention litigieuse qu'elle a pris l'initiative de faire traduire et notamment de l'existence de la clause compromissoire dont elle revendique elle-même le bénéfice;

Or considérant que dans le droit de l'arbitrage international, les effets de la clause compromissoire s'étendent aux parties directement impliquées dans l'exécution du contrat dès lors que leur situation et leurs activités font présumer qu'elles avaient connaissance de l'existence et de la portée de cette clause afin que l'arbitre puisse être saisi de tous les aspects économiques et juridiques du litige;

Considérant qu'en application de cette règle, le contredit formé par la Société Jaguar France doit aussi être accueilli;

Considérant que l'équité ne commande pas d'accorder à la Société Project XJ 220 LTD le bénéfice des dispositions de l'article 700 du nouveau Code de procédure civile;

Par ces motifs:

Déclare recevables et bien fondés les contredits formés par la Société Jaguar France aux droits de laquelle se trouve la Société V 2000 et la Société Project XJ 220 LTD au jugement rendu le 26 avril 1994 par le Tribunal de grande instance de Paris;

Dit que ce tribunal n'est pas compétent pour connaître du litige qui oppose Philippe Renault aux Sociétés V 2000 et Project XJ 220 LTD et renvoie les parties à se mieux pourvoir;

Dit n'y avoir lieu d'accorder à la Société Project XJ 220 LTD le bénéfice des dispositions de l'article 700 du nouveau Code de procédure civile;

MmeCOLLOMP, prés.; MmeCAHEN -FOUQUE, M.LINDEN, cons.; M.GUIRIMAND, av. gén.; MesSANTANA,MOISSINAC, av.

I swear that I am a fluent speaker of the French language and that the above translation of the decision of the Paris Court of Appeal, dated December 7, 1994, is true and correct in every respect, to the best of my knowledge.


Signed on the 22nd of February 2007.



Elizabeth Lefebvre-Gross, Esq.

Member of the New York bar


White & Case LLP

1155 Avenue of the Americas

New York, New York 10036

212-819-8200



LE SERVICE PUBLIC DE LA DIFFUSION DU DROIT          Vendredi 23 février 2007

ACCUEIL

## Les codes en vigueur


Retour

### NOUVEAU CODE DE PROCEDURE CIVILE

**Article 1458**

*(inséré par Décret nº 81-500 du 12 mai 1981 art. 5 Journal Officiel du 14 mai 1981 rectificatif JORF 21 mai 1981)*

Lorsqu'un litige dont un tribunal arbitral est saisi en vertu d'une convention d'arbitrage est porté devant une juridiction de l'Etat, celle-ci doit se déclarer incompétente.

Si le tribunal arbitral n'est pas encore saisi, la juridiction doit également se déclarer incompétente à moins que la convention d'arbitrage ne soit manifestement nulle.

Dans les deux cas, la juridiction ne peut relever d'office son incompétence.

Copier ou envoyer l'adresse de ce document

À propos du site    Plan du site    Nous écrire    Établir un lien    Mise à jour des textes

# CHAPTER III : COMMON RULES

Home > CODE OF CIVIL PROCEDURE
> BOOK IV - ARBITRATION
> TITLE I - ARBITRATION AGREEMENTS
> CHAPTER III - COMMON RULES

**Article 1451**
*(Decree n°81-500 of 12 May 1981, Official Journal of 14 May 1981, amendment JORF of 21 May 1981)*
The assignment of the arbitrator may only be entrusted upon a natural person; the latter must enjoy the full exercise of his civil rights.
If the arbitration agreement appoints a corporate entity, the latter may exercise the powers only of organizing the arbitration.

**Article 1452**
*(Decree n°81-500 of 12 May 1981, Official Journal of 14 May 1981, amendment JORF of 21 May 1981)*
The constitution of the arbitration tribunal will be completed only if the arbitrator or arbitrators accept the assignment entrusted upon them.
The arbitrator, who is aware of a ground for his recusal, must inform the parties. In that case, he may accept his assignment only upon the approval of the parties.

**Article 1453**
*(Decree n°81-500 of 12 May 1981, Official Journal of 14 May 1981, amendment JORF of 21 May 1981)*
The arbitration tribunal consists of one or more arbitrators in odd numbers.

**Article 1454**
*(Decree n°81-500 of 12 May 1981, Official Journal of 14 May 1981, amendment JORF of 21 May 1981)*
Where the parties designate arbitrators in even numbers, the arbitration tribunal will be completed by an additional arbitrator chosen either in accordance with the expectations of the parties, or in the absence of such expectations, by the appointed arbitrators, or in default of an agreement between the latter, by the president of the High Court.

**Article 1455**
*(Decree n°81-500 of 12 May 1981, Official Journal of 14 May 1981, amendment JORF of 21 May 1981)*
Where a natural person or corporate entity is entrusted to organise the arbitration, the task of arbitration will be entrusted to on: or more arbitrators approved by all parties.
In default of agreement, the person or entity entrusted to organise the arbitration will invite each party to designate an arbitrator and will designate, if necessary, the arbitrator necessary to complete the arbitration tribunal. The person will be appointed where th: parties fail to designate an arbitrator, the latter or entity entrusted to organise the arbitration.
The arbitration tribunal may also directly be constituted in accordance with the terms and conditions provided for under the preceding sub-article.
The person or entity entrusted to organise the arbitration may stipulate that the arbitration tribunal will pronounce only a draft award and that if one party contests said draft; the matter will be submitted to a second arbitration tribunal. In the latter event, the person or entity entrusted to organise the arbitration will designate the members of the second (arbitration) tribunal. Each party has the right to get one of the appointed arbitrators replaced.

**Article 1456**
*(Decree n°81-500 of 12 May 1981, Official Journal of 14 May 1981, amendment JORF of 21 May 1981)*
If the arbitration agreement does not specify the time-limit, the assignment of the arbitrators will last only for a period of six months to be reckoned as of the date on which the last of them accepted the said assignment.
The legal or contractual time-limit may be extended either by virtue of the agreement of the parties, or, at the request of one of them or of the arbitration tribunal, by the president of the High Court, or in the case referred to under Article 1444, sub-article 2, by the president of the Commercial Court.

**Article 1457**
*(Decree n°81-500 of 12 May 1981, Official Journal of 14 May 1981, amendment JORF of 21 May 1981)*
In the case referred to under Articles 1444, 1454, 1456 and 1463, the president of the court, to whom the case is referred, as ir a matter of summary interlocutory procedure, by a party or by the arbitration tribunal, will rule upon it by way of an order not open to

any review action.

However, this order may be subject to appeal where the president declares against the appointment of arbitrators in view of the grounds referred to under Article 1444 (sub-article 3). The appeal is brought, managed and determined as in an appellate plea against jurisdiction.

The competent president is that of the court designated in the arbitration agreement or, in default thereof, the one in whose jurisdiction the agreement has located the arbitration proceeding. Where the agreement is silent upon the same, the competent president will be that of the court of the place where one or more respondents to the interlocutory action live(s), or where the respondent does not live in France, the court of the place where the plaintiff dwells.

### Article 1458
*(Decree n°81-500 of 12 May 1981, Official Journal of 14 May 1981, amendment JORF of 21 May 1981)*

Where a dispute, referred to an arbitration tribunal pursuant to an arbitration agreement, is brought before a court of law of the State, the latter must decline jurisdiction.

Where the case has not yet been brought before arbitration tribunal, the court must also decline jurisdiction save where the arbitration agreement is manifestly null.

In both cases, the court may not raise sua sponte its lack of jurisdiction.

### Article 1459
*(Decree n°81-500 of 12 May 1981, Official Journal of 14 May 1981, amendment JORF of 21 May 1981)*

Any provision or agreement contrary to the rules herein laid down is deemed unwritten.

# EXHIBIT 18

Excerpt from: Fady Nammour, Droit et pratique de l'arbitrage interne et international 627-629 (2005).

## SECTION 2: ADDING CONTRACTUAL PARTIES

880    **Participation in the Contract.** It is very common that the performance of certain international contracts involves various economic operators depending on the complexity of the contractual operations envisioned, their technicality, or their specificity. The question is then to discover whether the arbitration clause affects these third party participants in the performance of the "parent agreement." Case law holds that in international arbitration law, the arbitration clause binds the parties directly involved in the performance of the contract in which they play a role, even though they may not be signatories thereto, when their situation or their activity leads to the assumption that they were aware of the existence and the scope of this clause. Such is the case of a company which is substituted for a first contractual party which had maintained contractual relations with the other party for several years and which was directly involved in the performance of the contracts containing the clause in dispute. (Paris 1st Ch., October 4, 2000, JCP E 2000 p. 1735; Gazette du Palais, Rec. 2001, summary p. 857, Journal No. 123, May 3, 2001, p. 50 footnote X; Paris 1st Ch., December 17, 1997, Gazette du Palais, Rec. 2000, summary p. 156, Journal No. 11, January 11m 2000, p. 54).

881    **Groups of Companies.** The Supreme Court [*Cour de Cassation*] endorses such extension on the grounds of the existence of a group of companies, stating that:

"According to the usages of international commerce, an arbitration clause contained in an international contract has its own validity and effectiveness, which require that the clause be extended to parties directly involved in the performance of the contract and the disputes that arise out of it, once it has been established that their contractual situation, their activities and the on-going commercial relationships between the parties create the presumption that they accepted the arbitration clause and were aware of its existence and its scope, although they did not sign the contract containing it – to which factor one may attach the final factor that the third party was perfectly aware of the conditions governing the commercial relationship, including the arbitration clause, habitual in the practices of international commerce" (Cass. com. November 8, 1982, Revue Arbitration 1983, p. 177 footnote J. RUBELLIN-DEVICHI).

882    **Common Intention of the Parties.** In the absence of a clause, case law attempts to extend the legal effect of the arbitration clause relying essentially on "the common intention of the parties" (on this question, see D. COHEN, op. cit. No. 521, p. 273, spec. No. 534, p. 279). Thus, in the very well-known matter of Isover v. Dow Chemical, cited previously, the arbitral tribunal composed of Messrs. Goldman, Vasseur and Sanders rendered an arbitral award on September 23, 1982 (supra, No. 213), which held that two companies of the Dow Chemical group, including the parent company, had the right, as claimants, to invoke an arbitration clause that they had not signed themselves but that was contained in a contract signed by two other companies of the group. The award stated:

"The arbitration clause expressly accepted by certain companies of the group must bind the other companies that, by the role that they played in the conclusion,

performance or termination of the contracts containing said clauses, appear, in accordance with the common will of all the parties to the proceedings, to have been the true parties to these contracts or to have been principally concerned by the disputes that may arise therefrom."

883     **Appearance**.  Similarly, to allow the clause to bind a third party, the Paris Court of Appeal relied on the "principle of appearances applicable to international commercial relationships."  Thus ruling that:

"As the circumstances of the negotiation, conclusion and performance of a contract created for one of the contracting parties the legitimate belief that a company with which it had dealings in the past was also a party to this contract, even though it was not a signatory to it, the arbitration agreement is binding on this second company in accordance with the principle of appearances that is applicable to international commercial relationships." (Paris 1st Ch., October 7, 1999, Rev. Arb. 2000 p. 288, footnote D. Bureau; Gazette du Palais, Rec. 2000, summary p. 2551, Journal No. 337, December 2, 2000, p. 52.  Concerning the connections between legitimate belief and appearances, see J.L. Sourioux, Legitimate Belief, JCP G 1982, I 3058, spec. No. 103s; according to the author it is not "belief that is an element of the appearance, but rather it is the appearance as likelihood that is an element of legitimate belief.")

# DROIT ET PRATIQUE DE L'ARBITRAGE
## INTERNE ET INTERNATIONAL

FADY NAMMOUR

Deuxième édition
Refonte complète

BRUYLANT          DELTA          L.G.D.J.

 L'objet du logo qui figure ci-dessus est d'alerter le lecteur sur la menace que représente pour l'avenir de l'écrit, le développement massif du photocopillage. Or, cette pratique s'est généralisée dans les établissements d'enseignement supérieur, entraînant une forte baisse des achats de livres, au point que la création et l'édition des œuvres nouvelles par les auteurs sont aujourd'hui menacées.

Cette oeuvre est protégée par les dispositions de la loi libanaise n° 75 du 3 avril 1999 relative à la propriété littéraire et artistique et aux droits d'auteur. Ces droits sont la propriété exclusive de l'auteur. Toute reproduction intégrale ou partielle, par quelque moyen que ce soit, non autorisée par l'auteur ou ses ayants droit, est strictement interdite.

1ᵉ édition : Mars 2000
2ᵉ édition : Septembre 2005

© Etablissements Emile Bruylant, S.A.
    Rue de la Régence 67, 1000 Bruxelles.

© Librairie Générale de Droit et de Jurisprudence, E.J.A, Paris,
    31, rue Falguière, 75741 Paris cedex 15.

© Editions DELTA,
    Jdeidet El-Metn, Beyrouth, Liban. Tél: 01-898085/Fax: 04-411189

2005 Imprimé au Liban
ISBN : 2-8027-2153-4

EFFETS A L'EGARD DES TIERS

*constitue une modalité* » (Rev. arb. 1993, p 632 cité par Ph. FOUCHARD, E. GAILLARD, B. GOLDMAN, n° 719, p 448).

Néanmoins, jugé que la clause compromissoire figurant sur une charte-partie est inopposable aux assureurs subrogés dans ses droits par une société en sa qualité de destinataire de la marchandise dès lors que ce n'est pas en qualité d'affréteur au voyage que cette société avait été indemnisée (Cass. civ. 1e, 6 mars 2004 JCP G 2004, I-149 n°22-29 obs. BARTHEZ, en faveur de l'opposabilité, supra, n°194).

## (§3) MANDAT

879    La substitution peut également s'effectuer par mandat. Dans son arrêt du 8 février 2000 précité (Supra, n°877), la Haute Cour énonce : « *La clause d'arbitrage international s'impose à toute partie venant aux droits de l'un des contractants. Une cour d'appel, après avoir jugé qu'une société s'était substitué deux autres sociétés dans sa fonction de mandataire, en a exactement déduit que la convention d'arbitrage stipulée dans le mandat devait recevoir application à l'égard des mandataires substitués* ».

## SECTION 2 : ADJONCTION DE CONTRACTANTS

880    **Participation au contrat.** Il est très fréquent que l'exécution de certains contrats internationaux mette en cause divers opérateurs économiques selon la complexité des opérations contractuelles envisagées, leur technicité ou leur spécificité. La question est alors de savoir si la clause arbitrale touchera ces tiers participants à la réalisation de "l'opération-mère"? La jurisprudence considère que dans le droit de l'arbitrage international, les effets de la clause compromissoire s'étendent aux parties directement impliquées dans l'exécution du contrat où elles figurent bien qu'elles n'en soient pas signataires, dès lors que leur situation ou leur activité font présumer qu'elles avaient connaissance de l'existence et de la portée de cette clause. Tel est le cas d'une société s'étant substituée à un premier contractant, ayant entretenu des relations contractuelles avec l'autre partie pendant de nombreuses années, et étant directement impliquée dans l'exécution des contrats

627

EFFETS A L'EGARD DES TIERS

contenant la clause litigieuse (Paris 1re ch, 4 octobre 2000, JCP E 2000 p1735 ; Gaz. Pal., Rec. 2001, somm p 857, J. n°123, 3 mai 2001, p 50 note X ; Paris 1ère ch, 17 décembre 1997, Gaz. Pal., Rec. 2000, somm p 156, J. n°11, 11 janvier 2000, p. 54).

881  **Groupes de société.** La Cour de cassation avalise un telle extension en se fondant sur l'existence d'un groupe de sociétés en énonçant que :

> « *Selon les usages du commerce international, la clause compromissoire insérée dans un contrat international a une validité et une efficacité propres qui commandent d'en étendre l'application aux parties directement impliquées dans l'exécution du contrat et les litiges qui peuvent en résulter, dès lors qu'il est établi que leur situation contractuelle, leurs activités et leurs relations commerciales habituelles existant entre les parties font présumer qu'elles ont accepté la clause d'arbitrage dont elles connaissent l'existence et la portée, bien qu'elles n'aient pas été signataires du contrat qui la stipulait; considérant auquel on peut relier le considérant final selon lequel le tiers avait une parfaite   connaissance des conditions régissant les rapports commerciaux; y compris la clause d'arbitrage usuelle dans la pratique du commerce international* » (Cass. com. 8 novembre 1982, Rev. arb. 1983, p 177 note J. - RUBELLIN-DEVICHI).

882  **Intention commune des parties.** En l'absence de clause, la jurisprudence essaie d'étendre les effets juridiques de la clause arbitrale en se basant surtout, sur "*l'intention commune des parties*" (Sur la question, v. D. COHEN, op. cit. n° 521, p 273 spéc. n° 534, p 279). Ainsi, dans la très célèbre affaire Isover c/ Dow chemical, précédemment relevée, le tribunal arbitral composé de MM GOLDMAN, VASSEUR et SANDERS a rendu une sentence arbitrale du 23 septembre 1982 (Supra, n°213) estimant que deux sociétés du groupe Dow chemical, dont la société mère, étaient en droit d'invoquer, comme demanderesses, une clause compromissoire qu'elles n'avaient pas elles-mêmes signée, mais qui figurait dans un contrat signé par deux autres sociétés du groupe. La sentence relevait :

> « *La clause compromissoire expressément acceptée par certaines sociétés du groupe doit lier les autres sociétés qui, par le rôle qu'elles ont joué dans la conclusion, l'exécution ou la résiliation des contrats contenant lesdites clauses, apparaissent selon la commune volonté de toutes les parties à la procédure comme ayant été de véritables parties à ces contrats, ou comme étant concernées, au premier chef, par ceux-ci par les litiges qui peuvent en découler* ».

883  **Apparence.** De même, pour admettre l'extension de la clause, la Cour d'appel de Paris se fonde sur le « *principe de l'apparence applicable aux relations du commerce international* ». Ainsi jugé que :

628

EFFETS A L'EGARD DES TIERS

« *Les circonstances de la négociation de la conclusion et de l'exécution du contrat ayant créé pour l'un des contractants la croyance légitime qu'une société, avec qui elle avait déjà traité dans le passé, était également partie à ce contrat bien que n'en étant pas signataire, la convention d'arbitrage a un effet obligatoire pour cette dernière conformément au principe de l'apparence applicable aux relations du commerce international* » (Paris, 1ᵉ ch., 7 octobre 1999, Rev. arb. 2000 p 288 note D BUREAU; Gaz. Pal., Rec. 2000, somm. p 2551, J. n°337, 2 décembre 2000, p. 52. Sur les liens entre croyance légitime et apparence, v. J.-L. SOURIOUX, La croyance légitime, JCP G 1982, I 3058, spéc. n°103s ; selon l'auteur ce n'est « pas la croyance qui est un élément de l'apparence, mais c'est l'apparence comme vraisemblance qui est un élément de la croyance légitime »).

884    **Règle matérielle.** Plus récemment, la Haute Cour française a fondé la transmission automatique de la clause dans les termes suivants : « *En matière internationale, la clause d'arbitrage juridiquement indépendante du contrat principal est transmise avec lui, quelle que soit la validité de la transmission des droits substantiels* » (Cass. civ. 1ᵉ, 28 mai 2002, Gaz. Pal. Rec. 2003, jur. somm p 28 note M.-C. NIBOYET). Il en résulte que la clause sera transmise même si l'opération principale souffrante d'un vice quelconque ne le sera pas. Ce faisant, la Haute Cour pose une véritable règle matérielle propre à l'arbitrage international surtout qu'elle décide de la transmission abstraction faute de la loi qui régit le transfert de l'opération commerciale.

885    **Clause de circulation.** En présence de clause, les parties réglementeront la circulation du contrat selon les règles qu'elles entendent. Ainsi, elles pourront prévoir expressément l'extension de la clause arbitrale en cas de cession, de fusion ou même en cas de modification du contrôle de l'entreprise du partenaire. La clause arbitrale peut être étendue à tout organisme dépendant du contractant ou dont il dépend lui-même. D'autres clauses maintiendront la clause arbitrale pour certaines filiales et sociétés apparentées dans les limites de l'opération contractuelle envisagée. Les parties pourront faire une référence explicite aux entreprises multinationales, qui aboutira, pourquoi pas, à une véritable liste de sociétés. Au contraire, les parties peuvent décider que la convention d'arbitrage ne sera ni transmise, ni cédée.

# EXHIBIT 19

RECYCLED

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 20



RECYCLED

This exhibit has been redacted in its entirety and is filed under seal.

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2007, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Edward P. Welch, Esquire
Edward B. Micheletti, Esquire
Skadden, Arps, Slate, Meagher
& Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899

I hereby certify that on February 23, 2007, I caused to be sent by Federal Express the foregoing document to the following non-registered participants:

Jeffrey H. Dasteel, Esquire
Jason D. Russell, Esquire
Marina V. Bogorad, Esquire
Skadden, Arps, Slate, Meagher
& Flom LLP
300 S. Grand Avenue, 34th Floor
Los Angeles, CA 90071
jdasteel@skadden.com

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

RLF1-3089050-1