IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x

URS CORPORATION )
)
)
Plaintiff, )
)
v. )
)
THE LEBANESE COMPANY FOR THE )
DEVELOPMENT AND RECONSTRUCTION )
OF BEIRUT CENTRAL DISTRICT, S.A.L., )
a/k/a SOLIDERE, )
)
Defendant. )

---------------------------------------------------------- x

Civil Action No. 06-415-SLR

**REDACTED
PUBLIC VERSION**

<u>VOLUME II</u>

## <u>DECLARATION OF PAUL B. CARBERRY IN SUPPORT OF DEFENDANT SOLIDERE'S ANSWERING BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION</u>

PAUL B. CARBERRY declares as follows:

1.      I am an attorney admitted to practice law before the courts of the

State of New York and a member of the law firm of White & Case LLP ("White &

Case"), counsel for Defendant, The Lebanese Company for the Development and

Reconstruction of Beirut Central District, s.a.l., ("SOLIDERE"), in the above-referenced

action. I have been admitted <u>pro hac vice</u> to appear before this Court. This declaration is

based entirely upon my personal knowledge and information supplied to me by other

attorneys at White & Case, and is submitted, in support of Defendant SOLIDERE's

Answering Brief in Opposition to Motion for Preliminary Injunction.

NEWYORK 5997087 (2K)

2.       Attached hereto as Exhibit 1 is a true and correct copy of the transcript of Nasser Chammaa's deposition conducted on January 23, 2007.

3.       Attached hereto as Exhibit 2 is a true and correct copy of the transcript of Alberto Cuenca's deposition conducted on January 26, 2007.

4.       Attached hereto as Exhibit 3 is a true and correct copy of the transcript of Kristin L. Jones's deposition conducted on January 30, 2007.

5.       Attached hereto as Exhibit 4 is a true and correct copy of the transcript of Thomas Bishop's deposition conducted on January 31, 2007.

6.       Attached hereto as Exhibit 5 is a true and correct copy of the transcript of William D. Balfour's deposition conducted on February 1, 2007.

7.       Attached hereto as Exhibit 6 is a true and correct copy of the transcript of Amine Bou Onk's deposition conducted on February 2, 2007.

8.       Attached hereto as Exhibit 7 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00106414-18 (Sept. 30, 2002 Corporate Resolution).

9.       Attached hereto as Exhibit 8 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00106423-26 (April 13, 2004 Corporate Resolution).

10.      Attached hereto as Exhibit 9 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00105117-18 (Aug. 9, 2000 Letter from URS to the Texas Board of Professional Engineers).

11.     Attached hereto as Exhibit 10 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00097579-83 (April 3, 2000 Email entitled "Corporate Identity Program Update").

12.     Attached hereto as Exhibit 11 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00255861-64 (July 23, 2001 Facsimile attaching a copy of a Short Term Foreign Assignment Agreement).

13.     Attached hereto as Exhibit 12 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00057037- 41 (April 15, 2005 Email regarding creation of shell entity in Lebanon).

14.     Attached hereto as Exhibit 13 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00274717- 19 (Nov. 20, 2000 Email regarding novation of Radian contracts).

15.     Attached hereto as Exhibit 14 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00256275-76 (July 3, 2000 Amendment to Radian's 401(k) Thrift Plan).

16.     Attached hereto as Exhibit 15 is a true and correct copy of Julian D M Lew QC, Control of Jurisdiction by Injunctions Issued by National Courts, Conference Paper – ICCA 2006.

17.     Attached hereto as Exhibit 16 is a true and correct copy of  Abdul Hamid El-Ahdab, Arbitration with the Arab Countries 320-321 (1998).

18.     Attached hereto as Exhibit 17 are true and correct copies and translations of French cases and statutes: Société Isover-Saint-Gobain v. Sociétés Dow Chemical France et autres, Cour d'Appel [CA] [regional court of appeal] Paris, 1e ch.,

October 21, 1983, Rev. Arb. 1984, 98, 100; Société Sponsor A.B. v. Lestrade, Cour

d'Appel [CA] [regional court of appeal] Pau, November 26, 1986, Rev. Arb. 1988, 153,

156; Société Korsnas Marma  v. Société Durand-Auzias, Cour d'Appel [CA] [regional

court of appeal] Paris, 1e ch., November 30, 1988, Rev. Arb. 1989, 691, 694; Société Kis

France et autres v. Société Générale et autres, Cour d'Appel [CA] [regional court of

appeal] Paris, 1e ch., October 31, 1989, Rev. Arb. 1992, 90, 93; Orri v. Société des

Lubrifiants Elf Acquitaine, Cour d'Appel [CA] [regional court of appeal] Paris, 1e ch.,

January 11, 1990, Rev. Arb. 1992, 95, 97-98; Soc. V 2000, Soc. Project XJ 220 LTD v.

Renault Jean François, Cour d'Appel [CA] [regional court of appeal] Paris, December 7,

1994, RTD com. 1995, 401, 405-06; and French New Code of Civil Procedure, Article

1458.

   19. Attached hereto as Exhibit 18 is a true and correct copy and

translation of Fady Nammour, Droit et pratique de l'arbitrage interne et international 627-

629 (2005).

   20. Attached hereto as Exhibit 19 is a true and correct copy of a

document produced by URS in this litigation bates-stamped URS00274593-604 (Jan. 3,

2005 Letter from Gardere, Wynne, Sewell LLP to Ambrust & Brown, LLP).

   21. Attached hereto as Exhibit 20 is a true and correct copy of a

document produced by URS in this litigation bates-stamped URS00164282-311 (URS

Corp. Balance Sheet, dated as of December 26, 2006).

   22. Attached hereto as Exhibit 21 is a true and correct copy of a

document produced by URS in this litigation bates-stamped URS00240712-34 (Jan. 5,

2000 Memorandum regarding URS contracts).

23.    Attached hereto as Exhibit 22 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00153076 (Jan. 17, 2001 Letter from John Rakow III).

24.    Attached hereto as Exhibit 23 are true and correct copies of documents produced by URS in this litigation bates-stamped URS00055925-26, URS00045767-68, URS00055510-11, URS00045766-67, and URS00055456-57 (Emails requesting funds for Radian).

25.    Attached hereto as Exhibit 24 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00200308-09 (Jan. 16, 2001 Letter attaching a letter from John Rakow III).

26.    Attached hereto as Exhibit 25 is a true and correct copy of a document produced by SOLIDERE in this litigation bates-stamped SOLDEL00537-43 (May 12, 2003 Facsimile from John Rakow III).

27.    Attached hereto as Exhibit 26 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00236245-47 (Dec. 2, 2004 E-mail from Alberto Cuenca).

28.    Attached hereto as Exhibit 27 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00001910-13 (Oct. 14, 2002 Letter regarding Contract insurance).

29.    Attached hereto as Exhibit 28 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00079321-578 (Undated agenda and supporting documents for a September 10, 2002 meeting).

30.    Attached hereto as Exhibit 29 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00106394-404 (Sept. 10, 2002 Corporate Resolution).

31.    Attached hereto as Exhibit 30 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00106386-87 (Sept. 30, 2002 URS Holdings Inc. Corporate Resolution).

32.    Attached hereto as Exhibit 31 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00164237-67 (July 15, 2004 Fourth Amendment to Lease Agreement).

33.    Attached hereto as Exhibit 32 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00234248-54 (Second Amendment of Office Lease).

34.    Attached hereto as Exhibit 33 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00238401-05 (April 6, 2000 URS Memorandum regarding 401(k) Retirement Plan).

35.    Attached hereto as Exhibit 34 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00001932-42 (June 26, 2002 Monthly Report on the Normandy Landfill Project).

36.    Attached hereto as Exhibit 35 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00108744-47 (Dec. 12, 2005 Email).

37.     Attached hereto as Exhibit 36 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00025440-87 (Jan. 14, 2003 Letter).

38.     Attached hereto as Exhibit 37 is a true and correct copy of B. Hanotiau, Non-Signatories in International Arbitration: Lessons from Thirty Years of Case Law, paper given at ICC Congress, Montreal (June 2006).

39.     Attached hereto as Exhibit 38 is a true and correct copy of the expert report of Gene L. Deetz, CPA.

40.     Attached hereto as Exhibit 39 is a true and correct copy of G. Born, International Commercial Arbitration Commentary and Materials 203 (2d ed. 2001).

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 23, 2007.

PAUL B. CARBERRY

**UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2007, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Edward P. Welch, Esquire
> Edward B. Micheletti, Esquire
> Skadden, Arps, Slate, Meagher
> & Flom LLP
> One Rodney Square
> P.O. Box 636
> Wilmington, DE 19899

I hereby certify that on March 2, 2007, I caused to be sent by electronic mail the foregoing document to the following non-registered participants:

> Jeffrey H. Dasteel, Esquire
> Jason D. Russell, Esquire
> Marina V. Bogorad, Esquire
> Skadden, Arps, Slate, Meagher
> & Flom LLP
> 300 S. Grand Avenue, 34th Floor
> Los Angeles, CA 90071
> jdasteel@skadden.com

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

# EXHIBIT 21

RECYCLED

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 22



URS00153078

01/16/01 11:08 FAX 415 547 7954 O'BRIEN KREITZBERG LEGAL @002

**URS**

John W. Rakow III, Esq.

January 16, 2001

To Whom It May Concern:

I am sending this letter of explanation to you in accordance with your request. URS Corporation, a publicly-traded engineering and design firm (NYSE: URS), incorporated in Delaware, acquired Dames & Moore Group and all of its subsidiaries (Dames & Moore, BRW, O'Brien Kreitzberg, Radian International and others) in June of 1999. The various Dames & Moore Group companies continue to operate as separate subsidiaries under their existing names, although all correspondence is now on URS Corporation letterhead.

Radian International, LLC has not changed its corporate name. It continues to operate as a separate subsidiary under its own, current name.

You will see no change in the manner in which we serve you or in our commitment to provide you with quality services. All prior commitments, including your contract, will continue to be honored. Please do not hesitate to call me if I can be of assistance or if you have further questions. My direct telephone number is (415) 281-2640.

Sincerely,

John W. Rakow III
Corporate Counsel

URS Corporation
Legal Department
50 Fremont Street, 24th Floor
San Francisco, CA 94105
Tel: 415.777.0188
Direct 415.281.2640
Fax: 415.547.7954
john_rakow@urscorp.com

URS00153076

# EXHIBIT 23


RECYCLED

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 24



Redacted

**URS**

Radian

Radian International
P.O. Box 11-1261
Beirut, Lebanon

January 17, 2001

W A Fairhurst International Partnership
Daouk building, 10th Floor
Sidani St., Ras Beirut
P.O. Box: 11-4040
Beirut, Lebanon

Attention: Mr. David Horne

Subject:    Normandy Landfill Reclamation – Phase 2 Project
            Change of Letter Head

Dear Sir,

Please find enclosed a copy of a letter from URS's Corporate Counsel that includes the explanation requested in your letter Ref: Let-0440-DWH-RAD dated 19th September 2000. Do not hesitate to contact me if you have any questions or require additional information.

Sincerely,

Amine Bou Onk
Contractor Representative

Enclosed

Cc:   Hisham Karameh, SOLIDERE
      JB Holeman, URS Radian

| Project Name: | Landfill Treatment-North of Blvd | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 12382 | LET | 0270 | 00 | ABO-CM-270jun01 | ABO-CM-270jun01 | 1/1 |

URS00200308

Redacted

**URS**

John W. Rakow III, Esq.

January 16, 2001

To Whom It May Concern:

I am sending this letter of explanation to you in accordance with your request. URS Corporation, a publicly-traded engineering and design firm (NYSE: URS), incorporated in Delaware, acquired Dames & Moore Group and all of its subsidiaries (Dames & Moore, BRW, O'Brien Kreitzberg, Radian International and others) in June of 1999. The various Dames & Moore Group companies continue to operate as separate subsidiaries under their existing names, although all correspondence is now on URS Corporation letterhead.

Radian International, LLC has not changed its corporate name. It continues to operate as a separate subsidiary under its own, current name.

You will see no change in the manner in which we serve you or in our commitment to provide you with quality services. All prior commitments, including your contract, will continue to be honored. Please do not hesitate to call me if I can be of assistance or if you have further questions. My direct telephone number is (415) 281-2640.

Sincerely,

John W. Rakow III
Corporate Counsel

URS Corporation
Legal Department
50 Fremont Street, 24th Floor
San Francisco, CA 94105
Tel: 415.777.0186
Direct: 415.281.2640
Fax: 415.547.7854
john_rakow@urscorp.com

# EXHIBIT 25

RECYCLED

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 26

William Hadaya      To: William Hadaya/SanJose/URSCorp@URSCORP
12/03/2004 04:41 PM     cc:
                      Subject: Re: cross charge

---- Forwarded by William Hadaya/SanJose/URSCorp on 12/03/2004 08:41 AM ----

 Carol Hunter      To: brenda martin, William Hadaya/SanJose/URSCorp@URSCORP
11/23/2004 04:11 PM     cc:
                      Subject: Re: cross charge

Here's the email about the RROS Lebanon job.

Carol Hunter
URS Corporation
Oakland, CA
510-874-3210 tel
510-874-1704 fax

---- Forwarded by Carol Hunter/Oakland/URSCorp on 11/23/2004 04:17 PM ----

Alberto Cuenca      To: Carol Hunter/Oakland/URSCorp@URSCORP
10/04/2004 03:22 PM    cc: Lynn Melendez/SanJose/URSCorp@URSCORP, Jim
                          Wagner/Austin/URSCorp@URSCorp
                     Subject: Re: cross charge

Carol,
1) Because the Client has stopped paying us since August'04 last year, URS continues working on it, the URS Corporate Legal Dept. is now managing this job because URS keeps filing Legal Claims in order to document our case,
  This job is one of the children jobs used to track the whole project and there is also a case of revenue over comp. at the whole project level and a lot of other technical/legal and financial issues.

2) Regarding the other decision about granting other offices supporting the project some mark up in order for them to continue to support this project with their people (making the situation of this contract worst); you'll have to discuss it with Jim Wagner or someone else in Tom Bishop's shop.


Regards
Alberto Cuenca
URS Corporation
Phone # (301) 721-2236
Fax #     (301) 977-6370
Carol Hunter


Carol Hunter      To: Alberto Cuenca/Gaithersburg/URSCorp@URSCORP
10/04/2004 04:01 PM    cc: Lynn Melendez/SanJose/URSCorp@URSCorp
                     Subject: Re: cross charge

Alberto -- why is job #41673301 not recognizing revenue?

thanks,

Carol Hunter

URS Corporation
Oakland, CA
510-874-3210 tel
510-874-1704 fax


---- Forwarded by Carol Hunter/Oakland/URSCorp on 10/04/2004 01:04 PM -----

   **Alicia Brewer**          To: Carol Hunter/Oakland/URSCorp@URSCORP
              10/04/2004 12:54 PM      cc: Lynn Melendez/SanJose/URSCorp@URSCorp
                                   Subject: Re: cross charge

This job is recognizing zero revenue, per Jim Wagner and Alberto Cuenca.   If you have any questions
about that you can contact Alberto.

Thanks,
Alicia Brewer
Austin Accounting
Team Leader
(512) 419-6791
(512) 419-6944 (Fax)
Carol Hunter


**Carol Hunter**          To: Alicia Brewer/Austin/URSCorp@URSCORP
10/04/2004 02:48 PM      cc: Lynn Melendez/SanJose/URSCorp@URSCorp
                     Subject: Re: cross charge

Alicia — Any luck with this person's rate?  He showed up again on this last week's cross charge without a
rate.
Lynn — Can you help with Bob's rate?

thanks,

Carol Hunter
URS Corporation
Oakland, CA
510-874-3210 tel
510-874-1704 fax


---- Forwarded by Carol Hunter/Oakland/URSCorp on 10/04/2004 12:50 PM -----

**Carol Hunter**          To: Alicia Brewer/Austin/URSCorp@URSCORP
09/30/2004 03:21 PM      cc:
                     Subject: Re: cross charge

They are a he.  You will have to check with the PM.  According to the system that is Amine Bou-Onk.

thanks,

Carol Hunter
URS Corporation
Oakland, CA
510-874-3210 tel
510-874-1704 fax

URS00236247

Alicia Brewer

 **Alicia Brewer**
09/30/2004 03:19 PM

To: Carol Hunter/Oakland/URSCorp@URSCORP
cc:
Subject: Re: cross charge 📄

Carol,

What is her rate?

Thanks,
Alicia Brewer
Austin Accounting
Team Leader
(512) 419-6791
(512) 419-6944 (Fax)
Carol Hunter

 **Carol Hunter**
09/30/2004 03:55 PM

To: Alicia Brewer/Austin/URSCorp@URSCORP
cc:
Subject: cross charge

Alicia,

Can you please add a rate for the following employee?

| Proj Office | Project # | Empl Name | Empl # | Empl Office |
|---|---|---|---|---|
| RROS Lebanon | 41673301 | R. Healy | 16028 | San Jose |

thanks,

Carol Hunter
URS Corporation
Oakland, CA
510-874-3210 tel
510-874-1704 fax

URS00236247

# EXHIBIT 27



# Radian International, LLC

P.O. Box 11-1261
Riad El Solh Beirut 1107 2080
Commercial Register No.: 74673, Beirut
Tel / Fax: 01 983 575
Beirut - Lebanon

October 14, 2004

W A Fairhurst International Partnership
Daouk building, 10th Floor
Sidani St., Ras Beirut
P.O. Box: 11-4040
Beirut, Lebanon

Attention:    Mr. Neville Judd

Subject:      **Normandy Landfill Reclamation – Phase 2**
**Alpina Insurance Company Policy No. 01 75 328 00305**
**(LV00305.01)**

Dear Sir,

We refer to your letter Let-1276-NJ-RAD dated October 4, 2004 in which you request that we: (1) provide a draft confidentiality agreement that is acceptable to Alpina Insurance Company ("Alpina"), and (2) provide written evidence that we have reinstated and/or extended the above referenced insurance policy (the "Alpina Policy") or obtained other professional and environmental insurance for works and services performed from April 14, 2004 until Completion of the Works.

We are enclosing a proposed confidentiality agreement that is acceptable to Alpina. If it is acceptable to you, please sign it and return it to us. Once we have received your signed agreement, we will provide you with a copy of our application for the Alpina Policy.

As we previously advised you, we are and have been in active discussions with Alpina to extend the Alpina Policy or to renew it with the renewal date being April 14, 2004 to ensure continuity of coverage. We have not, however, received a definitive response from Alpina as to whether they will provide coverage.

Accordingly, please be advised that URS Corporation has an existing insurance policy written on an annual basis by an AIG affiliate or subsidiary that provides contractors' professional and environmental insurance for its subsidiary, Radian. The policy meets the minimum limits of US $20 million in respect of each and every claim with an aggregate limit of US $50 million. While the policy provides additional insureds with coverage for environmental matters, it does not provide additional insureds with coverage for professional liability claims. In the event, as described above, we are unable to extend or reinstate the Alpina Policy, we are seeking other project-specific insurance to cover any gap. We will provide you with evidence of URS's insurance coverage upon request.

| Project Name: | Landfill Treatment-North of Blvd | | | | | | |
|---------------|-----------|-------------|--------|--------|----------|-------------|------|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 12382 | LET | 0609 | 00 | ABO/CM/609oct04 | ABO/CM/609oct04 | 1/2 |

URS00001911

# Radian International, LLC

We have also directed our insurance broker to submit applications to various insurers (other than Alpina) to obtain appropriate professional and environmental coverage. Once we receive your signed confidentiality agreement, we will provide you with a copy of all relevant applications.

We reserve all rights under the Contract and applicable law.

Sincerely,

Amine BouOnk
Contractor's Representative

Enclosures

| Project Name: | Landfill Treatment-North of Blvd | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 12382 | LET | 0609 | 00 | ABO/CM/609oct04 | ABO/CM/609oct04 | 2/2 |

**URS00001912**

## NONDISCLOSURE AGREEMENT

In order to protect certain confidential information which may be disclosed by Radian Corporation ("Radian") to WA Fairhurst International Partnership ("WAFI") and/or The Lebanese Company for the Development and Reconstruction of Beirut Central District, s.a.l. ("Solidere"), the recipients identified on the signature page hereto (the "Recipients") of such confidential information have signed this Nondisclosure Agreement as of the date set forth on the signature page hereto.

1.      The term "Confidential Information" shall mean and include: (i) the Contractors and Consultants Pollution Liability Application dated June 8, 1999, and (ii) all other insurance-related materials containing confidential or proprietary information of or concerning Radian, its parent, affiliates, employees, agents and representatives.

2.      The Recipients shall protect the disclosed Confidential Information by using the same degree of care to prevent the unauthorized use, dissemination or publication of the Confidential Information as the Recipients use to protect their own confidential information of a like nature. Except to the extent that the Recipients obtain the prior written consent of Radian, Recipients shall not disclose any Confidential Information to any third party except as permitted by Section 5 hereof.

3.      This Agreement imposes no obligation upon the Recipients with respect to Confidential Information which (a) was in the Recipients' possession before the receipt from the Director; (b) is or becomes a matter of public knowledge through no fault of the Recipients; (c) is rightfully received by the Recipients from a third party without a duty of confidentiality; (d) is independently developed by the Recipients; or (e) is required to be disclosed by the Recipients pursuant to a judicial or governmental order or as may otherwise be required by law.

4.      All Confidential Information furnished to the Recipients by Radian shall remain the property of Radian. The Recipients shall make no copies of any Confidential Information without the prior written consent of Radian. At Radian's request, the Recipients shall return to Radian promptly all of the Confidential Information along with all copies made thereof and all materials, documents, or things containing any portion of any Confidential Information.

5.      Prior to disclosing any Confidential Information to any other person, the Recipients shall notify Radian, in writing, of the names of any such person or persons and the relationship of such person or persons to the Recipients; and the Recipients shall not disclose any Confidential Information to such person or persons until such time as Radian shall have received from each such person or persons an executed non-disclosure agreement containing substantially the same obligations as set forth in this Agreement.

6.      This Agreement shall be governed by and construed according to the laws of the State of California, excluding its conflict of laws rules to the extent such rules would apply the law of another jurisdiction. The parties hereto consent to the jurisdiction of all federal and state courts in California, and agree that venue shall lie exclusively in San Francisco County, California.

7.      Any notice, demand, or request required or permitted to be given under this Agreement shall be in writing and shall be deemed given when delivered personally or sent via registered or certified mail, return receipt requested, or via overnight courier and addressed to the party at the address of such party set forth at the end of this Agreement or such other address as such party may request by notifying the other in writing.

8.      If any legal action arises relating to this Agreement, then the prevailing party shall be entitled to recover all costs, expenses, and reasonable attorneys' fees incurred by the prevailing party in connection with such action. The "prevailing party" within the meaning of this Section includes without limitation a party who: (i) agrees to dismiss an action or proceeding upon the other's payment

of the sums allegedly due or upon the other's performance of the obligation allegedly breached, or (ii) obtains substantially the relief it seeks.

9.      The Recipients shall not assign this Agreement or any of the rights and obligations hereunder to any third party. Subject to the preceding sentence, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

10.     If any provision of this Agreement, or the application of such provision to any person or circumstances, is held invalid or unenforceable, then the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and shall continue in full force and effect.

11.     This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and enforceable against the parties actually executing such counterpart, and all of which together shall constitute one instrument.

RECIPIENT                                       RADIAN INTERNATIONAL

By: _____                    By: _____

Name: _____                    Name: _____

Title: _____                   Title: _____

Date: _____                    Date: _____


RECIPIENT

By: _____

Name: _____

Title: _____

Date: _____

2

# EXHIBIT 28

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 29



RECYCLED

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 30



This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 31


RECYCLED

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 32



## SECOND AMENDMENT OF OFFICE LEASE

THIS SECOND AMENDMENT OF LEASE AGREEMENT is made as of December 22, 2005 by and between GREIT – AmberOaks, LP, a Texas limited partnership ("Landlord"), acting by and through Triple Net Properties Realty, Inc. (Agent for Landlord") and URS Corporation, a Nevada corporation ("Tenant").

## RECITALS

A.    Landlord (as successor in interest to Austin Jack, L.L.C.) and Tenant (as successor in interest to Radian International L.L.C.) entered into that certain Lease Agreement dated May 26, 2000, as amended by that certain First Amendment to Lease Agreement dated June __, 2000 (collectively, the "Lease") whereby Landlord leased to Tenant and Tenant leased from Landlord that certain premises located at 13620 and 13630 Briarwick, Austin Texas (collectively, the "Premises").

B.    Tenant has requested that it be permitted to install a generator on the Premises. Landlord is willing to allow Tenant to do so on the following terms and conditions.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

I.    **Rights to Install Generator and Air Conditioning Unit.**  Subject to all of the terms and conditions of Sections 5 and 6 (except as expressly provided herein) of the Lease, Tenant shall be entitled to install (a) a diesel powered generator (the "Generator") with dimensions of approximately 202.37 inches in length, 91.25 inches in width, and 100.20 inches in height in a mutually approved location in Tenant's designated area shown on **Exhibit A** attached hereto and (b) a 30-ton air conditioning unit in a mutually approved location within the computer room in Building Two of the Premises together with 4 cooling fans mounted on the roof of Building Two in a mutually approved location (collectively, the "AC Unit"); provided that (i) Tenant obtains all necessary approvals from the City of Austin and all other governmental authorities having jurisdiction over Tenant, the Premises, the Generator and the AC Unit, and (ii) the Generator and the AC Unit conform to all applicable laws, rules and regulations of any governmental authorities having jurisdiction over the Generator, the AC Unit or the Premises. Tenant, at its sole cost and expense shall be responsible for (A) the installation of the Generator, which shall include without limitation, visual screening in a manner and with materials comparable to that used to screen the existing generator located at 13640 Briarwick Drive, Austin, Texas, environmental hazard protection and pollution prevention; and (B) the installation of the AC Unit, which shall include without limitation, environmental hazard protection and

1

URS00234248

pollution prevention. The Generator shall, if requested by Landlord, include a critical silencer muffler. No additional rental shall be owing by Tenant under the Lease solely as a result of the installation of either the Generator or the AC Unit. Subject to Paragraph B below, once Landlord and Tenant have agreed upon the location for the cooling fans that are a part of the AC Unit, if Landlord requests that Tenant relocate such fans, the relocation shall be at Landlord's cost and expense and Landlord shall, within 30 days of submittal of Tenant's invoice requesting reimbursement for the relocation costs, remit payment to Tenant.

   A.  Maintenance and Indemnification. Tenant, at its sole cost and expense, shall also maintain the Generator and the AC Unit in good and operable condition and shall be responsible for the maintenance, repair, replacement and removal of the Generator and AC Unit, as necessary. Such maintenance and operation shall be performed in a manner to avoid any interference with any other tenants or Landlord. Further, Tenant shall indemnify and hold Landlord harmless from and against any and all claims, demands, fines, liabilities, costs, expenses, damages and causes of action accruing from or related to the Generator and the AC Unit, **EVEN IF THE SAME IS CAUSED BY THE NEGLIGENCE (BUT NOT THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT) OF LANDLORD OR ANYONE ACTING FOR LANDLORD.**

   B.  Removal. The Generator, the AC Unit and all appurtenances thereto, if any, shall remain the personal property of Tenant, and shall be removed by Tenant at its own expense at the expiration or earlier termination of this Lease or Tenant's right to possession hereunder. Tenant shall remove or relocate the Generator or the AC Unit, as applicable, and all appurtenances thereto at Tenant's expense if, in Landlord's reasonable discretion, Tenant fails to maintain the Generator or the AC Unit, as applicable, in good and operable condition or the operation of the Generator or the AC Unit, as applicable, materially interferes with any other tenants in the Buildings or the Landlord's operation of the Project. Tenant shall repair any damage caused by the removal of the Generator or the AC Unit, as applicable, including the patching of any holes to match, as closely as possible, the color surrounding the area where the equipment and appurtenances were attached. Notwithstanding anything to the contrary herein, Tenant shall have the right, without paying Rent under the Lease, to effect the removal of the Generator and all appurtenance thereto during the 10-day period following the expiration or earlier termination of this Lease.

   C.  Any rebates or discounted energy rates given by a utility provider solely as a result of the installation of the Generator shall inure solely to the benefit of Tenant and Landlord shall have no right or interest therein or thereto.

  II.    **Representations and Warranties.** Each of Landlord and Tenant hereby represents to the other, that to such party's knowledge: (1) there exists no breach, default or event of default by the other party under the Lease, or any event or

506699 000049 DALLAS 1965776.2

URS0023424

condition which, with notice or passage of time or both, would constitute a breach, default or event of default by the other party under the Lease: (2) the Lease continues to be a legal, valid and binding agreement and obligation of such party: and (3) such party has no current offset or defense to their performance or obligations under the Lease.

III.    **Miscellaneous.**

A.    This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein.  There have been no additional oral or written representations or agreements with respect to the subject matter of this Amendment.

B.    In the case of any inconsistency between the provisions of the Lease and this Amendment, the provisions of this Amendment shall govern and control.  Except as modified hereby, the terms and conditions of the Lease shall remain in full force and effect, enforceable in accordance with the terms of the Lease.

C.    The capitalized terms used in this Amendment shall have the same definitions as set forth in the Lease to the extent that such capitalized terms are defined therein and not redefined in this Amendment.

D.    Tenant hereby represents to Landlord that Tenant has dealt with no broker in connection with this Amendment. Tenant agrees to indemnify and hold Landlord, its trustees, members, principals, beneficiaries, partners, officers, directors, employees, mortgagee(s) and agents, and the respective principals and members of any such agents harmless from all claims of any brokers claiming to have represented Tenant in connection with this Amendment.  Landlord hereby represents to Tenant that Landlord has dealt with no broker in connection with this Amendment.  Landlord agrees to indemnify and hold Tenant, its trustees, members, principals, beneficiaries, partners, officers, directors, employees, and agents, and the respective principals and members of any such agents harmless from all claims of any brokers claiming to have represented Landlord in connection with this Amendment.

E.    Each signatory of this Amendment represents hereby that he or she has the authority to execute and deliver the same on behalf of the party hereto for which such signatory is acting.

[Remainder of page intentionally left blank]

506699 000049 DALLAS 1965776.2

URS00234250

**IN WITNESS WHEREOF**, Landlord and Tenant have duly executed this Amendment as of the day and year first above written.

LANDLORD:

**Triple Net Properties Realty, Inc.**
Agent for Landlord

By: _Christe Cavaness_

Name: _Christe Cavaness_

Title: _Asset Manager_


TENANT:

**URS Corporation,**
a Nevada corporation

By: _Craig P. Pell_

Name: _CRAIG D. Pedersen_

Title: _Office Manager_

URS0023425

EXHIBIT A



SITE PLAN

506699 000049 DALLAS 1965776.2

URS00234252



## ① CONCRETE PAD FOOTPRINT
SCALE: 1/8" = 1'-0"

THIS DOCUMENT IS RELEASED FOR THE PURPOSE
OF INTERIM REVIEW UNDER THE AUTHORITY OF
WILLIAM E. HARRIS, JR., P.E., REG. #43754 ON
08/26/05 IT IS NOT TO BE USED FOR BIDDING,
PERMIT, OR CONSTRUCTION.

| | | DATE: AUGUST 26, 2005 | REFERENCE SHEET NO. |
|---|---|---|---|
| **URS BUILDING B** COMPUTER ROOM PROPOSED EXPANSION AUSTIN, TEXAS | | DRAWN BY: BB | NA |
| | | CHECKED BY: TE | SHEET NO. |
| | | JOB NO: 47004.00 | NA |

URS & ASSOCIATES INC.
Consulting Mechanical · Electrical Engineers

506699 000049 DALLAS 1965776.2

URS00234254



URS00234254

# EXHIBIT 33



This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 34



This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 35



URS00108744



**URS**

Tom
Bishop/SanFrancisc
oCorp/URSCorp

12/12/2005 06:40 PM

To  Martin Koffel/SanFranciscoCorp/URSCorp@URSCorp, Gary
Jandeglan/SanFranciscoCorp/URSCorp@URSCORP,
rwotring@egginc.com@URSCorp, Joe
Masters/SanFranciscoCorp/URSCorp@URSCORP, Kent
Ainsworth/SanFranciscoCorp/URSCorp@URSCORP, Tom
Hicks/SanFranciscoCorp/URSCorp@URSCorp, Reed
Brimhall/SanFranciscoCorp/URSCorp@URSCorp, Mary
Sullivan/SanFranciscoCorp/URSCorp@URSCorp, Irwin
Rosenstein/NewYork/URSCorp@URSCORP

cc  Olga Perkovic/SanFranciscoCorp/URSCorp@URSCorp, S
Dhamotharan/Houston/URSCorp@URSCORP, Barbara
Noel/SanFranciscoCorp/URSCorp@URSCORP

bcc

Subject  Beirut blast kills anti-Syria MP - Dec 12, 2005 - All URS
Employees/Family SAFE

Management Committee,

There was another major bomb blast in Beirut this morning, killing 4 individuals, injuring 30. All URS staff
and their families have been accounted for and are safe. We continue to have the project site in a shut
down condition.

- - Tom B.

This e-mail and any attachments are confidential. If you receive this message in error or are not the intended recipient, you
should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or
copies.

---- Forwarded by Tom Bishop/SanFranciscoCorp/URSCorp on 12/12/2005 10:36 AM -----



AMINE
BOUONK
<abouonk@inc
o.com.lb>

12/12/2005
10:30 AM

To  Tom_Bishop@urscorp.com

cc  JDASTEEL@skadden.com, Joe_Masters@urscorp.com,
Joe_Moore@urscorp.com, MBOGORAD@skadden.com,
Mary_Sullivan@urscorp.com

Subject  RE: CNN.com - Beirut blast kills anti-Syria MP - Dec 12, 2005

Tom,

Yes all are safe along with family members.

This e-mail and any attachments are confidential. If you receive this
message in error or are not the intended recipient, you should not retain,
distribute, disclose or use any of this information and you should destroy
the e-mail and any attachments or copies.

-----Original Message-----
From: Tom_Bishop@URSCorp.com [mailto:Tom_Bishop@URSCorp.com]
Sent: Monday, December 12, 2005 6:53 PM

URS00108744

To: abouonk@inco.com.lb
Cc: JDASTEEL@skadden.com; Joe_Masters@URSCorp.com;
Joe_Moore@URSCorp.com; MBOGORAD@skadden.com; Mary_Sullivan@URSCorp.com
Subject: Re: CNN.com - Beirut blast kills anti-Syria MP - Dec 12, 2005


Amine - are all our staff and family members safely accounted for?

- - Tom B.


This e-mail and any attachments are confidential. If you receive this
message in error or are not the intended recipient, you should not retain,
distribute, disclose or use any of this information and you should destroy
the e-mail and any attachments or copies.




                    abouonk@inco.com.
                    lb
                                                                          To
                    12/12/2005 08:19       MBOGORAD@skadden.com,
                    AM                      Joe_Masters@URSCorp.com,
                                            Joe_Moore@URSCorp.com,
                                            Tom_Bishop@URSCorp.com,
                                            JDASTEEL@skadden.com
                                                                          cc

                                                                     Subject
                                            CNN.com - Beirut blast kills
                                            anti-Syria MP - Dec 12, 2005




(Embedded image moved to file: pic12481.gif)(Embedded image moved to file:
pic17168.gif)


  (Embedded image moved to file: pic28315.gif)
    (Embedded image moved to file: pic19396.gif)


    (Embedded image moved to file: pic16225.gif)CNN.com
                                    (Embedded image moved to
                                        file: pic01009.gif)

URS00108746

Powered by
(Embedded image
moved to file:
pic22012.gif)


* Please note, the sender's email address has not been verified.

(Embedded image moved to file: pic18136.gif)


FYI

Another bad day for Lebanon. The situation is tense in Beirut
tonight. We are all safe. I will keep you all updated.

amine




(Embedded image moved to file: pic11455.gif)


Click the following to access the sent link:




(Embedded image moved to file: pic18762.gif)CNN.com -
Beirut blast kills anti-Syria MP - Dec 12, 2005*


(Embedded image moved to file: pic25043.gif)SAVE THIS
link
(Embedded image moved to file:
pic00742.gif)FORWARD THIS link



Get your EMAIL THIS Browser Button and use it to email


URS00108746

Get your EMAIL THIS Browser Button and use it to email
information from any Web site.
               (Embedded image moved to file:
               pic00021.gif)


                    (Embedded image moved to file:
                     pic17922.gif)


*This article can also be accessed if you copy and paste the
entire address below into your web browser.
http://www.cnn.com/2005/WORLD/meast/12/12/lebanon.blast/index.ht
ml


--
No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.1.371 / Virus Database: 267.13.13/197 - Release Date: 12/9/2005

--
No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.1.371 / Virus Database: 267.13.13/197 - Release Date: 12/9/2005

URS00108747

# EXHIBIT 36



This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 37



# NON-SIGNATORIES IN INTERNATIONAL ARBITRATION:

## LESSONS FROM THIRTY YEARS OF CASE LAW

### Bernard HANOTIAU[1]

## I. DEFINITION OF THE ISSUE AND DISTINCTION FROM OTHER CONNECTED ISSUES

### A. Non signatories in international arbitration : the issue

1.  Given the increasing number and complexity of commercial transactions and of national and international groups of companies and the fact that for financial, tax or other commercial reasons, there is not always an identity between the individual(s) or company(ies) that has (have) signed the agreement and those that perform it, international arbitrators and national courts are more and more often confronted with the issue whether an arbitration agreement concluded by one individual or company may be extended or imputed to other non-signatory individuals or companies or States as additional claimants or defendants[2].

2.  The issue may be more precisely defined as follows. One or more individuals or companies (or even a State) are formal parties to an arbitration agreement. If a dispute arises and an arbitration procedure is initiated, may an individual, a company or a State, which is not a formal party to the agreement, join the arbitration as an additional claimant or be joined as an additional defendant in the request for arbitration[3]:

---

[1]  Member of the Brussels and Paris bars, Professor at the University of Louvain. Vice-Chairman of the LCIA Court of Arbitration, of the Institute of Transnational Arbitration (Dallas) and of CEPANI (Brussels). Member of the ICC International Arbitration Commission.

[2]  On this issue, see Hanotiau Bernard, Complex Arbitrations – Multiparty, Multicontract, Multi-Issue and Class Actions (hereinafter "Complex Arbitrations"), Kluwer Law International, 2006, in particular Chapter II and the bibliography.

[3]  In contrast, the issue referred to as "Joinder" arises when an additional party wants to join in the course of the arbitration or a party to the arbitration wants to join a non-party thereto in the course of the procedure. See below, n° 12.

- because even though it is not a formal signatory to the agreement, it is in fact a party, by application of the mechanism of representation or given the existence of a principal-agent relationship;
- by application of the theory of apparent mandate or ostensible authority;
- because it is a third-party beneficiary or an assignee of the contract containing the clause or a member with the signatories of a general partnership or a community of rights and duties;
- as a result of the application of the theory of estoppel or the theory of alter ego;
- because it may be inferred from the circumstances of the case that the party concerned has consented to the arbitration agreement, at least impliedly, by its conduct in the negotiation and performance of the contract;
- because the fraudulent conduct of the party concerned justifies the extension, or if it is a company, justifies piercing the corporate veil.

3.    Before addressing the issue, I would like to denounce the lack of rigor and the use of imprecise terminology in the doctrinal writings and even in the arbitral and judicial case law.

## B.    Groups of companies and groups of contracts

4.    First, a clear methodological distinction – one that is not often made – should be made between the issues arising from the circumstance that the project at the centre of the dispute has been negotiated and performed by one or more companies that belong to a group, some of which are not signatories of the arbitration clause, and the issues arising from the fact that the dispute involves or concerns a variety of problems originating from, or in connection with, two or more agreements entered into by the same and/or different parties and which do not all contain the same – or at least compatible – arbitration clauses. In this second scenario, the fact that the parties to the contracts may belong to a

group is *a priori* irrelevant, although it may in some cases help clarify or resolve the issues that arise from the existence of a group of contracts[4].

5.    In other words, the question of "extension" of the arbitration clause to non-signatory members of a group of companies, and the question whether and to what extent it is possible to bring into one arbitral proceeding all the parties that have participated in a single economic transaction through various agreements and to decide in the same proceeding all the issues arising from the latter, should be clearly distinguished and are indeed – in the main – the subject of distinct case law. In the first case, the issue is whether an arbitration clause contained in one contract may be "extended" to a company that did not sign the arbitration agreement. In the second case, there are two or more connected agreements and the issue of whether it is possible to join and decide together in one single set of proceedings all the disputes arising from these interrelated contracts arises because the parties thereto are not identical; or because the jurisdiction clauses in the various agreements are not identical or compatible or one or more contracts do not contain any jurisdiction or arbitration clause. Moreover, the problem may arise in two-party as well as in multiparty situations.

## C.    "Extension" to non signatories is a misleading concept

6.    On the other hand, the widely used concept of "extension" of the arbitration clause to non-signatories is a misleading concept, and moreover, is probably wrong to a large extent since, in most cases, courts and arbitral tribunals still base their determination of the issue on the existence of a common intent of the parties and, therefore, on consent. The basic issue therefore remains: who is a party to the clause, or has adhered to it, or eventually is estopped from contending that it has not adhered to it. This is in other words a classic problem of contract law. The real issue therefore becomes whether in

---

[4]    See, *e.g.*, Société Kis France v. Société Générale (Paris Court of Appeal, 31 Oct. 1989) 1992 Rev. Arb. 90; 16 Y.B. Com. Arb. 145 (1991), and text accompanying notes 285-289 in Complex Arbitrations and ICC partial award in case n° 8910 of 1998, 127 J. Droit Int'l 1085 (2000), obs. D. Hascher (Paris, French law) and text accompanying note 304.

international arbitration, given its specific character and taking into consideration the usages of international trade, one should follow the same rules as are applicable to ordinary civil and commercial cases or adopt a more liberal approach; and in the latter case what approach should be adopted.

### D.    The so-called "group of companies" doctrine

7.    The issue of "extension" of the arbitration clause to non-signatories is sometimes "reduced" by commentators to the issue of "groups of companies", or by Courts to the issue whether the applicable law recognizes or not the existence of groups of companies or the so-called group of companies doctrine. This is an unfortunate "reduction" of the issue of "extension". First, even if it is true that *"irrespective of the distinct juridical identity of each of its members, a group of companies constitutes one and the same economic reality of which the Arbitral Tribunal should take account when it rules on its own jurisdiction ... "*[5], it remains that the issue of "extension" of the arbitration clause to non-signatories does not only arise in relation to companies (belonging or not to the same group) but also in relation to individuals or States. Second, I will emphasize in the conclusions that I have drawn from an analysis of the case law, that the existence of a group of companies is not *per se* a sufficient element to allow the "extension" to a non-signatory company of an arbitration agreement concluded by another member of the group. Third, in most cases, courts and arbitral tribunals require, to allow the "extension", the existence of consent or of a conduct amounting to consent. Express consent or conduct as an expression of implied consent – or as a substitute for consent – is still the basis on which most courts and arbitral tribunals reason to decide on the "extension". It is true that the factual existence of a group of companies gives a special dimension to the issue of conduct or consent. But the fact that the signatory and the non-signatory belong to the same group is only one factual element ("un indice") to be taken into consideration

---

[5]    *Dow Chemical* v. *Isover Saint Gobain,* ICC Interim Award of September 23, 1982 in case n° 4131, 1 ICC Awards, at 464.

to determine the existence of consent[6]. It is doubtful in this respect that the non-recognition by the applicable law of the legal existence of groups of companies should in most cases have a decisive impact on this determination. The problem is more factual than legal and this is unfortunately overlooked by a number of commentators, courts and tribunals.

8.    In other words, it is probably better to avoid restricting itself to the formula "group of companies doctrine" as a tool for legal reasoning in the determination of whether an arbitration clause should be extended to non-signatory companies of a group. Indeed, there is a risk that the formula will be used as a *shortcut permitting avoidance of rigorous legal reasoning,* to quickly agree without substantial factual or legal analysis, to the "extension" of the relevant arbitration clause to non-signatory companies of the group, in cases where such an "extension" is unwarranted; or to a refusal of "extension" in cases where it would be duly justified. It is in my view better to refer to the principles that have been applied by courts and arbitrators dealing with this issue in a great number of international disputes and apply them to the facts of the case. These principles are enunciated below by way of conclusion of my analysis of the case law[7].

9.    On the other hand, if one still wants to refer to the concept "group of companies doctrine" in the reasoning, it should at least be clear what this concept means and encompasses or in either words what principles among those referred to above are intrinsic, fundamental, to that theory. These principles are probably the following :

---

[6]    As was pointed out by the sole arbitrator in ICC case n° 11405 (unpublished, commented in Complex Arbitrations at n° 158), "[t]here is no general rule, in French international arbitration law, that would provide that non-signatory parties members of a same group of companies would be bound by an arbitration clause, whether always in or in determined circumstances. What is relevant is whether all parties intended non-signatory parties to be bound by the arbitration clause. Not only the signatory parties, but also the non-signatory parties should have intended (or led the other parties to reasonably believe that they intended) to be bound by the arbitration clause... The legal literature confirms that what is relevant is whether the non-signatory parties were intended to be bound, rather than a general rule about a group of companies : "[c]learly, however, it is not so much the existence of a group that results in the various companies of the group being bound by the agreement signed by only one of them, but rather the fact that such was the true intention of the parties" (Fouchard, Gaillard, Goldman : On International Commercial Arbitration, the Hague, 1999, n° 500, p. 283)".

[7]    See below, n° 21 and following.

- the issue of consent to arbitration may take a special dimension when one (or more) company(ies) to a complex international transaction is (are) member(s) of a group of companies, given the nature of the relationships which exist between companies of such group;

- in particular, consent to arbitrate may sometimes be implied from the conduct of a company of the group – although it did not sign the relevant arbitration agreement – by reason of its "implication" in the negotiation and/or the performance and/or the termination of the agreement containing the  arbitration clause and to which one or more members of its group are a party;

- but on the other hand, the sole fact that a non-signatory company is part of a group of companies, one or more other members of which have signed the agreement containing the arbitration clause, is not *per se* a circumstance which is sufficient to permit the "extension" of the clause to the non-signatory.

### E.    Inadequate qualifications

10.    Courts and arbitral tribunals sometimes qualify an issue as one of jurisdiction of the Arbitral Tribunal on a non-signatory when the problem to which the court is confronted is of a different nature. One illustration is the *Peterson Farms* case which ended in an English Commercial Court decision of 4 February 2004[8] in which the Court had to decide on a challenge under Section 67 of the 1966 English Arbitration Act of an award in which the Tribunal had decided that it did have jurisdiction to consider and determine the damage claims of other entities within the claimant's group, which were not parties to the arbitration. It is clear that the issue submitted to the Commercial Court was not a real issue of jurisdiction in relation to a group of companies. It was rather an issue of the

---

[8]    "Peterson" Farms Inc v. C&M Farming Ltd, [2004] EWHC 121 (Comm). For an analysis of the decision, see "Complex Arbitrations", *supra* note 1 at 462 and following. See also a.o. John Leadley and Liz Williams, *Peterson Farms: There is no group of Companies Doctrine in English Law*, [2004] Int. A.L.R. 111, John P. Gaffney, *The Group of Companies Doctrine and the Law Applicable to the Arbitration Agreement*, 2004 Mealey's International Arbitration Report, 47; Otto Sandrock, The Group of Companies Doctrine forms no part of English Law – Ein bemerkenswertes Urteil der Queen's Bench, 2005 IDR 51. See also in re. *Scaplake*, QB, [1978] 2 Lloyd's Rep. 380 and *Roussel-Uclaf v. Searle*, Ch. D., [1978] 1 Lloyd's Rep. 225.

extent of the damages that could be recovered by claimants, purchasers of live poultry which were subsequently sold to other group entities and to other purchasers. The real question to which the arbitrators and subsequently the Court were confronted was rather whether the purchasers, claimants in the arbitration, could also recover, beyond the damages they had suffered, the damages suffered by companies closely connected to them and to the contractual scheme? The issue was therefore not an issue of jurisdiction *ratione personae* but rather a classical issue of pass-through claim, which is not specific to groups of companies and does not necessarily have to be decided on the basis of the group of companies doctrine, as the Court did.

### F.    Inadequate use of the expression "Piercing the corporate veil"

11.    The concept of "piercing the corporate veil" is often used, especially in the United States, as synonymous with "extending the arbitration clause to a non-signatory". This is totally wrong and inappropriate. Piercing the corporate veil means that one will go behind the corporate veil of the company and hold its owners liable for the corporation's commitments. But this theory, in most legal systems, has a very limited scope of application. It will be applied only if the owners exercised complete control over the corporation with respect to the transactions at issue and such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil[9].

### G.    Distinction of the non-signatory issue from Joinder and Consolidation

12.    The issue of "extension" of the arbitration clause to non-signatories should be clearly distinguished from the issues which are usually referred to as :
- joinder : that is, whether a non-party to the arbitration may intervene in the arbitration proceedings, once they have been initiated, or whether a party to the arbitration proceedings (Claimant on the one hand, Respondent on the other hand) may join a non-party during the arbitration;

---

[9]    In the same vein, one could also regret the sometimes abusive reference by counsel to the theory of alter ego.

- consolidation : that is, if multiple disputes that arise from, or in connection with, different contracts, must in the first place be the object of separate arbitration requests, can the arbitral proceedings be subsequently consolidated? It should however be pointed out that in the United States, the word consolidation has a broader meaning. It also overlaps to some extent the issues of group of contracts, i.e., the question of whether it is possible to bring into one "consolidated" arbitration proceeding all the disputes arising from various connected agreements. In this respect, it is not unusual for parties under these various contracts to petition a court in the United States to consolidate their disputes in advance in one arbitration procedure.

**H.**   **Do the issues of extension to a State and to a company arise in the same terms?**

13.   This problem is complex and would deserve long developments. I will limit myself in this article to a few basic remarks concerning arbitrations based on a contract. According to Fouchard, Gaillard and Goldman[10], the problem of "extension" to the State of an arbitration agreement concluded by government entities does not arise in terms which are different from those of the extension of the scope of an arbitration clause within a group of companies (even if the issue may raise additional problems such as immunity from jurisdiction). In both cases, it is the intention of the parties that is the main criterion to determine the scope *rationae personae* of the arbitration clause. This is undoubtedly correct. But is it possible in relation to States, to reason the problem as it is done with groups of companies, when a court is asked to decide on the extension of the arbitration clause by application of theories such as *alter ego*, agency or third party beneficiary? Some authors have expressed serious doubts. It is worth in this respect to cite the critics addressed by Professor Roger Alford to the decision of the United States Court of Appeals for the Fifth Circuit in *Bridas S.A.P.I.C. v. Government of Turkmenistan*[11] in which the Court considered unjustified and therefore invalidated the decision of an ICC

---

[10]   p. 290 and following.

[11]   345 F. 3d 347 (5th Cir. 2003) rehearing and rehearing en banc denied, 84 Fed. Appx 472 (5th Cir. 2003), cert. denied, 124 S.Ct. 1660, 158 L.Ed. 2d 357 (2004); Binding Sovereign Non-Signatories, 19-3 Mealey's Intl. Arb. Rep. 14 (2004) ; summary of the decision by C. Lamm, E. Hellbeck and A. Kovina in 2004 Int'l A.L.R., N - 58.

Arbitral Tribunal to extend to the Government of Turkmenistan the arbitration clause contained in an agreement concluded by Bridas and entities owned by the Turkmen Government : *"thus, the goal of such government instrumentalities is to create within the government structure a special enterprise that resembles a private corporate entity in form and purpose. Such entities often are created devoid of any traditional regulatory function, and specially established for the purpose of engaging in commercial activities. Thus, while the entity itself may resemble a private corporation, the motivation of the government in establishing the entity, and the relationship of that entity vis-à-vis its "parent" are quite distinct. Bridas virtually ignored these distinctions, assuming that principles derived in the private sphere could be brought and applied in the government context. For example, in holding that the District Court erred in its alter-ego determination, the Court imposed a test for parent-subsidiary alter ego status that is far removed from the context of government instrumentalities. One cannot address, as the Court requires, whether the government of Turkmenistan is the alter ego of Turkmeneft based on the fact that the parent and subsidiary have "common business departments" or "consolidated financial statements" or "common directors and officers" or "common stock ownership". In addition, the Court utilized traditional third-party beneficiary cases without addressing the special rules applicable to government contracts that may reflect public policies that afford rights to third parties to enforce the agreement. Likewise, in its analysis of agency, the Court utilized traditional notions of private agency to determine whether an "agency relationship" existed between Turkmeneft and Turkmenistan. Yet government agencies and instrumentalities do not easily lend themselves to such private comparisons. ... As difficult as it may be to develop a more accurate analysis of the circumstances under which a sovereign non-signatory should be bound by the signature of its instrumentality, Bridas certainly underscores the hazards of freely transposing criteria established in the private sector to government contracts."*[12]

---

[12] Under United States law, the mere status of an entity as an agency or instrumentality of a foreign State is insufficient to subject the foreign State to suit for the agency or instrumentality's wrongdoings. US Courts generally look to the principal / agent relationship between a sovereign and a State-owned entity, or to abuses of the corporate form, such as where the State-owned entity is in fact an *alter ego* of the sovereign, or merely a corporate shell. Often this entails a fact-based inquiry into the level of control over the day-to-day operations of the instrumentality. US Courts also conduct a separate inquiry, namely whether principles of fairness and equity mandate that the State-owned entity's

## I.  **Procedure and strategy**

14.  From a strictly procedural point of view, the issue of whether the arbitration clause signed by a company of the group should be extended to other companies of the same group – non-signatories – is an issue of jurisdiction that the parties sometimes ask the arbitral tribunal to decide in a partial award, in a preliminary phase of the arbitration. This is not always possible. The decision on jurisdiction often depends upon the facts of the case and therefore, on the evidence that will be submitted by the parties on the merits. On the other hand, it sometimes happens that the issue of "extension" will require the arbitrators to decide collateral procedural issues at an early stage of the arbitration, even before the signature of the terms of reference. For example, in ICC case n° 13041 of 2004[13], claimant had initiated the arbitration procedure against the party with which it had concluded a contract containing the arbitration clause, but also against other companies of the group. To support its case, claimant filed with its request for arbitration, a number of documents that had been exchanged between the parties, including the non-signatories, during settlement negotiations. Respondents immediately objected to the communication of these documents and asked the arbitral tribunal to order claimant to exclude them from its file. Extensive submissions were exchanged by the parties on this issue, before the signature of the terms of reference. After an oral hearing, the arbitral tribunal issued a procedural order on the issue of admissibility of the documents. The parties settled soon thereafter.

15.  One should also consider why one does want to join non-signatory companies as additional claimants or respondents. The reasons are various and often pertain to strategy: for example, the real party in interest is not the company that signed the relevant agreement but rather a subsidiary or the parent company of the group; or the company that has signed the arbitration clause is insolvent while the other subsidiaries of the group

---

corporate form should be disregarded. Lamm and Aqua, *supra* note 2, p. 89 and 90 and references cited.

[13]  Unpublished.

or the parent company are not; or the victim of the damage resulting from a breach of contract or a tort committed by respondent, is not the company that signed the contract containing the arbitration clause with respondent but other companies of the group. Other parties invoke the fact that justice would not be well-administered if a specific, additional, non-signatory respondent could not be a party to the arbitration. One will immediately point out that this is not a good argument. However far one is ready to stretch the concept of consent (and it may go as far as considering certain specific conduct as a substitute for consent), one should not forget that consent is the fundamental pillar of international arbitration.

## II. THE IMPACT OF THE REQUIREMENT THAT THE ARBITRATION CLAUSE BE IN WRITING

16.  One will not dispute that an arbitration clause in writing is necessary to give jurisdiction to an arbitral tribunal. But by definition, if one wishes to join a non-signatory, it means that this particular company has not signed the arbitration clause. Can one say that there is therefore no arbitration clause in writing in relation to this particular company and that therefore it may not be joined to the arbitration? The Swiss Federal Supreme Court, in its landmark decision of 16 October 2003[14], had the opportunity to address this fundamental issue, which might be called the "formal" issue. It answered the question in the negative. The Court held that from the moment there is an arbitration clause, the issue of "extension" to a non-signatory may be considered. The fact that the clause or the contract containing the clause was not signed by the "non-signatory" is not a formal bar to the

---

[14]  X. S.A.L., Y. S.A.L. and A v/ Z, SARL and ICC Arbitral Tribunal, DFT 129 III 727. The decision has been commented by Laurent Lévy and Blaise Stucky in 2005 Int. A.L.R., N-5 and 2004 Rev. Arb. 695, 707; Otto Sandrock, *Die Aufweichung einer Formvorschrift und anderes mehr*, 2005 German Arb. J. 1; François Knoepfler and Philippe Schweizer, Jurisprudence suisse en matière d'arbitrage international, Revue Suisse de Droit International et de Droit Européen, 2005, p. 158 and Jean-François Poudret, *Un statut privilégié pour l'extension de l'arbitrage aux tiers*, 22 ASA Bulletin 390 (2004). According to Poudret, the Federal Court gives a privileged status to the extension of the arbitration clause and therefore creates a discrimination between the initial parties and the non-signatory.

"extension"[15]. In the words of the Swiss Federal Court: *"this formal requirement (contained in article 178 al. 1 of the Swiss Law on Private International Law) only applies to the arbitration agreement itself, that is to the agreement ... by which the initial parties have reciprocally expressed their common will to submit the dispute to arbitration. As to the question of the subjective scope of an arbitration agreement formally valid under article 178 al. 1 – the issue is to determine which are the parties which are bound by the agreement and eventually determine if one or several third parties which are not mentioned therein nevertheless enter into its scope ratione personae –, it belongs to the merits and should consequently be decided in the light of article 178 al. 2 LDIP"[16]* (which provides that the arbitration agreement is valid, as to its substance, if it meets the conditions either of the law chosen by the parties, or the law governing the subject matter of the dispute, and in particular, the law applicable to the main agreement, or Swiss law).

17.    In the United States too, it is accepted that even though there must be an agreement in writing to arbitrate, there is no requirement that this agreement be signed. Therefore, from the moment there is a written agreement, US Courts have held that a non-signatory may be considered in an appropriate case to have agreed to it or may be bound to submit to arbitration and that the ensuing award can be entitled to the protection of the New York Convention[17].

18.    In France, when confronted with the objection that the non-signatory did not sign the arbitration agreement, arbitral tribunals have also from time to time held that the French law of international arbitration does not subordinate the validity of the arbitration provision to compliance with formal requirements[18].

---

[15]    This principle is also often referred to in the U.S. case law. See for example *McCarthy v. Azure*, 22 F. 3d 351, 355-56 (1st Cir. 1994).

[16]    DFT 129 III 736.

[17]    See for example *Fisser v. Int'l Bank*, 82 F. 2d 231 at 233 (2d Cir. 1960) and *Interocean Shipping Co. v. Nat'l Shipping and Trading Corp.*, 523 F. 2d 527 at 539 (2d Cir. 1975).

[18]    See for example ICC award in cases 7604 and 7610 of 1995, 125 J. Droit Int'l (Clunet) 1027 (1998) and 4 ICC Awards, 510 and note D.H.

## III. ANALYSIS OF THE CASE LAW

19.    There is no place in this limited article to analyze, case-by-case, all the court decisions and arbitral awards that have dealt with the issue of "extension" of the arbitration clause to non-signatories. This analysis has been done in other writings[19]. The reader is referred to them. I will limit my comments to an analysis of the factual patterns that one encounters in the case law and to a presentation of the general conclusions that may be drawn from an analysis of thirty years of awards and court decisions.

### A.    The factual schemes

20.    The arbitral awards and court decisions in which tribunals have been confronted with the issue of "extension" of the arbitration clause to non-signatories may be subdivided into some 12 different factual patterns that may themselves be put into two groups: "extension" of the clause to one or several other defendants, and "extension" to one or several other claimants.

- "extension" to one or several non-signatories as additional defendants:
    - to the parent company of the group;
    - to a State;
    - to one or more subsidiaries or one or more companies of the group that are not subsidiaries;
    - to a sister corporation and an employee;
    - to another company, unrelated to the signatory;
    - to a director or general manager or CEO or to the owner of the group;
    - to an individual, possibly a majority shareholder of the group, and another company within the group;

---

[19]    In particular in Complex Arbitrations, *supra* note 2.

- "extension" to one or several non-signatories as additional claimants;
  - to the parent company of the group;
  - to a State;
  - to an individual (possibly a majority shareholder of the group) and other companies within the group;
  - to one or more subsidiaries or one or more companies within the group that are not subsidiaries;
  - to a director and principal shareholder.

The various cases that fall within these categories are analyzed below.

### B.    Conclusions of the analysis

21.    It is very difficult to draw general conclusions from the above survey of the case law. The "extension" of the arbitration clause to other companies of the group – non-signatories – started in France, and still today, its courts and arbitrators are among the most innovative in the development of this jurisprudence. Swiss courts, on the other hand, appeared in the first place extremely reluctant to accept the "extension" of an arbitration clause to non-signatories but the Swiss Federal Court has considerably relaxed its jurisprudence. On the other hand, the German approach still appears to be more restrictive[20] and so seems to be also the position in England, where the so-called doctrine of group of companies is said to be inconsistent with the principle of privity of contract, the principle of the corporate veil and the treatment of derivative actions[21]. Moreover, the principles of *lex mercatoria* are not part of English law. The issue of who is party to the arbitration clause is therefore mainly viewed as an issue of consent, but "extension" may nevertheless be achieved by

---

[20]    According to Poudret and Besson, Droit comparé de l'arbitrage international, 2002, L.G.D.J., p. 237, the German doctrine, following Sandrock and Schlosser, rejects the theory of groups of companies and only admits in a very restrictive way the theory of piercing the corporate veil (Durchgriff). They point out that various authors like Raeschke-Kessler and Berger, consider that the German jurisprudence lies way behind the arbitral practice in this area.

[21]    See in particular the landmark decision *Peterson Farms Inc. v. C&M Farming Ltd.*, [2004] EWHC 121 (Comm.), footnote 8 above.

recourse to such other theories as agency, trust or piercing the corporate veil. The same theories are also applied in the United States, which to some extent appears to be one of the most liberal jurisdictions with respect to the "extension" of the arbitration clause to non-signatories.

22. Subject to these reservations, a first conclusion may be drawn from the awards and court decisions to the effect that the determination of whether an arbitral clause should be extended to other companies of the group or its directors or shareholders is "fact specific" and may differ depending upon the circumstances of the case[22]. As was expressed by the arbitral tribunal in its first interim award in ICC case no. 9517[23]: *"... the question whether persons not named in an agreement can take advantage of an arbitration clause incorporated therein is a matter which must be decided on a case-to-case basis, requiring a close analysis of the circumstances in which the agreement was made, the corporate and practical relationship existing on one side and known to those on the other side of the bargain, the actual or presumed intention of the parties as regards rights of non-signatories to participate in the arbitration agreement, and the extent to which and the circumstances under which non-signatories subsequently became involved in the performance of the agreement and in the dispute arising from it".*

23. A second conclusion is that arbitral tribunals do not often base their decision to extend the clause or not on a prior determination of the applicable law. Starting from the principle of autonomy of the arbitration clause, they generally feel free to determine their competence according to what they consider to be – on the basis of the facts of the case – the common intention of the parties, also taking into consideration the usages of international trade.

---

[22]  Smith/Enron Cogeneration Ltd P'ship v. Smith Cogeneration Int'l, Inc., 198 F. 3d 88, 97 (2d Cir. 1999).

[23]  30 November 1998, unpublished.

24.    There seems on the other hand to be an agreement that the existence of a group of companies is not *per se* a sufficient element to allow the "extension" to a non-signatory of an arbitration agreement concluded by another member of the group.

25.    In most cases, courts and tribunals require proof of the existence of an intention at least implicit of all the parties that the non-signatories be parties to the underlying contract and its arbitration clause[24]. Some courts however limit themselves to an awareness of the clause and the requirement that the additional claimant or defendant be concerned by the dispute. But the company concerned must always have played a role in the conclusion and the performance of the agreement and this has to be proved by the party requesting the "extension" of the clause.

26.    The analysis of the arbitral awards also leads to the emergence of a rebuttable presumption that a parent company binds its subsidiaries[25] but that, on the other hand, only companies that have participated in the conclusion and performance of the agreement will be bound by the contract and the arbitration clause.

27.    Various other elements equally play a role in the decision to extend the clause to a non-signatory:
    - the fact that the other party has obviously entered into the agreement with a group as a whole and did not really care which companies would be involved in its performance, assuming that the determination of the signatory companies only concerned the details of performance of the contract;

---

[24]    However, in a recent decision, the Dutch Supreme Court decided that the "extension" could only take place if the will of the non-signatory to adhere to the arbitration agreement was clear and expressed without doubt, since it implied a waiver by the relevant individual or company of its constitutional right of access to the national court system. Hoge Raad (Civil Chamber) 20 January 2006, NJ 2006/77, JOL 2006, 40, RVDW 2006, 109. See in contrast, the much more liberal approach of the Spanish Supreme Court in its May 26, 2005 decision, *ITSA v. Satcon & BBVA* (although the case did not properly address an issue of "extension" of the arbitration clause to a non-signatory but rather an issue of group of contracts).

[25]    *See also* K. Berger, *The Creeping Codification of the Lex Mercatoria*, principle 50 at 300, and M. Mustill, *The New Lex Mercatoria*, in Liber Amicorum for Lord Wilberforce (Clarendon Press, 1987) principle No. 8, at 176.

- or the fact that all the companies concerned have participated in the rights and obligations of the contractual relationship (in what has sometimes been called "a total confusion").

28. The application of the theory of lifting the corporate veil is generally considered to be limited to cases of fraud, abuse of rights, and violation of mandatory rules. It should moreover be pointed out that this theory is very often wrongly presented and applied by advocates. They invoke the theory to extend the arbitration clause, beyond the company whose corporate veil allegedly has to be lifted, to the owners of the company. In many legal systems, this is not correct: lifting the corporate veil means that the legal personality of the company is disputed and has to be lifted and that therefore the action should be directed only to its owners, those who stand "behind the corporate veil". In other words, it is often "the shareholders instead of the company" and not "the company plus the shareholders". Before raising such a theory one should therefore have in the first place a good understanding of basic principles of corporate law, which is not always the case[26].

29. It is also admitted that the "extension" of the clause can never be considered a sanction of the conduct of the non-signatory.

30. Arbitral tribunals and courts have also emphasized the right to use a group structure as appropriate, but once a choice has been made, it must be fully assumed. In this respect, the use of a company vehicle for tax or other reasons is not *per se* an argument to justify lifting the corporate veil and extend the arbitration clause to the underlying shareholders.

31. It seems that at least in a great number of cases, a good test to decide whether an "extension" of the clause is appropriate is to determine whether the same solution would

---

[26] As Professor Roger Alford rightly pointed out in "Binding Sovereign Non-Signatories", 19-3 Mealey's Intl. Arb. Rep 14 (2004), *"[i]n debating whether to "pierce the corporate veil" or treat the principal as the alter ego of the subsidiary, the arbitration community often appears to have ignored the admonition of the Supreme Court, resorting to "worn epithets" as a substitute for "rigorous analysis". Yet, as the Supreme Court has warned, "[m]etaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it"* (citing *First National City Bank v. Banco Para El Comercio Exterior ("Bancec")*, 462 U.S. 611, 623 (1983)).

be justified if the situation was reversed. In other words, it is tentatively suggested that the principles used to determine the eventual "extension" of the clause to additional defendants should also be applied when the case concerns additional claimants and vice versa[27].

32.    Finally, it appears that in relation to the issue of "extension" of the clause to non-signatories, American case law is much more liberal than any in Europe, at least in some Circuits[28], the paramount concern of the courts being the "federal policy favouring arbitration".

## IV. THE CHALLENGE OF AWARDS BY NON SIGNATORIES

33.    An arbitral award can be set aside in the State where it was made. National laws generally provide that such an application to set aside is available to the parties, either when the arbitral tribunal has not been validly constituted, or has exceeded its jurisdiction or powers, or where the principle of contradiction and of the rights of defence have not been respected, or in the event of a violation of international public policy[29].

---

[27]    Although, as it was rightly pointed out by the sole arbitrator in ICC case n° 11405 (unpublished, commented in Complex Arbitrations at n° 158), "*a distinction should be made between the case in which a claimant submits that it is a proper party to the arbitration ... and the case in which a respondent objects to the jurisdiction of an arbitral tribunal ... In the former case, the claimant non-signatory party expressly confirms that it intended to be bound by the arbitration clause. In the latter case, the respondent non-signatory party objects and submits to have never accepted the arbitration clause: it is then much harder for the claimant to extend the scope of the arbitration clause to the non-signatory party, as the claimant has to demonstrate the intent (or apparent intent) of the non-signatory party*".

[28]    Some Circuits are less liberal than others. See for example the decision of the Fifth Circuit in Westmoreland v. Sadoux, 299 F. 3d 462 (5th Cir. 2002) in which the Court refused the extension to a non-signatory. It pointed out that "*... the courts must not offer contracts to arbitrate to parties who failed to negotiate them before trouble arrives. To do so frustrates the ability of persons to settle their affairs against a predictable backdrop of legal issues*".

[29]    See for example article 1704 C.J. in Belgium or article 1484 NCPC in France, or article 34(1) and (2)(a)(ii)(iii)(iv) and b(ii) of the UNCITRAL Model Law on International Commercial Arbitration.

34.    Similarly, the recognition or enforcement of the award can equally be refused, by virtue of Article V of the New York Convention[30] on the following grounds:

(a)  the party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case[31]; or

(b)  the award deals with a dispute not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration[32]; or

(c)  the composition of the arbitral authority or the arbitral proceedings was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the laws of the country where the arbitration took place[33]; or

(d)  the recognition or enforcement of the award would be contrary to the public policy of that country[34].

National legislations concerning enforcement of arbitral awards generally provide for analogous grounds, in whole or in part[35].

35.    It is certain that the grounds cited above are such that would allow a party brought to arbitration proceedings (eventually consolidated) against its will[36] to lodge an application

---

[30]  Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 10 June 1958, reproduced in Appendix 4, below. To illustrate the problems which might arise, see i.a. the debate between S. Jarvin and A.J. van den Berg over the consolidation provisions of the Netherlands Arbitration Act 1986 in 3 Arb. Int'l 254, 257 (1987).

[31]  V, 1, b.

[32]  V, 1, c.

[33]  V, 1, d.

[34]  V, 2, b.

[35]  In Belgium, see article 1710(3) as well as 1723 of the Code Judiciaire of which paragraph 3 refers to the grounds to set aside set out in article 1704.

[36]  But, on the other hand, a non-signatory to an arbitration agreement, who initiated arbitration proceedings and signed the Terms of Reference prior to the arbitration, may not later oppose the enforcement of an interim award of costs issued by the arbitrator after he has determined that he had no jurisdiction to entertain the proceedings because claimant was not a party to the written agreement containing the arbitration clause. He is bound by the award. The Terms of Reference are an arbitration agreement within the meaning of the New York Convention and the New Zeeland International

to set aside the award or to oppose its enforcement. Actions to set aside are quite frequent. On the other hand, decisions rendered in the context of enforcement proceedings are relatively rare. It remains that the risk of refusal of *exequatur* is a real one and should therefore encourage caution.

36.   One example of a case where an award was refused enforcement against an individual who was not a party to the relevant arbitration agreement but was considered by the Court a party to the arbitral proceedings, is the decision of the Supreme Court of British Columbia in *Re. Javor v. Francoeur*[37]. An arbitration was carried out under the rules of the American Arbitration Association pursuant to an arbitration agreement dated March 25, 1995 entered into between the claimants Eddie Javor and Fusion-Crete, Inc., and the respondent Fusion-Crete Products Inc. Javor and Fusion-Crete Inc. filed the arbitration not only against respondent Fusion-Crete Products Inc., but also against respondent Luke Francoeur, who was not a party to the arbitration agreement. However, the arbitrator accepted jurisdiction over Francoeur considering that there was no separation between himself and the corporate respondent, thus he was the *alter ego* of Fusion-Crete Products Inc. The arbitrator did not decide that Francoeur was a party to the arbitration agreement but that he was a proper party to the arbitration proceedings. He found Francoeur *"personally liable for any debts of the corporation that might ultimately be imposed in these proceedings ... "*. He also found that Francoeur was liable jointly with the corporation to pay the costs of the arbitration.

37.   Javor and Fusion-Crete Inc. sought an enforcement order against Francoeur under the provisions of either the Foreign Arbitral Awards Act or the International Commercial Arbitration Act. The Supreme Court of British Columbia refused enforcement of the award. It considered that enforcement could be ordered only if the conditions provided in either act were fulfilled. This was not the case here since an arbitration agreement is the common foundation upon which each of the two statutes rest. As Francoeur was not a

---

Arbitration Act 1974. *Commonwealth Development Corporation (United Kingdom) v. Austin John Montague*, Court of Appeal of the Supreme Court of Queensland, 17 April 2000, 27 June 2000, 2000 [QCA 252].

[37]   2003 BCSC 350.

party to the arbitration agreement but was only found by the arbitrator to be a proper party to the arbitration proceedings, petitioners could not have an award for costs against him enforced under the FAAA or the ICAA.

38.    Another example of case in which enforcement of a foreign award was refused, on the ground that one of the parties condemned by the arbitral tribunal was a non-signatory to the arbitration agreement, is the decision of the United States Court of Appeals for the Second Circuit in *Sarhank Group v. Oracle Corporation*[38]. Unfortunately, the decision is wrong, being based on a totally erroneous interpretation – that we have denounced several times[39] – of the term "arbitrability" referred to in Article V (2) of the New York Convention. Article V (2)(a) of the Convention, provides that a court may refuse to enforce a foreign award if the subject matter was not capable of settlement through arbitration. The "arbitrability" concept used in this article refers to a very restricted and shrinking core of disputes pertaining to public policy that legislators have reserved for the jurisdiction of their national courts (criminal law, family law ...). In the history of the Convention, there have not be more than a few cases in which enforcement has been refused on the basis of Article V (2)(a). This article has in any case nothing to do with the stretched and unusual theory of arbitrability prevailing in the United States, which in other parts of the world is rather referred to as the determination of the scope *rationae materiae* and *rationae personae* of the arbitration agreement. In other words, enforcement may not be refused under Article V (2)(a) of the New York Convention on the basis of the fact that one of the parties over which the arbitral tribunal accepted jurisdiction, did not sign the relevant arbitration agreement. This is however what the United States Courts of Appeals unfortunately did in the *Sarhank Group* decision.

39.    An Egyptian corporation, Sarhank Group ("Sarhank") had entered into an agency agreement with Oracle Systems Ltd. ("Oracle Systems"), under which Sarhank agreed to act as provider of Oracle products and services within Egypt. Oracle Systems is a wholly-

---

[38]    404 F. 3d 657 (2d Cir. 2005).

[39]    See for example Hanotiau B., L'arbitrabilité, in The Hague Academy of International Law, 296, Collected Courses, p. 42 (2003).

owned subsidiary of Oracle Corporation ("Oracle"), a United States software manufacturer incorporated under the laws of Delaware. A few years later, a dispute arose between the contracting parties and Oracle Systems terminated the agreement. As a result, Sarhank commenced arbitration against both Oracle Systems and Oracle, the parent company. An arbitral tribunal was constituted under the auspices of the Cairo Regional Center for International Commercial Arbitration. Oracle argued that the tribunal lacked jurisdiction over it since it had not signed the agreement with Sarhank. The tribunal rejected the objection and affirmed its jurisdiction over Oracle on the basis that Oracle Corporation was a consolidated partner with Oracle Systems in the relation with Sarhank. The arbitral tribunal also decided that, as a matter of Egyptian law, despite their having separate legal personalities, subsidiary companies to one group of companies are deemed subject to the arbitration clause incorporated in the contract because contractual relations cannot take place without the consent of the parent company owning the trademark by and upon which transactions proceed[40]. In the arbitrators' view, a group of companies' analysis was particularly appropriate since the agreement granted Oracle Systems a right to assign its rights and obligations to "an affiliated company" without Sarhank's consent. Finally, the tribunal rendered an award in favor of Sarhank jointly and severally against Oracle and Oracle Systems. The award was subsequently upheld by the Egyptian Court of Appeals and the Egyptian Court of Cassation.

40.    Sarhank moved to enforce the award in the United States Federal Court on the basis of the New York Convention. On October 8, 2002, the U.S. District Court for the Southern District of New York confirmed the award and directed that judgment be entered accordingly. The District Court rejected Oracle's defenses that the arbitrators lacked authority to determine arbitrability and to impose liability on Oracle and that enforcement of the award would be contrary to American public policy. The decision was appealed. The Second Circuit refused enforcement on the basis of Article V (2) of the Convention considering that *"under American law, whether a party has consented to arbitrate is an issue to be decided by the Court in which enforcement of an award is sought. An*

---

[40]    At 662.

*agreement to arbitrate must be voluntarily made, and the Court decides, based on general principles of domestic contract law, whether the parties agreed to submit the issue of arbitrability to the arbitrators"*[41]. The Court considered that it was for itself to determine whether the dispute was "arbitrable" in relation to Oracle. It considered that it was not, stating that *"an American non-signatory cannot be bound to arbitrate in the absence of a full showing of facts supporting an articulable theory based on American contract law or American agency law"*.

41.   As pointed out by two American commentators[42], the Court could have based its decision not to enforce on other articles of the Convention. It could for example have formed a view that no arbitration agreement existed as between Sarhank and Oracle and that therefore, the arbitrators exceeded their authority. Alternatively, it might have concluded that the application of a group of companies' analysis in this case offended United States public policy. But choosing the "arbitrability" exception was undoubtedly an erroneous decision.

42.   On the other hand, in *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GmbH*[43], the United States Court of Appeals for the Fourth Circuit confirmed the enforcement of an award involving a non-signatory to the arbitration agreement. The main issue under article II (1) and V (1)(a) of the New York Convention was whether an award could be enforced against a predecessor-in-interest of one party when the predecessor was not a party to the arbitration agreement. The predecessor of International Paper Company, Westinghouse Electric Corporation, had agreed to buy an industrial saw manufactured by Schwabedissen Maschinen, through its United States distributor, Wood Systems Incorporated. A purchase order was sent by Schwabedissen to Wood, without Westinghouse signature. This purchase order included an ICC arbitration clause. In other

---

[41]   Citing the Supreme Court decision in *First Options* v. *Kaplan*, 514 US. 938, 943 (1995).

[42]   Barry H. Garfinkel and David Iherlihy in *Looking for law in all the wrong places : The Second Circuit's decision in Sarhank Group v. Oracle Corporation*, 20-6 Mealey's Intl. Arb. Rep. 12 (2005). The two authors approve our conclusion.

[43]   206 F. 3d 411 (4th Cir. 2000).

words, the arbitration clause was included in a document that Westinghouse did not sign. A dispute arose between the parties and International Paper initiated arbitration against Schwabedissen. The arbitral tribunal held that there was no agreement between Schwabedissen and International Paper and therefore no basis for the arbitration. The arbitrators assessed costs against International Paper.

43.    International Paper refused to comply with the award and Schwabedissen sought its enforcement in the United States District Court. The District Court granted Schwabedissen's motion to enforce the arbitral award. The Court of Appeals confirmed it. It pointed out that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him or, in other words, when it receives a direct benefit from the contract. Quoting *Avila Group, Inc.* v. *Norma J. of California*[44], the Court pointed out that *"to allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act"*.

### CONCLUSION

44.    The issue of "extension" of the arbitration clause to non-signatories would be easier to decide if it were approached by courts and commentators in a more rigorous way. Confusion with related issues, such as those arising from the existence of a group of contracts that do not all contain the same or compatible arbitration or jurisdiction clauses, the reference to inadequate qualifications, the inadequate use of expressions such as piercing the corporate veil or the unnecessary or arbitrary reference in some cases to the so-called group of companies doctrine, obscure the analysis and may even lead to totally unwarranted results.

---

[44]    426 F. Supp. 537, 542 (S.D.N.Y. 1977).

45.    On the other hand, there is not one unique answer to the issue with which we have dealt. Indeed, it is in the first place fact specific. On the other hand, it results from a proper analysis of the case law that courts and arbitral tribunals generally follow the same scheme of reasoning. Their decisions are rarely based – and should not be based – on considerations such as equity or good administration of justice. The solution they reach is founded in most cases on a prior determination of who is a party to the arbitration clause, or who has adhered to it, or who eventually is estopped from contending that it has not adhered to it, such adhesion being decided on the relevant individual or company's consent, either express, or implied through its conduct in the negotiation, performance and termination of the agreement.

# EXHIBIT 38


RECYCLED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| URS CORPORATION, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff,) | | Civil Action No. 06-415 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| THE LEBANESE COMPANY FOR | ) | |
| THE DEVELOPMENT AND | ) | |
| RECONSTRUCTION OF BEIRUT | ) | |
| CENTRAL DISTRICT SAL, a/k/a | ) | |
| SOLIDERE, | ) | |
| | ) | |
| Defendant.) | | |

EXPERT REPORT OF GENE L. DEETZ

**Table of Contents**

1. **Qualifications / Experience** .......................................................................1

2. **Scope** ..............................................................................................................2

3. **Background** ....................................................................................................3

   A. Timeline..........................................................................................................3

   B. Financial and Operational Considerations .....................................................5

4. **Analysis**..........................................................................................................7

   A.    Subsequent to Radian's acquisition by URS, Radian's parent corporations

         transferred assets from Radian to URS . .......................................................7

         1.   Capitalization and Viability Analysis................................................7

         2.   Corporate Governance......................................................................10

         3.   Post-Acquisition Management: Plans and Implementation...............11

         4.   Operational Realities .......................................................................13

   B.    Radian did not have sufficient assets to meet its current obligations, including

         payroll and other incidental daily operating expenses, and these obligations

         were paid by URS...........................................................................................16

   C.    There is cause for confusion about whether Radian or URS was responsible for

         the Normandy Landfill Project.......................................................................20

         1.   External Documents ........................................................................20

         2.   Internal Correspondence..................................................................24

         3.   Operational Resources.....................................................................24

         4.   Testimony ........................................................................................28

5. **Conclusion** ..................................................................................................29

Appendix 1: Resume of Gene Deetz

Appendix 2: List of Documents Considered

Appendix 3: Correspondence Relating to Request of Funds by Radian Lebanon Personnel

Appendix 4: Balance Sheet information for Radian Lebanon

# 1. Qualifications / Experience

1.      My name is Gene L. Deetz and I am the Principal in charge of the New York, New York office of Chicago Partners, LLC. Between May 1, 2002 and July 21, 2006, I was the Director in charge of the New York office of LECG Corporation, a global expert services firm. From February 19, 2001 through April 30, 2002, I was a Managing Director in the Strategic Valuation Practice of Arthur Andersen LLP, a public accounting firm. Prior to relocating to New York and Chicago, I was a partner at Stoughton Davidson Accountancy Corporation in Fresno, California (January 11, 1972 through May 31, 1998) and Noell, Deetz, Agnew and Morse also in Fresno, California (June 1, 1998 through February 18, 2001).

2.      I am a Certified Public Accountant (since 1975) licensed in the states of California, New York, and Pennsylvania, a member of American Institute of Certified Public Accountants and the California Society of Certified Public Accountants. I am an Accredited Valuation Professional and an Accredited Senior Appraiser and have appraised numerous companies under Generally Accepted Accounting Principles ("GAAP") and the Uniform Standards of Professional Appraisal Practice ("USPAP") over the course of my career. I have practiced in the areas of valuation, financial and goodwill accounting and auditing since 1972. This has included work as an audit staff, audit manager, and audit partner. I have also practiced in the area of accounting and auditing consulting involving, among other things, commercial damages, mergers and acquisitions, forensic accounting and securities litigation.

3.      I have conducted numerous valuations, damages calculations and studies in commercial damages, fraud, breach of contract, breach of fiduciary duty, and minority shareholder dispute matters. My valuation experience includes opinions on the fairness of various transactions to equity holders. The above-described work includes small, privately-owned companies, as well

1

as large, publicly-traded companies. Appendix 1 attached hereto is a copy of my current resume and recent testimony.

4.    Chicago Partners is being compensated at a rate of $550 per hour for my services. My compensation is entirely independent of my opinion and any outcome in this matter. Furthermore, I have no relationship with either of the parties to the above captioned matter. I have directed staff at Chicago Partners to assist in my analysis. These professionals have standard billing rates ranging from $180 to $500 per hour.

## 2. Scope

5.    I have been asked to consider the URS Corporation ["URS"] and Radian International LLC ["Radian"] parent/subsidiary relationship and to determine, based on documents and testimony produced in this matter, whether or not and to what extent those documents and testimony are consistent with Radian functioning as an ongoing, adequately capitalized and economically viable entity with independent management and adherence to corporate formalities.    In my analysis of the economic viability and capitalization of the firm, I have considered both financial and economic factors that are generally accepted as relevant to valuation and viability, including liquidity, profitability, and leverage,[1] as well as Radian's corporate governance practices and its relationship with URS.[2]

6.    To conduct my analysis, I have relied on documents produced by URS providing background information on both URS and Radian, including financial information for URS and

---

[1] For instance, empirical evidence on the importance of these factors regarding the viability of a corporate entity is provided by Altman, Edward I., "Predicting Financial Distress of Companies: Revisiting the Z-Score and ZETA Models", working paper, July 2000, and Shumway, Tyler, "Forecasting Bankruptcy More Accurately," *Journal of Business*, 2001.

[2] For instance, empirical evidence on the importance of corporate governance in determining firm value is provided by Gompers, P. et al., "Corporate Governance and Equity Prices," *Quarterly Journal of Economics* 118 (1), Feb 2003. and Brown, L. and M. Caylor , "Corporate Governance and Firm Valuation," *Journal of Accounting and Public Policy*, Vol. 25, No. 4, 2006.

Radian, and corporate resolutions for those entities.    In addition, I have reviewed correspondence, answers to interrogatories, affidavits, and the following list of deposition testimony.

Deposition Testimony Reviewed
- Thomas Bishop, Senior Vice President of Radian and Senior Vice President of URS
- Amine Bou Onk, Vice President for Federal Programs Operations; General Manager of Lebanon Branch, URS; and Project Manager SOLIDERE, Reclamation of Normandy Landfill Phase II, Beirut Lebanon
- Alberto Cuenca, Regional Comptroller of Radian and Regional Controller of URS
- Kristin Jones, Legal Assistant to the General Counsel of URS; Corporate Secretary for certain URS entities and Assistant Corporate Secretary for other URS entities
- David Balfour, Senior Vice President and Secretary of Radian and Senior Vice President of URS

See Appendix 2 for a complete listing of documents considered.

7.    The conclusions reached herein are my own and are based on my review of the documents and testimony described above, my education, training, and expertise in economic and financial valuation and my review of the academic literature as appropriate.

# 3. Background

## A. Timeline

8.    In 1997, Radian was an international engineering and technical services firm that provided a wide range of environmental based consulting services to industries and governments around the world. The company had been formed in January 1996 as a joint venture between the Hartford Steam Boiler Inspection and Insurance Company and Dow Chemical Company.[3]

9.    In May 1998, Radian had 35 offices worldwide, 1966 employees, and 800 environmental consulting clients.   Gross revenues in 1997 were reported to be $303 million, and Radian's services included real estate audits, manufacturing plant audits, design and analysis of remediation plans, design of waste minimization plans, litigation support, public health risk

---

[3] Hartford Steam Boiler Inspection and Insurance Company, Form 10-K/A, filed July 3, 1997, pages 5 and 8.

assessment, regulatory and public policy analysis, compliance strategies, training, compliance software, compliance procedures manuals. Radian's other services included remediation activities, environmental consulting to insurers and policymakers, general risk management consulting, monitoring, modeling, environmental data management, control technology, environmental/troubleshooting, permitting, waste management, wastewater treatment design.[4]

10.    On July 31, 1998, Dames & Moore Group ["D&M"] acquired all of the membership interests of Radian for $117 million.[5] Prior to the acquisition, on June 30, 1998, the book value of Radian's total assets was approximately $157 million.[6]

11.    In January 1999, Radian was hired by SOLIDERE, Lebanon's largest company, to treat and process the waste contained in the Normandy Landfill. According to a press release, the contract price was $53 million, and the landfill contained five million cubic meters of waste.[7]

12.    In June 1999, URS acquired D&M for $376.2 million.[8] As of its fiscal year end in October 1999, URS had approximately 185 offices and approximately 15,700 employees. Revenues for fiscal year 1999 were approximately $1.4 billion, which was over 75% higher than 1998. Management stated that the increase in revenues was primarily attributable to the D&M acquisition.[9]

13.    I am not aware of any publicly available income statement or balance sheet information for Radian after 1998.

---

[4] Business Insurance, "Business Insurance Directory of Environmental Consultants", May 25, 1998.
[5] Dames & Moore Group, Form 8-K/A, filed on October 9, 1998 as of July 31, 1998.
[6] Dames & Moore Group, Form 8-K/A, filed on October 9, 1998 as of July 31, 1998.
[7] Reuters Press Release, "Beirut's Solidere awards U.S. Radian $53 mln contract", Jan 25, 1999.
[8] URS Corporation, Form 10-K, as of October 31, 1999, page 15.
[9] URS Corporation, Form 10-K, as of October 31, 1999, pages 6 and 11.

4

## B. Financial and Operational Considerations

14.    Consistent with the Uniform Standards of Professional Appraisal Practice ["USPAP"] and well-recognized economic literature, many factors should be considered in determining the valuation and economic viability of a corporation.[10] Certain key factors are described below:

- **Liquidity**

   Liquidity measures, such as the current ratio and the quick ratio, describe the firm's available cash. A firm's liquidity is an important consideration for both valuation and viability. As stated by Brealey and Myers, in their widely-used textbook on corporate finance, the reason why liquidity measures matter is that "firms with poor liquidity are more likely to fail and default on their debts."[11]

- **Profitability**

   Analyzing a firm's cash flows and profitability can provide important information regarding a firm's valuation and viability, because it reveals information about the firm's ability to survive its competition. In fact, analysis of projected revenues and costs is the basis for discounted cash flow analysis, a widely-used approach to valuation of both public and privately held entities.[12]

---

[10] For instance, empirical evidence on the importance of these factors regarding the viability of a corporate entity is provided by Altman, Edward I., "Predicting Financial Distress of Companies: Revisiting the Z-Score and ZETA Models", working paper, July 2000, and Shumway, Tyler, "Forecasting Bankruptcy More Accurately," *Journal of Business*, 2001. In addition, empirical evidence on the importance of corporate governance in determining firm value is provided by Gompers, P. et al., "Corporate Governance and Equity Prices," *Quarterly Journal of Economics* 118 (1), Feb 2003, and Brown, L. and M. Caylor , "Corporate Governance and Firm Valuation," *Journal of Accounting and Public Policy*, Vol. 25, No. 4, 2006.
[11] Brealey, Richard, and S. Myers, *Principles of Corporate Finance*, McGraw-Hill, 6th ed. page 826.
[12] The value-relevance of profitability and earnings was confirmed in a study of highly-leveraged transactions. See Kaplan, Steven, and Richard Ruback, "The Valuation of Cash Flow Forecasts: An Empirical Analysis", *Journal of Finance*, 1995.

- **Leverage**

  Leverage ratios indicate how much debt the firm holds, relative to its assets and its earnings. Like liquidity, leverage is an important consideration in determining the viability of a firm. According to Brealey and Myers, leverage is important because, "In extreme cases, if hard times come, firms with high leverage are liable to find that they cannot pay their debts."[13]

- **Corporate Governance Considerations**

  A firm's ability to survive as a stand-alone entity depends on the ability of its senior management team to act as independent and effective leaders. Firms require corporate leadership and strategic decision-makers who are unbiased. For instance, they should not have managerial responsibilities to maximize the shareholder value of a competitor entity. In general, the influence and importance of senior management on firm value has been demonstrated empirically.[14] In my analysis, I have also considered corporate governance measures including control and independence, which are relevant to valuation and viability, again consistent with USPAP.

15.    I have considered the above-listed factors in evaluating Radian's viability as a stand-alone entity. In applying my analysis to the facts available, I have evaluated the unique facts and circumstances surrounding the relationship between URS and Radian.

---

[13] Brealey and Myers, page 824.
[14] See, for example, Denis, D. and D. Denis, "Performance Changes Following Top Management Dismissals", *Journal of Finance*, Sept. 1995.

These pages were omitted for confidentiality.

US.[105] Any internal confusion on the part of senior management could also adversely affect the ongoing operations of the firm, potentially impacting its economic viability. In addition, Mr. Bishop's lack of information is inconsistent with careful and independent management of the entity.

## 5. Conclusion

67.    Based on my education, training, expertise, and review of academic literature as appropriate, as well as my analysis of documents and testimony produced in this matter, I have concluded that URS owns 100% of the member interests of Radian, URS and Radian have common directors and/or officers, URS finances Radian, Radian has inadequate capital, URS pays for Radian's expenses, the Normandy Landfill Project of Radian has been described as if it were URS business, URS uses the property of Radian as its own, executives of Radian do not act independently in its interests, and the formal legal requirements of the subsidiary such as the existence of an independent board of directors, have not been observed.

68.    The observations listed above are important considerations because they affect the valuation and viability of Radian as a stand-alone entity. Based on the factors listed above, I find that these facts are not consistent with Radian functioning as an ongoing, adequately capitalized and economically viable entity with independent management and adherence to corporate formalities.

69.    My opinions as expressed in this report reflect my review and analysis of the materials provided to date. My opinions may be further updated based on any new information that comes to my attention.



29

Submitted By:

_____        2-23-07
Gene L. Deetz                                     Date

Appendix 1

# GENE L. DEETZ

Principal
Chicago Partners, LLC
810 7th Avenue, Suite 11C
New York, New York 10019
Telephone: (646) 354-4004
Facsimile: (646) 354-4040

## CURRENT EMPLOYMENT

Chicago Partners, LLC
Principal, July, 2006 – Present

## EDUCATION

B.S. Economics (1972) California State University, Fresno, California

## PROFESSIONAL CREDITS

Certified Public Accountant (California, New York and Pennsylvania)
Accredited Senior Appraiser, American Society of Appraisers, Business Valuation
ABV Designation, American Institute of Certified Public Accounts

## TEACHING EXPERIENCE

Taxation of Real Property Transactions, Partnership Taxation
San Joaquin College of Law, Fresno, California

## PROFESSIONAL EXPERIENCE

LECG
Director, Valuation Services, 2002 – 2006

Arthur Andersen
Managing Director, Strategic Valuation Services, 2001 – 2002

Noell Deetz Agnew & Morse LLP
Partner in charge of Valuation and Litigation Support Services, 1998 – 2001

Stoughton Davidson
Partner in charge of Valuation and Litigation Support Services, 1972 – 1998

# CV AND SUMMARY OF TRIAL AND DEPOSITION TESTIMONY

Mr. Gene Deetz is a Principal at Chicago Partner's New York office. He specializes in providing accounting standards guidance, forensic accounting, valuation consulting for intellectual property, claims and dispute matters, and expert witness advice to clients and counsel in commercial, regulatory and tax controversy matters.

Prior to joining Chicago Partners, Mr. Deetz was the director of valuation services with LECG, LLC. He has also held positions as the managing director of strategic valuation services with Arthur Andersen, and the partner in charge of valuation and litigation support services with Noell Deetz Agnew & Morse, and Stoughton Davidson.

Mr. Deetz's strategic valuation experience includes financial advisory engagements, purchase price allocations, estate and gift tax planning, acquisitions and divestitures, and intangible asset valuations. Mr. Deetz has also provided valuation, business, economic and financial analyses on behalf of clients involved in a variety of disputes, over matters such as financial reporting before the Securities and Exchange Commission, business interests and intangible assets, securities litigation, contract claims, fraud and breach of fiduciary duty, minority shareholder actions, wrongful termination, and federal tax controversies.

He has worked on a variety of licensing projects and conducted valuations of various intangible assets including patents, trademarks/trade names, and trade secrets.

He has provided consulting in diverse industries including:

- Agriculture
- Cable Media
- Energy
- Food
- Pharmaceutical
- Retail
- Telecommunications

- Automotive
- Chemicals
- Fabricated Goods
- Forestry
- Printing & Publishing
- Service
- Transportation

- Branded Consumer Products
- Construction
- Financial Services
- Healthcare
- Recreation Products
- Technology
- Utilities

## Speeches and Seminars

Continuing Education courses for the California Society of Certified Public Accountants

## Professional Memberships

American Institute of Certified Public Accountants
California Society of Certified Public Accountants
American Society of Appraisers

## Summary of Valuation, Economic, Business, and Financial Analysis and Litigation Support Services:

- Prepared expert report in Securities Litigation matter regarding the application of SFAS 115.

- Performed various intangible asset valuations for companies wishing to value their entire business and business segments, as well as for companies considering licensing agreements. He has constructed various models to forecast cash flows generated from licensing in order to determine the cost/benefit of each model and implementation.

- Prepared valuation reports and forensic accounting analysis associated with acquisitions and divestitures, minority shareholder actions, securities class actions, gifts to universities, estate and gift tax planning matters, trademarks, trade names, patents and a variety of other intangible assets. He has presented his findings before the United States Tax Court, the Internal Revenue Service and Federal and State courts.

- Conducted complex damage studies involving lost sales, lost profits, incremental profits, capacity, fixed and variable costs, product line profitability, market place confusion, reasonable royalty and licensing rates, breach of contract, value of delivery contracts, withholding of assignment of lease, product failures, trademark and patent infringement, government contract claims, wrongful termination and eminent domain actions. He has presented federal tax controversy work before the United States Tax Court and the Internal Revenue Service, and also presented findings before Federal and State courts.

## Deposition and/or Trial Testimony (2002 – 2007):

- *Atlantic Coast Airlines Holdings, Inc., v. Mesa Air Group, Inc.,* United States District Court for the District of Columbia

- *Coelho v. Coelho,* Fresno County Superior Court

- *Downey Savings and Loan Association, F.A. v. Comdisco, Inc.,* United States Bankruptcy Court, Northern District of Illinois

- *J.C. Robinson Seed Company v. Garwood Seed Comp., Golden Harvest Seed, LLC, et. al.,* United States District Court for the District of Illinois, Peoria Division

- *IDT Corporation v. Telefonica, S.A., et. al.,* United States District Court, District of New Jersey

- *Perfect Care, Inc. v. Pharmaceutical Buyers, Inc., Abbott Laboratories, Inc. t/a Ross Products Division,* United States District Court for the District of New Jersey

- *Reinhart and Smith v. Lucent Technologies, Inc. v. National Union Fire Insurance Company, et. al.,* United States District Court for the District of New Jersey

- *The Proctor & Gamble Company, et al. v. The United States of America,* United States District Court for the Southern District of Ohio, Western Division

- *The DIRECTV Group, Inc. v. Darlene Investments, LLC,* United States District Court, Southern District of New York

- *The DIRECTV Group, Inc., et al. v. Darlene Investments, LLC, et al., and Darlene Investments LLC v. The DIRECTV Group, Inc. et al.,* JAMS Arbitration

- *JP Foodservice Distributors, Inc. v. Sorrento, Inc.,* Supreme Court of the State of New York, County of New York

- *Adelphia Communications Corp. v. Deloitte & Touche, LLP,* Court of Commonpleas, Philadelphia County, Pennsylvania

February 2007

Appendix 2

These pages were omitted for confidentiality.

Appendix 3

These pages were omitted for confidentiality.

Appendix 4

These pages were omitted for confidentiality.

# EXHIBIT 39

RECYCLED

SECOND EDITION

# INTERNATIONAL
# COMMERCIAL
# ARBITRATION

## Commentary and Materials

Gary B.Born

 Transnational Publishers

 Kluwer Law International

Published and distributed in North America by Transnational Publishers, Inc.
410 Saw Mill River Road
Ardsley, NY 10502

Phone: 914-693-5100
Fax: 914-693-4430
E-mail: info@transnationalpubs.com
Web: www.transnationalpubs.com


Published and distributed in the rest of the world by Kluwer Law International
P.O. Box 85889
2508 CN The Hague
The Netherlands

Phone: 31-70-308-1560
Fax: 31-70-308-1515



ISBN 1-57105-174-0 Transnational Publishers
ISBN 1-57105-175-9 Transnational Publishers (student edition)
ISBN 90-411-1559-5 Kluwer Law International

Copyright (c) 2001 by Transnational Publishers, Inc. and Kluwer Law International

All rights reserved. This book may not be reproduced, in whole or in part, in any form (beyond that copying permitted by U.S. Copyright Law in Section 107, "fair use" in teaching and research, Section 108, certain library copying, and except in published media by reviewers in limited excerpts), without written permission from the publisher.

Manufactured in the United States of America

2      Introduction

In many circumstances, national law permits parties to agree upon the arbitral procedures that will govern the resolution of their dispute. As a consequence, the procedural conduct of arbitrations can vary dramatically across industrial sectors,[2] arbitral institutions,[3] geographic regions,[4] and categories of disputes. In particular fields, or individual cases, parties may agree upon procedural rules that are tailor-made for their individual needs.

Aside from specialized fields, commercial arbitration often bears broad resemblances to commercial litigation in national courts: arbitration will frequently involve the submission of written pleadings and legal argument (often by lawyers), the presentation of documentary evidence and oral testimony, the application of "law" (in the form of judicial precedents and statutes), and the rendition of a reasoned, binding award. Nevertheless, in practice, arbitral procedures are usually less formal than litigation, particularly on issues such as pleadings and evidence.[5] Arbitration often lacks various characteristics that are common in national court litigation, including broad discovery, summary disposition procedures, and appellate review. In smaller matters, domestic arbitrations are frequently conducted without the participation of legal advisers, before a lay-arbitrator, according to highly informal procedures.

## 2. Special Characteristics of International Commercial Arbitration

International commercial arbitration is similar in important respects to domestic arbitration. As in domestic matters, international arbitration is a consensual means of dispute resolution, by a non-governmental decision-maker, that produces a legally-binding and enforceable ruling. In addition, however, international arbitration has several characteristics that distinguish it from domestic arbitration.

Most importantly, international arbitration is designed and accepted particularly to assure parties from different jurisdictions that their disputes will be resolved neutrally. Among other things, the parties usually seek an independent decision-maker, detached from the courts, governmental institutions, and cultural biases of either party. They also ordinarily contemplate the arbitrator's application of internationally-neutral procedural rules, rather than a particular national legal regime.

In addition, international arbitration is frequently regarded as a means of mitigating the peculiar uncertainties of transnational litigation. These uncertainties can include protracted jurisdictional disputes, expensive parallel proceedings, and choice-

---

2. In a number of industries, specialized arbitral regimes provide well-established means of dispute resolution. Examples include maritime, commodities, construction, and labor arbitration. *See, e.g.,* D. Johnson, *International Commodity Arbitration* (1991); F. Rose, *International Commercial and Maritime Arbitration* (1988); AAA, *Business Arbitration — What You Need to Know* (1992)(providing descriptions and bibliographies for construction, textile, apparel, and insurance arbitrations).

3. *See infra* pp. 13-19.

4. *See infra* pp. 27-41.

5. Arbitration can also involve extremely summary procedures, such as those in "fast-track" or "documents only" proceedings. In the latter, no oral evidence or hearings are permitted, with the parties relying entirely on written submissions and evidence.

of-law debates. International arbitration seeks to avoid these uncertainties by designating a single, exclusive dispute resolution mechanism for settling the parties' disagreements. Moreover, international arbitration awards are often more readily enforceable in jurisdictions other than their place of origin than national court judgments.[6]

### 3. Legal Framework for International Commercial Arbitration

Although international arbitration is a consensual means of dispute resolution, it has binding effect only by virtue of a complex framework of national and international law. As we discuss below, international conventions, national arbitration legislation, and institutional arbitration rules provide a specialized legal regime for most international arbitrations. This legal regime enhances the enforceability of both arbitration agreements and arbitral awards, and seeks to insulate the arbitral process from interference by national courts or other governmental authorities.

On the most universal level, the United Nations Convention on Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") has been ratified by more than 120 nations, including all significant trading states and most major developing states. The Convention obliges member states to recognize and enforce both international commercial arbitration agreements and awards, subject to limited exceptions.[7] Other international conventions impose comparable obligations on member states with respect to particular categories of disputes or with respect to particular bilateral or regional relationships.[8]

In addition, most developed trading states (and many other countries) have enacted national arbitration legislation that provides for the enforcement of international arbitration agreements and awards, that limits judicial interference in the arbitration process, and that authorises specified judicial support for the arbitral process.[9] National arbitration legislation typically affirms the capacity of parties to

---

6. The existence of various international agreements — such as the New York Convention — providing for the recognition and enforcement of foreign arbitral awards facilitates the enforceability of such awards. *See infra* pp. 19-27. Many states have entered into bilateral or regional treaty regimes (such as the Brussels Convention) which give some foreign court judgments a high degree of enforceability. In contrast, the United States is not a party to any international convention or bilateral treaty relating to the enforcement of foreign court judgments. *See* G. Born, *International Civil Litigation in United States Courts* 938-39 (3d ed. 1996).

7. The New York Convention is reproduced in Appendix B and is discussed in detail below. *See infra* pp. 19-23.

8. Other significant international agreements concerning arbitration include the Inter-American Convention on International Commercial Arbitration of 1975, *see* Appendix C and *infra* pp. 23-24; the Convention on the Settlement of Investment Disputes of 1965, *see infra* pp. 24-26; the 1961 European Convention on International Commercial Arbitration, *see* Appendix A; and bilateral treaties, *see infra* pp. 26-27.

9. Under the laws of many countries, international arbitration does not include contractual dispute resolution of issues of pure fact — such as valuation of property, verification of compliance with engineering specifications, or determination of conformity of goods with contract terms. Civil law states in particular distinguish between arbitration proper and the processes of valuation or appraisal. (Arbitration

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2007, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Edward P. Welch, Esquire
> Edward B. Micheletti, Esquire
> Skadden, Arps, Slate, Meagher
>   & Flom LLP
> One Rodney Square
> P.O. Box 636
> Wilmington, DE 19899

I hereby certify that on February 23, 2007, I caused to be sent by Federal Express the foregoing document to the following non-registered participants:

> Jeffrey H. Dasteel, Esquire
> Jason D. Russell, Esquire
> Marina V. Bogorad, Esquire
> Skadden, Arps, Slate, Meagher
>   & Flom LLP
> 300 S. Grand Avenue, 34th Floor
> Los Angeles, CA 90071
> jdasteel@skadden.com

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

RLF1-3089050-1