IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------ x

URS CORPORATION              )
                                  )
            Plaintiff,       )      Civil Action No. 06-415-SLR
                                  )
       v.                  )
                                  )
THE LEBANESE COMPANY FOR THE   )      **REDACTED**
DEVELOPMENT AND RECONSTRUCTION )     **PUBLIC VERSION**
OF BEIRUT CENTRAL DISTRICT, S.A.L., )
a/k/a SOLIDERE,             )       VOLUME II
                                  )
           Defendant.     )

------------------------------------------------ x

## CORRECTED DECLARATION OF PAUL B. CARBERRY IN SUPPORT OF DEFENDANT SOLIDERE'S ANSWERING BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

PAUL B. CARBERRY declares as follows:

      1.     I am an attorney admitted to practice law before the courts of the State of New York and a member of the law firm of White & Case LLP ("White & Case"), counsel for Defendant, The Lebanese Company for the Development and Reconstruction of Beirut Central District, s.a.l., ("SOLIDERE"), in the above-referenced action. I have been admitted pro hac vice to appear before this Court. This declaration is based entirely upon my personal knowledge and information supplied to me by other attorneys at White & Case, and is submitted, in support of Defendant SOLIDERE's Answering Brief in Opposition to Motion for Preliminary Injunction.

2.    Attached hereto as Exhibit 1 is a true and correct copy of the transcript of Nasser Chammaa's deposition conducted on January 23, 2007.

3.    Attached hereto as Exhibit 2 is a true and correct copy of the transcript of Alberto Cuenca's deposition conducted on January 26, 2007.

4.    Attached hereto as Exhibit 3 is a true and correct copy of the transcript of Kristin L. Jones's deposition conducted on January 30, 2007.

5.    Attached hereto as Exhibit 4 is a true and correct copy of the transcript of Thomas Bishop's deposition conducted on January 31, 2007.

6.    Attached hereto as Exhibit 5 is a true and correct copy of the transcript of William D. Balfour's deposition conducted on February 1, 2007.

7.    Attached hereto as Exhibit 6 is a true and correct copy of the transcript of Amine Bou Onk's deposition conducted on February 2, 2007.

8.    Attached hereto as Exhibit 7 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00106414-18

**REDACTED**

9.    Attached hereto as Exhibit 8 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00106423-26

**REDACTED**

10.    Attached hereto as Exhibit 9 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00105117-18

**REDACTED**

11.     Attached hereto as Exhibit 10 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00097579-83 (April 3, 2000 Email entitled "Corporate Identity Program Update").

12.     Attached hereto as Exhibit 11 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00255861-64

**REDACTED**

13.     Attached hereto as Exhibit 12 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00057037- 41

**REDACTED**

14.     Attached hereto as Exhibit 13 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00274717- 19

**REDACTED**

15.     Attached hereto as Exhibit 14 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00256275-76

**REDACTED**

16.     Attached hereto as Exhibit 15 is a true and correct copy of Julian D M Lew QC, Control of Jurisdiction by Injunctions Issued by National Courts, Conference Paper – ICCA 2006.

17.     Attached hereto as Exhibit 16 is a true and correct copy of  Abdul Hamid El-Ahdab, Arbitration with the Arab Countries 320-321 (1998).

18.     Attached hereto as Exhibit 17 are true and correct copies and translations of French cases and statutes: Société Isover-Saint-Gobain v. Sociétés Dow Chemical France et autres, Cour d'Appel [CA] [regional court of appeal] Paris, 1e ch.,

October 21, 1983, Rev. Arb. 1984, 98, 100; Société Sponsor A.B. v. Lestrade, Cour

d'Appel [CA] [regional court of appeal] Pau, November 26, 1986, Rev. Arb. 1988, 153,

156; Société Korsnas Marma v. Société Durand-Auzias, Cour d'Appel [CA] [regional

court of appeal] Paris, 1e ch., November 30, 1988, Rev. Arb. 1989, 691, 694; Société Kis

France et autres v. Société Générale et autres, Cour d'Appel [CA] [regional court of

appeal] Paris, 1e ch., October 31, 1989, Rev. Arb. 1992, 90, 93; Orri v. Société des

Lubrifiants Elf Acquitaine, Cour d'Appel [CA] [regional court of appeal] Paris, 1e ch.,

January 11, 1990, Rev. Arb. 1992, 95, 97-98; Soc. V 2000, Soc. Project XJ 220 LTD v.

Renault Jean François, Cour d'Appel [CA] [regional court of appeal] Paris, December 7,

1994, RTD com. 1995, 401, 405-06; and French New Code of Civil Procedure, Article

1458.

19.    Attached hereto as Exhibit 18 is a true and correct copy and

translation of Fady Nammour, Droit et pratique de l'arbitrage interne et international 627-

629 (2005).

20.    Attached hereto as Exhibit 19 is a true and correct copy of a

document produced by URS in this litigation bates-stamped URS00274593-604

## REDACTED

21.    Attached hereto as Exhibit 20 is a true and correct copy of a

document produced by URS in this litigation bates-stamped URS00164282-311

## REDACTED

22.    Attached hereto as Exhibit 21 is a true and correct copy of a

document produced by URS in this litigation bates-stamped URS00240712-34

## REDACTED

23.    Attached hereto as Exhibit 22 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00153076 (Jan. 16, 2001 Letter from John Rakow III).

24.    Attached hereto as Exhibit 23 are true and correct copies of documents produced by URS in this litigation bates-stamped URS00055925-26, URS00045767-68, URS00055510-11, URS00045766-67, and URS00055456-57

**REDACTED**

25.    Attached hereto as Exhibit 24 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00200308-09 (Jan. 16, 2001 Letter attaching a letter from John Rakow III).

26.    Attached hereto as Exhibit 25 is a true and correct copy of a document produced by SOLIDERE in this litigation bates-stamped SOLDEL00537-43

**REDACTED**

27.    Attached hereto as Exhibit 26 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00236245-47 (Dec. 2, 2004 E-mail from Alberto Cuenca).

28.    Attached hereto as Exhibit 27 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00001910-13 (Oct. 14, 2002 Letter regarding Contract insurance).

29.    Attached hereto as Exhibit 28 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00079321-578

**REDACTED**

30.     Attached hereto as Exhibit 29 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00106394-404

**REDACTED**

31.     Attached hereto as Exhibit 30 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00106386-87

**REDACTED**

32.     Attached hereto as Exhibit 31 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00164237-67

**REDACTED**

33.     Attached hereto as Exhibit 32 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00234248-54 (Second Amendment of Office Lease).

34.     Attached hereto as Exhibit 33 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00238401-05

**REDACTED**

35.     Attached hereto as Exhibit 34 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00001932-42

**REDACTED**

36.     Attached hereto as Exhibit 35 is a true and correct copy of a document produced by URS in this litigation bates-stamped URS00108744-47 (Dec. 12, 2005 Email).

37.     Attached hereto as Exhibit 36 are true and correct copies of documents produced by URS in this litigation bates-stamped URS00025440-87

REDACTED URS00150406-20    REDACTED

URS00079203-62    REDACTED    . URS00164354-87 (June 2,

2003 FSQ Criteria Proposal), and URS00181132-77    REDACTED

REDACTED.

     38.    Attached hereto as Exhibit 37 is a true and correct copy of B. Hanotiau, <u>Non-Signatories in International Arbitration: Lessons from Thirty Years of Case Law</u>, paper given at ICC Congress, Montreal (June 2006).

     39.    Attached hereto as Exhibit 38 is a true and correct copy of the expert report of Gene L. Deetz, CPA.

     40.    Attached hereto as Exhibit 39 is a true and correct copy of G. Born, <u>International Commercial Arbitration Commentary and Materials</u> 203 (2d ed. 2001).

     I declare under penalty of perjury that the foregoing is true and correct. Executed on March 2, 2007.

                                  _____

                                  PAUL B. CARBERRY

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2007, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Edward P. Welch, Esquire
> Edward B. Micheletti, Esquire
> Skadden, Arps, Slate, Meagher
>  & Flom LLP
> One Rodney Square
> P.O. Box 636
> Wilmington, DE 19899

I hereby certify that on March 2, 2007, I caused to be sent by electronic mail the foregoing document to the following non-registered participants:

> Jeffrey H. Dasteel, Esquire
> Jason D. Russell, Esquire
> Marina V. Bogorad, Esquire
> Skadden, Arps, Slate, Meagher
>  & Flom LLP
> 300 S. Grand Avenue, 34th Floor
> Los Angeles, CA 90071
> jdasteel@skadden.com

> Anne Shea Gaza (#4093)
> Gaza@rlf.com
> Richards, Layton & Finger, P.A.
> One Rodney Square
> P.O. Box 551
> Wilmington, Delaware 19899
> (302) 651-7700

# EXHIBIT 21

RECYCLED

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 22



**URS**

John W. Rakow III, Esq.

January 16, 2001

To Whom It May Concern:

I am sending this letter of explanation to you in accordance with your request. URS Corporation, a publicly-traded engineering and design firm (NYSE: URS), incorporated in Delaware, acquired Dames & Moore Group and all of its subsidiaries (Dames & Moore, BRW, O'Brien Kreitzberg, Radian International and others) in June of 1999. The various Dames & Moore Group companies continue to operate as separate subsidiaries under their existing names, although all correspondence is now on URS Corporation letterhead.

Radian International, LLC has not changed its corporate name. It continues to operate as a separate subsidiary under its own, current name.

You will see no change in the manner in which we serve you or in our commitment to provide you with quality services. All prior commitments, including your contract, will continue to be honored. Please do not hesitate to call me if I can be of assistance or if you have further questions. My direct telephone number is (415) 281-2640.

Sincerely,

John W. Rakow III
Corporate Counsel

URS Corporation
Legal Department
50 Fremont Street, 24th Floor
San Francisco, CA 94105
Tel: 415.777.0188
Direct: 415.281.2640
Fax: 415.547.7954
john_rakow@urscorp.com

URS00153076

# EXHIBIT 23



This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 24


RECYCLED

Redacted

# URS

Radian

Radian International
P.O. Box 11-1261
Beirut, Lebanon

January 17, 2001

W A Fairhurst International Partnership
Daouk building, 10th Floor
Sidani St., Ras Beirut
P.O. Box: 11-4040
Beirut, Lebanon

Attention: Mr. David Horne

Subject:     Normandy Landfill Reclamation – Phase 2 Project
             Change of Letter Head

Dear Sir,

Please find enclosed a copy of a letter from URS's Corporate Counsel that includes the explanation requested in your letter Ref: Let-0440-DWH-RAD dated 19th September 2000.  Do not hesitate to contact me if you have any questions or require additional information.

Sincerely,

Amine Bou Onk
Contractor Representative

Enclosed

Cc:    Hisham Karameh, SOLIDERE
       JB Holeman, URS Radian

| Project Name: | Landfill Treatment-North of Blvd | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0911-005 | 12382 | LET | 0270 | 00 | ABO-CM-270jan01 | ABO-CM-270jan01 | 1/1 |

URS00200308

Redacted

**URS**

John W. Rakow III, Esq.

January 16, 2001

To Whom It May Concern:

I am sending this letter of explanation to you in accordance with your request. URS Corporation, a publicly-traded engineering and design firm (NYSE: URS), incorporated in Delaware, acquired Dames & Moore Group and all of its subsidiaries (Dames & Moore, BRW, O'Brien Kreitzberg, Radian International and others) in June of 1999. The various Dames & Moore Group companies continue to operate as separate subsidiaries under their existing names, although all correspondence is now on URS Corporation letterhead.

Radian International, LLC has not changed its corporate name. It continues to operate as a separate subsidiary under its own, current name.

You will see no change in the manner in which we serve you or in our commitment to provide you with quality services. All prior commitments, including your contract, will continue to be honored. Please do not hesitate to call me if I can be of assistance or if you have further questions. My direct telephone number is (415) 281-2640.

Sincerely,

John W. Rakow III
Corporate Counsel

URS Corporation
Legal Department
50 Fremont Street, 24th floor
San Francisco, CA 94105
Tel: 415.777.0188
Direct: 415.281.2640
Fax: 415.547.7894
john_rakow@urscorp.com

# EXHIBIT 25

RECYCLED

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 26

RECYCLED

William Hadaya
12/03/2004 04:41 PM

To: William Hadaya/SanJose/URSCorp@URSCORP
cc:
Subject: Re: cross charge

----- Forwarded by William Hadaya/SanJose/URSCorp on 12/03/2004 08:41 AM -----

   Carol Hunter
11/23/2004 04:11 PM

To: brenda martin, William Hadaya/SanJose/URSCorp@URSCORP
cc:
Subject: Re: cross charge

Here's the email about the RROS Lebanon job.

Carol Hunter
URS Corporation
Oakland, CA
510-874-3210 tel
510-874-1704 fax

----- Forwarded by Carol Hunter/Oakland/URSCorp on 11/23/2004 04:17 PM -----

Alberto Cuenca
10/04/2004 03:22 PM

To: Carol Hunter/Oakland/URSCorp@URSCORP
cc: Lynn Melendez/SanJose/URSCorp@URSCORP, Jim
    Wagner/Austin/URSCorp@URSCorp
Subject: Re: cross charge

Carol,
1) Because the Client has stopped paying us since August'04 last year, URS continues working on it, the URS Corporate Legal Dept. is now managing this job because URS keeps filing Legal Claims in order to document our case,
This job is one of the children jobs used to track the whole project and there is also a case of revenue over comp. at the whole project level and a lot of other technical/legal and financial issues.

2) Regarding the other decision about granting other offices supporting the project some mark up in order for them to continue to support this project with their people (making the situation of this contract worst); you'll have to discuss it with Jim Wagner or someone else in Tom Bishop's shop.

Regards
Alberto Cuenca
URS Corporation
Phone # (301) 721-2236
Fax #    (301) 977-6370
Carol Hunter

Carol Hunter
10/04/2004 04:01 PM

To: Alberto Cuenca/Gaithersburg/URSCorp@URSCORP
cc: Lynn Melendez/SanJose/URSCorp@URSCorp
Subject: Re: cross charge

Alberto -- why is job #41673301 not recognizing revenue?

thanks,

Carol Hunter

URS00236245

URS Corporation
Oakland, CA
510-874-3210 tel
510-874-1704 fax

----- Forwarded by Carol Hunter/Oakland/URSCorp on 10/04/2004 01:04 PM -----

 **Alicia Brewer**
10/04/2004 12:54 PM

To: Carol Hunter/Oakland/URSCorp@URSCORP
cc: Lynn Melendez/SanJose/URSCorp@URSCORP
Subject: Re: cross charge

This job is recognizing zero revenue, per Jim Wagner and Alberto Cuenca.   If you have any questions about that you can contact Alberto.

Thanks,
Alicia Brewer
Austin Accounting
Team Leader
(512) 419-6791
(512) 419-6944 (Fax)
Carol Hunter

**Carol Hunter**
10/04/2004 02:48 PM

To: Alicia Brewer/Austin/URSCorp@URSCORP
cc: Lynn Melendez/SanJose/URSCorp@URSCorp
Subject: Re: cross charge

Alicia -- Any luck with this person's rate? He showed up again on this last week's cross charge without a rate.
Lynn -- Can you help with Bob's rate?

thanks,

Carol Hunter
URS Corporation
Oakland, CA
510-874-3210 tel
510-874-1704 fax

----- Forwarded by Carol Hunter/Oakland/URSCorp on 10/04/2004 12:50 PM -----

**Carol Hunter**
09/30/2004 03:21 PM

To: Alicia Brewer/Austin/URSCorp@URSCORP
cc:
Subject: Re: cross charge

They are a he.  You will have to check with the PM.  According to the system that is Amine Bou-Onk.

thanks,

Carol Hunter
URS Corporation
Oakland, CA
510-874-3210 tel
510-874-1704 fax

Alicia Brewer

 **Alicia Brewer**
09/30/2004 03:19 PM

To: Carol Hunter/Oakland/URSCorp@URSCORP
cc:
Subject: Re: cross charge

Carol,

What is her rate?

Thanks,
Alicia Brewer
Austin Accounting
Team Leader
(512) 419-6791
(512) 419-6944 (Fax)
Carol Hunter

**Carol Hunter**
09/30/2004 03:55 PM

To: Alicia Brewer/Austin/URSCorp@URSCORP
cc:
Subject: cross charge

Alicia,

Can you please add a rate for the following employee?

| Proj Office | Project # | Empl Name | Empl # | Empl Office |
|---|---|---|---|---|
| RROS Lebanon | 41673301 | R. Healy | 16028 | San Jose |

thanks,

Carol Hunter
URS Corporation
Oakland, CA
510-874-3210 tel
510-874-1704 fax

URS00236247

# EXHIBIT 27



# Radian International, LLC

October 14, 2004

P.O. Box 11-1261
Riad El Solh Beirut 1107 2080
Commercial Register No.: 74673, Beirut
Tel / Fax: 01 983 575
Beirut - Lebanon

W A Fairhurst International Partnership
Daouk building, 10th Floor
Sidani St., Ras Beirut
P.O. Box: 11-4040
Beirut, Lebanon

Attention:    Mr. Neville Judd

Subject:    Normandy Landfill Reclamation – Phase 2
Alpina Insurance Company Policy No. 01 75 328 00305
(I.V00305.01)

Dear Sir,

We refer to your letter Let-1276-NJ-RAD dated October 4, 2004 in which you request that we: (1) provide a draft confidentiality agreement that is acceptable to Alpina Insurance Company ("Alpina"), and (2) provide written evidence that we have reinstated and/or extended the above referenced insurance policy (the "Alpina Policy") or obtained other professional and environmental insurance for works and services performed from April 14, 2004 until Completion of the Works.

We are enclosing a proposed confidentiality agreement that is acceptable to Alpina. If it is acceptable to you, please sign it and return it to us. Once we have received your signed agreement, we will provide you with a copy of our application for the Alpina Policy.

As we previously advised you, we are and have been in active discussions with Alpina to extend the Alpina Policy or to renew it with the renewal date being April 14, 2004 to ensure continuity of coverage. We have not, however, received a definitive response from Alpina as to whether they will provide coverage.

Accordingly, please be advised that URS Corporation has an existing insurance policy written on an annual basis by an AIG affiliate or subsidiary that provides contractors' professional and environmental insurance for its subsidiary, Radian. The policy meets the minimum limits of US $20 million in respect of each and every claim with an aggregate limit of US $50 million. While the policy provides additional insureds with coverage for environmental matters, it does not provide additional insureds with coverage for professional liability claims. In the event, as described above, we are unable to extend or reinstate the Alpina Policy, we are seeking other project-specific insurance to cover any gap. We will provide you with evidence of URS's insurance coverage upon request.

| Project Name: | Landfill Treatment-North of Blvd | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 12382 | LET | 0609 | 00 | ABO/CM/609oct04 | ABO/CM/609oct04 | 1/2 |

URS00001910

# Radian International, LLC

We have also directed our insurance broker to submit applications to various insurers (other than Alpina) to obtain appropriate professional and environmental coverage. Once we receive your signed confidentiality agreement, we will provide you with a copy of all relevant applications.

We reserve all rights under the Contract and applicable law.

Sincerely,

Amine BouOnk
Contractor's Representative

Enclosures

| Project Name: | Landfill Treatment-North of Blvd | | | | | | |
|---|---|---|---|---|---|---|---|
| Proj. code | Issuer ID | Doc. Nature | Seq. # | Rev. # | Filename | Issuer ref. | Page |
| 1-1-0011-005 | 12382 | LET | 0609 | 00 | ABO/CM/609oct04 | ABO/CM/609oct04 | 2/2 |

## NONDISCLOSURE AGREEMENT

In order to protect certain confidential information which may be disclosed by Radian Corporation ("Radian") to WA Fairhurst International Partnership ("WAFI") and/or The Lebanese Company for the Development and Reconstruction of Beirut Central District, s.a.l. ("Solidere"), the recipients identified on the signature page hereto (the "Recipients") of such confidential information have signed this Nondisclosure Agreement as of the date set forth on the signature page hereto.

1.  The term "Confidential Information" shall mean and include: (i) the Contractors and Consultants Pollution Liability Application dated June 8, 1999, and (ii) all other insurance-related materials containing confidential or proprietary information of or concerning Radian, its parent, affiliates, employees, agents and representatives.

2.  The Recipients shall protect the disclosed Confidential Information by using the same degree of care to prevent the unauthorized use, dissemination or publication of the Confidential Information as the Recipients use to protect their own confidential information of a like nature. Except to the extent that the Recipients obtain the prior written consent of Radian, Recipients shall not disclose any Confidential Information to any third party except as permitted by Section 5 hereof.

3.  This Agreement imposes no obligation upon the Recipients with respect to Confidential Information which (a) was in the Recipients' possession before the receipt from the Director; (b) is or becomes a matter of public knowledge through no fault of the Recipients; (c) is rightfully received by the Recipients from a third party without a duty of confidentiality; (d) is independently developed by the Recipients; or (e) is required to be disclosed by the Recipients pursuant to a judicial or governmental order or as may otherwise be required by law.

4.  All Confidential Information furnished to the Recipients by Radian shall remain the property of Radian. The Recipients shall make no copies of any Confidential Information without the prior written consent of Radian. At Radian's request, the Recipients shall return to Radian promptly all of the Confidential Information along with all copies made thereof and all materials, documents, or things containing any portion of any Confidential Information.

5.  Prior to disclosing any Confidential Information to any other person, the Recipients shall notify Radian, in writing, of the names of any such person or persons and the relationship of such person or persons to the Recipients; and the Recipients shall not disclose any Confidential Information to such person or persons until such time as Radian shall have received from each such person or persons an executed non-disclosure agreement containing substantially the same obligations as set forth in this Agreement.

6.  This Agreement shall be governed by and construed according to the laws of the State of California, excluding its conflict of laws rules to the extent such rules would apply the law of another jurisdiction. The parties hereto consent to the jurisdiction of all federal and state courts in California, and agree that venue shall lie exclusively in San Francisco County, California.

7.  Any notice, demand, or request required or permitted to be given under this Agreement shall be in writing and shall be deemed given when delivered personally or sent via registered or certified mail, return receipt requested, or via overnight courier and addressed to the party at the address of such party set forth at the end of this Agreement or such other address as such party may request by notifying the other in writing.

8.  If any legal action arises relating to this Agreement, then the prevailing party shall be entitled to recover all costs, expenses, and reasonable attorneys' fees incurred by the prevailing party in connection with such action. The "prevailing party" within the meaning of this Section includes without limitation a party who: (i) agrees to dismiss an action or proceeding upon the other's payment

of the sums allegedly due or upon the other's performance of the obligation allegedly breached, or (ii) obtains substantially the relief it seeks.

9.      The Recipients shall not assign this Agreement or any of the rights and obligations hereunder to any third party. Subject to the preceding sentence, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

10.      If any provision of this Agreement, or the application of such provision to any person or circumstances, is held invalid or unenforceable, then the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and shall continue in full force and effect.

11.      This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and enforceable against the parties actually executing such counterpart, and all of which together shall constitute one instrument.

RECIPIENT                                   RADIAN INTERNATIONAL

By: _____                   By: _____

Name: _____                   Name: _____

Title: _____                 Title: _____

Date: _____                  Date: _____


RECIPIENT

By: _____

Name: _____

Title: _____

Date: _____

2

# EXHIBIT 28

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 29



This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 30


RECYCLED

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 31



This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 32



# SECOND AMENDMENT OF OFFICE LEASE

THIS SECOND AMENDMENT OF LEASE AGREEMENT is made as of December 22, 2005 by and between **GREIT – AmberOaks, LP,** a Texas limited partnership ("**Landlord**"), acting by and through Triple Net Properties Realty, Inc. (**Agent for Landlord**") and **URS Corporation,** a Nevada corporation ("**Tenant**").

## RECITALS

A.    Landlord (as successor in interest to Austin Jack, L.L.C.) and Tenant (as successor in interest to Radian International L.L.C.) entered into that certain Lease Agreement dated May 26, 2000, as amended by that certain First Amendment to Lease Agreement dated June __, 2000 (collectively, the "**Lease**") whereby Landlord leased to Tenant and Tenant leased from Landlord that certain premises located at 13620 and 13630 Briarwick, Austin Texas (collectively, the "**Premises**").

B.    Tenant has requested that it be permitted to install a generator on the Premises. Landlord is willing to allow Tenant to do so on the following terms and conditions.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

I.    **Rights to Install Generator and Air Conditioning Unit.** Subject to all of the terms and conditions of Sections 5 and 6 (except as expressly provided herein) of the Lease, Tenant shall be entitled to install (a) a diesel powered generator (the "**Generator**") with dimensions of approximately 202.37 inches in length, 91.25 inches in width, and 100.20 inches in height in a mutually approved location in Tenant's designated area shown on **Exhibit A** attached hereto and (b) a 30-ton air conditioning unit in a mutually approved location within the computer room in Building Two of the Premises together with 4 cooling fans mounted on the roof of Building Two in a mutually approved location (collectively, the "**AC Unit**"); provided that (i) Tenant obtains all necessary approvals from the City of Austin and all other governmental authorities having jurisdiction over Tenant, the Premises, the Generator and the AC Unit, and (ii) the Generator and the AC Unit conform to all applicable laws, rules and regulations of any governmental authorities having jurisdiction over the Generator, the AC Unit or the Premises. Tenant, at its sole cost and expense shall be responsible for (A) the installation of the Generator, which shall include without limitation, visual screening in a manner and with materials comparable to that used to screen the existing generator located at 13640 Briarwick Drive, Austin, Texas, environmental hazard protection and pollution prevention; and (B) the installation of the AC Unit, which shall include without limitation, environmental hazard protection and

URS00234248

pollution prevention. The Generator shall, if requested by Landlord, include a
~~critical silencer muffler. No additional rental shall be owing by Tenant under the~~
Lease solely as a result of the installation of either the Generator or the AC Unit.
Subject to Paragraph B below, once Landlord and Tenant have agreed upon the
location for the cooling fans that are a part of the AC Unit, if Landlord requests
that Tenant relocate such fans, the relocation shall be at Landlord's cost and
~~expense and Landlord shall, within 30 days of submittal of Tenant's invoice~~
requesting reimbursement for the relocation costs, remit payment to Tenant.

A. **Maintenance and Indemnification.** Tenant, at its sole cost and expense,
shall also maintain the Generator and the AC Unit in good and operable
~~condition and shall be responsible for the maintenance, repair,~~
replacement and removal of the Generator and AC Unit, as necessary.
Such maintenance and operation shall be performed in a manner to avoid
any interference with any other tenants or Landlord. Further, Tenant shall
indemnify and hold Landlord harmless from and against any and all
claims, demands, fines, liabilities, costs, expenses, damages and causes of
action accruing from or related to the Generator and the AC Unit, **EVEN
IF THE SAME IS CAUSED BY THE NEGLIGENCE (BUT NOT
THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT) OF
LANDLORD OR ANYONE ACTING FOR LANDLORD.**

B. **Removal.** The Generator, the AC Unit and all appurtenances thereto, if
any, shall remain the personal property of Tenant, and shall be removed by
Tenant at its own expense at the expiration or earlier termination of this
Lease or Tenant's right to possession hereunder. Tenant shall remove or
relocate the Generator or the AC Unit, as applicable, and all appurtenances
thereto at Tenant's expense if, in Landlord's reasonable discretion, Tenant
fails to maintain the Generator or the AC Unit, as applicable, in good and
operable condition or the operation of the Generator or the AC Unit, as
applicable, materially interferes with any other tenants in the Buildings or
the Landlord's operation of the Project. Tenant shall repair any damage
~~caused by the removal of the Generator or the AC Unit, as applicable,~~
including the patching of any holes to match, as closely as possible, the
color surrounding the area where the equipment and appurtenances were
~~attached. Notwithstanding anything to the contrary herein, Tenant shall~~
have the right, without paying Rent under the Lease, to effect the removal
~~of the Generator and all appurtenance thereto during the 10-day period~~
following the expiration or earlier termination of this Lease.

C. Any rebates or discounted energy rates given by a utility provider solely as
a result of the installation of the Generator shall inure solely to the benefit
of Tenant and Landlord shall have no right or interest therein or thereto.

II. **Representations and Warranties.** Each of Landlord and Tenant hereby
represents to the other, that to such party's knowledge: (1) there exists no breach,
default or event of default by the other party under the Lease, or any event or

URS0023424

condition which, with notice or passage of time or both, would constitute a breach, default or event of default by the other party under the Lease: (2) the Lease continues to be a legal, valid and binding agreement and obligation of such party; and (3) such party has no current offset or defense to their performance or obligations under the Lease.

III.   **Miscellaneous.**

A.   This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein.  There have been no additional oral or written representations or agreements with respect to the subject matter of this Amendment.

B.   In the case of any inconsistency between the provisions of the Lease and this Amendment, the provisions of this Amendment shall govern and control. Except as modified hereby, the terms and conditions of the Lease shall remain in full force and effect, enforceable in accordance with the terms of the Lease.

C.   The capitalized terms used in this Amendment shall have the same definitions as set forth in the Lease to the extent that such capitalized terms are defined therein and not redefined in this Amendment.

D.   Tenant hereby represents to Landlord that Tenant has dealt with no broker in connection with this Amendment. Tenant agrees to indemnify and hold Landlord, its trustees, members, principals, beneficiaries, partners, officers, directors, employees, mortgagee(s) and agents, and the respective principals and members of any such agents harmless from all claims of any brokers claiming to have represented Tenant in connection with this Amendment.  Landlord hereby represents to Tenant that Landlord has dealt with no broker in connection with this Amendment. Landlord agrees to indemnify and hold Tenant, its trustees, members, principals, beneficiaries, partners, officers, directors, employees, and agents, and the respective principals and members of any such agents harmless from all claims of any brokers claiming to have represented Landlord in connection with this Amendment.

E.   Each signatory of this Amendment represents hereby that he or she has the authority to execute and deliver the same on behalf of the party hereto for which such signatory is acting.

[Remainder of page intentionally left blank]

URS00234250

URS00234251

**IN WITNESS WHEREOF,** Landlord and Tenant have duly executed this Amendment as of the day and year first above written.

LANDLORD:

**Triple Net Properties Realty, Inc.**
Agent for Landlord

By: _Christe Cavaness_

Name: _Christe Cavaness_

Title: _Asset Manager_

TENANT:

**URS Corporation,**
a Nevada corporation

By: _Craig D. Pedersen_

Name: _CRAIG D. Pedersen_

Title: _Office Manager_

S06699 000049 DALLAS 1965776.2

4

URS00234252

EXHIBIT A



SITE PLAN

URS00234252



## ① CONCRETE PAD FOOTPRINT
SCALE: 1/8" = 1'-0"

URS0023425

URS00234254



URS00234254

# EXHIBIT 33



This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 34



RECYCLED

This exhibit has been redacted in its entirety and is filed under seal.

# EXHIBIT 35


RECYCLED



**URS**   Tom
          Bishop/SanFrancisc
          oCorp/URSCorp

          12/12/2005 06:40 PM

To    Martin Koffel/SanFranciscoCorp/URSCorp@URSCorp, Gary
      Jandegian/SanFranciscoCorp/URSCorp@URSCORP,
      rwotring@egginc.com@URSCorp, Joe
      Masters/SanFranciscoCorp/URSCorp@URSCORP, Kent
      Ainsworth/SanFranciscoCorp/URSCorp@URSCORP, Tom
      Hicks/SanFranciscoCorp/URSCorp@URSCorp, Reed
      Brimhall/SanFranciscoCorp/URSCorp@URSCorp, Mary
      Sullivan/SanFranciscoCorp/URSCorp@URSCorp, Irwin
      Rosenstein/NewYork/URSCorp@URSCORP

cc    Olga Perkovic/SanFranciscoCorp/URSCorp@URSCorp, S
      Dhamotharan/Houston/URSCorp@URSCORP, Barbara
      Noel/SanFranciscoCorp/URSCorp@URSCORP

bcc

Subject   Beirut  blast kills anti-Syria MP - Dec 12, 2005 - All URS
          Employees/Family SAFE

Management Committee,

There was another major bomb blast in Beirut this morning, killing 4 individuals, injuring 30.  All URS staff
and their families have been accounted for and are safe.  We continue to have the project site in a shut
down condition.

- - Tom B.

This e-mail and any attachments are confidential. If you receive this message in error or are not the intended recipient, you
should not retain, distribute, disclose or use any of this information and you should destroy the e-mail and any attachments or
copies.

---- Forwarded by Tom Bishop/SanFranciscoCorp/URSCorp on 12/12/2005 10:36 AM -----



          AMINE
          BOUONK
          <abouonk@inc
          o.com.lb>

          12/12/2005
          10:30 AM

To    Tom_Bishop@urscorp.com

cc    JDASTEEL@skadden.com, Joe_Masters@urscorp.com,
      Joe_Moore@urscorp.com, MBOGORAD@skadden.com,
      Mary_Sullivan@urscorp.com

Subject   RE: CNN.com - Beirut  blast kills anti-Syria MP - Dec 12, 2005

Tom,

Yes all are safe along with family members.

This e-mail and any attachments are confidential.  If you receive this
message in error or are not the intended recipient, you should not retain,
distribute, disclose or use any of this information and you should destroy
the e-mail and any attachments or copies.

-----Original Message-----
From: Tom_Bishop@URSCorp.com [mailto:Tom_Bishop@URSCorp.com]
Sent: Monday, December 12, 2005 6:53 PM

URS00108744

To: abouonk@inco.com.lb
Cc: JDASTEEL@skadden.com; Joe_Masters@URSCorp.com;
Joe_Moore@URSCorp.com; MBOGORAD@skadden.com; Mary_Sullivan@URSCorp.com
Subject: Re: CNN.com - Beirut  blast kills anti-Syria MP - Dec 12, 2005


Amine - are all our staff and family members safely accounted for?

- - Tom B.


 This e-mail and any attachments are confidential. If you receive this
 message in error or are not the intended recipient, you should not retain,
 distribute, disclose or use any of this information and you should destroy
 the e-mail and any attachments or copies.




                    abouonk@inco.com.
                    lb
                                                                         To
                    12/12/2005 08:19     MBOGORAD@skadden.com,
                    AM                    Joe_Masters@URSCorp.com,
                                          Joe_Moore@URSCorp.com,
                                          Tom_Bishop@URSCorp.com,
                                          JDASTEEL@skadden.com
                                                                         cc

                                                                    Subject
                                          CNN.com - Beirut blast kills
                                          anti-Syria MP - Dec 12, 2005




(Embedded image moved to file: pic12481.gif)(Embedded image moved to file:
pic17168.gif)


 (Embedded image moved to file: pic28315.gif)
  (Embedded image moved to file: pic19396.gif)


  (Embedded image moved to file: pic16225.gif)CNN.com
                              (Embedded image moved to
                                  file: pic01009.gif)

Powered by
(Embedded image
moved to file:
pic22012.gif)

* Please note, the sender's email address has not been verified.

(Embedded image moved to file: pic18136.gif)

FYI

Another bad day for Lebanon. The situation is tense in Beirut tonight. We are all safe. I will keep you all updated.

amine

(Embedded image moved to file: pic11455.gif)

Click the following to access the sent link:

(Embedded image moved to file: pic18762.gif)CNN.com - Beirut blast kills anti-Syria MP - Dec 12, 2005*

(Embedded image moved to file: pic25043.gif)SAVE THIS link

(Embedded image moved to file: pic00742.gif)FORWARD THIS link

Get your EMAIL THIS Browser Button and use it to email

URS00108746

Get your EMAIL THIS Browser Button and use it to email
information from any Web site.
                    (Embedded image moved to file:
                    pic00021.gif)


                            (Embedded image moved to file:
                                    pic17922.gif)


    *This article can also be accessed if you copy and paste the
    entire address below into your web browser.
    http://www.cnn.com/2005/WORLD/meast/12/12/lebanon.blast/index.ht
    ml


--
No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.1.371 / Virus Database: 267.13.13/197 - Release Date: 12/9/2005
--
No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.1.371 / Virus Database: 267.13.13/197 - Release Date: 12/9/2005

# EXHIBIT 36


RECYCLED

This document, bearing Bates Number URS00025440 to URS00025487, has been redacted in its entirety and is filed under seal.

This document, bearing Bates Number URS00150406 to URS00150420, has been redacted in its entirety and is filed under seal.

This document, bearing Bates Number URS00079203 to URS00079262, has been redacted in its entirety and is filed under seal.





**NORMANDY LANDFILL**

**FINAL SITE QUALITY ("FSQ")**
**CRITERIA PROPOSAL**

Prepared by:
URS Corporation
9400 Amberglen Blvd.
Austin, Texas

June 2, 2003



## Table of Contents

Page

Preface ...................................................................................................................1

1.0  Data Collection, Review, and Verification ..................................................2

    1.1  On-Site Testing ..................................................................................2
        1.1.1  Install Three New Test Cells ...............................................2
        1.1.2  Install One Monitoring Well Next to GW03 for Quality Control
              Purposes ..............................................................................2
        1.1.3  Check Condition of All Monitoring Wells for Plugging ......2
    1.2  Testing ................................................................................................2
        1.2.1  Continue Existing Testing ...................................................3
        1.2.2  Test for Methanotrophic Bacteria and Issue Report .............3
    1.3  Data Reporting ...................................................................................3

2.0  Develop and Submit Model and Plan for Final Site Quality .....................4

    2.1  Model for Final Site Quality ..............................................................4

3.0  Survey and Analysis of Existing Building Codes and Practices ...............6

    3.1  Building Attributes that Ensure Safety ..............................................6
    3.2  Local Construction Practices for Similar Prestige Markets ...............7
    3.3  Planned Construction Standards and Practices ..................................8

4.0  Final Site Quality (FSQ) Definition Amendment ......................................9

    4.1  Additional Gas Standard ....................................................................9
    4.2  Contract Clarification to Define "No Specific Precautions" for Construction
        On Site ................................................................................................9

5.0  Site Environmental Controls for Plastics and Shredded Tires ...............13

    5.1  Plastics .............................................................................................13
        5.1.1  Quantity .............................................................................13
        5.1.2  Treatment ...........................................................................14
        5.1.3  Disposal .............................................................................14
    5.2  Shredded Tires .................................................................................14
        5.2.1  Fire Protection ...................................................................14
        5.2.2  Disposal .............................................................................14

6.0  Conclusion ...................................................................................................15



## List of Attachments

Attachment 1  CD of data since August 2002

Attachment 2  Estimated Air Concentrations

Attachment 3  Local Construction Standards

Attachment 4  In Situ Sampling of $CH_4$ and $CO_2$ Gas Flow Rates

Attachment 5  Estimated Decay Rate Of Biogas Production In Normandy Landfill
Phase II Backfill

## List of Tables

Page

2-1   Indoor Air Concentrations for the Subterranean Parking Garage Scenario...................5
2-2   Indoor Air Concentrations for the Subterranean Utility Room Scenario ......................5
2-3   Ambient Air Concentrations for the Park Area Scenario .............................................5
3-1   Examples of Typical Building Ventilation Rates .........................................................8

**I. Preface**

This Final Site Quality ("FSQ") Proposal is submitted under our Contract with The Lebanese Company for the Development and Reconstruction of Beirut Central District ("SOLIDERE") dated January 25, 1999 (the "Contract") and in accordance with the Memorandum of Understanding dated May 13, 2003, which provides:

> *Radian will submit to Solidere for its review and consideration a formal proposal for incorporation into the Contract of additional quantitative Final Site Quality criteria addressing:*
>
> - *Indoor Air Quality for flammable gas, carbon dioxide and oxygen; and*
> - *Soil gas generation and flow rates.*
>
> *Furthermore, Radian will provide a definition of "international standards" in order to clarify the meaning of "no specific precautions" found at Table 3.1.*

The purpose of this FSQ Proposal is to suggest incorporation of additional language into the Contract to clarify requirements concerning soil gas emissions thereby enabling Radian to reassure SOLIDERE that Radian's work is in conformance with the Contract requirements and that at the end of the Contract performance period, Radian will deliver land meeting the Final Site Quality criteria set forth in the Contract and Fit for the Purpose as defined and guaranteed in the Contract.

In support of the FSQ criteria proposed herein, Radian further provides the technical data and analysis relied upon by Radian in reaching its conclusion that the backfilled portions of the Normandy Landfill Phase II area are unconditionally safe for development. Further, construction in conformance with standard building techniques will provide an additional level of assurance that there is no concern with landfill gas. The backfilled materials are Fit for the Purpose and no specific precautions against landfill gas will need to be provided for built development at the project site. Finally, as previously proposed, Radian commits to regularly communicating to the Construction Manager during the remainder of the contract performance period the technical data obtained from the site confirming Radian's contractual compliance.

**II. The Current FSQ Standards**

The Contract currently provides:

**Technical Conditions of Contract,**
**Table 3.1.  Chemical and Biological Final Site Quality**

| Parameter | Level in mg/kg (unless shown otherwise) |
|---|---|
| Organic Carbon C | <5% |
| *** | *** |
| Flammable Gas | <1% v/v (g) |
| Carbon Dioxide | <1.5% v/v (g) |

June 2, 2003                                                    Normandy Landfill FSQ Proposal

| Oxygen | 18% - 23% (g) |
| Landfill Gas | No specific precautions will need to be provided for built development, including landscape works in the reclaimed area. |

During the course of performance, the parties have debated the requirements for acceptable levels of landfill gas. Solidere insists the site be unconditionally safe for development. Radian agrees, but points out that the site can never be completely free of all gas and that the specifications permit up to 5% organic carbon.

Radian has concluded that the debate arises from an ambiguity in the contract language in that it does not specify where or how the FSQ parameters should be measured. Table 3.2 of the Technical Conditions of Contract shows that the measurements should relate to "Head Space." The term "Head Space" is not defined in the contract. Most significantly, the contract does not specify whether these standards apply to soil gas or to indoor air. Nevertheless, using standard rules of contract interpretation, Radian believes that the FSQ criteria apply to indoor air, based upon the totality of the contract language (for example, the oxygen standard could not apply to soil gas).

Moreover, the gas levels prescribed at Table 3.1 are unattainable in soil at this site or at any other site as soil gas typically has less than 18% oxygen and often contains more than 1.5% carbon dioxide. Accordingly, during the Normandy Landfill review meeting held in London on January 7, 2003, Dr. A. C. Ellis explained that the FSQ standards for flammable gas, carbon dioxide, and oxygen were indoor air standards. We speculate that the intent of the contract author was to use these criteria as soil gas standards, reasoning that if soil gas complies with indoor air standards, then surely actual indoor air in future buildings will be safe. However, in practice, Radian has shown that this reasoning is flawed given the differing characteristics of soil gas. We note that the FSQ standards at Table 3.1 originated and were adopted from Page 9, Table 1, Column 3, of the Fairhurst Report F/I/34516/03 April 1996 Amended October 1997 entitled "Final Site Quality."

### III. Proposed FSQ Criteria

To address this issue while maintaining the strict importance placed by Solidere on ensuring that the site is unconditionally safe, Radian proposes that the current contract language in Table 3.1 regarding Final Site Quality Standards for flammable gas, carbon dioxide, and oxygen be replaced with a set of standards applying to indoor air quality and gas production.
In the following sections, Radian's proposed FSQ criteria are presented (in italics) for indoor air quality for flammable gas, carbon dioxide and oxygen.

A.      Radian proposes incorporation into the Contract of the following indoor air quality standards:

#### *Proposed Indoor Air Quality FSQ Standards*

| Gas | Indoor Air Quality Standard |
| --- | --- |
| *Flammable Gas (CH₄)* | *0.25% by volume* |

| Carbon Dioxide (CO₂) | 0.5% by volume |
|---|---|
| Oxygen (O₂) | 19.5-22% by volume |

*The indoor air quality will be measured as follows. Indoor air concentrations will be measured at breathing zone height (i.e., 1.5 m (5 ft) above floor level) in at least one representative location per 500 m² within each subsurface level and within the ground floor of the building. The measurements will be performed under normal conditions with respect to building operations and ventilation*

**B.    Justification of the Proposed Indoor Air Quality Standards**

**1.  Flammable Gas (CH₄):**
The primary risk from methane is its explosion hazard. Under most regulations (U.S. RCRA, U.S. Mine Safety and Health Administration, OSHA underground construction, etc., see URS, September 2002), 20% of the lower explosive limit (LEL) triggers protective and corrective action, such as de-energizing equipment and increasing ventilation. The LEL for methane is 5% in air, so 20% of the LEL is 1% methane (10 000 ppm). To be conservative, Radian proposes to use one quarter of that level (i.e., 0.25% or 2500 ppm) as the methane FSQ standard.

**2.  Carbon Dioxide (CO₂):**
[Bob, this section needs a narrative]
- U.S. OSHA 8-hr time-weighted average (TWA) permissible exposure limit (PEL); OSHA 29 CFR Part 1910;

- UK Domestic Occupational Exposure Limit (OEL), 8-hour weighed average exposure limit; EH40 2000; and

- European Indicative Occupational Exposure Limit Value (IOELV), 8-hour weighed average exposure.

**3.  Oxygen (O₂):**
[Bob, this section also needs a narrative]
U.S. OSHA confined space rules (29 CFR Part 1915 and 1926.800(j)(ii)(A)).

**IV.    Soil Gas Generation and Flow Rate Criteria**

A.    Radian further proposes incorporation into the contract of the following soil gas generation and flow rate criteria:

*FSQ Soil Gas Generation and Flow Rate*

| A. Gas | Soil Gas/Test Cells |
|---|---|
| Flammable Gas (CH₄) | 1%ᵃ |
| Methane flow (CH₄) | ≤ 0.075 L CH₄/hr/m² |

> *a*   *If the methane concentration exceeds 1%, the average gas flow must be $\leq 0.075$*
> *L of methane per hour per $m^2$ of horizontal surface area. "Average gas flow"*
> *shall mean the monthly average of the measurements from all the standard test*
> *cells on the site. All cells constructed over Radian backfill shall be included.*

Note that Radian proposes that the soil gas/test cell values shall be applicable until such time that buildings are completed at the site and indoor air measurements can be made directly.

## B.   Rationale for Gas Generation and Flow Rate FSQ Standard

For biogas to present an indoor air problem, there must be both an elevated concentration of a specific type of gas in the soil and a pressure gradient (driving force) resulting in gas movement. The maximum flow rate one would expect from natural diffusion alone at this site is 0.15 L $CH_4/hr/m^2$; it is far lower than the advective (pressure-driven) flow that would occur if a significant pressure gradient existed over a short distance. Problems with biogas intrusion occur only at sites that have advective (pressure-driven) gas flow. For conservatism, the proposed flow rate of 0.075 L $CH_4/hr/m^2$ is half of the safe (i. e. diffusive) flow identified.

The flow limit of 0.075 L $CH_4/hr/m^2$ is equal to a methane flow of 3.75 L/hr for the test cells, which enclose a planar surface area of 50 $m^2$ (see Figure 1-1).

The only scenario of concern at this site is one where a large volume of backfill feeds gas into a small, poorly ventilated room. Therefore, our concern is with the average gas emission rates over a large area, rather than the maximum rates that might occur over any small area. With this in mind, the flow limit of 0.075 L $CH_4/hr/m^2$ is based on an average reading at the monitoring locations across the site, and not on the maximum reading at any individual monitoring location. Measurements of methane flow will be performed each week until the end of construction. Post-works monitoring will be performed at a reduced frequency.

## V.   Definition of "international standards" Clarifying the Meaning of "No Specific Precautions" found at Table 3.1

Table 3.1 of the Technical Conditions of Contract currently provides: "No specific precautions will need to be provided for built development, including landscape works in the reclaimed area." Radian proposes incorporating the following addendum into the contract to clarify the meaning of the phrase "no specific precautions":

*It is recognized that landfill gas will be produced at the site as a consequence of the allowable percentage of organic carbon and as a consequence of the surrounding environment. Further, the Contractor is confident that no specific design or mechanical precautions regarding landfill gas will be necessary to manage the gas produced so long as the gas produced and corresponding methane flow does not exceed the levels permitted at Table 1.2. Further, Employer agrees to use its best efforts, recognizing the limitations of its authority, to ensure that all construction at the Normandy Landfill Phase II area complies with the Institut De Normes Libanaises – Libnor standards for waterproofing and ventilation in new construction, and that developers at the site require that:*

June 2, 2003                                          Normandy Landfill FSQ Proposal

- *All subsurface walls and floors shall be waterproofed, and the waterproofing shall extend up to ground surface or higher.*

- *Grading shall provide for drainage of surface water and prevent the accumulation of standing water against the building; all voids between shoring walls, if any, and the building wall, shall be backfilled with gravel per established practice. The gravel shall not be sealed at the top.*

- *All utilities shall be grouped and the number of utility penetrations minimized; all utility penetrations shall be waterproof.*
- *All buildings on site shall have ventilation rates protective of human health, consistent with international standards, guidelines, and recommendations. These standards will be compatible with relevant ASHRAE ventilation standards for subsurface spaces. Examples of applicable ASHRAE ventilation standards are listed on Table 1-3.*

*Table 1-3. Examples of Typical Building Ventilation Rates*

| Type of space | Air Changes per Hour (ACH) | | Comment |
| | Typical Value | Standard | |
|---|---|---|---|
| New Office, Telecom Center | 0.72 | ASHRAE 62-1999 | Based on 10 L/s of outside air per person |
| New Mechanical Room | 9 | ANSI/ASHRAE 15-1994 | Based on 9 kgs of refrigerant, room = 6 m x 4.5 m x 3 m |
| Parking Garage | 6 | NFPA 88A-1999, ASHRAE 62-1999 | Based on 1.0 or 1.5 $m^3$ air/ min/ $m^2$ of floor area |

## VI.    Radian's FSQ Criteria Are Technically Appropriate

Radian is confident that these proposed criteria and Contract addendum are technically appropriate given the following:

a) The rate of gas production is low and rapidly declining;
b) Conservative scientific estimates of biogas infiltration in future buildings show no resulting safety hazard as confirmed by modeling; and
c) The building techniques used at the site further guarantee safety.

## A.    The rate of gas production is low and rapidly declining

The production rate of methane from the large-scale, in-situ gas measurement cells is low and steadily declining, as can be seen from Figure 1 below. These cells are generally considered to be the most accurate method for measuring in-situ gas production. This figure shows the average

methane production from Cells 2 through 7, as proposed in the attached FSQ amendments (Cell 1 was excluded because there is a debate about how much of the underlying fill was actually deposited by Radian). In the proposed FSQ amendments, a methane production rate of 0.15 L methane/m$^2$/hour is identified as being safe, and we have proposed a standard of one half of that, i. e. 0.075 L methane/m$^2$/hour. Note that the actual average production rate at the site has always been well below this level.

Additional evidence for the rapid decline of biogas production is attached at Attachment___. It includes a summary of all the information collected to date.

B. Figure 1: Average Historical Methane Production from Cells 2 through 7
(Vertical gridlines are spaced 90 days apart)



**B**    **Conservative scientific estimates of biogas infiltration in future buildings show no resulting safety hazard**

URS' engineers have confirmed that the site is safe based upon detailed modeling. This permits for conclusive, quantitative data to establish the safety of future development at the site. Radian's model is based upon generally accepted procedures and very conservative inputs and assumptions. We considered air emissions in the park area, biogas infiltration into a subterranean parking garage, and a worst case scenario. The worst case scenario assumes that gas from a long utility trench leaks massively for several days into a small underground utility room, in which the ventilation system has failed. The conservative analysis showed that the resulting air concentrations are acceptable.

SOLIDERE anticipates that future buildings on the site will include below-grade spaces, most likely for parking and utilities. Accordingly, after reviewing new construction within the immediate area of the project site, Radian prepared three scenarios for estimating air

Normandy Landfill FSQ Proposal

concentrations of methane and carbon dioxide, which are presented in this section. Estimates were developed for three scenarios:

1. Indoor air within a subterranean parking garage;
2. Indoor air within a small, subterranean room connected to a long utility trench; and
3. Ambient air in the park area.

For each scenario, estimated air concentrations were developed for four time periods:

1. Present (interim) site status – December 31, 2002;
2. Projected site status at completion – April 15, 2004;
3. Projected site status at completion of first year of monitoring – April 15, 2005; and
4. Projected site status at completion of monitoring phase – April 15, 2008.

The results are given below in Tables 2-1 through 2-3. The supporting documentation is provided at Attachment 2.

The concentrations shown in Tables 2-1, 2-2, and 2-3 reflect only the contribution of methane and carbon dioxide (soil gas) generated at the site. The concentrations do not include the typical background levels of 2 ppm methane and 360 ppm carbon dioxide found in ambient air, nor the contribution from any other emission sources of these gases (e.g., vehicles), both of which are outside the scope of the FSQ.

As an additional margin of safety, the estimated concentrations are calculated based upon very conservative assumptions. Accordingly, the actual concentrations measured in the field are expected to be much lower than the estimated concentrations.

**Table 2-1.  Indoor Air Concentrations for the
Subterranean Parking Garage Scenario**

| Year | Indoor Air Concentration | |
| --- | --- | --- |
| | Methane | Carbon Dioxide |
| 2002 | 4 ppm | 2 ppm |
| 2004 | < 1 ppm | < 1 ppm |
| 2005 | < 1 ppm | < 1 ppm |
| 2008 | < 1 ppm | < 1 ppm |

Note: 1% = 10,000 ppm and 1.5% = 15,000 ppm

**Table 2-2. Indoor Air Concentrations for the
Subterranean Utility Room Scenario**

| Year | Indoor Air Concentration | |
|---|---|---|
| | Methane | Carbon Dioxide |
| 2002 | 30,000 ppm | 20,000 ppm |
| 2004 | 7,300 ppm | 4,700 ppm |
| 2005 | 3,300 ppm | 2,200 ppm |
| 2008 | 3,300 ppm | 2,200 ppm |

Note: 1% = 10,000 ppm and 1.5% = 15,000 ppm

**Table 2-3. Ambient Air Concentrations for the
Park Area Scenario**

| Year | Ambient Air Concentration | |
|---|---|---|
| | Methane | Carbon Dioxide |
| 2002 | < 1 ppm | < 1 ppm |
| 2004 | < 1 ppm | < 1 ppm |
| 2005 | < 1 ppm | < 1 ppm |
| 2008 | < 1 ppm | < 1 ppm |

Note: 1% = 10,000 ppm and 1.5% = 15,000 ppm

Normandy Landfill FSQ Proposal

**Table 3-1. Examples of Typical Building Ventilation Rates**

| Type of space | Air Changes per Hour (ACH) | | Comment |
| | Typical Value | Standard | |
|---|---|---|---|
| New Office, Telecom Center | 0.72 | ASHRAE 62-1999 | Based on 10 L/s of outside air per person |
| New Mechanical Room | 9 | ANSI/ASHRAE 15-1994 | Based on 9 kgs of refrigerant, room = 6 m x 4.5 m x 3 m |
| Parking Garage | 6 | NFPA 88A-1999, ASHRAE 62-1999 | Based on 1.0 or 1.5 $m^3$ air/ min/ $m^2$ of floor area |

**C.    The building techniques used at the site further guarantee safety**

1.

The Technical Conditions of Contract state at Section 2.0 that "The reclaimed land will be marketed by the Employer for the construction of a prestige high density development (offices, hotels, and condominiums), park land, and associated infrastructure works...." In the construction completed to date, SOLIDERE has utilized the latest and strictest international standards (i.e., from the UK, France, and/or USA, depending on the design firm) for construction within the Beirut Central District. Radian verified these high quality construction practices by inspecting numerous new prestige buildings in the area of Beirut surrounding the project site. From this inspection, Radian has concluded that typical construction practices employed by local developers in the Beirut Central District exceed the specifications set forth in NL 145:1999 (LIBNOR).

For example, Radian observed that high quality synthetic liners (e.g., 3 mm ethylene propylene diene monomer/EPDM) are installed covering the entire underground structure and extending up to ground level. A protective exterior layer such as "plastic board" is placed over the synthetic liner. Outside the protective layer, a drainage layer of pea gravel fills the void between the excavation and the piles. Sleeve conduits are set into the concrete walls at casting and incorporated in the waterproofing membrane. Sleeves are sealed with synthetic sealants after service pipes are installed.

These construction practices ensure waterproofing and are necessary to prevent flooding of the basements because much of the subgrade construction extends well below the lowest water table. All subgrade construction is subject to flooding due to the proximity to the sea, the high water table, and the chronic moisture saturation of the entire soil profile. The current and future construction practices at the site fulfill the first two requirements listed under Section 3.1 (complete waterproofing and double-wall construction).

It is also expected that SOLIDERE or other developers will require that prominent international standards for ventilation will be followed, such as ASHRAE Standard 62-2001 "Ventilation for Acceptable Indoor Air Quality (ANSI Approved)." For illustration, some other applicable ventilation standards are listed in Table 3-1.

Radian has determined that construction in conformance with standard building techniques currently employed by Solidere will provide an additional level of assurance that there is no concern with landfill gas. Based upon SOLIDERE's statements in the contract that the site will be developed as a high quality, prestige multi-use development, and based upon observations of SOLIDERE's recent development within the Beirut Central District, it is clear that the planned development will utilize the highest construction standards. These standards provide an additional level of assurance that there is no reason to be concerned with landfill gas. It is manifestly evident that high quality local design and construction standards for prestige buildings enhance safety and eliminate any concern with respect to landfill gas.

Based upon the construction standards and practices currently followed for development within the Beirut Central District, it is expected that all construction in the Normandy Landfill Phase II area will, at a minimum, include:

1. All below-ground building walls will be permanently and completely waterproofed, including any utility interfaces and other penetrations of the building wall. The waterproofing will extend up to ground level. It will typically consist of a high quality synthetic liner or equivalent.

2. The space between the building wall and the outer wall or piles will be filled by a protective drainage layer of pea gravel or equivalent.

3. Utility penetrations will be minimized and grouped, and all penetrations will be waterproof.

4. All buildings on site will have ventilation rates protective of human health and consistent with international building codes, standards, and guidelines. The ventilation rates will comply with ASHRAE Standards 62 and 15 and applicable NFPA standards, and with similar international standards. All below-grade space will be mechanically ventilated in accordance with these standards.

The combination of complete waterproofing, gravel-filled annular space surrounding the building, outside wall or construction support structure, and adequate indoor ventilation rates will provide redundant protection against biogas infiltration into the building and will prevent indoor methane concentrations from ever approaching the proposed standard of 2500 ppm.

Finally, it should be emphasized that these standards are not necessary for achieving compliance with the FSQ. They merely provide an additional guarantee of safety.

2.    **Building Attributes That Ensure Safety**

Three construction attributes of prestige buildings such as those planned for the Phase II area
will provide redundant protection from any potential hazard resulting from landfill gas intrusion:

a. **Waterproofing** — In typical building construction, the entire subsurface envelope is
waterproofed. In fact, the INSTITUT DE NORMES LIBANAISES – LIBNOR (The
Lebanese Standards Institution) includes in its comprehensive set of building
standards, which are generally followed in construction of Class A space in Beirut,
specific sections addressing ventilation and waterproofing (see for example NL
145:1999). Relevant LIBNOR excerpts are included in Attachment 3. Waterproofing
alone will prevent gas intrusion. Waterproofing includes coating the wall surfaces
and waterproofing the utility penetrations. It is a necessity for all building
components extending below grade in soil that is chronically flooded over its entire
depth, as will be the case for all new construction on the site. Complete and
permanent waterproofing extending upwards to the soil surface will by itself provide
complete protection against biogas intrusion.

b. **Subgrade Construction** — Typical buildings in the area are constructed inside an
excavation support system (i.e., outer wall). The space between building wall and the
outer wall/excavation support system is typically filled with porous material like
gravel. The porous interstitial space will cause any gas infiltrating the outer wall to
preferentially dissipate in this annular space rather than infiltrating the building.

c. **Ventilation** — The type of buildings planned for the Phase II area are expected to
have forced ventilation with redundant power supply, especially in subgrade spaces,
compliant with international ventilation standards. Such ventilation will, for
example, be necessary in car parks to protect against the carbon monoxide in vehicle
fumes.

Based upon our review of the LIBNOR standards and current local construction practices
(Radian inspected the construction of new prestige buildings neighboring the site), Radian has no
doubt that the future buildings in the Phase II area will have these attributes.

## VII.    Data Collection, Review, and Verification

The landfill gas issue first arose in March 2001 in correspondence received from WAFI. Radian
commenced field investigations that very month, immediately following receipt of WAFI's letter
and has continued to focus on this matter uninterrupted to the present time. Radian's
documented efforts began with test pits and field observation in the Spring of 2001 and
subsequently expanded to include exhaustive field testing, monitoring and observations, detailed
laboratory analysis both on site and in the United States, and the assembly of a panel of outside
experts from both Europe and the United States.

The analysis and data obtained from all of these activities have been exchanged in documented
correspondence with both WAFI and SOLIDERE. Further, both URS and Radian have pledged
to SOLIDERE that this testing, monitoring, and analysis will continue. Although both
URS/Radian and the panel of experts consider these data exhaustive and conclusive Radian ~~does
not agree with this statement, but~~ nonetheless proposes to install additional monitoring devices,

URS00164368

June 2, 2003                                    Normandy Landfill FSQ Proposal

verify the effectiveness of existing devices, perform further testing and monitoring, and report additional data as described below.

1.    **On-Site Testing**

a)    **Install New Test Cells in the Future Park Area.**

The design of the existing large scale in situ gas measurement cells are regarded as the best tool to measure on-site gas production. Of the seven cells existing now, five are in the area designated to be the park area. Radian will install two additional cells of the same design in the eastern half of the park area , as that area is made available. . A further 5 to 6 cells will be installed in the future development area to the east of the park after that area expands with the placement of fill.

b)    **Install One Monitoring Well Next to GW03 for Quality Control Purposes**

Radian will install a test well immediately adjacent to GW03 for the purpose of confirming the reproducibility of the gas production data being obtained from GW03.

c)    **Check Condition of All Monitoring Wells for Plugging**

Radian will confirm the proper operation of all of the existing wells. Further, the three monitoring wells located in the water-saturated zone will be cleaned by surging and tested for drawdown recovery.

2.    **Laboratory Testing**

As documented, Radian has performed a continuous in-depth study of the gas issue. We propose to continue the existing monitoring and testing program and to expand upon it to include performance of the additional tests discussed at the London meeting, the results of which will be reported back to WAFI and SOLIDERE.

a)    **Continue Existing Testing**

b)    **Test for Methanotrophic Bacteria and Issue Report**

URS will test for methanotrophs (methane-consuming bacteria). Such bacteria are ubiquitous in the surface soils of the earth and likely to be active at the site. The observed major discrepancy between the production rate and the surface flux of methane at the site suggests that most methane is oxidized before it reaches the surface. Methanotrophs could have a substantial impact on the evolution of methane emissions at the site and the related concern.
The purpose of this test is to a) confirm the presence of significant methanotrophic activity at the site; b) narrow down the depth profile of this activity; and c) estimate the rate of methane oxidation. Soil samples from five depths will be taken from three locations corresponding with three different backfilling dates. The samples will be sent for methanotrophic analysis, which will consist of a) intrinsic methane oxidizing activity; and b) presence of methanotrophs by

polymerase chain reaction -- denaturing gradient gel electrophoresis (PCR-DGGE) analysis. Based on the results of this first study, further sampling and analysis may be conducted to measure the areal extent of methanotrophic activity.

c)    **Data Reporting**

Radian proposes to expand upon its current reporting of test results. Specifically, Radian will:

1. Provide SOLIDERE with all data collected since August 2002 (the date of Radian's latest report to SOLIDERE) (Attachment 1);

2. Provide a new data every other month ; and

3. Submit an update to the previously issued gas issue reports in May 2003.

## VIII. Conclusion

The gas issue at the Normandy Landfill's Phase II area has been thoroughly documented and quantified by Radian in exhaustive field and laboratory measurements commencing in March 2001. Radian International agrees to continue this monitoring and add some specific measurements, as detailed in Section 1 and Attachments 1, 4, and 5 of this Action Plan. Hazard modeling, reviewed and approved of by distinguished experts, shows that the site is safe, based on the large body of site data available, and on very conservative assumptions about future construction at the site, as described in Section 2 and Attachment 2. Construction and operational characteristics of the expected buildings at the site further confirm its fitness for the purpose, as detailed in Sections 3 and Attachment 3 of this Action Plan. Some of the FSQ standards in the contract are recognized to be ambiguous, so we propose to amend them and remove the ambiguity, as described in Section 4. Finally, we confirm the safety of our disposal method for shredded tires and pelletized plastics in Section 5.

Based on all the information gathered, the detailed modeling performed, and the review of distinguished experts in all the areas of concern, Radian confirms that the backfilled portions of the Normandy Landfill Phase II area are unconditionally safe for development using standard building techniques. The backfilled materials are Fit for the Purpose and no specific precautions against landfill gas will need to be provided for built development at the project site.

June 2, 2003                                           Normandy Landfill FSQ Proposal

**Attachments**

URS00164370

June 2, 2003 <u>Normandy Landfill FSQ Proposal</u>

**Attachment 1**

CD of data since August 2002.

June 2, 2003           Normandy Landfill FSQ Proposal

## Attachment 2

**Estimated Air Concentrations**

As described in Section 2, estimates were developed for three scenarios:

1. Indoor air within a subterranean parking garage;
2. Indoor air within a small, subterranean room; and
3. Ambient air in the park area.

For each scenario, estimated air concentrations are given for four times:

1. Present (interim) site status – December 31, 2002;
2. Projected site status at completion – April 15, 2004;
3. Projected site status at completion of first year of monitoring – April 15, 2005; and
4. Projected site status at completion of monitoring phase – April 15, 2008.

The estimated air concentrations are dependent on the gas production rate of the backfill material. The estimated gas production rate is presented below, followed by a description of the modeling scenarios and the model results.

### A2.1    Total Methane and Carbon Dioxide Production Rates

A finite amount of biogas (methane and carbon dioxide) is being produced at the Normandy site. The total amount of a given gas being produced can be calculated as follows:

$$Q_{gas} = [P_{a,t}M_{a,t} + P_{b,t}M_{b,t} + P_{c,t}M_{c,t}...](1/24,000) \qquad \text{(Eq. 1)}$$

where: $Q_{gas}$     = Gas production rate ($m^3$/hr);
        $P_{a,t}$     = Gas production rate for backfill section a at time t (L/day-ton);
        $P_{b,t}$     = Gas production rate for backfill section b at time t (L/day-ton);
        $M_{a,t}$    = Mass of backfill in Section a at time t (ton);
        $M_{b,t}$    = Mass of backfill in Section b at time t (ton); and
        1/24,000    = Conversion factor ($m^3$/L)(day/hr).

The various sections of the landfill are shown in Figure A2-1. In terms of biogas production, the site can be thought of as three areas: 1) the area with backfill already in place, 2) the area where predominantly undersea material will be backfilled, and 3) the area where predominantly clean material will be backfilled. These three areas are color-coded in Figure A2-1. The estimated mass of backfilled 0-30 mm material in each area is shown in Table A2-1.

The estimated methane production rate is summarized in Table A2-2. To be conservative, the methane production rate for 2002 is the weighted average of all 17 values derived from test cell and microcosm data, including all outliers (i.e., 0.16 L $CH_4$/day-ton).

URS00164372



**Figure A2-1. Schematic of Backfilled Areas at the Normandy Landfill.**

**Table A2-1. Estimated Mass of Backfill**

| Landfill Section | End of Backfilling | Total Volume | Total Mass |
|---|---|---|---|
| 2A, 2B, 3A, 3B, 4A, 4B | October 1, 2002 | 1,570,000 m$^3$ | 1,810,000 tons |
| 2C, 2D, 2E, 5A, 5B, 6A, 6B, 7A, 7B, 8A | January 1, 2004 | 2,000,000 m$^3$ | 2,310,000 tons |
| 8B | January 1, 2004 | 720,000 m$^3$ | 832,000 tons |
| Totals = | | 4,290,000 m$^3$ | 4,952,000 tons |

[a] Volume of material below 1.5m above sea level.

[b] Mass based on 70% of volume being 0-30 mm material with an average dry density of 1.65 metric ton/m$^3$.

**Table A2-2. Estimated Methane Production Rate Per Day Per Metric Ton of Backfill**

| Landfill Section | Methane Production Rate (L/day-ton) | | | | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2008 |
| 2A, 2B, 3A, 3B, 4A, 4B | 0.16 | 0.032 | 0.016 | 0.008 | 0.008 |
| 2C, 2D, 2E, 5A, 5B, 6A, 6B, 7A, 7B, 8A | N/A | 0.06 | 0.012 | 0.006 | 0.006 |
| 8B | N/A | N/A | 0.016 | 0.0032 | 0.0032 |

The production rate is predicted to decrease by one order of magnitude over the next two years (a factor of 5 in the first year and a factor of 2 in the second year), at a lower rate (50%/year) in the third year, and to remain constant thereafter. The rationale for this model is provided in Attachment 5. The yellow area shown in Figure 2A-1 will consist mainly of clean backfill and processed subsea material (i.e., material with a low organic content). Therefore, the initial methane production rate is assumed to be that of undersea material (i.e., 0.06 L CH$_4$/day-ton). The blue area is clean and has trace to no organic content (i.e., no biogas production). Therefore, the initial methane production rate is assumed to be about one-tenth that of the backfill already in place (i.e., 0.016 L CH$_4$/day-ton).

The total volume of methane being produced at the site was calculated using Equation 1 and the values given in Tables A2-1 and A2-2. The results are shown in Table A2-3. Gas production rates in subsequent years will be lower than the value shown for 2005. To be extremely conservative, the value for 2005 is assumed to still hold true in 2008.

The total volume of carbon dioxide being produced at the site is estimated to be 67% of the methane production rate, based on a typical biogas composition of 60% methane and 40% carbon dioxide.

### Table A2-3. Estimated Volume of Methane Produced by Entire Site

| Landfill Section | Methane Production Rate (m³/hr) | | | | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2008 |
| 2A, 2B, 3A, 3B, 4A, 4B | 12.1 | 2.4 | 1.2 | 0.60 | 0.60 |
| 2C, 2D, 2E, 5A, 5B, 6A, 6B, 7A, 7B, 8A | 0 | 5.8 | 1.16 | 0.58 | 0.58 |
| 8B | 0 | 0 | 0.55 | 0.11 | 0.11 |
| Totals = | 12.1 | 8.2 | 2.9 | 1.3 | 1.3 |

## A2.2   Biogas Emission Factors

At completion, the backfilled material will cover an area of 20 hectares (200,000 m²). From Table A2-1, the total volume of backfill is 4,290,000 m³ and the total mass of 0-30 mm material is 4,952,000 metric tons. Therefore, on average, a total of 25 tons of 0-30 mm material underlies each square meter at the surface. This represents an average depth of about 15 m of 0-30 mm material.

As of the end of 2002, less than 50% of the total volume of backfill material had been put in place, and this material covered less than 10 hectares (100,000 m²).

The data in Tables A2-1, A2-2, and A2-3 were used to develop emission factors for methane and carbon dioxide in terms of:

- Total gas production rate for the site (m³/hr);
- Average gas production rate (L/day-ton);
- Average emission flux (L/hr-m²); and
- Average emission flux (μg/sec-m²).

These emission factors are given in Tables A2-4a and A2-4b for methane and carbon dioxide, respectively.

## A2.3   Model Scenarios

The three scenarios that were modeled are described below.

URS00164375

### Table A2-4a. Methane Emission Factors

| | Time | | | |
|---|---|---|---|---|
| | 2002 | 2004 | 2005 | 2008 |
| Total Mass (metric tons) | 1,810,000 | 4,952,000 | 4,952,000 | 4,952,000 |
| Total Area ($m^2$) | <100,000 | 200,000 | 200,000 | 200,000 |
| Total Gas Production ($m^3$/hr) | 12.1 | 2.9 | 1.3 | 1.3 |
| Average Production Rate (L/day-ton) | 0.16 | 0.014 | 0.0063 | 0.0063 |
| Average Emission Flux (L/hr-$m^2$) | 0.12 | 0.0145 | 0.0065 | 0.0065 |
| **Average Emission Flux[b]** ($\mu$g/sec-$m^2$) | 22 | 2.6 | 1.2 | 1.2 |

### Table A2-4b. Carbon Dioxide Emission Factors

| | Time | | | |
|---|---|---|---|---|
| | 2002 | 2004 | 2005 | 2008 |
| Total Mass (metric tons) | 1,810,000 | 4,952,000 | 4,952,000 | 4,952,000 |
| Total Area ($m^2$) | <100,000 | 200,000 | 200,000 | 200,000 |
| Total Gas Production ($m^3$/hr) | 8.1 | 1.9 | 0.87 | 0.87 |
| Average Production Rate (L/day-ton) | 0.11 | 0.0093 | 0.0042 | 0.0042 |
| Average Emission Flux (L/hr-$m^2$) | 0.080 | 0.0097 | 0.0043 | 0.0043 |
| **Average Emission Flux[b]** ($\mu$g/sec-$m^2$) | 40 | 4.8 | 2.1 | 2.1 |

[a] Gas production in 2008 assumed to be equal to gas production in 2005.
[b] Assuming 24.45 L/mole at 20°C.

**Subterranean Parking Garage** – The first scenario that was evaluated was a subterranean parking garage. The parking garage is assumed to have three levels, with each level having dimensions of 50 m by 50 m by 3 m high. Therefore, the internal volume is 7,500 $m^3$ per level and 22,500 $m^3$ in total. The minimum ventilation rate is assumed to be four air changes per hour (ACH) (ASHRAE, 1991). Therefore, the ventilation rate is 30,000 $m^3$/hr per level and 90,000 $m^3$/hr for the entire structure.

We have assumed that all the soil in the vicinity of the building is generating biogas at the average rates shown in Tables A2-4a and A2-4b. In reality, the backfill near the building will be predominantly subsea material and will have a lower gas production rate. We have assumed that all gas generated within 5 m of the building may migrate laterally to the building. The total surface area of this 5 m strip around the perimeter of the building is 1,100 $m^2$ (4 x [5 x 50] + area near building corners). We also have assumed that a 5 m column of gas generating backfill lies underneath the building. Both of these assumptions are conservative. The total mass of backfill capable of generating biogas is:

Lateral migration = 1,100 $m^2$ x 25 tons/$m^2$ = 27,500 tons

Migration from underneath building = 2,500 $m^2$ x 5m x 1.65 tons/$m^3$ = 20,625 tons

Total = 48,000 tons

Using the average production rates (L/day-ton) from Tables A2-4a and A2-4b, the gas production rates of interest are given in Table A2-5 (Example, for methane in Year 2002: 48,000 tons * 0.16 L/day-ton) * ($m^3$/1,000 L) * (day/24 hr) = 0.32 $m^3$/hr).

**Table A2-5.  Gas Production Rates in Vicinity of Subterranean Parking Garage**

| Year | Gas Production Rate at Building ($m^3$/hr) | |
|------|---------|----------------|
|      | Methane | Carbon Dioxide |
| 2002 | 0.32 | 0.22 |
| 2004 | 0.028 | 0.019 |
| 2005 | 0.013 | 0.0084 |
| 2008 | 0.013 | 0.0084 |

The fraction of gas produced that will enter the subterranean parking garage will be less than 100%. This fraction can be estimated using Equation 2, which has terms to account for losses due to oxidation in the soil, losses to the atmosphere above the backfill, and losses to the interstitial space of a double-wall building.

$$Q_{inf} = Q_{gas} - [L_{ox} + L_{sol} + L_{atm} + L_{int}] \qquad \text{(Eq. 2)}$$

where: $Q_{inf}$ = Gas infiltration rate (m$^3$/hr);
$Q_{gas}$ = Gas production rate (m$^3$/hr);
$L_{ox}$ = Losses due to oxidation in the soil (m$^3$/hr);
$L_{sol}$ = Losses due to solubility in soil or water (m$^3$/hr);
$L_{atm}$ = Losses to the atmosphere (m$^3$/hr); and
$L_{int}$ = Losses to the interstitial space between building walls.

Methane may be lost to oxidation in the surface layers of soil due to the action of methanotrophic bacteria. The rate will be limited by the rate of diffusion of oxygen into the soil. This rate will be high in surface layers of soil, but may be negligible in deeper layers of backfill or under buildings. To be conservative, the losses due to oxidation are assumed to be zero in this evaluation.

Methane and carbon dioxide are both somewhat soluble in water, but further losses due to solubility will not occur once steady-state conditions are reached. Therefore, to be conservative, the losses due to solubility are assumed to be zero in this evaluation.

The losses to the atmosphere reflect that fraction of methane or carbon dioxide that escapes to the atmosphere before it can pass through the excavation support system (e.g., pilings) of the building. The vast majority of soil gas will diffuse to the atmosphere rather than pass through the outer wall/excavation support system. Typically, these losses to the atmosphere will represent at least 90% of the gas production (i.e., will reduce the gas volume being considered by an order of magnitude). To be conservative, the losses to the atmosphere are assumed to be zero in this evaluation.

The losses to the interstitial space (i.e., drainage layer) between building walls and the excavation support system reflect that fraction of methane or carbon dioxide that escapes to the atmosphere before it can pass through the watertight inner wall of the building. If the interstitial space is not sealed off from the atmosphere, the vast majority of gas entering the space will be lost to the atmosphere. Typically, these losses will represent at least 90% of the gas that enters the interstitial space (i.e., will reduce the gas volume being considered by an order of magnitude). To be conservative, the losses to the atmosphere are assumed to be zero in this evaluation.

Given that all losses are assumed to be zero for this scenario, the gas infiltration rates to the subterranean parking garage are equal to the gas production rates shown in Table A2-5.

**Small Subterranean Room** – The second scenario that was evaluated was a small, subterranean room such as a utility room. Based upon the design of recent new construction in Beirut, it is very unlikely that such a room would ever be built in Beirut, but this design was considered for purposes of modeling.

The room is assumed to have dimensions of 4 m by 5 m by 3 m high. Therefore, the internal volume is 60 m$^3$. The room is assumed to be unventilated, with a minimal ventilation rate of 0.1 ACH, which is equal to 6 m$^3$/hr.

The worst-case scenario is where a utility trench runs across the site and is attached directly to the outer wall of the small room, with conduits for utility lines running through the outer

and inner walls of the building. We have assumed that the trench is 300 m long, 2 m wide, and 2 m deep. Furthermore, we have assumed that all the gas produced beneath the trench and all gas produced within 4 m of either side of the trench feeds into the trench. Therefore, the trench has a footprint of 3,000 m². This footprint is 1.5% of the total site footprint of 200,000 m², so the trench is assumed to collect 1.5% of the total gas production at the site.

Using the total gas production rates (m³/hr) from Tables A2-4a and A2-4b, the gas production rates of interest are given in Table A2-6 (e.g., for methane in Year 2002: 12.1 m³/hr * 0.015 = 0.18 m³/hr).

The fraction of this gas production that will enter the subterranean room is less than 100% of the gas entering the trench. This fraction can be estimated using Equation 2. As was the case with the parking garage scenario, the losses due to oxidation and solubility are assumed to be zero, even though oxidation is likely to occur in a shallow trench. The losses to the atmosphere are likely to be several orders of magnitude; however, to be conservative, it is assumed that losses to the atmosphere will be zero. The losses to the interstitial space also are assumed to be zero. Given that all losses are assumed to be zero, the gas infiltration rates to the subterranean utility room are equal to the gas production rates shown in Table A2-6.

**Table A2-6.  Gas Production Rates in Vicinity of Utility Trench**

| Year | Gas Production Rate at Trench (m³/hr) | |
|---|---|---|
| | Methane | Carbon Dioxide |
| 2002 | 0.18 | 0.12 |
| 2004 | 0.044 | 0.028 |
| 2005 | 0.020 | 0.013 |
| 2008 | 0.020 | 0.013 |

**Ambient Air in the Park** – The third scenario that was evaluated was the ambient air in the park. The emission fluxes from the backfill in units of $\mu g/sec\text{-}m^2$ are shown in Tables A2-4a and A2-4b and are reproduced below in Table A2-7.

**Table A2-7.  Emission Fluxes From Backfill in Park Area**

| Year | Emission Flux (µg/sec-m²) | |
|---|---|---|
| | Methane | Carbon Dioxide |
| 2002 | 22 | 40 |
| 2004 | 2.6 | 4.8 |
| 2005 | 1.2 | 2.1 |
| 2008 | 1.2 | 2.1 |

These emission fluxes were used along with a simple box model to estimate the ambient air concentrations. In the box model, all emissions were assumed to be trapped within the first 2 m of the atmosphere. A conservatively minimal wind speed of 1 m/s (2.2 mph) was assumed to pass through the box.

The ambient concentration is calculated by Equation 3:

$$C_i = E_i * A / Q \qquad (Eq. 3)$$

where: $C_i$     = Ambient concentration of species i ($\mu g /m^3$);
       $E_i$     = Emission flux of species i ($\mu g/sec\text{-}m^2$);
       A     = Area of emitting surface ($m^2$); and
       Q     = Air dilution rate ($m^3$/sec).

The air dilution rate, Q, is the total flow rate of air through the box. Q is equal to the wind speed multiplied by the cross-sectional area of the box, which is equal to the box height multiplied by the box length ($\sqrt{A}$). For 2002, $A \approx 100,000$ $m^2$, and $Q \approx 632$ $m^3$/s. For subsequent years, A = 200,000 $m^2$ and Q ≈ 894 $m^3$/s.

The resulting concentrations can be converted to ppm as follows:

1 $\mu g /m^3$ of methane = 0.65 ppb = 0.00065 ppm

1 $\mu g /m^3$ of carbon dioxide = 1.64 ppb = 0.00016 ppm

## A2.4    Estimated Air Concentrations

The air concentrations associated with each scenario are listed below.

**Subterranean Parking Garage** – The estimated indoor air concentrations were determined by dividing the production rates from Table A2-5 by the assumed ventilation rate of 90,000 $m^3$/hr. The results are shown in Table A2-8.

**Small Subterranean Room** – The estimated indoor air concentrations were determined by dividing the production rates from Table A2-6 by the assumed ventilation rate of 6 $m^3$/hr. The results are shown in Table A2-9.

**Table A2-8.  Indoor Air Concentrations for the Subterranean Parking Garage Scenario**

| Year | Indoor Air Concentration | |
|------|---------|---------|
|      | Methane | Carbon Dioxide |
| 2002 | 4 ppm   | 2 ppm   |
| 2004 | < 1 ppm | < 1 ppm |
| 2005 | < 1 ppm | < 1 ppm |
| 2008 | < 1 ppm | < 1 ppm |

Note:  1% = 10,000 ppm and 1.5% = 15,000 ppm.

**Table A2-9.  Indoor Air Concentrations for the Subterranean Utility Room Scenario**

| Year | Indoor Air Concentration | |
|------|---------|---------|
|      | Methane | Carbon Dioxide |
| 2002 | 3.00%   | 2.00%   |
| 2004 | 0.73%   | 0.47%   |
| 2005 | 0.33%   | 0.22%   |
| 2008 | 0.33%   | 0.22%   |

Note: 1% = 10,000 ppm and 1.5% = 15,000 ppm

**Ambient Air in the Park** – The estimated ambient air concentrations were determined using Equation 3 and the emission fluxes from Table A2-7.  The results are shown in Table A2-10.

The concentrations shown in Tables A2-8, A2-9, and A2-10 reflect only the contribution of methane and carbon dioxide from soil gas at the site.  The concentrations do not include the typical background levels of 2 ppm methane and 360 ppm carbon dioxide found in ambient air.  Nor do they include the amount of these gases produced by the building's occupants or any equipment, such as automobiles in a car park.

The estimated concentrations are based on very conservative assumptions.  The actual concentrations in the field are expected to be several orders of magnitude lower than the estimated concentrations.

The assumptions include conservative (high) assumptions of gas production and gas transport rates and extremely conservative (low) assumptions of gas losses to other migration pathways and losses due to oxidation.  Furthermore, the assumed building dimensions and ventilation rates are conservative.

Table A2-10.  Ambient Air Concentrations for the Park Area Scenario

| Year | Ambient Air Concentration | |
| --- | --- | --- |
| | Methane | Carbon Dioxide |
| 2002 | 5.4 ppm | 3.8 ppm |
| 2004 | < 1 ppm | < 1 ppm |
| 2005 | < 1 ppm | < 1 ppm |
| 2008 | < 1 ppm | < 1 ppm |

Note: 1% = 10,000 ppm and 1.5% = 15,000 ppm

## A2.5   References

American Society of Heating, Refrigeration, and Air-Conditioning Engineers (ASHRAE). Handbook – Heating, Ventilating, and Air-Conditioning Applications.  1991.

## Attachment 3

**Local Construction Standards**

### A3-1. Summary of Lebanese Standards for Aeration of Lodgings from NL 154:1999

Lebanese standards for ventilation are based on assumed carbon dioxide and water vapor production in buildings and the ventilation debts required for indoor air quality. Carbon dioxide and water vapor are used as surrogate indicators for good indoor air quality. High levels of $CO_2$ and/or water vapors indicate that ventilation may be inadequate to protect occupants from odors, pathogens, tobacco smoke, carbon monoxide, etc. Production of $CO_2$ of metabolic origin is estimated from 11 $CO_2$ liters per hour for a sleeping occupant, up 55 $CO_2$ liters per hour for a working occupant.

2.6     Acceptable carbon dioxide levels should be less than 0.5% on an 8-hour and relative humidity should be less than 70%.

Annex C.     Recommended debits of ventilation in the housing.

Ordinary housing.

1.     Bedroom     2 persons x $25m^3/h$
2.     Sitting room   0.35 air change
3.     Dinning room 0.50 air change

House with climate control.

1.     Bedroom     2 persons x 30 m3/h
2.     Sitting room, lounge, etc.     number of persons x 30m3/h x 0.75

House heated by radiator

1.     Bedroom     greatest of 2 x 12m3/h or 1 ACH.

### A3-2. Summary of Lebanese Standards for Waterproofing for Underground Structures from NL 145:1999

Lebanese standards for watertight waterproofing for high quality buildings discuss use of waterproof membranes, EPDM, bitumen (tars), or PVC, to protect underground structures from water. Waterproofing is applied to the entire subsurface including the bottom surface and reaching above water level or ground level. Waterproofing is sandwiched between building walls and protective outer layers of plastic board or concrete block on the vertical faces and blinding concrete in the case of the foundation.

6.2.3. Single Points. Single points all service and insertions should be inserted into the internal structure not the external boundary of the building. The number of inserts should be kept to a minimum and they should be pass through the vertical walls of the building, not horizontal surfaces.

## Attachment 4

### In Situ Sampling of CH₄ and CO₂ Gas Flow Rates

**Principle:**      The flow and composition of gases emitted from test cells will be measured using a gas analyzer to determine the flow rate of methane.

**Apparatus:**

1.    Gas Data Ltd., LMSx analyzer (G3) or equivalent
2.    Flexible tubing 1/4" I.D.

**Procedure:**

Turn on the LMSx gas analyzer and allow it to go through warm-up sequence. When the warm-up is complete, the flow measurement screen will appear.

Attach the gas analyzer "flow in" sample line to the gas monitoring port. Press the "tick" button for real-time flow readings. Observed the real-time flow readings until stable readings are displayed. Stable readings should typically be observed in approximately 60 seconds. Press the "cross" button to lock the flow measurement.

Remove the "flow in" sample line from the gas monitoring port and attach the "sample in" line to the port. Press the "sample" button to begin the sample sequence. Peak methane detection is recommended, the settings specific to the LMSx to be used are.

| | | | |
|---|---|---|---|
| AutoFlush: | Off | Stabilize: | 4 (sec) |
| Preflush: | 30 (sec) | Peak CH₄: | On |
| Pump time: | 30 (sec) | Stability Err: 2% | |
| No. Peaks: | 4 | Period: | 4 (sec) |

The instrument will automatically scan peak readings and indicate when stable methane readings are detected. After the instrument indicates that readings are stable, write down or store the readings in the LMSx data logger.

Allow the gas analyzer to pump ambient air in between samples to flush out the analyzer between samples.

**Data Reduction Procedure:**

One measurement should be made per test cell each week and the rate of methane flow in L/hr should be calculated and recorded. If more than one measurement is made for a given location during a weekly period, the average flow rate of methane in L/hr should be calculated for each test cell for the period. The weekly average measurements performed during a monthly period will be used to calculate the monthly average for the site with all weekly measurements given equal weighting.

The flow limit given in Section 4-1 is equal to a methane flow of 7.5 L/hr for the test cells, which have an enclosed planar surface area of 50 m². The overall average for the data set

should be calculated from the average for each test cell. The overall average should be compared with the Final Site Quality limit for methane flow.

Data from all test cells and from all measurements at each test cell will be included in the data set, unless an individual measurement is invalidated due to a specific problem with the gas analyzer (e.g., error message) or with the sampling protocol (e.g., poor seal between the gas analyzer and the sampling line, as evidenced by a high oxygen reading that cannot be reproduced). In such cases, the problem should be identified and corrected, and the measurement repeated at an early opportunity.

## Attachment 5

**Estimated Decay Rate of Biogas Production in Normandy Landfill Phase II Backfill**

The production of biogas in the Normandy Landfill Phase II area has been monitored since March 2001, as described in two reports submitted to date. The data indicate that the biogas production rate diminishes rapidly after backfill is submerged.

### A5-1. Evidence

### A5-1.1 Microcosms, Room Temperature

These microcosms cannot be used to estimate the biogas production decay rate directly, because of historical fluctuations in the temperature in the laboratory. However, they clearly indicate that backfill generated from above sea waste produces more gas that backfill generated from waste originating from below sea level. On average, above sea waste produces gas at a rate 3 to 6 times higher than undersea waste. A rigorous side-by-side comparison using duplicate 5-L microcosms shows a rate 12 times higher in above sea material than in undersea material. The significance of this is discussed below.

### A5-1.2 Microcosms, 35°C

These microcosms were set up to measure total, ultimate biogas production potential. By definition, they do not simulate the site due to their temperature, so their results cannot be used to estimate production rate. However, they too show that above sea waste produces biogas at 4 times the rate of undersea waste.

### A5-1.3 General Anaerobic Digestion Experience

Based on anaerobic digestion experience worldwide, at 20°C and with an adapted microbial population, one would expect 90% of the biogas production from any substrate to occur in approximately two years.

### A5-1.4 Gas Monitoring Wells

The three 2001 wells showed a decline in gas production by one order of magnitude or more in 6 to 12 months. The 2002 wells show no clear trend over 7 months, but some inverse correlation between gas production rate and age of backfill.

### A5-1.5 Large Scale In Situ Gas Measuring Cells

These produce the highest quality data. One could argue that it is unclear to what extent Cell 1 is underlain by reclaimed backfill. Cell 5 has been observed to "breathe", and no methane emissions have been observed, which may be due to microbial oxidation. Even if one eliminates these cells from consideration, it is clear that the longer the backfill has been in place (submerged), the lower the biogas production. The decline in gas production amounts to at least a factor 5 in one year.

### A5-1.6 Methane Flux At The Surface

The flux of methane at the soil surface is inversely correlated with age of the backfill, and declines to zero after the backfill has been in place for 18 months. Note that the evidence so far indicates that a large fraction of the produced methane is microbially oxidized before reaching the surface, so below a certain level of methane production in the soil, no methane emissions may be detected at the surface.

### A5-1.7 Above Sea Versus Undersea Material

The simple fact that undersea material produces approximately one order of magnitude less gas than above sea material confirms that biodegradation occurs rapidly once material is immersed.

### A5-2.  Conclusion

The evidence indicates that once backfill is submerged, biogas production declines by one order of magnitude within 1 to 2 years; some very low level residual production is possible in outlying years. Thus, we will assume for modeling purposes that the decline is a factor of 10 in the first two years; the production further falls by half in the third year; and it remains constant after the third year. This is a conservative set of assumptions in light of the observed results.

This document, bearing Bates Number URS00181132 to URS00181177, has been redacted in its entirety and is filed under seal.

# EXHIBIT 37


RECYCLED

# NON-SIGNATORIES IN INTERNATIONAL ARBITRATION:

## LESSONS FROM THIRTY YEARS OF CASE LAW

### Bernard HANOTIAU[1]

## I.  DEFINITION OF THE ISSUE AND DISTINCTION FROM OTHER CONNECTED ISSUES

### A.  Non signatories in international arbitration : the issue

1.  Given the increasing number and complexity of commercial transactions and of national and international groups of companies and the fact that for financial, tax or other commercial reasons, there is not always an identity between the individual(s) or company(ies) that has (have) signed the agreement and those that perform it, international arbitrators and national courts are more and more often confronted with the issue whether an arbitration agreement concluded by one individual or company may be extended or imputed to other non-signatory individuals or companies or States as additional claimants or defendants[2].

2.  The issue may be more precisely defined as follows. One or more individuals or companies (or even a State) are formal parties to an arbitration agreement. If a dispute arises and an arbitration procedure is initiated, may an individual, a company or a State, which is not a formal party to the agreement, join the arbitration as an additional claimant or be joined as an additional defendant in the request for arbitration[3]:

---

[1]  Member of the Brussels and Paris bars, Professor at the University of Louvain. Vice-Chairman of the LCIA Court of Arbitration, of the Institute of Transnational Arbitration (Dallas) and of CEPANI (Brussels). Member of the ICC International Arbitration Commission.

[2]  On this issue, see Hanotiau Bernard, Complex Arbitrations – Multiparty, Multicontract, Multi-Issue and Class Actions (hereinafter "Complex Arbitrations"), Kluwer Law International, 2006, in particular Chapter II and the bibliography.

[3]  In contrast, the issue referred to as "Joinder" arises when an additional party wants to join in the course of the arbitration or a party to the arbitration wants to join a non-party thereto in the course of the procedure. See below, n° 12.

- because even though it is not a formal signatory to the agreement, it is in fact a party, by application of the mechanism of representation or given the existence of a principal-agent relationship;

- by application of the theory of apparent mandate or ostensible authority;

- because it is a third-party beneficiary or an assignee of the contract containing the clause or a member with the signatories of a general partnership or a community of rights and duties;

- as a result of the application of the theory of estoppel or the theory of alter ego;

- because it may be inferred from the circumstances of the case that the party concerned has consented to the arbitration agreement, at least impliedly, by its conduct in the negotiation and performance of the contract;

- because the fraudulent conduct of the party concerned justifies the extension, or if it is a company, justifies piercing the corporate veil.

3.   Before addressing the issue, I would like to denounce the lack of rigor and the use of imprecise terminology in the doctrinal writings and even in the arbitral and judicial case law.

### B.   Groups of companies and groups of contracts

4.   First, a clear methodological distinction – one that is not often made – should be made between the issues arising from the circumstance that the project at the centre of the dispute has been negotiated and performed by one or more companies that belong to a group, some of which are not signatories of the arbitration clause, and the issues arising from the fact that the dispute involves or concerns a variety of problems originating from, or in connection with, two or more agreements entered into by the same and/or different parties and which do not all contain the same – or at least compatible – arbitration clauses. In this second scenario, the fact that the parties to the contracts may belong to a

3

group is *a priori* irrelevant, although it may in some cases help clarify or resolve the issues that arise from the existence of a group of contracts[4].

5.    In other words, the question of "extension" of the arbitration clause to non-signatory members of a group of companies, and the question whether and to what extent it is possible to bring into one arbitral proceeding all the parties that have participated in a single economic transaction through various agreements and to decide in the same proceeding all the issues arising from the latter, should be clearly distinguished and are indeed – in the main – the subject of distinct case law. In the first case, the issue is whether an arbitration clause contained in one contract may be "extended" to a company that did not sign the arbitration agreement. In the second case, there are two or more connected agreements and the issue of whether it is possible to join and decide together in one single set of proceedings all the disputes arising from these interrelated contracts arises because the parties thereto are not identical; or because the jurisdiction clauses in the various agreements are not identical or compatible or one or more contracts do not contain any jurisdiction or arbitration clause. Moreover, the problem may arise in two-party as well as in multiparty situations.

## C.    "Extension" to non signatories is a misleading concept

6.    On the other hand, the widely used concept of "extension" of the arbitration clause to non-signatories is a misleading concept, and moreover, is probably wrong to a large extent since, in most cases, courts and arbitral tribunals still base their determination of the issue on the existence of a common intent of the parties and, therefore, on consent. The basic issue therefore remains: who is a party to the clause, or has adhered to it, or eventually is estopped from contending that it has not adhered to it. This is in other words a classic problem of contract law. The real issue therefore becomes whether in

---

[4]    See, *e.g.*, Société Kis France v. Société Générale (Paris Court of Appeal, 31 Oct. 1989) 1992 Rev. Arb. 90; 16 Y.B. Com. Arb. 145 (1991), and text accompanying notes 285-289 in Complex Arbitrations and ICC partial award in case n° 8910 of 1998, 127 J. Droit Int'l 1085 (2000), obs. D. Hascher (Paris, French law) and text accompanying note 304.

international arbitration, given its specific character and taking into consideration the usages of international trade, one should follow the same rules as are applicable to ordinary civil and commercial cases or adopt a more liberal approach; and in the latter case what approach should be adopted.

### D.    The so-called "group of companies" doctrine

7.    The issue of "extension" of the arbitration clause to non-signatories is sometimes "reduced" by commentators to the issue of "groups of companies", or by Courts to the issue whether the applicable law recognizes or not the existence of groups of companies or the so-called group of companies doctrine. This is an unfortunate "reduction" of the issue of "extension". First, even if it is true that *"irrespective of the distinct juridical identity of each of its members, a group of companies constitutes one and the same economic reality of which the Arbitral Tribunal should take account when it rules on its own jurisdiction ..."*[5], it remains that the issue of "extension" of the arbitration clause to non-signatories does not only arise in relation to companies (belonging or not to the same group) but also in relation to individuals or States. Second, I will emphasize in the conclusions that I have drawn from an analysis of the case law, that the existence of a group of companies is not *per se* a sufficient element to allow the "extension" to a non-signatory company of an arbitration agreement concluded by another member of the group. Third, in most cases, courts and arbitral tribunals require, to allow the "extension", the existence of consent or of a conduct amounting to consent. Express consent or conduct as an expression of implied consent – or as a substitute for consent – is still the basis on which most courts and arbitral tribunals reason to decide on the "extension". It is true that the factual existence of a group of companies gives a special dimension to the issue of conduct or consent. But the fact that the signatory and the non-signatory belong to the same group is only one factual element ("un indice") to be taken into consideration

---

[5]    *Dow Chemical* v. *Isover Saint Gobain*, ICC Interim Award of September 23, 1982 in case n° 4131, 1 ICC Awards, at 464.

to determine the existence of consent[6]. It is doubtful in this respect that the non-recognition by the applicable law of the legal existence of groups of companies should in most cases have a decisive impact on this determination. The problem is more factual than legal and this is unfortunately overlooked by a number of commentators, courts and tribunals.

8.     In other words, it is probably better to avoid restricting itself to the formula "group of companies doctrine" as a tool for legal reasoning in the determination of whether an arbitration clause should be extended to non-signatory companies of a group. Indeed, there is a risk that the formula will be used as a *shortcut permitting avoidance of rigorous legal reasoning*, to quickly agree without substantial factual or legal analysis, to the "extension" of the relevant arbitration clause to non-signatory companies of the group, in cases where such an "extension" is unwarranted; or to a refusal of "extension" in cases where it would be duly justified. It is in my view better to refer to the principles that have been applied by courts and arbitrators dealing with this issue in a great number of international disputes and apply them to the facts of the case. These principles are enunciated below by way of conclusion of my analysis of the case law[7].

9.     On the other hand, if one still wants to refer to the concept "group of companies doctrine" in the reasoning, it should at least be clear what this concept means and encompasses or in either words what principles among those referred to above are intrinsic, fundamental, to that theory. These principles are probably the following :

---

[6]   As was pointed out by the sole arbitrator in ICC case n° 11405 (unpublished, commented in Complex Arbitrations at n° 158), "[t]here is no general rule, in French international arbitration law, that would provide that non-signatory parties members of a same group of companies would be bound by an arbitration clause, whether always in or in determined circumstances. What is relevant is whether all parties intended non-signatory parties to be bound by the arbitration clause. Not only the signatory parties, but also the non-signatory parties should have intended (or led the other parties to reasonably believe that they intended) to be bound by the arbitration clause... The legal literature confirms that what is relevant is whether the non-signatory parties were intended to be bound, rather than a general rule about a group of companies : "[c]learly, however, it is not so much the existence of a group that results in the various companies of the group being bound by the agreement signed by only one of them, but rather the fact that such was the true intention of the parties" (Fouchard, Gaillard, Goldman : On International Commercial Arbitration, the Hague, 1999, n° 500, p. 283)".

[7]   See below, n° 21 and following.

-   the issue of consent to arbitration may take a special dimension when one (or more) company(ies) to a complex international transaction is (are) member(s) of a group of companies, given the nature of the relationships which exist between companies of such group;

-   in particular, consent to arbitrate may sometimes be implied from the conduct of a company of the group – although it did not sign the relevant arbitration agreement – by reason of its "implication" in the negotiation and/or the performance and/or the termination of the agreement containing the arbitration clause and to which one or more members of its group are a party;

-   but on the other hand, the sole fact that a non-signatory company is part of a group of companies, one or more other members of which have signed the agreement containing the arbitration clause, is not *per se* a circumstance which is sufficient to permit the "extension" of the clause to the non-signatory.

### E.  Inadequate qualifications

10.    Courts and arbitral tribunals sometimes qualify an issue as one of jurisdiction of the Arbitral Tribunal on a non-signatory when the problem to which the court is confronted is of a different nature. One illustration is the *Peterson Farms* case which ended in an English Commercial Court decision of 4 February 2004[8] in which the Court had to decide on a challenge under Section 67 of the 1966 English Arbitration Act of an award in which the Tribunal had decided that it did have jurisdiction to consider and determine the damage claims of other entities within the claimant's group, which were not parties to the arbitration. It is clear that the issue submitted to the Commercial Court was not a real issue of jurisdiction in relation to a group of companies. It was rather an issue of the

---

[8]    "Peterson" Farms Inc v. C&M Farming Ltd, [2004] EWHC 121 (Comm). For an analysis of the decision, see "Complex Arbitrations", *supra* note 1 at 462 and following. See also a.o. John Leadley and Liz Williams, *Peterson Farms: There is no group of Companies Doctrine in English Law*, [2004] Int. A.L.R. 111, John P. Gaffney, *The Group of Companies Doctrine and the Law Applicable to the Arbitration Agreement*, 2004 Mealey's International Arbitration Report, 47; Otto Sandrock, The Group of Companies Doctrine forms no part of English Law – Ein bemerkenswertes Urteil der Queen's Bench, 2005 IDR 51. See also in re. *Scaplake*, QB, [1978] 2 Lloyd's Rep. 380 and *Roussel-Uclaf v. Searle*, Ch. D., [1978] 1 Lloyd's Rep. 225.

extent of the damages that could be recovered by claimants, purchasers of live poultry which were subsequently sold to other group entities and to other purchasers. The real question to which the arbitrators and subsequently the Court were confronted was rather whether the purchasers, claimants in the arbitration, could also recover, beyond the damages they had suffered, the damages suffered by companies closely connected to them and to the contractual scheme? The issue was therefore not an issue of jurisdiction *ratione personae* but rather a classical issue of pass-through claim, which is not specific to groups of companies and does not necessarily have to be decided on the basis of the group of companies doctrine, as the Court did.

### F.   Inadequate use of the expression "Piercing the corporate veil"

11.   The concept of "piercing the corporate veil" is often used, especially in the United States, as synonymous with "extending the arbitration clause to a non-signatory". This is totally wrong and inappropriate. Piercing the corporate veil means that one will go behind the corporate veil of the company and hold its owners liable for the corporation's commitments. But this theory, in most legal systems, has a very limited scope of application. It will be applied only if the owners exercised complete control over the corporation with respect to the transactions at issue and such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil[9].

### G.   Distinction of the non-signatory issue from Joinder and Consolidation

12.   The issue of "extension" of the arbitration clause to non-signatories should be clearly distinguished from the issues which are usually referred to as :

- joinder : that is, whether a non-party to the arbitration may intervene in the arbitration proceedings, once they have been initiated, or whether a party to the arbitration proceedings (Claimant on the one hand, Respondent on the other hand) may join a non-party during the arbitration;

---

[9]   In the same vein, one could also regret the sometimes abusive reference by counsel to the theory of alter ego.

- consolidation : that is, if multiple disputes that arise from, or in connection with, different contracts, must in the first place be the object of separate arbitration requests, can the arbitral proceedings be subsequently consolidated? It should however be pointed out that in the United States, the word consolidation has a broader meaning. It also overlaps to some extent the issues of group of contracts, i.e., the question of whether it is possible to bring into one "consolidated" arbitration proceeding all the disputes arising from various connected agreements. In this respect, it is not unusual for parties under these various contracts to petition a court in the United States to consolidate their disputes in advance in one arbitration procedure.

**H.    Do the issues of extension to a State and to a company arise in the same terms?**

13.    This problem is complex and would deserve long developments. I will limit myself in this article to a few basic remarks concerning arbitrations based on a contract. According to Fouchard, Gaillard and Goldman[10], the problem of "extension" to the State of an arbitration agreement concluded by government entities does not arise in terms which are different from those of the extension of the scope of an arbitration clause within a group of companies (even if the issue may raise additional problems such as immunity from jurisdiction). In both cases, it is the intention of the parties that is the main criterion to determine the scope *rationae personae* of the arbitration clause. This is undoubtedly correct. But is it possible in relation to States, to reason the problem as it is done with groups of companies, when a court is asked to decide on the extension of the arbitration clause by application of theories such as *alter ego*, agency or third party beneficiary? Some authors have expressed serious doubts. It is worth in this respect to cite the critics addressed by Professor Roger Alford to the decision of the United States Court of Appeals for the Fifth Circuit in *Bridas S.A.P.I.C. v. Government of Turkmenistan*[11] in which the Court considered unjustified and therefore invalidated the decision of an ICC

---

[10]    p. 290 and following.

[11]    345 F. 3d 347 (5th Cir. 2003) rehearing and rehearing en banc denied, 84 Fed. Appx 472 (5th Cir. 2003), cert. denied, 124 S.Ct. 1660, 158 L.Ed. 2d 357 (2004); Binding Sovereign Non-Signatories, 19-3 Mealey's Intl. Arb. Rep. 14 (2004) ; summary of the decision by C. Lamm, E. Hellbeck and A. Kovina in 2004 Int'l A.L.R., N - 58.

Dossiers BH/Publications/Non Signatories in International Arbitration

9

Arbitral Tribunal to extend to the Government of Turkmenistan the arbitration clause contained in an agreement concluded by Bridas and entities owned by the Turkmen Government : *"thus, the goal of such government instrumentalities is to create within the government structure a special enterprise that resembles a private corporate entity in form and purpose. Such entities often are created devoid of any traditional regulatory function, and specially established for the purpose of engaging in commercial activities. Thus, while the entity itself may resemble a private corporation, the motivation of the government in establishing the entity, and the relationship of that entity vis-à-vis its "parent" are quite distinct. Bridas virtually ignored these distinctions, assuming that principles derived in the private sphere could be brought and applied in the government context. For example, in holding that the District Court erred in its alter-ego determination, the Court imposed a test for parent-subsidiary alter ego status that is far removed from the context of government instrumentalities. One cannot address, as the Court requires, whether the government of Turkmenistan is the alter ego of Turkmeneft based on the fact that the parent and subsidiary have "common business departments" or "consolidated financial statements" or "common directors and officers" or "common stock ownership". In addition, the Court utilized traditional third-party beneficiary cases without addressing the special rules applicable to government contracts that may reflect public policies that afford rights to third parties to enforce the agreement. Likewise, in its analysis of agency, the Court utilized traditional notions of private agency to determine whether an "agency relationship" existed between Turkmeneft and Turkmenistan. Yet government agencies and instrumentalities do not easily lend themselves to such private comparisons. ... As difficult as it may be to develop a more accurate analysis of the circumstances under which a sovereign non-signatory should be bound by the signature of its instrumentality, Bridas certainly underscores the hazards of freely transposing criteria established in the private sector to government contracts."*[12]

---

[12] Under United States law, the mere status of an entity as an agency or instrumentality of a foreign State is insufficient to subject the foreign State to suit for the agency or instrumentality's wrongdoings. US Courts generally look to the principal / agent relationship between a sovereign and a State-owned entity, or to abuses of the corporate form, such as where the State-owned entity is in fact an *alter ego* of the sovereign, or merely a corporate shell. Often this entails a fact-based inquiry into the level of control over the day-to-day operations of the instrumentality. US Courts also conduct a separate inquiry, namely whether principles of fairness and equity mandate that the State-owned entity's

## I.   **Procedure and strategy**

14.   From a strictly procedural point of view, the issue of whether the arbitration clause signed by a company of the group should be extended to other companies of the same group – non-signatories – is an issue of jurisdiction that the parties sometimes ask the arbitral tribunal to decide in a partial award, in a preliminary phase of the arbitration. This is not always possible. The decision on jurisdiction often depends upon the facts of the case and therefore, on the evidence that will be submitted by the parties on the merits. On the other hand, it sometimes happens that the issue of "extension" will require the arbitrators to decide collateral procedural issues at an early stage of the arbitration, even before the signature of the terms of reference. For example, in ICC case n° 13041 of 2004[13], claimant had initiated the arbitration procedure against the party with which it had concluded a contract containing the arbitration clause, but also against other companies of the group. To support its case, claimant filed with its request for arbitration, a number of documents that had been exchanged between the parties, including the non-signatories, during settlement negotiations. Respondents immediately objected to the communication of these documents and asked the arbitral tribunal to order claimant to exclude them from its file. Extensive submissions were exchanged by the parties on this issue, before the signature of the terms of reference. After an oral hearing, the arbitral tribunal issued a procedural order on the issue of admissibility of the documents. The parties settled soon thereafter.

15.   One should also consider why one does want to join non-signatory companies as additional claimants or respondents. The reasons are various and often pertain to strategy: for example, the real party in interest is not the company that   signed the relevant agreement but rather a subsidiary or the parent company of the group; or the company that has signed the arbitration clause is insolvent while the other subsidiaries of the group

---

corporate form should be disregarded. Lamm and Aqua, *supra* note 2, p. 89 and 90 and references cited.

[13]   Unpublished.

or the parent company are not; or the victim of the damage resulting from a breach of contract or a tort committed by respondent, is not the company that signed the contract containing the arbitration clause with respondent but other companies of the group. Other parties invoke the fact that justice would not be well-administered if a specific, additional, non-signatory respondent could not be a party to the arbitration. One will immediately point out that this is not a good argument. However far one is ready to stretch the concept of consent (and it may go as far as considering certain specific conduct as a substitute for consent), one should not forget that consent is the fundamental pillar of international arbitration.

## II.  THE IMPACT OF THE REQUIREMENT THAT THE ARBITRATION CLAUSE BE IN WRITING

16.     One will not dispute that an arbitration clause in writing is necessary to give jurisdiction to an arbitral tribunal. But by definition, if one wishes to join a non-signatory, it means that this particular company has not signed the arbitration clause. Can one say that there is therefore no arbitration clause in writing in relation to this particular company and that therefore it may not be joined to the arbitration? The Swiss Federal Supreme Court, in its landmark decision of 16 October 2003[14], had the opportunity to address this fundamental issue, which might be called the "formal" issue. It answered the question in the negative. The Court held that from the moment there is an arbitration clause, the issue of "extension" to a non-signatory may be considered. The fact that the clause or the contract containing the clause was not signed by the "non-signatory" is not a formal bar to the

---

[14]   X. S.A.L., Y. S.A.L. and A v/ Z, SARL and ICC Arbitral Tribunal, DFT 129 III 727. The decision has been commented by Laurent Lévy and Blaise Stucky in 2005 Int. A.L.R., N-5 and 2004 Rev. Arb. 695, 707; Otto Sandrock, *Die Aufweichung einer Formvorschrift und anderes mehr*, 2005 German Arb. J. 1; François Knoepfler and Philippe Schweizer, Jurisprudence suisse en matière d'arbitrage international, Revue Suisse de Droit International et de Droit Européen, 2005, p. 158 and Jean-François Poudret, *Un statut privilégié pour l'extension de l'arbitrage aux tiers*, 22 ASA Bulletin 390 (2004). According to Poudret, the Federal Court gives a privileged status to the extension of the arbitration clause and therefore creates a discrimination between the initial parties and the non-signatory.

"extension"[15]. In the words of the Swiss Federal Court: *"this formal requirement (contained in article 178 al. 1 of the Swiss Law on Private International Law) only applies to the arbitration agreement itself, that is to the agreement ... by which the initial parties have reciprocally expressed their common will to submit the dispute to arbitration. As to the question of the subjective scope of an arbitration agreement formally valid under article 178 al. 1 – the issue is to determine which are the parties which are bound by the agreement and eventually determine if one or several third parties which are not mentioned therein nevertheless enter into its scope ratione personae –, it belongs to the merits and should consequently be decided in the light of article 178 al. 2 LDIP"*[16] (which provides that the arbitration agreement is valid, as to its substance, if it meets the conditions either of the law chosen by the parties, or the law governing the subject matter of the dispute, and in particular, the law applicable to the main agreement, or Swiss law).

17.    In the United States too, it is accepted that even though there must be an agreement in writing to arbitrate, there is no requirement that this agreement be signed. Therefore, from the moment there is a written agreement, US Courts have held that a non-signatory may be considered in an appropriate case to have agreed to it or may be bound to submit to arbitration and that the ensuing award can be entitled to the protection of the New York Convention[17].

18.    In France, when confronted with the objection that the non-signatory did not sign the arbitration agreement, arbitral tribunals have also from time to time held that the French law of international arbitration does not subordinate the validity of the arbitration provision to compliance with formal requirements[18].

---

[15]    This principle is also often referred to in the U.S. case law. See for example *McCarthy v. Azure*, 22 F. 3d 351, 355-56 (1st Cir. 1994).

[16]    DFT 129 III 736.

[17]    See for example *Fisser v. Int'l Bank*, 82 F. 2d 231 at 233 (2d Cir. 1960) and *Interocean Shipping Co. v. Nat'l Shipping and Trading Corp.*, 523 F. 2d 527 at 539 (2d Cir. 1975).

[18]    See for example ICC award in cases 7604 and 7610 of 1995, 125 J. Droit Int'l (Clunet) 1027 (1998) and 4 ICC Awards, 510 and note D.H.

## III.   ANALYSIS OF THE CASE LAW

19.    There is no place in this limited article to analyze, case-by-case, all the court decisions and arbitral awards that have dealt with the issue of "extension" of the arbitration clause to non-signatories. This analysis has been done in other writings[19]. The reader is referred to them. I will limit my comments to an analysis of the factual patterns that one encounters in the case law and to a presentation of the general conclusions that may be drawn from an analysis of thirty years of awards and court decisions.

### A.    The factual schemes

20.    The arbitral awards and court decisions in which tribunals have been confronted with the issue of "extension" of the arbitration clause to non-signatories may be subdivided into some 12 different factual patterns that may themselves be put into two groups: "extension" of the clause to one or several other defendants, and "extension" to one or several other claimants.

- "extension" to one or several non-signatories as additional defendants:
    - to the parent company of the group;
    - to a State;
    - to one or more subsidiaries or one or more companies of the group that are not subsidiaries;
    - to a sister corporation and an employee;
    - to another company, unrelated to the signatory;
    - to a director or general manager or CEO or to the owner of the group;
    - to an individual, possibly a majority shareholder of the group, and another company within the group;

---

[19]    In particular in Complex Arbitrations, *supra* note 2.

- "extension" to one or several non-signatories as additional claimants;
  - to the parent company of the group;
  - to a State;
  - to an individual (possibly a majority shareholder of the group) and other companies within the group;
  - to one or more subsidiaries or one or more companies within the group that are not subsidiaries;
  - to a director and principal shareholder.

The various cases that fall within these categories are analyzed below.


### B.   Conclusions of the analysis

21.   It is very difficult to draw general conclusions from the above survey of the case law. The "extension" of the arbitration clause to other companies of the group – non-signatories – started in France, and still today, its courts and arbitrators are among the most innovative in the development of this jurisprudence: Swiss courts, on the other hand, appeared in the first place extremely reluctant to accept the "extension" of an arbitration clause to non-signatories but the Swiss Federal Court has considerably relaxed its jurisprudence. On the other hand, the German approach still appears to be more restrictive[20] and so seems to be also the position in England, where the so-called doctrine of group of companies is said to be inconsistent with the principle of privity of contract, the principle of the corporate veil and the treatment of derivative actions[21]. Moreover, the principles of *lex mercatoria* are not part of English law. The issue of who is party to the arbitration clause is therefore mainly viewed as an issue of consent, but "extension" may nevertheless be achieved by

---

[20]   According to Poudret and Besson, Droit comparé de l'arbitrage international, 2002, L.G.D.J., p. 237, the German doctrine, following Sandrock and Schlosser, rejects the theory of groups of companies and only admits in a very restrictive way the theory of piercing the corporate veil (Durchgriff). They point out that various authors like Raeschke-Kessler and Berger, consider that the German jurisprudence lies way behind the arbitral practice in this area.

[21]   See in particular the landmark decision *Peterson Farms Inc. v. C&M Farming Ltd.*, [2004] EWHC 121 (Comm.), footnote 8 above.

recourse to such other theories as agency, trust or piercing the corporate veil. The same theories are also applied in the United States, which to some extent appears to be one of the most liberal jurisdictions with respect to the "extension" of the arbitration clause to non-signatories.

22.     Subject to these reservations, a first conclusion may be drawn from the awards and court decisions to the effect that the determination of whether an arbitral clause should be extended to other companies of the group or its directors or shareholders is "fact specific" and may differ depending upon the circumstances of the case[22]. As was expressed by the arbitral tribunal in its first interim award in ICC case no. 9517[23]: *"... the question whether persons not named in an agreement can take advantage of an arbitration clause incorporated therein is a matter which must be decided on a case-to-case basis, requiring a close analysis of the circumstances in which the agreement was made, the corporate and practical relationship existing on one side and known to those on the other side of the bargain, the actual or presumed intention of the parties as regards rights of non-signatories to participate in the arbitration agreement, and the extent to which and the circumstances under which non-signatories subsequently became involved in the performance of the agreement and in the dispute arising from it"*.

23.     A second conclusion is that arbitral tribunals do not often base their decision to extend the clause or not on a prior determination of the applicable law. Starting from the principle of autonomy of the arbitration clause, they generally feel free to determine their competence according to what they consider to be – on the basis of the facts of the case – the common intention of the parties, also taking into consideration the usages of international trade.

---

[22]   Smith/Enron Cogeneration Ltd P'ship v. Smith Cogeneration Int'l, Inc., 198 F. 3d 88, 97 (2d Cir. 1999).

[23]   30 November 1998, unpublished.

24.  There seems on the other hand to be an agreement that the existence of a group of companies is not *per se* a sufficient element to allow the "extension" to a non-signatory of an arbitration agreement concluded by another member of the group.

25.  In most cases, courts and tribunals require proof of the existence of an intention at least implicit of all the parties that the non-signatories be parties to the underlying contract and its arbitration clause[24]. Some courts however limit themselves to an awareness of the clause and the requirement that the additional claimant or defendant be concerned by the dispute. But the company concerned must always have played a role in the conclusion and the performance of the agreement and this has to be proved by the party requesting the "extension" of the clause.

26.  The analysis of the arbitral awards also leads to the emergence of a rebuttable presumption that a parent company binds its subsidiaries[25] but that, on the other hand, only companies that have participated in the conclusion and performance of the agreement will be bound by the contract and the arbitration clause.

27.  Various other elements equally play a role in the decision to extend the clause to a non-signatory:
     - the fact that the other party has obviously entered into the agreement with a group as a whole and did not really care which companies would be involved in its performance, assuming that the determination of the signatory companies only concerned the details of performance of the contract;

---

[24]  However, in a recent decision, the Dutch Supreme Court decided that the "extension" could only take place if the will of the non-signatory to adhere to the arbitration agreement was clear and expressed without doubt, since it implied a waiver by the relevant individual or company of its constitutional right of access to the national court system. Hoge Raad (Civil Chamber) 20 January 2006, NJ 2006/77, JOL 2006, 40, RVDW 2006, 109. See in contrast, the much more liberal approach of the Spanish Supreme Court in its May 26, 2005 decision, *ITSA v. Satcon & BBVA* (although the case did not properly address an issue of "extension" of the arbitration clause to a non-signatory but rather an issue of group of contracts).

[25]  *See also* K. Berger, *The Creeping Codification of the Lex Mercatoria*, principle 50 at 300, and M. Mustill, *The New Lex Mercatoria*, in Liber Amicorum for Lord Wilberforce (Clarendon Press, 1987) principle No. 8, at 176.

- or the fact that all the companies concerned have participated in the rights and obligations of the contractual relationship (in what has sometimes been called "a total confusion").

28.    The application of the theory of lifting the corporate veil is generally considered to be limited to cases of fraud, abuse of rights, and violation of mandatory rules. It should moreover be pointed out that this theory is very often wrongly presented and applied by advocates. They invoke the theory to extend the arbitration clause, beyond the company whose corporate veil allegedly has to be lifted, to the owners of the company. In many legal systems, this is not correct: lifting the corporate veil means that the legal personality of the company is disputed and has to be lifted and that therefore the action should be directed only to its owners, those who stand "behind the corporate veil". In other words, it is often "the shareholders instead of the company" and not "the company plus the shareholders". Before raising such a theory one should therefore have in the first place a good understanding of basic principles of corporate law, which is not always the case[26].

29.    It is also admitted that the "extension" of the clause can never be considered a sanction of the conduct of the non-signatory.

30.    Arbitral tribunals and courts have also emphasized the right to use a group structure as appropriate, but once a choice has been made, it must be fully assumed. In this respect, the use of a company vehicle for tax or other reasons is not *per se* an argument to justify lifting the corporate veil and extend the arbitration clause to the underlying shareholders.

31.    It seems that at least in a great number of cases, a good test to decide whether an "extension" of the clause is appropriate is to determine whether the same solution would

---

[26]    As Professor Roger Alford rightly pointed out in "Binding Sovereign Non-Signatories", 19-3 Mealey's Intl. Arb. Rep 14 (2004), "[i]n debating whether to "pierce the corporate veil" or treat the principal as the alter ego of the subsidiary, the arbitration community often appears to have ignored the admonition of the Supreme Court, resorting to "worn epithets" as a substitute for "rigorous analysis". Yet, as the Supreme Court has warned, "[m]etaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it" (citing *First National City Bank v. Banco Para El Comercio Exterior ("Bancec")*, 462 U.S. 611, 623 (1983)).

be justified if the situation was reversed. In other words, it is tentatively suggested that the principles used to determine the eventual "extension" of the clause to additional defendants should also be applied when the case concerns additional claimants and vice versa[27].

32.    Finally, it appears that in relation to the issue of "extension" of the clause to non-signatories, American case law is much more liberal than any in Europe, at least in some Circuits[28], the paramount concern of the courts being the "federal policy favouring arbitration".

## IV.    THE CHALLENGE OF AWARDS BY NON SIGNATORIES

33.    An arbitral award can be set aside in the State where it was made. National laws generally provide that such an application to set aside is available to the parties, either when the arbitral tribunal has not been validly constituted, or has exceeded its jurisdiction or powers, or where the principle of contradiction and of the rights of defence have not been respected, or in the event of a violation of international public policy[29].

---

[27]    Although, as it was rightly pointed out by the sole arbitrator in ICC case n° 11405 (unpublished, commented in Complex Arbitrations at n° 158), *"a distinction should be made between the case in which a claimant submits that it is a proper party to the arbitration ... and the case in which a respondent objects to the jurisdiction of an arbitral tribunal ... In the former case, the claimant non-signatory party expressly confirms that it intended to be bound by the arbitration clause. In the latter case, the respondent non-signatory party objects and submits to have never accepted the arbitration clause: it is then much harder for the claimant to extend the scope of the arbitration clause to the non-signatory party, as the claimant has to demonstrate the intent (or apparent intent) of the non-signatory party"*.

[28]    Some Circuits are less liberal than others. See for example the decision of the Fifth Circuit in Westmoreland v. Sadoux, 299 F. 3d 462 (5th Cir. 2002) in which the Court refused the extension to a non-signatory. It pointed out that *"... the courts must not offer contracts to arbitrate to parties who failed to negotiate them before trouble arrives. To do so frustrates the ability of persons to settle their affairs against a predictable backdrop of legal issues"*.

[29]    See for example article 1704 C.J. in Belgium or article 1484 NCPC in France, or article 34(1) and (2)(a)(ii)(iii)(iv) and b(ii) of the UNCITRAL Model Law on International Commercial Arbitration.

34.   Similarly, the recognition or enforcement of the award can equally be refused, by virtue of Article V of the New York Convention[30] on the following grounds:

   (a) the party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case[31]; or

   (b) the award deals with a dispute not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration[32]; or

   (c) the composition of the arbitral authority or the arbitral proceedings was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the laws of the country where the arbitration took place[33]; or

   (d) the recognition or enforcement of the award would be contrary to the public policy of that country[34].

National legislations concerning enforcement of arbitral awards generally provide for analogous grounds, in whole or in part[35].

35.   It is certain that the grounds cited above are such that would allow a party brought to arbitration proceedings (eventually consolidated) against its will[36] to lodge an application

---

[30]   Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 10 June 1958, reproduced in Appendix 4, below. To illustrate the problems which might arise, see i.a. the debate between S. Jarvin and A.J. van den Berg over the consolidation provisions of the Netherlands Arbitration Act 1986 in 3 Arb. Int'l 254, 257 (1987).

[31]   V, 1, b.

[32]   V, 1, c.

[33]   V, 1, d.

[34]   V, 2, b.

[35]   In Belgium, see article 1710(3) as well as 1723 of the Code Judiciaire of which paragraph 3 refers to the grounds to set aside set out in article 1704.

[36]   But, on the other hand, a non-signatory to an arbitration agreement, who initiated arbitration proceedings and signed the Terms of Reference prior to the arbitration, may not later oppose the enforcement of an interim award of costs issued by the arbitrator after he has determined that he had no jurisdiction to entertain the proceedings because claimant was not a party to the written agreement containing the arbitration clause. He is bound by the award. The Terms of Reference are an arbitration agreement within the meaning of the New York Convention and the New Zeeland International

to set aside the award or to oppose its enforcement. Actions to set aside are quite frequent. On the other hand, decisions rendered in the context of enforcement proceedings are relatively rare. It remains that the risk of refusal of *exequatur* is a real one and should therefore encourage caution.

36.     One example of a case where an award was refused enforcement against an individual who was not a party to the relevant arbitration agreement but was considered by the Court a party to the arbitral proceedings, is the decision of the Supreme Court of British Columbia in *Re. Javor v. Francoeur*[37]. An arbitration was carried out under the rules of the American Arbitration Association pursuant to an arbitration agreement dated March 25, 1995 entered into between the claimants Eddie Javor and Fusion-Crete, Inc., and the respondent Fusion-Crete Products Inc. Javor and Fusion-Crete Inc. filed the arbitration not only against respondent Fusion-Crete Products Inc., but also against respondent Luke Francoeur, who was not a party to the arbitration agreement. However, the arbitrator accepted jurisdiction over Francoeur considering that there was no separation between himself and the corporate respondent, thus he was the *alter ego* of Fusion-Crete Products Inc. The arbitrator did not decide that Francoeur was a party to the arbitration agreement but that he was a proper party to the arbitration proceedings. He found Francoeur *"personally liable for any debts of the corporation that might ultimately be imposed in these proceedings ..."*. He also found that Francoeur was liable jointly with the corporation to pay the costs of the arbitration.

37.     Javor and Fusion-Crete Inc. sought an enforcement order against Francoeur under the provisions of either the Foreign Arbitral Awards Act or the International Commercial Arbitration Act. The Supreme Court of British Columbia refused enforcement of the award. It considered that enforcement could be ordered only if the conditions provided in either act were fulfilled. This was not the case here since an arbitration agreement is the common foundation upon which each of the two statutes rest. As Francoeur was not a

---

Arbitration Act 1974. *Commonwealth Development Corporation (United Kingdom) v. Austin John Montague*, Court of Appeal of the Supreme Court of Queensland, 17 April 2000, 27 June 2000, 2000 [QCA 252].

[37]    2003 BCSC 350.

party to the arbitration agreement but was only found by the arbitrator to be a proper party to the arbitration proceedings, petitioners could not have an award for costs against him enforced under the FAAA or the ICAA.

38.    Another example of case in which enforcement of a foreign award was refused, on the ground that one of the parties condemned by the arbitral tribunal was a non-signatory to the arbitration agreement, is the decision of the United States Court of Appeals for the Second Circuit in *Sarhank Group v. Oracle Corporation*[38]. Unfortunately, the decision is wrong, being based on a totally erroneous interpretation -- that we have denounced several times[39] – of the term "arbitrability" referred to in Article V (2) of the New York Convention. Article V (2)(a) of the Convention, provides that a court may refuse to enforce a foreign award if the subject matter was not capable of settlement through arbitration. The "arbitrability" concept used in this article refers to a very restricted and shrinking core of disputes pertaining to public policy that legislators have reserved for the jurisdiction of their national courts (criminal law, family law …). In the history of the Convention, there have not be more than a few cases in which enforcement has been refused on the basis of Article V (2)(a). This article has in any case nothing to do with the stretched and unusual theory of arbitrability prevailing in the United States, which in other parts of the world is rather referred to as the determination of the scope *rationae materiae* and *rationae personae* of the arbitration agreement. In other words, enforcement may not be refused under Article V (2)(a) of the New York Convention on the basis of the fact that one of the parties over which the arbitral tribunal accepted jurisdiction, did not sign the relevant arbitration agreement. This is however what the United States Courts of Appeals unfortunately did in the *Sarhank Group* decision.

39.    An Egyptian corporation, Sarhank Group ("Sarhank") had entered into an agency agreement with Oracle Systems Ltd. ("Oracle Systems"), under which Sarhank agreed to act as provider of Oracle products and services within Egypt. Oracle Systems is a wholly-

---

[38]    404 F. 3d 657 (2d Cir. 2005).

[39]    See for example Hanotiau B., L'arbitrabilité, in The Hague Academy of International Law, 296, Collected Courses, p. 42 (2003).

owned subsidiary of Oracle Corporation ("Oracle"), a United States software manufacturer incorporated under the laws of Delaware. A few years later, a dispute arose between the contracting parties and Oracle Systems terminated the agreement. As a result, Sarhank commenced arbitration against both Oracle Systems and Oracle, the parent company. An arbitral tribunal was constituted under the auspices of the Cairo Regional Center for International Commercial Arbitration. Oracle argued that the tribunal lacked jurisdiction over it since it had not signed the agreement with Sarhank. The tribunal rejected the objection and affirmed its jurisdiction over Oracle on the basis that Oracle Corporation was a consolidated partner with Oracle Systems in the relation with Sarhank. The arbitral tribunal also decided that, as a matter of Egyptian law, despite their having separate legal personalities, subsidiary companies to one group of companies are deemed subject to the arbitration clause incorporated in the contract because contractual relations cannot take place without the consent of the parent company owning the trademark by and upon which transactions proceed[40]. In the arbitrators' view, a group of companies' analysis was particularly appropriate since the agreement granted Oracle Systems a right to assign its rights and obligations to "an affiliated company" without Sarhank's consent. Finally, the tribunal rendered an award in favor of Sarhank jointly and severally against Oracle and Oracle Systems. The award was subsequently upheld by the Egyptian Court of Appeals and the Egyptian Court of Cassation.

40.    Sarhank moved to enforce the award in the United States Federal Court on the basis of the New York Convention. On October 8, 2002, the U.S. District Court for the Southern District of New York confirmed the award and directed that judgment be entered accordingly. The District Court rejected Oracle's defenses that the arbitrators lacked authority to determine arbitrability and to impose liability on Oracle and that enforcement of the award would be contrary to American public policy. The decision was appealed. The Second Circuit refused enforcement on the basis of Article V (2) of the Convention considering that *"under American law, whether a party has consented to arbitrate is an issue to be decided by the Court in which enforcement of an award is sought. An*

---

[40]    At 662.

Dossiers BH/Publications/Non Signatories in International Arbitration

23

*agreement to arbitrate must be voluntarily made, and the Court decides, based on general principles of domestic contract law, whether the parties agreed to submit the issue of arbitrability to the arbitrators*[41]. The Court considered that it was for itself to determine whether the dispute was "arbitrable" in relation to Oracle. It considered that it was not, stating that *"an American non-signatory cannot be bound to arbitrate in the absence of a full showing of facts supporting an articulable theory based on American contract law or American agency law"*.

41.    As pointed out by two American commentators[42], the Court could have based its decision not to enforce on other articles of the Convention. It could for example have formed a view that no arbitration agreement existed as between Sarhank and Oracle and that therefore, the arbitrators exceeded their authority. Alternatively, it might have concluded that the application of a group of companies' analysis in this case offended United States public policy. But choosing the "arbitrability" exception was undoubtedly an erroneous decision.

42.    On the other hand, in *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GmbH*[43], the United States Court of Appeals for the Fourth Circuit confirmed the enforcement of an award involving a non-signatory to the arbitration agreement. The main issue under article II (1) and V (I)(a) of the New York Convention was whether an award could be enforced against a predecessor-in-interest of one party when the predecessor was not a party to the arbitration agreement. The predecessor of International Paper Company, Westinghouse Electric Corporation, had agreed to buy an industrial saw manufactured by Schwabedissen Maschinen, through its United States distributor, Wood Systems Incorporated. A purchase order was sent by Schwabedissen to Wood, without Westinghouse signature. This purchase order included an ICC arbitration clause. In other

---

[41]    Citing the Supreme Court decision in *First Options* v. *Kaplan*, 514 US. 938, 943 (1995).

[42]    Barry H. Garfinkel and David Iherlihy in *Looking for law in all the wrong places : The Second Circuit's decision in Sarhank Group v. Oracle Corporation*, 20-6 Mealey's Intl. Arb. Rep. 12 (2005). The two authors approve our conclusion.

[43]    206 F. 3d 411 (4th Cir. 2000).

words, the arbitration clause was included in a document that Westinghouse did not sign. A dispute arose between the parties and International Paper initiated arbitration against Schwabedissen. The arbitral tribunal held that there was no agreement between Schwabedissen and International Paper and therefore no basis for the arbitration. The arbitrators assessed costs against International Paper.

43.    International Paper refused to comply with the award and Schwabedissen sought its enforcement in the United States District Court. The District Court granted Schwabedissen's motion to enforce the arbitral award. The Court of Appeals confirmed it. It pointed out that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him or, in other words, when it receives a direct benefit from the contract. Quoting *Avila Group, Inc. v. Norma J. of California*[44], the Court pointed out that "*to allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act*".

## CONCLUSION

44.    The issue of "extension" of the arbitration clause to non-signatories would be easier to decide if it were approached by courts and commentators in a more rigorous way. Confusion with related issues, such as those arising from the existence of a group of contracts that do not all contain the same or compatible arbitration or jurisdiction clauses, the reference to inadequate qualifications, the inadequate use of expressions such as piercing the corporate veil or the unnecessary or arbitrary reference in some cases to the so-called group of companies doctrine, obscure the analysis and may even lead to totally unwarranted results.

---

[44]    426 F. Supp. 537, 542 (S.D.N.Y. 1977).

45.   On the other hand, there is not one unique answer to the issue with which we have dealt. Indeed, it is in the first place fact specific. On the other hand, it results from a proper analysis of the case law that courts and arbitral tribunals generally follow the same scheme of reasoning. Their decisions are rarely based — and should not be based — on considerations such as equity or good administration of justice. The solution they reach is founded in most cases on a prior determination of who is a party to the arbitration clause, or who has adhered to it, or who eventually is estopped from contending that it has not adhered to it, such adhesion being decided on the relevant individual or company's consent, either express, or implied through its conduct in the negotiation, performance and termination of the agreement.

# EXHIBIT 38



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

URS CORPORATION,                )
                                )
                                )
                                )
                                )
                     Plaintiff,)    Civil Action No. 06-415 (SLR)
                                )
v.                              )
                                )
THE LEBANESE COMPANY FOR        )
THE DEVELOPMENT AND             )
RECONSTRUCTION OF BEIRUT        )
CENTRAL DISTRICT SAL, a/k/a     )
SOLIDERE,                       )
                                )
                                )
                    Defendant.)
                                )

EXPERT REPORT OF GENE L. DEETZ

# Table of Contents

1.  Qualifications / Experience ...........................................................................1

2.  Scope ...........................................................................................................2

3.  Background ..................................................................................................3

A. Timeline .........................................................................................................3

B. Financial and Operational Considerations ..........................................................5

4.  Analysis .......................................................................................................7

A.  Subsequent to Radian's acquisition by URS, Radian's parent corporations
    transferred assets from Radian to URS . ..........................................................7

    1.  Capitalization and Viability Analysis .................................................7

    2.  Corporate Governance ....................................................................10

    3.  Post-Acquisition Management: Plans and Implementation ................11

    4.  Operational Realities ......................................................................13

B.  Radian did not have sufficient assets to meet its current obligations, including
    payroll and other incidental daily operating expenses, and these obligations
    were paid by URS ............................................................................................16

C.  There is cause for confusion about whether Radian or URS was responsible for
    the Normandy Landfill Project ........................................................................20

    1.  External Documents ........................................................................20

    2.  Internal Correspondence ..................................................................24

    3.  Operational Resources .....................................................................24

    4.  Testimony .......................................................................................28

5.  Conclusion .................................................................................................29

Appendix 1: Resume of Gene Deetz

Appendix 2: List of Documents Considered

Appendix 3: Correspondence Relating to Request of Funds by Radian Lebanon Personnel

Appendix 4: Balance Sheet information for Radian Lebanon

# 1. Qualifications / Experience

1.      My name is Gene L. Deetz and I am the Principal in charge of the New York, New York office of Chicago Partners, LLC. Between May 1, 2002 and July 21, 2006, I was the Director in charge of the New York office of LECG Corporation, a global expert services firm. From February 19, 2001 through April 30, 2002, I was a Managing Director in the Strategic Valuation Practice of Arthur Andersen LLP, a public accounting firm. Prior to relocating to New York and Chicago, I was a partner at Stoughton Davidson Accountancy Corporation in Fresno, California (January 11, 1972 through May 31, 1998) and Noell, Deetz, Agnew and Morse also in Fresno, California (June 1, 1998 through February 18, 2001).

2.      I am a Certified Public Accountant (since 1975) licensed in the states of California, New York, and Pennsylvania, a member of American Institute of Certified Public Accountants and the California Society of Certified Public Accountants. I am an Accredited Valuation Professional and an Accredited Senior Appraiser and have appraised numerous companies under Generally Accepted Accounting Principles ("GAAP") and the Uniform Standards of Professional Appraisal Practice ("USPAP") over the course of my career. I have practiced in the areas of valuation, financial and goodwill accounting and auditing since 1972. This has included work as an audit staff, audit manager, and audit partner. I have also practiced in the area of accounting and auditing consulting involving, among other things, commercial damages, mergers and acquisitions, forensic accounting and securities litigation.

3.      I have conducted numerous valuations, damages calculations and studies in commercial damages, fraud, breach of contract, breach of fiduciary duty, and minority shareholder dispute matters. My valuation experience includes opinions on the fairness of various transactions to equity holders. The above-described work includes small, privately-owned companies, as well

1

as large, publicly-traded companies. Appendix 1 attached hereto is a copy of my current resume and recent testimony.

4.    Chicago Partners is being compensated at a rate of $550 per hour for my services. My compensation is entirely independent of my opinion and any outcome in this matter. Furthermore, I have no relationship with either of the parties to the above captioned matter. I have directed staff at Chicago Partners to assist in my analysis. These professionals have standard billing rates ranging from $180 to $500 per hour.

## 2. Scope

5.    I have been asked to consider the URS Corporation ["URS"] and Radian International LLC ["Radian"] parent/subsidiary relationship and to determine, based on documents and testimony produced in this matter, whether or not and to what extent those documents and testimony are consistent with Radian functioning as an ongoing, adequately capitalized and economically viable entity with independent management and adherence to corporate formalities. In my analysis of the economic viability and capitalization of the firm, I have considered both financial and economic factors that are generally accepted as relevant to valuation and viability, including liquidity, profitability, and leverage,[1] as well as Radian's corporate governance practices and its relationship with URS.[2]

6.    To conduct my analysis, I have relied on documents produced by URS providing background information on both URS and Radian, including financial information for URS and

---

[1] For instance, empirical evidence on the importance of these factors regarding the viability of a corporate entity is provided by Altman, Edward I., "Predicting Financial Distress of Companies: Revisiting the Z-Score and ZETA Models", working paper, July 2000, and Shumway, Tyler, "Forecasting Bankruptcy More Accurately," *Journal of Business*, 2001.

[2] For instance, empirical evidence on the importance of corporate governance in determining firm value is provided by Gompers, P. et al., "Corporate Governance and Equity Prices," *Quarterly Journal of Economics* 118 (1), Feb 2003. and Brown, L. and M. Caylor, "Corporate Governance and Firm Valuation," *Journal of Accounting and Public Policy*, Vol. 25, No. 4, 2006.

Radian, and corporate resolutions for those entities.   In addition, I have reviewed correspondence, answers to interrogatories, affidavits, and the following list of deposition testimony.

Deposition Testimony Reviewed
- Thomas Bishop, Senior Vice President of Radian and Senior Vice President of URS
- Amine Bou Onk, Vice President for Federal Programs Operations; General Manager of Lebanon Branch, URS; and Project Manager SOLIDERE, Reclamation of Normandy Landfill Phase II, Beirut Lebanon
- Alberto Cuenca, Regional Comptroller of Radian and Regional Controller of URS
- Kristin Jones, Legal Assistant to the General Counsel of URS; Corporate Secretary for certain URS entities and Assistant Corporate Secretary for other URS entities
- David Balfour, Senior Vice President and Secretary of Radian and Senior Vice President of URS

See Appendix 2 for a complete listing of documents considered.

7.      The conclusions reached herein are my own and are based on my review of the documents and testimony described above, my education, training, and expertise in economic and financial valuation and my review of the academic literature as appropriate.

## 3. Background

### A. Timeline

8.      In 1997, Radian was an international engineering and technical services firm that provided a wide range of environmental based consulting services to industries and governments around the world. The company had been formed in January 1996 as a joint venture between the Hartford Steam Boiler Inspection and Insurance Company and Dow Chemical Company.[3]

9.      In May 1998, Radian had 35 offices worldwide, 1966 employees, and 800 environmental consulting clients.  Gross revenues in 1997 were reported to be $303 million, and Radian's services included real estate audits, manufacturing plant audits, design and analysis of remediation plans, design of waste minimization plans, litigation support, public health risk

---

[3] Hartford Steam Boiler Inspection and Insurance Company, Form 10-K/A, filed July 3, 1997, pages 5 and 8.

assessment, regulatory and public policy analysis, compliance strategies, training, compliance software, compliance procedures manuals. Radian's other services included remediation activities, environmental consulting to insurers and policymakers, general risk management consulting, monitoring, modeling, environmental data management, control technology, environmental/troubleshooting, permitting, waste management, wastewater treatment design.[4]

10.    On July 31, 1998, Dames & Moore Group ["D&M"] acquired all of the membership interests of Radian for $117 million.[5] Prior to the acquisition, on June 30, 1998, the book value of Radian's total assets was approximately $157 million.[6]

11.    In January 1999, Radian was hired by SOLIDERE, Lebanon's largest company, to treat and process the waste contained in the Normandy Landfill. According to a press release, the contract price was $53 million, and the landfill contained five million cubic meters of waste.[7]

12.    In June 1999, URS acquired D&M for $376.2 million.[8] As of its fiscal year end in October 1999, URS had approximately 185 offices and approximately 15,700 employees. Revenues for fiscal year 1999 were approximately $1.4 billion, which was over 75% higher than 1998. Management stated that the increase in revenues was primarily attributable to the D&M acquisition.[9]

13.    I am not aware of any publicly available income statement or balance sheet information for Radian after 1998.

---

[4] Business Insurance, "Business Insurance Directory of Environmental Consultants", May 25, 1998.
[5] Dames & Moore Group, Form 8-K/A, filed on October 9, 1998 as of July 31, 1998.
[6] Dames & Moore Group, Form 8-K/A, filed on October 9, 1998 as of July 31, 1998.
[7] Reuters Press Release, "Beirut's Solidere awards U.S. Radian $53 mln contract", Jan 25, 1999.
[8] URS Corporation, Form 10-K, as of October 31, 1999, page 15.
[9] URS Corporation, Form 10-K, as of October 31, 1999, pages 6 and 11.

## B. Financial and Operational Considerations

14.    Consistent with the Uniform Standards of Professional Appraisal Practice ["USPAP"] and well-recognized economic literature, many factors should be considered in determining the valuation and economic viability of a corporation.[10] Certain key factors are described below:

- **Liquidity**

     Liquidity measures, such as the current ratio and the quick ratio, describe the firm's available cash. A firm's liquidity is an important consideration for both valuation and viability. As stated by Brealey and Myers, in their widely-used textbook on corporate finance, the reason why liquidity measures matter is that "firms with poor liquidity are more likely to fail and default on their debts."[11]

- **Profitability**

     Analyzing a firm's cash flows and profitability can provide important information regarding a firm's valuation and viability, because it reveals information about the firm's ability to survive its competition. In fact, analysis of projected revenues and costs is the basis for discounted cash flow analysis, a widely-used approach to valuation of both public and privately held entities.[12]

---

[10] For instance, empirical evidence on the importance of these factors regarding the viability of a corporate entity is provided by Altman, Edward I., "Predicting Financial Distress of Companies: Revisiting the Z-Score and ZETA Models", working paper, July 2000, and Shumway, Tyler, "Forecasting Bankruptcy More Accurately," *Journal of Business*, 2001. In addition, empirical evidence on the importance of corporate governance in determining firm value is provided by Gompers, P. et al., "Corporate Governance and Equity Prices," *Quarterly Journal of Economics* 118 (1), Feb 2003, and Brown, L. and M. Caylor , "Corporate Governance and Firm Valuation," *Journal of Accounting and Public Policy*, Vol. 25, No. 4, 2006.
[11] Brealey, Richard, and S. Myers, *Principles of Corporate Finance*, McGraw-Hill, 6th ed.  page 826.
[12] The value-relevance of profitability and earnings was confirmed in a study of highly-leveraged transactions.  See Kaplan, Steven, and Richard Ruback, "The Valuation of Cash Flow Forecasts:  An Empirical Analysis", *Journal of Finance*, 1995.

- **Leverage**

> Leverage ratios indicate how much debt the firm holds, relative to its assets and
> its earnings. Like liquidity, leverage is an important consideration in
> determining the viability of a firm. According to Brealey and Myers, leverage is
> important because, "In extreme cases, if hard times come, firms with high
> leverage are liable to find that they cannot pay their debts."[13]

- **Corporate Governance Considerations**

> A firm's ability to survive as a stand-alone entity depends on the ability of its
> senior management team to act as independent and effective leaders. Firms
> require corporate leadership and strategic decision-makers who are unbiased.
> For instance, they should not have managerial responsibilities to maximize the
> shareholder value of a competitor entity. In general, the influence and
> importance of senior management on firm value has been demonstrated
> empirically.[14] In my analysis, I have also considered corporate governance
> measures including control and independence, which are relevant to valuation
> and viability, again consistent with USPAP.

15.    I have considered the above-listed factors in evaluating Radian's viability as a stand-
alone entity. In applying my analysis to the facts available, I have evaluated the unique facts and
circumstances surrounding the relationship between URS and Radian.

---

[13] Brealey and Myers, page 824.
[14] See, for example, Denis, D. and D. Denis, "Performance Changes Following Top Management Dismissals", *Journal of Finance*, Sept. 1995.

6

These pages were omitted for confidentiality.

US.[105] Any internal confusion on the part of senior management could also adversely affect the ongoing operations of the firm, potentially impacting its economic viability. In addition, Mr. Bishop's lack of information is inconsistent with careful and independent management of the entity.

## 5. Conclusion

67.    Based on my education, training, expertise, and review of academic literature as appropriate, as well as my analysis of documents and testimony produced in this matter, I have concluded that URS owns 100% of the member interests of Radian, URS and Radian have common directors and/or officers, URS finances Radian, Radian has inadequate capital, URS pays for Radian's expenses, the Normandy Landfill Project of Radian has been described as if it were URS business, URS uses the property of Radian as its own, executives of Radian do not act independently in its interests, and the formal legal requirements of the subsidiary such as the existence of an independent board of directors, have not been observed.

68.    The observations listed above are important considerations because they affect the valuation and viability of Radian as a stand-alone entity. Based on the factors listed above, I find that these facts are not consistent with Radian functioning as an ongoing, adequately capitalized and economically viable entity with independent management and adherence to corporate formalities.

69.    My opinions as expressed in this report reflect my review and analysis of the materials provided to date. My opinions may be further updated based on any new information that comes to my attention.



29

Submitted By:

_____    _____
Gene L. Deetz                           Date

Appendix 1

# GENE L. DEETZ

Principal
Chicago Partners, LLC
810 7th Avenue, Suite 11C
New York, New York 10019
Telephone:  (646) 354-4004
Facsimile:  (646) 354-4040

## CURRENT EMPLOYMENT

Chicago Partners, LLC
Principal, July, 2006 – Present

## EDUCATION

B.S. Economics (1972) California State University, Fresno, California

## PROFESSIONAL CREDITS

Certified Public Accountant (California, New York and Pennsylvania)
Accredited Senior Appraiser, American Society of Appraisers, Business Valuation
ABV Designation, American Institute of Certified Public Accounts

## TEACHING EXPERIENCE

Taxation of Real Property Transactions, Partnership Taxation
San Joaquin College of Law, Fresno, California

## PROFESSIONAL EXPERIENCE

LECG
Director, Valuation Services, 2002 – 2006

Arthur Andersen
Managing Director, Strategic Valuation Services, 2001 – 2002

Noell Deetz Agnew & Morse LLP
Partner in charge of Valuation and Litigation Support Services, 1998 – 2001

Stoughton Davidson
Partner in charge of Valuation and Litigation Support Services, 1972 – 1998

# CV AND SUMMARY OF TRIAL AND DEPOSITION TESTIMONY

Mr. Gene Deetz is a Principal at Chicago Partner's New York office. He specializes in providing accounting standards guidance, forensic accounting, valuation consulting for intellectual property, claims and dispute matters, and expert witness advice to clients and counsel in commercial, regulatory and tax controversy matters.

Prior to joining Chicago Partners, Mr. Deetz was the director of valuation services with LECG, LLC. He has also held positions as the managing director of strategic valuation services with Arthur Andersen, and the partner in charge of valuation and litigation support services with Noell Deetz Agnew & Morse, and Stoughton Davidson.

Mr. Deetz's strategic valuation experience includes financial advisory engagements, purchase price allocations, estate and gift tax planning, acquisitions and divestitures, and intangible asset valuations. Mr. Deetz has also provided valuation, business, economic and financial analyses on behalf of clients involved in a variety of disputes, over matters such as financial reporting before the Securities and Exchange Commission, business interests and intangible assets, securities litigation, contract claims, fraud and breach of fiduciary duty, minority shareholder actions, wrongful termination, and federal tax controversies.

He has worked on a variety of licensing projects and conducted valuations of various intangible assets including patents, trademarks/trade names, and trade secrets.

He has provided consulting in diverse industries including:

- Agriculture
- Cable Media
- Energy
- Food
- Pharmaceutical
- Retail
- Telecommunications

- Automotive
- Chemicals
- Fabricated Goods
- Forestry
- Printing & Publishing
- Service
- Transportation

- Branded Consumer Products
- Construction
- Financial Services
- Healthcare
- Recreation Products
- Technology
- Utilities

## Speeches and Seminars

Continuing Education courses for the California Society of Certified Public Accountants

## Professional Memberships

American Institute of Certified Public Accountants
California Society of Certified Public Accountants
American Society of Appraisers

## Summary of Valuation, Economic, Business, and Financial Analysis and Litigation Support Services:

- Prepared expert report in Securities Litigation matter regarding the application of SFAS 115.

- Performed various intangible asset valuations for companies wishing to value their entire business and business segments, as well as for companies considering licensing agreements. He has constructed various models to forecast cash flows generated from licensing in order to determine the cost/benefit of each model and implementation.

- Prepared valuation reports and forensic accounting analysis associated with acquisitions and divestitures, minority shareholder actions, securities class actions, gifts to universities, estate and gift tax planning matters, trademarks, trade names, patents and a variety of other intangible assets. He has presented his findings before the United States Tax Court, the Internal Revenue Service and Federal and State courts.

- Conducted complex damage studies involving lost sales, lost profits, incremental profits, capacity, fixed and variable costs, product line profitability, market place confusion, reasonable royalty and licensing rates, breach of contract, value of delivery contracts, withholding of assignment of lease, product failures, trademark and patent infringement, government contract claims, wrongful termination and eminent domain actions. He has presented federal tax controversy work before the United States Tax Court and the Internal Revenue Service, and also presented findings before Federal and State courts.

## Deposition and/or Trial Testimony (2002 – 2007):

- *Atlantic Coast Airlines Holdings, Inc., v. Mesa Air Group, Inc.,* United States District Court for the District of Columbia

- *Coelho v. Coelho,* Fresno County Superior Court

- *Downey Savings and Loan Association, F.A. v. Comdisco, Inc.,* United States Bankruptcy Court, Northern District of Illinois

- *J.C. Robinson Seed Company v. Garwood Seed Comp., Golden Harvest Seed, LLC, et. al.,* United States District Court for the District of Illinois, Peoria Division

- *IDT Corporation v. Telefonica, S.A., et. al.,* United States District Court, District of New Jersey

- *Perfect Care, Inc. v. Pharmaceutical Buyers, Inc., Abbott Laboratories, Inc. t/a Ross Products Division,* United States District Court for the District of New Jersey

- *Reinhart and Smith v. Lucent Technologies, Inc. v. National Union Fire Insurance Company, et. al.,* United States District Court for the District of New Jersey

- *The Proctor & Gamble Company, et al. v. The United States of America,* United States District Court for the Southern District of Ohio, Western Division

- *The DIRECTV Group, Inc. v. Darlene Investments, LLC,* United States District Court, Southern District of New York

- *The DIRECTV Group, Inc., et al. v. Darlene Investments, LLC, et al., and Darlene Investments LLC v. The DIRECTV Group, Inc. et al.,* JAMS Arbitration

- *JP Foodservice Distributors, Inc. v. Sorrento, Inc.,* Supreme Court of the State of New York, County of New York

- *Adelphia Communications Corp. v. Deloitte & Touche, LLP,* Court of Commonpleas, Philadelphia County, Pennsylvania

February 2007

Appendix 2

These pages were omitted for confidentiality.

Appendix 3

These pages were omitted for confidentiality.

Appendix 4

These pages were omitted for confidentiality.

# EXHIBIT 39

SECOND EDITION

# INTERNATIONAL
# COMMERCIAL
# ARBITRATION

## Commentary and Materials

Gary B.Born

 *Transnational Publishers*      *Kluwer Law International*

Published and distributed in North America by Transnational Publishers, Inc.
410 Saw Mill River Road
Ardsley, NY 10502

Phone: 914-693-5100
Fax: 914-693-4430
E-mail: info@transnationalpubs.com
Web: www.transnationalpubs.com

Published and distributed in the rest of the world by Kluwer Law International
P.O. Box 85889
2508 CN The Hague
The Netherlands

Phone: 31-70-308-1560
Fax: 31-70-308-1515

ISBN 1-57105-174-0 Transnational Publishers
ISBN 1-57105-175-9 Transnational Publishers (student edition)
ISBN 90-411-1559-5 Kluwer Law International

Copyright (c) 2001 by Transnational Publishers, Inc. and Kluwer Law International

All rights reserved. This book may not be reproduced, in whole or in part, in any form (beyond that copying permitted by U.S. Copyright Law in Section 107, "fair use" in teaching and research, Section 108, certain library copying, and except in published media by reviewers in limited excerpts), without written permission from the publisher.

Manufactured in the United States of America

## 2    Introduction

In many circumstances, national law permits parties to agree upon the arbitral procedures that will govern the resolution of their dispute. As a consequence, the procedural conduct of arbitrations can vary dramatically across industrial sectors,[2] arbitral institutions,[3] geographic regions,[4] and categories of disputes. In particular fields, or individual cases, parties may agree upon procedural rules that are tailor-made for their individual needs.

Aside from specialized fields, commercial arbitration often bears broad resemblances to commercial litigation in national courts; arbitration will frequently involve the submission of written pleadings and legal argument (often by lawyers), the presentation of documentary evidence and oral testimony, the application of "law" (in the form of judicial precedents and statutes), and the rendition of a reasoned, binding award. Nevertheless, in practice, arbitral procedures are usually less formal than litigation, particularly on issues such as pleadings and evidence.[5] Arbitration often lacks various characteristics that are common in national court litigation, including broad discovery, summary disposition procedures, and appellate review. In smaller matters, domestic arbitrations are frequently conducted without the participation of legal advisers, before a lay-arbitrator, according to highly informal procedures.

## 2. Special Characteristics of International Commercial Arbitration

International commercial arbitration is similar in important respects to domestic arbitration. As in domestic matters, international arbitration is a consensual means of dispute resolution, by a non-governmental decision-maker, that produces a legally-binding and enforceable ruling. In addition, however, international arbitration has several characteristics that distinguish it from domestic arbitration.

Most importantly, international arbitration is designed and accepted particularly to assure parties from different jurisdictions that their disputes will be resolved neutrally. Among other things, the parties usually seek an independent decision-maker, detached from the courts, governmental institutions, and cultural biases of either party. They also ordinarily contemplate the arbitrator's application of internationally-neutral procedural rules, rather than a particular national legal regime.

In addition, international arbitration is frequently regarded as a means of mitigating the peculiar uncertainties of transnational litigation. These uncertainties can include protracted jurisdictional disputes, expensive parallel proceedings, and choice-

---

2. In a number of industries, specialized arbitral regimes provide well-established means of dispute resolution. Examples include maritime, commodities, construction, and labor arbitration. *See, e.g.,* D. Johnson, *International Commodity Arbitration* (1991); F. Rose, *International Commercial and Maritime Arbitration* (1988); AAA, *Business Arbitration — What You Need to Know* (1992)(providing descriptions and bibliographies for construction, textile, apparel, and insurance arbitrations).

3. *See infra* pp. 13-19.

4. *See infra* pp. 27-41.

5. Arbitration can also involve extremely summary procedures, such as those in "fast-track" or "documents only" proceedings. In the latter, no oral evidence or hearings are permitted, with the parties relying entirely on written submissions and evidence.

of-law debates. International arbitration seeks to avoid these uncertainties by designating a single, exclusive dispute resolution mechanism for settling the parties' disagreements. Moreover, international arbitration awards are often more readily enforceable in jurisdictions other than their place of origin than national court judgments.[6]

## 3. Legal Framework for International Commercial Arbitration

Although international arbitration is a consensual means of dispute resolution, it has binding effect only by virtue of a complex framework of national and international law. As we discuss below, international conventions, national arbitration legislation, and institutional arbitration rules provide a specialized legal regime for most international arbitrations. This legal regime enhances the enforceability of both arbitration agreements and arbitral awards, and seeks to insulate the arbitral process from interference by national courts or other governmental authorities.

On the most universal level, the United Nations Convention on Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") has been ratified by more than 120 nations, including all significant trading states and most major developing states. The Convention obliges member states to recognize and enforce both international commercial arbitration agreements and awards, subject to limited exceptions.[7] Other international conventions impose comparable obligations on member states with respect to particular categories of disputes or with respect to particular bilateral or regional relationships.[8]

In addition, most developed trading states (and many other countries) have enacted national arbitration legislation that provides for the enforcement of international arbitration agreements and awards, that limits judicial interference in the arbitration process, and that authorises specified judicial support for the arbitral process.[9] National arbitration legislation typically affirms the capacity of parties to,

---

6. The existence of various international agreements — such as the New York Convention — providing for the recognition and enforcement of foreign arbitral awards facilitates the enforceability of such awards. *See infra* pp. 19-27. Many states have entered into bilateral or regional treaty regimes (such as the Brussels Convention) which give some foreign court judgments a high degree of enforceability. In contrast, the United States is not a party to any international convention or bilateral treaty relating to the enforcement of foreign court judgments. *See* G. Born, *International Civil Litigation in United States Courts* 938-39 (3d ed. 1996)..

7. The New York Convention is reproduced in Appendix B and is discussed in detail below. *See infra* pp. 19-23.

8. Other significant international agreements concerning arbitration include the Inter-American Convention on International Commercial Arbitration of 1975, *see* Appendix C and *infra* pp. 23-24; the Convention on the Settlement of Investment Disputes of 1965, *see infra* pp. 24-26; the 1961 European Convention on International Commercial Arbitration, *see* Appendix A; and bilateral treaties, *see infra* pp. 26-27.

9. Under the laws of many countries, international arbitration does not include contractual dispute resolution of issues of pure fact — such as valuation of property, verification of compliance with engineering specifications, or determination of conformity of goods with contract terms. Civil law states in particular distinguish between arbitration proper and the processes of valuation or appraisal. (Arbitration

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I hereby certify that on February 23, 2007, I caused to be served by hand delivery and

electronic mail the foregoing document and electronically filed the same with the Clerk of Court

using CM/ECF which will send notification of such filing(s) to the following:

> Edward P. Welch, Esquire
> Edward B. Micheletti, Esquire
> Skadden, Arps, Slate, Meagher
> & Flom LLP
> One Rodney Square
> P.O. Box 636
> Wilmington, DE 19899

I hereby certify that on February 23, 2007, I caused to be sent by Federal Express the

foregoing document to the following non-registered participants:

> Jeffrey H. Dasteel, Esquire
> Jason D. Russell, Esquire
> Marina V. Bogorad, Esquire
> Skadden, Arps, Slate, Meagher
> & Flom LLP
> 300 S. Grand Avenue, 34th Floor
> Los Angeles, CA 90071
> jdasteel@skadden.com

*Anne Shea Gaza*

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

RLF1-3089050-1