## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ONE RODNEY SQUARE

P.O. BOX 636

WILMINGTON, DELAWARE 19899-0636

———

TEL: (302) 651-3000

FAX: (302) 651-3001

www.skadden.com

DIRECT DIAL
302-651-3093
DIRECT FAX
302-651-3001
EMAIL ADDRESS
TVCLARK@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

March 19, 2007

<u>BY E-FILING & HAND DELIVERY</u>

Dr. Peter T. Dalleo
Clerk
United States District Court for the
District of Delaware
844 North King Street, Room 4209
Wilmington, Delaware 19801

> RE:    *URS Corp. v. The Lebanese Co. for the Development
> and Reconstruction of Beirut Central District, S.A.L.,
> a/k/a Solidere*, Civil Action No. 06-415-SLR

Dear Dr. Dalleo:

    I write on behalf of plaintiff URS Corporation with regard to the
Declaration of T. Victor Clark filed under seal on March 13, 2007. As stated in
paragraph 5, an article by Professor Ibrahim Fadlallah was included behind Tab 4,
for which the English translation was not available by the date of the filing.
Attached pursuant to Local District Court Civil Rule 7.1.3 (d) is an English
translation of that article.

    We will hand deliver to the clerk's office a copy for The Honorable
Sue L. Robinson. Thank you for your attention to this matter.

Respectfully,

/s/ T. Victor Clark

T. Victor Clark  (I.D. No. 4233)

Enclosure
cc:    Samuel A. Nolen

488803.01-Wilmington Server 1A - MSW



*Multilingual*
*Communication*
*Solutions*

# Certificate of Accuracy

## State of New Jersey

## County of Essex

This is to certify that the attached translation(s) of:

"INTERNATIONAL PRIVATE LAW: WORK OF THE FRENCH COMMITTEE ON
INTERNATIONAL PRIVATE LAW, 1984-1985" / "DROIT INTERNATIONAL PRIVÉ: TRAVAUX
DU COMITÉ DE DROIT INTERNATIONAL PRIVÉ, Années 1984-1985"

was done by an experienced translator who produced, to the best of his (her)
knowledge, ability and belief, a true and accurate translation from <u>French</u>
into <u>English</u>. **<u>Copies of the originals and of their translations must NOT
be detached from this Certificate.</u>**

**Matt Lulofs, Project Manager for Auracom International, Inc.**

Sworn before me this __17__ day of __March__, 200_7_.

**Notary public**

DANIEL C. EASTWICK
Notary Public, New Jersey
My Commission Expires June 11, 2009

# INTERNATIONAL PRIVATE LAW

## WORK
## OF THE FRENCH COMMITTEE
## ON INTERNATIONAL PRIVATE LAW

## 1984-1985

PUBLICATIONS OF THE
NATIONAL CENTER FOR SCIENTIFIC RESEARCH
15, quai Anatole-France, 75700 Paris
1987

NOTICE: THIS MATERIAL MAY
BE PROTECED BY COPYRIGHT
LAW TITLE 17 U.S. CODE.

©National Center for Scientific Research, Paris, 1987
ISBN 2-222-03990-8

International Private Law
1984-1985
*Ed. CNRS, Paris, 1987*

## ARBITRATION CLAUSES AND GROUPS OF COMPANIES

### PAPER BY Mr. Ibrahim Fadlallah
#### Meeting of April 24, 1985
#### Mr. Andre Ponsard, presiding

1) Can an arbitration clause agreed to by a company belonging to a group and a third party be invoked by or against another company in the same group? This question is the subject of the present paper. We will therefore disregard internal arbitration within a group of companies, which could be interesting to study, but which presents particularities too different from the question at hand: that is, the extension to the group of an arbitration clause agreed upon with a third party.

2) A traditional answer might have consisted of citing the restrictive interpretation of arbitration clauses. Such clauses only take effect between signatory parties. In support of this answer, one can invoke not only the principle of relativity of agreements, but also the very particular purpose of arbitration clauses. The submission of disputes to an arbitration procedure entails the removal of the parties from their natural judge, which remains the state court. The parties waive the guaranties inherent in resorting to a normally competent judge. Arbitration constitutes an exceptional, not to say abnormal, means of settling disputes; it must have been chosen without any possible doubt by the parties, capable of consenting to it, in cases where the Government agrees not to retain its exclusive jurisdiction.

3) But is not the idea that arbitration would constitute an exceptional means of settling disputes losing ground in matters of international commerce? There are numerous signs of this decline: the abundance of arbitration clauses — that sometimes attain the rank of formal conciliation clauses—, the liberalism of state laws, the proliferation of international agreements, or international regulations, for example under the aegis of UNCITRAL (the United Nations Commission on International Trade Law). It appears difficult to reconcile this generalized tendency with the lingering perspective of a marginal procedure. There is unquestionably an evolution in the view we have of international commercial arbitration. If we admit that it constitutes the normal means of settling international commercial disagreements, minds are then prepared for a certain extension of the application of *ratione personae*, of arbitration clauses.

4) And so, for the last ten or so years, various decisions, rendered under different aegis, rule for the extension of the arbitration procedure to other companies belonging to the same group as the signatory to the clause. Certain state courts have lent their support to this movement. Again, this is just a matter of the landmarks of a case law in the process of being formed; the time seems to have come to attempt to review it[1].

The key idea that is drawn from the decisions that have accepted the extension is that the participation of the non-signatory company conforms to the proper administration of justice and to the needs of international commerce.

There is only an advantage in grouping connected claims in the same proceedings with respect to costs, time limits and the convenience of the parties. One will particularly avoid the risks of opposing decisions. The arbitration procedure encounters, in its evolution, the pitfalls that the state procedure, provided with better means, was able to authoritatively resolve.

5) These concerns are those of works currently in progress on multi-party arbitration and on the development of this process in certain countries. Arbitration that involves a group of companies is a broader matter than multi-party arbitration. But there are specific differences must be noted. The similarity of interests generally found among companies of the same group simplifies many problems of arbitration organization; and the extension of the arbitration to a non-signatory company, is recommended, among other things, by the fact that it belongs to the same group.

6) The notion of group used in the decisions is an economic notion. One of the decisions defined the group as follows:

"The concept of a group is defined, beyond the formal independence born of the creation of distinct legal entities, by the unity of economic orientation depending upon a common authority" (decision CCI 2375/1975)[2]

This definition, moreover, has not been an issue in disputes. It has always concerned strongly integrated group, the absolute control being neither contestable nor contested, and even often being claimed by the group itself.

7) Based on these facts, the dispute arose in terms of the jurisdiction of the arbitrators. One could have posed it in terms of jurisdictional authority. But, for the arbitrator, with respect to his nomination by the parties, authority and jurisdiction are more difficult and less useful to distinguish than for state courts. One could have still posed the problem in terms of the capacity of the parties to invoke the clause— and thus the admissibility—. But all these variations end with the same fundamental question: does the arbitration clause have any effect on the non-signatory company belonging to the same group? It is a matter of knowing whether taking the group into consideration as a unit can play a role with regard to arbitration clause, after so many other national and international jurisdictions[3].

8) One must briefly describe the precedential phenomenon before asking the questions that arise from applicable law and substantive law.

## I.    DESCRIPTION

9)    Let us draw up a synopsis, a kind of fact sheet of the phenomenon. It concerns fifteen *published* decisions; the examination is therefore not exhaustive.

## A. Decisions and appeals

All of the involved decisions result from institutional arbitration. No *ad hoc* arbitration was encountered.

The ICC (International Chamber of Commerce) takes the lion's share with published decisions spanning the period from 1975 to 1983[4]. But this not the only institution involved. The ICSID (International Centre for Settlement of Investment Disputes) dealt with the problem in the Holiday Inn v. Maroc matter and ruled by partial sentence dated July 1, 1973[5]. Several maritime arbitration decisions, in both New York and Paris, equally tackled the question[6].

The state courts were also called upon to rule on these matters. The English High Court of Justice rendered in the Roussel-Uclaf v. Searle matter, a decision dated October 6, 1977[7]. The Swiss Federal Court rendered two decisions: the Cartier ruling dated October 10, 1979 and the Tradax ruling dated February 7, 1984[8]. The Paris Court finally rendered two decisions[9], one in the Dow Chemical case dated October 21, 1983 that directly interests us, the other in the Pyramides case, dated July 12, 1984, that only indirectly interests us.

## B. Subject of the dispute

10) The dispute bears always upon the jurisdiction of the arbitrator or the state court judge.

The question is posed directly to the arbitrator (in the most recent case) or to the state court judge to obtain either his removal or a deferral —according to the 1975 English law governing arbitration—. Indirectly, the question is posed with respect to Government control over the arbitration decision that would have been ruled upon without agreement.

The dispute only applies to arbitration clauses. Never to compromises: perhaps because these are rare in institutional arbitration, but also because, during a compromise, one tends to define the disputing parties without ambiguity. It must be noted here that the arbitration mission provided for in the ICC ruling, although historically born of the need for compromise, is not equal to compromise. Certainly it could include one; but if it includes among the disputed points, an argument on jurisdiction, it would be very paradoxical that the pronouncement of this argument required submission to the jurisdiction of the arbitrators. As curious as this seems, the Paris Court had to refer to it in its decision dated July 12, 1984 in Pyramides case.

## C. Parties

11) The plaintiff parties to the extension of the clause were sometimes the group companies, and sometimes the third party co-contracting parties. It even happens that the dispute arises between two non-signatory companies of the group which belong respectively to the same groups as the signatories. It is interesting to note that in one case (decision 1510 of the New York maritime arbitration company dated November

28, 1980), the signatory company presented the demands of the other companies of the group, without their being formal parties to the arbitration.

## D. The Result

12) The result is as follows. Each time that the group - non-signatory company – invoked the clause to its benefit, with one very specific exception[10], the benefit of the clause was granted. On the other hand, the results are mixed, with dismissals predominating when it is the third party who seeks to extend the effect of an arbitration clause to a non-signatory company. We will see if this controversy takes on a particular significance, by examining the questions of applicable and substantive law which this current case raises.

## II. QUESTIONS OF APPLICABLE LAW

13) In terms of legal conflicts, we are balanced between two focal points:

- the group – structural pole

- the arbitration clause – matter of circumstance.

It is extremely awkward to dissect a single question that combines these two elements. A legal standard would no doubt be – as always – more appropriate. But this preference does not do away with measuring the respective roles of corporate law and applicable law with respect to the clause. The choice is not indifferent and at times bears witness to previous statements on the designation of applicable law.

## A. The group

14) It is corporate law that will say whether the group constitutes a distinct entity, endowed with its own legal personality; whether and to what extent its influence or control permits the establishment of transparency within the group.

In this instance, one evidently runs into the problem of the multiplicity of national laws in multinational groups. One can only overcome this stumbling block either by recognizing a hypothetical law unique to the group, to be determined with all the known problems (parent company? Decision-making center?, etc.) or by a distributive application of the laws of the companies involved. It is this solution that, in the current state of positive law, appears necessary to be upheld: the law of each company will say if and to what extent the company was able to be bound by the acts of another company within the group. Thus if the law – or case law – of the parent company decides that the acts of the subsidiary must be treated as emanating from the parent company – on the grounds, for example, that the subsidiaries are only instruments of commerce of the parent – such indication will have to be followed.

But in none of the cases considered was it upheld or admitted, at the very least, that the group constituted an indissociable legal entity. The judicial independence of companies

has even occasionally served as basis for dismissal of appeals for attraction of non-signatory companies in an arbitration proceeding.

15)    The company law will also determine if the signatory to the arbitration clause had the authority or capacity to act on behalf of the non-signatory company. The Cartier decision rendered by the Swiss Federal Court dated October 10, 1979 resolved this question in terms of authority. Having noted that in spite of the "interrelationships and inter-leaving of companies controlled be a single man:", the arbitration clause signed by the officer and president of a group could only be signed in the name of the companies of the group by a special entity or agent, positions whose existence had not been deemed as established in this case.

The reference to the entity's authority evidently refers to the law of the company concerned.

16)    But the determination of the entity's authority only resolves a partial aspect of the problem. Even if the signatory had authority, it would remain to be known in what capacity it had, *in fact*, acted. This is not always very clear in groups of companies. And, supposing that the signatory had neither authority nor capacity, the full question remains to know whether the non-signatory company must not be supposed to have accepted the arbitration clause or to have adhered to it.

And yet, on this point it is appropriate to turn to the other element of the couple: the arbitration clause.

### B. The arbitration clause

17) To the extent that the rule of conflict applies to the arbitration clause, its submission to the rule of intention – subject to legal standards – is not discussed. This law can moreover, no longer be the law governing the fundamental contract. The commitment of the parties and the third parties to the act derives naturally from the rule of intention.

But one must also remember that a problem of form can be raised, particularly with respect to the requirement of a written document – it is appropriate to give another chance to the validity by optional application of *locus regit actum*.

18)    The clause can, in certain countries, fall under the law of the location of the arbitration, either as a matter of procedure or of public policy. In Switzerland, where arbitration is considered an exception to the constitutional guaranty of recourse to a trial judge, the 1969 Intercantonal Agreement on arbitration imposes as a required provision the written form of the arbitration agreement, and this provision applies to any arbitration seated in the territory of one of the cantons party to the Agreement (all unless I am mistaken, with the exception of Zurich).

19)    The question of form can be settled directly by an international instrument. The New York Convention of June 10, 1958, that of Washington dated March 18, 1965, the European Convention dated April 21, 1961, require, according to the terms and conditions and at different degrees, that the clause be written or signed by the parties.

When such instruments apply, one must research whether the extension of an arbitration clause to a non-signatory party complies with the requirement of a written agreement.

20)    Beyond that, the question arises to know whether it is necessary to create, with respect to a group of companies, a new legal standard for international commercial arbitration. It is for each Government to decide this for itself. But does such a rule exist outside of all state law?

21)    The Dow Chemical decision of September 23, 1982, rendered under the aegis of the ICC by a prestigious arbitration board, provides the most elaborate draft of this endeavor. This decision intends to assess the meaning and effects of an ICC arbitration clause based on a *non-state* legal standard, derived solely from *lex mercatoria*.

This step is based on the ruling of the ICC Court of Arbitration. The decision stated that because of the intention of the arbitration clause, the designation by the parties of an applicable law only concerns the foundation of the dispute, excluding expressly contrary stipulations. This reading of the contract is demanded by the reference of the parties to the ICC Rules which, with regard to the decision of arbitrators on their own jurisdiction, does not "provide for recourse to any state law": article 8 § 3 grants the arbitration court the authority to "make any decision on its own jurisdiction" without requiring that it apply any state law in order to do so.

As a result, the court, freed from all state law, researched and upheld its jurisdiction based on the common will of the parties and international trade practices, particularly with respect to a group of companies.

22)    This initial step raises several questions.

    a)    First of all, is the ICC Arbitration Court ruling not the slightest bit solicitous?

    Article 8 § 3 states:

    "When one of the parties raised one or more grounds related to the existence or legality of the arbitration Agreement, the Court, having acknowledged "prima facie" the existence of this Agreement, can decide, with out prejudging the admissibility or the soundness of these grounds, that arbitration will take place. In such case, it is the up to the arbitrator to make any decision on his own jurisdiction".

    The last sentence, cited by the decision, means, in its context, that the court is not bound by the interim decision of the Arbitration Court. This provision contributes nothing to the question of knowing whether the arbitration clause is subject to state law.

    It is true, on the other hand, that the ruling does not provide for recourse to state law. But neither does it discharge the arbitrator. I think quite simply that it is silent – I was going to say without opinion – on this question. The ruling envisages the legality of the clause without referring to a state law. Does one deduce from this that nullity cases escape from all state law?

That being the case, is it not more legitimate to interpret the designation of a law by the parties as also applying, *prima facie*, to the arbitration clause? Its intention makes it possible but does not require that it be subject to a law other than that governing the fundamental contract and, in the absence of indication to the contrary, there is no material reason for dissociating, *a priori*, the applicable laws. Moreover, the intention of the clause above all materially helps to avoid the possible nullity of the contract. And yet, we will see that the extension of the clause to a non-signatory company, supposes important material inroads in the contract. The application of a single and same law would therefore be all the more desirable.

In addition, if it concerns the interpretation of the will of the parties, one can reasonably think that the designation of a law in the contract is psychologically closer to them than the detour through the provisions of the ruling on the jurisdiction of the arbitrators.

One should no longer grant a considerable importance to the often general manner in which the arbitration mission is written. If not, one transforms the document into a trap for the parties and complicates even more its execution.

23 b)    The second question has to do with the legitimacy of the approach. Concerning researching the applicability of the clause to the non-signatory, one invokes the will of the signatories to refer to the ICC rules. This is only valid if one can take into account the will of the non-signatory. That is to say that recourse to the will of the parties (including the non-signatories) is implied in the initial approach. One does not invoke the rules in order to then freely research the legal standard. It is the very substance of the rule that authorizes basing oneself on the rules – supposing the interpretation that it was given to be exact.

24 c)    The third – and final – question concerns the point of view of the trial judge. Does French law allow the arbitrator to rule on his jurisdiction without referring to a state law? The question, in an ultimate fashion, stems from the philosophy of arbitration: exemption from the law of the State, or sometimes also the natural law accompanying the law of the State.

More pragmatically, does article 1502 NCPC (New Code of Civil Procedure) allow the arbitrator to rule on the basis of an arbitration agreement not sanctioned by a State law? The text is silent, but one can think that the liberalism of articles 1495 and 1496 NCPC can here inspire the same solution: the arbitrator is not required to apply a State law, but he is bound by a rule of law. He can not hold his authority from his own decision. His nomination – his jurisdiction – must be based on a rule of law.

And one is once again returned to the question of knowing if the *lex mercatoria* is by law (as well as to the vicissitudes of the Pabalk-Norsolor case)[11]. To my mind, and in avoiding the general debate, one can admit the directive that constitutes a rule of law legitimizing the authority of the arbitrator, a precise rule that, considering the circumstances, is sufficiently restrictive to avoid the risk of arbitration.

In other terms, it is the pertinence of the rule the will serve as its justification. This leads us to enter the debate of substantive law.

## III. QUESTIONS OF SUBSTANTIVE LAW

25)    The decision studied had to rule on the question of form and to determine a substantive rule.

### A. Question of form

When the law applicable to the clause requires a written form, can this clause be extended to a non-signatory company? The question is raised particularly with respect to ICSID arbitrations instituted by the Washington Convention dated March 18, 1965, the New York Convention dated June 10, 1958 and by Swiss law. For French law, we are inclined to think that article 1443 NCPC – sanctioning unwritten arbitration clauses with nullity – does not apply to international arbitration.

### 1. *Washington Convention*

26) The problem arose in the Holiday Inn v. Morocco case. Here is an outline of the facts. The American group Holiday Inn (as well as the Occidental Petroleum group, but I will only discuss, *brevitatis causa*, the former) executed, by a Swiss subsidiary (at the time still in formation – additional complication outside of the scope of this discussion) a basic agreement with Morocco for the construction of hotels. The question of participation in ICSID arbitration provided for by the convention was posed regarding:

-the American parent company,

-subsidiaries created in Morocco.

27 a) *For the American parent company*, it is suitable to apply article 25 § 1 of the Washington Convention that makes provision for the jurisdiction of the Center of the disputes between a contracting Government and a national of another contracting Government, when the parties *"have agreed to it in writing."*

The arbitration court (July 1, 1973) refused to take a formalistic approach to this text. It allows the patent company to invoke the arbitration clause based on the grounds of its role in the contract containing this clause which is inseparable from it.

28 b) *For the Moroccan subsidiaries*, another problem is posed. Article 25 §2.b authorizes a company of a contracting Government to profit from arbitration by the Center only if it has been agreed to "consider it as a national of another contracting Government by reason of the control exercised over it by foreign interests".

It was not in doubt, in this case, that the Moroccan subsidiaries were under foreign control. But no *express* convention had been executed between them and Morocco.

Article 25 § 2.b is dependant upon § 1, which defines one of its terms. Consequently, the question is posed to know whether a written agreement is or is not required to credit the Moroccan subsidiaries with the character of foreign national.

Here again the arbitration court demonstrated liberalism with respect to form – but basically with strictness:

"The question arises, however, whether such an agreement must be expressed or whether it may be implied. The solution which such an agreement is intended to achieve constitutes an exception to the general rule established by the convention and one would expect that parties should express themselves clearly and explicitly with respect o such derogation. Such an agreement should therefore normally be explicit. An implied agreement would only be acceptable in the event that the specific circumstances would exclude any other interpretation of the intention of the parties, which is not the case here."

The Court considered that the agreement set forth in article 25 § 2.b was a derogation of the principles of the Convention and would therefore need to be more explicit. But it did admit an implicit agreement "in the case where specific circumstances would exclude any other interpretation of the intention of the parties." Basically, it did not admit in this case that such an implicit agreement had been made: the waiver of the Government of its own jurisdictions with respect to one of its nationals can only be established beyond any doubt.

### 2. New York Convention

29)    The Swiss Federal Court had to rule on the application of the New York Convention to a group of companies in the Tradax v. Amoco decision dated February 7, 1984. The convention imposes on contracting Governments the recognition of written arbitration agreements. In this case, a charter party executed by a company of the Amoco group containing an arbitration clause and the bill of lading, delivered to another company of the Amoco group, containing a reference to the clauses and condition of the charter-party. The Federal Court considered that the reference applied to the arbitration clause. It gave substantive ground to its decision, without ruling on the considerations of form resulting from the absence of the clause in a document signed by the parties that were invoking it. But the court clearly stated that it was interpreting the Convention – and not Swiss law.

### 3. Swiss Law

30)    One is aware of the Swiss tendency to strictly interpret the arbitration clause, refusing, for example to apply it to an accessory contract[12]. How was it applied to the extension to a group of companies?

Decision 4401/1983 examined the application of the Swiss rule requiring that arbitration clauses be in written form to a group of companies. The decision first recalls the requirement of a *written* agreement, that is to say signed by all persons upon whom it imposes obligations, as a condition of the forfeiture of the constitutional guaranty of

recourse to a natural judge. Then the decision questions whether the signatory acted solely on its own behalf or also for the other companies in the group, and if the behavior of these companies carries am implicit agreement to arbitration.

This approach aptly demonstrates that the question is not one of pure form. As in the Dow Chemical decision, it concerns the examination of the scope and effects of the clause, to know who is a party and who is a third party. As soon as a person has signed the clause, the requirement of form is fulfilled if it can be demonstrated that the signatory acted on behalf of another company in the group[13]. Whether it concerns initial representation – according to various modes – or the transfer of rights, by cession or subrogation, the requirement of form, namely, the existence of an initial written and signed clause – is in all ways respected. The only question remaining is that of the efficacy of the basic institution that permits its extension to a person not materially a signatory. If there is a requirement of form, it is shifted to this institution.

Truthfully, the essential effort of the arbitrators who admitted the extension of the clause has implication on substantive cause.

### B. Substantive questions

31) Extensive case law refuses to allow itself to be trapped in the consideration of decision 2138/1974:

> "Whereas, if it results from many file elements that the negotiation of the matter and its conclusion on the essential terms were conducted by Company X…, it is not at all established that if the latter had itself signed the contract of…., it would have accepted the arbitration clause…".

Such grounds, by their generality and abstraction, would stifle any attempt at extension, In reality, the decisions that admitted the extension are based on the will of the parties, including non-signatory companies. This will is deduced from:

-the fact that these companies belong to the same group as the signatory company;

-their role in the matter in question.

32)    Belonging to the same group is never, in and of itself, sufficient. The group is not considered by itself as a principle of integration carrying *ipso facto* transparency within itself. The existence of the group – uncontested – is used as an indication – a triggering signal – or a field on which considerations of the role of the parties in contractual relations develop. The existence of the group attests to a unity of interests, to the knowledge of various contractual documents, of the indifference of a third party to its internal organization or its legitimate belief that it deals with an entire group.

But it is especially the participation of various companies in the operation that is the subject of the agreement that is determinant.

It is essential to illustrate this proposition with several examples, as all of current case law rests on this foundation.

33) *1ˢᵗ example: the Rousel-Uclaf case* (High Court of Justice October, 6, 1977)

The American company Searle invented a basic pharmaceutical product and granted Roussel-Uclaf an exclusive license to manufacture and market the product anywhere except in the United States. The agreement included an ICC arbitration clause. The American company developed a *derivative* of the base product that is marketed through its various subsidiaries, particularly in Great Britain. The dispute was going to be raised on the point of knowing whether the derivative product was or was not included in the granting of the exclusive license.

Roussel-Uclaf summoned before the English courts both the American parent company and its English subsidiary, non-signatory to the arbitration clause, for violation of the agreement of exclusivity. The American company introduced a request for arbitration before the ICC Arbitration Court. At the same time as its English subsidiary, it requested the suspension of the proceedings before the English courts.

The 1975 Arbitration Act makes possible  the obtaining of such a suspension when it is requested by a party to the arbitration agreement or by a person acting "by or for such a party". Could the English subsidiary be considered as acting by or for its parent company? A positive answer was given to the essential argument that the situations of the parent and the wholly-owned subsidiary with respect to the dispute were practically identical in this case:

> -if the parent is at fault, the subsidiary will be so as well;

> -however, if the parent is not at fault, common sense requires considering that the subsidiary is not either.

> "…no reason why these words in the Act should be construed so narrowly as to exclude a wholly-owned subsidiary company claiming, as here, a right to sell patented articles which it has obtained from and been ordered to sell by its parent. Of course, if the arbitration proceedings so decide, it may eventually turn out that the parent company is at fault and not entitled to sell the articles in question at all; and, if so, the subsidiary will be equally at fault. But, if the parent is blameless, it seems only common sense that the subsidiary should be equally blameless. The two parties and their actions are, in my judgment, so closely related on the facts in this case that it would be right to hold that the subsidiary can establish that it is within the purview of the arbitration clause, on the basis that it is claiming "through or under" the parent to do what is in fact doing whether ultimately held to be wrongful or not."

Therefore, there is, here, a quasi-indivisibility of situations that make it possible to rule that *one remains within the limits of the arbitration clause*.

34) *2ⁿᵈ example: Holiday Inn v. Morocco case* (July 1, 1973)

The dispute involved the manifestations of the sale in France of an insulation product manufactured and marketed under different trademarks by the various companies of the Dow group, through a particularly complicated and mobile network.

The arbitration court tried to show that the various companies of the Dow group have acted indifferently, both during the negotiation and during the performance and termination of the contracts.

A great confusion reigned from which resulted the following very meticulous statements of the arbitrators, that:

    -the identity of the company (Venezuelan, then Swiss subsidiary) signatory to the contract was not important;

    -the American parent company, while not a signatory, owner of the trademarks, had necessarily agreed to the contract that had been signed without a license to manufacture;

    -another non-signatory company, the French subsidiary, had been designated to sign the contract, which moreover provided the potential right – not used in fact – to have deliveries made by other companies in the group. It is this same company that proceeded to terminate the contracts.

The court decided that:

    -the parent company was the focal point for contractual relations and exercised absolute control over its subsidiaries that were involved in the matter;

    -the French subsidiary had behaved completely – and had been treated – as a party to the contract.


*Other examples*

36) In a more general manner, there is no example where the extension of the arbitration clause was admitted without the court referring to the involvement of the companies of the group in the specific contractual relations. Such is particularly true in maritime cases where the rights were born of bills of lading issued following a charter party.

Similarly, in the two ICC decisions nos. 2375 and 1434 rendered in 1975, the arbitrators noted the inter-leaving of contractual obligations of various companies of a group, the will of the signatory companies to stipulate for themselves and for their subsidiaries, and the *unreasonable* character of the interpretation of a contract that would isolate the single arbitration clause from the complex connections of rights and obligations.

37) Does one want counter-proof?

The decisions that refused the extension themselves also underline the will of the companies of the group to act separately, the independence of their legal personalities, the absence of confusion between them, the awareness of the co-contracting party to deal with the sole signatory company, and not with the group, finally the absence of proof of the will of the non-signatory companies to submit to the arbitration clause.

38)    Thus understood, the new arbitration case law would ultimately be more classic than it would appear. Based, in the final analysis, on the will of the parties, one may wonder whether there is not already an existing rule in French law. It can only prolong the liberalism of case law in the matter of form and proof of the clause, the admission of the arbitration by reference to another act or even its extension to accessory or ancillary contracts[14].

One can thus explain that the extension of the clause was upheld each time that the non-signatory company invoked it[15]; this eliminated any discussion of willingness; no doubt the third party could maintain that the clause is not an open agreement to which anyone could adhere, but the links of the non-signatory company with the operation, without which its interest in acting would be uncertain, make it possible to respect of the relativity of agreements.

In any case, one sees that it does not concern an anti-group company, where the third party – and it alone – could take advantage of an appearance created or of a confusion maintained by the group. The given objective – the group – comes to the support of a specific subjective reality: the adherence of the non-signatory company to the clause, separate from a concrete analysis of contractual relations. Arbitration remains a voluntary procedure for the settling of disputes: it sanctions neither belonging to a structure, or behavior that does not imply the real will to submit to an arbitration jurisdiction.

39)    But it is necessary to measure whether this approach affects the intention of the arbitration clause. While the analysis of contractual relations basically controls the decision on the jurisdiction of arbitrators, the clause appears inseparable from the other stipulations of the contract. That is way justifications based on the intention of the arbitration clause seem artificial to us. The extension of the clause to non-signatory parties can only lead to successful conclusion through its integration in the group of relationships. One decision speaks to the inseparable character of the arbitration clause, another states that it would be "inconceivable" to isolate it. In fact, the arbitration case law examined illustrates well the limits of the intention of the arbitration clause. And, on this subject, it is no doubt fortunate that the editors of the May 12, 1981 decree were under the influence of constitutional scruples and did not freeze the rule in a text: one would thus have taken the risk of depriving it of the flexibility that the development of arbitration requires.

40)    The moment has come to measure the *scope* of this case law. I will do so from three points of view.

(a) *Will of the parties*

If one intends to maintain only a serious willingness, two requirements must be maintained:

> -the responsibility of proof must fall to the person or entity that invokes the extension of the clause to a non-signatory; the sole existence of the group does not suffice to reverse the responsibility of proof;

> -an effort of specific motivation must be undertaken in each case. Nothing is more dangerous than to content oneself with a general motivation. It would have a dissuasive effect and would make groups reticent with respect to arbitration.

It is of course necessary to reserve the opposite will. It is not impossible that an express limitation of the clauses to signatories might arise, to the exclusion of every other company in the group.

But the arbitrators must also infer this opposite will from the circumstances. For the group is not just an *element of unity*, it is also an element of *diversity* and division of labor, and *organization of the compartmentalization of responsibility*: the limitation of responsibility is often the price that a social system agrees to pay for the encouragement of private initiative and of a venture company; it is part of the rules of the game. If a group has taken the precaution to only deal through one of its companies, if it has avoided confusion, if the subscribed obligations are only intended to be performed by the signatory party, then the interpreter must not resort to misleading the legitimate expectations of the interested parties, or else the arbitration itself would suffer.

It will be the same if a contract cannot be performed by a non-signatory company: there are examples, in fact, where as a result of state regulations, only a subsidiary of a different nationality can subscribe to a commitment and sign the contract. If the parties are knowingly in agreement, one must leave the non-signatory company out of the arbitration. Not being bound by an obligation, its interest would most often be in having it assume a guaranty in the case of insolvability of the signatory company. It would be a distortion of the arbitration clause to make it play this role: if one wanted a guaranty, one must have asked for it clearly.

### (b) *Concerned structures*

41) The predominantly voluntarist basis held leads to the question of whether the solution can be extended to structures other than groups of companies. One already notes that in the cases studied, no challenge to the existence of the group was ever raised. It concerned in fact strongly integrated groups of practically all wholly-owned subsidiaries[16]. What would happen if the control were less absolute or if there were forms other than participation? To our thinking, the question would be absorbed by the specific research on the will of the parties.

But then, can one not extend this case law to forms of cooperation that do not borrow the structure of a group of companies? One thinks of groupings of inter-enterprise cooperation, of joint ventures, indeed of approved sub-contracting. In all these figures, the reasoning applied to companies of a same group can be transposed, since specific

circumstances are favored when compared with the facts of structure. But arbitrators must be prudent. The identification of interests within a highly integrated group is not necessarily found in other hypotheses. And yet is weighs incontestably in the search for the will of parties.

42)    Would one go as far as to assimilate in the case of the group that of government companies in their relations with the Government? The question was raised in the Pyramides case. ICC decision n°3493 rendered February 16, 1983 lead, with respect to the Egyptian government and the company that emanated there from, an approach similar to that described for groups of companies. It held the Government as party to the arbitration. This decision was quashed by the Court of Paris on July 12, 1984[17].

The situation of the Government is notable in more than one respect. Its intervention is less univocal than that of a parent company. It can specifically intervene as regulatory authority. In this case, the Ministry of Tourism had inserted in the contract executed by the sole government company the phrase "approved agreed and ratified". The arbitrators had therein found a joining of the contract, while the Court of Appeals saw the simple exercise of control by the regulatory authority.

The second consideration deals with the Government's immunity from jurisdiction. The arbitration clause meriting waiver of such immunity, it is advisable to be particularly circumspect in order to admit a non express waiver.

But having made these two remarks, the case law elaborated for groups is not incompatible with its application to the Government.

### (c) *Control of governmental jurisdictions*

43)    The Pyramides case invites the evocation of a final limit to the arbitration case law: the control of governmental jurisdictions.

In the Dow Chemical case, the Paris Court had, following a decline in governmental control, recognized the *sovereign authority* of arbitrators in the search for the will of parties to submit to arbitration jurisdiction.

The same Paris Court abandoned this idea in the Pyramides case to directly assess itself the existence of an arbitration agreement and to overturn the decision. This solution appears to be the correct one[18]. The issue is to verify whether the arbitrator ruled without an arbitration agreement. Leaving it up, in this respect, to its own assessment,, is to make it source and principal of its jurisdictional authority. And yet it only has derivative powers. And since the Court of Appeals must verify that the arbitrator did not rule without an arbitration agreement, its investigation must apply to everything that allows it to respond, by itself, to this question. There is there, in part, a basic revision, but limited in its purpose to the verification of the authority or the jurisdiction of the arbitrator. One cannot apply to the arbitrator the rule of the Brussels Convention of September 27, 1968 which binds the judge to the admission by the facts that served to affirm the competence of the original jurisdiction.

The existence and the extent of the governmental control constitute a guaranty against possible excess of arbitration case law.

44) For if this case law can be approved, it is on the condition that it rest on serious factual motivation. Creating a presumption of extension of arbitration to the group must be avoided, at the risk of provoking a defensive reflex that could extend to the refusal of any arbitration.

---

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

# DROIT INTERNATIONAL PRIVÉ

## TRAVAUX
## DU COMITÉ FRANÇAIS
### DE DROIT INTERNATIONAL PRIVÉ

### Années
### 1984-1985

ÉDITIONS DU
CENTRE NATIONAL DE LA RECHERCHE SCIENTIFIQUE
15, quai Anatole-France, 75700 PARIS
1987

NOTICE: THIS MATERIAL MAY
BE PROTECTED BY COPYRIGHT
LAW (TITLE 17 U.S. CODE)

© Centre National de la Recherche Scientifique, Paris, 1987
ISBN 2-222-03990-8

Droit International Privé
Années 1984-1985
*Éd. du CNRS, Paris, 1987*

# CLAUSES D'ARBITRAGE ET GROUPES DE SOCIÉTÉS

## COMMUNICATION DE M. Ibrahim FADLALLAH
### Séance du 24 avril 1985
### Présidence de M. André PONSARD

1) Une clause d'arbitrage convenue entre une société appartenant à un groupe et un tiers peut-elle être invoquée par ou contre une autre société du même groupe ? Cette question fait l'objet de la présente communication. L'on négligera donc l'arbitrage interne au groupe de sociétés, qu'il pourrait être intéressant d'étudier, mais qui présente des particularités trop différentes de la question ici retenue : à savoir, l'extension au groupe d'une clause convenue avec un tiers.

2) Une réponse traditionnelle eût consisté à opposer l'interprétation restrictive des clauses d'arbitrage. Ces clauses ne produisent leurs effets qu'entre les parties signataires. A l'appui de la solution on peut invoquer non seulement le principe de la relativité des conventions, mais encore l'objet très particulier des clauses d'arbitrage. La soumission des litiges à une procédure arbitrale entraîne la soustraction des parties à leur juge naturel, qui demeure la juridiction étatique. Les parties renoncent aux garanties inhérentes au recours au juge normalement compétent. L'arbitrage constitue un moyen exceptionnel, pour ne pas dire anormal, du règlement des litiges : il doit avoir été choisi sans aucun doute possible par des parties, capables d'y consentir, dans des matières où l'État accepte de ne pas se réserver l'exclusivité juridictionnelle.

3) Mais l'idée que l'arbitrage constituerait une voie exceptionnelle de règlement des litiges n'est-elle pas en recul en matière de commerce international ? Les signes de ce recul sont nombreux : foisonnement des clauses compromissoires – qui accèdent parfois à la dignité d'apaisante clauses de style –, libéralisme des droits étatiques, multiplication des conventions internationales, ou des règlements internationaux, par exemple sous l'égide de la CNUDCI. Il paraît difficile de concilier cette tendance généralisée avec la perspective rémanente d'une procédure marginale. Il y a incontestablement une évolution dans la vue que l'on a de l'arbitrage commercial international. Si l'on admet qu'il constitue la voie normale de règlement

106

des différends du commerce international, les esprits sont alors préparés pour une certaine extension de l'application *ratione personae,* des clauses d'arbitrage.

4) Et voici que, depuis une dizaine d'années, des sentences diverses, rendues sous différentes égides, se prononcent pour l'extension de la procédure arbitrale à d'autres sociétés appartenant au même groupe que le signataire de la clause. Certaines juridictions étatiques ont apporté leur renfort à ce mouvement. Il ne s'agit encore que de jalons d'une jurisprudence en cours de formation; le moment paraît venu de se risquer à en faire le point[1].

L'idée-force qui se dégage des décisions qui ont admis l'extension est que la participation de la société non signataire est conforme à une bonne administration de la justice et aux besoins du commerce international.

Il n'y a qu'avantage, en matière de frais, de délais, de commodité des parties, à grouper dans une même instance des prétentions connexes. L'on évitera, surtout, les risques de contrariété des décisions. La procédure arbitrale rencontre, dans son évolution, les écueils que la procédure étatiques, mieux pourvue en moyens, a pu résoudre d'autorité.

5) Ces préoccupations sont celles des travaux actuellement en cours sur l'arbitrage multi-partite et du développement de cette procédure dans certains pays. L'arbitrage qui implique un groupe de sociétés est une espèce du genre plus large de l'arbitrage multi-partite. Mais il faut souligner les différences spécifiques. L'identité d'intérêts généralement rencontrée entre les sociétés du même groupe simplifie maints problèmes d'organisation de l'arbitrage; et l'extension de l'arbitrage à une société non-signataire se recommande, entre autres, de l'appartenance à un même groupe.

6) La notion de groupe utilisée par les sentences est une notion économique. L'une des sentences définit ainsi le groupe :

«Le concept de groupe se définit, au-delà de l'indépendance formelle née de la création de personnes morales distinctes, par l'unité d'orientation économique dépendant d'un pouvoir commun» (sentence CCI 2375/1975)[2].

Aucune querelle de définition n'a d'ailleurs agité les litiges. Il s'est toujours agi de groupes fortement intégrés, le contrôle absolu n'étant ni contestable ni contesté, et étant même souvent revendiqué par le groupe lui-même.

7) A partir de ces données, le litige s'est élevé en termes de compétence des arbitres. L'on aurait pu le poser en termes de pouvoir juridictionnel. Mais, pour l'arbitre, s'agissant de son investiture par les parties, pouvoir et compétence sont plus difficiles et moins utiles à distinguer que pour les juridictions d'État. L'on aurait pu encore poser le problème en termes de qualité des parties pour invoquer la clause – et donc de recevabilité –. Mais toutes ces variations aboutissent à une même interrogation fondamentale : la clause d'arbitrage produit-elle effet à l'égard de la société non-signataire appartenant au même groupe? Il s'agit de savoir si la prise en considération du groupe en tant qu'unité peut jouer un rôle, après tant d'autres domaines nationaux ou internationaux, en matière de clause d'arbitrage[3].

8) Il faut décrire bri questions qu'il soulève de

9) Dressons un tabl mène. Il s'agit d'une q exhaustif.

Toutes les sentence arbitrage *ad hoc* n'a été r

La CCI se taille la 1975 à 1983[4]. Mais ce n'e problème dans l'affaire I du 1er juillet 1973[5]. Quel York, ont également abc

Les juridictions état anglaise a rendu dans l'a 1977[7]. Le Tribunal féd 10 octobre 1979 et l'arrê deux arrêts[9], l'un dans l' intéresse directement, l'a qui ne nous intéresse qu'

10) La contestation juge étatique.

La question se pos étatique pour obtenir so l'arbitrage de 1975 –. Ir étatique sur la sentence

Le litige ne porte q mis : sans doute parce q aussi parce que, lors d' parties au litige. Il faut la CCI, bien qu'il soit n compromis. Certes il po litigieux, une contestatio cette contestation empo que cela paraisse, la Co dans l'affaire des Pyram

rs préparés pour une
s d'arbitrage.

ces diverses, rendues
procédure arbitrale à
nataire de la clause.
ouvement. Il ne s'agit
ion; le moment paraît

l'extension est que la
onne administration de

nmodité des parties, à
on évitera, surtout, les
rencontre, dans son
rvue en moyens, a pu

ent en cours sur l'arbi-
e dans certains pays.
du genre plus large de
spécifiques. L'identité
ême groupe simplifie
n de l'arbitrage à une
artenance à un même

e notion économique.

nce formelle née de la
ientation économique

tiges. Il s'est toujours
tant ni contestable ni
-même.

es de compétence des
dictionnel. Mais, pour
ir et compétence sont
ons d'État. L'on aurait
our invoquer la clause
outissent à une même
le effet à l'égard de la
de savoir si la prise en
le, après tant d'autres
d'arbitrage[3].

8) Il faut décrire brièvement le phénomène jurisprudentiel avant de poser les questions qu'il soulève de loi applicable et de droit substantiel.

## I. DESCRIPTION

9) Dressons un tableau synoptique, une sorte de fiche signalétique du phénomène. Il s'agit d'une quinzaine de décisions *publiées*, l'examen n'est donc pas exhaustif.

### A. Sentences et arrêts

Toutes les sentences concernées résultent d'arbitrages institutionnels. Aucun arbitrage *ad hoc* n'a été rencontré.

La CCI se taille la part du lion avec des sentences publiées s'échelonnant de 1975 à 1983[4]. Mais ce n'est pas la seule institution concernée. La CIRDI a connu du problème dans l'affaire Holiday Inn. c/Maroc et l'a réglé par une sentence partielle du 1er juillet 1973[5]. Quelques sentences d'arbitrage maritime, tant à Paris qu'à New York, ont également abordé la question[6].

Les juridictions étatiques en ont également été saisies. La High Court of Justice anglaise a rendu dans l'affaire Roussel-Uclaf c/Searle, un arrêt en date du 6 octobre 1977[7]. Le Tribunal fédéral suisse a rendu deux décisions : l'arrêt Cartier du 10 octobre 1979 et l'arrêt Tradax du 7 février 1984[8]. La Cour de Paris enfin a rendu deux arrêts[9], l'un dans l'affaire Dow Chemical en date du 21 octobre 1983 qui nous intéresse directement, l'autre dans l'affaire des Pyramides, en date du 12 juillet 1984, qui ne nous intéresse qu'indirectement.

### B. Objet de la contestation

10) La contestation porte toujours sur la compétence de l'arbitre ou celle du juge étatique.

La question se pose directement à l'arbitre (cas le plus courant) ou au juge étatique pour obtenir soit son dessaisissement soit un sursis – selon la loi anglaise sur l'arbitrage de 1975 –. Indirectement, la question se pose dans le cadre du contrôle étatique sur la sentence arbitrale qui aurait statué sans convention.

Le litige ne porte que sur des clauses compromissoires. Jamais sur des compromis : sans doute parce que ceux-ci sont rares dans les arbitrages institutionnels, mais aussi parce que, lors d'un compromis, l'on a tendance à définir sans ambiguïté les parties au litige. Il faut rappeler ici que l'acte de mission prévu dans le règlement de la CCI, bien qu'il soit né historiquement de l'exigence d'un compromis, ne vaut pas compromis. Certes il pourrait en contenir un; mais s'il comporte, parmi les points litigieux, une contestation sur la compétence, il serait bien paradoxal que l'énoncé de cette contestation emporte soumission à la compétence des arbitres. Aussi curieux que cela paraisse, la Cour de Paris a eu à le rappeler dans son arrêt du 12 juillet 1984 dans l'affaire des Pyramides.

108

## C. Parties

11) Les parties demanderesses à l'extension de la clause ont été tantôt les sociétés du groupe, tantôt le tiers co-contractant. Il arrive même que le litige s'élève entre deux sociétés non-signataires appartenant respectivement aux mêmes groupes que les signataires. Il est intéressant de noter que dans un cas (sentence 1510 de la Société d'arbitrage maritime de New York du 28 novembre 1980), la société signataire a présenté les demandes des autres sociétés du groupe, sans que celles-ci soient formellement parties à l'arbitrage.

## D. Le résultat

12) Le résultat est le suivant. Toutes les fois que le groupe – société non signataire – a invoqué à son profit la clause, à une exception très particulière près[10], le bénéfice de la clause lui a été reconnu. En revanche, les solutions sont mitigées, avec une dominante au rejet lorsque c'est le tiers qui cherche à étendre l'effet d'une clause compromissoire à une société non-signataire. L'on verra si cette constatation revêt une signification particulière, en examinant les questions de loi applicable et de droit substantiel que soulève ce courant jurisprudentiel.

## II. QUESTIONS DE LOI APPLICABLE

13) En termes de conflits de lois, l'on balance entre deux pôles d'attraction :
– le groupe – pôle structurel
– la clause d'arbitrage – affaire de circonstance.

Il est fort gênant de dépecer ainsi une question unique qui intègre les deux éléments. Une règle matérielle serait sans doute – et comme toujours – mieux adaptée. Mais cette préférence ne dispense pas de mesurer le rôle respectif de la loi de la société et de la loi applicable à la clause. Le choix n'est pas indifférent et témoigne parfois de prises de position préalables à la désignation de la loi applicable.

## A. Le groupe

14) C'est la loi de la société qui dira si celle-ci constitue une entité distincte, dotée d'une personnalité propre ; si et dans quelle mesure sa domination ou son contrôle permettent d'instaurer une transparence au sein du groupe.

L'on se heurte, ici, évidemment, au problème de la multiplicité des lois nationales dans les groupes multinationaux. On ne peut surmonter l'écueil que soit par la reconnaissance d'une hypothétique loi unique du groupe, à déterminer avec tous les problèmes que l'on sait (société mère ? Centre de décision ?...) soit par une application distributive des lois des sociétés concernées. C'est cette solution qui, en l'état actuel du droit positif, paraît devoir être retenue : la loi de chaque société dira si et dans quelle mesure celle-ci a pu être engagée par les actes d'une autre société du

---

groupe. Ainsi, si la loi – [...]
de la filiale doivent être [...]
exemple que les filiales n[...]
indication devra être suiv[...]

Mais dans aucune de[...]
admis que le groupe con[...]
juridique des sociétés a [...]
sociétés non-signataires c[...]

15) La loi de la so[...]
d'arbitrage avait pouvo[...]
signataire. C'est en term[...]
fédéral suisse le 10 octob[...]
«l'interpénétrabilité et (c[...]
la clause arbitrale signée[...]
être signée au nom des [...]
spécial, qualités dont l'ex[...]

Le renvoi aux pouv[...]
concernée.

16) Mais la détermi[...]
de la difficulté. Même s[...]
qualité il a *en fait*, agi. C[...]
Et, à supposer que le s[...]
entière de savoir si la so[...]
clause compromissoire ou[...]

Or, sur ce point il [...]
clause d'arbitrage.

17) Dans la mesure [...]
la soumission de celle-ci[...]
n'est plus discutée. Cette[...]
fond. La détermination d[...]
d'autonomie.

Mais il faut aussi [...]
notamment quant à l'ex[...]
supplémentaire à la valid[...]

18) La clause peut, [...]
au titre de la procédure[...]
considéré comme une e[...]
d'État, le Concordat i[...]

groupe. Ainsi, si la loi – ou la jurisprudence – de la société mère décide que les actes de la filiale doivent être traités comme émanant de la société mère – au motif par exemple que les filiales ne sont que les instruments du commerce de la mère – cette indication devra être suivie.

se ont été tantôt les
ne que le litige s'élève
it aux mêmes groupes
s (sentence 1510 de la
ore 1980), la société
ipe, sans que celles-ci

Mais dans aucune des espèces rencontrées l'on n'a soutenu ou, à tout le moins, admis que le groupe constituait une unité juridique indissociable. L'indépendance juridique des sociétés a même servi parfois au rejet des demandes d'attraction des sociétés non-signataires dans la procédure arbitrale.

15) La loi de la société déterminera également si le signataire de la clause d'arbitrage avait pouvoir ou qualité d'agir pour le compte de la société non-signataire. C'est en termes de pouvoir que l'arrêt Cartier rendu par le Tribunal fédéral suisse le 10 octobre 1979, a résolu la question. Ayant constaté qu'en dépit de «l'interpénétrabilité et (de) l'imbrication de sociétés dominées par un seul homme», la clause arbitrale signée par l'administrateur et président d'un groupe ne pouvait être signée au nom des sociétés du groupe que par un organe ou un mandataire spécial, qualités dont l'existence n'a pas été considérée comme établie en l'espèce.

groupe – société non
ès particulière près[10],
olutions sont mitigées,
à étendre l'effet d'une
a si cette constatation
de loi applicable et de

Le renvoi aux pouvoirs de l'organe désigne évidemment la loi de la société concernée.

16) Mais la détermination du pouvoir de l'organe ne résout qu'un aspect partiel de la difficulté. Même si le signataire avait pouvoir, il resterait à savoir en quelle qualité il a *en fait*, agi. Ce n'est pas toujours très clair dans les groupes de sociétés. Et, à supposer que le signataire n'ait ni pouvoir ni qualité, la question demeure entière de savoir si la société non-signataire ne doit pas être réputée avoir accepté la clause compromissoire ou y avoir adhéré.

: pôles d'attraction :

Or, sur ce point il convient de se tourner vers l'autre élément du couple : la clause d'arbitrage.

e qui intègre les deux
me toujours – mieux
rôle respectif de la loi
'est pas indifférent et
on de la loi applicable.

### B. La clause d'arbitrage

17) Dans la mesure où la règle de conflit s'applique à la clause compromissoire, la soumission de celle-ci à la loi d'autonomie – sous réserve de règles matérielles – n'est plus discutée. Cette loi peut d'ailleurs n'être point la loi régissant le contrat au fond. La détermination des parties et des tiers à l'acte relève naturellement de la loi d'autonomie.

e une entité distincte,
sa domination ou son
roupe.

Mais il faut aussi se rappeler qu'un problème de forme peut se poser, notamment quant à l'exigence d'un écrit – et il conviendrait de donner une chance supplémentaire à la validité par l'application facultative de *locus regit actum*.

i multiplicité des lois
nonter l'écueil que soit
ipe, à déterminer avec
cision?...) soit par une
t cette solution qui, en
de chaque société dira
d'une autre société du

18) La clause peut, en certains pays, relever de la loi du lieu de l'arbitrage, soit au titre de la procédure, soit au titre du droit public. En Suisse, où l'arbitrage est considéré comme une exception à la garantie constitutionnelle du recours au juge d'État, le Concordat intercantonal sur l'arbitrage de 1969 impose comme une

110

disposition impérative la forme écrite de la convention d'arbitrage, et cette disposition s'applique à tout arbitrage ayant son siège sur le territoire de l'un des cantons concordataires (tous sauf erreur, à l'exception de Zürich).

19) La question de la forme peut être réglée directement par un instrument international. La Convention de New York du 10 juin 1958, celle de Washington du 18 mars 1965, la Convention européenne du 21 avril 1961 imposent, selon des modalités et à des degrés divers, que la clause soit écrite ou signée par les parties. Lorsque ces instruments s'appliquent, il faut rechercher si l'extension d'une clause à une société non-signataire est compatible avec l'exigence d'une convention écrite.

20) Au-delà, la question se pose de savoir s'il ne faut pas provoquer, en matière de groupe de sociétés, une nouvelle règle matérielle de l'arbitrage commercial international. Il appartient à chaque État d'en décider pour son propre compte. Mais une telle règle existe-t-elle en dehors de tout droit étatique?

21) L'ébauche la plus élaborée de cette tentative est fournie par la sentence Dow Chemical du 23 septembre 1982 rendue sous l'égide de la CCI par un collège arbitral prestigieux. Cette sentence entend apprécier la portée et les effets d'une clause compromissoire CCI selon une règle matérielle *non étatique,* déduite de la seule *lex mercatoria.*

La démarche se fonde sur le règlement de la Cour d'arbitrage de la CCI. La sentence énonce qu'en raison de l'autonomie de la clause compromissoire, la désignation par les parties d'une loi applicable ne concerne que le fond du litige, sauf stipulation expresse contraire. Cette lecture du contrat est commandée par la référence des parties au Règlement de la CCI qui, concernant la décision des arbitres sur leur propre compétence, ne «prévoit de recours à aucune loi étatique»: l'article 8 § 3 confère au tribunal arbitral le pouvoir de «prendre toute décision sur sa propre compétence» sans lui prescrire d'appliquer, pour ce faire, une loi étatique quelconque.

En conséquence, le tribunal, libéré de toute loi étatique, a recherché et retenu sa compétence en se fondant sur la commune volonté des parties et sur les usages du commerce international, notamment en présence d'un groupe de sociétés.

22) Cette démarche soulève plusieurs interrogations.

a) Tout d'abord, le règlement de la Cour d'Arbitrage de la CCI n'est-il pas un tant soit peu sollicité?

L'article 8 § 3 énonce :

«Lorsqu'une des parties soulève un ou plusieurs moyens relatifs à l'existence ou à la validité de la Convention d'arbitrage, la Cour, ayant constaté *prima facie* l'existence de cette Convention, peut décider, sans préjuger la recevabilité ou le bien-fondé de ces moyens, que l'arbitrage aura lieu. Dans ce cas, il appartiendra à l'arbitre de prendre toute décision sur sa propre compétence».

La dernière phrase, citée par la sentence, a pour objet, dans son contexte, de signifier que le tribunal n'est pas lié par la décision provisoire de la Cour. Cette

111

trage, et cette disposi-
re de l'un des cantons

ent par un instrument
elle de Washington du
l imposent, selon des
signée par les parties.
tension d'une clause à
e convention écrite.

provoquer, en matière
l'arbitrage commercial
n propre compte. Mais

ournie par la sentence
la CCI par un collège
tée et les effets d'une
*étatique*, déduite de la

rage de la CCI. La sen-
missoire, la désignation
litige, sauf stipulation
ar la référence des par-
arbitres sur leur propre
'article 8 § 3 confère au
a propre compétence»
quelconque.

, a recherché et retenu
ties et sur les usages du
e de sociétés.

e la CCI n'est-il pas un

relatifs à l'existence ou
constaté «*prima facie*»
er la recevabilité ou le
e cas, il appartiendra à
».

, dans son contexte, de
oire de la Cour. Cette

disposition n'apporte rien sur la question de savoir si la clause compromissoire est soumise à une loi étatique.

Il est vrai, en revanche, que le règlement ne prescrit pas le recours à une loi étatique. Mais il n'en libère pas non plus l'arbitre. Je crois tout simplement qu'il est muet – j'allais dire sans opinion – sur la question. Le règlement envisage la validité de la clause sans se référer à une loi étatique. En déduit-on que les cas de nullité échappent à toute loi étatique?

Dès lors, n'est-il pas plus légitime d'interpréter la désignation d'une loi par les parties comme s'appliquant aussi, *prima facie*, à la clause compromissoire? L'autonomie de celle-ci permet mais n'impose pas de la soumettre à une autre loi que celle régissant le fond du contrat et, en l'absence d'indication contraire, il n'y a pas de raison déterminante de dissocier, *a priori*, entre les lois applicables. De surcroît, c'est surtout matériellement que l'autonomie de la clause rend service, pour échapper à la nullité éventuelle du contrat. Or, nous verrons que l'extension de la clause à une société non-signataire suppose des incursions matérielles importantes dans le contrat. L'application d'une même loi serait alors d'autant plus souhaitable.

En outre, s'il s'agit d'interpréter la volonté des parties, l'on peut raisonnablement penser que la désignation d'une loi dans le contrat leur est psychologiquement plus proche que le détour par les dispositions du règlement sur la compétence des arbitres.

Pas davantage on ne devrait accorder une importance considérable à la manière, souvent générale, dont est rédigé l'acte de mission. Sinon, l'on transforme ce document en un piège pour les parties et l'on complique d'autant sa signature.

23 b)  La deuxième interrogation tient à la légitimité de la démarche. S'agissant de rechercher l'applicabilité de la clause à un non-signataire, on invoque la volonté des signataires de se référer au règlement de la CCI. Ce n'est légitime que si l'on tient compte de la volonté du non-signataire. C'est dire que le recours à la volonté des parties (y compris les non-signataires) est impliquée par la démarche initiale. On n'invoque pas le règlement pour rechercher ensuite librement la règle matérielle. C'est la substance même de la règle qui autorise de se fonder sur le règlement – à supposer exacte l'interprétation qui en a été donnée.

24 c)  La troisième – et dernière – interrogation concerne le point de vue du juge étatique. Le droit français permet-il à l'arbitre de se prononcer sur sa compétence sans se référer à une loi étatique? La question, d'une manière ultime, tient à la philosophie de l'arbitrage : dérogation à la justice d'État, ou justice parfois tout aussi naturelle accompagnant la justice d'État.

Plus pragmatiquement, l'art. 1502 NCPC permet-il à l'arbitre de statuer sur le fondement d'une convention d'arbitrage non sanctionnée par une loi d'État? Le texte est muet, mais l'on peut penser que le libéralisme des articles 1495 et 1496 NCPC peut inspirer ici la même solution : l'arbitre n'est pas tenu d'appliquer une loi d'État, mais il est tenu par une règle de droit. Il ne peut tenir son pouvoir de sa propre décision. Son investiture – sa compétence – doivent se fonder sur une règle de droit.

112

Et l'on est ainsi une fois de plus renvoyé à la question de savoir si la *lex mercatoria* est du droit (ainsi qu'aux avatars de l'affaire Pabalk-Norsolor)[11]. A mon sens, et en évitant le débat général, l'on peut admettre la directive que constitue une règle de droit légitimant le pouvoir de l'arbitre, une règle précise qui, tenant compte des circonstances, soit suffisamment contraignante pour éviter le risque d'arbitraire.

En d'autres termes, c'est la pertinence de la règle qui lui servira de justification. Ce qui nous conduit à entrer dans le débat du droit substantiel.

### III. QUESTIONS DE DROIT SUBSTANTIEL

25) Les décisions étudiées ont dû se prononcer sur une question de forme et dégager une règle de fond.

#### A. Question de forme

Lorsque la loi applicable à la clause exige une forme écrite, cette clause peut-elle être étendue à une société non-signataire? La question se rencontre notamment à propos des arbitrages du CIRDI institués par la Convention de Washington du 18 mars 1965, de la Convention de New York du 10 juin 1958 et du droit suisse. Pour le droit français, nous inclinons à penser que l'article 1443 NCPC – sanctionnant de la nullité la clause compromissoire non écrite – ne s'applique pas à l'arbitrage international.

#### 1 – *La Convention de Washington*

26) Le problème s'est rencontré dans l'affaire Holiday Inn c/Maroc. En schématisant, voici les faits. Le groupe américain Holiday Inn (ainsi que le groupe Occidental Petroleum, mais je ne parlerai, *brevitatis causa*, que du premier) a conclu, par une filiale suisse (alors en formation – complication supplémentaire hors de notre propos) un accord de base avec le Maroc pour la construction d'hôtels. La question de la participation à l'arbitrage CIRDI prévu par la convention s'est posée à propos

– de la société mère américaine,
– des filiales créées au Maroc.

27 a) *Pour la société mère américaine*, il convenait d'appliquer l'article 25 § 1 de la Convention de Washington qui prévoit la compétence du Centre des litiges entre un État contractant et un ressortissant d'un autre État contractant, lorsque les parties y «*ont consenti par écrit*».

Le tribunal arbitral (1er juillet 1973) a refusé d'avoir une approche formaliste de ce texte. Il admit la société mère à invoquer la clause d'arbitrage pour des motifs tirés de son rôle dans le contrat contenant cette clause qui en est inséparable.

28 b) *Pour les filiale*
n'autorise une société d'u
s'il a été convenu de la «c
en raison du contrôle exe

Il n'était pas doute
contrôle étranger. Mais a
le Maroc. L'article 25 § 2.
des termes. Dès lors, la q
écrit pour reconnaître au

Ici encore, le tribuna
rigueur au fond :

«The question arises
or whether it may be imp
achieve constitutes an ex
and one would expect th
with respect to such a de
explicit. An implied agr
specific circumstances wo
parties, which is not the c

Le Tribunal a consid
aux principes de la Conve
accord implicite «dans le
interprétation de l'intenti
qu'un tel accord implicite
juridictions à l'égard de l'
tout doute.

Pas d'exigence de for
demander si la meilleure
écrite de la volonté.

29) C'est le Tribuna
Convention de New Yor
7 février 1984. La conve
conventions écrites d'ar
société du groupe Amoco
à une autre société du gr
de la charte-partie. Le T
clause compromissoire. Il
des considérations de for
par les parties qui l'invoc
Convention – et non le d

l de savoir si la *lex*
-Norsolor)[11]. A mon
ve que constitue une
e qui, tenant compte
e risque d'arbitraire.

rvira de justification.


L

question de forme et


cette clause peut-elle
contre notamment à
a de Washington du
du droit suisse. Pour
PC – sanctionnant de
ue pas à l'arbitrage


y Inn c/Maroc. En
(ainsi que le groupe
que du premier) a
supplémentaire hors
struction d'hôtels. La
nventiuon s'est posée


uer l'article 25 § 1 de
entre des litiges entre
nt, lorsque les parties


pproche formaliste de
e pour des motifs tirés
éparable.

28 b) *Pour les filiales marocaines,* un autre problème se posait. L'art. 25 § 2.b n'autorise une société d'un État contractant à bénéficier de l'arbitrage du Centre que s'il a été convenu de la «considérer comme ressortissant d'un autre État contractant en raison du contrôle exercé sur elle par des intérêts étrangers».

Il n'était pas douteux, en l'espèce, que les filiales marocaines étaient sous contrôle étranger. Mais aucune convention *expresse* n'avait été conclue entre elles et le Maroc. L'article 25 § 2.b se présente dans la dépendance du § 1, dont il définit l'un des termes. Dès lors, la question s'est posée de savoir s'il fallait, ou non, un accord écrit pour reconnaître aux filiales marocaines le caractère de ressortissant étranger.

Ici encore, le tribunal arbitral a fait preuve de libéralisme sur la forme – mais de rigueur au fond :

«The question arises, however, whether such an agreement must be expressed or whether it may be implied. The solution which such an agreement is intended to achieve constitutes an exception to the general rule established by the convention, and one would expect that parties should express themselves clearly and explicitly with respect to such a derogation. Such an agreement should therefore normally be explicit. An implied agreement would only be acceptable in the event that the specific circumstances would exclude any other interpretation of the intention of the parties, which is not the case here».

Le Tribunal a considéré que l'accord visé par l'art. 25 § 2.b était une dérogation aux principes de la Convention et devrait dès lors être explicite. Mais il a admis un accord implicite «dans le cas où des circonstances spécifiques excluraient toute autre interprétation de l'intention des parties». Sur le fond, il n'a pas admis en l'espèce qu'un tel accord implicite ait été conclu : la renonciation de l'État à ses propres juridictions à l'égard de l'un de ses ressortissants ne peut être acquise qu'au-delà de tout doute.

Pas d'exigence de forme, donc, mais une exigence de fond telle que l'on peut se demander si la meilleure – ou la seule – manière d'y satisfaire n'est pas l'expression écrite de la volonté.


### 2 – *La Convention de New York*


29) C'est le Tribunal fédéral suisse qui a eu à statuer sur l'application de la Convention de New York à un groupe de sociétés dans l'arrêt Tradax c/Amoco du 7 février 1984. La convention impose aux États contractants la reconnaissance des conventions écrites d'arbitrage. En l'espèce, une charte-partie conclue par une société du groupe Amoco contenait la clause d'arbitrage et le connaissement, délivré à une autre société du groupe Amoco, contenait un renvoi aux clauses et conditions de la charte-partie. Le Tribunal fédéral a considéré que le renvoi s'étendait à la clause compromissoire. Il a donné à sa décision des motifs de fond, sans s'arrêter à des considérations de forme tenant à l'absence de la clause dans un document signé par les parties qui l'invoquaient. Mais le tribunal a bien précisé qu'il interprétait la Convention – et non le droit suisse.

se développent des considérations sur le rôle des parties dans les relations contrac-tuelles. L'existence du groupe atteste de l'unité d'intérêts, de la connaissance des divers documents contractuels, de l'indifférence du tiers à son organisation interne ou de sa croyance légitime qu'il traite avec tout un groupe.

Mais c'est surtout la participation des diverses sociétés à l'opération objet de la convention qui est déterminante.

Il est essentiel d'illustrer cette proposition de plusieurs exemples, car tout le courant jurisprudentiel repose sur ce fondement.

### 33) *1er exemple : l'affaire Roussel-Uclaf* (High Court of Justice 6 octobre 1977)

La société américaine Searle a inventé un produit pharmaceutique de base et concédé à Roussel-Uclaf une licence exclusive pour fabriquer et commercialiser le produit, partout, sauf aux États-Unis. Le contrat comportait une clause d'arbitrage CCI. La société américaine a mis au point un *dérivé* du produit de base, qu'elle a commercialisé par ses diverses filiales, notamment en Grande-Bretagne. Le litige allait s'élever sur le point de savoir si le produit dérivé était compris ou non dans la concession de licence exclusive.

Roussel-Uclaf a assigné devant les juridictions anglaises pour violation de l'accord d'exclusivité aussi bien la société mère américaine, que la filiale anglaise non signataire de la clause d'arbitrage. La société américaine a introduit une requête en arbitrage devant la Cour d'arbitrage de la CCI. Elle a, en même temps que sa filiale anglaise, demandé la suspension de la procédure devant les juridictions anglaises.

L'Arbitration Act de 1975 permet d'obtenir une telle suspension lorsqu'elle est demandée par une partie à l'accord d'arbitrage ou par une personne agissant «par ou pour une telle partie». La filiale anglaise pouvait-elle être considérée agir par ou pour sa mère ? Une réponse positive a été donnée au motif essentiel que les situations de la mère et de la filiale à 100 % au regard du litige étaient pratiquement identiques en l'espèce :

– si la mère est en faute, la filiale le sera également,
– mais si la mère n'est pas en faute, le sens commun commande de considérer que la filiale ne l'est pas non plus.

«... no reason why these words in the Act should be construed so narrowly as to exclude a wholly-owned subsidiary company claiming, as here, a right to sell patented articles which it has obtained from and been ordered to sell by its parent. Of course, if the arbitration proceeding so decide, it may eventually turn out that the parent company is at fault and not entitled to sell the articles in question at all; and, if so, the subsidiary will be equally at fault. But, if the parent is blameless, it seems only common sense that the subsidiary should be equally blameless. The two parties and their actions are, in my judgment, so closely related on the facts in this case that it would be right to hold that the subsidiary can establish that it is within the purview of the arbitration clause, on the basis that it is claiming 'through or under' the parent to do what is in fact doing whether ultimately held to be wrongful or not».

Il y a donc, ici, une quasi-indivisibilité des situations qui permet de considérer que *l'on demeure dans les limites de la clause d'arbitrage.*

114

### 3 – *Le droit suisse*

30) L'on sait la tendance, en Suisse, à une interprétation restrictive de la clause d'arbitrage, refusant par exemple de l'étendre à un contrat accessoire[12]. Qu'allait-il en être de l'extension à un groupe de sociétés?

L'application à un groupe de sociétés de la règle suisse qui exige une forme écrite de la convention d'arbitrage a été examinée dans la sentence 4402/1983. La sentence rappelle d'abord la nécessité d'une convention *écrite*, c'est-à-dire signée par toutes les personnes auxquelles elle impose des obligations, comme condition de la privation de la garantie constitutionnelle du recours au juge naturel. Puis la sentence se demande si le signataire a agi seulement pour son compte ou également pour les autres sociétés du groupe, et si le comportement de ces sociétés emporte un accord implicite à l'arbitrage.

Cette démarche montre bien que la question n'est pas de pure forme. Comme le dit la sentence Dow Chemical, il s'agit d'examiner la portée et les effets de la clause, de savoir qui est partie et qui est tiers. Dès lors qu'une personne a signé la clause, l'exigence de forme est remplie si l'on peut démontrer que le signataire a agi pour le compte d'une autre société du groupe[13]. Qu'il s'agisse de représentation initiale – selon ses divers modes – ou de transfert des droits, par cession ou subrogation, l'exigence de forme, à savoir l'existence d'une clause initiale écrite et signée – est de toute manière respectée. Seule se pose alors la question de l'efficacité de l'institution de fond qui en permet l'extension à une personne non matériellement signataire. S'il y a exigence de forme, elle est déplacée vers cette institution.

A la vérité, l'effort essentiel des arbitres qui ont admis l'extension de la clause a porté sur une justification de fond.

### B. Question de fond

31) La jurisprudence extensive refuse de se laisser enfermer dans la considération de la sentence 2138/1974 :

«Attendu que s'il résulte bien des éléments du dossier que la négociation de l'affaire et sa conclusion sur les termes essentiels ont été menées par la Société X..., il n'est nullement établi que si celle-ci avait signé elle-même le contrat du..., elle aurait accepté la clause compromissoire...».

Un tel motif, par sa généralité et son abstraction, étoufferait toute tentative d'extension. En réalité, les décisions qui ont admis l'extension se fondent sur la volonté des parties, y compris les sociétés non-signataires. Cette volonté est déduite :
– de l'appartenance de ces sociétés au même groupe que la société signataire,
– de leur rôle dans l'affaire concernée.

32) L'appartenance à un même groupe n'est jamais, à elle seule, suffisante. Le groupe n'est pas considéré par lui-même comme un principe d'intégration entraînant *de plein droit* la transparence en son sein. L'existence du groupe – non contestée – est utilisée comme un indice – un signal de déclenchement – ou un terrain sur lequel

---

se développent des cons
tuelles. L'existence du
divers documents contra
ou de sa croyance légitir

Mais c'est surtout la
convention qui est déter

Il est essentiel d'ill
courant jurisprudentiel

33) *1er exemple :* l'

La société américa
concédé à Roussel-Ucla
produit, partout, sauf au
CCI. La société améric
commercialisé par ses
allait s'élever sur le poi
concession de licence e

Roussel-Uclaf a
l'accord d'exclusivité au
signataire de la clause d
arbitrage devant la Cou
anglaise, demandé la su

L'Arbitration Act
demandée par une part
pour une telle partie».
pour sa mère? Une r
situations de la mère et
identiques en l'espèce :

– si la mère est en
– mais si la mère n
que la filiale ne l'est pa

«... no reason why
exclude a wholly-own
patented articles which
Of course, if the arbitr
parent company is at fa
if so, the subsidiary wi
only common sense tha
and their actions are, in
it would be right to hol
of the arbitration claus
to do what is in fact do

Il y a donc, ici, u
que *l'on demeure dans*

116

34) *2ᵉ exemple : l'affaire Holiday Inn c/Maroc* (1ᵉʳ juillet 1973)

Dans cette affaire, les négociations avaient été menées par la société mère – la filiale signataire n'étant pas encore constituée. La société mère non-signataire de la clause avait *garanti* l'exécution par la filiale de la convention contenant la clause compromissoire. Un argument de subrogation en avait été tiré. Le tribunal arbitral a considéré que, dans la mesure où elle avait exécuté les obligations du contrat, la société mère pouvait invoquer la clause d'arbitrage qui doit être considérée comme inséparable.

L'accord prévoyait également que le contrat pouvait être *cédé*, transféré à une autre filiale du groupe. Le tribunal en a conclu que l'esprit du contrat était de laisser aux sociétés contractantes une grande *flexibilité* dans la désignation des sociétés qui assumeraient la responsabilité de l'exécution des obligations.

35) *3ᵉ exemple : l'affaire Dow Chemical c/Isover Saint-Gobain*

Le litige portait sur les avatars de la commercialisation en France d'un produit d'isolation fabriqué et commercialisé sous diverses marques par les diverses sociétés du groupe Dow, à travers un réseau particulièrement complexe et mouvant.

Le tribunal arbitral s'est efforcé de montrer que les diverses sociétés du groupe Dow avaient agi indifféremment, tant lors de la négociation que lors de l'exécution et de la résiliation des contrats.

Une grande confusion a régné d'où il résulte, à suivre les constatations très minutieuses des arbitres, que :
– l'identité de la société (filiale vénézuélienne puis suisse) signataire du contrat était sans importance,
– la société mère américaine, bien que non signataire, propriétaire des marques, avait nécessairement consenti au contrat qui avait été exécuté sans licence d'exploitation,
– une autre société non signataire, la filiale française, avait été désignée pour exécuter le contrat, qui prévoyait d'ailleurs la faculté – non utilisée en fait – de faire livrer par d'autres sociétés du groupe. C'est cette même société qui a procédé à la résiliation des contrats.

Le tribunal en a déduit que :
– la société mère était le pivot des rapports contractuels et exerçait un contrôle absolu sur ses filiales qui sont intervenues dans l'affaire,
– la filiale française s'était comportée pleinement – et avait été traitée – comme une partie au contrat.

*Autres exemples*

36) D'une manière plus générale, il n'est pas d'exemple où l'extension de la clause compromissoire ait été admise sans que le tribunal relève l'implication des sociétés du groupe dans les relations contractuelles spécifiques. Il en est ainsi notamment des affaires maritimes où les droits étaient nés de connaissements émis à la suite d'une charte-partie.

De même, dans les
arbitres ont relevé l'imbr
du groupe, la volonté de
leurs filiales, et le cara
isolerait la seule clause co

37) Veut-on la conti

Les sentences qui o
sociétés du groupe d'a
l'absence de confusion er
seule société signataire,
volonté des sociétés non

38) Ainsi entendue
plus classique qu'il n'y
parties, l'on peut se dem
droit français. Elle ne fai
forme et de preuve de la
acte ou encore son exten

L'on peut ainsi s'exp
fois que la société non-si
sa volonté; sans doute
convention ouverte à lac
non-signataire avec l'op
permettent de respecter

En tout cas, l'on voi
– et lui seul – tirerait ava
par le groupe. La donn
subjective spécifique : l
d'une analyse concrète d
volontaire de règlemen
structure, ni un compor
une juridiction arbitrale.

39) Mais il faut me
compromissoire. Dès l
commande la décision s
inséparable des autres
artificielles les justificati
L'extension de la clause
son intégration dans l'e
inséparable de la clause
l'isoler. En définitive, la
l'autonomie de la clause
les rédacteurs du décret
n'aient pas figé la règle
souplesse que le dévelop

De même, dans les deux sentences CCI n⁰ˢ 2375 et 1434 rendues en 1975, les arbitres ont relevé l'imbrication des obligations contractuelles des diverses sociétés du groupe, la volonté des sociétés signataires de stipuler pour elles-mêmes et pour leurs filiales, et le caractère *déraisonnable* d'une interprétation du contrat qui isolerait la seule clause compromissoire de liens complexes de droits et d'obligations.

37) Veut-on la contre-épreuve ?

Les sentences qui ont refusé l'extension soulignent, elles aussi, la volonté des sociétés du groupe d'agir séparément, l'indépendance de leurs personnalités, l'absence de confusion entre elles, la conscience du co-contractant de traiter avec la seule société signataire, et non avec le groupe, enfin l'absence de preuve de la volonté des sociétés non signataires de se soumettre à la clause compromissoire.

38) Ainsi entendue, cette nouvelle jurisprudence arbitrale serait finalement plus classique qu'il n'y paraît. Fondée, en dernière analyse, sur la volonté des parties, l'on peut se demander si elle ne pose pas une règle existant d'ores et déjà en droit français. Elle ne fait que prolonger le libéralisme jurisprudentiel en matière de forme et de preuve de la clause, l'admission de l'arbitrage par référence à un autre acte ou encore son extension à des contrats accessoires ou annexes[14].

L'on peut ainsi s'expliquer que l'extension de la clause ait été retenue toutes les fois que la société non-signataire l'invoquait[15]; cela supprimait toute discussion sur sa volonté; sans doute le tiers pouvait-il soutenir que la clause n'est pas une convention ouverte à laquelle quiconque peut adhérer, mais les liens de la société non-signataire avec l'opération, sans lesquels son intérêt à agir serait aléatoire, permettent de respecter la relativité des conventions.

En tout cas, l'on voit qu'il ne s'agit pas d'une entreprise anti-groupe, où le tiers – et lui seul – tirerait avantage d'une apparence créée ou d'une confusion entretenue par le groupe. La donnée objective – le groupe – vient au soutien d'une réalité subjective spécifique : l'adhésion de la société non-signataire à la clause, dégagée d'une analyse concrète des relations contractuelles. L'arbitrage demeure un procédé volontaire de règlement des litiges : il ne sanctionne ni l'appartenance à une structure, ni un comportement n'impliquant pas la volonté réelle de se soumettre à une juridiction arbitrale.

39) Mais il faut mesurer que cette approche affecte l'autonomie de la clause compromissoire. Dès lors que l'analyse des relations contractuelles au fond commande la décision sur la compétence des arbitres, la clause apparaît comme inséparable des autres stipulations du contrat. C'est pourquoi, nous paraissent artificielles les justifications fondées sur l'autonomie de la clause compromissoire. L'extension de la clause à des non-signataires n'a pu être menée à bien qu'à travers son intégration dans l'ensemble des relations. Telle sentence parle du caractère inséparable de la clause compromissoire, telle autre dit qu'il serait «inconcevable» de l'isoler. En définitive, la jurisprudence arbitrale examinée illustre bien les limites de l'autonomie de la clause compromissoire. Et, à ce sujet, il est sans doute heureux que les rédacteurs du décret du 12 mai 1981 aient été pris de scrupules constitutionnels et n'aient pas figé la règle dans un texte : on aurait ainsi pris le risque de la priver de la souplesse que le développement de l'arbitrage rend nécessaire.

40) Le moment est venu de mesurer la *portée* de cette jurisprudence. Je le ferai à trois points de vue.

#### (a) *La volonté des parties*

Si l'on entend ne retenir qu'une volonté sérieuse, deux exigences doivent être maintenues :

– la charge de la preuve doit incomber à celui qui invoque l'extension de la clause à un non-signataire ; la seule existence du groupe ne saurait suffire à renverser la charge de la preuve ;

– un effort de motivation spécifique doit être entrepris dans chaque cas. Rien n'est plus dangereux que de se contenter d'une motivation générale. Elle aurait un effet dissuasif et rendrait les groupes réticents à l'égard de l'arbitrage.

Il faut bien entendu réserver la volonté contraire. Il n'est pas exclu que l'on voie apparaître une limitation expresse des clauses aux signataires, à l'exclusion de toute autre société du groupe.

Mais les arbitres doivent aussi induire cette volonté contraire des circonstances. Car le groupe n'est pas seulement *principe d'unité*, il est aussi principe de *diversité* et de division du travail, *organisation du cloisonnement de la responsabilité* : la limitation de la responsabilité est souvent le prix qu'un système social accepte de payer à l'encouragement de l'initiative privée et de l'entreprise à risque ; elle fait partie de la règle du jeu. Si un groupe a pris la précaution de ne traiter que par l'une de ses sociétés, s'il a évité la confusion, si les obligations souscrites ne sont destinées à être exécutées que par le signataire, alors il ne faut pas que l'interprète en vienne à tromper l'attente légitime des intéressés, sinon l'arbitrage lui-même en pâtirait.

Il en sera de même si un contrat ne peut être exécuté par une société non-signataire : il est des exemples, en effet, où par suite de règlements étatiques, seule une filiale d'une autre nationalité peut souscrire l'engagement et exécuter le contrat. Si les parties en sont ainsi convenues en connaissance de cause, il faut laisser en dehors de l'arbitrage la société non-signataire. N'étant pas tenue d'une obligation, son attraction aurait pour objet, le plus souvent, de lui faire assumer une garantie en cas d'insolvabilité de la société signataire. Ce serait un détournement de la clause compromissoire que de lui faire jouer ce rôle : si l'on voulait une garantie, il fallait la demander clairement.

#### (b) *Les structures concernées*

41) Le fondement à dominante volontariste retenu conduit à se demander si la solution peut être étendue à d'autres structures que les groupes de sociétés. Déjà l'on relève que dans les espèces étudiées, aucune contestation ne s'est élevée sur l'existence du groupe. Il s'agissait en fait de groupes fortement intégrés, pratiquement de filiales à 100 %[16]. Qu'en sera-t-il si le contrôle est moins absolu ou s'il revêt d'autres formes que la participation ? A notre sens, la question sera absorbée par la recherche spécifique de la volonté des parties.

Mais alors, ne peut-on étendre cette jurisprudence à des formes de coopération qui n'empruntent pas la structure d'un groupe de sociétés ? L'on pense aux

groupements de coopér[...]
ventures »), voire à la sou[...]
tenu sur les sociétés d'[...]
privilégie les circonstanc[...]
prudence s'impose à l'a[...]
intégré ne se rencontre [...]
incontestablement dans l[...]

42) Irait-on jusqu'à [...]
leurs rapports avec l'Éta[...]
La sentence CCI n° 34[...]
égyptien et de la sociét[...]
décrite pour les groupes [...]
Cette sentence a été ann[...]

La situation de l'É[...]
moins univoque que cell[...]
autorité de tutelle. En l'[...]
conclu par la seule socié[...]
agreed and ratified »). L[...]
que la Cour d'appel y vo[...]

La seconde considé[...]
compromissoire valant r[...]
ment circonspect pour a[...]

Mais ces deux rem[...]
dence élaborée pour les [...]

43) L'affaire des Pyram[...]
arbitrale : le contrôle d[...]

Dans l'affaire Dow[...]
du contrôle étatique, re[...]
la volonté des parties de[...]

La même Cour d[...]
position pour apprécier [...]
trage et annuler la sen[...]
L'enjeu est de vérifier si[...]
à cet égard, à son appr[...]
pouvoir juridictionnel. [...]
d'appel doit vérifier qu[...]
investigation doit s'éten[...]
cette question. Il y a là [...]
objet à la vérification [...]
étendre à l'arbitre la rè[...]
lie le juge de la recon[...]
compétence de la juridi[...]

prudence. Je le ferai

igences doivent être

ue l'extension de la
iit suffire à renverser

ns chaque cas. Rien
érale. Elle aurait un
itrage.

is exclu que l'on voie
i l'exclusion de toute

re des circonstances.
rincipe de *diversité* et
'a *responsabilité* : la
ne social accepte de
se à risque; elle fait
traiter que par l'une
ites ne sont destinées
'interprète en vienne
nême en pâtirait.

ıté par une société
èglements étatiques,
ement et exécuter le
e cause, il faut laisser
nue d'une obligation,
umer une garantie en
nement de la clause
me garantie, il fallait

t à se demander si la
de sociétés. Déjà l'on
ne s'est élevée sur
nt intégrés, pratique-
is absolu ou s'il revêt
sera absorbée par la

; formes de coopéra-
tés? L'on pense aux

groupements de coopération inter-entreprises, aux entreprises communes («joint ventures»), voire à la sous-traitance agréée. Dans toutes ces figures, le raisonnement tenu sur les sociétés d'un même groupe peut être transposé, dès lors que l'on privilégie les circonstances spécifiques par rapport aux données de structure. Mais la prudence s'impose à l'arbitre. L'identité d'intérêts au sein d'un groupe fortement intégré ne se rencontre pas nécessairement dans les autres hypothèses. Or elle pèse incontestablement dans la recherche de la volonté des parties.

42) Irait-on jusqu'à assimiler au cas du groupe celui des sociétés d'État dans leurs rapports avec l'État? La question s'est posée dans l'affaire dite des Pyramides. La sentence CCI n° 3493 rendue le 16 février 1983 a mené, à propos de l'État égyptien et de la société qui en était l'émanation, une démarche analogue à celle décrite pour les groupes de sociétés. Elle a retenu l'État comme partie à l'arbitrage. Cette sentence a été annulée par la Cour de Paris le 12 juillet 1984[17].

La situation de l'État est particulière à plus d'un égard. Son intervention est moins univoque que celle d'une société mère. Il peut notamment intervenir comme autorité de tutelle. En l'espèce, le Ministre du tourisme avait apposé sur le contrat conclu par la seule société d'État la formule «approuvé agréé et ratifié» («approved agreed and ratified»). Les arbitres y avaient trouvé une adhésion au contrat, alors que la Cour d'appel y voit le simple exercice d'un contrôle par l'autorité de tutelle.

La seconde considération tient à l'immunité de juridiction de l'État. La clause compromissoire valant renonciation à cette immunité, il convient d'être particulière-ment circonspect pour admettre une renonciation non expresse.

Mais ces deux remarques faites, il n'y a pas incompatibilité entre la jurispru-dence élaborée pour les groupes et son application à l'État.

(c) *Contrôle des juridictions d'État*

43) L'affaire des Pyramides invite à évoquer une dernière limite à la jurisprudence arbitrale : le contrôle des juridictions d'État.

Dans l'affaire Dow Chemical, la Cour de Paris avait, dans la foulée d'un recul du contrôle étatique, reconnu le *pouvoir souverain* des arbitres dans la recherche de la volonté des parties de se soumettre à la juridiction arbitrale.

La même Cour de Paris a, dans l'affaire des Pyramides, abandonné cette position pour apprécier elle-même directement l'existence d'une convention d'arbi-trage et annuler la sentence. Cette dernière solution paraît bien être la bonne[18]. L'enjeu est de vérifier si l'arbitre a statué sans convention d'arbitrage. S'en remettre, à cet égard, à son appréciation souveraine, c'est le rendre source et maître de son pouvoir juridictionnel. Or il n'a de pouvoir que dérivé. Et dès lors que la Cour d'appel doit vérifier que l'arbitre n'a pas statué sans convention d'arbitrage, son investigation doit s'étendre à tout ce qui lui permet de répondre, par elle-même, à cette question. Il y a là, partiellement, une révision au fond, mais limitée dans son objet à la vérification du pouvoir ou de la compétence de l'arbitre. On ne peut étendre à l'arbitre la règle de la Convention de Bruxelles du 27 septembre 1968 qui lie le juge de la reconnaissance par les faits qui ont servi à l'affirmation de la compétence de la juridiction d'origine.

120

L'existence et l'étendue du contrôle étatique constitue une garantie contre un éventuel excès de la jurisprudence arbitrale.

44) Car si cette jurisprudence peut être approuvée, c'est à la condition qu'elle repose sur une motivation factuelle sérieuse. Il faut éviter de créer une présomption d'extension de l'arbitrage au groupe, à peine de provoquer un réflexe de défense qui pourrait aller jusqu'au refus de tout arbitrage.

1. V. Derains et Schaf
1985.231; Institut du Droit e
1982.495; Derains, «Sources
Droit et pratique de l'arbitr
International Chamber of Co

2. *Chunet* 1976.973, obs
sous la direction de Goldmar

3. V. pour quelques exe
sein des groupes de sociétés»

4. Sentences CCI : N°
1976.978, obs. Derains; N° 2
*Chemical, Rev. arb.* 1984.13
*(YCA)* 1984.131, recours e
Chapelle; N° 4392/1983, *Ch*
16 fév. 1983, N° 3493, *Pyran*
note Goldman; d'autres se
reprennent le raisonnement

5. V. l'article très instru
Morocco) — Some legal Pro
v. aussi sur le CIRDI et sa
Différends relatifs aux Inves
rations», 1 *Jour. Int. Arb.* 10

6. Ch. arb. Mar. Paris,
Arbitrators, New York, 28 n

7. English High Court c
*L. Rep.* 225 (1978); comp. s
v. Kammgarn, *YCA* 1979.31

8. Trib. féd. 7 oct. 197
*suisse*, t. I, L'arbitrage intern

9. Préc. note 1 *supra*.

10. La filiale marocaine
v. *infra* N° 28.

11. Sur la *lex mercator*
*Mélanges Goldman*, p. 125
nationaux», *Trav. com.*, 19
dernier lieu, Robert, «Retou