IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------- x

URS CORPORATION                                    )
                                                   )
                    Plaintiff,                     )
                                                   )
        v.                                         )
                                                   )   Civil Action No. 06-415-SLR
THE LEBANESE COMPANY FOR THE                       )
DEVELOPMENT AND RECONSTRUCTION OF                  )   **REDACTED**
BEIRUT CENTRAL DISTRICT, S.A.L., a/k/a             )   **PUBLIC VERSION**
SOLIDERE,                                          )
                                                   )
                    Defendant.                     )
-------------------------------------------------------------- x

## DEFENDANT SOLIDERE'S REPLY BRIEF IN FURTHER SUPPORT OF MOTION TO DISMISS THE COMPLAINT

WHITE & CASE LLP

Paul B. Carberry (admitted *pro hac vice*)
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8507
pcarberry@whitecase.com

RICHARDS, LAYTON & FINGER, P.A.

Samuel A. Nolen (#971)
Anne Shea Gaza (#4093)
One Rodney Square
Wilmington, DE 19899-0551
P.O. Box 551
302-651-7700
Nolen@rlf.com
Gaza@rlf.com

*Attorneys for Defendant The Lebanese
Company for the Development and
Reconstruction of Beirut Central District,
S.A.L. a/k/a SOLIDERE*

Dated: March 13, 2007

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................. iii

Preliminary Statement ............................................................................................................ 1

Statement of Facts .................................................................................................................. 2

Argument ................................................................................................................................. 6

I.    URS HAS FAILED TO PROVE, BY A PREPONDERANCE OF THE EVIDENCE,
      THAT SOLIDERE HAD MINIMUM CONTACTS WITH THE UNITED STATES, OR
      THE STATE OF DELAWARE, SUFFICIENT TO SUBJECT IT TO THIS COURT'S
      EXERCISE OF PERSONAL JURISDICTION ......................................................... 6

      A.    URS Bears the Burden of Proving Jurisdiction by a Preponderance of the
            Evidence ........................................................................................................ 7

      B.    The Nationwide Contacts Test Does Not Apply ........................................... 7

      C.    The Contacts Alleged By URS Are Insufficient to Establish Either General
            Jurisdiction or Specific Jurisdiction Over SOLIDERE ................................ 9

            1.    Many of the Contacts Alleged By URS Are Not Relevant to the
                  Jurisdictional Analysis or Are Unsupported by Competent Evidence.. ...... 9

            2.    The Contacts Alleged Are Insufficient to Establish Specific
                  Jurisdiction ........................................................................................ 10

            3.    The Contacts Alleged Are Insufficient to Establish General
                  Jurisdiction .......................................................................................... 14

            4.    The Exercise of Jurisdiction Over SOLIDERE Would Not Comport With
                  Traditional Notions of Fair Play and Substantial Justice ................. 15

II.   URS HAS FAILED TO PROVE FACTS SUFFICIENT TO ESTABLISH THAT
      SOLIDERE IS AN ORGAN OF THE LEBANESE GOVERNMENT UNDER THE
      FOREIGN SOVEREIGN IMMUNITIES ACT .................................................... 16

      A.    SOLIDERE Is Not an Organ of the State of Lebanon ................................. 17

      B.    SOLIDERE Is Not Owned By the State of Lebanon ................................... 18

      C.    SOLIDERE Was Not Created by Statute ..................................................... 19

| | D. | SOLIDERE's Activities Are Non-Governmental | 20 |
|---|---|---|---|
| | E. | SOLIDERE's Employees Are Not Public Employees | 21 |
| | F. | The Lebanese Government Does Not Supervise SOLIDERE's Day-to-Day Business | 21 |
| | G. | SOLIDERE's Profits and Losses Are Its Own | 23 |
| | H. | SOLIDERE Does Not Exercise Sovereign Power | 24 |
| III. | | EVEN IF PERSONAL JURISDICTION OVER SOLIDERE DID EXIST, THE COURT SHOULD DECLINE TO EXERCISE SUCH JURISDICTION ON EQUITABLE ESTOPPEL AND/OR FORUM NON CONVENIENS GROUNDS | 26 |
| | A. | Equitable Estoppel Should Bar URS From Proceeding With This Action | 26 |
| | B. | This Action Should Be Dismissed on the Basis of Forum Non Conveniens | 27 |
| | | 1. The ICC Arbitration is an Adequate Alternative Forum | 27 |
| | | 2. URS's Choice of Forum Is Not Entitled to Any Significant Deference | 28 |
| | | 3. The Balance of Private and Public Interest Factors Favors Dismissal | 29 |
| Conclusion | | | 30 |

# TABLE OF AUTHORITIES

## CASES

Alco Standard Corp. v. Benalal, 345 F. Supp. 14 (E.D. Pa. 1972) .................................. 13

Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265 (1995) .................................... 8

Amtrol, Inc. v. Vent-Rite Valve Corp., 646 F. Supp. 1168 (D. Mass. 1986) .................. 15

Apollo Tech. Corp. v. Centrosphere Indus. Corp., 805 F. Supp. 1157 (D.N.J.
    1992) ................................................................................................................ 13

BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254 (3d Cir. 2000) ......... 8, 16

Bd. of Regents of the Univ. of Tex. Syst. v. Nippon Tel. & Tel. Corp., No. 05-
    51432, 2007 WL 273957 (5th Cir. Feb. 1, 2007) .......................................... 21, 23

Bechtel v. Robinson, 886 F.2d 644 (3d Cir. 1989) ........................................................ 26

Bergquist Co. v. Sunroc Corp., 777 F. Supp. 1236 (E.D. Pa. 1991) .............................. 26

Berman v. Parker, 348 U.S. 26 (1954) .......................................................................... 24

Brautigam v. Priest, No. 99-365, 2000 WL 291534 (D. Del. Mar. 2, 2000) .............. 7, 10

Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985) .................................................. 12

Burstein v. Applied Extrusion Tech., Inc., 829 F. Supp. 106 (D. Del. 1992) ......... 28, 29

Cal Caufield and Co., Inc. v. Colonial Nursing Homes, Inc., 642 F. Supp. 777 (D.
    Kan. 1986) ...................................................................................................... 13

California v. NRG Energy, 391 F.3d 1011 (9th Cir. 2004) .................................. 20, 21, 23

Carfagno v. Ace, Ltd., No. 04-6184, 2005 WL 1523530 (D.N.J. June 28, 2005) .......... 7

Chisholm & Co. v. Bank of Jamaica, 643 F. Supp. 1393 (S.D. Fla. 1986) ................... 14

Chrysler Capital Corp. v. Woehling, 663 F. Supp. 478 (D. Del. 1987) ...................... 28, 29

Cole v. Tobacco Inst., 47 F. Supp. 2d 812 (E.D. Tex. 1999) ......................................... 14

Compaigne des Bauxites de Guinea v. Ins. Co. of N. Am., 651 F.2d 877 (3d Cir
    1981), aff'd, 456 U.S. 694 (1982) .................................................................... 14

Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226 (3d Cir. 1994) .................26

Curiale v. Tiber Holding Corp., No. 95-5284, 1997 WL 597944 (E.D. Pa. Sept. 18, 1997) ...............................................................................................................29

De Sanchez v. Banco Central de Nicaragua, 770 F.2d 1385 (5th Cir. 1985) ...............21

Doe v. Unocal Corp., 248 F.3d 915 (9th Cir. 2001) ...............................................15

Dollar Sav. Bank v. First SEC Bank of Utah, 746 F.2d 208 (3d Cir. 1984)...................9

EIE Guam Corp. v. Long Term Credit Bank of Japan, 322 F.3d 635 (9th Cir. 2003) ...................................................................................................................23

Estate of Monroe v. Bottle Rock Power Corp., No. 03-2682, 2005 WL 119883 (E.D. La. Jan. 19, 2005)....................................................................................14

Filler v. Hanvit Bank, 378 F.3d 213 (2d Cir. 2004)...............................................18

First Agr. Nat. Bank of Berkshire County v. State Tax Comm'n, 392 U.S. 339 (1968)............................................................................................................20

Fiscus v. Combus Fin. AG, No. 03-1328 , 2006 WL 1722607 (D.N.J. June 20, 2006) ................................................................................................................13

Foster Wheeler Energy Corp. v. Metallgesellschaft AG, No. 91-214, 1993 WL 669447 (D. Del. Jan. 4, 1993)....................................................................7, 14

Galtney v. KPMG LLP, No. H05583, 2005 WL 1214613 (S.D. Tex. May 19, 2005) ................................................................................................................27

Gates v. Victor Fine Foods, 54 F.3d 1457 (9th Cir. 1995) .......................................22

Gehling v. St. George's Sch. of Med., Ltd., 773 F.2d 539 (3d Cir. 1985) ...................14

Glencore, Ltd. v. Chase Manhattan Bank, No. 92-6214, 1998 WL 74294 (S.D.N.Y. Feb. 20, 1998)..................................................................................17

Grand Enter. Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476 (3d. Cir. 1993)...........13

Hawaii Hous. Auth. v. Midkiff, 467 U.S. 229 (1984) .............................................24

Heft v. AAI Corp., 355 F. Supp. 2d 757 (M.D. Pa. 2005) .........................................7

Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408 (1984) ...................10

Hester Int'l Corp. v. Fed. Republic of Nigeria, 879 F.2d 170 (5th Cir. 1989) ............14

IFC Interconsult, AG v. Safeguard Int'l Partners, LLC, 356 F. Supp. 2d 503 (E.D.
      Pa. 2005) .............................................................................................8

IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254 (3d Cir. 1998) ..................................7

In re Reading Co., 404 F. Supp. 1249 (E.D. Pa. 1975) ........................................ 26

In re Terrorist Attacks on Sept. 11, 2001, 345 F. Supp. 2d 765 (S.D.N.Y. 2005)...........26

Int'l Shoe Co. v. Washington, 326 U.S. 310 (1945) ...........................................10

Kaplan v. First Options, 19 F.3d 1503 (3d Cir. 1994), aff'd, 514 U.S. 938 (1995) .......27

Kelo v. City of New London, 545 U.S. 469 (2005)..............................................24

Lacey v. Cessna Aircraft Co., 932 F.2d 170 (3d Cir. 1988) ...................................29

Lexington Ins. Co. v. Forrest, 263 F. Supp. 2d 986 (E.D. Pa 2003)...........................13

Marine Midland Bank v. Goyak, 585 F. Supp. 1358 (S.D.N.Y. 1984) ............................14

Markferding v. Westmoreland County (Pa.) Domestic Relations Office, No. 05-
      755, 2005 WL 1683744 (D.N.J. June 17, 2005)...............................................7

Mellon Bank (East) PSFS v. Farino, 960 F.2d 1217 (3d Cir. 1992) ........................6, 14

Mesalic v. Fiberfloat Corp., 897 F.2d 696 (3d Cir. 1990) ..................................... 6

Millen Indus. v. Coordination Council for N. Am. Affairs, 855 F.2d 879 (D.C.
      Cir. 1988)...................................................................................25

Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93 (3d Cir. 2004)...........................6, 11

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985)...........28

Monsanto Co. v. Syngenta Seeds, Inc., 443 F. Supp. 2d 636 (D. Del. 2006)..................8

New Generation Foods, Inc. v. Spicer's Int'l Common Trust, 669 F. Supp. 599
      (S.D.N.Y. 1987).............................................................................13

Newport Components, Inc. v. NEC Home Elecs. (U.S.A.), Inc., 671 F. Supp.
      1525 (C.D. Cal. 1987) ......................................................................14

Pan Ocean Trade & Invest Co. v. Super Time Int'l Corp., No. 94-5539, 1995 WL 31613 (E.D. Pa Jan. 26, 1995) .......................................................................... 13

Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Nos. 05-6886, 06-0624, 2007 WL 241294 (2d Cir. Jan. 30, 2007) .................................................. 20

Pfizer, Inc. v. Uprichard, 422 F.3d 124 (3d Cir. 2005) ............................................. 8

Pinker v. Roche Holdings Ltd., 292 F.3d 361 (3d Cir. 2001) .................................. 14

Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981) .............................................. 27, 30

Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289 (S.D.N.Y. 2003) ...................................................................................................... 15

Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Assoc., 819 F.2d 434 (3d Cir. 1987) ....................................................................................................................... 14

Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas, 675 F.2d 587 (3d Cir. 1982) .............................................................................................................. 14

Remick v. Manfredy, 238 F.3d 248 (3d Cir. 2001) ........................................... 11, 13

Rotec Indus., Inc. v. Mitsubishi Corp., 215 F.3d 1246 (Fed. Cir. 2000) ................. 10

S. Seafood Co. v. Holt Cargo Sys., Inc., No. 96-5217, 1997 WL 539763 (E.D. Pa. Aug. 11, 1997) ........................................................................................................ 26

Saudi Arabia v. Nelson, 507 U.S. 349 (1993) ......................................................... 17

Schnader, Harrison, Segal & Lewis, L.L.P. v. Basic Capital Funds, Inc., No. 99-4655, 2000 WL 1367601 (E.D. Pa. Sept. 21, 2000) ............................................. 13

SEC v. Carrillo, 115 F.3d 1540 (11th Cir. 1997) ..................................................... 14

Shamrock Holdings of Cal., Inc. v. Arenson, 421 F. Supp. 2d 800 (D. Del. 2006) .... 7

Smith v. S&S Dundalk Eng'g Works, Ltd., 139 F. Supp. 2d 610 (D.N.J. 2001) ........ 8

Stein v. Stein, No. 04-1311, 2005 WL 1242401 (D. Kan. May 25, 2005) ................ 14

Sunbelt Corp. v. Noble, Denton & Assoc., Inc., 5 F.3d 28 (3d Cir. 1993) ................ 12

Supra Med. Corp. v. McGonigle, 955 F. Supp. 374 (E.D. Pa. 1997) ...................... 25

Telcordia Techs., Inc. v. Alcatel S.A., No. 04-874, 2005 WL 1268061 (D. Del. May 27, 2005).................................................................................................15

Telcordia Techs., Inc. v. Telkom SA, Ltd., 458 F.3d 172 (3d. Cir. 2006) .......................13

Theo. H. Davies & Co. v. Republic of Marshall Is., 174 F.3d 969 (9th Cir. 1998)...........15

Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446 (3d Cir. 2003) ......................................7

U.S. ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd., 976 F. Supp. 207 (S.D.N.Y. 1997).............................................................................................13

U.S. Fidelity and Guar. Co. v. Braspetro Oil Servs., No. 6124, 1999 WL 307666 (S.D.N.Y. May 17, 1999)................................................................................19, 21

U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd., 241 F.3d 135 (2d. Cir. 2001)...................................................................................................13

USX Corp. v. Adriatic Ins. Co., 345 F.3d 190 (3d Cir. 2003) ............................... passim

Vetrotex Certaineed Corp. v. Consol. Fiber Glass Prods. Co., 75 F.3d 147 (3d Cir. 1996) ...................................................................................................... passim

Waimberg v. Meds. Trans. of Am., 52 F. Supp. 2d 511 (E.D. Pa 1999).........................13

## STATUTES

9 U.S.C. § 206.................................................................................................8

9 U.S.C. § 207.................................................................................................8

28 U.S.C. § 1330(a) .........................................................................................8

28 U.S.C. § 1332.............................................................................................8

28 U.S.C. § 1603(a) .........................................................................................8

28 U.S.C. § 1605(a)(2)....................................................................................26

28 U.S.C. § 1605(a)(6)....................................................................................26

29 U.S.C. § 793..............................................................................................23

## RULES

Fed. R. Civ. P. 4(k)(2).....................................................................................8

## FOREIGN STATUTES

Law No. 91-117 ...................................................................................19, 22, 24

New Code of Civil Procedure ..............................................................27

## OTHER INTERNATIONAL AUTHORITY

Rules of Arbitration of the ICC Court ....................................26, 27, 28, 29

## PUBLICATIONS

Jane Easter Bahls, <u>A Demanding Customer- Government Contract Guidelines,</u>
    Nation's Business (March 1990)..........................................................23

Yves Derains & Eric A. Schwartz, <u>A Guide to the New ICC Rules of Arbitration</u>
    (1998)...................................................................................................29

## Preliminary Statement

Desperate to find any conceivable "hook" on which to hang its argument that SOLIDERE[1] – a foreign, publicly-held corporation whose sole business operations are conducted outside the United States – can be haled into court here, URS, in its Opposition to Defendant SOLIDERE's Motion to Dismiss the Complaint ("Answering Brief," cited as "Ans. Br."), misstates or inflates the relevant facts of this dispute to justify the improper extension of this Court's injunctive power to a party not subject to personal jurisdiction of United States courts. Putting aside URS's attempt to examine the minutiae of SOLIDERE's contacts with the United States,[2] URS cannot contest the essential facts of this dispute: SOLIDERE is a publicly-held, Lebanese corporation. Until very recently[3] its sole business was, and had always been, the reconstruction and redevelopment of the Beirut Central District ("BCD") in Lebanon, pursuant to a commercial agreement with the Council for Development and Reconstruction ("CDR") (a Lebanese public body). It has never sold any product or performed any service within the United States. Every contract for goods or services that SOLIDERE has ever entered into with any U.S. entity has explicitly called for the provision of those goods and services in Beirut, Lebanon. This is true as well for the Contract at issue in the prior pending ICC Arbitration and this action.[4]

---

[1]  SOLIDERE appears in this action for the limited purpose of challenging this Court's jurisdiction and maintains that, at this stage, the sole, proper forum for the resolution of all disputes with URS is the arbitration between the parties currently pending in Paris, France and being conducted under the rules of the International Chamber of Commerce ("ICC") (the "ICC Arbitration").

[2]  Contrary to URS's assertion that a nationwide contacts test applies, Ans. Br. at 1 n.2, the proper forum for analyzing SOLIDERE's minimum contacts is the state of Delaware.  See Section I.B., infra.

[3]  SOLIDERE recently amended its Articles of Incorporation, which had restricted its activities solely to the reconstruction and redevelopment of the Beirut Central District, to allow it to pursue land development projects outside of Beirut. SOLIDERE is currently working with developers in the United Arab Emirates and Egypt on various private development projects wholly unconnected to Lebanon or the Lebanese government (or the United States for that matter). Declaration of Mounir Douaidy in support of Defendant SOLIDERE's Reply Brief in Further Support of Motion to Dismiss ("Douaidy Decl.") ¶ 8. The fact that this work is unrelated to the State of Lebanon further supports the conclusion that SOLIDERE is not an "organ" of the Lebanese government.  See infra Section II.

[4]  The Contract called for URS's wholly-owned subsidiary, Radian, to perform certain remediation services on a site in central Beirut known as the Normandy Landfill. The Contract contemplated that all remediation work, including all excavation, treatment and backfilling of material, would take place solely

SOLIDERE has never solicited any customers nor sought any business in the United States. SOLIDERE's contacts with the United States have been sporadic and piecemeal and have nothing to do with URS's cause of action. Given these undeniable facts, there is no basis for the assertion that SOLIDERE has purposefully availed itself of this forum such that it could – or should – have anticipated being haled into court here. Moreover, forcing SOLIDERE to engage in protracted litigation in the United States courts would be inconsistent with due process and established jurisdictional precedent. Nothing in URS's Answering Brief alters this conclusion.

### Statement of Facts

SOLIDERE provides the following factual summary to identify for the Court certain errors or misstatements in URS's recitation of the relevant facts underlying this dispute.

<u>Ex-Im Bank Loan Guarantee</u>

URS repeatedly refers to the partial financing arrangement provided by the Ex-Im Bank as a "loan." Ans. Br. at 5, 6, 9, 15 (bullet points 5 and 6). This is not correct. Ex-Im Bank never loaned SOLIDERE any money in connection with the Contract (or otherwise) - rather, it provided a loan guarantee. See Declaration of Nasser Chammaa in Support of Defendant SOLIDERE's Motion to Dismiss the Complaint ("Chammaa Decl.") Ex. E (Credit Agreement) at 1 ("a condition to the Lender's extension of the Credit under this Agreement is the availability of the Ex-Im Bank Guarantee . . .") More specifically, Ex-Im Bank agreed to guarantee SOLIDERE's obligation to repay a loan that SOLIDERE had obtained from Citibank's Beirut branch to finance the Contract. Id. ("This Credit Agreement . . . is made by and among [SOLIDERE] (the 'Borrower'), Citibank N.A. Beirut Branch (the 'Lender') . . ."). URS's misapprehension as to the nature of the Ex-Im Bank transaction appears throughout the Answering Brief; for example, URS asserts that SOLIDERE did the following:

- "financed . . . the Contract with U.S. government funds," (Ans. Br. at 5);

- "received funds from the American Import/Export Bank," (Ans. Br. at 1);

in Beirut and, in fact, all such work did occur there. In addition, SOLIDERE specifically negotiated for the Contract to be governed by Lebanese law.

- "received funds from Ex/Im Bank loan," (Ans. Br. at 15);

- "paid Radian with proceeds of the Ex/Im Bank loan guarantee," (Ans. Br. at 6);

- "opened a New York Citibank account to receive funds drawn down from the Ex-Im Bank" (Ans. Br. at 7).

The documents and testimony cited by URS do not support URS's characterization of the facts. See, e.g., Chammaa Decl. Ex. D. The reality is that SOLIDERE never received a single dollar from Ex-Im Bank – or any other U.S. government agency – to help pay for goods or services under the Contract.

URS then compounds its error by claiming that "U.S. government[ ] support" in the form of the Ex-Im Bank financing was a determinative factor in SOLIDERE's selection of Radian for the Contract. Ans. Br. at 4. This assertion is contradicted by testimony from SOLIDERE witnesses. See Chammaa Depo. Tr. 71:3-19 REDACTED . URS further contends that "[b]y design, over half the Project was to be performed out of the U.S. utilizing U.S. resources." Ans. Br. at 4. This statement mischaracterizes the nature of the Contract and is not consistent with the testimony of URS's own Project Manager for the Normandy Landfill, Mr. Amine Bou Onk. See Bou Onk Depo. Tr. 97:18-98:11 REDACTED

Moreover, regardless of the origin of any goods or services utilized on the Project, the Project itself – as well as all the required project activity, e.g. all excavation, treatment and backfilling of waste material – was to be performed (and, in fact, was performed) in Beirut.

Finally, URS misstates the origin of the Ex-Im Bank transaction by claiming that "Ex-Im Bank has been approached by Solidere to help it finance U.S. equipment and technology for the Normandy Project," Ans. Br. at 5 (quoting Russell Decl. Ex. 45 and citing Exs. 46, 47)[5] and "[SOLIDERE] applied for and received a . . . long term guarantee . . . ." Id. at 15.

REDACTED

---

[5] Tellingly, the quoted language does not appear in Exs. 45-47, nor do they support URS's assertion.

REDACTED

See Bou Onk Depo. Tr. 121:3-22    REDACTED

, see

also March 12, 2007 Declaration of Paul B. Carberry in Support of Defendant SOLIDERE's Reply Brief

In Further Support of Motion to Dismiss ("Carberry Decl. III") Ex. 1    REDACTED

## Performance Guarantee

URS also errs in its characterization of the nature of the performance guarantee required of

Radian under the Contract. See Ans. Br. at 7 ("Solidere negotiated for and received from Radian an $8.2

million performance guarantee bond that was supported by a California branch of Wells Fargo

Bank . . .") SOLIDERE did not negotiate for the guarantee to be supported by a bank located in the

United States. Rather, the Contract requires that a Performance Letter of Guarantee be "issued by a bank

located in the Republic of Lebanon." (Chammaa Decl. Ex. C Part 1 at § 32.1) (emphasis added). The

guarantee was also to be governed by the laws of Lebanon. Id. at Ex. 6. In fact, the Performance Letter

of Guarantee was issued by the Lebanese Banque Saradar sal. See Chammaa Decl. Ex F. When

SOLIDERE drew down on the performance guarantee due to URS/Radian's failure to complete the

Project, it was Banque Saradar, not Wells Fargo or any other U.S.-based financial institution, that paid

SOLIDERE under that guarantee. See Carberry Decl. III Ex. 3

REDACTED

## GDR Program

---

[6] URS similarly misstates the origin of the two grants provided by the USTDA, stating that SOLIDERE
"applied for and received a $220,000 training grant from the USTDA . . ." and that it "applied for and
received a second USTDA grant to finance a feasibility study[.]" Ans. Br. at 15

See Chammaa Depo. Tr

150:7-11 ·    REDACTED    Carberry Decl. III Ex. 2

at SOLDEL29444

URS argues that SOLIDERE purposefully availed itself of the United States securities markets because SOLIDERE's GDRs "are trading on the U.S. Over The Counter . . . Exchange [ ]" Ans. Br. at 10, Ex 14. By definition, "over the counter" trading in the United States is trading that does not occur on or in connection with a formal exchange. See http://www.pinksheets.com/otcguide/investors_index.jsp (over the counter trading is any informal "market in an equity security that is not listed on a U.S. exchange or on the Nasdaq Stock Market."). SOLIDERE's GDRs are listed solely on the London Stock Exchange and its underlying shares are listed on exchanges in Beirut and Kuwait. See http://www.solidere.com/invest/howtobuy.html. Thus, any over the counter trading of SOLIDERE's GDRs cannot form the basis of a claim that SOLIDERE has purposefully availed itself of the United States securities markets.

Further, URS asserts that SOLIDERE conducted a series of "roadshow" meetings with potential GDR investors in 1998, Ans. Br. 11, and that such meetings indicate "how vital U.S. investors' participation is for Solidere's financial well-being." Id. at 17. However, as Mr. Douaidy clarified at deposition, there was no new issuance of GDRs, by SOLIDERE, in 1998 and any investor orders that resulted from the roadshow were not fulfilled. See Douaidy Depo. Tr. 187:11-189:5. Moreover, GDRs were not "vital" to SOLIDERE's financial wellbeing and GDRs held by qualified United States investors are even less significant to SOLIDERE's finances. See Douaidy Depo. Tr. 189:9-18 (GDRs "represent a small percentage of the capital of the company. And those GDRs are subscribed to by a big number of international investors, many of which are UK-based investors as well as Middle Eastern investors. The American or U.S. investors' part I think probably is a certain – is a certain percentage of that small percentage of the capital.")

Hariri Foundation

URS alleges that "Solidere . . . regularly corresponded with a U.S. foundation established by Solidere's founder, Rafik Hariri (located in Maryland) to request names and hire registrants from its resume data bank," Ans. Br. at 10 (emphasis added), and that SOLIDERE "continuously reached out to the Hariri Foundation to obtain resumes from potential candidates to fill vacancies at Solidere." Id. at 20.

REDACTED

See Russell

Decl. Ex. 103 at HF002·

REDACTED

These errors[7] and mischaracterizations[8] make clear that the evidentiary record does not support the exercise of jurisdiction over SOLIDERE.

### Argument

I.    **URS HAS FAILED TO PROVE, BY A PREPONDERANCE OF THE EVIDENCE, THAT SOLIDERE HAD MINIMUM CONTACTS WITH THE UNITED STATES, OR THE STATE OF DELAWARE, SUFFICIENT TO SUBJECT IT TO THIS COURT'S EXERCISE OF PERSONAL JURISDICTION**

The Third Circuit has explicitly declined to establish bright-line rules governing when a foreign defendant has sufficient contacts with the forum to justify the exercise of personal jurisdiction, preferring to "approach[ ] each case individually and take[ ] a 'realistic approach' to analyzing a defendant's contacts with a forum." Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 100 (3d Cir. 2004) (citing Mellon Bank (East) PSFS v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992)). Especially in the context of a contractual claim, the court should look to the totality of the contractual relationship to determine whether the defendant has "purposefully availed" itself of the forum so as to anticipate being haled into court there and whether the exercise of personal jurisdiction over the foreign defendant would be consistent with "fair play" and "substantial justice." Mesalic v. Fiberfloat Corp., 897 F.2d 696, 701-02 (3d Cir. 1990).

---

[7] URS's quote of a SOLIDERE website that "SOLIDERE is a government-empowered corporation," is incomplete. See Ans. Br. at 26 (citing Russell Decl. Exs. 115, 116, and Compl. ¶ 25). The entire quote states: SOLIDERE is "a government-empowered private development corporation[ ]" (emphasis added). That website also states: SOLIDERE "combines the business independence and acumen of a private company with global vision and a sense of public service." See http://www.solidere.com/solidere/aboutsol.html (emphasis added). URS similarly omits reference to SOLIDERE as a "private company" in a draft report by the U.S. Embassy. See Russell Decl. Ex. 116 at Chapter 6.

[8] URS cites to statements contained in the website biographies of two junior associates of White & Case LLP to support its claim that SOLIDERE is "an entity owned by the Government of Lebanon." See Ans. Br. at 26 (citing Russell Decl. Ex. 117). These statements are incorrect, impermissible hearsay and, obviously, in no way binding on SOLIDERE.

A.    **URS Bears the Burden of Proving Jurisdiction by a Preponderance of the Evidence**

The Third Circuit has stated that the preponderance of the evidence standard applies even in the absence of an evidentiary hearing so long as the parties have engaged in jurisdictional discovery. IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 257 (3d Cir. 1998). Other courts in this Circuit have similarly found. See Carfagno v. Ace, Ltd., No. 04-6184, 2005 WL 1523530, at *5 (D.N.J. June 28, 2005) ("[T]he plaintiff must come forward with facts sufficient to establish by a preponderance of the evidence that the district court has personal jurisdiction over the defendant.") (citations omitted).[9] Here, URS has failed to meet this significant evidentiary burden.

Further, URS's assertion that it is entitled to the presumption that its jurisdictional allegations are true is based on the assumption that there will not be an evidentiary hearing on the instant motion. See Ans. Br. at 12 (citing Shamrock Holdings of Cal., Inc. v. Arenson, 421 F. Supp. 2d 800, 803 (D. Del. 2006)). If URS is wrong and the Court does hold a hearing, it is beyond dispute that URS must prove the existence of jurisdiction over SOLIDERE by a preponderance of the evidence. Markferding v. Westmoreland County (Pa.) Domestic Relations Office, No. 05-755, 2005 WL 1683744, at *2 (D.N.J. June 17, 2005) ("If the Court conducts an evidentiary hearing, plaintiff is put to the higher burden of proving that personal jurisdiction is proper by a preponderance of the evidence.").

B.    **The Nationwide Contacts Test Does Not Apply**

URS's argument that SOLIDERE's nationwide contacts should be considered in the Court's jurisdictional analysis is relegated to a footnote, see Ans. Br. at 1, n.2, and is based solely on two cases, Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446 (3d Cir. 2003) and Heft v. AAI Corp., 355 F. Supp. 2d 757 (M.D. Pa. 2005). Neither Toys "R" Us nor Heft supports URS's contention that such a test is applicable here. This is because, as URS fails to note, a party's contacts with the United States as a whole

---

[9] Even the principal cases upon which URS relies make it clear that, once the existence of personal jurisdiction has been challenged, the plaintiff "must produce 'sworn affidavits or other competent evidence,'" Brautigam v. Priest, No. 99-365, 2000 WL 291534, at *1 (D. Del. Mar. 2, 2000), establishing jurisdiction and that, "the Court . . should look beyond the façade of the pleadings." Foster Wheeler Energy Corp. v. Metallgesellschaft AG, No. 91-214, 1993 WL 669447, at *1 (D. Del. Jan. 4, 1993)

may be taken into account for purposes of assessing personal jurisdiction over that party <u>only</u> where the plaintiff's claims arise under federal law. <u>See</u> <u>BP Chems. Ltd.</u> v. <u>Formosa Chem. & Fibre Corp.</u>, 229 F.3d 254, 258 (3d Cir. 2000) (declining to evaluate foreign defendant's nationwide contacts under Rule 4(k)(2)[10] because plaintiff's claims did not arise under federal law); <u>Monsanto Co.</u> v. <u>Syngenta Seeds, Inc.</u>, 443 F. Supp. 2d 636, 647 (D. Del. 2006) (Robinson, J.) (before applying a national contacts test, "[t]he court must first determine that . . . [t]he case arises under federal law[.]")  URS's claims do <u>not</u> arise under federal law for jurisdictional purposes.

URS originally asserted three bases for this court's subject matter jurisdiction: (i) the Federal Arbitration Act ("FAA"); (ii) the FSIA and 28 U.S.C. § 1330(a); and (iii) diversity of citizenship. <u>See</u> Compl. ¶¶ 19-25. Under the FAA, federal district courts have original jurisdiction over: (1) an action to compel arbitration pursuant to an arbitration agreement falling under the convention, <u>see</u> 9 U.S.C. § 206; and (2) an action to confirm an arbitral award as against any other party to an arbitration conducted pursuant to an agreement falling under the convention. <u>See</u> 9 U.S.C. § 207; <u>IFC Interconsult, AG</u> v. <u>Safeguard Int'l Partners, LLC</u>, 356 F. Supp. 2d 503, 505 (E.D. Pa. 2005) <u>rev'd on other grounds</u>, 438 F.3d 298 (3d Cir. 2006). Because URS's claims do not seek to compel arbitration or to confirm an arbitral award, the FAA does <u>not</u> provide for original subject matter jurisdiction over this action. <u>See</u> <u>IFC Interconsult</u>, 356 F. Supp. 2d at 505; <u>see also</u> <u>Allied-Bruce Terminix Cos.</u> v. <u>Dobson</u>, 513 U.S. 265, 291 (1995); <u>Pfizer Inc.</u> v. <u>Uprichard</u>, 422 F.3d 124, 128 n.5 (3d Cir. 2005). Similarly, URS's contention that jurisdiction is proper under the Foreign Sovereign Immunities Act ("FSIA") fails because SOLIDERE is not a "foreign state" under 28 U.S.C. § 1603(a). <u>See</u> <u>infra</u> Section II.

Therefore, the only remaining basis for subject matter jurisdiction is diversity of citizenship, under 28 U.S.C. § 1332. Where subject matter jurisdiction exists based on diversity of citizenship, only contacts with the forum state are relevant to the assertion of personal jurisdiction over a foreign defendant. <u>Monsanto Co.</u>, 443 F. Supp. 2d at 647; <u>Smith</u> v. <u>S&S Dundalk Eng'g Works, Ltd.</u>, 139 F

---

[10] URS likewise asserts that jurisdiction is proper here under Federal Rule 4(2)(k), <u>see</u> Ans. Br. at 12, and, thus, that the nationwide contacts test should apply.

Supp. 2d 610, 616-17 (D.N.J. 2001) ("In a diversity case ... the issue of personal jurisdiction must be determined according to the law of the forum state. In such cases, the federal district court is constrained by the Fourteenth Amendment's requirements of minimum contacts with the forum state, instead of a national contacts analysis.").

URS fails to allege any contacts between SOLIDERE and the state of Delaware nor have any meaningful contacts with Delaware been uncovered during jurisdictional discovery herein.[11] While URS must meet a preponderance of the evidence standard, see Section I.A., supra, given the lack of any contacts with Delaware, either alleged or uncovered during discovery, URS fails short of even a prima facie showing of minimum contacts with Delaware. Since due process requires at least "minimum contacts" relating to the cause of action as between the foreign defendant and the forum state, Vetrotex Certaineed Corp. v. Consol. Fiber Glass Prods. Co., 75 F.3d 147, 150 (3d Cir. 1996), this case must be dismissed for lack of personal jurisdiction over SOLIDERE.

**C.    The Contacts Alleged By URS Are Insufficient to Establish Either General Jurisdiction or Specific Jurisdiction Over SOLIDERE**

Even assuming the nationwide contacts test were applicable to the question of whether the Court can exercise personal jurisdiction over SOLIDERE, the contacts between SOLIDERE and the United States alleged by URS are insufficient to establish either general jurisdiction or specific jurisdiction.

**1.    Many of the Contacts Alleged By URS Are Not Relevant to the Jurisdictional Analysis or Are Unsupported by Competent Evidence**

As noted in SOLIDERE's Answering Brief in Opposition to Motion for Preliminary Injunction (cited as "Def. P.I. Br."), when conducting a minimum contacts analysis for jurisdictional purposes, federal courts have held that only contacts occurring within "a reasonable number of years" from when

---

[11] URS's reference to an insurance application directed to Steadfast Insurance of Dover, Delaware listing SOLIDERE as an additional insured, Ans. Br. at 8, is not a contact with Delaware. The application was submitted by URS/Radian pursuant to the Contract and it was URS/Radian who listed SOLIDERE as a potential "named insured." See Russell Decl. Ex. 79. However, even if SOLIDERE had submitted an application for an insurance policy to a company based in Delaware, this lone contact, unconnected to the claims at issue, would be insufficient to establish personal jurisdiction over SOLIDERE. Dollar Sav. Bank v. First SEC Bank of Utah, 746 F.2d 208, 213-15 (3d Cir. 1984)

the action was filed are relevant  See Def P.I. Br. at 9 (collecting cases)  Although there does not appear to be a bright-line cut-off, even applying the seven-year period applied by the Supreme Court, in Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 409-11 (1984), many of the contacts alleged by URS fall well outside the permissible timeframe for determining SOLIDERE's minimum contacts with the forum.

This action was filed on June 30, 2006.  (D.I. 1).  Therefore, contacts occurring before June 30, 1999 would be irrelevant under Helicopteros.  URS has cited numerous such contacts, e.g. the 1993 appointment of the Dames & Moore Group to assess the Normandy Landfill (Ans. Br. at 10); a 1995 trip to the U.S. by SOLIDERE's Chairman (Id.); the 1996 GDR program roadshow in the U.S. (Id. at 11); a 1997 contract between SOLIDERE and the Consortium of GE-Hitachi (Id. at 9); and the 1998 GDR program roadshow (Id. at 10-11).

In addition, the burden to come forth and produce "sworn affidavits or other competent evidence" rests squarely with the plaintiff seeking to establish jurisdiction over a foreign defendant.  Brautigam, 2000 WL 291534, at *1  Evidence that is inadmissible under the Federal Rules of Evidence cannot be considered "competent."  Rotec Indus., Inc. v. Mitsubishi Corp., 215 F.3d 1246, 1256 (Fed. Cir. 2000) (affirming exclusion of declaration as "inadmissible hearsay and [therefore] 'incompetent' evidence")  Here, URS attempts to satisfy its evidentiary burden by submitting numerous documents which contain inadmissible hearsay, cannot be authenticated or suffer from other evidentiary infirmities.  For instance, URS cites to interviews conducted of non-parties not subject to cross examination (Russell Decl. Ex. 13 (2/3/95 interview with H.E. Dr. Assaad Rizk, Minister of Industry and Petroleum)), third-party press releases (Id. at Ex. 25 (3/17/03 USTDA press release)), and unsupported news articles and web pages.[12]

## 2.    The Contacts Alleged Are Insufficient to Establish Specific Jurisdiction

For specific jurisdiction to lie against a foreign defendant, the plaintiff's claim must "'arise[ ] out of' or 'relate[ ] to' the defendant's contacts with the forum."  Vetrotex, 75 F.3d at 152 (quoting Int'l Shoe

---

[12]  See also Russell Decl. Exs. 4, 13, 15-17, 24-25, 27-28, 38-40, 42, 44-45, 51, 59, 68, 78, 81-82, 88, 90, 102-103, 105, 107, 116, 118-121, 130-131, 134-137.

Co. v. Washington, 326 U S. 310, 319 (1945)). URS contends that Miller Yacht Sales, Inc. v. Smith, 384
F.3d 93, 99 (3d. Cir. 2004), "expressly limited Vetrotex" with regards to the degree of relatedness
required between a plaintiff's claims and the forum contacts of a foreign defendant to support specific
jurisdiction. See Ans. Br. at 13 n.7. However, URS fails to note that Miller involved tort claims while
Vetrotex, like the instant action, was a contract case In fact, after declining to apply "an immediate or
proximate cause standard" to the tort claims then before it, Miller, 384 F.3d at 98, the Miller court
explicitly distinguished the relatedness inquiry conducted in Vetrotex, observing "Vetrotex involved
contract claims and 'there are different considerations in analyzing jurisdiction over contract claims and
over certain tort claims.'" Id. at 99 (citing Remick v. Manfredy, 238 F.3d 248, 255-56 (3d Cir. 2001)).

In an effort to bring SOLIDERE's marginal forum contacts under the umbrella of its claim for a
declaratory judgment, URS asserts that its claim "'arise[s] out of' or 'relate[s] to,'" not just the Contract –
though the Contract contains the arbitration agreement by which URS asks this Court to declare it may
not be bound – but also the following: i) a training grant unrelated to the performance of the Contract; ii)
the selection of personnel to conduct the training grant; iii) the financing agreement for a portion of the
Contract; iv) the specific requirements of that financing agreement; v) the Ex-Im Bank's internal rules for
the extension of credit support; vi) a second grant unrelated to the performance of the Contract; and vii)
the fact that Radian contracted with a United States bank to provide a counter-guarantee to the
performance guarantee issued by a Lebanese bank related to the Contract. Ans. Br. at 14-16

These tangential contacts are irrelevant to the jurisdictional inquiry mandated by Third Circuit
precedent. See Vetrotex, 75 F.3d at 152 Vetrotex is instructive. In that case, plaintiff and defendant
entered into a number of supply agreements for the sale of fiber glass products The defendant did not
travel to plaintiff's home forum (Pennsylvania) during contract negotiations or performance (though
plaintiff visited defendant's home forum several times) but did direct numerous communications to the
plaintiff in Pennsylvania. The contract contemplated performance, and actually was performed, outside
of Pennsylvania Id. at 151. The Third Circuit held that the "[a]greement [between the parties], standing
alone, is an insufficient ground upon which to exercise personal jurisdiction over [defendant]." Id. The

court further held that, "the only contacts that [defendant] had with Pennsylvania consisted of some phone calls and letters written to [plaintiff] in Pennsylvania [,] [h]owever, this Court has recognized that 'informational communications in furtherance of [a contract between a resident and a nonresident does not establish the purposeful activity necessary for a valid assertion of personal jurisdiction over the nonresident defendant].'" Id. at 152 (quoting Sunbelt Corp. v. Noble, Denton & Assoc., Inc., 5 F.3d 28, 32 (3d Cir. 1993) (citation omitted))

URS's claims in this action arise directly out of the arbitration clause contained in the Contract. Per the Complaint, "URS seeks a declaratory judgment that: (i) URS has no agreement to arbitrate with Solidere; (ii) URS is not bound to arbitrate with Solidere any of the claims described herein; and (iii) the International Chamber of Commerce [ ] has no jurisdiction over URS because URS never agreed to arbitrate claims before the ICC and therefore cannot issue an enforceable award against URS on the claims asserted by Solidere." Compl. ¶2. Nowhere in its statement of the nature of its claims does URS mention the USTDA grants, the loan guarantee from the Ex-Im Bank, or the performance guarantee related to the Contract. Therefore, in determining whether SOLIDERE is subject to specific jurisdiction, the Court may only consider the Contract and the "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." Vetrotex, 75 F.3d at 151 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479 (1985))

SOLIDERE and Radian executed the Contract in January 1999. Compl. ¶ 6. SOLIDERE personnel never traveled to the United States for the purpose of conducting negotiations concerning the Contract; REDACTED See, e.g., Bou Onk Depo. Tr. 42:3-6; Carberry Decl. III Ex. 4 (10/24/98 fax from Amine Bou Onk coordinating a meeting at SOLIDERE's offices).

REDACTED

, see Chammaa Depo. Tr. 99:7-18, but the Contract did not contemplate performance in the United States, nor was it performed in the United States. Chammaa Decl. Ex. C (Contract). As the Vetrotex court observed of the defendant in that case, SOLIDERE was a "passive

buyer" of Radian's services under the Contract. Vetrotex, 75 F.3d at 152 n.5 (observing that "reaching

out" is particularly difficult to find where the nonresident defendant is a buyer of resident plaintiff's

products). Here, it is clear that the focus of the parties' contractual relationship was outside of the United

States, specifically, in Beirut, Lebanon. See Remick, 238 F.3d at 256 (3d Cir. 2001) (considering

"totality of circumstances" in action based on contract). As such, the scant contacts with this forum

identified by URS are insufficient to confer specific jurisdiction over SOLIDERE arising out of that

contractual relationship.

    The cases cited by URS to support the proposition that contract negotiations and related written

or electronic communications directed towards the forum can establish specific jurisdiction, see Ans. Br

at 15 n.9, are inapposite because in each of those cases, the plaintiff's claims arose out of the specific

negotiations themselves,[13] or involved travel to or additional contacts with the forum of a nature far more

significant than anything alleged herein.[14] Similarly, URS's authorities for the proposition that

"[r]eaching out to the U.S. to obtain financing" can establish specific jurisdiction are not persuasive

because, as an initial matter, it was Radian, not SOLIDERE, who "[r]each[ed] out" to Ex-Im Bank and

---

[13] See Grand Enter. Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 483 (3d. Cir. 1993) (negotiations directed to forum gave rise to claims); U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., 241 F.3d 135, 152 (2d. Cir. 2001) (same); Fiscus v. Combus Fin. AG, No. 03-1328, 2006 WL 1722607, at *5-6 (D.N.J. June 20, 2006) (same); Lexington Ins. Co. v. Forrest, 263 F. Supp. 2d 986, 994 (E.D. Pa. 2003) (same); Pan Ocean Trade & Invest Co. v. Super Time Int'l Corp., No. 94-5539, 1995 WL 31613, at *2 (E.D. Pa. Jan. 26, 1995) (claims arose from purchase orders sent to forum); Schnader, Harrison, Segal & Lewis, L.L.P. v. Basic Capital Funds, Inc., No. 99-4655, 2000 WL 1367601, at *1, 3 (E.D. Pa. Sept. 21, 2000) (claim for remainder of payment arose from partial payments sent to forum); Waimberg v. Med. Trans. of Am., 52 F. Supp. 2d. 511, 516 (E.D. Pa. 1999) (claim arose from offer letter directed to forum)

[14] See Telcordia Techs., Inc. v. Telkom, SA Ltd., 458 F.3d 172, 178 (3d. Cir. 2006) (defendant traveled to forum to consult on defective products which were subject of suit); Apollo Tech. Corp. v. Centrosphere Indus. Corp., 805 F. Supp. 1157, 1185 (D.N.J. 1992) (defendant traveled to forum and negotiated contract giving rise claim); New Generation Foods, Inc. v. Spicer's Int'l Common Trust, 669 F. Supp. 599, 601 (S.D.N.Y. 1987) (same); Cal Caufield and Co., Inc. v. Colonial Nursing Homes, Inc., 642 F. Supp. 777, 779 (D. Kan. 1986) (same); Alco Standard Corp. v. Benalal, 345 F. Supp. 14, 25 (E.D. Pa. 1972) (same); United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd., 976 F. Supp. 207, 210 (S.D.N.Y. 1997) (defendants "traveled repeatedly" to forum to negotiate contracts at issue)

the USTDA, see Ans. Br. at 15 n 10, and secondly, unlike here, those cases all involve claims which arose directly from the financing activities establishing jurisdiction.[15]

### 3.    The Contacts Alleged Are Insufficient to Establish General Jurisdiction

In order to establish general jurisdiction over a foreign defendant "the plaintiff must show significantly more than mere minimum contacts[.]" Foster Wheeler, 1993 WL 669447, at *3 (quoting Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Assoc., 819 F.2d 434, 437 (3d Cir. 1987)). The plaintiff must meet the high threshold of showing that the foreign defendant's contacts with the forum were "continuous and substantial." Id. (quoting Gehling v St. George's Sch. of Med., Ltd., 773 F.2d 539, 541 (3d Cir. 1985)). This burden is a heavy one in this Circuit. Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas, 675 F.2d 587, 589 (3d Cir. 1982) ("[T]he facts required to assert this 'general' jurisdiction must be 'extensive and persuasive '") (quoting Compaigne des Bauxites de Guinea v Ins. Co. of N. Am., 651 F.2d 877, 890 (3d Cir. 1981), aff'd, 456 U.S. 694 (1982)).

URS points to SOLIDERE's GDR program as its "most significant activity in the U.S." for the purpose of evaluating the existence of general jurisdiction yet cites to a case from the Eastern District of Texas, Cole v. Tobacco Inst., 47 F. Supp. 2d 812, 817 (E.D. Tex. 1999), as the sole authority[16] for the proposition that such a program is sufficient to establish general jurisdiction over a foreign defendant.

---

[15] See Chisholm & Co. v. Bank of Jamaica, 643 F. Supp. 1393, 1397 (S.D. Fla. 1986) (claim arose from failure to make payments on lines of credit provided by plaintiff); Mellon Bank (East) PSFS v. Farino, 960 F.2d 1217, 1220 (3d Cir 1992) (claim to recover defaulted loan payments); Stein v. Stein, No. 04-1311, 2005 WL 1242401, at *4 (D. Kan. May 25, 2005) (claims arose from loan transaction); Estate of Monroe v. Bottle Rock Power Corp., No. 03-2682, 2005 WL 119883, at *6 (E.D. La. Jan. 19, 2005) (claims arose from promissory note); Marine Midland Bank v. Goyak, 585 F. Supp. 1358 (S.D.N.Y. 1984) (claims arose out of loan transaction); cf. Hester Int'l Corp. v. Fed. Republic of Nigeria, 879 F.2d 170, 181 (5th Cir. 1989) (affirming finding that district court lacked jurisdiction over foreign state under FSIA)

[16] URS cannot rely on Pinker v Roche Holdings Ltd., 292 F.3d 361 (3d Cir. 2001), SEC v Carrillo, 115 F.3d 1540 (11th Cir 1997) and Newport Components, Inc. v NEC Home Elec. (U.S.A.), Inc., 671 F. Supp. 1525 (C.D. Cal 1987) to support this proposition because each of those cases involved claims arising out of or related to the foreign defendant's securities themselves. See Pinker, 292 F.3d at 371-72 (cause of action for fraud in connection with sales of ADRs); Carrillo, 115 F.3d at 1544 (securities fraud suit alleging U.S. contacts were part of allegedly fraudulent scheme); cf Newport Components, 671 F. Supp. at 1532 (finding no jurisdiction where plaintiff failed to link alleged wrongful actions to any alleged contacts with forum). Here, URS has not – because it cannot – contend that its claims arise out of SOLIDERE's GDR program or any activities related thereto.

See Ans. Br. at 20. However, the <u>Cole</u> case involved tort claims asserted against a British holding company over which the court determined it had specific jurisdiction. See <u>Cole</u>, 47 F. Supp at 814-17. For this reason alone, <u>Cole</u> cannot support URS's general jurisdiction argument in this contract case.[17]

More importantly, URS acknowledges that this Court has previously held, in <u>Telcordia Tech., Inc.</u> v. <u>Alcatel S.A.</u>, No. 04-874, 2005 WL 1268061 (D. Del. May 27, 2005), that, even where a foreign company's ADRs are traded on the New York Stock Exchange, that "factor alone does not justify the exercise of jurisdiction [over that corporation]." <u>Id.</u> at *7 (citing <u>Presbyterian Church of Sudan</u> v. <u>Talisman Energy, Inc.</u>, 244 F. Supp. 2d 289, 330 (S.D.N.Y. 2003); <u>Doe</u> v. <u>Unocal Corp.</u>, 248 F.3d 915, 922 (9th Cir. 2001) ("[T]he Court is not persuaded that Congress intended for the courts to assert jurisdiction under Rule 4(k)(2) whenever a corporation lists its stock on a United States exchange.")).

URS's remaining arguments in support of the exercise of general jurisdiction over SOLIDERE are based upon either contacts with the U.S. that are out-of-date for purposes of this Court's jurisdictional analysis – <u>see</u>, <u>e.g.</u>, Russell Ex. 103 (showing most recent communication between SOLIDERE and Hariri Foundation occurred in 1998, more than eight years before this action was filed) and SOLIDERE's contract with the Consortium of GE-Hitachi (USA), Ans. Br. at 20, which was executed in 1997 – or out of circuit cases which involved additional and more current U.S. contacts than are present here.[18]

### 4.    The Exercise of Jurisdiction Over SOLIDERE Would Not Comport With Traditional Notions of Fair Play and Substantial Justice

In conducting its jurisdictional analysis, the Court need only reach the question of whether the exercise of personal jurisdiction over SOLIDERE would be consistent with due process and traditional

---

[17]  Moreover, the <u>Cole</u> court's discussion of another court's finding of general jurisdiction over the holding company was <u>dicta</u> and the second court's finding of jurisdiction was based on numerous activities of the holding company – only one of which happened to involve the company's ADR program – including the acquisition of an American company. <u>Id.</u> at 817. Again, this is not the case here.

[18]  <u>See</u> Ans. Br. at 21 (citing <u>Theo. H. Davies & Co.</u> v. <u>Republic of Marshall Is.</u>, 174 F.3d 969, 974-75 (9th Cir. 1998) (finding personal jurisdiction proper where defendants and their agents made numerous purchases "[f]or many years" and conducted numerous activities in the U.S. directly related to the contract at issue); <u>Amtrol, Inc.</u> v. <u>Vent-Rite Valve Corp.</u>, 646 F. Supp. 1168, 1172-73 (D. Mass. 1986) (holding that extensive marketing activities of Dutch company, including marketing manager's multiple stays in the U.S. of up to one-year in length and use of business cards with U.S. address established jurisdiction over company despite company's lack of success in cultivating customers))

notions of fair play and substantial justice if URS had established – which it has not, see Section I.C.2.

and I.C.3., supra – sufficient minimum contacts between SOLIDERE and the relevant forum  See BP

Chems., 229 F.3d at 260.  However, even if URS had satisfied its burden of showing such minimum

contacts by a preponderance of the evidence, the exercise of jurisdiction by this Court over SOLIDERE

would be fundamentally unfair, especially in light of the previously-filed arbitral proceeding currently

pending which will consider these same issues, because SOLIDERE cannot reasonably have expected that

it would be haled into a United States Court in an action regarding an arbitration clause set forth in a

contract governed by Lebanese law, that provides for arbitration in France.  See Def. P.I. Br. at 16-18, 25-

33 (discussing the clear and unmistakable evidence of URS's intent to arbitrate the issue of arbitrability

and the misuse of Radian's corporate form).

## II.    URS HAS FAILED TO PROVE FACTS SUFFICIENT TO ESTABLISH THAT SOLIDERE IS AN ORGAN OF THE LEBANESE GOVERNMENT UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT

URS's misguided attempt to foist the mantle of sovereignty upon a publicly-held foreign

corporation is nothing more than an ill-conceived attempt to circumvent a showing of minimum contacts

as to SOLIDERE.  URS's novel argument turns the FSIA on its head and uses it as a sword to

affirmatively anoint SOLIDERE a sovereign entity, contrary to the fact that SOLIDERE has not claimed

immunity from suit as a sovereign.  URS then seeks to argue that SOLIDERE's purported sovereign

immunity has been waived, granting this Court personal jurisdiction over SOLIDERE where none exists

otherwise.  The FSIA clearly was not intended to work this way.  To the contrary, "[a] primary purpose of

the FSIA is to make it difficult for private litigants to bring foreign governments into court, thereby

avoiding affronting them."  USX Corp. v. Adriatic Ins. Co., 345 F.3d 190, 207 (3d Cir. 2003).  The FSIA

was never intended to be used offensively as a basis for establishing personal jurisdiction over a foreign

party not otherwise subject to such jurisdiction, and URS can cite no case where a plaintiff attempts – let

alone succeeds – to establish that a defendant is an organ of a sovereign entity where that defendant has

not claimed sovereign immunity.

A.    **SOLIDERE Is Not an Organ of the State of Lebanon**

This Court can exercise subject matter jurisdiction under the FSIA only if URS can meet the

heavy burden of establishing that SOLIDERE is an agency or instrumentality of the Lebanese

government. Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993). Unless a majority of its shares are

owned by a foreign state or political subdivision thereof, the only way for a corporate entity to be an

instrumentality of a foreign state is if it qualifies as an "organ" of that state. Glencore, Ltd. v. Chase

Manhattan Bank, No. 92 Civ. 6214, 1998 WL 74294, at *2 (S.D.N.Y. Feb. 20, 1998); see also USX, 345

F.3d at 208 ("[T]he statute and legislative history are silent as to a definition of the term 'organ,' and that

term is inherently vague and does not have a well-established common-law meaning"). It is undisputed

that SOLIDERE is a publicly-held corporation, with approximately 99.95% of its shares (as of October

13, 2006) held by parties other than the Lebanese government. See Chammaa Decl. ¶ 5.b; see also

Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories No. 16. Therefore, URS

must overcome the fact of SOLIDERE's private ownership to show that it somehow fits the "inherently

vague" definition of an "organ" of the Lebanese government. USX, 345 F.3d at 208.

The Third Circuit has emphasized that, "[f]or an entity to be an 'organ' of a foreign state, it must

engage in a public activity on behalf of the foreign government." Id. The Court of Appeals has stated

that requiring less "would open the door to situations in which a party only tangentially related to a

foreign state could claim[,]" – or, in this case, be saddled with – "foreign state status and avail itself ... of

the FSIA's procedural provisions[.]" Id. The Third Circuit clearly was concerned that defendants might

attempt to claim immunity from their very slight connections to sovereigns. Thus, where an entity is not

majority-owned by a foreign sovereign, such as here, the court must ensure that the entity is engaging in

public activity on behalf of a foreign state to find it is an organ of the State. See USX, 345 F.3d at 208

("Courts should consider how ... different ownership structures might influence the degree to which an

entity is performing a function on behalf of the foreign government.")

The following factors are relevant to determining whether an entity is an organ of a foreign state

for purposes of applying the FSIA: (1) the circumstances surrounding the entity's creation; (2) the

purpose of its activities; (3) the degree of supervision by the government; (4) the level of government
financial support; (5) the entity's employment policies, particularly regarding whether the foreign state
requires the hiring of public employees and pays their salaries; (6) the entity's obligations and privileges
under the foreign state's laws; and (7) the ownership structure of the entity. USX, 345 F.3d at 209. "[N]o
one [factor] is determinative." Id. Analyzing the factors set forth in USX demonstrates that SOLIDERE
is not an organ of the Lebanese government, cannot be an agency or instrumentality of the state of
Lebanon, and is not subject to U.S. jurisdiction under the FSIA.

**B.      SOLIDERE Is Not Owned By the State of Lebanon**

The Third Circuit, in USX, considered ownership as a proxy for control. See USX, 345 F.3d at
213 (explaining that "although the government does not directly own ICAROM, it indirectly has complete
control over ICAROM's shares"). In USX, the element of ownership was particularly significant. Id.
("Because Ireland has complete control over all shares of ICAROM ... this factor weighs in favor of a
finding of organ status"); see also Filler v. Hanvit Bank, 378 F.3d 213, 220 (2d Cir. 2004) (finding
subject banks were not organs of the state, in part, because they had "reverted or [were] in the process of
reverting back to private ownership").

As of October 2006, the government of Lebanon owned 83,707 shares of SOLIDERE,
representing approximately 0.05% of SOLIDERE's shares. Chammaa Decl. ¶ 5.b. The fact that the
Lebanese government owns roughly one-half of one percent of the shares of SOLIDERE and, in fact, has
never been a majority shareholder weighs against a finding of organ status.[19] See USX, 345 F.3d at 213;
Filler, 378 F.3d at 220.

---

[19] The state of Lebanon and other public entities became shareholders of SOLIDERE through the same
legal process by which all landowners in the BCD (including the State) transferred their interests to
SOLIDERE in exchange for shares in the company. Ownership interest in government-held properties
was transferred to SOLIDERE in the same manner as private interests. See Douaidy Decl. ¶ 6. This fact
is also inconsistent with SOLIDERE being an organ of the State.

C.    **SOLIDERE Was Not Created by Statute**

Despite the fact that "no one [factor of the USX test] is controlling," URS cites Filler v. Hanvit

Bank, 378 F.3d 213 (2d Cir. 2004), for the proposition that, where an entity is formed by statute, it is by

definition an organ of the state. See Ans. Br. at 24. Not only is this assertion an incorrect statement of

the law in this Circuit, it is also inapposite to the facts here because SOLIDERE was not formed by

statute. Although the recourse by the CDR to the private sector to perform reconstruction and

development work in any war-damaged areas of Lebanon was authorized by a statute, Law No. 91-117 of

December 7, 1991 ("Law No. 91-117"), that statute is one of general application. It does not mention,

establish or require the establishment of SOLIDERE. See Chammaa Decl. Ex. A (Law No. 91-117)

(CDR is authorized "[t]o carry out directly or through any public administration, public entity,

municipality, Joint-stock or mixed company that shall be formed with the participation of the [CDR] or

any Real Estate Company[.]").

Therefore, this factor weighs against a finding that SOLIDERE is an organ of the state since it

was not "created by statute" – i.e. there was nothing in Law No. 91-117 that required the creation of

SOLIDERE. See Douaidy Decl. ¶ 3; U.S. Fidelity & Guar. Co. v. Braspetro Oil Servs., No. 6124, 1999

WL 307666, at *5 (S.D.N.Y. May 17, 1999) (finding that, contrary to plaintiffs' argument that defendant

had been created by Brazilian Law, defendant was not an organ of the state where "there is nothing

explicit in that law . . . that requires the establishment of [that company]").

The requirement that CDR approve the Contract is consistent with this conclusion. Cf. Ans. Br.

at 24 (citing CDR approval of the Contract and its performance as evidence SOLIDERE is an organ of the

State of Lebanon). CDR and SOLIDERE are counterparties to an agreement under which SOLIDERE is

to perform – either directly or through the use of sub-contractors – the reconstruction work on the

infrastructure of the BCD. See Douaidy Decl. Ex. A    REDACTED

The Contract – essentially a sub-contract between SOLIDERE and URS/Radian – covered

a portion of the work SOLIDERE was to perform for its client – CDR – namely, the environmental

remediation of a section of the BCD known as the Normandy Landfill. Pursuant to the agreement

19

between the CDR and SOLIDERE, CDR compensated SOLIDERE for its work by the transfer to

SOLIDERE of the title and development rights to a portion of the land comprised within the BCD  See

Douaidy Decl. Ex. A at Art. 3. Since the relationship between CDR and SOLIDERE is one of client and

contractor, it is natural that CDR would be concerned with the manner in which its general contractor

(SOLIDERE) performed the work – including approval of sub-contractors (URS/Radian). This aspect of

the normal client-contractor relationship, even where the client is a governmental entity, does not

transform the contractor into an organ of the State under the FSIA.

### D.    SOLIDERE's Activities Are Non-Governmental

An entity is not an "organ" of a foreign State where its purpose is to make a profit for its private

owners. See California v. NRG Energy, 391 F.3d 1011, 1026 (9th Cir. 2004) (finding no organ status

where the company "acted not in the public interest, but rather as an independent commercial enterprise

pursuing its own profits"). By contrast, since it is a publicly-held corporation whose shares are owned by

numerous private shareholders and are listed on the Beirut and Kuwait Stock Exchanges, the "purpose" of

SOLIDERE's activities, as with any privately-owned company, is to increase the financial profit of its

shareholders. See First Agr. Nat. Bank of Berkshire County v. State Tax Comm'n, 392 U.S. 339, 354

(1968) (noting that bank was "a privately owned corporation existing for the private profit of its

shareholders"). Where a company operates for its own profit and is responsible for its losses, this factor

weighs against a finding of organ status. See NRG Energy, 391 F.3d at 1026 (finding Canadian company

was not an organ of the Canadian government where it acted "not in the public interest, but rather as an

independent commercial enterprise pursuing its own profits").

Moreover, none of SOLIDERE's activities are traditional governmental functions  The

"Object[s] of the Company," as memorialized in SOLIDERE's Articles of Incorporation, include: i)

acquiring certain real estate properties; ii) financing and ensuring the execution of the infrastructure

within the BCD; iii) preparing and reconstructing the area where the real estate properties are located; and

iv) restoring the existing buildings and then selling them for profit  See Chammaa Decl. Ex. B at Art. 3;

cf. Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Nos. 05-6886, 06-0624, 2007 WL

241294, at *1, *3 (2d Cir. Jan. 30, 2007) (entity performed traditional government functions and was an organ of the state where it oversaw the securities markets); De Sanchez v. Banco Central de Nicaragua, 770 F.2d 1385, 1393-94 (5th Cir. 1985) (regulating money system was an "intrinsically governmental function").

Although SOLIDERE's success in developing the BCD will certainly have economic and other benefits for the people of Beirut – by stimulating the economy, for example – this is no different than the economic impact the success of any major company typically has on its local area. Such ancillary benefits do not weigh in favor of a finding of organ status where, as here, the privately-owned company in question operates for the benefit of its shareholders. See NRG Energy, 391 F.3d at 1026.

### E.    SOLIDERE's Employees Are Not Public Employees

SOLIDERE has no public employees, and is under no obligation to hire any public employees. See Chamma Decl. ¶ 5.d ("Employees of SOLIDERE are employed solely by SOLIDERE and are not employed in any public or governmental capacity by the Lebanese government."). URS has failed to produce any competent evidence to contradict this assertion or, even, to contest this aspect of the USX analysis. See Ans. Br. at 23-26 (failing to discuss this factor of the USX test). Therefore, this factor weighs against a finding of organ status.

### F.    The Lebanese Government Does Not Supervise SOLIDERE's Day-to-Day Business

In order to weigh in favor of a finding of organ status, supervision of a defendant's operations by the relevant sovereign government must be substantial, see USX, 345 F.3d at 212, direct, see U.S. Fidelity and Guar. Co., 1999 WL 30766, at *5, and active, see Bd. of Regents of the Univ. of Texas Sys. v. Nippon Tel. & Tel. Corp., No. 05-51432, 2007 WL 273957, at *4 (5th Cir. Feb. 1, 2007).

SOLIDERE's day-to-day operations are entirely run by its independent management team. See Carberry Decl. III Ex. 5 at SOLDEL20891    REDACTED

Under SOLIDERE's Articles of Incorporation, its Board of Directors has "the broadest powers [permissible under Lebanese law] for the implementation of the resolutions of the Shareholders' General Meeting." Chammaa Decl. Ex. B at Art. 24. Among the powers held by SOLIDERE's Board of

Directors are to: i) set the general policy for the conduct of the Company's business; ii) conclude agreements with private or government entities; iii) establish or close down any branch; iv) approve personnel statutes; and v) settle legal disputes. Id. The Chairman of SOLIDERE's Board of Directors has the explicit power, under the Articles of Incorporation, to "conduct the general activities of the Company in his capacity as General Manager." Id. at Art. 28. Nowhere in the delegation of powers contained in SOLIDERE's Articles of Incorporation is supervision of the activities of SOLIDERE's Board of Directors, Chairman, or shareholders by the Lebanese government contemplated or implied. Cf. Gates v. Victor Fine Foods, 54 F.3d 1457, 1460-61 (9th Cir. 1995) (finding organ status to exist because company in question could "act only in a manner and on the subjects that the [the government] ha[d] previously authorized," and because government body "circumscribe[d] the entity's ability to act independently").

URS argues, see Ans. Br. at 24, that the Lebanese government, and specifically the CDR, exerts considerable control over SOLIDERE's activities. Id. ("Almost every aspect of Solidere's operations requires government approval."). URS cites various provisions of Law No. 91-117 to support its contention that the Lebanese government "regulates investment in Solidere, dictates its capital structure, and mandates that [two-thirds] of its Board members [ ] be Lebanese nationals," and that SOLIDERE's Articles of Incorporation had to be "approved by the Lebanese Council of Ministers." Id. These statements betray a fundamental misapprehension of the terms of Law No. 91-117.

The purpose of Law No. 91-117 is the modification of the public statute which formed the CDR – a governmental body – in order to authorize it to carry out its mission, i.e. the reconstruction of war-damaged parts of Lebanon, "directly or through any public administration, public entity, municipality, Joint stock or mixed company that shall be formed with the participation of the [CDR] or any Real Estate Company formed in line with the provisions of [the Lebanese law on town planning] . ." Chammaa Decl. Ex. A at Art. 1. The statute then proceeds to enumerate various conditions that must be met by any private company chosen by the CDR for the reconstruction. These conditions are similar in nature to guidelines for government contractors to participate in government works projects or be eligible for

certain government benefits. See, e.g., Rehabilitation Act of 1973, § 503, 29 U.S.C. § 793 (requiring certain federal contractors and subcontractors to employ and advance individuals with disabilities); Carberry Decl. III Ex. 6 (Jane Easter Bahls, <u>A Demanding Customer - Government Contract Guidelines,</u> Nation's Business, March 1990, at 29) ("Because of numerous laws aimed at achieving particular socioeconomic goals, the government requires contractors to make various certifications and representations about the ways they do business."). While the provisions of Law No. 91-117 place limits on the nature and character of any private company with which the CDR may contract for infrastructure works, Douaidy Decl. ¶ 3, this certainly does not transform every contracting private entity chosen by the CDR into a creation or organ of the state. See <u>Bd. of Regents</u>, 2007 WL 273957, at *4 (finding government authorization is not active supervision).

### G.    SOLIDERE's Profits and Losses Are Its Own

SOLIDERE is solely responsible for its profits and losses. Compare <u>EIE Guam Corp.</u> v. <u>Long Term Credit Bank of Japan</u>, 322 F.3d 635 (9th Cir. 2003) (company was organ of state where Japanese law provided company would be compensated for losses at close of fiscal year). Moreover, it is undisputed that, as noted in SOLIDERE's 2005 Annual Report, the reconstruction of the BCD "is <u>being achieved without recourse to public funds.</u>" See Carberry Decl. III Ex. 7 at 10 (SOLIDERE's 2005 Annual Report) (emphasis added); Douaidy Decl. Ex. A at ¶¶ 2.1, 2.3    REDACTED

Yet, URS argues that, because SOLIDERE stands to be compensated for its work under a contract with the CDR (which is part of the Lebanese State) it is therefore financially supported by the State. See Ans. Br. at 25. URS confuses financial support with contract payments. By its logic, any company that enters into a contract with a governmental entity would become an agency or instrumentality of that government. Since this cannot be the outcome sought by the FSIA or the "financial support" factor in the Third Circuit's <u>USX</u> analysis, this factor must weigh against a finding of organ status. See <u>NRG Energy</u>, 391 F.3d at 1026 (finding company was not organ of Canadian

government where "any profits and losses from its sales of power are solely the responsibility of [the company] and are in no way guaranteed or subsidized by the government").

### H.  SOLIDERE Does Not Exercise Sovereign Power

URS mischaracterizes the deposition testimony of SOLIDERE's General Manager and Chief Financial Officer, Mr. Mounir Douaidy, in an attempt to show that SOLIDERE "enjoys . . . exclusive eminent domain rights to perform its infrastructure work." Ans. Br. at 25 (citing Russell Decl. Ex. 2 (Douaidy Depo. Tr.) 184:2-16). Mr. Douaidy testified to no such thing. Contrary to URS's assertion, the Lebanese government has never delegated the power of eminent domain to SOLIDERE. See Douaidy Decl. ¶ 5. The process of transferring title to land located in the BCD was conducted pursuant to Law No. 91-117 which was promulgated by the Lebanese legislature. See Law No. 91-117, Art 3, part IV ("The capital of the Company shall consist of the contributions in kind (real estate properties) which fall within the boundaries of the area designated for redevelopment and reconstruction[.]"). In exchange for their property, the affected landowners were compensated with an amount of shares in SOLIDERE equivalent to the value of their property.[20] Id.

Under American law, where property is transferred from one party to another through the government's exercise of eminent domain, the transferee party plainly is not transformed into an organ of the government. See Haw. Hous. Auth. v. Midkiff, 467 U.S. 229, 243 (1984) (upholding state law under which land is transferred from lessors to lessees, who were "private beneficiaries"); Berman v. Parker, 348 U.S. 26 (1954) (upholding statute providing for use of eminent domain power to redevelop certain areas and for possible sale or lease of the condemned lands to private interests.); see also Kelo v. City of New London, 545 U.S. 469, 487 (2005) (finding eminent domain appropriate even where private party will benefit economically in the process).

URS's argument that SOLIDERE enjoys other "exclusive privileges," Ans. Br. at 25, is equally without merit. URS asserts that SOLIDERE is exempt from Lebanese registration and financial reporting

---

[20]  This transfer included the State of Lebanon and related government ministries that also owned property in the affected areas. See Section II.B , supra.

requirements, pays no taxes, has an "official relationship" with a government ministry, has the police

force at its disposal and has been dismissed from certain lawsuits filed against it [21] Id. However, all of

these allegations are supported by no more than a "Lebanese media report" – in actuality, a single web

page article consisting of impermissible hearsay – that cannot form the basis of a finding that SOLIDERE

is an organ of the State. With regards to each of these purported exclusive rights URS is either mistaken

as to the existence of the right or has identified a right common to all private companies under Lebanese

law.[22]

SOLIDERE must comply with the same Lebanese commercial law (the Lebanese Commercial

Code) that governs all commercial companies in Lebanon. Chammaa Decl ¶ 5. Nor is SOLIDERE

exempt from Lebanese taxes or registration obligations. In fact, SOLIDERE is registered in the Lebanese

Commercial Registry, see Douaidy Decl. ¶ 7, and has paid taxes since 2004 when its temporary tax

abatement[23] expired. Id. at ¶ 8.[24]

---

[21] According to URS's own cited authority these suits were dismissed as having "no legal foundation." Ans. Br. at 25. Obviously, if the dismissed lawsuits lacked merit, then the fact they were dismissed says nothing about whether SOLIDERE is an organ of the Lebanese government. Further, there is no way for this Court to determine whether the suits were dismissed improperly, other than to second-guess the Lebanese courts involved and conduct its own de novo review of those cases under Lebanese law

[22] For instance, the fact that the Lebanese police may have acted to enforce the property rights of SOLIDERE in a specific circumstance says nothing about whether SOLIDERE is an organ of the State since generally it is one of the responsibilities of the police to enforce the rights (including property rights) of private parties as against those who would transgress those rights

[23] The fact that SOLIDERE once enjoyed a tax abatement is irrelevant to its relationship with the state of Lebanon under the FSIA. See Millen Indus. v. Coordination Council for N. Am. Affairs, 855 F.2d 879, 884-85 (D.C. Cir. 1988) (finding tax abatements insufficient to render a transaction "sovereign" under the FSIA).

[24] URS's reliance on Supra Med. Corp. v. McGonigle, 955 F. Supp. 374 (E.D. Pa. 1997) is misplaced. In Supra Med., the district court found that a plaintiff who had shown that a British company: (1) was created by an act of Parliament; (2) received seventy percent of its funds from the British government; and (3) was obligated to account for these funds to the government, "without more, [had failed to] establish that [defendant] is an organ of the British government." Supra Med. at 379. Thus, that case affords no support to URS's position. Quite the contrary, Supra Med. confirms the infirmity of the "evidence" cited by URS to establish SOLIDERE's organ status. Moreover, SOLIDERE has been engaged in several legal proceedings against the Lebanese government in local courts and before arbitral tribunals, see Douaidy Decl. ¶ 9, Chammaa Depo Tr. 250:25-251:10 [REDACTED] which is inconsistent with the conclusion that SOLIDERE is an organ of the State it has sued

Since SOLIDERE clearly lacks the indicia of State ownership and involvement necessary to render it an organ of the State of Lebanon, it is unnecessary to refute in any great detail the assertion that one or more statutory exceptions[25] applies to (or that SOLIDERE has implicitly waived)[26] its immunity

## III.    EVEN IF PERSONAL JURISDICTION OVER SOLIDERE DID EXIST, THE COURT SHOULD DECLINE TO EXERCISE SUCH JURISDICTION ON EQUITABLE ESTOPPEL AND/OR *FORUM NON CONVENIENS* GROUNDS

### A.    Equitable Estoppel Should Bar URS From Proceeding With This Action

Equitable estoppel is an equitable doctrine that allows courts substantial leeway and discretion in rendering a decision. See Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 242 (3d Cir. 1994); In re Reading Co., 404 F. Supp. 1249, 1251 (E.D. Pa. 1975) ("Estoppel is essentially a flexible doctrine, to be applied or denied as equity between parties may preponderate.") The essence of the doctrine is fundamental fairness. See Bechtel v. Robinson, 886 F.2d 644, 650 (3d Cir. 1989) ("[The] foundation [of equitable estoppel] is justice and good conscience.").

URS invited the ICC Court to initiate a jurisdictional review pursuant to Article 6(2) of the ICC Rules[27] and should be prevented from abandoning that procedure in favor of this action simply to avoid an adverse initial ruling. Compare Bergquist Co. v. Sunroc Corp., 777 F. Supp. 1236, 1251 (E.D. Pa. 1991) ("At some point it would [be] unfair to [SOLIDERE] to allow [URS] to continue in the arbitration process, await an unfavorable decision, and then challenge the arbitration.") URS's assertion that

---

[25] Neither the commercial activity (28 U.S.C. § 1605(a)(2)) nor agreement to arbitrate (28 U.S.C. §1605(a)(6)) exceptions apply here. First, there is an insufficient nexus between SOLIDERE's commercial activities and the United States. See S. Seafood Co. v. Holt Cargo Sys., Inc., No. 96-5217, 1997 WL 539763, at *6 (E.D. Pa. Aug. 11, 1997) ("To establish a direct effect in the United States the plaintiff must establish that something legally significant actually happened in the U.S.") Second, this is not an action to enforce an agreement to arbitrate (since URS seeks to avoid such an agreement) or to confirm an arbitration award. See 28 U.S.C. §1605(a)(6).

[26] Implicit waivers to immunity are disfavored. See In re Terrorist Attacks on Sept. 11, 2001, 345 F. Supp. 2d 765, 803 n.31 (S.D.N.Y. 2005) ("[T]he waiver of FSIA immunity must be explicit.").

[27] SOLIDERE did not "submit[ ] the issue of jurisdiction to the ICC." See Ans. Br. at 3. SOLIDERE made certain jurisdictional averments in its Request for Arbitration, October 16, 2006 Declaration of Paul B. Carberry In Support of Defendant SOLIDERE's Motion to Dismiss the Complaint ("Carberry Decl. I") Ex. A, but URS explicitly initiated the Article 6(2) procedure in its March 13, 2006 letter to the ICC Court. Carberry Decl. I Ex. D ("We respectfully invite the ICC Court of Arbitration to consider the following preliminary matters[, including whether the arbitration should proceed against URS.]")

equitable estoppel cannot apply because SOLIDERE did not rely to its detriment on URS's actions exalts form over substance. While it is true that the ICC Arbitration will proceed – at least as against Radian – regardless of the outcome of this action, SOLIDERE's reliance on the efficacy of that proceeding would be defeated by URS's tactical maneuvering. The Court may use its equitable powers to prevent URS from employing multiple legal proceedings to unfair advantage. See Galtney v. KPMG L.L.P., No. H05583, 2005 WL 1214613, at *5 (S.D. Tex. May 19, 2005) ("The lynchpin for equitable estoppel is equity[.]").

**B.    This Action Should Be Dismissed On the Basis of *Forum Non Conveniens***

URS's argument that the doctrine of forum non conveniens does not apply here is without merit.

**1.    The ICC Arbitration is an Adequate Alternative Forum**

The proceeding before the ICC arbitral tribunal, whose decision on jurisdiction (or arbitrability) will be subject to a de novo review by the French courts,[28] is clearly an adequate alternative forum. SOLIDERE (like URS), is amenable to process in that proceeding and the parties have already participated in extensive briefing before the ICC Court on the same issue before this Court. See Op. Br. at 26. URS's contention that the ICC Arbitration "cannot be a forum at all," Ans. Br. at 30, because, under U.S. law, a court reviewing an arbitrator's decision on jurisdiction will apply a de novo standard of review, see Kaplan v. First Options, 514 U.S. 938, 943 confuses the issue. In the forum non conveniens context, the question of whether another jurisdiction is an adequate alternative hinges on whether the relief offered in that jurisdiction is adequate. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 n.22 (1981). Here, there can be no dispute that the ICC arbitral tribunal offers URS the same remedy that it seeks in this Court, i.e. a finding that the Contract arbitration clause does not bind URS.[29]

---

[28] See Articles 1502 and 1504 of the New Code of Civil Procedure (arbitral award rendered in France in matters of international arbitration may be vacated in defined cases, including "if the arbitrator has ruled upon the matter without an arbitration agreement or based on a void and lapsed agreement"), available at http://195.83.177.9/code/liste.phtml?lang=uk&c=39&r=7447#art30263.

[29] See Article 1458 of the New Code of Civil Procedure (arbitral tribunal has power to decide the proper parties before it); see also Carberry Decl. I Ex. C (ICC Rules) at Art. 6.2 (same). As noted, supra, the decision of the arbitral tribunal will be subject to a de novo review by the French courts.

Further, URS's burden argument is a red herring. See Ans. Br. at 30-31. As an initial matter, the arbitral tribunal will make a determination on jurisdiction before URS is compelled to go through "an entire arbitration." See Carberry Decl. III Ex. 11 at § 1.1 REDACTED

. In addition, URS voluntarily appeared in the ICC Arbitration and it is only now, after the ICC Court rejected its arguments, that URS has decided that the ICC arbitral tribunal is a "clearly unsatisfactory" forum. Ans. Br. at 30-31. Besides, if URS succeeds on its claim, it will not necessarily "assume [any] costs," since the ICC Rules permit a successful party to recover the costs of arbitration, including legal fees and expenses. See Carberry Decl. I Ex. C (ICC Rules) at Art. 31.

## 2.    URS's Choice of Forum Is Not Entitled to Any Significant Deference

When a plaintiff "chooses a forum which has no connection to himself or the subject matter of the suit, and is thus not his home turf, the burden on the defendant is reduced and it is easier for the defendant to show that the balance of convenience favors transfer." Chrysler Capital Corp. v. Woehling, 663 F. Supp. 478, 482 (D. Del. 1987) (quotations omitted)

URS's principal place of business and executive offices are located in California. See

REDACTED                 ; Carberry Decl. III Ex. 8 at 1 (URS Corp., Annual Report (Form 10-K) (Mar. 15, 2006)). The subject matter of this litigation, i.e. whether URS is bound by an arbitration clause in a contract entered into by its wholly-owned subsidiary relating to a project in Lebanon (the performance of which URS took over), has no connection to Delaware. In fact, being the state of incorporation for URS and Radian is Delaware's sole connection to this action. See Ans. Br. at 31-32. When deciding matters with similar facts, this District has routinely ceded jurisdiction in favor of the alternative forum. See Burstein v. Applied Extrusion Tech., Inc., 829 F. Supp. 106, 110-14 (D. Del. 1992); cf. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 629 (1985) ("We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts . . . .") (quotations and citations omitted)

Equally as ineffective is URS's reliance on the internal affairs doctrine for the proposition that Delaware law must be applied. Ans. Br. at 32, n.31. That doctrine only applies to purely internal

28

disputes, and not to disputes, like this one, involving the rights of parties external to the corporation. See Curiale v. Tiber Holding Corp., No. 95-5284, 1997 WL 597944, at *11 (E.D. Pa. Sept. 18, 1997) (holding doctrine inapplicable where "rights of third parties external to the corporation are at issue.").

### 3.    The Balance of Private and Public Interest Factors Favors Dismissal

URS discounts the inconvenience and cost posed by a Delaware trial by asserting that the focus of this action will be solely on "URS and Radian documents and witnesses [all of which] are here." Ans. Br. at 33. However, URS's documents and personnel are in California, not Delaware. See supra Section III.B.2. Moreover, documents and testimony from Lebanon will be essential to SOLIDERE's case as a crucial issue to be determined will be whether URS assumed performance of the Contract in Beirut. Relevant materials and persons with knowledge of that issue are all located in Lebanon, clearly hindering "the relative ease of access to sources of proof" if this action proceeds. See Lacey v. Cessna Aircraft Co., 932 F.2d 170, 180 (3d Cir. 1988).

In addition, the ICC Rules permit arbitrators to change the location of hearings to make witness attendance more likely. See Carberry Decl. I Ex. C (ICC Rules) at Art. 14.2; Yves Derains & Eric A. Schwartz, A Guide to the New ICC Rules of Arbitration 206 (1998) ("[I]t may sometimes be more economical for the Arbitral Tribunal to hear certain witnesses where they reside . . . instead of summoning them to the place of the arbitration."). This is an important consideration where, as here, the parties (and relevant third parties) are located at great distances apart.[30] Moreover, URS's protest that the hearing in the ICC Arbitration will not take place until December 2007 is a red herring since there is no guarantee that this action (including the parties' pending motions, the underlying merits and the applicable appellate rights) would be completed in advance of the ICC Arbitration proceedings.

Finally, URS mischaracterizes SOLIDERE's contention regarding the potential choice of law analysis and application of foreign law. See Ans. Br. at 37. SOLIDERE does not contend that "this

---

[30] See, e.g., Burstein, 829 F. Supp at 111-12 (transferring an action to Massachusetts for convenience of parties and prospective witnesses); Chrysler Capital Corp., 663 F. Supp. at 483 (transferring action to New Jersey).

Court cannot accomplish a complex choice of law analysis." Id. Rather, the ICC arbitral tribunal has a more streamlined procedure and greater discretion in deciding on an applicable substantive law in comparison to the complex and extensive choice of law analysis required under U.S. law. See Op. Br. at 19; see also Piper Aircraft, 454 U.S. at 251 ("[T]he public interest factors point towards dismissal where the court would be required to 'untangle problems in conflict of laws, and in law foreign to itself.'") (citations omitted).

## Conclusion

For the foregoing reasons, Defendant SOLIDERE respectfully requests that the Court dismiss this action with prejudice and grant such other relief as the Court may deem proper and just.

_Anne Shea Gaza_

Samuel A. Nolen (#971)
Anne Shea Gaza (#4093)
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Nolen@rlf.com
Gaza@rlf.com

OF COUNSEL:
Paul B. Carberry
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8507
pcarberry@whitecase.com

*Attorneys for Defendant The Lebanese
Company for the Development and
Reconstruction of Beirut Central District,
S.A.L. a/k/a SOLIDERE*

Dated: March 13, 2007

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2007, I caused to be served by hand delivery the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Edward P. Welch, Esquire
> Edward B. Micheletti, Esquire
> Skadden, Arps, Slate, Meagher
>  & Flom LLP
> One Rodney Square
> P.O. Box 636
> Wilmington, DE 19899

I hereby certify that on March 20, 2007, I caused to be sent by Federal Express the foregoing document to the following non-registered participants:

> Jeffrey H. Dasteel, Esquire
> Jason D. Russell, Esquire
> Marina V. Bogorad, Esquire
> Skadden, Arps, Slate, Meagher
>  & Flom LLP
> 300 S. Grand Avenue, 34th Floor
> Los Angeles, CA 90071
> jdasteel@skadden.com

> Anne Shea Gaza (#4093)
> Gaza@rlf.com
> Richards, Layton & Finger, P.A
> One Rodney Square
> P.O. Box 551
> Wilmington, Delaware 19899
> (302) 651-7700