## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

URS CORPORATION,      )
            )
       Plaintiff,  )  Civil Action No. 06-415 (SLR)
            )
    v.       )  **REDACTED VERSION**
            )  **FILED MARCH 20, 2007**
THE LEBANESE COMPANY FOR THE )
DEVELOPMENT AND RECONSTRUCTION OF )
BEIRUT CENTRAL DISTRICT SAL, a/k/a )
SOLIDERE,       )
            )
       Defendant. )
            )
            )

## REPLY BRIEF IN FURTHER SUPPORT OF PLAINTIFF'S MOTION
## FOR A PRELIMINARY INJUNCTION ENJOINING ARBITRATION

SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
Edward P. Welch (#0671)
Paul J. Lockwood (#3369)
Edward B. Micheletti (#3794)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
Tel: (302) 651-3000
plockwoo@skadden.com

Attorneys for Plaintiff URS Corporation

Of Counsel:

Jeffrey H. Dasteel
Jason D. Russell
Stacy R. Horth-Neubert
Marina V. Bogorad
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California  90071-3144
Tel: (213) 687-5000

DATED: March 13, 2007

## REDACTED VERSION - FILED MARCH 20, 2007

## TABLE OF CONTENTS

**PAGE:**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    SOLIDERE EFFECTIVELY CONCEDES THAT THIS COURT HAS
      EXCLUSIVE JURISDICTION TO DETERMINE ARBITRABILITY . . . . . . . . . . 4

      A.    Solidere Ignored URS's Supreme Court Authority Showing
            Arbitrability Is Decided By A Court, Not The Arbitrators . . . . . . . . . . . . . . 4

      B.    Solidere's Suggestion That URS's Tendering Of Jurisdictional Objections To
            The ICC Constitutes An Agreement To Arbitrate Is Absurd . . . . . . . . . . . . 6

II.   SOLIDERE'S UNSUPPORTED SUGGESTION THAT THIS COURT
      OWES COMITY TO THE ICC ARBITRATION IS ERRONEOUS . . . . . . . . . . . . 8

      A.    The ICC Arbitration Does Not Qualify For Application
            Of The International Anti-Suit Injunction Standard . . . . . . . . . . . . . . . . . . . 8

      B.    Even If The Foreign Anti-Suit Injunction Standard Applied,
            And It Does Not, URS's Request Would Satisfy It Here . . . . . . . . . . . . . . . 10

III.  SOLIDERE'S CHOICE OF LAW ARGUMENT IS BASELESS . . . . . . . . . . . . . . 12

      A.    The Notion That An American Citizen Who Never Signed
            An Arbitration Agreement Must Rely On Foreign Law To
            Decide Arbitrability Is Absurd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.    Solidere's Fight Over Whether Federal, Delaware Or California
            Alter Ego Law Applies Is Both Irrelevant And Legally Incorrect . . . . . . . . 14

IV.   ALTHOUGH IRRELEVANT TO THE MERITS OF THE MOTION, SOLIDERE
      FAILED TO ESTABLISH THAT URS IS RADIAN'S ALTER EGO . . . . . . . . . . 16

      A.    Radian Amply Complied With Corporate Formalities . . . . . . . . . . . . . . . . 17

            1.    Solidere Has Not Shown That Radian Failed To
                  Follow The Formalities Required Of A Limited
                  Liability Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            2.    Radian Does Not Need "Independent"
                  Management To Be A Separate Entity . . . . . . . . . . . . . . . . . . . . . . . 18

            3.    Radian's Use Of URS's Resources
                  Complied With Corporate Formalities . . . . . . . . . . . . . . . . . . . . . . . 20

      B.    Solidere Cannot Establish Fraud or Misconduct Akin to Fraud . . . . . . . . . 22

            1.    Solidere Cannot Pierce The Corporate
                  Veil Based on Radian's Alleged Insolvency . . . . . . . . . . . . . . . . . . 23

            2.    Radian's Asset Transfers Provide No
                  Grounds For Piercing the Corporate Veil . . . . . . . . . . . . . . . . . . . . 24

V.      SOLIDERE EFFECTIVELY CONCEDES THAT URS
        WILL SUFFER IRREPARABLE HARM PER SE IF
        FORCED TO ARBITRATE ARBITRABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VI.     THERE IS NO HARM TO SOLIDERE, MUCH LESS
        IRREPARABLE HARM, IF AN INJUNCTION IS
        GRANTED ENJOINING THE ARBITRATION . . . . . . . . . . . . . . . . . . . . . . . . 28

VII.    THE PUBLIC INTEREST FACTORS DO NOT FAVOR SOLIDERE . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

Action Mfg. Co. v. Simon Wrecking Co.,
    375 F. Supp. 2d 411 (E.D. Pa. 2005) ............................................................. 21

In re Acushnet River & New Bedford Harbor Proceedings,
    675 F. Supp. 22 (D. Mass. 1987) ................................................................. 21

AGCO Corp. v. Anglin,
    216 F.3d 589 (7th Cir. 2000) ..................................................................... 8

Akzona Inc. v. E.I. duPont de Nemours & Co.,
    607 F. Supp. 227 (D. Del. 1984) ................................................................ 22

Am. Life Ins. Co. v. Parra,
    25 F. Supp. 2d 467, 479 (D. Del. 1998) ...................................................... passim

Arbor Place, L.P., v. Encore Opportunity Fund, L.L.C.,
    C.A. No. 18928, 2002 WL 205681 (Del. Ch. Jan. 29, 2002) ........................... 19

AT & T Technologies, Inc. v. Communications Workers of America,
    475 U.S. 643 (1986) ............................................................................... passim

Atlantic Richfield Co. v. Blosenski,
    847 F. Supp 1261, 1278 (E.D. Pa. 1994) ..................................................... 17

Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH,
    585 F.2d 39 (3d Cir. 1978) ....................................................................... 14

Bell Oil & Gas Co. v. Allied Chem. Corp.,
    431 S.W.2d 336 (Tex. 1968) ..................................................................... 26

Bergquist Co. v. Sunroc Corp.,
    777 F. Supp. 1236 (E.D. Pa. 1991) ........................................................... 7, 30

Breyer v. First National Monetary Corp.,
    548 F. Supp. 955 (D.N.J. 1982) .................................................................. 5

Carapico v. Phila. Stock Exch., Inc.,
    791 A.2d 787 (Del. Ch. 2000) ................................................................... 19

Carte Blanche (Singapore) Pte,. Ltd. v. Diners Club Int'l, Inc.,
    2 F.3d 24 (2d Cir. 1993) .......................................................................... 17

Compagnie des Bauxites de Guinea v. Insurance Co. of North America,
    651 F.2d 877 (3d Cir. 1981) ...................................................................... 8

Curiale v. Tiber Holding Corp.,
    No. Civ. A. 95-5284, 1997 WL 597944 (E.D. Pa. Sept. 18, 1997) ..................... 15

i

Debakey Corp. v. Raytheon Serv. Co.,
    C.A. No. 14947, 2000 WL 1273317 (Del. Ch. Aug. 25, 2000) ...................................... 19

DeWitt v. Hutchins,
    309 F. Supp. 2d 743 (M.D.N.C. 2004) .............................................................. 15

E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,
    269 F.3d 196 (3d Cir. 2001) ............................................................................ 10

Eason v. Linden Avionics, Inc.,
    706 F. Supp. 311 (D.N.J. 1989) ....................................................................... 2

Edwards Co. v. Monogram Indus.,
    730 F.2d 977 (5th Cir. 1984) ............................................................................ 26

Elf Atochem N. Am., Inc. v. Jaffari,
    727 A.2d 286 (Del.1999) ................................................................................. 17

Enviroplan, Inc. v. Western Farmers Electric Co-op.,
    900 F. Supp. 1055 (S.D. Ind. 1995) .................................................................. 2

Films by Jove, Inc. v. Berov,
    250 F. Supp. 2d 156 (E.D.N.Y. 2003) .............................................................. 10

First Options of Chicago, Inc. v. Kaplan,
    514 U.S. 938 (1995) ................................................................................. passim

Fiscus v. Combus Finance AG,
    No. Civ. A. 03-1328, 2006 WL 1722607 (D.N.J. Jun. 20, 2006) ...................................... 2

In re Foxmeyer Corp.,
    290 B.R. 229 (Bankr. D. Del. 2003) ............................................................. 23, 24

Frydman v. Cosmair, Inc.,
    94 Civ. 3772 (LAP), 1995 WL 404841 (S.D.N.Y., Jul. 6, 1995) ................................... 13

General Electric Co. v. Deutz AG,
    270 F.3d 144 (3d Cir. 2001) ......................................................................... passim

Government of Virgin Islands, Bureau of Internal Revenue v. Lansdale,
    172 F. Supp. 2d 636 (D.V.I. 2001) ................................................................... 16

Grace Bros., Ltd. v. UniHolding Corp.,
    C.A. No. 17612, 2000 WL 982401 (Del. Ch. July 12, 2000) .......................................... 19

Gruca v. Alpha Therapeutic Corp.,
    19 F. Supp. 2d 862 (N.D. Ill. 1988) ................................................................... 22

H. Prang Trucking Co. v. Local Union No. 469,
    613 F.2d 1235 (3d Cir. 1980) ........................................................................... 5

Hilton v. Guyot,
    159 U.S. 113 (1895) ................................................................................ 8

Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co.,
    C.A. No. 89C-SE-35, 1995 WL 411795 (Del. Super. Ct. Mar. 31, 1995) ...................... 21

Howsam v. Dean Witter Reynolds, Inc.,
    537 U.S. 79 (2002) ................................................................................ 5

Irwin & Leighton, Inc. v. W.M. Anderson Co.,
    532 A.2d 983 (Del. Ch. 1987) ................................................................. 16

Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.,
    456 F. Supp. 831 (D. Del. 1978) ............................................................. 14

Kaplan v. First Options of Chicago, Inc.,
    19 F.3d 1503 (3d Cir. 1994) .............................................................. 23, 25

Laborers' International Union of N. America v. Foster Wheeler Corp.,
    868 F.2d 573 (3d Cir. 1989) ................................................................... 11

LaSalle Nat'l Bank v. Perelman,
    82 F. Supp. 2d 279 (D. Del. 2000) .......................................................... 16

Litton Finance Printing Division v. NLRB,
    501 U.S. 190 (1991) .............................................................................. 5

Maryland Casualty Co. v. Realty Advisory Board on Labor Relations,
    107 F.3d 979 (2d Cir. 1997) ................................................................... 28

Masefield AG v. Colonial Oil Industrial, Inc.,
    No. O5 Civ. 2231 (PKL), 2005 WL 911770 (S.D.N.Y. Apr. 18, 2005) .................. passim

Mason v. Network of Wilm., Inc.,
    C.A. No. 19434, 2005 WL 1653954 (Del. Ch. July 1, 2005) .................................. 16, 24

In re Matter of Application of Oxus Gold PLC,
    No. Misc. 06-82, 2006 WL 2927615 (D.N.J. Oct. 11, 2006) ................................. 8

McLaughlin Gormley King Co. v. Terminix International Co. L.P.,
    105 F.3d 1192 (8th Cir. 1997) ................................................................ 28

Meadows Indemnity Co. v. Baccala & Shoop Insurance Services, Inc.,
    760 F. Supp. 1036 (E.D.N.Y. 1991) ......................................................... 13

Merrill Lynch Inc. Managers v. Optibase, Ltd.,
    337 F.3d 125 (2d Cir. 2003) ................................................................... 27

Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.,
    84 F.3d 560 (2nd Cir. 1996) .................................................................... 2

Mobil Oil Corp. v. Linear Films, Inc.,
    718 F. Supp. 260 (D. Del. 1989) ............................................................. passim

Mobilificio San Giacomo S.p.A v. Stoffi,
    No. C.A. 96-415-SLR, 1998 WL 125534 (D. Del. Jan. 29, 1998) ..................... 4

Molloy v. American General Life Cos.,
    No. 05-4547 (MLC), 2006 WL 2056848 (D.N.J. Jul. 21, 2006) ...................... 14

NBC v. Bear Stearns & Co.,
    165 F.3d 184 (2d Cir. 1999) ..................................................................... 8

Northeastern Power Co. v. Balcke-Durr, Inc.,
    49 F. Supp. 2d 783 (E.D. Pa. 1999) ......................................................... 21

Oncology Therapeutics Network Connection v. Va. Hematology Oncology PLLC,
    No. C 05-3033 WDB, 2006 WL 334532 (N.D. Cal. Feb. 10, 2006) ............... 15

Opals on Ice Lingerie v. Bodylines Inc.,
    320 F.3d 362 (2d Cir. 2003) ..................................................................... 8

PaineWebber Inc. v. Chase Manhattan Private Bank,
    260 F.3d 453, 461 (5th Cir. 2001) .......................................................... 3, 7

PaineWebber Inc. v. Hartmann,
    921 F.2d 507 (3d Cir. 1990) .................................................................. 1, 27

Par-knit Mills v. Stockbridge Fabrics Co.,
    636 F.2d 51 (3d Cir. 1980) ..................................................................... 4, 6

Pearson v. Component Tech. Corp.,
    247 F.3d 471 (3d Cir. 2001) ..................................................................... 22

In re Peregrine Systems, Inc.,
    C.A. No. 04-1325 (SLR), 2005 WL 2401955 (D. Del. Sept. 29, 2005) ............ 8

Perpetual Real Estate Servs., Inc. v. Michaelson Props., Inc.,
    974 F.2d 545 (4th Cir. 1992) ................................................................... 27

Publicker Indus. v. Roman Ceramics Corp.,
    603 F.2d 1065 (3d Cir. 1979) ................................................................... 23

Raytheon Engineers & Constructors, Inc. v. SMS Schloemann-Siemag
Akiengesellschaft,
    No. 99 C 7771, 2000 WL 420866 (N.D. Ill. Mar. 16, 2000) ........................ 11

Rep. of Kazakhstan v. Biedermann Int'l,
    168 F.3d 880 (5th Cir. 1999) ..................................................................... 9

Rhone Mediterranee Compagnia Francese Di Assicurazioni E
Riassicurazoni v. Lauro,
    712 F.2d 50 (3rd Cir. 1983) ............................................................................ 13

Sandvik AB v. Advent International Corp.,
    Nos. Civ.A.99-486-RRM(SLR), Civ.A.02-143-SLR,
    2002 WL 1268052 (D. Del. May 22, 2002) ...................................................... 5

Sandvik AB v. Advent Intern. Corp.,
    220 F.3d 99 (3rd Cir. 2000) ............................................................................ 6

Sarhank Group v. Oracle Corp.,
    404 F.3d 657 (2d Cir. 2005) .................................................................. passim

Scherk v. Alberto-Culver Co.,
    417 U.S. 506 (1974) ...................................................................................... 13

Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.,
    119 F.3d 393 (6th Cir. 1997) .......................................................................... 9

Shaw Group Inc. v. Triplefine Intern. Corp.,
    322 F.3d 115 (2d Cir. 2003) .......................................................................... 13

Smith Wilson Co. v. Trading & Development Establishment,
    744 F. Supp. 14 (D. D.C. 1990) ................................................................. 5, 6

Somportex Ltd. v. Philadelphia Chewing Gum Corp.,
    453 F.2d 435 (3d Cir. 1971) .......................................................................... 10

Sonora Diamond Corp. v. Superior Court,
    83 Cal. App. 4th 523 (2000) .............................................................. 16, 22, 23

Stonington Partners, Inc. v. Lernout & Hauspie Speech Products N.V.,
    310 F.3d 118 (3d Cir. 2002) ........................................................................ 8, 9

Theo. H. Davies & Co. v. Republic of Marshall Islands,
    174 F.3d 969 (9th Cir. 1998) .......................................................................... 2

Thrift Drug, Inc. v. Universal Prescription Adm'rs,
    131 F.3d 95, 96 (2d Cir. 1997) ...................................................................... 17

Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,
    906 A.2d 168 (Del. Ch. 2006) .................................................................. passim

Trustees of Nat. Elevator Industry Pension, Health Benefit and
Educational Funds v. Lutyk,
    332 F.3d 188, 195 (3d Cir. 2003) .................................................................. 17

Tudor Dev. Group v. U.S. Fidelity & Guar. Co.,
    968 F.2d 357 (3d Cir. 1992) .......................................................................... 25

Turn of the Century Solution, L.P. v. International Rectifier Corp.,
        No. Civ. 05-816-SLR, 2006 WL 1653143 (D. Del. June 15, 2006) ................................. 15

In re Tutu Wells Contamination Litigation,
        909 F. Supp. 1005 (D.V.I. 1995) ........................................................................... 15

United States v. Bestfoods,
        524 U.S. 51 (1998) .................................................................................. 11-12, 19, 20

United States v. Davidson,
        308 F. Supp.2d 461 (S.D.N.Y. 2004) ....................................................................... 8

United States v. Funds Held in the Name or for the Benefit of Wetterer,
        210 F.3d 96 (2d Cir. 2000) ................................................................................... 15

United States v. Golden Acres, Inc.,
        702 F. Supp. 1097, 1103 (D. Del. 1988) ................................................................. 17

United States v. Pisani,
        646 F.2d 83, 86 (3d Cir. 1981) ............................................................................. 17

Upjohn Co. v. Syntro Corp.,
        C.A. No. 89-107-JFF, 1990 WL 79232 (D. Del. Mar. 27, 1990) ..................................... 23

Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,
        825 F.2d 709 (2d Cir. 1987) ................................................................................. 10

Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood,
        752 A.2d 1175 (Del. Ch. 1999) ............................................................................. 16

Weis Builders, Inc. v. Kay S. Brown Living Trust,
        236 F. Supp. 2d 1197 (D. Colo. 2002), aff'd,
        94 Fed. Appx. 687 (10th Cir. 2004) ......................................................................... 6


STATUTES

9 U.S.C. § 4 ......................................................................................................... 5


OTHER AUTHORITIES

ICC Arbitral Award in case n°5721,
        JDI, 1990, 1020 ................................................................................................ 14

ICC Arbitral Award in case n°2138,
        JDI, 1975, 934 ................................................................................................. 14

Julliard et autres v. Roy et autres,
        Cour de cassation, Chambre Commerciale, Jan. 9, 1979, Rev.1979 , 478 ....................... 14

vi

Professor Ibrahim Fadlallah, <u>Travaux du Comit Franais de Droit International Priv</u>,
1984, 1985 ................................................................................................................................ 14

Kathleen Gallagher, TRENDS: <u>Outsourcing Can Add Revenue, Too;</u>
<u>Fund Manager Sees 3 Stocks Gaining From Strong Trend</u>,
     MILWAUKEE JOURNAL SENTINEL, 2006 WL 17907000 (Oct. 16, 2006) ............................ 21

Barry H. Garfinkel & David Herlihy, "Looking For Law In All the Wrong Places:
The Second Circuit's Decision In <u>Sarhank Group v. Oracle Corporation</u>,"
20-6 <u>Mealey's Intl. Arb. Rep.</u> 12 (2005) .................................................................... 12

Bernard Hanotiau, "Non-Signatories in International Arbitration:
Lessons from Thirty Years of Case Law" .................................................................... 12

Edward P. Welch, Andrew J. Turezyn, & Robert S. Saunders, <u>Folk on the Delaware General</u>
<u>Corporation Law</u> § 329.3 (5th ed. 2006) ............................................................. 14-15

## PRELIMINARY STATEMENT

URS's motion for preliminary injunction presented this Court with a single, narrow question: who must decide whether URS can be compelled to participate in the ICC Arbitration commenced by Solidere in Paris, France on the basis of a contract between URS's indirectly owned subsidiary, Radian International LLC ("Radian"), and Solidere – a contract that URS indisputably did <u>not</u> sign. If the Court determines that it must decide this question, then, as a matter of law, URS is entitled to a preliminary injunction because, by definition, the arbitrators cannot also make this same determination. URS showed that it was likely to prevail on this narrow issue because it is well-settled that "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." (URS Br. (D.I. 37) at 2 and 16-20, quoting <u>AT&T Techs., Inc. v. Commc'ns Workers of Am.</u>, 475 U.S. 643, 649, 651 (1986); <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 943 (1995).) Here, there is <u>no evidence</u> that URS agreed to arbitrate the question of arbitrability, much less clear and unmistakable evidence. <u>In the face of no less than three Supreme Court decisions holding that arbitrability must be decided by this Court, Solidere fails to cite any of these decisions anywhere in its 40 page opposition, much less distinguish them. By this glaring omission, Solidere concedes the issue.</u> (<u>See</u> Section I.A, <u>infra</u>.)

URS then showed that it is presumed, as a matter of law, to suffer irreparable injury if it were forced to participate in an arbitration when it never agreed to arbitrate. As the Third Circuit explained, "we think it obvious that the harm to a party would be <u>per se</u> irreparable if a court were to abdicate its responsibility to determine the scope of an arbitrator's jurisdiction and, instead, were to compel the party, who has not agreed to do so, to submit to an arbitrator's own determination of his authority. (URS Br. at 35, quoting <u>PaineWebber Inc. v. Hartmann</u>, 921 F.2d 507, 515 (3d Cir. 1990), and <u>Am. Life Ins. Co. v. Parra</u>, 25 F. Supp. 2d 467, 479 (D. Del. 1998) ("[t]he Third Circuit recognizes a party is irreparably harmed as a matter of law if forced to arbitrate a matter that it has not agreed to arbitrate.").) <u>Once again, Solidere does not even mention URS's Third Circuit authority in its 40 page opposition, much less try to distinguish it. Thus, as to this issue too, URS's showing is unchallenged.</u> (<u>See</u> Section V, <u>infra</u>.)

As Solidere has failed to respond to the only two issues this Court need consider, the analysis is over before it starts, and URS is entitled as a <u>matter of law</u> to a preliminary injunction without even considering a single fact other than that URS never signed an arbitration agreement. Solidere tries to avoid this result by manufacturing a series of arguments that fall apart under even

modest scrutiny.  For example, Solidere argues that this Court cannot reach the central question because it lacks personal jurisdiction over Solidere.  (Solidere Opposition ("Opp'n") at 8-10.)  URS showed in its opposition to Solidere's motion to dismiss (where this discussion belongs) that Solidere has <u>extensive</u> U.S. contacts that justify exercising jurisdiction.[1]

Solidere next spends five pages trying to erect a higher standard for this Court to apply in deciding whether to issue a preliminary injunction.  In a nutshell, Solidere analogizes its ICC Arbitration to a court proceeding under the auspices of another country's legal system and suggests that this Court must show comity to the ICC Arbitration because an injunction is tantamount to an "anti-suit injunction."  (Opp'n at 10-15.)  Nonsense.  Solidere cited no authority holding that these considerations apply where, as here, the "foreign proceeding" is an arbitration – <u>i.e.</u>, a creature of contract between private parties – and the party seeking to avoid the arbitration never agreed to arbitrate in the first place.  This omission is not surprising because caselaw stating that a court may enjoin an ICC arbitration where a party did not agree to arbitrate is legion.  <u>See, e.g.</u>, <u>Masefield AG v. Colonial Oil Indus., Inc.</u>, No. OS Civ. 2231 (PKL), 2005 WL 911770 (S.D.N.Y.

---

[1]     URS already established that this Court has jurisdiction over Solidere.  (URS Opposition to Motion to Dismiss (D.I. 73) ("MTD Opp'n").)  Solidere raises a few new arguments in opposing this motion that were not asserted in the motion to dismiss, which should be ignored.  Regardless, these new arguments are meritless.  For example, Solidere asserts that it should not be subject to the Court's jurisdiction because it had conducted its affairs intending to avoid U.S. jurisdiction.  (Opp'n at 3.)  This argument defies credulity given that Solidere <u>consented</u> to jurisdiction in New York and <u>appointed an agent for service of process in the U.S.</u>  (MTD Opp'n at 6.)  Thus, if Solidere intended to avoid jurisdiction, it did a poor job.  <u>Cf.</u> <u>Eason v. Linden Avionics, Inc.</u>, 706 F. Supp. 311, 320 (D.N.J. 1989) (denying jurisdictional challenge despite defendant's contention that "it ha[d] intentionally crafted its commercial structure to limit jurisdiction," as "merely intending to avoid the jurisdiction of ... [the forum] is insufficient"); <u>see also</u> <u>Enviroplan, Inc. v. W. Farmers Elec. Co-op.</u>, 900 F. Supp. 1055, 1061 (S.D. Ind. 1995) (denying motion to dismiss, even though "Defendant may have hoped to structure its relationship with Plaintiff so as to avoid subjecting itself to the jurisdiction of a foreign court"); <u>accord</u> MTD Opp'n at 20, citing <u>Fiscus v. Combus Fin. AG</u>, No. Civ. A. 03-1328, 2006 WL 1722607, at *9 (D.N.J. June 20, 2006) (holding that "a defendant's subjective expectation about exposure to the forum's jurisdiction" was irrelevant in deciding a motion to dismiss on jurisdictional grounds).

Solidere's assertion that certain of its contacts are irrelevant because they date back 10-12 years (Opp'n at 9) also lacks merit.  Solidere's lead authority held that "[t]he minimum contacts inquiry is fact-intensive, and the appropriate period for evaluating a defendant's contacts will vary in individual cases" and thus "district courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances."  <u>Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.</u>, 84 F.3d 560, 569-70 (2d Cir. 1996).  The fact that from its very inception in 1994 Solidere relied on U.S. investment for its operations is certainly relevant to the jurisdictional analysis; moreover, Solidere's 1996 securities offering is only a year removed from the start of negotiations on Radian's contract in 1997.  <u>Cf.</u> MTD Opp'n at 21, citing, <u>inter alia</u>, <u>Theo. H. Davies & Co. v. Republic of Marshall Islands</u>, 174 F.3d 969, 974-75 (9th Cir. 1998) (analyzing 15 years of defendant's U.S. contacts).  Regardless, Solidere's recent contacts with the U.S. are more than sufficient to justify this Court's exercise of jurisdiction over Solidere; indeed, Solidere or its agents contacted the U.S. at least <u>169 times</u> between January 2004 and mid-February 2006, <u>more than once a week</u> on average.  (<u>See</u> Russell Decl. in Opposition to Solidere's Motion to Dismiss (D.I. 83) ("Russell MTD Decl.") Exs. 134 & 135.)

Apr. 18, 2005). But even if this higher standard applied, URS satisfies it because it is a fundamental American policy to protect American citizens from being forced to arbitrate absent an agreement and to recognize the corporate distinction between parents and subsidiaries. (See Section II, infra.)

Solidere then suggests that URS's tendering of ***objections*** in the ICC Arbitration constitutes a "clear and unmistakable" agreement to arbitrate. (Opp'n at 16-19.) Not surprisingly, the Supreme Court already has rejected this precise argument out of hand. First Options, 514 U.S. at 946 ("merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue"). As the Fifth Circuit put it, "we cannot fathom how a motion premised on a jurisdictional objection could simultaneously operate as a waiver of that very objection." PaineWebber Inc. v. Chase Manhattan Private Bank, 260 F.3d 453, 461 (5th Cir. 2001). As URS objected to the ICC's jurisdiction, it plainly did not agree to arbitrate. (Section I.B, infra.)

Solidere spends pages asserting that a U.S. citizen who did not sign an arbitration agreement cannot rely on U.S. law to determine arbitrability but instead must rely on the law of a contract it did not sign. (Opp'n at 19-23.) Again, U.S. courts have flatly rejected this argument, holding: "An American nonsignatory cannot be bound to arbitrate in the absence of a full showing of facts supporting an articulable theory based on American contract law or American agency law." Sarhank Group v. Oracle Corp., 404 F.3d 657, 661-62 (2d Cir. 2005) (applying U.S. law to determine whether nonsignatory was bound to arbitrate agreement governed by Egyptian law). (Section III.A, infra.)

Solidere then conflates the issue presented here – who decides the arbitrability question – with the merits of whether URS ultimately can be compelled to arbitrate its subsidiary's contract by arguing that URS is Radian's alter ego. This argument is not only irrelevant to resolving the motion, it is also simply wrong. Despite cramming 12 pages of argument into six by single spacing its entire argument, Solidere nonetheless managed to omit a key requirement to find alter ego liability. Starkly absent from Solidere's brief is any acknowledgment that it had to show by clear and convincing evidence "fraud or something like it" by URS in abusing Radian's corporate form. Solidere's opposition also is bereft of any evidence of "fraud or something like it" by URS; in fact, there is none. Lacking this essential element, Solidere's argument fails. At the proper time, URS will prevail on this merits issue in this Court. (See Section IV, infra.)

Unable to distinguish URS's authority showing that irreparable harm is presumed here, Solidere simply ignores it and argues that URS's tendering of objections to the ICC (and

accompanying expense in doing so) and its sharing of counsel with Radian evidence that URS will not suffer irreparable harm in arbitrating the arbitrability question. Solidere's arguments have been rejected by every court to consider the issue – a fact highlighted by Solidere's inability to cite even a single supporting Third Circuit case. Solidere then makes the circular argument that it, not URS, will suffer irreparable injury because proceeding here on the arbitrability question will deny Solidere the benefits of a contract that URS never signed. Solidere suggests that it will be denied the benefits of arbitration, totally ignoring that it is proceeding in arbitration at this very moment against Radian, i.e., the party that agreed to arbitrate with Solidere. (See Sections V & VI, infra.)

Solidere ends its brief by suggesting that the public interest factor weighs against an injunction. (Opp'n at 37.) This discussion is a regurgitation of the public interest factors from Solidere's *forum non conveniens* arguments that were addressed – and refuted – in URS's opposition to Solidere's Motion to Dismiss. URS showed in its opening brief that the public interest factor favors injunctions to allow a court to determine arbitrability. (See URS Br. at 36-37, citing, inter alia, Am. Life, 25 F. Supp. 2d at 479.) Solidere, once again, never even mentions this authority anywhere in its 40 page opposition. Instead, Solidere cites cases holding that the public interest factor favors enforcement of private contracts, but Solidere ignores that this puts the cart before the horse because URS never signed a contract with Solidere, and the entire dispute is about whether URS nonetheless may be forced to arbitrate a dispute under a contract to which Radian and Solidere – not URS – are parties. (See Section VII, infra.)

## ARGUMENT

## I.    SOLIDERE EFFECTIVELY CONCEDES THAT THIS COURT HAS EXCLUSIVE JURISDICTION TO DETERMINE ARBITRABILITY

### A.    Solidere Ignored URS's Supreme Court Authority Showing Arbitrability Is Decided By A Court, Not The Arbitrators

URS established that Solidere should be enjoined from proceeding with the issue of arbitrability in the ICC Arbitration because URS never signed the underlying arbitration agreement and never agreed to arbitrate with Solidere. (URS Br. at 17-18, citing authorities.) As this Court has previously confirmed, "[i]n the absence of a contract, a party cannot be compelled to arbitrate because arbitration is premised on the existence of an unequivocal contractual promise to do so." Mobilificio San Giacomo S.p.A v. Stoffi, No. C.A. 96-415-SLR, 1998 WL 125534, at *9 (D. Del. Jan. 29, 1998) (Robinson, J.) (emphasis added), citing Par-Knit Mills v. Stockbridge Fabrics Co., 636 F.2d 51, 54 (3d Cir. 1980). Where, as here, no such unequivocal promise (or "clear and

unmistakable evidence" of such promise) exists,[2] a court, not the arbitrator, determines whether a nonsignatory must arbitrate under a contract. Solidere does not seriously dispute this principle; rather, it simply ignores the long-established Supreme Court precedent and this Court's holdings to that effect. (See URS Br. at 19, citing 9 U.S.C. § 4, AT & T, 475 U.S. at 648; Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83-84 (2002); Litton Fin. Printing Div. v. N.L.R.B., 501 U.S. 190, 208 (1991); Sandvik AB v. Advent Int'l Corp., Nos. Civ.A.99-486-RRM(SLR), Civ.A.02-143-SLR, 2002 WL 1268052, at *1 (D. Del. May 22, 2002) (Robinson, J.).)[3]

Here, "[w]here the injunctive relief sought is a stay of arbitration, the inquiry is somewhat different" from a standard analysis of preliminary injunction factors because "[t]he focus is not on whether the movant will ultimately succeed in the underlying dispute, but whether he must pursue that dispute through arbitration." Breyer v. First Nat'l Monetary Corp., 548 F. Supp. 955 (D.N.J. 1982) (emphasis added), citing H. Prang Trucking Co. v. Local Union No. 469, 613 F.2d 1235, 1239 (3d Cir. 1980). Framed in this way, the only issue this Court need to determine is who must decide the arbitrability question, not whether URS will prevail on whether it ultimately will be forced to arbitrate. The reasoning in a procedurally similar case, Smith Wilson Co. v. Trading & Dev. Estab., 744 F. Supp. 14 (D.D.C. 1990), is particularly instructive here. In Smith Wilson, the court was asked to stay arbitration as plaintiffs never agreed to arbitrate with defendants. Defendants, like Solidere here, argued that plaintiffs should be bound by the agreement because there was extra-contractual evidence of plaintiffs' agreement to arbitrate, contending that the

---

[2]     (URS Br. at 19-20 (citing, Sarhank, 404 F.3d at 661-62 ("agreement between [other parties] which does not mention [the non-signatory] does not evidence a 'clear and unmistakable' intent by [the non-signatory] to arbitrate or to permit the arbitrator to decide the issue of arbitrability"); Masefield, 2005 WL 911770, at *2 (if plaintiffs did not sign the contract, there is no "clear and unmistakable evidence that plaintiffs agreed with defendant on any issue, much less the issue of arbitration").)

[3]     The only authority that Solidere challenges is First Options, 514 U.S. at 943, and then only to argue that the ICC Arbitration poses no threat to this Court's jurisdiction. (Opp'n at 12-13.) Solidere argues that First Options does not establish any priority as between courts and arbitrators when arbitrability concerns nonsignatories. Solidere is wrong. First Options dealt with enforcement of an arbitration award, issued despite the nonsignatories' objections to arbitral jurisdiction. The Court, considering the standard to be employed when reviewing such an award, was expressly asked to consider "who should have the primary power to decide ... [whether a nonsignatory party agreed to arbitrate]. Does the power belong primarily to the arbitrators ... or to the court?" and answered that question unequivocally: the court. Id. at 942-43. Solidere, however, cites to the Court's consideration of the pro-enforcement party's argument that a different standard of review should be employed where the arbitrators already rendered their decision on arbitrability; it is in response to that argument that the Court refused to find such an approach more efficient, pointing out that the argument is "inconclusive." (Opp'n at 12-13, citing First Options, 514 U.S. at 941.) First Options thus simply had no occasion to opine whether preventing the arbitrators from consideration of the issue in the first place would be the most efficient approach. But even if Solidere's analysis of First Options were correct, and it is not, there are many Supreme Court cases that hold arbitrability is for the courts to decide.

signatory to the agreement was plaintiffs' apparent agent and that plaintiffs later affirmed the contract. The court refused to consider such evidence and stayed the arbitration:

> In making their second type of argument, that the "Agreement" is enforceable because of [the agent]'s implied or apparent authority or because the plaintiffs' subsequent actions affirmed the contract, the defendants skip the appetizer and begin gobbling up the main course. These arguments go to the merits of whether the "Agreement" binds the parties instead of addressing the preliminary question now before the Court of whether that substantive dispute requires judicial or arbitral resolution. Espousing no view on the merits of the defendants' premature contract arguments, today the Court decides only that it – not an arbitrator – must determine whether the plaintiffs are bound by the "Agreement" ....Therefore, the arbitration proceedings pending before the American Arbitration Association must be stayed and may continue only if the Court ... has determined that the plaintiffs are bound by the arbitration provision of the "Agreement."

744 F. Supp. at 18 (expressly leaving "for another day" the issue whether the agreement binds the plaintiffs) (citing, AT & T, 475 U.S. at 650) (emphasis added). Cf. Sandvik AB v. Advent Int'l Corp., 220 F.3d 99, 107 n.5 (3d Cir. 2000) (citing Smith Wilson with approval and holding "that the question of whether a particular individual has authority to bind a party must be determined by the court, not by an arbitrator"); Weis Builders, Inc. v. Kay S. Brown Living Trust, 236 F. Supp. 2d 1197, 1204 (D. Colo. 2002) (staying arbitration "pending the determination that a valid agreement to arbitrate exists between the parties"), aff'd, 94 Fed. Appx. 687 (10th Cir. 2004).

Because Solidere has effectively conceded through its failure to challenge the binding authority cited by URS that the Court must decide arbitrability, URS's likelihood of success on the merits underlying the issuance of a preliminary injunction is established as a matter of law. Thus, the Court should enjoin Solidere, which is currently proceeding toward the same determination in the ICC Arbitration,[4] at the very least until the Court determines whether URS is bound by Radian's arbitration agreement. Indeed, under the FAA, "[i]n the event that the making of the arbitration agreement is in issue, then 'the court shall proceed summarily to the trial of that issue." Par-Knit Mills, 636 F.2d at 54 (citing 9 U.S.C. § 4) (emphasis added).

### B. Solidere's Suggestion That URS's Tendering Of Jurisdictional Objections To The ICC Constitutes An Agreement To Arbitrate Is Absurd

Instead of addressing the Supreme Court precedent on point, Solidere rehashes its Motion to Dismiss arguments, asserting that URS is not likely to succeed on the merits of this issue because its "invitation" to the ICC Court to consider URS's jurisdictional objections purportedly

---

[4] After the filing of this Motion, URS asked the arbitrators to stay their proceedings pending this Court's arbitrability determination. The Tribunal refused to do so and scheduled an evidentiary hearing to decide whether URS is bound by Radian's arbitration agreement. (See Declaration of T. Victor Clark in Support of Reply Brief in Further Support of Plaintiff's Motion for a Preliminary Injunction Enjoining Arbitration ("Clark Decl."), Ex. 1 (Procedural Order No. 1 dated December 22, 2006); see also Russell MTD Decl. Ex. 129 (Procedural Order No. 2 dated February 9, 2007).)

constitutes "clear and unmistakable" evidence of URS's intent to submit the arbitrability issue to arbitrators. (Opp'n at 16-18.) Solidere also asserts that URS somehow manifested its intent to abide by the ICC Court's resolution when it sought an extension of time "to file an answer" to Solidere's arbitration request. (Id. at 17.) However, as Solidere is aware, URS sought the extension to tender renewed objections – this time, to the arbitral tribunal – in the event the ICC Court allowed Solidere to proceed, which URS filed on June 30, 2006. (Russell MTD Decl. Ex. 127.)

Solidere's suggestion that tendering jurisdictional objections to the ICC constituted a clear and unmistakable agreement to arbitrate is absurd. Factually, as Solidere itself admitted, the ICC Court is an administrative body without any power to make substantive rulings. (See Solidere's Motion to Dismiss at 8; cf. MTD Opp'n at 38-39 (collecting authorities confirming the ICC Court's limited administrative powers).) Therefore, URS could not have intended to submit the arbitrability issue to an arbitral organ that is simply incapable of making such a determination.[5]

Legally, to borrow a phrase, "we cannot fathom how a motion premised on a jurisdictional objection could simultaneously operate as a waiver of that very objection." PaineWebber, 260 F.3d at 461. As URS established through citation of a long line of distinguished authorities (all ignored by Solidere), Solidere's contention that objecting to jurisdiction equates to submission thereto is frivolous. (See MTD Opp'n at 38-39, collecting cases, including First Options, 514 U.S. at 946 ("merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue . . . insofar as the [nonsignatories] were forcefully objecting to the arbitrators deciding their dispute with [the defendant], one naturally would think that they did not want the

---

[5]    Solidere faults URS for not ignoring the ICC Arbitration altogether and tries to distinguish First Options on that basis. (Opp'n at 17-18 (arguing that the First Options court credited the nonsignatories' objections because they "had a reason to be before the arbitrators[,]" as they were the signatory's principals).) As URS explained opposing Solidere's Motion to Dismiss, it is illogical and contrary to settled law to expect URS to pass up a simple administrative step provided by the ICC that could have avoided litigation altogether. (MTD Opp'n at 39 n.40.) Indeed, as Solidere's own authority demonstrates, the objecting party "d[oes] not have to refuse to attend the arbitration and let [defendant] get a default judgment against it[,]" but rather can "properly proceed with the arbitration mechanics while developing a strategy to prevent arbitration in the end." Bergquist Co. v. Sunroc Corp., 777 F. Supp. 1236, 1251 (E.D. Pa. 1991). Solidere also chastises URS for avoiding jurisdiction of the French courts, which, "as the courts of the situs of the arbitration," should, according to Solidere, have priority in ruling on the arbitrability issue. (Opp'n at 18 n.10.) URS, however, had nothing to do with choosing France as the situs for arbitration, since URS is not a signatory to the arbitration agreement. In any event, as Solidere admits, under French law, URS would be denied access to a judicial determination on arbitrability while arbitration is pending, which is clearly contrary to the Supreme Court's mandate that the issue of arbitrability is for the courts to decide. (MTD Opp'n at 30-31; Opp'n at 23 n.19.) Solidere's reliance on Bergquist, 777 F. Supp. 1236, to support its contention that URS should not be allowed to proceed here after obtaining the ICC Court's cursory determination that an arbitration agreement "might" exist (Opp'n at 18) is quite ironic because the Bergquist court rejected this very argument, ruling that the objecting party had not agreed to arbitrate even after participating unsuccessfully in an arbitration proceeding. 777 F. Supp. at 1251. (Cf. URS Br. at 19 n.9.)

arbitrators to have binding authority over them").) See also Masefield, 2005 WL 911770, at **1-2 (noting that plaintiffs had utilized the objections procedure before the ICC Court, but still finding that there was no evidence of intent to submit the issue of arbitrability to the arbitrators).[6]

## II.    SOLIDERE'S UNSUPPORTED SUGGESTION THAT THIS COURT OWES COMITY TO THE ICC ARBITRATION IS ERRONEOUS

### A.    The ICC Arbitration Does Not Qualify For Application Of The International Anti-Suit Injunction Standard

Solidere asserts that special considerations apply here under the "restrictive approach" adopted by the Third Circuit for anti-suit injunctions involving foreign proceedings. (Opp'n at 6-7, 10.) Solidere argues that such injunctions can issue only to protect the Court's jurisdiction or an important public policy because of comity concerns arising out of potential interference with a foreign tribunal's powers. (Id.) These considerations, and the "restrictive approach," are inapplicable where, as here, the foreign tribunal is a private arbitral body that derives its purported powers from a contractual agreement that was never signed by the party seeking the injunction.[7]

Solidere cites no authority establishing that this Court owes comity to an ICC Arbitration, which is a creature of contract between private parties, and not a court proceeding under the auspices of a foreign nation. Comity "is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation." Hilton v. Guyot, 159 U.S. 113, 164 (1895) (emphasis added). Comity refers to deference to the acts of a foreign government, not the acts of a private organization. The ICC (like the American Arbitration Association) is a private body entrusted with dispute resolution capabilities, but without any governmental affiliation. NBC v. Bear Stearns & Co., 165 F.3d 184, 185-86 (2d Cir. 1999) (ICC is a "private," "non-governmental" organization); U.S. v. Davidson, 308 F. Supp. 2d 461, 482 (S.D.N.Y. 2004) (same). Cf. In re Matter of Appl. of Oxus Gold PLC, No. Misc. 06-82, 2006 WL 2927615, at *6 (D.N.J. Oct. 11, 2006) ("international arbitral panels created exclusively by private parties, such

---

[6]    Accord Sarhank, 404 F.3d at 662 (defendant "objected repeatedly to its being a party to the [Egyptian] arbitration, thus preventing a finding that it waived its ability to object"); Opals on Ice Lingerie v. Bodylines Inc., 320 F.3d 362, 368 (2d Cir. 2003) (although defendant "participated actively" in arbitration, fact that defendant "objected repeatedly to arbitration ... prevent[s] a finding of waiver" of access to judicial relief); AGCO Corp. v. Anglin, 216 F.3d 589, 593 (7th Cir. 2000) ("If ... a party clearly and explicitly reserves the right to object to arbitrability, his participation in the arbitration does not preclude him from challenging the arbitrator's authority in court.").

[7]    See Stonington Partners, Inc. v. Lernout & Hauspie Speech Products N.V., 310 F.3d 118 (3d Cir. 2002) (dealing with parallel bankruptcy court proceedings in Belgium); Compagnie des Bauxites de Guinea v. Ins. Co. of N. Am., 651 F.2d 877 (3d Cir. 1981) (dealing with a declaratory judgment action filed in England's High Court); In re Peregrine Sys., Inc., C.A. No. 04-1325 (SLR), 2005 WL 2401955, at *2 (D. Del. Sept. 29, 2005) (Robinson, J.) ("judicial proceeding" in Germany).

as private commercial arbitration administered by the International Chamber of Commerce ... are not included in [28 U.S.C. 1782(a)]'s meaning" of ["foreign or international tribunal"]).

The Sixth Circuit addressed this issue, holding that the Anti-Injunction Act did <u>not</u> preclude an injunction of a private arbitration because an arbitration is <u>not</u> entitled to comity:

> The question, then, is whether the arbitration proceeding involved in this case is a "proceeding in State court" within the meaning of the [Anti-Injunction] Act. We conclude that it is not. Arbitration is a private dispute resolution mechanism instituted pursuant to an agreement between the parties. It occurs predominantly outside, and in lieu of, court proceedings.... Moreover, <u>the policies behind the Act suggest that private voluntary arbitration is not the kind of proceeding the Act intended to implicate</u>. The Supreme Court has explained that the purpose of the Act is to avoid "the inevitable friction between the state and federal courts that ensues from the injunction of state judicial proceedings by a federal court." ... <u>Staying a private voluntary arbitration proceeding does not implicate these concerns about comity</u> and the maintenance of the state judicial system. Indeed, by choosing arbitration, the parties have decided not to submit their legal controversy to the state courts.

<u>Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.</u>, 119 F.3d 393, 398 (6th Cir. 1997) (affirming injunction) (emphasis added, citations omitted); <u>cf. Rep. of Kazakhstan v. Biedermann Int'l</u>, 168 F.3d 880, 883 (5th Cir. 1999) (term "foreign and international tribunals" under 28 U.S.C. § 1782 does <u>not</u> include "private international arbitrations" as § 1782 was intended "to further comity among nations," which would <u>not</u> be implicated for such arbitrations).

The only authority cited by Solidere that even involved a private arbitral tribunal (as opposed to a foreign court) is <u>General Electric Co. v. Deutz AG</u>, 270 F.3d 144 (3d Cir. 2001), which is clearly inapposite. In <u>General Electric</u>, it was the nonsignatory parent that sought to invoke the arbitration clause contained in its subsidiary's contract. <u>See</u> 270 F.3d at 149. The district court put the issue of arbitrability to the jury, which ultimately found adversely to the parent. <u>Id.</u> at 153. At the same time, the parent commenced separate arbitration proceedings in London and petitioned the English High Court to resolve the issue of arbitrability. <u>Id.</u> at 149. The district court in <u>General Electric</u> then enjoined the parent on <i>res judicata</i> grounds, but the Third Circuit reversed, holding that <i>res judicata</i> did not apply. <u>Id.</u> at 157-59. Noting that the English High Court had assumed jurisdiction and asked the U.S. courts to give comity with respect to the English court's determinations on arbitrability, the Third Circuit concluded that considerations of comity precluded the district court from enjoining <u>judicial proceedings</u> in England. <u>Id.</u> at 159-61.[8]

---

[8]    Although the district court's injunction in <u>General Electric</u> also included an order prohibiting the nonsignatory parent from taking any further steps in connection with the arbitration proceedings, the Third Circuit largely ignored the arbitration portion of the injunction, focusing its discussion of comity on the deference due among the courts of England and the United States. 270 F.3d at 161-62 (focusing on the English High Court's opinion that specifically underscored the High Court's

General Electric did not decide, much less hold, that comity was owed to the foreign arbitral tribunal. This is because in General Electric, it was the nonsignatory parent that sought to voluntarily pierce its own corporate veil to invoke an arbitration agreement vis-a-vis a signatory to the arbitration agreement. Here, by contrast, URS is defending against Solidere's attempts to pierce the corporate veil between URS and Radian to force URS (a nonsignatory) into arbitration. This distinction has been recognized by the Third Circuit as a crucial one in this very context:

> Appellants recognize that these cases [involving non-signatories invoking arbitration agreements signed by their affiliates] bind a signatory not a non-signatory to arbitration, but argue that this is a distinction without a difference. They are wrong. ... The distinction between signatories and non-signatories is important to ensure that short of piercing the corporate veil, a court does not ignore the corporate form of a non-signatory based solely on the interrelatedness of the claims alleged.

E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 196, 202 (3d Cir. 2001) (emphasis added).

Assuming "comity" were owed to an ICC arbitration, which it is not, "comity is by no means automatic." Films by Jove, Inc. v. Berov, 250 F. Supp. 2d 156, 192 (E.D.N.Y. 2003), citing, inter alia, Somportex Ltd. v. Phil. Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir. 1971) ("Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation."). In particular, deference to a foreign tribunal as a matter of comity is appropriate "only if it 'does not prejudice the rights of United States citizens or violate domestic public policy.'" Films by Jove, 250 F. Supp. 2d at 192, citing Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B., 825 F.2d 709, 713 (2d Cir. 1987); cf. Gen. Elec., 270 F.3d at 160 (Second Circuit applies same "restrictive approach" standard to international anti-suit injunctions as Third Circuit). Here, deference to the ICC tribunal on the issue of arbitrability would prejudice URS's rights and undermine the public policy perpetuated by settled Supreme Court precedent requiring courts (not arbitrators) to rule on arbitrability where a nonsignatory resists arbitration (supra at 4-5).

## B. Even If The Foreign Anti-Suit Injunction Standard Applied, And It Does Not, URS's Request Would Satisfy It Here

Even if the Court applied the "restrictive approach" advocated by Solidere, URS still would be entitled to injunctive relief. First, this Court's jurisdiction would be threatened by

---

jurisdiction over the matter and reminded the U.S. district court of reciprocal comity owed as between the two court systems; referring to the injunction as "enjoining the proceedings in the English courts") (emphasis added). In fact, the Third Circuit later clarified that the holding in General Electric was limited to the anti-suit context. See Stonington Partners, 310 F.3d at 126-27.

definition were the ICC Tribunal to proceed to considerations of arbitrability,[9] given the Supreme Court precedent requiring courts, not arbitrators, to decide the issue and thus vesting the exclusive jurisdiction over the issue in this Court (supra at 4-5). Second, in any event, there are two important public policies at play here, each justifying the requested injunction. (See Opp'n at 7, citing Gen. Elec., 270 F.3d at 161 (enunciating the public policy exception).) One is the Supreme Court's adamant resolve to require courts, not arbitrators, to rule on the issue of arbitrability where there is no "clear and unmistakable evidence" that the parties agreed to arbitrate. Indeed, the Supreme Court has emphasized that this rule is of utmost importance:

> The willingness of parties to enter into agreements that provide for arbitration of specified disputes would be "drastically reduced," however, if a[n] ... arbitrator had the "power to determine his own jurisdiction . . . ." Were this the applicable rule, an arbitrator would not be constrained to resolve only those disputes that the parties have agreed in advance to settle by arbitration but, instead, would be empowered "to impose obligations outside the contract limited only by his understanding and conscience."

AT& T, 475 U.S. at 651. Cf. Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp., 868 F.2d 573, 576 (3d Cir. 1989) ("requirement for a judicial determination of the obligation to arbitrate may not be circumvented ... by relying on the parent-subsidiary relationship between [a signatory and nonsignatory]").

Another public policy (ignored by Solidere) that compels the requested relief here is the importance of recognizing the corporate separateness between a parent and subsidiary as "[t]he practice of dealing through a subsidiary is ... essential to our nation's conduct of foreign trade." (URS Br. 2-3, citing Sarhank, 404 F.3d at 662;[10] see generally URS Br. at 31 n.25, citing United

---

[9]    Solidere argues there is no threat to this Court's jurisdiction because the ICC Arbitration does not threaten "'to carve out exclusive jurisdiction'" over the issue of arbitrability. (Opp'n at 10-12.) Yet that is exactly what Solidere sought when it opposed URS's request for a stay of arbitration, urging the arbitrators to resolve the arbitrability issue no matter what this Court does. (Clark Decl. Ex. 2.) Solidere also tried to circumvent the FRCP governing these proceedings by asking that the ICC award it costs and legal fees incurred in defending this action, thus further usurping this Court's authority over the issues. (Clark Decl. Ex. 3.) Finally, Solidere asserts that the threat to jurisdiction is somehow minimized because a U.S. court would review the issue of arbitrability de novo were Solidere ever to enforce an award obtained against URS in the U.S. (Opp'n at 12.) But review at the enforcement stage is not the same as ex ante judicial review: "If the [arbitrability] dispute is arbitrated, [the non-signatory party] would lose unlimited judicial review of its claim (versus the narrow review a court may give an arbitrator's award)." Raytheon Eng'rs & Constructors, Inc. v. SMS Schloemann-Siemag Aktiengesellschaft, No. 99 C 7771, 2000 WL 420866, at *3 (N.D. Ill. Mar. 16, 2000).

[10]    Solidere takes issue with Sarhank, citing several articles – but, significantly, no courts – that purportedly criticized the Second Circuit's decision. (Opp'n at 14 n.8.) The cited sources, however, only question Sarhank's decision to classify its refusal to enforce the arbitral award as falling under Section V(2)(a) of the New York Convention ("non-arbitrable" subject matter); indeed, the Garfinkel/Herlihy article emphasizes that the Sarhank court would have been better off proceeding under the important public policy cited in the decision: "If the Court of Appeals objected to the arbitrators' decision to join ... [the nonsignatory parent] to the arbitration, the Convention provides

States v. Bestfoods, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.").) When a vital issue of U.S. corporate policy, such as a veil piercing determination, predominates, as it does here, the interests in protecting the corporate form under the law of the jurisdiction of incorporation are paramount. As public policy favors a court ruling on the corporate form of a resident corporation, URS is entitled to the requested relief.

## III.    SOLIDERE'S CHOICE OF LAW ARGUMENT IS BASELESS

### A.    The Notion That An American Citizen Who Never Signed An Arbitration Agreement Must Rely On Foreign Law To Decide Arbitrability Is Absurd

In its opening brief, URS established the seemingly obvious point that where a Delaware citizen who did not sign an arbitration agreement is faced with efforts to vicariously impose an obligation to arbitrate, the Delaware citizen may rely on American law to determine arbitrability. (URS Br. at 2, 21-22 n.12.)  In the words of the Second Circuit:

> Under American law, whether a party has consented to arbitrate is an issue to be decided by the Court in which enforcement of an award is sought . . . [and a]n American nonsignatory cannot be bound to arbitrate in the absence of a full showing of facts supporting an articulable theory based on American contract law or American agency law.

(Id., citing Sarhank, 404 F.3d at 661-62 (emphasis added) (applying U.S. law to determine whether nonsignatory was bound to arbitrate agreement governed by Egyptian law).)  See also Gen. Elec., 270 F.3d at 153 (applying U.S. law to determine arbitrability even though Swiss law governed arbitration clause as "that provision applied to the arbitration proceeding, not to the initial determination of whether there had been an agreement on who would decide arbitrability").[11]

---

avenues for addressing that issue.... [T]he enforcement court might have concluded that the application of a group of companies analysis in this case offended U.S. public policy." Barry H. Garfinkel & David Herlihy, "Looking For Law In All the Wrong Places: The Second Circuit's Decision In Sarhank Group v. Oracle Corporation," 20-6 Mealey's Intl. Arb. Rep. 12 (2005); accord Bernard Hanotiau, "Non-Signatories in International Arbitration: Lessons from Thirty Years of Case Law" (Declaration of Paul C. Carberry in Support of Defendant Solidere's Opposition to Motion for Preliminary Injunction (D.I. 100) ("Carberry Decl.") Ex. 37), at ¶ 41 (agreeing with Garfinkel & Herlihy that the Sarhank court could properly refuse enforcement under the public policy exception provided by the New York Convention). Finally, while Solidere argues that Sarhank stands for the proposition that the arbitrability issue must be decided by the enforcement court (Opp'n at 14), this argument is nonsensical, as Sarhank arose in the enforcement stage and thus could not decide what happens with the arbitrability issue at any other time. In any event, Solidere does not (and could not) suggest that it would seek enforcement of any award it may obtain against URS anywhere but in U.S. courts.

[11]      Solidere makes no attempt to distinguish the vast majority of URS's authority here, and, as discussed at n. 10, supra, misinterprets the criticism of Sarhank.

In the face of this overwhelming authority, Solidere nonetheless makes the nonsensical argument that the law of the contract (Lebanese law) or the situs of the arbitration (French law) should determine whether URS can be compelled to arbitrate even though URS did not agree to the Contract or to the situs of the arbitration. In other words, Solidere argues that a party may strip a U.S. citizen of the protections of U.S. law by simply claiming the existence of an arbitration agreement – where the evidence is undisputed that the U.S. citizen did not agree to arbitrate. (Opp'n at 20, 21-23.) This absurd argument completely ignores Sarhank's holding that it is American law that controls whether an American corporation can be dragged into a foreign arbitration pursuant to an agreement entered by an affiliated entity.[12] The fallacy of Solidere's argument is revealed by its admission that this choice of law argument hinges entirely on "the law of the state selected by the parties." (Opp'n at 19 (emphasis added).) Solidere then proceeds to argue that the law selected by Radian and Solidere should bind URS, assuming away the entire analysis. Here, of course, URS did not select anything; it never agreed to arbitrate at all, nor even entered into any contract with Solidere. Solidere adds insult to injury by openly conceding that "the arbitral tribunal is not likely to apply U.S. law to the question of arbitrability" (Opp'n at 16 n.9), which is expressly contrary to the mandate of Sarhank, General Elec. and the Supreme Court precedent discussed above. Solidere thus failed to show that American law does not govern here.[13]

---

[12]     Unable to point to a single case where a nonsignatory was compelled to arbitrate in a foreign arbitration, Solidere relies instead on authority standing for the unremarkable proposition that when deciding issues involving parties that expressly signed an agreement, federal courts generally adopt a "policy that presumes the enforceability of agreements to arbitrate." Rhone Mediterranee Compagnia Francese Di Assicurazioni E Riassicurazoni v. Lauro, 712 F.2d 50, 54 (3d Cir. 1983); see also Scherk v. Alberto-Culver Co., 417 U.S. 506, 519-20 (1974) (enforcing "agreement of the parties . . . to arbitrate any dispute" in federal courts); Shaw Group Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 120 n.2 (2d Cir. 2003) (successor corporation conceded to treatment as "an original signatory to the agreement"); Frydman v. Cosmair, Inc., No. 94 CIV. 3772 (LAP), 1995 WL 404841, at *4 (S.D.N.Y. July 6, 1995) ("The parties agree that plaintiffs and defendant ... entered into an agreement to arbitrate the value of plaintiffs' Paravision shares . . . [but] disagree, however, as to whether the final decision constituted an arbitral award[.]"); Meadows Indem. Co. v. Baccala & Shoop Ins. Servs., Inc., 760 F. Supp. 1036, 1039 (E.D.N.Y. 1991) (fraud claims brought by insurer against other insurers in reinsurance pool fell within scope of arbitration agreements in their reinsurance contracts). In fact, the district court in Shaw Group granted a parent company's motion to stay an ICC arbitration when it "found no evidence" that the parent "had assumed or directly benefitted from" the agreement containing the arbitration provision. 322 F.3d at 119. As URS showed, and Solidere ignores, this principle has no application when a non-signatory is involved. (URS Br. at 19 n.10 (citing cases).)

[13]     Even if French or Lebanese law applied, which it does not, URS still would not be bound to arbitrate as a nonsignatory to the Contract. Solidere claims that under both French and Lebanese law, the arbitration clause should be extended to URS, although URS is not a signatory, allegedly because of 1) URS's "tacit[] agree[ment]" to the arbitration clause; and 2) Radian's "lack of autonomy[.]" (Opp'n at 21-23.) Yet, the authority on which Solidere relies arises where nonsignatory companies were inextricably involved in the performance of the relevant contract or with the signatory from the beginning. (Opp'n at 21-22 nn.17-18.) Here, Solidere admits that URS had no relation whatsoever with Radian during negotiation or initial performance of the Contract. (Compl. (D.I. 1) ¶ 38; id. Ex.

**B.    Solidere's Fight Over Whether Federal, Delaware Or California Alter Ego Law Applies Is Both Irrelevant And Legally Incorrect**

Perhaps aware of the weakness of its argument, Solidere spends pages musing whether perhaps federal, Delaware, or even California law may control here. As a preliminary matter, this Court should apply not federal but "ordinary state-law principles that govern the formation of contracts." First Options, 514 U.S. at 944. (See also URS Br. at 21-22 n.12.)[14] Solidere seeks to distinguish First Options as addressing a "domestic arbitration" with no application where, as here, the U.S. court is deciding whether a party must participate in a foreign arbitration proceeding. (Opp'n at 13.) However, the Third Circuit considered and rejected this exact argument in General Electric, noting that "the international nature of the present litigation does not affect the application of First Options' principles." 270 F. 3d at 155. Thus, state law governs arbitrability.[15]

More specifically, Delaware law controls here, because "Delaware courts which have considered the question of whether a parent corporation should be subjected to liability for a subsidiary's obligations have applied Delaware law, even in the case of foreign subsidiaries." Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc., 456 F. Supp. 831, 841 n.17 (D. Del. 1978);[16] see also Edward P. Welch, Andrew J. Turezyn, & Robert S. Saunders, Folk on the

---

A ¶ 154; MTD Opp'n Ex. 1 at 117, 125.) Significantly, Solidere bears the burden of proving URS's intention to be bound by the arbitration clause, as French tribunals refuse to bind nonsignatories where the party seeking extension of the arbitral jurisdiction to a parent entity fails to prove the common intention of the parties. See Julliard v. Roy, Cour de cassation, Chambre Commerciale, Jan. 9, 1979, Rev.1979, 478, 484 (French Supreme Court confirming CIMEC company not bound by arbitration since it was not a signatory); ICC Arbitral Award in case n°5721, JDI, 1990, 1020, 1024 (claimant admitted it had "verif[ied]" the signatory party was an "effective business" before executing the contract and thus, the tribunal held, it did not show it intended to bind the nonsignatory); ICC Arbitral Award in case n°2138, JDI, 1975, 934 (company not bound by arbitration clause where company led negotiation and execution of the contract but did not sign the contract); Prof. Ibrahim Fadlallah, Travaux du Comité Français de Droit International Privé, 1984, 1985, op. cit., 118 ("burden of proof must be borne by the one invoking the arbitration clause against a non-signatory; the mere existence of a group [of companies] is not enough to shift the burden of proof"). Thus, Solidere failed to show URS is required to arbitrate if French or Lebanese law applied.

[14]    Accord Gen. Elec., 270 F.3d at 153 (same); Molloy v. Am. Gen. Life Cos., No. 05-4547 (MLC), 2006 WL 2056848, at *3 (D.N.J. July 21, 2006) ("inquiry into whether the parties agreed to submit their disputes to arbitration, and the scope of any arbitration agreement is governed by 'ordinary state law principles governing contract formation'"), quoting Gen. Elec., 270 F.3d at 154); cf. Sarhank, 404 F.3d at 661 ("agreement to arbitrate must be voluntarily made, and the Court decides, based on general principles of domestic contract law, whether the parties agreed to submit the issue of arbitrability to the arbitrators.").

[15]    Solidere cites Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH, 585 F.2d 39 (3d Cir. 1978), to argue that federal law is applicable here, but Becker was decided 17 years before First Options, which made clear that state contract law principles govern, a holding clarified and buttressed by the Third Circuit in General Electric. As such, if Becker is inconsistent, it is overruled.

[16]    This district distinguished the choice-of-law issue in Japan Petroleum as a diversity action and suggested that federal question cases might be governed by "a body of federal common law defining the corporate alter ego doctrine." Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 267-68 (D.

14

Delaware General Corporation Law § 329.3 (5th ed. 2006) ("[i]t has been held that the question of whether to disregard the corporate entity is determined under Delaware law not only when it is a Delaware corporation that would be ignored but also when a Delaware parent corporation would be held liable for the obligations of a foreign subsidiary"); In re Tutu Wells Contamination Litig., 909 F. Supp. 1005, 1009 (D.V.I. 1995) ("to determine whether to pierce the corporate veil of a particular corporation, the court must apply the law of the state of incorporation of that corporation").[17] Furthermore, given that URS is a Delaware corporation, Delaware "has an interest in litigation regarding companies incorporated within its jurisdiction." Turn of the Century Solution, L.P. v. Int'l Rectifier Corp., No. Civ. 05-816-SLR, 2006 WL 1653143, at *3 (D. Del. June 15, 2006) (Robinson, J.). Thus, Solidere's consideration of California law is unwarranted.

Regardless, this entire discussion is irrelevant because, as Solidere concedes, California and Delaware law apply essentially the same high standard for veil piercing (Opp'n at 25) – indeed, both require a showing of fraud or something like it – and therefore this Court need not "launch into a protracted choice of law analysis." Mobil Oil, 718 F. Supp. at 268 ("In any event, the Court ... is convinced that regardless of which law is applied to the alter ego question – whether federal, Delaware or Oklahoma common law – the outcome is the same. Fraud or

---

Del. 1989). However, the decisions in First Options and General Electric have since made clear that state law, not federal law, governs the alter ego issues at hand.

[17]    Cf. U.S. v. Funds Held in the Name or for the Benefit of Wetterer, 210 F.3d 96, 106 (2d Cir. 2000) ("in deciding whether [a Guatemalan corporation] observed corporate formalities and maintained its corporate existence separate from Wetterer, we look to the law and corporate practices of Guatemala"); DeWitt v. Hutchins, 309 F. Supp. 2d 743, 751 (M.D.N.C. 2004) ("if faced with a choice-of-law question regarding the equitable remedy of piercing the corporate veil, the North Carolina Supreme Court would adopt the internal affairs doctrine and apply the law of the state of incorporation. Here, [defendant] is incorporated in North Carolina; therefore, this court looks to North Carolina law in determining whether the Complaint alleges facts sufficient to disregard the corporate entity of LBG"). Solidere cites two non-binding cases to conclude that the "internal affairs doctrine" does not automatically mean Delaware law applies here. (Opp'n at 23 n.20.) These cases are unavailing. First, Solidere cites Curiale v. Tiber Holding Corp., No. Civ. A. 95-5284, 1997 WL 597944 (E.D. Pa. Sept. 18, 1997), where the court adopted the reasoning in an admiralty case to conclude that where third parties' rights are implicated, "the conflict of laws principles that apply ... 'call for a weighing of contacts and governmental interests.'" Id. at *12. Likewise, Solidere's characterization of the decision in Oncology Therapeutics Network Connection v. Va. Hematology Oncology PLLC, No. C 05-3033WDB, 2006 WL 334532, at *4 (N.D. Cal. Feb. 10, 2006), as "refusing to apply [the] internal affairs doctrine" is inaccurate, as the court there "refrained from ruling" on the internal affairs doctrine issue "[b]ecause neither party had adequately briefed the issue." More importantly, the court concluded that "the internal affairs doctrine is a product of the notion that a state has a substantial interest in governing the internal affairs of its corporations" and therefore is related to the "governmental interest" test "where we would identify the competing state's interests and assess their relative weight." Id. at *17. Under this standard, Delaware's interests would clearly trump California's here because, as explained above, Delaware has a significant interest in litigation involving its corporations, and Solidere does not point to any authority suggesting that California's interest as URS's principal place of business somehow outweighs this established principle.

something like it is required."). Like Delaware, California requires "fraud or other misdeeds." Sonora Diamond Corp. v. Super. Ct., 83 Cal. App. 4th 523, 538 (2000) ("Under the alter ego doctrine, then, when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity.... The alter ego doctrine prevents individuals or other corporations from misusing the corporate laws by the device of a sham corporate entity formed for the purpose of committing fraud or other misdeeds."). See also Gov't of Virgin Islands, Bureau of Internal Revenue v. Lansdale, 172 F. Supp. 2d 636, 647-48 (D.V.I. 2001) (comparing Delaware's veil-piercing law to California's, concluding "the factors to be considered are substantially similar").

## IV.    ALTHOUGH IRRELEVANT TO THE MERITS OF THE MOTION, SOLIDERE FAILED TO ESTABLISH THAT URS IS RADIAN'S ALTER EGO

As shown above, the only issue this Court need resolve is who decides arbitrability. Solidere, however, misapprehends the issues and seeks to move to the merits of URS's claims by engaging in a lengthy discussion aimed at establishing that URS is Radian's alter ego. Thus, Solidere's entire argument is irrelevant, as a matter of law, to whether an injunction should issue. In any event, Solidere failed to prove that URS is the alter ego of Radian.

"Persuading a Delaware court to disregard the corporate entity is a difficult task." Wallace v. Wood, 752 A.2d 1175, 1183 (Del. Ch. 1999) (Steele, V.C.). A party seeking to pierce the corporate veil must establish both (i) that the subject corporation and its alleged alter ego so ignored corporate formalities that they are in essence a single entity and (ii) that "the use of the corporate form would, if left unchecked, work as a fraud or something in the nature of a fraud." Mobil Oil, 718 F. Supp. at 267. Though both prongs are necessary, courts give greater weight to the element requiring misconduct akin to fraud. Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 989 (Del. Ch. 1987) ("Beyond according respect for the formalities some weight, however, the cases inevitably tend to evaluate the specific facts with a standard of 'fraud' or 'misuse' or some other general term of reproach in mind."); Wallace, 752 A.2d at 1184 ("Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.").[18] Solidere's brief ignores that the "injustice" required to pierce the corporate veil must

---

[18]    See also Mason v. Network of Wilm., Inc., C.A. No. 19434, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005) ("Delaware Courts ... require an element of fraud to pierce the corporate veil."); accord LaSalle Nat'l Bank v. Perelman, 82 F. Supp. 2d 279, 295 (D. Del. 2000) ("In order to prevail on a claim to pierce the corporate veil and hold the corporation's shareholders liable, a plaintiff must prove that the corporate form causes fraud or similar injustice.") (emphasis added).

rise to the level of fraud or similar misconduct. Solidere tries to sidestep this critical element of a veil piercing claim because the record shows Radian was not a sham company, but a separate and distinct corporate entity that engaged in good faith, arm's-length dealings with Solidere.[19]

## A.    <u>Radian Amply Complied With Corporate Formalities</u>

Solidere fills its brief with strings of single space bullet points purporting to catalog Radian's deviations from corporate formalities and other requirements, but none withstand scrutiny. Solidere's criticism of Radian rests on three false premises: that Radian (i) an LLC, is required to follow the same corporate governance procedures as traditional corporations; (ii) a wholly-owned subsidiary, must have independent and autonomous management; and (iii) in carrying out its obligations, cannot make arrangements with URS to gain access to the greater resources and expertise of URS. These flaws in Solidere's argument are discussed below.

### 1.    Solidere Has Not Shown That Radian Failed To Follow The Formalities Required Of A Limited Liability Company

Solidere's brief includes a long list of Radian's purported "failures" to follow supposed "corporate formalities" (Opp'n at 26-31), but Solidere has not even tried to show that any of these purported "formalities" apply to a Delaware Limited Liability Company such as Radian. Indeed, Solidere relies entirely on Radian's supposed failure to follow a traditional corporate governance structure, while the formal requirements for an LLC are radically different:

> The LLC is an attractive form of business entity because it combines corporate-type limited liability with partnership-type flexibility and tax advantages. The [LLC] Act can be characterized as a 'flexible statute' because it generally permits members to engage in private ordering with substantial freedom of contract to govern their relationship, provided they do not contravene any mandatory provisions of the [LLC] Act.

<u>Elf Atochem N. Am., Inc. v. Jaffari</u>, 727 A.2d 286, 290 (Del. 1999). Any analysis of whether an LLC observed requisite corporate formalities must be grounded in the terms of the LLC agreement or the mandatory provisions of the LLC statute. Solidere's critique of Radian's adherence to corporate formalities ignores Radian's LLC Agreement and the LLC statute.

---

[19]    Solidere relies on many cases that apply a lesser standard for veil piercing than Delaware. New York's less stringent standard applied in <u>Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.</u>, 2 F.3d 24 (2d Cir. 1993), was later overturned in favor of the two-part standard used in Delaware. <u>See</u> <u>Thrift Drug, Inc. v. Universal Prescription Adm'rs</u>, 131 F.3d 95, 96 (2d Cir. 1997). Four other cases cited by Solidere apply a more lax standard used in cases brought on by the U.S. or a party enforcing rights under a federal program. <u>See</u> <u>U.S. v. Golden Acres, Inc.</u>, 702 F. Supp. 1097, 1103 (D. Del. 1988) ("If Delaware courts are indeed as reluctant to pierce the corporate veil as defendants allege …, then application of Delaware law in cases such as this one would frustrate the national housing policy behind the HUD program which insured Golden Acres' mortgage."); <u>U.S. v. Pisani</u>, 646 F.2d 83, 86 (3d Cir. 1981) (Medicare claim); <u>see also</u> <u>Trs. of Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk</u>, 332 F.3d 188, 195 (3d Cir. 2003) (ERISA claim); <u>Atlantic Richfield Co. v. Blosenski</u>, 847 F. Supp 1261, 1278 (E.D. Pa. 1994) (CERCLA claim).

Solidere's lengthy criticism of Radian falls apart once Radian's status as an LLC is considered.

### 2. Radian Does Not Need "Independent" Management To Be A Separate Entity

In criticizing Radian's corporate governance, Solidere and its expert conflate "independence" and "autonomy" with corporate separateness. Solidere argues that for Radian to maintain a separate corporate existence from URS, Radian must be an "independently-managed, autonomous, viably operating economic entity." (Opp'n at 5; Carberry Decl. Ex. 38 at 2.) Solidere cites no case in support of that standard. On the contrary, Delaware law contemplates that wholly owned subsidiaries will not have "independent" management that acts "autonomously"

---

[20]    Radian's funds are not intermingled with URS's funds. All funds that are expended or received on behalf of Radian are specifically recorded and Radian's funds are readily identifiable. (See Affidavit of Alberto Cuenca, filed on October 23, 2006 (D.I. 40), at ¶¶ 3-4; see also URS Br. at 10.)

[21]

from the parent company. "Wholly-owned subsidiary corporations are expected to operate for the benefit of their parent corporations, that is why they are created." Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 173 (Del. Ch. 2006); Grace Bros., Ltd. v. UniHolding Corp., C.A. No. 17612, 2000 WL 982401, at *12 (Del. Ch. July 12, 2000) ("It is by no means a novel concept of corporate law that a wholly-owned subsidiary functions to benefit its parent."). The managers of a subsidiary corporation are "entitled to follow the parent's instructions unless those instructions required the [managers] to violate the legal rights of others." Trenwick, 906 A.2d at 202. Thus, while Radian's managers were authorized and obligated to make decisions regarding Radian, Delaware law expects them to seek out the view of the corporate parent before making significant decisions. In other words, wholly owned subsidiaries are not "independently" managed, but they are treated as separate and distinct entities. See Arbor Place, L.P. v. Encore Opportunity Fund, L.L.C., C.A. No. 18928, 2002 WL 205681, at *6 (Del. Ch. Jan. 29, 2002) ("The separate existence and rights of discrete entities is well established in Delaware law and the Court is reluctant to ignore such separate existence even in the case of a wholly-owned subsidiary."); Debakey Corp. v. Raytheon Serv. Co., C.A. No. 14947, 2000 WL 1273317, at *18 (Del. Ch. Aug. 25, 2000) (holding wholly-owned subsidiary is a separate entity from its parent, but has "no interest distinct from that of its parent"). "[M]ere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity." Carapico v. Phila. Stock Exch., Inc., 791 A.2d 787, 793 (Del. Ch. 2000).

Solidere's assertion that Radian acted as a "mere instrumentality" of URS rests on Solidere's fundamental misunderstanding of the proper role of a subsidiary. For example, Solidere's expert addresses at length the wholly irrelevant issue of "whether Radian's management is independent." (Carberry Decl. Ex. 38 at 21; see also id. at 6, 22-24.) In assessing Radian's lack of "independence," he gives great weight to the fact that URS and Radian have common "directors or officers." (Id. at 22.) (In fact, Radian, an LLC, has no directors.) Regardless, he ignores that:

> It is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's act.' [] This recognition that the corporate personalities remain distinct has its corollary in the 'well established principle that directors and officers holding positions with a parent and its subsidiary can and do "change hats" to represent the two corporations separately, despite their common ownership.

Bestfoods, 524 U.S. at 69.

Solidere's brief and expert report are littered with attempts to mischaracterize URS's

normal and appropriate supervision of its subsidiaries' policies and operations as somehow wrongful violations of the corporate form. For example, Solidere's expert criticizes Radian for adopting URS's time keeping policies following URS's acquisition of Dames & Moore. (Carberry Decl. Ex. 38 at ¶ 40.) But a parent corporation is expected to instruct its subsidiaries to follow the parent company's "general policies and procedures." <u>Bestfoods</u>, 524 U.S. at 72. Solidere further asserts that "URS maintained operational control of the Project" because URS's personnel discussed business strategies for Radian in URS internal reports. (Opp'n at 30.) But URS's officers and directors are expected to discuss Radian and to voice their preferences regarding Radian's business strategy to Radian's decision makers. Under Delaware law, the managers of a wholly owned subsidiary are expected "to follow loyally the direction of [the parent's] board as to what [the parent's] best interests [a]re." <u>Trenwick</u>, 906 A.2d at 202.[22]

In sum, the evidence cited by Solidere shows that URS's relationship with Radian has been perfectly consistent with the standards of conduct expected in the parent company or wholly owned subsidiary context under Delaware law.

### 3. Radian's Use Of URS's Resources Complied With Corporate Formalities

Solidere further argues – without citing any case law – that Radian violated corporate formalities by making use of URS's resources, including URS employees, in carrying out Radian's Normandy Landfill Project. (<u>See, e.g.</u>, Opp'n at 27 ("URS provides all of Radian's necessary administrative services"); <u>id.</u> at 28 ("URS personnel working on the Normandy Landfill Project remained employees of URS").) Like many businesses, Radian often used outsourcing to fill staff positions instead of directly hiring employees. (Bishop Aff. ¶ 8; Carberry Decl. Ex. 4 at 113.) URS provided Radian with that personnel, tracked the cost, and charged it to Radian. (<u>Id.</u> at 112.) In particular, when Radian needed special skill sets, URS gave Radian "access to specialists of affiliated companies charged to Radian to assist Radian in its performance under the Contract." (Bishop Aff. ¶ 8.) As Bishop explained at his deposition:

███████████████████████████████████████████████████

---

[22]   Solidere falsely asserts that "URS management made employment and managerial decisions for personnel working on the Normandy Landfill Project." (Opp'n at 30.) To support this assertion, Solidere cites Bou Onk's testimony that in 2001 he learned from Alan Krusi that Vladmir Khazak would be Bou Onk's supervisor on the Project. (Carberry Decl. Ex. 6 at 61-62.) This does not show that URS selected Khazak because Krusi was a Radian officer. (Carberry Decl. Ex. 4 at 96 ("Mr. Krusi was an officer of Radian LLC").) URS did not control the selection of Radian's executive personnel working on the project. (Affidavit of Thomas W. Bishop, filed on October 23, 2006 (D.I. 39) ("Bishop Aff.") ¶ 8.) In any event, it would have been perfectly acceptable for URS to have made its personnel preferences known to Radian. <u>See</u> <u>Trenwick</u>, 906 A.2d at 202.

██████████████████████████████

██████████████████  Solidere cites no cases suggesting that such arrangements –
which promote efficiency within affiliated corporations – are evidence of a failure to adhere to
corporate formalities.[23]   Courts do not pierce the corporate veil on such evidence.   See In re
Acushnet River & New Bedford Harbor Proceedings, 675 F. Supp. 22, 34 (D. Mass. 1987)
(declining to pierce veil based on myriad shared services between parent and subsidiary).  Solidere
also trumpets that Radian's U.S.-based officers – all of whom are also URS officers – work out
of URS's office space and use URS's phone and fax lines to conduct their business.  (Opp'n at 30.)
This evidence provides no  grounds to ignore Radian's separate corporate identity.  See, e.g.,
Action Mfg. Co. v. Simon Wrecking Co., 375 F. Supp. 2d 411, 418, 425 (E.D. Pa. 2005) (rejecting
alter ego claim where corporations "share the same Florida office space, mailing address, and
phone number and the same website"); Northeastern Power Co. v. Balcke-Durr, Inc., 49 F. Supp.
2d 783, 788 (E.D. Pa. 1999) (rejecting alter ego claims where corporations shared office space,
telephone and facsimile lines, and officers, and used same letterhead).  In any event, while some
of Radian's officers are located within URS's office space in the U.S., Radian had a distinct
physical presence in Lebanon when it interacted with Solidere on the Project.  Radian held
numerous Lebanese registrations and licenses as Radian alone, had a local bank account, and hired
local employees and subcontractors to carry out the work on the Project.  (URS Br. at 10-11.)

Solidere's expert contends that there was confusion about whether Radian or URS was
responsible for the Normandy Landfill Project.  (Carberry Decl. Ex. 38 at 25.)  The record shows
otherwise.  First, Solidere's contention that Radian used URS's letterhead is both untrue – Radian
used its own letterhead in its dealings with Solidere (see Bishop Aff. ¶ 11; see also Affidavit of
Amine Bou Onk, filed on October 23, 2006 (D.I. 41), at ¶ 5) – and irrelevant.  See Northeastern
Power Co., 49 F. Supp. 2d at 788; cf. Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co., C.A.
No. 89C-SE-35, 1995 WL 411795, at * 1-2 (Del. Super. Ct. Mar. 31, 1995) (subsidiary's use of
parent's letterhead is insufficient to establish corporate control or closeness in discovery dispute).

---

[23]      Outsourcing staffing instead of directly hiring employees is a commonplace practice for all
companies, not just wholly owned subsidiaries. See Gallagher, Kathleen, Trends: Outsourcing can add
revenue, too; Fund Manager sees 3 stocks gaining from strong trend, Milwaukee Journal Sentinel,
2006 WLNR 17907000 (Oct. 16, 2006) ("American companies are outsourcing everything from
accounting to human resources management and manufacturing – some overseas and some to domestic
companies focused on performing a task outside their customer's core competency.").

Second, Radian's transfer of its domestic operations to URS as part of an overall rebranding of URS's domestic subsidiaries could not have confused Solidere in Lebanon. Indeed, any doubts about Radian's continued existence and responsibility for its Contract were dispelled when, after URS became Radian's indirect parent, a URS lawyer sent a letter to Solidere's construction manager for the Project confirming that Radian "continues to operate as a separate subsidiary under its own, current name" and that there would be "no change" in Radian's dealings with Solidere. (Bishop Aff. ¶ 7, Ex. L.) There were a few incidental or mistaken uses of the name "URS" by Radian in its dealings with Solidere, but they provide no grounds for veil piercing.[24] As Radian's occasional external uses of the URS name are irrelevant, a fortiori, URS's internal references to Radian as part of "URS" is also irrelevant.

Most important, Solidere cannot avoid the undisputed facts that its Contract is with Radian, not URS. (Compl. Ex. B.) Indeed, URS and Radian had no affiliation with each other when Solidere executed the Contract. Solidere's newfound "confusion" about the contracting party is patently false litigation posturing. When Solidere became dissatisfied with Radian's performance under the Contract in 2003, Solidere entered into a memorandum of understanding with Radian (not URS), and commenced arbitration against Radian (not URS). (Russell MTD Decl. Ex. 1 at 132, 134, 138-40; see also Declaration of Jason D. Russell in support of Plaintiff's Motion for a Preliminary Injunction Enjoining Arbitration (D.I. 44), Ex. 11.) Thus, the record shows that at all times, Solidere knew that Radian, not URS, was the contracting party.

Solidere's remaining complaints about Radian's corporate practices concern allegations that Radian was or is insolvent and inadequately capitalized. URS refers the Court to the Expert Report of Kevin F. Dages (Clark Decl. Ex. 7), which explains that Radian was solvent and adequately capitalized at all relevant times. Solidere's argument about Radian's purported insolvency and inadequate capitalization are further discussed below.

**B.    Solidere Cannot Establish Fraud Or Misconduct Akin to Fraud**

Under the second prong of the veil piercing test, Solidere must show that URS's and Radian's "use of the corporate form would, if left unchecked, work as a fraud or something in the nature of a fraud." Mobil Oil, 718 F. Supp. at 267; see also Sonora, 83 Cal. App. 4th at 538 (same

---

[24]    See Pearson v. Component Tech. Corp., 247 F.3d 471, 485 (3d Cir. 2001) ("courts have refused to pierce the veil even when subsidiary corporations use the trade name of the parent, accept administrative support from the parent, and have a significant economic relationship with the parent"); Gruca v. Alpha Therapeutic Corp., 19 F. Supp. 2d 862, 867-68 (N.D. Ill. 1988) (rejecting alter ego claim where parent marketed subsidiary's operation as "our" projects and "our operation"); Akzona Inc. v. E.I. duPont de Nemours & Co., 607 F. Supp. 227, 237-38 (D. Del. 1984) (rejecting alter ego claims where parent referred to subsidiary as a "division" in public filings).

under California law). Solidere argues that URS bears the burden of proof on this issue. In fact, "the party who wishes the court to disregard that form 'bears the burden of proving that there are substantial reasons for doing so.'" Id. at 270.[25]  Moreover, because of the fraud-like nature of the second prong of the alter-ego test, Solidere bears a heightened burden of proof. Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1522 (3d Cir. 1994) ("[b]ecause alter-ego is akin to and has elements of fraud, ... it too must be shown by clear and convincing evidence."); In re Foxmeyer Corp., 290 B.R. 229, 237 (Bankr. D. Del. 2003) (veil piercing must be shown by "greater than merely a preponderance of the evidence standard").

### 1.   Solidere Cannot Pierce The Corporate Veil Based On Radian's Alleged Insolvency

The central thrust of Solidere's argument is that it would cause "injustice" to recognize Radian's separate status because Radian was undercapitalized, became insolvent, and would be unable to pay a judgment if Solidere succeeds in the ICC Arbitration. (See Opp'n at 31.) This argument fails on both the facts and the law.   As a matter of fact, Radian was adequately capitalized to carry out its obligations under the Contract. Radian was in no way created as a "sham" entity. At the time of the contract, Radian had substantial revenues and assets. (See URS Br. at 8.) Even today, Radian still has substantial assets from which it could satisfy any potential judgment, including $50 million in insurance. (Compl. Ex. B at Ex. 7.)  Despite proclaiming Radian's insolvency and undercapitalization, Solidere does not attempt to present Radian's assets and liabilities at any relevant time period.  Solidere instead argues that Radian is insolvent today based on cash flow difficulties that Radian encountered in the final stages of the Project. (See Opp'n at 26, 28-29.) But the evidence cited by Solidere and its expert demonstrates that Solidere is responsible for Radian's cash flow problems:

As a legal matter, that Radian eventually suffered cash flow problems is not grounds for piercing the corporate veil. "Clearly, mere insolvency is not enough to allow piercing of the corporate veil. If creditors could enter judgments against shareholders every time that a corporation becomes unable to pay its debts as they become due, the limited liability characteristic

---

[25]    See also Publicker Indus. v. Roman Ceramics Corp., 603 F.2d 1065, 1069 (3d Cir. 1979) ("The burden of proof on [veil-piercing] rests with the party attempting to negate the existence of a separate entity."); Upjohn Co. v. Syntro Corp., C.A. No. 89-107-JFF, 1990 WL 79232, at *5 (D. Del. Mar. 27, 1990) (noting that party seeking to prove alter ego carries the burden).

of the corporate form would be meaningless." <u>Mason v. Network of Wilm., Inc.</u>, C.A. No. 19434, 2005 WL 1653954, at * 3 (Del. Ch. July 1, 2005). Wrongdoing on the part of the defendant, not mere insolvency, is the critical component. <u>See id.</u>; <u>see also</u> <u>In re Foxmeyer</u>, 290 B.R. at 244. In addition, the fact that a corporation ended up insolvent is not evidence that it was undercapitalized. <u>Mason</u>, 2005 WL 165394, at *4. Solidere provides no evidence that Radian knew or should have expected that it would suffer future cash flow difficulties based on its capitalization. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ This evidence is unrebutted. The Dages report confirms this testimony.

### 2. Radian's Asset Transfers Provide No Grounds For Piercing The Corporate Veil

Solidere also argues that the Court should disregard Radian's separate corporate identity because "it would be ... inequitable to allow URS to deliberately drain Radian of its assets . . . perform the contract itself, and then rely on the formally separate corporate identities of the two companies when it comes time to answer for defects in the performance of the contract." (Opp'n at 32.) In support of this argument, Solidere asserts that "URS and certain of its subsidiary corporations took action to strip Radian of assets, or otherwise cause Radian to transfer assets to other URS subsidiaries for no legitimate business purpose." (Opp'n at 4.) Once again, Solidere has neither facts nor law to support its contention.

Solidere's assertion that Radian's asset transfers had "no legitimate business purpose" is refuted by Solidere's own evidence. Radian transferred its domestic assets to its corporate parent as part of URS's legitimate efforts to simplify its corporate structure and rebrand its businesses following the acquisition of Radian's parent, Dames & Moore. (<u>See</u> Carberry Decl. Exs. 7-10.) Radian observed all appropriate formalities in making those transfers pursuant to a member resolution and a formal distribution agreement between Radian and its then parent company. (Carberry Decl. Ex 7.) An August 9, 2000 letter to Texas regulators – written long before any dispute with Solidere could have been anticipated – sets out the legitimate business purpose behind this restructuring plan:

> Our plan is for all of these entities [including Radian] to conduct business as URS Corporation in the future. However, each of the affiliated companies has a number of existing contracts that must be completed prior to this transition. Therefore, at this time, it is not possible to consolidate all of these entities and employees under the common firm name of URS Corporation.

> To move toward our ultimate goal, our plan is for all of these entities to conduct and perform future work under the name of "URS Corporation and Affiliates." At

the same time, URS Greiner, URS Southern, Radian, and D&M will continue to perform work on existing contracts under their respective names.

(Carberry Decl. Ex. 9.)

Solidere's theory that this asset transfer plan was put in place to evade Radian's potential liabilities under the Contract with Solidere makes no sense because, as Solidere itself contends, the gas bubbles in the Normandy Landfill that eventually gave rise to the existing dispute between Radian and Solidere did not appear until March 2001, the parties disagreement regarding the gas issue did not develop until 2003, and Solidere did not seek damages until 2006. (Compl. Ex. A ¶¶ 75, 98-102.) A timeline of events demonstrating the chronological flaws in Solidere's accusations is attached hereto. (See Clark Decl. Ex. 6.)

Significantly, neither Solidere nor its expert offers any evidence that these transfers left Radian insolvent or insufficiently capitalized to carry out its remaining business. In contrast, URS's expert opines that Radian was both solvent and adequately capitalized following the transfers. (Clark Decl. Ex. 7.) After the transfers, Radian's sole remaining business was the Normandy Landfill Project. At that time, Radian believed the project was a "self sufficient" money-maker. (Carberry Decl. Ex. 2 at 104.) In the very month that Radian transferred domestic assets to its immediate parent company, URS received a presentation regarding the Normandy Landfill Project that estimated that project would turn an ████████ profit. (Carberry Decl. Ex.

████████████████████████████████████████████████

████████ Any unanticipated downside risks for the project were covered by the $50 million in insurance and an $8 million performance guarantee. (Compl. Ex. B at 30-31, 36, 74.) Thus, the record shows that following the transfers, Radian was solvent and adequately capitalized.

There are also strong legal grounds for this Court not to invoke its equitable powers to undo Radian's corporate form on the basis of Radian's asset transfers. As with all equitable remedies, before piercing the corporate veil, the Court should satisfy itself that there is no adequate remedy at law. See Tudor Dev. Group v. U.S. Fidelity & Guar. Co., 968 F.2d 357, 364 (3d Cir. 1992) ("[A]s a general matter, equitable relief is not appropriate where a party has an adequate legal or statutory remedy."). Solidere cannot make such a showing because a well-established legal remedy is available when an insolvent debtor transfers assets – a fraudulent conveyance claim. See Kaplan, 19 F.3d at 1522 n.28 ("withdrawal during insolvency could be void or voidable as a fraudulent conveyance, but we don't think they justify piercing the corporate veil"). Vice Chancellor Strine's decision in Trenwick is instructive. There, creditors of an insolvent subsidiary asked the court to pierce the corporate veil to hold the parent corporation's directors

liable for breach of fiduciary duties to the subsidiary's creditors. See 906 A.2d at 194. The court refused to invoke its equitable powers to aid the subsidiary's creditors, reasoning that legal remedies and other rights provided sufficient protection:

> That is not to say that Delaware law leaves the creditors of subsidiaries without rights. That would be inaccurate. Delaware has a potent fraudulent conveyance statute enabling creditors to challenge actions by parent corporations siphoning assets from subsidiaries. And Delaware public policy is strongly supportive of freedom of contract, thereby supporting the primary means of protecting themselves - through the negotiations of toothy contractual provisions securing their right to seize on the assets of the borrowing subsidiary.

Trenwick, 906 A.2d at 173.

Here, this Court should be particularly reluctant to use its equitable powers to aid Solidere because it took full advantage of its ability to protect itself with "toothy contractual provisions." Through negotiations, Solidere required Radian to guarantee its performance on the Contract with an $8.5 million performance letter guarantee that Solidere could unilaterally draw down if it was dissatisfied with Radian's performance. (Compl. Ex. B at 30-31.) Consistent with its contractual rights, Solidere has drawn down on the $8.5 million performance guarantee letter. (Compl. Ex. A ¶¶ 119-120.) In addition, Solidere ensured Radian's performance under the Contract by requiring Radian to obtain $50 million in insurance coverage. (Compl. Ex. B at Ex. 7.) As the Contract expressly limited Radian's liability to $20 million, Solidere, through its own negotiating efforts, amply protected itself from the risk of Radian's non-performance. (See id. at GCC § 22.1.)

If the Court were to intervene and pierce the veil, the Court would be improperly rewriting the Contract to provide Solidere with rights it willingly chose to forego during the negotiations. ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ Yet, in this case, Solidere elected to forego that standard procedure in lieu of the performance guarantee letter and the insurance requirement.[26] The Court should not rewrite the contract to provide Solidere with a parent company guarantee that it chose not to bargain for. See Edwards Co. v. Monogram Indus., 730 F.2d 977, 984 (5th Cir. 1984) (refusing to impose alter ego liability where plaintiff shipped products to an indirect subsidiary without any assurance or representation from parent that it would cover subsidiary's debts); cf. Bell Oil & Gas Co. v. Allied Chem. Corp., 431 S.W.2d 336, 341 (Tex. 1968) (refusing to pierce the corporate veil where credit extended to

---

[26] ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

subsidiary was not based on representations, statements or guarantees made by parent corporation); see also Perpetual Real Estate Servs., Inc. v. Michaelson Props., Inc., 974 F.2d 545, 550 (4th Cir. 1992) (stating courts should be reluctant to pierce veil for contract creditors).

In sum, Solidere's assertion that it has been "deprived" of its contract rights rings hollow. Solidere had no contractual or other cognizable expectation that Radian's business and assets would remain frozen in place. Radian's good faith transfer of assets to its corporate parent as part of a long-standing and legitimate business strategy in no way resembles misconduct that "if left unchecked, work as a fraud or something in the nature of a fraud." Mobil Oil, 718 F. Supp. at 267.

## V.    SOLIDERE EFFECTIVELY CONCEDES THAT URS WILL SUFFER IRREPARABLE HARM PER SE IF FORCED TO ARBITRATE ARBITRABILITY

URS established in its opening brief that "the harm to a party would be per se irreparable if a court were to abdicate its responsibility to determine the scope of an arbitrator's jurisdiction and, instead, were to compel the party, who has not agreed to do so, to submit to an arbitrator's own determination of his authority." (URS Br. at 35, citing PaineWebber, 921 F.2d at 511; see also URS Br. at 35 n.28 (collecting authority).) The harm thus arises from allowing the arbitrators to rule on their own jurisdiction where the objecting party never agreed to confer such authority on the arbitrators in the first place, be it because the objecting party agreed to arbitrate only certain matters or never agreed to arbitrate anything at all. Accord Masefield, 2005 WL 911770, at *7 ("Within the arbitration context, ... irreparable harm results from arbitrating a dispute involving a party who is not covered by the arbitration agreement.") (citing, inter alia, Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 129 (2d Cir. 2003) (observing that district court properly relied on authority dealing with non-arbitrable matter when it determined that a nonsignatory would suffer irreparable harm if forced to arbitrate)). The harm to URS arising from being forced into arbitration that it never agreed to is thus per se irreparable.

Given its 40 page opposition, and the dispositive nature of URS's cases, one would have expected a lengthy discourse from Solidere distinguishing URS's binding authority. But a search of Solidere's opposition will leave the reader striving in vain for even a reference to PaineWebber, Am. Life, or any of the multitude of cases cited by URS to establish that its harm is presumed. Solidere simply ignores these cases, and makes the tautological assertion that courts have found harm to the objecting party per se irreparable "only when matters not properly subject to arbitration are required to be arbitrated." (Opp'n at 33.) Solidere then assumes away the entire issue by tidily concluding that because (in Solidere's view) URS is obligated to arbitrate the entire dispute, it follows that URS would suffer no actual harm should it be required to arbitrate with

Solidere in the ICC Arbitration. Solidere then argues that URS's decision to incur expenses in tendering objections in the ICC Arbitration and sharing of litigation counsel with its subsidiary show the absence of any harm to URS. (Opp'n at 33-34.) As URS explained in its opening brief, courts have considered and rejected this argument many times.[27]

## VI.    THERE IS NO HARM TO SOLIDERE, MUCH LESS IRREPARABLE HARM, IF AN INJUNCTION IS GRANTED ENJOINING THE ARBITRATION

In its moving papers, URS established that Solidere cannot show that it will be harmed should an injunction be granted because Solidere only seeks money damages to cure the alleged wrongs by Radian and, while Solidere has no contractual right to arbitrate against URS as a non-signatory, Solidere is free to continue to arbitrate its claim against Radian per the Contract. (URS Br. at 36-37.) Solidere ignores this authority and asserts instead that it will "suffer substantial injury" because this Court's deciding whether URS should shoulder the burden of arbitration as a non-signatory "will deprive Solidere of a significant share of its bargain under the Contract" because Solidere will be "denied an opportunity to have its claim decided in the forum of its choice – an arbitration tribunal constituted under the ICC Rules." (Opp'n at 35-36.)[28]

But Solidere's contentions epitomize "20-20 hindsight." Although aware that Radian was a subsidiary first of Dames & Moore and then of URS, Solidere took no steps to secure any sort of guarantee from Radian's corporate parents, ████████████████████████████ ████ let alone seek to bind them to its agreement to arbitrate. (MTD Opp'n at 4-5, citing, inter alia, Russell MTD Decl. Ex. 1 at 123,125-126.) Solidere may now regret its (in)action, but the fact that URS is not a party to the Contract and cannot be compelled to arbitrate according to its terms means that the requested injunction poses no threat whatever to Solidere's bargained-for right to arbitrate.

---

[27]    (See URS Br. at 36, citing, for example, McLaughlin Gormley King Co. v. Terminix Int'l Co. L.P., 105 F.3d 1192, 1194 (8th Cir. 1997) (recognizing that the incident expense of participating in a potentially futile exercise of arbitral jurisdiction is irreparable injury); Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations, 107 F.3d 979, 985 (2d Cir. 1997) ("[T]he time and resources [plaintiff] would expend in arbitration is not compensable by any monetary award of attorneys' fees or damages pursuant to the provisions of the [arbitration] Agreement or the Arbitration Act.").) Thus, Solidere asserts that URS is itself to blame for duplication of effort because it purportedly chose to seek relief under the ICC Rules, completely ignoring the fact that it was Solidere that tendered the jurisdiction issue to the ICC in the first place by filing its arbitration request against a nonparty to its arbitration agreement with Radian (URS) and asserting that the ICC should exercise jurisdiction over such a nonparty. (See Compl. Ex. A ¶¶ 148-241.)

[28]    Solidere cites General Electric to show that arbitration is "highly desirable" (Opp'n at 36) but misleadingly omits the rest of the sentence, which negates Solidere's argument: "Although we agree that providing for dispute resolution in a neutral forum by an acknowledged competent agency is highly desirable, the matter does not end there. A court may only compel a party to arbitrate where that party has entered into a written agreement to do so." Gen. Elec., 270 F.3d at 154 (emphasis added).

Solidere also asserts that litigating in this Court is "unduly burdensome" due to the location of witnesses and documents in Lebanon. (Opp'n at 36-37.)[29] Not true. Not only does the key issue in this case require analysis <u>only</u> of URS's and Radian's documents and witnesses, <u>which are in the U.S.</u>, but Solidere has not and cannot undermine the presumption that its own employees will be willing and able to appear in its defense, obviating any need for compulsory process; indeed, two Solidere witnesses already have been deposed in New York in this action. (MTD Opp'n at 33-34.) Moreover, Solidere fails to explain how discovery and trial will be any less "costly and time-consuming" for a proceeding in Paris than the one before this Court (Opp'n at 36), especially since both parties will have to ship documents no matter where the proceeding is, and this Court routinely accepts recorded depositions in place of live trial testimony. (MTD Opp'n at 34-36.) Finally, Solidere's assertion that French or Lebanese law may "potential[ly be] need[ed]" here is not only wrong (<u>see</u> 12-13, <u>supra</u>), but the implication that international arbitrators are better equipped than a U.S. court "to select and apply foreign law" (Opp'n at 36) is routinely rejected by this District and other courts as insufficient reason to send an American plaintiff to a foreign forum. (MTD Opp'n at 36-37.) Thus, Solidere has failed to demonstrate that it will sustain <u>any</u> harm, let alone irreparable harm sufficient to deny the requested relief here.

## VII.    <u>THE PUBLIC INTEREST FACTORS DO NOT FAVOR SOLIDERE</u>

URS established that the public interest is served when courts stay arbitration proceedings to determine whether the parties are obliged to arbitrate. (URS Br. at 37-38, citing <u>Am. Life</u>, 25 F. Supp. 2d at 479 (holding "it is in the public interest to issue a preliminary injunction," because "[i]f a court determines that a valid arbitration agreement does not exist or that the matter at issue clearly falls outside of the substantive scope of the agreement, it is obliged to enjoin arbitration.").) In response, Solidere ignores URS's authority and recycles several tired arguments. Solidere asserts that public policy favors the "enforcement of private agreements between parties," and that because URS allegedly "performed as a party[,]" it is "bound by the Contract and arbitration provision therein." (Opp'n at 37.) Solidere ignores the overwhelming facts and authority wholly contravening this position, <u>i.e.</u>, URS's consistent and express disavowals of any intent to be bound by the arbitration provision of the Contract (<u>see</u> URS Br. at 33-34). This argument thus falls flat. Solidere also contends that because URS objected to the jurisdiction of the ICC tribunal, the public interest would not be served if this Court allows URS to "litigate the same issues in this forum."

---

[29]    Solidere half-heartedly complains that it "did not anticipate being haled before this Court" but the sheer number and frequency of Solidere's contacts with the U.S. belie this contention. (<u>See</u> n.1, <u>supra</u> and Russell MTD Decl. Exs. 134-137.)

(Opp'n at 37.)[30]  As discussed above and in the opposition to Solidere's Motion to Dismiss, this argument runs contrary to long-established precedent that raising objections to arbitral jurisdiction – and even receiving an adverse jurisdictional ruling – does not waive the right to seek relief in court on the same issue. (See 6-8, supra; MTD Opp'n at 38-39.) Finally, Solidere insists that "the public interest of Lebanon plainly outweighs Delaware's minimal interest in this litigation" because the arbitration provision was "bargained-for by a Lebanese company." (Opp'n at 38.) It is undisputed that URS did not bargain for anything with Solidere and, as discussed at length in the opposition to Solidere's Motion to Dismiss, this Court and others repeatedly recognize that the U.S. as a whole – and Delaware in particular – have a substantial interest in providing a forum for litigation involving companies incorporated within their borders. (MTD Opp'n at 36-37.) Thus, Solidere failed to prove why the requested injunction is against the public interest.

## CONCLUSION

For the foregoing reasons, this Court should grant a preliminary injunction, enjoining Solidere from forcing URS into arbitration proceedings before the ICC.

Respectfully submitted,

___/s/ Paul J. Lockwood_____
Edward P. Welch (#0671)
Paul J. Lockwood (#3369)
Edward B. Micheletti (#3794)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP

Of Counsel:

Jeffrey H. Dasteel
Jason D. Russell
Stacy R. Horth-Neubert
Marina V. Bogorad
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California  90071-3144
Tel:  (213) 687-5000

One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
Tel: (302) 651-3000
plockwoo@skadden.com

Attorneys for Plaintiff URS Corporation

DATED: March 13, 2007

---

[30]     Remarkably, Solidere cites Bergquist, 777 F. Supp. 1236, to support this contention, where, as noted above, the court determined that the objecting party had not agreed to arbitrate even after participating unsuccessfully in an arbitration proceeding because "it did not vitiate its objections by participating in the initial phases of the arbitration process. [It] had no other choice . . . [but to go] through the motions in 'protest' until it was able to formulate and act upon a plan to prevent the arbitration entirely." Id. at 1251. Obviously, the Bergquist court would wholly disagree with Solidere's assertion that URS "voluntarily appeared and fully participated in the ICC Arbitration" merely by filing objections to the tribunal's jurisdiction. (Opp'n at 37.)