IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| URS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 06-415 (SLR) |
| | ) | |
| v. | ) | **REDACTED VERSION** |
| | ) | **FILED MARCH 20, 2007** |
| THE LEBANESE COMPANY FOR THE | ) | |
| DEVELOPMENT AND RECONSTRUCTION | ) | |
| OF BEIRUT CENTRAL DISTRICT SAL, | ) | |
| a/k/a SOLIDERE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF T. VICTOR CLARK

I, T. VICTOR CLARK, declare as follows:

1.    I a member of the Delaware bar and an associate in the Wilmington office of Skadden, Arps, Slate, Meagher & Flom LLP, attorneys for plaintiff URS Corporation ("URS"). I submit this declaration in support of URS's Reply Brief in Further Support of Plaintiff's Motion for a Preliminary Injunction Enjoining Arbitration in the above-captioned litigation.

2.    Attached as Exhibit 1 is a true and correct copy of the Procedural Order No. 1 dated December 22, 2006 filed in the consolidated arbitration proceedings under ICC Case No. 14236/EC, captioned 1. Radian International LLC (USA) and 2. URS Corporation (USA) vs/ The Lebanese Company for the Development and Reconstruction of Beirut Central District SAL (Lebanon) ("Solidere Arbitration").

3.    Attached as Exhibit 2 is a true and correct copy of a letter dated December 13, 2006 from White & Case to the three members of the Tribunal of the International Court of Arbitration in the Solidere Arbitration.

4.    Attached as <u>Exhibit 3</u> is a true and correct copy of a letter dated March 8, 2007 from White & Case to the three members of the Tribunal of the International Court of Arbitration in the Solidere Arbitration.

5.    Attached as <u>Exhibit 4</u> is a true and correct copy of certified translations and the originals of French cases, authorities and ICC decisions: <u>Julliard v. Roy</u>, Cour de cassation, Chambre Commerciale, Jan. 9, 1979, Rev.1979, 478; <u>ICC Arbitral award in case n°2138</u>, JDI, 1974, 934; <u>ICC Arbitral Award in case n°5721</u>, JDI, 1990, 1020; Professor Ibrahim Fadlallah, <u>Travaux du Comité Français de Droit International Privé</u>, 1984, 1985, op. cit., 118. An English translation of the Fadlallah article was not available before the filing deadline but will be filed with the Court as soon as possible.

6.    Attached as <u>Exhibit 5</u> is a true and correct copy of the Third Amended and Restated Limited Liability Company Agreement of Radian International LLC dated September 9, 2004, bates stamped URS 00106216-41.

7.    Attached as <u>Exhibit 6</u> is a time line of relevant events in this dispute.

8.    Attached as <u>Exhibit 7</u> is a true and correct copy of the expert report of Kevin F. Dages, CPA.

I declare under the penalty of perjury that the foregoing is true and correct.

DATED: MARCH 13, 2007

_____/S/ T. VICTOR CLARK___
T. VICTOR CLARK (#4233)

2

# EXHIBIT 1

*W:\Dossiers BH\arbt\Radian\procedural orders\procorder1.doc*

---

**ICC 14208/EC (C-14236/EC) :**

**1. RADIAN INTERNATIONAL LLC (USA); 2. URS CORPORATION (USA)**
vs/
**THE LEBANESE COMPANY FOR THE DEVELOPMENT AND RECONSTRUCTION OF BEIRUT
CENTRAL DISTRICT SAL (LEBANON)**

**PROCEDURAL ORDER Nº 1 (22 December 2006)**

---

Considering the Terms of Reference signed by the parties on 18 December 2006;

Considering URS' and Radian's request that these arbitration proceedings be stayed until after the Honorable Judge Robinson of the United States District Court for the District of Delaware resolves URS' Corporation's motion for a preliminary injunction and SOLIDERE's motion to dismiss;

Considering the written submissions of the parties on this issue and the oral explanations they provided to the Arbitral Tribunal at the December 18 hearing;

**The Arbitral Tribunal hereby issues the following decisions and directions:**

1.  According to URS / Radian, the Arbitral Tribunal should stay the proceedings in this arbitration on the basis that :

    -   under United States law, which would be the law governing the question of whether URS Corporation is a proper party to these proceedings, the Unites States District Court has exclusive jurisdiction to decide the issue of the jurisdiction of this Arbitral Tribunal over URS;
    -   because the proceeding in the Delaware action will be heard first and could be dispositive of the jurisdictional issue, considerations of economy and efficiency favor a stay in these proceedings.

2.  SOLIDERE submits that URS / Radian do not attempt to explain why this ICC Tribunal, with its seat in Paris, should apply US law to the issue of whether it has jurisdiction over URS. It further submits that this Tribunal should not do so and that there is no reason why it should defer to a US Court on the issue of its own jurisdiction.

1

3.     According to Radian, this Tribunal is an independent jurisdiction which has the power to determine its own competence, both by virtue of the relevant arbitration agreement and relevant national law.

4.     In this case, the arbitration agreement is contained in article 44 of the General Conditions of the Contract dated January 25, 1999 (the "Contract"). It provides that:
   *"[a]ll disputes arising out of or in connection with the present Contract shall be finally settled under the Rules of conciliation and arbitration of the International Chamber of Commerce in force as of January 1st, 1998 by one or more arbitrators appointed in accordance with the said Rules.*
   *The place of arbitration shall be Paris".*

5.     This arbitration is therefore an arbitration under the ICC Rules, with seat in Paris, with the consequence that the Arbitral Tribunal has to follow the ICC Rules and that these proceedings are subject to French law.

6.     According to Article 6 of the ICC Rules, entitled "Effect of the Arbitration Agreement", which deals with the powers and duties of an Arbitral Tribunal where its jurisdiction has been challenged:
   *"... if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the [ICC] court may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is prima facie satisfied that an arbitration agreement under the rules may exist. In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself".*

7.     On the other hand, Article 6 (4) of the same Rules provides that *"unless otherwise agreed, the Arbitral Tribunal shall not cease to have jurisdiction by reason of any claim that the contract is null and void or allegation that it is non-existent, provided that the Arbitral Tribunal upholds the validity of the arbitration agreement. The Arbitral Tribunal shall continue to have jurisdiction to determine the respective rights of the parties and to adjudicate their claims and pleas eventhough the contract itself may be non-existent or null and void".* It results from this provision that an ICC Tribunal shall proceed eventhough it is clear that the contract containing the arbitration clause is void or non-existent.

8.     In this case, notwithstanding URS / Radian's objection, the ICC Court, on June 2, 2006, decided that it was *prima facie* satisfied that an arbitration agreement under the ICC Rules might exist with regard to URS, a conclusion which of course does not bind this Arbitral Tribunal. The only consequence of the Court's decision is that, under Article 6 (2) of the ICC Rules, the Arbitral Tribunal is now bound to decide itself the issue of its own jurisdiction and this, notwithstanding parallel national court proceedings.

9.     As pointed out by Craig, Park and Paulsson (International Chamber of Commerce Arbitration, Third Edition, 2000, p. 170) : *"Article 6 (4) of the ICC Rules makes it absolutely clear that the arbitrators have a duty to proceed and to determine their own jurisdiction eventhough parallel action in a state court may have commenced to nullify the*

2

*arbitration proceedings. Any other rule would encourage parties to deploy dilatory judicial procedures, often in their own national courts, and to disregard their agreement to arbitrate".*

10. Moreover, under Article 20 of the ICC Rules, the Arbitral Tribunal has to proceed *"within as short a time as possible to establish the facts of the case by all appropriate means"*. Article 24 (1) further provides that ICC arbitrators must render the final award within six months from signature of the Terms of Reference, which may be extended by the ICC Court.

11. It therefore results from the foregoing that the ICC Rules do not contemplate that there should be a stay in arbitral proceedings in the situation to which we are presently confronted.

12. On the other hand, French law, to which these proceedings are also subject, also confers upon arbitrators the power to decide upon their own jurisdiction, according to the principle "Kompetenz-Kompetenz" (or in other words, the arbitrators have competence to decide upon their competence). This principle is embodied in article 1466 of the new Code of Civil Procedure – applicable in international arbitration by virtue of article 1495 of the same Code – which provides that *"if, before the arbitrator, one of the parties challenges the basis or scope of the arbitrator's jurisdiction, the arbitrator shall rule on the validity or scope of his or her jurisdiction"* (*"si, devant l'arbitre, l'une des parties conteste dans son principe, ou son étendue le pouvoir juridictionnel de l'arbitre, il appartient à celui-ci de statuer sur la validité ou les limites de son investiture"*). This principle is considered by French authorities as a substantive rule of French arbitration law.

13. According to prominent authors, Fouchard, Gaillard and Goldman on International Commercial Arbitration (1999, para. 658), *"the competence-competence principle enables the Arbitral Tribunal to continue with the proceedings even where the existence or validity of the arbitration agreement has been challenged by one of the parties for reasons directly affecting the arbitration agreement, and not simply on the basis of allegations that the main contract is void or otherwise ineffective"*.

14. Consequently, under the law of France, an Arbitral Tribunal is obliged to decide on its own jurisdiction even where a party alleges that it is not a party to the arbitration agreement, as is the case here. Moreover, in French law, the competence-competence principle has both positive and negative effects. The positive effect is that it is for the Arbitral Tribunal to decide on its own jurisdiction. The negative effect is that when both the Arbitral Tribunal and a court are concurrently requested to decide on the jurisdiction of the Arbitral Tribunal, the arbitrators have priority to decide the issue. As pointed out by Fouchard, Gaillard and Goldman, *"taking both of its facets into account, the competence-competence principle can be defined as the rule whereby arbitrators must have the first opportunity to hear challenges relating to their jurisdiction, subject to subsequent review by the courts. From a practical standpoint, the rule is intended to ensure that the party cannot succeed in*

3

*delaying the arbitral proceedings by alleging that the arbitration agreement is invalid or non-existent"* (para. 660).

15. Accordingly, according to French law, this Arbitral Tribunal has the power, as well as the duty, to decide upon its jurisdiction over URS, even if the jurisdictional issue has been concurrently submitted to a French or a foreign court.

16. On the basis of the above, the Arbitral Tribunal dismisses URS / Radian request to stay these proceedings.


On behalf of the Arbitral Tribunal,


Bernard HANOTIAU,
Chairman

4

# EXHIBIT 2

**WHITE & CASE**

White & Case LLP
Avocats au Barreau du Paris
Toque Générale : J 002
11, Boulevard de la Madeleine
75001 Paris

Tel  + 33 1 55 04 15 15
Fax + 33 1 55 04 15 16
www.whitecase.com

Direct Dial + 33 1 55 04 15 45     cseppala@whitecase.com

December 13, 2006

### VIA E-MAIL and FACSIMILE

Professor Bernard Hanotiau
Chairman of the Tribunal
Hanotiau & van den Berg
IT Tower
480 Avenue Louise – Box 9
B-1050 Brussels
Belgium

Via facsimile: +32 2 290 39 39

Eric A. Schwartz, Esq.
Arbitrator
LeBoeuf, Lamb, Greene & MacRae LLP
130 rue du Faubourg St. Honoré
75008 Paris
France

Via facsimile: +33 1 42 56 08 06

The Honorable Charles B. Renfrew
Arbitrator
710 Sansome Street
San Francisco, CA 94111-1704
U.S.A.

Via facsimile: +1 415 397 7188
(via facsimile only)

Re:  **ICC Case No. 14236/EC**
      The Lebanese Company For The Development And Reconstruction Of Beirut Central
      District, S.A.L., v. URS Corporation and Radian International LLC

      **ICC Case No. 14208/EC**
      Radian International LLC v. The Lebanese Company For The Development And
      Reconstruction Of Beirut Central District, S.A.L.

Dear Sirs:

      This letter is in response to URS/Radian's[1] letter dated December 6, 2006 requesting
that the "proceedings in ICC Case No. 14236/EC against URS Corporation... be stayed until

---

[1]      While individual documents in this consolidated arbitration and this letter may, for convenience, refer
      to URS Corporation (**"URS"**) or Radian International LLC (**"Radian"**) separately, SOLIDERE's
      position is that following URS's takeover of Radian in June 1999, Radian was stripped of its
      (to continue)

WHITE & CASE

December 13, 2006

after the Honorable Judge Robinson of the United States District Court for the District of Delaware resolves URS Corporation's motion for a preliminary injunction and Solidere's motion to dismiss"[2] (**"Request for Stay"**).

In support of the Request for Stay, URS/Radian sets out two arguments, as follows:

(1)    That "under United States law, the law governing the question of whether URS Corporation is a proper party to the above referenced proceeding, the United States District Court has exclusive jurisdiction to decide the issue [of the jurisdiction of this Arbitral Tribunal over URS]" (the Delaware proceeding is herein called the **"Delaware Action"**).[3]

(2)    That "because the proceeding in the United States District Court for the District of Delaware will be heard first and could be dispositive of the jurisdictional issue, considerations of economy and efficiency favour a stay in this proceeding."[4]

We submit that both of these arguments are without merit. We maintain that: (I) this Tribunal has the power and duty to decide its own jurisdiction without regard to the U.S. courts, and (II) considerations of economy and efficiency do not favour a stay of this proceeding. We will expand on these two points below.

## I.    This Tribunal has the power and duty to decide its own jurisdiction without regard to the U.S. courts

URS/Radian first argues that a stay is warranted because "under United States law... the United States District Court has exclusive jurisdiction to decide the issue" of whether URS is a proper party to this arbitration, alleging incidentally that U.S. law governs this issue.[5] URS/Radian does not attempt to explain why this ICC Tribunal, with its seat in Paris, should apply U.S. law to the issue of whether it has jurisdiction over URS, and it is denied that this Tribunal should do so. But, quite apart from this, URS/Radian's argument amounts to suggesting that this Tribunal is somehow subordinate to, and should therefore defer to, a U.S. court and that this Tribunal does not have the power to determine its own jurisdiction.

Yet, as an international arbitral tribunal, this Tribunal is an independent jurisdiction which has the power to determine its own jurisdiction, both by virtue of the relevant arbitration agreement and relevant national law.

---

(... continued)

autonomous existence and, hence, that URS and Radian are to be regarded as one and the same entity. *See* SOLIDERE's Request for Arbitration, paras. 148 to 241 in ICC Case No. 14236/EC (Arbitration IV).

[2]    Request for Stay, p. 1.

[3]    Request for Stay, pp. 1-2.

[4]    Request for Stay, p. 2.

[5]    Request for Stay, p. 1-2.

Professor Bernard Hanotiau, Eric A. Schwartz, Esq., The Honorable Charles B. Renfrew

**WHITE & CASE**

December 13, 2006

In this case, the arbitration agreement is contained in Article 44 of the General Conditions of the Contract dated January 25, 1999 (the **"Contract"**).[6] This article provides in part as follows:

> "All disputes arising out of or in connection with the present Contract shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce in force as of January 1[st] 1998 by one or more arbitrators appointed in accordance with the said Rules.
>
> x          x          x
>
> <u>The place of arbitration shall be Paris.</u>"[7] [Emphasis added]

As the parties' arbitration agreement provides for the application of the ICC Rules of Arbitration (**"ICC Rules"**) and for arbitration in Paris, it is necessary to examine:

(1)     the relevant provisions of the ICC Rules, and
(2)     the law applicable to an arbitration in Paris, that is, French law.

### (1)     The ICC Rules

The relevant provisions of the ICC Rules are found in Article 6, entitled "Effect of the Arbitration Agreement", which deals with the powers and duties of an arbitral tribunal where its jurisdiction has been challenged. Article 6(2) of the ICC Rules provides in part as follows:

> "... if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the [ICC] Court may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist. <u>In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself.</u>" [Emphasis added]

---

6     The Contract, **Exh. C 19** in ICC Case. No. 14236/EC.

7     The Contract, GC 44, **Exh. C 19** in ICC Case. No. 14236/EC.

3

Article 6(2) is reinforced by Article 6(4) of the ICC Rules. Article 6(4) provides that an ICC arbitral tribunal shall proceed even though it is claimed that the contract containing the arbitration clause is void or non-existent, which is effectively the case here where URS alleges that it never became a party to the Contract containing the arbitration clause. Article 6(4) provides:

> "Unless otherwise agreed, the Arbitral Tribunal shall not cease to have jurisdiction by reason of any claim that the contract is null and void or allegation that it is non-existent, provided that the Arbitral Tribunal upholds the validity of the arbitration agreement. The Arbitral Tribunal shall continue to have jurisdiction to determine the respective rights of the parties and to adjudicate their claims and pleas even though the contract itself may be non-existent or null and void." [Emphasis added]

By letter date March 13, 2006, URS/Radian wrote to the ICC Court to "invite" the ICC Court to apply "Article 6(2) of the ICC Rules" and to "decline to allow the case to proceed against URS."[8]

On June 2, 2006, the ICC Court decided that it was *prima facie* satisfied that an arbitration agreement under the ICC Rules may exist with regard to URS. Consequently, under Article 6(2) of the ICC Rules, the Tribunal is now bound to decide itself the issue of its own jurisdiction ("any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself" [emphasis added]).

Under Article 6(4), ICC arbitrators are required to decide their own jurisdiction notwithstanding parallel national court proceedings. As an ICC commentary provides:

> "Article 6(4) of the ICC Rules makes it absolutely clear that the arbitrators have a duty to proceed and to determine their own jurisdiction even though parallel action in a State court may have commenced to nullify the arbitration proceedings. Any other rule would encourage parties to deploy dilatory judicial procedures, often in their own national courts, and to disregard their agreement to arbitrate."[9] [Emphasis added]

Moreover, under the ICC Rules, ICC arbitrators are required to proceed expeditiously. Thus, Article 20(1) of the ICC Rules provides that:

---

[8]    Letter dated March 13, 2006 from Skadden Arps, Slate, Meagher & Flom LLP to the ICC Secretariat, p. 1 and 2.

[9]    Craig, Park and Paulsson, *International Chamber of Commerce Arbitration* (2000, 3rd ed.), p. 170.

4

"The Arbitral Tribunal shall proceed <u>within as short a time as possible</u> to establish the facts of the case by all appropriate means." [Emphasis added]

In addition, Article 24(1) provides that ICC arbitrators must render the final award within six months from signature of the Terms of Reference, which may be extended by the ICC Court.[10]

The ICC Rules do not contemplate that there should be any stay or interruption in arbitral proceedings.

(2)    **French Law**

As the parties' arbitration agreement provides that any arbitration will take place in Paris, France, these proceedings are subject to French law.[11] French law complements and reinforces the provisions of Article 6 of the ICC Rules conferring upon arbitrators the power to decide upon their own jurisdiction, known as the "competence-competence" principle.[12] In French domestic arbitration law, the competence-competence principle is set forth in Article 1466 of the New Code of Civil Procedure ("NCPC") which provides as follows:

"*Si, devant l'arbitre, l'une des parties conteste dans son principe, ou son étendue le pouvoir juridictionnel de l'arbitre, <u>il appartient à celui-ci de statuer sur la validité ou les limites de son investiture</u>.*" [Emphasis added]

[Translation:

"If, before the arbitrator, one of the parties challenges the basis or scope of the arbitrator's jurisdiction, <u>the arbitrator shall rule on the validity or scope of his or her jurisdiction</u>."] [Emphasis added]}

---

[10]    In Footnote 4 at page 8 of the Request for Stay, URS/Radian refers erroneously to the *Arbitral Tribunal's* power to extend the time limits for the finalization of the Terms of Reference and the rendering of the final award pursuant to Articles 18(2) and 24(2) of the ICC Rules. In fact, it is the *ICC Court* that is empowered to extend those time limits.

[11]    In its Request for Stay, URS/Radian almost completely ignores the fact that this is an ICC arbitration in which the place of arbitration is Paris, France, acknowledging only that French law might "possibly" apply to Radian with respect to "procedural matters" (page 3).

[12]    This principle "is now recognized by the main international conventions on arbitration, by most modern arbitration statutes, and by the majority of institutional arbitration rules." *Fouchard Gaillard Goldman On International Commercial Arbitration* (Edited by Gaillard and Savage)(1999), para. 653 *et seq.* ("**Fouchard Gaillard**").

Where an international arbitration is subject to French law, the same rule applies by virtue of Article 1495 of the NCPC.[13] In any case, the rule is in fact of general application in French international arbitration law, as a result of case law predating the French 1981 Decree which introduced Article 1466 into the NCPC.[14]

The rule that arbitrators have the power to decide their own jurisdiction is a substantive rule of French arbitration law ("*une règle matérielle de l'arbitrage international*")[15] which will be applied by the French courts in the case of any review of an award in this case by them.

French legal authors have explained what this principle means when a party such as URS is denying that it has ever entered into an arbitration agreement. They state as follows:

> "The competence-competence principle enables the arbitral tribunal to continue with the proceedings <u>even where the existence or validity of the arbitration agreement has been challenged by one of the parties for reasons directly affecting the arbitration agreement</u>, and not simply on the basis of allegations that the main contract is void or otherwise ineffective."[16] [Emphasis added]

Thus, under the law of France, where this arbitration is taking place, an arbitral tribunal is obliged to decide its own jurisdiction even where one party alleges that it is not a party to the arbitration agreement, as is the case today where URS maintains that no arbitration agreement exists between it and SOLIDERE.[17]

As the same French legal authors have explained, under French law, the competence-competence principle has both a positive and a negative effect:

---

[13] Article 1495 of the NCPC provides as follows: "*Lorsque l'arbitrage international est soumis à la loi française, les dispositions des titres I, II et III du présent livre ne s'appliquent qu'à défaut de convention particulière et sous réserve des articles 1493 et 1494.*" [Translation: "Where the international arbitration is governed by French law, the provisions of Titles I, II, and III of the present Book shall only apply in the absence of a specific agreement, and subject to Articles 1493 and 1494."]

[14] Fouchard Gaillard, para. 655.

[15] Poudret and Besson, *Droit comparé de l'arbitrage international* (2002), para. 465.

[16] Fouchard Gaillard, para. 658.

[17] Consistent with both the ICC Rules and French law, the International Law Association has recently recommended that where parallel proceedings "are pending before a court of a jurisdiction other than the jurisdiction of the place of arbitration, consistent with the principles of *competence-competence*, the tribunal should proceed with the... [a]rbitration and determine its own jurisdiction, unless the party initiating the arbitration has effectively waived its rights under the arbitration agreement or save in other exceptional circumstances (emphasis in original text)." International Law Association, *Recommendations on lis pendens and res judicata and arbitration*, Resolution No. 1/2006 (adopted at the 72nd Conference of the International Law Association held in Toronto, Canada, June 4-8, 2006), Annex 1, para. 4.

Professor Bernard Hanotiau, Eric A. Schwartz, Esq., The Honorable Charles B. Renfrew

WHITE & CASE

December 13, 2006

"The positive effect of the competence-competence principle is to enable the arbitrators to rule on their own jurisdiction... However, the negative effect is equally important. It is to allow the arbitrators to be not the sole judges, but the first judges of their jurisdiction. In other words, it is to allow them to come to a decision on their jurisdiction prior to any court or other judicial authority, and thereby to limit the role of the courts to the review of the award.... the competence-competence is a rule of chronological priority. <u>Taking both of its facets into account, the competence-competence principle can be defined as the rule whereby arbitrators must have the first opportunity to hear challenges relating to their jurisdiction, subject to subsequent review by the courts.</u>

From a practical standpoint, <u>the rule is intended to ensure that a party cannot succeed in delaying the arbitral proceedings by alleging that the arbitration agreement is invalid or non-existent.</u> Such delay is avoided by allowing the arbitrators to rule on this issue themselves, subject to subsequent review by the courts, and by inviting the courts to refrain from intervening until the award has been made."[18] [Emphasis added]

Thus, under French law, as a consequence of the negative effect of the competence-competence principle[19], arbitrators have chronological priority to decide their

---

[18]   *Ibid.*, para. 660 (footnotes omitted). In the Request for Stay, URS/Radian makes reference to the competence-competence principle, stating:

"URS Corporation acknowledges the application in appropriate circumstances of the principles of *Kompetenz-Kompetenz* and the Tribunal's power to rule on the question of its own jurisdiction pursuant to those principles when the parties have agreed to such jurisdiction, URS Corporation is not subject to these principles because it never agreed to arbitrate with Solidere and thus never consented to be bound by this Tribunal's powers." (Request for Stay, p. 3) [Italics in original]

By URS/Radian's logic, as expressed in the above quotation, an arbitral tribunal can decide whether the parties have agreed to arbitrate <u>only if the parties have in fact agreed to arbitrate</u>. The competence-competence principle is designed exactly to overcome this circular situation.

[19]   The negative effect of the competence-competence principle is reflected in Article 1458 of the NCPC, which applies to both domestic and international arbitration in France (*see* Gaillard Goldman, para. 672). This states:

"*Lorsqu'un litige dont un tribunal arbitral est saisi en vertu d'une convention d'arbitrage est porté devant une juridiction de l'Etat, celle-ci doit se déclarer incompétente.*
*Si le tribunal arbitral n'est pas encore saisi, la juridiction doit également se déclarer incompétente à moins que la convention d'arbitrage ne soit manifestement nulle.*

(to continue)

7

own jurisdiction over state court judges. Yet this is precisely what URS/Radian seeks, by its Request for Stay, to deny to the Tribunal in this case. By the Request for Stay, URS/Radian is requesting the Tribunal to stay arbitration proceedings against URS so that the Delaware Action (which will be considering whether the Tribunal has jurisdiction over URS) can be heard and decided before the Tribunal decides its own jurisdiction.

The rule of chronological priority, under French law, means that French courts, which have primary supervisory jurisdiction over an arbitration taking place on French territory, cannot interfere at this stage of this arbitration. *A fortiori*, French law will protect against any interference by a non-French court at this stage.

In conclusion, URS/Radian is requesting relief: (1) by reference to United States law without justifying why it should apply at this stage to the issue of whether this Paris-based Arbitral Tribunal has jurisdiction and which is, in fact, irrelevant thereto, (2) in disregard of the express power and duty of an ICC arbitral tribunal, under the ICC Rules and French law, to decide its own jurisdiction, and (3) in disregard of the French rule that an arbitral tribunal should decide its jurisdiction in priority to a state court.[20]

Consequently, this Tribunal has the power and duty to proceed to decide its jurisdiction over URS without regard to U.S. courts.[21]

---

(... continued)

> *Dans les deux cas, la juridiction ne peut relever d'office son incompétence.*"
> [Emphasis added]
> [Translation:
> "<u>When a dispute submitted to an arbitral tribunal by virtue of an arbitration agreement is brought before a national court, such court shall decline jurisdiction.</u>
> If the arbitral tribunal has not yet been seized of the matter, the court shall also decline jurisdiction unless the arbitration agreement is manifestly void.
> In neither case may the court decline jurisdiction on its own motion." [Emphasis added]]

[20]    As mentioned earlier, as part of its first argument, URS/Radian also contends that United States law governs the question of whether URS is a proper party to this arbitration. We deny that United States law governs this question as we will explain when the issue of the Tribunal's jurisdiction over URS comes to be considered. This question is not relevant to the Request for Stay.

[21]    Contrary to URS/Radian's argument, this will not result in any unfairness or prejudice to URS. As shown above, URS/Radian had invited the ICC Court to decide whether it was *prima facie* satisfied that an arbitration agreement may exist with URS, with the consequence, under Article 6(2) that, if it was so satisfied, an ICC arbitral tribunal would decide its own jurisdiction. Moreover, the parties have agreed that the issue of jurisdiction over URS be decided by the Tribunal as a preliminary issue before consideration of the merits, so that the Tribunal's award on that issue can be subject to immediate review by the French courts (a *de novo* review), as well as review by the courts of any other country where enforcement of the award is sought. Hence the rights of URS are fully protected.

When URS decided to purchase Radian in 1999 and get involved in the Normandy project, in Lebanon, it engaged in international commerce. A U.S. company cannot expect to get involved in international commerce and yet not have to abide by international and/or foreign law.

8

Professor Bernard Hanotiau, Eric A. Schwartz, Esq., The Honorable Charles B. Renfrew

WHITE & CASE

December 13, 2006

## II.   Considerations of economy and efficiency do not favour a stay of this proceeding

URS/Radian's second argument is that because the Delaware Action will be heard first and could (according to URS/Radian) be dispositive of the jurisdictional issue, considerations of economy and efficiency favour a stay of this proceeding.

We submit that this argument is also without merit because:

(1)   The outcome of the Delaware Action is uncertain, at best. Finding for URS would require URS to overcome the following arguments of SOLIDERE, namely that: (a) as SOLIDERE is a Lebanese company that does no business in the United States, it is not subject to the jurisdiction of the Delaware Court, (b) even if SOLIDERE were subject to the Delaware Court's jurisdiction (which is denied), the action should be dismissed, under the U.S. legal doctrine of *forum non conveniens*, in favour of this preexisting arbitration, (c) having elected to proceed before the ICC Court and this Tribunal under Article 6(2) of the ICC Rules URS is estopped from proceeding with the Delaware Action, and (d) a preliminary injunction is inappropriate because, among other things, URS is unable to show a likelihood of success of its argument that it is not bound by the arbitration clause.

Consequently, it is inappropriate to prejudge the outcome of the Delaware Action.

(2)   Even if the Delaware Court were to find in favour of URS, (a) its decision would be subject to, and could be reversed, on appeal, and (b) in any event, this Tribunal sitting in Paris would not be obligated to suspend this proceeding because it is not required to obey the directives of a court outside France. In neither of these cases would costs be saved.

(3)   Any duplication of resources results from the conduct of URS, which filed the Delaware Action on June 30, 2006, more than four months after SOLIDERE began Arbitration IV against URS on February 14, 2006 and after URS applied, on March 13, 2006 to the ICC Court for a ruling that, *prima facie*, no arbitration agreement may exist with regard to URS and lost (on June 2, 2006).[22] URS should not be entitled to complain about any duplication of resources, as it is attributable to its own conduct.

URS/Radian also argues that "Solidere has already agreed to what essentially amounts to a stay of substantive proceedings here – albeit, for a limited time – as it recently stipulated

---

[22]   Furthermore, URS/Radian's letter of March 13, 2006 to the ICC Court contained no suggestion that the U.S. courts would have jurisdiction over this issue. Subsequently, after the reply dated March 24, 2006 of SOLIDERE to such letter, URS/Radian's next letter dated March 30, 2006 to the ICC Court similarly did not allege that the U.S. courts would have jurisdiction over this issue. Not until April 21, 2006, did URS/Radian allege for the first time that "A Determination of Arbitrability Must Be Made, If At All, By An American Court Not [The ICC] Court." URS/Radian's letter to the ICC Court dated April 21, 2006, pp. 5-6.

9

WHITE & CASE

to a scheduling order in connection with the motions pending before Judge Robinson on the express condition that that (*sic*) there shall be no hearings in these proceedings before April 15, 2007."[23] We already addressed this point in our three-page letter to the Tribunal dated October 30, 2006, and would only add that, had SOLIDERE agreed to such a suspension, URS/Radian's present request to this Tribunal would be superfluous.

URS/Radian also suggests that "the clear language of the Stipulation... presents a different picture, as it relies on the same reasons that are outlined above in support of the stay; namely, that the parties should have sufficient time to fully submit the issues to Judge Robinson and for Judge Robinson to resolve them, so as not to require duplication of effort by the Tribunal or the parties."[24] This argument is misconceived; the stipulation itself states that the parties "agree that they need sufficient time to conduct discovery into the issues raised by their respective opponent's motions" and does not mention anything regarding the judge in the Delaware Court having "sufficient time" to do anything at all.[25] SOLIDERE was willing to agree to the stipulation only in order to bring its Motion to Dismiss (and, by necessary extension, the preliminary injunction motion) before the Delaware Court as quickly as possible, while giving the parties a reasonable amount of time to undertake the necessary preliminary procedural steps.

Thus, SOLIDERE's agreement to the stipulation in the Delaware Action is irrelevant in these proceedings.

ooo0000ooo

The issue of whether an ICC arbitral tribunal sitting in Paris should grant a stay in favour of proceedings before a U.S. Federal Court was considered by an ICC arbitral tribunal in ICC Case No. 6000. While the relevant decision has not been published, it is referred to extensively in a book by Horacio A. Grigera Naón[26] (a former Secretary General of the ICC Court) who describes the case as follows:

> "An Arbitral Tribunal sitting in Paris, France, and hearing an arbitration involving French and German parties was called to decide whether arbitral proceedings should be stayed "until a final determination is reached concerning the jurisdiction of the United States Federal Courts as to any or all the (claims, counterclaims) or parties...""

---

[23]     Request for Stay, p. 6.

[24]     Request for Stay, p. 6.

[25]     Stipulation and Order Setting Discovery and Briefing Schedule, p. 2.

[26]     Horacio A. Grigera Naón, *Choice-of-Law Problems in International Commercial Arbitration* (2001), pp. 49-50 (footnotes omitted).

Professor Bernard Hanotiau, Eric A. Schwartz, Esq., The Honorable Charles B. Renfrew

**WHITE & CASE**

December 13, 2006

[T]he Arbitral Tribunal stated that:

> "it is admitted, by virtue of a general principle of international arbitration, which is embodied in article 1466 of the French New Code of Civil Procedure, and in the French case law, regarding international arbitration, that <u>arbitrators are – under the control a *posteriori* of the Court of the seat of arbitration (which is Paris, in this dispute) – the only judges of their own competence</u>. Moreover, the present arbitration is subject to the ICC arbitration rules, in application of the parties' common will, as well as the Terms of Reference, and article 8(3)[27] of the said Rules provides that, when the Court of Arbitration of the ICC has been satisfied of the prima facie existence of an arbitral agreement any decision as to the arbitrator's jurisdiction shall be taken by the arbitrator itself. The Arbitral Tribunal must comply with this rule. It cannot delay its decision, under the pretext that there exists a similar or very close dispute pending before a foreign Court, so much less that whatever the determination reached by the Federal Courts of South Carolina, the Tribunal would not and could not be bound by their decision. Consequently, <u>the requested stay, which is not only deprived of any legal basis, but a source of useless delay, must be dismissed</u>." [Emphasis added]

While this decision is obviously not binding on the Tribunal, we submit that it accurately expresses the relevant principles of international arbitration and French law which are applicable in these proceedings, and that the reasoning of the arbitrators in that case is exemplary of the reasoning the Tribunal should follow with regard to the Request for Stay.

ooo0000ooo

SOLIDERE respectfully requests the Tribunal to reject URS/Radian's Request for Stay.

Very truly yours,

*[signature]*

Christopher R. Seppälä

---

[27]    It appears that the matter was governed by the 1988 ICC Rules of Conciliation and Arbitration. Article 8(3) of that version of the rules was the equivalent of Article 6(2) of the current ICC Rules (in force as from 1 January 1998).

Professor Bernard Hanotiau, Eric A. Schwartz, Esq., The Honorable Charles B. Renfrew

WHITE & CASE

December 13, 2006

Cc:  Jeffrey H. Dasteel, Jason D. Russell, and          (Via facsimile: +1 213 621 5206)
     Marina V. Bogorad, Esqs.
     Skadden, Arps, Slate, Meagher & Flom LLP
     300 South Grand Avenue, Suite 3400
     Los Angeles, California 90071-3144
     U.S.A.

     Karyl Nairn and Noradele Ghubril, Esqs.          (Via facsimile: +44 20 75 19 7070)
     Skadden, Arps, Slate, Meagher & Flom LLP
     40 Bank Street
     Canary Wharf
     London E14 5DS
     United Kingdom

     Mr. Eliseo Castineira                            (Via facsimile: +33 1 49 53 57 75)
     Counsel
     Ms. Lara Hammoud
     Assistant Counsel
     Secretariat of the International Court of Arbitration
     International Chamber of Commerce
     38, Cours Albert 1er
     75008 Paris
     France

     Dr. Ghaleb Mahmassani                            (Via facsimile: +961 1 348 712)
     General Counsel
     SOLIDERE
     Serhal Building
     Cairo Street – Hamra
     Beirut
     Lebanon

12

**ICC Case No. 14236/EC**
The Lebanese Company For The Development And Reconstruction Of Beirut Central
District, S.A.L. v. URS Corporation and Radian International LLC

**ICC Case No. 14208/EC**
Radian International LLC v. The Lebanese Company For The Development And
Reconstruction Of Beirut Central District, S.A.L.

# List of Authorities

December 13, 2006

Craig, Park and Paulsson, *International Chamber of Commerce Arbitration* (2000, 3rd ed.),
pp. 167-171.

*Fouchard Gaillard Goldman On International Commercial Arbitration* (Edited by Gaillard
and Savage)(1999), pp. 394-415.

Horacio A. Grigera Naón, *Choice-of-Law Problems in International Commercial Arbitration*
(2001), pp. 49-50.

International Law Association, *Recommendations on lis pendens and res judicata and
arbitration,* Resolution No. 1/2006 (adopted at the 72nd Conference of the International Law
Association held in Toronto, Canada, June 4-8, 2006).

Poudret and Besson, *Droit comparé de l'arbitrage international* (2002), pp. 414-416 [with
White & Case translation]

# INTERNATIONAL CHAMBER of COMMERCE ARBITRATION

## Third Edition

W. Laurence Craig
William W. Park
Jan Paulsson

OCEANA PUBLICATIONS, INC. / DOBBS FERRY, NY



International Chamber of Commerce
*The world business organization*

In another rather complicated case decided in 1979,[30] an arbitral tribunal found that an ICC arbitration clause had been rescinded by the parties through a subsequent *ad hoc* agreement to arbitrate, and the arbitral proceedings were terminated. The subsequent failure of the alternative procedure could not be used as grounds for reviving the initial ICC arbitration agreement on the basis of which the Court had, in the first place, ordered the arbitration to proceed.

The system set up by the ICC Rules seems reasonable and practical. A jurisdictional objection does not require a separate action before a State court, nor should it delay the formation of the arbitral tribunal. In appropriate cases, the arbitral tribunal may provide for a procedure to have the jurisdictional issue decided preliminarily in an interim award. (*See* Section 19.03 *infra*). Allowing arbitrators to determine their own jurisdiction and providing the initial *prima facie* review by the ICC Court serves to prevent premature intervention by national courts in the arbitral process. The word "premature" here is used intentionally; at the stage of execution, courts under all systems of law and under all international treaties have the authority to verify that the arbitrators had jurisdiction to render the award as a prerequisite to enforcement.

## 11.04   Recognition by national courts of arbitrator's power to determine his own jurisdiction

Whether national courts will seek to halt an arbitration during the course of the proceedings depends mainly on the laws of the country of the seat of arbitration. The fundamental principles underlying the ICC Rules are generally embraced in most countries under modern arbitration statutes or recent case law involving international commerce (*see generally* Section 5.04, *supra*). Such legal systems have acknowledged that the arbitral tribunal may determine its own jurisdiction.[31]

In Switzerland (*see* Chapter 32, *infra*), the 1987 arbitration law (Chapter 12 of the Swiss Private International Law Act)[32] provides:

*Article 186*:

The arbitral tribunal shall decide on its own jurisdiction.

Any objection must be raised prior to any defense on the merits.

The arbitral tribunal shall, as a rule, decide on its jurisdiction by a preliminary award.

---

30.  ICC Case 3383/1979, extracts *in* 1980 JDI 979; extracts in English *in* VII YEARBOOK 119 (1982), commented on *in* section 4.03 *supra*, Note 2.

31.  Sanders, *supra* Note 21.

32.  Law of 18 December 1987, in effect as of 1 January 1989. The Swiss Intercantonal Concordat, which remains in effect and is applicable where the parties have expressly so agreed, has a similar provision (Article 8) regarding the power of an arbitrator to determine his own jurisdiction.

As for France, the Code of Civil Procedure provides similar legislation even for domestic arbitrations as of 1980:

*Article 1458:*

Whenever a dispute submitted to an arbitral tribunal by virtue of an arbitration agreement is brought before a court of the State, such court shall decline jurisdiction.

If the arbitral tribunal has not yet been seized of the matter, the court should also decline jurisdiction unless the arbitration agreement is manifestly null.

In neither case may the court determine its lack of jurisdiction on its own motion.

*Article 1466:*

If one of the parties contests, before the arbitrator, the latter's jurisdiction, whether in principle or scope, it is for the arbitrator to decide on the validity or scope of his mission.

For international arbitration in France (or taking place elsewhere but subject to French procedural law), the possibility of French courts' intervention is even more limited under Article 1494, which provides:

The arbitration agreement may, directly or by reference to a set of arbitration rules, define the procedure to be followed in the arbitral proceedings. It may also subject it to a given procedural law.

If the agreement is silent, the arbitrator, either directly or by reference to a law or a set of arbitration rules, shall establish such rules of procedure as may be necessary.

Thus specific precedence over French procedural rules is given to the rules to which the parties have agreed, whether by specific contractual stipulations or by incorporation of the rules of an arbitral institution. When viewed together with Article 6 of the Rules, Article 1494 seems to leave no room for intervention by French courts in the arbitral process except on review or execution of an award.

The English Arbitration Act 1996 specifically provides that an arbitral tribunal has jurisdiction to rule on its own jurisdiction (Article 30) and that prior to an arbitral tribunal's decision on this issue a party to arbitral proceedings may seek determination by the court only with the agreement of all parties or of the arbitral tribunal (Article 32).

An award may subsequently be challenged before the court on the ground of lack of substantive jurisdiction by the arbitral tribunal (Article 67). In addition, a party who takes no part in the arbitral proceedings may seek declarations or injunction from the court on the ground that there was no valid arbitration agreement (Article 72).

§ 11.04

Embracing this principle as well, the UNCITRAL Model Law on International Commercial Arbitration (*see* Section 28.06), proposed for adoption by states seeking a modern procedural framework for international arbitration, also provides (in Article 16) for the initial determination by the arbitrator of his own jurisdiction.

The clear trend has thus been to favor the arbitrator's power to determine the existence and scope of his own jurisdiction.[33] Nevertheless, some courts, particularly in common law jurisdictions, may reserve the right of intervention where specific claim is made to the effect of nullity or non-existence of the agreement to arbitrate itself (as opposed to the nullity or rescission of the principal contract) particularly in the case of fraud. This point has been made in several cases (which, it should be noted, nevertheless upheld arbitral jurisdiction in the premises).

Thus, in *Flood and Concklin Manufacturing v. Prima Paint*,[34] the U.S. Supreme Court stated:

> [E]xcept where the parties otherwise intend, arbitration clauses as a matter of federal law are "separable" from the contracts in which they are imbedded, and where no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was *induced by fraud.* (Emphasis added.)

Similarly, in its leading decision in *Heyman v. Darwins Ltd*,[35] the English House of Lords stated:

> If the dispute is whether the contract which contains the clause has even been entered into at all, that issue cannot go to arbitration under the clause, for the party who denies that he has ever entered into the contract is thereby denying that he has ever joined in the submission.

There thus seems to be a basis under some laws for national courts to intervene in arbitration proceedings even before an award is rendered (whether it be a final award or an interim award on the jurisdictional claim).[36]

---

33   This is based on the power inherent to the arbitral process. Sections 5.04, *supra* 28.07, *infra.* The most satisfying philosophical rationalisation of *compétence/compétence*—the arbitrator's power to determine his own jurisdiction—is found in P. Mayer, *L'Autonomie de l'arbitre international dans l'appréciation de sa propre compétence,* 217 RECUEIL DES COURS 323 (1989); see also W.Michael Reisman, W.Laurence Craig, William W. Park, Jan Paulsson, INTERNATIONAL COMMERCIAL ARBITRATION: CASES MATERIALS AND NOTES ON THE RESOLUTION OF INTERNATIONAL BUSINESS DISPUTES, (Foundation Press, 1997) 525-40, 645-80, in the case of ICC arbitration, this power is strongly reinforced by a specific institutional rule and is broader than, and may be distinguished from, arbitral powers flowing from the independence of the arbitration clause.

34   388 U.S. 395 (1967).

35   1942 A.C. 356; [1942] 1 ALL E.R. 337.

36   English law remains interventionist on questions of jurisdiction and considers that the court should retain the right, at the request of a party which does not participate in arbitral proceed-

In the United States, a court may in advance of arbitration, upon motion of any party, rule on issues of the existence, validity and scope of the arbitration agreement, as well as the objective arbitrability of claims, as provided in Articles 3 and 4 of the Federal Arbitration Act. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.*, 473 U.S. 213 (1985). Generally speaking, the American approach, where an arbitration agreement exists, has been to allow an arbitration to go forward despite arguments as to the agreement's scope, or its survival of intervening events (e.g., bankruptcy or assignment) so as to let the tribunal originally determine these issues but to step in where the clause is alleged to be void *ab initio* because, for instance, of the lack of authority to bind a party to arbitrate.[37] In ICC cases the fact that the Rules, which the parties have agreed, specifically provides that the arbitrator will decide upon his own jurisdiction favorably influences a court not to intervene to determine most jurisdictional issues until after an award has been rendered.[38] Article 6(4) of the ICC Rules makes it absolutely clear that the arbitrators have a duty to proceed and to determine their own jurisdiction even though parallel action in a State court may have been commenced to nullify the arbitral proceedings. Any other rule would encourage parties to deploy dilatory judicial procedures, often in their own national courts, and to disregard their agreement to arbitrate.

---

ings, to determine, *prior to arbitration*, such issues as authority of the corporate officer or employee to bind his principal to arbitrate, the scope and extent of the clause, and the identity of parties bound by the clause. Arbitration Act 1996, Section 72.

[37] *See e.g.*, Apollo Computer v. Berg, 886, F.2d 469 (1st Cir. 1989) (court refused to enjoin ICC arbitration based on allegations that the arbitration agreement had not been validly assigned by trustee in bankruptcy and that any assignment was unenforceable due to non-assignment clause in contract; these issues were for ICC arbitrators.); Three Valleys Municipal Water District v. E.P. Hutton, 925 F.2d 1136 (9th Cir. 1991) (court must determine whether person signing arbitration agreement had authority to do so.). Paine Webber v. Elahi, 87 F.3d 589 (1st Cir. 1996). *See generally,* Section 34.02.

[38] In *Apollo,* supra, n. 37, the court stated: "By contracting to have all disputes resolved according to the Rules of the ICC . . . Apollo agreed to be bound by Articles 8.3 and 8.4 [Articles 6.2 and 6.4 of the 1998 Rules]. These provisions clearly and unmistakably allow the arbitrator to determine her own jurisdiction when, as here, there exists a *prima facie* agreement to arbitrate whose continued existence and validity is being questioned." In Andersen Consulting v. Andersen Worldwide Société Coopérative and Arthur Andersen LLP, 1998 WL 122590 (SDNY), claimant's demand for an injunction to compel respondents to arbitrate certain disputed issues in a pending ICC arbitration was denied: "Under the circumstances of this case, the Court declines to order that [respondent] arbitrate all issues relating to the resolution before the ICC . . . the [respondent] correctly argues that it should not be compelled by this Court to arbitrate the validity of the resolution in the pending ICC arbitration because, while it is prepared to litigate that issue in an ICC arbitration, the jurisdictional issue of whether the ICC arbitration is the proper forum is itself subject to resolution before the ICC. The ICC should decide whether these issues are properly litigated in the pending ICC arbitration, in another ICC arbitration, or in another forum under the Swiss Intercantonal Convention." For a discussion of the limits of provisions in the arbitration agreement and arbitration rules to confer jurisdiction on the arbitrator to determine his own jurisdiction, see Sections 28.07 and 34.02. However, even where a state court intervenes to make its own jurisdictional findings prior to the issue having been addressed by the arbitral tribunal the arbitrators must proceed to make their own independent findings.

Because of this duty of the international arbitrator to proceed with the arbitration irrespective of the pendency of a judicial proceeding or injunctions contesting his jurisdiction, only a direct order emanating from a competent court at the seat of the arbitration itself should ordinarily be allowed to affect arbitral proceedings. Thus the arbitrator is bound to proceed with his mission based on the prior agreement of the parties—unless it is clear that such judicial actions have executory force over the arbitral tribunal itself.[39]

The system of ICC arbitration is fundamentally designed to discourage recourse to the courts on jurisdictional issues prior to the award. The parties' rights are not ultimately prejudiced by proceeding with the arbitration. Even after an award is rendered, it is subject to an action to have it set aside by the courts of the place of arbitration if it lacks a jurisdictional foundation. And in any enforcement forum, an arbitrator's decision exceeding his jurisdiction may be resisted.

This system is implemented by Articles 6(2) and 6(4) of the Rules which grant authority to the arbitral tribunal to determine jurisdictional issues. Article 6 (4) provides that "the Arbitral Tribunal shall not cease to have jurisdiction by reason of any claim that the contract is null and void or allegation that it is non-existent. . ." In light of the fact that the parties themselves have accepted the ICC Rules (assuming of course that the arbitrator agrees that such is the case), these provisions should effectively reduce the scope for court action on the jurisdictional issue prior to the arbitral award.

**11.05    Jurisdiction over parties who have not signed the arbitration agreement**

No one contests that arbitration is to be used only where the parties have agreed to arbitrate. There are, however, many ways in which consent may be manifested.[40]

A fundamental jurisdictional issue arises when it is contested that the party named in the arbitral proceeding is bound by, or may benefit from, an admittedly existing arbitration agreement. The issue may be raised first before the Court of Arbitration and subsequently before the arbitral tribunal. The possibility of judicial review may not be excluded.

---

39.  See, e.g., ICC Case 6709/1991, III ICC AWARDS 435 (the arbitral tribunal rejected Respondent's request for a stay of the arbitral proceedings until French courts would render a judgement concerning the alleged nullity of the agreement); ICC case 4862/1986, II ICC AWARDS 308 (the arbitral tribunal refused to stay arbitration with seat in Paris despite injunction from the national courts of Yemen (Sanaa)); in a recent case, an English court was able effectively to stay the arbitration, although the seat of the arbitration was Geneva, by extending the effect of an anti-suit injunction not only to the parties but also to two of the arbitrators, English Q.C.'s domiciled in England and subject to such imperative jurisdiction.

40.  For a consideration of this issue in the context of drafting arbitration agreements and clauses, see Section 5.09.

171

# Fouchard, Gaillard, Goldman

# On

# International
# Commercial Arbitration

*Edited by*
Emmanuel Gaillard
and
John Savage



KLUWER LAW
INTERNATIONAL
THE HAGUE / BOSTON / LONDON

acceptance by the arbitrators of their functions.[59] However, that agreement is itself a consequence of the arbitration agreement, and in the relations between the parties, it is the arbitration agreement that provides the basis for the arbitrators' jurisdiction.[60]

We shall consider in turn the extent of the jurisdiction of the arbitral tribunal (A) and its jurisdiction to rule on its own jurisdiction (B).

## A. – THE EXTENT OF THE JURISDICTION OF THE ARBITRAL TRIBUNAL

**648.** — It has sometimes been suggested that a distinction should be drawn between the appointment (*l'investiture*) of arbitrators and their jurisdiction,[61] whereby their appointment is the act of conferring on the arbitral tribunal the power to resolve disputes, and their jurisdiction is the extent of that power.

The arbitration agreement empowers the arbitral tribunal to make a decision resolving a dispute which the parties are obliged to submit to it. That decision will be binding on the parties, and it may be rendered enforceable by the courts: that, it is suggested, results from the arbitrators' appointment.

The arbitration agreement also determines which issues can be examined and decided by the arbitral tribunal. For instance, if an arbitration agreement refers only to a principal claim—which could only be the case with a submission agreement and not an arbitration clause—the question would arise as to whether, in the course of the proceedings and without a further arbitration agreement, the arbitral tribunal could hear subsidiary claims or counterclaims. That would be a matter of jurisdiction.

However, the distinction between the arbitrators' appointment and their jurisdiction has been strongly criticized.[62] Even if one were to draw such a distinction, the appointment and jurisdiction of the arbitrator still both have the same source, namely the arbitration agreement. One commentator observed with respect to arbitration that:

> the granting of jurisdictional powers is carried out by mere private parties: the actual contractors. Those parties simultaneously confer upon the arbitral tribunal both its existence and its jurisdiction. As the arbitrator is only a judge

---

[59] *See infra* paras. 941 *et seq.*

[60] On the question of the jurisdiction of arbitrators, generally, see ADAM SAMUEL, JURISDICTIONAL PROBLEMS IN INTERNATIONAL COMMERCIAL ARBITRATION (1989).

[61] *See, e.g.,* Trib. civ. Seine, June 7, 1956, Constantine v. Buck, JCP, Ed. G., Pt. II, No. 9,460 (1956), and observations by H. Motulsky; CA Aix, Dec. 7, 1954, Ferrari v. Bresset, 1955 REV. ARB. 31. *See also* Ibrahim Fadlallah, *L'ordre public dans les sentences arbitrales, in* COLLECTED COURSES OF THE HAGUE ACADEMY OF INTERNATIONAL LAW, Vol. 249, Year 1994, Part V, at 369, 399.

[62] *See* Eric Loquin, *Arbitrage – Compétence arbitrale – Introduction générale,* J.-CL. PROC. CIV., Fasc. 1030, ¶¶ 6 *et seq.* (1994), and the references cited therein.

to the extent that the parties intend, to say that he has not been appointed is the same as saying that he lacks jurisdiction.[63]

Accordingly, the extent of the arbitrators' power to resolve disputes, and hence their jurisdiction, coincides exactly with the limits of the arbitration agreement. Where the arbitration agreement needs to be interpreted because it is ambiguous[64] or pathological,[65] the extent of the arbitrators' jurisdiction will depend on that interpretation. The question of which parties have agreed to arbitration, which often arises in the context of groups of companies or states and state-owned entities, invariably concerns the extent of the arbitrators' jurisdiction. The same is true of the question of which issues are covered by the parties' consent to arbitrate, which often arises where only certain disputes may have been submitted to arbitration. It therefore suffices to refer on this point to our discussion of the interpretation and extent of the arbitration agreement itself.[66]

649. — The arbitral tribunal's jurisdiction to decide its own jurisdiction, however, requires further analysis.

## B. – THE ARBITRAL TRIBUNAL'S JURISDICTION TO RULE ON ITS OWN JURISDICTION ("COMPETENCE-COMPETENCE")

650. — The fact that arbitrators have jurisdiction to determine their own jurisdiction—known as the "competence-competence" principle—is among the most important, and contentious, rules of international arbitration. It has given rise to much controversy and misunderstanding, and behind the appearance of unanimity—most laws now recognize the principle in some form—it continues to be the subject of considerable divergence between different legal systems.[67]

---

[63] HENRI MOTULSKY, ÉCRITS – VOL. 2 – ÉTUDES ET NOTES SUR L'ARBITRAGE 239 (1974).

[64] See supra paras. 473 et seq.

[65] See supra paras. 484 et seq.

[66] See supra paras. 472 et seq.

[67] On this issue, generally, see Emmanuel Gaillard, Les manœuvres dilatoires des parties et des arbitres dans l'arbitrage commercial international, 1990 REV. ARB. 759, especially at 769 et seq.; Emmanuel Gaillard, L'effet négatif de la compétence-compétence, in ÉTUDES DE PROCÉDURE ET D'ARBITRAGE EN L'HONNEUR DE JEAN-FRANÇOIS POUDRET (forthcoming in 1999); Ernest Mezger, Compétence-compétence des arbitres et indépendance de la convention d'arbitrage dans la Convention dite Européenne sur l'Arbitrage Commercial International de 1961, in COMMERCIAL ARBITRATION – ESSAYS IN MEMORIAM EUGENIO MINOLI 315 (1974); Antonias Dimolitsa, Separability and Kompetenz-Kompetenz, in ICCA CONGRESS SERIES NO. 9, IMPROVING THE EFFICIENCY OF ARBITRATION AGREEMENTS AND AWARDS: 40 YEARS OF APPLICATION OF THE NEW YORK CONVENTION 217 (A.J. van den Berg ed., 1999); and, for a much more restrictive position, see SAMUEL, supra note 60, at 177 et seq.; William W. Park, The Arbitrability Dicta in First Options v. Kaplan: What Sort of Kompetenz-Kompetenz Has Crossed the Atlantic?, 12 ARB. INT'L 137 (1996); William W. Park, Determining Arbitral Jurisdiction: Allocation of Tasks Between Courts and Arbitrators, 8 AM. REV. INT'L ARB. 133 (1997).

651. — Even the terminology used contains a paradox. Traditionally the rule that arbitrators have jurisdiction to decide their own jurisdiction was expressed by the German phrase "*Kompetenz-Kompetenz*." That expression has been used for many years by French[68] and other European legal authors.[69] The working papers[70] and commentaries[71] of the UNCITRAL Model Law also referred to the rule in those terms. Yet, the origin of the expression has never been very clear. Authors frequently refer to "the well-known principle of *Kompetenz-Kompetenz*," or describe the arbitrators' power to rule on their own jurisdiction as a principle "which is often referred to as *Kompetenz-Kompetenz*."[72]

This situation is paradoxical in that German legal terminology lends a meaning to the expression which differs substantially from that which the expression is intended to convey when used in international arbitration. If one were to follow the traditional meaning of the expression in Germany, "*Kompetenz-Kompetenz*" would imply that the arbitrators are empowered to make a final ruling as to their jurisdiction, with no subsequent review of the decision by any court. Understood in such a way, the concept is rejected in Germany,[73] just as it is elsewhere.[74] From a substantive viewpoint, the paradox is all the more marked for the fact that in Germany the question of whether the courts should refuse to examine the jurisdiction of an arbitral tribunal until such time as the arbitrators have been able to rule on the issue themselves (the negative effect of the "competence-competence" principle),[75] has

---

[68]    *See, e.g.,* PHILIPPE FOUCHARD, L'ARBITRAGE COMMERCIAL INTERNATIONAL ¶ 203 (1965); Berthold Goldman, *Arbitrage (droit international privé), in* ENCYCLOPÉDIE DALLOZ – DROIT INTERNATIONAL ¶134 (1968); Pierre Mayer, *L'autonomie de l'arbitre international dans l'appréciation de sa propre compétence, in* COLLECTED COURSES OF THE HAGUE ACADEMY OF INTERNATIONAL LAW, Vol. 217, Year 1989, Part V, at 319, ¶ 9.

[69]    *See, e.g.,* MAURO RUBINO-SAMMARTANO, INTERNATIONAL ARBITRATION LAW 329 (1990); Veeder, *supra* note 19, at 170; DEPARTMENT OF TRADE AND INDUSTRY, A CONSULTATION PAPER ON DRAFT CLAUSES AND SCHEDULES OF AN ARBITRATION BILL (Feb. 1994), *reprinted in* 10 ARB. INT'L 189 (1994) (which led to the enactment of the 1996 Arbitration Act); *see also*, DEPARTMENTAL ADVISORY COMMITTEE ON ARBITRATION LAW, 1996 REPORT ON THE ARBITRATION BILL (Feb. 1996), *reprinted in* 13 ARB. INT'L 275 (1997); Dimolitsa, *supra* note 67.

[70]    *See* HOWARD M. HOLTZMANN AND JOSEPH E. NEUHAUS, A GUIDE TO THE UNCITRAL MODEL LAW ON INTERNATIONAL COMMERCIAL ARBITRATION – LEGISLATIVE HISTORY AND COMMENTARY 508 (1989).

[71]    *See* HOLTZMANN AND NEUHAUS, *supra* note 70, at 478 *et seq.*; ARON BROCHES, COMMENTARY ON THE UNCITRAL MODEL LAW ON INTERNATIONAL COMMERCIAL ARBITRATION 73 *et seq.* (1990).

[72]    *See, e.g.,* HOLTZMANN AND NEUHAUS, *supra* note 70, at 478 and 508.

[73]    See, before the January 1, 1998 reform, Ottoarndt Glossner, *Germany* (at 14), *in* ICCA INTERNATIONAL HANDBOOK ON COMMERCIAL ARBITRATION (1987); Günter Henn, *Gibt es eine hindernde Kompetenz-Kompetenz der Schiedsgerichte?, in* JAHRBUCH FÜR DIE PRAXIS DER SCHIEDSGERICHTSBARKEIT 1990, at 50 (1991); since January 1, 1998, see Article 1040 of the ZPO and the commentary by Peter Schlosser, *La nouvelle legislation allemande sur l'arbitrage*, 1998 REV. ARB. 291, 297; Klaus Peter Berger, *Germany Adopts the UNCITRAL Model Law*, 1 INT'L ARB. L. REV. 121, 122 (1998).

[74]    *See infra* para. 659. But see, in favor of allowing arbitrators exclusive jurisdiction to determine their own jurisdiction, except for review by the courts of the abusive exercise by the arbitrators of their powers, Clive M. Schmitthoff, *The jurisdiction of the arbitrator, in* THE ART OF ARBITRATION – LIBER AMICORUM PIETER SANDERS 285 (J. Schultz and A.J. van den Berg eds., 1982). On the possibility for the parties to specifically agree to apply such a system, see Mayer, *supra* note 68, at 340.

[75]    *See infra* para. 672.

never been accepted, neither before,[76] nor after the December 22, 1997 reform.[77] It therefore seems preferable to avoid the confusing German expression *"Kompetenz-Kompetenz,"* in favor of "competence-competence," which is more in keeping with the origin of a principle which had been applied by the French courts as early as 1949.[78]

It should also be observed that Swiss authors, always sensitive to the finer distinctions of comparative law, were quick to point out that the expression *"Kompetenz-Kompetenz"* was inappropriate because of its traditional German meaning.[79]

652. — Having considered the terminology, we shall now examine how the principle of competence-competence was established (1°), its basis (2°) and its exact meaning (3°).

## 1° Recognition of the Principle

653. — The competence-competence principle is now recognized by the main international conventions on arbitration, by most modern arbitration statutes, and by the majority of institutional arbitration rules.

654. — As the 1958 New York Convention only deals with the conditions for recognition and enforcement of awards, it does not cover the competence-competence principle. By contrast, the 1961 European Convention provides very clearly, in Article V, paragraph 3 that:

> [s]ubject to any subsequent judicial control provided for under the *lex fori*, the arbitrator whose jurisdiction is called in question shall be entitled to proceed with the arbitration, to rule on his own jurisdiction and to decide upon the existence or the validity of the arbitration agreement or of the contract of which the agreement forms part.

The Washington Convention establishing ICSID contains a similar rule in its Article 41.

---

[76] *See* PETER SCHLOSSER, DAS RECHT DER INTERNATIONALEN PRIVATEN SCHIEDSGERICHTSBARKEIT 418, n. 546 (2d ed. 1989).

[77] See Article 1032(1) and (2) of the ZPO which, since January 1, 1998, allows parties to apply to the courts for a determination whether the arbitration is admissible "[p]rior to the constitution of the arbitral tribunal" without preventing the arbitral procedure from going forward. On the situation in comparative law, see *infra* para. 675 and Schlosser, *supra* note 73.

[78] *See infra* note 83.

[79] *See, e.g.,* PIERRE JOLIDON, COMMENTAIRE DU CONCORDAT SUISSE SUR L'ARBITRAGE 185 (1984), and the references cited therein. Swiss authors thus generally avoid using the expression "Kompetenz- Kompetenz;" *see, e.g.,* PIERRE LALIVE, JEAN-FRANÇOIS POUDRET, CLAUDE REYMOND, LE DROIT DE L'ARBITRAGE INTERNE ET INTERNATIONAL EN SUISSE 380 *et seq.* (1989); Robert Briner, *Switzerland* (at 26), *in* ICCA INTERNATIONAL HANDBOOK ON COMMERCIAL ARBITRATION (1998). *But see* Swiss Fed. Trib., Apr. 19, 1994, Les Emirats Arabes Unis v. Westland Helicopters Ltd., 1994 BULL. ASA 404, 412; 1995 BULL. ASA 186, and P. Schweizer's note; 1995 REV. SUISSE DR. INT. ET DR. EUR. 564, and P. Schweizer's note; ANDREAS BUCHER, PIERRE-YVES TSCHANZ, INTERNATIONAL ARBITRATION IN SWITZERLAND ¶¶ 139 *et seq.* (1988).

655. — Major international arbitration statutes also recognize the principle. The UNCITRAL Model Law provides in Article 16, paragraph 3 that "[t]he arbitral tribunal may rule on [a plea that the arbitral tribunal does not have jurisdiction] either as a preliminary question or in an award on the merits," and that, in the event of an action to set aside a partial award concerning jurisdiction, "the arbitral tribunal may continue the arbitral proceedings and make an award."[80] Most recent laws on arbitration contain similar provisions.[81]

In French domestic arbitration law, the principle is set forth at Article 1466 of the New Code of Civil Procedure. This provides that "[i]f, before the arbitrator, one of the parties challenges the principle or scope of the arbitrator's jurisdiction, the arbitrator shall rule on the validity or scope of his or her jurisdiction."[82] Where an international arbitration is subject to French law, the same rule applies by virtue of Article 1495 of the same Code. However, the rule in fact is of general application in French international arbitration law, as a result of case law predating the 1981 Decree.[83] Recent decisions have confirmed the principle, giving it a very broad scope.[84]

---

[80] For an example of the application of this provision, see Ontario Court of Justice, Mar. 1, 1991, Rio Algom Ltd. v. Sammi Steel Co. Ltd., XVIII Y.B. COM. ARB. 166 (1993).

[81] Art. 186 of the 1987 Swiss Private International Law Statute and Art. 8, para. 1, of the Swiss *Concordat*; Art. 1697(1) of the Belgian Judicial Code (Law of July 4, 1972); Art. 1052(1) of the Netherlands Code of Civil Procedure (Law of Dec. 1, 1986); Art. 23(3) of the Spanish Law 36/1988 of December 5, 1988 on Arbitration; Art. 21(1) of the Portuguese Law No. 31/86 of Aug. 29, 1986 on Voluntary Arbitration; Art. 61 of the Tunisian Arbitration Code promulgated by Law No. 93-42 of April 26, 1993; Art. 458 bis 7 of the Algerian Code of Civil Procedure (Legislative Decree No. 93-09 of April 25, 1993); Sec. 30 of the 1996 English Arbitration Act; Art. 1040 of the German ZPO (Law of Dec. 22, 1997).

[82] This provision, enacted by the Decree of May 14, 1980, brought to an end the controversial case law concerning French domestic arbitration whereby "any dispute regarding the validity of the arbitration clause . . . must be heard exclusively by the courts" (Cass. com., Oct. 6, 1953, Courtieu v. Blanchard, JCP, Ed. G., Pt. II, No. 8293 (1954); Dalloz, Jur. 25 (1954), and the commentary by MOTULSKY, *supra* note 63 ("Menace sur l'arbitrage: la prétendue incompétence des arbitres en cas de contestation de l'existence ou de la validité d'une clause compromissoire," at 189 et seq.)).

[83] Cass. com., Feb. 22, 1949, Caulliez-Tibergien v. Caulliez-Hannart, JCP, Ed. G., Pt. II, No. 4899 (1949), and observations by H. Motulsky. See also MOTULSKY, *supra* note 63, at 222 et seq.; Trib. civ. Seine, Oct. 17, 1956, Kohorn v. Dimitrov, JCP, Ed. G., Pt. II, No. 9647 (1956), and observations by H. Motulsky; CA Colmar, Nov. 29, 1968, Impex v. P.A.Z., JCP, Ed. G., Pt. II, No. 16,246 (1970), and observations by P. Level and B. Oppetit; 1968 REV. ARB. 149: "The principle is that the judge hearing a dispute has jurisdiction to determine his own jurisdiction. This necessarily implies that when that judge is an arbitrator, whose powers derive from the agreement of the parties, he has jurisdiction to examine the existence and validity of such agreement." On the subsequent developments in the case, see *supra* para. 560.

[84] See TGI Paris, réf., Apr. 10, 1990, European Country Hotels Ltd. v. Consorts Legrand, 1994 REV. ARB. 545, 1st decision, and observations by P. Fouchard; CA Paris, Mar. 29, 1991, Ganz v. Société Nationale des Chemins de Fer Tunisiens (SNCFT), 1991 REV. ARB. 478, and L. Idot's note; CA Paris, May 19, 1993, Labinal v. Mors, 1993 REV. ARB. 645, and C. Jarrosson's note; 120 J.D.I. 957 (1993), and L. Idot's note; 1993 RTD COM. 494, and observations by E. Loquin; for an English translation, see 8 INT'L ARB. REP. 7 (July 1993); TGI Paris, réf., Jan. 10, 1996, *National Iranian Oil Co.*, *supra* note 46.

656. — The fact that the main institutional arbitration rules also include the principle of competence-competence[85] is a further example of its widespread recognition. Of course, from a strictly technical viewpoint, the recognition of the principle by the arbitral institutions is not sufficient to ensure its effectiveness. Institutional arbitration rules, which derive their authority from the parties' agreement, cannot grant the arbitrators more rights than the applicable legal systems allow them to exercise. In other words, unlike national laws, arbitration rules are contractual in nature and therefore cannot resolve the apparent contradiction which allows arbitrators to determine whether or not they have jurisdiction.[86] The same is true of arbitral awards applying the competence-competence principle.[87]

## 2° Basis of the Principle

657. — We have already seen that because case law develops by building on well-established rules in order to create new ones, the competence-competence principle has often been presented as the corollary of the principle of the autonomy of the arbitration agreement from the main contract.[88] As we noted, these two rules in fact overlap only slightly and should be carefully distinguished.[89]

658. — More fundamentally, although the arbitrators' jurisdiction to rule on their own jurisdiction is indeed one of the effects of the arbitration agreement (or even of a *prima facie* arbitration agreement, since the question would not arise in the absence of a *prima facie* arbitration agreement), the basis of that power is neither the arbitration agreement itself, nor the principle of *pacta sunt servanda* under which the arbitration agreement is binding.[90]

The competence-competence principle enables the arbitral tribunal to continue with the proceedings even where the existence or validity of the arbitration agreement has been challenged by one of the parties for reasons directly affecting the arbitration agreement, and not simply on the basis of allegations that the main contract is void or otherwise ineffective. The principle that the arbitration agreement is autonomous of the main contract is sufficient to resist a claim that the arbitration agreement is void because the contract containing it is invalid, but it does not enable the arbitrators to proceed with the arbitration where the

---

[85] *See, e.g.*, Art. 21(1) of the UNCITRAL Arbitration Rules; Art. 6(2) of the ICC Arbitration Rules (Art. 8(3) of the previous Rules); DERAINS AND SCHWARTZ, *supra* note 18, at 99 *et seq.*; Art. 23.1 of the 1998 LCIA Arbitration Rules; Art. 15(1) of the 1997 AAA International Arbitration Rules.

[86] See, on the other hand, for national laws, *infra* para. 658.

[87] *See, e.g.*, ICC Awards No. 1526 (1968), Belgian parties v. African state, 101 J.D.I. 915 (1974), and observations by Y. Derains; No. 2476 (1976), Swiss company v. Italian company, 104 J.D.I. 936 (1977), and observations by Y. Derains; No. 2558 (1976), Y v. French company, 104 J.D.I. 951 (1977), and observations by Y. Derains; No. 3987 (1983), Austrian company v. Greek company, 111 J.D.I. 943 (1984), and observations by Y. Derains; No. 6437 (1990), ICC BULLETIN, Vol. 8, No. 1, at 63 (1997). *See also* Yves Derains, *Les tendances de la jurisprudence arbitrale internationale*, 121 J.D.I. 829, 838 (1994).

[88] *See, e.g.*, CA Colmar, Nov. 29, 1968, *Impex, supra* note 83.

[89] *See supra* para. 416.

[90] *See supra* para. 627.

alleged invalidity directly concerns the arbitration agreement.[91] That is a consequence of the competence-competence principle alone. The competence-competence principle also allows arbitrators to determine that an arbitration agreement is invalid and to make an award declaring that they lack jurisdiction without contradicting themselves.

Of course, neither of those effects results from the arbitration agreement. If that were the case, one would immediately be confronted with the "vicious circle" argument put forward by authors opposed to the competence-competence principle: how can an arbitrator, solely on the basis of an arbitration agreement, declare that agreement to be void or even hear a claim to that effect? The answer is simple: the basis for the competence-competence principle lies not in the arbitration agreement, but in the arbitration laws of the country where the arbitration is held and, more generally, in the laws of all countries liable to recognize an award made by arbitrators concerning their own jurisdiction. For example, an international arbitral tribunal sitting in France can properly make an award declaring that it lacks jurisdiction for want of a valid arbitration agreement, because it does so on the basis of French arbitration law, and not on the basis of the arbitration agreement held to be non-existent or invalid. Similarly, it is perfectly logical for the interested party to rely on that award in other jurisdictions, provided that those other jurisdictions also recognize the competence-competence principle. As we shall now see, the legal basis for the principle does not prejudice the subsequent review by the courts, in France or in the country where recognition is sought, of the arbitrators' finding that the arbitration agreement is non-existent or invalid.

## 3° Meaning of the Principle

**659.** — Even today, the competence-competence principle is all too often interpreted as empowering the arbitrators to be the sole judges of their jurisdiction.[92] That would be neither logical nor acceptable. In fact, the real purpose of the rule is in no way to leave the question of the arbitrators' jurisdiction in the hands of the arbitrators alone. Their jurisdiction must instead be reviewed by the courts if an action is brought to set aside or to enforce the award.[93] Nevertheless, the competence-competence rule ties in with the idea that there are no grounds for the *prima facie* suspicion that the arbitrators themselves will not be able to reach decisions which are fair and protect the interests of society as well as those of the parties to the dispute. This same philosophy is also found in the context of arbitrability, where it serves as the basis for the case law which entrusts arbitrators with the task of

---

[91]  *See supra* para. 416.

[92]  On the traditional meaning in German legal terminology of the expression "Kompetenz-Kompetenz," which gave rise to this confusion, see *supra* para. 651.

[93]  *See infra* paras. 1608 and 1629. The English legislature felt it necessary to include a specific provision to this effect, at Section 30(2) of the 1996 Arbitration Act.

applying rules of public policy (in areas such as antitrust law and the prevention of corruption), subject to subsequent review by the courts.[94]

660. — However, it is important to recognize that the competence-competence rule has a dual function. Like the arbitration agreement,[95] it has or may have both positive and negative effects, even if the latter have not yet been fully accepted in a number of jurisdictions.[96] The positive effect of the competence-competence principle is to enable the arbitrators to rule on their own jurisdiction, as is widely recognized by international conventions and by recent statutes on international arbitration.[97] However, the negative effect is equally important. It is to allow the arbitrators to be not the sole judges, but the first judges of their jurisdiction. In other words, it is to allow them to come to a decision on their jurisdiction prior to any court or other judicial authority, and thereby to limit the role of the courts to the review of the award. The principle of competence-competence thus obliges any court hearing a claim concerning the jurisdiction of an arbitral tribunal—regarding, for example, the constitution of the tribunal or the validity of the arbitration agreement—to refrain from hearing substantive argument as to the arbitrators' jurisdiction until such time as the arbitrators themselves have had the opportunity to do so. In that sense, the competence-competence principle is a rule of chronological priority. Taking both of its facets into account, the competence-competence principle can be defined as the rule whereby arbitrators must have the first opportunity to hear challenges relating to their jurisdiction, subject to subsequent review by the courts.[98]

From a practical standpoint, the rule is intended to ensure that a party cannot succeed in delaying the arbitral proceedings by alleging that the arbitration agreement is invalid or non-existent. Such delay is avoided by allowing the arbitrators to rule on this issue themselves, subject to subsequent review by the courts, and by inviting the courts to refrain from intervening until the award has been made. Nevertheless, the interests of parties with legitimate claims concerning the invalidity of the arbitration agreement are not unduly prejudiced, because they will be able to bring those claims before the arbitrators themselves and, should the arbitrators choose to reject them, before the courts thereafter.

The competence-competence rule thus concerns not only the positive, but also the negative effects of the arbitration agreement.[99]

---

[94] *See supra* paras. 561 *et seq.*

[95] *See supra* para. 624.

[96] For a comparative law analysis, see *infra* para. 675.

[97] *See supra* paras. 653 *et seq.*

[98] For an illustration of this principle in common law jurisdictions which have adopted the UNCITRAL Model Law, see Ontario Court of Justice, Mar. 1, 1991, *Rio Algom, supra* note 80; Hong Kong Supreme Court, July 30, 1992, Pacific International Lines (Pte) Ltd. v. Tsinlien Metals and Minerals Co. Ltd., XVIII Y.B. COM. ARB. 180 (1993), which both accept the negative effect of the competence-competence principle.

[99] On the negative effects of the "competence-competence" rule, see *infra* paras. 671 *et seq.*

## SECTION II
# NEGATIVE EFFECTS OF THE ARBITRATION AGREEMENT

661. — To ensure that the arbitration agreement will be complied with, the positive effect of the arbitration agreement—the requirement that the parties honor their undertaking to submit to arbitration any disputes covered by their agreement—must be accompanied by a negative effect, namely that the courts are prohibited from hearing such disputes.

We shall consider in turn the principle that the courts have no jurisdiction (§ 1), its implementation (§ 2) and its limits (§ 3).

## § 1. – The Principle that the Courts Have No Jurisdiction

662. — The principle that the courts lack jurisdiction to hear disputes covered by an arbitration agreement can be found in the major international conventions on arbitration (A), as well as in national legislation (B).

### A. – INTERNATIONAL CONVENTIONS

663. — Article 4, paragraph 1 of the 1923 Geneva Protocol on Arbitration Clauses in Commercial Matters provides that:

> [t]he tribunals of the contracting parties, on being seized of a dispute regarding a contract made between persons to whom Article 1 applies and including an arbitration agreement whether referring to present or future differences which is valid in virtue of the said article and capable of being carried into effect, shall refer the parties on the application of either of them to the decision of the arbitrators.[100]

The 1958 New York Convention contains the same rule in its Article II, paragraph 3:

> [t]he court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall . . . refer the parties to arbitration."

Similarly, the 1961 European Convention indirectly recognizes the principle that courts have no jurisdiction where there is an arbitration agreement. Article VI, paragraph 3 states that:

---

[100] On the meaning of these provisions, see FOUCHARD, *supra* note 68, ¶ 233; Goldman, *supra* note 68, ¶¶ 155 *et seq.*

EFFECTS OF THE ARBITRATION AGREEMENT                                403

> [w]here either party to an arbitration agreement has initiated arbitration proceedings before any resort is had to a court, courts of Contracting States subsequently asked to deal with the same subject-matter between the same parties . . . shall stay their ruling on the arbitrator's jurisdiction until the arbitral award is made, unless they have good and substantial reasons to the contrary.

This provision is somewhat unsatisfactory, as it refers only to cases where arbitral proceedings have already been initiated. The same rule should apply simply where an arbitration agreement exists, in order to avoid turning the proceedings into a race to secure or avoid the jurisdiction of the courts.[101]

Of course, each of the above conventions allows for the review by the courts of the existence and validity of the arbitration agreement,[102] and the only real issue concerns the point in time at which that review should be exercised.[103]

## B. – ARBITRATION LEGISLATION

664. — Most modern arbitration statutes recognize the principle that the courts have no jurisdiction to hear disputes covered by an arbitration agreement.

The UNCITRAL Model Law includes the principle in its Article 8. Under the heading "Arbitration agreement and substantive claim before court," paragraph 1 of the article provides that:

> [a] court before which an action is brought in a matter which is the subject of an arbitration agreement shall, if a party so requests not later than when submitting his first statement on the substance of the dispute, refer the parties to arbitration.

This provision is very similar to Article II, paragraph 3 of the New York Convention.

Leading arbitration statutes likewise recognize the principle that courts have no jurisdiction.[104]

665. — English law long considered that the effect of the arbitration agreement was to justify the grant of a stay of proceedings by the courts until the making of the arbitral award,

---

[101] On the similar distinction found in French law, see *infra* para. 680.

[102] *See* Art. 4, para. 1 of the Geneva Protocol; Art. II(3) of the 1958 New York Convention; Art. VI(3) of the 1961 European Convention.

[103] *See infra* para. 671.

[104] *See, e.g.,* Art. 7 of the 1987 Swiss Private International Law Statute; Art. 1022 of the Netherlands Code of Civil Procedure (Law of July 2, 1986); Art. 11 of the Spanish law 36/1988 on Arbitration of December 5, 1988; Art. 1679 of the Belgian Judicial Code (Law of July 4, 1972); Art. 458 bis 8 of the Algerian Code of Civil Procedure (Legislative Decree No. 93-09 of April 25, 1993); Art. 52 of the Tunisian Arbitration Code promulgated by Law No. 93-42 of April 26, 1993; Art. 1032 of the German ZPO and, before the December 22, 1997 reform, Art. 1027(a) of the ZPO.

404                                    THE ARBITRATION AGREEMENT

rather than to exclude the jurisdiction of the courts altogether.[105] The 1996 Arbitration Act
also takes this approach. Section 9, which is a mandatory provision, states that rather than
asking a court to decline jurisdiction, "[a] party to an arbitration agreement against whom
legal proceedings are brought . . . in respect of a matter which under the agreement is to be
referred to arbitration may . . . apply to the court in which the proceedings have been brought
to stay the proceedings so far as they concern that matter. . . ."[106] The English courts strictly
apply the rule requiring a stay and will even enjoin parties bound by an arbitration agreement
not to bring the dispute before courts outside England.[107] A similar rule is found in Section
3 of the United States Arbitration Act, according to which courts confronted with an
arbitration agreement must stay the proceedings until the arbitration has taken place in
accordance with the terms of the arbitration agreement.[108]

   666. — In French domestic arbitration law, the principle is found in Article 1458 of the
New Code of Civil Procedure, which provides that:

        [w]here a dispute submitted to an arbitral tribunal by virtue of an arbitration
        agreement is brought before a national court, such court shall decline
        jurisdiction.

   The *Cour de cassation* has confirmed that this provision is "applicable to international
arbitration."[109]

   667. — Once again, all of the legislation discussed above recognizes that the courts are
entitled to review the existence and validity of the arbitration agreement on which the
arbitrators' jurisdiction is based,[110] although they differ as to when that review should take
place.[111]

---

[105]  *See* MICHAEL J. MUSTILL, STEWART C. BOYD, COMMERCIAL ARBITRATION 154 *et seq.* (2d ed. 1989); ALAN
REDFERN AND MARTIN HUNTER, LAW AND PRACTICE OF INTERNATIONAL COMMERCIAL ARBITRATION 285
*et seq.* (2d ed. 1991).

[106]  *See* RUSSELL ON ARBITRATION, *supra* note 21, at 324 *et seq.*

[107]  Aggeliki Charis Compania Maritima SA v. Pagnan SpA (The "Angelic Grace"), [1995] 1 Lloyds Rep. 87; XXII
Y.B. COM. ARB. 838 (1997) (C.A. 1994).

[108]  *See also* Howard M. Holtzmann and Donald Francis Donovan, *United States* (at 23), *in* ICCA INTERNATIONAL
HANDBOOK OF COMMERCIAL ARBITRATION (1999); JACK J. COE, JR., INTERNATIONAL COMMERCIAL
ARBITRATION: AMERICAN PRINCIPLES AND PRACTICE IN A GLOBAL CONTEXT 154 *et seq.* (1997).

[109]  Cass. 1e civ., June 28, 1989, Eurodif v. République Islamique d'Iran, 1989 Bull. Civ. I, No. 255; 1989 REV.
ARB. 653, 2d decision, and P. Fouchard's note; 117 J.D.I. 1004 (1990), 2d decision, and P. Ouakrat's note. On
the conditions governing challenges of the jurisdiction of the French courts, see CA Paris, June 23, 1993, Euro
Disney v. Eremco, 1994 REV. ARB. 151, and L. Cadiet's note.

[110]  See the references cited *supra* para. 664.

[111]  On this issue, see *infra* para. 675.

## § 2. – Implementation of the Principle that the Courts Have No Jurisdiction

**668.** — Two aspects of the regime governing the courts' lack of jurisdiction require further examination: first, the fact that the courts cannot declare *ex officio* that they lack jurisdiction as a result of the existence of an arbitration agreement (A) and, second, the point in time at which the courts can hear actions concerning the existence or validity of an arbitration agreement (B).

## A. – THE COURTS CANNOT DECLARE *EX OFFICIO* THAT THEY HAVE NO JURISDICTION AS A RESULT OF THE EXISTENCE OF AN ARBITRATION AGREEMENT

**669.** — Given that an arbitration is based, by definition, on the parties' agreement to have their disputes resolved by that means, it is always possible for the parties to agree to waive their obligation to submit disputes to arbitration and to go before the courts instead. Such a waiver may be either express or implied.[112]

For that reason, it is not for the court hearing a dispute covered by an arbitration agreement to declare *ex officio* that it has no jurisdiction. By bringing a court action on the merits, the plaintiff waives the benefit of the arbitration agreement.[113] By participating in the proceedings without challenging the court's jurisdiction, the defendant likewise accepts that jurisdiction.[114] The parties' intentions coincide and the court must give effect to those intentions, just as it would with an agreement in any other form.

**670.** — This approach is widely accepted. It is provided for in Article 4 of the 1923 Geneva Protocol,[115] Article II, paragraph 3 of the 1958 New York Convention[116] and in Article VI, paragraph 1 of the 1961 European Convention.[117] It also features in most

---

[112] *See infra* para. 736.

[113] This will not of course be the case where the claimant is seeking only provisional or protective measures compatible with the arbitration agreement. On this issue, see *infra* paras. 685 and 1302 *et seq.* For a counterclaim before the courts being deemed a waiver of the arbitration agreement, see Spanish *Tribunal Supremo*, Feb. 18, 1993, Black Sea Shipping Co. v. Novo Viaje, S.A., XXII Y.B. COM. ARB. 785, 788 (1997).

[114] See, for a late challenge of a court's jurisdiction on the basis of the existence of an arbitration agreement, Cass. 2e civ., Mar. 11, 1999; Project XJ 220 Ltd. v. de Dampierre, No. D 96-16.418, unpublished.

[115] Article 4 of this Protocol, set forth in part *supra* para. 663, makes the jurisdiction of the arbitrators conditional upon the request of one of the parties.

[116] *See supra* para. 663 (the courts will refer the parties back to the arbitrators "at the request of one of the parties").

[117] This provision reads as follows: "A plea as to the jurisdiction of the court made before the court seized by either party to the arbitration agreement, on the basis of the fact that an arbitration agreement exists shall, under penalty of estoppel, be presented by the respondent before or at the same time as the presentation of his substantial defence, depending upon whether the law of the court seized regards this plea as one of procedure
(continued...)

arbitration statutes.[118] In French law, Article 1458 of the New Code of Civil Procedure applies to both domestic and international arbitration[119] and expressly stipulates in paragraph 3 that if proceedings are pending before the arbitrators or if an arbitration agreement exists "the court cannot decline jurisdiction *ex officio*."[120] In the United States, the same rule has been developed by the courts.[121]

## B. – WHEN CAN THE COURTS REVIEW THE EXISTENCE AND VALIDITY OF THE ARBITRATION AGREEMENT?

**671.** — The issue of when the courts are empowered to review the existence and validity of the arbitration agreement is more controversial. In most legal systems, the debate surrounding the competence-competence rule now focuses on this issue. We have seen that a vast majority of countries admit the positive effect of the competence-competence principle. Thus, challenging the existence or validity of the arbitration agreement will not prevent the arbitral tribunal from proceeding with the arbitration, ruling on its own jurisdiction and, if it retains jurisdiction, making an award on the substance of the dispute, all without waiting for the outcome of any court action aimed at setting aside the award deciding the jurisdiction issue.[122]

However, the negative effect of the competence-competence principle is more contentious. This negative effect is that the arbitrators are entitled to be the first to determine their jurisdiction (and not to be sole judges of the issue), so that the courts' review of the arbitral tribunal's jurisdiction occurs only where there is an action to enforce or set aside the arbitral award.

We shall examine the position adopted in comparative law in this respect (1°), before considering the underlying policy considerations which, in our view, justify postponing court intervention until after the award is made.

---

[117](...continued)
   or of substance."

[118] See, for example, Article 8(1) of the UNCITRAL Model Law and the statutes cited *supra* para. 664.

[119] Cass. 1e civ., June 28, 1989, *Eurodif, supra* note 109.

[120] See, before the 1980 and 1981 reforms, FOUCHARD, *supra* note 68, ¶ 225; Goldman, *supra* note 68, ¶ 148; CA Aix, Mar. 19, 1964, Unipol v. Capitaine du "Seacob," 1965 DR. MAR. FR. 220; Cass. 1e civ., June 6, 1978, *British Leyland, supra* note 24.

[121] BORN, *supra* note 25, at 279 *et seq.* (1994).

[122] *See supra* para. 655.

### 1° The Position Adopted in Comparative Law

672. — French law was quick to recognize the negative effect of the competence-competence principle.[123] Article 1458 of the New Code of Civil Procedure, which applies to both domestic and international arbitration,[124] obliges the courts to decline jurisdiction where an arbitration agreement exists, provided that the merits of the dispute have already been put before an arbitral tribunal. Even in domestic arbitration, the French courts have been very strict in applying this principle. For example, in the *Coprodag* case, the first instance court held that an arbitration agreement was void and that the arbitral tribunal should therefore not be constituted, although one party had already initiated the arbitral proceedings. That decision was confirmed by the Court of Appeals, but in 1995 the *Cour de cassation* reversed the Court of Appeal's decision, holding that:

> the President of the Tribunal of First Instance cannot declare that the arbitrators should not be appointed on the grounds that the arbitration agreement is patently void unless he is seized of a problem concerning the constitution of the arbitral tribunal; the arbitral tribunal alone has jurisdiction to rule on the validity or limits of its appointment, provided that question has been brought before it.[125]

Where the dispute is not before an arbitral tribunal, the courts must also decline jurisdiction unless the arbitration agreement is "patently void."[126] This amounts to a *prima facie* review of the existence and validity of the arbitration agreement. As the French *Cour de cassation* held in its *V 2000* decision, without even referring to the hypothesis of the arbitration clause being patently void, the arbitrators must "apply the arbitration clause subject to subsequent review by the courts in order to verify their own competence,

---

[123] See, for instance, prior to the 1980-81 reform, the clear recognition of the rule according to which the arbitral tribunal has to be the first to make a determination on its own jurisdiction, in CA Paris, Mar. 9, 1972, Lefrère v. SA Les Pétroles Pursan, 1972 RTD COM. 344, and observations by M. Boitard and J.-C. Dubarry. On the issue generally, see Gaillard, *L'effet négatif de la compétence-compétence, supra* note 67.

[124] Cass. 1e civ., June 28, 1989, *Eurodif, supra* note 109. See also Cass. 1e civ., June 7, 1989, Anhydro v. Caso Pillet, 1992 REV. ARB. 61, and Y. Derains' note; TGI Paris, réf., Apr. 10, 1990, *European Country Hotels, supra* note 84. See also Cass. 2e civ., June 18, 1986, Buzzichelli v. S.a.r.l. S.E.R.M.I., 1986 REV. ARB. 565, 1st decision, and G. Couchez' note; Cass. 1e civ., Mar. 20, 1989, The General Authority for Supply Commodities Cairo-Estram v. Ipitrade International, 116 J.D.I. 1045 (1989), and B. Oppetit's note; 1989 REV. ARB. 494, 3d decision, and G. Couchez' note.

[125] Cass. 2e civ., May 10, 1995, Coprodag v. Dame Bohin, 1995 REV. ARB. 617, and E. Gaillard's note; Dalloz, Jur. 79 (1996), and G. Bolard's note.

[126] See, e.g., CA Paris, Dec. 7, 1994, V 2000 (formerly Jaguar France) v. Renault, 1996 REV. ARB. 245, and C. Jarrosson's note; 1995 RTD COM. 401, and observations by J.-C. Dubarry and E. Loquin; 1996 JUSTICES 435, and observations by M.-C. Rivier, *aff'd*, Cass. 1e civ., May 21, 1997, Renault v. V 2000 (formerly Jaguar France), 1997 REV. ARB. 537, and E. Gaillard's note; 1998 REV. CRIT. DIP 87 and V. Heuzé's note; 125 J.D.I. 969 (1998), and S. Poillot-Peruzzetto's note; CA Grenoble, Oct. 3, 1996, Logic groupe Concept v. Logi Concept, 1997 REV. ARB. 433, and observations by Y. Derains; Cass. 1e civ., Jan. 5, 1999, Zanzi v. de Coninck, 1999 DALLOZ AFF. 474.

particularly as regards the arbitrability of the dispute."[127] At the same time, when the French courts hear a request for the appointment of an arbitrator on the basis of an arbitration agreement the existence or validity of which is contested, they do not address the substance of the dispute and must, at the very most, make a *prima facie* assessment of the existence and validity of the agreement.[128]

673. — However, the major international conventions on arbitration and arbitration legislation in other legal systems do not always endorse this approach very clearly.

674. — Both the 1923 Geneva Protocol (Art. 4, para. 1) and the 1958 New York Convention (Art. II(3)), followed in this respect by the UNCITRAL Model Law (Art. 8), allow the courts to hear the merits of a dispute without referring it to arbitration, if they find that the arbitration agreement is "null and void, inoperative or incapable of being performed."[129] This provision is ambiguous in that it can be interpreted either as allowing a full trial of these issues before the courts or as requesting only their preliminary examination.[130] The 1961 European Convention (Art. VI(3)) goes further in prohibiting the courts from resolving the question of whether the arbitration agreement "was non-existent or null and void or had lapsed," unless they have "good and substantial reasons to the contrary." This language is intended to signal that only a *prima facie* assessment of the arbitration agreement's validity and scope may be performed by the courts at this stage, as opposed to the full review to be performed in the context of an enforcement action or action to set aside once an award has been made on the issue.

675. — The traditional approach is to allow a court which has been asked to rule on the merits of the case despite the existence of an arbitration agreement to fully review the existence and validity of such agreement without waiting for a decision from the arbitrators on those issues. That was the case in English law before the 1996 Arbitration Act[131] and

---

[127] Cass. 1e civ., May 21, 1997, *supra* note 126.

[128] On this issue, generally, see *infra* paras. 750 *et seq.*

[129] This formulation is that of the Model Law. The Geneva Protocol mentions the cases where "the agreement or the arbitration cannot proceed or becomes inoperative." The New York Convention refers to arbitration agreements that are "null and void." On the interpretation of these concepts by the courts of the countries bound by the New York Convention, see, every year, the YEARBOOK COMMERCIAL ARBITRATION, Part V – A, Court Decisions on the New York Convention 1958.

[130] In favor of the latter interpretation, see, for example, the Ontario and Hong Kong decisions cited *supra* notes 80 and 98 respectively. For a similar interpretation of the corresponding provisions of Swiss law, see *infra* note 136. The German legislature added to the provisions of the UNCITRAL Model Law a paragraph stating that "[p]rior to the constitution of the arbitral tribunal, an application may be made to the court to determine whether or not arbitration is admissible" (Art. 1032(2) of the ZPO (Law of Dec. 22, 1997)). This provision tracks the distinction made by the French law and the 1961 European Convention as regards the point in time when the court is entitled to intervene (see *supra* para. 672). However, very different consequences result from the suggestion that the court is not to limit its review to a *prima facie* examination of the matter (*see* Schlosser, *supra* note 73, at 300; Berger, *supra* note 73, at 122).

[131] Veeder, *supra* note 19, at 173. The author acknowledges, however, that the principle of the autonomy of the arbitration agreement and that of competence-competence are essential in international commercial arbitration

(continued...)

examples of this approach can still be found in the United States.[132] In other legal systems, the same position results from early cases which might be decided differently today. In Austria, for example, the Supreme Court held in 1935, that:

> it would entail duplication of effort if a party contesting the jurisdiction of an arbitral tribunal were obliged to pursue the proceedings before that tribunal before being able to bring a court action to annul the arbitral proceedings.[133]

The same position was taken more recently by the Swedish legislature in the 1999 Arbitration Act (Sec. 2, para. 1).

A number of recent statutes on arbitration have enacted provisions which, like the UNCITRAL Model Law,[134] are not completely determinative of the issue. For instance, Belgian law states that "a judge seized of a dispute which is covered by an arbitration agreement shall decline jurisdiction at the request of one of the parties, except where, with regard to the dispute in question, the arbitration agreement is invalid or has lapsed" (Art. 1679, para. 1 of the Judicial Code). Similarly, the 1986 Netherlands Arbitration Act provides that "[a] court seized of a dispute in respect of which an arbitration agreement has been concluded shall declare that it has no jurisdiction if a party invokes the existence of the said agreement before submitting a defense, unless the agreement is invalid" (Art. 1022(1) of the Code of Civil Procedure). The 1987 Swiss Private International Law Statute stipulates that "[i]f the parties have concluded an arbitration agreement covering an arbitrable dispute, a Swiss court seized of it shall decline jurisdiction unless: . . . b. the court finds that the arbitral agreement is null and void, inoperative or incapable of being performed" (Art. 7). These provisions could easily be read as implying that a court seized of the merits of a dispute in spite of the existence of an arbitration agreement would have to fully address the question of that agreement's effectiveness. However, after some hesitation,[135] the Swiss Federal Tribunal decided to interpret them as restricting the court's review at the outset of proceedings to a *prima facie* verification of the existence and effectiveness of the arbitration clause.[136] Swiss law thus now takes the same position as French law on this point.

The 1996 English Arbitration Act adopted a slightly different solution, whereby the courts may only rule on the issue of jurisdiction with the agreement of the parties or, if the parties do not agree, with the consent of the arbitral tribunal. In this latter case, the court must also

---

[131](...continued)

(*id.* at 171). On these issues, see *supra* para. 416. *See also* Peter Gross, *Competence of Competence: An English View*, 8 ARB. INT'L 205 (1992).

[132] *See, e.g.*, Comptek Telecomm., Inc. v. IVD Corp., No. 94–CV–0827E(H), 1995 U.S. Dist. LEXIS 11876 (W.D.N.Y. Aug. 1, 1995); 10 INT'L ARB. REP. A1 (Sept. 1995); XXII Y.B. COM. ARB. 905 (1997). See also the case discussed *infra* para. 680.

[133] *Oberster Gerichtshof*, Oct. 2, 1935, SZ17/131. On the situation in German law, see *supra* para. 651.

[134] *See supra* para. 674.

[135] See the discussion in Swiss Fed. Trib., Apr. 19, 1994, *Les Emirats Arabes Unis*, *supra* note 79, at 410.

[136] Swiss Fed. Trib., Apr. 29, 1996, *Fondation M.* v. *Banque X.*, 1996 BULL. ASA 527, and the note by C.U. Mayer at 361; 1996 REV. SUISSE DR. INT. ET DR. EUR. 586, and observations by F. Knoepfler. For a similar interpretation of the language adopted by the UNCITRAL Model Law, see *supra* note 98.

410                          THE ARBITRATION AGREEMENT

find that its decision is liable to save substantial cost, that the application was made promptly, and that there is a valid reason for the claim to be heard by a court (Sec. 32). This is, needless to say, a significant step towards the full acceptance of the negative effect of the competence-competence rule.[137]

676. —— As a result, and although it was at one time relatively isolated, the rule found in French law and in the 1961 European Convention has recently gained substantial acceptance. However, the fact that the issue remains controversial invites a more detailed study of the policy considerations that underlie each of the two different approaches.

## 2° Policy Considerations

677. —— From a legislative standpoint, each of the two approaches to the question of when the courts should be entitled to rule on the existence and validity of the arbitration agreement has its own advantages and disadvantages.

678. —— The approach whereby the courts seized of the merits of the case are entitled to rule immediately on the existence and validity of the arbitration agreement arguably leads to a certain degree of time and cost avoidance. It may prevent parties having to wait several months, or in some cases years, before knowing the final outcome of the dispute regarding jurisdiction—it will often take that long for the arbitrators and then the courts to reach their decisions.[138] However, that drawback is of less importance where the arbitrators are prepared to make a separate award on the issue of jurisdiction, which can generally be done relatively rapidly and will be subject to an immediate action to set aside. For that reason, Article 186, paragraph 3 of the Swiss Private International Law Statute suggests, without requiring it, that "[t]he arbitral tribunal shall, in general, decide on its jurisdiction by a preliminary decision."[139] In complex disputes, where the examination of the merits of the case is necessarily time-consuming, reaching a decision on jurisdiction by way of a preliminary award is certainly preferable.[140] The same considerations of cost and time explain the position taken in English law. Under Section 32(2) of the 1996 English Arbitration Act, the parties may agree (or, if the parties fail to agree, the arbitral tribunal may agree) that it would be more efficient to have the question resolved immediately by the courts.

---

[137] For an earlier discussion on the merits of each system, see the observations of Gaillard and Veeder, supra note 19, at 162 et seq. and 169 et seq. For an assessment of the current English rule, see infra para. 682.

[138] This consideration has sometimes been put forward as a basis for criticism of the position taken by French law in this respect; see Mayer, supra note 68, at 346.

[139] On the possibility of commencing an immediate action to set aside such awards, see infra para. 1357.

[140] On this issue, generally, see infra para. 1359.

679. — The approach adopted in the 1961 European Convention, in French law, and now in a number of other jurisdictions[141]—whereby courts asked to rule on the merits should restrict their investigation to a *prima facie* review of the arbitration agreement—is based on two considerations.

680. — The first is to ensure that parties seeking to obstruct the arbitration are not able to do so by exploiting court proceedings concerning the existence, scope and validity of the arbitration agreement. Although an immediate court action will not, in theory, prevent the arbitrators from continuing with the arbitration, the fact that a party contesting the existence or validity of the arbitration agreement can immediately bring such claims to court will necessarily interfere with the progress of the arbitration. Knowing that the courts have yet to rule on the issue will make neither the parties nor the arbitrators inclined to press ahead with the arbitration before the outcome of the court proceedings. For the French legislature and the drafters of the European Convention, the risk of having the arbitrators wrongly retain jurisdiction in some cases, and have that decision reversed by the courts several months, if not years, later, seemed less serious than the risk that parties acting in bad faith could disrupt arbitral proceedings by systematically challenging the jurisdiction of the arbitral tribunal not only before the arbitrators, but also before the courts.

That concern accounts for the distinction based on whether the arbitral tribunal has already been seized, found in Article 1458 of the French New Code of Civil Procedure[142] and in Article VI, paragraph 3 of the 1961 European Convention.[143] If the dispute is already before the arbitral tribunal, the courts have no jurisdiction, because of the risk of deliberate delay. On the other hand, the attitude of a plaintiff who brings its dispute directly before the courts is less likely to be in bad faith. Since the dispute has not yet gone before the arbitral tribunal, the idea of avoiding duplication of effort resurfaces: the court will retain jurisdiction to rule on the merits of the dispute only if it considers the arbitration agreement to be patently void.

The case law of jurisdictions which allow the courts to hear claims regarding the existence and validity of the arbitration agreement before the arbitrators are able to do so usefully illustrates the risks inherent in such an approach.

For example, an action was brought in 1991 before a United States federal court—the District Court for the Northern District of Illinois—by the exclusive distributor in the United States of a Swedish group, despite the existence of an ordinary ICC arbitration clause in the contract between the parties. This clause provided that the "agreement shall be governed in accordance with Swedish Law" and that "[t]he arbitration proceedings shall be conducted in the English Language and shall take place in London in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce." In deciding whether or not it should retain jurisdiction, the court observed that there are two types of arbitration agreement: one in which the parties may submit the dispute to arbitration, and one in which they must do so. The court then examined whether, under Swedish law—which it

---

[141] For Switzerland, see *supra* para. 675. On Hong Kong and Ontario, see *supra* notes 80 and 98 respectively.

[142] On the applicability of this provision in international arbitration, see *supra* para. 672.

[143] *See supra* para. 663. Compare, on the distinctions found in German law, *supra* para. 651, note 77.

412                    THE ARBITRATION AGREEMENT

considered as governing the arbitration agreement in spite of the principle of the autonomy of the arbitration agreement[144]—the arbitration clause in question was of the first or second variety. The court therefore reviewed the Swedish law opinions submitted by each of the parties, but found them to be poorly documented. It then requested further evidence as to the content of Swedish law, whereupon the parties submitted new opinions, which contradicted each other in every respect. On that evidence, the court concluded that the parties' submissions had shed little light on the interpretation of the clause under Swedish law and that, consequently, a hearing should be arranged, during which the parties were invited to provide proof of their true intentions as to the issue of jurisdiction.[145]

This case provides an extremely strong argument in favor of having the competence-competence principle apply to prevent the courts from intervening before the issue of the arbitrators' jurisdiction is heard by the arbitrators themselves. It also illustrates the benefits of the rejection of the use of the choice of law method in this area.[146]

681. — The negative effect of the competence-competence principle also satisfies another concern of the French legislature, the importance of which, although entirely procedural, should not be underestimated. It concerns the jurisdiction, both territorially and in terms of subject matter, of the courts responsible for reviewing the existence, validity and scope of the arbitration agreement. One of the major objectives of the French reform of international arbitration law in 1981 was to simplify the means of challenging arbitral awards before the courts and to direct such actions before the court of appeals of the place where those awards were made.[147] Similarly, the 1987 Swiss Private International Law Statute gives exclusive jurisdiction to the Federal Tribunal to hear actions to set aside awards made in Switzerland unless the parties specifically elect to give jurisdiction to the court which each Canton has designated for that purpose, or to have their arbitration governed by the rules of the *Concordat*.[148] The UNCITRAL Model Law itself has also attempted to centralize actions to set aside before certain courts in each country adopting it.[149] Without the negative effect of the competence-competence principle, this simplification exercise would be substantially undermined. The court which would normally have jurisdiction in the absence of an arbitration agreement would be any commercial or civil court, depending on the circumstances. To allow those courts to fully decide the validity and scope of such an arbitration agreement would clearly defeat the purpose of legislative provisions organizing the centralization of the court review of disputes associated with arbitration.

682. — The two policy reasons underlying the negative effect of the competence-competence principle, namely the prevention of delaying tactics and the centralization of

---

[144] *See supra* para. 412.

[145] SMG Swedish Machine Group v. Swedish Machine Group, Inc., No. 90 C 6081, 1991 U.S. Dist. LEXIS 780 (N.D. Ill. Jan. 4, 1991); XVIII Y.B. COM. ARB. 457 (1993).

[146] On this issue, see *supra* paras. 435 *et seq.*

[147] *See infra* paras. 1564 *et seq.*

[148] Art. 191 of the Swiss International Private Law Statute.

[149] Arts. 6 and 34(2).

litigation concerning the existence and validity of the arbitration agreement before certain courts, seemed more compelling to certain legal systems—and rightly so in our opinion—than the argument based on the desire to avoid duplication which led to the rejection of that approach in other legal systems. Thus, although it is not a rule which is yet universally accepted, we believe the approach adopted in French and Swiss law, as well as in the 1961 European Convention, to be sound.

It is, in our view, preferable to the intermediate position taken in 1996 English Arbitration Act.[150] Where the parties disagree, the decision by the arbitrators whether or not to authorize the immediate involvement of the courts can only properly be made after an examination—which will be superficial at least—of the jurisdictional issue in dispute. It might have been more efficient to have the arbitrators decide the question immediately by way of a preliminary award, and then to involve the courts in an action to set aside, rather than rely on the first instincts of the arbitrators themselves as to whether it is appropriate to ask the courts to resolve the question at the outset. On the other hand, enabling the parties to choose whether to have the courts dispose of the dispute immediately or not is an excellent idea, provided the parties can reach agreement. It remains to be seen how the fall-back position will be implemented by arbitrators.

## § 3. – The Limits of the Courts' Lack of Jurisdiction

683. — There is only one real exception to the principle that the courts have no jurisdiction to hear disputes covered by an arbitration agreement. That exception is the rare case where an arbitration agreement is ineffective to the extent that it is impossible to constitute the arbitral tribunal, whereupon it becomes necessary to revert to the courts in order to have the merits of the case resolved.[151] In contrast, where it is possible to constitute the arbitral tribunal and to give effect to the parties' initial intentions, the courts will intervene only on an incidental basis to ensure that the arbitration runs smoothly.

Such court intervention essentially occurs at three stages of the arbitral process: on constitution of the arbitral tribunal (A), where a party applies for provisional and conservatory measures (B) and on review of the award (C).

## A. – THE CONSTITUTION OF THE ARBITRAL TRIBUNAL

684. — The intervention of the courts to assist, if need be, in constituting the arbitral tribunal is provided for in all modern arbitration laws. Such intervention is subsidiary in character: any means of constituting the arbitral tribunal chosen by the parties themselves, whether directly or by reference to institutional arbitration rules, will take precedence. Nevertheless, the possibility of court intervention is useful in cases where the mechanisms

---

[150] See supra para. 675 in fine.

[151] See supra para. 633.

414                                    THE ARBITRATION AGREEMENT

agreed by the parties do not work satisfactorily or where no such mechanisms have been agreed upon in the first place. This is particularly true in *ad hoc* arbitration, where there is no arbitral institution to appoint an arbitrator where a party refuses to do so. However, the intervention of the courts does not compete with the arbitration in any way; on the contrary, it is designed to facilitate the progress of the arbitration in order to give effect to the intentions of the parties to enter into an arbitration agreement. It is therefore fully consistent with the principle that the courts have no jurisdiction to hear the merits of disputes covered by an arbitration agreement.

We shall examine this aspect of the intervention of the courts in more detail when considering the constitution of the arbitral tribunal.[152]


## B. – PROVISIONAL AND CONSERVATORY MEASURES

**685.** — As the arbitration agreement can only bind the parties that entered into it, and as the arbitrators have no *imperium*, some measures can only be effectively taken by the courts.

First, even where they are purely conservatory, seizures can only be ordered by the courts. The same applies to a number of measures that facilitate the gathering of evidence. The privity of the arbitration agreement prevents the arbitrators from compelling third parties to submit documents. Likewise, since they lack *imperium*, arbitrators cannot compel a party to arbitration to submit documents against its wishes, although such a refusal may lead the arbitrators to make unfavorable inferences as to that party's case. In addition, it will generally be impossible for measures requiring urgent action, such as those intended to prevent the deterioration or disappearance of evidence, to be taken by arbitrators within the appropriate timeframe, especially where the arbitral tribunal has yet to be constituted.

In each of the above cases, the main purpose of the court's intervention is to promote efficiency. Once again, however, the intervention of the court is not so much an infringement of the jurisdiction of the arbitral tribunal as a means of assisting the tribunal so that its award will be as effective as possible. Whenever there appears to be a genuine violation of the jurisdiction of the arbitrators to hear the merits of the dispute, the jurisdiction of the courts will be rejected.[153]

The issue of provisional and conservatory measures will also be examined at a later stage, in the context of our analysis of the conduct of the arbitral proceedings.[154]


## C. – REVIEW OF THE AWARD BY THE COURTS

**686.** — It is essential for the courts to exercise a minimum degree of control over the arbitral award. In order for the award to be enforceable in the same way as a court judgment,

---

[152] *See infra* paras. 742 *et seq.*

[153] See, however, on the issues raised by the French concept of *référé provision*, *infra* paras. 1339 *et seq.*

[154] *See infra* paras. 1302 *et seq.*

it must be the subject of an enforcement order, and it is hardly conceivable that an award could be rendered enforceable in a given country without some sort of review being exercised.[155]

687. — The only real policy question is whether the review of the award should take place in the jurisdiction where the arbitration has its seat, or in the jurisdictions where enforcement is sought, or in both.

As we shall see, not all legal systems deal with this question in the same way, with the general trend being to allow the courts to review arbitral awards in both the country of the seat of the arbitration and the country or countries where the award is to be enforced.[156]

688. — We shall discuss the review by the courts of arbitral awards in detail in Part Six below.[157] For present purposes, it is sufficient to note that the existence of such a review does not conflict with the jurisdiction of the arbitrators to hear the merits of disputes covered by the arbitration agreement. That would only be the case if the review of the award were to include a review of the merits. Most countries do not allow the courts reviewing the award to review the merits, as shown by the widespread ratification of the 1958 New York Convention, which specifically excludes such review by the courts.[158]

The existence of the review by the courts of arbitral awards, although limited in scope, is arguably one of the essential conditions for the development of arbitration. Indeed, review by the courts is the necessary counterpart of the inherently private nature of the arbitral process. In particular, it is the existence of subsequent court control which makes it acceptable for arbitrators to rule on their own jurisdiction[159] and for disputes involving matters of public policy to be arbitrable.[160] It is because the courts will review the arbitral award at a later stage that they can refrain from interfering with the conduct of the arbitration, no matter how serious the allegations may be as to irregularities affecting the proceedings.[161]

---

[155] On the specific position of ICSID arbitration, where the Contracting States of the 1965 Washington Convention undertook to recognize ICSID awards as decisions of their own courts subject only to the possible review by an *ad hoc* committee, see Articles 52 *et seq.* of the Washington Convention.

[156] See *infra* para. 1559.

[157] See *infra* paras. 1558 *et seq.*

[158] See *infra* paras. 1666 *et seq.*

[159] See *supra* para. 658.

[160] See *supra* paras. 532 *et seq.*

[161] See the examples cited *infra* para. 1169.

# CHOICE-OF-LAW PROBLEMS
# IN INTERNATIONAL COMMERCIAL
# ARBITRATION

by

HORACIO A. GRIGERA NAÓN

French law in connection with arbitral proceedings, or if it applied, which would be the conditions — under French law or any other national or a-national legal system or rules — to be fulfilled for it to become operative[25].

An Arbitral Tribunal sitting in Paris, France, and hearing an arbitration involving French and German parties was called to decide whether arbitral proceedings should be stayed "until a final determination is reached concerning the jurisdiction of the United States Federal Courts as to any or all of the (claims, counterclaims) or parties"[26]. The Respondent argued that because of the close connexity between both legal suits this would be a case of *lis alibi pendens*, and that the American courts should be given the opportunity to reach a final decision before the commencement of substantive proceedings before the arbitrators. The Arbitral Tribunal first indicated, without referring to any applicable law, that it considered that no *lis pendens* may exist between a State court and an Arbitral Tribunal, since such an exception would necessarily presuppose that two tribunals are equally competent, and by definition, a valid arbitral clause deprives State courts of any competence over the dispute subject to the clause. On the other hand, the Arbitral Tribunal indicated that

"it is admitted, by virtue of a general principle of international arbitration, which is embodied in article 1466 of the French New Code of Civil Procedure, and in the French case law, regarding international arbitration, that arbitrators are — under the control *a posteriori* of the Court of the seat of arbitration (which is Paris, in this dispute) — the only judges of their own competence. Moreover, the present arbitration is subject to the ICC arbitration rules, in application of the parties' common will, as well as of the Terms of Reference, and article 8 (3) of the said Rules provides that, when the Court of Arbitration of the ICC has been satisfied of the prima facie existence of an arbitral agreement any decision as to the arbitrator's jurisdiction shall be taken by the arbitrator itself. The Arbitral Tribunal must comply with this rule. It cannot delay its decision, under the pretext that there

---

25. Award of 1991 in ICC case 6223 (unpublished).
26. Partial Award of 1988 in ICC case 6000 (unpublished).

*H. A. Grigera Naón*

exists a similar or very close dispute pending before a for-
eign Court, so much the less that whatever the determination
reached by the Federal Courts of South Carolina, the Tribu-
nal would not and could not be bound by their decision.
Consequently, the requested stay, which is not only deprived
of any legal basis, but a source of useless delay, must be dis-
missed."

Among other issues, an Arbitral Tribunal sitting in France
and hearing a dispute involving French and Abu Dhabi parties
had also to decide if Claimant had waived the arbitration clause
by participating in administrative or court proceedings in the
Arab Emirates[27]. In two opportunities, Claimant filed applica-
tions with the administrative authorities of the Arab Emirates
aimed at obtaining the termination of the commercial agency
contract and the exclusion of the name of Respondents from
the registry of commercial agents. Claimant also participated in
court proceedings in the Arab Emirates to contest the jurisdic-
tion of the courts of the Arab Emirates to hear the dispute. Clai-
mant did not lodge an appeal against the decision rendered in
the course of such proceedings refusing to refer the dispute to
ICC arbitration. To decide this issue, the Arbitral Tribunal
referred both to arbitral practice (waiver of a right can only
clearly result from actions of the interested party) and French
law as revealed by French court decisions (waiver of an arbitra-
tion clause by participating in court proceedings only results
from pleading a case on the merits). On these bases, the Arbi-
tral Tribunal rejected Respondents' arguments that the arbitra-
tion agreement had been waived.

The jurisdiction of the Arbitral Tribunal may also depend on
whether the arbitration clause has been waived or whether there is a
*lis alibi pendens* situation which would prevent the Arbitral Tribunal
from hearing the case. Both situations may be closely related and
raise choice-of-law issues.

In the first case, the Arbitral Tribunal relies on French law — the
law of the place of the arbitration — to find whether the arbitration
clause had been waived. Implicitly — at least in connection with this
aspect — the Arbitral Tribunal seems to be of the view that the arbi-

---

27. Partial Award of 1998 in ICC case 8910 (unpublished).

RESOLUTION No. 1/2006

INTERNATIONAL COMMERCIAL ARBITRATION

The 72th Conference of the International Law Association held in Toronto, Canada, 4-8 June 2006:

**HAVING CONSIDERED** the Final Report on Res Judicata and Arbitration as well as the Report on Lis Pendens and Arbitration by the Committee on International Commercial Arbitration;

**RECOGNISING** the need for efficiency in conducting arbitral proceedings, the need for finality of arbitral awards and the role of party autonomy regarding arbitral proceedings;

**THANKS** the Chairman, the Rapporteur and the Members of the Committee for their work done in developing an understanding of the topic and its role;

**ADOPTS** the Recommendations annexed to this Resolution;

**COMMENDS** the Recommendations to arbitral tribunals, with a view to facilitate uniformity and consistency in the interpretation and application of provisions and principles concerning parallel proceedings and the conclusive and preclusive effects of prior arbitral awards;

**REQUESTS** the Committee and others to encourage the application of the Recommendations within the arbitral community; and

**RECOMMENDS** that the Executive Council renews the mandate of the Committee for a period of four years and to study and report on the topic of *iura novit curia* and issues related to the determination of the content of the applicable law in international commercial arbitration.

# RECOMMENDATIONS ON LIS PENDENS AND RES JUDICATA AND ARBITRATION

## ANNEX 1

## INTERNATIONAL LAW ASSOCIATION RECOMMENDATIONS ON LIS PENDENS AND ARBITRATION

### RECOMMENDATIONS

1. An arbitral tribunal that considers itself to be *prima facie* competent pursuant to the relevant arbitration agreement should, consistent with the principle of *competence-competence*, proceed with the arbitration ("Current Arbitration") and determine its own jurisdiction, regardless of any other proceedings pending before a national court or another arbitral tribunal in which the parties and one or more of the issues are the same or substantially the same as the ones before the arbitral tribunal in the Current Arbitration ("Parallel Proceedings"). Having determined that it has jurisdiction, the arbitral tribunal should proceed with the arbitration, subject to any successful setting aside application.

2. Nevertheless, in the interest of avoiding conflicting decisions, preventing costly duplication of proceedings or protecting parties from oppressive tactics, an arbitral tribunal requested by a party to decline jurisdiction or to stay the arbitration on the basis that there are Parallel Proceedings should decide in accordance with the principles set out in paragraphs 3., 4. and 5. below.

3. Where the Parallel Proceedings are pending before a court of the jurisdiction of the place of the arbitration, in deciding whether to proceed with the Current Arbitration, the arbitral tribunal should be mindful of the law of that jurisdiction, particularly having regard to the possibility of setting aside of the award in the event of conflict between the award and the decision of the court.

4. Where the Parallel Proceedings are pending before a court of a jurisdiction other than the jurisdiction of the place of the arbitration, consistent with the principles of *competence-competence*, the tribunal should proceed with the Current Arbitration and determine its own jurisdiction, unless the party initiating the arbitration has effectively waived its rights under the arbitration agreement or save in other exceptional circumstances.

2

5. Where the Parallel Proceedings have been commenced before the Current Arbitration and are pending before another arbitral tribunal, the arbitral tribunal should decline jurisdiction or stay the Current Arbitration, in whole or in part, and on such conditions as it sees fit, for such duration as it sees fit (such as until a relevant determination in the Parallel Proceedings), provided that it is not precluded from doing so under the applicable law and provided that it appears that:

5.1     the arbitral tribunal in the Parallel Proceedings has jurisdiction to resolve the issues in the Current Arbitration; and

5.2     there will be no material prejudice to the party opposing the request because of (i) an inadequacy of relief available in the Parallel Proceedings; (ii) a lack of due process in the Parallel Proceedings; (iii) a risk of annulment or non-recognition or non-enforcement of an award that has been or may be rendered in the Parallel Proceedings; or (iv) some other compelling reason.

6. Also, as a matter of sound case management, or to avoid conflicting decisions, to prevent costly duplication of proceedings or to protect a party from oppressive tactics, an arbitral tribunal requested by a party to stay temporarily the Current Arbitration, on such conditions as it sees fit, until the outcome, or partial or interim outcome, of any other pending proceedings (whether court, arbitration or supra-national proceedings), or any active dispute settlement process, may grant the request, whether or not the other proceedings or settlement process are between the same parties, relate to the same subject matter, or raise one or more of the same issues as the Current Arbitration, provided that the arbitral tribunal in the Current Arbitration is:

6.1     not precluded from doing so under the applicable law;

6.2     satisfied that the outcome of the other pending proceedings or settlement process is material to the outcome of the Current Arbitration; and

6.3     satisfied that there will be no material prejudice to the party opposing the stay.

7. The effects of Parallel Proceedings need not be raised on its own motion by an arbitral tribunal. If not waived, such effects should be raised as soon as possible by a party.

**ANNEX 2**
## INTERNATIONAL LAW ASSOCIATION RECOMMENDATIONS ON RES JUDICATA AND ARBITRATION

### RECOMMENDATIONS

1. To promote efficiency and finality of international commercial arbitration, arbitral awards should have conclusive and preclusive effects in further arbitral proceedings.

2. The conclusive and preclusive effects of arbitral awards in further arbitral proceedings set forth below need not necessarily be governed by national law and may be governed by transnational rules applicable to international commercial arbitration.

3. An arbitral award has conclusive and preclusive effects in further arbitral proceedings if:

   3.1   it has become final and binding in the country of origin and there is no impediment to recognition in the country of the place of the subsequent arbitration;

   3.2   it has decided on or disposed of a claim for relief which is sought or is being reargued in the further arbitration proceedings;

   3.3   it is based upon a cause of action which is invoked in the further arbitration proceedings or which forms the basis for the subsequent arbitral proceedings; and

   3.4   it has been rendered between the same parties.

4

4. An arbitral award has conclusive and preclusive effects in the further arbitral proceedings as to:

    4.1    determinations and relief contained in its dispositive part as well as in all reasoning necessary thereto;

    4.2    issues of fact or law which have actually been arbitrated and determined by it, provided any such determination was essential or fundamental to the dispositive part of the arbitral award.

5. An arbitral award has preclusive effects in the further arbitral proceedings as to a claim, cause of action or issue of fact or law, which could have been raised, but was not, in the proceedings resulting in that award, provided that the raising of any such new claim, cause of action or new issue of fact or law amounts to procedural unfairness or abuse.

6. The conclusive effects of an arbitral award can be invoked in further arbitration proceedings at any time permitted under the applicable procedure.

7. The preclusive effects of an arbitral award need not be raised on its own motion by an arbitral tribunal. If not waived, such preclusive effects should be raised as soon as possible by a party.

# Droit comparé de l'arbitrage international

par

### Jean-François Poudret
avocat, dr h.c. mult., professeur honoraire de l'Université de Lausanne

### Sébastien Besson
avocat, docteur en droit, LL.M. (Columbia)

BRUYLANT
BRUXELLES
2 0 0 2

L.G.D.J

Schulthess § 2002

5. Le contrôle de la compétence de l'arbitre

juge, sous réserve des exceptions prévues aux sect. 32 et 72. C'est donc l'ordre dans lequel la partie doit s'adresser à l'arbitre, puis au juge qui est désormais fixé. Le rapport explicatif attribue à cette solution le mérite d'éviter des procédés dilatoires[44]. Effectivement, la sect. 31 (4) laissant à l'arbitre, sauf convention contraire, le choix de trancher cette contestation par une décision séparée ou avec le fond, le bon déroulement de l'arbitrage n'en sera pas nécessairement affecté, avec le risque toutefois qu'en cas d'admission du recours, toute la procédure soit mise à néant. Mais, à la différence de l'art. 16 de la loi-type, cette règle n'est pas impérative, les parties pouvant convenir de l'écarter, notamment pour attribuer au juge la compétence exclusive de statuer sur ce point[45], comme par le passé. Il faut donc interpréter la convention d'arbitrage pour déterminer quelle a été la volonté des parties à cet égard[46]. A défaut d'intention contraire c'est le régime légal qui s'applique.

Selon celui-ci, la partie qui entend contester la compétence de l'arbitre dispose des cinq voies suivantes[47]:

– provoquer une décision de l'arbitre (sect. 31)[48] et recourir au besoin contre celle-ci (sect. 67 (1) (a));
– s'abstenir de procéder, attendre la sentence au fond, puis recourir (sect. 67 (1) (b));
– provoquer une décision préalable du juge sur la compétence de l'arbitre aux conditions exceptionnelles des sect. 32 ou 72;
– ouvrir action au fond devant le juge ordinaire et laisser à l'adversaire l'initiative de contester la compétence de ce juge par une exception d'arbitrage (sect. 9);
– s'opposer à l'exécution forcée de la sentence pour défaut de compétence (sect. 66).

C'est dire que toute action judiciaire directe au sujet de la compétence de l'arbitre n'a pas disparu en droit anglais, comme nous le verrons plus en détail au chapitre 5.3 ci-dessous.

465  En France, l'effet positif de la compétence de l'arbitre pour juger de sa propre compétence n'est expressément consacré que pour l'arbitrage interne. En effet, l'art. 1466 NCPC prévoit que «si, devant l'arbitre, une des parties conteste dans son principe ou son étendue le pouvoir juridictionnel de l'arbitre, il appartient à celui-ci de statuer sur la validité ou les limites de son investiture». Mais cette

---

[44]  DAC *Report* § 138.
[45]  HARRIS/PLANTEROSE/TECKS, p. 130–131 N. 30 A et C; RUTHERFORD/SIMS, p. 103 N. 30.6.
[46]  MERKIN, p. 75.
[47]  Cf. MUSTILL/BOYD (2001), p. 43 N. 7 et p. 301; RUSSELL, p. 200–201 N. 5.079; REDFERN/HUNTER, p. 273 N. 5-25 à 49; WOOLLETT, op. cit., p. 242.
[48]  Aux USA, selon l'arrêt de la Cour Suprême *First Options v. Kaplan*, le pouvoir de l'arbitre de statuer sur sa compétence et le contrôle corrélatif du juge dépendent essentiellement de la teneur de la clause (JALILI, op. cit., p. 176–177).

414

disposition, comme l'art. 1458 consacrant l'effet négatif, est applicable à l'arbitrage international lorsque celui-ci est soumis à la loi française, en vertu du renvoi de l'art. 1495. Il est même consacré par la jurisprudence, indépendamment de tout renvoi, comme une règle matérielle de l'arbitrage international[49]. Ainsi, dans son arrêt *Impex* de 1968, la Cour de Colmar affirme qu'il «est de principe que le juge saisi est compétent pour statuer sur sa propre compétence, ce qui implique nécessairement, lorsque le juge est un arbitre dont les pouvoirs tirent leur origine d'une convention des parties, la vérification de l'existence et de la validité de cette convention»[50]. Depuis lors, une jurisprudence constante affirme que l'arbitre international est compétent pour apprécier sa propre compétence, notamment quant à l'arbitrabilité du litige au regard de l'ordre public international[51]. Nous avons vu plus haut[52] que dans son récent arrêt *Zanzi*, la Cour de cassation a proclamé de manière tout à fait générale qu'il «appartient à l'arbitre de statuer sur sa propre compétence». C'est dire que ce principe ne souffre aucune discussion en droit français.

Dernière en date, la loi suédoise de 1999 consacre à son art. 2 un système hybride. En effet, comme le droit antérieur, elle reconnaît aux arbitres le pouvoir de statuer sur leur propre compétence, mais ajoute qu'une telle décision n'empêche pas les parties de requérir un jugement à ce sujet, ni les arbitres de poursuivre la procédure arbitrale. Ces règles apparamment contradictoires doivent être mises en relation avec la distinction opérée par l'art. 27 entre sentence et décision: si les parties requièrent les arbitres de statuer sur leur compétence, ils devront le faire par une sentence, qui peut faire l'objet d'un recours en annulation selon l'art. 34, réservé par l'art. 2, et jouit de l'autorité de la chose jugée; dans le cas contraire, les arbitres peuvent se prononcer par une simple décision, laquelle ne lie pas les parties et ne les empêche dès lors pas de provoquer une décision judiciaire[53].

Comme dans l'ancien droit anglais, le droit reconnu aux parties de provoquer en tout temps une décision judiciaire tend essentiellement à leur permettre de limiter les opérations et frais de l'arbitrage, ce qui suppose toutefois que le tribunal arbitral accepte de suspendre jusqu'à droit connu[54]. C'est dire que, moins encore que les Anglais, les Suédois ne sont entièrement convaincus des mérites du régime de la

466

---

[49] FOUCHARD/GAILLARD/GOLDMAN, N. 655.

[50] Rev. arb. 1968, p. 149, 155.

[51] Paris, Ganz, Rev. arb. 1991, p. 478, note IDOT; Paris, Labinal, Rev. arb. 1993, p. 645, note JARROSSON; Cass, Coprodag, Rev. arb. 1995, p. 617, note GAILLARD; Paris, Matra, Rev. arb. 1996, p. 87, note COHEN, et V2000, p. 245 (numéroté par erreur 67), note JARROSSON; Paris, Chambon, Rev. arb. 1999, p. 121, note BUREAU.

[52] Cf. N. 459, n. 19.

[53] Cf. JARVIN, p. 62–63 N. 2.

[54] Sur le nouveau droit, cf. J. RAMBERG, *The Arbitration Agreement*, Stockholm Arbitration Report 1999/1, p. 23–32, spéc. 31.

5.   Le contrôle de la compétence de l'arbitre

compétence-compétence. Cela nous semble dû pour une bonne part au fait que les uns et les autres ne considèrent pas que la contestation de la compétence de arbitres est en règle générale une procédure dilatoire qui s'avérera infondée au terme de l'arbitrage!

467   Ajoutons que les principaux règlements des institutions d'arbitrage reconnaissent également à l'arbitre le pouvoir de statuer sur sa compétence (cf. art. 6.2 R. CCI 23.1 R. LCIA, 15.1 R. AAA; 21 R. CIRDI; 2.3 R. CCZH). Le premier et le dernier des règlements cités prévoient toutefois un contrôle préalable par l'institution dont nous traiterons au chap. 5.1.3. A l'instar de plusieurs lois et règlements mentionnés ci-dessus, l'art. 21 R. CNUDCI consacre à la fois ce pouvoir de l'arbitre et, à son al. 2, l'autonomie de la convention d'arbitrage. Il importe toutefois de souligner que cette consécration dans les règlements d'arbitrage institutionnel ou de la CNUDCI ne saurait imposer ce régime dans la mesure où il est exclu par le droit impératif du siège[56]. Nous avons signalé plus haut que la jurisprudence anglaise n'en avait pas moins tenu compte pour habiliter l'arbitre CCI à statuer lui-même sur sa compétence à une époque où telle n'était pas encore la règle en droit anglais.

### 5.1.3 L'examen préalable de la compétence par l'institution d'arbitrage ou le juge d'appui

468   L'intervention d'une institution d'arbitrage ou du juge d'appui peut être subordonnée à un examen *prima facie* de l'existence d'une convention d'arbitrage liant les parties et portant sur l'objet du litige, mais sans que cet examen préjuge la décision que le tribunal arbitral, s'il est constitué, pourra rendre sur sa propre compétence. C'est dire que cet examen ne porte pas atteinte au pouvoir de l'arbitre étudié ici. Commençons par les institutions d'arbitrage. Il est légitime que celles-ci n'acceptent d'administrer un arbitrage et, en premier lieu, de constituer un tribunal que s'il y a au moins l'apparence d'un accord entre les parties soumettant leur litige à une telle institution. L'exemple le plus connu est la procédure d'examen préalable prévue par l'art. 6.2 – précédemment 7 et 8.3 – R. CCI[57]. En cas de contestation ou d'abstention du défendeur, «la Cour peut décider, sans préjuger la recevabilité ou le bien-fondé de ce ou ces moyens, que l'arbitrage aura lieu si *prima facie,* elle estime possible l'existence d'une convention d'arbitrage visant le règlement. Dans ce cas, il appartiendra au tribunal arbitral de prendre toute décision sur sa propre compétence». En bref, il s'agit d'un examen facultatif, qui ne peut

---

[56]   Cf. sur la jurisprudence arbitrale rendue en application de cette règle, CRAIG/PARK/PAULSSON, p. 163–167 § 11-03.

[56a]  FOUCHARD/GAILLARD/GOLDMAN, N. 656.

[57]   Sur cette procédure, cf. CRAIG/PARK/PAULSSON, p. 155–161 § 11-01 et 2; DERAINS/SCHWARTZ, p. 79–102; REDFERN/HUNTER, p. 265–266 N. 5-34.

416

White & Case Translation

December 13, 2006

Poudret and Besson, *Droit comparé de l'arbitrage international* (2002), para. 465.

The relevant sentence is (in French):

*En France, l'effet positif de la compétence de l'arbitre pour juger de sa propre compétence n'est expressément consacré que pour l'arbitrage interne. En effet, l'art. 1466 NCPC prévoit qu « si, devant l'arbitre, une des parties conteste dans son principe ou son étendue le pouvoir juridictionnel de l'arbitre, il appartient à celui-ci de statuer sur la validité ou les limites de son investiture ». Mais cette disposition, comme l'art 1458 consacrant l'effet négatif, est applicable à l'arbitrage internationale lorsque celui-ci est soumis à la loi française, en vertu du renvoi de l'art. 1495. Il est même consacré par la jurisprudence, indépendamment de tout renvoi, comme une règle matérielle de l'arbitrage international.*

[Translation:

"In France, the positive effect of the power of the arbitrator to rule on his own jurisdiction is expressly consecrated only for domestic arbitration. In effect, art. 1466 NCPC provides that "if, before the arbitrator, one of the parties challenges the basis or scope of the arbitrator's jurisdiction, the arbitrator shall rule on the validity or scope of his or her jurisdiction". But this provision, like art. 1458 which consecrates the negative effect, is applicable to international arbitration when it is submitted to French law by virtue of the reference contained in art. 1495. [The positive effect of the competence-competence principle] is even consecrated by case law, independent of any conflicts of law rules, as a substantive rule of international arbitration."]

# EXHIBIT 3

WHITE & CASE

White & Case LLP
Avocats au Barreau de Paris
Toque Générale : J 002
11, Boulevard de la Madeleine
75001 Paris

Tel  + 33 1 55 04 15 15
Fax  + 33 1 55 04 15 16
www.whitecase.com

Direct Dial + 33 1 55 04 15 45     cseppala@whitecase.com

March 8, 2007

## VIA E-MAIL and FACSIMILE

Professor Bernard Hanotiau
Chairman of the Tribunal
Hanotiau & van den Berg
IT Tower
480 Avenue Louise – Box 9
B-1050 Brussels
Belgium

Via facsimile: +32 2 290 39 39

Eric A. Schwartz, Esq.
Arbitrator
LeBoeuf, Lamb, Greene & MacRae LLP
130 rue du Faubourg St. Honoré
75008 Paris
France

Via facsimile: +33 1 42 56 08 06

The Honorable Charles B. Renfrew
Arbitrator
710 Sansome Street
San Francisco, CA 94111-1704
U.S.A.

Via facsimile: +1 415 397 7188
(via facsimile only)

Re:  ICC Case No. 14208/EC (C-14236/EC)

Dear Sirs:

At the procedural hearing held in Paris on December 18, 2006, the Tribunal and the parties discussed the litigation initiated by URS before the United States District Court for the District of Delaware (the "**Delaware Litigation**") in parallel to these arbitral proceedings. Indeed, the existence of the Delaware Litigation is recorded in the Terms of Reference dated December 18, 2006 (*see*, *e.g.*, paragraphs 5-7; paragraph 33, item 3.3 (page 18); paragraph 36; paragraph 38).

Since the hearing on December 18, 2006, the discovery phase in the Delaware Litigation has taken place, which ended on February 15, 2007. Regrettably, the Delaware

ALMATY  ANKARA  BANGKOK  BEIJING  BERLIN  BRATISLAVA  BRUSSELS  BUDAPEST  DRESDEN  DÜSSELDORF  FRANKFURT  HAMBURG
HELSINKI  HONG KONG  ISTANBUL  JOHANNESBURG  LONDON  LOS ANGELES  MEXICO CITY  MIAMI  MILAN  MOSCOW  MUNICH
NEW YORK  PALO ALTO  PARIS  PRAGUE  RIYADH  SÃO PAULO  SHANGHAI  SINGAPORE  STOCKHOLM  TOKYO  WARSAW  WASHINGTON, DC

PARIS 1166791 (2K)

March 8, 2007

Litigation generally, and its discovery phase in particular, has caused SOLIDERE to incur substantial legal fees and costs, including the need to arrange for the review of <u>over 270,000 pages</u> of documents disclosed by URS. Save exceptional circumstances, which do not apply in the present case, such fees and costs are not recoverable in Delaware litigation.

Pursuant to the Terms of Reference in this arbitration:

> "SOLIDERE reserves the right generally to amend and/or supplement [its requests for relief], including, among other things, to request other relief, including damages, as SOLIDERE may consider necessary or appropriate to enforce and/or defend its rights." (*See* Terms of Reference, paragraph 37.)

And:

> "The issues to be determined by the Arbitral Tribunal shall be those resulting from the Parties' submissions, <u>including forthcoming submissions,</u> and which are relevant to the adjudication of the Parties' respective claims and defences." [Emphasis added.] (*See* Terms of Reference, paragraph 40.)

In accordance with these provisions of the Terms of Reference, and in light of the developments in the Delaware Litigation referred to above, SOLIDERE wishes to amend its requests for relief in this arbitration by respectfully asking that the Tribunal adjudicate the following requests:

That the Tribunal:

(a)     declare that, by requesting the United States District Court for the District of Delaware to enjoin SOLIDERE from pursuing these arbitration proceedings, URS has breached the arbitration clause contained in the Contract;

(b)     order URS to compensate SOLIDERE for all damage suffered as a consequence of the breach referred to in item (a) above, including, but not limited to, legal fees and expenses and fees and expenses of experts, consultants and others, incurred by SOLIDERE in connection with the litigation brought by URS before the United States District Court for the District of Delaware.

SOLIDERE submits that these requests for relief fall within the limits of the Terms of Reference and do not constitute "new claims" requiring authorization by the Arbitral Tribunal pursuant to Article 19 of the ICC Rules. Indeed, the Terms of Reference already include a claim by SOLIDERE for payment of all costs incurred "in connection with the preparation

2

Professor Bernard Hanotiau, Eric A. Schwartz, Esq., The Honorable Charles B. Renfrew

WHITE & CASE

March 8, 2007

for and conduct of these proceedings" (*see* Terms of Reference, paragraph 37, item (viii)). In addition, as noted above, the Terms of Reference expressly refer to the Delaware Litigation and include a reservation by SOLIDERE of "the right generally to amend and/or supplement [its requests for relief], including, among other things, to request other relief, including damages, as SOLIDERE may consider necessary or appropriate to enforce and/or defend its rights" (*see* Terms of Reference, paragraph 37).

Alternatively, should the Tribunal consider that the above requests for relief constitute "new claims or counterclaims which fall outside the limits of the Terms of Reference" within the meaning of Article 19 of the ICC Rules, SOLIDERE respectfully requests the Tribunal's authorization to make these claims. The arbitration is still at an early stage. The Terms of Reference were signed less than three months ago. The proceedings have been bifurcated. The first memorial is not due until five weeks from now and URS will not be prejudiced in any way, because URS will have the opportunity to address these requests for relief in its memorials, in the same way as if these requests for relief had been expressly stated in the Terms of Reference.

We have consulted with counsel for URS in order to seek URS's consent to the above. URS's counsel has responded that they think the costs associated with the Delaware Litigation, including document production, can be recovered if at all in the Delaware Litigation. SOLIDERE is therefore raising this matter for the Tribunal's consideration.

Very truly yours,

Christopher R. Seppälä

Cc:  Jeffrey H. Dasteel, Jason D. Russell, and    (Via facsimile: +1 213 621 5206)
      Marina V. Bogorad, Esqs.
      Skadden, Arps, Slate, Meagher & Flom LLP
      300 South Grand Avenue, Suite 3400
      Los Angeles, California 90071-3144
      U.S.A.

      Karyl Nairn and Noradele Ghubril, Esqs.    (Via facsimile: +44 20 75 19 7070)
      Skadden, Arps, Slate, Meagher & Flom LLP
      40 Bank Street
      Canary Wharf
      London E14 5DS
      United Kingdom

PARIS 1168791 (2K)

Professor Bernard Hanotiau, Eric A. Schwartz, Esq., The Honorable Charles B. Renfrew

WHITE & CASE

March 8, 2007


Mr. Eliseo Castineira                              (Via facsimile: +33 1 49 53 57 75)
Counsel
Ms. Lara Hammoud
Assistant Counsel
Secretariat of the International Court of Arbitration
International Chamber of Commerce
38, Cours Albert 1er
75008 Paris
France

Dr. Ghaleb Mahmassani                              (Via facsimile: +961 1 348 712)
General Counsel
SOLIDERE
Serhal Building
Cairo Street -- Hamra
Beirut
Lebanon


4.

EXHIBIT 4
Part 1



**Auracom**
INTERNATIONAL INC.

*Multilingual Communication Solutions*

# Certificate of Accuracy

## State of New Jersey

## County of Essex

This is to certify that the attached translation(s) of:

Ruling of the Commercial Court of Cass. January 19, 1979
ICC Arbitral Award: Case n° 2138 in 1974
ICC Arbitral Award: Case n° 5721 in 1990

was done by an experienced translator who produced, to the best of his (her) knowledge, ability and belief, a true and accurate translation from <u>French</u> into <u>English</u>. **Copies of the originals and of their translations must NOT be detached from this Certificate.**

**Matt Lulofs, Project Manager for Auracom International, Inc.**

Sworn before me this _10th_ day of _March_, 200 7.

**Notary public**

**Kenneth Olin**
**Notary Public of New Jersey**
**ID #2265205**
**My Commission Expires October 5, 2010**



307 Radel Terrace, Suite 101
South Orange, NJ 07079 USA

www.auratrans.com
USA • CANADA

V: 973•378•5845
F: 973•378•8763

Case No. 1

Ruling of the Commercial Court of Cass. January 19, 1979

FRENCH JURISPRUDENCE

**COURT OF CASSATION** (Commercial Chamber)
*January 9, 1979 (2 rulings)*

Robert JUILLARD and others v. ROY and others

DECISION. - OPPOSABILITY BY THIRD PARITES (NO) -- COMPANY –
PARTICIPATION OF MAJORITY SHAREHOLDERS AND MANAGEMENT IN THE
PROCEEDINGS – COMPANY REPRESENTATION (NO).

APPEAL. - APPEAL-NULLITY – COMPANY NOT A PARTY TO THE DECISION --
APPEAL INADMISSABLE - VOLUNTARY INTERVENTION – ADMISSABILITY –
NULLIFICATION OF THE DECISION IN RESPECT THEREOF.

DECISION. – AUTHORITY OF RES JUDICATA. – DECISION ENACTING
INTERIM PROVISIONS. – VIOLATION (NO).

COMPANY.- SHAREHOLDER MEETING. – POWERS. – DECISION DISPOSING
ASSETS AND LIABILITIES OF THE COMPANY. -- NULLIFICATION.

*With respect to an agreement by which the owners of almost all of the shares of three*
*public companies had agreed to a distribution in kind of elements comprising the asset*
*base of these companies, then to an arbitration award involving the parties to this*
*agreement, deciding particularly that a building belonging to one company would be*
*allocated in full ownership to another, the Court of Appeals was able to decide that such*
*a distribution, in the absence of opposition by a third party, could not allow the eviction*
*of this company (1ˢᵗ ruling).*
    *The Court of Appeals did not contradict itself in ruling both that a company was*
*not admissible in appealing an arbitration award to which it had not been a party and*
*that it was permitted to appear before the Court to have said award nullified to the extent*
*that its interests might have been adversely affected by the arbitrators' decision. In*
*holding that the decision led to a settlement of accounts between the companies,*
*allocated to certain shareholders the assets and liabilities of one of the companies and*
*made the latter responsible for the payment of a large sum to another, the Court of*
*Appeals was able to nullify with respect to the intervening company a decision that*
*violated the mandates of the shareholder's meeting (2ⁿᵈ ruling).*
    *The Court of Appeals violates Article 1351 of the Civil Code by nullifying an*
*arbitration award on the grounds that the award had not respected the authority of res*
*judicata attached to a preceding decision, while the decision thus nullified was restricted*
*to rendering definitive the interim provisions of the former (2ⁿᵈ ruling).*

### *FIRST RULING*

The Court,

    *On the sole argument, taken in its various elements:*
Whereas, according to the findings of the contested ruling ((Riom, July 6, 1976),
Robert Juillard, on the one hand, Rene Roy and Janine Venet, on the other hand, owners

FRENCH JURISPRUDENCE

of almost all of the shares of three public companies: Entreprise Electrique, Constructions Industrielles Métalliques et Electriques (C.I.M.E.C.) and Société Nouvelle de Travaux et d'Installations Electriques (S.N.T.I.E.) agreed on July 26, 1969 to carry out a distribution in kind of elements constituting the asset base of these companies, according to a new distribution, among each of the interested parties acting in their capacity as individuals, of their commercial activities; whereas an arbitration decision, made on January 5, 1970 between the parties of this agreement, decided particularly that an administrative building would be allocated in full ownership to Entreprise Electrique, after release by C.I.M.E.C. and that "each of the parties would have a period of eight months to permanently release the buildings allocated to the other party, such time period to start on the date of receipt of the construction permit for the new buildings where C.I.M.E.C. must move its operations, etc."; whereas Juillard, on the basis of this decision, acting both as an individual and in his capacity as President and Chief Executive Officer of Entreprise Electrique, brought action against Roy, acting personally and as President and Chief Executive Officer of C.I.M.E.C., for the eviction of the building mentioned above; whereas the request was nonsuited;

Whereas, complaint is made against the decision for having so ruled, while, according to the appeal, on the one hand, had not raised the grounds of C.I.M.E.C.'s lack of representation at the arbitration decision to which the Court of Appeals was bound by the qualifications and the points of law to which the parties had limited the debate; whereas, it was not upon the grounds of pure law, that the Court could not act on its own motion, while, in addition, C.I.M.E.C. was represented by it Chief Executive Officer in the arbitration agreement and compromise, Roy having acted in the two instances as President of C.I.M.E.C., with a view to redistributing between the companies their activities and goods, and that, while the option allowed the companies, by Article 5 of the agreement, to continue to occupy the premises which they were using, this having been granted only due to the short time period that had been envisaged for the effective completion of the distribution – time period that had not been respected – the parties were within their rights to adapt their agreement to the new circumstances to modify the time period in which the companies must have use of the buildings that were intended for them, and that the arbitrators in execution of their mission had decided not only on the attribution of the buildings but the time period within which the companies would have to take possession thereof; and, while, on the other hand, the ruling then refused the eviction on the grounds that C.I.M.E.C. had not obtained the building permit which, according to the arbitration decision, marked the beginning of the eight-month time period provided for Entreprise Electrique to take possession of the building, while C.I.M.E.C. had obtained a building permit on October 30, 1973, and that the eight-month time period had already long expired;

But whereas, in the first place, the Court of Appeals in adopting the grounds for judgment that had decided that the distribution claimed by Juillard could not, in the absence of third party opposition, permit the eviction of C.I.M.E.C., judgment of which Roy requested confirmation, did not exceed the limits of litigation; that it did not moreover in so ruling misconstrue the agreement dated July 26, 1969 and the arbitration decision dated January 5, 1970;

(1979)

FRENCH JURISPRUDENCE

Whereas, in the second place, it is by sovereign assessment of the facts submitted for its examination, that the Court of Appeals held that the building permit obtained by C.I.M.E.C. had no bearing on the premises addressed in the arbitration decision;

From which it follows that the argument is not founded in any of its elements.

ON THESE GROUNDS:

Rejects the appeal made against the ruling dated July 6, 1976 by the Riom Court of Appeals;

Messrs. Vienne, presiding; Fautz, reporter; Toubas, general counsel; Goutet and S.C.P. Lyon-Chen, Fabiani and Liard, counsel.

## [5 BARRED PARAGRAPHS

*Second Ruling*]

The Court.

*On the sole argument, taken in its two elements*

Whereas, the particulars of the ruling referred for hearing dated May 5, 1975, preceded by a decision dated February 2, 1972, called "interim", was involved in a litigation proceeding between Robert Juillard, on the one hand, and Réné Roy and Mrs. Venet, on the other hand, being the holders of most of the shares of three public companies, namely Entreprise Electrique, Société Nouvelle de Travaux et d'Installations Electriques (S.N.T.I.E.) and Constructions Industrielles Métalliques et Electriques (C.I.M.E.C.), having agreed on July 26, 1969 to carry out a distribution in kind of the assets and liabilities of these companies, according to a new distribution among the parties, of their commercial activities; whereas the May 4, 1975 decision having been referred to the Court of Appeals for hearing by Roy-Venet et al, was overturned to the extent that it adversely effected the interests of C.I.M.E.C., intervening party;

Whereas, the Court of Appeals was criticized for having overturned the decision with respect to C.I.M.E.C., while deciding that C.I.M.E.C. could not have a decision pronounced null to which it was not a party, on the grounds that the arbitrators had proceeded to a settlement of the accounts between the companies and distributed the assets and liabilities of the companies in violation of the mandates of the shareholder meeting of each of them, then, according to the appeal, on the one hand, that the Court of Appeals could not without contradiction pronounce to the benefit of C.I.M.E.C. a reversal that it refused it the right to claim, and then, on the other hand, that the decision did not lead to any settlement of accounts or to any transfer of property, the final distribution having to be the result of the decisions of the shareholder meetings in which the members had agreed to vote in accordance with the decision;

FRENCH JURISPRUDENCE

But whereas, on the one hand, the Court of Appeals did not contradict itself in deciding that C.I.M.E.C. was not admissible in instituting an appeal of a decision to which it had not been a party, and, in judging that it was admissible in its participation, to the extent that its interests may have been adversely affected by the arbitrator's decision;

Whereas, on the other hand, the ruling notes exactly that the decision made initiated the settlement of accounts among the companies, allocated to Roy-Venet et al certain assets and liabilities of C.I.M.E.C. and made the latter company responsible for payment of a large sum to Entreprise Electrique;

From which it follows that in its two first elements, the argument is without foundation;

*But on the third element of the argument:*
In view of Article 1351 of the Civil Code;
Whereas, the May 5, 1975 arbitration decision was still overturned for not having respected the authority of res judicata that it attached to the February 2, 1972 decision; whereas that in so ruling while the May 5, 1975 decision is restricted to rendering definitive the interim provisions of the 1972 decision, the Court of Appeals violated the above-mentioned text.

ON THESE GROUNDS:

Quashes and nullifies, but only within the limits of the third element of the argument, the ruling rendered between the parties on July 6, 1976 by the Riom Court of Appeals; remands them to the Limoges Court of Appeals.

Messrs. Vienne, presiding; Fautz, reporter; Toubas, general counsel; Goutet and S.C.P. Lyon-Chen, Fabiani and Liard, counsel.

**END OF BARRED PARAGRAPHS]**

NOTE. – I. The reversal pronounced on the third element of the argument by the second reported appeal, bears upon the question, more theoretical than practical, of *the authority of res judicata* of the arbitration decision. But it is doubtful that it provides a decisive contribution. Certainly, one notes that the Supreme Court does not hesitate to cite Article 1351 of the Civil Code and to apply it to arbitration decisions. And it does not directly criticize the Court of Appeals for having invoked the authority of res judicata in a decision rendered between the same parties on February 2, 1972 to annul the one that followed on May 5, 1975; it observes only in the present case, that the two decisions were not contradictory, the second being "restricted to rendering definitive the interim provisions of the 1972 decision." The interim character of the first decision, as much as the non-contradiction of the two decisions, thus made it possible to set aside both the argument of the authority of res judicata and that of the violation of this authority.

On the basis of the question, one knows that the doctrine is generally favorable to the recognition of the authority of res judicata by arbitrators, as much because their

(1979)

FRENCH JURISPRUDENCE

decision is by nature jurisdictional as because the transaction, a purely private work of the parties themselves, lends itself to this authority (Motulsky, note to J.C.P., 1961.II.12204; J. Rubellin-Devichi, *L'arbitrage – Nature juridique*, n° 515, et seq; J. Robert. *Arbitrage civil et commerciale*, n° 222, and *Encycl. Dalloz Proc. Civ*, see Arbitrage, n° 348 et seq). The Court of Cassation, for its part, had affirmed (Com., December 22, 1959, *Rev. arb.*, 1960.16 D., 1960.685, note Robert) that only the order of exequatur gave the decision the authority of res judicata – but it did not censure (Civ. 2°, June 7, 1972; *Rev. arb.*, 1974.91 note Loquin, D., 1973.73, note Robert, *Rev. trim. dr. civ.*, 1973.389, observ. Hébraud) a Paris Court ruling (July 6, 1971 *Rev. arb.*, 1971.119, note Robert, J.C.P. 1971.II.16993, note Level) that had ruled that the decision had, once pronounced, the authority of res judicata and could therefore, henceforth, be under appeal. All the commentators saw in the June 7, 1972 ruling an important step towards recognizing the authority of res judicata to the benefit of arbitration decisions. The January 9, 1979 ruling perhaps constitutes additional progress in this direction. This would be the policy of small steps…

II. The contribution made by the above two rulings (of which only the second was published in the *Bull. Civ.*, IV, n° 11, p. 10) to the *relationships between arbitrage and corporate law* is not, by itself, much more significant. The rulings, in effect, do not formulate in this respect any new propositions. But the case examined and the grounds for the Riom Court of Appeals rulings (upheld on this point) and of the Court of Cassation allow one to recall and to clarify certain principles that the parties had forgotten.

The facts, relatively complex, and insufficiently explained in the above rulings, were as follows. Three shareholders, Messrs. Juillard and Roy and Mrs. Venet, are, each, owners of almost all of the shares of three public companies: Entreprise Electrique, Constructions Industrielles Métalliques et Electriques (C.I.M.E.C.) and Société Nouvelle de Travaux et d'Installations Electriques (S.N.T.I.E.). They agree by agreement dated July 26, 1969, to carry out a distribution in kind of the asset base of these companies, according to a new distribution of their commercial activities among each of the interested parties acting individually. A first arbitration decision was reached on January 5, 1972 between these three persons. It determined that an administrative building, belonging up until that point to C.I.M.E.C., would be allocated, after release by C.I.M.E.C., in full ownership to "Entreprise Electrique". What follows is more confusing. On February 2, 1972, another "interim" decision was rendered; its provisions were rendered definitive by a third decision dated May 5, 1975. This latter initiated a settlement of accounts between the three companies, and distributed the assets and liabilities of the companies; in particular, it allocated to Mr. Roy and Mrs. Venet certain assets and liabilities of C.I.M.E.C. and made that company responsible for payment of a large sum to Entreprise Electrique.

The execution of these decisions gave rise to two series of difficulties, and therefore to legal proceedings. First, in basing himself on the first decision, Mr. Juillard, acting both in his own name and in his capacity of President and Chief Executive Officer of Entreprise Electrique, brought action against Mr. Roy, acting personally and as President and Chief Executive Officer of C.I.M.E.C., for the eviction of the building mentioned

(1979)

FRENCH JURISPRUDENCE

above. It was nonsuited by the Riom Court of Appeals on July 6, 1976, and his appeal rejected by the Court of Cassation in its first ruling dated January 9, 1979. Secondly, Mr. Roy and Mrs. Venet submitted the third ruling for hearing by the same Count of Appeals; this was overturned by a second ruling dated July 6, 1976, partially quashed by the second elaborated ruling. But this cassation concerned only one of the grounds for overturning the decision, its alleged misconstruction of the authority of res judicata of the second decision: one has seen on this point, the Court of Cassation had censured the Riom Court; however it approves its having overturned the third decision "to the particular extent that it adversely effected the interests of C.I.M.E.C.".

The Court of Cassation, itself, examined only the manifestations and procedural consequences of this effect (A), but it also touched upon the basis of corporate law, that is to say on the violation of the operating rules of a public company, as the second ruling of the Riom Court remarked (B).

A)  The three physical persons that had signed the 1969 agreement and the arbitral compromise, and then participated in the arbitration process, simply had forgotten that the three companies, of which they were the almost exclusive shareholders and respective managers, were endowed with their own corporate status, and sole owners of the goods constituting the asset base of the company.

In particular concerning C.I.M.E.C., the fact that its President and Chief Executive Officer, Roy, had participated in the agreement, the compromise and in the arbitration proceedings did not suffice as representation of the company. Not because he did not have the power to do so: one knows that today the President and Chief Executive Officer can submit to arbitration in the name of a public company and represent it in an arbitration action without special empowerment (cf. P. Level *Juris-clas, Proc. Civ. Art.* 1003-1028, fasc. IV. 4° cah., n° 31 to 36; *adde* Paris, February 12, 1963, J.C.P., 1963.II.13281, note, Level; S., 1963.II.176, note Autesserre; *Rev. trim. dr. com.,* 1963.332, obs. Houin; Paris, May 7, 1963, *Rev. arb.,* 1963.138), for those are acts of current and daily management (cf. Brière de l'Isle, *Encycl. Dalloz Sociétés,* V, President and Chief Executive Officer, n° 92 and 93). But, because in this case, Roy had not acted as legal representative (or tacit agent) of the company: the trial judges ruled in effect using their discretion  (and the Court of Cassation considered that in so doing they did not misconstrue either the agreements or the decision) that Roy had acted in his individual capacity. Just as his contracting parties, he had considered himself direct owner of the property of the company that he managed and of which he owned, with them, almost all of the shares of stock.

Consequently, the solution that the Court of Cassation approves in its first ruling was obvious: C.I.M.E.C., not represented in the arbitration, was a third party to the decision that required it to vacate the building that it occupied and whose ownership of which had been transferred to Entreprise Electrique was not evidenced against it. And it could not be evicted from said building on the basis of this one decision.

(1979)

FRENCH JURISPRUDENCE

The company's procedural situation was a little less clear for the second and third decisions; certainly, it was no longer represented by its President and Chief Executive Officer, who had continued to act in an individual capacity; but, who, discovering a bit late that he had the legal power and responsibility to represent C.I.M.E.C. and to defend its interests, appealed the 1975 decision, in the name of the company, and, no doubt also in his individual capacity. It concerned a motion to quash.

The Riom Court, in its second decision, ruled that it was not admissible for C.I.M.E.C. to appeal a decision to which it was not a party, and that it could not therefore declare the decision to be null. This was the application of a classic rule of civil procedure. But the company appeared in the appeal procedure by means of an intervention (voluntary) and this intervention, according to equally well known principles (articles 325 and 329 of the new code of civil procedure), was admissible if its author proved its right to act concerning its claim; this was exactly the case in this instance, and the Riom Court, upheld by the Court of Cassation, ruled that the company could claim that its interests had been adversely effected by this decision. And it decided to nullify the ruling "with respect to said company". The method was perhaps clumsy, and offered the author of the appeal the appearance of an argument of contradictory reasons for judgment, since the Court of Appeals declared "to the benefit of C.I.M.E.C. a reversal that it had refused to allow it to ask for." The Court of Cassation, properly, did not quash this claim; it underlined the distinction between the appeal pure and simple, inadmissible by a third party, and the intervention, to the contrary, admissible, and insisted on its real scope, limited to the aspects of the decision adversely affecting the interests of the intervening party. Perhaps it would have been more worthwhile here to discuss the non-opposability of the decision by the company. But, perhaps, it was also unnecessary to affirm this non-opposability, because it is self-evident and because the company had the possibility of later resisting – one saw this easily in the first decision – any personal execution of a decision that was "foreign" to it.

  B) Beyond these hardly contestable procedural solutions, the matter examined here basically raised important questions dealing with the relationship that can exist between arbitration and the operation of corporations. These have not been addressed by the Court of Cassation, even though, in the second paragraph of the second ruling, the presentation of the argument echoed them.

By the agreement to distribute the assets of their companies and by the decisions rendered as a result of this agreement, the business associates and the arbitrators were in reality acting as substitutes for the legal bodies of these companies. Only the extraordinary meeting of shareholders can decide to carry out the partial transfer of assets, to liquidate or to redistribute ownership and activities. Their respective Boards of Directors were competent, on their side, to prepare these agreements and to submit them for approval to the shareholder meetings. But the majority shareholders, acting in their individual capacities, have no competence to decide such matters and could not moreover allocate this competence to arbitrators. The organization of the public company, the hierarchy of its bodies, the distribution of powers between them are regulated by law, of which most of the provisions in this matter present a character of

FRENCH JURISPRUDENCE

public policy. Litigation - if there was any – was not, in this case, arbitrable; only the companies themselves, duly represented, would have been able, after having exercised their own competencies for the redistribution of their activities, in accordance with the law of 1966, to submit to arbitration the difficulties of executing their decisions: but the companies must have been empowered within each of them by their competent bodies. It does seem that the process was reversed in this case: the decisions were made either by direct agreement between primary business associates, or by the arbitrators to whose care they had entrusted the reorganization of the three companies, and to distribute, as a result, their assets and liabilities. Litigation ensued when one of them became aware that he was responsible for representing and defending the interests of his company.

Undoubtedly, it is not exceptional, in practice, that arbitrage plays a certain role in concentrative operations and relations between companies. Recourse to a third party or to a council of managers of the companies involved that will rule discretely and with flexibility to the difficulties that may arise between them for a more or less long time, is a form of these new "contractual regulations" for which arbitrage today renders a service. With respect to corporations, however, the practitioners must take care, for very quickly, if a real dispute arises, the violation of the rules of corporate operations will be invoked.

It was, particularly in France, in the case of the creation of jointly-owned subsidiary companies, on the occasion of which the "protocols" concluded between the parent companies organized the mechanisms of decision making and control intended to maintain the agreed upon balance. This was the Marine-Schneider matter in which the courts had to recall that the rules relating to the operation of corporate organs were public policy (Trib. gr. Inst. Paris, March 13, 1974, *Rev. arb.*,1976.48, note Goldman; *Gaz. Pal.*, 1974.II.525, note Delaisi; *Rev. soc.*, 1974.685, note Oppetit; Trib. com. Paris, August 1, 1974. *Rev. soc.*, 1974.685, note Oppetit). The doctrine, for its part, maintains that such agreements "adversely effect the legal structure of the pubic company" (F. Goré, "Jointly-owned subsidiaries and French corporate law", report to the February 1975 Paris Colloquium, in *La filiale commune*, Lib. Tech., 1975, p.20 et seq, spec. p. 27; A. Benoit-Moury and D. Malray, "Arbitrage and corporate law", *Rev. arb.*, 1978.130, spec. p. 145).

In this case, to attempt to "save" the 1975 decision, the author of the appeal invoked one last argument: there could not have been, according to him, "violation of the powers of the shareholder meetings of each" of the companies, because "the decision had not led to any settlement of accounts and to any transfer of property, the final distribution having to result from the decisions of shareholder meetings in which the business associates committed to vote in accordance with the decision" (second ruling, second paragraph). Supposing that this presentation of the facts is accurate, it is doubtful that the agreements and decisions at issue were thereby reinforced. The commitments or agreements to vote are in effect often considered null by doctrine and jurisprudence (Dalsace, *Encyc. Dalloz Sociétés*, V, Shareholder meetings, n° 249 et seq, Com. May 8 , 1963 J.C.P., 1963.II.13282, note J.R.), and can even be

FRENCH JURISPRUDENCE

criminally sanctioned when one "grants, guarantees or promises benefits for voting a certain way" (Law of July 24, 1966, art. 440, 3°). Even if the commitment, in this case, only applied to a series of defined operations, and was not therefore limitless in time, the gravity of the decisions made, the need to leave shareholders totally free to decide for themselves, in a shareholder meeting, in consideration of the interests of the company, as they then appear to them, should have certainly led the judges, if need be, to respect the decision of the shareholders meetings, even if it was not in accordance with the arbitration ruling. It is not even certain that damages would have been granted for the violation by such shareholder of his previously made commitments to vote.

One will regret that the Court of Cassation, in its second ruling, did not more clearly take a position on these important questions. It does seem, however, in rejecting the appeal on this point, to have approved the analysis of the Riom Court on the nature of the decisions made by the 1975 ruling, and considered with the appeals judges that this decision should have been overturned for violation of the powers of the shareholder meetings. It was good in any case to recall that on this subject, the managers of corporations and the arbitrators must respect imperative competencies.

Philippe Fouchard

(1979)

Case No. 2
ICC Arbitral Award: Case n° 2138 in 1974

ARBITRATION DECISIONS

I.     Arbitration clause – Conciliation article – Enumeration of facts – Jurisdiction
       of the arbitrator to rule on its own motion (implicit)
II.    Arbitration clause. – Rule of construction. – Strict interpretation.

*Ruling made in the matter n° 2138 in 1974.*

Facts identical to those that are at the basis of the decisions rendered in 1974 equally in matters n° 2139 (supra, p. 929) and n° 2142 (*Clanet*, 1974, 892, submissions R.T.) gave rise to the present litigation. The solutions adopted by the arbitrators on the merits (force majeure, redress of a grievance) are a simple confirmation of the principles implemented in the aforementioned rulings, and it does not appear necessary to go over them again here. On the other hand, two particular difficulties related to the actual organization of the arbitration merit attention.

The first of these difficulties arose from the wording of the arbitration clause contained in the disputed contract. The parties were not, in fact, content to provide, according to the typical clause proposed by the C.C.I.[International Chamber of Commerce] that their disputes would be "subject to arbitration in accordance with the International Chamber of Commerce rules of conciliation and arbitration". The parties had added that, for disputes that can be adjudicated in conciliation, they would proceed first with such conciliation. The plaintiff having directly introduced the arbitration procedure, ignoring the conciliation phase, the arbitrators were called upon to decide on the legality of their seisin with respect to the will of the parties, as stated in the arbitration clause. They did so in the following terms:

"Whereas in this matter, the dispute is directed not at the settling of a dispute capable of being settled in conciliation without interfering with the course of performance of the contract, but the same non-performance by the purchasers resulting from the contract."
"Whereas, there is no reason to consider the stipulation regarding conciliation,
"Whereas, there is cause, the court having been duly constituted, to declare itself competent to deal with a dispute concerning opposing parties to a contract…."

After having thus asserted their jurisdiction in principle, taking into account the nature of the dispute, the arbitrators have a duty to verify the scope of the arbitration clause, vis-à-vis the two parties involved, as defendants to the complaining party. In fact, both had abstained from participating in the process. Such an assessment, however, did not appear indispensable for the first party, indisputably signatory to the contract containing the arbitration clause. It is not the same for the second defendant with respect to which the arbitrators had to declare themselves incompetent as follows:

"Whereas, however with respect to the claim formulated opposing Company X…there is reason to claim that this latter company is neither signatory nor party to the contract of….,
Whereas, while it results from many elements of the appeal case that the negotiation and conclusion of the matter on the essential terms were led by Company X…, it is not at all

INTERNATIONAL CHAMBER OF COMMERCE

established that if the latter had itself signed the contract of .....it would have accepted the arbitration clause....;

Whereas, the arbitration clauses are strictly interpreted and the Court could not, in that case, without exceeding its competence, hold Company X...as party to the present case."

REMARKS. – I. – Conciliation is opposed to arbitration by the fact that it leads habitually to a reciprocal abandonment of rights or claims on the part of each of the parties (Cf. J. Robert, *Arbitrage Civil et Commercial*, p. 15-16) and above all by its informal and voluntary character. In effect, while the arbitrator, vested with the power to judge, renders a decision that is imposed upon the parties, the conciliator can only formulate recommendations that remain deprived of all force of obligation to the extent that the parties did not accept them. It can happen that border disputes occur between these institutions, when it concerns the description of a set procedure, whether by reason of incorrect wording of a clause in a contract, which, for example, while anticipating an "arbitration" leaves open the recourse to the courts if the parties do not accept the decision of the so-called "arbitrators", or because the attitude of the parties or the designated third parties was sufficiently ambiguous such that one can question the real nature of the latter's powers (Cf. particularly H. Molulsky, *Etudes et notes sur l'arbitrage*, p. 37 s.). It is much rarer that one has to determine, in view of their articulation, the respective scope of a conciliation clause and an arbitration clause, just as the arbitrators were led to do in the decision reported here. Both the criterion held on this occasion and the use of such a step to justify the immediate introduction of the arbitration procedure calls for certain comments.

The arbitrators consider that the contractual stipulation related to conciliation can be ignored in this case because the dispute that was submitted to them is not one that is capable of being settled "without interfering with the course of performance of a contract". By this fact, do they not seem to consider that the recourse to conciliation would be reserved for this last category of dispute, arbitration being required, on the other hand, when the contractual relations are severed? Such a distinction would not fail to surprise. In effect, arbitration and conciliation are not necessarily different fields of application. To the contrary, one is correct to think that the same dispute could just as well, at the choice of the parties, be settled through conciliation as through arbitration, whether such dispute arises from difficulties in the performance of a contract or whether it concerns  liquidating the consequences of its non-performance. It is of course certain that the parties are much more susceptible to arguments of conciliators than they can anticipate the pursuit of contractual relations. But it is no less true that among the advantages of the arbitration process, over those that take place before state courts, the climate of harmony that is frequently provides is not to be overlooked. Has not arbitration been given the following slogan: *far guistizia, conservando l'amicizia* (E. Minoli, *Atti del Convegno internationale per la reforma dell arbitrato*, Cadenabbia, Milan, June 3-6, 1954, P. 67)? Without hiding the somewhat excessively optimistic character that is apparent in this expression, one would nevertheless betray the image of arbitration, if one took away its harmonizing role.

ARBITRATION DECISIONS

Such was certainly not the intention of the arbitrators. In effect, in affirming that one could have proceeded immediately to arbitration because the dispute was not one that could be settled "without interfering with the course of the performance of the contract," the arbitrators did not intend to define the zone of intervention of the arbitration process but to characterize the domain in which, through the wording of their agreement, the parties had previously committed to attempt a conciliation prior to any arbitration. It does not finally have to do with distinguishing disputes which, by their nature, would be reserved for arbitration from those that would be reserved for conciliation, but to establish a border between the cases where an attempt at conciliation was required and those in which such an attempt was only optional. In this context, resorting to the notion of dispute likely to be settled "without interfering with the course of performance of the contract" is more easily understood. It makes it possible to give a concrete meaning to the far too vague expression used by the parties in the arbitration clause when they referred to the disputes that can be decided by conciliation. The performance of contracts in effect gives rise to difficulties, of a more technical than legal order, of which the lack of an immediate solution is generally at the basis of numerous disputes. Arbitration, notably by reason of its judicial character which implies certain necessary time limits to the protection of the parties' rights, is not a process easily used when this type of difficulty arises. Even if the process of conciliation does not appear as a panacea in this respect, it presents at least the advantage of allowing the parties to hear recommendations capable of resolving their problems in an extremely short amount of time. The systems of technical expertise and specialized arbitration which the International Chamber of Commerce envisages being set up would have been, without any doubt, more appropriate, but one will understand that in the absence of such systems, the arbitrators were able to estimate that the parties had wanted to require an attempt at conciliation before any arbitration to increase their chances to settle quickly and amicably the disputes that interfered with the performance of their contract.

Was the search for the will of the parties as regards providing for their reference "disputes that can be decided through conciliation" however necessary in this case? In other terms, were the arbitrators really bound to verify that they were not hearing a dispute within the category of disputes for which the parties had provided that an attempt at conciliation would have to precede any arbitration? Some might consider, on the other hand, that it would have been simpler to declare that the voluntary character that dominates any conciliation proceeding implies that a party is always free to refrain from instituting such a proceeding or from participating in it, whatever the applicable contractual provisions might be. Refusal of recourse to conciliation would simply amount to its failure, and in the same way, would open the way to arbitration proceedings. It would therefore be perfectly useless to question whether the dispute is one that can be decided through conciliation. Even if such an analysis is not necessarily inexact, one will prefer to it the solution adopted by the arbitrators for being more respectful of the will of the parties, from which, one must never forget, the arbitrators derive their power. But in this case, the question is then raised to know what the attitude of the arbitrators would have been if it had turned out that the dispute that they were charged with hearing should have been the subject of a prior conciliation. One will deduce *a contrario* to their decision, that they would have declared themselves incompetent and that they would

INTERNATIONAL CHAMBER OF COMMERCE

have sent back the plaintiff to begin the conciliation process while charging him with the attempt at conciliation which would have followed. In effect, no reconciliation could have been achieved with the systems such as, for example, the one put in place in France, in administrative matters by the May 19, 1959 decree, that provides for (art. 56, etc.) the obligatory recourse to an out-of-court advisory committee, before being referred to administrative courts, for these latter are called upon to take into consideration the decisions of said committee. On the other hand, conciliation is a process totally independent of arbitration, as the Rules of Conciliation and Arbitration of the I.C.C. recalls in clarifying in its article 5 that "none of what has been done, said or written, in view of a conciliation can compromise in any way the prior rights of the parties, whether in arbitration or before the courts." Consequently, a forced conciliation process has strong possibilities of being a total waste of time. But such was the mechanism created by the parties that had perhaps forgotten that a dispute is in reality only likely to be decided by means of conciliation, whatever its nature, if the parties have truly decided to reconcile. It remains, however, that the experience makes it possible to wonder whether in such circumstances, the arbitrators would have made the contractual mechanism work at full force…

Let us also note, but only for the record, that the arbitrators did not question their power to rule on their own competence, no more than they will do so with regard to the particular difficulty created by the situation of the second plaintiff.

II. One will note first of all, that in claiming that the "arbitration clauses are strictly interpreted", the arbitration court did not rely on any domestic law. It is therefore a general principle that is called upon. Some will charge it with conservatism in a time in France when one could have saluted the tendency in jurisprudence to abandon the restrictive attitude it held in matters of interpretation of arbitration clauses (Cf. Jean Robert, *op. cit.* p. 127, see however Paris January 25, 1972: *Rev. Arb.* 1973, 158, which refuses arbitrators the power to pronounce the termination of a contract on the grounds that the arbitration clause only dealt with the interpretation of the contract). But to formulate such a judgment without taking the exact measure of the scope of the principle in question, taking into account the facts of the case would be far too hasty. Whatever the generality may be of the claim that "the arbitration clauses are strictly interpreted", the arbitrators only used it in fact to declare themselves incompetent with respect to a complaining party who, according to them, did not submit to the arbitration clause under which they derive their powers. To arrive at this conclusion, they referred to two observations, one of a formalistic character, the other drawn from their knowledge of the business world. In the first place, the arbitrators note that Company X…."is neither signatory nor party to the contract…" However, this remark does not suffice to remove it from arbitration. They add that if it is true that the Company led the transaction negotiations and its "conclusion on the essential terms…it is not at all established that if the Company had itself signed the contract of ……, it would have accepted the arbitration clause."

It becomes clear in the second aspect of the motivation that the lack of signature of the contract by Company X…, and consequently, of the arbitration clause that it contained,

ARBITRATION DECISIONS

did not in and of itself suffice to establish the incompetence of the arbitrators vis-à-vis this Company. The determining element is that it was not able to be proved that the Company would have accepted the arbitration clause if it had signed the contract, for – and it is here that the arbitrators use their knowledge of business practices – in the matter of contract negotiations, the insertion of an arbitration clause is not part of the required terms of a commercial operation, which terms Company X had effectively negotiated. It appears then that in its implementation, the general principle of "strict interpretation of arbitration clauses", does not enter into conflict with the tendency of international practice in favor of the tacit acceptance of arbitration clauses, without requiring a formal agreement expressed in this sense by the contacting parties (on this point see, among others, P.Level, *J.Ct. Dr. int.*, Fasc. 585, n°81).

But in this case, why take such a principle into account? It is that just as Mr. Fouchard revealed, international commerce arbitrators are bound by two imperatives: flexibility and efficacy (*Cf.* Fouchard, *op.cit.* p. 390). The Rules of Conciliation and Arbitration of the International Chamber of Commerce recall moreover this last imperative in its article 31 stated as follows: "In all cases not expressly cited below, The Court of Arbitration and the arbitrator proceed by drawing inspiration from these Rules and making every effort so that the decision will likely be legally sanctioned." Because, whatever the concerns of the state authorities to favor arbitration in departing, either in international agreements or in court decisions, from their past rigor regarding the formation and interpretation of arbitration clauses, we have to equally admit that they are not ready, with good cause, to admit that a party can oppose an arbitration clause without establishing that it submitted voluntarily to the clause, even if done tacitly (*Cf.* for France, Rouen December 15, 1972: *Rev. arb.* 1973, 179, note B.M. Trib. Re. inst. Paris, January 26, 1972: *Rev. arb.* 1973, 193, note J. Rubellin-Devichi).The motivation of the decision shows that the arbitrators are inclined to apply the principle of strict interpretation of arbitration clauses with flexibility (on another aspect of this flexibility *cf.* the decision rendered in matter 2331 in 1974, *infra*, p. 938). The efficacy of the decision had, however, been strongly compromised if, in ignoring this principle, the arbitrators had declared themselves incompetent with respect to Company X…

One will add to this, from a more general point of view, citing Mr. R. David, that "arbitration must only…be allowed….when at the beginning, there exists no equivocation on the will of the parties to submit to arbitration (R. David, *L'arbitrage commercial international en droit comparé*, Court mimeograph 1968-1969, p. 272). This is not as much, as the learned author estimates, because arbitration agreement ends up "depriving the parties, in large measure, of the guarantees that are offered to them by state judicial organizations" (R. David, *op. cit.* p. 267) for such guarantees are in fact replaced by others, at least in matters of international commerce. The absence of any ambiguity in the will of the parties to submit to arbitration is above all a condition sine qua non in order that arbitrators of international commerce feel that they are sufficiently empowered to truly contribute to freeing the law of international commerce from often unsuitable national judicial frameworks, thus responding to practitioners' wishes.

INTERNATIONAL CHAMBER OF COMMERCE

I. **Arbitration clause**. - Principles of interpretation. – Field of application.- Strict interpretation. – Validity. – Interpretation *pro validate*.
II. **Arbitration clause**.- Rules of Conciliation and Arbitration of the International Chamber of Commerce, article 7, §§ 1 and 2. – Interpretation.
III. **State**. – International arbitration.- Jurisdictional immunity.- Distinction between *jus gestionis* and *jus imperil*. – General exclusion. – Application of international law. – Principle (*Pacia sunt servanda*).

*Interim decision rendered in matter n° 2321 in 1974 (*[1]).*

The arbitrator, sitting in Sweden was hearing a case between two Israeli companies, as plaintiffs, and the government of an African State and a public establishment of such State. The action against the State was based on the fact that it had agreed to guarantee a commercial transaction concluded by the public establishment. Before undertaking instructions on the substance of the case, he was called upon to decide two problems of a procedural nature brought by the plaintiffs.

The latter first of all contested the legality of the nomination of the arbitrator by the Arbitration Court of the I.C.C., which, according to them, had not been carried out in accordance with the contractual stipulations. Moreover, they claimed that the arbitrator was incompetent to take cognizance of the claim made against the State in this case, by reason of his jurisdictional immunity. The arbitrator decided on these two points regarding his jurisdiction by the interim decision reported herein.

With respect to the legality of the appointment of the arbitrator, it is worth indicating that the general conditions of the contract —general conditions established by the International Federation of Consulting Engineers (FIDIC) —— fully provided for an arbitration according to the I.C.C. regulation "by one or more arbitrators designated in accordance with said regulation", an appendix to the contract specifying however that the nomination of arbitrators would be entrusted to an authority other than the I.C.C. Arbitration Court. However, the authority set forth in the Appendix to the contract having been called upon to name an arbitrator, declined. The I.C.C. Arbitration Court considered that in such conditions, the process of designating an arbitrator reverted to it, in application of the normal provision of its Rules. It is this decision, which led to the appointment of the arbitrator, that the plaintiffs considered as groundless.

The arbitrator declares that it is proper that the Arbitration Court had carried out its designation itself, based on the following reasoning:

"I share the point of view of the plaintiffs according to which an arbitration clause can, with respect to its field of application, be required to be strictly interpreted. This principle, however, can not have the same scope when one comes to appreciate the validity or efficacy of an arbitration clause. On the other hand, when the parties insert an arbitration clause in their contract, one must presume that their intention was to establish an effective mechanism for the settling of disputes contemplated by the arbitration clause.

---

[1] The original decision is in English.

ARBITRATION DECISIONS

Nevertheless, as it will appear from the grounds set forth below, the current case can and will be settled on the basis of a strict interpretation o the arbitration clause and of the regulation in which it is incorporated... In the matter that is before me, I can only declare that the designation of the arbitrator was done in accordance with the agreement of the parties, and this results from a strict and literal interpretation of such agreement. The fundamental arbitration agreement in this matter must be found in clause 67 of the general conditions where it is clearly provided that any dispute...will be finally resolved according to the I.C.C. Regulation by "one or more arbitrators named in accordance with this regulation...".

In general, it is the Court that designates the sole arbitrator or the third arbitrator. However the regulation provides for the possibility of opposing stipulations on the part of the parties in its article 7, § [NUMBER ILLEGIBLE]. In this case, the parties exercised this option by inserting in an appendix to the contract a provision according to which (another authority) would be empowered to designate the arbitrator. (Such other authority) which was invited by the plaintiffs to designate an arbitrator did not expressly designate the Court to proceed with the final designation. It simply refused to designate an arbitrator in accordance with the regulation, as provided in clause 67 of the General Conditions...The regulation provides in its article 7, § 2, that, in the absence of agreement by the parties (on the appointment of the sole arbitrator) within a period of 30 days beginning with the notification of request for arbitration to the adverse party, the arbitrator will be designated by the Court. While the parties, as stated above, had agreed on a method of designating a sole arbitrator, from the moment when this method proved ineffective due to the refusal of the (authority) empowered to designate the arbitrator, the parties nevertheless had to be considered as not having been able to nominate an arbitrator of common accord. Thus it was up to the Court, according to article 7, § 2 of the regulation, to designate the arbitrator."

Considering itself duly designated, the arbitrator then asserted, in the following terms, its jurisdiction vis-à-vis the defendant State, considering that the latter could not validly invoke its judicial immunity to disengage from the proceedings.

"...I am first of all going to examine according to which judicial system this question must be decided. On the side of the defendant, it was held that the contract is subject to the law of the (defendant State) and that, by this fact, the law (of the defendant State) which, in this respect, is, it appears, the same as English common law, should apply. In addition, given that it concerns its legal status, the law (of the defendant State) should apply to the question of immunity. A certain number of decisions of English courts or of Common Law countries were cited to support the point of view that a sovereign State escapes the jurisdiction of any other State. The first defendant holds that the same principle should apply to arbitration procedures. The plaintiffs, however, asserted that Swedish law should be applied based on the fact that the arbitration proceedings took place in Sweden. Swedish law does not grant immunity in such situations.

As far as I am concerned, I do not see the need to refer to particular system of domestic law or to the jurisdiction of any county in this respect. Whatever the "proper law" of the

INTERNATIONAL CHAMBER OF COMMERCE

contract might be, it has nothing to do with the protection of sovereign immunity. Sovereign immunity can act as a barrier to the exercise of judicial jurisdiction or can be opposed to measures of execution, but is does not intervene, as such, in legal relationships between parties as defined in a contract or otherwise. This point of view receives broad support in Common Law (The El Condado, n° 23, D.I.L.C., 1939, S. C. 413, p. 430) and in Swedish law (The Toomas n° 1 and 2 H., 1944, p. 266, An. Dig 1943-45, p. 61, 112).

ICC Arbitral Award: Case n° 5721 in 1990
(see page 1023-1024)

## INTERNATIONAL CHAMBER OF COMMERCE

[MISSING TEXT]

..in the arbitration agreement (no). – Formal validation of international arbitration agreement.

**II. — Contract.**— Conclusion by a branch not having a legal personality.— General principles of corporate law.

**III.—Arbitration clause.**— Opposability of the clause by a corporate executive (no).— Common practices of international commerce.— Good faith.— Search for a voluntary legal basis.

**IV.— Cancellation.**— Redress of a grievance.— Duty to minimize losses.

**V.— Bank guarantees on initial claim.**—Jurisdiction of arbitrators to rule on relations between a bank and a beneficiary (no).—Improper appeal of guaranty.—Jurisdiction of arbitrators (yes).

*Decision rendered in case 5721 in 1990*

In this case, the Arbitration Court seated in Geneva was hearing a claim introduced by a European company against two legal persons X USA and X Egypt, as well as against a natural person Mr. Z, president of X USA.

The plaintiff alleged in effect that, designated as a sub-contractor by the project owner, it had in June 1983 concluded with X Egypt — which had presented itself as a subsidiary in the process of incorporation in Egypt of Company X USA represented by its President, Mr. Z — two sub-contracting contracts respectively for the provision of materials and the performance of various works in a factory under construction located in a Cairo suburb. Mr. Z had signed the two contracts on behalf of X Egypt.

Under the terms of the contracts, X Egypt, to which, in its capacity as general contractor, fell a role of technical and administrative coordination, had to perform works of civil engineering and carcassing, and furnish the plaintiff with facilities permitting it to perform its own obligations.

The plaintiff affirmed having encountered serious problems, X Egypt not performing the obligations to which it had committed. This situation had then led the owner to evict X Egypt from the site and to entrust the plaintiff with the direct responsibility for the contract.

X Egypt, having in particular tried to call in warranty several standby letters of credit, some related to the return of the deposit and others to the proper execution of the works that had been provided to it by the plaintiff, the latter asked the Arbitration Court to, among other things, declare the cancellation of the contracts and pronounce the expiration of the letters of credit.

ARBITRATION DECISIONS

The two contracts stipulate that they are expressly subject to Egyptian law, the arbitrators having the powers of *amiable compositeur*.

With respect to the arbitration procedure, the group of plaintiffs had jointly appointed an arbitrator. It was only as a consequence—while X Egypt solely admitted being bound by the arbitration clause— that X USA and Mr. Z particularly raised an objection to the lack of jurisdiction on the grounds that they had not submitted to the arbitration procedure.

In the first place, the Arbitration Court seated in Geneva decided to rule on the legal validity of the arbitration clause, an argument based on the invalidity of the clause with respect to article 502 (3) of the Egyptian Code of Civil Procedure (CPCE) having been raised. The Court rejects this argument in these terms:

*"Article 502/3 CPCE states:*

*"On the basis of the observation of the provisions of special laws, it is required to designate by name the arbitrators of the Arbitration Court in contractual arbitration clause, or in a separate agreement."*

*One of the defendants affirms that this provision of the Egyptian Code of Civil Procedure applies in this case and that its non-observance leads to the nullification of the arbitration clause. One may ask whether, even in domestic law, this provision leads to the draconian consequences expressed. The text of the law does not in effect contain any express provision relating to nullification in case of violation of paragraph 3; this article is content to provide for nullification in the sole hypothesis of a violation of the first paragraph. The Court could not in any way give this article an international scope, given the needs of international commerce. It is true that article 502/3 CPCE gave rise in Egypt to an important judicial precedent and to doctrinal discussions (see in particular Sigvard Jarvin; L'exécution des sentences arbitrales, Paris, 1989, particularly p. 32 s.).*

*In a decision dated April 26, 1982 (Mabrouk Trading Import and Export v. C. Arab Continental Navigation Co.), the Supreme Court of Egypt established that arbitration having to take place outside of Egypt could be valid and not violate the Egyptian public policy, even if the conditions of article 502/3 CPCE had not been met. This provision is not public policy. What is contrary to the imperative Egyptian law is not necessarily contrary to Egyptian public policy. The Court explains in particular:*

*"Whereas the arbitration clause established in the lease agreement — subject of this proceeding—stipulates that any dispute that results from such agreement will be referred to arbitration in London.*

*Whereas the legislature allows the agreement to proceed to foreign arbitration and does not consider it as likely to adversely affect public policy.*

INTERNATIONAL CHAMBER OF COMMERCE

*— It follows that the validity and the consequential effects of the arbitration clause are subject to the provisions of British law, in other words, the law of the country chosen as the location for the arbitration, on the condition that such provisions of the law do not contradict in any way the rules of public policy in Egypt.*

*Whereas what preceded and what the judgment attacked — after having denied the claimant the right to invoke the arbitration clause—pronounced and established the invalidity of such clause, on the fact that it omits to mention by name the chosen arbitrators, as required by article 502/3 of the Code of Procedure, and therefore contravenes the observation of such law, having failed to subordinate this clause to British law which is the applicable law.*

*Whereas it is not allowed to set aside British law which applies in this instance, on the pretext that it contravenes article 502/3 of the Code of procedure — in even supposing that this were the case— because the only condition for setting aside British law (by virtue of article 28 of the Civil Code) is that it is in contradiction with the rules of public policy in Egypt, that is to say, contrary to the foundations of social, political, economic and moral order on which the State rests, putting at issue the superior interests of the nation, the fact that it contradicts another text of the law not being valid grounds to exclude its application.*

*Whereas article 502/3 of the Code of Procedure (stipulating that the names of the arbitrators must necessarily figure in the arbitration clause or in a separate agreement) does not in any way concern public policy, as demonstrated above."*

*As a result, and on many occasions, Egyptian parties have contested the validity of the ICC arbitration clauses, In particular, several decisions were rendered in which the Egyptian parties successfully pleaded that public companies could not agree to an international arbitration...The argument consisting of maintaining that the appointment of arbitrators must be done imperatively by the parties themselves under penalty of nullification of the arbitration clause and assuredly contrary to the spirit of arbitration, even more so when it is invoked once litigation has started and the arbitration begun...It seems, moreover, fit that the situation evolve in a direction favorable to international arbitration."*

Citing an excerpt from a judgment dated February 1, 1987 of the Court of First Instance of Giza (Cf. *JDI*, 1987, p. 1036) and citing a decision dated February 18, 1986 of the Court of First Instance of South Cairo, decisions which both admit the validity of the arbitration procedure without referring automatically to article 502(3) of the CPCE, the Court concluded:

*"In these conditions, the Arbitration Court considers that the requirements of domestic Egyptian law expressed in article 502/3 CPCE could not be extended to the domain of international arbitration."*

The legal validity of the clause having been recognized, it was then up to the Arbitration Court to rule preliminarily on the existence of X Egypt, sole defendant, to accept the

ARBITRATION DECISIONS

jurisdiction of the arbitrators. X Egypt, at the time of the signing of the contracts, had represented itself as a subsidiary—in the process of incorporation—of company X USA.

*"The arbitration request is directed particularly against the companies X USA and X Egypt. The response to the arbitration request separately indicates the American and Egyptian entities. Mr. Z affirms that the contracts in question had been signed by the Egyptian "company" and not the American company...*

*The Mission Statement separately indicates the name of the two entities, which seem legally distinct...*

*The uncertainties that existed in the plaintiff's mind, as in that of the Court, were raised by the Response filed only on behalf of Mr. Z alone.*

*This response establishes that the defendant named X Egypt is not a legal entity separate from X USA, but a simple branch of the American company ("a branch office"). According to the opinion of Mr. Z, confirmed by file items (Replication memorandum, Appendices 1 and 2), X Egypt did not have any legal individuality. It had never been more than a branch office. It is thus the defendant company n° 1, which is X USA, which through the intermediary of its Egyptian branch signed the contracts dated June 21, 1983. One will note moreover that at the time, Mr. Z acted as much in his capacity as Chairman of the Board of Directors of the American company as representative of the Egyptian branch. The mention of X, Inc, in the contract can only be construed as a reference to the American company whose Egyptian address was located in Egypt.*

*The very nature of X Egypt implies that only company X USA could have signed the contract. To maintain that the American company is not involved in this dispute because the contract had been signed only by the Egyptian branch is contrary to the general principles of corporate law, counter also to good judgment: not having its own existence, the "branch office" could only represent X USA.*

*The Court will hold therefore that the conclusions that were made against X Egypt are inadmissible and moot. But at the same time, the Court will admit that the activity of the Egyptian branch is encompassed within that of the American company."*

Having decided to include the activities of the branch X Egypt in the activities of the American company X USA (which will henceforth be identified in the extracts of the decision by the letter X) it still remained for the Arbitration Court to rule on the possible opposability of the arbitration clause by Mr. Z who was brought before the arbitration process in his capacity as President of X:

*"The arbitration clause that establishes the jurisdiction of the Arbitration Court is contained in the contracts dated June 21, 1983. The plaintiff intends to extend the scope of this clause to Mr. Z, third defendant. It wants, by this fact, to pierce the corporate veil...*

INTERNATIONAL CHAMBER OF COMMERCE

*The Arbitration Court will not examine this delicate question in the light of the only applicable law at the basis of the dispute, Egyptian law (See the decree Isover Saint-Gobain v. Dow Chemical France et al, CA Paris October 21, 1983: Rev. arb., 1984, 98). Article 13, paragraph 5 of the ICC Arbitration Rules invites the Court to take into account business practices and contractual texts. In this perspective, the Court is right in referring to lex mercatoria. The autonomy of the arbitration clause, widely recognized today, justifies this reference to non-governmental rule deduced solely from international business practices. In particular, it justifies itself in disassociating the basis of the contract from the legality and scope of the arbitration clause. This will therefore be by virtue of the general notion of good faith in business, and international business practices that the Arbitration Court will rule. That so being, it is interesting to note that the various national laws concerned by the present case lead to a similar result. It involves American law, as the law governing the incorporation of X, Swiss law governing the location of the court and Egyptian law applicable to the basis of the dispute.*

*The problem posed by lifting the corporate veil is not entirely recent, but it has taken on importance notably due to the significant development of the law of groups of companies since the 1950s.*

*In the United States, place of incorporation of defendant X and place of residence of Mr. Z, the principle is, as in continental law, that of the responsibility of the company for its own assets, to the exclusion of those of the shareholders (see Rudolf Tschani, Amerikonische Lehren fur schweizerisches Konzernrecht? in La Société anonyme suisse, 1980, p. 56 s.). As a general rule, this principle is not evinced by the sole fact that the capital of a company is in the hands of another and that the "officers" or "directors" are the same for the parent company and for the subsidiary. However, it is permitted to stray from this rule in particular circumstances. Such is the case when the subsidiary is a "mere instrument" of the parent company, that is to say, that one of the parties is in reality a simple representative or a simple instrument in the hands of the other … The theory of lifting the corporate veil … is justified every time that the principle of limited responsibility leads to totally unjust situations.*

*Under Swiss law, location of the seat of the Arbitration Court, the doctrine and legal precedent have both expressed an opinion of the question of lifting the corporate veil (E. Hombuger, Zum Durchgriff in schwiezerischen Gesellschoftstrecht, Revue Suisse de jurisprudence, 1951, p. 253 s.).The theory of "Durchgriff" is based on the prohibition of the abuse of law. In this perspective, one must always concretely examine whether the institution of the legal entity (and the legal independence that attaches thereto) is deterred from its goal by persons who are experts (ATF 112, II, 1 dealing with real property for example). One must thus allow the exception of lifting the corporate veil only with a prudent reserve. One should only ignore this independence in unusual circumstances, when it is invoked fraudulently, that is to say, contrary to the principle of good faith…*

ARBITRATION DECISIONS

*Egyptian law does not contradict these general rules. It also grants a decisive importance to the principle of good faith and sanctions any attitude abusive of the law (cf. articles 5 and 148 CCE).*

*... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...*

*One must add that the essence of arbitration is based on the principle of consensus. Likewise, the extension of the arbitration clause must have a voluntary foundation. Certainly, this willingness can only be implicit, otherwise the discussion of extension would make no sense. This extension must not, on the other hand, occur as a sanctioning of a third party. Such an occurrence must be reserved for ordinary courts before which a party may also put forward the argument drawn from lifting the corporate veil.*

*In brief, the fact that two companies belong to the same group or the dominance of a single shareholder are never, in and of themselves, sufficient reasons to justify ipso facto lifting of the corporate veil. However, when a company or individual person appears to be the focus of contractual agreements undertaken in particular matter, it is advisable to carefully examine whether the legal independence of the parties must not, exceptionally, be set aside for the benefit of a global judgment. One will allow such an exception when there appears to be confusion among the group or on the part of the majority shareholder. "*

Such principles once set forth, the Arbitration Court then proceeds to the examination and analysis of the facts of the case, ruling on each of the presumptions appearing serious with respect both to ownership and to the different addresses and to the control of X, which would tend to establish confusion between Mr. Z and company X. From this analysis, the Arbitration Court drew the following conclusions:

*"The Court considers, after having carefully considered all of the available elements of proof that the arbitration clause must not be extended in this case to Mr. Z. This conclusion is based on the following reasons:*

*An arbitration jurisdiction must be very circumspect when it is a matter of extending a clause to an officer who formally intervened in such capacity. The extension supposes that the individual was only the commercial instrument of the legal entity, such that one can make the contracts and agreements subscribed to by the individual benefit the legal entity. However, the presumptions enumerated above do not make it possible to have complete certainty in this regard.*

*The plaintiff admitted, during the hearing of June 29, 1989, that at the beginning of the contractual relations, it had its executive in charge of exports go to New York to verify that company X had offices and an effective business there.*

*It is therefore not certain whether the plaintiff intended to deal with Mr. Z through X, or that Mr. Z had the intention of being personally a party to the arbitration agreement. If the plaintiff means to call into question Mr. Z's responsibility for fraud or any other action, such as, the case so being, the divestiture or appropriation of the assets of X, it*

INTERNATIONAL CHAMBER OF COMMERCE

*will be up to them to have him brought before a court of competent jurisdiction: the extension of the arbitration clause does not constitute the sanction of a responsibility, but must conserve, as has been said, a voluntary foundation.*

*The Court therefore considers that the arbitration clause in the contracts of June 21, 1983 does not apply to Mr. Z personally and the he must be excluded from the arbitration proceedings, all rights reserved for the plaintiff to take action before ordinary courts."*

Having determined its jurisdiction regarding each of the defendant parties as were brought into the proceedings, the Arbitration Court in addressing the foundation ruled first of all on the cancellation of the contracts between the plaintiff and X. Considering that the deterioration of the situation invoked by the plaintiff that led to the decision by the project owner is due exclusively to the faulty attitude of X, the Court came to the conclusion that the contract between the project owner and X is cancelled, then continued:

*"As to the contract X/plaintiff, it was cancelled, against X, in accordance with article 157 CCE...*

*The contract X/plaintiff has the quality of an accessory contract in relation to the principal contract between the project owner and X. Egyptian law acknowledges a direct action to sub-contractors. Article 662 CCE states that:*

*"Sub-contractors and laborers that work on behalf of the general contractor in the execution of the work have a direct action against the project owner up to the limit of the amount of money the project owner owes to the general contractor at the time the action is initiated. This action belongs equally to the sub-contractors' laborers with respect both to the general contractor and to the project owner.*

*They have, in the case of a garnishment order made by one of them against the project owner or the general contractor, a lien at prorate of their respective rights, on the amounts due to the general contractor or sub-contractor at the time of the garnishment. Such amounts can be paid to them directly.*

*The rights of sub-contractors and laborers provided for in this article take precedence over those of the person to whom the contractor had assigned his receivables to the project owner."*

*One must, however, note that:*

*— such direct action is a guaranty for the sub-contractor and does not deprive it from acting against its immediate co-contracting party;*
*— such direct action is limited to what the project owner owes to the general contractor, which in this case will subject the plaintiff to all of the hazards of the relations between the project owner and X. The plaintiff, whose damage in principle is acknowledged as a*

ARBITRATION DECISIONS

*result of the faulty non-performance of its obligations by its direct co-contracting party, thus has an action against X.*

*The conclusion of a memorandum of understanding followed by two contracts between the project owner and the plaintiff does not change the situation other than ... to the benefit of X. In effect, the taking back by the project owner of large lines of contracts X/plaintiff made it possible to lessen the damages that the plaintiff would have experienced if the completion of the project had not been entrusted to it. If then any damage exists for the plaintiff, and it was not eliminated by the new contract plaintiff/project owner, X must assume reparations thereof."*

The Court—exercising its powers of *amiable compositeur*— then rules on the determination of damages sustained by the plaintiff before broaching the real issue of this procedure, namely the request to finding null and void the various letters of credit issued by an Egyptian bank in favor of X and against guaranties by a European bank, letters of credit that X tried to call even though the general contract concluded with the project project owner had been cancelled.

In this respect the Arbitration Court defined the scope of its field of jurisdiction in the following manner:

*"It is not at issue that the relationship established between the guarantor (the bank) and the beneficiary, between the originator (plaintiff) and the second-guarantor (European bank), are not covered by the arbitration clause of the June 1983 contracts. The guaranty contract is separate from the June 1983 contract. The arbitration is only concerned with the relations between the plaintiff and X."*

*The Court would therefore be without jurisdiction to give orders to either bank. However, it does have jurisdiction to say whether the beneficiary of the letters of credit, X, has the right to take advantage of the guaranties with respect to the plaintiff. It is also within its jurisdiction to say if the guaranties are valid in the context of the relationship between the originator and the beneficiary. Such guaranties have their basis in the June 1983 contracts. They are, for the parties engaged in arbitration, linked to the validity, scope and cancellation of the fundamental contract.*

*It is certain that to the extent that the fundamental contract, in this instance the June 1983 contracts, takes into account the bank guaranties, the Arbitration Court has the right to opine on their scope. The abstract character of the guarantee does not mean that the guarantee does not originate in the fundamental contract and that it is not closely tied thereto. It is exactly to guarantee the non-performance of the fundamental contract that the guarantee had been required and granted. The Court can render an opinion on the right of the beneficiary to take advantage of the guaranties. It has the right to render an opinion on the illicit character of a third-party complaint (on this subject see in particular Jurgen Dohm, Bankgarantiem und Schiedsgerichtsbarkeit, Bulletin de l'Association Suisse de l'arbitrage, 1987, p. 92 s.).*

INTERNATIONAL CHAMBER OF COMMERCE

*In this instance, there is no doubt that X wrongly tried to call the letters of credit. If one admits that the fundamental contract is cancelled (sub-contract agreement), the cancellation of the letters of credit is a natural consequence thereof, because they have their cause in the sub-contracting agreements. The beneficiary must have a credit against the originator. However, such is not the case in this matter. In attempting to cash the letters of credit, X committed an illegal act. If one must admit that X had a legal and abstract right, it then abused it, nothing justifying the call on the guarantees. No indication makes it possible to suppose that the plaintiff was insolvent (guarantee of return of deposit). The opposite, on the other hand, is at least plausible. Nothing establishes either that the plaintiff did not perform its contractual services (performance bond). Moreover, today it is the project owner alone who could have or could present a grievance of malfeasance. However the project owner delivered on March 10, 1987, with retroactive effect to December 31, 1986, a certificate of acceptance for construction that specifies that the guarantee will terminate on January 1, 1988. The risk covered by the letters of credit has thus disappeared for the project owner and, at the time, for the general contractor X.*

*As a result, the Court states that the letters of credit mentioned above are no longer at issue. Their beneficiaries no longer have any right to them. In taking advantage of them, their beneficiaries committed an illegal act. On the other hand, while the Court does not make any direct ruling with respect to the guarantying banks or the counter guarantors, it holds that a payment on their part, if they are aware of the terms of the present decision, would be likely to engage their responsibility.*

REMARKS.—1.— An historical precedent (*JDI* 1987, p. 1034) had already drawn our attention to the argument developed by certain Egyptian parties tending to contest the existence or validity of the arbitration agreement, basing their arguments on article 502(3) of the Egyptian Code of Civil Procedure (CPCE).

While it could, however have been noted that following numerous procedures, certain Egyptian courts of law had ruled that article 502(3) CPCE does not apply to international arbitration agreements and is not public policy, our attention was drawn to the doubts that still remained on the subject of the effectiveness of an arbitration agreement in an Egyptian context.
The present decision gives us the opportunity not only to note the vigor with which the arbitrators refused to give article 502(3) CPCE an international scope that would be counter to the spirit of arbitration and to the recognized principle of the autonomy of the arbitration clause, but also to take into account a recent decree of the Appeals Court of Cairo dated June 13, 1990.

In the decision reported her, the Arbitration Court indicates right away that it cannot give article 502(3) CPCE *"an international scope given the needs of international commerce"*. This position, which does not make express reference to the principle of autonomy of the arbitration clause with respect to the principle contract and with respect to any state law, seems to establish in principle the validity of the international arbitration agreement to which it would be suitable to confer its own effectiveness when it is

ARBITRATION DECISIONS

inserted in an international contract (on this principle, see Paris, April 20, 1988: *Rev. arb.* 1988, p. 570).

But the arbitrators took care, in ruling on the legal validity of the arbitration clause, to base their decision by referring to Egyptian state legal precedent, thus avoiding establishing the validity of the international arbitration clause as an absolute principle, while considering that *"the requirement of domestic Egyptian law... could not be extended to the domain of international arbitration"*.

In a case CCI 4746, an appeal had been interjected for a judgment rendered on January 27, 1987 by the Court of First Instance of Gulzeh that had — with respect to the argument according to which the arbitration clause was deemed null because no arbitrators had been named— nonsuited the plaintiffs on the grounds that an arbitration clause provided for the settling of disputes and established the denial of recourse to the state courts, whether the arbitrators were or were not named in the clause or in a separate agreement.

By decree dated June 13, 1990, the Cairo Court of Appeals confirmed the decision in these terms (official translation):

*"Considering that the grounds of defense of the two appellants, consisting of invoking the jurisdiction of the Egyptian courts to rule on the dispute, are not admissible in this case because the two parties had agreed to resort to arbitration, thus setting aside the jurisdiction of the courts. On the other hand, to say that certain disputes are not subject to arbitration or that the arbitration clause can not apply to the provisions of law is equally inadmissible because it is tantamount to questioning the clauses of the rental contract in its entirety. The absence of named arbitrators in the arbitration clause does not render the clause null and void.*

*The appeal is therefore without foundation, both in fact and at law. It is rejected and the appeals court decision affirmed."*

While the decree of the Egyptian Court of Cassation dated April 26, 1982 in the case of Mabrouk Trading Import Export v. The Arab Continental Navigation Co., to which the arbitrators refer in the reported decision, concerned an arbitration procedure taking place outside of Egypt, the decision of the Cairo Court of Appeals dated June 13, 1990, intervenes in an arbitration proceeding taking place outside Egyptian territory.

This latter decision and particularly the expected promulgation of a new law in Egypt on international arbitration the text of which would seem to adopt in large part the CNUDCI model making it possible today to appear more optimistic with respect to the future of arbitration in Egypt.

II.— The company on which a branch office depends has no legal personality is, following the general principles of corporate law, bound by the commitments subscribed to by the branch office.

INTERNATIONAL CHAMBER OF COMMERCE

In noting that the president of the company also acted in the capacity of representative of the branch, the Arbitration Court appears to make reference to the theory of "institutional connections" or again to "economic reality", permitting it to conclude that the activity of the branch is encompassed in that of the company on which it depends. The approach thus followed by the Arbitration Court validates more completely the arbitration agreement that was attached to the legal personality that signed the arbitration agreement.

This common sense decision is to be compared to decision 5065 rendered in 1986 (*JDI* 1987, p. 1039) where the arbitrator, charged with ruling on *"the classic problem of an existing legal entity contracting on behalf of a company to be created"* concluded that *"according to the general principles of international commercial law and the practices and good faith...the existing legal entity is personally bound"* (*ibid*, P. 1043).

III.— The path taken by the arbitrators in the decision herein reported is slightly different from that adopted in matter 4131 (*JDI* 1983, p. 899), but ends with the same result. Without excluding a priori the fundamental applicable law (Egyptian law), the Arbitration Court refers to article 13 (5) of the CCI Rules that states that "in all cases, the arbitrator will take into account the stipulations of the contract and the commercial practices". In order to justify the recourse to non-governmental material rule that it calls *lex mercatoria*, the Court called upon the principle of autonomy of the arbitration clause in deducing there from the duty to rule by virtue of the general notion of good faith in business and practices of international commerce. It is no doubt also to see to it that the decision be susceptible to legal sanction that the Arbitration Court sets forth that the different national laws able to be applied in this case, and that it examines, lead to a similar result.

This approach of the arbitrators of international commerce to determine the legal sources to be applied when they have to adjudicate the question of their jurisdiction with respect to a third party non-signatory to the contract appears justified when the parties have not expressly established a law applicable not only to the legality, but also to the scope and effects of an arbitration clause or when an imperative rule does not require the arbitrators to apply a specific law.

This recourse to the practices of international commerce, to good faith in business, leads the arbitrators to seek in the examination and the analysis facts the common will of the parties, the extension of the arbitration clause that must remain the exception before having a voluntary foundation.

One will note with interest the affirmation in the present decision that the extension of the arbitration clause can not intervene as a sanction of the behavior of a third party, returning to the plaintiff's need to better appeal its case before competent jurisdictions in order to bring into play the responsibility of a third party for fraud and any other act.

IV.— The sub-contracting agreement has the quality of an accessory contract with respect to the contract concluded between the general contractor and the project owner.

ARBITRATION DECISIONS

In demonstrating the dependence that exists between the principle contract and sub-contracting agreement and in noting that after the eviction of the contractor from the site, the project owner directly contracted with the sub-contractor, the arbitrators limited the scope of the reparations for consecutive damages to the cancellation in calling upon the general principle of the obligation made to a creditor to minimize its losses.

An historic precedent (*JDI* 1988, p. 1216, observ. Yves Derains) mentioned that this obligation of the creditor of an unexecuted obligation to minimize its losses is one of the best established principles of the practices of international commerce and of *lex mercatoria.*

V.—Obviously, an Arbitration Court only has power with respect to the parties to the arbitration and can not pronounce any decision that may be opposable to banks that are not parties to the procedure.

The decision properly notes that bank guaranty— guarantee agreement concluded between the guarantor and the beneficiary— is independent from the fundamental contract. However and because the bank guarantee finds it basis in the fundamental contract, arbitrators remain within their jurisdiction in the context of relations between the originator and the beneficiary: it then results that the bank guaranty is tied to the validity, the scope and the cancellation of the fundamental contract.

Having admitted the cancellation of the sub-contracting agreement, the arbitrators assert that the letters of credit no longer have a purpose and as a result pronounce them null and void.

# EXHIBIT 4
# Part 2

Case n°1 :

## Arrêt du Cass. Com. 19 janvier 1979

COUR DE CASSATION (Chambre commerciale)

9 Janvier 1979 (3 arrêts)

Robert JUBLARD et autres c/ ROY et autres

Case 1:06-cv-00415-SLR    Document 121-4    Filed 03/20/2007    Page 5 of 35

5. MAR. 2007 13:54    BIU CUJAS    N° 9644    P. 4

JURISPRUDENCE FRANÇAISE

496

487

COUR DE CASSATION (1re Chambre civile).
19 juin, 1979

COUR D'APPEL DE PARIS (1re Chambre C.)
18 octobre 1977 et 26 janvier 1979

S.A.R.L. Primor
c/
Société d'exploitation industrielle de Belgique,
Association nationale des Joyaux et autres

Assume c/ S.A.R.L. Primor

Philippe Fouchard.

Case n°2 :

## ICC Arbitral Award : Case n°2138 in 1974

Case 1:06-cv-00415-SLR    Document 121-4    Filed 03/20/2007    Page 10 of 35

5. MAR. 2007 14:01    BIU CUJAS    N° 9644    P. 13

328

SENTENCES ARBITRALES

329

CHRONIQUE DES SENTENCES ARBITRALES INTERNATIONALES

Case n°3 :

ICC Arbitral Award : Case n°5721 in 1990
(see page 1023-1024)

1.

**III. — Clause compromissoire. — Opposabilité de la clause aux tiers — Usages du commerce international. — Bonne foi.**

— **Recherche d'un fondement volontaire.**

**IV. — Réalisation. — Réparation du préjudice. — Devoir de minimiser les pertes.**

**V. — Contrôle bancaire à première demande. — Compétence des arbitres pour statuer sur les relations entre la banque et le bénéficiaire (non). — Appel abusif de la garantie. — Compétence des arbitres (oui).**

*Sentence rendue dans l'affaire 5721 en 1990*

[dense French legal text, illegible]

[dense French legal text, illegible]

5. MAR. 2007 13:57    BIB. CUJAS    N° 9644    P. 8

**1022**

## SENTENCES ARBITRALES

**1023**

## CHAMBRE DE COMMERCE INTERNATIONALE

5. MAR. 2007 13:58    BIU CUJAS    № 9644    P. 9

1024

SENTENCES ARBITRALES

1025

CHAMBRE DE COMMERCE INTERNATIONALE

J.D.I. 4, 1990

JURISPRUDENCE ARBITRALE

# DROIT INTERNATIONAL PRIVÉ

---

## TRAVAUX
## DU COMITÉ FRANÇAIS
### DE DROIT INTERNATIONAL PRIVÉ

---

### Années
### 1984-1985

ÉDITIONS DU
CENTRE NATIONAL DE LA RECHERCHE SCIENTIFIQUE
15, quai Anatole-France, 75700 PARIS
1987

NOTICE: THIS MATERIAL MAY
BE PROTECTED BY COPYRIGHT
LAW TITLE 17 U.S. CODE.

© Centre National de la Recherche Scientifique, Paris, 1987
ISBN 2-222-03990-8

Droit International Privé
Années 1984-1985
*Éd. du CNRS, Paris, 1987*

# CLAUSES D'ARBITRAGE ET GROUPES DE SOCIÉTÉS

## COMMUNICATION DE M. Ibrahim FADLALLAH
Séance du 24 avril 1985
Présidence de M. André PONSARD

1) Une clause d'arbitrage convenue entre une société appartenant à un groupe et un tiers peut-elle être invoquée par ou contre une autre société du même groupe? Cette question fait l'objet de la présente communication. L'on négligera donc l'arbitrage interne au groupe de sociétés, qu'il pourrait être intéressant d'étudier, mais qui présente des particularités trop différentes de la question ici retenue : à savoir, l'extension au groupe d'une clause convenue avec un tiers.

2) Une réponse traditionnelle eût consisté à opposer l'interprétation restrictive des clauses d'arbitrage. Ces clauses ne produisent leurs effets qu'entre les parties signataires. A l'appui de la solution on peut invoquer non seulement le principe de la relativité des conventions, mais encore l'objet très particulier des clauses d'arbitrage. La soumission des litiges à une procédure arbitrale entraîne la soustraction des parties à leur juge naturel, qui demeure la juridiction étatique. Les parties renoncent aux garanties inhérentes au recours au juge normalement compétent. L'arbitrage constitue un moyen exceptionnel, pour ne pas dire anormal, du règlement des litiges : il doit avoir été choisi sans aucun doute possible par des parties, capables d'y consentir, dans des matières où l'État accepte de ne pas se réserver l'exclusivité juridictionnelle.

3) Mais l'idée que l'arbitrage constituerait une voie exceptionnelle de règlement des litiges n'est-elle pas en recul en matière de commerce international? Les signes de ce recul sont nombreux : foisonnement des clauses compromissoires – qui accèdent parfois à la dignité d'apaisante clauses de style –, libéralisme des droits étatiques, multiplication des conventions internationales, ou des règlements internationaux, par exemple sous l'égide de la CNUDCI. Il paraît difficile de concilier cette tendance généralisée avec la perspective rémanente d'une procédure marginale. Il y a incontestablement une évolution dans la vue que l'on a de l'arbitrage commercial international. Si l'on admet qu'il constitue la voie normale de règlement

106

des différends du commerce international, les esprits sont alors préparés pour une certaine extension de l'application *ratione personae,* des clauses d'arbitrage.

4) Et voici que, depuis une dizaine d'années, des sentences diverses, rendues sous différentes égides, se prononcent pour l'extension de la procédure arbitrale à d'autres sociétés appartenant au même groupe que le signataire de la clause. Certaines juridictions étatiques ont apporté leur renfort à ce mouvement. Il ne s'agit encore que de jalons d'une jurisprudence en cours de formation; le moment paraît venu de se risquer à en faire le point[1].

L'idée-force qui se dégage des décisions qui ont admis l'extension est que la participation de la société non signataire est conforme à une bonne administration de la justice et aux besoins du commerce international.

Il n'y a qu'avantage, en matière de frais, de délais, de commodité des parties, à grouper dans une même instance des prétentions connexes. L'on évitera, surtout, les risques de contrariété des décisions. La procédure arbitrale rencontre, dans son évolution, les écueils que la procédure étatiques, mieux pourvue en moyens, a pu résoudre d'autorité.

5) Ces préoccupations sont celles des travaux actuellement en cours sur l'arbitrage multi-partite et du développement de cette procédure dans certains pays. L'arbitrage qui implique un groupe de sociétés est une espèce du genre plus large de l'arbitrage multi-partite. Mais il faut souligner les différences spécifiques. L'identité d'intérêts généralement rencontrée entre les sociétés du même groupe simplifie maints problèmes d'organisation de l'arbitrage; et l'extension de l'arbitrage à une société non-signataire se recommande, entre autres, de l'appartenance à un même groupe.

6) La notion de groupe utilisée par les sentences est une notion économique. L'une des sentences définit ainsi le groupe :

«Le concept de groupe se définit, au-delà de l'indépendance formelle née de la création de personnes morales distinctes, par l'unité d'orientation économique dépendant d'un pouvoir commun» (sentence CCI 2375/1975)[2].

Aucune querelle de définition n'a d'ailleurs agité les litiges. Il s'est toujours agi de groupes fortement intégrés, le contrôle absolu n'étant ni contestable ni contesté, et étant même souvent revendiqué par le groupe lui-même.

7) A partir de ces données, le litige s'est élevé en termes de compétence des arbitres. L'on aurait pu le poser en termes de pouvoir juridictionnel. Mais, pour l'arbitre, s'agissant de son investiture par les parties, pouvoir et compétence sont plus difficiles et moins utiles à distinguer que pour les juridictions d'État. L'on aurait pu encore poser le problème en termes de qualité des parties pour invoquer la clause – et donc de recevabilité –. Mais toutes ces variations aboutissent à une même interrogation fondamentale : la clause d'arbitrage produit-elle effet à l'égard de la société non-signataire appartenant au même groupe ? Il s'agit de savoir si la prise en considération du groupe en tant qu'unité peut jouer un rôle, après tant d'autres domaines nationaux ou internationaux, en matière de clause d'arbitrage[3].

8) Il faut décrire bri questions qu'il soulève de

9) Dressons un tabl mène. Il s'agit d'une q exhaustif.

Toutes les sentence arbitrage *ad hoc* n'a été r

La CCI se taille la 1975 à 1983[4]. Mais ce n'e problème dans l'affaire I du 1er juillet 1973[5]. Quel York, ont également abo

Les juridictions état anglaise a rendu dans l'a 1977[7]. Le Tribunal féd 10 octobre 1979 et l'arrê deux arrêts[9], l'un dans l'a intéresse directement, l'a qui ne nous intéresse qu

10) La contestation juge étatique.

La question se pos étatique pour obtenir so l'arbitrage de 1975. In étatique sur la sentence

Le litige ne porte q mis : sans doute parce q aussi parce que, lors d'u parties au litige. Il faut la CCI, bien qu'il soit n compromis. Certes il po litigieux, une contestatio cette contestation tempo que cela paraisse, la Co dans l'affaire des Pyram

8) Il faut décrire brièvement le phénomène jurisprudentiel avant de poser les questions qu'il soulève de loi applicable et de droit substantiel.

## I. DESCRIPTION

9) Dressons un tableau synoptique, une sorte de fiche signalétique du phénomène. Il s'agit d'une quinzaine de décisions *publiées,* l'examen n'est donc pas exhaustif.

### A. Sentences et arrêts

Toutes les sentences concernées résultent d'arbitrages institutionnels. Aucun arbitrage *ad hoc* n'a été rencontré.

La CCI se taille la part du lion avec des sentences publiées s'échelonnant de 1975 à 1983[4]. Mais ce n'est pas la seule institution concernée. La CIRDI a connu du problème dans l'affaire Holiday Inn. c/Maroc et l'a réglé par une sentence partielle du 1er juillet 1973[5]. Quelques sentences d'arbitrage maritime, tant à Paris qu'à New York, ont également abordé la question[6].

Les juridictions étatiques en ont également été saisies. La High Court of Justice anglaise a rendu dans l'affaire Roussel-Uclaf c/Searle, un arrêt en date du 6 octobre 1977[7]. Le Tribunal fédéral suisse a rendu deux décisions : l'arrêt Cartier du 10 octobre 1979 et l'arrêt Tradax du 7 février 1984[8]. La Cour de Paris enfin a rendu deux arrêts[9], l'un dans l'affaire Dow Chemical en date du 21 octobre 1983 qui nous intéresse directement, l'autre dans l'affaire des Pyramides, en date du 12 juillet 1984, qui ne nous intéresse qu'indirectement.

### B. Objet de la contestation

10) La contestation porte toujours sur la compétence de l'arbitre ou celle du juge étatique.

La question se pose directement à l'arbitre (cas le plus courant) ou au juge étatique pour obtenir soit son dessaisissement soit un sursis – selon la loi anglaise sur l'arbitrage de 1975 –. Indirectement, la question se pose dans le cadre du contrôle étatique sur la sentence arbitrale qui aurait statué sans convention.

Le litige ne porte que sur des clauses compromissoires. Jamais sur des compromis : sans doute parce que ceux-ci sont rares dans les arbitrages institutionnels, mais aussi parce que, lors d'un compromis, l'on a tendance à définir sans ambiguïté les parties au litige. Il faut rappeler ici que l'acte de mission prévu dans le règlement de la CCI, bien qu'il soit né historiquement de l'exigence d'un compromis, ne vaut pas compromis. Certes il pourrait en contenir un; mais s'il comporte, parmi les points litigieux, une contestation sur la compétence, il serait bien paradoxal que l'énoncé de cette contestation emporte soumission à la compétence des arbitres. Aussi curieux que cela paraisse, la Cour de Paris a eu à le rappeler dans son arrêt du 12 juillet 1984 dans l'affaire des Pyramides.

108

## C. Parties

11) Les parties demanderesses à l'extension de la clause ont été tantôt les sociétés du groupe, tantôt le tiers co-contractant. Il arrive même que le litige s'élève entre deux sociétés non-signataires appartenant respectivement aux mêmes groupes que les signataires. Il est intéressant de noter que dans un cas (sentence 1510 de la Société d'arbitrage maritime de New York du 28 novembre 1980), la société signataire a présenté les demandes des autres sociétés du groupe, sans que celles-ci soient formellement parties à l'arbitrage.

## D. Le résultat

12) Le résultat est le suivant. Toutes les fois que le groupe – société non signataire – a invoqué à son profit la clause, à une exception très particulière près[10], le bénéfice de la clause lui a été reconnu. En revanche, les solutions sont mitigées, avec une dominante au rejet lorsque c'est le tiers qui cherche à étendre l'effet d'une clause compromissoire à une société non-signataire. L'on verra si cette constatation revêt une signification particulière, en examinant les questions de loi applicable et de droit substantiel que soulève ce courant jurisprudentiel.

## II. QUESTIONS DE LOI APPLICABLE

13) En termes de conflits de lois, l'on balance entre deux pôles d'attraction :
– le groupe – pôle structurel
– la clause d'arbitrage – affaire de circonstance.

Il est fort gênant de dépecer ainsi une question unique qui intègre les deux éléments. Une règle matérielle serait sans doute – et comme toujours – mieux adaptée. Mais cette préférence ne dispense pas de mesurer le rôle respectif de la loi de la société et de la loi applicable à la clause. Le choix n'est pas indifférent et témoigne parfois de prises de position préalables à la désignation de la loi applicable.

## A. Le groupe

14) C'est la loi de la société qui dira si celle-ci constitue une entité distincte, dotée d'une personnalité propre; si et dans quelle mesure sa domination ou son contrôle permettent d'instaurer une transparence au sein du groupe.

L'on se heurte, ici, évidemment, au problème de la multiplicité des lois nationales dans les groupes multinationaux. On ne peut surmonter l'écueil que soit par la reconnaissance d'une hypothétique loi unique du groupe, à déterminer avec tous les problèmes que l'on sait (société mère? Centre de décision?...) soit par une application distributive des lois des sociétés concernées. C'est cette solution qui, en l'état actuel du droit positif, paraît devoir être retenue : la loi de chaque société dira si et dans quelle mesure celle-ci a pu être engagée par les actes d'une autre société du

se ont été tantôt les
ne que le litige s'élève
t aux mêmes groupes
s (sentence 1510 de la
re 1980), la société
pe, sans que celles-ci

groupe – société non
rès particulière près[10],
lutions sont mitigées,
à étendre l'effet d'une
a si cette constatation
de loi applicable et de

: pôles d'attraction :

e qui intègre les deux
me toujours – mieux
rôle respectif de la loi
'est pas indifférent et
n de la loi applicable.

e une entité distincte,
sa domination ou son
roupe.

t multiplicité des lois
onter l'écueil que soit
pe, à déterminer avec
cision?...) soit par une
t cette solution qui, en
de chaque société dira
d'une autre société du

---

groupe. Ainsi, si la loi – ou la jurisprudence – de la société mère décide que les actes de la filiale doivent être traités comme émanant de la société mère – au motif par exemple que les filiales ne sont que les instruments du commerce de la mère – cette indication devra être suivie.

Mais dans aucune des espèces rencontrées l'on n'a soutenu ou, à tout le moins, admis que le groupe constituait une unité juridique indissociable. L'indépendance juridique des sociétés a même servi parfois au rejet des demandes d'attraction des sociétés non-signataires dans la procédure arbitrale.

15) La loi de la société déterminera également si le signataire de la clause d'arbitrage avait pouvoir ou qualité d'agir pour le compte de la société non-signataire. C'est en termes de pouvoir que l'arrêt Cartier rendu par le Tribunal fédéral suisse le 10 octobre 1979, a résolu la question. Ayant constaté qu'en dépit de «l'interpénétrabilité et (de) l'imbrication de sociétés dominées par un seul homme», la clause arbitrale signée par l'administrateur et président d'un groupe ne pouvait être signée au nom des sociétés du groupe que par un organe ou un mandataire spécial, qualités dont l'existence n'a pas été considérée comme établie en l'espèce.

Le renvoi aux pouvoirs de l'organe désigne évidemment la loi de la société concernée.

16) Mais la détermination du pouvoir de l'organe ne résout qu'un aspect partiel de la difficulté. Même si le signataire avait pouvoir, il resterait à savoir en quelle qualité il a *en fait*, agi. Ce n'est pas toujours très clair dans les groupes de sociétés. Et, à supposer que le signataire n'ait ni pouvoir ni qualité, la question demeure entière de savoir si la société non-signataire ne doit pas être réputée avoir accepté la clause compromissoire ou y avoir adhéré.

Or, sur ce point il convient de se tourner vers l'autre élément du couple : la clause d'arbitrage.

### B. La clause d'arbitrage

17) Dans la mesure où la règle de conflit s'applique à la clause compromissoire, la soumission de celle-ci à la loi d'autonomie – sous réserve de règles matérielles – n'est plus discutée. Cette loi peut d'ailleurs n'être point la loi régissant le contrat au fond. La détermination des parties et des tiers à l'acte relève naturellement de la loi d'autonomie.

Mais il faut aussi se rappeler qu'un problème de forme peut se poser, notamment quant à l'exigence d'un écrit – et il conviendrait de donner une chance supplémentaire à la validité par l'application facultative de *locus regit actum*.

18) La clause peut, en certains pays, relever de la loi du lieu de l'arbitrage, soit au titre de la procédure, soit au titre du droit public. En Suisse, où l'arbitrage est considéré comme une exception à la garantie constitutionnelle du recours au juge d'État, le Concordat intercantonal sur l'arbitrage de 1969 impose comme une

110

disposition impérative la forme écrite de la convention d'arbitrage, et cette disposition s'applique à tout arbitrage ayant son siège sur le territoire de l'un des cantons concordataires (tous sauf erreur, à l'exception de Zürich).

19) La question de la forme peut être réglée directement par un instrument international. La Convention de New York du 10 juin 1958, celle de Washington du 18 mars 1965, la Convention européenne du 21 avril 1961 imposent, selon des modalités et à des degrés divers, que la clause soit écrite ou signée par les parties. Lorsque ces instruments s'appliquent, il faut rechercher si l'extension d'une clause à une société non-signataire est compatible avec l'exigence d'une convention écrite.

20) Au-delà, la question se pose de savoir s'il ne faut pas provoquer, en matière de groupe de sociétés, une nouvelle règle matérielle de l'arbitrage commercial international. Il appartient à chaque État d'en décider pour son propre compte. Mais une telle règle existe-t-elle en dehors de tout droit étatique?

21) L'ébauche la plus élaborée de cette tentative est fournie par la sentence Dow Chemical du 23 septembre 1982 rendue sous l'égide de la CCI par un collège arbitral prestigieux. Cette sentence entend apprécier la portée et les effets d'une clause compromissoire CCI selon une règle matérielle *non étatique,* déduite de la seule *lex mercatoria.*

La démarche se fonde sur le règlement de la Cour d'arbitrage de la CCI. La sentence énonce qu'en raison de l'autonomie de la clause compromissoire, la désignation par les parties d'une loi applicable ne concerne que le fond du litige, sauf stipulation expresse contraire. Cette lecture du contrat est commandée par la référence des parties au Règlement de la CCI qui, concernant la décision des arbitres sur leur propre compétence, ne «prévoit de recours à aucune loi étatique»: l'article 8 § 3 confère au tribunal arbitral le pouvoir de «prendre toute décision sur sa propre compétence» sans lui prescrire d'appliquer, pour ce faire, une loi étatique quelconque.

En conséquence, le tribunal, libéré de toute loi étatique, a recherché et retenu sa compétence en se fondant sur la commune volonté des parties et sur les usages du commerce international, notamment en présence d'un groupe de sociétés.

22) Cette démarche soulève plusieurs interrogations.

a) Tout d'abord, le règlement de la Cour d'Arbitrage de la CCI n'est-il pas un tant soit peu sollicité?

L'article 8 § 3 énonce :

«Lorsqu'une des parties soulève un ou plusieurs moyens relatifs à l'existence ou à la validité de la Convention d'arbitrage, la Cour, ayant constaté *«prima facie»* l'existence de cette Convention, peut décider, sans préjuger la recevabilité ou le bien-fondé de ces moyens, que l'arbitrage aura lieu. Dans ce cas, il appartiendra à l'arbitre de prendre toute décision sur sa propre compétence».

La dernière phrase, citée par la sentence, a pour objet, dans son contexte, de signifier que le tribunal n'est pas lié par la décision provisoire de la Cour. Cette

111

trage, et cette disposi-
re de l'un des cantons

ent par un instrument
elle de Washington du
l imposent, selon des
signée par les parties.
tension d'une clause à
e convention écrite.

provoquer, en matière
l'arbitrage commercial
n propre compte. Mais

ournie par la sentence
la CCI par un collège
tée et les effets d'une
*étatique,* déduite de la

rage de la CCI. La sen-
missoire, la désignation
a litige, sauf stipulation
ar la référence des par-
'article 8 § 3 confère au
sa propre compétence»
quelconque.

:, a recherché et retenu
ties et sur les usages du
e de sociétés.

e la CCI n'est-il pas un

relatifs à l'existence ou
constaté «*prima facie*»
er la recevabilité ou le
e cas, il appartiendra à
».

, dans son contexte, de
oire de la Cour. Cette

disposition n'apporte rien sur la question de savoir si la clause compromissoire est soumise à une loi étatique.

Il est vrai, en revanche, que le règlement ne prescrit pas le recours à une loi étatique. Mais il n'en libère pas non plus l'arbitre. Je crois tout simplement qu'il est muet – j'allais dire sans opinion – sur la question. Le règlement envisage la validité de la clause sans se référer à une loi étatique. En déduit-on que les cas de nullité échappent à toute loi étatique?

Dès lors, n'est-il pas plus légitime d'interpréter la désignation d'une loi par les parties comme s'appliquant aussi, *prima facie,* à la clause compromissoire? L'autono- mie de celle-ci permet mais n'impose pas de la soumettre à une autre loi que celle régissant le fond du contrat et, en l'absence d'indication contraire, il n'y a pas de raison déterminante de dissocier, *a priori,* entre les lois applicables. De surcroît, c'est surtout matériellement que l'autonomie de la clause rend service, pour échapper à la nullité éventuelle du contrat. Or, nous verrons que l'extension de la clause à une société non-signataire suppose des incursions matérielles importantes dans le contrat. L'application d'une même loi serait alors d'autant plus souhaitable.

En outre, s'il s'agit d'interpréter la volonté des parties, l'on peut raisonnable- ment penser que la désignation d'une loi dans le contrat leur est psychologiquement plus proche que le détour par les dispositions du règlement sur la compétence des arbitres.

Pas davantage on ne devrait accorder une importance considérable à la manière, souvent générale, dont est rédigé l'acte de mission. Sinon, l'on transforme ce document en un piège pour les parties et l'on complique d'autant sa signature.

23 b) La deuxième interrogation tient à la légitimité de la démarche. S'agissant de rechercher l'applicabilité de la clause à un non-signataire, on invoque la volonté des signataires de se référer au règlement de la CCI. Ce n'est légitime que si l'on tient compte de la volonté du non-signataire. C'est dire que le recours à la volonté des parties (y compris les non-signataires) est impliquée par la démarche initiale. On n'invoque pas le règlement pour rechercher ensuite librement la règle matérielle. C'est la substance même de la règle qui autorise de se fonder sur le règlement – à supposer exacte l'interprétation qui en a été donnée.

24 c) La troisième – et dernière – interrogation concerne le point de vue du juge étatique. Le droit français permet-il à l'arbitre de se prononcer sur sa compétence sans se référer à une loi étatique? La question, d'une manière ultime, tient à la philosophie de l'arbitrage : dérogation à la justice d'État, ou justice parfois tout aussi naturelle accompagnant la justice d'État.

Plus pragmatiquement, l'art. 1502 NCPC permet-il à l'arbitre de statuer sur le fondement d'une convention d'arbitrage non sanctionnée par une loi d'État? Le texte est muet, mais l'on peut penser que le libéralisme des articles 1495 et 1496 NCPC peut inspirer ici la même solution : l'arbitre n'est pas tenu d'appliquer une loi d'État, mais il est tenu par une règle de droit. Il ne peut tenir son pouvoir de sa propre décision. Son investiture – sa compétence – doivent se fonder sur une règle de droit.

112

Et l'on est ainsi une fois de plus renvoyé à la question de savoir si la *lex mercatoria* est du droit (ainsi qu'aux avatars de l'affaire Pabalk-Norsolor)[11]. A mon sens, et en évitant le débat général, l'on peut admettre la directive que constitue une règle de droit légitimant le pouvoir de l'arbitre, une règle précise qui, tenant compte des circonstances, soit suffisamment contraignante pour éviter le risque d'arbitraire.

En d'autres termes, c'est la pertinence de la règle qui lui servira de justification. Ce qui nous conduit à entrer dans le débat du droit substantiel.

### III. QUESTIONS DE DROIT SUBSTANTIEL

25) Les décisions étudiées ont dû se prononcer sur une question de forme et dégager une règle de fond.

#### A. Question de forme

Lorsque la loi applicable à la clause exige une forme écrite, cette clause peut-elle être étendue à une société non-signataire? La question se rencontre notamment à propos des arbitrages du CIRDI institués par la Convention de Washington du 18 mars 1965, de la Convention de New York du 10 juin 1958 et du droit suisse. Pour le droit français, nous inclinons à penser que l'article 1443 NCPC – sanctionnant de la nullité la clause compromissoire non écrite – ne s'applique pas à l'arbitrage international.

#### 1 – *La Convention de Washington*

26) Le problème s'est rencontré dans l'affaire Holiday Inn c/Maroc. En schématisant, voici les faits. Le groupe américain Holiday Inn (ainsi que le groupe Occidental Petroleum, mais je ne parlerai, *brevitatis causa*, que du premier) a conclu, par une filiale suisse (alors en formation – complication supplémentaire hors de notre propos) un accord de base avec le Maroc pour la construction d'hôtels. La question de la participation à l'arbitrage CIRDI prévu par la convention s'est posée à propos
    – de la société mère américaine,
    – des filiales créées au Maroc.

27 a) *Pour la société mère américaine*, il convenait d'appliquer l'article 25 § 1 de la Convention de Washington qui prévoit la compétence du Centre des litiges entre un État contractant et un ressortissant d'un autre État contractant, lorsque les parties y *«ont consenti par écrit»*.

Le tribunal arbitral (1er juillet 1973) a refusé d'avoir une approche formaliste de ce texte. Il admet la société mère à invoquer la clause d'arbitrage pour des motifs tirés de son rôle dans le contrat contenant cette clause qui en est inséparable.

28 b) *Pour les filiale* n'autorise une société d'u s'il a été convenu de la «c en raison du contrôle exe

Il n'était pas doute contrôle étranger. Mais a le Maroc. L'article 25 § 2 des termes. Dès lors, la c écrit pour reconnaître aux

Ici encore, le tribuna rigueur au fond :

«The question arises or whether it may be imp achieve constitutes an ex and one would expect th with respect to such a de explicit. An implied agr specific circumstances wo parties, which is not the c

Le Tribunal a consid aux principes de la Conv accord implicite «dans le interprétation de l'intenti qu'un tel accord implicit juridictions à l'égard de l tout doute.

Pas d'exigence de for demander si la meilleure écrite de la volonté.

29) C'est le Tribuna Convention de New York 7 février 1984. La conve conventions écrites d'arb société du groupe Amoco à une autre société du gr de la charte-partie. Le T clause compromissoire. Il des considérations de for par les parties qui invoc Convention – et non le di

*Note: left margin contains fragmentary text from the adjacent page, partially visible:*

> ı de savoir si la *lex*
> -Norsolor)[11]. A mon
> ive que constitue une
> e qui, tenant compte
> e risque d'arbitraire.
>
> rvira de justification.
>
> L
>
> question de forme et
>
> cette clause peut-elle
> ıcontre notamment à
> ı de Washington du
> du droit suisse. Pour
> PC – sanctionnant de
> ıue pas à l'arbitrage
>
> y Inn c/Maroc. En
> (ainsi que le groupe
> que du premier) a
> . supplémentaire hors
> struction d'hôtels. La
> nventiuon s'est posée
>
> ıuer l'article 25 § 1 de
> entre des litiges entre
> nt, lorsque les parties
>
> ıproche formaliste de
> e pour des motifs tirés
> :éparable.

28 b) *Pour les filiales marocaines,* un autre problème se posait. L'art. 25 § 2.b n'autorise une société d'un État contractant à bénéficier de l'arbitrage du Centre que s'il a été convenu de la «considérer comme ressortissant d'un autre État contractant en raison du contrôle exercé sur elle par des intérêts étrangers».

Il n'était pas douteux, en l'espèce, que les filiales marocaines étaient sous contrôle étranger. Mais aucune convention *expresse* n'avait été conclue entre elles et le Maroc. L'article 25 § 2.b se présente dans la dépendance du § 1, dont il définit l'un des termes. Dès lors, la question s'est posée de savoir s'il fallait, ou non, un accord écrit pour reconnaître aux filiales marocaines le caractère de ressortissant étranger.

Ici encore, le tribunal arbitral a fait preuve de libéralisme sur la forme – mais de rigueur au fond :

«The question arises, however, whether such an agreement must be expressed or whether it may be implied. The solution which such an agreement is intended to achieve constitutes an exception to the general rule established by the convention, and one would expect that parties should express themselves clearly and explicitly with respect to such a derogation. Such an agreement should therefore normally be explicit. An implied agreement would only be acceptable in the event that the specific circumstances would exclude any other interpretation of the intention of the parties, which is not the case here».

Le Tribunal a considéré que l'accord visé par l'art. 25 § 2.b était une dérogation aux principes de la Convention et devrait dès lors être explicite. Mais il a admis un accord implicite «dans le cas où des circonstances spécifiques excluraient toute autre interprétation de l'intention des parties». Sur le fond, il n'a pas admis en l'espèce qu'un tel accord implicite ait été conclu : la renonciation de l'État à ses propres juridictions à l'égard de l'un de ses ressortissants ne peut être acquise qu'au-delà de tout doute.

Pas d'exigence de forme, donc, mais une exigence de fond telle que l'on peut se demander si la meilleure – ou la seule – manière d'y satisfaire n'est pas l'expression écrite de la volonté.

## 2 – *La Convention de New York*

29) C'est le Tribunal fédéral suisse qui a eu à statuer sur l'application de la Convention de New York à un groupe de sociétés dans l'arrêt Tradax c/Amoco du 7 février 1984. La convention impose aux États contractants la reconnaissance des conventions écrites d'arbitrage. En l'espèce, une charte-partie conclue par une société du groupe Amoco contenait la clause d'arbitrage et le connaissement, délivré à une autre société du groupe Amoco, contenait un renvoi aux clauses et conditions de la charte-partie. Le Tribunal fédéral a considéré que le renvoi s'étendait à la clause compromissoire. Il a donné à sa décision des motifs de fond, sans s'arrêter à des considérations de forme tenant à l'absence de la clause dans un document signé par les parties qui l'invoquaient. Mais le tribunal a bien précisé qu'il interprétait la Convention – et non le droit suisse.

114

### 3 – *Le droit suisse*

30) L'on sait la tendance, en Suisse, à une interprétation restrictive de la clause d'arbitrage, refusant par exemple de l'étendre à un contrat accessoire[12]. Qu'allait-il en être de l'extension à un groupe de sociétés?

L'application à un groupe de sociétés de la règle suisse qui exige une forme écrite de la convention d'arbitrage a été examinée dans la sentence 4402/1983. La sentence rappelle d'abord la nécessité d'une convention *écrite*, c'est-à-dire signée par toutes les personnes auxquelles elle impose des obligations, comme condition de la privation de la garantie constitutionnelle du recours au juge naturel. Puis la sentence se demande si le signataire a agi seulement pour son compte ou également pour les autres sociétés du groupe, et si le comportement de ces sociétés emporte un accord implicite à l'arbitrage.

Cette démarche montre bien que la question n'est pas de pure forme. Comme le dit la sentence Dow Chemical, il s'agit d'examiner la portée et les effets de la clause, de savoir qui est partie et qui est tiers. Dès lors qu'une personne a signé la clause, l'exigence de forme est remplie si l'on peut démontrer que le signataire a agi pour le compte d'une autre société du groupe[13]. Qu'il s'agisse de représentation initiale – selon ses divers modes – ou de transfert des droits, par cession ou subrogation, l'exigence de forme, à savoir l'existence d'une clause initiale écrite et signée – est de toute manière respectée. Seule se pose alors la question de l'efficacité de l'institution de fond qui en permet l'extension à une personne non matériellement signataire. S'il y a exigence de forme, elle est déplacée vers cette institution.

A la vérité, l'effort essentiel des arbitres qui ont admis l'extension de la clause a porté sur une justification de fond.

### B. Question de fond

31) La jurisprudence extensive refuse de se laisser enfermer dans la considération de la sentence 2138/1974 :

«Attendu que s'il résulte bien des éléments du dossier que la négociation de l'affaire et sa conclusion sur les termes essentiels ont été menées par la Société X..., il n'est nullement établi que si celle-ci avait signé elle-même le contrat du..., elle aurait accepté la clause compromissoire...».

Un tel motif, par sa généralité et son abstraction, étoufferait toute tentative d'extension. En réalité, les décisions qui ont admis l'extension se fondent sur la volonté des parties, y compris les sociétés non-signataires. Cette volonté est déduite :
– de l'appartenance de ces sociétés au même groupe que la société signataire,
– de leur rôle dans l'affaire concernée.

32) L'appartenance à un même groupe n'est jamais, à elle seule, suffisante. Le groupe n'est pas considéré par lui-même comme un principe d'intégration entraînant *de plein droit* la transparence en son sein. L'existence du groupe – non contestée – est utilisée comme un indice – un signal de déclenchement – ou un terrain sur lequel

se développent des cons
tuelles. L'existence du
divers documents contra
ou de sa croyance légiti

Mais c'est surtout la
convention qui est déter

Il est essentiel d'ill
courant jurisprudentiel

33) *1er exemple : l'*

La société américa
concédé à Roussel-Uclaf
produit, partout, sauf a
CCI. La société améric
commercialisé par ses
allait s'élever sur le poi
concession de licence ex

Roussel-Uclaf a a
l'accord d'exclusivité au
signataire de la clause c
arbitrage devant la Cou
anglaise, demandé la su

L'Arbitration Act
demandée par une part
pour une telle partie».
pour sa mère? Une m
situations de la mère et
identiques en l'espèce :
– si la mère est en
– mais si la mère n
que la filiale n'est pa

«... no reason why
exclude a wholly-own
patented articles which
Of course, if the arbitra
parent company is at fa
if so, the subsidiary wil
only common sense tha
and their actions are, in
it would be right to hol
of the arbitration claus
to do what is in fact do

Il y a donc, ici, un
que *l'on demeure dans*

se développent des considérations sur le rôle des parties dans les relations contractuelles. L'existence du groupe atteste de l'unité d'intérêts, de la connaissance des divers documents contractuels, de l'indifférence du tiers à son organisation interne ou de sa croyance légitime qu'il traite avec tout un groupe.

Mais c'est surtout la participation des diverses sociétés à l'opération objet de la convention qui est déterminante.

Il est essentiel d'illustrer cette proposition de plusieurs exemples, car tout le courant jurisprudentiel repose sur ce fondement.

33) *1er exemple : l'affaire Roussel-Uclaf* (High Court of Justice 6 octobre 1977)

La société américaine Searle a inventé un produit pharmaceutique de base et concédé à Roussel-Uclaf une licence exclusive pour fabriquer et commercialiser le produit, partout, sauf aux États-Unis. Le contrat comportait une clause d'arbitrage CCI. La société américaine a mis au point un *dérivé* du produit de base, qu'elle a commercialisé par ses diverses filiales, notamment en Grande-Bretagne. Le litige allait s'élever sur le point de savoir si le produit dérivé était compris ou non dans la concession de licence exclusive.

Roussel-Uclaf a assigné devant les juridictions anglaises pour violation de l'accord d'exclusivité aussi bien la société mère américaine, que la filiale anglaise non signataire de la clause d'arbitrage. La société américaine a introduit une requête en arbitrage devant la Cour d'arbitrage de la CCI. Elle a, en même temps que sa filiale anglaise, demandé la suspension de la procédure devant les juridictions anglaises.

L'Arbitration Act de 1975 permet d'obtenir une telle suspension lorsqu'elle est demandée par une partie à l'accord d'arbitrage ou par une personne agissant «par ou pour une telle partie». La filiale anglaise pouvait-elle être considérée agir par ou pour sa mère? Une réponse positive a été donnée au motif essentiel que les situations de la mère et de la filiale à 100% au regard du litige étaient pratiquement identiques en l'espèce :

– si la mère est en faute, la filiale le sera également,

– mais si la mère n'est pas en faute, le sens commun commande de considérer que la filiale ne l'est pas non plus.

«... no reason why these words in the Act should be construed so narrowly as to exclude a wholly-owned subsidiary company claiming, as here, a right to sell patented articles which it has obtained from and been ordered to sell by its parent. Of course, if the arbitration proceeding so decide, it may eventually turn out that the parent company is at fault and not entitled to sell the articles in question at all; and, if so, the subsidiary will be equally at fault. But, if the parent is blameless, it seems only common sense that the subsidiary should be equally blameless. The two parties and their actions are, in my judgment, so closely related on the facts in this case that it would be right to hold that the subsidiary can establish that it is within the purview of the arbitration clause, on the basis that it is claiming 'through or under' the parent to do what is in fact doing whether ultimately held to be wrongful or not».

Il y a donc, ici, une quasi-indivisibilité des situations qui permet de considérer que *l'on demeure dans les limites de la clause d'arbitrage.*

116

**34) *2ᵉ exemple : l'affaire Holiday Inn c/Maroc* (1ᵉʳ juillet 1973)**

Dans cette affaire, les négociations avaient été menées par la société mère – la filiale signataire n'étant pas encore constituée. La société mère non-signataire de la clause avait *garanti* l'exécution par la filiale de la convention contenant la clause compromissoire. Un argument de subrogation en avait été tiré. Le tribunal arbitral a considéré que, dans la mesure où elle avait exécuté les obligations du contrat, la société mère pouvait invoquer la clause d'arbitrage qui doit être considérée comme inséparable.

L'accord prévoyait également que le contrat pouvait être *cédé*, transféré à une autre filiale du groupe. Le tribunal en a conclu que l'esprit du contrat était de laisser aux sociétés contractantes une grande *flexibilité* dans la désignation des sociétés qui assumeraient la responsabilité de l'exécution des obligations.

**35) *3ᵉ exemple : l'affaire Dow Chemical c/ Isover Saint-Gobain***

Le litige portait sur les avatars de la commercialisation en France d'un produit d'isolation fabriqué et commercialisé sous diverses marques par les diverses sociétés du groupe Dow, à travers un réseau particulièrement complexe et mouvant.

Le tribunal arbitral s'est efforcé de montrer que les diverses sociétés du groupe Dow avaient agi indifféremment, tant lors de la négociation que lors de l'exécution et de la résiliation des contrats.

Une grande confusion a régné d'où il résulte, à suivre les constatations très minutieuses des arbitres, que :
– l'identité de la société (filiale vénézuélienne puis suisse) signataire du contrat était sans importance,
– la société mère américaine, bien que non signataire, propriétaire des marques, avait nécessairement consenti au contrat qui avait été exécuté sans licence d'exploitation,
– une autre société non signataire, la filiale française, avait été désignée pour exécuter le contrat, qui prévoyait d'ailleurs la faculté – non utilisée en fait – de faire livrer par d'autres sociétés du groupe. C'est cette même société qui a procédé à la résiliation des contrats.

Le tribunal en a déduit que :
– la société mère était le pivot des rapports contractuels et exerçait un contrôle absolu sur ses filiales qui sont intervenues dans l'affaire,
– la filiale française s'était comportée pleinement – et avait été traitée – comme une partie au contrat.

***Autres exemples***

**36)** D'une manière plus générale, il n'est pas d'exemple où l'extension de la clause compromissoire ait été admise sans que le tribunal relève l'implication des sociétés du groupe dans les relations contractuelles spécifiques. Il en est ainsi notamment des affaires maritimes où les droits étaient nés de connaissements émis à la suite d'une charte-partie.

117

De même, dans les deux sentences CCI nᵒˢ 2375 et 1434 rendues en 1975, les arbitres ont relevé l'imbrication des obligations contractuelles des diverses sociétés du groupe, la volonté des sociétés signataires de stipuler pour elles-mêmes et pour leurs filiales, et le caractère *déraisonnable* d'une interprétation du contrat qui isolerait la seule clause compromissoire de liens complexes de droits et d'obligations.

### 37) Veut-on la contre-épreuve ?

Les sentences qui ont refusé l'extension soulignent, elles aussi, la volonté des sociétés du groupe d'agir séparément, l'indépendance de leurs personnalités, l'absence de confusion entre elles, la conscience du co-contractant de traiter avec la seule société signataire, et non avec le groupe, enfin l'absence de preuve de la volonté des sociétés non signataires de se soumettre à la clause compromissoire.

38) Ainsi entendue, cette nouvelle jurisprudence arbitrale serait finalement plus classique qu'il n'y paraît. Fondée, en dernière analyse, sur la volonté des parties, l'on peut se demander si elle ne pose pas une règle existant d'ores et déjà en droit français. Elle ne fait que prolonger le libéralisme jurisprudentiel en matière de forme et de preuve de la clause, l'admission de l'arbitrage par référence à un autre acte ou encore son extension à des contrats accessoires ou annexes[14].

L'on peut ainsi s'expliquer que l'extension de la clause ait été retenue toutes les fois que la société non-signataire l'invoquait[15]; cela supprimait toute discussion sur sa volonté; sans doute le tiers pouvait-il soutenir que la clause n'est pas une convention ouverte à laquelle quiconque peut adhérer, mais les liens de la société non-signataire avec l'opération, sans lesquels son intérêt à agir serait aléatoire, permettent de respecter la relativité des conventions.

En tout cas, l'on voit qu'il ne s'agit pas d'une entreprise anti-groupe, où le tiers – et lui seul – tirerait avantage d'une apparence créée ou d'une confusion entretenue par le groupe. La donnée objective – le groupe – vient au soutien d'une réalité subjective spécifique : l'adhésion de la société non-signataire à la clause, dégagée d'une analyse concrète des relations contractuelles. L'arbitrage demeure un procédé volontaire de règlement des litiges : il ne sanctionne ni l'appartenance à une structure, ni un comportement n'impliquant pas la volonté réelle de se soumettre à une juridiction arbitrale.

39) Mais il faut mesurer que cette approche affecte l'autonomie de la clause compromissoire. Dès lors que l'analyse des relations contractuelles au fond commande la décision sur la compétence des arbitres, la clause apparaît comme inséparable des autres stipulations du contrat. C'est pourquoi, nous paraissent artificielles les justifications fondées sur l'autonomie de la clause compromissoire. L'extension de la clause à des non-signataires n'a pu être menée à bien qu'à travers son intégration dans l'ensemble des relations. Telle sentence parle du caractère inséparable de la clause compromissoire, telle autre dit qu'il serait «inconcevable» de l'isoler. En définitive, la jurisprudence arbitrale examinée illustre bien les limites de l'autonomie de la clause compromissoire. Et, à ce sujet, il est sans doute heureux que les rédacteurs du décret du 12 mai 1981 aient été pris de scrupules constitutionnels et n'aient pas figé la règle dans un texte : on aurait ainsi pris le risque de la priver de la souplesse que le développement de l'arbitrage rend nécessaire.

118

40) Le moment est venu de mesurer la *portée* de cette jurisprudence. Je le ferai à trois points de vue.

### (a) *La volonté des parties*

Si l'on entend ne retenir qu'une volonté sérieuse, deux exigences doivent être maintenues :

– la charge de la preuve doit incomber à celui qui invoque l'extension de la clause à un non-signataire; la seule existence du groupe ne saurait suffire à renverser la charge de la preuve;

– un effort de motivation spécifique doit être entrepris dans chaque cas. Rien n'est plus dangereux que de se contenter d'une motivation générale. Elle aurait un effet dissuasif et rendrait les groupes réticents à l'égard de l'arbitrage.

Il faut bien entendu réserver la volonté contraire. Il n'est pas exclu que l'on voie apparaître une limitation expresse des clauses aux signataires, à l'exclusion de toute autre société du groupe.

Mais les arbitres doivent aussi induire cette volonté contraire des circonstances. Car le groupe n'est pas seulement *principe d'unité*, il est aussi principe de *diversité* et de division du travail, et *organisation du cloisonnement de la responsabilité* : la limitation de la responsabilité est souvent le prix qu'un système social accepte de payer à l'encouragement de l'initiative privée et de l'entreprise à risque; elle fait partie de la règle du jeu. Si un groupe a pris la précaution de ne traiter que par l'une de ses sociétés, s'il a évité la confusion, si les obligations souscrites ne sont destinées à être exécutées que par le signataire, alors il ne faut pas que l'interprète en vienne à tromper l'attente légitime des intéressés, sinon l'arbitrage lui-même en pâtirait.

Il en sera de même si un contrat ne peut être exécuté par une société non-signataire : il est des exemples, en effet, où par suite de règlements étatiques, seule une filiale d'une autre nationalité peut souscrire l'engagement et exécuter le contrat. Si les parties en sont ainsi convenues en connaissance de cause, il faut laisser en dehors de l'arbitrage la société non-signataire. N'étant pas tenue d'une obligation, son attraction aurait pour objet, le plus souvent, de lui faire assumer une garantie en cas d'insolvabilité de la société signataire. Ce serait un détournement de la clause compromissoire que de lui faire jouer ce rôle : si l'on voulait une garantie, il fallait la demander clairement.

### (b) *Les structures concernées*

41) Le fondement à dominante volontariste retenu conduit à se demander si la solution peut être étendue à d'autres structures que les groupes de sociétés. Déjà l'on relève que dans les espèces étudiées, aucune contestation ne s'est élevée sur l'existence du groupe. Il s'agissait en fait de groupes fortement intégrés, pratiquement de filiales à 100 % [16]. Qu'en sera-t-il si le contrôle est moins absolu ou s'il revêt d'autres formes que la participation? A notre sens, la question sera absorbée par la recherche spécifique de la volonté des parties.

Mais alors, ne peut-on étendre cette jurisprudence à des formes de coopération qui n'empruntent pas la structure d'un groupe de sociétés? L'on pense aux

prudence. Je le ferai

igences doivent être

ue l'extension de la
it suffire à renverser

ns chaque cas. Rien
érale. Elle aurait un
itrage.

is exclu que l'on voie
à l'exclusion de toute

re des circonstances.
incipe de *diversité* et
*a responsabilité* : la
ne social accepte de
se à risque; elle fait
: traiter que par l'une
ites ne sont destinées
'interprète en vienne
même en pâtirait.

lté par une société
èglements étatiques,
ement et exécuter le
e cause, il faut laisser
nue d'une obligation,
umer une garantie en
rnement de la clause
ine garantie, il fallait

t à se demander si la
de sociétés. Déjà l'on
ne s'est élevée sur
it intégrés, pratique-
is absolu ou s'il revêt
. sera absorbée par la

; formes de coopéra-
tés ? L'on pense aux

groupements de coopération inter-entreprises, aux entreprises communes («joint ventures»), voire à la sous-traitance agréée. Dans toutes ces figures, le raisonnement tenu sur les sociétés d'un même groupe peut être transposé, dès lors que l'on privilégie les circonstances spécifiques par rapport aux données de structure. Mais la prudence s'impose à l'arbitre. L'identité d'intérêts au sein d'un groupe fortement intégré ne se rencontre pas nécessairement dans les autres hypothèses. Or elle pèse incontestablement dans la recherche de la volonté des parties.

42) Irait-on jusqu'à assimiler au cas du groupe celui des sociétés d'État dans leurs rapports avec l'État ? La question s'est posée dans l'affaire dite des Pyramides. La sentence CCI n° 3493 rendue le 16 février 1983 a mené, à propos de l'État égyptien et de la société qui en était l'émanation, une démarche analogue à celle décrite pour les groupes de sociétés. Elle a retenu l'État comme partie à l'arbitrage. Cette sentence a été annulée par la Cour de Paris le 12 juillet 1984[17].

La situation de l'État est particulière à plus d'un égard. Son intervention est moins univoque que celle d'une société mère. Il peut notamment intervenir comme autorité de tutelle. En l'espèce, le Ministre du tourisme avait apposé sur le contrat conclu par la seule société d'État la formule «approuvé agréé et ratifié» («approved agreed and ratified»). Les arbitres y avaient trouvé une adhésion au contrat, alors que la Cour d'appel y voit le simple exercice d'un contrôle par l'autorité de tutelle.

La seconde considération tient à l'immunité de juridiction de l'État. La clause compromissoire valant renonciation à cette immunité, il convient d'être particulière-ment circonspect pour admettre une renonciation non expresse.

Mais ces deux remarques faites, il n'y a pas incompatibilité entre la jurispru-dence élaborée pour les groupes et son application à l'État.

(c) *Contrôle des juridictions d'État*

43) L'affaire des Pyramides invite à évoquer une dernière limite à la jurisprudence arbitrale : le contrôle des juridictions d'État.

Dans l'affaire Dow Chemical, la Cour de Paris avait, dans la foulée d'un recul du contrôle étatique, reconnu le *pouvoir souverain* des arbitres dans la recherche de la volonté des parties de se soumettre à la juridiction arbitrale.

La même Cour de Paris a, dans l'affaire des Pyramides, abandonné cette position pour apprécier elle-même directement l'existence d'une convention d'arbi-trage et annuler la sentence. Cette dernière solution paraît bien être la bonne[18]. L'enjeu est de vérifier si l'arbitre a statué sans convention d'arbitrage. S'en remettre, à cet égard, à son appréciation souveraine, c'est le rendre source et maître de son pouvoir juridictionnel. Or il n'a de pouvoir que dérivé. Et dès lors que la Cour d'appel doit vérifier que l'arbitre n'a pas statué sans convention d'arbitrage, son investigation doit s'étendre à tout ce qui lui permet de répondre, par elle-même, à cette question. Il y a là, partiellement, une révision au fond, mais limitée dans son objet à la vérification du pouvoir ou de la compétence de l'arbitre. On ne peut étendre à l'arbitre la règle de la Convention de Bruxelles du 27 septembre 1968 qui lie le juge de la reconnaissance par les faits qui ont servi à l'affirmation de la compétence de la juridiction d'origine.

120

L'existence et l'étendue du contrôle étatique constitue une garantie contre un éventuel excès de la jurisprudence arbitrale.

44) Car si cette jurisprudence peut être approuvée, c'est à la condition qu'elle repose sur une motivation factuelle sérieuse. Il faut éviter de créer une présomption d'extension de l'arbitrage au groupe, à peine de provoquer un réflexe de défense qui pourrait aller jusqu'au refus de tout arbitrage.

1. V. Derains et Schaf 1985.231; Institut du Droit e 1982.495; Derains, «Sources Droit et pratique de l'arbitr International Chamber of Co

2. Clunet 1976.973, obs sous la direction de Goldmar

3. V. pour quelques exe sein des groupes de sociétés»

4. Sentences CCI N° 1976.978, obs. Derains; N° 2 Chemical, Rev. arb. 1984.13 (YCA) 1984.131, recours e Chapelle; N° 4392/1983, Ch 16 fév. 1983, N° 3493, Pyran note Goldman; d'autres se reprennent le raisonnement

5. V. l'article très instru Morocco) – Some legal Pro v. aussi sur le CIRDI et sa Différends relatifs aux Inves rations», 1 Jour. Int. Arb. 1(

6. Ch. arb. Mar. Paris, Arbitrators, New York, 28 n

7. English High Court c L. Rep. 225 (1978); comp. s v. Kammgarn, YCA 1979.31

8. Trib. féd. 7 oct. 197 suisse, t. I, L'arbitrage intern

9. Préc. note 1 supra.

10. La filiale marocaine v. infra N° 28.

11. Sur la lex mercator Mélanges Goldman, p. 125 nationaux», Trav. com. 19 dernier lieu, Robert, Réto

EXHIBIT 5

REDACTED

# EXHIBIT 6

**June 1999:**
URS acquires Dames & Moore (including Radian)

**January 25, 1999:**
Radian enters into contract with Solidere

**April/March 2001:**
Gas emission first detected (Compl. Ex. A at 22)

**November 1999 – August 2000**
URS Corporation decides to reorganize its subsidiaries to benefit from shared resources and other synergies. Pursuant to this plan, Radian will perform existing contracts; future business will be conducted through URS (See Carberry Decl. Ex. 9, 21; see also Solidere Ans. Br. at 5)

**September 30, 2002:**
Per the longstanding reorganization plan, Radian transfers domestic assets to URS (Carberry Decl. Ex 7)

**September 10, 2002:**
Normandy Landfill project still $88 million profit-maker despite gas emissions (Carberry Decl. Ex. 28 at 1))

**May 13, 2003:**
Solidere and Radian enter into MOU instituting first arbitration; Solidere does not seek damages (Russell Decl. Ex. 11)

**January 2003:**
Solidere and Radian representatives agree gas emission problem needs action plan (Compl. Ex. A at 29)

**February 13, 2006:**
Solidere initiates new request for arbitration seeking damages for first time (Compl. Ex. A)

**February 10, 2006:**
Solidere terminates contract with Radian (Compl. Ex. A at 45)

# EXHIBIT 7

REDACTED