IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| URS CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Civ. No. 06-415-SLR |
| v. | ) |
| | ) |
| THE LEBANESE COMPANY FOR THE | ) |
| DEVELOPMENT AND | ) |
| RECONSTRUCTION OF BEIRUT | ) |
| CENTRAL DISTRICT SAL, | ) |
| | ) |
| Defendant. | ) |

Edward P. Welch, Paul J. Lockwood and Edward B. Micheletti, of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Jeffrey H. Dasteel, Jason D. Russell, Stacy Horth-Neubert and Marina V. Bogorad of Skadden, Arps, Slate, Meagher & Flom LLP, Los Angeles, California.

Samuel A. Nolen and Anne Shea Gaza, of Richards, Layton, & Finger, P.A., Wilmington, Delaware. Counsel for Defendant. Of Counsel: Paul B. Carberry of White & Case LLP, New York, New York.

## MEMORANDUM OPINION

Dated: September 28, 2007
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

On June 30, 2006, plaintiff URS Corporation ("URS") filed this action against

defendant, the Lebanese Company for the Development and Reconstruction of Beirut,

Central District SAL ("SOLIDERE"), based on its inclusion in an arbitration proceeding

currently underway in Paris, France. (D.I. 1 at ¶ 3) Before the court are SOLIDERE's

motion to dismiss (D.I. 32) based on lack of personal jurisdiction and improper venue,

and URS's motion for a preliminary injunction seeking to enjoin arbitration (D.I. 36). On

March 23, 2007, plaintiff URS filed a motion for conditional leave to file a surreply. (D.I.

123) This court heard oral argument on May 16, 2007. For the reasons that follow,

SOLIDERE's motion to dismiss is granted in part and denied in part. Plaintiff's motion

for a preliminary injunction is denied.

## II. BACKGROUND

### A. The Entities

SOLIDERE is a publicly traded joint stock company organized under the laws of

Lebanon. (D.I. 34 at ¶ 3) URS is an engineering design firm organized under the laws

of Delaware. (D.I. 1 at ¶ 12) Radian International LLC ("Radian") is a Delaware limited

liability company and subsidiary of URS that provides engineering and environmental

contractor services. (Id. at ¶¶ 3, 6)

### B. The Creation of SOLIDERE

After the Lebanese civil war, Lebanon began to rebuild the Beirut Central District

("BCD"), which was heavily damaged during the war. (D.I. 34 at ¶ 2) Initially, this

1

process was undertaken by the State of Lebanon through the Council of Development and Reconstruction ("CDR"). (Id.) The CDR is the authority in charge of overseeing major public works projects in Lebanon. (Id.) Several problems occurred, and Law 91-117 came into effect, which authorized the CDR to accomplish rebuilding by contracting with a private entity. (Id.) On May 5, 1994, SOLIDERE was formed as a private-sector, joint stock company on the basis of Lebanese Law 91-117 ("Law 91-117"). (Id. at ¶ 3) A company formed pursuant to Law 91-117 must have its Articles of Incorporation approved by the Council of Ministers. (D.I. 34, ex. A) Further, Law 91-117 dictates that the purpose of the company formed shall be the "development and reconstruction of the area in accordance with the approved Master Plan and Guiding Layout, the sale of the developed lots, the erection of buildings thereon and the sale or lease of such buildings." (Id.) Lebanese Law 91-117 compelled owners of real estate properties in the BCD to contribute their rights to SOLIDERE in exchange for shares in the company. (Id. at ¶ 4; D.I. 111 at ¶ 4)

SOLIDERE's business activities are the acquisition of real estate properties in the BCD and the re-construction, restoration and commercial development of the area, including the remediation of the Normandy Landfill. (D.I. 34 at ¶ 3) On September 20, 1994, the CDR entered into a contract with SOLIDERE, under which SOLIDERE became responsible for executing the infrastructure of the BCD. (Id. at ¶ 4; D.I. 93, ex. 106) Pursuant to its agreement with the CDR, SOLIDERE agreed to "finance and ensure the execution of the construction of roads, squares and public parks at the expense and for the account of the State." (D.I. 93, ex. 106 at SOLDEL29747) Specifically, CDR and SOLIDERE are counterparties to an agreement under which

2

SOLIDERE is to perform the reconstruction work on the infrastructure of the BCD. (D.I. 111 at ¶ 2) CDR approval was required "for all tendered documents relating to infrastructure works within the BCD." (D.I. 89, ex. 1 at 119:19-22,120:5-11; D.I. 93, ex. 112) As compensation for its efforts, SOLIDERE received title and development rights to 291,800 square meters of land on the reclaimed land known as the Normandy Landfill. (D.I. 34 at ¶ 4)

SOLIDERE is owned by individuals, companies and others. (Id. at ¶ 5) Sixty percent of SOLIDERE's initial capital consisted of contributions in kind represented by the ownership of real estate, while forty percent represented cash contributions made by private investors from Lebanon and abroad. (Id.) The State of Lebanon is one of over 34,000 shareholders in SOLIDERE. (Id.) As of October 13, 2006, the Lebanese government owned 83,707 shares, representing 0.05 % of SOLIDERE's total shares. (Id.) Shares of SOLIDERE are registered on the Beirut Stock Exchange and the Kuwait Stock Exchange. (Id.)

SOLIDERE is managed by its Board of Directors, which is comprised entirely of private citizens with the exception of a single director who represents the State of Lebanon and the Municipality of Beirut. (Id.) This director has the same powers as the other directors. (Id.) Employees of SOLIDERE are employed solely by SOLIDERE and are not employed in any public or governmental capacity by the Lebanese government. (Id.) SOLIDERE's Articles of Incorporation provide that at least two-thirds of its twelve-member board of directors must be Lebanese nationals, but impose no other restrictions on who may be employed by SOLIDERE. (Id.)

**C. The Contract**

3

On January 25, 1999, SOLIDERE and Radian entered into a contract (the "SR contract") under which Radian was responsible for the reclamation and remediation part of the Normandy Landfill site in Beirut. (D.I. 1, ex. B) The Normandy Landfill, part of the BCD, had been created as a result of waste deposited into the sea off the coast of Beirut during Lebanon's civil war. (D.I. 34 at ¶ 3) Pursuant to the SR contract, Radian was required to excavate part of the Normandy Landfill site, sort and treat the materials, and backfill them after treatment. (D.I. 1) The only two signatories to the SR contract are Radian and SOLIDERE. (Id., ex. B) The SR contract contains a choice of law clause selecting the laws of the Republic of Lebanon, and also provides that all disputes arising therefrom are to be resolved pursuant to arbitration in Paris, France under the Rules of Arbitration of the International Chamber of Commerce ("ICC"). (D.I. 34, ex. C at GCC §§ 44, 50) Specifically, the arbitration clause provides that

> [a]ll disputes arising out of or in connection with the present Contract shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce in force as of January 1st, 1998 by one or more arbitrators appointed in accordance with the said Rules. The language of arbitration shall be english. The place of arbitration shall be Paris.

(D.I. 34, ex. C at GCC § 44) CDR approval was a condition precedent to executing the SR contract, and the SR contract was to be performed according to the CDR's plans. (D.I. 1, ex. B at Art. 8 & GCC § 28)

At the time the SR contract was signed, Radian was owned by the Dames & Moore Group. (Id. at ¶ 6) URS purchased the Dames & Moore Group in June 1999, several months after the SR contract was signed. (D.I. 1 at ¶ 6) Radian commenced its work under the SR contract on April 14, 1999. Eventually, a dispute arose between

4

Radian and SOLIDERE regarding gas emissions at the Normandy Landfill. (D.I. 34 at ¶ 7d) In accordance with the SR contract, the dispute was submitted to ICC arbitration in May 2003 (the "first arbitration"). (D.I. 1 at ¶ 43) In the first arbitration, SOLIDERE obtained an award against Radian and submitted the award against Radian to the French courts for confirmation. (Id. at ¶ 43) SOLIDERE and Radian were unable to resolve their differences, despite the first arbitration award. (D.I. 34 at ¶ 7) SOLIDERE terminated the SR contract on February 10, 2006. (Id. at ¶ 7)

## D. The Pending Arbitration

On February 13, 2006, SOLIDERE commenced a second arbitration (the "pending arbitration").[1] (D.I. 1, ex. A) This second Request for Arbitration with the ICC named both URS and Radian as Respondents. (Id.) The ICC court is not a typical court; it is an administrative body that ensures the application of the ICC rules. (D.I. 35, ex. C at Art. 1) URS, on March 13, 2006, invoked Article 6(2) of the ICC rules to challenge its inclusion in the arbitration proceedings. (Id., ex. D, letter dated March 13, 2006) Under Article 6(2), where the "existence, validity or scope of the arbitration agreement" is in issue, the ICC court decides whether it is "prima facie satisfied that an arbitration agreement under the [r]ules may exist." (Id., ex. C at Art. 6(2)) If the ICC court is prima facie satisfied that such an agreement may exist, the ICC court will refer the case to the arbitral tribunal which will decide whether there is in fact such an agreement to arbitrate. (Id. at Art. 6) On June 2, 2006, the ICC court decided, pursuant to Article 6(2), that it was prima facie satisfied that an arbitration agreement

---

[1]Radian also filed a "Request for Arbitration" with the ICC on January 20, 2006. (D.I. 1 at ¶ 44)

5

may exist between URS and SOLIDERE. (Id., ex. D) The ICC tribunal, composed of confirmed arbitrators, was constituted on October 18, 2006. The tribunal held a preliminary hearing in Paris, France on December 18, 2006. At that hearing, the tribunal set a schedule for briefing on URS's jurisdictional objections concluding with a hearing to be held in December 2007. (D.I. 94, ex. 129)

Presently, URS asks this court for a declaration that URS has not agreed to arbitrate with SOLIDERE and, therefore, is not bound to arbitrate with SOLIDERE in the pending arbitration before the ICC. (D.I. 1 at ¶ 52) Based on its claim that no agreement to arbitrate exists, URS also asks this court for a preliminary injunction enjoining the pending arbitration. (Id. at ¶ 53)

## III. DISCUSSION

### A. Subject Matter Jurisdiction

Plaintiff URS has asserted subject matter jurisdiction on three grounds: (1) diversity pursuant to 28 U.S.C. § 1332;[2] (2) Chapter Two of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201 et seq.; and (3) the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1603-1611. (D.I. 1 at ¶¶ 19-31) Because the source of subject matter jurisdiction may determine the appropriate choice of governing law, it is prudent to examine all potential sources.

### 1. Standard of review

---

[2]The facts establishing diversity jurisdiction are undisputed: (1) URS is a Delaware corporation; (2) SOLIDERE is a Lebanese corporation; and (3) the alleged amount in controversy exceeds $75,000. As discussed below, personal jurisdiction is lacking over SOLIDERE under this basis and, therefore, an examination of the alternative bases of subject matter jurisdiction is necessary.

6

The lack of subject matter jurisdiction may be raised at any time; it cannot be waived and the court is obliged to address the issue on its own motion. See Moodie v. Fed. Reserve Bank of NY, 58 F.3d 879, 882 (2d Cir. 1995). Once jurisdiction is challenged, the party asserting subject matter jurisdiction has the burden of proving its existence. See Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc., 227 F.3d 62, 69 (3d Cir. 2000).

Under Federal Rule of Civil Procedure Rule 12(b)(1), the court's jurisdiction may be challenged either facially (based on the legal sufficiency of the claim) or factually (based on the sufficiency of jurisdictional fact). See 2 James W. Moore, Moore's Federal Practice § 12.30[4] (3d ed. 1997). The court must accept as true the allegations contained in the complaint on a facial challenge to jurisdiction. See id. Dismissal for a facial challenge to jurisdiction is "proper only when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous.'" Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1408-09 (3d Cir. 1991) (quoting Bell v. Hood, 327 U.S. 678, 682-83 (1946)).

Under a factual attack, however, the court is not "confine[d] to allegations in the ... complaint, but [can] consider affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction." Gotha v. United States, 115 F.3d 176, 179 (3d Cir. 1997); see also Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891-92 (3d Cir. 1977). In such a situation, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Carpet Group, 227 F.3d at 69 (quoting Mortensen, 549 F.2d at 891). Although the court should determine subject

7

matter jurisdiction at the outset of a case, "the truth of jurisdictional allegations need not always be determined with finality at the threshold of litigation." Moore at § 12.30[1]. Rather, a party may first establish jurisdiction "by means of a nonfrivolous assertion of jurisdictional elements, and any litigation of a contested subject-matter jurisdictional fact issue occurs in comparatively summary procedure before a judge alone (as distinct from litigation of the same fact issue as an element of the cause of action, if the claim survives the jurisdictional objection)." Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 537-38 (1995) (citations omitted).

### 2. Subject matter jurisdiction under the FAA

#### a. Agreement to arbitrate

Asserting the FAA as a basis for subject matter jurisdiction, URS seeks a declaration that it has not agreed to arbitrate with SOLIDERE and, therefore, is not bound to arbitrate with SOLIDERE in the pending arbitration. (D.I. 1 at 16) The FAA provides for the recognition and enforcement of foreign arbitral awards by incorporating the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"), 21 U.S.T. 2517. See 9 U.S.C. § 201. Under the FAA, federal district courts have original jurisdiction over actions "falling under" the New York Convention.[3] 9 U.S.C. § 203. Chapter 2 provides for two types of claims in federal district courts: (1) an action to compel arbitration pursuant to an arbitration agreement reached pursuant to the New York Convention, 9 U.S.C. § 206; and (2) an action to confirm an arbitral award against any other party to an arbitration made

---

[3]The United States and France (where the arbitration is proceeding) are both signatories to the New York Convention. See 21 U.S.T. 2517.

pursuant to an agreement falling under the New York Convention, 9 U.S.C. § 207. Despite this apparent limitation, URS argues that it is entitled to a judicial determination of whether an agreement to arbitrate exists based on First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995).

In First Options, the Court addressed "how a district court should **review** an arbitrator's decision" about whether the parties agreed to arbitrate the merits of a dispute. 514 U.S. at 940 (emphasis added). In other words, First Options determined the standard of review to be applied by courts when examining an arbitrator's decision regarding arbitrability. Id. at 942. Relying on contract principles, First Options held that a court reviews an arbitrator's arbitrability decision independently when there is not "clear and unmistakable" evidence that the parties agreed to submit that question to arbitration. Id. at 943-44. In contrast, if the parties clearly agreed that the arbitrability question is within the province of the arbitrator, then the standard of review applied by the court is more deferential. See id. at 943.

Notably, in the case at bar, the ICC tribunal has not issued a decision on arbitrability at this time. The ICC court, as an administrative body, determined that it was prima facie satisfied that an arbitration agreement under the Rules **may** exist. (D.I. 35, ex. D at facsimile dated June 2, 2006) The ICC rules make clear that the question of arbitrability will ultimately be addressed by the ICC tribunal composed of the confirmed arbitrators. (Id., ex. C at Art. 6) Here, the ICC tribunal has scheduled a hearing on the jurisdictional issue of arbitrability for December 2007. (D.I. 94, ex. 129) Consequently, as First Options only identified the standard of review to be employed

9

once an arbitrability decision has been made, First Options does not give URS a substantive right to have the court make the arbitrability determination in the first instance. See id. at 942.

Similarly, AT & T, Inc. v. Communications Workers of America, 475 U.S. 643 (1986), does not support URS's position that it is entitled to a judicial determination of whether it agreed to arbitrate at this juncture. In AT & T, the issue addressed was "whether a court asked to **order** arbitration" must first "determine that the parties intended to arbitrate the dispute." Id. at 644 (emphasis added). Because "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," AT & T mandates that a court must make a threshold determination of arbitrability before compelling a party to arbitrate under the FAA. See id. at 648-50 ("The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty.") (quoting John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 547 (1964)).

URS insists that an action compelling arbitration is the same as an action enjoining arbitration. (D.I. 128 at 35) ("We deem this to be a distinction without a difference."). In support of its contention, URS relies on General Electric Co. v. Deutz AG, 270 F.3d 144 (3d Cir. 2001). In General Electric, the Court stated that the "international nature" of litigation does not affect the application of First Options' principles. See id. at 155. Based on this statement, URS urges this court to make a determination regarding arbitrability at the threshold. See id. Importantly, General

10

Electric and AT & T both involved a party seeking to compel arbitration.[4] See id. at 149;

AT & T, 475 U.S. at 644. Here, neither party is seeking to compel arbitration. In order

to accept URS's argument, therefore, the court would have to agree that an action

compelling arbitration is the same as an action enjoining arbitration under the FAA and

the New York Convention. After examining the plain language of the FAA and the New

York Convention, the court concludes that it may only grant subject matter jurisdiction

over actions to compel arbitration or to enforce an arbitral award. See New York

Convention, art. 2(3), Sept. 1, 1970, 21 U.S.T. 2517 (stating that a court "shall, at the

request of one of the parties, refer the parties to arbitration"); New York Convention, art.

3(1), Sept. 1, 1970, 21 U.S.T. 2517 (mandating that a court "shall recognize arbitral

awards as binding and enforce them in accordance with the rules of procedure of the

territory where the award is relied upon"); 9 U.S.C. §§ 206-207.

Not only is the court's interpretation consistent with the relevant case law, it is

apparent that making a judicial determination on arbitrability, prior to an action seeking

recognition or enforcement of an award, is inconsistent with the purposes of the FAA

---

[4]Similarly, URS relies on several other cases that address the court's power to
compel and the threshold question of arbitrability. See Sandvic AB v. Advent Int'l Corp.,
220 F.3d 99, 100-01 (3d Cir. 2000) (affirming district court's denial of motion to compel);
Laborers' International Union of North America v. Foster Wheeler Corp., 868 F.2d 573,
574 (3d Cir. 1989) (addressing whether district court erred in compelling arbitration
before making a determination that the corporate veil of the parent company must be
pierced); Smith-Wilson Co. v. Trading & Development Establishment, 744 F. Supp. 14,
16 (D.D.C. 1990) (noting defendants filed a motion seeking to compel arbitration); see
also Sarhank Group v. Oracle Corp., 404 F.3d 657, 659 (2d Cir. 2005) (stating action
was to confirm and enforce a foreign arbitration award). Moreover, the inconsistency of
URS's position supports the determination that subject matter jurisdiction is lacking.
The FAA and the New York Convention explicitly require an agreement to arbitrate,
which is precisely what URS alleges does not exist. See New York Convention, art.
2(1) , 21 U.S.T. 2517; 9 U.S.C. 202.

and the New York Convention. The primary purpose of the New York Convention,

enforced through the FAA, is to efficiently "encourage the recognition and enforcement

of commercial arbitration agreements in international contracts and to unify the

standards by which agreements to arbitrate are observed and arbitral awards are

enforced in the signatory countries." China Minmetals Materials Import & Export Co.,

Ltd. v. Chi Mei Corp., 334 F.3d 274. 282-83 (3d Cir. 2003) (quoting Scherk v. Alberto-

Culver Co., 417 U.S. 506, 520 n.15 (1974)). Significantly, the Supreme Court has

noted that "sensitivity to the need of the international commercial system for

predictability in the resolution of disputes" underlies the New York Convention. See

Suter v. Munich Reinsurance Co., 223 F.3d 150, 155 (3d Cir. 2000) (citing Mitsubishi

Motors Corp. v. Soler Chrysler-Plymouth Inc., 473 U.S. 614, 629 (1985)). URS has

failed to demonstrate that an order by this court on the issue of arbitrability prior to a

decision by the ICC tribunal will adhere to the purposes of the New York Convention.

Even if the arbitrability question must be answered now, the FAA does not authorize an

injunction against a foreign arbitral proceeding.[5]

### b. Preliminary Injunction

As discussed previously, the FAA provides subject matter jurisdiction for two

actions: (1) to compel arbitration and (2) to enforce an arbitral award. See 9 U.S.C. §§

206-207. URS, nevertheless, asserts that subject matter jurisdiction exists under the

FAA because the power to enjoin is the equivalent of the power to compel. URS

---

[5]URS will not be deprived of judicial review guaranteed by First Options because
any enforcement action brought in the United States against URS will look to the
underlying question of arbitrability based on URS's jurisdictional objections in the
underlying ICC proceeding. See First Options, 514 U.S. 943-44.

argues that courts routinely interpret the power to enjoin into chapter 1 of the FAA.[6]
(D.I. 127 at 9) URS also asserts that, because chapter 1 of the FAA applies to chapter
2 of the FAA, to the extent that they are not inconsistent, then the power to enjoin must
also exist under Chapter 2 of the FAA. See 9 U.S.C. § 208; (D.I. 123 at 3).

URS primarily relies on four cases to support its position that this court can
enjoin a foreign tribunal proceeding abroad under the FAA.[7] This authority is not
persuasive. The Masefield and Satcom courts both granted preliminary injunctions
against proceeding arbitrations. Masefield, 2005 WL 911770, at *1; Satcom, 49 F.
Supp. 2d at 342 (S.D.N.Y. 1999), aff'd, 205 F.3d 1324 (2d Cir. 1999). Satcom involved
an arbitration agreement that fell under the New York Convention, while Masefield
involved an arbitration before the ICC. Masefield, 2005 WL 911770, at *1; Satcom, 49
F. Supp. 2d at 336-37. Significantly, and despite their international nature, both the
arbitrations in Masefield and Satcom were initiated in the United States. Masefield,
2005 WL 911770, at *1; Satcom, 49 F. Supp. 2d at 334. The fact that the arbitrations
took place on United States soil vested the district courts with primary jurisdiction over
those proceedings. See 9 U.S.C. §§ 203-204. In the case at bar, the SR contract

---

[6] Plaintiff's motion for leave to file a surreply to address subject matter jurisdiction
under the Federal Arbitration Act, 9 U.S.C. § 201, et. seq., (D.I. 123), is granted and the
information considered in the requests and opposition for a surreply was considered in
the court's disposition of the pending motions.

[7] In its brief, URS cites to Satcom Int'l Group PLC v. Orbcomm International
Partners, 49 F. Supp. 2d 331 (S.D.N.Y. 1999), aff'd, 205 F.3d 1324 (2d Cir. 1999).
URS relied on three other cases at oral argument: (1) Masefield AG v. Colonial Oil
Indus., Inc., No. Civ. A. 05-2231, 2005 WL 911770 (S.D.N.Y. Apr. 18, 2005); (2)
Raytheon Eng'rs & Constructors, Inc. v. SMS Schloemann-Siemag Akiengesellschaft,
No. Civ. A. 99-7771, 2000 WL 420866 (N.D. Ill. Mar. 16, 2000); and (3) American Life
Insurance Co. v. Parra, 25 F. Supp. 2d 467 (D. Del. 1998). (D.I. 128 at 87)

13

provides that arbitration is to be conducted in Paris, France. (D.I. 34, ex. C at ¶ 44)  In

this situation, the French courts have primary jurisdiction over the pending arbitration

and this court declines to extend its jurisdiction over those extraterritorial waters by

enjoining the ongoing arbitration in France.[8]  See New York Convention, art. 5(1), 21

U.S.T. 2517 (listing situations when recognition and enforcement may be refused).

Moreover, this result is supported by General Electric and the Third Circuit's

restrictive approach to granting such relief. See 270 F.3d at 148-49, 160-61.  The Third

Circuit reversed the grant of an injunction on comity grounds, where the district court

enjoined a foreign defendant from applying to the courts of primary jurisdiction to

enforce the alleged right to arbitration. See id. at 149.  In so doing, the Court

recognized that "anticipatory" injunctions are to be issued in "the rarest of

circumstances on the domestic front" and implied that a stricter standard applies to

injunctions whose reach is international.[9]  See 270 F.3d at 159; see also Stonington

Partners, Inc. v. Lernout & Hauspie Speech Prods., 310 F.3d 118, 127, 129 (3d Cir.

2002) (noting exceptions to the restrictive approach are narrowly drawn and that "our

---

[8]URS asserts that the Parra and Raytheon cases similarly support this court
enjoining a foreign arbitration proceeding. (D.I. 128 at 87)  After a thorough reading, it
is not clear where the arbitrations were proceeding in those cases. See Raytheon,
2000 WL 420866; Parra, 25 F. Supp. 2d at 467.  The court is unable to determine
where primary jurisdiction exists with respect to these cases.  URS, as the plaintiff
asserting subject matter jurisdiction, has failed to meet its burden in this regard. See
Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc., 227 F.3d 62, 69 (3d Cir. 2000).

[9]Anticipatory injunctions are injunctions that are issued before the subsequent
suit is under way. General Electric, 270 F.3d at 159.  The parties dispute whether the
present relief requested is an anticipatory injunction.  The court finds the standard
applicable here because, as in General Electric, there are two actions proceeding
simultaneously in different forums. See 270 F.3d at 149, 159.  Therefore, the effect of
this court's order is left "to the determination of the other forum." See id. at 159.

14

case law unequivocally directs courts to exercise restraint in enjoining foreign proceedings").

Further, comity and the purposes of the New York Convention do not support issuing an injunction against a foreign arbitral proceeding. Comity is an "important and omnipresent factor" in parallel litigation and "assumes even more significance in international proceedings." General Electric, 270 F.3d at 159-60. It is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation . . . ." Id. at 160 (quoting Hilton v. Guyot, 159 U.S. 113, 143 (1895)). "The primary reason for giving effect to the rulings of foreign tribunals is that such recognition factors international cooperation and encourages reciprocity. Thus, comity promotes predictability and stability in legal expectations, two critical components of successful international commercial enterprises." Id. As discussed above, the primary purpose of the New York Convention, enforced through the FAA, is to efficiently recognize and enforce commercial arbitration agreements in international contracts while unifying the standards by which these agreements are observed. See China Minmetals, 334 F.3d at 283 (quoting Scherk v. Alberto-Culver Co., 417 U.S. 506, 520 n.15 (1974)); see also S. Rep. No. 91-702, at 8 ("[T]he proposed system of implementation through the U.S. district courts will assist the uniform and efficient enforcement of arbitration agreements and awards in foreign commerce."). URS has not demonstrated how issuing an injunction against a foreign arbitral proceeding will further any of these goals. For these reasons, the court concludes that issuing an injunction against an arbitral proceeding abroad is inconsistent with the purposes of the New York Convention; therefore, the concomitant power to enjoin under Chapter 1 of

15

the FAA is inapplicable to Chapter 2 actions under the circumstances at bar.

### 3. Subject Matter Jurisdiction Under the FSIA

Alternatively, URS asserts subject matter jurisdiction pursuant to the Foreign

Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1603-1611, and 28 U.S.C. § 1330(a)

(foreign state jurisdiction).[10] (D.I. 1 at ¶ 25) Section 1603(a) of the FSIA provides that a

foreign state, "except as used in section 1608 of this title, includes a political subdivision

of a foreign state or an agency or instrumentality of a foreign state as defined in

subsection (b)." 28 U.S.C. § 1603(a). An agency or instrumentality of a foreign state

means any entity

(1) which is a separate legal person, corporate or otherwise; and (2) which
is an organ of a foreign state or political subdivision thereof, or a majority
of whose shares or other ownership interest is owned by a foreign state or
political subdivision thereof; and (3) which is neither a citizen of a State of
the United States as defined in section 1332(c) and (e) of this title, nor
created under the laws of any third country.[11]

28 U.S.C. §1603(b). Foreign states are immune from the jurisdiction of United States

courts unless an exception in sections 1605-1607 applies. 28 U.S.C. § 1604.

The issue at bar is whether SOLIDERE is an organ of a foreign state under 28

---

[10]Section 1330(a) provides that

[t]he district courts shall have original jurisdiction without regard to amount
in controversy of any nonjury civil action against a foreign state as defined
in section 1603(a) of this title as to any claim for relief in personam with
respect to which the foreign state is not entitled to immunity either under
sections 1605-1607 of this title or under any applicable international
agreement.

28 U.S.C. § 1330(a).

[11]The parties do not dispute that the requirements of sections 1603(b)(1) and
1603(b)(3) are met.

16

U.S.C. § 1603(b)(2).[12] "The FSIA does not define the term 'organ' as used in section 1603(b)(2)." USX, 345 F.3d at 207. In USX, the Third Circuit established a seven-part test to determine whether an entity is "an organ of a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b)(2); see USX, 345 F.3d at 209. The USX test considers the following factors: (1) the circumstances surrounding the entity's creation; (2) the purpose of its activities; (3) the degree of supervision by the government; (4) the level of government financial support; (5) the entity's employment practices, particularly regarding whether the foreign state requires the hiring of public employees and pays their salaries; (6) the entity's obligations and privileges under the foreign state's laws; and (7) the ownership structure of the entity. See id. at 209 (noting no one factor is determinative). The court addresses these factors in turn.

### a. The circumstances surrounding SOLIDERE's creation

SOLIDERE argues that it was not created by statute because Law 91-117 is a law of general application and "there was nothing in Law 91-117 that required the creation of SOLIDERE." (D.I. 110 at 19) In other words, SOLIDERE asserts that Law 91-117 modifies the public statute which formed the CDR and created conditions that must be met by any private company chosen by the CDR to perform the reconstruction of the BCD. (D.I. 110 at 22) SOLIDERE admits, however, that it was "constituted . . . on the basis of Lebanese Law 91-117." (D.I. 34 at ¶ 3); see also (D.I. 112, ex. 5 at

---

[12]Section 1603(b)(2) requires that either the entity be an organ of a foreign state or that a majority of the entity's shares or other ownership interest be owned by a foreign state or political subdivision thereof. 28 U.S.C. §1603(b)(2); USX Corp v. Adriatic Ins. Co., 345 F.3d 190, 203 (3d Cir. 2003). Here, URS does not assert that a majority of SOLIDERE's shares are owned by the Lebanese government and, therefore, only the "organ" prong is addressed.

SOLDEL 20890) (discussing pending litigation and noting cases attacking the foundation of the company were without merit because "the company was formed via a special law"). This admission weighs "more heavily in favor of organ status where the entity originally was created for a government purpose." See USX, 345 F.3d at 210.[13]

### b. The purpose of SOLIDERE's activities

URS asserts that SOLIDERE was created by the Lebanese government to perform an important governmental interest, rebuilding the BCD. (D.I. 73 at 24) In contrast, SOLIDERE argues that its purpose, like any privately held company, is to increase the financial profit of its shareholders. (D.I. 110 at 20) SOLIDERE's Articles of Incorporation state that the purpose of the company is to: (1) acquire certain real estate properties as specified in Decree No. 2236; (2) finance and ensure the execution of the infrastructure works in the area where the real estate properties are located at the expense of the State; (3) prepare and reconstruct the area where the specified real estate properties are located in accordance with the "provisions of a plan and a guiding layout duly approved"; (4) restore the existing buildings and sell them, and sell the replanned plans and real estate properties. (D.I. 34, ex. B at Art. 3) Pursuant to its agreement with the CDR and evidenced by its Articles of Incorporation, SOLIDERE must reconstruct and develop the BCD and Normandy Landfill, as well as execute their

---

[13]An examination of control exerted by the government in the formation of the entity is also appropriate under this first prong. See USX, 345 F.3d at 211. SOLIDERE's Articles of Incorporation had to be formed in consultation with the CDR and approved by the Lebanese Council of Ministers, a government body endowed with executive powers under the Constitution. (D.I. 34, ex. A; D.I. 93, ex. 109 at Art. 17) Additionally, Law 91-117 mandates that the company's object shall include the development and reconstruction of the area in accordance with the approved Master Plan and Guiding Layout. Id.

infrastructure. Significantly, the process of rebuilding and redeveloping the BCD was initially undertaken by the CDR, which is the Lebanese governmental authority that oversees major public works projects. Moreover, SOLIDERE has entered into an agreement with the CDR to perform infrastructure works in the BCD where it is subject to the supervision and control of the Council in performing those infrastructure works. (D.I. 93, ex. 106 at SOLDEL 29751)

The court finds that SOLIDERE's purpose is mixed. The initial attempt by the CDR to reconstruct and develop the BCD and SOLIDERE's agreement with the CDR suggests that SOLIDERE's purpose is public. Similarly, a government purpose is also indicated because providing infrastructure is a traditional government function. In contrast, SOLIDERE's purpose also contemplates selling the redeveloped land and buildings, presumably for a profit. Accordingly, this factor is neutral.

### c. The degree of supervision by the Lebanese government

The Lebanese government has played an active role in supervising SOLIDERE's activities. The government's active role is demonstrated through: (1) the CDR's approval of the SR contract; (2) one member of SOLIDERE's twelve member Board of Directors represents Lebanon and the Municipality of Beirut; and (3) CDR approval for all tendered documents relating to the infrastructure works within the BCD. (D.I. 1, ex. B at Art. 8; D.I. 34 at ¶ 5c; D.I. 83, ex. 1 at 119:19-22) SOLIDERE asserts that the degree of supervision exerted by the Lebanese government is comparable to a normal contractor-client relationship. (D.I. 110 at 20) Specifically, SOLIDERE argues that CDR approval of the SR contract (between Radian and SOLIDERE) and infrastructure works evidences a concern by the CDR for the way its general contractor (SOLIDERE)

19

performed the work – including the approval of subcontractors. Id. Moreover,
SOLIDERE notes that its day-to-day operations are run by its independent
management team. (D.I. 112, ex. 5 at SOLDEL 20891)

Although the Lebanese government clearly exercises some control over
SOLIDERE, this court accepts SOLIDERE's argument and finds that this factor weighs
against organ status. First, SOLIDERE is controlled by its Board, which contains
eleven members who do not represent the State. Moreover, SOLIDERE's Board of
Directors possesses the power, among other things, to: (1) set the general policy for
the conduct of the company's business; (2) conclude agreements with private or
government entities; (3) establish or close down any branch, agency, or office of
SOLIDERE; and (4) settle legal disputes. (D.I. 34, ex. B at Art. 24) The extent of
control exercised by the CDR based on its required approval of "all tendered documents
relating to infrastructure works" is unclear.[14]  This factor weighs against organ status.

## d. The level of government financial support

URS argues that the Lebanese government provides SOLIDERE with substantial
financial support because "SOLIDERE receive[d] approximately 291,800 square meters
of public land at the Normandy landfill created by the land reclamation as compensation
for undertaking the public works in Beirut." (D.I. 73 at 25) This argument blurs the
distinction between compensation for work performed under a contract and financial
support, and does not support organ status. Moreover, SOLIDERE's 2005 Annual
Report indicates that the project is to be achieved "without recourse to public funds."

_____

[14]URS has failed to meet its burden in this regard.

20

(D.I. 112, ex. 7 at 10)

Other examples of financial support provided by the Lebanese government cited by URS include: (1) SOLIDERE's tax liability exemption; (2) allowing it to use U.S. dollars for its financials; and (3) giving priority to the cash component of SOLIDERE's capital to the State and Public Institutions and Municipalities concerned.[15]  These facts do not lead this court to conclude the Lebanese government supports SOLIDERE. There is a difference between a government's provision of indirect incentives versus direct financial aid.  In other words, encouraging business development through incentives in order to benefit the public good is not equivalent to subsidizing that entity. URS's assertions, even when considered together, do not approach the level of support needed to tip this factor in favor of organ status, since the Lebanese government did not lend money to SOLIDERE, guarantee funds, or subject itself to any risk.[16]  See USX, 345 F.3d at 212.

### e. SOLIDERE's employment policies

In its brief, URS does not discuss this factor under a separate heading as it does all other USX factors.  (D.I. 73)  Based on the parties' submissions, the court notes that the only fact that weighs towards a finding of organ status is that one member of the Board represents the Lebanese government.  It is undisputed that SOLIDERE's Board

---

[15] The record indicates that this group is third in priority, with owners of real estate properties and Lebanese nationals enjoying a higher priority status.  (D.I. 34, ex. A at Art. 5)

[16] In contrast, URS has indicated that SOLIDERE obtained guarantees from two U.S. entities: the Export-Import Bank of the United States and the Wells-Fargo Performance Bond.  (D.I. 73 at 5-7)

21

of Directors must be comprised of two-thirds Lebanese nationals. Lebanese nationals are not the equivalent of civic employees. See USX, 345 F.3d at 212-13. Moreover, SOLIDERE has no public employees and is under no obligation to hire any public employees. (D.I. 34 at ¶ 5) This factor weighs against a finding of organ status.

### f. Other obligations and privileges under Lebanese law

To support organ status, URS claims that SOLIDERE enjoys the following privileges and exemptions under Lebanese law: (1) eminent domain rights pursuant to Law 91-117; (2) SOLIDERE is exempt from Lebanese taxes; and (3) SOLIDERE reports its financial statements in dollars, unlike most other Lebanese companies that report in Lebanese pounds.[17] Pursuant to Law 91-117, all property holders in the BCD transferred ownership to SOLIDERE. (D.I. 83, ex. 2 at 184:2-16) In so doing, all prior property owners, including the Lebanese government, became shareholders of SOLIDERE. (Id.; D.I. 111 at ¶ 6)

The eminent domain argument does not weigh in favor of organ status. First, the Lebanese government authorized the transfer of property to SOLIDERE by enacting Law 91-117. It was not SOLIDERE's privilege to exercise the taking of property from individual owners. Second, the transfer of property to SOLIDERE was a one-time

---

[17]As discussed above, the court finds SOLIDERE's tax exemption and use of US dollars to be business incentives meant to encourage development and not special privileges granted to SOLIDERE. In support of its argument that SOLIDERE has special privileges under Lebanese law, URS also quotes a Lebanese media report comparing SOLIDERE's relationship with the Lebanese government to that of a ministry. The court declines to consider this evidence because it is not of the same reliable nature as "affidavits, depositions, and testimony" that may permissibly be considered to resolve factual issues bearing on jurisdiction. See Gotha v. United States, 115 F.3d 176, 179 (3d Cir. 1997).

occurrence that enabled the performance of the project. In other words, the Lebanese government did not grant SOLIDERE the ongoing or continuous privilege to transfer property rights to itself. For the reasons discussed above, this factor weighs against organ status.

### g. SOLIDERE's ownership structure

In USX, the Third Circuit considered ownership as a proxy for control. See USX, 345 F.3d at 213 ("Although the government does not directly own ICAROM, it indirectly has complete control over ICAROM's shares."). In the case at bar, the Lebanese government owns roughly one-half of one percent of SOLIDERE's shares. (D.I. 34 at ¶ 5) More importantly, the Lebanese government does not control the shares because they are traded on the Beirut and Kuwait stock exchanges. (D.I. 34 at ¶ 5e)

URS argues this factor weighs in its favor because a number of government entities own SOLIDERE's stock and these entities are heavily involved in providing SOLIDERE with authority and funds to implement the BCD improvement project. (D.I. 73 at 26) This argument lacks merit. In an interrogatory response, SOLIDERE identified six government entities that own its stock. (D.I. 87, ex. 45A at response 18) (identifying the Lebanese Treasury, Ministry of Finance, Ministry of Youth, Ministry of Education, Ministry of Communication and the Municipality of Beirut). The Municipality of Beirut owns the largest percentage of shares, 2.1858 percent. Id. In total, the six governmental entities own 2.27% of SOLIDERE's stock. Id. This court finds that the 2.27% ownership in SOLIDERE's stock is insufficient to tip this factor towards a finding of organ status since the Lebanese government does not exert control over SOLIDERE

23

based on its ownership of stock.[18]  See USX, 345 F.3d at 213.

### h. Conclusion

One factor favors organ status, one factor is neutral, and five factors disfavor a

finding of organ status. "For an entity to be an 'organ' of a foreign state, it must engage

in a public activity on behalf of the foreign government."  USX, 345 F.3d at 208.

Essentially, SOLIDERE is a private company engaged in a major restoration project

with public aspects, that is supervised by the government in its capacity as

SOLIDERE's client.  SOLIDERE's completion of the reconstruction project undoubtedly

will benefit the Lebanese public; that does not, however, transform SOLIDERE into an

organ of the Lebanese government.  For the reasons discussed above, SOLIDERE is

not an organ of the Lebanese government and this court lacks subject matter

jurisdiction over this action under 28 U.S.C. § 1603(b)(2).[19]

### B. Motion To Dismiss

Defendant SOLIDERE argues that the suit should be dismissed for lack of

personal jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(2).  (D.I.

33)  SOLIDERE asserts that URS has made no showing that SOLIDERE has sufficient

contacts with Delaware and that this court cannot assert jurisdiction based on

aggregated contacts with the United States as a whole.  (Id.)  URS claims that personal

---

[18]Moreover, even if SOLIDERE perceived itself as a "government-empowered" corporation, but this does not equate with control exercised through its ownership structure.  (D.I. 93, ex. 115)

[19] Because the court concludes that SOLIDERE is not a foreign state for purposes of 28 U.S.C. § 1603, the parties arguments regarding the exceptions to foreign state immunity are not addressed.  See 28 U.S.C. § 1604.

jurisdiction over SOLIDERE exists based on SOLIDERE's "nationwide" contacts with

the United States. (D.I. 73) According to URS, either the FAA or the FSIA in

conjunction with Federal Rule of Civil Procedure 4(k)(2) make a "nationwide contacts"

test appropriate to assess whether personal jurisdiction exists over SOLIDERE.[20] (D.I.

73 at 12) As discussed above, the court finds that it lacks subject matter jurisdiction

under the FAA and the FSIA and, therefore, only addresses personal jurisdiction with

respect to diversity subject matter jurisdiction.

### 1. Standard of review

Rule 12(b)(2) directs the court to dismiss a case when the court lacks personal

---

[20] In the absence of diversity, personal jurisdiction exists over a foreign defendant when the requirements of Rule 4(k)(2) of the Federal Rules of Civil Procedure are met. See Monsanto Co. v. Syngenta Seeds, Inc., 443 F. Supp. 2d 636, 647 (D. Del. 2006). Rule 4(k)(2) provides

> [f]or a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed. R. Civ. P. 4(k)(2). In other words, Rule 4(k)(2) allows personal jurisdiction to be asserted over a foreign defendant "when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States' law but without sufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state." BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 258 (3d Cir. 2000). Pursuant to Rule 4(k)(2), personal jurisdiction over a foreign defendant exists when: (1) the case arises under federal law, and is not pending before the court pursuant to the court's diversity jurisdiction; (2) the foreign defendant lacks sufficient contacts with any single state to subject it to personal jurisdiction in any state; and (3) the foreign defendant has sufficient contacts with the United States as a whole to comport with constitutional notions of due process. See Monsanto Co., 443 F. Supp. 2d at 647. Because subject matter jurisdiction is lacking under the FAA and FSIA, this case does not arise under federal law for purposes of Rule 4(k)(2).

jurisdiction over the defendant. Fed. R. Civ. P. 12(b)(2). Once a jurisdictional defense has been raised, the plaintiff bears the burden of establishing with reasonable particularity that sufficient minimum contacts have occurred between the defendant and the forum to support jurisdiction. See Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987). The plaintiff must produce "sworn affidavits or other competent evidence," since a Rule 12(b)(2) motion "requires resolution of factual issues outside the pleadings." Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 67 n.9 (3d Cir. 1984). When reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), a court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor. Traynor v. Liu, 495 F. Supp. 2d 444, 448 (D. Del. 2007).

## 2. Discussion

To establish personal jurisdiction, the plaintiff must produce facts sufficient to satisfy two requirements by a preponderance of the evidence, one statutory and one constitutional. See Time Share Vacation Club, 735 F.2d at 66; Reach & Assoc. P.C. v. Dencer, 269 F. Supp. 2d 497, 502 (D. Del. 2003). With respect to the statutory requirement, the court must determine whether there is a statutory basis for jurisdiction under the forum's long arm statute. See id. The constitutional basis requires the court to determine whether the exercise of jurisdiction comports with the defendant's right to due process. See id.; see also Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

Under the Due Process Clause, a foreign defendant is subject to the jurisdiction of the federal judiciary only when the defendant's conduct is such that it should "reasonably anticipate being haled into court there." See World-Wide Volkswagen

Corp. v. Woodson, 444 U.S. 286, 297 (1980). Personal jurisdiction over a nonresident defendant is proper when either specific or general jurisdiction exists. See Dollar Sav. Bank v. First Sec. Bank of Utah, N.A., 746 F.2d 208, 211 (3d Cir. 1984). "Specific personal jurisdiction exists when the defendant has 'purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or related to those activities.'" BP Chems. Ltd. v. Fibre Corp., 229 F.3d 254, 259 (3d Cir. 2000) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)). General jurisdiction exists when the defendant's contacts with the forum are "continuous and systematic," whether or not the contacts relate to the litigation. See id. (quoting Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 416 (1984)).

A federal court sitting in diversity applies the substantive law of the state in which it sits and may exercise personal jurisdiction over a nonresident defendant "to the extent permissible under the law of the state . . . ." See Rees v. Mosaic Techs., Inc., 742 F.2d 765, 767 (3d Cir. 1984). In this case, the diversity grounds require URS to allege sufficient jurisdictional facts to demonstrate the existence of personal jurisdiction in accordance with both Delaware's long arm statute and constitutional due process. See Rees, 742 F.2d at 767-68. In other words, plaintiff URS bears the burden of establishing with reasonable particularity that sufficient minimum contacts have occurred between the defendant and the forum state to support jurisdiction. See Provident Nat'l Bank, 819 F.2d at 437.

URS has failed to demonstrate that any of SOLIDERE's contacts with Delaware are sufficient to confer personal jurisdiction. In fact, the only Delaware contact alleged is that Radian is organized in Delaware and that SOLIDERE signed a contract with

27

Radian. (D.I. 1 at ¶¶ 3,12)  This sole contact is insufficient to give rise to either general

or specific jurisdiction.  See, e.g., Grand Entm't Groups, Ltd. v. Star Media Sales, Inc.,

988 F.2d 476, 482 (3d Cir. 1993) ("[A] contract alone does not 'automatically establish

sufficient minimum contacts in the other party's home forum.'") (quoting Burger King

Corp. v. Rudzewicz, 471 U.S. 462, 478 (1985)).  Moreover, URS effectively admits that

it has not presented sufficient evidence for this court to exercise personal jurisdiction in

accordance with diversity standards by "reserv[ing] its rights to present an alternative

argument if the Court decides to rely on the diversity basis for subject matter jurisdiction

. . . ." (D.I. 73 at 19 n.15)[21]  For the reasons discussed above, defendant's motion to

dismiss will be granted for lack of personal jurisdiction.[22]

## IV. CONCLUSION

For the reasons stated above, defendant's motion to dismiss will be granted in

part and denied in part.  Additionally, this court lacks subject matter jurisdiction over

URS's claims proceeding under the FAA and FSIA.  Therefore, these claims will be

dismissed sua sponte.

---

[21]After the initial assertion of diversity in the complaint, URS subsequently
averred that the relevant forum for "SOLIDERE's contacts is the U.S. as a whole." (D.I.
73 at 1 n.2); see also (D.I. 73 at 12 asserting jurisdiction is based on the federal long
arm statute).  The jurisdictional facts alleged by URS focus on contacts within the forum
of the United States and do not allege nor provide proof of Delaware specific contacts.
URS's reliance on the nationwide contacts test indicates that any Delaware contacts
would have surfaced despite its reservation to present alternative arguments.  However,
based on URS's reservation of argument, the court's order will schedule a telephone
conference to address the status of the case.

[22] Because the motion is granted for lack of personal jurisdiction, venue need not
be addressed.